```
1              IN THE UNITED STATES MAGISTRATE COURT
                   FOR THE DISTRICT OF KANSAS
2                        WICHITA, KANSAS


3

       UNITED STATES OF AMERICA,          )
4      -------------------- Plaintiff,    )
                                          )
5           vs.                           )  Case No.
                                          )  07-10234-MLB
6      STEPHEN J. SCHNEIDER,              )
       LINDA K. SCHNEIDER,                )
7      -------------------- Defendants.   )


8

         TAPE TRANSCRIPTION OF BOND AND MOTION HEARING
9                           BEFORE
                 HONORABLE DONALD W. BOSTWICK
10                           on
                       March 14, 2008
11
       APPEARANCES:
12     For the Government:    Ms. Tanya S. Treadway
                              Asst. U.S. Attorney
13                            385 Federal Building
                              444 Quincy Street
14                            Topeka, KS  66683

15                            Mr. Alan G. Metzger
                              Asst. U.S. Attorney
16                            301 N. Main, Suite 1200
                              Wichita, KS 67202
17
       For the Defendant Stephen Schneider:
18                            Mr. Lawrence Williamson
                              Williamson Law Office
19                            816 Ann Street
                              Kansas City, KS  66101
20
       For the Defendant Linda K. Schneider:
21                            Mr. Uzo L. Ohaebosim
                              Attorney at Law
22                            510 North Topeka
                              Wichita, KS   67214
23
                              Mr. Eugene V. Gorokhov
24                            Eugene V. Gorokhov, PLLC
                              1800 Wilson Blvd., #12
25                            Arlington, VA 22201
```

```
1                     A P P E A R A N C E S
2                        (Continued)

3        For the Defendant Linda K. Schneider:
                                 Mr. Kevin P. Byers
4                                Kevin P. Byers Company, LPA
                                 107 South High Street
5                                Suite 400
                                 Columbus, OH  43215
6
         Transcriptionist:       Kelli Stewart, RPR, CRR, RMR
7                                Nora Lyon & Associates
                                 2300 S.W. 29th St., Ste. 121
8                                Topeka, Kansas   66611

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      I  N  D  E  X

2        Certificate------------------------------ 39

3

4                    W I T N E S S

5    ON BEHALF OF DEFENDANT LINDA SCHNEIDER:  PAGE

6    KERIN SCHELL

7    Direct Examination by Mr. Byers          5

8    Cross Examination by Ms. Treadway        17

9    Redirect Examination by Mr. Byers        28

10   Examination by The Court                 33

11

12

13                  E X H I B I T S

14   GOVERNMENT EX. NO.:     OFFERED     RECEIVED

15                    (NONE)

16

17

18

19

20

21

22

23

24

25

```
 1                    (THEREUPON, the proceedings were not

 2          transcribed until the following was had).

 3                    MR. BYERS:  Your Honor, should the

 4          witness go directly to the stand?

 5                    THE COURT:  He should, please, come

 6          take your seat in the-- or stand in the witness

 7          box until I give you the oath, if you would,

 8          please.

 9                    MR. BYERS:  And this is Doctor Kerin

10          Schell.  K-E-R-I-N, S-C-H--

11                    THE COURT:  I'll-- I'll have him

12          spell it to you after--

13                    MR. BYERS:  Yeah, that's--

14                    UNIDENTIFIED SPEAKER:  Of course you

15          will.

16                    THE COURT:  Would you raise your

17          right hand, please, and they can (INAUDIBLE)

18          an oath or you can (INAUDIBLE) affirm.

19                    THE WITNESS:  Oath is fine.

20

21                    KERIN SCHELL, Ph.D.

22          called as a witness on behalf of the Defendant

23          Linda K. Schneider, was sworn, and testified as

24          follows:

25                    THE COURT:  Please take your seat
```

5

1        there.  And if you would, adjust the microphone

2        so that we can hear you.  And, first of all,

3        state your name and spell it for the record,

4        please.

5                    THE WITNESS:  Kerin Schell.

6        K-E-R-I-N, Schell, S-C-H-E-L-L.

7                    THE COURT:  Counsel, you may proceed.

8                    MR. BYERS:  Thank you.

9                        DIRECT EXAMINATION

10       BY MR. BYERS:

11       Q.  Doctor Schell, are you employed?

12       A.  Yes, I own my own-- my own office, yes.

13       Q.  An office of what, what is that called?

14       A.  It's called the Center For Human Development.

15       Q.  Okay.  And what do you do at the Center For

16          Human Development?

17       A.  I'm a general psychologist.

18       Q.  Okay.  Are you licensed in the State of Kansas?

19       A.  Yes.

20       Q.  Is that office in Kansas, that practice?

21       A.  Yes.

22       Q.  How long have you been a practicing

23          psychologist?

24       A.  Since 1975.

25       Q.  Okay.

1          MS. TREADWAY:  Judge, may we approach

2     the bench for a minute?

3          THE COURT:  You may.  If you would,

4     on this side over here I think might be better.

5          (THEREUPON, a bench conference was

6     had which was inaudible).

7          THE COURT:  All right.  You may go

8     ahead.

9  Q.  (BY MR. BYERS)  And, Doctor, this is sort of

10     really basic foundational information.  Are you

11     over the age of 18?

12  A.  Yes.

13  Q.  Are you under the influence of any medications

14     or substances that would impair your ability to

15     testify honestly and accurately today?

16  A.  No.

17  Q.  Okay.  Do you understand the import of the oath

18     you took moments ago to tell the truth?

19  A.  Yes.

20  Q.  Okay.  I believe I was-- before our sidebar we

21     were talking about-- a little bit about your

22     practice.  So you are-- what kind of license do

23     you hold in the State of Kansas?

24  A.  Yes, Kansas, licensed psychologist.

25  Q.  Okay.  Have you held licenses in other

