IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-10234-MLB |
| | ) | |
| STEPHEN J. SCHNEIDER, | ) | |
| and | ) | |
| LINDA K. SCHNEIDER, a/k/a | ) | |
| LINDA K. ATTERBURY, | ) | |
| d/b/a SCHNEIDER MEDICAL CLINIC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **GOVERNMENT'S MOTION PURSUANT TO LOCAL RULE 83.2.3**

The United States of America, by and through Assistant United States Attorney

Tanya J. Treadway, in accordance with D. Kan. Rule 83.2.3,[1] hereby moves the Court

for an order addressing the following issues:

(1)    extrajudicial statements by defendants, their family members, their

proxies, and witnesses;

(2)    Professional Rule of Conduct 3.6;

(3)    Siobhan Reynolds' and Patricia Hatcher's contact with victims and

potential witnesses; and

---

[1]  Prior to filing this motion with the Court, the government sought defense counsel's agreement that a Rule 83.2.3 order was appropriate.  Only Mr. Williamson responded.  In an E-mail, Mr. Williamson essentially stated that he would not agree to a "gag order"; that he had a constitutional right to talk with the media; and that he would vigorously oppose such a request and ask for attorney's fees for having to respond to such a motion.

1

(4)      defendants' apparent intent to "investigate" the individuals prosecuting this

          case.

<u>INTRODUCTION</u>

In widely-publicized or sensational criminal cases, the Court, "on motion of any

party or on its own motion, may enter a special order governing such matters as

extrajudicial statements by attorneys, parties, or witnesses . . . and other matters which

the court finds necessary to insure a fair trial."[2]  The government contends that the

Court can take judicial notice that the above-captioned case has been a widely-

publicized criminal case.  And, with this motion, the government proffers evidence that

the defendants, their family, and other individuals associated with the case are working

to make it a sensational case, and may be attempting to use the media to influence the

jury pool.  Additionally, the defendants and others may be taking actions designed to

harass, influence, and intimidate victims, witnesses, and those prosecuting the case.

Consequently, to insure that the Court can impanel an impartial jury, to insure

that both the defendants and the government can receive a fair trial, and to prevent

harassment, undue influence, and intimidation of victims, witnesses and others, the

government respectfully requests that the Court enter a special order addressing these

issues.  Furthermore, due to a recent interview Mr. Williamson had with KAKE Channel

10, and Mr. Williamson's recent attempt to have the media interview his client at the

Butler County jail, the government submits that the Court should emphasize the duty of

all attorneys to adhere to Professional Rule of Conduct 3.6.

_____

[2]  D. Kan. Rule 83.2.3.

<u>GOVERNMENT'S PROFFER OF EVIDENCE</u>

**A.     The defendants are making efforts to influence the jury pool through the media.**

The government submits that the following evidence shows the defendants, their family members, and Siobhan Reynolds[3] seek to influence the media, and through the media, the jury pool.  During numerous telephone calls with defendant Linda Schneider's sister, Patricia Hatcher, the defendants have discussed using the media for their own designs, including using the media to influence the jury.  As can be seen from the conversations listed below, one of Ms. Hatcher's responsibilities is to "keep the media on [the defendants'] side."[4]

■     On December 30, 2007, defendant Stephen J. Schneider and Ms. Hatcher agree that "we need a lot on the news."[5]

■     On January 17, 2008, Ms. Hatcher and defendant Stephen J. Schneider discuss the fact that jurors will be influenced by the positive media she is obtaining.[6]

■     On February 29, 2008, defendant Stephen J. Schneider and Ms. Hatcher discuss whether the trial should be moved to Kansas City, but also discuss the

---

[3]  Ms. Reynolds is the founder and president of Pain Relief Network, an organization that has been reported in the press as having taken over the criminal case on behalf of the defendants.  <u>See</u> Exhibit 1 (February 14, 2008, Associated Press story).

[4]  <u>See</u> Exhibit 2 at **Call 8B** (Exhibit 2 is a CD of various excerpts of recorded jailhouse telephone conversations between the defendants and Patricia Hatcher).

[5]  <u>See</u> <u>id</u>. at **Call 2B, Clip #1**.

