IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-10234-MLB |
| | ) | |
| STEPHEN J. SCHNEIDER, | ) | |
| and | ) | |
| LINDA K. SCHNEIDER, a/k/a | ) | |
| LINDA K. ATTERBURY, | ) | |
| d/b/a SCHNEIDER MEDICAL CLINIC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through Assistant United States Attorney

Tanya J. Treadway, hereby submits its Sentencing Memorandum for the Court's

consideration. Based on the facts of the case, and based on similar cases across the

country,[1] the government submits that both defendants should be sentenced to life

terms, and/or should be sentenced consecutively on multiple counts to achieve life

terms. For example, the government submits that the mandatory minimum sentence of

20 years applicable to Counts 2 through 5, can simply be imposed consecutively for a

sentence of 80 years, which would achieve life sentences.

---

[1] *See, e.g., United States v. Webb*, 3:08cr136-001LAC (N.D. Fla. 2010) (doctor
sentenced to life for health care fraud resulting in death, drug dispensing resulting in
death); *United States v. Martinez*, 588 F.3d 301 (6th Cir. 2009) (doctor sentenced to life
for health care fraud resulting in death); *United States v. Merrill*, 513 F.3d 1293 (11th Cir.
2008) (doctor sentenced to life for health care fraud resulting in death and drug
dispensing resulting in death); *United States v. Mukherjee*, 289 Fed. Appx. 107 (6th Cir.
2008) (doctor sentenced to consecutive terms for illegal distribution of drugs to
accomplish a life sentence).

## I. FACTUAL DISPUTES

Except for the objections to the allegations about the defendants' obstructive activities, none of the defendants' factual objections will ultimately affect the guidelines calculation. Nevertheless, the government briefly addressed each objection, which the Probation Officer included in the Amended Presentence Reports.[2] As a general response, the government submits that the Court can reject the defendants' claims that statements in the Presentence Report were not supported by evidence at trial or are irrelevant and should be disregarded. All of the allegations were proved at trial, and all were relevant to proving that the defendants' Clinic was not a legitimate medical practice, and therefore that the defendants illegally dispensed drugs and committed health care fraud.

## II. GUIDELINES CALCULATIONS

The government supports the Guidelines Calculations in the Presentence Reports, and withdraws its objection regarding the omission of a 2-level enhancement for abuse of trust with regards to defendant Linda Schneider's drug convictions. In support of the specific enhancements, the government submits the following information and argument for the Court's consideration, but agrees with the Probation Officer's conclusions that even if the Court chooses not to impose some or all of the enhancements, the defendants would still be eligible for, and should still receive, life sentences.

---

[2] *See* Stephen Schneider's Report at ¶¶ 295-334, pp. 89-95; *see* Linda Schneider's Report at ¶¶ 314-340, pp. 85-92.

**A.    Drug Guidelines (Counts 2-6)**

**1.    The defendants' sentences should be enhanced for their victimization of a large number of vulnerable individuals under U.S.S.G. §§ 3A1.1(b)(1) & (b)(2).**

Based on the evidence at trial, including the testimony of former patients and experts, the defendants' Clinic catered to a vulnerable population.  Both defendants became aware during the course of their criminal scheme that their victims were vulnerable.[3]   These individuals were vulnerable in the following respects, as well as considering the totality of the circumstances:

(1)    some were drug addicts,[4] who came to the Clinic seeking drugs, and who unfortunately received what they asked for (*e.g.*, Alicia C, who testified at trial);

(2)    some were people in chronic pain who sought drugs, and who unfortunately became addicted or re-addicted to them as a result of the Clinic's prescription practices (*e.g.*, the individuals in Counts 2-5 and Tab H, who testified at trial);

(3)    some were people who had acute pain, who received drugs and became addicted to them (*e.g.*, Angela Dunnavent, who testified at trial);

(4)    many were people who suffered from various kinds of mental illness, including anxiety (numerous individuals), bipolar disorder (*e.g.*, Robin G, the subject of Counts 4 and 9), depression (*e.g.*, Patricia G, the subject of Counts 2 and 7), post traumatic stress disorder (*e.g.*, Toni W, one of the subjects of Count 5), and schizophrenia (*e.g.*, Leslie C, one of the 68 deceased listed in the overt acts of the conspiracy); and

---

[3]  In the Tenth Circuit, the defendant does not have to be aware of the victim's vulnerability before committing the offense and may learn about the vulnerability during "the criminal episode."  *See United States v. Proffit*, 304 F.3d 1001, 1007 (10th Cir. 2002); *United States v. Checora*, 175 F.3d 782, 789 n.4 (10th Cir. 1999).

[4]  Drug addicts can be vulnerable victims.  *See, e.g., United States v. Dullum*, 560 F.3d 133, 135 (3d Cir. 2009); *United States v. Amedeo*, 370 F.3d 1305, 1317 (11th Cir. 2004); *United States v. Evans*, 272 F.3d 1069, 1095 (8th Cir. 2001); *United States v. Pavao*, 948 F.2d 74, 78 (1st Cir. 1991).

(5)     at least three individuals were minors under the age of 21.[5]

The government contends that the physical and mental conditions of the people who came to the defendants' Clinic made them unusually vulnerable to the illegal drug dispensing and health care fraud activity the defendants perpetrated. In *United States v. Kaufman*,[6] the Tenth Circuit determined that more than 10 mentally ill individuals was a large number of vulnerable victims. In this case, there are easily more than 10 vulnerable victims. In *United States v. Caballero*,[7] 16 victims (illegal aliens) were sufficient to support this enhancement. Even if the number of victims does not qualify for the enhancement under § 3A1.1(b)(2), it can be the basis for an upward departure or a variance.[8]

## 2.     The defendants' sentences should be enhanced for being organizers and leaders of an extensive criminal activity, under U.S.S.G. § 3B1.1(a).

As the owners and operators of the Clinic, the defendants were clearly the organizers of the criminal activity that occurred at the Clinic. The government submits that both defendants were involved in planning and organizing their criminal venture;

---

[5] Minors have been found to be vulnerable victims. *See, e.g., Evans*, 272 F.3d 1069, 1095; *United States v. Kahn*, 175 F.3d 518, 521 (7th Cir. 1999) (defendant agreed to a 2-point enhancement under § 3A1.1(b) for distributing a controlled substance to a 15-year-old victim).

