```
 1              (Beginning at 9:00 a.m. April

 2              27, 2010, the following

 3              proceedings continued.)

 4         THE COURT:  Good morning, everyone.  By way of

 5  introduction, this is Krystle Dalke, who is my other law

 6  clerk and she is going to sit in this morning because

 7  Rachael has an appointment.  Okay.  Robert, where are

 8  we?

 9         MR. MOODY:  The Defense may exercise their

10  sixth peremptory challenge.

11         MR. WILLIAMSON:  Your Honor, at this time the

12  defense would excuse Juror No-001.

13         MS. TREADWAY:  Judge, before Juror No-001 is

14  out of the building, may we approach the bench please.

15         THE COURT:  Pardon me.

16         MS. TREADWAY:  May we approach the bench,

17  please.

18         THE COURT:  What for?

19         MS. TREADWAY:  A *Batson* issue.

20         THE COURT:  We'll take it up later.

21         MR. MOODY:  Juror No-078.

22         THE COURT:  Good morning, sir.

23  A   (Juror No-078) Good morning.

24         THE COURT:  All right.  Have you had an

25  opportunity to go through the list of witnesses, Juror
```

```
 1    No-078?
 2    A   Yes, sir, I have.
 3              THE COURT:  Did you know anyone?
 4    A   No, sir.
 5              THE COURT:  And how about the people who were
 6    introduced yesterday?
 7    A   No, sir.
 8              THE COURT:  Will the schedule cause you a
 9    problem?
10    A   Not that I'm aware of.
11              THE COURT:  Good.  Would you tell us about
12    yourself, please.
13    A   My name's Juror No-078.  I live in Bellaire.  I work
14    for Carlson Products.  I'm a fabrication supervisor.
15    I've been married 27 years.  My wife's name is Judy.
16    She works for Wildlife and Parks.  We have one daughter,
17    stepdaughter, 33 years old, lives in Halstead.  She's
18    widowed.  Three grand-kids.  High school education, two
19    and a half years of college.
20              THE COURT:  Now, were you able to hear the
21    questions yesterday that were asked?
22    A   Yes, sir.
23              THE COURT:  And would you have responded to
24    any of those questions yesterday?
25    A   No, sir.
```

1        THE COURT:  All right, sir.  Let me glance

2   through your questionnaire real quickly.  You've heard

3   news reports, something about prescriptions.  You don't

4   have any opinion about the case.  You do have some

5   First-Aid and CPR.  You've heard my questions about

6   that.  Is that going to bear in any way on your ability

7   to be fair and impartial?

8   A   No, sir.

9        THE COURT:  You're a reserve police officer.

10  It says for two years.  Does that mean that you're

11  presently a reserve police officer?

12  A   No, sir.  That was 2002 to 2004.

13       THE COURT:  All right.  Anything about that --

14  you've heard all my questions, I don't want to go

15  through all of this again.  Anything about that that's

16  going to bear on your ability to be fair and impartial?

17  A   No, sir.

18       THE COURT:  If you get picked on the jury I'm

19  going to tell you a funny story about Bellaire and one

20  of the other judges here in the building.

21       Now, this indicates that you are a recovering

22  alcoholic but have been sober for 26 years.

23  A   Yes, sir.

24       THE COURT:  I'm not going to get into that in

25  any detail.  I'll let the lawyers, if they're concerned

1   about that.  I'm not.  Will it -- from your point of

2   view, though, will that have anything to do with your

3   ability to be fair and impartial?

4   A   No, sir.

5            THE COURT:  All right, sir.  Ms. Treadway.

6            MS. TREADWAY:  Thank you, Judge.  Good

7   morning, sir.

8   A   Good morning.

9            MS. TREADWAY:  Could you tell me a little bit

10  more about what you do.  I'm not familiar with what a

11  fabricator does.

12  A   Mostly just metal.  We deal with companies like

13  Excel that builds mowers.  Local companies mostly.  We

14  have two lasers, operate two lasers, betting (sic)

15  brakes, punch press.  It's strictly just metal.

16  Q   So that's a skilled area you work on?

17  A   Yes.

18  Q   How long have you been doing that?

19  A   Four years with this company.

20  Q   But you've been in the business for a long time?

21  A   Yes, ma'am.  I was at Koch Engineering for 18 years.

22  Q   With Koch Industries?

23  A   Koch Engineering, yes, in the same line of work.

24  Q   Well, I started my day yesterday as a teacher and

25  I'm going to ask you the same question.  When you filled

1    out that questionnaire, did you define the word "you" as

2    the judge wanted you to, very broadly to include your

3    family and your friends and your relatives?

4    A    Yes.

5    Q    Great.  In your position, do you supervise other

6    people at your work?

7    A    Yes, ma'am.

8    Q    How many people do you supervise?

9    A    About ten.

10   Q    Do you have the ability to hire and fire them as

11   well?

12   A    Yes.

13   Q    I believe I asked the panel yesterday about their

14   exposure to television shows.  Do you watch any of those

15   crime dramas or medical shows that would tend to

16   influence anything that you might hear in the case?

17   A    No, ma'am.

18   Q    Okay.  Good.  Now, you've had some experience with

19   addiction to alcohol.  And I appreciate your honesty on

20   the questionnaire about that.  Here we're going to talk

21   about some alcoholics as well as people that were

22   addicted to both illegal and prescription medications.

23   Will you be able to set aside your experience and listen

24   to their experiences and not judge them based on your

25   experience?

```
 1    A    Absolutely.
 2    Q    We don't mean that you have to erase everything from
 3    your mind.  Obviously, you bring your common sense into
 4    the courtroom.  But what we need you to do is treat each
 5    individual and the facts as they are and not go back in
 6    the jury room and say, well, I know this and they didn't
 7    say that.  That's what we're asking you to do.  Do you
 8    think you can do that, sir?
 9    A    Yes, ma'am.
10    Q    Great.  Do you believe that people that go to
11    doctors with addictions, no matter what the addiction
12    is, and if they share that with the doctor, the doctor
13    should do something about it to help them?  Are you
14    answering yes to that?
15    A    As far as helping them for what they need help for?
16    Q    Yes.
17    A    Yes.
18    Q    As well as their addiction?
19    A    Yes.
20    Q    And do you think it's a doctor's job to figure out
21    if someone's addicted?
22    A    I feel it's their job to help them if they feel they
23    are addicted, yes.
24    Q    Thank you.  Any of your family or close friends
25    suffering from terminal illnesses?
```

1    A    No, ma'am.

2    Q    And have you ever had to exercise medical judgment

3    for someone?

4    A    My mother was in a home for seven years.  She passed

5    away a little over two years ago.  I was the

6    power-of-attorney.  But it was in Nebraska and we had a

7    healthcare worker that pretty much informed me on what

8    to do and how to do it.

9    Q    And were you satisfied with that experience even

10   from a distance that you were able to make medical

11   judgments for your mom and that they were carried out?

12   A    Yes.

13   Q    Any experience with the healthcare industry,

14   Medicaid or Medicare programs?

15   A    Just through her.  And it was basically the

16   healthcare worker told me Plan B, that's what I went

17   with.  I still to this day don't understand it all but

18   that's what we did so --

19   Q    Any disputes with Medicare over your mom's

20   illnesses?

21   A    No, none.

22   Q    I notice that you didn't have any past jury

23   experience or litigation experience.  In other words,

24   you weren't involved in any lawsuits?

25   A    Oh, no, ma'am.

1    Q    And haven't served on a jury?

2    A    No.

3    Q    Serving on a jury is a real important duty.  Do you

4    have any questions in your mind at all sitting here

5    today that you would have trouble reaching a decision or

6    trouble making up your mind in this case?

7    A    No, ma'am.

8              MS. TREADWAY:  Nothing further, Judge.

9              THE COURT:  Pass for cause?

10             MS. TREADWAY:  Yes, sir.

11             THE COURT:  Mr. Williamson.  Good morning.

12             MR. WILLIAMSON:  Good morning, Your Honor.

13   Good morning everybody.  Lucky for you I just get to

14   talk to Juror No-078 this morning so -- Juror No-078,

15   how are you doing.

16   A    (Juror No-078)  Fine.  Thank you.

17   Q    Just a few questions for you.  I'm sure you heard me

18   ask a lot of these questions yesterday.  Are you

19   concerned that you would not be able to be fair in this

20   case because the Government has alleged that 68 patients

21   have died while under the care at the clinic?

22   A    No, sir.

23   Q    Would you still be able to look at the facts and

24   make a determination as to whether any federal law was

25   actually violated?

1    A    Yes, sir.

2    Q    Okay.  You were asked questions about by

3    Ms. Treadway in regards to a doctor's responsibility

4    with addiction.  Will you be able to look at this case

5    and distinguish between, as Judge Belot mentioned

6    yesterday, between whether or not any malpractice may or

7    may not have been committed and whether or not any

8    federal, established federal law had been violated?

9    A    Will I be able to tell the difference?

10   Q    Yes.

11   A    If the facts are presented, yes, sir.

12   Q    Okay.  And when you say if the facts are presented,

13   kind of tell me what you're thinking about?

14   A    Well, on what people -- the witnesses say.  I mean,

15   it's based on fact.  I mean, to be fair and impartial, I

16   want to hear the facts before I can make a decision.

17   Q    And you would also want to know what the law

18   actually says?

19   A    Absolutely.

20   Q    Because it wouldn't be fair to hold a citizen

21   accountable to a law that -- to something that is not

22   unlawful, that's not in the statute that says this is

23   unlawful?

24   A    That's correct.

25   Q    It's important for us as citizens to have notice to

1    know what is wrong under the law and what is right under

2    the law; correct?

3    A    Correct.

4    Q    What about the number of of charges here.  There are

5    a lot of people who believe that, well, because there

6    are so many charges, or because the clinic may have been

7    closed down, or the media reports, you know, because of

8    all of this stuff, you know, something wrong must have

9    happened.  And because there are so many charges, they,

10   they had to have done at least one of these.  How do you

11   feel about that?

12   A    Not necessarily.  It has to be beyond a reasonable

13   doubt.

14   Q    What made you become a reserve officer up in

15   Belaire?

16   A    My wife was the police clerk there for about seven

17   years.  We knew a lot of the officers there and I used

18   to ride with 'em and kind of help 'em out and finally

19   started the reserve program which they hadn't had in

20   years and asked me if I would like to be on it.  And I

21   just did it part-time but it was -- it was something I

22   kind of wanted to learn and find out what it was about.

23   Q    What was the biggest thing that you learned from

24   that experience?

25   A    I went through almost all of the training required

1    to be a police officer.  I was actually a patrol

2    officer.  I did go out.  I did make arrests.  I did

3    everything a patrol officer would do.

4    Q   And in part of the training did you learn the term

5    probable cause?

