```
 1            THE COURT:  Call your first witness.
 2            MS. TREADWAY:  Judge Belot, at this time the
 3    Government would like to start its case with Exhibit 80,
 4    which is about a one minute video of Defendant Stephen
 5    Schneider giving testimony under oath.  We would offer
 6    this under 801 (D)(2)(a).
 7            THE COURT:  Any objection?
 8            MR. WILLIAMSON:  No objection, Your Honor.
 9                    (Government Exhibit 80 played
10                     for the jury.)
11            MS. TREADWAY:  That's it, Judge.  Government
12    would call Barry Rausch.
```

13                            **BARRY RAUSCH**

```
14    Having been first duly sworn to tell the truth, the
15    whole truth and nothing but the truth, testified as
16    follows on:
```

17                        **DIRECT EXAMINATION**

```
18    BY MS. TREADWAY:
19    Q    Could you please introduce yourself to the jury?
20    A    My name is Barry Rausch.  I'm with the U.S. Postal
21    Inspection Service here in Wichita.
22    Q    And what are your duties and responsibilities with
23    the U.S. Postal Inspection Service?
24    A    As a postal inspector.  I investigate any criminal
25    activity within the postal service, albeit, child
```

1    pornography through the mail, drugs through the mail.

2    Any burglaries, robberies, that type of thing.  Any kind

3    of criminal activity that occurs within the postal

4    service is our responsibility.

5    Q   How long have you been with the United States Postal

6    Inspection Service?

7    A   20 years.

8    Q   Have you been involved in the investigation of the

9    Defendants Stephen and Linda Schneider?

10   A   Yes, I have.

11   Q   Can you identify them for the record?

12   A   Yes.  Stephen is the gentleman here to my left in

13   the gray suit with the gray tie.  And Linda is seated

14   next to him to his left in the dark brown sweater.

15            MS. TREADWAY:  May the record reflect an

16   identification of both Defendants.

17            THE COURT:   Yes.

18   BY MS. TREADWAY:

19   Q   During the course of the investigation have you been

20   involved in gathering documents and records?

21   A   Yes.

22   Q   Did you participate in searches conducted at the

23   Schneider Medical Clinic?

24   A   Yes.

25   Q   How many?

1    A    Two.

2    Q    Were those searches conducted pursuant to court

3    authority?

4    A    Yes.

5    Q    Let me hand you -- may I approach?

6          THE COURT:  Yes.

7    BY MS. TREADWAY:

8    Q    Let me hand you what has been marked for

9    identification as Exhibits 109 and 109-A.  Do you

10   recognize those documents?

11   A    Yes.

12   Q    What is Exhibit 109?

13   A    109 is a United States District Court search warrant

14   that was issued by the Court on September 7th, 2005.

15   The warrant was executed on September 13th, 2005, at

16   approximately 7 a.m.

17          MS. TREADWAY:  Judge, at this time I would

18   like to place in front of the jury a demonstrative aid

19   we'll be using with several witnesses.  It's a reveal

20   chart that we will reveal various chronological events

21   as witnesses testify to.

22          THE COURT:  Is that one of these that's up

23   here with me?

24          MS. TREADWAY:  I don't know.  It's Exhibit

25   161.  It was a summary.  The Defendants are well aware

1    of it.

2          THE COURT:  Any objection, gentlemen?

3          MR. GOROKHOV:   No objection to the

4    chronology, Your Honor.

5          THE COURT:  Can you see it, Ladies and

6    Gentlemen?

7    BY MS. TREADWAY:

8    Q   So the first search warrant was executed on

9    September 13, 2005.  Is that correct?

10   A   Yes.

11   Q   Thank you.  The next exhibit, 109-A, what is that?

12   A   109-A is also a search warrant that was issued by

13   the United States District Court.  The warrant was

14   issued on March 24th, 2006.  The warrant was executed on

15   March 28th, 2006.

16         MS. TREADWAY:  Government would offer Exhibit

17   109 and 109-A.

18         THE COURT:  Any objection, gentlemen?

19         MR. GOROKHOV:    Yes, Your Honor.  We object

20   under Rule 403.  We stipulate to the fact that the

21   search has occurred; but we don't feel the admission of

22   the exhibit adds anything or is necessary.

23         THE COURT:  The objections -- objection is

24   overruled as to 109 and 109-A.  They're received.

25

1   BY MS. TREADWAY:

2   Q   Let me now hand you what has been marked for

3   identification as Government Exhibit 57.  Do you

4   recognize this set of documents?

5   A   Yes.

6   Q   And what are they?

7   A   These are photos that were taken at the time of the

8   search warrants.

9   Q   And were they obtained on both dates?

10  A   Yes.

11  Q   Both on the 28th of March, '06 and September 13th of

12  2005?

13  A   Yes.

14  Q   Do these pictures fairly and accurately represent

15  the exterior and the interior of the Schneider Medical

16  Clinic at the time of both searches?

17  A   Yes.

18          MS. TREADWAY:  Government would offer Exhibit

19  57.

20          THE COURT:  Any objection, gentlemen?

21          MR. GOROKHOV:   No objection.

22          THE COURT:   They're received.

23          MS. TREADWAY:  We would like to display these

24  for the jury as we go through them.

25          THE COURT:  You may.

1    BY MS. TREADWAY:

2    Q    What's the first page of Exhibit 57?

3    A    First page is a photo that was taken during the

4    search warrant on March 28th, 2006.  And it represents

5    the sign that is actually in the front of the building

6    out along the street.

7    Q    And does it give the address at 7030 South Broadway?

8    A    Yes.

9    Q    And is that in Haysville, Kansas?

10   A    Yes.

11   Q    And is that a major road in Haysville, Kansas?

12   A    Yes.

13   Q    The second page please.  And what is that?

14   A    That is a photo that was taken during the search

15   warrant on September 13th, 2005, and it is an accurate

16   photo of the outside of the building.  This would

17   actually be a photo if you were standing to the -- on

18   the southwest corner of the building looking at the

19   building.

20   Q    And it appears to have a portico there for cars to

21   drive under; is that correct?

22   A    Yes.

23   Q    What is the next page, sir?

24   A    Next page represents an office directly behind.

25   You're actually looking through a doorway into the

1    office area behind the front counter as you enter the

2    building.

3    Q    And the next picture?

4    A    This is a picture taken within that same room, just

5    a different angle.

6    Q    And the next picture?

7    A    This is another picture of the filing areas within

8    the building.

9    Q    And the next picture?

10   A    Again, another area, filing area.

11   Q    Did the clinic have a basement?

12   A    Yes.

13   Q    Was the first floor of the clinic where all of these

14   pictures were taken?

15   A    Yes.

16   Q    As to the pictures on Page 3 through 6 of the files,

17   can you tell the jury more about what you found during

18   your searches on September 2005 in terms of the clinic's

19   documents?

20   A    What you see in the photos is exactly the way we

21   found the files in the office.

22   Q    And from being in the Clinic and observing where the

23   charts were, can you generally explain the type of

24   organizational system the Clinic had for its medical

25   charts?

1    A    No, I can't.

2              MS. TREADWAY:  Nothing further, Judge.

3              THE COURT:  Mr. Williamson.

4              MR. WILLIAMSON:   Thank you, Your Honor.

5                      **CROSS EXAMINATION**

6    BY MR. WILLIAMSON:

7    Q    Is it Mr. Rausch?

8    A    Yes.

9    Q    And you are a postal inspector?

10   A    Yes.

11   Q    And an investigator for the postal inspection?

12   A    Yes.

13   Q    How does that, like, work with, like, DEA, FBI?

14   Just another segment of the Government?

15   A    We are a Government agency, yes.  We are federal

16   agents.

17   Q    And you normally -- you normally investigate crimes

18   where there's allegations of crimes where there's

19   information passing through the mail using the postal

20   service?

21   A    Yes.

22   Q    How'd you get involved with this case?

23   A    Postal inspectors are involved in any criminal

24   activity that would result from, in this case, mail

25   fraud.  Under the mail fraud statutes, we investigate

396

```
 1    any crimes that -- where a crime that the mails are used
 2    in furtherance of a scheme.
 3    Q    Okay.  They're not charged with mail fraud; correct?
 4    A    No.
 5    Q    Okay.  You're aware that bills would be submitted
 6    electronically to insurance companies; correct?
 7    A    They can be, yes.
 8    Q    Did you make a determination before you went in with
 9    this search warrant as to whether or not their billing
10    was done through the mail or done electronically?
11    A    I did not.  I was not the affiant on the search
12    warrant.
13    Q    Okay.  So you don't know what evidence existed or
14    anything at that point; is that correct?
15    A    No.
16    Q    You just got a call and said we want you to go in
17    over there?
18    A    Yes.
19    Q    Who called you?
20    A    The inspector that actually wrote the search warrant
21    asked me to assist.
22    Q    Who was that person?
23    A    Steve Hamilton.
24    Q    And he's -- what does he do?
25    A    He's a retired inspector.  He retired four years ago
```

397

1    I believe.

2    Q    Okay.  Now, just want to make sure.  I don't think I

3    have a lot of questions for you.  But I believe you

4    testified on direct that the pictures accurately

5    reflected the clinic on the days in question.  Is that

6    correct?

7    A    Yes.

8    Q    Did you take those photos?

9    A    No, I did not.

10   Q    How do you know that those photos -- were you there?

11   A    Yes.

12   Q    On the search warrant days?

13   A    Yes.

14   Q    Who took the photographs?

15   A    I don't know who the photo log was taken by.

16   Q    How do you know the photographs were taken on the

17   day that you believe they were taken?

18   A    All of the photos are marked on the bottom righthand

19   corner with the dates of the photos.

20   Q    And that's a digital setting that can be set on the

21   camera that's being utilized?

22   A    Yes.

23   Q    Did you check the camera for accuracy?

24   A    I did not, no.

25   Q    Okay.  Did you take a picture of the lab that was at

1    the clinic?

2    A    I took no pictures.

3    Q    Did anybody take pictures of the lab that was at the

4    clinic?

5    A    I did not see the photo log.

6    Q    Okay.  Are there any X-ray rooms in that photograph

7    array that you have in front of you?

8    A    Not that I can see.

9    Q    Okay.  Did you -- are there any pictures in there of

10   the bathrooms that had the controlled access in that

11   photo array?

12   A    Not that I can see.

13   Q    Are there any photographs of all the different

14   offices that the Clinic had for the different staff

15   members in that photo array?

16   A    Not that I can see.

17   Q    Are there any pictures of the basement where the

18   coders and the billers would be in that photo array?

19   A    There are no pictures in the basement, no.

20   Q    Are there pictures of the multiple exam rooms that

21   were -- in that photo array?

22   A    No.

23   Q    So those photos don't completely and accurately

24   reflect what the Clinic completely looked like; correct?

25   A    No.

1    Q    It's just partial, what the Government wanted to

2    present right now; is that correct?

3    A    Yes.

4    Q    But it was much more robust (sic) than having some

5    charts laying around in one room; right?

6    A    Yes.

7    Q    Did you ask anybody as to why those charts were

8    where they were?

9    A    I did not, no.

10   Q    Did you ask anybody as to how long those charts had

11   been there?

12   A    No.

13   Q    Do you know whether or not those charts were active

14   patients or past patients?

15   A    No.

16   Q    Do you know whether or not the clinic was in the

17   process of transferring those files into an electronic

18   system?

19   A    No.

20   Q    Did you ever ask anybody in the clinic, well, I see

21   these files over here and they don't look too kept, can

22   you show me, if you can, just how quickly you can find a

23   patient file?

24   A    No.

25   Q    Had you ever been by the Clinic before that day?

1    A    No.

2    Q    In regards to these search warrants that you happen

3    to -- that you didn't -- you weren't the affiant on but

4    you have laid the foundation for, tell the jury -- well,

5    strike that.

6        Isn't it true that in order to receive one of those

7    search warrants you merely have to have probable cause

8    that some crime may have been committed at this

9    location?

10   A    Yes.

11   Q    Okay.  And is it also true that in order to arrest

12   people that all that's necessary is probable cause?

13   A    Yes.

14   Q    Okay.  So you had enough information -- you had

15   probable cause at that time that if you guys so chose,

16   you could have arrested Linda and Steve; correct?

17   A    I don't know that there was probable cause for

18   arrest at that point.

19   Q    So there's a different standard between probable

20   cause and arrest and probable cause for a search

21   warrant?

22   A    All we had at the time was the search warrant to

23   issue.  We did not have any arrest warrants in hand.

24   Q    Well, I understand you didn't have an arrest

25   warrant; but you could have applied for one if you

401

```
 1    wanted to, couldn't you?
 2    A    I'm sure the case agents could have, yes.
 3    Q    And their standard would have been probable cause at
 4    that point; correct?
 5    A    Yes.
 6    Q    Okay.  They chose to do a search warrant instead of
 7    an arrest warrant; correct?
 8    A    Yes.
 9    Q    And that was issued on 9-13 of 2005; is that
10    correct?
11    A    September 13th of 2005, yes.
12    Q    Okay.  September is month 9?
13    A    Yes.
14    Q    Okay.  Are you aware that the Government contends
15    that even after this time that you allegedly had
16    probable cause where you could have taken the search
17    warrant or an arrest warrant, that Dr. Schneider was
18    allowed to continue practicing medicine up until 2007?
19    Are you aware of that?
20    A    Yes.
21    Q    Okay.  And are you aware that the Government
22    contends that during this time period where they had
23    probable cause that they allowed him to continue
24    practicing that they allege that 21 people passed away
25    during that time period?  Are you aware of that?
```

1    A    I don't know that they had the probable cause for

2    arrest at that point.

3    Q    I'm not asking -- that wasn't my question.   My

4    question is:   Are you aware that when there was probable

5    cause on 9-13 of '05 that something illegal was

6    happening with the owners of the Schneider Medical

7    Clinic, when whoever the case agent was chose to get a

8    search warrant instead of arrest warrant, that between

9    that time and 2007, Government contends that 21 people

10   allegedly passed away?   Are you aware of that fact?

11   A    Again, I'm not aware that they had probable cause

12   for arrest.

13   Q    Okay.   Are you aware that the Government alleges 21

14   people passed away between September 13th of '05 and

15   12-21 of '07?

16   A    Yes.

17   Q    Is there any reason you believe your case agent

18   would have allowed Dr. Schneider to continue practicing

19   medicine on 9-13 of '05 if he truly believed that he was

20   going to be killing people?

21              MS. TREADWAY:   Objection, speculative.

22              THE COURT:   Sustained.

23              MR. WILLIAMSON:   I don't have anything

24   further.

25              THE COURT:   Mr. Gorokhov?

403

```
 1              MR. BYERS:  May I, Your Honor?
 2              THE COURT:  Well, the rule is that if there's
 3   an objection made, the lawyer who makes the objection is
 4   the lawyer who examines the witness.  I'll make an
 5   exception in your case, Mr. Byers, this time.
 6              MR. BYERS:  Thank you very much, Your Honor.
 7   It won't happen again.
 8                        CROSS EXAMINATION
 9   BY MR. BYERS:
10   Q   Mr. Rausch, my name is Kevin Byers representing
11   Linda Schneider.  Just a couple questions.
12        The clinic was a pretty big place; right?
13   A   Yes.
14   Q   Do you know how many square foot it encompassed?
15   A   No, I don't.
16   Q   Do you know how many rooms were in it?
17   A   No idea.
18   Q   I'm curious -- you still have the exhibit in front
19   of you?
20   A   Yes.
21   Q   Okay.  Can you go to the very first -- we'll call it
22   the cluttered photo.  Do you have that?
23   A   The third page.
24   Q   Right.  You see where there appears to be a door
25   that's open with a big N on it?
```

1    A    Yes.

2    Q    Okay.  Now study that for me.  You see the copier

3    there?

