```
 1                        (Beginning at 1:10 p.m. April

 2                        29, 2010, the following

 3                        proceedings continued.)

 4              THE COURT:  Yes, sir, Mr. Williamson.

 5              MR. WILLIAMSON:   Thank you, Your Honor.

 6    BY MR. WILLIAMSON:

 7    Q   Mr. Seaton, just a couple questions I always like to

 8    ask witnesses after we take a break in the middle of

 9    cross.  Did you discuss your testimony with anybody?

10    A   No, I did not.

11    Q   Okay.  You remember when I asked you earlier about

12    what you utilized to determine which patients in the ER

13    actually were coded as to having somebody at the

14    Schneider Clinic as their physician?  You remember that?

15    A   Yes.

16    Q   I'm just going to hand you this document that's

17    marked as D-0-1.  Look at that and tell me if that's the

18    document -- does that contain the data that you relied

19    upon?

20    A   Give me a second to look through this, if you would.

21    Q   No problem.

22              MS. TREADWAY:  May I look at the exhibit with

23    the witness, Judge?

24              THE COURT:  Yes.

25              MS. TREADWAY:  Thank you.
```

```
 1                    (Off-the-record.)
 2    BY MR. WILLIAMSON:
 3    Q    Does that contain the data you relied upon?
 4    A    As far as I know, yes.
 5    Q    Okay.  All right.  I'll hold onto it for now.
 6         I remember you testifying previously that your
 7    analysis only included people who identified Dr.
 8    Schneider as his primary care physician.  Do you
 9    remember that?
10    A    Yes, I do.
11    Q    Well, isn't it true that the data that you had
12    included anybody who identified Dr. Schneider as either
13    a referring, consulting or attending physician?
14    A    I don't know how to answer that, sir.
15    Q    Okay.  Well --
16    A    My understanding is that it was based on Dr.
17    Schneider as attending, as the person's attending
18    physician.
19    Q    Okay.  But the data, and just taking a look at
20    D-0-1, doesn't that document identify -- state that
21    these are the codes for patients admitted through ER
22    with Dr. Schneider or St. Clair as attending, referring
23    or consulting physicians?
24    A    The chart is showing attending doctor number,
25    referring doctor number and consulting doctor number,
```

1    that's correct.

2    Q    Okay.  My question is:  Did your analysis with the

3    84 individuals, did that combine the attending doctor,

4    the referring doctor and the consulting doctor to get to

5    that 84 number?

6    A    I don't believe it did.

7    Q    All right.  You remember back in third grade when we

8    started learning the complex math and the teacher would

9    always tell us show our work.  Remember that?

10   A    Yes, sir.

11   Q    Okay.  Can you show us your work where we see where

12   you took these three columns and chose one column and

13   made it into the primary care column?  Do you have that

14   anywhere?

15   A    That would be in the work papers of the analysis

16   that was provided to the United States Attorney's

17   Office.

18   Q    Do you know if I got it?

19   A    I assume through the -- well, I assume the discovery

20   process would have provided that to you.

21   Q    And if I let you look at my file folder, could you

22   show me the document so I can refer to it?  Would that

23   be okay?

24   A    I'll give it a try.

25   Q    Okay.  And I have -- I have their disc in my

631

```
 1    computer.  Okay.  So -- do you see the folder called
 2    Perry Seaton Data Analysis and Work Product?
 3    A    Yes.
 4    Q    And we're talking about trial Exhibit 1-D.  Do you
 5    see a photo for that?
 6    A    That's correct.
 7    Q    And I see aggregate data.  Is that the document?
 8    A    That's an Excel file.
 9    Q    And then we see the SAS output?
10    A    That's the output from the SAS program that I wrote,
11    to produce it.
12    Q    So where would -- where's the document that has the
13    step from the hospital's papers to where we can see
14    where you selected only either attending physician or
15    referring physician as opposed to just any physician in
16    there?
17    A    Let me take a look at this.  Now, the program would
18    have the code that I used.  I just don't know if we have
19    the availability of opening that.
20    Q    The actual --
21    A    The actual program itself.
22    Q    And this SAS document?
23    A    That's the output document.
24    Q    Right.  The output refers to the information that
25    you put in; correct?
```

632

1    A    Well, it's what the program has generated, yes.

2    That's the ultimate result.

3    Q    Okay.  The key here is if you look at the top --

4    because statistics is a very complicated area, your

5    programmers should make sure their output is properly

6    labeled so it can be followed.  Correct?

7    A    And it is.

8    Q    Okay.  Now, the output should be sufficient enough

9    to let the ordinary person look at this document and

10   say, okay, I took data set 1, turned it into data set 2

11   and I translated data set 1 into data set 2?

12   A    That's not what the output will do, sir.

13   Q    The program will do that?

14   A    The program will show you what data set is used as

15   well as a section of SAS that's referred to as the log,

16   which produces computer information as to how the

17   program ran or executed it.  And it would show that the

18   program executed properly.

19   Q    For reference sake I'm just going to refer to this

20   document as D-0-2.

21            MS. TREADWAY:  May I see it, please.

22            MR. WILLIAMSON:  Yes, you may.

23   BY MR. WILLIAMSON:

24   Q    Speaking of the log, a log, can you take a look at

25   that document?  Does that look like a log to you?

1    A    That is a log that would be produced through the SAS

2    program, that's correct.

3    Q    Now, that log refers to the information that you put

4    in from the prescriptions; correct?

5    A    Yes.  This is pulling information off of the

6    prescription data set.

7    Q    Okay.  Do you remember what exhibit that referred

8    to?  Your prescription exhibit?  Do you remember what

9    that --

10   A    I do not.  I'm sure that the Government can provide

11   the number.  I don't have it.

12            MS. TREADWAY:   I believe it's 1-K.

13   A    1-K.  Thank you.

14   BY MR. WILLIAMSON:

15   Q    Okay.  Now, taking a look at this folder that we

16   were -- this disc that we were given by the Government.

17   If you look under 1-K you have something there called

18   SAS log?

19   A    Log Exhibit 1-K.

20   Q    That's the document I just handed you.  Let's just

21   take a look at it so -- let me pull that up for you.  Do

22   you see that?  Is that the same document?

23   A    Give me a minute.  Yes.  Yes, that is the same

24   document.

25   Q    All right.  So with 1-K we have that log and we can

634

```
 1    see your work on that output; correct?

 2    A    Yes.

 3    Q    But do you see in trial Exhibit 1-D, do you see a

 4    document labeled SAS log like you do for that one?

 5    A    I do not in your directory, although I do see a file

 6    labeled program and it's put in extension A-S-V which is

 7    not a SAS extension.  Perhaps that might be something

 8    that your computer is doing by default.

 9    Q    No.  We got this from PDF format.  So just so we're

10    clear, for Exhibit 1-D that talks about those overdose

11    deaths, you don't see a log in there; correct?

12    A    I don't see that, no.  Although it was produced.

13    Q    Okay.  To the Government; right?

14    A    Certainly.

15    Q    But you don't know if we got it?

16    A    I would assume that would be part of discovery.  I

17    don't know.

18    Q    I would, too.

19    A    I didn't produce that document for you so I don't

20    know.

21    Q    Exhibit 1-J, there's a log in there, isn't it, for

22    that exhibit?

23    A    Yes.

24    Q    There's a log for Exhibit 1-K, isn't it?

25    A    Yes.
```

635

1   Q    There's a log for Exhibit 1-M, in there; correct?

2   A    That is correct.

3   Q    There's a log for Exhibit 1-N?

4   A    Yes.

5   Q    All right.  Is this a log?

6   A    I can't tell.  It's shortening the name there.

7   Q    The bottom line is this:  Is there any reason why

8   the Government would give us logs for all your other

9   work but not this very, very vague overdose issue that

10  you've been testifying about?  Do you know?

11            MS. TREADWAY:  Judge, again, this is

12  argumentative and this witness is not responsible for

13  discovery.

14            THE COURT:  The objection is sustained on both

15  grounds.

16  BY MR. WILLIAMSON:

17  Q    Now, we left off talking about billing out-of-town

18  and Judge didn't want to entertain any discussion about

19  Sarah Palin, so we'll move on from that, but I just want

20  to ask one more follow-up with that.  Are you aware that

21  Stephen Schneider does not have a billing login number

22  so he can personally submit stuff to the insurance

23  company?  Were you aware of that fact?

24  A    No, sir.

25  Q    Okay.  When you were making these comparisons about

636

1    people being out of town, did you ever take the liberty

2    to determine whether or not Linda was traveling with him

3    on any of these days?

4    A    That was not my part of the investigation at all.

5    Q    Okay.  Now, you talked earlier about this diagnosis

6    code.  You remember that?  Where you stated 23.51% were

7    of either migraines or low back pain and one other

8    issue.  Do you remember that?

9    A    Yes.  I think you're referring to Government Exhibit

10   1-S if I'm correct.

11   Q    Okay.  Now, what I'm curious about is, what are the

12   other 70 or what's that 24 minus 100 -- again, I didn't

13   do well in math so -- what -- seventy something percent,

14   where is -- 76%.  Where's the other 76% of his

15   diagnoses?  You didn't present that on this 1-S, did

16   you?

17   A    That's true.  It would cover the range of available

18   diagnosis codes.

19   Q    But if you're here testifying for the Government who

20   is basically making a grand indictment against the whole

21   clinic, wouldn't you want to give the Jury a picture of

22   the whole clinic and see what all the diagnoses were?

23           MS. TREADWAY:  Objection.  Argumentative,

24   Judge.

25           THE COURT:  Sustained.

637

```
 1    BY MR. WILLIAMSON:
 2    Q    You chose not to present to the jury the whole --
 3    all of the diagnosis codes besides the three that were
 4    cherry-picked here; is that correct?
 5              MS. TREADWAY:  Objection, argumentative.
 6              THE COURT:  Leave out things like
 7    cherry-picked and -- just ask him a question without
 8    being so--
 9              MR. WILLIAMSON:  I can rephrase it, Your
10    Honor.
11              THE COURT:  Please do.
12    BY MR. WILLIAMSON:
13    Q    These diagnosis codes were selectively chosen by the
14    Government; correct?
15    A    They were selectively chosen as the highest
16    diagnosis codes used.
17    Q    Right.  But it was selectively chosen; correct?
18    A    That is correct.
19    Q    And you selectively chose not to present the other
20    diagnosis codes; correct?
21    A    Yes, sir.
22    Q    And can you tell the Jury what the percentage of
23    codes that -- strike that.
24         Diagnosis codes, these are for all the providers in
25    the clinic, not just Dr. Schneider; correct?
```

638

1    A    These codes would be for claims submitted under Dr.

2    Schneider.

3    Q    Just Dr. Schneider?  No other provider?  Is that

4    your testimony?

5    A    Under his provider number.

6    Q    Just under his provider number.  No St. Clair, no

7    PA's, nobody else in the clinic.  Is that correct?

8    A    That's correct.

9    Q    And what is Dr. Schneider's percentage for having a

10   diagnosis of a urinary tract infection?

11   A    I would have no idea without looking at the source

12   claims data that is available.

13   Q    What about high cholesterol?

14   A    I would have no idea without looking at the source

15   data.  But it is available.

16   Q    Are you aware that in the Clinic the physician was

17   not responsible for placing the diagnosis code on the

18   ticket before it was sent to the insurance company?  Are

19   you aware of that?

20   A    No, sir, I'm not.

21   Q    You didn't know that they hired a coder who was

22   specifically hired to know what these codes meant to

23   translate what they did in the office and find the most

24   appropriate billing code for it?  You didn't know that?

25   A    No.  That's not uncommon in healthcare.

639

1    Q   Okay.  Now, you testified earlier about this 99213

2    and these CPT code books.  You remember that?

3    A   Yes.

4    Q   These CPT code books aren't Federal Law, are they?

5    A   No.

6    Q   They're not Federal Regulations, are they?

7    A   I don't believe so.

8    Q   These are documents that are generated by programs

9    to help give guidance to providers and coders and

10   billers as to help them try to submit information to the

11   insurance company so the insurance company can determine

12   how much they want to pay; correct?

13   A   I'd like to rephrase that a little bit.  It's a

14   private entity.  The current procedural terminology is a

15   private entity that developed these codes.  I'm going to

16   say I believe here, I don't know absolutely, but I

17   believe it was done in consultation with the American

18   Medical Association and as a common practice among

19   health insurance companies, in order to get commonality

20   of understanding, they have used this code book as a

21   standard.

22   Q   Okay.  So this is basically to try to get everybody

23   to submit the same type of information to the respective

24   payers?

25   A   Yes.

640

1    Q    And to help give guidance to these people; correct?

2    A    Yes.  Exactly.

3    Q    And based on what we have here, it looks like the

4    CPT code book was rewritten every year between 2004 and

5    2007; correct?

6    A    Actually they have revisions to them every year.

7    Q    If they want it so uniform, why do they keep

8    changing it so much?

9    A    It's--

10   Q    Complicated?

11   A    I would say in my case it would be somewhat

12   speculative; but new procedures and techniques are

13   arrived at every year, different tests are devised, and

14   some things become obsolete; and so as a result of that,

15   just like many things, the books are updated to remain

16   current.

17   Q    Okay.  And you would agree that coding is a complex

18   area.  Would you agree with that?

19   A    For -- the, for the lay-person, that is true.  For a

20   trained coder, not so.

21   Q    Okay.  You're not a CPT expert, though, are you?

22   A    I don't think I'd represent myself as such; although

23   I've worked with and became very familiar with the CPT

24   coding for 36 years of my professional career.

25   Q    Okay.  Well, let's talk about what you've learned

1    through your 36 years here for a few minutes.  Can we

2    put 60-A up please, Mr. Moore.  Okay.  Actually let's do

3    60-B please.  I'm sorry.  And let's just focus in on

4    99213.

5    A    Let me sort down through this.  I've got quite a

6    stack here.

7    Q    Okay.

8    A    Here we go.

9    Q    Now, taking a look at this 99213.  First, and we'll

10   get into this time thing a little bit more, but that

11   time where it says physicians typically spend 15 minutes

12   face-to-face, that's not a requirement that a physician

13   has to spend 15 minutes face-to-face with a patient or

14   family before they can bill under 99213.  Correct?

15   A    That is correct.

16   Q    Unless they are actually in a counseling or

17   coordination of care session; correct?

18   A    No.  I would say that it's really a joint thing.

19   It's based on the complexity of the visit, what the

20   patient is presenting to the physician and his judgment

21   related to the complexity of the visit.

22   Q    Let me --

23   A    And the time that he would typically spend.  Now,

24   typically by its very nature is is not an absolute.

25   They're not saying precisely 14 minutes 59 seconds plus

642

```
 1    one.  There is a little bit of give and take there.
 2    Q   You would agree that that 15 minutes is maybe an
 3    average; correct?
 4    A   I'd say it would probably be more than an average.
 5    It would be the majority.
 6    Q   The majority.  Pull up document 60 for me, Page 3.
 7              MR. MOORE:  60 Page 3.
 8              MR. WILLIAMSON:  Yes.  Focus in on the--
 9    Q   Now, I'm going to ask you just a couple of
10    questions.  Can you show me where the time is on this
11    deal?  One more page over, please.  Right here.  You see
12    what the CPT code book says?
13    A   I am precisely where you are.
14    Q   Okay.  It states:  It should be recognized that the
15    specific times -- and let me point out for the Jury
16    where I'm starting -- it should be recognized that the
17    specific times expressed in the visit code descriptors
18    are averages and therefore represent a range of times
19    which may be higher or lower depending on the actual
20    clinical circumstance.  Do you see that?
21    A   Yes.  I don't disagree with it.
22    Q   Well, you just said it was typically more than an
23    average.  More so.  They're saying it's average, so more
24    or less.  Correct?
25    A   Around, yeah.
```

643

1    Q    And it depends -- and it depends on the specific

2    actual clinical circumstances; correct?

3    A    I agree with that.

4    Q    So before you know how long it should have taken in

5    a meeting, you should know about the individual

6    circumstance before you make a judgment and say, well,

7    it could have taken 10, it could have taken 15.  Would

8    you agree with that?

9    A    Well, again, there's two elements to the code.  One

10   is the complexity of the code and one of the time spent.

11   So you have to weigh both.

12   Q    Really.  That's your testimony?  That in order to

13   bill 99213 you have to deal with the complexity and you

14   also have to deal with the time?

15   A    Yes, sir.

16   Q    Okay.  Is it not true that in order to bill a 99213

17   that all a person has to do is meet the qualifications

18   of two of three of the documentation -- of the history,

19   exam or medical decision-making?  Isn't that true?

20   A    They refer to these as only components, and that is

21   true, two of three which would include a history, a

22   focussed examination and decision-making of low

23   complexity.  So you have to meet two of the three

24   elements.

25   Q    Regardless of how much time you spend with a person;

644

1    correct?

2    A   Well, the time then would be the second element and

3    that would depend on what code would be used.  If it was

4    less time, it would probably fall to the lower code.  If

5    it was more time, it might go to the higher code.

6    Q   Can you pull up 99212 and 99213, if you can.  Blow

7    them both up at the same time.  That would be great.

8        Now, let's look at this.  Let's look at this

9    specific language because this language is what you're

10   trying to hold physicians accountable to.  Under 99212

11   it states that it requires two of the three components.

12   It does not state anywhere that it has to be anywhere

13   near ten minutes, does it, under 99212?

14   A   Typically spends.  Which is the language used.

15   Q   And you were cautioned in the instructions that that

16   is not an absolute; correct?

17   A   That is not an absolute.

18   Q   When you're billing for a medical service, do you

19   think that insurance companies are more concerned with

20   about the time or whether or not you perform the service

21   that you're telling them that was given?

22   A   I would have no means to make a judgment on that.

23   Q   Okay.  Under 99213, it says two of these three key

24   components:  An expanded problem-focussed history; an

25   expanded focussed examination; and medical

645

1    decision-making of low complexity.  So if you have a

2    physician who gives an expanded problem-focussed history

3    and a low medical decision-making, that qualifies for

4    billing under 99213 according to the code book; correct?

