```
 1              (Beginning at 9:00 a.m. April

 2              30, 2010, the following

 3              proceedings continued.)

 4        MR. BYERS:  Your Honor, if I might make a

 5   comment before the witness is on the stand.  I just

 6   wanted to do clarify my objection yesterday, make sure

 7   it's on the record, relative to 403 and condition of

 8   admissibility.  I just wanted to highlight the fact

 9   there are two prongs supporting 403, both misleading the

10   jury, putting on death evidence prior to any kind of

11   evidence about the causation of those deaths as far as

12   drug dealing is conventionally understood; as well as

13   the probative value is substantially outweighed by the

14   prejudice.

15        THE COURT:  Yes, sir.  Thank you.

16        MR. BYERS:  Thank you.

17              (Jury enters the courtroom.)

18        THE COURT:  Good morning, Doctor.

19   A   Good morning.

20        THE COURT:  All right.  Mr. Williamson.

21        MR. WILLIAMSON:  Thank you, Your Honor.

22   BY MR. WILLIAMSON:

23   Q   We left yesterday talking about some general

24   principles and I was just getting ready to move into

25   some of the specific patient issues in this case.  But I
```

1    want to just cover just a couple of more general issues

2    with you before we move on to make sure -- since we've

3    had an overnight break, make sure the jury can follow

4    us.

5         I asked you yesterday about the NAME standards.

6    You remember that discussion?

7    A    Yes.

8    Q    And that NAME discussion, you clarified that it's

9    the National Association of Medical Examiners.   Correct?

10   A    Yes.

11   Q    And that organization sets standards that medical

12   examiners offices over the country, or whoever applies

13   for it, should follow.   Correct?

14   A    They're guidelines, yes.

15   Q    Are they standards or guidelines?   What is the

16   document called?

17   A    The document is called standards but there's no --

18   Q    I'm just asking what the document is called.

19   A    The document is called standards.

20   Q    But you interpret it as guidelines; correct?

21   A    Yes.

22   Q    NAME does do a review to determine whether or not

23   their standards are being followed; correct?

24   A    In what sense?

25   Q    You mentioned yesterday that you can only do 350

784

1    autopsies because there's a certification checklist that

2    has to be met before you can be certified; correct?

3    A    Yes.   That's a separate issue though from the

4    autopsy standards.

5    Q    All I'm asking you is NAME actually comes in and

6    reviews your operations to determine whether or not you

7    meet their standards; correct?

8    A    To meet the standards and the checklist for

9    accreditation.

10   Q    Right.   And when you become accredited, they expect

11   you to follow their standards.   You agree with that;

12   right?

13   A    Uhm, they're separate.   They're separate issues.

14   Q    So you don't have to meet NAME's autopsy standards.

15   Is that your testimony?

16   A    No.

17   Q    So you do have to -- you should meet and strive to

18   meet the standards set forth in the NAME standards;

19   correct?

20   A    You should strive to.

21   Q    And NAME came up with these standards because they

22   recognized them as best practices in your industry.

23   Would you agree with that?

24   A    They're a list of guidelines regarding practice,

25   yes.

```
 1    Q    My question was NAME developed these standards
 2    because they were best practices in the medical
 3    examining industry.  Would you agree with that?  Yes or
 4    no?
 5    A    For the most part, yes.
 6    Q    Now, would you agree that it's the best practice and
 7    a NAME standard to prepare a written narrative report
 8    for each post-mortem examination that you do?
 9              MS. TREADWAY:  Judge, this has been asked and
10    answered.  We went through all of this yesterday.
11              THE COURT:  I don't remember a question
12    regarding a narrative report.
13    Q    Would you agree with that?
14    A    To prepare a report?  Yes.
15    Q    My question was prepare a written narrative report
16    for each exam.  Would you agree?
17    A    I don't know what you mean by narrative.
18    Q    Did you ever review autopsy standards, the NAME
19    standards?
20    A    Yes.
21    Q    Okay.  And are you familiar with that H-31.1 states
22    that a forensic pathologist shall prepare a written
23    narrative report for each post-mortem examination.  Are
24    you aware of that?
25    A    If that's what it says.
```

786

1    Q   You read it, didn't you?

2    A   I don't know that it's -- I told you yesterday I

3    hadn't memorized it.  I did read it.

4    Q   Are you aware that the NAME standards state that a

5    forensic pathologist shall include the date, place and

6    time of examination?

7    A   I told you I don't know every single --

8    Q   I'm not asking about every single thing, ma'am.  I'm

9    asking about specific report writing requirements that

10   your national organization states should be followed and

11   I'm asking and testing your knowledge about the

12   standards that apply to your craft.

13   A   I don't have the standards in front of me.

14   Q   Okay.  Are you aware -- and it's a yes or no -- that

15   you should include the date, place and time of

16   examination?

17   A   That may be -- if it's in the standards, then, yes.

18   Q   Well, without -- you don't have the standards in

19   front of you when you're conducting autopsies, do you?

20   A   No.

21   Q   And when you're conducting autopsies and you are

22   performing your craft, at that point in time you should

23   be following the standards that you promised this

24   organization you would follow; correct?

25   A   I didn't promise the organization that I would

787

1    follow the standards.

2    Q    You didn't certify that we will meet the NAME

3    standards in our practices in order to become certified

4    under NAME?

5    A    No.

6    Q    So they don't require -- they don't hold any

7    accountability over the people they have under their

8    organization?

9    A    They -- when you come -- when they come in to --

10   Q    Ma'am, I didn't ask for a narrative response.  My

11   question was simple.  Did you certify -- do you

12   believe -- strike that.

13         Does NAME come in and review your operations?  Do

14   they?  Yes or no?

15   A    The operations, yes.

16   Q    And you understand -- you are held to some

17   accountability when you're performing these autopsies,

18   aren't you?

19   A    Yes.

20   Q    And when you're doing these autopsies, you want to

21   perform them in accordance to the standards that people

22   in your industry follow; correct?

23   A    Yes.

24   Q    You don't want to be performing autopsies and having

25   bad results because you just go willy-nilly and doing

 1   things that have never been recognized.   Correct?

 2   A   Yes.

 3   Q   And the NAME standards that you say you have

 4   reviewed, you apply those in your craft because you want

 5   to be good at what you do and be accurate; correct?

 6   A   That holds true for my practice regardless of the

 7   standards.

 8   Q   Would you agree that the standards require you to

 9   include observations of the external examination and --

10   when performing the internal examination?

11   A   Yes.

12   Q   Would you agree that the standards require you to

13   include a separate section on injuries?

14   A   I don't have the standards in front of me.

15           MR. WILLIAMSON:   Your Honor, may I approach?

16           THE COURT:   Yes, sir.

17   Q   I'm handing you Section H of the NAME standards.

18   Can you review that document and tell me if you've ever

19   seen that before?

20   A   It appears to be a copy of Section H of said

21   standards.

22   Q   Okay.   Now, can you just review those so when I

23   start asking these questions again you can be a little

24   bit more familiar with them please.

25   A   Okay.

```
 1                    (Off-the-record.)

 2     A    Okay.

 3     Q    Have you had a chance to review those?

 4     A    Yes.  I don't know that I'm going to have direct

 5     recall after you take it away.

 6     Q    Well, what we're talking about here is what you do

 7     when you're in the autopsy lab; correct?

 8     A    Okay.  Yes.

 9     Q    All right.  And you -- again, you don't have this

10     document set forth in front of you when you're in the

11     autopsy lab; correct?

12     A    Correct.

13     Q    And when you're in the autopsy lab, you're having to

14     use your judgment in comparison to the standards that

15     you know you should follow in your every day course of

16     conducting autopsies; correct?

17     A    Correct.

18     Q    Now, so you should have a basic understanding before

19     you conduct an autopsy of the standards that you're held

20     to.  You would agree with that; right?

21     A    I'm sorry.  Could you repeat the question.

22     Q    You should have an understanding of your standards

23     before you perform any autopsy; correct?

24     A    Yes.

25     Q    Now, it's also a standard that you should include
```

 1    descriptions of findings in sufficient detail to support

 2    diagnosis, opinions and conclusions.  Do you see that?

 3    I'm sorry.  Do you remember that?

 4    A    Could you read the sentence again?

 5    Q    Yes.  Is it true that H-31.8 states that you should

 6    include descriptions of findings in sufficient detail to

 7    support diagnosis, opinions and conclusions?

 8    A    To include findings in sufficient detail.  Is that

 9    what you said?

10    Q    Yes.

11    A    Yes.

12    Q    And you would also agree that's the standard that

13    you should include:  A list of the diagnosis and

14    interpretations in forensic autopsy reports.  Correct?

15    A    Yes.

16    Q    And another issue that we talked about that I think

17    I may have gotten confused in your answer and I just

18    want to make sure that the jury didn't.

19         It's the standard under NAME to perform a

20    histological exam in cases where there are no -- where

21    there's no gross anatomic cause of death unless the

22    remains are skeletonized; correct?

23    A    Correct.

24    Q    And when we say gross anatomic cause of death, we're

25    talking about like somebody's skull is crushed and it's

1     clear by looking at the body that you can determine the

2     cause of death; correct?

3     A    It's a visible cause of death at the time of

4     autopsy.

5     Q    So somebody was run over by a car and you see tread

6     marks over their abdomen and you see blood spilling out

7     and you see they passed away, that would be a situation

8     where a histological examination would not be called for

9     and you would still be in accordance with the NAME

10    standards; correct?

11    A    Yes.

12    Q    But in situations where the cause of death is not

13    clear by external examination, in those cases, NAME

14    standards state that you should, you shall, perform a

15    histological examination; correct?

16    A    That's if you do an internal examination.  You can't

17    do histology without examining the organs.

18    Q    Right.  My question is is that unless you can see

19    the actual cause of death from an external examination,

20    you shall perform a histological examination unless the

21    remains are skeletonized; correct?

22    A    No.

23    Q    That's not correct?

24    A    No.

25    Q    So I'm just making that up?  The standards are just

792

1   totally wrong?

2   A   No.  No.

3   Q   All I'm asking is is that the standard states -- yes

4   or no.  I'm not asking for your interpretation of the

5   standard.

6   A   No, not on external.  That's what you're --

7   Q   I'm not asking about external.

8   A   You just said external.  You said on external

9   examination.

10  Q   That's not what I said.  What I said was when you

11  cannot tell the cause of death by simply looking at the

12  person, i.e., the gross anatomical cause of death --

13  A   That gross anatomic is after you've done the

14  internal examination.

15  Q   Okay.  I think you got me clarified.  So in any

16  situation when you can't tell the cause of death by some

17  gross anatomical evidence, you shall perform a

18  histological exam.  Is that fair?

19  A   Yes.

20  Q   Okay.  Now, you testified yesterday about this --

21  strike that.  I'll get to that in a second.

22      How long have you been in the Sedgwick County

23  Coroner's office?

24  A   Ten years.

25  Q   And what year did you start?

```
 1    A    2000.
 2    Q    2000.  You did not -- between the years 2000 and
 3    2003 you never heard of Dr. Steven Schneider, had you?
 4    A    I don't recall.
 5    Q    There was not an internal issue -- when I say
 6    internal, internal at your office, there were never any
 7    internal issues that had anything to do with Dr.
 8    Schneider's patients before the year 2003; correct?
 9    A    I don't recall.
10    Q    You think that's something you would recall?
11    A    Not necessarily.
12    Q    Well, you testified yesterday about how abnormal --
13    things you've never seen in your career when the
14    prosecution was talking to you about Dr. Schneider's
15    patients.  Don't you think that if you had noticed a
16    pattern before 2003 that you would know that as well?
17    A    I don't recall the exact date when it came to my
18    attention.
19    Q    Well, you understand that the Schneider Medical
20    Clinic didn't open up until late 2002; correct?
21    A    I don't know when the clinic opened.
22    Q    Are you aware of any issues in your office where you
23    were briefed on any issues in your office for any
24    possible problems with Dr. Schneider when he was with
25    Riverside?
```

794

1    A    I don't know what his practice history is.

2    Q    I'm just asking in your office was it ever

3    discussed?

4    A    Riverside?

5    Q    Yes.

6    A    No.

7    Q    And you're aware that Dr. Schneider started

8    practicing in 1988; correct?

9    A    No, I'm not aware of his practice history.

10   Q    Are you aware of the patient population that was at

11   the Schneider Medical Clinic?

12   A    Other than the patients that I examined, I'm not

13   aware of his practice history.

14   Q    And the people you would examine are the people who

15   actually passed away.  You didn't examine anybody that

16   was -- that was a surviving patient; correct?

17   A    That's correct.

18   Q    How many physicians have a, in Wichita, had a

19   similar practice that Dr. Schneider had at the time when

20   you say all these problems were occurring that you were

21   noticing?

22   A    I don't know.

23   Q    Okay.  Now, you mentioned that -- you mentioned that

24   you had -- strike that.

25        You had this question from the prosecution

1    yesterday about can you imagine how nobody would put

2    this doctor on notice.  You remember that question?

3    A    You mean had -- the question about them receiving

4    information about deceased persons?

5    Q    That's correct.  You remember that?

6    A    Yes.

7    Q    And you told the jury that there is just -- I can't

8    imagine that there is any way that these people didn't

9    have notice about the number of people that were passing

10   away and the reasons they were passing away.  You

11   remember that?

12   A    No.  I listed the possible ways they could have had

13   contact.

