IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | District Court |
| vs. | ) | Case Nos. |
| | ) | 07-10234-01, |
| STEPHEN J. SCHNEIDER and | ) | 02 |
| LINDA K. SCHNEIDER, a/k/a | ) | |
| LINDA K. ATTERBURY, d/b/a | ) | Circuit Court |
| SCHNEIDER MEDICAL CLINIC, | ) | Case No. |
| | ) | 10-3281 |
| Defendants. | ) | |

TRANSCRIPT OF PROCEEDINGS

On the 14th day of March, 2008, came on to be heard proceedings in the above-entitled and numbered cause before the MAGISTRATE DON BOSTWICK, Judge of the United States District Court for the District of Kansas, sitting in Wichita, commencing at 1:30 p.m.  Proceedings recorded by digital recording.  Transcript produced by computer.


APPEARANCES:

The plaintiff appeared by and through:
        Ms. Tanya J. Treadway
        Office of United States Attorney
        290 U.S. Courthouse
        444 S.E. Quincy
        Topeka, Kansas  66683-3592
           -and-
        Mr. Alan Metzger
        Office of United States Attorney
        1200 Epic Center
        301 North Main
        Wichita, Kansas  67202

The defendant Stephen Schneider appeared by and through:
        Mr. Lawrence W. Williamson, Jr.
        Williamson Law Firm, LLC
        218 Delaware
        Suite 207
        Kansas City, Missouri 64105

```
The defendant Linda Schneider appeared by and through:
          Mr. Eugene V. Gorokhov
          Eugene V. Gorokhov, PLLC
          1800 Wilson Boulevard
          Arlington, VA   22201
            -and
          Mr. Uzo L. Ohaebosim
          218 Delaware
          Suite 207
          Kansas City, Missouri  64105
            -and-
          Mr. Kevin P. Byers
          Kevin P. Byers Company, L.P.A.
          107 South High Street
          Suite 400
          Columbus, Ohio  43215-3456
```

1           THE COURT:  We have three matters on the afternoon

2    docket.  This is the United States District Court for the

3    District of Kansas criminal docket, March 14, 2008, at 1:30.

4    May I have the appearance for the Government for today's

5    docket?

6           MS. TREADWAY:  May it please the Court, on behalf

7    of the Government for United States v. Schneider, Assistant

8    U.S. Attorneys Tanya J. Treadway and Alan Metzger.

9           THE COURT:  Thank you.  And for defendant Stephen

10   Schneider in 07-10234, counsel, please.

11          MR. WILLIAMSON:  Your Honor, Lawrence Williamson

12   appears on behalf of Dr. Schneider, who also appears in person.

13          THE COURT:  Thank you.  Now, on behalf of Linda K.

14   Schneider, first of all in 07-10234-02-WEB, counsel, please.

15          MR. OHAEBOSIM:  Yes, Ms. Schneider appears in

16   person and through counsel Uzo Ohaebosim, Eugene Gorokhov and

17   Kevin Byers.

18          THE COURT:  All right.  And as I recall, you've

19   all been admitted pro hac vice; is that correct?

20          MR. GOROKHOV:  That's correct, Your Honor.

21          MR. BYERS:  That's correct.

22          THE COURT:  For clarification then, in

23   06-10106-01-MLB, appearance for the defendant Linda Schneider

24   a/k/a Linda Atterbury.

25          MR. OHAEBOSIM:  Will be through Uzo Ohaebosim,

1    Your Honor.

2                    THE COURT:  All right.  Very well.  Let me first

3    of all talk about the procedural matters on the motion.  We set

4    all three of these cases today for appearance and for handling.

5    I note that we have a request in effect as part of the filings

6    from Ms. Atterbury, that we "consolidate the hearing in

7    07-10234 with the probation matters in 06-10106."  Is that

8    correct?

9                    MR. OHAEBOSIM:  That is correct, Your Honor.

10                   THE COURT:  Does the Government have any objection

11   to that procedure?

12                   MS. TREADWAY:  Yes, we do, Judge.  We believe

13   that the bond hearing should proceed first, because if the

14   Court will detain the defendant, we are going to withdraw our

15   motion to revoke in the underlying case because it would be

16   duplicative at this time, and we will just leave that for

17   another day.

18                   THE COURT:  Is there any reason, though, that I

19   need to treat any arguments or any testimony or any proffers in

20   the cases separately as between 07-10234 and 06-10106?

21                   MS. TREADWAY:  I believe some of the proffers

22   would go to both cases, Judge, especially with regards to the

23   threat against me.  However, that's up to the Court.  I

24   certainly think that's efficient.

25                   THE COURT:  All right.  I'm going to call all of

1   'em, and I'm going to consider this a joint record of all

2   purposes without any serious objection from any of the parties.

3           I would note, however, that this is only a

4   "consolidation" of the detention side of the issues.  As

5   counsel knows, in the probation revocation hearing I've an

6   obligation to do two things in connection with Ms. Atterbury:

7   first of all, to tell her she has a right to a probable cause

8   hearing that she can waive and if she does I simply will find

9   there's probable cause, the matter will go on to Judge Belot

10  for his consideration of what, if anything, to do with her

11  conditions of probation.  The second side then is whether or

12  not I would detain or release her pending appearance before

13  Judge Belot on the revocation issue.

14          I can certainly consolidate the probable cause

15  hearing issue and the detention issue for hearing today because

16  those are matters in my jurisdiction, but obviously whatever we

17  do today has no effect on Judge Belot's ultimate decision and

18  ultimate hearing under Rule 32.1 on the probation itself.  So

19  as long as we're clear on that.

20          And also we should be clear that in the event that

21  the defendant is released on any kind of bond, there is no

22  right to any probable cause hearing.  All right?

23          With that being said, we're here basically on the

24  motions of the -- I guess we can say we're here on two sets of

25  motions.  We're here on the motions of the defendants Stephen

1   Schneider and Linda K. Atterbury, Linda Schneider, in 07-10234
2   that I set a bond that allow their release, in the 10106 case
3   we're here basically on a pending motion to revoke.  And I'm
4   assuming that the defendants are asking for the same bond to
5   apply not only in 10234 but also in the revocation case; is
6   that correct?
7                  MR. WILLIAMSON:  That's correct, Your Honor.
8                  THE COURT:  All right.  I'm going to treat these
9   then as the defendants' motions.  I have read the submissions,
10  the brief from the defendants.  I've read the brief from the
11  Government which was filed recently.  I was in the status
12  conference this morning where I heard the counsel for the
13  Government indicate she had just recently -- as a matter of
14  fact, I think today -- delivered to counsel for the defendants
15  copies of recordings taken from telephone calls at the jail.  I
16  note that those, some of the clips of those, are used in the
17  Government's responsive briefs in the case, and I have listened
18  to those.  The Government has also provided me a full copy of
19  those telephone calls in the event should claim that things are
20  taken out of context and I need to hear more than just clips.
21  I have not reviewed the full tapes, but have only reviewed the
22  clips that are identified in the briefs.
23                  I guess one of my first questions from the
24  defendants is I set this matter so we can move it along, but do
25  either of the defendants desire to file a reply brief in light

 1   of the material you've just been provided and in light of the

 2   evidence in the Government's brief?

 3                MR. GOROKHOV:  Your Honor, we do have a motion

 4   today with respect to the -- with the taped testimony from the

 5   jail conversations.  And if I may address that now, I just have

 6   a few points on that.

 7                THE COURT:  All right.

 8                MR. GOROKHOV:  Much of the Government's evidence

 9   in this motion and the previously filed motion for conflict is

10   based on these recordings from the jail.  This is -- comes in

11   without any foundation, and we move to suppress that and any

12   pleading that's based on that because the Government -- it's

13   the Government's obligation to come forward with its foundation

14   as to how the tapes were obtained.  There are several grounds

15   for that.  The first ground is Title III of the Omnibus Crime

16   Control Act.  That's 18 U.S.C. 2510, et seq.  And that Act

17   states that there's only two exceptions to electronic

18   eavesdropping, which even listening to phone conversations and

19   recording phone conversations from jail falls under the Act.

20                The first law enforcement exception, which is that

21   the jail is doing it in the regular course of its duties, for

22   safety and security.  The second is the consent exception

23   whereby defendants consent to the taping.  We have had no

24   evidence that either of these exceptions are met in this case,

25   and we believe it's the Government's burden to come forward

1  with the foundation that this evidence is, in fact, valid.

2          Now, the reason for Title III is that, you know,

3  it's intended to protect people's constitutional rights.  Our

4  clients are federal pretrial detainees, and they are -- they do

5  retain their Fourth and Sixth Amendment rights under the

6  Constitution.

7          Here we know from the tapes, we know, that there

8  has been a Sixth Amendment violation.  Just to give the Court

9  an example, I would point to page 22 of the Government's brief

10  regarding the defendant's discussions of the decision whether

11  or not to have their previous counsel file a motion for bond.

12  Those are decisions that go directly to the heart of the Sixth

13  Amendment.  Those are strategies about the defense.  Those are

14  decisions as to the counsel of choice.  Those are things that

15  are not supposed to be in the hands of the Government, let

16  alone the press, as has occurred in this case.  This is a gross

17  violation, and we would ask the Court to allow us to conduct

18  discovery so we can find out just the extent of the violation.

19          The second point is that there's been a First

20  Amendment violation in this case.  The defendants have

21  conferred with PRN, which Judge Brown characterized this

22  morning as a, I believe -- and I don't want to butcher what he

23  said, but the effect of it was is that it's a political

24  organization that wants to change policy and change the law.

25  This is the United States of America.  The defendants have a

1   right to confer with such organizations and that right is

2   protected by the First Amendment and the right of expressive

3   association.  This right in this case has been chilled by the

4   listening of these tapes by the Government, by the publication

5   of these tapes in the press.

6            Now, there's a second question.  How did the

7   Government get these tapes?  Just because the jail conducts

8   monitoring does not mean that the Government is entitled to go

9   to the jail and say, "Hand over everything so that we can

10  conduct a fishing expedition as to what the defendants are

11  discussing."  We need to have discovery and we need to have a

12  full hearing as to how those tapes were obtained and the

13  circumstances under which the jail handed them over to the

14  Government.

15           Finally, Your Honor, we would just say that

16  regardless of the Court's decision on this point and regardless

17  of the decision on bail, we would still like a hearing on this

18  point as to how these tapes were obtained.

19           Your Honor, I think that's all I have.  Those are

20  my brief points, and if I could have rebuttal.  Thank you, Your

21  Honor.

22           THE COURT:  All right.  Mr. Williamson, I take it

23  you join in that motion?

24           MR. WILLIAMSON:  That's correct, Your Honor.  And

25  I would just add that we would, regardless of how the Court

 1    treats the substantive issue as to the tapes, we would like to

 2    have an issue addressed on the bond today for a recent order,

 3    for a coming order.

 4              THE COURT:  You mean you don't want to hold up my

 5    decision on bond waiting on decision on the tapes?

 6              MR. WILLIAMSON:  That's correct, Your Honor.

 7              THE COURT:  I'll decide what my timing is going to

 8    be on the issues that are before us, but I want to go ahead and

 9    hear -- I'll hear some rebuttal from the Government.  Before I

10    do that, let me say that I think it's clear in the law that,

11    first of all, this is not a place, this being the magistrate

12    court in a detention hearing, is not a place to conduct

13    discovery in a criminal case, and the motions to suppress are

14    not appropriate to be considered in connection with detention

15    issues, and I've ruled on those matters before in the Kaufman

16    case.  And you can look those up if you'd like, and I will also

17    look them up as I need to rule on these matters.  So that's a

18    little bit beyond where we are.

19              Second of all, the detention hearing issues that

20    are before me are not bound by strict evidentiary guidelines

21    and, as the Court knows -- or as you know, that means that the

22    Federal Rules of Criminal Procedure do not necessarily apply

23    and gives the Court leeway on what to consider.  That doesn't

24    mention Title III and I understand that, and you've not

25    mentioned the rules, but with that amount of background I want

1   to hear what the Government has to say about the oral motion

2   that I've now heard.

3          MS. TREADWAY:   Well, Judge, basically the

4   Government's position is that it's without merit.  Both the law

5   enforcement exception and the consent exception apply in this

6   case because, in fact, it is a regular course of business for

7   the Butler County jail, as it is with all places where federal

8   detainees are held and federal defendants are held to monitor

9   all telephone conversations.  Therefore, it fits within the law

10  enforcement exception of Article III eavesdropping.

11          Second of all, the defendants consented for their

12  calls to be recorded.  At the beginning of every single call

13  they are told they're going to be recorded.  They talk about

14  being recorded on the telephone calls, and they talk in code,

15  which we discussed with the judge in our briefing.  So they

16  well knew they were being monitored.  So by continuing to talk

17  about these issues, they consented.

18          There has been no Sixth Amendment violation,

19  Judge, because the conversations that are monitored are not

20  conversations between the defense and their counsel.  In fact,

21  the only phone calls that are monitored are particular phone

22  numbers, and those particular phone numbers were to family

23  members.  Most of these phone calls were phone calls with

24  defendant Linda Atterbury-Schneider's sister Pat Hatcher.

25  She's not an attorney.  To the extent that these conversations

3-14-08  USA v. SCHNEIDER  07-10234-01, 02                    12

1    occurred with Ms. Reynolds, which they occasionally did on

2    Ms. Hatcher's phone, she's also not an attorney.  Although she

3    may be acting in the capacity of attorney, against Kansas law,

4    that doesn't make her an attorney, and there's no Sixth

5    Amendment violation.

6            There's also no First Amendment violation.  We've

7    not kept them from talking.  Therefore, this evidence is

8    absolutely admissible in this case.  You can have hearsay,

9    proffer, any amount of evidence before you for purposes of

10   detention, Judge, and the motion is simply without merit.

11           THE COURT:  All right.  I'll hear your rebuttal.

12           MR. GOROKHOV:  Yes, sir.  Thank you, Your Honor.

13   Regardless of the rules of evidence, I would just say that the

14   Sixth Amendment and First Amendment still apply.  As pretrial

15   detainees they're still entitled to their rights under the

16   Sixth Amendment.  The situation here is the defendants are

17   incarcerated.  They need family members to go out and interview

18   attorneys, find out who the attorneys who are going to

19   represent them are, make the necessary arrangements, discuss

20   strategic points that need to be relayed to the attorneys or to

21   the potential attorneys.  All of this is implicated in the

22   Sixth Amendment.  The Sixth Amendment is -- also involves the

23   issue of counsel of choice, and the Government here has exposed

24   these discussions, and the exposure of such discussions have a

25   chilling effect on the defendants' exercise of their Sixth

1   Amendment rights.

2           Similarly with respect to the First Amendment, the

3   Government's actions undoubtedly chill the First Amendment

4   rights of our clients, the right of our clients to seek help

5   and to talk to political organizations.  These things were

6   indiscriminately placed into the public record by the

7   Government.  This has a chilling effect on their rights to do

8   so, and the case of the -- the Supreme Court case of White v.

9   Lee -- and I apologize, I don't have the cite offhand.

10           THE COURT:  All right.

11           MR. GOROKHOV:  -- states that this type of conduct

12   by the Government, intimidation, publication, legal actions and

13   so forth can have a chilling effect on the express association

14   right.

15           So, Your Honor, those are my points on rebuttal.

16           THE COURT:  All right.  Let me ask, when you talk

17   about chilling your Sixth Amendment rights, obviously they

18   obtained counsel.  You're all here.  What chilling effect has

19   it had?  What can you give me in terms of concrete chilled

20   advice or chilling effect of the taping, now that you all have

21   counsel, you're all here, none of your conversations have been

22   taped?  What's the chilling?

23           MR. GOROKHOV:  Well, Your Honor, the very fact of

24   the taping itself and the subsequent exposure causes them in

25   the future, for example, if we were to be changed, if other

1    counsel were to come in, just as an example, the defendants

2    would then say, oh, my God, everything I say over the phone is

3    not only going to go in public filings but is going to be

4    publicized by the newspapers, everything I say about wanting to

5    fire an attorney, wanting to hire an attorney.  Some of these

6    decisions, especially under these circumstances, have to go

7    through family members.  So that's just one example of how that

8    chills their right.

9            The second example is that these family members,

10   to some degree, are by necessity, at least at the inception of

11   the case, were by necessity our agents.  We, the attorneys,

12   needed to communicate vital information about early -- you

13   know, early-on strategy that is in the -- that is, in fact, in

14   the filings I mentioned on page 22, where the defendants didn't

15   want their court-appointed counsel, for strategic reasons, not

16   to file another bond motion because they wanted other attorneys

17   to file a bond motion.  That's a strategic decision that's been

18   exposed, just wide open for the public.

19           THE COURT:  Do you know that if the family members

20   had gone to the jail and met privately with these defendants in

21   a conference room, whether that conference would have been

22   recorded?

23           MR. GOROKHOV:  Your Honor, it --

24           THE COURT:  Do you know?  Do you know?

25           MR. GOROKHOV:  I do not know, Your Honor.

1              THE COURT:  Okay.  Let me turn to the Government.

2    Let me ask the Government.  If a family member had gone to the

3    Butler County jail and met in a visitation room with these

4    parties, would that tape -- would that have been taped?

5              MS. TREADWAY:  No, judge.

6              THE COURT:  Why couldn't they have gone to the

7    jail to discuss those items with them then and preserved any of

8    these chilling effects that you have here?

9              MR. GOROKHOV:  Your Honor, because I don't believe

10   that the family can conduct this type of legal analysis.  I

11   mean, this is a fine point of law.  This is a very -- I believe

12   it's a fine distinction, but I don't believe that lay persons

13   have the ability to make that distinction.

14             THE COURT:  I guess I don't understand.  They

15   could have gone to the jail.  Lawyers could have gone to the

16   jail.  Those discussions would not have been taped.  So the

17   discussions could have been full, free, about whether I want to

18   hire you, whether I don't want to hire you, whether I want to

19   strategy or no strategy, and that could have been done.  But it

20   wasn't done; it was done over the telephone on a consistent and

21   regular basis with people that knew that the discussions they

22   were having were being taped, because that was clearly made

23   obvious to them.  And in the tapes itself Dr. Schneider admits,

24   "We've got to watch it, this is being taped."  So what I'm

25   asking you is there was a way to prevent this problem and to

1    prevent your alleged chilling, your clients chose not to do it.

2            Now, I want to know how, then, this is really

3    affecting --

4            MR. GOROKHOV:  Well, Your Honor --

5            MR. WILLIAMSON:  The --

6            THE COURT:  Let me -- hold up a minute.

7            MR. GOROKHOV:  I believe that forcing the

8    defendants to go to the jail, I believe -- I'm sorry, the

9    defendant's family, and as the Court knows, several of the

10   attorneys here are out of city and out of state, it's

11   impracticable, it who believes the defense to the point where

12   nothing can get accomplished.

13           THE COURT:  Well, none of you were there.  None of

14   these conversations had anything to do with you.  I'm talking

15   about the family members again.

16           There were relationships, there were things said

17   about you, but none of these were yours, and so where you are

18   doesn't make any difference.

19           MR. GOROKHOV:  Well, Your Honor, I would make the

20   point that whether or not it's true that the jail tapes phone

21   conversations and not meetings, private meetings, it's my

22   belief -- and I can verify this for the Court -- but it's my

23   belief that the family members were operating under the

24   assumption that everything was being listened to.

25           THE COURT:  All right.  Mr. Williamson, you wanted

1   to join in on that?

2          MR. WILLIAMSON:  One comment, Judge, a couple of

3   points.  One, it's my understanding that the conversations

4   between family members and inmates when they come to the jail,

5   they are recorded.  They talk on the telephone.  They have to

6   pick up the phone through the glass, and when they pick up the

7   phone they have the same notice that is given when they dial

8   out to talk.  You have the same notice that it's being

9   discussed.

10          And I think that the chilling effect is extremely

11   critical in this type of case.  You have three attorneys who

12   are not in the Wichita area.  There are times when we may be

13   reviewing documents, and as long as our clients are

14   incarcerated -- and I'll discuss this later in the bond

15   motion -- but we will have to be able to communicate with

16   family members who they can ask we need you to get you this, we

17   need you to get that.  We may not know directly where that is.

18   They may have to call Dr. Schneider or Linda and say the

19   attorneys are asking for this document and I need to know where

20   to go get it, and it may be discussed as to why that document

21   was being requested.  And especially in the situation that

22   they're recorded either on the visit or if they're being

23   recorded on the telephone, how can they prepare a meaningful

24   defense to these charges that are placed against them so long

25   as the Government can dip into their thoughts, our thoughts,

1    and already have a leg up.

2              And I'll talk a little bit more about it, but

3    we're already behind.  They started this case in 2005, we

4    entered in 2008.  We need our clients' help, but while they're

5    in we need to know that access is free.

6              I would -- I would --

7              THE COURT:  Well, you would agree that they

8    selected you, knowing you lived in Kansas City?

9              MR. WILLIAMSON:  Absolutely.

10             THE COURT:  So they knew when they selected

11   counsel that this was a problem they were going to face.

12             MR. WILLIAMSON:  No, absolutely not.  This is --

13   this is the key.  Two things, one, the Sixth Amendment doesn't

14   have a geographical limitation on it.

15             THE COURT:  Right.

16             MR. WILLIAMSON:  You can get whatever attorney you

17   want, wherever they are, and you should not be punished because

18   you felt like you needed to go outside of the Wichita

19   community.  That's one.

20             THE COURT:  Right.

21             MR. WILLIAMSON:  Two, I would grant that arguably

22   the exceptions to Title III apply.  They're locked up and they

23   have to give these consents arguably, just for the purpose of

24   this.  However, when you -- when you take -- (A) they don't

25   have a choice, they have to communicate, and then the big point

3-14-08 USA v. SCHNEIDER 07-10234-01, 02

19

1    is, okay, they're being communicated, we know it it's being

2    monitored.  Why is it being monitored?  What is the policy

3    behind that?  They want to make sure inmates aren't planning

4    escapes, that they're not putting hits out on people, that

5    they're not doing criminal activity.  When was the policy ever

6    designed to give the Government free access to conversations

7    between them and family members who may have to relay that

8    communication?

9              That's my problem with everything.  If the

10   Government wanted to subpoena, wanted to go get a warrant like

11   they should and stop eroding our privacy rights, then let them

12   do that.  But just because these two are actually incarcerated,

13   it behooves me that the state of the law would allow the

14   federal government to just go in and listen to whatever they

15   want, when they want, even if it has to do with counsel.

16             And I would just say that if that is the state of

17   the law, it needs to change.  And we have to start somewhere.

18             THE COURT:  Well, you're making a good speech, and

19   I agree with a lot of what you're saying, but let me ask you,

20   how is the jail supposed to decide which conversation it

21   decides to tape as to whether or not they may be talking about

22   going to Mexico, whether they may be talking about us?  Do they

23   listen to it, tape it, and then destroy it?  Do they -- what do

24   they do?  You're asking -- you're asking after the fact for

25   them to have only done ones that are going to be law

 1    enforcement-related, which you admit is a valid exception to

 2    Title III.  But how are we going to know that unless they tape

 3    all of those and the parties know they're taped?

 4              MR. WILLIAMSON:  As long as they do it

 5    indiscriminately, they can tape all of them.  They can tape

 6    every conversation.  That's not my problem.  My problem is not

 7    the jail enforcing their regulations and taping conversations.

 8    My problem is is how are those conversations going from the

 9    jail to the federal government, a federal agency who is not

10    running the jail, and there's some Ninth Circuit case law that

11    says there is a distinction between a state-run facility in a

12    pretrial process and a posttrial.

13              And, you know, honestly, the way to solve this

14    whole problem, Judge, is to grant our motion.  You let them

15    out, the Government has no right to listen to any conversation

16    that they have, and they can be free to strategize, talk to

17    family, express things, and those type of things.

18              So the answer is you -- you look at it, but if you

19    release it, you have to release it for a valid purpose.  You

20    cannot just go give the Government, hey, you may like this,

21    this is juicy, you may like this.  You can't do that.  You

22    need -- I don't have the law to say you can't, but I think

23    that's the question --

24              THE COURT:  It would help a lot if you had some

25    law to help me.  I thought you had a Ninth Circuit case that

1    dealt with this issue.

2                 MR. WILLIAMSON:  I have a Ninth Circuit case that

3    deals with the distinction between pretrial detainees who are

4    kept in state facilities and posttrial, people who have been

5    found -- convicted who are in federal prisons.  I have to do a

6    little more research to hit the fine point.

7                 THE COURT:  I would, too.  Because when I remand

8    somebody to custody, I don't remand them to the custody of the

9    Butler County officials; I remand them to the custody of the

10   United States Marshal.  The United States Marshal makes the

11   agreements for housing for those people under a contract and

12   arrangement that's satisfactory to the marshal.  So it seems to

13   me that, at least without any other law to go contrary to,

14   they're in the custody of the United States Marshal and the

15   marshal has a right to have access to all of those.

16                 Now, whether from the marshal to the Government,

17   to an attorney, is another matter, but between the state and

18   the federal government, unless you can show me something pretty

19   strong I'm going to say they're in the custody of the

20   United States Marshal and he's got the right to do that.

21                 MR. WILLIAMSON:  I know there's a distinction.  I

22   don't know the context as to the conclusion of that distinction

23   as far as did it make a difference to the holding of the case.

24   The Ninth Circuit did take a point to discuss that, hey, there

25   is a difference between a pretrial detainee federal in a state

1    facility on pretrial detainee.

2              THE COURT:  Not to make light of this, but you do

3    realize that the Ninth Circuit is the most-reversed circuit in

4    the United States for the cases that are taken before the

5    United States Supreme Court?

6              MR. WILLIAMSON:  Well, Judge, I guess my brief

7    response would be they only get reversed by the Supreme Court,

8    and I don't particularly always agree with them either.

9              THE COURT:  Well, Tenth Circuit doesn't always

10   agree with either one of us, so I guess we all have our right

11   to disagree.

12             MR. WILLIAMSON:  Judge, I think just for the

13   purposes of today, I think it is an important question and we

14   need to get answered at some point.  I don't think that the

15   tapes that they actually produce have any bearing as to whether

16   or not the defendants are a flight risk or a danger to the

17   community, and so that's why I would just revert to my original

18   position.  We still want to address the bond issue.  And we

19   need to figure out what's going on with how these tapes are

20   getting from state facilities, marshals who are one branch of

21   the government, to the prosecutor.  And, you know, I just --

22   it's just I would like to do that as well.

23             THE COURT:  Okay.  Well, you may be able to do

24   that or you may not, but that's a matter I think that's not

25   going to happen here in front of U.S. magistrate; it's

1   something that Judge Belot will have to take up at an

2   appropriate time.  Because, as I said, this is not a ground --

3   this is not a place for discovery.  Courts have said that

4   before, and that these detention hearings are not a place for

5   you to engage in the discovery that will be provided to you and

6   allowed to you under Rule 16 and under the guidelines of the

7   district court.

8            Okay.  I'm going to take that motion under

9   advisement for now and ask then how you wish to proceed today

10  on any additional arguments in connection with detention.

11  We'll start with Mr. Williamson, since Mr. Schneider is the

12  first named defendant.

13            MR. WILLIAMSON:  Okay.  Your Honor, I think the

14  procedure we would like, I'm not going to call any witnesses.

15  I believe Ms. Atterbury-Schneider may call a witness or two.

16  I'm not for certain.  I believe we can address the evidence

17  through a proffer.  Also I would suggest that -- I guess I

18  would suggest to let me proffer.  I guess the Government can

19  respond to that.  I can reply, table that, and then address

20  Ms. Atterbury-Schneider's motion.

21            THE COURT:  All right.  I'll be happy to hear your

22  proffer then.

23            MR. WILLIAMSON:  Stand here, Your Honor?

24            THE COURT:  You may.

25            MR. WILLIAMSON:  Sometimes I like to move around.

1           THE COURT:  You might kind of move the mic just a
2    little bit closer to you.  Are we picking up okay?  I think
3    everybody's got a pretty good voice.
4           MR. WILLIAMSON:  Try and speak up a little bit.
5           THE COURT:  All right.
6           MR. WILLIAMSON:  Judge, we made a motion to reopen
7    this bond hearing, and I'm sure the Court's aware of the
8    standard under 3412(f), that we basically need to show there's
9    been a change in circumstances that have a direct bearing on
10   the Court's consideration.
11          In the previous hearing, on December 21st, this
12   court made a determination that Dr. Schneider should be
13   remanded in custody without any bond because he -- your primary
14   concern was that he was -- could possibly be a danger to the
15   community.
16          There has been one, one major, happening since
17   that time, is that the state board -- and I believe I attached
18   an exhibit to my motion.
19          THE COURT:  You did.
20          MR. WILLIAMSON:  The state board has temporarily
21   suspended Dr. Schneider's license.  And if you look at the
22   order, it was pretty clear in that order that doctor -- that
23   the board specifically made that decision based on your ruling
24   on December 21st.  In fact, they quoted a paragraph in regards
25   to the safety issue in that order, saying, look, Judge Bostwick

1    identified this, we need -- you know, it's our job to enforce

2    the safety.  So we're going to make this decision.

3            Your concern at that point in time, Your Honor,

4    was, well, it's possible that Dr. Schneider could attempt to

5    practice medicine through another doctor at the clinic.  I

6    noted in my memorandum that the defendant was troubled by that,

7    and not because of a lack of analysis from the Court, but it

8    seemed that you gave the defendants' argument a little more

9    weight than we believe should have been granted.

10            THE COURT:  You mean the Government's argument?

11            MR. WILLIAMSON:  The Government's, yes.

12            THE COURT:  All right.

13            MR. WILLIAMSON:  Nonetheless, at this point in

14    time it's moot because the clinic is closed, there's nobody

15    willing to assume responsibility for the clinic.

16    Dr. Schneider's license has been suspended.  He does -- his DEA

17    number has been discontinued or terminated.  And I picked up a

18    letter at my office, and if you would like a copy, may I

19    approach, Your Honor?

20            THE COURT:  You may.  Hand it to my clerk, would

21    you, please.

22            Would you like it marked as an exhibit?

23            MR. WILLIAMSON:  Please.

24            THE COURT:  Make it Defendant's Exhibit A.  And I

25    note for the record that you've handed a copy to counsel for

1    the Government.

2              You may proceed.

3              MR. WILLIAMSON:  Do I need to move to admit, since

4    we're not proceeding under the order --

5              THE COURT:  It's not the rule or guidelines.  I'll

6    ask the Government if you have any objection to this.

7              MS. TREADWAY:   No, judge.

8              THE COURT:  Okay, Exhibit 1 will be admitted.

9              MR. WILLIAMSON:  Exhibit A is a letter from the

10   DEA dated March 4th, 2008.  And it states that Dr. Schneider's

11   registration for his DEA number has been terminated, and that's

12   at the second paragraph, the first full -- or the second

13   sentence where it says, "Accordingly, his current registration

14   is considered to be terminated" unless Dr. Schneider takes a

15   couple of steps, which I would proffer to the Court he does not

16   intend on taking.

17             So we have a situation where Dr. Schneider cannot

18   practice medicine in any way, shape, form or fashion,

19   nonetheless the Government wants to argue, well, he still may

20   be able to somehow magically prescribe something to one of his

21   former patients.  I would just proffer that, hey, any doctor in

22   this state who would even go along with such should be sitting

23   at this table and not my client.  That's, first of all.

24             Second of all, there has never been an allegation

25   that anywhere in the indictment that stated that Dr. Schneider

1    attempted to prescribe medicine outside the practice.  And I

2    cited just an example in the indictment where their

3    complaint -- or the Government is complaining that he's

4    prescribing in the course of treatment.  It's just too much,

5    and we disagree.  I think that fight is for another day, but

6    nonetheless as we're standing here right now I think that goes

7    to the weight, weight of evidence, and it also goes to this

8    Court's concern in regards to safety.

9             And there -- I think the bigger point is is that

10   in order for the Court to find that he still should be

11   incarcerated because of safety concerns, this court has to

12   articulate why the conditions would not be sufficient to cover.

13   There is no way for him to prescribe anything to anybody.  He

14   can't write it.  He can't recommend it.  There is nobody at the

15   clinic.  It's closed.  So there's nothing that can happen

16   because of that.

17            THE COURT:  And are those steps being taken to

18   reopen the clinic?

19            MR. WILLIAMSON:  No, they are not.  Let me make

20   sure, just for full disclosure purposes, PRN made an attempt to

21   reverse the decision of the state agency in temporarily

22   suspending Dr. Schneider's license.  As I understand it, the

23   purpose of that was so that there could be a doctor there who

24   would continue to treat patients that need -- had a legitimate

25   medical need.  That attempt failed in state court, and that

1  attempt failed in federal court.  And it is not -- there are no

2  plans to move for Dr. Schneider to re -- to have his license

3  reinstated.

4           THE COURT:  All right.

5           MR. WILLIAMSON:  Even if it did happen later,

6  Judge, the case law is clear that the court can reconsider bond

7  at any point in time, so if it ever became apparent to the

8  Court or a concern as to whether or not circumstances have

9  changed and now he's a threat to the community, then the court

10  can take that up at that time.

11           So, again, without any means or methods to

12  prescribe anything, the whole danger is just thrown out of the

13  window because that is the only possible threatening type of

14  conduct that has been alleged in the indictment.

15           Before I move on -- and that's the reason why we

16  believe that reopening this is appropriate.  And before I move

17  on, I don't want it to be lost upon this court that everybody

18  sitting in this room is innocent of any crime that they're

19  charged of, and that is a presumption that the founders of this

20  country provided us.  If you look around the room, there are

21  two people suited in orange jumpsuits.  You look around the

22  room, there are two people who are shackled at the legs.  But

23  if you look around the room we're all otherwise innocent, and

24  how -- how can you be innocent yet shackled and walking in the

25  courtroom as if you've already been convicted of a crime?

1          This court, its job is to say I'm going to protect

2     the rights of the defendants and make sure they get a fair

3     trial.  And I have researched a lot of your past rulings on

4     bond, and we've had many experiences, and I know that this

5     court is a court that is concerned about protecting the rights

6     of our citizens.  And as long as they sit here innocent, they

7     need to be treated that way, and right now they're not.

8          And with that presumption in mind, the Government

9     needs to overcome it and say why they need to be here.  And

10    let's just call this case what it is.  It is a white-collar

11    criminal case where there are some allegations that within the

12    medical practice Dr. Schneider prescribed too much medicine and

13    they're saying that the wife knew about it, so there's some

14    grand conspiracy.

15         Well, I discussed in a few pages, without trying

16    to give all of our defense, that the weight of this evidence

17    that they presented is very lacking in that they allege that

18    some norms were violated.  They alleged that too much was

19    given.  Too much for what?  They don't give the Court any

20    information as to what quantity of pills should have been

21    provided, what is the length of time that the quantity of pills

22    happened.  They don't go into details of the actual autopsy.

23    And this Court found that that fact was neutral at the last

24    hearing, but if you take a look at the actual indictment, those

25    factors weigh in favor of releasing Dr. Schneider and also

1    Linda Atterbury.

2              Let's talk about what you don't see in there, in

3    the indictment, Judge.  You don't see any allegations of

4    undercover agents going in able to buy drugs without a --

5    professing a legal medical need.  You don't see any kind of

6    exchanges of sex for drugs.  You don't see any allegations of

7    Dr. Schneider, outside of the medical practice, writing

8    prescriptions under the table for (inaudible) of people.  You

9    don't see things that would be traditionally covered under this

10   act and which may give the court cause for concern.  With that

11   we say that the weight of evidence falls in favor of releasing

12   Dr. Schneider.

13             The next part that you have to look at is the

14   flight, flight risk, what flight risk is Dr. Schneider.  Well,

15   how do you determine what somebody's future conduct may be

16   other than by looking at what their past conduct might be?

17   Well, if you take a look, what happened in this case there was

18   a search warrant or a raid on the Schneider Clinic in 2005.

19   2005.  They were arrested December 2007.  For two whole years

20   these two individuals could have absconded, gone anywhere

21   around this country and never be seen again.  They could have

22   done it.  They had the choice.  There were no restrictions on

23   'em.  There was no electronic monitoring.  There was no "You

24   better stay here or else."  There was nothing.  And they

25   didn't.  They participated.  Linda Atterbury went in and

 1    actually met with federal agents.  Dr. Schneider, I believe --

 2    Dr. Schneider also met with federal agents during this time.

 3              How do we tell citizens we want you to help your

 4    federal government when we're investigating, and if you're

 5    innocent, come talk to us.  And you see it all the time, Judge.

 6    They don't want people invoking their rights for lawyers

 7    because they're not going to say anything 'cause we're going to

 8    tell 'em not to talk.  They didn't go get a lawyer to say not

 9    to talk; they talked.  And, nonetheless, they talked and we're

10    going to charge you and we don't want you to get out.  We're

11    just going to charge you and make you sit in jail all this

12    amount of time.

13              If they wanted to go, they could have gone.  So --

14    and that's one of the factors that the Court is supposed to

15    look at is more of the have they been to court, but there was

16    not a court proceeding, but if they were guilty and they knew

17    that, you know, charges may be looming and that the federal

18    agents had been in our building, we better go.  They could have

19    done that.  And I'm sure the Court has seen situations where

20    people have done that before.

21              The Government's response is, well, they didn't

22    know that government charges were coming, and they didn't know

23    that they were facing time in jail.  Well, while it may be an

24    argument, it's an argument that has no merit.  I mean, you --

25    if you are doing something wrong and you know that you've been

1   raided, according to the Government they know that this was a

2   conspiracy, you're going to leave.  They could have left.  They

3   don't have to be facing actual charges right then and there.

4   They could have taken their whole family and left.  They chose

5   not to do that.

6          We also make a point in our motion discussing,

7   there are, I believe, close to $2 million worth of assets

8   seized right now.  And we're talking about bond.  Bond is

9   designed to give the defendants some kind of motivation to come

10  to court or risk losing your assets or the things that -- the

11  things that you want, money particularly.

12         Well, if they leave, the assets are already

13  seized.  If they leave, they can't get those assets back.  And

14  the only way they can get those assets back is if they sit

15  here, fight these charges, prove that they're innocent, and

16  then they can move to get these assets back.  That's the only

17  way they get it back.  And, you know, so the Government's

18  argument that there's no authority that that money will be

19  given away if they run, I think, is lacking in merit as well.

20  Because how can they get it back if they leave?  They lose it.

21         And then we have a lack of access to a lot of --

22  to cash to live on, and the Government wants to say, well, they

23  have a house in Mexico.  Well, I would submit, Your Honor, if

24  I'm going to run, I'm not going to the house that the

25  Government knows about in Mexico.  You don't do that.  And the

1    chuckle is sometimes what I feel when I read some of these

2    arguments, because, come on, if you're going to leave, you're

3    going to go where nobody knows where you are.

4              THE COURT:  Or you may go somewhere where you've

5    read the treaty and you know you can't be extradited.

6              MR. WILLIAMSON:  They will go get Dog the Bounty

7    Hunter.  He will go get them.  They won't go to jail in Mexico.

8              THE COURT:  All right.

9              MR. WILLIAMSON:  And so, you know, they know where

10   they are, and, you know, Your Honor, even with that, with those

11   two points, I think the arguments that the Government provided

12   was, well, we got an envelope in the jail that said, "Be on the

13   beach in no time," that was sent from Dr. Schneider to Linda

14   Schneider.  And I would just proffer -- give me one second,

15   Your Honor.

16              (Brief pause.)

17              MR. WILLIAMSON:  I don't have -- I have one copy.

18   I think this was filed by the Government.  Do you have a copy?

19              THE COURT:  If it was filed I have a copy.

20              MS. TREADWAY:   It's Exhibit 2 to the Government's

21   motion, Judge.

22              THE COURT:  All right.  For the record, that's

23   Exhibit 2 to the Government's motion response, which is

24   Document 45 in the record.

25              MR. WILLIAMSON:  I don't have copies of these, and

1    I can make 'em for the Court.

2              THE COURT:  Hand 'em first to the prosecutor, let

3    her see what they are, and then you can hand 'em up.  If you

4    want to go ahead and before you hand 'em up and tell me what

5    they are, you're free to do so, or if you want to wait until

6    she --

7              MR. WILLIAMSON:  I'm going to wait, Your Honor,

8    'cause I'm going to use them as demonstrative evidence for when

9    I make the next argument.

10             THE COURT:  Shall we mark those also?  I don't

11   know that we know what we're referring --

12             MR. WILLIAMSON:   Yeah, let's please do, Your

13   Honor.

14             (Brief pause.)

15             THE COURT:  All right.  These will be Defendant's

16   Exhibits B, C and D.

17             MR. WILLIAMSON:  Your Honor, just taking a look at

18   B, C and D, do you mind if I look at 'em so I can just describe

19   them?

20             THE COURT:  No, let me give them back to you so

21   you can identify them what they are.  You might show them also

22   to the Government quickly.

23             MS. TREADWAY:   I've seen them, Judge.

24             THE COURT:  I didn't know whether you wanted the

25   numbers off of them.  I don't know that it will make a lot of

1    difference which letter is which.

2            MR. WILLIAMSON:  And for the record, Your Honor,

3    Exhibit B is a picture of a Tweety Bird with a caption at the

4    bottom that states, "You got my heart, Tweety."  Exhibit C is

5    an original color copy of the envelope that's Exhibit 2 to the

6    Government.  And Exhibit D is a picture with Winnie the Pooh,

7    Tigger, I can't remember the other cartoon character, Your

8    Honor.  It's been awhile, but with the --

9            MR. GOROKHOV:  Eeyore.

10           MR. WILLIAMSON:  -- Eeyore and Piglet.

11           THE COURT:  Somebody's been reading to their kids.

12           MR. GOROKHOV:  Being read to, Your Honor.

13           MR. WILLIAMSON:  Judge, the significance of these

14   three exhibits, what you have, and this is a proffer, is that

15   there's an inmate in the Butler County jail who draws on

16   envelopes, on the outside of envelopes, who puts cartoon

17   characters, and he, without any influence from any -- from

18   anybody else, he just draws and he puts certain information on

19   the envelope.

20           Now, if you take a look at it, what you will see

21   is that the caption talks about the picture.  The Tweety Bird,

22   Tweety is sitting on the lawn with a mai tai as if he's sitting

23   in a -- on a beach and thinking he'll be on the beach in no

24   time.  You have the other exhibit where Tweety says, with a big

25   heart, and the Tweety that says, "You have my heart, Tweety."

1    Then you have the group of Pooh bear and all the other

2    characters that says, you know, discussing all the guys are

3    just sitting there.  And if you look at the picture, the

4    animals are just sitting there.

5              What you have is a cartoon artist who draws stuff

6    on the outside of envelopes.  And the problem here is is that

7    any time -- well, hey, let me say this.  This is on the outside

8    of an envelope in the jail where the calls are monitored, the

9    mail is monitored, and the visits are monitored, the jail logs

10   are monitored, and they wonder -- and the Government wants to

11   allege that Dr. Schneider and Linda Schneider are these great

12   masterminds behind this health-care fraud and money-laundering

13   scheme but they're not bright enough to hide a message on the

14   inside of the envelope as opposed to on the outside front?

15             And when you listen to some of these arguments,

16   that's why I say the Court really needs to reconsider this

17   issue because, yes, it may be an attractive argument, "Be on

18   the beach in no time."

19             As they sit here innocent, this court needs to

20   keep in mind that they -- if there's an inference that needs to

21   be drawn it needs to be drawn in favor of the defendants.

22   Especially when you -- and we have more letters here, Your

23   Honor, with different drawings on it, but the point at this

24   point in time is that it doesn't mean anything.  It doesn't

25   mean that we're going to be here.  Maybe, maybe they would have

1    a better argument if there was a picture on the inside with

2    Tweety Bird behind jail, behind bars, and they had a Schneider

3    name tag on it and said, "I'll be at the beach in no time."

4    Maybe.  But that's not what you have.  You just have a cartoon.

5    And when you have that, I think that cuts against the

6    defendant's argument -- and they're free to make -- excuse me,

7    the Government's argument.

8              THE COURT:  Let me ask you to be clear on your

9    argument.  Is it your proffer to this Court that Dr. Schneider

10   did not write that word -- those words on the outside of that

11   envelope?

12             MR. WILLIAMSON:  That is my proffer, that it's not

13   Dr. Schneider who wrote those.  And if you look on the

14   envelopes you'll see there there are two different kind of

15   handwritings --

16             THE COURT:  Right.

17             MR. WILLIAMSON:  -- on those, and those are not

18   Dr. Schneider's handwriting.  That is the -- I don't know the

19   individual -- I can't remember the individual's name, but that

20   is -- those are his drawings.

21             THE COURT:  And how does this -- how does the

22   envelope get from Dr. Schneider to the artist?

23             MR. WILLIAMSON:  I think it goes from the artist

24   to Dr. Schneider.  It's drawn first, and then he gives it to

25   different inmates to send out letters.

1          THE COURT:  Okay.  So it comes to Dr. Schneider

2   with Tweety Bird on it and the language on it?

3          MR. WILLIAMSON:  With the language on it.

4          THE COURT:  Okay.

5          MR. WILLIAMSON:  And that's -- and, I mean, that's

6   just essentially what happens.

7          Even giving them the benefit of doubt on that, how

8   can electronic monitoring not work?  You're monitored 24 hours

9   a day, and if you leave the base from a certain amount for --

10  for a certain amount of time or distance, then the Government

11  will be notified.  Electronic monitoring works.  It protects

12  the interest of what's happening in regards to the flight.

13         He's not a flight risk.  He's not a safety --

14  threat to the safety of the community at this point, Judge.  He

15  should be let out.  Why else should he be let out?  Well, he --

16  we have to conduct a defense, and I know you were in the status

17  conference this morning.  This case is going to go to trial

18  April of 2009.  That is a long time.  Not because of a lack of

19  effort by us, or not because we're alleging the Government's

20  prolonging, it's just a natural course of a case like this.

21  And there are many documents, records, that I'm going to need

22  his help with.  And I'm in Kansas City, he's in Wichita, he's

23  confined to a certain amount of time, and I -- he has to be

24  able to engage in a meaningful defense, and I'm sure Eugene is

25  going to talk a lot about the due process issues in this case,

1   but we have -- the Government proffered that they have over 250

2   boxes of records.  250 boxes!  My largest civil case I don't

3   think has yielded 250 boxes, even though we normally do ours

4   electronically, so maybe it does.  But that's a lot of

5   information.

6          And in order for me to be able to prepare a good

7   defense for him, I have to have free access to Dr. Schneider.

8   He has to be able to look at records and help me fill in the

9   gaps.  And he can't do that, (A), when anything he says to

10  anybody outside of the jail, besides me, would go back to the

11  Government and thus affecting our strategic decisions.  But you

12  can't -- it's near impossible to sit in a cell and participate

13  in a case like this.  And with so much at stake in this case,

14  Your Honor, and with such a nebulous hook for -- on the

15  allegations, he needs to be out to help.  And that's the bottom

16  line.  And there are some due process problems with him staying

17  in for over a year and a half without the opportunity to get

18  bail.

19         And I think I'm about to wrap up, but lawyers

20  never like to stop talking, Judge, so let me double check.

21         I touched on this briefly, but the only reason as

22  of right now the Government can hear any kind of strategic

23  decisions is because they're incarcerated.  It's forcing them

24  to give up certain rights.  They're forced to give consent.

25  They have to make a strategic decision.  They can't talk to

 1     family members about it.  They can't say, hey, I may be asked

 2     to deal with police, should I do it, should I not?  I may be

 3     able to -- my attorney really needs, you know, this document,

 4     that document.  Even if they just want to vent because he's

 5     upset with me.  But the Government gets that, turns it into

 6     some kind of motion and it's published in the public record

 7     again.  And, again, it just chills our ability to conduct a

 8     defense.

 9              And in closing, Judge, this man is a father, he is

10     a human being, he is innocent of the charges that are lodged

11     against him, and he should be granted bail, and I looked at a

12     case -- I don't think you were the magistrate on it but I'm

13     working on an appeal case that was tried involving health care

14     fraud, husband and wife.  Those two were let out a $10,000 OR

15     bond.  These -- their assets are -- the Schneiders' assets are

16     primarily seized.  There's only a little left, and that is

17     for -- has been dedicated to the legal defense and expenses,

18     and we would just say at this point in time that the

19     conditions -- there are many conditions that could be effective

20     here.  Let them out.  Let them defend this case.  Treat them as

21     innocent people so they don't have to be paraded in the

22     courtroom amongst eight marshals at a time, with shackles on

23     their hands and feet, where their children have to see them

24     treated like criminals when they are not criminals and have not

25     been convicted.

1                THE COURT:  Thank you.

2            Let's do turn to the Government.  I'm not sure

3    whether that was a proffer or argument.  I guess I had some

4    proffer and a lot of argument, so I'll allow the Government to

5    continue with any proffer or witnesses or argument, keeping in

6    mind that -- and I don't mean to pick on you, but keeping in

7    mind that I have read the materials and I do have a few

8    materials to read, so keeping all that in mind.  Go ahead.

9                MS. TREADWAY:  Well, you stole my argument,

10   Judge.  That's right.  What we've heard today is argument, not

11   a proffer of new circumstances or new facts.  And that is

12   essential because that is all this judge can consider.  This is

13   not a de novo hearing, Judge.  What you need to know is are

14   there new facts I did not know on December 21st, 2007, when I

15   determined that Stephen Schneider was a danger to the community

16   and when I decided Stephen Schneider was a flight risk.

17            There are no new circumstances, Judge.  In terms

18   of the danger to the community, you considered him a danger to

19   the community even if on that day he had given up his license

20   to practice medicine and even on that day if he had given up

21   his DEA registration number.  You made your decision even with

22   that in mind.  Therefore, the suspension of his license and the

23   termination of his DEA registration are not new facts for this

24   court.

25            As to the flight risk, the only change in

 1    circumstance, Judge, is that now we have more evidence that

 2    he's a flight risk.  Not only the envelope which he received

 3    from the inmate with the "Be on the beach in no time" on it

 4    that he then sent to his wife, but we also have his wife's

 5    conversations that make it clear that there is an intention to

 6    flee and an ability to flee.  Therefore, the new circumstances

 7    before this court make them a greater flight risk, not a lesser

 8    flight risk.

 9            And as to the other arguments, Judge, they just

10    have no sway in this situation, because they are new argument

11    and this is not a de novo hearing.

12            THE COURT:  All right.  Brief rebuttal.

13            MR. WILLIAMSON:  Very brief.  A, the court in its

14    last opinion on December 21st, found that even if Dr. Schneider

15    gave up his medicine license and his DEA number, that he could

16    still prescribe medicine through the clinic.  That was the crux

17    as to why he was still considered a flight risk.  And it was an

18    "even if" argument.  The new facts are he doesn't have a

19    license and you have the statute that we cited that requires

20    the closing of the clinic if there is a -- not a licensed

21    doctor there.  You also have the new fact that there is nobody

22    willing to operate the clinic.  Those are material facts as to

23    why this court determined that he was a flight -- I mean,

24    excuse me, that he was a danger to his safety.

25            I don't represent Linda Schneider.  I will say

1    that the tapes don't give any impression that they want to

2    flee.  Any time you take something in a seven-second context,

3    anything can be argued, but the Court has the tapes.  There is

4    no intention.

5           Think about this, Judge.  Out of all the three

6    months that they've been incarcerated, what you have is the

7    best -- is the best of what they've got.  And you have to keep

8    this in mind.  This is the best.  This is the best they have to

9    base their arguments on, and one thing that's going to be

10   lacking anywhere in those tapes is Dr. Schneider saying I want

11   to flee.

12          I represent Dr. Schneider.  I'm moving to let

13   Dr. Schneider out on bond, and they're moving to represent --

14   or to let Linda out on bond.  And with that stated, the new

15   circumstances just don't warrant, as required in this case,

16   especially given the policy behind the Bail Reform Act, which

17   supports the release of inmates because even the Congress knew

18   that the presumption of innocence can be trumped because you

19   have creative and voluminous arguments and allegations from the

20   Government.

21          THE COURT:  Agree with you on the presumption of

22   innocence, but obviously since everyone is presumed innocent,

23   if the Bail Reform Act were read as strictly as you would like

24   to read it, no one would ever be detained because everybody

25   would be deemed to be innocent and, therefore, they'd be

1    released.  So we know we've got to consider something beyond

2    that.  And you acknowledge that.

3            MR. WILLIAMSON:  Absolutely.  And I've thought

4    about that, and I think the opposite is true, that if you read

5    it the way the Government wants you to, then nobody is granted

6    bond because they can always make an argument that you

7    committed a past crime, you may be able to commit another one.

8            The crux for this Court is to articulate -- this

9    is my position.  I think the Court has to let them out,

10   according to the law, unless you find that circumstance -- the

11   conditions will not satisfy any concerns.  I don't think that

12   that applies here.  And I think that's what the framers of this

13   statute had in mind is, like, they're all innocent, but, wait,

14   there may be some dangers, i.e. serial killers, i.e. someone

15   with a long criminal history that they've already violated bond

16   several times in state court, Judge, why let 'em out when

17   they're going to do it again.  I think that's the dichotomy and

18   those are the exceptions.

19           So I think we start with you have to let them out,

20   and then you have to give reasons that can be reviewed as to

21   why the conditions won't be met.  And I respectfully submit

22   that when you take a look at this case and the facts and just

23   similar cases when we have people, no criminal history

24   whatsoever, and upstanding family members and you have citizens

25   and you have the letters that we attached to the brief, when

 1    you have that, that's a starting point.  And I don't think you

 2    have the fact that these conditions -- I don't see why

 3    electronic monitoring won't work, I don't see why telling them

 4    to, you know, to stay away from any kind of medicine doesn't

 5    work.  The Government had undercover agents before.  I'm sure

 6    they'll have 'em again, and if they're found violating

 7    something we can be back here.

 8                THE COURT:  Let's -- I should have probably said

 9    this before.  Let's kind of restrict this first part to the

10    argument on release or detention in general, then I'm going to

11    go back after I hear that and just for my benefit I'm going to

12    go through what you recommended as conditions and deal with the

13    conditions separately.

14                MR. WILLIAMSON:  Okay.

15                THE COURT:  Feel free to talk about conditions

16    that will work, but in terms of details, I've got questions

17    that I would like to ask to that.

18                So let me turn then to Linda Schneider and her

19    proffer.

20                MR. BYERS:  Thank you, Your Honor.  Kevin Byers.

21    I'll be speaking on behalf of Linda Atterbury.  I do have a

22    witness to call, if I could beg the Court's indulgence.

23                THE COURT:  You certainly may.

24                MR. BYERS:  I sequestered him outside, so I need

25    to go find, for like two minutes.

1          THE COURT:  Certainly.  Feel free to stand up and

2   stretch a little bit.  Court's going to remain on the bench

3   while he gathers his witness.  Unfortunately no Coke machines

4   or anything available.

5          (This portion of the hearing was transcribed and

6   filed March 24, 2008, on CM/ECF under Document #50.  The

7   proceedings continued as follows:)

8          THE COURT:  Call your next witness.

9          MR. BYERS:  No further witnesses on behalf of

10  Linda Atterbury.

11         THE COURT:  All right.  Any further proffers?

12         MR BYERS:  I would like to make some proffers.

13  Can I take just a second to send the doctor off?

14         THE COURT:  Yes, you may.

15         MR. BYERS:  Thank you, Your Honor.  I appreciate

16  that.

17         THE COURT:  All right.

18         (Brief pause.)

19         MR. BYERS:  Thank you, Your Honor.  In the form of

20  a proffer, if I may proceed.

21         THE COURT:  You may.

22         MR. BYERS:  And I note I think the Court's been

23  outlandishly patient with us, and I do appreciate that.  I

24  appreciate the chance to be here again today, once you've

25  already determined the status of detention.  I do appreciate

1    the Court being willing to let us revisit this issue.

2           There's so much to say.  Mr. Williamson said it a

3    lot, much of it very eloquently, I think.  I just note a couple

4    points I just really need to highlight.  First off, while it's

5    fresh on my mind, this whole -- this line of questioning or

6    theory that Linda Atterbury has become a volunteer, she's a

7    pariah for some cause, I think is just so grossly misplaced I

8    can't let it go by without comment.  I think what it comes down

9    to is, hopefully, if the Court listens to the totality of the

10   tapes that have now been produced and not these snippets, the

11   Court will determine that that was a -- not so much a tactical

12   or strategic decision; it was a decision of chronology.

13   There -- the appointed counsel was not performing in the

14   fashion that defendant would have wanted.  And I'm just trying

15   to get clear that this woman did not volunteer to be in jail

16   for a cause.

17          Her defense counsel, she was hoping, could change.

18   She was looking for counsel through family, as is evidenced in

19   the taped conversations.  And it was just a matter of finding

20   counsel who were willing and able to take on the case, and then

21   file the motion that brings us here today.  If she were going

22   to be a pariah for the cause, she could stay in jail and

23   wouldn't be here today and she'd have a lot of notoriety for

24   being there months and months and months prior to trial as a

25   presumed innocent person.

1          On these phone calls -- and I'm pleased the

2     Government has given us apparently the totality of the tapes,

3     at least the tapes that relate to these phone calls, but it is

4     just astounding to me reading the State's -- or, I'm sorry, the

5     Government's response that was filed for this hearing today,

6     that these things are presented as indications generally of a

7     danger to the community or specific individuals, including the

8     prosecuting attorney herself, Assistant United States Attorney.

9     And I appreciate her concern.  If people are threatening her,

10    she has to take it seriously.

11          But ten -- and I'm just reading through what

12    they've given us very briefly here, and not the content, the

13    time.  Call 2C, 10 seconds; Call 2E, 34 seconds; Call 3F, seven

14    seconds; 46E, five seconds; 5B#1, 57 seconds; 5B#2, eight

15    seconds; 5B#3, 31 seconds; 5E#1, 28 seconds; 5E#2, 13 seconds;

16    5E#3, 22 seconds; 5F, 18 seconds; 6C, 19 seconds; 6E, 14

17    seconds; 8C, 11 seconds; 11A, 10 seconds; 14A, 11 seconds; 16A,

18    a long one, two minutes 18 seconds; 16E, 22 seconds; 17B, 30

19    seconds; 20B#1, 27 seconds; 20B#2, 10 seconds; 21C, 16 seconds;

20    21B, 50 seconds.  I respectfully submit to the Court that those

21    conversations tell us nothing.  I've listened to them.  I

22    believe there are mischaracterizations of the few words we hear

23    on those, and beyond that the ones that while maybe the words

24    were represented really as what they were saying when they came

25    out of the speaker's mouth completely out of context.  I think

1   the Court, now that you have the tapes with you, I think it's

2   an observation you're probably bound to listen to the totality

3   of what the Government's produced.

4          THE COURT:  I certainly intend to do that,

5   counsel, so that you --

6          MR. BYERS:  Exactly, good.  I appreciate that,

7   Your Honor.

8          I need to address the -- this cat-and-mouse

9   theory, too, on (inaudible) that has prevailed throughout a

10  number of pleadings.  I would proffer to the Court that the

11  three examples that supposedly the defendants were in that day

12  were at different times, to my understanding.  When they were

13  arrested in the evening hours, early evening, they were

14  together in one vehicle, Dr. Schneider and Ms. Atterbury and

15  their two children.  Earlier in the day Linda Atterbury had

16  gone different places.  First she went to lunch at Applebee's,

17  as is noted appropriately or correctly by the Government.  She

18  went to Applebee's.  And she drove there in -- in a vehicle

19  driven by another person, a physician in Wichita who took her

20  to lunch at Applebee's, so she's in the vehicle with someone

21  else.

22          Later on she -- her sister comes to the clinic and

23  picks her up, they go shopping.  Quick visits.  They go to

24  Hollywood Video, return some videos, in and out.  They go to

25  Kohl's, where the sister wants to buy pants, changes her mind

1    when she gets in there.  In and out.  There was another visit

2    which I'm forgetting about right now, in and out.  Oh, Radio

3    Shack, to repair the sister's phone, in and out.  There was no

4    way these were attempts to elude, evade or in any fashion play

5    games with the federal government.  They knew quite well that

6    they were being followed, and they were running errands.

7            Later in the day Dr. Schneider and Linda Atterbury

8    are together.  I believe they were on 21st Street.  They're

9    looking for a store they've never been to before, to use a

10   voucher, because Linda, in her good sense, realizes she's

11   probably going to be arrested soon because she understood there

12   was an agreement to turn herself in and her husband soon, so

13   she's trying to wrap up last-minute things.  She had a voucher

14   as a gift from another physician, I believe, to a shop she'd

15   never been to, and it expired soon, end of December.  This is

16   December 19th.  They're looking for a shop on 21st Street,

17   driving around.

18           And they're driving aimlessly through a business

19   park.  That was the sister that was driving and, as the sister

20   is well known for, she got lost.  She missed her turn at

21   Kohl's.  She drove into a dead-end business park, had to turn

22   around with -- while being followed, so it probably got a

23   little congested, then went to Kohl's and changed her mind

24   about buying pants.

25           Because that has sort of, it seems to me, taken on

1   its own life, this cat-and-mouse thing, which led to their

2   arrest that evening, I thought it was important to at least

3   proffer that information for the Court's consideration.

4            As Mr. Williamson has said, clearly relative to

5   Dr. Schneider, I don't believe there's any arguable, colorable

6   risk of flight here.  You've heard testimony about that.

7   You've heard proffers about that.  There are changed

8   circumstances, as Mr. Williamson talked about, the closure of

9   the clinic.  There's absolutely no way Linda Atterbury, if

10   released, would go and involve herself in the business of the

11   clinic because there is no business of the clinic.  I think a

12   changed condition also represents itself if the Court is

13   inclined to accept Dr. Schell's testimony about Linda

14   Atterbury's mental -- or psychological deterioration while

15   she's in custody.

16            Finally, what I think is the really big argument

17   and it's well detailed in our filings so I'm not going to

18   rehash it, Your Honor, I know the Court has read the pleadings

19   and the briefs, is the issue of due process.  And I know the

20   Government wants to put the regulatory label on it.  I

21   understand that.  If I were a prosecuting agent I would say

22   it's a regulatory incarceration, it's not punitive.  But if

23   it's not punitive, these people are being regulated in the hole

24   on occasion, they're being regulated in solitary, they're being

25   regulated by having privileges taken away, they're being

1    regulated by not being allowed to even mail things to each

2    other now.  And not even from a due process -- well, from a due

3    process perspective, that's where it needs to stay.

4              I think it's simply, with an April 2009 trial

5    date, with evidence of Linda's present condition, whether it's

6    caused by incarceration or not, it's there, I think it raises

7    far beyond a colorable claim of due process, and I don't think

8    it's inappropriate for us prophylactically, preventively try to

9    stop that from happening.  We don't have to suffer through the

10   due process to then try to seek redress at some future point.

11             With all that said, I respectfully request the

12   Court order a release under any conditions deemed appropriate.

13             THE COURT:  All right.

14             The Government then.

15             MS. TREADWAY:  Judge, again briefly.  We've heard

16   no new information.  The information that you based your

17   decision on is still in existence.  There's no change in

18   circumstance that alters the decision that you made with

19   regards to Linda Schneider's risk of flight.  There's no change

20   in circumstance with regards to your decision about her danger

21   to the community.  All we have heard today is new argument.

22             The only possible changed circumstance is this new

23   potential psychological problem that she is experiencing in

24   jail.

25             Well, Judge, I have a couple of things to say to

1   you about that.  Thank you for making one of my arguments,

2   which is it's of her own making.  She chose to sit in jail for

3   three months.  And they can color it any way they want to now,

4   but based on the advice of a nonattorney, Siobhan Reynolds, the

5   founder and president of Pain Relief Network, these people have

6   remained in jail "for the cause."

7         Lawrence Williamson told his defendant, "You might

8   be better off staying in jail."  That's what Mr. Schneider

9   told Pat Hatcher.  They chose to stay in jail for whatever

10  purpose, Judge.

11        Second, if she has a psychological problem, why

12  not treat it?  They haven't treated it.  They've chosen not to

13  treat it.  That's ridiculous.  She's a nurse.  She should know,

14  if she has a psychological problem and needs treatment, she can

15  get treatment in jail.  The thought that she can't get

16  treatment is absolutely absurd.  And if she needs treatment,

17  Judge, we have a suggestion.  She can be psychologically

18  evaluated under the federal statute that provides for that, and

19  she can be sent to a proper medical facility where her

20  psychological problems can be taken care of.

21        But, Judge, on this record detention is required.

22        THE COURT:  All right.

23        Mr. Ohaebosim, do you want to make a separate

24  argument in connection with Mrs. Schneider insofar as it

25  relates to the -- Ms. Atterbury insofar as it relates to the

1    probation issue?  Maybe before I even do that let me start

2    back.  Do you want a separate probable cause hearing in the

3    probation revocation matter separate from what we're doing

4    today?

5                MR. OHAEBOSIM:  It would depend totally on whether

6    she'd be detained at this particular time.  Our argument in

7    this particular case is quite simple, that the reason why we

8    asked for everything to be merged is the reason why she's here

9    and we have the one case.  We found one case in the D.C.

10   circuit that indicates that an indictment alone is insufficient

11   to result in revocation.  I mean, that's as simple as our

12   argument is going to be and that's, again, why we asked to

13   consolidate this.  If it's a situation where she'll continue to

14   be detained then, you know, we would like to go ahead and go

15   forth with the hearing based on what your ruling would be, and

16   I guess we'll leave that back with the Court, Your Honor.

17               THE COURT:  All right.  So we'll limit whatever

18   you want to talk about now to the issue of detention.  Do you

19   have anything further you want to add to the arguments that

20   have been made?

21               MR. OHAEBOSIM:  No, Your Honor, nothing further to

22   the detention arguments.

23               THE COURT:  All right.  I am going to allow the

24   Government, though, to respond, because it is a different

25   issue, and then I'll give you an opportunity to have a short

1    rebuttal after the Government goes forward.  I'll hear whatever

2    additional information the Government wishes to proffer in

3    connection with the detention in Case No. 06-10106-01 MLB, the

4    probation revocation matter.

5         MS. TREADWAY:  Yes, Judge.  Our proffer would be

6    threefold:  Since being on release October 6, 2006, in the

7    underlying Social Security fraud case, it is the Government's

8    evidence or proffer that the defendant has committed at least

9    three additional crimes.  First of all, she's committed the

10   crime of harboring a fugitive, which the Government presented

11   to the court earlier in its proffer in the original motion,

12   which was Document 26.

13        Second of all, she has committed the crimes as

14   alleged in the indictment.  And those crimes are many, but the

15   ones that are in particular after the point of her release are

16   the conspiracy, which returned until -- which continued until a

17   return of the indictment; an overt act at 51(g), which occurred

18   in November 2006, which was her attempt to obstruct the

19   investigation by instructing then administrator Timothy

20   MacDonald not to provide subpoenaed records; overt act at

21   51(h), in April of 2007, in which she again attempted to

22   obstruct justice by asking her real estate agent to destroy

23   information in the real estate file relative to the clinic.

24        Count 4 involving the death of Robin G. included

25   conspiratorial conduct into May 2007.  Count 6, involving the

1    illegal distribution of Actiq, included conspiratorial

2    activities through May 2007.  Counts 7 through 17, the health

3    care fraud counts involved fraud after October 6, 2006, in

4    Count 9, Counts 10 through 12, and Counts 13 through 17.

5              THE COURT:  What was the last, 9, 10 through 12,

6    and what was the other?

7              MS. TREADWAY:  13 through 17.

8              THE COURT:  All right.  Thank you.

9              MS. TREADWAY:  And Count 34, a money laundering

10   count, involves conspiratorial activities on January 2007.

11             Third, the new crime discovered on the jailhouse

12   tapes was retaliating against a federal official by threat of

13   injury.  The elements of that offense, Judge, are threat of

14   injury against a federal official with the intent to impede,

15   intimidate, interfere with or retaliate against the federal

16   official, on account of that official's performance of official

17   duties.

18             A threat is an expression of an intention to

19   inflict evil, injury or damage on another.  And the defendant

20   need not communicate the threat directly to the intended

21   target.  A true threat is not protected by the First Amendment.

22   A true threat is where the speaker means to communicate a

23   serious expression of an intent to commit an act of unlawful

24   violence to a particular individual.  Linda Schneider has made

25   a threat against me.  It is a true threat, and it would be

1    prosecutable under 18 United States Code, Section 115.

2              That is our proffer with regards to the revocation

3    in the underlying Social Security fraud case, 06-10106.

4              THE COURT:  All right.  I'll allow some response.

5              MR. OHAEBOSIM:  Thank you, Your Honor the

6    initial --

7              THE COURT:  And could you, by the way, provide me

8    the case -- if you have it there, give me the citation on the

9    D.C. circuit case you referenced before.

10             MR. OHAEBOSIM:  I do have it here, Your Honor.  It

11   is United States v. Joiner, 482 F.2d 1261.  It's a D.C. circuit

12   case out of 1973.

13             THE COURT:  All right.  Thank you.  Okay.

14             MR. OHAEBOSIM:  Concerning the three basic burdens

15   that they're looking at, the initial charge was settled, I

16   believe, in terms of the probation violation.  We don't see it

17   as a new charge because it's something that's already been

18   dealt with.  Everything else, Your Honor, concerning the second

19   charge, is bootstrapping.  They haven't gone out and provided

20   any evidence.  It's all through the indictment.  They're saying

21   that basically, if we can refer back to the case we just gave

22   you, they're saying that she did this, basically in the

23   indictment, as a result of that she's committed a probation

24   violation.  There's no evidence offered of it.  Nothing else

25   has been offered other than the indictment itself.

1          And yet just keeping it short and sweet, simply

2    going finally to the threat that was purported to have been

3    made against Ms. Treadway, again it's a major -- there's a

4    major contextual issue.  We don't have any evidence that

5    they've gone ahead -- and even though we know there need not be

6    a direct threat, it's something you heard that somebody said to

7    somebody to somebody to somebody.  I mean, there's no way you

8    can go ahead and go down the line like that and say, oh, well,

9    there was a threat that took place to me far, far a long way

10   away, I didn't hear it, it wasn't said directly to me, but it's

11   a situation where we believe the threat is there.  So very

12   simply we're saying there is no true threat that would rise to

13   the level of being violatable in terms of her probation, to go

14   ahead and revoke that.

15          So, you know, it was totally, as much as other

16   things as referred to by Mr. Williamson, one of those things

17   that was taken out of context.  There have been so many things

18   taken from these particular phone message rolls (inaudible) the

19   phone that we have so far, and if you look at it like you could

20   bring a multitude of other charges based on the way things have

21   been said, but we believe that was taken fully out of context,

22   Your Honor.

23          So if it's a situation where, as we said before,

24   you feel there's probable cause, we would like a hearing, but

25   if it's a situation where we're just dealing with it based on

 1    the indictment and she will not be detained after today, we

 2    would like to have a hearing.  If not, we'd just like it to be

 3    dealt with at this particular time.  Thank you, Your Honor.

 4                    THE COURT:  Thank you very much.

 5                    All right, let me address a few other procedural

 6    matters as we go on.  First of all, let me back up a little bit

 7    out of the prior motion that brought us here before and the

 8    issue of the repayment of fees in connection with appointed

 9    counsel.  I now have copies of the invoices that were submitted

10    by appointed counsel in this case for both parties.

11                    One counsel submitted not only a statement for

12    services rendered but also for a piece of an investigative

13    item, the other only items for fees.  These are sealed items

14    that remain in the court file.  I admonish counsel, to the

15    extent possible, keep these as sealed records.  You're

16    certainly free to show them to your client.  I'm not suggesting

17    in any way, shape, or form you can't do that, but these are

18    sealed records and I'm going to ask the clerk to hand to

19    Mr. Williamson the ones that relate to Dr. Schneider and to

20    Mr. Ohaebosim the ones that relate to Mrs. Schneider.

21                    And as I said before, I believe if I can have any

22    objections that you have to the items in that statement, I

23    think I said seven days from the day I gave them to you, so if

24    we could have them at close of business next Friday, which is

25    March the 21st, that would then let me get that matter behind

1    us.  All right.

2              Next item, let me talk to you a little bit about

3    the requests for conditions, just so that I can go through some

4    of these items.  I realize the Government is objecting to any

5    release, but let me go through the recommendations that the

6    defendants have made for possible conditions of release.

7    Dr. Schneider made yours on Document 42, page 8, and

8    Mrs. Schneider made hers on either Document 40 or 43.  You

9    proposed electronic monitoring.  Both of you proposed reporting

10   to pretrial services.  Dr. Schneider proposed to surrender his

11   passport and Ms. Schneider has already surrendered hers through

12   06-10106.  Dr. Schneider proposed travel restrictions to the

13   state of Kansas and the greater Kansas City area where his

14   counsel's located, with any travel outside those areas

15   preapproved by pretrial service.  And Ms. Schneider proposed

16   travel restricted to Kansas, with travel outside Wichita

17   preapproved by pretrial.

18             Dr. Schneider proposed that he not -- that he be

19   ordered not to enter the clinic, the Schneider Clinic, without

20   defense counsel present.  Ms. Schneider has proposed that she

21   would not enter the Schneider Clinic or any other facility

22   which prescribed controlled substances unless approved for

23   medical need.

24             Number six, both of them, I think, proposed that

25   they not participate directly or in any other fashion in the

1    business in a medical facility where health care services are

2    rendered and then, finally, any other conditions.

3              Is there anything else that you believe would be

4    an appropriate condition that you've not identified that I

5    should consider as I'm considering these, this release from

6    detention?  Anything else that you wish to supplement on that?

7              MR. WILLIAMSON:  Just one second, Your Honor.

8              THE COURT:  Surely may.  Page 8 on yours, page 3

9    on the others.

10              (Brief pause.)

11              MR. WILLIAMSON:  Your Honor, I guess the only

12   other statutory condition that I see that may be helpful for

13   the pretrial issue would be to comply with the specified

14   curfew.  The only exception would be is that if I knew, like,

15   Dr. Schneider was coming to the city of Kansas City for a

16   couple days to meet with me.  But I think that would aid the

17   Court in just making sure what time he comes home, and if he's

18   not there, reporting by a certain time.

19              THE COURT:  I think electronic monitoring is

20   almost inextricably intertwined with some type of home

21   detention, whether it's a curfew or whether there are other

22   restrictions, so I viewed your electronic monitoring request as

23   some type of home-detention restrictions that would be

24   monitored by the electronic process.

25              Do you agree that's what you were contemplating in

 1    this case?

 2                    MR. WILLIAMSON:  Yes, Your Honor.

 3                    MR. BYERS:  Yes, Your Honor.  And if I may, Your

 4    Honor, on behalf of Linda Atterbury, I guess implied in our

 5    suggested conditions is the posting of bond.  Of course, that

 6    ties back into the asset issue and all of that, but we

 7    certainly --

 8                    THE COURT:  Let me come back to the bond issue for

 9    a minute and turn to the Government on the other conditions and

10    then we'll come back to the bond.

11                    The Government's opposed release, and I understand

12    that, and I'm certainly not indicating here how I'm going to

13    rule, but if the defendants were to be released by this court,

14    can the Government indicate to me conditions that you would

15    impose, over and above those recommended by pretrial in this

16    case, that while you don't agree they would reasonably assure

17    appearance or reasonably protect the community, at least for

18    things that if I was going to release you would think

19    appropriate?

20                    MS. TREADWAY:  If the judge is considering

21    release, Judge, the only release that we believe is appropriate

22    would be complete home detention.  We don't believe electronic

23    monitoring in this case would be sufficient.  We believe

24    detention, of course, is appropriate, but home detention

25    without any travel except as absolutely necessary.  The

1    attorneys can travel to them.  There's no need for them to

2    travel whatsoever.  And I fear that if they leave at all,

3    they're going to be leaving for good, just like Mr. Cooper did.

4            THE COURT:  All right.  Let me return then to the

5    other issue that counsel just mentioned, and that is the issue

6    of bond.

7            I've gone back.  I think Mr. Williamson indicated

8    in his filings, maybe at page 3, that they had already -- the

9    Government already seized more than a million dollars in

10   assets, and this caused me to go back to the Government's

11   exhibit that was filed, I think, in the initial detention

12   issues.  And I've reviewed.  There was a spreadsheet and I

13   assume counsel's had a chance to review that, in which assets

14   were listed, it was indicated whether they were seized or

15   whether they were substitute assets as part of what we've

16   discussed before.  Reviewing those again, it looks like to me

17   that in the real property area they have -- the Government has

18   seized or in the process of proceeding with forfeiture

19   proceedings on the clinic, on the home in Haysville, on the

20   Grand Lake cabin, and I guess I don't think they -- I don't

21   know that you can forfeit Mexican property.  Do I understand

22   that you were even trying to do that?

23           MS. TREADWAY:  Well, Judge, based on advice from

24   the Department of Justice, Asset Forfeiture Division, you never

25   know what new treaty might come up, so they said to put it in

1    the indictment.

2                THE COURT:  Okay.  So that would all be real

3    property, illiquid in nature, some dispute as to the ownership

4    versus the lease rights in Mexico.  I'm assuming that would

5    involve some possible restriction on their ability to transfer

6    or convey those leases in exchange for monetary relief.  I

7    don't know.  No one's provided me any real evidence for that

8    other than for you to say it's leased, them to say it's owned.

9    They provided documents, trust documents, et cetera, but I've

10   not gone behind those to try to research Mexican law to know

11   what the restrictions are.

12               Do you have any idea what they could do with the

13   Mexican property if they wished to convey it in any way?

14               MR. WILLIAMSON:  I don't know a hundred percent.

15   I do know that the way it operates is that you can't buy

16   property unless you're a Mexican citizen.  You have to place it

17   in like a 99-year trust, and at the end of that term I think it

18   reverts back to the natural owner.  So I don't know -- I don't

19   know enough about that Mexican law, but I just know they don't

20   have an ownership interest.

21               THE COURT:  Is there any ability to borrow against

22   that 99-year lease?

23               MR. WILLIAMSON:  I can look it up, Judge.

24               MS. TREADWAY:  Judge, based on my information that

25   we got from the FBI down in Mexico, in fact they can sell the

1    property.

2              MR. WILLIAMSON:  I would venture to say that they

3    can somehow -- you know, if you're leasing a property under a

4    normal lease, you can't sell it.  I mean, you just give it back

5    to the owner or you can buy it out for a certain amount of

6    money.  I don't know about the --

7              THE COURT:  Well, there are loans made on leases

8    all the time in a commercial aspect.  I don't know in a

9    residential aspect like this, but certainly leaseholds are

10   encumbered.

11             MR. WILLIAMSON:  I would just say for the Court's

12   consideration, even if it is possible, it's going to be a

13   lengthy, time-consuming process that would probably be worth

14   more trouble than whatever they can get out in pesos.

15             THE COURT:  To look back on my notes then, using

16   the Government's figures, the clinic was valued at two million

17   six, with a million twenty-four mortgage against it by the

18   Valley Bank, which netted presumably a million five.  I realize

19   that's a paper number.  The Haysville home 278, the Grand Lake

20   cabin 250.  My recollection was that the defendants were not

21   claiming ownership or if they claimed ownership they were

22   claiming that the properties in Haysville and Grand Lake were

23   substantially liened to parents.  I believe they claimed that

24   the Haysville home was actually owned by the parents and that

25   the Grand Lake cabin had a lien on it.

 1              Is that the true situation as far as we're sitting

 2   here today?

 3              MR. WILLIAMSON:  That's correct, Your Honor.

 4              THE COURT:  Okay.  So the actual ownership of

 5   Haysville is in Ms. Schneider's, Ms. Atterbury's parents, and

 6   is there any kind of an agreement or contract between the

 7   parents and the Schneiders that they're purchasing it on any

 8   kind of account or that they're there on a lease basis or

 9   anything like that?

10              MR. WILLIAMSON:  Well, we're not aware of any

11   contract of that nature, Your Honor.

12              THE COURT:  All right.  In connection with the

13   Grand Lake cabin, my understanding is that there's some kind of

14   an official lien by the parents on that home.  Is that correct?

15              MR. WILLIAMSON:  That's correct, Your Honor.

16              THE COURT:  Has the Government been able to

17   ascertain whether that's accurate or not from the records in

18   the state of Oklahoma?

19              MS. TREADWAY:  Judge, that's one of the money

20   laundering counts.  We believe that lien to be a false lien to

21   hide assets from the Government, and that would be part of our

22   proof at trial.  That's, I believe, the last count in the money

23   laundering case.

24              THE COURT:  All right.  Let me then turn to what

25   I'll call more the liquid assets.  There were several accounts

1    and CD's at the Valley Bank, some at the Bank of America and

2    some at the Credit Union of America.

3              I pulled these numbers again off the spreadsheet,

4    68,000, 134,000, 49,000, 140,000, 132,000, $50, 28,000, $1200

5    and a hundred thousand dollars, which I total up to be $652,250

6    that had been seized, along with three boats and automobiles --

7    and maybe they're all automobiles -- that were valued by the

8    Government at 14,500.

9              There are forfeiture proceedings separately, in

10   separate proceeding brought by the Government, that cover some

11   of these assets.  The others have been, as I've said, seized or

12   subject to forfeiture allegations in the complaint.

13             I come up with the -- if you basically say that

14   the Haysville home and the Grand Lake cabin are thrown out and

15   you can't do anything with Acapulco, you're left with the

16   clinic at a million five, you're left then with 650,000 of

17   property that's been seized, plus another 50, so you're talking

18   about somewhere around two million one, two million two in

19   assets.  And that does not count the assets that have been

20   identified as substitute assets, which are approximately

21   600,000 plus, that have been the subject of the prior motion.

22             Now, let me ask then, Mr. Byers indicated that the

23   defendants would be willing to post a bond.  Tell me what kind

24   of a bond and how you would structure it and what you propose

25   that amount would be.

 1              MR. WILLIAMSON:  If you noticed from my pleading,

 2    I'm supporting an OR bond.  I think when you've given up more

 3    than $2 million of your assets, what more do you need?  I mean,

 4    you can't, you know, squeeze blood from a turnip.

 5              I think in the absence of that --

 6              THE COURT:  You're assuming that they're gone.

 7              MR. WILLIAMSON:  No, I'm assuming that they're

 8    unavailable right now.

 9              THE COURT:  Right now.

10              MR. WILLIAMSON:  And if he is convicted, then he's

11    going to lose it, or if he absconds then he's not going to be

12    able to get it.  The reason I make that is the purpose of bond

13    to assure appearance.

14              THE COURT:  Right.

15              MR. WILLIAMSON:  And if they have that type of

16    money and know the only way they can get it back is by

17    appearing, the purpose of the bail act, the Bail Reform Act,

18    has already been met.

19              THE COURT:  So with that being said, you wouldn't

20    have any objection to, if they were to be released, that

21    instead of the bond, they sign a forfeiture agreement under the

22    AO100 form that's been provided that says basically if I leave

23    I agree to forfeit the following property?  Because I think

24    your step is a little bit withdrawn from where they are.  I

25    think they could run and you as their counsel could still

1    litigate through the issue of forfeiture to some degree and it

2    isn't an automatic transaction.

3              What I'm saying is if that's your argument, that

4    that's their incentive to stay, then I'm assuming that you'd be

5    willing to sign the AO100 form, which would agree to forfeit

6    all that property in the event they failed to appear.  And I'll

7    deal with another issue later, but is that the kind of thing

8    you're thinking about?

9              MR. WILLIAMSON:  Absolutely, Your Honor.

10             THE COURT:  All right.

11             MR. BYERS:  And on behalf of Linda Atterbury, I'm

12   backing away a little bit from what I said earlier because

13   Lawrence makes such good sense.

14             THE COURT:  Now, that would be only then as to the

15   property that is subject to forfeiture as identified as

16   forfeiture property that I've outlined here as we sit here

17   today.

18             MR. WILLIAMSON:  That's correct, Your Honor.

19             THE COURT:  Let me deal with another issue,

20   because we're taking these things up combined.  Would it be the

21   parties' agreement or understanding that, of the assets that

22   would be subject to the forfeiture agreement, that they would

23   be deemed to be equally owned by the parties so that if you

24   have a forfeiture by one, half of the property would be

25   forfeited and if the other didn't --

1              MR. WILLIAMSON:  Yes, Your Honor.

2              THE COURT:  All right.

3              MR. BYERS:  On behalf of Ms. Atterbury, yes, Your

4    Honor.

5              THE COURT:  All right.  Let me deal then with

6    another issue.  There is also an AO form that is used on

7    occasion, and I have used it before.  Mr. Williamson's right.

8    Normally a bond is to ensure appearance, make certain the

9    defendants are here every time their appearance is required.

10   There's also a form known as an appearance and compliance form,

11   and the appearance and compliance bond, the AO Form 98A,

12   basically says the bond secures not only the defendant's

13   appearance at all court proceedings but also compliance with

14   all other conditions of release, so that if I were to allow

15   them released on some conditions that they not participate in

16   any kind of health care business or otherwise, and it would

17   later be determined that they, in fact, had violated those

18   conditions, rather than having them come back in and decide

19   whether I detain 'em or not, the Government could proceed,

20   under the bond, to attempt to forfeit that bond for failure to

21   comply with the conditions of release.

22              Are the defendants in this case willing to sign

23   such a compliance bond?

24              MR. WILLIAMSON:  I'd have to confer.  I would

25   probably counsel against that, for the -- the reason is

 1    technical violations, if they're something small, they were two

 2    minutes late, then the Government comes after all the money.  I

 3    think that that would be extreme.

 4              I'm not adverse to the concept, but I'm adverse as

 5    to -- I mean, in all honesty, the Government has many

 6    resources, and if -- I mean, just anything small is my concern,

 7    and then we have to come in and I don't know if it would be at

 8    the end of the case or even if we go and they're acquitted,

 9    then we have to go and litigate were they really three minutes

10    late, was their clock right, was their clock not right.  I

11    think that --

12              THE COURT:  That's appearance issues more than

13    anything else.  I want to talk about compliance issues, and I

14    understand you may have the same argument about compliance,

15    that it may be technical in nature.

16              MR. WILLIAMSON:  Right.  Aside -- like if, for

17    instance, they traveled outside of the state when they weren't

18    supposed to, I would be obligated to fight but I would know

19    that, you know, that you guys knew better.

20              THE COURT:  Right.

21              MR. WILLIAMSON:  And you knew it and you signed

22    this form.  But if it's a -- you know, it's just like you were

23    supposed to be 50 feet from your house, you went 53 feet or

24    something of that.  That's the one that has me concerned, is

25    that we're going to come back in and litigate all of that.  If

1    there's something that the Court can fashion that would address

2    that concern, we would be glad to do that.  It's just the small

3    technical things, as opposed to a real "You guys messed up and

4    you knew better" type of thing.

5                    THE COURT:  I understand.

6                    MR. BYERS:  On behalf of Ms. Atterbury, we agree

7    with Mr. Williamson.  One of the ongoing battles that we're

8    having right now with the Government relates to the contextual

9    issues, the way that they're looking at things and the way

10   things are perceived.  At this point, especially the compliance

11   issues, it appears that, you know, the perception is reality,

12   and that's one of the things that we'd like to avoid.  So,

13   again, if there was something that could be additionally

14   fashioned in an order that would deal with that, I don't know

15   how that would happen, it would be something that we would

16   definitely really consider.

17                   THE COURT:  All right.  Thank you.

18                   I think that covers my questions in that topic.  I

19   think I covered this before.  Counsel, is there -- counsel for

20   the defendant has urged an order to -- if I'm going to consider

21   any of the tapes, that I have some duty to listen to them in

22   their entirety as opposed to the clips that have been provided

23   as attached.  I indicated to you I believe I am going to do

24   that.  As a result of that, I'm not going to rule on the issue

25   of detention today.  I will issue a written order that will

1   fully and completely explain my decisions and I'll try to do

2   that as quickly as I can.

3              Having said that, I want to make certain that I

4   understand that the record is closed in terms of arguments,

5   proffers, or other matters here today, or if it's not, if

6   somebody wants to do something else, then I need to know what

7   it is.

8              So from the defendants' standpoint, do you have a

9   desire to file any type of a reply brief or additional brief at

10  this time related to issues that are directly resulting in the

11  detention decision I need to make?

12             MR. WILLIAMSON:  Not for Dr. Schneider, on

13  condition I can make one more quick point.  Quick, very quick.

14             THE COURT:  All right.  You may.

15             MR. WILLIAMSON:  Just a couple minutes, Judge.

16  The Government made a statement regarding a statement that

17  Dr. Schneider released or told Ms. Hatcher on the telephone

18  regarding that I told him he might be better off if he stays in

19  jail.  Since that conversation has been brought up, I think

20  that it's important to note that the context of that

21  conversation was, "Man, it seems like the Government has been

22  picking on you.  Maybe it's just better you stay in jail."

23             And it was a conversation between him and I

24  regarding I feel like the Government has just been all over him

25  when he was out and those type of things.  It was never a

 1     strategic decision to say you need to stay in jail, otherwise I

 2     wouldn't have spent so many hours working on this motion that I

 3     filed.

 4                THE COURT:  All right.  I'll accept that proffer.

 5                Anything else then from the defense, from

 6     Mrs. Schneider, on either the probation issue or on the main

 7     case?

 8                MR. BYERS:  Your Honor, I just wanted to correct

 9     or supplement the record on an issue Your Honor raised earlier.

10     And I understand that you've held today that the proper forum

11     to raise this is before Judge Belot, but I'd just like to put

12     it on the record.  My client informs me that, in fact, the

13     private calls -- I'm sorry, the visits in the jail are, in

14     fact -- they use a telephone and that the telephone provides a

15     warning that, you know, this is being monitored.  So private

16     visits are monitored as well, based on what my client has told

17     me.

18                THE COURT:  All right.  Other than that proffer,

19     anything else in the main case that you wish to say before I

20     reach the issue of detention?

21                MR. BYERS:  In the main case, Your Honor, I don't

22     have anything further.

23                THE COURT:  All right.  And, Mr. Ohaebosim, in the

24     probation matter?

25                MR. OHAEBOSIM:  Nothing, Your Honor, until we hear

3-14-08  USA v. SCHNEIDER  07-10234-01, 02

75

1    your -- or until we read your written response.

2              THE COURT:  And I will leave it that in the event

3    that I determine they remain in detention, we'll set a

4    preliminary hearing to go forward on the probation revocation

5    issue alone because that will be required, although the

6    Government has represented to us that if the defendants remain

7    detained in the main case, they are going to dismiss that

8    revocation motion, but I will deal with that in my opinion.

9              Back to the Government then.  I think you're

10   probably not entitled to anything further in the sense of

11   filings or anything else that I questioned the defendants

12   because they would have a right to reply.  Anything else,

13   though, the Government wishes to be heard on with regard to the

14   issue of detention?

15             MS. TREADWAY:  Mr. Metzger brought to my

16   attention, Judge, that I should have requested a condition of

17   release, if in fact the defendants are going to be released,

18   that they have no contact directly or indirectly through family

19   members to witnesses or victims, that victims and witnesses

20   should be dealt with only through the attorneys.  That's a very

21   common condition of release, and we would request that if, in

22   fact, the judge is going to consider that.

23             THE COURT:  If that were to be done, then in

24   keeping with Mr. Williamson's argument about how some possible

25   vagueness in terms of violations, would the Government be in a

 1  position to present names that you specifically deem to be

 2  people with whom they should not have contact?

 3              MS. TREADWAY:  In terms of being witnesses and/or

 4  victims?

 5              THE COURT:  Yes.

 6              MS. TREADWAY:  It would probably be the potential

 7  list of patients at Schneider Medical Clinic.  It's a rather

 8  lengthy list.

 9              The reason for that, Judge, is that we have had

10  some reports of some strong-arming going on in the background

11  where family members and others have been approaching in a very

12  aggressive manner various patients to get them to sign

13  affidavits, to get them to do things.  Several of those

14  patients have called us and reported this.  They called

15  investigative agents and reported it, and we are concerned that

16  that activity stop.

17              THE COURT:  Okay.  I'll hear back from the

18  defendants.

19              MR. WILLIAMSON:  The victims, no problem.  If

20  there are some true victims, which I don't know if there are

21  because the type of charges that the Government made,

22  understood.  Witnesses is an unworkable solution in this type

23  of case when you're dealing with thousands of patients, some of

24  which support the Schneiders, and it would be a blanket

25  prohibition to talk to or communicate with people that want to

1    communicate with you.

2              I agree with the Government in that nobody should

3    be strong-arming any witness, and I would not plan on calling

4    any witness that's been strong-armed.  I think it should also

5    be noted that there has been -- we've been contacted by

6    patients about federal agents going to strong-arm and threaten

7    potential individuals who may testify for the Schneiders.  And

8    I think that that should stop.  If we're going to try this

9    case, let's try it on the facts and not deal with all this

10   extra stuff, and let's not talk about -- stop talking -- you

11   can't talk to any witness.  I agree that there's any -- if

12   there is any witness that says that they don't want to be

13   contacted, I will agree with that.  If there is any victim, I

14   would agree with that.  But to say all witnesses just creates a

15   quagmire of problems that are totally, totally bad.

16              THE COURT:  All right.

17              MR. BYERS:  Just very briefly, to add to what

18   Mr. Williamson is saying.  This is a situation where,

19   regardless of the Government's view of the clinic, it has a

20   large number of supporters who are constantly contacting the

21   family.  I don't know how you can restrict those or potentially

22   punish these people as a condition of bond when they have

23   volunteers coming out of the woodwork and tracking them down

24   and offering help or just calling to see how they're doing.  So

25   I think that is one of those technical issues of a potential

 1    violation that Mr. Williamson is so concerned about.

 2             THE COURT:  All right.  I've had to deal with that

 3    in prior cases, and I dealt with in the Kaufman case that

 4    involved clients that were allegedly not fully mentally

 5    competent and whether contact could be made with those former

 6    patients.  I'm going to go back and review what I've done in

 7    that regard and see where I'm -- I think I have explored

 8    everything I need to explore on the issue of detention.

 9             Let me come to the final thing that I was given by

10    grace today.  Judge Brown asked me to talk to you about the

11    idea of a clinic custodian to maintain the files, or I think

12    you said in the alternative, in some method seal the clinic so

13    there wouldn't be any violations.

14             Tell me from the -- let me start with the

15    Government.  Let me ask, I've not read the motion you presented

16    to Judge Brown.  I just knew I was going to be involved in this

17    issue about 10:30 this morning and I had a few other things on

18    my mind.  Tell me what has been done and where we are on this

19    issue of the custodian of the clinic.

20             MS. TREADWAY:  When prior counsel, Mr. Greeno, was

21    representing Dr. Schneider, he and I agreed to move the court

22    for a preservation of evidence order, which Judge Brown -- and

23    it's a very simple order that says the evidence of the clinic

24    should be conserved.  Tim MacDonald is the custodian, if he

25    can't serve as the custodian, he needs to let me know and I can

 1    appoint one or we can do something else.  There was a very

 2    broad order that basically what he was concerned about and what

 3    Jay and I was concerned about was protecting evidence for both

 4    parties, and the patient files for the patients as well.

 5              The KBHA has a regulatory ability to go to a

 6    district court in the state of Kansas and ask for an

 7    appointment of custodian.  But the Kansas Board of Healing Arts

 8    is unwilling to do that without a custodian that they can tell

 9    the Court, "I've got Mr. X, he's willing to go in there and be

10    the custodian for X dollars."  They don't have anybody like

11    that.  They have beaten the bushes, I have beaten the bushes,

12    we've gone to the Medical Society of Sedgwick County.  They

13    will not take it on.  Nobody's willing to take it on without

14    pay.  And that is the issue, Judge.

15              But if there were some money released from the

16    assets, the $600,000 in assets that had not been seized, or

17    from monies coming in -- there's still monies coming into the

18    clinic.  I'm sure that you're well aware, Judge, that health

19    care claims don't get paid immediately.  Services rendered 30,

20    45, 60, 90 days, up to a year ago, can still have claims made

21    and be paid upon.  In fact, in one of the tapes Ms. Linda

22    Schneider has said, you know, "We've got tons of money that

23    we're sitting on but we need somewhere to deposit it."  So they

24    have money coming in.  They're just simply not expending it for

25    a custodian.

1            The de facto custodian right now is Pat Hatcher,

2   Linda Schneider's sister, and she's basically been at the

3   clinic copying patient files at the request of patients.  So

4   that's what's going on, to the knowledge of the Government,

5   Judge.

6            THE COURT:  From the defense standpoint, is that a

7   fairly accurate recitation of where we are?

8            MR. WILLIAMSON:  Yeah, and I would just add that,

9   you know, I talked with Ms. Treadway a couple of weeks ago.

10  She mentioned it to me.  I went and spoke with the client.

11  They're incarcerated, no means of income while they're

12  incarcerated.  I think it would be prejudicial to the defense

13  to require them to preserve evidence or pay for a custodian

14  that both parties would benefit from.  I can represent to the

15  Court that nobody's going to destroy any documents that I know

16  about because we think a lot of them benefit our defense.

17            THE COURT:  How are we going to share that,

18  though, I mean, in terms of some kind of --

19            MR. WILLIAMSON:  Who's going to be responsible?  I

20  don't know.  I guess the Court can issue -- order a special

21  master to be appointed.  I would say split the cost with the

22  Government.  But what you -- I guess my thought is that if the

23  Government already has the original files, based on the search

24  warrants that led to the indictment and those are the world of

25  the cases that we're dealing with, what more do they need, and

 1    what's the need for the preservation itself, in that I don't

 2    really object to keeping them, but it's just when you're going

 3    in, saying who's paying for this or that, who to hold

 4    accountable, I mean, I really don't know the answer to that.

 5                  And if the -- if the only thing was, listen,

 6    you're responsible for making sure nobody comes in and steals

 7    documents or something like that, I think that that would be

 8    fine.  I think we could find somebody to do that, maybe at no

 9    cost.  I don't want to promise that.  But if it is a situation

10    where you have to go in and every time that a document request

11    is served you're responsible for going in, digging through all

12    these files, and -- or another subpoena's issued, that takes

13    time and energy to go through all these paper files, I think

14    that's what we get a little concerned about.  I don't have any

15    problem with preserving it and, again, I would share that I

16    wouldn't let anybody mess with anything.

17                  THE COURT:  Now, Mrs. Hatcher is making copies if

18    a client of the clinic says, "I want my patient files so that I

19    can go somewhere else," my understanding is that's been done.

20    Is that correct?

21                  UNIDENTIFIED WOMAN:  Yes.

22                  MS. TREADWAY:  And, Judge, this is a statutory

23    requirement on Dr. Schneider.  This is a part of his licensure.

24    He has to maintain these files.  So we're not asking him to do

25    something that he is not already, by virtue of his medical

1    license, required to do.  Even though it's suspended, it

2    doesn't matter; that requirement lasts in perpetuity for many

3    years.  The clinic is required and he is required to keep those

4    records.  So we're not asking him to do anything out of the

5    ordinary.  What we're concerned about is, again, access for

6    patients who want the files, access for the defense, and access

7    for the Government.

8            The Government continues to investigate this case.

9    Unfortunately, there's been three more deaths that we've got to

10   investigate, and we asked for and received those files from the

11   clinic.  And if there are more deaths, we will ask for those

12   files, Judge.  And if we have additional people to report

13   issues to us that we need those files, we'll ask for those

14   files and we can subpoena those files.  But the problem is who

15   do we subpoena.

16           THE COURT:  I guess let me back up.  I heard some

17   reference, I thought, this morning to the thousand and fifty

18   patient files in the status conference.  Didn't the Government,

19   at the time of the search warrant, copy all patient files?

20           MS. TREADWAY:  No.  We have a small amount of the

21   files.  Over the course of the clinic existence, in its current

22   place, there were over 10,000 patients.  We have a thousand

23   fifty original medical files.  But there at -- the copies of

24   those medical files are still at the clinic as well.  So,

25   again, if the defense wants free access to those records

1   without the Government having to provide them, they're at the

2   clinic, so they're going to need access to those.

3              We have 10,050 of them.  We don't have --

4              THE COURT:  You have one thousand --

5              MS. TREADWAY:  I'm sorry, 1,050.  We don't have

6   9,000 of the rest of them.

7              MR. WILLIAMSON:  A good compromise, Judge, is if

8   you just let Dr. Schneider out, he'll guarantee they'll watch

9   the clinic and we don't have a problem.  If he's the one

10  responsible, you let him out, give him the responsibility, he

11  knows he has to have responsibility, all this is a moot point.

12             THE COURT:  How can I do that when you propose and

13  said he'll go nowhere near the clinic?

14             MR. WILLIAMSON:  Oh, I said with defense counsel.

15  In other words, if he had to serve a -- respond to a subpoena.

16             THE COURT:  You'd have to come down from Kansas

17  City and go with him?

18             MR. WILLIAMSON:  Yeah, but we'd have plenty of

19  time to respond to a subpoena.

20             THE COURT:  All right.  Okay.  That's the -- I'm

21  going to take that one under advisement also, see what I can

22  do.  I'll probably consult with Judge Belot on that because

23  that ultimately may be a matter that's more in his bailiwick

24  than it is in mine, so I will consult with him.

25             (End of requested portion.  The remainder of this

1   hearing transcript is contained within Document 50 filed on

2   EC/CMF.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were digitally recorded;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 31st day of March, 2011.


                    s/ Johanna L. Wilkinson
                    Johanna L. Wilkinson, CSR, CRR, RMR
                    United States Court Reporter