1004

```
 1                    (Beginning at 9:00 a.m. May 3,

 2                    2010, the following proceedings

 3                    continued.)

 4          THE COURT:  Redirect please.

 5          MS. TREADWAY:  Thank you, Judge.

 6                  REDIRECT EXAMINATION

 7   BY MS. TREADWAY:

 8   Q   Good morning, Dr. Oeberst.

 9   A   Good morning.

10   Q   I would like to start where Mr. Byers left off

11   Friday with his client Defendant Linda Schneider.  Based

12   on your review of the case files for the 29 autopsies

13   and two external examinations that you performed, did

14   you find evidence that the Defendants' clinic and each

15   of the Defendants individually had been contacted and

16   notified about deaths of some of these individuals?

17   A   Yes.

18   Q   Let me hand you what has been marked for

19   identification as Government Exhibit 151-B.  Have you

20   had an opportunity to review that prior to your

21   testimony today?

22   A   Yes.

23   Q   Does Exhibit 151-B contain business records from the

24   case files of the Forensic Science Center?

25   A   Yes.
```

1005

1    Q   With regards to the 31 individuals for whom you

2    prepared reports, do the case files evidence that the

3    Defendants and their clinic did in fact receive notice

4    of some of these deaths?

5    A   Yes.

6    Q   Turning to Kandace B who is one of the individuals

7    listed in Count 5 of the Indictment.  Can you refresh

8    your recollection as to how the clinic received notice

9    with regards to her death?

10          MR. WILLIAMSON:  Your Honor, I'm going to

11   object.  That's an improper method to refresh her

12   recollection.  Hasn't been established that the

13   witness's memory needs to be refreshed.

14          THE COURT:  Overruled.

15   BY MS. TREADWAY:

16   Q   Again, how did the Clinic receive notice of Kandace

17   B's death?

18   A   Coroner's subpoena for medical records.

19   Q   And turning to Terry C.  Could you refresh your

20   recollection as to how they received notice of Terry C's

21   death?

22   A   Dr. Schneider was directly contacted by the

23   investigator on call.

24   Q   In terms of Robin G, who is the individual named in

25   Count 4 and 9 of the Indictment, did the Forensic

1006

```
 1    Science Center request and receive medical records from

 2    the Defendants' clinic?

 3    A    Yes.

 4    Q    With regards to Casey G, who received notice of his

 5    death at the clinic?

 6    A    Debra McKetran.

 7    Q    Who received notice of William M's death according

 8    to the business records?

 9    A    Dr. Schneider.

10    Q    And who received notice of Lucy S' death according

11    to the business records?

12    A    Dr. Schneider.

13    Q    Was the Defendant Steven Schneider asked if he would

14    sign the death certificate for Lucy?

15    A    Yes.

16    Q    What was his response?

17    A    Uhm, no, he felt that it should be a Coroner's case.

18    Q    Did the Forensic Science Center request and receive

19    medical records from the Clinic with regards to Brad S

20    who is one of the individuals listed in Count 5 of the

21    Indictment?

22    A    Yes.

23    Q    Who received notice of Mary Jo S' death, another

24    individual listed in Count 5?

25    A    Linda Schneider.
```

1007

1    Q    Who received notice of Toni W's death, another

2    individual in Count 5?

3    A    Dr. Schneider's office.

4    Q    And did someone request a copy of Toni W's autopsy?

5    A    Yes.

6    Q    Who?

7    A    Dr. Schneider.

8    Q    Dr. Oeberst, in the years 2002 through 2007, did you

9    receive any calls or correspondence from the Defendant

10   Stephen Schneider or Linda Schneider questioning or

11   challenging the drug overdose conclusions regarding

12   former Schneider Medical Clinic patients?

13   A    No.

14   Q    If such calls had been made, would you have been

15   made aware of such calls if they related to your

16   autopsies?

17   A    Yes.

18   Q    During Mr. Williamson's cross-examination he spoke

19   to you about the National Association of Medical

20   Examiners and the standards and guidelines they have

21   developed.  Do your autopsy reports meet or exceed the

22   applicable NAME standards and guidelines?

23   A    Yes.

24   Q    During any accreditation reviews, have your autopsy

25   reports ever been designated as deficient?

1    A    No.

2    Q    Let me hand you what has been marked for

3    identification as Government Exhibit 65.  Are these the

4    now applicable standards since 2006?

5    A    Yes.

6    Q    And were these what Mr. Williamson was referring to

7    during your cross-examination but which he did not show

8    you?

9    A    Yes.

10    Q    Was this document the result of committee work?

11    A    Yes.

12    Q    Was Dr. Mary Dudley one of those committee members?

13    A    Yes.

14    Q    According to the preface to this document, are these

15    standards written in stone never to be deviated from?

16    A    No.

17    Q    What are they?

18    A    They are a constructive framework that defines the

19    fundamental services.

20    Q    What do these standards recognize in terms of how

21    they should be applied?

22    A    Deviation can be -- you can deviate from these

23    standards if it's justified by professional judgment.

24    Q    Is that consistent with the practice of medicine as

25    a whole?

1    A    Yes.

2    Q    Mr. Williamson repeatedly questioned you about

3    histological examinations.  Can you remind the jury what

4    a histological examination is?

5    A    It's looking at tissue under the microscope.

6    Q    Is a microscopic examination of tissue necessary in

7    all death investigations?

8    A    No.

9    Q    Is it required by NAME in all death investigations?

10   A    No.

11   Q    Nevertheless, do you keep tissue specimens from

12   death investigations?

13   A    Yes.

14   Q    And if there is ever a need to go back and do a

15   histological examination, can you do so?

16   A    Yes.

17   Q    Mr. Williamson also asked about damage caused to

18   livers due to acetaminophen poisoning.  Is acetaminophen

19   the active ingredient in Tylenol?

20   A    Yes.

21   Q    And do many of the drugs that were found on

22   toxicology in your autopsies, do they contain

23   acetaminophen?

24   A    Yes.

25   Q    Mr. Williamson also spoke to you about tolerance and

1010

1    post-mortem distribution.  I want to first speak to you

2    about post-mortem distribution.  Is that a well known

3    phenomenon in the field of forensic pathology?

4    A    Redistribution?

5    Q    Yes.

6    A    Yes.

7    Q    Post mortem redistribution?

8    A    Yes.

9    Q    Can you briefly remind the jury what that is in

10   simple terms?

11   A    It's essentially some drugs will have different

12   blood levels in heart blood than they will from

13   peripheral, like blood taken from a femoral vessel.

14   Q    And if I can use my own body, where is a femoral?

15   Is a femoral artery down here on the leg?

16   A    Yeah.  In your groin area or your thigh.

17   Q    Briefly, remind the jury what tolerance to a drug

18   means?

19   A    Tolerance means that over time you develop -- you

20   become tolerant to some of the sedative or side effects

21   and even to a certain extent pain control with certain

22   dosage of a certain drug.

23   Q    So if I have pain and one pill takes care of the

24   pain now, maybe I need more pills later to keep -- take

25   care of the same pain.  Is that essentially what we're

1011

1    talking about?

2    A    Yes.

3    Q    All right.  And during cross-examination you spoke

4    in terms of tolerance to a certain dosage of drug.  If a

5    person is tolerant to a certain dosage of drug, does

6    that mean the person cannot overdose on the drug?

7    A    No.

8    Q    Does the term overdose presume that someone has

9    taken too much of a drug?

10   A    Yes.

11   Q    Did most of the 31 individuals you testified about

12   die of mixed drug overdoses as opposed to a single type

13   of drug?

14   A    Yes.

15   Q    Is tolerance even an issue in mixed drug overdoses?

16   A    Not -- because the drugs -- no, because the drugs

17   have combined effects.

18   Q    In forming your conclusions about the cause and

19   manner of death in the 29 autopsies and two external

20   examinations you introduced into evidence, did you take

21   both of these issues, tolerance and post-mortem

22   redistribution, into account?

23   A    Yes.

24   Q    And did either of those issues cause you any

25   hesitancy in concluding that the primary or contributing

1    causes of death were drug overdoses?

2    A    No.

3    Q    Mr. Williamson also repeatedly talked to you about

4    the conditions of many of these individuals' hearts.  Is

5    all of that information found in your autopsy reports?

6    A    Yes.

7    Q    You didn't hide that information, did you?

8    A    No.

9    Q    In fact, did you consider that information in

10   forming your opinions?

11   A    Yes.

12   Q    As to any of these 31 individuals, was the primary

13   cause of death an enlarged heart?

14   A    No.

15   Q    Is an enlarged heart or a heavy heart simply a

16   symptom of other disease processes?

17   A    Yes.

18   Q    And when a person has a large or heavy heart, how do

19   the drugs in this case, especially the mixing of this

20   drug, the drugs in this case, effect that heart as

21   compared to a normal heart?

22   A    They're actually at a greater risk to being subject

23   to the effects of the drug.

24   Q    Same question with regards to heart disease in

25   general.  When someone has underlying heart disease and

1013

1    you add to that person all of this mix of drugs, what

2    effect does that have on a heart that is already at

3    risk?

4    A    Same answer as the question before.   It puts your

5    heart at increased risk.

6    Q    If any of the 31 individuals for whom you formed an

7    opinion about cause and manner of death had died of

8    heart disease, would the manner and death have been

9    listed as accidental?

10   A    No.

11   Q    What would the manner of death have been had they in

12   fact died of heart disease?

13   A    Natural.

14   Q    Does your conclusion that the heart disease

15   contributed to a person's death mean that the drug

16   overdose wasn't the cause of the person's death?

17   A    No.

18   Q    Were most of the 31 individuals relatively young?

19   A    Yes.

20   Q    Was the oldest person Lucy S at the age of 61?

21   A    Yes.

22   Q    Was the youngest person Dustin B at the age of 22?

23   A    Yes.

24   Q    Let's assume what you did not find.   Let's assume

25   that all 31 of these individuals at very young ages died

1014

1    of heart disease.  Would that have been another

2    disturbing trend, Dr. Oeberst?

3    A    In the overall scheme of things, yes.

4    Q    During Mr. Williamson's cross-examination, starting

5    with Eric T, he repeatedly asked you if there was one

6    single test which you could use to eliminate heart

7    attack or heart disease as the cause of death.  Do you

8    remember that line of questioning?

9    A    Yes.

10   Q    Is forensic pathology such an exact science or is it

11   instead a specialty in the field of medicine?

12   A    It's a specialty in the field of medicine.

13   Q    In practicing your medical specialty of forensic

14   pathology, do you ever rely on just one test to

15   determine the cause and manner of death?

16   A    No.

17   Q    What instead, Dr. Oeberst, do you rely on?

18   A    Investigative information.  It's a compilation of

19   all the data, all the observations we make at autopsy,

20   the investigation, review of medical records.  We look

21   at tissues in some cases under the microscope.

22   Toxicology results.  It's a combination of all the tests

23   and the autopsy findings.

24   Q    And then taking all of that information together in

25   practicing medicine, what do you ultimately use to

1  conclude what the cause and manner of death are in a

2  given case?

3  A   I base my medical opinion on my experience, training

4  and education.

5  Q   Although you testified that there was no one test to

6  eliminate heart attack as the cause of death, did you in

7  fact eliminate heart attack as Eric T's cause of death?

8  A   Yes.

9  Q   What did Eric T die from?

10 A   Complications of a mixed drug intoxication.

11 Q   And even though he died, were the emergency

12 responders able to restart his heart?

13 A   Yes.

14 Q   What was damaged beyond repair because of Eric's

15 drug overdose?

16 A   His brain.

17 Q   Prior to your death -- prior to his death, in your

18 opinion, did the investigation reveal classic signs of

19 drug overdose?

20 A   Yes.

21 Q   And what were those classic signs?

22 A   Well, it was reported that he ingested extra pain

23 medication.  He was noted to be lethargic.  He also had

24 the snoring respirations.  And then was later found

25 unresponsive.

1016

1    Q   Let's move to Robin G briefly.  And I'm going to

2    hand you a copy of Exhibit 4-G, your autopsy report for

3    her.  Could you bring that up, Mr. Moore, please.  And

4    I'd like you to turn to Page 7 and the last sentence of

5    that, "the changes within the myocardium of the right

6    ventricle are most likely secondary to the Fentanyl

7    intoxication."

8        Now, I know secondary to is a term of art in the

9    medical field and it's confusing to me.  What does that

10   mean?

11   A   That means basically that the changes in the heart

12   muscle on the right side of the heart were a result of

13   the Fentanyl intoxication.

14   Q   Now, Mr. Williamson had you speculate about how it

15   was that Robin overdosed on her Fentanyl.  Do you

16   actually know how she overdosed?

17   A   No.

18   Q   Did you need to know how she overdosed to determine

19   the cause and manner of her death?

20   A   No.

21   Q   And did you conclude that she died of an overdose of

22   Fentanyl?

23   A   Yes.

24   Q   During cross-examination Mr. Williamson repeatedly

25   asked you whether you knew the deceased's entire medical

1    history or whether you knew who treated the person while

2    they were alive.  Do you remember those questions?

3    A    Yes.

4    Q    Do you need to know the person's entire medical

5    history to determine the cause and manner of death?

6    A    No.

7    Q    Do you and your investigators obtain the medical

8    history you need to determine cause and manner of death

9    if that history is available?

10   A    Yes.

11   Q    And was that done in each of the cases you testified

12   about?

13   A    Yes.

14   Q    Do you need to know who treated the person or who

15   last prescribed them medication to determine cause and

16   manner of death?

17   A    No.

18   Q    Would knowing any of the information that

19   Mr. Williamson asked you about for over six hours have

20   changed your conclusions that the 31 individuals you

21   testified about accidentally died of drug overdoses?

22   A    No.

23   Q    Were you ever asked to render an opinion about

24   whether the Defendants and the employees under their

25   direction caused or contributed to anyone's death?

1018

1    A    No.

2    Q    Were you ever asked to determine whether the

3    policies and practices of the Defendants' clinic caused

4    or contributed to the deaths of the 21 individuals in

5    Counts 2 through 5 of the Indictment?

6    A    No.

7    Q    Is that for others to testify about?

8    A    Yes.

9    Q    Sitting here today, Dr. Oeberst, and using

10   Mr. Williamson's question, do you have any reasonable

11   doubt that the -- of any of the conclusions you formed

12   in any of your 31 reports?

13   A    No.

14   Q    Furthermore, based on a reasonable degree of medical

15   certainty, did all of the 31 people you have testified

16   about accidentally die of drug overdoses?

17   A    Yes.

18   Q    Now, as the medical examiner during this course of

19   time, did the bulk of the autopsies fall to you and Dr.

20   Mary Dudley?

21   A    Yes.

22   Q    Have you ever had to testify regarding as many

23   deaths in a single criminal trial as you have in this

24   case?

25   A    No.

1    Q    And although you were directly involved in only 31

2    death investigations, were you aware of the many other

3    death investigations involving people who received

4    controlled substances at the Schneider Medical Clinic?

5    A    Yes.

6    Q    You spoke on both direct and cross-examination about

7    the trend of drug overdose deaths you observed from the

8    Schneider Medical Clinic.  Since the clinic was closed

9    in January, 2008, have drug overdose deaths

10   unfortunately continued?

11   A    Yes.

12   Q    Nevertheless, Dr. Oeberst, have you seen any similar

13   trend of drug overdose deaths associated with any one

14   clinic or any single physician as you saw with the

15   Defendant and the Defendant's clinic?

16   A    No.

17   Q    Mr. Williamson also asked you about a Dr. Karch who

18   has been listed as a defense expert in this case.

19   Although you use the textbook he edits and compiles as a

20   reference book, do you consider Dr. Karch himself in any

21   way authoritative as a source on toxicology or

22   pathology?

23   A    No.

24   Q    Finally, Dr. Oeberst, I want to clear up one final

25   matter.  As a medical examiner and the Coroner, are you

1   often called to testify in criminal cases as you are

2   doing so in this case?

3   A   Yes.

4   Q   And is your testimony in criminal cases part of your

5   job as the medical examiner?

6   A   Yes.

7   Q   By contrast, if someone wants you to testify in a

8   civil case, like a medical malpractice case, is that

9   part of your job as the medical examiner?

10  A   No.

11  Q   Why not?

12  A   It's considered something that we're allowed to do

13  privately on our own time.  It's not part of my job

14  responsibilities as the Coroner.

15  Q   And do the policies and procedures established at

16  the Forensic Science Center allow you to do this work

17  and be compensated for your time?

18  A   Yes.

19  Q   Do you perform your work as a medical examiner and

20  Coroner with integrity?

21  A   Absolutely.

22  Q   And do your reports change depending on who you're

23  testifying for?

24  A   No.

25  Q   How many times have you testified in criminal trials

1   during your ten years as a forensic pathologist?

2   A   Somewhere between 50 and 75.

3   Q   In those ten years and on any of those occasions,

4   has your integrity ever been questioned or challenged?

5   A   No.

6   Q   Until last week; correct?

7   A   Yes.

8   Q   Do you believe Mr. Williamson question --

9   Mr. Williamson's questions last week about what he

10  termed a conflict of interest were an attack upon your

11  integrity?

12  A   Yes.

13  Q   Did you understand that Mr. Williamson was trying to

14  accuse you of reaching conclusions in your autopsy

15  reports so that you would create work for yourself?

16  A   Yes.

17  Q   In civil cases?

18  A   Yes.

19  Q   Would you like to respond to that outrageous

20  accusation, Dr. Oeberst?

21  A   I find it insulting.  I've always acted with

22  integrity.  I actually perform -- civil work actually

23  constitutes a very small, very small portion of any work

24  that I do in any given year; and these deaths would have

25  been certified, the autopsy would have been performed

1022

1    years before these cases came to civil litigation.

2    There's nothing that I have ever done to determine cause

3    and manner of death that would have been based on me

4    making additional monies outside of my normal job

5    duties.

6    Q    Do you believe Mr. Williamson had any good faith

7    basis to accuse you of that at all?

8              MR. WILLIAMSON:  Your Honor, I have listened

9    to the accusations at least three questions.  I let this

10   last answer go.  I think Ms. Treadway is way over the

11   line.

12             THE COURT:  I think so, too.  The objection is

13   sustained.

14   BY MS. TREADWAY:

15   Q    As to the 29 autopsies and two external examinations

16   you performed, are you testifying under oath that the

17   primary or contributing causes of death were drug

18   overdose?

19   A    Yes.

20   Q    Did anything influence you to reach those

21   conclusions?

22   A    No.

23   Q    Other than what you do every single day in the

24   performance of your job, namely, investigating and

25   certifying the cause and manner of people's deaths?

1023

```
1    A    No.

2                MS. TREADWAY:  Nothing further.

3                THE COURT:  Yes, sir.

4                    RECROSS EXAMINATION

5    BY MR. WILLIAMSON:

6    Q    You stated that the Defendants were notified as to

7    some of the deaths; correct?

8    A    Yes.

9    Q    And you identified eight; correct?

10   A    Yes.

11   Q    Okay.  And you also mentioned Lucy S.  Do you

12   remember that question by Ms. Treadway?

13   A    Yes.

14   Q    Isn't it true that -- and I believe you said this --

15   that Dr. Schneider actually sent Lucy S to the Coroner's

16   office for an autopsy; correct?

17   A    No.  He just said he wouldn't certify the death.

18   Q    No, you testified on direct that he said that it was

19   a Coroner's case; correct?

20   A    Yes.  But he doesn't actually make that

21   determination.

22   Q    But when he tells you that it's a Coroner's case,

23   that means that he's not going to sign the death

24   certificate unless he has something from the Coroner

25   identifying what the cause of death is; correct?
```

1   A    No.  He wouldn't sign the death certificate in a

2   Coroner's case.  The Coroner would.

3   Q    And so when he sends it to the Coroner, who is the

4   Coroner?

5   A    Me currently.

6   Q    So when he sends this as a Coroner's case, he says

7   this is a case for you; correct?

8   A    What he said --

9   Q    In his opinion?

10  A    In his opinion what he's saying is that he does not

11  have enough history of natural disease or he has other

12  concerns that he cannot certify it as a natural death.

13  Q    Okay.  He had an opportunity to certify Lucy S as a

14  natural death; correct?

15  A    Yes.

16  Q    And he said, no, I'm going to -- I think it should

17  go to the Coroner; correct?

18  A    Yes.

19  Q    And at the Coroner's office you conduct an autopsy

20  to determine the cause of death; correct?

21  A    Yes.

22  Q    If he was a drug dealer, wouldn't he just certify

23  this death as natural and keep 'em far away from your

24  office as possible; correct?

25  A    I don't know.

1    Q    Now, you mentioned these NAME standards and you

2    mention that they've never come in to say any of your

3    autopsies are bad.  Has NAME ever come in and reviewed

4    any of the autopsies that we've been talking about here

5    today or last week?

6    A    I don't know specifically which autopsies they

7    review during the accreditation process.

8    Q    So you don't know for certain that they reviewed any

9    of these that were discussed in this case; correct?

10   A    They reviewed some cases but I don't know

11   specifically these.

12   Q    Now, have you ever been disciplined in your office

13   for failure to keep accurate documentation?

14   A    No.

15   Q    And you've given a deposition before; correct?

16   A    Yes.

17   Q    Now, you were asked a few questions about these

18   standards and guidelines.  Is it your testimony that

19   guidelines are just supposed to give guidance but at the

20   end of the day you're still supposed to use your medical

21   judgment; correct?

22   A    Absolutely.

23   Q    And these guidelines, they're not law?  They're not

24   something that you have to follow under each and every

25   circumstance.  Correct?

```
 1   A    That's correct.

 2   Q    You were asked questions about the tolerance in

 3   mixed drug intoxication.  I believe your response was

 4   that mixed drug intoxication and tolerance are two

 5   totally different things.  Is that what your testimony

 6   was?

 7   A    Not exactly but --

 8   Q    Correct.  Because mixed -- you can still -- use a

 9   different -- you can use the same combination of

10   medicine over a long period of time and develop

11   tolerance to that medication pattern; correct?

12   A    Yes.

13   Q    Okay.  So just because there are multiple

14   prescriptions in a person's system doesn't mean that

15   tolerance is thrown out the window; correct?

16   A    Correct.

17   Q    You mentioned this trend that Ms. Treadway asked you

18   about.  Can you give us a written report of all the

19   autopsies that you reviewed and you've written about

20   this imaginary trend?

21   A    A written report?

22   Q    Yes.

23   A    No.

24   Q    Can you show us a study about this trend?

25   A    No.
```

1    Q    In fact, isn't it true that the accidental deaths in

2    Sedgwick County, or at least your office deals with, has

3    continued to increase since 2006?

4    A    Accidental deaths as a whole?

5    Q    Yes.

6    A    Yes.

7    Q    Can you tell the jury how many times in your

8    professional career you actually rely on the textbook of

9    people that you do not believe are authoritative?

10   A    How many times -- I'm sorry.

11   Q    How many times in your career do you utilize a

12   textbook from -- that is authored by somebody that you

13   do not believe is authoritative?

14   A    Repeatedly.

15   Q    So the person may not be authoritative, but the

16   texts that they create are?

17   A    No.  I use multiple references.  I don't consider

18   any single one reference an authoritative preference.

19   Q    Let me ask it differently --

20              THE COURT:  Don't interrupt her,

21   Mr. Williamson.  Let her answer the question.

22   Q    Sorry, Your Honor.  Are you finished?

23   A    Go ahead.

24   Q    Okay.  Apologize.  Let me ask it a different way.

25   If I was to write a textbook on pathology, would you

1    rely on my text in conducting your autopsy?

2    A    Probably not.

3    Q    Okay.  And -- I don't think I have anything further.

4            MR. BYERS:  No questions, Your Honor.

5            THE COURT:  Doctor, thank you very much.

6    You're excused.

7    A    Thank you.

8            THE COURT:  Next witness, please.

9            MS. TREADWAY:  Government calls Dr. Larry

10   Czarnecki.

11                    **LARRY CZARNECKI**

12   Having been first duly sworn to tell the truth, the

13   whole truth and nothing but the truth, testified as

14   follows on:

15                   **DIRECT EXAMINATION**

16   BY MS. TREADWAY:

17   Q    Could you please introduce yourself to the jury?

18   A    Yes.  I'm Lawrence Czarnecki.

19   Q    And are you a medical doctor?

20   A    I'm an osteopathic physician.

21   Q    And are you employed?

22   A    Yes.

23   Q    Where are you employed?

24   A    I'm employed by Coconino County Health Department.

25   It's in Flagstaff, Arizona.

1029

```
 1    Q    And what do you do there?

 2    A    I am the medical examiner.

 3    Q    And how long have been the medical examiner there?

 4    A    From 2005 to 2010, to the present.

 5    Q    In the past have you performed autopsies at the

 6    Sedgwick County Regional Forensic Science Center?

 7    A    Yes.  I performed autopsies there from approximately

 8    2002 to 2005.

 9    Q    Could you review with the jury your educational

10    background beginning with your undergraduate college

11    degree?

12    A    Yes.  I studied biology undergraduate at multiple

13    universities, San Diego State, Oregon State, University

14    of Oregon.  And I was accepted early to medical school

15    and I went to four years of medical school at Kirksville

16    College of Osteopathic Medicine in Missouri from '92 to

17    '96.  I then did a five year residency at St. Joseph's

18    Hospital in Phoenix.  This residency was in anatomic

19    pathology and clinical pathology.  I then did a one year

20    specialty training at University New Mexico in

21    Albuquerque from 2001 to 2002.

22    Q    Are you board certified?

23    A    Yes.  I'm board certified in anatomic pathology,

24    clinical pathology and forensic pathology.

25    Q    And so those are three separate boards?
```

1030

1    A    Yes.

2    Q    How many years have you been working as a forensic

3    pathologist?

4    A    Since 2002, so I'm in my eighth year.

5    Q    In those years could you estimate how many autopsies

6    you've been involved in?

7    A    Hundreds of autopsies.

8    Q    As a medical examiner and forensic pathologist do

9    you on occasion serve as a paid expert witness as

10   opposed to a witness in the normal course of your duties

11   as the medical examiner?

12   A    Yes.  Anything that would arise -- you know, I've

13   worked in different places.  I also worked at Kansas

14   University for a while.  So anything that would be

15   outside of my current jurisdiction, I would be called

16   out as an expert witness.

17   Q    And that's the case in this situation?

18   A    Yes.

19   Q    And in serving as a paid expert witness, do you

20   receive payment for the time you spend on the case?

21   A    Yes.

22   Q    And does that include the time you spend reviewing

23   files?

24   A    Yes.

25   Q    Discussing the case with the attorneys?

```
 1   A    Yes.

 2   Q    And the time you spend here in court?

 3   A    Yes.

 4   Q    And are we also compensating you for your travel

 5   expenses?

 6   A    Yes.

 7   Q    Have we paid you any money to date?

 8   A    No.

 9   Q    But you'll invoice us and you expect payment?

10   A    Yes.

11   Q    I've placed in front of you, sir, several autopsies.

12   Government Exhibit 6-J-2, 150-1-B, and 150-4-B.  Are you

13   familiar with those autopsy reports?

14   A    Yes, I am.

15   Q    And are those autopsy reports that you personally

16   authored?

17   A    Yes, they are.

18   Q    And are those public records?

19   A    Yes.

20   Q    And do those documents reflect your activities of

21   the Forensic Science Center here in Wichita, including

22   matters observed and your factual findings?

23   A    Yes.

24   Q    And were those created under a duty imposed by law

25   for you and the Forensic Science Center to make such
```

1  observations and report upon them?

2  A   Yes.

3  Q   And did you make your autopsy reports as the result

4  of an investigation made pursuant to authority granted

5  to you and the Forensic Science Center under law?

6  A   Yes.

7  Q   And prior to your testimony today, did you have the

8  opportunity to review this group of autopsies?

9  A   Yes.

10  Q   And do all of these autopsies include toxicology

11  reports?

12  A   Yes, they do.

13  Q   Did Dr. Rohrig author the toxicology reports for

14  Jessie D and David B?

15  A   Yes, Dr. Rohrig authored it for Jessie and Dr.

16  Rohrig authored it for David.

17  Q   And did Dr. Christopher Long author the toxicology

18  report for Christine?

19  A   Yes.

20  Q   Did you review the toxicology reports in the

21  ordinary course of your duties at the Forensic Science

22  Center?

23  A   Yes.

24  Q   And do the toxicology reports actually become a part

25  of your autopsy report?

1    A    Yes.

2    Q    Now I'd like you to identify for the record

3    Government Exhibit 6-J-2.  Whose autopsy report is that?

4    A    That's Jessie D.

5    Q    150-1-B?

6    A    That's Christine B.

7    Q    And 150-4-B?

8    A    That's Dave B.

9            MS. TREADWAY:  Government would offer those

10   three exhibits as public records under Federal Rule of

11   Evidence 803(8) and as business records under 803(6).

12           MR. WILLIAMSON:  No objection.

13           THE COURT:  They're received.

14   BY MS. TREADWAY:

15   Q    Let me also hand you what has been marked for

16   identification as Exhibit 1-A, which is a summary chart.

17   Prior to your testimony today, were you able to review

18   the information on your autopsies and compare them to

19   that chart?

20   A    Yes.

21   Q    And did you find the information on Government

22   Exhibit 1-A to be an accurate reflection of the

23   information from your autopsy reports and the death

24   certificates?

25   A    Yes, I did.

1034

1    Q   Now, also in front of you is Government Exhibits

2    6-J-1, 150-1-A and 150-4-A.  Are those the corresponding

3    death certificates for the autopsy reports you prepared?

4    A   Yes.  These correspond to the autopsy reports.

5    Q   Now, you were not the certifying physician on any of

6    those death certificates, were you?

7    A   No.  I performed the autopsy and authored those

8    reports; but I was not the person that signed the death

9    certificates.

10   Q   Nevertheless, did the death certificates accurately

11   reflect your findings from your autopsy reports?

12   A   Yes.

13   Q   And are these death certificates public records and

14   records of vital statistics?

15   A   Yes.

16           MS. TREADWAY:  Government would offer 6-J-1,

17   150-1-A, and 150-4-A as both public records and records

18   of vital statistics.

19           MR. WILLIAMSON:  No objection.

20           THE COURT:  I assume you're not objecting

21   either, Mr. Byers.

22           MR. BYERS:  That's correct, Your Honor.

23           THE COURT:  All right.  Those are received.

24   BY MS. TREADWAY:

25   Q   Let's first look at the autopsy and death

1035

1    certificate for Jessie D.  Exhibits 6-J-1 and 2.

2    Mr. Moore, if you would bring up 6-J-2, the autopsy.

3    And looking at Page 1 of this autopsy report for Jessie

4    D, what do you report as the cause of death?

5    A    I reported the cause of death as mixed drug

6    "Methadone and Alprazolam" intoxication and choking.

7    Q    And what did you report as the manner of death?

8    A    The manner of death was accident.

9    Q    And looking at 6-J-1, the death certificate,

10   specifically in box 30-D, how the injury occurred, what

11   does it state there?

12   A    Prescription drug abuse and aspiration of food

13   bolus.

14   Q    What does aspiration of food bolus mean?

15   A    This means the decedent -- I can talk about the

16   report -- but basically it means there was a food bolus

17   within the airway.

18   Q    Does that just mean a chunk of food?

19   A    Yes.

20   Q    And that's why you said he also choked?

21   A    Yeah.  I wasn't able to document that at the time of

22   autopsy but that was something that was reported to me

23   by emergency medical services.

24   Q    Now let's look at the next set of death certificate

25   and autopsy reports for Christine B, Government Exhibit

1036

1    150-1-A and B.  Let's first look at the autopsy report

2    150-1-B.  And looking on Page 1 of the autopsy report,

3    what did you report as her cause of death?

4    A    Combined drug "Carisoprodol, Chlordiazepoxide,

5    Phenobarbital" intoxication.

6    Q    And what was the manner of her death?

7    A    Accident.

8    Q    Those are some drugs we haven't seen before.  The

9    jury is familiar with Carisoprodol as Soma; but what is

10   Chlordiazepoxide?

11   A    That's Librium.  It's a benzodiazepine.

12   Q    So is that something that's prescribed for what?

13   A    Uhm, you know, it's basically like an anti anxiety

14   type medication.

15   Q    Okay.  Then we have phenobarbital.  What is that?

16   A    That's a barbiturate.  It's, you know, someone might

17   be prescribed that for like seizures, that type of

18   thing.  It has abuse potential as well.

19   Q    Do all of those drugs have central nervous system

20   depression potential?

21   A    Yes.

22   Q    Now, looking at the death certificate for Christine

23   B, again looking at Box 30-D, how the injury occurred.

24   What does that state?  Does it have anything?

25   A    Let's see here.  I'm sorry.  I'm having trouble

1037

 1    locating --

 2  Q    See if I can help.  I don't think there is anything

 3    listed on this one.  It doesn't say, does it?

 4  A    No.

 5  Q    All right.  Now, looking at Exhibits 150-4-A and B,

 6    the death certificate and autopsy reports for David B.

 7    Let's first look at the autopsy report.  What was the

 8    cause of David B's death?

 9  A    This had mixed drug "cocaine, Diazepam and

10    methadone" intoxication.  And Hepatitis C.

11  Q    And what was the manner of his death?

12  A    This was accident.

13  Q    Now, with regard to his Hepatitis C, was that the

14    actual cause of his death or was that contributory?

15  A    That's just considered a contributory entity.

16  Q    Now, Dr. Czarnecki, as to each of these cases, do

17    you begin your autopsy with a conclusion that these

18    patients died of mixed drug intoxication?

19  A    No.

20  Q    How would you reach that conclusion?

21  A    Well, it's by bringing a bunch of facts,

22    circumstances and what-not together.  We look at the

23    investigation, what that brings us.  We look at the

24    circumstances.  We then perform an examination of the

25    decedent.  We look at the external aspects of the body.

1038

1    We open up the body.  We take samples such as blood and

2    we run special tests such as toxicology.  And then once

3    we culminate all that information together, once we have

4    all that, we compose an opinion.

5    Q    In your opinion, within a reasonable degree of

6    medical certainty, do each of these autopsies we have

7    introduced into evidence correctly reflect both the

8    cause and manner of death?

9    A    Yes.

10              MS. TREADWAY:  Nothing further, Judge.

11              THE COURT:  Mr. Williamson.

12                    **CROSS EXAMINATION**

13   BY MR. WILLIAMSON:

14   Q    How you doing today?

15   A    Good.  Thanks.

16   Q    Let's start with discussing Christine -- well, let's

17   start with Dave B.  You mentioned that part of your --

18   the way you get to your diagnosis is relying on

19   investigation; correct?

20   A    Yes.

21   Q    And in part of that investigation you want to learn

22   all the facts that will help you weigh the information

23   that you learn during your autopsy; correct?

24   A    Yes.

25   Q    And part of the information you need to learn about

1039

1    the person is their prescription history; correct?

2    A    Yes.

3    Q    And that's because if a person had been taking a

4    certain prescription one time as opposed to that same

5    prescription dosage for 100 times in a regular

6    succession, that makes a difference as to how you would

7    interpret the levels that you may find present after a

8    toxicology exam; correct?

9    A    Absolutely.

10   Q    Okay.  How long were you with the Sedgwick County

11   Coroner's office?

12   A    About three years.

13   Q    And are you from Arizona originally?

14   A    I guess I grew up in the Chicago area.

15   Q    Okay.  And is there a professional reason you

16   decided to leave?

17   A    Oh, no.  No.  I just -- I went to medical school in

18   Missouri and they offered -- part of my training was

19   offered in Arizona and, you know, mostly moved around

20   because of family reasons, things like that.

21   Q    Okay.  Now, did you learn in regards to Dave B, did

22   you learn that he was not seen by Steve Schneider?

23   A    Did you say he was not seen?

24   Q    Correct.

25   A    I'm not, I'm not aware of that.

1040

1   Q    Okay.  And Dave B had an enlarged heart.  Is that

2   correct?

3   A    Yes, he did.  He had a -- his heart was slightly

4   enlarged.  It weighed 490 grams.

5   Q    And he also was found with cocaine in his system;

6   correct?

7   A    Correct.

8   Q    And cocaine is known to cause arrhythmia; correct?

9   A    Absolutely.

10  Q    Are you aware of any doctors being allowed to

11  prescribe cocaine?

12  A    No.

13  Q    Now, let's talk about Christine B briefly.  Are you

14  aware -- strike that.

15       Did you learn through the course of your

16  investigation that she was actually seen by Donna St

17  Clair at the Schneider Medical Clinic?

18  A    I wasn't aware of that but --

19  Q    And she was not taking any kind of pain medication;

20  correct?

21  A    Yes.  According to this chart here -- excuse me for

22  one second.  Let me just find her.

23  Q    Okay.

24  A    Yes, she was not prescribed any pain medication.

25  Q    Okay.  And I'm curious as to what you were relying

1041

1    on.  Can you just hold it up, that document you're

2    looking at.  You were relying on the Government summary

3    1-A to make that conclusion?

4    A    No.  I was just referring to this to make sure,

5    because I have three cases in front of me, just to make

6    sure I'm looking at the right one.  At the time of

7    autopsy, as I recall, I had the information that she was

8    not on prescription medicine.

9    Q    And do you know how long she had been taking

10   Carisoprodol?

11   A    No.

12   Q    Do you know how long she had been taking the

13   Nordiazepam?

14   A    Well, I should say that the information I had was

15   that she was not being currently prescribed these

16   medications by a doctor that were in her system.

17   Q    Okay.  Let's turn to Jessie G.  Now, you ever heard

18   the term cafe coronary?

19   A    Yes.

20   Q    Okay.  And that refers to when a person is eating

21   and they get food lodged in their airway and they pass

22   away because of -- they basically choke to death;

23   correct?

24   A    Correct.

25   Q    You actually found food in Mr. D's airway; correct?

1042

1    A    Well, there was a couple things.

2    Q    Well, let me -- strike that.  Let me rephrase.  EMS

3    actually found a large piece of hamburger meat in his

4    airway; correct?

5    A    Yes.  They reportedly found something in his airway

6    and then also at the time of autopsy there were some

7    gastric type contents in his airway.

8    Q    And that is indicative of choking; correct?

9    A    Yeah.

10   Q    Okay.  How long had Mr. D been taking Methadone?

11   A    Let me just refer to this.  It was my

12   understanding -- I had no history of being prescribed

13   Methadone at the time of my autopsy so I have no idea

14   how long he had been taking it or how he got it.

15   Q    Okay.  And you noted that the toxicology was

16   positive for Methadone; correct?

17   A    Yes.

18   Q    And all -- can you say that?

19   A    Alprazolam.

20   Q    Alprazolam.  There are only 24 nanograms of

21   alprazolam in his system; correct?

22   A    Yeah.

23   Q    And with the Methadone, if he had been on a regular

24   course of treatment, the amount that you found in his

25   post-mortem toxicology would have been within

1043

1    therapeutic levels; correct?

2    A   Yeah.  Methadone, you know --

3    Q   And so basically for your, for your examination, you

4    worked under the assumption that he was naive to

5    Methadone because the history didn't tell you anything

6    different; correct?

7    A   Correct.

8    Q   Do you know whether or not the medical investigaters

9    contacted Schneider Medical Clinic to get medical

10   records before you finished your autopsy?

11   A   As I recall, at the time I made this determination,

12   I felt that I did not have a source for this person's

13   Methadone.

14   Q   Okay.  And is that the reason you decide to call it

15   an overdose as opposed to a cafe coronary?

16   A   That's part of the reason, absolutely.

17   Q   And isn't it true that Mr. D's heart was actually

18   donated?

19   A   Yes.

20   Q   And a person who has been abusing drugs you think --

21   is it often that their organs are actually donated?

22   A   Well, the tissue donation and what-not, they have

23   their own set of rules and protocol and procedures and

24   he, he was a viable donor by their standards.

25   Q   Okay.  And without that full history, you cannot

1044

1    rule out the possibility that Mr. D was sitting at the

2    table eating a hamburger, choked, and passed away

3    without any contributing factors from that Methadone,

4    can you?

5    A    Again, you know, it's -- I think in the practice of

6    forensic pathology, you know, you need to take the whole

7    picture and, you know, weigh, weigh the possibilities

8    and what-not.  That would be -- that would be one way of

9    looking at it.

10   Q    And admittedly, possibly not your fault because you

11   don't do the investigation, you didn't have the whole

12   picture; correct?  You didn't have his whole medical

13   history as to how long he had -- if he had become

14   tolerant to Methadone in any shape, form or fashion;

15   correct?

16   A    Yeah.  Many times, you know, when I do an autopsy, I

17   just, I have to base it on the information I have at

18   that time.

19   Q    And that's fair.  And how long had he been, Mr --

20   A    Czarnecki -- oh, Jessie.

21   Q    Yeah, I -- how long had he been unresponsive before

22   the EMS arrived?

23   A    I don't recall; but I can tell you the information I

24   had was he was last seen alive the day before, you know,

25   approximately twelve hours before he was found.

1045

```
 1    Q   And there were not any reports of him going on any
 2    kind of Methadone drug binges at all either; correct?
 3    A   Not that I had at that time.  Not that I'm aware of.
 4              MR. WILLIAMSON:  Nothing further, Your Honor.
 5              THE COURT:  Mr. Byers.
 6              MR. BYERS:  No questions, Your Honor.  Thank
 7    you.
 8              THE COURT:  Redirect please.
 9                      REDIRECT EXAMINATION
10    BY MS. TREADWAY:
11    Q   Just have one question, Dr. Czarnecki.  When someone
12    is taking a large amount of drugs in combination, their
13    physical functions decline somewhat, including the
14    ability to swallow and process something down the
15    esophagus?
16    A   Yes.
17              MS. TREADWAY:  Nothing further.
18                      RECROSS EXAMINATION
19    BY MR. WILLIAMSON:
20    Q   Dr. Czarnecki, I'm just going to stand here so I
21    don't have to --
22    A   Sure.
23    Q   Did you have any information in your history that
24    would suggest that that question actually occurred, the
25    subject of that question actually occurred in this case
```

1    with Mr. D?

2    A    Again, the information I recall is that EMS found a

3    food lobus in his airway.

4    Q    Okay.  But there's no evidence in the history that

5    his bodily function had decreased to the point where he

6    couldn't eat; correct?

7    A    Well, I don't think it's possible to know that.  I

8    mean conclusively.

9              MR. WILLIAMSON:  No further questions.

10             THE COURT:  Doctor, thank you very much.

11   You're excused.

12   A    Thank you.

13             THE COURT:  Next witness.

14             MS. TREADWAY:  Government calls Judy

15   Watterson.

16                      **JUDY WATTERSON**

17   Having been first duly sworn to tell the truth, the

18   whole truth and nothing but the truth, testified as

19   follows on:

20                     **DIRECT EXAMINATION**

21   BY MS. TREADWAY:

22   Q    Could you please introduce yourself to the jury.

23   A    My name is Judy Watterson.

24   Q    And where are you employed, Ms. Watterson?

25   A    The Drug Enforcement Administration.

1    Q    How long have you been with the DEA?

2    A    I've worked there for 24 years.

3    Q    Ms. Watterson, the Jury has heard testimony here

4    that there was a search that law enforcement performed

5    at the Schneider Medical Clinic on September 13th of

6    2005.  Were you present at that search?

7    A    Yes, I was.

8    Q    While you were at that search did you have the

9    opportunity to speak with the Defendant Stephen

10   Schneider?

11   A    Yes, I did.

12   Q    And how did that come about?

13   A    Dr. Schneider was asked if he would voluntarily

14   participate in an interview and he agreed to do so.  And

15   so myself and KBI Agent Rowland, interviewed him.

16   Q    And was that William Rowland with the Kansas Bureau

17   of Investigation?

18   A    Yes.

19   Q    Where did your discussion take place?

20   A    It was in an exam room at the Schneider Clinic.

21   Q    And did the Defendant Stephen Schneider answer all

22   your questions?

23   A    Yes.

24   Q    And did he do so voluntarily?

25   A    Yes.

1048

```
 1    Q   Did he volunteer information even if not asked a
 2    specific question?
 3    A   Yes.
 4    Q   Did he take notes?
 5    A   I don't think so.
 6    Q   Did you?
 7    A   I did.
 8    Q   And did you eventually formalize those notes in a
 9    report of investigation?
10    A   I did.
11    Q   And have we shared both that report and your
12    handwritten notes with the defense team?
13    A   Yes.
14    Q   Will you need that report to refresh your
15    recollection during your testimony?
16    A   Possibly.
17    Q   All right.  I'd like to hand you what has been
18    marked for identification as Exhibit 158.  During the
19    course of your testimony if you need to refresh your
20    recollection, we'll let you.
21        During your discussion with Defendant Stephen
22    Schneider in September of 2005, did you discuss with him
23    whether he was board certified in pain management?
24    A   Yes, we did.
25    Q   What did he tell you?
```

1049

1    A    He told me he had been credentialed in pain

2    management in 2004.

3    Q    Was he board certified though?

4    A    No, he was not.

5    Q    And why is that?

6    A    The only people, he said, the only people that could

7    get board certified were anesthesiologists and

8    physiatrists.

9    Q    Did the Defendant give you an estimate regarding how

10   much of his medical practice was pain management?

11   A    Yes.  He estimated approximately 60%.

12   Q    Did he also give you an estimate about how much of

13   his patient population was comprised of Medicaid

14   patients?

15   A    Yes.  He said approximately one-third.

16   Q    Did the Defendant tell you who the clinic manager

17   was?

18   A    Yes.  He said the manager was Linda Schneider.

19   Q    Did the Defendant tell you what his work hours were

20   on a typical week?

21   A    Yes, he did.

22   Q    And what were those hours?

23   A    He said he worked 8 to 5, a.m. to p.m., Monday,

24   Tuesday, Thursday and Friday.  And 8 to noon on

25   Wednesday.

1   Q   What did the Defendant tell you about his typical

2   patient load per day?

3   A   His load was between 30 and 50 patients.

4   Q   Did he tell you how many days per week the Clinic

5   was open?

6   A   Yes.  He said it was open seven days a week.

7   Q   And what two reasons did he give for the Clinic's

8   being open seven days per week?

9   A   He said it was for patient care, and for financial

10  purposes.

11  Q   What did he tell you about the intervals at which

12  patients were scheduled for appointments?

13  A   He said that they were scheduling patients

14  approximately every 15 minutes and that had changed

15  recently from every 10 minutes.

16  Q   Did he give you a reason for the change?

17  A   The reason for the change was they had changed to

18  electronic patient charts so it was so they could make

19  the entries electronically.

20  Q   What did he tell you about how they dealt with walk-

21  in patients?

22  A   Walk-in patients were squeezed between patients with

23  appointments.

24  Q   Did the Defendant Stephen Schneider tell you how

25  many patients the clinic typically saw each day?

1051

```
 1   A   Yes.  He said they saw approximately 150 patients a
 2   day.
 3   Q   Did the Defendant Stephen Schneider talk with you
 4   about a physician's assistant named Debbra Klingsick?
 5   A   Yes.
 6   Q   And did he tell you why she had been fired?
 7   A   She had been working long hours and she was turning
 8   patients away.
 9   Q   What did the Defendant Stephen Schneider tell you
10   about what he did with charts after the physician's
11   assistants saw a patient?
12   A   He said he reviewed charts and signed-off on them.
13   Q   What did the Defendant Stephen Schneider tell you
14   with regards to how a typical office visit was billed?
15   A   He said the typical office visit was billed 99213.
16   Q   What did he tell you about whether the Clinic had a
17   sonogram machine?
18   A   He said they did not have a sonogram machine.
19   Q   At one point in your discussion did the Defendant
20   Stephen Schneider discuss his preference with regards to
21   the long acting narcotics he used for pain management?
22   A   Yes, he did.
23   Q   What did he tell you at first?
24   A   He told me at first he preferred morphine.
25   Q   And then did he change his mind?
```

1    A    Yes.

2    Q    What then did he say?

3    A    He then said he preferred Oxycotin.

4    Q    What did the Defendant Stephen Schneider tell you

5    about prescription pads?

6    A    That they had -- sometimes he had presigned some of

7    the prescription pads for the physician's assistants.

8    Q    What did he tell you about reinstating fired or

9    terminated pain patients?

10   A    That he had the ultimate say in reinstating

11   patients.

12   Q    What did he tell you about the physician's

13   assistants in terms of their terminating patients?

14   A    That they could do it; that they were usually

15   stricter than he was at doing it.

16   Q    Did the Defendant Stephen Schneider admit to

17   receiving phone calls from emergency rooms about

18   patients and patients overdosing?

19   A    Yes.

20   Q    What did he tell you about paperwork he would

21   receive from the hospitals regarding patients who had

22   overdosed?

23   A    He would receive paperwork maybe a week or so later,

24   usually by mail or fax.

25   Q    Did he receive discharge summaries?

1053

```
 1    A    I think so, yes.
 2    Q    And did he mention that he was often notified by a
 3    phone call as well?
 4    A    He could be notified by phone.
 5    Q    Did you ask Defendant Stephen Schneider about
 6    overdose deaths?
 7    A    Yes.
 8    Q    What did you ask him?
 9    A    I asked him if he knew how many patients had
10    overdosed.
11    Q    And what was his response?
12    A    His response was he couldn't estimate how many.
13    Q    What did the Defendant tell you about receiving
14    phone calls from pharmacies?
15    A    He received phone calls from pharmacies, and he
16    mentioned a call from a pharmacy named Dandurand and
17    that they -- the pharmacist told him there was a lady in
18    the parking lot selling her medication.
19    Q    Ms. Watterson, during the course of the September
20    13th, 2005, search of the Clinic, were there any
21    prescription pads found?
22    A    Yes, there were.
23    Q    And did you or other law enforcement personnel seize
24    those prescription pads?
25    A    Yes.
```

1054

1  Q    Let me hand you what has been marked for

2  identification as Government Exhibit 155.  Do you

3  recognize those prescription pads as being prescription

4  pads found during the September 13th, 2005, search of

5  the Clinic and being seized at that time?

6  A    Yes.

7             MS. TREADWAY:  Government would offer Exhibit

8  155.

9             THE COURT:  Sir.

10             MR. WILLIAMSON:  As long as I can take a look

11  at it, there will probably be no objection.

12                 (Off-the-record.)

13             MR. WILLIAMSON:  Your Honor, may I confer with

14  Dr. Schneider briefly?

15             THE COURT:  Speak with your client?  Yes.  Of

16  course.

17                 (Off-the-record discussion.)

18             MR. WILLIAMSON:  No objection, Your Honor.

19             THE COURT:  Mr. Byers?

20             MR. BYERS:  No objection, Your Honor.

21             THE COURT:  They're received.

22  BY MS. TREADWAY:

23  Q    I'm going to bring these up for the Jury to look at

24  them.

25       Now, these prescription pads, is there anything

1    significant about each and every single prescription on

2    these pads of paper?  Perhaps that's not a very good

3    question.

4         Has the Defendant signed each and every one of

5    these pieces of paper?

6    A    Yes.

7    Q    But is there a prescription written on any of the

8    pieces of paper?

9    A    No.

10   Q    So does this confirm what he said to you that he

11   presigned prescription pads for his physician's

12   assistants?

13   A    Yes.

14   Q    Now, there's a difference between these two sets of

15   documents.  One's kind of a blue piece of paper and

16   one's kind of a yellow piece of paper?

17   A    Yes.

18   Q    Are there other differences between the two sets of

19   pads?

20   A    Yes.  The header section is different.  There's

21   different names at the top of each pad.

22   Q    And would that indicate to you that these

23   prescription pads are perhaps from a different period of

24   time over the life the Clinic?

25   A    Yes.

1     MS. TREADWAY:  Nothing further.

2                   **CROSS EXAMINATION**

3     BY MR. WILLIAMSON

4     Q    How you doing today?

5     A    Fine.

6     Q    So Dr. Schneider met with you prior to any charges

7     being filed against him; correct?

8     A    Correct.

9     Q    He didn't invoke and say I want a lawyer, did he?

10    A    No.

11    A    Correct.

12    Q    And it was just you, him and you say Agent Rowland?

13    A    Right.

14    Q    That you guys were in a room all together; correct?

15    A    Right.

16    Q    And he basically answered all of your questions to

17    the best of his ability then; correct?

18    A    Yes.

19    Q    He didn't wait until he heard all the evidence in

20    the case and then decide to give a statement, did he?

21    A    Right.

22    Q    These prescription pads, he told you that there were

23    prescription pads that he presigned; correct?

24    A    Right.

25    Q    He never told you that he ever authorized anybody to

1057

1    use those pads outside of a clinical practice and

2    without his knowledge, did he?

3    A    Right.

4    Q    Okay.  There is nothing in between Count 2 and Count

5    34 in this case, the specific allegations, that allege

6    that it's illegal to have -- to sign your prescription

7    before it's actually completely filled out, is there?

8    A    I didn't -- I don't know the counts, so I can't

9    answer that.

10   Q    Okay.  Now, Dr. Schneider didn't just talk to you

11   about the few things Ms. Treadway asked you about.  The

12   conversation went a little bit more in depth than that,

13   didn't it?

14   A    There's other issues, right.

15   Q    He talked to you about his family; correct?

16   A    I don't remember that.

17   Q    You have your report in front of you?

18   A    Okay.

19          MS. TREADWAY:  Judge, this is subject to a

20   pretrial ruling.  Any attempt by the Defendants to ask

21   questions about the Defendant's statements beyond that

22   which the Government has elicited would be hearsay.

23          THE COURT:  Well, I don't remember the ruling.

24   But -- why don't you all come up here for a minute.  I

25   think I know where you're headed, but I've never seen

1    the documents.

2                         (Whereupon, the following

3                         proceedings were had at the

4                         bench OUTSIDE the hearing of the

5                         jury.)

6            THE COURT:  Exculpatory hearsay?

7            MS. TREADWAY:  Yes, Judge.

8            THE COURT:  This isn't even hearsay, is it?

9            MR. WILLIAMSON:  I don't think so.  This is

10   what she learned in the course of her investigation.

11           MS. TREADWAY:  Well, no.  He's going to ask

12   her did he say X, did he say Y, did he say Z and that is

13   exculpatory hearsay by the Defendant; and if he wants to

14   speak to that, that's fine, but he needs to take the

15   stand and do so.

16           THE COURT:  Well, I don't understand how

17   anything about his family could be exculpatory hearsay.

18           MS. TREADWAY:  Well, I don't know where he's

19   going with this.  I'm just trying to stop it before it

20   gets started, Judge.

21           MR. WILLIAMSON:  Judge, the Government is

22   saying everything he basically said is a lie.  So if

23   that's the case, let them try to impeach him.

24           THE COURT:  No.  You cannot introduce what

25   would be exculpatory hearsay.  But I don't know what

1059

1  you're going to ask him.

2           MR. WILLIAMSON:  I'm not going to ask him

3  about -- the only thing that will be exculpatory hearsay

4  is if I asked him if he says I was practicing medicine

5  in the legitimate course of a medical practice.  That

6  would be exculpatory hearsay because that's the actual

7  charge.  She asked about the billing, the typical 99213.

8  I can ask about that.  She asked about the patient

9  population.  I can ask about that.  I'm not going into,

10  well, did he tell you that he's not guilty of anything.

11           MS. TREADWAY:  No, Judge.  That's not the way

12  the rule is.

13           THE COURT:  I don't see any problem with any

14  of those kinds of questions.

15           MR. WILLIAMSON:  If you feel like I'm going--

16  she can object and I'll back off.

17           THE COURT:  As long as we -- I understand

18  where we're headed here.  Right?

19           MR. WILLIAMSON:  Yes.  I'm just going to

20  really cover the stuff she talked about.

21                     (Thereupon, the following

22                      proceedings continued in the

23                      hearing of the jury.)

24  BY MR. WILLIAMSON:

25  Q   Ms. Watterson, I asked you about whether or not Dr.

1060

1    Schneider discussed with you his family.  Did you see

2    that in your report on Page 2, Paragraph 3?  Very top.

3    A    Very top.

4    Q    On the third line, second or third line.

5    A    I'm sorry.  Page 2?  Okay.  Yes.  He lives with his

6    wife and two children.

7    Q    So you started with a dialogue and he gave you a

8    little bit of background about himself; correct?

9    A    Right.

10   Q    Now, you also were asked questions about Dr.

11   Schneider saying that his pain patient population had

12   become about 60% of his practice; correct?

13   A    Right.

14   Q    And did he tell you that was in part because nobody

15   else wanted to see these patients?

16         MS. TREADWAY:  Objection, Judge.  That's just

17   right in where we said we weren't going to go.

18         THE COURT:  The 60% is admissible.  The

19   remainder is not admissible.  So whatever he said about

20   other people not seeing the patients, you are to ignore

21   that response, that question.

22   BY MR. WILLIAMSON:

23   Q    And Dr. Schneider also told you that the Clinic was

24   trying to get better in the sense they went from ten

25   minute visits to 15 minute visits; correct?

1061

```
 1            MS. TREADWAY:  Objection to the form of the
 2   question, Judge.  Assumes, again, exculpatory
 3   information.
 4            THE COURT:  No, that one I'll allow.
 5   A   Yes, they changed from 10 minutes to 15 minutes.
 6   BY MR. WILLIAMSON:
 7   Q   Okay.  And you also mentioned electronic charts.
 8   You learned during this investigation that the Clinic
 9   had gone from handwriting charts to trying to integrate
10   in electronic charts; correct?
11   A   Right.
12   Q   And you also mentioned his prescribing preferences.
13   Dr. Schneider freely discussed his prescribing practices
14   with you; correct?
15   A   Right.
16   Q   And he also mentioned that he generally liked to use
17   one long-acting and one short-acting pain medicine as
18   his preference; correct?
19   A   Right.
20   Q   He didn't try to hide that from you, did he?
21   A   I don't believe so.
22   Q   Okay.  You were asked about a sonogram machine.  But
23   did he also mention an X-ray machine?
24   A   Yes.
25   Q   Are those different?
```

```
 1    A    Yes.
 2    Q    He said he had an X-ray but not a sonogram; correct?
 3    A    Right.
 4    Q    You were asked questions about whether or not --
 5    about Dr. Schneider's contact with the emergency rooms.
 6    You remember that?
 7    A    Right.
 8    Q    In that context, he also informed you that he often
 9    couldn't get charts from the emergency rooms; correct?
10    A    Right.
11            MS. TREADWAY:  Objection, Judge.  We're right
12    back in it again.
13            MR. WILLIAMSON:  She brought these topics up.
14            THE COURT:  It's not necessary -- I know where
15    we're headed here, and it's not necessary to make
16    arguments unless I ask for them.  The objection is
17    overruled.
18    BY MR. WILLIAMSON:
19    Q    Okay.  Just make sure we have that question and
20    answer for the record.  Ms. Treadway asked you about the
21    emergency room contacts; correct?
22    A    Yes.
23    Q    And Dr. Schneider also told you that in that context
24    that he could not get charts from the emergency room;
25    correct?
```

1  A   Yes.  I believe there were times when he couldn't.

2  Q   Okay.  And in that context, he also told you that he

3  would tell the -- tell the emergency room -- I'm

4  sorry -- tell the emergency room that he wanted to know

5  if his patients with coming in trying to get pain

6  medications; correct?

7  A   Let me check my report.

8  Q   Okay.  Please.  Would it be helpful if I point you

9  to the paragraph?

10 A   Yes.

11 Q   Let's try Paragraph 10 on Page 5, and ending on the

12 first line of Page 11.

13 A   Okay, yes.

14 Q   Okay.  So, he did tell you that?

15 A   Yes.

16 Q   Okay.  And you were also asked questions about Dr.

17 Schneider telling you about the hours of the Clinic.  Do

18 you remember that?

19 A   Yes.

20 Q   And he told you -- he told you it was open seven

21 days a week; correct?

22 A   Correct.

23 Q   Voluntarily told you when he worked; correct?

24 A   Correct.

25 Q   Okay.  Did he also -- he also told you that the

1064

```
 1    Clinic would be open for seven days a week to help
 2    handle that patient load and also to help make some
 3    money; correct?
 4    A    Correct.
 5    Q    Is there anything wrong with a business opening
 6    their hours to make money?
 7    A    I don't think so.
 8    Q    Okay.  And is there anything wrong with a doctor's
 9    office opening hours longer to take care of more
10    patients that may need to be taken care of?
11    A    No, there isn't.
12              MR. WILLIAMSON:  I don't have anything
13    further.
14              THE COURT:  Mr. Byers?
15              MR. BYERS:  Nothing, Your Honor.
16              THE COURT:  Redirect please.
17              MS. TREADWAY:  No redirect, Judge.
18              THE COURT:  Well, thank you very much.  Who's
19    your next witness.
20              MS. TREADWAY:  Dr. Mary Dudley.
21              THE COURT:  Is that the one with the eye
22    problems?
23              MS. TREADWAY:  Yes, sir.
24              THE COURT:  All right.  Well, I guess she's
25    going to be a long witness.  Relatively speaking.
```

 1              MS. TREADWAY:  Probably an hour, but maybe

 2     less.  For me, Judge.

 3              THE COURT:  All right.  Well, Ladies and

 4     Gentlemen, it's a little early but I'm going to send you

 5     out for your morning recess.  Remember and heed the

 6     admonition.  And ask Dr. Dudley to come in if you will.

 7              MS. TREADWAY:  Sure.

 8                   (Jury excused for the recess.)

 9              MS. TREADWAY:  I think the Judge wants to talk

10     to you about accommodating your eyesight.  So here is

11     the witness chair.

12     A    Okay.

13              THE COURT:  Doctor, you've had eye surgery?

14     A    Yeah.  I had two retinal detachments.  So right now

15     I really don't have much vision in my left eye.  It's --

16     it looks like I'm under water even with my glasses.  So

17     the problem is double vision.

18              THE COURT:  What can I do to accommodate you

19     so that you can testify comfortably?

20     A    It's mainly the glare.  And I'm fine like for a

21     couple hours but for seven hours, I'm gonna be --

22              THE COURT:  Would it help if we turned the

23     lights down?

24     A    It would help -- I have a lot of glare here with the

25     glass and the -- all the overhead lights.

1066

```
 1              THE COURT:  I'm going to let Mr. Moody change
 2    the lights a little bit and see.
 3    A    I think -- I'm sorry, go ahead.
 4              THE COURT:  When it gets comfortable for you,
 5    you say so.
 6    A    Okay.  It's gettin' better because I don't have the
 7    glare off of this glass.  There's glass on top of here.
 8              MS. TREADWAY:  Is that better?
 9    A    Yeah.  That's good.  I still have the -- you
10    probably can't do anything about that.
11              THE COURT:  We can change it.
12    A    It's actually -- that's, that's great.  But I don't
13    know if anybody else can see.
14              THE COURT:  You're the only one that has to
15    see, you and the lawyer questioning you have to see
16    but --
17    A    This is fine without the glare.  I'm just not sure,
18    and if there's any, if there's anything I have to read
19    off of --
20              MS. TREADWAY:  No, you will not need to be
21    reading.
22    A    -- the screen.
23              MS. TREADWAY:  You will not need to be reading
24    off the screen.  I'll just direct you to the documents.
25    A    Okay.  Because I'm fine just reading from my report
```

1067

1   here.

2          THE COURT:  All right.

3   A    The only other thing would be, if we could take the

4   glass off the wood and it looks like --

5          MS. TREADWAY:  Could we put something on top

6   of the glass?

7          THE COURT:  We could probably put something on

8   there that would keep it from reflecting but I'm not

9   sure about taking the glass off.

10         MS. TREADWAY:  Do you have perhaps a -- what

11  do they call those desk mats or something, Judge.

12         THE COURT:  We probably can find something

13  like that.

14  A    Or even some other paper to stop the glare.  And

15  then you could put the lights up again.

16         THE COURT:  We'll work on that.  Now, if you

17  need a break, you just say so, either during direct or

18  cross-examination, and we'll take a break.  Okay?

19  A    Okay.  I'm okay.  Like I said, it's just sometimes

20  if I have a lot of reading to do here it just gets a

21  little bit fatigued.

22         THE COURT:  Right.  Well, we'll work on the --

23  A    Okay.  I really appreciate that.

24         THE COURT:  Putting a desk mat down there.  I

25  think we've got some of those around here someplace. and

1    you let me know if you need a break and we'll take it.

2    A    All right.  Thank you.

3              MS. TREADWAY:  Thank you, Judge.

4                        (Recess)

5              THE COURT:  On the next witness, members of

6    the jury, she's had recent eye surgery so we're going to

7    have to considerably dim the lights so that the Doctor

8    can be comfortable.  And I told her that if she needs

9    more frequent breaks than we usually have just say so

10   and we'll do that for her.  So come forward, please and

11   be sworn.

12             MS. TREADWAY:  Government calls Dr. Mary

13   Dudley.

14                      **MARY DUDLEY**

15   Having been first duly sworn to tell the truth, the

16   whole truth and nothing but the truth, testified as

17   follows on:

18                   **DIRECT EXAMINATION**

19   BY MS. TREADWAY:

20   Q    Please introduce yourself to the jury.

21   A    My name is Dr. Mary Dudley.

22   Q    And where are you currently employed?

23   A    I'm a Chief Medical Examiner for Jackson County,

24   Missouri, in Kansas City, Missouri.

25   Q    And how long have you been employed as the Chief

1   Medical Examiner in Kansas City, Missouri?

2   A    For three and a half years.

3   Q    Were you previously employed here in Wichita at the

4   Sedgwick County Regional Forensic Science Center?

5   A    Yes.

6   Q    And in what capacity?

7   A    I was the Chief Medical Examiner District Coroner

8   and Director of the Sedgwick County Regional Forensic

9   Science Center for seven years.

10  Q    Could you quickly review with the jury your

11  educational background beginning with your undergraduate

12  college degree?

13  A    Yes.  I have a diploma in nursing and also BS and

14  Master's in Nursing and then went to medical school.

15  Following medical school I have two years of anatomic,

16  two years of clinical and two years of forensic

17  pathology.  Sub specialties.

18  Q    Are you board certified?

19  A    Yes.

20  Q    In what?

21  A    In anatomic and forensic pathology.

22  Q    Have you worked in developing any forensic pathology

23  guidelines?

24  A    Yes.

25  Q    And what would those be?

1    A    I'm on the Board of Directors for the National

2    Association of Medical Examiners and we developed the

3    guidelines for the forensic autopsy protocol.

4    Q    Did you have any academic appointments?

5    A    Yes.

6    Q    And what are those?

7    A    Currently I'm an Associate Professor with University

8    of Missouri Medical School, Kansas City.  And also

9    the -- I'm in the process of being an Associate

10   Professor of Clinical Pathology at K.U. Medical School

11   in Kansas City, Kansas, and UMKC which is a D.O. school

12   in Kansas.

13   Q    And D.O. means Doctor of Osteopathy?

14   A    Doctor of Osteopathy, yes.  And I also am on the

15   faculty of metro community -- of Metropolitan Community

16   College, Penn Valley Campus, in Kansas City, Missouri,

17   teaching CSI camp there.

18   Q    How many years have you been working as a forensic

19   pathologist, Dr. Dudley?

20   A    Approximately 20 years.

21   Q    In those years can you even estimate how many

22   autopsies you've performed or been involved in?

23   A    I'd say approximately -- for complete autopsy,

24   approximately 5,000.

25   Q    As a medical examiner and a forensic pathologist, do

1071

```
 1    you on occasion serve as a paid expert outside the scope
 2    of your state employment?
 3    A    Yes.
 4    Q    And are you doing so here in this case?
 5    A    Yes.
 6    Q    And do you have to take time off from your job and
 7    take vacation days to be here with us?
 8    A    Yes.
 9    Q    And are you allowed to be paid for the time you
10    spend on cases outside your current jurisdiction?
11    A    Yes.
12    Q    And are we --
13    A    Not by my -- I'm sorry.  Not by my office; but if
14    I'm not being paid at my office and doing outside
15    employment, I can accept compensation, yes.
16    Q    And are we compensating you for your time in this
17    case?
18    A    Yes.
19    Q    And for your travel?
20    A    Yes.
21    Q    Now, I'm going to be handing you quite a few
22    autopsies and you've had a chance to review all of these
23    autopsies prior to your testimony today, have you not?
24    A    Yes.
25    Q    And have you confirmed that each of these is a prior
```

1072

1   autopsy report that you prepared?

2   A   Yes.

3   Q   And we'll identify each for the record.  Could you

4   identify Government Exhibit 2-G by the person's first

5   name and the first initial of their last name?

6   A   Yes.  This is Patricia G.

7   Q   Exhibit 5-B-7?

8   A   Dalene C.

9   Q   5-F-7?

10   A   Victor J.

11   Q   5-H-7?

12   A   Mary Sue L.

13   Q   5-I-7?

14   A   Heather M.

15   Q   5-J-7?

16   A   Jo Jo R.

17   Q   And 5-K-7?

18   A   Billy Jay R.

19   Q   6-A-2?

20   A   Earl E A.

21   Q   6-B-2?

22   A   Sue E B.

23   Q   6-E-2?

24   A   Danny C.

25   Q   6-H-2?

```
 1    A    Patricia C.

 2    Q    6-K-2?

 3    A    Thomas W F.

 4    Q    6-N-2?

 5    A    Russell H.

 6    Q    6-Q-2?

 7    A    Shannon H M.

 8    Q    6-R-2?

 9    A    Jerrod M M.

10    Q    6-S-2?

11    A    Jason P.

12    Q    6-Y-2?

13    A    Ancira W.

14    Q    150-5-B.

15    A    Clifford C.

16    Q    150-10-B?

17    A    Michael F.

18    Q    150-12-B.

19    A    Amber Carrine G.

20    Q    150-16-B?

21    A    Dustin L L.

22    Q    150-18-B?

23    A    Deborah M.

24    Q    150-19-B?

25    A    Shannon M.
```

1074

```
1    Q    150-20-B?

2    A    Randall S P.

3    Q    150-22-B?

4    A    Marilyn S R.

5    Q    And finally, 150-24-B?

6    A    Debra S.

7    Q    By my count you performed 26 autopsies that we have

8    put in front of you.  Are all of those autopsies public

9    records?

10   A    Yes.

11   Q    And do those documents reflect the activities of the

12   Forensic Science Center, including matters observed and

13   your factual findings?

14   A    Yes.

15   Q    And were these documents created under a duty

16   imposed by law for the Forensic Science Center to make

17   such observations and report them?

18   A    Yes.

19   Q    And as to the factual findings recorded in these

20   documents, were they made as the result of the

21   investigation made pursuant to the authority granted to

22   you by law?

23   A    Yes.

24   Q    Prior to your testimony today, you reviewed these

25   autopsy reports.  Did you find all of them to include
```

1075

1  toxicology reports?

2  A   Yes.

3  Q   And did Dr. Rohrig author all but one of the

4  toxicology reports, namely, the toxicology report for

5  Jerrod M?

6  A   Yes.

7  Q   And as to that autopsy report, did Dr. Christopher

8  Long author that report?

9  A   Yes.

10  Q   Do you review toxicology reports in the ordinary

11  course of your duties as a medical examiner?

12  A   Yes.

13  Q   And do the toxicology reports become a part of the

14  autopsy reports?

15  A   Yes.

16          MS. TREADWAY:  The Government would offer the

17  previously identified exhibits as public records under

18  803(8) and as business records under 803(6).

19          THE COURT:  Sir.

20          MR. WILLIAMSON:  No objection.

21          THE COURT:  Mr. Byers.

22          MR. BYERS:  No objection, Your Honor.

23          THE COURT:  They're received.

24  BY MS. TREADWAY:

25  Q   I'm now handing you the corresponding death

1076

1    certificates as to each of the autopsies that you

2    authored.  Again, prior to your testimony today, did you

3    have the opportunity to review these autopsies and death

4    certificates and make certain that they were

5    corresponding?

6    A    Yes, I did.

7    Q    Now, although you were not the certifying physician

8    on all of the death certificates, were you the

9    certifying physician on all except for five?

10   A    Yes.

11   Q    And, generally speaking, were the certifying

12   physicians on those five people in other counties?

13   A    Yes.

14   Q    And is that common?

15   A    Yes.

16   Q    Are all of those death certificates public records

17   and records of vital statistics?

18   A    Yes.

19           MS. TREADWAY:  Government would offer Exhibits

20   2-F, 5-B-6, 5-F-6, 5-H-6, 5-I-6, 5-J-6, 5-K-6, 6-A-1,

21   6-B-1, 6-E-1, 6-H-1, 6-K-1, 6-N-1, 6-Q-1, 6-R-1, 6-S-1,

22   6-Y-1, 150-5-A, 150-10-A, 150-12-A, 150-16-A, 150-18-A,

23   19-A, 20-A, 22-A, and 24-A as both public records and

24   records of vital statistics under Rules 803(8) and

25   803(9).

1077

1       THE COURT:  Objection?

2       MR. WILLIAMSON:  No objection.

3       MR. BYERS:  No objection, Your Honor.

4       THE COURT:  They're received.

5    BY MS. TREADWAY:

6    Q   Now, prior to your testimony, Dr. Dudley, you

7    pointed out to a colleague of mine something that I had

8    not recognized on the death certificate and I'd like to

9    pull up one to indicate that.  Let's pull up 2-F please,

10   Mr. Moore.

11       There is a box on this death certificate form that

12   says:  Part 2, Other Significant Conditions Contributing

13   to Death but not Resulting in the Underlying cause.

14   A   Yes.

15   Q   As to most of these death certificates, is that

16   blank?

17   A   Yes.

18   Q   Dr. Dudley, as to all of the 26 autopsies that you

19   authored and that we have now introduced into evidence,

20   was the primary or contributing cause of death some sort

21   of mixed or single drug intoxication?

22   A   Yes.

23   Q   And as to all but three of the deaths that you

24   certified, was the manner of death accident?

25   A   Yes.

1    Q    As to Heather M, was the manner of her death

2    undetermined?

3    A    Yes.

4    Q    As to Danny C and Russell H, was the manner of their

5    deaths suicide?

6    A    Yes.

7    Q    Nevertheless, does this mean that for all 26

8    autopsies you authored, you ruled out natural causes as

9    the manner of death?

10   A    Yes.

11   Q    As to any of your autopsies, Dr. Dudley, did you

12   begin with the conclusion that these patients died of

13   mixed drug or single drug intoxication?

14   A    No.

15   Q    How do you reach that conclusion?

16   A    Basically by getting information on the

17   circumstances of death; performing a complete external

18   and internal examination.  If we don't find the cause of

19   death with the autopsy then we will wait for additional

20   studies to be returned to determine the cause of death.

21   In these particular cases we waited for toxicology to be

22   completed and with the toxicology levels were

23   indications that these individuals died of essentially a

24   drug overdose, then that then became the cause of the

25   death.

1    Q    In your opinion, within a reasonable degree of

2    scientific and medical certainty, did each of these

3    autopsies that we have introduced into evidence

4    correctly reflect both the cause and manner of death?

5    A    Yes.

6    Q    I'm going to try to make this as easy as possible

7    for you, Dr. Dudley.  I'm going to first direct your

8    attention to Exhibit 2-G, the autopsy report for

9    Patricia G.

10   A    Okay.

11   Q    Now, previous to your testimony, did you have an

12   opportunity to review each of the autopsies that you

13   authored against Exhibit 1-A?

14   A    Yes.

15   Q    And did you find the information in Exhibit 1-A to

16   be accurate in accordance with your autopsies?

17   A    Yes.

18   Q    Now, according to the toxicology report for Patricia

19   G, the drugs in her system when she died were Oxycodone,

20   Hydrocodone, Alprazolam, Diazepam, and Carisoprodol and

21   Meprobamate.  What are the primary effects of all of

22   those drugs on the central nervous system?

23   A    They create a toxic effect and a depressant effect

24   on the central nervous system.

25   Q    Do the drugs found in Patricia's system have an

1080

1   adtive and or synergistic effect?

2   A    Yes.

3   Q    And what does that mean?

4   A    It's essentially an accumulative effect.  As they

5   are similar drugs, will have a combined or accentuated

6   additive effect on the central nervous system causing

7   more toxicity and more central nervous system

8   depression, respiratory depression, that sort of thing.

9   Q    Based on a death investigation which included

10   Patricia G's hospital records, your autopsy and the

11   toxicology report, you concluded that Patricia's death

12   was an accidental drug overdose.  Were there any

13   findings in the death investigation that would cause you

14   to question or doubt that conclusion that Patricia

15   accidentally died of a mixed drug intoxication?

16   A    No.

17   Q    Were there any findings that would have led you to

18   conclude that her death was from natural causes like

19   heart attack?

20   A    No.

21   Q    Looking at Patricia's death certificate, Exhibit

22   2-F, do you have that in front of you?

23   A    Yes.

24   Q    And if you can find how the injury occurred.  Does

25   it say ingested prescription drugs?

1    A    Yes.

2    Q    In your opinion, Dr. Dudley, was the combination and

3    amount of drugs found in Patricia's system sufficient to

4    cause her death?

5    A    Yes.

6    Q    Can you describe for the jury in basic terms how

7    that all worked together to cause her death?

8    A    Basically, as I explained, with the drugs being

9    toxic to the body and to the central nervous system, it

10   will eventually cause respiratory depression; and as far

11   as the mechanism is concerned, the respirations start to

12   decrease the amount of oxygen getting to the brain and

13   to the heart and will eventually cause a person to go

14   into a coma and the respirations then cease at some

15   point.  And prior to that point, lack of oxygen getting

16   to the heart might cause an arrhythmia, which is just a

17   mechanism which is essentially how everyone would die.

18   Their respirations stop and their heart stops.

19   Q    So everybody that dies, dies because their heart

20   stops; right?

21   A    That's correct.

22   Q    It's how and why that you're looking for?

23   A    That's correct.

24   Q    If I might help the witness.  Now I want to focus on

25   six individuals for whom you performed autopsies and

1082

1   these six individuals were named in Count 5 of the

2   Indictment.  Prior to your testimony, again, you've

3   reviewed all of these autopsies.  And as to each of

4   these six individuals, Dr. Dudley, if any of them had

5   died of heart problems, would you have concluded that

6   the manner of death was accident?

7   A   No.

8   Q   Now I'd like to look at the death certificates for

9   each of these individuals, and we're going to be looking

10  at the box labeled how the injury occurred.  Starting

11  with Dalene C, Exhibit 5-B-6.  Do you have that death

12  certificate in front of you?

13  A   Yes.

14  Q   And does it say that she ingested prescription

15  medications?

16  A   Yes.

17  Q   Turning to Mary Sue L, Exhibit 5-H-6.  Does it also

18  say that Mary Sue L consumed prescription drugs?

19  A   I don't have that death certificate in front of me.

20  I'm sorry.

21  Q   That's fine.  I'll find it for you.

22                    (Off-the-record.)

23  A   Yes.

24  BY MS. TREADWAY:

25  Q   Next looking at Heather M, Exhibit 5-I-6.  And I

1    believe that's on the last page.  Does it say she

2    injected (sic) prescription drug overdose?

3    A    Yes.

4    Q    Looking at Exhibit 5-J-6.  This is for Jo Jo R.

5    Does it state that she ingested prescription

6    medications?

7    A    Yes.

8    Q    And, finally, as to 5-K-6, the death certificate for

9    Billie R.  Does the death certificate say on the last

10   page that she ingested prescription medications?

11   A    Yes.

12   Q    I'm next handing you the series 6 autopsies which

13   are ten autopsies you performed on individuals that are

14   named in Count 6 of the Indictment.  Again, as to each

15   of these ten individuals, if any of them had died of

16   heart problems, would you have concluded that manner of

17   death was accident or otherwise?

18   A    No.

19   Q    And as to each of the death certificates in this

20   case that you previously reviewed prior to your

21   testimony, do each of them read similarly to the ones we

22   just displayed for the jury?

23   A    Yes, they do.

24   Q    Finally, ma'am, I'm handing you some autopsies in

25   the Exhibit 150 series, which, for the record, are

1084

1   additional deaths named in the overt acts of the

2   conspiracy.  As to each of these nine individuals, if

3   any had died of heart problems, would you have concluded

4   that the manner of death was accident or otherwise?

5   A   No.

6   Q   Would you have declared that a natural death in fact

7   if they had died of heart problems?

8   A   Yes.

9   Q   Now, there is one or two autopsies in which you note

10  heart problems or heart disease on your autopsy reports.

11  One is Deborah S, and she's Exhibit 150-24-B.  Can you

12  find that autopsy report?  It would be almost the last

13  one or maybe the last one.

14  A   Okay.  Yes.

15  Q   Now, we want to look at that autopsy report.

16  Specifically Page 2, Mr. Moore.  And you've listed on

17  Deborah S, which is, again, Exhibit 150-24-B, that her

18  cause of death was mixed drug, Alprazolam, Hydrocodone,

19  Methadone and cocaine intoxication, and then you list

20  other, atherosclerotic cardiovascular disease and

21  emphysema.  Why did you list these diseases on Deborah

22  S' autopsy report?

23  A   They were other findings that I found at autopsy

24  that were just listed then under part 2 as contributory

25  conditions but not contributing to death.  It's

1085

1   basically just if the toxicology report had come back

2   negative, it possibly could have been her cause of

3   death.  But it was just an additional finding of heart

4   disease and emphysema.

5   Q   Did heart disease or emphysema or a combination of

6   those two things actually cause Deborah's death?

7   A   No.

8   Q   What caused her death?

9   A   Her death was caused by mixed drug intoxication.

10  Q   But when somebody has atherosclerotic cardiovascular

11  disease and emphysema and they are taking the kinds of

12  drugs found in her system, does that put her at greater

13  risk?

14  A   Yes.

15  Q   And does it put her specifically at greater risk for

16  overdose death?

17  A   Yes.

18  Q   And I believe there was one other individual, Thomas

19  F.  I believe he's 6-K.  I think I might have taken that

20  away from you.  Or do you still have the 6s up there?

21  A   Yes, I do.

22  Q   Could you find 6-K.

23  A   Okay.

24  Q   And with regards to Thomas F, 6-K-2, did you also

25  list some other issues with regards to his autopsy

1086

1    report?

2    A    Yes.

3    Q    Atherosclerotic cardiovascular disease and

4    positional asphyxia.  Now, we haven't seen that prior to

5    this.  What is positional asphyxia?

6    A    Positional asphyxia is when a person that sometimes

7    is intoxicated or otherwise placed in a position that

8    they -- it may compromise their breathing.  So when they

9    are found, they may be in a position that either blocks

10   their airway or makes it difficult for them to get

11   oxygen.  And we see signs on the body to indicate that

12   they were in a position that they had a reduced amount

13   of oxygen at the time of their death.

14   Q    Nevertheless, did you conclude that the cause of

15   death for Thomas F was mixed drug intoxication?

16   A    Yes.

17   Q    Now, finally, I want to direct your attention to

18   Exhibit 6-A, the autopsy for Earl A.  And did you note

19   his morbid obesity in your autopsy report?

20   A    Yes.

21   Q    Yet did he die of morbid obesity or any of the

22   complications from morbid obesity?

23   A    No.

24   Q    What did he die of?

25   A    He died of mixed drug intoxication.

1    Q    Now, we have learned in the course of other

2    testimony that as a result of the death investigation,

3    the deceased person's primary care physician can receive

4    notice of the death in a variety of ways.  Were you

5    aware of that?

6    A    Yes.

7    Q    And do you have any reason to believe that the

8    Defendants in this case, Stephen and Linda Schneider,

9    would not have received notice of deaths as other

10   physicians do in the normal course of business?

11              MR. WILLIAMSON:  Your Honor, I'm going to

12   lodge the same objection I lodged last time.  It's

13   speculation.  And I can add to that, Judge, it assumes

14   facts not in evidence, i.e., other physicians in the

15   normal course of their practice.  There has been no

16   testimony about that.

17              THE COURT:  That's sustained on that ground

18   and also that the question lacks sufficient foundation.

19   BY MS. TREADWAY:

20   Q    Prior to your testimony today, were you allowed to

21   review some business records of the Forensic Science

22   Center?

23   A    Yes.

24   Q    And were those contained in Exhibit 151-B?

25   A    Yes.

1088

```
 1    Q   Now, with regards to just the autopsy reports that
 2    you prepared, I would like to look at some of these
 3    documents and see if they refresh your recollection as
 4    to what, if any, notice would have been given to the
 5    Schneiders and their clinic.  All right?
 6    A   Okay.
 7    Q   First of all, and these are organized by name of
 8    person.  Let's look first at Patricia C, who is an
 9    individual named in Count 6 of the Indictment.  Do you
10    find that?
11    A   Okay.
12    Q   Is that a death investigation report from your
13    office?
14    A   Yes.
15    Q   And does it indicate that the Defendant Stephen
16    Schneider was notified of Patricia C's death?
17    A   Yes.
18    Q   If you could turn to Clifford C.  Based on the
19    documents in front of you, does it appear that the
20    Forensic Science Center requested and received medical
21    records from the Defendant's clinic?
22    A   Yes.
23    Q   In terms of Patricia G, who, again, is the
24    individual named in Counts 2 and 7 of the Indictment,
25    again, from the records in front of you, does it appear
```

1089

1  that the Forensic Science Center requested and received

2  medical records from the Defendants' clinic?

3  A   Yes.

4  Q   Turning to Victor J who is an individual named in

5  Count 5 of the Indictment, does it appear from the

6  records in front of you that the Forensic Science Center

7  requested and received medical records from the

8  Defendants' clinic?

9  A   Yes.

10  Q   With regards to Shannon M E, do the records in front

11  of you reflect that the Defendant Linda Schneider was

12  contacted about Shannon M E's death?

13  A   Yes.

14  Q   In terms of Jason P, who is also an individual named

15  in Count 6 of the Indictment, do the records in front of

16  you reflect that Linda Schneider was contacted about his

17  death?

18  A   Yes.

19  Q   In terms of Jo Jo R, who is an individual named in

20  Count 5 of the Indictment, does it appear from the

21  records in front of you that the Forensic Science Center

22  requested and received medical records from the

23  Defendants' clinic?

24  A   Yes.

25  Q   And finally, as to Deborah S' death.  Does the

1    report of death indicate that Dr. Schneider's office was

2    contacted regarding her death?

3    A    Yes.

4    Q    Dr. Dudley, during your tenure here in Sedgwick

5    County as the Chief Medical Examiner, did any one

6    physician stand out for any reason?

7    A    Yes.

8    Q    And who was that?

9    A    Dr. Stephen Schneider.

10   Q    And why did he stand out, ma'am?

11   A    Because of the number of fatalities and deaths that

12   we had received where he had been the primary physician

13   for these patients.

14   Q    Did you find the number of overdose deaths

15   associated with the Defendant Stephen Schneider and the

16   Defendants' clinic to be significant?

17   A    Yes.

18   Q    How so?

19   A    Again, with the number of deaths that occurred in

20   coming from that clinic.

21   Q    In your 20 years of being a pathologist, have you

22   ever been aware of a physician associated with such a

23   significant number of overdose deaths?

24   A    No.

25   Q    Is there anything that you can compare it to?

1    A    No.

2              MS. TREADWAY:  That's all, Judge.

3              THE COURT:  Yes, sir.

4              MR. WILLIAMSON:   Thank you.

5                        **CROSS EXAMINATION**

6    BY MR. WILLIAMSON:

7    Q    How are you doing, Dr. Dudley?

8    A    Good morning.

9    Q    I don't think we've had a chance to meet before,

10   have we?

11   A    I don't believe so.

12   Q    I'm Lawrence Williamson and I represent Dr.

13   Schneider.

14   A    Okay.

15   Q    I'm going to be asking you some questions.   My

16   cross-examination probably will take longer than what

17   Ms. Treadway did.

18   A    Okay.

19   Q    Probably not as long as it took on Friday and

20   Thursday; but if you need a break at any time, let me

21   know.

22   A    Okay.

23   Q    Because I think I'm going to have to have you refer

24   to some of these records.   Okay?

25   A    Okay.

1092

1   Q    One thing I want to just touch on before we get too

2   deep in our conversation.   The toxicology results that

3   are attached to your autopsies, I notice they only have

4   reference to like illegal drugs and pain medicines and

5   things of that nature.   Do you all test for like blood

6   pressure medicine and other medicines like that?

7   A    Yes, I believe so.

8   Q    So if people were found with that in their system,

9   would that show up in your -- should that show up in

10  your autopsy report?

11  A    Yes.

12  Q    Okay.   And if it's not there, would you agree that

13  that would be a failure on your part to include that

14  relevant information?

15  A    No.

16  Q    Why not?

17  A    I mean, we just list the -- the toxicology report

18  comes in as a separate report.

19  Q    So that would be the failure of the toxicology

20  department?

21  A    No.   If it wasn't present, then it wasn't

22  significant and wouldn't be listed.

23  Q    Okay.   So then that's what I'm trying to get at is

24  did you only list significant prescriptions or did you

25  list anything that may have been found in that person's

1093

1    system?

2    A    The toxicology report would list anything that was

3    found in the system.

4    Q    Okay.  And what would be attached to your autopsy

5    report?

6    A    Again, the complete toxicology report.

7    Q    Okay.  Now, you mentioned -- there were some

8    questions about you receiving some compensation and

9    everything.  Are you not on salary at Jackson County?

10   A    Yes.

11   Q    All right.  And do they just dock your pay for the

12   days that you're out of the office?

13   A    I have to take vacation days, yes.

14   Q    Okay.  And you don't get paid for those vacation

15   days?

16   A    No.  Well, I get paid, I only get, you know, two

17   weeks vacation a year so I'm taking four days here.

18   It's not really vacation.

19   Q    I want to talk to you about this topic of notice

20   that we just discussed.  These death certificates that

21   we went through, those are not sent to the physicians at

22   the conclusion of autopsy and after the death

23   certificates are signed; correct?

24   A    The death certificates, no, they're -- they go to

25   vital statistics.

1094

1    Q    Okay.  And the death certificate, that would be the

2    final piece of the process of post-mortem process for

3    people that pass away; correct?

4    A    That's correct.

5    Q    Either it's signed off before an autopsy by a

6    physician or there's an autopsy done and then it's

7    signed off by a physician; correct?

8    A    It depends on the type of death.  If it's a case

9    that comes under our jurisdiction, the private physician

10   cannot sign the death certificate.

11   Q    Okay.  So then the Coroner's office would have to

12   sign that; correct?

13   A    That's correct.

14   Q    Okay.  Now, you were asked to look at 151-B.  Do you

15   recall that?

16   A    Yes.

17   Q    And you mentioned -- first person was Patricia C

18   that you mentioned that the clinic received notice of;

19   correct?

20   A    Yes.

21   Q    Can you look in your documents and tell the jury

22   anywhere where it states that the office was told or Dr.

23   Schneider himself was told that Patricia C passed away

24   of mixed drug intoxication?

25   A    No.

1095

1    Q    Okay.  There is nowhere in the record, in Exhibit

2    151-B, where the notice or the request for records

3    regarding Patricia G stated that Patricia G died of

4    mixed drug intoxication; correct?

5    A    That's correct.

6    Q    There's nowhere in 151-B that states that Dr.

7    Schneider was told that Victor J passed away based on

8    mixed death (sic) intoxication; correct?

9    A    That's correct.

10   Q    There's nowhere in 151-B that Dr. Schneider was told

11   that Shannon M passed away because of a mixed drug

12   intoxication; correct?

13   A    That's correct.

14   Q    There's nowhere in 151-B that Jason P -- excuse

15   me -- that Dr. Schneider was told that Jason P passed

16   away because of a mixed drug intoxication; correct?

17   A    That's correct.

18   Q    And there's nowhere in 151-B that Dr. Schneider was

19   told that Jo Jo R passed away because of a mixed drug

20   intoxication; correct?

21   A    That's correct.

22   Q    And there's nowhere in 151-B that Dr. Schneider was

23   told that Deborah S passed away because of a mixed drug

24   intoxication; correct?

25   A    Correct.

1096

```
 1    Q    Now, when your office receives cases, it's not
 2    always because something illegal has happened; correct?
 3    A    That's correct.
 4    Q    It's when the natural causes of death cannot be
 5    determined.   True?
 6    A    It basically just depends.  If some person dies
 7    suddenly and unexpectedly, it will come under our
 8    jurisdiction to determine cause and manner of death by
 9    state statutes.
10    Q    And when your office would request records from the
11    Schneider Medical Clinic, you never had to file a motion
12    to compel the court to make them give you records, did
13    you?
14    A    No.  I have subpoena power and so I just would need
15    the medical records to review prior to autopsy on any
16    death that comes to our office.
17    Q    Right.  But the Clinic never resisted those
18    subpoenas and refused to give you information; correct?
19    A    That's correct.
20    Q    Now, you also were asked questions about Dr.
21    Schneider standing out.  You remember that?
22    A    Excuse me.
23    Q    You were asked questions about Dr. Schneider
24    standing out in your mind.  You remember that?
25    A    Yes.
```

1097

1    Q    Okay.  Do you know prior to 2002, did Dr. Schneider

2    ever stand out in your mind?

3    A    I don't recall exactly what year or what time we

4    started to see a cluster of deaths from that clinic.

5    Q    Okay.  And when you say from that clinic, you mean

6    regarding any provider that was in that clinic, it was

7    always associated with Schneider; correct?

8    A    He was the attending physician.

9    Q    On everybody that you --

10   A    Primary physician.

11   Q    -- everybody that you just testified about?

12   A    I believe so.

13   Q    Okay.  We'll talk about this a little bit later.

14   Did you ever determine what, if anything, happened in

15   Dr. Schneider's practice between 2002 or 2006 that would

16   have led to this pattern that you believe that you saw?

17   A    No.

18   Q    All right.  Did you learn -- did you at any time

19   learn that Dr. Schneider began to see a very large

20   sickly population between 2002 and 2006?

21   A    No.

22   Q    Did you learn that Dr. Schneider began to get

23   patients that other people did not want between 2002 or

24   2006?

25   A    No.  I was not aware of that.

1    Q   Now, just visiting your credentials a little bit.

2    You also wrote a textbook; correct?

3    A   I've written seven books, yes.

4    Q   Okay.  How many?

5    A   Seven.

6    Q   And are they all published by Dudley pub --

7    A   Yes.

8    Q   Okay.  And that means they're self published?

9    A   Yes.

10   Q   And you sell them off your web site?

11   A   Yes.

12   Q   Okay.  Are they used in -- strike that.

13       Now, you also understand that in the course of your

14   practice as a Coroner, it's important to be very

15   thorough; correct?

16   A   Yes.

17   Q   It's important to be accurate, isn't it?

18   A   Yes.

19   Q   And it's extremely important to be complete;

20   correct?

21   A   Yes.

22   Q   You want to make sure that this autopsy reviews all

23   relevant information in order for you to come to a

24   full -- to a reasoned conclusion; correct?

25   A   Yes.

1099

1    Q    And you would agree that being a Coroner is more --

2    it's not an exact science, is it?

3    A    It's a medical subspecialty.

4    Q    And basically you have to use your judgment based on

5    all the factors in front of you to come to an opinion;

6    correct?

7    A    Yes.

8    Q    And you make room that other pathologists could

9    review the same autopsies, same findings, and come up

10   with a different conclusion than you would; correct?

11   A    It's possible.

12   Q    Okay.  Now, part of also conducting these

13   autopsies -- and we've talked about this before you took

14   the stand -- is conducting histologies; correct?

15   A    That's correct.

16   Q    And histologies are valuable to Coroners because

17   they can help identify causes of death not readily seen

18   by the human eye; correct?

19   A    Yes.

20   Q    And so, for instance, when you've been talking about

21   sudden cardiac death.  You're familiar with that term?

22   A    Yes.

23   Q    And when you have sudden cardiac death, there is

24   scarring that happens to the heart, is there not?

25   A    Sudden cardiac death can be a number of reasons.

1100

1  Q   Okay.  If sudden cardiac death is caused by a heart

2  attack, the only way you would know that is by looking

3  at the histology slide and looking for scarring on the

4  heart tissue; correct?

5  A   The scarring would only occur if it was an older

6  myocardial infarction.  Not a recent one.

7  Q   So a recent heart attack will not show scarring

8  within 6 to 24 hours after the heart attack incident?

9  A   Generally the scarring wouldn't show up for about

10 two weeks.

11 Q   Two weeks.  But scarring will show up; correct?

12 A   Usually, yes, if there's, if there's heart damage.

13 Q   And -- but when you've been talking about a central

14 nervous system depression, that is a slower incident and

15 you won't find that type of scarring in that heart that

16 you would find like in a sudden death caused by a heart

17 attack; correct?

18 A   That's correct.

19 Q   So when you have issues where you're looking between

20 a cardiac event and maybe a central nervous depression

21 event, one of the main factors that really could help

22 you determine what truly may have happened would be a

23 histological review of that heart organ to determine

24 whether or not there was scarring which would suggest an

25 acute event or whether there was no scarring present

1  which would suggest a prolonged event; correct?

2  A   It's actually the other way around.  The scarring

3  would mean it was a -- that they had an old heart attack

4  and it may just be an incidental finding, that their

5  heart was fine.  We see scarring a lot in a lot of

6  different cases.  Basically there's really no reason to

7  do microscopic sections if we, again, if we found

8  nothing significant at autopsy.  We collect microscopic

9  sections on every case and keep those for five years.

10  But we wait until the toxicology comes back and if

11  that's positive then there's no need to go on and look

12  at all of the tissue microscopically because we already

13  have the cause of death.

14  Q   Okay.  So as I understand it, just make sure we're

15  all digesting this appropriately, if you -- you do not

16  do histology if you do a toxicology and it comes back

17  positive with some kind of drugs in there.  Is that

18  correct?

19  A   That's correct.

20  Q   And you're aware -- and no matter what level that

21  toxicology is; correct?

22  A   If it's significant enough -- we will have the

23  opinion of our toxicologist, and if it's a significant

24  level to cause death, then that's the cause of death.

25  Q   Okay.  And you would agree that the significance of

1    the level depends on a lot about the person's history

2    and use of these medicines; correct?

3    A   Basically if it's a toxic amount then that

4    generally, and with a negative autopsy, that would be

5    the cause of death.

6    Q   A toxic amount.  There is not one amount that is

7    considered toxic for all the population, is there?

8    A   No.

9    Q   The toxicity of the amount depends on the person's

10   tolerance to that medicine; correct?

11   A   Basically is an amount that causes their death.

12   Q   It's a yes or no question.  The way that this amount

13   of medicine in a person's system, how that would effect

14   each person, varies on a case-by-case basis.  Correct?

15   A   Yes.

16   Q   And the difference in a case-by-case basis depends

17   at least in part on how tolerant this individual had

18   been in taking this medicine; correct?

19   A   That's possible.

20   Q   In order for this -- when this toxicology comes

21   back, in order for you to know what this value means, it

22   would be extremely helpful for you to know how long this

23   person had been taking this combination of medicines and

24   in what amount they had been taking them; correct?

25   A   That's not usually something I consider or go into.

1103

1    Q    I'm not asking if you actually consider it.

2    A    Right.

3    Q    But it would be helpful if you knew that.  How can

4    you -- in other words, how can you weigh -- put weight

5    to a number from a toxicology exam across the board

6    without knowing the specific instances in regards to

7    every single person that you find these medicines in?

8    A    I don't.  I, you know, will look at each individual

9    case and if I don't have any anatomic cause of death and

10   I have high levels, significant levels of multiple

11   drugs, then my opinion is that the person died of mixed

12   drug intoxication.

13   Q    Okay.  So what is your level of significance?  Where

14   does that cut off at?

15   A    Again, they're reviewed by the toxicologist.

16   Q    But the toxicologist does not determine the cause of

17   death, do they?

18   A    No.  But we meet together when there's reports come

19   back and we'll discuss the levels.

20   Q    Okay.  So is there a cut off level that you've used

21   in every single situation that when it comes back it's

22   mixed drug intoxication as opposed to something else?

23   A    No.

24   Q    Okay.  So as we understand it, if you don't see an

25   apparent cause of death, you send off for a tox screen

1104

1    and it comes back positive, your conclusion is that it's

2    mixed death (sic) intoxication; correct?

3    A    Mixed drug intoxication, yes.

4    Q    Mixed -- okay.  Now, let's just talk about this

5    through a hypothetical.  Let's say that for whatever

6    reason I need to take Methadone.  Okay?

7    A    Okay.

8    Q    Let's say person B needs to take methadone.  And

9    let's say person B has been taking a certain dosage of

10   methadone every day for two years in a regular therapy.

11   And let's say that I have been taking it one day.  And

12   let's say we both pass away and you do a tox screen.

13   His says .30.  Mine says .30.  Would you not agree that

14   his .30 is less significant than my .30 because I was

15   naive and he had been using it for a very long time?

16   A    Yes.

17   Q    Okay.  Now, make sure I'm not putting words in your

18   mouth.  You believe that you only do histologies when

19   there's no apparent cause of death and the tox screen

20   comes back negative.  Is that fair?

21   A    That's correct.

22   Q    And you are on the NAME committee, are you not?

23   A    Yes.

24   Q    And you're aware that the NAME committee has set

25   forth autopsy standards.  Your name is actually on that

1105

```
 1   paper, isn't it?
 2   A    That's correct.
 3   Q    Have you reviewed those?
 4   A    Yes.
 5   Q    And are you aware that NAME states that the proper
 6   standard is you do histologies unless there is gross
 7   anatomical -- some kind of gross anatomical injury or
 8   the body is skeletonized.  Are you aware of that?
 9   A    Yes.  But it also indicates if there's other -- if
10   there is another cause of death, there's no reason to do
11   a histology.
12   Q    Is that -- you found that in those standards?
13   A    We're, we're in the process of modifying some of the
14   standards where there is, you know, obvious --
15   Q    I understand you're in the process of modifying
16   them.  I'm sorry.  I didn't mean to interrupt you.  Were
17   you finished?
18   A    No.
19   Q    Okay.  You can finish.
20   A    There's obvious things -- it took us two years on
21   the committee to develop these standards; but sometimes
22   there's obvious causes of death like with a motor
23   vehicle accident or electrocution or other obvious,
24   carbon monoxide, obvious, and drug overdose causes a
25   death, where microscopic sections is not going to be
```

1    beneficial for us.  And if, again, if the toxicology

2    comes back negative, then obviously we would go and look

3    at the microscopic sections to see if it would be

4    helpful in determining the cause of death.

5    Q    Okay.  Let me just chat with you a little bit about

6    if a person has a -- strike that.

7         It's possible for a person to have a heart attack

8    and be taking pain medicines; correct?

9    A    Yes.

10   Q    And it's possible for a person to be having a heart

11   attack and taking pain medicines and those pain

12   medicines not to have caused or contributed to their

13   heart attack.  True?

14   A    That's possible.

15   Q    So, for instance, if you have somebody with 80%

16   occlusion in three of their arteries, they could have

17   any kind of spasm which would send them into a cardiac

18   arrest; correct?

19   A    That's correct.

20   Q    And this same person could be on pain medicines for

21   years with a chronic pain issue; correct?

22   A    That's correct.

23   Q    Okay.  But under the way you do your autopsies, if

24   this person came in to you with this cardiac event, you

25   would hold off on doing this toxicology -- excuse me --

1    this histology until you get the toxicology back;

2    correct?

3    A    That's correct.

4    Q    And if you brought back that toxicology and it

5    had -- it was positive for pain medicines, you're going

6    to find that the cause of death was at least caused or

7    contributed to by that pain medicine in his system;

8    correct?

9    A    That's correct.

10   Q    And you wouldn't go the extra step to look at the

11   histology to see what the heart looked like.  Is that

12   fair?

13   A    I've already seen the heart and examined it grossly.

14   I would know if there's any occlusion of coronary

15   arteries.

16   Q    You would note that on your autopsy report, wouldn't

17   you?

18   A    Yes.

19   Q    You would agree that no two hearts ever look alike;

20   correct?

21   A    Yes.

22   Q    They're all different and specific; correct?

23   A    Yes.

24   Q    Now, again, your job depends heavily on your

25   judgment; true?

1    A    That's correct.

2    Q    And part of what we have to use to see how reliable

3    your judgment is is just to see how accurate you have

4    been in the past; correct?

5    A    Yes.

6    Q    When you were here in Sedgwick County, did you all

7    utilize a peer review process where somebody would take

8    15 of your autopsies and say I agree with 85 or 90% with

9    some peer review committee?  Did you ever do that?

10   A    No.

11   Q    You've actually missed diagnosises before, haven't

12   you?

13   A    Not that I'm aware of.

14   Q    You're not aware of missing two bullets in an

15   individual's head while you've been a chief medical

16   examiner in Kansas City?

17   A    No.

18   Q    You're not aware of nursing home sending back a body

19   that your office found was a natural cause of death but

20   there were actually two bullet holes that your office

21   missed.  You're not aware of that?

22   A    I believe you're talking about a case where our

23   investigators were not called to the scene.  Once the

24   case was reported to us, we autopsied that case, yes.

25   Q    You autopsied the case and you termed it natural

1109

1    death; correct?

2    A    No.

3    Q    You didn't do that?

4    A    No.

5    Q    Okay.  Your medical examiner's office never ruled a

6    person by the name of Anthony Crockett a natural death?

7    A    No, that's correct.

8    Q    Now, isn't it true that you don't do histologies

9    because they're one of the more expensive procedures

10   that the Coroner's office here could have done?

11   A    That's correct.

12   Q    Now, if two people's hearts never look alike, can

13   you tell us why in several of your autopsies your

14   descriptions of people's hearts are the exact same word

15   for word verbatim?

16   A    Well, basically we have a protocol to describe the

17   heart and the heart in general as the same structure and

18   so we use the -- a similar protocol and only make

19   adjustments according to the weight.  And we do that

20   with every organ.

21   Q    Okay.  So, in other words, as I understand it, you

22   will use the same verbatim language with a heart

23   regardless; correct?  Unless you see somewhat other

24   anatomical changes?

25   A    That's correct.

1110

1    Q   And would a person having like -- well, strike that.

2        So on your cardiovascular review, nobody -- if you

3    don't put anything on these autopsies, then that means

4    their heart doesn't have any occlusions?  Not 10%?  Not

5    20%?  Is that correct?

6    A   If that's not listed in my report, no, they don't.

7    Q   Okay.  What is cardiovascular disease?

8    A   It's mainly -- atherosclerotic cardiovascular

9    disease mainly means hardening of the arteries where

10   there would be cholesterol build up and calcium build up

11   in the cardiovascular system.

12   Q   And that means, like clogged arteries, it means

13   other hardened areas of the arteries; correct?

14   A   Correct.

15   Q   You actually found that on a couple of individuals,

16   didn't you?

17   A   Yes, I did.

18   Q   Okay.  Can we turn this -- let's talk a little bit

19   about Cliff C.  Clifford C.

20   A   Do you know what exhibit that is?

21           MR. WILLIAMSON:  I do not.  Ms. Treadway

22   might.

23   A   Here it is.

24           MS. TREADWAY:  150-5-B.

25

1111

1    BY MR. WILLIAMSON:

2    Q   Can you turn to Page 3 -- excuse me, 4 of this

3    autopsy.

4    A   Okay.

5    Q   And let's talk just a little bit about this

6    cardiovascular system of Cliff C.  Do you see that?

7    A   Yes.

8    Q   And you found that this individual's hard weighed

9    400 grams; is that correct?

10   A   Yes.

11   Q   And the rest of this language that's on this

12   cardiovascular system, is that that language we're

13   talking about that you just leave standard unless

14   there's something else found?

15   A   Yes.

16   Q   So the only thing wrong with his heart according to

17   you here is that it was a little enlarged at 400 grams;

18   correct?

19   A   Basically.  I can't say if that's enlarged or not;

20   but his heart weighed 400 grams.

21   Q   Nothing else was found in the course of your review

22   correct?

23   A   That's correct.

24   Q   But the curious part is is if you look at your

25   pathology diagnosis, you actually -- and the highlighter

1112

1  is from me.  That is my copy.  You actually identify

2  cardiovascular disease; correct?

3  A   That's correct.

4  Q   You identify hypertension and hypo -- that other

5  one?

6  A   Hypercholesterolemia.

7  Q   Right.  And so according to your pathologic

8  diagnosis, his heart showed signs of hypertension and

9  arrhythmia (sic) in the aorta but your actual work

10  product doesn't identify any areas of the heart, does

11  it?

12  A   The history is from the medical history that he had

13  high blood pressure, hypertension and high cholesterol.

14  Q   I understand that.  But -- there's a medical history

15  of all of these cardiac issues.  But your review does

16  not state anything different than what you found in the

17  majority of your reviews; correct?

18  A   No, that's not correct.

19  Q   It doesn't -- you have the same standard language

20  that you put in multiple of your autopsies; correct?

21  A   No.

22  Q   It doesn't?

23  A   No.

24  Q   What's different in that language?

25  A   What's different is the amount of that atheroma

1113

1    that's listed both on my pathologic diagnosis and also

2    under the cardiovascular system that's saying that the

3    aorta shows mild atheroma, which means the, again, the

4    cholesterol build up that sometimes can cause high blood

5    pressure when the aorta becomes calcified; and that's an

6    indication of atherosclerotic cardiovascular disease.

7    Q    And where is that located?

8    A    It's located two places.  Both on Page 1 under

9    atherosclerotic cardiovascular disease.  Part B is mild

10   atheroma of the aorta, meaning the cholesterol plaque of

11   the aorta.  And that would be something I would expect

12   to find with high cholesterol and with high blood

13   pressure.  It's also listed under the standard protocol.

14   I amended the protocol.  Normally I would say showed no

15   atherosclerosis of the aorta.  In this particular case,

16   on Page 4, the next to the last paragraph, says:  The

17   aorta and its major branches arise normally and follow

18   the usual course and show a mild atheroma.

19   Q    And where do you find any mention about any

20   occulsions that this man's heart may have had?

21   A    There's no occlusions found.

22   Q    So a person with hypertension and cardiovascular

23   disease has zero percent occlusions.  Is that your

24   testimony?

25   A    On this particular case, yes.

1114

```
 1    Q    And while we're talking about Cliff C, isn't it true
 2    that he also had a seizure disorder?
 3    A    Yes.  He had a history of a seizure disorder.
 4    Q    Isn't it true that there's a -- I don't know the
 5    best term to use -- but there is something out there
 6    called sudden death in epileptics?
 7    A    Yes.
 8    Q    Okay.  And also this man was taking cocaine, was he
 9    not?
10    A    Yes, that was found in his blood, yes.
11    Q    And cocaine can cause sudden -- can cause heart
12    attacks, can't it?
13    A    It can --
14    Q    I'm sorry --
15    A    It can, again, with the mechanism, a person can die
16    of the heart stopping on any drug.
17    Q    Right.  But cocaine causes arrhythmias; correct?
18    A    So do the other drugs.
19    Q    Oxycodone causes arrhythmias?
20    A    Secondarily to a lack of oxygen to the heart, yes.
21    Q    No.  Doesn't Oxycodone cause a central nervous
22    depression?
23    A    Right.  That eventually will cause the heart to
24    stop.
25    Q    All right.  But a sudden arrhythmia, cocaine can
```

1115

1    cause the heart to jump and spasm.  Isn't that true?

2    A    That can happen in any of the --

3    Q    All I'm asking about is cocaine.

4    A    Yes.  Cocaine can do that.

5    Q    And cocaine is a illegal drug?  Nothing that would

6    be prescribed by a physician; correct?

7    A    That's correct.

8    Q    You did not do a histology, a microscopic exam of

9    Mr. Cliff C's heart, did you?

10   A    No.

11   Q    Now, are there -- are you aware of any studies that

12   state that a person with an enlarged heart is five times

13   more likely to have clogged arteries, have occlusions in

14   the heart?  Are you aware of any studies?

15   A    No.

16   Q    Are you aware of any statistics, any general

17   statements like that?  Is it true that a person with an

18   enlarged heart has an increased chance of having blocked

19   arteries?

20   A    Not that I'm aware of.

21   Q    Now let's talk about Dalene C.

22   A    Do you have an exhibit number?

23            MS. TREADWAY:  5-B as in boy.

24   A    I don't have the five group.

25            MS. TREADWAY:  Those might have been some I

1116

```
 1    put over here.  I apologize.
 2                    (Off-the-record.)
 3            MS. TREADWAY:  Would it help if I gave those
 4    to her as you called them?
 5            MR. WILLIAMSON:  Yes, please.
 6    BY MR. WILLIAMSON:
 7    Q    Did you find that, Dr. Dudley?
 8    A    Yes.
 9    Q    Okay.  Now, with Dalene C, you did not perform a
10    microscopic exam with her, did you?
11    A    No.
12    Q    And her heart weighed 450 grams; correct?
13    A    Yes, that's correct.
14    Q    And that was an enlarged heart; true?
15    A    Again, I would have to do calculations to determine
16    that.  She weighed 231 pounds and sometimes you can have
17    an enlarged heart at that weight.
18    Q    Now, with Dalene C, with the medication that was
19    found in her system, do you know how long she had been
20    taking that medication?
21    A    No.
22    Q    Do you know in what amount she had been taking that
23    medication?
24    A    No.
25    Q    Do you know who had actually prescribed that
```

1    medication?

2    A    No.

3    Q    And you didn't do a histology or microscopic exam on

4    her because it came back there were medicines in her

5    system; correct?

6    A    That's correct.

7    Q    Let's talk about Earl E -- I mean Earl A.

8    A    I have that.

9    Q    You have that one?

10   A    Yeah.

11   Q    And Mr. Earl A had a heart that weighed 750 grams;

12   correct?

13   A    That's correct.

14   Q    You didn't do a microscopic examination on Earl A's

15   heart; correct?

16   A    I did not.

17   Q    He was overweight.  He weighed 493 pounds, didn't

18   he?

19   A    That's correct.

20   Q    And you actually noted he did have narrowing of one

21   artery of 50%; correct?

22   A    That's correct.

23   Q    Do you know -- did you learn through the course of

24   your investigation that Dr. Schneider did not prescribe

25   these medicines to Mr. Earl A at any time immediately

1118

1    prior to him taking them?

2    A    I'm not sure who prescribed the medications.

3    Q    All right.  And Mr. Earl A also had methamphetamines

4    in his system; correct?

5    A    That's correct.

6    Q    And doctors cannot prescribe methamphetamines, can

7    they?

8    A    I'm not sure.  At one time I think amphetamine was

9    prescribed for diet control.

10   Q    And that was pulled, wasn't it, or pulled from

11   the --

12   A    I believe so.  I don't know if there's any -- I

13   don't prescribe medications so I don't know if there's

14   any other use for amphetamines.

15   Q    Methamphetamines, meth --

16   A    Right.  But that can be a metabolite of amphetamine

17   I believe.  That's probably something you need to ask

18   the toxicologist.

19   Q    Okay.  Will do.  And isn't it true that

20   methamphetamines can cause an arrhythmia?

21   A    Yes.

22   Q    Which can cause a heart attack?

23   A    It doesn't cause a heart attack.  Again, it's a

24   mechanism of how a person dies from a drug overdose.

25   Q    Say that again.

1119

1    A    What you're calling heart attack or a fatal

2    arrhythmia is a mechanism of what occurs when the

3    underlying cause of death can be from drugs.

4    Q    Okay.  And so basically methamphetamine would

5    interact with the body differently say, than Oxycodone;

6    correct?

7    A    It possibly can have a different effect on the

8    heart.

9    Q    Okay.

10   A    Or an additive effect.

11   Q    Okay.  Meaning that the methamphetamine would cause

12   a sudden arrhythmia and you would have a sudden death as

13   opposed to the Oxycodone where it would be more of a

14   prolonged issue; correct?

15   A    No.  It's -- whenever you have an arrhythmia, it's

16   going to be sudden so --

17   Q    Okay.

18   A    -- so the arrhythmia will be sort of the final event

19   of when the heart goes into a fibrillation and then will

20   cease to be able to pump as a muscle.

21   Q    Okay.  Let's turn to Jerrod M.

22   A    Do you have a number of that one?

23              MS. TREADWAY:  6-R.

24   A    Okay.

25

1    BY MR. WILLIAMSON:

2    Q    All right.  Did you learn in the course of your

3    investigation that Dr. Schneider did not prescribe any

4    pain medicines to his Jerrod M?  True?

5    A    I'm not aware of who prescribed the medicines.

6    Q    You're aware that Jerrod M took his mother's

7    prescriptions; correct?

8    A    I don't believe I have that information.  That was

9    not under my -- what I have received of circumstances of

10   death.

11   Q    You learned that he took medicine that was

12   prescribed by somebody at the Schneider Clinic -- that

13   was issued to somebody else other than himself; correct?

14   A    I do have that in my report, yes.

15   Q    And you also learned that this individual ingested a

16   large amount of medicine because he was getting pulled

17   over by the police officers; correct?

18   A    I do recall that now, yes.

19   Q    Have you ever known a physician to prescribe --

20   instruct a patient to take medicine in that excess just

21   because he is getting pulled over by the police?

22   A    No.

23   Q    You didn't do a microscopic exam on Jerrod M either,

24   did you?

25   A    No.

1121

```
 1    Q    You also noted that the decedent had a pleural and

 2    abdominal diffusion.   Correct?

 3    A    Yes.

 4    Q    Are you aware of any studies that have found that

 5    those two things are associated at all with any kind of

 6    opiate related death?

 7    A    Of what type?

 8    Q    Opiate.

 9    A    Not that I'm aware of, no.

10    Q    Let's discuss Dustin L.

11              MS. TREADWAY:   150-16.

12    BY MR. WILLIAMSON:

13    Q    Now, did you learn during the course of your

14    investigation that Dr. Schneider never prescribed this

15    individual any medicines at all?

16    A    No.

17    Q    Did you learn -- strike that.   You didn't conduct a

18    histology on this individual, did you?

19    A    No.

20    Q    Okay.   And I think I stand corrected.   I think this

21    is the individual who took his mother's prescriptions;

22    correct?

23    A    That's correct.

24    Q    Okay.   First person took somebody else's.   And this

25    individual who didn't receive anything from the clinic
```

1    took his mother's; correct?

2    A    That's correct.

3    Q    Do you know why this is even being presented to the

4    jury if he didn't receive anything from Dr. Schneider or

5    his office?

6    A    No.

7    Q    Let's talk about Victor J.

8         MS. TREADWAY:  5-F.  I may have that one.

9    A    Okay.

10   BY MR. WILLIAMSON:

11   Q    Do you have it in front of you?

12   A    Yes.

13   Q    Now, this -- you didn't perform a microscopic exam

14   with the tissue here; correct?

15   A    No.

16   Q    And this individual was taking methamphetamines;

17   correct?

18   A    That's correct.

19   Q    You haven't seen any evidence at all that Dr.

20   Schneider was prescribing this man any methamphetamines;

21   correct?

22   A    I'm not sure.  I don't know.

23   Q    You don't -- do you know of any evidence that Dr.

24   Schneider was prescribing any methamphetamines?

25   A    No.  It -- you would have to check the medication

1123

```
 1    log.  I actually have under the circumstances of death
 2    that he was prescribed Valium, Lortab and Methadone.
 3    And I don't see methamphetamine listed there.
 4    Q   Okay.  And there's no test you can run or set of
 5    tests you can run -- I'm not looking for a magical
 6    test -- I'm looking for medical test that you can run to
 7    say what the effects of the medicines, the prescriptions
 8    that he was taking, absent any methamphetamine in his
 9    system, would have had on Victor J prior to his passing;
10    correct?
11    A   That's correct.
12    Q   Let's discuss Patricia C.
13    A   Do you have that number?
14          MS. TREADWAY:  6-H.
15    BY MR. WILLIAMSON:
16    Q   Just let me know when you're ready.
17    A   Okay.
18    Q   You didn't do any microscopic slides on Patricia C;
19    correct?
20    A   That's correct.
21    Q   And you learned through the course of your
22    investigation that Steve did not prescribe her the
23    medicines found in her system any time near prior to the
24    time she passed away; correct?
25    A   Excuse me.  Repeat the question.
```

1124

```
 1   Q    You learned during the course of your investigation
 2   that Dr. Schneider did not prescribe her the medicine
 3   that was found in her system at any time within two
 4   months of her passing away; correct?
 5   A    I just have that she was being treated by Dr.
 6   Schneider and that she did have medications prescribed.
 7   Q    And do you know if she was being seen by Dr.
 8   Schneider, Dr. St. Clair or another PA at the office?
 9   A    No, I don't.
10   Q    And Patricia C also was -- she had an epileptic
11   history; correct?
12   A    She did have a history of seizure disorder.
13   Q    And we've talked about this.  SUDEP is a -- can you
14   tell the jury what SUDEP actually is?  I don't know if I
15   asked you that.  Sudden --
16   A    Sudden unexpected cardiac death.
17   Q    Death in epileptics?
18   A    Oh, I'm not familiar with those initials.  Basically
19   I guess it's just a mechanism of how a person can die
20   suddenly and unexpectedly if they have a seizure
21   disorder.
22   Q    Okay.  And did you do any test to rule out the
23   possibility that Patricia C had an epileptic -- or an
24   uncommon passing based on her epileptic disorder?
25   A    No.
```

1    Q   And isn't it true that people with this condition,

2    it's more likely to occur when they do not take their

3    medicines that they're supposed to take; correct?

4    A   If they're on medication for their epilepsy.

5    Sometimes we do see a little therapeutic level if they

6    died of a seizure.

7    Q   Okay.  And you'll agree that people with epilepsy

8    are ten times more likely to pass away from sudden death

9    than the general population; correct?

10   A   I'm not aware of that statistic.

11   Q   But this, this condition can effect people even when

12   they're previously healthy; correct?

13   A   That would be something that I would have to get

14   information on when she had her last seizure.  If it was

15   like five years prior or five seizures a week, that sort

16   of thing.

17   Q   Did you get that as part of the history before you

18   made the final diagnosis in regards to Patricia C?

19   A   I didn't have any information regarding her having

20   an uncontrolled seizure disorder, no.

21   Q   But you knew that she had a history of seizure

22   disorder, didn't you?

23   A   Yes.

24   Q   But you didn't know how often she had the seizures;

25   correct?

1    A    That's correct.

2    Q    You don't know how intense the seizures were;

3    correct?

4    A    That's correct.

5    Q    You don't know when her last one was before the time

6    you did the autopsy; correct?

7    A    That's correct.

8    Q    And it's true that this is found -- this sudden

9    death in epileptics is found -- in 85% of the cases,

10   occur when the person is between the ages of 20 and 50;

11   correct?

12   A    Again, I'm not sure of those statistics, no.

13   Q    And Patricia C was 43 years old; correct?

14   A    Yes.

15   Q    As we just stated that this is more common when

16   their medicine is below therapeutic level; correct?

17   A    If the medication that they're on as far as the --

18   Q    Epilepsy?

19   A    -- epilepsy medicine is sub therapeutic, which I'm

20   not sure if her levels were.

21   Q    Her levels were below less than roughly 0.04

22   milligrams; correct?

23   A    I believe her level was 2 milligrams per liter.

24   Q    And would that be the Phenytoin?

25   A    Yes.   It's Dilantin.

1    Q   And it's true that that amount is lower than a

2    therapeutic amount, is it not?

3    A   I would have to check that.  I don't know.

4              THE COURT:  Are you moving on to somebody

5    else?

6              MR. WILLIAMSON:  Yes, Your Honor.

7              THE COURT:  How about a noon recess, Ladies

8    and Gentlemen?  Until about 1:00.  Remember and heed the

9    admonition.

10                   (Jury excused for noon recess.)

11             THE COURT:  Gentlemen, I got this Government's

12   Rule 11(f) motion this morning.  Do you all want to

13   respond to it?

14             MR. WILLIAMSON:  Yes, Your Honor.  I'll take a

15   look at it this evening and try to get a response on

16   file tonight.

17             THE COURT:  Thank you.

18                   (Noon recess.)

19

20

21

22

23

24

25