```
 1                         (Beginning at 1:08 p.m. the

 2                          following proceedings

 3                          continued.)

 4              THE COURT:  Yes, sir.

 5    BY MR. WILLIAMSON:

 6    Q   All right.  Dr. Dudley, we're getting ready to turn

 7    to another patient.  Can you pull the exhibit for

 8    Patricia G.

 9    A   Okay.

10    Q   Now, with Patricia G, you did learn through the

11    course of your investigation that Dr. Schneider was not

12    the last person to see her when she visited the clinic;

13    correct?

14    A   I'm not aware of those details, no.

15    Q   Okay.  You did not do a microscopic examination;

16    correct?

17    A   No.

18    Q   Okay.  And she did have an enlarged heart for a lady

19    her size; correct?

20    A   I don't believe so.

21    Q   Her heart was 310 grams; correct?

22    A   Right.  That's not --

23    Q   Shouldn't her heart have been around 245 grams?

24    A   There's a range.  That doesn't seem excessively

25    large to me.
```

1129

```
 1    Q   It doesn't seem enlarged at all or doesn't seem --
 2    A   I believe it's within the range.  I didn't call it
 3    cardiomegaly.
 4    Q   Okay.  And isn't it true that she was found with
 5    multiple prescription bottles from multiple doctors at
 6    the time she passed away?
 7    A   I'm not sure who prescribed the medication; but
 8    there were medications found.
 9    Q   And some of the medicine in her system was Diazepam,
10    Tempazepam, Oxazepam, Carisoprodol; correct?
11    A   Yes.
12    Q   And there was also Hydrocodone, Oxycodone; correct?
13    A   That's correct.
14    Q   And you would agree that no physician would instruct
15    a patient to take medicine in that combination; correct?
16    A   Again, I'm not sure.  I don't have a clinical
17    practice.
18    Q   Okay.  Well, do you know whether or not she had been
19    taking that medicine for a prolonged period of time in
20    that combination?
21    A   No, I don't.
22    Q   Let's turn to Amber G.
23            MS. TREADWAY:  That's 150-12.
24    A   Okay.
25    Q   You found it?
```

1130

```
 1    A    Yes.
 2    Q    Now, you learned through the course of your
 3    investigation, did you not, that Dr. Schneider never saw
 4    this patient?
 5    A    Again, I don't have that information on my
 6    circumstances of death.
 7    Q    Okay.  Is this one of the people that medical
 8    records were requested from in regards to the Schneider
 9    Medical Clinic visits?
10    A    I don't believe so.
11    Q    Do you have any in front of you, any records
12    request?
13    A    Not in front of me, no.
14    Q    Do you know whether you actually reviewed any
15    records before completing your autopsy from the -- let
16    me rephrase that.  Do you know whether or not you
17    reviewed any records from the Schneider Medical Clinic
18    before conducting your autopsy?
19    A    No, I don't know that.
20    Q    If Dr. Schneider never saw this patient, do you know
21    why she would be being presented to the jury?
22    A    No.
23    Q    You did not do any tox -- excuse me, no slides
24    either, did you?
25    A    No, there's no microscopic slides.  No histology was
```

1131

1    performed.

2    Q    Okay.  And the toxicology report was actually

3    incomplete with this patient; correct?

4    A    I'm not sure about it being incomplete.  I have a

5    report in front of me.

6    Q    That report shows a total amount of morphine in the

7    system; correct?

8    A    Yes.

9    Q    It doesn't break it down between the active and

10   inactive, strike that.

11       It doesn't show whether or not all the morphine in

12   there was active; correct?

13   A    It basically just has one morphine level.

14   Q    And you do realize that morphine can metabolize;

15   correct?

16   A    Yes.

17   Q    And if you don't complete the toxicology, then you

18   don't know how long -- you don't have any indication how

19   long that morphine had been in the system; true?

20   A    Again, I don't know the specifics, no.

21   Q    So, for instance, if you have morphine and it's in

22   there a prolonged period of time, you will -- you would

23   have an active and then you would have a metabolite of

24   that morphine; correct?

25   A    Again, we just go by one, one level.  If it's

1132

1   present.  We check the level in the heart, femoral

2   blood, the urine and the brain.

3   Q    So you don't take any extra steps to determine how

4   long that prescription medicine had been in the system?

5   You just look at the total number; is that correct?

6   A    We look at the total amount and then we go, like,

7   check it with what the toxic level would be.

8   Q    But would you agree that if the level was .30 and of

9   that .26 of that was a metabolite of morphine, the

10  active ingredient in the system at the time of death

11  would be very miniscule; correct?

12  A    I think that's probably a question for the

13  toxicologist.

14  Q    Okay.  But you have to interpret the toxicologist's

15  results, don't you?

16  A    Yes.

17  Q    So, again, if you're in a position where you have to

18  interpret the toxicologist's results and you see a .26

19  as far as the active morphine -- excuse me, as a

20  metabolite and .04 as an active morphine, that would

21  give you a different indication than whether or not it

22  was .30 all active; correct?

23  A    In any place I've worked for the last 20 years we

24  don't break that down into two levels.  So I only go by

25  the total amount.

1133

```
 1    Q    And Ms. Amber G was also taking an illegal drug,
 2   wasn't she?
 3    A    She had cocaine on board, yes.
 4    Q    And, again, you hadn't seen any prescription where
 5   Dr. Schneider prescribed any cocaine; correct?
 6    A    That's correct.
 7    Q    Let's turn to Thomas F.
 8    A    Do you have an exhibit number?
 9          MS. TREADWAY:  6-K.
10    A    Okay.
11   BY MR. WILLIAMSON:
12    Q    Did you learn during the course of your
13   investigation that Dr. Schneider did not see Thomas F at
14   any time leading up until he passed away?
15    A    No.
16    Q    And there was no histological, no microscopic slides
17   taken; correct?
18    A    That's correct.
19    Q    And this individual had at least an 80% narrowing of
20   one of the most important arteries; correct?
21    A    That's correct.
22    Q    His heart was enlarged; correct?
23    A    Yes.
24    Q    You actually diagnosed him with cardiomegaly which
25   is an enlarged heart; correct?
```

1134

1    A    That's correct.

2    Q    He had 50% narrowing of the left circumflex artery;

3    true?

4    A    Yes.

5    Q    He had 50% narrowing of another artery, the -- or

6    both the coronary arteries; correct?

7    A    Yes.

8    Q    And then he had another 50% blockage of the right

9    coronary artery; correct?

10   A    No.  He had just a small right coronary artery, I

11   called it 50% hypoplasty which means it was 50% the

12   normal diameter of a coronary artery.

13   Q    And he also had an abnormal mitralvalve; correct?

14   A    That's correct.

15   Q    And you would agree that an abnormal mitralvalve

16   increases the chance of sudden cardiac death; true?

17   A    It can be associated with death, yes, sir.

18   Q    Let's turn to Mary Sue L.

19            MS. TREADWAY:  5-H.

20   A    Okay.

21   BY MR. WILLIAMSON:

22   Q    Okay.  With Ms. Mary Sue L, did she have an enlarged

23   heart?

24   A    Yes.

25   Q    And what -- that heart was 420 grams; correct?

1    A    That's correct.

2    Q    And that was at least two standard deviations bigger

3    than the predicted one; correct?

4    A    Again, I don't have that formula.

5    Q    Her heart should have weighed around 250 grams for a

6    lady her height?

7    A    Again, there's a range.  I'm not sure about that.

8    Q    You didn't do a microscopic exam with her either;

9    correct?

10   A    No.

11   Q    Now, did you take any femoral blood?  Strike that.

12   Let me ask:  Was there any toxicology results run off of

13   blood taken from the femoral artery?

14   A    No, just the heart blood level, urine and brain.

15   Q    Now, do you know how long -- and you found morphine

16   at .10 milligrams; correct?

17   A    That's correct.

18   Q    And did you find -- tell the jury how long that Mary

19   Sue L had been on a morphine -- excuse me -- morphine

20   program?

21   A    No.

22   Q    Can you tell the jury how much morphine that Mary

23   Sue L had been taking over a long period of time?

24   A    No.

25   Q    Would you be surprised to know that she had been

1136

1    taking a consistent dose of morphine for years without

2    having any kind of problems, any kind of problems in

3    regards to the medicine harming her or hurting her?

4    A    No.

5    Q    Okay.  The amount that was found in Mary Sue L's

6    toxicology result can be consistent with somebody who

7    has a history of chronic pain and taking this for the

8    chronic pain syndrome; correct?

9    A    Again, I'm not sure about the levels.  It would be

10   something you would have to check --

11   Q    I understand that; but you are the person that has

12   to conduct the autopsy; correct?

13   A    That's correct.

14   Q    You are the person that has to interpret the levels

15   of the toxicologies; correct?

16   A    Yes.

17   Q    And, but as you sit here now, you don't know whether

18   or not that level that was found in Mary Sue L's -- how

19   it would have effected her if she was alive.  Is that

20   fair?

21   A    That's correct.

22   Q    Let's talk about Deborah M.

23            MS. TREADWAY:  150-18.

24   BY MR. WILLIAMSON:

25   Q    Okay.  You didn't take any slides with Deborah M,

1137

1    did you?

2    A    No.

3    Q    Ms. Deborah M also had an enlarged heart; correct?

4    A    Yes.

5    Q    It was 420 grams?

6    A    That's correct.

7    Q    And it should have been around 169 grams?

8    A    Again, I'm not sure of the range.

9    Q    Okay.  Did you determine whether or not Deborah M

10   had been diagnosed with myocarditis?

11   A    No, I don't believe I've seen the history of that,

12   no.

13   Q    I'm sorry?

14   A    No, I didn't have a history of myocarditis.

15   Q    And how do you know that it's not present in this

16   case?

17   A    Again, I didn't have any reason to consider

18   myocarditis.  That wasn't part of the history that I was

19   given.  Probably the only way to tell if there was

20   myocarditis would be to look at the heart

21   microscopically if that was indicated.

22   Q    And you didn't do that; correct?

23   A    That's correct.

24   Q    Do you know how long Deborah M had been receiving

25   any -- or been on any kind of chronic pain treatment?

1138

1   A    No.

2   Q    Do you know how tolerant her body had become when

3   she was alive to the pain medicines?

4   A    No.

5   Q    Do you know what amount she was taking at the time,

6   leading up until the time that she passed away?

7   A    No.

8   Q    Let's turn to Shannon M who was seen -- excuse me.

9   Are you there?

10           MS. TREADWAY:  150-19.

11           MR. WILLIAMSON:  I think there were two

12   Shannon Ms.  I'm at the one M D.  Is that the same one?

13           MS. TREADWAY:  Yes.

14   A    I don't think this is the same one.

15           MS. TREADWAY:  150-19.

16   A    Do you have the case number?  Do you have the

17   autopsy number.

18   Q    Yes.  18041235.

19   A    Okay.

20   Q    Now, this -- strike that.

21        In your investigation did you learn that this

22   person did not see Dr. Schneider at any time leading up

23   until the time he passed away?

24   A    No.  The history that I have under the circumstances

25   was that this was a patient where medications were

1139

1    prescribed by Dr. Schneider.

2    Q    Okay.  Now, when you see that in there, do you know

3    whether or not that was a prescription with a

4    PA/Schneider or whether it was just Dr. Schneider by

5    himself?

6    A    No, I don't know that.

7    Q    Your medical examiners did not distinguish between

8    the two; correct?

9    A    That's correct.

10   Q    And you've seen pill bottles based off of -- in your

11   experience, where they have a physician assistant who is

12   the person that actually writes the prescription with a

13   slash of a supervising physician's name next to it;

14   correct?

15   A    All we have is what would be on the medication

16   bottle.

17   Q    All you have is what the medical investigator told

18   you; correct?

19   A    Well, if the person died at home -- and this person

20   was dead at the scene -- we would have the medication

21   bottles at the scene and they would have the name of the

22   physician that prescribed the medication.

23   Q    Do we have any of those?  Do you have any of those?

24   A    We have them.

25   Q    Still?

1140

1    A    We may still have them.  But they are -- they're

2    destroyed on a regular basis, depending on the amount of

3    time; but that would be something to check with the

4    Forensic Science Center, but we keep them usually until

5    the case is closed or whatever the guidelines are for

6    destruction of medication.

7    Q    Okay.  And you don't know what date was on the

8    prescription bottles that were found there; correct?

9    A    We have a medication log.

10   Q    I'm talking about as you sit right here today?

11   A    No.

12   Q    Okay.  And so you don't know whether or not this

13   individual actually saw a physician's assistant named

14   Curt on the last couple of visits to the Schneider

15   Medical Clinic?

16   A    No, I wouldn't have that information.

17   Q    Okay.  And this individual had an enlarged heart at

18   370 grams versus the 258 predicted; correct?

19   A    Again, I didn't diagnosis this as a cardiomegaly.

20   Q    Okay.  Now, did you take any slides in regards to

21   Shannon M D?

22   A    Yes.

23   Q    Now, we've been talking about this microscopic slide

24   issue.  Tell the jury how that works.  You take tissue

25   off of certain organs; correct?

1141

1   A   We will look at every organ grossly and then section

2   them, examine them very thoroughly.  We do extensive

3   examination on the heart, looking through every coronary

4   artery at 5 millimeter levels.  Open up every chamber of

5   the heart.  And then also we remove certain sections of

6   the heart.  A section of the right ventricle.  Well,

7   first we will do a cross section from the apex of the

8   heart up to the valves.  And then look for any evidence

9   of abnormalities in the heart.  We save an entire

10  cross-section of the heart.  It would have the right and

11  left ventricle and the septum.  Then we take an

12  additional section of the left ventricle that we save in

13  our save jar for at least five years on every case.  And

14  we'll take a section of the right ventricle in the

15  pulmonary valve and the left ventricle and the -- it

16  would have a section of the mitralvalve that we save.

17  And then I put in a section -- when I do a section I put

18  in a section of the left ventricle and the left atrium

19  that would also include the mitralvalve that I look at

20  when I put in the section to look at microscopically.

21  And we also have a section of the septum.  So that we

22  can always go back and get additional -- make additional

23  slides on that particular case.  So for the heart I just

24  had one section looking at the left ventricle.

25  Q   Okay.  And did you make any other slides for any

1    other organs?

2    A    Yes.  All the organs, the heart -- when I put in

3    microscopic slides, I include the heart, liver, kidney,

4    lungs, spleen and brain.

5    Q    And you would put those all on one slide or they

6    would go on multiple slides?

7    A    No, they're each in individually -- generally I will

8    put the heart in one -- we have what's called a cassette

9    that's about the size of a postage stamp and about a

10   quarter of an inch thick.  We put the section of the

11   tissue in that cassette.  I put one section of the heart

12   in one cassette.  Four sections of the lung in the

13   second cassette.  A section of the liver and the spleen

14   in the third cassette.  Fourth cassette I generally will

15   put in a section of both kidneys, cross-section looking

16   at the outer level the cortex and the inner level of the

17   kidney.  And I'll put in five sections of the brain into

18   one cassette.

19   Q    Okay.  Now, because all of these tissues won't fit

20   on one slide, would they?  All these tissue samples

21   would not fit on one slide?

22   A    Not the way I do my autopsies.  I've seen some

23   physicians that will put very small sections and maybe

24   put two or three organs together on one slide; but I put

25   at least five slides in on the cases that I submit

1143

1    histology.

2    Q    Okay.  Now, this is one of those that I just want to

3    chat with you in a little bit more detail about, even

4    though there's no evidence that Steve actually saw this

5    person.

6              MS. TREADWAY:  Judge, the rolling commentary

7    of evidence that Mr. Williamson is testifying to is

8    simply inappropriate.

9              THE COURT:  I cautioned you about that last

10   week.

11             MR. WILLIAMSON:  I'm trying, Your Honor.

12             THE COURT:  Well, try harder.  I'm not going

13   to let you do any more testifying about whether the

14   doctor saw somebody or didn't.  Maybe that will be in

15   evidence, but not through you.

16             MR. WILLIAMSON:  Yes, sir.

17   BY MR. WILLIAMSON:

18   Q    You mentioned that this person had an enlarged

19   heart; correct?

20   A    There was some focal patchy very tiny microscopic

21   scarring.  That's not unusual to see in --

22   Q    That was my second question.  My first was that you

23   found the heart was enlarged.  The heart was enlarged;

24   correct?

25   A    I didn't call it a cardiomegaly, no.

1144

1   Q   Okay.  But was the heart enlarged or not?

2   A   I don't believe so.  I don't -- with every case, if

3   it's, to me, sort of over the realm, again, considering

4   their weight and everything, I will usually say,

5   especially if I have some other evidence that there's

6   some atherosclerosis at the aorta and they have a

7   history of high blood pressure.  If I see that the heart

8   seems to be like up around the 400 range or high level,

9   I may call that cardiomegaly as contributory to the high

10   blood pressure.  But I didn't call this cardiomegaly in

11   this particular case and I didn't have any history of

12   heart disease in this particular individual, who was 25

13   years old.  But I did microscopically see a few small

14   areas of scar.

15   Q   Okay.  And you didn't see any clogging of the arties

16   whatsoever despite his heart was 370 grams and the fact

17   that he had scarring on there?

18   A   No.

19   Q   Not even 10% occluded?

20   A   No.

21   Q   So he had a perfect heart aside from scarring and it

22   being a little large?

23   A   Yes.

24   Q   Now, you also mentioned about these slides.  You

25   remember that?  The conversation we just had.

1    A    In what regard?

2    Q    That you would -- you would put all of this

3    information on separate slides, all the tissue samples;

4    correct?

5    A    Yes.

6    Q    Let's turn to Heather M.

7              MS. TREADWAY:  5-I.

8    A    Okay.

9    BY MR. WILLIAMSON:

10   Q    Did you learn during the course of your

11   investigation that Dr. Schneider did not see Heather M

12   at any time leading up until the time she passed?

13   A    I don't have that information.

14   Q    Now, isn't it true that this individual's boyfriend

15   took her medicine, crushed it up, liquified it, and

16   injected it into her?

17             MS. TREADWAY:  Objection, Your Honor.  Assumes

18   a lot of facts not in evidence.

19             THE COURT:  I think only if that's in the

20   report somewhere.  Is that in the report, Doctor?

21   A    The only thing I have under circumstances of death

22   again was reportedly as reported to us, she was found

23   unresponsive after her boyfriend injected her with

24   Oxycodone intravenously and delayed calling for

25   assistance.

1146

1     THE COURT:  The objection is overruled.

2  BY MR. WILLIAMSON:

3  Q   If a person chose to -- strike that.

4      Let's talk about Randall P.

5          MS. TREADWAY:  150-20.

6  A   Okay.

7  BY MR. WILLIAMSON:

8  Q   Did you see scarring in this individual's heart,

9  Randall P?

10  A   Yes.

11  Q   And did you learn through the course of your

12  investigation that Dr. Schneider never saw this patient?

13  A   No.

14  Q   Now, did you learn that nobody at the Schneider

15  Clinic had prescribed Randall P anything for several

16  months before the time he passed?

17  A   No.

18  Q   Now, do you know if he did not get his prescriptions

19  from Dr. Schneider, do you know where he would have

20  gotten them from?

21  A   No.  The only information I have under circumstances

22  of death was that he was a 44 year old Caucasian male,

23  reportedly was a patient with Dr. Schneider, with a

24  history of back pain, was prescribed multiple pain

25  medications.

1147

```
 1    Q    And that doesn't state when anything may have been
 2    prescribed from the clinic; correct?
 3    A    That's correct.
 4    Q    It could have been years or months before; correct?
 5    A    That's correct.
 6    Q    Okay.  And you don't know where he would have gotten
 7    any other medicine from; correct?
 8    A    That's correct.
 9    Q    Just briefly.  Do you know how long Randall P had
10    been taking any kind of Oxycodone?
11    A    No.
12    Q    Do you know how long he had been taking any kind of
13    Methadone?
14    A    No.
15    Q    You don't know whether he had developed any kind of
16    tolerance; correct?
17    A    That's correct.
18    Q    Let's turn to Deborah S.
19              MS. TREADWAY:   150-24.
20    BY MR. WILLIAMSON:
21    Q    Ready?
22    A    Yes.
23    Q    Okay.  Deborah S had over 80% blockage in one of her
24    major arteries; correct?
25    A    That's correct.
```

1148

1    Q    You would consider that severe heart disease;

2    correct?

3    A    Yes.

4    Q    And she also had 80% or at least 50% in the left

5    coronary artery; correct?

6    A    That was just 50% of small coronary artery, the

7    circumflex coronary artery.

8    Q    She also had degenerative changes to her

9    mitralvalve; correct?

10   A    Yes.

11   Q    And you also found that Deborah S had cocaine in her

12   system; correct?

13   A    That's correct.

14   Q    And do you have any evidence that you haven't shared

15   with us that Dr. Schneider was prescribing Deborah S

16   with cocaine?

17   A    No.

18   Q    And you would agree that any package inserts of any

19   medication will tell you not to utilize this medicine

20   with alcohol or other illegal drugs; correct?

21   A    Yes.

22   Q    And if this person took cocaine, they took it by

23   their choice unless you found other evidence that

24   somebody forced them to take it; correct?

25   A    Yes.

1149

```
1    Q   And you didn't find any evidence that somebody
2    forced Deborah S to take cocaine; correct?
3    A   That's correct.
4    Q   Let's talk about Michael F.
5              MS. TREADWAY:  150-10.
6    A   Okay.
7    Q   Ready?
8    A   Uh-huh.
9    Q   Did you learn through the course of your
10   investigation that Michael F was a terminal patient
11   suffering from multiple sclerosis?
12   A   I have that he had a history of multiple sclerosis.
13   Q   Did you learn through the course of your
14   investigation that he had requested hospice care shortly
15   before the time he passed away?
16   A   No.
17   Q   Do you know how long Michael F had been taking
18   morphine?
19   A   No.
20   Q   You didn't do a complete autopsy on Michael F, did
21   you?
22   A   I believe I did an external examination because he
23   was hospitalized much -- I believe you just did -- he
24   was hospitalized for one day, I believe, at the hospital
25   and then apparently got jurisdiction later on this
```

1150

1    case --

2    Q    But my question is you did not do a complete autopsy

3    on Michael F, did you?

4    A    No.  We just did toxicology and an external exam.

5    Q    You didn't look at his heart; correct?

6    A    That's correct.

7    Q    You didn't look at his liver?

8    A    No.

9    Q    His kidneys?

10   A    No.

11   Q    So you don't know if he had any kind of blockages in

12   his heart; correct?

13   A    That's correct.

14   Q    You don't know if his liver was excessive in size,

15   do you?

16   A    Excuse me.

17   Q    You don't know if his liver was excessive in size,

18   do you?

19   A    No.

20   Q    You don't know what conditions his kidneys were in;

21   correct?

22   A    That's correct.

23   Q    And the amount of morphine that you found in his

24   system you termed as a trace amount; correct?

25   A    Well, we have a level, so I can't say if it's trace

1151

1    or not; but it's .08 milligrams per liter.

2    Q    Do you know how long Michael F had been on a

3    morphine therapy?

4    A    No.

5    Q    Do you know how long he had been taking Fentanyl?

6    A    No.

7    Q    And do you know what amounts of morphine and

8    Fentanyl that he had been taking?

9    A    No.

10   Q    You don't know what his tolerance had become at the

11   time -- leading up to the time he passed away; correct?

12   A    That's correct.

13   Q    And this is another situation that you saw the

14   presence of some prescription medicines and decided that

15   it was mixed drug intoxication even though you didn't do

16   a complete autopsy; is that correct?

17   A    That's correct.  It was based on the toxicology and

18   the body was decomposed by the time we got it into our

19   jurisdiction.

20   Q    You don't get anything about any history that led up

21   to the immediate time prior to Michael F passing away;

22   correct?  When I say -- I'm talking about like the

23   minutes or hours before he passed away; correct?

24   A    Well, he passed away in the hospital after being

25   there a day with the anoxic brain injury; but I don't

1   know as far as the information of when he was at home,

2   what the circumstances were there.

3   Q   I'm just curious.  How long was it between the time

4   the hospital transported him to your office and the time

5   you conducted the autopsy?

6   A   I don't have the -- do you have the -- do you have

7   the date of death?  Is it 5-11?  Because he was -- all I

8   have is the date when he was found unresponsive at home

9   on 5-10 and then I have that he died a day later.

10  Q   All right.  I see that.  And I see your date of 5-17

11  on the autopsy.

12  A   Right.  So it appears that it was six days after he

13  died.

14  Q   Do you know why there's a delay between the time he

15  passed away and the time you did your autopsy?

16  A   I believe we released him from our jurisdiction and

17  then we learned later that he had a history of

18  prescription drug use and then we accepted jurisdiction

19  to do toxicology.

20  Q   So you actually reject it, you learned he took

21  prescription medicine, and because he took prescription

22  medicine, you brought his body back?

23  A   Yes.

24          THE COURT:  You say his body had decomposed?

25  A   Yes.  There is moderate decompositional changes in

1    that period of time.

2            THE COURT:  Between the time he died at the

3    hospital and the time you received the body?

4    A    Right.  The body probably went from the hospital to

5    a funeral home, so I'm not sure where it was in the

6    meantime; but then when we initially just heard that

7    there was a history of multiple sclerosis, chronic

8    obstructive pulmonary disease, Hepatitis C and

9    fibromyalgia, probably released natural death.  Then we

10   later found that prescription drugs may have been

11   involved with him having this hypoxic event so we

12   regained --

13           THE COURT:  Funeral homes allow bodies to

14   decompose?

15   A    Again, I don't know the circumstances of this

16   particular case; but I'm not sure how long it was out of

17   the cooler or if they were waiting for cremation, if the

18   body hadn't been embalmed.  But I just -- I can only go

19   by what I saw on the body and there was moderate

20   decompositional changes and that's probably a reason why

21   it would be irrelevant for me to get organ weight or

22   anything because they wouldn't be accurate.

23           THE COURT:  I understand.  I'm only interested

24   in how -- why he would be decomposed if he died in the

25   hospital.

1154

```
 1   A   Right.  That would be something that they would have

 2   to check.  I don't have --

 3             THE COURT:  It's all right.

 4   A   -- that information.  Right.  It would either be,

 5   again, if the body hadn't been cooled or where it had

 6   been stored and how it had been -- stayed in six days.

 7   The body will decompose in that period of time.

 8             THE COURT:  All right.

 9   BY MR. WILLIAMSON:

10   Q   So we're clear, Dr. Dudley, this individual had been

11   termed a natural death; correct?

12   A   That's correct.

13   Q   And then just the mere presence or the fact that he

14   took pain medicine caused you to bring him back from a

15   funeral home and then conduct a toxicology exam; is that

16   right?

17   A   Right.  That's correct.

18   Q   And the toxicology exam, again, only gave you

19   amounts that were found in his system; correct?

20   A   That's correct.

21   Q   But without knowing anything more about his history,

22   you don't know how that amount would have effected him

23   when he was alive; correct?

24   A   That's correct.

25   Q   It's not illegal for people to take pain medication,
```

1   is it?

2   A    No.

3   Q    And just because I may happen to have chronic pain

4   and I pass away, does that mean that you automatically

5   come in and do all these different tests to my body?

6   A    Yes.

7   Q    Just because I take medicine from a doctor?

8   A    Yes.  If medication is taken and we have no other

9   reason to explain death.

10   Q    But you had a reason.  He had multiple sclerosis;

11   correct?

12   A    No.  The reason was he had hypoxic brain injury.

13   Q    And that was a reason before you knew anything about

14   the pain medicine; correct?  And you -- it was

15   sufficient enough for you without the toxicology to

16   summarize it and let his body come home with his family;

17   correct?

18   A    Again, I don't know the circumstances of that.

19   Q    Let's talk about Billie R.

20              THE COURT:  Who?

21              MR. WILLIAMSON:  Billie R.

22              MS. TREADWAY:  5-K.

23   BY MR. WILLIAMSON:

24   Q    Just before we talk about Billie R -- let me know

25   when you get there, Dr. Dudley.

1156

1    A    Yeah.

2    Q    If we as citizens don't want autopsies, are we able

3    to make a living will and say I don't want anybody

4    autopsied just because I'm a chronic pain patient?

5    A    No.

6    Q    Can't?

7    A    Absolutely not.

8    Q    With Billie R, her heart was enlarged; correct?

9    A    I don't have that down as a diagnosis.

10   Q    It wasn't 450 grams?

11   A    Hold on a second.  Yes.  It was 450 grams.

12   Q    And you did not take any -- strike that.  You saw

13   scarring on her heart; correct?

14   A    No.

15   Q    No scarring?

16   A    No scarring.

17   Q    Okay.  Now, you remember testifying a few minutes

18   ago about the fact that when you take all these slides,

19   or this tissue, that you will put those on multiple

20   slides.  You remember that?

21   A    Yes.

22   Q    Okay.  And according to your report here, you took

23   slides for heart, liver, kidneys, lungs and spleen;

24   correct?

25   A    Yes.

1157

1    Q    Isn't it true that you only submitted one slide to

2    be reviewed?  You only took one slide?

3    A    No.  Now, I take five slides on every case.  It's

4    just my routine.  And it would have to be according to

5    whatever is documented on the histology report where we

6    send it out for -- we document how many slides are sent

7    out and how many come back.  They make cassettes.

8    Q    And that is signed by who picks it up; correct?

9    A    Again, it's chain of custody through I think it was

10   Pathology Associates here in town.

11   Q    Kansas Pathology Consultants?

12   A    Right.

13   Q    And there would be a sheet that's called autopsy

14   slide preparation?

15   A    Yes.

16   Q    And a submitting physician would be coroner who's

17   requesting for the slides to be reviewed?

18   A    Yes.

19   Q    And it would have the name of the deceased person

20   plus their gender; correct?

21   A    I don't think a gender is on that form.  That's

22   usually completed by my forensic technician.

23   Q    And it will have the date of autopsy on there?

24   A    I don't know what else is on there.

25   Q    But this document would show that the number of

1158

```
 1   cassettes that were actually picked up; correct?
 2   A   Most of the time.
 3   Q   Okay.  And can you explain why the autopsy slide
 4   preparation for Billie R would only show that one
 5   cassette was being picked up and signed and attested to?
 6   A   No, I don't know why that would be.
 7   Q   Let me just hand you a document entitled autopsy
 8   slide preparation.  Do you see that document?
 9   A   Yes.
10   Q   And is that a document that we were just referring
11   to the jury?
12   A   Yes.
13   Q   And on that document how many cassettes does it --
14   who is the submitting physician?
15   A   I was.
16   Q   And who is the decedent?
17   A   Billie R.
18   Q   And how many cassettes does it say was actually
19   picked up?
20   A   It says one.
21   Q   And you're pretty certain you cannot fit all the
22   tissue in between on one slide; correct?
23   A   That's correct.
24   Q   Okay.  Can I -- and looking back at your report, you
25   only -- you have a lot of negatives there, but you only
```

1159

1    have one response of writing; correct?

2    A    That's correct.

3    Q    And only one response would be for lungs; correct?

4    A    Yes.

5    Q    So isn't it very possible that when you reviewed

6    this cassette sheet that you only submitted one

7    cassette, that you only submitted for the lungs, the

8    information that you actually put on your autopsy?

9    A    No.  That would not be my normal routine.

10   Q    I'm not asking about your normal routine, ma'am.

11   I'm sorry --

12   A    Okay.

13   Q    I'm just asking you about the evidence.  You're

14   human -- let me ask you that -- correct?

15   A    Yeah.

16   Q    And as a human, you can make mistakes.  Would you

17   agree with that?

18   A    Yes.

19   Q    And as a doctor, you can make mistakes; correct?

20   A    Yes.

21   Q    And just because you make mistakes as a doctor

22   doesn't make you a criminal, does it?

23   A    No.

24   Q    And it doesn't mean that you intentionally are

25   telling us something different than what you remember;

1    correct?

2    A   No.

3    Q   But we have the records here that there's one

4    cassette and one recording on your autopsy.  Is it

5    possible that with this instance you only submitted the

6    tissue for the lungs, the one that you actually

7    responded to in your autopsy?

8    A   No, I don't believe that's possible because I

9    couldn't write down the finding of negative unless I

10   looked at five cassettes, of every tissue.

11   Q   So the person who picked up this autopsy slide when

12   they saw the number of cassettes, they just ignored it

13   and signed it and verified that they picked up one

14   cassette.  They were mistaken?

15   A   It may be that you're missing another page that has

16   the other four cassettes.

17   Q   Okay.  All I have is what I have.

18   A   Right.  And the only way to verify that would be

19   to -- the Forensic Science Center has all of those

20   cassettes and all the slides in storage.  That would be

21   the only way that I would know if one was submitted.

22   Q   You are aware that our expert, Steven Karch, came

23   down to your office; correct?

24   A   No, I'm not in that office any more.

25   Q   Okay.  Did you learn at any point in time that your

1    slides could be reviewed by somebody else?

2    A   No.

3    Q   Are you aware that Dr. Karch attempted to review

4    slides and there were at least 18 slides that were not

5    available?

6    A   No.

7    Q   And that would mean if there were no slides made for

8    a certain patient, that means that sometimes slides just

9    didn't get done.  Would you agree with that?  It's

10   possible?

11   A   I guess it's possible; but that would be hard for me

12   to believe.

13   Q   Is it common in your practice that if a coroner

14   comes in to review some of your work that they have to

15   bring their own microscope?

16   A   Sometimes they do and sometimes they use ours.

17   Q   Now, back to Billie R.  Do you know how long she had

18   been receiving chronic pain medication?

19   A   No.

20   Q   Do you know what her tolerance had become?

21   A   No.

22   Q   Of -- okay.  The only toxicology here came from the

23   heart blood; correct?

24   A   Heart blood and --

25   Q   No blood was taken from the femoral blood, femoral

1162

```
 1   artery; correct?

 2   A   It's not listed here as femoral blood.

 3   Q   And you believe that if it had been taken, it would

 4   be listed on that document; correct?

 5   A   I believe so.

 6   Q   Billie R was also overweight, was she not?

 7   A   She was -- excuse me.

 8   Q   Overweight?

 9   A   She was 171 pounds.

10   Q   And she was also suffering from bronchial pneumonia,

11   was she not?

12   A   Yes.

13   Q   And bronchial pneumonia can lead to death in and of

14   itself in the absence of any prescription medicines

15   being anywhere in the system; correct?

16   A   Yes.

17   Q   Let's talk about Jo Jo R.

18           MS. TREADWAY:   5-J.

19   BY MR. WILLIAMSON:

20   Q   Are you there?

21   A   Yes.

22   Q   Are you aware -- did you learn through the course of

23   your investigation that Jo Jo R was primarily being

24   taken care of by Dr. Simons?

25   A   No.
```

1   Q   That's not in your history?

2   A   No.

3   Q   Okay.  This individual had an enlarged heart;

4   correct?

5   A   I didn't put it down as the diagnosis; but her heart

6   is 440, which may be on the high end.

7   Q   For a person her height?

8   A   Height and weight.

9   Q   Would you agree that it should have been around the

10  267 range?

11  A   Again, range, I think the higher range would be

12  below that 440.

13  Q   You didn't do any microscopic exam with Jo Jo R, did

14  you?

15  A   No.

16  Q   No femoral blood was taken from Jo Jo R; correct?

17  A   Again, I'm not sure if -- I'm not sure, but I know

18  blood taken -- the only blood tested was heart blood.

19  Oh, yes, there was.  Femoral blood was tested.

20  Q   It was tested?

21  A   Yeah.  Both those results are on the first page of

22  the toxicology report.  And also urine and brain.

23  Q   And you learned through the course of your

24  investigation that Jo Jo R was seeing multiple doctors;

25  correct?

1   A   No.  I don't have that she was receiving -- that she

2   was seeing multiple doctors.  I have that she had -- she

3   was receiving multiple medications and she had multiple

4   hospitalizations following prescription drug overdoses.

5   But I don't have her physician history.

6   Q   So you didn't learn that she had a medication called

7   trazodone issued by Dr. Caine a few days before she

8   passed?

9   A   No.

10   Q   You don't have in your investigation that she saw

11   Dr. Jason Williams?

12   A   No, I do not.

13   Q   You don't have in your history that she saw Dr.

14   Westin?

15   A   No.

16   Q   And you don't have in your report that she was

17   seeing Dr. Simons?

18   A   No.

19   Q   Now, looking at the amount of Oxycodone that was in

20   Jo Jo R's system, do you know how long she had been

21   taking a -- strike that.

22       Do you know what her tolerance was?

23   A   No.

24   Q   Okay.  And do you know how long she had been taking

25   whatever combination of medications she was taking?

1    A    No, I do not.

2    Q    And her heart was, what, 440 grams, but, again, even

3    though we have another enlarged heart, you don't see any

4    signs of any artery clogging; correct?

5    A    That's correct.

6    Q    Is there an explanation as to why when Dr. Jamie

7    Oeberst had multiple enlarged hearts, nearly every one

8    of those individuals had clogged arteries, but all of

9    your enlarged hearts look just fine.  Do you know?

10   A    No.

11   Q    You understand that Larry Czarnecki testified

12   earlier today, too; correct?

13   A    Yes.

14   Q    And are you aware that he had a couple of large --

15   found a couple of large hearts?  Did you know that?

16   A    No.

17   Q    And do you know why in each one of his autopsies he

18   would identify what the tricuspid measurement was?  Do

19   you know why?

20   A    The tricuspid?

21   Q    Tricuspid.

22   A    Right.  Sometimes that issue is included and

23   everyone has a different routine protocol.  I don't

24   normally include that in my cases.

25   Q    Do you normally include the occlusions when you

1166

1    believe that the cause of death is due to mixed drug

2    intoxication?

3    A    If there was occlusion, I would put down that there

4    was occlusion.

5    Q    And it just happens to be based on chance that the

6    majority of your autopsies have no occlusions

7    whatsoever?

8    A    It's based on my findings that there's no occlusion

9    in the coronary arteries of the cases that we talked

10   about except the ones where I indicated there was

11   occlusion.

12   Q    Ms. Treadway asked a question to a witness on maybe

13   Thursday evening that isn't it common in your practice

14   to find people with occlusions.  Do you disagree with

15   that, ma'am?

16   A    It depends, again, on the age of the patient and

17   their physical health but --

18   Q    All I'm really concerned about is in your opinion

19   when you were at the Sedgwick County Medical Examiner's

20   was it common for you to find people who have occlusions

21   in their arteries?

22   A    I have certainly had cases where there was occlusion

23   in the --

24   Q    You would agree those cases were most likely ones

25   where there were no prescription medicines on board when

1167

1    they passed, correct?

2    A    There could be some that had medications on board.

3    Q    How many -- how many of the Clinic's patients did

4    you find that had prescription medicines in their

5    system, that the prescription medicines itself did not

6    cause or contribute to these individuals' passing?

7    A    Again, I only have the autopsy reports on cases

8    that --

9    Q    I understand that --

10   A    So I don't know of any other cases whether

11   individuals from that particular clinic that we would

12   have had under our jurisdiction that died of natural

13   death.  Usually, if the physician is willing to sign a

14   death certificate in a person that he's been treating

15   that has a long history of natural disease then we

16   don't -- and we don't suspect there's another cause of

17   their death, then that case wouldn't come under our

18   jurisdiction.  So I don't have that answer.

19   Q    So, again, my question is:  You do not know how many

20   patients who may have visited the Schneider Clinic at

21   any point of time, how many of them presented with pain

22   medication in their system and that you did not find

23   that the pain medication either caused or contributed to

24   death?  You don't know that number; correct?

25   A    I don't know that.

1168

```
 1    Q   But you were very competent and able to testify
 2    earlier about this startling pattern that supposedly
 3    existed at the Schneider Medical Clinic; correct?
 4    A   All I can say is that of all the 26 autopsies that I
 5    did, their cause of death was from acute drug
 6    intoxication.
 7    Q   And so you're basing all of your testimony based on
 8    these issues that we're going through today; correct?
 9    A   That's correct.
10    Q   And based on the fact that you saw prescription
11    medicines in the system, you determined them as either
12    causing or contributing to the individual's death;
13    correct?
14    A   That's correct.
15    Q   Now let's talk about Jason P.
16    A   Do you have a number for me please?
17              MS. TREADWAY:   6-S as in Sally.
18    Q   Are you ready?
19    A   Yes.
20    Q   Now, did you learn through the course of your
21    investigation that Jason P was not a patient of Dr.
22    Schneider?
23    A   No.
24    Q   Do you ever learn through the course of your
25    investigation who the final physician was who was seeing
```

1169

1    people who passed away?

2    A    Generally it's on our report of investigation who

3    the attending physician is.

4    Q    Okay.  And -- but that's not included in your

5    circumstances of death, is it?

6    A    No.  It's just information so that we can notify

7    that office in order to get the medical records that we

8    can review prior to autopsy.

9    Q    Okay.  Now, you didn't conduct a microscopic exam on

10   Jason P, did you?

11   A    No.

12   Q    Was methamphetamine found in Jason P's system?

13   A    Yes.

14   Q    Do you know of any prescription written by anybody

15   at the Schneider Medical Clinic for methamphetamines?

16   A    No.

17   Q    Did you actually dictate an autopsy report in this

18   case?

19   A    Yes.

20   Q    And you also learned during this early investigation

21   that Jason P was doctor shopping; correct?

22   A    No.  I don't have that information under

23   circumstances of death.

24   Q    Did you learn during the course of your

25   investigation that this individual was seeing a doctor

1   named Dr. Kuhlman?

2   A   No.

3   Q   Do you have any evidence that Dr. Schneider was his

4   actual physician?

5   A   No.

6   Q   If there's no evidence in this record that Dr.

7   Schneider was the actual physician then -- well, strike

8   that.  Let's look at Dalene C?

9   A   Do we have a number?

10   Q   Did we already go through that one?

11           MS. TREADWAY:  Yes.

12   BY MR. WILLIAMSON:

13   Q   All right.  Let's go to Sue B.

14           MS. TREADWAY:  6-B as in boy.

15   BY MR. WILLIAMSON:

16   Q   Are you ready?

17   A   Let me just review something.

18   Q   Okay.  Did you do a complete autopsy on Sue B?

19   A   Yes.

20   Q   And you didn't do a microscopic exam, did you?

21   A   No.

22   Q   And did you learn that Sue B suffered from bipolar

23   disorder and depression?

24   A   Yes.  I don't have the depression history.  I have

25   arthritis, bipolar and she had a nephrectomy.

1171

1   Q   Okay.

2   A   A nephrectomy, a kidney removed.

3   Q   Okay.  And Sue B had illegal narcotics in her

4   system, didn't she?

5   A   She had methadone and cocaine.

6   Q   And are you aware of any evidence whatsoever that

7   Dr. Schneider ever prescribed Sue B to take cocaine?

8   A   No.

9   Q   Are you aware of any instructions by Dr. Schneider

10  that it's okay to take cocaine if you're taking pain

11  medicine?

12  A   No.

13  Q   Let's discuss Mark P.

14          MS. TREADWAY:  He's not one of the people

15  named, Judge.

16          MR. WILLIAMSON:  Judge, it is actually in the

17  Indictment under letter N on Page 32 of 69.

18          MS. TREADWAY:  We haven't introduced this

19  autopsy, Judge, because he wasn't an overdose death.

20          MR. WILLIAMSON:  Well, we can talk about it

21  because it's in the Indictment.

22          THE COURT:  I think you can.

23          MS. TREADWAY:  But I don't have the autopsy,

24  Judge, is what I'm saying.  It's not in the record.

25          THE COURT:  If he's in the Indictment -- I'm

1    not sure why he's in there, but if he's in the

2    Indictment, she can be questioned about it.

3    BY MR. WILLIAMSON:

4    Q    You actually diagnosed Mark P as an overdose death

5    originally; correct?

6    A    I don't know what case you're talking about.

7    Q    All right.  I'll let you take a look at my copy of

8    the autopsy.  Is that okay?

9    A    Okay.  This is exhibit?

10   Q    It's not an exhibit.

11   A    It's not an exhibit.

12   Q    No.  You just have to look at my copy.

13   A    Okay.  I have that the cause of death is mixed drug

14   intoxication and the manner of death is accident.

15   Q    And then you later changed your opinion that this

16   was not a mixed death intoxication; correct?

17   A    No, I did not.

18   Q    You didn't testify in a deposition that you no

19   longer hold true to that statement?

20   A    No.

21   Q    You never told a lawyer, Chris Cole, that you

22   changed your mind about that?

23   A    No.  No.  The death certificate has never been

24   changed and it hasn't been altered.  I had no additional

25   information to say he died other than a drug

1173

1    intoxication.

2    Q   You state Mark P had a methadone level of less than

3    .20 milligrams; correct?

4    A   You took my report away so I don't know.

5    Q   I'm sorry.

6    A   Whatever it says there.  If it says that, that's

7    what the toxicology results would have been.

8    Q   Okay.  And actually the heart blood found less than

9    .10 milligrams.  Would you disagree with that?

10   A   I'll have to just take a look.  Methadone was less

11   than ten, the results of the propazaline (ph) on board

12   at 69 and the Methadone was positive in the liver for

13   less than 20.

14   Q   And you don't know what Mr. Mark P's tolerance was;

15   correct?

16   A   That's correct.

17   Q   And you don't know how long he had been on a

18   methadone program; correct?

19   A   That's correct.

20   Q   His large was -- his heart was enlarged at 490

21   grams; correct?

22   A   Again, I don't know if that's large for his size or

23   if I called it a cardiomegaly.

24   Q   Shouldn't it have been around 345?

25   A   Again, I'm not sure of the range.

1174

1    Q    You didn't do a microscopic exam, did you?

2    A    If it's not listed there, no.

3    Q    Okay.  And do you have the less than .10 -- that

4    means that the amount of the chemical that you found

5    was -- or that they found was so low that the test did

6    not put a specific number on it; correct?

7    A    That's correct.

8    Q    And you don't recall ever changing your mind about

9    Mark P?

10   A    That -- no, it was never changed.

11   Q    And are you aware that a physician's assistant named

12   Mohamed Igram was the person actually seeing Mark P

13   towards the end of his care?

14   A    No, I don't know who saw these patients.

15   Q    Let's discuss Marilyn R.

16          MS. TREADWAY:  150-22.

17   BY MR. WILLIAMSON:

18   Q    Are you there?

19   A    Yes.  I'm just seeing her --

20   Q    Was Marilyn R -- you didn't -- I'm sorry.

21   A    Go ahead.

22   Q    With Marilyn R, you didn't conduct any microscopic

23   exams; correct?

24   A    No.

25   Q    And you learned through the course of your

1175

1   investigation that when officials first encountered

2   Marilyn R, she was alive; correct?

3   A   Yes, she was transported to the hospital.

4   Q   Okay.  And she was -- somebody called 911 because

5   she was being combative and abusive; correct?

6   A   I have that she was acting strangely, complaining of

7   being hot, was combative and removing her clothes.

8   Q   And her heart was 420 grams; correct?

9   A   Yes.

10  Q   And that was enlarged for a lady her size?

11  A   She was 238 pounds so I'm not sure that was

12  enlarged.  I don't have that as a diagnosis.

13  Q   Based on her size, was that -- would you consider

14  that morbidly obese?

15  A   Again, I'd have to go through the calculations to

16  determine that.

17  Q   Would you disagree that her body mass index was

18  around 38.4?

19  A   I would have to do the math, I don't know.

20  Q   What was found in her system?

21  A   We did the pathology I believe from the hospital

22  sample there was Amitriptyline, Nortriptyline,

23  Methamphetamine, Cyclobenzaprine, Lidocaine,

24  Norcyclobenzaprine.

25  Q   Have you ever known a doctor to prescribe medicine

1176

1    in that combination?

2    A   Again, I'm not sure.  There's methamphetamine.  Main

3    drugs that I commented on were Amitriptyline, and

4    methamphetamine, which Amitriptyline is a triclycic anti

5    depressant drug.

6    Q   Have you ever known a doctor to prescribe

7    methamphetamine the -- well, strike that.

8        Do you have any evidence that Dr. Schneider

9    prescribed methamphetamine to Marilyn R?

10   A   No.

11   Q   And do you have any evidence that Dr. Schneider even

12   saw Marilyn R towards the end of her care while she was

13   here with us?

14   A   No.

15   Q   And I believe the last one would be Ancira W.

16            THE COURT:  Who?

17            MR. WILLIAMSON:  Ancira W.

18            MS. TREADWAY:  6-Y.

19   Q   Are you there?

20   A   Yes.

21   Q   Did you learn during the course of your

22   investigation that this individual was seen primarily by

23   Dr. Sinclair and PA by the name of Curt towards the last

24   six or seven months of her care?

25   A   No.  I have she had a history of chronic back pain,

1177

```
 1    anxiety, was treated by Dr. Schneider with Diazepam,

 2    Estradiol, Desipramine, Ranitidine, Depakote and Lortab.

 3    Q    And was Ms. W considered obese?

 4    A    No.

 5    Q    She didn't have an enlarged heart?

 6    A    I don't have her diagnosed with an enlarged heart.

 7    Q    Her heart didn't weigh 360 grams?

 8    A    It did weigh 360 grams.

 9    Q    And shouldn't it have been around 286 grams?

10    A    Again, I don't know the range for her weight.

11    Q    If you don't know the weight then you don't know if

12    it was enlarged or not; correct?

13    A    That's correct.

14    Q    Now, you identified the fact that she had Methadone

15    in her system; correct?

16    A    Yes.

17    Q    And did you -- do you know how long she had been

18    receiving Methadone?

19    A    No.

20    Q    Do you know in what amount she had been receiving

21    Methadone?

22    A    No.

23    Q    Do you know whether or not she had been tolerant to

24    Methadone?

25    A    No.
```

1178

1   Q   The amount of Methadone that you found in her body

2   was within or well below the therapeutic level of

3   Methadone; correct?

4   A   That would be something to ask the toxicologist

5   about.

6   Q   But, again, you're the one that has to interpret

7   these toxicology results; correct?

8   A   That's correct.

9   Q   Well, actually you didn't really interpret them.

10  You just looked for the result and if the result was

11  there, end of question; correct?

12  A   No.  I would check generally in the reference book

13  and also we would have toxicology conferences on every

14  case.  And then discuss the case to see if it was the

15  cause of death, especially if we had found no other

16  cause of death in these young individuals.

17  Q   Any of those notes about these meetings that you

18  had, are those produced anywhere?

19  A   No.  We would always go over every -- whenever the

20  toxicology -- none of these cases were signed out until

21  the toxicology was completed and we would meet with Dr.

22  Rohrig on the toxicology results prior to determining

23  the cause and manner of death.

24  Q   Okay.  And I actually made a mistake.  We actually

25  have one more person to discuss but I've been moving

1    fast today.  So I'm working on it.

2          Can we turn to Shannon MI?

3    A    And the number?

4             MS. TREADWAY:  6-Q.

5    A    Okay.

6    BY MR. WILLIAMSON:

7    Q    And with Shannon MI, did you learn in the course of

8    your investigation that this person was seen by a

9    physician's assistant the last few visits with the

10   Schneider Medical Clinic?

11   A    No.

12   Q    Her heart weighed 390 grams; correct?

13   A    This is a male.  38 year old Caucasian male.  And

14   his heart weighed 390.

15   Q    And do you know what the range what his heart should

16   have weighed based on his height?

17   A    No.

18   Q    Now --

19   A    He was six foot.

20   Q    You found Hydrocodone in her system; correct?

21   A    In his system, yes.  Hydrocodone and Alprazolam and

22   Acetaminophen, Venlafaxine and metabolite, and

23   Mirtazapine, Oxazepam, Dihydrocodeine.

24   Q    And did you know how long -- and let's ask just for

25   the jury.  The Venlafaxine and its metabolite, what is

1    that?  What medicine would that be?

2    A    Which one?

3    Q    The Venlafaxine?

4    A    Again, I don't know.  I'd have to look it up to see

5    what category it goes under.

6    Q    So you don't know what that is or what it does to

7    people; is that correct?

8    A    That's correct.

9    Q    But just the fact that it was there, you termed it a

10   mixed drug intoxication; correct?

11   A    I actually on my report I pulled out drugs that I

12   felt were more significant.  So on my actual report I

13   have mixed drug, in paren, hydrocodone and Alprazolam

14   intoxication.  So I don't have --

15   Q    What is Alprazolam?

16   A    Again, I believe that has a sedative effect.

17   Q    But what is it?

18   A    I don't know.  Might be Xanax.  I don't know.  I

19   don't prescribe medication so I have to look all of

20   these up.

21   Q    But you do need to know what these chemicals are and

22   how they effect the body; correct?

23   A    That is why I have reference books, yes.

24   Q    And you're aware that there are -- that when people

25   receive chronic pain medicine, they may have other

1181

1    issues as well; correct?

2    A    Possibly, yes.

3    Q    And one thing I want -- last thing with this Shannon

4    MI, do you know how long he had been taking this

5    combination of prescriptions?

6    A    No.  I just have that reportedly he had injured his

7    back approximately seven years prior and had complained

8    of pain; but I don't know how long he had been taking

9    medication.

10   Q    Could you repeat that last part because I was

11   actually accidentally talking over you --

12   A    I'm sorry.  He had complained of pain since his

13   injury seven years prior.

14   Q    Okay.  And so you know that he had at least been

15   taking this for some time in between the seven years

16   that he hurt his back and the time that he passed away;

17   correct?

18   A    I don't know all of that information.  I only have

19   according to his brother he had been inappropriately

20   using pain medication for the past several months.

21   Q    And did you try to ascertain what he meant by

22   inappropriately?

23   A    No.

24   Q    Do you know whether or not he was taking more

25   medicine than he should have?

1    A    He died from mixed drug intoxication.

2    Q    My question was do you know whether or not he was

3    taking more than he was prescribed?

4    A    I don't know how much he was taking, no.

5    Q    You don't know why he was taking it if he did take

6    more, do you?

7    A    Again, apparently for the pain.

8    Q    Okay.  And I think that's all the questions I have

9    about him.

10        A few more points I want to visit with you about.

11   Are you aware of any studies that state that opiates are

12   actually cardioprotective?

13   A    No.

14   Q    You're not familiar with -- are you familiar with a

15   study that found that certain findings demonstrate a

16   cardioprotective effect when dealing with coronary

17   intervention for the prevention of reprofusion injury.

18   Are you aware of that?

19   A    No.

20   Q    Have you ever studied that?

21   A    No.

22   Q    Now, on all these autopsies that you have testified

23   about, do any of them have a place on the -- well,

24   strike that.

25        You remember testifying -- we talked a little bit

1183

1     about it earlier -- that you can't see how this clinic

2     wouldn't get notice of certain deaths.  You remember

3     that?

4     A    Yes.

5     Q    And we've established, one, that certificate of

6     deaths are not sent to the clinic.  Correct?

7     A    That's correct.

8     Q    And these autopsy results are not routinely sent to

9     doctors, are they?

10    A    No.

11    Q    The contact with doctors occurs prior to any

12    determination being made about a person passing -- as to

13    the reason why they passed away; correct?

14    A    Yes.

15    Q    And you even give the doctor a choice, if there are

16    natural causes, the doctor can say, hey, it's natural,

17    keep 'em away from the Coroner, send 'em straight to the

18    funeral home; correct?

19    A    If they died at home and we don't see anything

20    suspicious like they don't see multiple medication

21    bottles, then we may ask the physician if there's other

22    medical conditions that would -- that he's been treating

23    the person for that he's willing to sign the death

24    certificate based on those, based on the chronic medical

25    disease.

1184

1    Q    And so the notice that we're talking about is the

2    fact that a patient passes away; correct?

3    A    They would probably be notified, again, that they

4    died at home, the physician would probably be notified,

5    and then also our office would notify the office in

6    order to obtain medical records because we would have

7    listed who the attending physician was and then we would

8    then request any medical records from that clinic.  So

9    then the physician would also know that way that the

10   person had died and if our office is calling and

11   requesting those reports.

12   Q    The point of my question was, though, is the

13   physician would be contacted and simply told that a

14   patient has passed away; correct?

15   A    That's correct.

16   Q    He's not -- he or the office is not told that the

17   person passed away from mixed drug intoxication;

18   correct?

19   A    We wouldn't know that until the toxicology came

20   back.

21   Q    Okay.  Now, are you aware that the clinic had over

22   10,000 patients during this six year period?

23   A    No.

24   Q    And are you aware that you and the other medical

25   examiners have combined to talk about 68 individuals

1    over a six year period?  Are you -- or four year period.

2    I'm sorry.  Are you aware of that?

3    A    Yes.

4    Q    And are you aware that that would only be .065% of

5    his total patient population?  Are you aware of that?

6    A    No.

7    Q    And are you aware that that would be less than 1% of

8    all the patients he ever saw he received some kind -- or

9    the office received some kind of notice that the person

10   passed away.  Are you aware of that?

11   A    No.

12   Q    Isn't it true that any doctor that has patients will

13   have people that pass away?

14   A    Yes.

15   Q    And isn't it true that the number and the amount

16   could really be very dependent upon the type of patients

17   that that doctor is seeing; correct?

18   A    Yes.

19   Q    Is so if, for instance, if you have a physician who

20   only does physicals for schools, his patient population

21   of the people that pass away would be a lot lower or

22   expected to be a lot lower than somebody who actually

23   saw extremely, extremely sick people; correct?

24   A    Yes.

25   Q    Did you ever go out and visit the Schneider Medical

1  Clinic and talk to him about why -- about your concerns

2  about these people that may have been passing away?

3  A   No.

4  Q   Do you have any letters that you sent to Dr.

5  Schneider and said, hey, we notice this pattern of

6  individuals that have been passing away that are either

7  seeing you or somebody in your clinic, we have a

8  concern, let's get on top of this, let's take care of

9  it.  Did you do anything like that?

10  A   No.

11  Q   Now, again, are you familiar with any drug dealers

12  that voluntarily comply with your requests to send them

13  records about people that passed away that they

14  supposedly dealt drugs to?

15         MS. TREADWAY:  Judge, that's a ridiculous

16  question.  Object.  It's not relevant.

17         THE COURT:  Didn't hear your question.  I

18  heard part of it.

19         MR. WILLIAMSON:  Okay.

20         THE COURT:  Say it again.

21  BY MR. WILLIAMSON:

22  Q   Are you aware of any drug dealers that resist or --

23  excuse me -- that voluntarily give you records from

24  their office based on a request from your office?

25         THE COURT:  Well, it's a ridiculous question;

1    but if she wants to give a ridiculous answer, she may.

2    A   I don't understand the question.

3        THE COURT:  Any more ridiculous questions?

4        MR. WILLIAMSON:  Nope.  I just think that

5    underlies the ridiculous nature of what I'm having to do

6    here, Judge.

7        THE COURT:  No.  No.  No.  It does not.  How

8    would you all like to take a little longer recess, about

9    20 minutes, so you can go outside and see how nice the

10   day is.

11       MR. WILLIAMSON:  Judge, I think that's a

12   little torture since they have to come back.

13       THE COURT:  Well, I hope they'll come back.

14   You're excused.  Remember and heed the admonition.

15                    (Recess.)

16       THE COURT:  Redirect please.

17       MS. TREADWAY:  Thank you, Judge.

18                **REDIRECT EXAMINATION**

19   BY MS. TREADWAY:

20   Q   Dr. Dudley, I just have a few questions for you.

21   A   Okay.

22   Q   My first question is:  When you're working on a case

23   involving mixed drug intoxication, do you work

24   collaboratively with Dr. Rohrig?

25   A   Yes.

1188

1    Q    And when you're determining a mixed drug

2    intoxication cause of death, is it not only the presence

3    of the drugs themselves, but also the levels that you

4    find present --

5    A    Yes.

6    Q    -- that is important?

7    A    Yes.

8    Q    And is it also the combination of the various drugs

9    that you find important?

10   A    Yes.

11   Q    If any of the 26 individuals for whom you formed an

12   opinion about the cause and manner of death had died of

13   heart disease, would the manner of death have been

14   listed as accidental?

15   A    No.

16   Q    Would it have been instead listed as a natural cause

17   of death?

18   A    Yes.

19   Q    During the course of your cross-examination today

20   you mentioned on multiple occasions the young age of

21   these decedents.

22   A    Yes.

23   Q    During the break did we make a little calculation of

24   that?

25   A    Yes, we did.

1   Q   Did we find that one was age 18?

2   A   Yes.

3   Q   Seven were in their 20s?

4   A   That's correct.

5   Q   Five in their 30s?

6   A   Yes.

7   Q   10 in their 40s?

8   A   Yes.

9   Q   And 2 in their 50s, with the oldest person being 55?

10  A   Yes.

11  Q   During cross-examination Mr. Williamson repeatedly

12  asked you whether you knew this part of their medical

13  history or that part of their medical history, the

14  length of time they'd been on the drug, how much drug

15  they had been taking, who had prescribed it, who had

16  last seen them.   Remember those questions?

17  A   Yes.

18  Q   Do you need to know any of that information in

19  developing the cause and manner of death?

20  A   No.

21  Q   Would knowing any of that information today change

22  any of the decisions you made with regards to the cause

23  and manner of death?

24  A   No.

25  Q   Dr. Oeberst, I also want to make clear what -- I'm

1190

1    sorry -- Dr. Dudley.  I started with Dr. Oeberst this

2    morning.

3    A    That's okay.

4    Q    Dr. Dudley, I want to make clear also what you were

5    not asked to do in this case.

6    A    Okay.

7    Q    You were never asked to render an opinion in this

8    case about whether the Defendants and the employees

9    under their direction caused or contributed to anyone's

10   death, were you?

11   A    No.

12   Q    And you were never asked to determine whether the

13   policies and practices of the Defendants' clinic caused

14   or contributed to the deaths of the 26 individuals for

15   whom you did autopsy reports; correct?

16   A    That's correct.

17   Q    That's for somebody else to testify?

18   A    Yes.

19   Q    Now, Mr. Williamson indicated that you just did 26

20   autopsies.  And although that is true, ma'am, during the

21   course of being the Chief Medical Examiner here in

22   Sedgwick County, which covers a lot of territory as I

23   understand, you knew about what your other pathologists

24   were doing, didn't you?

25   A    Yes.

1191

1      MR. WILLIAMSON:  Your Honor, I'm just going to

2  object.  I let it go, but she keeps leading.

3      THE COURT:  Sustained.

4  BY MS. TREADWAY:

5  Q    During the course of being medical examiner, are you

6  aware of what your other medical examiners are doing?

7  A    Yes.

8  Q    Do you discuss the cases and collaborate with your

9  other medical examiners?

10  A    Yes.

11  Q    As a result of that collaboration did you become

12  aware not only of the 26 deaths you personally did

13  reports on, but did you become aware of other overdose

14  deaths associated with the Schneider Medical Clinic?

15  A    Yes.

16  Q    And is that what you based your testimony on

17  regarding the trends you saw from that clinic?

18  A    Yes.

19  Q    Mr. Williamson also asked you whether you ever

20  called anybody at the clinic to discuss your concerns

21  about that trend.  You remember that question?

22  A    Yes.

23  Q    Is that your role as a medical examiner to call

24  physicians and discuss your concerns?

25  A    No.

1192

1    Q   At the time you developed that concern, was there

2    already a law enforcement investigation going on?

3    A   Yes.

4    Q   Finally, Dr. Dudley, in the years 2002 through 2007

5    when you were the medical examiner here, did you receive

6    any calls or correspondence from the Defendant Stephen

7    Schneider or Linda Schneider questioning or challenging

8    the drug overdose conclusions regarding former Schneider

9    Medical Clinic patients?

10   A   No.

11   Q   Did you get any calls from either of those

12   individuals checking on why their patients were dying?

13   A   No.

14   Q   If any calls had been made relative to the autopsies

15   you performed, would you have known of such calls?

16   A   Yes.

17            MS. TREADWAY:  Nothing further, Judge.

18            THE COURT:  Mr. Byers, I neglected to ask you

19   if you had any cross-examination.  I assume that you

20   didn't, but maybe you do.

21            MR. BYERS:  I was not offended, Your Honor,

22   but now I do after the redirect.  If I might.

23            THE COURT:  You may.

24            MR. BYERS:  And then Mr. Williamson will have

25   some.  I only have one question if I can do it from

1193

1    here.

2              THE COURT:  I bet I know what it is, but go

3    ahead.

4                     RECROSS EXAMINATION

5    BY MR. BYERS:

6    Q   Ms. Treadway just asked you about these deaths that

7    are associated with the Schneider Medical Clinic.  What

8    does associated with mean?

9    A   Means that he was listed as the attending physician

10   or the treating physician on these cases.

11   Q   Even in the case that you talked about with

12   Mr. Williamson where the person, the decedent, stole

13   someone else's medication, that's associated with the

14   Schneider Medical Clinic?

15   A   All of the cases -- I don't know specifically but --

16             MR. BYERS:  Thank you.

17             THE COURT:  All right, sir.

18             MR. WILLIAMSON:  Thank you, Your Honor.

19                     **RECROSS EXAMINATION**

20   BY MR. WILLIAMSON:

21   Q   As I understand your testimony to Ms. Treadway's

22   questions, you would meet with your other ME's about

23   these deaths; correct?

24   A   Not specifically; but I was aware that there were

25   several deaths from the clinic.

1   Q   And you all would collaborate, as she asked you;

2   correct?

3   A   Well, generally there's only two of us there.  When

4   Dr. Oeberst was gone then generally one of the other

5   part-time doctors were there.  We are a very small

6   office.  And then we have one toxicologist.  So we would

7   have tox conferences together.

8   Q   And nobody at any point or time said, you know what,

9   we're concerned about people at this clinic, let's just

10  do this as doctors and let's see if we can help.  You

11  never said that; correct?

12  A   I don't know what you mean by helping.

13  Q   By letting the clinic know that we have a problem

14  down here, can you -- is there something, you know, you

15  guys really need to know this.  Did you ever do that?

16  A   No.

17  Q   Did you -- you mentioned that you never got a call

18  from the clinic; but, again, you did not send them any

19  correspondence telling them that you were finding that

20  these individuals were passing away because of

21  overdoses; correct?

22  A   We sent them information requesting their reports.

23  They knew that the patient died and they never returned

24  to them.

25  Q   That wasn't my question.

1195

1    A    Okay.

2    Q    My question was did you send them any specific

3    correspondence saying Dr. Schneider, Linda Schneider,

4    Dr. St. Clair, or whoever the other physicians there, we

5    have all these deaths and they are attributed to

6    overdoses; correct?

7    A    We never -- no, we don't routinely send a copy of

8    the death certificate.  It's public record.  They can

9    get that from the Clerk of the Court.

10   Q    So the answer is, no, you didn't do that; correct?

11   A    That's correct.

12   Q    And you knew that this -- some law enforcement

13   investigation was going on.  Is that what you testified

14   to?

15   A    That's correct.

16   Q    Do you know when that started?

17   A    No.  But I saw a cluster of four deaths that

18   concerned me --

19   Q    Do you know when the law enforcement investigation

20   started?

21   A    No.

22   Q    But it concerned you but not enough to call Dr.

23   Schneider as a fellow physician; correct?

24   A    No.  It was an investigation and so there was a task

25   force of people concerned about this.

1    Q   So is it more important for the investigation to go

2    on or to save these patients when you know there's a

3    problem?

4    A   It's not my role to do the investigation.

5           MR. WILLIAMSON:  No further questions.

6           THE COURT:  Anything further, Mr. Byers?

7           MR. BYERS:  No.  Thank you, Your Honor.

8           THE COURT:  All right.  Thank you very much,

9    Doctor.  You're excused.  Next witness please.

10          MS. TREADWAY:  Government calls Andrew

11   Stewart.

12                        **ANDREW STEWART**

13   Having been first duly sworn to tell the truth, the

14   whole truth and nothing but the truth, testified as

15   follows on:

16                      **DIRECT EXAMINATION**

17   BY MS. TREADWAY:

18   Q   Could you please introduce yourself to the jury.

19   A   My name is Andrew Stewart.  I'm a Special Agent with

20   United States Immigration and Customs Enforcement.

21   Q   Where are you employed?

22   A   I'm currently employed in Omaha, Nebraska.

23   Q   What are your duties and responsibilities for ICE?

24   A   My duties and responsibilities with ICE are to

25   investigate crimes against programs related to

1    immigration and customs enforcement.

2    Q    How long have you have been with ICE?

3    A    Approximately one year.

4    Q    Where were you employed previously?

5    A    I was employed here in Wichita as an agent with the

6    U.S. Department of Health and Human Services Office of

7    Inspector General.

8    Q    Were you involved in the investigation of the

9    Defendants Stephen and Linda Schneider?

10   A    I was.

11   Q    And during the course of that investigation were you

12   involved in gathering documents and records?

13   A    I was.

14   Q    And were you also involved in reviewing many

15   records?

16   A    I was.

17   Q    Were you also involved in compiling information from

18   your record reviews into various summary charts?

19   A    Yes.

20   Q    Let's first discuss some of the information you

21   gathered about the Defendants and their clinic,

22   Schneider Medical Clinic.

23        Did you participate in any of the searches

24   conducted at the Schneider Medical Clinic?

25   A    I did.

1    Q    And during the course of that investigation were you

2    otherwise at the Clinic?

3    A    I was.

4    Q    And for what purposes would you be at the Clinic?

5    A    Generally for the purposes of serving subpoenas,

6    picking information up for subpoenas, conducting reviews

7    at the Clinic.

8    Q    Let me hand you what has already been introduced

9    into evidence as Government Exhibit 57 which Mr. Barry

10   Rausch talked to the jury about.  Have you seen those

11   pictures before, sir?

12   A    I have.

13   Q    And those were pictures taken on both September

14   13th, 2005 and March 28, 2006 at the Clinic.  Do those

15   pictures fairly and accurately represent the exterior

16   and interior of the Schneider Medical Clinic as you saw

17   them?

18   A    They do.

19   Q    Now, Mr. Rausch showed pictures of one particular

20   file room.  Can we bring those up, one of those up,

21   Mr. Moore.  And do you remember the Clinic looking like

22   that even at the time you were at the Clinic in March of

23   '06 forward?

24   A    I do.

25   Q    But is this the whole story?

1  A   It's not.

2  Q   What else did you see when you were at the Clinic

3  repeatedly after March, 2006?

4  A   There was, there was stacks similar to that all

5  throughout the entire Clinic.  From the back, other

6  rooms, all the rooms that I've been in I believe I've

7  seen stacks of record.

8  Q   Were there charts in the hallways?

9  A   Yes.

10  Q   Were there charts on top of desks?

11  A   Yes.

12  Q   Chairs?

13  A   Yes.

14  Q   Podiums?

15  A   Yes.

16  Q   How many searches of medical clinics have you

17  performed during your career?

18  A   Approximately ten.

19  Q   Have you ever witnessed any clinic in this disarray?

20  A   I have not.

21  Q   Let me now hand you what has been marked for

22  identification as Government Exhibits 55 and 56.  Do you

23  recognize those documents, sir?

24  A   I do.

25  Q   What is Government 55?

1    A    It is the Articles of Organization for the Schneider

2    Medical Clinic.

3    Q    And what is Government Exhibit 56?

4    A    The Articles of Organization of the Schneider

5    Medical Properties.

6    Q    Are these public records kept by the Kansas

7    Secretary of State?

8    A    They are.

9            MS. TREADWAY:  Government offers Exhibits 55

10   and 56 as public records under Rule 803(8).

11           MR. WILLIAMSON:  I would like to take a look,

12   Judge.

13           THE COURT:  You may.

14               (Off-the-record.)

15           MR. WILLIAMSON:  No objection, Your Honor.

16           THE COURT:  Mr. Byers?

17           MR. BYERS:  None, Your Honor.

18           THE COURT:  They're received.

19   BY MS. TREADWAY:

20   Q    Looking first at Exhibit 55, the Articles of

21   Organization of the Schneider Medical Clinic.  According

22   to the date on the right side, when were these Articles

23   of Organization filed with the Secretary of State?

24   A    June 4th, 2002.

25   Q    According to the paragraph starting with third, what

1   is the company organized to do?

2   A    This company is organized to engage in the practice

3   of medicine pursuant to K.S.A. 17-7668-D and to engage

4   in other business operations and acts and activities

5   incident to or associated with the practice of medicine.

6   Q    And does it talk about the undersigned member being

7   a qualified person within that state statute?

8   A    Yes, it does.

9   Q    Who is the managing member?

10  A    Company is to be managed by the member, and member

11  shall be Stephen J. Schneider.

12  Q    What is attached to the Articles of Organization?

13  A    Kansas Board of Healing Arts certificate.

14  Q    And does that seem to evidence that the Defendant

15  Stephen Schneider was at that time licensed to practice

16  medicine in the State of Kansas?

17  A    That's correct.

18  Q    Turning next to Exhibit 56, the Articles of

19  Organization for Schneider Medical Properties.

20  According to the date stamp, when were these filed with

21  the Secretary of State?

22  A    July 10th, 2002.

23  Q    And who is the managing partner of this

24  organization?

25  A    Linda K. Atterbury.

1202

1   Q    Through your investigation did you discover the

2   relationship between Schneider Medical Properties and

3   Schneider Medical Clinic?

4   A    Yes.

5   Q    And what was that relationship?

6   A    Schneider Medical Properties essentially owned the

7   building.

8   Q    Let me now hand you what has been marked for

9   identification as Government Exhibit 51, Government

10  Exhibit 53 and Government Exhibit 54.  Do you recognize

11  those documents?

12  A    I do.

13  Q    What is Exhibit 51?

14  A    Exhibit 51 is an American Osteopathic Board of

15  Family Physicians certification for Stephen Schneider.

16          MS. TREADWAY:  Government would offer Exhibit

17  51.

18          MR. WILLIAMSON:  No objection.

19          MR. BYERS:  No objection.

20          THE COURT:  It's received.

21  BY MS. TREADWAY:

22  Q    According to this document, Mr. Stewart, in what

23  medical specialty was the Defendant Stephen Schneider

24  board certified?

25  A    Family practice.

1203

```
 1    Q    Now look at Exhibit 53.  What is that?

 2    A    This is a Curriculum Vitae for Stephen Schneider.

 3    Q    And when was that Curriculum Vitae or resume last

 4    revised?

 5    A    January 10th, 2004.

 6              MS. TREADWAY:  Government would offer Exhibit

 7    53.

 8              MR. WILLIAMSON:  Like to take a look, Your

 9    Honor.

10              THE COURT:  You may.

11                    (Off-the-record.)

12              MR. WILLIAMSON:  No objection, Your Honor.

13              MR. BYERS:  None here, Your Honor.

14              THE COURT:  53 is received.

15    BY MS. TREADWAY:

16    Q    Does this resume or curriculum vitae list the

17    Defendant's certification and licensure?

18    A    It does.

19    Q    Does it also include information about his

20    educational background?

21    A    It does.

22    Q    What is listed there?

23    A    1987, University of Health Sciences, Kansas City,

24    Kansas, Doctor of Osteopathy.

25    Q    What post graduate trainings is indicated, if any?
```

1204

1   A    Riverside Hospital, Wichita, Kansas, rotating.

2   Q    What work experience is indicated?

3   A    1998 to 2001, Riverside Health System, family

4   practice, Haysville, Kansas; 2001 to 2002, Derby Family

5   Practice, family practice in Haysville, Kansas; 2002 to

6   present, Schneider Medical Clinic, family practice,

7   Haysville, Kansas.

8   Q    On the third page, what does the Defendant Stephen

9   Schneider list as his professional association

10  memberships?

11  A    American Osteopathic Medical Association; Kansas

12  Osteopathic Medical Association; Sedgwick County Medical

13  Society.

14  Q    Now, Exhibit 54, what is that?

15  A    This is a verification of license status from the

16  Kansas State Board of Nursing.

17  Q    And is that regarding Linda Schneider or Linda

18  Atterbury?

19  A    That's correct.

20  Q    And you know this name to be referring to the same

21  person?

22  A    That's correct.

23          MS. TREADWAY:  Government would offer Exhibit

24  54 as a public document.

25          MR. BYERS:  No objection, Your Honor.

1    THE COURT:  It's received.

2    BY MS. TREADWAY:

3    Q   When did the Defendant Linda Schneider become

4    licensed as a -- under the Board of Nursing?

5    A   May 19 of 1978.

6    Q   And how is she licensed?

7    A   She's licensed as a Licensed Practical Nurse.

8    Q   And when did her license expire?

9    A   March 31st, 2008.

10   Q   Let me now hand you what has been marked for

11   identification as Government Exhibit 58 and 59.  Do you

12   recognize those as internet advertisements, Exhibit 58

13   as internet advertisements about the Defendants' clinic?

14   A   Yes.

15   Q   And does Exhibit 58 actually contain two web site

16   printouts?

17   A   Yes.

18   Q   What is the first printout date?

19   A   11-15-2005.

20   Q   So November 15th, 2005?

21   A   Yes.

22   Q   And the second printout, when was that?

23   A   August 1st, 2006.

24   Q   And did we simply obtain this off the internet?

25   A   That's correct.

1206

1     Q    And looking at Exhibit 59, what is that?

2     A    It appears to be a flier for the Schneider Medical

3     Clinic identifying the providers, address, phone

4     numbers, and days of operation.

5              MS. TREADWAY:  Government would offer Exhibit

6     58 and 59.

7              MR. WILLIAMSON:  No objection.

8              MR. BYERS:  None, Your Honor.

9              THE COURT:  They're both received.

10    BY MS. TREADWAY:

11    Q    Now let's look at Exhibit 58.  If we could pull that

12    up, Mr. Moore.  It states at the top: "Now open,

13    Schneider Medical Clinic."  Then it says -- what is the

14    specialty listed?

15    A    Family practice.

16    Q    And does it list the location?

17    A    It does.  7030 South Broadway in Haysville, Kansas.

18    Q    Now, does it state the hours on that first page?

19    A    It does.

20    Q    What are the hours stated?

21    A    Monday through Friday, 8 to 7; Saturday, 8 to 5; and

22    Sunday, 1 to 5.

23    Q    Now, on the second page of that, does it indicate

24    when the website was last updated?

25    A    It does.  January 12, 2003.

1207

```
 1    Q   Would that have been prior to the execution of the
 2    first search warrant in September of '05?
 3    A   It would.
 4    Q   Now turning to the next portion of this exhibit, the
 5    next website printout.  You indicated that that was
 6    printed on August 1st of '06.  When was this website
 7    last updated?
 8    A   January 16th, 2006.
 9    Q   Would this have been a few months after the
10    execution of the first search warrant?
11    A   It would.
12    Q   What is the specialty listed on the first page?
13    A   Family practice.
14    Q   What are the hours listed now?
15    A   Monday through Friday, 8 to 7; Saturday, 8 to 7;
16    Sunday, 12 to 7.
17    Q   Have the hours expanded since the search?
18    A   They have.
19    Q   Turn to go Exhibit 59.  Again, how does it refer to
20    the Clinic at the top?
21    A   Family practice.
22    Q   And what does it state regarding the hours of
23    operation at the bottom of this flier?
24    A   Monday through Friday, 8 to 7; Saturday, 8 to 5;
25    Sunday, 1 to 5.
```

1208

1    Q   Does it also say that it's open seven days a week

2    for all your health care needs, minor emergency service

3    available?

4    A   That's correct.

5    Q   Let me now hand you what has been marked for

6    identification as Exhibit 28-C.  Do you recognize that?

7    A   I do.

8    Q   What are those?

9    A   These are pictures of the vehicle that was

10   identified as the primary vehicle for Stephen Schneider.

11   Q   And how does it relate to the Schneider Medical

12   Clinic?

13   A   It was paid for through those business accounts.

14   Q   Is the Hummer -- I'm sorry, is this a picture of a

15   Hummer?

16   A   It is.

17   Q   And is the Hummer related to a money laundering

18   count in the Indictment?  Specifically Count 28?

19   A   It is.

20   Q   Are those fair and accurate pictures of the Hummer

21   vehicle?

22   A   They are.

23            MS. TREADWAY:  Government offers Exhibit 28-C.

24            MR. WILLIAMSON:  May we see the photos.

25                  (Off-the-record.)

1           MR. WILLIAMSON:  No objection, Your Honor.

2           MR. BYERS:  No objection.

3           THE COURT:  It's received.

4    BY MS. TREADWAY:

5    Q   Let's put that on the screen for the jury, please.

6    What is on the front bumper there?

7    A   It's a license plate of a skull and crossbones.

8    Q   Thank you.  During the course of your investigation,

9    Mr. Stewart, did you obtain records from hospitals in

10   the area?

11   A   I did.

12   Q   Did you specifically obtain records from Via Christi

13   and Wesley here in Wichita?

14   A   I did.

15   Q   And to which subject matter did those records

16   relate, sir?

17   A   They related to overdoses and withdrawals of

18   individuals that were currently patients of the

19   Schneider Medical Clinic.

20   Q   And using these hospital records and other records,

21   including medical records from the Schneider Medical

22   Clinic, did you develop a summary chart for the jury?

23   A   I did.

24   Q   Let me hand you what has been marked for

25   identification as Government Exhibit 1-B.  Is that your

1210

```
 1    summary chart?
 2    A    It is.
 3    Q    Let's review with the jury how you developed this
 4    chart.  Did you first discover from the hospital who had
 5    overdosed and who had been associated with the primary
 6    care practice of the Defendant Stephen Schneider?
 7    A    I did.
 8    Q    And did you review the hospital records of those
 9    individuals?
10    A    I did.
11    Q    And after reviewing those hospital records, did you
12    then confirm through searching the medical records at
13    the Schneider Medical Clinic that these people were in
14    fact patients of the Schneider Medical Clinic?
15    A    I did.
16    Q    Does this exhibit contain your work from reviewing
17    over 100 hospital records and over 76 medical records at
18    the Schneider Medical Clinic?
19    A    It does.
20    Q    Does Exhibit 1-B summarize voluminous information,
21    specifically, your review of all of those medical
22    records?
23    A    It does.
24    Q    And were you able to confirm that all of the
25    patients on your chart had been to Schneider Medical
```

1211

1   Clinic at some point in time prior to their overdose?

2   A   I was.

3   Q   Now, if you could not find a file at Schneider

4   Medical Clinic, did you find other means to confirm that

5   the people had been patients at the clinic?

6   A   Yes.  We corresponded the information with billing

7   information and pharmacy records as well.

8   Q   And would that have been information that Perry

9   Seaton and Mr. Martin Redd collected and analyzed?

10  A   That's correct.

11  Q   Will the chart you prepared eliminate the need for

12  the jury to review the voluminous data that you reviewed

13  and from which you created this chart?

14  A   It does.

15  Q   Does the information in this chart accurately

16  reflect the information it summarizes?

17  A   It does.

18          MS. TREADWAY:  Government would offer Exhibit

19  1-B as a summary exhibit under Federal Rule of Evidence

20  1006.

21          MR. WILLIAMSON:  Your Honor, we would make a

22  conditional objection.  We have not had a chance to

23  review all of these so-called source documents.  I need

24  to check with my office before I make any further

25  representations; but for right now -- I mean, I'll raise

1212

1     that issue with you if I learn something different.

2           THE COURT:  Mr. Byers?

3           MR. BYERS:  I would just add, Your Honor,

4     under 402 I believe it's irrelevant.  As I understand

5     it, a vast majority of the information is relative to

6     uncharged conduct and I don't think these necessarily

7     relate to any of the supposed deaths.  It talks about

8     the overdoses and withdrawals.  I certainly don't think

9     withdrawal causes are a part of the Indictment.  And if

10    it is indeed relevant under 403, I think the probative

11    value is outweighed by the prejudice and the chance of

12    misleading the jury and confusing the jury.

13          MS. TREADWAY:  Judge, this is directly charged

14    in the overt act of the conspiracy.

15          THE COURT:  Well, it may be charged, but that

16    doesn't make it relevant.  How long do you think it will

17    be, Mr. Williamson, before you can check your records?

18          MR. WILLIAMSON:  Before the end of the day, I

19    know, Your Honor.  I have an inquiry out -- I'm sorry --

20    I have an inquiry out right now.  So I'm just waiting to

21    get back to my office.

22          MS. TREADWAY:  Judge, they've had these

23    documents and the source records since this summary

24    exhibit was made since '08.

25          THE COURT:  I'm sure they have since the

1213

```
 1    beginning of time, but that's not what we're here for.
 2    My concern is with respect, not to the records at the
 3    clinic, but the hospital records.
 4            MR. WILLIAMSON:  Right.
 5            MS. TREADWAY:  They've had those, too, Judge.
 6            MR. WILLIAMSON:  I don't know that we have,
 7    and I don't want to say that we don't and be incorrect
 8    about that.  We have one record available to us under an
 9    OD folder.  We were told by Mr. Moore what folder to
10    look at.  I have a disc at my office with the folder on
11    it.  The only question is whether or not that folder has
12    all these hospital records.  I have not seen them.
13            MS. TREADWAY:  I have these source documents
14    back in my office, Judge.
15            MR. WILLIAMSON:  I wasn't finished,
16    Ms. Treadway.
17            MS. TREADWAY:  I can bring them into the
18    courtroom right now.
19            THE COURT:  We're not going to break while
20    Mr. Williamson goes through your records.  I'll do what
21    Mr. Williamson wants here and admit them conditionally;
22    but if you all have a problem then you can bring it to
23    my attention after you've had an opportunity to review
24    them.  But if you don't bring it to my attention, then
25    they're in.  Okay?
```

1        MR. WILLIAMSON:  That's correct.

2        MR. BYERS:  Thank you, Judge.  And you're

3    overruling my objection?

4        THE COURT:  Conditionally.

5        MR. BYERS:  Thank you.

6        THE COURT:  I guess my point is I'm not sure,

7    unless he's had an opportunity and you've had an

8    opportunity, to see them, and I've had an opportunity to

9    see them, how I could make any kind of a Rule 403

10   ruling.  Because I don't understand the underlying

11   hospital records at this point.  All right.  Let's go.

12       MS. TREADWAY:  Thank you.

13   BY MS. TREADWAY:

14   Q   Now, let's talk with the jury about how this chart

15   is organized.  And I believe we have a blow-up of this

16   for the jury so that we can show how we developed this

17   chart.

18        First of all, looking at the highlighted column,

19   how is this chart organized, sir?

20   A   Chronologically by the date they visited, the

21   patient visited the emergency room.

22   Q   And in the first column do we just have a running

23   sequence of numbers to keep track of how many?

24   A   That's correct.

25   Q   And in the second column do we have the person's

1    name?

2    A    That's correct.

3    Q    Now, if the person's name is in red, what does that

4    signify?

5    A    That signifies the person eventually died of a drug

6    overdose.

7    Q    And if we have a patient who has a parenthetical and

8    a number behind their name, what does that signify?

9    A    It's the counted number of overdoses.

10   Q    Now, in the next column, what is meant by SMC visit?

11   A    That's the visit that the patient immediately

12   preceding the ER visit visited the Schneider Medical

13   Clinic.

14   Q    And is that from the Schneider Medical Clinic's

15   records?

16   A    Yes.

17   Q    And then the date that the person was at the

18   emergency room, is this from the hospital records?

19   A    That's correct.

20   Q    And the next column has drugs.  Are those the drugs

21   that the hospital record indicates that the people

22   overdosed on?

23   A    That's correct.

24   Q    And if they didn't overdose but they presented with

25   withdrawal symptoms from drugs, is that also noted on

1216

1    the chart in this column?

2    A    Yes.

3    Q    Then following this, we have R-X after O-D.   What

4    does that mean, Mr. Stewart?

5    A    That's the date of the subsequent prescription that

6    the patient received after the overdose by the Schneider

7    Medical Clinic.

8    Q    And then the next column, does it indicate what

9    drugs were actually prescribed as seen in the Schneider

10   Medical records?

11   A    That's correct.

12   Q    And then the final column, notice to Schneider

13   Medical Clinic, what is in that column?

14   A    It's a summary of information that was provided to

15   the Schneider Medical Clinic in relation to the

16   overdose.

17   Q    And we have a few short abbreviations here that I'd

18   like to go through.   H and P.   What does that stand for?

19   A    That stands for history and physical.

20   Q    And what does P-N stand for?

21   A    P-N is from the progress note of the Schneider

22   Medical Clinic files.

23   Q    And we have V-C, C-C, to S-J-S.   What does that

24   mean?

25   A    That means Via Christi, carbon-copied those records

1217

1    to Stephen J Schneider.

2    Q    And then we have on the next row it says January

3    1st, 2004, fact, D-S.   What is D-S?

4    A    D-S is a discharge summary from the hospital.

5    Q    Now if we could move to the last page of the chart.

6         How many incidents of overdoses and drug withdrawal

7    admissions to Via Christi and Wesley hospitals are

8    indicated on this chart?

9    A    107.

10   Q    How many unique patients did those 107 overdose and

11   withdrawal admissions represent?

12   A    76.

13   Q    And of those, how many were you able to document

14   that the Schneider Medical Clinic received notice of?

15   A    61.

16   Q    How many times did the documents from the Schneider

17   Medical Clinic indicate that the providers at the

18   Schneider Medical Clinic prescribed controlled

19   substances following an overdose or withdrawal

20   admission?

21   A    76.

22   Q    And how many times were the drugs prescribed, the

23   very drugs on which the person had overdosed or from

24   which the person was withdrawing?

25   A    47.

1          MR. WILLIAMSON:  Your Honor, may I renew my

2     objection.  I have confirmed that we only received one

3     file of that of a person named Terry C.  We don't have

4     any of those other source files on a document called

5     source document and O-D for 1-B.  So we haven't been

6     given the underlying data that this alleged document was

7     made from.

8          THE COURT:  Rather than take this up while

9     you're here, would you all go back to the jury room for

10    a few minutes and I'll see if I can find out what's

11    going on.

12               (Jury excused for recess.)

13         THE COURT:  Sit down please.  I guess what I'm

14    concerned about is the hospital records.  Did you all

15    stipulate to those records?  I can't remember.

16         MR. WILLIAMSON:  We did not, Your Honor, and I

17    can tell you that every piece of paper that comes in on

18    this case is scanned into a data base.  And when we

19    looked at the data base last night and saw one file,

20    Shawn Hamm asked Mr. Moore today where do we find those

21    source documents.  This 1-B was hand-delivered to us

22    Friday, maybe Thursday or Friday of last week.

23         MS. TREADWAY:  The corrected copy, Judge.

24         MR. WILLIAMSON:  Ma'am, if you please don't

25    stop interrupting me.  I don't do that to you and I

1219

1    don't appreciate it.

2              THE COURT:  I don't either.

3              MR. WILLIAMSON:  And I did not want to say --

4    represent to the Court that we did not have it until I

5    had my assistant to check the disc that was delivered to

6    us.  She verified that the one file that we have

7    uploaded in the system is the one file that we have at

8    the office there.  We have the SMC files but we do not

9    have these hospital files anywhere where I can locate

10   them that identify anywhere near that these are the

11   source documents for this exhibit.

12             MS. TREADWAY:  Well, Judge, may I respond,

13   please.

14             THE COURT:  Well, if it's just that they've

15   had it for, you know, since the beginning of time.

16             MS. TREADWAY:  No, it's more than that, Judge.

17   Number one, we provided them, at their request, all of

18   the Via Christi documents and all of the Wesley

19   documents, long ago, in April of 2008 on disc.  Now,

20   this is --

21             THE COURT:  That's what I told you I didn't

22   want to hear.

23             MS. TREADWAY:  But this is a different issue,

24   Judge.  If you'll just hear me out, I think you'll

25   understand what I'm saying.  They have the actual

 1    complete patient record of all of these patients and all

 2    of these overdose admissions.  And they've had those on

 3    a separate disc that was provided in discovery, discs.

 4    And I can tell you and I can show you those discs that

 5    we kept copies of.  That's the first thing we did.

 6        The second thing we did was we produced the summary

 7    chart to them.  And with that summary chart we produced

 8    to them, twice now, once in '08 and once just recently,

 9    discs containing just the particular page from both the

10    hospital record and the Schneider Medical record that

11    supports the chart.  So they have had all of the records

12    and they've had the specific pieces of paper that

13    support the chart entries and they've been given the

14    specific pieces of paper and 1-B on two separate

15    occasions.

16            THE COURT:  Assuming they have, my concern is

17    not whether they have or they haven't.  There's no way

18    for me to make any determination of that.  But a chart

19    under Rule 1006 is fine if the underlying information is

20    admissible.  I don't have any problem with the Schneider

21    Clinic information; but how in the world did you manage

22    to get this information from the hospitals?  I was

23    thinking that they would -- they might object to the

24    authenticity -- I'm not trying to tell them what to

25    do -- of the information that you got from the

1221

1   hospitals.  And you had talked during some of our

2   conferences about stipulations and so I was thinking

3   maybe they'd stipulate to these documents; but -- the

4   hospital documents.  But if they haven't stipulated to

5   them, then somehow, if you're going to use this chart,

6   you're going to have to figure out a way to authenticate

7   those documents about hospital records.  I know I

8   couldn't walk over there to the hospital -- and even if

9   you subpoenaed them, which I'm sure you did, that in and

10  of itself isn't enough to get them in.

11          MS. TREADWAY:  Well, Judge, we're not

12  admitting the hospital records.  And under 1006, all the

13  records have to be is admissible.  Not admitted.  And

14  hospital records, like any medical record, would be

15  admissible under a variety of the hearsay rules, 803(6),

16  803(3), 803(4).

17          THE COURT:  They're probably business records,

18  I agree with that; but I'm always concerned on these

19  things about the privacy aspects under this stupid HIPAA

20  law.  And--

21          MS. TREADWAY:  That's why we're not

22  introducing the documents themselves.

23          THE COURT:  But the point is that if -- I'm

24  not trying to muddy up the waters here.  If these

25  document would come in, if you saw them and determined

1    that they were in fact legitimate records of the

2    hospital and the foundation could be laid and all this

3    sort of business, even if the records wouldn't come in

4    themselves, then I think they would be admissible in

5    terms of this chart.  But I don't know.

6            MS. TREADWAY:  Judge--

7            THE COURT:  It's your case, guys, not mine.

8    I'm just sittin' up here.

9            MS. TREADWAY:  Judge, again, I have the box of

10   the source records that were stacked back in my office.

11   If the Defendants want to actually look at the documents

12   themselves, I can give that box to them.  They are very

13   well organized.

14           THE COURT:  Well, it's a quarter to 4 in the

15   afternoon when this guy is on the witness stand.  I just

16   want to keep going here and not waste time.

17           MS. TREADWAY:  I hear you.

18           MR. WILLIAMSON:  If she's willing to give us

19   the box, Your Honor, we'll take it.  We can just keep

20   going under the provisional --

21           THE COURT:  I think that's the logical way to

22   do it.  And then if you have some objection, I'll hear

23   it.  That satisfactory to you, Mr. Byers?

24           MR. BYERS:  Certainly is, Your Honor.  Thank

25   you.

1           THE COURT:  All right.

2               MS. TREADWAY:  Thank you, Judge.

3           THE COURT:  We'll just keep going.  And you

4    can bring this to my attention after you've looked

5    through the materials that she has.

6               MR. WILLIAMSON:  Thank you, Your Honor.

7           THE COURT:  All right.  Bring the jury back

8    in, please.

9                    (Jury returns to the courtroom)

10          THE COURT:  Please be seated.  I'm sure you've

11   already figured all this out, Ladies and Gentlemen, but

12   when I receive something conditionally, that means that

13   I'm going to let it in subject to the objection.  And at

14   this point in time, I don't know and the lawyers don't

15   know enough about some of these documents, but they've

16   agreed -- and I think this is the logical way to do

17   it -- to go ahead and hear his testimony.  If I decide

18   later on for some reason that these documents on which

19   his testimony is based would not be admissible, then I

20   will tell you to disregard it.  So, with that, let's

21   keep going.

22              MS. TREADWAY:  Okay.

23   BY MS. TREADWAY:

24   Q   Laying some further foundation for the hospital

25   records, Mr. Stewart.  Did you obtain all of these

1    hospital records from Via Christi and Wesley pursuant to

2    subpoena?

3    A    That's correct.

4    Q    And based on your review of all of these records,

5    were they business records of both hospitals?

6    A    That's correct.

7    Q    And were they records of the course of care of these

8    individuals?

9    A    Yes.

10   Q    And did they contain information that typical

11   medical records contained?

12   A    Yes.

13   Q    Now, during the course of your investigation, have

14   you become familiar with the records of individuals who

15   have died of overdose deaths and who have been to

16   Schneider Medical Clinic, as well as those who have

17   overdosed and had withdrawal symptoms and were at the

18   ERs of the hospitals?

19   A    Yes.

20   Q    And are you familiar with Government Exhibit 1-A?

21   A    Yes.

22   Q    And although that has not been admitted into

23   evidence before, are you familiar with its contents?

24   A    I am.

25   Q    And is that a chronological listing of the 68

1    individuals who died?

2    A    It is.

3    Q    Let me now hand you what has been marked for

4    identification as Government Exhibit 1.  Are you

5    familiar with that document?

6    A    I am.

7    Q    Is that a summary that you created?

8    A    It is.

9    Q    And is Exhibit 1 a combination in chronological

10   order of the deaths from Exhibits -- from Exhibit 1-S

11   which the Coroners have been referring to, and overdose

12   and withdrawal admissions to the hospitals from Exhibit

13   1-B?

14   A    It is.

15   Q    Does Exhibit 1 further summarize the voluminous

16   information summarized in both Exhibits 1-A and 1-B?

17   A    It does.

18   Q    Will the chart eliminate the need for the jury to

19   review the voluminous data that you reviewed and from

20   which you created this chart, namely, the many medical

21   records from the hospitals, the medical records from the

22   medical clinic, and the autopsy reports?

23   A    It does.

24   Q    Does the information in this chart accurately

25   reflect the data it summarizes?

1226

```
 1    A    It does.

 2              MS. TREADWAY:  Government offers Exhibit 1 as

 3    a summary exhibit under Federal Rule of Evidence 1006.

 4              MR. WILLIAMSON:  Same objection, Your Honor.

 5              THE COURT:  Same ruling.  Is that correct, Mr.

 6    Byers?  Same objection?

 7              MR. BYERS:  Yes, sir.

 8              THE COURT:  I'm going to admit these -- I'm

 9    going to admit 1 conditionally.  You're not offering

10    1-A; correct?

11              MS. TREADWAY:  Correct.  Not at this time,

12    Judge.

13              THE COURT:  All right.

14              MS. TREADWAY:  If we could put that up for the

15    jury please, Mr. Moore.

16    BY MS. TREADWAY:

17    Q    So if we can look again how this chart is organized.

18    Is the first column simply a sequential number?

19    A    That's correct.

20    Q    And what is in the second column?

21    A    The patient's first name and last initial.

22    Q    And the third column?

23    A    The patient's age.

24    Q    And the next column?

25    A    The date the patient expired.
```

1227

```
 1    Q    And the last column?

 2    A    The date, if they had an emergency room visit, that

 3    it's included.

 4    Q    And as to the highlighted rows, what does that

 5    indicate?

 6    A    The yellow highlight is the name of the deceased

 7    individual.

 8    Q    What is the first date on this chart?

 9    A    February 9th, 2002.

10    Q    And is that the date of death of Heather M.?

11    A    That's correct.

12    Q    At the age of 28?

13    A    That's correct.

14    Q    What is the last date on this chart?

15    A    February 10th, 2008.

16    Q    And between those two dates, what is the combined

17    total of people who had been to Schneider Medical Clinic

18    that either died of a drug overdose or had been admitted

19    to the hospitals for overdoses and withdrawals?

20    A    176.

21    Q    As you were reviewing this chart for your testimony,

22    what pattern of significance, if any, did you notice?

23    A    I noticed that either a death or an overdose or

24    withdrawal occurred approximately every two weeks.

25    Q    Now, there are people whose names are bolded and
```

1228

1    underlined.  Who are these people?  Like Terry C.?

2    A    These are names of a deceased individual who had

3    prior overdoses.

4    Q    Are there also peoples' names in red.

5    A    There are.

6    Q    And we see them here.  And then do we later see them

7    in the chronology of events?

8    A    We do.

9    Q    And how so?

10   A    That individual eventually died of a drug overdose.

11   Q    And do we have all of this information in a legend

12   at the bottom of Exhibit 1?

13   A    We do.

14   Q    Let me hand you what has been marked for

15   identification as Government Exhibit 100.  Do you

16   recognize that document?

17   A    I do.

18   Q    Was that document something that was seized during

19   the first search warrant conducted on September 13th,

20   2005?

21   A    That's correct.

22   Q    And have you been able to verify that through the

23   inventory of that search?

24   A    That's correct.

25   Q    Does that document give the Defendants notice

1229

1    regarding concerns that had been raised about how they

2    operated their clinic?

3    A    It does.

4    Q    According to this, to the search warrant inventory,

5    where were these documents found?

6    A    These documents were found in the administrator's

7    office or Tim McDonald's office.

8    Q    And is Tim McDonald somebody that you know from this

9    investigation?

10   A    He is.

11   Q    And what was his role at the clinic?

12   A    He was the administrator of the clinic.

13   Q    Did he work there full time or part-time?

14   A    Part-time.

15              MS. TREADWAY:  Government offers Exhibit 100.

16              MR. WILLIAMSON:  Objection.  No

17   authentication; no foundation.  He was not the author of

18   that document.  We don't have any other information

19   about that document than it was found.

20              MS. TREADWAY:  I can lay some additional

21   foundation, Judge.

22              THE COURT:  You have never seen it?  Is that

23   what you're saying?

24              MR. WILLIAMSON:  Yes, we've seen it.  We have

25   a copy of that.  It's not admissible through this

1230

 1   witness.  If they want that in, they would have to call

 2   the author.

 3             THE COURT:  Lay some additional foundation if

 4   you would.

 5             MS. TREADWAY:  Sure, Judge.  I will.

 6   BY MS. TREADWAY:

 7   Q   Do you know where these documents are from, sir?

 8   A   I do.

 9   Q   And where are they from?

10   A   They're from the Peer Education Resource Council.

11   Q   And what relationship does that have to the Medicaid

12   program?

13   A   The department was established to conduct reviews

14   for the Medicaid program of providers that the program

15   considered may need another in-depth look.

16   Q   And is Medicaid part of what HHS, who you used to

17   work for, regulates?

18   A   That is correct.

19   Q   And are you familiar with letters and documents of

20   this kind in the course of the investigation -- of this

21   investigation as well as other investigations?

22   A   Yes.

23             MS. TREADWAY:  Judge, Government offers

24   Exhibit 100.

25