1        (Beginning at 9:08 a.m. May 5,

2             2010, the following proceedings

3             continued.)

4        THE COURT:  Good morning, Ladies and

5   Gentlemen.  All right.  We can continue with Mr. Moore.

6   Exhibit 151 is received.

7        THE COURT:  Mr. Williamson.

8        MR. WILLIAMSON:  Thank you, your Honor.

9                   **CROSS EXAMINATION**

10  BY MR. WILLIAMSON:

11  Q    How are you doing, Mr. Moore?

12  A    Good morning, sir.

13  Q    I want to chat with you a little bit about some of

14  these charts that you have been testifying about.  Okay?

15  A    That's fine.

16  Q    Let's start with Exhibit 1-A.  You compiled a lot of

17  information for that chart; correct?

18  A    That's correct.

19  Q    And you would agree that the charts that you made

20  aren't designed to give the whole picture of everything

21  that was happening at the clinic during this period of

22  time; is it?

23  A    That's correct.  They're designed to gather

24  information for the jury to easily look at.

25  Q    Okay.  And you decided what information that you

1552

```
 1   wanted the jury to look at in reference to those charts;
 2   correct?
 3   A   That's correct.
 4   Q   And you did that in consultation with Ms. Treadway?
 5   A   And other agents.
 6   Q   And other agents.  And, again, it wasn't designed to
 7   look at everything that happened with each respective
 8   patient during their treatment at the clinic.  Is that
 9   fair?
10   A   That's fair.
11   Q   Because there are -- that chart does not discuss
12   that -- each individual's medical condition, does it?
13   A   It does not.
14   Q   That chart does not identify specifically who the
15   primary provider was at the clinic, does it?
16   A   1-A does not.
17   Q   1-A does not.  It doesn't discuss whether or not
18   those individuals in 1-A have been receiving chronic
19   pain medicine before ever coming to the clinic, does it?
20   A   1-A does not.
21   Q   Now, let's talk about your series of two exhibits.
22   A   The 2-B series?
23   Q   Well, strike that.  1-A, all it discusses is any
24   pain medication that the Government has considered
25   schedule; correct?
```

1553

1    A   These are scheduled drugs that are in the last two

2    columns, yes.

3    Q   Okay.  And 1-A doesn't discuss at all how long that

4    person had been taking that medication throughout their

5    life; correct?

6    A   That's correct.

7    Q   Nothing in 1-A discusses any alternative -- other

8    treatments that those patients may have been receiving;

9    correct?

10   A   That's correct.

11   Q   So if people were receiving referrals to mammograms,

12   that's not reflected in 1-A, is it?

13   A   Referrals are not reflected in 1-A.

14   Q   Blood tests aren't reflected in 1-A; are they?

15   A   They are not.

16   Q   Cholesterol results aren't reflected there; correct?

17   A   That's correct.

18   Q   Whether or not people were receiving medicine for

19   yeast conditions, that's not reflected there; is it?

20   A   That's true.

21   Q   Blood pressure, hypertension medicine is not

22   reflected there; correct?

23   A   That's correct.

24   Q   MRI's that were ordered aren't reflected there; are

25   they?

1554

1    A    Not on 1-A.

2    Q    Physical therapies aren't -- referrals aren't

3    reflected on there; correct?

4    A    Not on 1-A.

5    Q    I'm sorry?

6    A    Not on 1-A.

7    Q    Okay.  Now, let's turn to the 2 series.

8    A    Are you talking about the controlled substance

9    charts, Mr. Williamson?

10   Q    Let's start with Exhibit 2.  This is a -- well,

11   no -- yes, like 2-A, 2-B, 2-C?

12   A    The charts for the controlled substances?

13   Q    Yes.

14   A    Okay.  Thank you.

15   Q    So, for instance, 2-B is the controlled substance

16   chart for Patricia G; correct?

17   A    That's correct.

18   Q    Now, looking at 2-B, again, this document does not

19   identify any other medicines that this patient may have

20   been receiving during her treatment at the clinic;

21   correct?

22   A    It identifies the controlled substances, and then in

23   some instances there are charts that reflect other

24   medications.  I couldn't tell you specifically without

25   going through them, but there are some.

1555

1    Q    Okay.  And do you know if this is 100% -- is-- does

2    this 100% accurately reflect every prescription that

3    Patricia G received from the Schneider Medical Clinic?

4    A    It reflects the prescriptions that are contained in

5    the C series of exhibits that we admitted through Mr.

6    Redd.

7    Q    And those C series are the, the scheduled pain

8    medicines; correct?

9    A    They are scheduled pain medicines, yes.

10   Q    So outside of the scheduled pain medicines with this

11   2 series, 2-B, 2-C, this does not contain every

12   prescription that Patricia G received while she was

13   being treated at Schneider Medical Clinic; correct?

14   A    That's probably correct, yes.

15   Q    You would agree that these charts that you've been

16   putting together only focuses in on less than 1% of Dr.

17   Schneider's total practice; correct?  Strike that.  Of

18   the Schneider Medical Clinic's total patient population;

19   correct?

20   A    You've quoted that statistic.  I'm not sure that

21   that's totally accurate.  But I can follow you.  There

22   are 68 deaths involved with the case.

23   Q    And you understand that you all entered an exhibit

24   that states that the total patient population was

25   roughly around 10,414?

1556

1    A    I understand that, yes.

2    Q    And you understand that that's less than 1% --

3    excuse me -- that 68 is less than 1% of 10,414?

4    A    I haven't done the math; but if that's the

5    calculation, I accept that.

6    Q    That's what we've been focusing the jury on.  Isn't

7    that fair?

8    A    True.

9    Q    And your charts don't take in consideration this

10   other 99% of things that may have been going on in the

11   clinic, do they?

12   A    These charts reflect the folks that are in the

13   Indictment.

14   Q    Okay, again, it doesn't reflect the other 99% of the

15   patient population of the clinic; does it?

16   A    True.

17   Q    And it doesn't reflect 99% of the other treatment

18   that was given to patients while they were at the

19   clinic; correct?

20   A    Correct.

21   Q    And you understand that the clinic -- that Dr.

22   Schneider is being charged with running a clinic that is

23   only concerned about giving out pain medicines.  You

24   understand those allegations; correct?

25   A    The allegations are in the Indictment, yes.

1   Q   And you understand that in order to get a full view

2   as to whether or not that is a true allegation, one

3   would really want to see what are the pain medicines in

4   relation to everything else that was going on in the

5   clinic.  Would you agree with that?

6   A   I'm not following that.

7   Q   Okay.  I'll withdraw that question.

8        Now, looking at -- you mentioned this 2 series that

9   Agent Redd, I believe, testified about.  Would that be

10  like a Government Exhibit 2?

11  A   No, sir.  Those are the timelines.  The 2 series

12  that Agent Redd introduced were the copies of the

13  prescriptions as reflected on 2-B series and et cetera.

14  Q   All right.  You put together, let's say for

15  instance, Exhibit 2; correct?

16  A   That's correct.

17  Q   And with Exhibit 2 you are -- you yourself went

18  through patient records; correct?

19  A   I did.

20  Q   And you pulled out the information that you wanted

21  to include on Exhibit 2; correct?

22  A   Myself and and the agents and others went through

23  these, yes.

24  Q   How many people actually went through these?

25  A   Probably three or four.

1    Q    Can you give me some names?

2    A    Agent Greer, Agent Redd.  I'm not sure if Agent

3    Stewart helped.  I don't believe Agent Stewart helped

4    with these.  Those two at least.

5    Q    Who is the actual lead agent handling this

6    investigation?

7              MS. TREADWAY:  Objection, beyond the scope.

8    Relevance.

9              THE COURT:  No, I think he can identify the

10   lead agent, if there is one.

11   A    Well, Agent Greer has been with us for most of the

12   time.

13   BY MR. WILLIAMSON:

14   Q    So you -- he would be the person you would identify

15   as the lead agent; correct?

16   A    I would say so.

17   Q    Okay.  And he did help with some of these charts;

18   correct?

19   A    He assisted.

20   Q    And can you point to -- strike that.

21        By looking at the chart, can you identify the

22   information that you put in as opposed to what Officer

23   Redd or Agent Greer put in?

24   A    All of this information was input by me at some

25   point.  They were reviewed again by others.  But most of

1559

1   this was input by me initially.

2   Q    Okay.  And is this document designed to identify

3   every prescription that Patricia G received from

4   Schneider Medical Clinic?

5   A    This is not designed for that.  This is a snapshot

6   timeline, if you will, for Patricia G's office visits

7   and significant events that occurred while at Schneider

8   Medical Clinic.

9   Q    Significant events, is that what you stated?

10  A    Right.  For example, again, oh, April 25th of '03,

11  identified M-V-A, as we stated yesterday, motor vehicle

12  accident.  And that comes from a note in the progress

13  notes of the chart.

14  Q    Who decided what was significant and what was not

15  significant?

16  A    I suppose we did collectively.

17  Q    There are several referrals to physical therapy that

18  Patricia G received that aren't included in this

19  exhibit; correct?

20  A    They may not be reflected in this exhibit, but I

21  believe they were in her progress notes which are in

22  evidence.

23  Q    Right.  But you're introducing this summary as a

24  convenient way, I think as the question was asked to you

25  by Ms. Treadway, for the jury just to review this

1    summary and -- so they don't have to review all the

2    voluminous charts.  You remember that question?

3    A    That's correct.  But they can review them.

4    Q    Okay.  And, in fact, they probably should review

5    them if they want to get a complete picture of what

6    truly happened with Patricia G during her treatment

7    course at the Schneider Medical Clinic; correct?

8    A    They're welcome to review them.

9    Q    And -- because this series 2, it doesn't identify

10   any medical pain conditions that Patricia G may have

11   been suffering from; correct?

12   A    The series 2 timelines and other timelines do not.

13   Q    Okay.  And it doesn't identify if she was receiving

14   other certain medications such as medication for high

15   cholesterol; correct?

16   A    I'm not sure what medication for high cholesterol

17   is, but in the other column in the blue there are other

18   nonscheduled, in all of these charts, medications that

19   are being prescribed.

20   Q    And is it your understanding that in that other

21   column it's 100% accurate in regards to other

22   medications that may have been prescribed?

23   A    It reflects from the progress notes of the Schneider

24   Medical Clinic, and, again, if they're in black, there's

25   an actual prescription that we've confirmed was filled.

1    If they're in blue, we could neither confirm or deny

2    they were filled.  But it was from the progress notes

3    where we got this information.

4    Q   So my question is: is it 100% accurate?

5    A   To the best of my knowledge, it's as accurate as it

6    can be from the progress notes and other information.

7    Q   Can you pull Patricia G's progress note from the

8    exhibit behind you, please.

9    A   If we could use the exhibits from our notebooks

10   there, that would be helpful.

11   Q   Sure.

12   A   Because I'm not sure of the organization at this

13   point.  I'm working on that.

14              MS. TREADWAY:  For the record, I'm handing the

15   witness Exhibit 2-D.

16   BY MR. WILLIAMSON:

17   Q   Now, particularly I just want to focus in on a

18   couple of visits.  Can you turn to 11-29-04 progress

19   note.

20   A   You said 11-29-04?

21   Q   Yes.

22   A   Okay.  I'm there.

23   Q   Okay.  Now, do you see something in that progress

24   note stated "Senthroid (ph), 0.088, number 30 C slash

25   six refills"?

```
 1   A   I see that, yes.
 2   Q   Okay.  Can you look on your Exhibit 2, 11-29-04, at
 3   your other column and can you tell me where you see that
 4   being reflected, that prescription being reflected?
 5   A   That's not reflected there.
 6   Q   So you missed that one?
 7   A   We didn't include it.
 8   Q   Did you miss it or you purposely left it out?
 9   A   I didn't purposely leave anything out.  We just
10   didn't include it in this chart.
11   Q   Did you make a conscious choice not to include it?
12   A   No.
13   Q   Just missed it?
14   A   That's your word.
15   Q   What's your word?  Just --
16   A   It's in the progress note, sir.
17   Q   Turn to January 3rd, 2005.  Do you see on the
18   progress note prescriptions for Omnicef?
19   A   Yes, I do.
20   Q   Do you see that on your sheet, on your chart?
21   A   It is not on the chart.
22   Q   Do you see a prescription for Skelexin (ph) on the
23   progress note?
24   A   I'm not sure what that is.  Is that below the word
25   or above the word Xanax?
```

1563

1    Q    I believe so.

2    A    If that's what's Scelexin is, that's not on the

3    chart either; but I'm not sure if that's what Scelexin

4    is on there.  I can't read that very well.

5    Q    Okay.  But you see a word there that could be

6    interpreted Scelexin; correct?

7    A    There's a word there, yes.

8    Q    Okay.  And Scelexin is not included on your chart,

9    is it?

10   A    Scelexin is not on the chart.

11   Q    Turn to April 20th, 2005.

12   A    Okay.

13   Q    Do you see on the progress note a prescription for

14   Premarin for 0.9 milligrams?

15   A    I see that.

16   Q    Is that reflected on your chart?

17   A    It's not on the chart.

18   Q    Okay.  So what I've done is just go through and pull

19   out three instances, and I represent I did not go

20   through this entire chart, but we've come across three

21   instances where you just made a mistake and didn't

22   include things.  Is that fair?

23   A    They're not reflected on the chart.  They're on the

24   progress notes.

25   Q    Right.  So this chart is not a complete and accurate

1564

1    representation of everything that's included in those

2    progress notes in regards to prescriptions; correct?

3    A    It's a summary chart of prescriptions, Schedule II,

4    III, IV, some others.

5    Q    Some others?

6    A    From the clinic.

7    Q    Who made the decision as to what would be included

8    in the other column?

9    A    Again, we collectively made decisions to put these

10   in.  These were used, again, for our experts.

11   Q    Did you collectively try to put in medication that

12   would tend to mislead the jury that the only thing these

13   people were receiving were pain medicines?

14   A    No, sir.

15   Q    But you just happened to make some mistakes when it

16   came to these others.  How many of these pain medicines

17   did you mistakenly leave out?

18   A    I don't believe we left out any, sir.

19   Q    And so we understand, there are a lot of exhibits

20   that are essentially multiples of the same form of

21   exhibit; correct?

22   A    I'm not following you.

23   Q    So for instance, like Exhibit 2 we just looked at,

24   you have Exhibit 2, 3, 4, and several other exhibits in

25   that same format; correct?

1   A   That's right.  As we discussed yesterday, 2, 3 and 4

2   are the first three counts, well, Count 2, Count 3,

3   Count 4, then there's the 5 series.

4   Q   And those charts that look just like Exhibit 2, just

5   so the jury can see, I'll show them a copy of Exhibit 2,

6   so all the charts in the series that look like this,

7   they were compiled the same way that you compiled

8   Exhibit 2 that we just discussed; correct?

9   A   That's correct.

10   Q   Now, just want to -- let me ask you a few questions

11   about -- a little bit more about Exhibit 2.  You

12   identified on these series of exhibits that certain

13   services were rendered by certain providers but it was

14   billed as a different provider.  Correct?

15   A   That's right.  That's in the second column.

16   Q   Second column.  You also identified like 61

17   patients, 53 patients, and those things.  You remember

18   that?

19   A   Yes, sir.  Those come from Perry Seaton -- I'm

20   sorry -- Mr. Seaton's data that he did.

21   Q   Okay.  And his was based off of that insurance data

22   that we spent some time discussing; correct?

23   A   Correct.

24   Q   Now, you forwarded these sheets to your experts.  Is

25   that fair?

1566

1    A    These were given to our experts, yes.

2    Q    And the expert on coding and billing, are these the

3    documents he relied upon in rendering his decisions?

4    A    Let me take that back.  I am not certain that these

5    particular documents were sent to that expert.  I know

6    that the information in Count -- and it's in Exhibit 7,

7    8 and 9 as well as 1-Q-1, which reflects similar

8    information, was sent to him.  I know that for certain.

9    Q    Can I take a look at Exhibit 7?

10   A    Sure.

11   Q    So Exhibit 7, 8 and 9 were actually sent to the

12   expert for him to review?

13   A    That's correct.  We provided these.  The first four

14   columns were filled in and then he did the rest.

15   Q    Okay.  What other records did you forward to him to

16   review?

17   A    Progress notes.

18            MS. TREADWAY:  Judge, again, this is beyond

19   the scope.

20            THE COURT:  What's the point of all this?

21            MR. WILLIAMSON:  That's the last question I

22   had about that.

23            THE COURT:  Good.  Then he may answer that if

24   he hasn't already.

25            MR. WILLIAMSON:  He answered it.

1           THE COURT:  Okay.

2    BY MR. WILLIAMSON:

3    Q   Now, you identified the -- are you the person that

4    identified the individual who -- that you believe that

5    the bills were submitted to?  I mean, in care of?

6    A   Are you talking about the blue?

7    Q   Yes.

8    A   The blue was identified --

9    Q   No.  No.  I'm sorry.  My question is: are you the

10   person that made that determination?

11   A   In part.  I looked at the information to make that

12   determination.

13   Q   Okay.  Tell me about the information you looked at.

14   A   First we took the progress notes from the Schneider

15   Medical Clinic files.

16   Q   Okay.

17   A   And then we also had the fee ticket information as

18   well as claims data.

19   Q   Okay.  Okay.  Now, when you took a look at all these

20   documents, you would take a look at the progress note

21   who would have a provider's signature; correct?

22   A   That's right.

23   Q   Okay.  And when you looked at the fee ticket, tell

24   me how you interpreted the fee ticket?

25   A   The fee ticket, up at the very top has a provider's

1    name typically typed in.

2    Q   Okay.  Top righthand side?

3    A   That's right.

4    Q   Okay.  Isn't there two names through that sometimes?

5    A   If it's crossed out, sometimes there's two names.

6    Q   Aren't there two names even when there's not

7    something crossed out; correct?

8    A   Been a little while since I've looked at the fee

9    tickets, per se, before trial here, but that's possible.

10   We could look at them if you like.

11   Q   And one says an appointment provider and one says

12   primary provider.  Remember that?

13   A   Vaguely.

14   Q   When you saw a name struck out, did that have any

15   significance to you?

16   A   If the name was struck out and another one was

17   handwritten in, we interpreted that as that was the

18   biller for that day.  In other words, that was the claim

19   it was submitted under.

20   Q   Is that the claim it was submitted you said, or is

21   that the claim it should have been submitted under?

22   A   I believe we interpreted that as the provider that

23   was billed for that office visit that day.

24   Q   Okay.  And would you take that name that shows up on

25   that progress note and attempt to match it up with

1569

1    the -- excuse me.  Would you take that name that

2    appeared on the fee ticket and attempt to match it up

3    with the progress note?

4    A    We attempted to.

5    Q    Okay.  And this claims data that you relied on, this

6    was from the insurance-side records.  Is that fair?

7    A    That's right.

8    Q    Okay.  That didn't come from the clinic; correct?

9    A    The clinic generated the claims for the claims data

10   to be there for the insurance company, yes.

11   Q    You understand that any time that there's a

12   transmission, you have a sender and you have a

13   recipient; correct?

14   A    That's true.

15   Q    And it's fair that a sender can have a copy of what

16   they sent and a recipient can have a copy of what they

17   received.  Would you agree with that?

18             MS. TREADWAY:  Judge, I'm going to -- again,

19   this is beyond the scope.  Mr. Moore is not a

20   substantive witness.  He was a summary witness for 1006

21   purposes.  This is really information that should be

22   addressed to a substantive witness.

23             THE COURT:  Are we getting back on the fax

24   thing again?

25             MR. WILLIAMSON:  No.  We're talking about what

1570

1   he utilized, interpreted his findings that he helped

2   compile the summary exhibit for.

3            MS. TREADWAY:  Those questions were way beyond

4   that, Judge.  It's asking about the claims process.

5   That's not this witness.  He's not a substantive witness

6   about the claims process.

7            THE COURT:  Go ahead.  I'm trying to be

8   somewhat lenient with you here so that you understand

9   how these work and the jury understands how these were

10  put together; but -- anyway.  Keep going.

11  BY MR. WILLIAMSON:

12  Q   Now, and you understand that, again, the claims

13  data, they have a recipient record and then the clinic

14  could have a sender record.  Did you understand that

15  when you were going through these documents?

16  A   I suppose.

17  Q   Okay.

18            THE COURT:  Wait a minute.  Now, are you

19  supposing you understood or are you supposing that what

20  he says is correct?  Because if you are here to suppose

21  things, then I'm going to sustain the objection.

22  A   I honestly don't know if there was a -- I mean, I'm

23  just assuming, Your Honor, that there was a record from

24  the clinic.  But that's probably something I shouldn't

25  do.  I agree.

1571

 1          THE COURT:  I want him to be able to ask you

 2   what you did --

 3   A   Right.

 4          THE COURT:  -- based on your knowledge.  Not

 5   what you suppose the companies do.

 6   A   Okay.

 7          MR. WILLIAMSON:  And if he doesn't know, Your

 8   Honor, that's a fair response.

 9   A   I don't know that.

10   BY MR. WILLIAMSON:

11   Q   Okay.  So you only focussed in on the recipient

12   data.  That would be the claims data; correct?

13   A   The claims data, yes.

14   Q   Now, you also put in an exhibit regarding UDSs,

15   urinary drug screens.  You remember that exhibit?

16   A   Yes.  Give me a minute.  I'll find it.  Okay.

17   Q   Now, did you -- strike that.  On that exhibit

18   there's nothing in -- there's not a reference to any law

19   that says that a provider has to give urinary drug

20   screens, is there?

21   A   There's no law on this exhibit.

22   Q   Yes.  Okay.  Did you find any law that says that

23   when you were preparing that document?

24          MS. TREADWAY:  Again, Judge, this is

25   substantive.  This is not 1006 information.  And this is

1572

1    an exhibit that was admitted without objection.

2              MR. WILLIAMSON:  I can challenge the weight of

3    the exhibit, Your Honor, without objecting to it.

4              THE COURT:  I don't know why he would be

5    putting law on any of these charts.  Try to help me

6    here.  Where are you headed?  The law comes from me.

7              MR. WILLIAMSON:  Exactly.  And the

8    significance of the document is what I am asking him

9    about.

10             MS. TREADWAY:  Well, again, Judge, that's

11   substantive testimony.  He's not here to talk about

12   significance of the document.  That's for the experts to

13   testify about.

14             THE COURT:  I think so.  But what caught my

15   attention was the question about law being on the

16   document.  That is up to me to make those decideses, not

17   this witness.

18             MR. WILLIAMSON:  Okay.  I can rephrase it.

19   BY MR. WILLIAMSON:

20   Q    You remember earlier there was a CFR introduced by

21   the Government in the case; correct?

22   A    I remember that.

23   Q    And that is a Code of Federal Register; correct?

24   A    The Code of Federal Regulation.

25   Q    Regulations, I apologize.  Do you have any Code of

1573

```
 1    Federal Regulation numbers on there, on that document,
 2    on that exhibit?
 3    A    Again, I didn't put any Code of Federal Regulations
 4    on this exhibit.
 5    Q    Did you compile that exhibit completely yourself?
 6    A    Yes.
 7    Q    And you relied on the progress notes?
 8    A    The progress notes which contained lab reports, yes.
 9    Q    Now, did you actually subpoena the information from
10    Labcorp?  Any information from Labcorp?
11    A    We did on -- yes, we did.
12    Q    And so you relied on those subpoenaed documents in
13    order to generate this document?
14    A    A combination of that, plus what was in the progress
15    notes in the Schneider Medical Clinic records.
16    Q    Okay.  Now, you mentioned -- just turning back to
17    Exhibit 2 briefly.  When these numbers of how many
18    patients were being billed under, did you go and try to
19    pull each and every progress note for the patients that
20    came in on respective days?
21    A    I'm not following that.
22    Q    Did you review each and every progress note on each
23    respective day?  So, for instance, you say on September
24    18th, 2003, 61 patients were billed.  Did you go pull
25    each and every one of the 61 progress notes?
```

1    A   Again, that information came from Mr. Seaton's data

2    analysis; and I didn't pull all the progress notes for

3    each of those patients, no.

4    Q   Okay.  And did you ever go in to try to confirm

5    whether or not Mr. Seaton's analysis was appropriate or

6    correct before you included it on the chart that you

7    compiled?

8    A   I rely on Mr. Seaton to do that.

9    Q   You didn't go to the clinic and pull any appointment

10   records, did you?

11   A   I didn't personally, no.  Never been to the clinic.

12   Q   Okay.  Did you ask anybody to go pull appointment

13   records so you could verify this information?

14   A   I didn't ask anybody to do that either.

15   Q   Now, there was a document regarding notice that you

16   testified about.  You remember that?

17   A   Exhibit 151?

18   Q   Yes.

19   A   Yes.

20   Q   Now, you're not representing to the jury that each

21   one of the source documents that is included in your 151

22   exhibit actually state that an individual died from

23   mixed drug intoxication, are you?

24   A   No.  But I will tell you that there are probably, on

25   the second column, if the death certificate states that,

1   that was found in the Schneider Medical records and that

2   would be on there, yes.

3   Q   So whatever that death certificate states is what

4   the clinic would have been on notice about.  Is that

5   what you believe?

6   A   First two columns came from the clinic records.

7   Q   Okay.  And it's your representation that every --

8   well, strike that.

9       Do you have your source documents for these death

10  certificates?

11  A   The 151-A, I believe is up there on the table.  I'd

12  like to correct one thing.  I'm sorry.  It's the one,

13  two, three, four, fourth and fifth column that contain

14  the Schneider Medical records on this chart.  So 151-A

15  is the source for those two.

16  Q   The fourth column.

17  A   It's the column that's entitled "deceased on file".

18  And then the other column is other "notice in SMC

19  records".  Those two columns stem from 151-A.

20  Q   Okay.

21  A   The Schneider records.

22  Q   Can you look at your source documents for me?

23  A   If you could hand them to me.

24  Q   Which one is it?

25  A   It's 151-A.

1576

1   Q   Before we look at these in detail, you would agree

2   that clinics actually -- most doctors receive notice if

3   a patient passes away; correct?

4   A   I don't know what --

5   Q   At some point?

6   A   I don't know what most clinic's receive.

7   Q   And you found in numerous files that there was a

8   cover sheet that the clinic identified a person as being

9   deceased; correct?

10  A   Again, that's reflected on the column 4.  And if the

11  front of the file said "deceased" written on it, that's

12  where that information came from.

13  Q   And, again, this was readily found in the clinic's

14  recordkeeping process; correct?

15  A   They were on the chart.

16  Q   Okay.  It wasn't hidden.  You didn't have to go find

17  it buried, folded away in some obscure part of the

18  chart.  It was on the front page, wasn't it?

19  A   I didn't go pull the files themselves.  When the

20  clinic respondeded to the subpoena, the chart came to us

21  and that's what it said on it.

22  Q   Very -- on the very front; correct?

23  A   Yes, sir.

24  Q   Okay.  Now, looking at Vicky H.  The Certificate of

25  Death that I see in your exhibit states acute myocardial

```
 1    infarction as the cause of death; correct?
 2    A    Give me a moment to find Vicky H, please.  That's
 3    what it states.
 4    Q    Nothing about mixed death -- excuse me -- mixed drug
 5    intoxication, does it?
 6    A    That's correct.
 7    Q    And that was what was found in their medical record;
 8    correct?
 9    A    Along with the front cover which shows deceased.
10    That's the other part of that.
11    Q    Okay.  Now, you understand we're not contending
12    that -- well, strike that.
13         Is it fair to state that even though there are
14    documents that identify people as being deceased, that
15    not each and every instance that you got -- that the
16    Government contends it occurred do the Schneider records
17    reflect that the individual passed away from mixed drug
18    intoxication; correct?
19    A    Other records reflect that, that would --
20    Q    No, that wasn't --
21    A    If that's not your question, I apologize.
22    Q    No.  In the Schneider Medical records --
23    A    Correct.
24    Q    -- isn't it fair to state that not every piece of
25    notice that you included on this chart identify that
```

1578

1    mixed drug intoxication was the cause of death?

2    A    That's probably true.

3    Q    Okay.  And outside of documents that were either

4    signed by Dr. Schneider himself or he noted in the

5    progress note, do you have any other information that he

6    knew about every single piece of notice that you have in

7    Exhibit 151-A?

8    A    Can you repeat that one more time.  I'm sorry.

9    Q    Yes.  Outside of documents that may have his

10   signature on it or another acknowledgement by Dr.

11   Schneider himself, those documents don't do anything

12   else to show that Dr. Schneider actually saw that;

13   correct?

14   A    The records say what they say.

15   Q    Okay.  And -- well, hold on a second, Your Honor.

16                      (Off-the-record discussion

17                      between counsel.)

18   BY MR. WILLIAMSON:

19   Q    Just to summarize, make sure we have a full idea of

20   the work that you had to do.  When you were compiling,

21   let's say the series Exhibit 2s and all these records

22   about the patients, how much of your information came

23   directly from the Clinic itself?

24   A    You're talking about the timelines again?

25   Q    Yes.

1   A    Most of the information came from the clinic and

2   then the prescription information was verified by the

3   prescriptions that we received from the various

4   pharmacies.

5   Q    So the records were sufficient enough for you to go

6   through them and compile all these timelines to be able

7   to follow the care and treatment given by Dr. Schneider

8   at any given point in time; correct?

9   A    Over time I began to be able to be reading the

10  records fairly well, yes.

11  Q    And then based on that, you selected what you wanted

12  to put in those summary charts; correct?

13  A    Again, we collectively did that.

14            MR. WILLIAMSON:  Nothing further, Your Honor.

15            THE COURT:  Thank you, Mr. Williamson.  Mr.

16  Byers?

17            MR. BYERS:  Not a single question, Your Honor.

18            THE COURT:  Thank you, sir.  Redirect please.

19            MS. TREADWAY:  Just briefly, Judge.

20                    **REDIRECT EXAMINATION**

21  BY: MS. TREADWAY:

22  Q    Ms. Boyd, could you please pull up Exhibit 2, the

23  timeline for Patricia G, and go to Page 3.  And could

24  you focus on the third column and blow that up a little

25  bit.

1      Mr. Moore, Mr. Williamson asked you about the

2  information on Patricia G's timeline that indicated

3  there was nothing indicated about when physical therapy

4  was ordered.  On Page 3 do we have two entries in the

5  third column indicating that PT ordered?

6  A   That's correct.  On May 17th of '04, and also on

7  July 29th of '04 we indicated PT ordered, or physical

8  therapy.

9  Q   He himself asked you about several drugs.

10 Synthroid.  Do you understand that to be a thyroid

11 medication?

12 A   That sounds correct but I don't know that for a

13 fact.

14 Q   Are you familiar with Omnicef as an antibiotic?

15 A   Yes, I've taken that I believe.

16 Q   And you couldn't read the word Skelaxin, is that why

17 you didn't put it in the chart?

18 A   That's right.

19 Q   Did Patricia die of an overdose of thyroid

20 medications?

21 A   Not my knowledge.

22 Q   Did she die of an overdose of antibiotic?

23 A   No.

24 Q   Are you familiar with Premarin being a hormone drug?

25 A   Yeah.

1581

```
 1    Q    And did she die of a Premarin overdose?

 2    A    No.

 3    Q    Moving to the final page, the final row, Ms. Boyd,

 4    on Exhibit 2.  Did we include in these timelines the

 5    drugs relevant to the person's death and other drugs

 6    that were relevant to our expert's reviews?

 7    A    Yes, we did.

 8    Q    For instance, with regards to Patricia, when she

 9    died, she had Oxycodone, Hydrocodone, Benzodiazepines

10    and Carisoprodol -- Soma, in her system.  And those are

11    the drugs that we scheduled on these timelines; correct?

12    A    That's correct.

13    Q    I would like to take you back to the death

14    certificate of Vicky H who died of acute myocardial

15    infarction, according to the death certificate.  Who

16    signed that death certificate?

17    A    Dr. Schneider.

18              MS. TREADWAY:  Thank you, nothing further.

19              MR. WILLIAMSON:  Briefly, Your Honor.

20                      **RECROSS EXAMINATION**

21    BY MR. WILLIAMSON:

22    Q    I was asking you about the physical therapy, wasn't

23    I, asking you about Exhibit 1-A?

24    A    You may have been, sir.

25    Q    Okay.  And when we're talking about Exhibit 2, we
```

1    were only focussed in on the prescriptions; correct?

2    A    That could be true, too.

3    Q    How long have you been with the United States

4    Government?

5    A    19 years, sir.

6    Q    And how many times have you come across a drug

7    dealer prescribing hormone pills?

8                MS. TREADWAY:  Objection, Judge,

9    argumentative.

10                THE COURT:  Yes.

11                MR. WILLIAMSON:  Nothing further, Your Honor.

12                THE COURT:  I take it you have no questions,

13   Mr. Byers.

14                MR. BYERS:  That's true, Your Honor.

15                THE COURT:  All right.  Thank you.  You may

16   resume your seat.

17   A    Thank you, Your Honor.

18                THE COURT:  Next witness.

19                MS. TREADWAY:  Government would reoffer the

20   conditionally admitted exhibits, Judge.

21                THE COURT:  Any further arguments with respect

22   to -- let me get the numbers out here so the record is

23   clear.  2, 3, 4, 5-A through 5-R.

24                MR. WILLIAMSON:  Are you ready for argument,

25   Your Honor?

1583

```
 1            THE COURT:  I think those are the only ones.
 2    7, 8, 9 and 12-1 were identified but not offered
 3    according to my notes.
 4            MS. TREADWAY:  1-Q-1, Judge.  That's correct.
 5    We did not offer those at this time.
 6            THE COURT:  So the -- just a second, here.
 7    All right.  Exhibit 1-A, 1-A-1 and the 2, 3, 4, the 5-A
 8    through R exhibits minus a couple of the letters and 2,
 9    3, 4, 5-A through 5-R are the ones that I note were
10    received conditionally.
11            MR. WILLIAMSON:  Yes.
12            THE COURT:  Okay.
13            MR. WILLIAMSON:  We would renew our objection,
14    Judge.  I think it's been established that there were
15    multiple authors of this document who have not testified
16    about which part were theirs, which part was somebody
17    else's.  We believe that, of course, to the weight, that
18    some information was left out of certain charts either
19    inadvertently or intentionally and we believe that that
20    does not satisfy rule 1006.
21            THE COURT:  Mr. Byers?
22            MR. BYERS:  We would just join in that, Your
23    Honor.  Nothing to add.
24            THE COURT:  Well, the Court finds that the
25    charts are -- that there's been sufficient foundation to
```

1    show -- to satisfy the requirements for admission of the

2    charts.  The jury, of course, is free to consider any of

3    the evidence, the charts or anything else, in terms of

4    the weight that you give to that evidence.  So if the

5    jury, for example, feels that the charts aren't entitled

6    to appropriate weight, under the Court's instructions,

7    because certain things aren't on the charts, things that

8    Mr. Williamson pointed out in his cross-examination, the

9    jury is free to do that.  Or not.  But from a pure legal

10   standpoint, I'm satisfied that the charts are

11   admissible.

12        Now, who's next?

13             MS. TREADWAY:  The Government would call Dr.

14   Brian Katan.

15                         **BRIAN KATAN**

16   Having been first duly sworn to tell the truth, the

17   whole truth and nothing but the truth, testified as

18   follows on:

19                     **DIRECT EXAMINATION**

20   BY MS. TREADWAY:

21   Q    Please introduce yourself to the jury, sir.

22   A    I am Dr. Brian Katan.

23   Q    Are you a medical doctor here in the Wichita

24   community?

25   A    Yes.

1    Q    Where are you employed?

2    A    At Via Christi St. Francis and Via Christi St. Jo.

3    Q    And what do you do at those hospitals?

4    A    I'm an emergency medicine physician.

5    Q    How long have you been an emergency medicine

6    physician?

7    A    Let's see, essentially since, oh, 1987.

8    Q    And how long have you been a doctor?

9    A    1982.

10   Q    What did you do prior to becoming an emergency

11   medicine physician?

12   A    I served the Navy and did two years with the Navy,

13   with the Marines, before doing residency in emergency

14   medicine.

15   Q    Could you give the jury a brief educational history

16   starting with college?

17   A    Okay.  I went to San Diego State University and

18   graduated there.  Then did a year of graduate work at

19   University of California San Diego before being accepted

20   into medical school at Georgetown, and attended

21   Georgetown from 1978 to 1982.  Following Georgetown, I

22   did my internship in internal medicine at Navy Hospital,

23   San Diego.  I then spent two years with the Marines

24   doing pay back time.  Following that, I went and did the

25   first residency that the Navy had for emergency

1    medicine.  A two year program.  And that completed my

2    residency, my education, formal education.

3    Q   As an emergency room or ER or ED, emergency

4    department, physician, what are your duties and

5    responsibilities?

6    A   Essentially to see the patients that come into the

7    emergency department to address who needs to be

8    admitted, who needs to be sent home, and to treat the

9    initial presenting problems, stabilize the situation,

10   identify the problems, and discharge the patients who

11   don't need to be admitted.

12   Q   Do you have any additional supervisory duties or

13   responsibilities on top of your actual patient care

14   duties?

15   A   We also supervise interns and residents that rotate

16   through the department and also nurse practitioner

17   students that rotate through the department.

18   Q   Can you give us the various locations of the

19   emergency rooms in Wichita in which you have worked?

20   A   I work at the Via Christi St. Francis, which is on

21   St. Francis street; and also St. Jo Hospital, which is

22   on Hillside and Harry.

23   Q   And would that have been true during the years 2002

24   through 2007?

25   A   Yes.

1587

1    Q    In the emergency room is it typical to get

2    historical information from a patient regarding the

3    identity of their primary care physician if they have

4    one?

5    A    Yes.

6    Q    In your capacity as an emergency room physician, do

7    you encounter patients from the majority of the

8    physicians in town?

9    A    Yes.

10   Q    And from those encounters do you get a feel for how

11   each physician practices?

12   A    Yes.

13   Q    In your capacity as an emergency room physician,

14   have you treated patients from the Schneider Medical

15   Clinic?

16   A    Yes.

17   Q    And did you do so during the years 2002 through

18   2007?

19   A    Yes.

20   Q    How would you know that a patient in your emergency

21   room was a Schneider Medical patient?

22   A    On the label that the registration people create it

23   says at the bottom the primary care physician that the

24   person sees.

25   Q    And is that important information for you to know in

1588

1    case you need to call that physician and consult with

2    them?

3    A    Absolutely.  We use that every single day

4    repeatedly.

5    Q    As an emergency room physician, do you treat people

6    with both acute and chronic medical problems?

7    A    Yes.

8    Q    What's the difference between an acute problem and a

9    chronic problem?

10   A    An example of an acute problem would be a person

11   gets stung by a bee and has an anaphylactic reaction,

12   shows up immediately in dire straits.  A chronic problem

13   example would be recurrent chest pain, arthritis, a

14   recurrent urinary tract infection; something that's

15   happened multiple times in the past.

16   Q    In terms of treating patients in the emergency room,

17   is it typical for the physician to ask the patient why

18   they are at the ER?

19   A    Absolutely.

20   Q    Is that part of the medical history you need to

21   treat the patient?

22   A    Of course.

23   Q    Do you remember a particular anecdote about a female

24   patient that came to the emergency room that you treated

25   after she had been to the Schneider Medical Clinic?

1    A    Yes.

2    Q    And tell the jury about that?

3    A    Essentially it was a female, young female, who had

4    come to the emergency department with pain to her right

5    lower quadrant, her right lower abdomen.  Essentially,

6    she was very concerned about the pain.  She had been to

7    the Schneider Clinic the preceding day and she

8    emphasized to me how there was no medical evaluation

9    done.  Essentially they wanted to just give her pain

10   medicines for the pain and not address what might be the

11   cause of the pain.  It was a pain that she hadn't had

12   before.  It was a new pain.  She was certainly concerned

13   about the possibility of having appendicitis and it

14   would seem appropriate that she would need a work-up to

15   get this addressed.

16   Q    And what did you in fact find was wrong with the

17   patient?

18   A    We ended up doing a CAT scan on her.  We ended up

19   admitting her to the hospital overnight.  It turned out

20   she was okay.  She did not have appendicitis.  She did

21   not have an ectopic pregnancy.  She did not end up

22   having a life threatening event; but it was appropriate

23   to do a work-up in order to discern that.

24   Q    In your years as an emergency room physician, have

25   you heard the term drug seeker?

1    A    Yes.

2    Q    What is your definition of a drug seeker, Dr. Katan?

3    A    Someone who repeatedly goes out and uses deceptive

4    means in order to obtain a significant amount of drugs,

5    often for overuse of the drugs themselves.  Sometimes

6    they overuse a portion themselves and sometimes they

7    sell the other portion.  It's people who are very, very

8    frequently coming to multiple physicians and/or the

9    emergency department in order to obtain an excessive

10   amount of drugs.

11   Q    In terms of patients coming to the emergency room

12   seeking drugs, what methods do you use as an emergency

13   room physician to distinguish drug seekers from people

14   who really are in pain and who really need relief from

15   their pain with drugs?

16   A    One of the things that we've developed is a computer

17   system that immediately prints out the patient's DRG

18   visits, the last visits to the hospital; and also on the

19   label, if you take the case number and subtract off the

20   last number, the next three digits are the number of

21   visits that the patient's had to the Via Christi

22   facility.  So you can see whether someone's had four

23   visits, which would not be unreasonable, versus whether

24   someone has had 120 visits, which would perhaps imply

25   it's an extremely critical or current chronic medical

1591

1  issue or some other event going on.

2  Q   In addition to that computer program which indicates

3  times or frequency of visits to the ER, what do you do

4  clinically to determine this is a drug seeker versus

5  this is a person that's actually in pain?

6  A   Okay.  Primarily, first off, when you walk into the

7  room, and particularly in emergency medicine, we tend to

8  get kind of a very instant need to be able to say this

9  person's sick, you know, call in three nurses to get

10  IV's and, you know, take the person to, you know, a stat

11  imaging or stat study or perhaps stat to the operating

12  room.  Essentially, as you walk in the room you're able

13  to see, you know, is the person having heavy sweating,

14  you know, are they writhing in pain.  What exactly are

15  the movements that they have when they have pain.  As

16  you're talking to 'em, you know, perhaps they'll have

17  neck pain.  You know, do they move their neck as you

18  walk around the room, things like that, are clues that

19  you use to pick up what's really going on.

20  Q   So general observation of the patient as well as an

21  examination of the patient?

22  A   Absolutely.

23  Q   Can these methods be employed by any physician to

24  make the distinction between a drug seeker and someone

25  who's actually in pain?

1    A    Absolutely.

2    Q    Were you able to distinguish Schneider Medical

3    Clinic patients that were drug seekers as opposed to

4    people who were actually in pain?

5    A    Yes.

6    Q    Now, with regard to that computer program that was

7    an additional aid to you, is that program generally

8    available to physicians in the community?

9    A    Anyone who has privileges in the Via Christi system

10   has access to Mirror Image.

11   Q    And is that a free access?

12   A    Absolutely.

13   Q    And do you know whether the Defendant was privileged

14   at Via Christi during this time period?

15   A    He did indeed have privileges.

16   Q    He didn't need to have privileges -- he did indeed?

17   A    He did indeed.

18   Q    He did indeed have privileges.  So he would have had

19   access to this computer program had he wished access?

20   A    Absolutely.  And it's available for your office or

21   for your home so that you can instantly access data on

22   any patient in the system at any time.

23   Q    In seeking treatment from you at the emergency room,

24   did any of the Schneider Medical Clinic patients ever

25   admit to you to seek treatment from you that they were

1593

1    addicted to the narcotics they were being prescribed by

2    the Defendant Stephen Schneider?

3    A    That did happen.  Particularly once the clinic was

4    closed.  We had people come to us and say that they were

5    addicted to medicine and that they wanted help with the

6    addiction.

7    Q    And did you provide that help?

8    A    Yes.  We referred them to -- St. Jo has a

9    stabilization unit now called The Assessment Center.  We

10   referred them to that area to help with both inpatient

11   and outpatient treatment for drug addiction.

12   Q    As a result of your treating and observing Schneider

13   Medical patients over the years, did you ever call the

14   Schneider Medical Clinic to talk with anyone?

15   A    Absolutely.

16   Q    Approximately when did you call in terms of the

17   years 2002 through 2007?

18   A    Certainly throughout the years of 2002 through 2005

19   when we had his patients.  You would end up calling when

20   you would need to admit the patient or when you would

21   have a bad outcome for a patient or when the patient

22   needed follow-up or you had questions.

23   Q    Do you know how many times you called?

24   A    Well, absolute minimum of two times a year with more

25   likely, you know, sometimes I'm sure it was easily ten

1594

1    times a year.

2    Q   And you say bad outcomes?

3    A   For example --

4    Q   Are you talking about death?

5    A   Yes.  When someone is brought in essentially with

6    CPR being done in the field, a resuscitated code where

7    they're trying to bring the patient back.  Sometimes

8    they would be able, you know, when you get them and CPR

9    is actively being performed and sometimes you're able to

10   reverse the course of what's going on.  Sometimes you

11   reverse the course and bring back the heart but the

12   brain did not get oxygen for a long enough period and

13   essentially the person is brain dead.  And other cases

14   where you completely bring them back but then you have

15   to admit them into the hospital in order to get further

16   treatment.

17   Q   During the course of your contacting the Schneider

18   Medical Clinic over the years, did you ever have any

19   trouble or difficulty actually getting in touch with the

20   Defendant Stephen Schneider?

21   A   In general I was able to reach him by paging for the

22   hospital operators.

23   Q   Did you ever have any direct conversations with the

24   Defendant Stephen Schneider?

25   A   Absolutely.

1595

1    Q    Do you know how many times you spoke directly with

2    him?

3    A    Easily, on some of the years, easily ten times a

4    year.

5    Q    Now, I'm sure you do not remember word for word

6    those conversations, Dr. Katan; but do you nevertheless

7    remember the substance of those conversations?

8    A    Yes.

9    Q    And what was the substance of those conversations

10   with the Defendant?

11   A    It would depend on the case.  Sometimes I would call

12   and say, you know, I don't understand what's going on,

13   this person, you know, states that they were at your

14   clinic just three days ago and they're here stating that

15   they need more pain medicines.  Whether they need an

16   injection or pain medicines to help with their pain

17   would be one example.  Another example would be in a

18   case where the patient was a resuscitated code and the

19   patient was brought back and was alive.  Sometimes

20   brought back alive with good brain function; sometimes

21   not.  And then we would need to admit that patient to

22   the hospital.  And then sometimes where the patient was

23   deceased and we would have to call him and say, you

24   know, this patient has passed away and we'll need

25   someone to sign the death certificate.

1   Q    What concerns, if any, did the Defendant Stephen

2   Schneider express to you during these calls about his

3   patients being at the ER?

4   A    The number one most consistent concern was --

5   particularly when you call and say, you know, gee, this

6   patient was at your office a few days ago and they're

7   asking us for pain medicines -- the number one answer

8   would be why are they at the emergency department, my

9   office is open seven days a week, why didn't they come

10  to my office.

11  Q    When you talked about overdoses and deaths, what was

12  his response?

13  A    The general response was not one that I would

14  normally get from other doctors.

15  Q    Please explain that.

16  A    Most times when you call a doctor and say, you know,

17  gee, we saw so and so, they ended up dying, we

18  understand you saw them a week ago at the office, you

19  know, and we wanted to get some further information and

20  we'll need for you to sign the death certificate, do you

21  have some further information for us.  You know, the

22  physician would be surprised, would be shocked, would

23  want to know, you know, what exactly happened, you know,

24  give me some information, give me some data.  You know,

25  they would be very inquisitive as to exactly what

1597

1    process happened, what caused them to collapse and then

2    have the CPR being performed.

3    Q   And how did that compare with the Defendant Stephen

4    Schneider's response?

5    A   Truly I never got that kind of response, inquiry,

6    inquisition as to what happened.  It was very much a

7    matter of, okay, you know, thank you for the

8    information.

9    Q   Did he ever express surprise?

10   A   I never received any surprise response from him on

11   cases like that at all.

12   Q   Did he ever express concern?

13   A   Not to me.

14   Q   Now, once you received the information from the

15   Defendant that his clinic was open seven days a week and

16   he was surprised that the patient was at the ER, would

17   you ask the patient, hey, I've talked to the doctor, he

18   says he's open seven days a week, why didn't you go back

19   to the primary care physician?  Would you ask that

20   question?

21   A   Yes.

22   Q   And would you ask that question in the course of

23   needing to know that information to treat that patient?

24   A   Yes.

25   Q   And was that to elicit information that would help

1    you determine whether they were a drug seeker or whether

2    they were a legitimate patient?

3    A    It's part of the information that you would normally

4    obtain on any kind of case, particularly if they had

5    just seen that doctor just a few day before.

6    Q    What would people tell you in response to your

7    question about why they didn't go to the clinic?

8    A    One of the most often cases was they would say they

9    didn't have the cash money in order to pay for the

10   visit.

11   Q    Did you have occasion to talk with other physicians

12   in the community about overdoses and overdose deaths

13   other than people at the Schneider Medical Clinic?

14   A    Yes.

15   Q    And would you have occasion to talk to other

16   physicians, not people of the Schneider Medical Clinic,

17   about overdoses and drug seekers?

18   A    Yes.

19   Q    And you were able to compare all of those and you

20   found the Defendants --

21        MR. WILLIAMSON:  Your Honor, I'm going to

22   object.  She's leading this witness.

23        MS. TREADWAY:  I agree, Judge.  I'll move on.

24   Thank you.

25

1    BY MS. TREADWAY:

2    Q    Have you ever written any e-mails about a

3    conversation that you had with the Defendant Stephen

4    Schneider?

5    A    Yes.

6    Q    Let me hand you what has been marked for

7    identification as Government Exhibit 157.  Do you

8    recognize that as an e-mail that you wrote?

9    A    Yes.

10   Q    And on what date did you write that e-mail?

11   A    September 16th, 2005.

12   Q    Dr. Katan, the evidence in this case has been that a

13   federal search warrant was executed at the Schneider

14   Medical Clinic on September 13th, 2005.  So how many

15   days later is your e-mail?

16   A    Three days later.

17   Q    And who is this e-mail addressed to?

18   A    It is addressed to the emergency medicine

19   physicians, nurse practitioners, physician assistants,

20   and to the management in the emergency department,

21   management nursing.

22   Q    What was the subject?

23   A    Essentially the --

24   Q    I mean the subject line.  I'm sorry.

25   A    Okay.  Doctor S.

1    Q    Doctor S?

2    A    Yes.

3    Q    Did everybody in the emergency room know Dr.

4    Schneider by Dr. S?

5    A    I think that no one had a question as to what the

6    subject was with the subject being Dr. S.

7    Q    Was this e-mail written contemporaneously with your

8    conversation with the Defendant Stephen Schneider on

9    September 16th, 2005?

10   A    I spoke to him that same day and did the e-mail that

11   same day.

12   Q    Is it an accurate reflection of the substance of

13   your conversation with the Defendant?

14   A    Yes, it is.

15            MS. TREADWAY:  Government offers Exhibit 157.

16            MR. WILLIAMSON:  No objection.

17            MR. BYERS:  No objection, Your Honor.

18            THE COURT:  It's received.

19   BY MS. TREADWAY:

20   Q    Let's review that e-mail with the jury.

21       Can you just look at the substance of the e-mail,

22   Doctor, and could you read that as the jury follows

23   along?

24   A    I called today and spoke directly to Dr. Schneider.

25   I informed him that his patients were telling us that

1601

1    he -- in quotes -- sent them to the ED.  He told me that

2    because he was under stress yesterday and could not see

3    his patients.  I directly informed him that it was

4    absolutely inappropriate.  I informed him that a

5    scheduled patient visit should not be turned into an ED

6    visit because of his unavailability yesterday.  He

7    agreed that sending his patients to the ED because of

8    missed appointments was inappropriate and it put life

9    saving limited resources at risk because he could not

10   see his hundred patients scheduled yesterday.  He has

11   assured me that he will no longer send his patients to

12   the ED if they cannot be seen in scheduled appointments.

13   Dr. Schneider went on to say that he had not always been

14   informed of when his patients had overdosed and that the

15   ED had not always told him of overdose cases.  I

16   immediately stopped him and said that I had personally

17   called him on several OD's and abuse of drug cases and

18   how on the ones admitted he primarily had me call

19   Mancao, Dr. Mancao, for the admissions.  I expressed to

20   him my total disbelief of any potential claim of

21   ignorance on his part of these issues."

22   Q   Had he mentioned anything about overdoses in the

23   conversation or did you?

24   A   I brought up the fact that we had taken care of his

25   patients with overdoses.  Of note also is that in

1602

1    preparation for those patients to be sent to the ED, he

2    started faxing to us the prescriptions that the patients

3    had been given historically so that we would know what

4    medicines to give his prescriptions when they -- his

5    patients when they came to the ED.  Which was quite

6    surprising.

7    Q    So when you called him, you were asking him to do

8    what?

9    A    To, number one, not tell his patients to come to the

10   emergency department because the emergency department

11   already on a daily basis, you know, runs at pretty

12   maximum patient volume for the staffing that we have.

13   And we couldn't be -- that we would be certainly

14   overwhelmed if he continued to tell all of his patients

15   to come to the ED for medication refills.

16   Q    Who brought up this idea that he hadn't been

17   informed of overdoses?

18   A    It was certainly he.  Dr. Schneider.

19   Q    And how did that strike you?

20   A    Incredible gall.  And also that I think he realized

21   that, you know --

22           MR. WILLIAMSON:  Your Honor, I'm going to

23   object.  That calls for total speculation.

24           MS. TREADWAY:  That's fine, Judge.

25           THE COURT:  Sustained.

1603

1    BY MS. TREADWAY:

2    Q    Now, at some point in time, Dr. Katan, did you

3    discontinue your efforts to contact the Defendant

4    Stephen Schneider or anyone else at the Schneider

5    Medical Clinic regarding the overdoses and overdose

6    deaths coming into your emergency room?

7    A    Once the clinic was closed, we did stop calling the

8    office and calling Dr. Schneider.

9    Q    How large is the medical community in the Wichita

10   area and its surrounding community?

11   A    Over 800 physicians.

12   Q    And how long have you been a part of the Wichita and

13   surrounding area's medical community?

14   A    15 years.

15   Q    Have you been a part of that medical community long

16   enough to become aware of Defendant Stephen Schneider's

17   reputation within that medical community?

18   A    Yes.

19   Q    On the basis of information you obtained within that

20   medical community, and based on your personal experience

21   as an ER physician treating his patients and on your

22   personal experiences having conversations with the

23   Defendant, have you formed an opinion as to the

24   reputation of the Defendant Stephen Schneider with

25   regards to his prescription practices?

1604

```
1    A    Yes.

2    Q    What is that opinion?

3    A    That they were excessive, extreme, not well thought

4    out; and that we saw lots of side effects from these

5    medicines that were given.

6    Q    Were the patients from the Schneider Medical Clinic

7    referred to by any common name in the emergency room?

8    A    Just saying it was a Dr. Schneider case alone, every

9    one knew what was -- what you were referring to or what

10   you were talking about.

11   Q    When a Schneider Medical Clinic patient came to the

12   ER and needed to be admitted to the hospital, what would

13   you do?

14   A    We essentially would call Dr. Schneider and tell him

15   that we had a patient of his that needed admission; and

16   in most cases he would say call Dr. Mancao, the

17   hospitalist, and the patient would be admitted to Dr.

18   Mancao.

19   Q    Can you relate to the jury a particular question Dr.

20   Mancao asked you when you told him that you had a

21   Schneider patient for admission?

22            MR. WILLIAMSON:   Your Honor, objection.

23   Deliberately attempting to elicit hearsay testimony.

24            MS. TREADWAY:   The question is not hearsay,

25   Judge, because it's not a statement.
```

1605

```
1              MR. WILLIAMSON:  A statement from Dr. Mancao
2    to this person is a statement.
3              MS. TREADWAY:  It's a question, Judge, not a
4    statement.
5              THE COURT:  Let me hear the question and then
6    I will make a ruling.
7    BY MS. TREADWAY:
8    Q   Can you relate to the jury a particular question Dr.
9    Mancao asked you after you had informed him that there
10   was a Schneider patient needing admission?
11   A   Yes.
12             THE COURT:  Objection is sustained.
13   BY MS. TREADWAY:
14   Q   Is it common for patients to ask you as an emergency
15   room physician for referrals or recommendations to
16   various specialists in the community?
17   A   Yes.
18   Q   Is it ethical for you to make referrals and
19   recommendations?
20   A   Yes.
21   Q   As a result of your experience with the Defendant
22   Stephen Schneider, would you recommend him to patients
23   seeking pain management?
24   A   No.
25   Q   Why not?
```

1606

1    A    From the experience of the patients that I saw, it

2    seemed that the answer was to always give more and more

3    pain medicines; that there was not significant attempts

4    at other things such as biofeedback; using TENS units,

5    which are electrical stimulators over nerve areas;

6    steroid injections, things of those natures.  The vast

7    majority of times it always seemed to be more and more

8    pain medicines.

9    Q    Let me hand you a copy of an exhibit that's been

10   admitted into evidence.  This is Government Exhibit 1,

11   sir.  Prior to your testimony today, were you allowed to

12   review this document?

13   A    Yes.

14   Q    And that's a chronological listing of the overdoses

15   and deaths associated with patients from the Schneider

16   Medical Clinic.  Did you find that exhibit significant?

17   A    Indeed.

18   Q    How so?

19            MR. WILLIAMSON:  Your Honor, I'm going to

20   object.  This is well beyond his testimony.  He's a fact

21   witness, not an expert.

22            MS. TREADWAY:  He has been disclosed as an

23   expert, Judge.

24            MR. WILLIAMSON:  He has not been qualified as

25   an expert in this area.  He's an emergency room doctor,

 1    not a pain management specialist.

 2            THE COURT:  Well, your client doesn't claim to

 3    be a pain management specialist.

 4            MR. WILLIAMSON:  And he's not taking the stand

 5    and testifying as an expert either, Your Honor.

 6            THE COURT:  I don't know what he's going to

 7    do; but I'm satisfied that this witness is sufficiently

 8    qualified to at least begin to testify about this

 9    exhibit.  I don't know where we're headed with it but --

10    BY MS. TREADWAY:

11    Q   Again, Dr. Katan, do you find this exhibit

12    significant?

13    A   Yes.

14    Q   And how do you find it significant?

15    A   There's an incredible number of deaths of patients

16    and revisits to the hospital for overdoses and eventual

17    deaths; and certainly a very, very large number of

18    overdoses and deaths.

19    Q   Do you have an opinion as a medical doctor whether

20    the number of overdoses and deaths would have given any

21    reasonable physician notice that his practices were

22    deadly?

23            MR. WILLIAMSON:  Your Honor, I'm going to

24    object.  Again, calls for speculation.

25            THE COURT:  Well, I think that that requires

1    laying further foundation.  He can offer -- he's offered

2    his opinion, which I think is quite appropriate; but

3    what other doctors' opinions would be, that's going to

4    require additional foundation.

5           MS. TREADWAY:  Then I'll just ask it in his

6    experience, Judge.  Thank you.

7    BY MS. TREADWAY:

8    Q   Dr. Katan, if this were a list of your patients,

9    would that have given you reasonable notice that your

10   practices were deadly, sir?

11   A   I would stop doing medicine and I would live on an

12   island.

13          MS. TREADWAY:  Nothing further, Judge.

14          THE COURT:  I think it's time for us to take

15   our morning recess, Ladies and Gentlemen.  Approximately

16   15 minutes.  Remember and heed the admonition.

17                   (Recess.)

18          THE COURT:  Mr. Williamson.

19          MR. WILLIAMSON:  Thank you, Your Honor.

20                **CROSS EXAMINATION**

21   BY MR. WILLIAMSON:

22   Q   You were asked a lot of questions about your opinion

23   about Dr. Schneider; correct?

24   A   Yes.

25   Q   And you were asked your opinion about Dr.

1609

```
 1    Schneider's practice; correct?

 2    A    Yes.

 3    Q    You've never visited the Schneider Medical Clinic,

 4    have you?

 5    A    I have never visited the Schneider Medical Clinic.

 6    Q    It's just -- it's sufficient to say yes or no.  You

 7    don't have to repeat my question in your answer.  Is

 8    that okay?

 9    A    Yes.

10    Q    You never met Dr. Schneider before, have you?

11    A    Not that I can recall.

12    Q    You never had a sit-down meeting with Dr. Schneider

13    at any point in time during this 2002 and 2007 --

14    what -- 2007 time period that you're talking about;

15    correct?

16    A    Correct.

17    Q    You never -- well, strike that.

18         You mentioned his reputation; but are you familiar

19    that your reputation in the medical community is being

20    pompous and judgmental?

21    A    You could certainly attack me in any way you choose

22    or wish.

23    Q    No, I'm not saying that I'm saying that.  Are you

24    aware that's your reputation in the medical community?

25              MS. TREADWAY:  Judge, what's the basis of
```

1610

1    that?  There's no good faith basis --

2              MR. WILLIAMSON:  I have a good faith basis for

3    it.  I investigated --

4              THE COURT:  Well, he can answer yes or no to

5    whether he's aware of that and then we'll move on.

6    BY MR. WILLIAMSON:

7    Q   Are you aware of that?

8    A   I'm sure that you could find people who would say

9    any particular statement.

10   Q   And you would agree that depending on who you talk

11   to at any point in time, they may have a particular

12   opinion about you, Dr. Schneider, or any other medical

13   provider; correct?

14   A   Of course.

15   Q   Now, you gave anecdotes and things that you talked

16   about.  I want us to talk a little bit about that.

17        First, you state that these individuals that you

18   based your opinion on were identified as Schneider

19   patients; correct?

20   A   Yes.

21   Q   These are self-identified patients.  True?

22   A   In some cases.

23   Q   How would you find out in other cases?

24   A   Sometimes they wouldn't put who their primary care

25   physician was on the record or tell us who it was, or

1611

1    they were unresponsive and could not tell us; and so

2    through getting prior records, we would be able to

3    obtain that data.

4    Q    Prior records meaning that Mirror Imaging System

5    that you're talking about?

6    A    Yes.

7    Q    Okay.  And that Mirror Imaging System is based on

8    data that the patient provides to the hospital; correct?

9    A    Yes.

10   Q    Okay.  So, again, my question is that these people

11   are identified as Schneider patients because they self-

12   identified themselves that way; correct?

13   A    In the majority of cases, yes.

14   Q    Okay.  And you don't know whether, A, whether these

15   people were telling the truth when they said that, do

16   you?

17   A    Of course I don't know whether they were telling the

18   truth.

19   Q    And you don't know whether or not these people were

20   seeing a physician's assistant at Schneider Medical

21   Clinic; correct?

22   A    In some cases they would say specifically that they

23   saw Dr. Schneider.

24   Q    And in other cases you would not know specifically

25   who they would be seeing at the clinic?  Dr. Schneider

1612

1    wasn't the only provider there; correct?

2    A    Correct.

3    Q    And they could easily have been saying Dr. Schneider

4    because it's called the Schneider Medical Clinic.  Fair?

5    A    Certainly.

6    Q    And you didn't have an independent way to verify

7    these individuals.  True?  Well, strike that.

8         You didn't go and verify each and every person that

9    entered into the hospital and identified Dr. Schneider

10   as the primary care physician that that was absolute

11   truth, did you?

12   A    Correct.

13   Q    And you did not -- you understand that -- well,

14   strike that.

15        There were people who may not have had a primary

16   care physician and may have seen somebody at the

17   Schneider Medical Clinic one time and they could have

18   said that that was Schneider Medical Clinic; correct?

19   A    Yes.

20   Q    It could have been somebody who walked into the

21   clinic and saw a physician's assistant, they could have

22   identified the Schneider Medical Clinic; correct?

23   A    Yes.

24   Q    So you're basing your opinion on an unverified

25   population.  Is that fair?

1613

1    A    No.

2    Q    Okay.  Now, you mentioned these telephone calls that

3    you had with Dr. Schneider.  You remember that?

4    A    Yes.

5    Q    And you say it was two a year at a minimum; right?

6    A    At an absolute minimum, yes.

7    Q    And approximately ten telephone calls; correct?

8    A    Certainly in some years, yes.

9    Q    And can you show the jury one e-mail regarding these

10   phone calls that you allegedly had between 2002 and

11   2005?

12   A    I believe we went over the e-mail here.

13   Q    Is that okay?

14   A    Yes.

15   Q    Show me any e-mails codifying any conversations you

16   had with Dr. Schneider in 2002?

17   A    Just like I made no e-mails for any of the

18   physicians that I paged, I made no e-mails for Dr.

19   Schneider that I paged; and I would frequently call or

20   contact sometimes up to 30 different doctors a day

21   depending on lots of variables.  And I did not make

22   e-mails for those either.

23   Q    That's fine.  My question is show me an e-mail that

24   you wrote codifying the conversation you had with Dr.

25   Schneider?

1614

1            MS. TREADWAY:  Objection.  Asked and answered.

2            THE COURT:  Sustained.

3    BY MR. WILLIAMSON:

4    Q   Show me a letter that you wrote to Dr. Schneider

5    discussing your concerns about these patients?

6    A   I don't have a letter to Dr. Schneider.  I did

7    contact the state medical board.

8    Q   Show me the letter that you sent to them?

9    A   I contacted them and spoke with them directly.  And

10   they did later interview me.

11   Q   Did you send them a letter?

12   A   I did not send them a letter.

13   Q   Did you send a letter to the Kansas Board of Healing

14   Arts?

15   A   I did not send them a letter.

16   Q   Did you send a letter to the medical society of

17   Sedgwick County?

18   A   I did not send a letter.

19   Q   Did you send a letter to Dr. Schneider?

20   A   I did not send a letter.

21   Q   You understand that in medicine that, at least --

22   yeah -- in medicine, in your profession, you all claim

23   that if it's not documented, it didn't happen, don't

24   you?

25   A   I don't state that, no.  That's silly.

1615

1    Q    Okay.  It's very silly?

2    A    I don't document that I walk into a room every time.

3    Q    And you don't document every single thing you do

4    with every single patient every time?

5    A    It would be impossible to do without a continuous

6    live camera.

7    Q    Those conversations allegedly took place between

8    2002 and 2005; but we don't have any written memorial

9    regarding these conversations.  Is that fair?

10   A    No, that's totally incorrect.

11   Q    You have a written memorialization of these ten

12   phone calls a year between 2002 and 2005?

13   A    On the cases when I called Dr. Schneider, in the

14   vast majority of the cases I would write that -- I would

15   write above -- under the physician notification area, I

16   would write the person that I called and would then

17   write what they would tell me that they wanted done,

18   such as call Mancao.  So I would then write an arrow to

19   Mancao.  That's written documentation.

20   Q    That's the only written documentation that you have?

21   A    That's the only written documentation I have on any

22   case.

23   Q    And if that written documentation doesn't state I

24   informed Dr. Schneider that this person is here over a

25   mixed drug intoxication, that means that didn't happen

1616

1    in that conversation?

2    A    For the vast majority of cases, I do document that.

3    I'm sure I have not documented on every single case

4    because sometimes in emergency medicine you get pulled

5    away immediately and you never get back to that

6    individual.

7    Q    You've testified under oath previously, haven't you?

8    A    Yes.

9    Q    You were asked multiple times how many times you

10   talked to Dr. Schneider about instances at the emergency

11   room, weren't you?

12   A    Yes.

13   Q    And the only answer you gave during that sworn

14   testimony was I talked to him at a minimum of two times;

15   correct?

16   A    Correct.

17   Q    You never once ever in that sworn testimony of over

18   30 pages of sworn testimony state I talked to him

19   approximately ten times over the years, did you?

20   A    I used the term --

21   Q    No, sir.  My question is:  Did you ever state in

22   that sworn testimony that you talked to Dr. Schneider

23   for ten times between 2002 and 2005?  Yes or no.

24           MS. TREADWAY:  Judge, we would object to

25   Mr. Williamson interrupting the witness who's trying to

1    answer his question.  He's badgering the witness.

2           THE COURT:  Yeah.  Calm down everybody.  Let's

3    follow the rules.  The doctor's testified before.  He

4    knows to let you ask the question and then he will

5    answer.  And you let him answer before you ask the next

6    question.

7           MR. WILLIAMSON:  Yes, sir.

8           THE COURT:  If we keep this up, I'm going to

9    recess and let everybody calm down so that we can do

10   this in an orderly fashion.

11   BY MR. WILLIAMSON:

12   Q   I'm going to repeat my question for you, sir.

13   Actually, can I get that question read back.

14              (Previous question read back.)

15   BY MR. WILLIAMSON:

16   Q   Did you state in your prior sworn testimony at one

17   time that you spoke to Dr. Schneider ten times

18   between -- at least ten times between 2002, 2005?

19   A   I said at least two times was my testimony, yes.

20   Q   And did you ever use the term ten?  That you spoke

21   to Dr. Schneider ten times during that testimony?

22   A   No.

23   Q   Today is the first time that you told anybody that

24   you allegedly spoke to Dr. Schneider ten times; correct?

25   A   That is correct.

1618

```
1    Q    And you met with the Government in preparation of
2    your testimony here today, didn't you?
3    A    Yes.
4    Q    Now, you gave a whole lot of more opinions and I
5    think one of 'em was about an anecdote.  You remember
6    that?
7    A    Yes.
8    Q    The anecdote about the young lady?
9    A    Yes.
10   Q    What's that lady's name?
11   A    I don't have that off the top of my head.
12   Q    When did that lady come into the ER?
13   A    It was several years ago.
14   Q    What was the final diagnosis?
15   A    Non specific abdominal pain I believe.
16   Q    And who did she actually see at the Schneider
17   Medical Clinic?
18   A    I do not know.
19   Q    So you have no specifics that I can confront you
20   about as I stand here and talk to you today.  Is that
21   fair?
22   A    No.
23   Q    And do you know -- strike that.
24        Doctors miss diagnoses, don't they?  That's not
25   unusual, is it?
```

1619

```
 1   A    It's not common.  We would like to have it be as
 2   rare as possible.
 3   Q    It's not criminal to miss a diagnosis, is it?
 4   A    It is not criminal to miss a diagnosis.
 5   Q    Now, you also talked about these drug seekers.  You
 6   remember that?
 7   A    Yes.
 8   Q    You also -- you believe that drug seekers are --
 9   that they come in and they use deceptive means to try to
10   get their prescriptions; correct?
11   A    Yes.
12   Q    That means they lie to the physicians in order to
13   get the medications or whatever they want from that
14   physician; correct?
15   A    Yes.
16   Q    They would try that at the ER; right?
17   A    Yes.
18   Q    They would try that with I guess any doctor that
19   they believe they want to get this medication from;
20   correct?
21   A    Yes.
22   Q    And you believe that you could detect a drug seeker.
23   Am I understanding that testimony?
24   A    Some cases, yes.
25   Q    Now, drug seekers don't have a big stamp on their
```

1620

```
 1   forehead that says I'm a drug seeker, do they?

 2   A   Correct.

 3   Q   And you understand that the leading pain management

 4   specialists in this country say it is impossible to

 5   detect an addict?  You understand that?

 6   A   I'm aware that they make statements to that effect.

 7   Q   Okay.  And you're not a pain management specialist,

 8   are you?

 9   A   No.  I'm an emergency medicine specialist.

10   Q   How long have you been an emergency medicine?

11   A   I finished my residency in 1987.

12   Q   And you've been in emergency the whole time;

13   correct?

14   A   Of course.

15   Q   You never operated a pain management clinic, have

16   you?

17   A   Correct.

18   Q   You never operated a family practice clinic, have

19   you?

20   A   Correct.

21   Q   You've never had your own patient case load of

22   people that you see from the time they're babies until

23   the time they're teenagers, have you?

24   A   I see people many times when they were infants and

25   when they're teenagers and when they're older through
```

1621

```
 1    the emergency department.

 2    Q    And you're not their primary caregiver, are you?

 3    A    I'm not their primary caregiver.

 4    Q    You understand there are things that happen between

 5    primary caregivers and their patients that you may not

 6    be aware of; correct?

 7    A    Correct.

 8    Q    And you did not go and observe any patient/physician

 9    encounter with Dr. Schneider and his patients; correct?

10    A    Correct.

11    Q    How many patients was Dr. Schneider seeing between

12    2002 and 2005?

13    A    From rumors I can give you that answer; but I do not

14    know a factual number.

15    Q    You don't know a factual number; correct?

16    A    Correct.

17    Q    You never heard of Dr. Schneider before 2002, had

18    you?

19    A    I'm not sure the first time of when I heard Dr.

20    Schneider.

21    Q    And are you aware of the fact that Dr. Schneider had

22    a -- when he opened his clinic, he had an influx of

23    Medicaid patients to come to his clinic roughly around

24    2003?  Are you familiar with -- did you know that?

25              MS. TREADWAY:  Objection.  Argumentative.
```

```
 1    Assumes facts not in evidence.
 2              THE COURT:  Let's slow down.  You can ask the
 3    question again.
 4    BY MR. WILLIAMSON:
 5    Q   Are you --
 6              MR. WILLIAMSON:  Were you finished, Your
 7    Honor?
 8              THE COURT:  Yes.
 9              MR. WILLIAMSON:  Okay.
10              THE COURT:  Were you?
11              MR. WILLIAMSON:  No, not quite.
12    BY MR. WILLIAMSON:
13    Q   Were you aware or are you aware that around 2003
14    that Dr. Schneider had a huge influx of patient
15    population?  Are you aware of that?
16    A   No.
17    Q   Are you aware that in 2003 there was a huge influx
18    of Medicaid patients?
19    A   No.
20    Q   Now, but you were able, without knowing all these
21    facts, to cast all these aspersions when this man is
22    sitting here fightin' for his liberty, weren't you?
23              MS. TREADWAY:  Objection.  Argumentative,
24    Judge.
25              THE COURT:  Now that's argumentative.  You
```

1623

1    know it.  Let's see if we can ask proper questions here.

2    BY MR. WILLIAMSON:

3    Q    Now, you mentioned this Mirror Image System.  You

4    remember that?

5    A    Yes.

6    Q    Are you able to track which physicians actually open

7    that and do not open that?

8    A    That is absolutely available to people in IT, yes.

9    Q    Okay.  Are you able to do that?

10   A    To track who opens and closes Mirror?

11   Q    Yes.  Let me ask that a little bit better.  I

12   apologize.  Are you able to determine which physicians

13   from the community actually access Mirror Image and who

14   don't?

15   A    Without requesting that data from IT, no.

16   Q    So you don't know whether or not Dr. Schneider ever

17   actually looked at Mirror Image, do you?

18   A    I am not aware.

19   Q    Are you aware that he actually received training

20   in -- on Mirror Image?

21   A    I am not aware.

22   Q    Now, are you also aware that Mirror Image does

23   not -- is not a drug seeking tracking data base, is it?

24   A    Actually, it tracks virtually all of the data that

25   we can get.  It tracks what medicines are given while

1624

1   they're in the hospital.  It tracks what medicines they

2   report that they're taking when they come in.  And you

3   can also follow any individual patient with each visit

4   that they make to the hospital should you choose.

5   Q   Okay.  That's what we're going to get to.  But

6   first, there isn't a tab on there where you can say

7   check drug seeker and then it pulls up a field of all

8   drug seekers, is there?

9   A   There is not.

10  Q   Now, that -- that data base is not designed to give

11  a physician a run report of everybody that's in that ER,

12  is it?

13  A   Incorrect.

14  Q   You have to search by individual patient, don't you?

15  A   At any individual moment on looking at a screen I

16  can tell who's in the emergency department because it's

17  a live feed as far as that moment who's in the emergency

18  department that moment.

19  Q   I'm concerned about at the end of the day if a

20  physician wants to go back and look and say, okay, who

21  was in the ER today.

22  A   That is easily accessible.

23  Q   It's accessible by every individual person that came

24  in regardless of who the primary care physician was?

25  A   As an emergency physician, I can search and see who

1625

1    came in to the emergency department that day, yes.

2    Q   So Dr. Schneider could go in and look at Mirror

3    Image and see all of Dr. Zepick's (ph) patients that

4    came into the ER that day?

5    A   Depending on your access level.

6    Q   Do you know what his access -- Dr. Schneider's

7    access level was?

8    A   I certainly do not.

9    Q   And you weren't involved in any training?

10   A   Of?  I'm sorry.

11   Q   I can rephrase that.  You weren't involved in any

12   training how to use Mirror -- strike that?

13   A   I was involved in training of Mirror Image from its

14   very inception.

15   Q   What I'm asking is were you involved in Dr.

16   Schneider receiving training regarding Mirror Image?

17   A   No.

18   Q   Now, these conversations that you discussed about

19   that you supposedly had with Dr. Schneider, when did the

20   first one take place?

21   A   I cannot recall.

22   Q   How long did it take place?

23   A   I cannot recall.

24   Q   You understand we're not claiming that you never

25   called Dr. Schneider at all.  Do you understand that?

1626

```
 1    A    I understand that.
 2    Q    Okay.  But you understand that there's a dispute
 3    about how many times he was called.  You understand
 4    that?
 5    A    I understand that you have questions about that.
 6    Q    Okay.  And you don't remember the specific dates
 7    these calls took place; correct?
 8    A    Correct.
 9    Q    You don't remember the actual specific conversation
10    that actually took place; correct?
11    A    Correct.
12    Q    You just remember you have a general sense of what
13    you believe you remember; correct?
14    A    Correct.
15    Q    And you don't have a specific time when these
16    conversations took place?
17    A    Should we decide that we wanted each and every one
18    of the calls, we could pull each and every record and go
19    and look and pull and see the notation of Schneider
20    called and then referral to Mancao or, you know, yes,
21    I'll see him in follow-up, et cetera.
22    Q    Did you do that in preparation of your testimony?
23    A    I did not.
24    Q    Did you not think it would be helpful for the jury
25    to know when exactly when you believe Dr. Schneider was
```

1    called?

2    A    That would have taken an extensive elaborate review

3    of records and a considerable amount of time.  I mean,

4    multiple, multiple weeks to get each and every call.

5    Q    So you'd rather just take the easy way out and come

6    tell off your basic general memory instead of taking a

7    detailed approach to see if you can be specific about

8    your testimony?  Is that what you're talking about?

9    A    I don't think it's easy to come here and testify

10   against a physician to begin with.  I have given you the

11   information that I have of multiple calls to Dr.

12   Schneider expressing cases of my apparent belief of

13   excessive pain medicine use of his patients; my calls to

14   him of resuscitating codes; and my calls to him on cases

15   where the patients died.

16   Q    And these alleged calls where you have no specific

17   documentation in front of you to back that up; correct?

18   A    I have no specific documentation in front of me to

19   back that up.

20   Q    Now, you mentioned like during these phone calls

21   that Dr. Schneider would not be surprised or shocked.

22   Do you remember that?

23   A    Yes, that's true.

24   Q    Do you know -- you don't know -- I think we

25   established, you don't know Dr. Schneider; correct?

1    A    Correct.

2    Q    You don't know if he's a very excitable person, do

3    you?

4    A    I do not know.

5    Q    You understand that people react to negative news in

6    a -- in different ways; correct?

7    A    Of course.

8    Q    Some people can be animated, maybe, like me;

9    correct?

10   A    Correct.

11   Q    And some people may be not so animated like Mr.

12   Byers.  You agree with that?

13   A    Certainly.

14   Q    And it's hard to determine what a person's state of

15   mind is by a few second phone call over a phone

16   conversation; correct?

17   A    It can be.

18   Q    Okay.  And that's all I'm asking.  And you weren't

19   there to see Dr. Schneider's facial reaction; correct?

20   A    Correct.

21   Q    You weren't there to determine if Dr. Schneider

22   discussed this with any other person; correct?

23   A    Correct.

24   Q    You don't -- you weren't there to determine whether

25   or not Dr. Schneider went to his priest and discussed

1   it; correct?

2   A   Correct.

3   Q   You don't know any of this; right?

4   A   That's such a broad statement, I won't answer that.

5   Q   You're right.  I'll withdraw that question.  I

6   apologize for that one.

7       Now, you also stated these drug seekers would be

8   coming into your ER three days, allegedly, after going

9   to the Schneider Medical Clinic; correct?

10  A   Certainly.

11  Q   And did it ever occur to you that they were coming

12  to you after three days because they knew they couldn't

13  go back to the clinic after three days?  Did that ever

14  occur to you?

15  A   I don't know what the sequencing was of how soon he

16  could -- they could go back to his clinic or not.  In

17  most cases, if a person has a problem, they could go

18  back and see their physician the next day or the next

19  day and the next day until something definitively gets

20  figured out.

21  Q   Exactly.  So if they did not -- don't you think they

22  had a reason for not going right back after three days,

23  i.e., Dr. Schneider would not give me my medication, I

24  don't want to give any -- I don't want to let him know.

25  Did you ever think about that?

1630

1    A    Well, that's not the answer that they gave me when

2    we would inquire.

3    Q    Who?  Who is they?  We hear we.  We hear they.  We

4    hear back then.  We hear all these broad -- who are

5    they?  Give me some theys so I can go interview them.

6    A    Okay.

7            MS. TREADWAY:  Judge, again, this is an

8    argumentative cross-examination.  It's improper.  It's

9    badgering.

10           THE COURT:  I think that it's unnecessary

11   to -- I think you can just simply ask him.  And I wish

12   you would, rather than get so excited --

13           MR. WILLIAMSON:  I'm sorry, Judge.

14           THE COURT:  Can you give me the names of any

15   of these individuals who you say made these statements

16   to you in the emergency room.  You get the point across

17   that way without being so animated about it.

18           MR. WILLIAMSON:  Sorry for being so animated.

19           THE COURT:  I don't want to interfere with

20   your cross-examination but, come on.

21   BY MR. WILLIAMSON:

22   Q    Can you think of any names as you sit here of people

23   who told you they went to Schneider Medical Clinic three

24   days previously and -- but they needed some more

25   medication?

1   A    I cannot think of specific names here at this

2   moment; however, if that data is wanted by you for me to

3   present those cases, then I will do that for you.

4   Q    You were called by the Government to testify;

5   correct?

6   A    Yes.

7   Q    You knew well in advance you were going to be here;

8   correct?

9   A    Yes.

10  Q    And you had an opportunity to say, hey, you know

11  what, I can get some things together to make sure my

12  testimony is as complete as possible, didn't you?

13  A    Uhm --

14  Q    Did you have that opportunity, sir?  Yes or no.

15  A    Yes, I had that opportunity.

16  Q    Okay.  And if Ms. Treadway wants to follow up, she

17  can; but you did not bring those records in here with

18  you today, did you?

19  A    Okay.  I happen to have pulled one record of a

20  patient that Dr. Litler (ph) had seen and I have that

21  record in my possession that I brought in here today.

22  Q    Okay.  Who's that patient?

23  A    Stephanie.  I could pull that actual chart, I

24  believe, and get that paper if that's needed.

25  Q    And Stephanie -- what's her last initial?

 1   A    I'll actually have to pull that paper to do that.

 2   Q    And what made you bring that record?

 3   A    Well, I looked at an e-mail that I had gotten from

 4   Dr. Litler concerning the case.

 5   Q    Okay.  Hold on.  I don't want you to discuss what

 6   Dr. Listler (ph) told you.  But that's what brought your

 7   attention to it.  Who is Dr. Litler, by the way?

 8   A    A fellow emergency medicine physician.

 9   Q    Okay.  And when did he send you this e-mail?

10   A    It was, let's see, probably about five years ago.

11   Q    Okay.  And you never turned that e-mail over to the

12   Government?

13   A    I must say, I don't know one way or the other.

14   Q    Did you ever turn this record over to the Government

15   before you sat here today?

16   A    I must say, I don't know.

17   Q    Now, with these alleged drug seekers that were

18   there, you also mentioned that you asked them why would

19   they not go back to the Schneider Medical Clinic;

20   correct?

21   A    On some of the cases, certainly.

22   Q    And you remember you said because they didn't have

23   cash money?

24   A    Sometimes that was the answer that was given, yes.

25   Q    When you say sometimes, how many instances are we

1633

```
 1    talking about?

 2    A    More times than not.

 3    Q    What does that mean?

 4    A    The majority.

 5    Q    So nine out of ten?  A hundred times?  Fifty times?

 6    A    I would guesstimate --

 7    Q    I'm not asking for a guesstimate.  I want to know a

 8    specific amount right now.

 9    A    Of the 30 plus patients that I see a day, I cannot

10    give you a specific amount of the Schneider population

11    broken down to that number.

12    Q    You understand that a large part of Dr. Schneider's

13    patient population was Medicaid, do you not?

14            MS. TREADWAY:  Asked and answered, Judge.

15            THE COURT:  I don't remember him asking that;

16    but he can answer again.

17    A    I'm not sure of the specific breakdown of the

18    insurance.  The insurance tends to be the rarest thing

19    that as an emergency physician that I ever look at.

20    Q    And that's because you have federal regulations that

21    you have to see any patient that's presented to the

22    emergency room; correct?

23    A    It's because I have to take care of the patient

24    regardless of the insurance status.

25    Q    Are you saying that there's not a federal regulation
```

1    that requires all emergency rooms to see patients

2    regardless of their financial condition?

3    A    Of course there's a federal regulation that states

4    that.

5    Q    And if you didn't do that, then you would be in

6    violation of that federal statute; correct?

7    A    I would be in violation of doing the right thing if

8    I didn't go in and see every patient that presented when

9    I could.

10   Q    And when people go to the ER, they have -- you have

11   a billing department that they can talk to; correct?

12   A    Absolutely.

13   Q    And you send bills to people even after you see them

14   even if they don't have insurance; correct?  Not you

15   personally, but the company, the hospital you work for.

16   Correct?

17            MS. TREADWAY:  Judge, this is way beyond the

18   scope.

19            THE COURT:  Sustained.

20   BY MR. WILLIAMSON:

21   Q    Now, as I understand it, you actually sent an e-mail

22   to -- strike that.

23       I've got a couple more topics I forgot to cover

24   here.

25       You testified about this acute and chronic pain

1635

1    issue.  You remember that?

2    A   Yes.

3    Q   It's true, is it not, that chronic pain patients can

4    also have acute pain?

5    A   Yes.

6    Q   Have you ever sent a patient home and then a few

7    days later they come back to the emergency room again?

8    A   Yes.

9    Q   It happens that sometimes as a physician you may not

10   get it the first time, that it may have to go a couple

11   of times; correct?

12   A   Yes.

13   Q   Now, this e-mail that we talked about, can we put

14   the from, to, date and all that stuff on the screen,

15   Mr. Moore.

16       Now, you sent this e-mail out three days after the

17   raid; correct?

18   A   Yes.

19   Q   And during this -- you said that this encompasses a

20   conversation between you and Dr. Schneider; correct?

21   A   Yes.

22   Q   And this supposedly happened on the very same day.

23   True?

24   A   Yes.

25   Q   And you state that Dr. Schneider was sending

1636

1    patients to the ER.  Is that what you said?

2    A   Yes.

3    Q   Do you have any evidence whatsoever that Dr.

4    Schneider personally told these patients to go to the

5    ER?

6    A   The individual patients told us that.

7    Q   Is it possible that the receptionist at the

8    Schneider Medical Clinic told them to go to the ER?

9    A   It would certainly be possible.

10   Q   Are you aware that after the raid, Dr. Schneider had

11   two or three physicians, providers, to quit the clinic?

12   A   Repeat the question please.

13   Q   Are you aware that a day or so after the clinic was

14   raided that several providers no longer saw patients at

15   the clinic by their own choice?  Were you aware of that?

16   A   I didn't know whose choice.

17   Q   But you knew he lost some providers right after that

18   raid; correct?

19   A   Yes.

20   Q   And he still had patients that needed to be seen?

21   A   Yes.

22   Q   And somebody at the clinic tried to send them

23   somewhere for them to be seen and you told them not

24   here; correct?

25   A   Okay.

1637

1    Q   And you decided -- well, strike that.

2        One thing that's missing from this to line is a

3    reference -- is a name named.  Stephen Schneider.  Do

4    you see that anywhere in that to line?

5    A   Oh, uhm, I don't have Dr. Schneider's e-mail.

6    Q   All I'm asking you is did you send this e-mail to

7    Dr. Schneider?

8    A   No, I did not.

9                    (Off-the-record discussion

10                   between counsel.)

11           THE COURT:  Would you scroll that up a little

12   bit please.  I'm having trouble -- okay.  Thanks.

13   BY MR. WILLIAMSON:

14   Q   Okay.  Did you send a letter to Dr. Schneider

15   recapping this conversation that took place?

16   A   No, I did not.

17   Q   And this was the first time that you decided to send

18   an e-mail regarding Dr. Schneider; correct?

19   A   I believe that there may have been other messages to

20   other doctors, or concerns to other doctors that

21   involved Schneider cases.

22   Q   Do you have a specific recollection of those e-mails

23   as you sit here today?

24   A   No.

25   Q   There were several -- strike that.  You put this

1638

1   blast out to every provider in the ER; correct?

2   A   The physicians, nurse practitioners, physician

3   assistants and key nursing staff.

4   Q   Now, in this conversation that you had with Dr.

5   Schneider you state that he told you that he had not

6   been getting notice of all of these alleged overdoses;

7   correct?

8   A   Yes.

9   Q   And you disagreed with him.  You said, oh, no, no,

10  wait a minute, yes, I have, I've been telling you about

11  it.  Correct?

12  A   Yes.

13  Q   Now -- and then not only did you tell him that, now

14  you tell everybody, hey, I told him that he's been

15  getting notice; correct?

16  A   Yes.

17  Q   And this happened three days after the raid;

18  correct.

19  A   It happened -- if the raid was on the 13th, yes.

20  Q   Really in close proximity; correct?

21  A   Yes.

22  Q   You knew about that raid, didn't you?

23  A   Only what I saw on the news later that day.

24  Q   It was publicized all over on every news channel in

25  Wichita, wasn't it?

1639

1    A   Yes.

2    Q   And you realized that, hey, if some of these

3    patients have been coming in here and we have not been

4    contacting this guy, we may have some liability;

5    correct?

6    A   I don't perceive there's any liability in this case

7    because we contacted him appropriately on these cases to

8    my belief.

9    Q   So if you didn't contact him, then you may be facing

10    some liability as well; correct?

11    A   Essentially, I don't --

12    Q   It's a --

13    A   No, I don't perceive how I could have liability for

14    a case that you described.

15    Q   You don't believe that if you knew that this

16    physician was overprescribing people, they were coming

17    to your ER, you had notice of it, you don't call him and

18    let him know, you don't have an idea that, hey, you know

19    what, maybe we have some civil exposure here.  I'm not

20    talking about criminal.  I'm talking about civil.  Some

21    malpractice exposure.  That didn't even cross your mind?

22    A   As we had been contacting him, as I already had

23    called the state board, I don't think there was any

24    liability.  I did what was appropriate.

25    Q   Okay.  Don't want to answer my question?

1640

1    A    I believe I did answer your question.

2    Q    And this state board thing, they have an actual

3    written complaint that you can file; correct?

4    A    Certainly.

5    Q    And did you file a written complaint?

6    A    I called them and spoke with them on this complaint.

7    Q    Not my question.  Did you file a written complaint?

8    A    I did not --

9         MS. TREADWAY:  It's been asked and answered

10   multiple times, Judge.

11        MR. WILLIAMSON:  I asked about a letter

12   earlier, Judge.  There's an actual complaint form that I

13   did not inquire about.

14        THE COURT:  Well, you can inquire about the

15   complaint form.

16   BY MR. WILLIAMSON:

17   Q    Did you complete, fill out, a written complaint form

18   and submit it to the Kansas Board of Healing Arts?

19   A    No.

20   Q    Okay.  So you don't perceive any liability?  You

21   have this conversation where Dr. Schneider says that he

22   didn't get notice and then you send this all blast

23   e-mail out to all of the physicians and physician's

24   assistants in the ER.  Correct?

25   A    I sent out this e-mail, yes.

1   Q    There were multiple times when patients would

2   present to your ER and you would actually send them back

3   to Dr. Schneider's clinic; correct?

4   A    Have them follow up with their provider, yes.

5             MR. WILLIAMSON:  No further questions.

6             THE COURT:  Mr. Byers?

7             MR. BYERS:  No questions on behalf of Linda

8   Atterbury.

9             THE COURT:  Redirect, please.

10            MS. TREADWAY:  Just briefly, Judge.

11                    **REDIRECT EXAMINATION**

12  BY MS. TREADWAY:

13  Q    Dr. Katan, you didn't have your grand jury testimony

14  in front of you when Mr. Williamson was speaking with

15  you so I'll share that with you.  May I approach, Judge?

16            THE COURT:  Yes, ma'am.

17  BY MS. TREADWAY:

18  Q    Did that grand jury testimony occur on January 3rd,

19  2006?

20  A    Yes.

21  Q    And within that time frame were you asked the

22  question:  We're now in January 3rd, 2006, but in 2005

23  do you know if you had any personal contact with Dr.

24  Schneider about the admission of his patients for

25  overdoses?  And do you see your answer there?

1   A   Yes.

2   Q   And do you answer: "Absolutely.  For at least the

3   last three years there are cases where I have spoken

4   with him on overdoses with patients and patients that we

5   have had admitted to the hospital."?

6   A   Yes.

7   Q   And later in the examination do you say in answer to

8   a similar question: "Well, over the, particularly the

9   last year and a half, I've had multiple conversations

10  with him, and that would be approximately three or four,

11  where we've said to him specifically that we have an

12  overdose case or a case where someone has almost died

13  from an overdose or cases where they have died."?

14  A   Yes.

15  Q   There are also cases where I called him and said --

16          MR. WILLIAMSON:  Your Honor, I'm going to

17  object.  She can't just keep reading his testimony

18  without any question.  And if there was a -- trying to

19  rehab him for telling inconsistent statements that --

20          THE COURT:  Rephrase your questions, please.

21  BY MS. TREADWAY:

22  Q   Were there multiple occasions during your grand jury

23  testimony that you in fact answered that you had spoken

24  with Defendant Stephen Schneider on more than two

25  occasions?

1643

```
1    A    Yes.

2            MS. TREADWAY:  Nothing further on that, Judge.

3    BY MS. TREADWAY:

4    Q    And on each of the occasions that you spoke with

5    him, did the Defendant Stephen Schneider go, that's not

6    one of my patients?

7    A    No.

8    Q    Did he ever deny that the people you were speaking

9    to him about was a Schneider Medical Clinic patient?

10   A    No.

11   Q    Although you don't meet and know individually all of

12   the 800 physicians whose patients you treat in the ER,

13   again, have you come to understand how they practice

14   medicine by the patients that you treat?

15           MR. WILLIAMSON:  Your Honor, I'm going to

16   object.  You have sustained that objection during direct

17   and she is trying to go back and get it back in again.

18           MS. TREADWAY:  I don't believe you did, Judge.

19           THE COURT:  Are we getting into reputation

20   again or what?

21           MS. TREADWAY:  No.  I'm getting into the fact

22   that Mr. Williamson inquired that he didn't know X, Y

23   and Z and therefore couldn't have an opinion as to the

24   Defendant's reaction.

25           THE COURT:  These are legitimate redirect
```

1    questions.

2    A    Could you reask it please.

3    BY MS. TREADWAY:

4    Q    You bet.  That was a very convoluted question.  Very

5    bad question.

6         You testified earlier that in dealing with patients

7    in the ER you get to know the practice patterns of many

8    physicians in the community?

9    A    Yes.

10   Q    Do you know every single physician in the community?

11   A    No.

12   Q    Have you met every single physician in the

13   community?

14   A    No.

15   Q    Yet based on your treatment of all of these patients

16   and your ability to compare practice patterns, were you

17   able to compare the Defendant Stephen Schneider's

18   reaction when you called him and told him we have an

19   overdose here, we have an overdose death here, to the

20   other physicians you would tell the same thing to?

21   A    Yes.

22   Q    And was his reaction completely different?

23   A    His reaction was very different.  Not too long ago I

24   talked to a physician about a death and --

25              MR. WILLIAMSON:  Your Honor, I'm sorry for

1    interrupting, but I'm going to object.  What another

2    physician said or did to him is totally hearsay.

3              THE COURT:  The answer is -- you're to

4    disregard what he is about to say about some

5    conversation with another physician.  You can consider

6    the remainder of his answer.

7    BY MS. TREADWAY:

8    Q    And by comparison, how did the Defendant Schneider

9    compare to this recent conversation?

10   A    It very much was not the same response that I had

11   from this other physician, which was --

12             MR. WILLIAMSON:  Your Honor, I'm going to

13   object.  He is about to try to do it again.

14             MS. TREADWAY:  You don't need to go there.

15   All right.

16   BY MS. TREADWAY:

17   Q    Let me represent to you, Dr. Katan, that you have

18   been disclosed as an expert in this case since June of

19   2008, which is almost two years ago.

20   A    Yes.

21   Q    In that almost two years, has anybody from the

22   defense team called to talk to you?

23   A    No one from the defense team has ever called and

24   talked to me to my knowledge.

25   Q    And did anybody from the defense team ever ask for

1646

1   you to develop the information that you offered to

2   develop today?

3   A   No one from the defense team ever did do that.

4   Q   Now, Mr. Williamson asked you about liability.  Do

5   you have an opinion, Dr. Katan, as to who, between you

6   and Dr. Stephen Schneider, was liable for the

7   individuals who ended up at your emergency room

8   suffering from overdoses or who had died as a result of

9   the overdose from prescription medication that the

10  Schneider Medical Clinic had prescribed?

11  A   Yes.

12  Q   What is that opinion, sir?

13  A   My opinion is that excessive medicines were given to

14  patients who had known abuse and addiction problems and

15  repeated documentation of that and that he is criminally

16  liable for that and civilly liable for that is my

17  opinion.

18          MS. TREADWAY:  Nothing further.

19          MR. WILLIAMSON:  Very brief, Your Honor.

20                **RECROSS EXAMINATION**

21  BY MR. WILLIAMSON:

22  Q   You did not review any prescriptions specifically

23  that Dr. Schneider hand wrote for any specific patient;

24  correct?

25  A   On the faxed prescriptions for me that he sent

1647

1   around the date of this e-mail, those were prescriptions

2   from Dr. Schneider.  My recollection is that they had

3   Dr. Schneider's signature on them.

4   Q   And for those patients on those prescriptions, do

5   you know what their medical condition was?

6   A   No.

7   Q   Do you know how long -- do you know what kind of

8   pain each person had been suffering from?

9   A   No.

10  Q   Do you know how long each person had been suffering

11  from some kind of pain issue?

12  A   No.

13  Q   Do you know how long they had been taking that

14  prescription?

15  A   No.

16  Q   Do you know what level of tolerance they had

17  developed to that prescription?

18  A   No.

19              MR. WILLIAMSON:  Nothing further.

20              THE COURT:  Mr. Byers.

21              MR. BYERS:  Nothing, Your Honor.  Thank you.

22              THE COURT:  Thank you Doctor, you're excused.

23  Next witness please.

24  A   Thank you.

25              MS. TREADWAY:  Yes, Judge.  The Government

1    would call Larry G and may we approach just for a

2    scheduling issue, Judge.

3              THE COURT:  Yes, ma'am.

4                        (Thereupon, the following

5                         proceedings were had at the

6                         bench by Court and Counsel

7                         outside the hearing of the

8                         jury.)

9              MS. TREADWAY:  Judge, I just wanted to inform

10   you that this next witness is very ill.  He only has

11   about 25, 30% of his heart.  He's extremely nervous.  I

12   would very much appreciate if we could get through cross

13   before lunch so he does not have to wait any longer.  I

14   have a very, very short exam of him.  So if you would

15   please make sure that the cross occurs before lunch

16   break, I would very much appreciate it, as would the

17   witness.

18             THE COURT:  Well, it's all going to depend on

19   what you ask him and what he answers.  I don't think

20   anybody wants Larry G to die here in the courtroom.

21             MR. WILLIAMSON:  I certainly do not, Your

22   Honor.

23             THE COURT:  I bet you don't.  We'll do the

24   best we can.

25             MS. TREADWAY:  All right.  I appreciate it,

1    Judge.

2              MR. BYERS:  Your Honor, one other thing while

3    we're up here at side-bar.  We would appreciate the

4    chance to do a very limited voir dire on Clowers when

5    she comes up.  Going directly to the disclosures by the

6    Government which some of the expert opinions she is not

7    qualified for and we would like to do that without the

8    jury.

9              THE COURT:  Who is that?

10             MR. BYERS:  She is a pharmacist.

11             THE COURT:  When is she coming?

12             MS. TREADWAY:  She'll be after Larry, after

13   lunch.

14             THE COURT:  Do you object to that?

15             MS. TREADWAY:  Well, Judge, I think I'll be

16   able to lay the sufficient foundation for the statements

17   she'll make.

18             THE COURT:  Well, I'd rather we didn't -- I

19   think it would be confusing to start out but we can

20   follow the standard procedure and that is she can ask

21   her the questions and when she starts getting ready to

22   ask for her opinion, if you want to object and ask to

23   voir dire her with respect to her qualifications, I'll

24   let you.  But I'm not going to let you start out.  I

25   think that would be very confusing.

1        MR. BYERS:  Okay.

2        THE COURT:  Okay.

3                    (Thereupon, the following

4                    proceedings continued in the

5                    hearing of the jury.)

6                         **LARRY G**

7    Having been first duly sworn to tell the truth, the

8    whole truth and nothing but the truth, testified as

9    follows on:

10                    **DIRECT EXAMINATION**

11   BY MS. TREADWAY:

12   Q   Could you please introduce yourself to the jury with

13   your first name please.

14   A   My name is Larry.

15   Q   You're really nervous, aren't you?

16   A   Yeah.  Really nervous.

17   Q   All right.  Well, we'll try to keep you up here as

18   little as possible?

19   A   I've never been through nothing like this.

20   Q   Are you currently working, sir?

21   A   No, I'm not.

22   Q   How long have you not been working?

23   A   Since 2003.

24   Q   Is that because you are medically disabled?

25   A   Yes, ma'am.

1651

```
 1    Q    Do you mind sharing with the jury the nature of your
 2    disability?
 3    A    Had chronic heart failure and triple heart bypass.
 4    Q    Prior to your being disabled, you were quite a hard
 5    worker, weren't you?
 6    A    Yeah, I worked a lot of hours.
 7    Q    What did you do, sir?
 8    A    I worked -- the last I worked I was overhead cranes
 9    for Boeing picking airplanes up, movin' 'em around,
10    loading road cars and stuff like that.
11    Q    How long have you worked in your life?
12    A    The hours I actually worked or hours I worked at
13    work.
14    Q    How long have you been working, in other words,
15    since what age?
16    A    16, 17.
17    Q    Sir, were you married to a woman by the name of
18    Patricia?
19    A    Yes.
20    Q    And did you call her Patty?
21    A    Called her Patty.
22    Q    When were you married?
23    A    Wanna say it was right around June of 2003, May or
24    June.
25    Q    Was this a first marriage for either of you?
```

1652

1    A    No.

2    Q    And how long were you married to Patty?

3    A    About three years.

4    Q    Although you hadn't been married long, had you known

5    Patty a long time?

6    A    Yeah, I knew her for years.  I knew her brothers.

7    We all kind of grew up around each other.

8    Q    Once you and Patty got married, were you and Patty

9    planning to spend your retirement years together?

10   A    Yes, we were.

11   Q    Did her death interrupt those plans, sir?

12   A    Pardon.

13   Q    Did her death interrupt those plans?

14   A    Oh, yes, it did.  Totally.

15   Q    Did she die at the age of 49?

16   A    48, 49, I think.

17   Q    And what do you understand was the cause of her

18   death?

19   A    It was a mixture of different kinds of pills that

20   were mixed together that caused a poison in her system

21   is what I was told.

22   Q    Did Patty have children?

23   A    Yes, they did.

24   Q    How many?

25   A    Two.

1653

1   Q   Did she have grandchildren?

2   A   Yes.

3   Q   How many?

4   A   Five.

5   Q   Did you have a good marriage?

6   A   It was all right.

7   Q   Patty have her own opinions?

8   A   As long as I did what she said, everything was fine.

9   Q   Was she a good mother and grandmother, sir?

10  A   She was a good mother.

11  Q   According to the evidence in this case, sir, your

12  wife began going to the Schneider Medical Clinic in

13  February of 2003.  So that would have been just before

14  you got married?

15  A   Right.

16  Q   Did she choose Schneider Medical Clinic on the

17  recommendation of a family member?

18  A   Yes.

19  Q   And who was that family member?  Just using her

20  first name.

21  A   Patricia.

22  Q   Another Patricia?

23  A   Yes.

24  Q   Let me hand you what has been admitted into evidence

25  as Exhibit 1-A, specifically Page 9.  Is Patricia C at

1    the top of that page the relative that recommended that

2    Patty go to Schneider Medical Clinic?

3    A    Yes, she is.

4    Q    Do you know how Patricia C died?

5    A    Supposed to have been an overdose.  I don't really

6    know what the details were.  It was just -- that's what

7    I was told.

8    Q    Did you ever accompany Patty when she went to the

9    Schneider Medical Clinic?

10   A    I really didn't get a chance to go with her until

11   the last three or four months that she was alive.  We

12   went two or three times.  Most of the time she went by

13   herself because I was working.

14   Q    When you would go to the Schneider Medical Clinic,

15   would you walk into the waiting room with Patty?

16   A    I went in there one time and -- you mean in the

17   front part.

18   Q    In the lobby?

19   A    Yeah, I went in there a couple times.

20   Q    Did you stay in the waiting room there in the lobby?

21   A    I did one time.

22   Q    Why didn't you stay the rest of the times?

23   A    Because I just didn't wanna wait.  I was tired of

24   sittin' on the ledge or -- wouldn't have chairs, you

25   know.

1655

1    Q   Was there anything you observed in the lobby or

2    about the Schneider Medical Clinic that concerned you?

3    A   Well, I don't know about really concerned me.  I --

4    just a lot of -- a lot of different kinds of people

5    there.

6    Q   Were you concerned about Patty going to Schneider

7    Medical Clinic?

8    A   Not really, not up until the last five, six months

9    when things started turnin' around and she didn't,

10   didn't act like, you know, things were going right for

11   her.

12   Q   So in those last few months of her life you noticed

13   a difference in Patty?

14   A   Oh, yeah.

15   Q   And I'm assuming that it wasn't a good difference?

16   A   No, it wasn't.

17   Q   Could you tell the jury a few of the things that you

18   noticed about Patty in those last few months, sir?

19   A   Well, she just, she just didn't seem to do the

20   things she used to do.  She seemed to sleep a lot more

21   than she used to.  Didn't -- I mean, we used to go to

22   movies quite a bit and go do things and shoppin' and

23   she, a lot of times she would kind of hesitate on

24   wantin' to do that.  But we would do it every once in a

25   while.  Things just slowed down.

1656

```
 1    Q    Prior to your wife Patricia's death, did you ever
 2    have to take her to the hospital?
 3    A    Yes.
 4    Q    The evidence in the case has been that Patty was in
 5    the emergency room March 19th, 2005, and June 16th,
 6    2005.  Do you remember both of those emergency trips?
 7    A    Yes, ma'am.
 8    Q    Let's talk about the first one in March of 2005.
 9    Tell us about how Patty ended up in the emergency room
10    that time?
11    A    Well, I went upstairs and she was just totally out
12    of it.  I mean, just, you know, she was groggy and she
13    wouldn't wake up.  Scared me.  So I called an ambulance.
14    Q    And was she admitted to the hospital?
15    A    Yes, she was.
16    Q    And what was wrong with Patty?
17    A    They said she had overdosed.
18    Q    On that hospital admission, did the Defendant
19    Stephen Schneider ever come visit her?
20    A    I never saw him.
21    Q    Now, the second time in June of '05, tell us how
22    Patty ended up in the hospital that time?
23    A    Okay.  She was shakin' real bad and she was kind of
24    slurrin' her words, but she was awake and she kept
25    tellin' me it was her diabetes.  And I have diabetes so
```

1    I know what it can do to you if you get too large.   And

2    so basically I believed her.   So I took her to the

3    hospital and had her admitted.   And they kept an eye on

4    her sugar and her blood for the night.   And they let her

5    out the next day.   And I tried to talk to the hospital

6    to ask 'em, you know, if that was what was really wrong

7    with her.   I couldn't get an answer.   And I tried to

8    call the doctor and couldn't get an answer out of him

9    either so --

10   Q   Now, after Patty started going to the Schneider

11   Medical Clinic, did you observe that she took a lot of

12   pills?

13   A    No, I never really -- I never really observed what

14   she actually took because, you know, she would do that

15   when I wasn't around.

16   Q   But did you observe that she had a lot of pills?

17   A    She had, she had quite a bit of medicine.   I didn't

18   really know what everything was for, but she had quite a

19   bit.

20   Q   And during that last four months of Patty's life,

21   you've already said that she was groggy and she had

22   slurred speech and she took naps.   Did she ever act

23   mixed up or incoherent?

24   A    Yeah, couple times.   That was one of the reasons why

25   I called an ambulance that one day because that's the

1658

1  way she was on the couch.

2  Q   Were there times when she couldn't remember if she

3  had taken her medications or not?

4  A   She never did really say.  I mean, you know, most of

5  the time I'd see her she'd be coherent and be cookin'

6  supper, or we would be doing something or going

7  somewhere or something.

8  Q   Now, looking back with hindsight, sir, now that

9  you've had a little time with this, do you know -- do

10  you now understand what was going on with Patty, your

11  wife?

12  A   Yes, I do.

13  Q   What was going on with Patty?

14  A   She was just taking too much medicine.

15  Q   And at the time did you suspect something like that

16  was going on?

17  A   I did the first time when they said she had

18  overdosed.  I mean, she, after that, she was fine for a

19  couple weeks and then, you know, she acted fine and

20  everything so I kind of blew that off until the second

21  time and then that one worried me.  But it was really

22  hard for me to swallow was her diabetes and I was trying

23  to find out to make sure but I just couldn't get it

24  done.

25  Q   Did you have an instinct to take Patty away at that

1659

```
1    point in time?

2    A    Right, yes.

3    Q    Where did you want to take her?

4    A    I just wanted to take her away from Wichita, you

5    know, take her to her daughter's in Arizona, or mom and

6    dad in Missouri, and regulate more of what she was doing

7    with her medicine.  Seeing if that didn't straighten

8    things out.

9    Q    Now, the evidence has been that Patty died on June

10   20th, 2005.  Do you remember that day, sir?

11   A    Yes.

12   Q    Can you tell the jury about that?

13   A    I'm sorry --

14   Q    It's okay.  Do your best.

15   A    Anyway -- she -- her brother run downstairs and told

16   me that Patty wasn't breathin'.  I was sleepin' on the

17   couch.  Because it was so hot that night.  And I went up

18   there.

19   Q    And did you have to call the ambulance?

20   A    Yes.  I tried to save her.  I couldn't do it.

21   Q    Since Patty's death, sir, have you been able to move

22   on with your life?

23   A    No.

24   Q    Are you here today in part to seek that closure so

25   that you can move on?
```

1    A    Yeah.  I need closure.

2    Q    Did the Defendant attend Patty's funeral?

3    A    No.

4    Q    Did you ever receive a sympathy card from the

5    Defendant?

6    A    I can't really answer that.

7              MS. TREADWAY:  Nothing further, Judge.

8              THE COURT:  Yes, sir.

9              MR. WILLIAMSON:  Thank you, Your Honor.

10                   **CROSS EXAMINATION**

11   BY MR. WILLIAMSON:

12   Q    Hi, Mr. G.  We never had a chance to meet before,

13   have we?

14   A    No.

15   Q    I'm going to ask you a few questions.  It shouldn't

16   take too long.

17   A    Okay.

18   Q    I think most people here can share your sympathy.

19   Most of us have lost a loved one.  So if I ask you any

20   questions, if you feel like they're too difficult and

21   you need a break, just let me know.  Okay?

22   A    Okay.

23   Q    But it shouldn't take too long.

24        When you met Patty, I think you have described it

25   as she was a woman full of pain.  Would you agree with

1    that?

2    A    She had some pain.  She wasn't full of pain.  She

3    didn't start gettin' a lot of pain until about a year,

4    year and a half after I met her.

5    Q    Okay.  So when you first met her, she was dealing

6    with some pain and then it continuously got worse?

7    A    Right.

8    Q    And when she started receiving pain medicines, you

9    knew that she was truly hurting from some things?

10   A    Right.

11   Q    And you knew that part of her pain -- well, strike

12   that.

13        After that year, year and a half, I believe you

14   told previously when you were asked questions that you

15   described her as a woman full of pain, she had just

16   gotten really bad.  Is that true?

17   A    Well, she had, she got in a car accident and that

18   seemed to kind of chronic everything up.

19   Q    Okay.  And I think you described her she had knee

20   pains?

21   A    Right.  She had hurt her knee.  She had wore out

22   knees.  She had hurt her knee in the wreck.

23   Q    I think you stated that she would describe it as

24   bone rubbing on feeling?

25   A    Right.

1    Q    She had back pain?

2    A    Yeah, she had -- it was all from the wreck.

3    Q    She had migraines real bad?

4    A    She didn't have too many of those but she did-- but

5    when she did have 'em, they were bad.

6    Q    Would those be those severe kind of migraines that

7    would -- she would have to turn out the lights and not

8    be disturbed?

9    A    Yeah, she had those.  In the three years we was

10   together, she had those a couple times.

11   Q    Okay.  And what about I think you also mentioned she

12   had some issues with her stomach?

13   A    Yeah.  She'd had a lot of operations.

14   Q    Okay.  And --

15   A    I don't know exactly what but --

16   Q    And you only attended the meetings or patient visits

17   with -- that she had with Dr. Schneider maybe two or

18   three occasions?

19   A    Right.

20   Q    And you would do that -- and when you did that, you

21   would stay in the waiting room when she went to the

22   back?

23   A    I went to the back one time with her.

24   Q    Okay.  And I think you described Patty as a private

25   person who keeps things to herself.  Is that true?

1663

1    A    She does.  She definitely does.

2    Q    Okay.  Were you aware that Dr. Schneider did not

3    start treating her with pain medicines like on her first

4    visit with the clinic at all?

5    A    Do what, sir?

6    Q    Did you ever learn that Dr. Schneider did not

7    prescribe her, like, pain medicines like on the first

8    several visits?

9    A    I did not know that.

10   Q    You mentioned a couple of hospital visits.  Remember

11   that?

12   A    Yeah.

13   Q    You mind if we visit about that briefly?

14   A    Okay.

15   Q    You stated that one time was in March, 2005?

16   A    Right.

17   Q    And you never saw Dr. Schneider come to that visit?

18   A    I never saw him, no.

19   Q    Okay.  You don't know whether or not anybody called

20   him and told him that Patty was actually in the

21   hospital?  True?

22   A    I have no idea.

23   Q    Okay.  And the second hospital visit -- and this

24   isn't your fault.  I think it was just the way the

25   question was asked.  Then -- you stated that you tried

1664

1    to get answers about the diabetes.  Remember that?

2    A   Right.

3    Q   That was with the ER attending physician, wasn't it?

4    A   It was actually with the nurse that was out in

5    the -- at the nurse's station.

6    Q   Okay.  And you were telling them I want to know

7    what's wrong with my wife?

8    A   Right.

9    Q   And the nurse wouldn't tell you?

10   A   She wouldn't tell me.

11   Q   You couldn't get the doctor, the attending

12   physician, was it which Mancao or --

13   A   Dr. Mancao.

14   Q   You couldn't get him to tell you?

15   A   I called his office the next day before he let her

16   go.

17   Q   And he didn't tell you anything either?

18   A   No, he wouldn't answer.  He wouldn't call me back.

19   Q   And you were asked this by Ms. Treadway that since

20   Patty has left us you've learned that you believe that

21   she was taking too much medicine?

22   A   Yeah, I think she was taking way too much.

23   Q   Okay.  Did you learn that she was taking medicine

24   that hadn't been prescribed by Dr. Schneider?

25   A   I didn't know that until after everything was over

 1    with.

 2    Q    Okay.  Was she like going to different physicians

 3    and not telling you where she was going?

 4    A    I can't answer that.

 5    Q    We just don't know where they came from?

 6    A    She had knee doctors, she had back doctors, she

 7    had -- there was doctors everywhere.

 8    Q    Okay.  And after she passed away, you started

 9    finding pills hidden in places that you didn't know

10    where they were?

11    A    Right.

12    Q    Correct?

13    A    Right.

14             MR. WILLIAMSON:  I don't think I have anything

15    else, Your Honor.

16             THE COURT:  Mr. Byers?

17             MR. BYERS:  Nothing, Your Honor.  Thank you.

18             THE COURT:  Redirect?

19             MS. TREADWAY:  Nothing, Judge.  Thank you.

20             THE COURT:  Thank you, sir.  You're excused.

21    We'll take our noon recess, Ladies and Gentlemen, until

22    1:00.  Please remember and heed the admonition.

23                   (Noon recess.)

24

25