```
 1                      (Beginning at 1:25 p.m. May 10,

 2                      2010, the following proceedings

 3                      continued.)

 4            THE COURT:  Mr. Williamson.

 5                    CROSS EXAMINATION:

 6  BY MR. WILLIAMSON:

 7  Q   Mr. Owens, I'm going to start --

 8            THE COURT:  I believe he's a doctor, isn't he?

 9            MR. WILLIAMSON:  What did I say, Your Honor?

10            THE COURT:  You said Mister.

11  BY MR. WILLIAMSON:

12  Q   Dr. Owens.  I apologize.  We're going to start where

13  the Government left off.  Your conclusion.  You were

14  asked whether or not you believe that -- whether or not

15  Dr. Schneider was all these -- these patterns that you

16  saw, if it was a legitimate medical practice outside the

17  usual scope of a clinical practice.  You remember that?

18  A   Yes, sir.

19  Q   Okay.  And your opinion was yes; correct?

20  A   Yes.

21  Q   Okay.  You have been retained by civil plaintiffs'

22  lawyers as their expert; correct?

23  A   Yes.

24  Q   In how many different cases?

25  A   I don't remember exactly.
```

1944

```
 1    Q    And you get paid by that plaintiff lawyer for each

 2    time you render an opinion; correct?

 3    A    Yes.

 4    Q    And you gave numerous depositions; correct?

 5    A    Four or five, something like that.

 6    Q    And you gave -- you said -- I think you testified

 7    that there were 11 civil cases that you gave reports in;

 8    correct?

 9    A    No.  I read documents on 11.

10    Q    Okay.  Read documents on 11.  How much have you been

11    paid by those plaintiffs' lawyers?

12    A    I don't know.

13    Q    Give me a rough estimate?

14    A    Somewhere around 30 or 40,000 all over.

15    Q    And, again, you authored numerous reports; correct?

16    A    Yes.

17    Q    And it's true that in no report have you ever opined

18    that you believe that Dr. Schneider was acting as a

19    drug-dealer, did you?

20    A    Correct.

21    Q    You never in any deposition opined that Dr.

22    Schneider was acting as a drug-dealer; correct?

23    A    Correct.

24    Q    Now that you're being paid by the Government, the

25    first time that we hear this opinion from you is sitting
```

1945

```
 1    here in this courtroom; correct?
 2    A    Yes.
 3    Q    And you had the opportunity, if you wanted to, in
 4    those prior reports, you could have opined whether or
 5    not Dr. Schneider was acting as a criminal; correct?
 6    A    I suppose so, yes.
 7    Q    I mean, you were given an open door, you would
 8    say -- look at these records and give us your opinion as
 9    a doctor as to what was going on in the clinic; correct?
10    A    Yes.
11    Q    And you neglected each and every time to mention
12    anything about legitimate medical practice and outside
13    the usual course.  You never used that language, did
14    you?
15    A    No, I did not.
16    Q    You found that Dr. Schneider was acting negligent;
17    correct?
18    A    Yes.
19    Q    You found he was acting grossly negligent; correct?
20    A    Yes.
21    Q    And you also found that there were a lot of mistakes
22    made in the clinic; correct?
23    A    Yes.
24    Q    Now, nowhere in your opinions have you ever
25    identified one single patient that you found that Dr.
```

1946

1    Schneider prescribed medicine to when they did not

2    present with a complaint of some pain issue; correct?

3    A   I don't understand the question.

4    Q   I can rephrase.  You have never -- well, strike

5    that.

6        You testified about these patterns a few minutes

7    ago; correct?

8    A   Yes.

9    Q   And one thing that was omitted from your patterns

10   was a statement that you found Dr. Schneider prescribing

11   medicine to somebody that did not present with the pain

12   condition.  You didn't say that, did you?

13   A   The last part of the sentence, I'm questioning, I'm

14   losing you.

15   Q   Okay.  It's no problem.  In your pattern, you never

16   found an instance where Dr. Schneider prescribed

17   medicine for a person that did not present with a pain

18   issue; correct?

19   A   I agree with that, yes.

20   Q   You never found a situation where Dr. Schneider met

21   with somebody outside the clinic and handed them a

22   prescription in exchange for money, did you?

23   A   No.

24   Q   You never found a situation where Dr. Schneider met

25   with somebody outside the clinic or in the clinic and

1    exchanged a prescription for sex, did you?

2    A    No.

3    Q    You never found a situation either in the clinic or

4    out of the clinic where a patient tells Dr. Schneider, I

5    need some meds to sell, and Dr. Schneider writes them a

6    prescription; did you?

7    A    No.

8    Q    Now, you understand we're not here on the medical

9    malpractice case?  You understand that?

10   A    Yes.

11   Q    You understand this man is fighting for his life

12   here?  Do you understand that?

13   A    Yes.

14   Q    And do you understand that there is a distinction

15   between medical malpractice and being a criminal?

16   A    Yes.

17   Q    And do you understand that you as a physician, you

18   can say, look, somebody was below the standards, they

19   were really bad, and they not be a criminal; correct?

20   A    Yes.

21   Q    Now, Doctor, being an expert in these civil cases

22   has opened up new doors for you, haven't they?

23   A    Yes.

24   Q    Now you advertise to be an expert in these kind of

25   cases; correct?

1948

1    A    Yes.

2    Q    And now you advertise based on all the reviews

3    you've done just based on Dr. Schneider.   True?

4    A    I don't understand the question.

5    Q    Your experience with these cases, the cases

6    involving Dr. Schneider, they have opened up the doors

7    for you to start -- to consider yourself an expert in

8    this area; correct?

9    A    Yes.

10   Q    Before then you weren't advertising as an expert

11   witness, were you?

12   A    No.

13   Q    Before then you had never reviewed multiple files

14   and tried to determine whether or not there were

15   patterns of negligence; correct?

16   A    Before what?

17   Q    Before you started reviewing cases involving Dr.

18   Schneider?

19   A    I had done a couple of malpractice cases before.

20   Q    Okay.  Now, you also testified that nothing got

21   better.  Do you remember that?

22   A    Yes.

23   Q    It's true that you just gave a recent deposition,

24   didn't you?

25   A    Yes.

1949

1    Q   And in that deposition you testified that you were

2    starting to be able to understand some of the medical

3    records that -- the later medical records; correct?

4    A   I testified to improvements between the last records

5    and most recent were that they were more legible but the

6    PADT instrument was still unreliable and did not show

7    any therapeutic improvement.

8    Q   Okay.  All I'm asking you, you said that nothing got

9    better in the clinic.  Do you remember that testimony?

10   That all these things happened, these deaths happened,

11   people overdosed and nothing got better.  Do you

12   remember that testimony?

13   A   Yes, sir, I was referring to the quality of the

14   clinical care, yes, sir.

15   Q   Okay.  And let's talk about that.  The medical

16   records got better.  You started to be able to

17   understand them more; correct?

18   A   I've only read one file and that was on Ms. S.

19   Q   Are you aware of whether or not the clinic began --

20   strike that.

21       You understand that the clinic had issues regarding

22   documentation.  Would you agree with that?

23   A   Yes.

24   Q   Would you agree that the clinic had issues with

25   records getting from the site down to billing then back

1950

1    into the chart.  You agree with that?  You learned that?

2    A    Yes.

3    Q    Okay.  And you understand that the clinic had an

4    option they could either keep things the same or try to

5    remedy that issue so they could make sure they have the

6    up-to-date charts when they see patients.  You agree

7    with that; correct?

8    A    Yes.

9    Q    And are you aware as to -- well, do you know that

10   the clinic began moving from electronic records to --

11   excuse me -- from paper records to electronic charts?

12   A    No.

13   Q    You didn't know that?

14   A    No.

15   Q    Are you aware that they started utilizing a pain

16   contract?  Something they did not do when they first

17   started seeing pain patients.

18   A    They had pain contracts in the records I had seen.

19   Q    Do you know when they started using those?

20   A    I believe had a contract in '03 or '04.

21   Q    Do you know when they started using those?

22   A    No.

23   Q    And you don't know whether or not they started

24   implementing -- strike that.

25        Do you know how often they changed that pain

1951

1    management contract?

2    A    No.

3    Q    Now, you also mentioned the fact that -- well,

4    excuse me.  Let me go back to that.  You testified that

5    no steps were taken by the clinic when they would learn

6    that somebody was -- could possibly be addicted.  Do you

7    remember that?

8    A    Yes.

9    Q    Now, one of your examples was Lacey F.  Correct?

10   A    Yes.

11   Q    Are you aware that Lacey F was discontinued from

12   being allowed to receive meds on 9-30 of '05?

13   A    I don't remember the exact detail.  I have to --

14   Q    But you remember that the clinic said, hey, you

15   cannot receive any more pain meds from us?

16   A    I'd have to read the -- I haven't read the file in a

17   while so I'd have to reread that.

18              MR. WILLIAMSON:  Can we have Exhibit 6-L.

19   Just a paper copy.

20              MS. TREADWAY:  It's admitted.

21              MR. WILLIAMSON:  Where is it?  Sean changed --

22   not changed it, but organized the exhibits.

23              MS. TREADWAY:  It's in the notebook marked 6-J

24   through 6-N.

25              MR. WILLIAMSON:  Thank you.

```
 1    BY MR. WILLIAMSON:

 2    Q    I'm going to hand you Government Exhibit 6-L.  I'm

 3    going to take it out of this binder just for the ease.

 4    I'm going to have you turn to 9-30 of '05.  There are a

 5    couple of pages behind that.  Do you see that record?

 6    A    Yes.

 7    Q    And can you just flip a couple of pages behind that?

 8    One more, please.  Do you see that?

 9    A    Yes.

10    Q    Okay.  Does that refresh your recollection?

11    A    I honestly don't remember that page; but I see it,

12    yes.

13    Q    And you understand that this is a Government

14    exhibit?

15    A    Yes.

16    Q    Okay.  Now, one thing I want to just make sure we

17    all understand.  Your review was based on the records

18    that the Schneider Clinic actually kept; correct?

19    A    Yes.

20    Q    So when there was an incident of something that you

21    would consider addictive behavior, that would have been

22    found -- they kept records of that; correct?

23    A    I don't understand the question.

24              THE COURT:  You asked him three questions.

25              MR. WILLIAMSON:  I understand that, Your
```

1    Honor.

2    BY MR. WILLIAMSON:

3    Q    When you found -- strike that.

4         You found information in the Schneider Clinic's

5    records that identified certain behaviors about

6    patients; correct?

7    A    Yes.

8    Q    You didn't find that these papers were destroyed or

9    hidden anywhere and you had to go do some kind of

10   forensic reconstruction; correct?

11   A    Correct.

12   Q    Now, you testified about -- gave your opinion about

13   the number of deaths and things like that.  You remember

14   that testimony?

15   A    Yes.

16   Q    Now, when -- how many patients did Schneider Medical

17   Clinic see between 2002 and 2006?

18   A    I don't know.

19   Q    How many Medicaid patients did they see between 2000

20   and 2006?

21   A    I don't know.

22   Q    You don't see Medicaid patients as a primary care

23   physician, do you?

24   A    No.

25   Q    You refuse to see Medicaid patients; correct?

1954

1    A    Yes.

2    Q    And one of the reasons why you refuse to see

3    Medicaid patients is because it's difficult to get them

4    additional help in certain communities; correct?

5    A    Yes.

6    Q    And a lot of people don't see -- don't accept

7    Medicaid.  You agree with that?

8    A    Yes.

9    Q    And it's difficult as a primary care physician to

10   care for people when they actually have difficulty

11   referring a certain patient population to get additional

12   referrals.  You agree with that?

13   A    Can you rephrase that.

14   Q    I sure can.  It's difficult for a primary care

15   physician to get additional help for Medicaid parents;

16   correct?

17   A    It can be, yes.

18   Q    And you're not an expert in family practice

19   medicine, are you?

20   A    No.

21   Q    You've never had a family practice clinic?

22   A    No.

23   Q    You have narrowed your focus in on pain management

24   specifically; correct?

25   A    Yes.

1955

1    Q    And you would agree that being a -- focusing your

2    practice in on that area has allowed you to have insight

3    that maybe a family practitioner doesn't have; correct?

4    A    Yes.

5    Q    Otherwise why would you need to -- I mean, it gives

6    you a specialty; correct?

7    A    Yes.

8    Q    Okay.  And you understand that family practice

9    individuals normally have to treat multiple symptoms of

10   multiple people; correct?

11   A    Yes.

12   Q    And are you aware that Dr. Schneider saw a vast -- a

13   large number of individuals that did not receive any

14   chronic pain medication at all.  Did you know that?

15   A    No.

16   Q    Did you know that over half of his practice was

17   dedicated to just family practice?

18   A    No.

19   Q    Now, when you made the decision not to accept

20   Medicaid, you were at a crossroads.  You could have --

21   strike that.

22       At first you did see Medicaid people; correct?

23   A    Yes.

24   Q    And you saw them because you had a contract and

25   agreement that you wouldn't limit your services;

1    correct?

2    A    I had a resources form; yes.

3    Q    And once that contract was up, you had a choice to

4    make.  You could say, well, I will see these Medicaid

5    patients knowing that I can't give them all the care

6    that I think they need, or I just won't see them at all;

7    correct?

8    A    That's partially true, yes.

9    Q    Now, do you know all the co-issues that the

10   individuals that were seen by the Schneider Medical

11   Clinic, do you know like all the other medical issues

12   that they had?  Let me rephrase that better.

13        Are you aware that many of the patients that went

14   to the Schneider Medical Clinic had numerous other

15   diagnoses besides chronic pain?

16   A    I'm sure they did, yes.

17   Q    And you're not representing to the jury that Dr.

18   Schneider would not diagnosis anything but chronic pain

19   just to give pain meds, are you?

20   A    No.

21   Q    Okay.  Now, you also mentioned about a meeting that

22   you had.  You remember that?

23   A    Yes.

24   Q    And you stated that this meeting took place in 2004?

25   A    Yes.

1957

1   Q   And you also stated that one of the reasons that

2   this -- you remember this meeting is because the pain --

3   the pharmaceutical representative identified Dr.

4   Schneider as utilizing a lot of short-acting

5   medications; correct?

6   A   Yes.

7   Q   Now, you and Dr. Schneider had a conversation as you

8   testified about, and isn't it true that Dr. Schneider

9   told you he believed in utilizing a short-acting

10  medication in combination with a long-acting?

11  A   He didn't rebut any of my comments.

12  Q   My question was:  Do you recall Dr. Schneider

13  telling you that he preferred to utilize a short-acting

14  medication as well as a long-acting.  Do you recall

15  that?

16  A   No, I don't.

17  Q   And it's true that there are pain specialists out

18  there that believe in utilizing a short-acting pain

19  medication in combination with long-acting; correct?

20  A   Yes.

21  Q   And this pain management area that we're discussing,

22  this is a growing and a continued learned area.  Would

23  you agree with that?

24  A   Yes.

25  Q   And what was in place in 2003, what was considered

1958

1    good practice, may necessarily change between 2010;

2    correct?

3    A    Correct.

4    Q    And there is not one single rule that every pain

5    management specialist must follow when they are seeing

6    these individual patients; correct?

7    A    There are consensus statements and guidelines.

8    Q    But there is not one rule that says every person who

9    engages in pain management must follow this one

10   guideline; correct?  There's not that one, is there?

11   A    No correct.

12   Q    It depends on if you're talking about pain

13   management individuals on the east coast versus the west

14   coast; correct?

15   A    Possibly.

16   Q    From smaller communities and larger communities;

17   correct?

18   A    Generally the literature is available to everybody.

19   Now, the regional differences should be minimal.

20   Q    And the literature that's available, the literature

21   actually contradicts themselves at times, don't they?

22   A    Yes.

23   Q    And you would agree that a family practice person

24   trying to learn this stuff has a lot of different and

25   even competing literature out there at their disposal;

1959

1    correct?

2    A    Not a lot of competing literature.  There's

3    occasional conflicting articles; but the vast majority

4    is pretty unanimous.

5    Q    And there is no unanimous thought on how to utilize

6    short-acting and long-acting prescriptions at the same

7    time, is there?

8    A    I'm not sure I understand the question.

9    Q    There is no consensus in the pain management

10   community on how to utilize short-acting medicine in

11   combination with long-acting medicine; correct?

12   A    There are some guidelines.

13   Q    There's no consensus in the pain management

14   community as to how to utilize short-acting medication

15   with long-acting; correct?

16   A    Well, there is a consensus by the American Pain

17   Society and American Academy of Pain Medicine written by

18   Chou, I think it's the "Journal of Pain" 2009, that

19   discusses that.

20   Q    Okay.  And does that discuss that as a recent trend

21   that we are starting to learn that this is the better --

22   that -- whatever you talk about in that article is the

23   best practice that we have learned about?

24   A    Yes.  And it also points to the conversation I

25   presented on the -- there was some of the talking points

1960

1    on my lecture in 2004.

2    Q    And there are -- and you would agree that there are

3    some pain management practitioners that are considered

4    conservative; correct?

5    A    Yes.

6    Q    And there are some that are considered aggressive;

7    correct?

8    A    Yes.

9    Q    And there is no ban whatsoever in the pain

10   management community on utilizing short-acting pain meds

11   in combination with long-acting; correct?

12   A    There's no ban, yes.

13   Q    And you fall on the conservative side of that token.

14   Would you agree with that?

15   A    I follow evidence-based medicine.

16   Q    And haven't you testified in a deposition before

17   that you would consider yourself more of a conservative

18   prescriber?

19   A    Yes.

20   Q    Okay.  So, again, you consider yourself more of a

21   conservative pain management practitioner; correct?

22   A    Yes, because I follow evidence-based medicine.

23   Q    And so you're saying these aggressive, the

24   individuals who are aggressive in their approach, they

25   don't follow evidence-based medicine?

```
 1   A    No, they don't.  Opioids are very controversial.
 2   They can help people but there's really not a lot of
 3   science to support it.
 4   Q    This is no science -- strike that.
 5        You're saying there's not a lot of science to
 6   support that opioids help people?
 7   A    No, there's not.
 8   Q    How many journal or peer review journal articles
 9   have you written?
10   A    None.
11   Q    How many peer review journal studies have you done
12   to back up what you just said?
13   A    I read a lot but --
14   Q    How many have you --
15   A    -- I have not done any, no.
16                       (Off-the-record discussion
17                        between counsel.)
18   BY MR. WILLIAMSON:
19   Q    Now back to this meeting with Dr. Schneider.  You
20   mentioned that, again, we've been talking about this
21   short term/long term.  You were there with Janssen
22   pharmaceuticals; correct?
23   A    Yes.
24   Q    They pay for you to come here and speak; correct?
25   A    Yes.
```

1962

1   Q    And part of their issue for coming was to discuss

2   one of their products; correct?

3   A    No.  My --

4   Q    There's not a question on the table sir.

5        Doesn't Janssen produce the Duragesic patch?

6   A    Yes.

7   Q    And the Duragesic patch is a Fentanyl delivery

8   system, is it not?

9   A    Yes.

10  Q    And -- but it's long term medication, isn't it?

11  A    Yes.

12  Q    Okay.  And when you gave -- you gave a powerpoint,

13  did you not?

14  A    Yes.

15  Q    And part of that powerpoint identified an

16  alternative long-acting medication that could be

17  utilized, didn't it?

18  A    I don't remember if it specifically said Duragesic.

19  What it talked about was how to minimize the risk of

20  using this group of medications.

21  Q    So is it your testimony that your powerpoint

22  presentation did not include a part and portion that

23  identified the Duragesic patch, Janssen's product, as an

24  alternative long term medication?

25  A    It may have, but that -- it was not a set -- the

1963

1    nice thing about the lecture, it was not a selling a

2    product lecture.  It was primarily focused on risk

3    management.

4    Q   And it was primarily focused on risk management

5    with, by the way, our product is a way to be a risk

6    management; correct?

7    A   Not entirely; but it was like, oh, by the way, this

8    is an alternative strategy.  I would agree with that.

9    Q   And was that presentation "Graves T Owen Assessing

10   Substance Abuse"?

11   A   Yes.

12   Q   And so as I understand it, you were targeting a

13   provider that utilized a lot of short-term medication,

14   correct?

15   A   I wasn't targeting.

16   Q   Janssen informed you that Dr. Schneider used a lot

17   of short-term medication; correct?

18   A   Yes.

19   Q   And they were aware that whoever the pharmaceutical

20   company was that was the beneficiary of these

21   prescriptions, they could have been making a lot of

22   money from that, couldn't they?

23   A   Sure.

24   Q   And Janssen saw an opportunity to come in and

25   present their long-term product hoping Dr. Schneider may

1964

1   actually start using their long-term product; correct?

2   A   Yes.

3   Q   They did not tell you meet with Dr. Schneider and --

4   but refuse to tell him about our product.  We don't want

5   him prescribing our product.  Correct?

6   A   Yes, I agree, they didn't tell me that.

7   Q   And you would not spend your hard earned time or

8   Janssen's money to come and just speak to people who you

9   believe just to be common drug dealers, would you?

10  A   No.

11  Q   You don't go on the street corner and find people

12  selling illegal narcotics and say, hey, I have a Janssen

13  presentation for you, do you?

14  A   No.

15  Q   Now, you said that Dr. Schneider identified you as

16  a -- what's that exhibit number?

17          MS. TREADWAY:   104.

18  Q   Take a look at 104 for us.  You state on there

19  that -- you stated that Dr. Schneider basically made up

20  the fact that you agreed to be an advisor; correct?

21  A   I didn't say that.

22  Q   You didn't say on direct whether or not it was

23  untrue statement that you agreed to be his advisor?

24  A   I agreed to be his mentor and never heard back from

25  'em.

1965

1    Q    Okay.  So are you quibbling over the definition of

2    mentor versus advisor?

3    A    No.  I'm saying that I provided him with a letter

4    agreeing to advise or mentor him and never heard back

5    from him.

6    Q    Isn't it true that Dr. Schneider called you in

7    December of 2004?

8    A    I don't remember any call.

9    Q    Isn't it true that he contacted you in January of

10   2005?

11   A    Talked to me directly?  No.

12   Q    Did anybody from the Schneider Medical Clinic -- do

13   you recall ever receiving any calls?

14   A    I don't remember any calls.

15   Q    Is your telephone number 512-310-7246?

16   A    Yes.

17   Q    And you're from in Round Rock, Texas?

18   A    Yes.

19   Q    Now, are you aware as to whether or not a call came

20   to you from the Schneider Medical Clinic at 4:15 on

21   January 4th of 2005 that lasted approximately three

22   minutes and 48 seconds?

23   A    No.

24   Q    Now, what's the date on that letter?

25   A    January 4th, 2005.

1966

1    Q   So if there are records that identify the Schneider

2    Medical Clinic, or testimony that Dr. Schneider actually

3    called you before that letter went out, would you be

4    able to dispute that?

5    A   Say that again.

6    Q   I'm sorry.  That was a compound question.

7        If there's testimony later when we can put on our

8    case that Dr. Schneider actually called you before he

9    put out that -- sent that letter out, do you have any

10   evidence that that would be untrue?

11   A   No.

12   Q   If there are phone records that identify a phone

13   call that went out from Dr. Schneider's office to your

14   office on January 4th, 2005, would you be able to

15   dispute the veracity of those records?

16   A   I dispute talking to him.

17   Q   So you actually agreed to be a mentor.  So Dr.

18   Schneider didn't lie on that document that you're

19   looking at; correct?

20   A   I agreed to mentor him, but never did mentor him.

21   Q   Okay.  That letter was written on January 4th, 2005;

22   correct?

23   A   Yes.

24   Q   As that date -- as the date that that document was

25   written, had you agreed or had you not agreed to mentor

1967

1    Dr. Schneider?

2    A   I did agree to mentor him.

3    Q   Okay.  So he wasn't making that up as of January

4    4th, 2005; correct?

5    A   Yes.

6    Q   And you agree that you and Dr. Schneider did have a

7    discussion about your philosophies versus his

8    philosophies; correct?

9    A   At the meeting here, the lecture meeting, yes.

10   Q   And he understood your position on short-acting

11   medication; correct?

12   A   Yes.

13   Q   Now, you also mentioned -- you told the jury that

14   Dr. Schneider never incorporated anything that you ever

15   provided him.  Do you remember that?

16   A   As far as alternative strategies besides pain

17   medications.

18   Q   You never talked to Dr. Schneider again after that

19   date or after somewhere early, late '04, early '05;

20   correct?

21   A   Yes.

22   Q   Okay.  You never interviewed him to say, okay, doc,

23   let's discuss and see if you've decided to change any of

24   your prescription practices; correct?

25   A   Yes.

1968

1    Q    You never did; correct?

2    A    Never did, yes.

3    Q    Now I'm just going to hand you a document.  I'll

4    identify it if I need to.  This is a Consent to Report

5    the Illegal Use of Controlled Substances.  Do you see

6    that document?

7    A    Yes.

8    Q    That document -- does that document, outside of the

9    Schneider Medical Clinic on it, look familiar to you?

10   A    Yes, it does.

11   Q    Okay.  That's a form that you provided Dr. Schneider

12   on the night that you guys met, isn't it?

13   A    No.  I didn't have that form with me in Wichita.

14   Q    Okay.  But you actually faxed Dr. Schneider some

15   documents that you use in your practice that he could

16   possibly use in his; correct?

17   A    Yes.  Possibly that's the phone call you're

18   referring to.

19   Q    How -- I'm referring to a phone call from the clinic

20   to your office.  I'm not referring to a fax from your

21   office to his --

22   A    Right.  But it -- that might have been a phone call

23   to request that and it was faxed without talking to him.

24   Q    But you don't recall talking to him?

25   A    I never talked to him, no.

1969

1   Q   Now, you would agree that that document was now

2   incorporated in the Schneider Medical practice,

3   something that you sent to him; correct?

4   A   Yes.

5   Q   So he didn't just totally ignore you, did he?

6   A   He did with respect to all the alternative options

7   for controlled substances like psychotherapy and

8   physical therapy, referring for additional counseling.

9   Q   Okay.  You never talked to him after these meetings

10  and agreeing to be his mentor; correct?

11  A   Yes.

12  Q   Are you telling us that the patient records will be

13  void of any referrals to physical therapy?

14  A   No.

15  Q   Are you telling us that the records are going to be

16  void of any referrals to psychotherapists?

17  A   I don't recall any referral initiated in the records

18  I reviewed to psychotherapy that were actually

19  accomplished.

20  Q   You never reviewed the medical record of Billy R?

21  A   I don't think so.

22  Q   And so you don't know if Billy R was sent to a

23  therapist by the name of Dr. Karen Shell, do you?

24  A   No.

25  Q   And you don't know whether or not Dr. Karen Shell

1    gave this individual an okay to continue on the pain

2    management; correct?

3    A    I don't know anything about it.

4    Q    So it's very possible there are things outside of

5    these few medical records that you looked at that would,

6    A, evidence a referral; correct?

7    A    Yes --

8    Q    It's possible that there are things in these records

9    that would evidence referrals to psychologists; correct?

10   A    Yes.

11   Q    Did you see in your records any referrals to taking

12   MRI's?

13   A    Yes.

14   Q    You saw referrals to people actually have surgery

15   while they were treating under Dr. Schneider; correct?

16   Patricia G?

17   A    I don't remember that.  Oh, yes.  She had orthopedic

18   knee surgery.  I remember that, yes.

19   Q    And you also saw referrals and records that Dr.

20   Schneider sent people to other orthopedic doctors;

21   correct?

22   A    Yes.

23   Q    Now, you may have mentioned about this -- these

24   physician's assistants and making this -- you heard the

25   legal argument about respondeat superior and all this

```
 1   stuff.  You remember that?

 2   A   Yes.

 3   Q   You're not a legal expert, are you?

 4   A   No, sir.

 5   Q   Okay.  You're not trying to replace the Judge --

 6   instructions that the Judge would give, are you?

 7   A   No, sir.

 8   Q   Okay.  And you're coming at this based on what you

 9   normally see on a civil side.  Agreed?

10   A   That and my requirements to employ mid-levels.

11   Q   Right.  And you're in Texas; right?

12   A   Yes.

13   Q   And we're in Kansas?

14   A   Yes.

15   Q   And Texas and Kansas have different rules and

16   regulations; correct?

17   A   Yes.

18   Q   Are you aware that in Kansas, physician's assistants

19   can see patients and exercise their own independent

20   medical judgment?

21   A   I'm not aware of the Kansas rule.

22   Q   Did you see any evidence in any charts where Dr.

23   Schneider forced a physician's assistant to prescribe a

24   large amount of prescriptions to any patient?

25   A   No.
```

1972

1    Q    Now, you mentioned things that you believe gave the

2    clinic a -- that it was indicative of an economic

3    incentive.  Do you remember that line of questions?

4    A    Yes.

5    Q    And I believe you identified the fact that there was

6    a high volume of patients?

7    A    Yes.

8    Q    Do you know when the clinic began receiving a high

9    volume of patients?

10   A    No.

11   Q    Do you know why they began receiving a high volume

12   of patients?

13   A    No.

14   Q    Are you aware that in Sedgwick County that one of

15   the providers, the people who would actually see

16   Medicaid pain patients, actually passed away around 2--

17   end of 2002, early 2003.  Did you know that?

18   A    No.

19   Q    Did you know that there is a lack of providers who

20   are willing to see Medicaid patients who have these

21   chronic pain issues.  Did you know that?

22   A    No.

23   Q    Did you ever come across any advertisement where Dr.

24   Schneider was advertising to try to receive a large

25   number of pain patients?

1973

1  A   No.

2  Q   Are you aware that Dr. Schneider also had to make a

3  hard choice to either give these disadvantaged patients

4  the best care he possibly could or refuse to see them.

5  Did you know he ever had to make that choice?

6  A   I'm not sure I understand the question.

7  Q   Did you know that Dr. Schneider ever had to make

8  a -- was at a crossroads and had to determine whether or

9  not he was going to see these patients that people

10  didn't want to see or if he could just do the best job

11  he could possibly could.  Did you know that?

12  A   I assume that you would have to make that decision

13  at some point.

14  Q   And you as a physician -- I think we just briefly

15  covered this -- you know that when you're at that

16  crossroad, you know you're going to be dealt with some

17  roadblocks in treating these individuals; correct?

18  A   Yes.

19  Q   And those roadblocks are going to be access to

20  medical care; correct?

21  A   Possibly, yes.

22  Q   And before 2002, Dr. Schneider didn't have any

23  formal specialized training as a pain management

24  specialist, did he?  Did you ever come across that?

25  A   No.

1974

```
 1    Q    And you understand that he had to learn basically
 2    on-the-job.  You understand that?
 3    A    Yes.
 4    Q    And, but as for being a physician, that can be
 5    difficult because mistakes can be costly when you're a
 6    physician; correct?
 7    A    Yes.
 8    Q    And just because a mistake happens and a bad outcome
 9    happens doesn't make you a criminal, does it?
10    A    No.
11    Q    You've known physicians to have bad outcomes and
12    they're not considered criminals; correct?
13    A    Yes.
14    Q    And did you come across any statement ever made by
15    Dr. Schneider that he at any point in time prescribed
16    medicines to people that he truly in his heart didn't
17    believe needed them?  Did you ever see any statement
18    like that?
19    A    Say it again.
20    Q    Absolutely.  Did you ever come across in your review
21    of the documents that you looked at any statement made
22    by Dr. Schneider that he was gonna prescribe medicine to
23    people irregardless if they truly need it or not.  Did
24    you ever see a statement like that?
25    A    No.
```

1975

```
1    Q    You also said that these people were rushed and that
2    kind of gave you pause and let you think that it was an
3    economic incentive; correct?
4    A    Yes.
5    Q    And you would agree that you can be rushed in a
6    clinic when you're trying to see the patients that you
7    have scheduled; correct?
8    A    Yes.
9    Q    And if you know there are a lot of people who need
10   medical care, you would try to get them in, get their
11   medical needs and move to the next patient; correct?
12   A    No.  I would take care of each person and do a good
13   job before moving on to the next.
14   Q    And that's very fair.  And that would cause -- if
15   you have a lot of patients scheduled for a day, that
16   would cause delays in getting that waiting room cleared
17   out, wouldn't it?
18   A    Possibly, yes.
19   Q    It would cause two -- maybe an hour or two delays
20   that could just set you back; correct?
21   A    It could, yes.
22   Q    Are you aware that there were providers who would
23   stay well beyond the closing hours at the Schneider
24   Medical Clinic so they could get through everybody?
25   A    I'm -- say that again please.
```

1976

1   Q   That's okay.  I'll move on.

2        Now, you also mentioned escalating and the dosages

3   that were given.  You remember that as a reason for an

4   economic incentive?

5   A   Yes, sir.

6   Q   Now, you do understand that Dr. Schneider didn't get

7   paid a cent more for providing, let's say, 60 days of

8   medication as opposed to 120 days; correct?  He got paid

9   for the same amount for that office visit; correct?

10  A   Yes.

11  Q   And speaking of payment for an office visit, you

12  understand that Medicaid normally pays between 15 and

13  20% of the true value of services, don't they?

14  A   I don't know what they pay right now.

15  Q   How about when you were actually taking them?

16  A   It was approximately 80% of Medicare.

17  Q   Medicare?

18  A   Yes.

19  Q   So Medicaid paid 80% of Medicare?

20  A   Of Medicare's allowables, I believe.

21  Q   Do you remember what those allowables were?

22  A   You know --

23  Q   And it's okay if you don't.

24  A   I don't.

25  Q   Bottom line is you take less money taking Medicaid

1977

1    patients than you do when you take, let's say, Blue

2    Cross/Blue Shield; correct?

3    A    Yes.

4    Q    Now, with these office visits, you understand that

5    Dr. Schneider would give an amount when he actually

6    wrote the prescription, enough to bring -- to keep that

7    person through the next 30 days; correct?

8    A    Yes.

9    Q    And that's a technique that's utilized by providers

10   to try to monitor the intake of prescriptions that

11   they're taking; correct?

12   A    Yes.

13   Q    Because if you provide 60 days, you have less

14   oversight of what's actually happening with them;

15   correct?

16   A    Yes.

17   Q    And when you bring them in every 30 days, you can at

18   least try to see and make sure that they're taking

19   what's given during that time; correct?

20   A    Yes.

21   Q    And there's a phenomenon known as early refills;

22   correct?

23   A    I'm not sure I understand the question.

24   Q    You're familiar with the term early refills?

25   A    Yes.

1978

1   Q    And you understand that early refills can happen

2   either, A, because a person -- strike that.

3        Early refills can happen because a person just

4   takes more than the amount that they were prescribed;

5   correct?

6   A    Yes.

7   Q    And that could be for a couple of reasons, one being

8   that they're abusing them; corrects?

9   A    Yes.

10  Q    One could be that they're diverting them; correct?

11  A    Yes.

12  Q    And another could be they need more to actually

13  address the pain that they're having?

14  A    Possibly, yes.

15  Q    And just because a person shows up for early refills

16  doesn't mean that they should be denied receiving their

17  next medication; correct?

18  A    I agree, yes.

19  Q    It would depend on what that person tells that

20  doctor and how that doctor judges that person's honesty;

21  correct?

22  A    Yes.

23  Q    Meaning that if I tell you that, hey, you know, I

24  accidentally -- look, doc, this pain is so bad I had to

25  double up on some days and if that doctor has to be able

1979

1    to trust that, what that person is telling them;

2    correct?

3    A    Yes.  And you need to document your rationale for

4    allowing early refills.

5    Q    Okay.  And you would agree that one of the

6    criticisms that you had with the Schneider Medical

7    Clinic was a lot of the people didn't document very

8    well; correct?

9    A    Yes.

10   Q    Now, you would agree that a person does not document

11   every single thing that happens during a visit; correct?

12   A    I agree.

13   Q    But you would agree that the clinic did actually

14   document when somebody came in early for refills;

15   correct?

16   A    I don't know what you mean by document.

17   Q    They would write down in for early refills?

18   A    Not always.

19   Q    They would sometimes?

20   A    Sometimes, yes.

21   Q    Now, with this -- and do you make room that Dr.

22   Schneider himself just may not have been a great

23   documenter?

24   A    Yes.

25   Q    And would you make room for the fact that other

1980

```
 1    things happen during that patient visit that may not

 2    show up in written format?

 3    A    Yes.

 4    Q    You can't exclude it without being in that exam room

 5    and making a determination as to what truly happened;

 6    correct?

 7    A    I don't understand the question.

 8    Q    I'll withdraw that.

 9         Now, we were talking about escalating dosages.  You

10    would agree that it's not a good practice to start a

11    person out on the highest amount of a certain opioid;

12    correct?

13    A    Yes.

14    Q    You would want to start them out at a lower amount;

15    agreed?

16    A    Yes.

17    Q    When you make that decision to actually treat the

18    person with that kind of medication; correct?

19    A    Yes.

20    Q    Now, isn't it true that Patricia G visited the

21    clinic several times before she ever received an opioid

22    prescription?

23    A    I think that's right, yes.

24    Q    And it wasn't until she suffered a motor vehicle

25    accident and started having real pain that she started
```

1981

```
1    receiving those chronic pain medicines; correct?
2    A   Can you rephrase that.
3    Q   I sure can.  It wasn't until Patricia G had a motor
4    vehicle accident where she sustained some painful
5    conditions that she started receiving the higher
6    dosages; correct?
7    A   Yes.
8    Q   And receiving higher dosages, is that part of what
9    we call titration?
10   A   It's possible, yes.
11   Q   And that means going up at times and going down at
12   times; correct?
13   A   Yes.
14   Q   And when you see that titration, when you see them
15   going up or going down, that's evidence of trying to
16   adjust that medication to find what works for that
17   patient.  Would you agree with that?
18   A   Yes.
19   Q   And would you also agree that if somebody came in
20   and complained that a certain medication made them sick,
21   that it would make sense to change that person's
22   medication to something that their system could
23   tolerate?
24   A   Yes.
25   Q   And did you find evidence that in Lacey F's
```

1    situation she complained that she was being sick, she

2    was getting sick from receiving one pain medication, and

3    the clinic actually changed over and gave her something

4    else?

5    A    Yes.

6    Q    Are you aware that there are charts where an

7    individual was receiving medication and the dosages

8    would go up and the dosages would go down?  Meaning that

9    the clinic was actually titrating different patients'

10   medications?

11   A    I don't recall -- in the vast trend of the records

12   over the long haul they were steadily going upwards

13   amongst the patient chart.

14   Q    You didn't recall ever seeing them going down at

15   all?

16   A    There may be a brief period.  I don't recall it.

17   Q    Now, you also testified about the fact that the

18   documents don't identify people getting better.  Do you

19   remember that?

20   A    Yes.

21   Q    Okay.  Eric T was one of the records that you

22   reviewed.  Is that right?

23   A    It's been a long time.  I did read that one, yes.

24   Q    Are you aware of any testimony by his widow that

25   stated that Eric T was able to actually be productive

1983

1    and have a life when he was actually receiving these

2    medications?

3    A    I don't recall that.

4    Q    Are you aware that Patricia G's husband testified

5    that she would be able to be functional and do certain

6    things when she was taking her pain medication?

7    A    I don't remember that much detail.

8    Q    Do you recall a patient by the name of Robin G who

9    would have to sit in bed all day and night with

10   unbearable migraines until she started being treated by

11   Dr. Schneider?  Are you aware of that?

12   A    I don't -- Robin G is way back there.  I don't

13   remember the details on it.

14   Q    Bottom line is it's possible that there were

15   numerous positive results from people that you have not

16   talked to; correct?

17   A    It's possible, yes.

18   Q    And it's possible that there are numerous positive

19   results in records that you didn't even get a chance to

20   review; correct?

21   A    It's possible, yes.

22   Q    You also testified that you never saw any corrective

23   actions.  Do you remember that?

24   A    Yes.

25   Q    And we've already established that you missed a

                                                                    1984

 1    corrective action in Lacey F's file; correct?
 2    A    Yes.
 3    Q    And is it possible -- are you aware that the clinic
 4    had refused to provide pain medication to hundreds and
 5    hundreds of people, maybe even up to a thousand.  Are
 6    you aware of that?
 7    A    No.
 8              THE COURT:  Let me stop you for a minute.  I
 9    want you to remember, Ladies and Gentlemen, with respect
10    to these are-you-aware-questions, which are appropriate
11    questions, I'm not criticizing Mr. Williamson's
12    questions, but the statements and the questions of the
13    lawyers are not evidence.  So if it turns out later on,
14    for example, with respect to this last question that
15    there are hundreds or thousands of these patients,
16    there's no evidence of that, and you must not decide the
17    case based on Mr. Williamson's or any other lawyer's
18    questions about are you aware of this or are you aware
19    of that.  Because that's not evidence.  He can ask the
20    witness.  But if the witness doesn't know and is not
21    aware, then there's no evidence of anything that was
22    asked until it comes in, if it comes in, through another
23    person as evidence.  Okay.
24              MR. WILLIAMSON:  Okay.
25

1    BY MR. WILLIAMSON:

2    Q    Now, and you understand that I'm asking you

3    questions basically testing whether or not you know

4    certain -- you know certain possible facts.  You

5    understand that?

6    A    Yes.

7    Q    And I'm -- yeah.  Now, we were talking about the

8    corrective actions.  So you make room that there are

9    records that identify corrective actions taken against

10   patients that you have not reviewed; correct?

11   A    Say that again please.

12   Q    You make room that there are records that identify

13   certain corrective actions taken against individuals for

14   violating, let's say, their pain management contract

15   that you have not reviewed; correct?

16   A    I only know what I've reviewed.

17   Q    Okay.  Who gave you the documents to review?

18   A    Most of 'em came from Larry Wall.

19   Q    Larry Wall is that plaintiff's lawyer you keep

20   talking about?

21   A    I haven't talked about him yet.

22   Q    I'm sorry.  I actually talked about him a couple

23   days back.  But Larry Wall is the primary civil lawyer

24   that hired you; correct?

25   A    Yes.

1986

1    Q    And the records that he gave you, did you have

2    any -- did you have any say-so into what he provided

3    you?

4    A    No.

5    Q    He selectively chose the records he wanted you to

6    review; correct?

7    A    Yes.

8    Q    So he didn't give you any records that would

9    identify for you the total number of patients that the

10   clinic had seen during this time period; correct?

11   A    I don't remember anything like that.

12   Q    So you don't know if you reviewed information

13   regarding less than 1% of the Schneider Medical Clinic's

14   patient population or if it was 70% of the patient

15   population; correct?

16   A    Correct.

17   Q    Now, you were asked certain questions regarding

18   specific patients.  Do you remember that?

19   A    Yes, sir.

20   Q    I'm just going to touch on a few.

21        Your testimony that Patricia G had no fault at all

22   on her own for -- for I guess allegedly passing away of

23   an overdose.  You remember that?

24   A    Yes.

25   Q    Now, you would agree that patients have a

1  responsibility to be honest with their physician;
2  correct?
3  A   Yes.
4  Q   They have a responsibility to follow their
5  physician's orders; correct?
6  A   Yes.
7  Q   And they have a responsibility to take their
8  medication responsibly.  You would agree with that
9  generally?
10  A   Yes.
11  Q   Isn't it true that, that Patricia G was taking
12  medicine from multiple doctors?
13  A   I think that's right.  I don't remember exactly.
14  It's possible, yes.
15  Q   And is it true that there's nothing in the records
16  for where Patricia G informed Dr. Schneider or any other
17  medical provider that she was what we call "doctor
18  shopping?"
19  A   Correct.
20  Q   Now, Kandace B, she also was taking medicine not
21  prescribed from the clinic; correct?
22  A   I think so, yes.
23  Q   Jeff H was found with cocaine in his system, wasn't
24  he?
25  A   You know, honestly, I don't remember but -- I'd have

1988

1   to look at the record.

2   Q   Do you have your report for Jeff H in front of you?

3   A   No, I don't.

4   Q   Well, Government Exhibit 1-A identifies cocaine

5   being in his system at the time he passed away.  Would

6   you disagree with that document?

7   A   No.

8   Q   And you understand that has been admitted as

9   evidence?

10   A   Okay.

11   Q   Okay.  Dr. Schneider didn't prescribe any cocaine to

12   Jeff H, did he?

13   A   I don't think so, no, sir.

14   Q   You can't prescribe cocaine, can you?

15   A   There is a medical indication for cocaine in nasal

16   surgery.

17   Q   Okay.  Did you see any evidence of Dr. Schneider

18   prescribing cocaine?

19   A   No.

20   Q   In fact, with Jeff H, Dr. Schneider never saw this

21   patient one time; correct?

22   A   I believe that's right, yes.

23   Q   He never prescribed one medicine to this person;

24   correct?

25   A   Yes.

1  Q   And isn't it true that the individual who was

2  prescribing medicine was a PA by the name of Curt

3  Atterbury.  Does that sound familiar?

4  A   Who?

5  Q   Curt Atterbury?

6  A   That's right, yes, sir.

7  Q   Isn't it true that the supervising physician of Curt

8  Atterbury was Donna St. Clair and not Dr. Schneider?

9  A   I don't remember.  It's possible, yes.

10 Q   Now, are you aware that Lacey F was asked by

11 several -- or a couple of providers at the medical

12 clinic as to whether or not she was abusing medicines

13 and she said no?

14 A   That's what addicts say.

15 Q   Okay.  And that's fair.  And I guess we can talk

16 about that for a minute.  I think I read this in your

17 deposition.  You would agree that addicts are

18 resourceful people; correct?

19 A   Yes.

20 Q   And they have the ability to undertake certain steps

21 in order to secure the source of their addiction.  You

22 agree with that?

23 A   Yes.

24 Q   And so in regards to people who are -- who may

25 suffer an addiction to pain medicine, they will lie in

1    order to tell a doctor what they believe the doctor

2    needs to hear in order to get their pain medicine;

3    correct?

4    A    Yes.

5    Q    And isn't it -- doesn't it make sense that if a

6    doctor is just going to give a person whatever they want

7    regardless if they truly need it or not, they don't

8    really have a reason to lie, do they?

9    A    No, that's not necessarily true.

10   Q    Well, if I want to -- well, strike that.

11        And when a person decides to make a representation

12   to a doctor, that is their choice to make that

13   representation; correct?

14   A    Yes.

15   Q    It's that person's choice whether or not they follow

16   the physician's instructions; correct?

17   A    Up to a point.

18   Q    And so is it your philosophy and your belief that an

19   addict is not responsible for the acts that they conduct

20   when they are in the throes of addiction?

21   A    When they're deep down in the severe form of

22   addiction, they don't lie just to the clinician.  They

23   also lie to themselves.  And in doing so they come up

24   with all kinds of justifications and rationales for why

25   they need this or that and they will be deceptive.

1991

1   Q   Okay.  And that's fair.  But you're saying that it
2   was Dr. Schneider's fault for prescribing the medicine
3   to 'em.  I think that was the gist of your opinion;
4   correct?
5   A   When you see patterns that are suggestive they're
6   losing control and you don't respond, that's when you're
7   negligent.
8   Q   Okay.  All right.  That's fair.  That's when you're
9   negligent.  Now, there is not a medical federal law that
10  says that if you think that a person is addicted then
11  you cannot prescribe this medicine to 'em, is there?
12  A   I'm not aware of one, no.
13  Q   Now, in regards to Darrell H, isn't it true that
14  Darrell H was receiving prescriptions from another
15  provider named Dr. Curry?
16  A   I remember that, yes.
17  Q   And he was receiving Lortab and other pain medicine
18  from this doctor at the same time he was seeing Dr.
19  Schneider; correct?
20  A   Yes.
21  Q   Now, in fairness, Darrell H had surgery; correct?
22  A   Yes.
23  Q   And he had a real pain issue, didn't he?
24  A   Maybe; maybe not.
25  Q   Now, you agree that there are some times that no

1   matter how many MRIs you do, no matter how many CT scans

2   you do, you may not be able to detect the source of a

3   person's pain; correct?

4   A   Yes.

5           MR. WILLIAMSON:  If I may just review my

6   notes.  I may be finished.

7                   (Off-the-record)

8           MR. WILLIAMSON:  I don't have anything

9   further, Your Honor.

10          THE COURT:  Mr. Byers?

11          MR. BYERS:  Yes.  No questions, Your Honor,

12  but I did want to make a procedural point so the record

13  is clear.  I would move to strike this witness's

14  testimony based upon our Motion to Dismiss the Court

15  already ruled on.  That was document 97.  As well as the

16  Daubert issue, Documents 187 and 215.  Just making that

17  for the record.

18          THE COURT:  All right.  I'll show they're made

19  for the record.  Redirect?

20          MS. TREADWAY:  Thank you, Judge.

21                **REDIRECT EXAMINATION**

22  BY MS. TREADWAY:

23  Q   First of all, Dr. Owen, I would like to clear up a

24  factual issue implicated by one of Mr. Williamson's

25  questions with regards to Jeff H.  He indicated to you

 1    that Jeff had cocaine in his system on death.  I'm

 2    showing you Exhibit 2 -- I'm sorry -- Exhibit 5-E-1

 3    that's been admitted into evidence.  Do you see any

 4    evidence that he had cocaine in his system?

 5    A    No, ma'am.

 6    Q    Mr. Williamson brought up a topic that we hadn't

 7    really talked very much about but I want to briefly talk

 8    about and that is titration.

 9         Now, tell the jury what titration is and what its

10    purpose is in pain management.

11    A    Titration is to start a controlled substance at a

12    small dose and over time slowly increase the dose for

13    optimal therapeutic benefit.  In order to go higher on

14    the dose you need to see some initial therapeutic

15    benefit that gives you medical rationale that maybe

16    you're sub-optimally dosed.

17    Q    So that's not a one-time occurrence, titration?

18    It's something that you do over time?

19    A    Yes.  But typically in my practice titration occurs

20    over a fairly short period and people remain stable

21    until, say, they want to come off the medicines down the

22    road.

23    Q    Does it require monitoring?

24    A    Yes.

25    Q    Does it require repeat assessments over time?

1994

1    A    Yes.

2    Q    Did you see any evidence in the documents that you

3    reviewed, Doctor, the Defendant Stephen Schneider or

4    people in his employ used titration in the way you

5    described it?

6    A    No, ma'am.

7    Q    You also talked a little bit about drug addicts.

8    When you're addicted to a controlled substance,

9    especially controlled stubsance that you're getting at

10   a prescription from a physician, do you have an ability

11   to control yourself?

12   A    No.

13   Q    And who should know that best of all?

14   A    Physicians.

15   Q    Did you see any evidence in the documents you

16   reviewed that the Defendant Stephen Schneider or his

17   employees recognized that problem?

18   A    No.

19   Q    Did you see any evidence that they took action in

20   response even when they did mention that the person was

21   addicted?

22   A    No response.

23   Q    Mr. Williamson was also asking you about Patricia G

24   and Kandace B taking other people's drugs.  In fact,

25   with regards to both of those patients, didn't their

1995

1  urine drug screens show that?

2  A   Yes.

3  Q   And if a physician sees that in a legitimate pain

4  medicine practice, what should the physician's response

5  be?

6  A   Re-evaluate and consider tapering the patient off

7  these drugs.

8  Q   Did you see any evidence that that is the practice

9  at Schneider Medical Clinic?

10  A   No.

11  Q   With regards to addiction with regards to the

12  patients you reviewed, who was responsible for addicting

13  those patients to prescription medications in your

14  opinion?

15  A   The physicians and the mid-levels both.

16  Q   At the Schneider Medical Clinic?

17  A   Yes.

18  Q   I want to talk to you briefly about your Medicaid

19  practice.  You did have Medicaid patients at one time in

20  your practice, did you not?

21  A   Yes, ma'am.

22  Q   And there were a lot of reasons you chose not to

23  keep seeing them; correct?

24         MR. WILLIAMSON:  Your Honor, I'm just going to

25  lodge an objection.  Several lines of leading questions

1996

 1    again.

 2              MS. TREADWAY:  I apologize, Judge.  I'll

 3    rephrase.

 4    BY MS. TREADWAY:

 5    Q   How many reasons were there that you stopped seeing

 6    Medicaid patients?

 7    A   There were a number of reasons.

 8    Q   Can you share those with the jury?

 9    A   Well, when we lost the contract for the Medicaid

10    patients to have resources, it became more difficult to

11    refer them; but my experience with the Medicaid patients

12    had been the vast majority of them just wanted

13    prescriptions and never showed up to the rehab clinics

14    that had physical therapy and psycho therapy.  My

15    success rate was very low to get them to comply with

16    what I thought was good medicine.  So combining that

17    with limited resources, I thought there was more risk

18    than benefit.

19    Q   Not only to you but to the patient?

20    A   Especially to the patient.

21    Q   When a person, a physician, is practicing pain

22    management, with or without a specialty or expertise in

23    that area, what standards must that physician meet?

24    A   When you do pain management, you meet the pain

25    management standards.

1997

```
 1    Q    Did you see any evidence that the Defendant Stephen

 2    Schneider met those standards in this case?

 3    A    No.

 4    Q    Did you see any evidence that he had even tried?

 5    A    No.

 6    Q    During the course of your review of the medical

 7    records, did you see evidence in the case that the

 8    prescription medications were helping the patients?

 9    A    No, ma'am.

10    Q    What did the evidence show instead?

11    A    As a general rule, the patient's deteriorated and

12    were eventually demised.

13    Q    Died?

14    A    Yes.

15    Q    With regard to the representations to First Guard.

16    If the Defendant continued representations over time,

17    past January 4th, 2005, that you were serving as an

18    advisor, would those representations be true or false?

19    A    False.

20    Q    With regards to the services provided by mid-level

21    practitioners, did you review fee tickets in this case?

22    The billing documents?

23    A    I did look --

24              MR. WILLIAMSON:   Your Honor, I'm going to

25    object.  That's outside the scope of cross-examination.
```

1998

1          MS. TREADWAY:  Judge, it relates to the

2   physician's assistant issue and the responsibility --

3          THE COURT:  I don't remember any questions

4   about reviewing any sorts of fees.

5          MS. TREADWAY:  No, not fees, Judge, fee

6   tickets.

7          THE COURT:  I don't remember -- I know the

8   difference and I don't remember anything about fee

9   tickets.

10          MS. TREADWAY:  Correct, Judge, but this is

11   relative to questioning as regards the physician's

12   assistants.

13          THE COURT:  Well, I'll allow it for that

14   limited purpose then.

15   BY MS. TREADWAY:

16   Q   In speaking with Mr. Williamson about the

17   physician's assistants who performed services for the

18   patients under the Defendant's direction.  Did you

19   review fee tickets from the clinic?

20   A   Yes, ma'am.

21   Q   And what do those fee tickets indicate -- or who do

22   those fee tickets indicate were certifying that the

23   services had been performed?

24   A   The physician.

25   Q   Dr. Schneider?

```
 1   A    Yes.
 2   Q    Mr. Williamson asked you a question whether you knew
 3   of any statements by the Defendant Stephen Schneider
 4   that he would prescribe people controlled substances no
 5   matter what.  You remember that question?
 6   A    Yes, ma'am.
 7   Q    And you said you did not know of any statements?
 8   A    Yes, ma'am.
 9   Q    But did you see evidence in the clinical files of
10   the Defendant that in fact he did that?
11   A    Absolutely.
12   Q    How many pain patients do you see in a given day,
13   sir?
14   A    It varies over the years.  We might see 20 to -- I
15   may see 15 to 20 a day for myself and with my mid-level
16   we may see 40 or 50, both of us.
17   Q    And do you review the records and documents that
18   your mid-level practitioners author?
19   A    Yes.
20   Q    With regards to early refills.  Did you see any
21   documented rationale for the repeated and continuous
22   early refills that patients received?
23   A    No, ma'am.
24   Q    Mr. Williamson asked you about the positive results
25   for Eric T, Patricia G and Robin G.  Is death from a
```

2000

1    drug overdose a positive result in a pain management

2    practice, sir?

3    A    No, ma'am.

4    Q    And was it the Defendant Stephen Schneider's

5    practices as witnessed by the Janssen representative

6    that brought you to Wichita, sir?

7    A    Yes, ma'am.

8    Q    Was it your goal in coming to Wichita to make a lot

9    of money?

10   A    No, ma'am.

11   Q    What takes this case from being a malpractice case

12   to a criminal case, Dr. Owen?

13   A    When you continue to give these dangerous drugs

14   without -- I'm sorry -- without a therapeutic benefit,

15   and especially when it results in so many deaths -- I'm

16   sorry.

17   Q    Is this any longer a malpractice case to you, sir?

18   A    No, ma'am.

19   Q    Although the Defendant was not providing

20   prescriptions for sex or providing prescriptions out the

21   back door or providing prescriptions for money

22   hand-to-hand, was he dealing drugs, Dr. Owen?

23   A    Yes, ma'am.

24        MS. TREADWAY:  Nothing further, Judge.

25        THE COURT:  Sir.

1          MR. WILLIAMSON:  Very brief, Your Honor.

2                  **RECROSS EXAMINATION**

3    BY MR. WILLIAMSON:

4    Q    Is it your representation that every fee ticket that

5    was submitted was signed by Dr. Schneider in every case

6    that you reviewed?

7    A    No, sir.

8    Q    Okay.  And let's make sure we understand something.

9    Death is never a -- well, rarely ever a good outcome.

10   And did I ever say that to you?

11   A    I don't understand the question.

12   Q    Did I ever ask you is death a good outcome?

13   A    No, sir.

14   Q    Okay.  It's a tragedy anytime that a life is lost.

15   You would agree with that?

16   A    Yes, sir.

17   Q    And you would understand that when a person is alive

18   and taking their medications as prescribed, they stand a

19   better chance of having a good outcome.  Would you agree

20   with that?

21   A    I'm sorry.  Say that again.

22   Q    When a person is taking their medicine as

23   prescribed, they have a better chance of having a good

24   outcome.  Would you agree with that?

25   A    Yes, sir.

2002

1    Q    Okay.  Now, when you made a decision for turning

2    away all these Medicaid patients, did it cause you to

3    choke up and tear up?

4    A    No, sir.

5    Q    Okay.  And you understand that these Medicaid

6    patients, even with all their problems and troubles,

7    they still need to see doctors.  You would agree with

8    that?

9    A    Yes, sir.

10   Q    Okay.  And just because somebody passed away --

11   well, strike that.

12        You never once opined before you took this stand

13   today that Dr. Schneider was acting intentionally as a

14   drug dealer, did you?

15   A    No, sir.  I was never asked.

16   Q    You were asked to give your opinion about his

17   practice; correct?

18   A    Yes, sir.

19   Q    You had the opportunity to say that; correct?

20   A    Yes, sir.

21   Q    When you were being paid by the civil lawyers, you

22   told them what they wanted to hear; correct?

23   A    No, sir.

24             MR. WILLIAMSON:  I don't have anything

25   further, Your Honor.

 1            MR. BYERS:  Nothing, Your Honor.

 2            THE COURT:  Thank you, Doctor.  Mr. Byers, you

 3   have any questions?

 4            MR. BYERS:  No, sir.

 5            THE COURT:  Thank you, Doctor.  You're

 6   excused.  Let's see, who's the next witness?

 7            MS. TREADWAY:  Agent Redd.

 8            THE COURT:  How long is he going to take?

 9            MS. TREADWAY:  Maybe 30, 45 minutes.

10            THE COURT:  Would you all like to take a

11   recess now instead of another 15 minutes?  Big decision.

12   You want to keep going or you want to take it now?

13                     (Off-the-record.)

14            THE COURT:  Keep going.

15            MR. WILLIAMSON:  Your Honor, the defense is

16   going to have an objection to some of this witness's

17   testimony.  We can either take care of it at side-bar --

18   I think it will be brief.

19            THE COURT:  Yes.  You may come up.  Agent

20   Redd, you're still under oath.

21   A    Yes, sir.

22                     (Thereupon, the following

23                      proceedings were had at the

24                      bench by Court and Counsel

25                      outside the hearing of the

2004

```
 1                          jury.)

 2              MS. TREADWAY:  I wanted to let you know what

 3    the agent is going to be testifying about.  Because they

 4    may be under a misimpression.  First, he is going to be

 5    testifying about some summary charts regarding Actiq,

 6    which is relative to Counts 10, 11 and 12.  And, second,

 7    he's going to be talking about the DEA registration

 8    number of the Defendant.  And that's it.

 9              MR. BYERS:  Okay.  Yeah.  We were under a

10    misimpression.

11              MR. WILLIAMSON:  Something else was

12    represented to us before so it must have just changed.

13    So that's fine.  No objection.

14              MS. TREADWAY:  He may be coming back later to

15    introduce additional clips from Linda Schneider's

16    October '07 meeting.  But not today.

17              MR. WILLIAMSON:  Then we'll object.

18              MR. BYERS:  We'll be objecting to that.

19              THE COURT:  Make a timely objection about that

20    because I may not remember.

21              MR. WILLIAMSON:  We will, Your Honor.

22              THE COURT:  All right.

23                        (Thereupon, the following

24                         proceedings continued in the

25                         hearing of the jury.)
```

2005

1                          **MARTIN REDD**

2      Having been previously duly sworn to tell the truth, the

3      whole truth and nothing but the truth, testified further

4      as follows on:

5                  **CONTINUED DIRECT EXAMINATION**

6      BY MS. TREADWAY:

7      Q    Agent Redd, as a part of our investigation, did you

8      review information about Actiq prescriptions written by

9      the providers at the Schneider Medical Clinic?

10     A    Yes, I did.

11     Q    And did you review information from the Defendant's

12     clinic's medical records?

13     A    Yes.

14     Q    Did you also review information about the

15     prescriptions themselves?

16     A    Yes.

17     Q    And did you review information from the pharmacies

18     who filled the prescriptions?

19     A    Yes.

20     Q    Did you also review information from the claims data

21     from the various healthcare benefit programs?

22     A    Yes.

23     Q    And based on that review, did you develop summary

24     charts for the jury with regards to this issue about

25     prescribing Actiq?

1   A    Yes.

2   Q    Let me first hand you what has been marked for

3   identification as Exhibit 1-L-2.  Do you recognize that

4   document?

5   A    Yes.

6   Q    How many individuals' information is contained in

7   this chart?

8   A    77.

9   Q    Did all 77 of these individuals receive Actiq

10  prescriptions from the Defendant or his employees at the

11  clinic?

12  A    Yes.

13  Q    And did you prepare Exhibit 1-L-2 from information

14  found in the individual medical records at the Schneider

15  Medical Clinic and the prescription information we

16  gathered?

17  A    Yes.

18  Q    Does it summarize voluminous information?

19  A    Yes, it does.

20  Q    Will this chart eliminate the need for the jury to

21  review the medical records of these 77 individuals?

22  A    Yes.

23  Q    Does it accurately reflect the data it summarizes?

24  A    Yes.

25           MS. TREADWAY:    Government offers Exhibit

 1   1-L-2 as a summary Exhibit under Rule 1006.

 2           MR. WILLIAMSON:  May we see a copy, please.

 3   No objection at this time, Your Honor, subject to

 4   cross-examination.

 5           MR. BYERS:  Same, Your Honor.

 6           THE COURT:  All right.  It's received.

 7   BY MS. TREADWAY:

 8   Q   Mr. Moore, could we display that, please, for the

 9   jury.  We're having a little bit of technical

10   difficulty, Judge, so we may have to use a paper copy.

11   Since I am technically challenged, I am going to have to

12   have help from Mr. Moord.

13       Taking a look at this exhibit, we have the first

14   column that says "count".  Is that just a numeric count,

15   not related to the count of the Indictment?  Just

16   sequential?

17   A   Just a numeric count.

18   Q   And then the second column, what does that

19   reference?

20   A   It's the name of the patient.

21   Q   And then the age is what?

22   A   The age would denote the patient's age of the first

23   Actiq prescription.

24   Q   And then the next column?

25   A   The diagnosis or complaint.

2008

1    Q    And how does that relate to the Actiq prescription?

2    A    I'm sorry.

3    Q    How does that relate to the Actiq prescription?

4    A    That was the diagnosis when they came into the

5    office that they gave to receive the Actiq.

6    Q    And then it indicates in that column "first OV".

7    What does that stand for?

8    A    First office visit.

9    Q    And then the next column?

10   A    First Actiq prescription.

11   Q    And then "first RX" what does that signify?

12   A    That would be the dosage of the first Actiq

13   prescription that was issued.

14   Q    And this is all in micrograms?

15   A    Yes.

16   Q    And then the "last RX", what does that signify?

17   A    That would be the last prescription for Actiq or the

18   last progress note in the file.

19   Q    And then the "high" column, what does that signify?

20   A    That would be the highest dosage amount that was

21   ever prescribed.

22   Q    And "DSB", what does that stand for?

23   A    Drug-seeking behavior.

24   Q    And if there is a Y in that column, what does that

25   signify?

1    A    Denotes a yes, there was drug-seeking behavior.

2    Q    And is that revealed in the Clinic's medical

3    records?

4    A    Yes, it is.

5    Q    And then the next column is "addiction", what does

6    that stand for?

7    A    Whether or not it was denoted in the patient file

8    that the patient was addicted.

9    Q    And, again, the Y stands for?

10   A    Yes.

11   Q    Then the next column is "OD"?

12   A    That means overdose.

13   Q    And do we have dates there?

14   A    Yes.  That would be denoted also in the file by the

15   date if the patient overdosed.

16   Q    And do we also have that information in Exhibit 1-B

17   which Mr. Stewart introduced, the overhead chart?

18   A    Yes.

19   Q    Then "term", what does that mean?

20   A    That denotes a date in the file if the patient was

21   terminated from pain management.

22   Q    And the next column?

23   A    Whether the patient was reinstated to pain

24   management.

25   Q    And then the last column states "provider".  Which

2010

```
 1    provider is this denoting?

 2    A    The provider that issued the Actiq.

 3    Q    The first prescription?

 4    A    Yes.

 5    Q    And have we put at the bottom of this chart a legend

 6    to remind the jury what is being discussed in each

 7    column?

 8    A    Yes.

 9    Q    We also have some other abbreviations here if I can

10    find one here.  Number 43 it says -- sorry -- number 18

11    for Mark C, it says DDD.  What does DDD stand for?

12    A    That would mean Degenerative Disk Disease.

13    Q    And we also have I believe a DJD.  What does DJD

14    stand for?

15    A    That would be Degenerative Joint Disease.

16    Q    Now let me hand you what has been marked for

17    identification as Exhibit 1-L-1.  Is that a sub-set of

18    Exhibit 1-L-2?

19    A    Yes.

20    Q    And do you recognize that document as being the same

21    chart that appears in the Indictment relative to Counts

22    10, 11 and 12?

23    A    Yes.

24    Q    Does it simply list the names, ages and diagnoses of

25    the 37 individuals who received Actiq prescriptions?
```

1    A    Yes.

2    Q    And did we prepare that from the same information

3    that was used in Exhibit 1-L-2?

4    A    I did.

5    Q    Does it summarize voluminous information?

6    A    Yes, it does.

7    Q    Does it accurately reflect the data it summarizes?

8    A    Yes, it does.

9            MS. TREADWAY:  Government would offer Exhibit

10   1-L-1 as a summary exhibit.

11           MR. WILLIAMSON:  Same objection, Your Honor.

12           MR. BYERS:  Join in that.

13           THE COURT:  It's received.

14           MS. TREADWAY:  I think we have a blow-up of

15   this one.

16   BY MS. TREADWAY:

17   Q    Again, the first column, is that just a sequential

18   number?

19   A    Yes, it is.

20   Q    And the individual's name, their age at which the

21   first Actiq prescription and then the diagnosis for

22   which the Actiq prescription was issued?

23   A    Yes.

24   Q    Now, these patients are arranged alphabetically; is

25   that correct?

1    A    By last name.

2    Q    What is the youngest person on the chart?

3    A    Tori S.

4    Q    How old was Tori S when she received her first

5    prescription for Actiq?

6    A    15.

7    Q    Now, with regards to these 37 people on Exhibit

8    1-L-1, did any of the patients listed here have a

9    diagnosis for cancer?

10   A    No.

11   Q    Now let me hand you what has been marked for

12   identification as 1-L-3.  Is that a further distillation

13   of the information from Exhibit 1-L-2, the comprehensive

14   chart?

15   A    Yes, it is.

16   Q    And does it accurately summarize and reflect the

17   data it summarizes?

18   A    Yes.

19              MS. TREADWAY:  Government would offer Exhibit

20   1-L-3 as a summary exhibit.

21              MR. WILLIAMSON:  Same objection.

22              MR. BYERS:  Same, Your Honor.

23              THE COURT:  It's received.

24   BY MS. TREADWAY:

25   Q    Mr. Redd, of the 77 individuals from the larger

2013

1    chart who received Actiq prescriptions, how many were

2    under the age of 21?

3    A    Four.

4    Q    And was that Michael C, age 16; Lacey F, 20; Tori S,

5    15; and Emily T, 20?

6    A    Yes.

7    Q    According to the Clinic's progress notes, how many

8    of the 77 had cancer?

9    A    Two.

10   Q    According to the Clinic's progress notes, how many

11   were receiving Actiq for migraines or headaches?

12   A    27.

13   Q    According to the progress notes, how many were

14   receiving Actiq for back pain and related ailments?

15   A    16.

16   Q    According to the Clinic's progress notes, how many

17   were receiving Actiq for other general pain conditions?

18   A    14.

19   Q    And according to the Clinic's progress notes, how

20   many were receiving Actiq for Fibromyalgia?

21   A    Six.

22   Q    And how many were receiving Actiq for miscellaneous

23   diagnoses?

24   A    Ten.

25   Q    And there are two others which we didn't really know

2014

1    what to do with and that's Hannah D, number 22, the

2    progress notes indicated lungs; and Shari P, indicated

3    liver transplant?

4    A    Yes.

5    Q    We didn't put these into categories, did we?

6    A    That's correct.

7    Q    How many of the people on the 77 person chart had

8    indications of drug-seeking behavior and addiction as

9    noted in the Clinic's records?

10   A    Of the 77?  55.

11   Q    And how many patients received Actiq after an

12   overdose as noted in the Clinic's records?

13   A    Two patients.

14   Q    And were those Sharon B and Lanny D?

15   A    Yes.

16   Q    And based on the Clinic's records, how many patients

17   received Actiq after allegedly being terminated from

18   controlled substance prescriptions?

19   A    Five patients.

20   Q    In addition to the medical information in the charts

21   we just discussed with the jury, did you prepare summary

22   charts regarding the payments for Actiq prescriptions

23   that the Defendant's Clinic issued to the 37 people

24   listed in Exhibit 1-L-1 that are the subject of Counts

25   10 through 12 of the Indictment?

2015

1    A    Yes.

2    Q    And was this information obtained from the claims

3    data Mr. Seaton worked with?

4    A    Yes, it was.

5    Q    And using this information, did you develop four

6    summary charts for the jury?

7    A    Yes.

8    Q    Let me hand you what has been marked for

9    identification as Exhibit 1-L, and Exhibits 10, 11 and

10   12.  Do those exhibits summarize voluminous information?

11   A    Yes.

12   Q    And will it eliminate the need for the jury to

13   review the voluminous data that you reviewed and Mr.

14   Seaton reviewed?

15   A    Yes.

16   Q    Does it accurately reflect the data it summarizes?

17   A    Yes, it does.

18            MS. TREADWAY:  Government offers Exhibits 10,

19   11, 12 and 1-L as summary exhibits under Federal Rule of

20   Evidence 1006.

21            MR. WILLIAMSON:  Same objection, Your Honor.

22            MR. BYERS:  Same, Your Honor.

23            THE COURT:  It's received.

24   BY MS. TREADWAY:

25   Q    Let's look at Exhibit 1-L as we're working through

2016

1    our other exhibits.  Do you -- we'll be able to put the

2    other exhibits up for the jury.  Let's start with

3    Exhibit 10, Mr. Redd.  To which healthcare benefit

4    program does this exhibit relate?

5    A   Medicaid.

6    Q   And does it indicate the payments made for the Actiq

7    prescriptions for the Medicaid insured individuals that

8    are on Exhibit 1-L-1, the 37 from the Indictment?

9    A   Yes.

10   Q   Again let's just remind the jury how this is set up.

11   We have the individual's name in the first column.

12   Their age at first RX and their diagnosis.  And then new

13   information we have is in the last column "Medicaid

14   payments made"?

15   A   Yes.

16   Q   What was the total amount of money that Medicaid

17   paid for the Actiq prescriptions for those on the chart

18   related to the 37 individuals?

19   A   $381,632.51.

20   Q   Moving to Exhibit 11.  Is that the same type of

21   chart but relating to a different healthcare benefit

22   program?

23   A   Yes, First Guard.

24   Q   And what was the total amount of money that First

25   Guard paid for Actiq prescriptions for the folks insured

2017

1   by First Guard in the list of 37?

2   A   $49,176.79.

3   Q   Now, on this list, Exhibit 11, we see two names that

4   we also saw on Exhibit 10.  So we saw two names on

5   Medicaid's list and First Guard's list.  Are these

6   duplicative payments or are they payments at different

7   times?

8   A   Payments at different times.

9   Q   To which healthcare benefit program does Exhibit 12

10  relate?

11  A   Blue Cross/Blue Shield of Kansas.

12  Q   And what was the total amount that Blue Cross/Blue

13  Shield of Kansas paid for Actiq prescriptions issued to

14  Blue Cross/Blue Shield insureds in the list of 37?

15  A   $92,148.74.

16  Q   And totaling those three programs together, what was

17  the total paid for the Actiq prescriptions for these

18  patients?

19  A   The total of all three healthcare programs was

20  $522,958.04.

21  Q   We just introduced Exhibit 104 and I would like to

22  direct your attention to item 6.  Could you read that

23  for the jury please?

24  A   Line 6 is:  "Will no longer use transmucosal

25  Fentanyl for First Guard patients, although there is

2018

1    scientific support for off-label use which we can

2    provide."

3    Q    So this is a promise that was made in January of

4    2005, according to the date of the letter?

5    A    Yes.

6    Q    Now, in your review of these Actiq prescriptions,

7    although you did not find any further Actiq

8    prescriptions for First Guard patients, did you in fact

9    find Actiq prescriptions for other patients that were

10   insured by other programs?

11   A    Yes.

12   Q    And can the jury find those people simply by looking

13   at Exhibit 1-L-2, the comprehensive chart, looking at

14   the last prescription and running the date and seeing

15   dates after January '05?

16   A    They could.

17   Q    And approximately how many people who were not

18   insured by First Guard continued to receive Actiq

19   prescriptions after January of '05?  Let me hand you

20   something that may refresh your recollection.

21   A    30.

22   Q    Is that a list that you compiled prior to your

23   testimony today?

24   A    Yes.

25   Q    Was one of the individuals that received Actiq after

2019

```
 1   the Defendant promised First Guard that he would not

 2   prescribe Actiq to First Guard patients Robin G, the

 3   subject of Counts 4 and 9 of the Indictment?

 4   A    Yes.

 5   Q    And is she on Exhibit 1-L-2 as number 28?

 6   A    She is.

 7   Q    Agent Redd, when we last spoke to you, you talked to

 8   the jury about the DEA registration numbers that doctors

 9   and other healthcare providers can apply for.  Is it

10   necessary to have a DEA registration number to practice

11   medicine?

12   A    No, it is not.

13   Q    When is it necessary to have a DEA registration

14   number?

15   A    Physician would need a DEA registration number if

16   they were going to order, prescribe, administer any

17   controlled substances.

18   Q    During the course of the investigation, did you ever

19   ask the Defendant Stephen Schneider to voluntarily

20   surrender his DEA registration number?

21   A    Yes.

22   Q    When did you do that?

23   A    I believe it was May, May of '06.

24   Q    And when did you do it again?

25              MR. WILLIAMSON:  Your Honor, I'm going to
```

2020

1    object.  There is no indication that he did it again.

2    That's -- that's leading the witness, clearly.

3              THE COURT:  Overruled.

4    BY MS. TREADWAY:

5    Q   And did you do it again?

6    A   Yes.

7    Q   When?

8    A   It was the first of February.

9    Q   Year?

10   A   '08.  I'm sorry.

11   Q   Did the Defendant voluntarily surrender his DEA

12   registration number on either of those occasions?

13   A   No, he did not.

14   Q   Nevertheless, did his DEA registration number get

15   suspended?

16   A   Yes.

17   Q   Why?

18   A   As a requirement of the medical license, the state

19   medical license, for you to have a DEA registration

20   number you have to have a medical license.  If your

21   medical license is suspended, revoked, taken away, then

22   you no longer are eligible to have a DEA registration.

23   Q   Let me hand you what has been marked for

24   identification as Exhibits 110 through 110-C.  You

25   recognize those documents, sir?

2021

1    A    Yes.

2    Q    Are they public records regarding the actions taken

3    by the Kansas Board of Healing Arts against the

4    Defendant Stephen Schneider's medical license?

5    A    They are.

6    Q    Using those documents simply to refresh your

7    recollection about certain dates, can you look at

8    Exhibit 110 and tell the jury when was the first

9    petition filed against the Defendant by the Kansas Board

10   of Healing Arts?

11   A    May 30th, 2006.

12   Q    Looking at Exhibit 110-A, when was the first amended

13   petition filed against the Defendant by the Kansas Board

14   of Healing Arts?

15   A    September 1st, 2006.

16   Q    Looking at Exhibit 110-B, when was the second

17   amended petition filed against the Defendant by the

18   Kansas Board of Healing Arts?

19   A    November 13th, 2007.

20   Q    And looking at Exhibit 110-C, when did the Kansas

21   Board of Healing Arts suspend the Defendant's license?

22   A    January 29th, 2008.

23   Q    With the suspension of his license, was the

24   Schneider Medical Clinic closed?

25   A    Yes.

2022

```
 1    Q    And after his license was suspended, did the DEA
 2    take action to remove his DEA registration number from
 3    him?
 4    A    Yes.
 5    Q    And was that because he would not voluntarily
 6    surrender it at that time?
 7    A    Yes.
 8              MS. TREADWAY:  That's all, Judge.
 9              THE COURT:  Let's take our afternoon recess,
10    Ladies and Gentlemen.  Approximately 15 minutes.
11    Remember and heed the admonition.
12                   (Recess.)
13              THE COURT:  I was going to tell you that I
14    went outside, but it's dry.  It's not raining.  We
15    haven't heard anything about any tornadoes.  Supposedly
16    we're in, you know, in the red area, but there's no
17    warnings.  Obviously, we would let you know if there was
18    a warning.  And I don't suppose there's a safer building
19    in Wichita than here.  All right.  Yes, sir.
20              MR. WILLIAMSON:  Thank you, Your Honor.
21                   **CROSS EXAMINATION**
22    BY MR. WILILAMSON:
23    Q    Can we take a look at Exhibit 1-L together, Agent
24    Redd.  You were asked a few questions about Exhibit 1-L.
25    A    Yes.
```

2023

```
 1     Q    And I just want to clarify.  The monies that are
 2     identified in this chart were not paid to Dr. Schneider
 3     or the Schneider Medical Clinic; correct?
 4     A    That was just the amount that was paid from the
 5     program.
 6     Q    My question is:  Was this amount paid to the
 7     Schneider Medical Clinic for Dr. Schneider himself?
 8     A    I'm not sure where the money went.
 9     Q    Well, what do these monies represent?
10     A    This was money that was from the healthcare
11     programs.
12     Q    And it says Actiq prescription payments at the top;
13     correct?
14     A    Right.
15     Q    So you don't know what this chart represents?
16     A    Yeah, it represents what was paid out from the
17     healthcare programs.
18     Q    Okay.  And wasn't this paid to the various
19     pharmacies that filled Actiq prescriptions?
20     A    That's correct.
21     Q    Okay.  And clinic did not have its own prescriptions
22     filled -- you know, no pharmacy on campus; correct?
23     A    No, they did not.
24     Q    So this amount represents what was paid out from
25     these various insurance companies; correct?
```

2024

```
 1    A    Yes.
 2    Q    Now, you mentioned -- and you can leave that up,
 3    Mr. Moore, please.
 4         You were asked questions about Actiq.  Do you
 5    remember that?
 6    A    Uh-huh.
 7    Q    And you remember the questions you were asked
 8    regarding whether or not Dr. Schneider stopped
 9    prescribing Actiq to First Guard patients.  You remember
10    that?
11    A    Yes.
12    Q    And so based on your review, Dr. Schneider stopped
13    prescribing Actiq to First Guard patients around January
14    of '05.  Is that true?
15    A    I believe he kept prescribing after January of '05.
16    Q    I'm asking about First Guard patients?
17    A    And your question again.
18    Q    My question is: Isn't it true that Dr. Schneider
19    stopped prescribing Actiq to First Guard patients after
20    around January of 2005?
21    A    I believe he continued after '05, January of '05
22    with First Guard.
23    Q    How many times did Dr. Schneider prescribe to --
24    prescribe Actiq to First Guard patients after January of
25    '05?
```

2025

```
1   A    What I'm thinking about is --

2   Q    Sir?

3   A    30 people.

4   Q    Is that 30 people -- as you testified earlier, the

5   questions were how many people other than First Guard

6   patients were prescribed Actiq after January of '05.  Do

7   you remember those questions?

8   A    Other than First Guard?

9   Q    Yes.

10  A    None.

11  Q    Okay.  So I want to make sure I understand.  Let me

12  have 1-L-2, please.  So as I understand your testimony,

13  you're saying that Dr. Schneider continued to prescribe

14  to 30 First Guard insurance patients after January of

15  '05?

16  A    I believe that's right.

17  Q    Okay.  Can you look at 1-L-2 and give me just a few

18  names so I can start tracking that.

19           MS. TREADWAY:  Judge, I think the witness is

20  misspeaking.  If --

21           MR. WILLIAMSON:  Your Honor -- I'm sorry, Ms.

22  Treadway, but you cannot give this man his answers.  He

23  had his chance to direct, Your Honor.

24           MS. TREADWAY:  If he had the document to

25  rerefresh his recollection, I believe he could clear
```

2026

 1    this up, Judge.

 2              THE COURT:  Well, this is Mr. Williamson's

 3    opportunity to cross-examine the witness.  If the man

 4    needs help, you can help him on redirect.

 5    BY MR. WILLIAMSON:

 6    Q    So it's your testimony -- strike that.

 7         Can you point to any specific First Guard patients

 8    that received Actiq prescriptions after January of '05?

 9    A    On Exhibit 1-L-2?

10    Q    Any exhibit.

11    A    That's not located on 1-L-2.

12    Q    Any exhibit that you have in front of you?

13    A    That's not located on here, no.

14    Q    On none of 'em?

15    A    Huh-uh.

16    Q    No exhibit?

17    A    Not the dates, no.

18    Q    Well, I thought that when you were asked on direct

19    examination about these Actiq payments you stated that

20    30 people who were not First Guard patients continued to

21    receive Actiq prescriptions after January of '05.  Did I

22    misunderstand?

23    A    That's correct.

24    Q    I misunderstood?

25    A    No, you're correct.

1   Q   I'm correct.  But you did not testify about any

2   people who were First Guard patients receiving an Actiq

3   prescription after January of '05; correct?

4   A   I'm sorry.  Again.

5   Q   You did not testify about 30 individuals, or any

6   individuals who were First Guard patients receiving

7   Actiq after January of '05; correct?

8   A   That was something that I made up from 1-L-2 and put

9   together the names.

10  Q   Where is that?

11  A   That's in a document that I had put together that --

12  Q   The 30 names that Ms. Treadway just showed us?

13  A   Refresh my memory, yeah.

14  Q   And it's your recollection -- may I see that

15  document, please.  It's your recollection that the

16  individuals on this document were actually First Guard

17  patients?

18  A   Yes.

19  Q   Okay.  Can you read the highlighted part of your

20  document that you generated?

21  A   These were 30 receiving Actiq after January of 2005,

22  not insured.

23  Q   Okay.  So it's 30 people who were not insured by

24  First Guard; correct?

25  A   You are correct.

2028

1    Q    And you haven't identified any individuals in any

2    review of any patients that were receiving First --

3    excuse me -- Actiq after January of '05.  Is that fair?

4    A    I believe that's right.

5    Q    All right.  Did you -- you never came across any

6    requests from Medicaid for Dr. Schneider not to

7    prescribe any Actiq to patients; correct?

8    A    Repeat the question, please.

9    Q    You didn't come across any request from Medicaid for

10   Dr. Schneider to cease prescribing Actiq to patients;

11   did you?

12   A    Not that I know of, no.

13   Q    You didn't come across any requests from Blue

14   Cross/Blue Shield for Dr. Schneider to stop prescribing

15   Actiq to patients; correct?

16   A    Not that I know of, no.

17   Q    Can we look at 104 in that same paragraph that we

18   just discussed.  Paragraph 6, please.

19        In this letter Dr. Schneider represents that he

20   will no longer use Fentanyl for First Guard patients;

21   correct?

22   A    Correct.

23   Q    He never represents that they're not going to

24   prescribe Actiq to any patients of the clinic, do

25   they -- does he?

1    A    It's just talking about First Guard.

2    Q    Okay.  Nowhere in that letter does he state that

3    we're no longer going to use the Actiq for all patients;

4    does he?

5    A    Correct.

6    Q    And he also states here that there is scientific

7    support for off-label use which he can provide.  Do you

8    see that?

9    A    I'm reading that, yes.

10   Q    And you're aware that it's not against any federal

11   law to prescribe medicine for off-label use; correct?

12   A    Not that I recall.

13   Q    Okay.  Now, you mentioned the fact that Actiq was

14   provided for all these different diagnoses.  Do you

15   remember that?  I think 1-L-2 would get you there.

16   A    Yes.

17   Q    Okay.  Now, you developed the diagnosis field from

18   what?

19   A    The progress note in the patient file.

20   Q    Okay.  So what you found in the progress note

21   accurately represented what the clinic believed the

22   diagnosis was; correct?

23   A    Yes.

24   Q    Okay.  Can you tell the jury about what, what is the

25   misrepresentation that you found between these

2030

1    diagnoses?  Did you find any misrepresentations?

2    A    As far as what?

3    Q    As far as did you see Dr. Schneider representing to

4    insurance companies that patients had cancer when in

5    fact they had a migraine?

6    A    That's not documented in the progress report.

7    Q    That's not documented anywhere in these summary

8    charts, is it?

9    A    No, it is not.

10   Q    Okay.  There is nothing documented in these charts

11   that shows that Dr. Schneider was creating these

12   fictional cancer diagnoses in order to get support for

13   payment; correct?

14   A    That's not in the patient file.

15   Q    Now, isn't it true that First Guard asked to --

16   asked Dr. Schneider to stop prescribing these medicines

17   because they were so expensive?

18   A    I'm not aware of that, no.

19   Q    Okay.  Now, you were asked questions about the age

20   of individuals receiving Actiq.  Do you remember that?

21   A    Yes.

22   Q    There is no prohibition in somebody under the age of

23   21 -- strike that.

24       There's no federal law stating that an individual

25   under the age of 21 can't receive Actiq; correct?

```
1    A    A federal law?

2    Q    Yes.

3    A    Not that I recall, no.

4    Q    Not a federal regulation, is there?

5    A    No, sir.

6    Q    You were also asked questions about the provider --

7    strike that.

8         You labeled the field DSB, drug-seeking behavior,

9    on Exhibit 1-L-2.  You remember that?

10   A    That's correct.

11   Q    Who determined whether it was drug-seeking behavior?

12   A    The provider.  The physician.

13   Q    Okay.  Who decided whether to include a Y in this

14   field?

15   A    Well, if the patient file or the progress note

16   reflected that there was a some type of drug-seeking

17   behavior from the patient, obviously, that's a yes.

18   Q    Okay.  But who made that determination whether the

19   progress note actually stated drug-seeking behavior?

20   A    When I read the progress note --

21   Q    Yes.

22   A    -- and it showed drug-seeking behavior.

23   Q    What is drug-seeking behavior?  What did you utilize

24   as a standard to determine whether or not something was

25   classified as drug-seeking behavior or not?
```

2032

1    A    If it denoted drug-seeking behavior.

2              THE COURT:  I had a question about that, too.

3    Are you saying that in a record that you reviewed it

4    said this patient is exhibiting drug-seeking behavior?

5    Or are you interpreting the note or the entry in the

6    record to be drug-seeking behavior?

7    A    Your Honor, sometimes the patient file or the

8    progress note in the patient file would state that the

9    patient would be seeking other drugs or they would have

10   some type of --

11             THE COURT:  No, I mean --

12   A    -- drug behavior.

13             THE COURT:  -- had this on direct and you

14   didn't ask it but now that we're bringing it up.  Does a

15   record from the Schneider Medical Clinic or whatever say

16   this patient is seeking drugs or something to that

17   effect?

18   A    I don't know that the exact words are this patient

19   is seeking drugs or has a drug-seeking behavior.

20             THE COURT:  Thank you.

21   BY MR. WILLIAMSON:

22   Q    What criteria did you utilize to determine whether

23   or not a note contained information about a drug-seeking

24   behavior?

25   A    If the patient file or the progress note had certain

2033

1    things in it such as the person called in and had

2    misplaced their drugs or anything to the provider that

3    would make them denote in the progress note that this

4    patient had suspicious activity or some type of other

5    behavior other than just taking their medication and

6    coming in the next month.

7    Q    Okay.  Again, my question is what criteria?  Give me

8    one, two, three, four and five.  What things that caused

9    you to denote whether or not there was drug-seeking

10   behavior?

11   A    There's not a standard that I used.

12   Q    Okay.  So if you felt like it was drug-seeking

13   behavior from reviewing the record, you included it on

14   this chart?

15   A    Yes.

16   Q    And there's no concrete standard that I could look

17   at and apply to the records that you utilized?

18   A    I don't know if there's a standard or not.

19   Q    You didn't use one?

20   A    No, I did not.

21   Q    Now, you mentioned this provider -- that the

22   provider only included the first provider that saw the

23   patient; correct?

24   A    I'm sorry.

25   Q    Under this provider column you mentioned that the

2034

1  person identified there was only the first provider to

2  see the patient; correct?

3  A   Right.  That was the provider that usually saw the

4  patient.

5  Q   Okay.  But you didn't include the last provider or

6  any other subsequent providers; correct?

7  A   Correct.

8  Q   So, for instance, looking at number 12, by Terry C,

9  you have Dr. Schneider as the actual first provider;

10  correct?

11  A   Yes.

12  Q   Okay.  And then they didn't receive an Actiq

13  prescription until they had been visiting the clinic for

14  three years; correct?

15  A   That's correct.

16  Q   Okay.  But we don't know, based on your summary

17  chart, whether or not Dr. Schneider was the provider

18  that issued the prescription on that first Actiq visit,

19  do we?

20  A   Dr. Schneider would have been the one to issue the

21  prescription.

22  Q   I thought you said that the provider was the first

23  provider to see the patient.  Are you saying it's the

24  first provider to issue the prescription?

25  A   I didn't understand your question.

2035

1    Q    Okay.  I'm just trying to make sure I understand

2    what this field means.  Is it the first provider who

3    issued the prescription or is it the first provider that

4    actually saw the patient?

5    A    Well, it may be one and the same.

6    Q    Right.  But it may be --  but in all cases, it's

7    either one or the other.  So I'm trying to figure out

8    which one it is.

9    A    Right.  It's going to be the same.

10   Q    Okay.  Well, just using Terry C as an example.  She

11   was first seen by the clinic on 6-8-03.  Her first Actiq

12   prescription was 3 of '06.  Do you see that?

13   A    Right.

14   Q    So Dr. Schneider may not have been the first

15   provider but he could have written the first

16   prescription for Actiq?

17   A    He could have.

18   Q    Okay.  So which one does this provider field

19   actually correlate with?

20   A    Well, if the provider saw the patient and wrote the

21   first prescription, it's going to be the same.

22   Q    We're not talking about that situation.  I think

23   we're clear on that.

24   A    Okay.

25   Q    I'm talking about the situation where the first

2036

1    office visit differs from the first Actiq prescription.

2    Which one does that -- which one does the provider

3    column correlate with?

4    A    That's going to be the physician that saw the

5    patient.

6    Q    Okay.  So in those situations --

7    A    There could be other physicians that see the same

8    patient.

9    Q    And that's what I'm trying to figure out.  Just what

10   do you mean here by provider?

11   A    That would be the first time.

12   Q    The first time what?

13   A    That the patient was seen.  That would be that

14   primary care physician, I guess you would say.

15   Q    Okay.  So the provider column correlates to the

16   first OV column?

17   A    Yes.

18   Q    It doesn't necessarily correlate to the first Actiq

19   column?

20   A    It may be one and the same.

21   Q    So when the first office visit and the first Actiq

22   dates are the same, the provider column correlates with

23   first OV and first Actiq?

24   A    At times it could be, yes.

25   Q    Okay.  Let's just put this up for a little bit so

2037

1    the jury can kind of follow what we're talking about

2    here.  I'm just focused on Terry C because I found that

3    there is a difference between -- and we'll show for the

4    jury, we're starting at number 12, because there's a

5    difference between the first office visit which is 6-8

6    of '03, and then there's a 4-3 of '06.  Do you see that?

7    A    Yes.

8    Q    And then we have over here the provider column it

9    says Schneider.  Do you see that?

10   A    Correct.

11   Q    Now, what I want to make sure we're all on the same

12   page is when we see a situation where the first office

13   visit differs from the first Actiq date, which would be

14   this column, which column does the provider column

15   correlate with?  This date, the first Actiq date?  Or

16   this date, the first office visit date?

17   A    I don't recall exactly.  I mean, there's a lot of

18   columns that aren't going to be the same.

19   Q    Okay.  So as I understand it, don't have an answer

20   as to whether or not that provider column correlates

21   with this first Actiq date or if it correlates with the

22   first office visit date?

23   A    No, I don't recall which date it would go to.  I

24   mean, on all of the majority of the columns, the first

25   office visit versus the first Actiq prescription is

2038

1    different.

2    Q    I --

3    A    This chart is not going to denote whether the

4    provider of Schneider is -- saw this patient the entire

5    time.

6    Q    I'm not asking about the entire time, sir.  You gave

7    this chart to the jury to review in substitution for the

8    actual records.  I think they would appreciate just

9    having an idea how to correlate this provider with this

10   chart.  I'm not asking trick questions.  The data is

11   what it is.  But as this summary chart, what does that

12   correlate with?  You don't know whether that means it

13   correlates with the first Actiq prescription given or if

14   it correlates with the first office visit.  Is that

15   fair?

16   A    I don't recall which column it would specifically

17   relate to.

18   Q    You were asked questions about whether or not Dr.

19   Schneider would voluntarily relinquish his DEA license.

20   You remember that?

21   A    Yes.

22   Q    And did it ever occur to you that Dr. Schneider

23   believes in his innocence as a reason why he didn't want

24   to give it up?

25   A    I don't know what he believed.

2039

1    Q    He hasn't been convicted of any federal crime, has

2    he?

3    A    That's correct.

4    Q    There's no requirement for him to just voluntarily

5    give it back, is there?

6    A    It's a voluntary surrender.

7    Q    Meaning he has a choice to voluntarily do it or not;

8    correct?

9    A    It's voluntary.

10   Q    And you were asked questions about the KSBHA.  You

11   remember that?

12   A    I don't know what the KSBHA is.

13   Q    Kansas Board of Healing Arts?

14   A    Yes.

15   Q    And you were asked questions about when a petition

16   was filed; correct?

17   A    Yes.

18   Q    And you were asked questions about when a suspension

19   actually occurred; correct?

20   A    With the state?

21   Q    Yes.

22   A    Yes.

23   Q    And you understand there was nearly a two year gap

24   between the time that that first petition was filed and

25   that suspension was issued; correct?

1    A    Yes.

2    Q    And you understand that suspension is temporary;

3    correct?

4    A    Yes.

5    Q    And you understand that Dr. Schneider has not been

6    found in violation of his standard-of-care leading up to

7    that suspension?  It basically preserves the status quo;

8    true?

9    A    Yes.

10   Q    And isn't it true that the Government told the KSBHA

11   to hold off doing anything to Dr. Schneider until they

12   got a chance to file their Indictment?

13   A    I'm sorry.  Say that again.

14   Q    Isn't it true that the Government told the state

15   Board of Healing Arts not to do anything in relation to

16   Dr. Schneider until they got a chance to file -- or you

17   guys got a chance to file an Indictment?

18   A    I wasn't a part of that conversation.

19   Q    Now, you also gave us a couple of more exhibits to

20   look at and I want to see if we can just make sure that

21   these things are accurate.  Turn to 1-L-1, would you

22   please.  I just want to make sure I'm not misreading

23   this so I don't make any improper incorrect statements

24   during my closing argument.  Okay?

25        Take a look at entry number 21 on this form.  Do

2041

1    you see that?

2    A    Uh-huh.  Yes, I do.

3    Q    Now, as I understand it, 1-L-1 is a summary of all

4    the individuals in Counts 10 through 12; correct?

5    A    That's correct.

6    Q    That's what's at the top of this document; right?

7    A    Yes.

8    Q    Now, you have Exhibits 10, 11 and 12 in front of

9    you, don't you?

10   A    Yes.

11   Q    Can you look at Exhibit 10 and tell us does Exhibit

12   10 have Gala H identified anywhere on that exhibit?

13   A    No, it does not.

14   Q    Can you look at Exhibit 11 and tell us whether or

15   not Gala H is anywhere on that exhibit?

16   A    No, she is not.

17   Q    Can you look at Exhibit 12 and tell us if Gala H is

18   on that exhibit?

19   A    No, she is not.

20   Q    So we have a Gala H on 1-L-1 that purports to

21   summarize everybody from Counts 10, 11 and 12, yet Gala

22   H doesn't appear on any of the exhibits that you

23   authenticated for 10 or 11 or 12; correct?

24   A    That's correct.

25   Q    Well, let's look at number 22, Mark L.  Is there a

1    Mark L on Government Exhibit 10?

2    A   No, there is not.

3    Q   Okay.  Is there a Mark L on Government Exhibit 11?

4    A   No, there is not.

5    Q   Is there a Mark L on Government Exhibit 12?

6    A   No, there is not.

7    Q   So, again, we have another error between the

8    correlation between Exhibit 1-L-1 and Exhibits 10, 11

9    and 12; correct?

10            MS. TREADWAY:  Objection.  The argument that

11   it's an error, Judge.

12            THE COURT:  Overruled.

13   BY MR. WILLIAMSON:

14   Q   Mark L doesn't appear on 10 or 11 or 12; correct?

15   A   It does not appear.

16   Q   So 1-L-1 missummarizes Exhibits 10, 11 and 12 so far

17   as you missed two; correct?

18   A   I don't know if it's a missummarization.  They

19   weren't included in the provider pay-outs.

20   Q   But they're on Count Exhibit 1-L-1; correct?

21   A   Yes, they are.

22   Q   All right.  Can you look at Exhibit 10, please.  Or

23   hold on, Mr. Moore.  Let's look at one more name.  You

24   have on number 24 is Brandy M on Government Exhibit 10.

25   A   Yes.

2043

1    Q    Brandy M is?

2    A    Brandy M is number 24 on 1-L-1.

3    Q    On Government Exhibit 10, do we see a Brandy M?

4    A    No.

5    Q    On Government 11, do we see a Brandy M?

6    A    No.

7    Q    On Government Exhibit 12, do we see a Brandy M?

8    A    No.

9    Q    All right.  Now, can we look at the title of

10   Exhibit, Government Exhibit 10.

11        Now, Count 10 represents the count that's in the

12   Indictment; correct?

13   A    Yes.

14   Q    And Exhibit 11 is Count 11 and Exhibit 12 is Count

15   12; correct?

16   A    Yes.

17   Q    And we find individuals in 1-L-1 that are absent

18   from these exhibits that are supposed to represent

19   the -- accurately represent who was actually in Count 10

20   through 12; correct?

21   A    That's correct.

22   Q    Now take a look -- looking at Government Exhibit 10.

23   There is a Brandy D.  Do you see that?  Scroll down just

24   a little bit, Mr. Moore.  Do you see that?

25   A    Yes.

1   Q   Age 41.  And if we can take a look at Exhibit 11.

2   There's another Brandy D that shows up, age 34.

3   Correct?

4   A   Yes.

5   Q   Okay.  Now, on Exhibit 1-L-1 there's only one Brandy

6   D identified; correct?  And that would be number 13?

7   A   That's correct.

8   Q   Now, so do you know where this Brandy D that's

9   actually age 34, where that comes from?

10  A   I would assume it's the same person.

11  Q   But they both have age at first prescription and one

12  of 'em says 41; correct?  On 1-L-1.  And on Exhibit 10

13  it states she was -- no, 41.  Correct?

14  A   Yes.

15  Q   But on Exhibit 11 it states she was 34 at the time

16  she received her first prescription; correct?

17  A   Yes.

18  Q   So there are names included on Counts 10, 11 and 12

19  exhibits, excluded from -- and excluded from 1-L-1;

20  correct?

21  A   I'm sure that's the same person.  I would have to go

22  back and review the file to make sure that's not a

23  typographical error in the age.

24  Q   So you would agree there's some errors somewhere in

25  these documents; correct?

1    A    There's going to probably be a human error.

2    Q    Maybe one human error?  But I've showed you three

3    names not included in these count Exhibits 10, 11 and

4    12, and I've showed you one name that is duplicated with

5    different ages between 1-L-1 and the other exhibits.

6    Those are -- that's more than one error, isn't it?

7    A    I don't know if it would be an error but --

8    Q    All right.

9    A    Definitely the Brandy D is.

10   Q    Can you explain to us why Gala H shows up on 1-L-1

11   which purports to represent Counts 10 through 12, but

12   doesn't show up on Exhibits 10, 11 or 12?

13   A    No, I cannot.

14   Q    Can you explain to us why Mark L shows up on 1-L-1

15   but doesn't show up on Government Exhibit 10, 11 or 12?

16   A    No, I cannot.

17   Q    Can you explain to us why Brandy M shows up on 1-L-1

18   but doesn't show up on Government Exhibit 10, 11 or 12?

19   A    No, I cannot.

20          MR. WILLIAMSON:  Your Honor, at this time

21   we'll move to exclude Exhibits 1-L-1, 10, 11 and 12

22   because it hasn't been shown to be accurate.

23          THE COURT:  Well, I think what I need to do is

24   to see if this can be cleared up on redirect examination

25   and then I'll make a ruling.  How about that?

1          MR. WILLIAMSON:  Thank you.  Nothing further

2     from me, Your Honor.

3          THE COURT:  Okay.  Golfball-sized hail coming

4     this way.  Wellington, from Oklahoma.  Tornado warning

5     for this area.  What do you want to do?  My concern on

6     this, frankly, is for your cars.  I'll let you go home

7     if you want to.

8                    (Off-the-record.)

9          THE COURT:  According to this, the hail will

10    be here at 5:00.  How much redirect do you have of this

11    witness and then I'll let the jurors go?

12         MS. TREADWAY:  Not very long, Judge.

13         MR. BYERS:  I have a smidge of cross, Your

14    Honor.

15         THE COURT:  Really?

16         MR. BYERS:  Yeah.

17         THE COURT:  Well, why don't you -- let's kind

18    of speed it up here and then -- because I don't want

19    them to have their cars damaged if they can avoid it.

20                    **CROSS EXAMINATION**

21    BY MR. BYERS:

22    Q    Good afternoon.

23    A    How are you?

24    Q    I just heard you testify "I don't recall" a number

25    of times; correct?

---

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

```
 1    A    Yes.
 2    Q    I heard you testify "not that I know of" a number of
 3    times; correct?
 4    A    Yes.
 5    Q    And I heard you testify at least one time "I wasn't
 6    a part of that conversation"; correct?
 7    A    That's correct.
 8    Q    Agent Redd, do you suffer any kind of memory
 9    impairment?
10    A    No, I don't.
11    Q    Okay.  Do you recall a conversation you had with
12    Mr. Williamson way back on the first day of trial, 13
13    days ago, where he asked you specifically -- and I'm
14    reading from Cindy's transcript -- "Are you aware of any
15    government agency as part of the investigation of this
16    case sending in an undercover agent into the Schneider
17    Medical Clinic".  Do you remember that question?
18    A    I do.
19    Q    Do you remember your answer as being "not that I'm a
20    part of or aware of".  You remember that?
21    A    That's correct.
22    Q    Okay.  And Mr. Williamson said:  "Okay.  So that --
23    so not that you're aware of?"  Do you remember that
24    question?
25    A    Yes.
```

2048

1    Q    And your response was:  "Right".  Is that correct?

2    A    Correct.

3    Q    So if we've heard from at least two federal agents

4    thus far, and may here from others before the case gets

5    to the jury, that you indeed were a part of

6    conversations about an undercover operation, who are we

7    supposed to believe?

8    A    I was never a part of any conversations with

9    undercover operations.

10   Q    So we're to believe you?

11   A    Yes.

12          MR. BYERS:  Okay.  Thank you.

13          THE COURT:  All right.  Redirect.  Quickly,

14   please.

15          MS. TREADWAY:  Thank you, Judge.

16                    **REDIRECT EXAMINATION**

17   BY MS. TREADWAY:

18   Q    When people ask you in unspecific questions,

19   sometimes they get unspecific answers, wouldn't that be

20   right?

21   A    Somewhat.

22   Q    When Mr. Williamson was asking you about whether you

23   had conversations with the undercover operators, you

24   didn't know who they were, did you?

25   A    No.

2049

1   Q    So you couldn't have had conversations with them?

2   A    No.

3   Q    And was that the truth?

4   A    Yes.

5   Q    Now, with regards to the issue about the patients,

6   the 37 patients on 1-L-1.

7   A    Yes.

8   Q    And the patients listed in Counts 10, 11 and 12.

9   A    Yes.

10  Q    If the patients were not insured by Medicaid, First

11  Guard or Blue Cross/Blue Shield of Kansas, were they in

12  Counts 10, 11 and 12?

13  A    No.

14  Q    With regards to the provider column in the chart,

15  let's look at Katrina B.  And did we provide the

16  Defendants all of the supporting documents for this

17  chart?

18  A    Yes.

19  Q    And does it say "first prescription progress note?"

20  A    Yes.

21  Q    And then does it have the progress note?

22  A    Yes, it does.

23  Q    And in Katrina's case, the first progress note is

24  2-18 of '03?

25  A    Yes.

1    Q   And that looks to be Kim He'bert?

2              MR. WILLIAMSON:   Your Honor, I'm going to

3    object.   That calls for evidence -- or excuse me -- that

4    calls for evidence -- calls for information not in

5    evidence.   And for speculation.   She is testifying as to

6    who did this on the document where there has not been

7    established who that signature belongs to.

8    BY MS. TREADWAY:

9    Q   Do you recognize who this progress note is by?

10   A   Yes.

11   Q   Is it Steve Schneider?

12   A   No.

13   Q   And then we have first Actiq progress note.   Is this

14   Steve Schneider's handwriting?

15   A   Yes.

16   Q   And is that the first prescription for Actiq?

17   A   Yes, it is.

18   Q   And is he listed as the provider in the column?

19   A   Yes, he is.

20   Q   So does that column indicate the first provider that

21   provided Actiq?

22   A   Yes.

23   Q   And sometimes it's also the first provider that ever

24   saw the patient?

25   A   It could be, yes.

2051

1    Q    Not in this case, but sometimes?

2    A    Yes.

3    Q    For instance, again, very briefly, going to look at

4    Terry C who Mr. Williamson was asking you about.  Did

5    Dr. Schneider see her not only on the first visit,

6    6-8-03 --

7              MR. WILLIAMSON:  Your Honor, I'm going to

8    object to the same line of questioning.  She is again

9    presuming who these signatures belong to without any

10   evidence.

11             MS. TREADWAY:  I just asked him.

12             THE COURT:  What are you showing the witness?

13             MS. TREADWAY:  The progress note relative to

14   the entry.

15             THE COURT:  I think Mr. Williamson's objection

16   is that there hasn't -- if you're asking him to identify

17   Stephen Schneider's signature, there hasn't been any

18   foundation laid to show that he can identify it.

19             MS. TREADWAY:  I'll be glad to do that, Judge.

20             THE COURT:  Was that your objection?

21             MR. WILLIAMSON:  Yes, Your Honor.

22             THE COURT:  Well, if you can lay a foundation,

23   that's okay.

24   BY MS. TREADWAY:

25   Q    After reviewing all of these documents, sir, do you

1  recognize Stephen Schneider's writing and his signature?

2  A   I'm familiar with it, yes.

3  Q   And is it distinctive?

4  A   Yes.

5  Q   Is this Stephen Schneider's writing and signature?

6  A   Yes.

7  Q   And did he see Terry C on her first office visit?

8  A   He did.

9  Q   And did he also prescribe her first Actiq?

10  A   Yes.

11  Q   Is that what you were trying to explain to

12  Mr. Williamson?

13  A   Yes.

14  Q   With regards to the drug-seeking behavior, will Dr.

15  Parran be talking about that?

16  A   Yes, he will.

17          MS. TREADWAY:  Judge, we would, we would

18  withdraw Exhibit 1-L-2 at this time and we will let Dr.

19  Parran review that with the jury later and we'll reoffer

20  it at that time.  Otherwise, we offer 1-L-1, 1-L-3, as

21  well as 10, 11 and 12.

22          THE COURT:  Do you --

23          MR. WILLIAMSON:  Yes, there is a major issue,

24  Judge.

25          THE COURT:  Well, go ahead and do your

1    recross.  But are you still objecting to 1-L-3?  That's

2    the 77 patients.

3              MR. WILLIAMSON:  No.  I'm not objecting to

4    that.

5              THE COURT:  All right.  And she's going to

6    withdraw 1-L-2.

7              MR. WILLIAMSON:  And we object to 1-L-1.

8              THE COURT:  So let's turn to 1-L-1.

9              MR. WILLIAMSON:  And we object to 10, 11 and

10   12, which those all correlated.  Do you want me to ask a

11   few questions, Judge, or just make my--

12             THE COURT:  No.  I'm going to sustain the

13   objection as to 1-L-1.  It can be reoffered if it's

14   corrected.  If that's possible.  But the objection is

15   sustained as to 1-L-1.  1-L-2 is withdrawn.  It may be

16   reoffered through Dr. Parran.  And the objection to

17   1-L-3 is withdrawn.

18             MR. WILLIAMSON:  Correct.  We would also make

19   another quick motion to strike --

20             THE COURT:  Then I don't have to make any

21   rulings on 10, 11 and 12.

22             MR. WILLIAMSON:  Maybe.

23             THE COURT:  Because I haven't seen them.

24             MR. WILLIAMSON:  We offered them, I believe.

25             MS. TREADWAY:  I did, Judge.

```
1                THE COURT:  Yeah, but they're not before me.
2    I don't have them in this notebook so I don't know what
3    they say.  You still objecting to them?
4                MR. WILLIAMSON:  Yes.  And the reason is is
5    the Indictment actually includes the names that
6    Ms. Treadway say are missing from Exhibits 10, 11 and
7    12.
8                THE COURT:  It includes them?
9                MR. WILLIAMSON:  The Indictment includes them;
10   but based on the redirect, she states that they are not
11   subject to --
12               THE COURT:  Because they were cash patients.
13               MR. WILLIAMSON:  Right.  Which means that they
14   can't be subject to that kind of -- those counts because
15   that's the fraud insurance company.
16               THE COURT:  Yeah.  Medicaid, First Guard.
17   Then the ruling is that 10, 11 and 12, the objection is
18   sustained as to those.  They may be redrawn and then
19   reoffered.  Now --
20               MR. WILLIAMSON:  I don't have any other cross
21   for this witness.
22               THE COURT:  What about you, Mr. Byers?
23               MR. BYERS:  Yes.  Recross, Your Honor.  Thank
24   you.
25               THE COURT:  Oh, my God.
```

1          MR. BYERS:  I'm sorry.  I missed that.

2          THE COURT:  Here we are right in the target of

3     a tornado --

4          MR. BYERS:  I know.  I've got a car sitting

5     out there, too I'm hoping to get under a bridge but I've

6     got to deal with this first.

7                    **RECROSS EXAMINATION**

8     BY MR. BYERS:

9     Q    When Ms. Treadway got up here, she asked you if you

10    had conversations with undercover operators and you sort

11    of giggled together and decide, no, you couldn't do that

12    because you didn't know who they were; correct?

13    A    Never had any conversations with them.

14    Q    With undercover operators; right?  Mr. Williamson's

15    question I read to you before reads as follows:  "Are you

16    aware of any Government agency as part of the

17    investigation of this case sending in an undercover

18    agent into the Schneider Medical Clinic?"  Is that a

19    question asking you if you talked to undercover people,

20    the ones who were in there trying to be snitches?

21    A    But if I don't know who they are --

22    Q    No.

23    A    -- I can't tell you if I had any conversations.

24    Q    Is that the way you read that question?  You think

25    that's what that question asks?

1    A    I mean, I was involved in no way with undercover

2    operations.  If there were any.

3    Q    And you think that question is asking if you talked

4    to the undercover people?

5    A    That's what I hear you asking a second time.

6              MR. BYERS:  Okay.  That's all I have.  Thank

7    you.

8              THE COURT:  All right.  Thank you, Agent Redd.

9    Now, I'm going to let you go until 9:00 tomorrow

10   morning.  I need to see Juror No-038 up at the bench

11   with counsel.  And I hope we all can beat the storm, if

12   there is going to be one.  And drive carefully and I'll

13   see you tomorrow morning.  Remember and heed the

14   admonition.

15                   (Jury excused from the

16                   courtroom.)

17                   (Juror No-038 at the bench with

18                   Court and Counsel.)

19             THE COURT:  Come up counsel, just for a

20   moment.  Juror No-038 told Robert that he may recognize

21   a name.

22             MR. WILLIAMSON:  Okay.

23             JUROR NO-038:  Right.  During Mr. Owen's

24   testimony he mentioned a last name.  And then I think I

25   put the first name and last name together with one of

1    the deceased victims.

2            MR. WILLIAMSON:  Okay.

3            THE COURT:  Which one?

4            MR. WILLIAMSON:  B---- was the last name and I

5    think it goes with Kandace.  Is that right?

6            THE COURT:  Does that make any difference to

7    you?

8    A    (Juror No. 038.)  No, it doesn't.  I know the family

9    that took her in to help her and so forth.  I really --

10   I met her a few times but I don't believe it does, but I

11   wanted to make sure I had full disclosure.

12           THE COURT:  Thank you.  Mr. Williamson, did

13   you have any questions?

14           MR. WILLIAMSON:  I guess just generally.  Did

15   you ever observe her in any of her less lucid states?

16   If there were any.

17   A    (Juror No. 038.)  No.  It was -- our friend that

18   took her in was from our church and took her and her son

19   in to help out and I knew there was issues going on but

20   didn't really know what the issues were.  But I met her

21   a few times.

22           MR. WILLIAMSON:  Okay.  I mean, does that

23   cause you to feel more sympathy for her or --

24   A    (Juror No. 038.)  I don't believe so.

25           MR. WILLIAMSON:  -- not believe ?

1   A   (Juror No. 038.)  No.  I just wanted to make sure I

2   had disclosure though because we had the eight pages or

3   so of witnesses, which were mind-boggling, but -- as the

4   list of names.  So, obviously, you know, something

5   popped up.

6              THE COURT:  Mr. Byers?

7              MR. BYERS:  I have no questions.  Thank you.

8              MR. WILLIAMSON:  And if you go home and think

9   about it and it does influence you at all, would you

10  just let us know?

11  A   (Juror No. 038.)  Sure would.

12             MR. WILLIAMSON:  Okay.  Appreciate your

13  letting us know.

14             THE COURT:  Thank you.  Be careful going home.

15                  (Juror No. 038 excused.)

16             THE COURT:  Now, may as well stay up here.

17  I'm going to let you go into this investigation

18  regarding Dr. Parran.  Frankly --

19             MS. TREADWAY:  Judge --

20             THE COURT:  -- well --

21             MS. TREADWAY:  They have nothing, Judge.  They

22  have absolutely nothing.

23             THE COURT:  They don't have much and I'm going

24  to be careful about how much I let them go into it.  And

25  if it hadn't been for this Tenth Circuit case that I

2059

1    cited in here --

2             MS. TREADWAY:  May I say why I think it's

3    distinguishable please.  I believe you're going to be

4    making a huge mistake, Judge.  *Terracino* is

5    distinguishable on this issue.  That person had charges

6    pending.  Charges pending.  When you have charges

7    pending, obviously, that can create bias.  But that is

8    not the case here, Judge.  There are no charges.  If

9    anything, he should be biased against me.

10            THE COURT:  Just a minute.  I don't want to

11   argue about this.  I think the words "constitutional

12   error" are purely gratuitous, undoubtedly put in there

13   by a law clerk who has never been in a federal trial.

14   But the fact is that is in a published opinion.  And I'm

15   not going to run the risk that one of the Government's

16   principle witnesses in this case is not allowed to be

17   questioned, to some extent, not raked over the coals,

18   spend hours going on about this investigation, and then

19   have somebody later on claim that I had committed

20   constitutional error by not allowing the examination.

21            Now, but I will tell you that you might want to be

22   careful because she could call that AUSA in rebuttal and

23   clear things up.  But that's up to her.  But this,

24   this -- you guys didn't cite this case to me.  Rachael

25   found it.  And that's the kind of thing that I'm just

1    not going to run the risk of somebody else is going to

2    end up trying this case again.

3              MS. TREADWAY:  Judge, I want to make you aware

4    that because of your ruling I will draw the -- I'm going

5    to bring it up.  And I will also tell you again,

6    Judge -- and I cautioned defense counsel about this --

7    depending on how they ask the questions, they are going

8    to run right smack into 801(d)(1)(B).  And if they do, I

9    will be offering Exhibit 159 into evidence which is --

10              THE COURT:  Which is what?

11              MS. TREADWAY:  -- which is his report that

12    was, that was developed prior to him knowing about this

13    investigation.  So if they even intimate that he has

14    changed his opinion based on this investigation, et

15    cetera, that document will come into evidence.  And it

16    is an absolute date-by-date of what this Defendant did

17    illegally.  And so they are going to run the risk of

18    that coming into evidence.

19              THE COURT:  Well, I don't know.  All I know is

20    that, you know, I don't like the term "constitutional

21    error".  I've been doing this too long.  We've all been

22    doing this too long, to run the risk of having a

23    reversal for what to me is an unimportant point.  I

24    don't think the jury is going to believe or disbelieve

25    this guy because of this unimportant investigation.  All

1    I'm telling you is you can get into it if you feel you

2    need to.  You don't have to.  But I'm not going to keep

3    it out because of that case.

4              MR. WILLIAMSON:  We understand the limitations

5    and we won't be spending hours --

6              THE COURT:  I hope not because I don't think

7    that's going to help you any.  And I don't know about

8    what you're going to offer in the way of putting the

9    report in.  I've never seen the report.  But, you know,

10   this case is being tried very well in my opinion and, by

11   everybody, but this is the kind of thing that if I screw

12   up, and however many weeks, you run the risk of it --

13   because if he was not an important government witness, I

14   wouldn't hesitate, but he apparently is.

15        How long do you think he is going to be on the

16   witness stand?

17             MS. TREADWAY:  I would anticipate I would at

18   least have a day with him if not more.  Depending on how

19   many objections we get and how -- how everything works

20   in terms of the jury being able to see the monitor, et

21   cetera.

22             THE COURT:  That's fine.

23             MS. TREADWAY:  But I will ask the Judge right

24   now -- this may speed things along.  The timelines that

25   are the color-coded time lines, Exhibits 2, 3, 4, 5,

1    they're for the 21 contributed-to deaths.  We have a

2    notebook made up for each juror and for defense

3    attorneys and you, Judge.  And in a prior ruling a long

4    time ago, before the first trial, you indicated that you

5    would have no problem with the jury having that.  That

6    will speed up his testimony dramatically.

7            THE COURT:  If the documents are in

8    evidence --

9            MS. TREADWAY:  They are.  They are in

10   evidence.  And we will be able to present those

11   notebooks to the jury and that will speed up, I believe,

12   his testimony a great deal.

13           THE COURT:  If that speeds it up, I don't know

14   how anybody can complain about that.

15           MR. WILLIAMSON:  I don't mind speeding it up,

16   Judge.

17           THE COURT:  What is this report you say you're

18   going to offer that you're beating them over the head

19   with?

20           MS. TREADWAY:  We gave them a very detailed

21   report of Dr. Parran.  It's about that long.  It's

22   Exhibit 159.  And we produced it as part of Jencks

23   material and --

24           THE COURT:  You say that this would come in

25   under what?

2063

1          MS. TREADWAY:  801(d)(1)(B), a prior

2    consistent statement.

3          And, Judge, while we're talking about moving the

4    case along.  I would like to lodge an objection to the

5    Defendant's constantly stopping and asking to see an

6    exhibit.  Judge, they've had these exhibits for over a

7    year and a half.  They have 'em --

8          THE COURT:  I know that, but they have a right

9    to do that.  I don't think it's necessary, but if they

10   think it's necessary, I'm not going to tell them they

11   can't look at an exhibit.

12         MR. WILLIAMSON:  Judge, we're not doing it

13   every single exhibit.  Sometimes you just want to double

14   check what's going in is what we have.

15         THE COURT:  I kind of thought that I ruled

16   that you have to give 48 hours and I --

17         MS. TREADWAY:  I've given that.

18         THE COURT:  -- I haven't said anything,

19   Lawrence, because I don't think it's necessary.  They're

20   not going to change the exhibits on you.

21         MS. TREADWAY:  And if we --

22         THE COURT:  But if you think it is.

23   Personally, I think it kind of irritates the jury; but,

24   you know, if you want to irritate the jury, that's your

25   prerogative.

2064

1            MS. TREADWAY:  Thank you, Judge.

2            MR. WILLIAMSON:  Thank you, Your Honor.

3            THE COURT:  Now, do you want me to look at

4   this report in case this comes up?

5            MS. TREADWAY:  If you want to, Judge.  We'll

6   be glad to give you a copy of it.

7            MR. WILLIAMSON:  I don't anticipate it being

8   an issue.  I am not going to say that he's lied in this

9   case.

10           MS. TREADWAY:  Well, if he says bias, that's

11  it.

12           MR. WILLIAMSON:  That does not open that door.

13           MS. TREADWAY:  I believe it does.

14           MR. WILLIAMSON:  No, it does not.

15           THE COURT:  Well, I don't know, but you might

16  give Rachael a copy of it and we can be glancing through

17  it and I'll take a look at the prior consistent

18  statements.  These are the things that don't come up

19  very often.

20           MS. TREADWAY:  I know it's bit me in the

21  rear-end on occasion so I now know that rule.  Judge

22  Lungstrom used that one against me and quite correctly.

23           THE COURT:  But I want to -- this case to

24  continue to go as smoothly as possible without too many

25  errors because it's too long and expensive a case to

1    have to try twice.  That's why I was kind of liberal on

2    some of this stuff and I'll continue to be because you

3    guys are doing a good job of getting the evidence on.

4    All right.

5                         (Recessed for the day at 4:10

6                         p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25