```
 1                    (Beginning at 9:03 a.m. May 13,

 2                    2010, the following proceedings

 3                    continued.)

 4          THE COURT:  Good morning everyone.  All right.

 5   Mr. Byers.

 6          MR. BYERS:  Thank you, Your Honor.

 7                    CROSS EXAMINATION

 8   BY MR. BYERS:

 9   Q   Good morning, Dr. Parran.

10   A   Good morning.

11   Q   Now, in your testimony yesterday you were relying on

12   your report, I believe it's Government Exhibit 159.  Is

13   that correct?

14   A   Yes.

15   Q   Okay.  And you probably created various drafts of

16   that report before the final version?

17   A   I keep a series of notes on my computer as I go

18   through charts and such, yes.

19   Q   Okay.  And you discussed some with both Ms. Treadway

20   and Mr. Williamson the V.A. investigation; correct?

21   A   Yes.

22   Q   Okay.  Now, did your report or your opinions --

23   let's do it this way.  Did your report change at all

24   because of the outcome of that investigation?

25   A   I actually submitted my report prior to knowing
```

2591

1    about that investigation.

2    Q    Okay.  And your testimony so far has been based on

3    that report?

4    A    Yes.

5    Q    Your testimony has not changed because of the

6    outcome of the V.A. investigation; correct?

7    A    My testimony is based on my review of the medical

8    records.

9    Q    Okay.  Now, listening to your experience, actually,

10   your current experiences, the Windsor-Laurelwood, that's

11   essentially inpatient addiction issues; right?

12   Treatment?

13   A    I do a lot of primary care internal medicine there

14   managing the medical problems of the patients who are

15   admitted to the psychiatric service at that hospital

16   since it's primarily a psychiatric hospital; and I also

17   provide addiction services to the patients admitted to

18   my service which is the addiction part of the service at

19   that hospital.

20   Q    Okay.  And that includes a detox unit; correct?

21   A    Yes.

22   Q    And at Huron Road Hospital, that's a ten bed unit;

23   correct?

24   A    That's a ten bed drug and alcohol treatment program,

25   yes.

```
 1    Q    And at University?

 2    A    University Hospital.  I'm basically a consultant

 3    there.  I don't have any patients there.

 4    Q    Okay.  And Cleveland Treatment Center is an

 5    outpatient methadone clinic that's focused on addiction;

 6    correct?

 7    A    Yes.

 8    Q    And then your service at the V.A., as I understand

 9    it, you were primary care within an addiction treatment

10    program?

11    A    Yes.

12    Q    Okay.  Now, yesterday I thought I heard you say that

13    you hadn't looked at -- you hadn't read an Actiq package

14    insert.  Is that correct?

15    A    I have read Actiq package inserts.  I have not read

16    one, you know, in a long time since it came out.

17    Q    Okay.  Because I was confused because then you

18    talked about the black box warning and that would be on

19    the package insert; correct?

20    A    Yes, it is.

21    Q    Now, in rendering your opinion, I believe you

22    testified that you relied upon the charts; correct?

23    A    Yes.

24    Q    Provided by the Government?

25    A    Yes.
```

1    Q   And you don't know how those were picked and

2    formulated for you?

3    A   Absolutely.

4    Q   Okay.  You relied upon prescriptions, prescription

5    printouts, as I understand it?

6    A   Oh, golly.  I honestly don't remember if I received

7    prescription printouts in this case.  I don't believe --

8    originally I got charts and then subsequently I received

9    prescription printouts when the prescriptions weren't

10   represented in the chart or there wasn't information in

11   the chart about how many pills were prescribed, yeah.

12   Q   Okay.  So it came sequentially?

13   A   Yeah.

14   A   But originally I got the chart.

15   Q   You also relied upon autopsy reports?

16   A   Yes.

17   Q   Are you aware that there's been testimony in this

18   proceeding that once toxicology came back as positive,

19   no histologies were done on some of these deceased

20   people?

21   A   I'm not aware of that, no.

22   Q   Okay.  You also relied on your reading of some of

23   Dr. Schneider's testimony in another proceeding; is that

24   correct?

25   A   I didn't rely on that for my report because I hadn't

2594

1    seen that until I arrived here in Kansas.

2    Q    Okay.  What other sources -- throwing out Dr.

3    Schneider's testimony then.  We've got charts, some kind

4    of prescription summary or information, and autopsies.

5    What other information did you rely on that was provided

6    by the Government?

7    A    I don't recall other information provided by the

8    Government.  You know, there's that e-mail we talked

9    about yesterday about some tables or whatever; but I

10   honestly don't recall what that was about.

11   Q    Okay.  I have in my notes that you testified -- and

12   this is I believe a direct quote -- that you drew a

13   clinical impression -- at least clinical impression was

14   in quotes -- that Dr. Schneider and Linda Schneider ran

15   a clinic.  How do you draw a -- and let me ask it this

16   way.  What is a clinical impression of running a clinic?

17   What does that mean?

18   A    Well, all of my impressions are impressions as a

19   physician, not as a, you know, not as an expert in law;

20   but they're my opinions as a physician.  And my

21   impression as a physician is that the Schneider Medical

22   Clinic was run by the Schneiders.

23   Q    And specifically as to Linda Schneider, how did you

24   form that opinion from charts, prescription summaries

25   and autopsies?

2595

1    A    Again, my clinical opinion was that the Schneider

2    Medical Clinic was run by the Schneiders.  Implied in

3    the name and implied in the fact that Dr. Schneider was

4    supervising mid level practitioners, signing all the

5    charts.

6    Q    I asked you about Linda Schneider.  Where did you

7    find her name in charts?  Where did you find -- well,

8    you testified you didn't look at policy manuals, didn't

9    look at protocol.  So you couldn't have seen her name on

10   any of that stuff; correct?

11   A    No, I did not see her name.  I don't believe I saw

12   Linda Schneider's name in a medical record.

13   Q    So you can't support an opinion that the Schneiders

14   were running a clinic based upon what you reviewed;

15   correct?

16   A    I certainly can support an opinion that the

17   Schneiders were operating the Schneider Medical Clinic

18   based upon what I saw in medical records.

19   Q    And, again, you're saying Schneiders meaning Linda

20   Schneider though you've not seen her name in a single

21   medical record; correct?

22   A    True.

23   Q    And yesterday you testified that you don't know how

24   the clinic was organized; correct?

25   A    No.  I never visited the clinic or, you know, I

 1   don't know what it looks like.

 2   Q   Assuming Linda Schneider worked at the clinic, what

 3   did she do?

 4   A   Again, I can give you my impression is that Dr. and

 5   Mrs. Schneider --

 6   Q   No.  I want -- I'm sorry.  I want you to tell me

 7   facts.  What you know she did at the clinic.  Not your

 8   impression.

 9   A   Okay.  I don't know what she did at the clinic

10   because I haven't visited the clinic.

11   Q   Who's Tim McDonald?

12   A   I don't know the name Tim McDonald.

13   Q   Now, in your testimony -- I believe it was on

14   direct -- it sounded to me -- well, you talked about, in

15   attributing responsibility specifically for the death of

16   Patricia G, I think that was the very first patient you

17   talked about in any great detail with the Government.

18   You specifically talked about liability to the owners

19   and managers of the clinic and later you also said

20   directors and supervisors.  Is that correct?

21   A   If it's in my testimony, it's correct.

22   Q   So -- and then you went on to talk about the

23   Hippocratic oath and that sort of I guess imposes

24   vicarious liability on everyone in the clinic.  Is that

25   correct?

2597

1    A    The obligation to individually practice medicine by

2    providers and the obligation to organize and manage a

3    clinic in a way that puts the health and safety of

4    patients first is an obligation that is an obligation

5    both to the providers as well as to the supervising --

6    supervisors and managers of a health care organization

7    that holds itself out as practicing medicine.

8    Q    Was Linda Schneider a provider?

9    A    I did not see her name in charts so at least not in

10   the records that I reviewed.

11   Q    So that's no?

12   A    Not in the records that I reviewed.

13   Q    What records would you like to review to find her

14   name in charts?

15   A    Again, I'm not here to, I believe, to review

16   records.

17   Q    And just now you talked about a health care

18   organization holding itself out as practicing medicine.

19   And yesterday you talked about a medical care system.

20   Is that correct?

21   A    I may have used the term medical care system.

22   Q    Specifically in reference to this all-encompassing

23   Hippocratic oath application, you said it applies to

24   members of a medical care system; correct?

25   A    It applies to people who are members of a medical

2598

1    care institution, system, clinic, hospital.

2    Q   Now, you swore to uphold the Hippocratic oath when

3    your M.D. was conferred; correct?

4    A   Yes.

5    Q   That wasn't part of your licensure process in Ohio

6    or any other state?

7    A   I don't believe that the Hippocratic oath is in the

8    state licensure, specifically in the state licensure

9    rules in Ohio.

10   Q   Okay.  So I want to ask you about some specific

11   professions or occupations in the medical care system or

12   a health care organization and you just tell me if it

13   fits within your definition of them being members of

14   this organization.  Do you understand what I'm going to

15   do?

16   A   No.

17   Q   Okay.  Well, I can ask you -- I have at least 39

18   things I want to go through.  I can ask you a long

19   question with each one or I can ask you a question and

20   then go through this list.

21       You testified that people who are in a medical care

22   system or health care organization are bound by the

23   Hippocratic oath; correct?

24   A   Health care organizations are bound by the

25   Hippocratic oath insofar as putting the health and

2599

```
 1    safety of the patients that they're caring for first
 2    above other considerations.
 3    Q    So that's a yes; correct?
 4    A    That's --
 5    Q    It's what you testified to yesterday, wasn't it?
 6    A    That's what I was saying yesterday.
 7    Q    Okay.  Are medical assistants part of a medical care
 8    system?
 9    A    Yes.
10    Q    Are surgical technicians?
11    A    Yes.
12    Q    Are phlebotomists?
13    A    Yes.
14    Q    Respiratory therapists?
15    A    Yes.
16    Q    Dialysis techs?
17    A    Yes.
18    Q    Physical therapists?
19    A    Yes.
20    Q    Speech pathologists?
21    A    Yes.
22    Q    Audiologists?
23    A    Yes.
24    Q    Pharmacists?
25    A    Yes.
```

1   Q   Pharmacy technicians?

2   A   Yes.

3   Q   Occupational therapists?

4   A   Yes.

5   Q   Billers?

6   A   Probably not.

7   Q   We have a no?

8   A   They're clerical.

9   Q   I'm sorry.  I thought you were done.  What did you

10  say after --

11  A   They're clerical people.

12  Q   Okay.  So that's where the split is.  Is that where

13  the Hippocratic oath stops?

14  A   It's not where the Hippocratic oath stops.  It's

15  where the obligation to put the health and safety of a

16  patient above the other concerns --

17  Q   But you specifically premise that upon the

18  Hippocratic oath; correct?

19  A   It's premised on the Hippocratic oath for

20  physicians, yes.

21  Q   Are coders a part of a medical care system?

22  A   They're certainly part of a medical care system.

23  Q   Okay.  Are they subject to the Hippocratic oath?

24  A   Coders aren't involved in patient care so they

25  wouldn't be involved in seeing patients, dealing with

2601

```
1    patients, and they wouldn't be involved in whether
2    patients -- in the actual health care provided to a
3    patient.
4    Q   Is that a no?  As far as them being subject to the
5    Hippocratic oath.  Coders?
6    A   Again, coders are subject to --
7    Q   They don't render --
8    A   -- to honesty, but they don't render patient care.
9    They don't supervise or develop approaches to patient
10   care.
11   Q   Is that a no?  You can say no for billers.  Why
12   can't you say no for coders?
13   A   Again, I -- they're similar.  They're clerical
14   support people who don't deal with patients.
15   Q   I'll take that as a no then.  All right?
16       How about EMTs?  Paramedics?
17   A   Paramedics are direct patient care providers or
18   supervisors of that, yes.
19   Q   How about dentists?
20   A   Yes.
21   Q   Dental techs?
22   A   Yes.
23   Q   Podiatrists?
24   A   Yes.
25   Q   Scheduling people?
```

2602

```
 1     A   Depends whether scheduling people are interacting

 2     with patients or not.  I suspect that they're

 3     interacting with patients.

 4     Q   So that's a maybe?  Depends?

 5     A   Yeah.

 6     Q   Hospital administrators?

 7     A   Hospital administrators are obligated to put patient

 8     care and patient safety above other concerns, yes.

 9     Q   Even though they don't render direct patient care?

10     A   They develop policies and procedures and supervise

11     an organization or an institution in its care of

12     patients.

13     Q   How about outpatient clinic managers?

14     A   Yes.

15     Q   Security on hospital campuses?  Security personnel?

16     A   Security personnel, probably not.  I would think

17     not.

18     Q   Health care lawyers?

19     A   Health care lawyers have other obligations than to

20     the patients.  Their obligation, I believe -- I don't

21     know much about the profession of law -- but I believe

22     that the obligation of a lawyer at any given time is to

23     their -- to whoever they're representing.

24     Q   And if they represent a medical care system, are

25     they bound by the Hippocratic oath as you've explained
```

```
 1    it?
 2    A   As I said, hospital lawyers are -- they're -- I
 3    believe that their ethical obligation is to their -- the
 4    people they represent, not to the patients.
 5    Q   But the medical care system is there for the
 6    benefit, health and safety of the patient; correct?
 7    A   I'm not here to -- I'm not here to give you an
 8    opinion about exactly who a lawyer's obligation to is;
 9    but my impression is a lawyer's obligation is to whoever
10    has retained that lawyer.
11    Q   How about janitorial staff at hospitals and clinics?
12    A   That's nonpatient care related.
13    Q   Maintenance workers?
14    A   Same.
15    Q   Psychologists?
16    A   They are bound by a primary ethical obligation to
17    the patient.
18    Q   Mental health therapists?
19    A   The same.
20    Q   Hospital chaplains?
21    A   Probably the same.
22    Q   Optometrists?
23    A   The same.
24    Q   Dental hygienists?
25    A   I think we talked about dental hygienists before.
```

2604

```
 1    Q   We may have.  Let me look back.  Well, I said dental
 2    techs, which actually in some states there's a
 3    difference between dental technician and dental
 4    hygienist.  So we'll say dental hygienists?
 5    A   The same.
 6    Q   Chiropractors?
 7    A   Yes.
 8    Q   Nursing home administrators?
 9    A   Yes.
10    Q   Home health care workers?
11    A   Yes.
12    Q   Dieticians?
13    A   Depends on the dietician's job.  If the dietician is
14    hired by, you know, a school.  So it depends where the
15    dietician works I suspect.
16    Q   Anesthesia assistants?
17    A   Yes.
18    Q   Radiology assistants?
19    A   Yes.
20    Q   Radiation techs?
21    A   I'm not sure what a radiation tech does so I'll just
22    leave that out.
23    Q   Acupuncturists?
24    A   If the acupuncturist is a licensed individual in a
25    state in terms of providing health care, then their
```

2605

 1  primary obligation is to the patient.

 2  Q    Prosthetic device makers.  I could call it the other

 3  term but I'm not even going to try and pronounce it.

 4  A    I don't know anything about prosthetic device

 5  makers.

 6  Q    Athletic trainers?

 7  A    I would -- I would think that the athletic trainer's

 8  obligation is to whoever they're providing services to

 9  as their primary obligation.

10  Q    Psychiatric social workers?

11  A    Yes.

12  Q    Okay.  So we've gone through a list of approximately

13  39 to 40 occupations and professions and you were able

14  to tell me that there are probably six that the

15  Hippocratic oath does not apply to.  There's a couple

16  you're not certain of.  But the rest.  So let's call it

17  30 of those, in your version of the world, they're bound

18  by the Hippocratic oath even though they've never sworn

19  to uphold it; correct?

20  A    They're bound to a primary ethical obligation to the

21  care of the patients that are in their care.

22  Q    Which is premised upon the Hippocratic oath,

23  according to your sworn testimony?

24  A    Which is premised upon the ethical principles

25  summarized in the Hippocratic oath.

2606

1    Q    Dr. Parran, in your practice -- and am I correct,

2    your only practice is through GMA Consultants?

3    A    Yes.

4    Q    So everything is billed through that central office?

5    The one spot?

6    A    Yes.

7    Q    And that's where all the recordkeeping is and

8    everything.  There's no other outside consulting or like

9    moonlighting or anything like that?

10   A    No.  I'm -- the patient records are at various

11   hospitals, but --

12   Q    Right.  I understand that.

13   A    -- but my actual administrative work, everything is

14   through the corporation, yes.

15   Q    Do you work for any pharmaceutical companies like a

16   speaker's bureau, going out and explaining things to

17   other physicians or health care providers?

18   A    Yes, I am now and I have been in the past.

19   Q    What companies?

20   A    Oh, gosh.  Right now I'm only on the speaker's

21   bureau of a company called Reckitt Benckiser, which is a

22   company that makes the medication Suboxone which is an

23   opiate maintenance drug.

24   Q    And you're involved in a Suboxone clinic through

25   Rosary Hall; correct?

1    A    We run an opiate maintenance clinic at Rosary Hall

2    where we prescribe Suboxone to all the patients.

3    Q    How often do you work for the pharmaceutical

4    company?

5    A    Probably about four times a year.

6    Q    What do they pay you?

7    A    Anywhere from $250 to $500 to give a talk.

8    Q    Plus expenses?

9    A    I guess they would provide expenses but I don't

10   travel for these things so there wouldn't be hardly any

11   expenses.

12   Q    Any other companies?

13   A    No, I don't work for any other companies, any other

14   pharmaceutical companies at this point.  I have in the

15   past.

16   Q    Such as?

17   A    I've been a member of the speaker's bureau for the

18   pharmaceutical company that makes the drug Tramadol or

19   Ultram.  Not probably for five to seven years at this

20   point.  I gave presentations on prescription drug abuse

21   for the pharmaceutical company -- I'm blocking on their

22   name -- but the pharmaceutical company that makes

23   Oxycontin in the past.  That was in probably 1998 to

24   about 2002.  There is another one.  I think the

25   Oxycontin one was Purdue.  Purdue Pharma.  And then I

2608

1   have been on the speaker's bureau in the past for

2   pharmaceutical companies that make addiction treatment

3   drugs, Naltrexone, which is an opiate blocker drug and

4   used in the treatment of alcoholism.  I think that

5   company was named Dupont.  But they went out of the

6   pharmaceutical business.  And then whoever makes a drug

7   to treat alcoholism called Campral.  I have given

8   presentations for them and been on their speaker's

9   bureau.  So I think it's like five or six and one that

10  I'm currently on the speaker's bureau for.

11  Q   And you were paid for all those presentations;

12  correct?

13  A   Yes.

14  Q   Have you done other government work outside of any

15  pain physician prosecution kind of a case?

16  A   Absolutely.

17  Q   Such as?

18  A   I've testified for the -- in criminal cases I've

19  testified for the public defender's office in Ohio on

20  several cases on behalf of defendants, including

21  testifying in appellate court in a death penalty

22  mitigation case.

23  Q   Such as the Hicks case?

24  A   Yes.

25  Q   All right.  What about federal government work

2609

1    beyond pain physician prosecutions.  Are you currently

2    employed by the government in any other capacity?

3    A    I don't believe so.

4    Q    Okay.  Now, this practice, this GMA Consultants, you

5    have an office manager or administrator in there?

6    A    No.  My partner Chris Addelman, he's a physician, he

7    is the president of the corporation.  I'm the

8    vice-president of the corporation.  He's the secretary

9    and I'm the treasurer.

10   Q    So do you have any employees beyond physicians?

11   A    He and I.  We have a contracted physician, a full

12   time contracted physician.  And then we contract

13   part-time with probably eight or ten physician

14   assistants or nurse practitioners and they're all

15   part-time.  That's it.

16   Q    Physician assistants are part of a medical care

17   system; correct?

18   A    Yes.

19   Q    Part of a health care organization?

20   A    Yes.

21   Q    Bound by the same ethical obligations we talked

22   about moments ago?

23   A    Yes.

24   Q    Okay.  Have you informed these eight part-time

25   physician's assistants that as physician's assistants

2610

1    they will be vicariously liable for any of your

2    mistakes?

3    A    I have -- in the state of Ohio --

4    Q    No.  I'm just asking you have you informed them that

5    they will be vicariously liable if you make a medical

6    mistake?

7    A    I have informed them that I am liable for any

8    mistakes they make under my supervision.

9    Q    Right.  Per your PA utilization plan and Ohio

10   Revised Code, you're the captain of the ship.  Have you

11   told them it goes back the other way?

12   A    I don't believe that it does go back the other way.

13   Q    Isn't that what you told us this is about, this

14   broad encompassing obligation premised upon the

15   Hippocratic oath.  You're trying to hold Linda Schneider

16   liable for any kind of medical mistake in the clinic,

17   aren't you?

18           THE COURT:  I think that's a misstatement, Mr.

19   Byers, in the sense that the Government is bringing this

20   case, not this witness.  I think that it would be -- it

21   is a misstatement to say that he is trying to hold even

22   Dr. Schneider liable.  He's not the government.

23           MR. BYERS:  Okay.  You're right, Your Honor.

24   I'm sorry.

25

2611

BY MR. BYERS:

Q   Isn't it true that in this case the Government is
trying to hold both Doctor and Linda Schneider liable,
criminally liable, for supposed medical mistakes?  Is
that correct?

A   Yes.

Q   Do the Kansas Board of Healing Arts guidelines apply
to Linda Schneider?

A   I wouldn't think so since she is not a licensed
physician.

Q   You talked about clinical aspects of pain management
and then went through the chart with the Government
writing.  Do you remember that testimony?

A   Yes.

Q   And there were components like evaluation; correct?

A   Yes.

Q   Assessment?

A   Yes.

Q   Treatment?

A   Yes.

Q   Monitoring?

A   Yes.

Q   Documentation?

A   Yes.

Q   Referrals?

2612

```
1    A    Yes.

2    Q    Okay.  And you essentially characterized that as the

3    essence of doctoring; correct?

4    A    That organizes, yes, the way that patients are

5    managed by physicians.

6    Q    Okay.  Was Linda Schneider obligated to perform an

7    evaluation, assessment, treatment, monitoring,

8    documentation or referral?

9    A    Not unless she was, you know, the clinician seeing

10   the patient.

11   Q    Matter of fact, she would probably be a criminal if

12   she did any of that; correct?  If she's not a physician?

13   A    Well, no.  Licensed additional health care

14   providers, including, you know, nurses, are able to be a

15   participant in that evaluation.

16                    (Off-the-record.)

17            MR. BYERS:  Your Honor, I'm sorry.  I forgot

18   to turn my phone off so -- I didn't even know if you

19   could hear it.  Can I go do that right now?

20            THE COURT:  Sure.

21            MR. BYERS:  My son.  I told him he could leave

22   a voice mail.  Then I left the phone on.  I'm sorry for

23   interrupting.

24   BY MR. BYERS:

25   Q    So, okay.  The other licensed health care
```

2613

1    professionals can do some of these things?

2    A    If a nurse is actually participating in seeing the

3    patients, it certainly wouldn't be inappropriate for her

4    to participate in part of that documentation and part of

5    that care.

6    Q    And you have no idea if Linda Schneider ever

7    performed any type of nursing activity at the Schneider

8    clinic, do you?  You have no idea?

9    A    No, I don't.  I saw no evidence of it in the records

10   I reviewed.

11   Q    You've testified in a lot of cases against

12   physicians or involving physicians; correct?

13   A    I have, yeah, I believe, averaged probably two a

14   year, maybe three a year over the past several years.

15   Q    Have you postulated this all-encompassing kind of

16   ethical obligation about the medical care system in any

17   of these other cases?

18   A    I think probably I have in cases that involved mid

19   level practitioners or PA's or the cases that involved

20   allegations about the way a practice was run in addition

21   to the way that the physicians behaved.

22   Q    Can you name some of those cases?

23   A    No.

24   Q    Dr. Parran, were you given any evidence of

25   undercover operations at the Schneider Medical Clinic as

2614

1    part of your case review?

2    A    No, I don't believe I was, although I have in the

3    past in other cases.

4    Q    Matter of fact, that's rather common, is it not?

5    A    Seems to be sort of 50/50.

6    Q    Now, you testified against both of the Doctor Chubes

7    --

8    A    Yes.

9    Q    -- in federal court?

10    A    Yes.

11    Q    Situated in Indiana I think?

12    A    Yes.  Northern Indiana.

13    Q    That was a pretty recent case, was it not?

14    A    No.  It was -- that was a long time ago.  I mean,

15    that was 2005, maybe 2004.

16    Q    Okay.  Well, as part of the case in the Chubes, did

17    not the whole V.A. investigation come up?

18    A    The Chubes case took place in the early to mid 2000s

19    but -- and the case finished, and I was unaware that the

20    case was continuing on various appeals; but in an effort

21    to be as thorough as possible, in June of 2008, when I

22    notified attorneys who I had -- who I was consulting

23    with, I also notified all the attorneys that I had

24    consulted with in the previous ten years or so about the

25    V.A. investigation.  The federal attorney in northern

2615

1    Indiana contacted me and said that she felt that it was

2    her obligation to -- I'm answering your question -- it

3    was her obligation to notify the defense attorneys in

4    the Dr. Chube case, which had been tried a few years

5    earlier, about the investigation.  I told her that that

6    was fine with me.  It was information that I made

7    available to her and it was up to her, you know, lawyer

8    decision, to decide about that.  And that's when the

9    attorneys for Dr. Chube contacted the "Cleveland Plain

10   Dealer" newspaper and disclosed a confidential federal

11   investigation of me to the newspaper.

12   Q   So it was in the newspaper.  But you think that came

13   from the -- out of the Chube case; correct?

14   A   The attorneys for Dr. Chube are the ones that

15   contacted the "Cleveland Plain Dealer" newspaper.

16   Q   So you understand there was some kind of report from

17   the government attorney in the Chube case even though

18   they'd already been convicted and were in the appellate

19   process; correct?

20   A   I can tell you exactly.  The attorney in the Chube

21   case, the federal attorney in the Chube case told me

22   that since appeals were still under way, she felt that

23   it was important to disclose to the attorneys in the

24   Chube case from several years earlier the presence of

25   the investigation.  So she did.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

2616

1    Q    Did the Government disclose that information to the

2    defense counsel here?

3    A    I have absolutely no idea.  It's been in the

4    Cleveland newspapers twice.  The initial report of an

5    investigation and then the report of the end of the

6    investigation.

7    Q    So it is correct, you know about the disclosure in

8    the Chube case because the Government lawyer told you he

9    or she was disclosing it; correct?

10   A    The Government lawyer asked -- said that she thought

11   it was important to disclose it and asked me if I gave

12   her permission to disclose it and I told her that I gave

13   her the information and that it was up to her to decide

14   to use however she saw fit.

15   Q    Did any Government counsel involved in this case ask

16   you for permission to disclose the information about the

17   V.A. investigation to defense counsel in this case?

18   A    I had no discussions with anyone in this case about

19   the V.A. investigation and the defense counsel.

20   Q    How many states are you licensed in?

21   A    Ohio.

22   Q    That's it?

23   A    I was licensed in Maryland originally but when I

24   moved back to Cleveland in 1988 I ended my licensure in

25   Maryland and keep it only in Ohio.

2617

```
1    Q    And Ohio has a biannual renewal cycle; correct?
2    A    Yes.
3    Q    And you renewed your license in March of 2008;
4    correct?
5    A    No.  I renewed my license in April of 2010.
6    Q    Okay.  Prior to that, when did you renew your
7    license?
8    A    I probably sent the materials in in December of 2007
9    in order to receive the renewal in March of -- or April
10   1st, probably, 2008.
11   Q    So you're on the April 1 cycle; correct?
12   A    I believe that's where I'm at.
13   Q    So if the records -- if the public records of the
14   state medical board of Ohio show you renewed in March of
15   2008, that was the prior renewal before your most recent
16   one, are you going to dispute accuracy of those records?
17   A    No.  I -- every two years I get licensed in Ohio,
18   and I re whatever.
19   Q    So, likewise, if they showed that your renewal was
20   completed for this present cycle no later than March
21   18th, 2010, you're not going to dispute that, are you?
22   A    No.
23   Q    Okay.  And as part of the renewal process, you fill
24   out an online questionnaire; correct?
25   A    Yes.
```

2618

1    Q    And one of the questions on that application says

2    has any board, bureau, department, agency or any other

3    body, including those in Ohio other than this board,

4    filed any charges, allegations or complaints against

5    you.  Is that correct?

6    A    Yes.

7    Q    And you responded no; correct?

8    A    I did not respond no in my application to the state

9    medical board for my current license which is -- which

10   is the time frame that involves this, this allegation

11   from the V.A.  I responded yes and I sent a letter to

12   the state medical board with an explanation of -- at

13   least with my explanation of the investigation.  I also

14   notified the state medical board of Ohio in June of 2008

15   when I was aware of this investigation and again in

16   December of 2009 -- no -- and again in December of 2008

17   when I was made aware that there would be a newspaper

18   article about me.

19   Q    How did you notify the board in June of '08?

20   A    In June of '08 I called the board and I spoke with

21   the -- with two attorneys at the board.  In December of

22   2008 I sent an e-mail to the board letting them know

23   that there would be the newspaper article about the

24   investigation that I had previously notified them about.

25   Q    Who were the attorneys you spoke with in June of

2619

```
 1   '08?
 2   A   Danielle Bickers, who is the lead attorney in
 3   physician compliance.
 4   Q   You have no reason to think Danielle Bickers is an
 5   attorney, do you?
 6   A   Yes.
 7   Q   What do you base that on?
 8   A   And William Schmidt.  Danielle Bickers I believe is
 9   an attorney.  She's the person who I send reports to on
10   a regular basis of all the impaired physicians in Ohio
11   that I monitor for the state medical board.
12   Q   She is called compliance supervisor; correct?
13   A   Yes.
14   Q   And Bill Schmidt you knew from your 40 hour CME
15   course; right?  He comes and talks at that every time?
16   A   Bill Schmidt I know from having served on the state
17   pain advisory board.  I know him from --
18   Q   But, Doctor, my question was Bill Schmidt comes and
19   talks at your seminar; correct?  The CME?  The cottage
20   industry for physicians who need help in understanding,
21   prescribing and complying with Ohio board rules or other
22   state board rules?
23   A   Bill or another member of the state medical board
24   comes to every one of our intensive courses in
25   controlled substance prescribing, doctor/patient ethics,
```

1    health record maintenance and doctor/patient

2    communication.

3    Q    Okay.  So your testimony today is you answered yes

4    on your last renewal application because that was the

5    one most recent after the V.A. investigation.  Correct?

6    A    Yes.

7    Q    And if the public records of the state medical board

8    show to the contrary, that you answered no, how do you

9    explain that?

10   A    I don't know anything about the public records of

11   the state medical board.  I do know that I've notified

12   them of this investigation all the way along.

13   Q    And as part of that application, do you recall that

14   it says under penalty of law I hereby swear or affirm

15   that the information I have provided in the application

16   is complete and correct?

17   A    Yes.

18              MR. BYERS:  If I may have just a moment, Your

19   Honor.

20              THE COURT:  Sir.

21              MR. BYERS:  May I confer?

22              THE COURT:  Sir.

23              MR. BYERS:  Thank you.

24                   (Off-the-record.)

25              MR. BYERS:  Can I mark something, Your Honor?

2621

```
 1              THE COURT:  Yes, sir.
 2              MR. BYERS:  May I approach, Your Honor?
 3              THE COURT:  You may, sir.
 4   BY MR. BYERS:
 5   Q   Dr. Parran, I'm showing you what's been marked as
 6   defense Exhibit D-010.
 7   A   Yes.
 8   Q   A three page document.
 9   A   Yes.
10   Q   Can you tell me what that is?
11   A   It's from the state medical board of Ohio.  It says
12   certification statement of the board of Ohio.
13   Q   That's the first page; right?
14   A   Yes.
15   Q   And then go to the second page.  And do you see the
16   highlighted question at the bottom of the page?
17   A   Yes.
18   Q   Okay.  And is that the one I read to you asking
19   about allegations since your last renewal?
20   A   Yes.
21   Q   Okay.  And if you go to the top of the next page --
22   because there's no response on that page; correct?
23   A   Yes.
24   Q   Okay.  Top of the next page says what in response to
25   that question?
```

2622

1    A    The top of the next page?  It says no.

2    Q    Okay.  And at the bottom of that page is the

3    statement under penalty of law; correct --

4    A    Yes.

5    Q    -- that I read to you?

6    A    Yes.

7    Q    Okay.  And the first page, again, is a

8    certification.  What does that certification say?  If

9    you would read that for me.

10   A    Says:  I hereby certificate that I have redacted the

11   social security number from the attached license renewal

12   document in the matter of Theodore Vandoren Parran, Jr.

13   The attached document is an otherwise true, accurate and

14   complete copy of the document as it appears in the

15   records of the state medical board of Ohio and it's a

16   public record under Ohio revised code.

17   Q    Thank you.

18             MR. BYERS:  That's all I have, Your Honor.

19             MS. TREADWAY:  May I see the document, please.

20             THE COURT:  Were you offering this or --

21             MR. BYERS:  Yes.  We would move to admit, Your

22   Honor.

23             MS. TREADWAY:  No objection.

24             THE COURT:  It's received.

25             MR. BYERS:  Thank you, Your Honor.

2623

1              THE COURT:  Redirect please.

2                    **REDIRECT EXAMINATION**

3    BY MS. TREADWAY:

4    Q   Like to take you right back to that document, Dr.

5    Parran.

6    A   Okay.

7    Q   Is it true that nobody has filed any charges,

8    allegations or complaints against you?

9    A   Yes, it's true.

10   Q   Dr. Parran, I'd first like to take you back to some

11   of the first questions that Mr. Williamson asked you

12   yesterday.

13   A   Okay.

14   Q   Do you believe those questions were challenging your

15   credibility, sir?

16   A   Yes.

17   Q   Do you believe those questions were implying that

18   the Government had bought your testimony with both money

19   and favors?

20   A   Yes.

21   Q   I want to look at the money you've been paid to

22   date, Dr. Parran?

23   A   Okay.

24   Q   Now, we've entered into contracts with you?

25   A   Yes.

2624

1    Q    And do those contracts provide for an authorized

2    amount of money that we can pay you?

3    A    Yes.

4              MR. WILLIAMSON:  Your Honor, I'm going to

5    object.  When I asked this witness about the contracts

6    yesterday, he could not answer any questions.  Now all

7    of a sudden he can.  It has to be speculation.  Or

8    coaching.

9              THE COURT:  I don't know what his answers are

10   going to be, but you certainly opened the door to this

11   yesterday.

12             MS. TREADWAY:  Certainly did.

13   BY MS. TREADWAY:

14   Q    And do you understand the difference between an

15   authorized amount to be paid and an actual amount that

16   you were paid?

17   A    Yes.  What typically happens is when I agree to

18   review a case, I receive a contract which says that I'm

19   authorized to provide services at a certain rate for

20   various services provided up to a certain maximum

21   amount.  And if it's gonna go above that amount, I need

22   to notify the attorney's office in order to find out

23   whether that can be gone above.  That's the contract.

24   And then once I'm done providing a service, I total up

25   all of the work that I've provided and I provide an

2625

1    invoice for the work I've actually provided.

2    Q    And based on those invoices, did we pay you?

3    A    Yes.

4    Q    Now Dr. Parran, you and I had a little trouble about

5    those invoices, didn't we?

6    A    Well, yes.

7    Q    I had trouble getting invoices from you, didn't I?

8    A    That is true.

9    Q    Because you were very slow about sending us

10   invoices?

11   A    That's very true.

12   Q    Did we pay them anyway?

13   A    Yes.

14   Q    Let me hand you what has been marked for

15   identification as Government Exhibit 164.  I'd like you

16   to use that to refresh your recollection as to what you

17   invoiced us and what we've paid.  And recognizing that

18   math is not my strong suit -- are those the invoices you

19   submitted and that the Government paid you in this case?

20   A    Yes.

21   Q    According to those invoices, does it refresh your

22   recollection as to when you began your work on this

23   case?

24   A    Yes.  I began reviewing records for Assistant U.S.

25   Attorney Alan Metzger in March of 2006.

2626

1    Q    And I believe you have a set of five invoices there.

2  How much did we pay you on the first invoice?

3    A    The first invoice was $2,100 in April of 2006.

4    Q    And what was the second?

5    A    The second was $2,700.

6    Q    And the third?

7    A    $3,300.

8    Q    And the next?

9    A    $2,300.

10   Q    And the next?

11   A    $1,200.

12   Q    And if my math is right, that's $11,600.  Was that

13  under what you testified to as to the $12,000 you

14  thought you received?

15   A    Yes.

16   Q    And based on your four days here, will we be

17  invoiced another $4,000?

18   A    3,500 because I anticipate today will be a half a

19  day.

20   Q    So you don't even charge us for travel time, do you,

21  sir?

22   A    No.

23   Q    So when Mr. Williamson suggested that you'd been

24  paid 30 to $40,000 in this case, that was not true, was

25  it, sir?

2627

1   A   I can't imagine that it is.  I don't believe that I

2   have been paid that much.  I believe it's in the $12,000

3   range over about four years.

4   Q   Mr. Williamson also spent a great deal of time

5   talking to you about your curriculum vitae or your

6   resume?

7   A   Yes.

8   Q   Let me hand you what has been marked for

9   identification as Government Exhibit 163.  Is that a

10  copy of your curriculum vitae?

11  A   Yes.

12            MS. TREADWAY:  Government offers Exhibit 163.

13            THE COURT:  Any objection?

14            MR. WILLIAMSON:  No objection.

15            THE COURT:  Mr. Byers?

16            MR. BYERS:  None, Your Honor.

17            THE COURT:  It's received.

18  BY MS. TREADWAY:

19  Q   That resume does list your employment at the V.A.

20  does it not?

21  A   It lists my employment at the V.A. and when it

22  ended, yes.

23  Q   Does it list every lecture you gave as a faculty

24  member at the Case Western School of Medicine?

25  A   No.  I -- I'm totally serious, I give 75 to 100

2628

1    lectures a year.

2    Q   And are you in fact going to be giving a new series

3    of lectures at the V.A.?

4    A   Yes, I will be.

5    Q   Tell the jury about that.

6    A   The V.A. is doing a nursing and physician staff

7    development program for the entire nursing and physician

8    staff.  A series of workshops on difficult

9    doctor/patient interviews dealing with the angry patient

10   and dealing with upset patients and families.  And

11   they've asked me to help them develop this series of

12   workshops and to take a lead role in teaching them.

13   Q   Does your resume include every award you have ever

14   received, Dr. Parran?

15   A   No.

16   Q   After the articles in the Cleveland newspaper

17   appeared that the defense attorneys made sure was in the

18   paper, did the Cleveland medical community react in a

19   way that indicated that they did not believe in your

20   credibility?

21            MR. WILLIAMSON:  Your Honor, I'm going to

22   object.  Calls for total speculation and hearsay.

23            MS. TREADWAY:  I'm asking for actions, Judge.

24            THE COURT:  I agree.  The objection is

25   overruled.

2629

1    A    Yes, they did.

2    BY MS. TREADWAY:

3    Q    They acted in a way that they believed in your

4    credibility, didn't they?

5    A    Yes.

6    Q    In fact, since that investigation of those false

7    allegations has been publicized, have you received

8    multiple awards, sir?

9    A    Yes.

10   Q    Are you now the Inaugural Professor of Medical

11   Education at the Case Western Reserve School of

12   Medicine?

13   A    Yes.

14   Q    Is that a high honor?

15   A    Yes.

16   Q    Were you nominated for promotion from associate to

17   tenured professor?

18   A    Yes.

19   Q    Are you one of the best doctors in America for 2009

20   and 2010?

21   A    Yes.

22   Q    Are you the codirector of a physician clinical

23   support program?

24   A    Federal National Clinical Physician Support Program

25   regarding prescribing methadone in pain management.

2630

```
 1    Q    Have you been nominated for the Outstanding
 2    Clinician of the Year award?
 3    A    Yes.
 4    Q    Was your testimony before this jury in any way
 5    influenced by the money we paid you?
 6    A    No.
 7    Q    Was your testimony before this jury influenced in
 8    any other way by your prior and subsequent work for the
 9    federal government?
10    A    No.
11    Q    Has the federal government provided you any favors
12    for your testimony, sir?
13    A    No.
14    Q    Is it fun sitting here in the middle of Kansas in
15    tornado season being cross-examined and having your
16    credibility questioned by these attorneys?
17    A    No.
18    Q    Let me hand you what has been marked for
19    identification as Exhibit 159, your report, and Exhibit
20    1-E, the summary of your findings from that report that
21    you testified to yesterday.  As Mr. Byers has
22    established for me, that report was done before the
23    investigation and has not changed since.  Is that
24    correct?
25    A    That is correct.
```

2631

1           MS. TREADWAY:  Government offers Exhibit 159

2    and Exhibit 1-E as an alternative under 801(d)(1)(B) as

3    a prior consistent statement, Judge.

4           MR. WILLIAMSON:  Objection.  Improper.

5    Totally improper.

6           THE COURT:  Well, I knew this was coming

7    because she told me and she told you it was coming.  Let

8    me look at 1-E.

9           MS. TREADWAY:  Yes, sir.  We believe that's

10   the best alternative, Judge, because it is a summary of

11   exactly his opinions.

12          MR. WILLIAMSON:  Judge, the point is --

13          THE COURT:  No, just a minute.  This is 1-E?

14          MS. TREADWAY:  This --

15          THE COURT:  Oh, all right.  I'll make up my

16   mind about the report, Exhibit 159, after you provide me

17   with a brief on it.

18          MR. WILLIAMSON:  I can do that, Your Honor.

19          THE COURT:  I thought you would.  Thank you.

20          MR. WILLIAMSON:  And we also --

21          THE COURT:  So I'll take that one under

22   advisement or, as they say with respect to the Court of

23   Appeals, under concealment.  What about Exhibit 1-E?  I

24   thought that had already been received.

25          MS. TREADWAY:  It was a demonstrative, Judge.

1    Now we want it in as a piece of evidence.

2              MR. WILLIAMSON:  Judge, again, it's improper

3    to put a summary opinion document in the evidence.

4              MS. TREADWAY:  Well, it's now a prior

5    consistent statement, Judge, under 801 (d)(1)(B).

6              MR. WILLIAMSON:  Nobody even at all stated

7    that this man changed his opinions at any time.  We

8    acknowledge that the opinions are --

9              THE COURT:  Well, you suggested it.  That's

10   the point.

11             MR. BYERS:  Your Honor, on cross --

12             MR. WILLIAMSON:  We did not suggest it.  We

13   established -- we established -- we're not contesting

14   that he changed it.

15             MR. BYERS:  On cross I specifically had him

16   say, yes, I'm holding to my opinions.

17             THE COURT:  Look.  Look.  Look.  Come on.  I'm

18   going to give you both a -- both sides an opportunity to

19   brief this.  This case ain't going to the jury for a

20   long time and I'll have plenty of time to decide whether

21   these exhibits go to the jury.  Okay?

22             MR. BYERS:  Thank you, Judge.

23             MR. WILLIAMSON:  Yes, Your Honor.

24             THE COURT:  All right.

25

2633

```
 1   BY MS. TREADWAY:
 2   Q   Dr. Parran, Mr. Williamson took you through your
 3   days the other day.
 4   A   Yes.
 5   Q   How many hours of work do you -- how many hours a
 6   week do you work?
 7   A   I work from 6 in the morning until typically 4:30 to
 8   5:30 in the afternoon Monday through Friday, and every
 9   third weekend I work for several hours.  So my average
10   is between 50 hours a week on weeks when I'm not on call
11   on the weekend.  It's 60 hour weeks when I'm on call on
12   the weekend.  And that's a minimum.
13   Q   When it gets to be 5:00 anywhere, do you just leave
14   your patients waiting to be seen by physician extenders?
15   A   I have to see my patients by the end of my workday;
16   and if it's late, it's late.
17   Q   Has the manager of anywhere you have ever worked
18   come and knocked on your exam doors to hurry you along
19   with your examinations?
20   A   That's absolutely unacceptable.  Never.
21   Q   Now, Mr. Williamson talked to you about several
22   individuals and I want to talk about those individuals.
23   First of all, let's talk about Robin G.  Was
24   Mr. Williamson trying to isolate your prior testimony to
25   that first office visit?
```

1    A    Yes.

2    Q    Was your opinion developed based on that isolated

3    progress note in Robin's records or in any other

4    individual's records?

5    A    No.  My opinion was based upon reviewing the entire

6    record.

7    Q    Let's first discuss that history form that he went

8    over with you.  Does a patient filling out a history

9    form constitute an evaluation and history by the medical

10   provider?

11   A    No.

12   Q    Is it a substitute for a thorough evaluation and

13   history by a medical provider?

14   A    No.

15   Q    Why not?

16   A    Because it's often filled out by a patient in the

17   waiting room while waiting to be seen by the doctor.

18   Which is certainly appropriate in order to gather some

19   information from the patient.  But in order to do a

20   reasonably appropriate -- in order to do an appropriate

21   initial history and physical, all of the things that a

22   patient circles need to then be explored with the

23   patient.  The patient listed asthma.  So they would

24   explore with the patient when did the asthma start?  How

25   severe is it now?  What medicines does the patient take

2635

1    for that asthma?  Which is a critical concern when

2    thinking about prescribing controlled drugs off the bat

3    because asthma can slow down the breathing and the

4    controlled drugs can slow down the breathing.  Circling

5    asthma on a patient history form is not a thorough

6    evaluation.

7    Q   In fact, was that history form that you saw in

8    Robin's records a rather rare form in the clinic records

9    that you reviewed?

10   A   It actually was quite uncommon.

11   Q   And did that form ask for a drug history?

12   A   It did not ask for a drug history.

13   Q   Did it ask for an abuse of drug history?

14   A   It did not ask for an abuse of drug history.

15   Q   And did it ask for an addiction history?

16   A   It did not ask for an addiction history.

17   Q   And with regards to that checklist on the progress

18   notes and the slash marks --

19   A   Yes.

20   Q   -- did those slash marks on the checklist indicate

21   to you that sufficient histories, examinations and

22   neurological examinations had been performed?

23   A   No.  It didn't indicate that a sufficient evaluation

24   had been performed.

25   Q   Why not?

1   A   Well, because if, for example, in the case of a

2   neurologic exam, the neurologic exam is one of the most

3   important parts of the exam when evaluating a patient

4   for pain because pain involves the neurologic exam.

5   It's nerves that conduct the pain to the brain.  If a

6   pain syndrome like a back pain problem or something

7   that's presenting as migraine headaches is actually

8   something that's much more serious like a brain tumor or

9   a ruptured disk and a pinched nerve, that could lead to

10  paralysis.  The neurologic exam is where you find that

11  information and so it's considered one of the most

12  critical areas of the physical exam to write down all of

13  the pertinent positives, meaning you found something

14  wrong; as well as the pertinent negatives, meaning that

15  you did review all of the reflexes, all of the sensation

16  in the legs and the arms, all of the cranial nerves to

17  be sure that there wasn't a finding in the cranial nerve

18  exam that would indicate a brain tumor.

19  Q   Did you see any such document and findings when you

20  gave the opinion that neurological exams had not been

21  done?

22  A   There was no documentation of any kind of findings

23  on neurologic exam, either normal findings or abnormal

24  findings.

25  Q   In the health care industry is it commonly

2637

1    recognized that if it isn't documented, it didn't

2    happen?

3    A    We are told -- in the health care industry, that

4    certainly is commonly held forward.  And we tell medical

5    students and interns and residents all the time that,

6    you know, if it isn't documented, it isn't done.  When I

7    review a medical record, I don't strictly go by that

8    premise; but that is what we teach students and

9    residents on a daily basis.

10   Q    When you were reviewing these records, did you give

11   the providers every benefit of the doubt that you could

12   and still come to your opinions?

13   A    I reviewed the medical records -- my approach to the

14   medical records is to approach the medical records

15   hoping that I'm not gonna see all kinds of aberrant

16   behaviors on the part of patients accumulating over time

17   to the point that any reasonable clinician looking at

18   that chart would come to the conclusion that this is an

19   out of control patient and this prescribing is

20   dangerous.  That's my hope every time I open a chart.

21   And there are some charts at times -- many charts at

22   times that I open and my opinion is that I can't find

23   any major concern.  With these charts, I was absolutely

24   astonished.  And continue to be in sort of

25   retrospectively reviewing the data now.

2638

```
1    Q   Let's pull up that first initial office visit of
2    Robin G.  That's number 4 on 4-D, Mr. Moore.  And if the
3    Court will permit, I'll just use my book with the
4    witness.
5         Now, Dr. Parran, when you testified that Robin
6    received on her first visit the drugs she asked for, did
7    she say that two drugs worked for her, Stadol and
8    morphine?
9    A   Yes.
10   Q   And did she get Stadol?
11   A   Yes.  She got a Stadol shot and --
12   Q   And did she get a prescription for morphine through
13   Avenza?
14   A   And she got a prescription for morphine, which is
15   Avenza.  So she said Stadol and morphine were the ones
16   that worked and that's what she got.
17   Q   And she was also prescribed Actiq on that visit --
18   I'm sorry.  I took it away from you.  And was she also
19   prescribed Actiq on that visit?
20   A   She was also prescribed Actiq, yes.
21   Q   And the very next visit, September 13th, '04, did
22   she talk about Actiq working well?
23   A   Yes.
24   Q   And thereafter did she get Actiq?
25   A   Yes.
```

2639

1    Q    And then on December 21st of '04 -- that's page 22,

2    Mr. Moore -- is this where you got the information that

3    she was reporting that she had two to three headaches a

4    month?

5    A    Yes.

6    Q    And until the time Robin died in 2007, about two and

7    a half years later, throughout the course of her

8    treatment, does she continue to have two to three

9    headaches a month or does she end up with daily

10   headaches?

11   A    She ended up with daily headaches.

12   Q    And that was your testimony on direct, wasn't it,

13   sir?

14   A    Yes.

15   Q    Now, you also talked to Mr. Williamson about Robin

16   and her husband telling Dr. Schneider we're pleased,

17   she's gettin' better, her life's great, her life's

18   better.  If a patient or their family member is saying

19   they are better sufficient to tell you that the pain

20   management system in place is working?

21   A    Not, not if the chart also has entries in it

22   including things like pain is acute, uncontrolled, and

23   the patient has many physicians and all of the other

24   exceedingly concerning behaviors on the part of the

25   patient that are documented in the chart.

1  Q   So in that case do you look at the objective

2  evidence as opposed to the subjective evidence and make

3  a judgment as a medical provider?

4  A   Yes.

5  Q   And was that happening at the Schneider Medical

6  Clinic?

7  A   It does not appear to have been happening.

8  Q   When Dr. Graves Owen talked to the jury, he said as

9  a pain management specialist it's more important to him

10  to look at function over those subjective reports.  Do

11  you agree with that in treating pain patients?

12  A   Yes.  My objective evidence of improved function is

13  really the primary thing that we look for in terms of

14  measuring whether our pain management intervention is

15  working or not.  The goal is to maintain and then

16  improve function with pain management.  Patient's

17  subjective report, I feel better, my pain is less, my

18  life feels more manageable, is part of that measure of

19  improved function; but that's a subjective report

20  measure of improved function.  What you really want to

21  look for, if possible, is objective evidence of improved

22  function, being able to do more in your day now that

23  you're on the medicine than you were before.

24  Q   With regards to Patty and Eric, did the fact that

25  the documents referenced a few osteopathic manipulations

2641

1    change your opinions regarding the course of treatment

2    resulting in their deaths?

3    A    Absolutely not.

4    Q    What was the primary treatment both Patty and Eric

5    received over the course of time at the Schneider

6    Medical Clinic?

7    A    Primary treatment that they received was controlled

8    drug prescriptions which directly, ultimately,

9    contributed to their death.

10   Q    Did Patty die of her knee pain?

11   A    No.

12   Q    Would she have likely died of her knee pain?

13   A    No.

14   Q    And regarding Terry C, the fellow who overdosed on

15   methadone and Xanax and then had a consult with Dr.

16   Parks --

17   A    Yes.

18   Q    You remember that?  Dr. Parks didn't prescribe him

19   methadone and Xanax after that overdose, did he, Doctor?

20   A    No.

21   Q    Who did?

22   A    Dr. Schneider.

23   Q    And were those the prescriptions that resulted in

24   Terry's death?

25   A    They were the prescriptions that resulted in his

2642

1    overdose, first overdose; and they were the

2    prescriptions that resulted in his death.

3    Q    Now, Mr. Williamson also talked to you about red and

4    yellow flags.

5    A    Yes.

6    Q    Are these simply recognized tools that doctors use

7    to make reasoned judgments?

8    A    Yes.  They're things to be on the lookout for in

9    case they happen.  And generally when treating patients

10   with chronic pain and long term opiates, these things

11   never happen; but they're things to be on the lookout

12   for.  Warning signs or things that sort of grab you by

13   the short hairs and pull you straight up and stop you,

14   to reevaluate what's going on with the patient because

15   they may well be signs -- they're not definitely, but

16   they may well be signs that the patient's use of the

17   controlled drugs is beginning to be dangerous.  And so

18   that's, that's what -- and so you just look for those as

19   you're managing patients.  Expecting that in the vast

20   majority of your patients, you'll never see one of them,

21   or at least very few.  And if one happens, you can

22   reorient the patient to the treatment plan and nothing

23   ever happens again.

24   Q    Did the Defendant Stephen Schneider or anyone else

25   at the clinic utilize these tools based on the progress

2643

1    notes that you reviewed?

2    A    They documented these tools.  They documented many

3    of these yellow and red flags, many of these concerning

4    behaviors on the part of patients; but they didn't

5    respond to them in terms of changing the way that they

6    prescribed other than either continuing to prescribe as

7    before or at times increasing the prescribing.

8    Q    Mr. Byers was asking you about what you did or did

9    not know about Linda Schneider.  The evidence in this

10   case, Dr. Parran, has been that the Schneiders owned and

11   operated the clinic together.  Does that surprise you?

12              MR. BYERS:  Objection, Your Honor.  She can't

13   educate him and try and rehabilitate him now.  He said

14   he didn't know what she did, if she had any position or

15   anything else.

16              THE COURT:  The objection is sustained.

17              MS. TREADWAY:  Well, Judge, I'm going to ask

18   if it would change his opinion.  I believe that's an

19   appropriate --

20              THE COURT:  The objection is sustained.

21   BY MS. TREADWAY:

22   Q    Did you learn what you needed to know about the

23   Defendant Linda Schneider through the documents?

24   A    Yes.

25   Q    And how was that?

2644

1    A    The medical records of the clinic, a clinic that a

2    person is working at, physician assistant, one of these

3    contract doctors or Dr. Schneider, the medical records

4    are developed by the people who run the clinic, the

5    clinic administrators and the people who direct the

6    clinic.  They are the ones who put medical records

7    together.  They're the ones who provide the forms that

8    you fill out for the histories and physicals.  They're

9    the ones who provide the ancillary staff in order to

10   obtain prior medical records.  They're the ones who will

11   provide release of information forms to the providers so

12   that the provider can have the patient fill out a

13   release of information form from the previous doctor so

14   that they can get old medical records.  They're the ones

15   that provide the pain contracts.  They're the ones that

16   provide and put in the chart the -- these PADT forms,

17   these forms where you assess patient's function, pain

18   relief, and then you also assess for aberrant behaviors.

19   People who direct the clinic put those together in a

20   chart.  They're the ones that maintain the charts.

21   They're the ones that, as I said, obtain all of these

22   prior data.  And, therefore, the medical record itself

23   is a reflection of the expectation that the people who

24   run the clinic have for medical care that takes place in

25   that clinic.

1          MR. BYERS:  Objection.  Move to strike as

2     nonresponsive.  I can't even remember the question now

3     but I think it was did you learn everything you needed

4     to know about Linda Schneider from the medical record.

5          MS. TREADWAY:  And how so.  And he is saying

6     how so.

7          MR. BYERS:  He hasn't mentioned Linda

8     Schneider once.

9          THE COURT:  The objection is sustained.  He

10    doesn't know anything about Linda Schneider and I'm not

11    going to allow him to speculate that Linda Schneider is

12    responsible for all of these things on this laundry list

13    that he's giving.

14       Now, come on, this man's been on the witness stand

15    for hours.  I want to hear another witness.  Would you

16    like to hear another witness, Ladies and Gentlemen?

17    Let's get it over with.  I'm guaranteeing you that

18    recross is going to be very very short because it's time

19    to move on to another witness.  He's been a good

20    witness.  You guys have worked him over.  But let's hear

21    somebody else for a change.

22          MS. TREADWAY:  I have a few follow-up

23    questions, Judge.

24    BY MS. TREADWAY:

25    Q   Were the documents in this case sufficient for you

1   to form the opinion that the Defendants operated their

2   clinic in such a way as to put money before patient

3   care?

4          MR. BYERS:  Objection.  Clumping them together

5   again, Your Honor.

6          THE COURT:  I think he's already testified

7   about that.  The objection is sustained.

8   BY MS. TREADWAY:

9   Q   Mr. Williamson asked you about percentages

10  yesterday.  What percentage of the files that you

11  reviewed indicated that the individuals receiving

12  controlled substances either became addicted because of

13  the prescriptions issued by the Defendants' clinic or

14  worsened an addiction because of those prescriptions?

15  A   Well, over 90%, nearly 100%.

16  Q   And you kept indicating to Mr. Williamson that this

17  case would provide a scientific study.  What did you

18  mean by that?

19  A   Taking the records that I reviewed from this case

20  and compiling them into a group of -- a series of

21  patients from a medical office and reporting them --

22  certainly without any patient identifiers or clinic

23  identifiers -- reporting them as how not to respond to

24  an accumulation of adverse events in patients' charts

25  and an accumulation of adverse events in patients' lives

1    when prescribing controlled drugs would certainly be a

2    publishable peer reviewed medical report.

3    Q   Both of the defense attorneys asked you about other

4    pill mill cases you've testified in.  How does this case

5    compare to those other cases you have testified in in

6    terms of the numbers of overdoses and overdose deaths?

7             MR. WILLIAMSON:  Your Honor, I'm going to

8    object.  It calls for speculation.  Irrelevant.

9             THE COURT:  Well, I don't know that it calls

10   for speculation.  But --

11            MR. WILLIAMSON:  And 403.

12            THE COURT:  Rule 403, the objection is

13   sustained.

14   BY MS. TREADWAY:

15   Q   Finally, Dr. Parran, Mr. Williamson talked to you

16   about the Controlled Substances Act.  Dr. Parran, do you

17   have an opinion regarding whether the way the clinic was

18   operated and the way the course of treatment of these

19   patients was undertaken constituted the illegal

20   distribution of drugs in violation of the Controlled

21   Substances Act?

22            MR. WILLIAMSON:  Your Honor, two quick

23   objections.  Yesterday when I asked about this he said

24   he is not an expert on the law; and it calls for an

25   ultimate conclusion.  And I have case law for the Court

2648

```
 1    if the Court wishes.
 2              THE COURT:  Well, the problem, Mr. Williamson,
 3    was that after he said that he didn't know anything
 4    about it, you kept after him and kept after him until he
 5    did know something about it based on your questions.
 6    I'll allow him to answer.
 7    BY MS. TREADWAY:
 8    Q    Do you want me to ask the question again?
 9    A    Yes.
10    Q    Do you have an opinion regarding whether the way
11    this clinic was operated and the way these patients were
12    managed over time whether the clinic was involved in the
13    illegal distribution of drugs in violation of the
14    Controlled Substances Act?
15    A    I do have an opinion.  And the clinic was at fault
16    in that.
17    Q    When a clinic's policies and procedures make it
18    impossible to practice legitimate medicine, are the
19    clinic managers responsible for that?
20              MR. WILLIAMSON:  Objection.  Your Honor, he
21    testified yesterday he has not reviewed one policy or
22    one procedure.  Calls -- he doesn't have the foundation
23    to even --
24              THE COURT:  I don't think he does.  But I
25    think you let -- you tried to -- you led him into it.
```

2649

1    You're all leading him into things here that really he's

2    not here for.  It's really -- you know, I felt kind of

3    bad yesterday, but nobody was objecting.  I wasn't going

4    to interrupt.  But there are twelve people in this room

5    that are going to decide whether or not what was going

6    on at the clinic and whether or not these two Defendants

7    violated federal law.  And I'm looking at 14 and whoever

8    is left, the 12, are going to decide that.  That's not

9    up to him to decide.  Okay.  And it's really not up to

10   him to opine on it.  That's not what he's here for.  So

11   let's conclude this and have a little bit of recross and

12   then we'll take a recess.

13   BY MS. TREADWAY:

14   Q   Are you ready to go back to Ohio?

15   A   Yes.

16        MS. TREADWAY:  Nothing further, Judge.

17                   **RECROSS EXAMINATION**

18   BY MR. WILLIAMSON:

19   Q   Five minutes.  Okay.  All right.  Dr. Parran, just

20   maybe three or four quick things I want to discuss with

21   you.

22        When Mr. Byers asked you about this state medical

23   board of Ohio document, you told him before you saw the

24   document that you answered yes as to -- that you

25   disclosed the fact that you had been subject to an

2650

1    investigation.  Correct?

2    A   I did disclose to the state medical board in June

3    and in December --

4    Q   Sir --

5    A   -- that I had been subject to an investigation, both

6    in writing and by phone.

7    Q   I told the jury five minutes.  If you keep answering

8    answers you want, I'm not going to be able to live up to

9    that.

10       My question was:  Did you tell Mr. Byers that on

11   your last renewal before the medical board you said yes,

12   you disclosed yes on that questionnaire?  Did you say

13   that?

14   A   Yes, I did say that.

15   Q   And the document that's in evidence contradicts that

16   testimony.  This says no, that you answered no to that

17   question.  Correct?

18   A   Yes.

19   Q   Okay.  Now, you mentioned that this case would be a

20   scientific study.  For a scientific study to be valid

21   and peer reviewed, it has to be based on a valid random

22   sample; correct?

23   A   Absolutely not.  You don't know.

24   Q   You don't know?

25   A   You don't know.

```
 1    Q    I don't know?
 2    A    Yes.
 3    Q    Okay.  And when I showed you the contract yesterday,
 4    you weren't able to discuss that with me at all, were
 5    you?
 6    A    I saw the contract out of context and you showed me
 7    the number at the bottom.  But that is the contract.
 8    That's not the invoice.  I have my invoices.  And
 9    they're around $12,000.
10    Q    Okay.  And, lastly, you stated that that history
11    form did not ask about drug history.  You remember that?
12    A    Yes.
13    Q    And just briefly, what does that ask about?  Do you
14    see drug habits right there?
15    A    Drug habits, yes.
16    Q    Okay.  And you stated that this is insufficient
17    because there was no discussion that went on.  Correct?
18    A    I stated that the entire initial evaluation was
19    insufficient for many reasons.
20    Q    I'm only talking about the history.  You said this
21    history was not complete or not thorough, in your words,
22    because there was no discussion that took place?
23    A    Partly because there was no investigation of some of
24    the data there.
25    Q    You can't prove beyond a reasonable doubt that Dr.
```

```
1    Schneider did not discuss the information on that
2    history form, can you?
3            MS. TREADWAY:  It's not his job to do so,
4    Judge.
5            THE COURT:  You can rephrase your question.
6            MR. WILLIAMSON:  Absolutely, Your Honor.
7    BY MR. WILLIAMSON:
8    Q    You don't have any evidence whatsoever that Dr.
9    Schneider did not discuss the information on that form;
10   correct?
11   A    The only evidence I have is what's on the form,
12   you're absolutely correct.
13           MR. WILLIAMSON:  Nothing further.
14           THE COURT:  Mr. Byers.
15           MR. BYERS:  Very briefly, Your Honor.
16                     RECROSS EXAMINATION
17   BY MR. BYERS:
18   Q    Yesterday, Dr. Parran, you agreed with
19   Mr. Williamson that you had never been informed that the
20   accusations revolving around the V.A. were determined to
21   be false.  Correct?  And we can look for the testimony
22   if you wish.
23   A    I've never even been told what the accusations were
24   at the V.A.
25   Q    Correct.  I think you testified that you had only
```

2653

1   learned of this sort of closure on this past Monday;

2   correct?

3   A   No.  I learned of the closure when we met with the

4   IG, or whatever it is, IG agents and they said that

5   the -- that the investigation was closed and that there

6   were no findings.

7   Q   Right.  No findings?

8   A   Yes.

9            MR. BYERS:  Thank you.  That's all, Your

10  Honor.

11           THE COURT:  All right.  Ladies and Gentlemen,

12  recess for approximately 15 minutes.  Remember and heed

13  the admonition.

14           MR. WILLIAMSON:  Your Honor, can we approach

15  briefly.

16           THE COURT:  Yeah.

17                 (Jury excused for recess.)

18           MR. WILLIAMSON:  Can we take up a legal issue

19  before the next witness is called?  It's going to be

20  regarding her exhibits.

21           THE COURT:  Yes.  Do you want to do it right

22  now or --

23           MR. WILLIAMSON:  We can take a break.  I know

24  you've been sitting for a while.

25           THE COURT:  All right.  Now, Mr. Williamson

2654

1    says he wants to take up a legal issue about the next

2    witness before the next witness comes in.  Who's the

3    next witness?

4              MS. TREADWAY:  The next witness is Tracy

5    Wagner the Medicaid reviewer, Judge.  You might remember

6    Tracy from the Franklin-El case.  She was one of the

7    experts in that case.

8              THE COURT:  I remember Peggy Franklin-El,

9    that's for sure.  But I don't remember her.  But that's

10   fine.  Let's take a recess and we'll take that up before

11   the jury comes back.

12                   (Recess.)

13                   (Whereupon, the following

14                    proceedings continued OUTSIDE

15                    THE PRESENCE of the Jury.)

16             THE COURT:  Yes, sir.

17             MR. WILLIAMSON:  Judge, we have a witness

18   coming up who is going to be testifying about a couple

19   of summary exhibits.  I know the Court is aware we've

20   raised this issue several times.  This exhibit has two

21   distinct problems -- these exhibits -- and I think they

22   would be -- they reference Count 13 and Count 14.  One,

23   we would like the fee tickets -- strike that.

24        Let me, I guess, explain.  They are essentially

25   audit results that the witness is going to testify about

1    in some shape, form or fashion.  They have -- and I'll

2    just give the Court Page 1 of mine so -- I'll give the

3    clerk just another copy just so she can follow along as

4    well.  Page 4 just so you can see the kind of fields.

5    This document has a couple of revisions in here that we

6    need to cross-examine about.  First, we want these

7    stricken because it is inconceivable how we can

8    sufficiently confront these summaries against Dr.

9    Schneider and Linda Schneider without individually going

10   through each and every allegation that a provider was

11   upcoded, each and every allegation that a service was

12   rendered that wasn't done.  What they have done is lump

13   hundreds and hundreds and hundreds of auditor's findings

14   on these spread sheets.  That's the first one.

15        Second, the Government does not have the fee

16   tickets here.  And --

17              THE COURT:  Well, what are fee tickets?

18              MR. WILLIAMSON:  Fee tickets are the sheets --

19   when the provider would go into the room -- well, let me

20   back up a little bit.  When a patient comes in, people

21   at the front desk, they generate paperwork.  They put it

22   on top of a chart.  The fee ticket identifies who the

23   appointment is with, who the primary person is with and

24   a lot of fields on there that are to be completed and

25   circled by whoever saw that patient.  That's put on the

2656

1    front of the chart.  That chart then moves through the

2    office through, depending upon what year you're there,

3    different mechanisms.  Ultimately it winds up in

4    billing.  The billing people in the billing department

5    are supposed to translate that fee ticket and with any

6    corresponding progress note, translate that information

7    to the insurance company.  Insurance company takes that

8    information, processes it, makes a determination whether

9    or not they're going to pay.  So there's a provision on

10   here that says fee ticket provider.  We have to be able

11   to confront that with the witness here in court.  The

12   Government --

13            THE COURT:  The fee ticket provider?  Who is

14   that?

15            MR. WILLIAMSON:  It -- I don't know until this

16   witness testifies.  I don't know what she -- and that's

17   why we needed fee tickets here.  We don't know how she

18   determined who a fee ticket provider was.

19            THE COURT:  The fee ticket provider would have

20   been an employee of the clinic obviously.

21            MR. WILLIAMSON:  Correct.  But this, this

22   relies on her interpretation of these fee tickets which

23   we need to see --

24            THE COURT:  Wait a minute.  You're going too

25   fast for me, Lawrence.

2657

```
1              MR. WILLIAMSON:  Sorry.
2              THE COURT:  You're concerned about the
3    upcoming witness's interpretation --
4              MR. WILLIAMSON:  Correct.
5              THE COURT:  All right.  Go ahead.
6              MR. WILLIAMSON:  Okay.  We need to be able to
7    confront that.  And I guess my second point was that the
8    fee tickets aren't here.
9              THE COURT:  Haven't you seen the fee tickets?
10             MR. WILLIAMSON:  When we first started
11   reviewing documents.  There are boxes and boxes and
12   boxes of fee tickets.  And we won't dispute that.  The
13   problem we have is those boxes were not correlated to
14   any summary chart.  So, for instance, the way you saw us
15   being able to -- when you allowed us to have that
16   evening to review the documents, we were able to
17   confront the witness sufficiently to protect our
18   clients' rights.  Well, when you just bury these fee
19   tickets in amongst all these different documents and do
20   not give us any context, then that becomes extremely
21   difficult.  And I'm sure the Court's aware of under 1006
22   you have the discretion to order that the documents be
23   produced in court.  I think it's extremely critical
24   because they have so many entries in here on these
25   spread sheets.
```

2658

1           THE COURT:  So what I'm looking at here, the

2      first is the patient name and that would be -- there

3      would be a corresponding fee ticket to A Wilson, who the

4      date of service was -- this is so small -- 8-16-2005, by

5      somebody named Akram.

6           MR. WILLIAMSON:  Correct.

7           THE COURT:  And I assume that's an employee of

8      the Schneider Clinic?

9           MR. WILLIAMSON:  Correct.

10          THE COURT:  Then it says fee tickets provider

11     not available.  What does that mean?

12          MR. WILLIAMSON:  We'll have to confront the

13     witness with that.  That's -- there are some that say

14     unknown; there are some that say not available; there

15     are some that say, let's say, for instance, Atterbury or

16     St. Clair.  I mean, there are just -- they range --

17          THE COURT:  Then it says was the PA billed as

18     a physician?  No.  E and M code.  What's that mean?

19          MR. WILLIAMSON:  That is the code -- you heard

20     the 99213 --

21          THE COURT:  Right.  But I can't remember what

22     E and M is.

23          MS. TREADWAY:  Evaluation and management.

24          THE COURT:  Okay.  That's the 99 code.  I

25     remember the testimony about that.  Did the record

2659

1   support the code?  Bill:  No.  Yes.  Revised E and M.

2   Okay.  History does not support the level billed.  And

3   then there's checkmarks beside a few of 'em.  Exam does

4   not support the level billed.  Same.  Complexity of

5   decision-making does not support level billed.  There

6   are some checkmarks.  Was the review of systems based

7   solely upon that PADT?  I don't remember what that

8   stands for but --

9            MS. TREADWAY:  The pain assessment --

10           THE COURT:  -- doesn't make any difference

11  because every one of them is no.  If checkmarks not

12  considered, would code be allowed at current or revised

13  level.

14           MR. WILLIAMSON:  Yes.  And, Judge, if I may, I

15  have a recent case by Judge Robinson in Topeka and I

16  just highlighted a couple of parts of that case that

17  will lead into my final argument in regards to these

18  documents.  This is a 2010 case, January, and in this

19  case --

20           THE COURT:  I know about this case because

21  this is Mark Bennett's case.  He told me about it.  Go

22  ahead.

23           MR. WILLIAMSON:  Okay.  So with this case,

24  Your Honor, I won't belabor it, I just highlighted where

25  Judge Julie discusses the foundation for admission of

1    summary charts.  What's critical in her opinion is that

2    she states that the Court shall allow admission of

3    summary documents if it's established that they are:

4    One, voluminous; two, discoverable by the Defendants;

5    and three, are present and available for discussion in

6    the courtroom.  And if you keep going --

7              THE COURT:  Well, but we know that number one

8    and number two have been satisfied.

9              MR. WILLIAMSON:  Correct.

10             THE COURT:  So if they bring the -- if they

11   bring them to the courtroom, that would satisfy number 3

12   and then we need to move on to the next one.

13             MR. WILLIAMSON:  Yes.  And this is where the

14   problem -- the real problem with these charts as-is

15   occurs.  She continues to state that the summaries may

16   only include the contents of the underlying documents,

17   e-statements, numbers, language and information on the

18   underlying documents, and blanks or omission, numbers,

19   language, or information on the underlying documents.

20   And if you look at her -- the conclusion, Judge Robinson

21   stated that the summaries must be limited to what is

22   actually blank or missing from the required documents --

23   or, excuse me -- from the required or permissible

24   content of the underlying documents.  The summaries

25   shall not include any testimonial, interpretive or

2661

1    inferential statements drawn from the content of the

2    underlying documents.

3        As you just went through this document, date of

4    service -- well, let's start at field one.  Patient

5    name --

6            THE COURT:  Well, let's start where it seems

7    obvious.  If I follow what Julie did, then where it says

8    history does not support, that's where the conclusions

9    and what-not would begin.  Correct?

10           MR. WILLIAMSON:  I think it would go two

11   fields before that.  Possibly even was the PA billed as

12   a physician.  That is an interpretive question based on

13   how this witness interpreted the fee ticket.  Then you

14   move over to did the record support the E and M bill.

15   That's the conclusion and opinion.  That's her

16   interpretation.  If you look next to that under some of

17   those fields, revised E and M, the witness is saying,

18   well, I don't believe the document supported 99203 but I

19   would revise it as 99201.

20           THE COURT:  Well, wait a minute.  Where the

21   column E and M code billed, isn't that on the document,

22   the fee ticket?

23           MR. WILLIAMSON:  E and M code billed is, yes.

24   The one next to it, did record support E and M billed,

25   that is an interpretation of her review of the progress

1    note in comparison to the billing, the provisions of the

2    CPT code that she's applying in her audit review.

3            THE COURT:  Okay.  Gotcha.

4            MR. WILLIAMSON:  And then, of course, to the

5    obvious, as you stated, Your Honor, history does not

6    support, and before that, the revised E and M.  That's

7    not on the document.  Complexity of decision-making.

8    Was it reviewed.  All these additional fields over there

9    are her opinions and interpretations of the data that

10   she conducted in the audit.

11           THE COURT:  All right.  Now, let's assume

12   you're right.  Okay?

13           MR. WILLIAMSON:  Okay.

14           THE COURT:  How are we going to do it?

15           MR. WILLIAMSON:  How are we going to do?

16           THE COURT:  Because this is still relevant.

17           MR. WILLIAMSON:  Yes, we agree.

18           THE COURT:  This would take a week's worth of

19   this woman's testimony to put this evidence on and --

20           MS. TREADWAY:  Probably take two weeks, Judge.

21   For not only Tracy, but for Medicare, PHS, and Blue

22   Cross/Blue Shield.

23           MR. WILLIAMSON:  And this is the problem that

24   we have with these counts, Judge.  We are -- the

25   Defendants are not charged with a specific act of fraud

1   in Counts 13 and 14.  They say, well, it's fraud because

2   30% of things were upcoded; it's fraud because 27% of

3   the things aren't supported by the records.  That is a

4   nonspecific allegation.  And although it's one count, we

5   are going to have to sit back and go through these

6   things one by one by one by one.  There is no other way

7   that we can do it because, I mean, I guess we could go

8   through and show 15% of her errors are, you know, that

9   are errors or that her interpretation of 15% are

10   incorrect.  But I don't think that satisfies the

11   confrontation clause.

12          THE COURT:  Well, I don't know.  I think

13   you've made your point on the patient records that only

14   150 with this last witness were reviewed out of 10,000.

15   But on the other hand, his chart was only as to those he

16   reviewed.

17          MR. WILLIAMSON:  Yes.  And we were able -- I

18   believe --

19          THE COURT:  Did she review all of these?

20          MS. TREADWAY:  Yes, sir, every single one.

21   Just like she did in the Franklin-El case.  And, Judge,

22   if you remember, the Franklin-El case we had a very

23   similar chart that both Ms. Wagner and another

24   individual, Stacy Chamberlain, introduced into evidence.

25   Almost identical in context.

2664

1          THE COURT:  Well, I know, but nobody objected

2     to it in Franklin-El.

3          MS. TREADWAY:  I believe they did originally,

4     Judge.  And, again, it's one of those situations where

5     the Defendants are overlooking the applicable rules of

6     evidence to this chart.  It's not just a 1006 chart.  We

7     submitted a brief, Judge.  It's document 464.  And we

8     cited therein relevant Tenth Circuit law about these

9     kinds of charts.  They are both 1006 charts and they are

10     611-A charts.  And the case is *United States V Stiger*

11     and *United States V Ray*.  Those are both Tenth Circuit

12     cases and they have both expressly approved these kind

13     of charts when experts are testifying.

14          THE COURT:  Well, I haven't looked at those

15     cases but I did -- I've, you know, issued maybe 15 or 20

16     rulings in this case.  Have I already ruled on this?

17          MS. TREADWAY:  Well, Judge, again, it's one of

18     those situations where they complained about these

19     charts since they got them in June of '08.  Their

20     experts have seen the data.  Their experts have seen the

21     documents.  Their experts are going to be trying to

22     submit to the Court the very same kinds of charts.  So

23     this is spitting in the wind in a large measure because

24     their experts are not going to be -- they're not going

25     to be allowed to do it either.  And we have to be able

2665

1      to prove up our case, Judge, as charged.  And we've

2      charged this case appropriately and we're proving it

3      appropriately under the precedent in the Tenth Circuit

4      as well as across the country.

5                  THE COURT:  Tell me the cites on those two

6      cases.

7                  MS. TREADWAY:  Yes.  The brief that we

8      submitted is Document 464.  And the Tenth Circuit cases

9      are *Stiger*, S-T-I-G-E-R, 413 Fed. 3rd 1185.  The

10     pinpoint cite is 1198.  That's an '05 case.  And *United*

11     *States V Ray* is 370 Fed. 3rd 1039, which is an '04 case.

12           Essentially, Judge, we have very similar cases,

13     very similar charts in those cases.  And in a Fifth

14     Circuit case, very, very recent out of Texas, I believe,

15     *United States vs. Palazzo*, which is also cited in our

16     brief, these summary charts are admissible when, A, the

17     chart is based on competent evidence before the jury,

18     that is, the expert's testimony; B, the primary evidence

19     used to construct the charts is available to the other

20     side for comparison in order that the correctness of the

21     summary may be tested.

22           Mr. Williamson has indicated that he has had that

23     evidence and has been given the opportunity to inspect

24     it.  In fact, they've given it to their experts, so they

25     cannot claim they don't have this.

2666

1          Third, or C, the person who prepared the charts is

2     available for cross-examination.  And, D, the jury is

3     properly instructed concerning their consideration of

4     the charts.  And, furthermore, charts like this are

5     admissible when they are sufficiently accurate and

6     reliable.

7          The Defendants are basically challenging the weight

8     of the evidence, not their admissibility.  And in your

9     prior rulings, Judge, that is where you came down over

10    and over and over again, weight, not admissibility.  And

11    that's where we are.

12          THE COURT:  Well, I think I covered this in

13    Docket 462 to some extent by saying that I couldn't rule

14    on the objections to the charts.  I said:  The Court

15    will again defer its ruling on the admissibility of the

16    charts at trial.

17          MR. WILLIAMSON:  Yes, sir.

18          THE COURT:  However, based on the one summary

19    chart provided as an example -- and I don't remember

20    whether this was one of 'em but --

21          MS. TREADWAY:  It was, Judge.

22          THE COURT:  -- as well as the Court's previous

23    experience in other cases with similar charts,

24    Defendants will have to make more specific and pervasive

25    arguments.

2667

1          And that's what they're doing --

2               MR. WILLIAMSON:  That's what we're doing.

3               MS. TREADWAY:  Judge, this chart is

4    additionally admissible under Rule 703.  Again, the case

5    we cite in our brief is *Milkiewicz*, a First Circuit

6    case, out of 2006.  Again, this is an expert witness,

7    and expert witness charts are admissible to prove that

8    which the expert is testifying to.  This is not a

9    situation, Judge, where the expert reviewed ten charts

10   and is extrapolating to thousands.  Instead, what we

11   have is a expert on the stand that has actually

12   physically reviewed all of these claims and compared

13   them to the documents.  The Defendants have had all of

14   that information for two years.  Their experts have

15   reviewed it.  They have plenty of opportunity to

16   challenge the weight of the evidence but the

17   admissibility should not be challenged at this point.

18          We believe that these are fully admissible under

19   1006, 611 and 703.

20               THE COURT:  Where are the fee tickets?

21               MS. TREADWAY:  They're in Kansas City.  As

22   they always have been.

23               MR. WILLIAMSON:  Judge, I can tell you that I

24   contacted Ms. Treadway March 31st and I asked about

25   several documents.  In her response letter she states

2668

1    all the files have been moved to Wichita.  If she was

2    only talking about -- she didn't say the files requested

3    have been moved to Wichita.  She stated all the files

4    have been moved to Wichita.  If they were here and

5    available and so long as the Court understands that this

6    is gonna take an extremely long time, beyond the fact

7    that these are unspecific charges.  I mean, I researched

8    and I could not find a case where the charge is based on

9    a percentage.  The charge has to be that you

10   fraudulently submitted certain materials to these

11   benefit companies in order to be enriched.  And it's --

12   it's just difficult to fathom that.

13        And, too, our experts have reviewed the patient

14   files that were provided to us -- and I think this is

15   critical -- they provided us files that they correlated

16   with the first -- with these audits.  We have those

17   uploaded and we can let the Court see them.  Absent from

18   those documents are any fee tickets whatsoever.

19             THE COURT:  Did you ever ask for the fee

20   tickets to give to your expert?

21             MR. WILLIAMSON:  No, we didn't.

22             THE COURT:  Why not?

23             MR. WILLIAMSON:  Because we relied on this

24   chart to give to the expert.  We did not understand

25   fully what this was going to be until she gave us our

2669

1    exhibits.  We relied on --

2              MS. TREADWAY:  Judge --

3              MR. WILLIAMSON:  Ma'am, I let you talk and I

4    did not interrupt you.

5              MS. TREADWAY:  Unbelievable.

6              MR. WILLIAMSON:  When we went in there,

7    Judge -- understand this -- there were like 30 to 40

8    boxes of documents.  There were multiple, multiple,

9    multiple boxes of fee tickets.  We had no inclination,

10   no idea, at that time that those fee tickets correlated

11   with this exhibit.  When the Government provided us the

12   disk that was provided to their expert, it had on

13   there -- it had on there patient files, and that was it.

14   Those were the source documents given to us.

15             MS. TREADWAY:  Judge, that is just such a

16   misrepresentation --

17             THE COURT:  Well, wait a minute.  Let me stop

18   you.  When did you get this type of SVRS review chart?

19             MR. WILLIAMSON:  We received a copy of the --

20   it's an elongated copy of basically a lot more fields

21   than what's in this chart.  We received that with the

22   Blue Cross/Blue Shield data.

23             MS. TREADWAY:  No, Judge, they received all of

24   these spread sheets --

25             THE COURT:  Just a minute.  I want to hear

1    from him.

2              MR. WILLIAMSON:  It was similar spread sheets

3    but they were in color but they were a lot longer, a lot

4    more fields.  And we received those --

5              THE COURT:  Okay.  When?

6              MR. WILLIAMSON:  It's been a while.  We've had

7    those and our expert has those.  And there's not so much

8    an issue of that as opposed to having the fee tickets

9    here so we can cross-examine this lady.  If the Court

10   feels that our clients' confrontation rights can be

11   protected --

12             THE COURT:  I'm going to protect your clients'

13   confrontation rights.  It's 11:00.  Go call the U.S.

14   Attorney's office, tell 'em to bring the fee tickets

15   down here.

16             MS. TREADWAY:  They're not at the U.S.

17   Attorney's office, Judge, they're at the HHS office.

18   And, again, Judge, they are somewhat misrepresenting

19   what has gone on.

20             THE COURT:  Well, I don't care where they are.

21   They have a right to have them here.

22             MS. TREADWAY:  But they've had the right and

23   the opportunity to review them and copy them for two

24   years, Judge.  I pleaded with them to do so.

25             THE COURT:  I know.  I remember all the stuff

1    that went on.  But the point is that now we're at the

2    trial, we've got a jury sitting in there, we've been

3    here now damn near three weeks, and I want the fee

4    tickets here.  Now, that means somebody's going to have

5    to load up the boxes, get in the car and drive down

6    here.

7            MS. TREADWAY:  Oh, no, Judge, it will be a

8    truck.  It won't be a car.

9            THE COURT:  I don't care what it is.

10            MS. TREADWAY:  But can we still proceed with

11    this witness's direct exam and --

12            THE COURT:  Yes, we can.

13            MS. TREADWAY:  Great.  We will not be able to

14    get them here tomorrow either, Judge.  Probably not

15    until next week.

16            THE COURT:  What kind of truck are you

17    getting?  Do you have to build a truck first?

18            MS. TREADWAY:  Judge, I'll have to rent a

19    truck -- again, my agent, my HHS agent is in California

20    dealing with his -- the death of his mother.

21            THE COURT:  I know.

22            MS. TREADWAY:  I do not have other HHS agents

23    that I can call on the phone and say rent a truck, get

24    it loaded and bring it to Wichita.  I don't have that

25    kind of power.  I will say that you are ordering that

1    and they will get it done as quickly as possible, Judge,

2    but it's going to be a logistic situation and I don't

3    even know where we're going to put 'em when we get 'em

4    here, Judge.  Do you have a place to store them?  I am

5    full up to my rafters in my space.

6              THE COURT:  Well, I've got two witness rooms.

7    I've got the big witness room.  We can put them in

8    there.

9              MS. TREADWAY:  All right.  We'll put them --

10             THE COURT:  One that's right over here, right

11   behind you there.  If that isn't open, we'll open it for

12   you.  Is somebody using that?

13             MR. WILLIAMSON:  Which one?  This one?  We

14   have been using that one.

15             THE COURT:  Okay.  You put it in there with

16   them.  They want to look at them --

17             MS. TREADWAY:  These fee tickets are organized

18   as the Defendants organized them.  They are organized --

19   and we haven't changed that organization -- they are

20   organized by date in chronological order.

21             THE COURT:  Okay.  That ought to be easy.

22   Well, if that's the way they organized them, then they

23   have to live with their organization.

24             MS. TREADWAY:  It's my belief, Judge, they

25   have copies of all these fee tickets, too.

2673

1              THE COURT:  If there are that many, I'd be

2     amazed if they copied them.

3              MS. TREADWAY:  They scanned most of everything

4     they had in the Clinic when we were taking documents and

5     I believe they have copies of these fee tickets

6     available.

7              THE COURT:  Well, okay.  All right.  Here's

8     what we're going to do.  I hate to -- I hate to disagree

9     with Judge Robinson.  She's my favorite.  But, I think

10    that we're at a different point than she was, perhaps.

11    But even if we aren't, there's no way that I'm going to

12    keep this jury here for two weeks while we go through

13    each one of these tickets.  I don't think that's

14    necessary.  I don't think it's fair.  I don't even think

15    it's fair to the Defendants.  And --

16             MR. WILLIAMSON:  Judge, are you open for any

17    more discussion or do you pretty much have your mind

18    made up?

19             THE COURT:  I'm open to discussion about how

20    to resolve this in such a way that it is fair to the

21    Defendants and fair to the Government and that it

22    doesn't take two weeks to go through each one of these

23    because what I have here is 57 entries on Page 1 of

24    21 --

25             MS. TREADWAY:  Judge, I would offer the

2674

 1    following compromise.  If we can admit the first page

 2    and not the detailed summary but the overall summary,

 3    the first page is how many claims she found had been

 4    upcoded by provider, how many claims had been upcoded

 5    with the checklist, without the checklist, and then the

 6    percentages of what she reviewed.  Are you understanding

 7    me?  The very first page of that exhibit, sir.

 8                THE COURT:  Is this the first page?

 9                MS. TREADWAY:  No, sir.

10                THE COURT:  Well, let me see it.  I don't know

11    what you're talking about.

12                MR. MOORE:  Your Honor, if you look on your

13    screen, it's --

14                MS. TREADWAY:  We would compromise that we

15    would introduce that instead of the complex chart, which

16    is the expert's opinion, and a summary of voluminous

17    data.

18                MR. WILLIAMSON:  Judge, it's a summary of an

19    opinion.  It's not a summary of data.

20                MS. TREADWAY:  It's a summary of her data

21    review, Judge, which she's subject to cross-examination

22    about.

23                MR. WILLIAMSON:  I know -- this still means we

24    need the fee tickets, but I guess the problem I have --

25    I think we're getting closer -- but the problem here is

1    billed as though a physician provided the service when a

2    physician's assistant provided the service.  That is a

3    conclusion --

4           MS. TREADWAY:  It's an expert opinion, Judge.

5           MR. WILLIAMSON:  -- and there's only one rule

6    in the Rules of Evidence that I've seen that deals with

7    summaries and it doesn't allow for summary opinions.

8    Otherwise you could just put summary reports in for

9    every expert that you have just to usurp the general

10   rule that reports aren't admissible.

11          MS. TREADWAY:  Again, Judge, this is

12   absolutely allowable under the law.  1006, 611-A, 703,

13   as we set forth in our brief with multiple cites to

14   multiple cases, including Tenth Circuit cases.

15          THE COURT:  Well, what I'm trying to puzzle

16   out in my mind -- Julie says in her order that the

17   charts cannot contain statements about what is false or

18   fraudulent about the omission as that is the proper

19   subject of testimony, it is interpretive and

20   influential -- inferential -- I'm sorry.  But she

21   doesn't cite any authority for that.  And I don't know

22   what those charts look like.

23          MS. TREADWAY:  They were different charts.

24   And there's nothing on this chart that says false or

25   fraudulent.  Instead, that will be Tracy's testimony

1    about this information.  But basically it's her opinion

2    that this many that she reviewed were billed as though a

3    physician saw --

4             THE COURT:  Well, but that's not an answer to

5    just put this summary in because then they have the

6    right -- and I agree that they do, and you do, too, I'm

7    sure -- to determine how she came up with those

8    percentages and the basis for her opinion.  And that

9    probably brings us back to the chart.

10            MR. WILLIAMSON:  Judge, I think the chart --

11            THE COURT:  -- doesn't it?  I mean, doesn't it

12   bring us back to the chart?

13            MR. WILLIAMSON:  Yes.

14            THE COURT:  Without the chart, how are you

15   going to be able to cross-examine her?

16            MR. WILLIAMSON:  Right.  I don't think that

17   the chart, per se, is inadmissible, the chart as drafted

18   is inadmissible.  The chart with the interpretive data

19   on here, the interpretive information that relied upon

20   her to review the documents and her opinion as to what

21   that meant, that can't be on that document.

22            THE COURT:  Well, that's what Julie says in

23   her order but that's -- she doesn't cite any authority

24   for that.

25            MR. WILLIAMSON:  Well, I think --

2677

1           THE COURT:  -- but here's my problem.  I wish

2     you guys would listen to me here.  I'm the one who has

3     to make the decision.  When you're cross-examining,

4     Lawrence -- and I'm going to bring the fee tickets down

5     here -- you're going to want to cross-examine her about

6     the material that's in the chart.  And if you don't have

7     the chart, you can't effectively cross-examine her and

8     the jury won't understand what you're talking about if

9     you don't have the chart --

10          MR. WILLIAMSON:  I agree, Your Honor.

11          THE COURT:  -- so let's take the first line

12    here, A Wilson, history does not support the level

13    billed.  She says there's an X there so that must be

14    that she's determined the history does not support the

15    level billed.  I would think that you would want to,

16    using the fee ticket or the history or whatever it is

17    she's relied on, you'd want to say, all right, let's

18    take a look at this one, and you cross-examine her about

19    it.

20          MR. WILLIAMSON:  Judge, I think I understand

21    your concern and --

22          THE COURT:  If I were you, I would want this

23    rather than to try to introduce individual documents,

24    and I don't know how you'd do it, but without the chart,

25    you're going to have to provide the same -- you're going

2678

1    to get the information from her on the witness stand

2    without the documents and I don't think the jury would

3    understand it.

4         MR. WILLIAMSON:  I think the -- the small

5    separation we have is I think the chart could be useful

6    even for the witness to use to testify; but to take the

7    chart to the jury as admissible with these opinions on

8    here is improper.  I'm not saying she can't use it.  I'm

9    saying it's improper under 1006 to submit this as an

10   admissible document and that -- and I just look at the

11   plain language of 1006 when it says statements and

12   writings.  The word opinion is missing from the plain

13   language of 1006.

14        THE COURT:  Well, I haven't looked at those

15   cases under 611-A, though, but I think we need to get

16   started.  I told the jury an hour ago that I was going

17   to put them out there for 15 minutes.  I think we can

18   get started without the necessity of putting the chart

19   in --

20        MR. WILLIAMSON:  I think so.

21        THE COURT:  -- and I'm going to have to think

22   about this.  It may be that the chart can be modified

23   but -- is it -- it's not the Government's intention, I

24   wouldn't think, to go through every single entry,

25   obviously.  They wouldn't be offering the chart.

2679

1          MS. TREADWAY:  No, Judge.  We're not going to

2     go through every single entry.  We're simply going to

3     lay the foundation as to how Ms. Wagner approached her

4     review and then we're going to go immediately to the

5     summary of that review and her opinions.

6          THE COURT:  You know, my inclination here is,

7     since this is basically a cross-examination issue, and

8     the Government's not going to use the chart during

9     direct examination and the fee tickets somehow will get

10     here, that to some extent it's going to depend on how

11     the Defendants cross-examine this witness.  It may be

12     that, depending on cross-examination, the chart will

13     become admissible.  I don't know.  Or at least partially

14     be admissible.  Because if you challenge her

15     testimony -- I don't see that again -- but, that 30% of

16     these that she reviewed didn't -- history doesn't

17     support the level billed, then she's going to be able to

18     say, and I think probably at that time show to the jury,

19     yes, I did, I went through every one of these and I

20     noted, you know, it wasn't just a figure that I drew out

21     of the air.  But I'll take a look at this and see where

22     we get.  I might even call Julie and find out what the

23     chart looked like in that case.  Matter of fact, I think

24     I will call her and ask her if she had a chart in front

25     of her or if she was just listening to them talk about

1    the chart.  Because I don't know what the charts look

2    like, if there were any in existence at the time.

3              MS. TREADWAY:  I believe those charts, Judge,

4    had words like false, et cetera, on it.

5              MR. WILLIAMSON:  Judge, I would just point you

6    to her language.  I doubt you have to remind her.  She

7    is very astute.  But the opinion is not limited to

8    statements of fault.  It states interpretive language,

9    any interpretations by the witness is for testimony

10   so --

11             THE COURT:  Well, I think we've covered this

12   enough.  The jury is going to wonder if maybe something

13   has happened to us out here.  I think I've done

14   everything I can.  And how long do you think this lady

15   will take?

16             MS. TREADWAY:  It's not a long exam, Judge.  I

17   don't think I can do it in 45 minutes but I might be

18   able to do it between now and 12:30.

19             THE COURT:  She's from Topeka, isn't she?

20             MS. TREADWAY:  Yes, sir.

21             THE COURT:  Are we in a position where she can

22   be deferred until next week?

23             MS. TREADWAY:  I think we have a couple of

24   witnesses -- I'm not sure whether they're here or not

25   yet, Judge, but I know we had a couple of more witnesses

2681

1    scheduled today.

2           THE COURT:  Well, I don't want to send --

3    we're going to only work half a day tomorrow.  I don't

4    want to send the jury home after only hearing a few

5    hours of testimony.  We'll hear her direct testimony.

6    You can start on cross-examination.  And if we get to

7    the point where you need the fee tickets, then we'll

8    suspend her testimony, put these other people on --

9           MS. TREADWAY:  Judge, just for the record,

10   they've had notice that Ms. Wagner was going to be here

11   for almost a week and they waited until today to ask for

12   the fee tickets.  I think that's just absolutely

13   unconscionable and it's a strategy that needs to stop.

14          THE COURT:  Well, you know, my job is not to

15   manage children.  This is a not a kindergarten.  I've

16   tried to make that clear here.  I like you lawyers, but

17   I have a different job than you have.  And it would have

18   been very helpful for the Defendants to do this; but by

19   the same token, we've all tried cases and sometimes

20   things just don't happen when the other side wants them

21   to happen.  But is this going to happen again?

22          MR. WILLIAMSON:  No, Judge.  I mean,

23   generally, maybe the Court -- Dr. Parran was an

24   important witness that I spent like a lot of time

25   preparing for so -- and, you know, we normally try when

2682

1    we get notice to go --

2              THE COURT:  Well, I know, but you've got help

3    here.  I don't want this to come up again.  In other

4    words, I told you all I did not want situations like

5    this where the jury is in the jury room wondering what

6    is going on out here.

7              MR. WILLIAMSON:  Judge, I just assumed that

8    they were going to be here based on that March 31st

9    letter when she said all documents were going to be

10   here --

11             THE COURT:  Well, okay.  Then you could have

12   asked her though.

13             MR. WILLIAMSON:  Yes.

14             THE COURT:  You could have said, Lawrence,

15   where are the fee -- you said they were going to be

16   here, where are they, we would like to look at them.

17   Last week or whenever the trial started --

18             MR. WILLIAMSON:  Yes.

19             THE COURT:  -- so I don't want this happening

20   again.

21        Now, I'll bring the jury out.  It's 11:20.  And

22   we'll go until about noon or thereabouts.  And I've got

23   to quit today at about 4:30.  I've got an appointment at

24   4:30.  So we're going to quit about 4:30 generally and

25   then tomorrow we'll go until about noon.  Then Monday,

2683

1    you remember, we don't have court on Monday because I've

2    got all kinds of other cases to work on, criminal cases,

3    on Monday.

4              MS. TREADWAY:  We're also off Friday next

5    week, Judge.

6              THE COURT:  So you're going to have plenty of

7    time to look through these fee tickets and compare them

8    to this chart and do all this stuff that you're

9    concerned about.  Okay?

10             MR. WILLIAMSON:  I think that would work, Your

11   Honor.

12             THE COURT:  All right.

13             MR. BYERS:  Your Honor, will you be able to

14   allow weekend access --

15             THE COURT:  -- to the courthouse?

16             MR. BYERS:  Yeah.  If the fee tickets are

17   here.

18             THE COURT:  Harry, what do you think about

19   that?

20                      (Off-the-record discussion

21                       between the Court and CSO

22                       Minor.)

23             MR. WILLIAMSON:  Judge, last time we were able

24   to take the documents with us.  We brought them back in

25   the same condition that we took them out.

1          THE COURT:  The only -- I'm not worried about

2     you messing with the documents or doing something with

3     'em.  If there are that many --

4          MR. WILLIAMSON:  We'll just take a handful,

5     more or less --

6          THE COURT:  A handful more or less?

7          MR. WILLIAMSON:  -- to get started.  I mean,

8     if it's that many -- it is a lot.  I mean, when we saw

9     these fee tickets, I mean, it is a lot --

10         THE COURT:  She's represented that, you know,

11    you need a 53 foot trailer to get them down here.

12         MS. TREADWAY:  Well, Judge, if they want -- if

13    they want to look at 'em, they can go to Kansas City

14    where they are.  That's where Mr. Williamson lives.  If

15    they want to look at them in-site instead of moving them

16    all the way down here.  If they're just going to look at

17    a few --

18         MR. WILLIAMSON:  No, we're just taking a few

19    over the weekend --

20         MS. TREADWAY:  I don't know that I can get

21    them here by tomorrow, Judge.  I'll do my best but I

22    have no promises on that.

23         THE COURT:  I want them here by noon tomorrow.

24    You tell 'em that if they're not here by noon tomorrow,

25    somebody at HHS is going to answer to me.

```
 1              MS. TREADWAY:  All right, Judge.

 2              THE COURT:  I don't know who HHS is, but I'm

 3      going to flex my muscles once in a while.  They can get

 4      them down here.  All right.  Then you can take some home

 5      over the weekend.

 6              MR. BYERS:  Thank you, Your Honor.

 7              THE COURT:  Okay?

 8              MR. WILLIAMSON:  Yes, Your Honor.

 9              THE COURT:  All right.

10              MR. BYERS:  Your Honor, I did want to give you

11      a heads-up.  On cross of this witness, Mr. Gorokhov will

12      take over.  I didn't want you to think because I've made

13      a couple comments here I was going to do the cross.  Is

14      that acceptable?

15              THE COURT:  It's acceptable.

16              MR. BYERS:  And I'll stay quiet now.  Thank

17      you.

18                   (Jury enters the courtroom.)

19              THE COURT:  I apologize.  When you finish your

20      jury service, we'll give you this little

21      questionnaire -- no, I'm serious now -- about whether

22      you liked your jury service and all that and they are

23      very valuable to us as the judges.  We try to listen to

24      what the jurors have to say.  We can't always

25      accommodate everything that may come up.  But one of the
```

2686

1    questions is how much time did you have to spend

2    waiting.  And I am very sensitive about that.  I try to

3    minimize that.  But this particular problem that I had

4    to deal with is just one of those times when I needed to

5    keep you in there and get this resolved.  So we'll try

6    not to do that again but I can't promise, it's just --

7    you guys are pros by now.  You know the way this is

8    going.  And sometimes it just takes longer to resolve

9    things than others.  All right.  Next witness.

10           MS. TREADWAY:  Government calls Tracy Wagner.

11           THE COURT:  What I think we might do, we

12   talked about this, if it's alright with you all, we

13   might go until about 12:30.  Ms. Treadway thinks that

14   she might finish her direct by then.

15           MS. TREADWAY:  I'll try.

16           THE COURT:  Well, if not -- or do you want

17   to -- it's up to you all.  Do you want to break at 12 as

18   usual or do you want to see if we can finish her direct

19   testimony and then you take your lunch?

20                    (Off-the-record.)

21           THE COURT:  That's what they want to do.  All

22   right.

23           MS. TREADWAY:  That's fine, Judge.  I'll do my

24   best.

25

2687

1                    **TRACY WAGNER**

2    Having been first duly sworn to tell the truth, the

3    whole truth and nothing but the truth, testified as

4    follows on:

5                 **DIRECT EXAMINATION**

6    BY MS. TREADWAY:

7    Q    Please introduce yourself to the jury.

8    A    My name is Tracy Wagner.

9    Q    Where are you employed, Ms. Wagner?

10   A    I'm currently employed by Hewlett-Packard Enterprise

11   Services.

12   Q    And did this used to be known by a different name?

13   A    Yes, it was.

14   Q    What was the name?

15   A    Electronic Data Systems.

16   Q    And whether it's Electronic Data Systems or

17   Hewlett-Packard, what is that entity?

18   A    We are the fiscal agent for the State of Kansas for

19   the Medicaid contract.

20   Q    And what does that mean?

21   A    That means that we provide various services for the

22   State of Kansas and contract with Hewlett-Packard to

23   provide various services for Kansas Medicaid.

24   Q    And does that include handling of the claims?

25   A    It does.

1   Q   What are your job duties and responsibilities?

2   A   I am the supervisor of the surveillance and

3   utilization review department.   In that department we do

4   provider and consumer reviews.   As well as handle the

5   lock-in program and the can-be-healthy program.

6   Q   We'll talk about the lock-in program later.   Is

7   Medicaid a healthcare benefit program?

8   A   It is.

9   Q   And is it engaged in interstate commerce?

10  A   Yes.

11  Q   How long have you worked in the healthcare industry

12  or the healthcare insurance industry?

13  A   I've worked in the healthcare industry for 25 years.

14  Q   And where did you work prior to working at

15  electronic data systems?

16  A   I worked for St. Francis Hospital in Topeka.

17  Q   And what did you do there?

18  A   I managed the admissions and initial utilization

19  review department.

20  Q   Have you ever worked as a healthcare provider?

21  A   Yes.

22  Q   And in what capacity?

23  A   I'm a Registered Nurse.

24  Q   How does a medical provider such as a clinic or a

25  physician or a physician's assistant become eligible to

1    be paid through a beneficiary's healthcare insurance

2    with Medicaid?

3    A    They apply for enrollment to the Medicaid program.

4    Q    Let me hand you what has been marked for

5    identification as Exhibit 13-G.  Do you recognize that

6    document?

7    A    Yes, I do.

8    Q    And what are those documents?

9    A    These documents are from the provider enrollment

10   packet.

11   Q    And are those documents the Defendant Stephen

12   Schneider and Schneider Medical Clinic submitted

13   application to become enrolled as Medicaid providers?

14   A    Yes, they are.

15           MS. TREADWAY:  Government offers Exhibit 13-G.

16           MR. GOROKHOV:  No objection, Your Honor.

17           MR. WILLIAMSON:  No objection.

18           THE COURT:  13-G is received.

19   BY MS. TREADWAY:

20   Q    Once enrolled in the Medicaid program, does the

21   provider receive a number?

22   A    Yes.

23   Q    And does each provider receive a unique number?

24   A    Yes.

25   Q    Did the Defendant Stephen Schneider receive a

2690

```
 1    number?
 2    A    Yes.
 3    Q    And did the Schneider Medical Clinic receive a
 4    number?
 5    A    Yes.
 6    Q    And did the physician's assistants who worked at the
 7    clinic receive individual numbers?
 8    A    Yes.
 9    Q    Let me hand you what has been marked for
10    identification as Exhibit 13-H.  Do you recognize that
11    package of documents?
12    A    Yes.
13    Q    And what are they?
14    A    They are letters notifying the individual providers
15    of their provider ID numbers.
16    Q    And do each of them have an effective date for the
17    number?
18    A    Yes.
19    Q    And what does that signify?
20    A    That signifies the date we will begin paying claims
21    under that provider ID number.
22              MS. TREADWAY:  Government would offer Exhibit
23    13-H.
24              MR. WILLIAMSON:  No objection.
25              MR. GOROKHOV:  No objection.
```

1        THE COURT:  It's received.

2   BY MS. TREADWAY:

3   Q   Now, could you quickly review for the jury the

4   provider's name, the number, and the effective date of

5   their provider numbers?  And if Mr. Moore can help us

6   there with that as well.

7   A   The first letter is to Dr. Stephen Schneider, with

8   an effective date of 9-1-02.  Was there something else

9   you wanted me to identify on that.

10  Q   That's it?

11  A   That's it.  Okay.  Second letter is for Schneider

12  Medical Clinic.  The effective date again is 9-1-0.

13  Then we have a letter to Kimberly He'bert, effective

14  date 9-1-02.  One for Dr. Donna St. Clair, effective

15  date 10-1-02.  Curtis Atterbury, effective date 2-1-03.

16  Debra Klingsick, they changed the format of the letter.

17  Let me find the effective date here.

18  Q   That's all right.  It would at least be the date of

19  the letter?

20  A   Correct.  It would at least be May 19th, '04.

21  Q   Right.

22  A   The next is Charles Craig, dated November 12th of

23  '04.  Oh, excuse me, the effective date is on the second

24  page.  And his is effective 10-16-04.  Mike Hall,

25  effective date 2-18-05.  Nguyen, effective date --

2692

```
 1    Q    Hien Nguyen?

 2    A    Nguyen -- I wasn't sure how to pronounce that.  I

 3    apologize.  Effective date 5-10 of '05.  Mohammed Akram,

 4    effective date 7-15 of '05.

 5              THE COURT:  What was the date again?

 6    A    7-15 of '05.

 7              THE COURT:  And who was the one previous to

 8    Mohammed?

 9    A    Nguyen.

10              MS. TREADWAY:  Hien Nguyen is the

11    pronunciation.

12              THE COURT:  Okay.

13    A    5-10 of '05 on that.  Connie White with an effective

14    date of 6-1 of '05.  And Dr. Simons with an effective

15    date of 9-18 of '05.

16    Q    And all of those individuals were associated with

17    the Schneider Medical Clinic when they were applying to

18    the program and receiving those numbers?

19    A    Correct.

20    Q    Now, could you briefly describe to the jury how the

21    claims process at Medicaid works?

22    A    A claim is submitted to Kansas Medicaid either on

23    paper or electronically.  Then the claim is processed

24    through the computer system of a variety of edits and

25    audits are looked at to make sure the claim meets the
```

2693

1    basic standards for payment.  And then a claim is

2    adjudicated to either a paid or denied status based on

3    those edits and audits.

4    Q    When healthcare providers send in claims, do they

5    typically send in their progress notes with the claims?

6    A    No.

7    Q    Why not?

8    A    The computer system can't read the progress notes

9    and the claims go directly into the computer system.

10   Q    Is this standard in the industry?

11   A    Yes.

12   Q    Can Medicaid nevertheless investigate any document

13   they wish to?

14   A    Yes.

15   Q    But, can Medicaid investigate every claim it

16   receives before it pays it?

17   A    No.

18   Q    Is that humanly possible?

19   A    I don't believe financially it would be humanly

20   possible.

21   Q    All right.  What does Medicaid therefore depend on

22   when it comes to the truthfulness and accuracy of the

23   claims it receives?

24   A    We depend on the honesty of the provider to submit

25   accurate and true claims.

1    Q    And is this dependency on the honesty of the

2    providers standard in the industry?

3    A    Yes, it is.

4    Q    Now, Ms. Wagner, when a physician becomes a Medicaid

5    provider, do they agree to be responsible for the claims

6    submitted to the Medicaid program?

7    A    Yes.

8    Q    Is the physician's agreement to be responsible for

9    the claims submitted an express written condition of

10   being able to submit claims and be paid by the Medicaid

11   program?

12   A    Yes.

13   Q    Is it an explicit part of the contract entered into

14   with the Medicaid program?

15   A    Yes, it is.

16   Q    And based on your experience in the healthcare

17   industry, is this a universal requirement for submitting

18   claims to any insurance company?

19   A    Yes.

20   Q    Does the physician agree to submit truthful and

21   accurate claims?

22   A    Yes.

23   Q    And is that, again, a condition of being able to

24   submit claims and be paid?

25   A    Yes.

1    Q    If the provider is a clinic as opposed to just one

2    physician, are all of these rules the same?

3    A    Yes.

4    Q    If the provider is a clinic, who would be

5    responsible for the claims being submitted?

6    A    The owner of the clinic.

7    Q    Now let's return to Exhibit 13-G, the application

8    and I believe the contract.  And let's read the

9    applicable provision of the contract that the Defendant

10   Stephen Schneider and the Schneider Medical Clinic

11   entered into with Medicaid, which is Paragraph 9.

12   Somewhat in the heart of the document.

13        As Mr. Moore is showing that to the jury.  Could

14   you please read Paragraph 9?

15   A    "Item provider agrees that the services listed on

16   all claims are medically necessary for the health of the

17   patient and are personally rendered by the provider; or

18   in the case of an individually enrolled provider under

19   the provider's personal direction.  The charges for such

20   services are just, unpaid, and actually due according to

21   federal and state statutes and regulations and program

22   policy as announced in the Kansas Medical Assistance

23   Provider manuals and bulletins and are not in excess of

24   regular fees.  The information provided on the claim is

25   true, accurate, and complete; and the words on file or

1    signature on file when placed on the Kansas Medical

2    Assistance Program claim refers to the provider's

3    signature on this document."

4    Q    And moving down the page to Paragraph 14.   Are

5    providers told the consequences of submitting false

6    claims?

7    A    Yes.

8    Q    And could you read the first sentence?

9    A    "The provider agrees that payment of claims is from

10   federal and/or state funds and that any false claims,

11   statements or documents or concealment of a material

12   fact may be prosecuted under applicable federal or state

13   laws."

14   Q    After being paid by the Medicaid program, can a

15   physician choose to opt out of being responsible for the

16   claims submitted to Medicaid and for which he has been

17   paid?

18   A    No.

19   Q    You smiled.   Is that a ridiculous idea?

20   A    Yes.

21   Q    Can a clinic choose to opt out of being responsible

22   for the claims submitted and for which it has been paid?

23   A    No.

24   Q    As a part of the physician's and the clinic's

25   responsibility for submitting claims, does the physician

1    or the clinic represent every time a claim is submitted

2    that it is truthful and accurate?

3    A    Yes.

4    Q    Can a physician or a clinic disclaim responsibility

5    for the claims submitted by blaming the people who enter

6    the claims data?

7              MR. WILLIAMSON:  Your Honor, I'm going to

8    object.  That confounds state law, contract with the

9    federal statute.  This is back to the heart of the issue

10   that the prosecution is trying to do in this case.

11             THE COURT:  The prosecution is trying to prove

12   its case.  I've told you, Ladies and Gentlemen, that

13   this is a case based on federal law.  You're not going

14   to get any instructions based on state law in this case.

15   But Mr. Williamson will have an opportunity to

16   cross-examine this witness with respect to her

17   testimony.  So the objection is overruled at this time.

18   She's an expert witness.

19   BY MS. TREADWAY:

20   Q    I'll ask my question again.  Can a physician or a

21   clinic disclaim responsibility for the claims submitted

22   by blaming the people who enter the claims data?

23   A    No.

24   Q    Can a physician or a clinic disclaim responsibility

25   for the claims submitted by blaming the person who

2698

1    filled out an internal document used for billing such as

2    a fee ticket used in this case?

3    A    No.

4    Q    Can a physician or clinic disclaim responsibility

5    for the claims submitted by blaming the billing

6    personnel?

7    A    No.

8    Q    So if the claim is false, whose responsibility is

9    it, Ms. Wagner?

10              MR. WILLIAMSON:  Your Honor, I'm going to

11   object again.  Criminal responsibility is different than

12   the civil liability that the standard that this witness

13   is talking about.

14              THE COURT:  I'll give you appropriate

15   instructions at the time with respect to the elements of

16   proof.  The objection is overruled.  You may

17   cross-examine her about this, Mr. Williamson, if you

18   wish.

19   BY MS. TREADWAY:

20   Q    My question again, Ms. Wagner, was: if the claim is

21   false, whose responsibility is it?

22   A    The enrolled provider.

23   Q    If the provider is a physician, who is responsible

24   for the false claim?

25   A    The physician.

2699

1    Q    If the provider is a clinic, who is responsible for

2    the false claim?

3    A    The owner of the clinic.

4    Q    During the course of your job, did you request

5    records from the Schneider Medical Clinic?

6    A    Yes.

7    Q    Did you always receive the records you requested?

8    A    No.

9    Q    When did you not receive the records you requested?

10   A    In I believe it was around 2003 I was doing a

11   consumer review and requested records from the clinic

12   and did not receive those records.

13   Q    And do you know why?

14   A    No.

15   Q    Had you paid money on those claims?

16   A    No.

17   Q    Were you going to pay money on those claims?

18   A    No.

19   Q    Was there any financial incentive for them to send

20   you the documents?

21   A    No.

22   Q    When a physician or clinic contracts to be a

23   Medicaid provider, do they agree to provide

24   documentation on request?

25   A    Yes.

2700

1    Q    Is it usually in their financial interest to do so?

2    A    Yes.

3    Q    If they do not do so, can Medicaid refuse to pay a

4    claim?

5    A    Yes.

6    Q    Or if they do not do so, can Medicaid take back

7    money that has already been paid?

8    A    Yes.

9    Q    Now let's talk about how providers can be paid.  Is

10   it basically in a typical transaction with a check?

11   A    Providers can be paid with a check or they can ask

12   to have an electronic deposit of the funds.

13   Q    Let me hand you what has been marked for

14   identification as Exhibit 13-I.  Do you recognize that

15   document?

16   A    Yes.

17   Q    And what is it?

18   A    It's an authorization for electronic deposit of

19   payment.

20   Q    For whom?

21   A    For Schneider Medical Clinic.

22   Q    And to what bank?

23   A    To Valley State Bank.

24            MS. TREADWAY:  Government offers Exhibit 13-I.

25            MR. WILLIAMSON:  No objection.

1          MR. GOROKHOV:  No objection, Your Honor.

2          THE COURT:  It's received.

3   BY MS. TREADWAY:

4   Q    In addition to the provider being paid by Medicaid,

5   does the patient or the beneficiary pay the provider?

6   A    At times, yes.

7   Q    Let me hand you what has been marked for

8   identification as Government Exhibit 13-C.  Do you

9   recognize that document?

10  A    Yes.

11  Q    And what is that?

12  A    It's from the Medicaid provider manual.

13  Q    And does it discuss copayments by Medicaid patients?

14  A    Yes.

15         MS. TREADWAY:  Government offers Exhibit 13-C.

16         MR. GOROKHOV:  No objection, Your Honor.

17         MR. WILLIAMSON:  No objection.

18         THE COURT:  13-C is received.

19  BY MS. TREADWAY:

20  Q    What is the copayment for Medicaid patients

21  receiving physician services?

22  A    $2.

23  Q    So every time a Medicaid person sees a physician,

24  they would pay $2 and Medicaid would pay the rest?

25  A    Correct.

2702

1    Q    In becoming a provider enrolled with Medicaid, does

2    the provider agree to abide by the programs, rules and

3    regulations and policies?

4    A    Yes.

5    Q    Does Medicaid publish its policies and procedures so

6    that the providers are aware of them?

7    A    Yes.

8    Q    And how are they published?

9    A    Initially they were published by paper and mailed to

10   the providers.  That has changed over the years.  It is

11   now an electronic notification to providers of changes

12   to the program.

13   Q    If we could return to Exhibit 13-G a moment.  In the

14   very first paragraph of the provider agreement.  I'm

15   sorry, Mr. Moore, that's quite a few pages in again.

16   Could you zoom in on those highlighted areas.  Could you

17   read that for the jury, Ms. Wagner.

18   A    "The Provider agrees that the Kansas Medical

19   Assistance Program provider manual, provider manual

20   revisions, provider manual or -- " excuse me --

21   "provider bulletins are a part of this agreement and

22   shall be read promptly.  The manual represents Medicaid

23   program limitations and requirements that providers must

24   follow to receive payment and to continue participation

25   in the Medicaid program under KAR 30-5-59(c)(1)."

2703

1   Q   Thank you.  Now let me hand you what has been marked

2   for identification as Exhibit 13-A.  Is that a

3   compilation of some of those policies and regulations

4   that the provider in this case Stephen Schneider and the

5   Schneider Medical Clinic, agreed to abide by?

6   A   Yes.

7   Q   And are they the documentation policies in effect

8   from 2002 through 2007?

9   A   Yes.

10  Q   And are they consistent throughout that period?

11  A   Yes, with some minor changes.

12          MS. TREADWAY:  Government offers 13-A.

13          MR. GOROKHOV:  No objection, Your Honor.  As

14  long as it's clear that they're not laws of any kind.

15          MR. WILLIAMSON:  Same objection.

16          THE COURT:  What is 13-A again?

17          MS. TREADWAY:  13-A are the documentation

18  requirements by Medicaid for 2002 through 2007.

19          THE COURT:  Are they in CFR?

20          MS. TREADWAY:  No, Judge, they're part of the

21  agreement with the provider.

22          THE COURT:  The contract.  All right.  Yes,

23  those would not be laws, per se.  Nor are they

24  regulations, which are interpretations of federal

25  statutes.  But if they're part of the contract, they're

1    part of the contract.  So 13-A is received.

2    BY MS. TREADWAY:

3    Q   And are these documentation requirements that

4    providers that are submitting claims to the Medicaid

5    program would have to abide by?

6    A   Yes.

7    Q   Let's review some of these requirements.  First of

8    all, on the first page could you read for the jury the

9    first paragraph?

10   A   " As with all other insurance carriers, Medicaid has

11   specific requirements regarding documentation of

12   services performed and billed to the Kansas Medical

13   Assistance Program.  These requirements are within the

14   standards of each professional scope of practice and are

15   consistent with requirements of other major insurance

16   carriers.  The following information regarding

17   documentation requirements is not new, but is provided

18   as education to each provider, may assure all services

19   billed to Medicaid are medically necessary and have been

20   provided as billed."

21   Q   Then can you read the first two sentences -- or, I'm

22   sorry -- the first three sentences of the next

23   paragraph.

24   A   "The patient records shall be legible and stand on

25   its own.  The date and reason for a service must be

2705

1   included.  Extent of patient history and exam should be

2   documented along with treatment plan."

3   Q   And the next sentence.

4   A   "Documentation must support the level of service

5   billed."

6   Q   And then skipping to the very last sentence of that

7   paragraph --

8              MR. WILLIAMSON:  Your Honor, I'm going to

9   object.

10  A   Check --

11             MR. WILLIAMSON:  I'm sorry.  I'm going to

12  object.  Skipping to that last sentence when she's

13  having her read every paragraph except an important

14  paragraph or every sentence except an important sentence

15  and she is taking it out of context.

16             THE COURT:  It's right up here.  The jury can

17  see it.  Have her read the whole thing.

18             MS. TREADWAY:  Fine, Judge.

19  BY MS. TREADWAY:

20  Q   You can read the whole thing, Ms. Wagner.

21  A   "Assessments documented merely using a rubber stamp

22  will not be accepted unless there is documentation to

23  the side of the stamp which reflects results of the exam

24  for each of the systems identified on the rubber stamp.

25  Checkmarks will not be accepted."

1    Q    Go ahead.

2    A    "Progress notes shall include chief complaints or

3    presenting problems, type of history, extent of

4    services, patient progress and response to treatment,

5    and evidence of the type of decision made; which

6    includes but is not limited to, the diagnosis, treatment

7    options, extent of data reviewed and the risk of

8    morbidity and mortality."

9    Q    And please continue.

10   A    "The following questions should be asked to assure

11   appropriate documentation exists to support the level of

12   service billed.  Is the reason for the visit documented

13   in the patient record?  Are all services that were

14   provided documented?  Does the patient record clearly

15   explain why support services, procedures, supplies and

16   medications were or were not provided?  Is the

17   assessment of the patient's condition apparent in the

18   record?  Does documentation contain information on the

19   patient's progress and results of treatment?  Does the

20   patient record include a plan for treatment?  Does

21   information in the patient record provide medical

22   rationale for the services and the place of service that

23   are to be billed?  Does information in the patient

24   record appropriately reflect the care provided in the

25   case where another health care professional must assume

2707

1    care or perform necessary medical services?  Is there

2    documentation of timely referrals?"

3    Q    And then we have the second sentence in the last

4    paragraph highlighted.  Could you read that, please.

5    A    "Recordkeeping responsibilities rest primarily with

6    the provider.  When a service is not documented or

7    documentation is not legible, the service will not be

8    reimbursed."

9    Q    Is that fairly standard in the industry?

10   A    Yes.

11   Q    Now, on the first page I noted a sentence that said

12   "the patient record shall be legible and stand on its

13   own."  What does that mean "stand on its own"?

14   A    That means that in reading that record alone,

15   without looking at any other documentation related to

16   the records that support the service billed, that record

17   must on its own support that service that is billed.

18   Q    You've reviewed a lot of files from the Schneider

19   Medical Clinic, haven't you, Ms. Wagner?

20   A    Yes.

21   Q    Did the files that you reviewed meet these

22   documentation requirements for Medicaid?

23   A    Not all of them, no.

24   Q    How about a majority of them?

25   A    No.

1   Q   Let me now hand you what has been marked for

2   identification as Exhibit 13-B.  Are those further

3   Medicaid guidelines that the provider would agree to

4   adhere to?

5   A   Yes.

6   Q   And are those the policies about mid level

7   practitioners or none physicians such as physician's

8   assistants?

9   A   Yes.

10  Q   Are they the policies that were in effect from 2002

11  through 2007 regarding mid level practitioners such as

12  physician's assistants?

13  A   Yes.

14           MS. TREADWAY:  Government offers Exhibit 13-B.

15           MR. WILLIAMSON:  No objection.

16           MR. GOROKHOV:  No objection, Your Honor.

17           THE COURT:  It's received.

18  BY MS. TREADWAY:

19  Q   Ms. Wagner, what has always been Medicaid's policy

20  about billing for services provided by physician's

21  assistants?

22  A   Physician's assistants are paid at a lesser rate

23  than physicians.

24  Q   And must they bill under their own unique provider

25  number for the services they are providing?

2709

1    A    Yes.

2    Q    And does it so state on Exhibit 13-B?

3    A    Yes.

4    Q    Read that.

5    A    "Physician's assistant and R-M-M must be enrolled as

6    Medicaid provider to bill for services."

7    Q    And then on the next line.

8    A    "PA's are reimbursed at 57% of the Medicaid allowed

9    amount for services provided."

10   Q    Has that been true in the years 2002 through 2007?

11   A    Yes.

12   Q    Let me next hand you what has been admitted as

13   Exhibit 13-F.  Do you recognize that document?

14   A    Yes.

15   Q    And what is it?

16   A    These are the pain management guidelines for Kansas

17   Medicaid.

18   Q    Approximately when were those guidelines put into

19   effect?

20   A    They were first published in February of 1999.

21   Q    And are they still in effect?

22   A    Yes.

23   Q    Prior testimony in this case has established these

24   were found at the Schneider Medical Clinic.  How would

25   the Clinic have obtained these guidelines?

1    A    Through Kansas Medicaid.

2    Q    And let's review those with the jury if we might.

3    I'm not going to have you read the whole document, but

4    let's just first read the first paragraph.

5    A    "The Peer Education and Resource Council, along with

6    Kansas Medical Assistance Program, have adopted the

7    following guidelines when evaluating the use of

8    controlled substances for pain control.  These

9    guidelines were adopted from the Model Guidelines for

10   the use of controlled substances in the treatment of

11   pain by the Federation of State Medical Boards of the

12   United States."

13   Q    And does this basically set forth the various areas

14   of treatment that is expected?

15   A    Yes.

16   Q    Does it include evaluation of the patient?

17   A    Yes.

18   Q    A treatment plan?

19   A    Yes.

20   Q    Informed consent and agreement for treatment?

21   A    Yes.

22   Q    Periodic review?

23   A    Yes.

24   Q    Consultation?

25   A    Yes.

1    Q    Medical records?

2    A    Yes.

3    Q    And compliance with controlled substances laws and

4    regulations?

5    A    Yes.

6    Q    Does Medicaid have a program called the lock-in

7    program?

8    A    Yes.

9    Q    What is your responsibility with regards to the

10   lock-in program?

11   A    I supervise the lock-in program.

12   Q    Could you explain to the jury what the lock-in

13   program means with regards to controlled substances?

14   A    Consumers are reviewed for -- to meet certain

15   criteria established by Kansas Medicaid; and if it's

16   determined that they meet that criteria, they're locked

17   in to either -- it can be a hospital, a physician and a

18   pharmacy or it can be one of the three.

19   Q    What is a primary reason for a Medicaid beneficiary

20   being locked in to one provider?

21   A    It's generally drug-seeking behavior.

22   Q    And do you lock in to specialists?

23   A    No.

24   Q    Who do you lock in to?

25   A    General practice providers.

2712

1    Q    Do you consider pain management to be a specialty?

2    A    Yes.

3    Q    Nevertheless, do you know that non-specialists can

4    provide pain management?

5    A    Yes.

6    Q    Do you consider the Defendant Stephen Schneider or

7    the other providers at the Schneider Medical Clinic to

8    be pain management specialists under the Medicaid

9    program?

10   A    No.

11   Q    What kind of provider did you consider them to be?

12   A    General practice providers.

13   Q    Let me now hand you what has been marked as Exhibit

14   13-D.  Are those the criteria for the lock-in program?

15   A    Yes.

16            MS. TREADWAY:  Government offers Exhibit 13-D.

17            MR. WILLIAMSON:  One second, Your Honor.  No

18   objection.

19            MR. GOROKHOV:  No objection, Your Honor.

20            THE COURT:  13-D is received.

21   BY MS. TREADWAY:

22   Q    We're not going to read this extensively,

23   Ms. Wagner.  I would just like you to explain to the

24   jury what the first page of these guidelines is about.

25   A    It explains when a referral is required for a

2713

1    lock-in consumer.

2    Q   And that would be coming from whom?

3    A   The referral would be written by the lock-in

4    physician.

5    Q   And then the next page, what is generally that

6    second page?

7    A   The second page is the form that would need to be

8    filled out by the lock-in physician in referring the

9    beneficiary to another provider.

10   Q   And then what is the third page?

11   A   The third page are the policies and procedures under

12   Kansas Medicaid for the initial or probationary lock-in.

13   Q   And so basically the consumer or the beneficiary is

14   put on the lock-in program for a probationary period?

15   A   Generally, yes.

16   Q   And moving to the "lock-in is initiated if any of

17   the following criteria is met."  I'd like you to read

18   the first six criteria?

19   A   Okay.  "Number one, questionable occurrences of

20   obtaining same or similar services for same or similar

21   diagnoses from more than one provider not in the same

22   group practice with no referrals.  Accessing emergency

23   department care for non life-threatening conditions.

24   Questionable occurrences of using more than one

25   prescribing physician to obtain drugs from the same

2714

1    therapeutic class of medication.  Questionable

2    occurrences of same therapeutic class medication billed

3    before previous same therapeutic class medication is

4    exhausted either by the same or a different pharmacy

5    provider.  Questionable occurrences using more than one

6    pharmacy to obtain or attempt to obtain quantity of

7    drugs from the same therapeutic class of medication

8    which exceeds the manufacturer's maximum recommended

9    dosage as approved by the Food and Drug Administration.

10   Dismissal from a primary care provider for inappropriate

11   behavior or noncompliance with medical management.

12   Medical management is understood to also include patient

13   noncompliance to prescribed medications."

14   Q    Now, we have been talking in shorthand in this trial

15   and if you're looking at the first criteria, is that

16   often known as doctor-shopping?

17   A    Yes.

18   Q    And, number two, when someone goes to an emergency

19   room seeking drugs, is that a criteria?

20   A    Yes.

21            MR. WILLIAMSON:  Your Honor, I'm going to

22   object.  That's not what that says.  Misstates --

23            THE COURT:  I agree.  That's not what it says.

24   The objection is sustained.

25

```
 1    BY MS. TREADWAY:

 2    Q    What is number 2 about?

 3    A    Number 2 is when people go to an emergency room for

 4    things such as a toothache or a migraine headache.

 5    Things that are non life-threatening.

 6    Q    And would they be requesting drugs?

 7              MR. WILLIAMSON:  Your Honor, I'm going to

 8    object.  That calls for speculation.  Trying to

 9    bootstrap her answer -- her question right back into

10    it's drugs when it's not even anywhere expressed on this

11    document.

12              MS. TREADWAY:  This is what the program is

13    about as she just explained, Judge.

14              THE COURT:  I agree.  The objection is

15    overruled.

16    A    Yes.

17    BY MS. TREADWAY:

18    Q    And again, number 3 is another kind of doctor

19    shopping?

20    A    Yes.

21    Q    And is number 4 early refills?

22    A    Yes.

23    Q    And is number 5 pharmacy shopping or polypharmacy?

24    A    Yes.

25    Q    And is number 6 sometimes what we call terminated or
```

2716

1    fired patients?

2    A    Correct.

3    Q    And if a physician receives a lock-in patient under

4    your program, is the physician then on notice that one

5    or more of these problems has already occurred with that

6    patient?

7    A    Yes.

8    Q    Then moving to the next document, we have the

9    extended lock-in review criteria.  When does a patient

10   move from probationary period to extended lock-in?

11   A    The probationary period is a two year lock-in and at

12   the end of -- six months prior to the end of that two

13   years, we will review the claims data again and

14   determine whether that consumer should go on the

15   extended program or whether the lock-in assignment can

16   be terminated.

17   Q    And then the next two documents in this package, are

18   those just examples of the kinds of letters that would

19   go to the doctor that has agreed to accept this lock-in

20   Medicaid patient?

21   A    Yes.

22   Q    Were there other providers in the Wichita area that

23   provided pain management treatment services to Medicaid

24   beneficiaries from the years 2002 through 2007?

25   A    Yes.

1    Q   And did you develop a summary chart for the jury

2    about these providers.

3    A   Yes.

4    Q   And is that Exhibit 13-E?

5    A   Yes.

6    Q   Now, how did you develop that chart for the jury?

7    A   I reviewed the enrolled providers with Kansas

8    Medicaid and reviewed treatment that had been provided

9    to the beneficiaries, consumers.  I consulted with the

10   lock-in coordinator who works directly with the

11   physicians on who had agreed to provide pain management,

12   and in some cases I actually called the office to

13   inquire on their stance of treating pain management

14   patients.

15   Q   And do we have a list of the Medicaid providers in

16   Wichita that also provided pain management?

17   A   Yes.

18   Q   And do we have included in this chart those

19   individuals that in fact accepted even lock-in Medicaid

20   beneficiaries?

21   A   Yes.

22           MS. TREADWAY:  Government would offer Exhibit

23   13-E.

24           MR. WILLIAMSON:  No objection.

25           MR. GOROKHOV:  No objection, Your Honor.

2718

```
 1              THE COURT:  It's received.
 2    BY MS. TREADWAY:
 3    Q    So how many physicians in Wichita were providing
 4    pain management services to Medicaid patients?
 5    A    25.
 6    Q    And are many of them still doing so today?
 7    A    Yes.
 8    Q    Were there other physicians on this list other than
 9    the Schneider Medical Clinic physicians and providers
10    that took and still take lock-in Medicaid patients?
11    A    Yes.
12    Q    Is it fair to say then that Defendant Stephen
13    Schneider and the Schneider Medical Clinic were the only
14    place in Wichita that took Medicaid patients for pain
15    management treatment?
16    A    No.
17    Q    Now, during the course of this investigation did we
18    ask you to review claims submitted to Medicaid from the
19    Defendant Stephen Schneider and the Clinic and the
20    providers who worked at the Schneider Medical Clinic?
21    A    Yes.
22    Q    Did you choose which patients claims to review?
23    A    No.
24    Q    What was your understanding how those patient names
25    were chosen?
```

1   A   I understood it was a statistically valid random

2   sample.

3   Q   And even though you did not choose the sample, do

4   you know what a statistically valid random sample is?

5   A   Yes.

6   Q   And have you developed them in the course of your

7   career?

8   A   Yes.

9   Q   Could you tell the jury briefly what a statistically

10  valid random sample is?

11  A   A statistically valid random sample is a sampling of

12  claims based on mathematical equations that assures

13  equal sampling of various components of the population

14  to assure that you're getting a clear view of the entire

15  population and not just segmented components of that.

16  Q   Now, would a shorthand version say it's a way to not

17  cherrypick?

18  A   Correct.

19  Q   All right.  Did you review all of the claims

20  submitted to Medicaid for a particular patient in your

21  review?

22  A   Yes.

23  Q   And what did you have to conduct this review?

24  A   I had the billings to Kansas Medicaid.  I had the

25  medical records from the Schneider Medical Clinic; the

1    fee tickets; and the patient financial histories from

2    Schneider Medical Clinic.

3    Q    Did you review over 150 patients' files?

4    A    Yes.

5    Q    Did you review 1,094 claims regarding these over 150

6    patients?

7    A    Yes.

8    Q    And did your review focus on two topics?

9    A    Yes.

10   Q    And what were those two topics?

11   A    The topics were who provided the services compared

12   to who was billed to Kansas Medicaid as providing the

13   service; in addition to do the codes meet criteria for

14   the procedure code billed.

15   Q    Now, what information did you use to determine

16   whether the provider was correctly billed?

17   A    I reviewed who was listed as the performing provider

18   on the claimed Kansas Medicaid and then I reviewed the

19   documentation to determine who had provided the services

20   in the clinic.

21   Q    And would that include the patient's chart?

22   A    Yes.

23   Q    What guidelines did you use to determine whether the

24   office visit was correctly billed?

25   A    I used the CPT or Current Procedural Terminology

2721

1      guidelines as well as the 1995 Medicare guidelines.

2   Q   And what are the 1995 Medicare guidelines?

3   A   Those are guidelines that have been developed that

4      specifically count different components within the

5      medical record to determine if they meet criteria for

6      the CPT codes, E and M CPT codes.

7   Q   E and M meaning Evaluation and Management?

8   A   Correct.

9   Q   Are the guidelines, the 1995 guidelines that

10     Medicare developed, do they mesh with the CPT code

11     requirements?

12  A   Yes.

13  Q   Are they essentially a narrative of how to look at

14     the CPT code requirements?

15  A   Correct.

16  Q   And in 1995 -- have there been additional guidelines

17     issued by Medicare?

18  A   Yes.

19  Q   But why did we use 1995?

20  A   They're more lenient for the physician.

21  Q   During the course of your review, did you create a

22     spread sheet of your findings?

23  A   I did yes.

24  Q   Let me hand you what has been marked for

25     identification as Government Exhibit 13.  Is that the

1   summary of your findings?

2   A   Yes.

3   Q   And we have a general summary on the first page?

4   A   Correct.

5   Q   And what are the pages thereafter?

6   A   The pages thereafter are the claims-specific

7   findings of the review.

8   Q   And did you personally prepare this?

9   A   Yes, I did.

10  Q   Does Exhibit 13 summarize voluminous information?

11  A   Yes.

12  Q   Will it eliminate the need for the jury to review

13  the voluminous data you reviewed and from which you

14  created the chart?

15  A   Yes.

16  Q   In fact, does this comprise about 16 boxes of

17  documents back in my office?

18  A   Yes.

19  Q   Does the information in the chart accurately reflect

20  the data it summarizes as well as your findings?

21  A   Yes.

22          MS. TREADWAY:   Government offers Exhibit 13 as

23  a summary exhibit under Federal Rule of Evidence 1006,

24  Rule 611-A and Rule 703.

25          THE COURT:   This is what we were talking about

 1     while you guys were cooling your heels in the jury room,

 2     and I'm going to make a ruling on this pretty quickly

 3     but I'm not going to admit it right now.  She can

 4     explain what she did to create the chart and various

 5     things, but I'll have a ruling pretty quickly about

 6     whether or not the chart itself can come in.

 7               MS. TREADWAY:  May I display the chart

 8     demonstratively at this time, Judge?

 9               THE COURT:  Yes.  As a matter of fact, you can

10     display it demonstratively.  The real question is going

11     to be whether the chart comes -- is evidence that goes

12     to the jury room.  So you may display it so that you can

13     get some idea, Ladies and Gentlemen, about what she's

14     talking about.

15               MR. GOROKHOV:  Your Honor, there's an

16     additional foundational issue here, we believe, that

17     wasn't addressed.  Based on the testimony --

18               THE COURT:  What is it?

19               MR. GOROKHOV:  It's the fact that the random

20     sample was not conducted by this witness and that opens

21     up a whole 'nother area of reliability.

22               THE COURT:  Well, that's something you can

23     cross-examine her about if you want at the appropriate

24     time.  I'm just letting the jury see this.  All we're

25     doing right now is looking at the first page, in any

2724

 1    event.
 2              MS. TREADWAY:  We're going to go to the second
 3    page right away, Judge.  Sorry.
 4              THE COURT:  All right.
 5    BY MS. TREADWAY:
 6    Q   All right.  Because of all the information on this,
 7    this is pretty small, Ms. Wagner, so we'll have to blow
 8    these up.
 9        Now, the first column, is that just a sequential
10    number for the claims that you reviewed?
11    A   Yes.
12    Q   And then the second column, does that just have the
13    first name of the patient, Wilson, and the first initial
14    of the last name?
15    A   Correct.
16    Q   Does it include in the next column the date of
17    service for which you were reviewing the claim versus
18    the documents?
19    A   Correct.
20    Q   And then the service billing data provider, what
21    does that mean?
22    A   That would be the performing provider indicated on
23    the claims submitted to Medicaid.
24    Q   And then the next says SMC account financial history
25    provider.  What is that?

2725

1    A    That was what was listed on the financial history

2    from the Schneider Medical Clinic as the performing

3    provider.

4    Q    And then the next column?

5    A    That would be the performing provider listed on the

6    fee ticket if it was available.

7    Q    From the Schneider Medical Clinic?

8    A    From the Schneider Medical Clinic, yes.

9    Q    And then now reaching your conclusion, that first

10   column is "was the physician assistant billed as a

11   physician".  And then you have either no or yes.  If

12   there is a no, what does that mean?

13   A    That means that either the physician assistant was

14   billed as a physician assistant on the claim or that a

15   physician was billed accurately on the claim.

16   Q    And if you have a yes in that column, what does it

17   mean?

18   A    It means that we paid too much money.

19   Q    Then the next column it says E and M.  Is that

20   evaluation and management code billed?

21   A    Yes.

22   Q    Where did that information come from?

23   A    That came from the claim form.

24   Q    And then the next column is, again, your findings.

25   Did the records support the evaluation and management

2726

1    code billed.  Now, what record are you talking about

2    there?

3    A    The medical record obtained from Schneider Medical

4    Clinic.

5    Q    And, again, if you have a no, it didn't support, and

6    if you have a yes, it did support?

7    A    Correct.

8    Q    And then next you have a column called revised E and

9    M, evaluation and management.  What's that about?

10   A    That would be the code that the medical record did

11   meet.

12   Q    So that would be revised per your interpretation of

13   the actual chart and what you believe the claim should

14   have been?

15   A    Correct.

16   Q    And then it says: "History does not support the

17   level billed.  Exam does not support the level billed.

18   Complexity of decision-making does not support the level

19   billed."

20        Are those from the 1995 guidelines that interplay

21   with the CPT code requirements?

22   A    Those are, yes, those are the three major categories

23   that are reviewed.

24   Q    And if there is a X, does that mean it doesn't

25   support?

2727

1   A    That means that that area was not supported by the

2   medical record, yes.

3   Q    Then does it say:  "Was the review of systems based

4   solely on the pain assessment diagnostic tool."  What

5   does that mean?

6   A    That means if an assessment was documented in the

7   record, did we -- was it only documented in the pain

8   assessment tool.

9   Q    And what's the relevance of that?  Is that back to

10  that stand on its own issue?

11  A    Yes.

12  Q    All right.  So if the document, the medical record,

13  stood on its own, is there a no there?

14  A    Yes.

15  Q    Okay.  Then we are talking about checkmarks.  "If

16  checkmarks not considered, would code be allowed at the

17  current or the revised level."  Now what are you talking

18  about there?

19  A    I'm talking about frequently in the medical records

20  from Schneider Medical Clinic a tic mark could be down

21  one side of the page in the various systems categories.

22  And if we didn't consider any of those tic marks in the

23  review, if there was no other documentation besides tic

24  marks on the documentation, then it would be listed in

25  this category.

1    Q    All right.  And if in fact you followed the

2    guidelines for Medicaid, are checkmarks sufficient?

3    A    No.

4    Q    So were we being liberal here?

5    A    Yes.

6    Q    So if they aren't considered, do you actually

7    indicate what code would be appropriate when those

8    checkmarks are not considered?

9    A    Yes.

10   Q    And then the last column is "additional comments".

11   What kind of comments did you make here?

12   A    Either the records were totally missing; or, if

13   Medicare paid as a primary insurance, that would be

14   listed.  One of 'em talks about a suture, suturing that

15   was done, and the size of the wound itself had not been

16   identified on the medical records so that effects

17   payment of the suture repair.

18   Q    Now, although this probably looks pretty complex to

19   the jury, is this kind of what you do on a daily basis,

20   Ms. Wagner?

21   A    Yes.

22   Q    And is it something similar to what you share with

23   providers during the course of your utilization reviews?

24   A    Yes, it is.

25   Q    And is this something that providers see all the

2729

1     time from you?

2     A   Yes.

3     Q   Now, moving to the first page, and based on your

4     review, do we have the final results of your review in

5     terms of what you found as to the topics that you were

6     asked to look at?

7     A   Yes.

8     Q   All right.  First of all, it says that you reviewed

9     1,094 claims.  And you found how many had been billed as

10    though a physician provided the services when a

11    physician's assistant had provided the services?

12    A   328.

13    Q   And what percentage did that represent?

14    A   30%.

15    Q   And you found how many were billed at a higher level

16    of service than the documentation supported, even taking

17    the checklist into account?

18    A   216.

19    Q   And what percentage was that?

20    A   20%.

21    Q   And then how many did you find had been billed at a

22    higher level of service than the documentation supported

23    with the checklist being ignored or not taken into

24    account?

25    A   288.

2730

1    Q    And what percent was that?

2    A    26%.

3    Q    Now, in terms of the 328 claims that you found were

4    billed as though a physician provided the service but

5    only a physician's assistant had provided the services,

6    based on the records you reviewed, would you consider

7    those claims to be false?

8    A    Yes.

9    Q    Would you consider those claims to be upcoded?

10   A    Yes.

11   Q    And as a result, did Medicaid pay more money than it

12   should have?

13   A    Yes.

14   Q    With regards to the 216 claims that you found were

15   billed at a higher level, even taking the checklist into

16   account, were those claims false?

17   A    Yes.

18   Q    Were those claims upcoded?

19   A    Yes.

20   Q    And would they have caused Medicaid to pay more

21   money than it should have?

22   A    Yes.

23   Q    And finally, is the same true of the 288 claims you

24   found were upcoded when you ignored the checklist?

25   A    Yes.

2731

1    Q    Would they have been false?

2    A    Yes.

3    Q    Upcoded?

4    A    Yes.

5    Q    And did they result in more money being paid?

6    A    Yes.

7    Q    Did you perform a similar review with regards to the

8    claims submitted to First Guard?

9    A    Yes.

10   Q    Remind the jury the relationship of First Guard to

11   Medicaid?

12   A    First Guard is the HMO component of Kansas Medicaid.

13   Q    And what is a HMO?

14   A    It is a Health Maintenance Organization, or

15   essentially you're assigned to a primary care physician

16   and then if you choose to go to someone beyond that

17   primary care physician, you need a referral to do so.

18   Q    For the First Guard review, did you review 100

19   patient files?

20   A    Yes.

21   Q    And did you review 626 claims related to these 100

22   patients?

23   A    Yes.

24   Q    Let me hand you what has been marked for

25   identification as Government Exhibit 14.  Is that your

2732

1    First Guard review?

2    A    Yes.

3    Q    And is it set up just like the Medicaid review that

4    you just showed the jury?

5    A    Yes.

6    Q    Just looking at the first page of this document, and

7    the claims that you reviewed for First Guard --

8              MS. TREADWAY:  Government would offer this as

9    a demonstrative aid at this time, Judge.

10             MR. GOROKHOV:  Same objection, Your Honor.

11             THE COURT:  Which is what?

12             MR. GOROKHOV:  Which was that the matters

13   discussed earlier as well as the fact that she doesn't

14   know about the -- how the sample was selected.

15             THE COURT:  Well, I've got an answer for you

16   on the first part, and I'll tell you that when we take

17   our lunch recess.  And as I said, you may cross-examine

18   her at the appropriate time with respect to her

19   statistical analysis.

20             MR. GOROKHOV:  Thank you, Your Honor.

21             THE COURT:  You're welcome.  As matter of

22   fact, I do have an answer for you and it will speed

23   things along so I think I'm going to let you go to

24   lunch, Ladies and Gentlemen, for about an hour.

25   Remember and heed the admonition.  And hopefully things

2733

1    will move along after lunch.

2                    (Jury excused for noon recess.)

3            THE COURT:  Be seated please.  I have an

4    answer with respect to the chart.  That is, the big

5    chart.

6            MS. TREADWAY:  You mean the detail chart,

7    Judge?

8            THE COURT:  Yes.  Here's a case -- I'm going

9    to read these cases off to you and you can go look at

10   them over the lunch hour but I think this is what the

11   rule is.  *United States vs. Janati*, J-A-N-A-T-I, 374

12   Fed. 3rd 263.  That's a Fourth Circuit case in 2004.

13   *United States vs. Bray*, B-R-A-Y, 139 Fed. 3rd 1104,

14   that's a Sixth Circuit case in 1998.  And *Verizon*

15   *Directories against Yellowbook*, which is 331 Fed Supp

16   2nd 136 and that's an Eastern District of New York.  And

17   I think the reason this case is significant is because

18   it's one of Jack Weinstein's cases and he's the

19   "Weinstein on Evidence", and seems to be rightfully

20   recognized as the most authoritative source on the rules

21   of evidence in the federal system.

22          Now, the *Janati* case, and I'll -- I'm going to

23   summarize what these cases say.  They use a term which I

24   was not familiar with.  You all, I'm sure, know what it

25   is but --

2734

1          MS. TREADWAY:  Pedagogical --

2          THE COURT:  -- pedagogical.  And what Exhibit

3    13 is is a pedagogical summary.  And these cases say

4    that those summaries may be used but not admitted.  And

5    they may contain opinions of the person putting them

6    together.

7          Here's what the Fourth Circuit says in the

8    headnote.  If I can find -- here we are.  "Rule 1006,

9    summary charts, are distinguishable from other charts

10   and summaries that may be prevented under Federal Rule

11   of Evidence 611-A to facilitate the presentation and

12   comprehension of evidence already in the record.  These

13   pedagogical devices are not evidence themselves; but are

14   used merely to aid the jury in its understanding of the

15   evidence that has already been admitted.  Thus,

16   pedagogical charts or summaries may include the

17   witness's conclusions or opinions, or they may reveal

18   inferences drawn in a way that would assist the jury.

19   But displaying such charts is always under the

20   supervision of the District Court under Rule 611-A; and,

21   in the end, they are not admitted as evidence."

22         That's kind of what I was thinking earlier that

23   this witness can't explain her testimony without the use

24   of that type of a chart; but you all, because you're

25   getting the fee tickets, are going to have everything

2735

```
 1    that's necessary to cross-examine her about her
 2    conclusions.  And then the charts themselves won't go to
 3    the jury; and, frankly, I don't see how the charts would
 4    help the jury anyway.  They're not going to knit-pick
 5    those charts, I wouldn't think.  They can if they want,
 6    if they want to be here until Christmas.  But I don't
 7    think they will.  I don't think they will need to.  But
 8    that's up to them.
 9        Now, has that cleared everything up as far as
10    Exhibit 13 is concerned?
11              MR. GOROKHOV:  Yes, Your Honor.
12              MR. WILLIAMSON:  Yes, Your Honor.
13              THE COURT:  And I will say, in deference of
14    Julie Robinson, I'm not sure that she would have made
15    that ruling in that case had she been aware of this --
16    these other cases.  She didn't cite any authority so --
17    anyway.  Let's take our recess.  I'll see you around
18    1:15.
19                    (Noon recess.)
20
21
22
23
24
25
```