2736

1               (Beginning at 1:20 p.m. the

2               following proceedings

3               continued.)

4          THE COURT:  I'll tell you what we did on this

5     Exhibit 13, Ladies and Gentlemen, and you saw it a

6     minute ago.  Lots of entries on this spread sheet.  The

7     case law says that that can be admitted as a

8     demonstrative exhibit.  The witness can use it.  The

9     lawyers can use it.  You all can see it as it's being

10    used.  But it won't go to the jury room.  And I think

11    when you see -- there are twenty some pages of this

12    spread sheet and you'll see that probably it's better to

13    let the witness talk about it than to take it to the

14    jury room and try to figure it out.  All right.  Go

15    ahead.

16         MS. TREADWAY:  Thank you, Judge.

17    BY MS. TREADWAY:

18    Q   Ms. Wagner, just before our break we were getting

19    into the First Guard review that you performed in the

20    same manner that you performed the Medicaid review and

21    we were getting to those results.  Based on your review

22    of the 626 claims in the First Guard category of

23    patients, how many did you find were billed as though a

24    physician provided the services when in fact a

25    physician's assistant provided the services?

2737

1    A    330.

2    Q    And what percentage was that?

3    A    53%.

4    Q    And how many were billed at a higher level of

5    service than the documentation supported with the

6    checklist taken into account and considered?

7    A    135.

8    Q    And what percentage is that?

9    A    22%.

10   Q    And how many were billed at a higher level of

11   service than the documentation supported with the

12   checklist not being taken into account or discounted?

13   A    203.

14   Q    And what percentage is that?

15   A    32%.

16   Q    Now, as to each of those areas, do you consider

17   those to be false claims?

18   A    Yes.

19   Q    And do you consider those to be upcoded?

20   A    Yes.

21   Q    And why would they be false and upcoded?

22   A    Because it was a misrepresentation of either the

23   physician or the clinician that performed the service

24   and the code that was -- the service that was provided.

25   Q    Based on your review of the 1,094 Medicaid claims

2738

1   and the 626 First Guard claims and the records

2   supporting them, what were your observations about the

3   legibility of the medical records you received from the

4   Schneider Medical Clinic?

5   A   Many of the records were not legible.

6   Q   If a healthcare service is not documented, should it

7   be paid?

8   A   No.

9   Q   Why not?

10   A   Because if it's not documented, it's not done.

11   Q   And that's even set forth in the guidelines that we

12   reviewed earlier?

13   A   Correct.

14   Q   If a medical record is not legible, is the

15   healthcare service documented?

16   A   No.

17   Q   And if a service is not documented, or if the

18   documentation is not legible, what can Medicaid do with

19   regards to a claim based on that undocumented service?

20   A   Either not pay the claim or recoup the funds that

21   have been paid.

22   Q   With regards to the claims you reviewed, should the

23   upcoded claims you found have been paid?

24   A   No.

25   Q   Why not?

2739

1   A   Because they did not support the service that was

2   provided.

3   Q   Ms. Wagner, the evidence in this case has been that

4   office visits for pain management patients at the

5   Schneider Medical Clinic often consisted of a provider

6   just writing a prescription for refills.

7           MR. WILLIAMSON:  Your Honor, I'm going to

8   object.  That has not been the evidence in this case.

9           THE COURT:  I agree.  Objection --

10           MS. TREADWAY:  I believe Tab said that.

11           THE COURT:  Objection is sustained.

12           MS. TREADWAY:  And Barbara.

13           THE COURT:  I haven't heard that specific

14   evidence.

15           MS. TREADWAY:  Well, I'll state it another

16   way, Judge.

17   BY MS. TREADWAY:

18   Q   If the evidence has been that a physician walked

19   into a room and said: What will it be, and then wrote a

20   prescription, is that a billable service?

21   A   No.

22   Q   Does Medicaid pay for prescription drugs?

23   A   Yes.

24   Q   Should Medicaid pay for prescription drugs when the

25   prescription is issued outside the usual course of

```
 1    medical practice and not for a legitimate medical
 2    purpose?
 3    A    No.
 4    Q    Aside from the reviews you just discussed with the
 5    jury, did Medicaid perform any other reviews of the
 6    Defendant Stephen Schneider's claims or the claims of
 7    the Schneider Medical Clinic?
 8    A    Yes.
 9    Q    How many reviews were performed?
10    A    Two.
11    Q    What types of reviews were those?
12    A    One review was focussed on quality of care provided
13    and the other review was focussed on upcoding issues.
14    Q    Now, the review with regards to quality, was that
15    related to PERC?
16    A    Yes.
17    Q    What's P-E-R-C?
18    A    That's the PERC education and review committee.
19    It's a committee of physicians and pharmacists that work
20    for Kansas -- actually they're consultants for Kansas
21    Medicaid, to review providers.
22    Q    Did you perform the claims review associated with
23    Medicaid and the Schneider Medical Clinic?
24    A    Yes.
25    Q    Approximately when did you perform that review?
```

2741

1    A    The review was completed in I believe it was

2    September of 2006.

3    Q    And how many patient files did you review?

4    A    97.

5    Q    And how were those patient files selected?

6    A    It was a statistically valid random sample.

7    Q    And what did you look for in your claims review?

8    A    I specifically looked for the performing provider on

9    the claim matching that documented in the medical record

10   and the procedure code being supported by the

11   documentation.

12   Q    And what were your findings?

13   A    My findings were a great deal of the time the wrong

14   performing provider was billed on the claim and the

15   medical record did not support the code billed.

16   Q    Were your findings in that 97 patient file review

17   consistent with the reviews you discussed with the jury

18   here today?

19   A    Yes.

20   Q    Now let's turn to the quality review that was

21   performed.  Let me hand you what has been marked for

22   identification as Government Exhibit 13-L.  Are you

23   familiar with that document?

24   A    Yes.

25   Q    And what is it?

2742

1   A   It is a summary of the quality assurance review that

2   was done.

3   Q   And is this a record of Electronic Data Systems

4   previously and now Hewlett-Packard?

5   A   Yes.

6   Q   Does it document regularly conducted business

7   activity?

8   A   Yes.

9   Q   Is it the regular business practice of your business

10  to create and maintain such records?

11  A   Yes.

12  Q   Therefore, is this a document that EDS and now

13  Hewlett-Packard would have created and maintained in the

14  ordinary course of its business?

15  A   Yes.

16  Q   Would the results of this review have been shared

17  with the Defendant Stephen Schneider?

18  A   No.

19  Q   Now, would the results of -- not the results --

20  would the consequences of this review have been shared

21  with the Defendant Stephen Schneider?

22  A   Yes.

23  Q   And in what way?

24  A   It --

25          MR. WILLIAMSON:   Your Honor, I'm going to

2743

```
 1    object.  A, it calls for speculation.  B, it's a lack of
 2    foundation.  She is not the author of this document.
 3    Her name is not anywhere on this document.  There is no
 4    record of submission with this witness of the document.
 5              THE COURT:  Overruled.
 6    BY MS. TREADWAY:
 7    Q   How would he have received notice of consequences
 8    based on this review?
 9    A   He would have received notice through a letter.
10    Q   All right.
11              MS. TREADWAY:  Government would offer Exhibit
12    13-L as a business record under Federal Rule of Evidence
13    803(6).
14              THE COURT:  Is 13-L the review or the letter?
15    A   The review.
16              MS. TREADWAY:  It's the review.  I'll get to
17    the letter in a minute, Judge.
18              THE COURT:  Any objection to 13-L?
19              MR. WILLIAMSON:  Yes, Your Honor.  That's the
20    *Melendez-Diaz* issue.  This is a, this is improper.  It
21    should not go through this witness.  The Government is
22    supposed to call the witness that this could go through
23    but this isn't that witness.
24              MS. TREADWAY:  It's a business record.
25    *Melendez-Diaz* did not overrule the business record
```

2744

1    exception to the hearsay rule.

2              THE COURT:  I agree.  Plus, just as with the

3    Coroner that was here, and you made the same objection,

4    you'll have an opportunity to cross-examine this witness

5    with respect to that review summary.  13-L is received.

6    BY MS. TREADWAY:

7    Q    How many patient files were reviewed in the quality

8    review, Ms. Wagner?

9    A    65.

10   Q    And what was the period of time these patient files

11   covered?

12   A    They covered June 1st, 2004 through December 27th,

13   2004.

14   Q    And if we could bring that up, Mr. Moore.  The first

15   page.  What is the date of the review?

16   A    5-5 of '05.

17   Q    That's May 5th of 2005?

18   A    Correct.

19   Q    Okay.  What did Medicaid discover as a result of

20   this 65 file review?

21   A    Medicaid discovered that there were multiple issues

22   related to pain management, the quality of care and

23   billing of the services.

24   Q    Were there essentially a page, almost two pages of

25   significant findings from this review?

2745

1    A    Yes.

2    Q    And does that start at the bottom of Page 2?

3    A    Yes.

4    Q    And let's first look at pain management.  What does

5    that first bullet point indicate?

6    A    That the provider had not followed the previously

7    recommended correction action plan that was sent to him

8    on February 5th, 2004.

9    Q    What is the second bullet point?

10   A    Continued polypharmacy practices and overuse of

11   narcotic medication without appropriate documentation.

12   Q    And the third bullet point?

13   A    That there was no improvement from the prior

14   education and pain management protocol that was to have

15   been implemented.

16   Q    Next?

17   A    The PADTs were not completed or were not present.

18   Q    Next?

19   A    None pharmacological modalities or alternative

20   therapies were not addressed.

21   Q    Next.

22   A    Prescribing practices appear to be determined by the

23   request and desires of the patient.

24   Q    Next?

25   A    Quantity and frequency of doses not adjusted

1    according to intensity and duration of the pain.

2    Q    Next?

3    A    And the patients receiving pain shots of different

4    combinations of Nubain and Stadol with Benadryl,

5    Vistaril and Phenergan, some of which were so frequent

6    that it was every day to every other day.  Patients that

7    were given this medication while concurrently under

8    opioid therapy suffered withdrawal or other side effects

9    due to the contraindication of these medications being

10   combined and having antagonistic effects towards each

11   other.

12   Q    Then with the quality of care review, were there

13   many significant findings?

14   A    Yes.

15   Q    Can you just go through those with the jury please?

16   A    Instances of the incomplete or missing documentation

17   including medication lists, the office notes, the lab

18   results, the PADTS.  The patients complete the

19   medication form.  That was based on the spelling errors

20   and sloppy handwriting.  When the provider adjusts any

21   medication, the form is not updated.  Drug allergies are

22   not consistently completed many times, or updated.  The

23   patient being given Nubain injection while already

24   taking medications resulting in an antagonistic effect.

25   She ended up in cardiac arrest by the next morning.  And

1    she had received Stadol injection another time which

2    would also be contraindicated.  Medications prescribed

3    or refilled with a notation on the progress note that

4    the chart was not available.  Medication refills were

5    inappropriate for repeated office visits.  Diagnosis did

6    not appear to be addressed with the patients and there

7    was no evidence of referrals to specialists when these

8    diagnoses were not addressed.  Changing of medications

9    from one brand to another without providing rationale

10   such as side effects.  Diagnosis does not support the

11   medication prescribed.  Appropriate follow-up lab work

12   is not ordered for high risk medications.  Referrals

13   made to specialists but reports of the findings or the

14   treatment were not always included in the chart or

15   incorporated into the care.  There was failure to

16   address preventative health measures and screenings.

17   Patient education component was lacking consistently

18   throughout the medical practice.  Medical records of

19   various patients contained medical documentations of

20   other patients and even had treatment prescribed due to

21   the misfiled information.  Failure by D.O.'s to provide

22   adequate oversight of the care being rendered by the

23   physician's assistants in their practice in accordance

24   with Article 28(a), physician's assistants found at --

25   in the website listed.

1    Q    Then were there significant findings with regards to

2    the billing?

3    A    Yes.

4    Q    What were those?

5    A    Medication refills were inappropriate for repeated

6    office visits.  Prior documentation -- excuse me -- poor

7    documentation that does not meet the guidelines for

8    documentation standards for an office visit

9    reimbursement.  Concerns with handwriting and signatures

10   that are not corresponding correctly with provider

11   signature sheet that was submitted for the review.

12   Missing and incomplete documentation.  Billed and paid

13   for MRI exams at Allied Medical Imaging, formerly

14   Haysville Imaging, but there were no reports of these

15   exams in the medical records.

16   Q    And then there is a global summary of findings

17   there.  Could you please read those paragraphs?

18   A    "All of the providers reviewed within the Schneider

19   Medical Clinic are consistently not following the

20   established standards of care and appear to

21   overprescribe medications and encourage

22   polypharmaceutical practices and provide potential for

23   both diversion and addiction.  Global failure of all

24   providers to address other medical issues, concerns or

25   findings either in a timely manner or at all.  This does

1    not follow the established medical standards of care.

2    The office visit that consists of medication refills is

3    the standard visit with this review and this is also

4    global practice with all the reviewed providers.

5    However, this is not accepted standard of care.  Global

6    failure of all providers to consistently meet the

7    requirement as stated in the Kansas Medicaid General

8    Benefits Provider Manual under Documentation,

9    Requirements for Documentation of the Reimbursement of

10    the Provision of Care."

11    Q   And when we're talking about all providers, are we

12    talking about both the Defendant Stephen Schneider and

13    Donna St. Clair, another doctor of osteopathy in the

14    clinic?

15    A   Yes.

16    Q   And are we talking about the physician's assistants

17    present in the clinic at that time period?

18    A   Yes.

19    Q   Does Medicaid have the right to terminate a

20    provider?

21    A   Yes.

22    Q   Did Medicaid -- did Medicaid attempt to terminate

23    the Defendant Stephen Schneider, Dr. St. Clair and the

24    Schneider Medical Clinic as well as the physician's

25    assistants as Medicaid providers based on the findings

1    that you have just shared with the jury?

2    A   Yes.

3    Q   Let me hand you what has been marked for

4    identification as Exhibit 13-M.  Do you recognize that

5    document?

6    A   Yes.

7    Q   What is it?

8    A   It is a letter of intent to terminate that was

9    mailed to the Schneider Medical Clinic.

10             MS. TREADWAY:   Government offers Exhibit 13-M.

11             MR. GOROKHOV:   No objection, for Linda

12   Schneider Your Honor.

13             MR. WILLIAMSON:   No objection.

14             THE COURT:   It's received.

15   BY MS. TREADWAY:

16   Q   Now, first of all, we need to clear up an error on

17   that letter, don't we, Ms. Wagner?

18   A   Yes.

19   Q   What is the date as typed on the letter?

20   A   May 24th, 2004.

21   Q   What should it be?

22   A   It should be May 24th, 2005.

23   Q   And how do you know that to be the case?

24   A   Because the review took place on May 5th of 2005.

25   Q   Now, we would like to put this up on our reveal

2751

1    chart, which is our chronology chart.

2         Now, who is this letter addressed to?

3    A    It's addressed to the Schneider Medical Clinic, care

4    of Stephen Schneider.

5    Q    And what does it inform the Clinic?

6    A    It informs the Clinic of the intent of Kansas

7    Medicaid to terminate the enrollment of Schneider

8    Medical Clinic.

9    Q    Then in this letter does it set forth the

10   significant findings that you have just shared with the

11   jury?

12   A    Yes.

13   Q    Now I'd like to hand you what has been marked for

14   identification as 13-N.  What is that document, ma'am.

15   Do you recognize that?

16   A    Yes.  I just need to read it for a second to make

17   sure I understand what it is.

18   Q    I'm sorry.

19   A    This is the results of the administrative review

20   that took place when Dr. Schneider appealed the initial

21   termination.

22   Q    And what does this letter inform the Defendant

23   Stephen Schneider about?

24   A    It informs him that the decision to terminate was

25   upheld after the administrative review.

2752

1          MS. TREADWAY:  Government offers Exhibit 13-N.

2          MR. WILLIAMSON:  Your Honor, these are a

3    series of letters that this witness hasn't authored, is

4    not cc'd on.  It's inadmissible.  It's hearsay.

5          THE COURT:  It's a business record, isn't it?

6          MS. TREADWAY:  It is, Judge.

7          THE COURT:  Isn't it in his files?

8          MR. WILLIAMSON:  No.  This didn't come from

9    his files.

10         THE COURT:  He didn't get it?

11         MR. WILLIAMSON:  I'm not representing that.

12   The document they have, it did not come from his files.

13         THE COURT:  Okay.  Let me see it, would you

14   please.

15         MS. TREADWAY:  13-M is admitted and 13-N is

16   offered for admission, Judge.

17         THE COURT:  Well, you didn't object to 13-M

18   which was the letter addressed to Stephen Schneider

19   saying that -- threatening to terminate his Medicaid

20   privileges.  And it was authored by Cynthia Ludwig who

21   is not this witness anyway.

22         MR. WILLIAMSON:  Judge --

23         THE COURT:  -- and then you now are objecting

24   to another letter that was similarly sent to Stephen

25   Schneider authored by Laura Howard who similarly is not

1   a witness.  Your objections seem to me to be

2   inconsistent.

3          MR. WILLIAMSON:  I objected to the summary.

4   You overruled me.  She went to another letter.  I didn't

5   object.  But now we're at another letter.  She cannot --

6   I'm not concerned about the letters being admitted; but

7   it has to be done the right way and she is just going in

8   under a B way with this witness when you'll see when we

9   get a chance to cross-examine is not going to be able

10  to -- I'm not going to be able to confront her about

11  these documents.

12         MS. TREADWAY:  I'll be glad to lay sufficient

13  foundation for a business record, Judge.

14         THE COURT:  Well, I don't understand your

15  objection.  You still haven't explained to me the

16  reasons for the inconsistency in not objecting to one

17  and objecting to the other; but be that as it may, if

18  she can lay a foundation that 13-N is a business record,

19  I'm going to admit it over your objection.  And then if

20  you can satisfy me through cross-examination that this

21  witness doesn't know anything about this, then I'll

22  reconsider as to any of the exhibits.  But -- I note we

23  didn't see the rest of the letter but I note that the

24  letter really is just a summary of the -- of 13-L.

25

2754

BY MS. TREADWAY:

Q   With regards to both of these letters, Ms. Wagner,
were you involved in the loop of the decision makers
that determined that the Schneider Medical Clinic and
Dr. Schneider and the rest of the providers should be
terminated from the Medicaid program?

A   Yes.

Q   Were you copied on these letters?

A   Yes.

Q   And are these letters business records of the
Medicaid program in Kansas?

A   Yes.

Q   And in fact, as such, are they even public records?

A   I believe so.

Q   Are they created and maintained in the normal course
of Medicaid's business here in the State of Kansas?

A   Yes.

Q   And when Medicaid is terminating or attempting to
terminate providers, are they doing so for the public
health and safety?

A   Yes.

          MS. TREADWAY:   Government reoffers 13-M and
13-N as business records under 803(6) and public records
under 803(8).

          MR. WILLIAMSON:   Same objection, subject to

2755

```
 1    cross-examination.
 2            THE COURT:  Same ruling.
 3    BY MS. TREADWAY:
 4    Q   Now let's discuss the date of this letter, ma'am.
 5    A   This letter is dated June 8th, 2005.
 6    Q   And who is it addressed to?
 7    A   It's actually two letters in the packet.  The first
 8    one is addressed to Steven Schneider and the second is
 9    addressed to Schneider Medical Clinic care of Stephen
10    Schneider.  They're the exact same letter.
11    Q   Do you know that there were other letters addressed
12    to the other providers at this clinic?
13    A   Yes.
14    Q   What was the Defendant Stephen Schneider's response
15    to Medicaid's effort to terminate him from the program?
16    A   He appealed that decision.
17    Q   Let me hand you what has been marked for
18    identification --
19            THE COURT:  I didn't understand her answer.
20    A   He appealed that decision.
21            THE COURT:  Oh, all right.
22    BY MS. TREADWAY:
23    Q   Let me hand you what has been marked for
24    identification as Exhibit 13-O.  Do you recognize that
25    document?
```

2756

1    A    Yes.

2    Q    And what is it?

3    A    It is documentation of the appeal.

4    Q    And is this a First Amended Verified Petition for

5    Judicial Review and Application for Stay?

6    A    Yes.

7    Q    And turning to the last page of this document, is

8    there a declaration on it?

9    A    Yes.

10   Q    And is it a declaration under penalty of perjury

11   that the factual allegations contained in this petition

12   are true and correct?

13   A    Yes.

14   Q    And who is it signed by?

15   A    Stephen Schneider.

16        MS. TREADWAY:  Judge, although I'm not going

17   to admit this record, I do wish to read parts of it as

18   Defendant's admissions under 801(d)(2)(A).

19        MR. WILLIAMSON:  I would just ask that the

20   document be admitted if we're going to read from it.  If

21   they're laying a foundation of what happened, then the

22   jury should have all of it.

23        THE COURT:  Is there some reason you don't

24   want to admit all of it?

25        MS. TREADWAY:  Judge, there's a lot of false

2757

1    exculpatory statements in it.  And we are just

2    highlighting some.

3              THE COURT:  Well, I think the way to handle

4    this is this is the Government's case at this point and

5    I'm going to allow the Government to put on whatever

6    portions of Exhibit 13-O it chooses to and,

7    Mr. Williamson, you certainly are -- may cover other

8    contents of it, whatever those are, and if you feel

9    during cross-examination that you want to offer the

10   exhibit, I'll consider that at the time.

11             MR. WILLIAMSON:  Thank you, Your Honor.

12             THE COURT:  Okay.

13   BY MS. TREADWAY:

14   Q   Now, first of all, Ms. Wagner, was this filed July

15   6th, 2005?  That's on Page 10.

16   A   Yes.

17   Q   And could you turn to Page 3 and specifically

18   paragraph 8.  And does that paragraph state:  Agency

19   representatives made reference to a February 5th, 2004,

20   letter imposing a corrective action plan to address

21   issues identified as part of a chart audit.  Doctor had

22   not received this letter and was unaware of any such

23   corrective action plan having been imposed.

24   A   Yes.

25   Q   Let me hand you what has been previously identified

2758

1    and conditionally admitted as Exhibit 100.  Have you

2    seen that document before?

3    A    Yes, I have.

4    Q    And is that the February 5th, 2004, letter being

5    referenced in Paragraph 8?

6    A    Yes, it is.

7    Q    And is that the document that the doctor, Dr.

8    Schneider, claimed in this verified petition under oath

9    that he had not received?

10   A    Yes.

11   Q    Let me hand you what has been marked for

12   identification as Government Exhibit 100-A.  Do you

13   recognize that document?

14   A    Yes.

15   Q    What is it?

16   A    It's a return receipt for certified mail.

17   Q    And what does the return receipt indicate to you

18   regarding whether the letter was in fact received by the

19   Schneider Medical Clinic?

20   A    It is signed for by Mike Atterbury on 2-13-04.

21   Q    Turning --

22              MS. TREADWAY:  Government would offer Exhibit

23   100-A.

24              MR. WILLIAMSON:  No objection.

25              MR. GOROKHOV:  No objection, Your Honor.

2759

1          THE COURT:   100-A is received.

2    BY MS. TREADWAY:

3    Q   Now, going back to the verified petition.   Could you

4    go to Paragraph 15.   And does it say in that paragraph

5    "Doctor is the only physician in the area currently

6    accepting Medicaid pain management patients."?

7    A   Yes.

8    Q   Based on your earlier testimony about Wichita area

9    providers treating Medicaid patients for chronic pain,

10   do you agree with this statement?

11   A   No.

12   Q   Is it false?

13   A   Yes.

14   Q   Have you had an opportunity to read this entire

15   Petition for Stay before your testimony?

16   A   Yes.

17   Q   Does the Defendant Stephen Schneider anywhere in

18   this verified petition tell the state court judge that

19   there have been numerous overdoses and overdose deaths

20   as a result of the controlled substance prescriptions

21   that he and his providers at the clinic have issued?

22   A   No.

23   Q   What happened, nevertheless, as a result of this

24   stay petition, Ms. Wagner?

25   A   The stay was granted.

2760

1    Q    Does that mean he continued to be a Medicaid

2    provider despite your attempt to terminate him?

3    A    Yes.

4    Q    Are you familiar with a drug called Actiq?

5    A    Yes.

6    Q    Did Medicaid issue a change in coverage for Actiq in

7    the not-too-distant-past?

8    A    Yes.

9    Q    And why did Medicaid issue a change in coverage for

10   Actiq?

11   A    Concerns related to Actiq being misused.

12   Q    Let me hand you what has been marked for

13   identification as Exhibit 13-P.  Do you recognize that

14   document?

15   A    Yes.

16   Q    And what is it?

17   A    It would be notification that goes out to the

18   providers concerning the change.

19   Q    Would this notice have gone out to the providers at

20   the Schneider Medical Clinic, including the Defendant

21   Stephen Schneider?

22   A    Yes.

23             MS. TREADWAY:  Government offers Exhibit 13-P.

24             MR. WILLIAMSON:  No objection.

25             MR. GOROKHOV:  No objection.

2761

1          THE COURT:  It is received.

2    BY MS. TREADWAY:

3    Q    Turning to.  That could we please see that,

4    Mr. Moore.  Thank you.  Let's just indicate the date is

5    June, 2006.  And what does this change in coverage

6    provide?

7    A    It requires prior authorization for use of this

8    medication.

9    Q    And what else?

10   A    And it requires that the beneficiary be 16 years of

11   age or older; the quantity limited to four units per

12   day; the prescriber must be an oncologist or a pain

13   specialist; the beneficiary must have a diagnosis of

14   malignant cancer; and the beneficiary must be receiving

15   opioid therapy and be considered opioid tolerant.

16   Q    And was the basis of this change in coverage medical

17   information or just a whim of Medicaid?

18   A    Medical information.

19   Q    Finally, Ms. Wagner, did you perform a search of

20   information about Medicaid patients who had been

21   patients at the Schneider Medical Clinic and who later

22   sought other services elsewhere?

23   A    Yes.

24   Q    And what types of services were you looking at?

25   A    Alcohol and drug treatment.

2762

1    Q    And how was this search performed?

2    A    Through a claims analysis of the Medicaid

3    information.

4    Q    And as a result of your search, how many patients

5    were you able to identify as seeking addiction treatment

6    services following being a patient at Schneider Medical

7    Clinic?

8    A    35.

9            MS. TREADWAY:  Judge, that's all we have of

10   this witness.  Because of the scheduling issues, we ask

11   that her cross be postponed until next week.  She needs

12   to get back to her office to rearrange her schedule for

13   next week to be available.

14           MR. WILLIAMSON:  Your Honor, I initially

15   agreed before a lot of these documents that she just

16   testified went in.  I think it's imperative for my

17   client for me to at least talk with Ms. Wagner for a few

18   minutes before she hits the road.

19           THE COURT:  No, I don't think so.  I think the

20   jury can remember these things.  And what's happened

21   here, Ladies and Gentlemen, so that you understand, is

22   that in order -- the spread sheet that I showed you,

23   there are some additional documents that the Defendant

24   is entitled to see in order to be prepared for

25   cross-examination of this witness of that spread sheet,

2763

1    and those documents are in Kansas City and they have to

2    be brought down here, and we made arrangements to do all

3    of that -- or they're being made.  And so she'll be back

4    on the witness stand to finish her direct testimony

5    about the spread sheet and by that time the Defendant

6    will have had an opportunity to go through these

7    additional documents and be prepared for

8    cross-examination.  So I'm going to excuse you and we'll

9    see you probably next week.

10   A    Thank you.

11         MR. FLEENOR:  Your Honor the Government calls

12   Robert W.

13                    **ROBERT W**

14   Having been first duly sworn to tell the truth, the

15   whole truth and nothing but the truth, testified as

16   follows on:

17                **DIRECT EXAMINATION**

18   BY MR. FLEENOR:

19   Q    Would you please state your first name?

20   A    Robert D W.

21   Q    And are you employed?

22   A    Yes.

23   Q    Where are you employed?

24   A    Frontier Oil Refinery in ElDorado.

25   Q    What do you do there?

2764

1    A    I'm a top operator.

2    Q    How long have you been there?

3    A    23 years.

4    Q    Did you know someone named Robin G?

5    A    Yes.

6    Q    How did you know her?

7    A    She was my wife.

8    Q    How long were you married?

9    A    17 years four months.

10        MR. FLEENOR:  Your Honor, may I approach for

11   the purposes of identifying an exhibit.

12   Q    Sir, I'm handing you what's been previously admitted

13   as Government Exhibit 4-A.  Do you recognize this?

14   A    Yes.

15   Q    What is that?

16   A    That's my wife Robin.

17   Q    Is Robin deceased?

18   A    Yes.

19   Q    And what do you understand she died of?

20   A    Overdose of Fentanyl.

21   Q    Sir, was Robin -- did she attend or go to the

22   Defendant's Schneider Medical Clinic between 2004 and

23   2007?

24   A    Yes.

25   Q    Why did she go there?

1    A    For severe migraines.

2    Q    Did she have migraines when you first married her?

3    A    Yes.

4    Q    How often -- when you first married her, how often

5    was she getting migraines?

6    A    Probably one or two a month.

7    Q    Do you ever go with Robin to the Schneider Medical

8    Clinic?

9    A    Yes.

10   Q    How often would you go with her?

11   A    Probably about 85% of the time.

12   Q    How were you able to do that if you were working?

13   A    I work shift work and would schedule my days off

14   during the week.

15   Q    Now, during the years that she was going to the

16   Clinic, how often would she go?

17   A    Once a month.

18   Q    Let's talk about the first time that she went.  Did

19   you go with her?

20   A    Yes.

21   Q    Did you go into the exam room with Robin on the

22   first time she went to the clinic?

23   A    Yes.  Always.

24   Q    And on the first time you went, which provider,

25   which medical person did you and Robin see?

2766

1    A    Dr. Schneider.

2    Q    During this first visit did the Defendant ask Robin

3    any questions?

4    A    What are you here for.

5    Q    Did he give her a physical?

6    A    No.

7    Q    Did he ask her about her medical history?

8    A    Yes.

9    Q    What did he ask?

10   A    What are you here for.  And she said severe

11   migraines.

12   Q    And what did he do?

13   A    Said I have something for you.

14   Q    And what was that?

15   A    Medicine.

16   Q    Did he tell you what the medicine was?

17   A    Yes.

18   Q    What did he say?

19   A    Fentanyl.

20   Q    And was this in -- what form was it in?  Liquid or

21   pill?

22   A    It was a sucker.

23   Q    How long did you and Robin spend with the Defendant

24   on this first visit in the exam room?

25   A    Probably ten minutes.

1    Q    During all the times that you went with Robin, did

2    you see other medical staff at the Clinic besides the

3    Defendant?

4    A    Dr. Simons and the PAs.

5    Q    Did any of those people ever give Robin a physical

6    examination when you were there?

7    A    No.

8    Q    Let's talk about not just the first time but the

9    times you went to the Clinic with Robin.  Would you wait

10   with her in the waiting room?

11   A    Yes.

12   Q    How long would you typically have to wait?

13   A    At first it would be from two to four hours,

14   depends.  It was packed.

15   Q    Packed with what?

16   A    People.

17   Q    Were there people inside and outside?

18   A    Yes.  There was people standing and people waitin'

19   outside.

20   Q    I apologize if I already asked you.  How often would

21   Robin go to the Clinic with an appointment?

22   A    Once a month.

23   Q    What did the Defendant Dr. Schneider and his other

24   medical staff do on these times that you went to the

25   Clinic with Robin?

1    A    Give her the medicine.

2    Q    The same medicine as on the first visit?

3    A    Pretty much so.  The dosage increased.

4    Q    You're talking about the suckers?

5    A    Yes.

6    Q    Do you remember what numbers there would be

7    regarding the amounts and the dosages?

8    A    At first Fentanyl was 400 and it was always 160

9    suckers a month.  And it increased at the very last

10   there were 800 and still 160 suckers a month.

11   Q    Was Robin prescribed other medications at the Clinic

12   as well?

13   A    Yes.

14   Q    Do you remember what they were?

15   A    Avenza, Diazepam, Valium.  There's some stomach

16   medicine, Prometrazine (ph) or something like that.

17   There was some other --

18   Q    Did she also get the Actiq suckers or the Fentanyl

19   suckers when she went?  Or get a prescription for them?

20   A    Yes.

21   Q    During the times that you saw the other providers

22   other than the Defendant, how long would you spend in

23   the exam room with Robin and that person?

24   A    Most of the time it was ten minutes, except for one

25   PA was kind and we would spend more time with her.

2769

1  Q   What did she talk about?

2  A   Religion and eating.

3  Q   Sir, did the suckers or these other drugs that were

4  prescribed at the Clinic help your wife's migraines?

5  A   At first they did.

6  Q   Did that change later?

7  A   Yes.

8  Q   How did it change?

9  A   The migraines got worse in severity.

10 Q   Would she get more -- would they become more

11 frequent or less frequent?

12 A   More frequent; more severe.

13 Q   Did anyone at the Clinic talk about changing Robin's

14 diet?

15 A   Connie.

16 Q   Did you know Connie's last name?

17 A   White I believe.

18 Q   Was there any follow-up after that discussion with

19 Connie White about Robin's diet?

20 A   No.

21 Q   Did the staff ever order any blood work for Robin?

22 A   Not to my knowledge, no.

23 Q   Do you know if they gave her any blood tests -- I'm

24 sorry -- drug tests?

25 A   No.

2770

1    Q   During all the time that you went with Robin each

2    month, what did the staff do to treat these increasing

3    headaches?

4    A   Just give her refills.

5    Q   Did anyone at the clinic recommend treatment other

6    than these drug prescriptions?

7    A   No.

8    Q   Did you and Robin ever discuss maybe getting

9    treatment elsewhere?

10   A   Yes.

11   Q   Did you discuss that with anyone at the Defendant's

12   clinic?

13   A   Dr. Schneider.

14   Q   What did you tell him?

15   A   That we was thinkin' about going to the Mayo Clinic

16   in Arizona.

17   Q   What was the Defendant's response?

18   A   That we could do every test here that they could do

19   down there.

20   Q   Did he ever order any other tests?

21   A   No, not to my knowledge.

22   Q   Typically, how many suckers did the Defendant and

23   other staff at the Clinic prescribe for your wife at

24   each of these office visits?

25   A   160.

2771

1    Q    How long were they supposed to last her?

2    A    A month.

3    Q    Did they last that long?

4    A    At first they did.  Later on, no.

5    Q    Did you become concerned about that?

6    A    Yes.

7    Q    Why didn't they last the entire month?

8    A    At first it would help; and at the end of her life

9    they didn't help as much so she was taking more of 'em.

10   Q    She would run out before the next visit?

11   A    Yes.

12   Q    Did you do anything to try to help her or stop that?

13   A    I would hide some so she would have some at the end

14   of the month.

15   Q    Did that work?

16   A    No.  She'd find 'em.

17   Q    During the time that Robin was going to the

18   Defendant's clinic, did her health get better with these

19   suckers and the other drugs that you mentioned?

20   A    No, it wouldn't.  We first went her weight was

21   probably 190 pounds; and the very last -- I think when

22   she died she was like 125 pounds.

23   Q    You say at the beginning the drugs seemed to work

24   some?

25   A    Yes.

1    Q    And that changed?

2    A    Yes.

3    Q    Can you describe -- I want to talk about the last

4    few months of Robin's life.  Can you describe what a

5    typical day was like for her?

6    A    When she had the migraines she would just stay up in

7    her room, would cover the windows.

8    Q    Why?

9    A    She could not take the light.

10   Q    Anything else physically about her that you could

11   describe?

12   A    She would not eat.  She would throw up.  Be

13   constipated.

14   Q    During this time did Robin ever go to the hospital

15   emergency room?

16   A    Yes.

17   Q    More than once?

18   A    Couple times.

19   Q    Why did she have to go there?

20   A    The migraines got really severe.

21   Q    Did she notify the Clinic about those visits?

22   A    Yes.  One time they sent her to Galichia and another

23   time she called and said we're going to the hospital in

24   ElDorado.

25   Q    Did she still have regular appointments at the

2773

1    Defendant's clinic even after going to the emergency

2    room?

3    A    Just her regular monthly appointments.

4    Q    Did the Defendant or the other staff at the clinic

5    change her prescriptions after these emergency room

6    visits?

7    A    No.

8    Q    Was Robin working during this time?

9    A    At the end of the -- of her life, no.  She was going

10   to school.

11   Q    Where was she going to school?

12   A    WSU.

13   Q    Was she involved in her church when you first got

14   married?

15   A    Yes.  At the middle she was a Sunday school teacher,

16   for about a year, the regular Sunday school teacher.

17   That was --

18   Q    Towards the end of her life did she still -- was she

19   still going to school as a student?

20   A    The last semester, no.  The fall semester she did go

21   off and on.  They worked with her for being sick.

22   Q    Was it difficult for her to do her class work?

23   A    Yeah.

24   Q    Did she continue with her church work?

25   A    Yes.

2774

1   Q   As much as before?

2   A   Yes.

3   Q   I want to talk about Robin's death briefly.  Can you

4   describe for the jury the last day that you were with

5   Robin?

6   A   The last day.  I worked a daylight shift and I was

7   umpiring high school regional softball and she always

8   liked going with me, so she got all cleaned up and then

9   decided she didn't feel good.  So -- decided she didn't

10   want to go.  So got home.  We watched a little TV and

11   decided she wanted to go eat.  Took her out to eat.  And

12   we came back home and watched TV.  And about midnight

13   told her I was going to go to sleep 'cause I had the

14   daylight shift the next day.

15   Q   Where were you both watching TV?

16   A   Upstairs.  We always watched TV upstairs in bed.

17   Q   And you told her what?

18   A   That I was tired and I needed to go to sleep.

19   Q   And then what happened?

20   A   And about 2:00 she yelled, wanted me to help her

21   carry a couple drinks up to her bed.  And did that.  And

22   then next I knew about 4:00 in the morning she woke me

23   up, said she had called my mom, and I asked her why

24   and -- why in the crap would she call my mom at 4:00 in

25   the morning, and she told me somebody told me to.  And I

 1   went back to bed.  I was wore out.  And then the next

 2   thing I knew I woke up probably after 5:00 and she was

 3   layin' on the bed.  She was naked, feet on the floor,

 4   and I touched her and she was cold.  And I put her feet

 5   up on the bed and ran downstairs and called 911, opened

 6   the door and ran back upstairs, started CPR on her.  I

 7   was able to get a pulse back going and finally EMS and

 8   the firemen showed up.

 9   Q   Did they take her to the hospital?

10   A   Yes.  The emergency room in ElDorado.

11   Q   Did she die later that same day?

12   A   Yes.

13   Q   How old was Robin?

14   A   45 at the time.

15           MR. FLEENOR:  One moment, Your Honor.

16                (Off-the-record.)

17           MR. FLEENOR:  Thank you, sir.  No further

18   questions.

19           THE COURT:  Cross-examination please.

20           MR. WILLIAMSON:  Thank you, Your Honor.

21                   **CROSS EXAMINATION**

22   BY MR. WILLIAMSON:

23   Q   How are you doing, Mr. W?  We never had a chance to

24   meet before, have we?  I'm Lawrence Williamson and I

25   represent Dr. Schneider.  Okay?

2776

1   A   Okay.

2   Q   I'm going to ask you a series of questions similar

3   to that the prosecution asked you.  Okay?

4   A   Yes.

5   Q   If you don't understand anything, will you just let

6   me know?

7   A   Okay.

8   Q   And if you get emotional -- I know it's tough -- if

9   you need a break, will you let me know?

10  A   Yes.

11  Q   Okay.  I want to start chatting with you about Robin

12  and you prior to the time that she began with the

13  Schneider Clinic.  Okay.  When did you guys get married?

14  A   1990, March 17th.

15  Q   Okay.  And when you got married, she was already

16  having migraine headaches; correct?

17  A   Some, yes.

18  Q   And then they started getting worse about 1988 --

19  excuse me, 1998 or '99, around that area?

20  A   Later on.  It was severe.

21  Q   And that was before you guys started at the

22  Schneider Clinic; correct?

23  A   Yes.

24  Q   And that's one of the reasons why you started

25  looking for somebody to help with this headache because

1   it was starting to get worse; correct?

2   A   Yes.

3   Q   And Ms. Robin was actually seeing another doctor as

4   a primary care physician at this time; correct?

5   A   Yes.

6   Q   And that was Dr. Olsen?

7   A   Yes.

8   Q   Did he -- had he tried to treat Robin's migraines

9   with some other medication that was unsuccessful?

10  A   He was one of the doctors, yes.

11  Q   And before you all visited with Dr. Schneider, had

12  you tried neurologists to help?

13  A   Yes.

14  Q   They weren't able to help; correct?

15  A   No.   Just trying to find something for what was

16  causing it.

17  Q   And you understand neurologists are specialists that

18  look at the neurological areas of your head and body?

19  A   Yes.

20  Q   And they were unable to find the cause?

21  A   No.

22  Q   But could you tell from being with her that they

23  were -- it was serious and painful for her?

24  A   Yes.

25  Q   Okay.   You tried acupuncture?

2778

1    A    Yes.

2    Q    That didn't help, did it?

3    A    No.

4    Q    Now, when she would have these headaches -- well,

5    let me back up.  When you first got married I think you

6    said ones or twice a month?

7    A    Yes, something like that.

8    Q    And when it started to get worse around -- was it

9    '99, 2000, roughly around that area?

10   A    Oh, probably about 2003, 2004.

11   Q    Okay.  I have a deposition that you gave and in that

12   deposition you said that it began getting worse around

13   1998 or '99?

14   A    Okay.

15   Q    And you gave that deposition a while back.  Does

16   that refresh your memory at all?

17   A    Yes.

18   Q    Okay.  And when they started getting worse, how

19   often would the headaches happen?

20   A    Probably from four to eight times a month.

21   Q    Okay.  So by the time that Ms. Robin began with the

22   Schneider Medical Clinic, her headaches had gone up

23   to -- well, I'm sorry, let me back up.  At least by 1998

24   to '99 they were going up to four to five times a month?

25   A    Yes.

2779

1    Q   And while this was going up, is it between I guess

2    1990 and 1998 when you would be going to the neurologist

3    and acupuncture?

4    A   Yes.

5    Q   Acupuncturist I guess is the proper term.

6    A   Yes.

7    Q   And she was also still seeing Dr. Olsen during this

8    time period?

9    A   Yes.

10   Q   So while all these medical physicians were trying to

11   help her, she just continued to get worse?

12   A   Yes.

13   Q   And then I believe the records will show that

14   Ms. Robin first visited the Clinic in 2004.  Does that

15   sound right to you?

16   A   Yes.

17   Q   Like July 13th?

18   A   Yes.

19   Q   How bad had they gotten by the time that she visited

20   Dr. Schneider in about 2004?

21   A   They were bad.

22   Q   So went from one to three a month when you first got

23   married about 1990.  And then went to about four to five

24   a month in about '98 to '99.  And then they even got

25   worse between '99 and 2004?

2780

1    A    Still about four or five a month.

2    Q    Okay.  And you were asked was a physical exam done

3    on the first visit.  What do you mean by physical exam?

4    Do you know?

5    A    If they -- if he touched her or listened to her

6    heart or -- like normal doctors do.  Put your knee up

7    and hit it with a rubber hammer.

8    Q    Do you remember whether or not he listened to her

9    heart?

10   A    No.

11   Q    Do you remember any medical assistants did before

12   they brought her in?

13   A    Oh, the nurse took a blood pressure and her weight.

14   Q    Okay.  And when he came in -- excuse me.  When you

15   guys came in and Dr. Schneider finally came in the room,

16   do you recall him performing like a trapezius test on

17   Robin to try to see if he could find any tenderness at

18   all?

19   A    No.

20   Q    Okay.  If the medical records reflect that, would

21   you really disagree with that or just --

22   A    Yes.

23   Q    -- or just don't remember?

24   A    I don't remember him touching her.  He set down in

25   the chair next to her.  That was all I remember.

1    Q    That was back in 2004.  Is it possible you just may

2    not remember every single thing that happened at every

3    single visit?

4    A    I think I'm pretty positive of the very first time.

5    Q    Okay.  And when you first met with him he asked her

6    what her concern was?

7    A    Yes.

8    Q    He didn't try to keep you out in the lobby at all,

9    did he?

10   A    No.

11   Q    He wasn't rude to you all?

12   A    No.

13   Q    If he was rude that visit, you wouldn't have come

14   back; right?

15   A    No.

16   Q    Okay.  Was he soft spoken when you met with him?

17   A    Yes.

18   Q    And did he cut Robin off when she was explaining

19   anything about her migraines?

20   A    No.

21   Q    Okay.  Do you remember her reviewing the medications

22   that she had been taking prior to coming in and seeing

23   Dr. Schneider?

24   A    Yes.  She told him what she was taking then.

25   Q    Okay.  Was some of that Nubain?  Did she try Nubain?

 1    A    That sounds familiar.  She tried a lot --

 2    Q    Okay.  I'm just going to list off what we have here

 3    and just at the end if they sound familiar just let me

 4    know.  Okay?  Toradol, Lortab, Imitrex, Stadol -- I

 5    never get this one right -- Depakote or something like

 6    that.  And I think a couple others, beta blockers.

 7    A    Yes.

 8    Q    Sound right.  Is it fair to say that she was trying

 9    different treatments to try to solve the pain that her

10    headaches were causing her?

11    A    Trying to relieve the pain, yes.

12    Q    And before -- when these headaches -- before you

13    started seeing Dr. Schneider and before these headaches

14    got -- when they started getting bad, the quality of

15    your interaction in your marriage, would you agree that

16    that had changed?

17    A    Interaction?  Yeah, she didn't do as much.

18    Q    So before she started seeing Dr. Schneider -- trying

19    not to get too personal into, you know, a witness's life

20    but I think this one is important.  The amount of

21    marital relations that you guys had would suffer because

22    her headaches were starting to come so frequent;

23    correct?

24    A    Suffer?

25    Q    Meaning you started having sex less frequently?

2783

```
 1   A   Yes.  I mean --
 2   Q   Before her headaches started getting worse, you guys
 3   would enjoy ATVing together?
 4   A   Yes.
 5   Q   But when they started getting worse I guess between
 6   '89 and 2004, that even decreased; correct?
 7   A   Yes.
 8   Q   Your wife didn't go to Dr. Schneider because she was
 9   addicted to any kind of pain medicine, did she?
10   A   No.
11   Q   She went there because she was in pain?
12   A   Yes.
13   Q   And when -- she would also cry herself to sleep
14   because it would be so painful?
15   A   Yes.
16   Q   She would sometimes have to shut herself up in her
17   room, turn out all the lights and just not be bothered;
18   correct?
19   A   Correct.  I'd get hot packs or cold packs for her,
20   whatever, ice.
21   Q   Isn't it hard to -- if you haven't felt that kind of
22   pain, do you think it's really hard for us to even be
23   able to describe what she was feeling at times?
24   A   It would be hard because I, I'd see her bawlin'.
25   Q   And it was hard for you when you were there with
```

1   her?

2   A   Yes.

3   Q   And she also -- the movies, she couldn't watch

4   movies because of all of that?

5   A   Couldn't look at the screen at the movies.

6   Q   When you started going to Dr. Schneider you said the

7   medicine started helping at first?

8   A   At first, yes.

9   Q   Now, when she would take the Actiq lollipop, she

10   would have to sit it inside her mouth and let it like

11   slowly dissolve?

12   A   Yes.  We talked about that.  He described to put it

13   in your cheek and twirl it around.

14   Q   So he gave her instructions on how to use it?

15   A   Twice.

16   Q   Okay.  And she was only supposed to use it for

17   when -- the initial onset of the migraine?

18   A   Yes.

19   Q   And it was described to you like Actiq is what's

20   known as a breakthrough pain medicine, that it should

21   try to catch the migraine before the pain gets too bad?

22   A   I'm not sure.  Just help the pain.

23   Q   And when she first started taking this Actiq, did

24   it -- were you able to start doing things that you

25   hadn't done for a while?

1    A    At first, yes.

2    Q    Do you ever recall Robin taking the medicine at a

3    time other than when she was having an onset of a

4    headache?

5    A    No.

6    Q    She wasn't abusing Actiq, was she?

7    A    No.

8    Q    But her headaches were coming at a frequency where

9    she was having to take it?

10   A    Yes.

11   Q    Did Dr. Schneider instruct you guys to only use the

12   medicine at one pharmacy?

13   A    She said that we could get it through Durand (sic)

14   Drugs a lot easier because we tried at Dillons and they

15   didn't carry it.

16   Q    And I believe you also had testified before that he

17   instructed you guys not to take -- or instructed Robin

18   not to take any illegal drugs with this?

19   A    Yes.

20   Q    And she wasn't an illegal drug user, was she?

21   A    No.

22   Q    In fact, Robin didn't even like taking medicine the

23   entirety of her life --

24   A    No.

25   Q    -- correct?

```
 1    A    No.  She wanted off of it.

 2    Q    And the only reason she was taking it is because she

 3    was having those migraines?

 4    A    Yes.

 5    Q    And would you agree that that Actiq at least for

 6    quite a while is the only thing that you guys found that

 7    would really handle that pain for a while?

 8    A    At first, yes.

 9    Q    And you understand that Dr. Schneider does not

10    manufacture Actiq; right?

11    A    Correct.

12    Q    Okay.  You know he's not the CEO of that big Ceflon

13    company?

14    A    Correct.

15    Q    And you understand that doctors have to make their

16    best judgments with the available literature that they

17    have in their possession at that time?  Would you agree

18    with that?

19    A    Yes.

20    Q    Meaning they have to research and try to stay

21    abreast of the changes in medicine and -- yeah, in

22    medicine; correct?

23    A    Correct.

24    Q    Okay.  I think you also mentioned that Robin had

25    some visits to the ER.  You remember that?
```

```
 1    A    Yes.
 2    Q    She was actually having ER visits prior to the time
 3    that she would see Dr. Schneider?
 4    A    Yes.
 5    Q    Okay.  And these ER visits, she wasn't going there
 6    seeking drugs, was it?
 7    A    No.
 8    Q    She was in true pain when she went?
 9    A    She was in true pain, yes.
10    Q    Do you know that there have been people testifying
11    that individuals who go to the emergency room
12    complaining of pain are just basically trying to be drug
13    seekers?
14    A    I've heard that; but I couldn't tell you yea or nay.
15    Q    But that wasn't Robin, was it?
16    A    No.
17    Q    She also -- she had a bad experience at an ER before
18    she met with Dr. Schneider, didn't she?
19    A    Yes.
20    Q    She was given some kind of medicine that did not
21    agree with her at all.  Do you remember what that was?
22    A    No, not the medicine, no.
23    Q    Now, Dr. Schneider also sent Ms. Robin out for MRIs?
24    A    I don't recall that, no.
25    Q    Okay.  What about CT scan.  Do you remember that?
```

2788

```
1    A    No.

2    Q    I have a note here that on September 8, 2004, Dr.

3    Schneider scheduled an MRI for Robin to take place on

4    September 9, 2004.  Does that strike any -- ring a bell?

5    A    I don't --

6    Q    You wouldn't have attended that meeting with her?

7    A    I went with her a lot of doctor's appointments and I

8    don't remember that.

9    Q    Okay.  And you're not saying it didn't happen.  You

10   just don't remember whether it did or not?

11   A    No.

12   Q    Okay.  If somebody was asking me what happened in

13   2004, I would give less answers than you.  You're doing

14   pretty good actually.

15        Now I want to make sure I understood your direct

16   testimony right.  Dr. Schneider learned that Robin had

17   to go to the hospital because she ran out of Actiq and

18   was still having these pains; correct?

19   A    Yes.

20   Q    Okay.  And did you say that he sent her over to

21   Galichia and then also to ElDorado?

22   A    Yes.  We got the okay to go to Susan B Allen.

23   Q    Okay.  And that was to give him extra support in

24   trying to see if they could find out what is causing all

25   these migraines?
```

```
 1   A   No.  That was because she had a very severe
 2   migraine.
 3   Q   Okay.  So is the -- so you went to Galichia and
 4   Susan B Anthony --
 5   A   Two times, two different times.
 6   Q   Okay.  You went once to Galichia and once to Susan B
 7   Anthony?
 8   A   Yes.
 9   Q   Okay.  Do you know what year those would have taken
10   place?
11   A   I can't recall.  It was later on in her life.
12   Q   Okay.  Were they able to give Robin anything for her
13   migraines that made 'em stop or go away?
14   A   Yes.
15   Q   What did they do for her?
16   A   They usually put her to sleep and something for her
17   throwing up.
18   Q   Okay.  When you say put her to sleep, can you -- I'm
19   not familiar with that --
20   A   It would make her drowsy and she would kind of sleep
21   it off.
22   Q   What would they gave her?  Do you know?
23   A   Demerol.
24   Q   Okay.
25   A   And Phenergan.
```

1   Q   And so basically that would help put her to sleep so

2   while the pain is going on she could sleep and not deal

3   with it?

4   A   Yeah.  That would usually put her to sleep.

5   Q   Now, before she started seeing Dr. Schneider, she

6   also had trouble with school because of all the

7   headaches and she started missing school a little bit?

8   A   A little bit, yes.

9   Q   Just a couple more topics and then I'll be finished

10  with you.  Okay?

11      Dr. Schneider did do X-rays.  You remember

12  testifying about that in that deposition?

13  A   No.  I don't remember the X-rays.

14  Q   I think I misread that.  You brought X-rays in that

15  she had for Dr. Schneider to review?

16  A   Yes.

17  Q   Okay.  So he reviewed previous X-rays that she had?

18  A   I don't know if he reviewed them or not.  We just

19  give 'em to him.

20  Q   Okay.  Did you leave them with him?

21  A   Yes.

22  Q   Okay.  At any of the times that you visited with Dr.

23  Schneider, was he mean or rude to you?

24  A   No.

25  Q   Did he ever tell you, listen, if you guys really

2791

```
 1    don't have pain, that's okay, just let me know and I'll
 2    still give you these prescriptions?
 3    A    No.
 4    Q    Okay.  You believe that when Dr. Schneider was
 5    seeing Robin, regardless if he made mistakes or not,
 6    that he was really trying to help her with her
 7    migraines?
 8    A    Yeah, with the medicine, yes.
 9    Q    And you understand that doctors are humans and
10    mistakes may be made sometimes?
11    A    Yes.
12    Q    Last topic.  I'm going to combine two topics in one
13    I don't want to misspeak.  There were times when Dr.
14    Schneider would increase the medicine that Robin
15    received?
16    A    Yes.
17    Q    And there were times he would decrease it; correct?
18    A    Yes.
19    Q    And I think Robin had -- would get worse migraines
20    when certain events were occurring outside.  Do you
21    remember that?
22    A    Yes.
23    Q    Can you tell the jury what those events would be?
24    A    When they burned pastures.  She would ask to
25    increase it.  And then go back down after the burning
```

1    was stopped.  Then the very last time he stayed at 800.

2    He didn't decrease it.

3    Q    Okay.  And so if there was something going on such

4    as burning fields and she told him, look, Dr. Schneider,

5    it's about to be bad because the burning fields are

6    coming, he would increase the amount?

7    A    Yes.

8    Q    And he normally would decrease it once the burning

9    fields was over?

10   A    Yes.

11   Q    But the last visit you thought it was supposed to be

12   decreased to 600 but it was still at 800?

13   A    Yes.

14   Q    And she had been taking that 800 like off and on for

15   a little while?

16   A    For a month.  The month before in April.

17   Q    One observation you made when you went to the

18   Clinic, you saw the different patients -- or not

19   different -- you saw the patients that would be waiting

20   out there?

21   A    Yes.

22   Q    A lot of 'em I think you've termed 'em looked like

23   lower class people?

24   A    Yes.

25   Q    Did you ever see Dr. Schneider be rude to any of

1   these people regardless of whatever social or economic

2   class they came from?

3   A   He never came out in the waiting room so -- I don't

4   know what happened inside.

5   Q   Okay.  If Dr. Schneider would have ever been rude or

6   mean or if you felt like he was just there to deal

7   drugs, would you have stopped Robin from going right

8   then and there?

9   A   Yes.

10   Q   Okay.

11          MR. WILLIAMSON:  I don't have anything

12   further, Your Honor.

13          THE COURT:  Mr. Byers?

14          MR. BYERS:  No questions, Your Honor.

15          THE COURT:  Redirect please.

16          MR. FLEENOR:  Briefly, Your Honor.

17                   **REDIRECT EXAMINATION**

18   BY MR. FLEENOR

19   Q   Did you trust the Defendant and his staff to treat

20   your wife to try to make her better?

21   A   At first, yes.

22   Q   You talked with Mr. Williamson about your wife's

23   health at the beginning and at the end.  It's true the

24   headaches became worse towards the end of her life?

25   A   Yes.

2794

1   Q   Did the Defendant change anything he had been doing

2   with his prescriptions or treatment of her even though

3   they got worse?

4   A   No.

5   Q   Mr. Williamson asked you about talking with the

6   Defendant about how to use the suckers.  Did the

7   doctor -- did the Defendant ever talk to your wife about

8   if the first sucker didn't work, what to do next?

9   A   Yes.

10   Q   What did he say?

11   A   Yes.  First time he said if you still had a

12   headache, wait 15 minutes and take another sucker.

13          MR. FLEENOR:  Nothing further.

14          THE COURT:  Yes, sir.  Anything further?

15          MR. WILLIAMSON:  No, Your Honor.

16          THE COURT:  Thank you, sir.  You're excused.

17   Let's take our recess, Ladies and Gentlemen.

18   Approximately 15 minutes.

19              (Recess.)

20          THE COURT:  Next witness please.

21          MR. FLEENOR:  Thank you, Your Honor.  The

22   Government calls Lori Lynn T.

23                  **LORI LYNN T**

24   Having been first duly sworn to tell the truth, the

25   whole truth and nothing but the truth, testified as

 1    follows on:

 2                        **DIRECT EXAMINATION**

 3    BY MR. FLEENOR:

 4    Q    Would you please state your first name for us?

 5    A    Lori Lynn.

 6    Q    Ma'am, did you know someone named Eric T?

 7    A    He was my husband.

 8    Q    How long were you married?

 9    A    Almost 20 years.

10    Q    Did you and Eric have children?

11    A    Yes.  We had three.

12    Q    Any grandchildren?

13    A    Two.

14    Q    Is Eric deceased?

15    A    Yes, he is.

16    Q    When did he die?

17    A    April 23rd, '06.

18    Q    And what do you understand he died from?

19    A    Accidental overdose.

20    Q    Did Eric work while you were married?

21    A    Yes.

22    Q    What did he do?

23    A    He was a truck driver.

24    Q    Was he over-the-road or local or?

25    A    Local P and D driver, pick-up and delivery driver.

 1          MR. FLEENOR:  Your Honor, may I approach the
 2    witness to identify an exhibit?
 3          THE COURT:  Yes, sir.
 4    BY MR. FLEENOR:
 5    Q   Ma'am, I want to hand you what's been admitted as
 6    Government Exhibit 1-A do you recognize that?
 7    A   That's Eric, more clean shaven.
 8    Q   Ma'am, was Eric a big man?
 9    A   Yes.  He was my grizzly bear.
10    Q   Was he strong when you first married him?
11    A   Very strong.
12    Q   Did Eric have health issues when you were first
13    married?
14    A   No.
15    Q   Was he the type that would take medications if he
16    ever had any pain?
17    A   No.
18    Q   Why not?
19    A   He just didn't take medication.
20    Q   Did Eric eventually hurt his back?
21    A   Yes.
22    Q   And what happened?
23    A   He ran into a train.
24    Q   Was he driving?
25    A   Yes.

1    Q    When did that happen?

2    A    In 1996.

3    Q    And was he injured as result of that vehicle

4    accident?

5    A    Yes.  He had a disease of the back but when he ran

6    into the train it progressed a little bit more.

7    Q    Did he eventually go and seek treatment at the

8    Schneider Medical Clinic between 2003 and 2006?

9    A    Yes.

10   Q    Did you ever go with Eric to the clinic?

11   A    Yes.

12   Q    Do you know about how many times you were with Eric

13   when he went to the clinic?

14   A    About a year and a half.

15   Q    Were you working at the time?

16   A    No.

17   Q    During this year and a half time how often would

18   Eric go and how often would you go with him?

19   A    Eric would go once a month and I went with him once

20   a month.

21   Q    When you would go to the clinic, would you wait with

22   Eric in the waiting room?

23   A    Yes, I would.

24   Q    While you were waiting there were you able to

25   observe other people waiting?

1    A    Yes.

2    Q    What was the waiting room like when you were there?

3    A    All sorts of people.  It was chaotic.  There were

4    not enough chairs for people.  People stood outside.

5    Q    While -- during all these times that you were

6    waiting, were you able to observe the clinic staff?

7    A    Yes.

8    Q    In the waiting room?

9    A    Yes.

10   Q    Did you observe them call people to the exam room?

11   A    Yes, I did.

12   Q    Could you tell if the staff called the people to the

13   exam rooms in the order that the people came into the

14   clinic?

15   A    There was so many people there, I wouldn't know,

16   have a recollection of who got called in when.

17   Q    How did they call people in the exam room?

18   A    There would be someone that would come to the door,

19   they would call out about four or five, six names,

20   everybody would line up to the door.  And then they

21   would open the door and everybody go in together.

22   Q    What was that like?

23   A    It was like herdin' cows.

24   Q    Did you go with Eric to the exam room all the times

25   that you went with him to the clinic?

2799

1    A   Yes, I did.

2    Q   How long would you have to wait in the waiting room

3    before being called to the exam room?

4    A   In the waiting room.  Anywhere from 30 minutes to

5    two hours.

6    Q   When you would go back with Eric to the exam room

7    would you have to wait there as well?

8    A   Yes.

9    Q   And typically how long would you wait there?

10   A   30 minutes to an hour.

11   Q   During the times that you were with Eric at the

12   clinic, which medical staff would come to see Eric in

13   the exam room?

14   A   There was all different sorts.

15   Q   Do you remember who?

16   A   There was nurses that came in at first.  And they

17   did like the blood pressure.  And then after that the

18   doctors would come in.

19   Q   What doctors did you see?

20   A   Dr. Schneider.  There was like a Dr. St. Clair.  And

21   then there was some Asian lady with long hair but I

22   don't know what her name was.

23   Q   Did Eric see the Defendant or did the Defendant come

24   to the exam room several times during this course of 18

25   months, year and a half you were going there?

```
 1   A   I'm sorry.  I don't understand.
 2   Q   Did the Defendant come to see Eric in the exam room
 3   several times during that year and a half that you went?
 4   A   Yes.
 5   Q   Did the staff ever give Eric a physical -- a
 6   physical examination when you were there with him in the
 7   exam room?
 8   A   No.
 9   Q   What did they do?
10   A   They came in, asked him about if his pain was
11   manageable or if it had progressed and if his scripts
12   were workin' for him.  And start writin' out
13   prescriptions.
14   Q   What did they prescribe to Eric?
15   A   On different, several different types on several
16   different occasions.  Lortabs, Percocets, Methadone,
17   Oxycontin, Valium, and some higher like Aspirin, higher
18   dosage of Aspirin that had to be prescribed.
19   Q   When you saw the Defendant or the other staff in the
20   exam room, other doctors that you've mentioned how long
21   would they spend with you and Eric in the exam room?
22   A   Not very long.  15 minutes.
23   Q   Now, during this time that Eric was going to the
24   Defendant's clinic, did he have back surgery?
25   A   Yes, he did.
```

1    Q   And did that help his back?

2    A   No, it did not.

3    Q   Did he continue to go to the clinic after that

4    surgery?

5    A   Yes, he did.

6    Q   You mentioned the list of drugs that were prescribed

7    to him.  Was that pretty typical for each visit?

8    A   Yes.  It was a mixture of them.  He didn't always

9    get the Percocets when he got the Lortabs.  Didn't

10   always get the Oxycontins when he got the Methadone but

11   he had always gotten two or three or four prescriptions.

12   Q   Every time?

13   A   Every time.

14   Q   At some point during the time frame we're talking

15   about, did you become concerned about the medications

16   that Eric was taking?

17   A   Yes, I did.

18   Q   That were prescribed by the clinic?

19   A   Yes, I did.

20   Q   Why were you concerned?

21   A   He just wasn't my teddy bear any more.  He was just

22   so out of himself.  He was sleeping.  He just did not

23   act like himself any longer.

24   Q   How long did you understand the drugs were supposed

25   to last that were prescribed at each of these

2802

```
 1   appointments that he had at the clinic?

 2   A   30 days.

 3   Q   Did they last that long?

 4   A   No, they didn't.

 5   Q   Why not?

 6   A   I think he took more than he was supposed to take.

 7   Q   Did you ever tell anyone at the clinic about your

 8   concerns?

 9   A   Yes.

10   Q   And who did you talk to?

11   A   Yes, I did.  I called up and had talked to the

12   receptionist.  I believe her name was Brenda.

13   Q   What did you tell her?

14   A   I told her that my husband I believed was abusing

15   his medication.

16   Q   And did Eric and you return to the clinic even after

17   this phone call?

18   A   I don't know if I did.  I don't recall.  But Eric

19   did, yes.

20   Q   Did he still get prescriptions from the clinic after

21   that phone call?

22   A   Yes, he did.

23   Q   Did you become aware of Eric maybe selling some of

24   the drugs that he obtained from the Defendant's clinic?

25   A   Yes.
```

1    Q    Do you know why he sold those drugs?

2    A    Pay the bills.

3    Q    And, ma'am, did Eric's health get better during the

4    time that he was seeing the staff at the Defendant's

5    clinic?

6    A    No.  He was able to do more; but as far as get

7    better, no.

8    Q    How did his health change?

9    A    He just seemed to withdraw.  He just started losing

10   weight.  He just looked gaunty, sickly.

11   Q    Did his behavior change?

12   A    Yes.  He was very much a family man before.  He just

13   really didn't wanna do anything any more besides watch

14   television.

15   Q    Was he as strong as when you first met him towards

16   the end of his life?

17   A    No.

18   Q    Can you describe briefly for us the last day that

19   you saw Eric?

20   A    Yes.  We just had our grandbaby two weeks prior.  I

21   came home from work.  We were supposed to watch the

22   grandbaby the next day.  And I come walkin' up to the

23   door and he had the house spic and span.

24   Q    Was that unusual for Eric?

25   A    Yes.

1    Q    Why?

2    A    Eric didn't clean house.  And he handed me paper

3    towels as I came in because we were cleanin' windows.

4    And I thought, why do we need to clean windows.  But we

5    did.  Got the house all cleaned.

6    Q    Why was he cleaning the house?

7    A    For the grandbaby to come over.  Then we went to get

8    pizza.  I wanted to have it at home but we went ahead

9    and had pizza there.  I noticed him --

10   Q    You went to the restaurant to eat?

11   A    We went to the restaurant, Pizza Hut.  Noticed him

12   dozing off.

13   Q    Was that unusual?

14   A    Very unusual.

15   Q    And then what did you do?

16   A    I got the pizza to go, drove home, we got in the

17   house and he said he didn't feel well.  And I said why

18   don't you go to bed.  And like I said, it was a Friday

19   night.  Saturday morning I was waitin' on my daughter to

20   come home.  She came home.  I go back there to the bed,

21   my husband's laying diagonally across the bed and I just

22   kind of laughed at him and started rubbin' his back, and

23   he wouldn't, he wouldn't move.  So I pulled him over,

24   found that he was deceased.  Pulled him off the bed,

25   called 911, did CPR.  Ambulance came and took him to the

1    hospital.  And he later died Sunday morning.

2                MR. FLEENOR:  One moment, Your Honor.

3                        (Off-the-record discussion

4                        between counsel.)

5    BY MR. FLEENOR:

6    Q    I apologize.  Just a few more questions.  Did Eric

7    snore regularly when he would sleep?

8    A    No.

9    Q    Did you notice him snoring this time when you went

10   back to the bedroom before you realized the worst?

11   A    Prior, yes, he was snoring.

12   Q    Ma'am, do you know somebody or some people named

13   Danny C?

14   A    Yes.

15   Q    Do you know him by a different name?

16   A    I know a Danny C that is my husband's brother.

17   Q    Do you know another --

18   A    I know a Danny C which is Buckwheat I know him by.

19   His nickname.

20   Q    Were they related?

21   A    That would have been my husband's nephew.

22               MR. FLEENOR:  Your Honor, may I approach for

23   the purpose of identifying an exhibit.

24   BY MR. FLEENOR:

25   Q    I want to hand you what's been previously admitted

1    as Government Exhibit 1-A.

2         On Page 6, Counsel.

3         Do you recognize this person?

4    A   Yes.   That's Buckwheat.

5              MR. FLEENOR:   Nothing further, Your Honor.

6              THE COURT:   Yes, sir.

7              MR. WILLIAMSON:   Thank you, Your Honor.

8                        **CROSS EXAMINATION**

9    BY MR. WILLIAMSON:

10   Q   Hi, Miss Lori Lynn.   How are you?

11   A   Fine.

12   Q   This is a part of my job I don't particularly like

13   doing.   But you understand I have to ask you a few

14   questions.   Okay?   I'm going to attempt to be as

15   respectful as possible.   Won't pry too much into your

16   personal affairs but some of 'em may be just a little

17   relevant.   Okay?

18   A   Okay.

19   Q   If you need to take a break at any time, will you

20   just let me know?

21   A   All right.

22   Q   Okay.   And if I'm too mean, you can tell the Judge

23   and he'll get me.   Okay?

24   A   Okay.

25   Q   Before Eric began seeing Dr. Schneider, he had a

2807

```
 1    couple other doctors that he would see; correct?
 2    A    Yes.
 3    Q    Do you remember when he hurt his back?
 4    A    No.  It -- it was explained to us as just a disease
 5    that came on.  It just seemed to get worse after he hit
 6    the train.
 7    Q    Okay.  Do you know when that -- when you say hit the
 8    train.  Can you explain to us what you mean?
 9    A    Yeah.  We were coming home from a function at my
10    folks' house.  It was a real dark road.  They park like
11    black tanker trucks across the road.  And they live out
12    in the country, so it was real dark.  And just ran smack
13    into it.
14    Q    In a vehicle accident?
15    A    Yes.
16    Q    You just couldn't see it because it wasn't lit?
17    A    It wasn't lit, right.
18    Q    Were you in the car with him?
19    A    No.  He was in the car -- the truck with my son in
20    front of us and then I was in the car behind him with
21    the rest of my family.
22    Q    Okay.  And do you know when that happened?
23    A    I believe it was 1996.
24    Q    And do you know when he first started seeing a
25    physician for, I guess, right after that accident?
```

```
 1   A   Regularly he didn't start seeing one for quite a
 2   while.  I believe it was Ron Merrick.
 3   Q   Okay.  And I see those records.  I'm just going to
 4   see if I can find an early date.  While I'm looking for
 5   that date -- at some point Dr. Merrick refused to see
 6   Eric because he couldn't afford to pay a $128 bill?
 7   A   I'm not aware of that.
 8   Q   Let me see if I can find the date.  I think the
 9   earliest date that I see here is around 10-5 of '01.
10   Does that -- I have 10-4 of '01 as the first visit.  I'm
11   sorry, 8-30 of '01.  Does that sound familiar?
12   A   It could have been.
13   Q   Roughly around the area about August, 2001?
14   A   Yeah.
15   Q   Okay.  And when he started with Dr. Merrick, he was
16   going in for those issues that we talked about; correct?
17   A   Yes.  They would like massage his back and actually
18   had cracked his neck and did like heat on 'em, heat
19   massages.
20   Q   Okay.  And I'm going to hand you a note from Dr.
21   Merrick's 8-30-2001 visit.  Dr. Merrick -- we know this
22   S-O-A-P is SOAP.  So when you hear me say SOAP, I'm not
23   talking about, you know, what we normally talk about.
24   A   Right.
25   Q   Uhm, he states that the subjective complaint was
```

1    Eric -- Mr. Eric coming in with complaints of low back
2    pain.  And he discusses the accident about five or six
3    years ago in which he hit a train.  And that's the
4    incident that we're talking about?
5    A    Yes.
6    Q    And he noted that day there was a MRI that had
7    happened and then they discussed the disease in his
8    back?
9    A    Yes, that's the disease, yes.
10   Q    Okay.  And around this time it looks like Eric was
11   given a shot of Norflex and Stadol and then he had a
12   prescription for Lortab 7.5, number 45, and he was
13   supposed to take one every four to six hours for pain.
14   And then Vioxx was given as well and Skelaxin for muscle
15   spasm.  Did he go that route?
16   A    That sounds fairly right.
17   Q    Then they had the OMT, and that's the -- the D.O.'s
18   do that massaging and --
19   A    Uh-huh.
20   Q    Okay.  Now, would this represent as far as you can
21   remember like the first time that Eric began as a
22   regular regimen with a doctor because of his pain?
23   A    Yes.
24   Q    And was Eric truly in pain?
25   A    Yes.

```
 1   Q   He didn't start going to Dr. Merrick just to, quote,
 2   unquote, "score" some Lortab?
 3   A   No.
 4   Q   As you stated he wasn't even -- he didn't even like
 5   taking medicine until he had to take it absolutely?
 6   A   That's correct.
 7   Q   So when he would take his medicine, it's fair to say
 8   that you know he was in some pain?
 9   A   Yes.
10   Q   And it looks like Eric went back a couple times some
11   more for some Vioxx, some massage therapy.  And then it
12   looks like on 10-4 of '01, which is probably right at
13   that 30 days, he went in to refill his medication.  Was
14   that the customary, I guess, relationship he had with
15   Dr. Merrick at this time to go in, get a massage and if
16   he needed his medicine, they would refill it?
17   A   As far as I'm aware, yes.
18   Q   Okay.  And you understand -- would you agree with me
19   that, you know, Eric saw Dr. Merrick, Dr. Schneider and
20   he also saw another doctor, Dr. Brown.  Does that strike
21   you as familiar?
22   A   I don't remember a Dr. Brown.  He had a Dr. Brown
23   when he was a young kid.
24   Q   Okay.  I may just visit with you about that later.
25   But when he was visiting -- well, let's say with Dr.
```

1    Merrick, it looks like there were times he came in at

2    10-04-01.  Then he came back in at 10-23-01.  Even back

3    in 2001 when Eric was taking his medicine and getting

4    his massage therapies, would he only go in when he

5    believed he needed more medicine to take care of his

6    pain?

7    A    I would believe that to be, yes.

8    Q    Let me just show you these two notes.  I actually

9    circled one because sometimes I space off and I need to

10   pick up where I left off.

11       We have one visit -- and just so the jury knows,

12   I'm not showing this because it's not redacted so I want

13   to respect the patient privacy so we'll just talk about

14   on 10-4-01.  He went in to see Dr. Merrick and he got

15   the massage therapy that we talked about.  Looks like he

16   took care of some of his blood issues, you know, I guess

17   checking the blood.  Then he refilled his Lortab.

18   Norflex.  And gave him another Stadol shot.  Does that

19   look -- did I get that right?

20   A    That appears to be right, yes.

21   Q    And then on 10-23 he went back in, he got more

22   massage therapy, he had some Ibuprofen.  He also

23   received some Vioxx and they gave him his Lortab, they

24   refilled his Lortab again that day.  They discussed

25   talking about decreasing his Lortab intake.  Long time

2812

```
 1    treatment of a condition.  Yeah, and he was going to

 2    work to try to get off that Lortab.  Do you see that?

 3    A   Yes, I do.

 4    Q   Okay.  I know you haven't been siting here during

 5    the entire trial, but there have been some people that

 6    would say that because Eric came in three or four days

 7    early that he really wasn't in pain, he was just going

 8    in to try --

 9    A   I'm sorry.  He really wasn't what?

10    Q   Really was not in pain.  That he was just going to

11    get pain pills.  Would you agree that there were several

12    times that he went in could have been earlier than 30

13    days but he only went in when he felt like he needed the

14    medicine?

15    A   Yes.  Eric took medicine just when he needed it.

16    Q   Okay.  And I just want to show you the final

17    document that we have in the chart.  I guess, let me, I

18    guess I'll show you -- I guess these kind of go

19    together.  It looks like the last visit that Mr. Eric

20    had with Merrick occurred on 1-7 of '03.  Does that look

21    familiar?

22    A   As far as --

23    Q   Well, I'm sorry.  Do you see like January 7th on

24    here?

25    A   Yes.
```

2813

1   Q   And that -- and you see that's a visit and this one

2   he was also, you know, got some more OMT.  He got hot

3   pads.  He wasn't doing well.  They refilled the Lortab.

4   And I guess by this time he had started taking Soma?

5   A   Yes.

6   Q   Okay.  And then looks like he was given Dr. Brown's

7   name and phone number to call for pain management

8   appointment.  You're not familiar with that?

9   A   I don't know if it's the same Dr. Brown, like I

10  said, he went to as a child.

11  Q   Okay.  And it looks like here there's a statement

12  that discusses the charges, the OMT, you know, the

13  massage therapy that he would -- are you guys hearing me

14  okay?  No.  Okay.

15      It looked like that on 1-7 of '03 there was a

16  statement that talks about the services that occurred on

17  1-7-03 and it looks like there was a balance due of

18  128.16?

19  A   I see that.

20  Q   And it looks like in his record they said that they

21  won't see him again because he owed the $128.16?

22  A   I see that.  I wasn't aware of that.

23  Q   Okay.  Now, before we move on from this, when

24  Mr. Eric was seeing Dr. Merrick, he had a regular course

25  of taking his pain meds and getting like massage

2814

1    therapy, muscle relaxers and it looked like by the end

2    he was actually taking Soma?

3    A    Yes.

4    Q    Was he, was he getting better during that time

5    period or did you see him continue -- just his pain

6    continue to increase between like 2001 and 2003?

7    A    It was about an even keel.

8    Q    Okay.  And now we have records from a Dr. Brown in

9    the record, in the medical records.  And the first visit

10   I see with Dr. Brown occurs on -- I guess it would be

11   1-22 of '03.  Now, you're not familiar of him going to

12   see Dr. Doctor brown between 1-22 of '03 and March 3rd,

13   2004?

14   A    I'm not aware of that, no.

15   Q    Would there have been times he was able to go to see

16   another doctor besides Dr. Schneider without you knowing

17   about it?

18   A    Yeah.

19   Q    Were you working at this time?

20   A    I was working full time.

21   Q    And just so I'm clear, I saw in the note that you

22   had First Serve health insurance?

23   A    We had what?  I'm sorry.

24   Q    First Serve health insurance.  Do you remember that?

25   A    No, I don't.

2815

```
 1    Q    Never heard of it?  So I was just --

 2    A    Doesn't sound familiar.

 3    Q    Okay.  Now, you started seeing Dr. Schneider --

 4    excuse me -- Mr. Eric started seeing Dr. Schneider in

 5    2003, March 14th, 2003?

 6    A    I'm not aware of when he started.  I just know that

 7    I went with him.

 8    Q    Okay.  If the Government has like introduced medical

 9    records and the records show that he started like on

10    March 14, 2003, would you disagree with that?

11    A    Not if there's evidence.

12    Q    Okay.  And what I want to show you, what we have in

13    the records, is a message from Dr. Brown's office dated

14    March 20th, 2003.  Do you see that document?

15    A    Yes, I do.

16    Q    Okay.  Does that appear to be -- I'm sorry -- I'm

17    having to talk a little loud so they can hear me.

18    A    Okay.

19    Q    Does that appear to be a prescription for Eric T

20    dated 3-21 of '03 of Methadone, 10 milligrams, number

21    90?

22    A    Yes, it does.

23    Q    And it's signed by Ronald Brown?

24    A    Yes, it is.

25    Q    It states:  Patient called for refill, will pick up
```

2816

```
 1   after 12 today at KSRC?

 2   A   That's what it says.

 3   Q   Now, you gave a deposition before regarding the

 4   issues in this case; correct?

 5   A   I'm sorry.  I didn't hear the question.

 6   Q   A deposition?

 7   A   A deposition, yes.

 8   Q   Yes, ma'am.  And in the deposition you talked about

 9   the fact that Dr. Schneider did not do a physical exam

10   every time.  You remember those questions at all?

11   A   Yes, I do.

12   Q   And it didn't strike you as odd because Dr.

13   Schneider knew what was wrong with Eric?

14   A   That was his doctor.

15   Q   Yeah.  And Dr. Schneider even tried some of those

16   massage techniques on Mr. Eric as well?

17   A   Not that I seen.

18   Q   Okay.  If the records show that on, let's say, maybe

19   the first few visits that he gave OMT, are you saying

20   you know that didn't happen or just not that you

21   remember?

22   A   Not that I seen.  Any time I went with him, it was

23   not done.

24   Q   Okay.  And I think -- are you aware that -- well,

25   strike that.  You learned I guess during the course of
```

1    your deposition that Mr. Eric had began using marijuana?

2    A   Yes.

3    Q   When he was with this -- you didn't know that?

4    A   I knew he did one time.  He did it on July the 4th.

5    Q   Okay.

6    A   Recreational.

7    Q   Okay.  And when Eric was taking his medicines, would

8    his, would his pain actually -- he was actually able to

9    function when he was taking his medicine; correct?

10   A   Yes.

11   Q   I think you stated like -- I hate misquoting so let

12   me just pull it up real quick.

13        "That when he was taking his medicine he seemed

14   happy because he wasn't as -- his pain, he wasn't in

15   pain as much".  You remember that?

16   A   That's correct.

17   Q   When you guys were seeing these other doctors, was

18   anybody ever able to find a cure for his back issues?

19   A   What other doctors?

20   Q   Like Dr. Merrick?

21   A   Find a cure?  A hundred percent cure?

22   Q   Yes, ma'am.

23   A   No.

24   Q   Did Dr. Merrick tell him that best he could do was

25   just manage the pain for him and massage him and just

1    try to help him?

2    A    He also thought he should have surgery, back

3    surgery, physical therapy.

4    Q    Okay.  And that's when he did have back surgery?

5    A    Yes, he did.

6    Q    And he was with the Schneider clinic when he had

7    that back surgery?

8    A    He must have been.  It started in '03.

9    Q    And how did he respond after that back surgery.  Did

10   it make him better?

11   A    No.  He actually got worse.

12   Q    Okay.  Now, it seems from the records that we have

13   that Mr. Eric was also receiving medicine from this Dr.

14   Brown that you hadn't heard about as well as Dr.

15   Schneider.  He never told you about that?

16   A    No.

17   Q    Okay.  He never told Dr. Schneider about that at any

18   of the visits that you went?

19   A    That I went to?  Eric telling Dr. Schneider he was

20   seeing another doctor?

21   Q    Yes.

22   A    No.

23   Q    If you learned of that, you would have stopped it

24   immediately?

25   A    Yes.

2819

1    Q    And I guess did he previously have hand surgery as

2    well by a Dr. Poole?

3    A    No.

4    Q    No.  And when he wasn't taking his pain meds, I

5    think you described his pain as chronic and

6    excruciating.  Is that right?

7    A    Yes.

8    Q    Are there any words that can describe for us the

9    type of agony that you saw him in when he was actually

10   dealing with these pain issues?

11   A    Yes.  My husband never cried.  And I walked in on

12   him and he was crying.

13   Q    The pain had gotten that bad?

14   A    On some occasions, yes.

15   Q    Okay.  Did that type of pain start happening after

16   the back surgery or was that even before?

17   A    It was even before.  He fought having back surgery

18   done.  He was scared to have back surgery done.

19   Q    Okay.  Did you now -- did you learn that somebody

20   believed that Eric passed away because of an overdose of

21   medication?

22   A    An over -- an accidental overdose, a mixture.

23   Q    Okay.  And did Eric's father have heart issues as

24   well?

25   A    Yes.

```
 1    Q   And their family had -- I guess he had a family
 2    history of heart attacks and cardiac issues?
 3    A   Yes.
 4    Q   Now, when you ever visited the clinic and you saw
 5    Dr. Schneider, was he ever rude or mean to you?
 6    A   No.
 7    Q   Did he ever tell you you have to go wait in the car
 8    so me and Eric can do our thing in our little waitin'
 9    room?
10    A   No.
11    Q   Did he appear to really be trying to help Eric?
12    A   Yes.
13    Q   And you understand that he's human even though he's
14    a doctor?
15    A   But he is a doctor, yes.
16    Q   And even doctors can make mistakes?
17    A   Yes.
18                MR. WILLIAMSON:  I don't think I have anything
19    else.
20                THE COURT:  Mr. Byers?
21                MR. BYERS:  Nothing, Your Honor.
22                THE COURT:  Anything further.
23                MR. FLEENOR:  Very briefly, Your Honor.
24                          **REDIRECT EXAMINATION**
25    BY MR. FLEENOR:
```

2821

1    Q    You just had some conversation with defense counsel

2    about the effect the drugs had on Eric.  Did they effect

3    him physically?  Was there any one drug in particular

4    that effected him physically that you noticed?

5    A    There was a couple.  I mean, he just gradually just

6    started to deteriorate.  The Valiums made him goofy.

7    Q    When you say goofy, what do you mean?

8    A    He just kept fallin' asleep, dozing off.

9    Q    Did it effect -- did any of these drugs effect his

10   speech in any way?

11   A    Yes.

12   Q    How so?

13   A    His speech was slurred.

14   Q    In fact, did Eric think his speech was slurred when

15   you talked to him about it?

16   A    No.  Eric denied it.  For a long time.  And he had

17   called home one day and had left a message on the

18   answering machine and I saved that message.

19   Q    Did you play it for Eric?

20   A    I played it for him.  And he agreed.

21   Q    How did he sound on that message machine?

22   A    It was (Witness indicating.) like every word was

23   slurred.

24   Q    Was Eric able to work the entire time that he was

25   going to the Defendant's clinic?

2822

```
 1    A    No.

 2    Q    He stopped work eventually?

 3    A    He was on long term disability.  He was going to go

 4    back.

 5    Q    Did Eric drive even after taking the drugs that were

 6    prescribed by the clinic?

 7    A    Yes, he did.

 8    Q    Did that effect him in any way?

 9    A    Yes.  He couldn't -- he realized he couldn't drive

10    so he quit.

11    Q    Did he have any legal problems because of that?

12    A    Yes.

13    Q    What happened?

14    A    He was comin' home from someplace in his regular

15    vehicle, fell asleep.  He parked the car on 47th street

16    and fell asleep.  Cops hauled him off to jail.

17    Q    Was he put on diversion because of that?

18    A    Yes.

19    Q    Was he still on diversion even when he died?

20    A    He was supposed to go to court that week that he

21    died.

22              MR. FLEENOR:  Nothing further.

23              THE COURT:  Thank you, ma'am.  Call your next

24    witness please.

25              MR. WAMBLE:  Thank you, Your Honor.
```

2823

 1   Government would next call Cindy Curry.

 2                        **CINDY CURRY**

 3   Having been first duly sworn to tell the truth, the

 4   whole truth and nothing but the truth, testified as

 5   follows on:

 6                     **DIRECT EXAMINATION**

 7   BY MR. WAMBLE:

 8   Q    Can you please state your name.

 9   A    Cindy Curry.

10   Q    And, Ms. Curry, are you currently employed?

11   A    Yes, I am.

12   Q    And where are you employed?

13   A    Lowe's in Derby.

14   Q    Lowe's store in Derby?

15   A    Yes.

16   Q    Okay.  And how long have you been at Lowe's?

17   A    A couple months.

18   Q    And what are your duties there at Lowe's?

19   A    I'm a cashier.

20   Q    Have you had previous to your employment at the

21   Schneider Medical Clinic, any experience in the medical

22   field?

23   A    Yes, I have.

24   Q    And can you recount just the time that you were

25   there and various places where you were in the medical

2824

1    field?

2    A    Prior to Schneider Clinic back, in '87 I worked at

3    Northwest Orthopedic and Fracture Clinic in Spokane,

4    Washington.

5    Q    And what were your duties there?

6    A    I started as a file clerk and then moved up to case

7    manager.

8    Q    Then your next job in the medical field?

9    A    Sports Medicine Fairbanks, in Fairbanks, Alaska.

10   Q    And what were your duties there?

11   A    I started out as a receptionist.

12   Q    Did you begin your work at the Schneider Medical

13   Clinic approximately January of 2003?

14   A    Yes, I did.

15   Q    And did you leave the clinic around March of 2004?

16   A    Yes.

17   Q    And --

18            MR. WAMBLE:  Your Honor, I do believe we have

19   the demonstrative exhibit.  Government's Exhibit 162.

20   BY MR. WAMBLE:

21   Q    In your adult life, how many years would you say

22   that you were employed in the medical field?

23   A    Off and on 20.

24   Q    20 years?

25   A    20 years, off and on.

2825

```
 1    Q    Who hired you at the Schneider Medical Clinic?
 2    A    Linda Schneider.
 3    Q    And what was your first official position at the
 4    clinic?
 5    A    Receptionist.
 6    Q    And your duties as a receptionist?
 7    A    Answering phones, scheduling appointments, files,
 8    normal receptionist duties.
 9    Q    How long were you in the receptionist room.
10    A    Two or three months.
11    Q    While you were at the Clinic, do you recall patients
12    coming from long distances to visit the clinic?
13    A    Yes.
14    Q    Even out-of-state?
15    A    Yes.
16    Q    Can you tell us specific cities in states where
17    patients would come from?
18    A    Blackwell, Oklahoma.  Ponca City.
19    Q    Ponca City, Oklahoma?
20    A    Oklahoma.
21    Q    How about from far distances within the State of
22    Kansas?
23    A    Colby, Kansas, I believe.
24    Q    As a receptionist, what was your understanding as to
25    how often the patients were to be scheduled apart?
```

2826

1    A   Every ten minutes.

2    Q   And who first informed you about this scheduling

3    policy?

4    A   Linda.

5    Q   Linda Schneider?

6    A   Yes.

7    Q   And what was her policy?

8    A   She wanted us to schedule patients every ten minutes

9    to get 'em in and get 'em out.

10   Q   If a patient was in the exam room with a physician

11   or a physician's assistant longer than ten minutes, what

12   would happen?

13   A   She would knock on the door.

14   Q   She being Linda Schneider?

15   A   Linda would knock on the door, uh-huh.

16   Q   And what was the purpose of her knocking on the

17   door?

18   A   She wanted to hurry up and get to the next patient.

19   Q   While you were working as a receptionist, did the

20   Defendant Linda Schneider give you any instruction as to

21   what patients should be seen in which order?

22   A   Yes.

23   Q   And what was that direction?

24   A   She preferred insurance companies, Blue Cross, some

25   of the ones that would pay quicker.  She said she would

2827

```
 1    prefer that we got them in sooner.
 2    Q   So the policy was to arrange the patients perhaps in
 3    order of insurance?
 4    A   Yes.
 5    Q   And according to Linda Schneider, what would be the
 6    most preferred insurance company?
 7    A   She liked Blue Cross/Blue Shield.
 8    Q   And why was that the favorite?
 9    A   They paid quick.
10    Q   They paid quick?
11    A   Uh-huh.
12    Q   Least preferred insurance company?
13    A   Medicaid, First Guard, the state insurances.
14    Q   So if a Medicaid patient came in first and then 30
15    minutes later a Blue Cross/Blue Shield came in, who was
16    to be seen first?
17    A   Blue Cross/Blue Shield.
18    Q   And did you agree to arrange the patients in that
19    manner?
20    A   No.
21    Q   Can you give us a specific instance where you
22    confronted the Defendant Linda Schneider about this
23    insurance hierarchy?
24    A   We had been real busy and there was quite a few
25    patients in the waiting room.  And it ran into lunch and
```

2828

1    so we -- the doctors took a lunch break and then

2    afterwards she came to the back and was looking through

3    the charts and said she wanted this chart to go before

4    another chart.  And I had already said that this lady

5    and her baby had been in the waiting room for a long

6    time, and she said she didn't care and put the

7    patient -- I think it was with Preferred Plus

8    insurance -- up before the Medicaid patient.

9    Q    How did that make you feel?

10   A    Sad.  And angry.

11   Q    Were there any consequences if you decided that you

12   didn't want to rank the patients in that order?

13   A    Yes, I would be terminated.

14   Q    And was this from a request or statement from Linda

15   Schneider?

16   A    Yes.

17   Q    While you were working as a receptionist, did you

18   ever see any Medicaid patients pay with cash?

19   A    Yes.

20   Q    And why would the Medicaid patients pay with cash?

21   A    Because they had already came in for their monthly

22   visit and in order to be seen again, if they wanted to

23   be seen again, they were going to have to pay cash

24   because Medicaid wouldn't pay for it.

25   Q    Who required Medicaid patients to pay with cash?

2829

1    A    Linda.

2    Q    Schneider?

3    A    Yes.

4    Q    And in your prior medical experience -- you talked

5    about Alaska, I believe, and Washington?

6    A    Yes.

7    Q    Were you ever trained to notice drug-seeking

8    behavior?

9    A    Yes.

10   Q    What type of things in the past were you trained on

11   to see if a particular patient was drug-seeking?

12   A    Calling in a lot, making appointments over and over.

13   Sometimes they would be real irritable, agitated,

14   couldn't talk to 'em.  Couldn't, you know, please them

15   in any way.

16   Q    Based upon your prior experience in the medical

17   field and your observations at the Defendant's clinic,

18   did you see any people come into the Schneider Medical

19   Clinic that you thought were drug-seeking?

20   A    Yes.

21   Q    And how frequently would you see that?

22   A    Daily.

23   Q    And what did you see about the Defendant's patients

24   that caused you to think that they were drug-seeking?

25   A    Normally they were very irritable, agitated,

2830

```
 1    demanding.  Violent at times.
 2    Q    Did the police ever have to respond to the clinic?
 3    A    Yes.
 4    Q    Frequently?
 5    A    Couple times when I was employed there.
 6    Q    What was your next job after serving as a
 7    receptionist?
 8    A    Billing, coder.
 9    Q    Did you have any specific conversations with Linda
10    Schneider about the drug-seeking behavior that you saw?
11    A    Yes.
12    Q    What was her response?
13    A    That it was none of my business.
14    Q    As a biller and coder, what were your job
15    responsibilities?
16    A    To match the fee ticket, place it with the progress
17    note, the diagnosis on it, had to match the fee ticket
18    to make sure that they were being seen, what they were
19    being seen for, for insurance purposes.
20    Q    And just so we're clear, could you explain to us
21    what a fee ticket is?  Just real brief.
22    A    It's the sheet that you put on the front of the
23    chart and the doctor would mark it that if they were
24    coming in for a follow-up exam or if it was their
25    initial exam, what they were being seen for, low back
```

2831

```
 1    pain or whatever, headache.
 2    Q   Was it your job to bill what was indicated on the
 3    fee ticket?
 4    A   Yes.
 5    Q   After you were a coder and a biller, did you have
 6    any other jobs at the clinic?
 7    A   Yes.
 8    Q   And what was that?
 9    A   Medical assistant.
10    Q   And what were your duties in this position?
11    A   To call for the patient, put the patient in the
12    room, vitals, history, document for the doctor why
13    they're being seen.
14    Q   Did you see this as a promotion?
15    A   Yeah.  Yes, I did.
16    Q   And do you remember who promoted you?
17    A   Linda.
18    Q   Schneider?
19    A   Uh-huh.
20    Q   While you were working as a medical assistant, even
21    though you weren't a receptionist any more, did you
22    still continue to field telephone calls?
23    A   Yes.
24    Q   And why did you do that?
25    A   Sometimes it was so crazy that, you know, if you
```

2832

```
 1   heard the phone ringing a lot, we would just help out,
 2   grab it.
 3   Q   While you were employed at the Defendant's clinic,
 4   do you remember receiving phone calls from area
 5   emergency rooms about overdosing patients?
 6   A   Yes.
 7   Q   And did you speak to Defendant Steve Schneider about
 8   these calls from area emergency rooms?
 9   A   Yes.
10   Q   And what was his response?
11   A   Kind of nonchalant.  Just --
12   Q   Did he seem concerned at all?
13   A   No.
14   Q   Did you have these conversations with Defendant
15   Linda Schneider about the overdose calls coming in from
16   area emergency rooms?
17   A   Yes.
18   Q   And what was her response?
19   A   To field them all to her.  She wanted all of those
20   calls.
21   Q   Was there any implementation of procedures?  Was
22   there a meeting, was there anything done after you spoke
23   to both Defendants about area hospitals calling about
24   overdose patients?
25   A   Not a meeting.
```

1    Q   Was there anything in your opinion that was done to

2    address the issue?

3    A   Yes.  Linda wanted to make sure that we gave those

4    calls to her, not to bother Doctor.

5    Q   Do you recall a specific incident where you received

6    a call from an area emergency room and you used the

7    paging system at the Defendant's clinic?

8    A   Yes.

9    Q   Can you tell us about that?

10   A   The Coroner's office had called and was asking for

11   Dr. Schneider.  And he was in with a patient.  And we

12   were told to field the calls to Linda.  And they said

13   they had already left several calls for Linda and had

14   not received a phone call back and that they needed to

15   speak to her immediately.  And we could not find her so

16   I paged over the system that there was a call from the

17   Coroner's office.

18   Q   Do you remember as precisely as you can what exactly

19   you said over the intercom system?

20   A   I said there was a call from the Coroner's office on

21   whichever line for Linda.

22   Q   And did you have a discussion with Defendant Linda

23   Schneider about you paging over the intercom system?

24   A   Yes.

25   Q   And were you reprimanded for that?

2834

```
1    A    Yes, I was.

2    Q    And why were you reprimanded for that?

3    A    She did not want me to page that it was the

4    Coroner's office with other patients being in the lobby.

5    Q    I'd like to talk to you specifically about a

6    conversation that you overheard Defendant Stephen

7    Schneider talking about patients that were dying at his

8    clinic.  Do you remember that conversation?

9    A    Yes.

10   Q    Can you tell us about that conversation and

11   specifically the statements that you heard from the

12   Defendant Stephen Schneider?

13   A    He just didn't seem concerned, that it was just

14   another day, you know, at the clinic and that sometimes

15   you have to get rid of the bad grapes to make a good

16   one.

17   Q    And the bad grapes was -- who was he referring to?

18   A    Patients.

19   Q    Patients that were alive or patients that were dead?

20   A    Patients that were deceased.

21   Q    From what you could observe as a receptionist or

22   coder, and more specifically, a medical assistant, how

23   would you describe Defendant Steven Schneider's bedside

24   manner with patients?

25   A    Once again, nonchalant, kind of cold.
```

2835

```
1    Q   Did he seem compassionate?

2    A   No.

3    Q   Did he seem to care?

4    A   Not really, no.

5    Q   When you left the Defendant's clinic, did you quit

6    or were you fired?

7    A   I was terminated.

8    Q   And why were you terminated?

9    A   Because I refused to do some of the things that

10   Linda had asked me to do.

11   Q   And what type of things did she ask you to do?

12   A   Change progress notes, fee tickets, shred documents.

13   Q   As it refers to the fee tickets, is this something

14   that you didn't want to do because you thought it was

15   outside of your job description or you were being lazy?

16   Why did you not want to do it?

17   A   Because it wasn't right.

18   Q   And you said change fee tickets did you interpret

19   that to mean that she wanted you to do something

20   fraudulent?

21   A   Yeah, I felt that way.

22   Q   Did you ever see Defendant Linda Schneider alter

23   documents?

24   A   Yes.

25   Q   What type of documents?
```

2836

```
 1    A    Fee tickets, progress notes, referrals from other

 2    doctors in the area.

 3    Q    Prescription pads?

 4    A    Prescriptions.

 5    Q    Whose name did she sign on these documents?

 6    A    Dr. Schneider's.

 7    Q    So she would forge Dr. Schneider's name --

 8    A    Yes.

 9    Q    -- on prescription pads?

10    A    Yes.

11    Q    You talked briefly about written referrals.  In your

12    various positions at the clinic, were you involved with

13    the written referrals to other clinics and other

14    physicians?

15    A    Yes.

16    Q    Why is it important that there be a written referral

17    in a patient's chart?

18    A    Some of the insurance companies require that you

19    have a referral from another doctor to see another

20    doctor for whatever reason, and sometimes we wouldn't

21    get paid if we didn't have the referral.

22    Q    Did you ever see the Defendant Linda Schneider

23    handle the written referrals that were in the charts?

24    A    Yes.

25    Q    And did you see the Defendant Linda Schneider handle
```

1    the written referrals from other doctors?

2    A    Yes.

3    Q    And did this cause you any concern?

4    A    Yes.

5    Q    Why?

6    A    Because it wasn't proper.  She would change dates

7    and you can't -- you can't, you know, do anything to

8    medical documents without, like the doctor, that's the

9    only one who can do that.  And she does it quite

10   regularly.

11   Q    Was the purpose to perhaps maybe explain what was

12   going on or to correct something or was the purpose for

13   some other gain?

14   A    We would not get paid from the insurance companies

15   without having the proper documentation in the chart and

16   so if we didn't, she would make sure it was there.

17   Q    What, if any, other treatment other than the

18   prescription of narcotic drugs did you see going on at

19   the clinic?

20   A    None.

21   Q    You said nothing?

22   A    Nothing.  I apologize.

23   Q    How would you describe the working conditions at the

24   clinic?

25   A    Chaotic.  Very disorganized.  Unprofessional.

2838

1    Q   As far as the organizational structure of the

2    clinic, how was that?

3    A   Horrible.

4    Q   Were medical charts from the patients easily

5    accessible?

6    A   We had a file room but they weren't easily

7    accessible at all times, no.

8    Q   Were you ever asked to locate charts?

9    A   Yes.

10   Q   How often?

11   A   Daily.

12   Q   If the charts weren't in the file room, where's the

13   first place you would look?

14   A   Doctor's office.

15   Q   If they weren't in the doctor's office, where would

16   you go?

17   A   Linda's, office.

18   Q   If they weren't in Linda's Schneider's office, where

19   would you go?

20   A   X-ray room, lab -- they were -- the referral desk.

21   Q   If they weren't in that room, where would you go?

22   A   We just kept looking other places.  They would show

23   up everywhere.

24   Q   Was there a place in the clinic that you didn't find

25   files?

2839

```
 1    A    We didn't?

 2    Q    Yes.

 3    A    The bathroom.

 4    Q    To your knowledge the time period that you were

 5    there, were you moving or integrating some sort of

 6    electronic paperless system?

 7    A    No.

 8    Q    After you were fired, did you file for unemployment?

 9    A    Yes, I did.

10    Q    Did you receive it?

11    A    No.

12    Q    Were you ever threatened from anyone that worked at

13    the clinic?

14    A    Yes.

15    Q    Who?

16    A    Linda Schneider.

17    Q    Can you give us the nature of those threats?

18    A    Several times, others included also, she would

19    threaten us that if we didn't get our work done, we

20    wouldn't get paid; and we were, you know, six, seven

21    months behind in the billing department and so it was

22    kind of scary.

23    Q    What there any other threats that you remember?

24    A    Yes.

25    Q    Can you please tell us about it?
```

2840

1    A    She called me a busy-body and would threaten me that

2    I need to stay, you know, out of her business, it wasn't

3    my clinic and that she had connections with the Mexican

4    Mafia.

5    Q    Did you believe her when she said this?

6    A    Yeah, I did.  I really did.

7    Q    How often would she threaten you?

8    A    Oh, off and on over the course of the year that I

9    was there, probably five, six times.

10   Q    Do you remember a newspaper article in the

11   "Haysville Times" around April 23rd of 2004?

12   A    Yes.

13   Q    And without getting into the specifics of it, can

14   you give us, I guess, the gist of the article?  Was it a

15   negative portrayal or positive portrayal?

16   A    It was a negative portrayal.

17   Q    Of the Defendant's clinic?

18   A    Yes.

19   Q    Why would you call it negative?

20   A    Oh, they, you know, said that we had patients that

21   were waiting three, four hours in the waiting room, and

22   that it was unorganized, a lot of chaos, and that it was

23   dirty.

24   Q    Did you take issue with that article?

25   A    Yes, I did.

```
 1   Q    Did you contact or did anyone contact you from the
 2   newspaper about that article?
 3   A    Yes, they did.
 4   Q    Did you have anything to say about that harm?  How
 5   did you feel?
 6   A    I was upset at the fact that the employees there, we
 7   worked hard, and we did the best we could to make up for
 8   all the chaos.  And Haysville needed a clinic, you know,
 9   they needed a medical clinic.  And so we all wanted it
10   to succeed.
11   Q    Do you remember e-mailing someone to the clinic?
12   A    Yes.
13   Q    And in that e-mail did you speak in glowing terms of
14   the Schneider Medical Clinic?
15   A    I spoke in respect for my coworkers that I worked
16   with and for a couple of the other providers that were
17   there.  But as far as -- and like I said, the clinic, we
18   needed it there in Haysville.
19   Q    When you spoke in glowing terms about the clinic,
20   were you speaking directly about Defendant Steve
21   Schneider?
22   A    No.
23   Q    Were you speaking about Linda Schneider?
24   A    No.
25   Q    Who were you talking about when you said it was a
```

 1   wonderful place to work and wonderful people?

 2   A    My coworkers and a couple of the other providers

 3   that were there.

 4   Q    At some point -- at what point in your employment

 5   did your feelings about the Defendant Stephen Schneider

 6   or Linda Schneider change?

 7   A    Pretty soon after I was hired my feelings for Linda

 8   had changed and it took a while, you know, a few months

 9   after that, for Dr. Schneider.

10   Q    And what caused you to change?

11   A    It was just chaos.  It was stressful.  Things

12   weren't done right.  It was a very stressful

13   environment.

14   Q    Do you remember a man that worked at the clinic by

15   the name of Ulysses?

16   A    Yes.

17   Q    Who was he?

18   A    I'm not really sure who he was.

19   Q    Do you remember your first introduction to Ulysses?

20   A    Yes.

21   Q    Who introduced you to Ulysses?

22   A    Linda.

23   Q    Linda Schneider?

24   A    Linda Schneider.

25   Q    Did she tell you what his role was to be?

2843

```
 1    A   I was supposed to go to him with questions and
 2    concerns I had had with the clinic and not to bother the
 3    providers.
 4    Q   He was on staff at the clinic?
 5    A   Yes.
 6    Q   To your knowledge did he have any medical knowledge
 7    or training whatsoever?
 8    A   I don't think so, no.
 9    Q   Did he make any decisions, interact with patients on
10    a day-to-day level?
11    A   Yes.
12    Q   What types of things would you see him do?
13    A   He would talk to patients regarding their bill.  A
14    lot of times there was confusion over their bill and so
15    he would talk to them.  He would sometimes escort the
16    patients into rooms.
17    Q   Was the relationship between Linda Schneider and
18    Ulysses professional?
19    A   No.
20              MR. BYERS:  Objection, Your Honor.
21              THE COURT:  Sustained.
22    BY MR. WAMBLE:
23    Q   In terms of what you knew to be of Ulysses' role,
24    what was that?
25              MR. BYERS:  Objection, Your Honor.  Asked and
```

2844

1   answered.

2            THE COURT:  Is it different than what you've

3   already asked her -- him -- her, about Ulysses?

4            MR. WAMBLE:  Your Honor, I believe that she

5   stated that she didn't know specifically what his role

6   is but --

7            THE COURT:  Right.  You asked her what you

8   saw -- what she saw him do and she answered that.  Is

9   this something different now that you're headed into?

10            MR. WAMBLE:  Quite possibly, Your Honor.

11            THE COURT:  Go ahead then.

12   BY MR. WAMBLE:

13   Q   As far as his role at the clinic and his

14   relationship with Linda, was he a personal assistant?

15   What was his role that you could tell?

16            MR. BYERS:  Objection, Your Honor.  She

17   answered earlier she didn't know his role there and then

18   she said she saw him rooming patients and talking to

19   them about bills.

20            THE COURT:  Well, that -- if she saw him doing

21   something else, I'll hear her answer.  But if that's all

22   she saw him do, then it's time to move on.

23   BY MR. WAMBLE:

24   Q   What other things did you see Ulysses do at the

25   Schneider Medical Clinic?

1    A   He was very unprofessional, very -- I was very

2    uncomfortable --

3              MR. BYERS:  Objection, Your Honor.

4    Nonresponsive.  That's not doing something.

5              THE COURT:  Sustained.

6    BY MR. WAMBLE:

7    Q   I'll reask the question again.  What other things

8    did you see Ulysses do other than room patients and

9    interact with patients?

10   A   He was inappropriate.

11   Q   With whom?

12   A   Linda Schneider.

13             MR. BYERS:  Objection.  Relevance, Your Honor.

14             MR. WILLIAMSON:  Your Honor, beyond that --

15             THE COURT:  Sit down.  This is -- this doesn't

16   concern Dr. Schneider.  The objection is sustained.

17             MR. BYERS:  Thank you, Your Honor.

18             MR. WAMBLE:  May I have a moment, Your Honor?

19             THE COURT:  You may.

20                     (Off-the-record.)

21             MR. WAMBLE:  Nothing further, Your Honor.

22   Thank you.

23             THE COURT:  I've go an appointment at 4:30,

24   Ladies and Gentlemen.  Would you like a short recess or

25   would you like to keep going?

2846

```
 1                    (Off-the-record.)

 2          THE COURT:  Keep going.  All right.  Mr.

 3   Byers, are you first?

 4          MR. BYERS:  I think Mr. Williamson is going to

 5   go first, Your Honor.

 6          THE COURT:  All right.

 7                   CROSS EXAMINATION

 8   BY MR. WILLIAMSON:

 9   Q    How are you doing?

10   A    Okay.

11   Q    We've never had a chance to meet before, have we?

12   A    No.

13   Q    I'm Mr. Williamson and I represent Dr. Schneider.

14   Okay?

15   A    Nice to meet you.

16   Q    Just want to ask you a few questions.  Mainly

17   focusing in on what you remember in regards to certain

18   interactions with Dr. Schneider.  Okay?

19   A    Okay.

20   Q    You started with the clinic in January of 2003?

21   A    Yes.

22   Q    And the clinic had just recently opened up; correct.

23   A    I believe so.

24   Q    And you were there for a year?

25   A    Yes.
```

1    Q    And you didn't go back and regularly visit the

2    clinic after you were terminated, did you?

3    A    No.

4    Q    Do you know what day you were terminated?

5    A    Not for sure which day, no.

6    Q    It was in March of 2004?

7    A    I believe so.

8    Q    Okay.  About March 13th or so?

9    A    Maybe.

10   Q    Now, when you first started at the clinic, was it

11   already busy or did it start getting busy after you

12   worked there?

13   A    It was already busy.

14   Q    Okay.  And do you know how many providers were there

15   when you started?

16   A    Four.

17   Q    You were hired initially for what position?

18   A    Receptionist.

19   Q    And then you were moved down, or I guess physically

20   moved down but received a promotion to the billing

21   department?

22   A    Yes.

23   Q    And I think you said while you were in billing

24   because you guys were so busy you would get six to seven

25   months behind in billing?

1    A    Yes.

2    Q    And then you were moved upstairs again to medical

3    assistant?

4    A    Yes.

5    Q    Now, you stated that you would take emergency room

6    calls; correct?

7    A    Yes.

8    Q    How often would you talk to Dr. Schneider outside of

9    these calls that you testified about?

10   A    Repeat that.

11   Q    How often would you talk to Dr. Schneider just in

12   casual conversation?

13   A    Occasionally.

14   Q    Okay.  And Dr. Schneider has, would you agree, that

15   he's always been a laid back personality?

16   A    Yes.

17   Q    You never seen him overly excited, running around

18   shouting and those kind of things; correct?

19   A    Correct.

20   Q    Okay.  I think generally people have described him

21   as a nice guy.  Would you disagree with that?

22   A    I wouldn't disagree.

23   Q    Okay.  But you didn't have a relationship with Dr.

24   Schneider outside the clinic like you would go over to

25   his house or and hang out or anything; correct?

2849

1    A    Oh, no.

2    Q    And you didn't have an especially close relationship

3    with Linda Schneider either; correct?

4    A    No.

5    Q    Okay.  Now, first talking about these ER visits.

6    You said you would talk to Steve when you received some

7    calls; correct?

8    A    Yes.

9    Q    Okay.  You wouldn't necessarily use the terms

10   overdose when you would talk to Steve about those calls;

11   correct?

12   A    No.

13   Q    You would just say there's a doctor calling from Via

14   Christi on the phone; correct?

15   A    Yes.

16   Q    And I'll wait for a yes or no because Miss Cindy has

17   to write down -- type down your answer and it's hard to

18   type down a nod.  Okay?

19   A    Okay.

20   Q    Now, when you would talk to Steve, you wouldn't

21   follow him around the rest of the day to find out what

22   he did; correct?

23   A    I would follow him -- repeat that.

24   Q    You would not follow him around after you had that

25   conversation; correct?

2850

1    A    Correct.

2    Q    He would go back and finish taking care of whatever

3    patients he was dealing with; correct?

4    A    Yes.

5    Q    And so you don't know if he called people back?  You

6    don't know if he went in his office and reviewed charts?

7    You just really don't know; correct?

8    A    No, that's wrong.

9    Q    No?

10   A    No.

11   Q    I'm sorry.  Okay.  Let me rephrase it.  Let me see

12   if we can clear this up here.  After you would talk to

13   Steve about some of these calls that he would receive,

14   you don't know what he did physically after you had

15   those conversations?

16   A    I don't know what he did physically, no.

17   Q    Do you know how many of these calls you remember

18   having or discussions you had with Steve?

19   A    Just a couple, just a few with him.

20   Q    Okay.  Now, you stated that you believed that a lot

21   of the people in the patients (sic) were drug-seeking.

22   You remember that?

23   A    Yes.

24   Q    And when did you first notice this?

25   A    After I worked there a little while as a

2851

1    receptionist, I had noticed.

2    Q   Okay.  So roughly around what, January, February,

3    2003, you believe you started seeing drug-seeking

4    patients there?

5    A   I don't recall the exact time.

6    Q   Now, with these people that you saw, why do you

7    think they were drug-seeking?  Because they were, they

8    were agitated and their behavior was different?

9    A   Yes.

10   Q   And would you also agree that there was a large

11   number of patients at the clinic that would be termed

12   lower class?

13   A   I don't like to use the word lower class.

14   Q   I don't either.  How would you term it?  You said

15   drug-seekers.  I'm trying to see if there's another term

16   we can --

17   A   You don't have to be lower class to be a

18   drug-seeker.

19   Q   So you saw upper class drug-seekers around 2003 come

20   into the clinic?

21   A   I saw numerous people come into the clinic seeking

22   drugs.

23   Q   Okay.  And this is in 2003 you see all of this;

24   right?

25   A   I believe so.

2852

1   Q    Can you show us a written complaint that you made

2   regarding those drug-seekers to the Kansas Board of

3   Healing Arts?

4   A    No.  I went to Linda with it.

5   Q    You didn't feel like Linda would do anything based

6   on your prior testimony; correct?

7   A    After I got to know her, I knew she wasn't going to

8   do anything.

9   Q    So you see these drug-seekers coming to this

10  doctor's office.  Did you go talk to the medical

11  society?  Did you send a letter to them?

12  A    No.

13  Q    Did you send a letter to any, any, let's say,

14  Medicaid, did you send a letter to Medicaid saying, hey,

15  all these drug-seekers are in here, come do something

16  about it?

17  A    Not at that time.

18  Q    Did you file a written complaint with Dr. Schneider

19  and say, hey, Dr. Schneider, here are these

20  drug-seekers?

21  A    No.  I didn't.

22  Q    Now -- and this is happening in 2003.  You didn't

23  quit then, did you?

24  A    No.  I didn't quit.

25  Q    You continued working?

2853

```
 1    A    I sure did.

 2    Q    Helping serve all these drug-seekers?

 3    A    No.

 4    Q    No?  You were --

 5    A    Helping patients.

 6    Q    You were a medical assistant, weren't you?

 7    A    For about a month at the very end.

 8    Q    Okay.  You didn't say, you know, I don't want to go

 9    up there and deal with these patients because they're

10    drug-seekers, did you?

11    A    No.

12    Q    Now, you also -- you had a little crew you liked to

13    hang with at the clinic, correct?

14    A    Sure.

15    Q    Angela Dunnavent?

16    A    There was a few of us that we got to know each other

17    and enjoyed each other's company.

18    Q    Angela Dunnavent was one?  Jamie Hilliard?  Is that

19    a yes to both?  I'm sorry.  I saw the nod but --

20    A    Angela, uhm, I don't recall the last name, I don't

21    recall that, but Jamie --

22    Q    You remember?

23    A    I do remember Angela.

24    Q    You remember Angela.  You just don't remember her

25    last name?
```

2854

```
 1   A   I don't think it was Dunnard (sic) at the time.

 2   Q   Dunnavent?

 3   A   I'm not sure.

 4   Q   Not sure?

 5   A   No, it's been a long time.

 6   Q   Okay.  I understand that.  You do remember Angela;

 7   correct?

 8   A   I do.

 9   Q   And you guys were friends; correct?

10   A   Yes.

11   Q   And there was Jamie Hilliard, you guys were friends;

12   correct?

13   A   Yes.

14   Q   And who else was it -- I think there was one or two

15   more of you guys that liked to hang out together.  I'm

16   drawing a blank.  Can you --

17   A   I don't recall.

18   Q   Okay.  But you definitely remember Jamie and

19   definitely remember Angela?

20   A   Yes.

21   Q   Okay.  Now, when you received these calls from the

22   ER, you didn't quit employment then, did you?

23   A   No.

24   Q   Okay.  You continued to work there; correct?

25   A   I did.
```

2855

1    Q    Now, isn't it true that you were disciplined by the

2    clinic for beating up a pregnant girl?

3    A    That is not correct.

4    Q    It's not?

5    A    No, that is not correct.

6    Q    You don't remember a complaint made by a Brenda --

7    Brenda Byer --

8    A    Yes, I do.

9    Q    And was that complaint that they saw you in the

10   parking lot pushing a pregnant girl into a car?

11   A    That is incorrect.

12   Q    That's not what the complaint was?

13   A    That is not what the complaint was.

14                         (Off-the-record discussion

15                          between counsel.)

16   BY MR. WILLIAMSON:

17   Q    So, you were asked by the prosecution about an

18   e-mail.  You remember that?

19   A    I sure do.

20   Q    Okay.  So -- and you remember you wrote this e-mail

21   around March 7, 2004?

22   A    Okay.

23   Q    Do you?  Yes or no.

24   A    Yes.  Okay.

25   Q    And in this e-mail you made several statements about

2856

1    the clinic; correct?

2    A    Yes, I did.

3    Q    And before we talk about this e-mail, you never

4    heard Dr. Schneider come to you or any other employee

5    and say, hey, guys, you know what, let's just start

6    giving out pain medicines to people even though they

7    don't need it, let's just, let's forget medicine.

8    Correct?

9    A    Correct.  Why would he?

10   Q    Right.  You never heard -- overheard him and another

11   provider talking saying, hey, you know, let's be the

12   biggest drug pushers in Haysville.  Correct?

13   A    Correct.

14   Q    Okay.  Kind of sounds silly, doesn't it?

15   A    Yes.

16   Q    And when you were a medical assistant, did you ever

17   work directly with Dr. Schneider?

18   A    I would room his patients for him.

19   Q    Okay.  And you never heard any complaints about him

20   being rude or mean to patients; correct?

21   A    That's incorrect.

22   Q    You did hear about Dr. Schneider being rude?

23   A    Yes.

24   Q    Who told you that?

25   A    Several patients did not like his bedside manner and

```
 1    that's where it was left at.

 2    Q   Give me a couple of names?

 3    A   Give you a couple of names.  I don't have any names.

 4    Q   Well, you making this general allegation about these

 5    several people --

 6    A   Well --

 7    Q   -- tell me a name.  Give me one name.

 8    A   I don't --

 9           MR. WAMBLE:  Objection, Your Honor.  Asked and

10    answered.

11    A   I don't recall names.

12           THE COURT:  She can't recall any names.

13    BY MR. WILLIAMSON:

14    Q   All right.  You can't recall any names so I can't go

15    interview these people to determine whether or not they

16    agree with your statement?

17           MR. WAMBLE:  Objection, Your Honor.  Asked and

18    answered twice.  And argumentative.

19           THE COURT:  It's argumentative.

20    BY MR. WILLIAMSON:

21    Q   Now let's turn back to this -- well, strike that.

22        When you heard these complaints, did you file any

23    written complaints about this alleged bad behavior?

24    A   No.  It wasn't my place.

25    Q   You cared about the patients, didn't you?
```

2858

1    A    Yes, I did.

2    Q    Okay.  And you didn't quit when you heard about

3    these complaints, did you?

4    A    No.

5    Q    You continued to work as a medical assistant until

6    until you were terminated; right?

7    A    Sure, yes.

8    Q    Now, you have an e-mail where you contacted the

9    Haysville times; correct?

10   A    Correct.

11   Q    Okay.  So right now -- and this was done on March 7,

12   2004.  So as of now, you see all this bad behavior, you

13   don't contact any enforcement agencies, and then you

14   have an e-mail that goes to the "Haysville Times".  So

15   let's talk about what's in here.  You actually started

16   writing this e-mail at about 3:45 a.m. on a Sunday

17   morning; correct?

18   A    Correct.

19   Q    And you finished the e-mail about 5:42 a.m.,

20   correct?

21   A    Correct.

22   Q    You spent almost two hours writing that e-mail and

23   this e-mail -- matter of fact, let's -- I'm going to

24   have you take a look at it.  I may be missing it.  I

25   don't claim to be perfect.

2859

1    A    Thank you.

2    Q    You're welcome.

3    A    I'm not perfect either.

4    Q    Tell me in that e-mail where you state that the

5    clinic is treating drug-seeking patients?

6    A    Repeat that.

7    Q    Look in the e-mail and tell us where you state that

8    the clinic is treating drug-seeking patients?

9    A    It's not in this.

10   Q    Look at the e-mail and tell us where this first

11   public statement that you make where you state that Dr.

12   Schneider was rude to patients?

13   A    It's not in here.

14   Q    Look in there and state where --

15   A    Have you read it?

16   Q    Okay.  It's nowhere in there in this public

17   statement that you give that Linda Schneider was asking

18   you to forge records?  It's not in there, is it?

19   A    No, it's not.

20   Q    Don't look at me like that.  That's your e-mail --

21   A    No, it's not.

22   Q    And you had a chance during that two hours when you

23   were drafting this e-mail to put all this damaging

24   information, you could have confirmed that story that

25   went out; correct?

1    A    My thought process when I was writing this e-mail

2    was on behalf of my coworkers and that we were working

3    hard at trying to make it a better clinic.

4    Q    Okay.  In that e-mail do you state me and my

5    co-workers are trying to make it better but our

6    management sucks?  Do you say that in there?

7    A    No.  But you wouldn't have either.

8    Q    You don't know what I would do, ma'am.

9         Let's talk about what you actually did state in

10   there.  You state -- you stated that it is stressful;

11   correct?

12   A    Yes.  It was stressful.

13   Q    But you also stated that other medical clinics are

14   stressful, too; correct?

15   A    Yes.

16   Q    So you didn't say everything a hundred percent

17   positive in this article; correct?  Or in this e-mail;

18   correct?

19   A    Correct.

20   Q    And let's see, what else, you criticized the people

21   who went to the newspaper saying did they try to help

22   make it better.  Correct?

23   A    Correct.

24   Q    You stated that the clinic was doing a good thing

25   because they were staying open seven days a week trying

2861

1   to help these people in Haysville; correct?

2   A   Yes.

3   Q   You said it was a good thing that the clinic was

4   trying to see people the same day that they had a

5   problem; correct?

6   A   Correct.

7   Q   And that was something unique to Haysville; correct?

8   A   Yes, it was.

9   Q   Now, the clinic didn't just see pain -- people in

10   chronic pain, did they?

11   A   No, not only.

12   Q   They accepted all patients.  They had people from

13   babies to older individuals; correct?

14   A   Yes.

15   Q   Dr. Schneider was actually part of a hospital

16   nursinghome, wasn't he?

17   A   Yes.

18   Q   Wasn't he like a chief or something like that?  Very

19   high up over there.  Do you remember?

20   A   I'm not sure on that.

21   Q   But, you know, he would go take care of individuals

22   in the nursinghome?

23   A   Yes.

24   Q   You stated you value your job and the friends that

25   you have made at SMC; correct?

2862

1    A    Yes, and I did.

2    Q    And you stated that, yes, we do need to do some

3    things differently; correct?

4    A    Yes.

5    Q    Now, you understand that medical clinics are -- can

6    be subject to the same inefficiencies as any other

7    business, don't you?

8    A    Yes.

9    Q    Disorganization.  You said that happened; correct?

10   A    Yes.

11   Q    Getting behind.  That happened?

12   A    Yes.

13   Q    But you and the other employees, according to your

14   e-mail on March 7th of '04, were doing -- the clinic was

15   doing its best to try to help the people of Haysville.

16   That was the sentiment of your e-mail; correct?

17   A    Yes.

18   Q    And that people should step up and try to help

19   instead of just sittin' back criticizing; correct?

20   A    Correct.

21   Q    Why not -- you also asked these people should offer

22   suggestions, come talk to us, help us, help us try to

23   make this a better place; correct?

24   A    Yes.

25   Q    Quote "To the providers at Schneider Medical Clinic,

2863

```
 1    I commend you for what you do, and I respect you for all

 2    your long hours you put in to helping sick people get

 3    the medical care they deserve.  And to those of you who

 4    may read this, please remember that the employees at the

 5    Schneider Medical Clinic are doing the best they can to

 6    be there for you and your families."  Do you see that?

 7    A    I wrote it.

 8    Q    You wrote that, didn't you?

 9    A    There's other providers there.

10    Q    Absolutely.  Dr. Schneider was not the only

11    provider; correct?

12    A    No, he was not.

13    Q    You didn't say to the providers, everybody except

14    Dr. Schneider, did you?

15    A    No.

16    Q    You did not have to write this e-mail, did you?

17    A    No.

18    Q    Glowing recommendations identifying -- or, excuse

19    me -- acknowledging that things could get better on

20    March 7 of '04.  After that, you were terminated about a

21    week later; correct?

22    A    I was.

23    Q    Linda Schneider terminated you; correct?

24    A    She did.

25    Q    She refused to give you your unemployment, didn't
```

2864

1   she?

2   A   Yes.

3   Q   Now, about a month after you were terminated you

4   went back to the Haysville newspaper, didn't you?

5   A   I don't recall.  I don't remember.

6   Q   You don't recall giving the "Haysville Times" a

7   story to Angie Gumm --

8   A   No.  Remind me.

9   Q   I'll let you take a look at the article and see if

10  that refreshes your memory.

11                     (Off-the-record.)

12  A   Okay.

13  Q   Does that refresh your memory?

14  A   Yeah, a little bit.

15  Q   All right.  May I take a look, please.  Your memory

16  refreshed?

17  A   Yeah.

18  Q   Okay.  So you remember about a month after you were

19  terminated from the clinic you went to the "Haysville

20  Times" reporter named Angie Gumm; correct?

21  A   I did not go to her.

22  Q   She came to you; correct?

23  A   Correct.

24  Q   And you started talkin' to her this time, didn't

25  you?

1    A    Yes.

2    Q    Okay.  Now, after you were terminated, your story

3    changed dramatically from that March 7, 2004, e-mail;

4    correct?

5    A    Did you notice whose name I named in that article?

6    Q    Yeah.  I noticed a lot of stuff.  Let's talk about

7    that.  You state after you're terminated -- by the way,

8    you state that Linda signed prescriptions, fee tickets,

9    and progress notes for the doctor.  You told 'em that;

10   correct?

11   A    Yes.

12   Q    So after you were terminated, you let this spill;

13   but before you terminated, glowing praises for the

14   clinic?

15   A    For the employees.

16   Q    And providers?

17   A    And a couple of the providers, yes.

18   Q    Did you say a couple of providers in the e-mail?

19   A    No, I did not.

20   Q    Okay.  Now, when you decided to talk to Angie Gumm,

21   you did not first go to the Kansas Board of Healing Arts

22   and say this place is out of control, did you?

23   A    Not at that time.

24   Q    You didn't go to the Wichita Medical Society and

25   say, hey, this clinic is out of control, did you?

2866

1    A    No, I did not.

2    Q    You didn't go to the Attorney General and say, hey,

3    this place is out of control, did you?

4    A    No, I did not.

5    Q    You went to the newspaper.  Your intention was to

6    hurt the people at the clinic at this point, wasn't it?

7    A    No.

8    Q    It wasn't to try to help anybody?

9    A    No, it wasn't to hurt.  Not at all.

10   Q    Okay.  Just -- I may be missing it and I apologize

11   if I -- am, but can you look at this article and tell me

12   where you mention anything, any negative statement about

13   Dr. Schneider?

14   A    I don't believe that I did.

15   Q    You didn't tell the newspaper that you were

16   complaining to Dr. Schneider about drug-seekers in

17   there, do you?

18   A    No.

19   Q    You don't state in there that Dr. Schneider seemed

20   nonchalant about your reports about emergency room calls

21   coming in from various hospitals; correct?

22   A    No.

23   Q    Your attack in that article is directed towards

24   Linda Schneider, not Dr. Schneider; correct?

25   A    That's what it seems like, yes.

2867

1              MR. WILLIAMSON:  I don't have anything

2     further.

3              THE COURT:  Sir.

4              MR. BYERS:  Thank you, Judge.

5                    **CROSS EXAMINATION**

6     BY MR. BYERS:

7     Q    Good afternoon.

8     A    Hi.

9     Q    Ma'am, do you remember your deposition from November

10    19th, 2008?

11    A    A little bit of it.

12    Q    Okay.  You were deposed; right?

13    A    Yes, I was.

14    Q    Have you given more than one deposition relative to

15    your time working at the Schneider Medical Clinic?  I'm

16    just talking civil depositions right now.

17    A    Oh, no, just the one.

18    Q    One deposition.  Okay.  At that point in time were

19    you represented by an attorney?

20    A    Yes.

21    Q    Was that Tina Hungington?

22    A    Yes, it was.

23    Q    Is she in this room today?

24    A    No.

25    Q    She's not here.  Was she paid by you to represent --

2868

1    A    No.

2    Q    -- yourself at the depo?  Who paid her?

3    A    I'm not sure.

4    Q    Okay.  Was that deposition taken by Larry Wall?

5    A    Yes, it was.

6    Q    Okay.  And you also gave grand jury testimony on

7    October 5th, 2005; correct?

8    A    Yes.

9    Q    And how many times have you spoken with

10   investigators since you left employment with the

11   Schneider Medical Clinic?

12   A    Just those -- just at the deposition and the grand

13   jury.

14   Q    You never talked to investigators from KBI or HHS or

15   OIG or any other kind of acronym?

16   A    Not that I recall.

17   Q    Okay.  In that deposition do you recall being unable

18   to confirm that you wrote that e-mail Mr. Williamson was

19   asking you about?

20   A    I was a little confused on the dates.  But then

21   after reviewing it, I do, I do remember.

22   Q    Okay.  But you never did admit during that

23   deposition that you wrote the e-mail, did you?

24   A    I don't remember.  I don't recall.

25   Q    That's fine.

2869

1    Q    Now, assuming what you say is true about Linda

2    shuffling various insurance plans around as far as their

3    order of patients, is it your view that's some kind of

4    criminal conduct?

5    A    Possibly.

6    Q    And what crime would that be?

7    A    Well, maybe not criminal.  Morally, it wasn't right.

8    Q    So it's not a crime in your view of the world?

9    A    Probably not.

10   Q    Okay.  You remember talking about in direct

11   examination with the Government that patients would be

12   irritable there at Schneider Medical Clinic?

13   A    Yes.

14   Q    Agitated?

15   A    Yes.

16   Q    Violent?

17   A    Yes.

18   Q    Okay.  The day you had the confrontation with the

19   coworker in the parking lot, were you irritable,

20   agitated and violent?

21   A    I was irritable, agitated.  I wasn't violent.

22   Q    And didn't you try to explain away this as rather

23   than an assault that ended up in a temporary restraining

24   order against you, rather you were trying to hug the

25   other worker?

```
 1   A   I was trying to calm her down, yes, that is correct.
 2   Q   So if there are written statements in your personnel
 3   file -- you got disciplined for that event, didn't you?
 4   A   Yes, I did.
 5   Q   By Linda Schneider?
 6   A   Yes, I did.
 7   Q   And you refused to sign that disciplinary write-up,
 8   did you not?
 9   A   I refused.
10   Q   And why was that?
11   A   Because it was misunderstood.  It was -- she had no
12   part -- it was none of her business.
13   Q   Didn't you essentially feel like it had nothing to
14   do with the clinic even though it was in the clinic
15   parking lot with a clinic worker in front of clinic
16   patients?
17   A   There were no patients around.
18   Q   And why was that?
19   A   Because we were in the work parking lot off to the
20   side.
21   Q   Isn't the place always loaded with patients per your
22   testimony?
23   A   Yes.
24   Q   Couldn't patients have seen you throwing another
25   worker against the car?
```

2871

```
 1    A    There's no windows on that side.

 2    Q    And so if there are other workers who testified or

 3    who made statements such as "Cindy lost control" and

 4    "that's when this other person had to get in your face

 5    and break you up", that person is lying?

 6    A    Not lying.  It might have looked that way but it was

 7    not -- it was misconstrued.

 8    Q    Were you sent home after that event?

 9    A    Yes.

10    Q    Were you disciplined in any other fashion as you

11    recall?

12    A    Yes.  Oh -- no, I was sent home.

13    Q    And what was your position at the clinic at that

14    point?  Were you a roomer?

15    A    I don't recall.  I'm not sure.  I think I was in the

16    billing department.

17    Q    Okay.  Talking about billing.  You also told us, the

18    Government, on direct examination that you were a biller

19    and coder.  But I didn't hear you talk about coding at

20    all.  Is there a difference?

21    A    Well, I wasn't a professional.  I hadn't been

22    certified.  They were training me on-the-job.

23    Q    As what, a biller or a coder?

24    A    As a coder.

25    Q    As a coder?
```

2872

1   A   Uh-huh.

2   Q   And who was your supervisor?

3   A   Linda.

4   Q   Linda was your direct supervisor as a coder?

5   A   Well, she didn't train me.

6   Q   But -- well, then why would -- did you answer to

7   Linda, though?

8   A   Yes.

9   Q   And who told you to answer directly to Linda?

10   A   Linda.

11   Q   But you sat downstairs in the clinic; right?

12   A   Yes.

13   Q   And Linda sat upstairs?

14   A   Uh-huh.

15   Q   Now, you made a statement on direct examination that

16   you tried to talk to Linda about all these drug-seekers;

17   right?

18   A   Yes.

19   Q   And actually in your -- well, in your grand jury

20   testimony you said 90% were drug-seekers and they were

21   very demanding and not very clean.  Do you recall that

22   testimony in your grand jury?

23   A   Yes.

24        MR. BYERS:  Just a minute, Your Honor.  I have

25   one other spot I'm looking for.

1                    (Off-the-record.)

2    BY MR. BYERS:

3    Q    Anyway, back to that conversation.  Did you have

4    more than one of those conversation with Linda trying to

5    bring her up to speed on all these drug-seekers?

6    A    We had numerous conversations.  I don't recall

7    exactly.

8    Q    Where would those occur?

9    A    Sometimes in her office.  Sometimes down in the

10   coding room.

11   Q    Who else heard that?

12   A    I don't recall.

13   Q    Did you ever put notes in charts saying this person

14   is a drug-seeker, please, Mr. Provider or Ms. Provider,

15   don't treat them with drugs?

16   A    No.

17   Q    Why not?

18   A    It's not my place.

19   Q    Now, you talked about this direction to I guess

20   funnel all overdose calls or Coroner calls to Linda; is

21   that correct?

22   A    Yes.

23   Q    So is it your view of the world that that's a bad

24   thing to have a central repository for important

25   information about patient population?

2874

1  A   It is when that person doesn't get back to those

2  people.

3  Q   And how do you know she didn't get back to those

4  people?

5  A   Because they called several times.

6  Q   And did you follow her a hundred percent of the day

7  to know exactly what Linda was doing?

8  A   They would not call back if she had spoke to them.

9  They would have no reason to.

10 Q   And it's your view -- apparently your view of the

11 world that announcing over a public announcement system

12 that a Coroner is on the phone in a family practice, you

13 don't think that's a problematic thing?

14 A   No.

15 Q   Are you aware that there's been testimony in this

16 trial by a medical investigator that a call to Linda was

17 responded to promptly and was very, very helpful,

18 actually bizarrely good is the way it ended up.  Are you

19 aware of that?

20 A   So one out of a hundred -- no, I wasn't aware of

21 that.

22 Q   Show me the other 99?

23 A   When someone calls continuously asking to speak to

24 someone, that means they're usually not being called

25 back.

2875

1   Q    So, oh, one call to the office a hundred times is

2   what you're saying?  Not a hundred different calls?

3   That's what you just said; right?

4   A    I did -- I shouldn't have --

5   Q    One other thing on the incident in the parking lot.

6   There was a restraining order lodged against you;

7   correct?  By the recipient?  Of your advances?

8   A    No.

9   Q    There was not.  You were never served with a

10  restraining order?

11  A    We went to court and it was dismissed because Megan

12  stood up there and told them --

13  Q    And prior to that time there was a temporary

14  restraining order against you; correct?

15  A    From Linda I believe.

16  Q    Now, how could Linda do that?

17  A    That's what I'm wondering.

18  Q    So Linda got a restraining order against you?

19  A    That's what I was --

20  Q    For something you did in the parking lot that she

21  heard about from other people.

22                        (Witness nods in the

23                         affirmative.)

24  A    It was chaos --

25  Q    There's no question.  Thank you.

2876

```
 1        Now, you keep talking about being terminated.  And
 2   then you talked about your unemployment benefits being
 3   denied.  They were denied because you voluntarily left
 4   the position; correct?
 5   A    No.
 6   Q    Why were they denied?
 7   A    Because I was terminated refusing to do what was
 8   asked of me.
 9   Q    And that was -- I think your story was the day you
10   were asked to again shuffle people in order and you just
11   wouldn't do it.  Right?
12   A    Partly, yes.
13   Q    Okay.  You talked about Linda altering a great
14   number of things here.  You listed progress notes,
15   referrals, prescriptions, fee tickets.  Who else
16   observed that?
17   A    I'm not sure.
18   Q    Where would she do this at?
19   A    Sometimes right there in the front desk.
20   Q    Just completely brazen, right out in front of
21   everybody?
22   A    Yes.
23   Q    And you saw her writing scripts out, too?
24   A    She would sign the scripts.
25   Q    Were they already filled in or just, you know, going
```

2877

```
 1   through and signing names for some reason?
 2   A   Sometimes they were not.  Sometimes they were filled
 3   in.  Sometimes they weren't.
 4   Q   And where did she do that?  Where were --
 5   A   Sometimes in the back.
 6   Q   Where'd you see that?
 7   A   Sometimes right there in the front.  When I was
 8   receptioning.
 9   Q   And you can't tell me a single other worker of
10   dozens who passed through there that saw Linda doing
11   this?
12   A   I'm not going to speak -- I don't know if they saw
13   her.  There were other receptionists that were there.
14   Q   So since you say you've never talked to government
15   investigators outside the grand jury process, you've
16   never gone in or been asked to review charts showing
17   what -- where these things were falsified or altered by
18   Linda Schneider; correct?  No one has come to you and
19   said is that her bogusing up a signature of somebody
20   else?
21   A   In the deposition.
22   Q   The deposition?  You were asked to identify
23   signatures; correct?
24   A   Yes.
25   Q   And you could identify two signatures; correct?  Of
```

2878

1    many presented to you?

2    A    Yeah.

3    Q    And then you said you just couldn't do it any more?

4    A    Some of 'em were sloppy.

5    Q    And that deposition was at least a year and a half

6    ago; right?  November of 2008; correct?

7    A    I believe so.

8    Q    And the grand jury was '05.  So as not to confuse

9    you, there was a three year gap there.  So your memory

10   may well have been even better a year and a half ago as

11   far as what signature belonged to who; right?

12   A    I started remembering things.

13   Q    Didn't you actually just identify Dr. Schneider's

14   signature and Kim He'bert or Curt Atterbury?

15   A    Yeah.

16   Q    There was no discussion about that's a forged

17   signature from Linda Atterbury, was there?

18   A    I was asked whose signature I thought it was and I

19   told them.

20   Q    And you identified who you thought really signed it.

21        Now, in response to the Government's question about

22   your opinion of organizational structure, you said it

23   was horrible and that was all you said.  What's a

24   horrible organizational structure?  I thought it was

25   like a president, vice-president, you know, secretary,

2879

1    general counsel.  I thought that's what organizational

2    structure was.  What is it?

3    A    It was very unorganized.

4    Q    You just thought the place was chaotic.  You

5    testified to that; right?

6    A    Yes.

7    Q    Okay.  Now, you also testified about being

8    threatened.  And the first threat you told us about was

9    that if you didn't do your work, you didn't get paid.

10   And you took that as a threat?

11   A    I want to make sure that I state this properly.

12   Basically she would -- Linda would tell us if we did not

13   hurry up and finish and get caught up, and things were

14   already behind when I started, then there was a chance

15   we couldn't make payroll.

16   Q    So if you're seven months behind in billing and

17   money isn't coming in because seven months -- you're

18   seven months behind in billing, how do people get paid

19   then if the money is not flowing from here to there?

20   That -- isn't that a statement of fact?  If we don't

21   make money, nobody gets paid?

22   A    She was threatening.  I've never had that happen to

23   me before.

24   Q    No one's ever told you to do a job or you don't get

25   paid?

2880

1    A    Not like that.

2    Q    You felt threatened because Linda called you a

3    busybody and said you should mind your own business;

4    correct?  You testified to that on direct?

5    A    That's misconstrued.

6    Q    What did you mean?  Why did you bring up the

7    busybody as part of a threat?

8    A    She did not like me.  She thought I was a busybody.

9    And then other cases she would threaten me.

10   Q    Did you like Linda Schneider particularly after

11   you -- she put the restraining order on you?

12   A    Did I --

13   Q    That don't bother you?

14   A    To be honest, no, it really didn't because I knew

15   that the truth would come out.  And it did.

16   Q    So you have these threats over, as my notes show,

17   off and on over the course of the year you were there,

18   you got threatened five or six times.  You never looked

19   for another job, did you, while you were working at

20   Schneider Medical Clinic?

21   A    Yes, I did.

22   Q    Then why did you say in deposition and grand jury

23   you never looked for another job while you were at

24   Schneider Medical Clinic?

25   A    Looking for one and applying for one are two

2881

```
 1    different things.
 2    Q    How?
 3    A    I was seeking -- if I found another place for
 4    employment --
 5    Q    So -- I'm not going there.
 6          So even after the very first threat, you decided to
 7    stay there.  You didn't think right then this is a bad
 8    place, I gotta get out of here and I've got to talk to
 9    the media about it, too?
10    A    When you're living by yourself and trying to raise
11    your kids, yeah, it's kind of scary.
12    Q    Do you know who a fella by the name of Vannatta was?
13    I think it was Jeff?
14    A    Say that name again.
15    Q    Jeff Vannatta.  I think he was a roomer.  Are you
16    familiar with him?
17    A    I do not -- no, I am not.
18    Q    Wasn't there also an invoice floating around --
19    actually it was in your personnel file -- from this
20    company called LTD that you had ordered some merchandise
21    sent to the Schneider Medical Clinic and billed to the
22    clinic?
23    A    I did not order it.
24    Q    Okay.  But your name was at the attention line;
25    correct?
```

1    A    It was.

2    Q    Okay.  Some -- what?  Somebody else did that at the

3    clinic?

4    A    They used me as a reference.

5    Q    As a reference?

6    A    Well, someone to contact.

7    Q    As a --

8    A    As a contact person.

9    Q    And you were just going to give it to whoever did

10   this then?  I don't understand the scheme --

11           MR. WAMBLE:  Your Honor -- relevance, Your

12   Honor.  This is way outside the scope.

13           MR. BYERS:  Goes directly to credibility.

14           THE COURT:  I don't see how, but -- it's

15   getting late.  Let's move it along.

16           MR. BYERS:  You have a 4:30; right?

17           THE COURT:  Yep.

18           MR. BYERS:  I'll try to get through this but

19   there's a lot --

20           THE COURT:  Well, would you like to recess and

21   start again tomorrow morning?

22           MR. BYERS:  I believe so, Your Honor.

23           THE COURT:  All right.  Ladies and Gentlemen,

24   remember and heed the admonition.

25      Now, remember, tomorrow we're going to quit at noon

1    and then we won't have court on Monday because I've got

2    a lot of other cases to deal with on Monday.  So I'll

3    see you tomorrow morning.

4                          (Recessed for the evening at

5                          4:32 p.m.)