2884

1            (Beginning at 9:05 a.m. May 14

2            2010, the following proceedings

3            continued.)

4      THE COURT:  Good morning.  Yes, sir.

5      MR. BYERS:  Thank you, Your Honor.

6  BY MR. BYERS:

7  Q   Good morning.

8  A   Good morning.

9  Q   I'm glad we had this break because I had a chance to

10  reflect a little bit about our conversation yesterday.

11  Did you think I was harassing you?

12  A   No.

13  Q   Okay.  Didn't feel like I was trying to bully you

14  into things maybe you didn't want to say?

15  A   No.

16  Q   Okay.  And you understand I have a duty to zealously

17  represent Linda Schneider as her attorney?

18  A   You have a job to do.

19  Q   Okay.  I appreciate that.

20       Now, you told us yesterday about some of these

21  things that Linda altered such as actual prescriptions

22  from a pad; is that correct?

23  A   Yes, sir.

24  Q   Okay.  And then -- so as I understand it, the way

25  the clinic worked, the only way the clinic could bill

2885

1    for issuing prescriptions was if a patient came in, had

2    an office visit with a provider and received a

3    prescription; correct?

4    A    I don't understand your question.

5    Q    Okay.  A patient comes in; correct?

6    A    Yes.

7    Q    To get, say, a refill?

8    A    Uh-huh.

9    Q    And it's billed as office-visit and clinic makes

10   money on that.  They collect from insurance or

11   something; correct?

12   A    On the visit, yes.

13   Q    Okay.  The clinic does not make money by simply

14   issuing prescriptions without having office visits with

15   patients; correct?

16   A    No.

17   Q    Okay.  Now, with the fee tickets you said Linda

18   altered, you did mention fee tickets, too; correct?

19   A    Yes.

20   Q    Okay.  Were those a particular color?

21   A    The time I was there they were white.

22   Q    Okay.  And that was a single sheet?

23   A    Yes, sir.

24   Q    Correct?

25   A    Uh-huh.

```
 1    Q    And how specifically would she alter a fee ticket?
 2    A    Sometimes she would cross out an office visit, mark
 3    another one.  Or if they weren't marked, she would mark
 4    it, okay, well, we'll just mark this.  A lot of times
 5    Doctor didn't mark on his fee tickets so we had to ask.
 6    Q    Was this just with Dr. Schneider's cases, or what
 7    did you observe about that?
 8    A    I don't recall.
 9    Q    Okay.  And you said she also altered progress notes;
10    correct?
11    A    Yes.
12    Q    And that's -- that's distinct from the fee ticket;
13    correct?
14    A    Yes.
15    Q    Okay.  And when you were downstairs in billing,
16    would you have the progress notes with the cases you
17    were working on?
18    A    Sometimes we had to get the charts and inside the
19    charts were the progress notes, yes, sir.
20    Q    Okay.  But typically you were just working from the
21    fee ticket downstairs; correct?
22    A    Not there, no.
23    Q    What else were you working from?
24    A    The chart.
25    Q    So you always had the chart downstairs?
```

```
 1   A   Pretty much always had to have a chart.

 2   Q   What was the layout of Linda's office?  Do you

 3   remember?

 4   A   What do you mean by --

 5   Q   Take me in the doorway.  Okay.  What do you see when

 6   you're standing in her doorway?  Is there a desk?  A

 7   table?  A computer somewhere?

 8   A   Her desk was on the right side.  I remember.

 9   Q   Okay.  So as you walk in, her desk is on your right

10   like against the wall, so she was sitting at her desk.

11   Was she facing this wall?

12   A   I believe so.

13   Q   Okay.  What else was in that office?

14   A   Bookshelves.

15   Q   Okay.  Do you remember any other furniture?

16   A   No.

17   Q   Any other tables, accessories, computer?

18   A   A computer was on her desk.

19   Q   Okay.  How big do you think that office was?

20   A   Size of maybe a large closet.  I'm not sure.

21   Q   Okay.  Sounds pretty small, then; right?

22   A   Well, it was decent.  I mean, it wasn't huge but it

23   was okay for an office.

24   Q   Okay.  Do you remember if her door opened in or out?

25   A   Opened in, I believe.
```

2888

1    Q    Okay.  Do you remember which side it opened, the

2    hinges were on, left or right?

3    A    Possibly on the left if I'm facing it, I believe.

4    Gosh, I don't recall.

5    Q    Okay.  And you left the clinic in '04?

6    A    Uh-huh, yes.

7    Q    Okay.  Around -- it was April; right?

8    A    I believe so.

9    Q    You were there about 13 months; correct?

10   A    Correct.

11   Q    And you typically worked Monday through Friday;

12   correct?

13   A    Yes.  Sometimes on weekends if I was asked.

14   Q    Okay.  And didn't you actually have a dispute with

15   Linda Schneider toward the end of your employment there

16   that caused your termination because you refused to work

17   weekends?

18   A    No.

19   Q    Who is Jody LeBroke?

20   A    She was a receptionist, I believe.

21   Q    And she worked there during the time you did?

22   A    Briefly, uh-huh.

23            MR. BYERS:  May I approach Your Honor, the

24   witness?

25            THE COURT:  Yes, sir.

 1    BY MR. BYERS:

 2    Q    Would you read this for me out loud?

 3            MS. TREADWAY:   Can we identify it, Judge,

 4    please.   And can we have a copy of it.

 5    BY MR. BYERS:

 6    Q    Can you tell me what that is?

 7    A    First time I've seen this.

 8    Q    Okay.   Let me show it to Government counsel.

 9                  (Off-the-record.)

10    BY MR. BYERS:

11    Q    You've not seen this before; correct?   That's what

12    you just said.   Okay.   Would you read that out loud for

13    me.

14            MR. WAMBLE:   Objection, Your Honor.

15            THE COURT:   Just a second.   If she can't

16    identify it, no point in having her read it.

17            MR. BYERS:   Okay.

18    A    I'm not going to --

19    BY MR. BYERS:

20    Q    Now, yesterday you told us you were a single mother

21    when you were working at the clinic; correct?

22    A    I was separated from my husband, yes, I was.

23    Q    Okay.   Was that for the whole duration of your

24    employment at the clinic, the 13 months?

25    A    No, not all of it.   Majority of it.

1    Q    Can you name for me some of your coworkers at the

2    clinic?  And not just people you maybe were friendly

3    with, but people -- just other people you remember

4    working there?

5    A    Brenda Eller was a receptionist.

6    Q    Anybody else?

7    A    There were several people.

8    Q    Okay.  Name other people for me that you remember

9    working there?

10   A    Jamie, Angie, Brenda.

11   Q    Another Brenda?

12   A    Whitehead, uh-huh.

13   Q    Okay.

14   A    Several people.

15   Q    Any other specific names?

16   A    Meagan Throckmorton.  Brenda Maurer, I believe, was

17   her last name.

18   Q    So that's a third Brenda?

19   A    Yes.

20   Q    Okay.  Yesterday you told me you couldn't name any

21   of these people who would have seen Linda Schneider

22   altering these records; correct?

23   A    Correct.

24   Q    And that's still your testimony today?  You haven't

25   remembered anyone who you know saw these alterations or

1   forgeries?

2   A   You'd have to ask them.

3   Q   Right.  You can't tell me who to ask?

4   A   No, sir.

5   Q   Okay.  I don't recall if you testified on direct or

6   earlier cross about being asked to shred any records.

7   Were you ever asked to shred records?

8   A   Yes.

9   Q   Okay.  By whom?

10   A   Linda.

11   Q   And where did that conversation take place?  Or that

12   request?  Where were you?

13   A   I believe first time was in her office.

14   Q   Okay.  Were you specifically summoned into her

15   office for that request?

16   A   I don't recall.

17   Q   Okay.  Who else was there?

18   A   I don't remember.

19   Q   You remember what month it was when this first

20   request was?

21   A   No, sir.

22   Q   What day?

23   A   No, sir.

24   Q   Time of day?

25   A   No.

1    Q    And what were you asked to shred specifically?

2    A    Faxes at times.  I'm not sure if it was that day it

3    was a fax or not.

4    Q    Do you know where the faxes originated?

5    A    On the fax machine.

6    Q    But who sent them?

7    A    Several places sent us faxes.

8    Q    Do you know any of the places?

9    A    Pharmacies; other doctors.

10   Q    Okay.  And you don't know if that was specifically

11   that first request?  You just remember being asked to

12   shred faxes.  Okay.  And there were other requests from

13   Linda to shred documents?

14   A    Yes.

15   Q    What types of documents were those?  Anything beyond

16   the faxes that you remember?

17   A    A progress note.

18   Q    On what patient?

19   A    Kandace B.

20   Q    Just a single page note, is that what you remember?

21   A    That's what I remember.

22   Q    Where was the shredder at?  Was there a shredder in

23   the clinic?

24   A    Up in the fax room.

25   Q    Okay.  And where was the fax room in relation to

1    Linda's office?

2    A    Kind of across from it in the file room.

3    Q    In the what?

4    A    In the file room.

5    Q    Okay.  Across from Linda's office in the file room.

6    Okay.  And were you a downstairs worker when she asked

7    you to shred these things?

8    A    Yes.

9           MR. BYERS:  I'm going to stop with that, Your

10   Honor.  Thank you.

11          THE COURT:  Thank you, Mr. Byers.  Redirect,

12   please.

13          MR. WAMBLE:  Thank you, Judge.

14                    **REDIRECT EXAMINATION**

15   BY MR. WAMBLE:

16   Q    Good morning, Ms. Curry.

17   A    Good morning.

18   Q    Yesterday Mr. Byers on cross-examination asked you a

19   couple questions about the organizational structure of

20   the office.  I just wanted to clarify a few things with

21   you.  When we talked about the organizational structure

22   of the office, who owned the clinic?

23   A    Who owned the clinic?

24   Q    Yes.

25   A    Dr. Schneider and his wife Linda.

1    Q    And who was -- and you said, Dr. Schneider.   And

2    you're testifying that he was the doctor at the clinic?

3    A    Yes.

4    Q    And who ran the clinic?

5    A    Linda Schneider.

6    Q    Was there any doubt in your mind who was in control

7    of that clinic?

8    A    No.

9    Q    We briefly talked about the environment at the

10   clinic.   You testified that it was chaotic?

11   A    Yes, it was.

12   Q    Were there people at the clinic involved in making

13   medical decisions, personnel decisions, that had no

14   previous medical training?

15   A    Yes.

16            MR. WILLIAMSON:   Your Honor, I'm going to

17   object to asked and answered; covered on direct a couple

18   of times.

19            THE COURT:   Well, I know he asked about

20   Mrs. Schneider's brother -- or not brother, but -- what

21   was that guy's name -- Ulysses.   The real question is

22   whether it was asked on cross-examination because that's

23   the only basis for covering something on redirect

24   examination, Ladies and Gentlemen.

25            MR. WILLIAMSON:   It wasn't asked by me, Your

2895

```
 1    Honor.
 2              MR. BYERS:  Nor I.
 3              THE COURT:  I think that's right.  The
 4    objection is sustained.
 5    BY MR. WAMBLE:
 6    Q   Ms. Curry, you testified that you were a roomer and
 7    that involved what at the clinic?
 8    A   A roomer?
 9    Q   As a medical assistant you were involved in rooming
10    patients.  Could you tell us what that involved?
11    A   Getting the patient's chart and asking the patient
12    in the lobby, calling their name and then walking them
13    back to the room that we designated for them.  Doing
14    their vitals, temperature, height, weight, document why
15    they are being seen, and make sure that it's all clear
16    to the doctor for when he comes in to the room to see
17    them.
18    Q   And back to Mr. Byers' discussion with you about the
19    organizational structure and the chaos there.  Were
20    there people acting as roomers that had no previous
21    medical training?
22    A   Yes.
23    Q   Who were those people?
24    A   Different people at different times.  If we got
25    behind Linda would say "hey, can you grab a person and
```

2896

```
 1    put 'em in a room for me".
 2    Q   And who would that be?  Do you remember her name?
 3    A   I apologize, no.  I just -- I know several of us
 4    did.
 5    Q   Would Ulysses be one of those persons that did that?
 6    A   Yes.
 7              MR. WILLIAMSON:  Your Honor, objection.  You
 8    sustained that objection a few minutes ago and now he is
 9    leading the witness.
10              THE COURT:  Where are you headed here?
11              MR. WAMBLE:  To the next question, Your Honor.
12              THE COURT:  Well, that's a terrific answer.
13    What I meant was, what are you trying to cover with her?
14              MR. WAMBLE:  I'm sorry, Your Honor.
15              THE COURT:  What are you trying to cover with
16    her at this point?
17              MR. WAMBLE:  Just trying to clarify a few
18    things from cross-examination, Your Honor.
19              THE COURT:  All right, sir.  Go ahead.  Just
20    don't cover things that you covered in direct that
21    weren't covered in cross.  Okay?
22              MR. WAMBLE:  Certainly.
23              THE COURT:  You know that.
24    BY MR. WAMBLE:
25    Q   Mr. Byers described to you perhaps the office was
```

2897

```
 1    just inefficient.  Do you think that it was beyond

 2    inefficient?

 3    A    Yes.

 4    Q    Why do you think that?  What led you to believe that

 5    it was more than just being inefficient?

 6    A    Things just didn't flow like they should.  It was,

 7    once again, chaotic.  Very unorganized.

 8    Q    Mr. Byers also talked to you about faxes.  Were any

 9    of these faxes from emergency rooms?

10    A    There was several faxes from everywhere.  Possibly.

11    Q    Any of these faxes from a Coroner's office?

12    A    I don't recall on that.

13    Q    Were these faxes stacked up?

14    A    Oh, yes.

15    Q    On cross-examination Mr. Williamson asked you if Dr.

16    Schneider ever called a meeting and said: today is the

17    first day that we're going to open up this business and

18    we're going to be drug-dealers.  And you said no.

19    A    No.

20    Q    And on direct examination you testified from what

21    you could see 90% of the patients that came into the

22    clinic you thought were drug-seekers?

23    A    Yes, I did.

24    Q    Did you even think that Dr. Schneider would even

25    have to stand up and make that announcement that he was
```

1    a drug-dealer?

2    A    No.

3    Q    And as far as you could tell, did you think that Dr.

4    Schneider was just a drug-dealer in a white coat?

5    A    Yes.

6            MR. WAMBLE:  Nothing further.

7            THE COURT:  Yes, sir.

8                    **RECROSS EXAMINATION**

9    BY MR. WILLIAMSON:

10   Q    You never told Dr. Schneider that you thought he was

11   a drug-dealer in a white coat; did you?

12   A    No.

13   Q    You never told the Kansas Board of Healing Arts you

14   thought Dr. Schneider was a drug-dealer in a white coat;

15   did you?

16   A    No.

17   Q    He never told you that he believed he was just

18   dealing drugs and not taking care of patients, did he?

19   A    No.

20   Q    Are you aware that two witnesses testified before

21   you yesterday that they believed that Dr. Schneider was

22   doing his best to try to treat the pain that their

23   family members were suffering from?

24   A    Okay.

25   Q    Did you know that that testimony happened?

1    A    I didn't know that.

2    Q    And you never said this at any time before you got

3    fired from the clinic, did you?

4    A    Yes, I did.

5    Q    You did?  You said it in that March 7th e-mail that

6    you sent to the newspaper, didn't you?

7    A    No, I did not.

8              MR. WILLIAMSON:  I don't have anything

9    further.

10             THE COURT:  Mr. Byers?

11             MR. BYERS:  Just one, Your Honor.  I think

12   just one.

13                   **RECROSS EXAMINATION**

14   BY MR. BYERS:

15   Q    These faxes, you have no idea if they had already

16   been -- the ones you were supposed to do shred, you have

17   no idea if they had already been dealt with or were

18   duplicates or in any other fashion were trash; do you?

19   A    I do not, no.

20             MR. BYERS:  Okay.  That's all, Your Honor.

21             THE COURT:  Thank you, Ms. Curry.  You're

22   excused.  Next witness please.

23             MS. TREADWAY:  Government calls Pam Shaw, Dr.

24   Pam Shaw.

25

2900

1                              **PAMELA SHAW**

2     Having been first duly sworn to tell the truth, the

3     whole truth and nothing but the truth, testified as

4     follows on:

5                          **DIRECT EXAMINATION**

6     BY MS. TREADWAY:

7     Q    Good morning, Dr. Shaw.  Could you introduce

8     yourself to the jury please.

9     A    Yes.  My name is Dr. Pamela Shaw.

10    Q    Where are you employed?

11    A    I'm employed at the University of Kansas in Kansas

12    City, Kansas.

13    Q    How long have you have been employed at K.U.?

14    A    I've been there since 1990.

15    Q    And what do you do there?

16    A    I'm a pediatrician.  I'm a Professor of Pediatrics

17    in the Division of Ambulatory Medicine.

18    Q    In addition to your work in pediatrics, do you have

19    a role that is associated with the Medicaid program in

20    the State of Kansas?

21    A    Yes, I do.  I'm chairman of the PERC Council, Peer

22    Education and Resource Council.

23    Q    And how long have you been the Chair of the Peer

24    Education Resource Council?

25    A    Since 2002.

```
 1    Q    Could you explain to the jury what the Peer
 2    Education and Resource Council is and what it does?
 3    A    Sure.  We are an advisory council that meets at
 4    least every other month to review quality and healthcare
 5    issues for the State of Kansas, specifically for the
 6    Kansas Health Policy Authority and Medicaid.
 7    Q    And does it have an educational function as well?
 8    A    Yes.  We function primarily in review of cases to
 9    help educate providers as far as evidence-based care and
10    standard of care.
11    Q    And what is evidence-based care?
12    A    Evidence-based care is care that is based on
13    research that is shown to be the most efficacious, as
14    well as the best care for patients.
15    Q    Now, the Council is known as the PERC for short,
16    isn't it?
17    A    Yes, it is.
18    Q    Who comprises the membership of the PERC?
19    A    There's a multi-specialty group of physicians and
20    nurse practitioners who are involved in it.  There's
21    internists, family medicine, pediatricians, pharmacists,
22    nurse practitioners.  We don't have any PA's at this
23    time, but we have a variety of providers who serve --
24    and OB/GYN.  I'm sorry.
25    Q    In addition to having providers from many
```

2902

1    disciplines, does the PERC attempt to have providers

2    from different areas of the state?

3    A    Yes.  We like to represent different areas of the

4    states and different types of practices, as well as

5    private practice, as well as the academic practice.

6    Q    Now, how does the PERC become aware that a physician

7    in the State of Kansas needs education or that a

8    physician's quality of care needs to be reviewed?

9    A    All of the cases that we review are either brought

10   by what's called the Quality Assurance Team, or QAT,

11   Kansas Health Policy Authority, KHPA.  And they are

12   brought to light by either other practitioners,

13   pharmacists, nurses, physicians who have brought these

14   physicians (sic) or by the patients themselves.  So it's

15   a multitude of ways that they can be brought.  They're

16   always reviewed by a nurse, who is in the Quality

17   Assurance Team at KHPA, first, before they're brought to

18   the PERC.

19   Q    So the KHPA, that is the organizational name of the

20   state agency that manages and administers Medicaid?

21   A    That's correct.

22   Q    Now, after you became the chairperson of PERC in

23   2002, did the PERC receive complaints about the

24   Defendant Stephen Schneider and the Defendant's medical

25   clinic, Schneider Medical Clinic?

2903

1    A    Yes, we did.

2    Q    As a result of those complaints, did the PERC take

3    action?

4    A    Yes, we did.

5    Q    Let me hand you what has been marked for

6    identification as Exhibit 100.  And I've taken it out of

7    its envelope.  Do you recognize that document?

8    A    Yes, I do.

9    Q    And is that a letter that you, in fact, authored?

10   A    Yes.

11   Q    What is the date of this letter?

12   A    The date is February 5th, 2004.

13   Q    We have a chronology that we would like to put up

14   for the jury so that we remind them of these dates.

15            MS. TREADWAY:  Government offers Exhibit 100.

16            MR. WILLIAMSON:  No objection, Your Honor.

17            MR. BYERS:  No objection.

18            THE COURT:  100 is received.

19            MS. TREADWAY:  We would like to display this

20   for the jury and go over it with them.

21   BY MS. TREADWAY:

22   Q    First of all, ma'am, what is the date of the letter?

23   A    February 5th, 2004.

24   Q    And who is the letter addressed to?

25   A    Schneider Medical Clinic.

1    Q   Does this letter generally give the Defendant

2    Stephen Schneider and the Defendant's clinic, Schneider

3    Medical Clinic, notice regarding the concerns that had

4    been raised about how they operated their clinic?

5              MR. WILLIAMSON:  Objection, Your Honor.  That

6    is a compound question and confuses the clinic with Dr.

7    Schneider.  It's only addressed to the Schneider Medical

8    Clinic.

9              MS. TREADWAY:  It says dear Schneider Medical

10   Clinic, and the address is 7030 South Broadway Street,

11   Haysville, Kansas.

12             THE COURT:  I think that's sufficient to give

13   notice to Dr. Schneider.  I was looking through my

14   notes.  Didn't we have a return receipt?  Did we have a

15   return receipt in evidence yesterday on this letter?

16             MS. TREADWAY:  Yes, 100-A, Judge, has been

17   admitted.

18             MR. WILLIAMSON:  We do -- that was not signed

19   by Dr. Schneider, and I will cover that on

20   cross-examination.

21             THE COURT:  Well--

22             MS. TREADWAY:  Judge, this was previously

23   testified to by not only Ms. Wagner, but also Andrew

24   Stewart who was the one that identified it as being

25   found during the search.

2905

1          THE COURT:  That's what I remember now.  The

2   objection is overruled.

3   A   Yes.

4   BY MS. TREADWAY:

5   Q   Let me ask that question again.

6   A   Okay.

7   Q   Did this letter generally give the Defendant Stephen

8   Schneider and the Defendant Schneider Medical Clinic

9   notice regarding the concerns that had been raised about

10  how they operated the clinic?

11  A   Yes.

12  Q   And let's review this letter with the jury.  I'd

13  just like you to read it and we'll follow along on the

14  screen.

15  A   "Random sample of records were reviewed based on

16  your provider number.  In this case a group number.

17  Based on this review from a record request of October

18  13th, 2003, performed by the Quality Assurance Team,

19  QAT, of the fiscal agent of the Kansas Medicaid

20  Assistance Program, several concerns became apparent.

21      As these concerns were forwarded to the Peer

22  Education and Resource Council, PERC, for additional

23  review.  The concerns consisted of: polypharmacy;

24  overuse of narcotics; lack of appropriate documentation

25  as to need of narcotics; generally, poor documentation

1    practices; illegible documentation; inability to

2    demonstrate which provider was actually providing care

3    based on the documentation versus billing; inappropriate

4    antibiotic use; antibiotics ordered for a diagnosis of

5    URI that is an inappropriate use of antibiotics; and

6    clearly found in documentation."

7    Q   You're moving a little fast there, Doctor.  I know

8    you are probably a person that works at breakneck speed;

9    but Cindy is going to probably clobber you here in a

10   minute if you don't slow down.

11            THE COURT:  Cindy is capable of taking -- let

12   Cindy tell her if she can't -- Cindy can do it at twice

13   that speed.

14            MS. TREADWAY:  I realize that, Judge.  I'm

15   just trying to get her to slow down.

16            THE COURT:  And I'm not kidding.  She can.

17                 (Off-the-record.)

18   A   "No pain contract present in record, but not

19   followed consistently by practitioner.  No documented

20   drug screens on potentially behaviorally aberrant

21   patients with very high numbers of narcotic medications;

22   Actiq, for Cephalgia, et cetera."

23   Q   Could I -- I'm going to stop you here.  What is

24   Cephalgia.

25   A   That's pain above the neck and head.

1    Q    Okay.

2    A    "In response to these serious concerns and dramatic

3    deficits in the records, the PERC has made the following

4    recommendations.  Schneider Medical Clinic has been

5    placed on a corrective action plan, or CAP, effective

6    immediately, with a review in three months.  The same

7    six records will be reviewed again at that time as well

8    as other random samples to assess for improvement.  The

9    original six records are -- and those are listed."

10   Q    Then we have on the copy redacted the names and the

11   date of births to protect patient privacy, haven't we?

12   A    Yes.

13   Q    You don't need to read those names.  You can go

14   forward into the second page, ma'am.

15   A    "Number 2.  Your office practice and providers are

16   being referred to the Board of Healing Arts for the

17   concerns listed regarding polypharmacy and overuse of

18   narcotic drugs without proper notification.

19        "Number 3:  You will be expected to accept a

20   detailing visit from a representative from Purdue

21   Pharmaceuticals to go over, at length, the contents of

22   the enclosed CD, 'Partners Against Pain'.  Your office

23   will notify the Quality Assurance Team by sending a fax

24   to 785-274-5437, attention, sandy Jones, RN, with the

25   Purdue representative's name and the members of your

2908

1    office who attended the detailing, including the length

2    of the visit.

3        "It is expected that all members of your office

4    will attend.  Although it may take more than one

5    session.  This is to be completed within three months of

6    the receipt of this letter."

7        "Number -"

8    Q    I'm sorry.  I want to stop you there.  First of all,

9    can you hold up for the jury the actual CDs that were

10   enclosed in that envelope?

11   A    There's two of them.

12   Q    All right.  And those were produced by Purdue

13   Pharmaceuticals?

14   A    That's correct.

15   Q    And do you remember the Purdue Pharmaceutical

16   representative that was going to be working with the

17   clinic on this issue?

18   A    I don't specifically remember his name; but, yes, I

19   do remember the -- I believe it was Mr --

20   Q    Was it Tom Wagner?

21   A    I was going to say Wagner, but, Tom Wagner, that's

22   correct.

23   Q    And is that a common thing that the PERC will do is

24   utilize the pharmaceutical representatives as the

25   educators?

1   A   We do in the case of pain management, just because

2   Purdue has been so proactive in producing these CD's, as

3   well as producing really fine tools for physicians to

4   use in pain management.

5   Q   Now you can continue with the letter.   Thank you.

6   A   "Number four:  This will be independently verified

7   for correctness by our staff with the Purdue

8   representative.

9       "Number five:  The enclosed CD 'Partners Against

10  Pain' is also enclosed in paper form.  For your

11  convenience it is separated by chapter with colored slip

12  sheets.  This documentation kit is easy to follow,

13  easily imprintable with your office name when using the

14  CD version, as is consistent with Kansas State Board of

15  Healing Arts' statement on pain control.

16      "Number six:  With the inconsistencies in your

17  documentation, it would be highly advisable for you to

18  use this documentation kit, or a similar one.  At the

19  next review of charts it is expected that there will be

20  examples of all the following types of documentation for

21  clients receiving opioid treatment.  Assessment forms:

22  A, checklist for long term opioid therapy; B, initial

23  pain assessment; C, initial pain assessment tool; D,

24  patient history.

25  Pain assessment scales:  A, nine different pain rating

 1    scales are included.  Consent and treatment forms.  A

 2    consent for chronic opioid therapy.  B, long term

 3    controlled substance therapy for chronic pain sample

 4    agreement.  C, additional resources on consent and pain

 5    diaries for patient use.  Keeping an, A, pain-diary; B,

 6    records for keeping track of your care; and C, pain

 7    management log; D, daily plan -- " I'm sorry "-- daily

 8    pain-diary; E, my pain diary."

 9    "Clinical follow up:  A, follow-up office visit for

10    chronic opioid analgesia; B, opioid progress report; C,

11    functional progress form.

12    "You will be reviewed in three months.  Without

13    substantial improvement, additional penalties will be

14    incurred.  Any correspondence may be directed to Kansas

15    Medical Assistance Program, Office of the --"

16    Q    That's fine.  And you signed that letter?

17    A    Yes, I did.

18    Q    And who was it copied to?

19    A    It was copied to Wayne Wallace, M.D., who was the

20    SRS medical director.  Janelle Garrison, manager of the

21    Health Connect Kansas program, State of Kansas.  Greta

22    Hamm, program manager, quality improvement, State of

23    Kansas.  Eddie Clark, manager of utilization review,

24    State of Kansas SRS Quality Assurance Team, Fiscal

25    Agent; and Tracy Litherland, Manager for Managed Care,

2911

 1    who was the fiscal agent."

 2    Q    And the fiscal agent is -- at that -- was that -- at

 3    that time was it EDS, Electronic Data Systems?

 4    A    That is correct.

 5    Q    Now, when there's a statement like assessment forms,

 6    and then there's a whole list, it wasn't your intention,

 7    the PERC's intention, to have the clinic use each and

 8    every one of those forms, was it?

 9    A    No.  They were examples of forms that could be used.

10    Q    So there was a lot to choose from?

11    A    Yes.

12    Q    Okay.  And you were going to allow the clinic and

13    the providers there to decide what best worked for them?

14    A    Absolutely.

15    Q    All right.  Let's look at some of these forms.

16    Again, they were in paper form as well as on the CD.

17    What's the first form there?

18    A    The first form is a checklist for long term opioid

19    therapy.

20    Q    What kind of things is it listing on the lefthand

21    side of the page for work-up?

22    A    A complete medical history; complete physical exam;

23    assessment of the pain; affect of pain on physical and

24    psychological function; history of substance abuse,

25    co-existing diseases or conditions; recognized medical

1    education for the use of a controlled substance; risks

2    and benefits communicated, written agreement optional.

3    If high risk or history of substance abuse:  Periodic

4    review of goals; monitor compliance; consultation as

5    necessary for additional evaluation and treatment;

6    accurate and complete records to include medical

7    history, physical examinations, evaluations

8    consultations, treatment plan, objectives, informed

9    consent, treatments, medications and agreements with the

10   patient.

11   Q    And what would this help a provider do?

12   A    Basically it would help to keep them organized and

13   also help them track the patient long-term, who was

14   having difficulties with pain.

15   Q    Okay.  And the next, I believe is the initial pain

16   assessment.  What does this -- I'm not going to have you

17   read all of it.  But what is the focus, or the goal of

18   this document in the packet?

19   A    It again, helps focus the practitioner on how to

20   assess the pain for each patient, whether it be in

21   different locations, or where the pain is, and the

22   quality of the pain as well.  So it's really a nice tool

23   to help with a new patient when you're assessing.

24   Q    The next document.  This is another type of initial

25   pain assessment tool where we have some figures.  How

2913

1    would this be used in the practice?

2    A   You could use this, or the previous pain assessment

3    tool if you were going to map out where the pain was,

4    for each of the patients; as well as the intensity, the

5    quality and the onset the character of the pain.  All of

6    the questions that are usually documented when a patient

7    has pain.

8    Q   All right.  Next --

9    A   This is a patient history form, and it basically

10   goes over the general health for the patient as well as

11   their surgical history, allergies, medications that

12   they're on.  As well as just some demographic data that

13   you would get from every patient.  So it would be like

14   an intake form when you first saw a patient.

15   Q   And next we have a visual analogue scale.  What is

16   that?

17   A   Basically what you do is, you would hold this up to

18   a patient and you would say, on this scale, can you tell

19   me where you are as far as your pain is.  So you would

20   ask the patient to grade their pain based on this scale.

21   Q   On some kind of a continuum?

22   A   Exactly.

23   Q   All right.  And the next document?

24   A   This is also a pain assessment tool where you would

25   ask the patient to grade their pain, and it's numeric

2914

1    and it's based on a zero to ten.

2    Q    All right.  Next?

3    A    Same thing.  Again, these are all examples of

4    different kinds of ways that you can describe pain and

5    assess it and then document it for the chart.

6    Q    And so these are ways where you can use a form to

7    communicate with a patient and get information from them

8    that the doctor would use in treatment?

9    A    That's correct.

10   Q    All right.  How about the next page?

11   A    This is a verbal rating scale, where zero is no pain

12   and 10 is the worse possible pain that they've ever had.

13   You can also use the 0 to 100.  It depends on what you

14   want to use.  Again, this is really set up so the

15   clinician can decide what works best in their office and

16   their practice.

17   Q    Let's go to some consent and treatment forms next

18   because there are several methods here for the pain

19   assessment.  And then we go to some of the consent

20   forms.  And, again, do we have several types of consent

21   forms?

22   A    Yes.

23   Q    And what do you understand the purpose of these

24   consent forms is, Dr. Shaw?

25   A    The purpose of these consent forms is so that the

2915

1    physician and the patient go into this therapy together.

2    You inform the patient of what you will do as far as the

3    physician is concerned and what you expect from them.

4    In return -- so it's like informed consent before a

5    procedure.

6    Q    And then let's look at some of the pain diaries that

7    are included in here.  What is the purpose of a pain

8    diary for the patient, and the physician?

9    A    Just with any illness, or with any problem, it's

10   important to document what the patient is experiencing.

11   And if the patient can keep a diary as to when pain is

12   occurring, it's easier then to treat them appropriately.

13   So the pain diaries are really to keep track of the

14   patient's illness, just as it would be for diabetes or

15   other type of illnesses.

16   Q    Now, also included in this packet of information

17   that was sent to the Schneider Medical Clinic in

18   February of 2004, there were the guidelines for the use

19   of the controlled substances for the treatment of pain.

20   Are you familiar with those guidelines?

21   A    Yes, I am.

22   Q    And are those guidelines adopted by Kansas, the same

23   as the national guidelines that were promulgated and set

24   forth for the states to adopt and change as they wished?

25   A    Yes.

2916

1    Q    Did the PERC ask someone to actually visit the

2    Schneider Medical Clinic for the purpose of education,

3    following the sending of this packet?

4    A    Yes.

5    Q    And was that Mr. Wagner, from Purdue?

6    A    Yes, it was.

7    Q    And what was he supposed to educate the Schneider

8    Medical Clinic about?

9    A    The management of pain based on those treatment

10   guidelines, using these tools, as well as the guidelines

11   that are promulgated from the Kansas Board of Healing

12   Arts.

13            MS. TREADWAY:  Nothing further, Judge.

14            THE COURT:  Yes, sir.

15            MR. WILLIAMSON:  Thank you, Your Honor.

16                    **CROSS EXAMINATION**

17   BY MR. WILLIAMSON:

18   Q    How you doing, Dr. Shaw?

19   A    I'm fine.  Thank you.

20   Q    My name is Lawrence Williamson, and I represent Dr.

21   Schneider.  We've never had a chance to meet, have we?

22   A    No.

23   Q    Okay.  I'm going to ask you some questions, a series

24   of questions about the testimony you just provided.

25   Okay?

```
 1    A    Okay.

 2    Q    Where did you do your undergraduate?

 3    A    At the University of Kansas.

 4    Q    Do you know Ms. Treadway from your days at K.U.?

 5    A    No, I do not.

 6    Q    Okay.  Do you guys have a personal relationship

 7    outside of being professional -- knowing each other

 8    professionally?

 9    A    No.

10    Q    Okay.  Now -- and you work at K.U. Med now, as well?

11    A    Yes, I do.

12    Q    Now, let's start with the February 5th, 2004 letter.

13    You drafted that letter based on a review that occurred;

14    correct?

15    A    That's correct.

16    Q    Now, when you were testifying initially were you

17    attempting to give the whole and complete truth?

18    A    Yes.

19    Q    Okay.  Were you attempting to give the jury the

20    complete picture of what happened with your interaction,

21    or your knowledge of the interaction that PERC had with

22    the Schneider Medical Clinic?

23    A    Yes.

24    Q    But you didn't talk about -- you mentioned in your

25    letter there was an initial review, but you don't give
```

2918

1    specifics about the specific parts of the findings from

2    the PERC committee; correct?

3    A    I don't understand your question.

4    Q    That was a bad question.  You summarized what you

5    believed the findings were of the PERC committee;

6    correct?

7    A    Yes.

8    Q    Now, let's start at square one.  There were

9    complaints made about the clinic, and I believe you

10   mentioned that on direct, which led you to actually

11   request records from the clinic; correct?

12   A    That's correct.

13   Q    Let me see if I can find those real quick.

14        Now, it was a -- five grievances; is that correct?

15   A    Yes.

16   Q    Now, can you tell the jury what the grievances

17   actually were?

18   A    The grievances were brought by consumers, and they

19   had to do with quality of care, as well as access to

20   care.  I cannot specifically tell you the grievances, as

21   those are protected by HIPAA.

22   Q    All right.  I'm going to have to apologize.  I am

23   not seeing a document that I'm looking for.  I may have

24   to take a little break later, but we can keep moving

25   right now.

1          You actually came up -- strike that.

2          After these complaints, these five complaints --

3     they occurred in October 13th, 2003; correct?

4     A    Yes.

5     Q    And based on those five complaints, you actually

6     requested records from the Schneider Medical Clinic;

7     correct?

8     A    Uh-huh.  Well, specifically, Quality Assurance Team

9     requests records and then brings them to the PERC for

10    our review.

11    Q    So, make sure we understand.  There are several

12    layers that we have happening here.  You have the

13    Quality Assurance Team, who has the direct

14    communication, who receives a complaint and then who may

15    get the records request.  Correct?

16    A    That's correct.

17    Q    And Sandy Jones was -- does that sound familiar?

18    She was the person in charge of the records request?

19    A    That's correct.

20    Q    And then after they request the records, they send

21    it to the PERC committee; correct?

22    A    That is correct.

23    Q    And then the PERC committee makes a recommendation;

24    correct?

25    A    We review the records, and we meet as a group, and

2920

1    then we make recommendations based on the review.

2    Q    And after the review, you send your letter stating

3    what those findings were; correct?

4    A    That is correct.

5    Q    Okay.  Now, isn't it true that when the PERC

6    committee met, the only recommendation was to send the

7    Schneider Medical Clinic a letter of education?

8    A    There were two -- specifically there was, yes, the

9    recommendation to send the letter of education, but also

10   there was a recommendation to refer to the Board of

11   Healing Arts.

12   Q    Okay.  The PERC review happened on January 28, 2004?

13   A    Yes.

14   Q    And when you went through this PERC review, you went

15   through 25 records; correct?

16   A    Yes.

17   Q    And would that be the 25 records of the individuals

18   that were requested by the clinic?

19   A    Yes.

20   Q    Now, before we talk about this review, you didn't

21   have any trouble -- the Quality Assurance Team didn't

22   have any trouble from the clinic getting the records

23   when they got that letter; correct?

24   A    As far as I know, no.

25   Q    You didn't have to go subpoena these records;

2921

1    correct?

2    A    No.

3    Q    And how many people were part of the PERC committee?

4    A    We have ten members of the committee and we have --

5    specifically we send the records to all of the

6    physicians plus the pharmacist, if there's pharmacy

7    issues involved with it.

8    Q    Okay.  Now, let me see if I can get an exhibit

9    sticker here.

10                      (Off-the-record.)

11   Q    I'm going to hand you defense Exhibit D-011.  Can

12   you tell us, does that document reflect the notes from

13   the PERC committees meeting on January 28, 2004?

14   A    Yes.

15   Q    Okay.  And this document would have been kept in the

16   ordinary course of business similar to these other

17   letters that you testified about that have been admitted

18   in evidence; correct?

19   A    Uh-huh.

20              MR. WILLIAMSON:  Your Honor, we'll move to

21   admit defense Exhibit D-011.

22              MS. TREADWAY:  No objection.

23              THE COURT:  D-011 is received.

24   BY MR. WILLIAMSON:

25   Q    Mr. Moore, can we get this elmo working, please.

2922

1    Taking a look before we look at this.  Looking at

2    your -- well, strike that.

3         Let's just take a look at this review.  These don't

4    have any patient information in it, does it?

5    A    No.  They've been based on numbers.

6    Q    Okay.  Now, the first beneficiary, the conclusion is

7    there was not a problem with the review of claims versus

8    what is in the medical record; correct?

9    A    Yes.

10   Q    Okay.  It talks about referral to oncologist and an

11   ENT; correct?

12   A    Yes.

13   Q    It identifies that there was a diagnosis for throat

14   cancer, radiation and RSD; correct?

15   A    Yes.

16   Q    And identifies the medication that was given;

17   correct?

18   A    Yes.

19   Q    All right.  Then we move to number 2.  They state

20   that there was only brief mentions of medications

21   working in the records; correct?

22   A    Uh-huh.

23   Q    There was not a problem of review of claims versus

24   what's in the medical records.  You see that?

25   A    Yes.

2923

1    Q    I'm going to have to just truncate this a little bit
2    because of the arm of the elmo.  For beneficiary 3.  All
3    right.  Beneficiary 3, it states that the -- mentions
4    the pain meds of little help; correct?
5    A    Yes.
6    Q    And just reading through there, after admission to
7    hospital and providers decided to discontinue the
8    narcotics, Dr. Schneider began decreasing the narcotics
9    described.  Do you see that?  Beneficiary 4, seen one
10   time and given immunizations and referrals.  No
11   prescriptions.  You see that?
12   A    Yes.
13   Q    Then here's beneficiary number 5. There's no
14   documentation on how the pain medication is working.  Do
15   you see that?
16   A    Uh-huh.
17   Q    Now, one little curious thing here is, it says PERC
18   5-2803 and it says Coffeyville Doctors Clinic.  Is this
19   because this form is used off of a template?
20   A    Whoever created this template just didn't correct
21   that part down there, yes.
22   A    Yes.
23   Q    And Dr. Schneider isn't the first doctor in Kansas
24   to have his clinic reviewed by your board; correct?
25   A    That is correct.

1    Q    Now, there are 25 of these.  We're not going to look

2    at every one, but just look at a couple where there may

3    have been some problems actually identified.  But you

4    have beneficiary 6.  You state that: found on 7-8-03,

5    claim filed for Creatine but it's not supported by

6    records.  Do you see that?

7    A    Yes.

8    Q    But there were no pain medications given to that

9    person; correct?

10   A    Correct.

11   Q    So, Doctor, the documentation problem that you guys

12   may have identified was not specific only to pain

13   patient people; correct?

14   A    That is correct.

15   Q    And you have beneficiary 7, no problem identified

16   with the billing.  Do you see that?

17   A    Yes.

18   Q    Okay.  And then here's a problem we see.  There are

19   no records received to support claims on a certain date.

20   Do you see that?

21   A    Yes.

22   Q    So you have -- so far we've gone through at least

23   eight of these -- what -- nine of these, where you see

24   some problems with billing, or couple of problems with

25   some documentations not supporting the billings.  Then

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

1    you have somewhere there's no problem at all; correct?

2    A    Yes.

3    Q    Now, there was a designation as to the actual

4    problems that were found by the PERC review committee;

5    correct?

6    A    I don't understand what you mean by designation.

7    Q    There were findings, observations and concerns;

8    correct?

9    A    Yes.

10   Q    And the concerns that you had is with beneficiary 1,

11   2, 10 and 14, there was little documentations on the

12   specifics of how pain medications working.  Usually the

13   only mention as to why is in the diagnosis.  Do you see

14   that?

15   A    Yes.

16   Q    Then there is a concern, observation and concern

17   about pain shot that's given to beneficiaries with

18   little or no documentation of the pain assessment.  And

19   four people are listed there; correct?

20   A    Yes.

21   Q    Then there's one:  Claims not supported by medical

22   records on several individuals.  Then you have another

23   couple complaints about no records.  No records.  Blood

24   draws with no records.  X-rays, no records.  Ankle

25   X-rays not supported by documentation.  But with

2926

1    beneficiary 19, if I'm not mistaken, there was no X-ray

2    but there was a fracture noted.  Does that sound

3    familiar to you?

4    A    This summary was the QAT summary that they brought

5    to PERC, so they were the ones who reviewed these

6    records, so I specifically do not remember beneficiary

7    number.

8    Q    And what I want to focus on here is what the

9    recommendation was on January 28, just a few days before

10   you sent your letter out.  The recommendation was: PERC

11   presentation for consideration of letter of education;

12   correct?

13   A    That was the QAT recommendation to PERC; yes.

14   Q    Now, I haven't found a letter, a document between

15   January 28, 2004, and February 5th, 2004, that expounded

16   upon these recommendations.  Are you aware of any?

17   A    Of a letter to who?

18   Q    To anybody.

19   A    After PERC met, and this was presented to PERC, the

20   letter that we discussed of February 5th was what was

21   sent to Schneider Medical Clinic.

22   Q    So, as I understand it, on January 28 the Quality

23   Assurance Team told that you these are their -- this is

24   their concerns; correct?

25   A    That's right.

2927

1    Q    Their main concern was: hey, there's some -- the

2    documentation isn't great over at the clinic.  We saw

3    that several times; correct?

4    A    Yes.

5    Q    These individuals who sat down and reviewed these

6    documents never once said to you, that we're concerned

7    that Dr. Schneider is acting as a drug-dealer at the

8    clinic, let's shut him down right now; correct?

9    A    That was never said.

10   Q    And you have your -- are there notes, or any kind of

11   recorded recollection that state:  Well, we're not going

12   to follow the QAT recommendation and we're going to go a

13   step beyond and require this corrective action plan?

14   A    When QAT reviews the records, their review is then

15   sent to PERC along with the medical records for each of

16   the members to review.  Then we meet as a group and we

17   formulate our response, which is the letter.  Okay?

18   Q    Okay.

19   A    Does that make sense?

20   Q    Yes.  So, there's no contemporaneous notes taken

21   from your decision other than the letter that you

22   stated?

23   A    Since this is peer review, it is protected and we're

24   in executive session during PERC when we meet and

25   formulate this plan.

1    Q    Protected by who?

2    A    It's protected, as far as I know, by the state.

3    Q    So you're saying that the state will not let you

4    testify here today about what findings the PERC

5    committee found?

6    A    They're right here.  I'm telling you --

7    Q    Specifically -- this is the problem.  Your letter

8    has a summary of what you believe was the problems.

9    A    Correct.

10   Q    Which is inconsistent with the individual chart

11   review that we went through.  What I'm trying to do is

12   bridging the -- to eliminate that inconsistency and see

13   how you went from the QAT, who identified documentation

14   issues, to your letter of February 5th.  And what you're

15   saying is you don't have any documents other than this

16   February 5th letter; correct?

17   A    That's correct.  The reality is the QAT is -- are

18   nurses who are reviewing the records, and what happened

19   after the nurses reviewed the records, they send them to

20   the physicians for review and the physicians review them

21   and come up with these recommendations.

22   Q    All right.  Where are the recommendations by those

23   physicians?  That's what I'm looking for.

24   A    They're here in the letter.

25   Q    Did the -- did all these physicians sit down with

2929

```
 1    you while you were sittin' there drafting the letter?
 2    A    Yes.
 3    Q    So, you were sitting there drafting the letter in a
 4    room full of physicians?
 5    A    Yes.
 6    Q    And nobody had any contemporaneous notes?
 7    A    No.
 8    Q    Now, all these documents in this February 5th letter
 9    that you talked about with Ms. Treadway, there is no
10    legal requirement for a clinic to utilize those;
11    correct?
12    A    No, there's no legal requirement.
13    Q    Can you see the envelope that you were handed.  And,
14    Counsel, what is the return receipt?  Which Exhibit?
15              MS. TREADWAY:  100-A.
16                   (Off-the-record.)
17    Q    Okay.  Now, 100-A was signed by an individual by the
18    name of Mike Atterbury; correct?
19    A    Yes.
20    Q    You saw this earlier?
21    A    Yes, I did.
22    Q    Now, the date that's -- what date does that
23    certified receipt say that your February 5th letter was
24    sent out on?
25    A    The date of -- the date of sent, or the date of
```

1    delivery?  Because I just have the -- mailed -- I'm

2    sorry -- 2-11-04.

3    Q    Okay.  Your letter was drafted on February 5th of

4    '04; correct?

5    A    Yes.

6    Q    Is there a reason why this letter sat around six

7    days with all this important information before it went

8    out?

9    A    I do not know the answer to that.

10   Q    Now, Mike Atterbury is not Dr. Stephen Schneider, is

11   he?

12   A    No.

13   Q    You do not see a signature on any document that Dr.

14   Schneider ever actually saw this letter; correct?

15   A    Correct.

16   Q    So you don't know that Dr. Schneider, himself, had

17   notice of the information in this packet before the

18   clinic went to court to reverse the decision made

19   against them; correct?

20   A    Correct.

21   Q    Okay.  So you have no evidence that Dr. Schneider

22   was lying or making up the fact that he never saw this

23   document; correct?

24   A    Correct.

25   Q    Now, when -- let's continue walking through this

1    timeline.  You all just -- you all -- excuse me for

2    that.  Medicaid, based on the PERC recommendations,

3    decided to terminate the Schneider Medical Clinic from

4    coverage; correct?

5    A    They did.

6    Q    Now, just so we're clear, this review that we looked

7    at, that wasn't just looking at Dr. Schneider's

8    patients, that was looking at all the providers'

9    patients at the clinic; correct?

10   A    That's correct.

11   Q    And this February 5th, 2004, letter was not just for

12   Dr. Schneider, it was for all the providers; correct?

13   A    That's correct.

14   Q    Now, in this -- isn't it true that in -- about June

15   3rd, 2004, somebody from the PERC committee contacted

16   the Schneider Medical Clinic about a second review?

17   A    Yes.

18   Q    Okay.  Isn't it true that that person actually

19   learned that Linda Schneider had not received this

20   package of this letter of February 5th, 2004?

21   A    I'm not aware of that.

22   Q    Okay.  You're aware of the re-review in September of

23   2009; correct?

24   A    Yes.  2004, yes.

25   Q    I'm sorry.  Absolutely.  2004.  Been dealing with a

```
 1    lot of dates in this case.  I'm going to hand you what I
 2    just marked as D-011.  Do you see that document?
 3    A   Yes, I do.
 4    Q   Is that the re-review we were just speaking of.
 5    A   Yes.
 6              MS. TREADWAY:  That's the same number, Judge.
 7              THE COURT:  You already marked -- I think the
 8    previous one was 011.  Yes.
 9              MR. WILLIAMSON:  I'm sorry.  I meant to put, I
10    was looking at 011 thinking not to use that.
11              THE COURT:  Is this 012?
12              MR. WILLIAMSON:  Yes.  012.
13    A   Thank you.
14    BY MR. WILLIAMSON:
15    Q   Now, that's the second re-review that we just
16    discussed; correct?
17    A   Correct.
18    Q   And this document was kept -- it's kept in the
19    course of ordinary business; correct?
20    A   Yes, this is --
21    Q   I'm sorry --
22    A   This is, again, a QAT, a summary of what has
23    happened in a timeline.
24    Q   All right.  Let me -- let Ms. Treadway look at that,
25    so I can move to admit it into evidence.
```

2933

```
 1                    (Off-the-record.)

 2            MS. TREADWAY:  Judge, this has not been

 3     redacted to protect patient privacy.  We don't have an

 4     objection to the document, if it would be redacted.

 5            MR. WILLIAMSON:  We'll wait to offer it,

 6     Judge, after we make the redactions but we can discuss

 7     the content without specifics to people.

 8            THE COURT:  Fair enough.  It's received.

 9     BY MR. WILLIAMSON:

10     Q   Now, this QAT review states that on 6-3-2004, that

11     the QAT received a call from the office manager with

12     Schneider Medical Clinic.  She says she received the

13     records request and copy of the original letter.  This

14     is the first she has heard of a problem.  She said the

15     person who signed for the letter in February is out of

16     the office for five months.  She showed the letter to

17     the providers and said they would make the changes

18     requested.  But it will start now, not in three months.

19     She said that she already -- excuse me, she said they

20     already have -- sorry again.  She said they have already

21     received pain management education from different

22     companies and will get confirmation from it.

23         Are you familiar that this conversation took place

24     in June of 2004?

25     A   Yes.
```

2934

1    Q    Now, you also received confirmation from the clinic

2    about the education that the providers had been

3    receiving; correct?

4    A    Yes.

5    Q    And that was from Tom, the Tom Wagner individual;

6    correct?

7    A    That's correct.

8    Q    And that actually occurred prior to June 3rd, 2004,

9    where the clinic just learned of this letter; correct?

10   A    Correct.

11   Q    Now, you sent a letter -- strike that.

12        Let's look at this in just a little bit more

13   detail.

14        You stated that there were five complaints made

15   against the clinic; correct?

16   A    Those were the initial reason that the review

17   happened; yes.

18   Q    One of them was that the -- that the provider did

19   not want to see the beneficiary if she could not pay the

20   copay.  Provider was educated and then saw the

21   beneficiary.  Do you see that?  I mean, is that one of

22   the complaints?

23   A    I believe so.  Without the document, I couldn't say

24   for sure.

25   Q    All right.  A second complaint that was there was --

2935

```
 1    they complained about the two hour wait; correct?
 2    A    Uh-huh, that's correct.
 3    Q    And it was told that the provider did not like to
 4    turn patients away and that grievance was closed;
 5    correct?
 6    A    Correct.
 7    Q    Then there was another complaint about access issue,
 8    and it was closed because the beneficiary didn't even
 9    respond; correct?
10    A    Yes.
11    Q    Then the fifth one was another -- the quality issue
12    that was closed with monitoring because the beneficiary
13    had never been seen at the Schneider Medical Clinic;
14    correct?
15    A    Correct.
16    Q    He wanted to go to a different doctor?
17    A    Yes.
18    Q    So the allegations, the complaints, that led to this
19    all out review of all these medical records were a long
20    wait, a complaint that the beneficiary didn't even
21    respond to, a beneficiary that didn't even see the
22    Schneider Medical Clinic, and a beneficiary who didn't
23    have a copay when they went to the doctor's office who
24    actually did get seen.  Correct?
25    A    Those were not the only access issues.  Those were
```

1    the ones that precipitated the review.  There had been

2    other issues that had been brought by practitioners as

3    well.

4    Q   By practitioner?

5    A   I'm sorry -- by pharmacists as well.  Concerns about

6    prescribing habits.

7    Q   Okay.  In the letter that you sent on February 5th,

8    2004 -- I'm sorry.  Let me back up.

9        In the letter that you sent on October 13th -- and

10   I don't think we can admit this because it has a lot of

11   identifying information, but you can look at it.  You

12   state in that letter that the purpose of the review was

13   based on five grievances; correct?

14   A   This was a review that was started by quality

15   assurance.  This was not the review from PERC.  They're

16   two separate things.  The Quality Assurance Team is the

17   one who takes calls from the consumers and other

18   practitioners.  They start the review process.  Once the

19   review is done, then they bring it to PERC if they think

20   there's something that's substantiated, or needs to be

21   reviewed by physicians.  So I didn't send any of these

22   letters.  These were sent by the Medicaid agency.

23   Q   Okay.  But make sure we're on the same page.  The

24   initial records review that led to your February 5th

25   letter started based on those five grievances; correct?

2937

```
 1    A    That was what we were told at PERC; yes.

 2    Q    And the Schneider -- let's look at what the

 3    Schneider Medical Clinic was told.  It was told -- it

 4    was based on five grievances on October 13th, 2003;

 5    correct?

 6    A    Yes.

 7    Q    Anywhere in that letter does it state that there are

 8    grievances by pharmacists and we're going to review your

 9    records in that letter?

10    A    This one that's in front of me?

11    Q    Yes.

12    A    I'm sorry.  I need to read it very quickly.

13         No, it does not.

14    Q    Now, looking at Exhibit 100, that 2-5-2004 letter

15    that was actually sent to the clinic.  Anywhere in there

16    does it state that Medicaid believed that Dr. Schneider

17    was intentionally committing fraud?

18    A    No.

19    Q    Anywhere in that letter does it state that Medicaid

20    believed that Dr. Schneider was intentionally treating

21    people with pain medication that he truly did not

22    believe needed it?

23    A    No.

24                      (Off-the-record discussion

25                      between counsel.)
```

2938

1   Q   Okay.  And there was a final review that PERC did

2   prior to making the decision to terminate the Schneider

3   Medical Clinic from Medicaid; correct?

4   A   There was a final review, but I just wanted to

5   clarify something.  We're an advisory council, so

6   Medicaid makes the final decision about termination.  We

7   can only recommend actions.

8   Q   Okay.  So based on your -- strike that.

9        So the PERC committee -- you know when I use you

10  I'm not specifically saying you?

11  A   I understand.

12  Q   Okay.  The PERC committee performed one more final

13  review, and I believe the Government put that in as

14  13-L.  And that took place at the end of 2004?

15  A   Yes.

16  Q   Okay.  Now, you understood that when you did this

17  review and you made your findings, Medicaid would rely

18  on these findings; correct?

19  A   Yes.

20  Q   And this final review, this final review that was

21  placed into evidence has a lot of issues that were read

22  by Ms. Wagner yesterday in regards to quality of care

23  and pain management; correct?

24  A   Yes.

25  Q   Now, the last QAT review, when they presented their

2939

1    findings to the PERC committee, those don't have nearly

2    the amount of issues identified based on that review

3    than what the PERC committee finally submitted to

4    Medicaid; correct?

5    A    Correct.

6    Q    And I guess that's another situation where we don't

7    know what happened because you guys didn't take

8    contemporaneous notes between the QAT review and the

9    final review that you guys put together; correct?

10   A    Correct.

11   Q    So we can't look at the charts, like we did with

12   those beneficiaries, and see what the independent

13   findings were for each specific beneficiary; correct?

14   A    Other than what's in the letter, which is

15   document -- which has documented what we reviewed.

16   Q    Okay.  And one of the issues was that the clinic did

17   not perform the corrective action plan that was

18   recommended previously; correct?

19   A    That's correct.

20   Q    Now, I'm just going to hand you our copy of 13-L

21   instead of having to dig it out.  Can you tell the jury,

22   in that letter where you state that a few months prior

23   to all this happening that the Schneider Medical Clinic

24   informed you that they did not have the February 5th

25   letter until sometime way later?

1   A    In this letter that you just handed to me?

2   Q    Yes.  And let me just -- that's Exhibit 13-L for the

3   record.  Are those the findings of the PERC committee?

4   A    These are the findings of the PERC committee; yes.

5   Q    Okay.

6   A    And, no -- there is no mention of when the

7   corrective action plan, the initial letter, was

8   discovered.

9   Q    Don't you think that would have been an important

10  piece of information Medicaid would have wanted to know

11  before they made the decision against the clinic?

12  A    Well, the timeline that you mentioned -- yes, I'm

13  sorry, the timeline that you mentioned before, we were

14  aware when the call was made that -- and that's why the

15  original plan was to re-review in three months and why

16  we waited to re-review since they stated at the clinic

17  that they did not receive the notification in a timely

18  fashion.  Because if -- we sent the letter in February

19  and we would have wanted to review in May instead of

20  later in the year, but waited because of the

21  notification.

22  Q    When Dr. Schneider filed his first verified amended

23  petition that was -- you weren't here but it was

24  discussed yesterday.  One of the primary reasons that he

25  stated that he should be allowed back in is because he

1   didn't have the letter in February; correct?

2   A   I don't know.

3   Q   Are you aware that during this same time period

4   Medicaid's state agency also conducted a quality review?

5   A   No.

6   Q   You didn't talk to anybody over at First Guard?

7   A   No.

8   Q   If the evidence shows that the clinic actually

9   performed a quality review and corrective action plan

10   with the state version of Medicaid, is there any

11   conceivable reason why they wouldn't have wanted to

12   comply with your version as well?

13   A   I don't understand the question.

14   Q   I'm sorry.  And so you're not aware as to whether or

15   not the clinic was found to have outstanding compliance

16   based off of First Guard's review of the Schneider

17   Medical Clinic?

18   A   No, that was not part of our review.

19        MR. WILLIAMSON:  One second, Your Honor, and I

20   think I'm about finished.

21             (Off-the-record.)

22   BY MR. WILLIAMSON:

23   Q   Just so I'm clear, there was nothing in the PERC

24   committee having any direct conversation with Dr.

25   Schneider himself; correct?

```
1    A   No.

2    Q   There's nothing in the PERC committee notes with

3    anybody having direct communication with Donna St.

4    Clair; correct?

5    A   No.

6    Q   There is nothing in PERC committee notes that state

7    that they had contact with any of the physician's

8    assistants at the Schneider Medical Clinic; correct?

9    A   No.  I mean yes.  I'm sorry.  Correct.  Yes.

10             MR. WILLIAMSON:  Okay.  I don't have anything

11   further, Your Honor.

12             THE COURT:  Mr. Byers?

13             MR. BYERS:  Nothing, Your Honor.

14             THE COURT:  Any redirect, please?

15             MS. TREADWAY:  Thank you, Judge.

16                  REDIRECT EXAMINATION

17   BY MS. TREADWAY:

18   Q   Dr. Shaw, returning to the envelope that is Exhibit

19   100.  Does the envelope clearly -- is it clearly

20   addressed to a specific place?

21   A   Yes, it is.

22   Q   What is it addressed to?

23   A   Schneider Medical Clinic.

24   Q   And is it clearly marked from whom the envelope is

25   coming?
```

2943

1    A    Yes.  It's from the Peer Education and Resource

2    Council, PERC.

3    Q    And this was a certified letter?

4    A    Yes, it was.

5    Q    Which required a signature?

6    A    Yes.

7    Q    Are doctors who are Medicaid providers knowledgeable

8    about the PERC and what it's about?

9    A    Yes.

10   Q    How do you handle certified mail from important

11   places like the PERC?

12   A    If my nurse signs for the certified mail then she

13   places it on my desk so that it's the first thing that I

14   see when I sit down.

15   Q    Now, you mentioned on cross-examination that you had

16   received a referral from a pharmacist about the

17   prescription practices.

18   A    Yes.

19   Q    And as a result of that referral, was that one of

20   the reasons that the PERC took the action it did?

21   A    Yes.

22   Q    And without disclosing the who, which is protected,

23   I understand, can you disclose what the concern was

24   expressed to the PERC?

25   A    Yes.  The concern was multiple narcotics prescribed

1    to the same patient from two different pharmacies with

2    the same medication.  So, therefore, doubling the

3    strength of the medication.

4    Q    Now, is the PERC part of the process of protecting

5    the State of Kansas health and public safety?

6    A    Yes.

7    Q    Mr. Williamson asked you about the PERC review --

8    and you personally reviewed some of the medical charts

9    in this case; didn't you?

10   A    Yes, I did.

11   Q    And you were reviewing those medical charts as a

12   physician?

13   A    I was.

14   Q    And based on that review, Dr. Shaw, what was your

15   general observation about the documentation at that

16   clinic?

17   A    It was very difficult to follow patient care.  The

18   documentation was very poor.  Especially regarding

19   health problems of the patients outside of their pain

20   needs.  For example, a patient with diabetes you

21   couldn't tell what the management on that chronic

22   disease was based on the documentation in the chart.

23   Q    Generally speaking, with the documentation that you

24   reviewed, did it evidence the practice of medicine as

25   you know it?

1    A    No.

2    Q    Based on your review of the Schneider Medical Clinic

3    records, did you note anything about the controlled

4    substances being prescribed?

5    A    There were many controlled substances that were

6    being prescribed out of the normal prescribing patterns;

7    as well as approving being prescribed early for patients

8    at doses that, frankly, were way above what the normal

9    prescribing patterns would be.

10   Q    I'd like to hand you what has been introduced as

11   Government Exhibit 1, Pam.  And for the record, Dr.

12   Shaw, that's a chronology of the overdoses and the

13   overdose deaths associated with the Schneider Medical

14   Clinic.  Have you seen that document before?

15   A    No, I have not.

16   Q    What's your reaction to that, ma'am?

17            MR. WILLIAMSON:  Your Honor, I'm going to

18   object.  A, outside the scope of cross; B, this witness

19   was not proffered as an expert on any kind of causation

20   or standard of care issues.  She was brought in to talk

21   about the PERC review and that's where we kept it.

22            THE COURT:  The objection is sustained.

23   BY MS. TREADWAY:

24   Q    Had you known this information when you were doing

25   your PERC review, would it have effected your PERC

1    review?

2              MR. WILLIAMSON:  Your Honor, I'm going to

3    object.  End around.  We talked about what she had in

4    front of her on the PERC review.

5              THE COURT:  The objection is sustained.

6              MS. TREADWAY:  Nothing further, Judge.

7              MR. WILLIAMSON:  Very brief, Your Honor.

8                    **RECROSS EXAMINATION**

9    BY MR. WILLIAMSON:

10   Q    You were assigned to review one chart in this case;

11   correct?

12   A    Yes, initially.

13   Q    And that was a patient number 22; correct?

14   A    Yes.

15   Q    You don't have any notes provided anywhere else

16   about any other charts that you reviewed; do you?

17   A    No.

18   Q    On September 29th, there was that second PERC

19   presentation; correct?

20   A    Yes.

21   Q    Out of all the charts you reviewed, the

22   recommendation, again, from the Quality Assurance Team

23   was a consideration of letter of education from the

24   quality assurance people who looked at all these records

25   to your committee; correct?

2947

1    A    What they recommended is that we review the -- I'm

2    sorry, re-review the charts again and provide education

3    if needed.

4    Q    Let me hand you the September 29th, 2004, PERC

5    review.  Do you see that?

6    A    Yes.

7    Q    Can you turn to that last page and read under

8    "recommendation"?

9              MS. TREADWAY:  Is that already admitted,

10   Judge?

11             THE COURT:  What's the -- is that 012 that

12   needs to be redacted?

13             MR. WILLIAMSON:  Yes, Your Honor.

14             THE COURT:  All right.

15   A    The last sentence says "PERC presentation for

16   consideration of letter of education."

17   Q    So this is --

18   A    So this is QAT's recommendation to us.

19   Q    Okay.  QAT has recommended twice to give a letter of

20   education, but your committee has decided to go well

21   above and beyond; correct?

22             MS. TREADWAY:  Judge, this is beyond the

23   scope.

24             THE COURT:  Sustained.

25

2948

BY MR. WILLIAMSON:

Q    You were asked about that envelope.  Remember that?

A    Yes.

Q    The date that that was sent out was February 11th;
correct?

A    Yes.

Q    Okay.  The certificate of service that we looked at,
100-A, was not attached to that envelope; correct?

A    You mean the registered letter?

Q    Yes.  Correct.

A    It's not -- there is a sticker that says certified
mail at the top.  But this was not part of the envelope,
no.

Q    Okay.  You also sent out -- the PERC committee also
sent out another letter around February 11th, 2004;
correct?

A    To Dr. Schneider?

Q    To the Schneider Medical Clinic.

A    This is the only letter we sent.

Q    And lastly, the last document that we talked about
that you sent to Medicaid that recommended terminating
the Schneider Medical Clinic for Medicaid.  That did not
mention the findings in the September 29th, 2004, PERC
committee meeting, did it?

          MS. TREADWAY:  Beyond the scope, Judge.

```
 1            THE COURT:  Sustained.
 2            MR. WILLIAMSON:  I don't have anything
 3   further, Your Honor.
 4            THE COURT:  Thank you, Dr. Shaw.
 5   A    Thank you.
 6            THE COURT:  You're excused.  About 15 minutes,
 7   Ladies and Gentlemen.  Remember and heed the admonition.
 8                  (Recess.)
 9            THE COURT:  Next witness please.
10            MR. WAMBLE:  The Government calls Jody
11   LeBroke, Your Honor.
```

12                      **JODY LeBROKE**

```
13   Having been first duly sworn to tell the truth, the
14   whole truth and nothing but the truth, testified as
15   follows on:
```

16                    **DIRECT EXAMINATION**

```
17   BY MR. WAMBLE:
18   Q    Can you please state your name.
19   A    Jody Lynn LeBroke Reagans.
20   Q    And where are you currently employed?
21   A    Klaus Spire Construction.
22   Q    And where is that?
23   A    K-42 and Tyler.  In Wichita.
24   Q    And what are your duties there?
25   A    Receptionist.
```

2950

1    Q    And did you ever work at the Schneider Medical

2    Clinic?

3    A    Yes, I did.

4    Q    And did you start working there around the summer of

5    2003 and then stop your employment there around October

6    of 2004?

7    A    Yes, I did.

8    Q    And, again, we have Government Exhibit 162 to

9    demonstrate your time at the clinic.  What was your

10   initial position at the clinic?

11   A    Receptionist.

12   Q    And who hired you as a receptionist?

13   A    Linda Schneider.

14   Q    How long did you work as a receptionist?

15   A    Oh, possibly two weeks.

16   Q    And what were your duties as a receptionist?

17   A    To check people in, to make appointments, set

18   appointments, take payments.

19   Q    Were you promoted to another position after being a

20   receptionist?

21   A    Yes, I was.

22   Q    And who gave you that promotion?

23   A    Linda Schneider.

24   Q    What was that promotion to?

25   A    Medical assistant.

2951

```
 1    Q    What were your duties as a medical assistant?

 2    A    To room the patients, take their vitals, their

 3    complaint.

 4    Q    Before taking that position, did you have any formal

 5    training to be a medical assistant?

 6    A    No.

 7    Q    I want to jump back just a little bit to the time

 8    that you were receptionist.  What, if anything, did you

 9    notice about the patients as they sat in the waiting

10    room?

11    A    Oh, they were agitated or kind of spaced out.  When

12    they were called back to the room, they all of a sudden

13    acted real sick and couldn't walk and --

14    Q    Can you tell us about the wait times at the clinic?

15    A    Oh, poor people would stay there over four hours.

16    Q    As a receptionist, did you ever see patients in the

17    lobby comparing pills?

18    A    Yes, I did.

19    Q    Nodding off?

20    A    Nodding off.  Sleeping, snoring.

21    Q    Any of 'em seem to have impaired speech?

22    A    Well, like they were just woke up or, you know, were

23    on their way to sleep.

24    Q    Were there ever arguments in the lobby?

25    A    I'm sorry.
```

1    Q   Arguments between patients in the lobby?

2    A   Yes.

3    Q   You said that they were asleep.  Can you describe

4    how this would occur in the lobby.  Were they in the

5    chairs?  Were they on the floor?

6    A   They're in chairs nodding off, or leaning back

7    against the wall nodding off.

8    Q   And did you report what you saw as a receptionist

9    with the patients to Defendant Linda Schneider?

10   A   Many times.

11   Q   And what was her response?

12   A   Those are the people we treat.

13   Q   Did you specifically tell her about the pill

14   swapping in the lobby?

15   A   Yes.

16   Q   And what was her response?

17   A   There isn't much we can do about that.

18   Q   Did you report your observations of the pill

19   swapping to the Defendant Steve Schneider?

20   A   Yes, I did.

21   Q   And what was his response?

22   A   He chuckled and shook his head.

23   Q   He laughed?

24   A   Yeah.

25   Q   While you were the receptionist, did the clinic have

2953

1    any out-of-state patients?

2    A    Yes.

3    Q    And you remember what state they would come from?

4    A    Norman, Oklahoma; Blackwell, Oklahoma and then far

5    away in Kansas.

6    Q    I want to talk about a situation that you

7    experienced as a medical assistant.  Do you ever

8    remember -- do you remember a specific patient that you

9    helped that had overdosed with narcotic drugs?

10   A    Yes.

11   Q    Can you tell us about this particular time?

12   A    She came in to the clinic one day, and she thought

13   she was having a heart attack.  And I did an EKG on her.

14   And I reassured her that she had not -- she was not

15   having a heart attack but probably should have been.

16   They told me the night before she had taken cocaine, a

17   hit of cocaine or something.  And that she needed some

18   help.

19   Q    How old was she?

20   A    18, 19.

21   Q    After you learned that she had ingested cocaine the

22   night before, did she leave the Schneider Medical Clinic

23   with a prescription?

24   A    Yes, she did.

25   Q    Do you remember who treated her that particular day?

2954

```
1    A    Stephen Schneider.

2    Q    And what prescription after taking cocaine did she

3    leave with?

4    A    Oxycontin.

5    Q    Was her parent or guardian there?

6    A    No.  She came with a girlfriend.

7    Q    Did you talk to Steve Schneider about this incident?

8    A    I talked to him, plus I showed him the chart.

9    Q    So he was aware of the previous cocaine?

10   A    Yes.

11   Q    And, again, what were your duties as a medical

12   assistant?

13   A    To room the patient, to take their vitals, weigh

14   'em, take down their complaint, and do any preliminary

15   tests like EKG's or take 'em to X-ray or whatever was

16   needed.

17   Q    Who instructed you that these were your duties?

18   A    Linda Schneider.

19   Q    Were you promoted to this position even though she

20   knew that you had no formal medical training?

21   A    Yes, I was.

22   Q    Were you comfortable with all the duties that you

23   were asked to perform?

24   A    No.

25   Q    What were some of the duties that Linda Schneider
```

1   asked you to perform that you were uncomfortable doing?

2   A    Leaving -- leaving the files alone, drawing blood or

3   giving, or, you know, giving a shot or something like

4   that.

5   Q    Were you uncomfortable doing this because you had no

6   training?

7   A    Exactly.  Yes.

8   Q    Did you shadow any other medical assistants before

9   you were promoted?

10  A    No.

11  Q    As a part of your duties as a medical assistant, did

12  you take the patient's history and then chart that?

13  A    Yes, I did.

14  Q    With regard to chronic pain, when you met with the

15  patients what were the typical reasons that they would

16  tell you that they were there?

17  A    Back pain, migraine headaches.

18  Q    And would you record this in the progress note?

19  A    Yes.

20  Q    Were you given any specific instructions as to chart

21  medicine refills?

22  A    No.

23  Q    When you took a patient to the exam room, were you

24  always provided with a chart?

25  A    No.

```
 1    Q   And why not?

 2    A   We couldn't find 'em.

 3    Q   Was this rarely or quite often?

 4    A   Oh, this was every day.

 5    Q   We talked briefly with other witnesses about rooming

 6    patients, and I believe that we all have an

 7    understanding of what that means.  In terms of rooming

 8    patients at the Schneider Medical Clinic, how many

 9    patients would you typically room a day?

10    A   Oh, goodness.  My side?  There would be a good 80,

11    85 patients a day.

12    Q   That you would personally room?

13    A   Oh, no.  Oh, I'm going to say a good 50.

14    Q   That you would room?

15    A   Yep.

16    Q   How about a record day?  Do you remember how many

17    patients you would have roomed?

18    A   I remember one time I roomed a hundred -- there was

19    like 160 all together.  I roomed probably 130 by myself.

20    Q   Were there any Registered Nurses at the clinic?

21    A   I don't think so.  I think they were both LPNs.

22    Q   Okay.  When you were serving as a medical assistant,

23    who told you to knock on the door every ten minutes?

24    A   Linda Schneider.

25    Q   And what was the purpose of doing this?
```

2957

1    A    I was to knock on the door, stick my head inside the

2    room and ask Dr. Schneider if he needed any assistance.

3    That was his clue to wrap things up and go to the next

4    one.

5    Q    Did it matter if the examination was still going on?

6    A    No.

7    Q    You were just instructed that ten minutes put your

8    head in the door?

9    A    Yep.

10   Q    And who instructed this?

11   A    Linda Schneider.

12   Q    While you were a medical assistant, did you happen

13   to be inside the examination room with Doctor Steve

14   Schneider?

15   A    A few times, yes.

16   Q    And what was the purpose of having you in the room?

17   A    I guess just to, if a real medical case came in, to

18   assist him.

19   Q    What do you mean by a real medical case?

20   A    Well, most of 'em were just in for scripts.  I mean,

21   there weren't that many that came in with true medical

22   problems.

23   Q    As far as his hands-on examination and interaction

24   with patients, how would you describe that?

25   A    I never saw Dr. Schneider touch a patient to examine

2958

1    them.

2    Q   Do you remember a specific incident where a woman

3    had a cyst on her breast?

4    A   Yes, I do.

5    Q   Did he examine the breast?

6    A   He looked, he just looked.  He never physically

7    touched her.

8    Q   You remember teenagers coming into the clinic

9    unassisted by their parents?

10   A   Yes, I do.

11   Q   What were their ages?

12   A   Oh, I'm gonna say 15, 16.

13   Q   Do you know if they received any narcotic when they

14   left?

15   A   They left with a prescription.

16   Q   How many times would this happen?

17   A   I only saw it happen once.

18   Q   Were they accompanied by their parents?

19   A   No.

20   Q   Did you talk to Defendant Stephen Schneider about

21   the juveniles coming into the clinic?

22   A   Yes, I did.

23   Q   And what was his response?

24   A   He just laughed and said it's okay, I know their

25   parents.

2959

1    Q    You talked briefly about the demeanor of the
2    patients that were in the lobby.  I want to talk to you
3    about how many patients total that you would see come
4    through the clinic in a typical day.
5    A    Oh, goodness.  It was like cattle on both sides.  A
6    good 160 to 180 patients a day.
7    Q    And did they appear to be coming to the clinic for a
8    particular reason?
9    A    Yes.
10   Q    And what was that reason?
11   A    Their drug prescriptions.
12   Q    If a person was there just for a drug refill, how
13   long would this interaction with the Defendant
14   Stephen --
15   A    Three or four minutes.
16   Q    So a medicine refill, the visit would last three to
17   five minutes?
18   A    Yeah.
19   Q    You just previously talked about why you suspected
20   people were at the clinic only to receive drugs.  Why do
21   you feel that way?
22   A    Because of the things that I saw, the things that I
23   heard, the things that I witnessed.  Dr. Schneider
24   always had his pad in his hand and his pen in his hand
25   and -- I went in when I--

2960

```
 1    Q   We'll talk about that in just a second.  I want -- I
 2    just want to specifically talk about what you saw, what
 3    made you believe that the people there were
 4    drug-seekers?
 5    A   The way the people -- the patients acted.  When they
 6    said -- they would meet each other out in the waiting
 7    room after their visit with Dr. Schneider.  Where they
 8    would meet and how big their prescriptions were.  I
 9    heard a lot of that.
10    Q   Was there a particular change in demeanor from the
11    lobby to the examination room?
12    A   Yes.
13    Q   Can you tell us about that?
14    A   They sounded pretty okay in the lobby but by the
15    time they got to Dr. Schneider's end of the building
16    there, the examining room, they acted like they were
17    half dead with pain.
18    Q   Did you have a specific conversation about this
19    change in demeanor with Linda Schneider?
20    A   Yes, I did.
21    Q   What was her response?
22    A   Just, well, that's -- those are the type people that
23    we treat.
24    Q   How about Steve Schneider, what was his response?
25    A   He just would chuckle and he wouldn't say anything.
```

2961

```
 1    Just laugh.
 2    Q   As far as you could tell, did you ever see anyone
 3    that you thought was a legitimate pain patient walk
 4    through the building?
 5    A   Yes.  Yes.
 6    Q   What type of patient would that be?
 7    A   We had one patient that had a gunshot wound and I
 8    truly believe he was a pain management patient.
 9    Q   Okay.  While you were working at the clinic did you
10    meet a person by the name of Ulysses?
11    A   Yes.
12    Q   And who introduced you to Ulysses?
13    A   Linda Schneider.
14    Q   And did she tell you what his role at the clinic is?
15    A   Yes.
16    Q   And what did she tell you?
17    A   Office manager.
18    Q   Did he perform any office managing duties?
19    A   Made the schedules.
20    Q   As far as you know, did he have any medical
21    training?
22    A   None that I know of.
23    Q   About the same as perhaps what you had?
24    A   Yes.
25    Q   During your the time at the Schneider Medical
```

1    Clinic, did you become aware of patients dying from

2    prescription drug overdoses?

3    A    Yes, I did.

4    Q    How did you learn of these overdose deaths?

5    A    Through, through other patients, through doctor's

6    calls from the hospital.

7    Q    Would you take calls from the emergency room?

8    A    Yes, I did.  Dr. Mancao.

9    Q    Specifically as it pertains to Steve Schneider did

10   you have a specific conversation with Stephen Schneider

11   about these deaths?

12   A    Yes, definitely.

13   Q    How often would you talk to him about these deaths?

14   A    Well, two or three times a week.

15   Q    Do you remember what he would say when you raised

16   the concerns about the number of people dying at the

17   Schneider Medical Clinic?

18   A    He just said it wasn't his fault that they were

19   dying and then we all gotta go sometime.

20   Q    After you had these coversations with Defendant

21   Stephen Schneider, did you have conversations with Linda

22   Schneider about this?

23   A    I talked to Linda as well, yes.

24   Q    Did one single thing change at the clinic after

25   these conversations?

```
 1    A    Yes.

 2    Q    What changed?

 3    A    It changed to us -- that if we were to discuss one

 4    more thing with Dr. Schneider, we would be fired.

 5    Q    And who told you that?

 6    A    Linda Schneider.

 7    Q    Within the Schneider Medical Clinic, did the

 8    Defendant Stephen Schneider have any nicknames?

 9    A    Have any what?

10    Q    Nicknames?

11    A    Yes.

12    Q    And what were those nicknames?

13              MR. WILLIAMSON:  Your Honor, I'm going to

14    object.  I'm going to object, 404-A, improper.

15              THE COURT:  Overruled.

16    BY MR. WAMBLE:

17    Q    Can you please give us the nicknames?

18    A    "Schneider the Writer" was one I heard a lot.

19    "Kevorkian Jr." was one.  And the other one was "Drug

20    Lord of Haysville."

21    Q    What did you think "Schneider the Writer" meant?

22    A    I took it as if you -- if you need him to write

23    something, he's right there.

24    Q    What about "Kevorkian, Jr"?

25    A    People were dying.
```

2964

1   Q   And "Drug Lord of Haysville" what did you think that

2   meant?

3   A   I think everybody in Haysville knew where they could

4   go to get drugs.

5   Q   Was that his reputation within the clinic?

6   A   Yes.

7   Q   And what reputation was that?

8   A   That it was a pill-mill.  I mean --

9   Q   While you were at the clinic, did you ever see

10  prescription pads with the signature already filled out?

11  A   Yes, I did.

12  Q   And in your time at the clinic, did you become

13  familiar with Defendant Stephen Schneider's signature?

14  A   Yes, I did.

15  Q   And was his signature on those blank prescription

16  pads?

17  A   Yes, it was.

18  Q   Based on your time at the clinic, did you form a

19  reputation (sic) about Dr. Schneider's prescription

20  practices?

21           MR. WILLIAMSON:  Your Honor, I'm going to

22  object.  This is --

23           THE COURT:  Did she perform a reputation?

24           MR. WAMBLE:  I'm sorry, Your Honor.

25           THE COURT:  You said did she perform -- or

2965

```
 1   form a reputation.
 2           MR. WAMBLE:  Did she develop, I'm sorry, a
 3   rep -- did she, during her time at the clinic, did she
 4   develop what she thought Dr. Schneider's prescribing
 5   reputation would be.
 6           THE COURT:  I think she's already testified to
 7   that, hasn't she?
 8           MR. WAMBLE:  I believe the question was around
 9   the clinic but more specifically her thoughts.  And she
10   may have mentioned that before and I didn't recall.
11           THE COURT:  I think you should move on.
12           MR. WAMBLE:  Okay.
13   BY MR. WAMBLE:
14   Q   Before you worked at the clinic, were you ever a
15   patient of Defendant Stephen Schneider?
16   A   Yes.
17   Q   And do you recall the first thing that the Defendant
18   said to you when you walked in the room?
19   A   Yes.  When I first moved here I had a bad toe and
20   the first thing he said to me was what can I get for you
21   today.
22   Q   At that particular time, did you know what he meant?
23   A   I didn't have a clue.
24   Q   Did he have his prescription pad in his hand?
25   A   Yes, he did.
```

2966

```
1    Q    Did he have a pen in his hand?

2    A    Yes, he did.

3    Q    In retrospect, what did he mean?

4    A    Well, I think he thought I wanted some drugs.

5    Q    What did you want?

6    A    I wanted him to fix my toe.

7    Q    What was wrong with your toe?

8    A    I had an ingrown toenail.

9    Q    Did he look at your toe?

10   A    He -- he looked at it -- didn't -- never touched it.

11   And then turned around and sent me to another doctor.

12   Q    Did you ask for prescription drugs?

13   A    No.

14   Q    Did you ever go back to him as a patient?

15   A    No.

16   Q    Was there an occasion when your husband went to the

17   clinic?

18   A    My husband got very badly hurt on a riding lawn

19   mower, and he had emphysema.  And I -- the muscle was

20   exposed and everything and I took him to Dr.

21   Schneider's.  And I'll never forget Dr. Schneider walked

22   in, and he looked at Gene's leg and he went, "can't help

23   ya".  And if it hadn't been for Curtis, Curtis came in

24   and he said "well, Gene, you ready -- you ready to

25   practice with me", or something like that.  Made Gene
```

2967

```
 1    feel a lot more comfortable and he -- he helped Gene.
 2    But, I forgot Gene's oxygen and Gene havin' problems
 3    breathing.  And he was really, you know, he was agitated
 4    and in a lot of pain and there wasn't one bottle of
 5    oxygen in the whole clinic.  So the guy suffered
 6    greatly.
 7    Q    Curtis Atterbury, is he a physician's assistant?
 8    A    He's a physician assistant, yes.
 9    Q    And reports to Steve Schneider?
10    A    Yes.
11    Q    The physician's assistant stitched up your husband?
12    A    Yes, he did.
13    Q    Steve Schneider walked out of the room?
14    A    He walked away.
15    Q    There was no oxygen?
16    A    No oxygen, not one bottle full.
17    Q    Did you ever remember them running out of
18    prescription pads?
19    A    No.
20    Q    Did Stephen Schneider even care or seem to care?
21    A    No.
22    Q    Did you eventually quit your job at the clinic?
23    A    Yes, I did.
24    Q    Did you report your concerns to anyone?
25    A    Yes, I did.
```

1    Q    Who did you report your concerns to?

2    A    I went down to the police station and reported them

3    to Bruce -- well, now I can't remember his last name.

4    Q    Do you remember which police department?

5    A    Yes, Haysville police department.

6    Q    What did you tell them?

7    A    I just told 'em, I said, you know, I says,

8    there's -- there's something really bad going on.  I've

9    looked.  I've watched.  I've listened.  And I've had

10   enough.

11            MR. WAMBLE:  One moment, Your Honor.

12                 (Off-the-record.)

13            MR. WAMBLE:  Thank you.  I have nothing

14   further.

15            THE COURT:  Mr. Williamson.

16                 **CROSS EXAMINATION**

17   BY MR. WILLIAMSON:

18   Q    Let's start with when you left off.  When did you

19   quit the clinic?

20   A    It was in October of '04.

21   Q    And why did you quit?

22   A    Well, why I quit is I -- I'd had enough of what was

23   going around and the thing that made me quit was a job

24   that Ulysses gave me.

25   Q    Okay.  Now, you quit in October.  And when did you

2969

```
 1    start working there?
 2    A    I can't remember.  I think it was April of '03.
 3    Q    Isn't it true that you told the clinic in July of
 4    2004 that you were going to have to quit because you
 5    were running your own business?
 6    A    Oh, yes, I did say that.
 7    Q    And didn't you tell them that you hate the thought
 8    of leaving the place like this that you've called home
 9    for so long?
10    A    I hated the thought of leaving the clinic, yes.
11    Q    But you just testified for 20 minutes that this
12    place was a cesspool, but in July of '04 you say you
13    hate to leave this place; correct?
14    A    That's correct.
15    Q    You said you worked the reception desk.  True?
16    A    Yes.
17    Q    And you worked at this reception desk and within a
18    couple of weeks you saw all of this, these drug-seekers
19    in the lobby; correct?
20    A    Yes.
21    Q    You didn't quit, did you?
22    A    No, I did not.
23    Q    You didn't go to the police right then, did you?
24    A    No.
25    Q    You didn't go to the Kansas Board of Healing Arts
```

```
 1    right then?
 2    A    No.
 3    Q    You didn't go to the police or anybody until Ulysses
 4    gave you a job that you didn't want to have; correct?
 5    A    Oh, no.  I had spoken with someone before then.
 6    Q    Did you send a letter to them?
 7    A    To the police department?
 8    Q    Yeah.  When you went -- allegedly first talked to
 9    this police person, did you quit then before Ulysses
10    gave you this job?
11    A    No.
12    Q    You didn't quit -- well, strike that.
13         You say you went and saw Stephen and the first
14    thing he said was "what can I get for you"?
15    A    Uh-huh, yes.
16    Q    This was before you started working there; right?
17    A    Yes.
18    Q    But you went and took a job with this doctor anyway,
19    didn't you?
20    A    Well, I didn't know what he meant.
21    Q    Oh, you didn't know what he meant.  Didn't you
22    testify previously under oath that he didn't -- he said
23    what can I write for you today?
24    A    No, I did not say that.
25    Q    You remember testifying under oath before; correct?
```

2971

```
 1    A    Yes, sir.

 2    Q    You are Jody Lynn LeBroke, aren't you?

 3    A    Yes, I am.

 4    Q    And didn't you testify under oath that: "I was new

 5    to Haysville, I've been in Kansas for five years.  And I

 6    went to Dr. Schneider because our first place that we

 7    lived was -- it was in Haysville, and I went to Dr.

 8    Schneider one day for something.  I can't even remember.

 9    And never ever met the man before.  And he come in the

10    room and he goes, what can I write you today".  Quote,

11    unquote.  Wasn't that your testimony under oath?

12    A    Yes, it was.

13    Q    Now, there's a big difference between what can I get

14    for you today and what can I write for you today.  Would

15    you agree with that?

16    A    No.

17    Q    Okay.

18    A    It's the same.

19    Q    But you drew that indication under this sworn

20    testimony that then he was just asking about writing a

21    prescription; right?

22    A    Yes, sir

23    Q    You saw these teenagers coming in during your first

24    couple of weeks while you were at the clinic supposedly;

25    right?
```

1    A    No, sir.

2    Q    When did you see these teenagers start coming in?

3    A    Oh, later on.

4    Q    How many teenagers -- who was the first teenager

5    that you remember?

6    A    Well, I can't remember their names.

7    Q    None of 'em?

8    A    No.

9    Q    Do you know the dates that they came in?

10   A    No.

11   Q    Now, when did you -- what days did you work at the

12   clinic?

13   A    Mondays through -- well, I worked five days a week.

14   Q    So you were full time?

15   A    Yes.

16   Q    And weekends?

17   A    Yes.

18   Q    So you worked seven days a week?

19   A    No.  I worked five days a week.

20   Q    Now, you stated earlier that the number of patients

21   at the clinic were mostly all drug-seekers.  You

22   remember that?

23   A    Yes.

24   Q    Are you aware that there has been evidence in this

25   case that at least half of the people that visited the

2973

1    clinic at all never received a controlled substance?

2    Are you aware of that?

3    A    I find that hard to believe.

4    Q    Okay.  You understand that's the Government's

5    evidence; right?

6    A    Yes.

7    Q    Now, you -- you're not a pain management expert, are

8    you?

9    A    No, I'm not.

10   Q    You working at a construction company now; correct?

11   A    Yes, I do.

12   Q    You're not even in the medical field at all?

13   A    No, I'm not.

14   Q    Now, you stated earlier that you would talk to Steve

15   about these overdose and deaths two or three times a

16   week.  You remember that?

17   A    Yes, I do.

18   Q    If you extrapolate that out, that would mean that

19   you had over 700 -- strike that.

20        If you keep that average, that means there were

21   over 780 overdoses and deaths that would occur.  You

22   understand that that is well beyond the realm of any

23   evidence that's been presented in this case?

24   A    I don't understand anything you're sayin'.

25   Q    Two or three times a week.  You understand that?

1    A    Yes.

2    Q    You understand there are 52 weeks in a year?

3    A    We could be talkin' about the same death.

4    Q    Oh, okay.  Well, that's not what you said on direct

5    examination.  You made it seem like two or three times a

6    week the whole year that you were there.

7            MR. WAMBLE:  Objection, Your Honor

8    argumentative.

9            THE COURT:  Let's calm down and stop this

10   histrionic type of examination.  Ask her questions or

11   I'm going to tell you to sit down.  We've been doing

12   this for three weeks, and I am tired of it.  I don't

13   know if they're tired of it, but I am.

14   BY MR. WILLIAMSON:

15   Q    Now, when you mentioned that --

16           THE COURT:  You do it one more time,

17   Mr. Williamson, and that's going to be your last time.

18           MR. WILLIAMSON:  Judge --

19           THE COURT:  No, I don't want to hear from you.

20           MR. WILLIAMSON:  I'm going to cross-examine

21   this witness the best of my ability.

22           THE COURT:  You're going to cross-examine the

23   witness the way I tell you to.

24           MR. WILLIAMSON:  No, I'm sorry --

25           THE COURT:  Not with cross-examination by

1    histrionics -- walking up and down, throwing your arms

2    up in the air.  You stand there at the podium.  Don't

3    move from that podium.  This applies to every single

4    witness here on out throughout this trial.  However long

5    it lasts.  Unless I give you permission to move from the

6    podium.  Now, is that clear?

7                    MR. WILLIAMSON:  Yes, Your Honor.

8    BY MR. WILLIAMSON:

9    Q    You mentioned the 16 year old individual who came

10   into the clinic and walked out with a prescription;

11   correct?

12   A    Yes, I did.

13   Q    Did you lock at her prescription?

14   A    No, I did not.

15   Q    Well, how do you know what prescription she had?

16   A    Because I spoke with one of the other girls.

17   Q    Oh, so you're basing this off of hearsay?  Nothing

18   that you saw yourself?

19   A    I saw the prescription.  I just don't know what was

20   on the prescription.

21   Q    Oh, okay.  So you don't know if he gave her

22   something to help her with whatever issues she may have

23   been going in there with -- you don't know what was on

24   there.  You just guessing based off what somebody else

25   told you?

2976

```
 1   A    No, I'm not guessing.

 2   Q    You didn't see it; right?

 3   A    No, I did not see it.

 4   Q    Now, you testified under oath before that you seen

 5   prescriptions (sic) walk out of the clinic with over 480

 6   Lortabs issued in one setting?

 7   A    Yes.

 8   Q    Now, even the Assistant U.S. Attorney told you that

 9   he did not find any prescription such as that; correct?

10   A    Sir, I can't help -- I know what I saw.

11   Q    What did you see it on?

12   A    What did I see it on?

13   Q    Yeah.

14   A    A prescription.

15   Q    An actual -- you looked at a lady's prescription --

16   or a person's prescription?

17   A    Yes, I did.

18              MR. WILLIAMSON:  Your Honor, we have

19   prescriptions in evidence.  Well, strike that.

20   Q    You understand that there has not been any evidence

21   offered whatsoever that Dr. Schneider ever wrote a 400

22   count prescription?

23   A    And that's too bad.

24   Q    Point me to the chart that said -- where's that

25   chart, the person that you found that in?
```

2977

```
 1    A    Sir, this is five years ago we're talkin' about.

 2    Q    Ma'am, you are in court today --

 3    A    I do not know names.

 4    Q    Okay.  So I can't go look at this record and try to

 5    find this information?

 6    A    I wish you could.

 7    Q    I wish I could, too, ma'am.

 8         Now, didn't you state to an officer that this 17

 9    year old person that you believed was under the

10    influence of cocaine, when you talked to the officer you

11    said it was heroin, didn't you?

12    A    Heroin?

13    Q    Yes.  Never made that statement, did you?

14    A    About what?  I'm sorry.

15    Q    The 17 year old that you testified about coming in

16    with cocaine, you stated that it was heroin, didn't you?

17    A    Oh, I said heroin, cocaine, whatever.

18    Q    Okay.  You don't -- you don't know what it was?

19    A    She said she took a hit.

20    Q    Okay.  Now, you say that you had this conversation

21    with Dr. Schneider about pill-swapping; correct?

22    A    Yes.

23    Q    Now, did you make any written complaints at the time

24    that you -- at any time before you decided to quit the

25    clinic to Dr. Schneider?
```

2978

1    A    No.  I had talked to somebody, a friend of mine
2    about it.
3    Q    I'm asking about what you -- a written complaint to
4    Dr. Schneider?
5    A    Written complaint to Dr. Schneider?
6    Q    Yes.
7    A    No.
8    Q    There was testimony that Dr. Schneider would not go
9    out into the waiting room.  Are you saying that Dr.
10   Schneider would be out there seeing these patients pill
11   swapping?
12   A    No.  Dr. Schneider never went out in the waitin'
13   room.
14   Q    But when these patients would go back to see Dr.
15   Schneider, then they would start having these ailments,
16   according to you; correct?
17   A    Yes, sir.
18   Q    And that was to put on an act so they could scam the
19   clinic so they could try to keep gettin' their medicine,
20   according to you; right?
21   A    Yes, sir.
22   Q    Now, you mentioned people sleeping in the waiting
23   room.  Are you saying it's unusual for patients to fall
24   asleep when they have a long wait?
25   A    No, it's, it's probably not unusual for one or two

1   to fall asleep but --

2   Q   Now -

3   A   -- we had it going on.

4   Q   -- clinic had a lot of patients, didn't it, when you

5   started?

6   A   Oh, it was like a cattle drive.

7   Q   You never -- the clinic never went out and

8   advertised on TV, did they?

9   A   No.

10  Q   And I think you mentioned the time that your husband

11  came into the clinic.

12  A   Yes.

13  Q   Do you remember that?  When did that happen?

14  A   Well, if memory serves me right, August.

15  Q   Of what year?

16  A   It would be 2004.

17  Q   So you decide to bring your husband to the doctor

18  who you feel like is just prescribing nothing but pain

19  pills to people all out in the community?  You bring him

20  to that clinic?

21  A   Yes.

22  Q   Okay.  And now, now, fairly, Dr. Schneider came in,

23  he looked at your husband; correct?

24  A   Uh-huh.

25  Q   And you said he left out, he didn't seem to care;

2980

```
 1    correct?
 2    A    No, he didn't.
 3    Q    What did he -- do, who did he talk to when he left
 4    the exam room?
 5    A    He went back to treating his other patients.
 6    Q    How do you know?  Did you follow him around?
 7    A    Oh, well, I, yes, I left the room.  Because we were
 8    lookin' for oxygen.
 9    Q    And you followed Dr. Schneider where he went from
10    the time he left the room until you came back in there?
11    A    I followed him to the front desk where he picked up
12    another chart and went on.
13    Q    And you don't know that Dr. Schneider actually
14    talked to Curt and told Curt to come in and take care of
15    your husband?
16    A    No.  Curtis came down all on his own.  And he said
17    what's going on in here.
18    Q    Okay.  Now, isn't it true that Curt is actually Dr.
19    St. Clair's -- was Dr. St. Clair's PA?
20    A    They worked together on one side; yes.
21    Q    Okay.  So Curt would have been on the other side.
22    How do you think he knew -- well, strike that.
23         When you came in, did your husband have to wait
24    four hours to get back there?
25    A    Not at all.  I took him right back.
```

2981

1    Q    So before Dr. Schneider came in, somebody had to let

2    him know that your husband was there; correct?

3    A    Yeah.

4    Q    Okay.

5    A    The nurse.

6    Q    And you don't know if Dr. Schneider went over and

7    told Curt to come over to your side or not, do you?  You

8    weren't there to see him talk to Curt, were you?

9    A    We were on Curtis' side.

10   Q    Okay.  So Dr. Schneider came from his side over to

11   Curtis' side?

12   A    That's correct.

13   Q    Who came and got Dr. Schneider?

14   A    One of the nurses.

15   Q    You know which one?

16   A    I believe Jamie.

17   Q    Jamie?

18   A    Pillet.

19   Q    So she came over there and got Steve?

20   A    Uh-huh.

21   Q    You don't know whether or not Steve ever

22   communicated with Curt that day?

23   A    No, I do not.

24   Q    You mentioned there were a lot of patients that

25   would have to get roomed.  Do you remember that?

1    A    Oh, yeah.

2    Q    And there would always be multiple providers there

3    to try to help these people; right?

4    A    Yes.

5              MR. WILLIAMSON:   One second, Your Honor.   May

6    I go to my table?

7              THE COURT:   Yes, sir.

8                        ( Off-the-record discussion

9                        between counsel.)

10   BY MR. WILLIAMSON:

11   Q    Now, do you know whether or not Curt Atterbury was a

12   better stitcher than Dr. Schneider?

13   A    A better stitcher?

14   Q    Yes.

15   A    I never saw any of Dr. Schneider' stitching.

16   Q    Okay.   Now, I'm looking for this one paragraph and

17   then I'll be through talking with you.

18        You felt the clinic treated a lot of lower class

19   people, didn't you?

20   A    Yes, I did.

21   Q    People who didn't care about their personal

22   appearance?

23   A    Correct.

24   Q    Felt like they didn't control their kids; right?

25   They would just tear up the place?

1    A    Correct.

2    Q    And you said that you had an incident with the

3    black -- a black gentleman that came in with a gunshot

4    wound; correct?

5    A    Yes.

6    Q    And you said he grabbed you?

7    A    Oh, that evening, yeah.  That -- that one night

8    where he --

9    Q    And another black gentleman actually came in and I

10   guess basically defended you?

11   A    Yes.

12          MR. WAMBLE:  Objection, Your Honor.  This is

13   starting to sound a bit like a deposition.

14          MR. WILLIAMSON:  No, I'm about to wrap it up.

15          MR. WAMBLE:  I don't see the relevance.

16          THE COURT:  I don't know what the relevance

17   is, but she did talk about somebody with a gunshot

18   wound.

19   BY MR. WILLIAMSON:

20   Q    And you stated that you could not understand what

21   these two gentlemen were saying because these two black

22   guys were speaking in, quote, "their language"?

23   A    Yes.

24          MR. WAMBLE:  Objection, Your Honor.  Again,

25   the relevance of this.

2984

```
 1              THE COURT:  Overruled.
 2      BY MR. WILLIAMSON:
 3      Q    Correct?
 4      A    They were talkin' street talk.
 5      Q    Your quote, language was --
 6      A    Yes.
 7      Q    I couldn't understand because the two were talking
 8      in, quote, "their language"?
 9      A    That's correct.
10              MR. WILLIAMSON:  I don't have anything
11      further.
12              THE COURT:  Mr. Byers.
13              MR. BYERS:  Thank you, Your Honor.  And you
14      know I'll stay tethered.
15              THE COURT:  You know you better.
16              MR. BYERS:  That's one reason you know I will.
17                        CROSS EXAMINATION
18      BY MR. BYERS:
19      Q    Good morning, ma'am.
20      A    Good morning.
21      Q    I want to follow up with some questions.  Some
22      follow up from Mr. Williamson's examination of you and
23      some from Mr. Wamble's.  Let me try and get these
24      ordered in my head.
25           You don't know any training requirements that are
```

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

1    required to function as a medical assistant, do you?

2    A    Formally trained, no.

3    Q    Okay.  Now, you talked about these -- the feigned

4    illnesses or pain you saw the patients changing from the

5    reception area into the exam room; correct?

6    A    Yes.

7    Q    You never mentioned that to the grand jury in your

8    testimony of February 1st, 2006, did you?

9    A    I honestly don't remember if I did or not.

10   Q    Okay.  Are you qualified to read an EKG?

11   A    Oh, heavens no.

12   Q    But didn't you testify you told the girl you

13   administered an EKG to --

14   A    Yes, I did.

15   Q    You had some type of -- I need to finish my

16   question.

17   A    I'm sorry.

18   Q    You told her she was not having a heart attack;

19   correct?

20   A    That's correct.

21   Q    Okay.  And today I believe you testified that girl

22   was 18 or 19 years old; correct?

23   A    Yes.

24   Q    And how does that -- well, did you not in fact tell

25   the grand jury that girl was 16 or 17 years old?

2986

1   A    No.  She was older than that.

2   Q    So you're denying you told the grand jury that?

3   A    I may have told the grand jury that.  But I'm -- I'm

4   thinking she was a little bit older than that.

5   Q    Okay.  How many times have you been interviewed by

6   Government agents or investigators?

7   A    Several.

8   Q    How many?

9   A    Three, four.

10  Q    More?

11  A    No.

12  Q    How many times have you testified about this in

13  front of the grand jury?

14  A    Once.

15  Q    You say you roomed 50 a day.  Is that your

16  guesstimate as to an average?

17  A    Yes.

18  Q    Okay.  And you also testified you roomed 130

19  patients in one day by yourself; correct?

20  A    Yes.

21  Q    That was a personal record.  Okay.  How long did you

22  work that day?

23  A    Oh, gosh, probably nine, ten hours.

24  Q    You remember a single patient from that day when you

25  roomed 130 people?

1    A    Do I remember?

2    Q    Yes.  Can you give me a name?

3    A    Let's see, that was on Curtis' side.  No, I don't --

4    Q    Okay.  You don't know when teenagers would happen to

5    come into the clinic if they had some kind of written

6    authorization in their chart or in their hands that

7    allowed them to be treated, a parental consent?  You

8    have no idea, do you?

9    A    No, I don't.  To my understanding, it didn't matter

10   about written --

11   Q    You just answered no, you don't know if it was

12   there; correct?

13   A    That's correct.

14   Q    Okay.  That was my question.  Thank you.

15        Do you know if there was -- well, was there a Dr.

16   Estivo who was in the clinic sometimes?

17   A    Yes.

18   Q    Orthopedic surgeon; correct?

19   A    Yes.

20   Q    What about a Dr. Alvarez?

21   A    Yes.

22   Q    Okay.  They would have regular half days there, or

23   something like that, maybe full days; correct?

24   A    That's correct.

25   Q    Okay.  As consulting or referring physicians being

```
 1    referred by providers at the Schneider clinic; correct?

 2    A    That's correct.

 3    Q    Okay.  So those patients for Estivo and Alvarez

 4    would also use the same waiting area as Schneider

 5    patients; correct?

 6    A    Yes.

 7    Q    Okay.  So you testified that I think you were

 8    averaging this, again, there were like 160 to 180

 9    patients a day.  Do you remember that testimony?

10    A    Yes, I do.

11    Q    Okay.  And there were typically four provide -- four

12    Schneider providers working at the clinic at any point

13    in time; correct?

14    A    Yes.

15    Q    So we've got two PA's and to physicians.  Okay.  So

16    if we have 160 patients for four providers -- and the

17    PA's worked ten hour days; correct?

18    A    That's correct.

19    Q    So we have, without Estivo and Alvarez patients, we

20    have 40 patients per day, per provider; right?  With

21    your 160 number?

22    A    Yes.

23    Q    160 divided by four equals 40?

24    A    Yes, sir.

25    Q    Okay.  And if we go to your higher number, 180, that
```

2989

1  adds five more patients per provider; correct?  20 more

2  total?

3  A   It didn't work that day.

4  Q   It didn't work that day?

5  A   No.  No.

6  Q   So 160 and 180 is completely wrong?

7  A   That's correct.

8  Q   Okay.  What higher number would you like to pitch?

9  A   Oh, not -- numbers are right, but it didn't work

10  that way per PA and per doctor.

11  Q   Okay.  So we would have PA's and doctors just not

12  working, then some other doctor or PA would take the 100

13  of the 160 and the other people would just sit and drink

14  coffee.  I don't understand what you mean it doesn't

15  work that way?

16  A   No.  Dr. Schneider's side was always more booked.

17  Q   Okay.  But you roomed on both sides; correct?

18  A   I roomed on both sides, yes.

19  Q   Why would an office manager need medical training,

20  and specifically, Mr. Wamble asked you about Ulysses

21  being an office manager without medical training.  Tell

22  me why an office manager would need medical training?

23  A   Well, because he, he should know where to put the

24  most experienced aids, the assistants, he should know

25  who to call for an emergency.  It -- he should be able

1    to apply emergency care if needed.

2    Q    And this Ulysses fella was unable to do that?

3    A    Oh, definitely, correct.

4    Q    And how do you know that?  How was he unable to

5    render emergency care since that's one of his

6    obligations by your standards?

7    A    Because --

8    Q    What was his training?

9    A    What was his -- he had no training.

10   Q    Was he certified in CPR?

11   A    No.

12   Q    How do you know that?

13   A    Well --

14   Q    He didn't look like he was certified, did he?

15   A    No, sir.

16   Q    Is it your testimony -- and this relates to you

17   saying Linda Schneider said, "if you guys go to the

18   doctor any more about this stuff, you're fired".  So is

19   it your testimony that an office manager trying to

20   insulate a physician so he's able to practice medicine

21   and focus on medicine and patient care, that's a bad

22   thing?

23   A    It's -- yes, I think it is.

24   Q    Okay.  And you also testified along with that

25   admonishment -- admonishment, yeah, from Linda, don't go

1    to the doctor.  You also tetified when you were in front

2    of the grand jury, which under there, that was

3    consistent.  You also said you constantly went to

4    Schneider; correct?

5    A    Yes.

6    Q    So you completely ignored her?  You weren't worried

7    about being fired even though you heard that warning;

8    correct?

9    A    No, I stopped after she told us.

10   Q    Okay.  When did she tell you that?

11   A    I guess when he got tired of hearing it from all of

12   us.

13   Q    And when was that?

14   A    Well, sir, I can't give a day and a time.

15   Q    So did you have a meeting where this was announced

16   by Linda?

17   A    No, we had no meetings.  It was just, she just, she

18   just, that came through -- well, I suppose you could say

19   it was -- she just stood there at the desk and said it.

20   I mean, it wasn't no formal meeting.

21   Q    Okay.  Sort of a general announcement whoever was

22   within ear-shot?

23   A    Uh-huh.

24   Q    Who else heard her give that warning?

25   A    Deb McKerchen, Jamie Hilliard.  It was given to, I

2992

```
 1    guess, all of us that were there.
 2  Q   All three of you?
 3  A   Yep.
 4  Q   Anybody else?
 5  A   Whoever else was aiding or assisting.
 6  Q   You don't have other names though?
 7  A   No.
 8  Q   Now, you told the grand jury -- well, you talked
 9  with Mr. Williamson about this.  You told the grand jury
10  that Schneider walked in when you were there as a
11  patient, and said, "what can I write for you today";
12  correct?
13  A   Yes.
14  Q   You didn't tell the grand jury that he referred you
15  to a physician, did you?
16  A   No.
17  Q   But he sent you to another doctor who fixed your
18  in-grown toenail; correct?
19  A   Oh, on the other side, yes.
20  Q   Okay.  On the other side of the clinic?
21  A   Yeah.
22  Q   Okay.  So it was dealt with that day?
23  A   No.
24  Q   It wasn't?
25  A   No.
```

2993

1    Q    When was it dealt with?

2    A    After I went to a surgeon and had 'em operated on.

3    Q    Okay.  So when did you go to the other side of the

4    clinic?

5    A    He sent Dr. Lakin over to see me.

6    Q    Okay.  So Lakin is another one who was at the clinic

7    part-time; correct?

8    A    Yes.

9    Q    And it required surgery to repair -- to fix the

10   in-grownness to that point?

11   A    Yes.

12   Q    Now, at the grand jury you were repeatedly asked to

13   name specific patients, and you did not come up with a

14   single name at the grand jury four years and three

15   months ago; correct?

16   A    That's right.  I'm terrible with names.

17   Q    Okay.  At the grand jury you told them three times

18   that copies of prescriptions were supposed to be kept in

19   the charts; correct?

20   A    Yes, they are.

21   Q    And in April, 2004 -- Mr. Williamson asked you a

22   little bit about this note you had written about how

23   happy you were at the clinic and it felt like home and

24   you were actually asking for fewer hours because of your

25   business; right?

2994

```
 1    A    Right.

 2    Q    Okay.  And then in your resignation letter of

 3    October, 2004, six months later, you told -- you wrote

 4    that you were quitting because you weren't getting

 5    enough hours; correct?

 6    A    That's correct.

 7              MR. BYERS:  If I may have a moment, Your

 8    Honor?

 9              THE COURT:  Sir.

10                    (Off-the-record discussion

11                    between counsel.)

12              MR. BYERS:  May I approach, Your Honor?

13              THE COURT:  Yes, sir.

14    BY MR. BYERS:

15    Q    Ma'am, I'll hand you a single page.  Can you read

16    that and tell me what that appears to be?

17    A    Uh-huh.  "Linda, as of Monday 10-3 I am resigning

18    from Schneider Clinic.  I have asked nothing from you

19    but 40 hour week and able to make a living but for some

20    reason my requests get ignored.  Here is my badge and BP

21    cuff.  Stethoscope is mine.  I expect my paycheck

22    deposited as always.  I was hoping for a long time work

23    relationship.  I've always done good by you and gave you

24    good performance.  Jody."

25    Q    You were upset with the lack of hours, weren't you?
```

1    A    Well, yes, I'm sole provider of my family.

2    Q    Okay.  So -- and in that note did you say you were

3    quitting because you were tired of working in a

4    pill-mill?

5    A    No.

6    Q    Did you say you were tired of working, or being

7    associated with "Schneider the writer"?

8    A    No.

9    Q    Did you say you were sick and tired and humiliated

10   from being associated with "Kevorkian, Jr."?

11   A    No.

12   Q    And is that the same day -- when you tendered that

13   letter, is that the day you went down to the Haysville

14   police department?

15   A    I don't believe that was the day.

16   Q    Did you make any kind of a written record anywhere

17   associated with the Schneider Medical Clinic about all

18   these problems that you thought there were there?  In

19   other words, did you file written complaints with Linda,

20   Steve, any other provider, any other coworkers?

21   A    I wouldn't be stupid enough to do that.

22   Q    And why would that be stupid if you think this stuff

23   is going on?

24   A    Because that would mean my job.  I had a family and

25   a home to take care of.

1    Q    In relation to that 480 number you testified about

2    with Dr. Schneider writing for.  You remember that

3    testimony?

4    A    Yes, I did.

5    Q    Didn't you also tell the grand jury that the fella

6    who had a script that large had set up a table outside a

7    pharmacy and was dealing his drugs in front of a

8    pharmacy?

9    A    Yes, I did.

10   Q    Do you remember being interviewed by an agent, a KBI

11   agent named Rowland in October of 2004?

12   A    Yes, I do.

13   Q    Where did that occur?

14   A    Haysville police department.

15   Q    Do you remember in October -- still in October,

16   2004, another meeting with KBI individuals?  At least

17   one named Barkoski?

18   A    Yes, I do.

19   Q    Okay.  Do you remember an April 4th, 2008, interview

20   with Agents Stewart and Harsha and that would have been

21   in your home?

22   A    Yes.

23   Q    April, 2008?

24   A    Yes.

25   Q    And then you testified in front of the grand jury in

1    February 2006; correct?

2    A    Yes.

3              MR. BYERS:  That's all I have, Your Honor.

4              THE COURT:  Any redirect.

5              MR. WAMBLE:  Just briefly, Your Honor.

6                    **REDIRECT EXAMINATION**

7    BY MR. WAMBLE:

8    Q    Why were you willing to stay at the Schneider

9    Medical Clinic?

10   A    Why was I willing?  Because I had, I had a husband

11   to take care of who was dying.  I had bills to pay.

12   Gene had no retirement.  He just was on social security.

13   Q    Did you feel like you had nowhere else to go?

14   A    I had nowhere else to go.  I mean, you know, when

15   you get to be 50 years old, people don't exactly put you

16   on top of their list for employment.

17   Q    Mr. Williamson seemed to suggest that you have a

18   problem with black people.  Do you?

19   A    My husband is a black person.

20             MR. WAMBLE:  Nothing further.

21                    **RECROSS EXAMINATION**

22   BY MR. WILLIAMSON:

23   A    Yes, sir.

24   Q    When you were down and out, when you needed

25   somewhere to go, the Schneider Medical Clinic brought

1    you in and gave you a job; correct?

2    A    Yes, they did.

3              MR. WILLIAMSON:  Nothing further.

4              MR. BYERS:  Nothing, Your Honor.

5              THE COURT:  Thank you, ma'am.  You're excused.

6    A    Thank you, sir.

7              THE COURT:  Ladies and Gentlemen, we're

8    through for the week.  I get to go up and see my number

9    three son graduate from the University of Kansas.  Thank

10   you, I'll extend your applause to him.  Mr. Byers' son

11   graduated a week ago, as I recall.

12             MR. BYERS:  Actually it was fiance of my son.

13   He is coming up in June.

14             THE COURT:  All right.  Well, this is

15   graduation season.  Now, remember, Monday I've got

16   another calendar to take care of.  So have a good

17   weekend.  Remember and heed the admonition.  And I'll

18   see you on Tuesday morning at 9:00.  Thank you.

19                       (Recessed for the weekend at

20                       11:50 a.m.)

21

22

23

24

25

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas