2999

1          (Beginning at 9:05 a.m. May 18,

2              2010, the following proceedings

3              continued.)

4          THE COURT:  Well, I'm sad to say that we have

5   lost Juror # 106.  He needs surgery.  He asked his

6   doctor if he could delay it until after the trial was

7   over and the doctor said no.  So I've excused him.  All

8   right.  Good morning.  You're still sworn.

9              **TRACY WAGNER** (Continued)

10  Having been first previously duly sworn to tell the truth,

11  the whole truth and nothing but the truth, testified

12  further as follows on:

13              **CROSS EXAMINATION**

14  BY MR. GOROKHOV:

15  Q   Good morning.

16  A   Good morning.

17  Q   You testified on direct that you prepared these

18  charts that are Exhibits 13 and 14 -- they're Government

19  Exhibit 13 and 14; correct?

20  A   Yes.

21  Q   Okay.  And what did you do to prepare those charts?

22  A   I reviewed the documentation in the medical records

23  from the clinic and compared that to the Medicaid

24  billing for those services, and then put the data into

25  the spreadsheets.

3000

1    Q    And the documentation, how did you get that

2    documentation?

3    A    I got that through the U.S. Attorney's office.

4    Q    Who at the U.S. Attorney's office provided you with

5    that?

6    A    I believe Sean Moore provided me with that

7    information.

8    Q    Okay.  And what were the documents that he provided

9    you with?

10   A    The patient charts consisted of the medical records,

11   the fee tickets and the patient financial histories.

12   Q    So, it's your testimony that you reviewed the fee

13   tickets?

14   A    I looked at the fee tickets, yes.

15   Q    Okay.  You reviewed -- in order to create that

16   column in your chart that says fee ticket provider, is

17   that what you looked at?  Is that what you base that on?

18   A    Yes.

19   Q    And you compared that to the claims data obtained

20   from the insurance companies?

21   A    From our -- from our claims data in our computer

22   system.

23   Q    Okay.  For both First Guard and Medicaid; correct?

24   A    Correct.

25   Q    Okay.  I want to ask you about some of these rules

1  that you discussed with Ms. Treadway on direct, some of

2  those rules, contract rules.  I believe you talked about

3  the rule regarding billing of physician's assistant

4  versus billing of doctors; correct?

5  A   Correct.

6  Q   Okay.  And you testified that physician's assistants

7  are reimbursed at lower rate than doctors; correct?

8  A   Correct.

9  Q   Okay.  Has that always been the rule with First

10  Guard?

11  A   That has not always been the rule with First Guard.

12  Q   And when did that change?

13  A   I would have to consult the documentation to find

14  the date.  I believe it was in 2004 that that changed.

15  Q   Okay.  And you're aware that those rules are not

16  consistent throughout different payers; correct?

17  A   I only know about Medicaid.

18  Q   Do you know that the Schneider Medical Clinic dealt

19  with about, by the Government's representation, about 93

20  payers?

21  A   No, I don't know that.

22  Q   And so, you wouldn't know what their specific

23  rules--

24  A   Not really.  Not related to that issue, no.

25  Q   Okay.  You discussed this rule about documentation

3002

1    and I think -- and correct me if I'm wrong -- but I

2    think you said, if it wasn't written down or if it

3    wasn't documented, it didn't happen.

4    A    Correct.

5    Q    Is that a correct statement of the rule?

6    A    It's not a Medicaid written -- well, it is in the

7    documentation requirements.  It's a standard of medical

8    practice.

9    Q    Okay.  You would agree, wouldn't you, that if

10   something isn't written down, that doesn't really mean

11   it didn't occur; correct?

12   A    Correct.

13   Q    That's only because you put that in your contract

14   and that's something that the provider agrees to follow

15   for purposes of reimbursement, auditing and so forth;

16   correct?

17   A    It's a standard of medical practice that if it's not

18   documented, it's not done.

19   Q    And it's a standard of medical practice for purposes

20   of auditing and the processes that you have set up at

21   Medicaid; is that correct?

22   A    It's a standard of medical practice in patient care.

23   Q    Okay.  So, is it your testimony that if a doctor

24   sees a patient and performs a complex exam and he

25   doesn't write it down, then that complex exam did not

1    take place?

2    A    From a medical standpoint, correct, yes.

3    Q    Do you understand that this is not a medical

4    auditing case.  You understand that; right?

5    A    I'm not sure what you're asking.

6    Q    You understand that this is a criminal prosecution?

7    A    Yes.

8    Q    Okay.  Do you understand that under our

9    Constitution, the Government has a burden of proof --

10           THE COURT:  All right.  All right.  That

11    doesn't have anything to do with her testimony.

12           MR. GOROKHOV:  Your Honor, I'm sorry, but --

13           THE COURT:  I said it didn't have anything to

14    do with her testimony and that's what -- where we are.

15    I've heard that from several lawyers here.  The jury

16    knows this.  She's here to testify about what she did,

17    not Constitutional standards.  Now move on.

18           MR. GOROKHOV:  I'll move on, Your Honor.

19    BY MR. GOROKHOV:

20    Q    You testified about a rule, and I believe it's also

21    from the contract, that if a physician signs something

22    and his electronic signature is used in submitting

23    claims, that he bears the responsibility for that, for

24    those claims.  Is that correct?

25    A    Correct.

3004

1   Q   Okay.  Now, when you say he bears the

2   responsibility, you mean that when the physician or his

3   office gets audited, then you presume that he's

4   responsible for that claim; is that right?

5   A   Again, I'm not sure exactly what you're asking.

6   Q   Okay.  I'll strike that.

7       When you stated that when a physician's electronic

8   signature is used he bears the responsibility for that

9   claim, do you mean to tell the jury that he reviews and

10  knows about each and every claim that's submitted in his

11  name?

12  A   I don't know that he's reviewed each claim.  But he

13  bears the responsibility for the claim being accurate

14  and truthful.

15  Q   Is it your testimony that every physician whose

16  electronic claim is used knows about and reviewed every

17  claim that's submitted with his signature?

18  A   Based on his agreement with Kansas Medicaid, he is

19  accepting responsibility for the accuracy of the claims

20  submitted when those are submitted.

21  Q   Okay.  But is it your testimony that you have

22  knowledge that Dr. Schneider reviewed and had knowledge

23  of every claim that was submitted with his electronic

24  signature?  Is that your testimony?

25  A   I would have no way of knowing what he reviewed and

1    what he did not.

2    Q   So you don't know his knowledge of each and every

3    claim that was submitted; correct?

4    A   Correct.

5    Q   And you don't know the degree of his oversight over

6    each of the claims that was submitted; correct?

7    A   Correct.

8    Q   Okay.  And you don't know who in the billing -- who

9    in the billing department submitted the claims?

10   A   Correct.

11   Q   You didn't interview employees in the billing

12   department about whose responsibility that was?

13   A   No.

14   Q   Did you interview the people that were the heads of

15   billing at the Schneider Medical Clinic throughout the

16   years?

17   A   I did not interview anybody at the Schneider Medical

18   Clinic.

19   Q   Okay.  And so the same would go for these claims of

20   upcoding; correct?

21   A   The same would go.  What does that mean?

22   Q   Strike that.

23       Let's back up a little bit.  You testified that as

24   part of your spreadsheets that you created that there

25   were certain codes that were billed for office visits

1    that were billed at a higher rate than what you thought

2    the documentation showed happened.

3    A    Correct.

4    Q    You didn't interview a single patient about what

5    actually happened in those exams; correct?

6    A    Sir, I did not interview anyone.

7    Q    So your knowledge is based entirely on the medical

8    records?

9    A    I reviewed the documentation.

10   Q    So you don't know what actually occurred in the

11   medical exam room when Dr. Schneider saw the patient;

12   correct?

13   A    Again, I reviewed the documentation only.

14   Q    So is that a no?

15           THE COURT:  Ladies and gentlemen, have you

16   gotten the point at this juncture that she didn't talk

17   to anyone at the Schneider Clinic, and she didn't talk

18   to any patients?  Do you need to hear any more testimony

19   from her?  Nobody needs to hear any testimony on that

20   point.  Move on --

21           MR. GOROKHOV:  That's fine, Your Honor.

22           THE COURT:  -- or sit down.

23           MR. GOROKHOV:  Thank you.

24                   **CROSS EXAMINATION**

25   BY MR. WILLIAMSON:

3007

1    Q    How you doing, Ms. Wagner?

2    A    Okay.

3    Q    You testified on direct several days ago in regards

4    to exhibit 13-E.  Do you remember that?

5    A    It appears that's the other clinicians in the area

6    that provide pain management; correct.

7    Q    All right.  Now, when did you draft this document?

8    A    There is no date on the document so I couldn't tell

9    you that.

10   Q    Well, did you actually draft this document?

11   A    Yes.

12   Q    And what did you do to prepare it?

13   A    I reviewed for active physicians in Medicaid system

14   or physicians who had previously been active in the

15   Medicaid system and whether or not they were -- had

16   previously taken patients with a pain management type

17   diagnosis or -- and some of them I contacted their

18   offices to inquire whether or not they would provide

19   pain management.

20   Q    Did you ask, when you said the words pain

21   management, did you ask them about a medication therapy?

22   A    I asked them about pain management.

23   Q    Ma'am, my question was did you specifically ask them

24   about medication therapy?

25   A    No.

3008

1    Q    Now, do you know how many of these doctors actually

2    share the same office?

3    A    No, I don't.

4    Q    Now, do you know how many of these individuals are

5    or were accepting Medicaid patients for a medication

6    therapy between 2002 and 2005?

7    A    I have their active dates listed on the chart.

8    Q    Okay.  My question is do you know how many of these

9    people that are on this document state that -- were

10   accepting patients for medication therapy between 2000

11   and 2005?

12   A    I previously stated I did not use the words

13   "medication therapy" so I could not answer that

14   question.

15   Q    Okay.  So if Dr. Cooper -- excuse me -- if Dr. Dye's

16   (ph) office states that they don't provide medicine to

17   people under chronic pain, you wouldn't have any

18   information to dispute that; correct?

19            THE COURT:  We've heard no testimony about

20   that, Mr. Williamson.  Dr. Dye?

21            MR. WILLIAMSON:  We haven't put on our case

22   yet, Your Honor.

23            THE COURT:  What?

24            MR. WILLIAMSON:  We haven't put on our case

25   yet.

1          THE COURT:  Well, you don't have to put on a

2     case and so you base your questions on the evidence that

3     is in, not what evidence either isn't in or you put on

4     during your case.  Those are the rules.  This jury is

5     operating under the assumption at this point that you

6     are not required to put on any evidence.  And the fact

7     that you say that you're going to put on evidence

8     doesn't mean anything because you could change your mind

9     about that at the end of the Government's case and put

10    on no evidence.

11         Now, I'm going to make myself clear about this just

12    once to all the defense counsel.  I don't want to hear

13    any more of these questions about assume that somebody

14    who hasn't testified and about which there's been no

15    evidence will do something or not do something.  Clear?

16         MR. WILLIAMSON:  Yes, sir.

17         THE COURT:  Thank you.

18    BY MR. WILLIAMSON:

19    Q   Now, which doctors did you actually call from this

20    list?

21    A   I don't recall.

22    Q   Did you take any notes based on the telephone calls?

23    A   I don't recall.

24    Q   Now, you testified about the Medicaid lock-in issue.

25    You remember that?

3010

1    A    Yes.

2    Q    Now, you testified that -- can you pull those

3    exhibits up?  I don't remember the exhibit number.  The

4    exhibit where the Government had you reading the

5    different provisions that lock-in covers.  I believe it

6    may be 13-D.

7    A    Yes.

8    Q    Okay.  Now, looking at that document, this is what

9    gives the providers notice of what lock-in provisions

10   mean.  Is that correct?

11   A    It's an overview of the guidelines for the

12   physician.

13   Q    And this is what would be given to the providers.

14   Is that fair?

15   A    Correct.

16   Q    Now, is there anything in that document that states

17   that these provisions relate to individuals with

18   drug-seeking behavior?  Is drug-seeking behavior

19   anywhere in that document?

20   A    No, sir.

21   Q    Okay.  So -- now, but you testified that these

22   lock-ins are for individuals who the insurance company

23   has identified with drug-seeking behavior; correct?

24   A    I said some of them have been identified with

25   drug-seeking behavior.

3011

1    Q    Okay.  But not all of them; correct?

2    A    Correct.

3    Q    And some of these individuals could be people who

4    appear at emergency rooms because they just are

5    hyper-medical, they just go all the time; correct?

6    A    That is one of the criteria that can be met, yes.

7    Q    And that doesn't necessarily equate to being

8    drug-seeking behavior; correct?

9    A    Not always.

10   Q    Okay.  Now, on your Exhibit 13-E you identified four

11   individuals who were accepting these lock-in patients.

12   Correct?

13   A    Correct.

14   Q    And two of them were at the Schneider Medical

15   Clinic; right?

16   A    Correct.

17   Q    So as we understand it, at least between 2002 and

18   2005, Medicaid was sending individuals with these,

19   quote, unquote, "drug-seeking" behaviors to the

20   Schneider Medical Clinic to at least two providers;

21   correct?

22   A    Not all had -- excuse me -- not all had drug-seeking

23   behavior.

24   Q    Did you send a note to the Schneider Medical Clinic

25   saying, well, individual A is coming there under lock-in

3012

```
 1    provision but he does not have drug-seeking behavior?
 2    A    No.
 3    Q    So the bottom line is, is that when all these
 4    alleged complaints were happening, you all were sending
 5    people with problems to the clinic; correct?
 6    A    Excuse me.  I'm sorry.  Can you restate that.
 7    Q    Absolutely.  Between 2002, 9-1 of '02, and 1-28 of
 8    '08 when the Schneider Medical Clinic was -- these
 9    lock-in providers, you all were sending people with
10    potential problems to the clinic; correct?
11    A    Some consumers were locked in to the clinic;
12    correct.
13    Q    Now, you testified about this -- these spreadsheets
14    the other day; correct?
15    A    Yes.
16    Q    And Mr. Gorokhov asked you a few questions regarding
17    you made a statement to the jury that you considered
18    certain claims to be false.  Remember that?
19    A    Yes.
20    Q    Now, let's turn to the First Guard spreadsheet.
21    Let's just pull up maybe the top 10 or 15 or so.
22    That's good, Mr. Moore, we don't have to go very far.
23    Let's blow up the dates of service.  Let's get it just a
24    little bit better so the jury can see that just a little
25    bit better.  Okay.
```

3013

1    Now, you testified that 53% of the claims submitted

2    to First Guard were upcoded by a provider; correct?

3    A   I don't have that document in front of me.

4    Q   Exhibit 14.

5    A   I don't have that document.

6              MS. TREADWAY:  I believe it's the first page

7    of that exhibit.

8              MR. WILLIAMSON:  First page of 14-A.

9    A   This goes to 13-M.  Oh, I'm sorry, there's more

10   behind it.  I didn't see it.  Okay.  I'm sorry.  Again,

11   there's nothing under 14.  It's empty.

12   Q   Can we just look at 14.  We'll just put it up on

13   the -- all right.

14       Do you see that of the 626 claims reviewed, you

15   state that 330 were billed as though a physician

16   provided the services when a physician's assistant

17   provided the service.  Do you see that?

18   A   Yes, and that's correct.

19   Q   And you said that was false; correct?

20   A   I said that statement is correct.

21   Q   No, I mean but you said the claims -- these are

22   false claims according to you; right?

23   A   Correct.

24   Q   All right.  And it's your testimony that 53% is an

25   accurate representation of what was, quote, unquote,

3014

1    "false"?

2    A    Correct.

3    Q    All right.  Now, let's look at these claims.

4         Now, you would agree that in a medical practice

5    there can be inadvertence and inattentiveness, and then

6    you can have intent to defraud.  Would you agree there's

7    a distinction there?

8    A    From my standpoint, I have no way of determining

9    that.

10   Q    Okay.  So you didn't go in to determine whether or

11   not any mistakes that may have been submitted to the

12   insurance company were intentionally done to try to

13   defraud the insurance company or they were mistakes that

14   happened.  Is that fair?

15   A    Correct.

16   Q    You just looked at the numbers; correct?

17   A    Correct.

18   Q    And when you say false claims, you mean that the

19   information was inaccurate based on the records that you

20   reviewed; correct?

21   A    I mean the claim was paid inaccurately and it was

22   submitted.

23   Q    Now, interestingly, under Vivian A, you have 12-2 as

24   date-of-service.  Do you see that?

25   A    Yes.

1    Q   Mr. Moore, do you mind if we go to the upcoded

2    column.

3                        (Off-the-record.)

4    BY MR. WILLIAMSON:

5    Q   Okay.  Now, where we see the no's and the yeses,

6    that's the column that says was the claim upcoded.

7    Okay.  Does that look familiar?  Do you see that?

8    A   I believe it's the column that says was the PA

9    billed as the physician.

10   Q   Right.  But that's the column that you claim that

11   is -- that represents whether the claim was upcoded or

12   not; right?

13   A   Correct.

14   Q   Now, in order for there to be a mistake, there needs

15   to be a technical rule violation.  Would you agree with

16   that?

17   A   I don't understand the question.

18   Q   All right.  If somebody submits a claim in

19   accordance with the rules, then there's nothing --

20   there's no mistake or inaccuracy about that; correct?

21   A   Correct.

22   Q   Okay.  So in order for there to be a mistake or

23   inaccuracy, you first have to have -- you want to look

24   for a violation of the rules; correct?

25   A   Correct.

3016

1    Q   All right.  Now, isn't it true that before December

2    1 of 2004 a provider was allowed to bill as though they

3    saw the person even if the physician's assistant was the

4    actual provider?

5    A   For First Guard only.

6    Q   And that's what we're looking at, First Guard;

7    correct?

8    A   I believe so.  I don't know.

9    Q   Okay.  But if you take a look under 3-11-04, you

10   claim that that's an upcode even though that it was

11   totally appropriate at that time to bill that way?

12   A   Sir, I believe the statement is:  Was the PA billed

13   as a physician on the claim form.  And the statement

14   says, yes.  So that's a true and accurate statement.

15   Q   All right.  Let's go to the end of this spreadsheet.

16   Let's accept that.  Excuse me, the very, very end, the

17   totals.

18           MR. MOORE:  What would you like?

19           MR. WILLIAMSON:  The totals.  The highlighted

20   part.  That's good.

21   BY MR. WILLIAMSON:

22   Q   All right.  But at the very end of this you tally up

23   all of the yeses, and you come up with 53% of the claims

24   were, quote, unquote "false".  Do you see that?

25   A   Yes.

```
 1    Q    All right.  You did not subtract out all of the

 2    claims before December of 2004 when you came up with

 3    that percentage, did you?

 4    A    That is accurate.

 5    Q    So you have included claims that are technically

 6    allowed by the rules, and claims that are technically

 7    unallowed by the rules in coming up with that complete

 8    figure; correct?

 9    A    Correct.

10    Q    And if they submitted claims in accordance to the

11    rules, there cannot be a falsity; correct?

12    A    I don't believe that's necessarily correct; no, sir.

13    Q    All right.  When you looked at these documents --

14    you say you looked at fee tickets?

15    A    As stated there, I reviewed the fee tickets.

16    Q    And who helped you learn how to interpret these fee

17    tickets?

18    A    I simply looked at who the performing provider was

19    as indicated on the fee tickets.  That's all that was

20    reviewed.

21    Q    And when did you do that?

22    A    Pardon.

23    Q    When did you look at these fee tickets?

24    A    When I reviewed the records.

25    Q    How long ago?
```

3018

1    A    I couldn't tell you.  It's been a while.

2    Q    All right.  Now, these 99213, 99212s, those are

3    what's known as CPT codes; correct?

4    A    Correct.

5    Q    Now, did you compile the fields under -- that's

6    stated whether you agreed or disagreed with the

7    designation by the clinic as to what they submitted?

8    A    Yes.

9    Q    And you say you used the 1995 guidelines; correct?

10   A    Correct.

11   Q    Okay.  What are the guideline requirements for a

12   99213?

13   A    I'm sorry, sir, I don't have those memorized.

14   Q    All right.  A lot of times when auditors do these

15   audits, they have an audit sheet that encapsulates their

16   findings; correct?

17   A    I don't use an audit sheet, sir.

18   Q    So you take your -- do you take notes?

19   A    Not generally.

20   Q    Do you use a checklist that states provision 1 is

21   made but 3 is not?

22   A    I have the guidelines sitting in front of me as well

23   as the CPT code book and review based on that.

24   Q    Okay.  Now, you're aware that in the CPT world there

25   is a rate of disagreement amongst auditors; correct?

3019

1    A    No, I'm not aware of that.

2    Q    So you never encounter a situation where two

3    auditors can look at the same file and come up with two

4    different conclusions?

5    A    It can happen, I'm sure.

6    Q    I'm sorry.  What was the last part?

7    A    I said I'm sure that can happen.

8    Q    And you understand that every mistake submitted does

9    not equate to intent to defraud.  You agree with that?

10   A    No, I don't.

11   Q    So every mistake -- all right.  Let me back up.

12        You have a contract with these providers; correct?

13   A    Correct.

14   Q    And a provider can breach that contract; correct?

15   A    Correct.

16   Q    And just because that provider breaches that

17   contract does not mean that provider intended to defraud

18   Medicare or Medicaid; correct?

19   A    I don't know the provider's intent.

20   Q    Okay.  Now, when you went in to these medical

21   records, did you find any alterations on the progress

22   notes that would try to -- that would seem to show that

23   a provider saw a person when it was actually somebody

24   else?

25   A    I'm sorry.

3020

```
 1    Q    Let me rephrase.  That's a bad question.
 2         You relied -- when you're doing this audit process,
 3    you're looking at two or three different levels or
 4    documents.  You agree with that?
 5    A    For what part of the audit?
 6    Q    For your -- this spreadsheet that you're putting
 7    together.
 8    A    For the spreadsheet, I looked at several different
 9    documents.
10    Q    Okay.  You have the progress notes; correct?
11    A    Correct.
12    Q    You have the fee tickets; correct?
13    A    Correct.
14    Q    Then there's billing data that would go to the
15    insurance companies; correct?
16    A    The patient financial history was the third document
17    that was in the charts.
18    Q    Okay.  And then you have the fourth, the claims
19    data, what you received on your end; correct?
20    A    What's in our computer system.
21    Q    Okay.  Now, you understand that the question in this
22    case is whether or not there was an intent to defraud
23    Medicaid, First Guard and these other insurance
24    companies.  You understand that; correct?
25    A    Yes.
```

3021

1   Q   Now, when you're looking at the numbers and you're

2   trying to make a determination if these claims are

3   false, you're not here -- you weren't asked to determine

4   whether or not this was fraud or whether or not it was a

5   mistake.  Is that correct?

6   A   I was asked to review the documentation and identify

7   the errors.

8   Q   Okay.

9           MR. WILLIAMSON:  One second, Your Honor.

10          THE COURT:  Sir.

11                  (Off-the-record discussion

12                  between counsel.)

13  BY MR. WILLIAMSON:

14  Q   The Schneider Medical Clinic is not the first clinic

15  that has submitted bills that have errors on them;

16  correct?

17  A   They're not the first clinic I've found that had

18  inaccurate billings.

19  Q   Okay.  And did you see any information on your

20  claims data that stated that Stephen Schneider submitted

21  a claim directly himself?

22  A   I would have no way of knowing who directly

23  submitted the claim.

24          MR. WILLIAMSON:  I don't have anything else

25  further, Your Honor.

3022

1          THE COURT:  Thank you, Mr. Williamson.

2          THE COURT:  Redirect please.

3          MS. TREADWAY:  Thank you, Judge.  Just

4    briefly.

## REDIRECT EXAMINATION

6    BY BY MS. TREADWAY:

7    Q   Ms. Wagner, both counsel have talked to you about

8    your review of the claims data versus the progress notes

9    in this case.  Were your findings in this case, as

10   published to the jury, conservative findings?

11   A   Yes.

12   Q   Did you give every benefit of a doubt to the

13   provider in this case?

14   A   Yes.

15   Q   Mr. Gorokhov was asking you about whether the

16   Defendant Stephen Schneider knew about the claims being

17   submitted.  When a provider agrees to accept payment

18   from Medicaid, is that knowledge imputed to him by

19   virtue of the fact that he is getting paid for the

20   claims submitted?

21   A   Yes.

22   Q   Mr. Williamson asked you about other Medicaid

23   providers in the Wichita area that received -- I'm

24   sorry -- that did pain management.  And he also asked

25   you about lock-in with regards to the Defendant Stephen

3023

1    Schneider and the Schneider Medical Clinic.  I'd like to

2    hand you what has been marked for identification as

3    Government Exhibit 13-Q.  Have you seen that document

4    before?

5    A    Yes.

6    Q    Is it a document that Medicaid received from the

7    Schneider Medical Clinic?

8    A    Yes.

9            MS. TREADWAY:  Government offers 13-Q.

10            MR. WILLIAMSON:  No objection.

11            MR. GOROKHOV:  No objection, Your Honor.

12            THE COURT:  It's received.

13            MS. TREADWAY:  Could we please bring that up,

14    Mr. Moore.

15    BY MS. TREADWAY:

16    Q    First of all, could you state the date of that

17    letter?

18    A    October 13th, 2005.

19    Q    And the evidence in this case has been that a search

20    warrant was conducted at the clinic on September 13th,

21    2005.  Would that be about a month later?

22    A    Yes.

23    Q    And then the letter reads "Dear Dionne".  Who is

24    Dionne?

25    A    Dionne is a staff that works in our managed care

3024

1   department.

2   Q   "At this time Schneider Medical Clinic LLC will no

3   longer be accepting new Medicaid patients.  Thank you

4   for your --"

5   A   Time.

6   Q   "-- time in this matter.  Sincerely, Linda

7   Atterbury."

8        After October 13, 2005, would Medicaid have sent

9   any new lock-in patients, given this letter?

10  A   No.

11  Q   Now, Ms. Wagner, I understand from your earlier

12  testimony that you've been doing this kind of work for

13  quite a while for the Medicaid program?

14  A   Yes.

15  Q   And in doing this work, have you -- you've become an

16  expert at reviewing claims data as compared to progress

17  notes?

18  A   Yes.

19  Q   And although you cannot know what's in a provider's

20  mind, can you nevertheless develop an opinion on whether

21  claims are being submitted for the purpose of making

22  more money as opposed to by mistake?

23  A   Yes.

24  Q   And have you developed such an opinion in this case?

25  A   Yes.

1    Q    And what is that opinion based on in this case, as

2    well as others?

3    A    My opinion is based on the pattern, and the

4    escalation of the frequency of the inaccurate claims

5    that were submitted.

6    Q    And in this case were there patterns sufficient for

7    you to develop an opinion as to whether the evidence

8    that you reviewed showed mistake or intentional conduct?

9    A    Yes.

10   Q    And what did that evidence show?

11   A    Intentional conduct.

12            MS. TREADWAY:  Nothing further, Judge.

13            THE COURT:  Sir.

14                    **RECROSS EXAMINATION**

15   BY MR. WILLIAMSON:

16   Q    All right.  Since you have that opinion, let's talk

17   about a topic that I wasn't going to talk about.

18        Did you come across any progress note and fee

19   ticket that had been altered to show that Dr. Schneider

20   saw a person when it was actually a physician's

21   assistant that saw them?

22   A    I did not identify altered documentation as one of

23   my findings.

24   Q    I'm sorry.

25   A    I did not identify altered documentation as a

3026

1   finding in this review.

2   Q    Okay.  Now, you understand that in the Schneider

3   Medical Clinic you had two sides, two floors.  You had

4   the providers and then you had a billing department.

5   Did you know that?

6   A    No, sir, I've never been to the Schneider Medical

7   Clinic.

8   Q    Do you know the Schneider Medical Clinic hired

9   qualified individuals to handle the billing at their

10  office?

11  A    I have no idea who they hired at their office.

12  Q    Okay.  Now, you -- since you say you reviewed these

13  documents, you have to -- and you come up with this

14  opinion, you have to take an analytical undertaking

15  before you make your opinion; correct?

16  A    I'm sorry.  I don't understand.

17  Q    You have to think through the data before you

18  develop an opinion; right?

19  A    The data was presented to me for this review.  I

20  didn't pull the data or think through the data.  I

21  simply reviewed the data compared to the notes.

22  Q    But you came up with an opinion.  How do you come up

23  with an opinion if you don't think about it.

24  A    Based on the amount that was seen and the patterns

25  that were identified through the review.

3027

1    Q    Does that pattern include the inaccurate information

2    that you had in the First Guard review?

3    A    Actually that pattern was seen clearly in the

4    Medicaid review data.

5    Q    Okay.

6    A    Which was the first review that I did.

7    Q    But it wasn't seen in the First Guard review?

8    A    The pattern continued in the First Guard review.

9    Q    Okay.  You identified at least 30% of stuff that you

10   felt like was upcoded where a provider was identified as

11   the doctor as opposed to the PA; correct?

12   A    I don't remember the exact numbers but that sounds

13   accurate.

14   Q    The vast majority of the claims that were submitted

15   were submitted by the -- under the provider who actually

16   gave the service.  You would agree with that; right?

17   A    No, I wouldn't agree with that.

18   Q    So 70% is not a majority?

19   A    I don't have that data in front of me.  I'm sorry.

20   Q    Can you look at 13, Exhibit 13.

21   A    It is empty.  There's nothing here under 13.

22           MR. WILLIAMSON:  Can we pull up Exhibit 13,

23   Mr. Moore.

24   BY MR. WILLIAMSON:

25   Q    You state that 30% of the claims showed that a

3028

1    physician's assistant provided the service, or that a

2    physician provided the service when it was actually a

3    physician's assistant; correct?

4    A    Correct.

5    Q    This isn't a situation where 98% of the claims came

6    in under a physician; correct?

7    A    Correct.

8    Q    This is a situation where you had a minority of the

9    information submitted came in incorrectly, according to

10   you; correct?

11   A    30% of the information came in inaccurate; correct.

12   Q    Okay.  Now, when you're thinking through this data

13   and before you come up with this opinion, don't you want

14   to say, okay, if I'm going to consider if this is a

15   mistake or if this is intentional, what factors can I

16   consider to make that determination.  Would you agree

17   with that?

18   A    I don't understand the question.

19   Q    I can rephrase it.  You see these numbers; correct?

20   A    Correct.

21   Q    That's the data findings; right?

22   A    Correct.

23   Q    All right.  Do you ask yourself before you give the

24   opinion that Ms. Treadway asked you to give, do you ask

25   yourself what could -- why are these numbers happening?

1    Did you ask yourself that?

2    A    No.

3    Q    So you -- well, let's keep exploring that.   You

4    understand that the provider represents on a fee ticket

5    who actually saw a patient in question.   You understand

6    that?

7    A    Yes.

8    Q    Now, and you understand that there's a progress note

9    that the provider is also responsible for filling out?

10   A    Correct.

11   Q    And do you understand that once this fee ticket and

12   progress note are filled out, they go down to the

13   billing department.   Did you learn that?

14   A    I would have no way of knowing that.

15   Q    If there was a misrepresentation by the provider,

16   don't you agree it would be found in that progress note

17   and on that fee ticket?

18   A    Not necessarily, sir, no.

19   Q    Okay.   So when you came across a situation and you

20   saw a fee ticket that accurately represented that a

21   physician's assistant saw a patient -- matter of fact,

22   can we pull up 14-A with just a few of those.

23        Now, you see -- let's look at Line 12 where it

24   states St. Clair/Atterbury.   Do you see that?

25   A    Yes.

3030

1    Q   Okay.  Now, that represents that Curtis Atterbury

2    was actually on the fee ticket; correct?

3    A   I can't see the column titles.  Yes.

4    Q   Okay.  So -- did you learn whether or not that fee

5    ticket is the document that communicates to the billing

6    department as to what they're supposed to bill under?

7    A   I have no way of knowing that.  I reviewed the

8    medical records to determine who was listed as the

9    treating physician.

10   Q   And which one is the treating physician on this

11   spreadsheet?

12   A   That is not -- that column is to indicate that it

13   was misrepresented.

14   Q   My question was:  What column on your spreadsheet

15   indicates who the treating physician was in the progress

16   note?

17   A   I don't believe there's a column to represent that.

18   Q   So this critical aspect of your, quote, unquote,

19   "audit" and investigation excludes a critical piece of

20   information as to who is identified in the progress

21   note.  Is that correct?

22   A   From what I'm looking at right there, it appears

23   that that column is not listed.

24   Q   Do you want to look at the whole spreadsheet that's

25   in front of you?

3031

1    A   I don't see that column on the spreadsheet.

2              MR. WILLIAMSON:  I don't have anything

3    further.

4              THE COURT:  Now, is this -- is 14 the

5    spreadsheet for First Guard or for Medicaid?

6              MR. WILLIAMSON:  First Guard, Your Honor.

7              THE COURT:  Is it First Guard?

8              MR. WILLIAMSON:  Well, Your Honor, may I just

9    clarify with Exhibit 13.  I think that's a good point

10             THE COURT:  13 is the Medicaid summary.

11             MR. WILLIAMSON:  Correct.

12             THE COURT:  And 14 is First Guard.

13             MR. WILLIAMSON:  That's correct.

14             THE COURT:  Did you understand that?

15   A   Yes.

16             THE COURT:  Okay.  Thank you very much.

17             MR. WILLIAMSON:  Can we just look at Exhibit

18   13 real quick.

19             THE COURT:  Yes, you may.

20   BY MR. WILLIAMSON:

21   Q   Now, your work in Exhibit 13, does that have a

22   column that identifies who you found the provider was in

23   the actual progress note?

24   A   I don't believe so.  The spreadsheets are set up

25   exactly the same.

3032

1    Q    Okay.  Can you --

2    A    But there is a column that identifies if the PA was

3    billed as physician; but that is the extent of the

4    indications.

5    Q    Can you look at the spreadsheet in front of you --

6    and this is more for the record purposes -- to say

7    whether or not looking at that entire spreadsheet,

8    whether or not your analysis includes the actual

9    provider who was identified in the progress note?

10   A    It is not listed on the spreadsheet.  Yes, it was

11   included in my analysis; but it is not listed on the

12   spreadsheet.

13   Q    Okay.  But you testified earlier that your analysis

14   went straight into this spreadsheet, you didn't take any

15   notes; correct?

16   A    Correct.

17            MR. WILLIAMSON:  Okay.  Nothing further.

18            THE COURT:  Thank you very much.  You're

19   excused.  Next witness please.

20            MS. TREADWAY:  Government calls Joan Madsen.

21                        **JOAN MADSEN**

22   Having been first duly sworn to tell the truth, the

23   whole truth and nothing but the truth, testified as

24   follows on:

25                    **DIRECT EXAMINATION**

3033

BY MS. TREADWAY:

Q    Could you please introduce yourself to the jury.

A    Yes.  My name is Joan Madsen.

Q    And where are you currently employed, Joan?

A    At the Visiting Nurse Association.

Q    And you talk really fast --

A    I will slow down.

Q    You're from the east, aren't you?

A    I am not.

Q    You sound like you are.

A    No.  I am from Council Bluffs, Iowa.

Q    Well, if you could slow down a little bit I'd appreciate it.  Sometimes that just passes right by me.

A    Okay.

Q    How long have you been employed with the Visiting Nurses Association?

A    Ten years.

Q    And where are you living today?

A    Council Bluffs, Iowa.

Q    Is that near Omaha?

A    Yeah, they're sister cities.

Q    Did you previously work with a company known as IntegriGuard.

A    I did.

Q    And was IntegriGuard associated with the Medicare

3034

1   program?

2   A   Yes, they were.

3   Q   And how were they associated with the Medicare

4   program?

5   A   They were program safety contractors.

6   Q   And explain what that means to the jury?

7   A   Those are people who go out and investigate kind of

8   fraud and abuse against the Medicare contractors.

9   Q   What did you specifically do with IntegriGuard when

10  you worked there.

11  A   I was the program director for the DME product as

12  well as being the supervisor for the MIC contract.

13  Q   Lots of alphabet there.

14  A   D-M-E is Durable Medical Equipment.

15  Q   And what's MIC?

16  A   MIC is Medicare Integrity Contract.

17  Q   Now, what were your job duties and responsibilities

18  when you were supervising the Medicare Integrity

19  Contract?

20  A   I was responsible for overseeing the product work of

21  my staff as well as actually supervising, developing and

22  providing workload for my staff.

23  Q   And what would your staff be doing?

24  A   They would be reviewing charts.  Depending upon

25  whatever product that we were reviewing at that time

3035

```
 1    period, it could be skilled nursing facilities,

 2    outpatient facilities, or they could just be regular

 3    doctors visits kind of routine.

 4    Q    Would this review be to determine if Medicare had

 5    been appropriately billed?

 6    A    Correct.

 7    Q    How long have you worked in the healthcare industry

 8    or the healthcare insurance industry, ma'am?

 9    A    I graduated in 1985.  So, 25 years.

10    Q    And did you previously work in the clinical field?

11    A    I worked in the hospital.

12    Q    And what did you do?

13    A    I was the night charge nurse for medi-surge unit.

14    Q    Are you a Registered Nurse?

15    A    I am.

16    Q    Is Medicare a healthcare benefit program?

17    A    It is.

18    Q    And who does Medicare insure, generally speaking?

19    A    Generally it's people over 65.  Although they do

20    also do renal clients as well.

21    Q    And can people be insured by Medicare if they are

22    determined to be disabled?

23    A    Yes, they can.

24    Q    Is Medicare engaged in interstate commerce?

25    A    Yes.
```

3036

```
 1    Q    Can a medical provider such as a clinic, a physician

 2    or a physician's assistant become eligible to be paid

 3    through a beneficiary's healthcare insurance with

 4    Medicare?

 5    A    Yes.

 6    Q    Let me hand you what has been marked for

 7    identification as Government Exhibits 15-D and 15-E.

 8    Are those applications to become Medicare providers?

 9    A    Yes.

10    Q    Is Exhibit 15-D the Schneider Medical Clinic's

11    application?

12    A    15-D is, yes, it's the Schneider Clinic.

13    Q    And is 15-E the individual application of the

14    Defendant Stephen Schneider?

15    A    Yes, it is.

16    Q    And would these have been documents that the

17    Defendant Stephen Schneider and the Schneider Medical

18    Clinic submitted to Medicare to become enrolled as

19    Medicare providers?

20    A    Yes.

21              MS. TREADWAY:  Government offers Exhibits 15-D

22    and 15-E.

23              MR. WILLIAMSON:  No objection.

24              MR. GOROKHOV:  No objection.

25              THE COURT:  They're received.
```

3037

1    BY MS. TREADWAY:

2    Q   Let's start with 15-D, Ms. Madsen, which is the

3    clinic's application?

4    A   Okay.

5    Q   And if we could go to the 16th page of that exhibit.

6    It's almost to the end.  It's number 15, the

7    certification statement.  Whose signature appears at the

8    bottom of that page?

9    A   Stephen Joseph Schneider.

10   Q   And his title is president?

11   A   Correct.

12   Q   And what is the date he signed this application?

13   A   June the 5th, 2002.

14   Q   Now, turn two pages more, and we have delegated

15   official, optional.  First of all, who appears to have

16   signed that part of the document?

17   A   Linda K Atterbury.

18   Q   And on what date?

19   A   June the 5th, 2002.

20   Q   Now, let's read with the jury on that page.  I don't

21   think that's the right page.  There we go.  It's the

22   18th page of the document.  Could we go up to the very

23   top please.  That's not correct.  It's the next couple

24   of pages down.  The first paragraph up.

25       And does this state that, "The signature of the

3038

1    authorized official below constitutes a legal delegation

2    of authority to the official's named in this section to

3    make changes and/or updates to this supplier's

4    enrollment information.  The signature of the delegated

5    official shall have the same force and effect as that of

6    the authorized official and shall legally and

7    financially bind the supplier to the laws, regulations

8    and program instructions of the Medicare program."

9         Is that basically the description of what a

10   delegated official is?

11   A    Correct.

12   Q    And then the next sentence says:  "By his or her

13   signature, the delegated official certifies that he or

14   she has read the certification statement in Section 15

15   and agrees to adhere to all of the stated requirements."

16        So, now I want to go back two pages to that

17   certification statement, and I want to point out a

18   couple of paragraphs.  Does Paragraph 3 state: "I agree

19   to abide by the Medicare laws, regulations and program

20   instructions that apply to this supplier.  The Medicare

21   laws, regulations and program instructions are available

22   through the Medicare contractor.  I understand that

23   payment of a claim by Medicare is conditioned upon the

24   claim and the underlying transaction complying with such

25   laws, regulations and program instructions, including

3039

1    but not limited to, the federal anti-kickback statute

2    and the Stark law and on the supplier's compliance with

3    all applicable conditions of participation in Medicare."

4         Have I read that correctly?

5    A    Yes.

6    Q    And then Paragraph 6 states:  "Will not knowingly

7    present or cause to be presented a false or fraudulent

8    claim for payment by Medicare and will not submit claims

9    with deliberate ignorance or reckless disregard of their

10   truth or falsity."

11   Have I read that correctly?

12   A    Yes.

13   Q    By signing this application form, did both the

14   Defendant Stephen Schneider and Defendant Linda

15   Atterbury Schneider certify to those statements?

16   A    Yes.

17   Q    Now let's turn to Exhibit 15-E, which is the

18   individual application of the Defendant Stephen

19   Schneider.  Does he sign this on Page 13?

20   A    Yes, it's signed there.

21   Q    And what date did he sign this application?

22   A    June the 5th, 2002.

23   Q    Now, I'm sorry to batter you about these pages, but

24   could you turn back to Page 3.  And is this the page on

25   which the physician indicates his specialties?

3040

1    A    Yes.

2    Q    Let's look at that more closely, please.  Does he

3    indicate the specialty is family practice, general

4    practice and geriatric medicine?

5    A    Yes, as well as osteopathic manipulative treatment.

6    Q    Is there a space for pain management?

7    A    Yes.

8    Q    Could you move that over, Mr. Moore.  Okay.  Does he

9    mark that?

10    A    No.

11    Q    Now, turning back to that page that he signed, Page

12    13, the certification statement.  This is similar to but

13    a little different than the certification statement we

14    just reviewed as to the clinic, isn't it?

15    A    Correct.

16    Q    All right.  Paragraph 4 is exactly like Paragraph 3

17    from the prior ones?

18    A    Correct.

19    Q    Now, I would like to, however, highlight Paragraph

20    7, 8 and 9 here.  It says: "I understand that the

21    Medicare billing number issued to me can only be used by

22    me or by a provider or supplier to whom I have

23    reassigned my benefits under current Medicare

24    regulations when billing for services rendered by me."

25        8 is the same as we had in the prior certification.

1    "I will not knowingly present or cause to be presented a

2    false or fraudulent claim."  Correct?

3    A   Correct.

4    Q   And then 9 is: "I further certify that I am the

5    individual practitioner who is applying for Medicare

6    billing privileges".

7       Did I read that correctly?

8    A   Correct.

9    Q   Now, once a provider has applied and been accepted

10    into the Medicare program, does the provider receive a

11    number?

12    A   Yes.

13    Q   And what is this number called?

14    A   It's called the provider number basically, yeah.

15    Q   Does each provider have a unique provider number?

16    A   Correct.

17    Q   And is it sometimes called a U-PIN?

18    A   Yes.

19    Q   A Unique Provider Identification Number.  And what

20    is the purpose of having a Unique Provider

21    Identification Number?

22    A   To make sure that nobody else will bill under

23    somebody else's name, so that number is unique to that

24    provider.

25    Q   And when that provider number shows up on a claim,

1    what does that tell Medicare?

2    A    That provider provided those services.

3    Q    Now, did the Defendant Stephen Schneider receive

4    such a number?

5    A    Yes.

6    Q    And did his clinic receive such a number?

7    A    Yes.

8    Q    Now I'd like to hand you what has been marked for

9    identification as Government Exhibit 15-F.  And are

10   these a series of documents that identify those numbers

11   not only for Dr. Schneider and the clinic but also for

12   the physician's assistants who worked at the clinic?

13   A    Yes.

14            MS. TREADWAY:  Government offers Exhibit 15-F.

15            MR. WILLIAMSON:  No objection.

16            MR. GOROKHOV:  No objection.

17            THE COURT:  It's received.

18   BY MS. TREADWAY:

19   Q    Now let's quickly review who the providers were and

20   the effective dates of their numbers.  On the first page

21   do we have Stephen Schneider, Kimberly He'bert, and

22   Curtis Atterbury with the effective dates of September

23   1st, 2002?

24   A    Yes.

25   Q    And then going down a couple of pages.  Do we have

3043

1    Donna St. Clair with the same effective date, September

2    1st, 2002?

3    A    Yes.

4    Q    Moving to the next page, do we have a physician's

5    assistant, Debra Klingsick, with the effective date of

6    April 22nd, 2004?

7    A    I'm sorry.  Give me that date again.

8    Q    April 22nd, 2004?

9    A    Yes.

10   Q    And then the next do we have Charles Craig with the

11   effective date of August 16th, 2004?

12   A    Yes.

13   Q    And the next do we have Mike Hall a physician's

14   assistant, with the effective date of February 25th,

15   2005?

16   A    Yes.

17   Q    And then next Nhanhien Nguyen, a physician's

18   assistant, May 24th, '06?

19   A    Yes.

20            MS. TREADWAY:  For the record Ms. Schwemmer,

21   that's N-H-A-N-H-I-E-N, middle initial D, N-G-U-Y-E-N.

22   BY MS. TREADWAY:

23   Q    And next do we have Mohammed Akram, another

24   physician's assistant, whose effective date was July 15,

25   2005?

1    A    Yes.

2    Q    Is that yes?

3    A    Yes.

4    Q    And do we have Lawrence Simons, M.D., with an

5    effective date of September 27th, 2005?

6    A    Yes.

7    Q    And, finally, do we have a physician's assistant by

8    the name of Connie White with an effective date of

9    November 14th, 2005?

10   A    Yes.

11   Q    With regard to that effective date, what does that

12   mean?

13   A    That means as of that date they could start -- they

14   were given a unique number, a U-PIN number, so they

15   could bill Medicare for their services.

16   Q    When healthcare providers send claims to Medicare,

17   do they typically send in the progress notes and other

18   supporting documentation with the claims?

19   A    No.

20   Q    Does Medicare investigate every claim before it pays

21   it?

22   A    No.

23   Q    Does Medicare instead have to depend on the honesty

24   of the providers sending in the claims?

25   A    Yes.

3045

1    Q    When a physician becomes a Medicare provider, does

2    he or she agree to be responsible for the claims

3    submitted to the Medicare program?

4    A    Yes.

5    Q    Is the physician's agreement to be responsible for

6    the claims submitted a condition of being able to submit

7    claims and be paid by the Medicare program?

8    A    Yes.

9    Q    And is that what that certification meant?

10    A    Exactly why people fill that out.

11    Q    Does the physician agree to submit truthful and

12    accurate claims?

13    A    Yes.

14    Q    And is that an express condition of being able to

15    submit claims and be paid by the Medicare program?

16    A    Yes.

17    Q    If the provider is a clinic as opposed to just one

18    physician, are all of these rules the same?

19    A    Yes.

20    Q    If the provider is a clinic, who would be

21    responsible for the claims being submitted?

22    A    It would be the person who submitted the document

23    for that order, which would be Dr. Schneider in this

24    case.

25    Q    And the delegated official Linda Atterbury?

1    A    Correct.

2    Q    So they would both be responsible for the clinic's

3    claims?

4    A    Correct.

5    Q    After being paid by the Medicare program, can a

6    physician choose to opt out of being responsible for the

7    claims submitted and for which he has been paid?

8    A    Once they are paid, they cannot opt out.

9    Q    Can a clinic choose to opt out of being responsible

10   for the claims submitted and for which it has been paid?

11   A    No.

12   Q    As a part of a physician's and the clinic's

13   responsibility for submitting claims, does the physician

14   or the clinic represent every time a claim is submitted

15   that it is truthful and accurate?

16   A    Yes.

17   Q    So if a claim is false, and it was submitted by a

18   physician, whose responsibility is it?

19   A    It would be the physician's responsibility.

20   Q    And if the provider is a clinic and the claim is

21   false, who is responsible?

22   A    It would be ultimately finally the person who signed

23   the document to make it a clinic under the Medicare

24   system.

25   Q    And in this case it would be both of the Defendants?

1    A    Yes.

2    Q    Now, in terms of paying providers, does Medicare

3    have a couple of options in terms of how they send money

4    to a provider?

5    A    Yes.

6    Q    And can they send it by check?

7    A    No.  They may have along time ago before they become

8    modernized, but not any more.

9    Q    Not any more.  It's almost all electronic deposit

10   now, isn't it?

11   A    That is correct.

12   Q    Let me hand you what has been marked for

13   identification as Government Exhibit 15-G.  Do you

14   recognize that document as an authorization for such

15   electronic deposits of Medicare payments?

16   A    Yes.

17            MS. TREADWAY:  Government would offer Exhibit

18   15-G.

19            MR. WILLIAMSON:  No objection.

20            MR. GOROKHOV:  No objection.

21            THE COURT:  It's received.

22   BY MS. TREADWAY:

23   Q    Now, in the Medicare system, Ms. Madsen, not only

24   does Medicare pay the provider, but does the Medicare

25   beneficiary have an obligation at times to pay the

3048

1    provider?

2    A    Yes.

3    Q    And is that often called a copayment?

4    A    Correct.

5    Q    Let me hand you what has been marked for

6    identification as Exhibit 15-C.  Is that general

7    information from Medicare about copayments?

8    A    Yes.

9              MS. TREADWAY:  Government offers Exhibit 15-C.

10             MR. GOROKHOV:  No objection.

11             MR. WILLIAMSON:  None, Your Honor.

12             THE COURT:  15-C is received.

13   BY MS. TREADWAY:

14   Q    Now if we could turn to Page 3, ma'am.  Under Part

15   B, Coinsurance, which is another name for copayment,

16   isn't it?

17   A    Yes.

18   Q    It says: "After the deductible has been satisfied,

19   coinsurance of 20% is usually applicable".

20         So let me do some math here.  If a charge by a

21   provider is $100 and I've paid my deductible, what do I

22   have to pay?

23   A    You'd have to pay the $20.

24   Q    And Medicare would pay?

25   A    $80.

3049

1    Q    If the $100 was what the fee would be applicable to

2    Medicare?

3    A    Right.

4    Q    Now, in becoming a provider enrolled with Medicare,

5    does the provider agree to abide by the program's rules

6    and regulations and policies?

7    A    Yes.

8    Q    And does Medicare publish its policies and

9    procedures so that providers are aware of them?

10   A    Yes.  They can get that at the CMS website, as well

11   as their intermediary also will provide that information

12   to them.

13   Q    What's an intermediary?

14   A    An intermediary are -- they used, well -- the

15   intermediary is basically the people who pay the bill

16   for a certain region.  So, the United States is set up

17   in several different regions, and each region is a

18   Medicare region that pays the bills for that area.

19   Q    Now, for instance, it used to be in Kansas that

20   Medicare payments were made by Blue Cross/Blue Shield?

21   A    Correct.

22   Q    That's no longer true, but it was at this time?

23   A    Right.

24   Q    Now, how are they published?  You say the website?

25   A    There's CMS Medicare/Medicaid services website.

3050

1    Q    Now, does Medicare have published policies about

2    documentation requirements?

3    A    Yes.

4    Q    Let me hand you what has been marked for

5    identification as Exhibit 15-A.  Are those the published

6    documentation requirements for the time period 2003

7    through 2007?

8    A    Yes, they are.  They're also the established time

9    period since 1995.  Nothing has changed.

10   Q    Okay.  Are the documentation policies therefore

11   consistent throughout the period '95 through 2007?

12   A    Yes.

13            MS. TREADWAY:  Government would offer Exhibit

14   15-A.

15            MR. WILLIAMSON:  No objection.

16            MR. GOROKHOV:  No objection.

17            THE COURT:  15-A is received.

18   BY MS. TREADWAY:

19   Q    Now let's look at this document, ma'am, starting

20   with Page 1.  We're not going to go into detail, but I'd

21   like to just briefly review these documentation

22   guidelines.  Can you read the information under the

23   heading "What is Documentation and Why is it Important"?

24   A    "Medical record documentation is required to record

25   pertinent facts, findings and observations about an

1    individual's health history; including past and present

2    illnesses, examinations, tests, treatments and outcomes.

3    The medical record chronologically documents the care of

4    the patient and is an important element contributing to

5    high quality care".

6    Q    And then does it go on to say what that medical

7    record facilitates with several bulletpoints?

8    A    It does.  It says:  "The medical record facilitates

9    the ability of the physician and other healthcare

10   professionals to evaluate and plan the patient's

11   immediate treatment and to monitor his or her healthcare

12   over time.  Communication and continuity of care among

13   the physicians, and other healthcare professionals

14   involved in the patient's care.  Accurate and timely

15   claims review and payment.  Appropriate utilization

16   review and quality of care evaluations and collections

17   of data that may be useful for research and education".

18   Q    Now, moving to II, "General Principles of Medical

19   Record Documentation", can you review that with the

20   jury, please?

21   A    "The principles of documentation listed below are

22   applicable to all types of medical and surgical services

23   in all settings for evaluation and management otherwise

24   known as E and M services.  The nature and amount of

25   physician work and documentation varies by type of

1   service, place of service, and the patient status.  The

2   general principle listed below may be modified to

3   account for these variable circumstances in providing E

4   and M services".

5   Q   And then it lists seven issues that are anticipated

6   that these documentation -- the documentation would

7   meet?

8   A   Correct.

9   Q   Now let's move to Page 3.  Now, when we say

10  evaluation and management services, typically,

11  Ms. Madsen, are those going to be office visits?

12  A   Yes.

13  Q   Not always, but typically?

14  A   Most of the time, they always are.  They're based

15  upon the kind of time that's usually spent with the

16  client in regards to visuals, and times you actually

17  spent with the client in regards to what service is

18  provided.

19  Q   Now, in the documentation of E and M services, or

20  Evaluation and Management services, it says in the

21  second paragraph that there are seven components.  Do

22  you see that?

23  A   Yep.

24  Q   What are those seven components?

25  A   "History, examination, medical decision-making,

3053

1    counseling, coordination of care, nature of present

2    problem and time".

3    Q    And then reading that next first sentence, what are

4    the key components of the evaluation and management

5    services?

6    A    "The first three of these components i.e. history,

7    examination, and medical decision-making are the key

8    components in selecting the level of E and M services".

9    Q    And then following in this documentation guideline,

10   does it go into detail as to each element, each

11   component and tell the physician exactly what is

12   required?

13   A    Yes.

14   Q    Now, does Medicare also have policies about

15   mid-level practitioners or non-physicians such as

16   physician's assistants?

17   A    Yes.

18   Q    Let me hand you what has been marked for

19   identification as Exhibit 15-B.  Are those the Medicare

20   policies for physician's assistants?

21   A    Yes.

22   Q    And are those the policies that were in effect from

23   2003 through 2007?

24   A    Yes.

25              MS. TREADWAY:  Government would offer Exhibit

3054

```
 1   15-B.
 2              MR. WILLIAMSON:  No objection.
 3              MR. GOROKHOV:  No objection.
 4              THE COURT:  It's received.
 5   BY MS. TREADWAY:
 6   Q   Does Medicare pay for services rendered to Medicare
 7   beneficiaries when they have been provided by a
 8   physician's assistant as opposed to a physician?
 9   A   Yes.
10   Q   And did they do so for the period of time 2002
11   through 2007?
12   A   Yes.
13   Q   And are there two ways in which a physician's
14   assistant's services can be billed to the Medicare
15   program?
16   A   Yes.
17   Q   And is this a rather odd provision that's only used
18   by Medicare?
19   A   Yes.
20   Q   And they can bill directly using their own unique
21   provider identification number?
22   A   Right.
23   Q   But what's the other way they can bill?
24   A   It's called incident-to.
25   Q   Tell the jury what incident-to is, Ms. Madsen?
```

3055

1    A    Incident-to is a case where a PA will see a client

2    for a physician.  So in other words, it's a client who

3    is actually under a physician's care and the physician's

4    assistants will see the client for the physician and so

5    then he bills it as an incident-to.  The caveat for this

6    situation is that the physician has to be in the office,

7    not in the necessary exam room, but has to be in the

8    clinic when the service is being provided.

9    Q    And must the physician have started the care with

10   the patient?

11   A    Yes.

12   Q    Now I want to look at the second document in 15-B

13   which I think starts on Page 4 and, again, this would

14   have been available information for any Medicare

15   provider?

16   A    Correct.

17   Q    And I want to go to the bottom of that first page of

18   that second document.  And it says:  "To be covered

19   incident-to, the services of a physician or other

20   practitioner, services and supplies must be -- " and

21   then we have "an integral although incidental part of

22   the physician's professional service commonly rendered

23   without charge or included in the physician's bill; of a

24   type that are commonly furnished in physician's offices

25   or clinics; and furnished by the physician or by

3056

1    axillary personnel under the physician's direct

2    supervision".  Have I read that correctly?

3    A    Yes.

4    Q    Now turning to the next page.  Let's move down to

5    the next to the last paragraph: "Direct supervision".

6    A    Okay.

7    Q    Does it state:  "Direct supervision in an office

8    setting does not mean that the physician must be present

9    in the same room with his or her aid; however, the

10   physician must be present in the office suite and

11   immediately available to provide assistance and

12   direction throughout the time the aid is performing the

13   services."

14   A    Yes.

15   Q    So is that the actual physical presence requirement?

16   A    Yes.

17   Q    Now moving to the next document, which I believe is

18   an incident-to services education brochure.  Does it

19   further identify what we've talked about?

20   A    It doesn't -- actually it's a -- it's a Medicare

21   learning network program that provides further -- there

22   probably was quite a few questions in regards to how the

23   incident-to program actually works and so what they do

24   is Medicare then provides education further so that

25   people and providers know how to use that system

3057

1    correctly.

2    Q   Why don't you review that with the jury.

3    A   Okay.  "To qualify as incident-to, services must be

4    part of your patient's normal course of treatment during

5    which a physician personally performed an initial

6    service and remains actively involved in the course of

7    the treatment.  You do not have to be physically present

8    in the patient's treatment room while those services are

9    provided; but you must provide direct supervision, that

10   is, you must be present in the office suite to render

11   assistance if necessary.  The patient record should

12   document the essential requirements for incident-to

13   services."

14   Q   So if a physician did not start the treatment

15   initially of a Medicare patient, can a physician's

16   assistant services to that patient be billed to

17   Medicare?

18   A   No.  Could not bill it as an incident-to.

19   Q   Could the physician's assistant bill it directly

20   under their unique provider number?

21   A   Yes.

22   Q   If a physician is not present at the clinic, say

23   they're out-of-town, or they're at a continuing medical

24   education seminar or they're in Mexico, could the

25   physician's number be used to bill as incident-to

3058

1    services provided by a physician's assistant?

2    A    No.

3    Q    Now, when a physician's assistant is providing the

4    services and it's not incident-to, does Medicare pay at

5    a lesser rate than it pays for physicians?

6    A    Yes.

7    Q    And is the reimbursement rate at a percentage?

8    A    Yes.

9    Q    And is that percentage 85%?

10   A    Yes.

11   Q    And what is it 85% of?

12   A    It's 85% of what the physician would actually be

13   making.

14   Q    So, again, back to my example, if the Medicare fee

15   for a service was $100 for a physician, it would be $85

16   for the physician's assistant?

17   A    That would be correct.

18   Q    Okay.  And is that in Subsection 110 which is in the

19   last document that we have in 15-B?

20   I think we have to go for a while here.  Did you find it?

21   A    I did.

22   Q    And does it say:  "Physician assistant services are

23   paid at the lesser of the actual charge or 85% of the

24   physician fee schedule"?

25   A    Yes.

3059

1    Q    Again, this would be something that is very

2    available in terms of information for providers?

3    A    Correct.

4    Q    And how long has Medicare paid physician's

5    assistants at 85%?

6    A    I don't know the answer to that question.  Probably

7    for as long as physician's assistants have actually been

8    certified.

9    Q    Been recognized?

10   A    Been recognized and certified, yes.

11   Q    If the evidence in this case will be that the

12   Schneider Medical Clinic did not use incident-to

13   billing, what would that mean in terms of how the clinic

14   was supposed to be billing Medicare for physician's

15   assistants?

16             MR. WILLIAMSON:  Your Honor, I'm going to

17   object on the same grounds that you told me not to ask

18   the questions of what the evidence will or won't be.

19             MS. TREADWAY:  This is a hypothetical to an

20   expert, Judge.

21             THE COURT:  Will the expert be testifying to

22   this?

23             MS. TREADWAY:  Another expert?  No.  It will

24   be a fact that somebody else will be testifying to.

25             THE COURT:  That's fine.

3060

1          MS. TREADWAY:  This is a hypothetical for this

2    expert.

3          THE COURT:  Some witness for the Government

4    will come --

5          MS. TREADWAY:  Yes, sir.

6          THE COURT:  All right.  The objection is

7    overruled.

8    BY MS. TREADWAY:

9    Q   Let me ask it again.  I'm sorry.

10   A   Please.

11   Q   If the evidence in this case will be that the

12   Schneider Medical Clinic did not use incident-to

13   billing, what would that mean in terms of how the clinic

14   was billing Medicare for physician's assistants?

15   A   That they should have received the 85% of the

16   physician's bill.

17   Q   And should they have billed using the physician's

18   assistant's unique provider identification number?

19   A   Yes.

20          THE COURT:  Who is that person who's going to

21   testify?

22          MS. TREADWAY:  Charles Craig.

23          THE COURT:  All right.  Now, if Charles Craig

24   doesn't give that testimony that was hypothesized to

25   this witness, then you are to, obviously, disregard this

3061

```
 1    witness's answer with respect to that particular
 2    question.
 3              MS. TREADWAY:  Thank you, Judge.  That's it.
 4              THE COURT:  Mr. Williamson.
 5              MR. WILLIAMSON:  Thank you, Your Honor.
 6              THE COURT:  And I want to repeat -- I was a
 7    little sharp with Mr. Williamson.  I didn't mean to be.
 8    But here's the whole point about these questions that
 9    might depend on a witness for the defense.  The
10    Defendants are not required to call witnesses or produce
11    any evidence.  You remember I told you that.  And I
12    don't doubt Mr. Williamson.  I trust Mr. Williamson's
13    representation.  But those representations, to some
14    extent, can change; and if for some reason it was
15    decided, for whatever reason, not to put on that witness
16    or not to put on a defense, then it would not be proper
17    to ask questions based on what the Defendant's witnesses
18    may say.  Do you follow what I'm saying?  Because they
19    don't have to -- the Defendants don't have to put on
20    evidence.  The Government does.  So that's the
21    difference.
22              MR. WILLIAMSON:  Thank you, Your Honor.
23                     CROSS EXAMINATION
24    BY MR. WILLIAMSON:
25    Q    How you doing, Ms. Madsen?
```

3062

1   A   Doing okay.

2   Q   We've never had a chance to meet before, have we?

3   A   No.

4   Q   I'm Lawrence Williamson and I represent Dr.

5   Schneider.

6   A   Okay.

7   Q   I want to just ask you a few questions.  And so I

8   understand it, in your testimony you've basically kind

9   of laid out the requirements for provider to engage in

10  receiving Medicare reimbursements for seeing Medicare

11  patients; correct?

12  A   Correct.

13  Q   Okay.  You didn't undertake any findings in this

14  case?  You didn't do any audits of the clinic; right?

15  A   I did not.

16  Q   Have you ever met Dr. Schneider?

17  A   I have not.

18  Q   And you say you have experience with being in other

19  clinical settings?

20  A   Not clinical setting.  I've been in a hospital

21  before.

22  Q   Okay.  Now, let's turn to Exhibit 15-E.  Mr. Moore,

23  can we put up that same provision.  Section 15,

24  Paragraph 8 that the Government had Ms. Madsen looking

25  at.

3063

```
 1        It is Ms. Madsen, isn't it?

 2   A   It is.

 3   Q   I'm sorry.

 4   A   Which number was that that you were looking for?

 5   Q   15-E.

 6   A   Okay.

 7   Q   And let's look at number 8, Mr. Moore, if we could.

 8   A   I'm sorry, which page?

 9   Q   It's Paragraph 15, the certification.

10   A   Oh, where he signs it?

11   Q   Yes.

12   A   Okay.  There you go.

13   Q   All right.  We're going to look at number 8

14   together.

15   A   Okay.

16   Q   Before we delve too much into that, you would agree

17   that when a provider signs up for Medicare, there are a

18   lot of rules and regulations that come along with that;

19   correct?

20   A   Yes.

21   Q   And there are a lot of provisions in the contract

22   that could lead to disallowance of receiving benefits;

23   correct?

24   A   Uhm --

25   Q   Let me rephrase.  If there's a technical violation
```

3064

1    of the contract, Medicare could disallow the payment;

2    correct?

3    A    Correct.

4    Q    They could audit the records and ask for recoupment;

5    correct?

6    A    It depends.  That's technical.  Then basically you

7    would never get the money to begin with because it would

8    be a miss-key thing so you would never get the money to

9    begin with.

10   Q    Okay.  Now let's take a look at this.  Well, strike

11   that.

12        Before we look at this.  Can you find anywhere in

13   the contract that Dr. Schneider or anybody at the clinic

14   signed that says they will be criminally -- they agree

15   to be criminally responsible for mistakes made by

16   somebody else other than themselves?

17   A    They choose to be criminally responsible?

18   Q    That they are going to be criminally responsible for

19   mistakes made by somebody else.  Is that anywhere in

20   that contract?

21   A    No, it's not in the contract; but when you sign that

22   agreement, you sign for anybody who works under you.

23   Q    Okay, and we'll talk about that.  But let's right

24   now -- we're looking at number 8 and this is where Dr.

25   Schneider agrees that he will not knowingly present or

3065

1    cause to be presented a false or fraudulent claim for

2    payment.  Do you see that?

3    A    Yes.

4    Q    Okay.  Here Dr. Schneider says that he's not going

5    to do anything to cause somebody to submit a false

6    claim; correct?

7    A    I will not knowingly present or cause to be

8    presented a false or fraudulent claim by -- yes.

9    Q    Okay.  And -- all right.  Now let's work with your

10   example for a second.  You were asked several questions

11   as far as what would be the responsibility that the

12   clinic and Dr. Schneider had; correct?

13   A    Correct.

14   Q    Now, you agree that there is a difference between

15   being responsible under, let's say, civil law and

16   responsible under criminal law; correct?

17              MS. TREADWAY:  Judge, objection.  Again, we're

18   getting right back into this.  This is not -- this is

19   not what this witness's expertise is.  The law --

20              THE COURT:  Well, he certainly can ask her

21   what the contract says.  If there's language in the

22   contract, or as he asked her a minute ago, if there's

23   not language in the contract.  But she's not here to

24   testify as an expert on whether somebody is criminally

25   responsible or civilly responsible.  So the objection is

1   sustained on that ground.

2   BY MR. WILLIAMSON:

3   Q   Okay.  Does the contract differentiate a provider

4   being responsible, let's say, for breach of contract or

5   being responsible for criminal acts that he is unaware

6   of?

7   A   It doesn't really designate that; but the issue is

8   is that when you sign this thing, you're responsible

9   under the Medicare program for anybody who's going to do

10  any kind of billing for Medicare.

11  Q   Okay.  And that's what I want to have an

12  understanding -- what your understanding of that is.

13  And let's use a hypothetical.  If a provider -- well,

14  strike that.

15      You know providers often send their bills out to a

16  third party; correct?

17  A   Correct.

18  Q   And these are billing companies?

19  A   Yes.

20  Q   And a provider has a responsibility, you would

21  agree, to submit accurate information to that billing

22  company; correct?

23  A   Correct.

24  Q   And if that provider submits -- knowingly submits

25  false information to that billing company in order for

3067

1    that billing company to send it to Medicare, that would

2    be fraudulent and false, wouldn't it?

3    A    I'm not familiar with that.  I guess I would say

4    that seems like it would be unusual, yes.

5    Q    Okay.  Now let's change that scenario, and let's say

6    that the provider actually sends accurate information to

7    the billing company and then the billing company gets it

8    wrong going to the insurance company.  The billing

9    company can have its own independent liability for

10   submitting incorrect claims; correct?

11   A    I have no recognition of that but I would presume

12   they would.

13   Q    Okay.  So if a provider under Medicare has a

14   responsibility to accurately communicate what he or she

15   did in the course of their services.  You would agree

16   with that?

17   A    Yes.

18   Q    Do you know -- strike that.  You didn't take any

19   findings.

20        Now, with this incident-to billing, you stated

21   that -- strike that.

22        Medicare has always allowed incident-to billing;

23   correct?

24   A    Correct.

25   Q    Now, if you have a provider and let's say a

3068

1    physician's assistant; correct?  Following me okay?

2    A    Uh-huh.

3    Q    And let's say this physician's assistant actually

4    sees patients but there's another provider in the

5    office.  How is it supposed to be billed?  Do you need

6    me to clarify that a little bit?

7    A    Yeah, would you please.

8    Q    Okay.  For those of us who don't do this on a

9    regular basis, just correct me if I'm mistaken about

10   anything.

11        Normally under incident-to you have a supervising

12   provider; correct?

13   A    Correct.

14   Q    And then you have physician's assistants under that

15   person; correct?

16   A    Right.

17   Q    And if you actually -- if that provider sees this

18   individual, a patient, for the first time and then PAs

19   see this -- physician's assistants see this patient

20   subsequently, those physician's assistants can bill as

21   though they are the -- they can bill as though they were

22   a physician; correct?

23   A    So long as the physician is present at the clinic;

24   correct.

25   Q    Okay.  Now, what I'm not clear on is, does it have

3069

1    to be the supervising physician or does it have to be a

2    physician?

3    A    It has to be the physician who originally saw that

4    client that allows the PA to see them.

5    Q    Okay.  Now, can you show me in the records that

6    Ms. Treadway had you looking at in regards to

7    incident-to that delineates the difference.

8    A    It says:  "The incident-to, a physician's

9    professional services means that the services are

10   supplied or furnished as an integral --"

11   Q    Ms. Madsen, Ms. Treadway asked you to slow down.

12   I'm going to need you to do that, too.

13   A    Okay.  I thought I was.  I'll try it a little

14   slower.  It says under 760.1, it says:  "Incident-to a

15   physician's professional services means that the

16   services or supplies are furnished as an integral

17   although incidental part of the physician's personal

18   professional services in the course of diagnosis of or

19   treatment of an injury or illness".

20        So therefore it would have to be the initial

21   physician who allows them to bill under incident-to.

22   Q    But there isn't -- and you understand that in many

23   offices there are people who are left to have to

24   interpret these provisions before sending bills out.  Do

25   you agree with that?

3070

1    A   I do.  Although in most offices the bills are

2    already set up and they're just sent to the billing

3    company to bill.

4    Q   But you have updates of rules and regulations;

5    correct?

6    A   Yes.  You mean Medicare?  Yes.

7    Q   Yes.  Okay.  But is there a specific provision that

8    says if the -- if there is -- if the supervising

9    physician is not at the location but there is another

10   provision (sic) under the same clinic, that you cannot

11   be incident-to?

12   Let me lay a little bit of foundation for that.

13   You have a provider contract; correct?

14   A   Yes.

15   Q   And then you have a clinic contract; correct?

16   A   Correct.

17   Q   And Dr. Schneider was not the only provider,

18   physician provider at the clinic that was allowed to see

19   Medicare patients; correct?

20   A   I don't know the answer to that question.  I'm not

21   sure whether there were other physicians involved or

22   not.

23   Q   You never heard of Dr. Donna St. Clair?

24   A   Based upon the information here, yes.

25   Q   Okay.  So under this clinic umbrella, if a physician

3071

1    was on location when a PA saw a patient --

2    A    Uh-huh.

3    Q    -- and it was billed incident-to because there was a

4    physician there, assuming that the initial visit was

5    seen by a different provider, what provision can we look

6    at under the contract that dictates the rules that

7    should be followed in that situation?  Just the one that

8    you pointed out?

9    A    Well, that, and the fact -- okay.  Let's take an

10   example.  You come in, you see a client because they

11   have congestive heart failure.  The doctor looks at

12   them, says your feet are swollen, we've got to do

13   something about that.  He sees them.  He says I want to

14   see you next week.

15   Q    He being the doctor?

16   A    The physician.

17   Q    Okay.

18   A    So then let's say the PA sees 'em because the

19   physician has an emergency or something else like that.

20   The doctor would have pretty clear rules in regards to

21   how that physician's assistant would see that client and

22   therefore would bill it as incident-to.

23   Q    Okay.  Now -- and what I'm trying to figure out is

24   just where in the rules can we find if the situation is

25   a little different in the sense of whether that

3072

1    physician who saw 'em the first time is out of the
2    office but another physician is actually in the office.
3    Under your interpretation of the rules, that should be
4    billed as a provider saw the individual?
5    A    If the physician who originally saw the client who
6    determined they had congestive heart failure was not in
7    the clinic at that time period, then officially it
8    couldn't be billed as incident-to.
9    Q    Okay.  Now -- and I think this is the last topic we
10   can visit about.  Do you know in the clinic what
11   documents the providers would complete to represent to
12   the billing department who actually saw patients?
13   A    I do not.
14          MR. WILLIAMSON:  I don't have anything
15   further, Your Honor.
16          THE COURT:  Mr. Gorokhov?
17          MR. GOROKHOV:  No questions, Your Honor.
18          THE COURT:  Redirect?
19          MS. TREADWAY:  Thank you, Judge.
20                    **REDIRECT EXAMINATION**
21   BY MS. TREADWAY:
22   Q    Could you turn to Exhibit 15-D first.  That is the
23   application for the Schneider Medical Clinic.  And could
24   you turn to Page 15, the page before the certification,
25   ma'am.  Does this application specifically inform and

3073

1   indicate the person applying to Medicare about the

2   penalties for falsifying information on the enrollment

3   application?

4   A    It does.

5   Q    And does this include criminal and civil penalties?

6   A    Yes.

7   Q    And are those the same types of penalties that are

8   available when a provider submits false claims?

9   A    Yes.

10   Q    And is that information widely available in all of

11   the Medicare guidelines, program instructions,

12   requirements, policies, rules and regulations?

13   A    Yes.

14   Q    Is there any doubt in your mind that a provider

15   knows that if they submit false claims they can be both

16   civilly and criminally liable for that activity?

17   A    I do not know how that could ever happen.

18              MS. TREADWAY:  Nothing further, Judge.

19              THE COURT:  Sir.

20              MR. WILLIAMSON:  No recross.

21              MR. GOROKHOV:  Your Honor, I have just one

22   question.

23              THE COURT:  Yes, sir.

24                    **RECROSS EXAMINATION**

25   BY MR. GOROKHOV:

3074

1    Q   Can you look at that section of the contract you

2    just looked at and tell the jury whether or not 18

3    U.S.C. 1347 appears in that contract?

4    A   You'll have to repeat that number again for me.

5    Q   It's 18 United States Code 1347.

6    A   I do not see any statutes listed on this page.

7    Q   What would be the page you just looked at,

8    Ms. Madsen?

9    A   Have I picked the wrong page?

10   Q   Looks like Paragraph 14, "Penalities for Falsifying

11   Information".

12   A   Are you looking at the certification statement,

13   before the certification statement or --

14   Q   Yes.

15   A   Are you at the penalties and falsifying on

16   enrollment application?

17   Q   Right.  The very same section Ms. Treadway just went

18   over with you.

19   A   Okay.  I'm sorry.  Say again?  You want to know if

20   it refers to?

21   Q   18 U.S.C. 1347?

22   A   There is an 18 -- give me the last four digits

23   again.

24   Q   1347.

25   A   I do not see that.

1          MR. GOROKHOV:  Thank you.

2          THE COURT:  All right.  Thank you very much,

3    ma'am.  We'll take our morning recess, Ladies and

4    Gentlemen.  Approximately 15 minutes.  Remember and heed

5    the admonition.

6                    (Recess.)

7                    (Whereupon, the following

8                    proceedings continued OUTSIDE

9                    THE PRESENCE of the jury.)

10         THE COURT:  Mr. Gorokhov, did you want to make

11   a record on something?

12         MR. GOROKHOV:  I did, Your Honor.  Just very

13   brief.  We have a Rule 403 objection.  The Government

14   has now twice elicited evidence that a contract imputes

15   knowledge.  We believe that's confusing.  We believe

16   that's prejudicial.  The contract can't replace the

17   Government's proof of knowledge or intent in this case.

18   In this case both knowing and willful mens rea.  So we

19   just make that for the record, Your Honor.

20         THE COURT:  Well, the objection -- if it had

21   been made timely, I would have sustained it; but it

22   wasn't made timely and that's a requirement.  So the

23   objection is overruled.  Let's go get the jury, please.

24                    (Jury enters the courtroom.)

25         THE COURT:  Who's the next witness?

3076

```
 1          MS. TREADWAY:  Jamie Dahlberg.

 2          THE COURT:  Next witness please.

 3                    JAMIE DAHLBERG

 4  Having been first duly sworn to tell the truth, the

 5  whole truth and nothing but the truth, testified as

 6  follows on:

 7                  DIRECT EXAMINATION

 8  BY MS. TREADWAY:

 9  Q    Could you please introduce yourself to the jury.

10  A    My name is Jamie Dahlberg.

11  Q    And where are you currently employed, Ms. Dahlberg?

12  A    IntegriGuard.

13  Q    And how long have you been employed with

14  IntegriGuard?

15  A    Almost seven years.

16  Q    And where did you work prior to that?

17  A    I've worked in various facilities, hospitals, home

18  healthcare.

19  Q    Are you a Registered Nurse?

20  A    Yes.

21  Q    And for the last seven years as you've been working

22  for IntegriGuard, what have you done for that company?

23  A    Currently I do quality assurance for the nursing

24  staff.  I used to work in doing medical review myself.

25  Q    And when you did medical review, what were your job
```

3077

1    duties and responsibilities?

2    A    To review medical records and billing by various

3    providers.

4    Q    How long have you worked in the healthcare industry

5    or the healthcare insurance industry?

6    A    18 years.

7    Q    Now, during the course of the investigation, did we

8    ask you to review claims submitted to Medicare from the

9    Defendant Stephen Schneider and other providers who

10   worked at the Defendant's Schneider Medical Clinic?

11   A    Yes.

12   Q    Did you choose which patients claims to review?

13   A    No.

14   Q    What was your understanding of how those patient

15   names were chosen?

16   A    Randomly.

17   Q    Did you review all of the claims submitted to

18   Medicare for the randomly chosen patients?

19   A    Not myself.  I did some.  There were two other

20   nurses that worked on them as well.

21   Q    And did you supervise what they did?

22   A    No.

23   Q    Did you review what they did?

24   A    We reviewed each other's, on occasion.

25   Q    All right.  What documents did you have to conduct

1   this review?

2   A   We had progress notes, billing information, the fee

3   tickets, their account summaries.

4   Q   Did you review over 50 patients files, the three of

5   you?

6   A   Yes.

7   Q   And who were the other two people that helped you in

8   this review?

9   A   Rosemary Shaud (ph) and Gaylon Pedding, both

10  Registered Nurses.

11  Q   Did you as a group review 482 claims for these

12  patients?

13  A   Yes.

14  Q   And what types of claims did your review focus on?

15  A   Office visits.

16  Q   And what issues was your review focussed on?

17  A   To verify that the provider billed correctly.

18  Q   And what information did you use to determine

19  whether the provider had billed Medicare correctly?

20  A   The medical records themselves, the fee tickets, and

21  the claims.

22  Q   Did you have a list of signatures against which you

23  could compare the progress notes to determine who the

24  provider was?

25  A   Yes.

3079

1   Q   What guidelines in terms of Medicare guidelines did

2   you use to determine whether the office visit was

3   correctly billed?

4   A   We used the 1995 documentation guidelines set out by

5   Medicare.

6   Q   And the 1995 guidelines, now, have they -- have

7   there been guidelines published since then?

8   A   No.  Well, sorry, 1997 there were additional

9   guidelines and the ruling by Medicare is that we use

10  whichever is more advantageous to the physician.

11  Q   And were the 1995 guidelines more advantageous to

12  the physician?

13  A   Yes.

14  Q   So was your review conservative?

15  A   Yes.

16  Q   And during the course of your review did you create

17  a spreadsheet of the findings that you made?

18  A   Yes.

19  Q   Let me hand you what has been marked for

20  identification as Exhibit 15.  That first page is a

21  overall summary, but following that first page, is that

22  the spreadsheet on which the findings of your review

23  were recorded?

24  A   Yes.

25  Q   And does this summarize voluminous information?

3080

1   A    Yes.

2   Q    And does it accurately reflect the data it

3   summarizes, namely, the findings from your review?

4   A    Yes.

5        MS. TREADWAY:  Government would offer Exhibit

6   15 as a summary exhibit under Federal Rule of Evidence

7   1006 but understands the Court's prior ruling and will

8   offer it as a demonstrative exhibit.

9        MR. WILLIAMSON:  No objection, with that

10  understanding.

11       MR. GOROKHOV:  Your Honor, since this is not

12  the only witness who created it, there's still a

13  Melendez-Diaz issue.

14       THE COURT:  Well, I've wondered about that.

15       MS. TREADWAY:  This is a summary, Judge.

16       THE COURT:  She reviewed -- my notes say that

17  she reviewed the randomly chosen claims; two others,

18  nurses, also reviewed, but she didn't check their work.

19       MS. TREADWAY:  They reviewed each other's

20  work.  She did say that, Judge.

21       THE COURT:  And then said they reviewed each

22  other's work.  I don't know what she means by that.

23  BY MS. TREADWAY:

24  Q    Did you review each other's work for accuracy of the

25  finding?

3081

1    A    Yes.  And consistency.

2    Q    And did you find that the findings as reflected in

3    the spreadsheet are accurate and fair?

4    A    Yes.

5              MR. GOROKHOV:  Same objection, Your Honor.

6              THE COURT:  She didn't answer.

7              MS. TREADWAY:  She said yes.

8              THE COURT:  You said yes?

9    A    Yes, sir.

10             THE COURT:  I think I'll let you voir dire her

11   on this, Mr. Gorokhov.

12             MR. GOROKHOV:  Okay.  Thank you, Your Honor.

13   Good morning.

14   A    Good morning.

15             MR. GOROKHOV:  When you reviewed these claims,

16   for each line that's on that spreadsheet you had to come

17   to a conclusion based on what code was justified and so

18   forth; correct?  And that was based on your knowledge of

19   the coding; correct?

20   A    Yes.

21             MR. GOROKHOV:  That was based on your

22   interpretation of the records?

23   A    It's based on what was written in the records.

24             MR. GOROKHOV:  Okay.  And you would agree that

25   that involves some judgment and some knowledge that goes

3082

```
 1    into those decisions in that chart; correct?
 2    A    According to the guidelines that are set out by the
 3    Government is how we make a determination.
 4             MR. GOROKHOV:  And you're trained in that and
 5    you used your training and experience in arriving at
 6    those conclusions; correct?
 7    A    Correct.
 8             MR. GOROKHOV:  Did you review every single
 9    line of that spreadsheet?
10    A    Myself and the two other nurses did, yes.
11             MR. GOROKHOV:  Did you review the work --
12    every single line of that spreadsheet yourself?
13    A    Did I review each record?
14             MR. GOROKHOV:  That's correct.
15    A    I looked at each record as we looked at each other's
16    work.
17             MR. GOROKHOV:  So did you review every single
18    patient chart that's represented in those.
19    A    I would have looked at each record, yes.
20             MR. GOROKHOV:  And you would have come to your
21    own independent conclusion based on reviewing those
22    records whether the billing was justified?
23    A    Could you repeat that.  I'm sorry.
24             MR. GOROKHOV:  You would have come to your own
25    independent conclusion on each of those lines presented
```

3083

1    in the spreadsheet whether or not the billing was

2    justified for each of those claims?

3    A    Yes.

4                  MR. GOROKHOV:  Okay.

5                  MR. GOROKHOV:  No objection, Your Honor.

6                  THE COURT:  All right.  15 is received.

7                  MS. TREADWAY:  As a demonstrative, Judge?

8                  THE COURT:  Yes.  That means, of course, that

9    we'll use it but won't have it in the jury room.

10   BY MS. TREADWAY:

11   Q    Now, looking at the first page of this summary, is

12   this a summary of your findings?

13   A    Yes.

14   Q    Of the 482 claims you reviewed, how many were billed

15   as though a physician provided the services when a

16   physician's assistant actually provided the services?

17   A    180.

18   Q    And what percentage does this represent?

19   A    37%.

20   Q    Of the 482 claims you reviewed, how many were billed

21   at a higher level of office visit service than the

22   documentation supported with the checklist and the

23   progress notes taken into account?

24   A    200.

25   Q    And what percentage does this represent?

1    A    41.

2    Q    And would you consider those claims to be false?

3    A    Yes.

4    Q    Why?

5    A    Because they billed at a level that they didn't meet

6    in their documentation.

7    Q    And would this have caused Medicare to pay more

8    money to the clinic and the Defendants than they were

9    entitled to?

10   A    Yes.

11   Q    Of the 482 claims you reviewed, how many were billed

12   at a higher level of office service than the

13   documentation supported, when you did not take the

14   checklist into account?

15   A    314.

16   Q    And what percentage does this represent?

17   A    65.

18   Q    And would you consider those claims to be false?

19   A    Yes.

20   Q    For the same reasons?

21   A    Yes.

22   Q    How many claims would you have denied outright?

23   A    58.

24   Q    Why?

25   A    There were various reasons.  Primarily they did not

3085

1    even meet the lowest standard to bill for an office

2    visit.  Some of them we might not have had any records

3    at all to support that they were seen that day.

4    Q   Based on your review of these 482 claims and the

5    records supporting them, what were your observations

6    about the legibility of these medical records?

7    A   They were difficult to read.

8    Q   If a healthcare service is not documented, should it

9    be paid?

10   A   No.

11   Q   Why not?

12   A   Because you have to support what you did to know

13   that it's payable.

14   Q   If a medical record is not legible, is the

15   healthcare service documented?

16   A   No.

17   Q   If the service is not documented, or if the

18   documentation is not legible, can Medicare refuse to pay

19   the claim?

20   A   Yes.

21   Q   If the claim has already been paid can Medicare

22   request the money back?

23   A   Yes.

24   Q   With regards to the claims you reviewed, should the

25   false claims you found have been paid?

3086

1    A    No.

2                MS. TREADWAY:  Nothing further, Judge.

3                THE COURT:  Who's starting.  Mr. Williamson?

4                MR. WILLIAMSON:  Thank you, Your Honor.

5                        **CROSS EXAMINATION**

6    BY MR. WILLIAMSON:

7    Q    Ms. Dahlberg, correct?

8    A    Yes.

9    Q    I'm Lawrence Williamson.  I represent Dr. Schneider.

10   I want to ask you just a few questions about your

11   testimony.  Okay?

12   A    Sure.

13   Q    First, just to understand what you did, you reviewed

14   the documentation that the clinic had in its possession;

15   correct?

16   A    Right.  The medical records.

17   Q    And that was based on a sample request that was made

18   by Medicare to the Schneider Medical Clinic; correct?

19   A    Did you ask if the request was made by Medicare?

20   Q    Yes.

21   A    The request I believe was made by the Government.

22   Q    The U.S. Attorney's office or--

23   A    I'm not sure.

24   Q    -- investigators with the Federal Government?

25   A    Yes.

3087

1    Q   Okay.  So before the Federal Government decided to

2    ask for these records, there had never been any notice

3    to the clinic that Medicare believed that the billing

4    submitted to Medicare were fraudulent; correct?

5    A   I don't know that.

6    Q   Okay.  Now, you're looking at these records.  You

7    don't go interview the providers; do you?

8    A   No.

9    Q   You don't go interview the patients, do you?

10   A   No.

11   Q   You don't go interview people in the billing

12   department; do you?

13   A   No.

14   Q   You just look and say, applying our Medicare rules,

15   does the document support what was actually billed;

16   correct?

17   A   Correct.

18   Q   Now, under the administrative side of things, when a

19   provider wants to get paid, they have to prove to you

20   that, through the documentation, that their services

21   were rendered and that there's support -- that the

22   documents support the code that was sent to you;

23   correct?

24   A   Initially, no records are provided with a claim.

25   Q   And let me go a step beyond that.  If there's an

3088

1    audit, if Medicare challenges the submissions, they can

2    do that; correct?

3    A    Yes.

4    Q    Medicare can say, "listen, provider, you have a

5    contract with us and it's your duty to show us through

6    the documentations that what you billed is supported by

7    the documents"; correct?

8    A    Yes.

9    Q    Okay.  There's nothing in the Medicare contract that

10   states that if a person is criminally charged they are

11   going to be liable for any unintentional mistakes made

12   by a billing department.  You agree with that?

13   A    I don't know that.

14   Q    Okay.  You would agree that billing departments in

15   any clinic can make mistakes?

16   A    Well, we're all human but I don't, I don't know what

17   the numbers or anything like that would be on that.

18   Q    So has Medicare ever undertaken a study and

19   determined what the error rate amongst clinics enrolled

20   in its system actually is?

21   A    I don't know.  That's not within what I do.

22   Q    Okay.  So, but you had to come to a conclusion and

23   an opinion as to whether or not you believed these

24   claims were false; correct?

25   A    Yes.

3089

1    Q   Now, numbers, percentages, can mean many things just

2    by looking at the percentage by itself; correct?

3    A   I'm sorry.  I don't know what you're --

4    Q   You would agree that in order to interpret a

5    percentage to see what the meaning is, you would need to

6    have something, a base line, to compare that against.

7    Would you agree with that?

8    A   Yes.

9    Q   Okay.  So for instance, if providers under Medicare,

10   if there is a 30% error rate amongst all providers

11   nationally and the clinic's error rate is at 30%, that

12   would mean that they're consistent with what you

13   normally see on an every day basis; correct?

14   A   Stating it that way, yes, but I don't know if that's

15   applicable in this case.

16   Q   Right.  You never went to look to determine what the

17   national error rate was before interpreting these

18   numbers; correct?

19   A   No, we were concerned with what they did.

20   Q   Okay.  And you mentioned that -- if we can look at

21   15 again, please, Mr. Moore, just that front sheet.

22       Now, you mentioned that 37% of claims were billed

23   as though a physician provided the service when it was

24   actually a physician's assistant; correct?

25   A   Correct.

3090

1    Q    Now, in order for a claim to be false, it has to

2    violate a rule.  Would you agree with that?

3    A    Yes.

4    Q    Okay.  Did you, with these 180 claims, did you go a

5    step further to determine whether or not the supervising

6    physician was actually at the clinic on the days that

7    certain bills were provided or billed as though a

8    physician provided the services?

9    A    No, that's not part of what medical review does.

10   Q    Okay.  But you have to put some kind of weight to

11   that 37%, don't you?

12   A    Meaning what?

13   Q    You said that that's false; didn't you?

14   A    Said that the, that it was false, that it was not

15   the physician that provided the service.

16   Q    Right.  But aren't you aware that under Medicare

17   that providers can bill as though they're a physician

18   provided the service when a physician's assistant

19   actually did the service?

20   A    Yes.

21   Q    Okay.  And to take step one -- to get past step one,

22   don't you need to see whether the requirement of

23   allowing that, quote, unquote "incident-to billing" was

24   actually met before you come up with those findings?

25   A    Can you repeat that.  I'm sorry.

3091

```
 1    Q    Let me ask it a different way.  You have 180 claims
 2    there.  Do you see that?
 3    A    Yes.
 4    Q    And you stated that those are false.  Remember that?
 5    A    Yes.
 6    Q    Now, of those 180 claims, how many were billed as
 7    though the physician provided the services when the
 8    physician was not at the clinic?
 9    A    I don't personally know what days the physician was
10    or was not at the clinic.
11    Q    So you don't know if that 180 is completely accurate
12    as far as whether or not it's technically incorrect.
13    True?
14    A    Well, technically the physician billed the service.
15    The physician's assistant saw the patient.
16    Q    I understand.  Are you familiar with the incident-to
17    services requirement?
18    A    Yes.
19    Q    And a provider can bill -- strike that.  A physician
20    can bill as though the physician saw that individual
21    even when a physician's assistant saw 'em so long as the
22    physician initiated the service and is available on
23    site.  Correct?
24    A    Correct.
25    Q    How many of these 180 times where you stated that
```

3092

1    this false information was submitted did you determine

2    that the initial visit was done by the physician and the

3    subsequent services were provided by a physician's

4    assistant?

5    A    I'm sorry.  Can you repeat that question.

6    Q    Absolutely.  Of this 180, how many times did the

7    incident-to rule was not met?  Let me ask it that way.

8    A    I did not personally check to see whether the

9    physician was there.

10   Q    Don't you think before you set up here and state

11   that these 180 were false that that's information that

12   you would want to know?

13   A    All we were looking at is whether or not the

14   physician that billed it actually delivered the service.

15   That was what this statement says.

16   Q    So you weren't concerned whether or not any

17   technical rule was actually violated.  You were just

18   looking at the end result of the data; correct?

19   A    For medical review, yes.  There are other people

20   that look at whether he was in the office.

21   Q    Who did?

22   A    I do not know.  That's outside of my scope of work.

23   Q    Did you consult with those individuals?

24   A    Other people would have had this data afterward.

25   Q    Who?

3093

1    A    I don't know everyone that would have had it.

2    Q    Did you talk to anybody -- and the point I'm getting

3    at is, before you represented that that 180 were falsely

4    submitted claims, did you consult with anybody to see if

5    there was a technical violation of the rule?

6    A    What we did is give the data to the people that were

7    looking at other information.

8    Q    Who did you give that data to?

9    A    We gave the data back to the investigators.

10   Q    Were you the point person that gave it to the

11   investigators?

12   A    No.  That would have been given back by my

13   supervisor.

14   Q    Who's your supervisor?

15   A    Joan Madsen.

16   Q    Did Joan Madsen actually review your findings?

17   A    I don't know whether she reviewed them or whether

18   she just forwarded them on.

19   Q    Now, you state that under this, 200 claims were

20   billed at a higher rate of services than the

21   documentation supported.  Do you see that?

22   A    Yes.

23   Q    Okay.  Now, if we can just pull up maybe the first

24   page of that spreadsheet, Mr. Moore.

25            MR. MOORE:  Same area as before, sir?

3094

```
 1    Q   Let's slide out to where you see the 99213s and 212s

 2    and revised codes.

 3               MR. WILLIAMSON:  Your Honor, may I approach

 4    the screen?

 5               THE COURT:  Yes, sir.

 6    BY MR. WILLIAMSON:

 7    Q   Can you see from there?

 8    A   No, but I have a copy here if you'll show me what

 9    you're referring to.

10    Q   Okay.  We're looking under the E and M code billed.

11    Do you see that?

12    A   Yes.

13    Q   Okay.  Now, I want to make sure the jury has an

14    appreciation for what work you had to do.

15    The 99213 represents what the clinic believed the document

16    supported as far as a level and code; correct?

17    A   I don't know what they believed.

18    Q   Where did that number come from?

19    A   That would have been what they billed to Medicare.

20    Q   Okay.  And based on your representations, that would

21    be the clinic's representation as to what -- whoever

22    submitted the bill believed the service qualified under

23    that level.  Do you agree with that?

24    A   Repeat that, please.

25    Q   The clinic represented that the services provided
```

3095

```
 1    qualified under a 99213; correct?

 2    A    I don't know if they believed that.

 3    Q    They just made it -- brought it out of thin air?

 4    A    I don't know how they arrived at their decision.  I

 5    wasn't there.  I'm sorry.

 6    Q    Okay.  Now, you looked to see if the clinic's

 7    records actually supported that level; correct?

 8    A    Correct.

 9    Q    Okay.  Now, next you state that the revised E and M

10    was 99212.  Do you see that?

11    A    Yes.

12    Q    Now, in most of these instances, outside of the 12%,

13    the 58 claims, there was documentation to support that a

14    service occurred; correct?

15    A    Yes.

16    Q    The disagreement is, is to what the level of that

17    service would qualify as; correct?

18    A    Yes.

19    Q    And in many instances the clinic at least believed

20    that it was 99213 but your review found that it was

21    99212; correct?

22    A    They billed at 213 and it did not meet the criteria

23    for 213.

24    Q    So it was one level below; correct?

25    A    Correct.
```

3096

1    Q    This isn't a situation where they were billing

2    99213s and nothing exhibited.  It was a disagreement

3    between the clinic and your findings; correct?

4    A    I don't know that I would term it as a disagreement.

5    Their records didn't support that.

6    Q    Now, you understand that there are professional

7    coders; correct?

8    A    Yes.

9    Q    And auditors disagree with each other's findings;

10   correct?

11   A    At times, yes.

12   Q    Now, on your spreadsheet, how many times did you

13   find that the codes billed were, let's say, 99212 but

14   the documentation supported that it was 99213?

15   A    I don't know.

16   Q    Well, you have your spreadsheet in front of you.

17   Can you just glance?

18   A    This is a very long spreadsheet.  I don't think I

19   can --

20   Q    Do you recall ever finding at any time that the

21   clinic billed at a 99212 but the documentation supported

22   99213?

23   A    No, I do not recall.

24   Q    When you were looking at this audit, aren't you

25   supposed to be looking at both ways to determine what

3097

1    may have been overbilled, what may have been

2    underbilled?

3    A    No.

4    Q    You just look for one thing, whether or not it was

5    overbilled?

6    A    Correct.

7    Q    What significance did these fee tickets have to you?

8    A    They were part of the documentation that we looked

9    at.

10   Q    Did they hold any particular significance in your

11   mind when you were doing this review?

12   A    The fee tickets were something that were filled out

13   by the providers.

14   Q    Okay.  And that would have been what the provider --

15   who the provider represented actually completed the

16   service; correct?

17   A    Not necessarily.  We would want to see who

18   documented on the visit note, progress note.

19   Q    But the fee ticket was a document?  Not the only

20   document, but a document that represented by the

21   provider who saw a patient on a given day; correct?

22   A    Should be, yes.

23   Q    And you found in over 99 instances, or, excuse me,

24   99% of instances when the provider was identified on the

25   fee ticket matched the same provider that was on the

 1   progress note; correct?

 2   A   Where are you seeing 99%?  I'm sorry.

 3   Q   I'm not saying it's on this spreadsheet.  I'm asking

 4   what were your findings?

 5   A   How many times it did match the fee ticket?

 6   Q   Yes.  How many times -- what percentage of the times

 7   did the fee ticket and the progress note match?

 8   A   I couldn't tell you that right now.

 9   Q   You didn't look at that, did you?

10   A   It's not on the spreadsheet.  I can't tell you

11   whether -- what we documented -- what we saw on that.

12   Q   Okay.  And so we're clear, you were able to go into

13   the clinic records and determine who the actual provider

14   was by looking at fee tickets and progress notes;

15   correct?

16   A   We can see who they documented that the provider

17   was.

18          MR. WILLIAMSON:  I don't have anything

19   further, Your Honor.

20          THE COURT:  Mr. Gorokhov.

21          MR. GOROKHOV:  Just very briefly, Your Honor.

22          THE COURT:  Sir.

23                  **CROSS EXAMINATION**

24   BY MR. GOROKHOV:

25   Q   Mr. Moore, can you put up the first sheet just where

3099

```
 1   it has the title, the first part of the spreadsheet.
 2   Very first page where it has that title.  At the very
 3   top there.  No, not the -- above that.  Yeah.  Okay.  Do
 4   you see where it says S-V-R-S?
 5   A    Yes.
 6   Q    You're aware that stands for Statistically Valid
 7   Random Sample.  Did you pull the sample in this case?
 8   A    No.
 9   Q    Did you select the sample?
10   A    No.
11   Q    Did you decide the sampling methodology that would
12   be used to pull this sample?
13   A    No.
14   Q    Okay.  Who pulled the sample in this case?
15   A    It would have been the investigators.
16   Q    And who would that be?
17   A    I don't know them by who pulled it, I'm sorry.
18   Q    And you don't know the methodology they used;
19   correct?
20   A    No.
21   Q    Okay.  You would agree, wouldn't you, that it's
22   important to pull a random sample because you don't want
23   to, say, pull out a bunch of charts that were done wrong
24   by one person; correct?
25   A    Sure.
```

1    Q   So that's important.  But you have no testimony to

2    give this jury that this is in fact a random sample?

3    A   No, that's outside of what I do.

4               MR. GOROKHOV:  Thank you.

5               THE COURT:  Redirect.

6               MS. TREADWAY:  Very briefly, Judge.

7                    **REDIRECT EXAMINATION**

8    BY MS. TREADWAY:

9    Q   Ms. Dahlberg, Mr. Williamson was asking you about

10   what is known in the industry as undercoding.  Does

11   undercoding cost Medicare money?

12   A   No.

13   Q   Are you concerned with that as a medical reviewer?

14   A   No.

15   Q   Whose responsibility is it to appropriately document

16   and bill incident-to services?

17   A   The provider.

18               MS. TREADWAY:  Nothing further.

19                    **RECROSS EXAMINATION**

20   BY MR. WILLIAMSON:

21   Q   Ma'am, if you're trying to draw a conclusion as to

22   whether or not a provider was chronically overcoding,

23   wouldn't you want to look at the inverse and say, well,

24   let's see, is this just general billing errors or is

25   this an intent by those to just overcode?  Don't you

3101

1    think that would be helpful?

2    A    There is another factor of Medicare review that does

3    that.  It is not part of the program safeguard

4    contractor's duties, and not what is asked of us by

5    Medicare.

6    Q    Okay.  So it would be helpful if somebody else does

7    it, but that's just not your department?

8    A    Correct.  And they do that at random.

9    Q    And that wasn't presented on this spreadsheet or

10   anything; correct?

11   A    No.

12            MR. WILLIAMSON:  Nothing further.

13            THE COURT:  Mr. Gorokhov?

14            MR. GOROKHOV:  Nothing Your, Honor.

15            THE COURT:  Thank you, ma'am.  You're excused.

16   Next witness, please.

17            MS. TREADWAY:  May we approach, Judge, about a

18   scheduling issue.

19            THE COURT:  Sure.

20                     (Thereupon, the following

21                      proceedings were had at the

22                      bench by Court and Counsel

23                      outside the hearing of the

24                      jury.)

25            MS. TREADWAY:  Just wanted to get the Court

3102

```
 1    and Counsel's feeling about this.  My next witness is a

 2    woman by the name of Sherrie Mills.  Ms. Mills'

 3    testimony for the Government is very, very brief.  But

 4    she has an interview for a job at 1:30.  She's been

 5    unemployed for about nine months, and I certainly don't

 6    want her to miss that interview.  I can do one of two

 7    things.  I can put her on and get her direct on and then

 8    we can break and bring her back at some other time for

 9    cross or --

10             THE COURT:  What's she going to testify about?

11             MS. TREADWAY:  She is a -- she was one of the

12    billing people at the clinic.  One of the two billing

13    people that we called.

14             MR. WILLIAMSON:  I think our cross is going to

15    be -- I guess the concern is we're not going to be done

16    before 12.  She's going to have to come back at 1.  I

17    don't think it's going to be --

18             THE COURT:  Well, what if we work through

19    lunch to finish her.

20             MS. TREADWAY:  We can either work through

21    lunch or I can call somebody else and put her on later

22    in the day.

23             MR. WILLIAMSON:  That's fine.

24             MS. TREADWAY:  I didn't want to -- I didn't

25    want to inconvenience her.
```

```
 1              THE COURT:  Let's do that.  Yeah, I don't want
 2    her to be unemployed.
 3              MR. WILLIAMSON:  We agree.
 4              MS. TREADWAY:  Okay.  Thank you.
 5              THE COURT:  So put somebody else on and call
 6    her later.
 7              MR. WILLIAMSON:  Judge, can I run to the
 8    restroom.  I've been having to take a lot of medicine
 9    and drink a lot of water.  But can I just run and come
10    right back?
11              THE COURT:  I'll wait for you.
12              MR. WILLIAMSON:  Okay.  Thanks.
13                        (Thereupon, the following
14                         proceedings continued in the
15                         hearing of the jury.)
16              THE COURT:  We are just going to take a short
17    break in place here.
18              MS. TREADWAY:  We apologize, Judge.  Shifting
19    witnesses.
20              THE COURT:  Okay.
21              MS. TREADWAY:  Government calls Brenda Maurer
22    Whitehead.
23                   BRENDA MAURER WHITEHEAD
24    Having been first duly sworn to tell the truth, the
25    whole truth and nothing but the truth, testified as
```

1    follows on:

2                    **DIRECT EXAMINATION**

3    BY MS. TREADWAY:

4    Q    Would you saddle up to that microphone and introduce

5    yourself to the jury please.

6    A    Brenda Maurer.

7    Q    And where are you currently employed, Ms. Maurer?

8    A    At Derby Family Medicine as a nurse.

9    Q    How long have you been at Derby Family Medical

10   Center?

11   A    This time, just past five years.

12   Q    And what do you do there?

13   A    I'm a certified coder.

14   Q    And what is Derby Family Medical Center?

15   A    A family practice group.

16   Q    You said you're a certified coder.  What do you do

17   as a certified coder?

18   A    Turn the things that happen during a patient

19   encounter into numbers to submit to the insurance

20   company.

21   Q    Do you primarily work with diagnosis codes?

22   A    No.  Both diagnosis and procedure codes.

23   Q    So both diagnosis codes and what they call CPT

24   codes?

25   A    Uh-huh.

3105

1   Q    What importance do diagnosis codes have in the

2   billing process?

3   A    It explains to the insurance company in number form

4   what the patient was seen for that day.

5   Q    And what importance does the CPT, or the procedure

6   code, have in billing insurance companies?

7   A    It explains what was done to treat the patient that

8   day.

9   Q    Did you ever work for the Schneider Medical Clinic

10   or the Defendant Stephen Schneider?

11   A    Yes.

12   Q    When did you first begin working with Defendant

13   Stephen Schneider?

14   A    Before they opened their new office on south

15   Broadway.

16   Q    So before the clinic actually existed?  The

17   Schneider Medical Clinic?

18   A    The physical building, yes, before, yeah.

19   Q    And where would this have been that you worked with

20   the Defendant before Schneider Medical Clinic was built?

21   A    We had a very small office in a strip mall in

22   Haysville.

23   Q    Now, when you worked for the Schneider Medical

24   Clinic, did you begin when the clinic began?

25   A    Yes.

3106

1    Q    And that would have been in the fall of --

2    A    Well, no, I was there before.

3    Q    So actually before the doors opened?

4    A    Yes.

5    Q    So you were part of the start-up, is that fair?

6    A    Yes.

7    Q    And that would have been in about the fall of 2002?

8    A    I believe so; yes.

9    Q    And did you work there until about July of 2004?

10   A    Yes.

11   Q    And what was your job title when you were at the

12   Schneider Medical Clinic?

13   A    When I first started, I was a coder and then that

14   turned into business office manager.

15   Q    Business office manager.  All right.  And we have

16   you on our timeline here, Government Exhibit 162, to

17   place you in context with the other employees that have

18   testified.

19        What did you do as the business office supervisor?

20   A    I posted insurance payments, did account follow-up,

21   claims reconciliation.  I submitted claims to the

22   insurance companies electronically.

23   Q    Did you do actual data-entry?

24   A    I'm sure at some point I did; yes.

25   Q    And when you say posting insurance payments, is that

3107

1    kind of the accounts receivable function in a medical

2    office?

3    A   Yes.  Part of it.

4    Q   Now, you were the business office manager or

5    supervisor.  Who did you manage?

6    A   A small group of people who did kind of the same

7    thing that I did.

8    Q   And who managed you?  Who was your supervisor?

9    A   Linda.

10   Q   And who did you report to?

11   A   Linda.

12   Q   And who had the final say at the clinic regarding

13   the billing policies and practices?

14   A   Linda did.

15   Q   And who made the final decisions regarding who would

16   be hired at the clinic?

17   A   Linda.

18   Q   Based on your employment there, did you observe what

19   types of people the Defendant Linda Schneider typically

20   employed?

21   A   Yes.

22   Q   And what types?

23   A   I'm not sure if this is a type, but most of them

24   were inexperienced in what they were being hired to do.

25           MS. TREADWAY:  Your Honor, at this time the

3108

1    Government would ask permission to play one more short

2    clip from the videotape discussion the Defendant Linda

3    Schneider had with the agents on October 17th, 2007,

4    from Exhibit 82.

5            MR. GOROKHOV:  Your Honor, this witness can't

6    lay the foundation for that clip.  She wasn't present at

7    the interview.

8            MS. TREADWAY:  She doesn't have to, Judge.

9    It's already been laid.  It's an admission by the

10   Defendant Linda Schneider.

11           MR. GOROKHOV:  I don't believe that this

12   particular clip has been admitted into evidence, Your

13   Honor.

14           THE COURT:  Well, I can't remember whether it

15   has been.

16           MS. TREADWAY:  It has been, Judge.

17           THE COURT:  But whether it has or it hasn't,

18   you've seen it, haven't you?

19           MR. GOROKHOV:  Yes, we have, Your Honor.

20           THE COURT:  Well, does it not depict an

21   interview of Mrs. Schneider?

22           MR. GOROKHOV:  That's correct, Your Honor.

23   I'm just saying that this particular witness can't say

24   if that's an accurate --

25           THE COURT:  She doesn't have to.  If it's an

1    accurate interview of your client --

2              MS. TREADWAY:  May we play it, Judge?

3              THE COURT:  Please.

4              MS. TREADWAY:  Thank you.  It's very short.

5                   (Video clip played for the

6                   jury.)

7    BY MS. TREADWAY:

8    Q    With regards to the billing of insurance companies,

9    did the clinic have the various provider manuals from

10   the various insurance companies available?

11   A    Yes.

12   Q    And did these manuals include the payment rules and

13   regulations?

14   A    They should have; yes.

15   Q    Did you observe the Defendant Linda Schneider

16   working with these manuals over the course of your

17   employment there?

18   A    Not that I remember.

19   Q    Did she interact with insurance companies for the

20   purpose of receiving payment?

21   A    Yes.

22   Q    When changes to the manuals occurred, did the clinic

23   receive notice of those changes?

24   A    Yes.

25   Q    And are you familiar with the Medicaid rules and

1    regulations regarding referrals to primary care

2    physicians?

3    A    Yes.

4    Q    Does Medicaid require a referral to a primary care

5    physician?

6    A    If the physician that they're seeing is not their

7    preferred care provider that's listed on their card,

8    yes.

9    Q    When Schneider Medical Clinic first opened in the

10   fall of 2002, was there an issue that came up with

11   regard to Medicaid referrals into the clinic?

12   A    When they first opened?

13   Q    Yes.

14   A    Yes.

15   Q    And what was that issue?

16   A    Well, I don't know if it was an issue with

17   referrals.

18   Q    Well, what do you remember it as?

19   A    We would see patients who we should not be seeing

20   because we were not their PCP listed on their card.

21   Q    And PCP is Primary Care Physician?

22   A    Uh-huh.

23   Q    So, if you're not the listed primary care physician

24   and you submit a claim to Medicaid, will Medicaid pay

25   for that service?

3111

```
 1    A    They shouldn't, no.

 2    Q    All right.

 3    A    Not without a referral.

 4    Q    And, in fact, did Medicaid start sending you denials

 5    for that very reason?  In other words, denying the

 6    claims?

 7    A    Yes.

 8    Q    And following those denials, what did the Defendant

 9    Linda Schneider give you and what did she ask you to do

10    with what she gave you?

11    A    She didn't physically, that I can remember, give me

12    anything; but during the course of my work, I remember

13    seeing forged documents to be sent to the insurance

14    company.

15    Q    And what documents were forged?

16    A    Referrals.

17    Q    And how were they forged?

18    A    Meaning?  I don't understand your question.

19    Q    What was altered or false about them?

20    A    The pertinent information such as patient's name

21    would be whited out and another name would be put in.

22    Q    Were these back-dated in any way?

23    A    I don't know.

24              MR. GOROKHOV:  Objection, Your Honor.  That's

25    leading.
```

3112

1           THE COURT:  Sustained.

2    BY MS. TREADWAY:

3    Q   Approximately how many of these forged or altered

4    referrals did you have?

5    A   I can't give you a number because there's no way to

6    know how many were sent out without anybody knowing

7    about 'em.

8    Q   Okay.  Did you actually have the responsibility to

9    do something with these forged referrals?  Were you

10   asked to do anything with them?

11   A   Well, it was assumed that they would be mailed to

12   the insurance company.

13          MR. GOROKHOV:  Objection, Your Honor.

14          THE COURT:  It was assumed.  What do you mean

15   by it was assumed?

16   BY MS. TREADWAY:

17   Q   Is that what you were -- you were requested to do?

18   A   That's what the employees were requested to do, yes.

19          MR. GOROKHOV:  Your Honor --

20          THE COURT:  I'm still going to sustain the

21   objection on the basis of lack of foundation.

22   BY MS. TREADWAY:

23   Q   Do you know whether those referrals were mailed to

24   Medicaid?

25   A   I heard that they were; but I do not myself know

3113

 1    because I did not do it.

 2              MR. GOROKHOV:  Move to strike, Your Honor.

 3              THE COURT:  Then the answer is stricken.

 4    BY MS. TREADWAY:

 5    Q   Did the denials get paid eventually when the --

 6    after the referrals had been mailed in?

 7              MR. GOROKHOV:  Your Honor, that assumes facts

 8    not in evidence.  You just struck the answer.

 9              THE COURT:  I think she can answer that.  If

10    she knows whether the --

11    A   Can you ask the question again.

12    BY MS. TREADWAY:

13    Q   Sure.  We started with the denials from Medicaid and

14    then the forged referrals.  And did Medicaid eventually

15    pay on the claims they had originally denied?

16    A   I believe that I did post payments on originally

17    denied claims.

18    Q   Now, after a patient had been seen upstairs by a

19    provider, to whom did the medical chart and fee ticket

20    go first?

21    A   Linda.

22    Q   Based on your employment at the clinic and your

23    interactions with the Defendant Linda Schneider, did she

24    understand how much money the clinic would receive based

25    on what codes were billed?

3114

1          MR. GOROKHOV:  I'm going to object, Your

2     Honor.  Calls for speculation.

3          THE COURT:  Can you lay a better foundation

4     than that?

5     BY MS. TREADWAY:

6     Q    Did you speak with the Defendant Linda Schneider

7     during the course of your employment?

8     A    Did I speak with her?  Yes.

9     Q    Did you -- you need to answer.

10    A    Yes, I did speak with her.

11    Q    And was she in charge of the billing department in

12    which you worked?

13    A    Yes.

14    Q    And based on your interactions with the Defendant,

15    was that on a daily basis?

16    A    Yes.

17    Q    Based on your daily interactions with the Defendant

18    Linda Schneider and her managing the billing department,

19    did you believe based on those interactions that she

20    understood how much money the clinic was reimbursed

21    depending on the CPT code billed?

22    A    Yes.

23          MR. GOROKHOV:  Same objection, Your Honor.

24          THE COURT:  Sustained.

25

3115

1    BY MS. TREADWAY:

2    Q   Were the claims submitted based on the codes marked

3    on the fee tickets?

4    A   Can you ask that again.

5    Q   Were claims submitted based on the codes marked on

6    the fee tickets?

7    A   Yes.

8    Q   Was there any independent review of the medical

9    records as compared to the fee tickets in terms of

10   billing for services?

11   A   If there was, it was done in Linda's office.  There

12   was -- it was not by myself or my office.

13   Q   And who established that policy?

14   A   Linda.

15   Q   During your employment at the Schneider Medical

16   Clinic, did the providers use a dictation service for

17   their progress notes or did they hand-write their

18   progress notes?

19   A   What I remember is that they hand-wrote progress

20   notes.  If they did have a dictation service, I don't

21   remember.

22   Q   Were you aware of any electronic medical records at

23   the time you worked at the clinic?

24   A   No.

25   Q   During your employment at Schneider Medical Clinic

1    did the Defendant Linda Schneider ever countermand or

2    reverse your directions about how billing should be

3    done?

4    A    Yes.

5    Q    Why did you leave your employment at the Schneider

6    Medical Clinic?

7    A    I knew that there were things being done there that

8    were illegal and I wanted to get out.

9    Q    Prior to your leaving your employment, did you

10   inform anyone about what you thought was being done

11   illegally in terms of the billing?

12   A    I spoke with Tim McDonald at one point in time.

13   Q    Did you ever speak with anyone else?

14   A    I vaguely remember speaking with Dr. Schneider about

15   some kind of -- I'm not sure if it had to do with

16   billing, but it was a concern that I had.

17   Q    What was -- who was Tim McDonald?

18   A    At that point in time I believe he was being called

19   the clinic administrator.

20   Q    And prior to your leaving, what did you tell Tim

21   McDonald?

22   A    What I just said, that there were things being done

23   that were gonna get them shut down.

24          MS. TREADWAY:  Nothing further.

25          THE COURT:  Are you starting Mr. Gorokhov?

1    MR. GOROKHOV:  I'll get started, Your Honor,

2    thanks.

3    THE COURT:  All right.

4    **CROSS EXAMINATION**

5    BY MR. GOROKHOV:

6    Q   Hello, Ms. Maurer.  Is it Ms. Whitehead or

7    Ms. Maurer?

8    A   Maurer.

9    Q   Prior to working at the Schneider Medical Clinic,

10   how long had you worked in billing?

11   A   Well, all together I've been working in billing for

12   24 years.

13   Q   Okay.

14   A   So, five, before Schneider -- oh, I can't do math

15   that quickly.

16   Q   That's fine.  Would you say it was be about ten

17   years or more than ten years?  Less than ten years?

18   A   Actually my first job I worked at for 13 years, so

19   over 13.

20   Q   At least 13 years?

21   A   13 to 15.

22   Q   And during that time did you attend trainings and

23   seminars in billing and coding?

24   A   Yes.

25   Q   So you would say you were a fairly knowledgeable

1   person?

2   A   Uh-huh.

3   Q   Okay.  So you testified that Linda Schneider would

4   hire misfits and people that weren't--

5   A   I didn't say that.

6   Q   Did Ms. Treadway not ask you if Linda Schneider

7   hired unqualified people?

8   A   I said that they were unqualified but I didn't call

9   them misfits.

10  Q   Okay.  But you didn't -- I apologize.  I don't mean

11  to put words in your mouth.  You don't fall into that

12  category, do you?

13  A   I don't believe that I do.

14  Q   Okay.  In fact, you stated in the past when you were

15  interviewed by the FBI that you were one of the most

16  knowledgeable people in the Schneider Medical Clinic?

17  In fact, I think you stated that you knew more than --

18  no one who worked at SMC knew more than her -- more than

19  you.  Is that correct?

20  A   It depends on what the context is; but, yes, I

21  was -- I knew more about the medical side of billing

22  than the other people that were hired.

23  Q   Okay.  I'm going to show you a document.  Take a

24  look at this and then see if that refreshes your

25  recollection.  It would be the end of this paragraph

3119

1    here, too, whether you told the FBI that you were the

2    most knowledgeable person.

3            MS. TREADWAY:  Judge, this is inappropriate

4    impeachment.  It's not her statement.  It's a statement

5    of an agent.

6            THE COURT:  He's using it just to refresh her

7    recollection.  The objection is overruled.

8    A    Where are you pointing my attention?

9    BY MR. GOROKHOV:

10   Q    Right here.  This would be this sentence.  The last

11   sentence of that paragraph.

12   A    That I did not have any problems with my work.  I

13   don't remember ever saying that no one knew more than

14   me.

15   Q    Okay.  That's fine.  So this FBI report would be

16   incorrect if that's what he -- what it reflects?

17   A    No, I just don't remember saying that sentence.

18   Q    So, you don't recall saying nobody knew more than

19   you at the Schneider Medical Clinic?

20   A    I don't recall saying that.

21   Q    Okay.  You testified that you started your

22   employment with the clinic I believe -- you didn't run

23   the billing department at that time; correct?

24   A    I started as a coder.

25   Q    You started as a coder.  And your responsibility as

3120

1    a coder was to enter the diagnosis codes based on what

2    the chart reflected; is that correct?

3    A    Enter the diagnosis codes based on what was written

4    on the fee ticket.

5    Q    On the fee ticket?

6    A    Uh-huh.

7    Q    Where would you write the diagnosis codes?

8    A    I can't remember.

9    Q    Okay.  Was it your responsibility to make sure that

10   the CPT codes that were entered were correct?

11   A    No.

12   Q    That was not your responsibility as a coder?

13   A    There were times when procedures were performed that

14   I made sure that the procedure code was right; but

15   office visits were always chosen by the providers.

16   Q    Now, you eventually were moved down to actually head

17   the billing department; correct?

18   A    I was moved into the basement where the billing

19   department was, yes.

20   Q    And you supervised the people who worked in that

21   department?

22   A    Yes.

23   Q    And part of your job was to make sure that the

24   payments would get posted to the system; is that

25   correct?

3121

1    A    That was part of it, yes.

2    Q    And part of your job was to make sure that the rules

3    of Medicaid, Medicare and all the other payers were

4    followed in terms of billing?  Is that correct?

5    A    I would say that's not correct.

6    Q    Do you recall telling the FBI that you were on the

7    phone with Medicare and Medicaid on a daily basis,

8    almost on a -- I'm sorry, I don't want to butcher what

9    you said here.  We'll come back to that.

10        You state that you were familiar with the Medicaid,

11   ma'am?

12   A    No, I stated we had a Medicaid manual in our office.

13   Q    Okay.  You don't remember saying to the FBI that you

14   stated you were familiar with the Medicaid provider

15   manual?

16   A    I am familiar with the document, yes.

17   Q    Okay.

18   A    I mean, I have seen one.

19   Q    Are you familiar with Medicaid's policies?

20   A    Most of them.

21   Q    And you were familiar with those policies when you

22   headed the billing department at SMC; correct?

23   A    Many of them.

24   Q    And when there were any questions regarding the

25   application of a rule or a policy, you often called

3122

```
 1    Medicaid or whatever payer was necessary to call to find
 2    out to clarify that; correct?
 3    A   I don't remember.
 4    Q   You don't remember that.  Okay.  Do you recall
 5    stating to the FBI that you did not know that mid-level
 6    practitioners are reimbursed at the same level as
 7    physicians?
 8    A   Can you ask that question again.
 9    Q   Okay.  Do you recall stating to the FBI that you did
10    not know that mid-level practitioners are reimbursed at
11    the same level as physicians?
12    A   No, I don't recall stating that.
13    Q   Okay.  Do you recall how these services were billed
14    while you were at SMC?
15    A   How what services were billed?
16    Q   How PA services were billed versus services provided
17    through a doctor.  Were they billed as a doctor?
18    A   I don't remember.  They were billed as we were told
19    to bill them.
20    Q   But you previously stated that you knew a lot about
21    billing; correct?
22    A   Yes.
23    Q   And as the head of the billing department, wasn't it
24    your responsibility to make sure that the rules and
25    procedures, including the ones for billing PA's, were
```

3123

1    followed?

2    A    No, that was not my responsibility.

3    Q    It was -- did you not tell the FBI that you oversaw

4    the employees in the billing department?

5    A    I did oversee the employees in the billing

6    department.  To a certain point.

7    Q    Okay.  What was your function as the head of the

8    billing department?

9    A    There was really no function any different than any

10   of the other billing department employees.  I posted

11   payments, submitted insurance claims, did account

12   follow-up.  Most of the supervising policies came from

13   Linda.  I never felt like I was the manager.

14   Q    Okay.  Were you in touch with Medicaid and Medicare

15   and other companies regarding denial of claims?

16   A    I don't remember.

17   Q    Okay.  I'm going to show you the same FBI report and

18   see if it refreshes your recollection.

19   A    When was this report taken?  In 2006.  Okay.  Where

20   are you directing my attention?

21   Q    The bottom paragraph here.

22   A    I don't specifically remember saying that, but I am

23   positive that I would have had to contact insurance

24   companies at some point in time regarding denials.

25   Q    Did you ever instruct employees to fill in parts of

3124

1    progress notes that weren't complete?

2    A   Not that I remember.

3    Q   Are you aware that Angela Dunnavent has testified in

4    this case that you instructed her to fill in parts of

5    progress notes that weren't complete?

6    A   I'm not aware of that, no.

7    Q   Would that be a true statement if she said it under

8    oath before?

9    A   Not to my recollection.  I don't remember.  I don't

10   remember telling her to do that.

11   Q   Okay.  Now, you've previously stated in talking to

12   the FBI, that Linda Schneider never told you to upcode

13   or falsify any billings; is that correct?

14   A   No, I don't remember her ever telling me to upcode,

15   no.  Those particulars came ready to charge, enter, when

16   they were -- came to my office.

17   Q   Did Linda Schneider -- I'm sorry.  Strike that.

18   Linda Schneider never told you to bill for services that

19   weren't actually provided; is that correct?

20   A   To my knowledge, I don't think she did.

21   Q   Linda Schneider never asked you personally to forge

22   any -- to forge any documents; is that correct?

23   A   As far as I can remember.

24   Q   In fact, you told the FBI that if Linda Schneider

25   ever did do that then you would have quit because you're

3125

```
1    not going to do something illegal.  Isn't that correct?
2    A   Well, I probably would have refused to do it but; I
3    don't remember her asking me to so --
4    Q   Okay.  And you also told the FBI that -- about your
5    time at SMC, you didn't have any problems with your
6    employment.  Isn't that correct?
7    A   I don't know.  I don't remember.  Again, that's
8    context.
9    Q   Okay.  Let me again show you the same FBI report.
10   And just before you go on.  You would agree that your
11   memory about the events that happened at SMC back when
12   you worked there is better, was better back in 2006 than
13   it is today?
14   A   Absolutely.
15   Q   So can you please take a look here at the bottom of
16   this paragraph and see if that refreshes your
17   recollection.
18   A   About not having any problems with my work?
19   Q   That's correct.
20   A   I don't even know what that would have meant.
21   Q   Would you like to read the paragraph for context.
22                    (Witness complies with request.)
23   A   I still don't understand what that would have meant.
24   Q   Okay.
25   A   I don't recollect saying that.
```

3126

```
 1    Q    That's fine.  Do you remember giving a deposition in
 2    a civil case?
 3    A    Yes.
 4    Q    And there was a court reporter at the deposition?
 5    A    Yes.
 6    Q    And you were under oath?
 7    A    Yes.
 8    Q    Do you remember stating at the deposition that
 9    physicians are often not qualified to choose the level
10    of service because billing is complex -- billing can be
11    complex?
12    A    I do remember saying that some physicians are not
13    knowledgeable enough to do that, yes.
14    Q    And that's why you went through all those seminars
15    in coding and training to get it right; correct?
16    A    Yes.
17    Q    And you would say that it's true that physician's
18    routinely make mistakes just because they don't have the
19    level of training that you do?  Is that true?
20    A    Can you ask that question again.  I didn't
21    understand.
22    Q    Sure.  You would agree, won't you, that physicians
23    routinely make mistakes in billing because they're not
24    really trained in billing as much as coders or billers
25    are, as you are?
```

1   A   I don't know how to answer that question.  I don't

2   know.

3   Q   Now, you said that you talked to Tim McDonald about

4   some problems that were going on at the clinic that you

5   felt you were uncomfortable with; is that correct?

6   A   Yes.

7   Q   Did you identify what those problems were

8   specifically?

9   A   Not at that meeting; no.

10  Q   Did you ever tell him specifically what the problems

11  were that caused you to have discomfort about working at

12  the clinic?

13  A   At that meeting he requested that I put something

14  together and I quit before I did that.

15  Q   Okay.  But when did that meeting take place?

16  A   Pardon me.

17  Q   When did that meeting take place?

18  A   Shortly before I quit.  I don't know a date.

19  Q   You don't remember how long it took before you quit?

20  A   No.  Less --

21  Q   -- and you --

22  A   -- weeks.

23  Q   And, again --

24  A   I don't know.

25  Q   You didn't follow through with actually telling him

3128

1    what was wrong at the clinic; isn't that right?

2    A    No, I did not.

3              MR. GOROKHOV:  That's all I have, Your Honor.

4              THE COURT:  Ladies and Gentlemen, why don't we

5    take our noon recess.  Approximately an hour.  Remember

6    and heed the admonition, please.

7                        (Noon recess.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25