```
 1                    (Beginning at 1:05 p.m. May 18,

 2                    2010, the following proceedings

 3                    continued.)

 4              CROSS EXAMINATION

 5  BY MR. WILLIAMSON:

 6  Q    Is it Maurer-Whitehead, or --

 7  A    It's just Maurer.

 8  Q    I'm Lawrence Williamson.  I represent Dr. Schneider.

 9  I just want to ask you a few questions about your

10  testimony.  Okay?  One thing that will be helpful is if

11  you can say yes or no verbally because Miss Cindy has to

12  transcribe your responses so it's hard for her to say

13  nod yes or nod no.

14  A    Okay.

15  Q    All right.  When did you start working for the

16  clinic?

17  A    Before 2002.  I don't know the exact date.

18  Q    Okay.  And it was before the Schneider Medical

19  Clinic actually developed and opened up; correct?

20  A    I was there while it was developing.

21  Q    Okay.  Now, you were given -- you gave several

22  statements to investigators; correct?

23  A    Yes.

24  Q    And at any of those conversations did they ever

25  threaten you?
```

3130

1    A    Did whom ever threaten me?

2    Q    FBI, or any federal investigator?

3    A    No.

4    Q    Okay.  And if you will, let's talk a little bit

5    about the clinic.  First you mentioned that typically

6    they would hire inexperienced people; correct?

7    A    Correct.

8    Q    But when it came to billing, they hired you based on

9    the fact that you had a lot of experience; correct?

10   A    I assume so.

11   Q    Okay.  This wasn't your first time dealing with

12   billing; correct?

13   A    Correct.

14   Q    I think you told Mr. Gorokhov you had 24 years of

15   billing prior to --

16   A    No, 24 all together.

17   Q    Okay.  So by then it would have been roughly around

18   16 or 17 years?

19   A    Maybe somewhere around there.

20   Q    Okay.  And when you were working at the clinic, did

21   the clinic ever start having a lot of patients?

22   A    Yes.

23   Q    And you guys got behind in billing?

24   A    There were times when we were behind.

25   Q    Okay.  Anywhere between two months behind and seven

3131

1    months behind?

2    A   I don't remember being behind that far.  I don't

3    remember.

4    Q   Did you feel like you were short-staffed at times?

5    A   Yes.

6    Q   Okay.  Now, I believe Mr. Gorohov asked you this

7    question, and I'm going to try my best not to duplicate

8    his same questions, but at no time did Dr. Schneider

9    ever instruct you to falsely submit claims to the

10   insurance company; correct?

11   A   Dr. Schneider?

12   Q   Yes.

13   A   Correct.

14   Q   And at no time did Dr. Schneider ever come down to

15   billing and try to tell you how to bill; correct?

16   A   Correct.

17   Q   How many times during the time you were there did

18   you ever see Dr. Schneider come into the billing

19   department?

20   A   I don't remember.  I don't recall any time that he

21   was downstairs in the billing department.

22   Q   Okay.  And you would agree -- and you never

23   purposely submitted a claim that you knew to be false to

24   the insurance company?

25   A   No.

3132

1    Q   Correct?

2    A   Correct.

3    Q   If Dr. Schneider, Linda Schneider, anybody at the

4    clinic would have tried to get you to do that, you would

5    have told them no; correct?

6    A   I would assume -- if I knew that it was false;

7    correct.

8    Q   Okay.  And since you have so much experience I think

9    it would be helpful just to chat about this for a

10   minute; but billing and coding is something that you

11   would consider a complex -- it's a complex field.  Would

12   you agree with that?

13   A   It can be, yes.

14   Q   And the clinic had over 90 insurance companies

15   during the time that you were there; correct?

16   A   I don't know.

17   Q   They had a lot?

18   A   A lot of insurance companies they submitted to?  Is

19   that your question?

20   Q   Yes, ma'am.

21   A   Yes.

22   Q   It was more than just the five that we've seen --

23   well, you haven't been here, but it's more than just the

24   five, more than five insurance companies; correct?

25   A   I would -- yes.

3133

1    Q   The Government had an exhibit that stated that it

2    was around 93.  Would you disagree with that?

3    A   I have no idea.

4    Q   And you would agree that these 93 payers would all

5    have different rules at different times; correct?

6    A   That's not a correct statement.

7    Q   Okay.  They all had the same rule?

8    A   Some of them follow the same rules.  Some of them

9    have their own.

10   Q   Okay.  I think I understand.  All 93 didn't follow

11   one standard.  Is that fair?

12   A   It depends on what you're talking about.

13   Q   Okay.  The different -- well, let me ask it better.

14   Did the different payers or insurance companies have

15   their own policies and procedure manuals?

16   A   Not all of them.  Some of them did have their own.

17   Q   Okay.  Do you know how many did?

18   A   No.

19   Q   Do you know how many of them shared the same policy

20   and procedure manual?

21   A   No.

22   Q   Were there some insurance companies that didn't have

23   any policy and procedure manuals?

24   A   Yes.

25   Q   And when you were faced with those situations you

1    had to use what you would consider the best industry

2    practice in submitting the bills; correct?

3    A    I guess.

4    Q    Okay.  And during billing, mistakes can happen.

5    Would you agree with that?

6    A    Yes.

7    Q    Have you ever worked at any place where the clinic

8    or the employer made zero billing errors?

9    A    No.

10   Q    Okay.  And do you make room that billing mistakes

11   happened while you were at the clinic?

12   A    I'm sure they did.

13   Q    Okay.  Now, what I want to do is kind of talk about

14   the practice at the Schneider Medical Clinic while you

15   were there.  Okay?

16   A    Okay.

17   Q    The Government has an Exhibit 3-E that we just

18   pulled a few excerpts out of.

19             MR. WILLIAMSON:  Your Honor, do you mind if we

20   give the jury copies of about four fee tickets.  I have

21   one for His Honor, as well.

22             THE COURT:  No.  I think it would be helpful

23   to see a fee ticket actually.

24             MR. WILLIAMSON:  That's what I was thinkin'.

25             THE COURT:  We've talked about 'em.  I don't

3135

1    believe they've been displayed yet.  Did you want to

2    mark this as an exhibit?

3              MR. WILLIAMSON:  I think we can as an excerpt

4    of 3-E.  We'll give a designation for the record.

5              THE COURT:  Probably be a good idea.

6                   (Off-the-record.)

7              MR. WILLIAMSON:  For the record, we'll mark

8    this D-013.

9              THE COURT:  Any objection to D-013?

10             MS. TREADWAY:  No.  They're already admitted

11   as 3-E, Judge.

12             THE COURT:  Well, good.  D-013 is admitted.

13             MR. WILLIAMSON:  Okay.  I guess it would be

14   helpful if you had a copy.

15   BY MR. WILLIAMSON:

16   Q   Taking a look at D-013, do you recognize that to be

17   a fee ticket from the clinic?

18   A   Yes.

19   Q   And what is the date on the first page of that fee

20   ticket?

21   A   Date of service?

22   Q   Yeah, the date of service?

23   A   4-22 of 2004.

24   Q   Okay.  Now, let's just start with these fields and

25   let's just walk the jury through what these mean and you

3136

1    as the biller, when you receive this document, what's

2    communicated to you.    Okay?

3    A    Okay.

4    Q    Starting at the top, obviously "patient", we have it

5    redacted here.    That tells you who the patient that was

6    seen; correct?

7    A    Yes.

8    Q    Then you have the birthday, telephone number,

9    primary insured, primary insurance.    All at the top

10   left.    Do you see that?

11   A    Yes.

12   Q    Then you have an account number.    Do you know what

13   that account number is?

14   A    The patient's account number at the clinic.    I

15   believe it's given in numerical order as accounts are

16   made.

17   Q    Okay.    So basically when the clinic takes on a new

18   patient, a specific identifier number for that patient

19   is generated?

20   A    Yes.

21   Q    And it follows the patient throughout his or her

22   course of treatment with the clinic?

23   A    As far as I know, yeah.

24   Q    Okay.    Now, you have appointment doctor there and we

25   see walk-in.    What does that communicate to you?

3137

1    A    That the patient didn't have an appointment, that he

2    walked in.

3    Q    And then there's a name next there, Curt, with a

4    circle.  What does that say to you?

5    A    I'm assuming that means that they assigned that

6    patient to be seen by Curt.

7    Q    And the appointment time is regular.  What does that

8    communicate?

9    A    I don't know what those meant.

10   Q    Then we have date of service and appointment time.

11   Is that when the person was entered into the system and

12   the date they came in?

13   A    I don't know.  I didn't work at the front desk.

14   Q    Okay.  Now, you have a place down there that says

15   office visits on the lefthand side Level 1, Level 2,

16   Level 3, Level 4, Level 5.  Do you see that?

17   A    Uh-huh.

18   Q    Then you have the one column that says "new" and one

19   column that says "EST".  What does that communicate to

20   you?

21   A    The new column is for patients who have not been

22   seen in the last three years, and the established are

23   established patients who have been seen in the last

24   three years.

25   Q    Okay.  Now, there's a 1-2 with a circle around

3138

1    there.  What would that communicate to you?

2    A   I did not personally code this ticket, but I'm

3    assuming that means they want diagnosis codes 1 and 2 to

4    be connected with that office visit.  And that's just an

5    assumption.  I did not code this ticket.

6    Q   Okay.  There was a -- and we'll talk about the life

7    of this fee ticket just briefly here in a minute.  But

8    there would be a code, a diagnosis code entered in by a

9    coder on the fee ticket that would correlate with the

10   diagnosis that's in the far righthand corner to the

11   bottom right.  Correct?

12   A   Correct.

13   Q   Okay.  And then we see the 99211, 99212, 99213,

14   99214, 99215.  Those are those level 1's through level 5

15   visits; correct?

16   A   Yes.

17   Q   And on this document there are codes for multiple

18   procedures that were given, or had by a -- between a

19   provider and a patient; correct?

20   A   Can you ask that question again.

21   Q   Yes.  There are multiple codes here that identify

22   what services the patient received during their visit;

23   correct?

24   A   Correct.

25   Q   And sometimes on these fee tickets there would

3139

```
 1    actually be instructions regarding referrals; correct?

 2    A    I believe so, yes.

 3    Q    Now, can you flip over and -- well, strike that.

 4    Before I move on.  This fee ticket was generated -- or

 5    all these fee tickets are generated by the person at the

 6    front desk who checks in the patient; correct?

 7    A    I assume so.

 8    Q    Did you ever learn how the fee tickets were actually

 9    put together in the clinic?

10    A    What do you mean by how they were put together?

11    Q    Who entered the information in, as far as the

12    patient, the date of service, the appointment time?

13    A    The front desk personnel.

14    Q    Okay.  And they would attach this to the chart, the

15    patient's chart; correct?

16    A    I believe so.

17    Q    Did you ever learn -- I mean, you say you believe

18    so, but you worked there for at least two years;

19    correct?

20    A    I didn't work at the front desk.

21    Q    Okay.  All right.  But this fee ticket is a document

22    you would rely on in order to determine what you chose

23    to bill the insurance company; correct?

24    A    Yes.

25    Q    And so you had to know how to read this document and
```

3140

1    interpret this document in order to translate

2    information to the insurance company; correct?

3    A    Yes.

4    Q    So looking at this first document, we know that you

5    would bill Benesight, the insurance company; correct?

6    A    Correct.

7    Q    And based on this fee ticket, Curt was identified as

8    the provider?

9    A    I can't answer that.  I guess so, yes.

10   Q    Okay.

11   A    That's --

12   Q    And turn to the next page and tell me what do you

13   have?  What date is that, your second page?

14   A    5-10-2004.

15   Q    And this is Eric T's again, and there's the same

16   thing as far as appointment doctor and it says walk-in,

17   and it's circled, it says Curt there.  Correct?

18   A    Yes.

19   Q    Okay.  Again, would that tell you that this -- and

20   looking at this fee ticket, it should be billed as a

21   99213, and Curt was the provider?

22   A    According to the fee ticket, yes.

23   Q    And what date do you have on the next ticket?

24   A    3-19 of 2004.

25   Q    Okay.  Now, this document looks a little bit

3141

1   different than the previous document; doesn't it?

2   A   Uh-huh.

3   Q   Was this a form that was used prior to the forms

4   that we just looked at?

5   A   I don't know what order they came in.

6   Q   But the clinic utilized different fee tickets

7   depending upon the point in time; correct?

8   A   I don't know.

9   Q   You don't -- you don't remember being there and

10  seeing -- determining whether or not the fee ticket ever

11  changed while you were employed there?

12  A   I do not remember if the fee ticket changed while I

13  was there.

14  Q   Okay.  Now, looking at 3-19 of '04 you see this was

15  billed as a Level 3 and the appointment doctor is Curtis

16  Atterbury.  Do you see that?

17  A   Yes.

18  Q   And there's a circle around Curtis Atterbury, is it

19  not?

20  A   Yeah.

21  Q   And it says PRI doctor.  Do you see that?

22  A   Yes.

23  Q   What is the difference between the appointment

24  doctor and the PRI doctor?

25  A   I could only assume.

3142

1    Q    Well, ma'am, I'm really not asking you to assume.

2    You were responsible for interpreting this document;

3    correct?

4    A    Actually, no, not -- only at the very very beginning

5    did I code these documents.  When I became business

6    office manager, I myself didn't even see these

7    documents.

8    Q    So, you're saying that in 2004 you never entered any

9    information, you didn't interpret any fee tickets and

10   submit bills to the insurance company?

11   A    I submitted electronically to the insurance

12   companies on the computer.

13   Q    Right.  But you --

14   A    Somebody else had entered the information into the

15   computer for me to --

16   Q    Okay.  So, let me make sure I understand.  You had

17   other people working under you in the billing

18   department; correct?

19   A    Yes.

20   Q    And it was their responsibility to interpret the

21   information on these fee tickets; correct?

22   A    It was the coder's responsibility to interpret, the

23   coder and charge entry.

24   Q    Ma'am, who submitted the fee -- excuse me, the

25   charts (sic) to the insurance company when you were

3143

```
 1   working there in the billing department?
 2   A    There's -- I don't understand your question.
 3              THE COURT:  The chart?
 4              MR. WILLIAMSON:   The charge.
 5              THE COURT:  Charge.
 6              MR. WILLIAMSON:  Yes, sir.
 7   BY MR. WILLIAMSON:
 8   Q    The insurance company received claims?
 9   A    I, every day, made our computer system take
10   everything that had been entered and send it
11   electronically to the insurance company.
12   Q    Okay.  Who was in charge of entering the information
13   that you sent to the insurance company?
14   A    I don't remember who the charge entry people were.
15   Q    Those were employee level people who were
16   subordinate to you; correct?
17   A    I don't know that.
18   Q    Okay.  You don't know who they were?  You don't
19   know --
20   A    I don't remember who they were.
21   Q    Do you have any names that you can think of?
22   A    No.
23   Q    Mark Friend?
24   A    Pardon me.
25   Q    Mark Friend?
```

3144

1   A   I don't even know that name.

2   Q   Julie Larson?

3   A   I don't know.

4   Q   Katherine Gains?

5   A   That sounds -- she sounds familiar, yes.

6   Q   Now, you understand that you are the person that

7   submitted the claims to the insurance company; correct?

8   A   Yes.  I transferred the electronic information.

9   Q   And did you ever talk to anybody as far as what were

10  they relying on when they were interpreting these fee

11  tickets?

12  A   I don't understand the question.

13  Q   Did you ask these subordinates that were working

14  under you, when you look at the fee tickets, how do you

15  determine who the provider was that saw the patient?

16  Did you ever ask anybody that?

17  A   Not that I recall.

18  Q   So, you don't know if they were misreading the fee

19  tickets, and loading them up into the interface to be

20  sent over to the insurance companies; correct?

21  A   I do not know if they were misread.

22  Q   Now look at the last one in this package.  It's

23  2-24-04; correct?

24  A   Correct.

25  Q   And, again, you see the appointment doctor circled

3145

1    as Curtis J Atterbury.  Do you see that?

2    A    Uh-huh.

3    Q    Is it possible that when you have the appointment

4    doctor identified on these fee tickets that that's who

5    the bills should have been submitted under?

6    A    It's possible.

7    Q    And are you aware that there were times when if

8    there's an appointment doctor's name in that field that

9    there will be a strike out and the actual provider who

10   saw the patient would sign their name up there; correct?

11   A    I don't know.

12   Q    Are you aware that on 4-22-04 -- hold on, excuse me.

13   Strike that.

14       Are you aware that on April 22nd, 2004, the

15   Government contends that the bill submitted stated that

16   St. Clair was the actual provider?

17   A    No, I'm not aware of that.

18   Q    Okay.  Looking at the 4-22-04 fee ticket, do you see

19   Dr. St. Clair identified as the appointment doctor?

20   A    I don't see that anywhere.

21   Q    Okay.  Isn't it true that you're the person that

22   submitted the bill on 4-22-04 stating that it was Dr.

23   St. Clair?

24   A    I don't know that.  I probably submitted it

25   electronically, yes.

3146

1    Q   Okay.  But you would have been relying on the

2    data-entry people in submitting that; correct?

3    A   Yes.

4    Q   Okay.  And you wouldn't have looked at these fee

5    tickets every single time before you submitted the data

6    entry that went out?

7    A   No.

8    Q   Correct?

9    A   Correct.

10   Q   You had to rely on them to interpret these fee

11   tickets accurately and correctly; correct?

12   A   Correct.

13   Q   No employee up under you came to you and said

14   Ms. Maurer, we don't care what these fee tickets say,

15   we're gonna submit 'em any way we want to, did they?

16   A   I don't recall anybody saying that to me.

17   Q   None of these employees came to you and said the

18   providers instruced us to fraudulently enter this

19   information into our data base, did they?

20   A   I don't remember.

21   Q   Okay.  Now, this fee ticket is the one document that

22   would be filled out by the provider early in the process

23   when they saw the patient and would travel the life of

24   the patient's file until the billing department finished

25   with it; correct?

3147

1    A    Yes.

2    Q    Okay.  Meaning that the provider would make

3    representations on this fee ticket, and the

4    representations on this fee ticket were to be relied

5    upon by the data-entry people at the billing department;

6    correct?

7    A    Correct.

8    Q    So if a physician wanted to misrepresent his

9    services, you would expect to find it on the fee ticket;

10   right?

11   A    I -- yes.

12   Q    And if -- if a provider wanted to submit

13   fraudulent -- strike that.

14        You all, in the billing department, you and the

15   data-entry individuals under you, you had the ability to

16   go and look at charts if you had a question about who

17   the provider was; correct?

18   A    Yes, we could look at charts.

19   Q    You guys didn't do that very often, did you?

20   A    I don't know how often.

21   Q    And if a provider wanted to commit fraud and make

22   false representations, the provider could doctor up the

23   progress note, doctor up the fee ticket and make them

24   look like individual A actually saw the person when it

25   was individual B; correct?

3148

1    A   I guess that could happen, yes.

2    Q   You were never told that there was this conspiracy

3    between all these doctors and physician's assistants to

4    doctor up progress notes to make them false; correct?

5    A   I don't remember ever being told.

6    Q   Is that something you would remember if you were

7    told?

8    A   You would hope so, but that's, you know, a very long

9    time ago.

10   Q   That's pretty brazen, you would agree; right?

11   A   For somebody to tell me that they're going to

12   doctor -- I would think; yes.

13   Q   And you understood that you were an at-will employee

14   while you were with the clinic; correct?

15   A   Correct.

16   Q   And if this clinic was going to be having this grand

17   conspiracy, wouldn't they want to make sure that

18   everybody is in the loop so nobody would go and talk

19   without some kind of prior notice?

20   A   I don't necessarily agree with that statement, no.

21   Q   Okay.  So if you -- if you were ever asked to be

22   part of some grand conspiracy to defraud the insurance

23   companies, you would have said no; correct?

24   A   Correct.

25   Q   Now, you do understand that although some

3149

```
 1    information has been pointed out, as far as percentages,

 2    that the evidence has been that the vast majority of

 3    these submissions were correct.  Does that strike you as

 4    odd that there were some mistakes?

 5    A   No, I don't find it odd that there are mistakes

 6    made.

 7    Q   Do you know when the first time you spoke with

 8    government agents was?

 9    A   No.

10    Q   Was it before you left your employment with the

11    clinic?

12    A   No.

13    Q   It was after?

14    A   Long after.

15    Q   Now, I remember that you mentioned that you quit

16    because of some bad things that were happening at the

17    clinic; correct?

18    A   Illegal things.

19    Q   Illegal things.  And as I understand it, you said

20    you went and you talked to Tim McDonald about these

21    illegal things; correct?

22    A   I did, yes.

23    Q   And he asked you to put them in writing; correct?

24    A   He wanted specific instances.

25    Q   Okay.  Well, if he's acting as office administrator
```

1    and you make these general allegations, is it uncommon

2    for him to want to see specifically what's happening so

3    it could be addressed?

4    A   No, I wouldn't say it's uncommon.

5    Q   And as I understand it, you didn't provide any

6    specifics.  You left before you had a chance to write

7    anything down; correct?

8    A   Correct.

9    Q   Do you know when this particular meeting with

10   McDonald took place?

11   A   No.

12   Q   Well, do you know what year it took place?

13   A   It would have been 2004, before I left.

14   Q   Okay.  After you failed to give Mr. McDonald the

15   specifics, did you contact Medicaid and give them any

16   specifics of this alleged illegal activity?

17   A   No, I did not.

18   Q   Did you contact Medicare and give them any specifics

19   of this alleged illegal activity?

20   A   No.

21   Q   Did you contact Blue Cross/Blue Shield and give them

22   specifics of this alleged illegal activity?

23   A   No.

24   Q   Did you contact any insurance company whatsoever to

25   give them specifics about this alleged illegal activity?

3151

1    A    Not that I can recall.

2    Q    Your first contact with law enforcement in regards

3    to this issue happened in 2006; correct?

4    A    I do not know.

5    Q    If our records show that the first interview with

6    you happened July 12, 2006, would you disagree with

7    that?

8    A    No.

9    Q    Does that sound about accurate?  Would you like to

10   see it to refresh your memory?

11   A    No, that's fine.

12   Q    Okay.  Does that sound accurate?

13   A    Yes.

14   Q    And so for two years after you left the employment

15   with Schneider Medical Clinic, you never voluntarily

16   went to the Federal Government and provided them with

17   any of these alleged specifics; correct?

18   A    Not that I can recall.

19   Q    Now, didn't you threaten to quit the clinic before

20   you actually quit?

21   A    I believe I had turned in my resignation one other

22   time, yes.

23   Q    And the clinic believed that you were valuable and

24   they gave you a raise and you decided to stay; correct?

25   A    Correct.

3152

1    Q   So, the illegal activity that supposedly was

2    happening at the clinic didn't dissuade you from taking

3    that dollar an hour raise; correct?

4    A   I don't know as far as timeline whether the things

5    that I felt were illegal that I had noticed happened

6    before I had turned in that resignation or after, I

7    don't know.

8    Q   Okay.  Now -- and that's because you don't have any

9    specifics on these referrals that we were talking about;

10   correct?

11   A   Correct.

12   Q   You know the referrals that you say that were

13   fraudulently put together, and all that stuff.  You

14   remember that conversation?

15   A   Yes.

16   Q   And you don't know any dates, no specifics about

17   those -- no patients?

18   A   Not any more.

19   Q   Did the federal investigators ever ask you to sit

20   down and look at some referrals with us to see if you

21   can identify which ones are fraudulent and which ones

22   are accurate?

23   A   Not that I recall.

24   Q   They never did that?  They never gave you that

25   chance, huh?

3153

```
 1    A    I don't remember.
 2    Q    Now, when you decided to leave the clinic, you
 3    provided a notice of termination; correct?
 4    A    Yes.
 5    Q    And in that notice of termination you did not
 6    mention anything about illegal activities taking place
 7    at the clinic; correct?
 8    A    Correct.
 9    Q    And in that notice you actually provided on June 28,
10    2004; correct?
11    A    I don't remember.
12    Q    I'm going to hand you a document dated June 28th of
13    '04?
14    A    Then you're correct.
15    Q    Okay.  Does that refresh your recollection?
16    A    I remember this document.
17    Q    And this document was your notice to leave the
18    clinic, to terminate your employment; correct?
19    A    Correct.
20    Q    And you continued to work -- you gave a two week
21    notice?
22    A    I did --
23    Q    Am I boring you?
24    A    No, I'm sorry.
25    Q    You gave a two week notice; correct?
```

```
 1    A    I believe I did, yes.

 2    Q    And you continued to work up until June 9th of 2004;

 3    correct?

 4    A    I think I worked the full two weeks if I remember

 5    correctly.

 6    Q    Okay.

 7              MR. WILLIAMSON:  One second, Your Honor.  I

 8    think I may be finished.

 9              THE COURT:  Yes, sir.

10                        (Off-the-record discussion

11                         between counsel.)

12              MR. WILLIAMSON:  I don't have anything

13    further, Your Honor.

14              THE COURT:  Redirect please.

15              MS. TREADWAY:  Thank you, Judge.

16                    REDIRECT EXAMINATION

17    BY MS. TREADWAY:

18    Q    Ms. Maurer, Mr. Gorokhov started his

19    cross-examination of you asking about the unqualified

20    people that Linda Schneider hired at the Schneider

21    Medical Clinic, and we saw a clip where she called them

22    misfits.  You remember that?

23    A    Yes.

24    Q    Did you complain to Linda Schneider about the fact

25    that she hired unqualified individuals?
```

3155

 1    A    Yes.  I think I remember complaining.

 2    Q    Did she continue to hire unqualified individuals?

 3    A    Yes.

 4    Q    Do you remember whether the unqualified individuals

 5    were ever offered any training before they began working

 6    at the Schneider Medical Clinic?

 7    A    Well, yes.  It depends on what position they were

 8    hired for.  Some of them you'd have to have some kind of

 9    training to actually begin working.

10    Q    Do you know whether that training occurred?

11    A    I don't know.  I assume.

12    Q    Do you know why Linda Schneider hired people that

13    were unqualified?

14              MR. GOROKHOV:  Objection.  Calls for

15    speculation, Your Honor.

16              MS. TREADWAY:  I'm just asking her yes or no.

17              THE COURT:  She can answer yes or no.

18    BY MS. TREADWAY:

19    Q    Do you know why Linda hired unqualified individuals?

20    A    No.

21    Q    Do you remember talking to FBI agent Rebecca Martin

22    on July 12th, 2006?

23    A    No.

24    Q    All right.  I'm going to hand you what Mr. Gorokhov

25    handed you previously and I'd like you to just refresh

1    your recollection.  Don't read it out loud, but could

2    you read the highlighted portion on Page 2 of

3    Ms. Martin's report.

4              MR. GOROKHOV:  Your Honor, I object.  That's

5    improper.

6              THE COURT:  She is just using it to refresh

7    her recollection.

8              MR. GOROKHOV:  She asked her to read it out

9    loud.

10             THE COURT:  No, she said don't read it out

11   loud.

12             MR. GOROKHOV:  I apologize.  My fault, Your

13   Honor.

14   A   I've read it.

15   BY MS. TREADWAY:

16   Q   You've read that.  Does that refresh your

17   recollection about whether you knew why Linda Schneider

18   hired unqualified people?

19   A   Ask again.  I've got to understand it.

20   Q   Does that refresh your recollection about what you

21   told Ms. Martin about why Linda Schneider hired less or

22   unqualified people at the clinic?

23   A   May I read it again?

24   Q   You may.

25                      (Witness complies with request.)

3157

1   A    That was the opinion I had, yes.

2   Q    And what was that opinion?

3   A    That they would cost less to work.

4   Q    Now, when Mr. Gorohov was talking to you about

5   supervising people, you broke out in a big grin.  Why is

6   that, Ms. Maurer?

7   A    I did not supervise people.  I helped people with

8   their day-to-day work, but Linda made all of the

9   decisions.

10  Q    Now, Mr. Gorohov also talked to you about Medicaid

11  policies and your familiarity with that.  When Medicaid

12  made changes to the policies, do you remember whether

13  you made it a point to make everyone aware of those

14  changes in Medicaid policies?

15  A    I don't remember myself trying to make it a point.

16  Q    All right?.

17  A    Those were all --

18  Q    Again, let me have you read something and see if

19  this refreshes your recollection.  If you could read

20  this paragraph silently to yourself and see if it

21  refreshes your recollection about what you did when

22  Medicaid policy changes came into the clinic.

23                    (Witness complies with request.)

24  A    Okay.  Now can you ask the question again.

25  Q    Does that refresh your recollection as to what you

3158

1  would do when Medicaid policy changes came into the

2  clinic?

3  A   Yes.

4  Q   And what does it refresh your recollection about?

5  What did you do?

6  A   It sounds like I tried to notify Linda when those

7  policies came in, and I know I entered them into the

8  policy manual, filed them.

9  Q   Was Medicaid big business for this clinic?

10  A   Yes.

11  Q   Now, you said that we were billed, we billed the

12  physician's assistants as we were told to bill them.

13  You remember that testimony on cross-examination?

14  A   Yes.

15  Q   Who told you how to bill them?

16  A   All of the policies were made by Linda.

17  Q   You also said that the fee tickets came

18  charge-ready.  I like that term.  What did you mean by

19  that?

20  A   I don't remember saying that.

21  Q   You said that on cross.  I think you were talking

22  about the office visit codes, you know, the 99213s, et

23  cetera.  You said they were charge-ready when they came

24  to billing.  What did you mean by that?

25  A   When they came to charge entry, they had the

3159

1    procedures marked and the diagnoses, the ICD-9 codes put

2    on them.

3    Q    And whose hands did the fee tickets always pass

4    through before they came to billing?

5    A    They all went through Linda's office.

6    Q    Now, Mr. Williamson was asking you about rules and

7    regulations with regards to insurance companies.  And

8    you've been working in this business for almost a

9    quarter century now.  Kind of scary to think about that,

10   isn't it?

11        Would you agree that all insurance companies follow

12   the same policy with respect to they expect the

13   providers to submit honest, accurate and truthful

14   claims?

15   A    Yes.

16   Q    Who is it that's going to reap the benefits of those

17   claims being submitted?  Is it you, the coder, or is it

18   the providers that owned the clinic?

19   A    The owners of the clinic.

20   Q    I want to take you back to some of these fee

21   tickets, and I want to point you to a specific area of

22   that fee ticket that Mr. Williamson didn't cover.  Look

23   at the 04-15-04.  That's the April 15th, '04 fee ticket

24   for Eric T where Kim He'bert was the appointment doctor?

25   A    Did you say 4-15 of '04?

3160

1    Q    Yes, ma'am.  Do you have that one?

2    A    I don't believe I do.  None of these are dated 4-15.

3               MR. WILLIAMSON:  I didn't go over that, Your

4    Honor.

5               MS. TREADWAY:  Okay.  4-22 then.  I apologize.

6    Let's look at the 4-22.  It's the same type of form.

7    And that's where it was a walk-in where you've got

8    "Curt" in the top there.  Do you know who Curt is?

9    A    I believe I know who he is.

10   Q    And who is that?

11   A    Curtis Atterbury.

12   Q    And who was that in relationship to Linda Schneider?

13   A    Brother.

14   Q    Now, down in the far left corner of that document do

15   you see:  Physician signature, I certify that all the

16   above services have been rendered by me.  And then a

17   signature?

18   A    Yes, I see that.

19   Q    Do you recognize that signature at this point in

20   time?  It's probably been too long and if you don't,

21   that's fine.  This is not a test.

22   A    No.

23   Q    This is not a test.  And the CPT codes that came

24   charge-ready, those are the ones up at the top of the

25   form that are circled?

3161

1    A    Correct.

2    Q    All right.  Mr. Williamson asked you about whether

3    you provided Tim McDonald any specific instances of the

4    illegal activities you believed were going on with

5    regards to billing.  Did you come to believe, Ms.

6    Maurer, that it would do no good to provide Mr. McDonald

7    or anyone else at the Schneider Medical Clinic with any

8    information beyond that which you'd already provided

9    about the illegal activity?

10              MR. GOROKHOV:  Objection.  Leading, Your

11   Honor.

12              THE COURT:  Sustained.

13   BY MS. TREADWAY:

14   Q    Why did you not tell Tim McDonald specific

15   instances?

16   A    I didn't feel like it would do any good and I didn't

17   feel like I could do that timewise, and I decided just

18   to leave the practice instead.

19   Q    And did you leave because you did not want to be

20   involved in illegal activities?

21   A    Yes.

22              MS. TREADWAY:  If I can consult, Judge.

23              THE COURT:  Yes, ma'am.

24                   (Off-the-record discussion.)

25              MS. TREADWAY:  Nothing further, Judge.

3162

1          MR. WILLIAMSON:  I'm going to go first, Judge.

2          THE COURT:  Okay.

3                    **RECROSS EXAMINATION**

4   BY MR. WILLIAMSON:

5   Q   Ms. Maurer, so I don't be remiss.  The signatures in

6   the bottom lefthand corner on these fee tickets that we

7   looked at, isn't it true that in the clinic the

8   physicians would have to counter-sign the work done by

9   the physician's assistants?

10  A   I believe that's true.

11  Q   And you mentioned that you didn't provide anything

12  specific to Mr. McDonald because you didn't have time,

13  and you didn't think it would do any good.  Is that

14  correct?

15  A   Correct.

16  Q   Did you even give him the opportunity by presenting

17  specifics?

18  A   I think I've answered that already.

19          MR. WILLIAMSON:  Okay.  You did.  I don't have

20  anything further.

21          THE COURT:  Mr. Gorokhov.

22                    **RECROSS EXAMINATION**

23  BY MR. GOROKHOV:

24  Q   Ms. Treadway just talked to you briefly about the

25  Medicaid billing issue.  The billing of PAs versus

3163

1    doctors.  Do you remember that?

2    A    I don't have a whole lot of knowledge of that

3    problem in the clinic.

4    Q    Okay.  You stated that you're familiar with the

5    Medicaid provider manual, or were at that time; isn't

6    that true?

7    A    For the most part.

8    Q    Okay.  You stated to the FBI that you've looked at

9    the provider manual numerous times.  Isn't that true?

10   A    During the course of my work, it was necessary to

11   look, yeah.

12   Q    You told the FBI that you checked the manual for

13   updates regarding notices of changes regarding billing

14   and coding.  Isn't that correct?

15   A    No, I didn't check the manual for updates.  We would

16   get updates that I would put into the manual.

17   Q    Okay.  You would let everyone know about the changes

18   that occurred with billing and coding?

19   A    Not everyone, no.

20   Q    I want to show you again the FBI interview and I'd

21   like you to look at this first paragraph here.  In fact,

22   you want to read through that because we're going to be

23   talking about that.

24                    (Witness complies with request.)

25   Q    Just that page you're looking at, you don't have to

3164

1    read the whole thing.

2    A    Pardon me.

3    Q    Just that page we were looking at.

4    A    I'm halfway down this page.

5    Q    Go ahead.

6    A    Okay.

7    Q    Thank you.  Now, does that refresh your recollection

8    as to whether you reviewed the manual and whether you

9    would inform everyone about the changes?

10   A    My answers would still be the same.

11   Q    Okay.  You testified on direct that you never saw

12   Linda working with a provider manual; is that correct?

13   A    I don't recall her ever coming downstairs to get it;

14   no.

15   Q    So -- but yet you stated here that you worked with

16   the manual before; correct?

17   A    It was in my office.

18   Q    Now, while you were interviewed by the FBI you told

19   the FBI, quote "you knew something about the

20   requirements regarding physician's assistants."  Isn't

21   that true?

22   A    Yes.

23   Q    That's true.  Okay.  And you told the FBI that you

24   did not know the mid-level practitioners could be billed

25   at the same level as doctors under Medicaid; isn't that

3165

1    true?

2    A    I did not know at the time I was working there.

3    Q    Yet you submitted the bills to the insurance company

4    in many cases; isn't that right?

5    A    Again, I want to explain.  When I say I submitted

6    bills, I took our data-base that was in our computer

7    system and I electronically moved it from our computer

8    system to the insurance companies'.  That's what I mean

9    by I submitted them.

10   Q    Okay.  So, just to go back a little bit.  You

11   reviewed the manual; correct?

12   A    I don't understand what you're asking me.

13   Q    You reviewed the Medicaid manual; correct?

14   A    I still don't understand what you're asking me.  Are

15   you asking me if I reviewed the Medicaid manual before I

16   sent --

17   Q    Yes.

18   A    -- insurance claims every day?

19   Q    No.  I'm saying did you review the Medicaid manual

20   while you were at the Schneider Medical Clinic?

21   A    At some point in time, yes.

22   Q    And I believe you already answered yes.  Okay.

23   A    Yes.

24   Q    And you said that you kept up with the changes?

25   A    Tried to apply all files -- all the changes in the

3166

```
 1    manual.
 2    Q   You submitted the bills; correct?
 3    A   Yes.
 4    Q   Are you aware that one of the allegations in this
 5    case was that the physician's assistants weren't billed
 6    correctly based on who actually saw the patient?
 7    A   No.
 8              MR. GOROKHOV:  That's all I have.
 9              THE COURT:  Thank you, ma'am.  You're excused.
10    Next witness, please.
11              MS. TREADWAY:  Judge, at this time I would
12    like to read into the record additional statements by
13    the Defendant Stephen Schneider, given under oath in the
14    case of Wicklund vs. Tiaphyl SEU and Frontier Runners
15    LLC about a patient that he saw, and about general
16    practices at the clinic.
17              THE COURT:  Does Mr. Williamson know what
18    you're planning on reading.
19              MS. TREADWAY:  This is Exhibit 107.
20              MR. WILLIAMSON:  May I just take a look at it
21    over here real quick.
22              MS. TREADWAY:  It's not the entire deposition,
23    Judge.  It's only excerpts from it.
24              MR. WILLIAMSON:  No objection.
25              THE COURT:  All right.
```

3167

1              MS. TREADWAY:  To aid the jury, Judge, we will

2     be presenting this on the screen as well.

3         For the record, this is a deposition that was given

4     the 24th of May, 2005.  On Page 4.  Question:  "After

5     that year of internship, what did you do?"  Answer:  "I

6     went into practice."  Page 16 --

7              MR. WILLIAMSON:  Your Honor, may I just

8     interject.  I think we have a witness in the courtroom

9     and this is testimony --

10             MS. TREADWAY:  I apologize.  Sorry.

11             MS. TREADWAY:  Thank you, Mr. Williamson.

12    BY MS. TREADWAY:

13    Q    "Answer:  Most of the handwriting is mine.

14         "Question:  All right.  Now let's go down -- you

15    have what is called objective?

16         "Answer:  Yeah.

17         "And there is one that says C-O-N-S-T.  What does

18    that stand for?

19         "Answer:  Oh, that's just -- I don't know what

20    const --

21         "Question:  It is checked and says well nourished/

22    well developed.

23         "Answer:  How they look I guess."

24         Page 25.

25         "Question:  Whose initials are those?

3168

1        "Answer:  I don't know.  It looks like a JS.  We

2    got so many employees come and go, I can't remember

3    their names."

4        Page 29.

5        "Answer:  I put down get urine drug screen next

6    visit.

7        "Question:  Why do you want to do that?

8        "Answer:  We do that on all our pain management

9    patients to verify they are taking their medication and

10   not selling it, or using any illegal drugs."

11       Pages 34 and continuing to 35.

12       "Question:  How do you decide whether you are going

13   to see her or the physician's assistant is going to see

14   her?  What's the protocol on that?

15       "Answer:  Well, they schedule appointments.  And my

16   schedule is usually pretty packed.  So, if they can't

17   get in to see me, they will have to see a PA.  Or a lot

18   of times, like the one visit where she came in early,

19   she apparently was a walk-in, per se, and I don't have a

20   lot of time for walk-in's so they will see the physician

21   assistant."

22       Pages 47 through 48.

23       "Did you ever talk to any of her prior physicians

24   about her?

25       "No.

3169

1          "Did you ever review any tests or any X-rays or

2     anything like that that had been done before you saw

3     her?

4          "No.

5          "So you really -- when she came in to you, that's

6     when your treatment and testing of her started?  You

7     really didn't go back -- you didn't really go back, you

8     took whatever she told you the history was, and

9     basically just ran it forward the way we have gone

10    through it here in this deposition?

11         "Answer:  Correct."

12         Government would now call Tom Buell.

13                      **THOMAS BUELL**

14    Having been first duly sworn to tell the truth, the

15    whole truth and nothing but the truth, testified as

16    follows on:

17                    **DIRECT EXAMINATION**

18    BY MS. TREADWAY:

19    Q    Good afternoon, sir.  Would you please introduce

20    yourself to the jury?

21    A    My name is Thomas A Buell.  I'm a director of Family

22    Preservation Services currently, for DCCCA Incorporated.

23    Q    And what is DCCCA Incorporated?

24    A    DCCCA is one of the larger social service

25    not-for-profit agencies in the State of Kansas.

1    Q    And what exactly do you do for DCCCA?

2    A    Currently, I'm the regional director of child

3    welfare services here in Sedgwick County.  Previously, I

4    was director of addiction services for DCCCA for the

5    State of Kansas.

6    Q    Does DCCCA have locations throughout Kansas?

7    A    They do.

8    Q    And are you basically the director of the location

9    here in Wichita?

10   A    I am.

11   Q    And do they have multiple locations even in Wichita

12   or is it just one place?

13   A    Well, are we talking drug and alcohol treatment, or

14   are we talking who I currently, the program I currently

15   work for?

16   Q    Let's talk about drug and alcohol treatment.

17   A    Okay.  We have two current facilities here in

18   Sedgwick County.

19   Q    And how long were you associated with the addiction

20   service end of DCCCA?

21   A    Off and on for about eight years.

22   Q    All right.  And for the record, is DCCCA D-C-C-C-A?

23   A    It is.

24   Q    Now, during the course of your investigation did we

25   ask for your help in identifying DCCCA clients who had

3171

1    sought help with drug addiction?

2    A    Yes.

3    Q    And did we specifically ask you to identify DCCCA

4    clients that had previously been patients at the

5    Schneider Medical Clinic?

6    A    Yes, ma'am.

7    Q    And how did we go about this identification process?

8    A    Well, originally I was provided a list of 4300

9    names, first and last names, who were supposedly the

10    patient list from the Schneiders' clinic.  I was asked

11    to cross reference those names with KHPC data-base,

12    which is the Kansas client placement criteria data-base,

13    which holds the information on our consumers that have

14    attended DCCCA drug and alcohol programs.  I was not

15    able to accurately identify off of that 4300 name list

16    because it was only first and last names so I requested

17    another list with identifiers of social security numbers

18    or date of births.  At which time I was provided with a

19    list of about 10,000 names.  From that list I went one

20    by one and compared those names and social security

21    numbers and date of births with our former consumers or

22    current consumers.  And came up with a list of those

23    folks in common.

24    Q    And how many people in common did you find?

25    A    Originally out of 10,000 names originally, I found

3172

```
 1    494 names.  I requested the KBI to give me a -- cull
 2    that down to the area of concern, or years of concern,
 3    and they told me 2003 to 2006.  And in that time period
 4    there were 253 names in common.
 5    Q   And would those 253 individuals have come to DCCCA
 6    for treatment for addiction?
 7    A   Yes.
 8    Q   Now, are there laws and regulations that protect
 9    these people's identities?
10    A   Yes, there are.
11    Q   And is that in fact to assure that people are
12    encouraged to seek addiction treatment?
13    A   Yes.
14    Q   Can you share the identities of those 253 people
15    with me?
16    A   No.
17    Q   Can you share them with law enforcement?
18    A   No, ma'am.
19            MS. TREADWAY:  Nothing further, Judge.
20            THE COURT:  Yes, sir.
21            MR. WILLIAMSON:  Thank you, Your Honor.
22                    CROSS EXAMINATION
23    BY MR. WILLIAMSON:
24    Q   How are you doing?  Is it Mister?  Doctor?
25    A   Mister.
```

1    Q    Mr. Buell.  Few questions.  Okay.  Won't keep you

2    too long.

3         The Government contacted you to undertake this

4    task?

5    A    Yes.

6    Q    And out of 10,000 names you came up with 253;

7    correct?

8    A    Correct.

9    Q    Now, this 253, that meant that they had utilized

10   DCCCA services at some point between 2003 and 2006;

11   correct?

12   A    That is correct.

13   Q    It doesn't mean that each one of these 253

14   individuals ever received pain medicine from the clinic;

15   correct?

16   A    I wouldn't know that.

17   Q    You didn't look at their medical records --

18   A    No, sir.

19   Q    -- correct?  So there has been evidence that one

20   individual named Dusty L received no pain meds from the

21   clinic but he passed away by using somebody else's pain

22   medicine.  Okay.  And if he had gone to DCCCA, he would

23   have shown up on the clinic's list and he would have

24   also shown up on your list even though he never received

25   any pain meds from the clinic; correct?

3174

1    A    That is true.

2    Q    Okay.  Now, you can't give the names of these 253

3    people generally, correct?

4    A    I can't give them to anybody.

5    Q    But you could ask for a release for information for

6    these 253 individuals; correct?

7    A    I could.

8    Q    And you actually did, didn't you?

9    A    I did.

10   Q    And you received how many responses?

11   A    I received a total of six responses.

12   Q    And how many of them authorized you to give their

13   information out?

14   A    Three.

15        MR. WILLIAMSON:  I don't have anything

16   further.

17        THE COURT:  Yes, sir.

18        MR. GOROKHOV:  No questions, Your Honor.

19        THE COURT:  Did you ask for a release from the

20   253?

21   A    Yes, sir.

22        THE COURT:  Thank you.  Redirect?

23        MS. TREADWAY:  Nothing further, Judge.

24        THE COURT:  Thank you, Mr. Buell.  Next

25   witness please.

3175

1    MS. TREADWAY:  Judge, would it be possible to

2    have a bit of a break right now?  We're having a little

3    witness availability issue, but I hope to have somebody

4    here within the next 15 minutes.

5    THE COURT:  I don't think that's a problem.

6    Do you think that's a problem, gentlemen, ladies?

7    MS. TREADWAY:  Thank you very much.

8    THE COURT:  We'll take a recess.

9    (Recess.)

10   THE COURT:  Next witness, please.

11   MS. TREADWAY:  Thank you, Judge.  The

12   Government calls Michael Hall.

13   **MICHAEL HALL**

14   Having been first duly sworn to tell the truth, the

15   whole truth and nothing but the truth, testified as

16   follows on:

17   **DIRECT EXAMINATION**

18   BY MS. TREADWAY:

19   Q   Good afternoon, sir.  Could you please introduce

20   yourself to the jury.

21   A   Michael Scott Hall.

22   Q   And where are you currently employed, Mr. Hall?

23   A   Employed through ConMed, who is contracted through

24   the Sedgwick County Adult Detention Facility.

25   Q   And what do you do for ConMed?

3176

```
1    A    I'm a physician assistant there.

2    Q    How long have you been employed in that position?

3    A    Three years.

4    Q    Prior to becoming a physician's assistant, Mr. Hall,

5    where did you work?

6    A    Sedgwick County Regional Forensic Science Center.

7    Q    And what did you do for the Forensic Science Center?

8    A    I was a pathology assistant.

9    Q    When did you work there?

10   A    1998 through 2002.

11   Q    During your employment at the Sedgwick County

12   Forensic Science Center as a pathology tech, were you

13   aware of the Defendant Stephen Schneider and the

14   Defendant's clinic the Schneider Medical Clinic?

15   A    No.

16   Q    When did you decide to go to school to get a

17   physician's assistant's degree?

18   A    In 200 -- decided around 2000, went to school, got

19   accepted in 2002.

20   Q    And when did you graduate?

21   A    2004.

22   Q    From where did you graduate?

23   A    Wichita State University.

24   Q    Where did you first work after graduation?

25   A    A clinic in physiatry.
```

3177

1    Q    And tell us what physiatry is?

2    A    Physiatry is physical medicine.

3    Q    After working at the physiatrist's office, did you

4    end up working at the Schneider Medical Clinic?

5    A    Yes.

6    Q    Had you ever been to the Schneider Medical Clinic

7    previously?

8    A    Yes, I did.

9    Q    And in what capacity were you there previously?

10   A    As a student in the PA school I did a rotation

11   there.

12   Q    While you worked at the Schneider Medical Clinic as

13   a student, did you shadow the Defendant Stephen

14   Schneider?

15   A    Yes.

16   Q    And can you explain to the jury briefly what a

17   shadow is?

18   A    I would follow the doctor into the room, see

19   patients, actually watch him see patients.

20   Q    At the time you shadowed him as a student, had you

21   already learned about how to conduct histories and

22   physical examinations of patients?

23   A    Yes.

24   Q    Based on what you observed the Defendant Stephen

25   Schneider do when you were shadowing him, how did what

3178

1    he did compare to what you had learned to do in school?

2    A    It appeared that he did a very brief exam.

3    Q    Would you consider the histories and the

4    examinations he did to be thorough?

5    A    No.

6    Q    What did the Defendant Stephen Schneider typically

7    do at the end of these brief and not very thorough

8    examinations, Mr. Hall?

9    A    Write prescriptions.

10   Q    For what?

11   A    Depending on what it was, anything from narcotics to

12   antibiotics.

13   Q    When you shadowed him, how long did his office

14   visits with patients typically last?

15   A    Five to ten minutes.

16   Q    While you were working at the Defendant's clinic as

17   a student, did anyone offer you employment there full

18   time or part-time?

19   A    Yes.   Part-time.

20   Q    And who was that?

21   A    Linda Schneider.

22   Q    Did you accept?

23   A    Yes.

24   Q    On the first offer?

25   A    No.

3179

1    Q    Okay.  Let's talk about the first offer.  Did you

2    accept her first offer of employment?

3    A    No.

4    Q    Why not?

5    A    Due to -- as a student -- and my experience there.

6    Q    And what was it about your experience there that

7    made you not take that first offer of employment?

8    A    Felt like I would be seeing too many people in too

9    short a time.

10   Q    During your student work there, did you have

11   sufficient opportunity to observe what type of clinic it

12   was?

13   A    Yes.

14   Q    How would you describe it from your viewpoint as a

15   student?

16   A    A very busy, busy clinic, seeing lots and lots of

17   people for a lot of pain management type issues.

18   Q    Had you had any training with regards to treating

19   chronic pain when you were a student shadowing the

20   Defendant Stephen Schneider?

21   A    No.

22   Q    Nevertheless, did you observe what the primary

23   treatment was for chronic pain patients at the Schneider

24   Medical Clinic?

25   A    Yes.

3180

1    Q    What was that primary treatment that you observed?

2    A    Prescription medication.

3    Q    Of controlled substances?

4    A    Yes, at times.

5    Q    When you were employed by the Defendant's clinic,

6    was that from approximately May through July of 2005,

7    just about three months?

8    A    Yes.

9    Q    So at some point in time you did accept an offer to

10   be employed there?

11   A    Yes.

12   Q    And why did you change your mind?

13   A    It was a part-time position and currently at that

14   time I also was working PRN for another doctor.

15   Q    And what does PRN mean?

16   A    As needed.

17   Q    So did you need a job?

18   A    Yes.

19   Q    What days did you work at the Schneider Medical

20   Clinic, Mr. Hall?

21   A    Saturdays and Sundays.  And occasionally on a

22   Wednesday.

23   Q    All day Wednesday or a particular time during the

24   day on Wednesdays?

25   A    Usually just the afternoon.

3181

```
1   Q    Who was your supervising physician?

2   A    Dr. Donna St. Clair.

3   Q    And when she was not available, who was your

4   secondary supervising physician?

5   A    Dr. Stephen Schneider.

6   Q    How often did you see and consult with Donna St.

7   Clair?

8   A    Not often.

9   Q    Did she work at the Schneider Medical Clinic full

10  time or part-time?

11  A    Part-time.

12  Q    Did you see patients that had been seen by both the

13  Defendant Stephen Schneider and Donna St. Clair?

14  A    Yes.

15  Q    You said you worked Saturdays and Sundays.  Who

16  typically worked weekends at the Defendant's clinic,

17  Schneider Medical Clinic?

18  A    Myself and another PA.

19  Q    And who would that other PA have been?

20  A    Charles Lee Craig.

21  Q    Did you ever see the Defendant Stephen Schneider

22  work weekends there?

23  A    Not when I worked there.

24  Q    Did you ever see Donna St. Clair, your supervising

25  physician, work there on weekends?
```

3182

```
 1    A    No.
 2    Q    Now, with regards to people who came for pain
 3    management, were they ever required to take off their
 4    clothes and put on a gown for examinations?
 5    A    No.
 6    Q    During your employment at the Defendant's clinic,
 7    Mr. Hall, were you ever required to see more than one
 8    patient at a time?
 9    A    Yes.
10    Q    Could you tell the jury about that.
11    A    Sometimes patients were scheduled even as families.
12    I do recall seeing six people at once in one room.  It
13    was a whole family.
14    Q    And was the whole family being prescribed controlled
15    substances?
16    A    No.
17    Q    What were they there for?
18    A    Every one of them had a different complaint.
19    Q    But you were expected to see all of them
20    simultaneously?
21    A    Yes.
22    Q    In one room?
23    A    Yes.
24    Q    What, if anything, did the Defendant Linda Schneider
25    tell you about how much time to spend with patients?
```

```
 1    A    That the encounter should be brief, five minutes.

 2    Q    When you examined patients at the Defendant's

 3    clinic, did you have several ask you an unusual

 4    question?

 5    A    Yes.

 6    Q    What was that unusual question?

 7    A    Why I was performing a medical physical exam.

 8    Q    And would they tell you why they asked you that?

 9    A    Many of 'em said they have not had that before.

10    Q    Mr. Hall, why did you work for the Schneider Medical

11    Clinic only a few months?

12    A    Due to the fact that there was so many people to see

13    and a short amount of time, I didn't feel I could do --

14    continue to do a thorough medical exam and assessment

15    and that most of it appeared to me to be pain management

16    which I wasn't comfortable with.

17    Q    Did the Defendant Stephen Schneider or the Defendant

18    Linda Schneider ever offer to train you so that you

19    could handle chronic pain patients?

20    A    No.

21    Q    Did you not only leave because of the overwhelming

22    number of patients and what you just said, did you leave

23    because you didn't like the type of clinic it was?

24    A    Yes.

25    Q    Did you leave because you didn't like how the clinic
```

3184

```
 1    was run?

 2    A   Yes.

 3    Q   And did you also want full-time instead of part-time

 4    work?

 5    A   Yes.

 6    Q   Did anyone at Schneider Medical Clinic ever offer

 7    you full-time work?

 8    A   Yes.  Linda did, Schnedier.

 9    Q   And why didn't you accept her offer of full-time

10    work, which you wanted?

11    A   Again, due to the type of clinic that it was and the

12    amount of people that would have to be seen.  I wasn't

13    comfortable with it.

14    Q   Did you have any concern about how the patients were

15    treated for pain?

16    A   Yes.

17    Q   What were your concerns?

18    A   I feel some of them were not being treated, only by,

19    you know, medicine, only by prescriptions, that that

20    wasn't thorough.

21    Q   Based on your student rotation and your part-time

22    employment at Schneider Medical Clinic, did you form an

23    opinion based on your observations at the clinic with

24    regard to how it treated patients?

25    A   Yes.
```

```
 1    Q    And what was that opinion?

 2    A    That it was, again, too many people to be seen; it

 3    seemed like a patient mill, running too many people in

 4    and out of there.

 5    Q    And what was the purpose of the volume of patients

 6    as you observed?

 7              MR. WILLIAMSON:  Your Honor, objection.  Calls

 8    for speculation.

 9              MS. TREADWAY:  Based on his observations,

10    Judge.  It's a lay opinion.

11              THE COURT:  I'd prefer if you phrase the

12    question does he have an opinion.

13    BY MS. TREADWAY:

14    Q    Do you have an opinion as to why the volume of

15    patients was as it was at the Schneider Medical Clinic?

16    A    Yes.

17    Q    And what is that opinion, sir?

18    A    My opinion was was to see the most amount of people

19    that they possibly could for money.

20    Q    Based on your student rotation and your employment

21    at Schneider Medical Clinic, did you form an opinion

22    about whether the Defendant's clinic was offering

23    legitimate medical services to their pain management

24    patients?

25              MR. WILLIAMSON:  Your Honor, I'm going to
```

3186

1    object.  That calls for an expert conclusion and this

2    man is not a doctor.

3              MS. TREADWAY:  It's a lay opinion, Judge.

4              MR. WILLIAMSON:  And that's a legal

5    conclusion.

6              THE COURT:  The objection is sustained.

7    BY MS. TREADWAY:

8    Q    During your time at the Schneider Medical Clinic,

9    Mr. Hall, did you believe you had time to perform

10   legitimate medical services for your patients?

11   A    No.

12             MS. TREADWAY:  Nothing further.

13                    <u>**CROSS EXAMINATION**</u>

14   BY MR. WILLIAMSON:

15   Q    How are you doing, Mr. Hall?

16   A    Good.

17   Q    I'm Lawrence Williamson.  And I represent Dr.

18   Schneider.  We haven't had a chance to meet before

19   today, have we?

20   A    No.

21   Q    Okay.  Just want to chat with you a little bit about

22   your testimony.  Let me -- let's start at the beginning.

23   You first learned about the clinic through your time at

24   Wichita State; correct?

25   A    Yes.

3187

1    Q    There was a position advertised for student

2    rotations at the Schneider Medical Clinic; correct?

3    A    No.

4    Q    Okay.  How did you find out that there were

5    availability at the Schneider Medical Clinic?

6    A    As a student?

7    Q    Yes.

8    A    I was just placed there.

9    Q    Okay.  So Wichita State would place students at

10   different clinics in Wichita; correct?

11   A    Yes.

12   Q    And they placed you at the Schneider Medical Clinic;

13   correct?

14   A    As a rotation, yes.

15   Q    And Schneider Medical Clinic didn't get any kind of

16   grants or anything for you?  You basically were like an

17   intern position; correct?

18   A    Not that I know of.

19   Q    And you were supposed to go and report your findings

20   that you found regularly to your professors at WSU;

21   correct?

22   A    I don't understand.

23   Q    Normally when you have a practicum if you're a

24   teacher or a professional going into a field, they send

25   you to get hands-on training.  You agree with that?

1    A    Uh-huh.

2    Q    And -- but when you do the hands-on training, did

3    you get credit for going to that rotation?

4    A    Yes.

5    Q    So like educational credits; correct?

6    A    Right.

7    Q    Okay.  So you had to do that in order to graduate

8    your program?

9    A    Yes.

10   Q    And -- but to get those educational credits you

11   would have to provide information to WSU about your

12   experiences at whatever clinic or hospital that you did

13   your rotation in; correct?

14   A    Yeah.  Well, as a -- the preceptor person contact at

15   WSU contacts the places where you do your rotations.

16   So, it's generally through them.

17   Q    So, when a clinic accepted you as a rotation intern,

18   they knew that you would be reporting back to WSU

19   everything that you observed at the clinic; correct?

20   A    I would suppose.

21   Q    Okay.  Dr. Schneider never sat down with you and

22   said I want you to keep whatever you learn here secret,

23   don't share it with anybody, did he?

24   A    No.

25   Q    If he would have done that, that would have been a

3189

```
 1    real red flag for you to get out of there and you
 2    wouldn't even have accepted a job at any point in time;
 3    right?
 4    A    Yes.
 5    Q    Okay.  Now, you actually shadowed Dr. Schneider as a
 6    student, I believe you testified to; correct?
 7    A    Yes.
 8    Q    Did you ever see Dr. Schneider prescribe a pain pill
 9    to a person who did not complain of being in pain?
10    A    I don't recall.
11    Q    And if you -- if you had seen that, that would have
12    been another one of those red flags; correct?
13    A    Yes.
14    Q    That would have been something you would have
15    reported to your professors at WSU, that this man is
16    just prescribing pain pills to people who don't even
17    complain about pain; right?
18    A    Yes.
19    Q    Okay.  And you had conversations with Dr. Schneider
20    about his philosophy in treating people in pain;
21    correct?
22    A    I did.
23    Q    And you learned that Dr. Schneider believed that
24    pain was often undertreated; correct?
25    A    Yes.
```

3190

1    Q   And you learned that he felt he was one of the few

2    doctors in the area that treats pain patients with pain

3    medicines; correct?

4    A   Yes.

5    Q   You also had conversations with Dr. Schneider about

6    taking steps to ensure that the medicines are being

7    taken responsibly; correct?

8    A   Yes.

9    Q   And some of those were these urine drug screens,

10   bringing people in within 30 days every month for

11   visits; correct?

12   A   Yes.

13   Q   Now, you understand, don't you, that it's not a

14   requirement under the law to prescribe a pain medicine

15   to bring people in once a month; correct?

16   A   Yes.

17   Q   And it's not required under the law to give urine

18   drug screens; correct?   In order to prescribe pain

19   medicines to people?

20   A   Yeah, I believe that is up to the physician or PA or

21   practitioner.

22   Q   So when he was implementing these policies and

23   procedures, these were optional things he was doing

24   trying to catch people who may have not been using their

25   prescriptions right; correct?

1    A    Yes.

2    Q    But you would agree that the volume of patients

3    there made it difficult to catch everybody; correct?

4    A    Could be.

5    Q    Okay.  And you mentioned I believe to an agent when

6    you were interviewed that you felt like your experience

7    with the clinic was a good learning experience but it

8    was just way too many people; correct?

9    A    Yes.

10   Q    Now, you mentioned about the volume of patients and

11   you believed that that was because the clinic could get

12   more money; right?

13   A    Yes.

14   Q    You never talked to Dr. Schneider -- strike that.

15        Dr. Schneider never told you that, did he?

16   A    Told me what?

17   Q    That the only reason we have so many people is so we

18   can get more money?

19   A    No, he didn't.

20   Q    Did you learn at all during your time at the clinic

21   that there was a doctor named Dr. Curry that passed away

22   who used to see a lot of these Medicaid patients?

23   A    No, I did not.

24   Q    You never saw the clinic advertise as being a pain

25   management clinic, did you?

3192

```
 1    A    Physically see or--

 2    Q    Correct.  Actually see?

 3    A    No.

 4    Q    And the clinic saw a lot of Medicaid patients;

 5    correct?

 6    A    I believe.

 7    Q    And are you aware that Medicaid pays anywhere

 8    between 15 and 18% of the total value of services?

 9    A    Yes.

10    Q    And you're aware that a lot of physicians in Wichita

11    don't see Medicaid patients because of -- it's just not

12    financially feasible to do so?

13    A    I've heard that.

14    Q    Do you have a cold?

15    A    Yes.

16    Q    Okay.  You can take a break.

17                      (Off-the-record.)

18    A    Pardon me.

19    Q    When you were a student and you were observing Dr.

20    Schneider, you never saw him prescribe medicine to

21    anybody without a physical exam; correct?

22    A    No.

23    Q    And I think the -- he didn't do the type of exams

24    that you all were taught to do while you were in school;

25    is that correct?
```

3193

1    A    Correct.

2    Q    Would you call his exams more of the

3    problem-focussed exams?

4    A    Barely.

5    Q    Okay.  And you attributed that to the fact that he

6    had so many patients to get through and see; correct?

7    A    Well, that was just the style.

8    Q    Okay.  And you would agree that in your field, just

9    like most fields, there's a difference between what we

10   learn academically and what happens out in the field;

11   correct?

12   A    Yes.

13   Q    Dr. Schneider never came to you and said, "Mike, we

14   want you to write prescriptions for people regardless if

15   you think they need 'em or not", did he?

16   A    No.

17   Q    You have never written a prescription while you were

18   at the clinic for a pain patient that you truly did not

19   believe needed it; correct?

20   A    Correct.

21   Q    And you would agree that in Wichita there are a lot

22   of providers who would not write prescriptions for pain

23   medicines for chronic pain patients; correct?

24            MS. TREADWAY:  Objection, calls for

25   speculation.  I don't believe he knows all the providers

3194

1    in Wichita.

2              THE COURT:  Sustained.

3    BY MR. WILLIAMSON:

4    Q   To your knowledge do you know how many providers in

5    Wichita actually write prescriptions for pain medicines

6    for chronic pain patients?

7    A   I do not.

8    Q   Now, with these conversations you had regarding --

9    with Dr. Schneider.  He would tell you to run urine drug

10   screens on people; correct?

11   A   He didn't advise me specifically.

12   Q   Did he ever tell you not to run urine drug screens

13   on people?

14   A   No.

15   Q   You remember giving testimony under oath?

16   A   Yes.

17   Q   Okay.  If I show you a part of your transcript,

18   would it help refresh your recollection as to whether or

19   not Dr. Schneider actually told you to run urine drug

20   screens on people?

21   A   Yes.

22   Q   It's been a while since that happened; correct?

23   A   Uh-huh.

24             MS. TREADWAY:  May we have a page reference,

25   please.

```
 1              MR. WILLIAMSON:  Yes, Page 22.

 2   Q   Refresh your recollection?

 3   A   Yes.

 4   Q   Okay.  Now, do you recall whether Dr. Schneider

 5   actually stated that you should periodically run urine

 6   drug screens on people?

 7   A   Yes.

 8   Q   Now, would you agree that there were times when the

 9   clinic was backed up, the paperwork was backed up?

10   A   Yes.

11   Q   There were times when the organization wasn't the

12   best; correct?

13   A   Yes.

14   Q   There were times where you needed information for

15   charts and they would still be in the records room and

16   hadn't circulated all the way back through; correct?

17   A   There were times we didn't have a chart, yes.

18   Q   And while you were there did the clinic attempt to

19   address that issue by starting to utilize electronic

20   medical records?

21   A   While I was there, I don't believe so.

22   Q   You weren't there when they started using, like the

23   little tablets.  Did you ever use the tablet?

24   A   No.

25   Q   Okay.  Now, when you would see a patient you would
```

3196

1    have to fill out a -- you would have a fee ticket

2    attached to the chart; correct?

3    A    Correct.

4    Q    And I believe the jury has some in their possession.

5    I'm going to hand you just a small stack of some.  Help

6    me out here.  D-013.  That first page on that document

7    is what date?  Do you see the date at the top?

8    A    4-22-2004.

9    Q    Okay.  Now, are these the fee tickets that you would

10   complete while you were -- the type of fee tickets that

11   you would complete while you were working there?

12   A    I believe so.

13   Q    Now, if you look a couple of pages -- that's it.  If

14   you look a couple of pages in, the fee ticket changes

15   and it's not lined and just a sheet of paper.  I'm

16   looking at -- what date do you have in front of you?

17   A    3-19.

18   Q    So looking at the 3-19 of '04, you see that's a

19   different form than that's on the front page; correct?

20   A    Yes.

21   Q    When you were working there, which kind of fee

22   ticket would be used?

23   A    I believe the first one, the one dated 4-22-2004.

24   Q    Okay.  The one with the lines and the name and

25   everything at the top; correct?

3197

1    A    Yes.

2    Q    Okay.  Now, at the top you'll see a provision where

3    it says "appointment doctor".  Do you see that?

4    A    Which one are you referring to?

5    Q    Let's look at the 4-22-04.

6    A    Okay.

7    Q    Do you see at the top righthand side?

8    A    The appointment time?

9    Q    Appointment doctor where it says "walk in"?

10   A    Yes.

11   Q    Okay.  Now, in fairness, it's been about five years

12   since you've seen one of those; right?

13   A    Right.

14   Q    Okay.  When you talked with Government agents, they

15   never handed you one and tell you to help them kind of

16   see, you know, what this stuff meant; did they?

17   A    I don't believe so.

18   Q    Now, to the best of your recollection, when you

19   would see a patient, would you -- if it was a walk-in,

20   would you put your name right there and circle it like

21   Hall?

22   A    I believe so.

23   Q    And was that the indicater that you were the person

24   that actually saw the patient during that time?

25   A    Yes.

1    Q   And that's how all the providers would alert the

2    billing department as to who the provider was is by

3    placing either initial or name or circling the

4    "appointment doctor" up there; correct?

5    A   I believe so.

6    Q   And then Dr. St. Clair or Dr. Schneider would have

7    to counter-sign these this fee tickets and the chart

8    that you completed when you saw a patient; correct?

9    A   Yes.

10   Q   And then head up to -- are you aware of whether or

11   not the laws in Kansas say they have up to 14 days to

12   review that chart and counter-sign it?

13   A   Yes.

14   Q   And is that what the law says?

15   A   That's what the law says.

16   Q   Okay.  And you learned that when you were in school?

17   A   Yes.

18   Q   Now, Dr. Schneider never instructed you to

19   fraudulently complete, fill out these fee tickets, did

20   he?

21   A   No.

22   Q   You never represented to anybody at the clinic that

23   you saw a patient when you didn't, did you?

24   A   No.

25   Q   And you never would have done that even if Dr.

3199

```
 1     Schneider would have asked to you do it; correct?

 2     A    Correct.

 3     Q    That would have been against the law?

 4     A    Yes.

 5     Q    When you were working with Dr. Schneider, did he

 6     tell you that there were certain medications that he did

 7     not like to prescribe?

 8     A    If I recall, I believe there was one.

 9     Q    And that would be Dilaudid?

10     A    Dilaudid.

11     Q    And that was because it's really strong and very

12     addictive?

13     A    Yes.

14     Q    Okay.

15               MR. WILLIAMSON:  One second, Your Honor.

16                         (Off-the-record discussion.)

17               MR. WILLIAMSON:  I don't have anything

18     further, Your Honor.

19               THE COURT:  Mr. Gorokhov?

20               MR. GOROKHOV:  No questions, Your Honor.

21               THE COURT:  Any redirect, please.

22               MS. TREADWAY:  Briefly, Judge.

23                    REDIRECT EXAMINATION

24     BY MS. TREADWAY:

25     Q    Mr. Hall, Mr. Williamson was asking you about
```

3200

1    writing prescriptions.  When you were working at the
2    Schneider Medical Clinic as a physician's assistant, did
3    you write prescriptions based on what had been
4    prescribed before?
5    A   Yes, at times.
6    Q   And did you terminate individuals that you believed
7    were abusing controlled substances or addicted to
8    controlled substances or were otherwise violating the
9    pain management agreement?
10   A   Yes.
11   Q   And although you terminated these people from pain
12   management, would they show back up at the clinic as
13   pain management patients?
14   A   Occasionally.
15           MS. TREADWAY:  Nothing further.
16           MR. WILLIAMSON:  Very brief, Your Honor.
17                   **RECROSS EXAMINATION**
18   BY WILLIAMSON:
19   Q   When people -- when you would terminate people, do
20   you know whether or not Dr. Schneider would actually sit
21   down with them and try to find out the patient's side of
22   the story before he reinstated them?
23   A   I do not.
24   Q   Okay.  And as far as prescribing medicines, you as a
25   physician's assistant are trained to use your medical

1    judgment; aren't you?

2    A    Yes.

3    Q    And there were times where you prescribed the same

4    regimen of medicines that a person was taking and there

5    were times where you changed the regimen of the medicine

6    they were taking based on your medical judgment;

7    correct?

8    A    Yes.

9              MR. WILLIAMSON:  I don't have anything

10   further.

11             THE COURT:  Thank you very much, sir.  You're

12   excused.  Next witness please.

13             MS. TREADWAY:  Judge, I'm afraid I'm going to

14   have some availability issues again.  I don't know

15   whether Ms. Mills has returned from her job interview.

16   And I need to go check.  I'm sorry.

17             THE COURT:  It's alright.  We can wait here

18   for a minute and see if she's here.  If not, we'll take

19   another recess.

20             MS. TREADWAY:  I apologize.

21                   (Off-the-record.)

22             MS. TREADWAY:  I apologize, Judge.  It does

23   appear we're going to need another break.  I've been

24   trying to run the trains on time but some days it just

25   doesn't work that way.

3202

1          THE COURT:  All right.  Ladies and Gentlemen,

2     another recess.  Please remember and heed the

3     admonition.

4          MR. WILLIAMSON:  Judge, when we take our time

5     in cross-examination, we have witnesses.  When we hurry

6     up and get through, we have breaks.  I think we should

7     take longer in cross.

8               (Off-the-record discussion.)

9          MS. TREADWAY:  Did you just want me to advise

10     you, Judge, when she arrives?

11          THE COURT:  Yes.  Just come back and get me.

12               (Recess.)

13          THE COURT:  Yes, sir.

14          MR. WAMBLE:  Thank you, Judge.

15                    **CRYSTAL BLACK**

16     Having been first duly sworn to tell the truth, the

17     whole truth and nothing but the truth, testified as

18     follows on:

19                  **DIRECT EXAMINATION**

20     BY MR. WAMBLE:

21     Q   I guess the Government has previously called and

22     already been sworn in Crystal Updegraff.

23          Could you then for the record please state your

24     name.

25     A   Crystal Black.

3203

1    Q    Previously Crystal Updegraff?

2    A    Yes.

3    Q    And who is your current employer?

4    A    IPC Security.

5    Q    And were you employed at the Schneider Medical

6    Clinic from July 2004 to June of 2005?

7    A    Yes.

8              MR. WAMBLE:  And again, Your Honor, we have a

9    demonstrative exhibit, 162.  I believe Ms. Treadway is

10   going to help me with that.

11   Q    When you initially interviewed at the Schneider

12   Medical Clinic, what position were you interviewing for?

13   A    For phones.

14   Q    Also known as a receptionist?

15   A    Correct.

16   Q    And what were your duties as a receptionist?

17   A    Answer the phones, scheduling patients.

18   Q    And shortly after you started as a receptionist, did

19   your job duties change?

20   A    Yes.

21   Q    And what was your promotion to?

22   A    I moved to several positions.  I moved back to

23   medical records and insurance.  And then acting CNA.

24   Q    Okay.  Let's talk about your duties as a medical

25   assistant.  Who gave you that promotion?

3204

```
1    A    Linda.

2    Q    Linda Schneider?

3    A    Yes.

4    Q    And in this position did you learn about certain

5    patients that were only to be seen by the Defendant

6    Stephen Schneider?

7    A    Correct.

8    Q    Could you move closer a little bit.  I'm sorry.  I'm

9    having a little trouble hearing you.

10   A    Yes.

11   Q    And was there a specific name that was used at the

12   clinic for these Schneider patients, Steve Schneider

13   patients?

14   A    VIP.

15   Q    Who told you to refer to these patients as VIP

16   patients?

17   A    Linda Schneider.

18   Q    And why were they indicated as VIP patients?

19   A    They were to only see Dr. Schneider in order to get

20   their medications refilled.

21   Q    So they were not to see any other physician but

22   Stephen Schneider?

23   A    Correct.

24   Q    May I approach the witness, Your Honor?

25        THE COURT:  Sir.
```

1    BY MR. WAMBLE:

2    Q   Ms. Black, do you recognize the documents I've

3    placed in front of you?

4    A   Yes.

5    Q   And what are they?

6    A   These are fee tickets.

7    Q   And are they kept in the ordinary course of business

8    at the Schneider Medical Clinic?

9    A   Correct.

10   Q   We've had some previous discussions about what fee

11   tickets are, but can you just briefly describe to us how

12   you would use those fee tickets in your job?

13   A   In order to bring the patients back and check 'em in

14   and it gets them to be billed.

15              MR. WAMBLE:  Your Honor, the Government would

16   offer Exhibit 152 pursuant to Rule 806(6) as a business

17   record and an admission.

18              MR. WILLIAMSON:  We would like to take a look,

19   Your Honor.

20              THE COURT:  You may.

21              MR. WAMBLE:  Certainly.

22                     (Off-the-record.)

23              MR. WILLIAMSON:  No objection, Your Honor.

24              MR. BYERS:  No objection, Your Honor.

25              THE COURT:  They're received.

3206

1          MR. WAMBLE:  Your Honor, I misspoke I meant to

2     say Rule 803(6).

3          THE COURT:  I knew what you meant.

4          MR. WAMBLE:  Thank you, Judge.

5     BY MR. WAMBLE:

6     Q    And these are the fee tickets that you would use in

7     the billing and record department?

8     A    Correct.

9     Q    And do these documents contain a special designation

10    in the upper righthand corner of each page?

11    A    Correct.

12    Q    Could you look at at least the first couple pages

13    and tell the jury what specific designation is in the

14    righthand column?

15    A    Only Dr. Schneider.  Dr. Schneider only.  Dr.

16    Schneider only.

17    Q    When you were at the clinic, were there times that

18    patients were scheduled to see Steve Schneider but

19    because it was late in the day someone else was to see

20    them?

21    A    Correct.

22    Q    Were you given any instructions as to what the

23    physician's assistants were to do when seeing these

24    particular patients?

25    A    I honestly cannot remember.

3207

1    Q    Okay.  If there were patients in the lobby and

2    Defendant Stephen Schneider went home for the day, did

3    anyone else see those patients?

4    A    We had physician assistants.

5    Q    And they would see those patients after perhaps

6    5:00?

7    A    If the patient wanted to be seen by them, yes.

8    Q    Were they given a prescription from the Defendant

9    Stephen Schneider even though he wasn't there?

10   A    Yes.

11   Q    And how would this occur?

12   A    Well, it would be a written out prescription that

13   had his signature stamped on it and it was given to them

14   with the permission by Linda Schneider.

15   Q    And do you remember what type of drugs that these

16   particular patients would receive from the PAs or the

17   physician's assistants?

18   A    For narcotics like Lortab or Percocets, Oxycontin.

19   Pain medication.

20   Q    How long would you say that you worked with the

21   Defendant Stephen Schneider?

22   A    For a year at that clinic.

23   Q    And did you work with him at a previous clinic?

24   A    Yes, I did.

25   Q    Was this the Riverside Clinic?

3208

1    A    Yes.

2    Q    And was this around 2001, 2002?

3    A    Yes.

4    Q    What, if anything, can you tell us changed with

5    Stephen Schneider between his time at Riverside when you

6    were there and then when you worked with him when he had

7    his own clinic?

8    A    When I worked with him at Riverside, you were able

9    to communicate with him and he paid attention to

10   everything that he did.  From when we were at Haysville,

11   it was more along the lines of we weren't allowed to

12   talk to him and Linda ran the show at the Haysville --

13   at the Haysville clinic of their own.

14   Q    When you say Haysville, you mean the Schneider

15   Medical Clinic?

16   A    Yes.

17   Q    Was Linda Schneider in charge at the Riverside

18   Clinic?

19   A    At the Riverside Clinic?  No.

20   Q    Did you feel you had the opportunity to talk to

21   Stephen Schneider when he had his own clinic?

22   A    When he was at the Schneider Clinic?

23   Q    Yes.

24   A    No.

25   Q    You remember some of the things that you wanted to

1    talk to Stephen Schneider about but couldn't?

2    A    Yes.

3    Q    What types of things?

4    A    We had patients that would come in that whenever

5    they wanted a refill, they were supposed to have a

6    police report, and some of 'em didn't; and there was

7    some that I knew for a fact that -- had discussed the

8    fact that they were doing early refills and it was just

9    purely off the fact that they wanted it.  And I would

10   try to discuss it with him and I was told not to talk to

11   him about it.

12   Q    And who told you that?

13   A    Linda Schneider.

14   Q    Were you ever in the patient room with Stephen

15   Schneider when there were patients in there?

16   A    No, I was not.

17              MR. WAMBLE:  May I have a moment, Your Honor.

18              THE COURT:  Yes, sir.

19                  (Off-the-record discussion.)

20   BY MR. WAMBLE:

21   Q    Ms. Black, we've had previous discussions before

22   your testimony that there were a lot of fee tickets that

23   were involved in this case.  Arguably, a truckload full.

24   What you have in front of you, are those representative

25   samples of the fee tickets that you saw during your time

3210

1    at the clinic?

2    A    Correct.

3            MR. WAMBLE:  Thank you.  I have nothing

4    further.

5            THE COURT:  Mr. Williamson.

6            MR. WILLIAMSON:  Thank you, Your Honor.

7                    **CROSS EXAMINATION**

8    BY MR. WILLIAMSON:

9    Q    How you doing -- Mrs. Black; right?

10   A    Correct.

11   Q    Okay.  When did you stop working at the clinic?

12   A    Around June.  I can't tell you specifically the

13   date, 2005.

14   Q    Just around 2005.

15   A    Yes.

16   Q    Now, with the "doctor only" fee tickets, you were

17   not in the room when Dr. Schneider would meet with these

18   patients; correct?

19   A    Correct.

20   Q    You don't know if Dr. Schneider requested at certain

21   times to only meet with certain patients because he had

22   information he needed to review with them, do you?

23   A    Not if he did that in the room.

24   Q    Are you aware if the Government is alleging on one

25   hand that the clinic would let these patients see

3211

1    multiple providers, but now they're showing evidence

2    where there were times when Dr. Schneider didn't want

3    these patients to see multiple providers.  Are you aware

4    of that?

5    A    There was times.

6    Q    Okay.  Now, these prescriptions with these signature

7    stamps, which patients did you see walk out with

8    prescriptions that Dr. Schneider had signed for but was

9    not there?

10   A    Are you asking me specifically which patients?

11   Q    Yes.

12   A    I can't remember the patients --

13   Q    Okay.

14   A    -- names.

15   Q    Did you review the prescription when they would

16   leave?

17   A    Yes.

18   Q    You would look at it and say -- you would look at

19   it, the actual prescription itself?

20   A    Yes.

21   Q    And how often did this happen?

22   A    It would happen rather often.

23   Q    Okay.  Between what years?

24   A    The time that I was there from 2004 to 2005.

25   Q    How many times between 2004 and 2005 did it happen?

3212

1   A   I can't count the -- numerous times.

2   Q   You understand that physician's assistants were able

3   to write their own prescriptions, don't you?

4   A   Correct.

5   Q   Okay.  So what physician's assistants were writing

6   prescriptions on Dr. Schneider's presigned pads?

7   A   They used the stamp for Dr. Schneider.  He had

8   prewritten it out for the patient.

9   Q   Who?

10  A   Well, we had --

11  Q   I'm sorry.  Let me rephrase that.  Which physician's

12  assistants?

13  A   Well, there was Tim and Kim and there was Curtis.

14  Q   You understand Kim and Curtis had their own DEA

15  number, do you not?

16  A   Correct.

17  Q   So which PA never had a DEA number that had to rely

18  on Dr. Schneider's pads to send them out?

19  A   I wouldn't know that.

20  Q   Did you ever tell Dr. Schneider that somebody is

21  sending out prescriptions on your pad while you're not

22  here?

23  A   I tried to.

24  Q   Did you tell him?

25  A   I was not able to.  Any time I approached him, Linda

1    would tell me not to.

2    Q    Okay.  And all I'm concerned about is what he knew

3    from you.  You never specifically told him that;

4    correct?

5    A    Correct.

6    Q    Okay.  Now, did you send a letter to the -- to any

7    law enforcement while you were working there stating

8    that somebody in this clinic is sending out false

9    prescriptions while Dr. Schneider is not there?

10   A    No.

11   Q    He never came to you and said:  Crystal, let anybody

12   in my clinic write prescriptions on presigned pads,

13   don't mention it, did he?

14   A    No.

15   Q    Now, you worked with Dr. Schneider over at

16   Riverside; correct?

17   A    Correct.

18   Q    And based on that relationship that you had

19   developed with him, you were asked to come over to the

20   Schneider Medical Clinic; correct?

21   A    Actually I came over there when I didn't have a job.

22   It had been a couple years in between.

23   Q    Okay.  So you had a prior relationship with Dr.

24   Schneider.  And you went up here without a job, and then

25   you went a period without a job, and then you went back

3214

1    to Dr. Schneider and the clinic gave you a job?

2    A    Correct.

3    Q    Now, Dr. Schneider's practice at the Schneider

4    Medical Clinic was considerably more busy than it was

5    when he was at Riverside; correct?

6    A    Correct.

7    Q    You all were seeing a whole lot more Medicaid

8    patients that he did not see when he was at Riverside;

9    correct?

10   A    Correct.

11   Q    You were seeing a lot of more pain patients at

12   Riverside -- excuse me -- at the Schneider Medical

13   Clinic that he wasn't seeing at Riverside; correct?

14   A    Correct.

15   Q    And you were able to see, when Dr. Schneider

16   actually had time to visit with patients, you got to see

17   what he was able to do with those patients as opposed to

18   when he was rushed through and had to see those

19   patients; correct?

20   A    Correct.

21   Q    Okay.  And if you thought Dr. Schneider was just

22   this drug dealer when he was at Riverside, you wouldn't

23   have taken a job with him over at Schneider Medical

24   Clinic, would you?

25   A    No, he was different.

3215

1    Q    Okay.  And did you ever have conversations with Dr.

2    Schneider at all?

3    A    When he was at Riverside?

4    Q    At the Schneider Medical Clinic.

5    A    Not at Schneider Medical Clinic.  I wasn't allowed

6    to.

7    Q    Okay.  And did you learn while you were at the

8    Schneider Medical Clinic that these Medicaid patients,

9    the office visits, paid a whole lot less than what he

10   could bill under normal circumstances?

11   A    Yes.

12   Q    And when you saw Dr. Schneider over at Riverside did

13   he -- strike that.

14        Now, were you terminated from the clinic in '05?

15   A    No.

16   Q    Okay.  Did you ever get disciplined for falling

17   asleep at the front desk?

18   A    No.

19   Q    You never saw the clinic advertise being a pain

20   management clinic, did you?

21   A    No.

22   Q    Okay.  And based on your observations, the Medicaid

23   patients, would you consider them to have been a

24   difficult population of patients?

25   A    What do you mean difficult?

3216

1    Q    Did they have a lot of medical issues?

2    A    Some would.

3    Q    Okay.

4              MR. WILLIAMSON:  One second, Your Honor.

5                        (Off-the-record discussion.)

6              MR. WILLIAMSON:  Nothing else, Your Honor.

7              THE COURT:  Mr. Byers?

8              MR. BYERS:  Thank you, sir.  Very briefly.

9                        **CROSS EXAMINATION**

10   BY MR. BYERS:

11   Q    Good afternoon.  How many times have you been

12   interviewed by the Government since you quit the

13   Schneider Medical Clinic?

14   A    About two times.

15   Q    Did you testify in the grand jury?

16   A    I'm sorry.

17   Q    Did you testify at a grand jury?

18   A    No.

19   Q    It would be a whole body of people like this.

20   A    No.

21   Q    Do you remember where those interviews took place

22   with the government agents?

23   A    I don't remember.

24   Q    Do you remember who the government agents were?

25   A    I can point them out by face.

3217

1   Q   Do you see any of them in here?

2   A   Right there.

3   Q   Who's that?  Okay.  Ms. Treadway?

4   A   Yes.

5   Q   Did you ever give a deposition relative to the

6   Schneider Medical Clinic?

7   A   Deposition?

8   Q   Like a sworn statement in a civil proceeding.

9   Lawyers would have asked you questions, lawyers on each

10  side of a case.

11  A   We had -- I don't remember.

12  Q   Now, I believe I heard you say on direct testimony

13  that you started out as a receptionist; correct?

14  A   Correct.

15  Q   Then you moved to medical records; correct?

16  A   Correct.

17  Q   And then you moved to insurance?

18  A   Correct.

19  Q   And then you moved to acting CNA?

20  A   Correct.

21  Q   What is an acting CNA?

22  A   They had me check-in patients in rooms, and pulse,

23  and I would actually go in there with the doctors or the

24  PA's, would go in there for certain procedures and find

25  out what they were coming in for.

3218

1    Q    And are you using CNA to stand for Certified Nurse

2    Assistant?

3    A    Correct.

4    Q    Were you a Certified Nurse Assistant at that point?

5    A    No.

6    Q    And is that what the -- essentially is that what

7    other people might call roomers, people who would take

8    the chart from here to there, put it on the door, take

9    the vitals, record the vitals and then stick the chart

10   there for the doctor?

11   A    Correct.

12   Q    Okay.  Now, these VIP patients you talked about, I

13   believe I heard you say that Linda Schneider told you

14   they only wanted to see Dr. Schneider in order to get

15   their pain meds.  Is that what she told you?

16   A    The majority of them, yes.

17   Q    Okay.  She never told you anything about these

18   people could only be seen by Dr. Schneider because they

19   wouldn't be reimbursed for a PA visit?

20   A    No.

21   Q    You know nothing about that?

22   A    No.

23   Q    Do you know anything about if those patients

24   requested to see Dr. Schneider because maybe he had been

25   their physician for 20 or more years?

3219

1    A    There was maybe one or two that would do that.

2    Q    How would you know those patients from these other

3    ones?

4    A    I could recognize them by face.

5    Q    You were trained by Sherrie Mills when you went down

6    to billing; correct?

7    A    Correct.

8    Q    And then when you went to insurance, how is that

9    distinct?  What was insurance?

10   A    I would have to check and make sure the insurance

11   was in there, make sure they filed it correctly, had

12   written down everything correctly on the paperwork for

13   which insurance and what they were billing for, for that

14   insurance.

15   Q    Now, you know that at least one assistant or roomer

16   got fired for falsifying vitals; correct?

17   A    Correct.

18   Q    And you told the Government about that on a February

19   7th, 2006, interview?  You talked about this fella named

20   Jeff being fired because of the false vitals; correct?

21   A    I don't remember.

22   Q    Were you reprimanded at any point in time while you

23   were employed at Schneider Medical Clinic?

24   A    No.

25            MR. BYERS:  That's all I have, Your Honor.

3220

1    Thank you.

2              THE COURT:  Yes, sir.

3              MR. WAMBLE:  Just briefly, Your Honor.

4                    **REDIRECT EXAMINATION**

5    BY: MR. WAMBLE:

6    Q    Mrs. Black, this may have gotten lost in

7    translation, but were these completed prescription pads

8    that were left by Defendant Steve Schneider to be given

9    out after 5:00?

10   A    They were completed.

11   Q    So they had the drug that the patient was supposed

12   to receive and then his rubber stamp signature?

13   A    There was either a stamped signature or either the

14   PA would stamp it.

15   Q    But otherwise it was filled out as to which drugs

16   were supposed to be dispensed?

17   A    Correct.

18   Q    You mentioned on cross-examination that you were

19   promoted to CNA and that stands for Certified Nurse's

20   Aid?

21   A    Correct.

22   Q    And did you have any certification to be a nurse's

23   aid?

24   A    No.

25   Q    Did you receive any training before you received

3221

1    this promotion?

2    A    No.

3    Q    Did you receive any training after you received this

4    promotion?

5    A    Just through the other CNAs that had been working

6    there.

7    Q    Just kind of watching?

8    A    Yes.

9    Q    Otherwise, before then did you have any formal

10   medical training?

11   A    No.

12            MR. WAMBLE:  Thank you.  I have nothing

13   further.

14            THE COURT:  Gentlemen, do you have any

15   questions?

16            MR. WILLIAMSON:  One second, please, Your

17   Honor.

18                 (Off-the-record discussion.)

19                 **RECROSS EXAMINATION**

20   BY MR. WILLIAMSON:

21   Q    One question.  Maybe two.

22        It's true, is it not, that pharmacies will not

23   accept prescriptions with a rubber stamp; isn't it?

24   A    I wouldn't know.  I don't work at a pharmacy.

25   Q    You don't work at a pharmacy.  Okay.

```
1              MR. WILLIAMSON:  I don't have anything
2    further.
3              MR. BYERS:  Nothing, Your Honor.  Thank you.
4              THE COURT:  I'm a little confused about your
5    designations.  You said you were an acting CNA?
6    A   Correct.
7              THE COURT:  Is that a title that -- did you
8    wear a badge or something that said acting CNA or is
9    this something that somebody told you that's what you
10   were?
11   A    No, sir.  Whenever they put me back there, that's
12   what the CNA's would do, so we called it an acting CNA.
13   And some people called it rooming.
14             THE COURT:  So it was just a title that was
15   within the clinic itself?
16   A   Correct.
17             THE COURT:  All right.  But you -- I think
18   that's the only question I have.  Thank you very much.
19   You're excused.
20   A   Thanks.
21             THE COURT:  Next witness, please.
22             MS. TREADWAY:  Government calls Sherrie Mills.
23                       SHERRIE MILLS
24   Having been first duly sworn to tell the truth, the
25   whole truth and nothing but the truth, testified as
```

3223

1    follows on:

2                        **DIRECT EXAMINATION**

3    BY MS. TREADWAY:

4    Q    Good afternoon.   Could you please introduce yourself

5    to the jury.

6    A    Hi.  My name is Sherrie Mills.

7    Q    And are you currently employed, Ms. Mills?

8    A    No, I am not.

9    Q    Did you previously work for a doctor named Dr.

10   Wheeler?

11   A    Yes, I did.

12   Q    What kind of doctor was he?

13   A    A cosmetic surgeon.

14   Q    And did he retire on you?

15   A    He retired his practice, yes.

16   Q    What did you do for Dr. Wheeler's office?

17   A    I was actually jack-of-all-trades.  I did

18   scheduling.  I did charges.  I did payment posting.

19   Yeah.

20   Q    So kind of a girl Friday?

21   A    Correct.

22   Q    How long have you worked in the medical industry,

23   Ms. Mills?

24   A    Approximately 15 years.

25   Q    And in that time of that 15 years have you done a

3224

1      lot of medical billing?

2      A    Yes, I have.

3      Q    Did you previously work at the Schneider Medical

4      Clinic?

5      A    Yes, I did.

6      Q    Did you work at the clinic from approximately June,

7      2004, through May, 2006?

8      A    That's correct.

9      Q    I think we have you on our Exhibit 162.  We're

10     keeping a chronological picture of when people worked.

11          What were you hired to do at the Schneider Medical

12     Clinic in about June of '04?

13     A    I was hired to work in the billing office, to do

14     billing.

15     Q    And who hired you?

16     A    Linda.

17     Q    And who did you replace?

18     A    I replaced Brenda Whitehead.

19     Q    And I believe we met her earlier today and her name

20     is now Maurer?

21     A    Oh, okay.

22     Q    Who was your supervisor when you worked at the

23     clinic?

24     A    Linda.

25     Q    During the time you worked there, which was

1    approximately two years, did the providers use a

2    dictation service for their progress notes?

3    A    Not to my knowledge.

4    Q    Were progress notes ever done electronically?

5    A    Not to my knowledge.

6    Q    And did you ever see that the clinic moved to

7    electronic medical records?

8    A    If they did, I wasn't there at that time.

9    Q    Now, the testimony in this case has been that the

10   Schneider Medical Clinic used what they called fee

11   tickets as basic billing paperwork.  You remember those

12   fee tickets?

13   A    Yes, I do.

14   Q    I'm going to hand you a group of those which we've

15   identified as Government Exhibit 153.  Have you had an

16   opportunity to look at those prior to your testimony

17   today?

18   A    Yes.

19   Q    And are those a representative sample of fee tickets

20   that would have come through your billing department?

21   A    Yes.  They look the same.

22   Q    They're not every fee ticket in the world, but just

23   a representative sample?

24   A    Yes.

25   Q    Now, I would first like to -- I'm sorry --

 1              MS. TREADWAY:  Government would offer Exhibit

 2     153, Judge.

 3              MR. WILLIAMSON:  No objection.

 4              MR. GOROKHOV:  No objection.

 5              THE COURT:  They're received.

 6     BY MS. TREADWAY:

 7     Q   Now, I'd like to review with the jury how the fee

 8     tickets would work their way through the clinic and end

 9     up in the billing department during the time you worked

10     there, which was after Ms. Whitehead Maurer, from June

11     of '04 to May or June of '06.

12     A   Okay.

13     Q   Tell the jury about that.

14     A   The process was the girls would pull charts for in

15     the morning, for the patients that were coming in, the

16     night before.  And those fee tickets were placed on the

17     chart so when the physician's assistant come out, or

18     somebody come out to get the patient -- those -- they

19     were placed on the chart and brought back to the

20     doctor's room.  From there I guess the doctor's did

21     their marks, charges.  And from there they went -- I

22     believe they either went to Marty for coding or they

23     went back to Linda.

24     Q   Now, once the fee tickets came to the billing

25     department, how were they used to submit claims to the

3227

1    insurance companies?

2    A    They were used by entry.  You would actually enter

3    charges off of the charge sheet into a computer and that

4    would create a bill to be billed electronically.

5    Q    All right.  Did you bill the office visit codes as

6    they appeared on the fee tickets?

7    A    I didn't enter the charge tickets.

8    Q    Who did?

9    A    Katherine.

10   Q    And who is Katherine?

11   A    Katherine done charge entry in the billing office.

12   Q    And what was her last name?

13   A    I believe her last name was Gains.

14   Q    And was she related to Linda Schneider?

15   A    I believe she was related by -- through marriage.

16   Q    By marriage.  Did Katherine use the fee tickets to

17   bill and key in the electronic claims that eventually

18   got submitted to the insurance companies?

19   A    She entered the charges from the fee tickets;

20   correct.

21   Q    Fee tickets.  And the CPT code for the office visit.

22   Did Katherine have the ability to make her own decisions

23   about which CPT code to enter or would she enter it

24   right off the fee ticket?

25   A    She was, to my knowledge, entering it off the fee

3228

1    ticket.

2    Q   So, who was responsible for marking the codes for

3    the office visits on the fee tickets before they came to

4    you in the billing department?

5    A   The doctor.

6    Q   Now I want you to look back at Exhibit 153 that you

7    had an opportunity to review.  Do all of these in your

8    stack have one common feature with regards to the CPT

9    codes?

10   A   Some of 'em have been marked through and a different

11   level circled.

12   Q   Have all of them been changed in the same respect?

13   A   Yes.

14   Q   And have all of them been changed to a higher

15   billing code?

16   A   From what I see, yes.

17   Q   And would that result in the clinic receiving more

18   money?

19   A   Yes.  A higher level would cause you to get higher

20   reimbursement on your office visit.

21   Q   Based on your employment at the clinic, and

22   specifically your work in the billing department, what

23   was the primary code on which the clinic made its money?

24   A   That's unknown.

25   Q   Was it an office visit code, or was it some other

3229

1   procedure code?

2   A   They were office visits.

3   Q   I asked my question poorly but I got where I needed

4   to go.

5   A   That's fine.

6   Q   Was there one person in the clinic who reviewed all

7   the records before those records ended up in the billing

8   department?

9   A   I don't know who that was.

10   Q   You don't remember Linda reviewing the charts before

11   they came to the billing department?

12            MR. GOROKHOV:  Objection.

13            THE COURT:  Sustained.

14   BY MS. TREADWAY:

15   Q   Did Defendant Linda Schneider ever tell you who she

16   thought could do medical billing?

17   A   She said that monkeys could do billing.

18   Q   Monkeys could do billing?

19   A   Uh-huh.

20   Q   Did Defendant Linda Schneider ever make specific

21   requests for information about Medicaid insurance

22   regulations?

23   A   Yes, she did, for pain management.

24   Q   Did you provide those to her?

25   A   Yes, I did.

3230

1    Q    Ms. Mills, you eventually left your employment at

2    the clinic.  Did you resign or were you terminated?

3    A    I resigned my position.

4    Q    When you were employed at the clinic, were there

5    things you witnessed and observed that concerned you?

6    A    Yes, there was.

7    Q    What?

8    A    Practices where doctors were -- or the PA's were

9    being billed under doctors and things like that.  My

10   computer sign-on for one.  There was some billing done

11   under my sign-on, my password.

12   Q    That you hadn't done?

13   A    That I had not done.  And nobody else should have

14   had that information on how to get onto my computer.

15   Q    Did the Defendant Linda Schneider ever countermand

16   billing instructions that you would give?

17   A    Yes.

18   Q    And what would she do in countermanding your

19   instructions?

20   A    She would tell the other staff to do something

21   totally different than what I had instructed them to do.

22   Q    And do you believe you instructed the staff to do it

23   correctly?

24   A    Yes, I do.

25   Q    And what did Defendant Linda Schneider instruct the

3231

1    staff to do?

2    A    What she believed was what she wanted billed.

3    Q    The evidence has been, Ms. Mills, that there was a

4    federal search warrant executed at the clinic on

5    September 13th, 2005.  Were you at the clinic that day?

6    A    No, I was not.

7    Q    Nevertheless, at some point in time you heard about

8    the search and you knew there was an investigation under

9    way?

10   A    Correct.

11   Q    As a result of that, did you write a letter to rally

12   support for the clinic or the Defendants?

13   A    Yes, I did, for Dr. Schneider.

14   Q    Now, Ms. Mills, the evidence has been that the

15   Defendant's prescription practices contributed to

16   multiple overdoses and overdose deaths.  When you wrote

17   that letter to rally support for the Defendant Stephen

18   Schneider, did you know about that?

19   A    No, I did not.

20   Q    If you had known about the overdoses and the

21   overdose deaths, would you have written that letter of

22   support?

23   A    Absolutely not.

24   Q    Why did you leave your employment with the Schneider

25   Medical Clinic, Ms. Mills?

1    A    For unethical practices.  When you approach a

2    supervisor and tell her that somebody is doing billing

3    under your sign-on, and your supervisor -- and her

4    response is who did you give your password to.  No.

5    Q    You were out of there?

6    A    Right.  Correct.

7              MS. TREADWAY:  Nothing further.

8              THE COURT:  Yes, sir.

9                      **CROSS EXAMINATION**

10   BY MR. GOROKHOV:

11   Q    Good afternoon.

12   A    Hi.

13   Q    I believe we met once before; isn't that right?

14   A    I believe so.

15   Q    Okay.  And we discussed how things worked at the

16   clinic and you were very helpful in explaining to us how

17   that worked.  Isn't that right?

18   A    Somewhat, yeah.  What I knew, yeah.

19   Q    Okay.  Now, let's start at the beginning.  Prior to

20   being hired at Schneider Medical Clinic you were -- you

21   had experience in billing; is that correct?

22   A    Yes, it is.

23   Q    Okay.  And how many years experience did you have?

24   A    I have approximately about 15 years billing

25   experience.

3233

1    Q   Okay.  And that included training, seminars and so

2    forth?

3    A   Correct.

4    Q   Okay.  And when you came on, you had a couple weeks

5    where you were trained by Ms. Whitehead or Maurer, she

6    now goes by Maurer?

7    A   Yeah.  It might have been close to two weeks.

8    Q   Okay.  And did Ms. Maurer seem like she understood

9    what was going on in the billing department?

10   A   Yes, she did.  She seemed very educated,

11   knowledgeable in billing.

12   Q   And she told you what you needed to know to take

13   over the billing department; correct?

14   A   In a two weeks time she went over probably basics on

15   what was going to need to be done in the business

16   office.

17   Q   But eventually you kind of learned your way around

18   and learned how things worked?

19   A   Yes, uh-huh.

20   Q   Okay.  Now, you went through with Ms. Treadway --

21   I'm sorry -- strike that.

22       Ms. Treadway had you go through kind of how things

23   flowed through the clinic when the patients arrived,

24   when the fee ticket was generated and so forth and I'd

25   like to go through that with you because I think it's

3234

```
 1    really, really important for the jury to see that in

 2    detail.  Okay.  Is that all right?

 3    A    Sure.

 4    Q    And we're going to have our paralegal, Mr. Hamm,

 5    diagram that for the jury as we talk.  And if you see

 6    anything that's not correct or needs to be changed,

 7    please let us know and we'll have Mr. Hamm get it right.

 8    Okay?

 9    A    Okay.

10    Q    The only concern is I'm worried that the jury won't

11    be able to see it over here.  Maybe I should stand over

12    here if that's all right.

13              THE COURT:  Wherever you want.  Just make sure

14    they can see what he's doing.  And that she can see what

15    he's doing.

16              MR. GOROKHOV:  If I'm in the way, please let

17    me know.

18    BY MR. GOROKHOV:

19    Q    So let's start at the beginning.  The patient comes

20    in and they go to the front desk first; correct?

21    A    Correct.  And they check-in, yes.

22    Q    Now, is the fee ticket generated by the front desk

23    initially when it's blank?

24    A    I don't recall that.  But I do know they are put on

25    the charts.
```

3235

1    Q   Okay.  They're put on the charts when the patient
2    comes in?
3    A   Right.
4    Q   And then the patient is taken back by roomer or a
5    medical assistant.  Is that right?
6    A   Correct.
7    Q   Okay.  When the patient is taken back by a roomer or
8    medical assistant, the fee ticket goes with them?
9    A   It's on the chart, yes.
10   Q   It goes with the chart?
11   A   Yes.
12   Q   And after the medical examiner or roomer sees the
13   patient, do they then get seen by that -- the provider?
14   A   Yes.
15   Q   And that would be the PA or the doctor?
16   A   Correct.
17   Q   And the fee ticket would then go to the PA or doctor
18   for them to fill out; is that right?
19   A   Yes.
20   Q   Okay.  Now, after they're seen by the PA or the
21   doctor, several things can happen; right?
22   A   Correct.
23   Q   They could go to the lab if the doctor sends them to
24   the lab; is that right?
25   A   They could; yes.

3236

```
 1    Q    They can go to the X-ray room to be X-rayed, if
 2    that's what happens?
 3    A    That's true.
 4    Q    Then eventually they may need to go back to the
 5    doctor again after their exam -- I'm sorry -- after
 6    their lab or X-ray; correct?
 7    A    Possibly, yeah.
 8    Q    Or they may need to just -- that may be the end of
 9    their visit; is that right?
10    A    Correct.
11    Q    Okay.  And do you know if the fee ticket goes with
12    them to the lab for the lab to fill out, or how does
13    that work?
14    A    I actually -- I don't know that.
15    Q    Okay.  Now, at some point, tell me what happens to
16    the fee ticket after the provider gets done with the
17    patient?
18    A    From what I knew, it went to coding.
19    Q    Okay.  And who did the coding while you worked at
20    the clinic?
21    A    Her name was Marie.  I can't remember her last name.
22    Q    And do you recall if she was a trained coder?
23    A    I believe she was certified.
24    Q    She was a certified coder?
25    A    I believe so.
```

3237

1    Q    And her job was to put certain codes on the fee

2    ticket; is that correct?

3    A    Correct.

4    Q    What kind of codes would they put on the fee ticket?

5    A    Actually what the doctor writes on the notes as far

6    as a patient's diagnosis.  I mean, she would have to

7    match diagnosis codes accordingly to what he has wrote

8    on the chart or on the ticket, you know, back pain, et

9    cetera.

10   Q    And are those like three digit codes with decimal --

11   some decimals?

12   A    Yes, they are, yes.

13   Q    And do you still have those fee tickets that the

14   Government showed you?

15   A    Yes.

16   Q    Let's look at one together.  I'm looking at Exhibit

17   153, Government Exhibit 153, the very first page.

18   A    Okay.

19   Q    And are these 593.9 -- 599.0, are those the ICD-9

20   codes?

21   A    Those are the diagnosis codes.

22   Q    Okay.  Now, you mentioned at some point before the

23   chart gets to billing it goes through Linda Schneider's

24   office; is that correct?

25   A    Linda or Marty's, yes.

3238

1    Q    Linda or Marty's.  And did you know why it went

2    through Linda Schneider's office?

3    A    I have no idea.

4    Q    You're not aware of the purpose of that; correct?

5    A    No, I'm not.

6    Q    Now, eventually after the fee tickets are coded,

7    they make their way down to the billing department;

8    correct?

9    A    Correct.

10   Q    Okay.  And can you just tell us the steps in the

11   billing department that the fee ticket follows as it

12   goes through the billing department?

13   A    When it goes down to the billing department,

14   Katherine enters the charges off of the fee ticket here

15   and it creates an electronic claim that later the next

16   day will probably be electronically billed by me -- or

17   was billed by me.

18   Q    Okay.

19   A    And I guess those tickets are bundled up and put in

20   boxes for storage.

21   Q    Okay.  And the electronic claim, is that the -- the

22   same version of that is a CMS 1500 form; is that

23   correct?

24   A    Yes.

25   Q    And what is the electronic claim form called?

3239

```
1    A    It is a 1500 as well but it's an electronic claim.

2    Q    I understand.  So it's the same thing, just in an

3    electronic version?

4    A    Right.

5    Q    Okay.  Now, who else did posting other than

6    Katherine?  Do you remember if there was anyone else?

7    A    I believe there was somebody else at one time that

8    had help with posting but I don't remember who.  I do

9    remember that she needed help or something.  I don't

10   remember who.

11   Q    But Katherine or a person in her job would not have

12   the ability to submit the claim on her own.  It would

13   have to be a supervisor like you; is that right?

14   A    Somebody that had the capability to bill the claims,

15   yeah, through the electronic system.

16   Q    After the claim was submitted to the insurance

17   company, were there times when it came back to the

18   billing department?

19   A    Yeah.

20   Q    And what is that process called when it comes back

21   due to some formal --

22   A    It's a rejected or denied claim.

23   Q    And what are some reasons why it could be rejected

24   or denied?

25   A    It could be rejected or denied for -- sometimes I
```

3240

 1    got a mismatch date-of-birth.  That needs to be looked

 2    at.  Your insurance, oh, your numbers could be

 3    transposed for the number.  You have to check your

 4    insurance card again.  Sometimes it could come back for

 5    invalid diagnosis code.

 6    Q    And whose job would it be to deal with those

 7    problems when the chart got kicked back?

 8    A    When a claim got kicked back electronically, it was

 9    me.

10    Q    Was it your responsibility to deal with that?

11    A    Right.  To fix what was wrong with it, yeah, the

12    date-of-birth, whatever.

13    Q    Okay.  So look at this chart here.  Does that give a

14    pretty good indication of what happens with the fee

15    ticket as it goes along through the clinic?

16    A    Yeah, I suppose, yeah.

17    Q    And so you would agree that's fairly accurate based

18    on your memory?

19    A    Based on -- yes.

20    Q    Now, your function at the clinic was to oversee the

21    employees in the billing department; is that correct?

22    A    I was a supervisor, yes.

23    Q    And you were pretty knowledgeable in the rules of

24    the insurance companies?

25    A    Yes.

1   Q   And one of your roles in your job was to make sure

2   that these insurance companies were doing -- I'm sorry

3   --  that the rules of those companies were being

4   followed?

5   A   To the best I could, yes.

6   Q   And one of the things you did was when a change, you

7   know, when there was a change in the policies, you would

8   inform people in the clinic that, hey, this company

9   changed their rule, we have to do this differently now;

10  is that right?

11  A   Yes.  If the insurance carrier put out a memo for a

12  different -- for an upset, we could no longer use like,

13  say, this diagnosis code replaces this diagnosis code.

14  So, yeah.

15  Q   And you stayed on top of those or to the best you

16  could?

17  A   Yes.

18  Q   All right.  Now, okay.  When you had questions

19  regarding the policies of the insurance companies, you

20  would sometimes call the insureds; correct?

21  A   Yeah, you called the insurance company.

22  Q   Did anybody ever tell you I don't want you calling

23  them to find out what the rules are?

24  A   No.

25  Q   In your role as a supervisor, how much did you kind

3242

1    of look over people's shoulder to see if they were doing

2    things correctly?

3    A    I wouldn't say I did a lot, no.

4    Q    So you didn't really checkup on the employees?

5    A    Yeah, I would checkup on them but I wouldn't stand

6    over them, no.

7    Q    Okay.  Did you try to occasionally check to make

8    sure they were doing things correctly?

9    A    I would have them come to me if they didn't know or

10   understand what they were doing, their process for that

11   day.

12   Q    So you would expect them to tell you if they thought

13   they were doing something wrong?

14   A    Yeah.  If they didn't know what they were doing.

15   Q    You're also familiar with CPT coding; is that right?

16   A    Somewhat, yeah.

17   Q    And part of your function in the billing department

18   was to kind of oversee that and make sure it was done

19   correctly.  Is that right?

20   A    Overcoding?  No.  I was not overcoding.

21   Q    No.  No, I'm sorry.  You didn't check the CPT codes

22   to see if something seemed unusual or not direct?

23   A    No.  They would come back on the electronic billing

24   if they were incorrect and then they were redirected to

25   the right person that was the coder.

3243

1    Q    So, if something seemed incorrect, it would go back

2    to Marcie?

3    A    If it had to do with a coding issue, yes.

4    Q    Now, when you discovered potential errors in some of

5    the bills and fee tickets and so forth, you went and

6    sometimes checked with Dr. Schneider?  You would ask him

7    questions about his charting or his billing; correct?

8    A    About different levels, yeah.

9    Q    And the medical files of the patients were made

10   available to you?  In case there were any questions, you

11   could always use those; is that right?

12   A    Well, yeah, but we weren't supposed to be doing the

13   coding.  Is that what you're doing -- asking?

14   Q    No.  No.  I'm saying, for example, if there was an

15   issue with who provided the service?

16   A    Yes.  Charts were available but we can't see which

17   doctor actually provided the service for that patient.

18   Q    Did anybody ever tell you not to look at the charts

19   to ensure that it was done correctly?

20   A    Please say that again.

21   Q    Sure.  Did anybody ever instruct you not to look at

22   those charts when you had a question regarding who

23   provided the service?

24   A    No.

25   Q    Okay.  Linda Schneider never told you to upcode

3244

1    providers; is that correct?

2    A   I'm sorry.

3    Q   I'm sorry.  Let me -- we've kind of -- we've kind of

4    been using this terminology of upcoding -- but what I

5    really mean is Linda Schneider never told you to bill a

6    physician -- I'm sorry -- a physician's assistant as if

7    they were a physician; is that right?

8    A   No, she never told me that.

9            MR. GOROKHOV:  I think we're done for now but

10   we may have more later.  Thank you.

11                  (Off-the-record discussion.)

12   BY MR. GOROKHOV:

13   Q   Did she ever tell you or anyone to change the CMS

14   1500 forms not to reflect who actually saw the patient?

15   A   No.

16   Q   Now, you testified about the clinic being raided and

17   in fact there came a time when you had to respond to

18   subpoenas; correct?

19   A   Yes.

20   Q   And you sometimes helped Linda with that task;

21   correct?

22   A   Yes, I did.

23   Q   Linda never told told you to falsify anything in the

24   medical records that were being --

25   A   No.

```
 1    Q    -- as a result of the subpoena --
 2    A    No.
 3    Q    -- correct?  There was one incident where I believe
 4    she told you -- and I may have this wrong -- but I think
 5    they told you that they didn't have a chart.  Is that
 6    correct?
 7    A    I don't know.
 8    Q    Okay.  Now, I want to ask you this question about
 9    handwriting.  We've had a lot of testimony about
10    handwriting.  Did you sometimes have trouble reading the
11    handwriting of Dr. Schneider?
12    A    Yes.
13    Q    And when you had these problems reading that
14    handwriting, you would sometimes go to Marti or even Dr.
15    Schneider himself; right?
16    A    Right.
17    Q    And then they would clear that up?
18    A    Right.
19    Q    And as time went on, you kind of got better at
20    understanding what it was that --
21    A    Depends on what it was, yeah.
22    Q    But just like the progress notes, for example --
23    A    Uhm, I guess.
24    Q    -- did you feel like the progress notes were -- I'm
25    sorry.  Strike that.
```

3246

1        You didn't feel like the progress notes were not

2    complete; correct?  It was just the legibility that you

3    sometimes had a problem with.  Is that right?

4    A    The legibility was a problem at times, yes.

5    Q    But the completeness wasn't an issue; is that right?

6    A    I'm not qualified to answer that.

7    Q    Okay.  I understand.  I want to talk to you about

8    your departure from the clinic.  One of the reasons you

9    left the clinic was because somebody, you believe, had

10   logged-in to the computer and was using your password

11   and made some charges that you didn't do; is that

12   correct?

13   A    Rebilled some claims, yes.

14   Q    Rebilled the claims.  And you don't know who that

15   is?

16   A    No, I don't.

17   Q    Okay.  Taking a little step back, before you left, I

18   believe it was like less than two weeks before you left,

19   you had an interview -- you were interviewed by the -- I

20   believe it was the FBI.  Possibly the KBI.  Is that

21   correct?

22   A    That's correct.

23   Q    And at that interview you talked to them and you

24   answered their questions?

25   A    Uh-huh.

1    Q    Correct?

2    A    Yes.

3    Q    And let's just talk about that a little bit, that

4    first interview.  And that I believe was on June 16th,

5    of 2006.  Does that sound right?

6    A    I don't know.

7    Q    Okay.  At that time the KBI and the FBI asked you

8    some questions about whether you saw there was fraud

9    going on or something else going on in the billing

10   department; is that right?

11   A    Correct.

12   Q    And at that time you stated you didn't believe that

13   there was any fraud; correct?

14   A    At that time I stated that there could probably be

15   some mistakes that people are making, not necessarily

16   maybe fraudulent.

17   Q    All right.  And I believe you called them dumb

18   mistakes, right?  Things that happen because there's so

19   many details and it just gets lost in the mix.  Is that

20   right?

21   A    Sometimes, yes.

22   Q    And you also -- they also asked you if anyone at the

23   Schneider Medical Clinic had told you how to answer

24   their questions; correct?

25   A    Right.

1    Q    And you said no, nobody did?

2    A    Right.

3    Q    Okay.  And you were also shown some billings that

4    actually apparently had your name as the person who

5    submitted the billings and you saw that they were wrong,

6    that they couldn't have been -- because they were billed

7    by a PA -- I'm sorry -- they were billed as if it was a

8    doctor, particularly, I believe, Dr. Schneider, but he

9    was not in the clinic on the weekend; right?

10   A    Right.

11   Q    Okay.  Now, after that interview you went back to

12   the clinic.  Okay?  And you looked and you kind of --

13   you kind of got suspicious, didn't you, after that

14   interview?

15   A    Well, yeah, it makes you wonder what's going on.

16   When people are lookin' at you like the KBI and FBI are

17   looking at your facility, yeah.

18   Q    So, you were pretty nervous about the whole thing?

19   A    Not nervous.  I just didn't like it.  I didn't want

20   my name associated with it.

21   Q    I understand.  And at that point around June 20th

22   you looked in the computer and you said this -- I didn't

23   bill these claims; right?

24   A    Right.  I saw some things in there that I didn't

25   bill because I would know better.  I would know that

3249

1    even though they were billed incorrectly, they weren't

2    gonna get paid anyway so -- I don't know why they billed

3    them like that.

4    Q   At that point you went to Linda and you said I think

5    someone is using my password; is that right?

6    A   Yeah.  I said somebody is using my sign-on to do

7    billing.

8    Q   And did Linda tell you that she knew who it was that

9    did it?

10   A   No, she didn't.

11   Q   Did Linda tell you not to worry about it?

12   A   She said who did you give your billing -- or, who

13   did you give your password to.

14   Q   And did Linda say don't say anything about this to

15   anybody?

16   A   No.

17   Q   Okay.  In fact, then you went to Tim McDonald;

18   correct?

19   A   Yes, I did.

20   Q   And Tim McDonald was kind of the clinic computer

21   guru; isn't that right?  He kind of ran the system?

22   A   Yes, he was.

23   Q   And you told him what had happened?

24   A   Uh-huh.

25   Q   And Tim told you that I can't use your password, I

3250

```
 1    can only change your password; isn't that right?
 2    A    I don't recall what he said.
 3    Q    Okay.  You don't recall what he told you?
 4    A    No, I don't.
 5    Q    We'll get to that in a little bit here.  But long
 6    story short, you were really uncomfortable with this and
 7    you left?
 8    A    Yes.  When somebody is billing under your password,
 9    your sign-on, and you know the claims are incorrect,
10    yeah, you become concerned.
11    Q    I'm going to show you a letter and see if you
12    recognize that.
13    A    Yes.
14    Q    Is that your resignation letter of I believe June
15    21st, 2006?
16    A    Yes.
17    Q    Okay.  Now --
18    A    It was mailed.
19    Q    I'm sorry?
20    A    It was mailed in.
21    Q    You mailed it in?
22    A    Uh-huh.
23    Q    So you must have quit the day before or something
24    like that?
25    A    Yeah.  I -- it was probably -- I had probably been
```

1    gone maybe five days when I submitted that.

2    Q   So you -- in fact, I think you previously told us

3    that you just got your stuff and left?

4    A   I did.

5    Q   Okay.  Now, does this letter say anything about the

6    computer issue, the log-in, somebody using your

7    password?

8    A   No, it does not.

9    Q   After you quit the clinic, you went and met with the

10   law enforcement authorities again; correct?

11   A   Yes.

12   Q   Okay.  And this time you had a little bit more of a

13   detailed discussion with them about what was going on;

14   is that right?

15   A   Probably the same.  I mean, probably about the same

16   amount of time and discussion.

17   Q   Okay.  At that time you talked to them about this

18   computer problem; isn't that true?

19   A   Yes, I did.

20   Q   And you told them that there were two ways that this

21   wrong incorrect billing could have occurred.  Isn't that

22   right?

23   A   I don't have that information in front of me.  I

24   don't remember the whole story that we talked about.

25   Q   Sure.  Let me give you the report and you can review

3252

 1   it and see if that refreshes your recollection?

 2   A   Sure.  Where did you obtain this from?

 3   Q   This was given to us by the Government.

 4   A   Okay.

 5   Q   And you didn't get a chance to review this before

 6   your testimony today?

 7   A   No, I did not.

 8   Q   Okay.  Why don't you just start here, and this is

 9   the part that talks about that discussion that you had.

10   Okay?

11   A   Okay.

12                         (Witness complies with request.)

13   BY MR. GOROKHOV:

14   Q   I'm sorry.  It's a rather lengthy statement.  I

15   apologize.

16                         (Witness continues to comply

17                          with request.)

18   A   Okay.  I remember saying this.

19   Q   Okay.  Do you want to hang onto it?  That's fine if

20   you need to refer to it.

21   A   Okay.

22   Q   So, just a couple questions here.  You talked to the

23   investigators about how this possibly could have

24   happened; correct?

25   A   Uh-huh.

3253

1    Q    One of the ways it could have happened is that when

2    you get these, these kicked back charges, sometimes you

3    have the employee go into the system and fix the charge

4    and at that time they could have changed the provider as

5    if it was a doctor rather than a PA.   Correct?

6    A    It gives you a drop down box to correct if you've

7    billed the wrong physician and you rebill the claim as a

8    corrected claim.

9    Q    And, in fact, you told law enforcement that you

10   wouldn't have known if it happened in that manner;

11   correct?

12   A    I think maybe we're getting something mixed up here.

13   Q    Let me rephrase.   I think what you told the

14   investigators -- and you correct me if I'm wrong --

15   but -- that if one of your employees had changed this

16   and mistakenly or intentionally changed it to a

17   provider, a physician rather than a PA --

18   A    Uh-huh.

19   Q    -- then you wouldn't have known about it?

20   A    I would if their provider number wasn't being used.

21   I, mean that's the only way you know in the electronic

22   billing system.   That's how I knew these claims were

23   being billed wrong because they were being put back

24   under a provider number that was no longer valid.

25   Q    And the other way that this could have occurred is

3254

1    that somebody found out your password and used it?

2    A    Yes.  And they could -- then they could go back in

3    and manage that.

4    Q    Did you give your password to anyone?

5    A    At one time I was asked to train another employee to

6    do electronic billing and I gave my password to Mark

7    just for training.  Mark Friend.

8    Q    Mark Friend.  Okay.

9    A    And after that training, I changed my password.

10   Q    So, you changed your password after that and the new

11   password you didn't give to anybody; correct?

12   A    Correct.

13   Q    Now, you actually had yet another meeting with law

14   enforcement; right?  A third meeting?

15   A    I believe I had three, yeah.

16   Q    At that meeting you provided some more information

17   and then you said I'd be willing to help you any way I

18   can answer, you know, answer questions that you have

19   about the clinic or the billing process or whatever.  Is

20   that generally right?

21   A    If I have that knowledge, yes.

22   Q    After that occurred, did anyone in the Government

23   take you to the clinic to go through the computer

24   system?

25   A    No, they didn't.

 1    Q   Did the Government send any computer experts to talk

 2    to you about how that system worked and that incident

 3    with the billing?

 4    A   No.

 5    Q   Okay.  To your knowledge is the Government providing

 6    any kind of a forensic computer expert to talk about

 7    this?

 8    A   I don't have any knowledge of that.

 9    Q   Okay.  I believe that's -- actually, one last

10    question.

11        The August 13th interview which was the last one.

12    You told the authorities that Linda Schneider never told

13    you to change or add billing information.  Correct?

14    A   No, she never told me.

15            THE COURT:  I didn't understand your question.

16    Change or what?

17            MR. GOROKHOV:  Change -- it's a bad question.

18    Q   She never told you to change billing information,

19    gave you instructions to change it?

20    A   No.  She never give me instructions to change any

21    billing information.

22            MR. GOROKHOV:  Okay.  That's all I have, Your

23    Honor.  Thank you.

24                      **CROSS EXAMINATION**

25    BY MR. WILLIAMSON:

3256

1   Q   How you doing, Ms. Mills?

2   A   Hi.

3   Q   We did have a chance to meet before; correct?

4   A   Yes.

5   Q   I wasn't too mean towards you at that meeting, was

6   I?

7   A   No, you were very nice.

8   Q   I'll try to be nice here today.  Okay?

9   A   Okay.

10  Q   I shouldn't keep you too long.  Let's just go over a

11  few points that you discussed.  Doing billing and

12  coding, you would agree that can be a very complicated

13  area?

14  A   Yes, it can be.

15  Q   And you've benefited from your years and years of

16  experience?

17  A   Yes, I have.

18  Q   And you would agree that mistakes can happen;

19  correct?

20  A   Yes, I agree with that.

21  Q   And you were asked questions by the federal

22  investigates in regards to ways that a provider -- the

23  way the billing department would identify a provider on

24  a fee ticket.  Remember that?

25  A   Yes.

1    Q    And part of one way you stated was that on the fee

2    ticket they would identify the appointment doctor.

3    Correct?

4    A    Yeah.  It should be on the fee ticket, yes.

5    Q    And would there be times when in that field it may

6    have a physician's name, a strike-out and a physician's

7    assistant's name?

8    A    Yes.

9    Q    And that would represent that the physician's

10   assistant actually saw the patient on that visit;

11   correct?

12   A    Right.

13   Q    And the people who worked under you, they were

14   supposed to interpret that fee ticket that way; correct?

15   A    Correct.

16   Q    Now, and you told the investigators that at least 80

17   or 90% should be correct.  Correct?

18   A    I don't recall that.

19   Q    Okay.  Would you disagree with that?

20   A    Yeah, I would.

21   Q    What percentage do you think should have been

22   correct?

23   A    I really don't have a percentage.  I was going based

24   on when you're entering the charges, not paying

25   attention maybe to who the correct provider you should

3258

1    be billing for.

2    Q    Okay.  And there was another way that was billed at

3    the clinic built-in to determine who the provider was as

4    well; correct?

5    A    Yeah, their scheduling system would printout onto

6    the charge ticket.

7    Q    And you also had sign-in sheets -- or the front desk

8    kept sign-in sheets segregated by provider; correct?

9    A    I don't recall that.

10   Q    Now, your department when they were doing billing,

11   were there times they got behind with their charges?

12   A    Yes.

13   Q    And there were times where it's up to seven months

14   behind?

15   A    I don't know approximate months behind; but, yes,

16   they -- the charges were behind.

17   Q    Cindy Curry testified that they were about five to

18   seven months behind.

19   A    Who did?

20   Q    Cindy Curry?

21   A    Okay.

22   Q    Do you disagree with that?

23   A    I do know they were behind.  I'm not going to give a

24   specific; but, yes, they were behind.

25   Q    Now, you were asked questions by Mr. Gorokhov

1   regarding these edits that could happen.  Remember?

2   A   Uh-huh.

3   Q   Now, the only people who were -- who you've ever

4   seen do a charge edit would be Katherine Gains and Mark

5   Friend; correct?

6   A   And me.  But they're not charge edits.  What you're

7   doing is correcting a claim.  You cannot change charges.

8   Q   Okay.  What is a charge edit?

9   A   What is a charge edit?

10  Q   Yes.

11  A   That's where the person that's entering the charges

12  goes in and edits that charge --

13  Q   Okay.

14  A   -- off of the --

15  Q   You never saw -- Dr. Schneider never came down to

16  the billing department and tried to tell you how to

17  bill; correct?

18  A   No, he never did.

19  Q   He never came down and instructed you to submit

20  false claims to the insurance company, did he?

21  A   No, he did not.

22  Q   In fact, he never asked you to change the billing

23  codes on any fee tickets; correct?

24  A   No, he never did.

25  Q   He never discussed with you the CPT codes that

3260

1    should be used; correct?

2    A    No, he did not.

3    Q    Now, Dr. Schneider himself would have come and asked

4    you to do something fraudulently, would you have stayed

5    with the clinic?

6    A    No, I would have -- no, absolutley not.

7    Q    In fact, when you got concerned that something may

8    have been going on that you didn't know about, you left

9    without even needing the proof that something wrong was

10   going on; right?

11   A    Without proof?  I did have proof.  I mean, I know

12   billing and I knew what I was looking at to know that it

13   was incorrect.

14   Q    Okay.

15   A    So the proof was -- all the proof that was needed

16   was my own.

17   Q    Okay.  Now, did you ever talk to Mark Friend and ask

18   him, had you been logging in under my pass code?

19   A    No.

20   Q    Did you ever talk to Katherine Gaines and ask her,

21   did you ever log in under my pass code?

22   A    No.

23   Q    Okay.  So, again, without knowing who did what, just

24   the thought of something wrong may have happened and you

25   decided to leave; correct?

3261

1    A    I decided to leave based on what I know is right.

2    Q    Okay.  And you were shown Exhibit 153.  You remember

3    that?  Is it in front of you?

4    A    Is this this letter here?

5    Q    No.  I'll take -- that's Mr. Gorokhov's fee tickets.

6    A    Okay.

7    Q    And on there there are marks that strike out, let's

8    say, maybe a Level 2 and they have a Level 3 on there.

9    Correct?

10   A    Right.

11   Q    Now, I think this was touched on both by

12   Ms. Treadway and Mr. Gorokhov briefly, but the files

13   would be sent to a lady named Marty Brown; correct?

14   A    The fee tickets would be sent to Marty, yes.

15   Q    Along with the chart; correct?

16   A    Yes.

17   Q    And it was Marty's job to balance the or compare the

18   written information in the progress note with what's on

19   the fee ticket; correct?

20   A    Correct.

21   Q    And then she would be in charge of determining

22   whether or not, based on her experience, the

23   documentation supported the code that was going to be

24   billed?

25   A    Yes.

3262

1    Q   So, this is another fail safe, or another safeguard

2    that the clinic had in place to at least try to ensure

3    that accurate information was being sent down to the

4    billing department.  Correct?

5    A   I agree.

6    Q   And Marty is human and she's not perfect; correct?

7    A   That's right.

8    Q   And she could have made mistakes?

9    A   Yes.

10   Q   She never came to you and said, I've been instructed

11   to commit these frauds against insurance companies, did

12   she?

13   A   No, she never did.

14   Q   Now, you don't know, at least looking at those 153,

15   if Marty Brown was the person who double checked those

16   fee tickets, checked the documentation, and marked the

17   code that may be appropriate in this situation?

18   A   No.

19   Q   Okay.  You mentioned the letter of support that you

20   wrote for Dr. Schneider?

21   A   Uh-huh.

22          MR. WILLIAMSON:  Your Honor, may I have one

23   second.  I think I've misplaced a document.

24          THE COURT:  Keep looking.

25               (Off-the-record.)

1    Q   I want to just talk to you a little bit about that

2    letter.

3    A   Okay.  Can I ask a question?

4    Q   I'm sorry.  That's not appropriate.

5    A   Oh --

6    Q   Okay.  You sent a letter September 29th, 2005;

7    correct?

8    A   Yes.

9    Q   I'm going to hand you a copy of that letter.  Tell

10   me, does that -- is that the letter that we're talking

11   about?

12   A   Yes, it is.

13   Q   Can you read that for the jury?

14   A   Many of us who have known and loved Dr. Schneider

15   feel powerless in these trying times.  We feel as if our

16   caring doctor who put our lives -- who helped us live

17   better quality of life is now being prosecuted,

18   vilified.  We believe this is unfounded.  So many of us

19   want to help, but we are not sure how we can.  So let's

20   get organized, let's stand together, and be strong for

21   the man who has been our strength.  Let our voices be

22   the voices to make a difference.  Remember, we are the

23   ground swell of people.  Great change starts from the

24   ground up.  God bless each of you.  And thank you for

25   your support, prayers and beliefs.

3264

1    Q    You wrote that letter before you started being

2    interviewed by federal agents?

3    A    That is correct.  With --

4    Q    And you've heard the allegations lodged against Dr.

5    Schneider; correct?

6    A    Yes, I have.

7    Q    While you were working there, if you believed that

8    he was just killing people, you wouldn't have stayed at

9    that clinic, would you?

10   A    No.

11   Q    If you believed he was just killing people, you

12   wouldn't have wrote this letter of support; correct?

13   A    That's correct.

14   Q    And you understand that he has not been convicted of

15   those allegations?

16   A    That is correct.

17   Q    And that he's presumed innocent?

18   A    Until proven guilty, yes.

19   Q    And you believed in that when you first heard about

20   all these allegations; correct?

21   A    Yes.

22   Q    And then you heard about a lot of -- this case in

23   the media a lot?

24   A    I wouldn't say it had to do really with the media.

25   It just had to do with things being produced saying that

1  he was killing patients.

2  Q   Okay.  Who produced that?

3  A   Well, I just mean, you know, people going over the

4  charts and those kind of things.

5  Q   Okay.  So you mean like plaintiff's lawyers?

6  A   I just mean whoever needs to be going over those

7  charts.

8  Q   Okay.

9  A   I mean, apparently that's why he's here is because

10  people are thinking that he's doing wrong by the

11  patients.

12  Q   Right.  And you understand that the Government can

13  be wrong; correct?

14  A   Yes.

15  Q   Now, Dr. Schneider actually saw you as a patient

16  some; correct?

17  A   He saw me a couple of times, yeah.

18  Q   And you had migraines?

19  A   Yes, which I no longer have.

20  Q   Okay.  Great.  And when he saw you as a patient, you

21  didn't complain about his care to you to the Kansas

22  Board of Healing Arts; correct?

23  A   No.

24  Q   Didn't complain -- you didn't quit the clinic

25  because of his care for you; correct?

3266

1    A    No, I did not.

2    Q    In fact, you identified that you had a very good

3    working relationship with Dr. Schneider; correct?

4    A    Yes.

5    Q    Now, when you decided to leave the clinic, you left

6    because of the stressful work environment based on

7    all -- based on the investigations being conducted

8    against the clinic; correct?

9    A    I left because of the billing issues on my computer,

10   people using my billing issues.  (sic)

11   Q    Mr. Gorokhov showed you your termination letter --

12   A    Yes.  I was instructed by my attorney that I didn't

13   have to put anything on there other than that.

14   Q    Okay.

15   A    Okay.

16   Q    And just read to the jury what the notice you gave

17   to the clinic as to why you were leaving?

18   A    I'm sorry.  Please state that again.

19   Q    Read to the jury the notice that you provided to the

20   clinic as to the reason why you were leaving?

21   A    Okay.  It says:  "I, Sherrie Mills, of June 21st,

22   2006, approximately 1:50 p.m., now tender my resignation

23   due to stressful work environment and the legal and

24   civil investigations being conducted of Schneider

25   Medical Clinic."

1        MR. WILLIAMSON:  I don't have anything

2   further, Your Honor.

3        THE COURT:  Redirect please.

4                   **REDIRECT EXAMINATION**

5   BY MS. TREADWAY:

6   Q   Ms. Mills, having worked in the medical industry and

7   the billing industry for about 15 years, who do you

8   understand is responsible for the truth and accuracy of

9   the claims submitted to the insurance companies?

10  A   Right.

11  Q   Who is?

12  A   I'm sorry.

13  Q   Who is responsible for the truth and accuracy of the

14  claims submitted to insurance companies?

15  A   The clinic.

16  Q   And would that have been the DefendantS Stephen and

17  Linda Schneider at the Schneider Medical Clinic?

18  A   Yes.

19  Q   And is that who got paid by the insurance companies?

20  A   Yes.

21  Q   Now, the issue about the rebilling of the claims

22  under your name as you described it to the federal

23  authorities was based on an issue about physician's

24  assistants versus doctors --

25  A   Right.

```
 1    Q    -- is that right?  And you knew based on your
 2    billing experience that some insurance companies didn't
 3    pay for physician's assistants?
 4              MR. GOROKHOV:  Objection.  Leading, Your
 5    Honor.
 6              THE COURT:  Sustained.
 7    BY MS. TREADWAY:
 8    Q    Did you know that some insurance companies paid for
 9    physician's assistants while others did not?
10    A    Yes.
11    Q    And when you saw these rebillings under your name,
12    was that the issue that you saw?
13    A    I can't recall.
14    Q    All right.  Let me hand you something that they've
15    been talking about.  This is your July 14th interview.
16    I'll have you read some highlighted portions and see if
17    that refreshes your recollection.
18    A    I have been very busy today.  Is there any way I can
19    use the restroom and --
20              MS. TREADWAY:  Of course.  Is that the
21    question you wanted --
22    A    That was what I was going to ask.  Honestly, I have
23    had a very, very busy day and I haven't had time --
24              MS. TREADWAY:  I'm sorry.  There's a restroom
25    right in the witness room.
```

```
 1              MR. WILLIAMSON:  Your Honor, I apologize to

 2    the witness for not letting her ask that question.

 3    A    That's quite all right.

 4                    (Off-the-record.)

 5    BY MS. TREADWAY:

 6    Q    First of all, I'd like you to read silently to

 7    yourself that paragraph.

 8    A    Uh-huh.

 9    Q    This paragraph that's highlighted.

10    A    Okay.

11    Q    Then I'd like you to read this other highlighting.

12    A    Okay.

13                    (Witness comples with request.)

14    Q    Does that refresh your recollection about the tie-in

15    between the --

16    A    A little bit.  It's been several years since I've

17    been on that computer system.

18    Q    I understand.  So, when you talked to the federal

19    authorities, were you concerned about how physician's

20    assistants were being billed using your passcode?

21    A    Correct.

22    Q    And were you concerned about that because they were

23    being billed as though the provider was the physician as

24    opposed to the physician's assistant?

25    A    Right.  My concern was the physician was being
```

1    billed instead of the correct person that was providing

2    the services.

3    Q    Now, with regards to Marty Brown and what she coded,

4    did she code diagnosis codes?

5    A    Yes, she did.

6    Q    She didn't code the office visit code, did she?

7    A    No.  The office visit levels were supposed to be

8    chosen by the physician or PA.

9    Q    And that was marked on the fee ticket, and when it

10   came to billing, that's how it would be billed.  Is that

11   how it would happen?

12   A    Right.  They were interpreting it off of this form.

13   Q    Mr. Williamson and Mr. Gorokhov both talked to you

14   about that letter that you wrote right after the first

15   search warrant.

16   A    Yes.

17   Q    Ms. Mills, sitting here today, would you write that

18   letter again today?

19   A    No, I would not.

20             MS. TREADWAY:  Thank you.

21             THE COURT:  Mr. Gorokhov.

22             MR. GOROKHOV:  Very briefly, Your Honor.

23                    **RECROSS EXAMINATION**

24   BY MR. GOROKHOV:

25   Q    I'm going to have you look at the bottom of this

1    statement.  That very well might be what Ms. Treadway

2    just had you look at.

3    A    Okay.

4    Q    When you were originally interviewed by the FBI and

5    the KBI -- or I should say when you originally spoke

6    with them, you had questions regarding Medicaid for

7    mid-level practitioners; correct?

8    A    They asked me that question, yes.

9    Q    And do you recall that you were unsure that PA's

10   were reimbursed at different levels?

11   A    That's right.

12   Q    Okay.  And after the first interrogation took place,

13   you went back and researched the issue; correct?

14   A    Yes, I called Medicaid to verify.

15   Q    And later you found out that they were reimbursed at

16   a lower rate; correct?

17   A    Right.

18   Q    And you told the FBI that the people that you spoke

19   with originally told you that they were reimbursed at

20   the same rate; correct?

21   A    I don't recall that; but I do remember telling an

22   FBI agent that you were right with your speculation.  I

23   called to verify that.

24   Q    Okay.  But you don't recall stating that you spoke

25   with the representative who said that they thought that

1    they were billed at the same level?

2    A    I read that on the statement there that was

3    reported, so that must be so.

4    Q    So, your memory back in '06 would have been better

5    than almost four years later; right?

6    A    Yeah, I've -- yeah, I've slept since then.  I've

7    worked for other medical people.  And I've put this

8    behind me.

9    Q    I understand.  Thank you very much for your time.

10   A    Thank you.

**RECROSS EXAMINATION**

11

12   BY MR. WILLIAMSON:

13   Q    You have a question for me now?

14   A    No, I'm fine now.  Thank you.

15   Q    I'm trying to make up for last time.  Okay.  Just

16   quick about this rebilling.  The rebilling would be if a

17   bill was put in, it was sent to the insurance company

18   and it was kicked back for various -- for some reasons;

19   correct?

20   A    Right.  A rebilling is a claim that you need to

21   resubmit to the insurance carrier as corrected.

22   Q    And that was Mark Friend and Katherine Gaines'

23   responsibility to fix that information and get it back

24   in the loading dock to go back to the insurance company?

25   A    Actually Katherine entered the charges -- I'm going

3273

1    to go over this one more time.

2    Q    That's all right.

3    A    Katherine entered the charges off of this fee

4    ticket.  Once she entered these, they went into an

5    electronic billing system in the computer where you bill

6    to the insurance company.  When you bill those claims to

7    the insurance company, if there were edits that kicked

8    them back or, oh, it could be for needing a modifier, it

9    could be kicked back for that, or invalid policy number

10   maybe, or missing the alpha prefix isn't there, like on

11   the Blue Cross and Blue Shield, so it would give you

12   kickbacks like those to fix those, to fix those problems

13   before you submitted it in to the insurance.  But once

14   you submitted it in to the insurance, and if it came

15   back on an EOB or a remittance advice that there was

16   something wrong --

17   Q    Let me interrupt.  EOB?  For us people who don't do

18   billing, what does that mean?

19   A    An electronic Explanation of Benefits.

20   Q    All right.

21   A    Sorry.

22   Q    That's okay.  Were you finished with your

23   explanation?  You said if it would come back with an --

24   A    If it would come back, if the claim would come back

25   denied from a remittance advice or an EOB, those were

1    resubmitted and sent in.  I don't know where I was

2    leading up with that.

3    Q   Well, whose responsibility was it to remit those?

4    A   Actually, anything that was wrong with the

5    electronic side, if there needed to be something fixed

6    in the electronic billing, it was me.  If it was paper,

7    Mark could do that, I could do that --

8    Q   Okay.

9    A   -- judy could also do that on the commercial side.

10   Q   Okay.  And when these things would have to come

11   back, that would add to the backlog that the clinic had

12   as far as billing; correct?

13   A   Yeah.  You have to -- yeah, you'd have to fix those.

14   Q   Okay.

15           MR. WILLIAMSON:  I don't have anything

16   further.

17           THE COURT:  Well, Ms. Mills, thank you.

18   You've been --

19   A   Thank you.

20           THE COURT:  -- pretty helpful.

21   A   I'm sorry.

22           THE COURT:  You've been very helpful.

23   A   Oh, thank you, sir.

24           THE COURT:  Ladies and gentlemen, we'll take

25   our recess.  And I'll see you tomorrow morning at 9:00.

1    Remember and heed the admonition.

2                         (Recessed for the evening at

3                         4:45 p.m.)