3276

```
 1                    (Beginning at 9:00 a.m. May 19,
 2                    2010, the following proceedings
 3                    were had OUTSIDE THE PRESENCE OF
 4                    THE JURY.)
 5            THE COURT:  Did you want to raise something
 6    before the jury comes out?
 7            MR. WILLIAMSON:  I would, Your Honor.  We
 8    would like to make an oral motion to strike the next
 9    witness as cumulative.  Dr. Rogers worked in the same
10    Via Christi emergency room as a prior witness, Dr.
11    Katan.  Their testimonies are essentially going to
12    mirror each other.  We think we've been here for, what,
13    three, three and a half weeks, calling the same type of
14    witnesses to talk about the same facts is outweighed by
15    403.  More prejudicial than probative.
16            THE COURT:  Who is this next witness?
17            MS. TREADWAY:  Dr. Mark Rogers.
18            THE COURT:  What's he going to say?
19            MS. TREADWAY:  Well, Judge, he's an ER
20    physician that works in the Wichita community.  His
21    testimony is not cumulative of Dr. Katan's for several
22    reasons.  First of all, Dr. Katan has worked in this
23    community for 15 years.  Dr. Rogers has only worked here
24    since about 2004.  He was not a supervisor as was Dr.
25    Katan.  So his observations are only his personal
```

1    observations.  He had different observations during a

2    different time period.  He saw different patients and he

3    had different conversations with the Defendant.  That is

4    key.  This is not needlessly cumulative because we are

5    having to show a conspiracy that had a time-frame,

6    duration over time.  The Defendants have continually

7    argued we didn't get notice.  They have challenged the

8    credibility of every single witness, including Dr.

9    Katan --

10              THE COURT:  Is he the arrogant one?

11              MS. TREADWAY:  They said he was pompous, yes.

12              THE COURT:  He was.

13              MS. TREADWAY:  And therefore, we have the

14   burden of proof and we should be able to present not

15   cumulative evidence and certainly not needlessly

16   cumulative evidence, Judge.  This witness will take 20

17   minutes.

18              THE COURT:  Well, if he's had conversations

19   with the Defendants --

20              MS. TREADWAY:  Yes.

21              THE COURT:  -- the Defendant, I think that's

22   very relevant.  But let's keep it short.  I agree with

23   Mr. Williamson, we've been here a long time and --

24              MS. TREADWAY:  Well, good news is, Judge, that

25   the Government anticipates closing its case as early as

 1    Tuesday next week, or by the latest, Wednesday,

 2    depending on cross.

 3              THE COURT:  Well, that's good news, of course.

 4              MR. WILLIAMSON:  And we may just want to chat

 5    with the Court about scheduling, i.e., dealing with the

 6    Rule 29.  Maybe a short hearing, and giving the Court

 7    time to decide before we have to present our case, if

 8    any.

 9              THE COURT:  Well, I'll give you time to make

10    your motion, but I -- there's no way to really know.  I

11    appreciate that next week we will probably end the

12    Government's case; but beyond that, I don't know.  But

13    anyway, I'll hear what he has to say.

14              MS. TREADWAY:  And we are not asking the same

15    questions of Dr. Rogers that we did of Dr. Katan.  It's

16    a different exam, Judge.

17              THE COURT:  Okay.

18                   (Jury enters the courtroom.)

19              THE COURT:  Please be seated.  Next witness

20    please.

21              MS. TREADWAY:  Judge, before the Government

22    calls its next witness, we have a minor housekeeping

23    matter.  The Government would reoffer Exhibits 10, 11

24    and 12.  We corrected the typographical errors.  The

25    Defendants now have no objection to these exhibits.

3279

1          THE COURT:  All right.  They're received.

2          MS. TREADWAY:  Thank you, Judge.  The

3    Government would call Dr. Mark Rogers.

4                        **MARK ROGERS**

5    Having been first duly sworn to tell the truth, the

6    whole truth and nothing but the truth, testified as

7    follows on:

8                    **DIRECT EXAMINATION**

9    BY MS. TREADWAY:

10   Q    Could you please introduce yourself to the jury.

11   A    My name is Dr. Mark Rogers.

12   Q    And where are you employed, Dr. Rogers?

13   A    Via Christi Hospital.

14   Q    And what do you do at the hospital?

15   A    I'm an emergency physician.

16   Q    And at what locations do you work?

17   A    I work at the St. Francis campus and the St. Joseph

18   campus in Wichita.

19   Q    And how long have you been employed as an emergency

20   room physician here in Wichita?

21   A    Since August of 2004.

22   Q    Could you give the jury a brief educational history

23   starting with your college?

24   A    Undergraduate degree is University of California at

25   San Diego, in engineering.  I have a medical degree from

1   the University of Kansas School of Medicine, Wichita.

2   Graduated in '96.  And I did my emergency medicine

3   residency training at the Cleveland Clinic at Metro

4   Health Medical Center, Cleveland, Ohio.

5   Q   Could you give the jury a brief employment history

6   prior to your current job?

7   A   Okay.  I finished residency in June of '99 and I

8   worked for St. John's Hospitals as an emergency

9   physician in Lebanon, Missouri, for five years; and then

10  after five years working there, I've been at Via Christi

11  since then.

12  Q   Now, when you first worked at Via Christi, were you

13  just a line emergency room physician?

14  A   Yeah.  I mean, I was a staff attending emergency

15  physician and still am.

16  Q   And at some point in time did your duties change?

17  A   About two years ago I became the Assistant Medical

18  Director.

19  Q   In the emergency room do you typically get

20  historical information from a patient regarding the

21  identity of their primary care physician?

22  A   Yes.

23  Q   And as an emergency room physician, do you encounter

24  patients from virtually every physician in town?

25  A   Yes.

1   Q   And from those encounters do you get a feel for how

2   each physician practices?

3   A   Yes.  Definitely.

4   Q   In your capacity as an emergency room physician

5   since 2004, did you treat patients from the Schneider

6   Medical Clinic between the time of the years 2004

7   through 2007?

8   A   Yes.

9   Q   And how would you know that a patient in your

10   emergency room was a Schneider Medical Clinic patient?

11   A   We would ask them.

12   Q   Do you know the Defendant Stephen Schneider

13   personally?

14   A   No.

15   Q   Nevertheless, do you know that he has an association

16   with the Schneider Medical Clinic?

17   A   Yes.

18   Q   And what is that association?

19   A   It's his clinic.

20   Q   During the course of the treatment of the Schneider

21   clinical patients in the years 2004 through 2007 in the

22   emergency room, did you have an opportunity to speak

23   with these patients at length?

24   A   Yes.

25   Q   And did you have the opportunity to observe them?

3282

```
1    A    Yes.
2    Q    Approximately how frequently would you treat a
3    Schneider Medical Clinic patient in your emergency room?
4    A    Every day.
5    Q    Based on your conversations with the patients and
6    your observations of these patients, did you notice any
7    patterns?
8    A    Yes.
9    Q    And how quickly did you notice these patterns?
10   A    Within one week of working there.
11   Q    And did those patterns cause you concerns?
12   A    Yes, they did.
13   Q    What concerns?
14   A    Well, I noticed that there was a pattern of the
15   patients coming in and wanting narcotic scripts and
16   wanting pain medications.
17   Q    Now, did you also notice that you had Schneider
18   Medical Clinic patients coming in that were suffering
19   from overdoses?
20   A    Yes.
21   Q    And withdrawals?
22   A    Yes.
23   Q    And did you experience any overdose fatalities or
24   deaths in the emergency room?
25   A    Yes.
```

3283

```
 1    Q   I have a little chart here to keep us on focus.  The
 2    first name I have here is Dr. Rody; is that right?
 3    A   Uh-huh.
 4    Q   And did he work at the emergency room prior to you?
 5    A   Yes, he did.
 6    Q   All right.  And you said 2004 to now?
 7    A   Uh-huh.
 8    Q   Now, for the next few questions, Dr. Rogers, I'm
 9    going to want you to be making some comparisons for the
10    jury.  Based on your observations not only of the
11    Schneider Medical Clinic patients that came through your
12    ER, but of all the patients that came through your ER in
13    this time, did you have an opportunity to observe a
14    sufficient number of drug overdose admissions to the
15    emergency room to compare the quantity of those overdose
16    admissions from the clinic as compared to all other
17    practices in Wichita?
18    A   Yes.
19    Q   And what is the comparison?
20    A   My estimate would be probably five to one.
21    Schneider overdoses were probably five to one of all the
22    other docs combined.
23    Q   And with regards to a comparison of the overdose
24    admissions as to the other pain management physicians in
25    Wichita, do you have a comparison?
```

1    A    I'm not quite understanding your question.

2    Q    This is for all other physicians and then this is

3    just limited to other pain management physicians.

4    A    50 to one.  I hardly ever saw anybody that had a

5    chronic pain specialist.  Once in a while.  I mean, it

6    was very uncommon for their patients to show up in our

7    emergency department wanting pain medications.

8    Q    With regards to drug overdose fatalities, did you

9    have sufficient opportunity to make observations and

10   make similar comparisons?

11   A    Yes.

12   Q    With regards to drug overdose fatalities and death,

13   as compared to all other practices, what was the

14   comparison?

15   A    I would say probably again around five to one.  Just

16   an estimate.

17   Q    And as to the other pain management practices?

18   A    I don't really remember any offhand actually.  I

19   mean, the ratio would be high.

20           MR. WILLIAMSON:  Your Honor, I'm going to have

21   to object.  Two grounds.  Lack of foundation.  Witness

22   has said he estimates and he doesn't know several times

23   on these numbers.  There hasn't been an underlying study

24   offered that he conducted to validate these numbers.

25   These are pure speculation and pure guesses on this

1    witness's part.

2            THE COURT:  Well, there's a difference between

3    speculation and estimates, Ladies and Gentlemen, but the

4    objection is overruled; but, obviously, one of your jobs

5    is to consider the weight of the testimony and you can

6    consider the cross-examination when it occurs.

7    BY MS. TREADWAY:

8    Q   Now, did you also have an opportunity to make the

9    same comparison with regards to people being admitted to

10   the ER with drug withdrawal symptoms?

11   A   Yes.

12   Q   And what is the comparison between the Schneider

13   Medical Clinic patients and all other physicians for

14   withdrawal admissions?

15   A   Again, I mean, the ratio is probably around five to

16   one.

17   Q   And as to other pain management practices?

18   A   It would be high.  I mean, I just couldn't tell you.

19   Probably never.

20   Q   So as to others, you didn't remember any drug

21   fatalities and you didn't remember any withdrawal

22   admissions from the other pain management practices?

23   A   No.

24   Q   As an emergency room physician, do you have patients

25   that come into the emergency room to feed their

1    addictions to prescriptions medications?

2    A    Every day.

3    Q    And what do you typically call individuals that are

4    coming to your ER for controlled substances?

5    A    Typically we call them drug-seekers.

6    Q    With regards to drug-seekers, were you able to again

7    make a comparison based on your observations?

8    A    Yes.  I mean, probably around five to one again.

9    And this is five to one, five Schneider patients to one

10   for the whole community combined.

11   Q    And, again, as to other pain management practices?

12   A    It would be very high.

13   Q    Now, during the course of your observations of the

14   Schneider Medical Clinic patients, did you notice the

15   types of medication these patients tended to be on?

16   A    Yes.  They were on usually some kind of narcotic or

17   opioid like Percocet, Lortab, Vicodin, Oxycodone,

18   Oxycontin, something along those lines.  They might be

19   on a muscle relaxant like Soma or Flexeril.  And then

20   oftentimes were on benzodiazepines such as Valium,

21   Ativan, Xanax, things like that.  And maybe some kind of

22   combination.

23   Q    Did you see those kinds of patterns in terms of the

24   types of medication from other physicians in the Wichita

25   community?

1    A    Not as heavily.  I mean, those drugs are used

2    commonly and sometimes in those combinations, but not at

3    the level and the quantity that we were seeing with Dr.

4    Schneider's patients.

5    Q    So, again, in comparison, the clinic was higher?

6    A    Much higher.

7    Q    And in terms of a comparison to other pain

8    management practices?

9    A    It doesn't compare.  I mean, most pain management

10   practices, their patients aren't ending up in the

11   emergency department.  I mean, it happens on occasion,

12   but it's very rare.

13   Q    Did you make observations about the amounts of the

14   controlled substances that were prescribed to the

15   Schneider Medical Clinic patients?

16   A    Large doses; large quantities.  So, in other words,

17   for the doses, you're talking, you know, instead of

18   Lortab 5 you would have Lortab 10s.  You would have big

19   doses of Fentanyl.  Where people might start off with a

20   patch of 25 or 50 micrograms, you're looking at 100, 200

21   microgram patches.  And in the overdoses, bottles that

22   were filled with hundreds of pills or had quantities

23   that would have filled the bottle with hundreds of

24   pills.

25   Q    So in your comparison, how did the amounts of the

1    controlled substances being prescribed for the Schneider

2    Medical Clinic compare to all other physicians in the

3    community?

4    A    They were much higher.

5    Q    And as to the other pain management practices?

6    A    Again, we saw so few -- we see so few of these

7    patients that I, you know, I can't necessarily speak to

8    the quantities of doses.

9    Q    During your treatment of patients from the Schneider

10   Medical Clinic, did you notice that many of them had

11   psychiatric diagnoses?

12   A    Yes.

13   Q    Based on your treating the clinic patients in the

14   emergency room and your observations of them, did you

15   form an opinion regarding whether these patients

16   medically required the controlled substances being

17   prescribed to them in the quantities being prescribed to

18   them by the Schneider Medical Clinic?

19   A    Yes.

20   Q    What is that opinion?

21   A    That they were taking too much.  That they were

22   prescribed too much.

23   Q    In terms of treating pain with medication, should

24   there be some sort of proportionality?

25   A    Yes.

3289

1    Q    And what do we mean by that, Dr. Rogers?

2    A    Well, I mean, I think on the one hand you have

3    what's the medical condition.  You should apply the

4    resources to that medical condition that makes sense.  I

5    mean, if you stub your toe, I don't think you need 100

6    Percocets, for instance.  If you have a broken femur and

7    the bone is sticking out, then you're going to need a

8    lot of morphine.  And I think that's what we're talking

9    about.  Proportionality is applying the medical

10   condition in relation to the amount of medication that

11   one would expect it to take to treat.

12   Q    Based on your treating Schneider Medical Clinic

13   patients in the emergency room and your observations of

14   them, did you form an opinion regarding whether the

15   amount of the controlled substances they were being

16   prescribed was proportional to their reports of pain and

17   their causes?

18   A    Yes.

19   Q    What is your opinion?

20   A    I think they were prescribing too much.  The amounts

21   were, you know, bottles of hundreds of pills and that

22   doesn't seem to me to be appropriate.

23   Q    Now, when you were treating patients from the

24   Schneider Medical Clinic in your emergency room, do you

25   ask patients of all kinds, but also of the Schneider

3290

1    Medical Clinic patients, why they're there and not at

2    their primary care doctor?

3    A    Yes.

4    Q    And is that important for you to know?

5    A    Yes.  I mean, I think it's important in the

6    emergency department for us to get a feel for, is this

7    an access problem, have they been fired from their

8    physician because -- for some reason.  Is there, you

9    know, trying to correlate the story with reality is

10   really what we're trying to do; and then, you know,

11   trying to do what's best for the patient.  But we need

12   to know kind of why they're there.

13   Q    So is that part of the medical history you need to

14   treat the patient?

15   A    Yes.

16   Q    What were some of the typical responses you heard

17   from the Schneider Medical Clinic patients when you

18   asked them for that medical history?

19             MR. WILLIAMSON:  Your Honor, I'm going to

20   object.  That calls for hearsay.

21             MS. TREADWAY:  803(3) and 803(4), Judge.

22             THE COURT:  That's a clear exception to the

23   hearsay rule.

24   A    Can you repeat the question, please.

25

```
 1   BY MS. TREADWAY:
 2   Q   I certainly can.  What were some of the typical
 3   responses you heard from the Schneider Medical patients
 4   when you asked for why they were there and their medical
 5   history?
 6   A   Typical responses were, "I'm out of my meds", "I
 7   can't pay to go to the clinic", "it's after hours",
 8   "it's the weekend", "it's a holiday".  Either some --
 9   there's usually some excuse to explain away why they
10   can't -- couldn't be seen.
11   Q   Did any Schneider Medical Clinic patient ever come
12   to the emergency room and admit to you that they were
13   addicted to the narcotics they were being prescribed by
14   the Defendant Stephen Schneider?
15   A   Yes.
16   Q   And did they request help for that addiction?
17   A   Yes.
18   Q   And did you offer that help?
19   A   Yes.
20   Q   As a result of your treating and observing Schneider
21   Medical patients, did you ever call the Schneider
22   Medical Clinic to talk with anyone?
23   A   I called Dr. Schneider.
24   Q   Do you know how many times you called?
25   A   By my estimate, more than twice but less than ten.
```

3292

1    Q    What difficulties, if any, did you have getting in

2    touch with Dr. Schneider?

3    A    Sometimes you couldn't get ahold of him.  Sometimes

4    he did respond.

5    Q    I'm sure you do not remember sitting here today

6    every word-for-word conversation that you had; but do

7    you remember the substance of the conversations you had

8    with Dr. Schneider?

9    A    Yes.

10   Q    And what was the substance of each conversation?

11   A    The substance was me communicating what was going on

12   with the patient.  Usually it was in the setting of an

13   overdose, something serious.  And him acknowledging

14   that, but not really saying one way or the other what he

15   would do about it, whether he would fire the patient.

16   Didn't seem overly concerned about the situation.

17   Q    Did he seem surprised?

18   A    Not really.

19   Q    How did that compare with conversations you have had

20   with other providers?

21   A    Well, I mean, most providers when I tell them that a

22   patient has overdosed on medications they've prescribed

23   them, they feel very bad.  They feel concern.  Sometimes

24   they're upset or angry.  It depends on the situation

25   because, you know, depends on the motivation of why the

1    patient overdosed.  But for the most part, they're

2    rather upset and they, you know, make note of that and

3    things are gonna change.

4    Q   How large is the medical community in the Wichita

5    area and its surrounding community, Dr. Rogers?

6    A   I think there's at least 900 or more physicians in

7    the community and the county.

8    Q   And you've been part of that community since 2004?

9    A   Correct.

10   Q   Have you been a part of that medical community long

11   enough to become aware of the Stephen Schneider

12   reputation within that medical community?

13   A   Yes.

14   Q   On the basis of the information you have obtained

15   within that medical community, have you formed an

16   opinion as to the reputation of the Defendant Stephen

17   Schneider with regards to his prescription practices?

18   A   Yes.

19   Q   What is that opinion?

20   A   That he prescribes needlessly narcotics, benzoes,

21   and muscle relaxants to multiple patients in huge

22   quantities for unsubstantiated reasons.

23   Q   As a result of that reputation, have you personally

24   referred to him by any nickname?

25   A   The "candy man".

3294

1   Q   Were the patients from the Schneider Medical Clinic

2   referred to by any common name in the emergency room?

3   A   We just knew that they were drug-seekers or

4   Schneider patients.  I mean, once you hear the word

5   Schneider patient, you knew that you were gonna have to

6   dig deep to figure out why that patient was really there

7   for their painful condition.

8   Q   Is it common for patients to ask you as an emergency

9   room physician for referrals or recommendations to

10  various specialties, to specialists in the community?

11  A   Yes.

12  Q   And is it ethical for you to make such referrals and

13  recommendations?

14  A   Yes.

15  Q   As a result of your experiences with the Defendant

16  Stephen Schneider's patients, would you recommend him to

17  patients seeking pain management?

18  A   Absolutely no.

19  Q   Do you know Dr. Katan?

20  A   Yes.

21  Q   Have you been a part of the Wichita medical

22  community long enough to become aware of his reputation

23  within the medical community?

24  A   Yes.

25  Q   On the basis of that information you have obtained

1    within that medical community, have you formed an

2    opinion as to the reputation of Dr. Brian Katan as to

3    his reputation for truthfulness and honesty?

4    A    Yes.

5              MR. WILLIAMSON:  Your Honor, I'm going to

6    object.  That's improper bolstering.

7              THE COURT:  Sustained.

8    BY MS. TREADWAY:

9    Q    On the basis of the information you obtained within

10   the Wichita medical community, have you formed an

11   opinion as to the reputation of Brian Katan as to his

12   reputation as a physician?

13             MR. WILLIAMSON:  Objection, same.

14             THE COURT:  Sustained.

15   BY MS. TREADWAY:

16   Q    Let me hand you what has been marked for

17   identification as Government Exhibit 1, Dr. Rogers.

18   Have you had an opportunity to review that exhibit prior

19   to your testimony today?

20   A    Yes.

21             MR. WILLIAMSON:  Your Honor, objection.  This

22   is cumulative.  Same objection I made earlier.  She's

23   having him look at the same exhibit that the prior

24   emergency room doctor looked at.

25             THE COURT:  Well, all he's doing now is

3296

1    looking at it.  Go ahead.

2    BY MS. TREADWAY:

3    Q    And for the record, that is a chronological listing

4    of the overdose deaths and overdose and withdrawal

5    emergency room admissions to Via Christi and Wesley.

6         In your observations at the emergency rooms, does

7    that comport or is it consistent with your observations

8    over the years that you were at the emergency room?

9    A    Yes.

10   Q    Do you find that list significant?

11   A    I find it overwhelming.

12   Q    And do you find it specifically significant in terms

13   of your conversations with the Defendant Stephen

14   Schneider?

15   A    I'm sorry.  Can you say that question again.

16   Q    Did you find it specifically significant in terms of

17   your conversations with the Defendant Stephen Schneider?

18   A    Yeah, because there's no change in the pattern.

19   It's like a drum beat, consistent, every day, every week

20   there's two or three overdoses or deaths for years.

21        MS. TREADWAY:  Nothing further.

22        THE COURT:  Cross-examination.

23        MR. WILLIAMSON:  Thank you, Your Honor.

24                **CROSS EXAMINATION**

25   BY MR. WILLIAMSON:

3297

```
 1     Q    You started in the emergency room in 2004?

 2     A    Correct.

 3     Q    So you've been a doctor for about six years now?

 4     A    No.

 5     Q    How long?

 6     A    I've been a doctor since 1996.

 7     Q    Just been in Wichita for about six years?

 8     A    Correct.

 9     Q    Now, you remember the conversation you just gave

10     about these dosages, that they're large amounts;

11     correct?

12     A    Uh-huh.

13     Q    And you said that these large amounts are higher

14     than anybody else gives in Wichita.  You remember that?

15     A    Yes.

16     Q    Okay.  Well, tell me what other physicians in

17     Wichita see Medicaid patients for medication maintenance

18     therapy.

19     A    I can't speak to what physicians see or don't see

20     Medicaid patients.

21     Q    You just, you just spoke for 15 minutes about these

22     comparisons to these other doctors.  Well, tell us what

23     you know about these other doctors' practices.  Okay.

24     That's what I want to talk about with you.  What other

25     doctor --
```

1   A   You asked me a question.

2   Q   Yes.  Did you -- you answered it; correct?

3   A   You said -- okay.  I'm confused.

4   Q   I'm sorry if I cut you off.

5   A   Okay.

6   Q   You didn't -- have you gone in to survey other

7   physicians' practices?

8   A   I don't survey -- go to -- I don't go to people's

9   offices.

10  Q   Before you came up with all these numbers on this

11  board, you did not conduct any studies; correct?

12  A   I didn't conduct a study.

13  Q   You didn't do any statistical sampling to see if

14  your observations are valid; correct?

15  A   Can you rephrase the question.

16  Q   You never did any statistical sampling to see -- to

17  check to see if your observations are valid; correct?

18  A   I personally did not do any statistical sampling.

19  Q   Now, have you ever been out to the Schneider Medical

20  Clinic?

21  A   No.

22  Q   You mentioned like these dosages would be high.  You

23  mentioned there would be a hundred pills in some of

24  these dosages.  Correct?

25  A   Yeah.  There would be large bottles.  Some of 'em

1    were empty though.  If they overdosed, they would be

2    empty.

3    Q   Now, if a person is prescribed 100, let's say,

4    Lortab.  What is the appropriate method of taking

5    Lortab?  How many can you take a day?

6    A   It's limited by the Tylenol primarily.

7    Q   Up to eight a day; correct?  No more than eight is

8    where it's limited; correct?

9    A   No, not correct.

10   Q   It's not?

11   A   No.  I just said it's limited to the Tylenol dosing

12   so you can have up to four grams.  It depends.

13   Q   So are you stating that with Lortab the usual dosage

14   is not one to two tablets --

15   A   I'm sorry.  I thought you said Percocet.  We're

16   talking about Lortab?  If the Lortab -- we need to be

17   more specific when we're talking about this.  If it has

18   500 milligrams in the pill, you are correct, eight a

19   day.  So that would be four grams.  They recommend not

20   exceeding four grams a day, which would be eight pills a

21   day, that's correct.

22   Q   Now.  You never went and requested the medical

23   records of these patients that came into the emergency

24   rooms; correct?

25   A   Not correct.

3300

1    Q    You did?

2    A    We have a computer system that has their medical

3    record.

4    Q    Let me rephrase.  Did you ever request their entire

5    medical history from the Schneider Medical Clinic?

6    A    I'm not sure how I would get that accomplished in an

7    ER visit.

8    Q    I'm not asking how you would get it accomplished.

9    I'm asking whether you did or didn't do it.

10    A    No, I did not do it.

11    Q    Do you know how long these individuals had been

12    taking whatever therapies they were on at the time that

13    they showed up in your emergency room?

14    A    If I asked the patient and they told me, then I

15    would know.

16    Q    Speaking of that, the only way you identified people

17    as alleged Schneider Medical Clinic patients is by them

18    telling you; correct?

19    A    No, not exactly.  Sometimes they have medical cards

20    that identify themselves.  For instance, if they're

21    Medicaid.  They might have a card that says the

22    physician's name on it.  They might have an insurance

23    card that says the physician's name on it.  They

24    themselves would tell me I'm Dr. Schneider's patient.  I

25    usually don't think they're lying to me.  My default is

3301

```
 1    that they're telling me the truth, that they do in fact
 2    see Dr. Schneider.
 3    Q   And how many of the patients -- identify for me
 4    specific patients that came in with Medicaid cards?
 5    A   Specific patients by name?
 6    Q   Yes.
 7    A   I see 5,000 patients a year.  I can't identify
 8    patients by name necessarily.
 9    Q   You're not in here talking about 5,000 patients per
10    year, are you?
11    A   I'm telling you that I personally see over 5,000
12    patients per year in my practice.  I can't tell you
13    everybody's name.
14    Q   Well, can you tell us -- give us some names of these
15    people that came in addicted?  Give me somebody that I
16    can go double check on.  Give me a name.
17    A   Give you a specific name today?
18    Q   Yes.
19    A   I can't offhand.  I could probably look at this and
20    try to correlate.
21    Q   Now, you made, again, you made these comparisons
22    about these drug overdose fatalities.  You said no other
23    pain physician in Wichita ever had a death related to
24    overdoses; correct?
25    A   That's not what I said.
```

3302

1    Q    It says high there; zero there.  What does that

2    mean?

3    A    I think she's asking about my personal experience.

4    I did not remember seeing any overdoses or deaths

5    related to patients overdosing on pills prescribed by

6    pain specialists.  I don't recall any cases of that.

7    There was no pattern.  I mean, when you're in a

8    department and you work with another doc and you talk

9    about all the cases that you see, you start to see a

10   pattern.  You talk and say, "hey, do you remember seeing

11   this case"; "yeah, I saw this case"; "gosh, who's the

12   doc"; "Dr. Schneider".  You see a pattern.  There was

13   never any pattern.  I couldn't even tell you the names

14   of the chronic pain specialists in Wichita 'cause I just

15   don't see their patients very often enough to even know

16   who they are.

17   Q    Sir, you can't tell us their name but you're making

18   all these comparisons.  Correct?

19   A    Well, a certain number to zero.  You, you recognize

20   the number zero and that's what you perceive something

21   to be is basically either zero or next to zero.

22   Q    Ms. Treadway asked you about other pain

23   practitioners specifically; correct?

24   A    Correct.

25   Q    You did not state that I don't have the knowledge of

3303

1    these other pain patients so I can make a comparison.

2    That wasn't your testimony; was it?

3    A    Well, it's hard for me --

4    Q    Sir, just please answer my question.  Was that your

5    testimony?  Yes or no.

6    A    Can you re -- can you ask the question again.

7    Q    When Ms. Treadway asked you to compare Dr. Schneider

8    to other pain patients, you did not state I don't know

9    anything about these other chronic pain patients; did

10   you?

11   A    That's not what I was asked and that's not what I

12   said.

13   Q    Now, you testified on direct about the -- well,

14   strike that.

15       We're talking about this dosage thing.  You don't

16   know how long certain patients, these unknown patients,

17   were actually on their medication therapies when they

18   came to your emergency room; correct?

19   A    Yes and no.  Sometimes.

20   Q    Sometimes you knew and sometimes you didn't?

21   A    Well, if you ask the patient when did you first

22   start taking Percocet, sometimes they would tell you.

23   Sometimes it really didn't matter.

24   Q    Well, tell us who told you.

25   A    Who?  I already said in my testimony earlier --

3304

```
 1    Q    You can't remember any specific --
 2    A    I can't give you a specific name.
 3    Q    Well, when you noticed this pattern, did you call
 4    the Kansas Board of Healing Arts on Dr. Schneider and
 5    say, "hey, we noticed this pattern"?
 6    A    I spoke to my director at the time, Dr. Canton.
 7    Q    Sir, that's not my question.
 8    A    Okay.  Answer is, no, I did not call the Kansas
 9    Board of Healing Arts.
10    Q    Did you send a letter to Dr. Schneider saying, "Dr.
11    Schneider, we're noticing a pattern in our ER with your
12    patients"?
13    A    No.
14    Q    Did you send a letter to the Sedgwick County Medical
15    Society saying, "medical society, we're noticing a
16    pattern regarding Dr. Schneider's patients"?
17    A    No.
18    Q    Now, you testified under oath before; correct?
19    Somebody called you in and asked you some questions?
20    A    Yeah, at the grand jury.
21    Q    Now, you testified that you would e-mail Dr.
22    Schneider; correct?
23    A    No.
24    Q    You didn't mention e-mail?
25    A    No.
```

3305

1    Q    Now, you testified that you spoke to Dr. Schneider

2    between two occasions and ten occasions.   True?

3    A    True.

4    Q    Now, when you gave this prior testimony under oath

5    you didn't mention anything about ten occasions, did

6    you?

7    A    I don't know the specific number.   I'm giving you a

8    range.   When you talk to somebody on the phone, over the

9    years you don't remember every single time.   I don't

10   keep a notebook of how many times I talk to doctors

11   specifically.   I can give you a range.   More than a

12   couple, probably less than ten, and it's in that range.

13   But --

14   Q    You were asked a specific question.   And prior to

15   that time frame, had you had any contact with Dr.

16   Schneider?   And your answer was:   I had spoken to him on

17   the phone probably on two occasions about his patients.

18   A    Uh-huh.

19   Q    Isn't that true?

20   A    That's the grand jury testimony that I gave; yes.

21   Q    At that time you did not say a range between two and

22   ten times; correct?

23   A    I'm sorry.   Can you say the question again.

24   Q    When you gave this prior testimony, you didn't say

25   between two or ten times; did you?

3306

```
 1    A    That's not -- yeah, that's correct.  I did not say
 2    between two and ten.  That was not my testimony.
 3    Q    In fact, you stated that you would not normally call
 4    the physician when these patients are going to be sent
 5    home; correct?
 6    A    I don't remember that question being asked.
 7    Q    How many patients that came in with these alleged
 8    overdoses did you refer to the Kansas Board of Healing
 9    Arts?
10    A    None.
11    Q    You sent patients back to Dr. Schneider after the
12    hospital would discharge them; correct?
13    A    Not correct.
14    Q    You never sent patients back there?
15    A    That were overdosed?
16    Q    Any patients?
17    A    That were admissions?
18    Q    Any patient's --
19    A    Well, that wasn't what the question was.  Your first
20    question was did I send overdoses back to Dr.
21    Schneider's clinic.  My answer is no.
22    Q    Where did you send them?
23    A    I don't send them.  I admit them to the hospital.
24    Q    Who does the discharge?
25    A    The hospitallist, the admitting physician who takes
```

3307

1    care of the overdoses; or if they're medically stable,

2    they go to a psychiatry service and the psychiatrist

3    sees them and dismisses the patient.  I have no

4    involvement in their disposition once they're admitted

5    to the hospital or they're sent on to psychiatry.  I

6    have no involvement with their care and where they

7    eventually go back to.

8    Q    Okay.  So your responsibility is at least in regards

9    to patients who overdose, you send them -- you admit

10   them into the hospital; correct?

11   A    If they're medically unstable and they've overdosed,

12   they get admitted upstairs to the -- or to the ICU.

13   Q    What about those patients that would come in to your

14   ER that were medically stable?  You would discharge them

15   and send them back to Dr. Schneider; wouldn't you?

16   A    Can you ask the question again.

17   Q    Yes.  People that were medically stable and they

18   identified Dr. Schneider as the primary care physician,

19   you would discharge them and tell them to follow up with

20   their primary care physician who was Dr. Schneider;

21   correct?

22   A    Not necessarily.

23   Q    You're saying that never happened?

24   A    No, that's not what I said.  I said not necessarily.

25   Q    Did it happen at times?

3308

1    A    Let me explain because your question is not --

2    Q    My question is did it happen at times?

3    A    I can't answer the question.

4    Q    Now, you stated people would come in asking for pain

5    medicines and prescriptions; correct?

6    A    Correct.

7    Q    And they would tell you that they couldn't get back

8    into the clinic; correct?

9    A    Sometimes, yes.

10   Q    Again, you don't have any specifics on who these

11   patients are; do you?

12   A    I don't have the patient list.

13   Q    You don't have any specifics on exactly when these

14   patients came in; correct?

15   A    Correct.

16   Q    You don't have any specifics on what kind of

17   medications each specific patient was receiving;

18   correct?

19   A    I'm sorry.  Can you say the question again.

20   Q    You don't have any information on the specific

21   medicine a specific patient was receiving; correct?

22   A    Why wouldn't I have that information?

23   Q    I'm asking do you have it?

24   A    Oh, with me now?  No.

25   Q    You don't know it as you sit here today and testify;

3309

1    do you?

2    A    I don't know --

3    Q    Now, you never --

4    A    I don't understand the question.

5    Q    No problem.  You didn't go out to the Schneider

6    Medical Clinic at any time to sit down with Dr.

7    Schneider?

8    A    No.

9    Q    You never went to Dr. Schneider and said, "hey,

10   we're noticing this pattern of these people coming in,

11   let's sit down and see what we can do to help out"?

12   A    No.

13   Q    Now, it's true that you don't know when the last

14   visit was with many of these unknown patients that they

15   had with the Schneider Medical Clinic; correct?

16   A    I don't know when -- I'm sorry.  Can you repeat the

17   question.

18   Q    You don't know when their last visit was with the

19   Schneider Medical Clinic; correct?

20   A    I would know if they told me.  If I asked the

21   patient and they told me, then that's what I would know.

22   Q    You haven't limited your observations to people who

23   happened to come in, in the last 60 days prior to their

24   overdose.  You're limiting your observation to anybody

25   that said or you somehow saw that they saw Dr. Schneider

3310

```
1    at some point in time; correct?

2    A    Can you ask the question again.

3    Q    You're limiting your observation to anybody that

4    came in and identified Dr. Schneider as their primary

5    care physician; correct?

6    A    I'm limiting my observation -- I still don't

7    understand your question.

8    Q    Which part of it you don't understand?

9    A    Can you repeat it again because it is not making

10   sense.  I'm limiting my observation.  My observations

11   are for all patients and all doctors that I see, so I'm

12   not --

13   Q    Let me clarify.  You're limiting your testimony

14   based on what you believe you saw coming from patients

15   at the Schneider Medical Clinic based on the individuals

16   identifying themselves as Schneider Medical patients;

17   correct?

18   A    Not always because sometimes -- the answer is no.

19   Q    Let me -- okay --

20   A    All right.

21   Q    When you made your observations in regards to

22   Schneider Medical patients --

23   A    Uh-huh.

24   Q    -- did you limit your observations to people who

25   were actually prescribed pain medicine from Schneider
```

3311

```
 1    Medical Clinic or who were identified in some way as to
 2    visiting the Schneider Medical Clinic?
 3    A    I would say no, I'm not limiting my observations.
 4    Q    To what?
 5    A    Again, I'm not understanding your question.  I
 6    just -- I'm sorry.  I don't understand your question.
 7    Q    It's a straightforward question.
 8              THE COURT:  I don't understand it either.
 9              MR. WILLIAMSON:  I'm sorry, Judge.  Let me see
10    if I can break it down a little bit more.
11    BY MR. WILLIAMSON:
12    Q    You made observations at the ER; correct?
13    A    I make observations; yes.
14    Q    Okay.  You made all these comparisons in regards to
15    Dr. Schneider versus all these other doctors in the
16    community; correct?
17    A    Correct.
18    Q    On direct you stated that people would identify
19    themselves as Schneider Medical patients and that's how
20    you would know that they were associated with the
21    Schneider Medical Clinic; correct?
22    A    That is one, yes, that is one way to identify is --
23    you ask the patient.
24    Q    And on cross-examination you expanded that a little
25    bit and you stated that it is also because of medical
```

3312

1    cards or some other identifying information; correct?

2    A    Yes.  I mean, the patient could be unconscious --

3    Q    Sir -- sir --

4    A    -- and you have to ask family.

5    Q    Sir, please answer my question.

6    A    The answer is yes.

7    Q    Okay.  Now, when you made these observations -- you

8    follow me so far with those few questions?  You there?

9    A    Yeah.

10   Q    Okay.  We're on the same page?

11   A    When I made observations; yeah.

12   Q    Okay.  Did you exclude people from your estimates

13   that never received pain medication from the Schneider

14   Medical Clinic?

15   A    No.

16   Q    You understand that people could be a family patient

17   of the Schneider Medical Clinic and get drugs from

18   somebody else and show up in your emergency room;

19   correct?

20   A    It's possible; yes.

21   Q    And that person would be identified as a Schneider

22   Medical patient; correct?

23   A    It's possible; yes.

24   Q    How many patients did Dr. Schneider's clinic see

25   between 2004 and 2005?

3313

1    A    I have no idea.

2    Q    What are the number of Medicaid patients that Dr.

3    Schneider's clinic saw between 2004 and 2005?

4    A    Don't know.

5    Q    What is the availability in the Sedgwick County pain

6    management community for Medicaid people who have

7    chronic pain issues and need medication therapy?

8    A    I don't know.

9    Q    Now, you mentioned that you talked to Dr.

10   Schneider -- today you said between two and ten times.

11   You said that he had a -- he didn't seem concerned.  You

12   didn't know if he was concerned.  Correct?

13   A    Correct.

14   Q    You don't know Dr. Schneider personally; do you?

15   A    Personally as like, as a friend personally?

16   Q    Personally outside of the medical community?

17   A    No.

18   Q    You never sat down with him and had a conversation

19   face-to-face; correct?

20   A    Correct.

21   Q    You don't know if -- you don't know what his general

22   demeanor is; do you?

23   A    No.

24   Q    You don't know how he responded when his mother

25   passed away; do you?

3314

```
 1    A    No.
 2    Q    You don't know how he would respond in the face of
 3    bad news; do you?
 4    A    No.
 5    Q    And you understand that everybody here could respond
 6    to a notice of death in different and distinct ways;
 7    correct?
 8    A    Yes.  Correct.
 9    Q    People grieve and mourn in different ways.  True?
10    A    True.
11    Q    Now, you testified on direct that this pattern
12    continued.  Did you ever go into the clinic and talk to
13    the other providers and try to determine was the clinic
14    trying to change and make things better?
15    A    I've never been to the clinic.
16    Q    You never called another pain practitioner in
17    town -- strike that.
18         You talk about this reputation question of Dr.
19    Schneider.  When you gave him these telephone calls, you
20    didn't give him the courtesy to say, "Dr. Schneider, you
21    know, your reputation in the community is pretty bad,
22    let's sit down and talk"; did you?
23    A    I did not say what you just said I said, no, I did
24    not have that particular conversation.
25    Q    How many doctors have you talked about in regards to
```

3315

1    Dr. Schneider?  I'm sorry.  Let me rephrase that.

2        How many doctors have you talked to in regards to

3    Dr. Schneider?

4    A    I don't know the number.

5    Q    When did you get here?

6    A    2004.

7    Q    What month?

8    A    August.

9    Q    You understand that the media had already run at

10   least two stories about the Schneider Medical Clinic

11   before you got here; correct?

12   A    I don't know anything about the media.

13   Q    I'm sorry?

14   A    You're asking me if I knew about two articles

15   written and I'm telling you I don't know anything about

16   two articles written.

17   Q    All right.  You don't know the exact number of

18   physicians that you sat down with.  Give me an estimate?

19   A    Well, here's the situation.  We have a group of

20   less -- just shy -- well, 17, 18 emergency physicians.

21   We have a monthly meeting.  We meet every month.  The

22   docs sit around and talk.  At any given time I'm working

23   with one, two or three ED physicians as well when I'm

24   working shifts.  We sit and talk about these issues.  So

25   I would say 17 to 18.  Plus you got all the docs that I

```
 1    admit these patients to, so -- when you have an
 2    overdose, I have to call the hospitalist up.  That's
 3    another two, three, four docs.  It just depends.  It
 4    rotates if it's at St. Jo.  So it could have been
 5    dozens.  But specifically in a concentrated format we
 6    would talk with the emergency physicians which --
 7    amongst ourselves, and we would voice concerns to our
 8    director because that's kind of the chain of command, so
 9    to speak.  You talk to your medical director when
10    there's a medical care issue.  That's who you talk to.
11    And then it's their job to address the issue.
12    Q    Okay.  Now, of these people -- well, is it fair to
13    say that the reputation that you spoke of is the
14    reputation amongst the ER docs that you work with on a
15    regular basis?
16    A    Correct.
17    Q    That would be Dr. Rody that's on that board there;
18    correct?
19    A    Uh-huh.
20    Q    That would be yourself?  Dr. Katan?
21    A    Correct.
22    Q    And neither one of you all have gone out to the
23    clinic and -- to see what kind of facility it is;
24    correct?
25    A    I don't know what Dr. Katan or Dr. Rody have done.
```

3317

1    I can only testify to the fact that I've never been to

2    the clinic.  As I've testified twice already, I have not

3    been to that clinic before.

4    Q    Now, when you were sitting down having this meeting

5    with all these ER docs discussing these patterns, these

6    concerns, you never said, "for the sake of these

7    patients let's go out and have a sit-down with Dr.

8    Schneider", did you?

9    A    We didn't say, "let's go out and have a sit-down";

10   that's correct.

11   Q    You didn't say, "for the sake of these patients

12   let's report this doctor"; did you?

13   A    We wanted to report him and we did to our superiors.

14   Q    Let me --

15   A    Who then took it to another level.

16   Q    You never sat down and sent a written complaint to

17   anybody regarding Dr. Schneider; did you?

18   A    Me personally?  No.

19              MR. WILLIAMSON:  Nothing further, Your Honor.

20              THE COURT:  Mr. Byers?

21              MR. BYERS:  Not a thing, Your Honor.

22              THE COURT:  Redirect please.

23                    **REDIRECT EXAMINATION**

24   BY MS. TREADWAY:

25   Q    Dr. Rogers, when you were talking about the medical

3318

1     director that you voiced concern to, was that Dr. Rody?

2     A    Dr. Rody and Dr. Katan.

3     Q    Now, there was a question that Mr. Williamson wasn't

4     letting you answer and that was when patients came to

5     the emergency room that were medically stable and didn't

6     need to go to the hospital or a psych facility what did

7     you do with them.  What, as an emergency room physician,

8     do you do with people that you've serviced at the

9     emergency room?

10    A    Well, there's basically two things that are gonna

11    happen.  They're either gonna be admitted to the

12    hospital -- this is assuming they're alive.  They're

13    going to be admitted to the hospital or they're going to

14    be dismissed out of the emergency department.  What I

15    was trying to say is that in a case of an overdose, they

16    don't go home.  They either get admitted medically or

17    they go to the psych facility, in which case I don't

18    have any say as to where they go after that.  When we

19    see somebody for like a painful condition or whatever,

20    and they're stable and they're being dismissed, then

21    they're being dismissed.  I don't try to tell them not

22    to, or to go to any given physician.  That's not really

23    a good way to practice medicine, you know, telling

24    people not to go somewhere or, you know, say bad things

25    about a certain physician.  That's just not

1    professionally what you do.

2    Q   And some people unfortunately didn't go to the

3    hospital or a psych facility.  They went to the

4    Coroner's office; didn't they?

5    A   Correct.

6    Q   And based on your observations of the clinic

7    patients, if they wanted controlled substances, would

8    they go back to the Schneider Medical Clinic?

9    A   Yes.

10   Q   Now, based on your observations and based on

11   reviewing Exhibit 1, that chronological listing of the

12   deaths and the overdoses, have you seen any evidence in

13   the years you've been in Wichita that the Defendant

14   Stephen Schneider is a caring, compassionate or

15   courageous physician?

16            MR. WILLIAMSON:  Your Honor, objection.  That

17   calls for speculation and lack of foundation.

18            THE COURT:  Sustained.

19            MS. TREADWAY:  Nothing further, Judge.

20            THE COURT:  Anything further?

21            MR. WILLIAMSON:  One second.

22                  (Off-the-record.)

23            MR. WILLIAMSON:  I don't have anything

24   further.

25            THE COURT:  Dr. Rogers, thank you.  You're

3320

1    excused.

2    A    Thank you.

3              THE COURT:   Next witness, please.

4              MS. TREADWAY:   Judge, our next witness is

5    Steve Sulpor, and Mr. Moore will go get him and counsel

6    Jon Fleenor will be handling that examination.

7                         **STEVE SULPOR**

8    Having been first duly sworn to tell the truth, the

9    whole truth and nothing but the truth, testified as

10   follows on:

11                      **DIRECT EXAMINATION**

12   BY MR. FLEENOR:

13   Q    Will you please state your name for the jury.

14   A    Steven R Sulpor.

15   Q    And where are you employed?

16   A    Centers for Medicare and Medicaid Services in

17   Chicago.

18   Q    How long have you have been employed there?

19   A    About 31 years.

20   Q    And what is the Centers for Medicare and Medicaid

21   Services?

22   A    That is the federal agency that administers the

23   Medicare and Medicaid program.

24   Q    Do you call them CMS for short?

25   A    Yes, sir.

3321

1    Q    And what do you do for CMS?

2    A    I'm a statistician.

3    Q    How long have you worked as a statistician with CMS?

4    A    31 years.

5    Q    What are your job duties and responsibilities?

6    A    Right now, I do the sampling and projection of

7    investigation findings for what is potentially aberrant

8    healthcare providers and most of my work is as a

9    statistical consultant for Justice Department cases.

10   Q    How long have you been designing sampling plans?

11   A    Over 35 years.

12   Q    And why does CMS do sampling?

13   A    In healthcare provider audits, the reason CMS does

14   sampling is that it's not administratively feasible to

15   look at all patients in the entire population.  We have

16   to do sampling.  And also it's mandated under the

17   Medicare manual.

18   Q    Could you please review with us your educational

19   background beginning with college?

20   A    I have a Bachelor's and Master's degree from

21   Rosevelt University in Chicago in quantitative

22   psychology; and I have 57 hours toward a PhD at Illinois

23   Institute of Technology in Chicago, quantitative

24   psychology.  I've taken additional statistical work at

25   Segman State University in Springfield, Illinois.  I

1    studied -- from 1976 to 1980 I studied with statistician

2    Dr. Gary Morse at the Institute of Technology, and then

3    from about 1982 to 1994 I studied with Professor Klaus

4    Mischke from University of Illinois, statistical

5    sampling for healthcare provider audits.  And then I

6    attended Harold Washington College from 1989 to 1996 and

7    I took eight computer science courses.

8    Q    Can you briefly describe some of your work

9    experience in this field?

10   A    Well, starting out I worked at the University of

11   Illinois hospital as a research assistant on a research

12   project dealing with the effects of cleft palate

13   syndrome.  Then I worked for State of Illinois Medicaid

14   program as chief statistician for program integrity

15   Medicaid audits where the state audited providers for

16   Medicaid overpayments.  I then went over to the Federal

17   Government, and I was chief regional statistician for a

18   program called Medicaid Eligibility Quality Control.  In

19   this program we looked at Medicaid, a sample of Medicaid

20   recipients who were on Medicaid and to see if they were

21   eligible for Medicaid and also people who are denied

22   Medicaid to see if they were denied properly.  After,

23   after being in that program and for about the last 15 to

24   20 years I've been the statistician for Program

25   Integrity.  Program Integrity refers to the federal

3323

1     program where potentially aberrant providers are audited

2     for overpayments and also for fraud and abuse.  And

3     right now for the past several years almost a hundred

4     percent I work as a consultant to the Justice Department

5     on Medicare and Medicaid cases that the Justice

6     Department is investigating for healthcare fraud and

7     abuse, potential healthcare fraud and abuse.

8     Q    During the course of your career, for how many cases

9     approximately have you have done a statistical sample

10    plan?

11    A    From the beginning I would say about 250.

12    Q    And in any of those cases were your sampling plans

13    ever found to be deficient or defective in any way?

14    A    No.

15    Q    Were you asked to develop a plan in this case?

16    A    Yes, I was.

17    Q    In developing your sampling plan for this case, did

18    you follow the methods outlined in the program

19    memorandum transmittal B-01-01, dated January 8, 2001?

20    A    The answer is yes.  But I am one of the people who

21    wrote that manual.  There was five major members on the

22    committee and I was one of the members who wrote the

23    manual.  And we purposely wrote the manual to be

24    flexible, not to be too directive, so we have the

25    general statistical principles everybody all over the

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

3324

1    country has to follow.  But there is enough flexibility

2    in the manual where for different cases, different types

3    of sampling methodologies can be used.

4    Q   We kind of got ahead of ourselves.  Tell the jury

5    generally what that program transmittal is?

6    A   I'm sorry.  The program transmittal is the Medicare

7    -- Federal Medicare instructions on how to do sampling

8    in audits of healthcare providers for overpayments and

9    for fraud and abuse.  That's the general sampling

10   instructions.  It's called -- that program memorandum

11   now has been incorporated into the Program Integrity

12   manual.

13   Q   Could you explain to the jury what a valid random

14   sample is in the healthcare industry?

15   A   A valid random sample is a sample that was selected

16   according to the principles of random sampling, and the

17   general principle in a random sample is that every

18   patient in the population has an equal chance or a known

19   chance of being selected.  And once the statistician or

20   an agency uses the principles of random sampling, the

21   sample is valid, it's called a valid sample and can be

22   used to project from population -- from sample to

23   population.

24   Q   And did you develop the means by which we could

25   develop a valid random sample plan in this case?

3325

```
 1    A    I did.
 2              MR. FLEENOR:  Your Honor, may I approach for
 3    purposes of identifying an exhibit?
 4              THE COURT:  Yes, sir.
 5    BY MR. FLEENOR:
 6    Q    I'm handing you what's been previously admitted as
 7    Government Exhibit 1-J.
 8              MR. FLEENOR:  Your Honor, for the record, I'm
 9    providing a copy for defense counsel for their use as
10    well.
11              MR. WILLIAMSON:  Thank you.
12    BY MR. FLEENOR:
13    Q    Mr. Sulpor, this is a breakdown of payments made by
14    93 insurance companies to the Schneider Medical Clinic.
15    During the course of the investigation, was this
16    information discussed with you?
17    A    Yes.
18    Q    Based upon your review of this information, did you
19    make suggestions about development of the sample plan?
20    A    Yes.
21    Q    And what did you suggest?
22    A    Approximately two years ago, Assistant U.S. Attorney
23    Tanya Treadway called me in Chicago and at that time she
24    said that she had an investigation of a provider.  There
25    were 12,061 patients in the population patients who had
```

3326

1   claims paid by the -- by the provider.  She never

2   mentioned the name by the provider.  And that the --

3   there were 93 insurance entities, 93 insurance companies

4   including Medicare and Medicaid that had claims paid by

5   this provider in the audit period.

6   Q    Did you make any suggestion then about the types of

7   insurance companies that you were going to look at or

8   develop your sample plan for?

9   A    Yes, Assistant U.S. Attorney Treadway faxed me this

10  document and also --

11  Q    I believe if you take it out, there's -- 93 is on

12  the back attached to it.

13  A    There's a listing of all the 93 insurance companies

14  that had claims paid through the provider in the audit

15  period.  And I looked at that listing of the 93

16  insurance companies and one thing was very clear.  There

17  were five insurance companies, five insurance entities,

18  including Medicare and Medicaid, that had processed the

19  bulk of the claims.  Those five insurance companies out

20  of the 93 accounted for 92% of the recipients seen by

21  the provider, claims paid to the provider, and 88% of

22  the payments.  The other 88 had the remainder.  And also

23  after you looked at the top five, there was a big drop

24  off to the next provider.  It may have been Sigma or

25  another company and the payments to that provider were

1    only 2%.  So we decided that we would concentrate on the

2    top five providers because those providers provided the

3    bulk of the services and the bulk of the patients had

4    claims paid by that provider.

5    Q    What does the term stratify mean?

6    A    Stratify is -- stratify sampling works this way.

7    There are 12,000 patients who had claims paid for the

8    Schneider Clinic, to the provider, to the Schneider

9    clinic in this case.  And in stratified sampling, we

10   divide those 12,000 into five sections by insurance

11   company.  Medicare is all patients with claims paid by

12   Medicare.  Medicaid, all patients with claims paid by

13   Medicaid.  There was Blue Cross/Blue Shield of Kansas.

14   All patients with claims paid by that insurance entity.

15   And then First Guard was another insurance entity and

16   Preferred Health.  So there's five separate segments to

17   this universe of 12,000 patients.  And we separated the

18   patients into the five entities by insurance entity, by

19   payer.

20   Q    You may have already explained this, but briefly, if

21   you could, describe the difference between a simple

22   random number sample and a stratified random sample?

23   A    Okay.  In simple random number sampling in this case

24   if we had chosen that method of sample selection we

25   would put the 12,000 patients in a long list and then we

3328

1   would generate random numbers, as many as we needed

2   for -- to achieve our sample size.  And from this long

3   list, we would pick our sample of 500 or whatever our

4   sample size was.  Stratified random sampling is somewhat

5   different.  First, we divide all the patients into their

6   insurance entities, into the five entities.  Then we

7   take an independent sample from each entity.  And every

8   entity has a certain sample size.  Every insurance

9   entity has a certain sample size.  And they add to the

10  total sample size.  In this case it was 500.

11  Q   Now, after doing all your work, did you finally

12  determine what would be needed to be reviewed for a

13  valid random sample?

14  A   There were two questions that assistant attorney --

15  Assistant U.S. Attorney Treadway asked me.  One was the

16  method of sample selection.  That's what I just

17  discussed.  Stratified random sampling.  The second

18  question was what sample size would be appropriate given

19  the population with 12,061 patients.  And I determined

20  that sample size to be 500.

21  Q   Now, the evidence in this case has been that

22  Defendants had approximately 10,000 unique patients for

23  whom they submitted claims.  Can you tell us why your

24  number of 12,000 was used instead?

25  A   Because, as is true in most of the cases I deal

3329

1    with, patients may have more than one insurance entity.

2    Someone may be on Medicare and Medicare may pay the vast

3    majority of the claims, but also be on Medicaid.  So

4    whatever Medicare doesn't pay, then Medicaid pays the

5    rest of the claim.  So they have two payors.  Another

6    example would be someone could be working for the

7    Federal Government and over 65 so that person is on

8    Medicare, most of the claims are paid by Medicare but

9    not everything.  As you know, 20% of the claims for Part

10   B are the patient's responsibility.  So in that case,

11   their employer's insurance would pay the rest.  So in

12   this case they would, if they had a person like that,

13   would be in the Medicare stratum and also in the let's

14   say the Blue Cross stratum and that's perfectly okay

15   because when we do our audit investigation if that

16   person is picked then the Medicare stratum, we only look

17   at the Medicare claims.  And we don't look at the claims

18   by private insurance company.  If someone would be on

19   Medicare or Medicaid and we pick them in the Medicaid

20   stratum, we just look at what Medicaid pays for.  So

21   it's perfectly valid to sample that way.

22   Q   So again -- so the fact that some patients had --

23   may have had benefits from two insurance entities, does

24   that effect the 500 patient sample size that you

25   determined would be sufficient for a valid random sample

1    in this case?

2    A    No, it doesn't.  It's perfectly valid.

3    Q    Is that common in healthcare cases?

4    A    Yes.

5    Q    How did you apportion those 500 patient files for

6    patients among the top five pain insurance strata we've

7    discussed?

8    A    Well, first, I mentioned that the sample size was

9    500 and then the reason it's 500 is there is a formula

10   for sample size determination that I've been using since

11   1977.  I've used that in all my 250 plus cases.  And I

12   used that formula in this case.  That formula has been

13   discussed in the statistical literature in the Bulletin

14   of the International Statistical Institute, 1999.  And I

15   used that formula.  That formula, you have a sample size

16   of 372 from the population of 12061.  But I increased it

17   to 500 because we had determined we were going to

18   stratify in this case and there was going to be five

19   insurance entities.  So I increase the sample to 500.

20   And then the question arises, we have five insurance

21   entities, how do we apportion the 500 patients to the

22   five insurance companies.  And the way we do that is by

23   what's called proportional allocation.  In this case

24   Medicaid had 32% of the patients in the population of

25   12,061 so we made 32% of the sample patients come from

3331

1    Medicaid.  21% were Blue Cross/Blue Shield in the

2    population so in the sample 21% were from Blue

3    Cross/Blue Shield.  It's exactly proportional.  So every

4    insurance entity has the same representation in the

5    sample than it does in the population.

6    Q   Now, other than determining the number of patient

7    files that would be selected randomly, have you done

8    anything else in regards to this case?

9    A   No, nothing.

10         MR. FLEENOR:  Nothing further, Your Honor.

11         THE COURT:  Yes, Mr. Gorokhov.

12                    **CROSS EXAMINATION**

13   BY GOROKHOV:

14   Q   Good morning.

15   A   Good morning.

16   Q   I'll pick up where Mr. Fleenor left off.  You didn't

17   conduct the actual audits in this case; is that correct?

18   A   Yes, sir.

19   Q   Okay.  But you understand that your design of the

20   sample was created to allow an audit to take place?

21   A   Correct.

22   Q   Based on a random sample; correct?

23   A   Yes, sir.

24   Q   Okay.  And as I understand it, you basically divided

25   the group of 500 patients proportionally among the five

3332

1    groups based on the size I guess, or the percentage of

2    the insurance that was being paid.  Is that roughly

3    correct?

4    A    Yes.

5    Q    Okay.  Now, did you write out instructions for

6    someone on the investigation side to follow in pulling

7    those patient files so that they could be audited?

8    A    By instructions, the only task that I did was I just

9    wrote down what the sample size was for each of the five

10   entities.  And as far as what goes -- what was done

11   beyond that, I was not involved with that.

12   Q    Okay.  So you're saying, for example, let's take one

13   company and let's say it's First Guard.  You told

14   them -- and these are not -- this is just for purposes

15   of an example --

16   A    Oh, sure.

17   Q    Let's say you told them we need to pull 130

18   patients --

19   A    Okay.

20   Q    -- for that.  Right.  And wanted to make sure those

21   patients were pulled randomly.  Correct?

22   A    Well, I would have to say no because that wasn't

23   what I was asked to do.  Only thing Assistant U.S.

24   Attorney Tanya Treadway asked me to do was to determine

25   the sample size and to determine the method of sample

3333

```
 1    selection.  I determined the sample size to be 500.  I
 2    determined the method of sample selection to be
 3    stratified random sampling, and I did nothing else after
 4    that.
 5    Q   Okay.  So, you had no involvement in actually -- you
 6    never saw any patient names, for example?
 7    A   Correct.  I never saw any patient names.
 8    Q   Okay.  So you don't have any testimony to offer as
 9    to once your instructions or method were provided to the
10    Government, you have no testimony as to how they
11    followed through with that.  Is that correct?
12    A   That's correct.
13              MR. GOROKHOV:  Okay.  Thank you.
14    A   Sure.
15              THE COURT:  Mr. Williamson.
16              MR. WILLIAMSON:  Thank you, Your Honor.
17                     CROSS EXAMINATION
18    BY MR. WILLIAMSON:
19    Q   How you doing today?
20    A   Fine.  Thank you.
21    Q   I guess we'll just follow the trend here picking up
22    where Mr. Gorokhov left off.  You did not -- you don't
23    know how the Government chose to select the actual
24    patient files based on the numbers that you provided
25    them; correct?
```

3334

1    A    That's correct.  I have no first hand knowledge of

2    what they did after I provided the strata sample size.

3    I'm sorry.

4    Q    So -- no problem.  I apologize for interrupting.

5    It's very possible that they took -- they could have

6    selected any number or any specific patient that they

7    chose and they didn't come to you and say, hey, this is

8    how we selected these patients, is this okay?

9    A    That's correct.

10   Q    And I think you understand where I'm trying to get

11   is, like if they chose to cherry-pick the charts.   So

12   long as they met your numbers, you don't have any

13   testimony to either confirm nor deny that that happened?

14   A    I have no direct knowledge of that.

15   Q    Now, you said you were first contacted by

16   Ms. Treadway two years ago.  Can you give me a little

17   bit more specific for me.

18   A    Well, I work in the CMS office in Chicago and

19   Assistant U.S. Attorney Tanya Treadway called me, as I

20   described to Mr. Fleenor.

21   Q    Bad question.  More specific as far as when the call

22   came in?

23   A    I don't remember exactly.  I think it was in the

24   Spring of 2007, but I may be wrong on that.  I'm not

25   sure though.

3335

1    Q   Well, you know, two years from now would be about

2    2008 and I think it's kind of --

3    A   It could be.  Maybe, maybe it was 2007.

4    Q   Okay.

5    A   I'm not sure though.  It was a while ago.

6    Q   Did she tell you that the Indictment had already

7    been filed?

8    A   No.  No.

9    Q   So this is pre-Indictment?

10   A   Yes.  I didn't know who the provider was or what

11   took -- what the investigation was about.

12   Q   Okay.  Now, you stated on direct that we decided to

13   use the five companies.  But Ms. Treadway had already

14   selected the five companies and provided you their

15   findings as far as the number of claims and patients

16   that they found; correct?

17   A   We discussed whether that was appropriate or not.

18   It is true that I was presented with the five companies;

19   but we had a discussion and they went through their

20   justification for picking the five, so I think it's

21   correct to say that it was a group decision to use the

22   five insurance entities that I was presented with.

23   Q   Okay.  And that conversation never had to do with

24   the charging decision.  That had to do with the decision

25   to -- what kind of sample you would utilize; correct?

3336

```
 1   A   Yes.  I know nothing about the charging.
 2            MR. WILLIAMSON:  I don't have anything
 3   further, Your Honor.
 4            THE COURT:  Redirect?
 5            MR. FLEENOR:  No, Your Honor.
 6            THE COURT:  Thank you, sir.  You're excused.
 7   A   Thank you, Judge.
 8            THE COURT:  Well, let's take our morning
 9   recess, Ladies and Gentlemen.  Approximately 15 minutes.
10   Remember and heed the admonition.
11                      (Recess.)
12            THE COURT:  Next witness, please.
13            MR. FLEENOR:  Your Honor, the Government calls
14   Rodney Brown.
15                    RODNEY BROWN
16   Having been first duly sworn to tell the truth, the
17   whole truth and nothing but the truth, testified as
18   follows on:
19                **DIRECT EXAMINATION**
20   BY MR. FLEENOR:
21   Q   Would you please introduce yourself to the jury.
22   A   Yes.  My name is Rodney Brown.
23   Q   Where are you employed?
24   A   I work for the Office of Inspector General, Audit
25   Services, in Kansas City, Missouri.
```

3337

1    Q    And how long have you been employed?

2    A    With them?  Ten years.

3    Q    Is that part of HHS?

4    A    Yes.

5    Q    And what do you do for them?

6    A    I'm an auditor, so I audit Medicare or Medicaid

7    providers.  I also, as the -- work on the ATS staff and

8    I get the, when we get large data from the states and

9    providers, I put that in a format that the audit team

10   can use.  And I also am one of two statistic specialists

11   for the unit.

12   Q    What is a statistic specialist?

13   A    A statistic specialist is someone -- we do quite a

14   few sampling plans.  So, to make sure we are consistent

15   with our policy, all the sampling plans are reviewed by

16   me or other personnel review them.

17   Q    Please review about your educational background

18   starting with college?

19   A    I have a BS/BA from Missouri Western State College

20   and I worked for over 14 years with the State of

21   Missouri as an auditor; in the last over ten years with

22   the OIG as an auditor.

23   Q    Now we've heard from Steve Sulpor who developed this

24   stratified valid random sample in this case.  Were you

25   asked to do something with that?

3338

1    A    Yes.

2    Q    What were you asked to do?

3    A    I took -- I received the list of the patients that I

4    reviewed for each of the five insurance companies.  I

5    removed the zero paid where the --

6    Q    Let me stop you right there.  What's a zero paid?

7    A    Zero paid is where the insurance company actually

8    did not pay anything on that claim, or for that

9    particular patient.  So removed those from the

10   population.  I also reviewed the population to make sure

11   there was not a duplicate patient for the same insurance

12   company.

13   Q    And did you agree with the assessment that 500 files

14   would be sufficient for a valid random sample in this

15   case?

16   A    That would be in compliance with our policy; yes.

17   Q    Now, to actually select randomly the patient files

18   for each insurance company to review, what did you start

19   with?

20   A    I took the list of patients that I received.  I

21   removed, like I said, the zero paid and duplicates, and

22   then I took what was left and I sorted them by name,

23   date of birth, and social security number.  And then I

24   numbered those.  Once I've done that, I sorted those

25   from A to Z, name first.  Then I put a number in front

3339

1    starting with one to the end of the population for each

2    insurance company.

3    Q   Previously with the jury we talked about --

4    Mr. Sulpor talked about five strata.  Did you eventually

5    use six strata in this case?

6    A   I did, because one of the insurance companies that

7    we was working with found additional cases that they

8    wanted to include so we added an additional sixth strata

9    and actually pulled sample items for that additional

10   sixth strata.

11   Q   Did this adjusted population in any way effect the

12   valid random sample?

13   A   No, it did not.

14   Q   With regard to each of the six lists, what was

15   listed on the information that you received?

16   A   The information I received, the information had the

17   patient name, the date of birth, social security number

18   and the amount of the payment.

19            THE COURT:  What was the last?

20   A   I'm sorry.

21            THE COURT:  You said the patient name, social

22   security number and what?

23   A   The date of birth and also the amount of payment

24   that the --

25            THE COURT:  Amount of payment.

1    A    Yes.  Some insurance companies did not have all the

2    social security numbers.  That's the reason we could not

3    sort first by social security number.

4    Q    Then from that information, how did you randomly

5    select the patient files to be reviewed in this case?

6    A    The number of sample items already was chosen for me

7    so what I did was used RAD Stats.

8    Q    Tell us what that is, by the way?

9    A    That is a software package developed by the OIG that

10   is currently used throughout the healthcare industry;

11   and one of the modules in that is a random number

12   generator.

13   Q    Is that standard procedure in developing a random

14   sample?

15   A    Yes.

16   Q    Did you separate random -- the random number

17   generator for each of the six strata that we have

18   discussed?

19   A    Yes.  We actually ran six separate random numbers.

20   We pulled six sets of separate random numbers, yes, one

21   for each strata.

22   Q    Aside from the random number generator program, the

23   RAD Stat you described, did you have any involvement

24   with actually reviewing the randomly selected patient

25   files in this case?

3341

1    A    No, I did not.

2              MR. FLEENOR:  Nothing further, Your Honor.

3                    **CROSS EXAMINATION**

4    BY MR. GOROKHOV:

5    Q    Good morning, sir.

6    A    Good morning.

7    Q    I want to just go back a little bit.  You said you

8    received the instructions from Mr. Sulpor as to how to

9    get the random sample; correct?

10   A    I received the number of sample items that I wanted

11   to pull per stratum, yes.

12   Q    And then you ran this program that generated

13   basically a list of random names?

14   A    What it does, it generates a list of random numbers;

15   and then I take those numbers and match them up to the

16   population, like I said earlier, that I numbered from

17   one to the population--

18   Q    That's to -- I'm sorry.  I cut you off.  That's to

19   ensure that it's completely random; correct?

20   A    That is correct.

21   Q    Okay.  After you did that, did you then go and pull

22   the patient charts?

23   A    No.

24   Q    Okay.  Who did that?

25   A    I honestly have no idea.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

3342

1    Q   So to ensure that your random -- the sample that was

2    generated by the RAD Stats, we have to make sure that

3    the person who then pulls the files pulls the correct

4    files to then put into the spreadsheets that were

5    ultimately generated.  Is that correct?

6    A   Could you repeat that, please.

7    Q   Sure.  It's actually a long question.  Going from

8    your program that generated the random numbers that then

9    went to random patients, a person would then have to go

10   and pull those files; correct?

11   A   That's correct.

12   Q   Okay.  And so the accuracy or the randomness of the

13   sample that's generated depends on this person who's

14   pulling the files getting them correctly?  You

15   understand my question?

16   A   I mean, that's kind of beyond what my scope -- I

17   mean, I just pulled the random numbers and gave the

18   list.  I don't really know.

19   Q   So the purpose of making this random -- pulling

20   these random numbers and then connecting them to names

21   is so that we have a random sample?

22   A   That's correct.

23   Q   And that is designed so that we then know which

24   files to get so that -- to conduct that audit?

25   A   That's correct, yes.

3343

1    Q    So the accuracy of the audit depends on that person

2    taking your information and pulling the correct files?

3    A    To a point, yes.

4    Q    Based on what you've given that person, he has to

5    take what you've given him or her and pull those files?

6    A    That would be correct.

7    Q    And then they would audit those files?

8    A    That would be correct, yes.

9    Q    Okay.  Now, you mentioned there was this company

10   that -- there was a sixth strata.  Which company was

11   that?

12   A    Preferred Health, I believe.

13   Q    Preferred Health?

14   A    Yes.

15   Q    Okay.  And you're aware that that's one of the

16   counts in this case is that there's a healthcare fraud

17   count involving Preferred Health.  You understand that?

18   A    I don't really know what the charges are, no.

19   Q    Okay.  Now, you said that there was additional

20   claims that they wanted included.  Can you tell the jury

21   about that?

22   A    From the initial list we received, they said they

23   found additional patients.  That's all I really know

24   about it.  They just came up, they had additional

25   patients that were in the -- included in the original

3344

1    spreadsheet they gave.

2    Q    So they had additional claims data that you hadn't

3    previously received when you did the first --

4    A    That is correct.

5    Q    Correct?

6    A    Yes.

7    Q    Okay.  Now, in terms of how the -- after you

8    generated the random sample in terms of how the files

9    were obtained, do you know where they were obtained

10   from?

11   A    No, I do not.

12   Q    Okay.  Do you know if they were -- so you wouldn't

13   know if they're obtained from the actual company itself

14   or --

15   A    That is correct.

16   Q    Okay.  Are you familiar with the spreadsheets that

17   were ultimately -- these exhibits that are demonstrative

18   exhibits that were ultimately generated based on the

19   five companies?

20   A    No.

21   Q    You have not seen those?

22   A    I've never seen the final ones, no.

23   Q    Okay.  Let me ask you this question.  Since you

24   haven't seen them, it's a bit of a hypothetical, but

25   just see if you can follow.  If the purpose of the audit

3345

1    was to randomly audit the claims, including the CPT

2    codes, the different level codes -- you're familiar with

3    those; correct?

4    A   I really didn't do anything with that.  I basically

5    took the patients.  What things they were looking for, I

6    really don't know.

7    Q   But in the scope of your work with the OIG, you're

8    familiar with what CPT codes are?

9    A   Yes, I am.

10   Q   Okay.  If the purpose of the sample was to take a

11   random sample of the claims and determine if those codes

12   were justified by the documentation in the case, would

13   you expect to see a variety of codes in a random sample?

14   A   It depends on what we're looking for.  I mean,

15   sometimes we narrow down the population just to include

16   those codes.

17   Q   Okay.  If we're looking for the amount of -- or the

18   proportions of different CPT codes that a practice

19   charges -- do you follow.  So, if we're looking for a

20   representation of the various CPT codes that a practice

21   charges, then you would expect to see some codes, you

22   know, you would expect to see a variety of codes;

23   correct?

24   A   I guess so, yes.

25   Q   Okay.  So, I'm not a statistician so I'm having --

3346

1    I'm really having trouble saying this in a clear way.

2    But basically what I'm trying to get at is, if we're

3    trying to get a fair picture of the universe of codes

4    that a practice bills, then you would expect to see some

5    99213s, some 99212s, some the the 214s, et cetera?

6    A    I mean, that would be very hard to say because you

7    don't know how often those particular codes were in the

8    population.  So, I mean, the sample, random sample,

9    would give you a -- I'm not even sure -- I mean, a

10   statistically valid sample to a population is only going

11   to -- is not always going to give you certain codes.  I

12   mean, you don't know for sure what you're going to get

13   when you do a random sample.  That's the whole idea of

14   doing it.

15   Q    Okay.  The purpose of a statistically valid random

16   sample is kind -- is to reflect the larger whole.  Would

17   you agree with that?

18   A    Yes.

19   Q    Kind of to give you an idea of the larger whole?

20   A    Yes.

21   Q    Okay.  And if I were to tell you that there were

22   four -- there were -- well, strike that.

23             MR. GOROKHOV:  That's all I have, Your Honor.

24   Thanks.

25             THE COURT:  This is probably a good time to

3347

1    give up, isn't it, Mr. Gorokhov?

2             THE COURT:  Mr. Williamson, are you ready to

3    give up?

4             MR. WILLIAMSON:  Not quite, Your Honor.  You

5    know I can be stubborn at times.

6             THE COURT:  My guess is he has not been out to

7    the clinic, Mr. Williamson.

8                    **CROSS EXAMINATION**

9    BY MR. WILLIAMSON:

10   Q    How you doing, Mr. Brown?

11   A    Fine.

12   Q    Is it Mister or Doctor?

13   A    It's Mister.

14   Q    Okay.  Now, you mentioned this RAD Stat program that

15   you utilized; correct?

16   A    Yes.

17   Q    Now, the RAD Stat creates a data-set.  Agreed?

18   A    It creates a printout of random numbers, yes.

19   Q    And you provided that printout to the Government;

20   correct?

21   A    That's correct.

22   Q    And I'm just -- just so you and I are on the same

23   page -- I'm just going to hand you a copy of what I have

24   as the printout for Blue Cross/Blue Shield.  And just

25   tell me, does that look familiar?

3348

1    A    Yes, it does.

2    Q    Okay.  So this is a printout of what you would see?

3    The program would kick out these numbers; correct?

4    A    That's correct.

5    Q    And we see where it says "selection order and value"

6    on that document.  Correct?

7    A    Uh-huh.

8    Q    "Selection order" means what?

9    A    That's the order that the program actually selected

10   the random number.

11   Q    Okay.  So that would -- so when I see 84, 65 and 22,

12   that means 84 was the number correlated to the patient

13   that was number 84 on the list that you provided?

14   A    Could I see the number?  I'm not sure which one

15   you're on.

16   Q    Sure.

17   A    The order is -- RAD Stat's selected 84 the first

18   number, I mean, it's a value first but the value that

19   would actually correspond would be the value number,

20   number 11.

21   Q    Okay.  The value means what?

22   A    That would actually correspond to the sample, the

23   population.

24   Q    Okay.  For the jury, since they can't see this

25   document, let's just kind of diagram what's on this

3349

1    document for 'em.  You have "selection order".  That's

2    one column; correct?

3    A    Yes.

4    Q    And then you have "value" on the next column?

5    A    Yes.  Value means the actually random number.

6    Q    Let's go step-by-step.  Let's just use the first two

7    generated numbers so we can have an idea of what you did

8    and everything.  So the first one under, "selection

9    order" is 84?

10   A    Uh-huh.

11   Q    The first value correlated with that selection order

12   is 11?

13   A    Yes.

14   Q    The next number, what is the selection order?

15   A    That's 65.

16   Q    Okay.  And the value is?

17   A    16.

18   Q    Okay.  All right.  Now, what do these numbers mean?

19   A    Okay.  That means the very first number selection

20   order, the 84th random number selected with number 11.

21   Basically, the second column is going to be in numeric

22   order.  So basically it's going to be 11, 16, 32, 64.

23   That's -- you put 'em in order.  So actually the

24   selection order, over here that number 11, was actually

25   selected by the program the 84th number so --

3350

1    Q    Okay.  I don't understand.

2    A    Well, to make it simple.  The values are putting --

3    in descending order -- I mean --

4    Q    Ascending order.  But that doesn't start at number

5    1.  It started with 11; right?

6    A    That's the random selected, number 11 was the random

7    select.

8    Q    So, let's take a step prior to this generation.  You

9    numbered -- you took a list of patients; correct?

10   A    That's correct.

11   Q    And you put a number next to those patients?

12   A    That's correct.

13   Q    Is that the value?

14   A    No, the number is just a number.  It's just one

15   through the population.  So the sample item selected was

16   the number.

17   Q    Let's cut to the chase.  This where it says

18   "selection order" and "value", who does that refer to?

19   A    That refers to line item from the population number

20   11.

21   Q    Okay.  So that would be the person that you labeled

22   as number 11 in your spreadsheet?

23   A    That's correct.

24   Q    Okay.  Now, the picture that I'm not getting a full

25   picture of is I see your work as far as pulling the

3351

1    numbers that came up.  Okay?

2    A    Okay.

3    Q    What we don't have is a spreadsheet that correlates

4    number 1 to a certain patient.  Did you -- do you have

5    that spreadsheet?

6    A    No.  I mean, I think we provided it.

7    Q    You provided it?

8    A    I don't know.  I'm not sure if I provided that or

9    just the sample items.  Basically, that's why we sort

10   the population by certain things so that anybody could

11   reproduce that listing if they so desire.

12   Q    Right.  I understand that.  But your testimony is,

13   is that you gave the Government the names that should be

14   selected randomly based on the statistical work that you

15   did with the RAD Stat; correct?

16   A    Yes.

17   Q    Okay.  All right.  So we have several pictures here.

18   We have picture one, your step one, where you take the

19   actual names and you number the names.  That's step one;

20   correct?

21   A    That's correct.

22   Q    Step two, you input that information into the RAD

23   Stat program and you program it and it runs the numbers;

24   correct?

25   A    That's correct.

3352

1    Q    And then step three, you have the output of that

2    program which identifies the randomly selected numbers?

3    A    Uh-huh.

4    Q    And then step four would be to correlate those

5    randomly sampled numbers to the work you did there in

6    step one; correct?

7    A    Yes.

8    Q    Okay.  What we have is, we have step two, your

9    programming that you put in; and then three, the

10   results.  What I want to see is step one, the names that

11   correlate to the numbers, and step four, who these

12   individuals are that correlate to the values that were

13   produced.

14   A    Four you should have --

15   Q    Okay.

16   A    -- for sure.  And I would think you would probably

17   have step one, too, but I --

18   Q    Do you know what that document would be titled?

19   A    No, I do not.

20                    (Off-the-record discussion

21                     between counsel.)

22   Q    Now, just using Exhibit -- can we look at Exhibit

23   13, that spreadsheet that we have.  I'd just like the

24   numbers there like 1 through 10 and the names.  That

25   would be fine for right now.

3353

1          Now, the spreadsheet that we have that's in

2     evidence, we have 1 through 15, but that's -- 14 of 'em

3     are for one patient and number 15 is for a second

4     patient.  Do you see that?

5     A    Uh-huh.

6     Q    Is there another spreadsheet in existence that would

7     say A Wilson -- or, excuse me -- Wilson A correlates to

8     value number 11 or value number 12?

9     A    There should be a listing of that, yes.

10    Q    What's the title of that spreadsheet?

11    A    I don't know.  It would have just been a worksheet.

12    Q    You gave it to the Government?

13    A    Yeah.

14    Q    Who did you give it to specifically?

15    A    I believe it went through the OIG Agent, James

16    Greer.

17    Q    When did you first speak to James Greer about

18    conducting this analysis, this RAD Stat analysis?

19    A    I don't know the specific dates.  It was -- must

20    have been around in 2007, I believe.

21    Q    As you testify here today, can you state without a

22    doubt that the names that you provided to James Greer as

23    the valid random sample were actually pulled by him and

24    correlated with the charts that were introduced --

25    A    I didn't have any part to do with that.

3354

1    Q    So, you don't know if he followed your random

2    sample; correct?

3    A    No.

4    Q    And you don't have the chart here so we can double

5    check and make sure that he did it right?

6    A    No.

7              MR. WILLIAMSON:  I don't have anything

8    further.

9              THE COURT:  Redirect.

10             MR. FLEENOR:  Just briefly, Your Honor.

11                  **REDIRECT EXAMINATION**

12   BY MR. FLEENOR:

13   Q    Nothing magical about pulling the files.  Isn't it

14   true that the person would just have to follow the list

15   that you generated and pull the files?

16   A    Yes.  Just match up the names.  And we have -- the

17   data that I gave 'em had the names, date of birth,

18   social security number.  So they had all the information

19   there so --

20   Q    And if the work product was produced to Defendants'

21   counsel, they would have all the information that you

22   had?

23   A    Yeah.

24   Q    Now, secondly, Mr. Gorokhov asked you about -- if I

25   understood the question correctly -- was random sampling

3355

1    of procedure codes.  Is that how you understood his

2    question?

3    A    Yeah.

4    Q    Is it valid to do an audit to specific procedure

5    codes?

6    A    Sure.

7    Q    But in this case it was even broader than that, was

8    it not?

9    A    Yea.  It was all the payments received for a

10   particular patient, yes.

11   Q    So all of the claims that had been submitted after

12   it had been stratified were captured in your random

13   sample?

14   A    Yes, uh-huh.

15           MR. FLEENOR:  Nothing further.

16           THE COURT:  Sir?

17           MR. GOROKHOV:  Nothing further, Your Honor.

18           THE COURT:  Mr. Williamson.

19           MR. WILLIAMSON:  Nothing, Your Honor.

20           THE COURT:  Thank you, sir.  You're excused.

21   Next witness please.

22                        **JEAN RUMBAUGH**

23   Having been first duly sworn to tell the truth, the

24   whole truth and nothing but the truth, testified as

25   follows on:

3356

1                    **DIRECT EXAMINATION**

2    BY MS. TREADWAY:

3    Q    Could you please introduce yourself to the jury.

4    A    Yes.  My name is Jean Rumbaugh.

5    Q    Where are you currently employed?

6    A    I'm currently employed with the University of Kansas

7    Hospital.

8    Q    And how long have you been employed there?

9    A    A little over two years.

10   Q    And do we call that K.U. Med for short?

11   A    People call it K.U. Med for short.

12   Q    And what do you for K.U. Med, Ms. Rumbaugh?

13   A    I'm the Director of Program Development and

14   Planning.

15   Q    Can you briefly tell the jury about your educational

16   background starting with college?

17   A    Yes.  I have my Bachelor's degree I received through

18   Gustavus Adolphus College, which is in St. Peter,

19   Minnesota; and then my Master's degree is in Health and

20   Human Services, and I received that through St. Mary's

21   College -- or University in Minneapolis, Minnesota.

22   Q    Were you previously employed by First Guard?

23   A    Yes, I was.

24   Q    Does First Guard still exist?

25   A    No, it does not.

3357

1    Q    Why not?

2    A    In 2006 our contract with the State of Kansas to

3    administer the Medicaid benefits was not renewed.  We

4    also had a contract with the State of Missouri and we

5    sold that part of the business and closed the First

6    Guard office in Kansas City.

7    Q    What was your job at First Guard?

8    A    During this time my position was as Chief Operating

9    Officer.

10   Q    And what were your responsibilities as the Chief

11   Operating Officer at First Guard?

12   A    I was responsible for the operations of the health

13   plan, which included things such as provider relations,

14   information system, claims payment, member services,

15   compliance.

16   Q    Did First Guard receive public monies from which to

17   pay claims submitted by healthcare providers?

18   A    Yes, we did.

19   Q    And explain what public monies First Guard would

20   receive?

21   A    We had a contract with the State of Missouri and a

22   contract with the State of Kansas and the states paid us

23   to then administer the Medicaid benefits, health

24   benefits, for those individuals who are enrolled with

25   First Guard.

3358

1    Q    First Guard was a type of insurance called a HMO.

2    Can you tell the jury what that means?

3    A    Sure.  A Health Maintenance Organization is an

4    insurance product where the individual makes a choice,

5    they choose health -- First Guard or are assigned First

6    Guard through the Medicaid program and then they choose

7    or are assigned a primary care physician and their care

8    is coordinated or managed through that primary care

9    physician with referrals to specialists.  So we manage

10   the administration of the medical benefit.

11   Q    Was First Guard engaged in interstate commerce?

12   A    Yes.

13   Q    Now, how would a healthcare provider become

14   associated with First Guard to be able to bill First

15   Guard for services?

16   A    If a provider wanted to be part of First Guard, they

17   would apply to First Guard.  There was a credentialing

18   process.  And then also if they -- from a credentialing

19   process, then they would be offered a contract.  And in

20   the State of Kansas our contract, First Guard, actually

21   leased our provider network through Heartland, HPHN,

22   which was a subsidiary of Kansas Medical Society.  So

23   the contract was actually with HPHN and we leased those

24   contracts for the provider network.

25   Q    Is that a complicated way of saying somebody else

3359

1    did this?

2    A   Well, they held the contract.  We did a lot of the

3    administrative work.

4    Q   Let me hand you what has been marked for

5    identification as Exhibit 14-C.  Do you recognize that?

6    A   Yes, I do.  It is a Heartland Physician Health

7    Network, or HPHN, contract for physician services.

8    Q   And is it associated with the Defendant in this case

9    Stephen Schneider?

10   A   Yes.  This is Dr. Schneider's contract.

11   Q   And did he sign that document on Page 17?

12   A   Yes, it was signed on 4-15-02.

13   Q   And did the Defendant Stephen Schneider become

14   eligible to bill First Guard through this agreement and

15   previous, previous agreements?

16   A   This is a replacement agreement.  He was a member

17   contracted through HPHN prior to this.  We had to

18   recontract the network based upon some new Medicaid

19   agreements.  So this is the most current agreement.  So

20   it has -- includes the basic agreement and it includes

21   two attachments for the Healthwave 19 and the Healthwave

22   21 products.

23   Q   Those were two additional types of insurance

24   products?

25   A   Those describe the specifics about the two Medicaid

3360

1    programs with 19 and 21.

2    Q    Now --

3              MS. TREADWAY:   Government offers Exhibit 14-C,

4    Judge.

5              MR. GOROKHOV:   No objection.

6              MR. WILLIAMSON:   No objection.

7              THE COURT:   It's received.

8    BY MS. TREADWAY:

9    Q    I'd like you to turn to Page 2 of that exhibit.  And

10   I'd like to read a couple of provisions.  First of all,

11   provision 1.3 talking about covered services.  Could you

12   read that for the jury please?

13   A    Sure.  "1.3, Covered Services, means those medically

14   necessary health services and benefits to which members

15   are entitled under the terms of an applicable contract

16   or applicable law as may be amended by health plan from

17   time to time."

18   Q    And then in Paragraph 1.7, does the contract further

19   define what medically necessary means?

20   A    Yes.  "Medically necessary means, unless otherwise

21   defined in the member's contract or by applicable law,

22   services or supplies required to identify or treat a

23   member's illness or injury in which as determined by

24   health plan are, A, consistent with the symptoms or

25   diagnosis and treatment of the member's illness and

3361

1    injury; B, appropriate with regard to standards of good

2    medical practice; C, not solely for the convenience of

3    the member, participating provider or other healthcare

4    provider; and D, the most appropriate supply or level of

5    service which can be safely provided."

6    Q   Okay.  Thank you.  Now, turning to Page 5 of this

7    agreement.  At the bottom of the page, Paragraph 3.2,

8    can we talk about claims submission.

9    A   3.2 is under Section 3, Obligations of Physicians.

10   And it indicates:  "Claims Submission:  Physician shall

11   exercise his or her best efforts to submit all health

12   claims to Health Plan within 120 days after the date of

13   service."

14   Q   Now I want to skip to the next page.  And the

15   last -- I'm sorry -- the last sentence of that

16   paragraph.

17   A   "Physician shall submit claims according to

18   specifics developed by the Health Plan and as required

19   by applicable law."

20   Q   Ms. Rumbaugh, when a physician becomes a First Guard

21   provider, do they agree to be responsible for the claims

22   submited to First Guard?

23   A   Yes, they do.

24   Q   Do they agree to submit truthful and accurate

25   claims?

3362

1    A   Yes, they do.

2    Q   And is that a condition of being able to submit

3    claims and be paid?

4    A   Yes.

5    Q   After being paid by the First Guard program, can a

6    physician choose to opt-out of being responsible for the

7    claims submitted to First Guard and for which he has

8    been paid?

9            MR. WILLIAMSON:  Your Honor, I'm going to

10   object.  This is blurring the lines as we discussed

11   yesterday between criminal liability and contract

12   liability.

13           MR. GOROKHOV:  Your Honor --

14           THE COURT:  I think she's just talking about

15   contract liability at this point.

16           MR. WILLIAMSON:  As long as that's clear.

17           MS. TREADWAY:  It's a provision of the

18   contract to be able to be billing First Guard, Judge.

19           THE COURT:  The objection is overruled.

20   BY MS. TREADWAY:

21   Q   Let me ask the question again, Ms. Rumbaugh.

22   A   Thank you.

23   Q   After being paid by the First Guard program, can a

24   physician choose to opt-out of being responsible for the

25   claims submitted to First Guard and for which he's been

3363

1   paid?

2   A   No.  During the term of the contract, they are

3   responsible for the contract terms.

4   Q   As part of the physician's responsibility for

5   submitting claims, does the physician represent every

6   time a claim is submitted under his name that it is

7   truthful and accurate?

8   A   Yes.

9   Q   Can a physician disclaim responsibility for the

10  claims submitted by blaming the people who enter the

11  claims data?

12  A   No.

13  Q   Can a physician disclaim responsibility for the

14  claims submitted by blaming the person who filled out an

15  internal document used for billing, such as the fee

16  tickets in this case?

17          MR. GOROKHOV:  Your Honor, I'm going to

18  object.  Blaming in what context?

19          MS. TREADWAY:  In the context suggested by

20  cross-examination, Judge.

21          MR. WILLIAMSON:  It's not suggested by

22  cross-examination.  It was admitted by witnesses on the

23  stand.

24          THE COURT:  Well, I don't know how she could

25  know unless this is something that's in the contract.  I

3364

```
 1    don't know how she can answer that question.
 2                 MS. TREADWAY:  I can move on, Judge.
 3                 THE COURT:  All right.
 4    BY MS. TREADWAY:
 5    Q   If the claim is false, Ms. Rumbaugh, whose
 6    responsibility is it?
 7    A   The individual -- the person who the contract is
 8    with and whose --
 9                 MR. GOROKHOV:  Your Honor, same objection.
10    Responsibility in what context?
11                 THE COURT:  The objection is overruled.  I
12    believe, unless you tell me otherwise, that we're
13    talking here about the interpretation and the language
14    of the contract.  Is that correct?
15                 MS. TREADWAY:  That's correct, Judge.
16                 THE COURT:  Well, you all have had the
17    contract.  You've been able to read it.  You can
18    cross-examine her about the contract.  That's what we're
19    here for at this point.
20    BY MS. TREADWAY:
21    Q   So, if the provider is a physician, who is
22    responsible for the false claim?
23    A   The provider.
24    Q   Now, did other providers at the Schneider Medical
25    Clinic besides Stephen Schneider become eligible to bill
```

3365

```
 1   First Guard over time?

 2   A    There were contracts with other providers at the

 3   Schneider Clinic.

 4   Q    And let me hand you what has been marked for

 5   identification as Government Exhibit 14-D.  Is that a

 6   summary list of those providers?

 7   A    This is a list of the physician assistants,

 8   mid-level providers, who were contracted and associated

 9   with the Schneider Clinic through First Guard contracts.

10   Q    And did they receive their individual provider

11   numbers?

12   A    Yes.  The provider numbers are listed.

13             MS. TREADWAY:  Government would offer Exhibit

14   14-D.

15             MR. WILLIAMSON:  No objection.

16             MR. GOROKHOV:  No objection.

17             THE COURT:  It's B or D?

18             MS. TREADWAY:  D as in dog, sir.

19             THE COURT:  It's received.

20   BY MS. TREADWAY:

21   Q    Are physician's assistants paid at a different rate

22   than physicians?

23   A    Yes.  Prior to -- actually First Guard had a change

24   in policy on this.  At one point we did pay the

25   physician's assistants at the same level as the primary
```

1    care physicians.  We changed that policy and the

2    mid-levels were paid at 75% of the fee schedule.

3    Q    Let me hand you what has been marked for

4    identification as Exhibit 14-B.  Do you recognize that

5    set of documents?

6    A    Yes.  It's a letter -- the top one is a letter that

7    First Guard sent to all of the providers notifying them

8    of the change of policy that I just talked about.  The

9    letter was dated October 24th, 2004.  And it indicates

10   that on December 1st, 2004, the First Guard changed our

11   policy and requires all mid-level practitioner PA and

12   ARNPs be added to the First Guard database so they would

13   have their individual provider number and could bill

14   separately for those services that were consistent with

15   their license and consistent with the incident-to

16   Medicare billing guidelines.

17           MS. TREADWAY:  Government would offer Exhibit

18   14-B.

19           MR. GOROKHOV:  No objection.

20           MR. WILLIAMSON:  No objection.

21           THE COURT:  It's received.

22   BY MS. TREADWAY:

23   Q    Let's look at this letter.  You said it was dated

24   October 27, 2004.  And let's read the first sentence of

25   the first paragraph please.

3367

1    A    Okay.  "Effective December 1st, 2004, First Guard

2    health plan will require that all mid-level practitioner

3    PA's and ARNP's be added to the First Guard provider

4    database and issued an individual provider number."

5    Q    PA is physician assistant.  What is an ARNP?

6    A    An Advanced Registered Nurse Practitioner.

7    Q    Then the next sentence is important.  Could you read

8    that?

9    A    "Until December 1st, 2004, First Guard allowed

10   non-physician practitioners to bill their services under

11   incident-to guidelines meaning that the supervising

12   physician could bill for the provided services."

13   Q    So under incident-to guidelines, can you explain

14   what that means to the jury?

15   A    It's very specific Medicare guidelines about when a

16   physician bills -- does the bill or when the mid-level

17   practitioner is independent and bills specifically.  So

18   the incident-to guidelines refers back to those Medicare

19   guidelines.

20   Q    And those are the guidelines that First Guard used

21   until December 1st, 2004?

22   A    Until December 1st, 2004, we allowed the physicians

23   to bill for the mid-levels.  And then after December 1st

24   then we mirrored the state policy which is -- so it

25   would be consistent with the state guidelines where the

3368

1    mid-levels actually had their own provider number and

2    billed separately.

3    Q    So until December 1st, 2004, you followed Medicare

4    incident-to guidelines?

5    A    Yeah, we, we did.

6    Q    All right.  Now, if the evidence in this case will

7    be that the Defendant Linda Schneider told a physician's

8    assistant that the clinic did not bill incident-to

9    provisions, what would that mean to you?

10   A    Prior to December 1, 2004, that they were not

11   billing consistent with their First Guard contract.

12   Q    Now, turning to the next two pages of Exhibit 14-B,

13   this appears to be a provider administration manual

14   dated September, 2006.  And does this have the specific

15   reference to the 75% payment rate for physician's

16   assistants?

17   A    Yes.  Every year we updated a provider

18   administration manual that went into great detail about

19   very specific things.  And on Page 144 there's a section

20   where mid-level practitioner credentialing -- and the

21   last sentence is that:  "Please keep in mind that

22   mid-level practitioners are reimbursed at 75% of the

23   state fee schedule."

24   Q    Let me hand you what has been marked for

25   identification as Exhibit 14-A.  Is this another

1    provider administration manual for First Guard?

2    A    It is the same provider administration manual with

3    different pages.

4    Q    And is it the manual excerpts regarding the

5    documentation requirements?

6    A    It includes on Page 18 through Page 20 medical

7    record review requirements.

8    Q    And does that indicate what kind of records First

9    Guard wanted and required its providers to maintain?

10   A    Yes.  It indicates that the -- that this procedure

11   outlines expectations for medical record documentation

12   measured in quality improvement focussed studies.  Then

13   it says:  "The following items -- "

14   Q    Before you start reading.  Would this document have

15   been sent to all providers that were being -- that were

16   billing First Guard?

17   A    Right.  The provider administration manual was

18   provided to all providers.

19             MS. TREADWAY:  Government offers Exhibit 14-A.

20             MR. GOROKHOV:  No objection.

21             MR. WILLIAMSON:  No objection.

22             THE COURT:  It's received.

23   BY MS. TREADWAY:

24   Q    Did First Guard have these documentation

25   requirements during all the years that Defendant Stephen

3370

1    Schneider was submitting claims to First Guard?

2    A    We updated our provider administration manual every

3    year.  I don't recall that we ever updated this section.

4    But I didn't go and pull previous provider

5    administration manuals.

6    Q    Let's look at some of the documentation requirements

7    on Page 18.  Those are outlined at the very top of the

8    page there.  Could you just read that first paragraph

9    and the bulleted points with the jury?

10   A    "First Guard requires providers maintain an adequate

11   and complete patient record for each patient and may

12   maintain electronic records provided recordkeeping

13   format is capable of being printed for review.  An

14   adequate and complete patient record shall include

15   documentation of the following information."

16        First bullet:  "Identification of the patient,

17   including name, birthday, address and telephone number.

18   Date the patient was seen.  Current status of the

19   patient, including the reason for the visit.

20   Observation of pertinent physical findings.  Assessment

21   and clinical impressions for diagnosis.  Plan for care

22   and treatment or additional consultations or diagnostic

23   testing if necessary.  If treatment includes medication,

24   physician shall include in the patient record the

25   medication and dosage for any medication prescribed,

1    dispensed or administered.  Any informed consent for

2    office procedures."

3    Q    Then at the bottom it's talking about medical review

4    requirements.  Now, what are we moving into in this part

5    of the manual?

6    A    We're looking at what is actually kept in the

7    medical record.

8    Q    And let's just review some of those.  First of all,

9    item 6, what does that state?

10   A    Item 6 indicates, "The record is legible by someone

11   other than the writer, and in parenthesis, a second

12   surveyor examines any record judged to be illegible by

13   one surveyor doing a record review."

14   Q    And number 7 through 18?

15   A    Okay.  7 is:  "Significant past surgery, illnesses

16   recorded on the problem list."

17        8 is:  "Medical allergies and adverse reactions are

18   recorded on the problem list and are prominently

19   displayed on the chart folder."

20        9 is:  "Continuing or (chronic medications) are

21   ordered on the medication list."

22        10 is:  "Appropriate past medical history and

23   social history is recorded (for patients seen three or

24   more times)."

25        11 is:  "Subjective/objective findings are

3372

1      pertinent to the presenting problem."

2          12 is:  "Laboratory and other studies ordered (as

3      appropriate)."

4          13 is:  "The working diagnosis is consistent with

5      findings."

6          14 is:  "Treatment plans consistent with the

7      diagnosis."

8          15 is:  "Visit notes have a notation when indicated

9      regarding follow-up care, calls or visits.  Specific

10     time or return is noted in weeks, months or as-needed."

11         16 is:  "Unresolved problems from previous visits

12     addressed in subsequent visits."

13         17 is:  "The record contains consultation reports,

14     discharge summaries (as appropriate)."

15         And 18 indicates:  "Consultation, reports and lab

16     X-ray results validated by the ordering practitioner."

17     Q   And then could you read 22 through 25?

18     A   Okay.  22 is:  "The record contains evidence of

19     referral forms (as applicable)."

20         23:  "Indicates informed consents are present and

21     signed by the patient (as applicable)."

22         24 is: "Patient outreach and education documented."

23         25 is:  "Prescriptions indicate dose instructions,

24     amount dispensed and number of refills."

25     Q   That's it.  Thank you.  Now, at some point in time

3373

1    did First Guard develop concerns about the quality of

2    care being provided at the Schneider Medical Clinic?

3    A   Yes, we did.

4    Q   Let me hand you what has been marked for

5    identification as Government Exhibit 14-F.  Is that a

6    letter you wrote to the clinic?

7    A   Yes, it is.

8            MS. TREADWAY:  Government offers Exhibit 14-F.

9            MR. WILLIAMSON:  No objection, Your Honor.

10           MR. GOROKHOV:  No objection.

11           THE COURT:  It's received.

12   BY MS. TREADWAY:

13   Q   Let's look at this letter.  What is the date of this

14   letter, ma'am?

15   A   September 22nd, 2004.

16   Q   And yet by the contents of the letter, is this the

17   first contact you've had with the Schneider Medical

18   Clinic about their quality of care?

19   A   No.

20   Q   To whom is this letter addressed?

21   A   It's addressed to the Schneider Medical Clinic

22   attention Dr. St. Clair and Dr. Schneider.

23   Q   Was Dr. St. Clair another provider associated with

24   First Guard?

25   A   Yes.

3374

1    Q   Let's review the first paragraph for the jury

2    please.

3    A   Go ahead and read it?

4        The first paragraph says:  "I was not able to reach

5    you today to discuss the corrective action plan

6    submitted to First Guard.  First Guard continues to

7    receive grievances from members related to appointment

8    scheduling, long wait times and treatment of commercial

9    members prior to First Guard members; therefore, your

10   response of corrective processes are not acceptable to

11   address the continued concerns.  Please provide revised

12   corrective processes that address all the issues

13   presented by September 27th, 2004."

14   Q   Now, I think the jury will understand easily the

15   appointment scheduling and the long wait times; but you

16   say treatment of commercial members prior to First Guard

17   members.  What is a commercial member?

18   A   A commercial member in this context is someone who

19   has private insurance or has insurance through their

20   employer.  And one of the things as a Medicaid

21   contractor that we monitor, and actually I think the

22   contract even addresses, is that there is no

23   discrimination based upon payer.

24   Q   And what did you learn that made you concerned about

25   treatment of commercial members prior to First Guard

3375

1    members?

2    A    This was related to administrative correction action

3    plan and we had members who called in and so we had a

4    quality improvement -- a quality process with

5    complaints, appeals and grievances and we had a numerous

6    number of people who were calling to complain because

7    either staff was rude, there was long waits or we had

8    people who indicated that they thought that they were

9    not being seen in -- that other people were being seen

10   before them because they had better insurance.

11   Q    Let me hand you what has been marked for

12   identification as Exhibit 14-E.  Do you recognize that

13   document?

14   A    Yes, I do.

15   Q    Was that a document that was sent to the

16   Defendant -- I'm sorry -- sent to First Guard?

17   A    This is a document that we sent to Dr. Schneider on

18   December 8, 2004, and it's related to a quality of care

19   review.

20   Q    And is that different than the administrative

21   corrective action plan?

22   A    Yes.

23   Q    All right.  So I got that wrong.  That is a First

24   Guard document?

25   A    This is a First Guard document, yes, it is.

3376

1    Q   And who is William Pankey, the signatory on this

2    document?

3    A   Dr. Pankey is the Chief Medical Officer at First

4    Guard.

5              MS. TREADWAY:  Government offers the December

6    8, 2004 letter, Exhibit 14-E.

7              MR. GOROKHOV:  No objection, Your Honor.

8              MR. WILLIAMSON:  No objection, Your Honor.

9              THE COURT:  It's received.

10   BY MS. TREADWAY:

11   Q   Now, generally speaking, Ms. Rumbaugh, what is this

12   letter informing the Defendant Stephen Schneider and the

13   Schneider Medical Clinic?

14   A   We had a -- some -- quality of care issue and

15   review.  Our quality of care peer reviews, reviewed it

16   and actually were informing Dr. Schneider that based

17   upon that, we were putting them on a corrective action

18   plan.

19   Q   And are the reasons behind this corrective action

20   plan actually set forth in this letter?

21   A   Yes.

22   Q   All right.  Let's review the paragraph that starts,

23   "A few comments from committee members were".  And this

24   is the peer review committee?

25   A   This is the peer review committee who reviewed the

3377

1    records.

2    Q    And could you read that for the jury please?

3    A    Sure.  "A few comments from committee members were

4    primary care physicians who choose to manage chronic

5    pain patients must be particularly disciplined in their

6    management.  Documentation showed lack of coordination

7    with local pharmacists, repetitive documentation of poor

8    control of patient compliance to the pain management

9    agreements.  It is dangerous in the current industry

10   environment to use off-label prescription drugs without

11   scientific support, especially if there is no pharmacy

12   data for use of this drug by pain management specialists

13   in the First Guard network."

14   Q    And what were the off-label prescription drug that

15   was the concern?

16   A    Actiq.

17   Q    Did First Guard propose a corrective action plan?

18   A    Yes, we did.  There was a --

19   Q    Let me hand you what has been marked for

20   identification as Government Exhibit 102.  Is that the

21   proposed corrective action plan?

22   A    Yes, it is.

23   Q    Let me get that before you start talking about it.

24   I apologize.

25        Is this a document that was sent to the Schneider

3378

1    Clinic by First Guard?

2    A   Yes, it is.

3              MS. TREADWAY:   Government would offer Exhibit

4    102.

5              MR. GOROKHOV:   No objection.

6              MR. WILLIAMSON:   No objection, Your Honor.

7              THE COURT:   It's received.

8    BY MS. TREADWAY:

9    Q   Looking at this document briefly, what is its date?

10   A   December, 2004.

11   Q   And was this regarding the quality of care concerns

12   that the peer review committee had developed?

13   A   Yes, it is.

14   Q   I would just like to look at a couple of items.

15   First of all, Number 1, what do you immediately set in

16   place?

17   A   We essentially closed their panel to new members and

18   also reported them to the national provider database as

19   we're required to do.

20   Q   What is the national provider database?

21   A   It is a national database where if there are adverse

22   credentialing types of actions or quality actions

23   against a provider that you report it to.  So insurance

24   companies and others, when we are doing credentialing,

25   we query that database so that we can see if there's any

1    history that we need to be aware of as we credential

2    this provider.

3    Q    Can you then look at and read item 2?

4    A    2 is:  "Engaged the services of board certified pain

5    management specialist to advise the PCP practice under

6    reasonable hierarchy of use of controlled substances and

7    DEA classes IV, III and II (most) potent, which will be

8    documented and submitted to First Guard."

9    Q    So this was a requirement that you were asking the

10   clinic to abide by?

11   A    Yes.  All of these are requirements.

12   Q    And what was number 3?

13   A    3 was: "Revise the practice pain management contract

14   to reflect Schneider Clinic physicians as the pain

15   management provider and prescriber."

16   Q    Do you remember what the genesis of that was?

17   A    No.

18   Q    Number 4?

19   A    4 is: "Submit to First Guard a protocol to assure

20   consistent and complete use of a pain assessment and

21   documentation tool for each patient visit."

22   Q    And item 6?

23   A    Item 6 is:  "Limit use of oral trans-mucosal

24   Fentanyl for rescue pain to FDA indications or submit

25   scientific support for off-label use in nonmalignant

3380

1    chronic pain."

2    Q   And the oral trans-mucosal Fentanyl, is that the

3    Actiq?

4    A   Yes, it is.

5    Q   Did the Defendant Stephen Schneider and Donna St.

6    Clair agree to the corrective action plan?

7    A   Yes, they did.

8    Q   Let me hand you what has been marked for

9    identification as -- and admitted into evidence as

10   Exhibit 104.  If I can find it here.  Excuse me, Judge.

11       Mr. Moore, I'm going to need your assistance.  Can

12   we just display that for the jury while I'm looking for

13   it.  Right in front of my face, too.

14       This is Exhibit 104 which has already been admitted

15   into evidence, Ms. Rumbaugh.  Are you familiar with that

16   document?

17   A   Yes, I am.

18   Q   And what is the date of that document?

19   A   The date of this document is January 4th, 2005.

20   Q   And is it addressed to the First Guard Health Plan?

21   A   It is addressed to the First Guard Health Plan,

22   Corrective Action Plan Chronic Pain Management.

23   Q   And has it been signed by Stephen Schneider and

24   Donna St. Clair?

25   A   It was signed by both physicians and actually the

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

3381

1    second page is an acknowledgement of acceptance.

2    Q   The numbers in this letter, do they correspond to

3    the numbers in the document we just reviewed with the

4    jury, Exhibit 102?

5    A   Yes, they do.

6    Q   All right.  And so when you said you need to get a

7    board certified advisor in pain management, what was

8    Stephen Schneider and Donna St. Clair's response?

9    A   "Doctor Graves T Owen, M.D. board certified in pain

10   management, will be our advisor."

11   Q   And then as to 6, what is their response with

12   regards to the Actiq issue?

13   A   "Will no longer use trans-mucosal Fentanyl for First

14   Guard patients, although there is scientific support for

15   off-label use which we can provide."

16   Q   Now, there are some attachments to this transmittal

17   back to First Guard.  The first is an acceptance of the

18   corrective action plan.  And is that signed by Stephen

19   Schneider on December 29th of '04?

20   A   Yes, it is.

21   Q   And then next we have what appears to be a business

22   card.  And is that related to the representation in

23   Paragraph 2 that Graves Owen will be their advisor?

24   A   It appears that this is his business card.

25   Q   All right.  And then with regard to item number 3

3382

1    about a pain management agreement, do they attach a new

2    pain management agreement?

3    A    Yes, they do.

4    Q    And let's look at that pain management agreement.

5    Could you read the first paragraph of that agreement?

6    A    "This is a family practice clinic.  We are not pain

7    management specialists.  We believe treating pain is a

8    basic duty of family practice.  If your pain is not

9    controlled, or want to see a pain specialist, we will be

10   happy to refer you to one."

11   Q    Now, did this corrective action plan occur over

12   time?

13   A    Yes.

14   Q    During the time period that it was occurring, did

15   First Guard continue to request information from the

16   Defendant Stephen Schneider, Donna St. Clair and the

17   Schneider Medical Clinic?

18   A    Yes, we did.

19   Q    Let me hand you what has been marked for

20   identification as Government Exhibit 105.  Is that such

21   a request for information?

22   A    Yes.

23            MS. TREADWAY:  Government would offer Exhibit

24   105.

25            MR. WILLIAMSON:  One second, Your Honor.

3383

```
 1              MR. WILLIAMSON:  No objection, Your Honor.

 2              MR. GOROKHOV:  No objection.

 3              THE COURT:  It's received.

 4    BY MS. TREADWAY:

 5    Q   I'd like to direct your attention, ma'am, first of

 6    all, to the date.  And the date is what?

 7    A   April 4th, 2005.

 8    Q   And then I would like to direct your attention to

 9    who it's directed to.

10    A   It is attention to Linda and Dr. Stephen Schneider.

11    Q   And then down in the message area.  Could you read

12    that for the jury please?

13    A   The message is:  "Please have Dr. Schneider provide

14    a written narrative summary to the interventions

15    regarding the corrective action plan.  We will also need

16    documented discussions and follow-up that occur with Dr.

17    Graves Owen from the Texas Rehab Institute.  Thanks."

18    Q   And is that last request in bold?

19    A   It's either bold or italic.

20    Q   Let me next hand you what has been marked for

21    identification as Government Exhibit 106.  Does that

22    appear to be a responsive document to the April 4th

23    document just spoken about?

24    A   Yes, it is.

25    Q   And is that a memo that appears to be from both the
```

3384

1    Defendant Stephen Schneider and Dr. Donna St. Clair?

2    A    Yes.   To First Guard regarding corrective action

3    plan and both of the physicians have signed it.

4             MS. TREADWAY:   Government would offer Exhibit

5    106.

6             MR. GOROKHOV:   No objection on behalf of

7    Linda, Your Honor.

8             MR. WILLIAMSON:   No objection.

9             THE COURT:   It's received.

10   BY MS. TREADWAY:

11   Q    Now, I want you to find the sentence that begins

12   with "since doctor" -- do you see that?

13   A    Uh-huh.

14   Q    Could you read that please?

15   A    "Since Dr. Terry Owens agreed to be our advisor, we

16   have had several discussions with him and his clinic

17   (Texas Pain Rehabilitation Institute).   With their help,

18   we've adapted the following."

19   Q    Okay.  Ms. Rumbaugh, the jury has heard from Graves

20   T Owen.  He's testified before this jury.  And he's

21   testified that he does not go by the name of Terry.  He

22   also further testified that he never advised the

23   Defendant or anyone else at the clinic after he met with

24   them at a lunch meeting in December of 2004.  Would

25   First Guard have acted differently during the course of

1    this corrective action plan had it known the

2    representations in this memorandum were false?

3            MR. WILLIAMSON:  Your Honor, I'm going to

4    object.  A, to the implication that the representations

5    are false.  Graves Owens said he did not remember when

6    we confronted him with phone records and he said that he

7    did fax information to the clinic.  There was also

8    evidence that there were incorporations that Graves

9    Owens gave the clinic as far as documentation that they

10   now use in their records.  That's just a total

11   misrepresentation of the prior testimony.  And lack of

12   foundation.

13           THE COURT:  The jury will remember his

14   testimony.  It's up to the jury to decide whether or not

15   his -- the representation is false.  Go ahead.

16           MS. TREADWAY:  Thank you.

17   BY MS. TREADWAY:

18   Q   Ma'am, had you known about these representations and

19   Dr. Owen's testimony regarding the corrective action

20   plan, would First Guard have acted differently?

21   A   If we had known about -- that this had not occurred,

22   we would have presented that to our quality review peer

23   committee and they would not have met the requirements

24   of the corrective action plan which required advisement

25   through a board certified pain management physician.

1    Q    Let me next hand you what has been marked for

2    identification as Exhibit 14-H.  Is that a document from

3    the Defendant Linda Schneider and the Schneider Medical

4    Clinic dated approximately April 6, 2006?

5    A    Yes, it is.

6    Q    Is that a document that First Guard would have kept

7    and maintained in the regular course of its business?

8    A    Yes.

9          MS. TREADWAY:  Government would offer Exhibit

10   14-H as both an admission by the Defendant Linda

11   Schneider as well as a business document under 803(6).

12         MR. GOROKHOV:  Can we take a look, Your Honor?

13         MS. TREADWAY:  We gave them to them earlier

14   this week, Judge.

15         MR. GOROKHOV:  Your Honor, I'd object that,

16   number 1, I don't understand how this is an admission of

17   any kind; but, number 2, we're skipping two years into

18   the future here.  It's misleading the jury, Your Honor.

19         THE COURT:  I didn't understand what you said.

20   You said -- the last part of your statement.

21         MR. GOROKHOV:  That this is two years after

22   what she just testified about, Your Honor.

23         MS. TREADWAY:  It's another topic, Judge.

24         THE COURT:  Can I look at it for a minute?

25         MS. TREADWAY:  Sure.

3387

1                THE COURT:   The objection is overruled.   14-H

2      is received.

3      BY MS. TREADWAY:

4      Q    Does this document concern the Defendant Linda

5      Schneider's attempts to get payments from First Guard

6      for the services of a doctor by the name of Lawrence

7      Simons?

8      A    Yes.   It's a fax that was sent to Maria Gells who is

9      one of our provider relations representatives.   It's --

10     the attachment is a list of claims that were denied by

11     this physician.   And actually there's some documentation

12     to the physician started but they didn't notify First

13     Guard so we did not put him through our credentialing

14     and contracting process so he was not participating.   So

15     all of these -- it's a list of claims prior to when he

16     was credentialed and entered into the First Guard

17     network and she was asking for us to go and pay those

18     claims.

19     Q    And had she -- and so she is asking for money back

20     or money to be paid that wasn't paid?

21     A    That's correct.   And actually with documentation

22     that we indicated that, no, we would not do that.

23     Q    Let me hand you what has been marked for

24     identification and admitted as Government Exhibit 1,

25     which the jury knows to be a chronology of the overdoses

3388

1    and deaths in this case.  During the course of the

2    corrective action plan, Ms. Rumbaugh, did the Defendants

3    make anyone at First Guard aware of the fact that many

4    of their patients had been admitted to Wichita area

5    emergency rooms for overdoses or -- on prescription

6    medications?

7    A    No, they did not.

8    Q    Would you have known about that if First Guard had

9    been informed?

10   A    I believe that I would because the individuals who

11   would have been contacted were all aware that this

12   individual had been on our corrective action plan.

13   Q    During the course of this corrective action plan,

14   did the Defendants make anyone at First Guard aware of

15   the fact that many of those patients had died from

16   prescription overdoses?

17   A    No.

18   Q    By December 8th, 2004, the date of Exhibit 14-E,

19   that corrective action plan, had there been 70 overdoses

20   and overdose deaths according to Exhibit 1?

21   A    Yes.

22   Q    By April 4th, 2005, the date of Exhibit 105, the fax

23   from Ms. Wooten, had there been an additional 22

24   overdoses and overdose deaths for a total of 92?

25   A    Yes.

1    Q   Let me also hand you what has been marked for

2    identification and admitted into evidence as Exhibit

3    1-A, which is simply the chronological listing of the

4    overdose deaths.

5              MR. WILLIAMSON:  Your Honor, I'm going to

6    object.  This is cumulative and the basis of 403.  This

7    document has been entered, reviewed and reviewed and

8    re-reviewed by the Government.

9              MS. TREADWAY:  I'm asking about its

10   relationship to the corrective action plan, Judge.

11             THE COURT:  It's not been reviewed with this

12   witness --

13             MS. TREADWAY:  That's right, Judge.

14             THE COURT:  -- from First Guard.  The

15   objection is overruled.

16   BY MS. TREADWAY:

17   Q   Buy December 8, 2004, the date of the corrective

18   action plan, had there been four First Guard patients

19   die of overdoses, Ms. Rumbaugh?  Kandace B, Robert S,

20   James C, and Jon P?

21   A   According to this document, yes.

22   Q   If First Guard had been aware of the overdoses and

23   deaths, including the deaths of their own First Guard

24   beneficiaries, would First Guard have continued to pay

25   for their beneficiaries to go to the Defendant's clinic?

3390

1    A    The documentation clearly would have been part of

2    the quality review, peer review, and the option to

3    terminate the physician, in which case they would no

4    longer be participating with First Guard.

5    Q    And if they had been terminated as a First Guard

6    participant, what would have happened to the

7    beneficiaries at First Guard?  Would they have to get

8    another doctor?

9    A    We would have reassigned all of the primary -- all

10   of the people assigned to the physicians to other

11   primary care physicians and worked with them to

12   transition their care to other physicians who were

13   participating with First Guard.

14          MS. TREADWAY:  Nothing further, Judge.

15          THE COURT:  Yes, sir.

16          MR. WILLIAMSON:  Thank you, Your Honor.

17                   **CROSS EXAMINATION**

18   BY MR. WILLIAMSON:

19   Q    You were asked to come testify by the Government;

20   correct?

21   A    That is correct.

22   Q    We've never had a chance to meet, have we?

23   A    No.

24   Q    And you've done your best to answer the questions

25   Ms. Treadway asked you; correct?

1    A    That is correct.

2    Q    And one thing that was missing from your testimony

3    was the result of the corrective action plan.  She

4    didn't ask you about that, did she?

5    A    No.

6    Q    Wow.  She didn't ask you about whether or not

7    anybody from First Guard came down and actually -- or

8    what the results was when they came down to visit the

9    clinic; correct?

10   A    That's correct.

11   Q    That would be the whole picture then, wouldn't it?

12   Is that a yes?

13   A    I answer all the questions that are given to me.

14   Q    Well, let's -- you don't mind if I take a little bit

15   of time with you so we can kind of fill out this whole

16   picture.  Okay?  That's a yes for Ms. Cindy?

17   A    Yes, I'm sorry.

18   Q    Now, let's first let's just talk about the contract

19   that Ms. Treadway had you looking at.  I think it was --

20   A    14-C.

21   Q    14-C.  Can you look at Page 16 and provision 5.2.

22   A    16 is not 5.2.

23   Q    Page 16.

24   A    Right.  5.2 is interpretation, Page 12.

25   Q    Yeah, I'm sorry.

1    A    Okay.

2    Q    Now, Mr. Moore, could you highlight Page 12, 5.2 on

3    Exhibit 14-C for us.  It states that, "when you're

4    interpreting this contract, the agreement shall be

5    governed in all respects by the laws of the State of

6    Kansas except to the extent governed by Federal Law."

7    Do you see that?

8    A    Uh-huh.

9    Q    Do you see that?  And you understand submitting

10   false claims is governed by Federal Law?

11   A    That's correct.

12   Q    And you would agree that this contract -- in nowhere

13   does a provider agree that they will be criminally

14   responsible for mistakes made by their billing

15   department?  Is that anywhere in there?

16   A    I -- in our provider -- this talks about being

17   responsible for all of the claims submission

18   requirements in the provider administration manual.  And

19   in the provider administration manual, it has very

20   detailed guidelines of how claims should be submitted.

21   Q    Okay.  My question was:  Does this contract state

22   that a provider agrees to be criminally responsible for

23   mistakes made by their billing department?

24   A    It does not state that.

25   Q    Okay.  And you understand there's a difference

1    between somebody intentionally submitting or causing

2    false claims to be submitted and claims being submitted

3    in error?

4    A    That is correct.

5    Q    Okay.  Now, are you aware that the individuals

6    responsible for the billing department at the Schneider

7    Medical Clinic have testified that they were never

8    instructed to submit false claims?

9    A    I have not been privy to previous discussion.

10   Q    And are you aware that the evidence presented in

11   this case was that the people in charge of the billing

12   department admit that mistakes happened while -- under

13   their watch?

14   A    Again, I was not -- I've not heard previous

15   testimony.

16   Q    Okay.  Were you aware that the evidence has been

17   that the individuals that were actually hired by the

18   clinic actually had experience in billing before they

19   started with the clinic?

20         MS. TREADWAY:  Judge, this is an argumentative

21   line of questioning.  Questions just -- he's arguing his

22   case.  This is not appropriate.

23         THE COURT:  I agree.  The objection is

24   sustained.  Here's what's happened in this case, Ladies

25   and Gentlemen.  There's an applicable rule that has been

1    invoked that prevents anybody from telling others what

2    witnesses have testified to.  So assuming the rule is

3    being followed, and I have no reason to think that it

4    isn't being followed by all parties, when this witness

5    comes in, she doesn't know what anybody else has said.

6    So there's no point in asking her these questions.  It's

7    just wasting time.

8                   MR. WILLIAMSON:  I think I can make it

9    relevant, Your Honor, and not a waste of time.

10   BY MR. WILLIAMSON:

11   Q   As part of the correction active plan, did anybody

12   ever contact the billing department at the Schneider

13   Medical Clinic?

14   A   Not that I'm aware of.

15   Q   And --

16   A   The --

17   Q   I'm sorry --

18   A   Are you talking about the quality of care corrective

19   action plan?

20   Q   Yes.

21   A   No.

22   Q   All right.  Now, you mentioned on your prior

23   testimony that there was a document, that letter, that

24   states that it was okay to bill incident-to prior to

25   December of -- 1st of 2004.  You remember that?

1    A    Uh-huh.

2    Q    Okay.  And so if there were incident-to billings

3    that occurred prior to December 1st, 2004, there was

4    nothing -- there was no violation of the rule in doing

5    that; correct?

6    A    Not prior to 2004, no.

7    Q    Okay.  Now, the question that I had based on the

8    direct is you stated if the clinic was not following the

9    incident-to before 2004, following the incident-to rule,

10   they wouldn't have been billing in accordance with the

11   contract; correct?

12   A    They would have been billing -- the contract refers

13   to the provider administration manual.  And the provider

14   administration manual prior to 2004 was different than

15   it was post -- I mean, it talked about the change in

16   policy and accurately reflected what it was.

17   Q    Right.  But you were asked specifically -- you were

18   specifically asked if they were not billing incident-to

19   based on a possible representation which he hasn't

20   testified that they would not have been billing in

21   accordance with the contract.  Remember that?

22   A    I -- I believe what I said was consistent with the

23   letter, that prior to incident-to was how we asked them

24   to bill.  After that, we asked them to bill differently.

25   Q    So, before December 1st, 2004, if they weren't

3396

1    billing incident-to, your testimony was they would not

2    have been billing in accordance with the contract;

3    correct?

4    A   I don't think that is what I said.  I think I said

5    prior to January 1 -- or December 1, that it was

6    acceptable to bill that way.  After, it was not.

7    Q   You don't remember Ms. Treadway asked you if a PA

8    says that Linda Schneider told him that the clinic did

9    not bill incident-to, what would that mean.  And your

10   response was that means they were not billing in

11   accordance with the terms of the contract.

12   A   That's correct.  Incident -- if they were not

13   billing --

14   Q   Okay.  All right.  So I didn't make that up?

15   A   No, that is accurate.

16   Q   I'm --

17   A   I didn't quite understand what your question was.

18   Q   Okay.  Now, if they weren't billing incident-to,

19   would that mean that they would have had to have been

20   billing by submitting the claim as if -- under the PA's

21   own individual provider number?

22   A   Well, prior to that point in time, the PA did not

23   have an individual number, so they could not have.

24   Q   Okay.  So, before December 1st, 2004, it was

25   impossible for the clinic to bill a physician's

3397

1    assistant in any way other than if a physician saw them?

2    At least with First Guard?

3    A    For First Guard, that's correct.

4    Q    Okay.  Now, let's kind of walk through this

5    corrective action plan.  You started with I believe

6    14-F.  Correct?

7    A    14-F is a letter.

8    Q    Okay.  And as I understand it, the complaints were

9    limited to accessibility, wait time, and preference as

10   far as who's seen and when; correct?

11   A    Right.  There were multiple grievances.

12   Q    Okay.  At this point in time there was no question

13   or concern raised about the prescription practices, at

14   least identified in 14-F; correct?

15   A    At this point in time we had not sent the

16   communication to Schneider Clinic regarding the quality

17   of care.  The quality of care review was internally

18   occurring but was separate from this.

19   Q    Okay.  Now, the next letter is 14-E.  And is this

20   the letter of December 8, 2004, that states that -- that

21   identifies the quality of care issues?

22   A    That is correct.

23   Q    Okay.  And in this 14-E letter, there is not a claim

24   that the committee -- well, strike that.

25        All right.  So now we have 14-E, we have the actual

3398

1    document that was sent to -- at least 14-E is sent to

2    Stephen Schneider.  Was there a separate letter sent to

3    Dr. St. Clair?

4    A   I don't have a separate letter.  I'm sure if

5    there -- I don't know --

6    Q   Well --

7    A   I'm assuming that there is because they both

8    responded.

9    Q   Okay.  And they both were under a --

10   A   Corrective action plan.

11   Q   -- corrective action.  Okay.

12   A   But I don't have a copy of that letter with me.

13   Q   Okay.  Now, I believe your next information jumps to

14   102.  Is that correct.  Exhibit 102?

15   A   Exhibit 102 is the corrective action plan that was

16   submitted to the Schneider Clinic outlining the ten

17   steps that we required them to do.

18   Q   I'm sorry.  I had the wrong notebook open here.

19   Now, 102, when was 102 actually drafted?  Exhibit 102?

20   A   December, 2004.

21   Q   Okay.  Would that have been before the December 8th,

22   2004, time?

23   A   No.  The December 8 was the initial notification.

24   So the corrective action plan was probably sent with

25   this.  And it actually indicates that upon review of the

3399

1    corrective action plan that the First Guard clinical

2    individuals would meet with them and talk to them about

3    that.

4    Q    Okay.  So pausing here, we're at December 8, 2004.

5    Prior to December 8, 2004, the committee sent off

6    records for a pain management specialist to review the

7    records.  Correct?

8    A    I mean, how we -- we ran a pharmacy profile

9    initially where we ran all of the pharmacy data of the

10   physicians.  Then based upon that pharmacy profile, we

11   requested medical records after clinical review of that

12   pharmacy profile.  Then our clinical staff, as well

13   as -- we did engage a third party to also review those

14   medical records to prepare presentation of the quality

15   management committee peer review because we wanted to

16   make sure that we were accurately representing the

17   information.

18   Q    Okay.  And that third party was a pain management

19   specialist; correct?

20   A    That is correct.

21   Q    And that doctor is Dr. Chadperra (ph)?

22   A    Chadhaparah. (ph)

23   Q    Chadhaparah.  And Dr. Chadhaparah reviewed the

24   records that you forwarded to -- is it a he or her?

25   A    It is a he.

1    Q    And he is a pain management specialist; correct?

2    A    That is correct.

3    Q    And he sent you a letter on November 29, 2004,

4    didn't he?

5    A    I don't have that copy with me but he did correspond

6    with us those results.

7    Q    I'm going to hand you a document that's been

8    produced to us by the Government.  It's not identified.

9    But can you take a look at that letter.  Who is that

10   addressed to?

11   A    That is addressed to myself.

12   Q    Okay.  Do you remember seeing that letter?

13   A    Uh-huh.

14   Q    Okay.  Is that a yes, for the record?

15   A    Yes.  I'm sorry.

16   Q    No problem.  Now, you weren't asked about that

17   letter by the Government; were you?

18   A    No.

19   Q    Okay.  And that's an accurate letter that -- there's

20   a stamp on the bottom of that that says F-G and some

21   numbers; correct?

22   A    Yes.

23   Q    Is that like the internal Bates labeling system for

24   First Guard?

25   A    No.  That must be something that the pain management

3401

1    associate --

2    Q   Is it possible that the Government put it on there

3    after you produced the documents to them?

4    A   I don't know.

5    Q   And that letter accurately reflects the information

6    conveyed to you from Dr. Chadhaparah; correct?

7    A   That is correct.

8    Q   And that doctor identified that there were some

9    issues with the -- some of the medicine being practiced

10   at the clinic; correct?

11   A   That's correct.

12   Q   He was specific, based on his experience as a pain

13   management specialist, identifying some things that he

14   found to be wrong; correct?

15   A   Right.  There are eight things enumerated.

16   Q   Okay.

17            MR. WILLIAMSON:  Your Honor, we would move to

18   admit this document as D-014.

19            THE COURT:  Any objection.

20            MS. TREADWAY:  No, Judge.

21            THE COURT:  D-014 is received.

22   BY MR. WILLIAMSON:

23   Q   During this corrective -- before we display this.

24   During this corrective action plan, Dr. Schneider never

25   represented to you or the quality assurance team that,

3402

```
 1    you all are crazy, there are no problems in my practice,

 2    I'm going to ignore you and do what I want to do.

 3    Correct?

 4    A    I did not have any direct interactions with Dr.

 5    Schneider.  That was through our medical director.

 6    Q    Okay.  Your medical director never told that you Dr.

 7    Schneider simply ignored the recommendations that the

 8    quality assurance team found; correct?

 9    A    I think we've already talked about what they

10    submitted in response.

11    Q    I'm asking more about -- you understand that the

12    medical director came and specifically met with Dr.

13    Schneider; correct?

14    A    Absolutely.  I mean, that was part of the corrective

15    action plan was to personally meet and to go over what

16    needed to be done.

17    Q    And he came down for a site visit; correct?

18    A    That's correct.

19    Q    He walked around the whole clinic; correct?

20    A    Uh-huh.

21    Q    He met with Linda Schneider and Dr. Schneider and

22    Dr. St. Clair; correct?

23    A    Correct.

24    Q    And he never reported in any internal findings that,

25    Dr. Schneider is nonchalant and doesn't care about what
```

1   we say, did he?

2   A   No.

3   Q   He never said that, the Schneider clinic is ignoring

4   the issues that we've identified in this clinic.

5   Correct?

6   A   No.

7   Q   All right.  Now, before you sent this letter out on

8   December 8, 2009, Dr. Chadhaparah let you know that

9   based on his independent review -- and, in fact, he

10  wasn't being paid by the United States Government here

11  to testify; has he?

12  A   Not -- First Guard paid him to review the records.

13  Q   And First Guard is not owned by the Federal

14  Government; correct?  Was it?

15  A   No.

16  Q   Okay.  "In summary I did not find anything illegal

17  or fraudulent in the management of these patients.

18  After reviewing the records, there are significant

19  concerns raised as itemized below -- above, that should

20  be addressed."  Do you see that?

21  A   Right.

22  Q   Okay.

23  A   Yes.

24  Q   And this letter was mailed on November 18 and

25  received by your office on November 29 of '04; correct?

3404

```
1    A    That is correct.

2    Q    So before you even started this corrective action

3    plan, an independent doctor took a look at the records

4    that you guys provided and found that there was no, at

5    least in his opinion, there was no illegal activity or

6    fraudulent activity occurring; correct?

7    A    Dr. Chahapara's report was part of what was reviewed

8    by our quality peer review.

9    Q    Right.  And you sent it to him because you cared

10   about what his opinion would be as a pain specialist;

11   correct?

12   A    We took our responsibility very seriously to make

13   sure that we were providing quality care to our members.

14   Q    Okay.  And if you didn't believe he could provide an

15   accurate opinion, you wouldn't spend money sending it to

16   him; correct?

17   A    We paid him to provide the records that were

18   submitted.

19   Q    My question is:  You wouldn't send the records to

20   somebody unqualified to provide an opinion?

21   A    No.  We identified a pain specialist.  We wanted to

22   make sure that we were getting the -- the expert

23   opinion.

24   Q    And that expert opinion found nothing illegal but

25   there are some issues in the practice that we need to
```

3405

1    address; correct?

2    A    Based upon the records that they reviewed.

3    Q    And based upon his recommendation and the

4    recommendation of your quality control committee, that's

5    when 14-E was developed and sent to the clinic; correct?

6    A    That is correct.

7    Q    And just so -- in case the jury looks at this

8    document when they get to the jury room.  You redacted

9    out his name and identifying information, Dr.

10   Chadhaparah; correct?

11   A    I -- I don't know.

12   Q    Well, you had a policy that the provider is not to

13   know who the committee members are and who the experts

14   are that actually reviewed --

15   A    Dr. Schneider would have never seen that letter.

16   Q    Okay.

17   A    That was part of the internal peer review

18   documentation.

19   Q    Do you know who -- do you know who would have

20   redacted his name out?

21   A    I do not know that.  And it could have been if it

22   was pulled from the quality review chart that it could

23   have been taken out because it was reviewed by peers.

24   Q    Okay.

25              THE COURT:  Would this be a good time to have

3406

1     our noon recess?  We'll take our noon recess, Ladies and

2     Gentlemen.  Approximately one hour.  Remember and heed

3     the admonition.

4                         (Noon recess.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas