1            (Beginning at 1:05 p.m. May 19,

2            2010, the following proceedings

3            continued.)

4        THE COURT:  Yes, sir.

5                    **CONTINUED CROSS EXAMINATION**

6    BY MR. WILLIAMSON:

7    Q   All right.  Ms. Rumbaugh, we're moving right along.

8    I think I'm getting ready to talk about another part of

9    the interaction that First Guard had with the clinic.

10   Okay?

11   A   Okay.

12   Q   I believe when we left we finished up looking at Dr.

13   Chapradha. (ph)

14   A   Charhapadah.

15   Q   Charhapadah's letter.  Okay.  Do you know whether or

16   not Dr. Charhapadah ever told Dr. Penkey or any other

17   quality assurance team that the clinic has a large

18   number of difficult patients?

19   A   The document that you provided, which was Dr.

20   Charhapadah's letter to us, was, to the best of my

21   knowledge, the only interaction there was.

22   Q   Okay.  All right.  So a letter goes out in November.

23   You receive it November 29th.  We've already discussed

24   the December 8th letter that went out.  Correct?

25   A   Correct.

3408

1    Q    Okay.  Now, in that December 8th letter, is there an

2    accusation from First Guard to Dr. Schneider that we

3    suspect you of providing fraudulent services?

4    A    No.

5    Q    Okay.  There's nothing in that December letter where

6    First Guard tells Dr. Schneider we suspect you of

7    illegally prescribing medicine to people; correct?

8    A    No.

9    Q    The only thing in that letter identifies the

10   standard of care issues that the peer -- the peer

11   committee as well as the independent expert identified

12   occurring in the clinic; correct?

13   A    It is specific to the quality of care review.

14   Q    Okay.  And the quality of care that First Guard

15   found involved Dr. Schneider; correct?

16   A    Yes.

17   Q    It involved Dr. St. Clair?

18   A    That is correct.

19   Q    It involved the mid-level physician's assistants

20   that were seeing people as well; correct?

21   A    The letter is specifically to Dr. Schneider and the

22   physicians are responsible for the mid-levels that they

23   have collaborative agreements with.

24   Q    Okay.  So.  But the care -- the charts that you

25   reviewed -- the findings that you found were for all of

1  the providers at the clinic and not specific to Dr.

2  Schneider; correct?

3  A    The letter on December 8th is really specific to Dr.

4  Schneider.

5  Q    But --

6  A    I did not bring any -- I think I stated -- I did not

7  bring what we sent to Dr. St. Clair.

8  Q    But she was put on the corrective action plan, too;

9  correct?

10  A    That is correct.

11  Q    And it would had to have been communicated to her

12  that there was a corrective action plan for her to agree

13  to do it; correct?

14  A    That's correct.  But the letter that is just the one

15  I have in front of me is Dr. Schneider's.

16  Q    And I'm not tying it to that letter right now

17  because you didn't bring Dr. St. Clair's; true?

18  A    That's correct.

19  Q    Okay.  But as you understand it, the corrective

20  action plan was not -- in other words, let me just short

21  cut it.  Dr. Schneider was not the only provider at the

22  clinic that was -- where it was shown that there could

23  have been improvements in the medical practice; correct?

24  A    Dr. Schneider and Dr. St. Clair were named in the

25  corrective action plan; correct.

3410

1    Q    And that would include all the physician's

2    assistants under them as well; correct?

3    A    I'm not -- I don't remember all of the medical

4    records that were pulled and who were the primary, but

5    it could have.

6    Q    Okay.  That's fair.  All right.  Now, on December

7    21st, 2004, the medical director and the senior care

8    manager went and visited the clinic; correct?

9    A    I thought it was -- I thought it was January 12th.

10   Q    What are you basing that off of?

11   A    Based upon the follow-up note that Vanessa sent them

12   with the notes:  First Guard medical director and senior

13   care management, met on January 12th to review and

14   discuss --

15   Q    Okay.  Can I --

16   A    Actually this could be when we met internally after

17   their visit.  I'm not sure I have anything that says the

18   date that they visited.

19   Q    Let me see what the Government provided you.  I'm

20   not for certain if they gave you a certain document or

21   not.

22        Did the Government give you a document, a note to

23   file by Dr. Pankey that would have identified what he

24   found when he went and visited the clinic?

25   A    I do not have that in front of me.

1    Q    Did they give you a document that would have

2    identified the date that Dr. Pankey went to the clinic

3    to do a site visit and meet with Dr. Schneider and Dr.

4    St. Clair?

5    A    That would have been on Dr. Pankey's documentation.

6    Q    Were you asked any questions by the Government as to

7    what Dr. Pankey found when he went to the clinic?

8    A    No.

9    Q    I'm going to hand you what's been previously marked

10   as Defendant Exhibit D 11-A-10.  Take a look at that

11   document.

12             MS. TREADWAY:  May I see a copy, please.

13   BY MR. WILLIAMSON:

14   Q    Does that document reflect the note to file in

15   regards to the quality of care review by Dr. William

16   Pankey?

17   A    It documents the corrective action plan visit that

18   occurred on December 21st.

19   Q    And this is -- this document would have been kept as

20   part of the quality of care review corrective action

21   plan; correct?

22   A    That's correct.

23   Q    And this would aid the committee in learning as to

24   what happened during the course of the quality of care

25   review; correct?

3412

1    A    Right.  It was standard policy to make notes to file

2    whenever a site visit was made.

3    Q    Okay.

4              MR. WILLIAMSON:  Your Honor, we move to admit

5    D 11-A-10.

6              MS. TREADWAY:  No objection.

7              THE COURT:  It's received.

8    BY MR. WILLIAMSON:

9    Q    Now, why do directors actually do site visits during

10   quality of care reviews?

11   A    I think -- First Guard's policy was we looked at

12   what the issue was, and our purpose of the site review

13   was to sit down face-to-face with the individuals,

14   discuss what the corrective action plan was and make

15   sure that everyone understood what needed to happen and

16   to provide any guidance that we could.

17   Q    Okay.  And do they also want to make sure -- excuse

18   me -- did First Guard also want to make sure that

19   facilities were adequate to handle the patients that

20   were being sent to them?

21   A    Well, I think the purpose of this particular was

22   focussed on the quality of care so -- we do site visits

23   during the credentialing process where we look at the

24   facility and -- physical facility.  But that wasn't the

25   purpose of this.

3413

 1    Q   Okay.  This one was more of a tour so Dr. Pankey
 2    could have an idea of what's happening and to sit down
 3    with the doctors to discuss the corrective action plan?
 4    A   Right.  The discussion was probably the most
 5    important piece of it.
 6    Q   And this piece of the quality of care review is
 7    considered and factored into what steps the committee
 8    would take next; correct?
 9    A   Any interaction that we had, including this, would
10    be then reviewed and part of the quality peer review.
11    Q   Okay.  Let's talk about some of this information
12    that Dr. Pankey actually found when he was at the
13    clinic.  I'll try to blow this up as much as I can for
14    the jurors, but you and I may just have to assist with
15    the reading.
16         Now, during the visit, Dr. Pankey -- who was the --
17    who went with Dr. Pankey?
18    A   Vanessa Wooten, who is one of our senior case
19    managers.
20    Q   And she's also a Registered Nurse?
21    A   Yes, she is.
22    Q   And she's in Kansas City as well?
23    A   Yes.
24    Q   Now, during this meeting, Dr. Pankey and Vanessa
25    Wooten met with Linda Schneider; correct?

1    A    I believe they met with Linda and with Dr. Schneider

2    and Dr. St. Clair.

3    Q    And Linda Schneider actually discussed the clinic

4    and the type of practice that the clinic had; correct?

5    A    I'm reading, and that's what the notes indicate.

6    Q    And I think of particular importance is Dr. Pankey

7    and Vanessa Wooten learned that because of their

8    geographics and patient issues with access and

9    availability to other physicians, they attempted to be a

10   full -- as full service as practical.  Do you see that?

11   A    Yes.

12   Q    And did you all learn during the corrective --

13   excuse me -- the quality of care review that there were

14   not many other providers in the immediate area as to

15   where the Schneider Medical Clinic was?

16   A    That really isn't part of the quality of care

17   review.  We monitor the access based upon where our

18   members lived to primary care on a regular basis.

19   Q    Let me follow up with that.  First Guard would match

20   patients with providers?

21   A    Actually the first thing is that members were asked

22   to choose their providers.  If members did not actively

23   choose a provider, then we actually used a program to,

24   first of all, see if they had seen a provider

25   historically; and if they had, we tried to match them,

1    assuming that they had a relationship with that primary

2    care.  If they didn't have a relationship, then we would

3    look at geographically and try to find a primary care

4    physician to meet their needs.

5    Q    Okay.  And so for the people that First Guard would

6    have sent to the Schneider Medical Clinic, it would have

7    included the geographic area around Haysville and that

8    southern hemisphere of Wichita?

9    A    Correct.

10   Q    Now, Dr. Pankey also made some findings as to what

11   he saw when he went down to the clinic; correct?

12   A    I think he documented what his visit was.

13   Q    And he documented that at the time he went the

14   clinic had one and a half -- and I'm guessing FTE means

15   full time employee, positions?

16   A    That's correct.

17   Q    So I guess the one and a half, Dr. St. Clair was

18   working part-time during this time; correct?

19   A    I assume.  I don't know.

20   Q    Three mid-level practitioners and then the clinic

21   had 16 examination rooms.  Correct?

22   A    That's what the document says.

23   Q    It had a large laboratory; correct?

24   A    Yes.

25   Q    It had a surgical procedure area; correct?

3416

```
 1   A    Yes.
 2   Q    And the record -- can't read that document on the
 3   screen so I have to, like, actually say what we see and
 4   that's why sometimes people are asked to read --
 5   A    Okay.
 6   Q    -- so bear with me.  There was a radiology procedure
 7   room; correct?
 8   A    Yes.
 9   Q    And there was a well-stocked, locked sample
10   medication supply where the clinic did not keep any
11   controlled substances; correct?
12   A    Yes.
13   Q    All right.  Just reading this, this is not a
14   hole-in-the-wall location that has no equipment but
15   tables and chairs; correct?
16   A    No.  This is a description of the clinic.
17   Q    And if this was some hole-in-the-wall where there
18   was no equipment used to make medical decisions, Dr.
19   Pankey would have made that observation when he went to
20   the clinic; correct?
21   A    I --
22   Q    Let me ask that a different way.  If Dr. Pankey went
23   down to the clinic and it looked like that they are not
24   interested in performing procedures, i.e., X-rays where
25   they have a radiology room, if they only had two
```

3417

1    examination rooms, that could have effected the quality

2    of care review.  Don't you agree?

3    A    I think that this is a description.  I think that

4    the quality of care review, again, I would say that

5    probably a site visit is when we would actually look at

6    the physical facilities and that it probably doesn't

7    relate to the quality of review.  It's just a

8    description.

9    Q    Well, think about it like this.  If you go to -- if

10   your doctor goes to a site visit and they see a location

11   that is inadequately stocked, inadequate space, no

12   medical equipment, that would be something that would

13   raise a concern with the medical director and the

14   quality of care review committee; correct?

15   A    It would; but I think, as I shared with you, that we

16   do an on-site visit to look at the facilities.  So that

17   had already been done.  So that really wasn't something

18   considered.

19   Q    Make sure I understand.  We had a credentialing

20   process where a site visit was done before the clinic

21   was even allowed to accept First Guard patients;

22   correct?

23   A    That's correct.

24   Q    Okay.  And if it would have been one of those shacks

25   or holes-in-the-walls, if there was a determination made

3418

1    that this place was inadequate to see people, they

2    wouldn't have never made the cut?

3    A   That's correct.

4    Q   Okay.  Now, you also -- Dr. Pankey also learned that

5    the clinic hoped to implement an electronic health

6    record system within months.  Do you see that?

7    A   Yes.

8    Q   And they also learned -- excuse me.  Dr. Pankey also

9    learned that the clinic had been working on this over

10   the past year; correct?

11   A   Yes.

12   Q   And they were also informed that there were 30

13   support staff, 12 phone lines and the clinic was open

14   seven days a week; correct?

15   A   Yes.

16   Q   Now, what I really want to focus on here is the

17   interaction as we've established is actually Dr. Pankey

18   met with Dr. St. Clair and Dr. Schneider; correct?

19   A   Yes.

20   Q   Okay.  Now, the first line states that the meeting

21   with Drs. Schneider and St. Clair were very productive

22   with the concurrence of the findings of the FG

23   corrective action plan recommendations.  Do you see

24   that?

25   A   Yes.

3419

1    Q    So you learned that Dr. Schneider and Dr. St. Clair

2    didn't snub their nose at the recommendations, they took

3    them at heart and actually agreed; correct?

4    A    Correct.

5    Q    Okay.  And Dr. Schneider -- obviously, because they

6    were there, Dr. Schneider and Dr. St. Clair didn't skip

7    town and leave Dr. Pankey hanging by himself?  Didn't

8    dodge them, did he?

9    A    No.  They were there.

10   Q    Now, Dr. Schneider admitted that he had probably

11   been too trusting with some of the patients compared

12   with other practitioners after looking at some of the

13   First Guard documentation; correct?

14   A    Yes.

15   Q    He didn't say, I'm perfect, I know I didn't make any

16   mistakes, did he?

17   A    No.

18   Q    They both agreed that they need to do a much better

19   job documenting and ensuring the medical records

20   available at the time of the visit to see the most

21   recent practice refill activity for controlled

22   substances before writing prescriptions; correct?

23   A    Yes.

24   Q    Now, you did learn that there were issues at the

25   clinic that sometimes the charts would -- people would

3420

1    come back in before the charts made it back around, so

2    when the next provider saw the patient they didn't know

3    what was written before; correct?

4    A    That is correct.

5    Q    And so this is an acknowledgement, yes, that has

6    happened, we really need to work on something to try to

7    make this -- to correct this; correct?

8    A    That is correct.

9    Q    And one way that could correct that would be to

10   implement electronic records; correct?

11   A    Yes.

12   Q    Do you know if Dr. Pankey took a look at the tablet

13   that the clinics had?

14   A    I do not know that.

15   Q    All right.  And just at the last line here, they

16   also agreed, acknowledged, inadequate management of the

17   pain agreements and have already begun revisions based

18   on First Guard's feedback.  Do you see that?

19   A    Yes.

20   Q    Okay.  Now, are you -- did you learn during the

21   course of your review that the clinic actually started

22   using a one-page pain contract but then they changed to

23   the multi-page that the Government showed you that they

24   submitted to First Guard?

25   A    Because that isn't in this documentation, I don't

3421

1   know.  But I do know that they did go to a two-page
2   document.
3   Q   Okay.  And couple more things here.  One, that there
4   were no First Guard recommendations with which they had
5   a major disagreement; correct?
6   A   Yes.
7   Q   And they discussed the Texas Pain Management
8   physician by phone regarding medication management.  I
9   want to pause there for a second.
10       There's no representation that Dr. Schneider flew
11  down to Texas made by Dr. Schneider and met with this
12  guy; correct?
13  A   It indicates that he consulted them by phone.
14  Q   Okay.  In any of the documentation, there has not
15  been a representation but -- excuse me.  In the
16  documents, there has not been a representation by Dr.
17  Schneider that he flew Dr. Owens in to his clinic and
18  met with him; correct?
19  A   Actually there is the business card.
20  Q   Okay.  Do you know how he got the business card?
21  A   I do not.
22  Q   There is not a representation in the documents by
23  Dr. Schneider that he flew Dr. Owens in to Wichita;
24  correct?
25  A   I'm reading it just to make sure.

3422

 1    Q    All right.  No problem.  And you can consult your

 2    other documents as well.

 3    A    It doesn't document it here.  It indicates that

 4    they -- that we accepted Dr. Owen as to be the advisor.

 5    Q    And it says that it happened by telephone; correct?

 6    A    It does not say.

 7    Q    Texas Pain Management physician by phone?

 8    A    By phone.

 9    Q    Okay.  Now, there's a little statement in here, I

10    don't know if you know what this means or not; but that

11    this particular specialist reported that he does not use

12    any rescue medications for his chronic pain patients.

13    Do you see that?

14    A    Yes.

15    Q    Is that what's known as the breakthrough pain

16    medication?

17    A    I do not know.

18    Q    Okay.  So as of December 21st, 2004, First Guard has

19    met with Schneider Medical Clinic and Schneider Medical

20    Clinic has been cooperative and acknowledged that

21    mistakes have have happened in their practice; correct?

22    A    That is correct.

23    Q    Now, I think the next exhibit that you guys

24    discussed was Exhibit 104.

25    A    Okay.

3423

1   Q   All right.  Mr. Moore, can we put that up, please.
2   And first let's look at number 2.
3        Do you see that this is what we have talked about
4   several times about Graves Owens being advisor; correct?
5   A   Correct.
6   Q   Dr. Schneider identified Graves Owen, as you just
7   testified, he actually gave you a card with his contact
8   information on there; correct?
9   A   It's included in this, yes.
10  Q   Okay.  Now, so he made this individual accessible
11  and available for First Guard to contact; correct?
12  A   He just indicated, according to the corrective
13  action plan, who his advisor was.
14  Q   If somebody from First Guard wanted to call Graves T
15  Owens, Dr. Schneider provided the phone number and fax
16  number, address, to Graves T Owen; correct?
17  A   That is correct.
18  Q   Do you know if anybody ever called Graves T Owen?
19  A   I do not know that.
20  Q   Okay.  Now, go back to -- let's go down to number 6.
21  Let's blow that up just a little bit, please.
22       Now, number 6, Dr. Schneider says we will no longer
23  use the trans-mucosal Fentanyl for who?
24  A   For First Guard patients.
25  Q   Okay.  He does not represent to First Guard that

3424

1    we're never going to prescribe Actiq; correct?

2    A    He says for First Guard patients.  And that was

3    really the scope of our review.

4    Q    Okay.  That's fair.  And he also states that he has

5    literature -- can we blow that up just a little bit --

6    that there is scientific support for using off-label --

7    for using Actiq off-label for which he can provide.  Do

8    you see that?

9    A    Yes.

10   Q    Did the quality care review team actually request

11   the scientific literature that Dr. Schneider had in his

12   possession?

13   A    I'm not aware of that.

14   Q    Now, I think the next exhibit to talk about is

15   Exhibit 106.

16   A    Okay.

17   Q    Okay.  Now, Mr. Moore, could we see Exhibit 106

18   again.  All right.

19        Now, Exhibit 106 identifies areas that the clinic

20   stated that they have done in order to comply with the

21   corrective action plan; correct?

22   A    That is correct.

23   Q    And, again, look at number 4, because Actiq is

24   actually this charge in this case.  That's why I'm

25   focusing on it a little bit.  It states that he will no

3425

1   longer use the trans-mucosal Fentanyl for migraines and

2   breakthrough pain for who again?

3   A   First Guard patients.

4   Q   Okay.  And he also stated that, here that he

5   would -- did you learn during the course of your review

6   that Dr. Schneider actually adopted forms that were

7   given to him by Dr. Graves T Owen?

8   A   We did chart reviews and looked for different pieces

9   in the corrective action plan.  I don't know where they

10  received those forms.

11  Q   I'm going to hand you a document titled "Consent to

12  Report the Illegal use of Controlled Substances".  Have

13  you seen that document in any patient file?

14  A   I have not; but I did not review the patient files.

15  Q   Okay.  You don't know if Graves Owens testified that

16  this is a document that he provided to Dr. Schneider?

17  A   I did not hear other testimonies.

18  Q   All right.  Now let's move to 106.  We're at about

19  April of 2005.  Now let's move to May 5th, 2005.

20  A   Okay.

21  Q   The quality control team actually closed out the

22  quality review of the Schneider Medical Clinic; correct?

23  A   That is correct.

24  Q   And I think as to right now, we have not heard what

25  the final review or findings from First guard was;

3426

1    correct?  Do you need me to rephrase that?

2    A   Yeah.  Yes.

3    Q   You haven't testified before right now as to the

4    actual findings, the final findings, that First Guard

5    made in regards to the Schneider Medical Clinic;

6    correct?

7    A   Well, I'm not sure what you mean by final findings.

8    If you want the findings of the final report of the

9    corrective action plan, no.

10   Q   Okay.  Going to hand you what's been previously

11   marked as Defendant Exhibit D-11-A-23.  Do you see that

12   document?

13   A   Yes.

14   Q   And there's a second page of that document as well

15   D-11-A-24.  Do you see that?

16   A   Yes, I do.

17   Q   Okay.  Is this the letter that was sent by First

18   Guard to Dr. Schneider evidencing the conclusion of the

19   corrective action plan?

20   A   Based on the review of the First Guard files?

21   Q   Right.

22   A   It was the final -- it was a closure of the

23   corrective action plan.

24   Q   Okay.  So now we're closing the loop in regards to

25   the corrective action plan; correct?

3427

1    A    This is the documentation of the --

2    Q    Okay.  Now, looking at the second page.  It states

3    there are actual findings; correct?

4    A    This is really just a summary of future -- I mean,

5    of medical audit review and it talks about areas of

6    improvement and areas of strengths.

7    Q    Okay.

8              MR. WILLIAMSON:  Defense would move to admit

9    Defendant Exhibit D-11-523 and dash A-24.

10             MS. TREADWAY:  No objection.

11             THE COURT:  They're received.

12   BY MR. WILLIAMSON:

13   Q    All right.  The final finding that First Guard made

14   in regards to the Schneider Medical Clinic as of May

15   5th, 2005, was we are -- well, strike that.

16             Let me just put it up for the jury while I

17   review it.  Starting with the second sentence in the

18   second paragraph.  The findings are we are most pleased to

19   report outstanding practice group compliance with the

20   elements of the corrective action plan and process.

21   Correct?

22   A    Yes.

23   Q    And now as starting May 9, First Guard would open

24   back up to the Schneider Medical Clinic; correct?

25   A    Yes.

3428

1    Q    Do you know why you weren't asked to provide this

2    information on direct examination?

3              MS. TREADWAY:   Objection, argumentative,

4    Judge.

5              THE COURT:   Sustained.

6    BY MR. WILLIAMSON:

7    Q    Now, they're also congratulated for the diligence

8    and sincere efforts that were put into the quality of

9    care to patients; correct?

10   A    Yes.

11   Q    First Guard's conclusion was you guys made mistakes,

12   you guys are working to fix those mistakes and we

13   acknowledge that; correct?

14   A    Based upon the review of the records that we

15   reviewed, we closed the corrective action plan.

16   Q    Okay.  Now, looking at defense Exhibit *D-11-A-24 --

17   now, are you saying that this was an internal document?

18   This was not sent to the Schneider Medical Clinic?

19   A    Actually, I'm not sure.  This very well could have

20   been sent.

21   Q    You just don't know?

22   A    Yeah, I'm just not sure if this was the second page

23   of that document or not.  It doesn't say page one of

24   one.

25   Q    Okay.  Again, the conclusion was: The Schneider

3429

1    practice has done an outstanding job with their

2    implementations and has improved in providing quality

3    medical care to the members they are seeing for pain

4    management.  Do you see that?

5    A    Yes.

6    Q    Okay.  Do you know why the Schneider Medical Clinic

7    would take all the steps necessary under First Guard but

8    when Medicaid decided to conduct a review, not take any

9    steps?

10   A    I don't know.  How I would know that?

11   Q    Okay.  Maybe if they didn't get notice --

12   A    I don't know.  How I would know that, sir?

13   Q    Now, you were given -- you were asked questions

14   about people that overdose and passed away.  Do you

15   remember that?

16   A    Yes.

17   Q    You haven't reviewed all of the charts that were

18   reviewed by the United States Government, have you?

19   A    No.

20   Q    And you haven't sat here through weeks and weeks of

21   testimony regarding the accuracy and reliability of

22   autopsies, have you?

23   A    No.

24          MS. TREADWAY:  Argumentive again, Judge, the

25   objection.

3430

1        THE COURT:  No, overruled.

2   BY MR. WILLIAMSON:

3   Q   You haven't sat here through the weeks and weeks of

4   testimony of us challenging whether these deaths were

5   even related to the overdose, have you?

6   A   No.

7   Q   Your review, your testimony, is based on what First

8   Guard did; correct?

9   A   That is correct.

10  Q   Now, last document we'll talk about is 14-H.  Do you

11  see that document?

12  A   Yes.

13  Q   All right.  I know it was asked of you and it was

14  introduced through you.  But what is this document?

15  What does 14-H talk to us about?

16  A   14-H is a fax that was sent to Marie Gells, one of

17  our provider relations representatives, with the cover

18  sheet asking for us to reconsider payment for some

19  denied claims that were submitted.  So then there's a

20  report of claims that were denied; and then there is

21  some documentation about when they requested that Dr.

22  Simons be added to the First Guard panel.

23  Q   Okay.  So let's make sure we understand what's

24  happening here.  Dr. Simons was hired by the clinic;

25  correct?  At some point in time?

3431

1    A    Correct.

2    Q    He started seeing First Guard patients prior to

3    receiving a provider number with the Schneider Medical

4    Clinic; correct?

5    A    Yes.

6    Q    Okay.  And those claims were submitted to First

7    Guard but denied because he was not an approved

8    provider; correct?

9    A    Correct.  He was not a contracted provider.

10   Q    Okay.  And what ensued was the clinic sent Maria --

11   Marie --

12   A    Marie.

13   Q    Marie, documentation stating these are the patients

14   who saw Dr. Simons, and will you please consider paying

15   them; correct?

16   A    It says, "I would appreciate if you could at least

17   give me reimbursement as if Schneider would have seen

18   them under his $75 charge."

19   Q    Okay.  And the attachment to 14-H identifies the

20   report date -- is this a report run by you -- or run by

21   the Schneider Medical Clinic?

22   A    I believe this is a Schneider Medical Clinic report.

23   Q    Okay.  And this report was run for the dates of 9-18

24   of '05 to 2-17 of '06; correct?

25   A    Correct.

1    Q    And the providers are identified as LMS; correct?

2    A    Correct.

3    Q    That would be Lawrence M Simons; would you agree?

4    A    I'm assuming that --

5    Q    Okay.

6    A    -- just from the correspondence.

7    Q    Okay.  And each one of these patients are accurately

8    identified as a Lawrence Simons patient; correct?

9    A    Yeah, if that's what that means.

10   Q    Okay.  Well, do you know what it means?

11   A    Well, this isn't our report so --

12   Q    Do you know how you're qualified to lay a foundation

13   as to even receiving this document?

14   A    Well, it was sent to our provider relations rep and,

15   as I indicated, it was asked if we could make payment to

16   these.  And our response was our provider relations

17   manager said, no, he's not a contracted provider.  And

18   then they --

19   Q    Okay.  Now, as a result of what was going on as far

20   as trying to get these payments made based on Dr. Simons

21   seeing these individuals, certain patients actually

22   appealed to First Guard; correct?

23   A    I don't know that.  There's always the appeal

24   rights.

25   Q    Let me just you hand for identification -- see if

3433

```
 1    you can identify a document.
 2    A    This is a document that was sent to a member who had
 3    appealed the denial.
 4    Q    Okay.  Hold on.  I don't want you to --
 5    A    Okay.
 6    Q    Have you seen a document like that before?
 7    A    Yes.
 8    Q    That has First Guard's letterhead on there; correct?
 9    A    Yes.
10    Q    And you recognize that as an official First Guard
11    document?
12    A    That is correct.
13    Q    And does that refresh your recollection as to
14    whether there were any patients who appealed the denial
15    and First Guard actually decided to pay?
16    A    This is a case where a member appealed the denial
17    and First Guard paid it.
18    Q    Okay.
19    A    It doesn't give us all the information behind it.
20    Q    It doesn't say why the decision was made to pay it;
21    correct?
22    A    No, it does not.
23    Q    It just states that the -- excuse me -- the patient
24    appealed and First Guard paid?
25    A    That's correct.
```

3434

1    Q    And they paid at 75% of what the total -- the normal

2    value, the normal First Guard value would have been?

3    A    I don't see where you say that.  Plus Dr. Simon is a

4    physician.  It's $25.

5    Q    Okay.  So they agreed to pay the rest except for a

6    copay of $25?

7    A    Well, what it's saying is that on June 9th we

8    received your appeal about First Guard's denial and your

9    grievance about the clinic refusing to see you unless

10   you pay $25 each time for its bills that weren't paid by

11   First Guard.

12        So in this case the member was appealing because

13   the clinic had asked them to pay a $25 copayment.  So

14   that's why we -- it was brought to us by the member and

15   we reviewed it; and based upon that, we paid this claim.

16   Q    Hold on.  Let me make sure I understand.  There are

17   two issues.  Do you need a drink of water?

18   A    No, I'm fine.  Thanks.

19   Q    There were two issues.  One, First Guard denied the

20   claims related to Dr. Simons; correct?

21   A    When he was not a participating provider, that is

22   correct.

23   Q    And then, two, the clinic needed a $25 copay before

24   they were seen by the clinic; correct?

25   A    That would be their internal -- if it was a First

3435

1    Guard member, there is no copayment, and they should not

2    have been asking for a copayment.

3    Q    Okay.  And based on this appeal, First Guard --

4    A    Based upon this appeal, we processed the claim so

5    that the member would be able -- would not be billed

6    that $25.

7    Q    Didn't you agree to pay the claim that Dr. Simons

8    actually saw the person?

9    A    We paid the claim to Dr. Simons because they had

10   inaccurate -- they had -- and, again, I don't have the

11   whole file, but if I could kind of piece it together --

12   because they had asked the member to inappropriately pay

13   $25 each time they were seen.

14   Q    Okay.  Now, you say inappropriately.  If Dr. Simons

15   wasn't an approved provider under First Guard, then the

16   provisions of the First Guard contract wouldn't have

17   applied; right?

18   A    That is correct.  So it would have been denied.

19   Q    Okay.

20   A    But the member would not have been assigned to Dr.

21   Simon.  The member should have been assigned to someone

22   else.

23   Q    And do we know who that person was assigned to?

24   A    I don't know that we do; but typically what we do

25   with these is we do member education.  And it probably

3436

1    would have indicated -- I mean, they'd have to have a

2    primary care physician so they did have a different

3    primary care physician.  I don't know if it was another

4    physician within the clinic or not.

5    Q   Okay.  I can take that back.

6    A   Okay.

7              MR. WILLIAMSON:  One second, Your Honor.  I

8    think I may be finished.

9                    (off-the-record discussion.)

10             MR. WILLIAMSON:  I don't have anything

11   further, Your Honor.

12             MR. GOROKHOV:  Your Honor, just briefly.  I

13   don't have any questions, but I think based on the

14   testimony just now, I would move to strike that exhibit

15   because clearly the fax was not sent to this witness and

16   it was not received by this witness and the return --

17   the response was not by this witness as well.

18             THE COURT:  You mean the one that

19   Mr. Williamson was talking to her about?

20             MR. GOROKHOV:  Yes, Your Honor.  Based on

21   cross-examination, I think there's an inadequate

22   foundation for the exhibit.  14-H.

23             MS. TREADWAY:  Judge, it's a party admission

24   by his client Linda Schneider.

25             MR. GOROKHOV:  Yes, but, Your Honor, it still

3437

1    has to be in context and this witness -- and therefore

2    it lacks foundation.

3              THE COURT:  Let me see that again.

4              MR. WILLIAMSON:  14-H, Your Honor?

5              THE COURT:  Yes, please.

6                   (Off the record.)

7              THE COURT:  Well, this purports to be a letter

8    from Linda Schneider written on Schneider Medical Clinic

9    stationary to First Guard.  We've heard a lot of

10   testimony about it.  I don't understand why I would

11   strike it when it was already admitted.

12             MR. GOROKHOV:  Your Honor, I just -- you know,

13   I didn't realize -- we don't know the context of how --

14   I mean, this witness's knowledge about this letter.  And

15   from cross-examination, it seems quite clear that

16   Ms. Rumbaugh is just making an educated guess as to what

17   occurred between Linda Schneider and Ms. Gells, who is

18   not called by the Government to testify.

19             THE COURT:  Well, I don't know.  The jury will

20   have to weigh the testimony.  Didn't sound like an

21   educated guess to me.  But, in any event, that will be

22   up to the jury.  Motion to strike 14-H is denied.  But I

23   take it you didn't have any questions, Mr. Gorokhov.

24             MR. GOROKHOV:  I do not, Your Honor.

25             THE COURT:  All right.  Redirect please.

1          MS. TREADWAY:  Thank you, Judge.

2                **REDIRECT EXAMINATION**

3     BY MS. TREADWAY:

4     Q    Just a couple of issues, Ms. Rumbaugh.  Back to the

5     incident-to billing issue.  Let's see if we can clarify

6     this a little bit.  Is the only way that First Guard

7     recognized physician's assistants is if they were

8     working under the direct supervision of a physician and

9     were being billed as incident-to like Medicare?

10    A    That is correct.  Because they did not have their

11    own number.

12    Q    And until they had their own number, that's the only

13    way you would recognize a bill for a physician's

14    assistant?

15    A    That is correct.

16    Q    And, therefore, if the evidence is that the clinic

17    didn't bill incident-to, you would not have paid for any

18    physician assistants?

19    A    That is correct.

20    Q    Now, Mr. Williamson asked you about whether the jury

21    had the whole picture about what had happened at First

22    Guard.  My question is a little different, but similar.

23    Did First Guard have the whole picture about the

24    Schneider Medical Clinic, Ms. Rumbaugh, given Exhibit 1

25    and Exhibit 1-A?

3439

1          MR. WILLIAMSON:  Your Honor, I'm going to

2    object to the extent that the witness said she was not

3    aware, she hasn't been here during the whole

4    cross-examination and evidence presented.

5          MS. TREADWAY:  Judge, this is directly

6    relevant to her testimony on cross.

7          THE COURT:  I don't agree.  The objection is

8    sustained.

9    BY MS. TREADWAY:

10   Q   When Dr. Chadhaparah reviewed the records, did he

11   know about the overdoses and deaths?

12         MR. WILLIAMSON:  Same objection, Your Honor.

13         THE COURT:  I don't know how she would know

14   what Dr. Chadhaparah knew.  The objection is sustained.

15   BY MS. TREADWAY:

16   Q   When Dr. Pankey--

17         THE COURT:  If that's an issue, then I'd

18   suggest that we hear from Dr. Chadhaparah.

19   BY MS. TREADWAY:

20   Q   When Dr. Pankey went to the clinic on December -- in

21   December of 2004, did he know about the overdose and

22   deaths?

23         MR. WILLIAMSON:  Your Honor, same objection.

24         THE COURT:  Same ruling.

25

3440

```
 1    BY MS. TREADWAY:

 2    Q    Are they anywhere listed in Dr. Charhapadha's

 3    letter.

 4              MR. WILLIAMSON:   Your Honor, I'm going to

 5    object that she is just --

 6              THE COURT:   Same ruling.

 7    BY MS. TREADWAY:

 8    Q    Was it to the Defendant's financial benefit to

 9    cooperate with the First Guard audit?

10    A    Cooperation meant that -- successful completion

11    meant that we would continue to -- that we would open up

12    their panel again to new members.

13    Q    And this was a quality of care review; was it not?

14    A    Yes, it was.

15    Q    You were not investigating criminal activity?

16    A    No, we were not.

17    Q    You were not investigating fraud?

18    A    No.

19    Q    You were not investigating violations of the

20    Controlled Substances Act?

21    A    No.

22    Q    And you weren't investigating billing fraud?

23    A    No.

24    Q    Were you aware at the time of the corrective action

25    plan about the peer education review council review
```

3441

1    being conducted by Medicaid almost simultaneously?

2    A    No, I was not.

3    Q    And when the First Guard corrective action plan was

4    closed in May of 2005, were you aware at the same time

5    that Medicaid was seeking to terminate the clinic as a

6    Medicaid provider?

7    A    No, we were not.

8    Q    If you had been aware of that, would that have been

9    significant to whether the clinic continued as a First

10   Guard provider?

11   A    When Medicaid did terminate, we are required to then

12   terminate our contract also.  And that did occur.

13   Q    So, did you have the whole picture during the

14   corrective action plan, ma'am?

15   A    The corrective action plan was based upon the

16   information that we had and the First Guard records that

17   we reviewed.

18   Q    So did you have the whole picture?

19   A    I would say no.

20             MS. TREADWAY:  Thank you.

21             THE COURT:  Very briefly, please.

22             MR. WILLIAMSON:  I won't even leave my table,

23   Your Honor.

24                    **RECROSS EXAMINATION**

25   BY MR. WILLIAMSON:

3442

1  Q   Were you aware, regarding this whole picture, that

2  Medicaid had to reinstate the clinic?

3  A   Yes, I was.

4  Q   And when Medicaid had to reinstate the clinic, First

5  Guard would have to reinstate the clinic; correct?

6  A   I think it was a judge's order.  And based upon

7  that, we did.

8          MR. WILLIAMSON:  Okay.  Nothing further.

9          MR. GOROKHOV:  Nothing, Your Honor.

10         THE COURT:  Thank you very much.  You're

11  excused, ma'am.

12  A   Thank you.

13         THE COURT:  Appreciate your testimony.  Next

14  witness please.

15         MS. TREADWAY:  Government calls Alice Fox.

16         MR. WILLIAMSON:  Judge I think we may have an

17  objection.  I have to find a document.  May we approach.

18         THE COURT:  You may, sir.

19                 (Thereupon, the following

20                  proceedings were had at the

21                  bench by Court and Counsel

22                  outside the hearing of the

23                  jury.)

24         MR. WILLIAMSON:  One, cumulative, same

25  testimony as the previous pharmacist.  Two, we just

3443

1    received notice of this yesterday morning at 9 a.m.

2              THE COURT:  You said it's cumulative.  Of

3    which witness?

4              MR. WILLIAMSON:  Clowers.  Jamie Clowers.

5    This is another pharmacist.  Same kind of testimony.

6    Same kind of cross-examination.  I think the jury pretty

7    much already knows what I'm going to ask the witness

8    before I do it.  I think it's a waste of time.

9    Moreover, we just got notice of these -- of this witness

10   yesterday at 9 in the morning.  We have been -- what you

11   see here is what we've been given notice of everybody

12   that may testify.  We have not complained to the Court

13   that we're not getting a specific 40 hour notice.  We

14   are working with the Government.  We understand witness

15   availability issues.  I am not pouting or complaining.

16   But we were ready for everybody up until this line.  We

17   just got this yesterday.  And we have not had a chance

18   to prepare anything for this witness.

19             THE COURT:  Is that right?

20             MS. TREADWAY:  Well, Judge, I don't believe

21   that that's when we noticed Ms. Fox.  I think she's been

22   noticed for a while as an expert.  She's been noticed

23   since like June of 2008 as an expert.

24             THE COURT:  Yeah, but were you--

25             MS. TREADWAY:  I've been giving them as much

1    notice as I can based on the availability of my

2    witnesses.  Ms. Fox is available today and she's not

3    available again until next Wednesday because of her

4    pharmacy's obligations.  So I'm doing the best I can.

5              THE COURT:  I'll tell you something -- I know

6    you are.  I don't buy this not availability stuff.  She

7    is available when the subpoena tells her to be here and

8    if she doesn't show up, she's going to get to meet a

9    U.S. Marshal, and you know that.

10             MS. TREADWAY:  I realize that.

11             THE COURT:  And they need to know that.

12             MS. TREADWAY:  But I'm trying to work with

13   these professionals because it's very difficult for them

14   to get people to work in their positions.  These

15   schedules are set in advance and I've been trying very

16   hard to work with them.  That is a very short witness.

17   It's not cumulative.  She had conversations with the

18   Defendant.  Again, they've had notice of what she's

19   going to say since June of 2008, Judge.

20             THE COURT:  She's an expert, and she's not

21   going to take very long.

22             MS. TREADWAY:  Right.  She's a pharmacist.  We

23   noticed up anybody that had any expertise and the

24   testimony that they would give in June of 2008.  They've

25   had notice since then, Judge.

3445

```
 1            THE COURT:  All right.  Now, you say that
 2   she's talked to Dr. Schneider --
 3            MS. TREADWAY:  Yes, sir.  She had individual
 4   conversations with him --
 5            THE COURT:  -- and he told her to piss up a
 6   rope, basically, like you say all the other people --
 7            MS. TREADWAY:  I'm not really sure what he
 8   said to her.
 9            THE COURT:  Well --
10            MR. WILLIAMSON:  Judge, again, I --
11            THE COURT:  I don't want to put her off until
12   next Wednesday.
13            MS. TREADWAY:  You know, we can't, Judge.  We
14   may be done by then.  I mean, why don't I direct her and
15   give 'em a break.  That would be fair.
16            THE COURT:  Well, why don't you just ask her
17   when she talked to Dr. Schneider and let it go at that.
18            MS. TREADWAY:  Well, I've got to give some
19   foundation to that, Judge.  But I will definitely -- I'm
20   not going -- this is not a long witness --
21            THE COURT:  Who's the other person?
22            MR. WILLIAMSON:  Jennifer Harry.
23            MS. TREADWAY:  She is not on today.  She's
24   tomorrow.
25            THE COURT:  But you've not been talking to
```

1    these people, Lawrence, so --

2              MR. WILLIAMSON:  We have tried to talk to

3    people.  They won't talk to us.  We have tried to

4    contact numerous people.  I just don't ask 'em on the

5    stand.  I just -- I may ask one or two people, but I

6    haven't gotten to those --

7              THE COURT:  Who else have you got this

8    afternoon?

9              MS. TREADWAY:  Next two people are Lori

10   Maddox, Chanda Little and then Charles Lee Craig.

11             THE COURT:  Are they -- who are they?

12             MS. TREADWAY:  Employees, PAs, employees.

13             THE COURT:  Well, you tell Ms. Fox to be back

14   here in the morning.  You tell her if she doesn't show

15   up, she'll be brought here.

16             MR. WILLIAMSON:  I'll be ready.

17                       (Thereupon, the following

18                       proceedings continued in the

19                       hearing of the jury.)

20             THE COURT:  Next witness.

21             MS. TREADWAY:  Government would call Lori

22   Maddox.

23                       <u>**LORI MADDOX**</u>

24   Having been first duly sworn to tell the truth, the

25   whole truth and nothing but the truth, testified as

```
 1    follows on:

 2                    DIRECT EXAMINATION

 3    BY MS. TREADWAY:

 4    Q    Good afternoon.  Would you please introduce yourself

 5    to the jury.

 6    A    Lori Maddox.

 7    Q    And are you currently employed, Ms. Maddox?

 8    A    Yes.

 9    Q    And where are you employed?

10    A    Wichita Urology.

11    Q    And what do you do there?

12    A    I'm a physician assistant.

13    Q    How long have you worked there as a physician

14    assistant?

15    A    Since February.

16    Q    Are you married, ma'am?

17    A    Yes.

18    Q    And what does your husband do?

19    A    He's in the Air Force.

20    Q    When did you graduate with your physician's

21    assistants degree?

22    A    2005.

23    Q    And where did you graduate from?

24    A    Wichita State.

25    Q    What was your first job after receiving your degree?
```

3448

```
 1    A    Schneider Medical.

 2    Q    And did you start working at the Schneider Medical

 3    Clinic in approximately August of '05?

 4    A    Yes.

 5    Q    And when did you interview for your job there?

 6    A    I don't remember exactly.  I believe it was shortly

 7    before being hired.

 8    Q    You were hired.  And who did you interview with?

 9    A    Linda.

10    Q    During that job interview, what did the Defendant

11    Linda Schneider tell you about the Schneider Medical

12    Clinic?

13    A    That it was a family practice clinic that had some

14    Hep-C patients and some pain patients.

15    Q    When in relationship to your interview were you

16    hired?

17    A    Shortly after.

18    Q    Before being hired, did you meet with any of the

19    physicians?

20    A    I don't believe so.

21    Q    What days were you hired to work?

22    A    I believe it was Wednesday through Saturday.

23    Q    And what hours were you required to work?

24    A    8 a.m. until when we were through for the day which

25    was generally around between 5 and 6 and 7.
```

3449

1    Q    Who was your primary physician supervisor?

2    A    Donna St. Clair.

3    Q    And what was her work schedule?

4    A    I don't remember exactly.  I know that it only

5    coincided with mine by a day or two.

6    Q    And when she was not there, who was your back-up

7    supervisor?

8    A    Dr. Schneider.

9    Q    What did you observe Defendant Schneider's work

10   schedule to be?

11   A    Mostly Monday through Friday, I believe.

12   Q    And what hours?

13   A    Generally the normal standard hours, 8 to about 5, I

14   believe.

15   Q    As a result of that, who staffed the clinic after

16   5:00 and on weekends?

17   A    Generally the PA's.

18   Q    Did you meet with Dr. St. Clair on a regular basis

19   and get feedback from her?

20   A    No.

21   Q    Who instructed you about the various types of

22   documents the clinic used?

23   A    Both Linda and Dr. St. Clair.

24   Q    What did the Defendant Linda Schneider instruct you

25   with regards to how to bill for established patient

3450

1    office visits?

2    A    I don't remember exactly.

3    Q    Do you remember a code number or a type of code?

4                 MR. BYERS:  Objection.  Leading, Your Honor.

5                 MS. TREADWAY:  Do you remember?

6                 THE COURT:  That's not leading.  If she

7    tells -- if she tells her the code number, then that's

8    leading.

9                 MR. BYERS:  She told her there was a code

10   number, Your Honor.  She denied that before.

11   A    I don't remember what code.

12   BY MS. TREADWAY:

13   Q    All right.  When you worked at Schneider Medical

14   Clinic, was there a person named Ulysses that worked

15   there?

16   A    Yes.

17   Q    And did anyone tell you what his role at the clinic

18   was?

19   A    I was under the impression that he was there as the

20   security-type person.

21                MR. BYERS:  Objection as non-responsive, Your

22   Honor.  She said she's under the impression and the

23   question was was she told what his role was.

24                THE COURT:  Sustained.

25

3451

1   BY MS. TREADWAY:

2   Q   Were you told that by someone?

3   A   I don't remember.

4   Q   Did Defendant Linda Schneider tell you that patients

5   were going to be unruly?

6   A   I don't remember.

7   Q   Did you find that patients were unruly at the

8   clinic?

9   A   At times.

10   Q   All right.  And who was supposed to deal with that

11   problem?

12   A   Ulysses.

13   Q   Before you started working at Schneider Medical

14   Clinic, did you have any pain management training?

15   A   I did not.

16   Q   Did you receive any training in pain management

17   while you were employed at the Schneider Medical Clinic?

18   A   I did not.

19   Q   What instructions did you receive about prescribing

20   controlled substances to established pain management

21   patients?

22   A   Particular instructions?  I do not remember.

23   Generally just continue with the same as what they were

24   on.

25   Q   So continue to prescribe what had been prescribed

3452

1    previously.  And who gave you that instruction?

2    A    I don't remember.

3    Q    While you were employed at the Schneider Medical

4    Clinic, did you have the ability to actually issue and

5    sign controlled substances prescriptions?

6    A    No.  My DEA license was pending.

7    Q    Nevertheless, did you have prescription pads that

8    you were supposed to use?

9    A    There were some available.

10   Q    Yes.  And were those presigned prescription pads?

11   A    Yes.

12   Q    And who had presigned them?

13   A    I believe Dr. Schneider.

14   Q    Now, you said that when you were hired, the

15   Defendant Linda Schneider told you that the clinic was a

16   family practice with some pain management patients.  Is

17   that what turned out to be your experience?

18   A    I noticed there were quite a few more pain patients

19   than what I had thought there were.

20   Q    How long did you work there before you started

21   looking for a new job?

22   A    I was there for a total of eight days.

23   Q    Why?

24   A    I was not comfortable working in that setting with

25   that particular patient population.

3453

1    Q    What was it about the patient population that made

2    you uncomfortable?

3    A    The particular nature of their conditions, both

4    being pain patients and Hep-C patients.  At times those

5    patients can be a little more difficult to manage and I

6    was not comfortable with that.

7    Q    How did you feel every day you worked there,

8    Ms. Maddox?

9    A    Uncomfortable.

10   Q    Did you ever feel overwhelmed?

11   A    Yes.

12   Q    Tell the jury why you felt overwhelmed?

13   A    I did not feel as if I could take care of that

14   particular patient population as they needed to be taken

15   care of.  I did not feel that I could handle everything

16   that they needed.

17   Q    Is that because you lacked training?

18   A    That, and I didn't feel that I could keep up with

19   the volume.

20   Q    So it was also lack of time?

21   A    Yes.

22   Q    What, if any, continuity of care did you notice

23   being provided at the Schneider Medical Clinic while you

24   were there?

25   A    It was sketchy.  There were a number of providers

3454

1    that had been there or were taking care of patients; and

2    not necessarily the same patient would see the same

3    provider at each visit.

4    Q    What observations did you make about the patient

5    files when you were there?

6    A    I was concerned at times that there weren't as many

7    supporting background medical history documentation

8    included in the charts.

9    Q    Now, the evidence in the case has been that the

10   clinic used progress notes with a checklist.  Do you

11   remember those progress notes?

12   A    Uh-huh.

13   Q    How helpful was the checklist in meeting the time

14   constraints that you had to work under?

15   A    It was helpful.

16   Q    But was it very helpful in terms of being able to

17   treat the patient once you got somebody else's

18   checklist?

19   A    From time to time I could look back and see if a

20   patient had a certain complaint and compare it.

21   Q    Other than that, were they helpful?

22   A    Uhm --

23            MR. WILLIAMSON:  Your Honor, I'm going to

24   object to leading and asked and answered.

25            MS. TREADWAY:  How were they helpful?

3455

1                THE COURT:  The objection is sustained as to

2       leading but not asked and answered.

3       A    Uhm, it was helpful in the sense that it gave some

4       kind of documentation as to a previous visit.

5       BY MS. TREADWAY:

6       Q    And sometimes was that the only documentation was

7       the checklist?

8       A    In some of the patients.

9       Q    What was the primary treatment you observed the

10      chronic pain patients receiving during your short time

11      there?

12      A    Primarily medication.

13      Q    Controlled substances?

14      A    Uh-huh.

15      Q    And you stayed at the Schneider Medical Clinic only

16      a brief period of time.  Did you resign on September 14,

17      the day after the Federal search warrant was executed?

18      A    Yes.

19      Q    Would you have resigned even if the search had not

20      occurred on September 13th?

21      A    Yes.

22      Q    And why?

23      A    I was not comfortable working under those -- working

24      with that patient population and with the volume.  I was

25      not comfortable.

1          MS. TREADWAY:  Thank you.  Nothing further

2     Judge.

3          THE COURT:  Yes, sir.

4                   **CROSS EXAMINATION**

5     BY: MR. WILLIAMSON:

6     Q    How are you, Ms. Maddox?

7     A    Good.  How are you?

8     Q    A little nervous.  Have you ever seen those legal

9     shows where the cross-examiners come out and they start

10    pointing fingers and stuff.  Have you seen those?

11    A    Yeah.

12    Q    Okay.  I won't do that to you.  I promise.  Okay?

13    A    Okay.

14    Q    All right.  Just a few things.  Just a few things.

15    You were fresh out of school when you first started

16    working with the clinic; correct?

17    A    Yes.

18    Q    You learned from -- there was a job posting at

19    Wichita State; correct?

20    A    Yes.

21    Q    And you learned from that job posting at Wichita

22    State that there was an opening at the clinic?

23    A    Yes.

24    Q    And you responded to that job posting?

25    A    Yes.

3457

1    Q   Is that a posting that -- I know when I was in
2    school we would have like this big cork board where
3    employers would, you know, the career services who post
4    employers' openings on the cork board.  Was it something
5    like that?
6    A   No.  It was online.
7    Q   So it was only open to the PA students?
8    A   No.
9    Q   Okay.  All right.  You were there for eight days;
10   correct?
11   A   Yes.
12   Q   How many of those eight days did you actually work
13   with Dr. Schneider?
14   A   I don't remember.
15   Q   Okay.  You never received any direction from Dr.
16   Schneider as to do A, B or C; correct?
17   A   I don't remember.
18   Q   Okay.  You you don't remember Dr. Schneider ever
19   asking you to falsify the information; correct?
20   A   I don't remember.
21   Q   Okay.  It's been a while since you've been there;
22   correct.
23   A   Yes.
24   Q   Okay.  And you were there for eight days?
25   A   Yes.

3458

```
 1    Q    Okay.  So you may not remember some details?

 2    A    Right.

 3    Q    But you remembered instructions from Dr. St. Clair

 4    and Ms. Schneider that at least while you were there

 5    that you should follow -- generally continue the

 6    medication therapy that the patients were on; correct?

 7    A    I was under the impression that I had.

 8    Q    When you say under the impression, what gave you

 9    that impression?

10    A    I don't remember exactly.

11    Q    You don't remember Dr. St. Clair or Ms. Schneider

12    specifically making those statements to you; correct?

13    A    Correct.

14    Q    Okay.  Now, you started going there and you noticed

15    that there was a difficult patient population; correct?

16    A    Right.

17    Q    And in the midst of this, you come to work one day

18    and the clinic is raided?

19    A    I was actually not at work that particular day.  I

20    believe that was one of the days that I was off.

21    Q    Okay.  You heard about the raid?

22    A    Yes.

23    Q    And it scared you for your professional future to be

24    associated with a place that had been raided by federal

25    investigators; correct?
```

3459

1   A   That added to concern.

2   Q   Okay.  Do you think you would remember if Dr.

3   Schneider ever instructed you to fraudulently complete

4   fee tickets?

5   A   I would probably remember.

6   Q   Okay.  And you would have reported that to somebody

7   when you had given prior statements; correct?

8   A   Correct.

9   Q   Okay.  And you wouldn't have done it even if

10  somebody asked you; correct?

11  A   Correct.

12          MR. WILLIAMSON:  I don't have anything

13  further.

14          THE COURT:  Mr. Byers?

15          MR. BYERS:  Very briefly.  If I could just

16  stay here at the table, Your Honor.

17          THE COURT:  Yes, sir.

18                    **CROSS EXAMINATION**

19  BY: MR. BYERS:

20  Q   Isn't it correct, ma'am -- I'm sorry, I'm over here.

21  Isn't it correct, ma'am, that Linda's description to you

22  of this as a family practice with pain management

23  component was correct and true?

24  A   Correct.

25  Q   Okay.  And in your eight days working at the clinic,

 1   was Linda -- it's true, isn't it, that Linda Schneider

 2   was off on vacation?

 3   A   I believe maybe for part of it.  I don't remember

 4   exactly.

 5           MR. BYERS:  That's all I have.  Thank you,

 6   Your Honor.

 7           THE COURT:  Any redirect?

 8           MS. TREADWAY:  No, Judge.

 9           THE COURT:  Thank you, Ms. Maddox.  You're

10   excused.  We'll take a recess, Ladies and Gentlemen.

11   Approximately 15 minutes.  Remember and heed the

12   admonition.

13                   (Recess.)

14           THE COURT:  Next witness, please.

15           MR. WAMBLE:  Thank you, Judge.  Government

16   next calls Chanda Little.

17                 **CHANDA LITTLE**

18   Having been first duly sworn to tell the truth, the

19   whole truth and nothing but the truth, testified as

20   follows on:

21               **DIRECT EXAMINATION**

22   BY MR. WAMBLE:

23   Q   Can you please introduce yourself to the jury.

24   A   My name is Chanda Little Smith.

25   Q   And are you currently employed?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

3461

1   A   Yes, I am.

2   Q   And where is that?

3   A   I work at Audiology and Hearing Aid Services.

4   Q   And how long have you been there?

5   A   It will be two years in September.

6   Q   Okay.  And were you ever employed at the Schneider

7   Medical Clinic?

8   A   Yes, I was.

9   Q   Would that be from March of 2004 through January of

10  2005?

11  A   Yes.

12             MR. WAMBLE:  Again, Your Honor, I believe we

13  have a demonstrative Exhibit 162.  Thank you,

14  Ms. Treadway.

15  BY MR. WAMBLE:

16  Q   And what were your duties at the Schneider Medical

17  Clinic?

18  A   I would check in patients, check their vitals, their

19  blood pressures, ask 'em why they were there, and put

20  'em in a room.

21  Q   Would your title be that of a roomer or medical

22  assistant?

23  A   Medical assistant.

24  Q   Have you previously worked as a pharmacy clerk?

25  A   Yes.

3462

1    Q    And when was that?

2    A    I worked at Professional Pharmacy in I think it

3    would be in 2005.

4    Q    Was that here in Wichita?

5    A    Yes.

6    Q    Was that immediately following your employment at

7    the Schneider Medical Clinic?

8    A    Yes.

9    Q    Now, as a pharmacy tech or clerk, did you see or

10   work with prescriptions from providers at the Schneider

11   Medical Clinic?

12   A    Yes.

13   Q    Do you see those prescriptions coming in?

14   A    Yes.

15   Q    And what types of prescriptions did you fill as

16   an -- or did you see filled as a pharmacy clerk from the

17   Schneider Medical Clinic?

18   A    Narcotic medications.

19   Q    In comparison to other providers that would send

20   patients to your pharmacy, were the narcotic

21   prescriptions higher in volume than in other places?

22          MR. WILLIAMSON:  Your Honor, objection.  Lack

23   of foundation.  Calls for speculation.

24          THE COURT:  Yes.  Sustained.

25

3463

1   BY MR. WAMBLE:

2   Q   What, if anything, did you notice about the dosages

3   and the quantities of narcotics coming from the

4   Schneider Medical Clinic?

5   A   They were a great volume.

6   Q   Prior to your experience at the Schneider Medical

7   Clinic, did you have any previous medical experience?

8   A   No.

9   Q   What was your typical workday from time?  When did

10  you start there and when did you leave?

11  A   Depending on what day it was, what hours I had.

12  Q   Okay.  Let's say Monday through Friday.  Did you

13  work weekends?

14  A   Yes, I did.

15  Q   Let's start with Monday through Friday.  When did

16  you start your job?

17  A   In the morning we would get there and we would see

18  the patients until lunch.

19  Q   Okay.  And then when you say in the morning, what

20  time would you get there?

21  A   8:00 in the morning.

22  Q   And what time did you leave?

23  A   If it was 8:00 it would be 4:00.

24  Q   And you said that you worked weekends.  Was this

25  something that happened a lot or just occasionally?

3464

```
 1    A    I worked weekends a lot.
 2    Q    When you worked on the weekends, did you see
 3    Defendant Stephen Schneider there working on the
 4    weekends?
 5    A    I can only name one time where I saw him work on the
 6    weekend.
 7    Q    Did you see Dr. St. Clair working on the weekends?
 8    A    No.
 9    Q    You didn't have much medical experience before you
10    started at the Schneider Medical Clinic.  In just that
11    short time, did you have -- or did you develop an
12    opinion about the clinic in the six months that you
13    worked there?
14    A    Yes.
15    Q    And what conclusions did you draw during your
16    initial time there about the clientele of the clinic?
17    A    They were there for pain medication.
18    Q    What gave you that indication?
19    A    Because the people that came in to see Dr. Schneider
20    was there for pain medication.
21    Q    How long did it take you to come up with that
22    conclusion?
23    A    A week.
24    Q    What, if any, treatment did you observe for chronic
25    pain patients receiving other than the prescription for
```

3465

```
1    controlled substances?

2    A    I wasn't aware of any.

3    Q    I'm going to shift the focus here and talk about a

4    specific patient.  When you were working at the clinic,

5    did you become familiar with a patient by the name of

6    Jamie S?

7    A    Yes.

8    Q    And how did you become familiar with her?

9    A    She was a frequent patient that came in at least two

10   or three times in a week.

11   Q    And what did she come to the clinic for?

12   A    Pain medication.

13   Q    Do you remember the ailment that she often

14   complained of?

15   A    Migraines.

16   Q    Did she show up to the clinic with any symptoms that

17   would indicate that she had migraines?

18               MR. WILLIAMSON:  Your Honor, I'm going to

19   object.  She is not a medical doctor.

20               THE COURT:  She doesn't have to be a medical

21   doctor to say what symptoms the woman was complaining

22   of.

23   BY MR. WAMBLE:

24   Q    Sure.  What was her demeanor?

25   A    She would be laughing, telling jokes, standing out
```

3466

1    in the hallway.

2    Q   And could you describe her physical make up?

3    A   She was very frail, tiny.  She looked like she had

4    to have been on some kind of drug.

5    Q   Did she receive any pain injections as a patient?

6    A   Yes.

7    Q   Did you often administer those pain injections?

8    A   Yes.

9    Q   Was it difficult?

10   A   Very --

11   Q   Why?

12   A   -- difficult.  Her veins were collapsed.  There was

13   very minimal tissue to be able to administer the

14   injection.

15   Q   Okay.  Did you ever witness a conversation between

16   Defendant Stephen Schneider and a physician's assistant

17   by the name of Kim He'bert about Jamie S?

18   A   Yes.

19   Q   Do you remember what this conversation was about?

20   A   Yes, I do.

21   Q   And what was the tone of this conversation?

22   A   Kim was very upset.

23   Q   And did you learn exactly what made her upset?

24           MR. WILLIAMSON:  Your Honor, I'm going to

25   object.  That calls for hearsay.

3467

1            THE COURT:  I don't know how she would know

2    why Kim was upset.  Doesn't call for hearsay.  It's

3    speculation, it seems to me.

4            MR. WILLIAMSON:  I think the only way she

5    knows how Kim was upset is either, A, speculation; or,

6    B, Kim told her.  So I think it is a twofold --

7            THE COURT:  Well --

8            MR. WILLIAMSON:  -- twofold objection.

9            THE COURT:  I don't know.  Can you lay a

10   better foundation?

11           MR. WAMBLE:  Certainly, Your Honor.

12   BY MR. WAMBLE:

13   Q   You were privy to this as what you described as an

14   argument?

15   A   Yes.

16   Q   And you described Kim He'bert as being very upset?

17   A   Yes, she was.

18   Q   Did you -- were you able to hear what they were

19   arguing over?  Defendant Stephen Schneider and Kim

20   He'bert?

21   A   Yes.

22   Q   And what were they arguing about?

23   A   They were arguing --

24           MR. WILLIAMSON:  Your Honor, I'm sorry, I'm

25   going to object as to hearsay.  There are two people in

3468

 1    this --

 2              THE COURT:  Why wouldn't this be hearsay?

 3              MR. WAMBLE:  I'll ask the witness specifically

 4    what she encountered from Defendant Stephen Schneider.

 5              THE COURT:  Stephen Schneider.  Now that's

 6    different.

 7              MR. WAMBLE:  Certainly, Your Honor.

 8              THE COURT:  All right.

 9    BY MR. WAMBLE:

10    Q   As far as what you could encounter from Defendant

11    Stephen Schneider, what did you hear him say in relation

12    to this argument?

13    A   Well, that Jamie S was gonna be getting narcotic

14    medications again.

15    Q   And did Kim He'bert terminate her previously?

16    A   Yes.

17    Q   And Stephen Schneider was going to reinstate her?

18    A   Yes.

19    Q   And that upset Kim He'bert?

20    A   Yes.

21    Q   As a part of your duties, did you have anything to

22    do with the patient charts at the clinic?

23    A   Yes.

24    Q   And what was your interaction or what were your

25    duties with the charts?

3469

```
 1    A   To get the charts in the morning, get them ready, up

 2    on the station, to see the patients, and then, of

 3    course, getting the patients, taking them into the

 4    rooms, writing in the chart.

 5    Q   So you were in charge of organizing the charts for

 6    the morning?

 7    A   Yes.

 8    Q   And how would you organize the charts?

 9    A   I would organize the charts by the times the

10    patients were supposed to come in.

11    Q   So it wasn't alphabetical or anything?  It was

12    basically 10:00 we've got a list of patients, 11:00 a

13    list of patients?

14    A   Yes.

15    Q   After you finished organizing them by time, did they

16    stay in that manner?

17    A   No.

18    Q   What would happen to the charts?

19    A   I would come back to the station and notice that

20    they had been changed.

21    Q   When you say changed, reorganized?

22    A   Yes.

23    Q   And who reorganized the charts after you first

24    organized them?

25    A   Linda.
```

3470

1    Q    Linda Schneider?

2    A    Yes.

3    Q    And what was her organizational structure.  You used

4    the time.  How did she organize the charts?

5    A    By insurance.

6    Q    By insurance.  Did she have a favorite to least

7    favorite insurance?

8    A    Yes.

9    Q    What was her favorite insurance?

10   A    I'd say independent insurances like Blue Cross &

11   Blue Shield.

12   Q    What were her least favorite?

13   A    Medicaid.

14   Q    Why was Medicaid her least favorite?

15   A    I think it was about the payment, how much they

16   paid.

17   Q    Did Defendant Linda Schneider have a motto with

18   regards to the walk-in patients that would come into the

19   clinic?

20   A    Yes.

21   Q    What was that motto?

22   A    That every patient that walked in would be seen the

23   same day.

24   Q    Do you remember working with a physician's assistant

25   by the name of Debra Klingsick?

1   A   Yes.

2   Q   And did Linda Schneider ever tell you why Debra

3   Klingsick was fired?

4   A   Uhm, I think I heard why she was fired.

5           MR. BYERS:   Objection as non-responsive.

6           THE COURT:   Not if she heard it from Linda

7   Schneider.

8           MR. BYERS:   Well, we don't know who she heard

9   it from.

10          THE COURT:   Did your hear it from Linda

11  Schneider?

12  A   I can't recall.

13          MR. WAMBLE:   Okay.   That's fine.

14  BY MR. WAMBLE:

15  Q   How frequently did you see Linda Schneider working

16  with the patient charts?

17  A   Every day.

18  Q   And did you become aware of an insurance audit that

19  took place at the clinic?

20  A   Yes.

21  Q   And how would you -- how did you become aware of

22  these insurance audits?

23  A   We were told by Linda.

24  Q   Linda Schneider?

25  A   Yes.

3472

```
 1    Q    And what did she tell you to do in relation to these
 2    audits?
 3    A    We had to make sure that we had all the charts and
 4    then we gave 'em to her.  And then everything that was
 5    supposed to be in the charts, we needed to make sure
 6    that everything was in there.
 7    Q    Okay.  What about the things that were missing from
 8    the charts.  Was there ever a time when things were
 9    missing from the charts?
10    A    Yes.
11    Q    What types of things were missing?
12    A    Pain management forms, vital signs, sometimes the
13    reason why they were there.
14    Q    When these types of documents were missing from the
15    charts, did you give the charts to Linda Schneider
16    anyway?
17    A    The charts after they were seen would go back to the
18    podium and then go to Linda.
19    Q    Okay.  In relationship to the audits, did you
20    physically see Linda Schneider go through the patient
21    charts to get ready for the audit?
22    A    Yes.
23    Q    And how would she know which charts to go through?
24              MR. BYERS:  Objection.  Calls for speculation.
25              THE COURT:  Rephrase your question, please.
```

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

3473

```
1    BY MR. WAMBLE:

2    Q    We'll move on.  Were part of your duties at the

3    clinic to answer the phone?

4    A    Yes.

5    Q    Would you get patient complaints and then pass those

6    complaints on to Defendant Stephen Schneider?

7    A    Yes, I would.

8    Q    Could you give us a few of the patient complaints

9    that you passed on to Defendant Stephen Schneider?

10   A    One of 'em was a husband calling in about his wife

11   being on narcotic medication and he called to try to let

12   Dr. Schneider know not to give his wife any more

13   narcotic medication.

14   Q    Did you have a conversation with Stephen Schneider

15   about this phone call?

16   A    Yes, I did.

17   Q    What was his response?

18   A    He didn't give me one really.

19   Q    What about another phone call that you took?

20   A    A hospital, a doctor called from a hospital and

21   wanted to talk to Dr. Schneider about a patient that had

22   OD'd that was at their hospital.

23   Q    And did you take that concern or that phone call to

24   Stephen Schneider?

25   A    Yes, I did.
```

3474

1    Q    And what was his response?

2    A    That he was too busy.

3    Q    To take the call?

4    A    Yes.

5    Q    Did you receive any complaints from local pharmacies

6    about some of the prescriptions that were coming across

7    their desk?

8    A    Yes.

9    Q    And what were some of the problems that they told

10   you about?

11   A    The quantity was not either filled out on the

12   prescription or they could not read the prescription or

13   they didn't like how the prescription was written.

14   Q    Okay.  Did you take these specific complaints to

15   Defendant Stephen Schneider?

16   A    Yes.

17   Q    And let's talk specifically about perhaps the

18   prescriptions that were inaccurate.  Did you have a

19   discussion with him about that?

20   A    Yes.

21   Q    And what was the solution that he came up with?

22   A    That patient would come back to the clinic and wait

23   for the doctor to fill out another one.

24   Q    During your employment as a medical assistant at the

25   Schneider Medical Clinic, did you have the opportunity

3475

1    to observe most of the pain management patients that

2    came into the clinic for narcotics?

3    A    Yes.

4    Q    And according to your observation, did you take what

5    you saw as to be the physical demeanor of these patients

6    and talk with Defendant Stephen Schneider about this?

7    A    No.

8    Q    As far as all of the things that we've talked about

9    previously about the hospitals calling, about family

10   members calling, about the pharmacies calling, at some

11   point did you just stop talking to Defendant Stephen

12   Schneider and Linda Schneider about the problems at the

13   clinic?

14   A    Yes.

15   Q    And why did you stop?

16   A    Because they weren't listening.

17   Q    Do you think that they would have listened if you

18   would have brought it to their attention the entire time

19   that you worked there?

20   A    No.

21   Q    And why not?

22   A    Because the way I feel about it is that they didn't

23   care what I had to say because they were more interested

24   in the money.

25   Q    Did you personally often go to lunch with the drug

```
 1   representatives that stopped by the clinic?

 2   A    No.

 3   Q    Why not?

 4   A    We weren't invited.

 5   Q    Who at the clinic went on these lunches with the

 6   drug representatives?

 7   A    The doctors and the PAs.

 8   Q    Can you give me some specific names?

 9   A    Dr. Schneider.  Kim He'bert.

10   Q    Okay.

11   A    Linda.

12   Q    Did anyone else accompany Linda Schneider on these

13   lunches?

14   A    Excuse me.

15   Q    Anyone else accompany Linda Schneider on these

16   lunches?

17   A    Ulysses.

18   Q    And how long would these lunches last?

19   A    Longer than the lunch period.  Longer than an hour.

20   Q    And what would happen to the patients while they

21   were away at lunch?

22   A    We would be putting them in the rooms when their

23   appointment time was and they would wait.

24   Q    Would they wait in the patient room?

25   A    Yes.
```

1    Q    Would they wait in the lobby?

2    A    Yes.

3    Q    What would happen if there wasn't a drug rep that

4    was scheduled to take the Schneider Medical Clinic crew

5    out to lunch?  What would Linda Schneider do?

6    A    Linda would call and see if she could get ahold of a

7    drug rep.

8    Q    Just to take her to lunch?

9    A    Yes.

10             MR. BYERS:  Objection, as to relevance, Your

11   Honor.

12             THE COURT:  Overruled.

13   BY MR. WAMBLE:

14   Q    Do you remember a patient by the name of Jeff H?

15   A    Yes.

16   Q    As far as you could tell, did he fit in to what you

17   normally saw at the clinic as far as the pain patients

18   that came in?

19   A    No.

20   Q    And what was different about Jeff H?

21   A    He dressed in suits.  He looked like a banker.

22   Q    Was he considered a VIP patient?

23   A    Yes.

24   Q    Did you have, at some particular time while you were

25   acting as a medical assistant, the opportunity to look

3478

1   at Jeff H's chart?

2   A   Yes.

3   Q   And what, if anything, did you notice about his

4   pulse that was recorded in the chart?

5              THE COURT:  About his what?

6              MR. WAMBLE:  His pulse.

7              THE COURT:  Pulse.

8   A   That they were the same.

9   Q   The same.  The same as what?

10  A   Like the last progress note that he came in.

11  Q   His pulse was exactly the same?

12  A   Uh-huh.

13  Q   And did you happen to notice the weight that was

14  indicated on Jeff H's chart?

15  A   Yes.

16  Q   And what, if anything, did you notice that was

17  peculiar about the weight?

18  A   His weight fluctuated.

19  Q   Because of what you saw indicated on Jeff H's chart,

20  did you start to suspect that anything was going on with

21  the chart?

22  A   Yes, I did.

23  Q   And what did you suspect?

24  A   That the MA or the person that was checking him in

25  was not putting down his vital signs and they were being

3479

```
 1    put in.
 2    Q   Did you have a specific conversation with Curtis
 3    Atterbury about Jeff H while you were working at the
 4    Schneider Medical Clinic?
 5    A   Yes.
 6    Q   And what was Curtis Atterbury's feelings about Jeff
 7    H?
 8              MR. WILLIAMSON:  Your Honor, objection.  That
 9    calls for total hearsay.
10              MR. WAMBLE:  Your Honor, in response to that,
11    Curtis Atterbury was working in his capacity as an
12    employee and as an agent, I believe, under Rule 801-D,
13    that that would be allowable.
14              THE COURT:  I think so.  I'll hear it.
15    BY MR. WAMBLE:
16    Q   What was Curtis Atterbury's feelings about Jeff H?
17    A   He didn't like him.
18    Q   Why did he not like him?
19    A   Because --
20              MR. WILLIAMSON:  Your Honor, I'm going to
21    object.  That calls for speculation.
22              THE COURT:  That objection is sustained.
23    BY MR. WAMBLE:
24    Q   What did Curtis Atterbury tell you the reasons why
25    he did not like Jeff H?
```

3480

1          MR. WILLIAMSON:  Objection.  It assumes facts

2     not in evidence.  It has not been established that he

3     told her anything.

4          THE COURT:  Well, rephrase your question.

5     BY MR. WAMBLE:

6     Q    Did Curtis Atterbury tell you why he did not like

7     Jeff H?

8     A    Yes.

9     Q    What did he tell you?

10    A    That he was a drug-seeker.

11    Q    And is that the reason that he didn't like him?

12    A    Yes.

13    Q    Nevertheless, knowing that Jeff H was a drug-seeker,

14    during the time that you were employed at the clinic,

15    did you see Jeff H leave with prescriptions for

16    controlled substances?

17    A    Yes.

18    Q    Was there a so-called quality assurance person at

19    the Schneider Medical Clinic?

20    A    Yes.

21    Q    And who was that supposed to be?

22    A    Linda Schneider.

23    Q    And did Linda Schneider see all of the patient files

24    before going to billing?

25    A    Yes.

3481

1          MR. WAMBLE:  Thank you.  Just a moment, Your

2     Honor.

3                    (Off-the-record discussion.)

4          MR. WAMBLE:  I have nothing further.

5          MR. WILLIAMSON:  I'll go first, Judge.

6          THE COURT:  All right.

7                    **CROSS EXAMINATION**

8     BY MR. WILLIAMSON:

9     Q    How are you, Ms. Little?

10    A    Fine.  How are you?

11    Q    Good.  We haven't had a chance to meet before, have

12    we?

13    A    No.

14    Q    I'm Lawrence Williamson.  I represent Dr. Schneider.

15    Okay?

16    A    Okay.

17    Q    Just want to ask you several questions about your

18    direct testimony.  Let's start with where you left off

19    with Jeff H.

20         Dr. Schneider never saw Jeff H, did he?

21    A    Not that I can remember.

22    Q    And Dr. Schneider was not responsible for filling

23    out vitals; correct?

24    A    Correct.

25    Q    He relied on the medical assistants to do it;

3482

1    correct?

2    A    Correct.

3    Q    He never -- you were a medical assistant at some

4    point; correct?

5    A    No, I was a Certified Nurse's Assistant.

6    Q    Okay.  He never asked you to fraudulently put in

7    vitals on anything, did he?

8    A    No.

9    Q    Do you know how long -- strike that.

10        You mentioned that Jeff H stood out because he

11   dressed in suits.  Did most of the clientele, most of

12   the patients at the clinic, did they dress in -- how did

13   they dress?

14   A    Not in suits.

15   Q    Okay.  How did they dress?

16   A    Regular clothes, jeans --

17   Q    Nobody --

18   A    -- shorts.

19   Q    He never had any other business people who would be

20   seen by the clinic?

21   A    They didn't come in in suits if they were.

22   Q    Okay.  What about Tim Norman, the former Mayor of

23   Haysville, did you ever see him there?

24   A    I don't recall ever seeing him.

25   Q    What about Mr. Kitchen, the former Chief of Police

3483

```
 1    for Haysville, did you ever see him there?
 2    A    I don't think so.
 3    Q    So it's fair that you haven't observed every patient
 4    that came in to the clinic; correct?
 5    A    That -- every patient that I saw there.
 6    Q    But you didn't see every patient during the life of
 7    the clinic; correct?
 8    A    No.
 9    Q    Okay.  Now, you and Jamie Hilliard were really good
10    friends while you were at the clinic, weren't you?
11    A    Yes.
12    Q    You and Jody LeBroke were also good friends and
13    would often talk about things going on at the clinic;
14    correct?
15    A    Yes.
16    Q    Now, you mentioned one phone call that you passed on
17    to Dr. Schneider regarding somebody's husband.  You
18    remember that?
19    A    Yes.
20    Q    Do you remember who that person was?
21    A    I cannot recall the name.
22    Q    Do you remember who the patient was?
23    A    Yes, but I cannot recall her name.
24    Q    Okay.  Do you know whether or not Dr. Schneider
25    returned that phone call?
```

3484

1    A    No, I don't.

2    Q    Okay.  This emergency room doctor that called, who

3    was that?

4    A    I know it was from Good Shepherd.

5    Q    Do you know who it was?

6    A    No.

7    Q    Do you know whether or not Dr. Schneider returned

8    his phone call?

9    A    No.

10   Q    What time of the day did this phone call come in?

11   A    I can't recall that long ago.

12   Q    It was during business hours?

13   A    Yes, it was.

14   Q    Clinic was always busy?

15   A    Yes.

16   Q    Okay.  Is it possible that Dr. Schneider was

17   actually busy with patients and couldn't take the call

18   right then?

19   A    Could be.

20   Q    Okay.  Dr. Schneider had an office; correct?

21   A    Yes.

22   Q    And he had a telephone in his office; correct?

23   A    Yes.

24   Q    And you can't say whether or not Dr. Schneider

25   actually called that person back that day or the next

3485

1    day or the following day, can you?

2    A    No.

3    Q    Now, you mentioned that the only treatment that was

4    provided to people suffering from chronic pain was pain

5    medications.  You remember that?

6    A    Yes.

7    Q    Did you ever see Dr. Schneider perform osteopathic

8    manipulation therapy on patients?

9    A    I think maybe one time out of the year I was there.

10   Q    Okay.  Do you know who that was with?

11   A    I can't remember.

12   Q    Were you in the -- were you in the exam room with

13   every patient every time Dr. Schneider had to see them?

14   A    No.

15   Q    You had to room the patient and then be concerned

16   with getting the other patients roomed; correct?

17   A    Yes.

18   Q    You had your own responsibilities to take care of;

19   correct?

20   A    Yes.

21   Q    Some of that was taking vitals?

22   A    Yes.

23   Q    Some of that was taking blood pressure, weight;

24   correct?

25   A    Yes.

3486

```
 1   Q   You were also instructed to get a medication list
 2   from the patient?
 3   A   Yes.
 4   Q   You also worked in other departments while you were
 5   at the clinic; correct?
 6   A   Yes.
 7   Q   You worked in the X-ray department?
 8   A   Yes.
 9   Q   You didn't last long because you just weren't good
10   at that; correct?
11   A   Right.
12   Q   And then they moved you back to the front?
13   A   Yeah.
14   Q   I'm sorry.  What did you do after being an x-ray
15   tech?
16   A   I was never an X-ray tech.
17   Q   You just performed X-rays?
18   A   I tried.
19   Q   You tried?
20   A   Yeah.
21   Q   Now, you mentioned -- you mentioned Jamie S, a
22   patient?
23   A   Yes.
24   Q   It's true that Jamie S was terminated from being a
25   pain patient at the clinic; correct?
```

3487

```
 1    A    Yes.

 2    Q    Now, you stated that you were the one performing

 3    these shots on her?

 4    A    Among others.

 5    Q    Okay.  Now -- and you say it was hard to find her

 6    vein?

 7    A    No.

 8    Q    Okay.  You did not put those shots in her vein; did

 9    you?

10    A    No.

11    Q    That's a muscular shot; correct?

12    A    Right.

13    Q    Okay.  So you didn't have trouble finding her veins

14    in order to give these shots?

15    A    You didn't give 'em in the vein.

16    Q    I was under the impression when you testified, and

17    maybe I'm the only one, but you had trouble with the

18    veins because they were sunken and the trouble happened

19    because you had to give these shots.  That's a

20    misconception on my part; correct.

21    A    Well, I think I was asked her appearance and on her

22    skin, how she looked.

23    Q    Okay.  And I believe you stated under oath before

24    that before she would see a physician or a provider, her

25    demeanor would change from the time she was in the
```

3488

1    waiting room until the time that she went back to the --

2    to see the providers; correct?

3    A   Yes.

4    Q   And you believed that was a scam so she could

5    convince the doctor she really needed this pain

6    medication; correct?

7    A   Yes.

8    Q   And you also noticed that there were other patients

9    that would be fired from the clinic who would demand to

10   see either Dr. Schneider or Dr. St. Clair; correct?

11   A   Say that again please.

12   Q   If a patient was told, let's say, by a physician's

13   assistant that they were not going to be able to receive

14   any more pain medication because they were terminated,

15   they would often say I want to see a physician before

16   this final decision is made; correct?

17   A   Yes.

18   Q   And based on your experience, these people would go

19   telling, I believe you stated, a Saturday (sic) story,

20   or some story to tell the physician so they could try to

21   get back on; correct?

22   A   Yes.

23   Q   You never saw Dr. Schneider standing out at the back

24   of the clinic handing out prescriptions to a line of

25   people for cash, did you?

3489

```
1    A    No.
2    Q    And if you would have seen that, would you have quit
3    right then?
4    A    Yeah.
5    Q    If Dr. Schneider would have asked you to falsify
6    vitals, would you have quit right then?
7    A    Yes.
8    Q    If he had asked you to falsify information on a fee
9    ticket, would you have quit right then?
10   A    Yes.
11   Q    Dr. Schneider never told you stop bringing me
12   complaints, did he?
13   A    Not that I can remember.
14   Q    Okay.  And you were able to observe Dr. Schneider
15   over -- how long were you there?
16   A    Almost a year.
17   Q    You were able to observe Dr. Schneider over that
18   year period; correct?
19   A    Yes.
20   Q    Dr. Schneider never appear to you as an excited
21   individual, did he?
22   A    No.
23   Q    Okay.  He always has pretty -- same kind of moves.
24   Would you agree with that?
25   A    Yes.
```

3490

1    Q    He's kind of quiet and kind of reserved?

2    A    Yes.

3    Q    Would you describe him as a nice guy?

4    A    Yes.

5    Q    He never yelled at you if any mistake was made; did

6    he?

7    A    Just on that one bad X-ray.

8    Q    And other than that, he was --

9    A    No, he was -- oh, yeah, he was fine.

10   Q    And do you believe that the providers at the

11   Schneider Medical Clinic were just too trusting with

12   some of these patients?  That they believed these

13   stories that these patients would go tell them?

14   A    I don't think I could say.

15   Q    Because you weren't there during these

16   conversations; correct?

17   A    Right.

18   Q    And you understand that the provider had to weigh

19   what the patient told them and make a decision as to

20   whether or not they will reinstate them on pain

21   management; correct?

22   A    Okay.

23            MR. WILLIAMSON:   One second, your Honor.  I

24   think I may be finished here.

25            THE COURT:   Yes, sir.

3491

```
 1              (Off-the-record.)

 2              MR. WILLIAMSON:  I don't have anything

 3      further, Your Honor.

 4              THE COURT:  Mr. Byers.

 5              MR. BYERS:  Thank you, Your Honor.
```

6                    **CROSS EXAMINATION**

```
 7      BY MR. BYERS:

 8      Q    Good afternoon.

 9      A    Hi.

10      Q    My name is Kevin Byers.  I'm representing Linda

11      Schneider.  I need to ask you some questions, too.

12           Now, you don't have any idea of the portion of

13      family practice versus pain management patients at the

14      Schneider Medical Clinic, do you?

15      A    No.

16      Q    Isn't it a fact that you had one of your own family

17      members was treated there because she was diabetic;

18      correct?

19      A    Yes.

20      Q    You've been interviewed a number of times by federal

21      agents since you left your employment there, haven't

22      you?

23      A    Yes.

24      Q    How many times?

25      A    I think three.
```

3492

```
1    Q   And you've also given a grand jury testimony?

2    A   Yes.

3    Q   And you've also given a written statement to

4    Plaintiff's attorney Larry Wall?

5    A   Yes.

6    Q   Any other interviews or depositions or sworn

7    statements you have given?

8    A   No.

9    Q   Can you tell me where these three interviews took

10   place with the federal agents?

11   A   The one was at the lawyer Wall's.

12   Q   But outside those.  I know about lawyer Wall's.

13   A   No.

14   Q   But where were you interviewed by federal agents?  I

15   thought you said you were interviewed three times?

16   A   Sorry.  I was mistaking that for the other times,

17   the two times that I have talked to --

18   Q   You did the grand jury?

19   A   Right.

20   Q   And then this written statement?

21   A   Right.

22   Q   And then there's some other contact with somebody?

23   A   No, that's it.

24   Q   So two times?

25   A   Yeah, two times.
```

3493

1    Q    No federal agents interviewed you that you recall?

2    A    No.

3    Q    Now, beyond your friendship with Hilliard and I also

4    mess up her name -- it's Braloke or Braroke -- actually

5    it's Reagans now?

6    A    Oh --

7    Q    Beyond being friends with those two, you were also

8    friends with Angie Dunnavent, were you not?

9    A    Yes.

10   Q    And you testified about Linda Schneider reorganizing

11   charts, I guess sequencing them to be seen by providers.

12   You said that was because of her preferred insurance

13   plans; is that correct?

14   A    Yes.

15   Q    Now, did she tell you that was why she would shuffle

16   charts if she indeed did that?

17   A    She didn't tell me that.

18   Q    So she didn't tell you anything related to that?

19   It's correct -- she did not tell you that she rearranged

20   charts sometimes based upon need such as a crying baby

21   who had been waiting a long time, or an elderly person

22   waiting in the lobby?

23   A    No.

24   Q    Do you recall telling the grand jury that you never

25   saw Linda Schneider remove one of those neon marker

3494

1 sheets from a chart?  Do you recall telling the grand

2 jury that?

3 A No, I don't.

4 Q And you were never told by Linda Schneider falsify a

5 chart in any fashion, were you?

6 A No, I wasn't.

7 Q Now, do you recall -- strike that.

8  It's correct that you did not mention this First

9 Guard audit in the least in either your statement to

10 Larry Wall or the grand jury testimony; correct?

11 A Can you rephrase that.  Can you say it again.

12 Q Do you remember mentioning the First Guard audit --

13 first -- we'll do it this way -- in the grand jury

14 testimony?

15 A Yeah.

16 Q You think you told them that in there about the

17 First Guard audit?

18 A You mean Medicaid audit?

19 Q Yeah.  If that's -- I thought you said First Guard.

20 A No, I didn't say First Guard.

21 Q The Medicaid audit.  Okay.  Do you think that's in

22 your grand jury testimony?

23 A Yes.

24 Q Okay.  Do you think it's in your statement you gave

25 to Larry Wall?

3495

1   A   I don't remember.

2   Q   Now, you don't have any idea, do you, if part of

3   Linda's responsibility at the clinic was to make sure

4   charts were complete and accurate, do you?

5   A   Yes, I do.

6   Q   You do have an idea.  Was that part of her job?

7   A   We were told to bring them to her.

8   Q   And from that, you're inferring some kind of evil;

9   correct?

10  A   No.

11  Q   So you agree it can be part of her job to make sure

12  charts at the clinic are accurate and complete?

13  A   Exactly, yes.

14  Q   And you don't know anything about the Haysville

15  Chamber of Commerce passing out coupons they call VIP

16  coupons for treatment at the Schneider Medical Clinic;

17  do you?

18  A   No.

19  Q   Now, you told the grand jury about seeing a KBI

20  agent in the lobby at Schneider Medical; correct?

21  A   Yes.

22  Q   And didn't you essentially get the impression or

23  didn't you believe you ran that person off by

24  recognizing them?

25  A   Yes.

3496

1          MR. BYERS:  If I could have a minute, Your

2    Honor.

3                    (Off-the-record discussion

4                     between counsel.)

5    BY MR. BYERS:

6    Q   Ma'am, if the Government has given us, the defense

7    team, defense attorneys, copies of interviews, interview

8    reports from the KBI and FBI, interviews with you, can

9    you explain that to me given your testimony that you

10   were never interviewed by agents?

11   A   Well, I guess I'm confused.

12   Q   You are now confused?

13   A   Well, I've been interviewed by the lawyers and --

14   okay.  So he's from the FBI, so I was interviewed from

15   the FBI.

16   Q   And KBI; correct?

17   A   Yes.

18   Q   And Health and Human Services; correct?

19   A   Okay.

20   Q   Is your residence at 1333 West May Street?

21   A   That's where I used to live, yes.

22         MR. BYERS:  That's all I have, Your Honor.

23   Thank you.

24         THE COURT:  Redirect.

25

1           **REDIRECT EXAMINATION**

2    BY MR. WAMBLE:

3    Q    Are you aware of the difference between a grand jury

4    proceeding and an interview with a federal agent?

5    A    Yes.

6    Q    And so when Mr. Byers was asking you about grand

7    jury interviews and interviews from other agents, is

8    that sometimes confusing?

9    A    Well, it was so long ago that --

10   Q    Okay.  I believe Mr. Williamson asked you whether

11   Defendant Stephen Schneider was an animated person and

12   you said that he was usually pretty calm, cool and

13   collected?

14   A    Yes.

15   Q    Even though he's not an animated person and he's

16   quite reserved, did you get the impression that he even

17   cared that you brought these complaints to him?

18              MR. WILLIAMSON:  Your Honor, I just want to

19   object, calls for total speculation.

20              THE COURT:  Well --

21              MR. WILLIAMSON:  And lack of foundation.

22              THE COURT:  -- can be based on something other

23   than speculation but you need to lay a foundation.

24              MR. WAMBLE:  Certainly.

25

3498

```
 1    BY MR. WAMBLE:
 2    Q    Did Defendant Stephen Schneider ever come to you and
 3    solicit complaints from you.  Did he ask you, hey, is
 4    anything going on that you'd like to talk about?
 5              MR. WILLIAMSON:  Objection; compound question.
 6              THE COURT:  Go ahead and answer.
 7    A    No.
 8    BY MR. WAMBLE:
 9    Q    Did he ever come to you and say how can I be a
10    better physician with you being a CNA?
11    A    No.
12    Q    Did he ever follow up with you on those phone calls
13    to say, hey, I took care of it?
14    A    No.
15    Q    Taking all of that in consideration, did he seem to
16    care if you brought these complaints to him or not?
17    A    No.
18    Q    Mr. Williamson asked you whether you thought that --
19    or did you ever see Defendant Stephen Schneider deal
20    drugs out the back door of the facility.  Did you ever
21    see that?
22    A    No.
23    Q    And taking into consideration your employment time
24    there, would you say in front of the jury that you felt
25    that the Defendant was actually dealing drugs out the
```

1    front door?

2    A    Yes, I would.

3    Q    As far as the alleged quality control service or

4    unit that Defendant Linda Schneider provided to the

5    clinic, was it your impression by all of the direction

6    that she gave you that the buck stopped with her?

7    A    Yes.

8              MR. WAMBLE:  Thank you.  Nothing further.

9              THE COURT:  Yes, sir.

10             MR. WILLIAMSON:  Very few.

11                    **RECROSS EXAMINATION**

12   BY MR. WILLIAMSON:

13   Q    Would you follow up with Dr. Schneider after you

14   made these I guess complaints to him about -- when you

15   discussed the ER phone call with Dr. Schneider, did you

16   go back to Dr. Schneider and say did you ever talk to

17   the ER doctor?

18   A    No.

19   Q    And when you took the phone call from the husband,

20   did you go back to Dr. Schneider and say Dr. Schneider,

21   did you follow up with this -- the husband that called

22   in?

23   A    No.

24   Q    You weren't Dr. Schneider's boss, were you?

25   A    No.

3500

1    Q    He wasn't required to answer to you; correct?

2    A    Right.

3    Q    Okay.  Can you tell me one patient that you observed

4    Dr. Schneider giving pain medicine to that did not

5    complain about a pain symptom?

6    A    No.

7              MR. WILLIAMSON:  No further questions.

8              THE COURT:  Mr. Byers.

9              MR. BYERS:  No further questions, Your Honor.

10             THE COURT:  Thank you, ma'am.  You're excused.

11   Next witness please.

12             MS. TREADWAY:  Government calls Charles Lee

13   Craig.

14                     **CHARLES LEE CRAIG**

15   Having been first duly sworn to tell the truth, the

16   whole truth and nothing but the truth, testified as

17   follows on:

18                    **DIRECT EXAMINATION**

19   BY MS. TREADWAY:

20   Q    Good afternoon, sir.  Could you please introduce

21   yourself to the jury.

22   A    Charles Lee Craig.

23   Q    Where are you currently employed, Mr. Craig?

24   A    Kansas Joint and Spine Institute.

25   Q    And how long have you have been employed there?

3501

1    A    A little over two and a half years.

2    Q    And what do you do there?

3    A    I'm a physician assistant assisting with surgery,

4    new patient history and physicals, patient education.

5    Q    Did you graduate with your physician assistant

6    degree in August, 2004?

7    A    Yes.

8    Q    And from where?

9    A    Wichita State.

10   Q    Prior to becoming a physician assistant, sir, what

11   did you do?

12   A    I was a Wichita firefighter.

13   Q    Where was your first job as a physician assistant?

14   A    Schneider Medical in Haysville.

15   Q    Who did you interview with for that job?

16   A    Linda Schneider.

17   Q    What did Defendant Linda Schneider tell you about

18   the Schneider Medical Clinic during your interview?

19   A    It was fast-paced, hectic, that they did a lot of

20   pain management.

21   Q    Did she tell you how many days a week the clinic was

22   open?

23   A    Seven days a week.

24   Q    Did she tell you about what types of prescriptions

25   the clinic wrote?

3502

1    A    A lot of narcotics.

2    Q    During your interview, did you express any concerns

3    to Linda Schneider about the pain management part of the

4    clinic's practice?

5    A    Yes.  I was concerned.

6    Q    And what did you basically discuss with her?

7    A    She assured me that the clinic had a patient

8    contract which kind of assured the method with which the

9    narcotics were, you know, written, and everything was on

10   the up-and-up.

11   Q    And was that a pain management agreement?

12   A    Yes.

13   Q    Did you work at the Schneider Medical Clinic from

14   approximately August, 2004, through July of 2005?

15   A    Yes.

16   Q    Who was your primary supervising physician?

17   A    Stephen Schneider.

18   Q    And who was your secondary supervising physician?

19   A    Donna St. Clair.

20   Q    Did Donna St. Clair work at the Schneider Medical

21   Clinic full time or part-time?

22   A    I believe full time.

23   Q    And did you see patients that had been seen by both

24   the Defendant Stephen Schneider and Dr. St. Clair?

25   A    Yes.

3503

1    Q    In reviewing the charts, did you see any difference

2    between how they prescribed controlled substances to

3    pain management patients?

4    A    No.

5    Q    What days did you work, Mr. Craig?

6    A    I worked Friday, Saturday, Sunday and Monday.

7    Q    On the weekends, how was the clinic typically

8    staffed?

9    A    Myself and one or two medical assistants.  There

10   would be one helping in the clinic and then maybe one or

11   two in the lab.

12   Q    Who, if anyone, trained you with regards to the fee

13   tickets and how to fill those out?

14   A    Both Linda and Dr. Schneider.

15   Q    Did you ever get any training from a person named

16   Ulysses?

17   A    I don't think so.

18   Q    Do you know who Ulysses is?

19   A    Yeah, I was familiar with him.

20   Q    Do you know what his role at the clinic was?

21   A    It was the front office manager.

22   Q    What did the Defendant Linda Schneider tell you

23   about the daily operations of the Defendant's clinic in

24   terms of what it was expected for the PA's to do with

25   regards to the patients?

3504

1    A    We were essentially open seven days a week.  We

2    would take any walk-in's or any patients that came up on

3    top of our regular scheduled program.  We had a very

4    busy schedule.

5    Q    And did you have to see all the patients that showed

6    up each day?

7    A    Yes.

8    Q    Did the Defendant Linda Schneider talk to you openly

9    about the volume of patients seen at the clinic?

10   A    Yes.  There was mention of the fact that since we

11   saw many Medicaid patients and others that didn't pay

12   well, that to keep the clinic open, we had to see a

13   higher volume in order to make ends meet.

14   Q    During your schooling at Wichita State University,

15   did you receive specific training about treating chronic

16   pain patients?

17   A    Not in a direct clinic context.  We did have some

18   exposure.

19   Q    And what was that exposure?

20   A    Dr. Scanlin, Timothy Scanlin, he is an addiction

21   specialist, mostly.  I spent like one day or two days

22   with him during the rotation.  And he kind of went over

23   his beliefs on that.

24   Q    Before starting to see patients at the Schneider

25   Medical Clinic, did you receive any training about

3505

1    treating chronic pain patients?

2    A    No.

3    Q    Did you ever receive any such training during the

4    time you were employed at the Schneider Medical Clinic?

5    A    No.

6    Q    Now, based on the evidence that we received in this

7    case so far, we learned that your DEA registration

8    number was a little behind your starting work at the

9    Schneider Medical Clinic.  Is that also your memory?

10   A    Yes.

11   Q    Approximately how long do you remember that it took

12   to get your DEA registration number?

13   A    I think approximately three weeks after I started.

14   Q    Before you had your DEA registration number, what

15   happened with regards to your being able to issue

16   prescriptions for controlled substances?

17   A    The first two weekends that I worked alone I -- we

18   just did not write controlled substances in the clinic

19   that week.  We put a sign up that said no narcotics.

20   Q    As a result, how many patients did you end up seeing

21   those weekends?

22   A    Very few.  Less than ten a day.

23   Q    And then what happened?

24   A    On I believe the -- probably around the first of

25   September, the first weekend of September, Dr. Schneider

3506

1    left a prescription pad that had already been signed.

2    Q    So he left presigned prescription pads for you to

3    use?

4    A    Yes.

5    Q    With regards to the people who came in for pain

6    management, were they required to take off their clothes

7    and put on a gown for examinations?

8    A    No.

9    Q    With regards to the examination rooms, were they

10   each equipped with blood pressure cuffs with wall

11   readout's?

12   A    No.

13   Q    Were they equipped with otoscopes for looking in

14   people's ears?

15   A    No.

16   Q    Were they equipped with stethoscopes for listening

17   to people's hearts and lungs?

18   A    No.

19   Q    Did you carry a stethoscope?

20   A    Yes.

21   Q    Was it yours?

22   A    Yes.

23   Q    Did the clinic in each examination room have

24   ophthalmoscopes which are the devices that you use to

25   look in people's eyes?

3507

1    A    No.

2    Q    And did they have electronic or digital thermometers

3    in each exam room?

4    A    No.

5    Q    Did the examination rooms have tables that raised

6    and lowered?

7    A    No.

8    Q    What were the tables like?

9    A    The majority of the rooms, they were bench style.

10   Q    And how high off the ground?  I'm about five two.

11   Where would a bench hit me?

12   A    Mid wasteline, probably about three feet.

13   Q    About right here?  (Indicating.)

14   A    Uh-huh.

15   Q    During your employment at the Schneider Medical

16   Clinic, did you observe whether the clinic's providers

17   strictly enforced the pain management agreement that the

18   Defendant Linda Schneider had shared with you during

19   your interview?

20   A    No.

21   Q    During your employment at the Schneider Medical

22   Clinic, were you allotted sufficient time to do complete

23   and thorough histories and physical examinations?

24   A    No.

25   Q    Why not?

1    A    In order to do what I would consider a thorough

2    physical and history would require 20 minutes or more,

3    depending on the issue.  With the volume we were seeing,

4    that was impossible.

5    Q    How many patients did you typically see in a given

6    day, Mr. Craig?

7    A    More than 50.

8    Q    Do you remember the most patients you ever saw in a

9    given day?

10   A    I believe it was in the 70s, 72.

11   Q    Why are you able to remember that all these years

12   later?

13   A    Because that's a lot.

14   Q    Given the time constraints of your schedule, could

15   you tell the jury what a typical examination of a

16   patient would be like?

17   A    Well, depending on the type of patient, it would be

18   very focussed.  Review the paperwork the patient had

19   filled out, ask if there's any significant changes, how

20   things have been going, at most, check rudimentary

21   physical; but that's about it.

22   Q    What did you typically do with regards to writing

23   prescriptions for controlled substances for established

24   patients?

25   A    For the most part, I just looked back and saw what

1  they had been taking and duplicated.

2  Q   And why would you just do that?

3  A   It was faster.

4  Q   Was speed important at the Defendant's clinic, sir?

5  A   Oh, yes.

6  Q   Why?

7  A   Volume.

8  Q   Did you have sufficient time to exercise your

9  independent medical judgment?

10  A   No.

11  Q   Did you have sufficient time to practice legitimate

12  medicine, Mr. Craig?

13  A   No.

14  Q   If you were spending too much time in the

15  examination room, what happened, Mr. Craig?

16  A   Someone, usually one of the medical assistants,

17  would knock on the door and ask if everything was going

18  okay.

19  Q   Despite the the emphasis on speed, was there a

20  dictation service for progress notes?

21  A   No.

22  Q   How were the progress notes then done?

23  A   A check sheet.

24  Q   Did the Defendants use that check sheet as a part of

25  their emphasis on speed and volume?

3510

1    A    Yes.

2    Q    How helpful was that checklist to you as a provider

3    to appropriately treat patients?

4    A    Minimal.

5    Q    What was the primary treatment you observed chronic

6    pain patients receiving at the Schneider Medical Clinic?

7    A    Medication.

8    Q    Was that controlled substances medication?

9    A    Yes.

10   Q    When you first began working at the Defendant's

11   clinic, what was your impression about the controlled

12   substances that you saw being prescribed?

13   A    It initially seemed like an awfully lot of medicine.

14   Q    What happened to your thinking about that over time,

15   Mr. Craig?

16   A    It becomes normalized.  You kind of become numb to

17   it.

18   Q    Did you observe patients travel from great distances

19   to come to the clinic?

20   A    I can recall at least one from out-of-state.

21   Q    And which state?

22   A    Texas.

23   Q    During the course of your employment at the

24   Schneider Medical Clinic, did you have any problems with

25   the patients' medical charts?

3511

 1    A    They were often unavailable for review during the

 2    patient visit.

 3    Q    Were documents timely filed in the patient's chart?

 4    A    No.

 5    Q    Did the Defendants' clinic receive faxes of

 6    information from a variety of sources?

 7    A    Yes.

 8    Q    And what sources would they receive faxes from?

 9    A    Everything from laboratory results, hospital notes,

10    progress notes for people that had been admitted,

11    radiological evaluations, consult letters from other

12    physicians we had sent them to.

13    Q    Tell the jury how the faxes were handled at the

14    clinic?

15    A    They typically came into the fax machine, which was

16    somewhere toward the front of the building.  Someone, I

17    think it varied day-to-day, would pick them up and bring

18    them back to the physicians' area and they were placed

19    into a stack on a bottom shelf where we worked.

20    Q    And how many faxes would stack up every day?

21    A    Oh, I would be hard-pressed to say less than 50 to

22    100.

23    Q    And would you sometimes take home stacks of faxes to

24    review?

25    A    Yes.

3512

1    Q    And why would you do that, sir?

2    A    Just to try to get caught up.

3    Q    Who was in charge of the filing when you were

4    employed at the Defendant's clinic?

5    A    I only know of one person who did filing full time.

6    I think her name was Myrna.

7    Q    What was her primary language?

8    A    Spanish.

9    Q    Did you ever hear her speak English?

10    A    No.

11    Q    Do you know whether she could read English?

12    A    No.

13    Q    Did the patients at the clinic come to learn about

14    the missing charts and the missing information in the

15    charts?

16    A    I can assume so, yes.

17    Q    And why do you assume that?

18    A    Because several times after information had been

19    compiled and the filing caught up with the patient, you

20    could determine a pattern that the patient was coming

21    back, say, one week after a visit, seeing a different

22    provider, and getting the exact same prescriptions

23    written again because they knew that they wouldn't be

24    caught that soon.

25    Q    So is that kind of like doctor-shopping within the

3513

1    confines of the Schneider Medical Clinic?

2    A    Yes.  That went on a lot.

3    Q    Did you and others discuss the doctor-shopping with

4    the Defendant Stephen Schneider?

5    A    Yes.

6    Q    And was he concerned by this?

7    A    Not directly that I could tell.

8    Q    During your employment at the Defendant's clinic,

9    did the Defendant Stephen Schneider have regular staff

10   meetings to discuss any problems or issues at the

11   clinic?

12   A    No.

13   Q    What, if any, concern did the Defendant Stephen

14   Schneider express to you about patients becoming

15   addicted to prescription medications?

16   A    He never expressed any direct concern to me.

17   Q    During the course of your employment, did you become

18   aware that people were overdosing and dying from

19   overdoses of controlled substances being prescribed at

20   the Defendant's clinic?

21   A    On one or two occasions.

22   Q    And how would that information come to your

23   attention?

24   A    Usually when I would find a fax from a hospital or

25   some other agency indicating something like that.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

3514

1    Q    When people overdose and die from overdose, what

2    happened with the person's medical chart?

3    A    The ones I knew about the chart was pulled.

4    Q    And where would they go?

5    A    I believe Linda Schneider's office.

6    Q    Do you know why the chart was given to her?

7    A    No.

8    Q    Did the Defendant Stephen Schneider ever discuss

9    with you the fact that patients were overdosing and

10   dying of the prescription medications?

11   A    No.

12   Q    Did you have an impression -- did Stephen Schneider

13   leave an impression with you about overdoses and deaths

14   and how he saw them?

15   A    I believe he felt the majority of the patients were

16   legitimate and that if a few people happened to

17   overdose, that was acceptable numbers wise.

18   Q    Did you ever hear him talking on the phone about a

19   patient overdose?

20   A    I overheard one conversation.  I'm not sure who he

21   was speaking with.

22   Q    And what did you overhear him talking about?

23   A    The comment that I heard was, yeah, we have people

24   in lots of pain so they're probably depressed, and

25   depressed people commit suicide sometimes.

3515

1    Q    So who did Defendant Stephen Schneider blame when it

2    came to the patients overdosing on a prescription

3    medication?

4    A    The patients.

5    Q    Do you know whether the clinic received information

6    about patients abusing their prescription medications?

7    A    Yes.  I know there were calls to the clinic at times

8    by their family, friends or something.

9    Q    And did you even see references about these calls in

10   the patient charts?

11   A    Yes.

12   Q    Did you ever see a reaction to those calls as a

13   consideration of stopping controlled substances

14   prescriptions?

15   A    No.

16   Q    Do you know whether or not the Defendant's clinic

17   received calls about patients diverting or selling

18   prescription medications?

19   A    Yes.

20   Q    And how did you come to know about this?

21   A    Same way.  Usually telephone calls, report,

22   sometimes anonymous, some by family.

23   Q    And how often did that happen?

24   A    At least weekly.

25   Q    And, again, did you see any reaction being no more

3516

1    controlled substances for that patient?

2    A    No.

3    Q    Did the Defendant Stephen Schneider ever tell you to

4    direct patients to certain pharmacies?

5    A    Yes.

6    Q    And which pharmacies?

7    A    We preferred to use Barney's or Dandurand.

8    Q    Did he tell you why?

9    A    Because they were nicer to our patients and didn't

10   cause as many problems.

11   Q    Did you ever hear Dr. Schneider direct patients away

12   from certain pharmacies?

13   A    Yes.

14   Q    Which pharmacies?

15   A    Mainly Dillons and Walgreens, that I remember.

16   Q    And why was that?

17   A    Because they gave our patients a much harder time

18   and would sometimes not fill the prescriptions.

19   Q    If you ever fired or terminated a patient from pain

20   management, did you ever notice whether Defendant

21   Stephen Schneider would reinstate the patient after you

22   terminated them?

23   A    Yes.

24   Q    Would he?

25   A    Several times that I know of.

3517

1    Q   Now, the jury has heard the term incident-to billing

2    in this case.

3    A   Yes.

4    Q   Did you talk to the Defendant Linda Schneider about

5    incident-to billing?

6    A   Yes.

7    Q   And what, if anything, did the Defendant Linda

8    Schneider ever tell you about whether the clinic billed

9    incident-to?

10   A   I brought it up with her and discussed whether or

11   not we were doing that, and if there was some sort of a

12   checkmark on the billing sheet that would indicate the

13   doctor was in the building so they would know whether or

14   not they could bill that.  And she said that they didn't

15   do that, it was too much of a bookkeeping hassle.

16   Q   Did the Defendant Stephen Schneider instruct you how

17   to bill for office visits?

18   A   Yes.

19   Q   What did he tell you to do?

20   A   That the majority of our visits, if not all of our

21   visits, were the 99213 schedule of lower case.

22   Q   What, if anything, did he tell you was sufficient

23   for a bill of a 99213 office visit?

24   A   He said if we had the vital signs, height, weight,

25   blood pressure checked, at least one or two organ

1    systems such as listening to their lungs and heart, and

2    in a focussed exam, that then that would qualify.

3    Q   What, if anything, did the Defendant Stephen

4    Schneider tell you about using the lesser code 99212?

5    A   He said that was more than we were doing if we

6    checked those things so not to use that.

7    Q   The lesser code?

8    A   Yeah, not to use the 212.

9    Q   Did Defendant Linda Schneider instruct you about how

10   to bill for office visits?

11   A   Yes.

12   Q   What did she tell you?

13   A   Very similar instructions.  That we tried to avoid

14   the 212 and bill the low stuff at 213.

15   Q   About how long had you been working at Schneider

16   Medical Clinic when Linda told you to use the 213 office

17   visit code?

18   A   About a week.

19   Q   What instructions did Linda Schneider give you about

20   having patients come back for refills and lab results?

21   A   It was the policy of the clinic that everyone would

22   return for refills at least once monthly.  We gave no

23   refills for -- at least on pain medications.  And we

24   would not call or give out lab information over the

25   phone.  They had to come back in to review that with us

3519

 1    in person.

 2    Q   Did Linda tell you why she wanted the patients to

 3    come back for medical refills and lab results?

 4    A   So she could write a ticket.

 5    Q   Write a fee ticket?

 6    A   Yes.

 7    Q   For an office visit?

 8    A   Yes.

 9    Q   And did she link that to reimbursement?

10    A   I'm -- yes.

11    Q   Mr. Craig, based on your having been a physician's

12    assistant for about six years now, were you performing

13    office visits at Schneider Medical Clinic that met the

14    99213 office code?

15            MR. WILLIAMSON:  Your Honor, I'm going to

16    object to the extent that not through this witness or

17    any other witness has it been established what the 99213

18    office code requires under the CPT code book.

19            MS. TREADWAY:  Judge, it's been offered by

20    many witnesses.

21            MR. WILLIAMSON:  No, it has not.

22            THE COURT:  I think he's qualified.

23    BY MS. TREADWAY:

24    Q   I'll ask the question again, Mr. Craig.  Based on

25    your having been a physician's assistant for about six

1    years now, were you performing office visits at

2    Schneider Medical Clinic that met the 99213 office visit

3    code?

4    A    No.

5    Q    What were you performing?

6    A    The 212.

7    Q    A lesser service?

8    A    Yes.

9    Q    Mr. Craig, based on your experience and observations

10   at the Schneider Medical Clinic, and based on your

11   experiences since then, have you formed an opinion about

12   what activity the clinic was engaged in?

13   A    Yes.

14   Q    And what is that opinion, sir?

15   A    The wholesale production of fee tickets for revenue.

16   Q    Have you formed an opinion, was the Defendant's

17   clinic engaged in the legitimate practice of medicine

18   when it came to the pain management patients?

19   A    No.

20   Q    How soon after you began working at the Schneider

21   Medical Clinic did you begin looking for work?

22   A    Within a few months, probably by three or four

23   months anyway.

24   Q    Did you eventually leave the Defendant's clinic?

25   A    Yes.

3521

```
1    Q    Why did you stay as long as you did?

2    A    Financial as much as anything.  I had just gotten

3    through PA school.  I had loans, family, wife, kids.

4    Q    Why did you leave your employment at Schneider

5    Medical Clinic?

6    A    There were a number of reasons.  I mean, the stress

7    of being under investigation.  The final straw, I guess,

8    though, was the loss of Medicare or Medicaid -- I'm

9    sorry -- Medicaid credentialing.  When they were

10   threatening that, I left.

11   Q    Did you begin to worry about the prescribing

12   practices as well?

13   A    Oh, yes, yes.

14   Q    How do you view having Schneider Medical Clinic on

15   your resume, sir?

16   A    I hope nobody reads that line.

17   Q    What, if anything, did you do to report your

18   experiences at Schneider Medical Clinic to anyone?

19   A    I had been notified of that job through the Wichita

20   State office, or the PA program where they offer that

21   service for students.  Physicians or offices can place

22   ads with them and they notify the students.  I called

23   the office the Spring of 2005 and told them that they

24   should definitely not refer any of the new graduates

25   that were about to finish there and to kind of make it
```

3522

1    known that that was a place to try to avoid because of

2    what was going on and I knew they liked to hire brand

3    new graduates.

4    Q   Like you?

5    A   Yes.

6            MS. TREADWAY:  Nothing further, Judge.

7                    **CROSS EXAMINATION**

8    BY MR. WILLIAMSON:

9    Q   How you doing, Mr. Craig?  Do you remember being

10   asked by the defense counsel to sit down with us and

11   kind of tell us about your experience with the Schneider

12   Medical Clinic?

13   A   I know there was a call and I declined to speak with

14   you.

15   Q   Okay.  And you were told by the Government not to

16   share -- not to talk to anybody about your interviews;

17   correct?

18   A   No.

19   Q   You were never told that?

20   A   No.

21   Q   Interesting.  Were you given an interview by a Judy

22   Watterson and KBI Agent Bill Rowland?

23   A   Names sound familiar.  I may have.

24   Q   Did you give an interview in August of 2005?

25   A   Again, I don't remember the names.

1    Q    I didn't ask about names.  I asked about dates.

2    A    No, I'm unaware.  I don't remember.

3    Q    Did you sit down with any KBI investigator?

4    A    I've sat down with a lot of people.

5    Q    Okay.  You voluntarily sat down and talked to them;

6    correct?

7    A    Yes.

8    Q    You went in on your own; correct?

9    A    Yeah, I talked to the DEA.

10   Q    You were worried that you may be under

11   investigation; correct?

12   A    Yes.

13   Q    Now, taking a look at number 17 of this report of

14   investigation by KBI Bill Rowland, read for the jury

15   what it says in number 17.

16          MS. TREADWAY:  Objection, Judge.  This is not

17   this witness's statement.  It's Agent Rowland's.  It's

18   improper for him to read from that.

19          MR. WILLIAMSON:  I'll rephrase, Your Honor.

20   BY MR. WILLIAMSON:

21   Q    Take a look at that document and see if it refreshes

22   your collection as to whether or not you were told not

23   to talk about your interviews with anybody else?

24   A    I do not remember that.

25   Q    Okay.  So if a KBI agent takes the stand and says

3524

1    they told you that, the agent would be wrong or would

2    you be wrong?

3    A    I'm guessing he would.

4    Q    He would?

5    A    Yes, because I don't remember that.

6    Q    Okay.  All right.  Well, let's talk about some of

7    your testimony.

8         First you mentioned that Dr. Schneider would often

9    rehire a lot of patients that you terminated; correct?

10   A    I didn't say often.

11   Q    Okay.  It was less than 5% of the time; correct?

12   A    Could be.

13   Q    Now, if a patient would go and complain to Dr.

14   Schneider about being terminated, do you know what would

15   occur in the room between that patient and Dr.

16   Schneider?

17   A    No.

18   Q    Patients would often run scams on you, Dr. Schneider

19   and other providers, wouldn't they?

20   A    Yes.

21   Q    And I think we've heard that people would -- their

22   demeanors would change between the time they're in the

23   waiting room until the time that they came in the back

24   with you; correct?

25   A    I don't see them in the waiting room.

1   Q    You talked about this lack of equipment.  You

2   remember that?  All those questions you were asked?

3   A    Yes.

4   Q    Did you have a stethoscope?

5   A    Yes.

6   Q    Did you have a little thermometer?

7   A    No.

8   Q    There was not a thermometer anywhere at the

9   Schneider Medical Clinic?

10  A    He didn't ask me that.

11  Q    I'm asking you now.

12  A    Yes, I believe there was.

13  Q    Okay.  Was there one of the, the pieces of equipment

14  that looked in the eyes?  Was that at the Schneider

15  Medical Clinic?

16  A    I had my own.

17  Q    Okay.  Was there -- what else were you asked about?

18  The equipment that looks in the mouth, did you have one

19  of those?

20  A    Yes.

21  Q    Okay.  So the Schneider Medical Clinic had the basic

22  equipment, contrary to the implication by the

23  Government's question, to perform the basic vitals;

24  correct?

25  A    Those were mine, not the clinic's.

1    Q    You were required to bring them, weren't you?

2    A    No.

3    Q    Nobody said you need bring that to be a provider?

4    A    No.

5    Q    Did anybody in the MA's have 'em?

6    A    Not that I'm aware of.

7    Q    Well, how did they take vitals and take care of all

8    of that information, take heartbeats and things?

9    A    Well, they had a blood pressure cuff there.

10   Q    Did Dr. Schneider have a stethoscope?

11   A    Yes.

12   Q    Did he have all the same basic doctoring equipment

13   that you have?

14   A    I assume.

15   Q    You were asked about this 99213.  You remember that

16   conversation?

17   A    Uh-huh.

18   Q    Now, as I understand it, Dr. Schneider told you that

19   he believes that most of the visits that they see are

20   99213; correct.

21   A    Yes, sir.

22   Q    And he told that you he believes it is because they

23   check hearts; correct?

24   A    Yes.

25   Q    That they check lungs; correct?

3527

1   A    Yes.

2   Q    They take vitals?

3   A    Uh-huh.

4   Q    I think he also told you because they had a medium

5   complex -- diagnosis; correct?

6   A    No, that wasn't really discussed much.

7   Q    Because there was a focussed exam; correct?

8   A    Yes.

9   Q    He never once instructed you to bill 99213 under any

10  circumstances regardless if these criteria are met or

11  not; correct?

12  A    No.

13  Q    He never instructed you to fradulently fill out your

14  fee tickets, did he?

15  A    No.

16  Q    You wouldn't have done that if he would have asked

17  you; correct?

18  A    No.

19  Q    You have a family?

20  A    Yes.

21  Q    And when you started learning that this clinic was

22  under investigation, you became afraid, didn't you?

23  A    Yes.

24  Q    If you get in trouble, your family's going to be

25  without a provider, your kids; correct?

3528

```
1    A    Yes.

2    Q    That's a natural reaction.  Would you agree?

3    A    Uh-huh.

4    Q    Now, when you were there, Dr. Schneider also never

5    told you to prescribe any pain medicine to anybody that

6    didn't present with a pain condition, did he?

7    A    Not in so many words.

8    Q    Okay.  Did he say that I don't care if they have

9    pain or not, give them pain medicine?

10   A    No.

11   Q    You wouldn't have done that either, would you?

12   A    No.

13   Q    The people that you prescribed pain medicine to were

14   people that you believed needed it; correct?

15   A    Yes.

16   Q    You all did -- the clinic was in a rural area;

17   correct?  Kind of?

18   A    Kind of, yeah.

19   Q    On the brink between the city and the rural area?

20   A    Uh-huh.

21   Q    Okay.  And you were the -- strike that.

22        You learned during your time with the clinic that

23   you all dealt with a difficult patient population.

24   Agreed?

25   A    Yes.
```

3529

1    Q    And you dealt with a patient population that many

2    providers in Wichita didn't see; correct?

3    A    Yes.

4    Q    And you dealt with this patient population -- strike

5    that.

6         With this difficult patient population, there were

7    people who would try to take advantage of you and the

8    other providers; correct?

9    A    Yes.

10   Q    And you as a physician's assistant, you tried to

11   weed out people who were trying to take advantage of

12   that system, didn't you?

13   A    Yes.

14   Q    And you kept a list at times, did you not?

15   A    Yes, I did.

16   Q    And you shared that list with Dr. Schneider, didn't

17   you?

18   A    And others.

19   Q    And others.  And Dr. Schneider never dissuaded you

20   from trying to do that, did he?

21   A    No.

22   Q    He told you go ahead and and keep it up; correct?

23   A    Yes.

24   Q    He thought you were doing a good job for the longest

25   part of time while you were there, didn't he?

3530

1    A    I assume so.

2    Q    Was it difficult to try to uncover some of these

3    scams that these patients would run?

4    A    Some, yes.

5    Q    Some of them can be very resourceful and convincing,

6    can't they?

7    A    Yes.

8    Q    Now, you mentioned this 99213.  And Ms. Treadway

9    asked you questions about whether or not you believed

10   those criteria are actually met as you look in

11   retrospect.

12   A    Yes.

13   Q    Okay.  Remember that?  Now, are you aware that there

14   have been certain charts provided in this case about

15   codes of 99213?

16   A    No.

17   Q    Okay.  If I represented to you that of some of the

18   Medicare and Medicaid spreadsheets that were entered,

19   based on your entries of what you put in, over 85% of

20   the visits that you billed were actually accurate, would

21   that surprise you?

22   A    No.

23   Q    85% is a large percent to get right, isn't it?

24   A    Uh-huh.

25   Q    You've learned through your six years of since being

3531

 1   with the clinic that this CPT coding is not an exact

 2   science, is it?

 3   A   No.

 4   Q   It takes -- it's the judgment of the provider to try

 5   to make a determination as to whether or not they

 6   believe the factors are met prior to -- or at the time

 7   where they do this, circle the level of service;

 8   correct?

 9   A   Yes.

10   Q   And Dr. Schneider specifically informed you that in

11   his mind these are the things he looks for with the

12   99213; correct?

13   A   Yes.

14   Q   Now, with this list that you kept and at times about

15   these people who were trying to take advantage of the

16   clinic, you had this conversation with Dr. Schneider.  I

17   believe you stated before that he told you to get them

18   out of here if they're doing that, we don't want them

19   here.  Correct?

20   A   Yes.

21   Q   He didn't tell you you're messing up my business,

22   don't do that.  He said if they're not doing what

23   they're supposed to do, do your job, Craig, and get 'em

24   out.  Correct?

25   A   Yes.

3532

1    Q    You would agree -- and I think you talked about

2    this -- that was a stressful work environment, wasn't

3    it?

4    A    Yes.

5    Q    When you first heard of the job, how did you hear

6    about it?

7    A    It was an ad placed or e-mailed from the Wichita

8    State physician assistant's program.

9    Q    Now, you knew that -- you understand -- strike that.

10        You understand that PAs, professors, actually, and

11   career people, they actually see these advertisements;

12   correct?

13   A    Yes.

14   Q    They're actually advertising for strangers who are

15   coming out of school to come into our clinic; correct?

16   A    Yes.

17   Q    Did you have difficulty getting a job before you

18   hired on with the Schneider Medical Clinic?

19   A    No.  That was my first job so --

20   Q    Okay.  What did you do before you went to school to

21   be a PA?

22   A    I was a Wichita firefighter.

23   Q    Sorry.  You stated that when you would see patients

24   because of the -- strike that.

25        The clinic saw a lot of people, didn't it?

3533

1    A    Yes.

2    Q    They never went out and advertised for being a pain

3    management clinic, did they?

4    A    Not in print or media.

5    Q    The Government's evidence has been that only about

6    50% of the total patient population ever received a

7    controlled substance at the Schneider Medical Clinic.

8    Are you aware of that?

9    A    No.

10   Q    Okay.  Do you believe that -- did you see family

11   practice patients while you were there?

12   A    Yes.

13   Q    Did you see babies?

14   A    Yes.

15   Q    Did you see older individuals?

16   A    Yes.

17   Q    And you saw conditions from diabetes?

18   A    Yes.

19   Q    You saw hypertension?

20   A    Uh-huh.

21   Q    You saw flu?

22   A    Oh, yes.

23   Q    You had people coming in for well-woman exams?

24   A    Yes.

25   Q    Now, in regards to some more of this equipment,

3534

```
 1    there were two rooms specifically suited with beds that
 2    were suited for gynecological exams; correct?
 3    A    Yes.
 4    Q    And those beds have to prop up; correct?
 5    A    Right.
 6    Q    So not every bed at this facility was a just a
 7    little small slab of a bed; correct?
 8    A    Right.
 9    Q    Okay.  Now, this clinic wasn't a hole-in-the-wall
10    location, was it?  Let me clarify that.
11    A    Yeah.
12    Q    It was nicely built?  Nice architecture?
13    A    I assume.
14    Q    About 16 exam rooms?
15    A    Yes.
16    Q    Okay.  You were never told by Dr. Schneider don't
17    see our family practice patients; correct?
18    A    Correct.
19    Q    He never told you that our family practice patients
20    are less important than our pain patients; correct?
21    A    Correct.
22    Q    And I believe you said -- well, strike that.
23         Dr. Schneider didn't open -- did you ever have a
24    conversation with Dr. Schneider, say, Doc, why are you
25    dealing with these difficult patient population when
```

3535

```
 1    nobody else will?
 2    A    No.
 3    Q    You testified previously that you believed that Dr.
 4    Schneider was really trying to help people; correct?
 5    A    Majority of the time.
 6    Q    You understand he's not perfect; correct?
 7    A    Yes.
 8    Q    That clinic could have had a better infrastructure,
 9    couldn't it?
10    A    Yes.
11    Q    Probably could have stood another provider or two?
12    A    Yes.
13    Q    Some of the hours could have been worked a little
14    bit better?
15    A    Uh-huh.
16    Q    Some of the scheduling could be better?
17    A    Yes.
18    Q    Some of the paperwork, keeping up with paperwork
19    could be better?
20    A    Yes.
21    Q    You understand that businesses go through bad times;
22    right?
23    A    Yes.
24    Q    And that this clinic was inundated with a lot of
25    patients over a short period of time.  Would you agree
```

3536

1    with that?

2    A    It stayed about the same level while I was there.

3    Q    And when did you start?

4    A    August of 2004.

5    Q    Four.  Okay.  Now, you mentioned like with these

6    patient records, like some of these patients would do

7    like this quick return scam; correct?

8    A    Yes.

9    Q    And what they would do is try to take advantage of

10   the fact that the clinic was behind in getting that

11   chart cycled back through completely; correct?

12   A    Yes.

13   Q    So as we understand it, you see an individual, he --

14            MR. WILLIAMSON:  Your Honor, is it okay if I

15   just stand this far away from the podium?

16            THE COURT:  Yes, it is.

17   BY MR. WILLIAMSON:

18   Q    You would agree that you would see the patient,

19   you'd fill out the fee ticket.  You'd circle the level.

20   And then it would have to go to the supervising

21   physician for them to sign off on it.  Correct?

22   A    Yes.

23   Q    And they would have up to two weeks to get that

24   signed off; correct?

25   A    Yes.

3537

```
 1   Q   And that's the state law; correct?

 2   A   Yes.

 3   Q   And then it would have to go to the billing

 4   department?

 5   A   Correct.

 6   Q   And then I guess it would hit the coder before then;

 7   correct?

 8   A   Right.  I -- yeah, I'm not familiar with the process

 9   but --

10   Q   But you know it would go to the front office?

11   A   Right.

12   Q   And they would either have a choice to return the

13   chart then or take it down to billing so they could

14   check the fee ticket against the progress note; correct?

15   A   Yes.

16   Q   Then it would have to cycle back through to go in a

17   central location to then get refiled on the shelf?

18   A   Right.

19   Q   And people started getting hip to that and they

20   would come in sooner so that you guys wouldn't see the

21   chart by the time they came back in again; correct?

22   A   Correct.

23   Q   You would agree that this would be a minority of

24   patients, but it still happened?

25   A   It did happen, yes.
```

3538

1    Q    When you were there -- were you there when the

2    clinic started using the tablets?

3    A    Yeah, partially.

4    Q    Okay.  Now, so the clinic understood and Dr.

5    Schneider understood, hey, we have this issue, we're

6    going to need some money -- do you know how much the

7    clinic invested in these tablets?

8    A    No.

9    Q    Do you know how many tablets there were?

10   A    No.

11   Q    But you saw them?

12   A    Yes.

13   Q    And the tablets -- you were being trained to take

14   those into the exam room and everything would be

15   electronically and automatically available; correct?

16   A    Right.

17   Q    That would have eliminated that one scam that people

18   were trying to do; correct?

19   A    Yes.  Yeah.

20   Q    It would have made everything a lot more efficient;

21   true?

22   A    Correct.

23   Q    But you decided to leave prior to seeing that

24   process completely work itself through; correct?

25   A    Yes.

1    Q    You had to train on it, it just didn't come natural;

2    right?

3    A    Right.

4    Q    Were you excited about that?

5    A    I had seen e-records before so I was familiar, yes.

6    Q    Well, when I get a new piece of technology, I love

7    it.  I just wanna use it as much as I can.  The jury can

8    see.  I got this little thing for this trial and I'm

9    using it as much as I can.  Did you sit down and say,

10   you know what, this would really be really efficient,

11   let me figure out how to use this thing so we can get

12   this thing implemented as soon a possible?

13   A    I didn't have time to spend a lot of time like that.

14   Q    And around this time is when you learned that the

15   clinic was being investigated; correct?

16   A    Yeah, I learned about it in the newspaper.

17   Q    I believe with these people trying to run this scam

18   and I think you said this, you did your best to try to

19   keep them out but sometimes you were successful and

20   sometimes you weren't.  Correct?

21   A    Yes.

22   Q    Now, as a physician's assistant, you were able  --

23   you're allowed under state law to exercise your own

24   independent medical judgment; correct?

25   A    Yes.

3540

1    Q    Dr. Schneider never told you, I want you to be a

2    robot and don't exercise your professional judgment;

3    correct?

4    A    No.

5    Q    Okay.  But you felt constrained because of the

6    number of patients that you had to see; correct?

7    A    Yes.

8    Q    The day that you saw these 72 patients, how long did

9    you have to stay?

10   A    Probably 7 or 8 in the evening.

11   Q    And you started at 8 in the morning?

12   A    Yes.

13   Q    So, you didn't shorten your visits to three minutes

14   a visit when you had all these patients.  You stayed and

15   put in the extra work to get these people seen; correct?

16   A    Yes.

17   Q    And the motto of the clinic, as you said earlier,

18   was to try to see people when they needed to be seen;

19   correct?

20   A    Yes.

21   Q    That wasn't just limited to chronic pain patients,

22   was it?

23   A    No.

24   Q    That was limited to people with minor emergencies;

25   correct?

1  A   Yes.

2  Q   That was limited to people -- or that included

3  babies that may be sick?

4  A   Uh-huh.

5  Q   Is that a yes?  For Ms. Cindy.

6  A   Yes.

7  Q   She's typing that down so sometimes you have to say

8  yes.

9       Now, there were times when -- and I think you

10  mentioned this on direct -- there were times when you --

11  when the clinic, some provider in the clinic would learn

12  that a person may be suffering from an addiction;

13  correct?

14  A   Yes.

15  Q   And you all would often send those people to

16  treatment centers if you learned that; correct?

17  A   We would recommend to the patient, yes.

18  Q   Dr. Schneider never said if somebody reports to you

19  addiction, ignore it, did they?

20  A   No.

21  Q   Excuse me -- did he?

22  A   No.

23  Q   I apologize.  He never told you do not place any

24  indicators that people are misusing their medicines in

25  the charts, did he?

3542

1    A    No.

2    Q    You wouldn't have done that if he would have asked;

3    correct?

4    A    No.

5    Q    That would jeopardize your family, your license;

6    correct?

7    A    Could.

8    Q    And, again, you left when this investigation

9    happened because you didn't want to be anywhere close if

10   there was possibly some illegal activity; correct?

11   A    Yes.

12   Q    And you haven't been accepted as an expert in any

13   court before, have you?

14   A    No.

15   Q    You haven't gone around to every other pain

16   management clinic in Wichita surveying how they do

17   things; correct?

18   A    No.

19   Q    Now, the clinic would receive notice of deaths every

20   once in a while; correct?

21   A    I'm aware of two.

22   Q    Okay.  You remember two instances in the time that

23   you were there; correct?

24   A    Yes.

25   Q    And you never received -- you're not aware of ten

3543

1    phone calls a week coming from emergency rooms, are you?

2    A    Not to me.

3    Q    And when the clinic would learn that somebody passed

4    away, what would happen on Monday mornings?

5    A    We would pull the patient's chart.

6    Q    And you guys would sit and you would talk about it

7    and figure out what the treatment was and those kind of

8    things; correct?

9    A    Yeah.  We were usually curious as to --

10   Q    And you remember hearing about two deaths and you

11   remember that happening both times; correct?

12   A    Yes.

13   Q    Now, you also heard about phone calls from family

14   members; correct?

15   A    Yes.

16   Q    Now, as a provider, it's difficult to make a

17   decision based solely on a phone call from somebody who

18   represents that they're a person's spouse; correct?

19   A    Yes.

20   Q    And because when you hear the phone call, you don't

21   know if the person is being -- just harassing the

22   patient; correct?

23   A    Correct.

24   Q    It could be a disgruntled boyfriend or girlfriend or

25   spouse just lookin' to do harm; correct?

3544

1    A    Yes.

2    Q    But it could be legitimate; correct?

3    A    Yes.

4    Q    And as a provider, you have a confidentiality, don't

5    you?

6    A    Yes.

7    Q    You can't discuss certain things with that patient

8    over the -- or that caller over the telephone; correct?

9    A    Correct.

10   Q    You have to bring the patient in and let the patient

11   choose to bring that family member in the room with

12   them; correct?

13   A    Yes.

14   Q    And at times did you do that?

15   A    I don't remember the complaining family ever coming

16   with the patient.

17   Q    Okay.  If they would have, would you have sat down

18   with the patient and the complaining party and say, hey,

19   tell me what's going on so I can help make a medical

20   decision?

21   A    Yes.

22   Q    Are you aware that Dr. Schneider actually met with

23   patients and their family members at times?

24   A    No.

25   Q    Okay.  Now, when you would meet with patients, you

3545

1    had to trust what they're telling you in order to make a

2    medical decision; correct?

3    A    Yes.

4    Q    If they're honest with you and they do what you say,

5    then you can make a decision, a sound medical decision;

6    correct?

7    A    Yes.

8    Q    If they start off by not being honest with you, it

9    makes it difficult to give a proper assessment; correct?

10   A    Correct.

11   Q    It takes two in this provider and patient

12   relationship to make it work; right?

13   A    Correct.

14   Q    And are you -- the evidence has been that less than

15   1% of the patient population of the Schneider Medical

16   Clinic had either overdose problems or withdrawal

17   problems.  That would mean that over 99% of the patients

18   did not.  Does that strike you as odd?

19   A    No.

20   Q    You would agree that the vast majority of the

21   patients at Schneider Medical Clinic had good outcomes

22   and were good patients and did what they were supposed

23   to do; correct?

24   A    More than half, yes.

25   Q    Now, this conversation that you remember having with

1    Steve about a patient committing suicide?  You remember

2    that?  That discussion on direct?

3              THE COURT:  I don't think he said anything

4    about suicide.

5              MR. WILLIAMSON:  Deaths.  Did I insert

6    suicide?

7    BY MR. WILLIAMSON:

8    Q    Remember the conversation that Ms. Treadway had with

9    you about deaths and you stated that Dr. Schneider told

10   you that, you know, about people being in pain, this is

11   going to happen?

12   A    He wasn't directing that toward me.  That was

13   observed.

14   Q    Okay.

15   A    I'm not sure who he was speaking with.

16   Q    The message he was conveying was these people here I

17   believe are in real pain, but just because some people

18   have a bad outcome doesn't mean that other people aren't

19   really having pain.  Is that the message he was

20   conveying?

21   A    I can't really say what he was --

22   Q    Okay.  Now, this checklist that you mentioned in

23   direct, did you ever see any charts that this same

24   progress note had been used way prior to the time that

25   Dr. Schneider even opened the Schneider Medical Clinic?

3547

```
1    A    You mean the same type of checklist or --
2    Q    Yes, the same progress note.
3    A    Not personally, no.
4    Q    Now, with this checklist, you didn't just check yes
5    or no, did you?
6    A    No.
7    Q    You would check whether or not something is done and
8    you would also identify if there's an abnormality that
9    you found in your exam; correct?
10   A    Yes.
11   Q    And then you could even -- you would even write on
12   the side of the checklist as to what your findings were;
13   correct?
14   A    Correct.
15   Q    Dr. Schneider never informed you don't keep track of
16   your findings on this, did he?
17   A    No.
18   Q    He never -- and in regards to progress notes, he
19   never instructed you not to sign your progress notes,
20   did he?
21   A    No.
22   Q    He never told you to try to cover up the fact that
23   you were the provider that actually saw these people;
24   correct?
25   A    No.
```

3548

1    Q   He never came to you and said, hey, we're gonna

2    engage in this fraudulent operation, I need you to be a

3    part of it, did he?

4    A   No.

5             MR. WILLIAMSON:  I don't have anything

6    further, Your Honor.

7             THE COURT:  Mr. Byers.

8             MR. BYERS:  Thank you, Your Honor.

9                    **CROSS EXAMINATION**

10   BY MR. BYERS:

11   Q   And in furtherance of becoming the jury's designated

12   favorite lawyer, this is going to be short and sweet.

13       Mr. Craig, I'm Kevin Byers representing Linda

14   Schneider.  Does my name ring a bell to you?  Kevin

15   Byers?

16   A   No.

17   Q   And did you receive a phone call from someone who

18   identified themselves as Kevin Byers approximately a

19   month ago requesting that you speak with that person?

20   A   I remember getting a couple calls.  I really

21   didn't --

22   Q   You don't remember a call from last month?

23   A   Not when it comes to that.  I wasn't focusing too

24   much.

25   Q   So, you can't recall refusing my request to speak

3549

1    with you and also refusing to tell me why?

2    A    Well, I know that I spoke with someone and, yes,

3    that was my response.

4    Q    In speaking with Mr. Williamson you just said, as I

5    understood it, you said if there was a conflict between

6    a governmental agent's report saying you were requested

7    not to talk to anybody about this matter and your own

8    memory of not being told that, you think the agent would

9    be wrong.  Is that correct?

10   A    It's possible, yes.

11   Q    Okay.  Did you happen to prepare a ten page report

12   after your conversation, your first conversation with

13   the KBI and the DEA, in August of -- August 23rd of

14   2005?  Did you prepare a ten page report about that

15   meeting?

16   A    No.

17   Q    Did you prepare any kind of report, short or long?

18   A    No.

19   Q    Now, it's correct you were interviewed, like I just

20   said, August 23rd, 2005; correct?  I'll represent that's

21   what records indicate to us.

22   A    Yes.  Okay.

23   Q    Then again November 29, 2005, you remember that one?

24   A    Okay.

25   Q    I believe even the same two agents, Rowland and

3550

1    probably Watterson from the DEA, at the DEA headquarters

2    in Wichita?

3    A    Yes.

4    Q    So that was 29, '05.  Then we have your grand jury

5    testimony.  January 31st, 2006, do you remember that?

6    A    Yes.

7    Q    Where was that at?  Did you have to go up to Topeka

8    or somewhere or was that here in Wichita?

9    A    I think it was here.

10   Q    Okay.  In a courtroom similar to this in front of a

11   panel of people?

12   A    It was more of a conference room; but, yes.

13   Q    Okay.  Are there other agent interviews beyond the

14   ones in August and November, '05, that you remember?

15   A    It's kind of confusing who I talked to -- when --

16   because I was also speaking with the Medicaid

17   investigators several times as well to -- in order to

18   reverse the suspension of my Medicaid privileges after

19   leaving.  So I spoke with a lot of people at different

20   times.

21   Q    Okay.  But those would have been those -- is it your

22   understanding those were criminal investigators?

23   A    Like I said, to me, an interview is blurring one to

24   another.

25   Q    Do you have any specific recollection of an

3551

```
 1    interview in August, 2007, with any government agent?
 2    A    August of '07?  Not based on that time; but, as I
 3    said, I've been to a lot of them.
 4    Q    I understand.  Now, it's correct in your very first
 5    DEA interview with agents -- well, it was DEA and KBI.
 6    Again, I think it was Agent Rowland and Watterson.  It's
 7    correct, is it not, that you told them if there were
 8    presigned scripts, Stephen Schneider's presigned
 9    scripts, you were just using those so as not to bother
10    him during his lunchtime; correct?
11    A    Yes.
12    Q    And you changed that story in front of the grand
13    jury; correct?
14    A    Correct.
15    Q    Now, when Linda Schneider interviewed you and said
16    Schneider Medical Clinic was fast-paced, that was
17    accurate, was it not?
18    A    Yes, it was.
19    Q    And she described it as hectic and that was correct?
20    A    Yes.
21    Q    And she said they did a lot of pain management;
22    correct?  And that was accurate?
23    A    Yes.
24    Q    And she said they used a lot of pain medication;
25    correct?
```

3552

1    A    Yes.

2    Q    And that was accurate?

3    A    Yes.

4    Q    And she said they were open seven days and that was

5    accurate?

6    A    Yes.

7    Q    Okay.  Now, walk-in's at the clinic, that would

8    include sick kids; correct?

9    A    Yes.

10   Q    Older people with maybe breathing problems or

11   medical issues?

12   A    Yes.

13   Q    Okay.  Maybe even sports physicals would be

14   walk-ins?

15   A    It could be.

16   Q    Well-baby checkups?

17   A    Yes.

18   Q    Now, you talked about your understanding of Linda

19   Schneider's theory about volume and the Medicaid

20   practice.  Do you remember that testimony?

21   A    Yes.

22   Q    Okay.  Would it also not be reasonable for someone

23   trying to run a successful medical practice to refuse

24   Medicaid and reduce the volume and spend more time with

25   higher reimbursing insured people, insured

3553

1   beneficiaries?  Is that not a reasonable counter to run

2   'em through and do it on volume?

3   A   It's another way; yes.

4   Q   Now, there was a billing department at Schneider

5   Medical Clinic; correct?

6   A   I assume so, yes.

7   Q   Did you ever go downstairs at the clinic?

8   A   I think once on a tour, so I saw it but I never

9   spent any time there.

10  Q   Okay.  Did the clinic ever employ a certified coder

11  while you were there?

12  A   I don't know.

13  Q   Now, you also testified about your perception or

14  your recollection of Linda Schneider's 30 day theory on

15  visits.  Do you remember that testimony?

16  A   Yes.

17  Q   Is that also not a sensible way to control pain

18  medications that might have a high street value by

19  having people come in every 30 days so you can do pill

20  counts, urine drug-screens, check with the family, look

21  for records?  Is that not a sensible way to control

22  those opioids?

23  A   It's one method.

24  Q   And those patients who might actually be diverting

25  here and there or doing other things they're not

3554

1    supposed to do?

2    A    Correct.

3    Q    It's correct, is it not, that you told the grand

4    jury that you saw Linda Schneider fiddling around with

5    charts only two or three times in the full year you were

6    there; is that correct?

7    A    Yes.

8              MR. BYERS:  If I may have a second, Your

9    Honor.

10                    (Off-the-record.)

11   BY MR. BYERS:

12   Q    Mr. Craig, just one other thing.  Do you -- I can't

13   remember where you said you were working now as a PA.

14   An orthopedic practice?

15   A    Yes, spine surgery.

16   Q    Is that sort of a plum job?

17   A    Yes.

18   Q    And you're happy there?

19   A    Yes.

20   Q    You're well compensated?

21   A    Yes.

22             MR. BYERS:  That's all I have, Your Honor.

23             THE COURT:  Redirect.

24             MS. TREADWAY:  Thank you, Judge.

25

3555

1            **REDIRECT EXAMINATION**

2     BY MS. TREADWAY:

3     Q   Mr. Craig, would you agree that if you didn't

4     perform a 99213 service but that was billed, that would

5     have been fraudulent?

6     A   Yes.

7     Q   And Mr. Williamson talked to you about weeding out

8     bad patients.  Based on your observations when you were

9     at the clinic, were terminated patients kind of on a

10    revolving door?  They came back to the clinic and you

11    kept seeing them over and over again even though you

12    terminated them?

13    A   There were a few, yes.

14    Q   And would they be back on controlled substances when

15    you saw them?

16    A   At times, yes.

17    Q   What was the majority of the patient population that

18    you saw on a daily basis at the clinic?

19    A   The majority were pain related.

20    Q   Now, with regard to these electronic medical

21    records, did you ever use an electronic medical device

22    to record your progress notes?

23    A   No.

24    Q   Was that instead used to electronically send

25    prescriptions to the pharmacy?

3556

```
 1    A    That was the intent, yes.

 2    Q    Now, you talked about the Medicaid suspension.

 3    A    Yes.

 4    Q    How did you find out about that?

 5    A    When they came to the office and did an interview

 6    and told us that that was pending.  Which would have

 7    been, I don't remember the exact date, but Spring of

 8    2005, probably May.

 9    Q    So, before then, the Defendant Stephen Schneider did

10    not tell you that they were under investigation by

11    Medicaid?

12    A    No.

13    Q    Did Defendant Linda Schneider?

14    A    No.

15    Q    So that came as a surprise?

16    A    Yes.

17    Q    An unpleasant surprise, sir?

18    A    Oh, yes.

19    Q    Did it take you quite a while to get that fixed?

20    A    Yes.

21    Q    Mr. Byers was asking you about reasonable actions

22    that might or might not be taken.  Based on your time at

23    the clinic, sir, did anything at the clinic seem to be

24    reasonable to you?

25    A    I'm not sure what --
```

3557

1    Q    Well, the way the clinic operated seem reasonable to

2    you?

3    A    Not looking back.

4    Q    And Mr. Williamson spent a lot of time asking you

5    about whether Stephen Schneider told you this or asked

6    you to do this or told you this.

7    A    Uh-huh.  Yes.

8    Q    You know that old addage "actions speak louder than

9    words"?

10   A    Yes.

11   Q    Did the Defendant's actions at the clinic speak

12   louder than words, sir?

13   A    Yes.  It established a corporate environment, so to

14   speak.

15   Q    And did that corporate environment have anything to

16   do with the legitimate practice of medicine?

17   A    Not in regard to pain medication.

18   Q    Mr. Williamson also asked you about the vast

19   majority of people having good outcomes.  Mr. Craig, do

20   you think it's a good outcome that over 170 people

21   overdosed and died of overdoses as a result of the

22   controlled substance prescription practices at the

23   Schneider Medical Clinic?

24   A    No.

25            MR. WILLIAMSON:  Your Honor, I'm going to

3558

```
 1    object that she combined overdoses and overdose deaths.
 2    There has not been 170 overdose deaths alleged.
 3              MS. TREADWAY:  Overdose and overdose deaths,
 4    Judge.
 5              MR. WILLIAMSON:  Compound question.  I'll
 6    withdraw the objection.  He answered the question.
 7              MS. TREADWAY:  I'll be glad to separate it,
 8    Judge.
 9              THE COURT:  He's withdrawn his objection.  He
10    may answer.
11    BY MS. TREADWAY:
12    Q   Looking back in retrospect, Mr. Craig, what was the
13    clinic engaged in?
14              MR. WILLIAMSON:  Your Honor, I'm going to
15    object.  Asked and answered.  Beyond the scope.
16              THE COURT:  Yes.  Sustained.
17              MS. TREADWAY:  Thank you, Judge.  That's all.
18                    **RECROSS EXAMINATION**
19    BY: MR. WILLIAMSON:
20    Q   Not finished with me yet.  Almost.  Electronic
21    prescriptions would eliminate patients' ability to alter
22    those; correct?
23    A   Yes.
24    Q   Okay.  And you were asked about actions louder than
25    words.  Remember that?
```

1    A    Yes.

2    Q    Were you ever instructed to misrepresent on your fee

3    ticket who the provider was that saw patients?

4    A    No.

5    Q    Did Dr. Schneider ever come behind you and change

6    your fee ticket and give you bad looks because you were

7    accurately reporting that information?

8    A    No.

9    Q    Were you ever disciplined, i.e. an action, for

10   failing to misrepresent anything on a fee ticket?

11   A    No.

12             MR. WILLIAMSON:  Nothing further.

13             MR. BYERS:  Nothing else, Your Honor.

14             THE COURT:  Thank you very much, sir.  You're

15   excused.  Who's your next witness?

16             MS. TREADWAY:  Jaime Leyden from Preferred

17   Health Systems -- Services.

18             THE COURT:  Do you want a recess, Ladies and

19   Gentlemen?  How long is this witness going to take?

20             MS. TREADWAY:  About an hour I think.  And

21   she's local, Judge, so tomorrow is fine.

22             THE COURT:  I think we'll have her come

23   tomorrow.  Would that be all right with you, Ladies and

24   Gentlemen?  We'll take our evening recess.  I'll see you

25   at 9:00 tomorrow morning.

3560

1              (Recessed for the evening at

2              4:25 p.m.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas