3561

```
 1                    (Beginning at 9:10 a.m. May 20,

 2                    2010, the following proceedings

 3                    continued.)

 4          THE COURT:  Next witness please.

 5          MS. TREADWAY:  Government calls Alice Fox.
```

**ALICE FOX**

```
 7  Having been first duly sworn to tell the truth, the

 8  whole truth and nothing but the truth, testified as

 9  follows on:
```

**DIRECT EXAMINATION**

```
11  BY: MS. TREADWAY:

12  Q    Could you please introduce yourself to the jury.

13  A    My name is Alice Fox.

14  Q    And where are you currently employed, Ms. Fox?

15  A    I'm employed with Walgreens at the 21st and Maize

16  Street store.

17  Q    How long have you been employed with Walgreens?

18  A    Approximately nine years.

19  Q    And what do you do for Walgreens?

20  A    I'm a pharmacy manager for that location.

21  Q    Could you briefly review with the jury your

22  educational background starting with college?

23  A    I have a B.A. Degree in Chemistry and I have a B.S.

24  Degree in Pharmacy.

25  Q    How many years of study does it take to become a
```

3562

1   pharmacist?

2   A    When I got my degree, it was a five year program.

3   Q    And have you spent your career as a pharmacist here

4   in the Wichita community?

5   A    Yes.

6   Q    Now, you said you were a pharmacy manager.  Do you

7   also practice as a pharmacist?

8   A    Yes.

9   Q    What are your duties and responsibilities as a

10  pharmacist as opposed to a pharmacy manager?

11  A    As a pharmacist, the job would include just the

12  daily duties of receiving prescriptions, counseling

13  patients, talking with doctors, other healthcare

14  professionals, depending on if there might be a problem

15  with the prescription; helping patients to pick out an

16  over-the-counter product that might be the most

17  appropriate thing for them to have; answering questions

18  if professionals call and ask about a dose or a

19  particular medication, whether we stock, or helping

20  people get the right prescription; making sure that none

21  of the drugs that they're currently taking are

22  interacting with the current prescription that they

23  might have brought to me.

24  Q    And then what would your job as a pharmacy manager

25  entail?

3563

1    A    More in a supervisory role.  I do some of the hiring

2    for my technicians.  I take care of the inventory

3    control; making sure that policy and procedures are

4    followed in the pharmacy.

5    Q    And are you required to follow DEA regulations in

6    your job?

7    A    Yes.

8    Q    Do you have an opportunity to communicate with a

9    good portion of the Wichita area medical community in

10   your job?

11   A    Yes.

12   Q    And what do those communications with the physicians

13   and the provider community consist of primarily?

14   A    As a prescription comes to the pharmacy, generally

15   that's what we're going to talk about, whether the

16   prescription is appropriate for the age or the condition

17   of the patient.  It might be that we have information on

18   our side, like an allergy, that they didn't have so I

19   need to call and clarify whether they want to distribute

20   that medication or not; whether one particular

21   prescription that they're getting they might be getting

22   from two different physicians, so I want to make sure

23   that both are aware of what they're obtaining and

24   whether one of them or the other wants to take control

25   of that prescription; making sure that we're filling

3564

1    prescriptions in a timely manner.

2    Q   Generally speaking, do the Wichita area physicians

3    and other providers cooperate with you as a pharmacist

4    to get you the information you need?

5    A   Yes.

6    Q   Did you previously work at a Walgreens pharmacy

7    located at 31st and South Seneca?

8    A   Yes.

9    Q   And during what period of time were you at that

10   location?

11   A   From approximately October of 2001 until April of

12   2005.

13   Q   Were you the pharmacy manager there?

14   A   Yes.

15   Q   And did you also work as a pharmacist?

16   A   Yes.

17   Q   And was that a 24/7 Walgreens, open every hour of

18   the day, every day of the week?

19   A   Yes.

20   Q   And what days would you work?

21   A   Any and all and a variety of shifts.

22   Q   As a result of working at the 31st and south Seneca

23   location, did you become acquainted with the Schneider

24   Medical Clinic and its providers?

25   A   Yes.

3565

1    Q   And why was that?

2    A   They're in close proximity to our pharmacy, and

3    generally, as a Walgreens we tend to be a neighborhood

4    pharmacy so people who either have physicians in that

5    area or who live in that area would frequent our

6    location.

7    Q   What, if anything, did you have to do at the 31st

8    and south Seneca Walgreens pharmacy in terms of

9    inventories of drugs to fill the prescriptions issued by

10   the providers at Schneider Medical Clinic?

11   A   At that particular location it had a much larger

12   volume of Control II medications.  We would have stocked

13   quite a bit more than the other locations that I've

14   worked at.

15   Q   And has that been true to this day?

16   A   Yes.

17   Q   And to whose patients were these controlled

18   substances being primarily dispensed?

19   A   A lot of the prescriptions that we had at that

20   location for those particular medications would have

21   come out of the Schneider clinic.

22   Q   Did this amount of narcotics and inventory cause

23   difficulties for your pharmacy?

24   A   The more -- the more volume that you have in a

25   Control II, because they're a highly controlled product,

3566

```
 1    the more time is spent on making sure that the inventory

 2    is correct and the more time is spent checking in

 3    those -- making sure that the product that's coming in

 4    is correct, and then that the product going out is

 5    correct.

 6    Q    As a pharmacist for almost 20 years, have you had

 7    experience with drug-seekers?

 8    A    Yes.

 9    Q    And are you trained as a pharmacist to recognize a

10    drug-seeker?

11    A    Yes.

12    Q    Did you see patients from the Schneider Medical

13    Clinic on the days that you worked?

14    A    Yes.

15    Q    And were you able to observe these patients?

16    A    Yes.

17    Q    And did you interact with them?

18    A    Yes.

19    Q    Based on your observations and interactions with the

20    Schneider Medical Clinic patients, were you able to

21    determine what percentage of the patients that came into

22    your pharmacy and brought you prescriptions for

23    controlled substances were drug-seekers?

24    A    A good percentage of them.

25    Q    Did you notice a pattern of prescriptions that were
```

3567

1   issued by Schneider Medical Clinic?

2   A   Generally when we got a prescription from Dr.

3   Schneider's clinic it didn't come in as one.  We usually

4   got multiple prescriptions, and not always just for

5   narcotics but they came with usually one in the

6   benzodiazepine class like Xanax.  They would come as a

7   muscle relaxant like Soma.  And then they would come as

8   a long-acting narcotic and then a short-acting narcotic.

9   Q   How common was this pattern of multiple

10  prescriptions at your pharmacy?

11  A   Very common for that particular location.

12  Q   For that particular location?

13  A   Right.

14  Q   And was it so common that pharmacists knew who

15  issued the prescriptions before they even looked at the

16  prescription pad and whose signature it was?

17  A   Yes.

18  Q   Now, did you observe other patterns with regards to

19  the dosing schedule for these control II drugs?

20  A   When we look at a dosing, we look at what's

21  generally prescribed and what's recommended by the

22  manufacturer.  A lot of times those would be outside the

23  range.  The number of tablets that would be allowed in a

24  day would be over and above.  Sometimes we would see

25  where Oxycontin generally is an every 12 hours kind of

1    medication, it would often be written as an every 8

2    hours.   Sometimes the Fentanyl patches, which are every

3    three day patch, would be written for every two days.

4    Q    Now, did you ever refuse to fill narcotics

5    prescriptions for the drug-seekers that you saw come

6    from the Schneider Medical Clinic?

7    A    Yes.

8    Q    And did you ever establish a policy with regards to

9    prescriptions from the Schneider Medical Clinic?

10   A    We established a policy for any narcotic coming from

11   any location; but was driven by the fact that we were

12   getting numerous ones from this particular location,

13   yes.

14   Q    And what was that policy?

15   A    The policy was that we wanted to fill in a timely

16   manner and so it became a very strict policy not to fill

17   early prescriptions unless there was some reason that we

18   could document for sure as to why we would be doing

19   that.   As well as, if the patient was allowed to get the

20   prescription, say, on a Tuesday -- because I am a 24

21   hour location, it became very difficult for my third

22   shift pharmacist to get their job done because at 12:01

23   on Tuesday morning I would have those individuals in

24   asking to fill those prescriptions.   So it became a

25   policy that we would only fill them on the day during

3569

1   normal business hours for the physician so if the

2   pharmacist had a question regarding that prescription,

3   that they could then call and find out.

4   Q   Did you ever call the Schneider Medical Clinic to

5   discuss prescriptions with the Defendant Stephen

6   Schneider?

7   A   Yes.

8   Q   And do you recall a specific conversation you had

9   with him about a patient named Lacey F?

10  A   Yes.

11  Q   And could you tell us about that conversation?

12  A   Lacey was a client of mine and she had come in two

13  weeks previously to fill the four prescriptions that she

14  was filling and when she came in on this particular day

15  she was two weeks out so she had just picked up some two

16  weeks before, so it's really, really soon for her to get

17  these prescriptions again.  So trying to understand why

18  we would be issuing a patient the exact -- virtually the

19  exact same prescriptions over again within a two week

20  period of time, I called Dr. Schneider's clinic and

21  asked to speak to the physician and was adamant enough

22  with my request that I got my personal cell phone, put

23  it in the pharmacy and said that Doctor could get ahold

24  of me on my cell phone because I wanted to speak with

25  him about this particular issue.

3570

1   Q    And did he eventually call you back?

2   A    He did.

3   Q    And what did you talk to him about?

4   A    I asked him why is it that I have a patient in my

5   pharmacy who has a prescription -- or four prescriptions

6   that are virtually a mirror image of what she had just

7   picked up two weeks prior.  And his comment was that he

8   didn't know for sure but it could possibly be that the

9   dictation that they take was not back in the chart yet,

10  or that the patient could have taken some of their own

11  records and they wouldn't have had record that she had

12  been there two weeks previously.

13  Q    And when you say taken her own records, what did you

14  understand that to mean?

15  A    Indicating that somehow they would have left the

16  chart available for the patient to take their records

17  out of.

18  Q    Now, did you also have a conversation with Lacey in

19  terms of your being a pharmacist and counseling her?

20  A    Yes.

21  Q    What did you tell Lacey?

22  A    After this incident, I took Lacey aside and told her

23  that it was my opinion that if she continued on the

24  route that she was taking of the amount of medications

25  that she was taking, if she did not find another

3571

1    physician, that she would eventually kill herself.

2    Q    Lacey was a young person, wasn't she?

3    A    Yes.

4    Q    She was under 21, wasn't she?

5    A    Yes.

6    Q    Did you ever receive any forged prescriptions from

7    Schneider Medical Clinic patients?

8    A    Yes.

9    Q    Can you give us an example of how you would see a

10   prescription and know that it was forged?

11   A    Generally over a period of time you have an idea of

12   what seems to be right; and on one occasion I was

13   presented with a prescription for a quantity of 160.

14   That's a very odd quantity because it's not generally

15   divisible by 30.  Generally when you're talking about

16   narcotic prescriptions, a lot of times they're divisible

17   by 30 because you take it once a day, you take it twice

18   a day, you take it three times a day.  But this one was

19   for 160, which didn't make sense.  But what had happened

20   was the individual -- or some individual had added a 1

21   to the 60 to make it 160, not a 60.

22   Q    And when you received forged prescriptions from the

23   Schneider Medical Clinic, what did you do?

24   A    Called and asked them whether they were valid

25   prescriptions or not.

3572

1   Q   And would you get responses?

2   A   I would on some occasions; and if I couldn't get a

3   response, then we just simply would not fill the

4   prescription.

5          MS. TREADWAY:  That's all, Judge.  Thank you.

6          THE COURT:  Yes, sir.

7          MR. WILLIAMSON:  Thank you, Your Honor.

8                    **CROSS EXAMINATION**

9   BY: MR. WILLIAMSON:

10  Q   Good morning.  You mentioned that your Walgreens was

11  a neighborhood Walgreens?

12  A   Yes, sir.

13  Q   Okay.  Now, exactly where was that one located?

14  A   At 31st and south Seneca.

15  Q   Okay.  Is that the closest Walgreens to 7030 South

16  Broadway where the Schneider Medical Clinic was?

17  A   Not at this point in time, no.

18  Q   Okay.  There was one actually closer?

19  A   There is one currently at 55th and South Broadway.

20  I do not know when that store opened.

21  Q   Okay.  When you were there like between 2002 and

22  2005, were you the closest store?

23  A   Again, I'm not sure when that store on 55th and

24  south Broadway opened.  There's also another one at

25  Broadway and -- Harry and Broadway.

3573

1    Q    Okay.  How many other doctors in the neighborhood

2    that your store saw had a Medicaid population that were

3    under chronic pain treatment?

4    A    I don't know of another pain clinic, if that's what

5    you're asking, a pain clinic or someone who was

6    specific -- we have physicians in that area that would

7    treat patients for pain, but whether they were

8    specifically a pain clinic or not --

9    Q    I'll break it up in two questions, maybe three.

10        Were there any, let's say, pain specialists in the

11   neighborhood area that you -- your store was located?

12   A    Not that I'm aware of.

13   Q    Were there any family practitioners that you knew of

14   that had a heavy Medicaid population that were under

15   chronic pain therapy?

16   A    Not that I'm aware of.

17   Q    Okay.  And Dr. Schneider's clinic was the only one

18   in that vicinity that had a heavy pop -- a heavy

19   Medicaid population who were under a chronic pain

20   therapy; correct?

21   A    I don't know.

22   Q    You don't know how many Medicaid patients he was

23   seeing?

24   A    No, sir.

25   Q    You don't know how many chronic pain patients he was

3574

1   seeing?

2   A   No, sir.

3   Q   Now, you mentioned that you did have a conversation

4   with Dr. Schneider; correct?

5   A   Correct.

6   Q   Okay.  And he didn't brush you off the phone and

7   say, I don't care what they're doing with my

8   prescriptions, did he?

9   A   No, he did not use those words.

10  Q   And he actually tried to talk with you and tried to

11  share with you what he thinks may have happened without

12  even having a chance to investigate; correct?

13  A   He did.

14  Q   And did you ever learn as to whether or not Lacey F

15  was terminated or prevented from receiving any other

16  pain medication from the clinic?

17  A   No.

18  Q   Now, you mentioned these forged prescriptions.

19  Remember that?

20  A   Uh-huh.

21  Q   And these forged prescriptions were ones altered by

22  somebody other than the physician; correct?

23  A   I can only make that assumption.  I don't know who

24  altered the prescriptions.

25  Q   A physician doesn't need to alter their own

3575

1    prescription, do they?  They can write it, and if they

2    wanted to write 160 they could have just written 160;

3    correct?

4    A    Yes, if they are the prescriber, yes.

5    Q    And you mentioned that -- well, let me ask you this.

6         A way to help prevent prescriptions from being

7    forged is to use electronic prescriptions; correct?

8    A    Is that an opinion question you're asking or --

9    Q    Yes.

10   A    I still think that we're trying to make that

11   determination whether electronic prescribing is actually

12   the best way.

13   Q    Has that been a way that the community has tried to

14   address this problem?

15   A    Currently right now it's my understanding the DEA

16   doesn't allow electronic prescriptions for controls.

17   Q    It still has to be handwritten?

18   A    No.  There are other means of getting a control

19   prescription to the pharmacy, but it cannot be

20   e-scribed.

21   Q    Okay.  What other ways have they come up with now?

22   A    Any way that could have been in the past.  It can be

23   hand-delivered by the patient.  It could be called to

24   the pharmacy by the doctor and left on the voice mail.

25   It could be called to the pharmacy by the physician or

3576

1    one of his representatives and given directly to a

2    pharmacist.  It could be faxed to the pharmacy.

3    Q   Okay.  Now, you said that basically it's still

4    trying to be determined if electronic prescriptions

5    actually solve the problem; is that correct?

6    A   Correct.  To my understanding.

7    Q   And back in 2005 do you know how many people had

8    started using electronic prescriptions?

9    A   At that time e-scribe was not available to anyone,

10   not e-scribing, no.

11   Q   Okay.  Are you aware that the clinic moved their

12   system to an electronic system back in 2005?

13   A   No.

14   Q   Are you aware that they started using electronic

15   charts back in 2005?

16   A   No.

17   Q   Using electronic charts would eliminate the ability

18   for people to take their file and snatch papers out;

19   correct?

20   A   It would seem so.

21   Q   Okay.  And if you tried to come up with mechanisms

22   to take the prescription out of the patient's hands and

23   have a direct communication between the doctor and the

24   pharmacist, that would also reduce potential forgeries

25   with prescriptions; correct?

3577

```
 1   A   As long as the forger is not a member of your staff,
 2   yes.
 3   Q   And Lacey F wasn't a member of the Schneider Medical
 4   Clinic, was she?
 5   A   Not to my knowledge.
 6   Q   Now, you mentioned these drug-seekers that you've
 7   had training.  Remember that?
 8   A   Uh-huh.
 9   Q   Can you tell us what does a drug-seeker look like?
10   A   They don't look any particular way.
11   Q   Is it more of a behavioral thing that you're trying
12   to determine?
13   A   It's -- yes.
14   Q   So, if you see people such as somebody coming in
15   with a forged prescription, that may tip you off;
16   correct?
17   A   Yes.
18   Q   If you see somebody who -- well, give me other
19   examples of what you look for?
20   A   The red flags that we show -- that go up when
21   someone's what we would consider a drug-seeking behavior
22   is more than one doctor writing for the same
23   medications; asking us to fill them early; asking us not
24   to fill them on their insurance; wanting to pay cash for
25   only certain medications and not all medications;
```

3578

1    wanting them filled at 12:01 instead of waiting until
2    business hours.  Those would be some ways.
3    Q   Okay.  So you can't just by looking at the person
4    determine they're a drug-seeker.  Is that fair?
5    A   No, sir.
6    Q   Okay.  And you agree that for everything that you
7    just named, you could attribute a legitimate motive to
8    that or you could attribute an illegitimate motive to
9    that; correct?
10   A   Potentially, yes.
11   Q   Potentially.  So, if somebody comes in asking for an
12   early refill, it's very possible that the medication
13   that they were receiving previously was not sufficient
14   to help with their pain; correct?
15   A   Could have been.
16   Q   But it also could be that they overuse their
17   medicine; correct?
18   A   Could be.
19   Q   It could that be they lost their medication?
20   A   Could be.
21   Q   Now, before you hand out these prescriptions, you
22   take time to counsel these patients; correct?
23   A   We do.
24   Q   And you tell them that it's important for them to
25   take the medicine as prescribed; correct?

3579

1    A    We do.

2    Q    And you counsel them on the consequences of them

3    failing to do that; correct?

4    A    We do.

5    Q    And you would agree that just the whole practice of

6    medicine when you're dealing with any kind of

7    prescriptions, it takes multiple people to make the

8    system work right.  Do you agree with that?

9    A    Yes.

10   Q    It takes the physicians to try to, you know, do the

11   best they can to diagnosis these patients; correct?

12   A    Yes.

13   Q    It takes the patients to follow the instructions of

14   the physicians; correct?

15   A    Yes.

16   Q    It takes the pharmacies to do their part when

17   they're handing out the prescriptions like you testified

18   you've done; correct?

19   A    Yes.

20   Q    And you testified that a good percentage of people

21   you believe were drug-seekers that actually came to your

22   clinic; correct?  Excuse me -- your pharmacy; correct?

23   A    Yes.

24   Q    You never sat down and did a study to determine

25   eight out of ten were or were not; correct?

1    A    No.

2    Q    You didn't keep notes as to whether people came in

3    with these behavioral identifiers that you discussed to

4    determine whether or not somebody in your opinion

5    actually had a legitimate reason for being in early or

6    an illegitimate reason for being in early; correct?

7    A    Actually we do.

8    Q    You kept records of it?

9    A    Yes, sir.

10   Q    Did you ever give that to the Government?

11   A    No one asked me for them.

12   Q    And did you ever determine how many patients you saw

13   that came from the clinic in total?

14   A    No.

15   Q    Do you know how many patients that came from the

16   clinic that you actually said -- that you refused to

17   fill a prescription for?

18   A    No, I don't know how many.

19   Q    Are you aware that some patients stated that

20   individuals at Walgreens would be rude to them?

21   A    If you say so.

22   Q    Did you try to really make a determination as to

23   whether or not -- well, strike that.  .

24        And you never visited face-to-face with Dr.

25   Schneider at all; correct?

3581

```
 1    A    I did meet him on one occasion but not --
 2    Q    Not in reference to a specific patient?
 3    A    No.
 4    Q    And was he ever rude to you when you met him or you
 5    talked to him on the phone?
 6    A    No.
 7              MR. WILLIAMSON:  I don't have anything else,
 8    Your Honor.
 9              THE COURT:  Mr. Byers.
10              MR. BYERS:  No questions, Your Honor.
11              THE COURT:  Redirect please.
12              MS. TREADWAY:  No Judge.
13              THE COURT:  Thank you, Ms. Fox.  You've been
14    very helpful.  Next witness.
15              MS. TREADWAY:  Government calls Dr. Brent
16    Rody.
17              MR. WILLIAMSON:  Judge, for the record we
18    would like to lodge another objection to cumulative
19    based on the same information that we discussed
20    yesterday.
21              MS. TREADWAY:  This individual had specific
22    conversations with the Defendant Schneider, Stephen
23    Schneider.
24              THE COURT:  I'm noting the objection, but
25    based on that representation, it's overruled.
```

3582

1                          **BRENT RODY**

2      Having been first duly sworn to tell the truth, the

3      whole truth and nothing but the truth, testified as

4      follows on:

5                        **DIRECT EXAMINATION**

6      BY MS. TREADWAY:

7      Q    Could you please introduce yourself to the jury.

8      A    I'm Richard Brent Rody.

9      Q    And where are you currently employed, Dr. Rody?

10     A    At -- with Team Health working in emergency

11     departments in South Carolina.

12     Q    And I called you doctor.  Are you a medical doctor?

13     A    I am.

14     Q    And is your specialty emergency medicine?

15     A    It is.

16     Q    And how long have you been in South Carolina?

17     A    Four and a half years.

18     Q    Could you give the jury a brief educational history

19     starting with your college?

20     A    I went to college at the University of Oklahoma

21     between 1979 and 1983.  I then went to University of

22     Oklahoma Medical School between 1983 and 1987.  I did a

23     year of internal medicine internship at the University

24     of Oklahoma from '87 to '88.  Then I did three years of

25     emergency medicine residency between '88 and '91, also

3583

1    at the University of Oklahoma.

2    Q    And can you give the jury a brief employment history

3    prior to your current job in South Carolina?

4    A    Did a lot of moonlighting in ER's when I was an ER

5    resident between '88 and '91 working at various ER's

6    around Oklahoma.  And during the last year of my ER

7    residency I started working at Presbyterian Hospital,

8    which was a part of the Health Sciences Center complex

9    in Oklahoma City.  Then I took a job there full time

10   when I finished my ER residency and worked there for --

11   it was either six or seven years until I came to Wichita

12   and started working at Wesley in June of 1997.  Worked

13   at -- I think it was '98.  Then I worked at Wesley for a

14   year and a half before joining Via Christi in December.

15   Wait a minute -- it was December of '98 I joined Via

16   Christi as an ER physician.  And then I worked for a

17   year as an ER doctor at the two Via Christi ER's before

18   becoming the Medical Director of the two ER's at Via

19   Christi in January of 2000.  And then continued to work

20   clinical shifts.  And then in January of 2001 I became

21   the Chief Medical Officer at Via Christi for kind of all

22   the campuses:  St. Jo, St. Francis, Our Lady of Lourdes,

23   The Good Shepherd Behavioral Center.  Then I had some

24   regional responsibility in that Chief Medical Officer

25   role.  But I continued to be the ER Medical Director for

3584

 1    St. Jo and St. Francis and continued to work clinical

 2    shifts.

 3    Q    And then did you eventually leave Wichita?

 4    A    I did.   In January of 2006.

 5    Q    So we'll put you on a timeline here with Dr. Rogers.

 6    So you were here from 1997 through January of 2006?

 7    A    Yes, in Wichita.

 8    Q    Now, as a supervisor of the ER physicians as well as

 9    taking shifts yourself as an ER physician, did you have

10    a general knowledge of the types of patients and medical

11    problems that were being taken care of in the emergency

12    rooms you were part of and that you supervised your

13    physicians were a part of?

14    A    I did.

15    Q    How many shifts per month does a full time ER

16    physician typically work?

17    A    12 to 13 was kind of our minimum to be full time.

18    Q    And how many shifts did you work after you assumed

19    your supervisory duties?

20    A    I was working eight shifts a month when I was the --

21    as the ER medical director.   And then when I took on

22    that Vice-President of Medical Affairs or Chief Medical

23    Officer job I pared that down to like five or six shifts

24    per month.

25    Q    In your capacity as a Wichita emergency room

3585

1    physician and a supervisor of these physicians, have you

2    treated patients from the Schneider Medical Clinic?

3    A    I have.

4    Q    And did you do so during the years 2002 through the

5    time you left in January of '06?

6    A    I did.

7    Q    And during the course of treating Schneider Medical

8    Clinic patients in those years, did you have the

9    opportunity to speak with them at length?

10   A    I did.

11   Q    Did you also have the opportunity to observe them?

12   A    I did.

13   Q    And based on your conversations with the patients

14   and your observations of them, did you notice patterns

15   over time?

16   A    Yeah.  There were definite patterns and the biggest

17   pattern was drug-seeking behavior that they displayed

18   when they came to the emergency department.

19   Q    And did you notice any patterns with regards to

20   patients coming to you, to your ER, with symptoms of

21   withdrawal from controlled substances?

22   A    Yeah.  The patterns would be that they would either

23   be in pain and asking for more narcotic medication or

24   they would be withdrawing from the medication, or they

25   may have overdosed on the medication and require

3586

1    intensive level care.

2    Q    And did you experience patients from the Schneider

3    Medical Clinic in your emergency room that actually died

4    from their overdoses?

5    A    I did.  And certainly in my director capacity was

6    aware of multiple deaths related to the patients

7    overdosing on their medications.

8    Q    As an emergency room physician since 1997, I'm

9    assuming that you do have occasion to treat people in

10   your emergency room that have chronic pain conditions?

11   A    Yes.

12   Q    Based on your experience over those many years with

13   chronic pain patients, are they typically treated with

14   only the prescribing of controlled substances?

15   A    No.  I mean, typically there's other methods that

16   you can use to treat their pain.  You can do

17   electro-stim; hot and cold whirlpool treatments;

18   physical therapy.  The doctors would often give

19   injections like say an axillary nerve block or various

20   nerve blocks, spinal nerve blocks, epidural blocks with

21   Lidocaine and steroid combinations.  And then oftentimes

22   they might be on something non-narcotic like Ultram, you

23   know, so they didn't get hooked on the narcotics.  So

24   there's multiple ways to treat these patients.

25   Q    Nevertheless, was that true of the people that you

3587

1    treated in your emergency rooms here in Wichita from the

2    Schneider Medical Clinic?

3    A    No.

4    Q    What was the primary treatment that these

5    individuals were receiving at the Schneider Medical

6    Clinic?

7    A    Oxycontin seemed to be the drug of choice; and most

8    of 'em were on a benzodiazepine as well.

9    Q    In terms of treating people in the emergency room,

10   is it typical for the physician to ask the patient why

11   they are in the ER?

12   A    Yes.  Especially if they're a chronic pain patient

13   and they have a doctor.  They really shouldn't be in the

14   ER.  They should be receiving all of their medications

15   from one source.  As I testified to in the grand jury

16   proceedings, we have 22 different emergency physicians

17   working at two hospitals working varying shifts and so

18   it's almost impossible to provide a chronic pain patient

19   any kind of continuity of care from the emergency

20   department.  And we did have a Mirror Image system that

21   we actually developed.  Dr. Katan, who you saw I think

22   some days ago, was the primary developer of that.  I

23   helped some in my VP role and my medical director role.

24   But we could kind of look back and see what prior docs

25   had done in terms of drugs given and things like that.

3588

1   But it's just a lousy way to practice medicine on a

2   patient with a chronic condition.  The patient could

3   theoretically see 22 different doctors in 22 different

4   visits.  And we're trying to keep up with narcotics

5   distributed, how many pills the patient is taking, you

6   know, could the patient be selling the pills or whatever

7   the case might be.  And it's pretty impossible to do

8   that in a 22 physician practice.

9   Q   So when you were talking to the Schneider Medical

10  Clinic patients in your emergency room, what were some

11  of the typical responses you got from those patients

12  about why they were in the emergency room rather than at

13  the clinic?

14  A   Well, a lot of 'em would say that Dr. Schneider told

15  'em to come.  Or they might say that they couldn't get

16  ahold of Dr. Schneider, or they'd tried to get ahold of

17  him and they were out of their meds so that's why they

18  were in the ER wanting more.

19  Q   Did they ever talk to you about not having enough

20  money?

21  A   No.

22  Q   Did they ever equate money with the number of pills

23  they were able to obtain?

24  A   Well, I mean, what I heard multiple times is if they

25  wrote -- I think they had to take cash to Dr. Schneider

3589

1    and they would give him $185 and get a prescription for

2    185 oxycontin.

3    Q   Did any Schneider Medical Clinic patient ever admit

4    to you straight up, hey, doc, I'm sellin' my pills?

5    A   Yes.  Not very many.  You get more admitting that

6    they had bought some off the street.  But several did

7    admit that they were selling the pills.

8    Q   As a result of your treating and observing Schneider

9    Medical patients in your emergency room here in Wichita,

10   did you ever call the Schneider Medical Clinic to talk

11   with anyone?

12   A   I called Dr. Schneider.  I think I paged him.  I

13   don't remember if I called his clinic or if I paged him

14   through the hospital operator; but, yes, I did call to

15   talk to him about it.

16   Q   Did you talk to him one time, based on just general

17   observations and did you talk to him other times about

18   specific patients?

19   A   Yes.  I called him several times about, you know,

20   while I was working clinically and taking care of his

21   patients.  And I called him one time specifically in my

22   role as, you know, vice-president of medical affairs and

23   medical director of the ERs, you know, mainly to tell

24   him to stop sending his patients to the ER expecting

25   further narcotics.  And also just to discuss with him

3590

1    that I felt like his prescribing patterns were, you

2    know, way out of line.

3    Q    And did you use that terminology?

4    A    I used that terminology or probably something

5    stronger like I thought it was crazy the number of meds

6    that he was prescribing these patients.

7    Q    And in any of the conversations you had with him,

8    either that general one, that you just discussed, or any

9    specific patient conversation, did the Defendant Stephen

10   Schneider represent to you that he was a pain management

11   specialist?

12   A    Yes.

13   Q    And what did he tell you?

14   A    He just told me he was a specialist in this area and

15   that he was fulfilling a need for these patients and

16   that, you know, these patients had chronic pain and he

17   was an expert and a specialist in providing this type of

18   service to 'em.  And in essence I think he was probably

19   getting the sense from me that I didn't feel like it was

20   legitimate medicine and he was legitimizing what he was

21   doing to me in terms of how he was responding.

22   Q    Would you agree that he was a pain management

23   specialist, Dr. Rody?

24   A    No.  I don't think he had specific pain management

25   training that I was aware of.  I think his residency was

3591

1   in something like family medicine.

2   Q   And based on your observations of how he treated the

3   patients at Schneider Medical Clinic, would you consider

4   that he had been a specialist?

5   A   Well, he wasn't treating them in the same manner

6   that other specialists in town were.  In other words, he

7   wasn't using these other modalities that I mentioned

8   earlier.  And, specifically, a pain management

9   specialist would tend to be like an anesthesiologist who

10  has specific training in doing injections in the

11  epidural spaces of the spine or specific nerve blocks.

12  You go in and, again, do Lidocaine and steroid type of

13  injections for nerve blocks.  And I wasn't aware that

14  Dr. Schneider was using those modalities nor any of the

15  other modalities that I mentioned.  It all seemed to be

16  kind of narcotics and specifically the Oxycontin.

17  Q   Did you ever discuss with Defendant Stephen

18  Schneider any particular patients that had come into

19  your ERs with overdoses or even overdose fatalities?

20  A   Yes.  And I reviewed my grand jury testimony on this

21  and, again, the grand jury testimony was in January of

22  2006, and what I said there was I was pretty darn sure

23  that I'd seen some of his overdose patients specifically

24  in my role as a medical director and also as VP of

25  medical affairs.  You know, I had to review cases and

3592

1    peer review was part of what I did.  So I was intimately

2    familiar with these patients coming in.  And I know for

3    a fact that I had called Dr. Schneider several times

4    when patients would come in and said, "hey, did you know

5    your patient was in here, what's the deal".

6    Q    And when you did call him and discuss those issues,

7    did he express any concern to you about his patients

8    being in the ER suffering from overdoses?

9    A    Uhm, I'd say it was different than when I would call

10   other pain doctors when they had patients in the

11   department.  I mean, he wasn't as alarmed or upset about

12   it as maybe I would have expected him to be.  And he did

13   tell me that his clinic was open seven days a week and

14   he didn't understand why the patients would come to the

15   department when he had open office hours every day.  You

16   know, Sunday through -- Sunday through Saturday or

17   however you want to describe that.  Seven days a week.

18   And he didn't seem particularly alarmed.

19       When I call other pain management doctors, I mean,

20   they would get, you know, pretty vocal about, you know,

21   I have a contract with this patient, I have an agreement

22   with the patient, they're not to come to the ER to get

23   drugs, if I'm going to prescribe narcotics then I want

24   to be the only one prescribing them and they shouldn't

25   be in there asking for more.  And sometimes I would call

```
 1    these docs, you know, for support, in essence, to be
 2    able to go back into the room and say no to the
 3    patients.  These were very difficult doctor/patient
 4    interactions.  I mean, the patients would get very vocal
 5    with us.  You know, cuss at us, cry, yell, scream.  I
 6    mean, these types of interactions are very unpleasant,
 7    especially when you're in the middle of a busy ER trying
 8    to take care of sick patients.  So the patients would
 9    get pretty abusive if you would say no and, you know,
10    threaten you and, you know, what are you gonna do about
11    my pain and why won't you give it to me and, you know,
12    that type of thing.  So sometimes to get support from
13    the regular physician we might call and say, "you know,
14    your patient's here, we really shouldn't be prescribing
15    these drugs, you're doing that already".  And in the
16    case of my conversation with Dr. Schneider, you know, I
17    told him very specifically I felt like he was giving
18    them too many medications.  You know, 185 pills at once
19    was way too many.  And so --
20    Q   When you were practicing in Wichita, Dr. Rody,
21    approximately how many physicians comprised the medical
22    community in the Wichita and surrounding area?
23    A   Well, when I was, again, the Chief Medical Officer
24    at Via Christi, we had 899 doctors on our medical staff
25    at Via Christi.  Then there were some cross-pollination
```

3594

1   between the physicians on staff at Wesley and Via

2   Christi.  So I would guess there were at least 200

3   physicians on staff at Wesley that were probably not on

4   our staff.  And then Riverside, which we bought, we

5   meaning Via Christi Health Systems bought, and then

6   closed at least portions of, had another two to 300

7   members of their medical staff.  So if you kind of put

8   those numbers together, I would say somewhere in the

9   neighborhood of 1100 to 1400.

10  Q    During the time you were part of the Wichita area

11  medical community did you become aware of the Defendant

12  Stephen Schneider's reputation within that community?

13  A    I did.

14  Q    And on the basis of the information you have

15  obtained within that medical community, have you formed

16  an opinion as to the reputation of the Defendant Stephen

17  Schneider with regards to his prescriptions of

18  controlled substances?

19  A    I think the reputation was -- is that his

20  prescribing habits were way out of line with the rest of

21  the physicians in the medical community or in the state.

22  Q    And how did you liken how he handed out narcotics?

23  A    Well, I mean, words like "candy man" and things like

24  that were said.  I mean, it was that number of narcotics

25  was just way, way out of line.  For example, I don't

3595

1    think I've ever prescribed Oxycontin to a patient in the

2    ER unless it was a cancer patient that was already on

3    it.  I think it's inappropriate to use that unless it's

4    somebody that like has metastatic cancer to their bones

5    or something like that.  In a typical prescription out

6    of the ER I may prescribe, you know, 15 Lortabs to

7    somebody that has like a broken arm.  Or, you know,

8    maybe, maybe, 20 or 25; but, you know, I've never seen

9    numbers like this in my, you know, 23 going on 24 year

10   career.

11   Q    Were the patients from the Schneider Medical Clinic

12   referred to by any common name in the emergency rooms?

13   A    Basically just things like, you know, another

14   Schneider patient.  I mean, they were --

15   Q    Was that enough?

16   A    That pretty much told you what was going on.

17   Q    During the years you treated Schneider Medical

18   Clinic patients in your emergency rooms, did you ever

19   see any evidence that the Defendant Stephen Schneider

20   ever changed his controlled substances prescription

21   practices?

22   A    No.

23                MS. TREADWAY:  That's all, Judge.

24                THE COURT:  Yes, sir.

25                MR. WILLIAMSON:  Thank you, Your Honor.

3596

### CROSS EXAMINATION

BY MR. WILLIAMSON:

Q   Let me make sure I understand you correctly.   You say you've never prescribed Oxycodone -- or, excuse me -- Oxycontin?

A   Oxycontin.

Q   To anybody other than a cancer patient?

A   I don't think that I've ever personally prescribed Oxycontin to anybody other than a cancer patient that was already on it.   I've never -- I've never prescribed that medication spontaneously myself in the 23, 24 year career.

Q   And you would agree that a doctor can prescribe Oxycontin as indicated for other patients besides cancer patients; correct?

A   If they felt like it was an appropriate medication then they certainly could.

Q   Well, my question is:   It's not -- Oxycontin is not limited to be given to cancer patients; correct?

A   It's not limited but it's unusual to see that.

Q   But you have a personal choice not to give it to anybody besides canser patients?

A   Correct.

Q   The labeling with the Oxycontin does not state that this is only to be given to cancer patients; does it?

3597

1   A    No.

2   Q    There's not an absolute standard that says Oxycontin

3   cannot be given to anybody other than a cancer patient;

4   correct?

5   A    That's correct.

6   Q    Now, you have never -- well, strike that.

7        You've been an emergency room doctor for 18 years?

8   A    Well, I started moonlighting in ERs in 1988, so 23

9   years of practice outside of ER residency.  My ER

10  residency ran between 1987 and 1991.  Excuse me -- '88

11  to '91.

12  Q    You've never had a family practice; have you?

13  A    No.

14  Q    You've always dealt with emergency room type of

15  relationship; correct?

16  A    That's correct.

17  Q    And emergency room relationship is different than a

18  primary care relationship; true?

19  A    It is.  There's sort of an immediacy about the

20  developing a relationship and a briefness to the

21  interaction.

22  Q    And primary care physicians often see patients for

23  years at a time; correct?

24  A    That's correct.

25  Q    That primary care physician would normally be in the

3598

```
1    best position to determine that patient's medical needs.
2    You would agree?
3    A   I would say in general; yes.
4    Q   Okay.  And that's because they've had a chance to
5    see this person's history; correct?
6    A   Yes.
7    Q   They've had a chance to see what medications this
8    person had been on since they had started with the
9    patient; correct?
10   A   Yes.
11   Q   They had an opportunity to see how this person
12   responded and reacted to certain medications; correct?
13   A   Yes.
14   Q   And then they've had a chance to make a medical
15   decision as to what the next steps that physician feels
16   are appropriate; correct?
17   A   I would agree with that.
18   Q   Now, you stated that you'd never seen Dr. Schneider
19   change any prescribing practices.  Did you ever audit
20   his charts?
21   A   No.
22   Q   Did you ever go in --
23   A   Well, I take that back.  I audited his patients'
24   charts through the ER in my capacity as chief medical
25   officer and medical director of the ER; but I think your
```

3599

 1    question was did I audit his office charts.  Is that

 2    what you're asking me?

 3    Q    That's correct.

 4    A    I wouldn't have access to his office charts.

 5    Q    You don't know what kind of regimens Dr. Schneider

 6    may or may not have changed with certain parents;

 7    correct?

 8    A    That's correct.

 9    Q    You don't know whether or not a person came in with

10    a side effect from Valium and then Dr. Schneider chose

11    to take them off of that because they had a bad side

12    effect; correct?

13    A    That's correct.

14    Q    You don't know whether or not patients were taking

15    Lortab but their pain was still uncontrolled so then he

16    decided to change to Oxycontin; do you?

17    A    Well, most of his patients seemed to be on Oxycontin

18    that I saw and my partner saw in the ER.

19    Q    How many patients did you see?

20    A    I couldn't give you an exact number; but I suspect

21    it was in the hundreds at least, and then the ones that

22    I reviewed would take that number up into the multiple

23    hundreds.

24    Q    You mentioned the nerve blocks.  You remember that?

25    A    I do.

3600

1    Q    Alternate modalities?

2    A    Yes.

3    Q    You understand that in the pain community there are

4    multiple thoughts and ideals as to how to treat pain

5    patients; correct?

6    A    Not really.  I mean --

7    Q    You're not a pain management specialist; are you?

8    A    I'm not.

9    Q    Okay.  You never dealt with a chronic pain patient

10   from the time they first came in to a primary care

11   physician until the last time they came in; correct?

12   A    No.  But one thing that's a little unfair is the

13   characterization that we would never see a patient

14   again.  When you work in the community for multiple

15   years as an emergency physician, you do see patients

16   recurrently and develop kind of an awareness or

17   knowledge of 'em.

18   Q    That's fair.  But you say you have 22 physicians

19   under the Via Christi umbrella; correct?

20   A    That's correct.

21   Q    And --

22   A    At that time.

23   Q    At that time.  And it is difficult -- you didn't --

24   strike that.  Let me back up.

25        You may see people multiple times but you were not

3601

1    the person that they would go see on a regular basis;

2    correct?

3    A    Well, hopefully I wouldn't be.

4    Q    Unless they just continuously have other

5    emergencies; correct?

6    A    I mean, frankly, a lot of patients do use the ER

7    recurrently, you know, to seek chronic care.  So it's an

8    unfortunate situation if I am the one seeing them on a

9    recurrent basis.  But ideally, you're right, they should

10   have a focal person that they see in the office on a

11   regular basis.

12   Q    Okay.  And these -- these other modalities you told

13   us about, you said nerve blocks injections?

14   A    Specific nerve blocks.  They can do, you know,

15   epidural or various spinal injections.  Typically

16   there's a combination of steroids and Lidocaine used for

17   those.  Electrical stimulation, you know, like TENS

18   units; hot and cold; whirlpool; physical therapy is used

19   very frequently for like chronic low back pain patients.

20   Q    Let me just interrupt you.  First --

21   A    Traction.

22   Q    Sorry.  Do you know how many patients Dr. Schneider

23   sent to physical therapy?

24   A    I don't have those numbers; no.

25   Q    Do you know how many patients Dr. Schneider sent to

3602

1    occupational therapy?

2    A    No.

3    Q    Now, these nerve blocks and these spinal procedures,

4    they can only be done by anesthesiologists; correct?

5    A    Well, typically pain management doctors do those

6    blocks.   And typically it's the anesthesia training that

7    gives you the ability to do those.

8    Q    No, my question is only anesthesiologists can only

9    provide these nerve blocks; correct?

10   A    I don't think it's only anesthesia.   I mean, I think

11   surgeons and other doctors that do pain can do 'em if

12   they're -- if they've been trained to do 'em.

13   Q    Okay.   That takes specialized training; correct?

14   A    You're right.

15   Q    Family practitioner cannot just go in and do a

16   spinal procedure on a patient in their office; correct?

17   A    No, not unless he's had the training to do it.

18   Q    Okay.   Now, you have this conversation with a lot of

19   these unknown patients that you haven't -- you can't

20   tell us who these people are; can you?

21   A    No.

22   Q    I can't go and interview these patients to determine

23   whether or not they were telling you the truth; correct?

24   A    Well, I don't have a list of the patients.   I didn't

25   ever try to catalog those patient names.

3603

```
 1    Q    And giving you the benefit of the doubt, you're
 2    accurately telling us what you believe they told you;
 3    correct?
 4    A    Yes.
 5    Q    But we, as we sit here now, we can't go and judge
 6    the veracity, the truthfulness, of what they told you at
 7    that time; correct?
 8    A    That's correct.
 9    Q    Now, you understand that people with drug-seeking
10    behavior, as you term it, they undertake these
11    manipulation tactics; correct?
12    A    Some of 'em do, yes.
13    Q    And they do things and say things so that they can
14    get what they want from the physician at a certain time;
15    correct?
16    A    They sometimes do, yes.
17    Q    Somebody is coming to you trying to give you a sob
18    story, Dr. Schneider won't see me because I don't have
19    any money, please help me out, that tactic, so you could
20    feel sorry for 'em and give 'em some more medicine;
21    correct?
22    A    I don't think any of the patients ever said that he
23    wouldn't see 'em because of money.
24    Q    Okay.
25    A    But they might say that they couldn't get ahold of
```

3604

1   him or they might say that Dr. Schneider told 'em to

2   come to the ER.  But I don't remember any of 'em saying

3   it was like he won't see me because of money or --

4   Q   Well, they're telling you, man, I can't get in, I

5   really need some help.  It could be that they're just

6   trying to sucker you in to give them some medicine;

7   correct?

8   A   It could be, yes.

9   Q   It could be that they really couldn't get in and

10  they really need some medicine; correct?

11  A   Well, I mean, Dr. Schneider said he was open seven

12  days a week so --

13  Q   Let's talk about that.  Why would Dr. Schneider send

14  patients into the emergency room if he was so accessible

15  and there to give these pain medications whenever they

16  wanted it according to what the Government says?

17  A   That's why I called him.  I couldn't understand why

18  he would do that.

19  Q   Is it possible that some of these people that were

20  coming in to your ER were people that Dr. Schneider

21  refused to give medicine to so they came to you to try

22  to get it?

23  A   Uhm, I, I'm not sure I ever saw a patient that said

24  that Dr. Schneider refused to give 'em medication.

25  Q   I'm not asking -- think about this.  If a patient

3605

1    says, "hey, Dr. Schneider refused to give me pain

2    medication", that would give you a red flag and say,

3    wait, Dr. Schneider is not giving it to 'em, maybe he

4    knows something I don't know, I shouldn't give them

5    anything.  Correct?

6    A    If Dr. Schneider was giving it to 'em, that was a

7    red flag to me as well.

8    Q    Yeah.  I understand how you guys feel.  I understand

9    how you guys feel over at Via Christi.  And I never try

10   to change a person's opinion and I'm not trying to do

11   that. I want to just continue to focus on a few more

12   facts.

13        If a patient told you that, hey, my primary

14   physician will not give me -- no matter who the primary

15   physician is -- I tried to get these controlled

16   substances from my primary physician and he won't give

17   them to me.  That's a red flag to you saying, wait, this

18   primary care physician who knows this patient won't give

19   it to 'em, maybe I shouldn't give it to 'em.  Correct?

20   A    That's correct.  But sometimes --

21   Q    Okay.  Well, sir --

22   A    I want to finish my answer because I am agreeing

23   with what you're saying; but if the patient had like a

24   bill with a doctor -- because that did occur from time

25   to time.  Like they might have a bill that was unpaid

3606

1    with a physician and then they wouldn't see 'em or help

2    'em because they owed a bill, then that's not a red

3    flag.  That's called I can't get my doctor to see me

4    because I owe money.  Then they might actually need our

5    help.

6    Q    Okay.  Now, so you do agree that that could be a

7    potential red flag but it depends on why the primary

8    care physician chose not to see them; correct?

9    A    That's correct.

10   Q    So if a patient comes to you and says, hey, my

11   doctor won't see me, but he doesn't give you a reason,

12   that patient could be simply trying to set you up to

13   give him more medication.  Correct?

14   A    It could be, yes.

15   Q    So you don't know whether or not these people that

16   were coming in there asking for medication even though

17   the clinic was open seven days a week were actually just

18   were turned away from the clinic and trying to find

19   alternate sources; do you?

20   A    Well, a lot of times we would call Dr. Schnedier to

21   see.  I've testified to that in the grand jury

22   proceedings so -- if we had question about it, we would

23   call Dr. Schneider.  And I never had a patient when I

24   would call Dr. Schneider that Dr. Schneider denied that

25   they were his patient any more.

```
 1   Q   How many times did you talk to Dr. Schneider about a
 2   patient that said they couldn't get in to see him?
 3   A   I don't remember the number specifically.
 4   Q   You said two when you testified in --
 5            THE COURT:  Stop -- stop interrupting him.
 6   Let him finish his answer.
 7            MR. WILLIAMSON:  I thought he was finished,
 8   Your Honor.
 9            THE COURT:  No, he wasn't finished.
10   Q   I apologize, sir.  Were you finished?
11   A   I'm not sure.
12   Q   Okay.  I'll reask the question.  How many times had
13   you talked to Dr. Schneider about specific patients
14   saying they couldn't get access to him?
15   A   I don't think that particular question was asked of
16   me in the grand jury proceeding so I don't have an
17   answer for that.  In terms -- you're asking me what I
18   said in the grand jury?
19   Q   No.  I'm just asking how many.  How many do you --
20   A   You're asking me now?
21   Q   Yes.
22   A   Okay.  I thought you were talking about my grand
23   jury testimony.  I don't remember for sure.
24   Q   Okay.  Now, again, you don't know as we sit here
25   today if these patients that were telling you that they
```

3608

```
 1    couldn't get in to see Dr. Schneider even though the

 2    office was open, whether or not they had been prohibited

 3    from receiving controlled substances from his office;

 4    correct?

 5    A    I don't know for sure unless I, unless I called him

 6    and asked him about it.

 7    Q    And as you sit here now, you can't think of the

 8    number of specific patients that you would have called;

 9    correct?

10    A    Yeah.  I, I think it's several but I just don't know

11    the exact number.  This has been some years.

12    Q    Okay.  And that's fair.  And when you talked to him,

13    he did not -- you did remember talking to him at least

14    on one occasion about him sending in patients; correct?

15    A    Yeah.  I called him specifically and then I had

16    several more conversations with him when just patients

17    would come in.  I would call him and talk to 'em.

18    Excuse me -- talk to him about those specific patients.

19    Q    Okay.  You remember having one conversation

20    specifically you can recall specifics about; correct?

21    A    Well, the one conversation was sort of out of the

22    context of seeing his patients in the department.  That

23    was kind of more my -- I sort of viewed it as my role as

24    the medical director of the ER at Via Christi.

25    Q    My question was:  Do you remember specifics from at
```

3609

1    least one conversation?

2    A    I do.

3    Q    Okay.  Now, that conversation you specifically

4    addressed with Dr. Schneider, "hey, you have patients

5    coming in here who are saying that you're sending them

6    to us"; correct?

7    A    Yes.

8    Q    He told you, I'm not sending these people to you;

9    correct?

10   A    He did.  He said that.

11   Q    Did you fax him over a list of the names of the

12   people that you were thinking of?

13   A    No.

14   Q    If you would have faxed him a list, he could have

15   compared that list to his office charts and said, "hey,

16   you know, number 1 through 22 on here, I refused to see

17   them, or I have" -- correct?  He could have said that;

18   correct?

19   A    Yes.

20   Q    He could have said, 1 through 10, I haven't seen

21   them since they were 15 years old; correct?

22   A    He could have, yes.

23   Q    He could have, said, 1 through 32, I've never even

24   given 'em a controlled substance; correct?

25   A    Yeah.  I mean --

3610

1    Q    You're aware that some people could be a Schneider

2    family practice patient?

3    A    I mean, the bulk of the patients were in there with

4    pill bottles with Dr. Schneider's name on it with

5    Oxycontin.  So, I mean, what you're saying is a little

6    bit far-fetched.  We had the medications from -- from

7    the patients with his name on 'em in the ER.

8    Q    Do you remember the days that were on those

9    prescription pills as you sit here right now?

10   A    Well, that's kind of a crazy question but --

11   Q    No, it's not.  We're -- I'm sorry, sir.  We're in a

12   court of law --

13            THE COURT:  It's a crazy question.  You know

14   that he can't remember specific dates five years ago.

15   And that's not a basis to try to discredit him.  Now

16   come on, let's move on here.

17            MR. WILLIAMSON:  Okay.

18   BY MR. WILLIAMSON:

19   Q    Now, you mentioned these -- well, strike that.

20        You mentioned that you all developed this Mirror

21   Image system; correct?

22   A    Yes.  Mainly Dr. Katan.  I give him the main credit

23   for it.

24   Q    This Mirror Image system was developed to help you

25   and other emergency room physicians communicate;

3611

```
 1    correct?

 2    A    That's correct.

 3    Q    Because you all were finding that you had some

 4    drug-seekers, as the term has been, who were taking

 5    advantage of the rotation of the doctors; correct?

 6    A    That's correct.

 7    Q    So these patients were coming in and let's say

 8    seeing you one day, maybe try to double check to see if

 9    you're going to be there two days later, come in and,

10    say, see Dr. Rody, and then come in a couple days later

11    and see somebody else.  Correct?

12    A    They would actually call and ask who was on to try

13    to avoid seeing somebody that they knew would not give

14    'em drugs or that they knew would recognize 'em from a

15    recent visit.

16    Q    Okay.

17    A    And we weren't supposed to give that information out

18    but --

19    Q    Right.  All right.  You mentioned that you noticed a

20    pattern at the clinic; correct?

21    A    Definitely.

22    Q    Okay.  You noticed a pattern that you believe Dr.

23    Schneider was overprescribing medications to these

24    people; correct?

25    A    Yes.
```

3612

1    Q    And we've already established you don't know the
2    full history of these people as we sit here today;
3    correct?
4    A    Well, I mean, I would take a full history when I
5    would see 'em in the ER.
6    Q    You didn't get their full medical charts before you
7    made a determination that they were receiving too many
8    meds; correct?
9    A    You mean from the office?
10   Q    Yes.
11   A    You're correct, we didn't have access to his office
12   charts in the emergency department.
13   Q    All right.  So -- and as I understand it from your
14   other comrades, you did not call the police to go out
15   and see Dr. Schneider; did you?
16   A    No.
17   Q    You didn't file a written complaint with the police
18   department; did you?
19   A    No.  As I mentioned, I called him myself and
20   confronted him directly with this.
21   Q    All right.  You never sent any letters to Dr.
22   Schneider memorializing these concerns that you're
23   testifying about; correct?
24   A    I don't remember if I followed up our conversation
25   with a letter or not.  I don't think I did.

3613

1    Q    Okay.  And it's your belief that you thought when

2    this stuff was happening that Dr. Schneider was harming

3    these patients; correct?

4    A    I did.  I thought he was prescribing them too much

5    medication.

6    Q    And you have a duty as a physician to protect

7    patients even if you see them on short occasions;

8    correct?

9    A    And I exercised that duty by addressing these

10   imbalances and medications when I saw the patients and

11   asked my doctors to do the same.

12   Q    You understand that there's a Kansas Board of

13   Healing Arts in Kansas; correct?

14   A    I do.

15   Q    That oversees physicians?

16   A    I do.

17   Q    And you know there's a complaint procedure; correct?

18   A    I do.

19   Q    And you know a complaint has to be in writing and

20   can be filed by anybody; correct?

21   A    Well, again, I was the Chief Medical Officer at the

22   hospital.  I was the one dealing with all the complaints

23   and issues and problems at Via Christi.  I was not -- I

24   don't think I ever sent a complaint to the Kansas Board

25   of Healing Arts because I was accustomed to taking care

3614

 1    of those things myself.

 2    Q    My question was: you know that the complaint has to

 3    be in writing; correct?

 4    A    I don't know that, to be honest.  I wouldn't

 5    disagree with you; but I don't know what their procedure

 6    is at the Kansas Board of Healing Arts.

 7    Q    You know that there is a complaint procedure;

 8    correct?  Strike that.  I asked that.

 9         You know there's a complaint form; correct?

10    A    A complaint form?

11    Q    Yes.

12    A    I'm not really sure what the procedure is through

13    the Kansas -- I never -- I don't think I ever filed

14    anything on a doctor through the Kansas State Board of

15    Healing Arts.

16    Q    Okay.  So even though you see this pattern of this

17    physician who is supposedly harming all these people,

18    you never once filed a written complaint with the Kansas

19    Board of Healing Arts, did you?

20    A    That's correct.

21              MR. WILLIAMSON:  I don't have anything

22    further.

23              THE COURT:  Mr. Byers?

24              MR. BYERS:  No questions, Your Honor.

25              THE COURT:  Redirect?

3615

```
 1              MS. TREADWAY:  No, Judge.
 2              THE COURT:  Thank you, Dr. Rody.  Where do you
 3    live in South Carolina?
 4    A   I live in the Greenville/Spartonburg area.  There's
 5    kind of three towns together:  Greenville, Greer and
 6    Spartonburg.  And you can kind of see the mountains from
 7    our towns.
 8              THE COURT:  No mountains in Kansas.
 9    A   I've been in Oklahoma City and Kansas the whole rest
10    of my life so it was kind of fun to see some mountains.
11              THE COURT:  A little more humidity down there
12    though.
13    A   It is humid in the summer.
14              THE COURT:  Thank you very much.  You're
15    excused.
16    A   Thank you, Judge.
17              THE COURT:  Who's your next witness?
18              MR. WAMBLE:  Your Honor, the Government would
19    call Jennifer Harry.
20              THE COURT:  Who?
21              MR. WAMBLE:  Jennifer Harry.
22              THE COURT:  And how long is Ms. Harry going to
23    take?
24              MR. WAMBLE:  Judge, I suspect less than 25
25    minutes.
```

3616

```
 1            THE COURT:  Would you like to take a recess

 2    now or do you want to move on?

 3                    (Off-the-record.)

 4            THE COURT:  Move on.  Call Jennifer Harry

 5    please.

 6            MR. WAMBLE:  Thank you Your Honor.

 7                     JENNIFER HARRY

 8    Having been first duly sworn to tell the truth, the

 9    whole truth and nothing but the truth, testified as

10    follows on:

11                  DIRECT EXAMINATION

12    BY MR. WAMBLE:

13    Q   Could you please state your name.

14    A   Jennifer Harry.

15    Q   And, Ms. Harry, are you currently employed.

16    A   Yes.

17    Q   Where are you employed?

18    A   Wichita State.

19    Q   Could you scoot forward just a little bit and speak

20    up for us.

21    A   Wichita State University.

22    Q   And what are your duties at Wichita State?

23    A   I'm a conference coordinator.

24    Q   Are you involved in the graduation activities at

25    Wichita State as well?
```

3617

1    A    Yes, sir.

2    Q    Are you glad it's over?

3    A    Yes.

4    Q    Were you employed at the Schneider Medical Clinic

5    around July of 2004 through the end of 2006?

6    A    Yes.

7    Q    And, again, we have a demonstrative exhibit.

8    Mr. Moore is going to peel that back for us.  Thank you,

9    sir.

10        Do you remember who interviewed you for that

11   position at the Schneider Medical Clinic?

12   A    Uh-huh, Linda and Ulysses.

13   Q    And who hired you after that interview?

14   A    It was mainly Linda.  I walked out of the room and

15   they kind of talked and then I went back in and they

16   told me when to start so -- they both, Linda and Ulysses

17   kind of discussed it.

18   Q    So you interviewed and were hired on the same day?

19   A    Uh-huh.

20   Q    And you said Ulysses was in the interview with you?

21   A    Yes.

22   Q    And did Linda Schneider introduce you to Ulysses?

23   A    Yeah.  He was -- yeah.  She introduced me -- or,

24   sorry -- introduced him to me as the dress code

25   coordinator or -- enforcer I guess would be the word.

3618

1    Q    What was your initial position at the Schneider

2    Medical Clinic?

3    A    I was receptionist.

4    Q    Did you receive any phone calls as a receptionist

5    from anyone discussing Schneider patients abusing their

6    prescriptions?

7    A    Yes.

8    Q    Who would typically call the office?

9    A    It could be a family member.  I mean, what do you

10   mean?  Who would call and make the complaint?

11   Q    Yes.

12   A    Family member, sometimes they said it was anonymous.

13   I mean --

14   Q    Did you do anything to document these particular

15   phone calls?

16   A    Uh-huh.  We usually wrote it down on a piece of

17   paper like a progress note and put it in their chart and

18   gave the chart to Linda.

19   Q    Do you remember -- not today -- but when you would

20   take these phone calls, would they give you a name of a

21   patient that they suspected were abusing the

22   prescription drugs?

23   A    Yes.

24   Q    While you were working as a receptionist, did you

25   see those same individuals come to the clinic and leave

3619

```
 1    with controlled substances?

 2    A    Yes.

 3    Q    After you were a receptionist, were you promoted to

 4    another position?

 5    A    Yes.  I worked in the billing department.

 6    Q    And who gave that you promotion?

 7    A    Linda.

 8    Q    Schneider?

 9    A    Yes.  Linda Schneider.

10    Q    And what were your duties in the billing department?

11    A    I was the collections coordinator.

12    Q    And did you have direct contact with patients while

13    you were in billing?

14    A    Yes.

15    Q    With the contact that you had with the patients, did

16    you understand why the majority of the patients were

17    actually coming to the clinic?

18    A    Yeah, the majority of 'em came to get pain

19    medication.

20    Q    What percentage of patients that came to the clinic

21    would you say were there for pain medication?

22    A    90% of 'em.

23    Q    In your personal life, do you have any experience

24    with people that are addicted to drugs?

25    A    Yes, I do.
```

3620

1    Q    Could you tell us about that?

2    A    I lived with -- well, the father of my children, we

3    were together for 12 years and he was majorly hooked on

4    drugs.  He still is hooked on pain medication, actually,

5    is what he's hooked on.  My mom is also hooked on pain

6    medication.

7    Q    While you were a receptionist and while you were in

8    billing, did you come to know any patients that came to

9    the clinic that were out-of-state?

10   A    Yes.

11   Q    Do you remember what states they would come from?

12   A    Texas, Oklahoma.  I think there was some that came

13   from Kansas City.

14   Q    I'll back up just a minute.  Were you able to view a

15   lot of the patients that were in the lobby in the

16   waiting room?

17   A    Yes.

18   Q    And did these patients exhibit the same types of

19   behaviors that you saw from those in your family members

20   that were addicted to  drugs?

21   A    Yes.

22   Q    And what were some of those types of behaviors?

23   A    Like slurring of their words.  Couldn't stay awake.

24   Kind of noddin' off all the time.

25   Q    During the course of your employment at the

3621

 1    Schneider, clinic did you become knowledgeable about how

 2    the patients were to be scheduled to be seen by the

 3    doctors?

 4    A    Yes.

 5    Q    And was there a specific time period that they were

 6    supposed to be scheduled in increment blocks?

 7    A    The appointments were scheduled in 15 minute

 8    increment blocks and then we had walk-in's like in the

 9    morning and then walk-in's in the afternoon.

10    Q    Okay.  And how would you describe the patient volume

11    at the clinic?

12    A    Very excessive.  We seen a lot of patients every

13    day.

14    Q    Who coordinated -- who developed the policy to see

15    patients at this volume?

16    A    Linda.

17    Q    And what was her goal behind this?

18    A    The more patients, the better I guess.

19              MR. GOROKHOV:  Objection, Your Honor.

20              THE COURT:  I want to see counsel up here

21    please.

22                        (Thereupon, the following

23                         proceedings were had at the

24                         bench by Court and Counsel

25                         outside the hearing of the

3622

1              jury.)

2              THE COURT:  This is about the third or fourth

3    witness that I've heard giving the same testimony about

4    what they saw at the Schneider Clinic, people noddin'

5    off.  I think the jury has gotten the point, number one.

6    Number two, if the Defendants put on evidence, I'm not

7    going to tolerate a parade of people coming in here

8    saying that Dr. Schneider, you know, was the best doctor

9    in the world, et cetera, et cetera.  But if you keep

10   puttin' on -- you and Mrs. Treadway keep puttin' on

11   repetitious witnesses, you're not going to have much

12   standing if they start putting on repetitious witnesses.

13   And I don't understand why it's necessary to call these

14   people in and go through the same testimony.  Is she

15   going to say anything different than any of the other

16   people that worked there?

17              MR. WAMBLE:  She will, Your Honor.

18              THE COURT:  Well, why don't we get to it.  Why

19   don't we just put these people on the witness stand,

20   say, you worked at the Schneider Clinic, the jury then

21   gets the idea, and get right to the point that you're

22   trying to make.  You know, my observation over the

23   years, to be honest with you, has been that once cases

24   like this start, the lawyers completely lose the jury

25   because they're so anxious to put the testimony on or

1       get up and show how smart they are on cross-examination,

2       that they just go on and on and on and the jury after a

3       while knows -- I think Mr. Williamson said yesterday

4       they already know what his cross-examination is going to

5       be.  They could probably do it themselves.  So I'm just

6       telling you.  You're trying this case to a jury, not to

7       me, and if you -- if they see the same stuff over and

8       over, it isn't going to make them believe whatever you

9       think is going on out there or whatever the Defendants

10      don't think is going on out there any more than just

11      two.  You could have 50 in here and they would know that

12      the Government's only calling the people that would give

13      their side of the story and the Defendants, if they call

14      witnesses, are going to call the people that give their

15      side of the story.  If it's the same story all the time,

16      it isn't making sense.  So, let's get -- I'm not

17      speaking to the defense counsel this time because they

18      don't have to put on a case.  So let's get this so when

19      they come in here, let's get right to the point of why

20      they're there, not just repeating the schedules and all

21      the rest of the stuff that goes on out there.

22              MR. WILLIAMSON:  Most of that stuff we're not

23      even contesting, Judge.  I mean, it's --

24              THE COURT:  Yeah, I mean, by this time it

25      should be obvious that certain things are going on out

3624

1    there.  That they're scheduling people -- their defense

2    is -- one of their defenses is that it was a very busy

3    place, that people were in there night and day, seven

4    days a week.  They're not denying it.  That's one of the

5    things they're going to try and capitalize on.  So

6    there's really no point in going over a lot of this

7    stuff again and again.

8                    MR. WAMBLE:  Okay.  Certainly, Your Honor.

9                         (Thereupon, the following

10                        proceedings continued in the

11                        hearing of the jury.)

12   BY MR. WAMBLE:

13   Q   Ms. Harry, were there instances where a physician's

14   assistant would refuse to write prescription?

15   A   Yes.

16   Q   What would you typically see happen in that

17   occasion?  Where would they go?

18   A   They would go to Linda.

19   Q   Linda Schneider?

20   A   Yes.

21   Q   And what would she do?

22   A   She would, I mean, different circumstances, but I've

23   seen where she's had the doctor write the prescription.

24   Q   So physician's assistants would refuse and Linda

25   Schneider would order it?

3625

```
 1    A    Uh-huh.

 2    Q    That's a --

 3    A    Sorry.  Yes.

 4    Q    Okay.  Were there instances where the Defendant

 5    Stephen Schneider would terminate a patient?

 6    A    Yes.

 7    Q    And would Linda Schneider reinstate that patient?

 8    A    Yes.

 9    Q    Did she have a particular motivation as to why she

10    would reinstate a patient?

11              MR. GOROKHOV:  Objection, Your Honor.  Calls

12    for speculation.

13              THE COURT:  Yes.

14              MR. WAMBLE:  I'm sorry, Your Honor.

15              THE COURT:  The objection is sustained as to

16    that question.

17    BY MR. WAMBLE:

18    Q    Did she tell you why she would reinstate a patient?

19    A    If they were cash-paying patient or they had Blue

20    Cross & Blue Shield.

21    Q    Then she would?

22    A    Yes.

23    Q    Do you remember a patient by the name of Jamie S?

24    A    Yes, sir.

25    Q    And how often would you see her at the clinic?
```

3626

```
 1            MR. WILLIAMSON:  Your Honor, I'm going to
 2   object to being cumulative, Rule 403.
 3            THE COURT:  Well, I think we've heard about
 4   Ms. S before.  Is there something special about her that
 5   you want to --
 6            MR. WAMBLE:  Yes, Your Honor.
 7            THE COURT:  All right.  Well, we know that
 8   Jamie or whatever her name is had been to the clinic so
 9   get to the point please.
10            MR. WAMBLE:  Okay.  Will do, Your Honor.
11   BY MR. WAMBLE:
12   Q   Was she terminated?
13   A   No.
14   Q   Why was she not terminated?
15   A   She was a cash paying patient.
16   Q   Was she -- did anyone attempt to try to terminate
17   Jamie S?
18   A   Atterbury, Curtis Atterbury did.
19   Q   And did Linda Schneider allow it?
20   A   No.
21   Q   Because she was a cash paying patient?
22   A   Yeah.
23   Q   Did you see the Defendant Linda Schneider handle any
24   charts and fee tickets?
25   A   Yes, sir.
```

3627

1    Q    Did she change anything on the charts and fee

2    tickets?

3    A    Yes.  The -- if they would mark, like, I don't

4    remember the numbers, but it was like a $45 visit I

5    think and then a $75 visit and then they always -- she

6    always made sure that it was marked the $75 office

7    visit.

8    Q    Even though it should have been a $45 visit?

9    A    Even though that's what the doctor had marked.

10   Q    Did anybody handle the charts before they went to

11   billing?

12   A    Linda Schneider did.

13   Q    Did she allow anybody to touch those fee tickets or

14   charts before they went to billing?

15   A    No.  They went to her office.

16   Q    How frequently would you see the Defendant Linda

17   Schneider change fee tickets?

18   A    I mean, I didn't personally stand there and watch

19   her every; day but I seen it on several different

20   occasions.

21   Q    While you worked at the clinic, did you see patients

22   coming in early to get refills?

23   A    Yes.

24   Q    Were they often denied those refills?

25   A    Sometimes the nurse would tell them you're too early

3628

1    for your -- you know, after they'd take their vitals and

2    stuff, the nurse would tell 'em you're too early for

3    your prescription, you're not going to be seen and they

4    would leave.  Sometimes the patients would, you know

5    persist to see the doctor, but most of the time if they

6    wanted their prescriptions they got 'em.

7    Q    In the event that they were denied a refill, would

8    they bill just for the -- were they billed just for the

9    denial?

10   A    Yes.

11   Q    While you worked at the clinic were there any

12   instances of missing progress notes?

13   A    Yes.

14   Q    And did Linda Schneider indicate what should happen

15   if there was a chart that contained or did not have the

16   progress notes?

17   A    They will just have the doctor make a new progress

18   note.  We would have to get the -- pull the chart and

19   take it to the doctor and have 'em remake a progress

20   note.

21   Q    Would they have to remake it from memory or was it

22   just something they would just pull the information out

23   of thin air?

24   A    I guess they would just have to make it from memory.

25          MR. GOROKHOV:  Objection, Your Honor.

1    Speculation, Your Honor.

2            THE COURT:   Yeah.   When she says -- when she

3    guesses, that's speculation.   The objection is

4    sustained.

5    BY MR. WAMBLE:

6    Q    Did Linda Schneider tell the physician or physicians

7    assistants how many patients they were supposed to see

8    in a day?

9    A    They were supposed to see like 50 patients a day.

10   Q    Who provided the instructions to bill physician's

11   assistants as if they were Stephen Schneider?

12   A    Linda.

13   Q    Do you recall when Lawrence Simons first began to

14   work at the Defendants' clinic?

15   A    Yes, sir.

16   Q    Do you remember if the patients -- or, I'm sorry --

17   do you remember if the Defendant billed for Dr. Simons

18   in his name or in the name of another provider?

19   A    We billed under Dr. Schneider.

20   Q    And who provided the instructions to bill Dr. Simons

21   under the name of Dr. Schneider?

22   A    Linda.

23   Q    Do you remember why that was to occur?

24   A    We didn't have a provider number for Dr. Simons and

25   it was gonna be timely filing, and so we would have had

3630

```
 1    to write it off so we billed them under Dr. Schneider.
 2    Q    During the time that you worked at the clinic, were
 3    you familiar with Dr. Schneider ever using a dictation
 4    device to record progress notes?
 5    A    No, sir.
 6    Q    Do you remember anybody at the clinic using a
 7    dictation device?
 8    A    No.
 9    Q    Why did you eventually leave the Schneider Medical
10    Clinic?
11    A    It, it was after they had raided the office the
12    first time and it was just, I didn't want to be a part
13    of it any more.
14    Q    When you say it, what do you mean by it?
15    A    Uhm, just, it was, it was a nightmare kind of
16    working there after, you know, after everything had went
17    down.  I guess not went down, after the place was
18    raided.  It was -- I personally felt like it was just a
19    time bomb waitin' to happen, you know.  And I just, I
20    had to get away from it.  I couldn't do it any more.
21    Q    Why did you stay as long as you did?
22    A    I mean, I enjoyed, you know, working there when I
23    worked there.  I mean, it was very stressful.  I had
24    migraines really bad when I worked there; but I liked
25    Linda and I liked Dr. Schneider as, you know, still to
```

3631

1    this day I don't have a problem with Linda nor Dr.

2    Schneider.

3    Q   Did you ever have a specific conversation with Linda

4    Schneider about the overdose deaths?

5    A   I'm sorry, I have to think.  Yeah, I do recall a

6    conversation that we've had, that we had.

7    Q   And what, if anything, did she tell you about the

8    patient's role and responsibility in their own overdose

9    death?

10   A   She had just said, you know, Dr. Schneider didn't

11   put a gun to their head and tell them to take the

12   prescription medication, or OD on the prescription

13   medication so it wasn't his fault.

14        MR. WAMBLE:  Just a moment Your Honor.

15                  (Off-the-record discussion.)

16        MR. WAMBLE:  Nothing further.

17        THE COURT:  I think we will now take our

18   morning recess, Ladies and Gentlemen.  Approximately 15

19   minutes.  Remember and heed the admonition.

20                  (Recess.)

21        THE COURT:  Who's starting?  Mr. Gorokhov or

22   Mr. Williamson?

23        MR. GOROKHOV:  No, Your Honor.  Actually,

24   prior to starting again, I just spoke to Ms. Schwemmer,

25   we wanted a side-bar.  We had an issue to raise before

    1     we proceeded.

    2              THE COURT:  Well, come up

    3                        (Thereupon, the following

    4                        proceedings were had at the

    5                        bench by Court and Counsel

    6                        outside the hearing of the

    7                        jury.)

    8              MR. GOROKHOV:  We had a disclosure from, from

    9     the Government about the interview with this witness --

   10              THE COURT:  Wait a minute.  Cindy, can you

   11     hear.  Let's wait until we get all the equipment going

   12     here.

   13              MR. GOROKHOV:  We had a disclosure from the

   14     Government regarding this witness's statement.  We never

   15     received a witness statement.  That's clearly Jencks

   16     material.  It's clearly Brady material.  We did not

   17     receive this interview.  We've tried not to raise these

   18     issues with the Court because you said you didn't want

   19     to --

   20              THE COURT:  What is this?

   21              MR. GOROKHOV:  This is a Brady disclosure from

   22     the Government, Your Honor.  And also, for the record,

   23     Your Honor, the story that she's told on the stand is

   24     also completely contradictory to the story that she told

   25     our investigator when she was interviewed.  So this is

3633

1   just --
2           THE COURT:  Well, but that's different --
3           MR. GOROKHOV:  I'm just telling Your Honor the
4   basis that it's not merely this --
5           MR. WILLIAMSON:  We haven't received that
6   statement.
7           THE COURT:  She was not -- well, she didn't
8   testify -- this witness never testified about changing
9   fee tickets.
10          MR. GOROKHOV:  She said Linda Schneider did.
11          MR. WILLIAMSON:  Did she say that?
12          MR. GOROKHOV:  Yes, she did.
13          THE COURT:  Today -- she said, she said fee
14  tickets.  She didn't say anything -- I can look at my
15  notes -- about Linda creating or changing progress
16  notes.  She didn't testify about that.  So there's no
17  difference there.  She didn't testify about fee tickets.
18  Let's see, and she didn't testify that Linda or Shirley
19  Mills, whoever that is, asked her to make any changes.
20  So, I don't think that anything that's on here is
21  contrary to what she's testified about.
22          MR. GOROKHOV:  I think it's clearly within
23  Jencks, Your Honor.  We should have received this
24  interview.
25          THE COURT:  I thought you did.  Where'd you

3634

```
 1    get it?
 2            MR. GOROKHOV:  All we received is this snippet
 3    of the interview.  We did not receive the Jencks
 4    material, Your Honor.
 5            THE COURT:  Well -- and there might not be a
 6    Jencks -- any Jencks material.  Did she make a statement
 7    to anybody?
 8            MR. GOROKHOV:  It's clear that the Government
 9    obtained some kind of a statement from her.
10            THE COURT:  Well, not necessarily.  They could
11    have just simply interviewed her.  Jencks, my
12    understanding of the Jencks Act is that there has to be
13    some kind of a statement.  That if it's just an
14    interview -- but do you have a statement from her?
15            MR. WAMBLE:  Judge, not to my knowledge.
16            MR. WILLIAMSON:  I think you should confer
17    with Ms. Treadway before you make that representation.
18            MR. GOROKHOV:  We would like the
19    representation on the record, please.
20            THE COURT:  Well, let's do this, ask her to
21    come up.
22            MR. WAMBLE:  Okay.
23                    (Ms. Treadway approaches.)
24            THE COURT:  Do you have any kind of a Jencks
25    Act statement from this lady?
```

3635

1           MS. TREADWAY:  A Jencks Act statement?  No.

2           THE COURT:  What is this then?

3           MS. TREADWAY:  That's from a report of

4    interview.

5           THE COURT:  Right.  But do you have any kind

6    of a Jencks Act statement from her?

7           MS. TREADWAY:  No, sir.

8           THE COURT:  She was just interviewed?

9           MR. GOROKHOV:  So it was a report of an

10   interview.

11          MS. TREADWAY:  That's not a Jencks Act

12   statement.  That's the statement of the interviewing

13   agent, not the witness.

14          MR. GOROKHOV:  Then why have you been

15   producing FBI interviews as Jencks material?

16          MS. TREADWAY:  Well, I told you why in my

17   letter.  What I did, Judge, is if a person had testimony

18   under oath, instead of me judging whether that testimony

19   under oath was inconsistent with an interview, I gave

20   them the interview reports.  I do that typically.  She

21   has no testimony under oath; therefore, I did not give

22   the FBI report because it's not a Jencks Act statement,

23   nor is it inconsistent with any statement under oath.

24   Therefore it's neither Brady nor Jencks.

25          MR. GOROKHOV:  Just for the record, Your

3636

```
 1      Honor, we feel we are entitled to that.
 2              THE COURT:  Well --
 3              MS. TREADWAY:  That's not the law.
 4              THE COURT:  Well, I don't know.  I think she
 5      knows her obligations and just a simple interview
 6      doesn't come under Jencks.  It could come under Brady.
 7      But she knows her obligation about Brady.
 8              MS. TREADWAY:  And that's Brady --
 9              MR. GOROKHOV:  I think we're entitled to the
10      context, if that's the case --
11              THE COURT:  Well, I don't think so; but if you
12      can come up with a case that says you are, I'll read it
13      but -- that's my understanding about Jencks and Brady at
14      this point.
15              MS. TREADWAY:  And this issue, Judge, I know
16      it's been a long time since a lot of this has been
17      briefed and you've ruled on it, but this was previously
18      briefed and that is how you previously ruled.
19              THE COURT:  Well, I've always done it this
20      way.
21              MS. TREADWAY:  Right.
22              THE COURT:  But if you can find me a case that
23      says that she has to turn over anything that she's got
24      with respect to a witness statement, I'll certainly read
25      it and see what I think.
```

3637

1        MR. GOROKHOV:  Thank you, Your Honor.

2        MR. WAMBLE:  Thank you.

3                (Thereupon, the following

4                proceedings continued in the

5                hearing of the jury.)

6        THE COURT:  Okay.  Who's going to start?

7        MR. WILLIAMSON:  I'm starting, Your Honor.

8   Thank you, Your Honor.

9                    **CROSS EXAMINATION**

10  BY: MR. WILLIAMSON:

11  Q   Good morning.

12  A   Good morning.

13  Q   Couple things I just want to talk with you about.  I

14  think you testified on direct you started working -- you

15  quit the clinic in late of 2006?

16  A   I think it was late 2006.

17  Q   Was it June 2006?

18  A   I don't remember exactly when it was.

19  Q   The Government has a chart that says you were there

20  until June of 2006, would that --

21  A   It very well could have been.  I just don't

22  remember.

23        THE COURT:  Ma'am, can you move up a little

24  bit so that -- a`little closer to the microphone please.

25  A   Sorry.

3638

```
 1    BY MR. WILLIAMSON:

 2    Q    Now --

 3              MR. WILLIAMSON:  Your Honor, may I approach

 4    the exhibits over here.

 5              THE COURT:  Yes, sir.

 6    BY MR. WILLIAMSON:

 7    Q    You testified previously that you remember Linda

 8    reinstating Jamie S.  Do you remember that?

 9    A    Yes.

10    Q    And you said it was because Jamie S was a cash

11    paying patient?

12    A    Yes.

13    Q    Did Linda specifically tell you that?

14    A    Yeah, that's what she said.

15    Q    Was Dr. Schneider around any time when these

16    supposed conversations took place?

17    A    No.  It was between Linda and Atterbury -- Curt

18    Atterbury.

19    Q    And you never had any conversations with Dr.

20    Schneider about front office issues?

21    A    Did I ever have any conversations?

22    Q    Yes.

23    A    Not really.

24    Q    Okay.  You can't recall anything specifically;

25    correct?
```

3639

1    A    No.

2    Q    I'm going to show you Government's Exhibit 10, but

3    you're not aware that Jamie S was actually a Medicaid

4    patient?

5    A    Jamie S, a lot of times if she came in, she paid

6    cash.

7    Q    Okay.  Well, let me just show you Exhibit 10.  You

8    see here Jamie S at 25 would come in with migraines and

9    Medicaid paid over $58,000 for her medications.  Do you

10   see that?

11   A    Yes.

12   Q    Okay.  So according to the Government's exhibit,

13   Jamie S had a lot of visits, correlated it with

14   migraines and Medicaid paid a lot of money; correct?

15   A    Yeah.

16   Q    You don't have any receipts from Jamie S paying

17   cash, do you?

18   A    No, why would I have receipts?

19   Q    Okay.  Now, you were in the billing department as a

20   collections person?

21   A    Yes.

22   Q    Now, your job was to collect payments from insurance

23   companies or patients when they hadn't paid; correct?

24   A    Yes.  When a patient would come in if they had a

25   balance.

3640

1    Q   And what did you do -- you were at the front desk at
2    some point?
3    A   Yes.  When I first started, I worked as a
4    receptionist.
5    Q   And how long were you a receptionist?
6    A   I think it was about six months.  Or so.  And then
7    they asked me if I wanted to work in the billing
8    department.
9    Q   So you were only up front for six months and you
10   started -- when did you start?
11   A   It was January of 2004.
12   Q   July of 2004?
13   A   July of 2004.
14   Q   So, you don't remember the basics about when you
15   started or quit working; correct?
16   A   No, I don't remember.
17   Q   So, for the last year and a half while you were with
18   the clinic you had no interaction, no responsibility at
19   the front desk; correct?
20   A   Well, if somebody didn't show up then I would fill
21   in for them at the front desk.
22   Q   All right.
23   A   But I was always at the front desk.  I mean --
24   Q   Weren't you supposed to be down in billing doing
25   your collections?

3641

1    A    My office wasn't down in billing.  My -- what my job

2    was was when the patients came in and they owed a

3    balance, and they wanted to know why their insurance

4    didn't pay or, you know, what-not, I had to go up front

5    and explain to them.  My office was back by one of the

6    nurse's stations up front.

7    Q    Okay.  So you would be up there dealing with

8    patients who had insurance; correct?

9    A    Yes.

10   Q    But you didn't remember that Jamie S had Medicaid;

11   correct?

12   A    I didn't remember that Jamie had Medicaid.

13   Q    Now, you also testified that 90% of the people that

14   came into the clinic were there for -- were

15   drug-seekers; is that what you said?

16   A    Yes.

17   Q    Okay.  Are you aware that the Government has an

18   exhibit that states that only 50% of the total patient

19   population at the clinic ever received controlled

20   substances at some point in time?

21   A    No.

22   Q    Can you reconcile why you believe it's 90% but the

23   facts in the case actually show that it's 50%?

24              MR. WAMBLE:  Objection, Your Honor

25   argumentative.

3642

 1          THE COURT:  He can rephrase that question.

 2   BY MR. WILLIAMSON:

 3   Q    Do you have any evidence to dispute the Government's

 4   accuracy stating that only 50% of the patients that ever

 5   came into the clinic ever received a controlled

 6   stubstance?

 7   A    No, I don't.

 8   Q    The clinic saw a lot of family practice patients;

 9   correct?

10   A    Yes.  They seen my children.

11   Q    They saw you as well; correct?

12   A    Yes.

13   Q    And Curt Atterbury was your primary caregiver;

14   correct?

15   A    Yes.  I seen him mostly.

16   Q    And you had migraines; correct?

17   A    Yes.

18   Q    And he tried to help with those migraines; correct?

19   A    Yes.

20   Q    And you did not follow through with your part of the

21   agreement with Curt Atterbury; did you?

22   A    What are you talking about?

23   Q    Weren't you requested to take a urinary drug screen

24   by Curt Atterbury?

25   A    I did take a urine drug screen.

3643

```
 1   Q   Did those results ever come back?
 2   A   I'm assuming they did.
 3   Q   Weren't you fired from being a pain patient from
 4   Curt Atterbury?
 5   A   Yes.
 6   Q   And you were fired in April of 2006; correct?
 7   A   Somewhere around there, I don't remember dates.
 8   Q   And you left within 60 days after that; correct?
 9   A   Yes.
10   Q   Why were you fired from being a pain patient?
11   A   That's when I was going through a separation with my
12   ex and I had told him, Curt Atterbury, that my
13   medicine -- that -- well, I'm not going to say names --
14   that, you know, he's a drug addict, he had taken my
15   medication.  I'd had conversations with the doctors
16   about him prior, you know, to all this because he went
17   there and was seen as a patient there.
18   Q   Let me clarify something.  Just because your husband
19   was an addict, did that mean that you didn't have your
20   migraines?
21   A   No.
22   Q   You really had migraines; correct?
23   A   Yes, I did.
24   Q   You didn't go to Curt trying to score any pain meds;
25   correct?
```

3644

1    A    No.  I never said I did.

2    Q    And when Curt realized that there was a problem that

3    your meds may be gettin' taken, he stopped prescribing

4    you controlled substances; correct?

5    A    Yes.

6    Q    They didn't fire you from the clinic, did they?

7    A    No.

8    Q    But soon after you decided to leave?

9    A    Yes.

10            MR. WILLIAMSON:  Nothing further.

11            THE COURT:  Yes, sir.

12            MR. GOROKHOV:  Thank you, Your Honor.

13                      **CROSS EXAMINATION**

14   BY MR. GOROKHOV:

15   Q    Good morning.

16   A    Good morning.

17   Q    Do you recall meeting with Government agents in this

18   case?

19   A    Yes.

20   Q    How many times did you meet with Government agents?

21   A    I don't know, three or four.

22   Q    Approximately how many times?

23   A    Three, four times maybe.

24   Q    Do you remember who you met with?

25   A    Was Greer a Government agent?  I'm not sure who even

3645

1    was Government agents.

2    Q    How many of them were there?

3    A    Three people maybe.  Usually when I went in and

4    talked there was two or three people.

5    Q    Now, you testified that Linda Schneider forged fee

6    tickets or changed fee tickets; correct?

7    A    Yes.

8    Q    And you testified that she changed charts?

9    A    That I changed charts?

10   Q    No.  You testified that Linda Schneider changed

11   charts.

12   A    Yes.

13   Q    Correct?

14   A    Yes.

15   Q    That was your testimony?

16   A    Yes.

17   Q    That's not true, is it?

18   A    Yeah, it's true.

19   Q    You didn't tell that to government agents when you

20   met with them, did you?

21   A    I don't remember.

22   Q    Okay.  I'm going to give you what's been provided to

23   us by the Government as part of your statement to the

24   Government agents and I'm going to ask you if that

25   refreshes your recollection as to what you told them.

3646

1    A   I don't -- I mean I kind of remember, but I don't

2    really remember.

3    Q   If the Government's report says you told them that

4    Linda did not change fee tickets, that would be not

5    correct?

6    A   I don't remember telling them that.

7    Q   Okay.  If the Government's report says that Linda

8    did not change charts, that would not be correct?

9    A   Linda changed charts.

10   Q   Okay.  So it wouldn't be correct if that's what the

11   Government agents wrote in their report that you told

12   them?

13   A   Yeah, I don't remember telling them that, sorry.

14   Q   Do you remember meeting with a gentleman by the name

15   of -- or speaking with a gentleman by the name of Shawn

16   Larkins?

17   A   No, I'm not good with names.  I don't remember.

18   Q   Do you remember a person contacting you on behalf of

19   Doctor and Mrs. Schneider to talk to you about the case?

20   A   No.

21   Q   I'm going to show you a document and you can review

22   that and see if that refreshes your recollection as to

23   whether you spoke with Shawn Larkins regarding the

24   Schneider case.  You can read the whole thing, but just

25   looking at it --

3647

1    A    I mean, I remember I've talked to several different

2    people.  I just don't remember who -- who's who.

3    Q    Okay.  So you remember talking to somebody about our

4    case; correct?

5    A    Yes, I've talked to several people.

6    Q    And you told that person Linda didn't forge charts;

7    correct?

8    A    I don't remember saying that Linda didn't -- I mean,

9    it's in there, but I know I've seen Linda forge charts

10   so --

11   Q    Okay.  So this document didn't refresh your

12   recollection?

13   A    No, I don't remember telling them that.

14   Q    Okay.  Now, did the Government ever take you into

15   the clinic to have you show them the forged charts?

16   A    No.

17   Q    Did the Government ask you to list out the names of

18   the forged charts?

19   A    No.

20   Q    Okay.  When was the first time you met with the

21   Government?

22   A    I don't -- I mean, I don't remember.

23   Q    Was it recently after you quit?

24   A    It was -- I mean, it wasn't recently after I quit,

25   no.  I think it was when all the court stuff started

3648

1    going on.

2    Q   Okay.  And at that time they didn't ask you to

3    provide the names of the individuals who had forged

4    charts?

5    A   No.

6    Q   Okay.  You understand our clients are on trial in a

7    criminal case?

8           MR. WAMBLE:  Objection, Your Honor

9    argumentative.

10          MR. GOROKHOV:  You un--

11   A   Yes, I do.

12          THE COURT:  She's already answered.  Go ahead.

13   BY MR. GOROKHOV:

14   Q   You understand this is a very serious matter?

15   A   Yes, I do.

16   Q   You can't provide any specifics so that we can take

17   a look at the handwriting on those charts to determine

18   whether or not they're forged?

19          MR. WAMBLE:  Objection, Your Honor.  Asked and

20   answered.  She --

21          THE COURT:  Yes.  Sustained.  It's

22   repetitious.

23          MR. GOROKHOV:  Thank you, Your Honor.  I'll

24   move on.

25

3649

```
 1    BY MR. GOROKHOV:
 2    Q    You say that when a physician refused to -- when a
 3    physician's assistant did not want to write
 4    prescriptions, Linda spoke with the doctor.  Is that
 5    correct?
 6    A    Yeah, Linda spoke with the PA.
 7    Q    Right.  And then you said -- your testimony I
 8    believe was that she then had a doctor write the
 9    prescription?
10    A    Yes.
11    Q    Is that correct.  You're aware that doctors
12    supervise PA's?
13    A    Yes, I am.
14    Q    You're aware that the doctor is more experienced and
15    therefore it's their job to review the decisions of the
16    PA?
17    A    Yes.
18    Q    Okay.  You also stated that Linda reinstated
19    patients who were fired by the doctor?
20    A    Yes.
21    Q    Okay.  Do you have any testimony to offer this jury
22    as to whether she discussed the case with the doctor?
23    A    What do you mean?  Was I standing in the room while
24    they are talking?
25    Q    Do you have any testimony to offer the jury as to
```

3650

1    whether Linda discussed the decision of firing the
2    patient with the doctor prior to making any decision?
3    A    No.  I mean, I guess not.  I don't understand what
4    you're asking.
5    Q    What I'm asking you is do you have anything to offer
6    this jury as to whether Linda discussed the decision to
7    fire or hire a patient with the doctor?
8    A    Not other than -- I mean, I've heard them arguing
9    about, you know, allowing a patient to come back and be
10   seen so they can be charged again for another UA or
11   whatever it was that they were gonna be charged for.
12   But, no, as far as something in writing or, no, I don't
13   have anything.
14   Q    Well, tell the jury which patients that involved?
15   A    Sir, I don't remember what all patients.  Do you
16   know how many patients we seen?
17   Q    You were troubled by this, weren't you?
18   A    Yeah.
19   Q    But you don't remember the patient's name?
20   A    No, I don't.
21   Q    You didn't write it down?
22   A    No.  I didn't write it down because I didn't know
23   that I'd be sitting here one day.
24   Q    And the Government agents didn't ask you to tell us
25   which patients they were, did they?

3651

1    A    No.

2    Q    So the Government agents never said we're concerned,

3    too, point this out for us?

4    A    I don't remember them ever asking me names.

5    Q    So as we sit here today, we can't, we can't confront

6    that accusation.  You understand that; correct?

7    A    Right.

8    Q    Okay.  You testified that there were new progress

9    notes made for patients.

10   A    Yes.

11   Q    Name a patient for whom a new progress note was

12   made?

13   A    They were made all the time.  I don't recall a

14   patient's name.  If any time there was a progress note

15   missing out of any chart, they grabbed the fee ticket

16   and had the doctor go by what it said on the fee ticket

17   to create a new progress note.

18   Q    So there would be many of these?

19   A    Yes.  It was a daily occurrence.

20   Q    Okay.  So when you were interviewed by the

21   Government, did they have you point these out?

22   A    No.

23   Q    Now, you stated that Linda provided instructions to

24   bill PAs as if they were doctors; right?

25   A    Correct.

3652

1    Q   Are you familiar with incident-to billing?

2    A   No, I didn't know anything about billing until I

3    walked into that -- until I was asked.

4         MR. GOROKHOV:  That's all I have, Your Honor.

5    Thank you.

6         THE COURT:  Redirect sir.

7         MR. WAMBLE:  Thank you, Judge.

8                   **REDIRECT EXAMINATION**

9    BY MR. WAMBLE:

10   Q   Ms. Harry, with Mr. Williamson you briefly talked

11   about Jamie S and whether she was a Medicaid patient or

12   cash patient.

13   A   Correct.

14   Q   If she came early before she was actually scheduled

15   to be seen by a physician, would she have to then pay in

16   cash?

17   A   Yes.  I do know that Jamie paid cash.  I don't know,

18   you know, why exactly; do but I know that she paid cash.

19   Q   Okay.  Well, Mr. Gorokhov just took you through a

20   litany of who had more discretion and more knowledge and

21   I believe on cross-examination he asked you who had more

22   knowledge and discretion, the doctor or the PA.  And you

23   said the doctor.  Right?

24   A   Correct.

25   Q   And so if a physician's assistant would terminate a

3653

```
 1    patient, they probably shouldn't second guess the
 2    doctor; right?
 3    A    Correct.
 4    Q    And to your knowledge, was Linda Schneider a nurse?
 5    A    Yes.
 6    Q    Does it make any sense then that she would second
 7    guess a doctor?
 8    A    No, it doesn't.
 9              MR. WAMBLE:  Thank you.  Nothing further.
10              MR. WILLIAMSON:  Nothing, Your Honor.
11              MR. GOROKHOV:  Nothing, Your Honor.
12              THE COURT:  Thank you, ma'am.  You're excused.
13    A    Thank you.
14              THE COURT:  Call your next witness please.
15              MS. TREADWAY:  Marguerite -- and I butcher
16    this name, Judge -- I believe it's Mzhickteno.  It's a
17    Pottawatomie name and it gives me all sorts of trouble.
18              MR. GOROKHOV:  Your Honor, we have another
19    issue with this witness so -- based on some testimony
20    yesterday regarding the sampling and so forth.
21              THE COURT:  Is this something that can wait?
22              MR. GOROKHOV:  If the Government doesn't
23    intend to introduce Exhibit 17 -- or I believe it's 16,
24    it's Blue Cross/Blue Shield, then it can wait; but if
25    the Government intends to introduce that, we would like
```

3654

1   to --

2            MS. TREADWAY:  Judge, you've ruled they're

3   demonstrative.

4            MR. GOROKHOV:  Your Honor, this is a new

5   issue.  This is a new issue.

6            MS. TREADWAY:  We can go for a while until I

7   get to that, Judge.

8            THE COURT:  No.  That's -- pay now or pay

9   later.  I don't like for you all to have to sit while we

10  take these things up.

11           MR. GOROKHOV:  We can do it after lunch, Your

12  Honor.  As long as it doesn't come in before.

13           THE COURT:  Well --

14           MS. TREADWAY:  I think that might work out,

15  Judge.

16           THE COURT:  All right.  We can take it up

17  during the noon hour when it doesn't take up your time.

18  All right.  Let's call this next witness.

19                    **MARGUERITE MZHICKTENO**

20  Having been first duly sworn to tell the truth, the

21  whole truth and nothing but the truth, testified as

22  follows on:

23                    **DIRECT EXAMINATION**

24  BY MS. TREADWAY:

25  Q   Could you please introduce yourself to the jury.

3655

1    A    Certainly.  My name is Marguerite Mzhickteno.

2    Q    And where are you currently employed?

3    A    Blue Cross and Blue Shield of Kansas.

4    Q    How long have you worked for Blue Cross and Blue

5    Shield?

6    A    I'll have my 24th anniversary next week.

7    Q    What do you do for Blue Cross/Blue Shield?

8    A    My official title is Special Investigations Auditor.

9    Q    And what do you do as a Special Investigations

10   Auditor?

11   A    It is my responsibility to protect the corporate

12   assets of Blue Cross and Blue Shield of Kansas.

13   Q    And how do you do that?

14   A    My investigating any oddities that we find in

15   whether it be members, providers, employees, anybody

16   trying to defraud the company.

17   Q    How long have you worked in the healthcare industry

18   or the healthcare insurance industry?

19   A    All my life.

20   Q    And prior to being in the insurance industry, were

21   you in the clinical field?

22   A    Yes.  I worked at a hospital in Topeka.

23   Q    Are you a Registered Nurse?

24   A    No.

25   Q    What kind of training do you have in the healthcare

3656

```
 1   field?
 2   A    I have a CPC accreditation that I received in 2006
 3   through the AAPC, which is the American Association of
 4   Procedure Coders.
 5   Q    And what does CPC mean?
 6   A    It's a coding designation for a Certified Procedure
 7   Coder.
 8   Q    Now, Blue Cross & Blue Shield of Kansas, like many
 9   insurance companies, provides healthcare benefits to
10   people; correct?
11   A    That's correct.
12   Q    And do we call these people by a variety of names?
13   A    Yes.  They're known as members, insureds, patients.
14   Q    And so if we use any of those terms, that's who
15   we're referring to today?
16   A    Yes.
17   Q    Is Blue Cross/Blue Shield of Kansas a healthcare
18   benefit program?
19   A    Yes, we are.
20   Q    And is it engaged in interstate commerce?
21   A    Yes.
22   Q    Now, how does a medical provider such as a clinic or
23   a physician or a physician's assistant become eligible
24   to be paid through a beneficiary's healthcare insurance
25   with Blue Cross/Blue Shield of Kansas?
```

3657

1    A    They would contact our office and we would send a

2    professional relations representative that services that

3    area out to see them and then they would sign a

4    contracting provider agreement if they chose to do so.

5    Q    Let me hand you some documents that we have marked

6    as Government Exhibit 16-D.  Do you recognize those

7    documents?

8    A    Yes.  This is one of our contracting provider

9    agreements.

10   Q    And are those documents that the Defendant Stephen

11   Schneider and the Schneider Medical Clinic submitted to

12   Blue Cross/ Blue Shield of Kansas to become enrolled as

13   providers?

14   A    Yes.

15   Q    Are there multiple agreements?

16   A    Yes.

17   Q    Now, there is an agreement called a CAP.  Could you

18   explain what a CAP is?

19   A    Yes.  A CAP contract is the basic contract that we

20   offer.  It's -- the CAP stands for Competitive Allowance

21   Program.  And it basically limits the provider to a

22   certain maximum allowable payment which kind of then

23   protects the member.

24            MS. TREADWAY:  Government would offer Exhibit

25   16-D.

3658

 1              MR. WILLIAMSON:  No objection.

 2              MR. GOROKHOV:  No objection.

 3              THE COURT:  It's received.

 4    BY MS. TREADWAY:

 5    Q    Once enrolled, does the provider receive a number?

 6    A    Yes.

 7    Q    And what is that number called?

 8    A    It's called a provider number.

 9    Q    And what is the purpose of the number?

10    A    Multiple.  It helps us as employees at Blue Cross/

11    Blue Shield of Kansas identify that provider.  It's a

12    way for us to reimburse him directly using that number.

13    And then it also issues or is used to issue earnings

14    statements at the end of the year.

15    Q    Does each provider receive a unique number?

16    A    Yes.

17    Q    Did the Defendant Stephen Schneider receive a unique

18    number?

19    A    Yes.

20    Q    And did the physician's assistants and other

21    physicians working at his clinic receive unique numbers?

22    A    Yes.

23    Q    Let me hand you what has been marked for

24    identification as Government Exhibit 16-E.  Are those

25    the various transmittal letters from Blue Cross/Blue

3659

1    Shield indicating to the providers at Schneider Medical

2    Clinic their provider numbers and the effective dates of

3    those numbers?

4    A    Yes.

5              MS. TREADWAY:  Government would offer Exhibit

6    16-E?

7              MR. WILLIAMSON:  No objection.

8              MR. GOROKHOV:  No objection.

9              THE COURT:  It's received.

10   BY MS. TREADWAY:

11   Q    Now, can you briefly describe to the jury how the

12   claims process at Blue Cross/Blue Shield of Kansas

13   works?

14   A    Certainly.  Once a service is rendered, the provider

15   then fills out the standard Medicare 1500 claim form

16   using the date-of-service, when the services were

17   provided, and signing the appropriate CPT code based on

18   the services rendered and they send it to Blue Cross &

19   Blue Shield of Kansas.  Once we receive the claim, then

20   we put it into our claims system, and nowdays a lot of

21   it's done electronically but there are still some paper

22   claims.  Then when we process the claim, we apply it

23   towards the member's benefits that they had when the

24   services were rendered so we can issue the appropriate

25   payment to that provider.

3660

1    Q    When healthcare providers send in claims to Blue

2    Cross/Blue Shield, do they typically send in the

3    progress notes and the other supporting documentation

4    along with the claims?

5    A    No.

6    Q    And why is that not done?

7    A    The volume is way too high.  It would tremendously

8    decrease our processing speed.

9    Q    And is that standard in the industry?

10   A    Yes.

11   Q    Can Blue Cross/Blue Shield investigate every claim

12   it receives before it pays it?

13   A    No.

14   Q    And is that again standard in the industry?

15   A    Yes.

16   Q    Is it simply volume?

17   A    Yes, volume is just too high.

18   Q    What does Blue Cross/Blue Shield depend on when it

19   comes to the truthfulness and accuracy of the claims it

20   receives?

21   A    Well, we expect the provider to bill it

22   appropriately based on what service was rendered.

23   Q    Is this dependence on the honesty of the providers,

24   again, standard in the industry?

25   A    Yes.

3661

1  Q   When a physician becomes a Blue Cross/Blue Shield

2  provider, do they agree to be responsible for the claims

3  they submit to your program?

4  A   Yes.

5  Q   And is the physician's agreement to be responsible

6  for the claims submitted a condition of being able to

7  submit claims and be paid by the program?

8  A   Yes.

9  Q   Does the physician agree to submit truthful and

10 accurate claims?

11 A   Yes.

12 Q   And is that, again, a condition of being paid?

13 A   Yes.

14 Q   If the provider is a clinic as opposed to just a

15 single person, are all of these rules the same?

16 A   Yes.

17 Q   And if the provider is the clinic, who would be

18 responsible for the claims being submitted truthfully

19 and accurately?

20 A   The clinic.

21 Q   After being paid by Blue Cross/Blue Shield, can a

22 physician choose to opt out of his responsibility?

23 A   No.

24 Q   Can a clinic?

25 A   No.

3662

1    Q    So if the claim is false, who is responsible for it?

2    A    The clinic.

3    Q    And if it's a physician's claim, who's responsible

4    for it?

5    A    The physician.

6    Q    Now let's talk about how providers are paid by Blue

7    Cross & Blue Shield.  Can that happen a couple of ways?

8    A    Yes.

9    Q    And what are those ways?

10    A    We still periodically will issue paper checks, but

11    we're moving towards the paperless world so a lot of

12    them are sent electronically.

13    Q    Let me hand you what has been marked for

14    identification as Government Exhibit 16-F.  Is that a

15    document you recognize?

16    A    Yes.

17    Q    And does that reflect that the Defendant Stephen

18    Schneider and the Schneider Medical Clinic received

19    electronic payments from Blue Cross/Blue Shield?

20    A    It does.

21              MS. TREADWAY:  Government offers Exhibit 16-F.

22              MR. GOROKHOV:  No objection.

23              MR. WILLIAMSON:  No objection.

24              THE COURT:  It's received.

25

3663

BY MS. TREADWAY:

Q   Did the Defendant Stephen Schneider and the
Schneider Medical Clinic also receive checks from Blue
Cross/Blue Shield?

A   Probably, yes, they would have.

Q   And why would that have occurred?

A   If additional payments were made on claims that
initially got processed incorrectly or denied, then the
additional payment would have gone out on paper.

Q   In addition to the provider being paid by Blue
Cross/Blue Shield of Kansas, does the patient also pay
the provider?

A   Yes.

Q   And what is that payment typically called?

A   Usually it's called an office visit copay.

Q   Let me hand you what has been marked for
identification as Exhibit 16-C.  Is that an excerpt from
the Blue Cross/Blue Shield manual that talks about
copayments?

A   Yes.  It's the general definition section of a
member contract.

Q   And does it contain a general definition of a
copayment?

A   Yes, it does.

          MS. TREADWAY:  Government offers Exhibit 16-C.

3664

```
 1              MR. GOROKHOV:  No objection.

 2              MR. WILLIAMSON:  No objection.

 3              THE COURT:  It's received.

 4    BY MS. TREADWAY:

 5    Q   And could you just read the definition of a

 6    copayment to the jury please?

 7    A   Certainly.  "Copayment or copay means the amount

 8    required to be paid by a subscriber before benefits can

 9    be provided for a covered service.  A copayment is

10    required each time a specific service such as an office

11    visit is provided.  A copayment does not accumulate

12    toward a specified maximum."

13    Q   Is it fairly standard in the industry to have a

14    patient be responsible for part of the provider's fee?

15    A   Yes.

16    Q   In becoming a provider enrolled with Blue Cross/Blue

17    Shield of Kansas, does the provider agree to abide by

18    the programs rules and regulations and policies?

19    A   Yes.

20    Q   And does Blue Cross publish its policies and

21    procedures so that providers are aware of them?

22    A   Yes.

23    Q   And how are they published?

24    A   Electronically on -- via our web as well as in hard

25    copy documents.
```

3665

1    Q    Does Blue Cross have policies about documentation?

2    A    Yes.

3    Q    I'm handing you what has been marked for

4    identification as Exhibit 16-A.  Are those the

5    documentation policies that were in effect for Blue

6    Cross/Blue Shield from 2002 through 2007?

7    A    Yes.

8    Q    And are they consistent throughout that time period?

9    A    Yes.

10           MS. TREADWAY:  Government offers Exhibit 16-A.

11           MR. WILLIAMSON:  No objection.

12           MR. GOROKHOV:  No objection.

13           THE COURT:  It's received.

14   BY MS. TREADWAY:

15   Q    Now, let's put this up on the screen for the jury.

16   And I'd like you to start with Page 1 of 16-A and I'd

17   like you to read the information that begins at the

18   note, those first three paragraphs please.

19   A    "All pertinent and complete medical records must be

20   provided by the contracting provider when records are

21   needed for the initial review of a claim.  Additional

22   information that is not part of the medical record will

23   not be accepted.  That is, only records created

24   contemporaneous with treatment will be considered

25   pertinent.  Medical records are expected to contain all

3666

1    the elements required in order to file and substantiate

2    a claim for the services as well as the appropriate

3    level of care, i.e., evaluation and management service.

4    Medical records are expected to support the medical

5    necessity for all aspects of patient care, including

6    ancillary services provided on the date of service for

7    which a claim is filed.  Each patient record must

8    contain adequate documentation to justify the course of

9    treatment provided and reflect the patient's current

10   status and progress during the course of treatment.  The

11   intensity of the service billed must be supported by the

12   diagnosis code.  Letters, checklists, are not acceptable

13   as documentation and do not replace what should be

14   included in the medical record.  Abbreviations must be

15   those that are generally accepted by your peers and

16   clearly translated to be understandsable to the

17   reviewer."

18   Q    Thank you.  Now, turning to the next page, can you

19   review the paragraph entitled "Documentation."?

20   A    "Appropriate documentation of services is an

21   integral part of the payment and/or review process.  The

22   contracting provider agrees to keep sufficient records

23   to support claims for reimbursement; documents medical

24   need for the service; and agrees to make available all

25   information necessary to carry out the terms of his or

1    her contracting provider agreement at no charge.

2    Information, when requested, should be submitted to Blue

3    Cross/ Blue Shield of Kansas within 30 days of the

4    request.  The member's contract gives us the ability to

5    obtain this information without a signed patient

6    release.  If there is insufficient information to

7    determine medical necessity, claims will ultimately be a

8    provider write-off or refund."

9    Q    And what does that mean?  A write-off or refund?

10   A    If the provider bills more than what we have set as

11   our maximum allowance for a specific service, say it's a

12   $50 charge and we only allow 30, that other $20, they

13   have to write it off.  They cannot bill the patient for

14   it.

15   Q    Now, this provision basically puts the provider on

16   notice that if you want to see the supporting

17   documentation, you get to see it?

18   A    Uh-huh, that's correct.

19   Q    And the prior information was that Blue Cross/ Blue

20   Shield does not accept checklists?

21   A    That's correct.

22   Q    Now, does Blue Cross/Blue Shield also have policies

23   about mid-level practitioners or non-physicians such as

24   physician's assistants?

25   A    Yes.

3668

1   Q   And have those policies changed somewhat over time?

2   A   Yes.

3   Q   Let me hand you what has been marked for

4   identification as Government Exhibit 16-B.  Are those

5   the various excerpts from the policies over time, 2002

6   through 2007?

7   A   Yes.

8           MS. TREADWAY:  Government offers 16-B.

9           MR. GOROKHOV:  No objection.

10           MR. WILLIAMSON:  No objection.

11           THE COURT:  It's received.

12   BY MS. TREADWAY:

13   Q   Now let's start back in 2002.  Let's look at Page 2.

14   And I believe we have a policy.  Can you direct me to a

15   paragraph number there?

16   A   B.

17   Q   Okay.  And let's just read this.

18   A   "A physician may bill for the services of the

19   non-physician if there is an employer/employee

20   relationship and the services are supervised by the

21   physician.  Supervision means the patient recognized the

22   supervising physician as his or her physician and there

23   is a periodic review of the records by the physician.

24   If the nonphysician is used as an adjunct incident-to

25   the physician's services, then the physician providing

1    the service should bill Blue Cross/Blue Shield of Kansas

2    as he or she would for all other covered services.  When

3    the services of the non-physician are not adjunct to any

4    definable services provided by the physician, the

5    employing physician would bill under a separate provider

6    number set up to identify this arrangement.  The

7    contracting status of the physician shall apply to all

8    persons in his or her employ, whether such services are

9    billed by the physician under a separate provider

10   number."

11   Q    So Blue Cross/Blue Shield kind of had a dual way to

12   handle physician's assistants.

13   A    Uh-huh.

14   Q    The incident-to rule, which the jury is familiar

15   with; or the physician assistant could bill separately?

16   A    That's correct.

17   Q    The evidence yesterday was that the Defendant Linda

18   Schneider indicated to a physician's assistant that they

19   didn't bill incident-to because it was a bookkeeping

20   nightmare.  If that's true, would the clinic have had to

21   use the unique provider number for all physician

22   assistant services?

23   A    Yes.

24   Q    Did you find that that was the way the clinic billed

25   in your review?

3670

```
1    A    Pretty much, yeah.  I mean, they billed, they billed
2    a lot of the physician's assistant services under the
3    M.D./D.O. provider number instead of their own.
4    Q    So they didn't bill under the physician's assistant
5    number.  They billed under the doctor's number?
6    A    That's correct.
7    Q    And would that be a false claim?
8    A    Yes.
9    Q    Now let's turn to the fifth page of this exhibit and
10   that's a January 2004 policy which is a couple years
11   later.  And the policy changed, didn't it?
12   A    Yes.
13   Q    And how did it change?
14   A    The reimbursement part of it changed.  We determined
15   that we should be paying PAs, physician's assistants,
16   and the ARNPs at a lower level than the the M.D.'s and
17   the D.O.s.
18   Q    And actually although there is a January, 2004,
19   policy manual, did this have effect even earlier than
20   that?
21   A    Yes.
22   Q    And was that as early as July, 2003?
23   A    Yes.
24   Q    And what is the reimbursement rate for physician's
25   assistants as opposed to doctors?
```

3671

1    A    They are reimbursed at 85% of the rate.

2    Q    And has that been the policy from July, 2003,

3    forward?

4    A    2004.

5    Q    I'm sorry, January, 2004, forward?

6    A    Right.

7    Q    But the providers got notice of it in July, 2003?

8    A    That's correct.

9    Q    So to get them ready for this change?

10   A    That's correct.

11   Q    Now, besides publishing this information and the

12   manual and sending out information ahead of the manual,

13   did Blue Cross/Blue Shield do something else to educate

14   the providers about this change coming and the lowering

15   of the reimbursement rate?

16   A    Yes.  We wanted to make sure they were aware of it.

17   So we identified all of the physicians' offices that had

18   PAs and ARNP's and we sent the professional relations

19   representatives out to those offices as well as had

20   seminars throughout the state.

21   Q    And do you know whether a personal representative of

22   Blue Cross/Blue Shield actually went out to talk to the

23   Schneider Medical Clinic about this upcoming change?

24   A    Yes.

25   Q    And did they?

```
 1    A   Yes.
 2            MS. TREADWAY:  Judge, it's at this point that
 3    I'm moving into what the Defendants want to object to.
 4            THE COURT:  Well, why don't we take a noon
 5    recess half an hour early.  Is that okay.  So we'll be
 6    in recess until about 12:30.  Remember and heed the
 7    admonition please.
 8                    (Jury excused for noon recess.)
 9            THE COURT:  You can be seated.  Okay.  Where
10    are we headed now?
11            MR. GOROKHOV:  May I proceed, Your Honor?
12            THE COURT:  Yes, sir.
13            MR. GOROKHOV:  Very brief.  Yesterday's
14    testimony regarding the sampling showed that there was
15    an intermediate step between the design of the sample
16    and the actual end result.  We haven't had the middle --
17            THE COURT:  You mean the intermediate step of
18    who pulled the record?
19            MR. GOROKHOV:  Of pulling the records,
20    ensuring that they're pulled correctly.  And actually
21    it's pretty clear that the first field of this
22    spreadsheet which identifies the patients was populated
23    by whoever it was that did that.  We've had no
24    testimony.  So I think that's a problem with the
25    foundation for the exhibit, Your Honor.
```

3673

1        THE COURT:  What do you say?

2        MS. TREADWAY:  Well, Judge, I'm amazed that

3   they can stand up and say that.  Because I have the

4   subpoenas here that were submitted to their client that

5   have these lists of patient files which they pulled.

6        THE COURT:  Who pulled?

7        MS. TREADWAY:  The clinic.  They --

8        THE COURT:  Wait a minute.

9        MS. TREADWAY:  They provided the clinic files

10  pursuant to the lists that Mr. Rodney Brown created.

11  And for them to stand up in court and say that they

12  don't know about it, that they've never seen it, and

13  that there's something wrong with it, is absurd.

14       THE COURT:  Well, I don't know whether that's

15  what they're saying.

16       MS. TREADWAY:  Well, Judge, they are saying --

17       THE COURT:  They're saying on your spreadsheet

18  there are only how many names on the spreadsheet,

19  whatever it is.

20       MS. TREADWAY:  They're the names that Rodney

21  Brown talked about yesterday.

22       THE COURT:  But they're saying who actually

23  picked the name that's on the spreadsheet.  I think

24  that's what they're saying.

25       MS. TREADWAY:  Well, again, Mr. Brown

3674

1    indicated how that worked.  And these are the lists that

2    were generated and were given to the Defendants.  Rodney

3    explained how that happened.  They are not listening as

4    to how that happened.  But he made it very clear how it

5    happened.  He got the information, he got the data-set

6    is what he called it, from Blue Cross/Blue Shield.  He

7    removed the zero pays and the duplicates --

8              THE COURT:  I know.

9              MS. TREADWAY:  He alphabetized --

10             THE COURT:  The names.

11             MS. TREADWAY:  -- and then he did his RAD

12   Stats program, which is simply a random number

13   generator.  We gave that to them.  And that program then

14   produced these lists.  And they are the identical lists

15   that are on each of the spreadsheets to the extent that

16   the clinic could provide the files.  To the extent the

17   clinic couldn't provide the files, the name's on the

18   list but there's no documentation that was reviewed.

19             THE COURT:  Was there another step or

20   individual who decided between whatever that is you're

21   holding up that the clinic provided and the names that

22   are on the spreadsheet?

23             MS. TREADWAY:  No, sir.

24             MR. WILLIAMSON:  Judge, when I cross-examined

25   Mr. Brown yesterday I made sure that I got the steps

1    complete.  We do not have -- the critical step that's

2    missing, we don't have what the values that came up in

3    that RAD Stat program, we don't have that correlated to

4    his actual analysis.  And just to say that the names on

5    this spreadsheet happened to be the names that he

6    picked, we're still missing the proof.  And he was

7    unable to provide it on the stand.  And we're here

8    beyond pleadings.  We're here where the evidence has to

9    be before this court and the jury.

10           THE COURT:  Well, I wasn't totally clear on

11   how -- on his testimony about value, but I understood

12   that that was all done by the RAD Stat.

13           MS. TREADWAY:  Well, Judge --

14           MR. WILLIAMSON:  Let me -- we have the RAD

15   Stat.  Let's just use 1 through 10.  He said patient A

16   is 1, patient B is, blah, blah, blah.  He enters that

17   information into that RAD Stat.  RAD Stat goes through,

18   does the program, selects value 3, value 2, value 1.

19   Patient C, patient B, patient A.  Okay.  We don't have

20   that output to contrast and compare to what she's saying

21   are these files that were pulled from the clinic.

22   That's what --

23           THE COURT:  So you think there's another list,

24   as it were?

25           MR. WILLIAMSON:  Yes.  He said there was.  He

3676

1    said that he had a spreadsheet that -- okay.  You have

2    the beginning spreadsheet that he had to take the data

3    from to input into the RAD Stat program.  And then you

4    have the output data spreadsheet that puts the results

5    and that correlates the RAD Stat outputs to some kind of

6    values.  Right now the only thing we have are these

7    values.  And if it's there and we can look at it, fine.

8    We can move on.  But you cannot just circumvent and put

9    these people on without giving us the opportunity to

10   say, well, let's make sure that this was done

11   appropriately, let's make sure it's admissible.

12        MS. TREADWAY:  Well, Judge, first of all, they

13   are incorrect that they don't have this information.

14   They evidently don't understand what they have.  What

15   they have is what Mr. Brown had and that's the data-set.

16   They have that data-set.  They've had it for two years.

17   And that data-set is in their possession.  They then

18   have what Mr. Brown did, what Mr. Sulpor did.  And they

19   have an expert, Dr. McClave, who has been able to take

20   all this information and test whether this was a valid

21   random sample or not.  If Dr. McClave wants to come in

22   and say this isn't a valid random sample, fine.  But we

23   have given them the documents, the data-sets, the

24   work-product, the computer runs of Mr. Brown as well as

25   Mr. Seaton, et cetera, to get them to where we are.  And

1    the list was provided to the clinic and the clinic

2    pulled the files.  This is a weight, not admissibility,

3    Judge.  They won their argument about the admissibility

4    of the charts.  Why are we still arguing about this?

5    And we are not extrapolating this in any way, shape or

6    form as we always stated.  Typically, Judge, what

7    Mr. Sulpor does and what Mr. Brown does in a typical

8    case, especially civil cases, this takes this valid

9    random sample and says we got 45% wrong and we're gonna

10   extrapolate the whole universe and come up with a loss

11   figure.  We're not doing that here.  What we are doing

12   is: we had these individuals individually review each of

13   these files as to each of the claims and come up with

14   their findings.  Those have been testified to.  And if

15   they want to argue about their weight, that's fine; but

16   it's not an admissiblity issue of their testimony.  They

17   can testify about what they reviewed.

18         THE COURT:  Well, I didn't hear Mr. Brown --

19   and you certainly had plenty of opportunity to

20   cross-examine him yesterday -- say that there was

21   another list out there somewhere.

22         MR. WILLIAMSON:  Yes, he did.  He said he

23   provided it to the Government.  He said that there is --

24   this is the thing.  Even if you look at that list she

25   provided, it is not correlated by any value.  That does

3678

```
 1   not correlate to what Mr. Brown said.  Yesterday he
 2   testified that there is a list that would show who the
 3   individuals were that correlated with the value output
 4   from his RAD Stat program.  He said he gave that to the
 5   Government.  We don't have that list.
 6            MS. TREADWAY:  I gave them what I have.
 7            MR. WILLIAMSON:  Ma'am, I did not interrupt so
 8   would you please stop doing that.  We have records
 9   requests from the Government for thousands and thousands
10   and thousands of records.  Not just these.  These are
11   the records we want in relation to this RAD Stat
12   program.  That is a misrepresentation that that list to
13   the subpoena somehow narrows the world.  We have to be
14   able to cross-examine these people, Judge, just on this
15   simple fact.  Their people.  We didn't disagree that
16   Mr. Brown conducted a random sample.  We don't.  And you
17   could tell by our cross-examination we're not
18   challenging that.  What we do want to see is:  What did
19   the Government do with his recommendations when he said
20   these are the files that will be random statistically.
21   Did they actually pull those files in accordance with
22   what he said or did they go cherry pick their charts and
23   this.
24            THE COURT:  I heard you say that yesterday.
25   But if there isn't a document that she -- she says
```

3679

 1    there's no document.  You seem to think there is a

 2    document.

 3              MR. WILLIAMSON:  He said under oath that there

 4    was.

 5              THE COURT:  Well, but she says she doesn't

 6    have it.  Now how am I supposed to deal with this?

 7              MR. WILLIAMSON:  We have a Government witness

 8    under oath, who's testifying under oath.  I didn't

 9    challenge his credibility.  I just wanted to know what

10    did he do, how'd he do it and what exists.  I don't know

11    what to do, Your Honor.  All I know is he says it's --

12              THE COURT:  I don't either.  They're obligated

13    to produce this to you.  If they haven't produced it and

14    they're hiding it, then -- but I don't think that's the

15    case.  I think she's produced -- I believe her when she

16    says she's produced everything.  At this point in time

17    what conceivable reason would be for the Government to

18    jeopardize its case by trying to hide what seems to be a

19    rather innocuous, if it exists at all, an innocuous

20    document.

21              MS. TREADWAY:  And, Judge, they just said they

22    don't challenge the fact that this is a valid random

23    sample.  That should end it.

24              MR. GOROKHOV:  There is a foundation.  I mean,

25    it's still the Government's burden, Your Honor.  But

3680

```
 1    also, just for the record, I just asked to see the
 2    subpoenas that Ms. Treadway just waved in front of the
 3    court and she refused to let me see them.
 4              MS. TREADWAY:  I'll give them copies when I
 5    can, Judge, but they have these.
 6              MR. GOROKHOV:  I'd like to see them as soon as
 7    possible, Your Honor, in light of the issues on the
 8    table.  If I could.
 9              THE COURT:  The issues, I'm going to rule on
10    the issue.  There's no point in dragging this out.  The
11    only -- you know, when you're the judge and you're not
12    familiar with -- the judge isn't familiar with the case
13    and all the documents that have flown between the
14    parties, I would have no idea.  I have to rely on what
15    the witnesses say and on what the lawyers say.  And I
16    have no reason not to rely on what she's saying.  It
17    would be incredibly stupid for her to be hiding some
18    kind of a document from you at this point in time and
19    lying about it.  And if the tables were turned, and you
20    were saying there is no document, I would believe you,
21    you know.  So I'm not -- I can't order her to produce
22    something which she says doesn't exist.
23              MR. WILLIAMSON:  Judge, just -- I don't think
24    that this is at Ms. Treadway's -- I don't think
25    Ms. Treadway is misrepresenting she doesn't believe it
```

3681

1  exists.  I don't believe she's the person that pulled

2  the charts.  There's an agent who is not here that

3  pulled the chart.

4          MS. TREADWAY:  No, the clinic pulled the

5  charts, Judge.

6          MR. WILLIAMSON:  If --

7          MR. GOROKHOV:  Your Honor, this issue could be

8  resolved if we could just see the subpoenas that

9  Ms. Treadway presented to the court.

10         THE COURT:  Okay.  Show 'em the subpoenas for

11 cryin' out loud.

12         MR. GOROKHOV:  If we could inspect them over

13 lunch.

14         MS. TREADWAY:  I'm not going to give you

15 original subpoenas.  I will give you copies.

16         THE COURT:  Okay.

17         MS. TREADWAY:  They don't have a good faith

18 basis for this, Judge, at all.

19                 (Ms. Treadway complies with

20                  request.)

21         MR. GOROKHOV:  Your Honor, this is voluminous.

22 If we could just look at it over lunch.

23         THE COURT:  Let's -- look it, you guys can

24 look at it over lunch and we'll reconvene about 12:25

25 and without the jury and we'll try to resolve this.

3682

1    Okay.

2          MR. GOROKHOV:  Thank you, Your Honor.

3    Appreciate it.

4                    (Noon recess.)

5          THE COURT:  Okay.  Mr. Gorokhov, have you got

6    it figured out?

7          MR. GOROKHOV:  We did, Your Honor.  We just

8    lodge our objection on the same basis, the missing list.

9    We understand the Court's ruling.  We're prepared to

10   move forward on the weight of the evidence and, you

11   know, we appreciate the Court's patience; but really

12   these are serious, serious allegations and we're just

13   doing our best --

14         THE COURT:  Well, thank you.

15         MR. GOROKHOV:  Thank you, Your Honor.

16         THE COURT:  But you've looked at the

17   subpoenas.  You said that the whole thing could be

18   resolved by looking at the subpoenas.  You've looked at

19   the subpoenas.

20         MR. GOROKHOV:  Well, the subpoenas don't fully

21   resolve that aspect of it.  The subpoenas resolve the

22   part about the, you know, how the records were obtained;

23   but it doesn't resolve the aspect of it with the

24   generation of the list of the patients and how that was

25   generated.

1        THE COURT:  So instead of it being a list, you

2    all think maybe there's some person out there who did

3    this?

4        MR. WILLIAMSON:  We are just missing, Your

5    Honor, the gap between being able to verify what

6    Mr. Brown identified as the individuals that should be

7    pulled and the actual individuals listed in the

8    spreadsheet and on the subpoenas.  The subpoena matches

9    the spreadsheet, so there's not an issue there.  We are

10   just still unable to verify whether the people that made

11   it to the subpoena and the people that made it to the

12   spreadsheet were the same individuals.  Now, we looked

13   at the timing as far as when the RAD Stat program was

14   run, when the subpoenas were issued.  It may be okay.

15   You know, at this point, we're just prepared to lodge

16   the objection and move forward.

17       THE COURT:  Well, my only concern is, for the

18   record, when you lodge an objection then I ought to rule

19   on it.  And I'm not sure what your objection is at this

20   point.

21       MR. WILLIAMSON:  Lack of foundation, Your

22   Honor.

23       MS. TREADWAY:  Lack of foundation for what

24   then, Judge?  Because they said they don't have a

25   problem that this is a valid random sample.  And that

3684

1    would be what the foundational objection would be about.

2            MR. WILLIAMSON:  If we knew -- we're unable to

3    confirm, and that's the problem, and, again, I just want

4    to make sure the Court understands.  We're not accusing

5    the Government of intentionally hiding something.  But

6    when a witness says that he generated something and he

7    produced it, I think we have an obligation to follow up

8    on it and see if it can be located.  There is a gap

9    between the random sample, which I would agree is valid.

10   The procedure is valid.  I do not -- we do not dispute

11   and our statistician does not dispute that the method

12   that Mr. Brown utilized was valid.  What we're unable to

13   have a confirmation of is whether or not the people that

14   are in the spreadsheet and the subpoena were the same

15   people that were in -- identified in specific fields in

16   Mr. Brown's analysis.

17           THE COURT:  Okay.  Here's how I can resolve

18   this objection to the best of my ability.

19           MR. WILLIAMSON:  Judge, would it be helpful if

20   you see this RAD Stat program at all because I don't

21   think we showed it --

22           THE COURT:  You can bring it up but I don't

23   know that it's going to help me.

24           MS. TREADWAY:  Well, Judge, maybe I can do one

25   more explanation.  And I've given this explanation to

3685

1    the Defendants multiple times.  I think the list they

2    want is within their power to recreate based on the same

3    data-set that Mr. Brown had, they have.  And Mr. Brown

4    took that data-set, alphabetized it by last patient

5    name, got rid of the duplicates, got rid of the zero

6    pays and then numbered those patients.  And anybody like

7    Dr. McClave can recreate that process.  And if Dr.

8    McClave has already determined that the process is

9    valid, he's obviously been able to recreate that

10   process.  So they have everything that we had to create

11   the list, including the list and including the randomly

12   generated numbers.  So they are not missing anything.

13   They have it all.  And, obviously, their expert has

14   confirmed that it's a valid process and a valid method.

15   So there's really no objection to foundation that they

16   can make at this point.  They're basically saying it's a

17   valid random sample, the methodology was good, the

18   process is good and their expert says so.

19           THE COURT:  Well, if I could order you to

20   produce something that you haven't produced and they

21   could identify what that is, then I would order you to

22   do it; but that's not what they're concerned about.  At

23   least Mr. Williamson just said that they don't think

24   you're hiding anything.

25           MR. GOROKHOV:  That's correct.

1          THE COURT:  So I don't know what else I can

2     do.  If this isn't good enough, frankly, maybe there's

3     some misunderstanding with Mr. Brown yesterday, I don't

4     know.  That seems to be what maybe generated all of

5     this, that his testimony may have been that there was

6     something else, another step in the process.  But we

7     have what we have.  And if the Defendants don't disagree

8     that the statistical analysis is accurate, and

9     apparently they don't, then I have to overrule the

10    objection as to foundation.  Because I don't know what

11    else to do.  And, you know, I don't want to send this up

12    on a record where the Court of Appeals says, oh, well,

13    you know, the judge didn't rule on the objection.  But I

14    don't know how else to rule.  Maybe one of them can rule

15    on it.  After all, they're smarter and better looking

16    than I am.  That's as far as I can go.  You can argue

17    the weight -- you can always argue the weight of the

18    evidence.  If the jury understands your argument.  But

19    remember, there's going to be finite time on the closing

20    arguments.  You aren't going to have, you know, an hour

21    to argue the weight of this.  If the jury understands it

22    at all.

23         By the way, what was the name of the little guy

24    that was the statistician?

25          MS. TREADWAY:  Sulpor.

3687

1          THE COURT:  Supor?

2          MS. TREADWAY:  S-U-L-P-O-R.

3          THE COURT:  I looked up statistician in the

4  dictionary and his picture was in there.

5          MS. TREADWAY:  Not bad, Judge.

6          THE COURT:  Okay.  Let's get the jury.

7                     (Whereupon, the following

8                      proceedings continued IN THE

9                      PRESENCE of the jury.)

10

11                     (No omissions.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas