3688

1              (Beginning at 12:45 p.m. May 20,

2              2010, the following proceedings

3              continued.)

4         THE COURT:  Please be seated.

5    BY MS. TREADWAY:

6    Q    During the course of this investigation, did we ask

7    you to review claims submitted to Blue Cross/Blue Shield

8    from the Defendant Stephen Schneider and other providers

9    who worked at the Schneider Medical Clinic?

10   A    Yes.

11   Q    And did you choose which patients claims to review?

12   A    No.

13   Q    What was your understanding of how those patient

14   names were chosen?

15   A    It was our understanding that it was a random

16   sample.

17   Q    And are you familiar and have you worked during your

18   whole career with random samples?

19   A    Yes.

20   Q    Did you review all of the claims submitted to Blue

21   Cross/Blue Shield for these randomly chosen patients?

22   A    Yes.

23   Q    What documents and other information did you have to

24   conduct this review?

25   A    We had the claims, we had the record, the chart.  We

```
 1    had the account, financial history and the fee tickets.
 2    Q   And except for the claims data, was the information
 3    that you received from the Schneider Medical Clinic?
 4    A   Yes.
 5    Q   And did you review for Blue Cross/Blue Shield
 6    approximately 100 patient files?
 7    A   Yes.
 8    Q   And did you review approximately 692 claims for
 9    those patients?
10    A   Yes.
11    Q   And did you focus your review on a type of claim?
12    A   Yes.
13    Q   What kind of claim?
14    A   The evaluation and management service or office
15    visit.
16    Q   And did you focus your review further on two
17    particular issues?
18    A   Yes.
19    Q   What issues?
20    A   We were reviewing to make sure that the correct code
21    was applied based on the medical record and that the
22    correct provider was billed for.
23    Q   And do both of those have to be correct on the claim
24    form?
25    A   Yes.
```

3690

1    Q    What information did you use to determine whether

2    the provider had been correctly billed?

3    A    We used whoever signed the medical record, the chart

4    itself.

5    Q    And did you have a group of signature facsimiles

6    that you could use to compare and contrast?

7    A    Yes.

8    Q    Is that common that you ask for those?

9    A    Yes.

10   Q    Now, when you were determining about the code, what

11   guidelines did you use to determine if the code for the

12   office visit was correct?

13   A    We used the Medicare 1995 established guideline.

14   Q    And are those less or more favorable to the

15   providers?

16   A    In this situation, more favorable.

17   Q    And so is your review a conservative review?

18   A    Yes.

19   Q    During the course of your review, did you create a

20   spreadsheet of your findings?

21   A    Yes.

22   Q    Let me hand you what has been marked for

23   identification as Government Exhibit 16.  Do you

24   recognize that group of documents?

25   A    Yes.

3691

1    Q    And is that your spreadsheet?

2    A    Yes, it is.

3    Q    And your spreadsheet actually has a lot more columns

4    than are on that document?

5    A    That's correct.

6    Q    But have we captured the most relevant information

7    from your review in that document?

8    A    Yes, you have.

9    Q    And does that document summarize voluminous

10   information?

11   A    Yes.

12   Q    And does it accurately reflect that voluminous

13   information as well as your findings?

14   A    Yes.

15           MS. TREADWAY:  The Government would offer

16   Exhibit 16 as a summary exhibit under Federal Rule of

17   Evidence 1006 but based on the Court's prior ruling we

18   will now offer it as a demonstrative exhibit.

19           MR. WILLIAMSON:  No objection, on that basis.

20           MR. GOROKHOV:  Not on that basis, Your Honor.

21           THE COURT:  You remember what I told you about

22   demonstrative exhibits and that's how it is admitted is

23   a demonstrative exhibit.

24   BY MS. TREADWAY:

25   Q    Let's look at the summary of your summary, which is

3692

1    the first page of Exhibit 16.  And review your findings

2    with the jury.  Of the 692 claims you reviewed, how many

3    were billed as though a physician provided the services

4    when a physician's assistant actually provided the

5    service?

6    A   229 claims or 33%.

7    Q   Do you consider these claims to have been upcoded?

8    A   Yes.

9    Q   Do you consider these claims to be false?

10    A   Yes.

11    Q   And why are these false claims?

12    A   Because they were not billed appropriately based on

13    who provided the services.

14    Q   And as a result, did Blue Cross/Blue Shield pay the

15    Defendant Stephen Schneider and the Defendant's clinic

16    more money than they were entitled to?

17    A   Yes.

18    Q   Of the 692 claims you reviewed, how many were billed

19    at a higher level of office visits than the

20    documentation supported with the checklist on the

21    progress note taken into account?

22    A   409 or 59%.

23    Q   And, again, was this conservative based on Blue

24    Cross/Blue Shield's rules and regulations?

25    A   Yes.

3693

1    Q    Would Blue Cross/Blue Shield take that checklist

2    into account?

3    A    No.

4    Q    Now, would these have been upcoded?

5    A    Yes.

6    Q    Would these have been false?

7    A    Yes.

8    Q    And would these have caused Blue Cross to pay more

9    money to the Defendant Stephen Schneider and the

10   Defendant's clinic than they were entitled to?

11   A    Yes.

12   Q    Of the 692 claims, what were the number of claims

13   that were billed at a higher level of service when you

14   did not take the checklist into account?

15   A    482 or 70%.

16   Q    Would these be upcoded claims?

17   A    Yes.

18   Q    Would these be false?

19   A    Yes.

20   Q    For the same reasons you've just testified to?

21   A    Yes.

22   Q    Based on your review of the 692 claims and the

23   documents supporting them from the medical clinic, what

24   were your observations about the legibility of these

25   medical records?

3694

1   A   They were very difficult to read.   Sometimes they

2   were totally illegible.

3   Q   If a healthcare service is not documented, should it

4   be paid?

5   A   No.

6   Q   Why not?

7   A   It's a standard rule that if it's not documented, it

8   was never performed.

9   Q   If a medical record is not legible, has the

10  healthcare service been documented?

11  A   No.

12  Q   If a service has not been documented or if the

13  documentation is not legible, what can Blue Cross/Blue

14  Shield do with regards to a claim based on that

15  undocumented service?

16  A   We would have to deny it.

17  Q   Could you also recoup money if you'd already paid

18  it?

19  A   Yes.

20  Q   With regards to the claims you reviewed, should the

21  false and upcoded claims you found have ever been paid?

22  A   No, not the way they were submitted.

23  Q   The evidence in this case has been that office

24  visits at the Schneider Medical Clinic often consisted

25  of only the provider asking what will it be, what can I

1    write you and then writing a prescription --

2              MR. WILLIAMSON:  Your Honor, I'm going to

3    object.  That's an inaccurate portrayal of what the

4    actual evidence in this case has been.  That's what she

5    said in opening.  That's not been the facts.

6              MS. TREADWAY:  Mr. Tab testified to that,

7    Judge, and Ms. Jody LeBroke testified to that on cross.

8    In fact --

9              THE COURT:  I think to help the jury out you

10   need to rephrase that question as to which witness said

11   what.

12             MS. TREADWAY:  I will.

13             THE COURT:  And then, of course,

14   Mr. Williamson and Mr. Gorokhov will have the

15   opportunity to cross-examine; but in the end that's your

16   memory of what the witness said.  But, clearly, this is

17   a compound question and isn't going to help the jury

18   so the objection is sustained on those grounds.

19   BY MS. TREADWAY:

20   Q   Ma'am, the evidence has been in this case that a

21   patient by the name of Tab H testified that when he went

22   in for an office visit the doctor said, "what will it

23   be" and then wrote a prescription for controlled

24   substances.

25             The evidence has also been from Jody LeBroke

3696

1    Reagans that the Defendant came into the exam room and

2    said, "what can I write for you" with his prescription

3    pad in hand.

4                MR. WILLIAMSON:   I'm going to object to

5    mischaracterization of the testimony.

6                THE COURT:   Well, your objection is noted for

7    the record.   But you'll have the opportunity to

8    cross-examine.

9    BY MS. TREADWAY:

10   Q    Are either of those examples an example of a

11   billable office visit?

12   A    No.

13   Q    Does Blue Cross/Blue Shield pay for prescription

14   medications?

15   A    Yes.

16   Q    Will Blue Cross/Blue Shield pay for prescriptions

17   that are issued outside the course of usual medical

18   practice and not for a legitimate medical purpose?

19   A    No.

20   Q    The review you conducted was based on the claims

21   that have already been paid.   Does Blue Cross/Blue

22   Shield ever conduct a review prior to claims being paid?

23   A    Yes.

24   Q    What are those types of reviews called?

25   A    Simply they're called prepay reviews.

3697

1    Q    Did Blue Cross/Blue Shield conduct any prepayment
2    reviews of the Defendant Stephen Schneider's claims and
3    claims from other providers who worked at the Schneider
4    Medical Clinic?
5    A    Yes.
6    Q    Approximately when did this prepayment review begin?
7    A    I believe it was December 1st of 2006.
8    Q    Does this type of review essentially work the same
9    way as the review you just discussed with the jury?
10   A    Yes.
11   Q    And what did Blue Cross discover as a result of this
12   prepayment review that began in December of 2006?
13   A    Pretty much the same thing that we found in the post
14   pay, that services were being upcoded and not billed
15   appropriately based on who provided the service.
16   Q    Does Blue Cross/Blue Shield of Kansas have the right
17   to terminate a provider?
18   A    Yes, we do.
19   Q    And did Blue Cross terminate the Defendant Stephen
20   Schneider and the Schneider Medical Clinic?
21   A    Yes.
22   Q    Did I hand you more exhibits than I should have?
23   A    Yes.
24   Q    Do you have Exhibit 16-I?
25   A    I do.

3698

```
1    Q    Do you recognize that document?

2    A    Yes.

3    Q    What is it?

4    A    It's a letter from the director of the professional

5    relations area terminating the Schneider Medical

6    Clinic's contract effective January 1st of 2007.

7              MS. TREADWAY:  Government offers Exhibit 16-I.

8              MR. WILLIAMSON:  No objection.

9              MR. GOROKHOV:  No objection.

10             THE COURT:  It's received.

11   BY MS. TREADWAY:

12   Q    And what is the date of that letter?

13   A    August 11, 2006.

14   Q    And who is it addressed to?

15   A    Schneider Medical Clinic.

16   Q    And what does it inform the clinic?

17   A    That we were exercising our right as per the CAP

18   contract to cancel their contract, giving them 120 days

19   notice, and that it would be effective January 1st of

20   2007.

21   Q    Now, is there a second letter in 16-I?

22   A    Yes, there is.

23   Q    And is that a similar letter?

24   A    Yes, it is.

25   Q    And what is the date?
```

3699

```
 1    A    The date on it is August 24th, 2006.

 2    Q    And who's it addressed to?

 3    A    Stephen Schneider and then Schneider Medical Clinic.

 4    Q    And does it inform the Defendant Stephen Schneider

 5    of the same plan to terminate?

 6    A    Yes.

 7    Q    Then do you have before you 16-J?

 8    A    I do.

 9    Q    And is that a termination letter for another

10    provider at the Schneider Medical Clinic?

11    A    Yes, it is.

12    Q    And who does that relate to?

13    A    Lawrence Simmons.

14    Q    I believe it's Simons.

15    A    Sorry.

16    Q    No problem.

17    A    Lawrence Simons.

18              MS. TREADWAY:  Government offers Exhibit 16-J.

19              MR. GOROKHOV:  No objection.

20              MR. WILLIAMSON:  No objection.

21              THE COURT:  It's received.

22    BY MS. TREADWAY:

23    Q    What is the date of that letter, ma'am?

24    A    May 25th, 2006.

25    Q    And what does it inform Dr. Simons?
```

3700

1    A   I'm sorry.  I'm reading.  I haven't seen this for a

2    little while.

3    Q   No problem.

4    A   He answered some questions negatively on a

5    recredentialing application and so we decided not to

6    offer him a contract to participate in our Premiere Blue

7    Network that was in effect at that time.

8    Q   And so that's essentially we're not going to deal

9    with you?

10   A   That's correct.

11   Q   All right.  Now, in terms of the members or the

12   patients, what happens when a provider with Blue

13   Cross/Blue Shield is terminated?  What is the patient's

14   option at that point?

15   A   Well, they can continue seeing that provider,

16   usually at a reduced benefit; or they can choose to go

17   someplace else.

18   Q   Now, this is going to be a complicated question and

19   let me see if I can ask it right.

20   A   Okay.

21   Q   The Defendant Stephen Schneider and the clinic were

22   terminated from Blue Cross/Blue Shield as of January,

23   2007?

24   A   Uh-huh.

25   Q   Blue Cross/Blue Shield began its prepayment review

3701

1    pretty much a month before?

2    A    That's correct.

3    Q    And that continued over time?

4    A    Uh-huh.

5    Q    If Blue Cross/Blue Shield found that the Schneider

6    Medical Clinic had upcoded the service or upcoded the

7    provider, who bore the loss on that?

8    A    The members did.

9    Q    The patients did?

10   A    Yes, the patient did.

11   Q    Finally, ma'am, did you perform a search of

12   information about Blue Cross/Blue Shield patients who

13   had been patients at the Schneider Medical Clinic and

14   who later sought other services elsewhere?

15   A    Yes, we did.

16   Q    And what types of services were you looking at?

17   A    We were looking for anything related to addiction

18   type services.

19   Q    As a result of your search, how many Blue Cross/Blue

20   Shield patients were you able to identify as people

21   seeking substance abuse treatment services following

22   being a patient at Schneider Medical Clinic?

23   A    I believe that number to be about 143.

24          MS. TREADWAY:   Nothing further, Judge.

25

3702

1                      <u>CROSS EXAMINATION</u>

2       BY MR. WILLIAMSON:

3       Q    How are you doing today?

4       A    I'm good.  How are you?

5       Q    Not going to try to say your last name because I

6       tried over the break and I lost it.  Okay?

7       A    That's okay.

8       Q    All right.  You mentioned the pre-review that

9       happened in late 2006; correct?

10      A    That's correct.

11      Q    Did you ever provide those findings of that

12      pre-review to the clinic?

13      A    The review -- what would have happened is we would

14      have sent a letter to the provider telling him that all

15      of his claims were subject to prepay review, meaning

16      that he would have to send in all the medical records

17      with the claim.  And so we would review the claim, make

18      a payment determination and then the claim would be paid

19      based on that, notifying the provider at that time.  So

20      every time a claim came in, it was reviewed, they were

21      told about the findings.

22      Q    Okay.  Government didn't have you to introduce any

23      letters to the clinic regarding those findings; correct?

24      A    No.

25      Q    Okay.  We don't know what those findings are, do we?

3703

1    A    Well, I can extrapolate the data out of my claims

2    system and get any information that you might need about

3    the reviews that were done.

4    Q    So that information was available but you weren't

5    asked by the Government to do that; correct?

6    A    That's correct.

7    Q    Okay.  You say it happened in December of 2006?

8    A    Uh-huh.

9    Q    Is there a reason why you started doing that if the

10   clinic was already terminated at the end of 2006?

11   A    They terminated January 1st of 2007.

12   Q    So for one month, the month prior to terminating

13   their services, you did the prepayment review?

14   A    That's when we started the prepay.  Okay.

15   Q    I'm with you.  All right.  Now, when did you learn

16   that the Schneider Medical Clinic was under

17   investigation?

18   A    Geez, I don't remember what the date was.  I don't

19   think we were contacted until well towards the end of

20   2007, first of 2008.

21   Q    Okay.  Was there already an Indictment?

22   A    I don't recall.

23   Q    Well, you understand that this Indictment in this

24   case was filed December 20th, 2007?

25   A    Okay.

3704

```
 1    Q   Were you asked to start reviewing these records
 2    before December 20th, 2007, or was it in 2008?
 3    A   No, it would have been in 2008.
 4    Q   Okay.
 5                         (Off-the-record discussion
 6                         between counsel.)
 7    BY MR. WILLIAMSON:
 8    Q   My colleague is going to pull up a document for me
 9    so we can talk about that.
10    A   Sure.
11    Q   I don't want to keep the jury sitting so I'll keep
12    moving.
13        Now, you -- Blue Cross/Blue Shield terminated the
14    relationship with the Schneider Medical Clinic; correct?
15    A   That's correct.
16    Q   And with Dr. Schneider in particular; correct?
17    A   The entire clinic, yes.
18    Q   And with Lawrence Simons the reason was he lied on
19    some information; correct?
20    A   Uh-huh.
21    Q   You're aware that the clinic, Dr. Schneider, they
22    terminated Dr. Simons' employment at some point?
23    A   No, I was not aware of that.
24    Q   Well, when you decided to terminate the relationship
25    with Dr. Schneider, the reason given was no cause, no
```

3705

1    reason was given as to why it was terminated; is that

2    correct?

3    A    That's correct.

4    Q    Blue Cross/Blue Shield never informed Dr. Schneider

5    prior to terminating him that Blue Cross/Blue Shield

6    believes that he's fraudulently submitting bills;

7    correct?

8    A    I don't know that Blue Cross/Blue Shield has ever

9    told a provider they were fraudulently billing claims.

10   I don't like -- I don't think I like the way that you

11   word that to me.

12   Q    I understand.  Did Blue Cross/Blue Shield alert Dr.

13   Schneider that there are some irregularities in your

14   billing and we're concerned?

15   A    Oh, yeah, we would have notified him of that because

16   we would have sent him a letter telling him that he was

17   on prepay and given him a reason why.

18   Q    But what is the reason why?

19   A    Because -- I've already stated that.  The evaluation

20   of management codes were not being billed appropriately

21   and physician's assistants were not being billed under

22   their own provider numbers.

23   Q    And that was given at the end of 2006; right?  When

24   you decided to terminate the program?

25   A    Well, that would have been one of many, yeah.

```
 1   Q   Okay.  But it would have been -- can you point me to
 2   specific dates and letters?
 3   A   No.
 4   Q   You introduced the actual termination letter;
 5   correct?
 6   A   That's correct.
 7   Q   And if there were other letters, Blue Cross/Blue
 8   Shield would have kept them in the regular course of
 9   business; correct?
10   A   That's correct.
11   Q   And that could have been given to the Government;
12   correct?
13   A   Correct.
14   Q   Which then would have had to have been given to us?
15   A   That's correct.
16   Q   But as we sit here now, we don't have any of those
17   letters; correct?
18   A   I don't know.  Do you?  If you don't have them, I
19   mean, I don't have any idea what you have.
20   Q   Okay.  I understand.  Now, you could have put in
21   this letter where it states without cause, you could
22   have put something similar to what you did with Dr.
23   Simons?  You could have put based on billing
24   irregularities in that letter; correct?
25   A   That's not typically policy that we do that.  The
```

3707

```
 1      Simons letter also was done by a re-credentialing
 2      committee.  It's two totally different areas that are
 3      making decisions.
 4      Q    But you also put in letters the contract clause that
 5      was actually violated; correct?
 6      A    For which one?
 7      Q    For any providers that you send these letters for.
 8      A    If we're terminating -- typically speaking, when we
 9      terminate them, we terminate them without cause, give
10      them 120 days.
11      Q    Okay.  So there was nothing different about the
12      termination that you provided for the Schneider Medical
13      Clinic than all these other clinics?  You just used the
14      same generic language?
15      A    That particular letter, yes.
16      Q    Okay.  And there's nothing in that letter -- there's
17      this 16-I where it states that you identify general
18      conditions as far as the reason why the Schneider
19      Medical Clinic would be terminated.  Correct?
20      A    That was in 16-I you said?
21      Q    Yes.
22      A    Yes, that's correct.
23      Q    And there's nothing specific in that letter that
24      states you're being terminated for submitting fraudulent
25      claims; correct?
```

3708

```
 1   A   I don't like that "F" word.  It's very difficult.
 2   Q   Let me rephrase.  There's nothing in 16-I that
 3   states you're being terminated for submitting false
 4   claims; correct?
 5   A   That's correct.
 6   Q   All right.  Now, you don't like the "F" word but you
 7   understand we're here because of that "F" word; right?
 8   A   Do it every day.
 9   Q   Okay.  We're talking about the good "F" -- not the
10   worst "F" word we could be using.
11   A   Yes, I understand.
12   Q   So we're looking at -- you understand that in your
13   line of work you will -- it's possible that Blue
14   Cross/Blue Shield can receive bills that are submitted
15   in error; correct?
16   A   That's correct.
17   Q   And that error can be based on mistake, or it could
18   be intentional.  You would agree with that?
19   A   I do.
20   Q   And people can submit bills by mistake and not
21   intend to defraud your company; correct?
22   A   That's correct.
23   Q   And then there are some bad actors out there who
24   will undertake schemes in order to submit false claims
25   to you in order to, to defraud the company; correct?
```

3709

1    A    That's correct.

2    Q    Now, is it your job to look for evidence of intent

3    to defraud or whether mistake or do you just record the

4    numbers?

5    A    Both.

6    Q    Okay.  Now, in this case did you talk to or

7    interview the billing managers at the Schneider Medical

8    Clinic?

9    A    No, not personally.

10   Q    Did anybody that you know of interview the billing

11   managers at the Schneider Medical Clinic?  Let me -- let

12   me finish my question.

13   A    Okay.  Sorry.

14   Q    As part of your review of the numbers that you

15   placed up on the -- testified about --

16   A    No, those reviews were done after his contract had

17   terminated.

18   Q    Okay.  But you were asked to review charts; correct?

19   A    Uh-huh.

20   Q    You were asked to take a look and see if these

21   claims are false; correct?

22   A    Uh-huh.

23   Q    And what I'm trying to find out, did you take any

24   steps to determine if the inaccuracies submitted were

25   based on mistake or if they were intentional.  And I

3710

1    want to focus on some steps that you either did or

2    didn't take.  Okay?

3    A    Okay.

4    Q    Did you interview the billing managers at the

5    Schneider Medical Clinic?

6    A    No.

7    Q    Did you know that both billing managers have

8    testified that they were not instructed to submit false

9    claims to any insurance companies?

10   A    No.

11   Q    Now, did you talk to any of the other billing

12   individuals in the billing department at Schneider

13   Medical Clinic?

14   A    With this review?  No.

15   Q    Have you ever talked to any?

16   A    Not personally.

17   Q    And have you ever talked to any of the physician's

18   assistants that worked under Dr. Schneider?

19   A    Not personally.

20   Q    Okay.  Are you aware that at least three physician's

21   assistants have testified that they were never

22   instructed to hide who the person was who actually saw

23   the patients?

24   A    I'm not sure how I would ever be privy to that.

25   Q    You've heard of investigations; correct?

3711

```
1    A    Yes, I understand.
2    Q    And you've heard of interviewing people in the
3    course of investigations?
4    A    That was not the intent of my review, nor was that
5    something I was asked to do.
6    Q    Okay.  Was anybody asked to try to make a
7    determination as to whether these mistakes that were
8    submitted were done intentionally, in a scheme or
9    whether or not they could have possibly been mistakes?
10   A    No.
11   Q    Now, in regards to the 99213 codes -- you're a
12   certified coder?
13   A    That's correct.
14   Q    What all did it take for you to get certified?
15   A    Well, there's multiple ways to do it.  I went
16   through a class that lasted about ten months.  And then
17   you have to take a test that is very intense and you
18   have to get a overall 80% score on the entire exam in
19   order to pass.
20   Q    Okay.  So you don't -- getting this certification
21   isn't just like going to a little weekend class and
22   calling yourself certified; correct?
23   A    No.
24   Q    This is a specialized training area; correct?
25   A    That's correct.
```

3712

1  Q   And even coders in that specialized training area

2  have dis -- I guess the proper term is rates of

3  disagreement when looking at the same set of charts;

4  correct?

5  A   Potentially.  I guess it depends on what they're

6  looking for.

7  Q   And you understand that we are going to have an

8  expert who reviewed your review?

9  A   Okay.

10 Q   And do you think it's uncommon for some auditing --

11 an auditor to have disagreements?

12 A   Uncommon?  I don't know.  I don't know how often it

13 happens.

14 Q   You haven't conducted any studies to determine the

15 error rate in your audits; correct?

16 A   No, huh-uh.

17 Q   Now, you understand that when these providers at the

18 Schneider Medical Clinic were having to identify their

19 services, they used a fee ticket; correct?

20 A   Uh-huh.

21 Q   Did you actually review the fee tickets?

22 A   Yes.  That was part of the chart that we had.

23 Q   And you looked at the fee ticket and the fee ticket

24 would identify the provider; correct?

25 A   That's correct.

3713

1    Q    And then you would see that provider, you would look
2    at the progress note as well; correct?
3    A    That's correct.
4    Q    And then in the progress note you would see a
5    signature.  If it's a physician's assistant you would
6    see a counter signature.  Correct?
7    A    No.
8    Q    You don't remember that?
9    A    The physician's assistant didn't necessarily need a
10   counter signature.
11   Q    Are you not aware that in Kansas that a physician
12   has to countersign a PA's chart within 14 days?
13   A    Well, not -- they may have to sign the chart, but it
14   wasn't always on there.
15   Q    Okay.  And you base that on -- how did you compare
16   the signatures?
17   A    Well, from chart to chart or we asked for a list of
18   all -- or something actually showing all the signatures
19   and who they belonged to.
20   Q    And who did you get that from?
21   A    Well, the provider's office.  We ask for that pretty
22   routinely if we request medical records and we can't
23   identify who the signature belongs to.
24   Q    Okay.  So you don't believe that some of these
25   progress notes were counter-signed?

3714

1    A    No.  Not all of them, no.

2    Q    Okay.  Do you know how many weren't?

3    A    I don't have a feel for the number.

4    Q    All right.  And we don't have a -- so you don't know

5    if a couple slipped through or if it was -- you just

6    don't know; is that fair?

7    A    That's correct.

8    Q    For the vast majority of records, the fee ticket and

9    the progress notes all matched up; correct?

10   A    Probably the majority, yes, did.

11   Q    And are you aware that at least three physician's

12   assistants have testified that they were not instructed

13   to withhold their signature from any progress notes?

14   A    No, I was not aware of that.

15   Q    Are you aware that at least three physician's

16   assistants testified that they were not instructed to,

17   by anybody, to change their name off the fee ticket and

18   make it look like a doctor saw the patient?

19   A    No, I was not aware of that.

20   Q    Now, with this random sample issue, you didn't --

21   we've heard about the random samples.  The charts came

22   to you already pulled; is that correct?

23   A    That's correct.

24   Q    Okay.  Now, I'm struggling with whether I was even

25   going to talk to you about this and I think I will just

3715

1    briefly.  You mentioned this whole upcoding physicians

2    thing and we kind of chatted a little bit about it.

3    Right?

4    A    Upcode?  You're talking about the upcoded claim?

5    The procedure code?

6    Q    No, I'm talking about the provider being billed as a

7    physician when it was actually a physician assistant?

8    A    Okay.  Sure.

9    Q    Now, you understand that for there to even be a

10   mistake, it has to be a technical violation of a rule.

11   Would you agree with that?

12   A    Uh-huh.

13   Q    Okay.  But as I understand it, Blue Cross/Blue

14   Shield always allowed physician's assistants to be

15   billed as physicians; correct?

16   A    No.  We've always had -- the physician's assistants

17   with Blue Cross/Blue Shield have always had a separate

18   provider number, one that identified them individually.

19   Q    Okay.  And -- but didn't Blue Cross/Blue Shield

20   allow clinics to use incident-to billing?

21   A    Back in 2002.

22   Q    When did that change?

23   A    2004.

24   Q    Okay.  Now, back to this 99213 thing.  The providers

25   don't walk around with a guideline in their pocket, do

3716

```
 1   they, normally?

 2   A   I have no idea what they walk around with.

 3   Q   Have you ever known doctors to walk around with the

 4   CPT code in their pocket?

 5   A   Not that I've seen.

 6   Q   And you understand that when they have to make a

 7   selection, it's normally right after they see a patient?

 8   A   It depends on the doctor's offices.  Some doctors

 9   don't even assign the code themselves at all.  Some of

10   them have a staff of coders that look at the medical

11   record and assign a code.  It just depends on the

12   doctor's office.

13   Q   Did you know that the Schneider Medical Clinic

14   actually had a coder?

15   A   No, I did not know that.

16   Q   Okay.  Did you know this coder would -- did you know

17   whether or not they had anybody who would double check

18   the documentation to see if it supported the code

19   selected?

20   A   I have no idea.

21   Q   Now, you understand that when this doctor has to

22   make this selection, they're having to use their best

23   judgment.  Would you agree with that?

24   A   Uh-huh.

25   Q   And when you're trying to make a determination as to
```

3717

1    somebody's intentionally trying to submit something

2    false, you would want to know their rationale as to why

3    they believed that the services they provided qualified

4    under whatever respective code submitted; correct?

5    A    All that information should be supported in the

6    medical record itself.  They shouldn't have to verbally

7    support it any other way.

8    Q    I understand that when it comes to getting paid

9    under your contract.  I think that's fair.  But when

10   you're trying to go a step further and find out a

11   person's intent, you know, were they intentionally

12   misrepresenting this 99212, 213, 214.  You have to go a

13   little bit further than documentation, don't you?

14   A    No.  The documentation should always support the

15   code that's billed.

16   Q    Always?

17   A    Always.

18   Q    Okay.  And so if the documentation supports it,

19   regardless if the service is actually rendered, the

20   documentation trumps; correct?

21   A    That would be fraudulent.

22   Q    Exactly.  It really would, wouldn't it?

23   A    Well, they have to do the service.

24   Q    All right.  Well, that's -- now we're gettin' to

25   business.  You have -- the issue, I believe you

3718

```
 1    testified to this on direct, and I'm looking for the
 2    quote here, "that the focus is on the service provided";
 3    correct?
 4    A    That's correct.
 5    Q    All right.  Now if a physician doesn't do a service
 6    and marks up this progress note for this imaginary
 7    patient that never came in and submits it, when you look
 8    at the documentation it would support the 99213;
 9    correct?  It could?
10    A    In theory.
11    Q    Okay.  But at the same token, if the provider
12    actually provides the service but doesn't do a good job
13    in documenting it, that doesn't mean the service didn't
14    happen, does it?
15    A    In theory.
16    Q    It just means that under your contract, you all
17    reserve the right to say we're not going to pay you for
18    this; correct?
19    A    Well, the standard and the norm in the industry is
20    you do, you bill based on what you do and --
21    Q    I understand?
22    A     -- and we as an insurer expect the honesty of the
23    provider to do so.
24    Q    I understand the standard in the industry.  But
25    we're, you know, again dealing with that "F" word.
```

3719

```
 1    Okay?
 2    A    Uh-huh.
 3    Q    If the provider does the service, doesn't do a great
 4    job in documenting that service, that does not mean the
 5    service didn't happen; correct?
 6    A    That's correct.
 7    Q    Okay.  Now, it's actually in the physician's
 8    interest to document as much as he possibly can;
 9    correct?
10    A    That's correct.
11    Q    Because the more you document, the less chances are
12    that you're going to get your money taken away from you;
13    correct?
14    A    As long as the documentation is applicable to the
15    services that are being rendered, yes.
16    Q    Right.  Okay.  That's why a lot of people go towards
17    dictation because it's a little bit more accurate?
18    A    More legible.
19    Q    More legible.  And by the way, the clinic's records
20    aren't the only doctor's records you've ever had trouble
21    reading; correct?
22    A    No, not typically.
23    Q    I mean, this is a -- in the industry, it's been
24    widely known that doctors' handwriting can stand to be
25    improved; correct?
```

3720

1    A    Probably.

2    Q    Okay.  I don't think lawyers are too far behind.  I

3    can't even read my own writing sometimes.  But we try

4    to -- should try to get better.  Would you agree with

5    that?

6    A    Explain your question.  Who should try to get

7    better.

8    Q    The physicians.  If they know it's in their best

9    interest to document their services as best they

10   possibly can so that it could withstand reviews and

11   actually show everything that actually happened, then

12   you would expect them to try to take steps to improve

13   that documentation; correct?

14   A    Well, I would hope so.

15              MR. WILLIAMSON:  Okay.  One second, Your

16   Honor, I need to review a document.

17                   (Off-the-record discussion.)

18   Q    Now, a couple of follow-up's.  As I understood your

19   testimony earlier, you were asked to do the review in

20   2008.  Do you remember like roughly when?

21   A    No, I really don't.  That's been too long ago.  I

22   don't remember exactly when it was.

23   Q    You had to go through 100 charts to do the review

24   that you talked about up there; correct?

25   A    Uh-huh.

3721

```
 1    Q    And how long did it take you to do it?

 2    A    Oh, I don't know.

 3    Q    Just roughly?

 4    A    I don't have any idea, but I'm sure it took at least

 5    three months I'm sure.  It took a while to go through

 6    all of them.  There were a lot of records.

 7    Q    And did you ever have to call Dr. Schneider to help

 8    him -- have him help you interpret some of those charts?

 9    A    No.

10    Q    Were you able to read everything on the charts?

11    A    No.

12    Q    Okay.  What did you do with the information you

13    couldn't read?  You just kind of ignored it?

14    A    If it's not legible, it's not documented, it's not

15    done.

16    Q    Those darn contract rules, huh?

17    A    I think that's also an industry standard, not just a

18    Blue Cross/Blue Shield standard.

19    Q    In other words, all insurance companies have that

20    documentation requirement; true?

21    A    Yes.  It's actually a requirement of the Board of

22    Healing Arts.

23    Q    Okay.  One thing I find -- I'm confused about is:did

24    you know that the original Indictment in this case was

25    returned on December 20th of 2007?
```

3722

1   A   I don't have all those dates just in my head.  I'm

2   sorry.

3   Q   Well, I'm just going to hand you a copy of the

4   original Indictment.

5   A   Okay.

6   Q   You see the filed with the District Court date on

7   the top of that?

8   A   Yes.

9   Q   Okay.  What date does that say?

10  A   I think that's a 7, it's hard to tell, December 20.

11  Q   2007?

12  A   Uh-huh.

13  Q   Now, turn it over to Count 16.  There's a place in

14  there where it states that about Blue Cross/Blue Shield

15  fraud allegations.  Correct?

16  A   That's correct.

17  Q   Can we look at Exhibit 16 please.

18      Count 16 of the exhibit that you testified about

19  has 692 claims reviewed.  Under count 16 under that

20  Indictment that was filed on December 20th, 2007, how

21  many claims were reviewed?

22  A   692.  So, we obviously reviewed it before this.

23  Q   You knew where I was going.  It's pretty impossible

24  for you to have reviewed --

25  A   Yeah, well, I couldn't remember the exact dates and

3723

```
 1    I told you that so --
 2    Q   Okay.  All right.
 3              MR. WILLIAMSON:  I don't have anything
 4    further, Your Honor.
 5              THE COURT:  Mr. Gorokhov.
 6                   CROSS EXAMINATION
 7    BY MR. GOROKHOV:
 8    Q   Good afternoon.
 9    A   Hi.
10    Q   You spoke a little bit about the -- these rules and
11    I know you spoke at some length with Mr. Williamson
12    about the documentation rules.
13    A   Uh-huh.
14    Q   Correct?
15    A   Uh-huh.
16    Q   And there's also the rules about whose
17    responsibility and so forth?
18    A   Okay.
19    Q   When these claims get submitted?
20    A   Uh-huh.
21    Q   These rules are applied when you do like an audit or
22    recoupment, when you try to get money back; is that
23    correct?
24    A   That's correct.
25    Q   So they place the burden on the physician or the
```

3724

1    clinic to show that there is adequate documentation or

2    else they don't get paid?

3    A    That's correct.

4    Q    And that's on them?

5    A    Uh-huh.

6    Q    Okay.  You're aware this is a criminal case?

7    A    Yes.

8    Q    You're aware the burden of proof is not on them in

9    this case?

10   A    Okay.  Sure, yes.

11   Q    Okay.

12        MR. GOROKHOV:  Okay.  That's all I have.

13        THE COURT:  Any redirect?

14        MS. TREADWAY:  Just briefly, Judge.

15                  **REDIRECT EXAMINATION**

16   BY MS. TREADWAY:

17   Q    Mr. Williamson was talking to you about how to find

18   a person's intent.  In the 24 years that you've worked

19   in this industry and in your work as a fraud and abuse

20   investigator, do you find that documents alone can often

21   evidence someone's intent?

22   A    Yes.

23   Q    And in this case did you see patterns that evidenced

24   intent?

25   A    Yes.

1   Q    And did you see patterns that evidenced fraud?

2   A    Yes.

3           MS. TREADWAY:  Nothing further.

4           THE COURT:  Sir.

5           MR. WILLIAMSON:  I don't have anything, Judge.

6           THE COURT:  Mr. Gorokhov.

7           MR. GOROKHOV:  Nothing, Your Honor.  Thanks.

8           THE COURT:  Thank you, ma'am.  You're excused.

9   A    Thank you.

10          THE COURT:  Next witness please.

11          MS. TREADWAY:  Government calls Robert

12  Swonger.

13                    **ROBERT SWONGER**

14  Having been first duly sworn to tell the truth, the

15  whole truth and nothing but the truth, testified as

16  follows on:

17                  **DIRECT EXAMINATION**

18  BY: MS. TREADWAY:

19  Q    Could you please state your name for the record.

20  A    It's Robert Swonger.

21  Q    And before I introduce you, Mr. Swonger, we need to

22  share with the jury the fact that you're having a little

23  trouble hearing, aren't you?

24  A    I am, yes.

25  Q    Did you just recently suffer from pneumonia?

```
 1   A    Yes, ma'am.
 2   Q    And are your ears still a little stopped up?
 3   A    Yes, ma'am.
 4   Q    So, if you have trouble hearing, you just let me
 5   know.
 6   A    I will.  Thank you.
 7   Q    And I want you to speak real loud into the mic so
 8   everyone can hear you.
 9   A    Okay.
10   Q    Mr. Swonger, where do you currently work?
11   A    The Salvation Army.
12   Q    And how long have you worked for the Salvation Army?
13   A    It will be two years the 22nd of May.
14   Q    What do you do for the Salvation Army?
15   A    I'm the Director of Operations.
16   Q    And what does that mean?
17   A    I supervise the family stores in the area.
18   Q    Did you previously work in the healthcare industry?
19   A    Yes, ma'am.
20   Q    And when did you begin working in the healthcare
21   industry?
22   A    1991.
23   Q    And do you have any special training in the
24   healthcare industry?
25   A    Yes, ma'am.
```

3727

1    Q    And what are those trainings that you've had?

2    A    CNA, Certified Nursing Assistant; CMA, Certified

3    Medication Assistant; and MA, Medical Assistant.

4    Q    And how long did it take to achieve your Certified

5    Nurse Assistant, CNA?

6    A    I believe it was six weeks.

7    Q    And how long did it take you to get your Certified

8    Medication Assistant certification?

9    A    An additional two weeks.

10   Q    And how long did it take you to get your Medical

11   Assistant's certification?

12   A    Nine months.

13   Q    Were you ever a patient at the Schneider Medical

14   Clinic?

15   A    Yes, ma'am.

16   Q    Did you see only one provider there?

17   A    No, ma'am.

18   Q    How many did you see?

19   A    All the providers.

20   Q    With whom did you have your first or initial office

21   visit?

22   A    Dr. Stephen Schneider.

23   Q    And why were you seeking medical care at the time?

24   A    I have cervical strain, herniated discs, in C-4 and

25   5.

3728

1    Q    And is that from prior automobile accidents?

2    A    Several, yes.

3    Q    When the Defendant Stephen Schneider walked into

4    your exam room for the first time, what did he ask you?

5    A    "What do you need?"

6    Q    What did you understand what do you need was

7    referring to?

8    A    What medications I needed.

9    Q    Did you want medications?

10   A    I wanted fixed.

11   Q    You wanted fixed?

12   A    Yes.

13   Q    How long was your first visit with the Defendant

14   Stephen Schneider?

15   A    Ten minutes.

16   Q    Did he ask you to take off your clothes and get in a

17   medical gown?

18   A    No, ma'am.

19   Q    Did he perform what you would consider a thorough

20   physical and history?

21   A    No, ma'am.

22   Q    Nevertheless, did he diagnosis you with a new

23   condition?

24   A    Fibromyalgia -- yes.

25   Q    Fibromyalgia?

```
 1    A    Uh-huh.

 2    Q    What did you think of that diagnosis?

 3    A    I didn't think it was correct.  I didn't know much

 4    about it.

 5    Q    What did he do to diagnosis you with that?

 6    A    Some pressure-point tests.

 7    Q    What type of testing did you want on that initial

 8    visit?

 9    A    Diagnostic testing, MRI, CAT scans.

10    Q    And did you eventually get a MRI?

11    A    Yes.

12    Q    What did it take for you to get a MRI?

13    A    Persistence.

14    Q    Can you describe for the jury the Defendant Stephen

15    Schneider's demeanor during that first initial visit?

16    A    It was cold and gruff.

17    Q    While you were a patient at the Schneider Medical

18    Clinic, did you find out about possible employment

19    opportunities there?

20    A    Yes, ma'am.

21    Q    Did you then become an employee at the Defendant's

22    clinic?

23    A    Yes.

24    Q    Why did you accept employment there?

25    A    My passion for the health industry.
```

3730

```
 1    Q    Did you need a job at the time?

 2    A    Yes, definitely.

 3    Q    Now, the clinic records show that you began your

 4    employment in April, 2006.  Do you remember when your

 5    employment ended?

 6    A    I believe it was October of '07.

 7    Q    If the records reflect December of '07, would that

 8    also be approximately correct?

 9    A    I believe so, yes, ma'am.

10    Q    And we have you on our timeline as our final

11    individual.  While you were an employee, Mr. Swonger,

12    did you continue being a patient?

13    A    Yes, ma'am.

14    Q    Who hired you to work at the Schneider Medical

15    Clinic?

16    A    Linda Atterbury.

17    Q    What did you do when you were initially hired?

18    A    Room patients.  Collected vital signs.

19    Q    What providers did you work with as a roomer or a

20    medical assistant?

21    A    Dr. Stephen Schneider and Connie White, Mohammed

22    Akram and Lawrence Simons.

23    Q    Did your job eventually change?

24    A    Yes.

25    Q    What did it change to?
```

3731

```
 1    A    The Assistant Nursing Supervisor.   I assisted her.
 2    Q    Were there actually any Registered Nurses at the
 3    clinic?
 4    A    No.
 5    Q    Who did they refer to as nurses?
 6    A    The medical assistants, CNAs.
 7    Q    Let's talk about the Defendant Linda Schneider.
 8    What was her role at the clinic?
 9    A    Office manager.
10    Q    Did you ever see the Defendant Linda Schneider turn
11    away patients because they could not pay?
12    A    Yes.
13    Q    Were these general family practice patients?
14    A    Yes.
15    Q    Did she turn away pain patients that could not pay?
16    A    Yes.
17    Q    How frequently would she do that?
18    A    I would say it was probably maybe not as frequent.
19    Q    Not as frequent as the family patients?
20    A    Uh-huh.
21    Q    How would you describe Defendant Linda Schneider's
22    management style when it came to supplying the clinic?
23              MR. BYERS:   Objection Your Honor, lack of
24    foundation.
25              THE COURT:   To doing what at the clinic?
```

3732

1          MS. TREADWAY:  Supplying the clinic.

2          THE COURT:   Supplying the clinic with what?

3          MS. TREADWAY:  Buying supplies for the clinic.

4          THE COURT:   The objection is sustained.   Lay

5    some foundation if you can.

6    BY MS. TREADWAY:

7    Q   Were you familiar with how the supplies were

8    purchased at the clinic?

9    A   Yes, ma'am.

10   Q   And how were you familiar with that?

11   A   I -- I did it at times.

12   Q   How would you describe Defendant Linda Schneider's

13   management style when it came to purchasing supplies for

14   the clinic?

15   A   We went the cheapest route.

16   Q   You went the cheapest route?

17   A   Yeah.

18   Q   How would she use paper in the clinic for instance?

19   A   Recycle.

20   Q   And when you say recycle, would she actually recycle

21   old patient medical records?

22   A   Yes.

23   Q   And would she print new information on the top of an

24   old record?

25   A   Yes.  The back side would have a line drawn through

3733

1    it.

2    Q   And would that end up in people's medical records?

3    A   At times.

4    Q   Did the Defendant Stephen and Linda Schneider spend

5    lunches at the clinic?

6    A   No.

7    Q   What did they do instead?

8    A   They had lunches with the drug representatives.

9    Q   What were Wednesdays known as Mr. Swonger?

10   A   "Red Lobster".

11   Q   What happened when pharmaceutical sales

12   representatives would bring food into the clinic?

13   A   It was usually left in the breakroom; but you didn't

14   touch it unless you had the okay.  Or it would go home

15   with her.

16   Q   So who would it go home with?

17   A   Linda.

18   Q   And who needed to okay the staff to eat it?

19   A   Linda.

20   Q   Now, you testified earlier about working with Dr.

21   Lawrence Simons.  Was he another physician at the

22   clinic?

23   A   Yes, ma'am.

24   Q   Was there ever a problem with Dr. Simons being able

25   to see patients?

3734

```
 1    A    Yes.

 2    Q    What was the problem?

 3    A    He seemed to be impaired at times when he came to

 4  work.

 5    Q    And how would he seem to be impaired?

 6    A    As if he were under the influence.

 7    Q    Of drugs or alcohol?

 8    A    Yes.

 9    Q    When that occurred, would Defendant Linda Schneider

10  cancel the patients he was to see?

11    A    No.

12    Q    What would she do instead?

13    A    He was to see his patients, but most of the time I

14  would see the patients and write the refills.

15    Q    So you would see the patients?

16    A    Right.

17    Q    And did Linda Schneider know you were seeing the

18  patients?

19    A    Uh-huh, yes.

20    Q    And did she know that you were writing the

21  prescriptions?

22    A    Yes.

23    Q    Did you have a DEA license to prescribe controlled

24  substances to people?

25    A    No, ma'am.
```

3735

1    Q    Did you have any medical training besides the

2    training you've talked about earlier?

3    A    No, ma'am.

4    Q    So how would Dr. Simons' prescriptions -- I'm

5    sorry -- how would Dr. Simons' patients that you were

6    seeing get controlled substance prescriptions from you?

7    A    He would sign the pads.

8    Q    But you would fill out the prescription?

9    A    That's correct.

10   Q    Did you also handle phone-in requests for controlled

11   substances prescriptions for people that were calling

12   for Dr. Simons?

13   A    Correct, yes.

14   Q    And were these people patients at the clinic?

15   A    Not all of them, no.

16   Q    Who were some of the people that were not patients

17   at the clinic?

18   A    There was a wide variety of 'em.  He had personal

19   friends, dancers, all kinds of -- mostly females.

20   Q    When those calls came in, did the Defendant Linda

21   Schneider instruct what you were to do with them?

22   A    Send them to him.

23   Q    Had Dr. Simons seen the patients at the clinic at

24   all before prescribing some of these medications?

25   A    Not always.

3736

1    Q    Did these folks get prescriptions for controlled

2    substances anyway?

3    A    At times, yes.

4    Q    And did Linda express any opinion about these

5    prescriptions for these nonclinic patients?

6    A    Yes.  That they should not be getting medication.

7    They needed to come in and be seen by the doctor.

8    Q    And why did she want them to come in?

9    A    So they were seen by the doctor and they would have

10   to pay an office visit to be seen.

11   Q    What eventually happened to Dr. Simons?

12   A    He was terminated.

13   Q    And who actually terminated him?

14   A    I did.

15   Q    Who asked you to terminate Dr. Simons?

16   A    Linda Atterbury.

17   Q    And how did you do that?

18   A    Over the telephone.

19   Q    Did you have the occasion to spend time with the

20   Defendant Stephen Schneider when you were working as a

21   medical assistant?

22   A    Yes, ma'am.

23   Q    Did you see how he handled patients who had failed

24   urine drug screens?

25   A    Yes, ma'am.

3737

```
 1    Q    What did he typically do?

 2    A    Usually a repeat of the drug screen.

 3    Q    How often would he terminate people with failed

 4    urine drug screens?

 5    A    Not very often.

 6    Q    During your employment at the Defendant's clinic,

 7    did you have concerns about the dosages and amounts of

 8    controlled substances being prescribed?

 9    A    At times, yes.

10    Q    Did you ever express your concerns and talk about

11    your concerns to the Defendant Stephen Schneider?

12    A    On occasion, yes.

13    Q    And what was his response?

14    A    I'm not a provider.

15    Q    You're not a provider?

16    A    Right.

17    Q    Did he ever ask you whether you had a medical

18    degree?

19    A    No.  Oh, yes.  Yeah, where I acquired my medical

20    degree.

21    Q    Did you ever discuss with him the fact that people

22    were overdosing and dying from their prescriptions?

23    A    When we would receive an overdose for a death, yes,

24    it was given directly to the provider, yes, ma'am.

25    Q    Did you hear the Defendant Stephen Schneider refer
```

3738

```
 1    to the patients who had died from overdoses with a
 2    particular term?
 3    A    Yes.
 4    Q    What was that term?
 5    A    They were "the bad grapes".
 6              MS. TREADWAY:  Nothing further.
 7                    CROSS EXAMINATION
 8    BY MR. WILLIAMSON:
 9    Q    Is it Robert?
10    A    Yes, sir.
11    Q    Okay.  You look kind of scared.  Are you scared to
12    be here?
13    A    No.  I'm sick.
14    Q    Just sick.  Okay.  Are you Robert Swonger with the
15    social beginning with 510?
16    A    Yes, sir, that's correct.
17    Q    You've lived at Market Street?
18    A    Uh-huh.  Correct.
19    Q    You've lived at Seneca?
20    A    At -- lived at Seneca?  No.
21    Q    3113?
22    A    No, my office was at Seneca.
23    Q    Okay.  Used to live at 3935 North Nims?
24    A    Yes, sir.
25    Q    Okay.  You go by any other names besides Robert?
```

3739

```
 1    A    Robbie.

 2    Q    Robbie.  What about Lyle?

 3    A    No, that's my middle name.

 4    Q    Okay.  What about Roberta?

 5    A    Roberta is my mother.

 6    Q    Okay.  You've never used that in association with

 7    your social security number?

 8    A    No.  No.

 9    Q    Okay.  Now, you had a relationship with Lawrence

10    Simons; correct?

11    A    I worked with Lawrence Simons, yes.

12    Q    Even after he was terminated from the clinic, you

13    continued to have a relationship with him; correct?

14    A    Yes.

15    Q    And you would -- you and Lawrence Simons would write

16    prescriptions for people without giving any kind of

17    physical exams to them; correct?

18    A    Write them?

19    Q    Write the prescriptions.

20    A    After he was terminated?

21    Q    Yes.

22    A    No, I didn't write prescriptions for him.

23    Q    Did you ever have Lawrence Simons writing

24    prescriptions for you without any office visits?

25    A    He had, yes.
```

3740

1    Q    Did you ever have Lawrence Simons write

2    prescriptions for your family members after he had been

3    terminated?

4    A    Yes, he did.

5    Q    Were there times that you would write a prescription

6    and have Lawrence Simons sign it for your family

7    members?

8    A    Yes, after he reviewed it, yes, sir.

9    Q    Okay.  And this occurred after Linda Schneider

10   wanted Mr. Simons, Dr. Simons terminated; correct?

11   A    No.  No.

12   Q    So you're saying that after Lawrence --

13   A    It was verbal.

14   Q    I'm sorry.

15   A    It was verbal.  He would call it.

16   Q    Okay.  So make sure we understand.  After -- did you

17   or were you aware that Linda Schneider actually went to

18   the federal government complaining about Lawrence (sic)

19   Simons?

20   A    No.

21   Q    Did you know whether or not she was afraid of

22   Lawrence Simons?

23   A    Afraid of him?

24   Q    Yes.

25   A    No.

3741

```
 1    Q    Okay.  Now, after the clinic fired Lawrence Simons,
 2    he would call in prescriptions for you; correct?
 3    A    He --
 4    Q    Yes?
 5    A    Yes.
 6    Q    He would call in prescriptions for your brother?
 7    A    Yes.
 8    Q    He would call in prescriptions for -- who else would
 9    he call in prescriptions for?
10    A    He continued to take care of my mother and my
11    father.
12    Q    And he wouldn't be meeting with these individuals;
13    correct?
14    A    Not after he left the clinic.
15    Q    Now, you actually became under investigation for
16    participating in this scheme; correct?
17    A    Under investigation?
18    Q    Yes.  Weren't you --
19    A    I was a witness.
20    Q    Huh?
21    A    I testified.
22    Q    Yeah.  Didn't you testify --
23    A    Yes.
24    Q    And weren't you told that you have a Fifth Amendment
25    right to remain silent?
```

```
 1    A    Yes, sir.
 2    Q    And weren't you told that you had the right to have
 3    counsel present?
 4    A    Yes, sir.
 5    Q    Now, you testified under oath previously, haven't
 6    you?
 7    A    Yes, sir.
 8    Q    And nowhere in that testimony had you ever stated
 9    anything negative about Dr. Schneider; correct?
10    A    I don't understand the question.  I'm sorry.
11    Q    When you testified previously under oath, you never
12    told the questioners that Dr. Schneider would not --
13    would do repeat UDSs, did you?
14    A    No, it wasn't the scheme -- was Simons that I
15    testified under oath on.  I wasn't asked about Dr.
16    Schneider.
17    Q    You've never testified before today anything in
18    regards to Dr. Schneider; correct.
19    A    No, sir.
20    Q    Okay.  Now, also when you were -- you were
21    terminated from the clinic?
22    A    No.
23    Q    You quit?
24    A    Yes.
25    Q    When did you quit?
```

3743

```
 1    A    I believe it was the last of October, 2007.

 2    Q    2007?

 3    A    Yes, sir.

 4    Q    Now, when you met with Dr. Schneider the first time

 5    you said that he asked you, "what do you need"; correct?

 6    A    Correct.

 7    Q    He didn't say you want oxycodone?

 8    A    No.

 9    Q    He didn't say you want Lortab?

10    A    No.

11    Q    And you proceeded to meet with him for about ten

12    minutes; correct?

13    A    Correct.

14    Q    And he did some kind of pressure-point test on you;

15    true?

16    A    Correct.

17    Q    Okay.  He didn't tell you create a diagnosis for me

18    so I can justify giving you some stuff, did he?

19    A    No.

20    Q    Okay.  You went to work at the clinic with good

21    intentions based on what you told Ms. Treadway; correct?

22    A    Repeat please.

23    Q    Yes.  You, when you decided to take a job at the

24    clinic, you went there with good intentions; correct?

25    A    Correct.
```

3744

1    Q    You were passionate about the medical field;
2    correct?
3    A    Yes.
4    Q    And isn't it true that Dr. Schneider would try to
5    give his patients opportunities even if they failed a
6    urine drug screen?
7    A    Yes, sir.
8    Q    He was not so cold that he would say you failed your
9    first one, you're cut off?  He would say, look, let me
10   work with you, I believe you're in pain, let me try
11   to -- let's try this again.  Correct?
12   A    He would repeat the UDS again, yes.
13   Q    Okay.  Now, you also helped Dr. Simons after you
14   left the clinic to help fill prescriptions for his wife;
15   correct?
16   A    No.
17   Q    You also helped Dr. Simons after he was fired from
18   the clinic to help write prescriptions for other
19   patients who he wasn't seeing; correct?
20   A    That he had seen in the past.
21   Q    Yeah, but that he wasn't currently seeing; correct?
22   A    Yes.
23   Q    You acted as an intermediary between Dr. Simons and
24   his patients, didn't you?
25   A    No, I wouldn't say that.

3745

```
1    Q    The patients would -- are you familiar with Connie
2    King?
3    A    Yes.
4    Q    You would talk with Connie King after talking with
5    Dr. Simons; correct?
6    A    Into what -- I don't understand.
7    Q    In what fashion -- let's say a patient would call
8    you and say, hey, I need my refills.  You would then
9    call Dr. Simons who would then call Connie King over at
10   the K-Mart pharmacy; correct?
11   A    Or whatever pharmacy he said to call it out at.  Not
12   necessarily just Connie King.
13   Q    You knew at this time he was not actively seeing
14   these patients; correct?
15   A    Correct.
16   Q    And this is after the clinic had reported that this
17   guy was doing some bad stuff and fired him.  You still
18   continued to help him; correct?
19   A    At times, correct.
20   Q    You understand that that could have exposed you to
21   criminal liability for helping him hand out
22   prescriptions to people he doesn't know needs 'em or
23   not; correct?
24   A    Yes.
25   Q    When was the last time you met with the Government?
```

1    A    Other than today?

2    Q    Yes.

3    A    I'd say April -- in April.

4    Q    April of 2010?

5    A    Yes, sir.

6    Q    And before April of 2010, you had never made a

7    statement to anybody that Dr. Schneider did anything

8    wrong ever while he was at the clinic; correct?

9    A    Not to the Government, no.

10   Q    Okay.  You never filed any complaints with the

11   Kansas Board of Healing Arts -- and I've gone through

12   all these questions over and over.  You haven't done

13   anything like that; correct?

14   A    No.

15   Q    Okay.  Now, these meetings with these pharmaceutical

16   reps, it's common for doctors to meet with

17   pharmaceutical reps, aren't they?

18   A    This was the first practice that I had worked in.

19   Q    So you think pharmaceutical reps only existed

20   because Dr. Schneider was working?

21   A    No, I didn't say that.

22   Q    You understand these pharmaceutical companies are

23   nationwide companies; right?

24   A    Yes.

25   Q    Jansen Pharmaceuticals?

3747

```
 1    A    Yes.
 2    Q    Cephalon?
 3    A    Yes.
 4    Q    They're not headquartered here in Wichita, are they?
 5    A    Not that I'm aware of.
 6    Q    Okay.  Do you know whether or not a lot of these
 7    meetings there were educational activities occurring?
 8    A    I don't know.  I wasn't allowed to attend.
 9    Q    When you were helping Dr. Simons after he was fired
10    from the clinic, you would actually write the
11    prescriptions and let him sign them; correct?
12    A    It was during his employment at the clinic.
13    Q    Okay.  Now, you testified earlier that this
14    statement that you gave under oath, it was -- it
15    refefrred to Dr. Simons; right?  You remember that?
16    A    What was it?
17    Q    The statement that you gave under oath, you were
18    being asked questions about Dr. Simons; correct?
19    A    Yes, sir.
20    Q    You weren't just asked about, say, did Dr. Simons do
21    this or Dr. Simons do that?  You were asked tell us how
22    this stuff worked; correct?
23    A    Yes.
24    Q    So when you were asked, you were telling them -- you
25    talked to the questioners about Dr. Simons' ex-wife;
```

3748

```
 1    correct?

 2    A    No.

 3    Q    You never mentioned that he had domestic issues with

 4    his ex-wife?

 5    A    With his second wife, yes.

 6    Q    His second wife?  Okay.

 7    A    I'm sorry, yes.

 8    Q    All right.  His second wife.  And you talked about

 9    signing prescriptions and -- excuse me -- filling them

10    out and letting Dr. Simons fill them out; correct?

11    A    That's correct.

12    Q    One thing that was missing -- and I'll let you look

13    at this -- you don't state -- well, actually you're

14    sick.  I don't want you to touch it.  I'm sorry.

15         Can you remember at any point in time telling these

16    questioners that Dr. Schneider and or Linda Schneider

17    instructed you or even knew about the fact that you were

18    signing these prescriptions?

19    A    I didn't sign prescriptions.

20    Q    That you were filling out these prescriptions?

21    A    Linda knew it, yes.

22    Q    No.  My question is when you were under oath several

23    years ago before April, before you met with the

24    Government, in your prior sworn statement you never

25    mentioned that Dr. Schneider knew that you were filling
```

1    out prescriptions and letting Lawrence Simons fill them

2    out; correct?

3    A    No.  No.

4    Q    And this sworn testimony that you gave a long time

5    ago before you met with the government agents in April,

6    you don't mention that Linda Schneider knew about that

7    these things were going on; correct?

8    A    No.  I wasn't asked.

9    Q    And you didn't know when you gave this statement or

10   even when you talked to the government agents in April

11   that Linda Schneider went to the federal government for

12   help to get Lawrence Simons out of there; correct?

13   A    No, I didn't know that.

14        MR. WILLIAMSON:  Nothing further.

15        THE COURT:  Mr. Byers.

16        MR. BYERS:  Thank you, Your Honor.

17                      **CROSS EXAMINATION**

18   BY: MR. BYERS:

19   Q    Good afternoon.  Now, can you tell me how many other

20   visits you had with government agents.  I heard about

21   the one in April of 2010.  How many times have you --

22   A    That was just for a subpoena.

23   Q    I'm sorry.

24   Q    That was when they handed me -- brought me the

25   subpoena.

3750

```
 1    Q    Okay.  Have you been interviewed by government
 2    agents before that?
 3    A    Yes, sir.
 4    Q    When were those meetings?
 5    A    I believe November, November or December of '09; and
 6    I was in front of the grand jury, I don't remember the
 7    date honestly.
 8    Q    You were in front of the grand jury November 12,
 9    2008.  Does that sound about right?
10    A    Yes.
11    Q    So prior to your grand jury appearance in 2008, did
12    you have any interviews or meetings with government
13    agents?
14    A    No, sir.
15    Q    So this  --
16    A    To the best that I remember.
17    Q    This session with the grand jury was your first
18    contact with some kind of investigative body as far as
19    you recall?
20    A    Yes, sir.
21    Q    I just want to make sure we're absolutely correct
22    here.  So that was 11-12-08.  And then you had the
23    meeting in November or December of '09; correct?  A
24    whole year later?
25    A    Yes, sir.
```

1    Q    Who was that with?

2    A    Special Agent Martin and Mr. Greer.

3    Q    Okay.  And if I tell you that was actually probably

4    Martin Redd --

5    A    No.

6    Q    Oh, it was a female?

7    A    It was Special Agent Rebecca Martin, I'm sorry.

8    Q    Okay.  Thank you.  And Mr. Greer?

9    A    Yes, sir.

10   Q    Where did that take place at?

11   A    At my office at 3113 South Seneca.

12   Q    Any other meetings before this one this past month?

13   A    Not that I recall, sir, no.

14           MR. BYERS:  Your Honor, I'm not sure how to

15   deal with this now.  I think we have another issue like

16   we discussed earlier with witness Harry.  I don't know

17   if we could do a quick side-bar.  I really hate to just

18   slam ahead on this because it seems pretty important to

19   me.

20           THE COURT:  Well, how would you like to take a

21   recess, Ladies and Gentlemen.  I'm not sure how long it

22   will be; but please remember and heed the admonition.

23               (Jury excused for recess.)

24           THE COURT:  You may be seated.  What's going

25   on?

3752

1          MR. BYERS:  It appears it's another Jencks

2     issue, Your Honor.  This witness has testified under

3     oath.  We have a grand jury transcript.  We don't have

4     any kind of investigative reports under Jencks.  And

5     Ms. Treadway represented earlier on the record this

6     morning that that was the thing that triggered her

7     revelation to us of these investigative reports if there

8     was sworn testimony so we could determine if there was

9     contradiction amongst the agents' reports or statements

10    through those reports versus sworn testimony.  We don't

11    have anything under Jencks, Your Honor.

12         THE COURT:  Maybe there isn't anything.  What

13    do you say, Ms. Treadway?

14         MS. TREADWAY:  Well, Judge, I know you know

15    this because you signed the order.  We took the

16    precaution of having you sign a 6(e) order in an

17    unrelated investigation and that was the Dr. Simons

18    investigation which was before you.  And we did that

19    because we knew Mr. Swonger was a possible witness.  And

20    we produced this grand jury transcript to the

21    Defendants.  That grand jury transcript has nothing to

22    do with the Schneider Medical Clinic, Linda Schneider

23    and Defendant Schneider.  The reports of interview do.

24    There is no Brady information because they're totally

25    separate investigations and totally different topics

3753

1    were discussed at the grand jury testimony versus the

2    reports.  Once again, Judge, the Defendants do not

3    understand or seek to not understand what the Jencks

4    rule and Rule 26.2 provides.  An investigative report

5    authored by an investigative agent is not anyone's

6    statement except that agent's statement, unless the

7    witness has read it, adopted it, authorized it, approved

8    it and signed off on it.  Mr. Swonger has never read,

9    looked at, authorized, affirmed, acknowledged any of

10   these reports.  They're not Jencks.  They're not 26.2.

11   We've made this clear in our briefing.  You've made it

12   clear in your orders.  I don't see why we're doing this

13   over and over again.

14             THE COURT:  Has the law changed as to what

15   Jencks Act statements are?

16             MS. TREADWAY:  No.

17             THE COURT:  No, I'm asking --

18             MR. BYERS:  No, sir, I don't believe so.  But

19   I'm not sure the Government's representation that the

20   grand jury testimony has nothing to do with the

21   Schneider Medical Clinic or the Schneiders is correct

22   because Schneiders are mentioned throughout that

23   testimony.  Obviously --

24             THE COURT:  But you've got a copy of that.

25             MR. BYERS:  We do, but we don't -- but she

3754

```
 1    just said it didn't relate to the Schneiders and it
 2    does.
 3              THE COURT:  Well, you have -- you have a copy
 4    of that --
 5              MR. BYERS:  And we don't --
 6              THE COURT:  -- and you know how to use it and
 7    apparently are using it to cross-examine Mr. Swonger.
 8              MR. BYERS:  But we don't have the related
 9    Jencks material from the agent interviews of which there
10    were at least two.
11              THE COURT:  She is saying there isn't any
12    Jencks material because, I assume --
13              MR. BYERS:  Because she said there wasn't --
14              THE COURT:  You're talking about Mr. Swonger
15    here?
16              MR. BYERS:  Correct.
17              THE COURT:  Mr. Swonger.
18    A    Yes, sir.
19              THE COURT:  Have you ever signed any kind of a
20    statement prepared either by yourself or by an agent?
21    A    No, sir.
22              MR. BYERS:  I guess you're satisfied with
23    that.  I understand your ruling.
24              THE COURT:  Well, no, I'm asking him that.
25    I'll let you ask him anything you want about whether
```

 1    he's made a statement that would qualify under Jencks.

 2            MR. WILLIAMSON:  Judge, may I interject just

 3    on behalf of Dr. Schneider.

 4            THE COURT:  Yeah.

 5            MR. WILLIAMSON:  Yeah.  If Mr. Byers is

 6    through.

 7            MR. BYERS:  Yes, sir.  I'll yield.

 8            MR. WILLIAMSON:  I think the issue here is I

 9    believe Jencks is broader than 26.2.  Jencks does

10    incorporate officers' reports.  Even though 26.2 only

11    requires signed statements.  I looked this up.  I don't

12    have the cases with me.  But Mr. Gorokhov and I had a

13    disagreement and actually did a little research on it

14    and I think I was right.

15            THE COURT:  Well, present me with the cases.

16            MR. WILLIAMSON:  All right.  One second.

17            MS. TREADWAY:  If it would aid the Court, I

18    have some Supreme Court precedent --

19            THE COURT:  I'll tell you what --

20            MR. WILLIAMSON:  Judge, I don't think -- I

21    think I'm incorrect.  I think the Court is correct based

22    on a recent -- it's an unpublished opinion that came out

23    in April from the Tenth Circuit that disagreed with me.

24            THE COURT:  You're a good man, Lawrence.  That

25    takes care of that, Mr. Byers.

3756

```
 1              MR. BYERS:  It certainly does, Your Honor.
 2              THE COURT:  Wouldn't you say so?
 3              MR. BYERS:  Yes, sir.
 4              THE COURT:  Would you all like to take a
 5    recess now.
 6                        (Recess.)
 7                        (Whereupon, the following
 8                        proceedings continued IN THE
 9                        PRESENCE of the jury.)
10              THE COURT:  Yes, sir.
11              MR. BYERS:  Thank you, Your Honor.
12    BY MR. BYERS:
13    Q    Now, Mr. Swonger, we talked a little bit about your
14    grand jury testimony in November, 2008.  Do you recall
15    appearing in front of that body?
16    A    Do I hear --
17    Q    Do you recall appearing in front of a grand jury?
18    A    Yes, sir, correct.
19    Q    Okay.  And at that point, like you did today, you
20    told them you were a Certified Nursing Assistant;
21    correct?
22    A    I don't remember if they asked.
23    Q    You don't remember that?
24    A    I don't recall, I'm sorry.
25    Q    Do you also not remember telling them you were a
```

3757

```
 1    Certified Medication Assistant?
 2    A    I don't recall.
 3    Q    And you don't recall telling them you were a
 4    Registered Medical Assistant?
 5    A    No, I don't recall if they asked.
 6    Q    Do you recall telling the grand jury you were
 7    Assistant Nursing Supervisor at Schneider Medical
 8    Clinic?
 9    A    No, I do not.
10    Q    Do you remember telling the grand jury that you sent
11    Simons, Dr. Simons to San Francisco because he was short
12    on his CME?
13    A    That I sent him?
14    Q    Yes.
15    A    I didn't personally send him, no.
16    Q    Okay.  So if a grand jury transcript says that you
17    said, you sent Simons to San Francisco to catch up on
18    his CME, is that incorrect?
19    A    That would be incorrect.
20    Q    Okay.  Did you tell the grand jury that you took
21    calls for Simons 24/7 --
22    A    Yes, sir.
23    Q    -- after he left the clinic?
24    A    For a period after he left the clinic, yes.
25    Q    And is that the same time frame you were speaking
```

3758

1    with Mr. Williamson about when you had various family

2    members who were being treated by Simons getting scripts

3    and he was not physically seeing them at all?

4    A    Speaking with who?

5    Q    When you were talking with Mr. Williamson on

6    cross-examination earlier.

7    A    Yes.

8    Q    That the same rough time frame?

9    A    Yeah.

10   Q    Okay.  And during that time frame you also told the

11   grand jury -- or relative to that time frame -- that you

12   were able to get Simons -- all you did was ask Simons

13   for a script for your brother and he wrote it; is that

14   correct?  For Lortab?

15   A    He wrote it for -- I mean, for a reason.

16   Q    Okay.  A reason you told him about.  He didn't see

17   your brother?

18   A    Right, correct.

19   Q    Did he give you the script?

20   A    No, it was -- yes, yes, I'm sorry.  Yes.

21   Q    And then you transmitted it to your brother?

22   A    Yes.

23   Q    Knowing that Simons had not seen your brother?

24   A    Correct.

25   Q    In that grand jury transcript you acknowledged

3759

1    knowing who Connie King is; correct?

2    A    That's correct.

3    Q    And who is Connie King?

4    A    She was a pharmacist in charge at a K-Mart pharmacy

5    at 47th and Broadway.

6    Q    Isn't it correct that at some point in time you and

7    Connie King had devised a plan where you would claim to

8    be married so you could be insured under her plan?

9    A    Be -- no.  No.

10   Q    You never did that with Connie king?

11   A    No.  It was a joke.

12   Q    Oh, it was a joke?

13   A    Yeah.  But nothing to do with insurance.

14   Q    And at the grand jury you testified that Simons was

15   prescribing you Lortab; correct?

16   A    That's correct.

17   Q    And Soma?

18   A    Yes.

19   Q    And Oxycontin?

20   A    No.  He had tried it but, no.

21   Q    And made you too loopy; right?

22   A    Yes.

23   Q    So he tried Oxycontin for you?

24   A    Right.  He tried various medications.

25   Q    Including Percocet?

3760

```
1    A    Yes.

2    Q    Valium?

3    A    Yes.

4    Q    Imitrex injections?

5    A    Yes.

6    Q    And these variety of other non-controlled substances

7    as well; correct?

8    A    Yes.

9    Q    And this was all after Simons had been terminated by

10   you from the Schneider Medical Clinic?

11   A    No.  He had given me medications prior to his

12   termination.

13   Q    Okay.  And this continued after he was not working

14   at Schneider Medical?

15   A    After he left Schneider Medical, I believe, to the

16   best of my knowledge, it was just Hydrocodone.

17   Q    Now did you tell the grand jury that you terminated

18   Simons --

19   A    Yes.

20   Q    -- from Schneider Medical?

21   A    Uh-huh.

22   Q    At Linda's direction.  Did you tell them that?

23   A    I believe so, yes, sir.

24   Q    So if the transcript says -- doesn't mention that at

25   all, which is the correct version?
```

3761

```
 1    A    That I did at the directive of Linda, yes.

 2    Q    So your memory in November 2008 was not as good as

 3    it is today; is that correct?

 4    A    No.  I don't have a copy of it to review.

 5    Q    Now, as I understand, you testified you quit the

 6    Schneider Medical Clinic at the end of October, 2007?

 7    A    Yes, sir.

 8    Q    Is that what you recall?  Okay.  Isn't it correct

 9    that Simons was fired from the clinic on October 18th,

10    2007?

11    A    Somewhere in October, yes.

12    Q    So within two weeks, you also left the clinic's

13    employment?

14    A    I went on vacation, yes, sir.

15    Q    And then you quit?

16    A    When I returned, yes.

17    Q    Now, you remember testifying about Linda Schneider

18    turning away patients because they couldn't pay.  Do you

19    remember that?

20    A    Correct.

21    Q    Okay.  You said that would be both family practice

22    and pain management people; correct?

23    A    That's correct.

24    Q    Can you give any names of patients she turned away?

25    A    No.
```

3762

```
1    Q   Any dates she turned people away?

2    A   No, sir.

3    Q   Did you make any notes about those things?

4    A   No, sir.

5    Q   Did you talk to her about that?

6    A   No.

7    Q   Now, you seem to be criticizing -- well, it's clear

8    you were criticizing Linda for trying to run the clinic

9    in an economical fashion.  Is that correct?

10   A   I wasn't criticizing anybody, no.

11   Q   You said she went the cheapest route; correct?

12   A   Correct.

13   Q   Okay.

14   A   Uh-huh.

15   Q   Well, I'm offended because I do things on the cheap,

16   like I recycle paper all the time.

17   A   Is that a violation --

18   Q   Do you believe somehow that is an unprofessional

19   act?

20   A   If it ends up in a patient's chart, yes.

21   Q   And you admitted on direct examination not all

22   recycled paper was patient chart information; correct?

23   A   Correct.

24   Q   Just like the information I've used recycled stuff

25   for, it's public information, I'm not worried about
```

3763

```
 1    people seeing it but I use the back side --
 2    A    Right.
 3    Q    When you suspected Simons was impaired at work, who
 4    did you report that to?
 5    A    To Linda.
 6    Q    And that's when you assumed the role of physician,
 7    is that -- is that correct?  You started writing scripts
 8    to cover for him?
 9    A    No, I didn't write -- I mean, no, I wasn't a
10    physician.  There were myself and another medical
11    assistant that saw these patients and the refills were
12    written if he approved them, yes.
13    Q    So he's in this room somewhere not seeing patients?
14    A    Right.
15    Q    You're acting as a physician when you go in and go
16    and see a patient; correct?
17    A    No, I wouldn't say so.
18    Q    What were you acting as when you see a patient, go
19    to him to get approval for a script, and deliver the
20    script based upon your evaluation?
21    A    Doctor's representative.
22    Q    A doctor's representative.  In fact, you were
23    practicing medicine without a license at that point in
24    time, were you not?
25    A    No, I wasn't.
```

3764

1    Q    You were practicing as a doctor's representative?

2    A    Correct.  And that could be anyone from the front

3    desk staff to the back staff.

4    Q    Now, you commented on direct examination that when

5    you would question Stephen Schneider about some kind of

6    medical decision, he essentially said when did you get

7    your medical degree; correct?

8    A    Correct.

9    Q    In fact, that's the exact same testimony you gave

10   the grand jury about Simons; is it not?

11   A    I don't recall that.

12   Q    Okay.  So if the grand jury transcript says you were

13   talking about Simons relative to that comment, is it

14   incorrect?

15   A    I wouldn't say that.  I just don't recall the

16   question.

17   Q    So, if we believe your testimony both at the grand

18   jury and today, at least both physicians at the

19   Schneider Medical Clinic were offended by your

20   questioning and they both responded exactly the same

21   way, when did you get your medical degree; correct?

22   A    As I said, I don't recall Simons saying that.

23   Q    You don't like Linda Schneider, do you?

24   A    No, I wouldn't say that at all.

25   Q    What would you say?

3765

1    A    No, I do like her.  I like everybody.

2    Q    Okay.

3    A    Yeah.

4    Q    Including me?

5    A    Yeah.

6    Q    Thank you.  But you seemed upset about the food

7    issue.

8    A    No, I wasn't upset.

9    Q    Food in the clinic Linda didn't share.  Linda took

10   it home.  That didn't upset you?

11   A    No, no.

12   Q    But you testified about it?

13   A    I testified about it.  It didn't mean I was upset

14   about it.

15   Q    And you had to have told Government agents about

16   that quirky little thing for them to know enough to ask

17   about it; correct?

18   A    I was asked about it; correct.

19   Q    They brought it up to you at some interview at some

20   point in time, by the way, has Linda Schneider ever

21   refused to share leftover food from the clinic meeting

22   room?

23   A    Yeah, I believe so.

24   Q    That's thorough.

25           MR. BYERS:  That's all I have, Your Honor.

3766

1           THE COURT:  Redirect, please.

2           MS. TREADWAY:  Nothing, Judge.

3           THE COURT:  Thank you, Mr. Swonger.  You're

4    excused.  Next witness, please.

5           MS. TREADWAY:  At this time, Judge, the

6    Government would now like to play some additional clips

7    from Exhibit 82 which are the prior statements of

8    Defendant Linda Schneider taken October 17th, 2007.  We

9    have four clips to play.

10          THE COURT:  Any objection?

11          MR. BYERS:  No, Your Honor.

12                   (Video clips played for the

13                   jury.)

14          MS. TREADWAY:  Government would next call

15   Jaime Leyden.

16          MR. BYERS:  Your Honor, I would just like to

17   note for the record at some point we anticipate moving

18   for admission of the whole transcript of that four hour

19   interview because it's so outrageously misleading, the

20   jury has the right to see the totality of that

21   interview.

22          MS. TREADWAY:  We tried to admit it wholly and

23   they objected to it, Judge.

24          MR. BYERS:  Well, there's an issue about that

25   and you know what that is.  And that's been corrected,

1  no?

2          MS. TREADWAY:  We offer it again.

3          MR. BYERS:  No, you can't offer that the way

4  it was.  And also would note, Your Honor, just need to

5  make -- can I just make the record that the video

6  version we got has almost two minutes missing.

7          THE COURT:  Well, at the appropriate time why

8  don't you identify that and offer it.  She can object or

9  whatever --

10          MS. TREADWAY:  We won't object, Judge.

11          THE COURT:  What am I supposed to do now?

12          MR. BYERS:  I'm just concerned the jury is

13  mulling things over while they're not getting the full

14  picture.

15          THE COURT:  I hope they are mulling things

16  over; but I've told them at least five times they are

17  not to make up their mind until they've heard all the

18  evidence.  All right.

19                      **JAIME LEYDEN**

20  Having been first duly sworn to tell the truth, the

21  whole truth and nothing but the truth, testified as

22  follows on:

23                   **DIRECT EXAMINATION**

24  BY MS. TREADWAY:

25  Q   Could you please introduce yourself to the jury.

3768

1    A    My name is Jaime Leyden.

2    Q    Where are you employed?

3    A    Preferred Health Systems.

4    Q    And how long have you been employed by Preferred

5    Health Systems?

6    A    Ten years.

7    Q    What do you do for them?

8    A    I'm Investigator with the Special Investigations

9    Unit.

10   Q    And what are your job duties and responsibilities?

11   A    I investigate healthcare fraud, waste and abuse.

12   Q    How long have you worked in the healthcare industry

13   or the healthcare insurance industry?

14   A    Twelve years.

15   Q    Where did you work prior to Preferred Health?

16   A    Mutual of Omaha in Omaha, Nebraska.

17   Q    Does Preferred Health Systems provide healthcare

18   benefits to people?

19   A    Yes, they do.

20   Q    Is Preferred Health Systems a healthcare benefit

21   program?

22   A    Yes.

23   Q    And is it engaged in interstate commerce?

24   A    Yes.

25   Q    Now, you're the fourth in a series of individuals

3769

```
1    that have had common testimony and so I assume that a
2    medical provider like the clinic or a physician or a
3    physician's assistant has to be, has to apply to become
4    eligible to be a provider for Preferred Health Systems?
5    A   Yes.
6    Q   Let me hand you what has been marked for
7    identification as Government Exhibit 17-B.  Are those
8    the applications and contracts relative to Defendant
9    Stephen Schneider and the Schneider Medical Clinic?
10   A   Yes.
11            MS. TREADWAY:  Government would offer Exhibit
12   17-B.
13            MR. GOROKHOV:  No objection.
14            MR. WILLIAMSON:  No objection.
15            THE COURT:  It's received.
16   BY: MS. TREADWAY:
17   Q   Once enrolled, does the provider receive a provider
18   number?
19   A   Yes.
20   Q   And does each provider receive a unique number?
21   A   Yes.
22   Q   Did the Defendant Stephen Schneider receive a
23   number?
24   A   Yes.
25   Q   And did the physicians working at his -- physicians
```

3770

1    and physician's assistants working at his clinic receive

2    individual numbers?

3    A    Yes.

4    Q    Let me hand you what has been marked for

5    identification as Exhibit 17-C.  Is that a listing of

6    the physicians and the physician's assistants and their

7    unique provider numbers for Preferred Health Systems?

8    A    Yes.

9              MS. TREADWAY:  Government offers Exhibit 17-C.

10             MR. WILLIAMSON:  No objection.

11             MR. GOROKHOV:  No objection.

12             THE COURT:  It's received.

13   BY MS. TREADWAY:

14   Q    Now, Ms. Leyden, can you tell the jury briefly how

15   the claims process works at Preferred Health Systems.

16   How a claim comes in and gets paid?

17   A    A claim comes in with the rendering physician's name

18   on the HICVA and then the service is provided.

19   Q    What's a HICVA?

20   A    A HICVA is a claim form that physicians use for

21   professional service?

22   Q    Can that be submitted both in paper form and

23   electronically?

24   A    Yes.

25   Q    When healthcare providers send in claims, do they

3771

1   have to send in their progress notes to Preferred Health

2   Systems?

3   A    No.

4   Q    Is that just because of the volume of paper that

5   that would entail?

6   A    Yes.

7   Q    Can Preferred Health Systems investigate every claim

8   it receives before it pays it?

9   A    No.

10   Q    Is that, again, a problem of volume?

11   A    Yes.

12   Q    Now, what does Preferred Health Systems depend on

13   when it comes to the truthfulness and accuracy of the

14   claims it receives?

15   A    That the services provided were done by the

16   rendering physician.

17   Q    And does Preferred Health Systems, like the other

18   insurance companies in the healthcare industry, depend

19   on the honesty of the providers that submit the claim?

20   A    Yes.

21   Q    When a physician become as PHS provider, do they

22   agree to be responsible for the claims they submit?

23   A    Yes.

24   Q    And is the physician's agreement to be responsible

25   for those claims a condition of being able to submit

3772

1    claims and be paid by PHS?

2    A    Yes.

3    Q    Does the physician agree to submit truthful and

4    accurate claims?

5    A    Yes.

6    Q    And is it, again, a condition of being paid?

7    A    Yes.

8    Q    And after being paid by PHS, can a physician just

9    choose to opt out of being responsible for the claim he

10   submits?

11   A    No.

12   Q    So if a claim is false, who is responsible for it?

13   A    The physician.

14   Q    Can providers be paid in one of two ways by PHS?

15   A    Yes.

16   Q    How?

17   A    They can be paid by check or electronically.

18   Q    Let me hand you what has been marked for

19   identification as Exhibit 17-D.  With regards to the

20   Schneider Medical Clinic and the Defendant Schneider as

21   as well as his other providers at the clinic, were they

22   paid by checks?

23   A    Yes.

24   Q    And are those listings of those checks?

25   A    Yes.

3773

1              MS. TREADWAY:  Government offers Exhibit 17-D.

2              MR. GOROKHOV:  No objection.

3              MR. WILLIAMSON:  No objection.

4              THE COURT:  It's received.

5    BY MS. TREADWAY:

6    Q   Now, in this listing of payments, Ms. Leyden, there

7    are some numbers in parenthesis.  Does that represent

8    credits?

9    A   Yes.

10   Q   And why would those have occurred?

11   A   Where a credit balance is taken for a PHS has asked

12   for money back.

13   Q   And so that's a credit to you, not to the doctor?

14   A   Yes.

15   Q   Now, in addition to the provider being paid by PHS,

16   does a PHS member or a PHS patient also have to pay the

17   physician?

18   A   Yes.

19   Q   And is that a copayment?

20   A   Yes.

21   Q   Is there one copayment amount for Preferred Health

22   Systems members?

23   A   No.

24   Q   Explain to the jury what that's about?

25   A   Each plan has different copay structure.  So they

3774

1    vary from either 10 to $40 usually in $5 increments.

2    Q    So depending on the plan I'm on as a PHS member, I

3    will have to pay anywhere from $10 to $40 as a copayment

4    to the provider?

5    A    Yes.

6    Q    In becoming a provider enrolled with Preferred

7    Health Systems, does the provider agree to abide by the

8    program's rules, regulations and policies?

9    A    Yes.

10   Q    And does Preferred Health publish its policies and

11   procedures so that the providers are aware of them?

12   A    Yes.

13   Q    And how are they published?

14   A    Through the provider manual.

15   Q    And what general guidelines does Preferred Health

16   follow regarding documentation requirements?

17   A    That if it's -- make sure that it's legible.

18   Q    Does Preferred Health Systems have policies about

19   mid-level practitioners or non-physicians such as

20   physician's assistants?

21   A    Yes.

22   Q    Let me hand you what has been marked for

23   identification as Exhibit 17-A.  Do you recognize that

24   document?

25   A    Yes.

1    Q    What is that?

2    A    It is a letter from Preferred Health Systems

3    explaining physician assistant and advanced registered

4    nurse practitioner fee arrangement.

5    Q    Would that letter have been sent to the Defendant

6    Stephen Schneider and the Schneider Medical Clinic?

7    A    Yes.

8              MS. TREADWAY:  Government offers Exhibit 17-A.

9              MR. GOROKHOV:  No objection.

10             MR. WILLIAMSON:  No objection.

11             THE COURT:  It's received.

12             MS. TREADWAY:  I'd like to bring that up,

13    please.  Mr. Moore.

14    BY MS. TREADWAY:

15    Q    I want to start with that intended paragraph you

16    have.  We've highlighted that for the jury.  Does this

17    explain the payment policies for physician's assistants?

18    A    Yes.

19    Q    Could you read that for the jury please?

20    A    "Effective July 1st, 2003, Preferred Healthcare,

21    PHC, and Kansas Health Plan, KHP, will require physician

22    assistants, PAs and advanced registered nurse

23    practitioners, ARNPs to bill independently for services

24    provided by the PAs and ARNPs rather than under the name

25    of the supervising physician."

3776

```
 1    Q   And at what rate was PHS going to pay these
 2    mid-level practitioners?  I believe it's the second
 3    highlighted sentence.  Starts effective January 1, 2004?
 4    A   "Effective January 1st, 2004, the PA, ARNP fee
 5    schedule reimbursement for all services will be
 6    established at 85% of the PHC or KHP schedule of
 7    allowable charges, will no longer be reimbursed at the
 8    100 % of the PHC or KHP scheduled allowable charge."
 9    Q   Is this essentially notifying providers that if you
10    have mid-level practitioners, they have to have their
11    own number, they have to bill for their own services and
12    we're going to pay them less than we pay a doctor?
13    A   Yes.
14    Q   And was that the policy from July 1st, 2003,
15    forward?
16    A   Yes.
17    Q   Now, during the course of this investigation,
18    Ms. Leyden, did we ask you to review claims that were
19    submitted to Preferred Health from the Defendant Stephen
20    Schneider and other providers who worked at his clinic?
21    A   Yes.
22    Q   And did you choose which patients claims to review?
23    A   No.
24    Q   Nevertheless, what was your understanding as to how
25    those patient names were chosen?
```

3777

```
 1    A    They were randomly selected.

 2    Q    And are you familiar with valid random samples?

 3    A    Yes.

 4    Q    And have you worked with them in your career in the

 5    healthcare industry?

 6    A    Yes.

 7    Q    Now, did you review all of the claims submitted by

 8    the Defendant Stephen Schneider and the Defendant's

 9    clinic to Preferred Health for a particular patient?

10    A    Yes.

11    Q    And what did you have to conduct your review?

12    A    The patient charts, the fee tickets, the account

13    financial statement.

14    Q    And did you also have your own claims data?

15    A    Oh, yes.

16    Q    Now, did you review approximately 90 patient files?

17    A    Yes.

18    Q    And did you review approximately 591 claims?

19    A    Yes.

20    Q    And what types of claims did your review focus on?

21    A    Office visits.

22    Q    And what was your review on these office visits

23    focussed on?

24    A    The level of the service provided and who rendered

25    the service.
```

3778

1   Q   And what information did you use to determine

2   whether who rendered the service was correctly on the

3   claim?

4   A   We looked at claims data, the patient record, the

5   fee ticket, and the accounts financial data.

6   Q   What guidelines did you use to determine whether the

7   office visit itself was correctly coded?

8   A   We used the 1995 Center for Medicaid and Medicare

9   Services E and M Documentation Guidelines.

10  Q   And are those guidelines that are conservative in

11  terms of being favorable to the provider?

12  A   Yes.

13  Q   Let me hand you what has been marked for

14  identification as Exhibit 17.  Do you recognize that as

15  a summary of your findings as well as the spreadsheet of

16  your findings?

17  A   Yes.

18  Q   Does that summarize voluminous information?

19  A   Yes.

20          MS. TREADWAY:  Government would offer this as

21  a summary exhibit under Federal Rule of Evidence 1006

22  and understanding the Court's prior ruling will use it

23  as a demonstrative aid.

24          MR. GOROKHOV:  Same objections already

25  addressed by the Court, Your Honor.

3779

1                MR. WILLIAMSON:  Join with Mr. Gorokhov.

2                THE COURT:  The objections are noted but the

3     exhibit, number 17, is received as a demonstrative

4     exhibit.

5     BY MS. TREADWAY:

6     Q    We'll get this up on the screen for the jury so they

7     can follow along.

8          Of the 591 claims that you reviewed, how many did

9     you find were billed as though a physician provided the

10    services when a physician assistant actually provided

11    the service?

12    A    233.

13    Q    And what percentage does that represent?

14    A    39%.

15    Q    Would you consider those to be upcoded claims in

16    terms of the provider?

17    A    Yes.

18    Q    Would you consider those to be false?

19    A    Yes.

20    Q    And are they false because they were paid at a

21    higher rate than they should have been paid?

22    A    Yes.

23    Q    Of the 591 claims you reviewed, how many were billed

24    at a higher level of office visit code than the

25    documentation supported with the checklist on the

3780

```
 1   progress note taken into account?

 2   A    276.

 3   Q    And what percentage did that represent?

 4   A    47.

 5   Q    And did those represent upcoded claims to you?

 6   A    Yes.

 7   Q    False claims?

 8   A    Yes.

 9   Q    And would they have as a result been paid -- would

10   the clinic have been paid more money than it was

11   entitled to?

12   A    Yes.

13   Q    Of the 591 claims you reviewed, how many were billed

14   at a higher level of office visit service than the

15   documentation supported when you did not take the

16   checklist into account?

17   A    374.

18   Q    And what percentage does this represent?

19   A    63%.

20   Q    And the same questions.  Upcoded?

21   A    Yes.

22   Q    False?

23   A    Yes.

24   Q    Would have meant the clinic received more money than

25   it was entitled to?
```

1    A    Yes.

2    Q    If a healthcare service is not documented,

3    Ms. Leyden, should it be paid?

4    A    No.

5    Q    Why not?

6    A    The industry standard is if documentation is not

7    supported then the service is not supported as well.

8    Q    So it's common in the industry if it's not

9    documented, it didn't happen?

10   A    Yes.

11          MR. WILLIAMSON:   I just want to just lodge the

12   same objections that we have been lodging regarding

13   confusion between the contract issue and the criminal

14   issue.   Preserving the record.

15          THE COURT:   Overruled.

16   BY MS. TREADWAY:

17   Q    If a service -- if documentation is not legible, is

18   it documented?

19   A    No.

20   Q    So if a service is not documented, or if it is not

21   legible, what can Preferred Health do with regardS to a

22   claim based on those undocumented services?

23   A    Not pay for the service rendered.

24   Q    And if you've already paid for it, what can you do?

25   A    Ask for the money back.

3782

1    Q    Now, Ms. Leyden, the testimony in this case from a

2    witness by the name of Tab H has been that when he was

3    in the examination room Dr. Schneider walked in and

4    said, "what will it be", and then wrote a prescription.

5    The evidence has also been that a witness by the name of

6    Jody LeBroke Reagans said that she was in the exam room

7    and the Defendant Stephen Schneider walked in and said,

8    "what can I write for you", with a prescription pad in

9    hand and a pen.  The evidence this afternoon has been

10   from Robert Swonger that on his initial visit with the

11   Defendant Stephen Schneider, Stephen Schneider walked in

12   and said, "what do you need".  And Mr. Swonger said he

13   was asking me what I wanted for prescriptions.

14        Are any of those examples office visits?

15   A    No.

16   Q    Does Preferred Health Systems pay for prescription

17   medications?

18   A    Yes.

19   Q    In order for Preferred Health System to pay for

20   prescription medications, do the prescriptions have to

21   be issued for a legitimate medical purpose?

22   A    Yes.

23   Q    And do they have to be issued in the usual course of

24   medical practice?

25   A    Yes.

1   Q   And if they have not been, should Preferred Health

2   Systems be paying for those prescriptions?

3   A   No.

4   Q   Does Preferred Health Systems have the right to

5   terminate or suspend its providers?

6   A   Yes.

7   Q   Did Preferred Health Systems suspend the Defendant

8   Stephen Schneider and the Schneider Medical Clinic?

9   A   Yes.

10  Q   Let me hand you what has been marked for

11  identification as Exhibit 17-F.  Do you recognize that

12  document?

13  A   Yes.

14  Q   Is it a business record of Preferred Health?

15  A   Yes.

16  Q   And is it relevant to Preferred Health's suspension

17  of Defendant Stephen Schneider and the Schneider Medical

18  Clinic?

19  A   Yes.

20          MS. TREADWAY:  Government offers Exhibit 17-F.

21          MR. GOROKHOV:  No objection, Your Honor.

22          MR. WILLIAMSON:  No objection.

23          MS. TREADWAY:  If you would bring that up, Mr.

24  Moore, please.

25          THE COURT:  It's received.

```
 1    BY MS. TREADWAY:
 2    Q    Now, first of all, Ms. Leyden, what is the date of
 3    this letter?
 4    A    March 31, 2006.
 5    Q    Who is it addressed to?
 6    A    Dr. Stephen J Schneider.
 7    Q    And?
 8    A    The Schneider Medical Clinic.
 9    Q    What does it inform the Defendant Stephen Schneider
10    and the Schneider Medical Clinic?
11    A    That he will be suspended by Preferred Health
12    Systems.
13    Q    Looking specifically at the second paragraph that is
14    not indented.  Could you review that with the jury.  It
15    says, "the decision to suspend"?
16    A    "The decision to suspend your participation is meant
17    to benefit you in lieu of utilizing the Preferred
18    Healthcare PHC and Kansas Health Plan KHP termination
19    provisions, section VC-4 of your provider agreement
20    which states, KHP and PHP.  HPC shall have the right to
21    terminate this agreement immediately if KHH, PHC makes a
22    reasonable and good faith determination that such
23    termination is necessary in order to protect the health,
24    welfare, or financial well-being of covered
25    individuals."
```

3785

1    Q    So PHS was again acting conservatively in this

2    situation and choosing to suspend rather than terminate?

3    A    Yes.

4    Q    When was the suspension to be effective?

5    A    May 1st, 2006.

6    Q    Now, in terms of people that are insured by

7    Preferred Health, what does it mean when a provider is

8    suspended?  What are their options?

9    A    They can choose another PCP; or if they choose to

10   see Dr. Schneider and providers in the Schneider clinic,

11   they will have less benefit.

12   Q    Now, did the Defendant Stephen Schneider contest the

13   suspension from Preferred Health Systems?

14   A    Yes.

15   Q    Let me hand you what has been marked for

16   identification as Exhibit 17-G.  Is that another record

17   from Preferred Health Systems?

18   A    Yes.

19   Q    And is it relevant to the suspension issue?

20   A    Yes.

21   Q    And is it addressed to Defendant Stephen Schneider's

22   lawyer Martha Ross?

23   A    Yes.

24            MS. TREADWAY:  Government offers Exhibit 17-G.

25            MR. GOROKHOV:  No objection, on behalf of

3786

1    Linda, Your Honor.

2                    MR. WILLIAMSON:  No objection.

3                    THE COURT:  17-G is received.

4                    MS. TREADWAY:  Let's bring this up, Mr. Moore,

5    please.

6    BY MS. TREADWAY:

7    Q    What is the date of this letter, Ms. Leyden?

8    A    May 9, 2006.

9    Q    And it's addressed to Martha Ross.  What is set

10   forth on the second page of this letter?

11   A    The reasons for Dr. Schneider's suspension.

12   Q    And let's review Paragraphs 1 and 2 with the jury.

13   A    "A periodic review of Dr. Schneider's member

14   complaints and PCP change requests reveal that Dr.

15   Schneider's occurrence of complaints, PCP changes and

16   deaths per thousand members was an outlier as compared

17   to similarly situated peers.  A retro-review of drug

18   utilization conducted by our pharmacy benefit manager

19   expressed scripts incorporated.  We feel that Dr.

20   Schneider's narcotic prescription patterns are

21   significantly higher than similarly situated peers."

22   Q    Now, I don't understand what a PCP change request

23   is.  What's that?

24   A    It is when a member calls and wants to select

25   another -- a primary care physician.

3787

```
 1    Q   And you also talk about a retro-review of drug
 2    utilization.  What's that?
 3    A   It means that we look at -- we look at it after the
 4    fact.
 5    Q   Now, after a result of the Defendant Stephen
 6    Schneider asking for -- I'm sorry, I should ask a better
 7    question.
 8        Did Stephen Schneider contest this suspension?
 9    A   Yes.
10    Q   And did he ask for a hearing?
11    A   Yes, a fair hearing.
12    Q   And as a result of his request for a fair hearing,
13    did Preferred Health Systems prepare a memorandum in
14    support of the suspension of the Defendant Stephen
15    Schneider?
16    A   Yes.
17    Q   Let me hand you what has been marked for
18    identification as Exhibit 17-H.  Is that a business
19    record of Preferred Health Systems?
20    A   Yes.
21    Q   And is this the memorandum in support of your
22    suspension of the Defendant?
23    A   Yes.
24    Q   And would that have been shared with him as well as
25    his attorney?
```

3788

```
 1    A    Yes.
 2                MS. TREADWAY:  Government offers Exhibit 17-H.
 3                MR. WILLIAMSON:  No objection.
 4                MR. GOROKHOV:  No objection.
 5                THE COURT:  It's received.
 6    BY MS. TREADWAY:
 7    Q    If we could bring that up.  Second page I believe.
 8    This is a memorandum.  What is the date of this
 9    memorandum?
10    A    June 8, 2006.
11    Q    And who did this go to?
12    A    It went to Dr. Stephen Schneider and the Schneider
13    clinic.
14    Q    And it's also sent to the PHS Practitioner/Provider
15    Fair Hearing Plan Hearing Committee?
16    A    Yes.
17    Q    And who is that?
18    A    It is representatives of his -- of other physicians
19    and executive board who make up that committee.
20    Q    So it's kind of peers as well as people from the --
21    from your company?
22    A    Yes.
23    Q    Let's go to Page 1.  That's I think Page 1.
24    Paragraph 3.  Could you read that paragraph for the
25    jury.  Yes, uh-huh.  That's it.
```

3789

1    A    "Providers credentialed as primary care physician,

2    PCP provider, has never provided certification,

3    completion of continuing medical education, and any

4    other type of credentials indicating that he specializes

5    in pain management."

6    Q    Okay.  Could you go to the next page and Paragraph 9

7    and could you read the first three sentences there which

8    are highlighted for the jury.

9    A    "A review of provider complaints took place for the

10   period between May, 2004, and April, 2006.  During that

11   period of time, provider received 127 complaints.  The

12   most any other PCP received was 30."

13   Q    Moving to the next page.  Could you read Paragraphs

14   12 and 13?

15   A    "A review of claims data for PCP's revealed that

16   during the time period from May 1st, 2004, through May

17   25th, 2006, six of providers members had claims

18   submitted for a drug overdose.  Seven of providers

19   members had claims submitted for opiate dependence.

20   Seven of provider's members had claims submitted for

21   continuous opiate dependence.  And six of provider's

22   members had claims submitted for drug abuse.  This

23   comparison looks at in-patient, outpatient and emergency

24   room places of service.  Each of the ICD codes

25   revealed -- reviewed, relates to substance abuse and/or

3790

1    drug overdose.  No other PCP had as many members with

2    drug abuse type claims as provider."

3    Q    Okay.  Now, the ICD 9, we'll remind the jury that is

4    the coding system for diagnosis codes, isn't it?

5    A    Yes.

6    Q    All right.  Now could you go to Paragraph 15 and

7    read that for the jury?

8    A    "While each individual piece of information may not

9    reach the threshold of eliciting a concern for the

10   health, safety and welfare of members covered by a PHS

11   product, cumulatively, the effect is overwhelming.

12   Provider clearly represents a significant potential

13   threat to PHS members.  PHS is obligated to provide a

14   network of providers that provide the highest quality of

15   care.  A comprehensive review of provider's data reveals

16   that he fails to meet that requirement.  As a result,

17   provider should be removed from the KHP and PHC

18   networks."

19   Q    Now, turning to some of the accompanying documents.

20   I'd like to look briefly at the member complaints.

21   You're familiar with this document and this complaint,

22   these complaints, are you not?

23   A    Yes.

24   Q    Did Preferred Health receive a variety of complaints

25   from the members or the patients, about Schneider

1    Medical Clinic?

2    A    Yes.

3    Q    Did PHS receive complaints, for instance, about long

4    wait times?

5    A    Yes.

6    Q    About not being seen by a physician?

7    A    Yes.

8    Q    And about not being referred to a specialist?

9    A    Yes.

10   Q    And did Preferred Health Systems notify the

11   Defendant Stephen Schneider and the Defendant's clinic

12   about all three types of complaints?

13   A    Yes.

14   Q    Ms. Leyden, did you perform a search of

15   documentation about Preferred Health Systems patients

16   who had been patients at the Schneider Medical Clinic

17   and who later sought other services elsewhere?

18   A    Yes.

19   Q    And what types of services were you looking for?

20   A    Substance abuse, rehab type benefits.

21   Q    And how did you perform that search?

22   A    We queried on Dr. Schneider's members with the

23   correct ICD-9 codes for substance abuse.

24   Q    And as a result of your search, how many patients

25   were you able to identify as seeking addiction treatment

3792

1    services following being a patient at Schneider Medical

2    Clinic?

3    A    64.

4    Q    Now, Ms. Leyden, did you ever have the opportunity

5    to actually visit the Schneider Medical Clinic?

6    A    Yes.

7    Q    On how many occasions?

8    A    Three different occasions.

9    Q    And who did you deal with on those three occasions?

10   A    Mostly Linda Schneider.

11   Q    What was the purpose of your first visit?

12   A    I was out with a provider relations representative

13   and we were there to drop off some forms that Linda had

14   requested.

15   Q    Did you let anyone at the clinic know you were

16   coming?

17   A    No.

18   Q    So this was an unannounced visit?

19   A    Yes.

20   Q    And what did you observe on your first visit to the

21   clinic?

22   A    There were people outside the portico of the office

23   loitering about.  When we walked into the waiting room,

24   there was -- the waiting room was completely full.

25   Q    Did you notice any animals anywhere?

1    A    When we went back into the room to give Linda

2    Schneider her forms, I observed a cat.

3    Q    Where?

4    A    It was in the hallway.

5    Q    Was it sitting there?  Running around?  What was it

6    doing?

7    A    It was running around.

8    Q    Now, did you have a second visit to the clinic?

9    A    Yes.

10   Q    What was the purpose of this visit?

11   A    To discuss an audit that I had performed in regards

12   to ARNP and PAs.

13   Q    And was this the same kind of audit that you

14   eventually performed for us?

15   A    Yes.

16   Q    And what did you find on that audit?

17   A    That Dr. Schneider was not credentialing his ARNPs

18   and PAs with Preferred Health Systems and he was billing

19   services under his name.

20   Q    And would that have created a false claim?

21   A    Yes.

22   Q    And would that have created a situation where the

23   clinic was receiving more money than it was entitled to?

24   A    Yes.

25   Q    Now, again, what did you notice upon your arriving

3794

1    at the clinic?

2    A    That there were people outside loitering about and

3    the waiting room was full.

4    Q    Did you again meet with the Defendant Linda

5    Schneider?

6    A    Yes.

7    Q    And what, if anything, did she tell you about the

8    number of patients for that day?

9    A    She said that it was a very busy morning, that the

10   walk-in list was already full.

11   Q    And what time was it when you got there?

12   A    9 a.m.

13   Q    Was this an announced visit?

14   A    Yes.

15   Q    Any cats?

16   A    No.

17   Q    But was there something unusual that happened on

18   this visit as well with regards to issues about candles?

19   A    When we got there, when we walked into the back

20   where the clinic is, where Linda Schneider's office is,

21   there was a very strong smell of Pine Sol like the

22   clinic had been recently cleaned.  And also when we

23   walked into her office, there were candles lit.

24   Q    And on that day, what did her office look like?

25   A    There were paper and like patient files scattered

3795

1    all around.

2    Q   What was your first thought when you walked into

3    that office and saw all those files and those candles

4    burning?

5    A   That if a candle were to be knocked over, we would

6    be in trouble because there was only one way into the

7    office and one way out.

8    Q   Did you meet anybody else on that visit?

9    A   I met someone named Eric.

10   Q   Okay.  And what was Eric?  Who was Eric?

11   A   He was -- it was stated to us that he was Linda

12   Schneider's office assistant.

13   Q   What was going -- sorry.  I already asked that

14   question.  I apologize.  Did you visit the clinic a

15   third time?

16   A   Yes.

17   Q   And was this in the fall of 2006 after these

18   notifications had gone out?

19   A   Yes.

20   Q   Who did you meet with on that occasion?

21   A   We went with -- I met with Dr. Schneider, Dr.

22   Simons, Dr. Simons' nurse, Connie White, the physician

23   assistant and Linda Schneider briefly.

24   Q   During that meeting, did the Defendant Stephen

25   Schneider make comments to you?

3796

1    A    Yes.

2    Q    What were the Defendant Stephen Schneider's comments

3    to you during this meeting.

4    A    That he was tired of jumping through hoops for

5    payers.

6    Q    And what was his general demeanor during the

7    meeting?

8    A    He was agitated.

9    Q    What did Preferred Health Systems eventually do with

10   regards to the Defendant Stephen Schneider, Dr. Lawrence

11   Simons and Connie White, the physician's assistant?

12   A    They were terminated from Preferred Health Systems.

13   Q    And was the termination primarily for the reasons

14   set forth in the suspension information we previously

15   shared with the jury?

16   A    Yes.

17   Q    Was PHS concerned about the safety, health and

18   welfare of its members?

19   A    Yes.

20            MS. TREADWAY:  Nothing further.

21            THE COURT:  Yes, sir.

22            MR. WILLIAMSON:  Thank you, Your Honor.

23                   **CROSS EXAMINATION**

24   BY: MR. WILLIAMSON:

25   Q    Okay.  Ms. Leyden I'm not going to go through the

3797

1    same cross-examinations that I've gone through with like

2    the past four people.  So we'll talk about new topics

3    because I think those points have been made.

4         There are some interesting things that you did say

5    that I would like to visit with you about.  Take a look

6    at Exhibit 17-G for me.

7    A    Yes.

8    Q    That document talks about similarly situated peers;

9    correct?

10   A    Yes.

11   Q    Okay.  Who are these similarly situated peers that

12   Dr. Schneider was compared against?

13   A    Would you like me to list them by name?

14   Q    Yeah.

15   A    Dr. Byron Cline.  Dr. Steen Mortensen.

16   Q    Slow down for me.

17   A    I'm sorry.

18   Q    All right.  Cline?

19   A    Dr. Byron Cline.  Dr. Steen Mortensen and Dr. Larry

20   Anderson.

21   Q    Okay.  Now, how many Medicaid patients did Dr. Cline

22   see?  Do you know?

23   A    No.

24   Q    Okay.  How many -- do you know how many chronic pain

25   patients Dr. Cline would see?

3798

1    A    No.

2    Q    Dr. Mortensen, how many low income patients did he

3    service?

4    A    I do not know.

5    Q    How many chronic pain patients did Dr. Mortensen

6    serve?

7    A    I do not know.

8    Q    Dr. Anderson, how many Medicaid or low income

9    individuals did Dr. Anderson serve?

10   A    I don't know.

11   Q    How many chronic pain patients did Dr. Anderson

12   serve?

13   A    I don't know.

14   Q    What was Dr. Cline's total patient population?

15   A    I don't know.

16   Q    Who was Dr. Mortensen's patient population?

17   A    I don't know.

18   Q    Do you know Dr. Anderson's patient population?

19   A    No.

20   Q    Okay.  Who determined that these were similarly

21   situated?

22   A    The executive board of Preferred Health Systems.

23   Q    Were these doctors interviewed before they were

24   selected to determine what their practice profile

25   actually was?

3799

1    A    I don't know the process.

2    Q    Okay.  Now, how long had Dr. Schneider been a member

3    of Preferred Health?

4    A    I don't know that information.

5    Q    Was he seeing Preferred Health individuals since,

6    let's say, in the early '90s when he was with Riverside?

7    A    I don't know.

8    Q    Now, 17-G was sent to Dr. Schneider when?

9    A    May 9th, 2006.

10   Q    Now, it's true that there was an audit -- there was

11   a raid, I'm sorry, on the clinic in September of 2005;

12   correct?

13   A    I don't know the exact date, no.

14   Q    You understand that there was a raid on the clinic

15   in October of 2005; correct?

16   A    I don't know the exact date.

17   Q    In the fall of 2005?

18   A    Yes.

19   Q    Okay.  And one of the main reasons why you sent this

20   letter to Dr. Schneider was because of the criminal

21   investigations that were lodged against him; correct?

22   A    I do not know that, no.

23   Q    Okay.  You mentioned in 17-G, don't you, or

24   doesn't -- you're not the author of this document;

25   correct?

3800

1    A    No.

2    Q    Okay.  But this author identifies issues regarding

3    civil and criminal matters; correct?

4    A    It does.

5    Q    Okay.  So Preferred Health knew that there was some

6    kind of criminal investigation going on against Dr.

7    Schneider before this letter went out; correct?

8    A    Yes.  Everyone knew that.

9    Q    Okay.  Now, how many letters did Dr. Schneider

10   receive regarding complaints prior to these criminal

11   investigations being lodged by the federal government?

12   A    From whom?

13   Q    From Preferred Health?

14   A    I don't know.

15   Q    Have you shown us any letters that the clinic

16   received prior to this federal investigation being

17   started?

18   A    Not that I'm aware of.

19   Q    Okay.  And when this letter went out, there had not

20   been any hearings and Dr. Schneider hadn't had his day

21   in court; correct?

22   A    No.

23   Q    In fact, Dr. Schneider had no actions taken against

24   him even by the Kansas Board of Healing Arts when you

25   decided -- or when Preferred Health sent this letter

3801

1   out; correct?

2   A   Correct.

3   Q   Now, look at 17-H with me.   I want to talk about a

4   specific provision in here, couple of facts that you

5   weren't asked about.

6        Looking at Page 3 of 17-H, and number 11.   That

7   discusses how many actual complaints that Dr. Schneider

8   received between 2004 and 2006, regarding the quality of

9   care; correct?

10  A   Yes.

11  Q   How many actual complaints did you all review, or

12  receive in regards to the quality of care in regards to

13  Dr. Schneider?

14  A   Four.

15  Q   So, out of all these hundreds of complaints, only

16  four dealt with Dr. Schneider's quality of care;

17  correct?

18  A   But it also states in the next sentence the

19  classification of member codes.

20  Q   So somebody classified these as quality of care;

21  correct?

22  A   Yes.

23  Q   And this information was communicated to Dr.

24  Schneider that there are four people that have

25  complained about your quality of care; correct?

3802

1   A   Yes.

2   Q   Okay.  And one of these was found not to be founded

3   because the patient was actually -- Dr. Schneider

4   stopped seeing this patient; correct?

5   A   Yes.

6   Q   Now, I may have missed it, but where in this letter

7   does Preferred Health discuss any audit results in

8   September?

9   A   It does not.

10  Q   There's no findings in there that Preferred Health

11  is suspecting somebody at the clinic of submitting false

12  and fraudulent claims in this letter; correct?

13  A   Correct.

14  Q   And at this point the decision to suspend Dr.

15  Schneider had already been made; correct?

16  A   Yes.

17  Q   Can you point us to a letter that Preferred Health

18  sent to Dr. Schneider before the raid that stated that

19  Preferred Health was concerned about false and

20  fraudulent billings being submitted by the clinic?

21  A   I cannot.  But I will tell you, and when I performed

22  my audit, a letter was sent to the Schneider Clinic

23  informing him of my audit results.

24  Q   When was that audit conducted?

25  A   Prior to this.  The exact date, I do not know.

3803

```
1    Q    Was he still a member?

2    A    Yes.

3    Q    You weren't asked to introduce that letter by the

4    Government?

5    A    No.

6    Q    Now, you say you met with Dr. Schneider on two

7    occasions; correct?

8    A    I met with Dr. Schneider two times, yes.

9    Q    Okay.  Now, the first time you mentioned you had a

10   discussion with him about his PA's not being

11   credentialed?

12   A    No.  I met with Linda Schneider at that time.  The

13   first time I met with Dr. Schneider was with his

14   attorney Ms. Ross.

15   Q    And when was that?

16   A    That I met with his attorney Ms. Ross?

17   Q    No.  I want to know when you met with Dr. Schneider.

18   A    I met with Dr. Schneider when I met with Ms. Ross

19   about his fair hearing.

20   Q    Okay.  That's fine.  When was that?

21   A    Around the same time that the letter went out, I'm

22   assuming.  I do not know exact dates.

23   Q    Did you memorialize that meeting with Ms. Ross and

24   Dr. Schneider?

25   A    I don't understand the question.
```

3804

```
1    Q   Did you make a memo to file?

2    A   No.

3    Q   Did you make any notes from that meeting?

4    A   I was just there as a representative.

5    Q   Did you even speak to Dr. Schneider yourself?

6    A   No.

7    Q   Who was there with you?

8    A   Ms. Ross and our corporate attorney Michelle

9    Carter-Gouge and the provider director Craig Singles.

10   Q   Around 2006, April, May, June, somewhere, 2006?

11   A   Yes.

12   Q   After the decision to termination -- or, excuse

13   me -- to suspend Dr. Schneider from receiving -- seeing

14   Preferred Health patients; correct?

15   A   Yes.

16   Q   Now, is this the meeting where you believe Dr.

17   Schneider was told about your audit findings?

18   A   No.

19   Q   Okay.  When is the next meeting that you had with

20   Dr. Schneider?

21   A   I don't know the exact date.

22   Q   Can you give me roughly.

23   A   I met with Dr. Schneider in the Fall of 2006.

24   Q   Okay.  So the second one would have been Fall of

25   2006; correct?
```

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

3805

```
 1    A    Yes.
 2    Q    Was it just you and Dr. Schneider at this meeting?
 3    A    No.  It was Linda Schneider, Dr. Simons, Connie
 4    White, myself, the provider relations representative
 5    Craig Singles and another SIU auditor, Jackie Pyles.
 6    Q    So, this was another meeting with -- this time with
 7    multiple providers discussing what can they do to be
 8    recredentialed; correct?
 9    A    It was to discuss their documentation.
10    Q    Okay.  But in Fall of 2006, they were no longer
11    seeing Preferred Health patients; correct?
12    A    That I am not aware of.
13    Q    They were suspended in the Spring of 2006?
14    A    They were suspended but not terminated.  When they
15    were suspended, they were still able to see established
16    patients by Preferred Health Systems.
17    Q    Okay.  So when all these troubles came in, the
18    clinic wasn't terminated?  You just stopped sending new
19    people there?
20    A    Right.
21    Q    Okay.  Now, this discussion about the documentation,
22    is this when the -- in the fall of 2006, is this the
23    time you mentioned to Dr. Schneider about the PAs not
24    being credentialed?
25    A    No, it was before that.  I didn't meet with Dr.
```

3806

1    Schneider.  I met with Linda.

2    Q   So you never told Dr. Schneider that his PAs were

3    not being credentialed?

4    A   No.  But in my role, that is not uncommon.  Usually

5    a provider meets with the office manager.  The office

6    manager disseminates that information to the physicians.

7    Q   Did you ever talk to anybody in the billing

8    department?

9    A   I have met with them.

10   Q   Who do you remember talking to?

11   A   I don't know names specifically.  They were in the

12   basement.

13   Q   Sherrie Mills sound familiar?  Well, let me just ask

14   you this.  When you met with these individuals, did

15   anyone of 'em tell you we're being forced to submit

16   these false claims to the insurance company, come help

17   us out?

18   A   No.

19   Q   Okay.  And did any of the billing managers tell you,

20   look, the providers are making us submit false claims to

21   insurance companies?

22   A   No.

23   Q   So when you talked to Dr. Schneider about the

24   documentation, what did you exactly tell him?

25   A   That it needed to be legible.

3807

```
1    Q   What else did you tell him?
2    A   Well, there's lots of other -- we mainly focussed on
3    him and Dr. Simons.
4    Q   What else did you tell him?
5    A   We talked about documentations and what we expected
6    with certain office levels.
7    Q   Okay.  Is this the meeting where he seemed
8    frustrated?
9    A   Yes, he seemed agitated.
10   Q   Okay.  And I guess by this point he's had his clinic
11   raided; correct?
12   A   Correct.
13   Q   And based on these allegations, he's had trouble
14   with Medicaid.  He's had trouble with First Guard.  Now
15   he's having trouble with you.  Correct?
16   A   He's having trouble with us.  I'm unaware of other
17   payers.
18   Q   You understand that any time that when these
19   insurance companies try to terminate him he's tried to
20   say over and over I'm not doing anything wrong.  You're
21   aware of that?  He told you that, didn't he?
22   A   No.
23   Q   When you decided to suspend him, he filed for a fair
24   hearing; correct?
25   A   Yes.
```

3808

```
 1    Q   And that's an option that people have when they
 2    believe they're unjustly being suspended or terminated;
 3    correct?
 4    A   That's a right they have.  I don't know what their
 5    feelings are at the time.
 6    Q   And he exercised that right; correct?
 7    A   Yes.
 8    Q   Now, with this 2006, we talked about the legibility,
 9    we talked about the documentations.  What you guys
10    expected to see at office levels.  Did we leave anything
11    out?
12    A   And that he needs to make sure that PAs and ARNPs
13    are being billed for the services they perform.
14    Q   Okay.  How did the meeting end?
15    A   We left the meeting.
16    Q   Okay.  Did he say don't come back any more or, I
17    mean, like how --
18    A   No, it left amicably.  It was cordial.
19    Q   He was frustrated but he wasn't mean?
20    A   No.
21    Q   He wasn't shouting at you?
22    A   No.
23    Q   He wasn't, you know, saying I hate big insurance
24    companies, did he?
25    A   No.
```

3809

1    Q    Okay.  He was feeling frustrated.  Is that fair?

2    A    Yes.

3    Q    Now, when you raised these issues, did he tell you,

4    okay, we're going to look into this?

5    A    I don't recall.

6    Q    Okay.  Did he tell you we're not going to look into

7    it?

8    A    I don't recall.

9    Q    Now, you mentioned that you, you reviewed all these

10   records in coming up with your numbers on the screen.

11   You remember that?

12   A    Yes.

13   Q    You reviewed these fee tickets; correct?

14   A    Yes.

15   Q    Now, when you were doing all your different audits,

16   how was it that you determined who the provider was that

17   was actually providing the service?

18   A    Whoever the signature was at the bottom.

19   Q    Of what?

20   A    The medical record.

21   Q    Okay.  And did you compare that signature at the

22   bottom of the medical record to the name on the fee

23   ticket?

24   A    Yes.

25   Q    And you found that in the vast majority of the cases

3810

1    the fee ticket, the name up there, correlated with the

2    progress note; correct?

3    A   What are the results?  I'd have to look at the

4    spreadsheet again.  I mean, I did review 591 claims.

5    Q   Well, the problem is your spreadsheet doesn't

6    identify who the provider was that signed the progress

7    notes, does it?

8    A   Could you please state the question again.

9    Q   Your spreadsheet does not identify who the provider

10   was that signed the progress note; correct?

11   A   No.  But there is a column that says was it a PA or

12   was it a physician.

13   Q   There's a column that says was it billed as PA or as

14   a physician; correct?

15   A   Yes.

16   Q   Now, you have a column on there that says fee ticket

17   provider; correct?

18   A   Yes.

19   Q   And then you have another column right next to it

20   that says was it a PA or was it a provider; correct?  I

21   mean -- excuse me -- or a physician; correct?

22   A   Yes.

23   Q   Okay.  Now, that fee ticket, are you aware was the

24   documentation that the providers utilized in the clinic

25   to represent to the billing department as to who should

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

3811

```
 1    have been billed for that service?

 2    A    I am unaware of the clinic's processes.

 3    Q    You're unaware of them?

 4    A    Yes.

 5    Q    The complaints that you, Preferred Health,

 6    identified, of the hundred and something that you guys

 7    found, how many of them were before, let's say, August

 8    of '05, or September of '05?  Do you know?

 9    A    How many of the member complaints were before August

10    of '05?

11    Q    September of '05.

12    A    Do you want me to count them?

13    Q    No.  I think that will take too long.  Is it fair to

14    say that there are a large number of complaints that

15    occurred after September of '05?

16    A    I guess compared to the documents I have in front of

17    me, it looks even.

18    Q    Does it?

19    A    Yes.

20    Q    And, again, most of these were these people

21    complaining about waiting long times; correct?

22    A    Yes.

23    Q    All right.  You understand we haven't disputed that

24    to be untrue.  You never heard us -- Government didn't

25    tell you that we're saying that's untrue; correct?
```

3812

```
 1    A    I don't understand the question.
 2    Q    Okay.
 3              MR. WILLIAMSON:  Nothing further, Your Honor.
 4    I'll withdraw that question.
 5              THE COURT:  Yes, sir.
 6                      CROSS EXAMINATION
 7    BY MR. GOROKHOV:
 8    Q    Good afternoon.
 9    A    Good afternoon.
10    Q    You testified about this cat that you saw at the
11    clinic.  Were you rather shocked?
12    A    Yes.  I mean, you usually don't see pets or animals
13    at a doctor's office.
14    Q    So did you go -- did you say to Linda, oh, my God,
15    why do you have a cat here, I'm really concerned?
16    A    No.  There was no comment made.
17    Q    So you didn't say anything?
18    A    No.
19    Q    When you noticed this, these candles, did you go to
20    Linda and say, Linda, this is terrible, please stop?
21    A    No.
22    Q    You didn't say anything?  You just let it go?
23    A    We -- there was no comment made.
24    Q    And patients from your insurance company were coming
25    to the clinic at the time; correct?
```

3813

1    A    Yes.

2    Q    I have -- I'm going to show you a couple of

3    demonstrative exhibits that the Government has put into

4    evidence and what I'd like you to do, real briefly, is

5    to compare the column from your audit, the column with

6    the CPT code here, the E and M code billed, and then

7    compare that to the columns in these other, in these

8    other exhibits and the same column.  And I'll just ask

9    you a few questions about that.

10        Mr. Moore, could you put up number 17, the first

11    page.  I'm sorry.  The first spreadsheet.  I apologize.

12    And maybe if you could zoom in on maybe the first third

13    of the page.

14        Do you notice a difference between your sheet and

15    the spreadsheets for the other payers for that column?

16    A    Under E and M code billed?

17    Q    Yes.

18    A    No.

19    Q    Okay.  Can you find in your spreadsheet on the first

20    page or on any of the pages in yours, Exhibit 17, a

21    99212 code or a 99214 code?  I could represent to you

22    that I don't think there is, just to save you some time.

23    I don't believe it's there.  But if you want to check,

24    that's fine.

25    A    No.

3814

1    Q   Can you just briefly look at those other ones and

2    see if there's 99213 codes but also 99214s, 99212s as

3    well?

4    A   There are, but not many.

5    Q   So you took it for granted that this was a random

6    sample; correct?  When these names were provided to you?

7    A   Yes.

8    Q   You don't know how the sample was put together?

9    A   No.

10   Q   Okay.  But there's a difference between the fact

11   that your spreadsheet doesn't contain a single 99212

12   code or a 99214, while the others do.  Is that correct?

13   A   Yes.

14   Q   Okay.  Were you the only person who conducted this

15   audit?  I can have those back or you can hold onto them.

16   Did anyone work on the audit with you?

17   A   In the beginning, but then I reviewed all -- I

18   reviewed her charts and my charts and then went forward.

19   Q   When was the audit -- when was this audit conducted?

20   A   This audit here?

21   Q   Yes.

22   A   I don't really know the time frame.  It was a long

23   time ago.

24   Q   Do you remember the year?

25   A   No.

1          MR. GOROKHOV:  Nothing further.  Thank you.

2          THE COURT:  Redirect.

3          MS. TREADWAY:  Nothing, Judge.

4          THE COURT:  Thank you.  You're excused, ma'am.

5          MS. TREADWAY:  Judge, may we have a side-bar

6   please.

7          THE COURT:  Yes.

8                    (Thereupon, the following

9                     proceedings were had at the

10                    bench by Court and Counsel

11                    outside the hearing of the

12                    jury.)

13         THE COURT:  Yes, ma'am.

14         MS. TREADWAY:  I feel like the Shoo-ma is

15  following me.  Remember from L'il Abner?  The little

16  dark cloud.  I had another witness today.  She went to

17  the doctor yesterday and they found a granuloma on her

18  tongue and they removed it and she cannot talk.  So I'm

19  out of witnesses.  But, I think I've done a very good

20  job, Judge, keeping it moving and keeping us full.

21         THE COURT:  Yeah.  It's 3:30 --

22         MS. TREADWAY:  So, I hope you take pity on me.

23         THE COURT:  Well, I don't know about that

24  but -- what's our schedule for next week?

25         MS. TREADWAY:  Well, I have some things to

3816

```
1    talk to the Court about with regards to discovery and
2    those scheduling issues as well.  Do you want to let the
3    jury go and just discuss those generally?
4              THE COURT:  Can we -- can you tell me
5    generally so that I can tell them.  We're going to be
6    back on Monday.
7              MS. TREADWAY:  We're going to have a longer
8    witness.  Not as long as Dr. Parran, he was my longest
9    witness.  We have Dr. Doug Jorgensen, who is our D.O.
10   family practice, pain management, certified coder,
11   expert.  And he was the person that will be testifying
12   as to the fraud issues, the healthcare fraud resulting
13   in death and he will be talking in terms of what he does
14   and he's exactly like the Defendant, D.O., family
15   practice, pain management.  So we'll be attacking it
16   from that angle as opposed to Dr. Parran's angle.  I
17   think we can probably do him in three to four hours
18   pretty easily.  He talks really fast.  So I'm going to
19   have to slow him down a little bit.  He's also got some
20   physical problems.  He just blew out his achilles
21   tendon.  And I've spoken to Rachael about this.  He's
22   going to need to be in a chair on the floor with a stool
23   and his foot up and hopefully a table and Cindy said he
24   could have a lapel mic so he could be heard.  But he
25   will be probably Monday.  And then I have about -- I
```

3817

1   can't remember how many more witnesses, Judge, but

2   they're all very brief.

3               THE COURT:  So you think you might be over by

4   Wednesday?

5               MS. TREADWAY:  Oh, yes.  I may even be done by

6   Tuesday, depending on the length of cross.  So it's,

7   it's -- there's no doubt that I will be done next week.

8   And it just depends on cross how early that happens.

9               THE COURT:  Okay.  Well, I'll tell 'em that

10  much and we'll talk about other stuff.

11              MS. TREADWAY:  Thank you, Judge.

12                          (Thereupon, the following

13                          proceedings continued in the

14                          hearing of the jury.)

15              THE COURT:  Okay.  The last Government witness

16  that was scheduled for today has had her tongue worked

17  on and can't talk.  So we can't have her today.

18  Ms. Treadway thinks that she'll be done perhaps Tuesday.

19  And then we'll see where we go from there.  But we're

20  through for today and you're excused until Monday

21  morning at 9:00.  Remember and heed the admonition.

22  Tomorrow is supposed to be a nice day so enjoy it.

23  Thank you very much.

24                          (Jury excused for the weekend at

25                          3:30 p.m.)

3818

1          THE COURT:  Please be seated.  Now, you wanted
2     to bring up some other things.
3          MS. TREADWAY:  Yes, Judge.  The Government
4     would like to renew a couple of motions that it made
5     previously.  First of all, we made a motion for a real
6     witness list from the defense attorneys.  We have a
7     witness list that comprises I think about 171
8     individuals.  One of those individuals is listed as
9     dead.  A third of them have never been talked to.
10    They've not been subpoenaed.  They've not been
11    interviewed.  They have no idea what they would have to
12    do with this case and have never been told that they
13    would be a witness.  It's very, very hard for the
14    Government to make any kind of plans about how to
15    cross-examine people, just generally, without knowing
16    what the parameters are of this witness list.  So we
17    would ask for a real witness list.
18         THE COURT:  Okay.  Why don't you give 'em a
19    real witness list?
20         MR. WILLIAMSON:  Actually, Your Honor,
21    Ms. Treadway sent us a letter or dropped off a letter on
22    our desk yesterday morning making that request.  We are
23    actually working on it and plan to do it hopefully by
24    tomorrow at the end of the day.  No later than Monday.
25         THE COURT:  How about that?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

1          MS. TREADWAY:  Great.  Second, Judge, we would

2   again ask for document copies of the exhibits.

3   Mr. Moore spent 16 hours with the electronic copies of

4   these exhibits and we can't make hide nor hair of 'em.

5   We don't know what's going on.  We would ask for

6   document copies of the exhibits.

7          THE COURT:  Now, refresh me on this.

8   Everything is on a disk, right.

9          MS. TREADWAY:  It's on a disk but it was

10  not -- it was not done such that you can click on

11  Exhibit 1, Exhibit 2, Exhibit 3.  Instead it's this pdf

12  file that is enormous and you have to search and search

13  and search and you can't really figure out what the

14  document is, how long it is.  I mean, literally

15  Mr. Moore spent two full days trying to figure out what

16  to do, how to print it off.  We were able to print off a

17  handful of exhibits and that's it.  Some of these

18  documents we just simply don't know what they are.

19         THE COURT:  What kind of documents do you

20  think you're going to have?

21         MR. WILLIAMSON:  Judge, as we were working on

22  this, narrowing down this list, we're also working on a

23  correlation chart similar to that that the Government

24  gave us, i.e. identifying which exhibits would be

25  introduced through each witness.  We're at a much better

3820

1    place now since we've actually heard the evidence, seen

2    the evidence, to know what we're going to bring in.  We

3    plan on working on all of this, getting our case ready,

4    if we call one, to have it all hopefully complete by the

5    weekend.

6              THE COURT:  Let's have it to 'em by Monday.

7              MR. WILLIAMSON:  Okay.

8              THE COURT:  And hard copy exhibits or somehow

9    fix the system so they can access the exhibits.

10             MR. WILLIAMSON:  We --

11             THE COURT:  Because that will take a lot of

12   time that we don't want to -- with the jury trying to

13   access exhibits and the jury doesn't want to spend that

14   time, I'm sure.

15             MR. WILLIAMSON:  We'll send them off to

16   Kinko's at the Government's cost just like we had to do

17   for their stuff at our cost or, I mean, we can go

18   through and segregate the files into individual --

19             THE COURT:  Well, I don't want to get into the

20   details.  I want you, you guys, to work with each other

21   so that this is a seamless presentation of exhibits.

22             MR. WILLIAMSON:  Yes, sir.

23             THE COURT:  Okay.  Now, I'm not holding you

24   down, but do you have any idea -- this is for both of

25   you, of course -- how long do you think, if we would

3821

1    start with your case, if she finishes on Tuesday, start

2    your case on Wednesday.  Have you got any idea how long

3    it might take?

4              MR. WILLIAMSON:  As long as you're promising

5    not to hold me accountable.

6              THE COURT:  I'm not going to hold you

7    accountable and I'm not going to tell the jury.

8              MR. WILLIAMSON:  Okay.  If we start on

9    Wednesday --

10             MS. TREADWAY:  And we have Friday off on the

11   28th.

12             THE COURT:  Yeah.  This is really for my own

13   planning for other cases that I've got to deal with.

14             MR. WILLIAMSON:  Judge, I want to say it will

15   take us a couple weeks, depending upon the Government's

16   cross-examination, but we only have maybe two, three

17   long witnesses.  And I would say definitely by like the

18   11th we may be wrapping up.

19             THE COURT:  Okay.

20             MR. WILLIAMSON:  Roughly around that time.

21             THE COURT:  All right.

22             MS. TREADWAY:  Next, Judge, we have not been

23   provided any discovery with regards to their experts.  I

24   can file a formal motion about this if you want me to.

25   But essentially we don't have contracts, fee agreements,

1    invoices, correspondence, what they reviewed, any of

2    what is typically provided in discovery.  We also have

3    no 26.2 statements.  Although the Defendants originally

4    agreed back in July to give us their 26.2 statements on

5    the first day of trial.  They decided not to do that.

6    We would ask for those statements.  We've --

7               THE COURT:  I thought that had all been

8    disclosed years ago.

9               MS. TREADWAY:  No, sir.

10              MR. WILLIAMSON:  Judge, we disclosed

11   everything we had to disclose.  The Government provided

12   us all their information on their opening day in chief.

13              MS. TREADWAY:  Which was the agreement, Judge.

14              MR. WILLIAMSON:  Well, you know, with some

15   more thinking, I think it's patently unfair to have our

16   26.2 stuff while you're putting on your case in chief.

17   We plan on giving it to her in our case in chief and I

18   think the Court's ruling was we have to produce the

19   stuff, I think, I believe, at least 48 hours in advance

20   but that we're going to submit our -- I don't know if

21   there's any 26.2 stuff as I stand here now.  But our

22   expert contracts, any work that they did, we plan on

23   giving that to the Government when we start our case in

24   chief.  And I expressed that to Ms. Treadway.

25              THE COURT:  I wasn't talking about that.  I

```
1   was talking about we had at some point rulings about
2   summaries of testimony, what they're going to be here
3   for.  That hasn't been provided?
4              MR. WILLIAMSON:  Yeah, it has been.
5              MS. TREADWAY:  Well, Judge, it has been but,
6   again, I think if we look back at the rulings, the
7   Government filed multiple motions regarding better
8   expert disclosures.  And the Defendant's position was
9   they are adequate.  And so the Court took the position
10  on January 12th, 2008, at a pretrial hearing that
11  everybody was going to have to live with what was
12  disclosed.  The Government and the Defendants.  Based on
13  some of the cross-examination, Judge, I do not believe
14  the Defendants plan to live within their disclosures.
15  For instance, Mr. Williamson stated on cross-examination
16  with Dr. Parran, that they have an individual who's
17  going to testify about all 68 deaths.  They haven't
18  noticed such an expert.  Now, it may be the Defendant,
19  and that's fine, they don't have to notice him.  But if
20  it's an expert, that's nowhere in that notice.
21  Ms. Cobuzzi's disclosure is another problem.  Hers is
22  very, very general.  She doesn't discuss any audits, any
23  audit findings.  But today Mr. Williamson indicates
24  that, well, we're going to have an expert that reviewed
25  your audits.  Oh, really.  Well, that's not in their
```

3824

1    disclosure.  It's not even disclosed as an opinion.  So

2    the Government believes that the Defendants plan to go

3    well outside the disclosures they've given to date.  And

4    we would just ask that the Court maintain its ruling

5    previously which we lived within, Judge.  We had

6    additional information that Dr. Parran could have

7    testified about but because we didn't disclose it in

8    that June 30th, 2008, disclosure, we lived within your

9    ruling and we would ask that you make the Defendants

10   live within that ruling as well and stick with the

11   disclosures as they are.  And they are minimal.  And I

12   think that that will keep their experts testimony very

13   short, which is fine with the Government.  But we don't

14   have any 26.2 materials.  We don't have any of

15   contracts, invoices, payments, materials shared with the

16   experts.  We don't have their -- any reports.  We don't

17   have any basis of their opinions.  We don't know what

18   documents they reviewed.  Nothing.  We don't have any of

19   that.  And it's very difficult to prepare for

20   cross-examination of these complex experts without any

21   of that information.

22        So we would simply ask the Court to exercise its

23   authority under Rule 705 as well as Rule 16 to have that

24   material produced as soon as possible because there's

25   really no reason to wait until the Defendant's case in

1    chief unless they're not going to put on a case in

2    chief.  And I'll be glad to file a formal motion, Judge,

3    if you would prefer that.  I am prepared to do that.

4              MR. GOROKHOV:  Your Honor, I can address the

5    expert disclosure issue whenever you're ready.

6              THE COURT:  Go ahead.  I'm listening.

7              MR. GOROKHOV:  Basically the expert disclosure

8    issue is not exactly as the Government says.  What

9    happened was initially we had our experts do a review of

10   some of the cases and we also stated in our expert

11   disclosure that they will testify in part on, based on

12   what happens in the Government's case in chief.  We have

13   no way of knowing how many cases the Government is going

14   to talk about.  We had no way of knowing what evidence

15   the Government's going to present.  They opened the door

16   to that, Your Honor.  And I think it's, it would be a

17   due process violation if we weren't allowed to have our

18   experts address what the Government's experts discussed

19   and we would be glad to provide, now that the

20   Government's case is basically over, we would be glad to

21   provide updated disclosures on that.

22             MS. TREADWAY:  Well, Judge, it's a little late

23   for that.

24             MR. GOROKHOV:  And I believe there's language

25   in those disclosures -- if the Government wanted to

1    close that door, she should have said strike that

2    language.

3              THE COURT:  I'm confused.  Let me interrupt

4    you.  What is it under 26.2 that you think you're

5    entitled to?

6              MS. TREADWAY:  Well, if they've prepared any

7    reports.  That's experts.  That would be prior

8    statements by the experts or correspondence by the

9    experts.  That would be statements.  We gave that to the

10   defense.

11             MR. WILLIAMSON:  Judge, we said we didn't want

12   the correspondence.  We had an agreement not to give the

13   correspondence.  Mr. Byers tried to give the

14   correspondence back and she said she didn't want it.

15             MR. GOROKHOV:  And we haven't had a

16   representation that it's complete correspondence that we

17   received.

18             MS. TREADWAY:  We gave correspondence, Judge,

19   and the basis of our experts' opinions.

20             THE COURT:  Well, you know, I don't know.  I

21   was never under the impression that Rule 26.2 pertained

22   to expert reports.

23             MS. TREADWAY:  Well, then 705 does, Judge, and

24   705 allows you to --

25             THE COURT:  But --

3827

1          MS. TREADWAY:  -- when necessary.

2          THE COURT:  -- I can tell you how I feel about

3   experts.  I've already announced this a long time ago.

4   You can sit down, Eugene.  I think I really really

5   screwed up on the expert disclosure in this case.  I

6   was -- you know, I ordered reports and I think that

7   everybody was agreeable to that and then we had that

8   decision from the Circuit by a judge that's no longer

9   there, thank God, that completely screwed everything up.

10  And instead of the parties having a full disclosure of

11  the experts in a case where expert disclosure is

12  important, we had to truncate it down to disclosure

13  under the -- whatever that case was.  I can't think --

14         MS. TREADWAY:  Nachhio.

15         THE COURT:  I shouldn't have done that.  I've

16  said so in an order.  So this isn't going to surprise

17  anybody.  I should have gone ahead and done it.  So what

18  I'm going to do now is this.  I think what's fair for

19  the goose is fair for the gander.  If for no other

20  reason than it will make problems as this case finishes

21  up, if the Government doesn't know what -- have some

22  idea about what your experts are going to say beyond

23  whatever it is that they've done.  So by Monday morning

24  I want you to update your disclosures.  You say that you

25  weren't sure what the experts were going to say.  I'll

3828

1    credit that.  That was two years ago.  Had no idea.  But

2    by Monday morning, update the disclosures.  Now, Rule

3    26.2, I don't know --

4              MS. TREADWAY:  For instance, Judge --

5              THE COURT:  -- that just relates to

6    statements.  I don't know that that covers bills that

7    have been submitted or anything like that.

8              MS. TREADWAY:  Certainly does.  It's scope of

9    work, and what I did and conclusions drawn.  Any kind of

10   e-mail correspondence, correspondence, we gave that to

11   the Defendants under Jencks --

12             THE COURT:  If you say so.  You know, but the

13   point is this, these experts ought to come in here, you

14   know, experts are basically professional witnesses.

15   Particularly like Dr. Parran, for example.  You know,

16   maybe the jury doesn't see that, but I've seen experts

17   that are just nothing but professional witnesses.  They

18   should know what they've been paid.  I've seen this in

19   so many cases.  These experts come in and, well, gee, I

20   don't know that, my office people take care of that.  I

21   don't know.  How much do you charge?  Oh, I don't know,

22   it depends.  They're lying.  They know.  And if they

23   don't know, they're stupid.  And it makes, it makes no

24   sense when everybody knows that these people charge, for

25   them to be -- to come in and just say so.  But because

3829

1    of that, there's no reason why you shouldn't be telling

2    the Government.  And that's the kind of thing -- now,

3    about their reports, I don't know.  You know, I have

4    never seen Rule 26.2 cited as justification for giving

5    an expert's report.

6             MS. TREADWAY:  Well, I have always anticipated

7    that if I have an expert report, I have to divulge it

8    under 703 and 26.2 and I've always done that, Judge.

9             THE COURT:  703 says the basis of their

10   report.  That gets us back to my prior ruling where I

11   should have just said the heck with what the Tenth

12   Circuit says.

13            MS. TREADWAY:  But I've always taken --

14            THE COURT:  What you do, Ms. Treadway, is not

15   necessarily what the rules require.

16            MS. TREADWAY:  Well, I understand that, Judge;

17   but, again, I was trying to be helpful to the Defendants

18   in providing information that we provided long ago.  For

19   instance, Dr. Jorgensen.  Dr. Jorgensen's findings are

20   in spreadsheets and these Defendants have had these

21   spreadsheets for a couple of years now.  So we provided

22   them information from which we thought it would help

23   them cross-examine.  And we're just simply asking for

24   the same professional courtesy.

25            THE COURT:  Well, the only thing I can tell

3830

1   you is I'm not going to order them to give it on the

2   basis that you do it because I don't see that as

3   anything that's in the rules.  I would encourage them to

4   do it because, if the doctor next week says I prepared a

5   report, then I'm going to have to, if you want to see

6   it, I'm going to have to bring things to a screeching

7   halt while you get an opportunity to see a report that

8   may be 50 pages long for all I know.

9           MS. TREADWAY:  That's right, Judge, and

10  sometimes they have handwritten notes as well.  I don't

11  know whether you'll remember this in the Kaufman case,

12  but we had a defendant witness on, Mr. Huff, and we got

13  his handwritten notes after he revealed that he had

14  handwritten notes.  And I was able to cross-examine him

15  based on those notes.

16          THE COURT:  I think, you know, my view of

17  criminal cases is this, that I view them as different

18  from civil cases so long as it doesn't appear that in

19  reality it's turning into a civil case.  In other words,

20  I recognize the burden of proof and the presumption of

21  innocence and all this business, but once it appears, as

22  it is appearing in this case, that we're going to have

23  expert versus expert, okay, then I don't see any reason

24  why there shouldn't be full disclosure ahead of time so

25  that the parties when they're cross-examining, like you

3831

1    guys have had the opportunity, to see all this ahead of

2    time and then your cross-examination can be pertinent

3    and we don't have to have this, Judge, I haven't seen

4    this, I haven't seen that, can we have a recess over the

5    noon hour while I read a report that I can't digest over

6    the noon hour anyway.  Well, maybe you can, Lawrence,

7    but --

8              MS. TREADWAY:  Judge, I think you have the

9    authority to do this under Rule 16.

10             THE COURT:  I probably have the authority to

11   do under Rule 2.

12             MS. TREADWAY:  Probably do, yes, sir.

13             THE COURT:  And all I'm saying is I think that

14   would be the better practice.  Okay.  I don't see how

15   you can be hurt by it.  I think everything will be

16   helped.  If -- I will tell you this, if we have to take

17   long recesses next week or week after, I'm going to tell

18   the jury it's because the Government lawyers need an

19   opportunity to review documents that haven't been

20   produced.  Because that will be the truth.  So you guys

21   can do whatever you think you need to do but --

22             MS. TREADWAY:  And my final issue, Judge, is

23   the fee ticket issue.  The Government went to great

24   expense to do as the Defendants asked, to bring on very

25   short notice a whole truckload of fee tickets from

1    Kansas City that have been sitting there for two years

2    and never reviewed.

3              THE COURT:  So what do you want me to do about

4    it?

5              MS. TREADWAY:  I want you to ask them to

6    reimburse us for that cost because they've not used a

7    single fee ticket.

8              THE COURT:  Well, how much is it?

9              MS. TREADWAY:  I don't know, Judge, but it --

10   that's because it wasn't on my personal credit card.  It

11   was on the personal credit card of Judy Williams, the

12   DEA supervisor.  Because they couldn't get the paperwork

13   done.

14             THE COURT:  Well, maybe they need the fee

15   tickets for their case.

16             MR. WILLIAMSON:  We are using several of the

17   fee tickets.  And, Judge, they didn't have to bring a

18   truckload.  We went through boxes and boxes of fee

19   tickets to realize all the relevant fee tickets were in

20   two segregated boxes.

21             THE COURT:  Well, I tell you, we can bring

22   this up at the end of the case.  But I'm never very

23   sympathetic to Government about it's costing a ton of

24   money to do this or do that.

25             MS. TREADWAY:  Well, it was unnecessary.

3833

1              THE COURT:  Every time a KC-135 flies out of

2    McConnell and goes around and does touch-and-goes and

3    flies over my house, it's costing more in fuel than this

4    whole case costs.  The Government -- the Government --

5    now, I'm not talking about you --

6              MS. TREADWAY:  I understand, Judge.

7              THE COURT:  -- spends money like -- well, we

8    all know, everybody in this courtroom knows that they're

9    spending money that we don't have.  Trillions of dollars

10   that we don't have.  And I'm not sure that I'm ready to

11   try to balance the budget by having them pay for the

12   truck to bring down the fee tickets.  But if you want to

13   raise it later --

14             MS. TREADWAY:  I will.

15             THE COURT:  Now, the other thing that you've

16   filed is this business about Dr. Parran's report.  Which

17   they haven't responded to.

18             MS. TREADWAY:  The 801(d)(1)(B) motion.

19             THE COURT:  I'll tell you right now, even if I

20   agreed with you, I will exclude that record under Rule

21   403.  There is so much evidence in this case and I don't

22   think it would be helpful to the jury to have this long

23   long report that covers things that weren't even covered

24   during his testimony.

25             MS. TREADWAY:  Alternatively, Judge, we ask

3834

1    for 1-E which is the summary.  We would ask that that be

2    admitted as a prior consistent statement.

3              THE COURT:  Well, I can't think of --

4              MS. TREADWAY:  I ask for that as well.

5              THE COURT:  I can't think what 1-E looks like.

6    All I remember is the report which I was sitting up

7    here -- you remember -- sitting up here reading it.

8              MS. TREADWAY:  Yes, sir.  1-E is simply the

9    statement at the top that says the prescribing of

10   controlled substances to the following individuals took

11   place.  It's that -- it's this exhibit.

12             THE COURT:  It's that little --

13             MS. TREADWAY:  It's very summary.  But I

14   believe that would be an appropriate exhibit to put in

15   as a prior consistent statement.

16             THE COURT:  No.  I'm not going to get into

17   that.  I think that's -- I don't think that -- Rachael

18   did the research on that and it just isn't clear enough

19   that we've got a true prior consistent statement here.

20   But that's in evidence anyway, those figures are in

21   evidence.

22             MS. TREADWAY:  Oh, his testimony is in

23   evidence, absolutely, Judge.  Absolutely.

24             THE COURT:  Right.  So -- and, you know, I

25   mean, I'm not telling you how to try your case, but the

1     figures are in evidence.  You can write them up there on

2     the flip chart --

3               MS. TREADWAY:  Sure, Judge.

4               THE COURT:  -- and get the same effect.  All

5     right.  Anything else that we need to do here?

6               MR. WILLIAMSON:  Not from the defense, Your

7     Honor.

8               THE COURT:  I have somebody I'm going to meet

9     here in a minute.  I'll be happy to --

10              MS. TREADWAY:  Thank you, Judge.

11              THE COURT:  So have a good weekend.  I'll see

12    you all on Monday.

13                        (Recessed for the weekend at

14                        3:55 p.m.)

15

16

17

18

19

20

21

22

23

24

25