3853

```
 1              THE COURT:  Well, I let Juror No-078 go.
 2   There's some evidence that he was saying some things
 3   about the case.  And I'll tell you basically what I told
 4   him -- I'm not ready for this witness to come in here
 5   yet.
 6              MS. TREADWAY:  I realized, Judge.  I'm sorry.
 7   They jumped the gun on me.
 8              THE COURT:  Take him out, please.
 9        He didn't say anything that was dramatic or
10   anything like that; but he did make a comment about the
11   evidence to somebody else that was overheard.  I don't
12   think that he -- I think he could have continued.  I
13   think he could be a fair and impartial juror.  But the
14   problem is that in the event this case would ever be
15   reviewed, it's frequently the case that it's reviewed by
16   judges who are not trial judges, who have not been trial
17   lawyers.  Some have, some haven't.  Many of them have
18   never tried a case.  I would doubt very seriously that
19   any of them have ever been jurors.  If they have tried
20   cases, they haven't tried one like this one, a long
21   case, a case that's hotly contested.  And it would be a
22   disaster financially and every other way if the case
23   then was reversed and sent back for another trial, which
24   is what would happen.  So I decided -- and it's my
25   decision, it's not the lawyers' decision.  It's my
```

3854

1   decision.  That I'm not willing to run a risk of this.

2        Now, this case is close to being over from the

3   standpoint of the Government.  I've told you that the

4   Defendants don't have to put on a case; but I believe at

5   this point I can tell you that they are going to put on

6   a case.  So the case will go on for a while.  I'm not

7   sure how long.  They'll try to expedite it as much as

8   possible.  We know that you've been here a long time and

9   it's a lot of evidence.  I think this witness that's

10  coming in here is, what, number 56, 54.  Something like

11  that.  I don't know how many more witnesses there are

12  going to be.  But all of this is leading up to tell you

13  I really mean it when I give you the admonition.  Even

14  the most innocuous comment, and none of us would be

15  there when the comment is made, could jeopardize this

16  trial.  So, please, I don't like to overemphasize these

17  things at the beginning of trial.  I don't like to scare

18  the jurors into thinking that if they make even the most

19  innocuous comment, like their boss says how much longer

20  are you going to be on the jury and you say the judge

21  says, you know, another three or four weeks or something

22  like that, that that's going to get you in trouble.  But

23  if you comment on the evidence, the weight of the

24  evidence, your feelings about the evidence, whatever

25  that is, then that's what causes this trouble.  So --

3855

1    all right.

2        Now we can bring in this witness.  And he's

3    suffered some kind of injury.  I don't know what it

4    is -- I'll take care of this, Ms. Treadway.

5                THE. TREADWAY:  Okay.

6                THE COURT:  So he can't -- he's a doctor.  But

7    he can't sit in the witness box.  He has to sit out here

8    in front where he can put his foot up.  And I anticipate

9    that he's going to be a fairly long witness.  But

10   Ms. Treadway believes that she can wrap her case up

11   maybe tomorrow.

12               MS. TREADWAY:  Yes, sir.

13               THE COURT:  Or Wednesday.  And then we'll

14   begin the Defendants' case at that point.  And I don't

15   know how long their case will take, but it's going to

16   take as long as it takes.  This is -- the whole idea of

17   this proceeding -- you all have figured this out by

18   now -- is that we're trying to give you, me, and the

19   lawyers, every bit of evidence that you're going to need

20   to decide this case.  And I know it's been a lot of

21   evidence and it will continue to be a lot of evidence;

22   but it wouldn't be fair to the parties, and by that I

23   don't mean just the Defendant, I mean the Government,

24   and it wouldn't be fair to you, if we didn't get the

25   evidence in that you'll need to make this difficult

3856

1    decision.  So, we all appreciate the fact that you're

2    here.  I'm not kidding you.  These long trials are rare.

3    They're not so rare in federal court.  They're rare --

4    more rare in state court where some of you may have been

5    jurors.  But sometimes they're necessary.  So, with

6    that, we'll bring this witness in and get going.

7              MS. TREADWAY:  Thank you, Judge.  As he is

8    coming into the courtroom, I have a housekeeping matter.

9    The Government would offer Exhibit 82-E, which is a CD

10   of the clips from the October 17th, 2007, discussion

11   with Linda Schneider that were played last week in

12   court.

13             THE COURT:  What's the number again?

14             MS. TREADWAY:  82-E as in every.

15             THE COURT:  Any objection?

16             MR. BYERS:  It's just the clips; correct?

17             MS. TREADWAY:  Just the clips.

18             MR. BYERS:  The five new ones or whatever --

19             THE COURT:  Whatever that was.

20             MR. BYERS:  No objection.

21             MR. WILLIAMSON:  No objection.

22             THE COURT:  All right.  It's received.

23                      **DOUGLAS JORGENSEN**

24   Having been first duly sworn to tell the truth, the

25   whole truth and nothing but the truth, testified as

1   follows on:

2                   **DIRECT EXAMINATION**

3   BY MS. TREADWAY:

4   Q   Could you please introduce yourself to the jury.

5   A   I'm Dr. Douglas Jorgensen.

6   Q   And are you a medical doctor or a doctor of

7   osteopathy?

8   A   I'm a Doctor of Osteopathy.

9   Q   Of course, we've got to know, what did you do?

10  A   Fractured my achilles tendon.

11  Q   So the doctor becomes the patient?

12  A   Yes.

13  Q   Where do you work, Dr. Jorgensen?

14  A   In Manchester, Maine.

15  Q   Do you have a clinical practice?

16  A   I do.

17  Q   And what percentage of your time do you spend taking

18  care of patients?

19  A   I spend 90 percent of my time taking care of

20  patients.

21  Q   Are you Board Certified in any areas?

22  A   I am.

23  Q   And what?

24  A   I'm Board Certified in Family Practice and OMT.  I'm

25  Board Certified in Neuromuscular Skeletal Medicine and

1    Osteopathic Manipulative Medicine.  And I'm a Certified

2    Professional Coder.

3                        (Off-the-record.)

4    Q   Now, Dr. Jorgensen, do you have any specialties

5    within your osteopathic practice?

6    A   I have pretty much been practicing pain medicine for

7    the last ten years or so.

8    Q   Where did you go to your graduate school?

9    A   Boden College in Brunswick, Maine.

10   Q   And what was your major there?

11   A   I majored in environmental studies and history and I

12   minored in biology.

13   Q   Where did you go to medical school?

14   A   It was the University of Health Sciences College of

15   Osteopathic Medicine in Kansas City.  It's now The

16   Kansas City University of Medicine and Biosciences.

17   Q   And is that the same medical school that the

18   Defendant Stephen Schneider attended?

19   A   I believe it is.

20   Q   Following medical school, did you do any

21   residencies?

22   A   I did.

23   Q   And what residencies did you do?

24   A   I did residency training in family medicine at the

25   Maine Dartmouth Family Practice Medicine Residency in

3859

1    Augusta, Maine.

2    Q    And since you finished your residency programs, have

3    you continued your education?

4    A    Yes.

5    Q    And in what ways?

6    A    I pursued Board Certification as a sub-specialty of

7    Neuro-musculoskeletal Medicine, which is a bit of

8    Rheumatology, Internal Medicine, Neurology, non-surgical

9    Orthopedics.

10   Q    In addition to being a medical doctor, you said you

11   have become a Certified Coder.  Tell the jury what that

12   means?

13   A    A Certified Professional Coder is someone who has

14   taken the hours, done course work and passed an

15   examination to understand two main texts.  The ICD, or

16   the International Classification for Disease, ICD-9, is

17   what we use in this country.  It's a World Health

18   Organization text to explain diagnoses and symptoms.  It

19   was originally founded to follow epidemics throughout

20   the world so they could use alphanumeric codes rather

21   than having to explain things in different languages.

22   And then the CPT, or the Current Procedural Terminology

23   text, is a publication of the American Medical

24   Association and the codes are approved by the federal

25   government that tell us what we can do in an office for

3860

1    procedures.  So the ICD book is really creating the

2    medical necessity of why you do, and the CPT book is

3    what you do.  It's office visit, surgery, et cetera.

4    Q    What did you do to become a certified coder?

5    A    There was a set number of hours that you're supposed

6    to pursue.  You had to prove that you had competency

7    through, I believe it was, a three or four hour

8    examination utilizing those texts and then you have to

9    maintain continuing education units in that field.

10   Q    Have you written any books about coding for

11   physicians?

12   A    I have.  I've written two, one of them in its second

13   edition.  I've written academic chapters in two books as

14   well.  And I have multiple publications in journals and

15   peer review literature on the topic.

16   Q    Do you also give presentations about coding?

17   A    I do.

18   Q    And to whom do you typically give these

19   presentations?

20   A    I give them usually at continuing medical education

21   programs offered by state, national and regional medical

22   societies.  I have done them when the new guidelines

23   came out.  The Massachusetts Medical Society, I helped

24   introduce those in New England when they first came out.

25   Q    Do you also do consulting work when it comes to

3861

1    coding?

2    A    I do.

3    Q    And what type of consulting work do you do?

4    A    We do medical record chart audits where we will go

5    in and analyze documents that represent the visit that

6    occurred with the patient or procedure that occurred

7    with the patient and make sure that it has the

8    appropriate documentation for the level of service

9    billed or the type of procedure that was billed.  And

10   we'll also do analyses of practice to look at work flow,

11   charge entry, make sure their fee schedules seem to be

12   appropriate for the region; and sometimes we will

13   comment on contractor determinations which are Medicare

14   organizations or private pay, other policies such as

15   Aetna, Sigma, et cetera.

16   Q    How long have you been performing these kind of

17   audits?

18   A    Twelve years.

19   Q    How long have you worked in the area of pain

20   management?

21   A    I've been in that field in my own practice almost

22   ten years.

23   Q    Have you published articles regarding pain

24   management?

25   A    I have.

3862

1    Q    Approximately how many?

2    A    Specifically regarding pain management?  Probably

3    only two or three.  But I've written on

4    anti-inflammatory agents and I've done some other

5    pieces, some web-based protocols and recommendations for

6    primary care based pain management.

7    Q    Have you given speeches and presentations about pain

8    management?

9    A    I have.

10   Q    And do you know approximately how many?

11   A    That's difficult to say because some of them have

12   been done while doing programs for different

13   pharmaceutical organizations and we end up discussing

14   pain rather than the medication.  I've lectured in about

15   31 states right now.

16   Q    In addition to your clinical practice treating

17   patients, do you also train other physicians?

18   A    Yes, I do.

19   Q    And how long have you been doing that?

20   A    Since I got out of residency.  I go back -- I'm on

21   clinical faculty at Dartmouth and we go back and I teach

22   the residents at least a half dozen to ten times a year

23   where I train medical students, residents.  We have

24   medical students, residents and then fellows.  Fellows

25   are people who have completed their residency training

3863

1    after medical school and they come to our office from

2    all over the country to learn how to do the procedures

3    that we do, the pain management that we do, and

4    manipulative medicine at our office.

5    Q    And in addition to residents and interns, do you

6    also train and educate practicing physicians?

7    A    Yes, I do.

8    Q    And in what areas?

9    A    I have done that in areas of injection techniques,

10   trigger point injections.  I have done work on different

11   types of manipulations:  Cervical manipulation, thoracic

12   manipulation.  And then I have done some work for

13   Harvard at a CME series that we do in the summer on

14   introducing osteopathic manipulation and the medical

15   philosophy of osteopathy to M.D.'s.

16   Q    Have you served any state, regional or national

17   committees or boards with regards to pain management?

18   A    I have been on some regional -- excuse me -- some

19   national boards for pharmaceutical organizations

20   consultatively.

21   Q    Have you previously served as an expert witness in

22   cases across the country?

23   A    Yes, I have.

24   Q    And do you know how many?

25   A    I have done one civil trial and then I've done

3864

```
 1    somewhere in the neighborhood of four or five
 2    administrative law judge hearings for Medicare issues;
 3    and then two other cases that I did were child
 4    endangerment issues where I had to testify locally.
 5    Q   Have you ever served an as expert witness for the
 6    Government in a criminal case?
 7    A   No, ma'am.
 8    Q   When we first contacted you, were you eager to serve
 9    as an expert in this case?
10    A   No, ma'am.
11    Q   What made you decide to serve as an expert in this
12    case, Dr. Jorgensen?
13              MR. WILLIAMSON:  Your Honor, I'm going to
14    object.  That's irrelevant as far as 702, 703.
15              THE COURT:  Oh, I'll hear what he has to say
16    and then I'll decide.
17    A   Can you repeat the question please.
18    BY MS. TREADWAY:
19    Q   Yes.  What made you decide to serve as an expert in
20    this case?
21    A   Well, my initial reluctance surrounded my belief
22    that pain management and prescribing pain medicines,
23    opiates and controlled substances in particular, is
24    something that has been vilified in our country; and my
25    reluctance was I wanted to see what was there.  And I
```

3865

1    believe in our first phone call you felt that if I

2    reviewed the evidence that I would make a determination

3    from there and I did.  I found the gravity of the

4    material that I saw, the number of deaths that were

5    involved, and the management or lack thereof was too

6    serious to ignore and I had a duty ethically as a

7    physician to make sure that this was dealt with

8    appropriately.

9              THE COURT:  I'll let that testimony stand.

10   BY MS. TREADWAY:

11   Q   In serving as an expert witness, do you receive

12   payment for the time you spend?

13   A   I do.

14   Q   Does that include the time you spend reviewing

15   files?

16   A   Yes.

17   Q   Does it include the time you spend discussing the

18   case with the attorneys?

19   A   Yes.

20   Q   And the time you spend here in court?

21   A   Yes.

22   Q   How much do you charge for your time, Dr. Jorgensen?

23   A   Three to four hundred dollars an hour for meetings

24   and phone calls.  And then $5,000 for court appearance.

25   Q   To date, have we paid you $21,390 to review files in

3866

1    this case and discuss the case with us?

2    A    Yes, I believe that's accurate.

3    Q    And is the Government also reimbursing you for your

4    travel expenses?

5    A    Yes.

6    Q    In serving as an expert witness in this case, did

7    you review charts from the Schneider Medical Clinic?

8    A    I did.

9    Q    And did you review approximately 54 medical charts?

10   A    Yes.

11   Q    Did you also review numerous autopsies and

12   toxicology reports?

13   A    Yes, I did.

14   Q    Did you also review information about how services

15   were coded and billed?

16   A    I did.

17   Q    Did you also review numerous summary charts that

18   have now been admitted into evidence in this case?

19   A    Yes.

20   Q    Based upon your review of all of this information

21   and your training and experience, did you form various

22   opinions that you will be sharing with the jury

23   throughout your testimony today?

24   A    Yes.

25   Q    And will those opinions be based on both your

3867

1    medical expertise and your billing and coding expertise?

2    A    Yes, ma'am.

3    Q    The jury has heard evidence that the Defendants

4    Stephen and Linda Schneider owned the clinic and

5    employed two doctors and several physician's assistants

6    over time.   In performing your review and developing

7    your opinions in this case, were you aware of those

8    facts?

9    A    I was.

10   Q    Were you also aware that the Defendant Linda

11   Schneider was an LPN, a Licensed Practical Nurse, and

12   that she managed the clinic?

13   A    Yes.

14   Q    Now, although the Defendant Stephen Schneider was

15   only one of the providers at the clinic, and although

16   Defendant Linda Schneider managed the clinic and did not

17   personally write prescriptions for patients, when you

18   testify generally about the Schneider Medical Clinic

19   today, whose actions will you be referring to and

20   offering opinions about?

21            MR. WILLIAMSON:  Your Honor, I'm just going to

22   object.  Any opinion about a specific Defendant has to

23   be segregated about that specific person.  You can't

24   have a general thing about both Defendants.

25            THE COURT:  I thought she was just going to

3868

1     elicit that.

2              MR. WILLIAMSON:  No, she basically is asking

3     when you start talking about the Schneider Medical

4     Clinic who are you going to be talking about.  And --

5              THE COURT:  What if he said just Dr.

6     Schneider.

7              MR. WILLIAMSON:  Well --

8              MS. TREADWAY:  I'm trying to lay the

9     foundation, Judge, for his opinions.

10             MR. WILLIAMSON:  I'll wait until the questions

11    are finished then.

12             THE COURT:  Go ahead.

13    BY MS. TREADWAY:

14    Q   Why do your opinions relate to both of the

15    Defendants Stephen Schneider and Linda Schneider?

16    A   In any medical practice, the owner and managing

17    folks within that practice are the people who are

18    culpable for what occurs in that practice.  Whether it's

19    patient care or advising physician care or the overall

20    tenor of the care provided within the clinic setting.

21             MR. WILLIAMSON:  Your Honor, I'm going to

22    relodge my objection which is the critical issue that we

23    have been discussing it seems like for a few weeks now.

24    If he has a specific opinion, it has to be for Dr.

25    Schneider or for Linda Schneider.  It has to be for acts

3869

1    they specifically do or instructed to be done.

2           THE COURT:  Well, I do want him to segregate

3    his opinions between the two Defendants.

4           MS. TREADWAY:  I am laying the foundation as

5    to why his opinions relate to both Defendants, Judge.

6    I'm not asking for his opinions yet.

7           THE COURT:  But -- I realize that, but --

8           MS. TREADWAY:  I understand.

9           THE COURT:  But I want you to understand --

10          MS. TREADWAY:  I understand.

11          THE COURT:  -- from me that I want him to be

12   able to say Dr. Schneider, Mrs. Schneider, not just the

13   Defendants.  Or we're going to be bombarded with

14   legitimate objections that he's not identifying who he's

15   talking about.

16          MS. TREADWAY:  I will be asking those

17   questions that way, Judge; but right now I'm just simply

18   laying the foundation for these opinions.

19          THE COURT:  I understand.

20   BY MS. TREADWAY:

21   Q    Okay.  Now, Dr. Jorgensen, is a doctor directly

22   responsible for what his physician's assistants do?

23   A    Depending upon the state's licensure, yes, that's

24   typically how a PA or physician assistant license and

25   their training works.

3870

```
 1    Q    And is a clinic manager like the Defendant Linda
 2    Schneider responsible for what her employees do?
 3    A    By definition of manager of the clinic, would be.
 4    Q    Would that include not only physician's assistants
 5    but doctors?
 6    A    The overall management of the clinic and the
 7    supervisory role of a manager would be to bring concerns
 8    to the doctors.  They may have final medical say, but
 9    the management and administrative duties would fall upon
10    that person.
11            MR. GOROKHOV:  Your Honor, I'm going to object
12    to foundation.
13            THE COURT:  Overruled.
14    BY MS. TREADWAY:
15    Q    Based on the information you have, did the
16    Defendants own and operate the clinic together?
17    A    Yes, ma'am.
18    Q    And did they operate it in a manner that you were
19    able to observe through the records you reviewed?
20    A    Yes, ma'am.
21    Q    And did the Defendants create and maintain the
22    environment of the clinic that you were able to observe
23    through the records you reviewed?
24    A    To the best of my knowledge, yes.
25    Q    And did you understand that the Defendant Linda
```

3871

1    Schneider did the hiring at the clinic?

2    A    That is my understanding.

3    Q    And based on your review of the records, were you

4    able to determine if the Defendant Stephen Schneider

5    made any changes in policies and procedures despite

6    adverse events to patients?

7    A    I did not see any policy changes based upon adverse

8    event.

9    Q    And did you see any policies and procedure changes

10   from the Defendant Linda Schneider based on adverse

11   events?

12   A    No, ma'am.

13   Q    Since forming your opinions in this case, have we

14   also shared with you additional information from the

15   evidence that has been admitted in the case so far

16   through the testimony of witnesses and various

17   documents?

18   A    Yes, ma'am.

19   Q    How has that additional information affected your

20   opinion that both of the Defendants, Stephen and Linda

21   Schneider, are responsible for the activities at their

22   clinic and the consequences of those activities?

23            MR. WILLIAMSON:  Your Honor, I'm just going to

24   object one more time under 403.  All of this testimony

25   about the respondeat superior liability is confusing the

3872

1     issues in this case and I have to preserve this.

2              THE COURT:  I know that you're preserving for

3     the record and at this point in time I'm going to listen

4     to these opinions, opinion by opinion and not -- so I

5     want you to, even though it may seem somewhat like he's

6     interrupting, Ladies and Gentlemen, it's important for

7     lawyers to make a record and this is an issue that I

8     haven't resolved yet and so we need to hear the

9     testimony.  But he understands this, so does Mr. Byers,

10    and so we may have some objections here but eventually

11    I'll decide the issue.  Go ahead.

12             MS. TREADWAY:  I'll ask the question again.

13    BY MS. TREADWAY:

14    Q   How has the additional information we've shared from

15    the testimony and documents admitted at trial affected

16    your opinion that both the Defendant Stephen Schneider

17    and the Defendant Linda Schneider are responsible for

18    the activities at their clinic and the consequences of

19    those activities?

20    A   It substantially confirmed it.

21    Q   From your review of the records, including the

22    summary charts, were you able to determine that the

23    Defendants operated a volume business?

24    A   Yes, ma'am.

25    Q   The jury has heard evidence that the Defendants

3873

1    operated a volume business with patients scheduled every

2    ten minutes with walk-in's squeezed in.  Did we make you

3    aware of that testimony?

4    A    Yes, you did.

5    Q    The jury has heard evidence that the patients were

6    herded like sheep or cattle.  Did we make you aware of

7    that testimony?

8    A    Yes, you did.

9    Q    The jury has heard testimony from a patient, Tab,

10   and his girlfriend Barbara, that the Defendant Stephen

11   Schneider would come into the exam room, ask: what will

12   it be, and write a prescription.  Did we make you aware

13   of that testimony?

14   A    Yes, ma'am.

15   Q    The jury has heard testimony from a patient and

16   employee Jody Reagans, who said that the Defendant

17   Stephen Schneider came into the exam room with his

18   prescription pad and a pen in hand and said:  What can I

19   write for you.  Did we make you aware of that testimony?

20   A    Yes, you did.

21   Q    The jury has heard testimony from a patient and

22   employee, Robbie Swonger, who said that the Defendant

23   Stephen Schneider came into the exam room for his

24   initial office visit with his prescription pad and a pen

25   in hand and said:  What do you need.  Did we make you

3874

1    aware of that testimony?

2    A    Yes.

3    Q    Assuming this evidence to be true, Dr. Jorgensen,

4    does it further support the opinions you will be

5    offering the jury today?

6    A    Yes, it does.

7    Q    From your review of the records, including the

8    summary charts, were you able to determine whether the

9    Defendants were submitting false claims to the

10   healthcare benefit programs?

11   A    Yes, I was.

12   Q    The testimony has been that the Defendant Stephen

13   and Linda Schneider directed employees to mark a 99213

14   office visit on the fee tickets and not a 99212.  Did we

15   make you aware of that testimony?

16   A    Yes, you did.

17   Q    The testimony has been that the Defendant Linda

18   Schneider directed employee Angela Dunnavent to bill

19   physician's assistants as physicians.  Did we make you

20   aware of that testimony?

21              MR. GOROKHOV:  Your Honor, I'm going to

22   object.  This is a leading series of questions.

23              MS. TREADWAY:  Judge, it's based on Supreme

24   Court law.

25              MR. GOROKHOV:  And it also misstates the

3875

1    testimony and the evidence.

2              MS. TREADWAY:  That's for cross.

3              THE COURT:  Well -- is it okay if I --

4              MS. TREADWAY:  I'm sorry Judge.

5              THE COURT:  -- if I act as the judge here.

6              MS. TREADWAY:  I'm sorry.

7              THE COURT:  Or would you like to come up here

8    and sit and have me go back and work on something else.

9              MS. TREADWAY:  I apologize, Judge.

10             THE COURT:  I'm going to let her lead as

11   introduction.  I think that it's alright to simply say

12   this is the evidence that the jury has heard.  If the

13   jury doesn't remember the evidence being that way, or

14   you can show them on cross-examination that the evidence

15   has not been that way, then you certainly are free to do

16   that, Mr. Gorokhov.  But I don't see any reason not to

17   allow this sort of leading examination, because it will

18   come out anyway.  Now, when she starts eliciting his

19   opinions, that's a different story.  All right.  Let's

20   go on.

21             MS. TREADWAY:  Thank you, Judge.

22   BY MS. TREADWAY:

23   Q   I believe the question was that the testimony has

24   been that the Defendant Linda Schneider directed

25   employee Angela Dunnavent to bill physician's assistants

3876

```
 1    as physicians.  Did we make you aware of that testimony?
 2    A   Yes, you did.
 3    Q   The testimony has been that the Defendant Linda
 4    Schneider reviewed all of the fee tickets before they
 5    went to billing.  Did we make you aware of that
 6    testimony?
 7    A   Yes.
 8    Q   The testimony from employee Cindy Curry and Jennifer
 9    Harry has been that the Defendant Linda Schneider often
10    changed the CPT office visit codes on the fee tickets
11    before they went to billing.  Did we make you aware of
12    that testimony?
13    A   Yes.
14    Q   The testimony has been from the two billing
15    employees, Brenda Maurer and Sherrie Mills, that the
16    coder coded diagnosis codes for billing, but that the
17    office visit codes were billed as marked on the fee
18    tickets.  Did we make you aware of that testimony?
19    A   Yes.
20    Q   The testimony has been that the Defendant Linda
21    Schneider and employee Angela Dunnavent falsified
22    information on progress notes and billed for procedures
23    not done such as X-rays and lab tests.  Did we make you
24    aware of that testimony?
25    A   Yes.
```

3877

1    Q    Assuming all of this evidence to be true, Dr.

2    Jorgensen, does it further support the opinions you will

3    be sharing with the jury today?

4    A    Yes, it does.

5    Q    From your review of the records, including the

6    summary charts, were you able to formulate opinions

7    regarding the manner in which the Defendants operated

8    their clinic?

9    A    Yes, I was.

10   Q    The testimony has been that the Defendant Linda

11   Schneider hired people without medical qualifications or

12   training who she labeled as "misfits".  And did so to

13   pay them less, according to Brenda Maurer.  Did we make

14   you aware of that testimony?

15   A    Yes.

16   Q    The testimony has been that the Defendant Stephen

17   and Linda Schneider did not have Registered Nurses or

18   LPNs at the clinic.  Did we make you aware of that

19   testimony?

20   A    Yes.

21   Q    The testimony has been that the people coming to the

22   Defendants' clinic would seem fine in the waiting room

23   and then act like they were in pain as they were taken

24   back to the examination rooms.  Did we make you aware of

25   that testimony?

3878

1    A   Yes, you did.

2    Q   The testimony has been that the Defendant Linda

3    Schneider would order the patients by insurance rather

4    than appointment time, putting the Blue Cross/Blue

5    Shield patients in front of lesser paying insurance

6    companies and Medicaid.  Did we make you aware of that

7    testimony?

8    A   Yes.

9    Q   The testimony has been that it was often difficult

10   to find the medical charts for the patients being seen

11   on a given day.  Did we make you aware of that

12   testimony?

13   A   Yes.

14   Q   The testimony has been from physician's assistant,

15   Charles Craig, that the faxes would stack up 50 to 100

16   per day and were not filed in the medical charts in a

17   timely manner.  Did we make you aware of that testimony?

18   A   Yes, ma'am.

19   Q   Also from the physician's assistant, Charles Craig,

20   the testimony has been that the file clerk did not speak

21   English but instead spoke Spanish.  Did we make you

22   aware of that testimony?

23   A   Yes.

24   Q   The testimony from Cindy Curry has been that the

25   Defendant Linda Schneider would forge her husband's name

3879

1    on prescriptions.  Did we make you aware of that

2    testimony?

3    A    Yes, ma'am.

4    Q    The testimony from a medical assistant, Robbie

5    Swonger, has been that the Defendant Linda Schneider

6    would have him see patients when Dr. Lawrence Simons

7    showed up impaired.  Did we make you aware of that

8    testimony?

9    A    Yes.

10   Q    And did we in fact play you the tape recorded

11   statements of the Defendant Linda Schneider that we have

12   played here before the jury?

13   A    Yes.

14   Q    Did we also play you the tape recorded statement of

15   the Defendant Schneider in which he testified under oath

16   that he was not a pain management specialist?

17   A    Yes.

18   Q    The testimony has been from Dr. Graves Owen, a pain

19   management specialist from Texas, that he met with the

20   Defendant Stephen Schneider and other people from the

21   Defendants' clinic in December 2004, to try to advise

22   him how to appropriately treat chronic pain patients

23   with other than just drugs and more drugs.  Did we make

24   you aware of that testimony?

25   A    Yes.

3880

1    Q   The testimony has been that three emergency room

2    physicians, Dr. Brian Katan, Dr. Mark Rogers and Dr.

3    Brent Rody, called and personally talked to the

4    Defendant Stephen Schneider about the fact that his

5    patients were ending up in the emergency room suffering

6    from overdoses, withdrawals and were dying from

7    overdoses.  Did we make you aware of that testimony?

8    A   Yes.

9    Q   The testimony has been that the Defendant Stephen

10   Schneider had several nicknames, including: "the candy

11   man", "Schneider the writer", "the drug Lord of

12   Haysville", "Kevorkian junior" and "the pill pusher".

13   Did we make you aware of that testimony?

14   A   You did.

15   Q   The testimony has been from Cindy Curry and Robbie

16   Swonger that the Defendant Schneider referred to the

17   people who died of drug overdoses as: "bad grapes".  Did

18   we make you aware of that testimony?

19   A   Yes, you did.

20   Q   Assuming this evidence to be true, Dr. Jorgensen,

21   does it further support the opinions you will be

22   providing the jury today?

23   A   Yes, it does.

24   Q   And does all of the evidence I've recounted for you

25   and shared with you further support your opinion that

3881

```
 1    both of the Defendants, Stephen and Linda Schneider, are

 2    responsible for all of the activities that went on at

 3    the Schneider Medical Clinic?

 4    A    Yes, it does.

 5    Q    And how so?

 6    A    The people who own the practice and who run the

 7    practice are in charge of what the clinic produces for

 8    medical care and that culpability is shared among the

 9    management or administrative staff as well as the people

10    who legally own the entity that is the practice.

11    Q    Based on the evidence I reviewed for you, do you

12    consider both the Defendants responsible for the

13    activities of the doctors that they employed, Dr. Donna

14    St. Clair and Dr. Lawrence Simons?

15              MR. GOROKHOV:  Same objection, Your Honor.

16              THE COURT:  Same ruling.

17    A    Yes, I do.

18    BY MS. TREADWAY:

19    Q    In your opinion, based on the summary of evidence I

20    have recounted for you, are both of the Defendants

21    responsible for the activities of the physician's

22    assistants that they employed?

23    A    Yes, ma'am.

24    Q    Dr. Jorgensen, the Defendant Stephen Schneider was a

25    Doctor of Osteopathy, as are you.  Can you briefly tell
```

3882

1   the jury the difference between a doctor of osteopathy

2   and a medical doctor, including the difference between

3   their training?

4   A   M.D.s and D.O.s go typically four years of

5   undergraduate school and then four years of medical

6   school.  And after medical school we do residency

7   training in a basic program like surgery or internal

8   medicine.  And then you could do family practice.  And

9   if you do surgery, internal medicine, you can

10  sub-specialize from there.  During medical school, a

11  D.O. student will also learn musculoskeletal

12  manipulation, osteopathic manipulative medicine in our

13  first two years and then when we are out in our third

14  and fourth year of clinical rotations we will use that

15  manipulative medicine.  And the M.D.'s are typically not

16  taught that, although some do get individualized

17  training.  But once we are done with medical school, we

18  go into specialties such as Neurosurgery, Orthopedics,

19  down to Pediatrics and Family Practice.  Primary care,

20  particularly family practice, are where the majority of

21  D.O.'s end up because there's a very, very large primary

22  care focus and a rural under-served focus in our medical

23  education system.

24  Q   Can a doctor of osteopathy, without further medical

25  education, be board certified in pain management?

3883

1    A    Without further training and education, no, they

2    cannot.

3    Q    What additional medical education would a doctor of

4    osteopathy need to be board certified in pain

5    management?

6    A    When a D.O. graduates from medical school and goes

7    on to residency, currently the only pathway available to

8    become pain certified is to go through the anesthesia

9    training.  If that D.O. did an M.D. residency -- and

10   they're two different programs that are regulated by

11   different national organizations -- in the M.D. world

12   you can do a neurology, anesthesia, PM&R physiatry

13   residency which is physical medicine and rehabilitation.

14   And there may be an internal medicine pathway that has

15   opened up as well.  But in the D.O. world you have to be

16   an anesthesiologist.  It's being petitioned for right

17   now but currently it does not exist otherwise.

18   Q    Even though doctors of osteopathy cannot be board

19   certified without that additional training, can you

20   specialize in treating pain as you do?

21   A    Yes.

22   Q    And why did you decide to specialize in treating

23   chronic pain?

24   A    When I first went out into practice doing primary

25   care and emergency medicine, because I was a D.O. a lot

3884

 1   of musculoskeletal complaints were sent to me.  And that

 2   is the origin of many pain complaints.  And I enjoyed

 3   the work and I found my manipulative medicine skills

 4   combined with the general medical practice skills

 5   allowed me to offer them something other people weren't

 6   and it was rewarding and I enjoyed doing it.

 7   Q   Before specializing in chronic pain treatment, did

 8   you work as a general family practitioner?

 9   A   I did.

10   Q   How do chronic pain patients compare in complexity

11   or difficulty as to general family medicine patients?

12   A   Well, if you have a general family medicine

13   practice, you will have a certain segment that will be

14   chronically ill with diabetes, hypertension, cholesterol

15   disorders, cardiac issues, and those people have what we

16   call co-morbidities meaning they have more than one of

17   those.  Those folks are about on the same level as what

18   are chronic pain patients who needs polypharmacy,

19   multiple medications, to manage as well as potentially

20   multiple sources of the pain that has to be investigated

21   and some instances the source has to continually be

22   reinvestigated until we either have the technology to

23   find it or it manifests itself through blood work or

24   some other system that they have that the diagnosis that

25   we're looking for.  So it can be far more complex in a

3885

1    pain system because in family practice you'll also get

2    very quick things like an ear infection or sore throat

3    that can be taken care of pretty quickly and don't

4    require the same level of detail or focus and long term

5    management.

6    Q    Because chronic pain patients can be more complex or

7    difficult, do you as a physician spend more time with a

8    chronic pain patient than a typical family medicine

9    patient?

10   A    I do.

11   Q    And as a result, how much time do you allot for a

12   bare minimum initial office visit for a new chronic pain

13   patient?

14   A    They're usually booked for at least 30 minutes.  We

15   don't see more than three in a day.  Because it's

16   overwhelming to the staff to enter in all the new data

17   and it's overwhelming to us to review the medical

18   records, the imaging studies, to potentially contact the

19   previous providers.  And although I'm booked for 30

20   minutes, I get yelled at because I usually take 45, and

21   it puts my staff behind, but it's just what they need

22   sometimes because there's a lot of information to review

23   in that setting.

24   Q    How much time do you allot for a bare minimum

25   follow-up visit for an established chronic pain patient?

3886

1    A    On rare occasion we'll squeeze someone in to 15

2    minutes; but it's typically three patients an hour, 20

3    minutes.

4    Q    How many other physicians are in your practice, Dr.

5    Jorgensen?

6    A    Two.

7    Q    So that's a total of three physicians?

8    A    Yes.

9    Q    Approximately how many unique patients does your

10   medical practice serve?

11   A    We have I think just shy of 4,000.

12   Q    The evidence in this case has been that over a four

13   year period Schneider Medical Clinic had over 10,000

14   unique patients of which over 5100 were pain patients.

15   In your opinion, are those large numbers?

16   A    Yes, they are.

17   Q    Why do you say that?

18   A    In a typical family practice, an individual provider

19   would normally have about 2500, maybe 3,000 if they're

20   really busy.  And that's usually at the time at which

21   that person would consider closing their practice.  I

22   closed my practice to new patients three or four years

23   ago.  I just reopened recently because one of my docs

24   wants to go out on his own south of us.  But when you

25   have that many patients in a chronic pain practice, it

3887

1    would be difficult to manage at best.  And the ability

2    to do the monitoring from a regulatory perspective,

3    urine drug screens, pill counts, the things that are

4    standard in a chronic pain practice, would be nearly

5    impossible to accomplish.

6    Q   In your practice, how many patients do each of you

7    and your two colleagues typically see each day?

8    A   I see between 18 and 20 people a day.  I'm right

9    about 80% right now because I have to spin around on a

10   stool around the table.  But my most productive doc sees

11   23 to 25.  The most I've ever seen in a day in my

12   practice was 35 or 36, but that was a 12 or 13 hour day.

13   Q   How many patients do each of you typically see per

14   week?

15   A   We each see between 80 and 90.  Might top that out

16   at 100 but that would be an extremely, extremely busy

17   week.

18   Q   For a week?

19   A   For a week.

20   Q   How many days per week is your clinic open?

21   A   Four and a half days.

22   Q   And what are your typical hours of operation?

23   A   7:30 is our first patient.  And we usually -- the

24   phones go off at 5.  Last patients are booked 3:45, 4.

25   Maybe 4:15.  And then on Fridays we're open 7:30 until

3888

1    noon.

2         MS. TREADWAY:  Sorry, Judge, I'm looking for

3    an exhibit.

4    BY MS. TREADWAY:

5    Q   Let me hand you what has been admitted into evidence

6    as Exhibit 10-D.  You've seen that document before

7    today, haven't you, Dr. Jorgensen?

8    A   Yes, I have.

9    Q   And reminding the jury and for the record, that is a

10   listing of the number of patients that the Defendants

11   billing records indicate the Defendant Stephen Schneider

12   saw on a given day, and it's listed from the highest

13   number to the lowest number.

14       If the billing and the claims data indicates that

15   the Defendant Stephen Schneider was the provider for all

16   of these individuals, is it appropriate to attribute

17   those office visits to the Defendant Stephen Schneider?

18         MR. WILLIAMSON:  Your Honor, I'm going to

19   object.  A, that calls for speculation.  B, that's 403.

20   It confuses the issues.  As we've been talking about

21   claims data being attributed to the Defendant when the

22   elements here are whether or not he intentionally

23   submitted some fraudulent documents and this is

24   dangerously confusing especially with this long trial.

25         THE COURT:  The objection is overruled.

3889

BY MS. TREADWAY:

Q   I'll ask the question again, sir.  If the billing
and claims data indicates that the Defendant Stephen
Schneider was the provider for all of these individuals,
is it appropriate to attribute those office visits to
the Defendant Stephen Schneider?

A   Yes, it is.

Q   And why?

A   Whenever we sign a -- we teach this in our class,
CME programs, for billing and coding.  When you sign up
with an insurance company, there's a line that says, and
the Medicare one reads, you are personally, financially,
civilly and criminally liable by all billing done by you
or your designee.  And if it states it was done by that
provider, then that provider is the person responsible
for it.

Q   So, if the claims submitted indicate that he was the
provider, is it appropriate to say he is telling the
insurance companies I saw 80 patients today?

A   Yes, ma'am.

Q   Based on your review of the information, including
Exhibit 1-O, have you formed an opinion about whether
the Defendant Stephen Schneider could have provided
legitimate medical services to the number of patients,
that is, 50 or more patients, per day, on that chart?

1    A    I have.

2    Q    What is that opinion, Dr. Jorgensen?

3    A    It would be virtually impossible.

4    Q    Do you have an opinion whether a doctor who was

5    properly treating a combination of family and pain

6    patients could possibly see that number of patients each

7    day?

8    A    I do.

9    Q    What is your opinion?

10   A    It would not be possible.

11   Q    Do you have an opinion whether a doctor who was

12   primarily treating chronic pain patients could possibly

13   see that number of patients each day?

14   A    I do.

15   Q    What is that opinion?

16   A    Without an inordinate amount of support staff, it

17   would be impossible.

18   Q    Do you have an opinion whether a doctor who was

19   properly supervising physician's assistants could

20   possibly supervise that number of patients being seen by

21   a mid-level practitioner per day?

22   A    I do.

23   Q    What is that opinion?

24   A    It wouldn't even make sense to attempt it.

25   Q    Have we shared similar data regarding what we call

3891

1    the big days for another doctor in the practice, Dr.

2    Donna St. Clair?

3    A    Yes, you have.

4    Q    And did she have a similar pattern of over 50

5    patients a day?

6    A    Yes, she did.

7    Q    In terms of reviewing the medical charts from the

8    Schneider Medical Clinic, did you review progress notes

9    authored by Dr. Donna St. Clair?

10   A    I did.

11   Q    And did you also review medical charts authored by

12   Dr. Lawrence Simons?

13   A    I did.

14   Q    Did you find that Dr. St. Clair's documentation was

15   different than the Defendant Stephen Schneider's in any

16   significant way?

17   A    Not significantly.

18   Q    Did you find that Dr. Simons' documentation was

19   different than the Defendant Stephen Schneider's in any

20   significant way?

21   A    Only in that he billed higher level codes.

22   Q    But his documentation was no different?

23   A    No, ma'am.

24   Q    With regards to Dr. St. Clair's prescription

25   practices, did you see any significant difference in her

3892

1   practices as opposed to the Defendant Stephen

2   Schneider's?

3   A   I did not.

4   Q   With regards to Dr. Simons' prescription practices,

5   did you notice any significant difference in his

6   practices as compared to Dr. Stephen Schneider?

7   A   No, ma'am.

8   Q   Do you currently use mid-level practitioners in your

9   practice such as physician's assistants?

10  A   I did.

11  Q   You do?

12  A   I do not currently, but I did.

13  Q   So why don't you now?

14  Q   My wife decided she did not want to practice any

15  longer and gave up her license a few years ago.

16  Q   So your wife was your physician's assistant?

17  A   Yes.

18  Q   And when your wife started as a physician assistant,

19  was that a new healthcare provider in the industry?

20  A   It was a very early period in the training.  In

21  fact, when we moved to Kansas City, she was finishing up

22  her last year.  When we arrived in Kansas City they

23  didn't know if she should be drawing blood or giving

24  immunizations.  They had never heard of them in the

25  area.

3893

1    Q   Now, even though it was your wife that was your

2    physician's assistant, did she have a limited scope of

3    practice in your clinic?

4    A   Yes.

5    Q   And what was her limit of practice?

6    A   Her limit of practice for our purposes were

7    predominantly joint injections.  She had done

8    orthopedics for over a decade at that point, actually,

9    nothing but hip and knee replacements for almost 13

10   years.  And even when we went before the licensing board

11   to get her license to work under me, it was very clear

12   that my role was to supervise her and she was not to go

13   outside of the scope of practice.  And in some

14   instances, they're not even allowed to change medication

15   regimens without physician involvement.

16   Q   In terms of dealing with unstable pain management

17   patients, did you ever let your wife handle those

18   patients alone?

19   A   Never.

20   Q   Based on your review of the Schneider Medical Clinic

21   records, have you formed an opinion about how the clinic

22   utilized physician's assistants?

23   A   Yes.

24   Q   What is that opinion?

25   A   They were there to produce volume.

3894

1    Q    Do you believe or do you have the opinion that the

2    physician assistants were relied on too heavily?

3    A    Yes.

4    Q    And is that true because of the patient population?

5    A    I think that it's a combination of the patient

6    population and the volume that they were seeing.

7    Q    Why is it a problem to have physician's assistants

8    act in the manner that you saw at this clinic?

9    A    Physician assistants are, by training, designed to

10   be able to work as an assistant to a physician.  They

11   can work independently to some extent.  But state

12   regulations can vary.  But when they are working with

13   these types of medications and these types of patients,

14   to not provide them supervisory roles would not make

15   sense.  And in many instances, writing for Schedule II

16   opiate pain medications for them would be well outside

17   of their scope of practice.

18   Q    Now, can you tell the jury the difference between

19   continuity of care and fragmented care?

20   A    Yes, I can.  Continuity of care means that you're

21   able to take a patient from the first time that you see

22   them over a period of time, could be months, could be

23   years, but you're able to utilize your notes, your

24   medical record system, the medical assistants, the

25   nurses, and even the other physicians or providers who

3895

1    are caring for that patient, so that everybody is on the

2    same page and you can clearly follow through so that

3    you're not losing tests to follow up, you're not --

4    people aren't stepping on each other's toes when they're

5    writing medications.  Everyone is working in a

6    coordinated effort in order to make certain that patient

7    is receiving optimal care over that period of time.

8    Whereas, fragmented care would mean there really is a

9    disjointed effort or no effort to make certain that the

10   patient's care is collaborative and comprehensive.  So

11   when I leave to go to a meeting or a trip like this, I

12   will either tell the docs in my practice this patient

13   has this issue going on, and, you know, this is what I

14   want them to be on next.  I had a phone call just

15   yesterday about one of my patients from one of my

16   associates who is on call this weekend asking me this is

17   what's going on with her, can you just give me a little

18   more information.  And we interact like that quite

19   regularly because otherwise he wouldn't know this person

20   unless he saw her in the office; and he hasn't.  So, we

21   try to do that so it's not fragmented and we can

22   anticipate the needs of a patient in the practice.

23   Q    So, what is the importance of continuity of care

24   especially with regards to pain management?

25   A    Well, pain management it becomes really important

3896

1    because the number of agents that are typically being

2    used, number of medicines, are more than what you would

3    give to certain other types of patients.  And the types

4    of medications, obviously, weigh into that.  But also

5    there needs to be some anticipatory guidance for the

6    patient so they know these are the next steps that we're

7    going to follow, these are the things you need to watch

8    out for.  And in all likelihood, I would say this is

9    where my expertise ends and I think we need to send you

10   to this person or to this person or to get this test or

11   this analysis done so that we can give you a better idea

12   of what you should be receiving for care.  And that way

13   they don't feel like they're just coming in to me for

14   the next step.  We've already made out a plan and that

15   if I'm not there it's in my notes so one of the other

16   providers or even one of the medical assistants can go

17   over it with the patient on the phone and then come to

18   me for more direction at that point.

19   Q    Based on your review of the Schneider Medical Clinic

20   records, have you formed an opinion about whether the

21   patients received continuity of care?

22   A    Yes, I have.

23   Q    And what is that opinion?

24   A    Absolutely not.

25   Q    What caused the failure in the continuity of care at

3897

1    the Defendant's clinic?

2    A    In my opinion, it was volume based.

3    Q    The evidence in this case from physician's assistant

4    Charles Craig was that the patients learned how to

5    doctor-shop within the clinic; and that he shared this

6    information with the Defendant Stephen Schneider.  Did

7    we share that testimony with you?

8    A    You did.

9    Q    What effect does that have on your opinion about the

10   continuity of care at the Defendant's clinic?

11   A    Doctor-shopping intimates that they are seeking from

12   the services of one provider what they think they can

13   get.  It's a negative connotation towards the patient.

14   If that's occurring within a practice, it means they're

15   not communicating, the patients are aware they're not

16   communicating, and they feel that they can move to the

17   next person because they stopped getting what they

18   wanted from the other.

19   Q    The evidence in this case has been that the

20   individuals who came to the Schneider Medical Clinic for

21   controlled substances prescriptions would often wait as

22   many as three to four hours to see a provider for a

23   short visit.  The evidence in this case has also been

24   some individuals who came to the clinic for controlled

25   substances prescriptions would travel long distances,

3898

1    either within the State of Kansas or from as far away as

2    Oklahoma and Texas.  Do you find those facts

3    significant?

4    A    I do.

5    Q    How so?

6    A    Any patient that waits three hours for a visit, we

7    would tell 'em why don't you reschedule because it's not

8    working and we're not going to be able to squeeze you in

9    appropriately.  And when they're waiting that long, it's

10   because they want or need something and they are

11   anticipating they're going to get it if they stay.

12        And the distance issues, we do see some patients

13   from three hours away but it's because we do a procedure

14   that isn't done in some areas.  I've had people travel

15   down from Canada, but when the procedure's done, they

16   don't come back and see us any more.

17   Q    Based on your review of the records in this case, do

18   you have an opinion as to why the patients were willing

19   to wait so long and travel such distances to get

20   controlled substances prescriptions at this clinic?

21   A    I do.

22   Q    What is that opinion?

23   A    Based upon the records, they received whatever they

24   wanted, whenever they wanted.

25   Q    Dr. Jorgensen, I now want to briefly walk you

3899

1    through what you and your colleagues at your practice do

2    when you do an initial evaluation of a new chronic pain

3    patient in your practice.  And as we're doing this, does

4    this not only relate to your medical practice, but does

5    it also relate to the documentation required to bill the

6    programs for what you're doing?

7    A    Yes, it does.

8    Q    First of all, do you start with a thorough history

9    of your new patients?

10   A    We do.

11   Q    Do you have them fill out a written history?

12   A    It is available online or they can get it from the

13   office so that they have plenty of time to fill it out.

14   Q    And do you personally review that medical history

15   with the patient?

16   A    I do.

17   Q    And do you discuss their prior treatment?

18   A    I do.

19   Q    Do you get prior records to verify the discussion

20   about their prior treatment?

21   A    We do.

22   Q    Do you discuss their prior drug abuse or addiction

23   or their current drug abuse or addiction issues?

24   A    You have to.

25   Q    Do you discuss their function, their ability to

3900

1    function?

2    A    That's the primary objective of what we do.  That's

3    -- we explain to them that is our main focus here.

4    Q    Do you discuss the history of the patient's pain and

5    its various causes?

6    A    Yes.

7    Q    Do you discuss the type of their pain in terms of

8    the degree or how it feels?

9    A    We do in order to help guide the treatment options

10   and to determine if there are diagnostic testing options

11   that have not yet been pursued.

12   Q    Do you discuss the degree of the pain, how much pain

13   they are feeling?

14   A    They fill out each time they come in a form that

15   will say worst pain for the last month, best pain, the

16   least the pain has been, what has relieved it, what has

17   made it worse.  Any other modifying factors that would

18   help us understand it.

19   Q    So you discuss both what aggravates and eases the

20   pain?

21   A    Yes.

22   Q    Do you discuss the patient's psychological and

23   psychiatric history?

24   A    Absolutely.

25   Q    Do you discuss the patient's family history?

3901

```
1   A    Yes.

2   Q    And do you discuss their social history?

3   A    Yes.

4   Q    Do you --

5             Now let's talk about family and social

6   histories.  Why are those especially important in a pain

7   management practice?

8   A    There is very clear evidence in the literature that

9   if there is a family history of drug or alcohol abuse or

10  substance abuse of any kind, arguably, people have said

11  cigarette smoking, even sex addiction, could potentially

12  lead that person to have an addictive personality and

13  you need to know that ahead of time.  The social history

14  becomes extremely important.  If you look at the data,

15  one in three boys, one in four girls are sexually abused

16  pre-adolescently.  And when a girl in particular is

17  pre-adolescently sexually abused, there's an alteration

18  that occurs in the brain chemistry, making opiates not

19  work as well as they should.  And that's on the opiate

20  risk tool that actually elevates them to moderate risk

21  immediately for potential for abuse or diversion.

22  Q    Why do you get a psychiatric or psychological

23  history?

24  A    When someone's in chronic pain, the psychological or

25  psychiatric component in terms of their body's
```

1    interpretation of the stress from that psychiatric or

2    psychologic issue is interpreted no differently than if

3    they were physically injured.  Because the brain

4    chemistry has been altered from the chronic pain injury.

5    Q    So, do psychological or psychiatric problems effect

6    a person's perception of pain?

7    A    Most definitely.

8    Q    Does a psychological or psychiatric condition

9    increase a person's perception of pain?

10   A    Yes, it does.

11   Q    Now, are you familiar with the term chemically

12   coping?

13   A    Yes.

14   Q    Tell the jury what that is.

15   A    It's typically what we describe someone who is --

16   who is using a medication or alcohol or illicit

17   substances to deal with a situation that is either

18   stressful, could even be a situation where they get

19   angry, and they are using meds or these other chemicals

20   in order to deal with the situation rather than address

21   it in a more pro-active or positive manner.

22   Q    Based on your review of the medical records in this

23   case, did you see evidence of individuals being allowed

24   to chemically cope with controlled substances?

25   A    Yes.

3903

1    Q    And did you see evidence that the Defendant Stephen

2    Schneider made an effort to determine whether his

3    patients had psychological or psychiatric problems that

4    would increase their perception of pain?

5    A    Can you repeat the question.

6    Q    Did you see evidence that the Defendant Schneider

7    ever took action with regards to patients with

8    psychological or psychiatric problems such that he

9    understood and dealt with the fact that their perception

10   of pain was increased?

11   A    I saw no evidence of that.

12   Q    Now, if chronic pain is treated appropriately with

13   controlled substances, is addiction a common problem?

14   A    Yes.

15   Q    It's a common problem?

16   A    I'm sorry, repeat the question.

17   Q    Let me try it again.  If chronic pain is treated

18   appropriately with controlled substances, is addiction

19   to those controlled substances a common problem?

20   A    My apologies.  It is not a common problem.  But is

21   one that has to be assessed.

22   Q    It's a risk?

23   A    It is a risk.

24   Q    Based on your review of the records in this case,

25   have you formed an opinion regarding whether the

3904

1    Defendant Stephen Schneider and the other clinic

2    providers under his employ obtained sufficient medical

3    histories for the patients who came in to the clinic

4    ostensibly for chronic pain treatment?

5    A    Yes.

6    Q    What is that opinion?

7    A    They did not obtain sufficient medical histories if

8    they obtained them at all.

9    Q    Based on your review of the records in this case,

10   have you formed an opinion regarding whether the

11   Defendant Schneider and the other clinic providers under

12   his employ obtained sufficient psychiatric histories for

13   the patients who came to the clinic ostensibly for

14   chronic pain management?

15   A    Yes.

16   Q    And what is that opinion?

17   A    There was not sufficient history obtained for

18   psychiatric purposes or other.

19   Q    Based on your review of the records in this case,

20   have you formed an opinion regarding whether the

21   Defendant Stephen Schneider and the other clinic

22   providers under his employ obtained sufficient drug

23   abuse and addiction histories for the patients who came

24   to the clinic ostensibly for chronic pain treatment?

25   A    Yes.

3905

1    Q    What is that opinion?

2    A    They did not obtain sufficient histories for drug

3    abuse or addiction issues.  And the ironic thing about

4    that is my patients who come in who are using will tell

5    me if I ask them.  They'll tell me what their favorite

6    is and they'll tell me how often they use it.

7    Q    Were the failures to obtain sufficient medical

8    histories, failure to obtain sufficient psychiatric

9    histories and the failure to obtain sufficient drug

10   abuse and addiction histories a part of the volume issue

11   that you identified?

12   A    Yes.

13   Q    And do you have an opinion as to who was responsible

14   at the clinic for the volume of patients?

15   A    Yes.

16   Q    And who was responsible?

17   A    Linda Schneider and Stephen Schneider.

18   Q    In your opinion, did the failure to obtain a

19   sufficient medical, psychiatric and drug abuse and

20   addiction history endanger the patients receiving

21   controlled substances?

22   A    Yes.

23   Q    In what way?

24   A    People who have psychiatric or psychologic

25   conditions, and particularly if they're being medically

3906

1    managed appropriately, those medicines are working

2    within the brain chemistry.  The medicines that we use

3    for pain management, particularly appropriate pain

4    management, which is polypharmacy, using several

5    different agents to try to address that, can interfere

6    with the other meds and how they're metabolized in the

7    liver, how they're potentially metabolized through the

8    kidneys, and also they can have interactions that are

9    unfavorable or dangerous.  Furthermore, some of the

10   psychiatric medications are the very same medications we

11   use for pain management.  So, I have to be in contact

12   with the psychiatrist and tell them this is what we're

13   going to manage; and if they're on a controlled

14   substance from that psychiatrist, the benzodiazepine

15   like Valium or Ativan, in my practice, I take that over

16   from the psychiatrist.  I will let them run it but we,

17   we take over the management because it is controlled and

18   we only want one provider providing that controlled

19   substance so as not to have the appearance of doctor

20   shopping for the patient, but also so that we can have

21   control over what controlled substances are coming and

22   from and how often so that we have a better regulatory

23   perspective on what's occurring in that patient's

24   management.

25   Q   Based upon your review of the records in this case

3907

1    have you formed an opinion regarding whether the

2    Defendant Stephen Schneider and the other clinic

3    providers under his employ prescribed controlled

4    substances in a manner that actually resulted in

5    addictions?

6    A    Yes, I have.

7    Q    What is that opinion?

8    A    They were prescribing in a manner that would have

9    actually promoted addiction.

10   Q    Do you have an opinion as to whether the Defendant

11   Stephen Schneider and the other clinic providers

12   prescribed controlled substances in a manner that caused

13   people to become re-addicted after remissions of their

14   addictions?

15   A    I do.

16   Q    What is that opinion?

17   A    I believe that they did.

18   Q    And do you have an opinion as to whether the

19   Defendant Stephen Schneider and the other clinic

20   providers under his employ prescribed controlled

21   substances in a manner that fed active addictions?

22   A    I have an opinion.

23   Q    And what is that opinion?

24   A    I believe that they certainly did, from what I've

25   read and seen.

3908

1    Q    In your opinion, did the prescribing of controlled

2    substances at the Schneider Medical Clinic in this

3    manner endanger the patients?

4    A    Yes.

5    Q    In your opinion, did the prescribing of controlled

6    substances in this manner enable and exacerbate patients

7    addictions to controlled substances?

8    A    Yes, it did.

9    Q    And do you have an opinion about the purpose of this

10   type of course of prescription practices at the

11   Defendant's clinic that led to addiction?

12   A    Can you say that again please.  I'm sorry.

13   Q    Do you have an opinion about the purpose of this

14   type of prescribing practices in terms of creating

15   addiction?

16   A    Yes, I do.

17   Q    What is that opinion?

18   A    The purpose was volume based to increase revenue and

19   to push as many patients through the practice as they

20   could.

21   Q    When a person is addicted to a controlled substance,

22   do they need a source for that controlled substance?

23   A    Obviously, they do.

24   Q    And in this situation, who became the source, Dr.

25   Jorgensen?

3909

1    A   The Schneider Medical Clinic.

2    Q   Turning back to your examination of your patient.

3    Following a history, do you personally perform a

4    physical examination of the patient?

5    A   Yes, I do and often times I'll do it with a medical

6    student or resident.

7    Q   And do you perform a thorough physical examination?

8    A   I believe I do.

9    Q   And do you perform a detailed physical examination

10   with regards to the specific pain issue the patient is

11   presenting with?

12   A   We focus on the area that hurts the most and then we

13   also have to investigate if there are referred pain

14   areas that could be causing the problem as well.

15   Q   What types of things do you do during a physical

16   examination?

17   A   We start from head to toe.  First thing I want to

18   see is how they're acting or behaving upon arrival in

19   the waiting room.  How they get into the room.  And

20   looking for behaviors that might be red flags to give me

21   concern.  Then we do eyes, ears, nose and throat.  Check

22   lymphatic tissue, neck, the armpits, the groin, to make

23   sure there aren't any cancers or anything that we could

24   potentially be missing or some type of infectious

25   source.  We do skin examinations, looking to see if

1    they've had any bites, ticks or problems in that area,

2    in particular, Lyme disease is epidemic in our area.  We

3    do cardiovascular examination, particularly looking at

4    the pulses and extremities, if the extremities are an

5    issue.  We'll do chest examination to make certain that

6    there aren't any areas that are restricted.  Sometimes

7    we'll do an abdominal examination or even a pelvic

8    examination if they're having pelvic or abdominal pain.

9    And we have had to do rectal examinations if they're

10   having tail bone and coccyx pain.  We do a thorough

11   neurologic examination, check the cranial nerves to make

12   sure there is nothing going on in their head.  We will

13   also then do deep tendon reflexes to make sure they

14   don't have any spinal issues could be the cause of pain

15   which could be from compression from discs or tumor or

16   some other type of pathology.  And then I'm also trying

17   to gain an idea of their affect of what is their

18   personality type like.  What's going on so that I can

19   gauge, one, if I think it's legitimate; and, two, are

20   there other issues that we need to be considering or

21   addressing relative to their pain issues.

22   Q    Do you perform diagnostic tests or find diagnostic

23   tests that have been performed in the past and review

24   them?

25   A    Yes.

3911

1    Q    And do you have the ability to perform diagnostic

2    tests in your office?

3    A    Yes.

4    Q    And do you also send your patients out for further

5    diagnostic testing that you cannot perform?

6    A    Yes.

7    Q    Based on your review of the records in this case,

8    have you formed an opinion regarding whether the

9    Defendant Stephen Schneider and the other clinic

10   providers under his employ conducted sufficient physical

11   examinations for the patients who came to the clinic

12   ostensibly for chronic pain treatment?

13   A    Yes, I have.

14   Q    What is that opinion?

15   A    There is no way that you could call it remotely

16   adequate what was done for physical examination of these

17   patients.

18   Q    In your review the of the records, what evidence did

19   you see that the Defendant Stephen Schneider and the

20   other clinic providers under his employ consistently and

21   regularly obtained prior medical records for their

22   chronic pain patients?

23   A    I saw no evidence of that.

24   Q    What evidence did you see that the Defendant Stephen

25   Schneider and the other clinic providers under his

3912

1    employ performed thorough histories?

2    A   I saw no evidence of that either.

3    Q   What evidence did you see that the Defendant Stephen

4    Schneider and the other clinic providers under his

5    employ provided thorough physical examinations?

6    A   I saw no evidence of that.

7    Q   Performed meaningful diagnostic work ups?

8    A   There were hardly ever diagnostic work-ups performed

9    that I could see.

10   Q   Regularly ordered appropriate medical tests?

11   A   Almost never.

12   Q   Regularly followed up on the tests ordered?

13   A   Again, almost never.

14   Q   In your opinion, as a result of these various

15   failures, did the Defendant Stephen Schneider and the

16   clinic providers under his employ endanger the

17   individuals who came to the Schneider Medical Clinic?

18   A   Yes, they did.

19   Q   And once again, Dr. Jorgensen, was volume the reason

20   that none of this was done?

21   A   In my opinion, it was.

22   Q   And who was responsible for the volume at the clinic

23   based on your review?

24   A   My review it would be Linda Schneider and Stephen

25   Schneider.

3913

1          MR. GOROKHOV:  I'm going to object on

2    foundation, Your Honor.

3          THE COURT:  Your objection is noted, but

4    overruled.

5    BY MS. TREADWAY:

6    Q   After the evaluation, sir, do you then discuss the

7    treatment options with the new patients?

8    A   Yes, we do.

9    Q   And what is the ultimate goal of your pain

10   management practice?

11   A   Well, sometimes surprising for patients to hear, I

12   tell them I really don't care about your pain, I care

13   about your functionality.  If their pain is right here

14   in front of them, I want the pain to go down here so the

15   rest of this is their life and they go about doing

16   whatever it is that they couldn't do.  And we try to

17   make a step-wise approach to get them to the next level.

18   Q   When you are treating chronic pain, do you use

19   general analgesics that are available such as

20   non-steroidal anti-inflammatories and over-the-counter

21   medications?

22   A   Typically they've tried those before they've

23   arrived; but, yes.

24   Q   Do you use steroids?

25   A   Sometimes.

3914

```
 1    Q    Physical Therapy?

 2    A    Sometimes, yes.

 3    Q    Manipulation?

 4    A    Yes, on most of our patients.

 5    Q    Massage?

 6    A    Sometimes.

 7    Q    What's TENs?  Do you use that?

 8    A    We do.  Actually we use a combination -- I use a

 9    combinatoin of E-Stem and TENS unit, Transcutaneous

10    Electrical Nerve Stimulator.  It's designed to actually

11    trick the spinal cord and the brain so that it will shut

12    off the pain response that's going into the spinal cord

13    so it will stop being activated.  Because once a site in

14    a spinal column has become activated, some would say six

15    weeks, but everyone would agree by at least six months,

16    that area of the spinal cord will maintain its

17    activation indefinitely.  They've proven that in animals

18    even after they've severed the spinal cord.  The TENS

19    unit is used to get it to stop receiving that input, to

20    get it calmed down.  If the body receives a pain input

21    from the sensory component, it sends out a motor

22    response, which could be a spasm or some other type of

23    movement that would be inappropriate in an effort to

24    protect the body, to guard it.

25    Q    Do you use hot moist packs?
```

3915

1    A    Yes.

2    Q    Do you have some of your patients change their

3    lifestyles?

4    A    Yes, we do.

5    Q    Do you use psycho-therapy?

6    A    Absolutely.

7    Q    Do you use injections?

8    A    Yes, we do.

9    Q    Do you use biofeedback?

10   A    As part of the psycho-therapy, yes.

11   Q    And, lastly, do you use controlled substances?

12   A    Yes, we do.

13   Q    Can all of these treatments be used together,

14   separately, in various combinations?

15   A    That's the whole point of a multimodal approach.

16   Q    And how long have you used controlled substances to

17   treat chronic pain in your practice?

18   A    We've done this for nine or ten years.

19              THE COURT:  Why don't we take a recess.  I

20   think -- it's 10:30 -- about 15 minutes, Ladies and

21   Gentlemen.

22                   (Recess.)

23              THE COURT:  You may continue.

24              MS. TREADWAY:  Thank you, Judge.

25

3916

```
 1    BY MS. TREADWAY:
 2    Q   Dr. Jorgensen, do all of your chronic pain patients
 3    receive controlled substances?
 4    A   No, they do not.
 5    Q   Are controlled substances the primary form of
 6    treatment you employ with your chronic pain patients?
 7    A   No, they're not.
 8    Q   When are controlled substances appropriate?
 9    A   Controlled substances are part of a method of
10    treatment that includes several other agents before we
11    get there.  Sometimes if they come to us and they've
12    already been on controlled substances, then obviously
13    that would obviate the need for us to potentially
14    consider maintaining them, assuming we're comfortable
15    with why they're using them, how they're using them and
16    there have been no issues prior.  But we would only use
17    them for moderate to severe pain typically.
18    Q   Do you develop a treatment plan for your new
19    patients?
20    A   Yes, we do.
21    Q   Do you document that treatment plan in the medical
22    records?
23    A   We document the next steps diagnostically,
24    therapeutically, and any other interventions we think we
25    need to do.
```

3917

1    Q    Do you discuss that treatment plan with the patient?

2    A    We discuss it with the patient and often times we'll

3    discuss it with their family as well.

4    Q    Now, you've been speaking in terms of involving

5    other physicians in the medical community in the

6    treatment of your chronic pain patients.  Is that often

7    called a multi-disciplinary approach?

8    A    Yes, it is.

9    Q    And do you even involve other pain management

10   specialists in the treatment of your chronic pain

11   patients?

12   A    Yes, we do.

13   Q    Based on your review of the records in this case,

14   have you formed an opinion regarding whether the

15   Defendant Stephen Schneider and the clinic providers

16   under his employ used a multi-disciplinary approach to

17   the treatment of chronic pain?

18   A    Yes, I have.

19   Q    What is that opinion?

20   A    I do not believe they did, that I could see, at all.

21   Q    In your review of records, what evidence did you see

22   that the Defendant Stephen Schneider and the other

23   clinic providers under his employ routinely referred

24   patients for consultations with other physicians?

25   A    I did not see any evidence of that.

3918

```
1    Q    What evidence did you see that there was routine
2    referral of patients for consultations with physicians
3    who specialized in pain management?
4    A    I saw no evidence of that.
5    Q    What evidence did you see of follow-up of any
6    referrals to make sure that the patients had gone for
7    consultation?
8    A    I did not see any follow-up in the notes.
9    Q    What evidence did you see of a multidimensional
10   approach to the treatment of chronic pain?
11   A    Almost never.
12   Q    Based on your review of the records in this case,
13   have you formed an opinion regarding what the Defendant
14   Stephen Schneider and the other clinic providers under
15   his employ primarily used to treat the reports of
16   chronic pain?
17   A    They used opiates, controlled substances.
18   Q    Is that typical or atypical in a pain management
19   practice?
20   A    To solely just use opiates or controlled substances
21   without using any of a number of other potential options
22   is not common, and it's not recommended.
23   Q    What evidence did you see that the Defendant Stephen
24   Schneider or other clinic employees used other means of
25   therapy as you discussed with the jury just before the
```

1  break in the treatment of chronic pain?

2  A   I saw no evidence of other physical medicine,

3  injections, other than pain meds injections, and those

4  were controlled as well.  All I saw in the notes were

5  controlled substances written for -- and sometimes in

6  quantities and amounts and combinations that really made

7  little to no sense to me.

8  Q   Did you see any evidence that the Defendant Stephen

9  Schneider or the providers under his employ developed

10  individualized treatment plans for the chronic pain

11  patients?

12  A   I saw no individualized treatment plans, no.

13  Q   Did you see individualized prescription practices?

14  A   I saw some individualized prescription practices, as

15  a provider would have a favorite scenario; but I didn't

16  see anything that would say we're going to treat this

17  disease this way.  It was just pain meds.

18  Q   Did you see patterns of prescribing?

19  A   Yes, I did.

20  Q   Did you see prescriptions on the first visit despite

21  no old records being requested or reviewed?

22  A   Yes, I did.

23  Q   Did you see large prescriptions on the first initial

24  visit?

25  A   Yes, I did.

3920

1   Q    Did you see the prescription of redundant

2   prescriptions?

3   A    Yes, I saw redundant --

4   Q    And could you discuss that briefly with the jury

5   what you saw?

6   A    Sure.  When we prescribe pain medicine, there's kind

7   of a therapeutic rule that you think about.  Schedule II

8   agents are the ones that we're usually most concerned

9   about.  Federal law requires that they be written out by

10  hand.  And those are Oxycodone, Morphine, Fentanyl,

11  Oxymorphone, Dilaudid.  There are several other

12  different types, but in that category.  And once you

13  move to that level, using medications, particularly at

14  the doses that were in those notes, using medications

15  like Vicodin, Hydrocodone, that kind of a mid-level

16  range, you start out with Hydrocodone, Tramadol here,

17  that's for mild pain.  Moderate pain you might consider

18  on the Lortab or the Vicodin which we don't write

19  because of the Tylenol issues with it usually.  And then

20  you go up into the next phase.  Once you get into that

21  Schedule II phase, that next phase, to be -- to continue

22  to write for meds in this bottom tier makes little to no

23  sense chemically.  The receptors that receive that

24  medicine in the body are saturated by the Schedule II

25  agents.  So those lower drugs, you might as well give

3921

1    them a Tic-Tac.  It's not going to do anything for them.

2    And at that point you're left with a patient that now

3    has both in their hands; and the therapeutic benefit to

4    me was not even remotely clear.  I'm really uncertain

5    why they were being given in those quantities,

6    particularly when you got to the levels of the Fentanyl

7    and other things.

8    Q    Did you see patterns where the diagnosis would not

9    typically require controlled substances?

10   A    Yes, I did.

11   Q    Did you see the pattern of high dosages and high

12   quantities of controlled substances?

13   A    I did.

14   Q    Did you see a pattern of an emphasis on quick

15   release medicines?

16   A    There were a lot of short-acting agents given, yes.

17   Q    And is -- what's the problem with the short-acting

18   agents?

19   A    When someone is in chronic pain, the trough over a

20   24 hour period, their pain level is here, whereas

21   someone who doesn't have pain, it's down here.  When I

22   treat with an around-the-clock agent, 12 to 24 hour

23   agent, or a patch, which is a Fentanyl patch or a

24   Duragesic patch, that gets to this level and it covers

25   them over that 24 hours.  That's the goal.  And if you

3922

1    want to cover them for breakthrough pain, which

2    literature has shown breakthrough pain is the short pain

3    that happens four to seven times a day, depending upon

4    the literature you read, it spikes over and above and it

5    will go over that layer of chronic pain treatment that

6    you're trying to do.  So, there are what we call ATC or

7    around-the-clock agents, and then BTB or breakthrough

8    pain agents.  And the breakthrough is for when it spikes

9    through that chronic pain level that you're trying to

10   cover.  You get on top of that breakthrough pain with

11   the short-acting agents.  If you use just short-acting

12   pain agents, you're getting this up and down, up and

13   down, up and down.  You're constantly chasing pain all

14   day and it really doesn't do a good job managing the

15   patient's pain.  And it oftentimes leaves them

16   overmedicated because it takes 45 minutes to an hour for

17   most agents to hit the system, with very few exceptions;

18   and when that occurs, they end up taking more meds

19   because it's not going away in 20 or 30 minutes and that

20   can create an impaired individual and their

21   functionality goes down.  That's why we try to use

22   around-the-clock agents in combination with short-acting

23   agents in order to -- and other agents as well that are

24   not controlled, to provide a more even amount of pain

25   treatment over the course of 24 hours.

3923

1    Q    The patterns that we just discussed about the

2    prescriptions on the first visit, initial prescriptions

3    are large, et cetera, did those patterns endanger the

4    individuals who came to the Schneider Medical Clinic?

5    A    I believe they did.

6    Q    In your opinion, did these patterns indicate

7    anything to you about the Defendant Stephen Schneider's

8    concerns regarding the medical needs of those

9    individuals?

10   A    The medical needs of the patients I saw were clearly

11   not being met.

12   Q    Now, how frequently do you see your chronic pain

13   patients, Dr. Jorgensen?

14   A    When a new patient comes to our office, we'll

15   typically see them at a two to three week interval after

16   the first visit.  But our objective is if they're going

17   to need controlled substances combined with the other

18   agents we're putting them on, would be to get them to

19   the point where they need to see us maybe three or four

20   time a year, maybe twice a year if they're stable.  I

21   have to remind some patients, you haven't seen me, you

22   need to come in before I can give you another

23   prescription because it's been that four to six month

24   window.  Because my goal is for them not to need to see

25   me.  My goal is for their medical visits to not be the

3924

1    focus of their life.  I want them to go live their life.
2    So, we would see some patients monthly when we're doing
3    manipulation treatments because that's part of their
4    treatment protocol.  But it's not necessarily we're
5    seeing them for the pain meds because our goal, like I
6    said, is quarterly visits out to six months if we can;
7    but to see them at least every six months or they won't
8    get meds in our office.
9    Q    Now, during the course of treating your patients, do
10   you have various methods to monitor how your patients
11   are doing?  Especially on controlled substances?
12   A    Yes, we do.
13   Q    Do you do strength testing?
14   A    Excuse me.
15   Q    Strength testing?
16   A    We do strength testing when we're evaluating someone
17   initially.
18   Q    Do you do range of motion tests?
19   A    We do.
20   Q    Do you do discussions about function on a regular
21   basis?
22   A    It's part of the form that they fill out on every
23   follow-up visit.  They complain about it, but I've
24   explained to them we're using that to measure how
25   they're doing over time.

3925

```
 1    Q    Do you use pain agreements?

 2    A    We do.

 3    Q    Do you use pain assessment tools?

 4    A    Yes, we do.

 5    Q    Do you use urine drug screens?

 6    A    Absolutely.

 7    Q    And you use pill counts?

 8    A    We do.

 9    Q    How do you use opiate agreements in your practice?

10    A    Opiate agreements are used for patients who are

11    going to be on controlled substances, particularly

12    anything from the moderate to high range, on a regular

13    basis, meaning we're prescribing that typically

14    around-the-clock for the year.  So, if someone is

15    getting -- if they do an injection technique that's

16    going to be painful, or they're -- they've acutely

17    injured themselves, I might give them a short amount of

18    a controlled substance.  That person would not get an

19    opiate agreement.

20         But people who we're going to continually be

21    prescribing, we put them on opiate agreements so there's

22    a clear understanding of what their responsibilities

23    are, what our responsibilities are, so it's very

24    transparent about what the rules are.  From a federal

25    regulatory perspective as well as our clinic's own rules
```

3926

1   to make sure there aren't any confusing points.

2   Q    Do you have an educational program that you've

3   developed in connection with that opiate agreement?

4   A    Yes, I do.

5   Q    And what is that called?

6   A    It's called The Patient 360 Opiate Program and it's

7   a group visit program that we put the patients through.

8   Q    And explain to the jury how that works?

9   A    Sure.  The patients bring in -- I usually have them

10  bring in their partner or immediate family members, and

11  these are for people who are considering going on opiate

12  therapy or because of the pain issue or people who are

13  currently on opiate therapy because of their pain

14  issues.  And we go over the risks and the benefits,

15  basically breaking down the opiate agreement into a

16  lecture format.  But in the very beginning, we explain

17  that this is a big decision, you're deciding to go on

18  this medicine, and usually once you go on one of these

19  agents, unless we find a cure for the problem, you're on

20  this indefinitely.  We may have to adjust chemicals, but

21  we're not able to usually take people off once they're

22  on, with very few exceptions.  When we do the risk

23  assessment, we go over the opiate risk tool and we show

24  them family medical history, social history, as we

25  discussed earlier becomes extremely important and it's

1    actually after those visits that people often times

2    disclose to me abuse or substance issues that they have

3    that they didn't think were germane because at the very

4    end of this program when we go over how we dose and what

5    we do and all the other options that are available

6    outside of medicine, they have a quiz they have to take

7    to prove conceptualization of the material and then

8    those patients are then put into the program.  And if

9    they have an issue with the opiate agreement, they have

10   to repeat the program to make sure that the

11   understanding is clear.

12   Q    Now, you use urine drug screens in your practice?

13   A    Yes, we do.

14   Q    And how do you use them?

15   A    On all initial patients who come in who are either

16   being considered for or who we're looking at starting we

17   do a urine drug screen and we do a quick strip right

18   there to see if there's anything that's potentially

19   problematic.  This is their point to come clean and to

20   tell me what you've taken, tell me what you've done.

21   And I need to know that when I look at that urine.  If

22   you've told me you smoked marijuana or you told me

23   you've been on oxycodone or methadone, that that's what

24   I'm going to see and nothing else.  And then if that is

25   something that we find, then we may or may not forgive

1    them anything on that date or we may give them a one

2    week prescription of something rather low dosage that's

3    going to kind of control things until we get back the

4    confirmation from the laboratory because you really

5    can't make a clinical determination with the quick

6    strip.  It's just not as accurate as the analytics that

7    they do at the lab.  We also do them randomly.  We have

8    a random process.  At the beginning of each appointment,

9    the patients are randomly selected and if it's time for

10   you to come in for that random urine, you have to show

11   up within 24 hours or you do not get any future

12   medication.  And we utilize it not just to make sure

13   that what we're giving them is in the urine; but,

14   obviously, so that other things are not in the urine

15   that shouldn't be.

16   Q   Based on your record review in this case, what is

17   your opinion regarding the clinic's use of urine drug

18   screens.

19   A   They were a joke.

20   Q   They were a joke?

21   A   They were a joke.

22   Q   Why?

23   A   They weren't done when they said they were going to

24   be done; and if they were, they weren't in the record.

25   They were flagrantly violated where there would be

1    completely negative for opiates.  On one of the cases I

2    looked, at there was at least a stack this thick of

3    notes after a urine screen that was completely negative

4    for the medicine the person was supposed to be taking.

5    And when that happens, that means in most

6    circumstances -- and I've discussed this with DEA in our

7    state as well as the local authorities and the state

8    police -- that's their biggest concern, that means that

9    drug is being potentially diverted.  Not only is that

10   person potentially abusing drugs, but that means that

11   someone else in the community is getting access to those

12   meds.

13   Q   Did you see evidence that the clinic used urine drug

14   screens on a consistent basis and a random basis with

15   all chronic pain patients receiving controlled

16   substances?

17   A   No, I saw no evidence of that.

18   Q   Let me hand you what has been marked for

19   identification as Exhibit 1-F, which is -- which has

20   been admitted into evidence.  That is the summary chart

21   regarding the urinary drug screens conducted on

22   approximately 77 individuals.  And if you would just

23   move to the last page and the summary of the summary

24   chart, Doctor.  It indicates how many of those

25   individuals, most of whom are deceased, received urine

1    drug screens.  Does that information corroborate your

2    opinions in this case?

3    A    It does.

4    Q    Is it consistent with what you found in reviewing

5    the records?

6    A    It does.  It's surprising to some extent because I'm

7    seeing in here that people had urine drug screens done

8    like I saw in the records, but then there not be urine

9    drug screens in the chart to say that they were actually

10   done.

11   Q    Now, you also said you used pill counts.  How do you

12   use pill counts in your practice?

13   A    When they go through the opiate education program

14   and as part of their agreement they are to bring all of

15   their pain medicine with them to a visit at our office.

16   And we randomly select who we wish to do pill counts on.

17   And if we get an anonymous phone call or a tip or a

18   family member has concerns, we will tell them they have

19   to come in for a urine and pill count and it's an issue.

20   That allows us to be able to count what they should be

21   on based to that date, to make sure overconsumption is

22   not occurring, to make sure that they are following the

23   rules and to make sure they actually still have the meds

24   that we gave them that were used for legitimate purposes

25   and not diverted.  And it's not a perfect thing to do,

3931

1    but it works really pretty well and it makes it

2    difficult for people in our practice to divert as

3    easily.

4    Q    In your opinion, do the providers that are engaged

5    in pain management have a continuing duty to keep up

6    with the literature and research regarding pain

7    management?

8    A    Yes, they do.

9    Q    And do they have a continuing duty to keep up with

10   the different ways patients can abuse and divert

11   controlled substances and other prescription medication?

12   A    Absolutely.

13   Q    Based on your review of the records in this case,

14   have you formed an opinion regarding whether the

15   Defendant Stephen Schneider and the other clinic

16   providers under his employ sufficiently performed

17   ongoing assessments and monitoring of the individuals

18   receiving controlled substances?

19   A    I have.

20   Q    What is that opinion?

21   A    It never happened.  There would be multiple times in

22   the records where it would say no more pain meds, then

23   they would just keep getting written.

24   Q    Did you see patterns where refills were given

25   without appropriate assessments being performed?

3932

1   A   Yes, I did.

2   Q   Therefore, did you form an opinion as to whether

3   this practice was in the legitimate medical pain

4   management business, or not?

5   A   Yes, I did.

6   Q   What is that opinion?

7   A   They were not.

8   Q   Based on your review of the records, what did the

9   clinic providers typically do in follow-up visits with

10  regards to individuals on controlled substances?

11  A   There was a cursory history done.  Check boxes.

12  Writing that was sometimes completely illegible.  And

13  then they would write down some diagnosis that may or

14  may not have been addressed in the history or the exam.

15  Then there would be a list of what meds they gave them.

16  Sometimes legible; sometimes not.

17  Q   Based on your review of the records, did you see

18  patterns of follow-ups noted but not done?

19  A   Yes, I did.

20  Q   Did you see patterns with regards to getting urine

21  drug screens?

22  A   I did.

23  Q   Getting records?

24  A   I did.

25  Q   Getting tests?

3933

1    A    I did.

2    Q    Did you see any patterns regarding the Tylenol

3    levels in the prescribed medications?

4    A    There was no consideration for that whatsoever that

5    I could see.

6    Q    And Tylenol is toxic to the liver?

7    A    It's incredibly toxic.  It's one of the more

8    dangerous over the counter meds that are out there.

9    Q    As you were reviewing the records in this case, did

10   you see patterns with regards to the recorded

11   respiration rates?

12   A    Sometimes.

13   Q    And what patterns did you sometimes see?

14   A    The typical it would say: "20".  Whether or not

15   those are checked, that's kind of standard what's

16   written down.  But normal respiration rate for a human

17   is supposed to be between 16 and 18 but 20 is what

18   people tend to write down.  Whether or not it's been

19   done is unclear.

20   Q    Did you see any patterns in some of those patients

21   regarding weight loss?

22   A    I did.

23   Q    What's the problem with weight loss?

24   A    Well, wasting in anyone who is having issues with

25   substance abuse is one of the key things that you look

3934

1    for.  The face becomes sunken in.  They begin to lose

2    weight.  And, you know, it's one of the things I look

3    for when I'm seeing patients to determine whether or not

4    I think that they're healthy or not because weight is

5    oftentimes a marker of health.

6    Q   What evidence did you see in the records that the

7    Defendant Stephen Schneider and other clinic providers

8    under his employ altered treatment plans over time?

9    A   I didn't see any altering of treatment plans.

10   Q   Was this true even if the patient's condition was

11   worsening as indicated in the documents?

12   A   Unfortunately, yes.

13   Q   Was this true even when the clinic's records

14   documented patient behavior indicating that he or she

15   was abusing the controlled substances being prescribed?

16   A   Yes.

17   Q   Was this true even when the clinic records

18   documented the patient behavior indicating that he or

19   she was addicted to the controlled substances being

20   prescribed?

21   A   Sadly, yes.

22   Q   And in your opinion, did the Defendants endanger

23   these abusing and addicted patients by providing

24   treatments that would leave them dependent on the clinic

25   for pain medication?

3935

1    A    Yes.

2    Q    Are patients who are abusing or addicted to

3    controlled medications at risk of overdose and overdose

4    death?

5    A    Yes, they are.

6    Q    In your opinion, did the course of conduct at

7    Schneider Medical Clinic put patients at risk of

8    overdose and overdose deaths?

9    A    Yes, it did.

10   Q    The evidence in this case has been that the

11   Defendant's clinic's records included pain assessment

12   documentation tools.  What is your opinion about the

13   Clinic's use of these pain assessment documentation

14   tools?

15   A    They were used as filler in the chart and they were

16   barely used and the most critical components of them

17   were completely ignored.

18   Q    What is your opinion regarding the clinic's use of

19   the pain management agreements in the document?

20   A    They weren't worth the paper they were written on.

21   Q    Why not?

22   A    Because they were ignored.  There would be

23   violation, after violation, after violation.  They would

24   say no more meds, and if they said no more meds, they

25   would go right back to one of the docs who would give

3936

1    them meds the next time.  And they did it over, and over

2    again.

3    Q    Did you see any evidence in the documents you

4    reviewed that the clinic regularly used pill counts?

5    A    I saw no evidence of pill counts.

6    Q    Now, the jury has also heard about red flags in this

7    case.  And I want to discuss some of those red flags.

8    Do you consider any of the following red flags?

9    Requests for early refills?

10   A    Yes, sometimes.

11   Q    Specific requests for particular drugs?

12   A    Sometimes.

13   Q    Claims that certain drugs do not help pain?

14   A    Something to consider, yes.

15   Q    Reluctance to change medications?

16   A    Something, again, to consider.

17   Q    Reports that the drugs have been lost or stolen or

18   destroyed?

19   A    Particularly if it happens repeatedly.

20   Q    Anonymous tips from family members about abuse or

21   addiction?

22   A    Yes.

23   Q    Doctor-shopping?

24   A    Absolutely.

25   Q    Pharmacy-shopping?

3937

```
 1    A    Again, yes.

 2    Q    Forging prescriptions?

 3    A    Absolutely.

 4    Q    And selling controlled substances?

 5    A    Clearly, that's a matter for the authorities to get

 6    involved immediately.

 7    Q    Now, none of these by themselves, unless it's

 8    forging prescriptions or selling, is sufficient for you

 9    to terminate a patient, is it, Dr. Jorgensen?

10    A    It could be grounds for them to be put on probation

11    within the practice; but it is not necessarily grounds

12    for dismissal.  Unless they've been caught flagrantly in

13    the act of selling.

14    Q    Instead, what are these red flags supposed to be

15    giving you so you can do something for the patient?

16    A    They are markers that this patient is at risk for

17    abuse or diversion.  And they need to be seriously

18    investigated.  If we get a telephone call from a family

19    member, I'll often times ask them:  Can you bring that

20    family member in with you so that we can have a

21    conversation about what's happening.  But they allow me

22    to have another set of eyes and ears out there to find

23    out what's going on because I rely on family.  I'll tell

24    people at the program and when I first meet them, I want

25    to have your partner or your spouse or whoever your
```

1    caregiver is present to tell me because you may feel

2    that you're doing fine, but they may see something that

3    you cannot because you're on controlled substances or

4    because you're just blind to how you're being looked at

5    from a third party.  So I need all of those

6    interactions.  And if those, any of those red flags were

7    to pop up, it is something that you have to pay

8    attention to.

9    Q    Did you see evidence of these types of red flag

10   behaviors documented in the Schneider Medical Clinic

11   charts?

12   A    Yes, I did.

13   Q    Did you see a response to these red flags?

14   A    They were ignored repeatedly.

15   Q    Did you see any evidence of a legitimate medical

16   response to any red flags?

17   A    Not that I could tell from the records, no.

18   Q    As a result, did the failure to address these red

19   flags endanger the patients?

20   A    It absolutely did.

21   Q    Now, Dr. Jorgensen, I'm sure it's unpleasant, but do

22   you have to terminate patients from controlled

23   substances prescriptions in your practice?

24   A    Yes, we do.

25   Q    And why would you do that?

3939

1    A    Well, they test positive for elicit substances or

2    another drug that we didn't give them.  That's usually

3    grounds for pretty immediate dismissal in opiate

4    therapy.  But we'll continue to see them as a patient.

5    We just won't give them controlled agents.  And if they

6    test positive for cocaine or heroin, then that's -- they

7    have to go to a rehab center, or we will absolutely not

8    see them back for any type of medication management.

9    Other than what's required by law in our state.

10   Q    Now, do you also deliberately take patients off of

11   controlled substances even when they haven't violated

12   any agreement?

13   A    Sometimes.

14   Q    And what do you call that?

15   A    We call it: "a drug holiday".

16   Q    Explain to the jury how that works?

17   A    Well, over time, chemical sensitivity can build up

18   and the patient is at a dose that is going to require us

19   to go to a level of pain medication that is extremely

20   high.  The reason that that happens over time is

21   tolerance will build up.  And tolerance and physical

22   dependence are related but people often times confuse

23   physical dependence and tolerance with addiction.

24   Addiction is a biogenetic issue that has a

25   predetermination because of risk factors and other

1    entities.  But when you look at physical dependence and

2    tolerance, the receptors that receive the pain medicine

3    over time get used to having the medicine there.  So, if

4    you can get the person off of the medicine, it may only

5    be two weeks where I put them on Prednisone for two

6    weeks just to calm their whole system down but get them

7    off the controlled substance.  That will allow us to

8    give their body a break.  If I have someone on 150

9    milligrams, let's say, of Oxycontin, just to pick a

10   number, the only way to get them to the next therapeutic

11   level for treatment would be to put them on 300

12   milligrams because you either have to double it or go to

13   50% of that prescribing dose.  So they're on 150.  I

14   have to take 150, divide it by two, and I can get 75.  I

15   have to add that to the 150 dose.  Now they're going

16   from 150 to at least 225 or they have to go all the way

17   up to 300.  And if I change that, I also have to change

18   the breakthrough pain medicine that I talked about.  So,

19   once someone arrives and we get them to that level,

20   which could take years, it could take years, that means

21   that I need to figure out another method for trying to

22   get them under control.  So everyone in our practice

23   also got trained under a drug called Suboxone, which is

24   typically used for addiction but it can also be used to

25   wean people down so that we can get them off of these

3941

1    other agents and give their body a break for a while.

2    Q    Did you see any evidence in the records that you

3    reviewed that the providers at Schneider Medical Clinic

4    used "drug holidays" for their chronic pain patients?

5    A    None whatsoever.

6    Q    Now, when you have to terminate a patient from your

7    practice altogether, what steps do you have to take to

8    terminate that patient such that you are following the

9    Hippocratic oath and your ethical standards?

10   A    In addition to the Hippocratic oath, the ethical

11   standards I am legally bound to care for that patient,

12   generally for a minimum of two weeks, we do four weeks

13   in our office, because there's a 400 doctor shortage in

14   the state of Maine, and I help them find another

15   physician to manage them.  Because it would be unethical

16   for me just to say that you're out of here, you're all

17   done.  Opiate withdrawal doesn't kill people, but it's

18   miserable to go through; and, frankly, in this day and

19   age, there's no reason for people to have to go through

20   it because we have means to help them so they don't have

21   to suffer through it.  I think it's rather parochial to

22   do that to people, so we don't.  That's not to say if

23   someone misuses a prescription I gave them, we'll

24   sometimes wean them down off the meds.  So we cut the

25   dose in half over five to seven days and then cut it in

3942

1    half again.  Because they may have burned all their

2    bridges.  Pain community is not that large.  There are a

3    small number of people in regions that treat chronic

4    pain patients and they usually know each other.  And,

5    you know, they may have gone to one office and had an

6    issue and then that office will let you know I'm sending

7    you this patient, these are the issues we've had.  And

8    they may arrive at our doorstep on probation knowing one

9    violation and you're all done with controls.  But that's

10   done up front.  And in addition to the state law, at two

11   weeks it would just be unconscionable to send someone

12   out the door and say good-bye, see you, all done, you

13   screwed up.  It's just not what we do in medicine.

14   That's not why most of us went to medical school.

15   Q    Have you been provided with a portion of a

16   deposition that Patricia Hatcher, Linda Atterbury

17   Schneider's sister, provided in a civil case?

18   A    Yes.

19   Q    And did that portion of Ms. Hatcher's deposition

20   concern whether the clinic referred patients to other

21   physicians after being terminated from the practice?

22   A    Yes.

23   Q    Based on your review of the records in this case and

24   that deposition testimony, have you formed an opinion

25   regarding whether the Defendant Stephen Schneider and

1    other clinic providers under his employ terminated

2    patients in an ethical and appropriate manner?

3    A    In my opinion, it was unethical and inappropriate to

4    just serially terminate someone never to be seen again.

5    Q    Based on your review of the records in this case,

6    have you formed an opinion regarding whether the

7    Defendant Stephen Schneider reinstated patients to pain

8    management with controlled substances based on

9    legitimate medical reasons?

10    A    That was -- they were for illegitimate reasons, and

11    actually that was the go-to provider in that practice if

12    someone violated the agreement.

13    Q    What do you mean he was the go-to provider?

14    A    When I would see a patient terminated from pain

15    meds, even the next visit was typically with Dr.

16    Schneider and then he continued to write.

17    Q    Are you familiar with the guidelines for the use of

18    controlled substances for the treatment of pain?

19    A    I am.

20    Q    And is it your understanding that Kansas adopted

21    those guidelines?

22    A    That is my understanding.

23    Q    And are those the guidelines the accepted standard

24    of medical practice for providers engaged in pain

25    management?

3944

1    A    That is my understanding, yes.

2    Q    Based on your review of the records in this case,

3    have you formed an opinion regarding whether the

4    Defendant Stephen Schneider and the other clinic

5    providers in his employ complied with those guidelines?

6    A    I have an opinion.

7    Q    And what is that opinion?

8    A    There was no compliance with that guideline

9    whatsoever.

10   Q    Now, I would like to turn to some issues about

11   billing and coding, Dr. Jorgensen.  From medical school

12   forward, does a physician learn about billing and coding

13   for his services?

14   A    Not as much as we probably should; but, yes, we do.

15   Q    And in practicing medicine, do physicians come to

16   learn more about billing and coding?

17   A    It -- actually at one of my Board of Trustee

18   meetings it's voted in as part of our annual CME program

19   so that it's being offered and I'm asked to speak to

20   residents and to the general population.  In fact, I'm

21   even doing a six part webinar this summer that's

22   sponsored by two of our largest national organizations

23   because it has become so critical that if you don't do

24   it appropriately you can't keep your doors open any

25   more.

3945

1    Q    Are the general rules and standards for billing and

2    coding common knowledge amongst healthcare providers?

3    A    They've been around for 15 years, so they should be.

4    Q    Is it also common knowledge amongst healthcare

5    providers that the provider is responsible for claims he

6    submits to the healthcare benefit programs?

7    A    I think I stated this earlier.  But it clearly

8    states on the forms that you're personally, civilly,

9    financially and criminally liable for billing done by

10   you or your designee, which means the person in your

11   office that may be doing it for you.

12   Q    So are physicians --

13            MR. GOROKHOV:  Your Honor, I'd object and ask

14   for a cautionary instruction.

15            THE COURT:  Well, I don't know what forms he's

16   talking about.  I don't remember seeing -- there's no

17   evidence that I know of.  It's up to you to remember.

18   On any of these provider forms that a patient is

19   criminally -- or that a doctor is criminally

20   responsible.  What forms is he talking about?

21            MS. TREADWAY:  I was going to ask that next,

22   Judge.

23   BY MS. TREADWAY:

24   Q    You were talking about forms.  What forms are you

25   talking about?

3946

1   A    That's the typical language on Medicare contractor

2   language.

3   Q    Okay.  And when we talk about forms, are claim forms

4   HICVA 1500 forms?

5   A    HICVA 1500 or CMS, the Centers for Medicare and

6   Medicaid Services; yes.

7   Q    And do those forms actually have that same language

8   on them?

9   A    The ones that I have seen have.

10        MR. GOROKHOV:  Your Honor, I'd now like to

11   renew the objection also under Rule 403.

12        THE COURT:  Well, the objection is overruled

13   under 403.  This man is a expert witness.  I'll -- do

14   you want to question him now about language on forms

15   that makes the -- a provider criminally responsible or

16   would you rather wait until cross-examination?

17        MR. GOROKHOV:  I think we can cover it in

18   cross, Your Honor.  I just think there's a prejudicial

19   effect here.

20        THE COURT:  Pardon.

21        MR. GOROKHOV:  I think it's prejudicial

22   testimony.

23        THE COURT:  I will tell you that every bit of

24   testimony offered by the Government is prejudicial

25   testimony.

3947

1          MR. GOROKHOV:  That's true, Your Honor.

2          THE COURT:  That's recognized even by courts

3     of appeals.  The point is, is it unfairly prejudicial.

4          MR. GOROKHOV:  That's right.

5          THE COURT:  And that's why I'm giving you the

6     opportunity to question him now about that if you want

7     to.  But you can certainly reserve it until

8     cross-examination.

9          MR. GOROKHOV:  May I confer with

10    Mr. Williamson?

11         THE COURT:  Yes, you may.

12                  (Off-the-record discussion

13                  between counsel.)

14         MR. GOROKHOV:  We can wait, Your Honor.

15         THE COURT:  All right sir.

16    BY MS. TREADWAY:

17    Q   When a physician becomes a provider for any

18    insurance company, do they agree to be responsible for

19    the claims submitted to that healthcare benefit program?

20    A   Yes, they do.

21    Q   And is that typically an express condition of being

22    able to submit claims and be paid by the programs?

23    A   Yes, it is.

24    Q   Is it typically an explicit part of a contract

25    entered into with the programs?

3948

```
 1   A    Yes, it is.

 2   Q    And based on your experience in the healthcare

 3   industry, is this a universal requirement for submitting

 4   claims to any health insurance company?

 5   A    If you want to get paid; it is.

 6   Q    Does a physician agree to submit truthful and

 7   accurate claims?

 8   A    Yes.

 9   Q    Again, is that a condition of being able to submit

10   claims to any program?

11   A    It's usually in the language.

12   Q    If the program is -- I mean, if the provider is a

13   clinic as opposed to just one physician, are all of

14   those rules the same?

15   A    They are.

16   Q    And if the provider is a clinic, who would be

17   responsible for the claims being submitted?

18   A    The owner of the entity in addition to the people

19   who are managing the billing process.

20   Q    After being paid by a healthcare program, can a

21   physician choose to opt out of being responsible for the

22   claims submitted and for which he has been paid?

23   A    They would like to; but, no.

24   Q    Can a clinic choose to opt out of being responsible

25   for the claims submitted and for which it has been paid?
```

3949

1    A    No, ma'am.

2    Q    As a part of the physician's and the clinic's

3    responsibility for submitting claims, does the physician

4    or the clinic represent every time a claim is submitted

5    that it is truthful and accurate?

6    A    That is the expectation.

7    Q    Do you have an opinion regarding whether a physician

8    or a clinic can disclaim responsibility for claims

9    submitted by blaming people who enter the claims data?

10   A    Bottom line, the doctor's responsible for what goes

11   through.

12   Q    Do you have an opinion regarding whether a physician

13   or a clinic can disclaim responsibility for claims

14   submitted by blaming the person who filled out the

15   internal document used for billing such as the fee

16   tickets in this case?

17   A    I do have an opinion.

18   Q    What is that opinion?

19            MR. GOROKHOV:  Objection, Your Honor.  Calls

20   for a legal conclusion.

21            THE COURT:  Overruled.

22   A    The billing responsibility stops and starts with the

23   provider seeing the patient.  And that has been

24   evidenced in all the administrative law judge hearings

25   that I've been involved with.  You can terminate the

```
1   employee.  You can reprimand them.  But bottom line, the
2   doctor that did the billing -- and as I've taught for
3   years, I tell them you should be picking your own codes.
4   Your staff should not be picking your codes.  They
5   weren't in the room with you with the patient, it's your
6   job to pick both the visit code the procedure code as
7   well as the diagnosis codes.  Otherwise, it's not a true
8   and valid representation of what occurred in the office.
9   Q   So if a claim is false --
10        MR. WILLIAMSON:  Your Honor, he went pretty
11   fast with that.  Could I have him just repeat that one
12   more time.
13        THE COURT:  Yes, I think -- Doctor, it might
14   be helpful if you would slow down a little bit.
15   A   I'm sorry.  It's the New Yorker in me.  I apologize.
16        MS. TREADWAY:  Since he's from Brooklyn, it's
17   really beyond his control, Judge.
18        THE COURT:  Well, he's not in Brooklyn.  He's
19   in Wichita.
20   A   Sure.  It is the responsibility of the provider of
21   what gets charged on a charge sheet or counter form.
22   The counter form has on it typically diagnosis codes,
23   which are the ICD codes I described to you earlier that
24   represent or create the medical necessity for what was
25   done in the visit.  Now, it may have just been an office
```

3951

1    visit, but it creates the medical necessity for

2    procedure, for a MRI, for a CAT scan, even for

3    medications.  And if you don't have the proper

4    diagnosises, then you can't bill for the other

5    components that you want to bill for.  And that

6    responsibility starts and stops with the doctor.  And I

7    have taught for the last ten, twelve years, at a

8    minimum, it is the doctor's responsibility to pick those

9    codes because the billing staff or the people who are

10   designated as the billers should never change a code

11   without verifying with the doctor because the biller or

12   the staff was not in the medical visit nor do they

13   potentially have the medical knowledge to make that type

14   of determination for you.  And if you let them, that's

15   still you that is culpable and you are putting yourself

16   in harm's way if it's done.  And it's wrong.  Or if it's

17   fraudulent, that is the responsibility of the doctor and

18   the people who own the clinic.

19   BY MS. TREADWAY:

20   Q   So, if the claim is false, whose responsibility is

21   it, if it's a physician?

22   A   It is the physician's responsibility.

23   Q   And if the provider is a clinic, who is responsible

24   for the false claim that has been submitted?

25   A   It's the provider in addition to the entity.

1    Q    Are CPT codes more complex than the information a

2    physician must know to practice medicine?

3    A    No.  It's actually in my pre -- my first book I

4    wrote that if you can learn the Krebs cycle in medical

5    school, you can learn billing and coding.  It's not

6    difficult.  It's just a pain in the neck.

7    Q    In terms of documenting medical services, as both a

8    physician and a certified coder, are you familiar with

9    general documentation requirements?

10   A    Yes.

11   Q    Let me hand you what has been admitted as Exhibit

12   62, which, for the record, are the minimal documentation

13   requirements required of physicians in the State of

14   Kansas.  Prior to your testimony --

15              MR. WILLIAMSON:  Your Honor, excuse me.  I

16   want to object to cumulative.  We've been over this and

17   I don't think there has been any contest as to the

18   accuracy of documentation kept by the clinic.

19              MS. TREADWAY:  My goodness, Judge, we've been

20   talking about the horrible documentation of this clinic

21   and it's lack of supporting claims for almost five

22   weeks.

23              THE COURT:  I don't understand what you mean.

24   There certainly has been evidence.  It's up to the jury

25   to weigh it.

 1           MR. WILLIAMSON:  We've read over these

 2    regulations once before.

 3           MS. TREADWAY:  I'm not going to ask him to

 4    read them.

 5           THE COURT:  Well, one of 'em says be legible.

 6    I don't know, Mr. Williamson, but if one of 'em says to

 7    be legible, we've had I don't know how many witnesses

 8    testify that the records aren't legible.  Again, it's up

 9    to the jury to weigh this, but I -- are these -- is your

10    objection that that is repetitious?

11           MR. WILLIAMSON:  Correct.

12           THE COURT:  Well, I'm going to allow it at

13    least for the time being.  I assume we're -- we're going

14    through his opinions fairly rapidly, so I don't think

15    that it will unduly delay the progress of the case.

16    BY MS. TREADWAY:

17    Q   Prior to your testimony today, Dr. Jorgensen, did

18    you have an opportunity to review this document?

19    A   Yes, I did.

20    Q   And are these the minimal requirements for

21    documentation in the State of Kansas?

22    A   Yes, ma'am.

23    Q   Based on your review of the records in this case,

24    did the clinic's documents meet these even minimal

25    documentation requirements?

3954

1    A    Not usually.

2    Q    What is the general rule of thumb about

3    documentation in the healthcare industry?

4    A    If it's not written down, it didn't happen.

5    Q    And when do physicians first learn this rule?

6    A    Usually when they're on rotations trying to write

7    their first note and their attending explains to them

8    what they're doing incorrectly.  Sometimes nicely,

9    sometimes not so nicely.

10   Q    Are there also requirements regarding legibility of

11   medical records?

12   A    Absolutely.

13   Q    If a medical record is not legible, has the medical

14   service been documented?

15   A    If you can't read it, it didn't happen.  It's the

16   same thing as not documenting it.

17   Q    Based on your review of the records in this case,

18   have you formed an opinion about the general legibility

19   of the clinic's medical records?

20   A    I have.

21   Q    What's that opinion?

22   A    They were enormously illegible for a significant

23   portion.

24   Q    Did you coin a phrase for the documents in this

25   case?

1    A    I did.

2    Q    What was that phrase?

3    A    I called them: "the horrendeomas".

4    Q    What do you mean by: "horrendeomas"?

5    A    Horrenddeomas means they're some of the worst notes

6    I have seen with the poorest documentation and they

7    really didn't meet muster the majority of the time.

8    Q    Jury has heard some evidence about the type of

9    progress notes the clinic utilized, which included a

10   checklist.  Based on your review of the medical records

11   in this case, did you form an opinion about this

12   checklist?

13   A    I did.

14   Q    What is your opinion?

15   A    That it didn't represent what occurred during the

16   visit.

17   Q    How did the use of the checklist in the progress

18   notes relate to the continuity of care issue that you

19   previously discussed with the jury?

20   A    When you use a checklist system, typically what

21   happens is you check the box that means that it's

22   normal.  And one of the risks you run when you use a

23   checklist system is you may or may not have done what

24   the whole line says.  That's one of the problems with

25   electronic medical records nowdays, too.  A template

3956

```
1    might imply that you did something that you didn't.  And
2    you're supposed to go back through and cross out what
3    you didn't do.  But typically because visits are rushed,
4    that doesn't always happen.  But the other piece is, if
5    you don't put a check or you circle it or you put a line
6    under it, each practice has their own way of doing it or
7    each doctor even can have their own way of doing it.
8    You would write out what was abnormal and that would
9    give you the ability to go back and look and see was
10   this abnormal last time.  And if it still was, maybe we
11   should pursue a different course of action for this
12   particular problem, complaint, et cetera.
13   Q   Did you see that the checklist was a valuable tool
14   in the documentation in the clinic?
15   A   It wasn't at all.
16   Q   The jury has also heard evidence in this case about
17   the CPT codes associated with office visits for both new
18   and established patients.  Now, you're familiar with
19   those codes, are you not, sir?
20   A   I am.
21   Q   And a prior witness, Mr. Seaton, talked to the jury
22   about Exhibit 1-N.  And I want to find that for you.
23   Have you reviewed Exhibit 1-N prior to your testimony
24   today?
25   A   Yes, I have.
```

3957

1    Q    And for the record, and for the jury's reminder,

2    that was Mr. Seaton's summary showing that the clinic's

3    primary income was from 99213 office visit codes.  And

4    much of that was from office visits provided to the

5    people who received controlled substances.

6         If a practice such as the Defendant's clinic, has a

7    good majority of its income from one office visit code,

8    do you have an opinion regarding the physician's and

9    management's responsibility for knowing what the

10   requirements of that code are?

11   A    Yes.

12   Q    What is that opinion?

13   A    Particularly if you are just using one code more

14   than any other, you should know what the requirements

15   are to make that code a valid submission.  And what

16   documentation needs to be present in order to make sure

17   that that is a legitimate code claim.

18   Q    As a certified coder and as a physician, do you

19   review medical records for the purpose of determining

20   whether a claim was properly coded?

21   A    Yes.

22   Q    And did you do so in this case?

23   A    Yes.

24   Q    And are there nationally recognized guidelines for

25   determining whether an office visit meets a certain

3958

1    level of CPT code?

2    A    There are two sets of national guidelines.

3    Q    And which guidelines did you use in this case?

4    A    Typically when I do audits we use the 1995

5    documentation guidelines.  It's a federal document that

6    was released in November of 1994.  And we usually use it

7    because it's more lenient than the 1997 guidelines.

8    Q    I'm handing you what has been admitted into evidence

9    as Exhibit 15-A.  Are those the 1995 guidelines you used

10    in this case?

11    A    Yes, they are.

12    Q    Are these guidelines generally used and relied on by

13    people in the healthcare industry?

14    A    They have been for the last decade and a half.

15    Q    Now, I'd like to put up 60-B I think.  That will

16    help us stay on track here with your testimony.

17         These are the established patient office visit

18    codes, are they not?

19    A    They are.

20    Q    And you recognize those?

21    A    I do.

22    Q    Now, with regards to the guidelines for

23    documentation and the CPT codes, do those guidelines

24    dovetail with the CPT codes?

25    A    They're designed to do so, yes.  And they do.

1    Q   All right.  And now, Mr. Moore, I'm going to be

2    wanting to go to Exhibit 15-A on the screen.  And we'll

3    have the CPT codes here for reference for the jury at

4    the same time.  I want you to turn to Page 3 of the 1995

5    guidelines.  And are there seven components?

6    A   There are seven components to an E and M service,

7    yes.

8    Q   All right.  And that's for a progress note.  And is

9    it also relative to determining which CPT code is the

10   correct code?

11   A   They are.

12   Q   And are the first three components of those seven

13   components: "history, examination and medical

14   decision-making", the key components for determining the

15   appropriate CPT code?

16   A   Yes, they are.

17   Q   Now, turning to the next page, are there four types

18   of history that a physician can take?

19   A   There are.

20   Q   And what are those four types?

21   A   The four types of history, I believe it's outlined

22   over there, is problem focussed, expanded problem

23   focussed, detailed and comprehensive".

24   Q   And that's probably on the next page of our -- I'll

25   just put that here if I can.  So, we move from problem

3960

1    focussed to expanded problem focussed to detailed to

2    comprehensive.  And as we move through those types of

3    histories, are they becoming longer?

4    A    They are becoming longer.

5    Q    Are they becoming more complex in the terms in the

6    documentation?

7    A    They are.

8    Q    And is that why the CPT codes will pay higher

9    reimbursement rates?

10   A    Typically they do, yes.

11   Q    Now, as the history moves on then, we go to Page 9

12   of the guidelines.  We talk about documentation of the

13   examination itself.  So, we've moved from the history to

14   the examination.  And do we still have that four level

15   of detail, problem focussed, expanded problem focussed,

16   detailed and comprehensive?

17   A    Yes.  The history and the exam use the exact same

18   terminology.

19   Q    And, again, is that reflected in the CPT codes?

20   A    It is.

21   Q    Turning to Page 10 of the guidelines.  Now do we

22   move to the Complexity of the Medical Decision-making.

23   Which, again, is the third bullet point under each of

24   the codes?

25   A    Yes.

3961

1    Q    And, again, do the documentation requirements and

2    the CPT code requirements echo each other?

3    A    They're designed to mesh.  It's a federal product so

4    it's not as nice as I'd like, but it is.

5    Q    Now, as the complexity of the history, the

6    examination and the decision-making increase, is it

7    natural for the time spent with the patient to increase

8    as well?

9    A    It can.

10   Q    And is that the focus of this last paragraph where

11   it says:  The physician typically spends a certain

12   number of minutes?

13   A    It can.  You either bill the components or you bill

14   time typically, but that is -- when those codes were

15   designed, they came up with on average how long it

16   should take by doing a physician's survey to perform

17   that level of service.

18   Q    So, those times are a pretty good gauge of the codes

19   that should be utilized?

20   A    They're -- that or the documentation are the only

21   two gauges we have.

22   Q    Now, in your experience as a certified coder and as

23   a consultant in this area, are there particular office

24   visit codes that are typically audited by the insurance

25   companies?

1    A    Yes, there are.

2    Q    And what are those?

3    A    They are usually level four and level five code

4    because they pay higher, there's a greater documentation

5    requirement, so there's a greater likelihood when they

6    perform an audit that they would be able to recover

7    money back from the practice for services that were done

8    illegitimately based upon the documentation.

9    Q    In your experience, have you found the fact that the

10   insurance companies audit these higher paying codes is

11   common knowledge amongst healthcare professionals?

12   A    It's in almost every medical publication at least

13   once or twice a year.

14   Q    In your review of the Defendants' records, including

15   the data regarding their claims, did you find many of

16   the upper level codes being billed?

17   A    Only by Dr. Simons.

18   Q    Based on your being a certified coder and your

19   experience reviewing claims, have you formed an opinion

20   as to why the Defendants did not bill those upper level

21   codes except as to Dr. Simons?

22           MR. WILLIAMSON:  Your Honor, I'm going to

23   object.  That calls for speculation well outside the

24   opinion of 702 and 703.  Asking why a person did

25   something is asking an improper question.

3963

```
 1              THE COURT:  I'm going to sustain it.  She may
 2    be able to lay a proper foundation for that opinion; but
 3    for that, it's sustained.
 4    BY MS. TREADWAY:
 5    Q   Based on your review of the records, did you form an
 6    opinion regarding whether the clinic's documents
 7    satisfied the CPT components needed to bill the office
 8    visits at the levels billed?
 9    A   I did.
10    Q   What is that opinion?
11    A   Typically they did not.
12    Q   A physician's assistant named Mike Hall testified
13    that the office visits he performed were barely problem
14    focussed examinations.  Did we share that testimony with
15    you?
16    A   You did.
17    Q   And another physician's assistant named Charles
18    Craig testified that he marked the fee tickets as though
19    he provided a 99213 visit even though he had performed a
20    lesser 99212.  Did we share that testimony with you?
21    A   Yes, you did.
22    Q   Is that testimony consistent with what you found on
23    your review?
24    A   It is.
25    Q   You can take those down for me, gentlemen.
```

3964

1                       (Off-the-record.)

2    BY MS. TREADWAY:

3    Q    I'm handing you what's been introduced as Exhibit

4    1-J.  You already have 1-N.  Do you not?

5    A    I do.

6    Q    I'm handing you 1-K and Exhibit 46.  And we'll

7    review what each of those is for the record here in a

8    minute.  Exhibit 1-J is the chart showing the payments

9    for the medical services from the 93 healthcare benefit

10   programs?

11   A    Yes, it is.

12   Q    1-K is the summary chart showing the payments for

13   the prescriptions.  1-N is, again, the information

14   showing the payments and percentages in terms of the

15   office visit codes.  You've previously looked at 1-O,

16   the big days chart.  And Exhibit 46 is the chart

17   concerning the Defendant's income from the practice.

18        Now, prior to your testimony today, Dr. Jorgensen,

19   did we allow you to review all of those summary charts?

20   A    Yes, you did.

21   Q    In your experience, Dr. Jorgensen, does a family

22   practice physician typically make a great deal of money

23   as compared to other physicians?

24   A    Typically they're one of the lower paid specialties.

25   Q    Are there published reports about family practice

1    physician salaries?

2    A    There are.

3    Q    And are those typically published and generally

4    available?

5    A    They come from the general accountability office and

6    they are often times in different medical economics

7    issues, "Family Practice Management", different journals

8    like that.

9    Q    Are you familiar with these reports?

10   A    I am.

11   Q    And based on that, do you know the typical annual

12   income a family practice physician can generally expect

13   to generate in the United States?

14   A    I just did a presentation actually with this data

15   last week.  The average family doctor over the last ten

16   years has only seen an increase in reimbursement from

17   the .9%.  The average family doc in 2008 made about

18   169,000.  The average family practice doc in 2009 went

19   down for the first time actually in that period to 167.

20   Q    Nevertheless, are there ways to make a great deal of

21   money in a family practice?

22   A    There are.

23   Q    How?

24   A    You can either do diagnostics in your practice or

25   you can do volume.

3966

```
 1    Q    Based on your review of the Government exhibits in
 2    your hand and based on your review of the medical
 3    records in this case, have you formed an opinion as to
 4    whether the Defendants made an atypical amount of money
 5    from their family practice clinic?
 6    A    I have.
 7    Q    What is that opinion?
 8    A    They made a substantial amount more money than a
 9    typical family practice doctor would make even in the
10    highest paid regions of the country.
11    Q    Have you formed an opinion as to how the Defendants
12    were able to make an atypical amount of money from their
13    family practice clinic?
14    A    I have.
15    Q    And what is that opinion?
16    A    It was a patient-mill.  It was pure volume.
17    Q    Did the fact that the clinic was open seven days a
18    week for long hours enter into your opinion?
19    A    Yes, it does.
20    Q    How so?
21    A    Most primary care practices can't stay open that
22    long because they don't have the people to staff it.
23    And it's just atypical.  Weekend coverage, while nice to
24    provide, is typically on an on-call basis or you
25    collaborate with other practices, one office.  In fact,
```

3967

```
 1    I don't know of any office that does that save for a
 2    rural access situation where you don't have anybody else
 3    around that can provide care, but you need to have some
 4    place that people can go to in an emergency.
 5    Q   How did Exhibit 1-O, the chart showing the 50 or
 6    more patients per day, inform your opinion that
 7    Schneider Medical Clinic was a patient-mill?
 8    A   Just by the sheer volume is -- of what a typical
 9    family practice doctor would see in a day.  It was
10    beyond excessive.
11    Q   What would it mean in terms of comprehensive care?
12    A   You wouldn't even be able to provide it.  Just
13    adding up the minutes in the day, it would be virtually
14    imimpossible.
15    Q   In addition to running a patient-mill, did you
16    discover through your review of the claims and the
17    documents supporting the claims other means by which the
18    Defendants were able to make a great deal of money?
19    A   I did.
20    Q   Let me first hand you what has been marked for
21    identification as Exhibit 1-P.  Do we have that, Mr.
22    Moore?
23        Let me hand you what has been marked for
24    identification as Exhibit 1-P, which is the summary
25    chart regarding when the Defendant was out of the clinic
```

3968

1    but for which days bills were submitted as though he

2    provided the services.  Did you review that summary

3    chart prior to your testimony?

4    A   Yes, I did.

5    Q   Is this one means by which the Defendants were able

6    to make money?

7    A   Yes.

8    Q   And did you discover other means?

9    A   When you have patients who are coming into a

10   practice that need refills and it's your policy that

11   they have to come see you, and you have 5,000 of them,

12   they have to see you monthly, that's a lot of people to

13   try to fit into an office.  On a five day work week,

14   even a seven day work week, it would be nearly -- there

15   was just no way you could provide the care they needed

16   and you have to just see them as rapidly as you can to

17   get through them.

18   Q   Did you also find in your review of the claims and

19   the medical records in this case that the Defendants

20   upcode who had provided the services?

21   A   Yes, I did.

22   Q   And is that a way to make more money?

23   A   It is.

24   Q   Did you also find that the Defendants upcoded what

25   service was being provided?

1    A    Yes.

2    Q    And is that a way to make more money?

3    A    It is, yes.

4    Q    Are upcoded claims, whether they be as to the

5    provider or the service rendered, false claims?

6    A    Yes, they are.

7    Q    Based on your review of the claims and the documents

8    in this case, were the Defendants by their claims,

9    indicating to the healthcare benefit program that they

10   were providing quality care to the patients?

11   A    They were indicating that they were providing care

12   that was a mid-level code which should have been even

13   mildly comprehensive in the management of these

14   patients.

15   Q    But what did the documents reveal instead?

16   A    The documents revealed that they didn't have the

17   supporting documentation; oftentimes it was illegible so

18   there was really no way to tell if it was or wasn't; and

19   based upon the volume numbers and the outcomes for the

20   patients themselves, clearly they weren't.

21   Q    In your opinion, did the patients receive the

22   quality healthcare the healthcare benefit programs were

23   billed for and for which they paid the Defendants?

24   A    No, they did not.

25   Q    In your opinion, as a result, did people become

1    addicted to the controlled substances prescribed by the

2    Defendant Stephen Schneider and his employees at the

3    clinic?

4    A    Yes.

5    Q    And in your opinion, is addiction a kind of serious

6    bodily injury?

7    A    It can be.

8    Q    In your opinion, as a result of the patients not

9    receiving any quality care at the Defendant's clinic,

10   did people overdose and die from their overdoses of

11   controlled substances?

12   A    Yes, they did.

13   Q    Dr. Jorgensen, I would now like to direct your

14   attention to particular individuals whose medical files

15   you reviewed in connection with the claims that the

16   clinic submitted for services?

17            THE COURT:  Is that going to be quite a few?

18            MS. TREADWAY:  Well, Judge, I can get through

19   the introduction before I get to the particulars and

20   that would probably take us to lunch.

21            THE COURT:  What do you want to do?  Go

22   through the introduction?  All right.  We'll do that.

23            MS. TREADWAY:  Thank you, Judge.

24   BY MS. TREADWAY:

25   Q    Did you review the claims and medical records for

3971

1    Patty G, Eric T, and Robin G?

2    A    Yes, I did.

3    Q    And did you also review their autopsy records?

4    A    I did.

5    Q    Let me hand you what has been marked for

6    identification as Exhibits 7, 8 and 9.  Mr. Moore has

7    already discussed with the jury parts of those charts;

8    but did you prepare the remaining parts of those charts?

9    A    Yes, I did.

10   Q    And do those three charts summarize voluminous

11   information?

12   A    Yes, they did.

13   Q    Do they summarize both billing data regarding the

14   services and the billing data regarding the providers?

15   A    Yes.

16   Q    And do they summarize your review of the

17   documentation as compared to the billing data?

18   A    Yes, it does.

19   Q    Do they also include information from Exhibit 10,

20   the charts regarding 50 or more patients per day?

21   A    Yes.

22   Q    And will those summary charts allow the jury to

23   understand your testimony without having to review every

24   line of that chart and without having to review the

25   voluminous information you reviewed?

3972

1    A    I believe they will.

2    Q    Do those summary charts accurately reflect both the

3    data you reviewed and the results of your review?

4    A    Yes.

5              MS. TREADWAY:  Government would offer Exhibits

6    7, 8 and 9, summary charts, under Rule 1006, 703 and

7    611-A.

8              MR. WILLIAMSON:  Same objection we had to the

9    last spreadsheets.  No objection to them being used

10   demonstratively; but as far as admissibility, they

11   contain summary of opinions and that is outside the

12   scope of 1006 and it's not a substitute for a report.

13   But as far as it being demonstrative evidence, I don't

14   have an objection to that.  And I believe that the

15   terminology was a chronological chart.

16             MR. GOROKHOV:  Same objection, Your Honor.

17             THE COURT:  All right.  We'll admit these as

18   demonstrative exhibits.  You remember what I told you

19   about that?  All right.

20   BY MS. TREADWAY:

21   Q    Now, before talking about each of them, Dr.

22   Jorgensen, I want to review with the jury how each is

23   set up in terms of information.  And, again, we've seen

24   part of these charts.  Can you bring up 7, please.

25             Is 7 the chart for Patty?

1    A    Yes, it is.

2    Q    And the first few columns are the date of service,

3    the CPT code billed, the provider it was billed as and

4    the actual provider that provided the services.  And in

5    that fourth column we have the information from the big

6    days, don't we?

7    A    Yes.

8    Q    Now, moving to the next column, we have a question:

9    Was the provider upcoded?  And if there is a yes in that

10   column, what does that mean?

11   A    That means that a doctor billed for that service

12   rather than the physician's assistant.

13   Q    And so did the clinic make more money as a result?

14   A    Typically 15% more on the visit.

15   Q    And the next column we have another question:  Was

16   the CPT code upcoded giving the checklist credit?  And

17   do we mean that you actually gave the checklist some

18   sort of credit that something had been done?

19   A    In the physical examination system it's done by

20   organ systems and body areas.  So, if there was a

21   checkmark off one of those areas, then that meant that

22   they examined that body area/organ system.  And it's

23   pretty simple.  You just count them.  And they move up

24   from problem-focused all the way to detail based upon

25   the exact number that were checked.  So, I did in that

3974

```
 1    section give them credit for whatever was checked.

 2    Q   And if it says yes, that means it's still upcoded?

 3    A   Yes.

 4    Q   And then the next column is upcoded CPT not giving

 5    the checklist credit?

 6    A   Yes.

 7    Q   And so now we've discounted the checklist, as your

 8    testimony would indicate?

 9    A   Correct.

10    Q   And you've determined whether it's upcoded and if it

11    is, you say yes?

12    A   Yes.

13    Q   And then lastly you have a legibility column and you

14    have either yes, no, or a plus/minus.  If it's not

15    legible, what did you say?

16    A   I wrote that -- I wrote a no, that it was not

17    legible.

18    Q   And yes means it was legible; correct?

19    A   Correct.

20    Q   And what does plus or minus mean?

21    A   Some of it I could read; some of it I had no idea

22    what it says.

23    Q   Now, as you go to the bottom of each of these

24    charts, do you aggregate your findings in each of those

25    four areas?
```

3975

1    A    Yes.

2    Q    And so you have a conclusion as to how many office

3    visits were upcoded by provider, how many were upcoded

4    by service giving the checklist credit, how many were

5    upcoded not giving the checklist credit and then how

6    many documents were legible?

7    A    That's correct.

8              MS. TREADWAY:  That's the introduction, Judge.

9              THE COURT:  Well, let's take our noon recess

10   until 1:00, Ladies and Gentlemen.  Please remember and

11   heed the admonition.

12                      (Noon recess.)

13

14

15

16

17

18

19

20

21

22

23

24

25