4138

1                    (Beginning at 9:00 a.m. May 25,

2                    2010, the following proceedings

3                    continued.)

4           THE COURT:  Good morning.  Next witness.

5           MS. TREADWAY:  Government calls Debra

6     Klingsick, please.

7                        **DEBRA KLINGSICK**

8     Having been first duly sworn to tell the truth, the

9     whole truth and nothing but the truth, testified as

10    follows on:

11                      **DIRECT EXAMINATION**

12    BY MS. TREADWAY:

13    Q    Would you please introduce yourself to the jury.

14    A    Hi.  My name is Debra Klingsick.

15    Q    Are you married, Ms. Klingsick?

16    A    Yes.

17    Q    And what does your husband do?

18    A    He's a minister.

19    Q    Are you currently employed?

20    A    No.

21    Q    But you just are embarking on a new career, aren't

22    you?

23    A    Yes.

24    Q    What is that new career?

25    A    Elementary education.

4139

1    Q    Have you been employed previously in the healthcare

2    field?

3    A    Yes.

4    Q    And in what capacity?

5    A    As a physician's assistant.

6    Q    Could you share with the jury your educational

7    background starting with college for your physician's

8    assistant's degree?

9    A    Yes.  From 1985 to 1988 I attended Ottawa University

10   in Ottawa, Kansas, studying premed.  Then I transferred

11   to WSU in the summer of '88 and graduated from the

12   physician's assistant program in August of 1990.

13   Q    And could you also share with the jury your work

14   history after you received your physician's assistant

15   degree?

16   A    Sure.  From September of 1990 to February of 1992 I

17   worked for Plasma Alliance as physician's assistant.

18   Then I moved to Oklahoma and worked from 19 -- February

19   1992 to July of 1994 as a physician's assistant at the

20   Cherokee Family Medical Clinic.  Then I moved to

21   Oklahoma City and worked as physician's assistant at --

22   from August of '94 to October of 2002 at Jimmy Everest

23   Cancer Center.

24   Q    And then did you eventually come back to Wichita?

25   A    Yes.

1    Q    All right.  Before getting into that, would you tell

2    the jury what a physician's assistant is and what a

3    physician's assistant is allowed to do in terms of

4    medical practice?

5    A    A physician's assistant gets the same training as a

6    physician except for in two years time instead of over

7    four years.  We're allowed to write prescriptions.  We

8    can do procedures.  We obtain histories and physicals.

9    Review lab, order lab, order X-rays.  Do procedures as

10   prescribed by our physicians.

11   Q    And at all times are you under the supervision of a

12   physician when you are working?

13   A    Yes, ma'am.

14   Q    Did you work at the Schneider Medical Clinic in

15   2004?

16   A    Yes.

17   Q    And our records reflect that you worked there from

18   approximately March of '04 to approximately July of '04.

19   Is that your memory?

20   A    Yes, ma'am.

21   Q    What were your typical workdays?

22   A    I worked Thursday, Friday, Saturdays and Sundays.

23   Q    And what were your typical work hours on each of

24   those days?

25   A    Thursday, Friday and Saturday I worked from 8 to 7.

4141

```
1      And on Sundays I worked from 1 to 7.
2    Q   When you worked on Saturday and Sunday, who was
3    typically at the clinic?
4    A   Myself, a receptionist and a medical assistant.
5    Q   How did you come to apply for a physician's
6    assistant's position at the Schneider Medical Clinic?
7    A   I was looking for a job, and so I always look at the
8    WSU website physician assistant website for job
9    openings.
10   Q   Who interviewed you for the position?
11   A   Linda Schneider.
12   Q   And who hired you?
13   A   Linda Schneider.
14   Q   And when were you hired in relationship to the
15   interview?
16   A   The same day.
17   Q   Did that surprise you?
18   A   Yes.
19   Q   Why?
20   A   Because she didn't -- hadn't looked at any of my
21   references, hadn't called any of my references to verify
22   whether or not I was good at what I do.
23   Q   Prior to hiring you, did she have you talk with any
24   of the physicians there?
25   A   No.
```

4142

1    Q    Any of the other physician's assistants?

2    A    No.

3    Q    During the course of the interview what, if

4    anything, did the Defendant Linda Schneider tell you

5    about the medical practice at the Defendant's clinic?

6    A    She told me that it was a fast-paced family practice

7    clinic that was heavily emphasized in pain management

8    and she was very proud of the fact that they were the

9    number one prescription writer clinic in the State of

10   Kansas.

11   Q    Once you were hired, did the Defendant Linda

12   Schneider tell you how frequently she expected you to

13   see patients throughout a given day?

14   A    I was expected to see a patient every five minutes.

15   Q    Based on the few months that you worked at the

16   clinic, did you find that what Defendant Linda Schneider

17   told you during the interview was true?

18   A    Yes, ma'am.

19   Q    How many patients did you typically have to see in a

20   day, Ms. Klingsick?

21   A    40 to 50.

22   Q    What was the policy with regards to walk-in patients

23   as opposed to patients with appointments?

24   A    You saw all the walk-in's.  It didn't matter whether

25   they had an appointment or not.

1    Q   What, if any, problems did that cause?

2    A   That eventually, because I was trying to, on

3    weekends I was trying to limit the number of walk-in's,

4    I eventually got fired.

5    Q   Did the clinic have registered nurses and licensed

6    practical nurses to help you with the patients?

7    A   No, ma'am.

8    Q   Did you find that unusual based on your experience?

9    A   Yes, ma'am.

10   Q   And why so?

11   A   Because you should have extra licensed practitioners

12   or help to help with clinic operations.

13   Q   Prior to working at the Schneider Medical Clinic,

14   had you had any prior pain management experience?

15   A   No, ma'am.

16   Q   Did either the Defendant Stephen Schneider or the

17   Defendant Linda Schneider offer you any training in pain

18   management?

19   A   No, ma'am.

20   Q   Did you receive any training in pain management?

21   A   No, ma'am.

22   Q   Now, you just told the jury that physician's

23   assistants are required to have physician supervisors.

24   I'd like to hand you what has been marked for

25   identification as Government Exhibit 63.  Are you

4144

1   familiar with that document?

2   A   Yes, ma'am.

3   Q   Are those the Kansas regulations regarding

4   supervision of physician's assistants?

5   A   Yes, ma'am.

6           MS. TREADWAY:  Government offers Exhibit 63 as

7   a public document.

8           MR. WILLIAMSON:  No objection.

9           MR. BYERS:  No objection, Your Honor.

10           THE COURT:  It's received.

11   BY MS. TREADWAY:

12   Q   Now, I don't want to review everything in this

13   document because the jury will have this, but I do want

14   to read a couple of paragraphs.  First of all, could you

15   read the very first sentence in Paragraph A?

16   A   It says: "Direction and supervision of the physician

17   assistant shall be considered to be adequate if the

18   responsible physician meets all of the following

19   requirements.  A, at least annually reviews and

20   evaluates the professional competency of the physician's

21   assistant."

22   Q   And then could you read Paragraph G?

23   A   "At least every 14 days reviews all records of

24   patients treated by the physician assistant and

25   authenticates this review in the patient record."

4145

1    Q   Now, when it says authenticates the review in the

2    patient record, what did you understand the supervising

3    physician needed to do with regards to your notes?

4    A   They needed to look at our notes and make sure that

5    what we have done follows along with what they have as a

6    treatment plan or guidelines and that needs to be done

7    at least every 14 days.

8    Q   And at the Schneider Medical Clinic, who was your

9    supervising physician?

10   A   Dr. Stephen Schneider.

11   Q   And would he countersign your notes when he read

12   them?

13   A   Yes, ma'am.

14   Q   Now moving to subparagraph (i).  Could you please

15   read that for the jury?

16   A   "Provides for a designated physician to provide

17   supervision and direction on each occasion when the

18   responsible physician is temporarily absent, is unable

19   to be immediately contacted by telecommunication or is

20   otherwise unavailable at a time the physician assistant

21   could reasonably be expected to provide professional

22   services."

23   Q   Now, who was your designated physician or secondary

24   physician supervisor when the Defendant Stephen

25   Schneider was unavailable?

4146

```
 1    A    Dr. Donna St. Clair.

 2    Q    Did the Defendant Stephen Schneider ever work with

 3    you on weekends?

 4    A    Yes.

 5    Q    How many times?

 6    A    Maybe three to four weeks.

 7    Q    Did Dr. St. Clair work with you on weekends?

 8    A    No, ma'am.

 9    Q    When you began working at the Schneider Medical

10    Clinic, did you have your DEA registration number so

11    that you could write prescriptions for controlled

12    substances?

13    A    No, ma'am.

14    Q    What did the Defendant Stephen Schneider do as a

15    result?

16    A    He gave me a presigned prescription pad with his DEA

17    number.

18    Q    After a weekend, would the Defendant Stephen

19    Schneider ask you about the presigned prescription pads

20    he had left for you?

21    A    Yes.

22    Q    What would he say?

23    A    He would ask me if I had any left and when I would

24    say, yeah, I still have some, he would basically laugh

25    and say, well, you didn't write enough prescriptions
```

4147

1    this weekend.

2    Q   When you began working at the Defendant's clinic,

3    did the Defendant Stephen Schneider tell you how to

4    prescribe medications for established chronic pain

5    patients who were already receiving controlled substance

6    prescriptions?

7    A   Yes, ma'am.

8    Q   And what did he tell you?

9    A   He told me that I was to write refills exactly as he

10   had previously prescribed them.

11   Q   Was there any leniency in this policy?

12   A   No, ma'am.

13   Q   Nevertheless, did you sometimes attempt to reduce

14   the amount of controlled substances that patients were

15   receiving?

16   A   Yes, ma'am.

17   Q   And what happened?

18   A   The next time Dr. Schneider saw them, he increased

19   their meds back up to their previous level or dosage.

20   Q   During the course of your employment at the

21   Defendants' clinic, did you have the opportunity to

22   observe and learn the specifics of how the clinic

23   submitted claims?

24   A   No, ma'am.

25   Q   Why not?

4148

1    A    Because I was told that was none of my business.

2    Q    By whom?

3    A    Linda Schneider.

4    Q    Nevertheless, during the course of employment, did

5    you have the opportunity to observe how the Defendants'

6    clinic operated from a general financial perspective?

7    A    No, ma'am.

8    Q    Based on your observations, who ran the clinic?

9    A    Linda Schneider.

10   Q    Who would run the Defendants' clinic in her absence?

11   A    Pat Hatcher.

12   Q    And who was she.

13   A    She's Linda Schneider's sister.

14   Q    Were there other relatives working at the

15   Defendants' clinic?

16   A    Yes.

17   Q    Do you remember who or what types of relatives?

18   A    I believe they were nieces and nephews.  And a

19   brother.  Her brother, Curtis Atterbury was a

20   physician's assistant.

21   Q    Now, I'd like to discuss your observations regarding

22   how the Defendants' clinic operated from a medical

23   standpoint.  Did you ever have to see patients without

24   their charts?

25   A    Yes, ma'am.

4149

1   Q   Tell us about the charts at the Schneider Medical

2   Clinic?

3   A   Charts were in total disarray.  They were --

4   sometimes I couldn't find a chart because they were

5   misfiled.  There were charts all over the place.  There

6   were charts in front of -- stacks of charts in front of

7   Dr. Schneider's office, in front of Dr. St. Clair's

8   office.  Where the physician's assistants, where we had

9   a place to write.  There were charts in Linda

10  Schneider's office.  They just were all over the place.

11  Q   Did you find that the charts often had information

12  missing from them?

13  A   Yes, ma'am.

14  Q   Did you find that they were months behind in filing

15  necessary information in the files?

16  A   Yes, ma'am.

17  Q   And how were the progress notes done?  Were they

18  done by hand or electronically?

19  A   By hand.

20  Q   Did the Defendants' clinic use a progress note form

21  with a checklist when you were there?

22  A   Yes, ma'am.

23  Q   How helpful was the checklist in helping you

24  appropriately treat patients that had been seen by other

25  providers?

4150

```
 1    A    It was not helpful.
 2    Q    In terms of the hours the providers worked, when was
 3    your supervising physician Defendant Stephen Schneider
 4    at the clinic?
 5    A    From approximately 7:30 to 5.
 6    Q    Did he typically arrive at a particular time every
 7    day?
 8    A    He was always there when I got there about 7:45.
 9    Q    And did he typically leave at a particular time
10    every day?
11    A    5:00.
12    Q    What would happen if he did not leave by 5:00?
13    A    He would get a call from Linda.
14    Q    Were you present for such a phone call?
15    A    Yes.
16    Q    And could you hear what the Defendant Linda
17    Schneider was saying?
18    A    Yes.
19    Q    What was she saying?
20    A    She said that -- she told him that she's not a baby,
21    you don't have to hold her hand, she can take care of
22    it, you need to get home.
23    Q    And who was the she she was referring to?
24    A    Me.
25    Q    Did you ever shadow the Defendant Stephen Schneider?
```

4151

1    A    Yes, ma'am.

2    Q    And what did you observe with regards to his

3    physical examinations of patients?

4    A    He would listen to their heart and lungs.  If they

5    had back pain, he may palpate their back.  If they came

6    in for an ear infection, he might look at their ear.

7    But his general exam was pretty minimal.

8    Q    What did you observe with regards to his patients

9    being referred out to specialists?

10   A    Referrals were very few and far between.

11   Q    Was there follow-through?

12   A    No.

13   Q    Were the patients often not informed of their

14   appointments with these referrals?

15   A    Yes, ma'am.

16   Q    Were the referrals often made several months after a

17   progress note indicated it was needed?

18   A    Yes, ma'am.

19   Q    What did you observe with regards to X-rays taken at

20   the Defendants' clinic?

21   A    X-rays were taken by personnel that were trained in-

22   house and Dr. Schneider looked at all the X-rays.  But

23   they were never sent out to be read by a radiologist and

24   therefore a formal document was never presented to the

25   clinic.

4152

1    Q    Because typically when you have an X-ray, do you

2    have an X-ray report, an interpretation of the report?

3    A    Correct.

4    Q    And those were never done?

5    A    Correct.

6    Q    Now, were patients required to come in for

7    prescription refills?

8    A    Yes, ma'am.

9    Q    And do you know why?

10   A    To perform another bill, another office visit.

11   Q    And who required that?

12   A    Linda Schneider.

13   Q    Were patients required to come in for lab results?

14   A    Yes, ma'am.

15   Q    Why?

16   A    To generate another office charge.

17   Q    And who required that?

18   A    Linda Schneider.

19   Q    Did anyone review the charts before the charts were

20   sent to the billing department based on your

21   observations?

22   A    Dr. Schneider reviewed those that were seen by his

23   physician's assistants and then after he got done then

24   Linda took them to her office and she reviewed them.

25   Q    Did you ever experience a situation where fee

4153

1    tickets that you had marked were changed?

2    A    Yes, ma'am.

3    Q    And how were they changed?

4    A    They were increased.  Like if I saw somebody and I

5    thought they just needed a 99212, they would be brought

6    back to me and said, no, they need a 99213.

7    Q    And who would tell you that?

8    A    Dr. Schneider.

9    Q    Based on your observations, was the Defendants'

10   clinic concerned with quantity or quality?

11   A    Quantity.

12   Q    What happened as a result of the emphasis on

13   quantity?

14   A    The overall patient care was not there.

15   Q    During the course of your employment at the

16   Schneider Medical Clinic, did you have discussions with

17   both of the Defendants?

18   A    Yes, ma'am.

19   Q    Let's first discuss your interactions with the

20   Defendant Linda Schneider.  Did you ever have a

21   discussion with Linda Schneider about how much time you

22   were spending with patients?

23   A    Yes, ma'am.

24   Q    What did she tell you?

25   A    She told me I needed to hurry up.

4154

1   Q   Is it possible to do a complete history and

2   examination in the five minutes you were allotted to see

3   patients?

4   A   No, ma'am.

5   Q   Did the Defendant Linda Schneider ever reprimand you

6   for spending too much time with the patients?

7   A   She just told me that I needed to speed up.

8   Q   Did you ever offer to shadow the billing clerks at

9   the office?

10   A   Yes, ma'am.

11   Q   And why did you offer that?

12   A   Because I was waiting for my license from the State

13   of Kansas and I wanted to know how the billing process

14   worked so that I could do a better job with the coding.

15   Q   And what was the Defendant Linda Schneider's

16   response to your offer?

17   A   That was none of my business.

18   Q   Did the Defendant Linda Schneider ever bring you

19   progress notes to work on?

20   A   Yes, ma'am.

21   Q   And what did she want you to do with regards to

22   those progress notes?

23   A   The progress notes she brought back to me were ones

24   that they could not find the original on and she wanted

25   me to regenerate one.

4155

1    Q    Did the progress notes that she brought to you that

2    were blank have any information on them whatsoever?

3    A    They had vital signs on them.

4    Q    And how would that have occurred?

5    A    That's a good question.

6    Q    Did you recreate progress notes?

7    A    No.

8    Q    Now let's turn to your discussions with Stephen

9    Schneider.  Did you ever have a discussion with

10   Defendant Stephen Schneider about how much time you were

11   spending with patients?

12   A    Yes.  He told me I needed to speed up.

13   Q    Did the Defendant Stephen Schneider ever instruct

14   you about billing?

15   A    He told me that all pain management patients

16   received a code of 99213 or greater.

17   Q    Based on your experience and training, did you

18   provide all the pain patients an office visit service at

19   a 99213 level?

20   A    No, ma'am.

21   Q    Did you provide mostly lesser services to the pain

22   management patients?

23   A    Yes, ma'am.

24   Q    Could you provide the pain management patients a

25   99213 office visit code given the urging of speeding up

4156

```
 1    and the five minute allotment of time?

 2    A    No, ma'am.

 3    Q    Did you ever have any discussions with the Defendant

 4    Stephen Schneider about calls from pharmacies?

 5    A    Yes, ma'am.

 6    Q    Do you remember one in particular?

 7    A    Yes, I do.

 8    Q    Could you tell us about that?

 9    A    We received a call, don't remember whether it was a

10    Saturday or Sunday, but, from Dandurand drug store from

11    the pharmacist who said that some of the Dr. Schneider's

12    patients were in the parking lot selling their drugs.

13    Q    And what was the Defendant Stephen Schneider's

14    response to this information?

15    A    He was pretty upset and he said that the pain

16    management patients future -- in the future -- I don't

17    remember if it was that next week or exactly how often,

18    would receive urine drug screens.

19    Q    And do you think that addressed the problem?

20    A    No.

21    Q    Did you ever have any conversations with the

22    Defendant Stephen Schneider in which you expressed

23    concern about the level of narcotics being prescribed?

24    A    Yes.

25    Q    What did you tell him?
```

4157

1    A    I told him that I felt that we were prescribing way
2    too many narcotics.
3    Q    And what was his response?
4    A    Basically it was none of my business how much he
5    prescribed.
6    Q    Did you ever have any conversations with the
7    Defendant Stephen Schneider about patients coming in to
8    switch their controlled substances prescriptions from
9    one narcotic to another?
10   A    Yes.
11   Q    And what did you tell him?
12   A    I would save those charts.  Since he wasn't there on
13   the weekend, I would save them and I would bring them to
14   him and ask him, say:  This person came in and they'd
15   been on Lortab and they said that wasn't working so they
16   wanted to go to Percocet and then two weeks later they
17   would come back in and say, well, the Percocet is not
18   working, I want to go back at the Lortab and I told him
19   I just didn't think that was right to be just switching
20   back and forth on patient request.
21   Q    And what was his response?
22   A    He told me basically that it was none of my business
23   and he didn't care that the patients were doing that.
24   Q    While you were working at the Defendant's clinic,
25   Ms. Klingsick, did you become aware that patients had

4158

```
 1    ended up in the emergency rooms because of prescription
 2    overdoses?
 3    A   Yes, ma'am.
 4    Q   And did you become aware that patients had died of
 5    prescription overdose?
 6    A   Yes, ma'am.
 7    Q   How did you become aware of these facts?
 8    A   A couple of times we heard because the ER docs
 9    called and said they were calling to find out what
10    medications the patients had been on.  And then the
11    other times we just found their names in the obituaries.
12    Q   Did you ever have any conversations with the
13    Defendant Stephen Schneider about these overdoses and
14    these overdose deaths?
15    A   Yes, ma'am.
16    Q   What did you tell him?
17    A   We told him about the overdoses and he just said,
18    oh, well.
19    Q   Oh, well?
20    A   Oh, well.
21    Q   What concern, if any, did you ever see the Defendant
22    Stephen Schneider show about the overdosing and dying
23    patients?
24    A   I didn't see any concern.
25    Q   What concern, if any, did you see Defendant Linda
```

4159

1    Schneider show about the overdose and dying patients?

2    A    I didn't see any concern either from her either.

3    Q    While you were working at the Defendants' clinic,

4    Ms. Klingsick, did you have concerns about patients who

5    were drug-seekers and not legitimately in pain?

6    A    Yes, ma'am.

7    Q    Were you able to distinguish between the

8    drug-seekers and the legitimate patients?

9    A    Yes, ma'am.

10   Q    And how were you able to do that?

11   A    The drug-seekers are the ones that come in for early

12   refills or always have a reason why their drugs got

13   stolen, their purse got stolen, their house got broken

14   into; whereas, the legitimate ones are the ones that

15   actually come in once a month, pass the urine drug

16   screens and actually -- you can, you can just tell.

17   Q    Did you ever have any pharmacies call you about

18   forged prescriptions that they had received?

19   A    Yes, ma'am.

20   Q    Tell us about that?

21   A    I had, I had seen a patient who wanted Lortab and I

22   told her I would not write her a prescription for

23   Lortab.  And about two hours later the pharmacy called

24   and asked me, because the pharmacy suspected it was a

25   forged prescription, and she asked me if I had written

4160

1    it and I said no and so she faxed me the prescription

2    and I verified that it was forged and she -- I asked the

3    pharmacist then to have the young lady arrested.

4    Q    Based on your observation and experiences at the

5    Defendants' clinic, did you form an opinion about how

6    many chronic pain patients were actually drug-seekers as

7    opposed to legitimate pain patients?

8    A    About 50%.

9    Q    Did you ever have any conversations with the

10   Defendant Stephen Schneider about the number of

11   drug-seekers at the Defendants' clinic?

12   A    I don't recall at this time.

13   Q    With regards to the writing of prescriptions for

14   narcotics, if you were seeing a patient that the

15   Defendant Stephen Schneider had seen and prescribed

16   narcotics to, what, if any, instructions did the

17   Defendant Schneider give you about the prescriptions you

18   were to write for these patients?

19   A    I was supposed to, again, write the prescriptions

20   exactly the way he had written them previously.

21   Q    And did you have any decision-making authority or

22   autonomy regarding what prescriptions you could write

23   for established pain management patients?

24   A    No.

25   Q    Did you ever terminate or fire a patient from pain

4161

1    management?

2    A    Yes, ma'am.

3    Q    And why would you do so?

4    A    Because they either failed two drug screens or they

5    were using polypharmacy, meaning getting their

6    prescriptions filled at multiple pharmacies.

7    Q    What happened with the patients after you fired

8    them?

9    A    They usually got rehired.

10   Q    By whom?

11   A    Dr. Schneider.

12   Q    On the basis of the information you obtained while

13   working at the Defendants' clinic and on your

14   observations there, as well as your having worked in

15   medical communities prior to Schneider Medical Clinic,

16   did you form an opinion as to the reputation of the

17   Defendant Stephen Schneider as to his prescribing

18   practices?

19   A    Yes.

20   Q    And what is that opinion?

21   A    I felt like he was a legalized drug dealer.

22   Q    Why did you leave your employment at Schneider

23   Medical Clinic?

24   A    I was told that I was no longer fit for their

25   clinic.

4162

```
 1    Q   And do you know why the Defendants thought you were
 2    not fit for their clinic?
 3    A   Because I didn't work fast enough and I just
 4    wasn't -- I didn't follow their instructions to the T.
 5    Q   As a result of your working at the clinic, did
 6    Medicaid notify you that it intended to terminate you as
 7    a provider?
 8    A   Yes, ma'am.
 9    Q   And did you respond to Medicaid?
10    A   Yes, ma'am.
11    Q   At the same time, did you write to anyone else?
12    A   I wrote to the Kansas State Board of Healing Arts.
13    Q   Let me hand you what has been marked for
14    identification as Exhibits 108 and 108-A.  Are those the
15    letters that you wrote to Kansas Medicaid and the Kansas
16    Board of Healing Arts?
17    A   Yes, ma'am.
18              MS. TREADWAY:  Government offerses Exhibit 108
19    and 108-A.
20              MR. WILLIAMSON:  No objection.
21              MR. BYERS:  No objection.
22              THE COURT:  They're received.
23    BY MS. TREADWAY:
24    Q   Let's first look at 108-A.  Is that your letter to
25    Medicaid?
```

```
 1    A    No.

 2    Q    I'm sorry, 108.  Not 108-A?

 3    A    Yes.

 4    Q    108?

 5    A    Yes, ma'am.

 6    Q    And what's the date of that letter, ma'am?

 7    A    June 23rd, 2005.

 8    Q    And I'd like to drop down to the third paragraph.

 9    Could you please read those two paragraphs on that page

10    please?

11    A    Sure.  "My job as a physician's assistant was to do

12    what the two physicians instructed me to do and there

13    was no autonomy given to make decisions on my own

14    regarding the care of the patients seen for pain

15    management that I saw on a daily basis.  When I began

16    working at the clinic, I was given strict instructions

17    as to the order in which pain medications were to be

18    dispensed from which I was not to digress.  I did have

19    autonomy in regards to prescribing medications for other

20    conditions not related to pain management.  When my

21    employment began, I was instructed to fill out the fee

22    tickets a certain way with no room for leniency.  I was

23    instructed that everyone was to receive a CPT code of

24    99213, no matter what they were being seen in the clinic

25    for or how long I was present in the room.  Once the fee
```

4164

1    ticket left my hands, I was unaware the remainder of the

2    billing process."

3    Q   And turning to the next page, could you read the

4    final paragraph.

5    A   "As stated previously, my employment at Schneider

6    Medical Clinic was only for three months.  In that short

7    period of time I saw an average of 40 patients a day and

8    began to determine the pattern of unethical and

9    unprofessional events.  My ethical and professional

10   beliefs were inconsistent with those being practiced at

11   Schneider Medical Clinic as to medication prescription,

12   with the result being that I terminated my employment

13   with the clinic on July 11, 2004.

14   Q   You told them that you terminated your employment

15   but that wasn't really correct?

16   A   It was actually a joint decision.

17   Q   All right.  Now moving to the next letter, Exhibit

18   108-A.  Is that your letter to the Kansas Board of

19   Healing Arts?

20   A   Yes, ma'am.

21   Q   And was that written June 29th, 2005?

22   A   Yes, ma'am.

23   Q   And let's drop down to the third paragraph and what

24   I would like you to review with the jury is, first of

25   all, on that first page, some of the things that

4165

1    happened through Paragraph 5 which goes to the next

2    page.

3    A    So, you want me to just to read 1 through 15.

4    Q    Pretty much, yes.

5    A    Okay.  "Some of the things that happened while I was

6    employed with the clinic were the following:  1, I was

7    left to run the entire clinic by myself on several

8    occasions, including every weekend with no real back-up

9    available when needed.

10        "2:  PAs were expected to see their entire

11   schedule and every walk-in that walked through the front

12   door while the clinic was open.

13        "3:  Patients were told that they were being

14   referred to specialists, but on many occasions either

15   missed their appointments because they were never informed

16   of the appointment by the person doing the referrals, or

17   the referral was made three to four months after the

18   provider had requested it to be made."

19   Q    Now, I'm going to stop you there because I had

20   forgotten something very important.  And that is that

21   you had some surgery on your tongue recently?

22   A    Yes.

23   Q    You mind if I take over the reading?

24   A    That's fine.

25   Q    All right.  "Number 4:  The incoming correspondence

4166

1     was at least three to four months behind in being read

2     by the providers and being filed in the patient charts.

3          "5:  On several occasions I have been brought a fee

4     ticket, the chart and a blank progress note several

5     weeks after the patient had been seen and told to

6     rewrite the note because the office manager or billing

7     person could not find the original.  I refused to

8     regenerate the progress notes because I did not remember

9     seeing the patient and was not going to document

10    something that I did not remember.  I began to write a

11    short paragraph on the bottom of the progress notes that

12    were brought back to me that stated the following, such

13    and such chart was brought back to me on the date it was

14    brought back because the original progress note was

15    lost.  I do not remember what the patient was seen in

16    the clinic for, what exam was done and what treatment

17    was prescribed.  Therefore, this progress note cannot be

18    regenerated.  My name.  These went back to the office

19    manager and I do not know if they are still in the

20    charts or if she removed them.  On at least one occasion

21    when I had refused to regenerate a progress note, the

22    office manager took it to another PA and had them write

23    something on the note so that she could bill the

24    patient.  In one instance I saw the patient a few weeks

25    later and the progress note that the office manager had

4167

1    taken to the other PA was in the chart.  It was

2    interesting to note that the PA who had not seen the

3    patient previously had written that he gave the patient

4    pain meds that the patient was not even on at that time.

5         "Number 6:  The progress notes that were lost and

6    asked to be regenerated are falsified signed information

7    as well.  There was no way any progress note would have

8    correct vital signs on it that the old one was missing.

9         "7:  The charts were everywhere in the clinic.

10   They were not refiled in the evening after the patients

11   had been seen and the charts signed by the physicians.

12   There were stacks of charts all over the floors and

13   boxes in the bill office, on cabinets in the lab and

14   occasionally in the file cabinets where they belonged.

15        "8:  On several occasions when there were multiple

16   deaths involving clinic patients, most of which were

17   overdoses, the doctor just said, oh, well, and went on

18   about his business.

19        "9:  One time he saw a new patient and gave him

20   scripts for narcotics and that patient went out and ran

21   into the portico post with his car.  The police were

22   called and that patient had track marks on his arm from

23   IV drugs

24            "10:  When I asked how to fill out the fee

25   ticket for the pain management patients that I saw, I

4168

1     was told to give everyone a CPT code of 99213.  Other

2     patients I was allowed to use my own judgment on billing.

3     "11:  When dealing with pain management patients I was

4     given strict instructions as to the order in which to use

5     the pain medications and was not to stray from that order.

6     There were many times I saw a patient for medication

7     refills the physicians had seen previously, especially

8     when I felt that the patient did not need as much pain

9     medication as had been prescribed previously.  But I did

10    not feel that I had the authority to make any changes in

11    the pain management regimen given the instructions I had

12    been given.  In certain circumstances where it was

13    apparent that the pain medications were not helping the

14    patient, I did, even though I had been told not to, change

15    the pain medications to something that was either stronger

16    or just increase the dose of the medication that the

17    patient was currently on.

18    "12:  In the three months of employment at the clinic,

19    there was never any licensed personnel besides the

20    providers present.  The employees in the clinic, other

21    than the providers, were trained to take vital signs,

22    draw blood, give injections, run strep and pregnancy

23    texts, and to take X-rays by clinic employees that had

24    worked in the clinic for a significant period of time and

25    some by providers.  There was one employee that had been

4169

1    professionally trained in taking X-rays.

2              "13:  The X-rays that were taken in the clinic

3    were never sent out for a radiologist to review.  They

4    were reviewed by the physicians but a report was never

5    generated to go into the patient's chart.

6              "14:  The providers in the office were very

7    proud of the fact that they were the leading narcotic

8    prescription writers in the state.  They even told me

9    that if I did not go through at least one prescription

10   pad a day that I was not writing enough prescriptions.

11   It was a big joke to them.

12             "15:  I asked on several occasions what the

13   Medicaid and Medicare treatment guidelines, policies and

14   procedures were, and was always told that I did not need

15   to know that information.  When I began my employment

16   with the clinic, I asked if I could follow the billing

17   clerks around for a day or two in order to learn what

18   happens to the fee tickets once they left the provider's

19   hands, and again I was told that I did not need to know

20   that information."

21             Is that an accurate reflection of your

22   experience at the clinic, Ms. Klingsick?

23   A    Yes, ma'am.

24             MS. TREADWAY:  Thank you.  Nothing further.

25             THE COURT:  Yes, sir.

4170

```
 1              MR. WILLIAMSON:  Thank you, Your Honor.
 2                    CROSS EXAMINATION
 3    BY MR. WILLIAMSON:
 4    Q   How are you doing, Ms. Klingsick?
 5    A   I'm alright.  Thanks.
 6    Q   You remember our investigator contacting you to try
 7    to chat with you about what your testimony was going to
 8    be and you told him that you weren't at liberty to
 9    discuss it with us?
10    A   Yes.
11    Q   Okay.  The Government told you not to talk with us
12    which I believe is what you told him?
13    A   No.  I said my attorney told me not to talk to him.
14    Q   Oh, okay.  Who's your attorney?
15    A   Lisa McPherson.
16    Q   At Martin-Pringle?
17    A   Yes.
18    Q   All right.  Now, let's talk about a few things.  The
19    letter that you wrote to the Medicaid, you stated on
20    there that you were -- that you terminated your
21    employment; correct?
22    A   Correct.
23    Q   Okay.  But the truth was -- is that Dr. Schneider
24    actually terminated your employment; correct?
25    A   It was a joint decision.
```

4171

1    Q    Okay.  When he came in, did you and Dr. Schneider

2    sit down and say: hey, you know, this isn't working for

3    us, and he gave you a chance to resign?

4    A    He told me at the end of the day.  He came in and

5    said I want to talk to you.  And I said okay.  He says,

6    your 90 days is up and we've just decided you're not fit

7    for our clinic.  And I said that's okay because I was

8    going to resign anyway.

9    Q    Okay.  You were going to resign but you never --

10   A    That same day.

11   Q    Okay.  Did you ever put in a resignation notice?

12   A    That day I was going to but he told me I did not

13   need to.

14   Q    Did you ever put in one before that day?

15   A    No.

16   Q    Okay.  He told you you were terminated; correct?

17   A    Yes.

18   Q    Okay.  And in your letter to the Medicaid people and

19   Kansas Board of Healing Arts, you didn't say it was a

20   joint decision; correct?

21   A    Correct.

22   Q    Okay.  Now, so that wasn't a hundred percent

23   accurate; correct?

24   A    Correct.

25   Q    Okay.  Now, you stopped working at the clinic in

4172

```
 1    2004; right?

 2    A    Correct.

 3    Q    All right.  Between 2004 and before you got this

 4    call from Medicaid, you never once sent a communication

 5    to the Kansas Board of Healing Arts, did you?

 6    A    No, sir.

 7    Q    You never once sent a communication to Dr. Schneider

 8    recounting the issues that you presented to the Kansas

 9    Board of Healing Arts; correct?

10    A    No, sir.

11    Q    What happened was you got a call from Medicaid

12    threatening your credentials; right?

13    A    No.

14    Q    They didn't tell you that they were going to

15    terminate you as a provider?

16    A    I did not get a call.  I got a letter.

17    Q    Okay.  And then you got that letter and in response

18    to that letter you wrote these two letters; correct?

19    A    I wrote the one to the utilization review manager.

20    Q    And then a few days later you wrote one to the

21    Kansas Board of Healing Arts; correct?

22    A    Correct.

23    Q    All right.  And, you know, you were credentialed

24    through the Kansas Board of Healing Arts.  True?

25    A    Correct.
```

4173

```
 1    Q    And so you started working at the clinic in March of

 2    2004?

 3    A    Correct.

 4    Q    Okay.  And between March of 2004 and July 2004 when

 5    you were terminated, you didn't put any of this in

 6    writing to Dr. Schneider, did you?

 7    A    No, sir.

 8    Q    You didn't put any of this in writing to the Kansas

 9    Board of Healing Arts; correct?

10    A    No, sir.

11    Q    Now, you mentioned these conversations about all

12    pain patients get a 99213.  Remember that?

13    A    Yes.

14    Q    Now, when did that conversation take place with Dr.

15    Schneider?

16    A    I can't give you exact dates.

17    Q    Okay.  Tell me about the conversation.  What were

18    the exact words that he used?

19    A    Exact words that he used about what I charged?

20    Q    Exact words, when he gave you the instruction that

21    all pain patients get a the 9213, what were the exact

22    words you remember him using?

23    A    All pain patients get 99213.

24    Q    Did you ask him why he felt that way?

25    A    No.
```

4174

1    Q    So, you didn't ask him if he believed that all the

2    medication maintenance visits would qualify under 99213?

3    A    No, sir.

4    Q    Did you ever bill less than a 99213?

5    A    Yes, sir.

6    Q    Did you ever get a written discipline for billing a

7    99212?

8    A    No, sir.

9    Q    Did Dr. Schneider ever give you any kind of

10   discipline for writing a 99212?

11   A    No, sir.

12   Q    Now, you mentioned that there would be times when

13   you would mark a 99212 and then it would be changed to a

14   99213; right?

15   A    Yes, sir.

16   Q    Now, when Dr. Schneider would actually review your

17   charts and your fee ticket; correct?

18   A    Correct.

19   Q    And did you know whether or not he looked at your

20   documentation and whether he truly believed that the

21   service you rendered went to a 99213 instead of a 99212?

22   A    No, I don't.

23   Q    Now, you believed that a 99213 was only indicated

24   when the visit was 15 minutes or more; correct?

25   A    Correct.

4175

1    Q    Okay.  Do you still believe that to be true?

2    A    Yes, I do.

3    Q    Are you aware that we have testimony from a coding

4    expert yesterday that states that the time is not an

5    element, it's the --

6              THE COURT:  Mr. Williamson, didn't I remind

7    you earlier that unless you can establish that either

8    she's an expert and that the Government was entitled to

9    tell her what previous testimony was heard, or, that the

10   rule, which you all have invoked, which prevents

11   witnesses from telling others what their testimony is,

12   has been violated.  I'm not going to allow you to ask

13   questions of these witnesses about what testimony was

14   already in.

15             MR. WILLIAMSON:  Yes, sir.

16             THE COURT:  Okay.

17             MR. WILLIAMSON:  Sorry about that, Judge.

18   BY MR. WILLIAMSON:

19   Q    Are you aware that time, that a 99213 is not judged

20   by the time?

21   A    No, I'm not aware of that.

22   Q    Okay.  You also believe that a 99213 requires a

23   complete physical; correct?

24   A    Correct.

25   Q    And so, you're not aware as to whether or not a

4176

1    99213, a physical exam has to be an expanded problem

2    focussed; correct?

3    A    Yes, I knew that.

4    Q    Is that what you consider a complete exam, an

5    expanded problem focussed exam?

6    A    Yes, sir.

7    Q    Okay.  Now, you mentioned that you had a

8    conversation with Dr. Schneider about the level of

9    medicine that people were receiving.  Remember that?

10   A    Yes, sir.

11   Q    And you said that basically his statement was none

12   of your business; correct?

13   A    Correct.

14   Q    Isn't it true that he told you that we're here to

15   help people deal with their pain management that can't

16   go any place else?

17   A    He never told me that.

18   Q    You remember giving testimony under oath?

19   A    Yes.

20   Q    And you don't remember telling the questioner under

21   oath that Dr. Schneider told you the statement that I

22   just provided?

23   A    I do not remember that, no.

24   Q    Okay.  I'm going to hand you a copy of that, your

25   sworn testimony, and Page 24, Line 12, through Line 15.

4177

1   Can you read that, what your response was to the

2   questioner.

3   A   It says basically his comments were that there's --

4   that that's what we're here for in the sense that we're

5   here to help people deal with their pain management that

6   can't go any place else.

7   Q   And this does say Debra Klingsick was the witness;

8   correct?

9   A   Yes, sir.

10  Q   Okay.  Does that refresh your memory as to whether

11  or not Dr. Schneider told you that information?

12  A   Yes, sir.

13  Q   Okay.  Now, you also mentioned that Dr. Schneider --

14  that you told him about that people were -- their

15  medication was getting changed every so often.  You

16  remember that?

17  A   Yes.

18  Q   And you stated that basically, again, that it was

19  none of your business, that's what he told you; right?

20  A   Yes, sir.

21  Q   Okay.  Well, first, are you familiar with the term

22  titrating?

23  A   Yes.

24  Q   Okay.  Titrating is when you either increase or

25  decrease medicine; correct?

4178

```
 1    A   Correct.
 2    Q   Or if you change medicine to try to see if you can
 3    find what's working for a patient; correct?
 4    A   Correct.
 5    Q   Now, this basically none of your business, can you
 6    remember exactly what Dr. Schneider said to you?
 7    A   Basically he didn't -- I can't exactly tell you what
 8    I said before.
 9    Q   Well, what I'm concerned about is what do you
10    remember him -- his exact words to you were.  Because,
11    to me, basically, none of your business is your
12    interpretation of what he said.  But what were the words
13    that he used?
14    A   I can't exactly tell you.  I do not recall at this
15    time.
16    Q   Do you know when these conversations took place?
17    A   Sometime during my employment.
18    Q   You didn't quit after these alleged comments
19    happened; correct?
20    A   Correct.
21    Q   We don't know -- you didn't report these comments to
22    anybody; correct?
23    A   Correct.
24    Q   Now, but you did talk to Dr. Schneider about the way
25    that pain meds should be prescribed at the clinic;
```

4179

1    correct?

2    A    Correct.

3    Q    And he told you that you should start people off

4    with the Tylenol 3 or anti-inflammatory; correct?

5    A    Correct.

6    Q    And then so you basically start with the lower

7    medicines and then work to the stronger medicines if the

8    lower ones didn't work; correct?

9    A    Correct.

10   Q    And did you ever start people on a Schedule II pain

11   medicine?

12   A    Only after I talked to him.

13   Q    Okay.  So you would never prescribe a Schedule II

14   without talking to Dr. Schneider?

15   A    Correct.

16   Q    And would you mark in the note whether or not you

17   spoke with Dr. Schneider?

18   A    Sometimes and sometimes not.

19                    (Off-the-record.)

20   BY MR. WILLIAMSON:

21   Q    Now, do you remember a patient by the name of Pamela

22   F?

23   A    No.

24   Q    Okay.  If Government records show that you were the

25   first provider to give her Percocet, which is a Schedule

4180

```
 1    II, on June 5th, 2004, would you disagree with that?
 2    A   I can't disagree with it.  I mean, if you have
 3    proof.
 4    Q   Okay.  Well, I'm going to hand you the June 5th,
 5    2004, note for Pamela F.  Do you see that?
 6    A   Uh-huh.
 7    Q   Is that your handwriting and your progress note?
 8    A   Yes.
 9    Q   Now, there's also a PADT form on that visit;
10    correct?
11    A   Correct.
12    Q   What is a PADT form?
13    A   It's a Pain Assessment and Documentation Tool.
14    Q   You were instructed to complete those with every
15    visit for pain patients; correct?
16    A   Yes, sir.
17    Q   And that was an attempt by the clinic to assess the
18    pain that people were suffering from; correct?
19    A   Correct.
20    Q   Now, on this visit do you prescribe Ms. Pamela F
21    Percocet?
22    A   Yes.
23    Q   Okay.  And according to the government exhibit, she
24    had not been prescribed Percocet at any time before this
25    time.  Would you disagree with that?
```

```
 1    A    I can't tell.
 2    Q    Okay.  Well, when you look at Ms. Pamela F, was she
 3    complaining about pain symptoms?
 4    A    She was having trouble with her right shoulder.
 5    Q    Okay.  And in the PADT did you note that you were
 6    going to change or add medication to help control the
 7    pain?
 8    A    I said I was going to add it, yes.
 9    Q    Now, anywhere on that PADT or that progress note
10    does it state per Dr. Schneider we will add Percocet?
11    A    No, sir.
12    Q    Okay.  Now, granted, I think your legibility is
13    probably better than mostly everybody's at the clinic,
14    and you tried to take accurate notes; correct?
15    A    Correct.
16    Q    And if Dr. Schneider actually told you that, that's
17    something that you would have most likely noted;
18    correct?
19    A    Correct.
20    Q    Now, when you were seeing Pamela F, you weren't
21    giving her Percocet to feed an addiction, were you?
22    A    No, sir.
23    Q    She was there complaining about pain; right?
24    A    Correct.
25    Q    You were able to do a physical exam and you saw a
```

1    change in her range of motion; correct?

2    A    Correct.

3    Q    Dr. Schneider never instructed you to provide pain

4    medicine to anybody who you did not believe was in pain,

5    did he?

6    A    Could you rephrase that.

7    Q    He never instructed you to give pain medicine to

8    anyone that you didn't feel like was in pain; correct?

9    A    Correct.

10   Q    Okay.  And you never gave any medicine to anybody

11   who you didn't believe was in pain; correct?

12   A    Correct.

13   Q    In fact, in the letters that you sent off to the

14   Medicaid and Kansas Board of Healing Arts, you never

15   even contended that Dr. Schneider instructed you to give

16   pain medicines indiscriminately; correct?

17   A    Correct.

18   Q    Now, in all honesty, if he would have ever

19   instructed you to submit or give pain medicine to people

20   regardless if they're in pain, you would have quit at

21   that moment, wouldn't you?

22   A    Yes, sir.

23   Q    You mentioned that Dr. Schneider would rehire

24   patients that you had terminated.  Remember that?

25   A    Yes, sir.

4183

```
 1    Q   How many times did that happen?
 2    A   I can't tell you.
 3    Q   Less than 5% of the time?  80% of the time?  100% of
 4    the time?
 5    A   I can't tell you.
 6    Q   Okay.  Do you know whether or not Dr. Schneider
 7    would actually sit down with the patient to hear their
 8    side of the story?
 9    A   I do not.
10    Q   Now, these conversations that -- where Dr. Schneider
11    mentioned, oh, well, when you would tell him about
12    people passing away.  How many times do you believe this
13    happened?
14    A   I think at least twice.
15    Q   Okay.  What was he doing when you told him this?
16    A   He was signing charts.
17    Q   And you told him specifically that a specific
18    patient passed away from an overdose and the only thing
19    he said to you was, oh, well?
20    A   Yes.
21    Q   When you got these, oh, wells from him, you didn't
22    walk out and quit, did you?
23    A   No.
24    Q   So, this allegedly heartless person who would only
25    say, oh, well, you decided to just stay there and
```

```
 1   continue working for him; right?
 2   A    Yes.
 3   Q    And you didn't complain, you didn't send a written
 4   complaint then to anybody about him just saying, oh,
 5   well; correct?
 6   A    Correct.
 7   Q    What specific patients did he say this about?
 8   A    I can't give you names right off the top of my head.
 9   Q    When did these conversations allegedly happen?
10   A    I can't tell you exact time.
11   Q    Now, you said that you were at the clinic on the
12   weekends.  Were you the only person working on the
13   weekends?
14   A    There was a receptionist and a medical assistant.
15   Q    There weren't two PA's working on the weekends?
16   A    No, sir.
17   Q    Are you aware -- you mentioned testimony about
18   referrals.  Isn't it true that the clinic had a full
19   time referral person?
20   A    Part of the time when I was there, yes.
21   Q    Her name was Valerie?
22   A    I don't know anybody by the name of Valerie.
23   Q    You were only there for, what, three or four months?
24   A    Correct.
25   Q    Now, you mentioned about these monthly visits.
```

4185

1    Isn't it true that monthly visits is a way to help

2    monitor how much medicine a person is taking?

3    A   Correct.

4    Q   Did you ever do any pill counts on patients?

5    A   No.

6    Q   Did you ever do any urinary drug screens on

7    patients?

8    A   Yes, sir.

9    Q   And when these lab results would come in, the clinic

10   would call people in to talk to them; correct?

11   A   No.

12   Q   They didn't -- I thought you said they set office

13   visits to discuss lab results and that was because of

14   money?

15   A   Patients had to make a return appointment.

16   Q   Okay.  You did send the labs off to Lab Corp, didn't

17   you?

18   A   Yes, sir.

19   Q   And the results had to come back, didn't they?

20   A   Correct.

21   Q   And the providers needed to talk to them about their

22   lab results; correct?

23   A   Correct.

24   Q   Sometimes it showed high blood pressure -- or,

25   excuse me -- high cholesterol; correct?

4186

```
1    A    Correct.

2    Q    Other issues that could only be seen in the blood;

3    correct?

4    A    Correct.

5    Q    Now, you didn't only see pain patients, did you?

6    A    No.

7    Q    You saw pediatric -- kids; correct?

8    A    Correct.

9    Q    In fact you, a lot, I believe you stated that a lot

10   of who you saw were pediatric patients; correct?

11   A    Quite a few were pediatric patients, yes.

12   Q    You stated that you believed -- you formed an

13   opinion that Dr. Schneider's clinic was a -- that the

14   clinic was basically a legalized drug dealer.  You

15   remember that?

16   A    Yes, sir.

17   Q    You base that opinion on the amount of people that

18   would come in there, I think your statement was,

19   "seeking narcotics"; correct?

20   A    Correct.

21   Q    Now, you never told Steve that you had that opinion

22   of his clinic; correct?

23   A    Correct.

24   Q    Who did you talk to about that?

25   A    My husband.
```

4187

```
1    Q    Did you talk to Jody LeBroke?

2    A    And Jody.

3    Q    You and Jody were friends around the clinic;

4    correct?

5    A    Yes, sir.

6    Q    You guys would often talk and chat about the goings-

7    on in the clinic; correct?

8    A    Yeah.

9               MR. WILLIAMSON:  One second, Your Honor.

10              THE COURT:  Sir.

11                   (Off-the-record discussion.)

12   BY MR. WILLIAMSON:

13   Q    Now, you were asked questions about the availability

14   of Dr. Schneider.  Do you remember that?

15   A    Yes, sir.

16   Q    Huh?

17   A    Yes.

18   Q    How far did Dr. Schneider live from the Schneider

19   Medical Clinic?

20   A    Three or four minutes.

21   Q    And you understand the regulations require him to be

22   within 30 minutes of the location after a visit;

23   correct?

24   A    Correct.

25   Q    And also when you were seeing these pain patients
```

1    you were instructed to do a history of prior drug use;

2    correct?

3    A    Correct.

4    Q    You were instructed to do a history of alcohol

5    problems; correct?

6    A    Correct.

7    Q    And you were instructed to put this in the progress

8    note; correct?

9    A    Correct.

10   Q    And in regards to these fee tickets, you were never

11   instructed to hide the fact that you were the provider

12   that saw the patient; were you?

13   A    Correct.

14   Q    And every patient -- strike that.

15           MR. WILLIAMSON:   I don't have anything

16   further, Your Honor.

17           THE COURT:   Thank you, sir.  Mr. Byers.

18           MR. BYERS:   Thank you, Your Honor.

19                  **CROSS EXAMINATION**

20   BY MR. BYERS:

21   Q    Good morning, ma'am.

22   A    Good morning.

23   Q    Now, you testified in front of a grand jury on

24   January 31st, 2006; right?

25   A    Correct.

4189

1    Q    And then prior to that you had been interviewed by

2    Government agents several times; correct?

3    A    Correct.

4    Q    Do you remember specific dates when you were

5    interviewed by agents?

6    A    I do not.

7    Q    Do you remember who the agents were?

8    A    I do not.

9    Q    Do you remember where the interviews took place?

10   A    At my home.

11   Q    And how many times in your home?

12   A    Before the grand jury?

13   Q    Or let's say overall.  How many interviews in your

14   home with government agents?

15   A    Two.

16   Q    Two.  Do you remember any interviews somewhere else,

17   a downtown office, anywhere?

18   A    No, sir.

19   Q    And then you also gave a deposition in a civil suit

20   on May 4th, 2009; correct?

21   A    Correct.

22   Q    Now, when you were interviewed by Linda for the job

23   at the clinic, how many years experience did you have as

24   a physician assistant?

25   A    I have to back up here.  Do some math.  16.

4190

1    Q    16 years experience.  Did you feel you were

2    unqualified to be hired on the spot by Linda?

3    A    I didn't think I was unqualified.  I was just -- I

4    was shocked.

5    Q    Then if you weren't unqualified, why were you

6    shocked?

7    A    Because most people check out your references.

8    Q    Do you know if Linda Schneider knew your references

9    personally?

10   A    I can tell you she didn't because my references were

11   from Oklahoma.

12   Q    Well, how do you know she doesn't know people in

13   Oklahoma?

14   A    I'm pretty sure she doesn't.

15   Q    You don't know that?

16   A    I don't know that, no.

17   Q    Now, she told you the clinic was fast-paced.  And

18   that was accurate; right?

19   A    Correct.

20   Q    And she told you it was a family practice clinic and

21   that was accurate; right?

22   A    Correct.

23   Q    And she told you they dealt with pain management and

24   that was accurate?

25   A    Correct.

4191

1    Q    Now, you talked about at least various times I think

2    I heard it today -- I know it's in your grand jury

3    testimony at Page 7 -- where you said patients were

4    scheduled every five minutes.  Is that accurate?

5    A    That's what I remember.

6    Q    Okay.  But with your numbers you've given us today,

7    between 40 and 50 patients -- you remember testifying

8    about that?

9    A    Yes, sir.

10   Q    And that would be a ten hour workday and 11 hour day

11   at the clinic; correct?

12   A    Correct.

13   Q    If we take 40 patients and divide that by 10 hour

14   workday, that's four patients per hour, that's 15

15   minutes per visit; correct?

16   A    Correct.

17   Q    Okay.  So, if we had 50 in a ten hour workday, it's

18   slightly less, probably twelve and a half or something?

19   A    Correct.

20   Q    Agreed?  Do you know if the clinic had any

21   contractual agreements with insurance companies that

22   they would function essentially as an urgent care where

23   they were bound to take all walk-in beneficiaries from

24   certain companies?

25   A    I have no knowledge of that.

4192

```
 1    Q   Okay.  You talked about this phone call you
 2    overheard between Linda and Steve.  Do you remember
 3    that?  The one where she said she's not a baby, you
 4    don't have to hold her hand?
 5    A   Yes.
 6    Q   Did that upset you that she was saying something
 7    like that?
 8    A   No.
 9    Q   Okay.  Because you were essentially an independent
10    practitioner; right?
11    A   Correct.
12    Q   And under Kansas regulations, you didn't even have
13    to have a physician on-site to render patient care?
14    A   Correct.
15    Q   And that's even the case with brand new patients
16    with new conditions; correct?
17    A   Correct.
18    Q   But then later in your Medicaid letter you talked
19    about on June 23rd, 2005, you complained about the lack
20    of autonomy; correct?
21    A   Correct.
22    Q   At least as far as pain medication?
23    A   Correct.
24    Q   Now, in your deposition of May 4th, 2009, you
25    testified you never saw Linda Schneider fiddling around
```

4193

1    with the fee tickets and the charts.  Do you recall that

2    testimony?

3    A    I said I never saw her?

4    Q    Never saw her doing that.  On May 4th, 2009, you

5    testified to that?

6    A    I don't remember saying that.

7    Q    Well, you may have actually said you never saw her

8    changing things?

9    A    That may have been what I meant.

10   Q    Okay.  I'm sorry.  I may have mischaracterized that.

11   I believe your testimony was you never saw her changing

12   things?

13   A    Yes.

14   Q    Because you did see her handling charts; correct?

15   A    Yes.

16   Q    And I believe you testified that after visits were

17   done, they would flow, at some point, through Linda's

18   office?

19   A    Correct.

20   Q    Okay.  Do you know what Linda was doing with charts

21   when she had them in there?

22   A    I do not.

23   Q    Now, in your deposition you testified that you never

24   inappropriately marked 99213, and I believe you

25   testified to that today, too.  Is that right?

4194

 1    A    Can you say that again.

 2    Q    Whenever -- let me try it again.  Whenever you would

 3    mark a 99213, you thought that was justified as the

 4    correct code on the fee ticket; correct?

 5    A    Sometimes and sometimes not.

 6    Q    Okay.  So, you were marking the 9213s when you

 7    didn't think it was proper?

 8    A    Occasionally, yes.

 9    Q    And is that because you didn't feel you spent the 15

10    minutes with the patient that you thought was required

11    for a 213?

12    A    When I would mark it?

13    Q    Uh-huh?

14    A    Would I feel that way?

15    Q    Right.

16    A    Yes.

17    Q    Because of your 15 minute requirement?

18    A    Because that's what I was always taught.

19    Q    Right.  Now, you were in practice quite a while

20    before going to the Schneider clinic and did you

21    practice after that at all as a PA?

22    A    I practiced at the Wichita clinic.

23    Q    For how long?

24    A    For about four months.

25    Q    Okay.  So with your time at the Schneider Clinic,

1    your time before and with Wichita clinic, you've had

2    almost 17 years of practice.

3                         (Witness nods in the

4                          affirmative.)

5    Q    Okay.  It's common in medical practices,

6    particularly family practices, to use checklists in a

7    variety of fashions; correct?

8    A    Correct.

9    Q    Now, in your letter so the Kansas Board of Healing

10   Arts, June 29th, 2005, portions of that were read by you

11   or Ms. Treadway into the record.  In there you said that

12   you were asked several times to recreate notes, progress

13   notes that were missing.  Correct?

14   A    Correct.

15   Q    Now, it's a good thing to try to have complete and

16   accurate medical records; correct?

17   A    Correct.

18   Q    And in your grand jury testimony six months later

19   you were able to recount one specific time where you

20   were asked to recreate a progress note.  Do you recall

21   that testimony?

22   A    Yes.

23   Q    Okay.  So is it several times or is it the one time

24   that you were asked -- a note disappeared, somebody

25   brought it to you and said can you conjure something up

4196

1    so we have a record?

2    A    It was several times.

3    Q    Okay.  So your grand jury testimony was inaccurate

4    if you said one time?

5    A    That was what I remembered at that time.

6    Q    And you were -- no one prevented you from writing on

7    those notes that you can't do this or you're guessing at

8    it, that this is a re-creation, this is a copy filling

9    in for a missing note?

10   A    No.

11   Q    It was your testimony you actually put something to

12   that effect on the note; correct?

13   A    I put what is written basically the same that I

14   typed on my letter to Shelly Wakeman on the bottom of

15   the chart.

16   Q    And can you identify any of those several charts?

17   Can you tell us names of patients?  First name and last

18   initial?

19   A    Rosetta H.

20   Q    And that's the same one you identified to the grand

21   jury in 2006; right?

22   A    Correct.

23   Q    Any others?

24   A    That's the only one I can remember.

25   Q    Did you consult with an attorney right away when

4197

1      Medicaid told you they were looking at removing your

2      provider number?

3      A    No, sir.

4      Q    You didn't consult with an attorney before you wrote

5      these letters to Medicaid and the Board of Healing Arts?

6      A    No, sir.

7      Q    During your time at the Schneider Medical Clinic,

8      did you see any other physician's assistants shadowing

9      the billing people?

10     A    No, sir.

11              MR. BYERS:  May I have just a moment to

12     confer?

13              THE COURT:  You may, sir.

14              MR. BYERS:  Thank you.

15                   (Off-the-record discussion.)

16              MR. BYERS:  That's all I have, Your Honor.

17     Thank you.

18              THE COURT:  Any redirect.

19              MS. TREADWAY:  Very briefly, Judge.

20                 **REDIRECT EXAMINATION**

21     BY MS. TREADWAY:

22     Q    Ms. Klingsick, Mr. Williamson asked you whether the

23     Defendant Stephen Schneider ever told you to give

24     prescriptions to people who didn't need 'em.  And he

25     never told you to do that, but in essence that's what

1    occurred because you didn't have any autonomy over the

2    prescriptions you wrote.  Isn't that correct?

3              MR. WILLIAMSON:  Your Honor, I'm going to

4    object to leading.

5              THE COURT:  The objection is sustained on the

6    basis of leading.

7    BY MS. TREADWAY:

8    Q   Mr. Williamson asked you whether the Defendant told

9    you that you should give prescriptions to people who did

10   not need them.  You remember that?

11   A   Yes.

12   Q   And he didn't tell you that?

13   A   No.

14   Q   But is that what ended up happening?

15   A   Yes.

16   Q   And was that because you had no autonomy?

17   A   Yes.

18   Q   And you didn't see patients on a regular basis, did

19   you, in terms of pain patients?  Would they see multiple

20   providers?

21   A   Correct.

22             MR. WILLIAMSON:  Object again to leading.

23             THE COURT:  Sustained.

24   BY MS. TREADWAY:

25   Q   Again, how did patients get seen at the clinic in

4199

1    terms of the pain patients?  Were they seen by one

2    provider or many?

3    A    Many.

4    Q    And I believe your earlier testimony was that 50% of

5    the pain patients were not legitimate.  Is that about

6    your testimony?

7    A    Correct.

8    Q    As a result of that, as a result of the five

9    minutes, as a result of the no autonomy with the

10   prescription practices, sitting here today do you

11   believe that you could have written prescriptionS for

12   people that didn't need them and that were addicted to

13   them?

14   A    Correct.

15            MS. TREADWAY:  Nothing further.

16                    **RECROSS EXAMINATION**

17    BY MR. WILLIAMSON:

18   Q    Did you ever prescribe a pain pill to somebody who

19   did not complain of being in pain?

20   A    I can't recall at this time.

21   Q    Okay.

22            MR. WILLIAMSON:  Nothing further.

23            THE COURT:  Mr. Byers?  Mr. Byers.

24            MR. BYERS:  I'm sorry.  I was thinking, Your

25   Honor.  I heard you.  No questions.

4200

1          THE COURT:  Well it's perfectly all right to

2     think.  All right.  Let's take an early morning recess,

3     Ladies and Gentlemen.  Remember and heed the admonition.

4     Thank you, Ms. Klingsick, you're excused.

5                    (Recess)

6          THE COURT:  Who's your next witness?

7          MS. TREADWAY:  Alicia C.

8          THE COURT:  All right.

9          MS. TREADWAY:  We're on schedule.

10          THE COURT:  That's fine.  Next witness please.

11          MR. FLEENOR:  Thank you, Your Honor.

12                    **ALICIA C**.

13     Having been first duly sworn to tell the truth, the

14     whole truth and nothing but the truth, testified as

15     follows on:

16                 **DIRECT EXAMINATION**

17     BY MR. FLEENOR:

18     Q    Would you please state your name.

19     A    Alicia C.

20     Q    And are you married?

21     A    Yes.

22     Q    And what is your husband's first name?

23     A    Mike.

24     Q    How long have you been married?

25     A    2004.

4201

1   Q   Do you have children?

2   A   Yes.

3   Q   How many?

4   A   Two.

5   Q   And what are their ages?

6   A   12 and 3.

7   Q   Girls?  Boys?

8   A   Two girls.

9   Q   And are they both from the marriage with Mike?

10  A   The youngest one is.  The 12 year old is from a

11  previous marriage.

12  Q   Now, Alicia, I'm going to call you just by your

13  first name.  We're going to talk about pain medications

14  as you know.  Are you currently taking pain medications

15  now?

16  A   No.

17  Q   Were you a patient at the Schneider Medical Clinic

18  between 2002 and 2004?

19  A   Yes.

20  Q   Why did you choose to go to the Schneider Medical

21  Clinic?

22  A   For pain medication.

23  Q   The first time you went to the Schneider Medical

24  Clinic, do you recall what medical staff you saw?

25  A   I don't remember if it was Dr. Schneider or Curtis.

4202

```
1    Q   Why did you need pain medication?

2    A   I wanted 'em.

3    Q   Did you have any pain?

4    A   No.

5    Q   During the first time -- and I apologize -- who do

6    you say -- what medical staff did you see the first

7    time?

8    A   I don't remember if it was Schneider or Curtis.

9    Q   When you say Schneider, you mean --

10   A   Dr. Schneider, yeah.

11   Q   During the first time that you went to the clinic,

12   did you request a specific drug you wanted?

13   A   Yes.

14   Q   And what drug was that?

15   A   Lortab 10s.

16   Q   Why did you request that drug?

17   A   I didn't want anything stronger.

18   Q   Had you taken other drugs before?

19   A   Yeah.

20   Q   What drugs?

21   A   Oxycontin, Percocet.

22   Q   Were you given the Lortab that you asked for on that

23   first visit?

24   A   Yes.

25   Q   How many -- well, you were given a prescription for
```

1    them?

2    A    Yes.

3    Q    What was the -- how many pills was the prescription

4    for?

5    A    100.

6    Q    Did the person you saw on that first visit ask you

7    about your current or prior drug use?

8    A    No.

9    Q    Did they give you a physical?

10   A    No.

11   Q    How long were you actually in the exam room with

12   this person?

13   A    Probably ten minutes.

14   Q    And you continued to go to the clinic for another

15   approximately two years after that first visit; correct?

16   A    Yes.

17   Q    How often would you go to the clinic?

18   A    Probably once a month.

19   Q    During the time that you went to the clinic, did you

20   have to wait in the waiting room?

21   A    Yes.

22   Q    Typically how long would you have to wait in the

23   waiting room?

24   A    Two to three hours.

25   Q    Were there other people waiting there when you were

4204

1    there?

2    A    Many.

3    Q    Was it crowded?

4    A    Yes.

5    Q    Describe for us what you saw?

6    A    Every seat would be full.  They had fountains on

7    each side of the doors and people would be sittin' along

8    the edges of the fountains.  Some outside smoking or --

9    Q    Can you describe how some of the people looked to

10   you?

11   A    Well, if you've been a pain pill addict and you

12   don't have 'em and you're sick, you can spot out the

13   other people that are sick and need 'em 'cause they're

14   jittery, like shaky, and sometimes like sweaty and

15   impatient.  I don't --

16   Q    Are those feelings that you'd experienced before?

17   A    Yeah.

18   Q    And did you feel that you had been an addict?

19   A    Yes.

20   Q    When you did meet the medical staff at the clinic

21   after waiting in the waiting room, how long would they

22   spend with you in the exam room?

23   A    About ten minutes.

24   Q    Did you see different medical staff members during

25   these visits?

4205

1    A    Just the three I saw usually was Schneider, Curtis,

2    and Lee.

3    Q    Did you know Curtis' last name?

4    A    Atterbury, something like that.

5    Q    Did you see sometimes female staff members?

6    A    I saw a woman once.

7    Q    Did she prescribe medications for you?

8    A    Yes.

9    Q    Did you prefer to see male staff members or female

10   staff members in the exam rooms?

11   A    Male.

12   Q    Why?

13   A    I felt more comfortable with the males because I

14   didn't -- when I saw the woman, I didn't feel like she

15   so readily wanted to give me the prescription.

16   Q    Did the staff members that you did see during these

17   two years give you have any treatment other than

18   prescriptions for medication?

19   A    No.

20   Q    Did you have to take a drug urine test any time you

21   went to the clinic?

22   A    The very first time I went and then at some point

23   another time they gave me a second one.

24   Q    Did the staff at the clinic ever tell you whether

25   you would pass or fail a urine test?

4206

```
 1    A    On the second one.

 2    Q    And what did they tell you?

 3    A    I, I flunked it because I guess I didn't have an

 4    opiate in my system.

 5    Q    Do you know why that would be?

 6    A    Because I had taken all the pills and had been out

 7    for like two weeks before my appointment.

 8    Q    Typically the prescriptions that were given to you

 9    at the clinic, how long were the pills supposed to last?

10    A    I'm assuming a month.  That's why I'd make it every

11    month.

12    Q    Did the pills usually last that long?

13    A    No.

14    Q    Why not?

15    A    Pain pill addict.  I'd just take 'em.

16    Q    Now, after you were told that you had failed this

17    drug urine test, did you return to the clinic?

18    A    Yes.

19    Q    And were you given prescriptions for the same

20    medications even after that drug test?

21    A    Yes.

22    Q    Now at some point when you were going to the

23    Defendant's clinic, did you ever tell anyone there that

24    you wanted treatment other than prescription drugs?

25    A    Yes.
```

4207

1    Q    And who did you talk to?

2    A    Dr. Schneider.

3    Q    And what did you tell him?

4    A    That I wanted -- if -- I needed to see my

5    neurosurgeon to see if it was worse, on my back.

6    Q    What are we talking about?  What was worse?

7    A    I'd had back surgery in August, 2000.  I had went up

8    to Illinois with my husband over the weekend and spent

9    the weekend in the hospital.  It just flared up for

10   whatever reason that weekend.  And they thought that I

11   would need emergency back surgery.  And when I talked to

12   the Illinois doctors about wait until I got back to

13   Kansas to see my own doctor, and when I went to see Dr.

14   Schneider I asked about, well, what do we do, you know,

15   do we get back with my neurosurgeon or what.  And he

16   said they'd rather like to handle it in the office if

17   they can.

18   Q    So, were you ever referred to anyone for surgery or

19   any other type of treatment?

20   A    No.

21   Q    Did the staff at the clinic -- let me back up, did

22   you continue to go to the clinic even after that

23   discussion with Dr. Schneider?

24   A    Yes.

25   Q    Did you continue to get prescriptions during those

4208

1    visits?

2    A    Yes.

3    Q    Do you believe that you were addicted to the

4    medication that was prescribed by the Schneider Medical

5    Clinic?

6    A    Yes.

7    Q    And why do you think you were addicted?

8    A    Because when you go off of 'em, you're horribly

9    sick.

10   Q    Did you ever overdose on prescription medication, or

11   prescriptions from the Schneider Medical Clinic?

12   A    Yes.

13   Q    Did you have to go to the hospital because of that?

14   A    Yes.

15            MR. FLEENOR:  Nothing further, Your Honor.

16            THE COURT:  Yes, sir.

17            MR. WILLIAMSON:   Thank you, Your Honor.

18                    **CROSS EXAMINATION**

19   BY MR. WILLIAMSON:

20   Q    Do you remember writing a letter to the Schneider

21   Medical Clinic?

22   A    No.

23   Q    You used to go by the last name R_____?

24   A    Uh-huh.

25   Q    Okay.  Did you ever need to get assistance from SRS?

4209

1    A    When I was seeing them I think I had Healthwave.

2    Q    Okay.  And did you used to have a phone number

3    ending with 1361?

4    A    Oh, I have no idea.

5    Q    I'm going to hand you what that the Government has

6    given as a document from your medical record.  You

7    recognize that handwriting?

8    A    Yeah.

9    Q    All right.  That's your handwriting?

10   A    Yes.

11   Q    That's a letter that you wrote to the Schneider

12   Medical Clinic on February 12th, 2004?

13   A    Yeah.

14   Q    I'm sorry?

15   A    Yes.

16   Q    Okay.  Read that to the jury please?

17   A    Uhm, dear, or "Dr. Schneider's office.  I have to

18   have this returned to SRS office tomorrow.  Can you

19   please fill out and fax it to me ASAP.  I have an

20   appointment Saturday, February 14th, '04, for a MRI.

21   There isn't a lot I can do right now as far as working.

22   I have to be able to stand when I need to sit, when I

23   need to lay on my back, when I need -- when I need to

24   lay on my back when I need to. I pretty much can't

25   function very good without being on my pain pills.  My

1   legs and back get to hurting very bad and sometimes when

2   my nerve gets really inflamed I have to be carried.  I

3   signed a medical record release for you guys to get my

4   CT scans from -- "  Okay "-- Indiana ER.  Because when I

5   went there I was in horrible pain and absolutely could

6   not walk.  My boyfriend had to carry me on his back.  So

7   until we figure out what's going on, I really can't do

8   much of anything.  My CT scan shows I have a herniated

9   disc.  I had back surgery August, 2000.  Dr. Redmeyer

10  did it.  I had a laminectomy.  The CT scan says I

11  herniated the same disc."

12  Q   Now, that letter, as of 2-12-2004, you're telling

13  the clinic these providers who are trying to care for

14  you that you were in so much pain that your boyfriend

15  would have to carry you sometimes?

16  A   That was the weekend that we were in Indiana or

17  Illinois when I went to the hospital.

18  Q   Now, you were getting pain medicine from doctors

19  before you ever went to the Schneider Medical Clinic;

20  correct?

21  A   Uhm, mainly my neurosurgeon.

22  Q   Okay.  And you also had a Dr. Baker in Wellington?

23  A   Uh-huh.

24  Q   You would go in and you would tell Dr. Baker in

25  Wellington that you were in pain?

4211

```
 1    A    Uh-huh.
 2    Q    And he would believe you and give you medicine for
 3    it?
 4    A    Yes.
 5    Q    And you admitted that you were suffering from an
 6    addiction?
 7    A    Yes.
 8    Q    And this addiction you had before you knew Dr.
 9    Schneider's office?
10    A    Yes.
11    Q    And that addiction would cause you to do basically
12    what you needed to do in order to get the pills;
13    correct?
14    A    Yes.
15    Q    Okay.  And when you went to the Schneider Medical
16    Clinic, you mainly saw Curtis Atterbury; correct?
17    A    Yes.
18    Q    I think you saw Dr. Schneider I think you said
19    earlier maybe, or previously, maybe once or twice?
20    A    Yes.
21    Q    And Curt Atterbury would trust you when you told him
22    that you were in pain; correct?
23    A    Yes.
24    Q    You guys didn't have any secret agreements to just
25    come in and give a wink and he would give you medicine;
```

1    correct?

2    A    No.

3    Q    In fact, the clinic actually treated you for

4    well-woman issues that you had; correct?

5    A    For what?

6    Q    You had an issue with your ovarian -- with -- I

7    don't know what that stuff is.  With your ovaries, I

8    guess that's the technical term.  Correct?

9    A    I think so.

10   Q    Okay.  And he sent -- and the clinic sent you to Dr.

11   David Shuck?

12   A    Yes.

13   Q    And they also sent you out to get MRIs for your

14   pelvic pain that you had?

15   A    I don't remember doing MRIs.

16   Q    Do you remember going to Wesley Medical Center to

17   get a diagnostic test on your -- for pelvic pain?

18   Ultrasound?

19   A    No.  I just remember going to Dr. Shuck and the

20   surgery.

21   Q    Okay.  So the clinic sent to you Dr. Shuck and you

22   actually received surgery for pain that you were having

23   in your pelvic area; correct?

24   A    Yes.

25   Q    So they didn't keep you away from the emergency room

4213

```
 1    when, when there was an issue?  They sent you out to try
 2    to get you help with that; correct?
 3    A    Yes.
 4    Q    Now, you mentioned that you failed a urinary drug
 5    screen.  You remember that?
 6    A    Yes.
 7    Q    And you told them that you failed it because of you
 8    had ran out of medicine; correct?
 9    A    I told Dr. Schneider's office?
10    Q    Yes.
11    A    No.  I told 'em that my brother was stayin' with me
12    and his girlfriend or something at the time and they had
13    stolen 'em.
14    Q    Was that true?
15    A    No.
16    Q    But they believed you?
17    A    Yes.
18    Q    And at some point in time the clinic I guess decided
19    to stop giving you controlled substances; correct?
20    A    Yes.
21    Q    They had gotten tired -- I guess they felt like they
22    were gettin' scammed at some point?
23    A    No.
24    Q    Okay.  Do you know why they decided to stop?
25    A    The hospital called 'em when I had an overdose and
```

4214

1    my husband called 'em.

2    Q    Okay.  So after they learned of you having an

3    overdose, they didn't give you -- they refused to give

4    you controlled substances; correct?

5    A    Pain pills, yes.

6    Q    But they kept giving you Ultram and other medicines;

7    correct?

8    A    Flexeril, yeah.

9    Q    So they didn't cut you off and send you out to the

10   wolves even though you were having a problem.  They

11   still tried to give you help?

12   A    Yes.

13   Q    Do you make room in your mind that -- well, strike

14   that.

15        You were actually having pain during this time

16   period; correct?

17   A    For the back and legs?  No.

18   Q    Okay.  So the story about you having to be carried

19   into the emergency room, that wasn't true?

20   A    No, that was true on the trip to Illinois or

21   Indiana, now I don't remember.

22   Q    Now, at one point the clinic -- well, strike that.

23        Would -- on that first visit that you had in the

24   clinic, you don't remember who the provider was but

25   whoever it was they actually looked at your scar and

4215

1   confirmed that you had surgery; correct?

2   A   Yes.

3   Q   And then they gave you a urinary drug screen?

4   A   Yes.

5   Q   They talked to you about what worked for you in the

6   past and what didn't work for you; correct?

7   A   I don't think so.

8   Q   Okay.  At some point you told Curt Atterbury that,

9   you know, I think I want to get off of these medicines,

10  didn't you?

11  A   Yes.

12  Q   And he gave you two prescriptions that would help

13  wean you off of these pain pills; correct?

14  A   Yes.

15  Q   He didn't ignore your request and say, no, you keep

16  taking these Lortab, did he?

17  A   No.

18  Q   He again was trying to help you?

19  A   Yes.

20  Q   Now, you said -- you mentioned about your

21  neurosurgeon.  You and your first husband would run

22  multiple scams on your neurosurgeon at that time,

23  wouldn't you?

24  A   What?

25  Q   Did your first husband ever contact -- did your

```
 1    first husband ever help you get medication from doctors?

 2    A    When?

 3    Q    In 2001.

 4    A    When I was gettin' -- I'm -- can you repeat that.

 5    Q    Yeah.  In 2001 do you remember, let's say, September

 6    6th of '01, did your -- and I'm saying it's your first

 7    husband 'cause you didn't marry Mike until 2004.

 8    Correct?

 9    A    Right.

10    Q    Were you married to somebody else in 2001?

11    A    Yes.

12    Q    Okay.  And did your first husband ever go by your

13    physician -- who was your physician in 2001?

14    A    My neurosurgeon?  Grundmeyer.

15    Q    Say that again?

16    A    Dr. Grundmeyer.

17    Q    He works at the Abay Neuroscience Center?

18    A    Yes.

19    Q    Do you recall that in September of 2001 that your

20    husband would go by the doctor's office for you and try

21    to get the prescriptions for you?

22    A    He would pick up my prescriptions.  We lived in Ark

23    City.

24    Q    Okay.  Did you ever tell Dr. Grundmeyer -- strike

25    that.  Was your husband's name Scott?
```

4217

1    A    Yes.

2    Q    Did he ever tell Dr. Grundmeyer that your purse was

3    stolen over the weekend with all your medications in it?

4    A    I have no idea.

5    Q    Okay.  Let me show you a note from -- that was

6    produced to us by the Government regarding a call.  I

7    want you to read that and see if that helps refresh your

8    memory.

9    A    No, I have no recollection of that at all.

10   Q    Okay.  But the note says that Scott contacted the

11   doctor's office and told them that your purse was

12   stolen; correct?

13   A    Yeah.

14          MR. FLEENOR:  Objection, Your Honor, this

15   calls for hearsay.

16          THE COURT:  Yes, it does.  The objection is

17   sustained.  And the jury will disregard what the letter,

18   the note, whatever that is, says.

19   BY MR. WILLIAMSON:

20   Q    Now, when you were seeing Dr.Grundmeyer, did you

21   ever tell him that -- strike that.  Were you in pain

22   when you were seeing him?

23   A    Yeah.

24   Q    Okay.  The whole time?

25   A    Before the surgery, then they had me on medicine for

4218

```
 1    a while after the surgery.  And then, yeah, I quit

 2    taking it and then, I don't know, it was six months

 3    later it kind of started again.  So, yes.

 4    Q   At some point Dr. Grundmeyer refused to prescribe

 5    you any more pain medicine; correct?

 6    A   Yes.

 7    Q   And that's because you weren't following -- strike

 8    that.

 9        You had numerous early refills with his office;

10    correct?

11    A   No.

12    Q   You were there every 30 days?

13    A   They gave me a prescription I believe of 80 every

14    ten days, Percocet 5s, and then seven fives.

15    Q   So they would refill your prescriptions without you

16    even coming in?

17    A   Right.  They just write 'em and like my mom or my

18    husband could go pick 'em up.

19    Q   So they didn't give you a physical exam every time

20    they wrote you a new prescription?

21    A   No.  I mean it was every ten days.

22    Q   Now, before you went to the Schneider Medical

23    Clinic, I think we established that you used to see Dr.

24    Baker in Wellington; correct?

25    A   Yes.
```

```
 1    Q    Were you in pain when you went to see him?

 2    A    No.

 3              MR. WILLIAMSON:  I don't have anything

 4    further, Your Honor.

 5              THE COURT:  Yes, sir.

 6              MR. BYERS:  Nothing, Your Honor.  Thank you.

 7              THE COURT:  Any redirect.

 8              MR. FLEENOR:  Real briefly, Your Honor.

 9                      REDIRECT EXMINATION

10    BY MR. FLEENOR:

11    Q    Ms. C, Mr. Williamson asked about whether the clinic

12    was helping you with your physical issues.  We talked

13    about your back and other treatments you had there.  Did

14    they ever give you any physical examinations during the

15    time you went to this clinic?

16    A    No.

17    Q    Did they manipulate your back in any way?

18    A    No.

19    Q    Did they recommend any exercise for you?

20    A    No.

21    Q    Now, on cross I think an issue with your brother

22    came up about you told them that the clinic, that he had

23    stolen some pills.  Did I hear that correctly?

24    A    Yes.

25    Q    In fact, did you recommend to other people to go to
```

1    the Schneider Medical Clinic?

2    A    Yes.

3    Q    And who was that?

4    A    My brother and my friend's husband.

5    Q    And why did you recommend that they go there?

6    A    Because it was like Burger King for a pain pill

7    addict.  I mean, you got what you ordered.  You

8    specifically asked for it and that's specifically what

9    you got.  Milligrams, everything.

10   Q    Whether you needed them or not?

11   A    Right.

12        MR. FLEENOR:  Nothing further, Your Honor.

13        THE COURT:  Sir.

14              **RECROSS EXAMINATION**

15   BY MR. WILLIAMSON:

16   Q    So, your testimony is that nobody ever did a

17   physical exam on you ever?

18   A    They just looked at my scar that first time.

19   Q    Okay.  Well, how did they know that your pelvis was

20   in pain?

21   A    Well, that was something else.

22   Q    It was part of the visits with the Schneider Medical

23   Clinic; correct?

24   A    Well, yeah.

25   Q    Okay.

4221

1          MR. WILLIAMSON:  Nothing further.

2          THE COURT:  Thank you, ma'am.  You're excused.

3    Next witness please.

4          MR. FLEENOR:  Thank you, Your Honor.

5    Government calls Michael C.

6                        **MICHAEL C.**

7    Having been first duly sworn to tell the truth, the

8    whole truth and nothing but the truth, testified as

9    follows on:

10                   **DIRECT EXAMINATION**

11   BY MR. FLEENOR:

12   Q    Will you please state your first name.

13   A    Michael.

14   Q    And are you employed?

15   A    Yes, I am.

16   Q    Where are you employed?

17   A    Lockheed Martin Aeronautics.

18   Q    Where?

19   A    Marietta, Georgia.

20   Q    What do you do there?

21   A    I build military aircraft, P3.

22   Q    Did you used to live in the Wichita area?

23   A    Yes, I did.

24   Q    And did you know someone that we've met previously

25   named Alicia?

4222

1    A    Yes, I do.

2    Q    How do you know her?

3    A    She is my wife.

4    Q    And how long have you been married?

5    A    Six years.

6    Q    Did you know that she had been going between the

7    years 2002 and 2004 to the Schneider Medical Clinic?

8    A    Yes, I did.

9    Q    Do you know what type of treatment she received at

10   the clinic?

11   A    Just pain medications.

12   Q    At some point, sir, did you become concerned about

13   the pain medications that she was being prescribed by

14   the clinic?

15   A    Yes, I did.

16   Q    Why did you become concerned?

17   A    Because of her behavior and her -- well, when she

18   didn't have 'em, she would be sick.  She would just

19   sleep all the time.  When she did have 'em, she would

20   just go, go, go, and she was scattered and couldn't keep

21   herself together.

22   Q    Did you ever go with Alicia to the Schneider Medical

23   Clinic?

24   A    Yes, I did.

25   Q    Why?

4223

1    A    She had said she wanted to get off of the pain pills

2    and she wanted me to go with her so that I could see

3    that she was actually telling them that.

4    Q    Did you have doubts that she might if you weren't

5    there?

6    A    Yeah.

7    Q    Who did you see when you went to the clinic on that

8    occasion?

9    A    Curtis.

10   Q    And did you talk to him about your concern for

11   Alicia.

12   A    Yes, I did.

13   Q    What did you tell him?

14   A    I told him that she had gotten on the pills

15   legitimately, you know, she had a bad back, she was in a

16   car wreck, and she had become addicted and she was

17   getin' too many and she needed to get off and she wanted

18   off and she needed help.

19   Q    What was Curtis' response?

20   A    They'd like to try to handle it in-house, maybe try

21   different medications.

22   Q    I want to talk more briefly about the way Alicia

23   appeared to you physically when she had been taking

24   these medications.  Did that have any impact on you

25   personally?

4224

```
1    A    Yeah, it did.

2    Q    How?

3    A    I couldn't go to work very often.  I couldn't go to

4    school.  I had to be there to keep an eye on her.  We

5    had a daughter and I had to be there to make sure

6    everything was taken care of.  When she -- especially

7    when she didn't have 'em.

8    Q    Tell us about what she was like when she didn't have

9    them?

10   A    She was just physically sick, ill, just couldn't

11   wake up.

12   Q    After this conversation that you had with Curtis at

13   the clinic, did Alicia return to the clinic?

14   A    Yes.

15   Q    Did she receive prescriptions even on those

16   occasions?

17   A    Yes, she did.

18   Q    Did she continue to have these physical problems

19   that you've talked about?

20   A    Yes, she did.

21   Q    Did you ever go to the clinic after that one

22   occasion you were with Alicia?

23   A    Yes.

24   Q    And did you go with her or just by yourself?

25   A    I went by myself.
```

4225

```
 1    Q    And why did you go?
 2    A    I went up there to find out why she was still able
 3    to get the medications after she had asked for help.
 4    Q    And what did you do when you went there?
 5    A    I asked to speak with one of the doctors, somebody,
 6    that I could get an answer as to why she was still
 7    receiving it.
 8    Q    And who were you speaking to, as to tell them why
 9    you were there?
10    A    Nurse, whoever was behind the counter.
11    Q    And did you tell 'em why you were there?
12    A    Yes, I did.
13    Q    Did you identify who you were?
14    A    Yes, I did.
15    Q    And who Alicia was?
16    A    Yes.
17    Q    Were you upset?
18    A    Yes, I was.
19    Q    Do you think you were visibly upset?
20    A    Probably.
21    Q    Were you able to talk to anyone other than this
22    person behind the counter?
23    A    No.
24    Q    So what did you do?
25    A    I waited and waited probably over an hour.  Then I
```

4226

```
1    gave 'em my phone number and I went out to my vehicle to
2    leave and I sat there for probably ten minutes just
3    trying to gather myself, figure out what to do next.
4    And then I got a phone call from Curtis.
5    Q    What did he say?
6    A    He said I understand you want to speak with me.  I
7    said, yeah, I'm still here, I'll come in.  He said, no,
8    don't come in, just what do you need.
9    Q    And what did you say?
10   A    Same thing I told 'em before, I wanted to know why
11   she was still able to walk in there and tell 'em what
12   she wanted and get it.
13   Q    What was his response?
14   A    Wasn't much response at all.  I wasn't gettin'
15   anything.
16   Q    Did Alicia ever overdose on a prescription
17   medication that was prescribed by the Schneider Medical
18   Clinic?
19   A    Yes, she did.
20   Q    Can you tell us about that?
21   A    Well, over time she just became completely saturated
22   with everything she was taking.  And she just started
23   losing touch with reality I guess.  Started
24   hallucinating.  Started hearing things.  She would be up
25   for days at a time.  Then she would nod off.  She would
```

4227

 1    just -- she would be eating and she would fall asleep.
 2    You would wake her up, she would just start chewing like
 3    nothing had happened, like she hadn't even been asleep
 4    and talkin' to people that weren't there.
 5    Q    Did you eventually take her to the hospital?
 6    A    Yes, I did.
 7    Q    Where did you take her?
 8    A    Via Christi.
 9    Q    Did they treat her in the emergency room?
10    A    Yes.
11              MR. FLEENOR:  Your Honor, may I approach the
12    witness for the purpose of identifying an exhibit?
13              THE COURT:  Yes.
14    BY MR. FLEENOR:
15    Q    Sir, I want to hand you or direct your attention to
16    what's been previously admitted as Government Exhibit
17    1-B.  Specifically, Counsel, Line 43.
18        It's identified on there an Alicia C having an ER
19    visit on February 23, 2004.  Would that be Alicia your
20    wife?
21    A    Yes, it would.
22    Q    Did she seek treatment for her drug problem after
23    this emergency visit?
24    A    Yes, she did.  She went to Good Shepherd I believe
25    it was.

4228

```
1    Q    And was that for in-patient care?
2    A    It was in-patient.
3    Q    Sir, are you still dealing with Alicia's issues with
4    drugs?
5    A    Every day.
6              MR. FLEENOR:  Nothing further.
7              THE COURT:  Yes, sir.
8                        CROSS EXAMINATION
9    BY MR. WILLIAMSON:
10   Q    How you doing?
11   A    How you doing?
12   Q    All right.  Before Alicia went to the Schneider
13   Medical Clinic, she was seeing other doctors and getting
14   medication from them, wasn't she?
15   A    Yes.
16   Q    She was telling those doctors that she was in pain
17   and that doctor would believe her; correct?
18   A    Yes.
19   Q    When she went to the Schneider Medical Clinic, she
20   was telling them she was in pain and they were believing
21   her; correct?
22   A    Yes.
23   Q    I don't think anybody discounts the toll an
24   addiction can put on a family.  I think most people
25   understand and can appreciate that.  But Alicia was
```

4229

1    getting medicine from even people on the street even

2    during the time she was being seen at Schneider Medical

3    Clinic; correct?

4    A    Yeah, she was meeting people at Schneider's clinic

5    and trading with them.

6    Q    Okay.  And did you ever tell Dr. Schneider, did you

7    ever have a conversation with him about any of that?

8    A    I don't know if I did with Dr. Schneider.

9    Q    Okay.  And when you went there and you -- you went

10   with Alicia on one visit and you met with Curt; correct?

11   A    Uh-huh.

12   Q    And he didn't make you stay out in the lobby, did

13   he?

14   A    No.

15   Q    He brought you in and you guys discussed the

16   treatment together; correct?

17   A    Yes.

18   Q    And he actually tried to give her some medicine that

19   would help her, help wean her off of those pain meds;

20   correct?

21   A    I'm not sure what he gave her.  She was given a

22   bunch of different things at different times.

23   Q    Okay.  And then did you learn that she would -- when

24   she went back to the clinic then she started seeing PA

25   by the name of Lee so she could try to continue to get

1    her pain meds?

2    A    I believe so.

3    Q    Did you know that she sent a letter to the clinic in

4    like February 12 of '04 telling them how bad the pain is

5    and how she couldn't live without -- couldn't function

6    without being on her pain meds?

7    A    No, I didn't.

8    Q    Did you know that the clinic sent her to a

9    specialist to help her with pelvic pain that she was

10   having that led to her having surgery?

11   A    I didn't know.

12   Q    Okay.  Do you ever remember sitting down with Dr.

13   Schneider at all?

14   A    I don't remember.

15   Q    Okay.  Do you remember -- but you remember sitting

16   down with Curtis?

17   A    Yes.

18   Q    If you had a conversation with Dr. Schneider, do you

19   think that's something you would remember?

20   A    Possibly.  I mean, I remember what happened.

21   Q    Okay.  And when you made that -- got that phone call

22   from Curtis, he told you he would look into it to see

23   what happened; correct?

24   A    Basically he would find out why she was still able

25   to get it.

4231

1    Q   So, again, he didn't ignore you or act like you were

2    a nuisance.  He just didn't know what happened.  Right?

3    A   Right.

4    Q   Okay.  Do you remember ever -- Alicia actually --

5    the clinic actually refused to give Alicia any

6    medication after they learned that she had an overdose;

7    correct?

8    A   I don't remember it because of the overdose.  I

9    remember because we owed the clinic some money.

10   Q   Okay.  You remember testifying under oath that after

11   the emergency room visit, she went back to get more and

12   they told her no, they weren't going to let her get any

13   more?  Does that help refresh your memory?

14   A   That they told her no that they wouldn't let her get

15   any more?

16   Q   Yes.

17   A   Maybe.  But I know she did get more.

18   Q   Okay.  Even after the overdose?

19   A   Yeah.  I know she went back and was still getting --

20   I don't know if it was the same medication.

21   Q   Okay.  That's fair.  And that's why I want to make

22   sure we understand because, you know, she just

23   testified.

24   A   Right.

25   Q   And the record would reflect that she actually

4232

1    received non-controlled medication?

2    A    Okay.

3    Q    Okay.  And you don't dispute that.  Is that fair?

4    A    Yeah, that's fair.

5    Q    When she was going through her difficult times,

6    would she lie to you about what she was doing?

7    A    Yes.

8    Q    Would she conceal her actions from you?

9    A    Yes.

10   Q    And for a while there was she able to deceive you?

11   A    She still can.

12   Q    And you know her extremely well; correct?

13   A    Yes.

14   Q    And if it's possible for her to deceive one of the

15   closest people to her, is it possible for her to deceive

16   some of these doctors she had seen at the clinic and

17   even before?

18   A    I don't know.  I can see the signs and I'll ask her

19   about it and she'll deny it.  And I think a lot of it's

20   because I want to believe her.

21   Q    Right.

22   A    And then when she'll admit to me later, I'm not

23   surprised.  I just feel foolish for just accepting her

24   word at it.

25   Q    Okay.

4233

```
 1              MR. WILLIAMSON:  I don't have anything
 2   further, Your Honor.
 3              MR. BYERS:  No questions.
 4              THE COURT:  Anything further?
 5              MR. FLEENOR:  No, Your Honor.
 6              THE COURT:  Thank you, sir.  You're excused.
 7   A    Thank you.
 8              THE COURT:  Next witness.
 9              MS. TREADWAY:  Government calls Hien Nguyen
10   Tran.
```

### HIEN NGUYEN TRAN

```
12   Having been first duly sworn to tell the truth, the
13   whole truth and nothing but the truth, testified as
14   follows on:
```

### DIRECT EXAMINATION

```
16   BY MS. TREADWAY:
17   Q    Could you please introduce yourself to the jury.
18   A    My name is Hien Tran.
19   Q    And where are you currently employed, Ms. Tran?
20   A    I work at an Urgent Care in Oklahoma.  And also at
21   Epic Medical Center there.
22   Q    How long have you been employed there?
23   A    I've worked at the Urgent Care for two years and I
24   just started at Epic Medical Center.
25   Q    And what did you do prior to your current
```

4234

1    employment?

2    A    I worked at Heartland Cardiology in Wichita and then

3    I worked for the Schneider Medical Group.

4    Q    Okay.  And you're down in Oklahoma for a particular

5    purpose, aren't you?

6    A    Yes.  My husband is in the optometry program.  This

7    is his last year, so --

8    Q    And do you hope to move back to this area?

9    A    Definitely.

10   Q    Now, did you have a maiden name before you were

11   married?

12   A    Nguyen.  N-G-U-Y-E-N.

13   Q    When did you graduate with your physician assistant

14   degree?

15   A    2004.

16   Q    From where?

17   A    From Wichita State University.

18   Q    Where was your first job as a physician assistant?

19   A    At Schneider Medical Group.

20   Q    Did you start working at Schneider Medical Clinic in

21   May of 2005?

22   A    Yes, I did.

23   Q    Why was there a year between the time you graduated

24   in '04 and the time you began work as a physician's

25   assistant?

4235

1    A    My mother fell ill, so I had to stay home and be

2    with her.

3    Q    How did you come to apply for a job at Schneider

4    Medical Clinic?

5    A    It was on a job posting on the Wichita State

6    University website.

7    Q    And when you went for your job interview, who

8    interviewed you at the Schneider Medical Clinic?

9    A    Linda and Ulysses.

10   Q    When, in relationship to that interview, were you

11   hired?

12   A    I was hired that day.

13   Q    What did the Defendant Linda Schneider tell you

14   about the kind of clinic Schneider Medical Clinic was?

15   A    It was a family practice that dealt with some pain

16   management.

17   Q    And did she say that it was an indigent clinic?

18   A    Yeah, it dealt with that kind of population.

19   Q    And did that interest you?

20   A    Yeah.  That's what I wanted to do.

21   Q    Did she say that it was primarily a pain management

22   practice?

23   A    No.

24   Q    How long were you employed at the Schneider Medical

25   Clinic?

4236

```
1    A    Four months.
2    Q    And did you leave the day after the first search
3    warrant was executed?
4    A    Yes.
5    Q    Did what the Defendant Linda Schneider tell you
6    about the type of clinic turn out to be true?
7    A    No.
8    Q    What type of clinic did it turn out to be?
9    A    Primarily pain management.
10   Q    And how long did it take you to figure that out?
11   A    Couple of days.
12   Q    What training, if any, did you receive in school
13   about the management of chronic pain?
14   A    Very minimal.
15   Q    What training, if any, did you receive at the
16   Schneider Medical Clinic prior to your treating chronic
17   pain patients?
18   A    Minimal to none.
19   Q    Did you ever have problems with the pain management
20   patients in terms of how they acted towards you?
21   A    Yes.
22   Q    How would you describe them?
23   A    They were very hostile.
24   Q    Were they aggressive?
25   A    Very aggressive.
```

4237

```
1    Q    Were they pushy?

2    A    Yes.

3    Q    Were they manipulative?

4    A    Yes.

5    Q    Did you ever have a patient threaten you?

6    A    Yes.

7    Q    Did you ever have a patient do anything violent?

8    A    Yes.  I had a patient throw a pop can at me before.

9    Q    A full or empty one?

10   A    I was running the other direction so I really

11   couldn't see.

12   Q    Why did this patient throw a soda can at you?

13   A    Because I didn't give her her narcotics.

14   Q    What days did you typically work?

15   A    It varied there.

16   Q    How many days per week did you work?

17   A    Four days, if Iyou worked during the week; but if it

18   was -- it was more if you had to work the weekend.

19   Q    What were your scheduled hours of work on a given

20   day?

21   A    My scheduled hours were completely different from

22   what I stayed.  I don't recall the actual clinic hours;

23   but I know I ended up staying two or three hours past

24   what the scheduled hours were.

25   Q    So how many hours a day would you typically work?
```

4238

```
 1    A    I would say 10 to 11.
 2    Q    Did the Defendant Stephen Schneider work weekends
 3    when you worked weekends?
 4    A    No.
 5    Q    Did any other physician work weekends when you
 6    worked weekends?
 7    A    No.
 8    Q    Did the Defendant Stephen Schneider work 10 and 11
 9    hour days?
10    A    No.
11    Q    What was his typical schedule?
12    A    From what I recall, I think it was like a 8 to 4 to
13    5 day.
14    Q    Would he leave before you left?
15    A    Always.
16    Q    Did the Defendant Stephen Schneider take lunches
17    every day?
18    A    Yes.
19    Q    And how long were they?
20    A    An hour.
21    Q    Did you ever go to lunch with the Defendant Stephen
22    Schneider?
23    A    Yes.
24    Q    And how frequently would you do that?
25    A    It depended on how -- if I was, if I had fallen
```

4239

1    behind then I wouldn't take a lunch.

2    Q    Who else was typically present at these lunches?

3    A    Linda, Ulysses, Dr. Schneider, Dr. St. Clair.  The

4    other PA if there was another PA working.

5    Q    And, typically, who was paying for the lunch?

6    A    The drug representative.

7    Q    And how frequently did these lunches at the drug

8    representative's expense occur?

9    A    Every day with the exception of weekends.

10   Q    Other than what you've described, what did you

11   generally do for lunch?

12   A    If I fell behind, then I worked through lunch.

13   Q    Did you ever see that the Defendant Stephen

14   Schneider worked through lunch?

15   A    No.

16   Q    Now, the testimony in this case has been that

17   patient appointments were scheduled about every ten

18   minutes.  Was that true when you were working there?

19   A    No, because there was a period they were scheduled

20   every five minutes.

21   Q    In addition to the scheduled patients, did you see

22   walk-in patients?

23   A    Yes.

24   Q    Did you ever have a discussion with the Defendant

25   Linda Schneider about the scheduling of appointments?

4240

1    A    Yes.  I said that that was not enough time for me to

2    be in a room, specifically if I was doing pelvic exams

3    on women.

4    Q    And what was her response?

5    A    She said that wasn't, that wasn't something that

6    they were gonna do there.

7    Q    Were you able to get your work done with the five or

8    ten minute scheduled for examinations?

9    A    No.

10   Q    As a result, would you fall behind?

11   A    On a daily basis.

12   Q    And what, if anything, did the Defendant Linda

13   Schneider do to speed up your examinations?

14   A    She would pace in the hall.  Sometimes she would

15   knock on the doors.

16   Q    Would she ever stick her head in the examination

17   room?

18   A    Yeah.

19   Q    And what would she say?

20   A    Just she would say that she was just checking up on

21   us.  Kind of just --

22   Q    Was that a clue?

23   A    I took it as a clue.

24   Q    To do what?

25   A    To hurry up.

4241

1    Q    As a result of the scheduling and the number of
2    patients, what was it like to work at the Schneider
3    Medical Clinic?
4    A    It was hectic and it was overwhelming.
5    Q    How did you go home most days?
6    A    I was very stressed out.
7    Q    Did you have a sufficient time allotted in the
8    schedule to perform medical examinations?
9    A    No.
10   Q    Did you have sufficient time allotted in the
11   schedule to adequately and sufficiently document in the
12   patient's medical record?
13   A    Well, not the five minutes given; but, like I said,
14   I always stayed a lot later than I was scheduled so I
15   would try to finish my documentation.
16   Q    Based on this, did you form an opinion about what
17   the Defendants hoped to achieve through this type of
18   scheduling and pace?
19   A    Yes.
20   Q    And what was that?
21   A    To generate more revenue.
22   Q    And were progress notes done by hand when you were
23   at the clinic?
24   A    Toward -- when I was leaving, they were trying to
25   merge towards electronic medical records, but I had

1    written progress notes.

2    Q    And did they use a progress note with a checklist?

3    A    Yes.

4    Q    How helpful was the checklist in helping you

5    appropriately treat patients that had been seen by other

6    providers?

7    A    It was hard for me because it seems like you have to

8    elaborate more on checkmarks.  You can't just go by a

9    checkmark.

10   Q    What, if any, statements did the Defendant Linda

11   Schneider make to you about how many patients you were

12   expected to see each day?

13   A    She wanted us to see at least 50.

14   Q    Did she bring to your attention what other

15   physician's assistants were doing in terms of patient

16   load?

17   A    She had mentioned that one PA was able to see 80 a

18   day.

19   Q    And do you know who that was?

20   A    I don't remember his name.

21   Q    How would she know about how many patients a

22   provider was seeing each day?

23   A    We had a sheet of paper at the end of our station

24   which would indicate how many patients we had seen.

25   Q    Did anyone else keep track of the numbers of

4243

```
 1    patients seen per day per provider?
 2    A    Yeah.   The nurses, Ulysses, I think they all
 3    reported back to her.
 4    Q    What did you understand Ulysses' role at the
 5    Defendant's clinic was?
 6    A    He was introduced to me as the assistant office
 7    manager.
 8    Q    Did he ever try to get involved in your medical
 9    treatment decisions?
10    A    Yes.   He reviewed one of my charts one time and
11    questioned a refill or a medication which was really
12    upsetting to me because I felt that he wasn't qualified.
13    Q    Do you know what, if any, medical training he had?
14    A    I asked him and he said he didn't have any medical
15    training.
16    Q    What, if any, instructions did the Defendant Stephen
17    Schneider give you about how to bill for your office
18    examinations?
19    A    I wasn't given any instruction.
20    Q    Did you ever observe him changing your fee tickets?
21    A    Yes.
22    Q    And what would he do to change them?
23    A    He would change the codes to the higher code.
24    Q    At the beginning of your employment at Schneider
25    Medical Clinic, did you shadow anyone?
```

1    A    I followed Dr. Schneider for a couple days.

2    Q    And what did you observe with regards to how he

3    examined the pain management patients?

4    A    Very minimum exam.

5    Q    Did he put his hands on patients?

6    A    No.

7    Q    What would he do in terms of speaking to the

8    patient?

9    A    He was usually speaking while he was writing a

10   prescription.

11   Q    How often did you observe him listen to a patient's

12   heart and breathing with a stethoscope?

13   A    I don't think I ever saw him do that.

14   Q    What did he typically do with his pain management

15   patients?

16   A    Just almost like a meet-and-greet.  Hello, here's

17   your 'script deal.

18   Q    And how long did he typically spend with his pain

19   management patients?

20   A    No more than five minutes.

21   Q    Based on your training and experience, do you have

22   an opinion whether his examinations were adequate?

23   A    I don't feel they were adequate.

24   Q    Did you ever fire or terminate any patients from

25   pain management?

1    A    Yes, I did.

2    Q    And then would you learn what happened to these

3    patients after you terminated them?

4    A    They usually were reinstated the next day by Dr.

5    Schneider.

6    Q    By whom?

7    A    By Dr. Schneider.

8    Q    Did the patient who threw the soda can at you get

9    reinstated after you terminated her?

10   A    I think she did, the next day.

11   Q    Did patients typically see just one provider at the

12   Schneider Medical Clinic?

13   A    No.

14   Q    What happened instead?

15   A    They saw anybody that had an open slot on their

16   schedule.

17   Q    Did the Defendant Stephen Schneider give you

18   instructions about what you should do about refilling

19   controlled substances prescriptions to established pain

20   patients?

21   A    Just to refill what they had been given the previous

22   month.

23   Q    And was this routine practice at the clinic?

24   A    It was very routine.

25   Q    Other than the prescribing of controlled substances,

1    what other treatment did you observe any of the chronic

2    pain patients receiving at the Schneider Medical Clinic?

3    A    Other than that, no other.  Very minimum other care.

4    Q    During your employment, did you ever observe Linda

5    Schneider with patient charts?

6    A    Yes.

7    Q    What did you observe her doing with the patient

8    charts?

9    A    She had whole stack of charts in her office every

10   morning and I would see her writing in the charts.

11   Q    Now, Ms. Tran, you were the last person to see Patty

12   G on the Saturday before her death, June 18th, 2005.  On

13   June 18th, 2005, how long had you been working at the

14   Schneider Medical Clinic?

15   A    One month.

16   Q    On that Saturday when Patty came in to the clinic,

17   were there any physicians there?

18   A    No.

19   Q    Within the month that you had been at the clinic,

20   had you received any training regarding pain management?

21   A    No.

22   Q    Were you instead following the Defendant Stephen

23   Schneider's instructions to refill the controlled

24   substances prescriptions he had previously issued for

25   the established pain management patients?

4247

```
 1    A    Yes.

 2    Q    Since you have had other experiences at other

 3    medical clinics since leaving the Schneider Medical

 4    Clinic, have you come to learn about any inadequacies in

 5    terms of how the Schneider Medical Clinic handled

 6    documents and particularly how the clinic handled

 7    incoming faxes from hospitals and other providers?

 8    A    It was very disorganized there.

 9    Q    Now, there was a fax that came in from the hospital

10    with regards to Patty and you know about that fax; don't

11    you?

12    A    I do.

13    Q    And that came in the night before you saw her,

14    didn't it?

15    A    Yes.

16    Q    In any other practice that you've worked in since

17    you would have had that fax from the hospital before

18    seeing Patty?

19    A    Absolutely.

20    Q    And having the fax from the hospital telling you

21    that she had overdosed on her medications, would you

22    have ever rewritten those prescriptions for her?

23    A    There's no doubt in my mind that she would have not

24    got those prescriptions if I'd had that fax.

25    Q    How has Patricia's death affected you?
```

```
 1    A    It saddens me.

 2    Q    Why did you go into the practice of medicine?

 3    A    To help people.

 4    Q    Based on your experience at the Schneider Medical

 5    Clinic, was the clinic engaged in the practice of

 6    medicine to help people?

 7    A    No.

 8              MS. TREADWAY:  Nothing further.

 9              THE COURT:  Yes, sir.

10              MR. WILLIAMSON:  Thank you, Your Honor.

11                    CROSS EXAMINATION

12     BY MR. WILLIAMSON:

13    Q    Hi, Ms. Tran.

14    A    Hi.

15    Q    You remember me giving you a telephone call?  I'm

16    Lawrence Williamson.

17    A    Oh, yes, I do now.

18    Q    And you remember saying you going to call me back?

19    A    Yeah.  I did.

20    Q    You called me back?

21    A    Yeah.  I told you that I wasn't comfortable talking

22    to you unless I had talked to my attorney.

23    Q    Okay.  You did call me back.  All right.  And then

24    after that phone call, did your attorney tell you it was

25    okay to talk to us or they said don't talk to us.
```

1    A    They said it was up to me.

2    Q    Okay.  And you didn't call me back after that?

3    A    I didn't.  I told you I wasn't comfortable.

4    Q    Okay.  You had met with Government agents several

5    times.  Is that fair?

6    A    Yeah, in the past five years, twice.

7    Q    Okay.  Let's start with -- let's start with this.

8    When you were at the clinic, you were trained to get

9    informed consent from every patient before any pain

10   medicine was handed out; correct?

11   A    I was briefly given that paper.  I was not formally

12   trained at all.

13   Q    But you were told that informed consent had to be

14   obtained; correct?

15   A    I had actually found that out through the nurses.  I

16   wasn't formally trained by anybody there.

17   Q    Okay.  I understand that, but the policy at the

18   clinic was informed consent had to be obtained before

19   prescriptions were handed out; correct?

20   A    I do believe so.

21   Q    Okay.  Now, in regards to Ms. Patricia, when you met

22   with her, did she tell you that she had the incident at

23   the hospital?

24   A    No.

25   Q    Had she -- did she tell you that she was in pain and

1    still needed her medicine?

2    A   Yes.

3    Q   Had she been honest with you and told you that she

4    suffered from that incident over the weekend, you

5    wouldn't have given her anything, would you?

6    A   No.

7    Q   Okay.  And you have to trust what the patients are

8    telling you when you're trying to treat them, don't you?

9    A   Yes.

10   Q   Okay.  And Dr. Schneider never instructed you to

11   give pain medicine to people that didn't truly say they

12   were in pain; correct?

13   A   He didn't specifically say that; but it's probably

14   common sense.

15   Q   Okay.  Common sense that you shouldn't give pain

16   medicine to people who don't say they're in pain?

17   A   Yes.

18   Q   Okay.  Now, do you remember what time Patricia came

19   in on the 18th of June?

20   A   I don't recall that.

21   Q   Okay.  I'll try to refresh your recollection here if

22   I have my documents.  She would normally have

23   appointments around 8:00 in the morning, wouldn't she?

24   A   I don't know.

25   Q   Okay.  Now, you mentioned that you -- that this

4251

1    patient who threw the soda can at you, you believe she

2    was reinstated?

3    A    Yes.

4    Q    Do you know who she was?

5    A    I don't remember her name.

6    Q    Why do you feel like she was reinstated?

7    A    I think the next day I witnessed it.

8    Q    You witnessed what?

9    A    Her get reinstated.

10   Q    Like -- when you say reinstated, did you mean that

11   the clinic saw her or did you see her get more

12   prescription medicine?

13   A    Well, if you were fired from the pain management

14   clinic you had a bright colored piece of paper in your

15   chart.  And once that's removed, you're pretty much

16   reinstated.

17   Q    Okay.  So you saw the bright paper in that chart

18   gone but you didn't see a conversation where it said she

19   was reinstated?

20   A    She was seen the next day and the paper was removed.

21   Q    Okay.  But you understand that people at the clinic

22   were fired from pain management but still received --

23   still continued to receive other services; correct?

24   A    Yeah.

25   Q    And then some people would also write in charts on

4252

```
 1    the progress notes, no more pain meds; correct?
 2    A   Yes.
 3    Q   But you didn't look at her chart to see if she
 4    received any pain meds, is that fair?
 5    A   I think I had asked the nurse about her because it
 6    was pretty fresh in my memory that she had thrown a pop
 7    can at me and it was normal for me to ask about somebody
 8    that had returned the next day.
 9    Q   Right.  But you didn't look at her chart to see what
10    she actually received.  Is that fair?
11    A   Fair.
12    Q   Okay.  Did you and Dr. Schneider have a conversation
13    about this soda can incident?
14    A   I think I told somebody about it in the office.  I
15    mean, it was witnessed by several people.
16    Q   Did you have a conversation with Steve, Dr.
17    Schneider about it?
18    A   I don't recall specifically.
19    Q   Now, how often -- how long did you shadow Dr.
20    Schneider?
21    A   A couple days.  I'm not sure to be exact.
22    Q   And when you were shadowing, were you already hired
23    on as an employee?
24    A   Yes.
25    Q   And the way the shadowing worked was that you two
```

4253

```
 1    would go in there together, you would do some of the

 2    visit and he would do some of the visit so he could

 3    observe you --

 4    A    No.

 5    Q    -- with his patients?

 6    A    No, I just followed him.

 7    Q    Okay.

 8    A    Yeah.

 9    Q    Now, you remember the conversation about the

10    pharmaceutical reps?

11    A    Yes.

12    Q    These would be pharmaceutical reps with all kind of

13    prescriptions; correct?

14    A    Yes.

15    Q    Not just pain medication.   True?

16    A    Yes.

17    Q    And sometimes you would go and sometimes you

18    wouldn't?

19    A    Yes.

20    Q    And some of the -- and did you understand that these

21    lunches occurred because this was the only time during

22    the day that Dr. Schneider could make to see these

23    people since he had such a full patient load?

24    A    Okay.

25    Q    Did you know that?
```

4254

```
 1    A    I figured it was part of lunchtime so --
 2    Q    You also had other physicians that would come into
 3    the clinic and see patients; correct?
 4    A    Yes, one other.
 5    Q    And you would also send people out for referrals;
 6    correct?
 7    A    For?
 8    Q    Different issues that they had.
 9    A    Yes.
10    Q    And you also saw a lot of Hepatitis C patients;
11    correct?
12    A    Yeah, I did the -- I saw all the Hepatitis C
13    patients there.
14    Q    And in Wichita, did you know, or strike that.
15         Do you know as to -- back to when you were working
16    with the clinic, how many other providers would see
17    these Hepatitis C patients?
18    A    Providers at the clinic or providers in town?
19    Q    Providers in town.
20    A    I knew there was a couple different
21    gastroenterologists that did that, too.
22    Q    But not many?
23    A    Not very many, yeah.
24    Q    Linda told you that they saw a lot of indigent
25    patients when you were first hired?
```

```
 1    A    Yes.
 2    Q    And the clinic did see a lot of indigent patients,
 3    didn't it?
 4    A    Indigent?  Yes.
 5    Q    You also saw family practice patients, didn't you?
 6    A    Yes.
 7    Q    You and Dr. Schneider also discussed urine drug
 8    screens of people; correct?
 9    A    I'm not sure what do you mean by discussed?  Like --
10    Q    Talked about it?
11    A    Not really.
12    Q    He didn't tell you that -- he didn't tell you what
13    you should look for when you were taking urine drug
14    screens?
15    A    Yeah, he told me to fire the people with positives.
16    Q    Okay.  So you had a conversation with him and he
17    told you that if people failed a urine drug screen you
18    should terminate them; correct?
19    A    Yeah, that's in the pain contract.
20    Q    Right.  But I'm not really concerned about the
21    contract right now, but just what he told you.
22    A    I'm not sure if he told me that or if I read it in
23    the contract.  I'm not sure.
24    Q    You remember testifying under oath in a deposition?
25    A    Yes.
```

4256

```
1    Q   And do you remember testifying at that deposition

2    that Dr. Schneider himself showed you what to look for

3    in urine drug screens?

4    A   I'm not sure.

5    Q   Did he give you a little chart?

6    A   There was a chart in the clinic that either one of

7    the other PAs or somebody else had made available to us.

8    Q   And you didn't say under oath that Dr. Schneider

9    provided you with a little chart that corresponded to

10   the levels of the urine in regards to the levels on the

11   drug screen?

12   A   It was made available in the clinic.

13   Q   Steve didn't give that to you?

14   A   I don't know if he did or it was made available in

15   the clinic.

16   Q   And you were allowed to utilize your medical

17   judgment when you were seeing patients, weren't you?

18   A   I was -- yes.

19   Q   And I believe you testified under oath that you

20   could increase or continue medicines as you felt needed

21   to be done; correct?

22   A   Yes.

23   Q   Okay.  Now, you left the day after the raid;

24   correct?

25   A   Yes.
```

4257

1    Q    And before then, you never sent any complaints to

2    Kansas Board of Healing Arts about any illegal practices

3    at the clinic, did you?

4    A    I was unsure.

5    Q    But did you ever send them?

6    A    No.

7    Q    Did you ever -- since that time, did you ever send a

8    letter to the Kansas Board of Healing Arts regarding any

9    illegal practices?

10   A    I had a -- they had sent me a form to fill out.

11   Q    Okay.  About Patricia G?

12   A    Yes.

13   Q    Okay.  But you never initiated a complaint against

14   Dr. Schneider; correct?

15   A    No.

16   Q    When you were at the clinic, you were never

17   instructed to alter fee tickets to show that Dr.

18   Schneider saw a patient when you actually saw 'em;

19   correct?

20   A    No.

21   Q    You were never instructed to submit any fraudulent

22   document to the billing department; correct?

23   A    No.

24   Q    If they would have asked you -- it Steve would have

25   asked you to do that, you would have quit, wouldn't you?

4258

1    A    Yes.

2    Q    Because even when the raid happened, you just didn't

3    want to take any chances after that.  Is that fair?

4    A    Yes.

5    Q    You were new?

6    A    Yes.

7    Q    And just starting your career; correct?

8    A    Yes.

9    Q    Now, the 99213s and 212 issues, Dr. Schneider would

10   review your paperwork, wouldn't he?

11   A    Yes.

12   Q    And he could look at your progress note and looked

13   at what you had marked; correct?

14   A    I would assume.

15   Q    And then he could make a determination as to what he

16   believed the appropriate code should be; correct?

17   A    That's what I would assume.

18   Q    He never told you to bolster any progress notes to

19   make it look like services occurred that didn't happen,

20   did he?

21   A    No.  He just changed the fee ticket himself.

22   Q    Okay.  And after he would look at these fee tickets,

23   did you ever discuss with him, well, why do you believe

24   a 99213 is appropriate?

25   A    He had told me that the majority of the visits here

                                                                    4259

1       at the clinic are either level 3s or level 4s and they

2       were never any level 2s because I had marked a couple

3       level 2s.

4       Q    Did you ask him why did he feel that way?

5       A    No.

6       Q    Okay.  And -- there was one more thing.

7                MR. WILLIAMSON:  I don't think I have anything

8       further, Your Honor.

9                THE COURT:  Thank you sir.  Mr. Byers.

10               MR. BYERS:  Thank you, Your Honor.

11                        **CROSS EXAMINATION**

12      BY MR. BYERS:

13      Q    Good morning, Ms. Tran.

14      A    Hello.

15      Q    I've got some questions for you.  Now, when you were

16      speaking with Mr. Williamson I believe I heard you say

17      that you were interviewed two times by government

18      agents?

19      A    Yes, in the past five years.

20      Q    Okay.  So if we have documents provided by the

21      Government that show that there were four interviews,

22      are those documents incorrect?

23      A    There wasn't four interviews unless you're counting

24      today.

25      Q    No.  This is not a Government interview today.

4260

1    There's a report from September 13th, 2005.  A report
2    from February 10th, 2006.  A report of an interview from
3    September 4th, 2007, and a report of a follow-up
4    questioning session from October 9th, 2007.
5    A   Well, there was two in-person interviews and then I
6    had several phone follow-ups because I live in Oklahoma.
7    So they had come out to my house in Oklahoma once.  Then
8    I interviewed here when I was in Wichita.
9    Q   Okay.  So when you said two times you were meaning
10   two --
11   A   I meant face-to-face interviews.
12   Q   And you also gave a deposition on March 23rd, 2007;
13   correct?
14   A   Yes.
15   Q   That was a long deposition, wasn't it?
16   A   Yes.
17   Q   9:30 in the morning until 6 p.m. at night?
18   A   Yes.
19   Q   Correct?
20   A   Yeah.
21   Q   You were one of the named defendants in that suit,
22   that civil action?
23   A   Yes.
24   Q   Now, you said when you were interviewed with Linda
25   Schneider she said it was a family practice.  And you

4261

1    saw family practice patients; correct?

2    A    Very minimal.

3    Q    And she said they had pain management practice;

4    right?  And you saw pain management people?

5    A    Majority pain management.

6    Q    Even though you were the Hepatitis person there, you

7    saw more pain people than you did Hep C?

8    A    That was only probably five people that I dealt with

9    Hepatitis.

10   Q    Did you see people who had no money?  Medicaid First

11   Guard type clientele?

12   A    I'm not sure because I wasn't aware of their

13   insurance.

14   Q    So you don't know if it was an indigent clinic like

15   she said?

16   A    I mean, I'm not understanding what you're saying.

17   Q    You don't know what type of insurance they had if

18   they had insurance?

19   A    Yeah, I did not know what type of insurance.

20   Q    Okay.  Do you know what percentage of the total

21   practice at Schneider Medical Clinic when you were there

22   those four months was apportioned or how much of that

23   was a pain practice?  Do you know?

24   A    My estimation would be 80% pain, 20% family.

25   Q    What do you base that estimation on?

4262

1   A    I usually saw -- the majority of my patients in a

2   day were pain management.

3   Q    So people who came to you, you thought were 80% pain

4   and 20% --

5   A    Yes.

6   Q    Is pain a legitimate medical issue?

7   A    Yes.

8   Q    If someone's addicted, is it your opinion they

9   should be denied pain treatment?

10  A    It depends on the circumstance.

11  Q    And who decides on that circumstance when it's

12  appropriate?

13  A    Family physicians, specialists.

14  Q    Providers; right?

15  A    Yes.

16  Q    Did you -- when you were at Schneider Medical Clinic

17  did you ever ask to shadow the billing people to see

18  what they do, how things work or where the paper goes?

19  A    No.

20  Q    Now, I believe you said patients were scheduled

21  every five minutes; right?

22  A    Yeah.  It's -- it went from ten minutes to five

23  minutes.  It varied there.

24  Q    I don't understand.  It varied?

25  A    When I first started, it was ten minutes and then it

4263

```
 1    got changed to every five minutes.
 2    Q    Okay.  How long after you started did it change and
 3    get reduced to five minutes?
 4    A    I don't remember exactly.  Probably within the first
 5    month.
 6    Q    Okay.  But I also heard you testify that you would
 7    have 50 patients in a day; correct?
 8    A    Yes.  That's what she wanted us to see as a goal.
 9    Q    Okay.  So with a ten hour workday, five minutes an
10    hour, comes to about twelve minutes a visit; correct?
11    And that's with an hour off for lunch?
12    A    Well, that's -- that's if you're there for ten
13    hours.  You're not scheduled for ten hours.  Usually I
14    stayed 10 to 11 hours because it was over the scheduled
15    amount.
16    Q    You weren't scheduled like 8 to 7?  You weren't
17    scheduled for ten work hours at a time?
18    A    I don't remember exactly.  I just remember staying
19    two or three hours in addition to what I was scheduled.
20    Q    Did you see that other PA's were routinely scheduled
21    for ten hour work days?
22    A    I really don't know.
23    Q    In your deposition do you remember telling a
24    questioner that you were very intimidated by Linda
25    Schneider?
```

4264

```
 1    A    She's quite intimidating.
 2    Q    Now, you've talked a little bit about electronic
 3    medical records.  And that would have been -- up in the
 4    clinic over -- well, just about five years ago.  Right?
 5    April to September of '05.  So about five years ago you
 6    were in the clinic.  May of '05 you would have been in
 7    there.  So five years ago the clinic had invested in
 8    switching over to electronic medical records; correct?
 9    A    Yeah, I think they were moving toward that.
10    Q    Do you have any idea what kind of financial
11    investment that would take for a clinic that size?
12    A    I don't know.
13    Q    And where are you working presently?  I don't recall
14    what you said.
15    A    In Oklahoma at -- it's called CMG Urgent Care and
16    then Epic Medical Center.
17    Q    What is Epic Medical Center?
18    A    It's a small town ER.  It's a hospital.
19    Q    So you are in an urgent setting, an emergent
20    setting?
21    A    Yes.
22    Q    Do you use checklists in those positions at either
23    of those spots?
24    A    One of 'em is an electronic based system so, no.
25    Q    There's not an electronic checklist used?
```

1    A    A little bullet system.

2    Q    How is that different from a checklist?

3    A    Well, it formulates it differently.  It's just not a

4    checkmark on the chart.

5    Q    And depending on where you mark a bullet, you have

6    different options?

7    A    Yeah.

8    Q    Like a checklist after a checklist?

9    A    It's not a checklist.  It's a written out note

10   after -- it's electronic.

11   Q    So it's a canned language.  You can put into a note

12   what your evaluation is of a patient, what the

13   presenting complaint is, those kinds of things?

14   A    Yes.

15   Q    Now, I believe you said in response to some of the

16   Government's questions that you had an encounter with

17   this Ulysses fella where he questioned your care.

18   A    Yes.

19   Q    Can you tell me about that again?

20   A    I think he was reviewing one of my charts and he

21   said either this was -- medicine wasn't sufficient or

22   something along the lines that he was trying to show me

23   how to do things.  That's what I kind of gathered from

24   it.

25   Q    Do you remember that patient?

1    A    I don't.

2    Q    Do you remember the date of that encounter with

3    Ulysses?

4    A    It was early, probably within the first month that I

5    worked there.

6    Q    Now, at your deposition, which was over three years

7    ago, March 23rd, 2007, do you think -- is it fair to --

8    well -- let me ask the question.

9                         (Off-the-record.)

10    Q    Back to the question.  Here's where we lead into it.

11    And this is from your deposition.  It's at Page 299 from

12    March 23, 2007.  The question says:  "Okay.  You were

13    asked a few questions about Ulysses who we also call

14    Eric Taylor, and I believe you said that you had very

15    little interaction with Mr. Taylor; is that right?"

16         Your answer:  "I had very little.

17         "Question:  Did he, during those four months, did

18    he interact at all with you regarding patient care?

19         "Answer:  No.

20         "Did he interact with you regarding management of

21    any administrative issues of your employment?

22         "Answer.  No."

23         Does that refresh your recollection at all?

24    A    Well, at that deposition, like you said, was 9 to

25    6:00 deposition, and I think that's just a different

1    environment.  I was very stressed out.  I was very

2    nervous and had been there for, I don't know how many

3    hours.  This is something I came to recall later.

4    Q    And you're not stressed out today?

5    A    I am, but not as bad as that time.

6         MR. BYERS:  Thank you.  That's all I have,

7    Your Honor.

8         THE COURT:  That was Page 299 of her

9    deposition?

10        MR. BYERS:  Yes, Your Honor.  It actually ran

11   on to Page 300 slightly.

12                    **REDIRECT EXAMINATION**

13   BY MS. TREADWAY:

14   Q    And upset, yes.  I just have a couple of questions,

15   Ms. Tran.  Mr. Williamson asked you whether you were

16   allowed to use your medical judgment.  That was true

17   except for when you were --

18        MR. WILLIAMSON:  Your Honor, I'm going to

19   object that this is leading questions.

20        THE COURT:  Sustained.

21   BY MS. TREADWAY:

22   Q    Was that always true?

23   A    No.

24   Q    Was it true as to the controlled substances

25   prescriptions?

4268

1    A   He had told me what to do for that, so --

2    Q   Did you ever see the Defendant Stephen Schneider

3    mark down a fee ticket?

4    A   Never.

5            MS. TREADWAY:   Nothing further.

6            MR. WILLIAMSON:   I do have just a couple of

7    questions on one of those topics, Your Honor.

8                    **RECROSS EXAMINATION**

9     BY MR. WILLIAMSON:

10   Q   Ms. Tran, the instructions you were given by Dr.

11   Schneider was to start people out on Tylenol and muscle

12   relaxants before moving up to controlled substances;

13   correct?

14   A   No.

15   Q   He never said that?

16   A   I don't recall.

17   Q   One second, Your Honor.  I've got to find this.  You

18   remember that deposition that Mr. Byers just asked you

19   about?

20   A   Yes.

21   Q   Okay.  Do you remember testifying, the question

22   being on Page 309, that "And what I'm wondering is what

23   advice he may have given you."

24       Your answer was:  "So the -- it's always depending,

25   of course, it's going to depend on the patient's

1   symptoms.  The general over-the-counter medications such

2   as Tylenol, aspirin, and inflammatories and then you

3   would go to like Celebrex and Mobic and then you would

4   graduate to like Ultram which is a little bit more

5   severe pain medication but not narcotic.  And then after

6   that, maybe some physical therapy and maybe after that

7   like Lortab 5s."

8       Do you remember saying that under oath?

9   A   I came to that realization on my own through my own

10   looking it up in a book.

11  Q   Really.

12  A   I don't recall him telling me.

13  Q   They weren't asking -- I'm sorry for interrupting.

14  A   I'm sorry.  Go ahead.

15  Q   The questioner didn't ask you so what you just said

16  and might have gone to him meaning Steve, and asked him

17  a question about anti-inflammatories, what's the next

18  step, your answer is yes.  You were talking -- you were

19  being asked about what you and Dr. Schneider discussed,

20  weren't you?

21  A   I'm not sure.

22          MR. WILLIAMSON:  I don't have anything

23  further, Your Honor.

24          THE COURT:  Mr. Byers.

25          MR. BYERS:  Just one, Your Honor, follow up to

4270

1    that.

2                     **RECROSS EXAMINATION**

3    BY MR. BYERS:

4    Q   And I'm looking at my computer.  The follow-up

5    question where you talk about Tylenol,

6    anti-inflammatories, then move to Celebrex, Mobic, then

7    graduating to Ultram.  Still non-narcotic, then PT,

8    physical therapy, and then Lortab 5.  The next question

9    says:  And then -- and this is how he advised you to

10   approach the treatment of chronic pain patients.  And

11   you answered yes.

12        Is that incorrect testimony?

13   A   I don't recall that.  I'm sorry.

14            MR. BYERS:  That's all I have, Your Honor.

15   Thank you.

16            THE COURT:  Thank you, Ms. Tran.  You're

17   excused.

18   A   Thank you.

19            THE COURT:  All right.  Ladies and Gentlemen,

20   how would you like to go eat your lunch.  Before you do,

21   I want to remind you, I think you've probably figured

22   this out by now, but this is a good example of this, a

23   deposition is sworn testimony but there's no judge there

24   to control it, the questioning, or the length of the

25   questioning.  All right.  Remember and heed the

4271

```
 1    admonition.  I'll see you about 1:00.
 2                      (Jury excused for noon recess.)
 3              THE COURT:  Well, where are we at?
 4              MS. TREADWAY:  I have one short witness and
 5    then I have my money laundering expert, Judge, and then
 6    we will rest with the contingency of I definitely want
 7    Mr. Moore and Mr. Moody to get together and reconcile
 8    the exhibits and make sure we've got everything in.  But
 9    definitely we will be done today.
10              THE COURT:  Good.
11              MS. TREADWAY:  As promised.
12              THE COURT:  Okay.
13              MS. TREADWAY:  Do I get a gold star?
14              THE COURT:  Yes, you do.  And I'll make sure,
15    if I can remember, to tell the jury that you get a big
16    gold star.
17                      (Noon recess.)
18
19
20
21
22
23
24
25
```