4272

```
 1                         (Beginning at 1:10 p.m. May 25,

 2                    2010, the following proceedings

 3                    continued.)

 4          THE COURT:  Next witness please.

 5          MS. TREADWAY:  Government calls JR Jones.

 6                         JR JONES

 7   Having been first duly sworn to tell the truth, the

 8   whole truth and nothing but the truth, testified as

 9   follows on:

10                    DIRECT EXAMINATION

11   BY MS. TREADWAY:

12   Q    Could you please introduce yourself to the jury.

13   A    Yes.  My name is JR Jones.  I'm a PA.

14   Q    And where are you currently employed as a physician

15   assistant?

16   A    I am in Fort Scott, Kansas, at Mercy Health Center.

17   Q    And how long have you been in Fort Scott?

18   A    About seven months.

19   Q    And can we share with the jury your recent

20   excitement?

21   A    Certainly.

22   Q    What happened to you ten days ago?

23   A    Well, I was married.

24   Q    How long have you been a physician's assistant,

25   Mr. Jones?
```

4273

1    A    22 years.  Graduated in 1988.

2    Q    Have you had primary areas of focus for your

3    practice over the years?

4    A    Yes.  Family practice.  I am -- and also emergency

5    and urgent care.  And I'm boarded by the NCCPA as

6    primary care and surgery.

7    Q    Did you ever work at Wesley Medical Center here in

8    Wichita?

9    A    Yes, I did.

10   Q    And approximately when did you work at Wesley?

11   A    Fall of '97 until fall of 2005.

12   Q    What did you do at Wesley?

13   A    I was in the emergency department.  I was actually

14   employed by a private practice that served the emergency

15   department at Wesley.

16   Q    When you were working in the Wesley emergency room,

17   did you treat any patients from the Schneider Medical

18   Clinic?

19   A    I had occasion to see a few come in.

20   Q    And what did they typically come to the emergency

21   room for?

22   A    Usually for refills of pain medication.

23   Q    And as a result of treating the Schneider Medical

24   Clinic patients at the Wesley emergency room, what did

25   you come to understand was the Schneider Medical

1    Clinic's patient population?

2    A    At that time I knew that there was a focus on pain

3    patients and pain management.

4    Q    At some point in time did you eventually become

5    employed at the Schneider Medical Clinic?

6    A    Yes, I did.

7    Q    And how did that happen?

8    A    I believe there was an ad for some part-time

9    coverage and I was interested in picking up just some

10   part-time shifts and applied and talked to them on the

11   phone.

12   Q    Who interviewed you for the position at Schneider

13   Medical Clinic?

14   A    Linda Schneider.

15   Q    And when in relationship to that interview were you

16   hired?

17   A    I believe almost immediately.

18   Q    Before you were hired, did you meet any of the

19   physicians?

20   A    Not that I recall.

21   Q    What did the Defendant Linda Schneider tell you

22   about the job and her clinic?

23   A    Basically that it was weekend coverage at that time

24   and that I would be seeing walk-in patients and also

25   refill appointments for pain management.

4275

1    Q    And based on our documents, it indicated to us that

2    you began working at the clinic approximately October

3    20th, 2005, and you ended your employ there November 11,

4    2005.  Less than a month later.  Is that your memory?

5    A    That sounds correct.

6    Q    And who was your supervising physician?

7    A    I don't recall the document.  It was either Dr.

8    Schneider or possibly Dr. Simons.  I don't recall.

9    Q    Did you ever consult with Dr. Simons on anything?

10   A    No.

11   Q    Did you ever consult with Dr. Schneider on anything?

12   A    No.

13   Q    Were either of them present on the weekends that you

14   worked?

15   A    I believe Dr. Simons was in the office at least one

16   of the shifts, although I didn't have a chance to

17   communicate with him at all.

18   Q    Was that because you were too busy?

19   A    Yes.

20   Q    Before working at Schneider Medical Clinic, had you

21   prescribed controlled substances to patients?

22   A    Yes.

23   Q    Did you have any fear of writing such prescriptions

24   for patients?

25   A    Not when they were appropriate.

1    Q    As a physician's assistant at Schneider Medical

2    Clinic did you have the opportunity to review numerous

3    patient charts?

4    A    No, I -- there was not adequate time to read charts.

5    Q    What observations did you make while you were

6    working at the clinic about what types of diagnostic

7    work-ups had been done on patients before you had seen

8    them?

9    A    Diagnostic work-up was almost non-existent on many

10   of the patients that I saw.  I did not see evidence of

11   imaging or MRI's or neurologic work-ups at all.

12   Q    While you were at the Schneider Medical Clinic what

13   observations did you make about the amount of narcotics

14   being prescribed?

15   A    There were excessive -- massive quantities of very

16   powerful, described as freight-train-type medications

17   that were excessive for this type of ambulatory patient

18   population.

19   Q    And what do you mean by ambulatory?

20   A    They were able to walk in under their own power.

21   They did not have terminal illness.  Most of them

22   ambulated freely without evidence of severe pain,

23   impairment or musculoskeletal difficulties.

24   Q    When you worked on the weekends, approximately how

25   many patients would you see for other than pain

1    management?

2    A    A handful perhaps.  I may have had a sore throat

3    complaint, one in ten perhaps.

4    Q    What concerns, if any, did you have about how the

5    pain management patients presented at the Defendant's

6    clinic?  In other words, their demeanor when it came to

7    their physical abilities?

8    A    Well, they looked very comfortable.  They ambulated

9    freely.  They got in, up and down from their chairs

10   easily.  They could walk back to the room at a normal

11   rate of speed.  And that's just not something that we

12   would typically see in severe pain patients.

13   Q    And with regards to the lack of diagnostic testing

14   and what you called freight-train narcotics, did you see

15   a disconnect there?

16   A    Absolutely.

17   Q    Explain that to the jury?

18   A    Well, these patients should have had significant

19   initial and ongoing monitoring of their pain conditions

20   to evaluate progress, lack of progress, the existence of

21   disease in the first place; and there was virtually

22   nothing available to review.  Perhaps some of them may

23   have had an X-ray, which today is considered very

24   minimal for these kind of complaints.

25   Q    Now, the jury's heard evidence about the progress

4278

1    notes that were used at the clinic and the checklist.

2    You're familiar with those progress notes?

3    A    Yes.

4    Q    And was this a clinic where you noticed that

5    patients saw multiple providers over time?

6    A    Yes.

7    Q    And what concerns did you have with regards to the

8    fact that people saw multiple providers and this

9    checklist progress note?

10   A    Well, the progress note was perhaps adequate for the

11   sniffles or a cold or sore throat, but was very minimal

12   and lacked detail for the kind of acuity that these

13   patients ostensibly were being seen for.

14   Q    Now, when you worked your weekend schedules, were

15   patients scheduled in such a way that it was difficult

16   to have sufficient time to conduct proper examinations?

17   A    Extremely difficult.

18   Q    What was there only enough time to do?

19   A    There was barely enough time to take a look in the

20   chart, see what kind of medication they were on, refill

21   the medication, and we were on to the next room.

22   Q    Now, often did you use your stethoscope?

23   A    Almost never.

24   Q    On average, how many prescriptions did you write for

25   each patient you saw?

4279

1    A    I would say two or three as an average.

2    Q    And were you directed to follow the refills as they

3    had been given before?

4    A    I don't know if I was directed to do so

5    specifically.  You know, I did not change many of the

6    medications primarily because of my concern for the

7    patients at that point going into acute withdrawal.  So

8    I did, I did refill as they had been.

9    Q    Because of the quantities of the medications and the

10   types of medications, did you feel comfortable just

11   taking them off the medications?

12   A    Absolutely not.

13   Q    And why not?

14   A    Well, these medications were prescribed in such a

15   quantity that these patients would have gone into acute

16   withdrawal almost immediately had they not had the

17   medication, which would have led to several possible

18   scenarios.  Having to pick up the medications on the

19   street to avoid that, illicitly; or ending up needing

20   medical care for detox.  I didn't sense that there was

21   adequate coverage, on-call coverage, for hospitalization

22   of the patients and I didn't want to be the one that

23   threw them into a very dangerous scenario without being

24   properly supervised, the patients being supervised.

25   Q    Now, you said you wrote two to three prescriptions

4280

1    for each patient you saw.  Was that different than your

2    past clinical experience?

3    A    Yes.

4    Q    And what would you do in your past clinical

5    experiences when it came to writing controlled substance

6    prescriptions?

7    A    Well, for acute situations, usually one pain

8    medication is adequate.  And in pain management there

9    may be more than one medication written.  What stands

10   out is that almost none of the pain management

11   medications that were written in this scenario were

12   non-narcotic.  In a pain management situation there

13   should have been a mix of other types of medications to

14   help with pain.  These were all narcotic.

15   Q    Did you ever enter an exam room to find more than

16   one patient waiting for you?

17   A    Yes.

18   Q    Tell us about that?

19   A    Well, I found it unusual to have such acute -- or I

20   should say chronic pain patients and then have more than

21   one family member on similar prescriptions.  Sometimes I

22   would have two, possibly three family members all on

23   amazingly powerful narcotic prescriptions.

24   Q    And they would be there all seeking refills?

25   A    Yes.

4281

1    Q    At the same time?

2    A    Yes.

3    Q    What observations did you make regarding patients in

4    the parking lot at the Defendants' clinic?

5    A    Well, the patients in general seemed to know each

6    other pretty well.  They seemed to socialize pretty

7    freely, pretty comfortably, too, move around pretty

8    well.  There was definitely a lot of familiarity among

9    the patients.

10   Q    Did that concern you, sir?

11   A    Yes.  I mean, it indicated that, A, they would move

12   around pretty well for patients on horse-killing doses

13   of narcotics; and, B, this must be a pretty regular

14   meeting place.

15   Q    What concerns did you have, if any, about the volume

16   of patients that you saw at the clinic?

17   A    Well, there was not anywhere near adequate time to

18   appropriately evaluate these patients.  And, I mean,

19   there was no time to do charts, there was no time to

20   examine the patient to see if anything changed or to

21   develop an opinion on whether or not the diagnosis was

22   appropriate or correct.

23   Q    Now, you've previously worked in high volume

24   practices, haven't you, and high volume situations like

25   an ER?

1    A    Yes.

2    Q    But how did Schneider Medical Clinic compare?

3    A    Well, for episodic care, sometimes a fairly brief

4    appointment or a brief evaluation of a patient is

5    appropriate to get an idea of what's going on and to

6    treat something acutely.  But for chronic care,

7    especially of the supposed, you know, gravity of these

8    severe pain patients, it was absolutely inadequate.  I

9    mean, they should have had probably 20 minute

10   appointments I would think.

11   Q    How did you feel after a weekend at the Schneider

12   Medical Clinic?

13   A    I felt beat up.  I was -- it was exhausting.

14   Q    Did the Defendants' clinic have any registered

15   nurses or licensed practical nurses working on the

16   weekends?

17   A    I don't believe so.  I would say there were probably

18   medical assistants.

19   Q    What, if any, treatment did you observe any of the

20   chronic pain patients receiving other than the

21   prescription of controlled substances?

22   A    Virtually none.

23   Q    And did you resign your position as a physician's

24   assistant on about November 11th, 2005?

25   A    That sounds correct.

```
 1    Q    So you only worked a few weekend shifts there?

 2    A    Correct.

 3    Q    Why did you leave, sir?

 4    A    I did not want to be involved in this sort of

 5    practice.  I didn't think that the prescriptions were

 6    appropriate.  I didn't think that the patients were what

 7    I would consider legitimate -- and not every patient

 8    perhaps, but many of the patients I saw were not

 9    legitimate chronic pain patients; certainly not being

10    managed correctly.

11    Q    What did you believe you had worked at in terms of

12    what the clinic was?

13    A    Well I, I felt like it was simply a prescription

14    writing practice, you know.  The terms pill-mill or drug

15    and prescription factory or whatever, I mean, it, it

16    simply seemed to exist to fill prescriptions and book

17    appointments.

18    Q    Did you speak to either of the Defendants about why

19    you were leaving?

20    A    No.

21    Q    Based on your experiences and observations at the

22    Schneider Medical Clinic, as well as your many many

23    years of training before working there, did you form any

24    opinions about the practices at the Schneider Medical

25    Clinic?
```

1    A    Yes.

2    Q    Specifically, did you form any opinions whether the

3    Defendants were offering legitimate medical services to

4    their pain management patients through the prescription

5    of controlled substances?

6    A    My opinion is that there was no legitimacy about it.

7    I didn't think that patient care was even in the

8    equation.  This was --

9    Q    What was the equation?

10   A    Well, I think the equation was to figure out how to

11   get office visits and, you know, the controlled

12   substance, ability to write for controlled substance may

13   be considered kind of the key to the castle at times and

14   think the key to the castle was there and it was

15   unfortunately being exploited.  And I guess the worst

16   part about it is that, you know, this makes it difficult

17   for legitimate pain patients to get good care because it

18   murks the water for everyone.  There are people that

19   need this kind of care, but I didn't see 'em at

20   Schneider.

21              MS. TREADWAY:  Thank you, sir.

22              THE COURT:  Yes, sir.

23              MR. WILLIAMSON:  Thank you, Your Honor.

24                        **CROSS EXAMINATION**

25    BY MR. WILLIAMSON:

4285

1    Q    How you doing, Mr. Jones?

2    A    Doing well, thanks.

3    Q    How many days did you actually work at the clinic?

4    A    I would say five or less.

5    Q    And, now, you gave an opinion as to what you think

6    was happening there; correct?

7    A    Uh-huh.

8    Q    And as I understand it, you never talked to Dr.

9    Schneider; correct?

10   A    Correct.

11   Q    And you only talked to Linda Schneider in regards to

12   being hired; correct?

13   A    I may have talked to her a couple times when I was

14   on a shift there.

15   Q    And Dr. Simons was your supervising physician?

16   A    I don't recall for sure who was on the contract.

17   Q    Now, part of your opinion was based on the fact you

18   believe a lot of the people there at the clinic were not

19   really in pain; correct?

20   A    Correct, or at least not in the pain that was

21   stated.

22   Q    And that's because they were up and walking around

23   and didn't seem to be in pain when you would see them;

24   correct?

25   A    Correct.

4286

```
 1    Q    Now, are you aware that people suffer from chronic
 2    conditions that cause them pain and you still may see
 3    them up and walking around?
 4    A    Certainly.
 5    Q    Okay.  So, for instance, like somebody who suffers
 6    migraines?
 7    A    Certainly.
 8    Q    And that person may not be suffering a migraine at
 9    the time they come in to see you; correct?
10    A    Correct.
11    Q    But when they're at home and when those episodes
12    hit, it could be very devastating; correct?
13    A    Correct.
14    Q    And do you know whether or not the -- you understand
15    that a lot of these people when they would come in would
16    still be taking medication at the time that they met
17    with you; correct?
18    A    Correct.
19    Q    And you know a lot of these people needed these
20    medications to function; correct?
21    A    No, not necessarily.
22    Q    You don't know if chronic pain people -- patients
23    needed the medication or you don't know if the people
24    you saw --
25    A    I don't know if the people I saw needed it.
```

4287

1    Q    Okay.  Did you write down a list of any of these

2    names of these people that you saw that you believe were

3    faking?

4    A    No.

5    Q    And let me make sure I understand your testimony.

6    When these illegitimate people infiltrate these

7    practices, is that what you're saying makes it difficult

8    for, like, legitimate pain patients?

9    A    Yes.  In part, yes.

10   Q    You understand a lot of these people -- let's just

11   focus on people who are actually faking.  They will come

12   in, claim they're in pain, wouldn't they?

13   A    Yes.

14   Q    They would claim that they can't function without

15   medicine; correct?

16   A    Yes.

17   Q    But at the same time you could have somebody in

18   legitimate pain making the same kind of complaints i.e.

19   they can't function; correct?

20   A    Absolutely.

21   Q    It's difficult at times to try to weed out some of

22   these people.  Would you agree?

23   A    Without diagnostic work-ups.

24   Q    And you mention that you didn't see a lot of

25   diagnostic work-ups in the patient files that you saw;

1    correct?

2    A    Correct.

3    Q    You did see a patient by the name of Robin G, did

4    you not?

5    A    Have no idea.

6    Q    So, you don't know whether or not Robin G had been

7    to the neurologist before she came to the clinic?

8    A    I do not know.

9    Q    Don't remember seeing any MRIs in any of the charts

10   you saw.

11   A    I wouldn't say I didn't see any.  I saw very few.

12   Q    Do you remember seeing referrals to orthopedic

13   doctors?

14   A    Very few.

15   Q    Do you remember seeing -- how many files did you --

16   do you remember seeing specifically?

17   A    Well, I would guess 35 or 40 a day for every day I

18   worked.

19   Q    I understand you don't remember how many patients

20   you remember seeing; but as you sit here, can you

21   visualize any records in your head that you saw during

22   those five days when you were working there?

23   A    In terms of what was written in them?

24   Q    Yes.

25   A    No.

4289

1    Q    Now, who are the two or three the families that came
2    in all wanting prescription medicines?
3    A    I don't know the names.
4    Q    When you quit, you didn't send a letter to the
5    Kansas Board of Healing Arts stating that you don't
6    believe anything is legitimate about the Schneider
7    Medical Clinic, did you?
8    A    No.
9    Q    You didn't send a letter to Dr. Schneider stating
10   your opinion, did you?
11   A    No.
12   Q    What year were you -- you started in 2005?
13   A    Yes.
14   Q    You didn't know Dr. Schneider as "Schneider the
15   Writer" at the time you applied for this position, did
16   you?
17   A    No.
18   Q    And even though you had worked in Wesley medical
19   emergency room, you had no idea that there were
20   complaints about people passing away out there; correct?
21   A    I did not know that.
22   Q    The people that you saw come into the clinic, were
23   they an indigent population?
24   A    I don't know.
25   Q    Did you -- do you recall looking through any charts

4290

```
 1    to determine where people's medicine cases started and

 2    in relation to where they were at the time they came in

 3    to see you?

 4    A   Where they started?

 5    Q   For instance, did you look to determine whether or

 6    not they started with like Tylenol and muscle relaxants

 7    before they were on the strong pain medication that you

 8    saw?

 9    A   I may have been able to review part of that.  I

10    don't recall.

11    Q   But you don't recall -- you can't recall whether or

12    not they ever did or didn't start with those kind of

13    medications?

14    A   No, I don't recall that specifically.

15    Q   Okay.  Now, you also stated there wasn't adequate

16    time to review charts and you couldn't do -- strike

17    that.

18         You remember testifying that there wasn't adequate

19    time to review charts; correct?

20    A   Yes.

21    Q   You also believe there wasn't adequate time to do

22    physical exams; correct?

23    A   Correct.

24    Q   Now, when you were there, did you accurately

25    complete your progress notes?
```

4291

1    A    As far as I recall.

2    Q    In other words, did you ever lie on your progress

3    note representing you did something that you didn't

4    actually do?

5    A    Not that I recall.

6    Q    Okay.  Did you ever misrepresent any information on

7    the fee tickets that you provided?  Or that you

8    completed?

9    A    I don't recall completing fee tickets.

10   Q    You didn't circle levels that you saw the patient?

11   A    I don't believe so.

12   Q    Okay.

13   A    I think that was taken care of afterwards.

14   Q    I'm going to hand you a record out of Dalene C's

15   progress notes for an 11-5-05 visit.  Do you recognize

16   the handwriting on that document?

17   A    Yes, for the most part, yes.

18   Q    And whose -- who filled out that progress note?

19   A    Well, I filled out the bottom portion of it.  I

20   don't know about the top portion.

21   Q    All right.  And on that document you represented

22   that you did a physical exam; correct?

23   A    Uh-huh.

24   Q    You went over the prescriptions she was taking?  If

25   you look at the bottom righthand side.  Correct?

4292

1    A    Yes.  I'm looking at it.  Yep.

2    Q    And then you also prescribed more medicine for her;

3    correct?

4    A    I'm not seeing that part of it necessarily.

5    Q    Let me --

6    A    I did change a blood pressure medication.

7    Q    Okay.  And before we talk about that note, the

8    clinic didn't just treat only pain conditions for these

9    pain patients; correct?

10   A    Right.  I mean, there were a few non-pain visits

11   that came in on the weekend, I believe, on a walk-in

12   basis.

13   Q    So even if they were getting pain medicine, they

14   would also get their blood pressure treated and well

15   woman exams and things like that.  Did you know that?

16   A    If they -- well, for my perspective, if they walked

17   in with a complaint other than pain, then that's what I

18   saw them for.

19   Q    Okay.  You weren't instructed by Dr. Schneider to

20   kick out people who were coming for anything other than

21   prescriptions; correct?

22   A    No, I was not.

23   Q    Now, let's go back to that 11-5-05 note.  Let's tell

24   the jury what you documented you did on this visit?

25   A    Okay.  You want me to --

4293

```
 1    Q    Let's go slow because I'm going to write this down.
 2    The first thing you did is what?
 3    A    Well, the patient came in and gave me a complaint.
 4    Q    Okay.
 5    A    And that was of sore throat, headache and back and
 6    neck pain.
 7    Q    Okay.
 8    A    And I did conduct a physical exam because it was an
 9    acute complaint.
10    Q    What kind of -- tell us what you did in that
11    physical examine?
12    A    E-N-T.  Ear, nose, throat, neck.
13    Q    Slow down.  Slow down.  What do you do when you talk
14    about ear, nose, throat?
15    A    Look in the ears, look in the nose, look in the
16    throat.
17    Q    Okay.  So you look into her ears, nose and throat?
18    A    Uh-huh.
19    Q    What else did you do?
20    A    Take a look at her neck to see if she had swelling
21    to do with the sore throat.
22    Q    Is that something you have to touch to do?
23    A    Uh-huh.
24    Q    So, you had time to touch her neck.  What else?
25    A    Deferred things like breast exam, female exam and so
```

1      forth.  Didn't do any of that.

2    Q    No female exams; correct?

3    A    Correct.  Listened to her chest to see if she had

4      any cough because of the sore throat again.

5    Q    Okay.

6    A    Neurologically, she was intact.

7    Q    So, you gave her a neurological exam?

8    A    Brief.  I mean, just to make sure things are

9      symmetric.  Not a detailed neurologic exam.

10    Q    Okay.

11    A    She was alert and cooperative.

12    Q    Okay.

13    A    I felt her neck.  I noticed her thyroid wasn't

14      enlarged.

15    Q    And you made a note on the record that --

16    A    I checked that she had no thyroid enlargement.

17    Q    Okay.

18    A    She didn't relay, didn't relay any emphatic

19      enlargement.

20    Q    Okay.

21    A    And my assessment was that she was there for chronic

22      pain also.  But she had some post nasal drip and sore

23      throat.

24    Q    Okay.

25    A    I did notice her blood pressue was a little high.

1    Q    Okay.

2    A    So we just changed -- slightly tweaked her blood

3    pressure medicine.

4    Q    Okay.  Did you also review the pain assessment tool

5    with her?  Maybe look at the second or third page there

6    on the pain assessment tool.  I think there's a place

7    for a signature for a physician.

8    A    Yeah.  Yeah, she didn't have any of the complaints

9    listed that had to do with side effects of pain

10   medication.  Nausea, vomiting, concentration, all of

11   that was stable.  On all of her visits, I'm sure.

12   Q    So, this is what you were able to do in the amount

13   of time that you were given to see patients.  Is that

14   fair?

15   A    For this patient.

16   Q    And would you agree that the amount of time that you

17   would see with various patients would differ from

18   patient to patient?

19   A    Depending on the complaining problem, yes.

20   Q    So, it's not fair to say that every visit only took

21   five minutes.  Is that fair?

22   A    No, I wouldn't be able to say every visit took five

23   minutes.

24   Q    Okay.  In your mind, you believe most of the visits

25   were more brief than extended?

1    A    Yes.

2    Q    Okay.  All right.  I'm just going to hand you a copy

3    of the 11-5-05 fee ticket for that, that corresponds to

4    that day.  Is that your signature on that document?

5    A    This is.

6    Q    So, you remember seeing those fee tickets?

7    A    I do.

8    Q    And that fee ticket represents that you actually saw

9    that patient?

10    A    I believe so, yes.

11    Q    And it was billed at a 99213.  You don't know --

12    A    All I did was write down the diagnosis.

13    Q    Okay.

14    A    I didn't circle any of the rest of that.

15    Q    Who countersigned that document?  Do you recognize

16    that signature?

17    A    This?  I do not.

18         MR. WILLIAMSON:  Thank you.  I don't have

19    anything further, Your Honor.

20         MR. BYERS:  No questions, Your Honor.

21         THE COURT:  Any redirect?

22         MS. TREADWAY:  No, Judge.

23         THE COURT:  Thank you very much, sir.  You're

24    excused.  Next witness please.

25    A    Thank you.

4297

1          MS. TREADWAY:  Robert Hawkins.

2          MS. TREADWAY:  Mr. Hawkins.

3          THE COURT:  You're still sworn, sir.

4          MS. TREADWAY:  Going to have a bit of a

5     multi-media presentation here, Judge.

6                      **ROBERT HAWKINS**

7     Having been previously duly sworn to tell the truth, the

8     whole truth and nothing but the truth, testified further

9     as follows on:

10              **CONTINUED DIRECT EXAMINATION**

11    BY MS. TREADWAY:

12    Q    Mr. Hawkins, I would like to circle back to

13    something I forgot to do on your first testimony.

14    That's when you previously testified we were looking at

15    your summary chart which was Government Exhibit 46.  And

16    that was the chart about how much money the Defendants

17    had taken out of the clinic over the various years.

18    A    Yes.

19    Q    And I forgot to note that you noted in 2002 they

20    took out $63,462 in income.  But then when we look at

21    Exhibit 47, the actual income from the clinic's tax or

22    the Defendants' tax returns we only have a gross income

23    of $49,238.  And I failed to have you explain how that

24    could possibly be true in 2002.  Could you please tell

25    the jury how that happened?

4298

1    A    Yes.   The Schneiders began building the clinic in

2    about Juneish, March through June of 2002.   They

3    obtained throughout the end of the year substantial

4    amount of construction loan and operating capital loan

5    from Valley State Bank.   And during the first three

6    months of the operation, which was October through

7    December of 2002, they used some of those, the loans,

8    operating capital loans, to pay salaries and operating

9    expenses of the clinic, including some of their own

10   salaries.   So, there were -- there was other funds

11   coming in which were loans during that period of time

12   other than just clinic income.

13   Q    Were both of the Defendants signatories on the

14   construction operation loans?

15   A    Yes.

16   Q    And what would that mean?

17   A    That means that they were both obligated -- they

18   signed the promissory notes, ultimately the mortgages

19   are backed by the building and the equipment and they

20   were both liable for the mortgages.

21   Q    Now, in regards to Government Exhibit 46, you

22   remember Mr. Williamson asking you to do some quick math

23   to average the income over the years, and again I'm not

24   very good at math.   And you told me that that was maybe

25   not a very fair look at things.   Could you explain to

1    the jury why averaging those yearly incomes is not a

2    very fair look?

3              MR. WILLIAMSON:  Your Honor, I just want to

4    object to the extent she's re-covering stuff that was

5    covered in earlier testimony.  He's being recalled to go

6    over new testimony and not prior testimony.

7              MS. TREADWAY:  This is my last question,

8    Judge, about this.

9    BY MS. TREADWAY:

10   Q   Could you go to the next page, Mr. Moore --

11             THE COURT:  Just a minute.  Let me -- it's

12   been a long time.  I'll allow it.

13   BY MS. TREADWAY:

14   Q   Again, looking at the incomes per year.  Is it fair

15   to average those?

16   A   Not really.

17   Q   And why not?

18   A   Because if you look at the -- I'm not looking at it

19   right now -- but my recollection was the total for the

20   four years and three months was a million 469.  Is that

21   correct?

22   Q   Yes, sir.

23   A   Yeah.  You know, sure, the average of four years is

24   $350,000.  But if you look at it, the two years that

25   they took out the lion's share of that money was 2004

4300

1   with $648,000 they took out, and 2005 was $540 -- is it

2   540,000?

3   Q    Yes.

4   A    So, you're looking at, of the million 469, a million

5   two of it, almost, came out in just those two years.

6   Q    And the evidence has been that the first search

7   warrant hit in September of '05.  After that, did the

8   clinic's income precipitously decline?

9   A    Substantially.  In, you know, it had gone up

10  tremendously in '04 and '05, and then by the end of '05

11  and throughout '06, as you can see, it dropped off

12  substantially.

13  Q    Now, Mr. Hawkins, have you reviewed numerous banking

14  records that relate to this case?

15  A    Yes, I have.

16  Q    Would that include the Defendants' bank records?

17  A    Yes.

18  Q    Would it include the Schneider Medical Clinic bank

19  records?

20  A    Yes, it did.

21  Q    Did it include the bank records of L.E. and Ellen

22  Atterbury?

23  A    It did.

24  Q    And who are they?

25  A    They're the parents of Linda Atterbury Schneider.

4301

1    Q   Did you also look at the bank records of Nationwide

2    Beverage Bottles Company?

3    A   I did.

4    Q   And what is that?

5    A   That is a former company that the Schneiders sent --

6    it's a former company in California.  It bottles some

7    kind of flavored bottled water.  They sent a substantial

8    amount of money to that company as purported

9    investments.

10   Q   Let's first look at Exhibits 36 through 36-G.  Do

11   you recognize those documents?  Are those essentially

12   the signature card and account opening forms for the

13   bank accounts that you reviewed?

14   A   Yes, they are.

15   Q   And have you prepared a summary chart that will aid

16   the jury as we go through these exhibits?

17   A   Yes, I have.

18   Q   And is that Exhibit 36?

19   A   It is.

20   Q   And does Exhibit 36 compile the information in

21   Exhibits 36-A through G for ease of reference?

22   A   Yes, it does.

23            MS. TREADWAY:  Government offers Exhibit 36 as

24   a summary chart.

25            MR. WILLIAMSON:  No objection.

4302

```
 1              MR. BYERS:  No objection.

 2              THE COURT:  36 and 36-G.

 3              MS. TREADWAY:  36 as a summary chart, Judge.

 4              THE COURT:  Mr. Byers?

 5              MR. BYERS:  No objection, Your Honor.

 6              THE COURT:  All right.  It's received.

 7   BY MS. TREADWAY:

 8   Q   Using our summary chart, Mr. Hawkins, let's see if

 9   we can quickly identify these various accounts and who

10   had the signatory authority.

11         Let's first look at 36-A and identify for the

12   record what the account name was, the financial

13   institution, the last three numbers of the account, the

14   signatories and the date it was opened, please.

15   A   Yes.  This is a signature card for the checking

16   account of Schneider Medical Clinic, LLC, at Valley

17   State Bank.  It was opened June 7, 2002.  The last three

18   numbers of the account, the account number, are 571.

19   And the authorized signatures -- signatories, are

20   Stephen J Schneider, Linda Atterbury Schneider, and

21   Michael C Robinson.

22   Q   And then on December 4th, 2002, do we have a change

23   in the signatories on this account?

24   A   That's right.

25   Q   And who is it changed to?
```

1   A   This Mr. Robinson was dropped and Timothy C McDonald

2   was added.

3               MS. TREADWAY:  Government would offer Exhibit

4   36-A as a business record by stipulation.

5               THE COURT:  Has it been stipulated, the

6   signature cards?

7               MS. TREADWAY:  I believe all the financial

8   records have been stipulated to, Judge.

9               MR. WILLIAMSON:  We have no objection.

10              MR. BYERS:  That's correct.

11              THE COURT:  All right.  Is it just a signature

12   card, though, 36-A?

13              MS. TREADWAY:  And the opening form.

14              THE COURT:  All right.  It's received.

15              MS. TREADWAY:  That's true for all of these,

16   Judge.

17              THE COURT:  Okay.

18              MS. TREADWAY:  Now, the next is 36-B which we

19   would also offer by stipulation.  We'll just offer all

20   of them now, Judge, by stipulation.  36-B through G.

21              THE COURT:  No objection, gentlemen?

22              MR. WILLIAMSON:  One second, Your Honor.  Just

23   glance at them real quick.

24                       (Off-the-record.)

25              MR. WILLIAMSON:  No objection to either one of

4304

1    those, Your Honor.

2              MS. TREADWAY:  Judge, I believe we entered

3    into stipulations that we filed with the Court as to all

4    of these documents, Judge.

5              THE COURT:  Well, they're all received then.

6    BY MS. TREADWAY:

7    Q   Now, moving to the second account.  What is the

8    account name, et cetera?

9    A   36-B.  All right.  36-B is an account at the valley

10   State Bank in the name of Schneider Properties, LLC.  It

11   was opened March 31, 2003.  The last three numbers of

12   the account number are 012.  The authorized signatures,

13   Linda Atterbury Schneider, Timothy C McDonald, and

14   Stephen J Schneider.

15   Q   And then the next account?

16   A   36-C is a youth savings account at the Credit Union

17   of America.  I'm sorry -- misspoke.  This is a savings

18   account at the Credit Union of America in the name of

19   Linda Atterbury and Stephen Schneider.  It was opened

20   April 12, 2004.  The last four numbers of the account

21   number are --

22   Q   Is that 678?

23   A   678, that's correct.

24   Q   And who are the signatories?

25   A   Linda K Atterbury and Stephen Schneider.

4305

1   Q   And the next account is, I believe L.E. Atterbury

2   and Ellen M Atterbury of Credit Union of America?

3   A   That's correct.  It's also the Credit Union of

4   America, Lee E and Ellen Atterbury.  The account last

5   three numbers are 131.  It was opened June 9 of 2005.

6   And the authorized signatures are L E Atterbury and

7   Ellen M Atterbury.

8   Q   The next account at the Bank of America, which was

9   formerly Bank IV, is that another account for Stephen

10  and Linda Schneider?

11  A   Yes, it is.

12  Q   But her name is Linda Atterbury on this account?

13  A   That's correct.

14  Q   And does this account end in 0429?

15  A   Yes.

16  Q   And who are the signatories and who was it opened

17  by?

18  A   Stephen J Schneider and Linda Atterbury Schneider.

19  Q   And it was opened on?

20  A   August 28, 1987.

21  Q   And the next account, Intrust Bank, is in the name

22  of Zoe F Schneider and Linda Atterbury Schneider.  Who

23  is Zoe F Schneider?

24  A   That is Mr. and Mrs. Schneider's young daughter.

25  Q   And the account number ends in 8364?

4306

1    A   Yes, it does.

2    Q   And who is the signatory and when was that opened?

3    A   The signatory is Linda Atterbury Schneider; and it

4    was opened September 17th, 1997.

5    Q   And then the final count in the names of Stephen

6    Schneider or Linda Atterbury Schneider at the Intrust

7    Bank formerly Haysville State Bank?

8    A   That's correct.

9    Q   And does it end in 2025?

10   A   Yes, it does.

11   Q   And when was it opened?

12   A   February 8, 1989.

13   Q   And who are the signatories?

14   A   Stephen Schneider and Linda Atterbury Schneider.

15   Q   Did you review financial information related to the

16   accounts that we have just identified for the jury that

17   are listed on Exhibit 36?

18   A   Yes, I did.

19   Q   And approximately what is the time period that your

20   review entailed?

21   A   Probably 2002, first part of 2002 up through the end

22   of 2006.

23   Q   Did you review account statements?

24   A   Yes, I did.

25   Q   Did you review checks written?

1   A    Yes.

2   Q    Did you review deposits and deposit items?

3   A    Yes, I did.

4   Q    Did you review withdrawals and withdrawal items?

5   A    Yes.

6   Q    And did you review wire transfers?

7   A    I did.

8   Q    From your review of these financial records, were

9   you able to pinpoint specific transactions involving

10  more than $10,000?

11  A    Yes, I was.

12  Q    And do some of those transactions involving over

13  $10,000 form the basis of Counts 18 through 34 of the

14  Indictment?

15  A    Yes, they do.

16  Q    I'm now handing you Exhibits 18 through 34-A, sir.

17  And you've had the opportunity to thoroughly review

18  those documents prior to your testimony today, have you

19  not.

20  A    Yes, I have.

21  Q    And generally speaking, are those the type of

22  documents that I just listed for you?

23  A    Yes, ma'am.

24  Q    And were those documents obtained from the banks?

25  A    Yes, they were.

4308

1          MS. TREADWAY:  Government would offer Exhibit

2    18 through 34-A by stipulation.  These are business

3    records of the various financial institutions identified

4    in Exhibit 36.

5          THE COURT:  Gentlemen?

6          MR. WILLIAMSON:  No objection.

7          MR. BYERS:  None, Your Honor.

8          THE COURT:  It's received.

9    BY MS. TREADWAY:

10   Q    Just to remind the jury, we have organized these

11   documents in a fashion to make it easier for the jury to

12   follow what documents are related to what count, have we

13   not?

14   A    Yes.

15   Q    So, specifically, are the documents numbered so they

16   correspond to a specific count in the Indictment?

17   A    Yes, they are.

18   Q    So, if we have an Exhibit 18, is Exhibit 18 the

19   actual documents that the financial transaction that we

20   are alleging is money laundering?

21   A    Yes, ma'am.

22   Q    And then is Exhibit 18-A related documents to that

23   transaction?

24   A    Yes.

25   Q    Now, with regards to these monetary transactions,

4309

 1    did we prepare a summary chart involving those

 2    transactions?

 3    A   Yes, we did.

 4    Q   And is that Government Exhibit 35?

 5    A   Yes.

 6    Q   And is that essentially the same chart of

 7    information that appears in the Indictment?

 8    A   Yes, it is.

 9    Q   And does it summarize the voluminous information

10    that I've presented for you in Exhibits 18 through 34-A?

11    A   It does.

12             MS. TREADWAY:  Government would offer Exhibit

13    35 as a summary Exhibit under Rule 1006.

14             MR. WILLIAMSON:  No objection.

15             MR. BYERS:  No objection, Your Honor.

16             THE COURT:  It's received.

17    BY MS. TREADWAY:

18    Q   So, let's see how this is set up.  The first column

19    indicates what count the transaction is related to.  The

20    second column is the on-or-about date of the

21    transaction?

22    A   Yes.

23    Q   And then we have the monetary transaction actually

24    explained?

25    A   Yes.

1    Q    And we have it highlighted in blue.  Is that the

2    actual transaction we are referring to?

3    A    Yes.

4    Q    Then we have the amount of the transaction in the

5    last column?

6    A    Correct.

7    Q    Now, were all of these transactions funded by monies

8    paid to the Schneiders and the Schneider Medical Clinic

9    by a healthcare benefit program?

10   A    Yes.

11   Q    And how did you determine that, Mr. Hawkins?

12   A    One of the bank accounts we talked about, the

13   Schneider Medical Clinic, LLC, checking account at the

14   Valley State Bank, is the only business checking account

15   they used into which they deposited all of the medical

16   clinic income, whether it was from healthcare providers

17   like Medicare, Medicaid, insurance companies, or other

18   funds that came into the clinic from patients, copays,

19   uninsured individuals and so forth.  That's the only

20   account into which they deposited all of the clinic

21   income.

22   Q    And is that account somewhere related in all of

23   these transactions?

24   A    Yes.

25   Q    One way or the other?

4311

1     A    Yes.

2     Q    Now, in addition to the Exhibit 35 summary chart,

3     did you also develop some flow charts that show how the

4     monies flow through the various accounts for the jury?

5     A    Yes.

6     Q    Is that Exhibit 37?

7     A    Yes, it is.

8     Q    And is that just a pictorial representation of what

9     we've narrated on Exhibit 35?

10    A    Of some of the transactions, yes.

11    Q    All right.  And will it help the jury follow the

12    flow of the money?

13    A    Yes, it will.

14         MS. TREADWAY:  Government would offer Exhibit

15    37, again, under Rule 1006.

16         MR. WILLIAMSON:  No objection.

17         MR. BYERS:  No objection, Your Honor.

18         THE COURT:  It's received.

19    Q    So, again showing how the flow chart starts, we have

20    the Valley State account that you identified as the

21    operating account at the top?

22    A    That's correct.

23    Q    For each transaction do we have the count and the

24    date and then in the box do we have the transaction from

25    Exhibit 35?

4312

1    A    Yes.

2    Q    Now we're going to display the actual instruments on

3    the screen for the jury as we go through this evidence.

4         Let's first talk about Count 18.  What transaction

5    took place on or about March 17, 2004?

6    A    On that date Linda Atterbury Schneider withdrew

7    $50,000 from the Schneider Medical Clinic operating

8    checking account and received a bank money order payable

9    to herself in the amount of $50,000.

10   Q    Okay.  Moving to Count 19, what transaction took

11   place on or about April 12, 2004?

12   A    On that date, Linda Atterbury Schneider opened a

13   savings account at the Credit Union of America in

14   Wichita and deposited that $50,000 check that she

15   obtained from Valley State Bank on March 17 of '04.

16   Q    And is that the personal account of the Defendant

17   Stephen and Linda Schneider?

18   A    It's -- I'm looking at the statement.  The statement

19   shows it's in the name of Linda Atterbury.  Let me go

20   back and look at the signature card.

21   Q    Sure.

22   A    Yes.  The signature card on there shows that it's --

23   the statement just shows Linda Atterbury.  The signature

24   card shows the authorized signatures are Linda Atterbury

25   and Stephen Schneider.

4313

1    Q    Thank you.  And what was the amount of this deposit?

2    A    $50,000.

3    Q    And how is that transaction in Count 19 related to

4    Count 18?

5    A    That's the same money.  On March 17 she withdrew

6    $50,000 from the Schneider Medical Clinic account,

7    received a check, bank money order, from Valley State

8    Bank.  Then on April 12 of '04, she opened up this

9    Credit Union of America account and deposited that

10   $50,000 into that Credit Union account.

11   Q    Then moving on to Count 20, what transaction took

12   place on or about April 27th, 2004?

13   A    April 27th, 2004.  Linda Atterbury Schneider

14   withdrew $50,000 from the Credit Union of America

15   account and on that withdrawal obtained from Credit

16   Union of America a cashier's check, check from them,

17   payable to herself, Linda K Atterbury.

18   Q    And how is this $50,000 related to the prior

19   $50,000?

20   A    It's the same money.

21   Q    So we have the same money moving three points?

22   A    Yes.

23   Q    Then moving to Count 21.  What transaction took

24   place on or about April 28th, 2004?

25   A    On that date Linda Schneider, Linda Atterbury,

4314

1    endorsed that check, that $50,000 check from Credit

2    Union of America and then deposited that $50,000 to the

3    youth savings account of her daughter Zoe Schneider at

4    the Intrust Bank.

5    Q   Is this again the same $50,000 we started with?

6    A   Yes.

7    Q   Now, moving to Count 22, what transaction took place

8    on or about April 28, 2004?

9    A   On that date Linda Atterbury, Linda Atterbury

10    Schneider, withdrew $60,000 from her daughter's savings

11    account at the Intrust Bank and obtained a cashier's

12    check in the amount of $60,000.  It says official check

13    in the amount of $60,000.  Payable to Sarah Lavine

14    D'Gonzales.  And the remitter shown or purchaser/

15    remitter shown on this official check says Gerri Murphy.

16    Q   Who is Gerri Murphy?

17    A   Gerri Murphy is the maiden name of Linda Atterbury's

18    brother's wife.  Her name is Geraline Atterbury.  This

19    was her maiden name.  She's been married over 20 years

20    but this is her maiden name.

21    Q   Is she married to Curtis?

22    A   She is.

23    Q   Now, there's something interesting about the

24    endorsement on this particular check, isn't there?  It's

25    not this one but I think it's the next one.  The next

1   page.

2   A   On 22-A, the second page?

3   Q   Yes.

4   A   What this is, this is the withdrawal slip.  The

5   second document on that page is the withdrawal slip that

6   Linda Atterbury filled out when she withdrew the $60,000

7   from her daughter's savings account.  And the reverse

8   side of it is printed to Sarah Lavine D'Gonzalez, from

9   Gerri Atterbury and then Atterbury is scratched out, and

10  then Murphy is printed in.  And that appears to be in

11  the instructions that were given to the bank teller on

12  how to make out that official check.

13  Q   Now, how is this transaction related to the prior

14  transaction of the $50,000?

15  A   This is $60,000.  $50,000 of it is the same money

16  and then $10,000 was Schneider funds that were already

17  in that account from other transactions.

18  Q   Based on your experience of over 30 years in the

19  Internal Revenue Service investigative department, and

20  your review of these records, sir, what is the benefit

21  of these five transactions, if anything?

22  A   Someone appears to be trying to hide something from

23  someone.  There appears to be no -- this is not easy.

24  Someone went through several different steps when they

25  could have easily converted the money to a cashier's

4316

 1    check.

 2    Q    May I have 161 please.  This is our chronology,

 3    Mr. Hawkins.  And the information that's been admitted

 4    into evidence previously is that on February 5th, 2004,

 5    the peer review organization for Medicaid sent the

 6    Defendants a certified letter about the fact that they

 7    were going to be audited.  And we've just reviewed

 8    several transactions in March and May of '04.  And do

 9    those transactions eventually end up in transfers to

10    Mexico?

11    A    Yes.

12    Q    We'll get to those in a minute.

13         Let's go to Count 23.  What transaction took place

14    on or about April 29th, 2004?

15    A    On that date Stephen and Linda Schneider borrowed

16    $70,000 from the Valley State Bank in Wichita.

17    Q    And how was this loan money going to be used?

18    A    The loan documents reflect to purchase investment

19    property.

20    Q    And was the collateral for the loan the income at

21    the clinic and the assets at the clinic?

22    A    It was assets at the clinic plus substantial

23    Certificates of Deposit already owned by the Schneiders.

24    Basically that's what it was.

25    Q    And what monies were the Defendants using to pay for

4317

1    the clinic's assets, including the clinic building?

2    A    The proceeds, income, from the medical practice.

3    Q    What money was used to pay this loan back?

4    A    Funds, income, from the medical practice.

5    Q    And what monies did -- and what were the source of

6    those monies?

7    A    The income from medical practice, income from

8    healthcare providers, insurance companies, Medicare,

9    Medicaid, payments from individuals who were uninsured

10   and copays.

11   Q    And with regards to Count 23, the loan was used to

12   fund a bank money order, was it not?

13   A    Yes, it was.

14   Q    And who was that payable to?

15   A    Linda Atterbury Schneider or Stephen Schneider.

16   Q    Now, moving to Count 24, what transaction took place

17   on or about April 29th, 2004?

18   A    All right.  On the 29th they obtained the loan.

19   Received a bank money order from Valley State Bank in

20   the amount of $70,000.  On the 29th of April, 2004,

21   Linda Atterbury Schneider endorsed that $70,000 check

22   from Valley State Bank and then took it to Intrust Bank

23   and endorsed that.  And then swapped it for another

24   Intrust Bank official check in the amount of $70,000

25   payable to Sarah D'Lavine Gonzalez (sic), showing a

4318

1    remitter or purchaser as Gerri Murphy.

2    Q   Now, interestingly, the prior check was to Sarah

3    Lavine D'Gonzalez?

4    A   Correct.

5    Q   And this is to Sarah D'Lavine Gonzalez; correct?

6    A   Yes.

7    Q   How is that transaction related to Count 23, the

8    loan?

9    A   Those funds represent the proceeds of the loan

10   obtained from Valley State.

11   Q   Now, looking at May 10, 2004, Count 25.

12   A   Yes.

13   Q   What transaction took place on or about May 10th,

14   2004?

15   A   On that date Linda Atterbury Schneider took those

16   two cashiers checks and two official checks from Intrust

17   Bank, one for $60,000 and one for $70,000.  She took

18   them to Intrust Bank, endorsed them, and deposited them

19   to her personal bank account at Intrust Bank.

20   Q   And then using that to -- we move to Count 26?

21   A   Yes.

22   Q   And what happens on about May 12, 2004?

23   A   A wire transfer of $130,000 was caused to be made

24   out of Linda Schneider and Steve Schneider's Intrust

25   Bank account to the bank account of Linda K Atterbury in

1    the -- at the Bancomer, B-A-N-C-O-M-E-R, Bancomer Bank

2    in Acapulco, Mexico.

3    Q    And what was the amount of the wire transfer?

4    A    $130,000.

5    Q    And is this the same money that is in Count 25 in

6    the deposit?

7    A    Yes, it is.

8    Q    Have you been able to determine whether the $130,000

9    ever came back into the United States?

10   A    It did not come back into any known bank accounts of

11   the Schneiders.

12   Q    Given your experience and training, and based on

13   your financial review of the Defendants' financial

14   transactions, do you have an opinion about the purpose

15   behind these nine transactions that form the basis of

16   Counts 18 through 26 of the Indictment?

17   A    Yes, I do.

18   Q    What is that opinion?

19   A    That Ms. Atterbury Schneider conducted a substantial

20   number of transactions to send $130,000 to Mexico in an

21   attempt to conceal something from someone as she was

22   doing it.

23   Q    From your review the of Defendants' personal tax

24   returns, were you able to determine what this money

25   wired to Mexico was used for?

1    A    I believe so, yes.

2    Q    And what did you determine?

3    A    They bought a second condominium in Alcapulco,

4    Mexico.  They've owned one since the 1990s.  And in

5    2004, the summer of 2004, bought a second one.

6    Q    Now, for Counts 19, which we already talked about,

7    and Counts 27 through 34, did you develop a second flow

8    chart?

9    A    Yes.

10   Q    And is that Exhibit 38?

11   A    Yes, it is.

12   Q    And does that do the same thing as our prior flow

13   chart did for the jury?  It just shows the transactions

14   in a picture format as opposed to narrative format?

15   A    Yes.

16              MS. TREADWAY:  Government would offer Exhibit

17   38 as a summary chart.

18              MR. WILLIAMSON:  No objection.

19              MR. BYERS:  No objection.

20              THE COURT:  It's received.

21   BY MS. TREADWAY:

22   Q    So, starting with Count 19, we have $50,000 coming

23   from the Schneider Medical Clinic operating account and

24   going into the Credit Union of America account; correct?

25   A    On April 4th of '04, yes.

4321

1    Q    All right.  Now, let's move to Count 27.  What

2    transaction took place on or about July 9, 2004?

3    A    On that date, July 9, 2004, Linda Atterbury

4    Schneider withdrew $100,000 from the Schneider Medical

5    Clinic operating checking account and obtained a bank

6    money order from Valley State Bank in the amount of

7    $100,000 and is payable to Linda Atterbury Schneider.

8    Q    Was this also deposited into the Credit Union of

9    America account that was Linda and Stephen Schneider's

10   account?

11   A    Yes, it was.

12   Q    Now, the next transaction is not on our flow chart,

13   but it is a transaction that I would like to talk about.

14        That's a transaction that occurred on or about July

15   16, 2004.

16   A    Yes.

17   Q    Could you tell the jury what happened on that date?

18   A    Yes.  On that date Steve and Linda Schneider bought

19   a yellow Hummer from Bob Moore Cadillac in Oklahoma

20   City, Oklahoma; and Linda Atterbury wrote a check for

21   Bob Moore on that date for $54,245.

22   Q    Now, going back to our flow chart, Exhibit 38, and

23   continuing on to Count 29, what transaction took place

24   on or about September 24th, 2004?

25   A    On that date Linda Atterbury Schneider withdrew

1    $90,000 from the Schneider Medical Clinic checking

2    account and received a bank money order from Valley

3    State Bank, payable to Linda Atterbury Schneider, in the

4    amount of $90,000.

5    Q    And was it also deposited into the Credit Union of

6    America account.

7    A    Yes.  On the same date, September 24, 2004, that

8    $90,000 check was deposited to the Linda Atterbury and

9    Steve Schneider's Credit Union of America account.

10   Q    Now, on Count 30, what transaction took place on or

11   about March 1st, 2005?

12   A    Linda Atterbury withdrew $100,000 from the Schneider

13   Medical Clinic checking account, obtained a cashier's

14   check -- I'm sorry -- bank money order payable to Linda

15   Atterbury.  And then on that same date, March 1st, 2005,

16   deposited that bank money order for $100,000 for her and

17   Steve Schneider's Credit Union of America account.

18   Q    Then moving on to Count 31.  What transaction

19   occurred on June 9th, 2005?

20   A    On June 9, 2005, Linda Atterbury withdrew $100,000

21   from the Schneider Medical Clinic checking account and

22   received a cashier's check from Valley State Bank in the

23   amount of $100,000 payable to herself, Linda Atterbury.

24   Q    And it was deposited in her parents' account?

25   A    On that same date her father, L E Atterbury, opened

4323

1   a new savings account at Credit Union of America.  Her

2   credit union.  In his and his own wife's name.  And that

3   $100,000 was deposited to Lee and Ellen Atterbury's

4   Credit Union of America account.

5   Q    Moving to Count 32, what transaction took place on

6   or about September 15th, 2005?

7   A    On that date Linda Schneider withdraw $85,000 from

8   her Credit Union of America account and obtained a

9   cashier's check or credit union check in the amount of

10  $85,000 payable to L.E. Atterbury.

11  Q    And then moving to Count 33, what transaction took

12  place on or about January 6, 2004.

13  A    On that date L.E. Atterbury withdrew $85,000 from

14  his Intrust Bank account and obtained an official check,

15  Intrust Bank official check, in the amount of $85,000

16  payable to Linda Atterbury.  Linda Atterbury then

17  deposited that check into her and Mr. Schneider or Dr.

18  Schneider's Schneider Properties checking account, and

19  then with that $85,000 and $15,000 more that was already

20  in there, she wire transferred $100,000 to Nationwide

21  Beverage Bottles in Corona, California.

22  Q    Is that the basis of Count 34?

23  A    Yes.

24  Q    And did that take place on or about January 6, 2006?

25  A    Yes, it did.

4324

```
 1    Q    Based on your review of these transactions, have you

 2    formed an opinion about their purpose?

 3    A    We talking about the -- which transactions?

 4    Q    All of these transactions.  What is their purpose?

 5    A    Yes.

 6    Q    What is that opinion?

 7    A    It was getting money out of the Schneider Medical

 8    Clinic account and some of them were designed, I

 9    believe, specifically to hide the money from the

10    Government.

11    Q    In addition, to the monetary transactions we have

12    just reviewed with the jury, did you find other

13    transactions that complete some of the pictures we've

14    just shared with the jury?

15    A    Yes.

16    Q    And why do those transactions interest you?

17    A    Because they appear to be circular in nature in that

18    the money would come out of an account and move through

19    two or three more accounts and then come back.  They

20    appeared to have no real reason other than to hide

21    something from someone.

22    Q    And did you prepare flow charts of these additional

23    transactions?

24    A    I did.

25              MR. BYERS:  Objection as to relevance, Your
```

4325

```
 1    Honor.  They're not part of the Indictment.  I think
 2    it's part of the conspiracy --
 3              MS. TREADWAY:  They are part of the
 4    Indictment.  Paragraph 50, Judge.
 5              MR. BYERS:  I thought you just said they
 6    weren't charged conduct.
 7              MS. TREADWAY:  They don't have to be charged
 8    to be part of the conspiracy.  They're part of the
 9    manner and means of the conspiracy, Judge.
10              THE COURT:  Overruled.
11    BY MS. TREADWAY:
12    Q   Let me first hand you what has been marked for
13    identification as Government Exhibit 39.  Is that one of
14    our additional flow charts?
15    A   Yes, it is.
16              MS. TREADWAY:  Government would offer Exhibit
17    39.
18              MR. WILLIAMSON:  No objection, Your Honor.
19              MR. BYERS:  No objection.
20              THE COURT:  It's received.
21    BY MS. TREADWAY:
22    Q   Related to that, let me hand you what has been
23    marked for identification as Exhibits 41 through 45 --
24              MS. TREADWAY:  -- which, again, Judge, by
25    stipulation, those are business records of the various
```

4326

 1    banks and we would offer them.

 2              MR. WILLIAMSON:  No objection.

 3              MR. BYERS:  None.

 4              THE COURT:  Received.

 5    BY MS. TREADWAY:

 6    Q    Let's work through these chronologically

 7    Mr. Hawkins, as we've been doing.  What happened on

 8    August 20th, 2004?  And I believe that would be Exhibit

 9    41?

10    A    Yes.  On that day, August 20th, '04 -- let me look

11    here.  Linda Atterbury withdrew $100,000 from her Credit

12    Union of America account and obtained a Credit Union of

13    America check payable -- in the amount of $100,000

14    payable to Dr. Michael Estivo.

15    Q    Estivo?

16    A    Estivo.

17    Q    All right.  Then on June 10, 2005, do we have a

18    $100,000 transfer from Linda and Stephen Schneider's

19    Credit Union of America account to Linda Schneider's

20    parents' account at the same institution?

21    A    Yes, we do.

22    Q    And that's in actually Exhibit 31-B, is it not?

23    A    Yes, it is.  It was the day after the other $100,000

24    transaction.

25    Q    So, the money that funded this originally came from

4327

1    the clinic?

2    A    That's correct.

3    Q    Then on July 12th, 2005, which is your Exhibit 42,

4    what happened?

5    Q    On July 12th, 2005, Lee Atterbury, Mrs. Schneider's

6    father, withdrew -- actually he wire transferred --

7    caused to be wire transferred, $100,000 from this Credit

8    Union of America account to Nationwide Beverage Bottles

9    in Corona, California.

10   Q    And, again, this money would have originated

11   originally from the operating account at Schneider

12   Medical Clinic?

13   A    Yes, it did.

14   Q    And then on August 24, 2005, what happened with the

15   $100,000 from Dr. Michael Estivo, which is, again, in

16   Exhibit 41.

17   A    All right.  On --

18   Q    This is August 24th.

19   A    -- August 24, 2005, Linda, using the name Linda

20   Schneider, Ms. Schneider, deposited a $100,000 check to

21   the Credit Union account of Lee Atterbury, Lee E

22   Atterbury, her father.

23   Q    And this would have been a year after the original

24   $100,000 went to Dr. Estivo?

25   A    Yes.  And this $100,000 was a check, a personal

4328

1    check, from Michael Estivo payable to Linda Schneider in

2    the amount of $100,000.  And the memo portion says loan

3    repayment, interest still owed.

4    Q    Now, going back to our chronology of events, we

5    learned in the evidence that on May 24th, 2005, and on

6    June 8th, 2005, Medicaid notified the clinic of its

7    intent to terminate them from the Medicaid program?

8    A    That's correct.

9    Q    Based on the transactions from June 9 through 10th

10   of 2005, do we have $200,000 moving from originally the

11   Clinic to Linda Schneider's father, L.E. Atterbury?

12   A    That's correct.

13   Q    And finally, on September 13, 2005, the first search

14   warrant was executed?

15   A    Yes, it was.

16   Q    And on September 15th, 2005, do we have another

17   $85,000 moving originally from the clinic to Linda

18   Schneider's father, L.E. Atterbury?

19   A    Yes.  On the 15th she withdrew $85,000 from her

20   credit union account.  There was a balance of about

21   $90,000 in there at the time.  Took $85,000 of it.  Got

22   a cashier's check to her father.  He bought a CD for 90

23   days at Intrust Bank where he banked.

24   Q    Now, to complete this circle of events, have we got

25   a final chart which combines charts 38 and 39?

4329

1    A    Yes.

2              MS. TREADWAY:  Government would offer Exhibit

3    40.

4              MR. BYERS:  No objection, Your Honor.

5              MR. WILLIAMSON:  No objection.

6              THE COURT:  It's received.

7    BY MS. TREADWAY:

8    Q    And Mr. Hawkins, does this portray the circular

9    nature of these transactions?

10   A    Yes, it does.

11   Q    Now, finally, sir, I'd like to hand you what has

12   been marked for identification as Exhibits 111 and

13   111-A.  Are you familiar with those documents?

14   A    Yes, I am.

15   Q    What is the date -- what are those documents?

16   A    Exhibit 111 is a promissory note dated January 17,

17   2007, wherein Doctor -- signed by Dr. Stephen Schneider,

18   which purports to be a promissory note where he promises

19   to pay $180,000 to Lee Atterbury.

20   Q    Is the note secured by anything?

21   A    Yes, it is.

22   Q    And is that Exhibit 111-A?

23   A    Yes, it is.

24   Q    And what is that?

25   A    This is a real estate mortgage dated January 17th,

1    2007, signed by Dr. Stephen Schneider in the amount of

2    $180,000 in favor of Lee Atterbury and it's secured by a

3    home in Delaware County, Oklahoma, that's owned by Dr.

4    and Mrs. Schneider on the Grand Lake of the Cherokees.

5         MS. TREADWAY:  Government would offer Exhibit

6    111 and 111-A.

7         MR. WILLIAMSON:  No objection.

8         MR. BYERS:  No objection.

9         THE COURT:  It's received.

10   BY MS. TREADWAY:

11   Q   Mr. Hawkins, during the course of your financial

12   review, did you find any records to support a $180,000

13   debt owed by the Defendant Stephen Schneider to his

14   father-in-law, L E Atterbury?

15   A   Absolutely not.

16   Q   Did you find any records to support a $180,000 debt

17   owed by the Defendant Linda Schneider to her father, L E

18   Atterbury?

19   A   Absolutely not.

20   Q   Did you find any records to be supporting the

21   ability of L E Atterbury to have loaned either or both

22   of the Defendants $180,000?

23   A   We did not.

24   Q   Why do you say that?

25   A   We examined all known bank accounts of Lee and Ellen

4331

1    Atterbury.  Examined their tax returns for a good number
2    of years.  And none of their monies in any of their bank
3    accounts moved -- were given or removed to the
4    Schneiders other than the funds we just talked about
5    that originally came from Linda and Steve Schneider.
6    And their tax returns for all these years don't show
7    sufficient income, resources, to be able to give the
8    Schneiders $180,000.
9    Q   Based on your experience, training and your review
10   of the Defendants and L.E. Atterbury's financial
11   records, did you form an opinion about the purpose of
12   this $180,000 promissory note and the document?
13   A   Yes, I did.
14   Q   And what is that opinion?
15   A   That they were false documents created to attempt to
16   prevent the Government from seizing their lake home.
17              MS. TREADWAY:  That's all, Judge.
18              THE COURT:  Well, let's take our recess,
19   Ladies and Gentlemen.  About 15 or 20 minutes.  Remember
20   and heed the admonition.
21                   (Recess.)
22              MR. BYERS:  Thank you, Your Honor.
23              THE COURT:  Yes, sir.
24                   **CROSS EXAMINATION**
25      BY MR. BYERS:

4332

1    Q    Good afternoon, Mr. Hawkins.

2    A    Good afternoon.

3    Q    I have a few questions, not too many here.  These

4    institutions that you were talking in detail about this

5    money moving through, they're essentially all federally

6    regulated; correct?

7    A    I would expect so, yes.

8    Q    Credit unions?  Banks?

9    A    Yes.

10   Q    Those types of things.  You expect or do you know?

11   A    I mean, I'm confident they are.  I know there's

12   several regulatory agencies, you know, FDIC, Office of

13   Controlled Currency.  I just don't know which one

14   regulates them.  And some institutions are regulated by

15   states.  But I believe all these are federally

16   regulated.

17   Q    So, it's fair to assume that this is probably a

18   pretty record-intensive kind of industry, is it not?

19   A    Very much.

20   Q    Financial institutions?  And actually that's how you

21   were able to trace this money so well; correct?  Because

22   there are lots and lots of records and copies and trails

23   to follow?

24   A    There's a lot of paper trails through bank accounts.

25   Q    Okay.  So does it make sense to you that, as you put

4333

1    it, somebody who's trying to hide something from

2    somebody would use a heavily regulated industry and just

3    let the paper trail be made?  How is that concealment?

4    A   That's just how they do it.

5    Q   They?  Who's they?

6    A   People who earn money through illegal activities who

7    attempt to legitimize the funds and launder them so they

8    can enjoy them.  That's just what they do.  They have to

9    do that to get the money into the banking system so they

10   can enjoy it.

11   Q   Okay.  So the thug on the street corner who's out

12   selling dope to kids, he takes his cash, he puts it in

13   the bank and he writes himself a check or gets a money

14   order.  He pays his mom rent, he does all of that stuff,

15   through regular banking institutions?

16   A   The thug on the street who's selling dope on the

17   street will commonly only put money in -- cash money,

18   into a bank account if he needs it to be in there such

19   as if he has to make a car payment or has to make his

20   rent payment or house payment.

21   Q   So, there is a difference?

22   A   Pardon me.

23   Q   There is a difference then?

24   A   Difference in what?

25   Q   You said the thug on the street will only do it as

4334

1    necessary; but this, this was clear out in the open

2    money being moved around by the Schneiders?

3    A    All these funds originated through the medical

4    practice account.  They were already in there.  They

5    didn't need to be put into some other bank account.

6    Q    And they only had the one account for Schneider

7    Medical Clinic; correct?

8    A    Early on, maybe a month or two, there was a small

9    account; but for at least the years, the end of 2002

10   through end of 2006, all they had was the Schneider

11   Medical Clinic account at Valley State.

12   Q    And then there was a Schneider Medical Properties

13   account as well; correct?

14   A    That's correct.

15   Q    Okay.  So there wasn't a multitude of Schneider

16   accounts?  This Schneider account there.  Atterbury

17   account over here.  You could tell where the healthcare

18   money started.  Correct?  That's how you started this

19   trail was assuming it's healthcare money, assuming

20   there's a crime, then you start tracking it; correct?

21   A    Yes, sir.

22   Q    It wasn't hard to find the genesis of that money,

23   was it?  The source?  It was right there?  Schneider

24   Medical Clinic is a named bank account out in the open?

25   A    Correct.

4335

1    Q    Did you ever ask to talk to Steve Schneider about

2    these money movements?

3    A    I became involved in the investigation in late 2006

4    and by that time both Doctor and Mrs. Schneider were

5    represented by attorneys and it's my understanding that

6    they were not available to talk to about it.

7    Q    And you testified on your first day of testimony

8    about what not available means.  Did you ever ask their

9    attorneys to talk to them, say, what's with the money

10   movement, can you tell me?

11   A    The investigator doesn't contact defense attorneys.

12   That's done by the prosecutor's office.

13   Q    Did you ever ask the prosecutor's office to contact

14   either Steve or Linda Schneider and be allowed to ask

15   them what's with the money?

16   A    I have a recollection that we all discussed that;

17   and it's my recollection that they were not because they

18   were represented by attorneys, they were not available

19   to be interviewed.

20   Q    Is that a yes or a no?  Did you ever ask the

21   Government, the Government attorneys to contact the

22   Schneider lawyers?

23   A    We discussed that and my recollection is that we

24   were told they had counsel and were not available to be

25   interviewed.

4336

1   Q    So, what does that mean?  Did they refuse?  Or did

2   the Government lawyer say we are not going to ask?  I

3   don't understand what you're saying.

4   A    I don't believe the Government lawyer said we're not

5   going to ask.  I believe that by the time I got

6   involved, they had been through several different

7   attorneys.  I'm sure this was before, before you came

8   around.

9   Q    So, you don't, you don't know if they ever asked to

10  talk to you?  You never did it directly; correct?

11  A    Do I know if their attorneys asked them?

12  Q    No.  I'm asking if they were ever asked by the

13  Government to explain the money.  All these movements

14  you told us about, all this inferred evil.  Were they

15  ever asked about it?

16  A    We did not have that opportunity.

17  Q    For whatever reason?

18  A    For whatever reason, we did not have that

19  opportunity.

20  Q    How many times have you tried to purchase real

21  property in Mexico?

22  A    None.

23  Q    Do you know anything about purchasing real property

24  in Mexico?

25  A    I know what I've heard.

4337

1    Q    Okay.  What do you know?

2    A    As I understand it --

3    Q    No, not what you've heard.  Tell me what you know.

4    A    Well, as I understand it, from what I've heard -- or

5    you want to know what I know from -- for fact?

6    Q    I want to hear facts that you know about purchasing

7    real property in Mexico?

8    A    I know what I've heard.

9    Q    Now, you testified that they purchased a condominium

10   in Mexico; is that right?

11   A    That's right.

12   Q    You don't know that that was a vacant lot?

13   A    I know they put it on their tax return as a house --

14   Q    And you also talked about other houses?

15   A    -- and depreciated it as a house.

16   Q    And a house?

17   A    If it was a vacant lot then that was -- then they

18   put that on there improperly; but it was put on their

19   tax return for '04 as a -- in fact, what they called the

20   first condo they had was the house.  And when they

21   bought this second unit in '04 they called it the house

22   next door.

23   Q    Have you ever been to that property?  Do you know

24   how it's laid out?

25   A    Have not.  I've seen photographs of the complex that

4338

1    it's in.

2    Q    Did you read your grand jury testimony of Lee

3    Atterbury?

4    A    I did not.

5    Q    Did you read any government reports about interviews

6    with Lee Atterbury?

7    A    I participated in interview with Lee Atterbury.

8    Q    Did he explain to you anything about the money

9    movements between he and Linda or he and Steve?

10   A    He made statements to us about money movement

11   between he and Steve.

12   Q    He told you he gave them $180,000 loan against a

13   lake property, did he not?

14   A    No, he didn't.

15   Q    You're completely unaware of that fact?

16   A    I completely know that's not what he told us.

17   Q    And how many times did you talk to him?

18   A    One time.

19   Q    And do you know that Lee Atterbury, before his

20   retirement, had worked probably 60 years in a carnival

21   industry?

22   A    That's what I understand.

23   Q    Do you have any idea if Lee Atterbury was a firm

24   believer in banking institutions?

25   A    I can tell you that the investigation showed he had,

1    he and his wife both had a substantial number of bank

2    accounts, smaller, a few small bank accounts; and then

3    several IRA's, all at Intrust Bank.  The only account he

4    had other than at Intrust Bank was the one that was

5    opened up to hold the Schneider funds that we talked

6    about.

7    Q   So, you found a few small bank accounts and some

8    IRA's after sixty plus years of working?  Owns his own

9    business; correct?

10   A   That's what we found that he has.

11   Q   Would that indicate to you, with your 30 years of

12   experience, that maybe this is someone who likes to

13   hoard their cash and doesn't trust banks?

14   A   I don't know that.  I wouldn't say he doesn't trust.

15   He had a significant number of -- I say significant -- I

16   want to say there was maybe half a dozen or eight

17   different accounts, including IRA's, between he and his

18   wife at Intrust Bank.  That did not appear to be someone

19   who doesn't like banks.

20   Q   IRA.  That's a Government approved instrument;

21   right?  Of savings?

22   A   Yes.

23   Q   Of securing your future?  Your retirement; correct?

24   A   That's the purpose for it.

25   Q   Do you know what the status of those IRA's owned by

1    Mr. Atterbury is today?

2    A   No, I don't.

3    Q   Do you have any idea over the years how much money

4    Mr. Atterbury has loaned Steve and Linda Schneider for

5    medical school?

6    A   I don't know anything about that.  He never

7    mentioned that during the interview.

8    Q   Do you have any idea how much money over the years

9    he may have loaned Linda and or Steve Schneider money

10   for living expenses?

11   A   What I can tell you, I can tell you what he told us

12   during the interview.

13   Q   Well, that's a yes or no.  Do you have any idea?  Do

14   you know what he has loaned them over the years for

15   living expenses?

16   A   Do I know what he really loaned them or what he

17   said?

18   Q   Do you know what he loaned them over the years for

19   living expenses?

20   A   No.

21   Q   Do you know what he loaned them over the years for

22   things such as taxes if they were behind in their taxes

23   or if they needed a tax payment?  Do you have any idea?

24   A   The only tax payment that I saw that Lee Atterbury

25   was involved in with the Schneiders was in December of

4341

1    2006.  He used $50,000 of their money that Linda

2    Schneider had given him to hold to then send $50,000 to

3    the IRS to pay their personal tax liability.  That's

4    only indication that I saw that he was helping out.  And

5    that wasn't helping out.  He was helping them out by

6    using their own money.

7    Q    Okay.  And that's your opinion?  You say she gave it

8    to him to hold?

9    A    That's not my opinion.  Those are the documents,

10   sir.

11   Q    You can see evil in about any transaction

12   financially, can't you?

13   A    Absolutely not.

14              MS. TREADWAY:  Objection; argumentative.

15              THE COURT:  Yes.  Come on.  The objection is

16   sustained.

17   BY MR. BYERS:

18   Q    Is it illegal to loan money to a family member?

19   A    Well, It depends on the source of the funds.

20   Q    Assume I have pure funds -- I don't know if they'll

21   be pure in your eyes, a client pays me, a lawyer, and I

22   loan it to my brother.  Maybe interest, maybe no

23   interest.  What's the problem with that transaction?

24   A    None.

25   Q    Okay.  So say the brother's replaced by a friend.

1    Again, the money we can presume is pure, it's from a

2    beautiful virginal corporation that has never committed

3    a felony.  They pay me to do something.  I do it.  I

4    bank it.  I give it to a friend as a loan.  What's the

5    problem with that transaction?

6    A    None that I know of.

7           MR. BYERS:  I believe that's all I have, Your

8    Honor.

9           THE COURT:  Thank you.

10           THE COURT:  Mr. Williamson, do you have

11    anything?

12           MR. WILLIAMSON:  Of course, Judge.  Not very

13    much, Your Honor.

14                    **CROSS EXAMINATION**

15    BY MR. WILLIAMSON:

16    Q    Mr. Hawkins, who all's bank records did you subpoena

17    and review?

18    A    Doctor and Mrs. Schneider.

19    Q    Okay.

20    Q    And the entities they control:  The Schneider

21    Medical Clinic, the Schneider properties entity we

22    talked about, that they formed to hold the ownership of

23    the clinic building --

24    Q    Okay.

25    A    -- her parents, Lee and Ellen Atterbury?

1    Q    Okay.

2    A    We subpoenaed bank -- once we learned that she was

3    using her daughter's name to hold -- an account to hold

4    funds, we subpoenaed both their children's bank

5    accounts.

6    Q    Okay.

7    A    I believe some other family members.

8    Q    Such as?

9    A    Mrs. of Mrs. Schneider?

10   Q    Such as?

11   A    Her brother, Curtis, and his wife, Geraline

12   Atterbury because we could determine that there were

13   some significant financial transactions between them.

14   Q    Okay.

15   A    That may be it.

16   Q    You didn't subpoena the National Bottles Company's?

17   A    We already talked about that.

18   Q    Well, I want to know everybody that you subpoenaed?

19   A    Nationwide Beverage Bottles Company.

20   Q    Okay.  Dr. Estivo?

21   A    No.

22   Q    Who else?

23   A    I think that's it.

24   Q    Okay.  Bob Moore Cadillac?

25   A    No.  We contacted Bob Moore Cadillac and requested

1    the records.  I don't know if they were given a subpoena

2    at Bob Moore for them but -- we didn't subpoena the

3    records of Bob Moore other than for the Schneiders'

4    purchase of that Hummer.

5    Q   Okay.  The purchase of the Hummer came from an

6    account in the Schneiders' name?

7    A   That was the Schneider Medical Clinic checking

8    account.

9    Q   So, you didn't have to go trying to track down some

10   cash to figure out where it went and you, by great

11   investigative work, learned it was given to Bob Moore.

12   It was right there in the records; correct?

13   A   It was in the records.

14   Q   Okay.

15   A   That was a check written out of the medical practice

16   account to buy that hummer.

17   Q   Okay.  Now, this Nationwide Bottling Company, there

18   were multiple investors from all over the country

19   investing in that company; correct?

20   A   That's what I understand.

21   Q   And that company didn't make it; correct?

22   A   That's what I understand also.

23   Q   So, all the investors lost their money; correct?

24   A   That's what I understand.

25   Q   Now, when you were looking at all these records of

1    the brother, the brother's wife, Dr. Schneider, Linda

2    Schneider, Lee Atterbury, Ellen Atterbury, you were able

3    to see every purchase they ever made with checking --

4    checking cards or checks during the time period that you

5    subpoenaed for.  Right?

6    A    I wouldn't say every check they ever wrote.

7    Generally when we subpoena documents, we don't ask for

8    the -- for the $10 check to the pizza boy.

9    Q    But you got the statements, don't you?

10   A    We get the statements, we see the funds going in,

11   the funds going out; and then we look at what, depending

12   on the case, are significant transactions that we want

13   to follow up.

14   Q    Did Lee Atterbury have advanced notice that you were

15   subpoenaing his records?

16   A    No.

17   Q    Did Curt Atterbury have advanced notice that you

18   were subpoenaing all his financial records?

19   A    Not to my knowledge.

20   Q    Did you limit the subpoenas to at least the time in

21   question so if you saw the transaction take place in '05

22   did you limit the transaction for those two months?  Did

23   you limit the subpoena for those two months or did you

24   just give a broad subpoena for all the records?

25   A    You say a broad subpoena.  A subpoena that covered

4346

1    the period covered by this investigation.

2    Q    So from, so even though you saw -- you knew of one

3    transaction in 2005, I believe it was, you requested all

4    transactions from -- that he ever made on his accounts

5    between 2002 and 2006?

6    A    Based on my experience, when you see a significant

7    transaction you want to follow up, you look, expand the

8    scope a little, at least to see if there are any others.

9    Q    Okay.  So, yes, you did expand it well beyond that

10   time period where you had that initial, I guess,

11   interest; correct?

12   A    Where we saw one significant transaction, we then

13   looked to see if there were others.

14   Q    Okay.  Did Curt's wife have a separate account or

15   did they have a joint account?

16   A    I don't recall.

17   Q    Okay.  Now, with Lee Atterbury, you subpoenaed

18   records for every account that you knew that he had;

19   correct.

20   A    Yes, we did.

21   Q    You got all this 30 years working with the federal

22   government?

23   A    Yes, sir.

24   Q    And that's how you do things; correct?

25   A    That's one of the ways we do things.

1   Q   Now, your conclusion, your opinion, that you gave

2   the jury was that all these transactions, they're not,

3   they couldn't be honest transactions, they were

4   transactions to hide money from the government.  You

5   remember that?

6   A   What I think I said that all of the transactions

7   flowed out of the medical practice account.  All of them

8   were over $10,000 in amount.  And some of them clearly,

9   in my opinion, were done in order to hide something from

10  someone.

11  Q   Okay.  But you said -- I specifically remember you

12  testifying on direct that it was -- that many of these

13  were done to hide money from the Government?

14  A   That's correct.

15  Q   Okay.

16  A   Not all of them.

17  Q   All right.  Now, Mr. Byers asked you about the

18  source of this money.  That you know where it was.  It

19  was in the Schneider Medical Clinic account?

20  A   That's where it started out.

21  Q   Okay.  Well, according to you, it really started out

22  with the healthcare beneficiaries, right?  According to

23  the Government.  Like this money that's flowing --

24  A   That was the original source of a lot of the funds.

25  Q   Okay.  And a lot of these beneficiaries are federal,

4348

1    at least two or three, two of them were federal

2    government insurance plans; correct?

3    A    I know there's Medicare and Medicaid.

4    Q    Okay.  So right now we know where this money comes

5    from, it comes from the Government and these other

6    insurance agencies, you have the source of the money in

7    the accounts.  Now, this money that was in these

8    accounts, they were reported to the federal government

9    on taxes; correct?

10   A    Yes.

11   Q    Okay.  So even before these transactions, you know

12   what was in the account.  They report to the federal

13   government what was in the account.  Nothing was hid at

14   this point; right?

15   A    No, because it was all still in the account.

16   Q    So, the federal government knew how much was in the

17   account, regardless of how much they decided to

18   withdraw, you knew what was there because they told you

19   what was there; correct?

20   A    They put those amounts on their tax returns.

21   Q    Now, even some of this money that you said was

22   intended to be hid from the federal government, they

23   took some of that money and paid it back to the federal

24   government through Lee Atterbury; correct?

25   A    $50,000 of it, yes.

4349

1    Q    So they're taking money -- strike that.

2         They're hiding money, but they told you about it.

3    Now they're still trying to hide more money but they

4    give it back to the federal government.  That's your

5    theory?

6    A    Would you like my opinion?

7    Q    Not really.

8    A    By late '06 when this happened, they had pulled out

9    a lot of money.  Their income as we saw on the chart in

10   2006 substantially was lower.  And I believe that she

11   had pulled too much money out and then now had to use

12   some of it and put it back into the system.

13   Q    That's your opinion; correct?

14   A    That's what I believe the documents showed.

15   Q    Okay.  All the while the clinic is accurately

16   reporting all the income they receive to the IRS?

17   A    The clinic reported all the money that they put in

18   the bank account.

19   Q    All right.  You're aware that after, the raid in

20   2005 a lot of providers left the Schneider Medical

21   Clinic; correct?

22   A    I believe so.

23   Q    If they were trying to hide the money from the

24   federal government, wouldn't it make sense not to tell

25   the federal government how much we got?  Never mind.

 1    I'll withdraw that question.  Nothing further, Your

 2    Honor.

 3              THE COURT:  Anything further?

 4              MS. TREADWAY:  No, Judge.

 5              THE COURT:  Thank you, sir.  You're excused.

 6    Next witness please.

 7              MS. TREADWAY:  Well, if I can have a drum

 8    roll, the Government rests.  Subject to the

 9    reconciliation of the exhibits, Judge.

10              THE COURT:  All right.  Today Mrs. Treadway

11    gets the big gold star for resting on time.  Now, it's

12    3:15, and whenever the Government rests, there are

13    certain motions and things that are brought to my

14    attention.  And I don't know how long that will take and

15    I don't see any point in having you sit in the jury room

16    while I do that.  So I'll see you tomorrow morning at

17    9:00.  Remember and heed the admonition.  And at that

18    time we will begin the Defendants' case.  So have a good

19    evening.

20              THE COURT:  Sir.

21                   Juror No-115?  Is applause

22                   appropriate.

23              THE COURT:  For me, yes.

24                   (Jury excused for the evening at

25                   3:15 p.m.)