4376

```
 1                    (Beginning at 9:00 a.m. May 26,
 2                    2010, the following proceedings
 3                    continued.)
 4
 5         THE COURT:  Good morning, everyone.
 6    Mr. Williamson, you may call your first witness.
 7            MR. WILLIAMSON:  Defense calls Dr. Stephen
 8    Schneider.
```

**STEPHEN SCHNEIDER**

```
10    Having been first duly sworn to tell the truth, the
11    whole truth and nothing but the truth, testified as
12    follows on:
```

**DIRECT EXAMINATION**

```
14    BY MR. WILLIAMSON:
15    Q    Good morning, Dr. Schneider.
16    A    Good morning.
17    Q    Introduce yourself to the jury.  I'm sure everybody
18    knows who you are, but go ahead and introduce yourself
19    for the record.
20    A    I'm Dr. Steve Schneider.
21    Q    Dr. Schneider, where are you from originally?
22    A    Wichita.
23    Q    And did you grow up in Wichita as well?
24    A    Yes.  Grew up in the south part of Wichita.
25    Q    And where did you go to high school?
```

1   A   I went to Bishop Carroll.

2   Q   And what did your parents do for a living?

3   A   My dad was a salesman at Andrew Paint and my mom

4   was -- she worked at Steffen's.

5   Q   Is it fair to say you didn't grow up with a silver

6   spoon in your mouth?

7   A   True.

8   Q   Okay.  Where did you go to college?

9   A   I went to Wichita State.

10   Q   And when you were in high school and college, did

11   you work your way through both of those?

12   A   Uh-huh.

13   Q   And at some point did you decide to go to medical

14   school?

15   A   Yes.  I decided to go to medical school after I had

16   got separated and divorced from my first wife.

17   Q   And do you have any children?

18   A   Yes, I have children.

19   Q   Tell the jury about your children.

20   A   Okay.  I've got a daughter from my previous marriage

21   and she just graduated from medical school.  I've got

22   two other daughters, Zoe and Gina, that we adopted from

23   Romania.

24   Q   And are any of those daughters here in the courtroom

25   today?

4378

```
 1   A   Yeah.  Zoe is right over there.

 2   Q   Are you married now?

 3   A   Yes.

 4   Q   How long have you been married?

 5   A   Twenty plus years.

 6   Q   And is that to Linda Schneider?

 7   A   Yes.

 8   Q   Also goes by Linda Atterbury?

 9   A   Yes.

10   Q   When did you make -- when did you go to medical

11   school?

12   A   Started in 1983.

13   Q   When did you graduate?

14   A   Graduated in 1987.

15   Q   And can you tell the jury why you decided to go to

16   medical school?

17   A   Well, when I got separated and divorced from my

18   first wife, my daughter was -- had asthma and she had to

19   go to the hospital.  And she was very ill.  She was in

20   intensive care.  She was in one of those mist tents and

21   everything.  And I thought this is really, really a neat

22   atmosphere, that people were helping people, and I just

23   wanted to be involved in that.  So I had the opportunity

24   to go back to college and that's what I did.  I went

25   back and talked to my counsellor at WSU and told them my
```

4379

1    plans.  And at the time my grade point average from when

2    I started before wasn't that great and so he kind of

3    told me, try to think of something other than becoming a

4    doctor.  You know, I think it was around 3.0 or

5    something like that at the time.  But I only took one

6    semester -- no, I guess it was a semester and a half --

7    when I quit before.  When I got out of high school.  And

8    so I told him I still was going to pursue that and

9    improved my grade point average.  Took the M-CAT and got

10   accepted into medical school and the rest is history.

11   Q    And where did you go to medical school?

12   A    At the time it was called University of Health

13   Sciences in Kansas City.  It's a D.O. medical school.

14   And now it's called something else, something --

15   biosciences or something.

16   Q    And the daughter that was seriously ill that you

17   told the jury about, is that the daughter who has now

18   become a doctor?

19   A    Yes.

20   Q    And while you -- before you went to medical school

21   but after that experience with your daughter, did you

22   start taking jobs in the health care field?

23   A    Yes.  I wanted to get, you know, in a hospital

24   setting and get exposure to more, you know, medical

25   training and stuff like that.  At the time I applied for

1   jobs at several hospitals but at the time they weren't

2   hiring or something.  And so I got a job at a nursing

3   home that my sister-in-law at the time was working at.

4   And so I started working there as a -- as a nurse

5   assistant or nurse's aide I guess is what they call

6   them.  And that's where I met Linda.

7   Q   And after you graduated medical school -- I believe

8   you said 1987?

9   A   Yes.

10  Q   Well, before we go there.  What are you doing --

11  you're not currently practicing medicine, are you?

12  A   No.

13  Q   What are you doing now?

14  A   Well, presently I have a job working at Ultimate

15  Electronics as a delivery driver and work in the

16  warehouse.

17  Q   And are you doing that to make sure you can continue

18  to provide for your family the best way you can?

19  A   Right.

20  Q   Okay.  Now, after medical school, can you tell the

21  jury what your first job was?

22  A   My first job after medical school?  Well, after

23  medical school I did an internship at Riverside

24  Hospital.  And that was actually a paid position.  It

25  was just a year of rotating internship.  It's required

4381

1    at the time for all D.O.s to do.  And then after that I

2    applied -- well, I didn't necessarily apply.  I was

3    going to go to internal medicine through Wesley and I

4    didn't think I needed to sign up for the match system

5    because they typically didn't fill that, all the

6    positions, so I planned on going and doing internal

7    medicine.  But those spots all did fill that year and so

8    I got the job working for Riverside Hospital as their

9    first hired family practitioner.

10   Q    And do you remember what year that was?

11   A    It was 1988.

12   Q    And were you fresh out of school when you were hired

13   on with Riverside?

14   A    Yes.

15   Q    And where was that clinic located?

16   A    In Haysville.

17   Q    And did you specifically request to work in

18   Haysville?

19   A    Yes.  The CEO at Riverside at the time said they had

20   property in Haysville and that's where we lived and so I

21   thought that was ideal because I had previously tried to

22   see if a position would be available with one of the

23   doctors that was in Haysville at the time and he wasn't

24   really interested in a partner at the time.  He said if

25   I wanted to buy his practice, I could buy it for a

4382

1    million dollars, which I didn't have no million dollars,

2    so -- so Mr. Dixon was the CEO.  He had approached me

3    and asked me if I would be interested and -- if they

4    built a clinic down there and if I would, you know, work

5    for 'em.  And I said yes.

6    Q    Okay.  And you were the first doctor to work with

7    Riverside in the Haysville area?

8    A    Yes.  I was the first hired family practitioner.

9    There was two other doctors that signed on shortly after

10   I did but they worked on the west side of town, of

11   Wichita.

12   Q    And do you remember those doctors names?

13   A    Dr. Carolina Sordia and Dr. Dennis Knight.

14   Q    Do you remember to this day how many patients you

15   saw on your first day in practice at Riverside?

16   A    I believe it was ten patients the first day we

17   opened.

18   Q    Now, how long were you with Riverside?  Well, let me

19   back up.

20        When you first started with Riverside, did you have

21   any support staff with you?

22   A    Yeah.  We had two employees and I was in the hiring

23   process with those.  We interviewed a bunch of people

24   and there was a receptionist that we hired and a medical

25   assistant.

4383

1   Q    How big was that clinic?

2   A    It was a big enough clinic to have two physicians.

3   There was two offices for the physicians but I was the

4   only physician at the time.  So we had -- I think there

5   was four examine rooms on both sides.

6   Q    And so right now let's just take a pause.  You've

7   started your medical career in 1988.

8   A    Yes, it was December of '88.  And prior to that,

9   actually, while I was waiting for the clinic to be built

10  I was doing some ER work for Riverside and also some

11  moonlighting at McConnell Air Force Base in the

12  emergency room.

13  Q    So you had emergency room experience with Riverside

14  and emergency room experience with the Air Force?

15  A    Yes.

16  Q    Was that in 1988?

17  A    Yes.

18  Q    Now, how long did you stay with Riverside?

19  A    I worked for Riverside until September 2001, I

20  believe.

21  Q    And why did you stop working for Riverside?

22  A    Riverside got bought out by Via Christi and Via

23  Christi was wanting to -- had to have all the physicians

24  sign a new contract with them.  And our negotiations

25  weren't going forward.  We could not agree with the

4384

1    contract.  And at the time there was another group that

2    was pursuing me to join their practice so --

3    Q    And do you remember what -- and you left in

4    September of 2001?

5    A    I believe so.

6    Q    And when you left Riverside, where did your

7    employment journey take you next?

8    A    I contacted Dr. Dave Nederle in Derby.  He was kind

9    of the head of Family Medicine Centers because he's the

10   one that was trying to recruit me.  And I told him I

11   would be available; and he helped, helped -- him and his

12   staff helped me get started in a little clinic in a

13   shopping center just a block away from where I was at

14   previously.

15   Q    What was the name of Dr. Nederle's group?

16   A    Dr. Nederle's group was called Family Med Centers.

17   And then they had ten partners and when -- and then when

18   they talked to me they put me in as the 11th partner.

19   And we all had our own little clinics.  Although some

20   clinics had multiple physicians in 'em.  But I was the

21   only one in the Haysville Family Med Center.

22   Q    So in 2001 you had been recruited by Dr. Nederle,

23   joined his group.  Your location was called Haysville

24   Family Medical Center.  Were there other Family Medical

25   Centers with different names?

4385

1    A    Yeah.   They were Hays -- they were Family Med

2    Center, Derby; Family Med Center, Southwest.   There was

3    one in Rose Hill.   There was another one on the east

4    side someplace.

5    Q    Okay.   And how long were you with the Haysville

6    Family Medical Center?

7    A    About, I don't know, eight months, seven months,

8    something like that.   We were in an optometry clinic,

9    actually.   It had three examine rooms which were made

10   for optometrists -- for an optometrist; and it really

11   wasn't adequate for what we needed, and shortly after we

12   got started there we were making plans to build another

13   Haysville Family Med Center and my plan was for a bigger

14   Med Center to employ more physicians and their idea was

15   not to have that big of an office and not that big of an

16   expense to start off.   And I was seeing a lot of

17   patients in this little clinic and the overhead was very

18   low, you know, and so I would get our monthly statements

19   and every month it said we were in the hole.   And I

20   didn't -- I couldn't understand that until I found out

21   that being partner that you had to -- they split up the

22   expenses for all the clinics and you had to pay your

23   percent.   And so, with me just having a little clinic

24   like that and I was the only provider, I was still

25   having to pay my little less than 10% of everybody's

4386

1    expenses and so it didn't work out.  And so I told Dr.

2    Nederle, I said, well, I'm just not going to be able to

3    stay with you because I can't afford to stay with you.

4    Every month we're going in the hole.

5    Q    At some point did you and Dr. Nederle and the other

6    physicians have a disagreement on the type of patients

7    you were seeing?

8    A    Well, yeah.  I had some Medicaid patients and nobody

9    else in the group had Medicaid and so they didn't --

10   they frowned on me for that and they likewise were

11   wanting to drop all the Medicare and I didn't agree with

12   that.

13   Q    Why didn't you agree with that?

14   A    Well, these were my patients.  I wasn't just going

15   to turn 'em out.

16   Q    But you understood you were losing money; correct?

17   A    Yes, I was losing money, but that wasn't my focus.

18   Q    Okay.  Did they have a meeting with you and tell you

19   that they didn't want you seeing these Medicaid

20   patients?

21   A    No, not so much.  They just suggested that everybody

22   else is not taking Medicaid and suggested that I didn't,

23   too, but --

24   Q    Okay.  And when did you decide to -- strike that.

25        Yeah, when did you decide to break away from the

```
 1    Haysville Family Medical Center?
 2    A    It was in the early part of '02.  I don't remember
 3    the exact date.  We had some management people from
 4    Derby that were, were -- they lost their job and they
 5    talked me and Linda into opening up our own practice and
 6    they seemed to think that we could do it with the volume
 7    we had and that we could -- and so this gentleman helped
 8    start Schneider Medical Clinic.
 9    Q    Now, let's take a snapshot.  Right around --
10    before -- towards the end of when you were with the
11    Haysville Family Medical Center but before you started
12    the Schneider Medical Clinic, how many providers were
13    with you?
14    A    It was me and then prior to me quitting Family Med
15    Centers I had hired Kim He'bert.
16    Q    And I think we've seen her name.  She came,
17    eventually she came with you from Haysville Family
18    Medical Center to the Schneider Medical Clinic?
19    A    That's correct.
20    Q    Did you have any other staff at this time before you
21    actually split away from Haysville Family Medical
22    Center?
23    A    Yes.
24    Q    Who else did you --
25    A    Well, there was Brenda Whitehead.  She was doing the
```

4388

1    billing.  I think there was another billing person I

2    think was Elaine Gallaher, which was a nurse.  There was

3    Brenda Byer, which was a nurse.  There was Brenda Eller,

4    which was a receptionist.

5    Q   Now, during this time period, I want to make sure

6    the jury understands what's happening.  You were in

7    negotiations with the Haysville Family Medical Center to

8    build a new location?

9    A   Right.

10   Q   Had you already started making plans like

11   architectural drawings and --

12   A   Correct.

13   Q   And there was a disagreement with what you wanted,

14   what you -- the vision you had and with what Haysville

15   medical center wanted?

16   A   Right.  I took our plans over there and showed it to

17   'em because they had the monthly meetings and stuff and

18   they thought we needed to scale down.

19   Q   Okay.  And what type of facility were you trying to

20   build?

21   A   I was wanting to build a nice family practice clinic

22   in Haysville and I wanted it to be able to do other

23   things than just family practice.  I was wanting to get

24   other modalities.  Like we talked to a cardiologist.  We

25   talked to an orthopedic specialist.  And have them come

4389

1    down and see patients down in Haysville where our

2    patients wouldn't have to drive to Wichita to be seen.

3    Q    And the place that became known as Schneider Medical

4    Clinic, that building, was that the vision that you had

5    in place?

6    A    My vision was I really didn't care what it looked

7    like.  I told Linda what I was wanting as far as examine

8    rooms and X-ray and lab and I said I don't care if it's

9    a metal building or what, you just get me the clinic,

10   you know.

11   Q    And how many examine rooms were you thinking you

12   wanted?

13   A    I wanted enough for at least four providers and so I

14   thought that I would need approximately 16 examine

15   rooms.

16   Q    And what about X-ray, why did you want X-ray at the

17   location?

18   A    Well, X-ray is really handy for acute situations if

19   you want to see somebody has like a pneumonia or if they

20   got a fracture of a bone of some sort.  Or you could

21   even do some abdominal X-rays that are helpful for acute

22   situations.

23   Q    And you wanted labs inside the facility as well?

24   A    I just wanted the basic lab; but I was going to run

25   all our blood that we drew and we already had contracted

1    with Lab Corp for that.

2    Q    So at some point did the Schneider Medical Clinic

3    open up prior to the building being built?

4    A    Yes.  We had Schneider Medical Clinic at the

5    optometry clinic while the building was being built.

6    Q    And do you remember when the Schneider Medical

7    Clinic actually opened up?

8    A    I don't remember, no, not exactly.  I think it was

9    in November of '02 or -- yeah.

10   Q    Let me rephrase that better.  Do you know when the

11   actual official switch was made from Haysville to

12   Schneider Medical Clinic?

13   A    No, I don't remember.

14   Q    Okay.  Now, when you switched over from Haysville

15   Family Medical Center to the Schneider Medical Clinic,

16   did your patients all stay with the Haysville Family

17   Medical Center group?

18   A    No.  They followed me.

19   Q    And so let's just take another snapshot in time.

20   Now, you've been having patients since 1988 from

21   Riverside.  Did those patients follow you to Haysville

22   Family Medical Center?

23   A    A lot of them did, yes.

24   Q    And then when you went from Haysville Family Medical

25   Center you had your same patients follow, at least the

4391

1    majority of patients followed you to Schneider Medical

2    Clinic?

3    A    Yes.

4    Q    So you didn't just all of a sudden wake up one day

5    and have 10,000 patients come through your door.  Is

6    that fair?

7    A    That's correct.

8    Q    Now, when you opened up the Schneider Medical

9    Clinic, can you tell the jury about who your initial

10   staff was?  And I'm talking about before the building

11   was actually built.

12   A    Before the building was built I think we talked

13   about we had myself, Kim He'bert and the administrator.

14   Then we had Linda was working as the office manager; but

15   we had tried prior to her being the office manager, we

16   had tried to hire an office manager that just didn't

17   work out and so she was kind of filling in until we

18   actually found an office manager and we thought that the

19   one billing person was going to possibly be able to do

20   that but she wasn't forceful enough.  She was really

21   timid, and so she stayed in billing.  So there was her

22   and Brenda Whitehead, Brenda Eller and Brenda Byers and

23   Elaine Gallagher, I believe.  And there was also

24   Ulysses.

25   Q    Now, at some point the actual building of the

1    Schneider Medical Clinic was actually built; correct?

2    A   Yes.

3    Q   And I believe you told the jury that you told Linda

4    at least equipment wise what you wanted.  And was it

5    basically her brainchild as far as the design --

6    A   Yes.

7    Q   -- and everything?

8    A   Yes, it was.

9    Q   Now, when you decided to open this clinic, did you

10   pay cash for that building?

11   A   No.

12   Q   How did you finance that building?

13   A   We went to the bank, or Linda mainly did, and talked

14   to 'em about what we were wanting to do and took our

15   financial records and we also had some certificates of

16   deposits and they loaned us the money.

17   Q   And how much did it cost to get that building off

18   the ground?

19   A   It was over $2 million.

20   Q   And that was financed by the bank?

21   A   Yes.

22   Q   Before you tried to open this first class location,

23   did you ever just consider, you know, staying inside a

24   shopping mall and just having less rooms and less

25   providers?

4393

1    A    It was very crowded and it was an inadequate space

2    for a family practice clinic.

3    Q    And so when you were opening this location you were

4    trying to make it large enough so you could service your

5    patients?

6    A    Yes.

7    Q    Now, was this a quiet opening of this, of this

8    building?

9    A    No.  We had it advertised.  We had the mayor, I

10   believe, was there.  The police chief was there.  Some

11   other Chamber of Commerce people were there on the

12   ground breaking.  And some media and, of course, the

13   construction crew and the designer.

14   Q    And was it covered by the media?

15   A    It was covered by the local media, I believe.

16   Q    Did you have an open house as well?

17   A    Yes, we did.

18   Q    When this place opened up, I believe you told the

19   jury that you wanted it to be a family practice that

20   offered a lot of different services?

21   A    Yes, we did.

22   Q    Was it ever your goal to become a pain clinic?

23   A    No.

24   Q    Did you ever advertise that you were opening a new

25   pain clinic?

4394

1   A    No.

2   Q    Now, when you decided to -- when you actually opened

3   up the actual location, did you bring in any other

4   providers?

5   A    Yes.  We hired Donna St. Clair.  Donna was having

6   some problems working with Via Christi.  They were

7   wanting her to do some more hours than I think what she

8   wanted to do.  And she asked us if we would hire her if

9   she could get the hours that she wanted and we said yes.

10  And so she joined us right off the bat when we opened in

11  November at the new building.

12  Q    And did you hire any other physician -- did you hire

13  any or did any physician's assistants join you?

14  A    Yes.  Curt Atterbury joined us shortly afterwards

15  because the Via Christi clinic that I initially was in

16  closed and he was looking for a job and I put him to

17  work.

18  Q    And so Curt Atterbury is your wife's brother?

19  A    Right.

20  Q    And he was working with Via Christi before he worked

21  with you?

22  A    He was working actually with me when I was working

23  for Riverside and he was my first physician assistant.

24  He did a rotation at my clinic and I talked to the CEO

25  at the time and recommended him hire him to work with me

1    at the clinic and so he was working there even past when

2    I left.

3    Q   Okay.  And when you all opened the Schneider Medical

4    Clinic, was it somewhat of a family business?

5    A   Yes.

6    Q   Did you try to hire family members if you believed

7    they could do the job?

8    A   Yeah.  I mean, we would help out our family members.

9    If they needed a job, we would put 'em to work.

10   Q   But Curt had experience as being a physician's

11   assistant before you brought him on with the Schneider

12   Medical Clinic?

13   A   Oh, yeah.  He was an excellent physician's

14   assistant.  I mean, he could have probably got a job

15   anywhere.

16   Q   And did Kim He'bert come with you?

17   A   She came with me from over at the optometry clinic.

18   She initially was working part-time because we needed

19   some help.  I tried to expand the hours to weekends when

20   I was working in the optometry clinic and so she was

21   working weekends.  And she worked for Dr. Couch at the

22   time prior to working with me down there.  But I had had

23   her as a PA student when I was working at Riverside.

24   And she was interested in coming to work for me.  She

25   had gotten -- Dr. Couch and his wife didn't really

4396

1    appreciate her working for me and they gave her the

2    ultimatum that you either work for Dr. Schneider or you

3    work for Dr. Couch but not both.  And so she decided to

4    come to work for us.

5    Q   Now, there's another pause for a snapshot.  At this

6    point now you have four providers:  You, Dr. St. Clair,

7    Curt Atterbury and Kim He'bert; is that right?

8    A   Correct.

9    Q   Now, the way we've been hearing about physician's

10   assistants, they've all -- they've sounded like

11   glorified medical assistants.  Are they much more than

12   that?

13   A   Yes.  They have the training, just like the PA said

14   yesterday, that they have essentially the same training

15   except it's all squeezed into two years instead of four

16   years and they have the knowledge to make their own

17   medical decisions, write their own prescriptions, and

18   they just have to have a supervisor that checks off on

19   their work.

20   Q   And do physician's assistants gather their own

21   patient loads?

22   A   Yes.  Matter of fact, Kim, when she first joined us,

23   brought patients from Dr. Couch with her.  And Curt

24   definitely brought patients with him when he came.  As

25   Dr. St. Clair brought patients with her when she came.

4397

1    Q    So, again, you know, we've heard this 10,000 number.

2    All these patients weren't there just for Dr. Stephen

3    Schneider.  Is that fair?

4    A    That's correct.

5    Q    And so when you brought these additional providers,

6    you brought a patient case load; correct?

7    A    Yes.

8    Q    Now, was there ever a decision when you brought

9    these new providers that, yes, we will continue to see

10   Medicaid patients or, no, we're not going to see 'em

11   since we have this new building?

12   A    No.  I don't remember any discussion with the

13   providers asking do you think we ought to keep Medicaid

14   or not.  No, I don't think we ever had that discussion.

15   Q    Now, before we move on talking more about the

16   Medicaid individuals, I want -- let's take a look at

17   some photographs.  I think we've only seen a couple of

18   pictures of the clinic.

19          MS. TREADWAY:  Judge, I don't believe they

20   need to be displayed before they're admitted.

21          THE COURT:  Yes.

22          MR. WILLIAMSON:  Okay.

23   BY MR. WILLIAMSON:

24   Q    We'll take a look at them in a second.  We'll get a

25   print copy for you, Dr. Schneider.

4398

1          Now, when you, you and your new providers opened up

2     and started the Schneider Medical Clinic, were you still

3     seeing Medicaid patients?

4     A   Yes.

5     Q   Were there a lot of providers in Wichita taking

6     Medicaid patients?

7     A   That's always been a problem with Medicaid

8     population is finding providers to care for them.

9     Typically, a provider that's been in practice for quite

10    sometime has got an established patient population and

11    they feel like they don't need to take any extra

12    Medicaid patients and so it, typically, it's hard for

13    Medicaid patients to find a provider.  And it's just --

14    I always felt that, you know, the Medicaid people are

15    some of the sickest people that needed help and if I

16    could get 'em functional that they would get better and

17    get real insurance and get a job or get real insurance.

18    But that usually is a slow process.

19    Q   Now, when you were at Riverside and at the Haysville

20    medical center, did you take care of people who were

21    suffering from chronic pain?

22    A   Yes.

23    Q   And were a lot of these people on Medicaid?

24    A   Yes.

25    Q   And did you try to refer them out to pain

4399

1    specialists?

2    A    Yes.

3    Q    And what was the normal response you would get?

4    A    It was very difficult to get a Medicaid patient to

5    see any specialist, let alone a pain specialist.  There

6    was very few pain specialists in town, and, of those, I

7    really don't know any that took the Medicaid population

8    unless they were admitted to the hospital and they were

9    consulted.

10   Q    Okay.  Now, that brings us up to about 2002 which I

11   guess catches us up to where the majority of these

12   allegations are concentrated.  We're going to try to --

13   I'm going to try to ask you any question that I think a

14   juror wants to know to be able to decide this case.

15   Okay?

16   A    Sure.

17   Q    And you understand that some of them may be

18   difficult questions?

19   A    Yes.

20   Q    You promise not to beat me up when we leave?

21   A    No.

22   Q    Let's start talking about your scheduling.  You

23   would -- well, one second, strike that.

24                      (Off-the-record.)

25

4400

BY MR. WILLIAMSON:

Q   Doctor, I'm going to hand you what I've just marked as D-015.  It's a series of photographs.  Do you recognize those photographs?

A   Yes.

Q   And are those various photographs of the Schneider Medical Clinic?

A   Yes.

Q   And do those accurately reflect what the Schneider Medical Clinic looked like during the time in question?

A   I believe so other than I don't see any examine room photos here.

Q   So it's missing -- it's not a complete picture array of every room in the clinic?

A   That's correct.

Q   But what is on on those pictures is accurate?

A   Yes.

            MR. WILLIAMSON:  We'll move to admit D-015.

            MS. TREADWAY:  Could we place them in time please?  Foundation.

            THE COURT:  What?

            MS. TREADWAY:  Could we place them in time when they were taken.

            THE COURT:  Well, he asked the Doctor if they accurately reflected the time in question which I assume

1    is approximately 2002 to 2007.

2              MR. WILLIAMSON:  Correct.

3              THE COURT:  Would that be right?

4              MR. WILLIAMSON:  Yes, Your Honor.

5              MS. TREADWAY:  That's what I wanted to

6    reflect, Judge.  Thank you.

7              THE COURT:  They're received.

8    BY MR. WILLIAMSON:

9    Q   Well, let's just take the jury on a tour looking at

10   some of these pictures and explaining to the jury what

11   we see.  Now, looking at these pictures, going back to

12   the first one, this is a picture taken of the clinic

13   after it closed?  Did the grass used to look like that

14   when business was occurring there?

15   A   I don't know when the photo was taken for sure; but,

16   yeah, there's a lot of weeds and stuff in the rock

17   garden there.

18   Q   Okay.  Now, that -- is that the outside of the

19   clinic?  I think the Government showed a picture similar

20   to that.

21   A   Yes.

22   Q   Let's look at the next picture.  What is that dome

23   we see?

24   A   That's the dome in the lobby.

25   Q   And let's go to the next one.  Now, is that the

4402

 1    entryway from the clinic?  I mean from outside.

 2    A   Yes, it is.

 3    Q   And is that dome we just looked at like right above

 4    that door?

 5    A   Yes.

 6    Q   And let's look at the next one.  This is another

 7    picture from the -- of the entryway; correct?

 8    A   Yes.

 9    Q   And looking off to the right we see chairs over

10    there.  Is that part of the waiting room?

11    A   Yes, it is.

12    Q   And let's take a look at the next picture.  Is that

13    a better view of the waiting room?

14    A   Yes.

15    Q   Now, is this where the patients would sit and wait

16    to be called to the back?

17    A   Yes.  But, you know, on the other side there's

18    chairs on this side also.  So they're lined all the way

19    around.

20    Q   So we don't have a picture looking at the other

21    side.  It essentially mirrors that side?

22    A   Yes.

23    Q   And just so we can have an understanding, when

24    you -- the Clinic was designed to have two mirror images

25    of each other; correct?

4403

1    A    Yes.

2    Q    So the two providers would be on one side and have a

3    layout and two providers would be on the different side

4    and have a layout?

5    A    Yes.

6    Q    About how many people would be able to be sat in the

7    lobby?

8    A    I don't remember.  I think it was around 30.

9    Q    So it wasn't seating for hundreds and hundreds of

10   people the way it's been portrayed?

11   A    That's true.

12   Q    And let's look at the next picture.  Not that one.

13   That one.  What is this?  What are we looking at?

14   A    That's a nursing station.  When they go through the

15   doors to be called back, this is the area typically they

16   would get their weight checked and where the charts

17   would be on this counter here and a sign-in sheet for

18   when the patient comes in.

19   Q    Now, looking off to the right we see a couple of

20   doors with some placards next to it with a looks like a

21   document holder.  What type of rooms are those?

22   A    Those are the examine rooms.

23   Q    And what would be placed in those document holders?

24   A    That's where the charts would go after the patient

25   got checked in.  They would put the chart in the folder,

4404

1    or in that chart holder there.  Usually laying like

2    sideways.  And then if something needed to be done then

3    the chart would be turned up on its side up and down.

4    Q    Okay.  So there was a system in getting people in

5    and getting them seen by a physician?

6    A    Yes.

7    Q    Let's look at the next picture.  Can you tell the

8    jury what we're looking at now?

9    A    That's part of the X-ray machine.

10   Q    And let's just scroll through to the next picture.

11   What is that we're looking at?

12   A    That's for the chest X-rays.  Where the film goes

13   into the deal.

14   Q    And then the next one?

15   A    That's just another X-ray picture.

16   Q    Okay.  Now, you had to finance all of this

17   equipment; correct?

18   A    Yes.

19   Q    Was this part of the loan that you got from the bank

20   to open the location?

21   A    Yes.

22   Q    So when you opened this building, you were financing

23   essentially everything that you needed or believed you

24   needed to be able to give patients full care?

25   A    Yes.

```
 1    Q   Let's move to the next picture.  What are we looking
 2    at here?
 3    A   This is the lab, part of the lab anyway.  Those
 4    chairs are where they drew the blood.
 5    Q   And we see equipment there.  Who would be there
 6    drawing the blood in these locations?
 7    A   Whatever nurse or medical assistant was in the lab
 8    that drew blood.  Brenda Byer was the main one.
 9    Q   And let's look at the next one.  What are we looking
10    at here?
11    A   That's the chart room.
12    Q   Well, when the Government was presenting their case
13    they made it seem like every chart in this building was
14    just everywhere and there was no organization system
15    everywhere -- anywhere, excuse me.  Did the Clinic
16    attempt to have an organization system for the charts?
17    A   Of course we did.
18    Q   Tell the jury what we're looking at and how these
19    charts are organized?
20    A   Well, they're arranged in alphabetical order and
21    other than that, they have their numbers, their names on
22    the side of the chart and a number that corresponds to
23    the patient, I believe.
24    Q   All right.  And let's look at one final picture.
25    We're looking at cubby holes.  Where are we looking at
```

4406

1    here?

2    A   This is in the basement.  This is the business,

3    billing office area.

4    Q   Okay.  And so you mentioned the basement.  Who all

5    was in the basement?

6    A   Well, at different times different people but --

7    Q   Let me rephrase that.  Like what personnel titles?

8    A   It was the billing.

9    Q   And they had their own area that -- did providers

10   frequent this area?

11   A   No.  Rarely went down in the basement for anything.

12   Q   And did you -- you hired Brenda Whitehead as the

13   billing manager.  And was she in charge of this

14   department down there?

15   A   Yes.

16   Q   All right.  You can take those down now.

17        All right.  So as it stands, we have seen a

18   location that you've -- does this give a better picture

19   of what the Schneider Medical Clinic actually looked

20   like?

21   A   Yes.

22   Q   Does it give a full picture of what it looked like?

23   A   No.

24   Q   What is it missing?  What else did we not see?

25   A   Well, we didn't get to the doctor's offices.

4407

1    There's also a sample room.  There's the rest of the

2    lab, the other side of the lab which had sinks and

3    stuff.  There was several bathrooms, you know, we had

4    employee bathrooms.  We had an employee break room.  We

5    had a change room for when they did X-rays.  There was

6    also, like I say, the examine rooms.  And there was two

7    procedure rooms.  Of the 16 examine rooms, two of 'em

8    were procedure rooms that had a table that went up and

9    down and tilted and was used for procedures.  Both rooms

10   had that.  Had electrocautery to do, you know, burn off

11   warts or whatever.  And, let me see, there was -- out in

12   the lobby there was an area for drinks and there was two

13   bathrooms out there.  There was two bathrooms by the

14   laboratory for urinary samples, you know.  There was

15   another office space upstairs near the lobby for the

16   coder.  And, like I said, there was bathrooms out there

17   in the lobby.  There was a storage room also over there

18   by the -- where the refreshments were and the candy

19   machine.  And there was a janitorial closet over there.

20   And down in the basement there was a big room for the

21   computer and stuff and another storage area.

22   Q    Now, with the computers and the information and the

23   electronics in the basement, did the clinic have a, like

24   a central server with all the computers networked there?

25   A    Yes.

4408

1    Q   And did you all have software that would help keep

2    track of what patients you saw and when?

3    A   Yes.

4    Q   Did you have software that was used to send billing

5    information to, like, the insurance companies?

6    A   Yes.

7    Q   If I asked you about how that -- those computers

8    work, could you tell me anything about 'em?

9    A   I don't know much about the computer stuff other

10   than, you know, the tablet thing I used for when I went

11   to see patients.  It had patient information in there

12   and the ability to check when they were last seen, their

13   vital signs in a chronological order and a graph of what

14   they had been up and down.  And, you know, I could get

15   into their labs and I could look up correspondence.  I

16   could look up -- I could send electronic prescriptions

17   to the pharmacy through this little pad.

18   Q   Okay.  And we'll get into a little bit more about

19   that pad and when you implemented all of the

20   information.  Did you hire somebody to be the

21   administrator of the office?

22   A   Yes.  We had an initial administrator that helped us

23   organize Schneider Medical Clinic.  He helped us get

24   started.  He got the lawyers and and he got the LLC

25   started.  And he's the one that ordered the computer

4409

1    stuff.  He's the one that ordered all the phone systems.

2    And he also helped us get the furniture and stuff for

3    the Clinic.

4    Q    And at some point his employment ended with the

5    Clinic?

6    A    Yes.

7    Q    And then who did the Clinic bring on to be an

8    administrator?

9    A    We asked Tim McDonald if he would do that.

10   Q    And is Tim of any relation to you?

11   A    He's no relation.  He's just a good friend of the

12   family.

13   Q    And did he have computer experience and those type

14   of things?

15   A    Yes.

16   Q    And was he the administrator until the time that the

17   Clinic closed?

18   A    Yes.

19   Q    Now, what was Linda's job function while she was at

20   the Schneider Medical Clinic?

21   A    Well, she kind of run the front office, you know,

22   help coordinate things.

23   Q    What was her main responsibility?

24   A    Dealing with the staff.

25   Q    Okay.

4410

1    A    And she would, you know, like the person that put

2    out fires and try to keep the employees happy.

3    Q    Did the Clinic attempt to hire people that they

4    believed needed a chance, an opportunity?

5    A    She would hire people that definitely were down on

6    their luck.

7    Q    And I think we've heard several people state that,

8    you know, after they left the Clinic they couldn't get

9    jobs.  Did you find that -- well, strike that.

10        When you were starting this clinic, you mentioned

11   that you weren't seeking to be a pain clinic.  Can you

12   tell the jury during that time period what kind of

13   medical conditions did you treat people for?

14   A    Any family practice clinic treats infants to

15   elderly, geriatrics, and so patients typically come to a

16   family practitioner for a variety of reasons but

17   typically it's a painful condition.  You know, it's a

18   sore throat, earache, stomachache, headache, backache,

19   and so family practitioners deal with pain.  And when it

20   comes to chronic pain, it's another story.

21   Q    And we'll talk about chronic pain specifically.  So

22   make sure we understand.  You didn't limit your practice

23   by age or patient; correct?

24   A    That's correct.

25   Q    Did you limit it by the type of insurance a person

4411

1    received?

2    A    No.

3    Q    Did you limit your practice based on a person's

4    social or economic status?

5    A    No.

6    Q    Just kind of give us a gamut.  Just run down the

7    list of ailments that you remember treating?  Just give

8    us like 10 to 15 of things other than chronic pain that

9    you recall treating on a regular basis?

10   A    Well, one of our big focuses were diabetes.

11   Diabetes, of course, effects every organ of the body and

12   so when you talk about diabetes you're talking about

13   lots of things because it effects the circulation

14   throughout your body so it can effect your eyes.  I

15   mean, that's why -- or your feet.  That's why people

16   lose their toes and stuff like that when they have

17   diabetes because it effects the circulation.  So

18   diabetes was a real main focus that we had.  And Kim

19   He'bert, she was excellent with adjusting people's

20   insulin levels and stuff like that so she was very good

21   with diabetes.  And also Lee Craig was good with

22   diabetics because actually his father-in-law was Dr.

23   Guthrie and he was working at his clinic for a while.

24   So diabetes was one.

25        Definitely dealing with cholesterol levels, you

1      know, dyslipidemias, checking blood and stuff like that.

2      We would monitor their cholesterol levels and give 'em

3      medication for that.  There's hypertension.  I mean, we

4      would check people's blood pressure whether they were in

5      pain or not and treating the blood pressure.  There was

6      earaches, sore throats, congestive heart failure, COPD.

7      I think you guys heard about that.  Congestive --

8      chronic obstructive pulmonary disease.  There was

9      asthma.  Allergies.  Ingrown toenails.  There was

10     abdominal problems.  Female, you know, examines.  We did

11     pap smears.  We had -- actually we had two pap tables

12     that weren't mentioned before, I believe.  So we did

13     gynecological examines.  We did -- took out foreign

14     bodies if somebody had splinter or something like that.

15     Or if they had something in their eye, we would take out

16     the foreign body from the eye.  We would do procedures

17     like cut cysts out or a suspicious looking levi (ph) or

18     moles to rule out cancer.  Matter of fact, we caught

19     several cancers of the skin, including melanoma.  Which

20     Dr. Simons actually caught one of those.  And we were

21     doing immunizations for children.  We were doing sports

22     physicals.  We were doing just health maintenance as far

23     as preventative health care.  We gave all sorts of the

24     shots to prevent infections.  And we did DOT physicals

25     for drivers.  We also did physicals for flight training,

4413

1    flight physicals.  I was not trained in that but Dr. St.

2    Clair did that.  And we invested in a specific machine

3    she needed to do those flight physicals.  And -- is that

4    enough?

5    Q   So is it fair to state that the Clinic was trying to

6    treat people fully and not just chronic pain patients?

7    A   Of course.

8    Q   Now, the Government put an exhibit up that stated

9    that of the Clinic population, 50% received a controlled

10   substance.  Does that equate to 50% of your patient

11   populations were chronic pain patients?

12   A   Say that again.

13   Q   Yes.  Did you have -- was 50% of your patient

14   population chronic pain patients or was it just at some

15   point in time during their treatment there they received

16   a controlled substance prescription?

17   A   I don't believe that 50% of our population was

18   chronic pain; but even if they did have chronic pain,

19   they weren't just treated for chronic pain.  They were

20   treated for other ailments or diseases.

21   Q   Well, let's start talking regarding scheduling.

22   When would you normally come to work?

23   A   I usually went to work at 7:00 in the morning.  I

24   would try to, you know, review the charts with the PA

25   that they'd seen patients the previous day and go over

4414

1      refills in the morning on the computer.  They were

2      computerized.  They would come to my computer, I'd check

3      it and see if there was refills that needed to be done.

4      If there was any correspondence that needed to be

5      checked off.

6      Q    And how many patients would you actually see on an

7      average per day?

8      A    I think 30, 40 patients is typically what I would

9      see.  I'm certain there was days I would see 50 or more;

10     but typically it was 30, 40.  40 was really a hard day.

11     Q    And on the days where you would see more than 40,

12     would you still be able to leave work at 5:00?

13     A    Yes.  I mean, rarely would I leave any patients for

14     the PA to see that were my patients.  It would only

15     happen if I was way behind and I asked the PA if they

16     wouldn't mind seeing them.  But that was a rare thing.

17     I wasn't doing that on a daily basis.

18     Q    Did you want to see your patients?

19     A    Of course.

20     Q    And there was testimony about these meetings with

21     pharmaceutical reps.  Did you have regular meetings with

22     pharmaceutical reps?

23     A    As busy as we were, we were probably targeted by

24     pharmaceutical reps.  There wasn't a day that went by

25     that we didn't have probably half a dozen reps in there,

```
 1    at least half a dozen reps a day come in.  And as busy
 2    as we were, we typically didn't have time to talk with
 3    these reps.  I mean, we would try to be as cordial as
 4    possible.  I would never turn a rep down by coming in
 5    because they were giving us samples of medication and
 6    giving us good information about their product.  But I
 7    would always tell them if they wanted to spend more time
 8    to go into more detail about anything that if they
 9    bought our lunch it would be a better way to do this.
10    Q    And did you schedule appointments over -- excuse me,
11    did you schedule clients -- excuse me.  Did you schedule
12    patient appointments over the lunch hour?
13    A    No.  Only time -- that's wrong.  Doctor St. Clair
14    seen patients on her days that she worked half days, she
15    would see patients until 1:00.  And so she would work
16    through the lunch hour and then she would go home.  So
17    those patients were scheduled for her.  But, otherwise,
18    the clinic -- other providers went to lunch at 12:00.
19    Q    Now, these pharmaceutical reps, what type of
20    medications would they come and try to talk to you and
21    educate you about?
22    A    All kinds.
23    Q    Not just controlled substances?
24    A    No.  Not -- I mean, controlled substance reps, there
25    wasn't a whole lot of 'em because -- there just isn't a
```

4416

```
 1   whole lot of controlled meds that were trying to be
 2   detailed other than the new ones that came out.  And so
 3   there wasn't a lot of those.  So we had, you know,
 4   practically all the pharmaceutical companies from
 5   antibiotics to, you know, asthma medications.  Most
 6   definitely diabetic medications.  The hypertensive
 7   medications.  The cholesterol medications.
 8   Antidepressants.  And skin, skin stuff, medications.  So
 9   anything that a pharmaceutical company wanted to detail
10   we were probably being targeted for.
11   Q   Now, we met Tom Wagner yesterday or the day before.
12   Do you remember meeting with Tom Wagner?
13   A   Yeah.
14   Q   And do you remember that -- the times when he was
15   trying to educate you on Oxycontin?
16   A   Uh-huh.
17   Q   And this Tom Wagner was the same person I believe
18   that First Guard wanted you to meet with to get more
19   education on Oxycontin.  Is that right?
20   A   That's correct.
21   Q   So even these insurance companies relied on these
22   pharmaceutical reps to educate doctors?
23   A   Yes.
24   Q   Now, did you also see patients in nursing homes?
25   A   Yes, I did.
```

1    Q    Tell the jury about when you would do that and who

2    you would do that for?

3    Q    Well, when I first started I did not limit where I

4    went to to see my nursing home patients so I would go to

5    several different nursing homes.  But then later on I

6    decided just to go to one and that was in Haysville.

7    And it changed names several different times but it was

8    the Haysville nursing home.  And I would go once a month

9    to see my nursing home patients.

10   Q    And how many patients would you have out there in

11   the nursing home that you would see?

12   A    I probably had about a dozen probably.

13   Q    And what --

14   A    Oh, I was just going to say, typically, in the

15   nursing home you don't have to see them every month.

16   You have to see them every other month so I would see

17   half one month and half the next month.

18   Q    What type of care were you giving these patients in

19   the nursing home?

20   A    Well, whatever needs they had.  Nursing home

21   patients typically are elderly.  Not always, but

22   typically are.  And so they all have what elderly people

23   have, those kind of disease processes, so I would

24   address all those.  Whether it be diabetes or congestive

25   heart failure, hypertension, COPD, you know, infected

4418

1    toenails or earaches or sore throats or upper

2    respiratory infections.  It's whatever their needs were.

3    Q    And were you on staff at any nursing home?

4    A    I wasn't medical director at any nursing homes, no.

5    I just had -- I mean, I just had patients at nursing

6    homes.

7    Q    Okay.  Now, we heard a PA say that in 2005 the

8    Clinic started scheduling patients at five minute

9    intervals.  Do you ever recall scheduling patients at

10   five minute intervals?

11   A    No.  That was never five minutes.  It was ten

12   minutes there for a lot of the time but then we changed

13   that to 15 minutes.  And then if they had specific

14   things like pap smears, those were scheduled longer.

15   Q    Why was the schedule to bring in patients every ten

16   minutes?

17   A    Well, it was my philosophy that a typical visit

18   doesn't take much more than ten minutes and if it does

19   that, you know, we always had people that would cancel

20   or not show up for their appointments so I really didn't

21   think that -- it was just to kind of keep things

22   flowing, not to have any voids in the time that we were

23   seeing patients.

24   Q    And we heard Dr. Jorgensen state that national

25   studies show that the average visit has gone to about

4419

1   seven minutes per patient.  Did that sound about right

2   to you?

3   A    Yeah, that's what I thought.  And matter of fact,

4   the daughter that just graduated from medical school,

5   she -- they have to take a test to pass, it's a national

6   test, to see a patient and -- for a first time and

7   document everything down and get a diagnosis and what

8   their plan of treatment is and they have to do it all

9   within 10 -- 15 minutes at the most.

10  Q    If you were seeing a patient and it was taking

11  longer than ten minutes, would you just abruptly end the

12  patient meeting and go to the next room?

13  A    No.

14  Q    What would you do?

15  A    Well, we take care of the patient.  And so it took

16  however long it took.

17  Q    And would that be one reason why the schedule could

18  have gotten backed up?

19  A    Sure.

20  Q    Okay.  Now, you've heard -- we've all heard these

21  allegations about you billing for services while you

22  were out of town.  You remember hearing about that?

23  A    Yes.

24  Q    Did you ever authorize anybody to bill for a service

25  or to allege that you conducted a service while you were

4420

```
 1    out of town?

 2    A   No.

 3    Q   Tell the jury how you would communicate to the

 4    billing department -- when I say you, the providers at

 5    the Clinic, how would the Clinic providers communicate

 6    to the billing department as to who the providers were

 7    that actually saw the patients?

 8    A   Well, the fee ticket was the main correspondence I

 9    would assume between us and billing because that's what

10    they utilized to decide who seen a patient.

11    Q   And the jury has seen a fee ticket.  So is it fair

12    that if you were going to try to represent --

13    misrepresent that you saw a patient when you actually

14    didn't, the fee ticket would be the document that the

15    billing department would rely upon?

16    A   Yes.

17    Q   Did you ever instruct any of your physician's

18    assistants to change fee tickets from the accurate

19    representation that they saw a patient to the inaccurate

20    representation that you saw a patient?

21    A   No.

22    Q   Now, you as a physician would have to review the

23    patient charts of your physician's assistants; correct?

24    A   Yes.

25    Q   And when you would look at them and review them, did
```

4421

1   you have about 14 days to get that done?

2   A   Well, I didn't know exactly how many days, to tell

3   you the truth, but that's what I understand.

4   Q   Okay.  And how long would it normally take you to

5   review the charts?

6   A   Well, typically the PA would see the patient and

7   then put the chart on my counter for me to review.  And

8   so if everything goes as planned then I would see, like

9   I said, I would do that throughout the day or the next

10  morning finish up.  But if I went out of town then that

11  would get backed up and so I'd have to do that when I

12  came back.  Or if the other provider, either doctor St.

13  Clair or Dr. Simons, they could do that also.

14  Q   Okay.  And when you would review the chart, would

15  you also review the fee ticket?

16  A   Yes.

17  Q   And would you review the fee ticket in comparison to

18  the documentation that was in the file?

19  A   Yes.

20  Q   And did you try to the best of your ability to

21  accurately code what you believed the documentation

22  showed the visit was worth?

23  A   Yes.  But I rarely changed their whatever they

24  circled.  I mean, occasionally, if I seen something in

25  the chart where they didn't document anything, I would

4422

1    say, well, is that all you did, you're going to have to

2    make it a lower code.

3    Q   Did you ever instruct them to make up information

4    and put on the progress note to act like something

5    happened that did not actually happen?

6    A   No.

7    Q   Now, you talked about a ten minute visit --

8              MR. WILLIAMSON:  Your Honor, at this time I'd

9    like to see if Dr. Schneider could give an example to

10   the jury of what he would do with a patient under a

11   couple of scenarios with the time that he had.  Can we

12   go ahead and take our morning break so we can get

13   everything set up?

14             THE COURT:  Oh, you're going to have --

15             MR. WILLIAMSON:  Yes.  I'm going to be the

16   patient, Judge.

17             THE COURT:  Yes.  We'll do that so they can

18   set up things.  Approximately 15 or 20 minutes, Ladies

19   and Gentlemen.

20                  (Recess.)

21             THE COURT:  Yes, sir.

22   BY MR. WILLIAMSON:

23   Q   Doctor, if you would step down here with us.  We've

24   heard a lot of testimony about the amount of time seeing

25   visits and things of that nature.  I think it would be

4423

```
 1    helpful for the jury just to see what you would normally
 2    do with a patient and what we're going to do is have you
 3    to fill out a progress note as me as the patient and
 4    just a fee ticket of how you normally would do it when
 5    you were practicing.  Okay?
 6    A    Okay.
 7    Q    Okay.  So the jury understands, I never was in
 8    drama, never been an actor, so I'm going to do my best.
 9    All right.  I'm a patient.
10                        (Witness leaves the witness
11                        stand.)
12    A    Hello, I'm Dr. Schneider.
13    Q    Hi.  Lawrence Williamson.  Nice to meet you.
14    A    What brings you in today?
15    Q    I'm having some trouble in my upper right shoulder,
16    my back.  I can't sleep at night and I've been taking
17    about six ibuprofen a day.  But it just kind of controls
18    the pain a little bit but I still just -- it's hard to
19    sleep at night and I can just feel a shooting in my
20    neck, too.
21                THE COURT:  Can you hear him, Ladies and
22    Gentlemen?
23                THE COURT:  The patient better speak up.
24                MR. WILLIAMSON:  I gave a disclaimer, Judge.
25                        (Off-the-record.)
```

4424

1    Q   Okay.  Uhm, I have this shooting pain in my upper

2    right back.  I've been taking about six ibuprofen a day,

3    just when the pain flares up.  And it's normally in the

4    morning when I get -- after I get out of bed and then

5    maybe around 3 in the afternoon.  You know, it's just --

6    and I feel the pain in my neck.  It's hard for me to

7    sleep at night.  So I'm not really getting good rest at

8    night.

9    A   Okay.  So how did this injury happen?

10   Q   I don't know.  I went to -- got a massage one day

11   and like the next couple days after that it stiffened up

12   like really really bad and then, you know, then it kind

13   of relaxed a little bit but it's still bad.  You know, I

14   think like when I played football back in college I

15   remember like, you know, getting like a little stinger

16   is what we call 'em, but I never really thought anything

17   about it because I didn't try to figure out where this

18   is coming from or why.  But I've never had any other

19   trauma to my back in my life.

20   A   This has been going on how long?

21   Q   Just off and on for about six to nine months.

22   A   Okay.  And ibuprofen seems to be helping?

23   Q   It helps for a while.  It's still stiff when I move

24   it.  So when I turn my neck that way I can -- I feel the

25   pain.  When I put my chin to my chest, I feel the pain.

4425

```
 1    But if I'm just standing or looking straight ahead or
 2    just left or right, I don't feel anything.
 3    A    Causing any headaches?
 4    Q    I get a couple of headaches but nothing real
 5    serious.
 6    A    Okay.  Have you had any X-rays or have you seen a
 7    doctor for this?
 8    Q    No.
 9    A    No X-rays?
10    Q    No.
11    A    Okay.  Have you had any previous injuries like this?
12    Q    No.
13    A    Okay.  Does it cause any numbness in your hands or
14    in your neck or shoulder area?
15    Q    I feel like just a little tingling on my right pinky
16    but nothing like it -- I kind of looked this stuff up on
17    the internet 'cause I don't have any insurance.  I try
18    to take care of myself.  And my grip is still strong so
19    I don't think there's anything majorly wrong.
20    A    Okay.
21    Q    With my nerve anyway.
22    A    All right.  Well, I see that you filled out one of
23    these history forms things and I don't see that you have
24    any significant history of any medical problem, any
25    surgeries or illnesses that are continuing problems.
```

```
 1    Also it does say you have two pregnancies.  Do you smoke

 2    or drink or have any drug problems?

 3    Q   No.  Never used any kind of drugs.  I don't like

 4    cigarette smoke.  And I'm -- no.

 5    A   Okay.  There's no significant family history of any

 6    medical problems?

 7    Q   No.  Just like my Great Aunt May, you know, had a

 8    stroke.  But like my dad is still here; my mom is still

 9    here.  My grandmother passed when she was like 60 from

10    pneumonia.  But other than that, we're fairly healthy.

11    A   Had any recent lab work done?

12    Q   No, I haven't been to the doctor in like eight years

13    since I played football.

14    A   And there's no family history of heart disease or

15    cholesterol problems or diabetes or anything like that?

16    Q   Not that I'm aware of.

17    A   No cancers?

18    Q   No.

19    A   Well, let me just do a little examine on you real

20    quick here.  Do you want to leave your coat on or would

21    it be okay to take your coat off?

22    Q   Sure.  I can take it off.

23    A   I'd like to listen to your heart and lungs.

24    Q   Okay.

25    A   Take a deep breath.
```

4427

```
 1          MR. WILLIAMSON:  Let's change so the jury can
 2   see what we're doing.
 3   A    Take a deep breath.  Out.  In.  Out.  In.  Out.  In.
 4   Okay.  Listen to your heart.  Okay.  Any pain in your
 5   abdomen?
 6   Q    No.
 7   A    Anything up in your head going on?  Ear problems?
 8   Sore throat?
 9   Q    No.  I'm okay.
10   A    Check real quick.  Open up.  Say ah.
11   Q    Ah.
12   A    Okay.  Where's the pain at?
13   Q    It's like right here, right in that blade, and then
14   just in my neck.  Whenever I turn, I feel it right in
15   here.
16   A    Okay.  Any pain in these bones up in here?
17   Q    No.
18   A    How about on the sides?
19   Q    No.  Not -- no.
20   A    Right there?
21   Q    It's a little tender but, just, yeah, like in that
22   area.
23   A    On the bone?  On the sides?
24   Q    Kind of on the side.
25   A    Okay.  Right in there?
```

4428

1    Q   Yeah.  I feel that.

2    A   Does it hurt -- motion with your shoulder make it

3    worse?

4    Q   No.

5    A   Check the range of motion in your neck.  Turn your

6    head to the left.  To the right.  Okay.  Straight

7    forward.  Bend forward.  Okay.  And back this way.

8    Okay.  Now I want you to turn your head that way.  And

9    back this way.

10   Q   See, I feel it when I do that.  I feel it right

11   here.

12   A   Hmm.  Well, you got a trigger point there.  It's

13   pretty isolated.  Yeah.  You know, I don't know, I don't

14   feel any bone problems, per se.  But might be a good

15   idea to give you an injection in that seeing how it's

16   been going on for quite sometime.  What I would give you

17   an injection would be like a Marcain (ph) and Celostone

18   (ph) or sort of a steroid to see if we can calm that

19   down.  Is that acceptable to you?

20   Q   Do they have any side effects?

21   A   Yeah.  There's side effects with everything.  Here,

22   I'll let you put your coat back on.  I don't know that

23   we need to do any X-rays at this time but seeing as how

24   the ibuprofen has been helping for you, probably keep

25   with something like that.  Or I'll give you a

1    prescription for a non-steroidol anti inflammatory or

2    something.  And I'll try this trigger point injection

3    and see how that works.  You know, seeing as how you

4    don't have insurance, you know, we may not decide to do

5    physical therapy now but physical therapy might be

6    helpful for you.

7    Q    Okay.  Well, thank you.

8    A    I'm just going to put a diagram of where your

9    trigger point is.  I'll give you a prescription for some

10   Motrin.  We'll try the 600 milligram maybe three or four

11   times a day but you don't have to take it all the time.

12   Problem with Motrin is it can bother your stomach.  And

13   your blood pressure looks fine.  I don't think -- it can

14   cause your blood pressure to go up, too, but if it

15   bothers your stomach, we may have to consider something

16   else or take an antacid or something like that with it.

17   Q    Okay.

18   A    But, anyway, we'll do that.  Give you some Motrin.

19   Have you follow up next week if it seems to continue to

20   bother you.

21   Q    All right.  Is this the end of --

22   A    Other than getting the injection.

23   Q    Okay.  All right.

24   A    This is the first visit; right?

25   Q    First visit.

4430

```
 1    A    So -- I did forget to do something to you, though.
 2    Q    What's that?
 3    A    I was going to check your -- you said you had some
 4    tingling in your hand.  I wanted to check that real
 5    quick.
 6    Q    Okay.
 7    A    Go ahead and grip my hand.  Does that hurt to do
 8    that?
 9    Q    No.
10    A    Okay.  Let me try this hand.  Okay.  If I do that,
11    does that cause any tingling?
12    Q    Just a little bit.
13    A    And what -- what's tingling?
14    Q    My right pinky finger.
15    A    Okay.  Well, that could be something in this ulnar
16    nerve here.  We may need to do some further tests like a
17    nerve conduction test or something like that or EMG to
18    pin point that.  It could be an entrapment in here or it
19    could be something up in your neck.  So we may have to
20    do further tests.
21    Q    Okay.
22                        (Witness returns to the witness
23                         stand.)
24    Q    Okay.  Now, tell the jury, at this point would I be
25    going back to the front desk?
```

4431

1   A   No.   Typically if I'm going to do the injection I'm

2   going to probably put you in a room.  I'll go get the

3   medication, come back, have you take your shirt off and

4   I use a little sterile swab in the area where I'm going

5   to inject you and then put a band aid on it and let you

6   go.

7   Q   Is all the paperwork completed?

8   A   Pretty much, yeah.

9   Q   All right.

10  A   Are we going to do another examine?

11  Q   No.  Okay.  We timed that visit and it came out to

12  10 minutes -- excuse me, 10 minutes and 18 and a half

13  seconds.  Is that representative of what type of

14  examination and visit a patient could receive in ten

15  minutes?

16  A   Probably.  I mean, usually with initial examines

17  they're usually a little bit longer.  And subsequent

18  visits are not as long typically but --

19  Q   Okay.  And let's show the jury for demonstrative

20  purposes only as to how you documented that visit.

21  Okay.  First, looking at the progress note.

22          THE COURT:  Did you want to mark this as an

23  exhibit?

24          MR. WILLIAMSON:  Your Honor, it's marked as

25  D-016.  And thank you, Your Honor.  For the record let's

4432

```
 1    refer to Exhibit D-016.  It's a two page document.
 2              THE COURT:  Any objection?
 3              MS. TREADWAY:  No, no objection, Judge.
 4              THE COURT:  All right.
 5    BY MR. WILLIAMSON:
 6    Q   This is a document that we just -- you just
 7    completed this sitting here; correct?
 8    A   Yeah.
 9    Q   Okay.  And --
10    A   I may have forgot something but -- I don't think I
11    documented the, you know, the tenile (ph) sign on you
12    and stuff like that, but I -- and the range of motion, I
13    didn't get that documented.
14    Q   Okay.  Well, now, in fairness, we're sitting in the
15    courtroom where you don't have any other patients
16    waiting; correct?
17    A   Yes.
18    Q   But this was designed to give the jury a
19    representative example of what could happen versus what
20    could be documented; correct?
21    A   Yes.
22    Q   So on this one you forgot to do the range of motion
23    test but you actually did do it, didn't you?
24    A   Yes.
25    Q   Now, you identified the C-O-N-S-T, as part of the
```

4433

1    examine you did.  What part of the examine was the

2    C-O-N-S-T?

3    A   Oh, can you let me look at that.  Can I have a look

4    at that.  I'm not certain I can read that.

5    Q   Okay.  Here, let me give you a blank one.

6    A   Yeah.  That's the constitutional type symptom, well

7    nourished, well developed.

8    Q   Okay.  And then you identified H-E-N-T?

9    A   Yeah.

10   Q   Is that when you were using that device to look at

11   my eyes and ears?

12   A   Yeah.

13   Q   Okay.  Did the oral.  And what was the R-E-S-P?

14   A   Oh, respirations.

15   Q   Okay.  That's when you were listening to my heart

16   and my stomach and back?

17   A   Listened to your lungs and your heart.  And then

18   that's cardiovascular is the heart.

19   Q   Okay.  And then the GI here, is that when you

20   were --

21   A   Yeah, kind of poking on your stomach and listening

22   to your bowel sounds.

23   Q   And then you had a zero, I believe this is muscular

24   but -- or M dash S, but we can't see it because of the

25   hole punch.  There's a circle there.  What does that

4434

1    mean?

2    A    That's the musculoskeletal examine.  And it

3    indicates an abnormality.

4    Q    And what was the abnormality that you found?

5    A    You had a little trigger point to the parascapular

6    area in your back?

7    Q    And then your treatment plan is down at the bottom;

8    correct?

9    A    Yeah.

10   Q    Okay.  Now, there were things that we talked about

11   that you didn't put on this note.  Why not?

12   A    I just forgot to do that.  And kind of a little

13   stressful environment here so -- so, yeah, I didn't

14   write everything down.  As a matter of fact, on the

15   H-E-N-T examine I didn't do the sinus, check for sinus

16   tenderness or I didn't stick that thing up your nose to

17   look in your nose.

18   Q    Thank you.  Okay.  And is it fair that when you were

19   writing this progress note, this is how you would do it

20   in the clinic?  You would, at the conclusion of the

21   meeting, try to document everything to the best of your

22   ability right then?

23   A    Yeah.

24   Q    Okay.  Is it possible that you didn't document every

25   single thing that occurred during various meetings?

1    A    Sure.

2    Q    Now let's look at your fee ticket.  And you coded

3    this as a new patient; correct?

4    A    Yes.

5    Q    Can you see that up there?

6    A    Yeah.

7    Q    You decided to code this as a level 2.  Why?

8    A    Most new patients, especially if it's a problem

9    focus, it would be a level 2.  And so that was

10   essentially a pretty problem focussed examine and so

11   that's what I thought it to be.

12   Q    Okay.  What would have, in your mind, would have

13   raised that initial visit to a level 3?

14   A    Much more in-depth physical examine, probably, and

15   more thought processing; but, typically, I didn't, I

16   didn't do a lot of level 3 first time visits anyway.

17   Q    Okay.  The level 3s were usually established

18   patients?

19   A    Established patients at level 3, yeah, was typical.

20   Q    All right.  Now, tell the jury how that visit would

21   would be different if I would have been complaining

22   about a chronic pain issue?

23   A    Okay.  Chronic pain issue would have to always be

24   addressed.  And depends if you were coming in for pain

25   management, which you're, you know, what you had been --

4436

```
 1    how you had been treated before on this chronic pain
 2    issue.  What your pain tolerance is.  What the specific
 3    diagnosis is.  And the, the source of your pain.  What
 4    seemed to be helpful for your pain.  How it affected
 5    your functionality, your quality of life, your ability
 6    to do daily activities.  So it's more in-depth.  I mean,
 7    we would have to go through the -- if you were going
 8    into an opiate regime where you need a scheduled drug,
 9    then we would go through the pain management agreement
10    and go over that step by step.  And so definitely there
11    would be some psych issues that would have to be
12    addressed, you know, to make certain that you're
13    mentally stable.
14    Q   Okay.  And would you go over that history form like
15    you and I went over?
16    A   Yes.
17    Q   Okay.  And just so we're clear, you and I discussed
18    my history, didn't we?
19    A   Yes.
20    Q   Okay.  But you don't have a detailed recitation as
21    far as my family history in this subjective part, do
22    you?
23    A   No.
24    Q   Okay.  But it did happen, didn't it?
25    A   Yes.
```

4437

1    Q    And is it very possible that a lot of these records

2    that may not actually discuss the history on the

3    progress note, that the actual history was discussed

4    with the patient?

5    A    True.

6    Q    Okay.  How often -- well, strike that.  We'll go

7    into that when we actually start talking more about

8    chronic pain specifically.  But just right now in

9    regards to visits, when a person has a, I'll call it a

10   maintenance visit, after they've been established under

11   an opioid therapy, when they would come in, how would

12   that encounter differ from what we just saw?

13   A    On an established patient?

14   Q    Yes.

15   A    Are we talking about a pain patient or diabetic

16   patient.

17   Q    An established chronic pain patient?

18   A    Okay.  Established chronic pain patient would fill

19   out the pain assessment documentation tool to, you know,

20   see how they're doing with their pain, rate their pain

21   from zero to ten.  And typically we would like to know

22   what it's like with the medication or without the

23   medication.  And how it effects their daily activities

24   and functionality.

25   Q    Okay.  And what kind of physical examine would you

4438

1   do to these established patients?

2   A   Well, it wouldn't be -- it depends upon if it's just

3   the pain issue, then we would focus just on the pain.

4   Typically we might palpate the back or -- if it's the

5   back pain.  Or if it's, if it's migraine you can't

6   really palpate their head, you know.  If you're talking

7   to 'em about the migraines, you know, if there's any

8   different symptoms more like blurred vision or double

9   vision or some neurologic signs that need to be

10  addressed, then you do a neurologic examine.

11  Q   Okay.  Now, turning to the issues you began to have

12  with insurance companies.  When was the first time that

13  you received information that any insurance company

14  wanted to review your quality of care?

15  A   Say that again.

16  Q   When was the first time that you recall receiving

17  information from an insurance company regarding the

18  insurance company wanting to review your quality of

19  care?

20  A   I don't remember a time, all of the care issues

21  other than, you know, the First Guard incident.

22  Q   Okay.  And that happened in, what, 2004?

23  A   I believe it was.

24  Q   Okay.  You're not for certain?

25  A   No.

4439

```
 1    Q   But before then between 1988 and let's just say it
 2    was 2004, had you -- had an insurance company ever
 3    raised a concern about your quality of care?
 4    A   No.
 5    Q   And even when First Guard wanted to review your
 6    practices, did they complain that you were billing them
 7    fraudulently?
 8    A   No.
 9    Q   Before this case was filed, did Blue Cross & Blue
10    Shield complain to you that you were billing them
11    fraudulently?
12    A   No.
13    Q   Before this case was filed, did Medicaid complain to
14    you that you were billing them fraudulently?
15    A   No.
16    Q   Before this case was filed, did Medicare complain to
17    you that you were billing them fraudulently?
18    A   No.
19    Q   Did any insurance company -- I forgot one.  Before
20    this case was filed, did Preferred Health complain to
21    you that you were billing them fraudulently?
22    A   No.
23    Q   At any time before this case was filed -- well,
24    strike that.
25        Now, we have been talking about things in the
```

1    Clinic.  You've been here and you've -- we've talked

2    about chronic pain.  So let's just turn to that topic

3    now.  Okay?

4    A    Okay.

5    Q    You decided to treat chronic pain patients.  Can you

6    tell the jury why?

7    A    I've always treated chronic pain patients.   I

8    haven't always used narcotics or controlled substances

9    for the chronic pain; but it was like my philosophy that

10   all family practitioners deal with pain and people come

11   to the doctor for a painful condition and so, yeah, I

12   would treat people with chronic pain, too.

13   Q    Okay.  Now, you said that you hadn't always used the

14   narcotic medication.  How would you used to treat

15   patients with chronic pain?

16   A    Well, I was from the old school, too.  They taught

17   us in medical school not to use controlled substances

18   for chronic pain and it's only indicated for acute pain.

19   And so that's the way I thought when I got out of

20   medical school and then out in the real world.

21   Q    And when did that philosophy change?

22   A    I think when I started seeing that patients were

23   still in pain with the noncontrolled medications, plus

24   the philosophy had changed when I was in practice where

25   it was acceptable to use controlled substances for

4441

 1    chronic pain.

 2    Q    Okay.  Do you recall why that philosophy changed?

 3    A    Because there are a lot of chronic pain conditions

 4    that cannot be controlled with the physical therapy, the

 5    surgery, the epidurals, the biofeedback, and physical

 6    therapy and all the modalities in addition to the non

 7    steroidal inflammatories or seizure medications.

 8    Q    When you began using the scheduled medications, did

 9    you automatically start using Schedule II medication or

10    did you start with like Schedule III medication?

11    A    No.  I was just like every other family

12    practitioner.  I was hesitant to use Schedule II

13    medications.  And that's why probably, you know, most

14    doctors are not that hesitant to write a prescription

15    for Lortab or a Vicodin or Tylenol 3s because they're a

16    Schedule III medication.

17    Q    And I believe when Tom Wagner was here we looked at

18    his call note and it reflected that at that time you had

19    a lot of patients who were getting the most Lortab they

20    could get and they still had uncontrolled pain.  Do you

21    remember that?

22    A    Yes.

23    Q    Okay.  Do you recall experiencing that in your

24    practice?

25    A    Yes.

1    Q   And tell the jury about that?

2    A   Well --

3    Q   And, frankly, tell them about that and specifically

4    tell them why people -- how people could max out with

5    Lortab?

6    A   Well, the Tylenol issue, I think you've all heard

7    about that.  Maximum amount that's allowed is four

8    grams.  And so, yeah, you can't have any more of that.

9    And sometimes it may be that other medications are

10   intolerable so, you know, you have no other choice than

11   to go to a schedule II drug to help with their pain.

12   Q   Now, we heard -- strike that.  Can you tell the jury

13   what is chronic pain?

14   A   Well, I think you guys have heard just about

15   everything about chronic pain; but my feeling is, I

16   mean, patients that I see, and I'd ask 'em about the

17   pain.  It is a pain that never goes away.  It, you know,

18   most patients would come in and they'd say -- I'd ask

19   'em what is your pain number, you know, between 1 and

20   10, and typically it would be way up there, 10, a lot of

21   guys, a lot of people would say ten plus, over ten.  And

22   how can you have something, I mean, if the worse

23   possible pain is a ten and I would have -- how could you

24   have worse than that.  But I think they wanted to make

25   certain that I was aware that they were really hurting.

4443

1    But I've had patients describe the pain as like somebody

2    stab 'em in the back with a knife, you know, and then

3    twistin' it.  Or some migraine patients with an ice pick

4    in their eye.  And it just really hits home as far as

5    the amount of pain they are perceiving.

6         Now, with this chronic pain thing is we try to get

7    that pain level so they can function.  I mean, if you've

8    got a knife stickin' in your back, you can't think of

9    anything besides a knife in your back.  I mean, you

10   can't think.  You can't sleep.  You can't eat.  You

11   can't do anything.  That knife's in your back the whole

12   time.  So we're trying to get the knife out of the back

13   and try to make 'em where they can live again, where

14   they can think again, where they can sleep again, where

15   they can go to their little kid's soccer game or

16   something.  I mean, the pain controls their life.  And

17   it's hard to describe how that happens; but you've heard

18   the story that chronic pain can become chronic after six

19   weeks or three months or whatever, but it's changed over

20   time.  Initially when I first started doing this, I

21   think it had to be like four to six months before they

22   considered it chronic pain.  And I think they changed

23   that to -- like, I think Parran said, or maybe it was

24   Jorgensen, said it was six weeks the other day.  But

25   whatever it is, it changes the pathway in your spine.

4444

1    Your spine for some reason changes or it has a -- the

2    dorsal column in your spine where it fires signals up to

3    your brain telling you that there's something wrong.

4    And a lot of times I would tell my patient an analogy is

5    if, like, you had somebody that had an amputated foot

6    and they say that foot is killin' 'em but there's no

7    foot there.  You see, well, there's no problem, the foot

8    has been cured.  There's no foot there to be hurting.

9    But there's still signals going up to the brain saying

10   there's a problem.  It's hypersensitive.  And so I think

11   they call it central sensitization and how that

12   changes -- the brain changes the spinal cord.  And so

13   you have to hit those pain receptors to get that under

14   control.

15   Q   And we heard from Eric T's wife that her strong

16   husband would be in so much pain that he would be

17   crying.  We heard from Robin G's husband that she would

18   be in so much pain that their marital relations were

19   suffering and that they couldn't do anything.  Are those

20   indicative of the majority of your patients that were

21   under chronic pain?  Does that begin to help the jury

22   understand the type of patients that you were treating?

23   A   I believe so.  I mean, it's hard to imagine.  I

24   don't know that any of you probably have a chronic pain

25   condition, but I'm certain you have experienced pain

4445

1    like with an earache or a toothache and it just, you

2    know, just keeps pounding away.  And so this is just on

3    a more, you know, severe basis.

4    Q   And when you are treating them with pain medicines,

5    do they -- does the medicine make the pain go away?

6    A   No.  I mean, I assume -- I had some patients say

7    occasionally they would have zero pain.  But typically

8    we would see pain levels -- we would think it would be a

9    success if we could get the pain level between 3 and 5.

10   Q   And can you tell the jury what you understand

11   breakthrough pain to be?

12   A   Breakthrough pain is a pain that breaks through

13   their long acting type pain medication.  Say they bend

14   over to pick up something on the floor and they just do

15   something to their back and and it just is killin' 'em.

16   Well, they can't wait another 12 hours before they can

17   take something for pain.  So breakthrough pain is

18   something to help relieve that pain in an acute

19   situation.  And we would typically, you know, allow them

20   enough to have like four breakthrough pain medications

21   during the day.

22   Q   And did you ever try different modalities to treat

23   people in chronic pain?

24   A   Yes.

25   Q   And can you tell the jury what all did you do

1    besides prescribe pain medicine to people?

2    A    Our referral desk was always busy.  We were

3    referring people here, there and everywhere for whatever

4    they could -- whatever we could do for them.  Physical

5    therapy.  There was a physical therapy department that

6    opened up down the street because we were so busy.  I

7    was involved also in Dopps Chiropractic when he was

8    putting a physical therapy department together to help

9    him, would consult on that.  So we would send them out

10   to physical therapy.  We would send them for diagnostic

11   tests, for the MRIs and CAT scans.  We would send them

12   to psychiatrists or psychologists to make certain that

13   they are mentally, you know, stable and that the

14   medication is helping them and address the psych issues.

15   We had a lady come in that was applying the TENS unit to

16   the patient.  She actually even rented office space.  We

17   had a chiropractor that came in that did -- did

18   chiropractic treatments on 'em on weekends.  We tried to

19   get a chiropractor to come in more frequently but that's

20   all we could get into our office.  We had an orthopedic

21   surgeon that came down and that we referred to.  We

22   referred to neurosurgeons, neurologists, physiatrists,

23   other anesthesiologists, and even referred other people

24   for pain management.

25   Q    Now, there are several different kind of pain

4447

1    medicines and I think we've heard about some.  You know

2    that; correct?

3    A    Yes.

4    Q    Before we go there and start talking about these

5    specific medicines, these chronic pain people that you

6    would even try these different modalities with, would

7    you only treat their pain and refuse to see them for

8    other medical issues?

9    A    No.

10   Q    Have you ever tried medicines other than Schedule II

11   with patients with chronic pain?

12   A    Yes.

13   Q    Would you regularly do that if they had not

14   undertaken any opioid therapy prior to seeing them?

15   A    Yes.

16   Q    Now, when your physician's assistants, were they

17   allowed to see chronic pain patients?

18   A    Yes.

19   Q    Have you ever been told or taught that physician's

20   assistants should not see chronic pain patients?

21   A    No.

22   Q    Can you tell the jury what were your physician's

23   assistants supposed to do when they saw chronic pain

24   patients and other patients?

25   A    They were to use their own medical knowledge and

 1    treat the patient for their medical condition.  I never

 2    told them how to practice medicine.

 3    Q    Would you ever consult with them?

 4    A    Yes.

 5    Q    If they had a question, could they contact you?

 6    A    Yes.

 7    Q    And would you all ever discuss medical treatment for

 8    some patients?

 9    A    Yes.

10    Q    Were there times when a physician's assistant felt

11    like they weren't ready or able to handle a patient and

12    you would specifically see that patient?

13    A    Yes.

14    Q    Let's just talk about some of these prescription

15    medications and tell the jury how a certain medication

16    is effective in controlling pain.  Okay.  Let's start

17    with Percocet.  Can you tell the jury what is Percocet

18    and how is it effective -- how is it most effective in

19    controlling pain?

20    A    Well, Percocet is Oxycodone and Tylenol or

21    acetaminophen and it comes in different strengths and

22    different, I think, combinations of acetaminophen.  It's

23    a Schedule II drug.  And so it is more controlled than

24    the Schedule IIIs.  It's more potent than Hydrocodone.

25    And it would typically be used for acute painful

1   conditions or breakthrough conditions, or if it was the

2   only medication that seemed to be effective for the

3   patient.

4   Q   And was that a long-acting or a short-acting

5   medication?

6   A   That's a short-acting pain medication.

7   Q   And when we say short-acting, can you tell the jury

8   what -- short as in one hour, two fours hours, four

9   hours?

10  A   Well, typically the Percocet would probably last

11  about six hours.

12  Q   And so a person taking Percocet should, depending

13  upon the dose, take one every six hours?

14  A   Yeah.  I mean, it was between four to six hours,

15  something like that.

16  Q   And how about Lortab?

17  A   Lortab is a Schedule III medication that's

18  controlled.  Has Hydrocodone and acetaminophen in

19  different combinations from the -- it's got Hydrocodone

20  in an elixir, Lortab elixir, which is indicated for, you

21  know, children.  And it goes all the way up to the

22  Lortab 10 with 500 milligrams of acetaminophen.

23  Q   And is that a short-acting or long-acting?

24  A   That's a short-acting.

25  Q   And with Lortab, when you say short-acting, what is

4450

1    that, every two, four, six hours?

2    A    No, it's similar.  Four to six hours.

3    Q    Now, Oxycontin.  Can you tell the jury about that?

4    A    Oxycontin is Oxycodone in a controlled release which

5    is long-acting.  Typically it is dosed at a 12 hour

6    interval.  Although the pharmaceutical reps indicated

7    that there are some people that need it every eight

8    hours.  And so sometimes if the pain didn't -- wasn't

9    controlled for a full twelve hours, we would make it an

10   every eight hour dose instead.

11   Q    Okay.  And what about Soma?

12   A    Soma is a muscle relaxer.  It is indicated for

13   muscle spasms, although how muscle relaxers work,

14   there's no studies really indicating how they work other

15   than that they relax the patient which relaxes the

16   muscle.  Seemed to be quite effective for fibromyalgia.

17   Q    Tell the jury about a couple of non-scheduled pain

18   medicines that you would use?

19   A    Nonscheduled meds, pain meds?  From Tylenol all the

20   way up to Ultram.  Some are opiate derivatives.  Like

21   Ultram is an opiate derivative, but it is a nonscheduled

22   pain medication.

23   Q    What do you mean opiod derivative?

24   A    That's -- it's similar to an opiate but it doesn't

25   have the side effects and potency of the scheduled

4451

1    drugs.

2    Q    Okay.

3    A    There's also Toradol, which is an injection.  It

4    also comes in pills.  Which is a non-steroidal anti

5    inflammatory.  Works really good for pain.  There's

6    Motrin.  There's Relafen.  There's some of the meds that

7    were taken off, you know, like Vioxx we used.  Bextra

8    was one that was also taken off.

9    Q    When you say taken off, that means the FDA initially

10   approved it and then they took the approval back?

11   A    Right.

12   Q    Now, the Government promised the jury during opening

13   statement that the only evidence that they would see

14   would be that you asked what do you need and write a

15   script.

16             MS. TREADWAY:  Objection.  Argumentative.

17             THE COURT:  Overruled.

18   BY MR. WILLIAMSON:

19   Q    Is that true?  Every time you saw a pain patient

20   would the only thing you would say would be what do you

21   need and write a script?

22   A    No.  That never happened.

23   Q    Okay.  Without going in too much detail about what

24   we did here, when you would talk to the patient, what

25   type of information would you want and need before you

4452

1   made a medical decision?

2   A   Are we talking about pain or any other condition?

3   Q   Just chronic pain right now.

4   A   Chronic pain.  The patient would come in, we would

5   do a detailed history and try to get medical records.

6   Almost always they would sign a medical record release

7   to get their medical records.  Whether we got them or

8   not, it didn't always happen.  I don't know why.  It was

9   always hard to get medical records from other doctors.

10  Typically we would address the painful condition, how it

11  came about, what they had done, if they had surgery,

12  what made it better.  And typically on a pain patient

13  that came in they were already on some scheduled

14  medicatoin and knew what seemed to be helpful for them.

15  Q   Let me pause you there because the testimony has

16  been that you would ask somebody or discuss with them a

17  certain type of medication and then basically prescribe

18  what they asked for.  Would you, without making any

19  medical decision, just give a person the medicine that

20  they asked for?

21  A   No.

22  Q   Well, why would you discuss with them these

23  medicines -- why would you discuss with them what they

24  took before?

25  A   Because, depends upon how long they've had their

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

4453

1    pain and how many doctors they've seen before me what

2    seemed to be helpful for 'em.  They may have already

3    tried every long-acting pain medication or maybe they've

4    never tried any long-acting pain medication.  And

5    definitely want to make certain what their painful

6    condition is, if it is acute.  You know, I mean,

7    sometimes they come in and they've got this surgical

8    scar, like that lady said yesterday, she had a surgical

9    scar, she'd had back surgery.  Well, that's probably the

10   source of her pain.  And so we have to find out where

11   the problem is and what they've gone through.  It's

12   their history.  It's a history of the meds that have

13   been helpful for 'em.  A history of what they've tried

14   like epidurals or biofeedback or any kind of modality

15   that was helpful for 'em.

16   Q    And so if they told you that, you know, a certain

17   pain medication made me sick and ill, is that something

18   you would be inclined to write for them again?

19   A    No.  No.  I mean, if it made 'em sick, why would I

20   give it to 'em.

21   Q    If it's a medicine that worked for them in the past,

22   would you lean towards giving that to them?

23   A    Typically, unless I thought -- if it was a short-

24   acting medication like Lortab or Percocet, I would try

25   to get them on a long-acting type pain medication.

4454

1    Q    Why?

2    A    Well, so they didn't have these ups and downs all

3    day like the previous doctors have explained.  What you

4    want is to try to get a steady state where they don't

5    have to be taking pills all day.  Plus you don't have to

6    worry about the Tylenol issue.

7    Q    Well, you understand that the Government is saying,

8    well, when people come in and tell you that X

9    medication, this is what worked for me and this is what

10   I want, that that's indicative of being a drug seeker.

11   Do you agree with that?

12   A    No.

13   Q    Why don't you agree with that?

14   A    This is a history.  This is what they're telling me

15   that seems to be helpful.  I mean, if I asked a person

16   that had hypertension what meds have you have tried and

17   they had side effects with those or it didn't work, why

18   would I give 'em that medication.

19   Q    Well, according to the Government, Dr. Schneider,

20   these people know what street value these drugs have.

21   All they've got to do is come in and pretend they're in

22   pain and say they want Oxycontin.  Shouldn't you just

23   ignore what they tell you?

24   A    No.  I mean, if they're coming in and asking for

25   Oxycontin and don't have a good reason for it then I'm

4455

1    not going to believe 'em; but if they've got significant

2    disease process that Oxycontin seemed to be helpful for

3    them then I may consider continuing that.

4    Q    Is it fair to lump all these patients just under one

5    category as drug seekers?

6    A    It's not fair at all.  And almost any chronic pain

7    patient can tell you how they are discriminated against.

8    You've seen it here, the discrimination.  From the

9    pharmacist, from the ER doctor, from other family

10   members, to the federal government.  These patients that

11   have chronic pain feel like addicts.  I've had patients

12   come in and told me, I'm addicted to these pain pills.

13   And I'll ask 'em, well, what do you mean by that.  And

14   they'll say, well, doctor, I can't, I can't move unless

15   I take the pain medication so I must be addicted.  And

16   I'll say, well, are you taking it to get high, are you

17   taking it to get inebriated.  No, but I feel like I'm

18   addicted because I can't do anything without the

19   medication.  And so I said you're not addicted.  And

20   there is -- and I think you guys understand the

21   tolerance issue thing.  Yes, people that are taking

22   controlled medication on a routine basis do develop

23   tolerance and so they're going to go through withdrawal

24   effects when they don't have the medication.  And that

25   is lot of reasons why these people are knockin' on the

4456

1    door at the pharmacy wanting them to get their

2    medication, because it's not pleasant.

3    Q    Now, you mentioned discrimination.  Do you mean that

4    people would often -- or not often -- people could

5    mistake -- be legitimate pain patients in pain needing

6    their medicine, they can mistake those or profile them

7    mistakenly as drug seekers as the Government called

8    them?

9    A    Of course.

10   Q    And what happens if somebody's mistakenly profiled

11   as a drug seeker but they're in legitimate pain and not

12   able to get their medicine?

13   A    They'll go through withdrawals if they've been on it

14   for very long.  And their pain will return.  And

15   sometimes the pain is worse.  You know, when they come

16   off the pain medication, they get a rebound effect.

17   Plus I've seen it in the ER's where I've had patients

18   tell me that they've gone to the ER due to an

19   altercation of some sort.  I had one patient that was a

20   diabetic and he went to the emergency room because his

21   mental status had changed.  They assumed him to be a

22   drug addict.  They gave him Narcan, twice.  It didn't

23   help.  Until they figured out his blood sugar was

24   severely low.

25   Q    So that patient had been profiled by the ER as a

4457

1   drug seeker?

2   A   Yes.

3   Q   Is there another situation that you recall one of

4   your patients informing you that the emergency room

5   thought he was abusing his drugs?

6   A   Yes.  I had a patient that had severe degenerative

7   disk disease on his neck and I was giving him Norgesic,

8   the Fentanyl patch that you put on your skin, and his

9   neck was hurting so bad he decided to put the patch on

10  his neck and not only put the patch on his neck, he

11  decided to put a hot -- the heating pad on his neck,

12  too.  Well, that heat just drove the medication into his

13  system so he overdosed on the medication.  And so it

14  wasn't an intentional overdose.  He was just trying to,

15  you know, get rid of this pain.  But when he gets to the

16  ER, he overdosed on his pain meds.

17  Q   When these ER docs have taken the stand, we have not

18  been able to talk about any specific patient to

19  determine whether or not it was a situation like you

20  said or whether or not it was a true person abusing

21  drugs; correct?

22  A   Yeah.  It's -- typically, if the patient is on

23  scheduled drugs they're considered a drug seeker or

24  addict until proven otherwise.

25  Q   And do you agree with that philosophy?

4458

1    A    No.

2    Q    Would you ever receive calls from emergency room

3    doctors regarding alleged overdoses?

4    A    Occasionally.

5    Q    And what would you do when you received a call?

6    A    Well, I would address that issue with the patient

7    when they came back in.  And so -- but like I said, I

8    was rarely called on these overdoses that supposedly the

9    ER doctors say because if I was, they would be calling

10   me every day and so, you know, I never got that.  I

11   would get -- if indeed they had an overdose and they got

12   admitted to the hospital, the internist that was taking

13   care of the patient would either give me a call or I

14   would get a discharge summary from the hospital on that

15   patient.

16   Q    And why would you wait to talk to the patient before

17   deciding what you're going to do next?  Wasn't it enough

18   that the ER docs would call or give you a discharge

19   summary?

20   A    No, because I have to listen to the side of the

21   patient.  You know, the patient and I have this

22   relationship.  I trust them.  He trusts me.  And so I

23   want to hear what they have to say about the situation.

24   Maybe they took too much medication.  They were really

25   hurting that day.  Maybe -- I don't know.  I'd have to

4459

```
 1    hear what they say happened.
 2    Q    When you were a doctor practicing at the Schneider
 3    Medical Clinic did you trust your patients to tell you
 4    the truth?
 5    A    Yes, I did.
 6    Q    Why did you trust your patients to tell you the
 7    truth?
 8    A    Because that's what doctors do.  I mean, we don't go
 9    into an examine room and automatically think that the
10    patient is lying to you.  I mean, hey, doc, I got this
11    sore threat; but you look in the throat and say, well,
12    you really don't have any problem in there, I don't know
13    what the problem is, you know.  But we try to
14    investigate what the deal is.  We try to believe -- and
15    it is my philosophy that if, I mean, that the patient
16    was a drug seeker, per se, that we would find 'em out.
17    I mean, we did the urine drug screens.  You know, we did
18    pill counts and things like that that Dr. Jorgensen
19    said.  I mean, if we did have somebody call, an
20    anonymous phone called, say, hey, such and such is doing
21    this, we would give them a call and have them come in
22    for a pill Count.
23    Q    And in fact, I believe was it Robin G's husband
24    stated that he called your wife, you called him back and
25    you invited them in to talk about his concerns; correct?
```

1    A    That was Patricia G I believe.

2    Q    Was it Patricia G?

3    A    Yes.

4    Q    I'm sorry.  Do you recall that specific incident?

5    A    Was that -- I remember Katherine D.  I think that

6    was Katherine D.  I met with her husband, yes.

7    Q    Okay.  It was Katherine D.  And is that indicative

8    of what you would do if you received a call from a --

9    A    Yes.  And I would tell almost all the new patients

10    to have their family members come in because most time

11    the family members aren't going to understand why Dr.

12    Schneider is giving these medications, you know, and I

13    want everybody to be on the same page.  I would

14    typically tell the patients to bring in their loved ones

15    or family member to discuss the treatment.

16    Q    Well, if you were just trying to act as a drug

17    dealer as commonly understood, why would you invite

18    their family members into the examination room?

19    A    If I was a drug dealer, I wouldn't do that.

20    Q    Well, when Mr. Leo gave you a call, why didn't you

21    just ignore his telephone call?

22    A    Well, I was concerned that he had a problem with her

23    taking the medication and so I wanted him to come in

24    with his wife so we could discuss the whole situation.

25    Q    But why not just cut 'em off, Dr. Schneider?  You

1    have a complaint from a family member.  Why not just

2    say, hey, you know what, one of your family members is

3    complaining, done deal, no more pain management?

4    A    Because the patient still has his painful condition

5    and if she's abusing the medication it needs to be

6    controlled somehow.  Not that they should be just cut

7    off like that.  And so on this situation he came in, we

8    talked about her medication and she verified that the

9    medication was quite helpful for her and even helped

10   control the issuance of other medication.

11   Q    Doctor, have you ever prescribed a pain pill to a

12   person that you truly in your heart did not believe was

13   in pain?

14   A    No.

15   Q    Have you ever prescribed a pain pill to a person in

16   your heart you did not believe that that medicine would

17   help?

18   A    No.

19   Q    Now, you mentioned some of these urinary drug

20   screens and things.  Before we talk about that.  There

21   was a time in your practice where the volume of patients

22   increased over -- increased over a short period of time

23   greater than it normally had; correct?

24   A    Yes.

25   Q    Can you tell the jury what led to that increase in

4462

1    the volume of patients?

2    A    Well, there was several reasons.  For one thing, Dr.

3    Curry died and he was doing a lot of pain management.

4    And I talked to the pharmacist that was filling a lot of

5    his prescriptions and he wanted to know if I would be

6    interested in seeing some of his patients and I said

7    sure.  And so that was one reason.  Another reason was

8    Dr. Piazza, who actually was renting office space from

9    me at one time, was doing -- was seeing a lot of pain

10   patients.  And when he -- he actually moved to Derby

11   after being at our clinic for sometime.  And then he

12   actually quit practicing.  And so his clientele,

13   patients, would come over to us, too.

14   Q    Okay.  And was there another physician at Grace

15   Medical that started referring patients to you?

16   A    Yes.

17   Q    And do you remember who that physician was?

18   A    I can't remember his name right offhand but I think

19   we've got referrals from him though.

20   Q    Was this in 2004 this occurred?

21   A    I can't remember the exact date.

22   Q    Now, with this increase in patients, did you try to

23   do anything to accommodate this increase?

24   A    We were continually trying to increase our staff.

25   We tried to hire other physicians, other PA's.  In 2005

4463

1    I think we were up to besides me and Dr. St. Clair, we

2    had Curt and Kim.  We also employed two other PA's.  So

3    we were -- we did hire more help.

4    Q   Well, I see that you hired more physician's

5    assistants.  Why did you not bring in more actual

6    physicians?

7    A   We tried to do that, too.

8    Q   Well, give us a name of somebody that you tried to

9    bring in?

10   A   I tried to hire Dr. Bumgardner, Lahie (ph)

11   Bumgardner.  And I also tried to hire George Howell.

12   And there was another physician, I can't remember her

13   name, that was in Anthony that was acting like she might

14   be interested at one time.  But none of 'em actually

15   did.

16   Q   Was doctor -- were any of these doctors actually

17   interested in a position?

18   A   No.  Most of 'em were not interested in doing pain

19   management.

20   Q   Did anybody express any concerns with the patient

21   population you were seeing?

22   A   No, I can't remember that.

23   Q   What about Dr. Howell, was he interested?

24   A   He was initially.  He was wanting to be hired on

25   until the raid happened and then he decided not to.

4464

1    Q    Do you blame him?

2    A    No.

3    Q    In fact, after the raid, you lost several of your

4    providers; correct?

5    A    Yes.  Everybody quit except one PA.  That was

6    Mohammed and he stayed on for a short time.  Then took a

7    leave of absence and then came back and at the same

8    time, shortly after the raid, we hired Dr. Simons.

9    Q    And we've heard a lot about Dr. Simons.  At least

10   for the couple of months leading up to his termination.

11   When he first started with you, was he a bad doctor?

12   A    No.  He was an excellent physician.  He was an

13   anesthesiologist.  I'd actually sent him patients for

14   pain management and he actually had patients that were

15   seeing him prior to me knowing about it for pain

16   management that were seeing me for other issues, health

17   care related issues.

18   Q    And was he -- is he the type of -- as an

19   anesthesiologist, can he give these epidural shots?

20   A    Yes, he was doing epidurals.  And Dr. Estivo was

21   doing epidurals in our clinic also.

22   Q    So you did as a clinic try to give some of these

23   other non-pain medication treatments to your patients?

24   A    Yes.

25   Q    And with Dr. Simons, did he have any of -- did he

1   work with another pain practitioner in town?

2   A   Yes.  He was working with Dr. Parks initially.

3   After Riverside closed, I think he went in to practice

4   with Dr. Parks with pain -- I can't remember the name of

5   the group, but he's actually the main pain doctor in

6   town.

7   Q   Okay.  And at some point you started having problems

8   with Dr. Simons?

9   A   Yes.

10  Q   And the Clinic decided to let him go when those

11  problems arose?

12  A   Yes.

13  Q   Were you aware to the extent of the problems he had?

14  A   Not for sure.  I'd heard rumors.  And I knew that he

15  was coming to work late.  And he was making his patients

16  wait long times before he would see 'em.  And so he had

17  some personal problems and it was effecting, you know,

18  our clinic and so we let him go.  And then Connie White

19  was the PA that was under his direct supervision and so

20  we hired another physician to sign off on her charts.

21  Q   And who was that physician?

22  A   Dr. Joe Sack.

23  Q   Okay.  Now, with this increased number of patients,

24  did you ever get to the point where you started feeling

25  overwhelmed?

4466

1    A   I was very overwhelmed after the raid.  Prior to

2    that, I would say not.  I mean, I would say we were very

3    busy; but I don't think we were ever overwhelmed.  We

4    had times where, like Lee Craig said, we had stacks of

5    correspondence and faxes that needed to be done; but we

6    made a change where we were scanning those faxes so we

7    didn't have to be hand-signing off on those every day.

8    They would be scanned in the computer and all we would

9    have to do is bring it up on the computer and check them

10   off.

11   Q   The Government contends you made no changes when you

12   saw problems in the Clinic.  Are you saying that you

13   recognized that the fax system that you had was

14   inadequate?

15   A   Yes.  We, we were definitely changing things all the

16   time.  I mean, we were evolving our pain management.  We

17   changed our pain management agreements several times.

18   Especially after the First Guard incident.  We started

19   doing more urine drug screens, I believe.  We started

20   referring more patients out for psychologist

21   evaluations, psych evaluations.  We had initially a

22   chart, if they failed their urine drug screen or they

23   were fired for pain management, we put this green sheet

24   or a pink sheet inside their chart to notify the

25   provider that they had been fired from pain management.

4467

1    Well, occasionally these sheets would be just

2    disappearing; and so instead of that, we put them in red

3    charts and so they couldn't take the chart.

4    Q   And were these changes that you were making to try

5    to run a better clinic?

6    A   We were trying to make the pain management better.

7    I think we never had issues regarding any family

8    practice problems.  I mean, I think our family practice

9    was great.  The problems only arose from the pain

10   management because there's so much more to document and

11   see how the patient, you know, is reacting to the

12   medication and so --

13   Q   In about 2004 and 5 did your Medicaid population

14   grow?

15   A   Between 2004 and 5, I believe so.

16   Q   And at some point in 2005 did you attend a pain

17   conference?

18   A   Yes.  I attended several pain conferences.

19   Q   And specifically here in Wichita did you attend one?

20   A   There was a Sedgwick County Pain Society meeting,

21   which was the first one, that was organized by several

22   pharmaceutical companies and some of the pain providers

23   in town.

24                    (Off-the-record discussion

25                     between counsel.)

4468

1    Q    I'm going to hand you what's been previously marked

2    as D-1-E-42.  Do you see that document?

3    A    Yes.

4    Q    And does that document identify -- is that an agenda

5    on the first page for the meeting that we're talking

6    about?

7    A    I believe so, yes.

8    Q    And on the second page is there a certificate of

9    attendance?

10   A    Yes.

11             MR. WILLIAMSON:  Your Honor, at this time we

12   will move to admit D-1-E-42.

13             MS. TREADWAY:  I think this is hearsay and it

14   lacks foundation.  I don't believe this is a document

15   that the Doctor created.  We don't mind him using it to

16   refresh his recollection.

17             THE COURT:  May I see it?  It's received.

18   BY MR. WILLIAMSON:

19   Q    All right.  Let's just kind of go over this, some of

20   the names on this document for the jury.  This meeting

21   occurred on August 4, 2005; correct?

22   A    Yes.

23   Q    And in attendance, number one is, Greg Lakin.  Can

24   you tell the jury who that is?

25   A    Greg Lakin is a family practitioner that practices

4469

1    on the west side.

2    Q    And William Simon?

3    A    He's in the same group.

4    Q    And are they -- do they both see chronic pain

5    patients?

6    A    I think they do see some chronic pain.

7    Q    Allison Hatfield?

8    A    I don't know her.

9    Q    Donna Sweet?

10   A    Donna Sweet has been mentioned here before.  She has

11   a primary care clinic which deals a lot with AIDS

12   patients.

13   Q    Hata?

14   A    I don't know who that is.

15   Q    Larry Simons.

16   A    That would be Lawrence Simons, I believe.

17   Q    Timothy Scanlan?

18   A    Yes.  He is an addictionologist.

19   Q    And, in fact, have you ever referred any of your

20   patients to Tim Scanlan?

21   A    Yes, I have.

22   Q    So if you had a concern about a person with

23   addiction, would he be one doctor that you would have

24   referred a patient to?

25   A    Yes, sir.  Yes, I would.

4470

1    Q    Alan Albaracin?

2    A    Yeah.  He's an internal medicine specialist that was

3    just starting in pain management I believe.

4    Q    Steve Schneider?

5    A    Yeah.

6    Q    Donna St. Clair is a doctor that was in your office.

7    Adrian Paye?

8    A    I don't know who that is.

9    Q    Joseph Sack.

10   A    Joseph Sack actually is the physician that we hired

11   to sign off on Connie White's charts.

12   Q    Parman?

13   A    Parman?  Probably Dr. Greg Parman who was a family

14   practitioner.

15   Q    Althene Feare?

16   A    I don't know him.

17   Q    Florantan Mancao?

18   A    He was an internal medicine specialist actually that

19   did most of my hospital patients when they were

20   admitted.

21   Q    Pedro Murati?

22   A    He is a physiatrist, physical therapy doctor, that

23   did primarily pain management.

24   Q    And looking at the top of this document it says Greg

25   Lakin was the guest moderator; correct?

4471

1    A    Yes.

2    Q    Now, at this meeting did you have an opportunity to

3    ask a question from the panel members that we just

4    reviewed?

5    A    Yes.

6    Q    Tell the jury about what happened at that meeting?

7    A    Well, it was a conference that -- for local people

8    that are interested in pain management; and at the time

9    I felt overwhelmed with the Medicaid population and --

10   that were needing pain management.  And so I asked the

11   people in the audience if I could get some help with the

12   Medicaid population, medicaid population, to treat their

13   pain.  And Greg Lakin said -- he asked if he could see a

14   show of hands of doctors that would be interested in

15   treating Medicaid population or were treating Medicaid

16   population, I believe, and there was -- I was the only

17   one that raised my hand.

18   Q    So at this point in time were you trying to let your

19   colleagues know that you could use some assistance with

20   this patient population?

21   A    Yes.

22   Q    Why did you not just cut 'em off?  We've heard

23   doctors say that I didn't deal with chronic pain

24   patients -- and I believe it was Graves Owen -- because

25   the risk is -- was more than the reward.  Why didn't you

1   follow the same line of thought?

2   A    Well, the reward you're talking about, the reward

3   for me was gratification, seeing these patients say that

4   I've made a real difference in their life and you can

5   actually see that.  And so I -- any doctor that takes

6   Medicaid population, the reward financially is not that

7   much, I mean, we get 15% or whatever, I don't know what

8   it is, but it's -- reimbursement is very poor.  And so,

9   yeah, that might be a reason that, you know, you have to

10  see more Medicaid population to be able to pay your

11  bills; but my reason for seeing them would be just to

12  help the people out because they were my patients and

13  they relied on me to help 'em.

14  Q    Well, you know, the Government is saying, well, the

15  only reason you had this number of patients was because

16  you wanted to make more money so you had to hurry more

17  people through.  And you heard all these opinions.

18  Before I ask my question -- all these people who had

19  opinions as to why you were seeing the number of

20  Medicaid patients.  Did any one of them sit down with

21  you and ask you, Steve, we have a lot of patients in the

22  Medicaid, why?

23  A    No.

24  Q    How are they able to give an opinion if they didn't

25  come to you to find out why you were seeing these

4473

 1    patients?

 2    A    I don't know.

 3    Q    Well, why don't you tell the jury.  The Government

 4    contends that you were only seeing these patients in

 5    such a large number because you wanted to strike it

 6    rich.  Is that true?

 7    A    No.

 8    Q    Why not?  We see the numbers.  There's a lot of

 9    patients.  You made -- you made some good money in 2004

10    and 2005.  Why should we not believe that?

11    A    Well, if I was interested in just money, I think I

12    probably would have gave up the Medicaid population and

13    probably would have gave up the Medicare population,

14    too, and just focussed only on the insurance companies

15    that paid better.

16    Q    That would have been the sensible thing to do if you

17    were trying to simply make money as a doctor?

18    A    Yes.

19    Q    And again, you had refused to give up your Medicaid

20    population well before you had this large number of

21    Medicaid people; correct?

22    A    Say again.

23    Q    You refused to give up your Medicaid population when

24    you were asked by your partners that you were with at

25    Haysville Medical Center --

4474

1   A   Yes.

2   Q   Now, here you are again refusing to give up your

3   Medicare population.  I mean, do you think that these

4   other doctors got it right by refusing to see these

5   patients?

6   A   No.  I think they got it wrong.  The Medicaid

7   population I believe are some of the sickest people that

8   need the most treatment; and if they are actually doing

9   their oath to try to help people, they should try to

10  help the people that need it the most.

11  Q   Well, you heard Dr. Parran say on this Hippocratic

12  oath thing is first do no harm.  Did you ever, ever,

13  ever intentionally give medicine to somebody that you

14  believed would cause them harm?

15  A   No.

16  Q   Would you have ever given somebody medicine if you

17  truly thought it was going to cause them harm?

18  A   No.

19  Q   Why not?

20  A   Why would I want to cause them harm?  I mean,

21  that's, that's not doctoring.  I mean, yes, you give

22  medication to people to help them with their problem,

23  and just like blood pressure people, blood pressure

24  medication helps for blood pressure.  Pain medication

25  helps for pain.  Prescription blood pressure medication

4475

1    hits blood pressure receptors.  Pain medication hits

2    pain receptors.  You can go through withdrawal effects

3    from blood pressure medication just like you can

4    withdrawal effects on pain medication.

5            MR. WILLIAMSON:  Would this be a good time for

6    a break, Your Honor.

7            THE COURT:  Yes, sir.  I think so.  About an

8    hour, Ladies and Gentlemen.  Please remember and heed

9    the admonition.

10                   (Noon recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25