```
 1        jurisdictions?

 2   A.   Illinois.

 3   Q.   Illinois?

 4   A.   Yes.

 5   Q.   Okay.  How long have you practiced psychology

 6        in the State of Kansas?

 7   A.   '84.

 8   Q.   Is it safe to assume you've practiced in other

 9        states prior to that?

10   A.   Yes, Illinois.

11   Q.   Okay.  Have you had occasion to interview Linda

12        Atterbury?

13   A.   Yes, I have.

14   Q.   Okay.  Do you know when you conducted that

15        interview?

16   A.   March 7.

17   Q.   Of?

18   A.   This year, I'm sorry.

19   Q.   Okay.  2008?

20   A.   Yes.

21   Q.   Okay.  Where did that interview take place?

22   A.   It was a Butler County jail or detention

23        facility.

24   Q.   Okay.

25   A.   Do I have the right county?  I think it was
```

1        Butler, I'm sure.

2    Q.  Were you-- at that point in time were you an

3        attending psychologist, a treating psychologist

4        for Linda Atterbury?

5    A.  No, I was not.

6    Q.  Okay.  Who contacted you about visiting with

7        Linda?

8    A.  Connie White.

9    Q.  Do you know who-- who-- who's that person?

10   A.  She was a ARNP or a PA at the Schneider clinic.

11   Q.  Okay.  Had you known Ms. White previously?

12   A.  I've never met her.

13   Q.  Okay.  So as of-- well, tell me what this

14       interview entailed.

15   A.  The what?

16   Q.  The interview, the visit with Linda Atterbury.

17   A.  Well, I was simply trying to come in to see

18       if-- what her mental condition was like and

19       whether she had been-- whether she had-- was

20       having difficulty mentally coping with her

21       environment and the trial and--

22   Q.  Were you sent in with an agenda or specific

23       mission?

24   A.  To find out whether she-- whether her mental

25       health was deteriorating or not and how it

```
 1        would affect her.

 2   Q.   Okay.  And what did you determine?

 3   A.   Well, it appeared to me that she was not in

 4        very good shape at all mentally, she had-- she

 5        wasn't coping well with her environment.  It's

 6        a difficult environment.  You know, some people

 7        do better or worse in that environment.  It

 8        appeared she wasn't doing well at all.

 9   Q.   Well, why would some people do better other

10        than-- when compared with how Linda would

11        appear the day you saw her?

12   A.   Well, you might say a hardened criminal can

13        walk right through there like it was nothing

14        and they just get a little upset that they're

15        not being treated right.  But a person who's

16        not really a criminal by nature is (INAUDIBLE)

17        anti-social personality disorder is going to

18        find this a quite horrifying experience, it's--

19        they're not strong in the sense that they can

20        easily cope with that.

21   Q.   Did you come up with any type of differential

22        diagnosis or other diagnostic labels that you

23        thought were appropriate for Linda's condition

24        when you met with her on March 8th, 2008?

25   A.   Yes.
```

1    Q.   What would that be?

2    A.   Well, it's a Bipolar II disorder.

3    Q.   And what does that mean?

4    A.   There's a-- a Bipolar II disorder or any kind

5         of bipolar disorder generally speaking means

6         you go up and down, you get depressed or have

7         the-- the-- you know, either you're walking on

8         water or you're depressed and suicidal, you

9         know, in the most extreme situation.  So in

10        this case, the-- the happy or the manic side is

11        not extreme, it's-- it's what you call a shadow

12        syndrome or a mild syndrome.  It's not a-- it's

13        not a severe manic condition, you have the mild

14        manic condition plus major depression together.

15   Q.   Has it been your experience in your practice as

16        a psychologist, a licensed psychologist, that

17        such a condition would be amenable to healing

18        itself, going away over time if untreated?

19   A.   No, it will gradually get worse if untreated.

20        We call it a kindling effect.

21   Q.   Kindling?

22   A.   Kindling, yeah, effect is the technical name

23        for it.

24   Q.   Okay.

25   A.   A gradual deterioration over time.

1    Q.   Okay.  And-- and what kind of further
2         deterioration would you expect or has been your
3         experience in an untreated condition like this?
4    A.   Gradually become non-functional, can't-- you
5         know, have difficulty working, you know, can't
6         focus, can't remember things, sleep all the
7         time, bad judgment, that type of thing.
8    Q.   Okay.  And I just-- I realized I need to
9         backtrack a little bit.  I asked you somewhat
10        about your experience, I don't think I asked
11        you about your educational background.
12   A.   Oh.
13   Q.   Could you tell me about say from undergraduate
14        forward your educational experiences?
15   A.   Well, I have a-- a bachelor's and a master's
16        degree and a Ph.D. in-- in the area of
17        psychology.
18   Q.   Okay.  What institutions are those from?  And
19        if you remember the years you received those
20        degrees.
21   A.   Yeah, the first two were from Wichita State
22        here-- here in Wichita.  And that was in '66
23        and '68.  And then the doctorate was '75 and
24        Southern Illinois University.
25   Q.   Okay.  Doctor, based upon your training,

1          education, and experience, do you have an

2          opinion to a reasonable degree of psychological

3          probability or certainty regarding Linda K.

4          Atterbury's condition if she remains confined

5          in jail?

6     A.   Well, I thought it was already pretty bad,

7          severe, you know, major depression.  And it

8          appeared to be-- as best I could tell, you

9          know, it's getting worse over time.  And I'm

10         not-- she was-- didn't look at all well to me.

11    Q.   Do you know how long Linda would have been in

12         jail when you interviewed her?

13    A.   I believe she went in to jail in-- February

14         19th.  So that would be, what, two-and-a-half

15         months or--

16    Q.   Okay.

17    A.   If I'm adding correctly.  Or, yeah,

18         two-and-a-half months, I think.

19    Q.   Okay.  I think-- did you say February then?

20              UNIDENTIFIED SPEAKER:  Yeah,

21         December.

22    A.   December 19th, I think.

23              THE COURT:  You did say February.

24              MR. BYERS:  Well, that's what I-- I

25         just didn't know if my--

1    A.   Oh, I'm sorry.

2                    MR. BYERS:  If I was thinking and not

3         listening well enough.  Thank you, Your Honor.

4    Q.   (BY MR. BYERS)  Did you have occasion to talk

5         with Linda about family and things outside of

6         jail when you were with her?

7    A.   Yes.

8    Q.   Okay.  Can you-- can you reveal for me what

9         Linda thinks about family or if-- just general

10        observations of things that she told you.

11   A.   Well, she's a more-- very family-oriented, but

12        most women are, of course, but I-- I think in

13        her case, you know, she has a very, very strong

14        attachment to her family, very strong.  They're

15        really attached to her.  It's a very strong,

16        you know, stable family.  A lot of families

17        nowadays aren't-- aren't that stable.  You get

18        split up and go to different parts of the

19        country and that type of thing, but she's had a

20        very long, stable family history.

21   Q.   Did you learn if she has any children?

22   A.   She has two teenagers whom she adopted that

23        came from Romania.

24                    MR. BYERS:  If I could have a moment,

25        Your Honor, I completely lost my train of

1          thought.  Do you have it?

2     Q.   (BY MR. BYERS)  Okay.  Based upon-- now-- now,

3          this information you're telling us about Linda

4          Atterbury, you've got it solely from Linda

5          Atterbury herself.  Right?

6     A.   Yes.

7     Q.   Okay.  Did you have any prior knowledge or

8          experience with her?

9     A.   I met her on one occasion, you know, briefly a

10         couple years ago.

11    Q.   Do you have any personal knowledge about her

12         family or if it's a close-knit family or a

13         feuding family or anything beyond what Linda

14         Atterbury told you?

15    A.   No.  I-- I did talk to her sister, Linda (sic),

16         but nothing-- she didn't say anything I didn't

17         know from Linda.

18    Q.   Okay.  Can you tell me if Linda Atterbury was

19         falsifying information that she gave you on

20         March 8th or prevaricating or otherwise making

21         things up to-- to appear some such way as-- as

22         was not her true self?

23              MS. TREADWAY:  Objection, calls for

24         rank speculation, Judge.

25              THE COURT:  Well, the rules of

1          evidence don't apply here.  I think we've gone

2          a little far with that.

3                    MR. BYERS:  Okay.  I withdraw that.

4          And I might try another tactic, it's a better

5          question.

6                    THE COURT:  All right.  You can try,

7          we'll see how it goes.

8                    MR. BYERS:  I appreciate that.

9     Q.  (BY MR. BYERS)  Doctor Schell, is it your

10         opinion based upon your training and education

11         and experience and to a reasonable degree of

12         psychological certainty or probability that

13         Linda K. Atterbury was being truthful with you

14         when she revealed information about herself on

15         March 8th, 2008?

16    A.  As best I could tell.

17    Q.  Okay.  And how do you tell?

18    A.  It's-- well, I suppose you could say it's a

19         logical process.  I can't read her mind, so,

20         you know, it's very difficult to tell if

21         somebody is lying or not.  So I have to look at

22         whether, you know, what she's saying makes

23         sense, if I can see a pattern to it, you know,

24         whether she's-- her-- conforms to her history,

25         that type of thing.

1    Q.   Okay.  You were talking a bit a while ago about

2         the-- you would expect further deterioration in

3         her mental condition if she's depressed.  Do

4         you recall that testimony?

5    A.   Yes.

6    Q.   Okay.  Would-- would a aggrieved depression

7         or-- or extended depression typically involve

8         any impingement of cognitive functions, ability

9         to communicate, ability to recall, ability to

10        think clearly?

11   A.   Yes, all of those.

12   Q.   Okay.  Doctor, were you able to form an opinion

13        as a living, breathing, compassionate human

14        being whether Linda Atterbury would be likely

15        to flee the jurisdiction if she's released from

16        jail?

17             MS. TREADWAY:  Objection, Judge.

18             THE COURT:  Counsel, I've read some

19        Tenth Circuit cases that say even family

20        members-- the testimony about who might or

21        might not flee is rank speculation.  And I

22        think we've gone far enough down that line, I'm

23        going to sustain that objection.

24             MR. BYERS:  Thank you, Your Honor.

25        That's all I have.

1          THE COURT:  All right.

2     Cross-examination from the Government.

3          MS. TREADWAY:  Thank you, Judge.

4               CROSS EXAMINATION

5     BY MS. TREADWAY:

6     Q.  On March 7th, Mr. Schell, how long did you

7         spend with the Defendant, Linda Atterbury

8         Schneider?

9     A.  I think it was close to three hours.

10    Q.  All right.  And you're referring to some

11        documents there.  What are those documents?

12    A.  Some notes that I took while I was with her.

13          MS. TREADWAY:  Judge, based on the

14     Jencks rule, Rule 26.2, I would ask that the

15     Government be given a copy of the witness' file

16     which he's using to refresh his recollection

17     and which would be a prior statement of his.

18          MR. BYERS:  Your Honor, on behalf of

19     Defendant, I have no real objection to the

20     prosecution having a copy of the notes.  But

21     again, as been noted numerous times today,

22     rules of evidence don't apply in the

23     proceedings.

24          MS. TREADWAY:  That's not a rule of

25     evidence, Judge.

1     THE COURT: 26.2(g) indicates the

2  scope of rule-- it indicates that the rule

3  applies at trial and suppression hearing under

4  Rule 12 and to the extent specified in the

5  following rules, and that would-- includes Rule

6  46(j) on detention hearings. Rule 46(j) on

7  detention hearings indicates that Rule 26.2(a)

8  through (d) and (f). (A) is the motion to

9  produce that's been made, applies at a

10  detention hearing under 18 U.S. Code, Section

11  3142 unless the Court for good cause rules

12  otherwise. So I think the rule-- that rule

13  specifically, pursuant to the rules, does apply

14  to a detention hearing. I'm going to-- I'm

15  going to grant the motion and allow the Court--

16  the Government to view the-- the notes that he

17  has. How voluminous are those documents?

18     THE WITNESS: Oh, this-- it's just

19  this, about-- looks like about 30 pages.

20     THE COURT: The Court is going to

21  take a ten-minute break. I'll reconvene at 3

22  o'clock. In the intervening time I'll allow

23  the Government and-- and also the Defendant to

24  be present-- I mean the defense to be available

25  to look at those also. Court's in recess

1        subject to call.

2                (THEREUPON, a short recess was had).

3                THE COURT:  All right.  Counsel, you

4        may proceed.

5                MS. TREADWAY:  Thank you, Judge.  We

6        would ask, for the record, to be provided a

7        copy of this file, Judge.

8                THE COURT:  I don't know that 26.2

9        allows you to have a copy of the file, it

10       allows you to produce it for your examination

11       and use in cross-examination.  At this point

12       I'm going to withhold a decision on that for

13       right now.

14               MS. TREADWAY:  All right, Judge.

15       Thank you.

16   Q.  (BY MS. TREADWAY)  I'll return these notes to

17       you in case you need to refer to them, Doctor

18       Schell.  Doctor Schell, I believe a previous

19       question was asked of you about your knowledge

20       or familiarity with Ms. Schneider before you

21       met with her.

22   A.  Yes.

23   Q.  And what was that answer, sir?

24   A.  Oh, I had met her a couple of years ago.  I

25       went-- I went to her clinic, I'm not

```
 1            remembering the year anymore, and I met her and

 2            Doctor Schneider.

 3     Q.   In fact, Doctor Schneider has referred patients

 4            to you, has he not?

 5     A.   Yes, for several years.

 6     Q.   So you do have a prior connection to the

 7            Schneiders, don't you?

 8     A.   Yes, I do.

 9     Q.   Now, when you went to the Butler County jail,

10            prior to discussing questions with Ms.

11            Schneider did you talk to jail officials about

12            her condition?

13     A.   No.

14     Q.   Did you find out whether she was on suicide

15            watch?

16     A.   No.

17     Q.   Did you find out whether she was otherwise in

18            protective custody for her own benefit?

19     A.   No, they didn't tell me anything.

20     Q.   And they didn't tell you that they had had any

21            reports of problems with her, did they, because

22            you didn't ask them.  Right?

23     A.   No.

24     Q.   Do you know whether she had ever been diagnosed

25            as bipolar prior to being placed in jail?
```

```
 1    A.   My understanding is she's not had a mental
 2         diagnosis of that--
 3    Q.   And how do you know that?
 4    A.   -- in the past.  I'm sorry?
 5    Q.   How do you know that?
 6    A.   Well, I asked her if she had any mental health
 7         treatment.
 8    Q.   Oh, so she hasn't had any mental health
 9         treatment.
10    A.   Right.
11    Q.   But that begs the question, do you know whether
12         she had this bipolar disorder prior to going
13         into jail?
14    A.   Well, from talking to her, I assumed that she
15         did not.
16    Q.   All right.  So she suddenly has become bipolar
17         since December 21st?
18    A.   Exactly.
19    Q.   All right.  And how common is that?
20    A.   Very.
21    Q.   All right.  And is bipolar disorder that
22         suddenly comes on in adult life treatable with
23         medication?
24    A.   Well, yeah, I'm not the world's foremost expert
25         on that.  I see a lot of people who do not
```

```
 1        respond well to treatment.
 2   Q.   Well, that's not my question, sir.  My question
 3        is, is it treatable with medication?
 4   A.   Sometimes.
 5   Q.   Is depression treatable with medication?
 6   A.   Sometimes.
 7   Q.   All right.  And did you offer her any
 8        treatment?
 9   A.   No, of course not.
10   Q.   You offered her no treatment for her bipolar
11        disorder and her depression?
12   A.   How-- how could I treat her if she's in jail?
13        I don't understand.
14   Q.   So you could not prescribe her medication.
15        That's your testimony?
16   A.   Well, I'm not a psychiatrist, I'm a
17        psychologist.
18   Q.   And--
19   A.   I can't prescribe medication.
20   Q.   But you can have a psychiatrist prescribe
21        medication for your clients, can't you?
22   A.   Well, of course.  I do it all the time.
23   Q.   Did you do that?
24   A.   I don't know any psychiatrists over there.
25   Q.   So the answer is no, you did not?
```

 1    A.   No, I did not.

 2    Q.   All right.  Now, are you familiar with federal

 3         facilities that can provide both psychological

 4         and medical services to defendants, either

 5         pretrial or post-trial?

 6    A.   No.

 7    Q.   So you don't know that there are federal

 8         facilities that are essentially hospital jails

 9         where people with psychological or medical

10         problems can get help?

11    A.   It sounds familiar.  That's all I can say.

12    Q.   All right.  So you're saying that you don't

13         know if she needs treatment.  Correct?

14    A.   No, she needs treatment.

15    Q.   All right.  But you didn't prescribe treatment.

16         Correct?

17    A.   No.  I have suggested it, but I--

18    Q.   So you suggest treatment and it can be

19         treated--

20    A.   But--

21    Q.   -- with medications?

22    A.   Yes.

23    Q.   All right.  Now, I noticed from your notes that

24         you did not perform some of the standard and

25         recognized tests in the psychological industry

1    such as the MMPI and the Wechsler, correct, you

2    did not perform those tests?

3  A.  That's right.

4  Q.  And those tests are recognized tests in the

5    industry to test truthfulness and deception and

6    the validity of someone's answers, aren't they?

7  A.  To some extent.

8  Q.  And you did not administer those, did you?

9  A.  No.

10  Q.  Lastly, sir, were you aware that the Defendant

11    and her sister, Ms. Hatcher, had, in fact,

12    discussed the tactic of hiring a psychologist

13    to come in and offer evidence of her depression

14    to help her get out of jail?

15          MR. BYERS:  Objection, move to

16    strike, Your Honor.  There's no basis for that

17    question whatsoever.

18          MS. TREADWAY:  I'll proffer the basis

19    and I will present the tape at a later date,

20    Judge.  I have it.

21          MR. BYERS:  What tape?

22          THE COURT:  Is it included in the

23    materials that was provided to the--

24          MS. TREADWAY:  It may well be, Judge,

25    I don't have my list of tapes, but you may

1           already have that tape.  But I will-- I will go

2           back and get that tape for the Court and for

3           the defense.  Of course defense has it now, but

4           I will provide that tape.

5                     THE COURT:  It is included in what

6           was provided to the defense today as part of

7           the--

8                     MS. TREADWAY:  Yes, sir.

9                     THE COURT:  -- of the discovery?

10                    MS. TREADWAY:  Yes, sir.

11                    THE COURT:  I'm going to allow the

12          question in for the limited purpose.  Go ahead.

13          And subject to follow-up.

14     Q.   (BY MS. TREADWAY)  Did you know that, sir?

15     A.   No, it doesn't-- I don't--

16     Q.   Would that affect your opinion of her

17          truthfulness if, in fact, this was just a big

18          manipulation of the Court to have you come in

19          and give an opinion about her depression?

20     A.   No, I think it would be common procedure.  I--

21          I don't understand.

22     Q.   So it's common procedure to manipulate people

23          of your nature; to come in and give you an act

24          and then have you come testify about that act

25          and claim that she's depressed?

```
 1              MR. BYERS:  Excuse me, Your Honor,
 2        objection again.  I thought the question was
 3        about discussion and not manipulation.  It's a
 4        complete mischaracterization, should be
 5        stricken.
 6              THE COURT:  I'm going to-- I'm going
 7        to sustain it.  It's a compound question.  I'm
 8        going to ask you to-- to rephrase it.
 9    Q.  (BY MS. TREADWAY)  Let me back up.  If you had
10        known prior to your talking to Ms. Schneider
11        that she and her sister had planned a
12        psychological evaluation merely for the purpose
13        of presenting to the Court evidence that she
14        was depressed, would that change your opinion
15        about her truthfulness?
16    A.  I think they should have done it.  I don't
17        understand what's wrong with it.
18    Q.  And if they planned to present her in a light
19        so that she would seem depressed as opposed to
20        actually being depressed, would that affect
21        your opinion?
22    A.  Well, planned--
23    Q.  Do you understand somebody acting versus
24        somebody being?
25    A.  Oh, sure.  Yeah, you're saying that they've
```

```
 1          planned to act out a-- a pretence of being

 2          depressed?

 3     Q.   Right.

 4     A.   Okay.

 5     Q.   Would that alter your opinion about her

 6          truthfulness?

 7     A.   I-- about her what?  I'm sorry.

 8     Q.   About her truthfulness.

 9     A.   Truthfulness.  Oh, that's a complicated

10          question.  You know, the problem is, of course,

11          in that situation people want to put their best

12          foot forward.  So it-- it's hard to say that

13          that's an act of untruthfulness.  I mean,

14          everyone wants to try to exaggerate their

15          symptoms to some extent so that they would be

16          understood.  Because if they don't present some

17          kind of evidence of a emotional display or

18          something, they're not-- not going to be

19          believed.

20     Q.   Exactly.  And you did not perform the tests

21          that are normally recognized in the industry to

22          catch that exaggeration, did you, Doctor?

23     A.   That wouldn't-- that wouldn't have helped me.

24               MS. TREADWAY:  Nothing further.

25               THE COURT:  Redirect.
```

```
 1              MR. BYERS:  Thank you, Your Honor.
 2                    REDIRECT EXAMINATION
 3       BY MR. BYERS:
 4       Q.  Why wouldn't that have helped you?  Following
 5           up on that last response.
 6       A.  Well, people commonly, on the lie scale and
 7           that sort of thing, under extreme stress are
 8           going to show elevations.  It's not a-- you
 9           know, to call it a lie detector is ridiculous.
10       Q.  Okay.  But--
11       A.  It doesn't really work like that.
12       Q.  I'm sorry.  Was the Government asking you about
13           performing lie detector tests like we're
14           familiar with on TV, the polygraph?
15       A.  Right, that's a-- that is more directed towards
16           actual lies, but--
17       Q.  Okay.  Is that what the Government was asking
18           you about, is that what an MMPI is?
19       A.  No.
20       Q.  Okay.  What about a Wechsler, is that a
21           polygraph test?
22       A.  No.
23       Q.  Okay.  What are those tests?
24       A.  The Wechsler and MMPI?
25       Q.  Yes.  Can you tell us what it's like?
```

1    A.   Well, Wechsler is just an IQ test.  Obviously

2         there's no point in giving her one unless I

3         wouldn't-- wanted to determine that she's

4         retarded or something, you know, had-- which I

5         don't believe.

6    Q.   You don't think she was borderline intelligent?

7    A.   No.  No.  She seemed quite bright and there was

8         really no use-- value, you know, in the time

9         that I had, to waste what little time I had by

10        giving those tests.  It wouldn't have

11        accomplished anything as far as me

12        understanding her case.

13   Q.   What would-- what does the MMPI entail?

14   A.   Well, it's-- it's about 600 true/false

15        questions.  It's a-- a statistical test.  It

16        was originally supposed to be used for

17        diagnosis, it didn't work.  It's-- you know,

18        some scales are very close to just sort of a

19        research level, you can only get so much out of

20        it.  It's very popular, but it-- it wouldn't--

21        it's not very valuable as far as diagnosis or

22        determining if somebody is lying or not.  So

23        I-- I didn't really want to waste any time on

24        that.

25   Q.   How long does it take to administer the MMPI?

1    A.   She could have probably have done it in an

2         hour-and-a-half.

3    Q.   An hour-and-a-half of checking little boxes, is

4         that what that is?

5    A.   Yes.

6    Q.   Doctor, you were talking a bit with the

7         prosecution about medication for the condition

8         of bipolar, condition of bipolar with

9         depression.  Do you recall that testimony?

10   A.   Yes.

11   Q.   Okay.  Is-- is it-- has it been your experience

12        that such conditions respond quickly and-- and

13        just quickly to medication, medication alone?

14   A.   I don't see it very often.  It-- it has limited

15        effect.  You know, I'm just talking about my--

16        the population of people that I see.  Now, I

17        had-- occasionally I see it actually have a

18        dramatic effect, but...

19   Q.   And you're talking just about bipolar with

20        depression patients at this point.  Right?

21   A.   Yes.

22   Q.   Okay.

23   A.   Not schizophrenia.

24   Q.   Right.

25   A.   Just bipolar.

1    Q.   Okay.  Is there ever-- has it been your

2         experience that there ever is the necessity

3         from titration of medication over a rather

4         extended period of time?

5    A.   Well, you never can tell how a person is going

6         to react to a medication.  It could be adverse,

7         the side effects could be too difficult for

8         them to tolerate, they may be overly sensitive

9         to medication.  Nothing may have-- none of the

10        medications may have what you may call a real

11        dramatic effect.  They may help, you know,

12        sleep, maybe some vegetative functions, or

13        something like that.  But, you know, just

14        knock-out depression is kind of a-- it-- you

15        hope it will do that, but it often doesn't, so

16        you can't really depend upon it.

17   Q.   Doctor, based upon your training, education,

18        and experience as a licensed psychologist and

19        to a reasonable degree of psychological

20        probability or certainty, do you believe that

21        if Linda Atterbury were released from custody

22        her condition would improve?

23   A.   I-- I suspect it will, at least if she's not in

24        there too long, that it would improve pretty

25        dramatically.

Q.   And why would a simple release from custody

     improve her psychological condition?

A.   Well, she could-- obviously she can get more

     help, she can get some medication from someone,

     you know, and do a good job and-- I'm not

     saying they don't do a good job in the jail,

     but usually it's-- there's limitations of what

     they can or will do there.  And she would also

     probably most importantly be with her family.

     It's-- I'm not sure the medication is going to

     be that helpful, even in jail, because she

     doesn't-- in my opinion, she does not really

     tolerate stress at all well.  And that's-- for

     that-- because she-- and the diagnosis itself

     really kind of suggests that.

          She was clearly hypomanic prior to going

     to jail.  She was not a-- she didn't have any

     trouble with depression.  And what happens in

     so many cases is that when somebody is

     hypomanic and they run up against a very

     difficult circumstance, they will develop a

     very intense and disabling depression because

     the fact is they're not as strong as they

     appear to be.  This hypomanic disorder actually

     limits your development of real resources to

 1          deal with problems.

 2               So when this-- when something that they

 3          can't deal with in an immediate, obvious and

 4          easy comes up, all of a sudden all of these

 5          strengths and resources they appear to have

 6          evaporate.  And I have seen it so many times

 7          that it's just-- to me it's commonplace, of

 8          course.  But that-- that's why I think, you

 9          know, logically I-- I arrive at this diagnosis.

10          I don't think it's just an off-the-wall thing,

11          it's actually happened-- I've seen it so many

12          times that I think that's what's happening to

13          her.  And I don't say she can't lie and, you

14          know, prevaricate or whatever.  That's

15          certainly possible, I would never rule that

16          out.

17     Q.   Okay.

18               MR. BYERS:  Thank you.  That's all I

19          have on redirect.

20                         EXAMINATION

21     BY THE COURT:

22     Q.   Doctor, I've got a little question.  Would it

23          affect your opinion, your diagnosis, if you

24          knew that the Defendant had elected to stay in

25          jail for some cause and purpose?  In other

```
 1        words, if she had decided not to take an

 2        appeal, if she decided not to come to court and

 3        ask to be released, if she decided to remain in

 4        jail for some purpose, would that affect your--

 5        your diagnosis of what she's doing or what her

 6        depression is?

 7   A.   Well, Your Honor, this is a complicated

 8        question because, you know, she has to use

 9        strategy to survive, a legal strategy.  And if

10        she did that just as a way of trying to, you

11        know, get through this whole process, that

12        would-- that in itself wouldn't surprise me at

13        all.  That would be sort of a normal thing for

14        a human being to do.  If she thought that

15        somebody advised her that that would be the

16        best strategy to try to keep from going to jail

17        the rest of your life, I mean, I wouldn't--

18   Q.   Well, I sit in this courtroom every day and I

19        listen to people.  I've never yet heard anybody

20        that volunteered to go to jail, with only one

21        exception.  And do you think it's normal for

22        people to want to stay in jail?

23   A.   I-- I---

24   Q.   Just yes or no, if you can.  I mean, if you

25        can't answer it, just--
```

1    A.   Well, of course-- well, of course, some people,

2         but it wouldn't be a-- she's not that type of

3         person.  The ones who obviously-- some people

4         do want to stay in jail.

5    Q.   But she's not the kind that would want to do

6         that--

7    A.   No, not--

8    Q.   -- from your knowledge?

9    A.   That's the kind of person who wants-- is

10        institutionalized.

11             THE COURT:  I have no further

12        questions.  And the witness may step down.

13             (THEREUPON, the proceedings were not

14        ordered transcribed until the following

15        proceedings were had).

16             THE COURT:  That is the agenda of the

17        matters I had set on the docket today.  Let me

18        turn to the Defendants.  Anything further that

19        the Defendants think is on the table today?

20             MR. WILLIAMSON:  No.  Just want to

21        thank the Court for giving the defendants a

22        hearing.

23             THE COURT:  All right.

24             MR. BYERS:  I think for Ms. Atterbury

25        the same thing, sir.

1          MS. TREADWAY:  Always a pleasure,

2     Judge.

3          THE COURT:  All right.  Well, it's an

4     important matter and the Court is more than

5     happy to spend the time that's involved here.

6     I'm going to-- first of all, I'm going to have

7     my clerk hand out to both-- to all counsel

8     copies of the exhibits that have been marked in

9     today's hearing so that you will have those as

10    part of the hearing.

11         Second of all, because the Defendants

12    have raised the issue of some concern about Ms.

13    Schneider's medical condition, I would ask the

14    marshals to check with Butler County to see if

15    there is anything that Butler County has or can

16    do for her that would in any way result in

17    her-- or assist in any condition or problems

18    that she's presumably had.

19         The fact is I would assume that, in light

20    of the testimony that I heard today, she

21    voluntarily would go to the doctors in the

22    clinic at Butler County in order to seek some

23    kind of advice or treatment.

24         Counsel for the Defendants, isn't that

25    the situation you would want for your client?

1          MR. GOROKHOV:  With the Court's

2     indulgence.

3          THE COURT:  You may.  And would you

4     reach up and hit-- there's a button on the

5     microphone that will shut off.

6          MR. GOROKHOV:  Thank you, Your Honor,

7     I just turned it on.

8          THE COURT:  Oh, we've had it off

9     during the whole hearing?  Oh, that's good.

10          MR. GOROKHOV:  Your Honor, our

11     position is that the Defendant would certainly

12     talk to the staff and see what, you know,

13     solutions they might propose.

14          We have further concerns.  I mean, the

15     issue here is if she's-- if-- if the solution

16     or some part of the solution is medication,

17     we're concerned that that's going to impact on

18     her ability to help in the defense, just as

19     much as her current condition or worse.  Some

20     medications don't work, it might take a long

21     time to find a plan that works.

22          We're going to be months and months down

23     the road unable to get effective assistance

24     from-- from our client if the jail is

25     attempting to come out with a treatment plan.

1    That said, you know, I-- I think it's the

2    best-- at this time it's the best thing for her

3    to get evaluated and see-- and see where we

4    stand.

5              THE COURT:  Well, I'm certainly not

6    going to order her to do it.  But I want it

7    clearly understood that because she raised the

8    issues (INAUDIBLE)--

9              MR. GOROKHOV:  Yes, Your Honor.

10             THE COURT:  -- that I'm-- I'm asking

11   the marshals to make certain that if there is

12   anything that the Butler County jail believes

13   they can do to assist her in connection with

14   the problems that the doctor has testified here

15   to, then I want those available to her.

16             MR. GOROKHOV:  Yes, Your Honor.

17             THE COURT:  I want that understood

18   clearly on the record.

19             MR. GOROKHOV:  That makes sense, Your

20   Honor.  Thank you.

21             THE COURT:  All right.  Court's in

22   recess.  Subject to call.

23

24

25

```
 1        UNITED STATES OF AMERICA  )
                                    )     ss:
 2        DISTRICT OF KANSAS        )

 3                      C E R T I F I C A T E

 4            I, KELLI STEWART, Certified Shorthand

 5        Reporter in and for the State of Kansas, do

 6        hereby certify that I was present at and

 7        reported in machine shorthand the proceedings

 8        had the 14th day of March, 2008, in the

 9        above-mentioned court; that the foregoing

10        transcript is a true, correct, and complete

11        transcript of the requested proceedings.

12            I further certify that I am not attorney

13        for, nor employed by, nor related to any of the

14        parties or attorneys in this action, nor

15        financially interested in the action.

16            IN WITNESS WHEREOF, I have hereunto set

17        my hand and official seal at Topeka, Kansas,

18        this _____ day of _____, 2008.

19

20

21                        /s/ Kelli Stewart

22                        KELLI STEWART

23                        Certified Shorthand Reporter

24

25
```