[6]  <u>See</u> <u>id</u>. at **Call 8C**  (We are getting the truth out little by little . . . The people changing over to our side will be on the jury.)

fact that they have support in the Wichita paper, which defendant Steve Schneider indicates the jury will listen to.[7]

■   On January 14, 2008, Ms. Hatcher informs her sister that she tries to put all she can in the media, and that she has interviews with the media every day.[8]

■   On January 20, 2008, defendant Linda Schneider asks her sister to take a family picture to the media to replace her mug shot.[9]

■   On January 21, 2008, defendant Linda Schneider encourages her sister to take stories to the papers.[10]

■   On February 2, 2008, Ms. Hatcher informs defendant Stephen J. Schneider that she took the media on a tour of the Schneider Medical Clinic.[11]

■   On February 10, 2008, Ms. Hatcher informs defendant Stephen J. Schneider that "we" have been putting stories in the paper.[12]

■   On March 6, 2008, Ms. Hatcher informs her sister that there will be a good article coming out in the paper tomorrow.[13]

---

[7]   See id. at **Call 21C**.

[8]   See id. at **Calls 6G, 7A**, **Clip #1**.

[9]   See id. at **Call 9E**.

[10]   See id. at **Call 10A, Clip #1**.

[11]   See id. at **Call 14A**.

[12]   See id. at **Call 16E, Clip #1**.

[13]   See id. at **Call 23A**.

■   On March 8, 2008, Ms. Hatcher informs her sister about a big article in the newspaper, and states that Eagle reporter Ron Sylvester "was given one shot at it to put the truth in, and if he done it, then he would be given more truth."[14]

■   On March 9, 2008, Ms. Hatcher informs her sister that something will be in the newspaper tomorrow or the next day.[15]

■   On March 12, 2008, Ms. Hatcher informs her sister that she had to go on the news with a rebuttal to the government's motion, and expressing that she was glad she had the news media on her side.[16]

■   On March 13, 2008, Ms. Hatcher informs her sister that there was "crap" in the paper, but she thinks she got it "straightened out."[17]

■   As recently as April 1, 2008, defendant Stephen J. Schneider attempted to give an interview to the Associated Press at the Butler County jail, and then issued a "recorded statement" through his attorney, Mr. Williamson.[18]

---

[14]  See id. at **Call 23G, Clip #1**.

[15]  See id. at **Call 24A**.

[16]  See id. at **Call 24D**.

[17]  See id. at **Call 24F**.

[18]  See Exhibit 3 (April 2, 2008, CJOnline Article by Roxana Hegeman). According to reports from both the Butler County Jail and the U.S. Marshal, Mr. Williamson attempted to have a reporter accompany him as a "guest" on a professional visit with his client, in violation of the jail's policies, rules, and regulations.  When the Butler County jail officials denied the AP Reporter's demands to be a visitor, Mr. Williamson then visited his client, tape recorder in hand, and recorded his client's statement for the reporter.  As the Court may remember, the Butler County jail previously had to deal with an attempt by defendant Linda Schneider to give KAKE a telephone interview from jail.

Furthermore, the defendants have associated themselves with Siobhan Reynolds, who focuses her efforts on obtaining media coverage for herself and her "Pain Relief Network", on the backs of the defendants.  Nevertheless, the defendants are allowing themselves to be used in this manner, as they and Ms. Hatcher speak repeatedly about what Ms. Reynolds is doing for them in the media.

- On December 29, 2007, Ms. Hatcher informs her sister that Ms. Reynolds wants to take over the news.[19]

- On December 30, 2007, Ms. Hatcher informs defendant Stephen J. Schneider that Ms. Reynolds is going to "start setting the press straight."[20]

- On January 15, 2008, Ms. Hatcher informs her sister that they need Ms. Reynolds back to handle the media.[21]

- On January 21, 2008, Ms. Hatcher informs her sister that Ms. Reynolds gets things in the national papers.[22]

- On February 12, 2008, Ms. Hatcher informs her sister that they are getting articles in the paper daily.[23]

---

[19] See Exhibit 2 at **Call 2A**.

[20] See id. at **Call 2B, Clip #2**.

[21] See id. at **Call 7E**.

[22] See id. at **Call 10A, Clip #2**.

[23] See id. at **Call 17B**.

■     On February 17, 2008, Ms. Hatcher informs her sister that Ms. Reynolds will just fly in to talk to the news.[24]

■     On February 28, 2008, Ms. Hatcher and Linda discuss Ms. Reynolds as being the "PR" for the case.[25]

Finally, in recorded telephone conversations, the defendants and Ms. Hatcher have recurring discussions about appearances on television, doing a movie, and having a book written.

■     On January 14, 2008, defendant Linda Schneider and her sister discuss the possibilities of 20/20, Oprah, and a movie.[26]

■     On January 17, 2008, Ms. Hatcher discussed the book and the movie with her sister.[27]

■     On February 4, 2008, Ms. Hatcher tells defendant Stephen J. Schneider that it will all pay off when we do the book and the movie.[28]

■     On February 10, 2008, Ms. Hatcher encourages defendant Stephen J. Schneider to keep a diary for the book and the movie.[29]

---

[24]   See id. at **Call 18F**.

[25]   See id. at **Call 21A**.

[26]   See id. at **Call 7A, Clip #2**.

[27]   See id. at **Call 8E**.

[28]   See id. at **Call 14E**.

[29]   See id. at **Call 16E, Clip #2**.

■    On February 21, 2008, defendant Linda Schneider directs her sister to get in

touch with the individual who wants to do the book.[30]

**B.    Siobhan Reynolds is contacting victims and witnesses in an effort to influence, harass, and/or intimidate them.**

In a recent article in the Topeka Capital Journal, journalist Tim Carpenter

reported the following alarming information about Ms. Reynolds' contact with victims

and potential witnesses:

> Lilly Shipman . . . was a clinic patient from 2003 until the arrests and viewed Schneider as a "compassionate doctor." While the Schneiders languished behind bars, Shipman was imprisoned by savage withdrawal from morphine and Percocet.  Shipman began working with Siobhan Reynolds, president of the Pain Relief Network, a New Mexico-based patient-advocacy group brought to Wichita to generate public sympathy for the incarcerated doctor and his wife.
>
> * * *
>
> Shipman was called by a former patient claiming that she and her husband wanted to die rather than live without a steady supply of morphine from the clinic.  Shipman called Reynolds to see if it was proper to send the addicts to a hospital emergency room.  According to an affidavit from Shipman,[31] Reynolds replied, **"If anyone is going to kill themselves, make sure they do it publicly."**  Reynolds recommended a Wichita hospital parking lot or the lobby of a local television station as ideal locations, Shipman said.
>
> "I asked her," Shipman said, "I thought you came in here to save lives?"  The Pain Relief Network founder's rebuttal, according to Shipman, was, **"Unfortunately, there will have to be deaths for this cause."**

---

[30]    See id. at **Call 20A**.

[31]    See Exhibit 4 (Excerpts from redacted Handwritten Statement of Lilly Shipman).

In a separate interview Reynolds said her first inclination was to help suffering people obtain treatment. But, she said, that wasn't realistic in every instance. Reynolds said she told Shipman, **"If you can't get help, make it count." A public suicide by a drug-addicted Schneider patient would create momentum for a campaign to legitimize "opiate therapy" in the United States, Reynolds said.** "People simply do not believe this unless they see it with their own eyes," she added.[32]

**C.    Defense Counsel Lawrence Williamson has made extrajudicial statements concerning the case.**

On March 21, 2008, KAKE News in Wichita aired part of an interview with defendant Stephen J. Schneider's attorney, Lawrence Williamson, in which he stated:

"We have information that government agents have been strong arming patients in this case. And, you know, it is just shocking to us that this is occurring."[33]

Not only is the above an extrajudicial statement, the undersigned investigated this claim and found it to be untrue. Had Mr. Williamson done some due diligence, he would have discovered the same. The government has requested Mr. Williamson to identify the patients to whom he was referring, and he has not responded to that request.

The former Schneider Medical Clinic patient[34] who appears in this same video clip, making false allegations against the investigating agents, voluntarily met with the

------

[32] See Exhibit 5 at pp. 4-5 (March 28, 2008, Capital Journal Article) (emphasis added).

[33] See Exhibit 2 at video clip.

[34] Notably, in a voluntary statement to law enforcement on October 17, 2007, defendant Linda Schneider identified this same patient as being a person who was obtaining prescription medication from a physician employed at the Schneider Medical Clinic through "barter" rather than for legitimate medical needs.

agents for over two hours in her home, where her son was present in the home, down the hall, for most of the interview, and where her husband was present in the interview for approximately 20 minutes.  The patient later called one of the interviewing agents to report additional information.  The agents were investigating whether Ms. Reynolds had instructed this patient to commit suicide publicly.  The patient confirmed that Ms. Reynolds had done so.  Additionally, the patient informed the agents that Ms. Reynolds told her to use cocaine to make her feel better.[35]

**D.      Defendants seek to "investigate" those prosecuting the case.**

In a March 8, 2008, telephone conversation with her sister, Patricia Hatcher, defendant Linda Schneider indicated that if she was still detained on May 1st, she had a private investigator ready to start "digging for skeletons" in the prosecutor's past, to uncover such things as unpaid income taxes, drinking, affairs, working as a stripper, and other "dirty little secrets."[36]  This statement, coupled with prior statements which could be regarded as death threats against the undersigned,[37] indicate the willingness and intent of the defendants to attack personally those tasked with prosecuting this case.

---

[35]  See Exhibit 6 (Declaration of Special Agent William Roland).

[36]  See Exhibit 2 at **Call 23G, Clip #2**.  The defendants' imagination obviously knows no bounds.

[37]  See Government's Consolidated Response in Opposition to Defendants' Motions for Release from Detention (Doc. 45) at pp. 19-21.

10

<u>DISCUSSION</u>

**Applicable Law**

As this Court well knows, in all cases, the jury's objective is to search for the truth.[38]  Outside influences, including pretrial publicity, potentially impair the jury's ability to search for the truth, and may therefore adversely affect the fairness of a trial.[39]  The central theory of our judicial system is that "the conclusions to be reached in a [criminal] case [must] be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."[40]

The Court bears the responsibility of guaranteeing the parties a fair trial by impartial jury.  "In exercising this responsibility, it is the Court's duty to take affirmative steps 'to insure the fairness of a criminal proceeding in the face of excessive publicity.'"[41]  In cases involving excessive and/or sensational publicity, selecting an impartial jury is made more difficult.  As a South Carolina District Court explained:

> Selection becomes particularly more difficult when statements of trial participants in particular are widely published. . . . [T]here is a substantial likelihood that prospective jurors are unwittingly exposed to statements constituting prejudicial inadmissible evidence that would jeopardize the defendants' right to a fair trial.  To the extent

---

[38]  <u>See</u> <u>Koch v. Koch Industries, Inc.</u>, 2 F. Supp. 2d 1409, 1412 (D. Kan. 1998), citing <u>Sims v. ANR Freight System, Inc.</u>, 77 F.3d 846, 849 (5th Cir. 1996).

[39]  <u>See</u> <u>id</u>.

[40]  <u>Patterson v. Colorado</u>, 205 U.S. 454, 462 (1907) (Holmes, J.).

[41]  <u>United States v. Simon</u>, 664 F. Supp. 780, 789 (S.D.N.Y. 1987), quoting <u>Levine v. U.S. District Court</u>, 764 F.2d 590, 596 (9th Cir. 1985).

11

that the Court has authority, it is the duty of the Court to
prevent that kind of jury prejudice.[42]

"In the context of criminal proceedings, a tension exists between a defendant's
Sixth Amendment right to a fair trial and the First Amendment rights of free speech and
access of the press, the public, and trial participants."[43]  In cases involving substantial
pretrial publicity, the courts have attempted to reconcile this tension.[44]  The Supreme
Court "long ago held that the Sixth Amendment imposes an affirmative duty on the trial
court to limit prejudicial publicity. . . . But in another set of decisions, the Court has
shown disfavor toward prior restraints on speech."[45]

Although there is no consensus as to whether an order regulating trial
participants' extrajudicial statements is a prior restraint,[46] the case law differentiates
between "restraints imposed on trial participants and those that directly obstruct
publication or dissemination."[47]  An order restraining the extrajudicial statements of trial

---

[42]  Central South Carolina Chapter, Society of Porfessional Journalists v. Martin,
431 F. Supp. 1182, 1189 (D.S.C.), aff'd as modified on other grounds, 556 F.2d 706 (4th
Cir. 1977).

[43]  United States v. Davis, 902 F. Supp. 98, 102 (E.D. La. 1995).

[44]  Koch, 2 F. Supp. 2d at 1412.

[45]  Davis, 902 F. Supp. at 102, citing Sheppard v. Maxwell, 384 U.S. 333, 362-63
(1966); Near v. Minnesota ex rel Olson, 283 U.S. 697 (1931).

[46]  See id., listing cases.

[47]  See id.

participants is less intrusive of First Amendment rights than an order restraining

publication.[48]  As the Southern District of New York concluded:

> Reasonable restraints, imposed at this stage and narrowly
> tailored to the censure of prejudicial statements, to which
> potential listeners have no right of access, are certainly far
> more desirable from both a judicial and societal standpoint
> than direct restraints on the publication of prejudicial
> extrajudicial statements.[49]

But, as Judge Crow explained in the Koch litigation:

> "The limitation of First Amendment freedoms must be no
> greater than is necessary or essential to the protection of the
> particular governmental interest involved." . . . "Less
> restrictive alternatives to an injunction against speech
> include such possibilities as a change of venue, trial
> postponement, a searching voir dire, emphatic jury
> instructions, and sequestration of jurors." . . .  The
> determination of what prior restraint, if any, is necessary to
> protect the integrity of the judicial process, is committed to
> the discretion of the district court.[50]

Whether a prior restraint or not, however, Rule 3.6 of the Kansas Rules of

Professional Conduct prohibits attorneys from making extrajudicial statements, except

for narrowly defined statements:

3.6 Advocate: Trial Publicity

(a)    A lawyer who is participating or has participated in the investigation or
litigation of a matter shall not make an extrajudicial statement that the
lawyer knows or reasonably should know will be disseminated by means
of public communication and will have a substantial likelihood of materially
prejudicing an adjudicative proceeding in the matter.

---

[48]   See id. at 102, citing In re Application of Dow Jones & Co., 842 F.2d 603, 608
(2d Cir. 1988) and Gentile v. State Bar of Nevada, 501 U.S. 1030, 1074 (1991).

[49]   Simon, 664 F. Supp. at 794.

[50]   See id. at 1413 (internal citations omitted).

(b)     Notwithstanding paragraph (a) a lawyer may state:

    (1)     the claim or defense involved and, except when prohibited by law, the identify of the persons involved;

    (2)     information contained in a public record;

    (3)     that an investigation of the matter is in progress;

    (4)     the scheduling or result of any step in litigation;

    (5)     a request for assistance in obtaining evidence and information necessary thereto;

    (6)     a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and

    (7)     in a criminal case, in addition to subparagraphs (1) through (6):

        (i)     the identity, residence, occupation and family status of the accused;

        (ii)    if the accused has not been apprehended, information necessary to aid in apprehension of that person;

        (iii)   the fact, time and place of arrest; and

        (iv)    the identity of investigating and arresting officers or agencies and the length of the investigation.

(c)     Notwithstanding paragraph (a), a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client.  A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.

(d)     No lawyer associated in a firm or government agency with a lawyer subject to paragraph (a) shall make a statement prohibited by paragraph (a).

The government submits that none of the above exceptions to Rule 3.6 apply to

the statement Mr. Williamson made during his March 21, 2008, interview with KAKE.

14

Moreover, in addition to the Court's ability to control extrajudicial statements, the Court possesses inherent authority and power to control other conduct of parties, counsel, and those who seek to harass victims and potential witnesses.[51]   The Court's "inherent authority" is typically exercised with "great caution" and with "restraint and discretion."[52]   In this case, the Court's inherent authority can be properly exercised to prevent the potential obstruction of this criminal proceeding.

**Relief Requested**

The evidence proffered above indicates that the defendants, through their family, their attorneys, and Ms. Reynolds, are attempting to use the media to influence the jury that will eventually be empaneled to hear their case.   Because of these attempts, the government submits that the Court should take appropriate action under Rule 83.2.3 and the above-discussed case law to restrain the defendants, their family members, Ms. Reynolds (who is essentially a proxy for the defendants and their family members), and potential witnesses, from making extrajudicial statements to the media.   This is not a prior restraint on the media, but is a prior restraint on trial participants.   As a corollary to this order, the government requests that the Court order Mr. Williamson to produce to the government and to the Court the "recorded statement" defendant Stephen Schneider provided the press.

---

[51]   See, e.g., generally, Chambers v. NASCO, Inc., 501 U.S. 32 (1999); see also, Shepard v. American Broadcasting Companies, 62 F.3d 1469, 1483-84 (D. C. Cir. 1995).

[52]   Chambers, 501 U.S. at 43 and 44.

Alternatively, the government asks the Court to consider an intra-district transfer for trial, which may eliminate any potential prejudicial impact on the jury pool from the wide publicity this case is receiving in the Wichita media.[53]

With regards to Siobhan Reynolds and Patricia Hatcher, the government also contends that they should be prohibited from contacting victims and witnesses in this case.  Essentially, Ms. Reynolds has inserted herself into this criminal trial and is serving in several capacities in addition to "public relations" and "media consultant." Ms. Reynolds is serving as an advisor to the defendants, their families, and their attorneys; as the defendants' proxy; as the defendants' advocate; and, bizarre as it sounds, a promoter of public suicides.

Similarly, Ms. Hatcher is essentially serving as the defendants' proxy while they are detained.  Because Ms. Reynolds and Ms. Hatcher are acting as defendants' proxies, the government believes they both should be treated in the same capacity as should a defendant on release in terms of contact with victims and witnesses.[54] Accordingly, as it did in the Kaufman case,[55] the Court should prohibit the defendants, Ms. Hatcher, and Ms. Reynolds, from contacting victims and witnesses, either directly or indirectly.

---

[53]  See Fed. R. Crim. P. 18, 21; D. Kan. Rule 40.2.

[54]  See 18 U.S.C. § 3142(c)(1)(B)(v) (allowing the Court to order that a released defendant "avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense").

[55]  See Case No. 04-40141-MLB, Doc. 50 at pp. 15-16.

16

The government also asks the Court to prohibit the defendants, their family members, their representatives, and their proxies from impeding, intimidating, or interfering with those prosecuting this case, whether through "private investigations" or otherwise.[56]

Finally, the government asks the Court to remind counsel that they are expected to adhere to Rule 3.6.

CONCLUSION

The government respectfully submits that any further attempts by the defendants, defense counsel, their family, Siobhan Reynolds/the Pain Relief Network, or witnesses to try this case in the media should end now.[57]   The trial of this case should not occur outside the courtroom.[58]   Therefore, the government requests that the Court enter an appropriate order under Rule 83.2.3, addressing all of the above-discussed issues.

Respectfully submitted,

ERIC F. MELGREN
United States Attorney

s/ Tanya J. Treadway

Tanya J. Treadway #13255
Assistant United States Attorney

---

[56] See 18 U.S.C. §§ 111, 115.

[57] See Koch, 2 F. Supp. 2d at 1415.

[58] See Davis, 902 F. Supp. at 103.

17

CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2008, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system, which will send a notice of electronic

filing to the following individuals:

Lawrence W. Williamson, Jr.
816 Ann Avenue
Kansas City, KS   66101
Fax: 913-535-0736

Uzo L. Ohaebosim
510 N. Topeka
Wichita, KS   67214
Fax:   316-261-5404

Eugene V. Gorokhov
1800 Wilson Blvd, Suite 12
Arlington, VA   22201

Kevin P. Byers
107 South High Street, Suite 400
Columbus, OH   43125-3456

s/   Tanya J. Treadway
Tanya J. Treadway #13255
Assistant United States Attorney