[6] 546 F.3d 1242 (10th Cir. 2008).

[7] 277 F.3d 1235 (10th Cir. 2002).

[8] *See, e.g., United States v. Melvin*, 187 F.3d 1316 (11th Cir. 1999) (affirming upward departure of 15 levels based on the large number and vulnerable nature of the victims); *United States v. Kahn*, 175 F.3d 518, 522 (7th Cir. 1999) (affirming upward departure under § 5K2.0 for distributing drugs to multiple vulnerable victims).

they exercised decision-making authority; they were involved in every aspect of the Clinic's operations on a daily basis; they directed the activities of many other individuals in the Clinic (from medical professionals like doctors and Physician's Assistants to clerical staff like receptionists); and they received the bulk of the criminal proceeds.

Notably, a defendant may be considered an organizer without exercising control over another participant and when he/she devises a criminal scheme, provides the wherewithal to accomplish the criminal objective, and coordinates and oversees the implementation of the conspiracy.[9]  Once the organizer requirements are met, the Court is free to consider the totality of the circumstances, including not only the number of participants, but also the width, breadth, scope, complexity, and duration of the scheme in order to determine if the "otherwise extensive" enhancement is applicable.[10]  The "otherwise extensive" prong of § 3B1.1(a) requires no set number of criminally

---

[9]  *See United States v. Tagore*, 158 F.3d 1124, 1131 (10th Cir. 1998); *United States v. Valdez-Arieta*, 127 F.3d 1267, 1272 (10th Cir. 1997).

[10]  *See United States v. Yarnell*, 129 F.3d 1127, 1139 (10th Cir. 1997), citing *United States v. Eidson*, 108 F.3d 1336, 1346 (11th Cir. 1997) and *United States v. Dietz*, 950 F.2d 50, 53 (1st Cir. 1991).

responsible participants, and can be based on the involvement of unwitting individuals used to accomplish the defendants' criminal objectives.[11]

While the government believes that there were other criminally responsible participants in the criminal activities,[12] this enhancement can be applied based simply on the extensive nature of the criminal activity in which the defendants were engaged.

Even before opening the Clinic's doors, the defendants were engaged in the illegal dispensing of drugs resulting in death, as the jury's verdicts confirmed.[13]  The defendants built their Clinic with volume in mind, and operated it as a volume business from day one.  Witnesses testified that patients were herded like sheep or cattle. Consequently, as numerous witnesses testified, there was inadequate time to practice legitimate medicine.  Defendant Stephen Schneider himself testified that he did not run a legitimate pain management practice and did not know what one was.  The

---

[11]  *See* § 3B1.1, comment n.3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."); *see also, United States v. Ellis*, 951 F.2d 580, 585 (4th Cir. 1991); *Dietz*, 950 F.2d at 53 (the sentencing court is free to consider the use of unwitting outsiders, and the width, breadth, scope, complexity, and duration of the scheme); *United States v. West*, 942 F.2d 528, 530-31 (8th Cir. 1991) (may include outsiders who did not have knowledge of the facts); *Yarnell*, 129 F.3d at 1139 (agreeing with *Dietz* case); *United States v. Reid*, 911 F.2d 1456, 1466 (10th Cir. 1990) (a criminal activity involving 4 conspirators, 2 drug suppliers and hundreds of customers was "otherwise extensive").

[12]  Other criminally responsible co-conspirators were previously identified in a letter to counsel and a subsequent letter to the Court.

[13]  Billie R, one of the individuals in Count 5, died well before the Clinic opened in the Fall of 2002.

defendants bragged to prospective employees and in credentialing applications that their Clinic was the #1 writer of narcotics prescriptions in Kansas.

The defendants successfully involved numerous individuals in their scheme, as eloquently summarized by one Physician's Assistant in her letters to Medicaid and the Kansas Board of Healing Arts. *See* GX 108, 108A.[14] The defendants even had Physician's Assistants use pre-signed prescription pads before being issued their DEA licenses to issue controlled substance prescriptions.

Defendants directed employees how to code the Fee Tickets and how to bill for certain providers to maximize reimbursement. Defendant Linda Schneider directed employees to falsify documents, and defendant Stephen Schneider admitted to falsifying missing progress notes. Defendant Linda Schneider also fired employees who were unwilling to help carry out the defendants' scheme or who were too nosy. The success of the defendants' illegal drug dispensing and health care fraud scheme depended on their ability to direct and control the activities of their numerous employees over time. Under their direction, the Clinic operated in the way it did for over 5 years, resulting in numerous deaths and overdoses. The defendants personally benefitted at least $1.4 million. As the fraud review revealed, the Clinic was permeated with fraud the entire time it was open.

---

[14] Due to their volume, the government will submit the government's exhibits on a CD, should the Court need to review or refer to them for sentencing. As the Court will recall, the parties took custody of their exhibits following the jury's verdicts.

### 3. Defendant Stephen Schneider's sentence should be enhanced for his abuse of a position of trust, under U.S.S.G. § 3B1.3.

As a physician, the defendant occupied a position of trust with respect to his patients, to whom he owed a duty to provide honest medical services. As the evidence repeatedly proved, the defendant put money before medicine, abusing his position of private trust with the patients. Compromising patient trust was a necessary component of the defendant's scheme to maximize his and his wife's earnings and significantly facilitated the commission of the offense.[15]

### 4. The defendants' sentences should be enhanced for obstructing justice, under U.S.S.G. § 3C1.1.

During the course of the investigation and prosecution, the defendants have engaged in multiple types of obstructive conduct. When viewed together, these activities well support an enhancement for obstructing justice.

### a. Obstruction by Defendant Stephen Schneider

**(1) Defendant made false statements during his May 2006 proffer.** Contrary to the defendant's objection to this enhancement, the government did not need to impeach the defendant at trial with his prior statements to make these false statements the basis of an obstruction enhancement. The false statements made during the proffer include at least the following:

---

[15] *See, e.g., United States v. Sidhu*, 130 F.3d 644, 656 (5th Cir. 1997); *United States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir. 2000); *United States v. Ntshona*, 156 F.3d 318, 321 (2d Cir. 1998); *United States v. Iloani*, 143 F.3d 921, 923 (5th Cir. 1998).

8

- *Defendant stated that he did not know any procedures or policies regarding the administrative or clerical aspects within SMC, including the billing department.*

  The testimony from multiple employees was that the defendant directed how Fee Tickets were marked and how services were billed.

- *Defendant stated that a new pain management patient was required to fill out a personal history report, a pain agreement, and that a physical examination was subsequently conducted.*

  The evidence at trial, including the defendant's own records did not support this statement, but flatly contradicted it, as the experts who reviewed the medical records testified.

- *Defendant stated that if illegal drugs were found in a urine drug screen, the patient was fired, and he only recalled one instance when such a patient was rehired.*

  The medical records and testimony flatly contradicted this statement. Numerous patients who failed urine drug screens, including those who had illegal drugs in their systems, continued as pain management patients, or even if fired, were eventually rehired, and put back on controlled substance prescriptions.

- *Defendant stated that he conducted pill counts.*

  There was no evidence that the defendant conducted pill counts.

- *Defendant stated that he did not treat drug addicts.*

  Again, the evidence, including defendant's own records, his admissions to a drug representative, Tom Wagner, and his admissions in various depositions and letters over the years, indicated that the defendant treated drug addicts and knew he was treating drug addicts. *See, e.g.,* GX 83, 156, 255, 257-60, 263.

- *Defendant stated that before issuing a prescription to treat pain, he required a medical/psychological evaluation to be performed.*

  There was little, if any, evidence that any of the pain management patients received adequate medical examinations prior to being prescribed narcotics, and no evidence that they were required to be evaluated psychologically before receiving such prescriptions.

- *Defendant stated that if a person failed a urine drug screen, the person was required to have a medical/psychological evaluation conducted.*

There is nothing in the defendant's medical records to support this statement; indeed, the records flatly contradict that such evaluations occurred after failed urine drug screens.

■ *Defendant stated that he did not continue to prescribe narcotics if a person was known to be diverting or abusing medications.*

The evidence at trial was replete with examples of the defendant continuing to prescribe narcotics to people he knew were diverting and abusing their prescription medications. *See, e.g.,* GX 2D, 3D, 4D, 5A-4 through 5R-4, 6A - 6AA (progress notes); 156 (Wagner call notes), 255, 257-60, 263 (Letters to the KBHA).

**(2)      Defendant and his father-in-law created false documents regarding the property in Oklahoma.**  In an attempt to keep the lake house out of the hands of civil plaintiffs in the medical malpractice cases, and out of the hands of the federal government in the criminal case, the defendant and his father-in-law created a false lien and promissory note against the defendants' Oklahoma lake property.  Although the defendants now claim that Linda Schneider's parents purchased this house for them, there is no proof of that claim.  Additionally, during the course of the investigation, L.E. Atterbury claimed that the note was not to repay him for the purchase of the lake home, but was instead related to other loans over time that he made to the defendants.  Again, there is no proof of these "other loans" and the loans Mr. Atterbury claimed to have made the defendants were actually nothing more than the return of money the defendants laundered through accounts in his name.  Mr. Atterbury had to lie to federal investigators to continue this charade, which lies are also attributable to both of the defendants.

**(3)      Defendant falsely testified that he had not treated or prescribed controlled substances to individuals named in Count 5.**  During his direct testimony, the

defendant claimed that he had not treated the individuals named in Count 5 of the indictment.  During cross examination, government counsel meticulously went through each of the individual's medical records with the defendant, having him admit to treating them and prescribing narcotics to them, either directly, and/or indirectly through his supervision of the Physician's Assistants.  Following that cross examination and those admissions, however, he continued to deny that he treated or prescribed to these individuals.

### b.    Obstruction by defendant Linda Schneider

**(4)    Defendant attempted to cast blame on Dr. Lawrence Simons, while deflecting blame from her and her husband in an October 2007 statement to federal investigators.**  The videotape of this discussion is sufficient proof of this obstructive activity.  *See* GX 82C.

**(5)    Defendant threatened employees (Angela Dunnavent, Jamie Hilliard, Cindy Curry) who complained about the overdoses, the deaths, the prescription practices, the volume of patients, the prioritization of patients by insurance, and the requests to falsify documents.**  These witnesses testified to the threats.  Although the jury did not unanimously find this overt act to have been proved beyond a reasonable doubt, the Court has sufficient evidence to sustain the standard of proof relevant to sentencing, which is a preponderance of the evidence.

**(6)    Defendant directed Tim MacDonald to not produce certain financial records responsive to a subpoena.**  Mr. MacDonald acknowledged this fact on cross-examination at trial, although he attempted to explain it away by claiming that an

attorney, David Schippers, had instructed the Clinic not to comply with the subpoena. Mr. Schippers denied that he did so. Additionally, Mr. MacDonald told a federal agent that he never spoke to Mr. Schippers, and that this information came from defendant Linda Schneider. Until the defendant had Mr. MacDonald produce the entirety of the financial records requested, the investigators were unable to decipher the Clinic's financial picture.

**(7)  Defendant attempted to have a real estate agent, Kathryn Morrison, destroy notes regarding the sale of the Clinic.**  In late 2006 and early 2007, the defendants were attempting to sell their Clinic, listing it with a real estate sales person, Kathryn Morrison. On April 12, 2007, Special Agent Drew Stewart contacted Kathryn Morrison about a time to meet her and serve a subpoena for her file regarding the sale of the Clinic. On the same date, Kathryn Morrison called defendant at 8:15 p.m., informing her that the agents would be picking up the file the next day at 8:00 a.m. The defendant asked "if anything could be torn up." Ms. Morrison "gave no answer and informed her that additional profits and losses would be filed." Kathryn Morrison recorded this conversation in her file. Again, the defendant was attempting to keep financial information from the investigators.

**(8)  Defendant threatened the lives of her former attorney, John Rapp, and an Assistant United States Attorney during her pretrial incarceration in Butler County.**  Defendant cannot deny these threats, because they are recorded in the jailhouse telephone calls. *See* Doc. 45 at pp. 19-21. She merely tries to make light of

these threats, which, contrary to her representations, Judge Bostwick did take seriously.[16]

**(9)** **Defendant feigned mental illness and committed a fraud on the court in an attempt to be released from detention.** *See* Doc. 46. On March 14, 2008, Dr. Kerin Schell testified in a detention hearing before The Honorable Donald W. Bostwick. Dr. Schell's testimony was, at best, questionable.[17] He testified that defendant Linda Schneider had "suddenly" become Bipolar because of her detention, suffering from major severe depression and hypomania, and the only cure for this chronic disease was her release from detention. Prior to Dr. Schell's meeting with Linda Schneider at the Butler County Jail on March 7, 2008, he had been contacted by Patricia Hatcher, Connie White, and at least two defense attorneys. Based on the jailhouse recordings, Dr. Schell's testimony, and Dr. Schell's notes, it appears that he gave the testimony he was manipulated to give.

The jailhouse recordings do not reveal defendant Linda Schneider suffering from severe depression or hypomania, but reveal that she was simply depressed because of her incarceration, as anyone would be. On the government's unopposed motion, this Court sent the defendant for a mental evaluation. She was evaluated at the Carswell, Texas, penitentiary, and the evaluation revealed absolutely nothing consistent with Dr.

---

[16] *See* Doc. 164 at p. 18 ("the language used during some of these conversations implies more than future legal proceedings when it includes statements about putting someone out of their misery. The Court does not take such comments lightly."); *see id.* at p. 24 ("the Court is very concerned about Linda Schneider's ill-advised comments concerning her prior defense counsel and the prosecuting attorney").

[17] *See* Doc. 184 at p. 9 n.6 ("Although the court is sorely tempted to say more, it will comment only that Schell's testimony was neither professional nor persuasive.").

Schell's testimony, even though it occurred only weeks after that testimony and his March 7th visit with her.

Now that he knows more of the facts, including listening to some brief excerpts from jailhouse recordings immediately before and after his interview with Linda Schneider, and his review of the Carswell evaluation, Dr. Schell believes his testimony was manipulated and that he was duped into providing the diagnosis and testimony he did.

**(10)    Indirectly, through Patricia Hatcher, defendant attempted to intimidate trial witnesses, including Angela Dunnavent and Robert Swonger.**  Both Ms. Dunnavent and Mr. Swonger reported incidences involving Patricia Hatcher during the course of the trial and before each of them testified.  Both reported that the contact made them fear for their safety.  Ms. Hatcher's conduct did intimidate Ms. Dunnavent, as it dramatically and negatively impacted her trial testimony.

### c.    Obstruction by Both Defendants

**(11)    The defendants have harbored a fugitive, Ulises Taylor, who was a potential witness.**  *See* Doc. 32 in Case 06-10106.  While defendant Linda Schneider is directly responsible for many of the harboring activities, given the defendants' extremely close relationship, and the fact that the defendants consider Mr. Taylor "family," the harboring activities should be attributable to both defendants.

On January 30, 2007, defendant Linda Schneider entered a plea of guilty to social security fraud in Case 06-10106.  See Doc. 18, 19.  Following her plea, she remained on release.  On April 16, 2007, the Court sentenced the defendant Linda

Schneider to two years probation.  See Doc. 20.  While on probation, the defendant was prohibited from committing another federal, state, or local crime.  See id.

The defendants and Eric M. Taylor/Ulises Taylor ("Taylor") met in Mexico, Taylor's country of origin, and where he is a citizen.  Following the defendant Linda Schneider's and Taylor's actions to obtain Taylor a social security card, Taylor worked at the Schneider Medical Clinic.  Defendant Stephen Schneider knew Taylor was not a legal resident, and he and Curtis Atterbury drove to Canada to help Taylor cross the border at one point during Taylor's employment at the Clinic.

Following her plea of guilty, but before her sentencing, defendant Linda Schneider engaged in the following transactions,[18] which the government submits were for the purpose of helping Taylor avoid arrest:

- On or about February 7, 2007, Linda purchased a 95 GMC Jimmy truck from Fine Line Auto for $4,818.00.  The paperwork she completed originally indicated that the owner would be Ulises Taylor, but she  crossed out his name and inserted the name of "Carlo Gutierrez."  She signed the paperwork with Gutierrez's name.

- On or about March 3, 2007, Linda made a payment on a Visa Credit Card, issued in Taylor's name, which she applied for in August 2002, and for which defendants have made all payments.

- On or about March 5, 2007, with her Citi Advantage World Master Card, Linda purchased Taylor a Mexicana airline ticket for a trip from Acapulco, Mexico, to Reyanosa, Mexico, for a departure on March 9, 2007.   Reyanosa is just across the border from McAllen, Texas.

- On or about March 6, 2007, Linda purchased a Continental airline ticket for a trip from Acapulco, Mexico, through Houston, Texas, to Wichita, Kansas.
- On or about March 7, 2007, Linda purchased a 1990 Chevrolet Silverado truck to take to Mexico.  She signed the paperwork with Gutierrez's name.

---

[18] The documentary evidence of these transactions was previously submitted to the Court in Case 06-10106.  See Exhibits attached to Doc. 32.

- Thereafter, Linda evidently drove the truck to Mexico for delivery, because she returned on March 21, 2007, on a flight from Acapulco, Mexico, to Wichita, without record of a corresponding and prior flight to Mexico, and her credit card indicates gasoline being purchased in Oklahoma and Texas on March 9th and 10th.[19]

- According to a letter Linda wrote to the Court prior to sentencing, the defendants have had Taylor take care of property they own in Acapulco, Mexico.

- On October 17, 2007, defendant Linda Schneider met with federal agents. She initiated this meeting. At the end of this meeting, the agents discussed the fugitive status of Taylor with her, and she refused to tell the agents where Taylor was, refused to give the agents Taylor's telephone number, and refused to call Taylor and ask him to turn himself in, because she considers him family.

**(12) Defendants suborned the perjury of, or sponsored the false testimony of, two defense experts – Barbara Cobuzzi and Steven Karch, and the perjury or false testimony of at least two other defense witnesses – Carole C and Kelly G.**

During cross examination, Barbara Cobuzzi lied on the stand, and then continued her lies based on defense counsel Lawrence Williamson's redirect examination. Although the defendants could not control the first lie, they could have prevented the further lies on redirect. The attorneys represented both defendants throughout the proceedings and were therefore serving as the defendants' agents throughout the trial.

On direct examination, Steven Karch was permitted to lie about the lack of an autopsy for Patricia G, the subject of Counts 2 and 7. Defendants and their counsel knew that there was an autopsy for Patricia G, because not only had it been admitted in evidence, defense counsel had cross-examined its author, Dr. Dudley. Yet, defense

---

[19] Both defendants utilized this credit card.

counsel directed Dr. Karch in an examination that permitted him to lie about the existence of the autopsy.

Defendants allowed Carole C and Kelly G to deceive the jury about their treatment at the Clinic by allowing them to testify falsely about their treatment at the Clinic, and specifically without the benefit of reviewing their patient files. This was done purposefully so that the defendant could now claim that their testimony was simply mistaken.

This type of activity has been determined worthy of an obstruction of justice enhancement. Essentially, when a defendant calls a witness, or allows a witness to be called to testify on his/her behalf, knowing that the witness will give perjured or false testimony, the defendant "acts in a manner that obstructs the administration of justice"[20] even if it does not necessarily constitute subornation of perjury.[21] When a defendant calls a witness to testify, he is presumed to know what that witness will testify about, and if false, the attribution of knowledge of the false testimony falls to the defendant.[22] It is reasonable for the Court to infer that the defendants' attorneys discussed with them the anticipated testimony of the experts, and the former patients, Carole C, and Kelly

---

[20] *United States v. Bradberry*, 466 F.3d 1249, 1254 (11th Cir. 2006).

[21] *See United States v. Johnson*, 261 Fed. Appx. 611, 614 (4th Cir. 2008), citing *United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999); *United States v. Lowder*, 148 F.3d 548, 552-53 (5th Cir. 1998); *United States v. Miller*, 159 F.3d 1106, 1112-13 (7th Cir. 1998); *United States v. Washington*, 171 Fed. Appx. 986, 988 (4th Cir. 2006).

[22] *See id.* at 1253 (comments of trial judge).

G.[23]  Therefore, the defendants cannot use their attorneys as a shield against an obstruction enhancement.[24]

**B.    Fraud Convictions (Counts 1, 7-17)**

The government requests that the Court follow the Presentence Report, which calculated the defendants' sentences under both the fraud guidelines and the drug guidelines.  Because money drove the drug dispensing scheme, and because both guidelines' calculations result in life sentences, the government believes calculating the guidelines' sentences under both theories of the case, and both types of convictions, will benefit the Court's analysis and further support a decision to impose life sentences.

> **1.    The amount of loss should be calculated on the basis of the amount billed for services and prescriptions, which was over $20,000,000.**

The recent Patient Protection and Affordable Care Act of 2010, Pub. L. 111-148 (3/23/2010), directed the United States Sentencing Commission to amend the guidelines to clarify that, when calculating the loss figure in the context of a health care fraud case, the total amount that the defendant **billed** to a health care program comprises *prima facie* evidence of the intended loss.  This direction addresses concerns that the calculation of loss in health care fraud cases had skewed in favor of defendants' arguments that the intended loss should exclude that portion of a claim for services that were actually provided and should be capped by the maximum amount that would have

---

[23]  *See Johnson*, 261 Fed. Appx. at 613 (applying enhancement).

[24]  *See Lowder*, 148 F.3d at 553.

been reimbursed.[25]  The Act codifies the approach taken by several courts, including the Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits.[26]  Clarifying amendments have no *ex post facto* implications.[27]

Since loss under 2B1.1(b)(1) is the greater of actual or intended loss,[28] the government contends that the Court should use the intended loss to calculate the sentencing enhancement in this case.  Under an intended loss theory, especially in the context of a case like this one, involving a Clinic permeated by fraud, the Court need not make findings about individual claims.  The submitted claims for services totaled $12,838,487.82; while the submitted claims for controlled substances totaled $13,695,681.43.  As the Court previously found, "there was sufficient evidence to show that the clinic **consistently** billed for services that were not provided and upcoded the majority of claims that were billed. . . . [and] that the prescriptions were not issued for a legitimate purpose."[29]

---

[25]  *See, e.g., United States v. Medina*, 485 F.3d 1291, 1304-05 (11th Cir. 1007); *United States v. Singh*, 390 F.3d 168, 193-95 (2d Cir. 2004).

[26]  *See, e.g., United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003); *United States v. McLemore,* 200 Fed. Appx. 342, 344 (5th Cir. 2006)*; United States v. Mikos*, 539 F.3d 706, 714 (7th Cir. 2008); *United States v. Serrano,* 234 Fed. Appx. 685, 687 (9th Cir. 2007)*; United States v. Wai-Keung,* 115 F.3d 874, 877 (11th Cir. 1997)*; United States v. Cruz-Natal*, 150 Fed. Appx. 961, 964 (11th Cir. 2005); *see also, United States v. Geevers*, 226 F.3d 186, 193 (3d Cir. 2000) (same analysis in bank fraud context).

[27]  *See, e.g., United States v. Groves*, 369 F.3d 1178, 1182 (10th Cir. 2004).

[28]  *See* § 2B1.1, comment 3(A).

[29]  Doc. 497 at pp. 2-3 & 9.

Alternatively, the evidence in this case as to the paid claims was not disputed and is found in GX 1J and 1K. GX 1J concerns the amounts paid by the 93 health care programs for medical services, for which the defendants would have received the indicated payments. GX 1K concerns the amounts the pharmacies would have been paid for the controlled drugs, which were based on false and fraudulent claims the defendants caused to be submitted.

Using just the paid claims, which are far less than the submitted claims, the total loss to the programs is over $10 million, meriting a 20-level enhancement. Using the submitted or billed claims, the total intended loss is over $26 million, which would increase the enhancement to 22. Both of these amounts are conservative, given that they do not include the submitted or paid claims from 2007,[30] nor do they include the cash from patients, which was at least $3 million.[31]

As an alternative for the "services" side of the loss calculation, the following amounts are derived from the percentages of false claims from the valid random sample reviews (GX 1Q-2, 13, 14, 15, 16, 17), as summarized in Forfeiture Exhibit 1, attached to the government's forfeiture motion, Doc. 510:

---

[30] Due to the delay in the health care programs' ability to generate data for a billing year, the government chose to end its calculations in 2006, so that we could present the indictment to the Grand Jury in 2007.

[31] This amount was calculated from the bank records and the Clinic's internal financial records. Because Mr. Byers indicated at trial that the Atterbury's "hoard cash," and because the investigation revealed a great deal of cash transactions, not all of which could be traced through the bank or the financial records, this amount may be quite conservative.

- $1,384,167.03 in upcoded provider claims, not considering services provided;
- $1,474,648.59 in upcoded services, if the checklists on the progress notes are given value, and not considering provider; or
- $1,970,642.01 in upcoded services, if the checklists on the progress notes are not given any value, and not considering provider.

As further alternative methods of determining loss, the government submits that defendants' gross gain of over $6.9 million (*see* GX 47) or their net gain of over $1.4 million (*see* GX 46) could be used as conservative loss amounts, since these loss amounts only capture the income for 2002 through 2006, although the Clinic was open another year.

2.     **The defendants' sentences should be enhanced for victimizing more than 250 insurance companies and individuals, under U.S.S.G. § 2B1.1(b)(2)(C).**

There were 93 insurance programs billed, and thousands of patients billed for co-payments and cash for upcoded services, upcoded providers, falsely documented services, and undocumented services.  *See* GX 1J, 1P, 1Q, 1Q-1, 1Q-2, 7, 8, 9, 13, 14, 15, 16, 17.  The patients were defrauded just like the programs, as they were required to pay either cash in full for upcoded services or co-payments based on a percentage of the upcoded services.  Additionally, the defendants caused the programs to be billed for, and patients to pay for, illegitimate prescriptions.  *See* GX 1K, 1L, 10, 11, 12. Therefore, both the insurance programs and the individuals suffered pecuniary harm, making them all victims of the defendants' fraud.[32]

---

[32]  *See, e.g., United States v. Stokes*, 2010 WL 3245536 *5 (6th Cir. Aug. 16, 2010) (a victim is one who suffers pecuniary harm, and can include patients).

The commentary to § 2B1.1 defines "victim" to include "any person who sustained any part" of the "reasonably foreseeable pecuniary harm that results from the offense." This definition is broad enough to include patients who pay excessive co-payments and fees as a result of the fraud. Contrary to the defendant's claim, the definition of "victim" for the purposes of § 2B1.1(b)(2) is not tethered to the elements of any particular offense. If a person suffers reasonably foreseeable pecuniary harm as a result of an offense, he qualifies as a victim. It is reasonably foreseeable that patients will pay elevated co-payments and fees as a result of health care fraud, and therefore, patients who suffer such pecuniary harm are counted as victims of the fraud. In contrast to crimes that do not involve harm to any identifiable person, but only victimize "society at large," health care fraud involves harm to identifiable victims -- both health care benefit programs and patients suffer pecuniary loss as a result of healthcare fraud.[33]

There were 93 insurance programs billed, and well over 500 patients[34] billed for co-payments and cash for upcoded services, upcoded providers, falsely documented services, and undocumented services. *See* GX 1J, 1P, 1Q, 1Q-1, 1Q-2, 7, 8, 9, 13, 14, 15, 16, 17. The patients were defrauded just like the programs, as they were required to pay either cash in full for upcoded services or co-payments based on a percentage of

[33] *See id.* at n.3; *see also United States v. Moon*, 513 F.3d 527, 540-41 (6th Cir. 2008) (patients were vulnerable victims of defendant's health care fraud).

[34] The individuals named in GX 1, 1A, 1B, the individuals represented in GX 1D, the individuals named in the valid random sample review spreadsheets (GX 13, 14, 15, 16, 17), and the individuals related to Counts 10-12 account for well over 500 victims, in addition to the 93 insurance companies.

the upcoded services. Additionally, the defendants caused the programs to be billed for, and patients to pay for, illegitimate prescriptions. *See* GX 1K, 1L, 10, 11, 12. The defendants perpetrated their fraud against the individuals named in the indictment, identified in the exhibits, and who testified at trial, as well as all individuals to whom defendants failed to provide legitimate medical care. Therefore, patients were not only direct victims of the crimes charged, they fall within the "relevant conduct" provisions of §1B1.3.[35]

**3.     The defendants' sentences should be enhanced for employing sophisticated means, under U.S.S.G. § 2B1.1(b)(9)(C).**

This enhancement applies if the offense conduct was complex or intricate in execution or concealment. In viewing the defendants' conduct, the total scheme, not each step in the scheme, must be reviewed to determine if the conduct was sophisticated. "[E]ven if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together . . . [to] exploit different vulnerabilities in different systems in a coordinated way."[36]  Health care fraud cases

---

[35]  *See Moon*, 513 F.3d at 541.

[36]  *See United States v. Halloran*, 415 F.3d 940, 945 (8th Cir. 2005); *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003); *United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir. 1996); *United States v. Ratliff*, 2010 U.S. App. LEXIS 8600 (10th Cir. Apr. 26, 2010).

commonly have this enhancement applied in calculating the guidelines' sentence.[37]

The defendants went to great lengths to perpetrate and attempt to conceal their drug dispensing and fraud. The defendants acted in a sophisticated manner in at least the following ways:

(1) building their own medical Clinic for the purpose of dispensing drugs through the issuance of prescriptions for controlled substances;

(2) building their own medical Clinic for the purpose of being able to bill the programs in the fraudulent manner in which they did, with little scrutiny;

(3) operating the Clinic in a manner which assured that legitimate pain management medicine could not be practiced by anyone hired;

(4) falsifying numerous documents required to support the claims submitted to the health care programs;

(5) enlisting others to falsify documents;

(6) hiring unqualified people to staff the Clinic to assure their scheme would not be easily detected, or if detected, not reported because the individuals hired (such as many single mothers) had to stay employed for economic reasons or were threatened if they indicated a desire to report the illegal activities;

(7) exploiting the vulnerabilities of the patients, allowing the patients to drive the prescription practices to feed their addictions;

---

[37] *See, e.g., United States v. Martinez*, 588 F.3d 301 (6th Cir. 2009); *United States v. Wayland*, 549 F.3d 526 (7th Cir. 2008); *United States v. Perez*, 2010 WL 1407239 (11th Cir. Apr. 9, 2010); *United States v. Carrazana*, 362 Fed. Appx. 973 (11th Cir. 2010) (the conspiracy qualified as "sophisticated means"); *United States v. Hernandez*, 352 Fed. Appx. 319 (11th Cir. 1009); *United States v. Valdes*, 319 Fed. Appx. 810 (11th Cir. 2009); *United States v. Harris*, 308 Fed. Appx. 932 (6th Cir. 2009); *United States v. Triana*, 295 Fed. Appx. 1 (6th Cir. 2008); *United States v. Rosin*, 263 Fed. Appx. 16 (11th Cir. 2008); *United States v. Little*, 230 Fed. Appx. 701 (9th Cir. 2007).

(8)     exploiting the inherent vulnerability of the health care programs, a vulnerability which exists because the programs cannot check every claim and must rely on the honesty of medical providers to submit truthful and accurate claims;

(9)     making false statements and representations to the programs during audits to maintain their provider status;

(10)    making false statements and representations to third parties (including the medical examiner's office, the Emergency Room physicians, the state court, the Kansas Board of Healing Arts, the federal investigators) to conceal their scheme; and

(11)    laundering proceeds of their criminal activity through convoluted transactions for the purpose of hiding their illegal proceeds from the government or keeping these illegal proceeds out of the hands of the government.

The long-term success of the defendants' scheme also speaks to its

sophisticated nature.[38]

**4.     The defendants' sentences should be enhanced because their health care fraud involved the reckless risk of death and/or serious bodily injury, under U.S.S.G. § 2B1.1(b)(13).**

The expert testimony of Dr. Parran and Dr. Jorgensen regarding the numbers of

patients allegedly seen by the clinic on given days (which fueled the false claims)

established a reckless risk of death and serious injury to the patients.  Dr. Jorgensen

expressly testified that the health care fraud resulted in the deaths of Patricia, Eric, and

Robin, and the jury found that the health care fraud resulted in these three deaths.  As

the Court previously ruled:

[E]xtensive evidence was presented as to the health insurance fraud perpetrated by defendants at the clinic.

---

[38]  *See United States v. Rettenberger*, 344 F.3d 702, 709 (7th Cir. 2003) (careful execution and coordination over an extended period of time evidences sophisticated means).

There was also extensive testimony regarding the patient deaths as a result of the clinic practices. Therefore, the court finds that a reasonable jury could have determined that the illegal health care fraud resulted in the deaths of the three patients listed in counts 7 through 9.[39]

**5.    The defendants' sentences should be enhanced for victimizing a large number of vulnerable individuals.**

*See* explanation above.

**6.    The defendants' sentences should be enhanced for being organizers and leaders of extensive criminal activity.**

*See* explanation above. Additionally, fraud cases involving proceeds over

$250,000 are often considered "otherwise extensive."[40]

**7.    The defendants' sentences should be enhanced for abusing a position of trust, under U.S.S.G. § 3B1.3.**

Medical services providers like the defendants occupy positions of trust with

respect to private or public insurers within the meaning of § 3B1.3.[41]  Medical providers

enjoy significant discretion and a lack of supervision in determining the type and quality

of services that are necessary and appropriate. This forces the insurer to depend to a

---

[39]  Doc. 509 at p. 12.

[40]  *See, e.g., United States v. Morphew*, 909 F.2d 1143, 1145 (8th Cir. 1990); *United States v. Bennett*, 161 F.3d 171, 194 (3d Cir. 1998) (affirming that a multi-year, multi-million dollar fraud scheme involving one other criminally responsible participant and at least 13 innocent individuals was "otherwise extensive"); *United States v. Rose*, 20 F.3d 367, 374 (9th Cir. 1994) (affirming application of enhancement in fraud scheme involving $3 million, 60 unwitting employees, other outsiders, and scores of duped investors).

[41]  *See, e.g., United States v. Vivit*, 214 F.3d 908, 924 (7th Cir. 2000); *United States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir. 2000); *United States v. Ntshona*, 156 F.3d 318, 321 (2d Cir. 1998); *United States v. Iloani*, 143 F.3d 921, 923 (5th Cir. 1998); *United States v. Sherman*, 160 F.3d 967, 970-71 (3d Cir. 1998); *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997).

significant extent on a presumption of honesty when dealing with statements received from medical professionals. Multiple witnesses, including the defendants' own fraud expert, testified that the health care benefit programs depend on the honesty of the providers to submit truthful and accurate claims.

The defendants also occupied a position of trust with respect to the patients, to whom they owed a duty to provide honest medical services, and not to bill for upcoded services, upcoded providers, and illegitimate services.

**8.    The defendants' sentences should be enhanced for obstructing justice.**

*See* explanation above.

## C.    Relevant Conduct

Although the jury did not unanimously find that the defendants illegally dispensed drugs to all of the 18 individuals in Count 5, or that all of their deaths resulted from that illegal drug dispensing, the Court may consider the testimony and evidence concerning these individuals in sentencing the defendants. Specifically, Dr. Parran's testimony was that the defendants illegally dispensed drugs to all of these individuals, and that the illegally dispensed prescription drugs contributed to each of their deaths. *See* GX 159 (Dr. Parran's summary). Additionally, Dr. Jorgensen's review of these individuals' medical records revealed numerous instances of fraudulent billing. *See* GX 1Q, 1Q-1, and the Count 5 Time Lines.

Similarly, although the jury did not consider all 27 individuals in Count 6, but stopped deliberating on Count 6 once they had unanimously found that the defendants had illegally dispensed drugs to Patricia C (who happened to be the sister-in-law to

Patricia G, the subject of Counts 2 and 7), the Court may consider the testimony and evidence concerning these individuals as well. Again, Dr. Parran's testimony was that defendants illegally dispensed drugs to all of these individuals, three of whom were minors. *See* GX159. Additionally, Dr. Jorgensen reviewed some of these individuals' medical records, finding numerous instances of fraudulent billing. *See* GX 1Q, 1Q-1.

**D.    Reasons to Depart Upward**

There are at least three reasons for an upward departure in this case. First, the defendants' scheme resulted in numerous overdose deaths and overdose admissions to the hospital, warranting an upward departure under U.S.S.G. § 5K2.1 and/or § 5K2.2. *See* GX 1, 1A, 1A-1, 1B, 1C, 1D. Second, numerous people became addicted to the prescription medications and had to seek addiction treatment, and are continuing to need addiction treatment to this day, warranting an upward departure under U.S.S.G. § 5K2.2 and/or § 5K2.3. *See* GX 13K, 15H, 16L, 17E (charts of individuals seeking addiction treatment after being "pain management" patients at Schneider Medical Clinic). Third, the defendants' scheme negatively impacted the public's health and welfare, warranting an upward departure under U.S.S.G. § 5K2.14.

**E.    Reasons to not Depart Downward**

The defendants request downward departures, claiming that the guidelines overstate the seriousness of the offenses, that defendant Linda Schneider had a minimal role, and that under § 5K2.10(5), the victims' misconduct caused the crimes to occur because the victims were not truthful with the Clinic providers and did not take the controlled substances as prescribed.

The guidelines do not overstate the seriousness of the offenses, but take into account the fact that the defendants' crimes resulted in the deaths and serious bodily injuries of numerous individuals, as well as millions of dollars in losses. No facts take the case out of the heartland of the guidelines under which the calculations were made.

Defendant Linda Schneider did not have a minimal role in the criminal activity. She is not entitled to a reduction under § 3B1.2(a), nor is she entitled to a downward departure on this basis. As the Court previously held: "on the entirety of the evidence presented, the jury was entitled to conclude that Linda Schneider was the **chief architect** of defendants' criminal conduct."[42]  Additionally, the defendant committed some of her crimes while on probation for her first federal felony, making any role adjustment inappropriate.

U.S.S.G. § 5K2.10(5) is inapplicable in this case because it does not involve violent offenses. As the guideline indicates: "this provision usually would not be relevant in the context of non-violent offenses." The defendants cite to no case law in which this section has been applied in drug dispensing or health care fraud cases. Even if this guideline were applicable, the evidence clearly proved defendants' knowledge that the individuals to whom the Clinic was prescribing controlled substances were addicts, or became addicts, and were not taking the drugs as prescribed, given the frequency of the "early visits" documented, as well as the overdoses and deaths of which the defendants had repeated notice.

---

[42]  Doc. 509 at p. 12 (emphasis added).

The defendants' attempt to blame the victims for their crimes is further evidence supporting life sentences. The defendants have never expressed any remorse or taken any responsibility for their crimes, and continue to blame the victims, many of whom can no longer speak for themselves.

## III.    THE 28 U.S.C. § 3553 FACTORS

The government submits that the applicable § 3553 factors also dictate a life sentence for both defendants.

## A.    3553(1):  The nature and circumstances of the offense and the history and characteristics of the defendant

As detailed in the Indictment, the government's opening statement and closing argument, and as proved by the evidence, the nature and circumstances of the offenses warrant substantial sentences.  Because the defendant Stephen Schneider's history as a medical provider meant he should have been helping, rather than harming, his patients, and because numerous witnesses described his callous disregard and disinterest in the consequences of his and his wife's criminal activities, a substantial sentence is imperative.  The defendant Linda Schneider's history includes a prior felony conviction for fraud, and she was characterized by numerous witnesses as the person who operated the Clinic to maximize profit, without regard to the consequences.  One of the most telling of the jury's verdicts was that the defendants continued their course of conduct, without change, despite notice of the deadly consequences.  *See* Doc. 495 (conspiracy verdict form) at Overt Act 51(k).

The jury found that the defendants' conduct resulted in the serious bodily injury of 14 individuals, and the deaths of 10 of these same individuals.  If this were a serial

murder case, instead of a drug dispensing and health care fraud case, there would be no question that life sentences should be imposed. The Court should consider the dire consequences of the defendants' crimes, regardless of the types of crimes they committed.

**B.      3553(2)(A):  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

Given the horrendous consequences of the defendants' criminal activity, life sentences should be imposed to assure just punishment and promote respect for the law, especially within the medical community. Similar cases across the country, with fewer deaths involved, have resulted, appropriately, in life sentences.[43]

**C.      3553(2)(B):  The need for the sentence imposed to afford adequate deterrence to criminal conduct**

Life sentences will adequately deter medical professionals who wish to cut corners in their medical practices for the purpose of financial gain.

**D.      3553(2)(C):  The need for the sentence imposed to protect the public from further crimes of the defendant**

The defendants have shown no remorse, and have never acknowledged their illegal conduct. If the defendants had the ability to do so, they would petition to restore their medical and nursing licenses and re-open their Clinic. They have maintained throughout the proceedings that they did nothing wrong and none of the deaths or overdoses were the result of anything they did or failed to do, and that none of the false

---

[43] *See* footnote 1, *supra*.

billings were their fault.  Therefore, the defendants should be sentenced such that they can no longer have the ability to harm the public or the insurance programs.

**E.      3553(6):  The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

Similar cases across the country, with fewer and even no deaths involved, have resulted in life sentences.  *See* footnote 1, *supra*.

## IV.    FORFEITURE

The government has filed separate motions regarding forfeiture, Doc. 510, 511.

## V.     RESTITUTION

The government's intention is to seek restoration of any money received through forfeiture so that it can be used for paying restitution to the victims.  The government submits that the 93 insurance companies that paid for services (GX 1J), and the 28 insurance companies that paid for controlled substances (GX 1K) are victims and are owed restitution in either (1) the amounts requested in their submissions to the Probation Officer; (2) the amounts paid, as indicated on GX 1J and 1K (which are conservative amounts because 2007 is not included), or (3) a percentage of the amounts paid for services, as calculated from the valid random sample reviews (*see* GX 1Q-2, 13, 14, 15, 16, 17) and applied to all services, plus the amounts paid for controlled substances, as indicated in GX 1K.

Additionally, the individual victims in Counts 2 through 6 paid monies to the Clinic, and they and/or their families should be reimbursed.  Some of the amounts are

insignificant, but are nonetheless are as set forth in the Amended Presentence Reports at ¶ 88 (Steve Schneider's Report) and ¶ 89 (Linda Schneider's Report).

## VI.    FINES

Other than the mandatory assessments, the government does not recommend that fines be imposed.  The government submits that any money the defendants have, or will forfeit, should go to the victims.

## CONCLUSION

The extreme nature and consequences of the defendants' conduct warrant life sentences, restitution, forfeiture, and a repatriation order.

Respectfully submitted,

BARRY R. GRISSOM
United States Attorney

s/ Tanya J. Treadway

Tanya J. Treadway #13255
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2010, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system, which will send a notice of

electronic filing to the following individuals:

Lawrence W. Williamson, Jr.           Kevin P. Byers
218 Delaware, Suite 207               529 E. Town Street, Suite 200
Kansas City, MO   64105               Columbus, OH   43125-3456

Eugene V. Gorokhov                David Phillip Leon
1739 Clarendon Blvd.                1540 N. Broadway, Suite 101
Arlington, VA   22209               Wichita, KS   67214

s/   Tanya J. Treadway
Tanya J. Treadway #13255
Assistant United States Attorney