6    A   Yes, sir.

7    Q   And that's the standard necessary to make an arrest?

8    A   Yes, sir.

9    Q   And did you learn that the standard, as Judge Belot

10   has mentioned several times yesterday, that in this

11   court is beyond a reasonable doubt?

12   A   Yes.

13   Q   As an officer, would you have any trouble

14   distinguishing between those two burdens and saying,

15   look, this system only works when we ensure that the

16   Government meets its burden beyond a reasonable doubt?

17   A   Yes, sir.

18   Q   And lastly, you were asked, again, questions about

19   if a doctor feels like a person is addicted.  Do you

20   know how to determine whether or not a person is

21   addicted just by looking at them?

22   A   No, sir.

23   Q   And part of what you would need to do, at least as a

24   physician, is listen to the patient and trust that

25   they're telling the truth?

 1    A    Absolutely.

 2    Q    And if a patient tells you, hey, I'm addicted,

 3    Doctor, I need some help, you would expect that doctor

 4    to help; correct?

 5    A    Yes.

 6    Q    But if a patient lies and covers up their addiction,

 7    makes it mighty difficult for that doctor to do his job.

 8    Would you agree?

 9    A    Yes, I would.

10    Q    And, again, you can distinguish in this case between

11    whether or not we're talking about good doctor, bad

12    doctor or if we're talking about a drug dealer?

13    A    Yes, sir.

14              MR. WILLIAMSON:   Okay.  I have nothing

15    further.

16              THE COURT:   Thank you, Mr. Williamson.  Good

17    morning, Mr. Byers.

18              MR. BYERS:   Morning, Your Honor.  Thank you.

19    Q    Good morning, Juror No-078.

20    A    Good morning.

21    Q    Just one question.  You mentioned making arrests as

22    a reserve officer.  I assume some of those arrests led

23    to incarceration for those people?

24    A    Most of the arrests -- I did warrants with another

25    officer so --

251

1    Q    So you were taking people into custody?

2    A    Yes.  I was taking them in custody, taking them to

3    jail.  And that was as far as it went.

4    Q    Okay.  With that experience, would it somehow cause

5    you difficulty presuming innocence for both Steve and

6    Linda Schneider if you learned that they were

7    incarcerated for a substantial amount of time before

8    they were even put to trial?

9    A    No, sir.

10             MR. BYERS:  Okay.  Thank you.  Pass for cause,

11   Your Honor.

12             MR. MOODY:  Government may exercise their

13   fourth peremptory challenge.

14             MS. TREADWAY:  Judge, we would waive as to

15   this panel.

16             THE COURT:  Thank you, Ms. Treadway.

17             MR. MOODY:  Defense may exercise their seventh

18   peremptory challenge.

19             MR. WILLIAMSON:  Judge, may we have a moment

20   to confer with our clients?

21             THE COURT:  You may, sir.

22                     (Off-the-record)

23             MR. WILLIAMSON:  Your Honor, the Defense

24   waives peremptory to this panel.

25             THE COURT:  I'm sorry.

1           MR. WILLIAMSON:  We waive our peremptory to

2    this panel.

3           THE COURT:  All right.  Call an alternate

4    please.  First alternate.

5           MR. MOODY:  Juror No-082.

6           THE COURT:  Morning, Juror No-082.

7    A   (Juror No-082) Good morning.

8           THE COURT:  We're going to pass you the

9    microphone.  Do you remember what I said yesterday about

10   being an alternate juror?

11   A   Yes, I do.

12          THE COURT:  Will that -- are you available for

13   the trial?  Will the schedule cause you any problems?

14   A   I might tell you, Judge, that since I filled out my

15   questionnaire, I've had a change of heart.  And I, in

16   all honesty, I cannot tell you that I am not biased and

17   impartial.  I wish I could.  But I feel in my heart I

18   cannot.

19          THE COURT:  All right.  Any objection if I

20   excuse Juror No-082, Counsel?

21          MR. WILLIAMSON:  Not from the Defense, Your

22   Honor.

23          MS. TREADWAY:  No, Judge.

24          THE COURT:  Thank you, Juror No-082.  Thank

25   you for your honesty.  Call another alternate please.

 1              MR. MOODY:   Juror No-088.

 2              THE COURT:   Ma'am, how do you pronounce your

 3    name?

 4    A    Last name is Juror No-088.

 5              THE COURT:   Juror No-088.  All right.  How

 6    about being an alternate.  You heard my explanation

 7    yesterday.  You're just as important as everybody else.

 8    But I am always concerned that an alternate might feel

 9    like they were not as important.  Does that cause you

10    any problem to be an alternate juror?

11    A    No, sir.

12              THE COURT:   Does the schedule cause you any

13    problem?

14    A    It could.

15              THE COURT:   How is that?

16    A    Since I filled out the survey, in 2006 I was

17    diagnosed with a chronic form of leukemia.

18              THE COURT:   Yes, ma'am.

19    A    Which does not effect my daily life except last week

20    I was told that I should increase the daily oral

21    chemo-therapy that I take, and sometimes when I do that,

22    my white cell count goes down and I'm susceptible to

23    infection.

24              THE COURT:   Under those circumstances, would

25    you rather not be an alternate?

1    A    I think perhaps if everybody could guarantee not

2    being ill around me, I'd be fine, but if I --

3              THE COURT:   There is no way that any of us

4    would want to jeopardize your health.

5    A    Well, I apologize for --

6              THE COURT:   You need not apologize.   That is

7    perfectly all right.   Thank you.   And I hope

8    everything's okay.

9    A    Thank you.

10             MR. MOODY:   Juror No-090.

11             THE COURT:   Juror No-090, I see your note

12   here.   I can be available for ten weeks beginning in

13   April.   If this case were to last longer than ten weeks,

14   I could not be there.   I'm in my sister's wedding in

15   Florida.   And then you're also pregnant.

16   Congratulations.

17   A    Thank you.

18             THE COURT:   If you were on the jury, you and

19   Rachael would have something to talk about.

20   A    I thought I noticed that but --

21             THE COURT:   Well, I certainly would not want

22   to place any stress upon you because of your pregnancy.

23   I am very hopeful that we can finish this case certainly

24   in that period of time.   Any objection if I excuse Juror

25   No-090?

255

```
 1              MS. TREADWAY:  No, Judge.

 2              MR. WILLIAMSON:  No, Your Honor.

 3              THE COURT:  All right.  Thank you very much.

 4    Good luck with your baby.

 5    A    Thank you.

 6              THE COURT:  Is this your first baby?

 7    A    Third.

 8              THE COURT:  Third.  You're an old pro.  This

 9    is Rachael's fourth, so --

10              MR. MOODY:  Juror No-091.

11              THE COURT:  Morning, Juror No-091.

12    A    (Juror No-091) Good morning.

13              THE COURT:  Were you -- will this cause you a

14    problem to be an alternate juror here for the duration

15    of the trial?

16    A    Only in two instances.  I have a scheduling conflict

17    in May.  I'm scheduled to deliver a presentation to

18    about 115 people regarding a software package we're

19    rolling out.  And one of the doctors on the list is my

20    personal physician.  And I don't know if he is being

21    called as a material witness or if he is being called as

22    an expert; but if he is being called as an expert, I'm

23    not sure that I want to jeopardize my personal

24    relationship with my physician by having the prosecution

25    perhaps discredit his credibility.
```

1          THE COURT:  Well, I don't know -- if he's a

2     true professional, I don't think that he would hold that

3     against you in any way.

4     A    No.  No.  But it's -- right now I have my full faith

5     and confidence in him and I don't want that jeopardized.

6          THE COURT:  So what you're saying is you would

7     believe him no matter what?

8     A    Probably so.

9          THE COURT:  All right.  Thank you.  I'll

10    excuse you, sir.

11    A    Thank you.

12         THE COURT:  We've still got plenty of jurors

13    here.  I'm sure you all wanted to hear that, didn't you.

14         MR. MOODY:  Juror No-097.

15         THE COURT:  Good morning, Juror No-097.

16    A    (Juror No-097)  Good morning, sir.

17         THE COURT:  Will the schedule cause you any

18    problems?

19    A    No.

20         THE COURT:  Hallelujah.  Did you have an

21    opportunity to look through the list of potential

22    witnesses yesterday?

23    A    I did.  I don't recognize anyone.

24         THE COURT:  And how about the people that were

25    introduced here?

1    A    No, sir.

2              THE COURT:  And the questions that were asked,

3    would you have responded to any of them?

4    A    No.

5              THE COURT:  Tell us about yourself if you

6    will.

7    A    I'm Juror No-097.  I live here in Wichita.  I am a

8    music teacher in the Catholic Diocese.  I'm not married.

9    I have a Bachelor's Degree in Music Education and a

10   Master's in Church Music.  Have no children.  And that's

11   me.

12             THE COURT:  All right, sir.  I'm going to look

13   very quickly at your questionnaire.  You've seen brief

14   reports on TV.  You say in the answer to 17:  Profit

15   margins in medicine seem to have grown too important.

16   Can you tell me what you mean by that.  That doctors

17   make too much money?

18   A    I think that's also a reflection on society at

19   large.  Sometimes the bottom line tends to be a little

20   bit more important in almost any industry.

21             THE COURT:  Well, of course, presumably,

22   because of the charges -- the lawyers haven't talked

23   much about the money laundering charges, but you'll

24   recall that that's one of the charges in the case, that

25   monies were being diverted.  Now, I don't know what the

1    evidence is going to be about that, but if the evidence

2    would be -- and I'll let the lawyers talk about this

3    because they know more about it than I do -- but if the

4    evidence would be that monies were being -- that the

5    Defendants were being enriched somehow with monies,

6    would you hold that -- would that influence your

7    thinking in terms of being fair and impartial?  I

8    apologize for stumbling around, but I don't know what

9    the evidence is on that.

10   A   Sure.  Sure.  It might shape it a little, yes.

11           THE COURT:  Well, how do you think it would?

12   A   I'm sure -- already in the back of my mind I'm

13   thinking how much did the possibility of financial

14   profit weigh upon an individual's decision.

15           THE COURT:  Okay.  I think what I'm going to

16   do, I'm going to let the lawyers question you about that

17   because they know more about that aspect of the case.  I

18   don't see any other -- but with that possible exception,

19   can you think of any reason why you can't be a fair and

20   impartial juror in the case?

21   A   No, sir.

22           THE COURT:  All right.  Ms. Treadway.

23           MS. TREADWAY:  Thank you, Judge.  Juror

24   No-097.

25   A   Yes, sir.

1    Q    From your first name and your cadence, Irish?

2    A    No.  No.  Usually the game that I have with my

3    students is if they can guess which country or where I

4    was born, they get a prize.

5    Q    I guess I didn't get the prize.

6    A    I was born here in Wichita, Kansas.  I'm Danish.

7    Q    You're Danish.  My husband is Danish.  And I didn't

8    catch it.  Isn't that terrible.  Well, I apologize for

9    calling you Irish?

10   A    We're all a little bit Irish, aren't we?

11   Q    Well, you have a lovely lovely cadence to your

12   voice.  So I like-- I'll get right to the Judge's

13   question.  The evidence in this case is going to be that

14   profit was important to the decisions in this case; that

15   profit was a deciding factor in how people were treated

16   at the Schneider Medical Clinic; and there was a lot of

17   profit at the Schneider Medical Clinic.  Is that going

18   to make it difficult for you, sir, to sit as an

19   impartial juror in this case?

20   A    I would say throughout the trial that would be a

21   lingering throught within my mind.

22   Q    And that's a fair comment.  Especially given your

23   comment on the questionnaire.  Any way that you can put

24   that out of your mind and listen to the evidence and

25   fairly decide the case on the evidence and not your

 1   feelings about this profit issue, generally speaking?

 2   A   I could not guarantee that throughout the case I

 3   would not always go back, but what about this, or what

 4   about that.

 5           MS. TREADWAY:  I understand.  Judge --

 6           THE COURT:  Mr. Williamson.

 7           MR. WILLIAMSON:  What was Ms. Treadway's

 8   statement?  Did she pass -- did she pass for cause or --

 9           MS. TREADWAY:  I didn't pass for cause.  I'm

10   going to allow them to ask some more questions, Judge.

11           THE COURT:  You all need to speak up.  This

12   courtroom is so big I can't hear you very well.

13           MR. WILLIAMSON:  I'll try to use the

14   microphone, Your Honor.

15   BY MR. WILLIAMSON:

16   Q   How you doing this morning?

17   A   I'm fine.  Thank you.

18   Q   We're going to be giving opening statements shortly

19   so I'm not going to give you one now, but the Government

20   said what the evidence is going to be.  That's not going

21   to be the evidence.  So what I want to talk to you about

22   is just some of your feelings.  Being a doctor is also,

23   you would agree, is also a business.  Being a clinic is

24   a business as well.  Correct?

25   A   Correct.

261

1    Q    Okay.  And I really think I understand where you're

2    coming from and probably share several of your views.

3    That as a physician, they have the patient care aspect

4    they really have to worry about, but then they have I

5    have to make a living that they have to worry about as

6    well.

7    A    Correct.

8    Q    How do you feel that dichotomy plays out in

9    today's -- in America's medical system?

10   A    I have to say, oftentimes when I look at the amount

11   that are charged for certain items, I have to sit back

12   and go, how much is enough profit wise.

13   Q    And are you familiar with Medicaid at all?

14   A    Just in the news.

15   Q    Are you familiar at all with the fact that Medicaid

16   normally pays like 20 cents on a dollar of what a person

17   may actually be billed?

18   A    Yes.

19   Q    And would you agree that people who agree to take on

20   that type of patient where you make only 20 cents on the

21   dollar, that doesn't seem to be that you're trying to

22   get the biggest buck out there.  Would you agree with

23   that?

24   A    In regards to Medicaid, yes.

25   Q    And a lot of doctors -- are you aware that a lot of

262

1    doctors don't take Medicaid patients because of that?

2    A    Uh-huh, yes.

3    Q    That slim profit margin?  That profit margin?

4    A    I'm sorry, yes.

5    Q    Hearing that, if that's going to be the evidence in

6    the case, how would you be -- how would you take your

7    personal view of the American medical system and apply

8    it to the facts?  Would you still be able to be fair and

9    impartial?  Or because any money was made at the clinic,

10   you know, you just can't do it?

11   A    I guess my personal opinion would be, yes, an

12   establishment would have to make up the difference

13   between the Medicaid but not to abuse the profit margin.

14   Q    Clarify the "not to abuse the profit margin" for me.

15   A    If they have to make up the 80%, they make up the

16   80% by going for 150% or 120% profit to make up for

17   that.

18   Q    So meaning like they up their charges up to 150% of

19   what they normally would charge so Medicaid would bump

20   up the amount they pay?

21   A    I'm not that familiar -- I'm just looking if they're

22   only making 20% of what they -- or only making 20%, so

23   they have to make up that 80%.  Then if they're going to

24   charge that 80%, are they bumping it up to get even

25   more.

263

1    Q   I see what you mean.  So basically, again, sometimes

2    what retailers do to us.  They say we mark it down 30%

3    but they bump their price up 40% so we still wind up

4    paying more than what we would have?

5    A   Exactly.

6    Q   Okay.  And I guess my -- just what about the number

7    of deaths that the Government alleges.  Would that cause

8    you to be less able to listen to the full facts of each

9    element in this case?

10   A   No, sir.

11   Q   What about the number of charges?  That simply

12   because the Government has charged a lot that they must

13   be guilty of something?

14   A   No, sir.

15   Q   And in regards to this profit, if you see that the

16   clinic made any profit at all, are you just gonna say,

17   well, because they made some money, I really can't be

18   fair in this case?

19   A   No.  Profit is part of having a business.

20             MR. WILLIAMSON:  I don't have anything

21   further, Your Honor.

22             THE COURT:  Thank you, sir.  Mr. Byers.

23             MR. BYERS:  Thank you, Your Honor.  Good

24   morning, Juror No-097.

25   A   Good morning.

1   Q   Couple questions I want to follow up on.  It sounds

2   like you've drawn some sort of natural conclusions from

3   the discussion you just had with Lawrence about billing.

4   If they're only making 20 cents on a dollar then they

5   have to make that up somewhere else.  Now this, this is

6   sort of another kind of a drawing conclusions kind of a

7   question.  If you heard at trial that Linda Schneider

8   was incarcerated for over a year before she got to

9   trial, would you be inclined to naturally conclude there

10  had to be a legitimate reason for her to be in jail,

11  otherwise -- in other words, she was a criminal?

12  A   No.

13  Q   That wouldn't be a natural conclusion for you?

14  A   No.

15  Q   Okay.  And if you heard that essentially all their

16  property was seized and or locked up by the Government

17  before trial, would that lead you to conclude that she

18  must have been involved in criminal activity?

19  A   No.

20  Q   Okay.  If at trial you hear people who are not

21  respectful, particularly, of Linda Atterbury, they don't

22  like her, they think she was -- they just want to drag

23  her through the mud, would that make you conclude that

24  she -- she must therefore be a criminal?

25  A   No.  It would be their opinion.

```
 1    Q    I'm sorry?

 2    A    It would be their opinion.  Simply that.

 3              MR. BYERS:  Thank you.

 4              THE COURT:  Pass for cause?

 5              MS. TREADWAY:  Government does, Judge.

 6                     (Off-the-record discussion

 7                     between defense counsel)

 8              MR. BYERS:  Pass for cause, Your Honor.

 9              THE COURT:  All right.

10              MR. MOODY:  Government may exercise their

11    peremptory challenge as to the alternate.

12              MS. TREADWAY:  We'll waive.

13              MR. MOODY:  And the Defendants.

14              MR. BYERS:  Your Honor, Defense would move to

15    excuse Juror No-097.

16              THE COURT:  All right.  Thank you, Juror

17    No-097.  Are you aware, Juror No-097, that your first

18    name -- that one of the most famous physicians in

19    history is Juror No-097?

20    A    Uh-huh, I was.

21              THE COURT:  Thank you very much, sir.

22    A    Thank you.

23              THE COURT:  Appreciate your answers.

24              MR. MOODY:  Juror No-102.

25              THE COURT:  Good morning, Juror No-102.
```

```
 1   A    (Juror No-102) Good morning, sir.
 2              THE COURT:  Were you able to look through
 3   the -- well, let me cut to the chase here since we're on
 4   alternates.  Based on the answers that you gave in your
 5   questionnaire, it wouldn't look like you could probably
 6   be a fair and impartial juror.  Would you agree with
 7   that?
 8   A    No, sir.
 9              THE COURT:  All right, sir.  Then we'll --
10   I'll cover it with you.  Maybe I misread these.  Have
11   you had an opportunity to review the names of the
12   potential witnesses?
13   A    Yes, sir.
14              THE COURT:  Did you know any of them?
15   A    No, sir.
16              THE COURT:  Did you know any of the folks who
17   have been introduced?
18   A    No, sir.
19              THE COURT:  And would you have answered any of
20   the questions yesterday that were asked yesterday and
21   today now?
22   A    No, sir.
23              THE COURT:  All right, sir.  Tell us about
24   yourself, if you will.
25   A    I'm a resident of the City of Mulvane.  I'm a
```

1   retired inspection supervisor for Boeing Company.  I've

2   been married for 20 years.  My wife is retired aircraft

3   worker.  Education, I've got two years tech school and

4   some college.  We've got a mixed group of kids.  I've

5   got a 42 year old stepdaughter who works for a

6   housekeeping outfit in Wichita.  I've got a 40 year old

7   stepson who's a practicing attorney in Wichita--

8            THE COURT:  What's his name?

9   A   Ark City and Wellington.

10           THE COURT:  What's his name?

11  A   Matt Wilson.

12           THE COURT:  I don't think I know him but

13  that's all right.

14  A   Okay.  My son is a psychologist at the University of

15  Georgia in Atlanta.  The younger son, stepson, is a

16  Sergeant in the United States Army and he is a combat

17  medic with the U.S. 7th.  That's it.

18           THE COURT:  All right, sir.  I neglected to

19  ask you:  Is it going to be a problem for you to serve

20  as a alternate here?

21  A   No, sir.  Just missing some fishing days, that's

22  all.

23           THE COURT:  Some what?

24  A   Fishing.

25           THE COURT:  Oh, fishing.  Well, now, here's

1    what concerns me.  I mean, you remember your answers so

2    you -- in answer to question number 5 you say, yes, you

3    believe that Stephen Schneider is guilty, used his

4    patients' conditions to better himself and in some

5    cases, and in some cases and theirs.  And you say with

6    respect to Linda Schneider:  She's guilty, knew of, and

7    did nothing to stop the doctor, enjoyed the riches of

8    what they did.  Have you changed your views about that

9    at this point?

10   A   No, sir.

11           THE COURT:  Well, I don't see how you could

12   possibly be a fair and impartial juror to be honest with

13   you.

14   A   No, sir, I really couldn't.

15           THE COURT:  I don't think so.  Thank you very

16   much.  I'll excuse you.

17   A   Thank you.

18           MR. MOODY:  Juror No-106.

19           THE COURT:  Good morning, Juror No-106.

20   A   (Juror No-106) How are you doing?

21           THE COURT:  So far okay.  Will the schedule

22   cause you problems in any way?

23   A   No.

24           THE COURT:  Have you had an opportunity to

25   look over the witness list?

```
 1    A    Yes.
 2              THE COURT:  Did you recognize anybody?
 3    A    Yeah.  The only one is Dr. Joseph Galichia.  My
 4    heart doctor works under him.
 5              THE COURT:  His clinic?
 6    A    Yeah.  But he looked at me once when my other doctor
 7    wasn't able to.  And then only other time I've seen him
 8    is, you know, in the building various times.
 9              THE COURT:  Well, I don't know, but if he
10    testifies, is that going to --
11    A    No.
12              THE COURT:  Are you going to assume that
13    anything he says must be the absolute truth or the
14    opposite, or can you judge his credibility?
15    A    Yeah, I don't know him, you know, that well other
16    than --
17              THE COURT:  Okay.  That's what I figured.  All
18    right.  And how about the parties and the lawyers who
19    were introduced, did you know any of them?
20    A    No, Your Honor.
21              THE COURT:  And what about the questions that
22    were asked yesterday.  Would you have -- and today I
23    guess.  Would you have responded to any of those?
24    A    No.
25              THE COURT:  All right.  Well, tell us a little
```

```
 1    bit more about yourself, if you will.
 2    A    I work for Butler County College.  I do maintenance
 3    and repair equipment.  I have a daughter that is 39.
 4    She works at the college.  I have a son that is 37.  He
 5    works for the turnpike.  And I have a son that is 34, he
 6    works for Spirit.
 7              THE COURT:  Well, I've looked through your
 8    questionnaire.  You answered yes that you served on a
 9    jury in Butler County a year ago.
10    A    Yeah.
11              THE COURT:  Do you remember what kind of case
12    it was now?  Was the state charging somebody with a
13    crime?
14    A    No.  It wasn't state.  It was the county.
15              THE COURT:  County.
16    A    Prosecuting a subject.
17              THE COURT:  You said that there was no
18    verdict.  Did the jury -- was the jury able --
19    A    There was ten of us that went one way, and two of us
20    went the other way and we put about another 16 hours
21    into it and it --
22              THE COURT:  Well, that's what I meant
23    yesterday when I said that in a criminal case unanimous
24    verdicts are required.  But let me ask you this.  I
25    assume that there was a lot of discussion back and forth
```

1   among the jurors about what ought to be done?

2   A    Yes.

3             THE COURT:  Did you develop any bad feelings

4   about the jury system --

5   A    No.

6             THE COURT:  -- as a result of that?

7   A    No.  I, you know, the ones that believed one way or

8   the other, I, you know, I didn't.  It was a choice.

9   You've got to do what you, you know, stay which way you

10  feel.

11            THE COURT:  That's right.  And that's what I

12  meant when I said people have to -- when you function as

13  a jury, there's the jurors and the jury, and the jurors

14  have to make individual decisions and have to be willing

15  to change, but they don't have to if they think they're

16  right because the jury has to reach an unanimous

17  verdict.  No problem for you?

18  A    No.

19            THE COURT:  And you're the nightmare of all

20  the news media.  You haven't heard anything about this

21  case.

22  A    Well, I didn't know the case was that, you know, I

23  have heard; but it's been so long ago I can't remember

24  any particulars.

25            THE COURT:  Well, nothing about that's going

1      to effect you obviously?

2      A    No.  No.

3               THE COURT:  All right.  Can you think of any

4      reason why you can't be a fair and impartial alternate

5      juror?

6      A    No, I don't.

7               THE COURT:  All right, sir.  Ms. Treadway.

8               MS. TREADWAY:  Thank you, Judge.  Good

9      morning, Juror No-106.

10     A    How are you doing?

11     Q    Good.  Thank you.  What kind of case was it in

12     Butler County that you were working on a jury?

13     A    Indecent liberty with a child.

14     Q    Was one of the witnesses in the case the child?

15     A    Pardon.

16     Q    Was one of the witnesses in the case the child?

17     A    Yes.

18     Q    Now, you -- you have what I consider an unusual

19     name.  I've never heard that before.  And do you know an

20     Allen W G-------?

21     A    Yes.  He's a cousin.

22     Q    He's a cousin.  Did you know that he was a patient

23     at the clinic, the Schneider Medical Clinic?

24     A    No, I did not.

25     Q    All right.  So you've never talked to him about

```
 1    being a patient there?

 2    A    No.

 3    Q    All right.  When you answered the questionnaire did

 4    you use that "you" to be a broad you?

 5    A    Yes.

 6    Q    Great.  Now, in the position -- you said that you

 7    are currently working or retired?

 8    A    Well, I'm down to one job.  I worked two jobs for 19

 9    years, so I just strictly work at the college now.  I

10    did maintenance for 375 for 23 years.

11    Q    All right.  So you worked with the public school and

12    the college?

13    A    Right.

14    Q    And now you're just at the college?

15    A    Right.

16    Q    Okay.  And when you say maintenance and repair, I

17    take it you're another renaissance man like Juror

18    No-975, you do a little bit of everything?

19    A    Yeah.  Air conditioning, stuff in the buildings.

20    Q    Do you supervise anybody in your position?

21    A    No.

22    Q    Have you had any experience with terminal illnesses

23    in your family or anybody that you had to take care of

24    for a long period of time?

25    A    No.
```

```
 1    Q    All right.  Never had to exercise medical judgment
 2    on behalf of a family member?
 3    A    No, uh-huh.
 4    Q    Do you have any experience in your family or with
 5    your friends with addiction?
 6    A    With a physician?
 7    Q    No.  With your friends or your family with
 8    addiction?
 9    A    Oh, no.
10    Q    No addiction.  Great.  Any experience with the
11    Medicare or the Medicaid program?
12    A    No, I don't.  I'm not that old quite yet.
13    Q    Not yet.  Or with a parent or anything like that?
14    A    Right.
15    Q    Okay.  And any of your family involved with the
16    pharmaceutical industry in any way?
17    A    No.
18    Q    You ever filed a worker's compensation claim?
19    A    No.
20    Q    Is there anything about juror duty that causes you
21    any concern?  Do you believe that serving on this jury
22    and if you were called to serve in the jury panel if
23    someone were sick or unable to serve, would you be able
24    to step in and make the decisions that need to be made
25    in this case?
```

1    A    I believe so.

2    Q    You have no hesitation at all?

3    A    No.

4    Q    One of the things about this case is that some of

5    the victims in this case are health care programs,

6    Medicare, Medicaid, Blue Cross/Blue Shield.  Does the

7    fact that the victim is a program rather than a live

8    human being, does that make you think, hmm, maybe that's

9    not so important?

10   A    No.  I think it would all be important.

11   Q    Okay.  Do you hold doctors on a pedestal such that

12   you think doctors are not capable of committing criminal

13   activity?

14   A    No, I don't.  I mean, through my experience like

15   that, I've had doctors that I've liked and I've had

16   doctors I haven't liked, you know; but, I mean, they're

17   only human.

18              MS. TREADWAY:  Pass for cause, Judge.

19              THE COURT:  Mr. Williamson.

20   BY MR. WILLIAMSON:

21   Q    How you doing, Juror No-106?

22   A    Fine.

23   Q    Few questions.  I may ask you a couple that I

24   haven't asked anybody else.  But they can answer at the

25   end about what their answer would be.  On your

1    questionnaire you mentioned that you hadn't seen
2    anything in the media and then, when you realized what
3    the case really was, you remembered hearing something
4    about it.  Am I -- did I get that right?
5    A    Yeah.  I mean, I didn't realize until I got, you
6    know, when they sent the name out for the questionnaire,
7    it didn't fall in place until there.
8    Q    Okay.  Have you been surprised as to how many
9    regular every day people make up their mind as to a
10   person's innocence or guilt just based on media reports?
11   Has that surprised you?
12   A    No.  Because people that I deal with, you know, they
13   get mean pretty easily.  But what you see on the news is
14   very one-sided in a lot of cases.  I mean, they want to
15   listen to the news, they're not wanting to really get to
16   the facts.
17   Q    And you're aware in this case the United States
18   actually gave a press release at the charging of this
19   case.  Are you aware of that?
20   A    No.
21   Q    Okay.  And without the Schneiders-- ever a shred of
22   evidence being given so far, multiple people have had to
23   excuse themselves because of the one-sided press given
24   in this case.  When you hear all of this, these people
25   come up and down, does that effect your ability to say,

1   you know what, they may have believed what the media

2   said, but I want to hear what the actual facts in this

3   case are?

4   A   Actual facts, yeah.  I mean, honestly, I can tell

5   you I have no opinion right now either way.

6   Q   Okay.  Our justice system would come to a crumbling

7   halt if people made guilty decisions all the time based

8   on what the media said.  Would you agree with that?

9   A   Yes.

10   Q   Okay.  What about the number of charges in this

11   case.  Would that concern you?

12   A   No, that wouldn't concern me.

13   Q   You can sit back and you can evaluate each and every

14   individual charge?

15   A   Yes.

16   Q   Okay.  And what about the number of individuals --

17   aside from -- setting aside, you know, whether or not

18   Dr. Schneider even saw the people, or causation, setting

19   all the factual issues aside, just the fact that there

20   are 68 individuals that passed away.  Would that in

21   itself make you -- cause you some hesitation to want to

22   hear the rest of the facts in this case?

23   A   No.

24           MR. WILLIAMSON:  I don't have anything

25   further, Your Honor.

1          THE COURT:  Pass for cause?

2          MR. WILLIAMSON:  Pass for cause.

3          MR. BYERS:  Hi, Juror No-106.  Just a couple

4    brief questions.  Do you recall hearing me ask Juror

5    No-097 who preceded you in that seat about the effect of

6    hearing about incarceration for the Schneiders?  Do you

7    remember me asking about that?

8    A    Yes.

9    Q    Would that impact you at all if you happened to hear

10   that they were incarcerated before trial?

11   A    No.

12   Q    For substantial periods of time?

13   A    Yeah.  It, I mean, that makes no opinion to me

14   whether they're guilty or not guilty.  I would have to

15   hear the facts.

16   Q    Does that hold for the same if you hear that their

17   property was seized by the Government before they were

18   ever put on trial?

19   A    Yes.

20   Q    What about if you hear bad things particularly about

21   Linda Schneider, that maybe people under her, you know,

22   that she was supervising, didn't care for her

23   personally?  Is that going to make you think that, well,

24   maybe she is indeed a criminal?  Maybe she has done

25   things that are unlawful?

1   A   No.  I've got people out at the college that likes

2   me, and some that dislikes me, you know.

3   Q   We probably all have those people --

4   A   That's their opinion.

5   Q   -- right?

6           MR. BYERS:  Okay.  Thank you.  Pass for cause,

7   Your Honor.

8           MR. MOODY:  Government may exercise their

9   peremptory challenge as to the alternate.

10          MS. TREADWAY:  May I confer, please.

11                  (Off-the-record discussion)

12          MS. TREADWAY:  We waive, Judge.

13          MR. MOODY:   Mr. Byers may exercise a

14  peremptory challenge as to the alternate.

15          MR. BYERS:  We waive, Your Honor.

16          THE COURT:  Call a second alternate please.

17          MR. MOODY:  Juror No-111.

18          THE COURT:  Morning, Juror No-111.

19  A   (Juror No-111)  Good morning, Your Honor.

20          THE COURT:  Juror No-111, I've read your

21  questionnaire, and without going into specific

22  responses, do you feel you could be a fair and impartial

23  juror in this case?

24  A   In considering my husband's past relationship with

25  the Defendant, no, I do not.

```
 1              THE COURT:  All right.  Anyone object if I
 2   excuse Juror No-111?
 3              MS. TREADWAY:  No, Judge.
 4              MR. WILLIAMSON:  No, Your Honor.
 5              MR. BYERS:  No, sir.
 6              THE COURT:  All right.  Thank you, Juror
 7   No-111.
 8              MR. MOODY:  Juror No-113.
 9              THE COURT:  Good morning, Juror N0-113.
10   A   (Juror No-113)  Good morning.
11              THE COURT:  Will it cause you a problem to be
12   an alternate juror in this case?
13   A   No.
14              THE COURT:  Good.  Have you had an opportunity
15   to read over the potential witness list?
16   A   Yes.  I had one acquaintance from 30 years ago.
17              THE COURT:  Who's that?
18   A   Carlos Truillo.  If it's the same Carlos Truillo.
19   He was an EMT at that time.
20              THE COURT:  Who's Carlos Truillo?
21              MR. WILLIAMSON:   He's a pharmaceutical rep,
22   Your Honor.
23              THE COURT:  He's a former what?
24              MR. WILLIAMSON:  He's a pharmaceutical rep.
25   And also I believe he was -- and he was EMS, Your Honor.
```

1          THE COURT:  Do you think that might be the

2     same fella?

3     A    Just someone I knew.

4          THE COURT:  Well, you know the question.  If

5     he shows up here and testifies, is there anything about

6     your knowledge of him 30 years ago that would cause you

7     not to either believe him or believe anything he said?

8     A    No, sir.

9          THE COURT:  All right.  And how about the

10    people who were introduced, did you know any of those

11    people?

12    A    No, I did not.

13         THE COURT:  And the questions that have been

14    asked here, would you have responded to any of those?

15    A    No, sir.

16         THE COURT:  Tell me about yourself, Juror

17    No-113.

18    A    I live here in Wichita.  I work for Mariott

19    International.  My wife works there also.  I have high

20    school education.  I have two children.  One's 23, works

21    at Ledford Gauge in Mulvane.  And my daughter's in Maize

22    middle school.

23         THE COURT:  That is like high school or--

24    A    Yeah.

25         THE COURT:  All right.  And tell me what you

1   do out at Mariott.  I'm having trouble hearing you.  Can

2   you talk about that.

3   A   I work in IT.  I make sure the computers at the

4   hotel that call the counter and such for Mariott are

5   talking to the PMS system so they'll appear on the bill

6   properly.

7               THE COURT:  All right, sir.  Let me glance

8   through your questionnaire.

9               THE COURT:  You've heard about the case but

10  you don't have any opinion about it.  You were a juror

11  35 years ago in Kansas City, Kansas.  Do you remember

12  anything about the case?

13  A   I don't even remember what the case was.

14              THE COURT:  Well, I've got to assume that that

15  won't have any effect on your ability to be a juror

16  here.

17  A   None whatsoever.

18              THE COURT:  I don't see anything else.  Can

19  you think of any reason why you can't be a fair and

20  impartial alternate juror in this case?

21  A   No, sir.

22              THE COURT:  Ms. Treadway.

23              MS. TREADWAY:  Thank you, Judge.

24              MS. TREADWAY:  What does your wife do for

25  Mariott?

1    A    She manages the help desk.

2    Q    And is that like in a hotel or just in a corporate

3    place?

4    A    We're just an office of 40 people that developed the

5    software and then support it from here.

6    Q    Okay.  I see what you're saying.  And do you

7    supervise people in your job?

8    A    No.

9    Q    Do you have any hiring and firing responsibilities?

10   A    No, I do not.

11   Q    When you answered the questionnaire, did you answer

12   it broadly using "you" for everybody in your family?

13   A    Yes, I did.

14   Q    Great.  Any experience in your family or friends

15   with addiction?

16   A    My mother recently died of cancer and she was on

17   some pretty heavy pain medication at the end and I'm

18   pretty certain she was addicted to it at that point.

19   Q    But that was, again, like Juror No-058 was talking

20   about yesterday, that's palliative care and at that

21   point you're trying to keep people comfortable?

22   A    Right.

23   Q    And you realize that's not what this case is about?

24   A    Right.

25   Q    Do you have any feelings one way or the other about

 1  addicts?  Is it their fault?  They're to blame?  Or it's
 2  a disease?
 3  A   Well, they're definitely to blame.  It's their own
 4  responsibility.
 5  Q   All right.  And what responsibility do you see the
 6  doctor having in that relationship when the doctor is
 7  aware of the addition?
 8  A   Well, I think the doctor needs to try to tell them
 9  that they have a problem, try to convince them to take
10  care of it; but I still believe it's the person's
11  ultimate responsibility.
12  Q   Do you hold health care professionals on a pedestal
13  such that you believe that they cannot be convicted of
14  criminal activities?
15  A   They're people just like us.
16  Q   Other than your mother, have you had other
17  experiences with people with terminal illnesses?
18  A   No.
19  Q   Did you have to exercise a power-of-attorney or
20  medical judgment on behalf of your mother?
21  A   No, I did not.
22  Q   Any experience with the Medicare or Medicaid
23  program?
24  A   None.
25  Q   With regards to your service in Wyandotte County,

1    you said that was 35 years ago?

2    A    Yeah.

3    Q    Do you remember if it was a criminal case or a civil

4    case?

5    A    No, really don't.

6    Q    Kind of long ago.

7    A    Yes.

8    Q    We've talked about jury service being very, very

9    serious work and kind of a heavy duty responsibility.

10   Are you prepared to sit through this trial, and if

11   called on to do so, would you be willing to render a

12   verdict in this case?

13   A    Yes, I would.

14            MS. TREADWAY:  Pass for cause, Judge.

15            THE COURT:  Mr. Williamson.

16            MR. WILLIAMSON:  Thank you, Your Honor.  How

17   you doing, Juror No-113?

18   A    Good.

19   Q    All right.  I'm going to ask you the same few litany

20   of questions I've been asking since, what, 11:00 a.m.

21   yesterday.  You know the Government is saying that 68

22   people passed away while they were under the care of the

23   Schneider Medical Clinic.  Just knowing that fact in and

24   of itself, will that cause you not to be able to look at

25   the law and determine whether or not the law was

1   violated in this case?

2   A   No, it won't.

3   Q   Okay.  You were asked questions about your mother

4   and that she received medication you believe that she

5   became addicted to it.  Just want to visit with you

6   about that.  And if it ever becomes uncomfortable, just

7   let me know.  Why do you feel like she was addicted to

8   it?

9   A   My dad once made the comment that the dosage she was

10  on, anybody else that was on that would be totally

11  incoherent.  So she had built up a significant

12  tolerance.

13  Q   Okay.  And was that medicine helping her pain?

14  A   Yes.  Strictly pain.

15  Q   And are you aware that there's a difference between

16  becoming dependent upon a medication in order to

17  maintain some form of a life as opposed to getting

18  medication and just abusing it?

19  A   Oh, absolutely, yes.

20  Q   And so just so we're all clear, your mother was

21  really using that because she needed it?

22  A   Yes.

23  Q   Are you familiar with chronic pain patients?

24  A   Only my mother.

25  Q   Okay.  There will be evidence about individuals in

287

```
1    chronic pain in this case that their lives were totally
2    turned upside down until they received care from Dr.
3    Schneider.  Is there anything about your experience with
4    your mother that would cause you to be overly
5    sympathetic to these individuals or ignore these
6    individuals?
7    A   I don't believe so.
8    Q   Do you know the elements of the law that Dr.
9    Schneider is being charged of violating?
10   A   Not at this time.
11   Q   And would you agree that it's impossible to
12   determine whether he was guilty of anything unless you
13   know what the law is?
14   A   Yes.
15   Q   Are you aware that there is no law against
16   prescribing chronic pain medication to people who are --
17   actually may be addicted to it?
18   A   Seems reasonable.
19   Q   Okay.  And you would agree that we want to be
20   careful not to turn doctors into detectives?  Would you
21   agree with that?
22   A   Yes.
23   Q   And as a physician, you have to be able to rely on
24   your patient to be honest with you so you can treat them
25   appropriately?
```

1    A    Yes.

2    Q    If you hear evidence that patients were not being

3    honest, would that cause you to be unfair either overly

4    sympathetic or unsympathetic?

5    A    If the patient doesn't tell the doctor what he needs

6    to know, I can't see how the doctor is going to be at

7    fault, necessarily.

8    Q    And that would be a fact that you would take in

9    consideration as to determining whether or not a law was

10   actually violated?

11   A    Yes.

12   Q    And what about these shotgun charges that the

13   Government has done, the 34 counts.  Do you believe that

14   just because they said 34 things may have happened that

15   they have to be guilty of something so I have to find

16   them guilty of something?

17   A    No, I don't believe that.

18   Q    And would you be able to look at every single charge

19   and every single element of every single charge and hold

20   the Government accountable to their high burden here?

21   A    Yes, I would.

22            MR. WILLIAMSON:  Okay.  Pass for cause, Your

23   Honor.

24            THE COURT:  Mr. Byers.

25            MR. BYERS:  Thank you, Your Honor.  Good

1    morning, Juror No-113.

2    A    Good morning.

3    Q    Just a couple follow-ups about your mother's

4    situation, and your surmising that she was addicted.   In

5    your observation, did your mother-- was she suffering

6    any kind of negative consequences because of the pain

7    killers she was receiving?

8    A    I don't know how to assess that.   She was in

9    constant pain.

10   Q    Okay.   So even though--

11   A    She never felt her dosage was enough.

12   Q    Okay.   But you said she may have been addicted but

13   she was still suffering pain?

14   A    Yes.

15   Q    Do you remember my conversation yesterday with Juror

16   No-040 -- he has since been excused -- when I asked him

17   about addiction tolerance and dependence?   Do you

18   remember that?

19   A    A little bit.

20   Q    Okay.   Where he defined for me addiction was

21   essentially getting a substance irregardless of negative

22   consequences.   Essentially craving it and doing things

23   you shouldn't do to get the drug.

24   A    Okay.

25   Q    Okay.   And then he told me about tolerance and

1   dependence.  And you talked about tolerance, too.  You

2   thought your mom must have been quite tolerant of the

3   pain medications?

4   A   Right.

5   Q   Do you think that tolerance would just be a natural

6   physiological kind of reaction if a substance is used by

7   a person on a regular basis?

8   A   You're going to build up some tolerance over time,

9   yes.

10  Q   And would you agree with me that perhaps that can

11  transform or ascend into dependence and actual kind of a

12  physical or psychological or psychiatric dependence on

13  that medication?

14  A   Yes.

15  Q   And yet still remain below a level of addiction

16  where you're doing -- you're engaging in negative things

17  to get that medication?

18  A   That's probably true.

19  Q   Okay.  And just having had the benefit, I guess, of

20  sitting through this for a day and a half and hearing

21  all my questions to other people.  Is there anything you

22  can recall me asking anybody that you think should be

23  brought to our attention at this point?

24  A   No, I do not.

25          MR. BYERS:  Okay.  Thank you.  Pass for cause,

1    Your Honor.

2              THE COURT:  All right.

3              MR. MOODY:  Government may exercise their

4    peremptory challenge.

5              MS. TREADWAY:  Judge, may we approach the

6    bench on a procedural issue.  I just need to ask a

7    question about how many peremptories and how we're going

8    to do this from here.

9              THE COURT:  You get one.

10             MS. TREADWAY:  That's it.  So they got one and

11   we get one.

12             THE COURT:  No.  You get one; they get two.

13             MS. TREADWAY:  Great.  That's all I needed to

14   know, Judge.  Thanks.

15             THE COURT:  Are you going to use it?

16             MS. TREADWAY:  Just a minute.  Thank you.

17                   (Off-the-record.)

18             MS. TREADWAY:  We would excuse Juror No-113

19   with appreciation.

20             THE COURT:  Thank you, Juror No-113.

21             MR. MOODY:  Juror No-114.

22             THE COURT:  Good morning, Juror No-114.

23   A   (Juror No-114)  Good morning.

24             THE COURT:  How do you feel about being an

25   alternate juror?  Actually the number two alternate

1    juror in this case.  Is that going to be a problem for

2    you?

3    A    No.

4            THE COURT:  All right.  Were you able to look

5    through the list of potential witnesses?

6    A    Yes.  I did not know any of them.

7            THE COURT:  All right.  And did you know any

8    of the people who were introduced here today?

9    A    No.

10           THE COURT:  I've read through your

11   questionnaire and particularly your answer to question

12   number 18 which is typed out.  This, whatever happened

13   in that situation, that did not involve the defendants

14   in this case, did it?

15   A    No.

16           THE COURT:  That is somebody else?

17   A    Yes.

18           THE COURT:  All right.  Now, would you have

19   responded to any of the questions that were asked here

20   either yesterday or today?

21   A    Yes.

22           THE COURT:  All right.  Tell me.

23   A    The one regarding television shows.

24           THE COURT:  Oh, all right.  Well, I'll tell

25   you what, I'm going to let Ms. Treadway cover that.

293

1       That's her question.  I don't want to deprive her of the

2       opportunity to ask you about that.

3       A    Of course.

4                THE COURT:  Any other questions that you would

5       have responded to?

6       A    I think that's the only one that I recall that I

7       would have responded to.

8                THE COURT:  I don't mean to make fun of this

9       but --

10      A    That's all right.

11               THE COURT:  -- but you -- your sister, or a

12      sibling anyway, was going to sell her Volkswagen and the

13      prospective buyer took it for a test drive and never

14      brought it back.

15      A    That's the truth.  She was an older adolescent.

16               THE COURT:  Did they ever find either the

17      Volkswagen or the test driver?

18      A    To my knowledge, no.

19               THE COURT:  Okay.  Well, that's the kind of

20      thing that --

21      A    That was many years ago.

22               THE COURT:  Right.  I assume that that

23      doesn't -- won't have any bearing on your ability to be

24      fair and impartial.

25      A    No.

1          THE COURT:  Okay.  And you do have some

2     knowledge about the case.  You've seen occasional news

3     reports about the case.  But you say that none of those

4     news reports have had any effect on your ability to be

5     fair and impartial.  Is that still the case after you've

6     heard all these questions here?

7     A    That is still the case, yes.

8          THE COURT:  Okay.  And you have some relatives

9     who have been -- and they seem to be -- your husband was

10    police reserves?

11    A    Yes.

12         THE COURT:  45 years ago?

13    A    That was before -- just before we were married.

14         THE COURT:  Do you think that's going to have

15    any bearing on your ability to be fair and impartial?

16    A    No.

17         THE COURT:  I wouldn't think so.  And your

18    nephew is also a police officer.  Any problem about that

19    that you can think of?

20    A    No.

21         THE COURT:  All right.  And the lawyers will,

22    I'm sure, get into this to some extent with respect to

23    your typewritten answer to question number 18.  But it's

24    not totally clear to me.  You had a very unfortunate

25    conversation with someone.  But who was that person?

1    A    My supervisor.

2               THE COURT:  But not a doctor?

3    A    No.

4               THE COURT:  Right?

5    A    No.

6               THE COURT:  And this was over a situation that

7    you were having -- or your husband was having -- I'm

8    sorry -- that I'm not clear on your answer.

9    A    Well, that's all right.

10              THE COURT:  It says an older friend, but, was

11   diagnosed --

12   A    I'm not sure I follow that.

13              THE COURT:  Well, it says here -- the question

14   is:  Have you ever had an experience with any person in

15   the health care industry in which you felt you were

16   treated improperly?  And you say an older friend was

17   diagnosed with a mild inherited cardiac disorder that

18   didn't seem problematic for her, and then--

19   A    Oh, excuse me, there were two incidents.  That's

20   another one that -- that is another one that is separate

21   and different from the one that is typed.  I typed that

22   one because it was -- it was a bit difficult for me to

23   just put simply and in a few words the situation.

24              THE COURT:  Okay.  But --

25   A    But the one involving my friend, what was your

1    question about that?

2          THE COURT:  Well, it says over as if you had

3    written on the back of one of the pages, on the back

4    page --

5    A   I thought I added something on the back regarding

6    that situation with my older friend.  I can explain that

7    to you if you like.

8          THE COURT:  Well, if you did, it didn't come

9    through on my copy.

10   A   Okay.

11         THE COURT:  So in terms of the problem with

12   your older friend who had this cardiac disorder, can you

13   tell me a little bit more about that.

14   A   Yes.  Yes.  And I will tell you what she told me,

15   and I didn't get all of the particulars, but just that

16   her family apparently -- members of her family had a

17   genetic disorder related to the heart and it was not a

18   problem, a real problem, but her doctor prescribed

19   medication for her that she later found out -- later

20   learned that was to be taken no longer than four months

21   but he had prescribed it for a year.  And because of

22   that, she is in constant pain.  She's in constant pain

23   and has been now for five years or so.  When she first

24   told me about that, she, she would have to -- when she

25   sat down, she would have to stand up and then sit down.

297

1    I mean, she was not able to find a comfortable position

2    in which to be.

3              THE COURT:  Yes.

4    A    And her situation grew worse over time to where she

5    ended up being bed-ridden at home, and then eventually

6    she had to be -- had to have around-the-clock care in a

7    nursing home.

8              THE COURT:  She still alive?

9    A    Yes, she is, yes.

10             THE COURT:  All right.  Tell me how, if you

11   think that that would bear on your ability to be fair

12   and impartial in this case?

13   A    No, it would not.  No.  I've had an experience with

14   a jury trial and that experience there gave me -- to me

15   a good background as to what needs to be, and, of course

16   the guidelines also, that we evaluate the evidence that

17   is presented and then we follow the law as it is given

18   by the judge.

19             THE COURT:  Said that that was in '76 or '77

20   over across the street.

21   A    About 34 years, yes, about 34 years ago.

22             THE COURT:  And was a robbery case.

23   A    Yes.

24             THE COURT:  And then did you serve in several

25   other cases?  It kind of sounds like it.

```
1    A    No, a sibling.  One of my sisters.

2              THE COURT:  Served four times.

3    A    In another state.  Had those four experiences.

4              THE COURT:  Well, anything about that that you

5    think -- your sister's experience that would bear on

6    your ability to be fair and impartial?

7    A    No.

8              THE COURT:  And your experience, it ended

9    apparently in a hung jury, but was there anything about

10   the case itself, that is, the -- it was a robbery case

11   so it obviously doesn't have anything to do with the

12   charges here.  But was there anything about the fact

13   that the jury was unable to reach a verdict that

14   presents a problem for you potentially in being a juror?

15   A    Not a problem, no.  It was a good experience.  I

16   learned a lot then.  But it was a great experience.

17             THE COURT:  Let me turn back now to the

18   typewritten explanation.

19   A    Yes.

20             THE COURT:  This did not relate to -- or did

21   it, did it relate to something dealing with a doctor or

22   was it just strictly with your supervisor?

23   A    It was with my supervisor and those above him.

24             THE COURT:  Okay.

25   A    But the situation actually was from -- it initiated
```

1    from him.

2              THE COURT:  Well, obviously, and I'm not going

3    to get into this in detail, but it was obviously a very

4    unpleasant experience for you.

5    A    It was.

6              THE COURT:  But does it relate in any way to,

7    in your view, to the allegations that are in this case?

8    A    No.

9              THE COURT:  And would it have any bearing on

10   your ability to be a fair and impartial juror?

11   A    No.

12             THE COURT:  There's some -- some of the

13   lawyers have asked about being a supervisor and having

14   problems at work and so I'm going to let them cover

15   that.  Okay.

16   A    Okay.

17             THE COURT:  All right.  Other than what we've

18   talked about here this morning, can you think of any

19   reason why you can't be a fair and impartial juror?

20   A    No.

21             THE COURT:  Okay.  Did I ask you to go over

22   this, the board here?  I don't think I did, did I?

23   A    No.

24             THE COURT:  Then I'll let you do that.

25   A    All right.  I'm a resident of Belaire, Kansas.  And

1      I am actually a retired -- just recently retired.

2      Retired from medical technology.  And I am married.

3      Have been married 45 plus years.  And he is retired.  He

4      retired from the school board.  Head custodian most of

5      the years.  And he worked there almost 30 years.  And I

6      have a Bachelor of Science degree in Biology and then my

7      further education in medical technology.  I have six

8      children and 13 grandchildren.  Their ages -- I will

9      just give a range.

10             THE COURT:  That's all right.

11     A    Between 35 and 45.  And they -- and their

12     occupations.  One works in avionics.  Connected with --

13     well, I don't really know the name of the company.  But

14     it's a company out west.  He's worked there for twenty

15     some years.  Ever since he finished up a class, a ten

16     month class.  And then one of them is -- has her degree

17     in -- not finances, but it's, it's slipped my mind what

18     her degree is.  I'm sorry.  But she and her husband have

19     a martial arts, a Karate business in Hutchinson.  And

20     one of my daughters and her husband are about to

21     graduate from Friends University within this year.  And

22     then I have another son who is working at a company

23     where he, he works in association with Cessna.  And I

24     have children living in -- one in Ellsworth and one in

25     Hutchinson.  One in a small town between Hutchinson and

 1    Wichita.   And the others in Wichita.

 2              THE COURT:   Do any of your children work in

 3    law enforcement?

 4    A    No.

 5              THE COURT:   Or do any of your children work in

 6    the medical field?

 7    A    No.

 8              THE COURT:   And all the time that you worked

 9    in medical technology, what did you actually do?

10    A    I did a variety of jobs; but primarily I did testing

11    on blood and urine samples.   Tests ordered by the

12    doctors.

13              THE COURT:   Right.   Did you have any direct

14    contact with patients?

15    A    Yes, in drawing blood.

16              THE COURT:   Okay.   Did you ever take histories

17    from them or have any occasion to give them medical

18    advice or anything like that?

19    A    No.

20              THE COURT:   All right.   Well, can you think of

21    any reason why you can't be a fair and impartial juror?

22    A    I cannot think of one reason.

23              THE COURT:   All right.   Thank you.

24    Ms. Treadway.

25              MS. TREADWAY:   May we approach, Judge.

```
 1              THE COURT:  Yes.

 2                        (Whereupon, the following

 3                        proceedings were held at the

 4                        bench OUTSIDE the hearing of the

 5                        jury.)

 6              MS. TREADWAY:  Judge, based on this diatribe,

 7    I am very concerned about this woman's mental health.

 8    She states that she suffered from severe stress, that

 9    she almost committed suicide --

10              THE COURT:  Well, let's --

11              MS. TREADWAY:  I'm very concerned for her

12    safety because if in--

13                        (Off-the-record.)

14              THE COURT:  Is it working?  Okay.

15              MS. TREADWAY:  I mean, she almost committed

16    suicide over this incident.  And this was many, many

17    years ago and yet this questionnaire brought it to her

18    forefront, which is very frightening.  What I'm afraid

19    of, Judge, is that her ability to be criticized or her

20    ability to deliberate is going to be very questionable

21    should she have to sit simply because all the supervisor

22    did was call her in to do a test and we get a diatribe,

23    she almost commits suicide over it.  This is very

24    scarey.  And when I saw this, I immediately flagged her.

25              THE COURT:  I get your point.  What do you
```

1   want to do about it?

2          MR. WILLIAMSON:   If Ms. Treadway wants to

3   question her outside the presence of the jury, I'm okay

4   with that.   I just think it's dangerous to exclude

5   people because they had issues in the past.   If she, she

6   was honest enough to bring this to the Court's attention

7   which means she wasn't trying to hide it.   To me, that

8   says a lot about a person.   Now, I don't know about her

9   mental stability.   I wouldn't mind inquiring about it.

10  I just wouldn't want to do it in front of everybody to

11  embarrass her.

12         THE COURT:   Well, I think this is another

13  thing.   This is number two alternate.   We've still got

14  20 or more jurors out there.   Is there any reason -- is

15  there any objection to me excusing her?

16         MR. WILLIAMSON:   No, we won't have an

17  objection.

18         MS. TREADWAY:   No, Judge.

19         THE COURT:   Well, let's just do it that way.

20  Okay?

21         MS. TREADWAY:   Thank you, Judge.   For her

22  safety.

23         THE COURT:   All right.

24                    (Whereupon the following

25                     proceedings continued in the

```
 1                        hearing of the jury.)
 2            THE COURT:  Juror No-114, I think I'm going to
 3   excuse you.  I think there's circumstances here that I
 4   don't want to go into that I'm concerned about; and for
 5   that reason, I really appreciate your candor and your
 6   honesty, but I think that it would be better to excuse
 7   you.  Thank you very much.
 8   A   You're welcome.
 9            THE COURT:  Are you all okay?  We're about at
10   the end here.  Anybody need a break?  Okay.  I think
11   we're about at the end.
12            MR. MOODY:  Juror No-115.
13            THE COURT:  Juror No-115.  Good morning.
14   A   (Juror No-115)  Good morning.
15            THE COURT:  How about the schedule, is it
16   going to present a problem for you to be an alternate
17   juror?
18   A   No.
19            THE COURT:  All right, sir.  Have you looked
20   over the names of the potential witnesses?
21   A   Yeah.
22            THE COURT:  Did you recognize anybody?
23   A   Two of them.  Dr. Galichia and Dr. Bajaj.
24            THE COURT:  Do you know them personally?
25   A   Galichia treated me 15, 16 years ago.  Bajaj I just
```

1    know through treating my father.

2              THE COURT:  All right.  Well, you've heard the

3    questions.  I'm not going to go into it.  Is there

4    anything about that that would bear on your ability to

5    be fair and impartial?

6    A    No.

7              THE COURT:  All right.  And how about the

8    folks who were introduced here today?

9    A    No.

10             THE COURT:  And the questions that have been

11   asked yesterday and today, would you have responded to

12   any of those?

13   A    No.

14             THE COURT:  All right.  Tell me about

15   yourself, if you will.

16   A    I live between Haysville and Mulvane.  I'm a retired

17   truck driver.  Married 43 years.  My wife delivers

18   aircraft at Bombardier.  High school with about a year

19   tech school.  Two sons, ages 43 and 41.  One is a truck

20   driver.  The other one is in quality control, takes

21   after his mother.

22             THE COURT:  I've looked through your

23   questionnaire here.  You know about the case but you

24   don't have any opinions about it.  Is that a correct

25   statement?

1    A    Yeah.

2            THE COURT:   And you've heard a lot now between

3    yesterday and today.   Is that still the case?   You

4    haven't developed any opinions one way or another about

5    the case?

6    A    No.

7            THE COURT:   Okay.   You were injured in 1970

8    and there was some litigation about that.   That was at

9    work.   And then there was a 1995 class-action against

10   Wichita in a home flooding.   Those are both civil cases.

11   Anything about either one of those cases that would bear

12   on your ability to be fair and impartial in a criminal

13   case?

14   A    No.

15           THE COURT:   I didn't think so.   Now, you have

16   had some injuries that have been painful.   Broken back,

17   broken neck, broken -- were you in a terrible accident

18   at some point?

19   A    I broke horses and ran into a train once.

20           THE COURT:   Yeah, that might do it.   But

21   you've had to take Oxycodone and Hydrocodone, or called

22   Lortab, in those instances, those injuries.   How long

23   ago were you taking either of those medications?

24           THE COURT:   Is that when you were seeing

25   Galitia?

1   A    No.  The neck injury, when I had the neck worked on,

2   that was in '88.  And I took 'em for probably a week

3   afterwards.  And then a couple years ago I had a

4   shoulder replaced.  And I took that for probably two or

5   three days afterwards.

6          THE COURT:  Say you took 'em maybe a week or

7   so?

8   A    Yeah.

9          THE COURT:  Took half of the prescription --

10  or, no, flushed the half the prescription.

11  A    Yeah.

12         THE COURT:  Anything about the fact that you

13  took some of these pain killing medications that you --

14  I assume were prescribed by a physician?

15  A    Right.

16         THE COURT:  That will bear on your ability to

17  be fair and impartial here?

18  A    No.

19         THE COURT:  I mean, it's the same thing we've

20  talked about all the way through here.  You know, if

21  you're picked -- I mean, if you end up being on the

22  jury, you understand that whatever your experience was

23  with respect to these two medications really isn't

24  relevant?

25  A    No, it's not.

308

1          THE COURT:  All right.  Can you think of any

2     reason why you can't be a fair and impartial alternate

3     juror?

4     A    No.

5          THE COURT:  Fair enough.  Ms. Treadway.

6          MS. TREADWAY:  Thank you, Judge.  I take it

7     you're not going to hold it against Juror No-075 that he

8     works on railroads?

9     A    No.

10    Q    Okay.  All right.  You have a great voice.  You ever

11    done any voice-overs for radio or television?

12    A    No, just a lot of talking.

13    Q    Sir, I don't really have very many questions for

14    you.  Obviously you've had some injuries.  Are you kind

15    of a bionic man now?  Because you said everything's good

16    for you now?

17    A    Much more and I'll be brand new.

18    Q    Well, that's great.  So we'll call you our bionic

19    man.  Do you have any experience within your family or

20    personally or friends with addiction?

21    A    No.

22    Q    So have you ever had terminal illness in your family

23    or had to exercise power-of-attorney or medical judgment

24    for someone?

25    A    No power-of-attorney; but several family members

309

1    died of cancer.

2    Q   And did you take care of them in any way?

3    A   No.

4    Q   Did you have to make any kind of medical decisions

5    for them in any way?

6    A   No.

7    Q   Do you hold doctors on a pedestal?

8    A   Not really.

9    Q   Even though they've done such a good job for you?

10   A   Oh, I thank 'em for it.

11   Q   But you will not have a problem sitting in judgment

12   on a healthcare provider simply because that's their

13   status?

14   A   No.

15   Q   You believe that doctors and nurses, just like

16   anybody else, can commit crime?

17   A   Uh-huh.

18   Q   Is that a yes?  I'm sorry.

19   A   Do what?

20   Q   Do you believe that healthcare providers, doctors

21   and nurses, can commit crimes just like anybody else?

22   A   Yeah.

23            MS. TREADWAY:  Pass for cause, Judge.

24            THE COURT:  Mr. Williamson.

25

310

```
 1    BY MR. WILLIAMSON:

 2    Q    How are you doing this morning?

 3    A    Okay.

 4    Q    Did you think you were gonna miss out on getting

 5    called to the box?

 6    A    I wasn't sure.

 7    Q    Just a few questions.  I mean, you've heard me ask

 8    the same questions over and over again.  The fact that

 9    68 -- the Government alleges that 68 individuals passed

10    away while they attended the clinic, does that -- or

11    they attended the clinic at some point in time in the

12    past.  Does that cause you any hesitation to be able to

13    listen to the facts and determine whether or not a law

14    was violated?

15    A    No.

16    Q    What about the fact that there are all these shotgun

17    charges, the 34 charges, that because they charged so

18    many that they have to be guilty of one?

19    A    No.

20    Q    Okay.  Now, would you have any hesitation in this

21    case in making a distinction between whether or not Dr.

22    Schneider acted as a drug dealer just pushing pills on

23    his people, or was he acting as a medical physician

24    making medical decisions with these people?

25    A    No problem.
```

311

1    Q   And you understand that when I say medical

2    decisions, they could be good, bad, or indifferent; but

3    if he was making medical decisions, he wasn't acting as

4    a drug dealer.  Are you going to be okay with that?

5    A   Yeah.

6    Q   Okay.  And I noticed, like, when you took pain

7    medicine after you had your surgeries.  Are you no

8    longer in pain?

9    A   Not much.

10   Q   Okay.  And you've stopped taking them when you

11   didn't need them?

12   A   Right.

13   Q   Did anybody force you to try to continue to taking

14   those medicines even though you didn't need 'em any

15   more?

16   A   My wife.

17   Q   What did she say?  You needed 'em because you were

18   getting cranky now?

19   A   She was getting cranky.

20   Q   When you went back to your physician, you told the

21   doc I'm finished with the medicine on your follow-up.

22   You have to be honest with him and tell him how you

23   felt; correct?

24   A   Right.

25   Q   And when you were honest with him, he was able to

```
 1    give you some good medical advice?

 2    A    He said if I didn't need 'em, don't take 'em.

 3    Q    Okay.  If you would have went in and lied to him and

 4    said doc, I'm still in pain, what do you think he would

 5    have done?

 6    A    Thrown me out of the office.

 7    Q    And why do you say that?

 8    A    That's just the way he is.

 9    Q    Who's your physician by the way?

10    A    Chris Miller.  He's an Orthopedic Surgeon.  He was a

11    bull rider.

12    Q    Okay.  No wonder.  And I think that may be it.

13              THE COURT:  Well, what could you possibly ask

14    him after that last answer?

15              MR. WILLIAMSON:  Judge, you know we're

16    notorious for asking one question too many.  So -- I

17    don't have anything further.  Thank you.

18              THE COURT:  Mr. Byers.

19              MR. BYERS:  Thank you, Your Honor.  Good

20    morning, Juror No-115.

21    A    Good morning.

22    Q    Just one thing I was curious about.  In your day and

23    a half of hovering around here waiting to be put on the

24    hot seat, have you overheard any kind of thing that

25    might cause you to not consider these Defendants as
```

313

1    innocent and -- or otherwise lessen the burden of proof

2    on the Government under a reasonable doubt?

3    A    No.

4    Q    Have you engaged in any conversations that have

5    swayed you in one way or the other?

6    A    No.

7    Q    Okay.  And you probably heard me asking the other

8    people if you hear people say bad things, particularly

9    about Linda Schneider, Linda Atterbury, do you think you

10   can keep an open mind and realize that, you know, it

11   might just be these people had some kind of grudge or

12   maybe she was a harsh supervisor but that doesn't equate

13   to criminal conduct?

14   A    I'd have to hear what's going on.

15   Q    Okay.  Thank you.

16            MR. BYERS:  Pass for cause, Your Honor.

17            THE COURT:  Pass for cause?

18            MR. WILLIAMSON:  Pass for cause.

19            MR. MOODY:  Mr. Williamson may exercise his

20   peremptory as to Juror No-115.

21            MR. WILLIAMSON:  We'll waive, Your Honor.

22            THE COURT:  Mr. Byers?

23            MR. BYERS:  Waive.

24            THE COURT:  Any reason why this panel cannot

25   now be sworn to try the cause?

1          MS. TREADWAY:  Not on behalf of the

2    Government.

3          MR. WILLIAMSON:  Not on behalf of Dr.

4    Schneider.

5          MR. BYERS:  Not on behalf of Linda Atterbury.

6          THE COURT:  Swear the panel.

7                    (Jury panel sworn to try the

8                    case).

9          THE COURT:  Please be seated.  Well, to those

10   of you who patiently sat here -- and may be breathing a

11   sigh of relief now, I don't know -- really, thank you.

12   I thank you, first of all, that you were willing to say

13   that you could sit in a trial that might take two or

14   three months.  That in and of itself is a real sacrifice

15   and I'm very sincerely appreciative of that.  I'm

16   appreciative that you would come here and sit for a day

17   and a half and listen to me and the lawyers and really

18   not get an opportunity to do anything but sit.  We try

19   very hard in these cases, not just this case, but every

20   case, to never call in more jurors than we feel are

21   necessary because we know that this is an inconvenience

22   for you.  Even if it's a short trial.  We have very few

23   trials that are estimated to be this long, but even in a

24   short trial it's an inconvenience to be called in and

25   have to sit during jury selection and then not get

 1    selected and get to go home.  So we try not to call in

 2    more than we need.  But -- and we called in more than we

 3    needed here because, frankly, we weren't sure -- we

 4    meaning me -- how many people would turn out not to be

 5    able to be jurors for that period of time and other

 6    problems.  And if I've inconvenienced you for the past

 7    day and a half, I sincerely apologize.

 8         But the other side of that coin is if we would have

 9    run out of jurors, we would have been in a real pickle

10    because we would have had to summon in more people who

11    wouldn't have known if they would have been available

12    for this period of time.  They would have had to fill

13    out the questionnaire, all the things that you all did,

14    and in the meantime we would have some people who would

15    be able to serve and others who wouldn't know.  So thank

16    you very much.  You're excused.  And have a good rest of

17    the day.  It looks like it's going to be real nice.  So

18    thank you again.

19                        (Remaining jury panel excused at

20                        10:45 a.m.)

21         THE COURT:  All right.  Now we're going to

22    move downstairs.  Mr. Moody will take you downstairs,

23    show you my courtroom downstairs, show you how to get in

24    and out of the courtroom.  It's quite a bit smaller than

25    this one but still plenty of room.  Get you acquainted

1    with the jury room.  You'll have a recess.  The lawyers

2    need to go down there and get set up so my guess would

3    be that it's going to be half an hour anyway before we

4    can reconvene and get things started.

5         I'm going to talk to you a little bit more then

6    about scheduling so that we're clear on that.  There are

7    some preliminary instructions that are appropriate for a

8    jury in any case and I'll give you those.  And then,

9    depending on what time it is, we'll either have the

10   Government's opening statement or we'll go to lunch

11   early and come back early and then have the Government's

12   opening statement.  So if you all will go with

13   Mr. Moody, I'll see you downstairs.

14                   (Recess.)

15           THE COURT:  I want to talk to the lawyers for

16   a minute about scheduling.  I told Robert to tell you

17   that I think we're going to have to have a James hearing

18   in this case because of potential co-conspirator

19   hearsay.  And I don't want to inconvenience the jury.  I

20   want to take-- I don't want to take up the jury's time

21   while we have a James hearing.  I've already talked to

22   everybody in the building here and we can do that

23   Saturday morning.  Is that going to be a problem?

24           MS. TREADWAY:  Judge, not in terms of

25   scheduling but I think that the Court may be

1    misperceiving the way we're going to be introducing

2    evidence in this case.  We're not going to be relying on

3    801 (D)(2)(d).

4              THE COURT:  Well, you said so in your trial

5    brief.

6              MS. TREADWAY:  No, sir.  I believe that we

7    said that was an option.  But almost all of the evidence

8    in this case is independently admissible outside of a

9    801 --

10             THE COURT:  I'm telling you -- and you know

11   what the rule is -- if you're going to have any

12   co-conspirator hearsay, we're going to have a James

13   hearing.  If you're telling me you're not going to have

14   any co-conspirator hearsay then we don't need a James

15   hearing.

16             MS. TREADWAY:  The way I have done this case,

17   Judge, is the way I did the Kaufmann case and the way

18   I've done --

19             THE COURT:  I don't remember the Kaufmann

20   case.  It's this case that I'm talking about.

21             MS. TREADWAY:  Well, again Judge, I'm just

22   trying to illustrate that the way the Government will be

23   introducing the evidence, we will be introducing the

24   evidence for the most part under the business records

25   rule, 8036; and then as to the Defendants statements, we

318

1   are not relying on 801 (D)(2)(e) to prove the conspiracy

2   or their involvement in the conspiracy.  Instead, we're

3   going to be introducing statements, as I believe our

4   brief indicated, under 801 (D)(2)(a).  In this case,

5   like the Franklin-El case and the Kaufmann case, those

6   statements don't have to be in furtherance of a

7   conspiracy.  They are admissible as against each

8   Defendant; and as to the business records, they are

9   admissible as to both Defendants.  So it's not the

10  Government's intention to rely on rule 801 (D)(2)(e) for

11  admission of statements.

12       THE COURT:  All right.  I don't have your

13  brief up here but I must have misread it.  That's what I

14  thought it said.

15       MS. TREADWAY:  Well, I think it was an option

16  that at the end of the case if we decided that we needed

17  it, we would introduce it.  But at this point in time, I

18  don't see that necessity, like did I not see it in

19  Kaufmann and Franklin-El, Judge.  We didn't ask for that

20  ruling in those cases either.  Essentially this is --

21  it's a different kind of conspiracy where the conspiracy

22  is really proved by conduct as opposed to the

23  co-conspirator statements.

24       THE COURT:  Well, that's fine.  You all

25  satisfied with that explanation, Mr. Williamson?  Mr.

1      Byers?

2              MR. WILLIAMSON:  Not completely, Judge.  I

3      think you asked the Government a specific question that

4      would call for a non-equivocating answer.  If they plan

5      to use the statements of a co-conspirator, then the

6      hearing should be had.  She says that she doesn't plan

7      on it, but maybe later.  If that's a possibility, I

8      would prefer to deal with the issue now, get it out of

9      the way so we can proceed smoothly through trial.  If

10     she's making a representation on the record that they

11     are not going to be offered for that purpose at all,

12     waive a hearing.

13             THE COURT:  Is that what you're saying?

14     You're not going to do it at all?

15             MS. TREADWAY:  Again, Judge, I don't

16     anticipate doing it just like I--

17             THE COURT:  That's an equivocal answer.  Are

18     you going to -- are you going to use co-conspirator

19     hearsay in this case?  Yes or no?

20             MS. TREADWAY:  No, we are not offering any

21     evidence under that theory.

22             THE COURT:  All right.  Now, Mr. Williamson?

23             MR. WILLIAMSON:  With the record clear, Judge,

24     we'll defer to your ruling on it.

25             THE COURT:  Mr. Byers?

320

1          MR. BYERS:  Your Honor, I'd like to yield to

2     Mr. Gorokhov on this point.

3          MR. GOROKHOV:  Your Honor, as long as it's

4     clear that 801 (D)(2)(e)is off the table, the

5     Government-- and if these statements aren't admitted

6     under any other subsection, (D)(2)(e) is not available

7     to the Government, we're fine with waiving a hearing.

8          THE COURT:  That's what I hear her saying.

9     She knows her case.  So we won't have a James hearing.

10    We don't have to be down here on Saturday.  All right.

11    I'll see you all downstairs.

12         The juror questionnaires, please carry these

13    downstairs and give them to Robert.

14                    (Recess.)

15

16                    (No omissions.)

17

18

19

20

21

22

23

24

25