4    A    Yes.

5              THE COURT:  I think whoever is responsible

6    here needs to put the picture up.

7              MR. BYERS:  I should have asked for it.  I'm

8    sorry.  I thought it was coming up.  There you go.

9    Q    And you see that box that's sitting there.  I don't

10   know if you can make it out from here.  I can see it on

11   mine.  There's like a little hand or something, too, but

12   it's the unopened box on the pile of charts.  You see

13   that as sort of like a landmark there?

14   A    Okay.

15   Q    Okay.

16             MR. BYERS:  May I approach and see where he's

17   got his finger --

18             THE COURT:  Yes.

19   BY MR. BYERS:

20   Q    All right.  Yeah, we're on the same thing.

21             MR. BYERS:  And may I point it out up here,

22   Your Honor?  Or is there a way to --

23             THE COURT:  Have you got one of those little

24   fancy pointers?  There you go.

25   Q    Just laser it.  All right.  Right there.  The one

1    that is red.  Okay.  A red dot.  All right.  That's what

2    we're talking about right there.  I'm not steady.  Geez.

3    Okay.  I've tried to shoot a gun with these on it and it

4    always shows me how shaky I am.  All right.  Now go to

5    the next photo, please.  Mr. Moore.  Thank you.  And do

6    you see this box here?

7    A    Yes.

8    Q    Does that seem to be the same box?

9    A    Yes.

10    Q    Okay.  If you go to the next photo.  Do you see this

11    box way down there?

12    A    Yes.

13    Q    Do you see how it's aligned with that other open

14    box?

15    A    Yes.

16    Q    That's sort of tilted there.  Do you think that's

17    the same box we're seeing?

18    A    Yes.

19    Q    So it's reasonable to assume this is taken from the

20    other end of that hallway type thing?

21    A    Yes.

22    Q    So we've got a photo here, a photo stepping in here,

23    a photo going to the other end and shooting back this

24    way?

25    A    Right.

406

```
 1    Q   And then we look at the final photo.  Thank you,
 2    Mr. Moore.  And there was my pointer.  And we've got
 3    that box there; right?
 4    A   Yes.
 5    Q   So that's stepping back even further from the other
 6    end?
 7    A   Yes.  It's a different angle, yes.
 8    Q   So we can agree we have four pictures of one thing?
 9    A   Of the same room, yes.
10    Q   Okay.  And all these other rooms we don't see in
11    this photo array?
12    A   None of the other rooms, no.
13    Q   Okay.  And I was curious, if you go to the second
14    photo, please.  It's the exterior of the building.
15    There you go.  Thank you.  Actually this is sort of
16    interesting.  Isn't that a mailman there?
17    A   That's actually the truck that I brought to haul
18    files back to the courthouse.
19    Q   But -- okay.  So it looks like a delivery mail
20    vehicle?
21    A   It was.
22    Q   Okay.  I just wondered if you raided the place while
23    you had somebody in there delivering mail?
24    A   No.
25    Q   This, I think you said this was taken from the
```

1   southwest corner of the property?

2   A    That picture is not one that I have.

3   Q    You don't have that at all.  I'm sorry.  That's not

4   what you identified.  Okay.

5           MR. BYERS:  May I approach, Your Honor?  I

6   don't know what he has in front of him.

7   BY MR. BYERS:

8   Q    Okay.  You don't have this one at all in your

9   packet?

10  A    No.

11  Q    Okay.  So you don't have the mail vehicle in there.

12  Okay.

13          MR. BYERS:  That's all I have.  Thank you,

14  Your Honor.

15          THE COURT:  Redirect.

16                **REDIRECT EXAMINATION**

17  BY MS. TREADWAY:

18  Q    Mr. Rausch, as we explained on direct, that

19  picture -- the pictures that we show, are those

20  indicative of what you saw throughout the clinic?

21  A    Yes.  In the file rooms, yes.

22  Q    Were files strewn in the hallways?

23  A    I don't remember.

24  Q    All right.  That's fine.  But nevertheless, this is

25  just an indicative picture of what you saw throughout

1    the clinic?

2    A    Yes.

3    Q    Now, Mr. Williamson spoke to you about probable

4    cause for search.  Is that probable cause to search for

5    evidence of criminal activity?

6    A    Yes.

7    Q    And did the Court authorize us to search for

8    evidence of criminal activity?

9    A    Yes.

10   Q    And then over the course of the years did we

11   continue to look in the documents for criminal activity?

12   A    Yes.

13   Q    And probable cause is far below the standard of

14   beyond a reasonable doubt, is it not?

15   A    Yes.

16   Q    Does it take a while to put fraud cases together for

17   a beyond a reasonable doubt criminal trial?

18   A    Yes.

19   Q    And did they take that time and care in this case?

20   A    Yes, we did.

21          MS. TREADWAY:  Nothing further.

22          THE COURT:  Yes, sir.

23          MR. WILLIAMSON:  Just very brief.

24                    **RECROSS EXAMINATION**

25   BY MR. WILLIAMSON:

409

```
 1   Q   Just follow up with what Ms. Treadway said.  You

 2   continued to investigate for almost -- for over two

 3   years; is that correct?  According to Ms. Treadway?

 4   A   Actually longer than that.

 5   Q   Okay.  It took two years to be able to determine

 6   that Dr. Schneider -- all he did was ask what you need

 7   and write a script, it took that long to see that?

 8   A   I can't honestly answer that.

 9           MR. WILLIAMSON:  I don't have anything else,

10   Judge.

11           THE COURT:  Yes, sir.

12           MR. BYERS:  Nothing else, Your Honor.

13           THE COURT:  All right.  Thank you, Mr. Rausch.

14   Next witness please.

15           MS. TREADWAY:  Government calls Martin Redd.
```

**MARTIN REDD**

```
17   Having been first duly sworn to tell the truth, the

18   whole truth and nothing but the truth, testified as

19   follows on:
```

**DIRECT EXAMINATION**

```
21   BY MS. TREADWAY:

22   Q   Could you please introduce yourself to the jury.

23   A   My name is Claude Martin Redd, III.

24   Q   Where are you employed?

25   A   The Drug Enforcement Administration in Overland
```

410

```
 1   Park, Kansas.
 2   Q   How long have you been employed by the Drug
 3   Enforcement Administration or the DEA?
 4   A   Approximately five years.
 5   Q   Where were you employed previously?
 6   A   In Aken, South Carolina, at the Sheriff's office.
 7   Q   And where are you from originally?
 8   A   South Carolina.
 9   Q   And how long have you been in Kansas?
10   A   Approximately five years.
11   Q   Do you have prior military service?
12   A   I do.
13   Q   And what is that?
14   A   Was in the United States Navy from '89 to '93.
15   Q   And what did you do in the Navy?
16   A   Uhm, I did a little bit of weapons security.  That
17   was mostly through like Desert Storm and all of that is
18   when I got into weapons security.
19   Q   Have you been involved in the investigation of the
20   Defendant Stephen and Linda Schneider?
21   A   I have.
22   Q   Do you know what the Defendants relationship is?
23   A   Husband and wife.
24   Q   In addition to being husband and wife, they own and
25   operate a business?
```

1    A    Yes, they do.

2    Q    What business did they own and operate?

3    A    They operated the Schneider Medical Clinic in

4    Haysville, Kansas.

5    Q    During the course of the investigation, have you

6    been involved in gathering documents and records?

7    A    Yes.

8    Q    And have you also been involved in reviewing

9    numerous records?

10   A    Yes, I have.

11   Q    And have you been involved in compiling information

12   from these records reviews and various summary charts?

13   A    Yes.

14   Q    Let me first hand you what has been marked for

15   identification as Government Exhibit 1-I.  Do you

16   recognize that document?

17   A    Yes.

18   Q    And is that a series of charts you developed to help

19   the jury understand the various types of scheduled drugs

20   involved in this case?

21   A    Yes.

22   Q    Will Exhibit 1-I help you talk with the jury about

23   scheduled drugs, their definitions and the names of the

24   various scheduled and nonscheduled drugs that are

25   relevant in this case?

412

1    A    Yes, it will.

2    Q    And does this exhibit contain a listing of all

3    scheduled and non-scheduled drugs?

4    A    Not all of them.

5    Q    Nevertheless, does it capture a majority of the

6    drugs that will be discussed during this case?

7    A    Yes, it will.

8              MS. TREADWAY:  Government offers Exhibit 1-I.

9              MR. WILLIAMSON:  Can I just take a look at it

10   real quick, Judge.

11                     (Off-the-record.)

12             MR. WILLIAMSON:  No objection, Your Honor.

13             THE COURT:  Mr. Byers?

14             MR. BYERS:  No objection.

15             THE COURT:  It's received.

16             MS. TREADWAY:  We have a blow-up of that also

17   for the jury so that they can both see it on the screen

18   or in the blow-up, whichever is easiest for them.

19   Everybody see that?  Or am I going to be in the way?

20   BY MS. TREADWAY:

21   Q    I also want to hand you Exhibit 72.  Are you

22   familiar with that document?

23   A    Yes.

24   Q    What is it?

25   A    It's a publication of pharmaceutical drugs that the

413

1    Drug Enforcement Administration came out with.

2    Q    And is that something that is a published

3    compilation of information about drugs?

4    A    Yes.

5    Q    And does the DEA distribute this -- is it kind of a

6    poster?

7    A    Yes.

8    Q    Does it distribute this poster to educate people

9    about scheduled drugs?

10   A    Yes.

11   Q    Does the DEA distribute this poster to schools, for

12   instance?

13   A    Yes.

14   Q    To pharmacies?

15   A    Yes.

16   Q    And anybody that works in the health care industry?

17   A    Yes.

18   Q    Is this poster publicly available to anyone who

19   wishes to have a copy?

20   A    Yes.

21   Q    Can this poster be generally used and relied on by

22   the public or by persons in the health care industry?

23   A    Yes.

24   Q    And will it serve as a good reference guide for the

25   jury during the course of this case?

414

1    A    Yes, it will.

2    Q    Does it provide a picture of the various drugs

3    associated with the case?

4    A    Yes.

5    Q    Does it tell you what type of drug it is, such as a

6    narcotic or depressant or stimulant?

7    A    Yes.

8    Q    And does it tell you the schedule of the drug?

9    A    Yes, it does.

10   Q    And will this poster help the jury follow your

11   discussion of the information in the Exhibit 1-I?

12   A    Yes, it will.

13            MS. TREADWAY:  Government offers Exhibit 72 as

14   a commercial publication under Rule 803(17).

15            THE COURT:  Any objection, gentlemen?

16            MR. WILLIAMSON:  Like to look at the document.

17                    (Off-the-record.)

18            MR. WILLIAMSON:  No objection, so long as his

19   looks just like this one.  Is this for me?

20            MS. TREADWAY:  Yes.

21            THE COURT:  Mr. Byers?

22            MR. BYERS:  No objection, Your Honor.

23            THE COURT:  It's received.

24            MS. TREADWAY:  Judge, we would ask permission

25   to pass each one of these to the jurors through Robert.

415

1    Thank you.

2              THE COURT:  You may.  Have you got an extra

3    one of those for me?

4              MS. TREADWAY:  I'm sorry, Judge.  I thought

5    you had one.  I believe there's enough.  Thank you, Your

6    Honor.

7    BY MS. TREADWAY:

8    Q   Now, turning your attention back to Exhibit 1-I.

9    Let's first look at a description of the scheduled drugs

10   on the first page.  Where did you get the descriptions

11   that are on this chart, Mr. Redd?

12   A   The schedule and descriptions are in the law.

13   Q   And does Congress establish what is and is not a

14   scheduled drug?

15   A   Yes.

16   Q   Could you review with the jury the different

17   schedules and their descriptions?  Starting first with

18   Schedule II.

19   A   Schedule II, the description, has a high potential

20   for abuse.  Has a currently accepted medical use in

21   treatment in the United States.  Or a currently accepted

22   medical use with severe restrictions.  Abuse may lead to

23   severe psychological and physical dependence.

24   Q   And what about Schedule III?

25   A   Schedule III.  Has a high potential for abuse.  Less

416

1    than the drugs in Schedule II.  Has a currently accepted

2    medical use in treatment in the United States.  Or a

3    currently accepted medical use with severe restrictions.

4    Abuse may lead to moderate or low physical dependence or

5    high psychological dependence.

6    Q    And Schedule IV description?

7    A    Schedule IV.  Has a low potential for abuse relative

8    to the drugs or other substances in Schedule III.  Has a

9    currently accepted medical use in treatment in the

10   United States.  Abuse may lead to limited physical

11   dependence or psychological dependence relative to drugs

12   in Schedule III.

13   Q    Now, we used a color coding on this chart to

14   distinguish the various schedules.  We used fuchsia for

15   Schedule II, pink for Schedule III, and purple for

16   Schedule IV.  Did we use that color combination

17   throughout the course of our exhibits to distinguish the

18   various drugs and their schedules?

19   A    Yes.

20   Q    Now, moving to the next pages of your chart.  Do we

21   list various drugs and dosages?

22   A    Yes.

23   Q    And, again, we have a big board for the jury as well

24   as Mr. Moore will display that.  I'm not tall enough to

25   do this.  There we go.  I need help from my taller

1    colleagues.  Thank you.  All right.  And I believe we

2    have this on the board as well.  And Mr. Moore will blow

3    up the portions as we read along.

4         Okay.  As to this part of your exhibit, you've

5    listed the dosages that various drugs come in and their

6    generic and common names in the industry.  Essentially

7    what is the dosage of a drug?

8    A    Referring to the strength.

9    Q    All right.  And when we talk about the quantity of a

10   prescription, what are we referring to?

11   A    That's the count.

12   Q    Of the pills?

13   A    The pills.

14   Q    All right.  Now, looking at this second page, this

15   is a listing for the Schedule II controlled substances,

16   is it not?

17   A    Yes.

18   Q    And these boxes, whether they're short term or long

19   term acting, is one of our experts going to be marking

20   that later?

21   A    Yes.

22   Q    You're not an expert in that and you can't do that

23   part, can you?

24   A    No, ma'am.

25   Q    All right.  What are the five different scheduled

418

```
 1    drugs we have listed on Exhibit 1-I Page 2?
 2    A    The ones that are listed are Oxycodone, Fentanyl,
 3    Morphine, Methadone and Hydromorphone.
 4    Q    And do we also give the general names that those
 5    drugs are sold under, for instance Oxycodone, you have
 6    several names?
 7    A    Yes.
 8    Q    Endocet, Oxycodone, Oxycontin, Percocet and
 9    Percodan.  But all of these are Oxycodone?
10    A    Yes.
11    Q    And then you've listed the various strengths that
12    they come in?
13    A    Yes.
14    Q    Now, we have some that have a slash -- like 5 slash
15    325.  What's that second number?  Do you know?
16    A    The second number would be not the Oxycodone.  It
17    would be like the Tylenol or Aspirin.
18    Q    So it's something else that's in the pill?
19    A    Yes.
20    Q    All right.  Now, when we talk about Fentanyl, what
21    are the drug names that are common in the industry as to
22    Fentanyl?
23    A    Actiq and Duragesic.
24    Q    Now, as to Fentanyl, this comes in micrograms, does
25    it not?
```

1   A    Yes.

2   Q    Is that a very tiny measurement?

3   A    Yes, it is.

4   Q    Is that one-thousandth of a milligram?

5   A    Yes, it is.

6   Q    And then Morphine, what are the names of Morphine?

7   A    The generic names for Morphine are Avinza, Kadian,

8   Morphine, MS Contin.

9   Q    And Methadone also comes in a product named

10  Methadose?

11  A    Yes.

12  Q    And Hydromorphone comes in a product called

13  Dilaudid?

14  A    Yes.

15  Q    And we figured out something about some of these

16  names.  When we see "contin" in a name like Oxycontin

17  and MS Contin, that "contin" is short for continuous,

18  isn't it?

19  A    Yes, it is.

20  Q    Okay.  And does that mean the drug is supposed to

21  have a continuous release through the body over a period

22  of time?

23  A    Yes, it will.

24  Q    All right.  Now let's move to Page 3 of Exhibit 1-I.

25  And we don't have a lot on Schedule III in this case.

1   Here we have Hydrocodone.  What are the types of

2   products that are Hydrocodone on the market?

3   A   Lortab, Lorcet, Norco and Vicodin.

4   Q   But nevertheless, all of those are types of

5   Hydrocodone; right?

6   A   Yes.

7   Q   And that's a Schedule III?

8   A   Yes, it is.

9   Q   Then on the next page we have the Schedule IV drugs,

10  do we not?

11  A   Yes.

12  Q   We have quite a few here.  And these are depressants

13  and narcotics both.  What is Alprazolam commonly sold

14  as?

15  A   Xanax.

16  Q   And Diazepam?

17  A   Valium.

18  Q   Clonazepam?

19  A   Klonopin.

20  Q   Lorazepam?

21  A   Lorazepam or Ativan.

22  Q   Triazolam?

23  A   Halcion.

24  Q   Zolpidem?

25  A   Ambien.

1    Q    Propoxyphene?

2    A    Darvocet.

3    Q    And Butorphanol?

4    A    Stadol.

5    Q    And except for those last two, are all those others

6    considered depressant medications?

7    A    Yes.

8    Q    During the course of your investigation, Mr. Redd,

9    did you gather documents from pharmacies in the Wichita

10   area?

11   A    Yes.

12   Q    What types of documents did you gather?

13   A    From the pharmacies we would gather profile type

14   documents, physician or patient profiles, and the

15   controlled substance prescriptions itself.

16   Q    Now, what is a profile?

17   A    It is everything that a patient would have gotten

18   from a certain provider; or if you ran a physician

19   profile, it would be everything that that physician had

20   prescribed to anybody that he prescribed to, he or she

21   prescribed.

22   Q    And are those essentially data printouts that the

23   pharmacy can print out for you as a DEA agent?

24   A    That's correct.

25   Q    And is that something that they just maintain in the

1    normal course of their doing business as a pharmacy?

2    A    Yes.

3    Q    Now, when you went to these pharmacies seeking

4    prescriptions for controlled substances, were you asking

5    for the prescriptions issued by the providers at the

6    Schneider Medical Clinic?

7    A    Yes.

8    Q    And were you able to obtain every single

9    prescription ever written for controlled substances from

10   the Schneider Medical Clinic for a given period of time?

11   A    No.

12   Q    Why is that not possible?

13   A    Well, there would be instances where you would walk

14   into a pharmacy and they may have misplaced some of

15   their documents or prescriptions, or they couldn't find

16   them for unknown reasons.  So it would have been

17   impossible to get every one of them.

18   Q    Nevertheless, were you able to use the other means

19   like the profiles to confirm whether a prescription had

20   been written?

21   A    Yes.

22   Q    And were you also able to look at other documents to

23   confirm whether a prescription had been written and

24   filled?

25   A    Yes.

1    Q    For instance, were you able to look at the Clinic's

2    progress notes?

3    A    Yes.

4    Q    Were you able to look at receipts that perhaps the

5    individual had kept, the patient had kept?

6    A    The pharmacy, relatives, correct.

7    Q    And were you able to look at the data for the

8    billing side of the pharmacy?  In other words, what they

9    submitted to the insurance programs for payment?

10   A    Yes.

11   Q    And in all those ways were you able to develop a

12   picture for the patients in this case as to the

13   prescriptions written by the providers at the Schneider

14   Medical Clinic?

15   A    Yes.

16   Q    And have we gathered those documents for purposes of

17   this case?

18   A    Yes, we have.

19   Q    Let me first hand you what has been marked for

20   identification as Government Exhibit 2-C, 3-C and 4-C.

21   Do you recognize those documents, sir?

22   A    Yes.

23   Q    What are they, generally speaking?

24   A    They're copies of prescriptions.

25   Q    And can you identify each exhibit for the record?

1    A    The 2-C is prescriptions of Patricia G.  Exhibit 3-C

2    are copies of prescriptions of Eric T.  And Exhibit 4-C

3    are copies of prescriptions for Robin G.

4    Q    Now, I notice that you're referring to these people

5    with their first name and the first initial of their

6    last name.  Are we doing this throughout the case to

7    protect patient privacy rights?

8    A    Yes, we are.

9    Q    And as to each of those, are those copies of

10   prescriptions written by the Defendant Stephen Schneider

11   and his employees at the Schneider Medical Clinic?

12   A    Yes.

13   Q    And as such, are they business records of the

14   Schneider Medical Clinic?

15   A    Yes, they are.

16   Q    Are they also the Defendants' and other providers

17   directions to the pharmacy about what prescriptions to

18   fill?

19   A    Yes.

20   Q    And are these documents also the business records of

21   the numerous pharmacies at which you obtained them?

22   A    Yes, they would be.

23   Q    How many pharmacies did you have to get information

24   from in this case?

25   A    We went to in excess of 90 different pharmacies in

425

1    the Wichita area.

2    Q   And are pharmacists required to keep prescriptions

3    as best they can in the normal course of their business?

4    A   Yes.

5    Q   Okay.

6           MS. TREADWAY:  Government would offer Exhibits

7    2-C, 3-C and 4-C.

8           MR. WILLIAMSON:  No objection.

9           MR. BYERS:  No objection, Your Honor.

10          THE COURT:  They're received.

11   BY MS. TREADWAY:

12   Q   Next hand you a series of exhibits dealing with

13   Count 5.  Are these, similarly, the copies of

14   prescriptions that you gathered during the course of

15   your investigation?

16   A   Yes, they are.

17   Q   And could you identify each for the record?

18   A   Yes.  Exhibit 5-A-3 are copies of prescriptions for

19   Kandace B.  Exhibit 5-B-3 are copies of prescriptions

20   for Dalene C.  5-C-3 are copies of prescriptions for

21   Terry C.  5-D-3 are copies of prescriptions for Pamela

22   F.  5-E-3 are copies of prescriptions for Jeff H.  5-G-3

23   are copies of prescriptions for Jeffrey J.  5-H-3 are

24   copies of prescriptions for Mary Sue L.  5-J-3 are

25   copies of prescriptions for Jo Jo R.  5-K-3 are copies

1    of prescriptions for Billie R.   5-L-3 are copies of

2    prescriptions for Brad S.   5-M-3 are copies of

3    prescriptions for Katherine S.   5-N-3 are copies of

4    prescriptions for Evelyn S.   5-O-3 are copies of

5    prescriptions for Mary Joe S.   5-P-3 are copies of

6    prescriptions for Robert S.   5-Q 3, copies of

7    prescriptions for Patsy W.   5-R-3 are copies of

8    prescriptions for Toni W.

9    Q    Thank you.   Now --

10            MS. TREADWAY:   Government would offer Exhibits

11    5-A-3 through 5-H-3 and 5-J-3 through 5-R-3.   There is

12    no 5-I-3.

13            MR. WILLIAMSON:   Object to the extent that the

14    Government did not give us advance notice according to

15    your order with these documents.   Other than that, we

16    don't contend that prescriptions weren't written at the

17    Clinic.

18            THE COURT:   Well --

19            MS. TREADWAY:   We did give them notice, Judge.

20            MR. WILLIAMSON:   Judge, I have the document

21    right here.   They did not give us notice.

22            THE COURT:   Well, you know what my rule is on

23    it.   I want both of you to do that.   I don't want any

24    arguments about this.   It's a waste of time to not do it

25    my way.   But, having said that, I take it there are no

1    objections to these documents?

2              MR. WILLIAMSON:  No, Your Honor.

3              THE COURT:  Mr. Byers?

4              MR. BYERS:  No, Your Honor.

5              THE COURT:  Thank you.

6    BY MS. TREADWAY:

7    Q   Now, we have organized those documents in a certain

8    way for the jury, have we not?

9    A   Yes, we have.

10   Q   And I want to try to hold them up as you explain

11   this.  The cover sheet just simply lists the name and

12   prescriptions and then we have the exhibit number on the

13   bottom corner?

14   A   Yes.

15   Q   And then if you see a fuchsia sheet, does that mean

16   the prescriptions following this sheet are going to be

17   controlled II?

18   A   Yes.

19   Q   And then do we have tabs to indicate actually the

20   name of the drug and its dosage?

21   A   Yes.

22   Q   And then are only prescriptions, for instance, of

23   Avinza, 30 mg, going to be behind that tab?

24   A   That's correct.

25   Q   And then when we see the pink, we know we're in

428

```
 1    Schedule III?

 2    A    Yes.

 3    Q    And, again, we have the tabs by the name of the drug

 4    and the dosage?

 5    A    That's correct.

 6    Q    And then we move to the purple and those are the 4s?

 7    A    Yes.

 8    Q    And, again, with the tabs of the names and the

 9    dosages?

10    A    That is correct.

11    Q    Then within each prescription area are they arranged

12    chronologically?

13    A    Yes.

14    Q    Mr. Redd, in the course of your being a DEA

15    investigator, are you aware of how physicians can

16    legally prescribe controlled substances?  That is,

17    Schedule II, III, IV controlled substances?

18    A    Yes.

19    Q    Must they do so in accordance with federal

20    regulations?

21    A    Absolutely.

22    Q    And are you familiar with those federal regulations?

23    A    Yes.

24    Q    And one in particular -- let me hand you Government

25    Exhibit 64.  Do you recognize that?
```

1    A    Yes, ma'am

2    Q    Is that a copy of the regulation governing how

3    doctors and other providers are to prescribe controlled

4    drugs?

5    A    Yes, it is.

6    Q    What is the number of the regulation?

7    A    The regulation is 21 CFR, which stands for the Code

8    of Federal Regulations, 1306.04.

9    Q    And does CFR stand for the code -- I'm sorry -- you

10   just said that. I'm not listening, am I.  You said it

11   was the Code of Federal Regulations?

12   A    Yes.

13              MS. TREADWAY:  Government would offer Exhibit

14   64 as a public record.

15              MR. WILLIAMSON:  No objection, Your Honor.  I

16   think the only thing we would ask is just for a limiting

17   instruction to assure that the jury knows that you will

18   give the law that they're to follow in this case and not

19   this public record.

20              THE COURT:  I will probably give them --

21   provide them with a copy of that if necessary, but he's

22   right.  This is -- it's not a law, but it's a

23   regulation.  It's a publication of the U.S. government;

24   and, beyond that, I don't think there's anything else to

25   say.

430

```
 1              MR. WILLIAMSON:  No other objection, Your
 2   Honor.
 3              MR. BYERS:  Nothing, Your Honor.
 4              MS. TREADWAY:  Is it admitted?.
 5              THE COURT:  Yes.
 6              MS. TREADWAY:  Thank you.  Could you display
 7   that, Mr. Moore.
 8   BY MS. TREADWAY:
 9   Q   According to this regulation, sir, must a
10   prescription be issued for a legitimate medical purpose?
11   A   Yes.
12   Q   And must the prescription be issued in the usual
13   course of the medical provider's professional practice?
14   A   Yes.
15   Q   Thank you.  Mr. Redd, as a part of our
16   investigation, did you determine who worked as a
17   physician assistant at Schneider Medical Clinic?
18   A   Yes.
19   Q   And did we determine that from the Clinic's own
20   employment records?
21   A   Yes.
22   Q   And were you also able to determine that from the
23   DEA's records of licenses or registration numbers?
24   A   Yes.
25   Q   By reviewing the various records, including the
```

1       employment records from the Clinic and your records,

2       were you able to determine the approximate starting and

3       ending dates of each physician's employment at Schneider

4       Medical Clinic and when they became licensed to provide

5       prescriptions for controlled substances?

6       A    Yes, I did.

7       Q    Were you also able to find documents from the Kansas

8       Board of Healing Arts regarding these physician's

9       assistants?

10      A    Yes.

11      Q    And is the Kansas Board of Healing Arts the

12      licensing agency for the State of Kansas over health

13      care providers like doctors and physician's assistants?

14      A    Yes, it is.

15      Q    And from that information, were you able to

16      determine who the primary and secondary supervising

17      physicians were for the physician's assistants?

18      A    Yes.

19      Q    Are physician's assistants allowed to prescribe

20      controlled substances?

21      A    Yes.

22      Q    Just like a doctor?

23      A    Yes.

24      Q    Are they required to meet the same standards that we

25      just went over?

432

1     A    Oh, yes, they are.

2     Q    Do they have to have a DEA registration number?

3     A    They do.

4     Q    Do they have to apply for that?

5     A    Yes, they do.

6     Q    And do they have to be granted that by the DEA just

7     like physicians?

8     A    Yes.

9     Q    And once they have that registration number and

10    their licensure and they agree to abide by the law, are

11    they allowed to prescribe controlled substances?

12    A    Yes, they are.

13    Q    Using all of this information, did we prepare a

14    summary chart for the jury to show when the physician's

15    assistants were employed and who their primary and

16    secondary supervising physicians were and when they got

17    their DEA numbers?

18    A    Yes.

19    Q    And is that Exhibit 1-T?

20    A    Yes, it is.

21    Q    Now, does Exhibit 1-T summarize somewhat voluminous

22    information that is not easily looked at in the

23    courtroom, especially the data information that's kept

24    at the DEA?

25    A    Yes, it is.

1    Q    And will this chart eliminate the need for the jury

2    to review that voluminous data that you reviewed and

3    from which you created the chart?

4    A    Yes, it will.

5    Q    Does the information accurately reflect the

6    information it summarizes?

7    A    Yes.

8              MS. TREADWAY:  Government would offer Exhibit

9    1-T as a summary exhibit under Federal Rule of Evidence

10   1006.

11             THE COURT:  Any objection, gentlemen?

12             MR. WILLIAMSON:  No, Your Honor.

13             MR. BYERS:  No, Your Honor.

14             THE COURT:  It's received.

15             MS. TREADWAY:  We again have a blow-up of this

16   and Mr. Moore will display it on the screen.

17   Q    Now, let's review this chart with the jury.  First

18   of all, the first column we have the physician's

19   assistant full name.  Then the second column we have the

20   DEA number start date.  What does that mean?

21   A    That was the date that they were issued a Drug

22   Enforcement Administration registration.

23   Q    And then we have approximate Schneider Medical

24   Clinic start date.  SMC start date.  And did we get this

25   information from the various documents at the Clinic in

434

1   their employment files?

2   A   Yes, we did.

3   Q   And same for the approximate end date?

4   A   That is correct.

5   Q   Then the primary supervising physician and the

6   secondary supervising physician, we got this information

7   from the Kansas Board of Healing Arts?

8   A   Yes, we did.

9   Q   Now, we've arranged the names how?  In what order?

10  A   By start date at the clinic.

11  Q   So chronologically?

12  A   Chronologically.

13  Q   All right.  Now, how many physician's assistants did

14  the clinic have over time?

15  A   Ten.

16  Q   Did they have more than one physician assistant

17  working during some time periods?

18  A   Yes.

19  Q   There is a name here, Atterbury.  Do you know that

20  person's first name?

21  A   I believe it's Curtis Atterbury.

22  Q   And do you know how is he related to the Defendants

23  in this case?

24  A   He is Linda Schneider, Linda Atterbury's brother.

25  Q   Now, at the time of the search on September 13th,

435

1    2005, were there three physician's assistants working

2    there at that time?

3    A    Yes, there were.

4    Q    That's N-G-U-Y-E-N, which I understand is Nguyen?

5    A    Nguyen.

6    Q    Mr. Akram and Ms. Hunter?

7    A    Yes.

8    Q    Now, did two of those people quit the day after the

9    search?

10   A    Yes, Nguyen and Hunter left September 14th, 2005.

11   Q    Of the ten physician's assistants, were there

12   several that stayed for a very short period of time at

13   the Clinic?  Say five months or less?

14   A    There were five.

15   Q    All right.  And who was that?

16   A    That is Ms. Klingsick from March to July of '04.

17   A    Correct.

18   Q    Mr. Hall, February to July of '05.  Ms. Nguyen

19   again?

20   A    Yes.

21   Q    Ms. Hunter?

22   A    Yes.

23   Q    And Mr. Jones?

24   A    Yes.

25   Q    Now, according to this chart, was Dr. Schneider the

1   primary supervising physician for several of these

2   people?

3   A   Yes, he was.

4   Q   Was he the primary supervising physician for

5   Ms. He'bert?

6   A   Yes.

7   Q   For Ms. Klingsick?

8   A   Yes.

9   Q   For Mr. Craig?

10   A   Yes.

11   Q   For Ms. Nguyen?

12   A   Yes.

13   Q   And for a while for Mr. Akram?

14   A   Yes.

15   Q   And then did his primary supervising physician

16   change to Dr. Simons in November of '05?

17   A   For Akram, yes.

18   Q   And then was he the secondary supervising physician,

19   Dr. Schneider, for Curtis Atterbury?

20   A   Yes.

21   Q   Mr. Hall?

22   A   Yes.

23   Q   Mr. Akram, once Dr. Simons took over?

24   A   That's correct.

25   Q   Ms. Hunter?

1    A    Yes.

2    Q    Mr. Jones?

3    A    Yes.

4    Q    And Ms. White?

5    A    Yes.

6    Q    I'm sorry.  Can we put that up again.  I apologize.

7    It's my fault.  We can just use the screen.

8        Now, the DEA start date for Charles Craig.  Can you

9    highlight that, Mr. Moore.  He had a start date at the

10   clinic in August of 2004.  And according to your

11   records, he didn't get his DEA registration until about

12   five, six weeks later?

13   A    Yes.

14   Q    During that five to six week period, would Mr. Craig

15   have been legally able to write prescriptions for

16   controlled substances?

17   A    No, he would not.

18   Q    Looking at Ms. Hunter, she has no DEA start date.

19   Can you explain what happened with her?

20   A    Ms. Hunter's registration was terminated before it

21   was issued.

22   Q    Do you know why?

23   A    I believe she -- it was a very short term of

24   employment.

25   Q    So just the paperwork maybe just didn't get through?

438

```
 1   A    That's correct.
 2   Q    So at any point in time that she worked at Schneider
 3   Medical Clinic would she have had the ability to legally
 4   write prescriptions for controlled substances?
 5   A    No, she would not have.
 6   Q    As another part of your investigation, Mr. Redd, did
 7   we subpoena other public records that helped us identify
 8   individuals who had been patients at the Schneider
 9   Medical Clinic and are now deceased?
10   A    Yes.
11   Q    Specifically, did we obtain from the Kansas
12   Department of Revenue the driver's license photos of the
13   people named in the overt acts of the conspiracy, the 68
14   deceased, to the extent those people did have driver's
15   licenses?
16   A    That's correct.
17   Q    As a law enforcement officer, do you commonly rely
18   on driver license photographs to identify individuals
19   both living and dead?
20   A    Yes.
21   Q    In response to our subpoena to the Kansas Department
22   of Revenue, did we receive driver license photos of all
23   the deceased individuals that in fact had driver's
24   licenses?
25   A    That did have driver's licenses, yes.
```

1   Q   Will these photos help the jury distinguish these

2   individuals throughout the course of the trial as we

3   discuss them by first name and the last letter, the

4   first letter of their last name?

5   A   Yes.

6   Q   Let me first hand you what has been marked for

7   identification as Exhibits 2-A, 3-A and 4-A.  Are you

8   familiar with these documents?

9   A   Yes.

10  Q   Could you identify them for the record?

11  A   Exhibit 2-A is the driver license photo of Patricia

12  G.  Exhibit 3-A is a photograph, driver's license

13  photograph of Eric T.  And Exhibit 4-A is a driver's

14  license photograph of Robin G.

15          MS. TREADWAY:  Government would offer Exhibits

16  2-A, 3-A and 4-A as public records under Rule 803 (8).

17          MR. WILLIAMSON:  No objection.

18          MR. BYERS:  No objection, Your Honor.

19          THE COURT:  They're received.

20  BY MS. TREADWAY:

21  Q   I'm next handing you the pictures for Count 5 of the

22  Indictment.  Could you identify those for the record

23  please.

24  A   Exhibit 5-A-1 is a driver's license photograph of

25  Kandace B.  5-B-1 is a driver's license photograph of

1    Dalene C.  5-C-1 is a driver's license photograph of

2    Terry C.  5-D-1 is a driver's license photograph of

3    Pamela F.  5-E-1 is a driver's license photograph of

4    Jeff H.  5-F-1 driver's license photograph of Victor J.

5    5-G-1, a driver's license photograph of Jeffrey J.

6    5-H-1 a driver's license photograph of Mary Sue L.

7    5-I-1 is a driver's license photograph of Heather M.

8    5-J-1 a driver's license photograph of Jo Jo R.  5-K-1,

9    a driver's license photograph of Billie R.  5-L-1 is a

10   driver's license photograph of Brad S.  5-M-1 is a

11   driver's license photograph of Katherine S.  5-O-1 is a

12   driver's license photograph of Mary Joe S.  5-P-1, a

13   driver's license photograph of Robert S.  5-Q-1, a

14   driver's license photograph of Patsy W.  And finally,

15   5-R-1, a driver's license photograph of Toni W.

16   Q   Let me now hand you what has been marked for

17   identification as Exhibit 1-A.  Is that a further chart

18   that we have developed for this case, and did you

19   correlate the photographs, the driver's license

20   photographs, with each of the individuals in that chart

21   in the first column to the extent they had a driver's

22   license photo?

23   A   Yes.

24   Q   During the course of your investigation, Mr. Redd,

25   did we obtain from the American Academy of Pain

441

1   Management an application that Defendant Stephen

2   Schneider completed?

3   A   Yes, we did.

4   Q   And is that Government Exhibit 52?

5   A   Yes, it is.

6   Q   Looking at the second page, does it appear that the

7   Defendant Stephen Schneider signed this application?

8   A   Yes.

9   Q   On what date?

10   A   October 12th, 2004.

11          MS. TREADWAY:  Government would offer Exhibit

12   52.

13          MR. WILLIAMSON:  No objection, Your Honor.

14          MR. BYERS:  No objection.

15          THE COURT:  Gentlemen, stand when you address

16   the Court.

17          MR. BYERS:  Thank you, Your Honor.

18          MR. WILLIAMSON:  I apologize, Your Honor.

19          THE COURT:  Received.

20          MS. TREADWAY:  Could we draw up the first

21   page, Mr. Moore.

22   BY MS. TREADWAY:

23   Q   Looking at this first page, does it indicate what

24   his specialty is?

25   A   Listed as family practice and pain management.

442

1    Q   On the second page, let's review with the jury

2    Question 13 and Defendant Stephen Schneider's answer.

3    A   Question 13.

4    Q   Let him bring it up first.  Pardon me.  Sorry.

5    We're going to use the elmo for this because somehow we

6    forgot to put that in.  I'm not good at this so -- do

7    you want to help me focus it on that.  There we go.

8    Thank you.  Let's see.

9        Does Question 13 say:  "Briefly outline your

10   experience in pain management.  Include information

11   about training, work experience, writing, research and

12   teaching."?

13   A   Yes.

14   Q   And then has Dr. Schneider answered:  "I am a family

15   practitioner that has done pain management approximately

16   three years.  I have attended regional and national

17   conferences on pain management.  I am one of the leading

18   writers of narcotics in the State of Kansas."?

19   A   Actually it says writers for narcotics in the State

20   of Kansas.

21   Q   For narcotics in the State of Kansas.  Thank you.

22   Mr. Redd, during the course of your investigation in

23   this case, did you have an opportunity to talk with the

24   Defendant Linda Schneider?

25   A   Yes.

443

1    Q    How did that come about?

2    A    Linda Schneider called and wanted to set up a

3    meeting between her and myself.

4    Q    And did you agree to meet with her?

5    A    Yes.

6    Q    When did the meeting with Linda Schneider occur?

7    A    I believe it was October of 2007.

8    Q    Was it October 17th of 2007 more specifically?

9    A    Yes.

10   Q    And where did that meeting occur?

11   A    At the Drug Enforcement Administration in Wichita,

12   Kansas.

13   Q    Who else was present besides you and the Defendant

14   Linda Schneider?

15   A    James Greer with the HHS-OIG.

16   Q    And was that meeting videotaped and recorded?

17   A    Yes, it was.

18   Q    Did Defendant Linda Schneider know that at the time?

19   A    I don't think she did, no.

20   Q    Okay.  Why did you choose to videotape and record

21   the meeting?

22   A    The room was set up for video and audio.

23   Q    Was it an interrogation room?

24   A    It was an interview room, yes.

25   Q    But was this an interview?

444

1    A    No, it was a meeting.

2    Q    All right.  Did we digitize the videotape that you

3    took of this meeting?

4    A    Yes.

5    Q    And did we have a transcript made?

6    A    Yes, we did.

7    Q    Let me hand you what has been identified as

8    Government Exhibits 82-1 and 82-2.  Are these the

9    videotapes of that meeting?

10   A    Yes, they were.

11   Q    And is 82-A a digitized copy of those videotapes?

12   A    Yes.

13   Q    And is 82-B the transcript?

14   A    Yes, it is.

15   Q    Have we taken some excerpts from this meeting and

16   put them in a software program to play for the jury

17   where you see the video and the transcript displayed

18   simultaneously?

19   A    Yes.

20   Q    And have we placed those clips onto a separate disc,

21   Exhibit 82-C?

22   A    Yes.

23   Q    Have you reviewed these clips prior to your

24   testimony today?

25   A    Yes.

1    Q    Although they are not the entire meeting with Linda

2    Schneider, are they a fair and accurate reflection of

3    some of her statements on October 17th, 2007?

4    A    Yes, they are.

5              MS. TREADWAY:  The Government would offer the

6    videotapes, Exhibits 82-1 and 82-2.  The digitized

7    version, 82-A, and the clips, 82-C, for the record,

8    Judge.

9              THE COURT:  Mr. Byers?

10             MR. BYERS:  Your Honor, only with the -- I

11   assume the Government is going to play the clips, and I

12   realize they're introducing the complete record, or the

13   totality, the rest outside the excerpts, and my concern

14   is that will the jury ever actually be required to view

15   the totality of the interview.  And that's why I would

16   move for that.  So that --

17             THE COURT:  I don't know that they would be

18   required to; but certainly on cross-examination, for

19   example, if you would want to play the excluded

20   portions, you certainly can.

21             MR. BYERS:  Okay.

22             MS. TREADWAY:  That's why we're introducing

23   the entire video, Judge, for their capabilities of doing

24   that.

25             THE COURT:  Okay.  All right.  82-1, 2 and 3

```
 1    are received.
 2    BY MS. TREADWAY:
 3    Q    We just heard from Special Agent Barry Rausch, whom
 4    you know; right?
 5    A    Yes.
 6    Q    And he told the jury that the first search occurred
 7    on September 13th, 2005.  During the meeting with
 8    Defendant Linda Schneider on October 17th, 2007, did she
 9    discuss what happened at the Defendants' clinic as a
10    result of that first search?
11    A    Yes.
12    Q    And do we have a clip of that discussion?
13    A    Yes, we do.
14              MS. TREADWAY:  Government requests permission
15    to play clip 1.
16              THE COURT:  Go ahead.
17                   (Portion of video clip played
18                      for the jury).
19    BY MS. TREADWAY:
20    Q    During the meeting with Defendant Linda Schneider on
21    October 17th, 2007, did she indicate an awareness about
22    patients selling drugs?
23    A    Yes.
24    Q    Do we have a clip of that discussion?
25    A    We do.
```

447

```
 1    Q    Could you play, please, clip 2.
 2                        (Portion of video clip played
 3                        for the jury.)
 4    Q    During the same meeting with the Defendant Linda
 5    Schneider did she indicate an awareness that people were
 6    overdosing on prescription medications?
 7    A    Yes.
 8    Q    And do we have a clip of that discussion?
 9    A    Yes.
10                        (Portion of video clip played
11                        for the jury.)
12    Q    And that was interrupted to, again, protect the
13    patient's last name and protect the patient's privacy?
14    A    Correct.
15    Q    During this same meeting with the Defendant Linda
16    Schneider, did she indicate an awareness of patients
17    doctor hopping?
18    A    Yes.
19    Q    What did you understand her to mean when she said
20    doctor hopping?
21    A    It's usually referred to as doctor shopping where a
22    patient will go from physician to physician to try to
23    obtain as many of the same type or different quantities
24    of different drugs or the same drug as they can.
25    Q    Do we have a clip of that discussion?
```

448

```
 1    A    Yes.

 2    Q    Could you please play clip 4.

 3                        (Portion of video clip played

 4                        for the jury.)

 5    Q    During the meeting with Defendant Linda Schneider,

 6    did she indicate whether she was involved in terminating

 7    patients from pain management at the Schneider Medical

 8    Clinic?

 9    A    Yes.

10    Q    What term did she use?

11    A    She referred as fired.

12    Q    And do we have a clip of that discussion?

13    A    Yes.

14    Q    Would you please play clip 5.

15                        (Portion of video clip played

16                        for the jury.)

17    Q    During the meeting with the Defendant Linda

18    Schneider on October 17, 2007, did she talk about a

19    policy regarding refills of prescription medications?

20    A    Yes.

21    Q    And do we have a clip of that discussion?

22    A    We do.

23    Q    Could you play clip 7, please.

24                        (Portion of video clip played

25                        for the jury.)
```

1    Q    During this same meeting, did the Defendant Linda

2    Schneider indicate an awareness that there were street

3    uses for prescription medications?

4    A    Yes.

5    Q    And do we have a clip of that discussion?

6    A    Yes.

7    Q    Could you please play clip 6.

8                        (Portion of video clip played

9                        for the jury.)

10   Q    During that meeting with the Defendant Linda

11   Schneider, did she indicate discontent over how another

12   provider wrote prescriptions?

13   A    Yes.

14   Q    And who was the other provider?

15   A    Lawrence M Simons.

16   Q    And do we have a clip of that discussion about Dr.

17   Simons?

18   A    Yes.

19   Q    And essentially what do you understand the Defendant

20   Linda Schneider to be complaining about here?

21   A    After reviewing the video, it was that Simons wasn't

22   getting the people to come in so they could pay an

23   office visit.

24   Q    Please play clip 8.

25                        (Portion of video clip played

 1                        for the jury.)

 2          MS. TREADWAY:  That's all, Judge.  Thank you.

 3          THE COURT:  This might be a good time to have

 4   a recess.

 5          MR. WILLIAMSON:  For the day, Your Honor?

 6          THE COURT:  No.

 7          MR. WILLIAMSON:  Oh, I thought it was late.

 8          THE COURT:  Time flies when you're having fun.

 9   Well, we'll take about ten minutes or so, Ladies and

10   Gentlemen.  Remember and heed the admonition.

11                        (Recess.)

12          MS. TREADWAY:  Judge, just a short

13   housekeeping matter I failed to do this afternoon.

14   Mr. Rausch -- Defendant -- we would ask that Mr. Rausch

15   be excused from the rule of sequestration.  We do not

16   intend to call him as a witness, nor does the defense.

17          MR. WILLIAMSON:  No objection.

18          MR. BYERS:  No objection.  I don't see him.

19          MS. TREADWAY:  No, he left for the day because

20   I didn't ask.

21          THE COURT:  That's fine.

22          MS. TREADWAY:  Thank you.

23                   **CROSS EXAMINATION**

24   BY MR. WILLIAMSON:

25   Q   How you doing, Mr. Redd?

1    A    Good.

2    Q    Do you go by Detective Redd or Agent Redd?

3    A    Investigator Redd.

4    Q    Investigator.  All right.  I'll try to be

5    respectful.

6    A    Whatever you call me.  I've been called worse, I'm

7    sure.

8    Q    I'll try not to do that.  Judge Belot might get me

9    today.

10        All right.  I just want to talk a little bit about

11   your testimony and first let's start with what you did

12   as far as part of this investigation.  Were you the lead

13   investigator?

14   A    As far as the Drug Enforcement Administration's

15   business, yes.

16   Q    Okay.  So you're the person that I would talk to if

17   I had questions about what you did as far as

18   investigation into the drug dealing allegations?

19   A    Controlled substance prescriptions, obviously, I did

20   some interviews, but mostly the controlled substance

21   prescriptions is what I was after.

22   Q    Now, you mentioned to the jury that you utilized a

23   physician patient profile.  Is that correct?

24   A    Yes.

25   Q    Okay.  And that profile is basically let's, you

452

1    know, or basically let's the DEA know everything that a

2    physician prescribed.  Is that correct?

3    A    Basically, yes.

4    Q    Okay.  And so the jury -- make sure the jury

5    understands that when a physician, before he can

6    prescribe medicine that is on that chart that you showed

7    the jury, they have to go through an application

8    process.  Is that correct?

9    A    That's correct.

10   Q    And part of that application they have to tell who

11   they are, where they practice; correct?

12   A    Yes.

13   Q    They have to tell -- give permission to do a

14   background check on that individual; correct?

15   A    The physician himself?

16   Q    Yes.  They can't have a felony and have a DEA --

17   A    That's correct.

18   Q    Okay.  Dr. Schneider didn't have a felony.  He

19   passed the background check and everything?

20   A    Correct.

21   Q    And physicians know that every prescription they

22   write that they put their DEA number on can be tracked

23   by the DEA; correct?

24   A    That's correct.

25   Q    That's not a secret?  You guys don't try to ambush

453

```
 1    people?  You let 'em know whatever you do, we'll be
 2    watching you.  Correct?
 3    A    Right.
 4    Q    Okay.  And, side question, where you went to
 5    these -- before you went to these pharmacies, did you
 6    contact patients of the Schneider Medical Clinic and
 7    say, hey, we know this is private investigation, but we
 8    need an investigation, is it okay if we look at your
 9    records?
10    A    No, we don't have to do that.
11    Q    Really?
12    A    No.
13    Q    Wow.
14    A    If it doesn't apply to --
15    Q    Federal Government?
16    A    Drug Enforcement Administration.
17    Q    Do you have any limitations on going to get records?
18    A    Sure.
19    Q    Okay.  Constitutional limitations?
20    A    Sure.
21    Q    Is there a Constitutional amendment that limits the
22    DEA from getting a patient's record whenever they choose
23    to?
24    A    Well, if I understand you correctly -- do you want
25    to repeat the question?
```

1   Q   Yeah.  Tell the jury what Constitutional Amendment

2   that prevents the DEA from going to get a medical record

3   of a patient without letting that patient know you're

4   doing it before you do it?

5   A   Well, in regards to documentation or records or

6   inventories that's required by DEA under the federal

7   regulations, we would be able to look at it, seize it,

8   analyze it.

9   Q   Right.  So basically make sure I understand.  I was

10  new to this whole thing before this case came so I want

11  to make sure I understand this.  If the DEA wants to go

12  pull patient records who is issued prescriptions by a

13  physician with a DEA number, you guys can do it without

14  even believing a crime had occurred?  You can just go

15  look at it for enforcement purposes?

16  A   As far as a criminal investigation is concerned,

17  yes.

18  Q   Okay.  And what about outside of criminal

19  investigation, can you just go and say let's randomly

20  select, you know, 100 providers and let's just review

21  their prescription pattern and make sure that, you know,

22  they're complying with all our regulations?  Can you do

23  that?

24  A   Aside from a criminal investigation?

25  Q   Aside from a criminal investigation.

 1    A    The Drug Enforcement Administration would, in order

 2    to look at somebody's records, even as far as to go into

 3    a pharmacy, we have what's called a Notice of

 4    Inspection, which is a DEA form, and that inspection --

 5    that Notice of Inspection allows a registrant such as a

 6    pharmacy, physician, manufacturer, distributor of

 7    controlled substances, that allows us -- it's giving the

 8    Drug Enforcement Administration voluntary permission for

 9    us to look at different things.

10    Q    And just make sure I understand.  That's called

11    notice of inventory?

12    A    Notice of Inspection.

13    Q    Inspection.  Who issues that?

14    A    We would.

15    Q    The DEA?

16    A    Yes.

17    Q    And the DEA basically let's the provider or whoever

18    you are know, hey, we're coming in to look at the

19    records?

20    A    That's correct.

21    Q    And you don't have to notify patients before you do

22    that according to any kind of federal law that you know

23    of?

24    A    That's correct.

25    Q    And the DEA is also the same organization that has

```
 1    the ability to put a certain drug under a certain
 2    schedule of that schedule that you showed the jury;
 3    isn't that correct?
 4    A   We have a hand in it, yes.
 5    Q   You have shared responsibility with the FDA?
 6    A   Yes.
 7    Q   Okay.  You don't have to go get approved by the
 8    Legislature?  That's basically administration's -- the
 9    two administrations can do that; correct?
10    A   I believe what they have to do, what the Drug
11    Enforcement Administration has to do is publish it in a
12    Federal Register.
13    Q   Right.  But --
14    A   Until it's accepted.
15    Q   Right.  But you don't have to go through the --
16    A   Drug Enforcement Administration just can't say I'm
17    going to make this a Schedule II drug and it's put in
18    the books.
19    Q   What's the process then.  Let's say you come up with
20    a new narcotic you don't know --
21    A   I'm not a part of that process.
22    Q   But it's fair to say it doesn't have to go through
23    the House in Congress and then go through the Senate.
24    Is that fair?
25    A   I'm unaware of that.
```

457

1    Q    Okay.  Now, when you went and talked to these

2    pharmacies without letting any of these patients know,

3    did you -- you say you went to 90 pharmacies?

4    A    In excess of 90 pharmacies.

5    Q    And just make sure the jury understands.  That

6    wasn't 90 pharmacies just for three patients of the

7    Schneider Medical Clinic; correct?

8    A    That's correct.

9    Q    That was every pharmacy in the Wichita area that

10   would have issued a prescription to a Schneider patient

11   since this clinic had been opened?

12   A    If that's what we were looking for, yes.

13   Q    What were you looking for?

14   A    Just that.

15   Q    Okay.  So that's what it was?

16   A    Yes.

17   Q    Okay.  And you cast this wide net, you came up with

18   this table, or these documents of prescriptions that the

19   Government marked as exhibits.  You remember identifying

20   those?

21   A    Yes.

22   Q    And as I understand it, these documents are

23   organized by the medication that was given and the date

24   that it was given.  Isn't that correct?

25   A    That's correct.

458

1    Q    Okay.  Not all of those were written by Stephen

2    Schneider, were they?

3    A    That's correct.

4    Q    You didn't organize those for the jury identifying

5    the ones specifically that you believed Stephen

6    Schneider wrote, did you?

7    A    That's correct.

8    Q    There's all co-mingled, everything from everybody

9    under the Schneider Medical Clinic; correct?

10   A    That's correct.  Providers from the Schneider

11   Medical Clinic.

12   Q    How many providers from the Schneider Medical Clinic

13   are on trial here today for writing prescriptions?

14   A    I'm sorry.

15   Q    How many providers from the Schneider Medical Clinic

16   are here today on trial for writing prescriptions?

17   A    One.

18   Q    You didn't think it would be helpful for the jury to

19   identify the specific prescriptions that Dr. Schneider

20   wrote?

21   A    They're included in that.

22   Q    You didn't come up with that organization scheme,

23   did you?

24   A    I'm not really sure who came up with that exact

25   scheme, but that's how they were organized.

1    Q    Did you physically organize them that way?

2    A    I was part of that, yes.

3    Q    Each and every one of those -- you say you were a

4    part.  Were you 50%, 30%, 100%?

5    A    Probably 90.

6    Q    Who else helped?

7    A    Different people from the U.S. Attorney's office.

8    Q    Just so we're clear.  You weren't in the room when

9    any of these people received prescriptions; correct?

10   A    That is correct.

11   Q    Did you review their -- strike that.

12        You actually mentioned that the pharmacies have a

13   document retention requirement; is that correct?

14   A    As far as what?

15   Q    As far as prescriptions that they fill for

16   controlled substances?

17   A    That's their record that they have to keep?  Yes.

18   Q    Why do they have to keep it?

19   A    The prescriptions?

20   Q    Yes.

21   A    That's their required record both by the Drug

22   Enforcement Administration and the State.

23   Q    Okay.

24   A    State Pharmacy Board to be exact.

25   Q    And you as the DEA, you have the ability to find or

460

```
 1    penalize pharmacies for not keeping accurate records;
 2    correct?
 3    A    Yes, we do.
 4    Q    You have the ability, if you felt like a pharmacy
 5    was obstructing justice, to bring a charge against that
 6    pharmacy?
 7    A    Yes.
 8    Q    And you didn't find any pharmacies that -- well, you
 9    haven't charged any pharmacies with obstructing justice
10    when it came to Dr. Schneider's prescriptions; correct?
11    A    I didn't charge any?
12    Q    You have not charged any pharmacies with obstruction
13    of justice when it came to retention of Dr. Schneider's
14    prescriptions; correct?
15    A    Not as of yet, no.
16    Q    And the reason I ask is because you understand he's
17    charged with conspiracy; correct?
18    A    That's correct.
19    Q    And you understand in a drug conspiracy there has to
20    be an initiator and there has to be a delivery person.
21    In other words, Dr. Schneider couldn't have gotten these
22    medications to the patients without the pharmacist;
23    correct?
24    A    That's correct.
25    Q    And you haven't charged any -- the government hasn't
```

461

```
 1    charged any pharmacists here; correct?
 2    A    Not as of yet.
 3    Q    Okay.  And this case has been pending since 2007;
 4    correct?
 5    A    Thereabout, yes.
 6    Q    And you wouldn't just let these pharmacists keep
 7    violating the law if you really truly thought they were
 8    obstructing justice or part of this conspiracy; correct?
 9    A    It's -- well, I mean, aside from us not making any
10    charges or fines of any pharmacies, that hasn't come to
11    a head yet.
12    Q    Okay.  But the point is you raided the clinic back
13    in 2005; correct?
14    A    Yes.
15    Q    And you brought these charges in 2007?
16    A    Uh-huh.
17    Q    And between 2005 and 2010 you have yet to charge a
18    pharmacist as part of this alleged conspiracy; correct?
19    A    That is correct.
20    Q    And it's undisputed that Dr. Schneider never handed
21    a narcotic to a patient without a prescription, isn't
22    it?
23    A    Not that I know of.
24    Q    Okay.  You're saying not that you know -- he never
25    did that that you know of; correct?
```

462

```
 1    A    Yeah, I don't know what happened in the clinic
 2    because I was never in the clinic as a patient.
 3    Q    But you investigated the Clinic?
 4    A    Yes.
 5    Q    And you never heard any of those allegations, did
 6    you?
 7    A    That is correct.
 8    Q    And everything that he wrote was traceable by the
 9    DEA?
10    A    That's correct.
11    Q    Did you know who Dr. Schneider was before you began
12    the investigation to him specifically?
13    A    No, I did not.
14    Q    Were you aware that he was practicing medicine for
15    15 years before he ever hit your radar?
16    A    No.
17    Q    Are you aware that he never had any issues with the
18    DEA until he started getting this large Medicaid patient
19    population?  Are you aware of that?
20    A    No, I am not.
21    Q    Okay.  Now, the jury's going to hear the Government
22    allege certain things about the documents in this case;
23    and I think they said in opening there were times when
24    there were physicians -- excuse me -- there were times
25    when the pharmacies didn't have records just because
```

463

1    they may have not kept the records.  Is that fair?

2    A    That's correct.

3    Q    In those instances you were able to determine the

4    prescription that Dr. Schneider wrote by going to his

5    clinic and pulling out his records; isn't that correct?

6    A    That was one of the documentations that we looked

7    at.

8    Q    Okay.  Did you ever recall seeing a progress note,

9    or -- strike that.

10        You were able to read the progress note, look on

11   there and see what Dr. Schneider prescribed to the

12   patient; correct?

13   A    For the most part, yes.

14   Q    Okay.  So it was legible enough for you to conduct

15   your investigation; correct?

16   A    I said for the most part.

17   Q    Granted I'm not going to say that his writing is

18   perfect.

19   A    Okay.

20   Q    But for the most part, they kept accurate enough

21   records that you were able to follow the paper trail;

22   correct?

23   A    For prescription purposes, yes.

24   Q    Yeah, for prescription purposes; correct?

25   A    Correct.

1    Q    I haven't seen an allegation that you found --

2    strike that.  Wrong thought.  Not the right way to --

3    you did talk about to the jury, you talked about --

4    let's talk about this application, Exhibit 52.

5    Mr. Moore, would you be so kind as to --

6             MR. MOORE:  I have page one.  If you would

7    like to do both pages, we have to put it on the elmo.

8             MR. WILLIAMSON:  I have a copy of it.

9                  (Off-the-record.)

10   BY MR. WILLIAMSON:

11   Q    Now, do you see at the top of this document in the

12   paragraph up there the American Academy of Pain

13   Management?

14   A    Yes.

15   Q    Is that who you contacted to get a copy of this

16   application?

17   A    The United States Attorney's Office in Topeka

18   subpoenaed this information.

19   Q    Okay.  Well, how are you able to lay a foundation

20   for it if you're not the one that subpoenaed it?  Well,

21   never mind.  I didn't object to it.  Let's just keep

22   going.

23        Did you -- did you read the document?

24   A    The application?

25   Q    Yes.

465

```
 1    A    Yes.
 2    Q    Did you investigate who the American Academy of Pain
 3    Management was?
 4    A    No, I did not.
 5    Q    So you have a document that you presented to the
 6    jury and the only thing you guys really wanted to point
 7    out was the fact that Dr. Schneider said he was the
 8    largest or the leading writer of narcotic prescriptions
 9    in Kansas.  Did you ever contact this organization and
10    see what was he submitting this application for?
11    A    I did not, no.
12    Q    Did you learn in the course of your investigation
13    that the American Academy of Pain Management is a group
14    that promotes the ethical practice of pain management?
15    Were you aware of that?
16    A    Vaguely.
17    Q    And are you aware that they require, like if you
18    apply to this place and you're accepted, you commit to
19    doing the best job, you commit to accountability with
20    your prescriptions?
21    A    Yeah, I don't know the specifics, no.
22    Q    Okay.  Well, in the course did you learn that you --
23    if you apply and you're accepted to this organization,
24    that you commit to professional growth and to be the
25    best doctor you can?
```

1   A    I don't know the specifics.

2   Q    Okay.  Well, what about this specific, that they

3   require you to have at least 100 continuing medical

4   education classes.  Are you aware of that?

5           MS. TREADWAY:  This line of questioning

6   assumes many facts not in evidence so we object to this

7   line of questioning on that basis.

8           THE COURT:  Overruled.

9   BY MR. WILLIAMSON:

10  Q    Are you aware of that?

11  A    No, I'm not.

12  Q    Okay.  Now, when Ms. Treadway asked you a question

13  about this little line I'm going to show you, her

14  question was, what did he say his specialty was.  Which

15  would kind of flow the implication that I wasn't being

16  truthful when I said that he never represented himself

17  as a pain management specialist.  Do you remember that

18  question?

19  A    Uh-huh.

20  Q    Let's read the full line of that document.  What

21  does that say under number 4?

22  A    Number 4 says discipline or specialty.

23  Q    Discipline.  What is discipline?  Do you know what a

24  medical discipline is?

25  A    What you practice.

467

```
 1    Q    Okay.  What does he state he practices?

 2    A    Family practice and pain management.

 3    Q    And isn't it true that at least half of his practice

 4    was -- dealt with family practice patients?

 5    A    I don't know if it was half.  I don't know the

 6    percentage but --

 7    Q    But he did have a family practice?

 8    A    Absolutely.

 9    Q    And he also had pain management; correct?

10    A    That is correct.

11    Q    And also, just to make sure that the jury

12    understands, Dr. Schneider also tells these individuals

13    who are going to hold him to this high standard that he

14    has been training and trying to get better.  He's been

15    going to conferences.  Correct?

16    A    Yes.

17    Q    By joining the organization, Dr. Schneider would

18    have been inviting additional scrutiny on his practice

19    at this time.  Would you agree with that?

20    A    I'm sorry.  Repeat the question.

21    Q    Would you agree that as of 10-12-2004, Dr. Schneider

22    would have been inviting additional reviews of his

23    medical practice?

24              MS. TREADWAY:  Objection.  Lack of foundation.

25              THE COURT:  I don't really understand the
```

 1    question.

 2                MR. WILLIAMSON:  I can repeat.

 3    BY MR. WILLIAMSON:

 4    Q   Are you aware --

 5                THE COURT:  Is there something on the document

 6    that says that?

 7                MR. WILLIAMSON:  It was based on the

 8    questions.  Well, yes, Your Honor.  Absolutely.  The

 9    problem is I have good eyes and I'm straining to see

10    this, so let me see how much I can blow this up.

11                THE COURT:  I see it now.  I gotcha.

12    BY MR. WILLIAMSON:

13    Q   And I'll let the jury read this and you can read it

14    if you like, but doesn't this state that when Dr.

15    Schneider signed this document that he is going to agree

16    to hold himself to the highest ethical standards and be

17    subject to be kicked out of this organization if he

18    doesn't do that?

19    A   I see highest standards, professional conduct as

20    established.

21    Q   How many drug dealers are a part of the American

22    Academy of Pain Management that you know of?

23                MS. TREADWAY:  Well, objection.  Lack of

24    foundation, Judge.

25                MR. WILLIAMSON:  I'll withdraw that, Judge.

469

```
 1    BY MR. WILLIAMSON:

 2    Q    You also testified about this federal regulation.

 3    What exhibit is that regulation?  Do you remember that?

 4    A    Yes.

 5    Q    Okay.

 6              MR. WILLIAMSON:  Can you put the federal

 7    regulation on the --

 8              THE COURT:  64.

 9    BY MR. WILLIAMSON:

10    Q    Now, I'm sure you heard me object, and the Judge

11    told the jury that he's going to be the person to give

12    them the law.  But let's talk about this federal

13    regulation.  Did you pull this out?

14    A    This?

15    Q    Yes.

16    A    I would assume that I made a copy of it.

17    Q    Okay.  And you gave it to the U.S. Attorney?

18    A    That seems to be correct.

19    Q    Now, when you decided to, you know, research this

20    and pull this out, did you find any other CFRs that

21    were -- that spoke to -- that gave guidance to

22    physicians when it came to prescribing medicine besides

23    this one here?

24    A    As far as what?

25    Q    As far as the issues involved in this case.  Issuing
```

470

1    prescriptions to patients.

2    A    There is a regulation that is for prescriptions.

3    Q    I understand.  Make sure we're on the same page.

4    A    I'm not sure I understand what you're saying.

5    Q    The regulation specific for physicians that give

6    physicians guidance as to when they can and cannot

7    prescribe controlled substances.  Is this the one?  What

8    I'm basically trying to find out, there's nothing else

9    out there.  That's the guidance right there; correct?

10   A    That's correct.

11   Q    Okay.  Now, can you look on that document and tell

12   the jury where it says that a physician cannot prescribe

13   a prescription to a patient that may be addicted or may

14   have suffered from an addiction?  Can you look at

15   that --

16   A    It doesn't say anything about addiction.

17   Q    Doesn't say it there.  And you've read the

18   Controlled Substance Act as well; correct?

19   A    The entire Controlled Substance Act?

20   Q    In reference to the physicians?

21   A    Parts of it, yes.

22   Q    And you read the part about legitimate medical

23   practice; correct?

24   A    Yes.

25   Q    Okay.  And there's nothing in that statute that

1    states that a physician cannot prescribe medicine to a

2    person or -- strike that -- a physician cannot prescribe

3    pain medicine to a person that may suffer from an

4    addiction.  That's not in the statute either, is it?

5    A    Not that I know of.

6    Q    It's in no federal statute and no federal regulation

7    that that is prohibited.  Isn't that true?

8    A    Not that I know of.

9    Q    Okay.  Now, one thing that's interesting here.  It

10   states "it must be provided in the acting in the usual

11   course of his professional practice."  Do you see that?

12   A    Yes.

13   Q    Tell the jury about any time that Dr. Schneider met

14   a patient on the corner outside of some store and gave

15   him a prescription in exchange for money?

16   A    I'm not aware of any of those times.

17   Q    Tell us a time that you found in your investigation

18   that Dr. Schneider prescribed medicine to somebody other

19   than an established patient to his clinic?

20   A    As far as prescriptions or actually hand-to-hand?

21   Q    Prescriptions?

22   A    I can't really say that -- I'm sorry.  Repeat the

23   question.

24   Q    Tell the jury about a time that Dr. Schneider

25   prescribed medicine to anybody other than a patient of

1    the Clinic?

2    A    Other than a patient of a clinic?

3    Q    Other than a patient of his clinic.

4    A    I don't know that there was or was not.

5    Q    You investigated this thing for over two years;

6    correct?

7    A    Yes.

8    Q    And as you sit here prepared to testify to this jury

9    to convict this innocent man, you would bring that

10   evidence if you had it, wouldn't you?

11   A    Absolutely.

12   Q    And you haven't presented anything like that, have

13   you?

14   A    That's correct.

15   Q    And you would agree that if a person has pain, a

16   chronic pain condition, prescribing pain medicine is a

17   legitimate purpose, wouldn't you?

18              MS. TREADWAY:  Objection.  Lack of foundation.

19              THE COURT:  Overruled.

20   BY MR. WILLIAMSON:

21   Q    Would you agree with that?

22   A    Not being a doctor, I mean --

23   Q    That's fair.  You also testified about the fact that

24   physician assistants can have their own DEA number.  You

25   remember that?

473

```
 1    A    That's correct.
 2    Q    They don't have to have their own DEA number, isn't
 3    that true?
 4    A    They don't have to.
 5    Q    But if they don't have a DEA number, the
 6    prescription has to be written by the physician and not
 7    by the PA.  Is that true?
 8    A    That would be correct.
 9    Q    And that basically means that the physician has to
10    make sure that he trusts the medical diagnosis of that
11    physician's assistant before writing that prescription.
12    Would you agree with that?
13    A    The physician's assistant?
14    Q    The physician has -- I'm sorry -- I know I'm using a
15    lot of physicians in one sentence.  But that physician
16    would have to trust that physician's assistant, the
17    review that he did with the patient and the medical
18    diagnosis that that assistant came up with, before
19    writing that prescription.  Correct?
20    A    Correct.
21    Q    And so if he trusts this physician's assistant,
22    there's nothing wrong with him writing a prescription
23    for the work that physician's assistant did in
24    diagnosing that patient.  Isn't that true?
25    A    I would assume.
```

1    Q    And under the State of Kansas laws, a physician's

2    assistant has his own independent medical judgment

3    ability; correct?

4    A    Yes.

5    Q    And when a physician's assistant decides to get a

6    DEA number, then they're allowed to prescribe these

7    controlled substances; correct?

8    A    If they have a current DEA registration, yes.

9    Q    Okay.  And they are held to the same standard as

10   that CFR in 21, 841, blah, blah, blah.  Correct?

11   A    That's correct.

12   Q    And they hold their own independent liability for

13   the prescriptions that they write under using that DEA

14   number; correct?

15   A    Yes, they have their own liability.

16   Q    Okay.  And how many physician's assistants are here

17   being charged for writing prescriptions outside the --

18   being a drug dealer?

19   A    None.

20   Q    How many providers other than Dr. Schneider that are

21   in these tons of prescriptions that were allegedly

22   written in part of a conspiracy are sitting here to

23   answer for their acts?

24   A    Besides Dr. Schneider?

25   Q    Besides Dr. Schneider.

1    A    Nobody.

2    Q    As part of your investigation, did you ever send

3    undercover agents into the clinic?

4    A    Not my investigation, no.

5    Q    Are you aware of the Government's investigation ever

6    sending undercover agents into the clinic?

7    A    Not that I have been a part of.

8    Q    Make sure we're on the same page.  Are you aware of

9    any Government agency as part of the investigation of

10   this case sending in an undercover agent into the

11   Schneider Medical Clinic?

12   A    Not that I'm a part of or aware of.

13   Q    Okay.  So not that you're aware of?

14   A    Right.

15   Q    Okay.  That's a different answer.  I can understand

16   that.

17        Now, the Government provided these snippets of an

18   interview.  That interview has a transcript basically

19   like 200 pages; correct?

20   A    At least.

21   Q    At least.  And Mrs. Schneider informed you -- strike

22   that.

23        She never told you in that interview that Dr.

24   Schneider knew of over 100 individuals overdosing;

25   correct?

476

1    A    I don't recall her saying that, no.

2    Q    They would have played that because that would have

3    been pretty damaging for Dr. Schneider, wouldn't it?

4    A    Yes.

5    Q    But that wasn't there, was it?

6    A    No, it was not.

7    Q    She never told you that Dr. Schneider knew that over

8    68 patients passed away in his practice over a six year

9    period; correct?

10   A    That's correct.

11   Q    Because that would have been damaging and that's not

12   there; correct?

13   A    It was not there.

14   Q    And she came to you voluntarily.  Is that true?

15   A    That is correct.

16   Q    And she complained about another practitioner that

17   was working there at the clinic at the time; correct?

18   A    That was part of the interview.

19   Q    And that man would have been Lawrence Simons.  True?

20   A    True.

21   Q    And Lawrence Simons was fired by Dr. Schneider,

22   wasn't he?

23   A    I'm not sure who terminated Dr. Simons.

24   Q    But you know he was terminated from the Schneider

25   Medical Clinic; correct?

477

```
 1    A    To the best of my knowledge, I believe he was.  I
 2    don't think he left on his own will.
 3    Q    Right.  And so you can make room for the fact that
 4    Dr. Schneider found out that something may have been
 5    happening in the clinic, let him go?  Would you make
 6    room for that?
 7    A    That would be correct.
 8    Q    Now, funny about Lawrence Simons because you later
 9    had more interaction with him, did you not?
10    A    I did.
11    Q    After he was fired from the clinic out doing his own
12    thing in the streets not even practicing medicine.  Tell
13    the jury what he did?
14    A    In what respect?
15    Q    What was he doing with prescriptions?
16    A    He was prescribing controlled substance
17    prescriptions illegally.
18    Q    And he was convicted of that, wasn't he?
19    A    He was.
20    Q    So Linda Schneider tells you in 2007 that this man
21    is doing some bad things, the clinic fires him, and
22    later you come to confirm that exactly what she was
23    telling you was the truth.  Correct?
24    A    Yes.
25              MR. WILLIAMSON:  I don't have anything
```

478

```
 1    further, Your Honor.
 2              THE COURT:  Thank you sir.  Mr. Byers?
 3              MR. BYERS:  Could I just have ten seconds to
 4    think about it, Your Honor?
 5              THE COURT:  You can have 30 seconds if you
 6    want.
 7              MR. BYERS:  30 would be great.
 8              THE COURT:  Take whatever time you want.
 9                   (Off-the-record discussion).
10              MR. BYERS:  I have no questions subject to
11    recall.
12              THE COURT:  Thank you, very much.  Redirect?
13              MS. TREADWAY:  No redirect, Judge.
14              THE COURT:  Thank you, sir.  You're excused
15    temporarily.  Call your next witness please.
16              MS. TREADWAY:  We would call Dan Robart.
17                         DAN ROBART
18    Having been first duly sworn to tell the truth, the
19    whole truth and nothing but the truth, testified as
20    follows on:
21                   DIRECT EXAMINATION
22    BY MS. TREADWAY:
23    Q   Please introduce yourself to the jury, sir.
24    A   My name is Dan Robart.
25    Q   And for whom do you work?
```

479

```
 1    A   I work for the U.S. Customs and Border Protection.
 2    Q   And is that a part of Department of Homeland
 3    Security?
 4    A   Yes, we are.
 5    Q   And how long have you worked for Customs Border
 6    Protection?
 7    A   Since 1988.
 8    Q   And where did you work previously?
 9    A   Previous to 1988?
10    Q   Yes.
11    A   I worked for the District Attorney in San Diego for
12    a short while.  And before that I was in school.
13    Q   Have you spent your entire career in law
14    enforcement, sir?
15    A   Yes.
16    Q   And did Customs Border Protection used to go by a
17    different name?
18    A   Yes.
19    Q   What was it known by?
20    A   It used to be three different agencies.  U.S.
21    Customs, U.S. Immigration and Naturalization Service,
22    and the Department of Agriculture.  And those three were
23    merged when Department of Homeland Security was formed
24    under the new name of Customs and Border Protection.
25    Q   And did that all occur after the tragedy of 911?
```

1   A    That is correct.

2   Q    Does your agency have the capability of tracking

3   when United States citizens cross the border from the

4   United States into Mexico?

5   A    Yes, we do.

6   Q    And does your agency also have the capability of

7   tracking when United States citizens cross the border

8   back into the United States from Mexico?

9   A    Yes, we do.

10  Q    And how does the Department of Homeland Security and

11  Customs Border Protection obtain information about

12  citizens who are crossing the border from and to Mexico

13  and vice versa?

14  A    The airlines provide the information to us before an

15  aircraft leaves.  And then on re-entry we have the

16  airline provided information but we also confirm the

17  information ourselves.

18  Q    And how do you confirm it?

19  A    By running a traveler's passport through our

20  passport reader and that matches up with the airline's

21  information and confirms that that is in fact the person

22  traveling.

23  Q    And when an airline sends you information, is that

24  entered into a data system?

25  A    Yes, it is.

481

1    Q    Now, when the person is coming back into the United

2    States, is there actually a physical verification that

3    the person coming back in the United States is the

4    person with that passport?

5    A    Yes.  It is Customs and Border Protection policy

6    that we are to confirm that the passport actually

7    belongs to the person standing in front of us.  And that

8    all the information matches.

9    Q    Does the Department of Homeland Security have a data

10   base that you can search for information about such

11   border crossings?

12   A    Yes, it does.

13   Q    And if you have a person's name, birth date and

14   passport number, can you search for that person's border

15   crossings?

16   A    Yes, I can.

17   Q    And did we perform a search with regard to the

18   Defendant Stephen Schneider's border crossings?

19   A    Yes.

20   Q    And did that search produce results?

21   A    Yes, it did.

22   Q    Do you have those results committed to memory?

23   A    No, I do not.

24   Q    Would it help if you had the printout, that is, the

25   search results provided to refresh your memory about

482

1   these dates?

2   A   Yes, it would.

3   Q   I'll hand you what has been marked for

4   identification as Exhibit 1-P-1.

5   Q   Are these the various printouts of the searches that

6   were conducted?

7   A   Yes, they are.

8   Q   And are you familiar with those documents, sir?

9   A   Yes.

10  Q   Now, you didn't actually do those printouts, did

11  you?

12  A   That is correct.

13  Q   Who did them?

14  A   They were provided by ICE, which is Immigration and

15  Customs Enforcement.

16  Q   Nevertheless, if you wanted to do it, could you have

17  done it?

18  A   Yes, I could do the exact same query.

19  Q   We just didn't have you redo it?

20  A   Correct.

21  Q   But you're familiar with these documents and can

22  testify to their contents?

23  A   Yes.

24  Q   Now, based on the Department of Homeland Security's

25  data base, did the Defendant Stephen Schneider leave the

483

1    United States for Mexico on November 24th, 2003?

2    A    Yes, he did.

3    Q    And approximately when did he arrive in Mexico?

4    A    Approximately 2:43 p.m.

5    Q    Did he then return to the United States?

6    A    Yes.

7    Q    And when was that?

8    A    That was on January 1st, 2003.

9    Q    On January 1st?

10   A    Excuse me.  That was December 1st, 2003.

11   Q    And where did he arrive?

12   A    He arrived at Dallas/Fort Worth International

13   Airport.

14   Q    And approximately when did he arrive in Dallas?

15   A    Approximately 7:44 p.m.

16   Q    Now, was there a second trip that we found?

17   A    Yes.

18   Q    Another trip?

19   A    Yes.

20   Q    And in that trip did the Defendant Stephen Schneider

21   leave the United States for Mexico on December 31st,

22   2003?

23   A    Yes, that is correct.

24   Q    And approximately when did he arrive in Mexico?

25   A    Approximately 2:43 p.m.

```
1    Q    Did he then return to the United States on

2    approximately January 7, 2004?

3              MR. WILLIAMSON:  Your Honor, may I enter an

4    objection -- or proffer.  The defense is not going to

5    contend that the dates on this chart that the Government

6    put forth are inaccurate.  I just think it's

7    excruciating to go through every single entry because

8    there are several.

9              THE COURT:  Well, I was kind of wondering.

10   You haven't offered the document.  How can you have him

11   read from it?

12             MS. TREADWAY:  Well, again, I didn't think

13   they were going to argue about this but then they said

14   they weren't going to stipulate so that's why I'm

15   putting it in, Judge.

16             THE COURT:  Well --

17             MS. TREADWAY:  If they're going to stipulate,

18   I'll be glad to take this witness off the stand.

19             THE COURT:  He doesn't have to stipulate.  But

20   I think you need offer it.

21             MR. WILLIAMSON:  We're not stipulating to the

22   accuracy.  We are stipulating the documents he looked at

23   are reflected in that chart; but, going through each and

24   every when did he leave, when did he come back, when did

25   he leave, when did he come --
```

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

485

```
 1            THE COURT:  How many of these trips in and out
 2    are there?
 3            MS. TREADWAY:  Six.
 4            THE COURT:  What's the purpose here of this?
 5    Why don't you just offer the exhibit?
 6            MS. TREADWAY:  I will be glad to, Judge.
 7            THE COURT:  Do you object to the exhibit,
 8    Mr. Williamson?
 9            MR. WILLIAMSON:  No, Your Honor.
10            THE COURT:  All right.  One whatever it is, is
11    received.
12            MS. TREADWAY:  1-P-1.
13            THE COURT:  1-P-1 is received.
14    BY MS. TREADWAY:
15    Q   Were there six such trips that the Defendant took to
16    Mexico?
17    A   Yes, there were.
18            MS. TREADWAY:  Nothing further.
19                    **CROSS EXAMINATION**
20    BY MR. WILLIAMSON:
21    Q   Not going to take very much of your time.
22    Government tracks medical records.  You track our
23    movement in and out of the country.  Is there anything
24    that the federal government is not tracking with us
25    these days?  Anything?
```

486

1           MS. TREADWAY:  Objection.  It's argumentative.

2           MR. WILLIAMSON:  All right.

3           THE COURT:  Wait a second.  Is there

4    anything --

5           MR. WILLIAMSON:  That the Government is not

6    tracking in regards to us regular citizens.  I'm just

7    curious.  I never heard of a lot of this stuff.

8           THE COURT:  Well, the objection is sustained.

9    BY MR. WILLIAMSON:

10   Q   Now, these documents that you relied upon in making

11   the chart and selecting the days, where does that come

12   from?  Where are those document generated?

13   A   These were specifically generated from a system

14   called A-T-S-P.

15   Q   Okay.  And I reviewed those documents in detail and

16   the dates say what you say they said.  But what I'm

17   curious about, there are several names on some of those

18   documents.  You have Stephen Schneider.  You have

19   another Stephen Schneider.  You have Stephen Joseph

20   Schneider.  You have another Stephen Schneider.  Why are

21   those different names on that document?

22   A   Which documents are you referring to?

23   Q   The source documents that the Government gave you.

24   May I approach, Your Honor.

25       Well, it looks like your copies don't have the same

1    information as my copies.

2        When you ran that search, you just search for

3    Stephen Schneider?  How does that search run?

4    A   The best way to run the search is using last name,

5    first name and date of birth.

6    Q   Okay.  Do you know how many other Stephen Schneiders

7    in America are born on -- what is it -- 9-4 of 1953?

8    A   I do not.

9    Q   Did anybody care to try to weed down and determine

10   to make sure that the Stephen Schneiders that are

11   reflected in those documents are the same Stephen

12   Schneiders sitting here?

13   A   No.

14   Q   Is there any error rate with these records?  Do

15   agents make mistakes in the field?  That was kind of a

16   compound question.  Do you want me to rephrase it?

17   A   Sure.

18   Q   Do agents make mistakes when entering this data in

19   the field?

20   A   Well, the -- it's first entered by the airline.

21   They can make mistakes.  But when we run the name, it's

22   through running the passport in a passport reader so

23   that the human element is taken out to prevent mistakes.

24   Q   Okay.  Was Stephen -- strike that.

25           MR. WILLIAMSON:  I don't have anything

1    further, Your Honor.

2              THE COURT:   well, I'm confused.   How can this

3    be an authentic document if we don't know that the

4    Stephen Schneider who is listed in Exhibit 1-P-1 is the

5    same Stephen Schneider that's in this case?  Do you

6    know?

7    A   We can simply go on the fact that it's the same last

8    name, first name, and date of birth.

9              THE COURT:   Have you determined if there are

10   other Stephen Schneiders in the United States who may

11   have been born on the same date this Defendant was born

12   on?

13   A    I have not determined that.

14             THE COURT:   1-P-1 is out.   Anything further of

15   this witness?

16             MR. WILLIAMSON:   Not from the defense.

17             MS. TREADWAY:   No, Judge.

18             MR. BYERS:   Not from Mrs. Atterbury.

19             MS. TREADWAY:   We'll clear this up with the

20   next witness, Judge.

21             THE COURT:   Well, you shouldn't have called

22   this guy in the first place if he doesn't know what he's

23   talking about.   You're excused, sir.   Next witness.

24             MS. TREADWAY:   Government calls Everett

25   Barger.

489

1                    **EVERETT BARGER**

2    Having been first duly sworn to tell the truth, the

3    whole truth and nothing but the truth, testified as

4    follows on:

5                   **DIRECT EXAMINATION**

6    BY MS. TREADWAY:

7    Q    Please introduce yourself to the jury.

8    A    Yes.  My name is Everett Franklin Barger, III.

9    Q    And where are you currently employed?

10   A    I'm currently employed as a Contract Investigator

11   with the Federal Bureau of Investigation, Kansas City

12   District Office.

13   Q    And how long have you been a contract employee with

14   the FBI?

15   A    In July it will be three years.

16   Q    Where were you employed previously?

17   A    Previous, before that I did some contract

18   investigative work with the Drug Enforcement

19   Administration for nine months.  Prior to that I was a

20   Special Agent with the Federal Bureau of Investigation,

21   various locations, for 21 years.  And prior to that I

22   was a Diversion Investigator with the U.S. Drug

23   Enforcement Administration.

24   Q    Would it be fair to say you spent your entire career

25   in law enforcement?

490

1    A    That is correct.

2    Q    Have you participated in the investigation of this

3    case?

4    A    I have.

5    Q    And what has been your involvement?

6    A    My involvement has been in the financial

7    investigation field with an emphasis in asset

8    forfeiture.

9    Q    As a result of your financial investigation, did you

10   learn about properties the Defendants own?

11   A    I did.

12   Q    And is one of those properties located outside of

13   the United States?

14   A    It is.

15   Q    And where was that?

16   A    In Acapulco, Mexico.

17   Q    During your financial investigation, did you review

18   the Defendants' financial records?

19   A    I did.

20   Q    Would that have included their credit card

21   statements?

22   A    It did.

23   Q    Did the information about the property in Mexico and

24   your review of the Defendants' credit card statements

25   lead you to another avenue of investigation?

491

1    A    Yes.

2    Q    And what did it lead you to?

3    A    As part of the investigation, this particular avenue

4    led me to an investigation that disclosed that Stephen

5    Schneider had been in various locations out of the

6    United States as well as in the United States at various

7    times.

8    Q    Did you specifically review records to determine

9    when the Defendant Stephen Schneider was out of town or

10   otherwise not at the Schneider Medical Clinic?

11   A    I did.

12   Q    And what records did you review?

13   A    I looked at, as we mentioned, credit card records;

14   some airline information; some border crossing

15   information from Customs Border Protection.  And as well

16   I was able to review some continuing medical education

17   records as well.

18   Q    Let me hand to you what's been marked for

19   identification as 1-P-1.  Mr. Robart previously

20   identified those as documents that were --

21              MR. WILLIAMSON:  Your Honor, I'm going to

22   object.  She can't tell this witness what somebody else

23   who was stricken, what they said about that document.

24              THE COURT:  The objection is sustained.

25

1    BY MS. TREADWAY:

2    Q    Do you know what those documents are, sir?

3    A    I do.

4    Q    And where were they obtained?

5    A    They were obtained from the -- an agent with the

6    Customs Border Protection.

7    Q    All right.  And after you obtained that information,

8    did you confirm that the Stephen Schneider on those

9    records was the Stephen Schneider in this case?

10   A    Yes.

11   Q    And how did you do that?

12   A    Well, the date of birth and name that was queried to

13   generate those records was one form that I was able to

14   verify.  And actually on these records they have a

15   document number attributable to a particular travel.

16   And that document number, there were two of them, were

17   passports of Stephen Schneider, are our Stephen

18   Schneider that is here today.

19   Q    So you confirmed looking at the passports that this

20   in fact traveler was the Defendant Stephen Schneider?

21   A    Yes.  Like I said, as well as the name, date of

22   birth, and then that document tied all three together.

23   Q    In terms of the border crossing records, did you

24   rely in general and do you in particular rely on these

25   border crossing records in performing investigative

1    activities?

2    A    We do.

3    Q    And in terms of that information, have you found it

4    to be accurate and reliable?

5    A    Yes.

6             MS. TREADWAY:  Government offers 1-P-1.

7             MR. WILLIAMSON:  No objection subject to

8    cross-examination.

9             THE COURT:  Do you want to question him about

10   it now?

11            MR. WILLIAMSON:  No, Your Honor.  I'll wait.

12   I mean, I'll wait.

13            THE COURT:  All right.  1-P-1 is received.

14   BY MS. TREADWAY:

15   Q    Now, in terms of the airline ticket information that

16   you obtained, were you able to obtain information that

17   further corresponded with the border crossing records?

18   A    In some cases, yes.

19   Q    And were you able to obtain information from the

20   airlines that further confirmed that Stephen Schneider

21   was in fact the traveler?

22   A    Yes.

23   Q    And actually on the airplanes?

24   A    Yes.

25   Q    And are the records on which you relied ordinary

1    business records from the airlines?

2    A    Yes.

3    Q    With regards to the credit card information, was the

4    information you reviewed the ordinary business records

5    from the various credit card companies with which the

6    Defendants did business?

7    A    Yes.

8    Q    Similarly, the continuing education records, are

9    those ordinary business records of various entities,

10   including the American Osteopathic Association to which

11   the Defendant belonged?

12   A    Yes.

13   Q    Now, in terms of the continuing medical education

14   classes that the Defendant Stephen Schneider attended,

15   what kinds of documents did you review?

16   A    I reviewed brochures or copies of brochures of the

17   particular function; an attendance roster, in some

18   cases, where Dr. Schneider, he attended.  And then last

19   but not least, a continuing education credits that were

20   requested and received for such attendance at the

21   continuing medical education.

22   Q    And did these brochures indicate both start and stop

23   times on a daily basis?

24   A    They did.

25   Q    And were there certificates of attendance issued to

1   the Defendant for his attendance at a number of hours?

2   A   Yes.

3   Q   And did he report to the American Osteopathic

4   Association these credit hours for purposes of keeping

5   his credentialing?

6   A   Yes.

7   Q   And for the continuing medical education classes

8   that you reviewed, did he request and receive the

9   continuing medical edcation credit for the entirety of

10  the programs?

11  A   Yes.

12  Q   And did all of these records reveal that the

13  Defendant Stephen Schneider attended these various

14  medical education courses and received credit as though

15  he attended them?

16  A   Yes.

17  Q   Did you also correlate this, when you could, to

18  credit card records that would place him where the

19  continuing medical education course was being held?

20  A   Yes, we did.

21  Q   As a result of all of this information, did you form

22  a conclusion as to whether the Defendant attended these

23  seminars or at least took credit for attending these

24  seminars?

25  A   I did.

1    Q    Did you also review information about a

2    pharmaceutical company event?

3    A    I did.

4    Q    And were these regular business records of the

5    pharmaceutical company?

6    A    Yes.

7    Q    And using these records, as well as other credit

8    card records that we identified previously, were you

9    able to confirm that the Defendant Stephen Schneider

10   attended a pharmaceutical company event?

11   A    Yes.

12   Q    And where was that?

13   A    New Orleans, Louisiana.

14   Q    Based on all of this information, did you help

15   develop a part of a summary chart for the jury?

16   A    I did.

17   Q    Let me hand you what has been marked for

18   identification as Exhibit 1-P.  Do you recognize that as

19   the summary chart you helped prepare?

20   A    Yes, I do.

21   Q    Now, you just prepared part of the chart; correct?

22   A    That is correct.

23   Q    And what part of the chart did you develop?

24   A    The part that I developed was the particular date,

25   the day, the location, and the event when we could

 1    determine such.

 2              MS. TREADWAY:  At this time, Judge, we would

 3    like to admit just that portion of the chart and display

 4    it for the jury.

 5              THE COURT:  Which portion is that?  This is

 6    several pages.

 7              MS. TREADWAY:  It's all three pages and it's

 8    the first five columns up through event.

 9              THE COURT:  I see what you're saying.  Any

10    objection, Mr. Williamson?

11              MR. WILLIAMSON:  Not if I may just review the

12    section she is speaking of briefly.

13              THE COURT:  Yes, sir.

14                      (Off-the-record.)

15              MR. WILLIAMSON:  No objection.

16              THE COURT:  It's received.

17              MS. TREADWAY:  We'll display that portion of

18    the chart only to the jury so they can see that and

19    follow along with us.

20    BY MS. TREADWAY:

21    Q    Mr. Barger, now, the first column, is that just a

22    count one, two, three, four, five, six?

23    A    Yes.

24    Q    And then the next column, is that listing of dates?

25    A    Yes.

498

```
 1   Q    And what do those dates signify to you, sir?
 2   A    The dates would be the dates of attendance and the
 3   location in question is to the right of that.
 4   Q    And is there a corresponding list of days?
 5   A    Yes.
 6   Q    And is the next column the location where the
 7   Defendant Stephen Schneider was?
 8   A    Yes.
 9   Q    And does the next column indicate the event if you
10   could determine one?
11   A    Yes.
12   Q    And let's just quickly go to the end of the exhibit.
13   How many days were you able to confirm that the
14   Defendant Stephen Schneider was out of the clinic?
15   A    51 days.
16   Q    And on how many of those days was he actually out of
17   the country in Mexico?
18   A    I believe that is 28 days.
19   Q    And how many days was he out of the State of Kansas?
20   A    I believe that's 13.
21   Q    And on how many of those days was he in Kansas but
22   at continuing medical education courses?
23   A    Ten.
24   Q    Looking more specifically at Exhibit 1-P-1, where do
25   the documents indicate that the Defendant Stephen
```

1    Schneider was on October 24th and 25th, 2003?

2    A    New Orleans, Louisiana.

3    Q    November 24th through November 27th, 2003?

4    A    Mexico.

5    Q    December 1st, 2003?

6    A    Mexico.

7    Q    December 31st to January 7th, 2004?

8    A    Mexico.

9    Q    January 21st through January 27th, 2004?

10   A    Mexico.

11   Q    April 2nd through April 5th, 2004?

12   A    Mexico.

13   Q    April 29 through May 1st?

14   A    Overland Park, Kansas.

15   Q    October 1st and 2nd, 2004?

16   A    Wichita, Kansas.

17   Q    April 28 through April 30th, 2005?

18   A    Wichita, Kansas.

19   Q    September 22nd through September 25th, 2005?

20   A    San Diego, California.

21   Q    December 8 through December 12th, 2005?

22   A    Mexico.

23   Q    March 17, 2006?

24   A    Topeka, Kansas.

25   Q    March 20 through March 25th, 2006?

```
 1    A    San Diego, California.

 2    Q    April 21st, 2006?

 3    A    Overland Park, Kansas.

 4    Q    May 13th and 14th, 2006?

 5    A    Mexico.

 6    Q    May 3rd and 4th, 2007?

 7    A    Oklahoma City, Oklahoma.

 8              MS. TREADWAY:  Nothing further, Judge.

 9              MR. WILLIAMSON:  I'll be very brief, Your

10    Honor.

11              THE COURT:  All right.
```

12                        **CROSS EXAMINATION**

```
13    BY MR. WILLIAMSON:

14    Q    I don't think there's much dispute from the defense

15    that Dr. Schneider was out of the country on certain

16    days.  Is there anything illegal about going to Mexico

17    using your passport?

18    A    Depends what you're going to be doing there; but

19    generally people go there for vacations and such now.

20    Q    Was there anything about any date that you pointed

21    out to the jury about Dr. Schneider being in Mexico or

22    Kansas City or Wichita?

23    A    Could you repeat that, please.

24    Q    Was there anything illegal about him being at those

25    places on the dates that you identified for the jury?
```

1    A    I would say yes, coupled with other investigative

2    information, yes.

3    Q    Okay.  What I'm asking is from the search that you

4    did, was it illegal for him to be in Mexico, Kansas City

5    and every where else that you put that?

6    A    You're asking if it was legal for him to be there?

7    Yes, as far as I know, yes.

8    Q    And you're trying to base everything else that you

9    think may have happened based on what you believe

10   happened during the investigation; is that correct?

11   Things that -- let me strike that -- things that

12   happened back here while he was down in Mexico.  Is that

13   correct?

14   A    I'm basing the first answer as far as things that

15   may have happened while he was there based upon the

16   totality of the circumstances of the investigation as I

17   know them, yes.

18   Q    Are you being proffered as an expert on the totality

19   of the investigation?

20   A    I'm here as an investigator of the part of my

21   financial investigation, which took, in part, other

22   aspects of this investigation.  So this is part and

23   parcel of a complete investigation and the totality of

24   it, as I know it, suggests many things to me, yes.

25   Q    And you're not the jury, are you?

1   A   No, sir, but I'm --

2             THE COURT:  Don't argue with him.  What you're

3   doing here is you're opening the door to him -- if you

4   aren't careful -- if this is what you want to do, I

5   don't care, but you're opening the door to him covering

6   stuff that Ms. Treadway didn't cover with him.

7             MR. WILLIAMSON:  I'm going to be very careful,

8   Your Honor.

9   BY MR. WILLIAMSON:

10  Q   You only were here to talk about your portion of the

11  investigation; is that correct?

12  A   I'm here to talk about what Ms. Treadway asked me

13  and what you ask me.

14  Q   Okay.  And what I'm asking you is the sheet that you

15  put before the jury, there was nothing illegal about Dr.

16  Schneider being in Mexico?  That's the only question I'm

17  asking you.

18  A   About being in Mexico?

19  Q   Yes.  That's all I asked.

20  A   No.

21  Q   I'm not asking you to be an advocate for your

22  employer here.  I'm just asking you to state the facts.

23  Is that okay?

24  A   Certainly it's okay.

25  Q   Okay.  Now, what I want to find out, just briefly,

1    that IC-9 that you used, did you run that, run that

2    search?

3    A    Could you repeat that question please.

4    Q    The documents that you relied upon, the IC-9 search,

5    the border crossing, all that information, did you run

6    that search?

7    A    I requested that it be done.

8    Q    Okay.  I ask the question.  You give an answer.  Did

9    you run the search?

10   A    No, I did not.

11   Q    Yes or no.  Okay.

12          MR. WILLIAMSON:  All right.  I don't have

13   anything else, Judge.

14          MR. BYERS:  Very briefly, Your Honor.

15          THE COURT:  Sir.

16                    **CROSS EXAMINATION**

17   BY MR. BYERS:

18   Q    Mr. Barger, did you interview Stephen Schneider

19   about any of these dates that he was at these locations?

20   A    I did not.

21   Q    Why not?

22   A    Because that was not part of my investigation; and

23   at the time that this product was generated, he was

24   represented by counsel and I don't believe at that time

25   interviews were being conducted by the Government with

1    the Defendants.

2    Q   So -- but didn't have anything to do with him having

3    a lawyer.  You just don't think the Government was

4    talking to Stephen Schneider at that point?

5    A   That was my understanding.

6    Q   So the person you were investigating, you have no

7    interest in talking to?

8    A   I have an interest in talking to him if available to

9    be talked to; but it was my understanding he was not

10   available to be talked to.

11   Q   You heard that from other Government people?

12   A   Yes.

13   Q   Okay.  You didn't hear it from Stephen Schneider?

14   A   No.

15   Q   And you didn't hear it from his lawyer?

16   A   No.

17   Q   You didn't hear from any family member?

18   A   No.

19   Q   Now, you said you have an emphasis on civil

20   forfeiture.  Do you remember saying that?

21   A   I didn't say civil forfeiture.  I said asset

22   forfeiture.

23   Q   I'm sorry.  Okay.  Asset forfeiture.  And that's a

24   component of this case, is it not?

25   A   It is.

1    Q   And the forfeiture -- that's essentially -- that's

2    where the property, at least in this case, it's locked

3    down.  The Government takes it at the time of the

4    Indictment; right?  If not earlier in a civil

5    proceeding?

6    A   No.

7    Q   Okay.  Explain that to me.

8    A   Well, there's different aspects.  Of course, with

9    asset forfeiture, you have due process; and for

10   something to be taken into the Government's custody,

11   typically you have a warrant issued by a United States

12   Magistrate that allows a particular asset to be seized.

13   If it's seizable.  In the case of real property, civil

14   complaints are filed against the property.  It's not

15   taken into the Government's custody; but, there again,

16   there is a review for that, a probable cause.  So --

17   Q   And how is this -- I'm sorry --

18   A   Things are not locked down, per se.

19   Q   I'm sorry.

20   A   Yes.

21   Q   So the probable cause, Government goes into a

22   magistrate or a judge, says we want this stuff.  Is the

23   owner notified?  Is the claimant notified?

24   A   They are.  And it's not a matter -- if I might

25   answer the question?

1          THE COURT:  Well, let him answer, then you

2     ask, then he answers.

3     Q    Got it.

4     A    Not a simple matter of going into a United States

5     Magistrate and say I want this stuff.  There is an

6     articuable affidavit submitted that's reviewed by the

7     United States Attorney's Office.  It then goes to the

8     reviewing official, United States magistrate or

9     sometimes a District Court Judge.  Then a seizure

10    warrant is issued or a complaint can be filed.

11         As far as the notification process, yes, there are

12    strict guidelines under due process where a particular

13    person or a person of interest or anybody that might

14    have an interest in a particular piece of property are

15    notified that the particular item has been seized, if

16    it's a seizable type property.  Or in the case of real

17    property, if it's a complaint has been filed and has

18    been what we call a lis pendens, notice that there's

19    pending legal action against the property, then that

20    person is notified a number of ways.  They have on--

21    Q    You've answered my question.

22    A    Okay.  Good.

23    Q    The notification goes out and the property owner

24    then realizes their property has been taken and they

25    become a claimant.  That's the short answer; right?

```
 1    A    That is one way of saying it, yes.

 2    Q    That's the short answer.  Okay.  Do you have any

 3    idea how many millions of dollars are seized by the

 4    Government every year through civil or criminal

 5    forfeiture?

 6              MS. TREADWAY:  Objection; relevance.

 7              THE COURT:  Sustained.

 8              MR. BYERS:  That's all I have.  Thank you.

 9              THE COURT:  Redirect, please.

10              MS. TREADWAY:  Nothing Judge.

11              THE COURT:  Thank you very much, Mr. Barger.

12    A    Thank you, sir.

13              THE COURT:  Ladies and Gentlemen, you're

14    excused until 9:00 Thursday morning.  Remember and heed

15    the admonition.  Thank you.

16                        (Jury excused for the evening at

17                         5:10 p.m. )

18              THE COURT:  All right.  I'll see you all on

19    Thursday morning.

20              MS. TREADWAY:  Judge, may I ask for a

21    scheduling help.  I'm trying to schedule some

22    out-of-town witnesses for Monday and it would be really

23    helpful to know if we are going to have a full day or

24    half day.  I know you --

25              MR. MOODY:  Everything is going to be moved.
```

```
 1              THE COURT:  Full day.

 2              MS. TREADWAY:  Fabulous.

 3              MR. BYERS:  Your Honor, also on scheduling,

 4     you had mentioned before you were going to try to be

 5     lenient on graduations, weddings.  How much notice

 6     should we try and work out?  Should I do that with

 7     Mr. Moody?

 8              THE COURT:  You can talk to Robert.  For

 9     example, one of our sons is graduating from K.U. and

10     I'll probably leave -- we'll probably recess at noon on

11     the 14th.  Have you got a time you need to go somewhere?

12              MR. BYERS:  I've got a son graduating in Ohio

13     and his fiance in Ohio and the date is May 8.

14              THE COURT:  What date?

15              MR. BYERS:  May 8 is her graduation, which is

16     a Saturday.  And his is June 13th, which is a Sunday.

17     So I'm just thinking I might have trouble with travel

18     time even though there's -- those are weekend things.

19              THE COURT:  What I'd like for you all to do is

20     to propose specific times.  I want you to, good Lord, I

21     want you to be with your son when he's graduating.

22              MS. TREADWAY:  Judge, I mentioned to Robert

23     earlier today that it's my understanding -- and I'm not

24     a Wichitan, but the River Festival is going to block off

25     main street on the 7th at 3:00 for a parade.
```

1           THE COURT:  You can go out there and watch the

2    parade if you want.

3           MS. TREADWAY:  No, Judge.

4           THE COURT:  Shouldn't have anything to do with

5    the trial.

6           MS. TREADWAY:  No, Judge.  What I'm suggesting

7    is that I understand that Main street will be blocked

8    off for a good portion of the evening and I'm worried

9    about how jurors get home.

10          THE COURT:  That's their problem.  All right.

11   You all deal with Robert, initially, in terms of when

12   you need to go.  And if there's a problem, you can bring

13   it to my attention.  But he's in charge.  On the 21st of

14   May, Cindy's daughter is graduating so we won't be here

15   on the 21st of May.

16                       (Recessed for the evening at

17                        5:15 p.m.)

18

19

20

21

22

23

24

25