5    It's the plain thing -- it's the plain language there?

6    A    I think the issue would be in the definition of

7    terms.  If you look at 99212 and 99213--

8    Q    Are you prepared to testify about those terms if I

9    ask you about them?  Do you know those terms?  Do you

10   know the terms of problem-focussed history?

11   A    I would have to refer to a reference document if

12   there is one related to it; but what I'm trying to point

13   out is that there is a difference in the language that

14   is recognizing a time element.  And that is the word

15   expanded.

16   Q    Exactly.

17   A    Okay.  So expanded, by its very nature and common

18   use, would mean that it's taking more time than, say, a

19   focussed history that is not expanded.

20   Q    Exactly.  And what you would do is you would defer

21   to how these terms are defined?  Would you agree with

22   that?

23   A    I would use them as they are used in the CPT manual.

24   Q    Right.  So --

25   A    And if in doubt, if there is not a definition, then

646

1    I would defer to common English usage.

2    Q    Okay.  Is there a place in there where it says

3    please -- well, strike that.

4         Again, so to -- when we get -- and you're not this

5    expert.  You're not their coding expert; right?  You're

6    not the Government?

7    A    I do not work for CPT, no, I do not.

8    Q    But as you sit here now, because you talked a lot

9    about 99213's and how many were submitted, if the

10   service qualified as an expanded problem-focussed

11   history as defined by the CPT code book, an expanded

12   problem-focussed examination as defined by the CPT code

13   book, and/or medical decision-making of low complexity,

14   if two of three of those are met by definition under any

15   shape, form or fashion, 99213 would be appropriate.

16   Correct?

17   A    That would be the way I would interpret it, yes.

18   Q    Okay.  I just think that's something that we should

19   remember for right now.

20        You -- are you aware that 99213s are the most

21   common codes billed by physicians?  Are you aware of

22   those studies?

23   A    There are many studies done by many different people

24   and I certainly would not sit here today and say that I

25   have known or read all of them, no.

647

1    Q   I'm not asking about all.  Have you ever read any

2    that have found that 99213s are the most common billing

3    code utilized by physicians?

4    A   I'm thinking.  I'd say that would not be surprising

5    to me, although I can't refer you to a specific study.

6    Only because it's in the mid-range and that would be

7    somewhat understandable that you would see coding of

8    that type being the most common.

9    Q   Okay.  You never went in a room with any of the

10   patients that either Dr. Schneider saw or any of the

11   other patients when they bill 99213, did you?

12   A   I was never in the Schneider Clinic.

13   Q   Okay.  You mentioned earlier -- you mentioned

14   earlier that -- well, strike that.

15        Your earlier testimony was that there have been

16   199,602 claims presented.  Do you remember that?

17   A   Yes.  Although I want to get back to that document

18   before we talk about it.

19   Q   Okay.

20   A   199,602 is what you're referencing.  Yes, that would

21   be Government Exhibit 1-M.

22   Q   Okay.  That number are for claims and not different

23   patients; correct?

24   A   These are for claims, that is correct.

25   Q   Okay.  And it's your testimony that all these were

648

1    for people that would be billed under Dr. Schneider's

2    provider number; is that correct?

3    A    That is correct.

4    Q    You also mentioned this time study that you did.

5    You remember that?

6    A    Yes.

7    Q    And you put these numbers up where it looks like

8    that Dr. Schneider has represented to somebody that he's

9    worked 31 hours in a day.  Do you remember that?

10   A    Yes, I do.

11   Q    Are you able to show the jury a document in there

12   where Dr. Schneider represented to anybody he worked 31

13   hours in a day?

14   A    There is no single document that will do that; but

15   in its totality of claims billing, on a particular date,

16   through all the insurers that I examined, that is the

17   case.

18   Q    My question was:  Are there a set -- let me change

19   it a little bit just to appease you a little bit.  Are

20   there a set of documents that Dr. Schneider has authored

21   and submitted and stated that I worked for 31 hours on X

22   day?  Are you aware of any, I should say?

23   A    I'm not sure that I understand the question.  I want

24   to make sure I understand the question so I can give you

25   a correct answer.

649

1    Q    That's okay.  Let's move on.  If a person is trying

2    to commit fraud and represents they worked 31 hours a

3    day when we only have 24, that wouldn't necessarily make

4    a lot of sense, would it?

5    A    Well, in my experience in 36 years I have seen this

6    more than once, and why a person would do it, if that

7    was your question --

8    Q    That wasn't my question.  I said it doesn't make

9    sense, does it?  Does it make sense?

10   A    Well, it certainly is inviting someone in the

11   investigative community to take a closer look.  And I've

12   never known anyone to get more than 24 hours out of a

13   day.  Have you?

14   Q    No, I sure haven't.

15        Now, let's talk about how you came up with this 31

16   hours.  Tell the Jury again how you developed -- how you

17   calculated 31 hours?

18   A    Basically the way this was done is we looked at the

19   various insurance companies that received claims with

20   Dr. Schneider's provider number on it.  We used the

21   time, the typical time frame that was given for the

22   code, either 10 or 15 minutes.

23   Q    Okay.  Let's stop there.  We already saw under 60,

24   Page 3, that the time element of a visit depends on the

25   actual clinical circumstances.  Do you remember seeing

1       that?

2       A    Yes, I do.

3       Q    Okay.  Did you take into account any actual clinical

4       circumstances that may have been occurring at the time

5       that whatever this number was provided was happening on

6       these certain days?

7       A    There would be no way for me to have that knowledge,

8       sir.

9       Q    So there would be no way for you to accurately state

10      how many hours somebody was truly working on these days

11      without that actual clinical information; correct?

12      A    I would say that within the averages of what the

13      codes are saying, yes, we can say that on those

14      particular days, he was exceeding 24 hours of claimed

15      services.

16      Q    Is there an element of any crime to bill

17      inconsistent with the average that's pointed out in the

18      CPT code?  Have you ever seen that in the Federal

19      Statute?

20      A    Well, it's referred to when you're -- it's referred

21      to basically as filing a false claim, which would be

22      under Section 1001.

23      Q    Right.  And a false claim would be, hey, I'm

24      representing, me, I'm representing I committed an act, a

25      service, that I know I didn't commit and hope that you

1    would pay me.  Correct?  That's a false claim.

2    That's --

3    A    Exactly.

4    Q    All right.  My question, however, is you cannot

5    accurately place how much time -- can you not state with

6    any accuracy, or any certainty, without looking at the

7    actual clinical practice, as to how much time any

8    provider put in on a certain day without going there and

9    talking to people?  Isn't that -- isn't that fair?  You

10   can guesstimate.  That's what you did, isn't it?

11   A    Well, I would say that it's, it's a reasonable

12   extrapolation, I guess, for lack of a better word.

13   Q    Okay.

14   A    If you use these times that these codes provide as

15   the term you used yourself, as an average, and you

16   aggregate that over an entire day, certainly, you're

17   seeing a large number of patients -- or you're claiming

18   to have seen a large number of patients on a day.  And

19   when you aggregate that time, when it's starting to I

20   would say even approach 15 or 16 hours, it gets down to

21   sort of a reasonableness of what a person is capable of

22   doing.

23   Q    Well, let's talk about reasonable.  You know in this

24   case that there are allegations that the typical clinic

25   visit would roughly last around ten minutes when it's a

652

1   the 99213.  You're aware of those allegations; correct?

2   A   I have not heard anyone say that.

3   Q   Don't you think that would be a factor you would

4   want to know when you're starting to get ready to put

5   down, like, this time study, to give the Jury a picture

6   of what may or may not have been happening at this

7   Clinic, and not some average clinic, but at this clinic?

8   Wouldn't that be helpful?

9   A   Let me respond that way--

10  Q   No.  Respond by answering my question. Please answer

11  yes or no.

12         MS. TREADWAY:  Objection, yes or no.

13  Badgering.

14         THE COURT:  No.  I think it's time sir, for

15  you to listen to his question.  We've gone a long time

16  on this and I'm not going to put up with it any more.

17  You want to qualify your answer to almost every question

18  that he asks you.  Now, here's the rule.  This is --

19  we're going to follow, or we're going to have trouble.

20  You listen to his question.  If you can answer it, then

21  you answer it without qualifying it or explaining it or

22  whatever you want to do.  If you don't understand his

23  question, you tell him you can't answer it because you

24  don't understand it.  You understand what I'm telling

25  you.

653

1    A   I understand you perfectly, Your Honor.

2           THE COURT:  Then you start following it.

3    Because I'm not going to spend the afternoon here having

4    some kind of a debate between the two of you.  He's got

5    to get finished here so that we can move on.  Now, let's

6    do it this way, my way, not the two of yours way.  This

7    isn't some kind of a debate.

8           MR. WILLIAMSON:  Yes, sir, Your Honor.

9    BY MR. WILLIAMSON:

10   Q   When you decided to make this time chart, you did

11   not consider the fact that evidence in this case will be

12   that the average 99213 visit would normally last around

13   ten minutes, did you?

14          MS. TREADWAY:  Again, Judge, that assumes

15   facts not in evidence.  Is he asking a hypothetical?

16          THE COURT:  He's not asking a hypothetical.

17   He's simply asking him how he put the thing together and

18   what he considered and what he didn't.

19   A   In response to that question, 99213, I used a 15

20   minute time slot.

21   BY MR. WILLIAMSON:

22   Q   Okay.  Which means you didn't use the ten minute

23   time slot, or review any specific clinic information;

24   correct?

25   A   That is correct.

654

1    Q    Now, are you aware -- did you go and try to consider

2    or research any rules that would explain away why

3    provider numbers that were linked to Dr. Schneider were

4    submitted to the billing companies?  Did you do any of

5    that?  Specifically -- let me get a little bit more

6    specific so we can move on.

7         Did you look at any sign-in sheets at the Clinic to

8    confirm what providers were in or out of the Clinic on

9    specific days?

10   A    That was not my part of the investigation.

11   Q    And that's fair.  All I'm asking you is about your

12   part.  Are you familiar with the rule that's called

13   incident-to-billing?

14   A    Sure.

15   Q    And under incident-to-billing, physician's

16   assistants can submit a bill under the provider's number

17   so long as there's a supervising provider at that

18   location; correct?  Or supervising physician?

19   A    That is true with one qualification.  The

20   qualification would be that the -- unless the

21   physician's assistant has his own billing number, in

22   which case that should be his.

23   Q    And you're saying that's a universal rule across 93

24   insurance companies?

25   A    I could not say that.

1    Q    Okay.  And the coders and the billers who do this

2    every day, they would have a better understanding as to

3    when it is and is not appropriate for

4    incident-to-billing; correct?

5    A    I could not -- I would make an assumption that that

6    is true; but I could not factually state that is true.

7    Q    And did you review any -- well, strike that.

8         On I think it's what?  11-1 of 2004 on your time

9    study.  I believe you stated there were 108 people

10   billed under Dr. Schneider's number.  Do you remember

11   that?

12   A    Give me the date again please.

13   Q    11-1-2004.

14   A    11-1-2004, there were 101 patients, unique patients.

15   Q    Patients billed under Dr. Schneider's provider

16   number?

17   A    That's correct, yes.

18   Q    Are you aware that that day there were two

19   physician's assistants on duty as well as Dr. Schneider?

20   Are you aware of that?

21   A    I am not aware of that.

22   Q    Are you aware that Dr. Schneider saw approximately

23   30 patients that day and that the two physician's

24   assistants roughly saw about 79.  Are you aware of that?

25   A    No, sir.

656

1    Q    Now, is it possible that on this day in question

2    that these two physician's assistants billed according

3    to incident to rule that they may have or may not have

4    understood?  Is it possible?

5    A    It's an area of the investigation I didn't do, so I

6    don't know.

7    Q    Okay.  Just for the sake of time --

8              MR. WILLIAMSON:  I have a lot to go through,

9    Your Honor, but we've been talking a lot of time so I'm

10   not going to --

11             THE COURT:  I'm not trying to cut you off-- I

12   just don't want this fencing back and forth.

13             MR. WILLIAMSON:  I think the Jury understands

14   the point.  But just to make sure.

15   BY MR. WILLIAMSON:

16   Q    Look at 11-29.  I think you said they billed like

17   108 patients.  11-2-9-2004?

18   A    Let me get down to that.  11-29.

19   Q    Yes.

20   Q    It should be towards the top of your--

21   A    I'm going to a different list.  I'm going on the

22   chronological list that would be 108.

23   Q    And are you aware that on that day Dr. Schneider was

24   in the office and he saw roughly around 32 patients?

25   Are you aware of that?

657

1    A    No, sir.

2    Q    Are you aware that Kim Lee He'bert was in the office

3    and she saw roughly around 42 patients?

4    A    I would have no means to know that, sir.

5    Q    Okay.  And are you aware that Charles -- you don't

6    have any means to know that, is that what you're saying?

7    A    That's not part of the investigation that I was

8    involved in.

9    Q    So I guess I'll just assume that you didn't know

10   Charles Craig was there and saw about 44 patients that

11   day?

12   A    I would have no means of knowing that.

13   Q    Okay.  And so, again, you don't know whether it's

14   possible or not whether or not these two physician's

15   assistants actually billed under Dr. Schneider's number

16   utilizing the incident-to rule, either they did or did

17   not understand?  Are you aware of that?

18   A    I wouldn't know whether they billed under his number

19   or whether they billed under their own number.

20   Q    You didn't put that on a chart either, did you, to

21   determine who else was billing that day?

22   A    This chart is representing claims billed under Dr.

23   Schneider's number.

24   Q    And as we stand here now, you don't know beyond a

25   reasonable doubt that Dr. Schneider actually submitted

658

1    all those claims himself to the insurance company;

2    correct?  Himself.  That's the question.

3    A   Well, I don't know if Dr. Schneider himself

4    physically submitted any claim.

5    Q   Okay.

6    A   A lot -- that's done by other staff usually.

7    Q   That's my point.  Thank you very much for that.

8        Last little topic that we'll talk about.  1-J.  Can

9    we look at 1-J and see what that is.  Can we get that

10   enlarged a little bit so -- .

11       Few points I want to talk about on this document.

12   First, the top, the program that is on here are

13   Medicare, Medicaid and First Guard.  Those are three

14   Government programs; correct?  As you testified earlier.

15   Correct?

16   A   Yes.  They're Government funded or Government

17   programs, yes.

18   Q   And then you have two private companies up there as

19   well; correct?

20   A   That's correct.

21   Q   Well, Dr. Schneider isn't being charged with

22   defrauding these other 88 companies that were at the

23   bottom of this list, is he?

24   A   I don't know the answer to that, sir.

25   Q   Never considered the Indictment before you testified

1   here?

2   A   I'm tesetifying to my portion of the investigation;

3   not the Indictment.

4   Q   All right.  And if the Indictment doesn't charge him

5   for the 88 -- other eighty something insurance

6   companies, you wouldn't disagree with that; correct?

7   You wouldn't disagree that that may be possible right

8   now.  Would you agree with that?

9           MS. TREADWAY:  Judge, again, he just said --

10          MR. WILLIAMSON:  It's a bad question.  I'm

11   sorry.

12          MS. TREADWAY:  He just said he didn't read it.

13          MR. WILLIAMSON:  It's a bad question.  I had

14   too many something in there.

15   BY MR. WILLIAMSON:

16   Q   All right.  Now, what I want to point out for the

17   Jury is under Medicaid, Dr. Schneider, or the Clinic, I

18   guess -- this is the whole clinic billing; is this

19   correct?

20   A   This is the Schneider Medical Clinic, yes, sir.

21   Q   Under Medicaid, 35% of his patient population was

22   Medicaid which is nearly double that of the next closest

23   competitor which is Blue Cross/Blue Shield.  Do you see

24   that?

25   A   As far as services, that's correct, yes.

1    Q    As far as services.  And so we're clear, Dr.

2    Schneider saw twice as many people, percentage-wise, as

3    that of Blue Cross/Blue Shield, but got a third less

4    funds for the services that were billed for.  Do you see

5    that?

6    A    Yes, I see that.

7    Q    Okay.  That's common, Medicaid normally pays less

8    than these private insurers; isn't that true?

9    A    Think that's pretty much true across the country,

10   yes.

11   Q    And a lot of providers don't want to see Medicaid

12   patients because of that?

13   A    I don't know why a lot of providers don't want to

14   see Medicaid patients.

15   Q    You're aware they don't, aren't you?

16   A    I know there's some issues with providers seeing

17   Medicaid patients; but what their individual reasons

18   are, I don't know.

19   Q    If you take Medicaid plus First Guard, which is the

20   state HMO of Medicaid, another part of the Government,

21   that gives you about 48 percent of his patient

22   population of the payments that he was receiving.  Do

23   you see that?

24   A    Yes, I do.

25   Q    Now, let's look at the prescriptions, the

661

```
 1    prescriptions, 1-K.  I guess we can just -- let's focus
 2    at the top five again please.
 3    A    Let me catch up with you here.
 4    Q    Okay.   Are you there?
 5    A    I'm there.
 6    Q    Now, you see these total paid over on the side 4
 7    million, 1 million, 727,000, 88,000, 38,000, 32000?  Do
 8    you see all those numbers?
 9    A    Yes, I do.
10    Q    That wasn't money that was paid to Dr. Schneider,
11    was it?
12    A    No, as I testified, that money was paid to the
13    pharmacies.
14    Q    Never found any evidence of any kind of kickbacks
15    that Dr. Schneider was receiving from any pharmacy for
16    them getting so much of this money; correct?
17    A    There was no evidence of any kickback -- didn't look
18    for any kickback.  This is payments for drugs expense --
19    Q    Wouldn't you want to know if the doctor is getting
20    kickbacks for the prescriptions he is writing in the
21    course of this investigation?
22    A    Well, if that was a part of the investigation, I'm
23    not aware of it.  It might be.  I don't know.
24    Q    You haven't heard of it?
25    A    I was not involved in that.
```

```
 1    Q   Okay.  That four million, that's costing Medicaid a

 2    lot of money over a four year period.  You agree with

 3    that?

 4    A   Yeah, that's a lot of money-- I mean, four million

 5    dollars is a lot of money.

 6    Q   It's a lot of money.  And you would agree before Dr.

 7    Schneider started taking care of these Medicaid patients

 8    and prescribing them medicine that Medicaid actually had

 9    to pay for, did you ever hear of a Stephen Schneider

10    before 2002?

11    A   I had no knowledge of Stephen Schneider before 2002,

12    and would have no reason to.

13    Q   Okay.  But when he started hitting your radar for

14    all these high payments going out for those patients --

15    it hit somebody's radar, didn't it?  Somebody got

16    interested; correct?

17    A   Correct.  They got interested.

18    Q   Now, you made -- you talked a lot about -- well,

19    strike that.

20         You mention up here Schedule II, III, IV and V,

21    that the clinic paid out-- but you don't have anything

22    in here about nonscheduled drugs that Dr. Schneider or

23    anybody on his employ actually prescribed, do you?

24    A   Not in this particular chart.  That was part of the

25    work-product.
```

663

1    Q    It was?

2    A    Yes, sir.

3    Q    Okay.  Let me take a look at it.  Is there a reason

4    why you didn't want to present that to the Jury, the

5    other part of the equation that, well, I was spending a

6    lot on -- or Medicaid was having to spend a lot of money

7    on scheduled prescriptions?  How come the jury didn't

8    get the picture of how many -- how much money Medicaid

9    had to spend on nonscheduled prescriptions?

10             MS. TREADWAY:  Objection; argumentative.

11             THE COURT:  Sustained.

12   BY MR. WILLIAMSON:

13   Q    Isn't it true that Dr. Schneider also prescribed a

14   lot of nonscheduled medication and that also cost

15   Medicaid a lot of money?

16   A    Yes.  He prescribed nonscheduled drugs.  And

17   certainly if the Medicaid claims payer determined that

18   those were payable, it would cost them money, yes.

19   Q    Okay.  But as you see this chart here, you learned

20   in your investigation that Dr. Schneider also

21   prescribed -- cost Medicaid a lot of money by

22   prescribing nonscheduled prescriptions as well; correct?

23   A    That's true.

24   Q    Okay.  And you mentioned earlier about how much

25   money the clinic was bringing in.  You're familiar with

1   a profit and loss scenario, aren't you?

2   A   Well, from my personal finances, yes.

3   Q   Okay.  And are you aware that the Clinic hired about

4   30 -- had about 30 people working at any given point in

5   time?

6   A   I have no knowledge of that, sir.

7   Q   Okay.  Are you aware that running a business you

8   have overhead; correct?

9   A   Well, yes, that's the nature of it.

10  Q   And you're aware that -- were you aware that Dr.

11  Schneider had to take loans out to put first class X-ray

12  machines in his clinic?  Are you aware of that?

13          MS. TREADWAY:  Judge, this is beyond the scope

14  of this witness's testimony.  I think this is more

15  relative to the financial side, not the claims side.

16          THE COURT:  Well, I'll allow him to answer

17  that question but I think we can move on to somebody

18  else here.

19  Q   Let's just sum it up like this.  Are you aware that

20  the clinic's overhead was between 90 and $100,000 a

21  month per year -- excuse me -- 90 to $100,000 per month?

22  Are you aware of that?

23  A   That was not a part of the information that I was

24  provided, no.

25  Q   And are you aware that Dr. Schneider actually took

1    less money home as operating the Schneider Medical

2    Clinic than he did when he was a physician with

3    Riverside?  Are you aware of that?

4    A   I would have no way of knowing that, sir.

5            MR. WILLIAMSON:  Your Honor, may I confer?  I

6    think I may be finished.

7                    (Off-the-record discussion.)

8            MR. WILLIAMSON:  Nothing further, Your Honor.

9            THE COURT:  Mr. Byers?

10           MR. BYERS:  If I may have just one minute to

11   confer with Mr. Williamson.

12                   (Off-the-record.)

13           MR. BYERS:  Thank you, Your Honor.

14                     **CROSS EXAMINATION**

15   BY MR. BYERS:

16   Q   Good afternoon.

17   A   Good afternoon.

18   Q   Linda Schneider wasn't a provider at the Schneider

19   Medical Clinic, was she?

20   A   No, she had no provider number.

21           MR. BYERS:  Thank you.

22           THE COURT:  Redirect, please.

23           MS. TREADWAY:  Thank you, Judge.

24                    **REDIRECT EXAMINATION**

25   BY MS. TREADWAY:

1    Q    Now, Mr. Seaton, I first want to direct your

2    attention to Exhibit 1-N.  I think we need to correct

3    something you said on cross-examination.

4    A    Okay.  Let me see if I can find it.  I've got the

5    exhibit.

6    Q    I believe in answer to one of Mr. Williamson's

7    questions you said that this information was relative to

8    only the claims submitted by Stephen Schneider?

9    A    Oh.

10   Q    In fact, isn't this all of the claims submitted by

11   all providers at Schneider Medical Clinic?

12   A    That is correct.  I misstated that.  I'm sorry.

13   Q    All right.  That's fine.  Just wanted to change that

14   for the record.

15        Now, during your direct examine we talked about

16   Exhibit 1-D, the bar graph.

17   A    Yes.

18   Q    And Mr. Williamson spoke to you at length about

19   that.  One of the things I'd like to show you -- and

20   maybe this will refresh your recollection.  Is this a

21   document that we shared with the defense with regards to

22   that standard deviation issue?

23   A    Yes.

24   Q    And does that document refresh your recollection

25   about the most common number of overdoses the 191

1    physicians had?

2    A    The most common number of patient drug overdoses for

3    the physicians at Via Christi was one.

4    Q    Thank you.  And also with regards to Exhibit 1-D.

5    Mr. Williamson, I believe, was talking to you about what

6    variables you did or did not take into account.  And I

7    want to go through some of those.

8    A    Okay.  1-D.

9    Q    1-D.  He said that you didn't consider the number of

10   patients any given doctor may have in a clinic.

11   A    That's true.

12   Q    Did you need to consider that?

13   A    No.

14   Q    He also asked you whether you had considered the

15   number of pain patients a particular doctor had taken

16   care of.  Did you need to consider that?

17   A    No.

18   Q    He also asked you if you considered the number of

19   Medicaid patients a particular doctor saw.  Did you need

20   to consider that?

21   A    No.

22   Q    And he also asked you whether you considered the

23   number of physician's assistants a clinic may have hired

24   and employed.  Did you have to consider that?

25   A    No.

668

1    Q    Did you have to consider any of these issues to

2    perform the analysis that you did that resulted in

3    Exhibit 1-D?

4    A    No.  None of that was necessary.

5    Q    But in terms of the kinds of doctors that are

6    represented on that chart, let me hand to you another

7    document which I hope will refresh your recollection.

8    Is that the list of the 23 doctors represented on

9    Exhibit 1-D?

10   A    Yes, it is.

11   Q    And for the most part, are all of those doctors

12   either family practitioners or general practitioners

13   like the Defendant claims to have been?

14   A    Where that information was known, that's true.  The

15   majority are.

16   Q    Now, Mr. Williamson also talked to you about your

17   diagnosis chart, 1-S, which we indicated was a very

18   limited chart.

19   A    Yes.  I know what you're referring to.  If I can get

20   down to it.  Yes.  I'm with you.

21   Q    And was the point of that chart to show how low the

22   percentage of cancer diagnosis were?

23   A    Yes.

24   Q    Okay.  Now, my last question to you is -- again, I

25   apologize for perhaps not doing a very good job on

1    direct examination about this.  Mr. Seaton, for 36 years

2    you've worked with Health and Human Services and these

3    health insurance programs?

4    A    That is correct.

5    Q    When a physician or another healthcare provider

6    applies to a program to become a provider and to submit

7    claims, and when they submit claims, who is responsible

8    for the information on that claim form or in that

9    electronic claim?

10   A    It's the physician because that is to whom the

11   payment is being made.

12   Q    And is that who the money went to in this case?

13   A    Exactly.  It did.

14            MS. TREADWAY:  Nothing further, Judge.

15            THE COURT:  Yes, sir.

16            MR. WILLIAMSON:  Very brief.

17                    **RECROSS EXAMINATION**

18   BY MR. WILLIAMSON:

19   Q    The document that Ms. Treadway pointed you to, that

20   identifies the standard deveiations as 6.85.  Correct?

21   A    Yes, that is correct.

22   Q    Nothing on that recent document changes your --

23   coincides with your testimony about 11 standard

24   deviations; correct?

25   A    I stand by my testimony.  That is representing one

1    standard deviation, 6.85.  And Dr. Schneider with 84

2    overdoses would have over 11 standard deviations.

3    Q    Okay.  Now, you just were asked a question about 23

4    doctors on a document.  Who are those 23 doctors?

5    A    That was just provided.  I'd have to have it again.

6    You want me to read those into the record?

7    Q    No.  I think the Jury will be upset with me if I did

8    that.  What I want you to do is help me understand how

9    did you get to 191 on your calculations when you were

10   handed a document of 23 physicians.  Is that just part

11   of the document?

12   A    191?  Well, these are the -- these are the

13   physicians who had ten overdoses or more.

14   Q    Okay.  So that doesn't represent your full study of

15   the 191 individuals that are reported to you by Via

16   Christi?  Is that fair?

17   A    That's true.  That would be available.

18   Q    Okay.  I'm just curious as to what it was.  And the

19   last question you were asked by the Government I think

20   is extremely important one that we really need to chat

21   about briefly.  Dr. Schneider is charged with federal

22   fraud; correct?

23   A    That's my understanding.

24   Q    And federal fraud has its own elements under the

25   law.  Would you agree with that?

1    A   Yes.

2    Q   And part of those elements is that he has to

3    knowingly and willfully submit something that has a

4    misrepresentation or fraudulent or false premises.

5    Correct?

6            MS. TREADWAY:  Judge, this witness is not the

7    legal scholar --

8            THE COURT:  No, he's not, but he is some sort

9    of investigator for 36 years, or whatever it is.  And if

10   he doesn't know the answer, he just says I don't know.

11   But if he knows, he's entitled to --

12           MS. TREADWAY:  He is asking a legal element so

13   that's why I'm objecting.

14           THE COURT:  Well, go ahead.

15   BY MR. WILLIAMSON:

16   Q   Do you remember my--

17   A   Can you repeat the question, please.

18   Q   Yes.  Isn't it true that under the federal fraud

19   statute that Dr. Schneider would have had to knowingly

20   and willfully submit false information that he knew to

21   be incorrect to an insurance company in order to get

22   paid?  Do you agree with that?

23   A   No, sir, I don't.

24   Q   Well, what are the elements that you know of?

25   A   Well, if you can let me phrase it to my

672

 1    understanding.  And this is my understanding and my

 2    recollection --

 3    Q    Please.

 4    A    In order to be involved or charged with a submission

 5    of a false claim, the physician would have had to

 6    knowingly and willfully submitted or caused to be

 7    submitted a service which he knew or should have known

 8    was not provided.

 9    Q    Which means that at the end of the day, anything

10    that he's responsible for submitting or directing

11    somebody to submit that he knows is false, that's when

12    it becomes a crime.  Correct?

13    A    That would be my understanding.

14    Q    Okay.  And this contract, this responsibility thing,

15    just because he signed a contract and says, hey, I'm

16    going to be responsible under our contract between me

17    and the insurance company that, you know, I'm going to

18    be responsible for what happens at my clinic, that does

19    not transform the legal standards in this courtroom,

20    does it?  It doesn't supersede it, does it?  Let me

21    just --

22    A    I think I answered the question.  I don't know how

23    else to answer it.

24    Q    That's fine.

25         MR. WILLIAMSON:  No further questions, Your

1    Honor.

2               MR. BYERS:  Nothing, Your Honor.

3               MS. TREADWAY:  I have nothing further, Judge.

4    Can this witness be excused, Judge?

5               THE COURT:  Well, at this point I'll allow

6    this witness's testimony regarding his understanding to

7    stand; but you're to evaluate, if you remember it, ten,

8    twelve weeks from now, in light of what my instructions

9    are with respect to the elements of proof.  And if his

10   understanding of the elements disagrees with my

11   instructions to you about what the elements of proof

12   are, then you're to evaluate that accordingly.  You're

13   excused, sir.

14   A    Thank you, Your Honor.

15              THE COURT:  Who's your next witness?

16              MS. TREADWAY:  Robert Hawkins.

17                        **ROBERT HAWKINS**

18   Having been first duly sworn to tell the truth, the

19   whole truth and nothing but the truth, testified as

20   follows on:

21                     **DIRECT EXAMINATION**

22   BY MS. TREADWAY:

23   Q    Could you please introduce yourself to the jury.

24   A    It's Robert Hawkins.

25   Q    Where are you currently employed?

```
 1    A    I'm a Financial Investigator at the U.S. Drug
 2   Enforcement Administration, DEA.
 3    Q    How long have you been employed there?
 4    A    Almost five years.
 5    Q    Where were you employed previously, Mr. Hawkins?
 6    A    For 32 years I was a Special Agent with Criminal
 7   Investigation Division of IRS.
 8    Q    And how long were you there?  I'm sorry --
 9    A    32 and a half years.
10    Q    Have you spent your career in law enforcement?
11    A    Yes, I have.
12    Q    And have you spent a good portion of your law
13   enforcement career performing financial analyses in
14   criminal cases?
15    A    Yes, I have.
16    Q    Mr. Hawkins, what has been your participation in
17   this case?
18    A    I participated in financial investigation of the
19   case, subpoenaing, analyzing financial records and
20   primarily tracing money.
21    Q    Generally speaking, what documents have you reviewed
22   in this case?
23    A    Bank account records.  Records of other financial
24   accounts.  Acquisitions of real estate, automobiles.
25   Insurance records.
```

```
 1   Q    Have you reviewed the Defendants' personal tax

 2   returns?

 3   A    Yes, I have.

 4   Q    And from those personal Federal Income Tax returns,

 5   were you able to determine the gross income for the

 6   Schneider Medical Clinic?

 7   A    Yes, I was.

 8   Q    Now, how were you able to determine the gross income

 9   of an entity, the Schneider Medical Clinic, from the

10   Defendants' personal tax returns?

11   A    The Schneider Medical Clinic was a -- for a while it

12   was a sole proprietorship, and then it was under a

13   limited liability company, which is still taxed as a

14   sole proprietorship.  So it's basically a two or three

15   four page form on their personal tax returns.  It's

16   taxed as a small business.  The income is represented

17   there.  All the expenses.  And the bottom line is their

18   net profit and that amount goes to the front page of

19   their tax return and they pay tax on it.

20   Q    Using those tax returns, did you develop a summary

21   chart for the jury regarding the gross income for the

22   Schneider Medical Clinic?

23   A    Yes, I did.

24   Q    Let me hand you what has been marked for

25   identification as Government Exhibit 47.  Is that the
```

676

1   summary you prepared?

2   A   Yes, it is.

3   Q   Does Exhibit 47 summarize voluminous tax

4   information?

5   A   Yes, it does.

6   Q   Will this chart eliminate the need for the jury to

7   review the detailed and rather voluminous tax

8   information you reviewed and from which you created the

9   chart?

10  A   Yes, it will.

11  Q   And does the information in the chart accurately

12  reflect the data it summarizes?

13  A   Yes, it does.

14          MS. TREADWAY:   Government offers Exhibit 47

15  under Rule 1006.

16          MR. WILLIAMSON:   No objection.

17          MR. BYERS:   No objection.

18          THE COURT:   It's received.

19  BY MS. TREADWAY:

20  Q   We'll put this on the screen and we also have a blow

21  up of it.

22      Now, first of all, I'd like you to tell the jury

23  what you mean by gross income?

24  A   Gross income is the gross receipts of the business

25  such as this medical practice, but in any business, less

1    cost of goods sold.  Say, if it's a manufacturing

2    company or something like that, they're buying inventory

3    for resale, less anything like that is gross income.

4    From that you then start deducting expenses such as

5    rent, salaries, utilities, things like that.  And then

6    the bottom line would be like net profit.

7    Q    So this is not net profit?  This is gross income

8    before overhead and expenses have been taken out?

9    A    That's correct.

10   Q    All right.  Now, the year 2002, has the gross income

11   of $49,238.  Do you know why the gross income in 2002

12   was so low?

13   A    Yes, I do.

14   Q    Why?

15   A    The Schneider Medical Clinic did not open until

16   October of 2002.

17   Q    Now, the combined gross income for 2002 through 2006

18   was $6.9 million?

19   A    Yes.

20   Q    Now, the jury just heard testimony from Mr. Seaton,

21   that 93 healthcare benefit programs paid the Clinic

22   approximately $4.24 million for this same time period.

23   Were you able to determine what income comprised the

24   difference between the 4.24 million that the healthcare

25   insurance companies paid the Clinic and this $6.9

678

1    million in gross income?

2    A    Yes.

3    Q    And what income comprised the difference?

4    A    There were payments from people such as copays,

5    insurance, people who didn't have insurance and just

6    wrote checks.  There were significant cash deposits,

7    arguably were from the same copays and people who did

8    not have insurance.

9    Q    So these would be people that were receiving

10   services at the Clinic and paying for them with their

11   own money?

12   A    Yes, ma'am.

13   Q    Did you compare the Defendants' tax returns to the

14   deposits of money made to the Clinic's bank accounts?

15   A    Yes, I did.

16   Q    And how did the tax return reports and the deposits

17   compare?

18   A    They were consistent.

19   Q    In reviewing the Defendants' tax records and their

20   banking records, were you able to determine how much

21   money the Defendant Stephen Schneider and Linda

22   Schneider personally took out from the Clinic?

23   A    Yes.

24   Q    From the Defendants' tax returns and bank records,

25   did you develop a summary chart for the jury regarding

1    the money that the Defendants took out from the

2    Schneider Medical Clinic for their personal benefit?

3    A    Yes, I did.

4    Q    Let me hand you what has been marked for

5    identification as Exhibit 46.  Is that your summary

6    chart?

7    A    Yes, it is.

8    Q    And does Exhibit 46 summarize voluminous

9    information?

10   A    Yes, it does.

11   Q    Will it save the jury time reviewing all of the tax

12   and financial information that you reviewed for 2002

13   through 2006?

14   A    Yes, it will.

15            MS. TREADWAY:  Government offers Exhibit 46

16   under Rule 1006.

17            THE COURT:  Any objection?

18            MR. WILLIAMSON:  No objection, Your Honor.

19            MR. BYERS:  No, sir.

20            THE COURT:  It's received.

21   BY MS. TREADWAY:

22   Q    I believe we have a blow-up of this as well.  We can

23   both put on the screen and put up for the jury.

24        First of all, I'd like to just review with the Jury

25   how this information is set up on the chart.  In the

1    first column, what information is on the first like six

2    or seven lines?

3    A    Those are the sources of the information.  In other

4    words, what bank account records or tax returns that I

5    used, analyzed, to obtain this information.

6    Q    And then after the total deposits there, the second

7    time, we have a list of things.  What are those, sir?

8    A    Those are specific transactions that I was able to

9    determine withdrawals, transfers, out of the Schneider

10   Medical Clinic operating bank account, and was able to

11   trace that money from that account through various other

12   accounts.  These are specific payments out of that

13   account for the benefit to or for the benefit of Stephen

14   and/or Linda Schneider.

15   Q    And when we talk about the specific transactions,

16   have we parenthetically noted if this transaction is

17   also a money laundering transaction charged in the

18   Indictment?

19   A    Yes.

20   Q    And, for instance, the second transaction, March

21   17th, 2004, deposit to Credit Union of America.  That is

22   actually also Count 18 of the Indictment?

23   A    That's correct.

24   Q    And will you be back later in the trial to talk

25   about the money laundering?

1   A   Yes, I will.

2   Q   Now let's look at the next columns in the chart.  If

3   we can go to the top, please, Mr. Moore.  All right.

4        The first column is 2002 and then we have columns

5   for each year through 2006.  And then what is the last

6   column, sir?

7   A   That's the total -- that's the total for all years.

8   Q   All right.  Now, in terms of the money that the

9   Defendants took out of their Clinic, what made up the

10  bulk of that money?  What types --

11  A   Significant withdrawals from the operating account.

12  Q   And were they salaries or just draws?

13  A   What you would call a draw.

14  Q   And is there anything wrong about an owner taking a

15  draw from a business they own?

16  A   Absolutely not.

17  Q   Now, for the first year in 2002, did the Defendants

18  actually take salaries out for that first three months?

19  A   Yes, they did.

20  Q   And what was the total salaries that they took out

21  for the first three months of -- I'm sorry -- the last

22  three months of 2002 but the first three months of the

23  Clinic's existence?

24  A   $63,462.

25  Q   And then the next information, SMC deposits to Bank

682

1    of America account 0429.  Was that an account for the

2    benefit of the Defendants?

3    A    Yes, it was.

4    Q    And over the course of '03 to '06, how much money

5    did the Defendants take out of the Clinic and place in

6    that account in a deposit?

7    A    $430,478.

8    Q    And then the rest of these transactions are

9    individually listed by amount and in the year that they

10   were done, weren't they?

11   A    Yes.

12   Q    And going to the bottom line, what were the total

13   amount of funds that the Defendants received for the

14   years '02 through '06 in all manner?

15   A    1,469,782.

16           MS. TREADWAY:  That's all, Judge.

17           THE COURT:  Mr. Williamson.

18                   **CROSS EXAMINATION**

19   BY MR. WILLIAMSON:

20   Q    How you doing today?

21   A    Good, sir.  And you?

22   Q    Pretty good.  Just a few questions for you.  You

23   were able to track and trace basically all of the

24   Schneiders' financial dealings between 2002 and 2006;

25   correct?

683

1    A    All of the financial dealings that we were able to

2    determine and uncover.

3    Q    You had a lot of records to go through; correct?

4    A    Yes, sir.

5    Q    That's why it would be impractical to bring all of

6    that stuff in here and show it to the jury; right?

7    A    Page by page, yes.

8    Q    Yeah.  Uhm, you learned that when you reviewed their

9    tax records they were telling -- they were being honest

10   and truthful, reporting the income they were receiving;

11   correct?

12        Let me rephrase that.  On their tax records -- and

13   I believe you said this on direct -- I just want to make

14   sure I understand -- that you found their tax records to

15   match up to the amounts that they were receiving from

16   the clinic; correct?

17   A    No.  What I said was the tax records were consistent

18   with their bank deposits to the -- their main operating

19   account at Valley State Bank was in the name of

20   Schneider Medical Clinic.  That's their primary account.

21   Q    Right.  I see.

22   A    The tax returns were consistent with the bank

23   account deposits.

24   Q    Okay.  Including the cash deposits; correct?

25   A    Yes.

684

1   Q   Okay.  So, no attempt to try to -- at least you did

2   not uncover any attempt to try to hide any cash that

3   they actually deposited and kept records of but not

4   reported to IRS.  That's fair?

5   A   That was a long question.

6   Q   I know it was.  They didn't try to hide the cash

7   deposits?

8   A   There were significant cash deposits to their bank

9   account.

10  Q   And they were reflected on their tax records?

11  A   Appeared to be reflected on the tax records.

12  Q   Okay.  Before you started getting all of this

13  information, you actually issued subpoenas for a lot of

14  this information.  Is that fair?

15  A   Yes, sir.

16  Q   Did you ever once go ask the Schneiders:  Are you

17  willing to go sit down with me and help me go through

18  this so we can determine whether or not something wrong

19  was going on?

20  A   I got into this investigation, was asked to

21  participate and assist in late 2006 or early 2007.  It's

22  my understanding, and was my understanding, that by that

23  time Mr. and Mrs. Schneider were both represented by

24  counsel and that they were not available to us --

25  Q   Okay.

685

1    A    -- for interview.

2    Q    But they never told you that; correct?  Let me

3    strike that.

4         You never made a request and they rejected you.  Is

5    that fair?

6    A    Because they were represented, I'm not allowed to go

7    ask them if they want to talk to me.

8    Q    You can send a letter to the lawyer, can't you?

9    A    I would not.  That's the United States Attorney's

10   Office procedure.

11   Q    I guess my point is that the reason why is you'd

12   rather just go subpoena people's information without

13   giving them any notice as opposed to just sitting down

14   and talking to them as honest citizens.  Is that the

15   reason why?

16   A    No, sir.  It's my understanding and belief that by

17   the time I became involved there had been one if not two

18   search warrants on their clinic and they were -- they

19   had various attorneys and they were well aware that

20   there was an investigation.  There was no secretly

21   sneaking around.

22   Q    Right.  And you realize that even after those search

23   warrants that these two voluntarily came in and spoke

24   with agents.  Are you aware of that?

25   A    I'm aware that they came in and spoke with agents

1    about a matter unrelated to themselves.

2    Q    Really?  They didn't talk -- strike that.

3         The Jury saw what -- the transcript.

4         That brings me to a question.  Just a little bit on

5    this spread sheet.  You stated that the Defendants

6    together received $1.4 million over a, what, four year

7    period?

8    A    That's the money that they received and took out of

9    the medical practice from October of 2002 through the

10   end of 2006.

11   Q    And that would give both of them a yearly salary,

12   assuming that that 1.4 is accurate, of a total of

13   $350,000 per year between 2002 to 2006.  Correct?

14   A    If you did the math, I'll go with on you that.

15   Q    That's what it came up to.  I just used my

16   calculator.  But what I have a question about is, there

17   are several things on here that you identified as

18   personal that I just wondered why you chose that

19   designation.  I think ultimately at the end of the day

20   it doesn't matter, but September 19th, 2005, there was a

21   payment for legal fees that you termed as personal.  Do

22   you see that?

23   A    Yes, I do.

24   Q    And that happened about five days after the search

25   warrant; correct?

687

```
 1    A    Yes, sir.
 2    Q    So, isn't it fair that the Clinic was being
 3    investigated and that amount of money would technically
 4    be for the legal fees possible regarding the fact they
 5    just got raided?
 6    A    No.  It's my understanding that Mr. and
 7    Mrs. Schneider were being investigated and had obtained
 8    personal counsel.
 9    Q    But that had to do with their involvement with the
10    Schneider Medical Clinic; correct?
11    A    I believe it had to do with things -- with potential
12    violations that they may well have committed in
13    connection with the operation of the Schneider Medical
14    Clinic.
15    Q    Okay.  And we see a few more after that.  And I
16    think other than that -- you say you will be back to
17    testify later about this whole money laundering thing;
18    correct?
19    A    That's my understanding.
20              MR. WILLIAMSON:  Okay.  I think we'll talk a
21    little bit more later.  No further questions, Your
22    Honor.
23              THE COURT:  Mr. Byers?
24              MR. BYERS:  Nothing, Your Honor.
25              THE COURT:  Anything further?
```

1          MS. TREADWAY:  Just one question, Judge.

2                    **REDIRECT EXAMINATION**

3     BY MS. TREADWAY:

4     Q   Mr. Hawkins, is it possible to trace cash that isn't

5     deposited in a financial institution or other similar

6     place?

7     A   Very difficult.  For the most part, no.

8          MS. TREADWAY:  Thank you.

9                    **RECROSS EXAMINATION**

10    BY MR. WILLIAMSON:

11    Q   You aware that the Clinic kept cash receipts?  Are

12    you aware of that?

13    A   I'm sorry.  Kept cash receipts?

14    Q   Yes.  Are you aware that the Clinic maintained cash

15    receipts that tracked all the money that was provided?

16    A   You mean like documents?

17    Q   Yes.

18    A   Okay.  Cash receipts sometimes is used to indicate

19    income that was received in cash.

20    Q   Okay.  So just for the Jury, that's like your -- in

21    your technical field?

22    A   That's correct.

23    Q   Okay.  I apologize.

24    A   They maintain receipts like carbon copy receipts for

25    currency.

689

1    Q    Yes.  And they also had a computer system that

2    tracked the cash that was provided to the Clinic;

3    correct?  Did you learn that in your investigation?

4    A    Yes.

5    Q    Okay.  And last question.  Did you look at how much

6    money Dr. Schneider was making in the years 2000 and

7    2001 alone, not including the joint assets?

8             MS. TREADWAY:  That's beyond redirect, Judge.

9             THE COURT:  Sustained.

10            MR. WILLIAMSON:  All right.  Nothing further,

11   Your Honor.

12            THE COURT:  Mr. Byers?

13            MR. BYERS:  No.  Thank you, Your Honor.

14            THE COURT:  All right.  15 minutes, Ladies and

15   Gentlemen.  Remember and heed the admonition.

16                    (Recess.)

17            THE COURT:  Are you all comfortable?  Next

18   witness.

19            MS. TREADWAY:  Government calls Dr. Jamie

20   Oeberst.

21                    **JAMIE OEBERST**

22   Having been first duly sworn to tell the truth, the

23   whole truth and nothing but the truth, testified as

24   follows on:

25                  **DIRECT EXAMINATION**

1    BY MS. TREADWAY:

2    Q    Could you please introduce yourself to the jury.

3    A    Hi.  My name is Jamie Oeberst.

4    Q    And where are you employed?

5    A    At the Sedgwick County Regional Forensic Science

6    Center here in Wichita.

7    Q    What is your title?

8    A    I'm the District Coroner and the Chief Medical

9    Examiner at the Forensic Science Center.

10   Q    How long have you been the Chief Medical Examiner?

11   A    Since January of 2007.

12   Q    What was your prior title?

13   A    I was the Deputy Coroner and Deputy Medical Examiner

14   prior to that.

15   Q    Here in Wichita?

16   A    Yes.

17   Q    Are you a medical doctor?

18   A    Yes.

19   Q    What are your duties and responsibilities at the

20   Sedgwick County Regional Forensic Science Center?

21   A    We conduct death investigations; post-mortem

22   examinations, which includes autopsies; external

23   examinations; generate reports from those examinations;

24   testify in court.  And then I, as the Chief Medical

25   Examiner, I have some administrative responsibilities as

691

1    well.

2    Q    During the time you have been employed at the

3    Sedgwick County Regional Forensic Science Center, have

4    other medical examiners performed autopsies at the

5    center who were not employees but who worked under

6    contract?

7    A    Yes.

8    Q    And tell the jury why that is and how that works?

9    A    The office of the Forensic Science Center Pathology

10   Division is accredited, which means we went through a

11   bunch of steps to pass and meet a bunch of standards for

12   the National Association of Medical Examiners.  And part

13   of that accreditation is that no single pathologist

14   perform more than 350 autopsies in one year.  In

15   addition, we've also had some changes in staffing so we

16   may at any one time -- not currently, but in the past --

17   we would have maybe only one doctor in the office, one

18   physician in the office, and we needed assistance to

19   just do all the examinations in the office; but also to

20   make sure that we remain in compliance with our

21   accreditation.

22   Q    Were Jill Cobb, Larry Czarnecki, Deborah Johnson and

23   George Thomas all medical examiners that worked

24   temporarily at the Center under contracts?

25   A    Yes.

692

1    Q    Could you review with the jury your educational

2    background beginning with your undergraduate college

3    degree?

4    A    I have an undergraduate degree from the University

5    of California at Berkeley.  After I graduated from

6    Berkeley, I went to medical school at Wake Forest

7    University.  It's the Bowman Gray School of Medicine --

8    or it was.  It's changed its name since then.  But it

9    was the Bowman Gray School of Medicine.  That's in

10   Winston-Salem, North Carolina.  After I graduated from

11   medical school, I did a five year residency in general

12   pathology, anatomic and clinical pathology at the

13   hospital, North Carolina Baptist Hospital, which is

14   associated with the Bowman Gray School of Medicine.

15   After I completed my pathology residency, I then did a

16   one year fellowship in forensic pathology at the

17   Southwestern Institute of Forensic Sciences in Dallas,

18   Texas.

19   Q    Are you board certified?

20   A    Yes.

21   Q    In what are you board certified?

22   A    I am board certified in anatomic, clinical and

23   forensic pathology.

24   Q    You have three board certifications?

25   A    Yes, ma'am.

693

```
 1    Q   And tell the jury what it means to be board
 2    certified?
 3    A   The -- there's the American Board of Pathology and
 4    they design a test that everybody has to take that wants
 5    to be board certified.  It's a several day exam,
 6    depending on which part you're taking or if you're
 7    taking several parts together, and it's a written test
 8    as well as a test looking at a number of things under
 9    the microscope and photographs of different kinds of
10    things that you may come in contact with while you're
11    in -- practicing pathology.  And if you pass the test,
12    you become board certified.
13    Q   Do you have any academic appointments?
14    A   Yes.
15    Q   And what are those?
16    A   I have an academic appointment at the K.U. Medical
17    School.  It's a clinical appointment.
18    Q   Are you a volunteer?
19    A   Essentially, yes.
20    Q   How many years have you been working as a forensic
21    pathologist?
22    A   Almost ten.
23    Q   In those years, could you estimate how many
24    autopsies you have performed?
25    A   Somewhere between 2500 and 3000.
```

1    Q    Is every death subject to autopsy?

2    A    No.

3    Q    When is an autopsy or a post-mortem examination

4    performed?

5    A    There are certain statutes, laws, in the State of

6    Kansas that govern the Coroner's process and Coroner law

7    and cases that come under the Coroner's jurisdiction.

8    We can assume authority in those cases, or jurisdiction,

9    if you will, and perform autopsies or other types of

10   post-mortem examinations on those cases as we feel it's

11   necessary.

12   Q    And post-mortem just means after death?

13   A    Yes, ma'am.

14   Q    And autopsy is a particular kind of post-mortem

15   examination?

16   A    Yes.

17   Q    Now, is the autopsy only part of a death

18   investigation?

19   A    Yes.

20   Q    In a death investigation, if a person dies other

21   than in a medical facility, such as a hospital or

22   nursing home, something of that nature, is there an

23   investigation at the scene of the death?

24   A    Yes.

25   Q    Who typically does that scene investigation?

1    A    One of our medical investigators.

2    Q    And what does a medical investigator do at a scene

3    investigation?

4    A    They obtain history.  They'll -- oftentimes, if

5    death has occurred at a residence, there's already

6    medical personnel there.  Usually law enforcement as

7    well.  So they may obtain history from those personnel

8    there present at the scene.  If family is present, they

9    may also interview them as well depending on the

10   circumstances and whether or not the family actually at

11   that point in time in their grief wants to be

12   interviewed.  They try to get a history about

13   circumstances surrounding the death.  And then they will

14   also examine the residence.  They will go through and

15   make observations about the deceased person, where they

16   are, what position they're in and that kind of thing.

17   Then if there's medications that the deceased person has

18   been prescribed, they will collect those and bring them

19   back to the Forensic Science Center and inventory them.

20   They may make some other observations; and, again, it

21   depends on the circumstances, but they will go through

22   the residence and make any observations that they think

23   may play a role in this person's death.

24   Q    And will they collect evidence if need be?

25   A    In general, only medications.  Occasionally, if

1    there's drug paraphernalia, they may collect that.

2    Occasionally law enforcement may collect that if it

3    appears to be of an illicit nature.

4    Q    In a death investigation, are family physicians

5    contacted?

6    A    Yes, sometimes.

7    Q    All right.  And how would they be contacted?

8    A    Well, initially, oftentimes how cases are reported

9    to our office is that there is a death at a residence

10   and first responders, which include usually law

11   enforcement personnel, will respond to the scene.  They

12   get there.  The person is pronounced deceased.  And law

13   enforcement usually tries to find out the medical

14   history and do some initial investigation while they're

15   there.  And law enforcement is usually the one that

16   contacts our medical investigator.  In the meantime, the

17   law enforcement officer, and, again, it depends on the

18   circumstances, but if it's -- if it looks like possibly

19   it's a natural death or something like that, they may

20   try to contact that person's personal physician to see

21   if this was an expected death and if the physician would

22   be willing to sign a death certificate, and try to get

23   some more information.  At that point, depending on what

24   the personal physician's responses may be, they then

25   call the medical investigator and give them the

697

1    information and then from there we decide if it appears

2    that it's a Coroner's case or not.

3    Q    And if it's a Coroner's case, can you get medical

4    information from a doctor that attended to the deceased

5    person prior to their death?

6    A    Yes.

7    Q    And do you do that by subpoena?

8    A    Yes.

9    Q    Now, with regards to the death scene investigations

10   outside the context of a hospital or nursing home

11   setting, are reports made by both law enforcement

12   officers at the scene as well as your medical

13   investigators?

14   A    Our medical investigators get reports.  Most -- it

15   depends again on the type of case, but sometimes we get

16   copies of law enforcement reports and sometimes we

17   don't.  It's dependent on the case.

18   Q    And do your investigators make their own reports?

19   A    Yes.

20   Q    Now, if a person dies at a medical facility, how

21   does the investigation proceed?

22   A    We're usually contacted by medical personnel,

23   oftentimes a nurse from the hospital, to say that this

24   person has been pronounced deceased.  They again give

25   history to the medical investigator and then the medical

698

1    investigator makes an assessment as to whether or not it

2    sounds like it would be a Coroner's case or not.  If

3    it's a case where they're unsure, they're going to

4    consult with one of the physicians.  And then, with the

5    exception of homicides, those -- the investigator does

6    not go to the hospital.  And the person is then

7    transported by our delivery service, which is a funeral

8    home, to the Forensic Science Center for examination.

9    Q    As a part of your job as a forensic pathologist, on

10   a case that you're actually working on, do you review

11   the investigative reports?

12   A    Yes.

13   Q    Is all of the information gathered during the scene

14   investigation or at the hospital, or information

15   gathered from a family physician, the family, all a part

16   of your death investigation?

17   A    Yes.

18   Q    And once a person's body is transported to the

19   Forensic Science Center, is there an external

20   examination of the body performed?

21   A    Yes.

22   Q    And who performs that external examination?

23   A    It depends on the practice of the particular

24   forensic pathologist.  We have pathology assistants at

25   the Forensic Science Center.  Some physicians choose to

699

1    do the entire external examination themselves.  Other

2    physicians, including myself, will have an assistant do

3    portions of the external examination and then will check

4    that as well as add other details that we feel are

5    necessary to add to the form.

6    Q    Then who will perform the autopsy if one is decided

7    necessary?

8    A    The pathologist with the assistance of the forensic

9    assistant.

10   Q    Is the work at the Forensic Science Center very much

11   a team effort?

12   A    Absolutely.

13   Q    Does the Forensic Science Center follow a set of

14   nationally recognized and accepted autopsy guidelines?

15   A    Yes.

16   Q    And who publishes those guidelines?

17   A    The guidelines were published by the National

18   Association of Medical Examiners.

19   Q    And who performs the toxicology portion of the

20   investigation?  Or the chemical analysis?

21   A    Our toxicology laboratory at the Forensic Science

22   Center.

23   Q    And who's in charge of that laboratory?

24   A    Dr. Rohrig.

25   Q    And is that Timothy Rohrig?

700

1    A    Yes.

2    Q    And is he actually the Administrator of the entire

3    Forensic Science Center?

4    A    Yes.  He's the Director of the Forensic Science

5    Center.

6    Q    Now, do you and the other pathologists use all of

7    the information from the death investigation and the

8    toxicology results, if any are forthcoming, to reach

9    conclusions?

10   A    Yes.

11   Q    And what are the two primary conclusions that will

12   be drawn about a dead person?

13   A    It involves -- it's certification of the death, so

14   that includes the cause of death, which is the injury or

15   natural disease, or the combination of the two resulting

16   in the death; and then the manner of death.

17   Q    So cause of death and manner of death?

18   A    Yes.

19   Q    Okay.  Now, is there typically a primary cause of

20   death?

21   A    Yes.

22   Q    And can there also be contributing causes of death?

23   A    Yes.

24   Q    What is a contributing as compared to a primary

25   cause of death?

1  A   The primary cause of death is the, again, injury or

2  natural disease that seems to most be the biggest

3  contributor.  If you have contributing causes of death,

4  it seems to be the biggest contributor, the most

5  significant finding at autopsy.

6  Q   And a contributing cause of death in comparison to

7  that?

8  A   Is something that's medically significant but in the

9  physician's opinion is not as significant as the primary

10  cause of death.

11  Q   And so a contributing cause is not the actual cause

12  of death but it simply contributed to the death?

13  A   Yes.  It, it played a role in the death but wasn't

14  the primary cause.

15  Q   Now, are there cases where no cause of death can be

16  determined?

17  A   Yes.

18  Q   Are those rare or common?

19  A   Rare.

20  Q   Now, let's talk about the causes of death in

21  general.  I know there's probably many, many causes of

22  death, but typically do you have some categories that

23  you can give us about causes of death?  Like, for

24  instance, one thing that comes into my mind because it's

25  part of my family history is a heart attack.  Would that

1   be a cause of death?

2   A   We might use slightly different language, but, yes.

3   Q   And what are some of the other causes of death that

4   you run into as a pathologist?

5   A   Injuries from a motor vehicle accident.  Gunshot

6   wounds.  Cancer.  Stroke.

7   Q   And in this case?

8   A   In which case?

9   Q   And in this case, in the Schneider case, what did

10  you find as a cause of death on many occasions?

11  A   Mixed drug intoxication.

12  Q   Now let's talk about the manners of death.  What are

13  the manners of death?

14  A   In the State of Kansas on the death certificate

15  there are five different boxes that you can check for

16  manner of death when you're certifying a death, and the

17  manners of death include natural death, accident,

18  suicide, homicide or undetermined.

19  Q   Now, how do you determine the manner of death was

20  accidental as opposed to death from natural causes?

21  A   Death from natural causes would only involve natural

22  disease.

23  Q   What are some of the natural causes of death?

24  A   Some of the things we discussed, heart disease,

25  cancer, stroke.

1    Q    How do you determine that the manner of death was

2    accidental as opposed to suicide?

3    A    To a certain extent that's done on a case-by-case

4    basis.  In general, with suicides, you look for certain

5    histories of mental illness, depression, have they

6    threatened to commit suicide, did they leave a note.

7    You know, obviously, there's different causes of death

8    that are consistent with a suicide.

9    Q    Now, are there cases where the manner of death

10    cannot be determined?

11    A    Yes.

12    Q    And is that common or rare?

13    A    Relatively rare.

14    Q    Do the toxicologist and the pathologist work

15    together to determine the cause and the manner of death?

16    A    On some cases, yes.

17    Q    And how would that work?

18    A    Well, we get all the information and I do the

19    post-mortem examination and then complete the autopsy

20    examination, look at the slides under the microscope, go

21    through all my findings, and then I get the toxicology

22    report.  And then, depending on the toxicology results,

23    the toxicologist functions as a consultant in assisting

24    me to determine the cause of death.

25    Q    What are some of the kinds of things a toxicology

704

1    report is going to tell you in terms of what's going on?

2    A    What substances are present.   What levels they are

3    present in the blood or brain or -- I mean, we do

4    toxicology on different specimens.

5    Q    So it's kind of a chemistry --

6    A    Yes.

7    Q    -- chemistry of the body?

8    A    Yes.

9    Q    Now, are the cause and the manner of death then,

10    when you work with a toxicologist, reached at

11    collaboratively or are you the one that decides the

12    cause and manner of death?

13    A    Ultimately the determination of cause and manner of

14    death is my responsibility.

15    Q    And are the cause and manner of death going to be

16    reported on an autopsy report?

17    A    Yes.

18    Q    And will the cause of death be reported on the

19    official death certificate?

20    A    Yes.

21    Q    And will the manner of death be reported on the

22    official death certificate?

23    A    Yes.

24    Q    Dr. Oeberst, during jury selection some of us had to

25    admit that we watch TV and watch shows like CSI.   Could

1    you tell the jury how accurate those television series

2    are in depicting what medical examiners' offices and

3    crime scene investigators actually do in real life?

4    A    They're relatively inaccurate.

5    Q    What are some of the major fictional qualities of

6    those shows?

7    A    They have unlimited budgets, first of all.  They

8    have lots of technical equipment that most of us don't

9    have access to because it's very expensive.  They also

10   often have a single person, at least in most

11   laboratories, doing the job of eight people.  Most of us

12   are pretty specialized in our areas of expertise and

13   they usually will have one person doing everything from

14   the beginning to end.  Occasionally they make up

15   scientific things as well but --

16   Q    All right.  Approximately how many people work at

17   the Sedgwick County Forensic Center?

18   A    About 35.

19   Q    Now I want to hand you a series of autopsies and

20   external examination reports that you personally

21   prepared.  And prior to your testimony today, Dr.

22   Oeberst, did you have an opportunity to review all of

23   these autopsy reports?

24   A    Yes.

25   Q    And are these reports concerning 29 autopsies and

1    two external examinations that you personally performed?

2    A    Yes.

3    Q    And are all of these autopsies and external

4    examinations of individuals who the death investigations

5    associated with a particular physician or medical

6    practice?

7    A    Uhm, I don't recall that every single one of them

8    was.

9    Q    Okay.  Do you know what physician and medical

10   practice these autopsies were generally associated with?

11   A    Yes.

12   Q    And who is that?

13   A    The Schneider Clinic.

14   Q    What is an external examination as opposed to an

15   autopsy?

16   A    An external examination is just basically examining

17   the outside of the body.  The external examination is

18   the same for pretty much all the examinations we do.  It

19   includes basic indicators like how tall you are, how

20   much you weigh, what color your eyes are.  And then if

21   there's any evidence of injury or if you have any

22   special tattoos, those -- or medical therapy, those

23   types of things would be noticed -- noted, excuse me.

24   After that, we will draw specimens for toxicology,

25   review medical records associated with that particular

1    case; and then certify the death.

2    Q    And why would an external examination be done and

3    not an autopsy?

4    A    The circumstances vary widely.  For certain

5    individuals that perhaps have had prolonged

6    hospitalization and have had injury or disease that has

7    been well documented in the hospital, we may not do a

8    complete examination because their disease processes or

9    injuries have already been well laid out.  Occasionally

10   there are certain families, for religious or personal

11   reasons, that have very strong objections to post-mortem

12   exam, to a complete autopsy; and as long as we feel it

13   doesn't compromise the certification of the death, we

14   try to honor their wishes.

15   Q    All right.  Are autopsies and external examinations

16   public records?

17   A    Yes.

18   Q    And do these records reflect activities of the

19   Forensic Science Center, including matters observed and

20   factual findings?

21   A    Yes.

22   Q    And were those documents created by you under a duty

23   imposed by law for the Forensic Science Center to make

24   such observations and report them?

25   A    Yes.

708

 1   Q   And as to the factual findings recorded in those

 2   documents, were they made as a result of an

 3   investigation made pursuant to the authority granted you

 4   by law?

 5   A   Yes.

 6   Q   Prior to your testimony, have you looked at all

 7   these autopsies and including the toxicology reports?

 8   A   Yes.

 9   Q   And did Dr. Rohrig author all but two of the

10   toxicology reports?

11   A   Yes.

12   Q   Did Dr. Christopher Long author the other two

13   reports?

14   A   Yes.

15   Q   And who is Dr. Long?

16   A   He's the toxicologist at the laboratory in St.

17   Louis.

18   Q   And why would Dr. Long in St. Louis be providing

19   toxicology services to you here in Sedgwick County?

20   A   There was a period of time where we were sending

21   some of the cases that did not originate from Sedgwick

22   County, we would send the toxicology to the St. Louis

23   laboratory.

24   Q   Because the Forensic Science Center services not

25   only Sedgwick County, but many surrounding counties,

709

1   does it not?

2   A   Yes.

3   Q   How many counties?

4   A   Somewhere between 30 and 40, depending on which

5   year.

6   Q   Do you review the toxicology reports in the ordinary

7   course of your duties at the Forensic Science Center?

8   A   The ones related to my cases, yes.

9   Q   And are those toxicology reports part of the autopsy

10  reports?

11  A   Yes.

12  Q   And are they part of the external examination

13  reports when you don't go forward with an autopsy?

14  A   Yes.

15  Q   Now I'd like you to identify each of the autopsies

16  for the record by exhibit number and the person's first

17  name and the first initial of their last name.  We'll

18  start with Exhibit 3-G.  Who's autopsy report is that?

19  A   Eric T.

20  Q   4-G?

21  A   Robin G.

22  Q   5-A-7?

23  A   Kandace B.

24  Q   5-C-7?

25  A   Terry C.

| | | |
|---|---|---|
| 1 | Q | 5-E-7? |
| 2 | A | Jeffery H. |
| 3 | Q | 5-L-7.  Did I miss G?  5-G-7?  Pardon me. |
| 4 | A | Jeffrey J. |
| 5 | Q | 5-L-7? |
| 6 | A | Bradley S. |
| 7 | Q | 5-M-7? |
| 8 | A | Katherine S. |
| 9 | Q | 5-N-7? |
| 10 | A | Evelyn S. |
| 11 | Q | 5-O-7? |
| 12 | A | Mary S. |
| 13 | Q | 5-P-7? |
| 14 | A | Robert S. |
| 15 | Q | 5-Q-7? |
| 16 | A | Patsy W. |
| 17 | Q | 5-R-7? |
| 18 | A | Toni W. |
| 19 | Q | 6-C-2? |
| 20 | A | Boyce B. |
| 21 | Q | 6-F-2? |
| 22 | A | Leslie C. |
| 23 | Q | 6-G-2? |
| 24 | A | James C. |
| 25 | Q | 6-M-2? |

711

```
 1    A    Marie H.

 2    Q    6-O-2?

 3    A    Darrell H.

 4    Q    6-W-2?

 5    A    Randall S.

 6    Q    150-2-B?

 7    A    Dustin B.

 8    Q    150-3-B?

 9    A    Michael B.

10    Q    150-8-B?

11    A    Jane E.

12    Q    150-9-B?

13    A    Julia F.

14    Q    150-11-B?

15    A    Gyna G.

16    Q    150-13-B?

17    A    Lynnise G.

18    Q    150-14-B?

19    A    Casey G.

20    Q    150-15-B?

21    A    Michael H.

22    Q    150-17-B?

23    A    William M.

24    Q    150-21-B?

25    A    Quinn P.
```

```
1     Q    150-23-B?

2     A    Lucy S.

3     Q    And 150-28-B?

4     A    Tresa W.

5              MS. TREADWAY:  At this time, Judge, we would

6     introduce the identified exhibits as public records

7     under 803(8) and as business records of the Forensic

8     Science Center under 803(6).

9              MR. WILLIAMSON:  Your Honor, we object to the

10    extent that any portion of those reports were authored

11    by somebody other than this witness.  I think she

12    testified there are at least three or maybe five reports

13    that contain portions that have not been -- no

14    foundation has been laid and that's pursuant to --

15             THE COURT:  Didn't understand the last part of

16    what you said.

17             MR. WILLIAMSON:  Sorry, Judge.  I'm getting

18    tired.  It's related to Melendez-Diaz.

19             THE COURT:  Well, I'm going to receive them at

20    this point.  I want to talk to you about that case but

21    we'll talk about it after we're through today.

22             MR. BYERS:  Your Honor, might I note an

23    objection based upon prejudice.  Not -- versus probative

24    value at this point in time.

25             THE COURT:  You may.
```

713

1        MR. BYERS:  Putting in death issues when we've
2   heard nothing else foundational about that.  I believe
3   it's 403.
4        THE COURT:  Did you want to -- well, I'm
5   conditionally receiving these, Mr. Byers.
6        MR. BYERS:  I understood that.
7        THE COURT:  And I'll hear anything that --
8   anything further that you want to say about it later.
9        MR. BYERS:  Thank you.
10  BY MS. TREADWAY:
11  Q   If you can keep those in order in a stack for us.  I
12  have some additional exhibits to give you.  I'm now
13  handing you the corresponding death certificates for
14  those autopsies.  Is a death certificate another public
15  record, Dr. Oeberst?
16  A   Yes.
17  Q   What is your typical involvement in completing a
18  death certificate?
19  A   I complete one -- well, I complete them when I do
20  thd post-mortem examinations as the Coroner for Sedgwick
21  County.  So I complete them on my cases for Sedgwick
22  County.
23  Q   So you don't always complete the death certificates
24  for the autopsies you perform?
25  A   Correct.

1    Q    And so that would be when you got out-of-county

2    deceased people that are being autopsied at the Forensic

3    Science center?

4    A    Yes.

5    Q    And then who would complete the death certificate in

6    those circumstances?

7    A    The out-of-county Coroner.

8    Q    As to the information contained on the death

9    certificates in terms of cause and manner of death,

10   where would that information come from?

11   A    From the autopsy report.

12   Q    Were you the certifying physician on all of the

13   death certificates except seven?  And I can go through

14   those with you if you wish, but if you have a list with

15   you, that's fine.

16   A    Yes.

17   Q    And is that something you wrote out for your

18   testimony today?

19   A    I did, yeah.  I went through as part of reviewing

20   before --

21            MS. TREADWAY:  May I show that to the defense,

22   Judge.

23            THE COURT:  Sure.

24                  (Off-the-record.)

25   Q    Let's review who the certifying physicians were on

```
 1    those seven that you didn't certify, Dr. Oeberst.  As to

 2    Robin G, Exhibit 4-F, and Julia F, Exhibit 150-9-A, was

 3    the certifying physician Ronald Varner?

 4    A    What was the second number.

 5    Q    I'm sorry.  150-9-A.

 6    A    Yes.

 7    Q    And who is Ronald Varner?

 8    A    He is the Coroner for Butler County.

 9    Q    And as to Robert S, Exhibit 5-P, and John P, Exhibit

10    150-21-A, was the certifying physician Ralph Beller?

11    A    Yes.

12    Q    And who is Ralph Beller?

13    A    The Harper County Coroner.

14    Q    As to Dustin B, Exhibit 150-2-A, and Tresa W,

15    Exhibit 150-28-A, was the certifying physician Brian

16    Dennett?

17    A    Second was 22-A?

18    Q    28-A.

19    A    I'm sorry.  Thank you.  Yes.

20    Q    And finally, as to Jane E, Exhibit 150-8-A, was the

21    certifying physician Scott Harder?

22    A    Yes.

23    Q    And who is he?

24    A    Scott Harder is the Deputy Coroner for Butler

25    County.
```

1    Q    And did I ask you who Brian Dennett is?

2    A    No.

3    Q    Who is he?

4    A    He's the Cowley County Coroner.

5    Q    Now, are those death certificates all public

6    records?

7    A    Yes.

8    Q    And are they records of vital statistics?

9    A    Yes.

10   Q    And have you reviewed these seven death certificates

11   that you did not certify in comparison to your

12   autopsies?

13   A    Yes.

14   Q    And do you find that these seven death certificates

15   accurately report the primary cause of death and the

16   manner of death in each case?

17   A    With the exception of one.

18   Q    All right.  And what is that exception?

19   A    Tresa W.  That was completed by Dr. Dennett.

20   Q    And how did it differ in the primary cause of death?

21   A    He had several things that I had put as contributing

22   or actually not even related, he had just listed them

23   all.  The primary -- my primary cause of death which I

24   believe was a mixed drug intoxication he has on there

25   but then he's got two other things underneath it.

1   Q   So he added more information?

2   A   Yes.

3   Q   All right.

4           MS. TREADWAY:  Now, the Government is going to

5   offer these exhibits also, and instead of reading them

6   off one by one, Judge, we would simply say that they are

7   identified like the others for the same people with the

8   designation of F, 3-F, 4-F; and then for the five

9   series, 5-A-6, 5-C-6, et cetera.  For the 6 series it's

10  6-C-1, et cetera.  And for the 150 series it's 150-2-A,

11  et cetera.  And we would offer those as both public

12  records and records of vital statistics under FRE

13  803(9)?

14          THE COURT:  Any objection?

15          MR. WILLIAMSON:  Same objection to the

16  documents as previous, Your Honor.

17          THE COURT:  Mr. Byers.

18          MR. BYERS:  And the probative value objection

19  as well, 403.

20          THE COURT:  Yes, sir.  Well, those objections

21  are overruled.  I'll conditionally admit these documents

22  and talk with you a little bit more about them after

23  we're through here today.

24  BY MS. TREADWAY:

25  Q   As to all of those autopsies, external examinations

718

```
 1    and death certificates we've introduced into evidence,

 2    was the primary or contributing cause of death some sort

 3    of mixed or single drug intoxication?  In other words, a

 4    drug overdose?

 5    A    Yes.

 6    Q    Was the primary cause of death drug overdose in all

 7    but four of the cases?

 8    A    I have to go back and look.

 9    Q    Yes.  Terry C, 5-C-7.  I've got these in order by

10    number so 5-C-7, Terry C?

11    A    Yes.

12    Q    Was a drug overdose a contributing cause of death to

13    Terry C?

14    A    Yes.

15    Q    As to Mary Joe S, 5-O-7, was the contributing cause

16    of death drug overdose?

17    A    Yes.

18    Q    As to Joyce B, 6-C-2,was the contributing cause of

19    death drug overdose?

20    A    Yes.

21    Q    And as to all of these deaths, was the manner of

22    death accident as to all -- I'm sorry -- 31 of the

23    autopsies and external examinations?

24    A    Yes.

25    Q    And, I'm sorry, there's one last person.  John P,
```

1    150-21-B.  Was his contributing cause of death a drug

2    overdose?

3    A    Yes.

4    Q    Now, if, as to all of these deaths, the manner of

5    death was accident, does that mean you ruled out natural

6    causes as the manner of death?

7    A    Yes.

8    Q    And does that mean you ruled out suicide as the

9    manner of death in each case?

10    A    Yes.

11    Q    And as to each of these cases, Dr. Oeberst, did you

12    begin with the conclusion that these patients died of

13    drug overdoses?

14    A    No.

15    Q    How would you reach that conclusion?

16    A    By using all the information that we gathered during

17    the investigation, in combination with my autopsy

18    findings, in combination with the toxicology report; and

19    then everything is all put together and a conclusion is

20    reached.

21    Q    In your opinion, within a reasonable degree of

22    scientific and medical certainty, do each of these

23    autopsies we have introduced into evidence correctly

24    reflect both the cause and manner of death?

25    A    Yes.

1    Q    Dr. Oeberst, can you explain to the jury what

2    central nervous system depression is?

3    A    The central nervous system basically includes your

4    brain and your spinal cord.   Central nervous system

5    depression is, when used in reference to drug

6    intoxication, involves the effects of the intoxicating

7    substance on the brain.   Certain substances -- when you

8    say the central nervous system is depressed, another

9    word you could use is sedated.   And basically what that

10   does is it makes your brain less sensitive to certain

11   things; and the greater the depression, the more it

12   effects your brain.   Everybody's seen intoxicated

13   persons.   Initially they may just act different.   And

14   that's the initial, you know, they're acting silly or

15   they're not making good judgments or stumbling or that

16   kind of thing.   They're not in a coma or anything like

17   that.   But that's the beginnings of the central nervous

18   system depression.   As it progresses, they may become

19   less and less conscious or pass out.   And at some point,

20   if the central nervous system depression continues, it

21   gets to the point where it actually depresses or impedes

22   the function of your brain stem, which is where the

23   centers for regulating your breathing and your heart

24   rate are located.   And once those get effected, it can

25   potentially result in death.

1    Q    So if I can explain it in my lay terms.  Does your

2    brain stop telling you to breathe?

3    A    To a certain extent.

4    Q    Does your brain stop telling your heart to beat?

5    A    The heart part of it is kind of a combination of the

6    fact that if you're breathing less or not breathing at

7    all.  Your heart doesn't really like to be without

8    oxygen.  So there's a little bit of it is what you're

9    saying, the brain is not telling your heart to beat; but

10   a lot of it is just because of the lack of oxygen.

11   Q    So the brain needs oxygen to work?

12   A    Yes.

13   Q    And so as this -- and we're not talking about a

14   depression like mental illness depression?

15   A    No.

16   Q    We're talking actual it's lowering?

17   A    Lowering of function.

18   Q    It's impeding the function?

19   A    Correct.

20   Q    And so does a central nervous system depression

21   death because of drug overdose happen over time?

22   A    It can, yes.

23   Q    And so death is usually not instantaneous in these

24   cases?

25   A    Not usually.

1    Q   And so how does the death essentially occur?  What

2    are we going to see?  What are we going to hear?

3    A   Well, again, it's sort of similar to what I

4    discussed earlier.  The person may have been observed to

5    be lethargic or stumbling or drowsy, groggy.  There's

6    all sorts of words to describe a person that appears

7    intoxicated.  Once they get into the central nervous

8    system depression where they're passed out, for lack of

9    a better term, oftentimes what people will hear is what

10    they call snoring respirations.  They're taking very

11    deep sort of snoring breaths.  And then there may be

12    gaps in between their breathing and that's when the

13    brain stem, the respiratory depression is starting to

14    occur.  Once they get to that point, they're sort of in

15    a comatose type state.  I mean, they're not arousable

16    and that kind of thing.  And slowly, as I discussed, as

17    your respiratory centers -- the parts of your brain that

18    are telling you to breathe get more and more depressed,

19    you may stop breathing.  And then your body is not

20    getting oxygen.

21    Q   If someone has heart disease, does this process

22    differ in any respect?

23    A   It may be accelerated.

24    Q   And if someone has a large heart or cardiomegaly,

25    does this process differ?

1    A    It can also be accelerated.

2    Q    Now, when someone dies of a drug overdose and

3    central nervous system depression occurs, can you

4    explain to the jury some of the typical autopsy findings

5    you will have?

6    A    Typically, not always, but typically you will have

7    brain swelling; very heavy lungs; and a very full

8    bladder.

9    Q    And why is the bladder full?

10   A    Because the brain hasn't been sending the signal to

11   the unconscious person that they need to get up and go

12   use the restroom.  There's other more complicated

13   nervous system descriptors for it; but basically they

14   just have -- they just have a very full bladder.

15   Q    I want to direct your attention now to Exhibit 3-G.

16   The autopsy and toxicology report for Eric T.  And while

17   you are doing so, I'm going to want you to refer to Page

18   18 of Government Exhibit 1.  Have you seen Government

19   Exhibit 1 before your testimony here today?

20   A    Yes, portions of it, I believe.

21   Q    And have you had the time to compare the autopsies

22   and toxicology reports to the information on this

23   exhibit?

24   A    Yes.

25   Q    Does Exhibit 1-A accurately reflect the pertinent

1    information from the autopsy and toxicology reports and

2    the death certificates?  Namely, the date of death, the

3    cause and manner of death, and the drugs reported in the

4    toxicology report for Eric T?

5    A    I'm sorry.  Could you repeat again the pertinent

6    information that you want me to confirm.

7    Q    Have you already compared this information prior to

8    your testimony today?

9    A    Yes.

10   Q    And did you find it accurate?

11   A    Yes.

12   Q    I didn't mean for you to do it all over again.  I'm

13   sorry.

14   A    Okay.

15   Q    Now, using this autopsy report, we're going to

16   display this for the jury, and I want you to go through

17   how a typical autopsy report is structured.

18   A    Okay.

19   Q    All right.  This is 3-G.  Mr. Moore.  All right.

20   Let's look at the top portion of this.  And it says who

21   the person is.  It has a case number.  It has a date.  A

22   time.  And it has the address of the decedent.  And it

23   generally describes him as a 46 year old white male.  It

24   also tells us who was present at the autopsy.  Does it

25   not?

725

1    A    Yes.

2    Q    And that's just general identifying information?

3    A    Yes.

4    Q    Okay.  Now the next portion is called pathologic

5    diagnosis.  What are those?

6    A    Pathologic diagnoses is a list of the most

7    significant findings at autopsy.  Sort of a very, very

8    condensed version of the autopsy report.

9    Q    Okay.  And is it basically inclusive of the person's

10   medical history?

11   A    Generally, yes.

12   Q    Now where does that information come from in

13   addition to the autopsy?  Can it come from medical

14   records?

15   A    Yes.

16   Q    All right.  Now let's go to the next page.  And the

17   very next part of this is cause of death and manner of

18   death.  And then we have your signature and the date you

19   signed this report.

20        Now, in this particular case your autopsy was

21   performed in April of 2006 but you didn't sign this

22   report until July of 2006.  Can you explain to the jury

23   why there was that several month gap?

24   A    Just awaiting toxicology results from the

25   laboratory.

1   Q   So you weren't going to sign off on this autopsy

2   until you verified the toxicology report?

3   A   Correct.

4   Q   And in this situation the cause of death for Eric T

5   was complications of mixed drug intoxication and

6   atherosclerotic cardiovascular disease.  Could you

7   please tell the jury what atherosclerotic cardiovascular

8   disease is?  Or ASCVD?

9   A   In this particular case it's coronary -- it's also

10  known as coronary artery disease.  Basically,

11  atherosclerotic disease refers to the plaques that you

12  hear about that are formed by high cholesterol and other

13  things; but, essentially, in this particular case, it's

14  another descriptor for coronary artery disease or heart

15  disease.

16  Q   Did Eric T die of heart disease?

17  A   It was listed as a contributing cause of death.

18  Q   Was it the primary cause of death?

19  A   No.

20  Q   What is the primary cause of death?

21  A   Complications of a mixed drug intoxication.

22  Q   And was the manner of his death accident?

23  A   Yes.

24  Q   Now, in the next several pages we have narratives

25  with various headings.  And is this simply a review of

1     all of the systems and all of the findings that you are

2     making as you are conducting the external examination

3     and the autopsy?

4     A   Yes.

5     Q   And do you collect evidence from the body to

6     investigate under a microscope?

7     A   When I do the examination of the organs I do take

8     small pieces of some of the primary organs to look at

9     under the microscope.

10    Q   And then we have this narrative which goes on for

11    several pages.  And then finally we end up at the

12    toxicology report, don't we?

13    A   Yes.

14    Q   And that information contains the results of the

15    tests on various parts of the body; correct?

16    A   You have specimens obtained either at the time of

17    the -- or near the time of the person's hospital

18    admission and then we also obtain samples during

19    autopsy.

20    Q   And not only do you have the toxicology report, in

21    your narrative you actually talk about the toxicology

22    report, don't you?

23    A   Yes.

24    Q   So that also indicates that you have to have that

25    before your autopsy is complete?

1    A    Yes.

2    Q    All right.  And according to this toxicology report,

3    did Eric have the following drugs in his system when he

4    died:  Methadone, Hydrocodone, Oxycodone, Carisoprodol

5    and Meprobamate?

6    A    Yes.

7    Q    And are Carisoprodol and Meprobamate both related to

8    one drug?

9    A    Yes.

10    Q    And what is that drug?

11    A    Soma.

12    Q    And in your experience as a doctor, do you

13    understand that methadone can be used as a narcotic pain

14    reliever?

15    A    Yes.

16    Q    Do the drugs found in Eric T's system after he died

17    have what we call an additive effect on his body?

18    A    They all can be central nervous system depressants.

19    Q    When we say additive, what do we mean?

20    A    That their effects add on to one another.

21    Q    Can these drugs also have what is known as a

22    synergistic effect or even not just additive but

23    multiplying effect?

24    A    Theoretically, yes.

25    Q    Now, based on the death investigation, which

1    included all of the components we discussed previously,

2    you concluded that Eric's primary cause of death was

3    mixed drug intoxication.  Were there any other findings

4    in the death investigation, your autopsy or the

5    toxicology report that would cause you to question or

6    doubt your conclusion that Eric accidentally died of a

7    drug overdose?

8    A    No.

9    Q    Were there any findings that would lead you to

10   conclude that his death was from natural causes like a

11   heart attack?

12   A    No.

13   Q    Were there findings regarding Eric's heart disease?

14   A    Yes.

15   Q    But you did not attribute that as his primary cause

16   of death, did you?

17   A    No.

18   Q    Now, this atherosclerotic cardiovascular disease, is

19   that a rather typical finding on autopsy these days?

20   A    It's -- we find it very common, yes.

21   Q    In fact, in the 29 autopsies that you performed in

22   front of you, did you find evidence of heart disease in

23   most of them?

24   A    Yes.

25   Q    And did you find that unusual, Dr. Oeberst?

1    A    No, not in general.

2    Q    Now let's talk about when a person has a sudden

3    cardiac myocardial infarction.  Heart attack.  When you

4    view that body on autopsy and you view that heart, what

5    are you going to see?

6    A    It depends on the time frame between when the heart

7    attack took place and when they actually died.

8    Q    What will you see?

9    A    Immediately you might not see anything.  After

10   several hours you can start seeing changes in heart

11   muscle that are associated with actual -- I mean, a

12   heart attack essentially is death of a certain portion

13   of the heart muscle so you start seeing changes

14   associated with that.

15   Q    All right.  Did you see any evidence of that in Eric

16   T's autopsy?

17   A    No.

18   Q    Now I'd like you to take a look at the death

19   certificate for Eric T, which is Exhibit 3-F.  And could

20   you specifically bring up that 32-D, the box 32-D on

21   that, Mr. Moore.  And there's actually a box on the

22   death certificate that says how did this injury occur.

23   Correct?

24   A    Yes.

25   Q    And how did Eric's injury occur?

1    A    I put that he had ingested multiple prescription

2    medications.

3    Q    In your opinion, Dr. Oeberst, was the combination

4    and the amount of drugs found in Eric T's system

5    sufficient to cause his death?

6    A    Yes.

7    Q    And in your opinion how did the combination and

8    amount of drugs cause Eric's death?

9    A    Well, as we discussed before, it produced central

10   nervous system depression to the point that he went into

11   cardiopulmonary arrest.  After that, he was resuscitated

12   in the hospital but there had been too much injury to

13   his body from a lack of oxygen.

14   Q    If Eric T had died of heart problems, would you have

15   concluded that the manner of death was accident?

16   A    No.

17   Q    I next want to direct your attention to Exhibit 4-G.

18   The autopsy and toxicology report for Robin G.  And

19   while you are doing so, again I want you to refer to

20   Page 21 of Exhibit 1-A.  And, again, prior to your

21   testimony today, were you able to review the accuracy of

22   the information on Exhibit 1-A as compared to the

23   autopsy and death certificate for Robin G, Exhibit 4-G

24   and 4-F?

25   A    Yes.

1    Q    And did you find the information on Exhibit 1-A to

2    be accurate?

3    A    Yes.

4    Q    Now, according to the toxicology report for Robin G,

5    what drugs were in Robin's system when she died?

6    A    Fentanyl, Diazepam and Diazepam metabolites and

7    Lidocaine.

8    Q    You said Diazepam metabolites.  That's a new one on

9    me.  What does that mean?

10   A    Drugs when they start getting broken down into

11   different pieces by your body, the different pieces are

12   called metabolites.  It's basically breakdown products

13   is a good way of saying it.  And some of those breakdown

14   products can still act like a drug.  They can still have

15   effects on your body.  And other ones don't have any

16   effect.  So just depends on the drug and what the

17   metabolite is.

18   Q    You mentioned Fentanyl.  What is Fentanyl?

19   A    It's a synthetic narcotic drug.

20   Q    Can you compare it to something like morphine in

21   term of its power?

22   A    It's many many times more powerful than morphine.

23   Q    Is Fentanyl a narcotic pain relever?

24   A    Yes.

25   Q    What is Diazepam?

1    A    Diazepam is a benzodiazepine.  It's also known as

2    Valium.

3    Q    And what is a benzodiazepine?

4    A    In general, they're used as -- to relieve anxiety.

5    You know, they're used in other medical settings; but in

6    general they're prescribed for anxiety.

7    Q    And then did Eric have -- I'm sorry.  Did Robin have

8    Lidocaine in her system?

9    A    Yes.

10    Q    And what is Lidocaine?

11    A    Lidocaine.  Well, it's got several different uses.

12    It can be used as an anesthetic type drug; but it also

13    can be used occasionally as a drug to prevent

14    arrhythmias or abnormal heart rhythms.  But in this

15    particular instance she had been prescribed what's

16    called a Lidoderm patch, and it's a patch that you put

17    over an area that's causing you pain and then it will

18    release the Lidocaine into your area that's hurting and

19    hopefully make it feel better.

20    Q    So it's a pain relief medication?

21    A    Yes.

22    Q    In Robin's situation?

23    A    Yes.

24    Q    Did the drugs found in Robin's system have either

25    additive or synergistic effects as we have previously

1    discussed?

2    A    Somewhat.

3    Q    But mainly what happened to Robin?

4    A    She died as a result of a Fentanyl overdose.

5    Q    Based on the death investigation, which included all

6    the components we discussed previously, what was the

7    conclusion that you reached with regards to Robin's

8    cause of death?

9    A    Toxic effects of Fentanyl.

10   Q    And what conclusion did you reach with regard to the

11   manner of Robin's death?

12   A    Accident.

13   Q    Were there any other findings in the death

14   investigation that would cause you to question or doubt

15   the conclusion that Robin accidentally died of the toxic

16   effects of Fentanyl?

17   A    No.

18   Q    Were there any findings that would lead you to

19   conclude that her death was from natural causes?

20   A    No.

21   Q    Like a heart attack?

22   A    No.

23   Q    In your opinion, was the amount of Fentanyl found in

24   Robin's system sufficient to cause her death?

25   A    Yes.

1   Q    If Robin had died of heart problems, would you have

2   concluded that the manner of death was accident?

3   A    No.

4   Q    Now I would like you to briefly address some of the

5   other people whose autopsies you performed.  And for the

6   record, these next individuals are part of Count 5 of

7   the Indictment.

8        Prior to your testimony today, did you compare the

9   information in Exhibit 1-A, the summary chart, against

10  the autopsy and toxicology and death certificates for

11  the following 11 individuals.  Kandace B; Terry C;

12  Jeffery H; Jeffrey J; Brad S; Katherine S; Evelyn S;

13  Mary Jo S; Robert S; Patsy W and Toni W?

14  A    Yes.

15  Q    And does Exhibit 1-A accurately reflect the

16  pertinent information from the autopsy, toxicology and

17  death certificates, including the cause and manner of

18  death, the date of death, the age of death and what was

19  on the toxicology report?

20  A    Yes.

21  Q    Did you conclude that drug overdose was the primary

22  cause of death as to these individuals except as to

23  Terry C and Mary Jo S as we previously discussed?

24  A    Yes.

25  Q    As to any of the other nine individuals, if any had

1   died of heart problems, would you have concluded the

2   manner of death was accident?

3   A    No.

4   Q    And did you in fact conclude that Terry C and Mary

5   Jo S died accidentally?

6   A    Yes.

7   Q    Now, with regards to Terry C and Mary Jo S, did you

8   conclude that drug overdose was a contributing factor

9   rather than the primary cause of their death?

10   A    Yes.

11   Q    Nevertheless, did you conclude that their deaths

12   were accidental?

13   A    Yes.

14   Q    Why?

15   A    If a drug intoxication is listed as a contributing

16   condition, then it's no longer a natural death.

17   Q    Now, I'd like to look at the death certificates for

18   these individuals.  Looking at the box labeled how the

19   injury occurred.  And we will test Mr. Moore's skills at

20   the computer here.  5-A-6, Mr. Moore.

21        Does it state that Kandace B died because of the

22   administration of prescription medication?

23   A    Yes.

24   Q    For 5-C-6, Terry C.  Does it indicate that he

25   ingested prescription medication?

1    A    Yes.

2    Q    For Jeffery H, Exhibit 5-E-6, does it state the use

3    and abuse of prescription medication?

4    A    Yes.

5    Q    For Brad S, 5-L-6, does it state also the use of --

6    abuse of prescription medication?

7    A    Yes.

8    Q    For Katherine S, Exhibit 5-M-6, does it state

9    ingested prescription medication?  If can you see the

10   screen from here.

11   A    Yeah, I can.

12   Q    It might --

13   A    It does say that, yes.

14   Q    5-N-6, Evelyn S.  Does it state that she also

15   ingested prescription medication?

16   A    Yes.

17   Q    As to Mary Jo S, 5-O-6, does it similarly say

18   ingested prescription medication?

19   A    Yes.

20   Q    For Patsy W, 5-Q-6, does it state the same, ingested

21   prescription medications?

22   A    Yes.

23   Q    And finally, 5-R-6, for Toni W.  Does it state the

24   use, abuse of elicit and prescription drugs?

25   A    Yes.

1    Q    Elicit.  Does that mean illegal?

2    A    Yes.

3    Q    Now, moving on to the individuals in Count 6 of the

4    Indictment for whom you performed the autopsies.  Prior

5    to your testimony did you also compare the information

6    in Exhibit 1-A, the summary chart, against the autopsy,

7    toxicology reports and death certificates for six

8    individuals:  Boyce B -- are you up with me.  Sorry.

9    Boyce B; Leslie C; James C; Marie H; Darrell H, and

10   Randall S?

11   A    Yes.

12   Q    And did Exhibit 1-A accurately reflect the pertinent

13   information from the reports that you authored or the

14   death certificates you were familiar with?

15   A    Yes.

16   Q    Did you conclude that drug overdose was the primary

17   cause of death as to all of these individuals except for

18   Boyce B?

19   A    Yes.

20   Q    And did you determine that drug overdose was a

21   contributing factor to Boyce B's death?

22   A    Yes.

23   Q    And as to all of these individuals, did you declare

24   that they had died as a result of an accident?

25   A    Yes.

1    Q    As to all of these death certificates, did they

2    state in similar fashion to the ones we've just

3    reviewed, that these individuals ingested, used, abused,

4    misused, prescription medication except for Marie H and

5    Randall S?

6    A    Yes.

7    Q    And did Marie H have a statement of cocaine abuse?

8    A    Yes.

9    Q    And did Randall S have a statement of ingested

10   Methadone?  Just one drug?

11   A    Yes.

12   Q    Now, the remaining twelve individuals who, for the

13   record, are named in the overt acts of the conspiracy in

14   this case, as to all but two of these individuals, did

15   you perform the autopsies; and as to those two

16   individuals, did you instead perform external

17   examinations?

18   A    Yes.

19   Q    And was that Julia F and Lucy S?

20   A    Yes.

21   Q    Prior to your testimony, did you again compare the

22   information in Exhibit 1-A to the information in your

23   autopsy, toxicology reports and the death certificates

24   and find the information in 1-A to be accurate as to

25   those individuals?

```
 1   A    Yes.
 2   Q    And were those individuals Dustin B; Michael B; Jane
 3   E; Julia F; Gyna G; Lynnise G; Casey G; Michael H.
 4   William M; Jon P; Lucy S and Tracey -- Tresa W?
 5   A    Yes.  I have Jon P listed as Quinn P.
 6   Q    Okay.  Thank you.  Now, did you conclude that drug
 7   overdose was the primary cause of death for all of these
 8   individuals except for Jon P?
 9   A    Yes.
10   Q    Nevertheless, did you decide that Jon P had drug
11   overdose as a contributing cause of death?
12   A    Yes.
13   Q    And as to all of these individuals, did you find
14   that they had died of accident and not natural causes?
15   A    Yes.
16   Q    And if the jury wishes to look at all of these death
17   certificates during their deliberation, will each of
18   them in the how injury occurred box have a statement
19   similar to the statements we've already reviewed with
20   them?
21   A    With the exceptions of the ones some of the
22   out-of-county Coroners filled out.
23   Q    Okay.  But if it's filled out by you, it's going to
24   be abused prescription, use/abuse of prescription
25   medication, something like that?
```

1   A    Yes.

2   Q    Prior to your testimony today, Dr. Oeberst, did we

3   ask that you review an additional autopsy that you did

4   not personally perform?

5   A    Yes.

6   Q    And did we ask you to form an opinion regarding the

7   cause and manner of death for this individual?

8   A    Yes.

9   Q    And did you do so?

10  A    Yes.

11  Q    Is this another part of your job as a forensic

12  pathologist to review autopsies done by other forensic

13  pathologists?

14  A    On occasion, yes.

15  Q    How did you perform your review to reach your

16  opinion as to the cause and manner of death in this

17  particular case?

18  A    I reviewed the entire case file and autopsy report

19  and toxicology.

20  Q    And does this -- was this autopsy performed by Dr.

21  Jill Cobb?

22  A    Yes.

23  Q    And is she a board certified forensic pathologist?

24  A    Yes.

25  Q    And has the Forensic Science Center utilized her to

1   perform autopsies over the course of several years?

2   A   Yes.

3   Q   Are you familiar with her work?

4   A   Yes.

5   Q   And prior to your testimony today, did you review

6   her work?

7   A   Yes.

8   Q   And did it include both an autopsy and toxicology

9   report?

10  A   Yes.

11  Q   And did Dr. Rohrig author the toxicology report?

12  A   Yes.

13  Q   And prior to your testimony today, did you compare

14  the information on Government Exhibit 1-A, the summary

15  chart, to Dr. Cobb's autopsy and Dr. Rohrig's toxicology

16  report and did you find them accurately reported?

17  A   Yes.

18  Q   I've also handed you Exhibit 6-AA-1.  Is that the

19  corresponding death certificate for the autopsy on

20  Ronald W?

21  A   Yes.

22  Q   Which is 6-AA-2?

23  A   Yes.

24  Q   And is that a public record?

25  A   Yes.

1    Q    And is it a record of vital statistics?

2    A    Yes.

3              MS. TREADWAY:  Government will offer Exhibit

4    6-AA-1, the death certificate, as a public record under

5    803(8) and as a record of vital statistics under 803(9).

6              MR. WILLIAMSON:  Object pursuant to

7    Melendez-Diaz.

8              THE COURT:  All right, sir.  Mr. Byers.

9              MR. BYERS:  Join in that, Your Honor.

10             THE COURT:  Same ruling as before.

11   BY MS. TREADWAY:

12   Q    Dr. Oeberst, based on your review of this autopsy,

13   the toxicology report and the case file, and based on

14   your training and experience, do you have an opinion

15   within a reasonable degree of medical certainty as to

16   the cause of death for Ronald W?

17   A    Yes.

18   Q    What is that opinion?

19   A    Combined drug toxicity.

20   Q    Do you have an opinion as to his manner of death?

21   A    Accident.

22   Q    On the death certificate, Exhibit 6-AA-1, what is in

23   box 33-D, how injury occurred, on the death certificate?

24   A    Ingested medication.

25   Q    Now on to just a couple of final points, Dr.

1    Oeberst.  As the result of a death investigation, can

2    the deceased's primary physician receive notice of the

3    death in a variety of ways?

4    A   Yes.

5    Q   In what ways can a physician receive notice of the

6    death?

7    A   From the initial investigation when law enforcement

8    may try to contact them regarding history prior to even

9    contacting our office.  Medical investigators may call

10   when they're at the scene or once they get back to the

11   office in an attempt to get additional medical history

12   on that particular individual.

13        If we feel they are necessary to complete the death

14   investigation, we will send a subpoena from our office

15   for medical records.  Oftentimes we just may call them

16   to get clarification about certain aspects of their

17   history, prescription history, that kind of thing.  So

18   there's a variety of ways, not just from our office,

19   that they may get that.

20        The hospital, also, someone dies at a hospital,

21   oftentimes the attending or personal physician of the

22   deceased will be contacted by hospital personnel very

23   much in the same manner that law enforcement contacts

24   them to try to get history to see if they would be

25   willing to sign a death certificate and for other

745

1    clarification purposes.

2    Q   Do you have any reason to believe that the

3    Defendants in this case would not have received notice

4    of the deaths of the people that came to Schneider

5    Medical Clinic?

6            MR. WILLIAMSON:  I'm going to object.  That

7    calls for total speculation.

8            THE COURT:  I don't think so.  I'll allow her

9    to answer.

10   BY MS. TREADWAY:

11   Q   Do you have any reason to believe that the

12   Defendants in this case would not have received notice

13   in the various ways you indicated?

14   A   At least for some of them, they wouldn't have.

15   Q   Now, from the --

16           THE COURT:  My concern about the question,

17   though, which, as you said, the Defendants --

18           MS. TREADWAY:  Yes.

19           THE COURT:  Did you mean Defendants?

20           MS. TREADWAY:  Yes.  Yes, sir.

21           THE COURT:  And did you have an objection, Mr.

22   Byers?

23           MR. BYERS:  I was going to note that for

24   cross, Your Honor.

25           THE COURT:  Yes, sir.

```
 1              MR. BYERS:  Thank you.
 2              THE COURT:  Go ahead.
 3    BY MS. TREADWAY:
 4    Q    From reports created during the death investigation,
 5    is there an association often made to a primary care
 6    physician?
 7    A    On the investigator's report oftentimes an attending
 8    physician will be listed if that attending physician is
 9    known.
10    Q    And does that information come from hospital
11    records, for instance?
12    A    Yes.
13    Q    Does it come from family members?
14    A    Yes.
15    Q    Will it come from prescription bottles found at the
16    scene?
17    A    Yes.
18    Q    And will it come from the investigation itself when
19    the investigators actually find the primary care
20    physician, for instance, to ask for records?
21    A    Yes.
22    Q    Now, I'm assuming that it's true, but that not every
23    person that comes to your Forensic Science Center can
24    actually be associated with a primary care physician?
25    A    That's correct.
```

```
 1    Q    Nevertheless, during your tenure here in Sedgwick
 2    County for the last ten years, has any one physician
 3    stood out for any reason?
 4    A    Yes.
 5    Q    Who?
 6    A    Dr. Schneider and his clinic.
 7    Q    Why has he stood out?
 8    A    We had a very large number of his patients in our
 9    office.
10    Q    And did you have a large number of his patients in
11    your office that died of overdose deaths?
12    A    Yes.
13    Q    From prescription medications?
14    A    Yes.
15    Q    Did you find the number of overdose deaths
16    associated with the Defendant Stephen Schneider and the
17    Schneider Medical Clinic to be significant?
18    A    Yes.  In the sense that it appeared to be a trend.
19    Part of my function as the District Coroner is to
20    recognize trends in deaths so that we can fine tune our
21    investigation process.  And if we see a certain
22    association or type of death that's occurring, that's
23    part of our job is to identify that as a trend in our
24    community.
25    Q    In your ten years of being a pathologist here in
```

```
 1    Wichita, have you ever been aware of a physician
 2    associated with such a significant number of overdose
 3    deaths other than the Defendant Stephen Schneider?
 4    A    No.
 5    Q    Is there anything in your ten years in Wichita that
 6    you can compare it to?
 7    A    No.
 8              MS. TREADWAY:  Nothing further, Judge.
 9              THE COURT:  You want a recess, Ladies and
10    Gentlemen, before we start cross-examination?  All
11    right.  We'll take about 10 or 15 minutes.  Remember and
12    heed the admonition.
13                   (Recess.)
14              THE COURT:  You may continue, Mr. Williamson.
15              MR. WILLIAMSON:  Thank you, Your Honor.
16                   CROSS EXAMINATION
17    BY MR. WILLIAMSON:
18    Q    Hi.  How are you?
19    A    Good.  How are you.
20    Q    Have we had a chance to meet before?
21    A    You look familiar but I'm not sure.  Not officially
22    but I think perhaps on a case.
23    Q    Okay.  I want to talk to you a little bit about your
24    testimony that you just gave and we're going to talk a
25    little bit about some of these exhibits and some of
```

1    those autopsies.

2         As a medical examiner, do you agree that you are

3    supposed to be thorough in all of your reports; correct?

4    A    Yes.

5    Q    And they should be accurate?

6    A    Yes.

7    Q    And they should be complete.  Would you agree with

8    that?

9    A    As much, you know, depends on the examination; but,

10   yes.

11   Q    You should complete the report as much as you can

12   possibly complete it with all the information that you

13   have available; correct?

14   A    Yes.

15   Q    And you understand that those are important

16   principles to insure that your work product is, you

17   know, is good and reliable.  Would you agree with that?

18   A    Yes.

19   Q    You mentioned earlier about the National Association

20   of Medical Examiners and they had some standards.  You

21   mentioned something about you can't see, or can't

22   perform more than 350 autopsies in a year.  Is that

23   right?

24   A    Yes.

25   Q    Okay.  And what provision is that found in?  Because

1    I was unable to find it.

2    A    I don't recall off the top of my head.

3    Q    Is it under the 2006 NAME standards?

4    A    You mean the autopsy standards?

5    Q    Yes.

6    A    No.  That's part of the accreditation standards.

7    They're different standards.

8    Q    What are these standards called?

9    A    Accreditation.

10    Q    And that's a policy and practice, or policy manual

11    that lays out all the things that medical examiners

12    offices can or can't do or should or shouldn't do in

13    order to remain accredited with NAME.  Correct?

14    A    It's actually more of a checklist.  You are allowed

15    a few -- they have what they call Phase 1 and Phase 2

16    deficiencies.  And you're allowed a few deficiencies and

17    still remain accredited.

18    Q    Okay.

19    A    But it's more of a checklist as opposed to a ruling

20    document.

21    Q    Okay.  And part of your NAME standards -- you

22    mentioned the autopsy standards.  You're familiar with

23    those; correct?

24    A    Yes.

25    Q    And part of those standards is to remain free from

751

1    influence when you're doing your position; is that

2    correct?

3    A    Free from the influence of?

4    Q    To be conflict free.

5    A    Yes.

6    Q    Okay.  And that's because your job relies heavily

7    upon your judgment in reviewing reports and data and

8    other results of your examinations; correct?

9    A    Yes.

10   Q    Do you all in your office have a policy where your

11   findings are reviewed by somebody else before they're

12   published?

13   A    A subset of our autopsy reports undergo internal

14   review as part of our quality assurance; but not every

15   single report.

16   Q    Okay.  What is your error rate in conducting

17   autopsies?

18   A    Error rate in regard to?

19   Q    You get reviewed; correct?

20   A    Yes.

21   Q    Okay.  And you're familiar that in the land of

22   science in order to determine whether or not you're

23   being effective or not effective there are peer reviews

24   that can help determine your error rate.  Are you

25   familiar with that?

752

1    A    Yes.  But this is medical practice.  It's not the

2    same thing as other forensic sciences.  This is the

3    practice of medicine.

4    Q    So you don't have anybody to tell you that out of

5    the last 100 autopsies you did, your peers agree with

6    you 89% of the time so you're doing a good job?  You

7    don't have anything like that?

8    A    We do get together on more challenging cases and

9    confer with one another; but, no, we don't -- it's not

10   that kind of process.

11   Q    Okay.  Now, when we talked about being conflict

12   free, isn't it true that you're being paid by

13   plaintiff's lawyers to be their expert in cases that may

14   be brought against Dr. Schneider?

15   A    I beg your pardon.

16   Q    Isn't it true that you're being paid as an expert by

17   plaintiff's lawyers in cases against Dr. Schneider?

18   A    Today?

19   Q    No.  In the past haven't you been paid as an expert

20   for plaintiff's lawyers?

21   A    Yes, I have been.

22   Q    And plaintiff's lawyers hire people who are going to

23   advocate for their position.  Would you agree with that?

24   A    I would have been hired as a consultant after the

25   procedure was performed.

1  Q   And you were named as an expert as well; correct?

2  A   On some cases, yes.

3  Q   And you were deposed as an expert for the plaintiff;

4  correct?

5  A   On a couple of occasions, yes.

6  Q   But you work for the Sedgwick County government;

7  correct?

8  A   Yes.

9  Q   And you get paid by the government regardless of

10  your findings.  Isn't that true?

11  A   Yes.

12  Q   Okay.  Now, the problem I think comes in is, you

13  know, that, well, if the more mixed drug intoxication

14  deaths of Schneider patients that come in, the more you

15  may be able to get paid.  You're aware that that could

16  be a -- what do we call it in the law?  Impropriety.

17  You know, appearance of impropriety.  Are you aware of

18  that?

19  A   Actually it never occurred to me.

20  Q   Never occurred.  It never occurred that you're

21  getting paid to make a finding and that if you find that

22  this is mixed drug intoxication, if these people are the

23  same plaintiff's lawyers, the same plaintiff's lawyer

24  may be able to pay me some more money.  That never

25  occurred to you?

754

```
 1    A    No.
 2    Q    Okay.  But you -- again, we would agree that the
 3    national standards say you really have to be careful to
 4    make sure that you remain free from conflict.  You agree
 5    with that.
 6    A    I didn't have any conflicts at the time or after
 7    when I performed these autopsies.
 8    Q    So you don't see anything wrong with being paid by a
 9    party in a civil lawsuit saying that somebody is doing
10    something wrong who is wholly relying upon your
11    opinions?  You don't see anything wrong with that?  And
12    if you don't, it's okay.
13    A    The only thing I testify to is as to my findings at
14    autopsy.  I made no judgment regarding the practice of
15    any other individual.
16    Q    I understand.  But you understand in those
17    plaintiffs cases -- and he left conveniently before you
18    started testifying -- but you understand that they're
19    relying heavily on the fact of -- the fact that a
20    certain number of individuals passed away who were at
21    the clinic.  You're aware of that, aren't you?
22    A    You mean there's -- I'm sorry.  I don't understand
23    the question exactly.
24    Q    You're aware that these plaintiffs' lawyers are
25    alleging that because the same -- this amount of number
```

1   of people that passed away from mixed drug intoxication,

2   you're aware that they're utilizing these large numbers

3   and trying to win their -- any lawsuit.  You're aware of

4   that, aren't you?

5   A   Actually I was only aware that they were out there,

6   that they were acting on behalf of any single plaintiff

7   at any one time.

8   Q   So in your deposition you never discussed with --

9   were never asked by defense counsel about any other

10  mixed drug intoxications while you were being deposed in

11  one single case.  Is that your testimony?

12  A   They asked me I think -- to be honest, I don't

13  remember all the details of my deposition but I --

14  Q   Okay.

15  A   -- I'm sure that I was asked if there were other

16  cases that I had discussed or done autopsies on or any

17  of those kind of things.

18  Q   Now, I want to make sure we understand.  What is the

19  difference between a full autopsy and an external

20  examination?  Can you help me with that?

21  A   Full autopsy involves examination of the organs of

22  the head, the brain, neck, trunk and abdomen.  External

23  examination is only to examine the outside of the body

24  and then obtain specimens for toxicology.

25  Q   And you would agree that an external examination is

756

```
 1    not a full autopsy; correct?
 2    A    That's true.
 3    Q    Now, you relied heavily on -- when you made your
 4    diagnosis with all those autopsies, you relied heavily
 5    on the fact that individuals had prescription medicines
 6    in their system at the time they passed away.  Isn't
 7    that correct?
 8    A    Yes.  I used the presence and the levels of the
 9    drugs.
10    Q    And I think it's fair to say that the level of the
11    drugs is of the utmost importance when you're looking to
12    determine whether or not a death may or may not be
13    caused or contributed to by mixed drug intoxication.
14    Would you agree with that?
15    A    Somewhat case dependent; but more or less I'll agree
16    with that, yes.
17    Q    Okay.  And isn't it true that before you can --
18    before you know what the level of medication means in a
19    person, you need to know more about that person's
20    history to determine how that medicine or that level of
21    medicine in their system would effect them.  Would you
22    agree with that?
23    A    As much as is possible, yes.
24    Q    Because there's a term in medicine called tolerance,
25    is there not?
```

1    A    Yes.

2    Q    And tolerance is essentially when a person takes a

3    certain pain medicine for an extended period of time,

4    they build up a tolerance as to how much of that

5    medicine they need before that medicine begins to work.

6    Would you agree with that?

7    A    Yes.

8    Q    And so, for instance me, if I take a Lortab today,

9    never -- I think I've had one in my life when I had a

10   tooth pulled and neither one were pleasant for me.  If I

11   take a Lortab now, take two, and somebody next to me who

12   is a chronic pain patient who has been taking these for

13   four months, my two could effect me worse than the four

14   that they're taking.  Would you agree with that?

15   A    It depends on what other medications they're taking.

16   Q    Right.  But just assuming we don't take anything

17   else but Lortab and I take two, they take four.  I could

18   be affected a lot more than this person taking four.

19   Would you agree with that?

20   A    It depends on your level of tolerance.

21   Q    Right.  And tolerance develops over time.  Would you

22   agree with that?

23   A    Yes.  But they may have developed tolerance.

24   They're too many parameters.

25   Q    So if they took four, they've been taking four every

1    day for six months, no gap in taking the medicine, this

2    is my first time taking two.  Are those enough

3    parameters to answer the question?

4    A    They were taking four every single day?

5    Q    Ever single day.

6    A    Then four would not effect them the same way it

7    effects you.

8    Q    That two would effect you; correct?

9    A    Yes.

10   Q    So when you're taking these autopsies, did you ever

11   take into consideration how long individuals have been

12   utilizing a prescription before reaching your conclusion

13   that it was mixed drug intoxication?

14   A    Yes.

15   Q    And we talked a little bit a while ago that you want

16   your autopsies to be thorough, accurate and complete.

17   So that type of information would be important and

18   included in that autopsy; correct?

19   A    It's part of the investigation.  It's not

20   necessarily included in the autopsy report.

21   Q    Well, a part of the NAME standards is for you to

22   make sure that the logic behind your opinion is clear in

23   your autopsy; correct?

24   A    I'm not understanding the line of questioning here.

25   Q    Yes.  The purpose -- under NAME standards, do they

759

1    not say that when you perform an autopsy, your opinion

2    and the logic that led to that opinion should be clear

3    in that autopsy report?

4    A    I don't recall that it's actually worded that way.

5    I don't recall the direct wording so I'll have to -- I

6    can't answer that question.

7    Q    What about that principle.  Are you familiar with

8    that principle?

9    A    It's a nice principle.

10   Q    I'm not asking if it's nice.  I'm asking if it's

11   part of the NAME --

12   A    I don't know specifically the answer to that

13   question.

14   Q    Is it not true that you should have -- that the

15   standards require you to have thorough documentation of

16   all findings?  Isn't that true?

17   A    I don't have the standards in front of me and I have

18   not memorized them word for word.

19   Q    That's fair.  Would you agree it's good practice to

20   make sure that you document, thoroughly document, all

21   findings?

22   A    Thoroughly document the autopsy findings, yes.

23   Q    Okay.  And part of those autopsy findings is

24   including the surrounding circumstances.  And I believe

25   you told Ms. Treadway that a little while ago.  The

1    surrounding circumstances of each individual person's

2    passing.

3    A    That's part of the investigation.

4    Q    Okay.  And there's a part in your report that's

5    specifically labeled investigation; correct?

6    A    It says circumstances of death.

7    Q    And that is where you put the report?

8    A    Some of the investigative information.  I have

9    investigative reports from some of my investigators that

10   are three pages long.  They're a part of my case file

11   but they are not part of the autopsy report.

12   Q    Well, I guess what I'm getting at, wouldn't you want

13   to put in your autopsy report all the relevant factors

14   that go into you making your final conclusion?

15   A    I don't include the entire hospital record in my

16   autopsy report and often times that has a distinct

17   influence on the final cause of death.

18   Q    You may not -- sorry for interrupting.  You may not

19   include the entire hospital reports, but if you see

20   something in that hospital report that can explain

21   something you're seeing in organs, wouldn't you put that

22   finding in your autopsy report?

23   A    Not necessarily.

24   Q    So your autopsy can't be complete if you're not

25   putting the relevant information that led to your final

1    opinion in your autopsy report, can it?

2    A   It is complete.  It's just --

3    Q   Not accurate?

4    A   I beg your pardon.

5             THE COURT:  Please don't interrupt her,

6    Mr. Williamson.

7             MR. WILLIAMSON:  I thought she was finished,

8    Your Honor.

9    A   It is accurate.  It's usually in the case file.  We

10   cannot include every bit of information that is in the

11   case file in the autopsy report.

12   Q   Okay.  Let's just specifically talk about mixed drug

13   intoxication.  If the -- if you learn in the course of

14   your investigation that a person has developed a certain

15   tolerance to a certain prescription, that would be

16   extremely relevant in explaining the level of the

17   chemical that is found in the toxicology report, would

18   it not?

19   A   Yes.

20   Q   Okay.  And is that something that you think should

21   be put in an autopsy report when you are making the

22   conclusion that the mixed drugs is the cause or

23   contributing part of death?

24   A   No.

25   Q   We just have to take it -- it's a public record,

 1    this autopsy report; correct?

 2    A   Yes.

 3    Q   And so if somebody who wants to just go pick up this

 4    public record and make a determination, hey, let me see

 5    why, you know, my third cousin passed away, and they see

 6    in there and they see this level of chemicals in their

 7    system without any explanation from the medical examiner

 8    as to why these would be there, that could really

 9    mislead that person as to the true cause of death,

10    couldn't it?

11    A   I don't think that they would understand it.  I

12    don't know about mislead; but I don't believe that they

13    would understand.

14    Q   Okay.  That's fair.  Now, you're familiar with the

15    term post-mortem redistribution, aren't you?

16    A   Yes.

17    Q   Tell the jury what that means?

18    A   Post-mortem redistribution is essentially something

19    that applies to toxicology regarding the change of the

20    concentration of drug in certain parts of the body

21    following death.  And without going into too much

22    scientific -- there's something called diffusion, and

23    diffusion involves something of a higher concentration,

24    it naturally goes to an area of lesser concentration.

25    So post-mortem redistribution in general applies to

1    levels, if you drew levels of blood from, say, around

2    the heart, some drugs, not all of them, but some of

3    them, and especially if you drew blood from the left

4    side of the heart, it will be higher, kind of

5    artifactually elevated, if you will, than if you drew

6    blood from a femoral artery or peripheral artery.  And

7    so there's been certain studies and things where they

8    have tried to estimate what the post-mortem

9    redistribution is.  So the heart blood level, for

10   example, might be two times higher than the femoral

11   blood level.  And all of those types of things are taken

12   into consideration when interpreting toxicology values.

13   Q    How is it taken into consideration when calculating

14   toxicology values?

15   A    Interpreting.

16   Q    Interpreting.  How is it taken into consideration?

17   A    Well, you would want to, when the sample is

18   available, look at femoral blood more preferentially to

19   heart blood with certain drugs.

20   Q    And would those drugs include pain medication?

21   A    Yes.

22   Q    So as we understand it, at least in post-mortem, the

23   levels of drugs in the system could be totally different

24   than what the levels of the medicine in the system was

25   when the person was alive.  Is that fair?

1   A   Somewhat of an overstatement; but, yeah.

2   Post-mortem redistribution, like I said, you can have

3   higher drug levels in the blood, especially around the

4   heart.

5   Q   And because these findings can be unreliable, NAME

6   has standards that you should take microscopic samples

7   of tissue and look at those under a microscope when

8   you're making a cause of death decision.  Would you

9   agree with that?

10  A   Not for all cases.

11  Q   What exceptions would there be for that?

12  A   I think cases where in the absence of an anatomic

13  cause of death.

14  Q   Okay.  I'm sorry for interrupting, but can you like

15  say that in regular speak for me.  Like anatomical

16  cause --

17  A   When you do the initial autopsy there are certain

18  things like cancer, heart disease, a stroke, that are

19  readily visible to the naked eye.  If you can see it at

20  the time of autopsy, that's called an anatomic cause of

21  death.  And in those cases there's not an absolute

22  requirement, according to the guidelines set forth in

23  the standards, that you have to do a histology.

24  Q   You said it's not an absolute standard.  But you

25  still -- is it still preferred to do them?

765

1    A    It depends on the case.  I mean, if you find

2    something while you're doing the autopsy that appears

3    different or suggestive of a disease process such as

4    pneumonia, then you would take sections at that time.

5    Q    And why is that histological exam important?

6    A    Confirms the presence or absence of natural disease

7    Q    When you don't take that histological exam, you

8    can't make that same confirmation.  Isn't that true?

9    A    Confirmation of what?

10   Q    Natural disease.

11   A    Well, if there's --

12   Q    Let me back up because I want to make sure we're on

13   the same page.  You just told me that if you do a

14   histological exam, that can confirm the presence of a

15   natural disease; correct?

16   A    Or absence, yes.

17   Q    Or absence.  Well, if you don't do the histological

18   exam then that mechanism, that preferred mechanism to

19   make that confirmation is no longer available to you;

20   correct?

21   A    That particular aspect of it.  Again, you know, but

22   in cases where you have an anatomically significant

23   finding, it's not absolutely necessary to do a

24   histology.

25   Q    Okay.

1    A    And that's what the standards actually say.

2    Q    And when -- and at least, I'm curious about this

3    heart disease.  When, according to you, if there's a

4    heart disease, is it okay not to do a histological exam?

5    A    It's on a case-by-case basis.

6    Q    Well, give me some examples of when you believe it's

7    okay not to do a histological exam when you see evidence

8    of a heart disease through the autopsy?

9    A    I mean, it's really case-by-case dependent.  I don't

10   know specifically what it is that you're asking me.

11   Q    So you just use your judgment and say, well, I don't

12   think I need one in this case and, well, I do think I

13   need one in this case?  Or is there a standard that you

14   apply to every case to say, okay, these factors are met

15   so I'm going to do a histological exam or the standards

16   are not met and I'm not going to do a histological exam?

17   A    A lot of it is very case dependent.  I will admit

18   that.  There are certain times where, if they have some

19   coronary artery disease but not really severe coronary

20   artery disease, if they have multivessels severe

21   coronary artery disease, then I won't necessarily put in

22   histology.  But it depends on the case.  And it depends

23   on what the circumstances are and what the history is

24   and, I mean, it's -- there's no hard or fast rule.

25   Q    Right.  And when you say severe coronary artery

1    disease, would you include that to -- would that include

2    an 80 to 90% blockage of arteries?

3    A    Yes.

4    Q    What would be not so severe?

5    A    Well, again -- and, again, it depends on the case;

6    but not so severe would be less than what you just said.

7    Q    Okay.  So we can agree if you see somebody come in

8    with 80, 90% blockage in their arteries that you would

9    consider that as severe coronary artery disease;

10   correct?

11   A    If they have 80 to 90%?

12   Q    Yes.

13   A    Yes, that is severe.

14   Q    And that would be sufficient in its own right,

15   regardless of anything else, to cause sudden death,

16   would it not?

17   A    Depends on the case.

18   Q    So everything depends -- are there any concrete

19   answers that you can give?

20   A    That's part of the practice of medicine.

21   Q    So part of the practice of medicine is making

22   judgment calls with the facts that are before you.

23   Would you agree with that?

24   A    I don't know that I'd call them judgment calls.  I'd

25   say that they're decisions based on training and

1    experience and education.

2    Q    What is the difference if -- okay.  So it's a

3    decision based on the facts that are presented to you at

4    a certain time.  Would you -- you'll agree with that?

5    A    Yes.

6    Q    And so based on a certain fact or factor that you

7    see at a certain point in time, your medical decision

8    could change depending upon, depending upon those facts.

9    Correct?

10   A    Yes.

11   Q    And it's hard to sit back and say without

12   considering specific facts in regards to that specific

13   situation what should have or should not have been done.

14   Would you agree with that?

15   A    To a certain extent.  But in the case of histology,

16   I can always go back and put it in later if I need to.

17   Q    Who would be the person to tell you to put it in

18   later?

19   A    Me.

20   Q    Now, are you aware that -- you mentioned Fentanyl.

21   You remember that?

22   A    Yes.

23   Q    Are you aware of studies that have found that the

24   post mortem levels of Fentanyl at autopsy are completely

25   unreliable?

1    A    No.

2    Q    You're not aware of that new study that came out

3    about four months ago?

4    A    No.

5    Q    Okay.  Are you familiar with Stephen Karch?

6    A    Yes.

7    Q    You've heard of him?

8    A    Yes.

9    Q    Who is he?

10   A    He is a physician that has be the editor of several

11   books on toxicology.

12   Q    Books that you've studied out of?

13   A    I've used them as a reference.

14   Q    Are you aware he's reviewed your findings and has

15   disagreed with several?

16   A    I was aware that he had been hired as an expert and

17   assumed that that would be the case.

18   Q    Now I want to just start talking about just a few of

19   these individuals.

20            MR. WILLIAMSON:  Judge, this is a transition

21   point.  I don't know if you want me to just start and go

22   over a couple or we can just break now because I know we

23   have some business with the Court.

24            THE COURT:  I think this is probably a good

25   breaking point, Ladies and Gentlemen.  We'll be in

1    recess until tomorrow morning at 9:00.  Remember and

2    heed the admonition.

3                              (Jury excused for the evening at

4                              4:50 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25