14   Q    And you also gave an opinion, in your opinion, that

15   there was no possible way that, or no reasonable way,

16   let me use the right words, no reasonable way that they

17   would not have had notice.  Do you remember that?

18   A    If that's what I said.

19   Q    Do you remember that?

20   A    I remember speaking of the subject.  I don't

21   remember the specific wording.

22   Q    I went through your autopsy notes.  I didn't find

23   any notes of meetings that you personally had with

24   Steven Schneider sitting down face-to-face.  Did I miss

25   anything?

1    A    No, I did not have a personal meeting with him.

2    Q    Did Mary Dudley in your office, I didn't see any

3    notes in her autopsies.  Are you aware of whether or not

4    she had any sit-down meetings with Dr. Schneider

5    face-to-face?

6    A    I'm not aware of her professional calendar.

7    Q    If these deaths were so important and notice from

8    your office was given, that's something that would have

9    been noted in some record somewhere that we would have

10   received; correct?

11   A    Several of the investigators had direct contact with

12   Dr. Schneider and Mrs. Schneider.

13   Q    So -- and how do you know that?

14   A    I have reports that say such.

15   Q    And you believe their reports are accurate and

16   complete?

17   A    Yes.

18   Q    And they're not here to testify about the reports;

19   correct?

20   A    Not today.

21   Q    Is one of those reports for an individual named Eric

22   T?

23   A    No.

24   Q    You don't have the medical report for Eric T in

25   there?

```
 1    A    I don't have his medical record in front of me, no.

 2   I just have his autopsy report.

 3    Q    Is Jason Butell a medical investigator?

 4    A    He was.

 5    Q    He was.  He's no longer there?

 6    A    No.

 7    Q    I'm going to hand you a document that I just have as

 8   D-0-03.

 9              THE COURT:  What was the number again?

10              MR. WILLIAMSON:  D-0-03.

11   BY MR. WILLIAMSON:

12    Q    Have you ever seen that document before?

13    A    Yes.

14    Q    Matter of fact, you signed Page 2 of that document,

15   didn't you?

16    A    Yes.

17    Q    And that document is a medical investigator's report

18   of Eric T; correct?

19    A    Yes.

20    Q    Okay.  May I have it back, please.  Now -- well,

21   actually, I'll let you keep it.  There is a place in

22   here that states that certain prescriptions were issued

23   by a certain physician.  Do you see that?

24    A    Yes.

25    Q    Who does it say prescribed those prescriptions?
```

798

1   A   Dr. Schneider.

2   Q   Are you aware that Dr. Schneider actually did not

3   prescribe those medicines, that Connie White did?

4   A   Connie White is?

5   Q   I'm just asking you the question.

6   A   No.

7   Q   You don't know that?

8   A   No.

9   Q   So if that investigative report states Dr. Schneider

10  prescribed these medicines to this patient and it was

11  Connie White that actually prescribed the medicine, that

12  investigative report would be incorrect; right?

13  A   To a certain extent, yes.

14  Q   Connie White had her own DEA number; correct?  Do

15  you know that?

16  A   She's a physician's assistant, though, correct?

17  Q   Yes.  Are you aware that she can write her own

18  prescriptions?

19  A   For Schedule I drugs?.

20  Q   For Schedule I, I don't know, Schedule II.  Are you

21  aware of that?

22  A   I'm not aware of her licensing.

23  Q   Are you aware that Eric T was receiving medicine

24  from several doctors at the time that he passed away?

25  A   No.

```
 1    Q   So this report just as what we looked at is
 2   incomplete and inaccurate; right?
 3    A   It was the information that was given to the
 4   investigatetor.
 5    Q   Ma'am, that's not my question.  My question is is
 6   that report accurate and complete if Connie White is the
 7   person that prescribed that information and he was
 8   receiving -- and Eric T was receiving prescriptions from
 9   multiple doctors?
10    A   It's accurate in terms of the information that was
11   available at the time.
12    Q   His medical records were available at the time;
13   correct?
14    A   But it wouldn't have said in his hospital record
15   that Connie White prescribed the medication.
16    Q   The Schneider Medical Clinic records were available
17   to this investigator.  He could have gone there and
18   asked for 'em, couldn't he?
19    A   Yes, he could have.
20    Q   And there's no evidence in that report that he did
21   that, did he?
22    A   Not in that report.
23    Q   He just took whoever's statement he relied on and
24   said Dr. Schneider prescribed A, B, C or D medication;
25   correct?
```

800

```
 1    A   He took the history that he got from the nurse from
 2    the hospital at Via Christi.
 3    Q   And there's nothing in that investigative report
 4    that identifies the other physicians he was receiving
 5    prescriptions from; correct?
 6    A   That information may not have been available.
 7    Q   I'm not asking whether it was available.  I'm asking
 8    what's in that official report that you signed off on in
 9    relying on your autopsy.  That information is not
10    included, is it?
11    A   Of other physicians that Mr. T was seeing?
12    Q   Yes.
13    A   No, it's not in there.
14    Q   And it's not in there that Connie White, a physician
15    assistant, who had her own DEA number, her own medical
16    judgment, actually prescribed medicine to this
17    individual.  That's not in there either, is it?
18    A   No, it's not.
19    Q   Are you aware that Dr. Schneider was unaware of over
20    90% of these, quote, unquote, mixed intoxication deaths?
21    Are you aware of that?
22              MS. TREADWAY:  Judge, objection.  Complete
23    speculation.
24              THE COURT:  Sustained.
25
```

1    BY MR. WILLIAMSON:

2    Q    Are you aware that many of the people that you

3    identified were not even the patients of Steven

4    Schneider himself?

5            MS. TREADWAY:  And, Judge, speculation.

6            THE COURT:  Yes.  Sustained.

7    Q    Can you tell us how many, the people that you

8    testified about yesterday, tell us how many have been

9    terminated as pain patients from the Schneider Medical

10   Clinic?

11           MS. TREADWAY:  Objection, speculation.

12           THE COURT:  Terminated.  What do you mean?

13           MR. WILLIAMSON:  I can explain.

14           MS. TREADWAY:  This witness does not have the

15   foundation to answer these questions.  He's simply

16   trying to testify, Judge, and that's inappropriate.

17           MR. WILLIAMSON:  Your Honor, I'm asking her

18   specific --

19           THE COURT:  I don't understand your question.

20   What do you mean terminated?

21           MR. WILLIAMSON:  I was going to -- she kept

22   talking, Your Honor.

23           THE COURT:  I'm asking you what you mean by

24   terminated.

25           MR. WILLIAMSON:  Oh, at the Schneider Medical

802

 1    Clinic they would terminate people from the pain

 2    management program when they violated the contract.

 3              THE COURT:  Yes.  The objection is sustained.

 4    BY MR. WILLIAMSON:

 5    Q   Now, when you -- you had to review -- well, strike

 6    that.

 7         When you had to make individual calls on these

 8    case-by-case basis, you had to rely on some

 9    investigation that the medical investigators performed;

10    correct?

11    A   Yes.

12    Q   And part of that investigation would be whether or

13    not -- who the actual physician was who saw these

14    patients; correct?

15    A   We attempt to get that information, yes.

16    Q   And when you get that information, you would want to

17    know that person's medical history to determine whether

18    or not any medical causes -- or there's anything in this

19    person's history that could have caused or contributed

20    to his death to help your autopsy findings; correct?

21    A   Yes.

22    Q   And if you would have gone and gotten the Schneider

23    medical records, would it have been possible for you to

24    determine which patients were still Dr. Schneider's and

25    which patients were not Dr. Schneider's?

803

1   A    Sometimes.  It depends on what records were

2   available.

3   Q    Out of all these individuals that you just testified

4   to in front of the jury yesterday, how many times did

5   your medical investigators go to Schneider Medical

6   Clinic, pull their medical records and bring them to you

7   to help you, aid you in your findings?

8              MS. TREADWAY:  Objection; argumentative.

9              THE COURT:  Sustained.

10  BY MR. WILLIAMSON:

11  Q    How many times did your medical investigators go to

12  Schneider Medical Clinic in reference to the individuals

13  that you testified about yesterday?

14  A    They never went to the clinic.

15  Q    So they never pulled any records from the Schneider

16  Medical Clinic?

17  A    We would subpoena records but they did not go to the

18  clinic.

19  Q    How many times were -- the individuals that you

20  testified about yesterday, were records subpoenaed from

21  the Schneider Medical Clinic prior to you providing your

22  autopsy finding?

23  A    I don't know the answer to that question.

24  Q    Are these the complete records you have in front of

25  you?

804

1    A    No.

2    Q    Where did those records come from?

3    A    Things that I copied out of my case file.

4    Q    You selected and chose what you brought out of your

5    case file?

6    A    Yes.

7    Q    What did you select and choose to bring?

8    A    Copies of investigative reports, autopsy reports,

9    toxicology reports, supplemental investigation reports

10   by the investigators.  There's a few pages of medical

11   records from ERs in here.  That's about it.

12   Q    Is it fair to state that if these records would have

13   been available -- strike that.

14        Is it fair to state that if the Schneider Medical

15   records would have been in the material that you

16   reviewed, you would have brought those here as well?

17   A    No, I didn't have enough room in my notebook.

18   Q    So you did see some Schneider Medical records in

19   there?

20   A    There were some, yes.

21   Q    How many is some?

22   A    I don't know.

23   Q    For which patients were they?

24   A    I don't know.

25   Q    Do you know for which individuals you relied on

805

1    previous records for in conducting your autopsies?

2    A    No.

3    Q    You mentioned yesterday that you're familiar with

4    Steven Karch and that you used one of his textbooks.  Is

5    that textbook *The Pathology of Drug Abuse*?

6    A    I have used it as a reference, yes.

7    Q    And you're familiar that his expertise -- he has a

8    specialty in pathology and how drugs interact with

9    cardiac conditions; correct?

10   A    I'm not aware that he has certification in those

11   areas, no.

12   Q    Did I say certification or did I say specialty?

13   A    Well, specialty to me implies training and

14   certification.

15   Q    I asked a specific express question.  Not implicit.

16   Are you aware that he has a specialty in addressing

17   cardiac cases where there may be prescription medicines

18   or other drugs aboard?

19              MS. TREADWAY:  Asked and answered.

20              THE COURT:  No.  If she does not understand

21   your definition of specialty then, Doctor, you can ask

22   him to define that.  If that's not something -- a term

23   that you recognize.  But if you do recognize it and you

24   understand the question then you should answer it.

25   A    I think my definition of specialty is different than

1   yours so -- is there another word you could choose.

2   Q   No.   That's okay.   Dr. Karch will be able to testify

3   for himself.   Let's talk about -- well, you understand

4   that you've identified some 20 individuals that have --

5   that you have termed as either died from mixed drug

6   intoxication or their death was contributed to by mixed

7   drug intoxication.   Correct?

8   A   Yes.

9   Q   Okay.   And you understand that Dr. Schneider is

10  being charged with several of those deaths as to

11  actually he caused it or he contributed to it.   Correct?

12  Are you familiar with that?

13  A   I'm sorry.   Could you repeat that, please.

14  Q   Yes.   Are you familiar with the fact that Dr.

15  Schneider himself is being charged with causing or

16  contributing to several of these individuals?

17  A   I'm not aware of the legal terms but I understand

18  what you're saying.

19  Q   Okay.   And so much as it may pain me, we're going to

20  have to talk about nearly all of these people

21  individually because, as you testified to yesterday, all

22  these things are basically case-by-case basis.   Correct?

23  A   Yes.

24  Q   And your findings from one case to another differ

25  based on the individual circumstance for each patient;

1    correct?

2    A    Yes.

3    Q    But yesterday you didn't testify on direct about the

4    individual circumstances for each patient's death, did

5    you?

6    A    No.

7    Q    Okay.  So I guess that's left to me to have to

8    discuss with you.  And let's start with --

9            MS. TREADWAY:  Judge, again, I'm going to

10   object to this constant commentary.  It's pejorative,

11   it's unnecessary and it's unprofessional.

12           THE COURT:  I agree.  I don't think we need

13   any of these snide comments, Mr. Williamson, and I want

14   you to stop it.

15           MR. WILLIAMSON:  I'm sorry, Your Honor.  I'm

16   not trying to be snide.

17           MS. TREADWAY:  Judge, we would object to this

18   line of cross-examination because it's beyond the scope

19   of this witness' expertise and it's beyond the scope of

20   her opinion.  She is not here to develop the causation

21   issue.  She is simply here to say what the cause and

22   manner of death was.  And that should be the focus of

23   the cross-examination, not causation.

24           THE COURT:  The objection is overruled.

25

```
 1    BY MR. WILLIAMSON:
 2    Q   Let's start with Eric T.  Let's discuss his
 3    situation and how you arrived to your conclusion.
 4    You're aware that Eric T had several health issues;
 5    correct?
 6    A   High blood pressure -- I'm sorry, the answer is
 7    simply yes.
 8    Q   And part of his -- and part of his history -- yeah,
 9    part of his history he did have high blood pressure.
10    Correct?
11    A   Yes.
12    Q   And what else did you note that he had in his
13    history?
14    A   Chronic back pain and obesity.
15           MR. WILLIAMSON:  Your Honor, just one second.
16    I'm missing a document that I need.
17    Q   And isn't it true that he also had a history of
18    having pneumonia?
19    A   I don't have that history.
20    Q   History of anxiety?
21    A   I don't have that history.
22    Q   History of insomnia?
23    A   I don't have that history.
24    Q   History of congenital spondylolisthesis, something
25    like that.  It's a low back spinal deformity.  Are you
```

```
 1    aware of that?
 2    A    Spondylolisthesis?
 3    Q    Yeah, that sounds right.  Are you aware that he had
 4    that condition?
 5    A    That goes along with his chronic back pain; but, no,
 6    I was unaware of that specific pathologic entity.
 7    Q    Are you aware he had spinal stenosis?
 8    A    No.
 9    Q    Are you aware that he had a family history of early
10    heart disease?
11    A    No.
12    Q    And there are a couple others but we won't discuss
13    all of them right now.  When a person has a family
14    history of heart disease, that is a predictor that that
15    individual may soon suffer some cardiac issues; correct?
16    A    It's a risk factor, yes.
17    Q    And isn't heart disease known as a silent killer?
18    A    I guess for lay people, yes.
19    Q    Right.  And you understand the jury, they're not
20    doctors, so we have to kind of communicate so at least I
21    understand.  If I understand, I hope they can.
22         And it's called the silent killer because often
23    times it's undetectable and it just sneaks up and before
24    you know it, you've already suffered; correct?
25    A    Yes.
```

1   Q   And it's true that heart disease has a higher death

2   rate than people from cancer; correct?

3   A   Yes.

4   Q   And turning to Eric T, you made a note in your

5   autopsy about the size of his heart.  How many grams did

6   you say his heart was?

7   A   520.

8   Q   That's not the standard -- that's not what you would

9   expect with a man of his weight and his height; correct?

10  A   I don't have the tables in front of me.  It actually

11  probably is within the 95th percentile.  But it is

12  enlarged somewhat, yes.

13  Q   And isn't it true that the range is 274 to 345

14  grams?

15  A   Depends on what table you're using.

16  Q   What about the Kitsman table?

17  A   If that's the one that you're using.

18  Q   Is that a reliable reference?

19  A   I don't know.

20  Q   You never heard of it?

21  A   I've heard of it.

22  Q   But you don't know if it's reliable.  Have you ever

23  used it?

24  A   Not the Kitsman, no.

25  Q   Okay.  But you would agree that 520 grams is an

1    enlarged heart?

2    A    Yes.

3    Q    And a person having an enlarged heart is a risk

4    factor for sudden cardiac death; correct?

5    A    Yes.

6    Q    And you would also agree that Eric T's arteries were

7    clogged up; correct?

8    A    Yes.

9    Q    And they were between 70 and 80% clogged up.  Isn't

10   that true?

11   A    Two of them were, yes.

12   Q    Two out of four?

13   A    Yes.

14   Q    So half of his heart had between 70 and 80%

15   clogging.  And the medical term is occlusion.  Is that

16   fair?

17   A    Yes.

18   Q    And isn't it true that a person with 70 to 80% of

19   occlusion, over half of their heart is at risk for

20   sudden cardiac death?

21   A    Yes.

22   Q    And isn't it true you also found focal -- actually

23   I'm going to probably let you read this one.  Actually

24   did you find any kind of degeneration in Mr. Eric T's

25   heart?

812

1    A    Yes.  I found focal single cell.

2    Q    Okay.  And isn't that consistent with a diagnosis of

3    myocarditis?

4    A    Given the fact that Mr. T suffered cardiopulmonary

5    arrest and then was resuscitated, it's difficult to

6    distinguish between myocarditis and just post

7    resuscitation, post cardiac arrest injury.

8    Q    Okay.  My question, though, and we'll address that,

9    isn't that consistent with a diagnosis of myocarditis?

10   It can be; correct?

11   A    It can be.

12   Q    Did you do anything, do any test, to distinguish, to

13   make the distinguish -- to try to distinguish whether or

14   not the diagnosis or it had happened from myocarditis or

15   because of the post cardiac arrest issue?

16   A    No.

17   Q    So that's one thing you didn't try to eliminate or

18   distinguish; correct?

19   A    No.  I didn't do any additional testing.

20   Q    And some people with myocarditis, they pass away

21   from that disease; correct?

22   A    They can.

23   Q    And did you bother to calculate Mr. T's body mass

24   index?

25   A    I did not on this report, no.

813

1    Q    Okay.  And if I told you that it was almost 35,

2    would that put him at increased risk of sudden death?

3    A    Yes.

4    Q    So you have several factors that he was suffering

5    from aside from any chronic pain issues that in of

6    themselves could have led to sudden death; correct?

7    A    Yes.

8    Q    Now, how long had Mr. Eric T been taking his pain

9    medication such as methadone and oxycodone?

10   A    I don't know the answer to that question.

11   Q    You remember testifying before the jury yesterday

12   that -- well, strike that.

13        You also found that there were -- the toxicology

14   report, that Mr. Eric T had medicines in his system.

15   You're aware of that?

16   A    Yes.

17   Q    And the amounts that you found was, you found

18   Hydrocodone less than .05.  Is that micrograms?  M-G?

19   A    Milligrams.

20   Q    Milligrams.  Oxycodone positive for less than 10

21   nannograms; correct?

22   A    Yes.

23   Q    Now, those levels in of themselves do not give us

24   any information about the toxicity that these medicines

25   may have had in Mr. Eric T's body; correct?

814

```
 1   A    I'm sorry, I don't understand the form of the

 2   question.

 3   Q    Just looking at these numbers, what is -- well,

 4   strike that.

 5        Negative .05 milligrams.

 6   A    You mean less than sign?

 7   Q    Yes.  What significance does that have in and of

 8   itself?

 9   A    It's present but it's below --

10   Q    It's present or --

11   A    It's present but it's below the quantitatable limit

12   within our laboratory.

13   Q    The oxycodone, there's a less than 10 nanograms of

14   oxycodone?

15   A    Yes.

16   Q    And does that mean the same thing, that it's below

17   the limit that your lab can test for?

18   A    That they quantitate, yes.

19   Q    Quantitate.  And these are well below therapeutic

20   levels of these prescriptions that were found; correct?

21   A    The Hydrocodone is.  The oxycodone was taken from a

22   post-mortem sample and that would have been greater than

23   a day after he had admitted to the hospital so I don't

24   know what kind of conclusions you can draw from what his

25   level of his oxycodone was the day of his hospital
```

815

1    admission.

2    Q    Right.  So when you did your autopsy, you cannot

3    determine how this oxycodone was interacting with

4    Mr. Eric T's normal bodily functions when he was alive;

5    correct?

6    A    Well, I wouldn't have known it was present when I

7    did the autopsy.

8    Q    No.  My question is from the post toxicology

9    results, the number that we see there --

10   A    Yes.

11   Q    -- you cannot draw a conclusion as to what effect

12   that oxycodone had on Mr. Eric T while he was alive;

13   correct?

14   A    No.  Because I don't know what the level was other

15   than it was higher.

16   Q    Okay.  Now, if he was taking methadone for -- strike

17   that.

18       There was also methadone found in Mr. Eric T's

19   toxicology reports; correct?

20   A    Yes.

21   Q    And that is 0.58 milligrams; correct?

22   A    Yes.

23   Q    And do you know how that affected Mr. Eric T when he

24   was alive?

25   A    No, I don't know -- well, I only have reports of his

816

```
 1   behavior prior to him becoming --
 2   Q   And you're aware Mr. Eric T had been on methadone
 3   for quite sometime; correct?
 4   A   Yes.
 5   Q   Do you know how long he had been on that?
 6   A   At least several months.  I don't know beyond that.
 7   Q   Do you know whether or not he took it every day?
 8   A   No, I don't know that.
 9   Q   And you were not able to measure his tolerance at
10   the time that this toxicology result came out; correct?
11   A   No.
12   Q   Now, but nonetheless, you have identified
13   complications of mixed drug intoxication as a pathologic
14   diagnosis; correct?
15   A   Yes.
16   Q   And that's because you found, you actually found
17   medicine in his system.  That's why you came up with
18   that conclusion; correct?
19   A   Multiple medicines.  Not just medicine.
20   Q   Okay.  What are the other reasons?
21   A   It's, again, we've discussed some of this yesterday;
22   but prior, first of all, when we first received the
23   report, EMS reported that a large amount of both his
24   methadone and Soma were unaccounted for.  According to
25   the history from family members, he had complaints of
```

817

1   increased pain and ingested additional pain medications

2   above and beyond his normal prescribed dosage.

3   Q   Okay.  Stop.  Let's stop there.  So you're aware

4   that Mr. Eric T decided to take medicine in a manner

5   that was not prescribed to him no matter who gave it to

6   him.  Correct?

7   A   Yes.

8   Q   Okay.  Do you know how much that was?

9   A   No.  Just extra.  Additional.

10  Q   If it was one extra pill, that would be a big

11  difference than if it was ten extra pills; correct?

12  A   That's correct.

13  Q   But this does not give us that information, does it?

14  A   No.

15  Q   Okay.  Anything else you want to add?

16  A   Following the ingestion of additional pain pills, he

17  was noted to be lethargic and had to be assisted to bed

18  where he later experienced the snoring respirations.

19  Q   Okay.  Now, let's pause there for a second.  How

20  long after he took those medications did he become

21  lethargic?

22  A   I don't know the exact time.

23  Q   Where was he having increased pain?

24  A   Back.  Well, that's what was reported why he took

25  the additional medication.

818

1   Q   And isn't it important if he immediately started

2   having increased pain or if it later developed that he

3   had increased pain?  I mean excuse me, lethargic?

4   A   Well, it takes a while for the medication to get

5   into your system.

6   Q   Right.  So if he immediately put some medicine in

7   his mouth, the medicine hadn't had a chance to get

8   through his system and he immediately becomes lethargic,

9   that would be an important fact that you would need to

10  know; correct?

11  A   It doesn't say that it was immediate.

12  Q   My question is if it was immediate as opposed to

13  time passing between when he took the medicine and

14  between he actually became lethargic, you would want to

15  know that when you're doing your autopsy; correct?

16  A   Possibly.

17  Q   And there is nothing in -- what are you reading

18  from, by the way?

19  A   Mr. Butell's report.

20  Q   So you did find it?

21  A   Yeah, I thought you were referring to a different

22  document.

23  Q   Okay.  No problem.  So right now as it stands with

24  Eric T we are at a point where he suffered from -- he

25  had an enlarged heart that could have been responsible

819

1    for death.  He had his body mass index was large.  He

2    possibly had myocar -- was that myocarditis or

3    mitrocarditis or what is it?  Myocarditis.  What did you

4    do to make the determination that the complications from

5    mixed drug intoxication as opposed to all these

6    preexisting natural causes were actually the cause of

7    death?

8    A   Well, in addition to the other medications that we

9    discussed earlier, he also had the presence of

10   Carisoprodol and Meprobamate in his system.

11   Q   What are those?

12   A   It's -- they're, well, they can be separate drugs

13   but they're also -- the Carisoprodol is the drug in

14   Soma.  Which is a muscle relaxant.

15   Q   All right.

16   A   And it was elevated.  And then Meprobamate was also

17   elevated.  And that's a metabolite or breakdown product

18   of the Carisoprodol.  Again, they can be prescribed as

19   separate medications; but given the history that he had

20   been prescribed Soma, it was probably just a metabolite.

21   Q   Did you know how long he had been taking Soma?

22   A   No.

23   Q   Do you know how many Soma he would take every day?

24   A   No.

25   Q   Do you know how tolerant he became of Soma?

1    A    No.

2    Q    So without knowing those factors, you don't know how

3    that elevated number truly affected Mr. Eric T when he

4    was being treated with Soma; correct?

5    A    The maximum prescribed dose is usually 700

6    milligrams and these levels are above what you would

7    expect with that dosage.

8    Q    So no physician would prescribe Soma in the amounts

9    that you found in Mr. Eric T's toxicology.  Is that

10   correct?

11   A    I'm not aware of all prescribing practices.

12   Q    But -- okay.  You wouldn't expect to see that then?

13   A    No.

14   Q    And where did the Soma testing come from?

15   A    The forensic science center.

16   Q    I mean part of Mr. Eric T's body.  Where was the

17   blood drawn from?

18   A    Actually it was blood that was drawn in the

19   hospital.

20   Q    Okay.  Do you know when they drew that?

21   A    Approximately an hour and 15 minutes after he was

22   admitted to the hospital on the 22nd.

23   Q    Okay.  Now, back to my other question.  What did you

24   do to eliminate the natural preexisting diseases as the

25   cause of Mr. Eric T's passing?

1    A    I didn't eliminate them.  I listed it as a

2    contributing condition.

3    Q    How much did the mixed drug intoxication contribute

4    as opposed to the cardiovascular disease?

5    A    Are you asking like a percentage?

6    Q    Yes.

7    A    There's not really a medical answer for that.

8    Q    So you cannot, as you sit here, say, say which

9    preexisting cardiac condition or mixed drug

10   intoxication, which played a greater percentage in his

11   passing away; correct?

12   A    Well, he had the cardiac disease before he became

13   intoxicated.  He had been living with cardiac disease.

14   So that's why I put the mixed drug intoxication as

15   primary.

16   Q    And isn't it true that he was living taking Soma;

17   correct?

18   A    Yes.

19   Q    He was living taking methadone; correct?

20   A    Yes.

21   Q    He was living taking oxycodone; correct?

22   A    Apparently, yes.

23   Q    And he was also -- he was doing these things for a

24   long period of time for which you don't know how long he

25   was doing it; correct?

1  A   No.

2  Q   Correct that you don't know how long he was taking

3  these medications?

4  A   No, I didn't even actually have a history that he

5  had been prescribed oxycodone so --

6  Q   Now, with cardiac disease, it's often that a person

7  lives with it and doesn't find out about it until they

8  pass away; correct?  Let me rephrase that.  It's often

9  that a person has a cardiac disease and nobody knows

10  that they had a cardiac disease until after they pass

11  away?

12  A   Yes, that's correct.

13  Q   So it's nothing unusual about a person having these

14  occlusions and not being found out or learned until an

15  autopsy or an internal examination; correct?

16  A   Correct.

17  Q   And so, again, there's no way for you to put a

18  percentage on how much these cardiac issues contrasted

19  with this -- these medicines that were in his system?

20  You can't put a percentage between the two and say which

21  one was the cause; correct?

22  A   I don't draw conclusions determining cause and

23  manner of death based on percentages.  My opinion on

24  cause of death in this report is my medical opinion.

25  Q   Well, I understand that.  But you understand that we

1   are in a court of law; correct?

2   A   Yes.

3   Q   And there's a certain burden by the Government in

4   this case.  You understand that, correct?

5   A   I'm not a lawyer but, okay.

6   Q   Okay.  You've been cross-examined before, haven't

7   you?

8   A   Yes.

9   Q   Okay.  A lot.  By people a lot meaner than me?

10  A   I don't know about that but --

11  Q   And you're familiar with the term of beyond a

12  reasonable doubt; correct?

13  A   Yes.

14  Q   Okay.  And you understand the Government has that

15  burden in this case; correct?

16  A   Yes.

17  Q   All right.  So what we are trying to figure out is

18  is there an accepted medical method that you utilized to

19  eliminate the preexisting cardiac conditions that can

20  kill anybody at any time from -- to distinguish to find

21  out why you decided that it was a mixed drug

22  intoxication?

23  A   Could you repeat the first part of the question

24  again.

25  Q   Yeah.  What we're trying to find out if there is an

824

```
 1    accepted medical method that you utilized that made you
 2    find that it was mixed drug intoxication as opposed to
 3    the cardiac issues that were found preexisting, all
 4    these independent medical cardiac issues.  Is there an
 5    acceptable method that you can say it's number one as
 6    opposed to number two?
 7    A    No.
 8    Q    Did you actually dissect Mr. Eric T's heart?
 9    A    Yes.
10    Q    Okay.  And isn't it true that you often will not see
11    signs of a heart attack with a dissected tissue for
12    several hours?
13    A    If they have sudden cardiac death, yes.
14    Q    Okay.  So you can't rule out the fact that Eric T
15    had a heart attack, can you?
16    A    Well, Mr. T died approximately 26 hours after he had
17    been brought to the hospital.  If he had a myocardial
18    infarct, at that point I would expect to see some gross
19    changes at autopsy.
20    Q    Again, my question is you can't rule it out beyond a
21    reasonable doubt, can you, that he had a heart attack?
22    A    I can't completely rule it out.
23    Q    Okay.  Now, let's talk about Robin G.  Can you tell
24    the jury what kind of -- strike that.
25         Mrs. Robin G, she also had a long medical history;
```

1    correct?

2    A    I have some medical history.

3    Q    Okay.  Are you aware that she had a long history of

4    having severe migraines?

5    A    Yes.

6    Q    Are you --

7    A    History of migraines, yes.

8    Q    Do you know how long that history had been?

9    A    No.

10   Q    Are you aware that she had anxiety?

11   A    No.

12   Q    Are you aware that she had scoliosis?

13   A    No.

14   Q    Are you aware that she suffered from asthma as well?

15   A    Yes.

16   Q    And what kind of Fentanyl patch was Ms. Robin G

17   utilizing in the course of her chronic pain treatment?

18   A    I think she actually had been prescribed lollipops.

19   Q    Okay.  And what is the difference between a Fentanyl

20   lollipop and a Fentanyl patch?

21   A    A patch is something you apply to your skin.  A

22   lollipop is exactly -- it's the same kind of lollipop

23   you have as a child.  It just has medicine in it instead

24   of candy.

25   Q    How big is it?

1    A    How big is it?

2    Q    Yes.  Like is it, you know, like --

3    A    I've never seen one.

4    Q    Okay.  I haven't either.  Now, do you know how long

5    she had been taking Fentanyl?

6    A    No.

7    Q    Do you know how long she had been taking the

8    lollipop as opposed to a patch?

9    A    No.

10    Q    Do you know if she ever took the patch?

11    A    No.

12    Q    And you based your diagnosis of Ms. Robin G based on

13    the level of Fentanyl that was in her system; correct?

14    A    Yes.

15    Q    Now, isn't it true that the post-mortem Fentanyl

16    measurements are an unreliable indicator of Fentanyl at

17    the time of death?

18    A    I'm not aware of that.

19    Q    You have to interpret toxicology results in

20    producing autopsies; correct?

21    A    Yes.

22    Q    And you understand that these medicines, there's

23    often an updating about findings and different

24    scientific studies that correlate with certain medicines

25    that you may come across in the course of your

1    profession; correct?

2    A    Yes.

3    Q    And you want to have the most up to date and recent

4    knowledge base to make sure that when you're making your

5    findings that they're accurate; correct?

6    A    Yes.

7    Q    And are you aware -- well.   Strike that.

8        Are you familiar with the "American Society of

9    Clinical Pathology Journal"?

10   A    Yes.

11   Q    And you recognize that as an authoritative

12   publication?   A peer review journal?   That's what we

13   call it; correct?

14   A    It's a peer review journal, yes.

15   Q    A peer review journal article, that essentially

16   means that before articles can be published in these

17   journals, it has to have the approval of leading

18   practitioners in whatever area that that journal is

19   being published in.   Correct?

20   A    Yes.

21   Q    And -- okay.   Are you aware that the "American

22   Society of Clinical Pathology" published a recent

23   article that states:   The present study provides

24   evidence that suggest that post-mortem FB may not be

25   reliable for the determination of the Fentanyl

828

 1    concentration present at the time of death, i.e., para

 2    mortem.  Are you aware of that?

 3    A    No, I'm not aware of that article.

 4    Q    When you hear that, is that an article you feel like

 5    you should probably read and see what they did in their

 6    study to reach that conclusion?

 7    A    I could review it.

 8    Q    And are you aware that there have been four studies

 9    where the person's Fentanyl level before death was less

10    than 0 nanograms and increased all the way up to at

11    least 26 post-mortem.  Are you aware of that?

12    A    No.

13    Q    So in four -- well.  Strike that.

14         Now, the amount of Fentanyl in Ms. Robin G's

15    toxicology would be considered a lot; correct?

16    A    Yes.

17    Q    And do you know how many micrograms she was

18    prescribed of this Fentanyl lollipop?

19    A    No.

20    Q    Do you know how many micrograms this Fentanyl

21    lollipop --  are you aware that she was receiving 800

22    micrograms, a prescription of Actiq, which is the

23    Fentanyl lollipop, in the amount of 800 micrograms -- or

24    milligrams?  Are you familiar with that?

25    A    I'm not familiar with that history.  I understand

1    what you're saying.

2    Q    Okay.  Well, in order to measure or determine --

3    well, strike that.

4         That amount in her body is shockingly high.  Would

5    you agree with that?

6    A    23?

7    Q    Yes.

8    A    Yes.

9    Q    In order to do that, if she was taking Actiq 800,

10   she would have had to take about ten Fentanyl lollipops

11   at one time in order for her measurements to reach that

12   high; correct?

13   A    I believe also if you chew them instead of actually

14   treat them like a lollipop you can also get an

15   accelerated dose.

16   Q    Right.  You can also melt them in liquid and get an

17   accelerated dose; correct?

18   A    Yes.

19   Q    Now, it's not -- you haven't seen any evidence that,

20   in your history when you performed this autopsy, that

21   she was ever prescribed to chew those up; correct?

22   A    No.

23   Q    That would be on the product label, says don't do

24   this.  Correct?

25   A    I assume so.  I haven't read the product

1    information.

2    Q    And you haven't seen evidence of a prescription to

3    melt those in any hot liquid to accelerate it; correct?

4    A    You mean a prescription for her to melt it?

5    Q    Yes.

6    A    No.

7    Q    And now, even if you chewed these, because I don't

8    think -- I think when we hear lollipops we feel like we

9    remember as kids we could probably go through ten

10   lollipops at a time.  But with these Fentanyl lollipops,

11   there's medicine released out of those; correct?

12   A    Yes.

13   Q    And that medicine has a numbing agent in it, doesn't

14   it?

15   A    Yeah.  It has some mucosal effect, yes.

16   Q    And it's my understanding that a person who's trying

17   to chew those things up couldn't get through three or

18   four of them before passing out.  Am I mis-- was I told

19   wrong about that?

20   A    I don't know that actual --

21   Q    You would agree, though, it would be mighty -- near

22   impossible, near impossible to sit down and chew up ten

23   Fentanyl lollipops at one setting.  You would agree with

24   that?

25   A    Well, there's other ways to break them up; but, if,

1    if that's what the --

2    Q   That's all I'm asking about.  Chewing them up.

3    Correct?

4    A   I don't know the mechanics and inhibitions of

5    chewing up the lollipops.

6    Q   But when you're looking at these -- we just

7    discussed a peer review study article that has found

8    levels to go from 0 to 26 in people with very little

9    Fentanyl, they're taking very little Fentanyl.  If you

10   were aware of that fact that, hey, there is this study

11   out there that I'm not aware of -- and I can give you

12   the title if you want to go research it.  Do you want

13   the title?

14   A   Not right now.

15   Q   Okay.  If you were aware of this study when you were

16   doing this autopsy that Fentanyl is unreliable and can

17   go from 0 to 26, you would have looked at this and said,

18   you know what, I need to do some more investigation.  Is

19   there an alternate cause for this Fentanyl level to

20   reach this high.  Correct?

21   A   Well, I would have first probably consulted with a

22   toxicologist in our office to see what his opinion was

23   about the article and the methods and the materials that

24   they used to study and draw their conclusion.

25   Q   Right.  So you would have taken some extra steps had

832

1    you known about this body of information; correct?

2    A   Yes.

3    Q   And this is not a criticism on you because new

4    articles, new studies, new searches, come out and you

5    don't know about them before they come out; correct?

6    A   Right.

7    Q   All right.  And you just have to try to stay learned

8    and stay up to speed as the reliable studies are

9    developed.  You review them, consider them and determine

10   how you're going to apply them to your practice.

11   Correct?

12   A   Yes.

13   Q   Now, you don't have a pari mortem, meaning while she

14   was living, blood sample from Ms. Robin G to determine

15   what her Fentanyl level was before she passed away;

16   correct?

17   A   Correct.

18   Q   So the -- that would be the most reliable indicator

19   as to how much Fentanyl was truly in her body at the

20   time that she passed away.  Agreed?

21   A   It's probably more accurate than the post-mortem

22   somewhat.

23   Q   Okay.  Now, Ms. Robin G was -- the night she passed

24   away, she was seen up and alert at least two or three

25   hours before her husband found her passed away; correct?

1    Do you see that in your report?

2    A   Yes.

3    Q   So she would have had to have been between -- and

4    just so the jury understands -- this is between 2 in the

5    morning and 5 in the morning; correct?  She was last

6    seen by her husband at 2 in the morning?

7    A   I have 4 in the morning and she is found at 6:20.

8    Q   Okay.  4 and 6:20.  And you're aware that her

9    husband said she was alert and just fine when he saw her

10   at 4 in the morning; correct?

11   A   Yes.

12   Q   So she would have had to have done something, if

13   these Fentanyl numbers are accurate -- well, strike

14   that.

15       You either have two conclusions.  These numbers are

16   inaccurate or she would have had to somehow ingest

17   roughly around 10 Actiq lollipops between 4:20, or 4:00

18   in the morning and 6:20 in the morning; correct?

19   A   At least ingest the contents of the lollipops.

20   Q   Right.  And after about four or five, three or four,

21   her mouth would be really numb if she was chewing them;

22   correct?

23   A   If she was chewing them, yes.

24   Q   Now, she also had fibrosis, scarring of the heart,

25   didn't she?

834

1    A    A little bit.

2    Q    A little bit.  Is that what your autopsy says is a

3    little bit?

4    A    No.  It says interstitial and perivascular fibrosis;

5    but if it's marked, I usually say marked or severe.

6    Q    Usually, but not every situation?

7    A    I usually comment if it's a significant amount.

8    Q    Okay.  She also had evidence of myocarditis;

9    correct?

10   A    It actually looked more like an infarct; but, again,

11   it goes back and forth, you know, this differential

12   between the two.

13   Q    So she had -- and tell the jury what that

14   description was that alerts us to that it may have been

15   myocarditis?

16   A    Section from the right ventricle had some

17   inflammation with contraction band necrosis and

18   coagulation necrosis of myocytes.

19   Q    And that's the textbook definition of myocarditis;

20   correct?

21   A    Or an infarct, yes.

22   Q    And did you take any steps to try to determine if it

23   was myocarditis or -- what did you say the other thing

24   was?  Infarct?

25   A    Heart attack.

```
1    Q   Heart attack.  Did you make -- take any steps to
2    determine whether or not what you saw was a result of a
3    heart attack or because of myocarditis?
4    A   No.
5    Q   And as we just established, people who suffer from
6    myocarditis can pass away; correct?
7    A   Yes.
8    Q   And that can be the cause of them passing away?
9    A   Can be, yes.
10   Q   Were you able to eliminate that Ms. Robin G actually
11   had a heart attack?
12   A   My medical opinion was that it was -- there was a
13   three hour period following the time she was found to
14   when she was actually pronounced deceased.  And that the
15   injury related to the heart was due to an infarct due to
16   lack of oxygen and things associated with the cardiac
17   arrest.
18   Q   So she did have a heart attack?
19   A   Well, yeah, after she arrested.
20   Q   So she was found and then had a heart attack?
21   A   Well, no, there -- it's hard to explain.  But you
22   might be found and you're unresponsive and so you're
23   maybe not, you either --
24   Q   All right.  Let me stop you there for a second.  If
25   you're found and you're unresponsive -- people have been
```

836

1    known to have multiple heart attacks; correct?

2    A    Yes.

3    Q    Okay.  All right.  Now, so you say -- so my original

4    question was were you able to eliminate the possibility

5    that she actually had a heart attack?

6    A    I think she had one after she arrested.

7    Q    Okay.  And what is arresting?

8    A    After her heart stopped beating and she stopped

9    breathing.  They did manage to resuscitate her.  And

10   when you get blood flow back into the heart afterwards,

11   you usually end up with some evidence, visible

12   microscopic evidence, of what they call a reprofusion

13   injury.  It's all very complicated but --

14   Q    What medical technique did you utilize to determine

15   that the heart attack happened after she arrested as

16   opposed to the actual cause of her arresting?

17   A    She didn't have any reason to have a heart attack.

18   Q    So now you have to have reasons to have heart

19   attacks?

20   A    Well, most people that have heart attacks have

21   coronary artery disease.

22   Q    Okay.  Most people.  But not all; correct?

23   A    Well, people can also have heart attacks if they are

24   abusing stimulants such as cocaine, methamphetamine.  I

25   mean, there's different reasons for you to have heart

1   muscle injury, which is basically what a heart attack

2   is.

3   Q   But you found evidence in your autopsy that she had

4   either a heart attack or myocarditis; correct?

5   A   Yes.

6   Q   And you did not do a differential diagnosis to rule

7   out myocarditis, did you?

8   A   It was not my opinion that it was myocarditis.

9   Q   I'm not asking what your opinion was.  We heard it

10  yesterday.  I'm asking about what you did.  Did you do a

11  differential diagnosis to rule out myocarditis?

12  A   Well, mentally.

13  Q   Okay.  A tested medical procedure.  Did you utilize

14  one to rule out myocarditis?

15  A   No.

16  Q   You also noted some issues with her liver; correct?

17  A   Yes.

18  Q   What did you note with her liver?

19  A   She had some fatty change, fat in her liver.

20  Q   And she had -- can you tell the jury about the

21  moderate micro and macrovesicular --

22  A   Steatosis.

23  Q   Yes.

24  A   Moderate means that about approximately 50% of the

25  tissue that I examined under the microscope had evidence

838

1    of little fat droplets actually in the cells of the

2    liver.

3    Q    Okay.  And that can be caused by two separate

4    conditions, couldn't it?  One, for a long term using

5    medication.  Or, two, it could be non-alcoholic

6    steatohepatitis; correct?  Known as NASH?

7    A    Yeah, that's associated with obesity in general.

8    Q    Okay.  But it would --

9    A    Can be from alcohol abuse.  There's lots of

10   different things that cause fatty change in the liver.

11   Q    Isn't it true that NASH is associated with higher

12   than normal risk of sudden cardiac death?

13   A    Yes.

14   Q    You did not include the changes of the liver in your

15   pathological -- pathologic diagnosis, did you?

16   A    Yeah.  It's on the front page under pathologic

17   diagnosis.  Number IV.

18   Q    All right.  I'm sorry.  I missed that one.  And what

19   method did you use to determine that Mrs. Robin G passed

20   away from Fentanyl other than myocarditis, or the heart

21   attack or even NASH?

22   A    First of all, the Fentanyl levels were exorbitant.

23   Secondly, as I stated, my medical opinion was that the

24   changes in her heart were due to injury that occurred

25   from the cardiopulmonary arrest.  And then I was able to

1    look -- and then resuscitated her, which then resulted

2    in -- gave enough time for the changes to be observed

3    under the microscope.

4    Q    All right.  Again, I'm asking my question again.

5    What method -- what medical methods did you utilize to

6    eliminate -- to determine whether or not Mrs. Robin G

7    passed away from the medicine as opposed to myocarditis,

8    the heart attack or even NASH?

9    A    There aren't any medical methods to do that.

10   Q    You just have to make a decision based on what you

11   believe happened; correct?

12   A    Yes.

13   Q    And if that Fentanyl level was incorrect, then that

14   would have effected your judgment at that time; correct?

15   A    I have no reason to believe that the Fentanyl level

16   is incorrect.

17   Q    That wasn't my question.  If the Fentanyl level was

18   incorrect, that would have effected your judgment.

19   Agreed?

20   A    It would have effected -- effected -- I'm not sure

21   how it would have effected my judgment.

22   Q    You would have considered that fact in making your

23   final opinion; correct?

24   A    Absolutely.

25              MR. WILLIAMSON:  Judge, the next one is going

840

```
 1    to take about 10 or 15 -- I don't know if you want to

 2    break or --

 3                THE COURT:  I think so.  About 15 minutes,

 4    Ladies and Gentlemen.  Remember and heed the admonition.

 5                        (Recess.)

 6                THE COURT:  Yes, sir.

 7    BY MR. WILLIAMSON:

 8    Q   The next individual I'd like to spend some time

 9    discussing with you is Katherine S.  Do you have her

10    autopsy in front of you?

11    A   Yes.

12    Q   Okay.  Are you aware that Katherine S was never seen

13    by Dr. Schneider one time?

14    A   Is this Katherine with a K?

15    Q   Yes.

16    A   Okay.

17    Q   Do you see that?

18    A   Date of death November 25th, 2003?  Just want to

19    make sure I'm --

20    Q   Yes, that's correct.

21    A   Okay.  Thank you.

22    Q   Are you aware that she was never seen by Dr.

23    Schneider?  Not one time?

24    A   No.

25    Q   Okay.  Are you aware that she suffered from
```

1    migraines?

2    A    I have chronic pain.  That might be included in

3    that.

4    Q    Okay.  And her last visit with the clinic, are you

5    aware that that was with Dr. St Clair?

6    A    Yes, I do have here that she was seen by Dr. St

7    Clair.

8    Q    On her last visit or just says --

9    A    I have November 19th, 2003.  If that is her last

10   visit.

11   Q    Okay.  And you're aware she also had fibromyalgia?

12   A    Again, that may fall under the chronic pain.  I

13   don't have that specific diagnosis history.

14   Q    And you know that she had Hepatitis C?

15   A    Yes.

16   Q    And were you aware that she had post traumatic

17   stress disorder?

18   A    No.

19   Q    Now, I'm not going to spend a lot of time, since

20   this isn't even Dr. Schneider's patient, but I think

21   there are a few things to point out for the jury.

22       On your final diagnosis you listed cardiomegaly;

23   correct?

24   A    Yes.

25   Q    And that is a --

1   A    In my pathologic diagnosis, yes.

2   Q    Yes.  I'm sorry.  Isn't it true that having an

3   enlarged heart places people at greater risk for sudden

4   cardiac death?

5   A    It can, yes.

6   Q    And her heart was 390 grams; correct?

7   A    Yes.

8   Q    And that is larger than what you would expect for an

9   individual her age; correct?

10  A    Not necessarily just for her age but, I mean, in

11  general, yes.

12  Q    In general.  And, again, an enlarged heart is

13  associated with sudden death, is it not?

14  A    Yes.

15  Q    And she also had hypertension; correct?

16  A    Yes.

17  Q    And people with hypertension also have an increased

18  risk of sudden death; correct?  Sudden cardiac death?

19  A    Not if it's well controlled but --

20  Q    Was hers well controlled?

21  A    I don't know.

22  Q    Okay.  So without knowing whether it's well

23  controlled or not, do you know whether or not her

24  hypertension would have been -- put her at increased

25  risk for sudden cardiac death?

843

1   A   Well, actually I put her enlarged heart under her

2   hypertension as a sign of her hypertension.

3   Q   So you believe it did play a part in her passing;

4   correct?

5   A   I did list it as a contributory cause of death, yes.

6   Q   And you also found a 95% obstruction in the left

7   anterior coronary artery; correct?

8   A   90.

9   Q   90%?

10  A   Yes.

11  Q   And what about the -- let's see, and as we discussed

12  earlier, that 90% is what we would term as severe;

13  correct?

14  A   Yes.

15  Q   And in and of itself that could lead to -- that's

16  serious and life threatening; correct?

17  A   Yes.

18  Q   Especially if they had a spasm; correct?  If the

19  individual had a spasm?

20  A   Yes.

21  Q   And, again, you were not able to perform any special

22  test to rule out the occurrence of a heart attack;

23  correct?

24  A   I didn't see any evidence of heart attack.  I did

25  list it as a contributing cause of death.

1   Q    You did not see any evidence of a heart attack but

2   you did list it as a contributing cause of death?

3   A    I listed it as a contributing cause of death, yes.

4   Q    Okay.  So -- okay.  And this individual was also

5   considered medically morbidly obese; correct?

6   A    I did not calculate her body mass index.

7   Q    Okay.  If it was 35.5, would that be morbidly obese?

8   A    Just obese.  Not morbidly.

9   Q    Just obese.  And that, again, that condition in and

10  of itself carries an increased risk of sudden cardiac

11  death; correct?

12  A    Obesity in and of itself.  Morbidy obese in and of

13  itself makes you at a greater risk for the previous

14  things we discussed:  High blood pressure, diabetes,

15  coronary disease.

16  Q    You remember being asked yesterday by Ms. Treadway

17  whether or not it's common for there to be coronary

18  issues with individuals?  You remember that question?

19  A    With individuals I see, yes.

20  Q    Okay.  And, you know, not to be flippant, but the

21  only individuals you see are the people that have

22  already passed away?

23  A    Yes.

24  Q    And it's not -- is it common for you to see 80 to

25  90% occlusions in individuals' arteries?

845

```
 1    A    Unfortunately in my profession, yes.
 2    Q    And that's because heart disease is one of the
 3    leading killers that's known to man right now; correct?
 4    A    Yes.
 5    Q    All right.  Probably won't spend a lot of time on
 6    this next patient.  Mr. Randall S.  Just let me know
 7    when you find it.
 8    A    Sorry.
 9    Q    Take your time.
10    A    Randall or Robert?
11    Q    Randall.  Found it?
12    A    Yes.
13    Q    Okay.  Now, are you aware that Mr. S was not seen
14    ever by Dr. Schneider?
15    A    No.
16    Q    Your investigation doesn't note that?
17    A    We have a different physician listed as his recent
18    attending physician.
19    Q    Who would that be?
20    A    Dr. Worley.
21    Q    Do you have the Schneider Medical Clinic identified
22    in your investigation report at all?
23    A    No.
24    Q    This individual who was not seen by Dr. Schneider
25    and where there's no mention of Schneider Medical
```

1  Clinic, he had 80 to 90% occlusion in his heart;

2  correct?  In his left artery?  Anterior descending

3  artery; correct?

4  A   Yes.

5  Q   And he also had a history of vascular disease.

6  Isn't that true?

7  A   The only medical history that I have was for chronic

8  obstructive pulmonary disease and chronic pain.

9  Q   So you knew before he came in to you that he had

10  suffered from some cardiac issues chronically; correct?

11  A   No.  Chronic obstructive pulmonary disease is lung

12  disease.

13  Q   Lung disease.  So he suffered from a lung disease

14  before he came in; correct?

15  A   Yes.

16  Q   And his right coronary artery was 70 to 80% clogged

17  up; correct?

18  A   No.

19  Q   What was it?

20  A   80 to 90.

21  Q   And his left was 80 to 90 as well?

22  A   Left anterior descending, it was 80 to 90 and right

23  was 80 to 90.

24  Q   Okay.  And we've already established that that is a

25  severe condition; correct?

847

1   A   Yes.  And I listed it as a contributing cause of

2   death.

3   Q   Okay.  Now, you saw evidence of marijuana in his

4   toxicology; correct?

5   A   Yes.

6   Q   It's not legal to prescribe marijuana here in

7   Kansas, is it?

8   A   Not that I'm aware of.

9   Q   And isn't it true that marijuana causes coronary

10  artery spasm?  Or it can cause it?

11  A   He had the metabolite but he was not actually

12  intoxicated by marijuana at the time.

13  Q   I didn't ask if he was intoxicated by it.  All I

14  want to know is if marijuana can cause a coronary artery

15  spasm?

16  A   It can.

17  Q   And you also noted that he had a previous heart

18  attack; correct?

19  A   Yes.  He had microscopic evidence of having an old

20  heart attack.

21  Q   And there was also evidence that he suffered from

22  myocarditis; correct?

23  A   No.

24  Q   You don't see any description of any inflammatory

25  infiltrates in your autopsy report?

848

1    A    Yes, but they're not associated with any injury.

2    Q    So you're saying that the interstitial lympho --

3    A    Lymphoplasmatic (ph).

4    Q    -- inflammatory infiltrate, that's not consistent

5    with a diagnosis of myocarditis?

6    A    I see it often in people's hearts; and unless they

7    have actual myocardial injury from that inflammatory

8    infiltrate, I don't call it myocarditis.

9    Q    The injury you're talking about is cell

10   degeneration; correct?

11   A    Or death, yes.

12   Q    Or death.  Same --

13   A    Same thing.

14   Q    Okay.  I see.  How long had Mr. S been taking

15   methadone before he passed away?

16   A    We have no prescription history for methadone for

17   Mr. S.

18   Q    Okay.  You listed the toxic effects of methadone as

19   a cause of death number one.  Even above the

20   cardiovascular disease.  Even though his arteries were

21   80 to 90% clogged up.  What test did you undertake to

22   decide that -- that showed that it was the toxic effects

23   of methadone as opposed to cardiovascular disease that

24   was the number one cause of death?

25   A    There is no specific test.

849

1    Q    Okay.  There's no peer review method to eliminate

2    serious cardiac issues as the cause of death even though

3    there may be some prescription medicines in the person's

4    system; correct?

5    A    I didn't eliminate it.

6    Q    Fair.  There's no peer reviewed method to quantify

7    or to determine that a person actually passed away from

8    a medicine when there is evidence of cardiovascular

9    disease in that individual; correct?

10   A    It's a medical opinion based on experience and

11   training.

12   Q    I'm not asking about -- well, I'm not asking about

13   opinion.  But different doctors can look at the same set

14   of facts and have a different opinion; correct?

15   A    Yes, they can have different medical opinions.

16   Q    And you understand that Dr. Karch has been doing

17   this a very long time; correct?

18   A    I beg your pardon.

19   Q    You understand Dr. Steven Karch has been doing this

20   a very long time; correct?

21   A    Doing what?

22   Q    Being a pathologist.

23   A    He's not a pathologist.

24   Q    He's a cardiac pathologist, isn't he?

25   A    Not that I'm aware of.

1   Q   Okay.  He is well regarded in this industry, isn't

2   he?  In your area?

3   A   In pathology?

4   Q   Yes.

5   A   Not as a pathologist.

6   Q   As what?

7   A   Person who's done -- who's written books on

8   toxicology that are used as references.

9   Q   And you just mentioned that you read one of his

10  pathology books earlier; correct?

11  A   I used it as a reference.

12  Q   Okay.  So he's a noted author in pathology; correct?

13  A   It's more about toxicology.  He's not a pathologist.

14  Q   That's fair.  Again, you understand that two doctors

15  can look at the same set of facts and disagree; correct?

16  A   Absolutely.

17  Q   And what we're concerned about is is there an

18  objective medical test that's peer reviewed that we can

19  point to that can eliminate the cardio -- or distinguish

20  between the true cause of death when there is a

21  cardiovascular disease.  There is not one, is there?

22  A   There is not a test, no.

23  Q   Okay.  And what was Mr. S's level of methadone in

24  his system?

25  A   .83 in his femoral blood.

851

```
 1    Q    And is that significant in your opinion?

 2    A    Yes.

 3    Q    Is that within any therapeutic range in your

 4    opinion?

 5    A    It is for, say, previous heroin abusers who are on

 6    methadone maintenance in the several hundred milligram

 7    range.

 8    Q    And it also could have been a therapeutic range for

 9    somebody who's been taking methadone for a very long

10    time; correct?

11    A    Depends on the dosage.

12    Q    You don't know what his dosage was, do you?

13    A    No.

14    Q    You don't know how long he had been on methadone;

15    correct?

16    A    No, I -- and based on the history that we received,

17    it is our office's practice in the absence of being able

18    to identify a prescription that they are naive.

19    Q    Okay.  So let me make sure I understand this.

20    Instead of going and actually getting the information

21    that could really put some value on what these levels

22    are, you make your decision assuming that the person had

23    no tolerance.  Is that fair?

24    A    If there's no prescription for methadone and there's

25    no drug and we don't -- and we can't find a history that
```

1   they'd ever been prescribed it.

2   Q   You knew who his primary physician was; correct?

3   A   Right.

4   Q   And you never contacted that doctor to get his

5   medical records; correct?

6   A   I don't know whether or not -- I don't have the

7   records here in my --

8   Q   Is it notated in the investigator's report whom you

9   have to rely on, by the way, that you had his full

10  medical --

11  A   No.  They don't usually comment on that in the --

12  Q   Okay.  So as you sit here today, you have no

13  evidence at all to offer the jury as to how long or how

14  much methadone that Randall S had been taking; correct?

15  A   No.  His brother said he had been abusing it because

16  that's not the same as taking a prescription.

17  Q   Is his brother a doctor?

18  A   No.  His brother is a brother --

19  Q   Is his brother addictionologist?

20  A   No.

21  Q   Did his brother -- all his brother knew is that he

22  took it and he took it for a long time according to your

23  report; correct?

24  A   No.  Just says abusing.  Doesn't give a length of

25  time.

853

1    Q    At that point -- did you note that before you made

2    your diagnosis?

3    A    Note what?

4    Q    That there was a report that he had been taking

5    methadone or abusing it?

6    A    Only in the sense in my report it says history of

7    prescription drug abuse.

8    Q    Okay.  And wouldn't that be relevant to determine

9    what the actual level that was found post-mortem, how it

10   may have effected Mr. Randall when he was alive?

11   A    I'm sorry, I don't understand.

12   Q    Let me just wrap it up this way.  You knew that he

13   had been taking methadone for at least -- or at least

14   there were allegations that he took a lot of it, whether

15   you term it as abuse or not.  And you did not follow up

16   to try to determine where he received that methadone,

17   did you?  And when I say you I'm also talking about your

18   medical investigators.

19   A    No.  When we have the history of abuse, we don't --

20   Q    How long had he been abusing it?

21   A    I have no idea.

22   Q    Okay.

23   A    And I have no idea what amount or when or how often

24   or anything like that.

25   Q    And without knowing how long he had been taking

854

1    methadone and without knowing how much he had been
2    taking, you're unable to determine what his tolerance
3    was to that methadone; correct?
4    A    I'm not aware of what his tolerance was.
5    Q    Let's move to Toni W.  Okay.  Ms. Toni W was a
6    patient of Dr. Schneider.  Does your record reflect
7    that?
8    A    Yes.
9    Q    Okay.  And let's talk a little bit about Ms. Toni.
10   How tall was Ms. Toni W?  No, strike that.  She was 69
11   inches tall.  Did you read that?
12   A    Yes.
13   Q    And did she have an enlarged heart?
14   A    Yes.
15   Q    How much did her heart weigh?
16   A    650 grams.
17   Q    650 grams.
18   A    Yes.
19   Q    And you would agree that's well beyond the normal
20   range of how much her heart should have weighed;
21   correct?
22   A    Yes.
23   Q    And, again, as we talked about previously, that in
24   and of itself is a -- could be a cause of sudden cardiac
25   death; correct?

855

1    A    Yes.  And I listed it as a contributing cause of

2    death.

3    Q    Okay.  You didn't do a microscopic examination of

4    her heart, did you?

5    A    No.

6    Q    You didn't do a histology of the organs with this

7    lady, did you?

8    A    No.

9    Q    She didn't have any arrows sticking in her body that

10   would have showed you any kind of gross anatomical

11   conditions, did she?

12   A    She had three-vessel coronary artery disease and a

13   650 gram heart.

14   Q    So you didn't need to do anything else?

15   A    Those are both anatomic causes of death.

16   Q    Okay.  So it was clear by just by looking at her

17   that her cause of death was because of an enlarged heart

18   and coronary artery disease and you didn't have to do

19   anything more; correct?

20   A    No.  She had anatomic causes of death --

21   Q    Which means you didn't have to do --

22   A    -- without histology.  And I listed both those

23   conditions that we discussed as contributing causes.

24   Q    And she also weighed over 269 pounds, didn't she?

25   A    276.

856

```
 1   Q   276.  And would you consider that to be morbidly
 2   obese for a female of her height?
 3   A   Yes.  She had a body mass index of 41.
 4   Q   And, again, that in and of itself, without taking
 5   any kind of prescription medicine, could, could cause
 6   death; correct?
 7   A   Yes.  And I listed it.
 8   Q   It was so sufficient in this case or so overwhelming
 9   in this case that you didn't even feel the need to do a
10   histological exam.  Agreed?
11   A   I had significant anatomic findings at autopsy, yes.
12   Q   Which caused you not to do a histological exam.
13   Agreed?
14   A   Yes.
15   Q   Ms. Toni W also had illegal drugs in her system from
16   her toxicology; correct?
17   A   Yes.
18   Q   That would be cocaine; correct?
19   A   Yes.
20   Q   And cocaine is known to cause an artery spasm and
21   heart attacks, is it not?
22   A   Yes.
23   Q   Doctors can't prescribe cocaine to patients, can
24   they?
25   A   No, not that I'm aware of.
```

857

1    Q    You also found oxycodone, methadone, hydrocodone and

2    alprazolam in her system; correct?

3    A    Yes.

4    Q    Is it your opinion that the drug that led to her

5    death is the cocaine and not these prescription

6    medicines?

7    A    No.  I think it's -- they all acted in combination

8    to a certain extent.

9    Q    Okay.  And you would agree that people should not be

10   taking cocaine under any circumstances; right?

11   A    Yes.

12   Q    And when a person does that, that's a choice that

13   they make to do unless somebody forces them; correct?

14   A    Yes.

15   Q    You never read any reports that Dr. Schneider forced

16   anybody to take cocaine, did you?

17   A    No.

18   Q    And in order to determine how much or if at all

19   these prescription medicines effected this lady who had

20   all of these cardiac issues, you would need to know how

21   long she had been maintaining under -- while taking

22   these prescription medicines; correct?

23   A    How long she had been maintaining?

24   Q    You need to know information about what prescription

25   medicine she was taking and how long she had been taking

858

1    it.  Agreed?

2    A   Yes.

3    Q   And that would help inform you as to whether the

4    levels in her system would be considered elevated;

5    correct?

6    A   Yes.

7    Q   And do you know that this lady had been maintaining

8    the same prescription program for over a year, year and

9    a half?  Are you aware of that?

10   A   I'm aware that she had been prescribed pain

11   medication for an extended period of time.

12   Q   She had been taking this pain medication for an

13   extended period of time and had not passed away until

14   there was -- she decided to take cocaine; correct?

15   A   Possibly.  I mean, I don't know what her cocaine

16   abuse history is so --

17   Q   Is that noted in your autopsy that she had a history

18   of abusing cocaine?

19   A   Illicit drug abuse is the history that we received,

20   which includes cocaine.  And there was evidence of

21   probable cocaine paraphernalia at the scene.

22   Q   So your -- strike that.

23        And lastly, your report also states that she had a

24   scarred mitralvalve.  Doesn't that suggest that she had

25   a rheumatic heart disease?

859

1    A    She may have.  It wasn't to the point that it was

2    completely characteristic of sort of textbook rheumatic

3    heart disease; but she may have.

4    Q    Okay.  All right.  The next individual I'd like to

5    visit with you about would be Robert S.  Have you found

6    it?

7    A    I'm narrowing it down.

8               MS. TREADWAY:  5-P.

9    A    Okay.

10   Q    Got 'em?

11   A    Yes.

12   Q    Now, Mr. Robert S, this individual had a heart that

13   weighed how much?

14   A    500 grams.

15   Q    Again, that's an enlarged heart; correct?

16   A    Yes.

17   Q    And, again, that is an independent cause of -- it

18   can be an independent cause of sudden cardiac death;

19   correct?

20   A    Yes.  And I listed it as a contributing condition.

21   Q    You listed it as contributing as opposed to the

22   cause though; correct?

23   A    Yes.

24   Q    And, again, isn't it true that marijuana can cause

25   coronary artery spasms?

860

1    A    Can.

2    Q    I'm sorry?

3    A    It can, yes.

4    Q    Okay.  And you didn't do a microscopic examination

5    on Mr. Robert S, did you?

6    A    No.

7    Q    When you decided not to do a histological exam, that

8    was prior to you receiving any kind of toxicology

9    report; correct?

10   A    Yes.

11   Q    And you chose not to do it because the sign of death

12   was what?

13   A    Well, he did have an enlarged heart; and his autopsy

14   actually would have been prior to the adoption of the

15   autopsy standards by NAME.  They were adopted in 2006.

16   One of the original drafts of the standards actually

17   included you didn't have to put histology in if you

18   thought the death was toxicology related.  The final

19   adopted version in 2006 deleted the portion about

20   toxicology and just said in the absence of anatomic

21   cause of death.  So at the time I performed the autopsy,

22   the standards were not in place.

23   Q    Okay.  Now, the standards just didn't develop out of

24   thin air, did they?  The NAME standards in 2006?

25   A    No.  They developed over a several year period,

 1   several drafts.

 2   Q   Right.  And basically standards are developed by

 3   research, reviewing, and determining what are the best

 4   practices in the area and adopting them as their

 5   standard.  You agree with that; correct?

 6   A   They had a committee that was formed that met on

 7   many occasions and did numerous revisions.

 8   Q   There was nothing that would have prevented you from

 9   doing a histology on Robert S, would there?

10   A   No.

11   Q   And because you did not do a histology, it's

12   possible that Robert S had a heart attack and you didn't

13   see it because you didn't look at the heart under the

14   microscope; correct?

15   A   No.

16   Q   That's not correct?

17   A   No.

18   Q   You can conclusively determine whether or not a

19   person had a heart attack without doing histology?

20   A   He had no reason to have a heart attack.

21   Q   I'm not asking if you think he had a reason.  I'm

22   asking you the actual cause.  That's why you have these

23   histology tests to confirm; correct?

24   A   Not necessarily.

25   Q   In part, would you agree?

862

1    A    In part, yes.

2    Q    Okay.  And if you had done the histology and placed

3    tissue under the microscope, you could have determined

4    whether or not you saw signs of a heart attack.  Agreed?

5    A    If his toxicology had come back insignificant, I

6    would have gone back and done that, yes.

7    Q    So you're guided by whether or not -- well, at least

8    at this time you're saying you're guided -- you would

9    wait to see what the toxicology test said to determine

10   whether or not you would do a histological exam?

11   A    Not entirely.  Some of it was based on clinical

12   history, findings at autopsy.  There were a lot of

13   things that went into determining at the actual time of

14   autopsy whether or not I chose to put in histology.  In

15   in this particular case, the history and finding, the

16   autopsy, I held off putting the histology in.  If the

17   toxicology had come back negative, I would have gone

18   back and put in a histology.

19   Q    Let's visit about that for a second.  If the

20   toxicology would have come back negative, zero, then you

21   would have put in histology; correct?

22   A    Yes.

23   Q    And that is because you would have found or believed

24   that zero toxicology has no effect on this individual

25   that you're conducting the autopsy with?

863

1    A    It's not a matter of zero toxicology.    He may have

2    had some positive or equivocal results and then I would

3    have gone back and put in histology.

4    Q    Okay.    And that's fair.    So if the toxicology would

5    have come back and to your interpretation it doesn't

6    have any meaning, then you would have conducted

7    histology; correct?

8    A    It's not that it doesn't have any meaning.    It's

9    just that I felt it would have been warranted to put in

10    some histology.

11    Q    What I'm trying to figure out is what did the

12    toxicology exam have to come back to say before you

13    would decide to conduct a histology?

14    A    Again, that's based on a case-by-case basis.    What

15    the toxicology reports.    What the history is.    What I

16    find at autopsy.    I mean, it's very -- it's very case

17    dependent.

18    Q    I understand that.    But we're talking about

19    Mr. Robert S.    We're not talking about other cases.    You

20    just said that you would have done a histology had the

21    toxicology come back negative.    Then I gave you a couple

22    of alternatives and you didn't answer those.    So what

23    I'm trying to figure out, what would that histology

24    have -- excuse me -- the toxicology would have had to

25    come back to say before, with Mr. Robert S, you would

864

1    have decided to do a histology and actually look at

2    tissue?

3    A    What -- let me just make sure I have this correctly.

4    What would the toxicology results have to be to sort of

5    trigger me submitting histology?

6    Q    Correct.

7    A    If they were equivocal or only slightly above the

8    lethal range or they detected substances we didn't

9    expect or they detected nothing.  I mean, again, it

10   really is result dependent.

11   Q    That's what I'm trying to figure out.  In this case

12   with Mr. Robert S, what would -- if the results would

13   have come back what, what would have caused you to

14   conduct a histology?

15   A    If they're --

16           MS. TREADWAY:  Judge, this question has been

17   asked several times and she keeps making the same answer

18   and he just won't accept her answer.  Asked and

19   answered.

20           THE COURT:  This is cross-examination.

21   Overruled.  But let's see if we can get to this.  I

22   mean, we're going awfully slow here.

23           MR. WILLIAMSON:  Judge, I don't have any other

24   choice.  I'm going as fast as I can.  I promise.

25   Q    Let's just talk about the actual results that you

865

1   found.  You found that this individual had 1.7

2   micrograms of oxycodone in his blood post-mortem;

3   correct?

4   A   Yes.

5   Q   He also had oxycodone in his blood, 1.9 milligrams;

6   correct?

7   A   Oh, that's in his heart blood.  The 1.9.  Did you

8   say that was oxycodone in his femoral?

9   Q   Yes.

10  A   Okay, yes.

11  Q   And oxycodone in his heart blood of 1.9 micrograms?

12  A   Milligrams.

13  Q   Milligrams.  And Diazepam .012 milligrams; correct?

14  A   No, 0.12.

15  Q   Milligrams; correct?

16  A   Yes.

17  Q   Okay.  Now, 1.7 milligrams is within the therapeutic

18  range of oxycodone for some people; correct?

19  A   Not that I'm aware of, but perhaps.

20  Q   Okay.  The oxycodone, the 1.9 milligrams, that came

21  from the heart blood; correct?

22  A   Right.

23  Q   And those numbers are less reliable than the

24  information that comes from the femoral blood; correct?

25  A   Yes.  The femoral blood is more reliable due to the

866

1    issue of post-mortem redistribution that we discussed

2    yesterday.

3    Q   As you sit here now, what -- with a person that's

4    naive, let's work with that hypothetical, how many

5    oxycodone would they have had to take prior to their

6    passing to reach this 1.7 milligrams?

7    A   First of all, it would depend on the dose; and,

8    secondly, that's really outside my area of expertise.

9    Q   Okay.  But you have to make a decision as to what

10   weight you're going to give this number; correct?

11   A   Yes.

12   Q   Okay.  And, again, making a decision as to what

13   weight you give this number, you need to know this

14   person's history of taking this medication; correct?

15   A   This level is huge.  He died of a -- I mean, it's,

16   it's not consistent with any prescription history that

17   I'm aware of.

18   Q   Okay.  And that's fine; but that's what I'm trying

19   to get at.  So basically if he got to this level he

20   would had to have taken his medicine well beyond the

21   prescribed amount; correct?  Is that fair?

22   A   As far as I know, yes.

23   Q   Okay.  Let's look at -- I believe this would be

24   Patsy L?

25   A   Patsy F or W?

867

```
 1    Q   W.   Just let me know when you're there.
 2              MS. TREADWAY:  She's 5-Q, I'm sorry.
 3    A   I've got it.  I'm sorry, would it be possible for me
 4    to use the ladies' room?
 5              MR. WILLIAMSON:  Yes.  Judge, the witness
 6    needs to take a break.
 7              THE COURT:  Oh, you may.
 8              MR. WILLIAMSON:  Do you want to recess for a
 9    few minutes?
10              THE COURT:  Yes.  We'll recess for five or ten
11    minutes.  Is it Patricia or Patsy?
12              MR. WILLIAMSON:  Patsy, Your Honor.
13              THE COURT:  Go ahead.  You all can take a
14    break, too, if you want.
15                       (Recess.)
16    BY MR. WILLIAMSON:
17    Q   Let's spend a few minutes talking about Ms. Patsy W.
18    First, she was primarily seen by a doctor at the
19    Schneider Clinic named Dr. Simons between '05 and '07;
20    correct?
21    A   I don't know the dates; but she was seen by him,
22    yes.
23    Q   And are you aware that she had been a patient of the
24    clinic since 1999?
25    A   No.
```

1    Q    Okay.  Are you aware that she -- she was a Medicaid

2    patient?

3    A    No.

4    Q    Are you aware that she suffered from general anxiety

5    disorder?

6              THE COURT:  She suffered from what?

7              MR. WILLIAMSON:  General anxiety disorder.

8              THE COURT:  General anxiety disorder.

9    A    No.  I have other medical history but not that

10   particular one.

11   Q    What medical history do you have?

12   A    She has a history of prescription drug abuse;

13   chronic obstructive pulmonary disease; coronary artery

14   disease with previous myocardial infarct; stint

15   placement within coronary arteries; arthritis; and

16   nicotine or cigarette use.

17   Q    Where did you get this drug abuse history from?

18   A    Officer Brown from the Wichita Police Department.

19   Q    And who did he talk to to get that?  Do you know?

20   A    Family members that were present at the residence.

21   Q    And are you aware as to whether or not she was

22   actually taking pain medicine for her rheumatoid

23   arthritis, headaches she would get, she had muscle

24   spasms and some other things that I can't pronounce.

25   Are you aware of that?

869

1    A    I have a prescription that was present at the

2    residence.

3    Q    So let's pause there.  So with Ms. Patsy W, even

4    though she wasn't -- the medicine that was given to her

5    was not prescribed by Dr. Schneider, you had a

6    prescription bottle in this instance.  Correct?

7    A    Yes.

8    Q    So you at least knew before this autopsy occurred

9    that she had prescriptions that you may be interested

10   in?

11   A    Yes.

12   Q    Okay.  Now, you mentioned a prior myocardial

13   infarction.  Do you remember that?

14   A    Yes.

15   Q    Is that a previous heart attack?

16   A    Yes.

17   Q    Okay.  And isn't it true that there was other scars

18   around her heart?

19   A    You mean in the heart muscle?

20   Q    Yes.

21   A    Yes.

22   Q    And isn't it true that scar tissue and fibroid cysts

23   form around healed infarcts?

24   A    Yes.

25   Q    And isn't it also true that the scars around the

```
1    infarcts can generate lethal cardiac arrhythmias?

2    A   Yes.

3    Q   And when you described her lungs you mentioned --

4    tell the jury what that word is empha --

5    A   Emphysematous.

6    Q   Yes.  But you didn't make a mention about any fluid

7    in her lung; correct?

8    A   Fluid?  Is that what you said?

9    Q   Yes.

10   A   No.

11   Q   So there was no fluid in her lungs; correct?

12   A   Well, I mean, other than the usual fluid that's in

13   there.

14   Q   Right.  No additional fluid that -- just no

15   additional fluid in there; correct?

16   A   No.

17   Q   Can you tell the jury how long Ms. Patsy W had been

18   taking oxycodone?

19   A   No.

20   Q   And, again, without -- can you tell them how much

21   she had been taking?

22   A   She had been prescribed 20 milligrams of extended

23   release oxycodone and she was to take one tablet every

24   12 hours.

25   Q   Okay.  And those were the instructions that were on
```

1    her prescription bottle as given by Dr. Simons; correct?

2    A    Yes.   Dated approximately ten days prior to her

3    death.

4    Q    Okay.   And without knowing how long she had been

5    taking that, you don't necessarily know how tolerant

6    that she had become to those medicines; correct?

7    A    She would have been -- if she had been taking this

8    dose for a certain period of time, she would have been

9    tolerant to this dose.

10   Q    Okay.   And the amount that you found --

11   A    Is inconsistent with her prescribed dose.

12   Q    Okay.   And let's talk about these toxicology results

13   for just a moment.   You took toxicology from two places.

14   You took one from the heart and one from the femoral;

15   correct?

16   A    Yes.

17   Q    And, again, we discussed that the heart is more --

18   or less reliable than taking blood from the femoral;

19   correct?

20   A    Yes.

21   Q    The blood from the heart revealed how much

22   oxycodone?

23   A    1.0 milligrams per liter.

24   Q    1.0 or 1.4?

25   A    Oh, from the heart?   I'm sorry.   1.4 from the heart.

1  I was reading the femoral.

2  Q   Okay.  And the 1.0 comes from the femoral; correct?

3  A   Yes.

4  Q   And this will be a high amount in your opinion;

5  correct?

6  A   Yes.

7  Q   And similar to the last person, that if she was

8  taking this medicine as she was told by Dr. Simons,

9  there is no way that her level could get to 1.0.  Is

10  that correct?

11  A   It's inconsistent with the medication as prescribed,

12  yes.

13  Q   Okay.  And since Dr. Schneider isn't the one that

14  saw her I think we'll just move on to the next person.

15  Let's discuss Jeffery H.  Are you there?

16  A   Yes.  I'm sorry.

17  Q   Now, are you aware that Jeffery H was never seen by

18  Dr. Schneider?

19  A   No, I don't have him listed in my records as an

20  attending physician.

21  Q   Who do you have him listed in your records as an

22  attending physician?

23  A   Unknown.

24  Q   And so I guess you wouldn't have had any reason to

25  call Dr. Schneider about Mr. Jeffery H; correct?

1    A    No.

2    Q    Okay.  Now, even though Dr. Schneider didn't see him

3    I think we want to spend just a few minutes discussing

4    this.  Did he have an enlarged heart?

5    A    Mildly.

6    Q    It was 480 grams?

7    A    For his height and weight it's probably mildly

8    enlarged.

9    Q    72.5 inches tall; correct?

10   A    Yes.

11   Q    And his heart should have weighed around 336 grams;

12   correct?

13   A    Depends on what table you're using; but, yeah.

14   Q    Okay.  And, again, having an enlarged heart is

15   significant -- is a significant cause that could lead to

16   sudden cardiac death; correct?

17   A    Yes.

18   Q    And you also found in your autopsy that there was

19   myocardial cell hytrophy (ph).  Correct?

20   A    Hypertrophy --

21   Q    Hypertrophy.  Yes?

22   A    -- is that what you're saying?  Are you looking at

23   the microscopic descriptions?  Is that what you're

24   talking about?

25   Q    Yes.  Under the heart.

874

1    A    Yes.

2    Q    Okay.  Now, you chose to do a histology with

3    Mr. Jeffery H; correct?

4    A    Yes.

5    Q    You also identified the inflammatory infiltrates in

6    his heart again; correct?

7    A    Without the cell degeneration, yes.

8    Q    Now, so he had inflammation of the heart.  Is that

9    fair?

10   A    Yes.  He also had cardiopulmonary arrest and been

11   resuscitated.  So often times there's increased

12   inflammation in the heart without really it being

13   myocarditis.

14   Q    And are you talking about he had this at the time of

15   his death like right preceding his death or at sometime

16   in the past?

17   A    Well, it's my opinion that it's probably just part

18   of the changes associated in his body after he had

19   cardiac arrest and then been resuscitated and then

20   resumed blood flow in his body.

21   Q    And he also had 80% blockage in his left artery;

22   correct?

23   A    Yes.

24   Q    And if this would have been -- if a cardiac doctor

25   would have looked at his condition at the time while he

875

1    was alive, he would have been a candidate for surgery,

2    wouldn't he?

3    A    Or stint placement.  I'm not a cardiologist so I

4    don't treat coronary artery disease.

5    Q    Okay.  Just I guess suffice it to say he had serious

6    cardiac issues that he was living with; correct?

7    A    Yes.  And I listed it as a contributing condition.

8    Q    Okay.  And, again, I'm trying not to be too terribly

9    repetitive so I'm not asking this same question over and

10   over; but, again, there's no test that would help you

11   place one above the other or eliminate one or the other

12   as we talked about earlier; correct?

13   A    What do you mean eliminate one or the other?

14   Q    Your contributing conditions that you keep saying

15   that you made an opinion of?

16   A    No, there's no scientific machine that I can put it

17   in to determine which one it is.

18   Q    It's not -- not just a machine, but a scientific

19   test?

20   A    There's no test.

21   Q    Looking at your history -- when he came into your

22   autopsy room, Mr. Jeffery H, he had evidence of cocaine

23   abuse on his body, didn't he?

24   A    When he came in where?

25   Q    To your autopsy room.  When he was brought there.

876

```
 1    A    He had evidence of cocaine abuse?  Is that what you

 2    said?

 3    Q    Repeat that.  I'm sorry.

 4    A    He had evidence of cocaine abuse?

 5    Q    Yes.

 6    A    Is that what you said?

 7    Q    Yes.

 8    A    On his body?

 9    Q    Yes.

10    A    I'm not seeing what you're referring to.

11    Q    I'm just asking do you recall whether or not he did

12    or didn't?

13    A    When he came from the hospital to my office?

14    Q    Yes.

15    A    No.

16    Q    Are you aware that when he was picked up by the EMS

17    that he had white powdery substance coming from his

18    nose?

19    A    Yes.

20    Q    Did you note that in your autopsy report?

21    A    No.

22    Q    Did that matter as part of your autopsy

23    investigation?

24    A    There are a number of substances that can be crushed

25    and formed to white powder, including many of the
```

1    substances that were detected in his toxicology.

2    Q    Okay.  And are you aware of any prescription that

3    tells a patient that -- of the substances that you

4    found -- that it's okay to crush it up and take it

5    through your nose?

6    A    Not that I'm aware of.

7    Q    In fact, the pamphlet for oxycodone states that you

8    should not crush it; correct?

9    A    I haven't read the prescribing information.

10   Q    And if he was taking it that way, he was taking it

11   inconsistent with the way that whoever prescribed it to

12   him would have instructed; correct?

13   A    I'm not aware of his prescription history.

14   Q    Okay.  All right.  Let's turn to Bradley S.  Just

15   let me know when you're ready.

16   A    Oh, go ahead.  I'm sorry.

17   Q    Okay.  Now, I'm not very -- all right.  Are you

18   aware that this individual was suffering from chronic

19   pain and anxiety?

20   A    Yes.

21   Q    Okay.  Now, you didn't perform a histological exam

22   on Mr. Bradley S, did you?

23   A    No.

24   Q    And did you see any gross anatomical distortions

25   when you first did the internal exam?

878

1    A    He had an enlarged heart and he also had some mild

2    to moderate coronary disease.

3    Q    And his heart was how many grams?

4    A    595.

5    Q    And depending upon the table that you rely on, his

6    heart should have been roughly around 345 grams;

7    correct?

8    A    Depending on the table you rely on, yes.

9    Q    He was 73 inches tall and weighed 241 pounds as

10   well; correct?

11   A    Yes.

12   Q    Okay.  And as we talked about earlier, having an

13   enlarged heart places you at increased risk for sudden

14   cardiac death.  Do you agree?

15   A    Yes.  And I listed it as a contributory condition.

16   Q    Okay.  And the methadone that he had in his system

17   when taken from the femoral blood, which is the more

18   reliable blood, was less than 0.25 milligrams; correct?

19   A    Yes.

20   Q    That is a therapeutic level of methadone in the

21   system, isn't it?

22   A    It can be.  Again, it depends on the dose.

23   Q    Okay.  Do you know what dosages Mr. Bradley S was

24   taking?

25   A    No.  At the time of the investigation, he was not

1    known to us to have been prescribed methadone.

2    Q   Did you check any Schneider Medical records to

3    determine whether or not he had been prescribed

4    methadone?

5    A   I don't recall.

6    Q   Did you check any Schneider Medical records to

7    determine whether or not he was suffering from a chronic

8    pain condition?

9    A   I don't recall.

10   Q   And the amount of hydrocortisone -- or, excuse me --

11   hydrocodone that was found in the femoral blood was .07

12   milligrams.  Correct?

13   A   Yes.

14   Q   And that is a therapeutic level of that prescription

15   medicine, is it not?

16   A   .07?

17   Q   Yes.

18   A   I guess it would depend on the dose.  Not that I'm

19   aware of.  It's pretty elevated.

20   Q   And would it depend on how long the individual had

21   been taking that medication?

22   A   Yes.  We didn't have any -- we didn't find any

23   prescriptions for Hydrocodone at his home.

24   Q   And you did not double check with the clinic to

25   determine whether or not he had been prescribed

880

1    Hydrocodone; correct?

2    A    I don't have any record of that, no.

3    Q    So if he had hydrocodone in his system and it wasn't

4    prescribed by the clinic, where would he have gotten it

5    from?

6    A    Possibly from another physician that we're not aware

7    of.

8    Q    Okay.  Now, that .07, just so we understand, when

9    you see hydrocodone, when does it go from being what you

10   would consider a therapeutic level to an elevated level?

11   A    You mean like what's the magic number?  Is that what

12   you're asking me?

13   Q    Yes?

14   A    There isn't really a magic number.  It depends on

15   the person and if we can get some history.  I mean, you

16   get different blood levels for different dosages.  And

17   so it depends.  If you can't get any history, again, you

18   can't track down anything, especially in individuals who

19   do take chronic pain medication and don't have

20   prescriptions that we can't track down, to a certain

21   extent we assume some naivete.  Not always.  But, I

22   mean, without a prescription history, we don't know

23   where it came from.

24   Q    Right.  So without a history of how much he's been

25   taking or where he's been getting it, you can't place

881

1   any weight on the number itself; correct?

2   A   Other than the fact that it would be additive with

3   all the other central nervous system sedation that he

4   had.

5   Q   But you did not conduct a histology because he had

6   an enlarged heart which is a cardiac issue; correct?

7   A   No, I did not conduct a histology.

8   Q   Because you saw an enlarged heart; correct?

9   A   Yes.

10  Q   And you saw evidence of cardiac disease; correct?

11  A   Yes.

12  Q   You didn't see any evidence of any kind of central

13  nervous depression thing that you were talking about;

14  correct?  That's not why you didn't do the histology.

15  True?

16  A   That's not why I didn't do the histology; but I did

17  see evidence of central nervous system depression.

18  Q   Doesn't the central nervous system get depressed any

19  time that somebody passes away?  It just stops; correct?

20  A   Correct.  Well, there's a difference between sort of

21  a gradual depression and an immediate stand still.

22  Q   And a sudden event would cause an immediate stand

23  still, wouldn't it?

24  A   Yes.

25  Q   And a heart attack would be a sudden event, wouldn't

1    it?

2    A    Yes.

3    Q    And you saw evidence of cardiac issues in this man

4    that supported a heart attack; correct?

5    A    It's possible that he could have had a sudden

6    cardiac death.  There were other findings at autopsy

7    that indicated more, a central nervous system

8    depression.

9    Q    You didn't do the histological exam.  If you had

10   done the histological exam, you could have looked at the

11   heart under a microscope; correct?  Tissue from the

12   heart under a microscope; correct?

13   A    I'm sorry.  I didn't understand the question.

14   Q    Yes.  If you did the histological exam on Mr. Brad

15   S, you could have taken a look at the tissues from the

16   heart under a microscope; correct?

17   A    Yes, that's what the histologic exam is for.

18   Q    And looking at that tissue under the heart, at least

19   after several hours you could have determined whether or

20   not there was any scarring from the heart that would

21   have indicated he had a heart attack; correct?

22   A    No.

23   Q    There wouldn't -- you wouldn't see scarring on the

24   tissue?

25   A    Well, no, but scarring is an old heart attack, not

1    an acute --

2    Q   So what do you look for under a microscope that

3    would give you the indication as to whether or not this

4    individual suffered a heart attack?

5    A   Acutely?

6    Q   Yes.

7    A   Changes that are consistent with acute heart attack.

8    Changes in the cells, blood, inflammation.

9    Q   That's fair.  I'm not a medical doctor so -- the

10   point is if you would have looked under the microscope

11   at the heart tissue with Mr. Brad S, you could have

12   looked to determine whether you saw any changes to the

13   cells that would have been consistent with an acute

14   heart attack.  Correct?

15   A   Yes.

16   Q   And when you did not do that, you cannot rule out

17   the fact that he passed away from a heart attack.  True?

18   A   He died of a drug overdose.

19   Q   I'm not asking what your opinion was.  I'm asking

20   can you, without looking at that heart under the

21   microscope and looking to see whether or not there were

22   cells -- any changes in the cells, you cannot rule out

23   medically that he died from a heart attack.  True?

24   A   I didn't see any evidence.  Usually you would see

25   evidence.

1    Q   That's not my question.  We're talking about the

2    histological exam.  If you would have looked at the --

3    under the microscope at the tissue of the heart under

4    the microscope.  And without doing that and looking to

5    determine whether or not there were changes in the

6    cells -- you could not rule out medically that this man

7    had a heart attack.  Correct?

8    A   That's a lot of sentence with lots of commas.  If I

9    had taken histology --

10   Q   No, ma'am.  My question is very simple.  If you

11   would have placed the heart tissues under a microscope,

12   you could have seen whether or not there were changes

13   consistent with an acute heart attack.  Agreed?

14   A   Not necessarily.  If I didn't sample the correct

15   area.

16   Q   Okay.  So, again, it depends on you doing the

17   correct job; right?

18   A   No.  If what you're saying is only a microscopic and

19   not a grossly visible finding -- meaning if I look at

20   the heart muscle and I don't see anything that looks

21   like a heart attack, then I would take a random sampling

22   of the heart muscle, which may or may not show the

23   changes which you are describing.

24   Q   Okay.  Let me -- let's just back up for a second.

25   Okay.  You saw this man with an enlarged heart; right?

1    A    Yes.

2    Q    And that enlarged heart with the other issues in the

3    heart you saw going on led you not to conduct a

4    histology; correct?

5    A    Yes.

6    Q    So it was sufficient, you had sufficient information

7    to know that something was going on cardiologically with

8    this individual; correct?

9    A    Yes.  And I put it as a contributory --

10   Q    I'm not asking about contributtory.  I'm asking

11   about eliminating.  There is a method utilized by

12   medical examiners and it's a standard with NAME and

13   that's take a histology.  Correct?

14   A    Not if you have an anatomic cause of death.

15   Q    And that's when you don't have a concern about what

16   the cause of death is?  You can just tell; right?

17   A    Right.

18   Q    So before you even got the toxicology back, you had

19   made up your mind that this man had a cardiac death?

20   A    He had significant cardiac disease.  Not death.

21   Q    He had significant cardiac disease.  So we know we

22   have this elephant in the room.  There's this method out

23   there that's available to you and it's taking tissue

24   from hearts to evaluate it.  And you could have taken

25   that tissue, looked at it microscopically and looked to

1    determine whether or not there were changes in the cells

2    that would be consistent with an acute heart attack;

3    correct?

4    A    I could have, yes.

5    Q    Okay.  Now, without you doing that -- you didn't do

6    that.  We've established that.  Right?

7    A    No, I did not.

8    Q    So you don't know whether or not that heart tissue

9    had any changes to the cells consistent with an acute

10   heart attack; correct?

11   A    No, I don't.

12        MR. WILLIAMSON:  Judge, would you like me to

13   keep going for a little bit?

14        THE COURT:  No.

15        MR. WILLIAMSON:  Lunch break.

16        THE COURT:  We're in recess, Ladies and

17   Gentlemen.  About an hour.  Remember and heed the

18   admonition please.

19              (Jury excused from the

20              courtroom)

21        THE COURT:  Robert says you've got somebody

22   else coming in at 1:00.

23        MS. TREADWAY:  Yes, Judge.  With the agreement

24   with the defense we're going to bring in Deborah Johnson

25   who is another medical examiner.  We're going to lose

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

887

1     her if we don't bring her in today because she is

2     leaving for New Zealand.

3                THE COURT:  Good for her.  See you at 1:00.

4                MR. WILLIAMSON:  Thank you, Judge.

5                     (Recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas