```
 1              (Beginning at 1:00 p.m. May 26,
 2              2010, the following proceedings
 3              continued.)
 4   BY MR. WILLIAMSON:
 5   Q   Doctor, since we're back from the break, you
 6   understand the Government has charged you with a crime
 7   for prescribing the medicine Actiq?
 8   A   Yes.
 9   Q   Can you tell the jury what you understand, or at
10   least at the time when you were prescribing it, what you
11   understood Actiq to be and when it was -- and when you
12   could use it?
13   A   Well, Actiq is, as has been described before, is
14   Fentanyl.  And it is used for -- it is indicated for
15   acute breakthrough pain for cancer patients.  And I was
16   detailed by pharmaceutical reps in using Actiq in other
17   situations, although they would always say it's only
18   indicated for such and such, like in cancer patients,
19   but they would give me articles and information of uses
20   that were off label.
21   Q   Okay.  And in regards to pain management, did you
22   continue to try to improve your knowledge base and your
23   education level in regards to prescribing medicines to
24   people in chronic pain?
25   A   Yes.
```

4477

1   Q   Tell the jury what you did, please?

2   A   I tried to see if I could get certified in pain

3   management and that wasn't a possibility unless I wanted

4   to go back to school and do a residency in anesthesia.

5   But I learned that I could get credentialed in pain

6   management through the American Academy of Pain

7   Management by studying for a test and they provided me

8   with a manual to read through and other journals and

9   things that I could read through to study for the test.

10  Q   Okay.  Did you take any kind of continuing medical

11  education courses?

12  A   Yes.

13  Q   And were those specific to pain management?

14  A   Yes.  There were some specific courses that I took

15  in pain management.

16  Q   And as a physician, do you have to take a certain

17  amount of continuing education courses every year?

18  A   Yes.

19  Q   And how many hours would you have to take every

20  year?

21  A   I think it was 50 hours every two years.  It

22  changed, so I'm not certain what it is now.

23  Q   Did you always meet that requirement?

24  A   Yes.

25  Q   Did you also have books in your office in regards to

4478

1   pain management?

2   A   Yes, I had books.

3   Q   Did you have articles in your office regarding pain

4   management?

5   A   Yes.  I had monthly pain journals that came to me.

6   Q   And would you read these in order to try to expand

7   your knowledge base?

8   A   Yes.

9   Q   Now, in regards to Actiq, you mentioned there were

10  some articles that you reviewed in regards to

11  prescribing Actiq off label; correct?

12  A   Yes.

13  Q   I want to talk to you about a few journal articles.

14  Are you familiar with the "American Journal of Pain

15  Management"?

16  A   Yes.

17  Q   Is that an authoritative journal in the field of

18  pain management?

19  A   I believe so.

20          MR. WILLIAMSON:  And for the Government, it's

21  D-10-13-A-3.

22  Q   I'm handing you Exhibit D-10-13-A-3.  Is that an

23  article found in the "American Journal of Pain

24  Management"?

25  A   Yes.

4479

1          MR. WILLIAMSON:  Move to admit D-10 --

2          THE COURT:  Something 3.

3          MR. WILLIAMSON:  Yeah, I know, Judge.  Sorry.

4    D-10-13-A-3.

5          MS. TREADWAY:  Judge, our document contained a

6    lot more than -- is it just preliminary findings?  Is

7    that the document?

8          MR. WILLIAMSON:  Yes.

9          MS. TREADWAY:  We have no objection, Judge.

10          THE COURT:  It's received.

11   BY MR. WILLIAMSON:

12   Q    Okay.  Now, can you tell the jury how doctors rely

13   on articles when they're making -- they're going to have

14   to make medical decisions?

15   A    Well, every medical journal or publication has to be

16   reviewed and published, you know, reviewed before it's

17   published.  And studies to further indications for use

18   of medications.  A lot of times a medication will be

19   indicated for a specific purpose and then by further

20   studies and reviews, it gets another indication.

21   Q    Now I want you to read part of this conclusion for

22   the jury.  The part that I have outlined, please.

23   A    "OTSC was administered to 100 consecutive ambulatory

24   patients with a variety of severe chronic nonmalignant

25   pain conditions requiring opioid treatment -- long-

1    acting opioid and a secondary opioid for DTP."  DTP

2    would be the breakthrough pain.  "A majority of patients

3    found OTSC to be very effective for this purpose and

4    desired to continue OTSC on an indefinite basis.  Rapid

5    onset of pain relief was the most desirable attribute

6    reported by patients.  This effect allowed more physical

7    and social function.  Few side effects occurred and many

8    patients were able to decrease their use of opioids.

9    The authors conclude that OTFC is an appropriate safe

10   and preferred treatment for breakthrough pain in many

11   opioid tolerant patients with nonmalignant chronic pain.

12   The other opioids should be explored for a sublingual or

13   mucal administration."

14   Q   Now, translate that for the jury.  Does that --

15   well, first, what is the date of that article?  Is it

16   October 2002?

17   A   October 4th, 2002.

18   Q   Now, tell the jury what that means to you as a

19   practitioner?

20   A   Well, that indicates that they've tried it on

21   non-cancer break throughpain and it was quite effective

22   with very few if any side effects.

23   Q   And, in other words, the medical literature in 2002

24   supported providing Actiq to people who were suffering

25   from chronic pain in order to try to help with their

4481

1   breakthrough pain; correct?

2   A   Yes.

3   Q   How many people did you personally prescribe Actiq

4   to that was not suffering from a chronic pain condition?

5   A   How many people I prescribed Actiq to that did not

6   have a chronic pain condition?  I can't answer that

7   specifically because I think possibly may have gave a

8   prescription to somebody for a migraine that was not

9   chronic.  I don't know.

10   Q   All right.  Did you prescribe it to anybody for a

11   condition other than to try to control breakthrough

12   pain?

13   A   Like I said, if it was a migraine, it may not have

14   been a breakthrough pain but --

15   Q   And so you actually prescribed Actiq specifically

16   for migraines at times; is that correct?

17   A   Yes.

18   Q   And are you aware of studies that discussed the

19   effectiveness of Actiq in regards to migraines?

20   A   Yes.

21   Q   And the studies also stated that migraines -- that

22   Actiq could help with migraine pain; correct?

23   A   Yes.

24   Q   And this education you were receiving regarding

25   Actiq, did you rely on the education in making the

4482

1    medical decisions in regards to decisions to prescribe

2    Actiq?

3    A    Yes.

4    Q    Did you ever prescribe Actiq to a person that you

5    did not believe would benefit from that medication?

6    A    No.

7    Q    You've heard some of the Government's experts

8    criticizing you for increasing medication.  You remember

9    that?

10    A    Yes.

11    Q    Now, are you familiar with the journal called "Pain

12    Medicine"?

13    A    I can't say I'm real familiar with that, no.

14    Q    Are you familiar with the American Academy of Pain

15    Medicine?

16    A    Yes.

17    Q    And do they provide a journal?

18    A    Yes.

19    Q    And is that journal authoritative in the field of

20    pain medicine?

21    A    I believe so.

22    Q    Did you -- have you ever looked at the American

23    Academy of Pain Medicine's journals at all?

24    A    Yes, I have.

25    Q    I'm going to hand you D-10-13-A-3-E.  Is that an

 1    article from the American Academy of Pain Medicine?

 2    A   Yes, it is.

 3              MR. WILLIAMSON:  At this time we would move to

 4    admit D-13-A-3-E.

 5              MS. TREADWAY:  No objection.

 6              THE COURT:  It's D-10, isn't it?

 7    D-10-13-A-3-E.

 8              MR. WILLIAMSON:  Yes, Your Honor.

 9              THE COURT:  It's received.

10    BY MR. WILLIAMSON:

11    Q   Now, this article discusses the dosing of using

12    Actiq.  Look at the -- does this article give a dosing

13    guideline as to how you should try Actiq when giving it

14    to patients?

15    A   Yes, it does.

16    Q   Okay.  I'm going to put this up for the jury to see

17    and if you can turn around a little bit, we'll do this

18    together.

19         Now, in regards to Actiq, they suggest to -- I'm

20    going to blow it up and just move down.  They suggest

21    that you try one 400 microgram unit and if you get pain

22    relief, the successful dose is 400.  Is that what that

23    means?

24    A   I can't read it too well from here.

25    Q   Okay.  Do you want to come down and take a look at

4484

 1    it?

 2    A    Unless you can get it pulled up here.

 3                      (Off-the-record.)

 4    Q    Can you see that?

 5    A    Yes.

 6    Q    Now, when you see that first line, can you explain

 7    to the jury as a practitioner what do you interpret that

 8    to mean?

 9    A    Okay.  That means you try one Actiq and if you have

10    pain relief then you're successful.

11    Q    Okay.  And at that point the dosage that you would

12    prescribe would be 400?

13    A    Correct.

14    Q    And the authors of this article state that if you

15    have inadequate pain relief then you should try two 400

16    microgram units?

17    A    That's correct.

18    Q    And can you tell the jury what the excessive effect

19    and then the pain relief line means?

20    A    The excessive effect would mean causing too much

21    sedation, I assume.

22    Q    Okay.  And the pain relief?

23    A    Pain relief means that it was successful.

24    Q    So as of right now, the authors say you try one

25    unit, if that works then that's the successful dose.  If

4485

1    it doesn't work and these individuals are still having

2    inadequate pain relief then you try two 400 micrograms.

3    And if you -- in order for a practitioner to know

4    whether or not a medication has an excessive effect,

5    they would first have to know that the patient was --

6    suffered some kind of effect other than the desired

7    effect.  Correct?

8    A    Correct.

9    Q    Now, as a medical practitioner, is that common that

10   you may prescribe something and you realize it doesn't

11   work and you may have to change the method of

12   prescription?

13   A    Yes.

14   Q    Okay.  And is medicine an exact science?

15   A    No.

16   Q    And, you know, without having to go through each and

17   every one of these, I believe the jury can understand,

18   but they discuss going from a 400 microgram unit to a

19   6 -- 1600 microgram unit.  Is that correct?

20   A    Yes.

21   Q    Okay.  And so with this, we are -- as a

22   practitioner, what is that called when you start with a

23   lower dose and then you get to a higher dose?

24   A    Titration.

25   Q    Okay.  Explain to the jury what titration means to

4486

1    you.

2    A    Titration is, as in this diagram here, titrate to

3    effect.  Just like in chemistry, you know, you titrate

4    to get the desired reaction.  We're titrating to get the

5    desired effect.

6    Q    So if we start going through some of the records and

7    we see that you made the decision to increase the

8    medication, would that be your attempt to titrate to try

9    to control the pain?

10   A    Yes.

11   Q    Now, Dr. Parran was critical of you of giving Actiq

12   to a 16 year old.  Do you remember that?

13   A    Yes.

14   Q    Have you ever been told or taught that you cannot

15   prescribe Actiq to a 16 year old?

16   A    No.

17   Q    Have studies -- at least back then, did studies

18   show -- well, strike that.

19       Tell the jury about this Fentanyl.  We've heard

20   about long term.  We've heard about short term

21   medication.  Can you tell the jury is the Fentanyl

22   lollipop a short term medication or a long term

23   medication?

24   A    It's short-acting.  It's very short-acting.  It's to

25   be absorbed in the buccal mucosa of the mouth.  I think

4487

1    it was Parran, or it may have been the other one, that

2    said it has to be absorbed in the mouth or if you

3    swallow the medication, it gets deactivated.  So it has

4    to be settin' there.  And it's not necessarily a

5    lollipop.  You don't suck on it.  You know.  If you suck

6    on it then it is not effective.  So it sets in your

7    cheek and you can twirl it a little bit or something

8    like that.  But if you twirl it too much, then it's

9    going to dissolve into your mouth and you swallow it and

10   it's not effective.  So that's how it's absorbed.  But

11   it's very short-acting.  It goes in and goes out quick.

12   And so that's why with the Fentanyl patch, Duragesic

13   patch, that's why it's in a patch form.  It's on your

14   skin and it's slowly absorbed through the skin, you

15   know.  And when you take the patch off, then you don't

16   have any medicine.  So, likewise, with the lollipop and

17   the way it's suggested here, you could do 200.  You put

18   another 400 in there, you start getting sedation or you

19   get the pain relief.  Then you can take the lollipop

20   out, or the sucker.  But Cephalon also come up with

21   another medication called Fentora that is also Fentanyl

22   and it's absorbed similarly.

23   Q   When a person puts this lollipop in their mouth, are

24   they just supposed to keep it in until they get the pain

25   relief?

4488

1    A    Yes.

2    Q    And it's a quick acting pain relief?

3    A    Very quick.

4    Q    But it doesn't stay in the system long?

5    A    Correct.

6    Q    And your initial dosage, would it all depend upon

7    the person's prior history of using pain medication?

8    A    Yes.

9    Q    There's not a standard that says you have to start a

10   person at 400 micrograms; correct?

11   A    That's correct.

12   Q    Now, with this 16 year old -- I'm just going to hand

13   you an excerpt of a Government Exhibit.  Can you tell

14   the jury -- I believe it was Parran that was critical of

15   you of prescribing Actiq to Michael C.  Can you tell the

16   jury whether or not you tried other medications with

17   Michael C instead of just Actiq?

18   A    Well, the first progress note here is dated 6-29.  I

19   believe that's '04.  And it looks to me like -- I think

20   that's Dr. St. Clair's signature.  It says at the top

21   migraines.  Then it says something on the top about

22   Lortab 10 and Topamax.  It says Topamax doesn't work and

23   it says diet pill is not working.  This guy weighed 276

24   pounds.

25   Q    Okay.  Let's stop there.  Does a -- when the

4489

```
 1    Government's witness was talking, I don't think he
 2    mentioned anything about the size or weight of the
 3    individual.  Only age.  Does a person's size and their
 4    body mass effect the dosing decisions regarding
 5    patients?
 6    A    Yes, it can.
 7    Q    So just looking at that note, this patient had tried
 8    Topamax at least for his migraines; correct?
 9    A    That's correct.
10    Q    And he told Dr. St. Clair that it didn't work?
11    A    That's correct.
12    Q    And is there any reason that Dr. St. Clair would
13    want to give Topamax again if she already knew that
14    Topamax didn't help this person?
15    A    Well, she did increase the dose on the Topamax it
16    says on the bottom.  And so he may have been sub
17    therapeutic is why it wasn't working.
18    Q    So she tried that then?
19    A    Yes.
20    Q    Who saw Mr. Michael C the next visit?
21    A    The next visit it looks like Curt seen him.
22    Q    What was tried before Actiq was tried this time?
23    A    The chief complaint says treating for major
24    headaches, pressure in his head.  And then it says
25    something about CAT scan being done.  And it says
```

4490

1    refills for Butorphanol.  And also Hydrocodone APAP.

2    And then it says in the subjective area, increased

3    visual changes, double vision.  And looks to me like a

4    MRI was scheduled.  And at the bottom down there it says

5    schedule MRI and Lortab 10, number 100 and Stadol nasal

6    spray.  Looks like three units was given.

7    Q   What is Stadol for?

8    A   Stadol is a Schedule III nasal spray that seems to

9    be effective for migraine headaches.

10   Q   Okay.  So just taking a glimpse at Michael C, he was

11   tried with other medication other than Actiq?

12   A   Yes.

13   Q   Now, this brings me to a question.  You had to read

14   the notes for Dr. Donna St. Clair; right?

15   A   Yes.

16   Q   And you had to read the notes for Curtis Atterbury?

17   A   Yes.

18   Q   Now, when these individuals were seeing patients,

19   let's start with Dr. Donna St. Clair, did she come to

20   you and try to clear every prescription decision with

21   you?

22   A   No.

23   Q   Was she supposed to use her own medical judgment in

24   making prescription decisions?

25   A   Yes.

4491

1    Q    Same with Curt?  Did he have to come to you and

2    clear with you a prescription decision before he issued

3    a prescription?

4    A    No.

5    Q    Was he supposed to use his medical judgment in

6    treating these patients?

7    A    Yes.

8    Q    And if you're sitting back trying to review what

9    they did right now, trying to justify it, are you able

10   in every instance to say I know why Dr. St. Clair made

11   this medical decision?

12   A    No.

13   Q    Are you able to say I know why Curt Atterbury made

14   this decision?

15   A    No.

16   Q    Are you able to say I know why Kim He'bert made the

17   decision?

18   A    No.

19   Q    Are you able to look and say, I made this decision

20   and I can tell you most likely what I was thinking?

21   A    Yes.

22   Q    Now let's turn to this topic that we've heard a lot

23   about.  Addiction.  We've heard that we don't know what

24   addicts look like.  You agree with that?

25   A    Yes.

4492

```
 1    Q   And I think that you've told the jury that you
 2    believe a lot of legitimate pain patients are
 3    misconstrued to be addicts when they're not?
 4    A   Yes.
 5    Q   Now, is it your philosophy that a person who may
 6    suffer from an addiction should not receive pain
 7    medication?
 8    A   No.
 9    Q   Why not?  Why not let -- why not, for us, you know,
10    nonmedical people, why is it that, you know, somebody
11    may be suffering from an addiction, regardless if they
12    have pain or not, why would we even still want to try to
13    treat that pain?
14    A   Because that person is having real pain and you have
15    to still treat everybody, you know, that comes to you.
16    I mean, if you decide not to, that's your choice; but if
17    they have a real painful condition and they have an
18    addiction problem, too, that still can be monitored.
19    It's in the state guidelines.  As long as they're
20    monitored closely.
21    Q   Now, talking about that monitoring, you've heard
22    criticism about the way you were monitoring these
23    patients.  You heard all that?
24    A   Yes.
25    Q   Okay.  And, first, have you seen any law that says
```

4493

1    that you cannot prescribe a controlled substance to

2    somebody who is in pain but also happens to suffer from

3    an addiction?

4    A    Say that again.

5    Q    Have you seen any federal law that says that you

6    cannot prescribe pain medicine to somebody in pain even

7    if they happen to suffer from an addiction?

8    A    No, I've not seen a law.

9    Q    Okay.  Now, have you seen a law that says you're

10   even required to monitor people at all before you

11   prescribe a controlled substance?

12   A    No.

13   Q    Now -- but you understand that you cannot only

14   prescribe a controlled substance for a medical reason,

15   i.e., something that a controlled substance can help

16   with?

17   A    Yes.

18   Q    And so that gets us back to that critical question.

19   If you prescribe medicine to somebody in pain, that's

20   making a medical decision, isn't it?

21   A    Yes.

22   Q    Now let's talk about your monitoring, your lack

23   thereof or problems you were having with that.  You

24   mentioned earlier that you were trying to do urinary

25   drug screens.  You are remember that?

4494

1    A    Yes.

2    Q    Well, the Government has exhibits that showed that

3    people failed multiple drug screens but they continued

4    to get treated.  You remember that?

5    A    Yes.

6    Q    Well, doesn't that mean that you failed?

7    A    No, not necessarily.

8    Q    Why not?

9    A    Well, there's all this, like I heard before, there's

10   two sides to the coin.  And so, yeah, maybe they did not

11   have the medication in their system and so that was a

12   failed urine drug screen.  But you have to find out what

13   the reason was they didn't have the medicine in their

14   system.  And so you would have to listen to what the

15   patient would say.  Well, if they ran out of medication,

16   say they were hurting too much, maybe they lost the

17   medication, there's all sorts of reasons that possibly

18   could happen.  And so I would typically give the patient

19   the benefit of the doubt.

20   Q    Well, what about these people smokin' marijuana

21   while they're taking their pain meds?

22   A    Yes, that would be addressed, too.  If they were

23   smoking marijuana, illegal substance, they would be

24   notified that that's inappropriate and that they needed

25   to discontinue.  But if they had something stronger than

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

4495

1    marijuana, then they definitely were terminated for pain

2    management right then and there and was referred to a

3    rehab.

4    Q    Well, is it possible that some of these people with

5    these positive drug screens, i.e., with cocaine in their

6    system, slipped through the cracks?

7    A    Yes.

8    Q    Well, what -- your charting system was in bad

9    disarray back then, wasn't it?  According to the

10   Government, your charting sucked.  Right?

11   A    Well, the charting definitely always could be

12   better.  And we were trying to improve that.

13   Q    Well, tell the jury how is it possible that you

14   could order a urine drug screen on somebody and the

15   results not make it back to the chart before the

16   person's next visit?

17   A    Well, I don't know all the case scenarios; but it's

18   possible that the urine got displaced or did not get

19   sent in.  Or it's possible that the lab didn't report it

20   or it got -- or that the report got misplaced.  A lot of

21   these factors were a concern to us and that's where we

22   tried to change to the electronic medical records where

23   all of that stuff could be scanned in.  And actually the

24   Lab Corp stuff was put in directly.

25   Q    When you say put in directly, did you take it out of

4496

1    several hands to shorten the steps to make sure that you

2    wouldn't miss these urinary drug screens?

3    A    That's correct.

4    Q    Well, this charting, tell the -- we mentioned

5    electronic charting earlier.  How would that help solve

6    the problem of charts missing or papers missing out of

7    charts?

8    A    Well, definitely paper charts, especially when they

9    get big, sometimes the papers don't all stay in, they

10   get pulled out.  Sometimes the patient, if they're in

11   the room with their chart, they'll pull out a page that

12   they don't want the doctor to see if they were, you

13   know, trying to be dishonest or something like that.  So

14   that's a possibility.  But we did have a problem

15   initially with getting the turn around on the charts

16   because if we did a lab; or if we referred them to

17   someplace, it would go to the referral desk and it may

18   sit there for a few days before that referral got done.

19   And so then it went over to Linda's office or someplace

20   before it got the rest, or to coding to get coded and so

21   it took a while for that to come back.  We tried to take

22   some of those steps out and try to, instead of --

23   initially what we had was the chart and the fee ticket

24   go down to the billing.  But then we took the chart out

25   and put it back on the chart rack and just sent the

 1    billing slips down.

 2    Q    Well, were there times when patients were seen

 3    without having their chart, the complete chart

 4    available?

 5    A    Yeah.  That was part of the reason why we tried to

 6    eliminate that problem.  And we, we had that problem

 7    initially.  And then we said, well, you can't -- the

 8    patient could not be seen unless they had their chart.

 9    Q    So you recognized there was a problem and you

10    actually implemented a policy change?

11    A    Yes.

12    Q    Did Dr. Parran ask you about any of these questions

13    before he opined that you made no changes?

14    A    No.

15    Q    Did Dr. Jorgensen ask you about these policies

16    before he opined you made no changes?

17    A    No.

18    Q    Did Dr. Owen ask you about these changes before he

19    opined you made no changes?

20    A    No.

21    Q    Was that the only change that you made?

22    A    No.  We made lots of changes.

23    Q    Well, let's talk about this monitoring.  What else

24    were you trying to do to monitor these people.  I think

25    you mentioned you were taking pill counts?

4498

1    A    Yes.  As Dr. Jorgensen said, if we had an anonymous

2    call, we would automatically call the patient in to have

3    a pill count.  And -- or if we were suspicious, you

4    know, we would call up and have 'em come in and do a

5    pill count.  So we were doing that.  And we were doing

6    more frequent urine drug screens I think.  Matter of

7    fact, when we got Dr. Simons on board, he couldn't

8    believe how many urine drug screens we were doing

9    compared to what he was working with at Dr. Parks.

10   Q    Now, with -- you also required people to come in

11   monthly; correct?

12   A    Yes.

13   Q    And was that a method to try to monitor pills?

14   A    Yes.

15   Q    Well, the Government says there were a lot of people

16   coming in early.

17   A    Well, yeah, a lot of -- and I was looking at that

18   when he said that.  And it looked like some days they

19   might be a day early.  Some days two or three days.  It

20   was our policy that usually three to five days was

21   acceptable.  At least that was my policy anyway because

22   I wasn't there every day of the week; and to allow for

23   weekends and extra days and so definitely didn't want my

24   patients to be without medication.

25   Q    Well, what about people that come in like in two

4499

1    weeks?  It looked like the Government found charts where

2    there were people that came in two weeks early and they

3    still got medication.

4    A    Yeah.  And I'd have to review those charts to see

5    the exact reason for that.  It could be that the

6    medication either wasn't working or that they had an

7    adverse side effect with the medication and wanted

8    something else.  I don't know.

9    Q    Well, let's talk about that.  Just because somebody

10   comes in early, does that necessarily mean that they're

11   abusing the drugs?

12   A    No.  It could be pseudoaddiction.  I think that

13   somebody may have talked about before where the pain is

14   not controlled and so they're taking more medication

15   than what is prescribed.

16   Q    And they're taking more in order to get -- to reach

17   that pain relief?

18   A    Yes.  They're not taking the pain medication more to

19   get a high or to abuse it.  They're using it to get pain

20   relief.

21   Q    Did you hear the testimony from Robin G's husband

22   that she would not come in early because -- she didn't

23   want to come in early because of the contract and would

24   have to go to the emergency room to get medication when

25   her headaches got real bad?  You remember that?

4500

1    A    No, I don't remember that.

2    Q    Okay.  Now, were you documenting telephone calls

3    from family members?

4    A    Yes.  Typically the phone call would come in and

5    receptionist or a nurse would take the phone call and

6    she would jot down a note and put it in the chart.

7    Q    Why would you have them doing that?

8    A    Well, so we would be aware of that.

9    Q    Well, you understand that, you know, you're supposed

10   to be running this drug enterprise, and according to

11   Government witnesses, if you don't document it, it

12   doesn't happen.  So if you don't document those phone

13   calls, they don't have that, quote, unquote, evidence

14   against you.  Do you understand that?

15   A    Yes.

16   Q    So why were you documenting them?

17   A    We were treating the patient.

18   Q    Was that information that you wanted to know so you

19   could do your best to help these patients?

20   A    Yes.  I mean, if there was a suspicion of

21   inappropriate use of the medication, we wanted to know.

22   We would not talk to whoever called in and say, well,

23   this person -- at least they were not supposed to, to

24   talk to any person, even a family member, about their

25   treatment.  Because that's confidential information.  So

1    if it was something that we were really concerned about,

2    we would call them in for a pill count.  If it was

3    something like an anonymous phone call or a family

4    member stating that they thought they were getting too

5    much pain medication or whatever, we would address that

6    in their next visit.

7    Q    You understand that if the Government's theory is

8    correct, all doctors really need to do is not document

9    the drug seeking behavior and these cases would

10   disappear.  You agree with that?

11   A    No.

12   Q    Why not?

13   A    These cases?  What do you mean by these cases?

14   Q    Meaning that these prosecutions can't happen if

15   doctors would just stop documenting this, quote,

16   unquote, drug seeking behavior.

17   A    Well, if you stop documenting what's going on with

18   the patient, I mean, then, yeah, I suppose you could be

19   classified as a drug dealer or something like that if

20   you're not keeping records.

21   Q    You were keeping records; correct?

22   A    Yes.

23   Q    Were you trying to monitor your patients?

24   A    Yes.

25   Q    Were you trying to ensure that the medication you

4502

1    were giving was being used to treat pain and not to be

2    sold in the streets?

3    A    Yes.

4    Q    Did you ever terminate people from pain management?

5    A    Yes.

6    Q    Did you terminate people that you refused to rehire?

7    A    Yes.

8    Q    Did you ever decide to rehire some patients back?

9    A    Yes.

10   Q    Why?  If, you know -- if you get, you know, this

11   quote, unquote, red flag that people like to throw

12   around, why would you give them another chance?

13   A    Because I truly believe that the patient had chronic

14   pain and so I would try to find out the reason why they

15   were fired and see if, whoever fired them, if it was a

16   PA fired them, what the reasoning was behind that and

17   the patient's reasoning why they got fired or why they

18   failed their test or whatever.  So I wanted to hear both

19   sides of the story.

20   Q    Have you ever terminated a patient who you agreed to

21   rehire but who then refused to take the steps necessary

22   to continue treatment?

23   A    Not that I know of.

24   Q    So when you made the decision to rehire people, it

25   wasn't just I look at the paperwork, uhm, you're

4503

1    refired?

2    A    Yeah, it was not that way.

3    Q    Do you know how many people you actually caught --

4    well, strike that.

5         Well, to terminate somebody I guess you have to

6    understand that there are some people who will seek

7    these medications even though they don't have pain?

8    A    Yes.

9    Q    Do you -- you've had an opportunity to sit back and

10   look at records retrospectively.  Do you believe that

11   maybe you and some of your staff got tricked and duped?

12   A    Of course.

13   Q    Well, you heard Alicia Collins yesterday sent a

14   letter to the clinic stating how much pain she was in

15   and had to be carried away.  Does that not tug at the

16   heartstrings of a caring doctor?

17   A    I would say so.

18   Q    Is that a person trying to take advantage of a

19   physician who in their heart of hearts is trying to help

20   people?

21   A    Yes.

22   Q    Do you feel like, based on some of these records

23   that the Government was able to find after two and a

24   half years of digging, that you got duped from time to

25   time?

1    A    Yes.

2    Q    But did you continue to try to weed out the people

3    who were faking you out and the people who really needed

4    your help?

5    A    Of course.  Just like Mr. Jones said yesterday.

6    It's the people that are doing that that make it, make

7    it hard for the people that do have chronic pain.

8    Q    Well, you hear -- all right.  Person comes in

9    discussing pain.  Okay.  Let's go back to our scenario

10   where I'm hurting.  Let's assume that I am like really

11   hurting, not just a little bit of, you know, pain from

12   getting old, but like I am really, really hurting.  And

13   I tell you that I'm hurting this bad.  You take a MRI.

14   It may show nothing.  Is that right?

15   A    That's correct.

16   Q    If you take a CAT scan, will that show you what the

17   pain is?

18   A    No.

19   Q    Is it very possible that you can take all of these

20   diagnostic tests and not know a source of a person's

21   pain?

22   A    That's correct.

23   Q    But does that mean that person is not in pain?

24   A    No.

25   Q    So what do you have to do in that situation?  You

4505

1    have these diagnostic tests in hand that do not show a

2    source of pain but you have this person nearly in tears

3    sitting in your office telling you that they're hurting.

4    What do you do in that situation?

5    A    Well, it's almost like a migraine patient.  You

6    know, there's no physical findings that you can see that

7    says she or he has that much pain but you can see that

8    they're wailing and they're cryin' and they can't sit

9    still and you can see that they're in pain.  Just like

10   I've had multiple, multiple people that have had back

11   surgeries.  And the doctor that does the surgery, he

12   sees the disc that's pushing against your spinal cord or

13   your nerve root and he, and he can remove that.  But he

14   can't see all those little nerve endings that he's

15   slicing and dicing through and cutting through the bone

16   and all that.  He can't see those that actually are the

17   source of the pain for a lot of these people.

18   Q    So what do you have to do?  You're sitting there

19   with this patient, do you have to trust them or do you

20   have to trust these tests?

21   A    Well, it would be the own clinician's judgment.

22   Q    What would you do, Dr. Schneider?

23   A    If I truly believed they were in pain, I would try

24   to relieve the pain.

25   Q    Did you see a lot of patients that were on

4506

1    disability?

2    A    Yes.

3    Q    Another criticism that we've heard about your clinic

4    is this continuum of care that the fact that you had

5    allowed physician's assistants to see patients and they

6    just didn't see the same provider.  You remember hearing

7    those criticisms?

8    A    Yes.

9    Q    Well, why was that?  Why didn't each provider see

10   only their patients and not try to see other people?

11   A    Well, there could be several reasons for that.  I

12   think most patients have a preference of who they would

13   see, but the way we scheduled the PAs, they were not

14   there five days a week.  They were there four days and

15   sometimes only three days a week.  One week they would

16   work four days; the next week they would work three

17   days.  They were on ten hour schedules.  And so it would

18   be hard sometimes to see the same PA every month.

19   Q    Okay.  And so make sure we understand.  Your PAs

20   didn't work seven days a week ten hours a day.  Fair?

21   A    That's correct.

22   Q    Okay.  And so you gave -- they worked hard, you

23   agree with that?

24   A    Yes.

25   Q    And your environment was quote, unquote, fast paced?

4507

1    A    Yes.

2    Q    And they had to see a lot of patients?

3    A    Yes.

4    Q    Did you trust them to do a good job with the

5    patients?

6    A    Yes.  I thought we had excellent PAs.

7    Q    Did you believe before this whole case came that you

8    all were not providing the best care possible?

9    A    No.  I thought we were providing excellent care.

10   Q    Well, the Government has pulled out about 68 charts

11   and are saying that's representative of your whole

12   clinic.  Do you agree with that?

13   A    No.

14   Q    Why not?

15   A    Well, I didn't see any charts that were just family

16   practice patients.  I didn't see any charts of people

17   that we done DOT physicals on.  I didn't see charts that

18   we done child immunizations and infant care.  I didn't

19   see any charts with elderly.  I didn't see any charts

20   with people that had severe diabetes.  I didn't see any

21   charts where we were treating their Hepatitis C with

22   Interferon shots.  So it's hard for me to say that was a

23   very good representative of what our clinic done.

24   Q    Did you ever refer to your patients as bad grapes?

25   A    Never.

4508

1   Q   Where did they get that from?

2   A   I don't know.

3   Q   Would you ever refer to your patient as a bad grape?

4   A   No.

5   Q   Did you take any of your patients for granted?

6   A   No.

7   Q   We heard testimony about a presigned prescription

8   pad.  You were interviewed by an investigator at the

9   time that this first search warrant was executed.

10  Correct?

11  A   Yes.

12  Q   And you told them that, yes, I use presigned pads?

13  A   Yes.

14  Q   Why did you just tell them that?

15  A   Well, that's because that's what I did.  I didn't

16  know it was inappropriate.

17  Q   You didn't go lawyer up and go hide in a hole and

18  say you can't talk to me until I get a lawyer?

19  A   No.

20  Q   You sat there right there during this search warrant

21  and spoke with them?

22  A   Yes.

23  Q   Did you feel like you had anything to hide?

24  A   No, I didn't think I had anything to hide.  I mean,

25  the federal agents were in our place, you know,

4509

1    practically every week; and I just assumed by them

2    coming in and seeing what we were doing there that there

3    wouldn't be even an Indictment or a prosecution or

4    anything.

5    Q    You trusted them --

6    A    Yes, I did.

7    Q    -- to look at everything and make a decision?

8    A    Yes.

9    Q    Have they presented everything to the jury?

10   A    No.

11   Q    When you came to work that day that this search

12   warrant happened, tell the jury, tell the jury about

13   that?

14   A    The day of the raid?  September 13th, '05.

15   Q    That date stands out?

16   A    Oh, yeah.

17   Q    Is that the first time you've ever had a search

18   warrant executed on your house, business or anywhere

19   else in your life?

20   A    Yes.  It was traumatic.

21   Q    Tell the jury about what happened that day.

22   A    Well, went to work that morning and the whole clinic

23   was surrounded, per se, with cars of, you know, the

24   police and agents and they wouldn't let anybody in the

25   parking lot.  And they seen who I was so they let me in.

4510

1    And they said, well, we've got a search warrant.  And I

2    asked 'em how long it would take, I said, 'cause I got a

3    lot of patients, you know, coming today.  And they said,

4    well, you're going to have to be closed for the day.  So

5    they took me and asked if I would answer some questions.

6    And it was the DEA agent that talked earlier and a KBI

7    agent, Bill Rowland.  And we went back in one of the

8    examine rooms and they talked to me about what was

9    happening at the Schneider Medical Clinic.

10   Q    Were you scared?

11   A    Oh, yeah.

12   Q    Were you nervous?

13   A    Yes.

14   Q    Did you know why they were raiding your clinic?

15   A    Well, we heard rumors.  And I think there was even

16   something published in the Haysville newspaper about we

17   were under investigation.  Matter of fact, Mr. Hall, who

18   testified, had met with us previously to the raid and

19   tried to warn us.  He said, well, the feds are looking

20   at you and they've interviewed me.  And I told him -- he

21   said, well, you're not doing anything different than

22   what Dr. Murati done, and so he seemed to be supportive

23   to us.  But that, yeah, it was not that much of a

24   surprise.

25   Q    Well, so you understand from a -- was it the

4511

1    newspaper article that came out that said that the

2    Schneider Medical Clinic is under some investigation?

3    A    I think so.  I think I heard about that.

4    Q    Well, why did you not just kick out your pain

5    patients right then?  Hey, you're under investigation,

6    I'm not gonna do anything any more with any pain

7    patients because I don't want to risk my livelihood to

8    get in trouble.

9    A    Well, I guess if I was smart I probably should have

10   done that.  But I was concerned about our patients.  And

11   as a matter of fact, I talked to the other providers

12   there about the situation after this rumor that we had

13   heard and I, I told them that I didn't think they needed

14   to be that concerned.  I thought that they were just

15   focusing on me.  You know, and that I, I would like

16   that, you know, if indeed something happened, that they

17   would continue with, you know, the practice if something

18   did happen to me.

19   Q    Even the day after the raid your office still tried

20   to help the patients who needed their medication to find

21   a place to find 'em; correct?

22   A    That's correct.

23   Q    And somebody at your front desk said we can't do it

24   but maybe you can go to the emergency room?

25   A    I believe so.  I think I seen a note where it said

1   that they were sending people to the emergency room.

2   Q   Even after that raid, did you continue to see pain

3   management clients?

4   A   Yes, I did.

5   Q   And why?  Why would you continue to see these

6   patients that seemed to be causing a lot of problems in

7   your practice?

8   A   Well, I really didn't feel like these patients had

9   any other place that they could go.  And as a matter of

10   fact, Mohammed, who did stick around for a little while,

11   me and him both said, hey, maybe we should just no more

12   pain management; but when patients came in, we just

13   couldn't say no to 'em.

14   Q   Because of the money?  Money was so good from these

15   patients?

16   A   No.

17   Q   How much did you get for an office visit, 65 $75 a

18   person?

19   A   That's what I think our charge was, yes.

20   Q   Medicaid would only pay a percentage of that?

21   A   Yes.

22   Q   20 bucks maybe?

23   A   15, 20 bucks.

24   Q   Government wants the jury to believe that for 20

25   bucks a person you're going to risk your wife, your

4513

1    children, your practice, and your livelihood; right?

2    A    I guess so.

3    Q    You told the jury at the beginning that you saw your

4    daughter in a hospital and you saw people working to try

5    to help her and that caused you to want to try to help

6    people.  Is your desire to help people as you're sitting

7    in that chair right here today?

8    A    Yes, I guess so.

9    Q    There were also other problems that you found as far

10   as the administration of the clinic; correct?

11   A    Yes.

12   Q    Now, let's make sure that the jury understands that

13   when you opened the Schneider Medical Clinic, this was

14   your first time and Linda's first time on your very own

15   without a parent company structure there to help guide

16   you, wasn't it?

17   A    That's correct.

18   Q    And did you try to create all these processes and

19   procedures based on what you did in the past and try to

20   improve upon them to make them better?

21   A    Yes.

22   Q    As you sit here today, do you believe that things

23   could have gotten better faster?

24   A    Oh, I'm certain things could have been better, yes.

25   Q    Now, we heard testimony about these -- that some

4514

1    patients would even try to forge prescriptions from the

2    Schneider Medical Clinic.  Did you know that that

3    happened some?

4    A    Yes.  I've heard several instances that that

5    happened.  And every time the pharmacist was told to

6    prosecute.  And rarely did that ever happen.  But if I

7    wrote a prescription for a Schedule II drug, I did not

8    make it very easily to be forged because I would not

9    only put the number down there but I would write out the

10   number so it would be harder for anybody to forge a

11   Schedule II drug.  But the Schedule III drugs actually

12   were sent electronically through our computer.

13   Q    Who controlled the ability to send prescriptions

14   electronically?  Would that be the federal government?

15   A    I don't know.

16   Q    If the federal regulations say you have to write by

17   hand a Schedule II prescription, you would have followed

18   that regulation?

19   A    Yes.

20   Q    Were you ever given the option to electronically

21   send Schedule II medicines directly to a pharmacist?

22   A    No.

23   Q    By sending electronically, would that not take

24   the -- take at least one opportunity for illegitimate

25   patients to try to alter medication and get it filled?

1    A    That's correct.  You know, I really didn't

2    understand why they didn't allow the Schedule II to be

3    sent that way because it's a much safer way I thought.

4    Q    You heard Tabbie H testify.  You remember that?

5    A    Yes.

6    Q    Did he ever tell you -- strike that.  Do you

7    remember him as a patient?

8    A    Yes.

9    Q    What do you remember about Tabbie?

10   A    Well, I don't remember seeing him that many times at

11   my clinic.  Other than I do remember the time he said

12   when he mentioned the D.U.I.s.  And I was actually

13   sitting in my office at the time and he came back and

14   gave me a cassette tape that he had made because he

15   was -- I think he was doing some vocal singing or

16   something like that.  And he just brought that in and he

17   said, hey, by the way, I had a couple D.U.I.s.  And I

18   didn't think anything about him, you know, as being the

19   medication that he was getting, you know, because I

20   hadn't really seen him that much.  He had been seeing

21   the PAs.  And so, no, I didn't think much about it.  I

22   said, well, maybe you ought to keep me informed what's

23   going on.  I didn't realize that it wasn't alcohol he

24   was talking about.

25   Q    If you realized that he told you that he had been

4516

1    under the influence of his pain medication, would you

2    have tried to counsel him right then?

3    A    Sure.

4    Q    Did he ever tell you that he was suffering from an

5    addiction?

6    A    No.

7    Q    Had you ever -- I think you mentioned it briefly --

8    but you have had patients that tell you that I think I'm

9    addicted?

10   A    Yes.

11   Q    And when they did, would you try to get them help?

12   A    Yes.

13   Q    And I believe Tabbie H also testified that, you

14   know, he wouldn't say certain things to the providers

15   because he wanted to make sure he got his fix.  Is that

16   common for people to want to get medication to say what

17   they believe they need to say in order to get it?

18   A    Well, I would assume so, yes.

19   Q    Now, the Government spend a week and a half or more

20   talking about people that visited the Schneider Medical

21   Clinic and passed away.  You remember that?

22   A    Yes.

23   Q    Before this case was filed, did you know that

24   anybody alleged that that many of your current and/or

25   former patients passed away because of alleged

1    overdoses?

2    A    No.

3    Q    And you understand from the testimony that the

4    defense disputes that a large majority of these patients

5    even passed away from a drug overdose because of

6    incomplete autopsies just because the people had

7    medication in their system?

8              MS. TREADWAY:  That assumes facts not in

9    evidence.

10             THE COURT:  Sustained.

11   BY MR. WILLIAMSON:

12   Q    You understand that the defense disputes the

13   accuracy of the autopsy findings?

14   A    That's correct.

15   Q    Okay.  I don't want you to be a lawyer.  Let me try

16   to, you know, try to do that.  But you're human, aren't

17   you?

18   A    Yes.

19   Q    You sat here and you listened and you saw the faces

20   of these people every day.

21   A    Yes.

22   Q    Some of these people you never saw at any point in

23   time, did you?

24   A    That's correct.

25   Q    Some of these people you never even prescribed any

4518

1    medicine to at all?

2    A    That's correct.

3    Q    Some of these people did receive pain medication

4    from the clinic?

5    A    That's correct.

6    Q    Well, when you sit back and you just hear of a

7    person -- you hear of these people passing away when

8    they claim that you missed this and you missed that,

9    tell the jury, tell the jury how you feel about that?

10   A    Well, it's very sad, very sad for anybody to lose

11   their life.  And I, I really feel like if there was any

12   opportunity that I could have saved their life and I

13   missed it, I regret that.

14   Q    Anybody on that list or in charts that have not been

15   presented by the Government did you ever -- would you

16   have ever prescribed medicine to them if you knew that

17   when they walked out of the door they would have abused,

18   misued or suffered an adverse consequence from that

19   medication?

20   A    I would never have wrote 'em another prescription if

21   I thought it was going to hurt them.

22   Q    Did you receive notices of all these people passing

23   away?

24   A    No.  Some.

25   Q    We never contended that you haven't, have we?

```
 1    A    No.

 2    Q    Did you ever say, oh, well, if you learned of a

 3    person passing away?

 4    A    I don't remember saying that.

 5    Q    Would you ever just say oh, well?

 6    A    No.

 7    Q    Were you seeing these patients you were seeing

 8    because you cared?

 9    A    Yes.

10    Q    And if you cared about these patients, why would you

11    just simply say oh, well?

12    A    I, I don't remember saying that.  I don't -- I don't

13    understand that.

14    Q    Now, we talked about patients being honest with

15    physicians.  You remember that?

16    A    Yes.

17    Q    And did you trust your patients to follow your

18    instructions?

19    A    I trusted my patients to follow the instructions

20    that I gave them and I believed in them.

21    Q    Now, the Government has charged you specifically

22    with causing the death of three human beings; correct?

23    A    Yes.

24    Q    We're going to spend some time just going through a

25    few charts.  I want the jury to have an opportunity to
```

1    hear you tell them at least with respect to several

2    visits as to why you believed the medication you were

3    giving on certain visits would be helpful to them.

4    Okay?

5    A    Okay.

6    Q    Let's talk about a few appointments that Robin G had

7    with you.  Okay?

8    A    Okay.

9    Q    Her first visit with you was 7-13 of '04?

10   A    Correct.

11   Q    Let's take a look at that first visit.  Let's just

12   focus in at the top, the subjective part right there.

13   Now, the jury -- I previously discussed the history with

14   Dr. Parran so, you know, try not to be too repetitive.

15   So we're not going to go through that.  But tell the

16   jury what's happening in this visit when you are writing

17   these list of medicines down?  You see the migraine, and

18   let's start there.

19   A    Okay.  Subjective says migraines.  And then looks

20   like I wrote down neurologist, specialist in Kansas

21   City.

22   Q    Let's pause there.  Is that her telling you that she

23   had seen a neurologist who was a specialist in Kansas

24   City?

25   A    Correct.

1    Q    Okay.

2    A    Then there's a list of meds.  And I assume these

3    were -- or these are the ones that actually were used

4    that she stated.  And Nubain caused an itch.  Toradol

5    was no help.  Lortab, high dose, caused an itch.

6    Imitrex had adverse effects.  Stadol helped.  Depakote,

7    no help.  Novatril (ph) no help.  Morphine helped.  And

8    it says beta blockers made her weak.

9    Q    Now, is this that interactive discussion that you

10   would normally have with patients who were going to

11   start an opioid therapy so you can find out what they

12   tried, what helped, and what didn't help?

13   A    That's correct.

14   Q    Did you always document this on every progress note

15   that you did on initial visit?

16   A    Well, I don't know about always, but definitely

17   would be part of the record, I believe, if we were

18   taking a history.

19   Q    And make sure the jury understands that if you don't

20   go through this medical history with people and find out

21   what medicines that they report that they've taken, you

22   could prescribe an opioid and they could suffer an

23   adverse consequence after one visit?

24   A    That's correct.

25   Q    Now, all of the patients that the Government has

1    picked out, that at least you were involved with, were
2    either long term patients or they were on a steady
3    opioid therapy.  And just keep that in mind before we --
4    when we move on to the next chart.  Okay?
5    A    Okay.
6    Q    Now, can you -- let's go down to the examine part.
7    Tell the jury what this tells you what you did through
8    that examine?
9    A    Well, the subjective, I checkmarked the first
10   sentence where it says well nourished, well developed.
11   Then I also checked the H-E-N-T examine.  And the oral
12   examine and respiratory and cardiovascular examine.
13   Q    Okay.  Pause.  We did not do a cardiovascular
14   examine, you and I?
15   A    Yes, we did.
16   Q    Oh, you did?
17   A    I listened to your heart.
18   Q    Did we do a respiratory examine?
19   A    Yes, I did.
20   Q    Listened to my lungs?
21   A    Uh-huh.
22   Q    All right.  So we did all of that.  So we won't
23   review that.  GI.  Is that where you listened to the --
24   or you poked around on my stomach?
25   A    Yeah, I poked on your stomach and listened to your

4523

1    bowel sounds.

2    Q   And there's a circle there.  What does that mean?

3    A   The circle is in the musculoskeletal area.

4    Q   And tell the jury what your findings were in regards

5    to your physical examine there?

6    A   Well, probably not everybody can read this, but

7    there's a positive sign there.  With para -- with para

8    vertebral spasm of the cervical dorsal and lumbar spine.

9    And there's a positive trapezius tenderness.

10   Q   Tell the jury what that translates to in nonmedical

11   talk?

12   A   Well, it's, it's just muscle spasms around the

13   spine, up and down the spine.  And then the trapezius

14   area up here.  (Witness indicating.)

15   Q   Now let's go back and look at the -- and I guess we

16   can -- let's talk about two things as we go through

17   this.  One, your handwriting is bad, isn't it?

18   A   Yeah.

19   Q   Okay.  Your handwriting didn't just get bad in 2002,

20   did it?

21   A   No.

22   Q   Okay.  Your handwriting has been bad since, what,

23   19 --

24   A   Ever since I can remember.  Medical school is

25   probably where it started.

1   Q    Do they teach that class in medical school?  Bad
2   handwriting for doctors?
3   A    Yeah.  I got an A in that course.
4   Q    Now, those electronic records that you moved to,
5   would that have helped with the inability to read these
6   notes?
7   A    Pardon.
8   Q    The electronic medical records, the tablets that you
9   started using, would that have helped in the ability to
10  read these notes?
11  A    Yes.
12  Q    Now let's go back and look at the checklist of the
13  exam.  Now, we've heard about checkmarks.  Now, this
14  isn't just solely a checkmark system, is it?
15  A    No, it's not just checkmarks.
16  Q    You checkmark and you make a notation if there's an
17  abnormality.
18  A    Yes.
19  Q    Okay.  So if there is nothing wrong with a
20  person's -- let's say you don't find anything wrong with
21  the neurological exam.  Well, under a lot of
22  circumstances, there probably won't be any medical
23  treatment in relation to that neurological exam?
24  A    That's correct.
25  Q    So when you're trying to inform these insurance

4525

1    companies as to why your treatment plan is a certain

2    way, then that would correlate to where you find

3    abnormalities in the physical exams; correct?

4    A    Yes.

5    Q    So you also did a neurological exam with Ms. Robin?

6    A    Yes.

7    Q    And you also did a psychological examine?

8    A    Yes.

9    Q    Now, tell the jury what your assessment was with

10   her?

11   A    Well, it says assessment, TMJ syndrome; but I didn't

12   comment anywhere in the subjective about the findings on

13   the TMJ joint.  But then it says chronic migraines after

14   that.

15   Q    Okay.  Let's stop there.  What is a TMJ joint?

16   A    That's the -- your jaw.  That little popping noise,

17   that's the TMJ, tempomandibular joint.

18   Q    And in order to find that, you examined her jaw?

19   A    Well, she probably complained of that and so I don't

20   know that I examined her because I don't have that wrote

21   down.

22   Q    Okay.  And tell the jury what your medication

23   therapy was on this visit?

24   A    It looks to me like Celebrex, which is an anti

25   steroidal anti inflammatory, 200 milligrams, number 30

1    were given.  It looks like one refill.  In addition to

2    that, Topamax was given, 25 milligrams.  And it looks

3    like 100 was wrote after that.  Avenza, which is the

4    long-acting morphine, 30 milligrams for that was given,

5    number 30.  And it says Actiq, and I believe that's 400

6    micrograms, two boxes.

7    Q   Okay.  Tell the jury how was this medication therapy

8    designed to help Robin G?

9    A   Well, the Celebrex is an anti inflammatory.  It does

10   help with moderate pain; but it doesn't help with major

11   pain like migraines.  It's not even indicated for

12   migraines that I know of.  But it definitely would help

13   with the TMJ.  And if she is having some of these spasms

14   in her neck and back, it may help with that.  And that

15   was a once a day pill.  The Topamax is a seizure

16   medication but it was also indicated for migraines.  And

17   the dose was titration.  We start off with 25 milligrams

18   a day and then after a week you bump it up after that.

19   Nothing was wrote down on how to titrate with that so

20   I'm assuming it might have been, you know, once a day

21   for a week and then on up.  Avenza is the morphine which

22   is a long-acting pain medication.  And then the Actiq,

23   which is the short-acting medication for acute pain, for

24   acute migraines.

25   Q   Why do you need Avenza and Actiq at the same time?

1    A    Well, I'm assuming that this here is chronic

2    migraines, that she did have chronic migraines and that

3    she had this TMJ syndrome, which both are painful

4    conditions.  And also commented that she had this spine

5    spasm and trapezius.  And also commented in the note

6    down here may need a MRI to C spine next visit.  So, I

7    was concerned about a chronic pain syndrome.

8    Q    Okay.  So even though on this first visit you

9    prescribe these medicines, you also note that she may

10   need some diagnostic testing?

11   A    Yes.

12   Q    So even though she had a history of these migraines,

13   you still wanted to do a little bit more?

14   A    Yes.

15   Q    Well, tell the jury why, practically, how would you

16   take Avenza and how would you take this Actiq?

17   A    Avenza is once a day morphine, slow release.  And so

18   you try to get a steady state where you don't have, you

19   know, so you get the pain under control and not be --

20   you have to worry about side effects, you know, if it

21   makes you drowsy.  Most common side effect I seen with

22   morphine, though, most people had --

23   Q    Steve, let me get you closer to the mic.  I'm having

24   a little trouble hearing you.

25   A    Most people a side effect of morphine was they

4528

1   didn't tolerate it.  It did upset their stomach and a

2   lot of the, the controlled substances caused some GI

3   upset.  So -- but it was a once a day morphine.

4   Q   Okay.  But what about the Actiq?  What do you do

5   with that?

6   A   The Actiq is for the acute migraine.  And typically

7   I would suggest they take one initially, and like we

8   showed or demonstrated, or you demonstrated, how -- and

9   even gave them a package or a pamphlet that was provided

10  by the pharmaceutical company to give the patient to

11  show 'em how to use it and suggested that if the pain

12  didn't go away, it took about 15 minutes for this to

13  dissolve in their cheek.  And after that 15 minutes

14  later it still hadn't gone away, to repeat that process.

15  Q   And is that similar to what we saw that the medical

16  literature said if you give a 400 and it doesn't work

17  then use two 400s?

18  A   Yes, somewhat.

19  Q   Well, you know, I'm still struggling, Steve.  I'm

20  sitting here thinking, like, well, okay, I have this

21  steady medication.  I still don't know how these work.

22  I mean, if I take Avenza and I'm not in pain any more,

23  why do you need Actiq?

24  A   You wouldn't need the Actiq unless you were having

25  pain and --

4529

1    Q   Well, let me rephrase it.  What if I got Actiq, why

2    do you need Avenza?

3    A   Well, I'm assuming -- I'm thinking that she has a

4    chronic pain syndrome in addition to the migraines.  The

5    migraines typically are not all day long.  They come on

6    and they go through their process and if you can get 'em

7    early, typically, the, like the Imitrex and that type of

8    medication, work quite effectively.  You don't even need

9    a narcotic.  But she said she had adverse effects with

10   that type of medication.  So, the quickest acting pain

11   relief would be either a shot, IV, preferably, or the

12   Actiq which is very quick onset.

13   Q   Okay.  So I think Dr. Jorgensen talked a little bit

14   about this.  So as I understand it, the Avenza is the --

15   is designed to keep the chronic pain down.

16   A   Correct.

17   Q   Why did you not just try to cure her pain?

18   A   Well, I think we have to know exactly what the pain

19   is.  The migraines, there's really no real cure for a

20   migraine.  The treatment that I gave her with the

21   Topamax is supposed to be treating that.  So I'm trying

22   to get the migraines under control with that.  And the

23   Avenza is something to keep the pain level down and

24   hopefully she wouldn't need anything else.  But if she

25   has a migraine then most likely she's going to need the

4530

1      Actiq.

2      Q    Okay.  Now let's go to the next visit of 8-13 of

3      '04.  All right.  We're not going to keep going through

4      the subjective.  But let's go down to the objective in

5      regards to the exam.  And I guess there is a mention

6      there.  What did she tell you -- she comes in 30 days

7      later; correct?

8      A    Yes.

9      Q    And are you the provided that sees her?

10     A    Yes.

11     Q    And what does she tell you about the pain relief

12     that she's been experiencing over the last 30 days?

13     A    It says here happy with pain relief.  Increased

14     migraines.  Actiq works well.

15     Q    Okay.  And did you continue her pain therapy or

16     medicine therapy?

17     A    Yes.  Looks to me like I added some Zanaflex, which

18     is a muscle relaxer.  And typically I dose Zanaflex for

19     migraineurs or migraine patients.

20     Q    What was the first word you said?

21     A    Migraineurs.

22     Q    What's that?

23     A    That's just a person that has migraines.

24     Q    Okay.

25     A    That I would dose Zanaflex at night to help 'em

4531

1   sleep.  And -- or, if they were having a migraine, to

2   take it at that time because a lot of people can sleep

3   through a migraine.

4   Q   Do you remember Robin G's husband attending any

5   visits with you and her?

6   A   Yeah.  He was with her most of the visits.  Or

7   another family member.

8   Q   You never tried to kick him out or keep him away

9   from learning the type of treatment you were giving

10  Ms. Robin?

11  A   No.

12  Q   Now let's go to the next visit, 9-18 of '04.  Let's

13  look -- before we actually talk about that.  That last

14  one, there was a notation that you conducted an exam.

15  Do you see that?

16  A   Yes.

17  Q   Okay.  So that's zero.  And that plus right there,

18  what does that mean you found on that visit?

19  A   It was similar to the last one.  Para vertebral

20  spasm of the cervical dorsal spine.

21  Q   Okay.  Now let's go to 9-18 of '04.  She's not early

22  on this visit again, is she?

23  A   I don't know.  Looks to me like it's 9-8-04.

24  Q   9-8?

25  A   Yes.

1    Q    Sorry about that.  Now, she comes in 9-8-04, about

2    five days, quote, unquote, before the 30 days is up.  So

3    I guess that's technically early.  Under your policy,

4    would you have considered this an early visit?

5    A    No.

6    Q    Okay.  Now, when she comes in, the documentation

7    shows -- tell the jury what you did on this visit?

8    A    Well, under the subjective it says refills of the

9    Diazapam, Zanaflex, Topamax.  Then it says something

10   about S-M-G.  I'm not certain what that is.  Respiratory

11   infection.  Biaxin XL.  Still green mucous.  Then says

12   X-rays.

13   Q    And then what is that writing right above the

14   objective line?

15   A    Past medical history and meds reviewed.

16   Q    Okay.  And so you go through the exam.  This time

17   you notice a zero next to the oral examine; correct?

18   A    Correct.

19   Q    What did you find?

20   A    I believe this indicates phalangal erythema.

21   Q    What does that mean?

22   A    The back of the throat was red.

23   Q    And you also found that same issue down with her

24   musculoskeletal issue?

25   A    There was a cough.  And also there was some

4533

1    scoliosis noted in her back.  And para vertebral spasm.

2    Q    What is scoliosis?

3    A    Usually it's just a little curvature of the spine.

4    Q    Abnormal curvature?

5    A    It would be abnormal.  It could be related to muscle

6    spasm.

7    Q    Now let's look off to the right of that visit, or

8    that -- you've got some notes over there?

9    A    Yes.

10   Q    All right.  Tell us what that says?

11   A    Well, there's, there's several notes.  At the top it

12   says send in sputum, I believe.

13   Q    What does that mean?

14   A    She was coughing up -- because I put down over here

15   the word cough.  Then off to the side of it, productive.

16   And then there's a note that says H-I with a circle

17   around it, and it says to schedule MRI and Dexa.

18   Q    What's Dexa?

19   A    Dexa scan, a bone density scan.

20   Q    If you're just trying to prescribe drugs to people

21   and not trying to treat them, why are you getting bone

22   density scans?

23   A    Well, we were treating this patient for her

24   conditions.

25   Q    And you scheduled her for a MRI?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

4534

1    A    Yes.

2    Q    Let's go down a little bit.  What else did you

3    order?

4    A    X-ray was done of the C spine and the L spine.  And

5    then X-ray wrote in here positive chip fracture of the C

6    spine with degenerative disc disease of the cervical

7    spine.  And I can't read what that says.  Then on the L

8    spine, it also says something a little bit of scoliosis

9    and osteopenia, which is thinning of the bone.

10   Q    So the X-rays showed that she was having -- what was

11   that that it showed?  Some spurs or --

12   A    Chip fracture.

13   Q    What is that?

14   A    There was a little chip off of one of the bones.

15   Q    Can that be painful?

16   A    I'm sure it could be, yes.

17   Q    How do you fix that?

18   A    Well, chipped fractures, depending on how big the

19   chip is, I mean, if it's typically a little chip, then

20   it usually doesn't cause too much -- it's probably, it's

21   going to be absorbed; but it usually means that there

22   was a strain where the muscle pulled a little bone off

23   when it got pulled or something.

24   Q    Okay.  Let's look down at your assessment and your

25   plan.  Tell the jury what you did at that visit?

1    A    Well, the assessment says osteopenia, migraine,

2    degenerative disc disease with C spine with a chip

3    fracture, scoliosis.  Then the last is this bronchitis.

4    Q    Okay.  And what do you -- do you order a throat

5    culture anywhere?

6    A    Yes.  A throat culture was sent in.

7    Q    Where did you see that?

8    A    Well, it says send in sputum, so she coughed up some

9    green sputum and we sent that in to the lab.

10   Q    Where is that?

11   A    That's -- this is the culture.

12   Q    Where it says culture right there?

13   A    Yeah.

14   Q    Okay.  So, the third visit that Robin had with you

15   you stated that you scheduled a MRI.  You scheduled a

16   bone density test.  And you ordered a throat culture?

17   A    It was sputum culture.

18   Q    Sputum?

19   A    Yes.  A little different than swabbing the back of

20   the throat.

21          MR. WILLIAMSON:  Okay.  Judge would you like

22   to take a break now before I go through the next --

23          THE COURT:  I think that's a good idea.  About

24   15 minutes, Ladies and Gentlemen.

25                  (Recess.)

4536

BY MR. WILLIAMSON:

Q   Dr. Schneider, I think we finished the 9-8-2004

visit.  Let's go to the next visit of 10-6-2004.  Now --

are you there?

A   Yes.

Q   Okay.  On this visit do you discuss the results of

the MRI and the Dexa Scan?

A   I believe so.

Q   Okay.  And there's a place on there that says

adverse reaction to Topamax.  Tell the jury what that

means?

A   Well, apparently she had an adverse reaction to the

Topamax and so that was for the treatment of her

migraines.

Q   And at this visit did you -- you just didn't ignore

the results of the diagnostic tests that went out;

correct?

A   Well, I assume I didn't.

Q   Are they in the chart there?

A   Probably.  I don't see the -- maybe they're this

way.  Sorry.  Yes.

Q   Okay.  Now, your charts weren't kept in like these

three ring binders like you're able to flip through

right now, were they?

A   That's correct.

4537

1    Q    Now, there's a place on there that says see PADT.

2    Do you see that?

3    A    Yes.

4    Q    And it says -- what does that -- I think the jury

5    has heard a little bit about it from some Government

6    witnesses -- but tell them what that was and why you

7    used it in your practice?

8    A    The PADT is the pain assessment documentation tool.

9    And that's just to document their pain.  And it goes

10   over analgesia, which is the amount of pain relief;

11   activities of daily living; adverse events; and

12   potential aberrant drug related behavior.

13   Q    Let's go to the potential aberrant drug related

14   behavior on the next page.

15   A    Yes.

16   Q    Well, stop.  First, looking here, when it says the

17   analgesia.  It states that 10 is her pain during the

18   week.  And when she's not on -- or when it's at its

19   worst.  And then the average was 6.  What does that tell

20   you as a clinician?

21   A    Well, the 6 is better than 7 and better than 8, 9 or

22   10.  6 is close to the middle of the pain scale.

23   Q    And you heard Robin G's husband state that before

24   she even came to see you, her migraines had begun to

25   progressively get worse.  You remember that testimony?

4538

1    A    Yes.

2    Q    And is that common with migraines?  Do migraines get

3    worse?  Do they get worse; get better?

4    A    That's not typical.  Most migraine people don't have

5    this severe of migraines.  And a lot is times we would

6    see migraines during, specifically in women, during

7    their menstrual periods and things like that, and once

8    they were post menopausal, sometimes the hormonal

9    changes would diminish and so the migraines tend to get

10   better.

11   Q    Now, sounds like the Government is faulting you

12   because she continued to get worse and you titrated the

13   medicine to try to adjust her pain.  Do you know why the

14   neurological people she saw before could not cure her

15   migraine?

16   A    No.

17   Q    Do you know why the acupuncturist that she saw

18   before could not cure her migraine?

19   A    No.

20   Q    Do you know why the specialist in Kansas City could

21   not cure her migraine?

22   A    No.

23   Q    Were you trying to help her function to the best of

24   your ability by prescribing medicine to her?

25   A    Yes.

4539

1    Q   Now let's go to -- let's go to 12-21 of '04.  Okay.

2    On this visit it states that -- what is that two to

3    three times state right there?

4    A   This is Kim He'bert's writing.  And it looks like to

5    me she comments headache two to three times and I think

6    it's many or monthly.

7    Q   Do you know what that means with a hundred percent

8    certainty?

9    A   No.  But it could be two to three times a month, but

10   it indicates that the pain is in the suboccipital

11   radiating to the temples, to the left temple.

12   Q   Okay.  Now, does Kim counsel her in regards to the

13   addictive properties of the medicine she's taking?

14   A   On the bottom it says counsel at great length on

15   long-acting --

16   Q   Can you read all of that?

17   A   I'm having a hard time, yes.

18   Q   Well, you wanted -- did you want your physician's

19   assistants to counsel and talk to and treat patients?

20   A   Yes.

21   Q   And was she following -- is she doing what she

22   should do here in addressing with this patient, hey,

23   there may be some problems about this medicine?

24   A   Yes.

25   Q   Is that strange, as Dr. Parran called it?

4540

```
 1     A    This is not strange.

 2     Q    Now let's go to 3-23 of '05.  Now this is another

 3     Kim visit.  But is there a note anywhere in there that

 4     states that Ms. Robin's husband and mother attended this

 5     visit?

 6     A    Yes.

 7     Q    Where do you see that?

 8     A    On the bottom.

 9     Q    Okay.  And this says follow up with doctor.  Do you

10     know who that is?

11     A    I believe it's Dr. Schneider.

12     Q    Okay.  And, again, the clinic allowed family members

13     to come in to listen to the treatment decisions that

14     were being made about their loved one; correct?

15     A    That's correct.

16     Q    Now let's look at May 5th, 2005.  Actually, before

17     that let's go to April 5th of 2005.  Tell the jury

18     what's happening in this visit?

19     A    It says discussion and refills at the top.  Then it

20     looks like history of loose stools.  Complaining of

21     fatigue.  Then it says past medical history reviewed.

22     Then it says loose stools, bad month, smoke aggravating

23     migraines.

24     Q    Tell the jury what that means?

25     A    Well, she was from ElDorado and over there in the
```

4541

1    Flint Hills sometimes they burn the fields and when they

2    do that in the spring it would aggravate her migraines.

3    Q    Okay.  Now, you remember Dr. Parran testifying that

4    he saw this pattern of quote, unquote, escalation

5    without any medical reason.  Right?

6    A    Yes.

7    Q    Okay.  Well, looking at this specific chart, you

8    document that she had a bad month; correct?

9    A    Yes.

10   Q    You document why she had a bad month; correct?

11   A    Yes.

12   Q    And then did you increase the dosage of Actiq that

13   she received over the next month?  Or for the next

14   month?

15   A    Yeah.  It looks like the previous visit -- well, I

16   think the previous visit was 600 microgram also.

17   Q    So you had increased it -- well, actually, Kim

18   He'bert increased it on March 23rd, 2005?

19   A    Yeah.

20   Q    All right.  Now, let's go to May 5th, and let's look

21   at what happened on May 5th.  Tell the jury what

22   happened on this visit?

23   A    Well, from the subjective, it doesn't say much.  It

24   just says refills.  And past medical history and meds

25   reviewed.  Then it says see PADT.  And on physical

1    examine it indicated she had some photophobia.

2    Q   Tell the jury what photophobia is?

3    A   Light was bothering her eyes.  Usually with

4    migraines, you know, the light or loud noise aggravates

5    their headache.

6    Q   Well let's look at the PADT and see what was

7    happening with Ms. Robin during this month.

8    A   At the bottom of the PADT under comments I wrote:

9    states she is able to function much better with pain

10   medication.  And it says try Actiq 400.  Is going to try

11   Zanaflex, I believe.

12   Q   Okay.  Now, you actually decreased the dose of Actiq

13   on this visit; correct?

14   A   Yes.

15   Q   Okay.  So is it fair that when you would see a

16   person escalating pain, you would try to titrate your

17   medicine up to get that pain under control?

18   A   Sure.

19   Q   And when here she says that I'm functioning better

20   on these pain meds, you bring her back down to the 400?

21   A   Yes.

22   Q   Let's go to the 11-13 of '05 visit.  Is there one?

23   A   I don't see 11-13.

24   Q   I'm sorry.  That must be for a different patient.

25   How about 1-9-2006.  Did I get that one right?

4543

```
 1    A    Yes.

 2              THE COURT:  1-9?

 3              MR. WILLIAMSON:  Yes, Your Honor.  '06.

 4    BY MR. WILLIAMSON:

 5    Q    Now, you don't see Ms. Robin on this visit, do you?

 6    A    No.

 7    Q    Okay.  But the PA that saw her, did they again

 8    review another MRI?

 9    A    Yes.

10    Q    Okay.  So this was a second MRI within the course of

11    treatment; correct?

12    A    Correct.

13    Q    And there was -- it confirmed a degenerative disc

14    disease?

15    A    Correct.

16    Q    Now, on the last visit that you had with Ms. Robin,

17    let's take a look at that, that last note.  That would

18    be 5-11 of '07.

19    A    Okay.

20    Q    Tell the jury what you did on this last visit and

21    what happened -- what you did, what you found on this

22    last visit.  And probably reverse that.  What you found

23    and then what you did.

24    A    Okay.  Subjective says:  Right arm and shoulder

25    pain.  Migraines are better.  Do not like Klonopin.
```

1    Anyway, looked like I reviewed the systems and indicated

2    she had some anxiety.

3    Q    Let me pause for a second.   This progress note looks

4    different than the previous ones.   Why is this one

5    different?

6    A    We added the review systems in the progress note to

7    help document more, better.

8    Q    So you, again, you took another step to help improve

9    the documentation that was happening at the clinic?

10   A    Yes.

11   Q    Now, finish telling the jury what you found, please.

12   A    Well, under the neurological review system it says:

13   Wants to go back on Valium; Klonopin had adverse

14   reaction.   And then on the subjective, physical finding,

15   there was a bruise noted, looks to be on the shoulder.

16   She had a recent fall.   Says from a fall.   And she had

17   some tenderness to palpation.   That's what the TTP

18   stands for.   And muscle spasm.   That's what the MM

19   stands for.   And these checkmarks on the back were -- or

20   X's are areas that were tender with muscle spasm.

21   Q    Okay.   And what did you prescribe her on this visit?

22   A    It looks to me I wrote try Lidoderm patches, one

23   box.   Then I put some refills on that, three refills.

24   Gave her Actiq 800 micrograms, four boxes.   And Valium

25   10 milligrams, number 120.

1    Q   Okay.  Now, I don't think we've really talked a lot

2    about Valium.  But tell the jury what Valium treats?

3    A   Valium is benzodiazepine that does treat anxiety.

4    And it also is -- I think Parran said it was used for

5    muscle spasm.  As I stated earlier, most muscle relaxers

6    causes the person to be relaxed so the muscles will be

7    relaxed.  So that's how Valium actually works, too.

8    Q   Now, what is the Lidoderm patch for?

9    A   Lidoderm is a topical Lidocaine patch that you put

10   on specific areas that are painful.  And it's absorbed

11   through the skin and it doesn't typically cause any

12   systemic effect.

13   Q   Is that for that bruise that you saw on her?

14   A   No.  The bruise, wouldn't probably put that on a

15   bruise.  I'd probably put it on this area on her back

16   where she has all these tender spots.

17   Q   Okay.  Now, the prescriptions that you provided on

18   that day were the same prescriptions she had received on

19   multiple times; is that correct?

20   A   She had had Valium before and the Actiq before; but

21   I don't know about the Lidoderm.

22   Q   But the Lidoderm doesn't have any real effect?

23   A   No, it doesn't cause sedation or anything.  It's

24   just --

25   Q   Okay.  And you understand that she passed away a few

4546

1    days after the last visit with you?

2    A    That's correct.

3    Q    You understand that the Coroner stated that she had

4    .46, I think, micrograms of Fentanyl in her system.   Do

5    you know if it's possible to take that much Actiq the

6    way you prescribed, told her to take it, and get to

7    levels that high?

8    A    That would be impossible.

9    Q    And you understand that I confronted their Coroner

10   with literature stating that Fentanyl levels in people

11   that pass away are unreliable?

12   A    Say that one more time.

13   Q    Do you remember that I confronted their expert with

14   literature that states that the levels of Fentanyl found

15   in the toxicology report are unreliable?

16   A    Yes.

17   Q    Okay.  And you don't recall the findings that the

18   medical examiner made in regards to Robin's heart, do

19   you?

20   A    No, I don't recall.

21   Q    If you knew, and let's assume for the sake of just

22   moving forward, that this same prescription that you had

23   prescribed on multiple occasions would have led to her

24   passing away, would you have prescribed that medicine?

25   A    No.

4547

1    Q    Did you believe that Robin G had a medical basis for

2    the pain that she had?

3    A    Yes, I believed she did.

4    Q    Did you believe that you were prescribing medicine

5    to treat her pain?

6    A    Yes.

7    Q    On that last visit did Robin G tell you anything?

8    A    Well, yeah.  She commented to me about the Klonopin

9    not helping her and that she wanted to go back on the

10   Valium for anxiety and that she had this bruise from her

11   fall.  But she didn't appear to be inebriated or

12   depressed or anything that concerned me.

13   Q    During the treatment that you gave Robin G, did her

14   mother tell you that the medicines that she was taking

15   had helped her actually live while she was here with us?

16   A    Yes.

17             MS. TREADWAY:  Object.  Hearsay.

18             MR. WILLIAMSON:  Medical decision, Your Honor.

19             MS. TREADWAY:  If a family member --

20             THE COURT:  Say that again.  Her mother told

21   him --

22             MR. WILLIAMSON:  Yes.  Told Dr. Schneider.

23   I've already established that the mother was in the

24   visits.

25             THE COURT:  It's still hearsay.  The objection

4548

1    is sustained.

2    BY MR. WILLIAMSON:

3    Q   Did you learn through the course of treatment with

4    Robin G that other individuals --

5            MS. TREADWAY:  Objection.  Around the bend,

6    Judge.

7            THE COURT:  If that's where you're headed, the

8    objection is us sustained.

9    BY MR. WILLIAMSON:

10   Q   Did you believe that you made a difference in

11   helping Robin G?

12   A   Yes, I did.

13   Q   Okay.  Let's talk about Eric T.

14   Q   Okay.  Let's talk about the first visit that you had

15   with Eric T.  Before we move on, Ms. Robin was a patient

16   of yours in the clinic for nearly three years; correct?

17   A   That's correct.

18   Q   Okay.  So for that three year period you were able

19   to help her with those migraines with that medicine?

20   A   Yes.

21   Q   And did she tell you on multiple occasions that the

22   medicine was helping her actually function again?

23   A   Yes.

24   Q   Did you know that before she came to see you that

25   her life was -- that she would sit and have to sit in

4549

1    dark rooms for a long time?

2    A   Yes.

3    Q   And did you know that her quality of life was what

4    she considered really bad before she came to see you?

5    A   Yes.

6    Q   Now, let's turn to Eric T.  Let's talk to the jury

7    about the first visit and let's just kind of walk them

8    through what he presented with, what you did and what

9    medical decision you made based on that.

10   A   It says subjective:  Wants OMT.  History is

11   spondylolisthesis.  Hit train seven years ago.  Has

12   chronic neck problems.  Lortab helps with his back pain.

13   Then says Soma.  Past medical history reviewed says lab

14   was done one year ago.  L spine MRI were done with Dr.

15   Poole and also Dr. Eyster and that they suggested

16   surgery.  He also indicated Ibuprofen helps and no MRI

17   of neck.

18   Q   What kind of examine did you perform on Eric T?

19   A   Subjective indicated that -- the first line says

20   well nourished, well developed.  Then H-E-N-T exam was

21   checked.  Oral exam.  Respiratory exam.  Cardiovascular

22   exam.  GI exam.  Muscoskeletal exam was abnormal with

23   paravertebral spasm of the cervical dorsal lumbsr spine

24   areas.  Negative straight leg test.

25   Q   Okay.  Pause there for a second.  What does all that

1    mean?

2    A    Well he has a spasm of the spine with tenderness.

3    And then negative straight leg test indicating that he

4    doesn't have any significant impingement on the nerves

5    that go down the leg.

6    Q    So you actually did a straight leg test with Eric T

7    on his first visit?

8    A    Yes.

9    Q    Okay.

10   A    And the psych eval was normal.  Endocrine, checked

11   no thyroid enlargement.  And lymphatic, no lymph nodes

12   were enlarged.

13   Q    All right.  Would you consider this a minimal exam

14   or a focussed exam.  What kind of exam would you

15   consider this?

16   A    I'd say that's a detailed exam.

17   Q    Okay.  And do you -- did you ever have your clients

18   dressing down to a gown before you would see them?

19   A    On occasion if they wanted me to look at a specific

20   area like on their skin or something like that.  If

21   they, if they were there for a rectal exam or something

22   like that then they would have to pull their pants down

23   or something like that.  But typically, no, I wouldn't

24   have them undress for regular visits.

25   Q    And that would be true with family patients and

1   chronic pain patients?

2   A    That's true.  I mean, the PAs and Dr. St. Clair did

3   gynecological exams.  I did not.

4   Q    And are you aware of any medical standard anywhere

5   that says you have to dress people down to a gown before

6   giving a physical exam?

7   A    No.

8   Q    All right.  Tell the jury what your treatment with

9   this individual was?

10  A    Well, my assessment was degenerative disc disease of

11  the lumbar spine with chronic pain.  And the treatment

12  plan says Lortab 10, I believe it's 100.  Soma, number

13  40.  Arthrotec, 75 milligram, number 60.  Then it says

14  warn about side effects of an addiction potential.

15  Q    Okay.  Now, is that something that you commonly did

16  with your patients?  You talked to them about the side

17  effects regarding addiction with these medicines?

18  A    Yes.  Any controlled medication.

19  Q    Is that what's called giving informed consent?

20  A    Informed consent?  I don't know if that's what it's

21  called or not.

22  Q    Okay.  But you would let them know how they should

23  take the medication and what happens if they take it

24  incorrectly?

25  A    Yes.

4552

1   Q   Now look to the far lefthand side.  Did you actually
2   provide OMT?
3   A   No.  It says follow up for OMT.
4   Q   So no OMT this visit?
5   A   Right.
6   Q   Okay.  Now we see there's 100 Lortab.  When you just
7   see a hundred, that seems like a lot.  Explain to the
8   jury how that 100 should have been taken over the next
9   30 days?
10  A   Well, if this was to be a month's supply, then, you
11  know, it would be a little more than three pills a day,
12  but it doesn't say come back in a month.  And typically
13  Lortab is taking one to two every four to six hours as
14  needed for pain.  So I don't know for certain on this
15  situation because I didn't write it out; but if he had
16  chronic pain, I'm certain he was probably taking it on a
17  routine basis so he was probably taking between three
18  and four pills a day.
19  Q   Did you know that at this time that he was seeing
20  another doctor getting methadone?
21  A   No.
22  Q   He wasn't honest with you about the other physicians
23  that he was seeing?
24  A   I don't believe he was honest with me about that,
25  yes.

4553

1    Q    Now, what's that, the 75 number 60?  What is that?

2    A    Oh, the Arthrotec is a non-steroidal anti

3    inflammatory medication.  It's usually dosed twice a

4    day.

5    Q    And the Soma, what was that for?

6    A    Soma is the muscle relaxer.  And gave him 40 of

7    those and they can be used on an as-needed basis.

8    Q    Was that for the findings that you found in regards

9    to his back?

10   A    Yeah.  The muscle spasm.

11   Q    All right.  Let's go to September 12, 2003.  Tell

12   the jury what was happening on this visit.

13   A    Subjective says:  Neck adjustment.  Lab results.

14   And then it looks like I wrote Percocet.  He didn't

15   tolerate.  Pain meds help.  Lortab, 6 to 8 per day.

16   Then I put down family history of coronary artery

17   disease and D-M, which stands for diabetes mellitus.

18   Q    Okay.  Let's look to the left a little bit.  What is

19   the neck adjustment --

20   A    The neck adjustment.  I'm assuming he was wanting

21   OMT.

22   Q    Do you know if he received OMT on this visit?

23   A    I don't see that it is checked.

24   Q    Okay.  Now, had you performed any OMT on Eric T?

25   And specifically take a look at 4-8-03, 5-6-04, 6-2-03.

4554

1    Look at those three visits and see if I'm misreading

2    those.

3    A    4-8-03.  OMT to one to two places and massage was

4    done.

5    Q    Where do you see that?

6    A    On the right on the bottom where it says other

7    modalities.  And in the plan says OMT after massage with

8    minimal effect.

9    Q    Tell the jury, kind of using me, show the jury like

10   what you would do like for OMT?

11   A    Well, typically I would have you laying down on a

12   table.  (Witness stands.)

13   A    And if you were laying flat, probably pull on your

14   head a little bit and massage these muscles and then

15   moving it around -- I don't know if I want to get too

16   close to you with that throat the way it is -- but I

17   would adjust your head, you know.  Possibly, you know,

18   give it a thrust or something like that.  But you would

19   be laying down and I would have you in the appropriate

20   position for that.

21   Q    Okay.  And what is that designed to do?

22   A    Well, that helps with neck pain a lot of times.

23   Q    Can you scoot back up to the mic.  Sorry.

24   A    If the facet joints are a little bit, you know, out

25   of alignment, then it helps realign the facet joints.

4555

```
 1    Q   Okay.  And you provided -- and what about -- what
 2    date are you looking at right now?
 3    A   That was --
 4    Q   What about 5-6?
 5    A   5-6.  Also OMT was done looks like on more areas.
 6    Three to four areas it says.
 7    Q   You know, these experts are saying that none of
 8    these other modalities were tried.  This is saying that
 9    you did try other things; correct?
10    A   That's correct.
11    Q   And what is three and four?  What's the difference
12    between what you just showed the jury and what three and
13    four is?
14    A   Well, probably was with you just checking the neck,
15    you know, and probably would have been doing your dorsal
16    spine area also.  And if I was doing three to four, I
17    was probably doing the low back also.
18    Q   Okay.  And what about 6-2 of '03.  Did you try
19    anything at all?
20    A   That's correct.
21    Q   Then on 6-26 of '03, did you do it then as well?
22    A   That's correct.
23    Q   And on 8-17 of '03 did one of your PAs order an
24    X-ray?
25    A   8-7?  Is that correct?
```

4556

1    Q    Yeah.  8-7 was there an X-ray scheduled?

2    A    Says X-rays next visit.

3    Q    And was there a MRI scheduled?

4    A    Says patient will get copies of MRI.

5    Q    Okay.  And on 9-2 of '03 was a MRI actually

6    scheduled and an X-ray reviewed with Eric T?

7    A    Yes.  Something was scheduled there at Wesley.  MRI

8    of the T and L spine it looks like.  And X-rays were

9    done of the -- I believe that's the thoracic spine.

10   Q    Now, on 9-20 of '04 Eric T receives a -- I believe

11   it's his first prescription of methadone from the

12   Clinic.  And Dr. St. Claire was the physician there.  So

13   to the extent -- can you tell me -- do you know why she

14   did that by looking at her chart?

15   A    It says here oxy something too expensive.  I assume

16   that's Oxycontin.

17   Q    Okay.  Let's talk about that for a second.  When

18   these patients would come in and they would get a

19   prescription, the insurance companies would pay for that

20   prescription; correct?

21   A    I don't know for certain.  Some insurance plans pay

22   for prescription.  Not all do.  And if I remember

23   correctly, Eric T at some time in his time coming to us

24   he didn't have insurance.

25   Q    Okay.  So he would have been stuck trying to pay for

4557

1    these?  If he didn't have insurance at this time he

2    would have been stuck trying to pay for the Oxycontin

3    out of his pocket?

4    A    That's correct.

5    Q    And is methadone a -- I think we established this,

6    it's a long-acting pain medication; correct?

7    A    Yes and no.  It is very long-acting as far as half

8    life.  As far as pain relief, it does not last long.  It

9    lasts --

10   Q    Help us understand the difference because I don't

11   know what half life really means.

12   A    Well, the medication stays in the system for a long

13   time.  And that's why at some of these methadone clinics

14   they can go treat the people that need treatment for

15   their addiction, they can go by usually a once-a-day

16   dosing.  When it comes to pain relief, though, the

17   effects of Methadone are short lived.  I don't know why,

18   to tell you the truth.  But I do know the metabolites of

19   methadone stay in the system for quite sometime.  And so

20   it's a little bit more of a dangerous medication.  It's

21   considered long-acting just because of the fact of it

22   having a long half life.  But typically the pain effects

23   only last at the maximum twelve hours; but typically

24   it's six to eight hours.

25   Q    Let's go to 3-1 of '05.  Okay.  Let's look down at

4558

1    the bottom for a second.  Now, this is a visit that you

2    saw Eric T on; correct?

3    A    What date is that?

4    Q    3-1 of '05?

5    A    Yes.

6    Q    All right.  Now, it says see the PADT  Let's look at

7    the PADT and see what you're being told on this visit.

8    What was happening here?

9    A    Well, on this part of the progress note on the PADT

10   when it says what was your pain level on average during

11   the past week, there's circled between looks like

12   between the 4 and 7 areas.  Probably more around the 5,

13   6 area.  And then it says what was your pain level at

14   its worst during the past week?  And it looks like the

15   7-8 area was circled.  And then what percentage of your

16   pain has been relieved during the past week.  Wrote

17   approximately 30%.

18   Q    Okay.  So at this point you're learning he is still

19   in pain and only about 30% of his pain is being

20   relieved; is that correct?

21   A    Correct.

22   Q    And your goal is to try to reduce it as much as you

23   probably -- as much as you safely can; correct?

24   A    Sure.

25   Q    Okay.  Now let's go back to the front, the first

4559

1    page of your progress note.  Tell the jury what you did

2    on that visit?

3    A   Well, it says refills on the subjective area.  His

4    vital signs look appropriate.  Past medical history and

5    meds were reviewed.  Says see PADT on the physical

6    subjective findings.  There was some para vertebral

7    spasm of the dorsal and lumbar spine area.  The

8    assessment was degenerative disc disease of the L-spine

9    and low back pain.  The plan was Valium, 10 milligrams,

10   and looks like number 60.  Looks like Percocet 10-325,

11   number 40.  Lortab 10, number 180.  Methadone 10, number

12   240.  And then it says continue with ibuprofen and

13   follow up in a month.

14   Q   Okay.  Tell the jury why that treatment plan makes

15   sense to you.

16   A   Well, methadone is the maintenance pain medication.

17   And typically methadone is ingested very slowly.  I

18   would probably have to review what he was taking

19   previously.  It looks like he was on the same dose of

20   methadone, so that was not adjusted.  Previous visit

21   looks like he was taking Lortab 10, number 180.  So that

22   was not adjusted.  And the Percocet 10-325, he was

23   getting 40 of those also at previous visits.  And the

24   Valium 10, number 60.  So there really wasn't any

25   changes done here; but this Percocet is stronger than

4560

1    Lortab.  It's a Schedule II medication.  And I'm

2    thinking that the number 40 meant that he didn't use it

3    on a routine basis.  He was using that for break through

4    pain.

5    Q    Okay.  Why does that number 40 tell you that?

6    A    Well, if he was taking it on a routine basis, there

7    wouldn't be enough to take more than one pill a day for

8    a month's supply.

9    Q    Okay.

10   A    And when he's taking Lortab 10 also for break

11   through pain and the Lortab 10, getting 180 would be

12   like taking two pills three times a day.  And the reason

13   for the Percocet at the lower acetaminophen level is to

14   keep that amount of acetaminophen in an acceptable range

15   because --

16   Q    I'm sorry?

17   A    That's all right.  So he was getting Lortab 10s,

18   which are not as strong as Percocet; but if he had some

19   real severe pain then he could take the Percocet which

20   would be stronger.

21   Q    Now, is the methadone as strong as oxycontin in

22   treating pain?

23   A    Everybody's different.  I mean, if we had one drug

24   that worked for everybody then that would make it easier

25   to treat chronic pain; but methadone, there's, you know,

1   there's -- most narcotics or most pain medications do

2   not have a maximum limit on the amount you use other

3   than to get to therapeutic effect.

4   Q   Let's just briefly look at 7-13 of '05.  I don't

5   believe this is a visit that you did but I want to visit

6   about it for a second.  Does Eric T tell this --

7   A   This is Hen Nguyen that seen him.

8   Q   Is there anything mentioned about him going out of

9   town?

10  A   Yes.

11  Q   Okay.  That going out of town, you understand that

12  we've heard testimony that when somebody says that,

13  that's a red flag that they're not using their

14  medication right; correct?

15  A   Yes.

16  Q   Okay.  But your PA asked for proof that they were

17  actually going out of town; right?

18  A   That's correct.

19  Q   And, again, were your PAs trained to try to weed out

20  people who did not truly need their pain medication?

21  A   I don't know that they were trained.  I mean, I

22  didn't do the training on the PAs, you know, they came

23  with their own medical knowledge when they came to work

24  for us.

25  Q   Why didn't you train 'em?

```
 1   A   Well, I didn't have training myself.  I didn't go
 2   through any specific school to be trained on how to
 3   recognize a drug addict or a drug seeker per se.
 4   Q   Is that something you --
 5   A   These are common sense type situations that, you
 6   know, that we probably hear about or reed about.
 7   Q   Okay.  Well, did you ever take any classes to try to
 8   increase your knowledge on how to spot some of these
 9   people?
10   A   Well, with that course or -- it wasn't necessarily a
11   course.  It was a test.  There was information in the
12   booklet that I studied about that situation.
13   Q   Okay.  Let's go to 9-16 of '05.  Now, on this day
14   can you tell -- let's talk to the jury about what
15   happened on this day.  What did Mr. Eric come in
16   complaining of?
17   A   It says post-op low back pain.  Back feels worse
18   since surgery.  Pain level has gone up maybe to steady
19   7, 8, with or without meds.
20   Q   Okay.  So on this date he had recent surgery;
21   correct?
22   A   That's correct.
23   Q   Okay.  Now he's saying his pain is going up even
24   worse; correct?
25   A   That's correct.
```

4563

1    Q   All right.  Now, looking at the -- let's go through

2    and look at what you marked as far as the physical exam.

3    A   Physical exam was remarkable for para vertebral

4    spasm of the dorsal lumbar spine.  And it looks like a

5    positive straight leg test.

6    Q   Okay.  What did that mean?

7    A   Well, that he had some neurologic impingement

8    indicating that he could be having something pinching

9    against his nerve or nerve root.

10   Q   So you, again, you did further tests to try to make

11   a medical decision in regards as to what to do with Eric

12   T?

13   A   That's correct.

14   Q   You didn't just say what do you need and write a

15   script, did you?

16   A   No, I did not.

17   Q   Now let's look at the treatment plan that you filled

18   out.

19   A   It says takes ibuprofen.  Increased methadone.  Then

20   it says 10, which indicates 10 milligrams.  It says

21   number 270.  Then it says three p.o.d.t.d. which would

22   be three pills three times a day.  Then underneath that

23   it says Valium 10, number 90.  Lortab 10, number 180.

24   Q   Okay.  Now, missing from this note, you take him off

25   of the Percocet.  Do you know why?

4564

1    A    I don't see that.

2    Q    Do you think that would have been something nice to

3    document?

4    A    Probably would have been nice to document, yes.

5    Q    But in any event, you were reducing the number of

6    medications he was taking on this time?

7    A    Correct.

8    Q    Okay?

9    A    Well, if he was taking Percocet routinely and we

10   discontinued that then that would be less, yes.

11   Q    Okay.  And -- now, in regards to Eric T, when you

12   were having these visits with him, did you believe he

13   was in real pain?

14   A    Yes.

15   Q    Did you prescribe these medicines to him because you

16   believed that this -- that this medicine would help him

17   function better?

18   A    Yes.

19   Q    If you thought that this medicine would have been

20   harmful to him in any way, would you have continued to

21   prescribe it?

22   A    No.

23   Q    Well, looking at the very last visit, you were not

24   the last provider to see Eric T; correct?

25   A    What is the date of that?

4565

1    Q    April 19th of '06.

2    A    That's correct.

3    Q    All right.  Now, on this April 19th of '06, the PA

4    was Connie White; correct?

5    A    That's correct.

6    Q    And she changed the established protocol that Eric T

7    was receiving, correct?

8    A    That's correct.

9    Q    Okay.  On this visit, she changes the methadone to

10   what?

11   A    40 milligrams and it says number 90.

12   Q    Okay.  Now tell the jury what's the difference

13   between a methadone 10 at 270, because that really

14   sounds like it's more, as opposed to methadone 40 at

15   number 90?

16   A    Well, methadone 10 at 270 would be approximately 30

17   milligrams three times a day.  And this here is

18   methadone 40 milligrams three times a day.

19   Q    So it was actually quite a bit more than you had

20   prescribed in the past?

21   A    That's more than the 30 milligrams three times a

22   day.  It's 40 milligrams three times a day.

23   Q    Okay.  And Connie White was Dr. Simons' PA?

24   A    Yeah.  He was the supervising physician, the main

25   supervising physician for her.

4566

1    Q    Does it say anything in there why Connie White

2    decided to change his methadone prescription?

3    A    It says here:  Insurance will only pay for number

4    100 tabs.  Wants to change methadone dose to fit.

5    Q    And that's what Eric told Connie?

6    A    I assume so.

7    Q    Were you there in the exam room on that last visit?

8    A    No.

9    Q    Did you instruct Ms. White as to what medicine she

10   should prescribe on this visit?

11   A    No.

12   Q    Now, did you believe that the pain that Eric T was

13   having was real?

14   A    Yes.

15   Q    In fact, we heard the wife state that he would be in

16   really severe pain?

17   A    That's correct.

18   Q    And Eric was a patient with the Clinic for over

19   three years; correct.  From 3-14 of '03 to 4-19 of '06?

20   A    Yes.

21   Q    And we look and you took histories from him when you

22   saw him; correct?

23   A    Yes.

24   Q    Did you take -- did you perform many exams on him?

25   A    Yes.

4567

1   Q   Did you all order imaging studies?

2   A   Yes.

3   Q   Did you provide OMT treatment?

4   A   Yes.

5   Q   Did you take labs from him?

6   A   Yes.

7   Q   Was all of this done because you all were trying to

8   provide medical treatment to Eric T?

9   A   Yes.

10   Q   Okay.  Now, with Patricia G, were you the first

11   provider to see her?

12   A   No.

13   Q   Who was the first doctor to actually see her?

14   A   Looks like Kim's writing.

15   Q   Okay.  Let's go to the next date, February 7 of

16   2003.  Who sees her on that day?

17   A   Well, there's two notes.  One looks like me and

18   another one from looks like Curt.

19   Q   Did they see two people on the same day?

20   A   I doubt it.

21   Q   Do you know how you got two notes in there on the

22   same day?

23   A   I'm assuming, seeing how this one has got my

24   signature on it, is one that probably I filled out

25   because there wasn't one in her chart.

4568

1    Q   And is that something you all would do when you

2    don't have a progress note?

3    A   Yes.

4    Q   And you could use the fee ticket to try to

5    regenerate?

6    A   True.

7    Q   And would you try to accurately put everything on

8    that progress note?

9    A   Yes.

10    Q   Okay.  Now, looking at April 30, 2003.  Who sees

11    Patricia G?

12    A   Looks like Dr. St. Clair did.

13    Q   Okay.  Now, April 30th, 2003, was this the first

14    time that she, Patricia G, actually received pain

15    medicine?

16    A   From our clinic.  It looks like she got some from

17    the emergency room.

18    Q   Okay.  And why did she present before she received

19    this pain medicine?

20    A   Says she was involved in a car wreck Friday night.

21    Says positive driver and something about north Oliver

22    and something.  Got hit from driveway on passenger side.

23    Says ER at Wesley.  Did lose -- or did something.  And

24    then left wrist.  Denies loss of consciousness.  Gave

25    Lortab, it looks like.  Physical exam, apparently she is

1    indicating something with the right elbow, left upper

2    left low back.  And then on the structural exam says

3    para vertebral tenderness at the L4-L5 on the left with

4    resomething joints.  I can't read all that.  Range of

5    motion, shoulder, at 110 degrees.

6    Q    Okay.  Let me stop you there.  Was this a -- did she

7    present for a pain condition?

8    A    Yes.

9    Q    Okay.  And nobody at the Clinic provided her pain

10   medicine when she came in before for conditions other

11   than for a pain condition; correct?

12   A    That's correct.

13   Q    All right.  Let's look at 9-18 of '03.  That looks

14   like the first time that you prescribed pain medicine to

15   Patricia G.  Can you tell the jury what she complained

16   about and what you did in response?

17   A    Subjective says history of surgery on the right knee

18   one year ago.  Has pain, swelling, swelling now.

19   Apparently I put a note Joplin, Missouri, was where she

20   had the surgery at.  Past medical history, meds

21   reviewed.  Physical exam indicated there was tenderness

22   palpation of the right knee.  With crepitance and with

23   range of motion.

24   Q    Okay.  What is crepitance?

25   A    It's kind of the grinding sensation you feel when

4570

1    you flex and extend the knee.  And you can feel the

2    kneecap, that there's a little grinding sensation.

3    Q   Okay.  So when she came in you didn't just continue

4    her on the same medications that Dr. St. Clair provided.

5    You actually went in and examined the source of her

6    complaint?

7    A   Correct.

8    Q   What did you do as far as treatment for that?

9    A   I gave her a prescription for Vioxx, 25 milligrams,

10   number 30.  And Lortab 7.5, number 30.  Says one week.

11   Follow up in one week if no improvement.

12   Q   Okay.  Now, what would -- what was the Vioxx

13   designed to do?

14   A   The Vioxx is a non steroidal anti inflammatory.  It

15   was supposedly easier on stomachs than like ibuprofen

16   and Naprosyn.

17   Q   And the Lortab was for the breakthrough pain?

18   A   It was for pain.  It was -- I assumed it was an

19   acute problem and I would typically write down one every

20   six hours as needed for pain.

21   Q   Okay.  Let's look at 10-24 of '03.  This is Kim's

22   note?

23   A   Looks to me like a PA student and then she co-signed

24   and then I co-signed after that.

25   Q   So you would have students in and they would get

1    hands-on experience?

2    A    That's correct.

3    Q    Now, I guess we should pause and talk about that.

4    These students would come from Wichita State?

5    A    That's correct.

6    Q    And tell me, how did that work?  How did you get

7    students rotating into the clinic?

8    A    Well, my first student, like I said previously, was

9    Curt Atterbury.  And so I started helping with the

10   teaching of PA students.  I can't remember when Curt

11   started so it was, you know, early '90s, probably.  And

12   so they would just rotate to different -- the PA

13   students would rotate to different doctors in the

14   community for hands-on type training, yeah.

15   Q    Okay.  And would these students just come work at

16   your clinic and go home or would they go back and report

17   to Wichita State?

18   A    Oh, yeah, they would report back.  They would have

19   to -- I would have to give them a grade actually and

20   that would go back into their record.

21   Q    Did anybody at Wichita State -- when was the last

22   time you had a student rotate in your clinic from

23   Wichita State?

24   A    I believe Mike Hall was the last one we had.

25   Q    Would that have been like '04 or '05?

4572

```
 1    A   Probably '03 or '04.  I can't remember.
 2    Q   Okay.  At any time -- and so let's make sure we
 3    understand this.  The Government is alleging that all
 4    you were concerned about was a pill mill.  But you would
 5    bring in students who you knew would have to go back and
 6    report to their teachers and their faculty; correct?
 7    A   Correct.
 8    Q   And you would have to evaluate those physician's
 9    assistants?
10    A   Yes.
11    Q   And did they have to complete any kind of paperwork
12    back to their faculty members?
13    A   Yes, they did.
14    Q   Okay.  What kind of paperwork -- what would they
15    have to tell their faculty members?
16    A   About their experience at the Clinic.
17    Q   Did you, based on any of these students rotating
18    into your clinic, ever have a Wichita State faculty
19    member bring a concern to you stating we're concerned
20    that you're running a pill mill, we're not sending any
21    more students to you?
22    A   No.
23    Q   It wouldn't make sense if you were trying to have
24    this illegal operation to bring in people who were going
25    to simply go back and report to somebody else, does it?
```

1    A    It doesn't make sense, no.

2    Q    Now, on 10-24 of '03, Patricia G was referred to Dr.

3    Estivo?

4    A    That's correct.

5    Q    And what did Dr. Estivo -- did what kind of doctor

6    was he?

7    A    Dr. Estivo was an orthopedic surgeon.

8    Q    Okay.

9    A    He actually came to our clinic, you know, once a

10   week to do orthopedics at our clinic.

11   Q    Okay.  What other orthopedic doctors would you refer

12   patients to?

13   A    Just about everybody in town.

14   Q    Give us a couple names.  You know I'm big on

15   specifics.

16   A    Oh, Dr. Eyster was one.  Dr. Pollock.  Dr. Poole.

17   Dr. Luminowski was a big one that we sent to.  Dr. J

18   Stanley Jones.  I mean, there was -- there was a lot of

19   orthopods in town so we referred all over.

20   Q    Okay.  And on this visit did the clinic perform an

21   X-ray?

22   A    Yes.

23   Q    You X-rayed the left knee?

24   A    Yes.

25   Q    Let's go to 12-12 of '03.  Tell the jury what

4574

1    happened on December 12th, 2003?

2    A    12-12-03.  Says medication refill.  Recent knee

3    surgery.  Increasing pain.  Past medical history and

4    meds reviewed.  Pain was 8 over 10 without medication.

5    5 over 10 with medication.  Physical exam indicated

6    tenderness to palpation of the left knee.  And under

7    psych I noted not suicidal.  Assessment:  Depression,

8    chronic left knee pain and migraine.

9    Q    Okay.  And what all did you provide -- did you

10   prescribe that day?

11   A    Gave him a prescription for Paxil CR, which is an

12   anti depressant.  Number 30 with six refills.  Klonopin,

13   0.5 milligrams.  Number 60.  Bextra, which is a non

14   steroidal anti inflammatory like was easier on stomachs.

15   Number 20 or -- or 20 milligram, number 30.  Kadian,

16   which is morphine, 50 milligrams, number 30.  And

17   Kadian, like I said, morphine, long-acting morphine, and

18   in this case it could be dosed either once or twice a

19   day.  It appears to be it was a monthly visit.  Because

20   it's a monthly visit, it was once a day.  Then also

21   Topamax, 25 milligrams, number 100.  And that was to

22   treat the migraines and help prevent recurrent

23   migraines.  And then there's Lortab 10, number 120.

24   That would be to help with breakthrough type pain.

25   Q    Okay.  The Klonopin, what is that?

4575

1    A    Klonopin is benzodiazepine.  I think one of the

2    other doctors talked about it.  That is for anxiety.

3    Q    Did you provide Bestor?

4    A    What was that?

5    Q    Bestor, B-E-S-T-O-R?

6    A    No, it's Bextra.

7    Q    Bextra?

8    A    Yeah.

9    Q    Okay.  Now, just as lay people looking like, man,

10   that is lot of medicine, you know, how was she supposed

11   to take this medicine?

12   A    How was she supposed to take it?

13   Q    Yeah.  I'm sorry.  I'm losing my voice.

14   A    Yeah.  The Paxil was once a day for depression.

15   Klonopin, the dose I gave her was .5 and she was to take

16   that looks like twice a day because I gave her 60

17   tablets.  Bextra is the anti inflammatory medication and

18   that would be once a day.  Kadian likewise was once a

19   day.  The Topamax I put down 25 milligrams and number

20   100.  Like I said before, that would be to help prevent

21   migraines and it's a dose that you kind of titrate.

22   Typically you go once a day in the evening for the first

23   week and then you increase it to twice a day and so

24   that's why I wrote for a 100 of those.  The Lortab was,

25   like I said, for breakthrough pain; and she was given

```
 1    enough to take four tablets a day for breakthrough pain.
 2    Q   Now, are people really able to function when they
 3    have these type of medication regimens?
 4    A   Yes.  I mean, people that are in pain, they don't
 5    typically get drowsy or have significant side effects
 6    from pain medication.  I mean, like if I gave you this
 7    dose here, it would probably kill ya.  I mean, people
 8    that are naive to narcotics, probably just make 'em pass
 9    out or make you very sedated.  And, but people that are
10    not naive to pain medication, they build up this
11    tolerance that everybody has been talking about and so
12    it doesn't really do anything, doesn't cause them to get
13    sedated.  Doesn't usually cause a, a buzz or a high, per
14    se.  And so it just works for the pain.
15    Q   And these medications were designed to help -- or
16    this medication regimen was designed to help her to be
17    able to function without the level of pain that she was
18    in?
19    A   That's correct.  That's what the goal is for pain
20    management is to increase the pain so function can
21    increase.
22    Q   Let's look at February 2nd, 2004.  Was this a visit
23    that you saw her on?
24    A   Yes.
25    Q   Okay.  So on this visit what is she telling you
```

1    about the pain that she's feeling?

2    A    Says up there pain is 9 over 10 without medication.

3    4 to 5 over 10 with pain medication.  She denies

4    drowsiness with the medication.  There's a note that

5    says increase A-D-L.  With med -- which is activities of

6    daily living.  And also increase in function.  F-C-N is

7    function.

8    Q    Okay.  Let me pause you there.  So as of February

9    22nd, 200 -- or excuse me -- February 22nd, '04, you're

10    asking her how is this medicine helping you?

11    A    Correct.

12    Q    And you're learning that with the medical -- the

13    medicine regimen that she's on, she's able to get her

14    pain down considerably?

15    A    That's what she reports, yes.

16    Q    Okay.  And she also tells you that -- so she also

17    told you that her activity of daily living has increased

18    and her function increased?

19    A    That's correct.

20    Q    So as you sit here, sit there, according to what

21    she's telling you, what you're doing is helping her?

22    A    That's correct.

23    Q    All right.  Tell the jury what else happened on this

24    visit?

25    A    Well, it says she wants OMT.  And then also down

4578

1    further down it indicates that OMT was given in three --

2    four areas and also massage.  There's a note that -- I

3    think that's Dr. Estivo -- assessment was bilateral knee

4    pain, degenerative joint disease.  Somata reduces

5    function of the cervical and dorsal lumbar spine areas.

6    Then it says also refer to Dr. Murati for knees.

7    Medication was given.  Kadian 30 milligrams, number 30.

8    Lortab 10, number 120.  Bextra, 20 milligrams, number

9    30.  And then it says OMT after massage to the cervical

10   dorsal lumbar spine with moderate results.  Follow up in

11   one month.

12   Q    Tell the jury what happened when you did the OMT?

13   A    Well, it seemed to be helpful.

14   Q    And, again, you didn't just say what do you need and

15   write a pill, did you?

16   A    That's correct.

17   Q    Were you're trying to render medical care to

18   Patricia G?

19   A    Yes.

20   Q    Now, you referred to two different physician's?

21   A    Well, apparently I thought she was going to Dr.

22   Murati.  Apparently the appointment was scheduled with

23   Dr. Estivo for some reason.  I don't know.

24   Q    Where do you see Murati at on the chart?

25   A    Where it says refer to Murati down there under plan

4579

```
 1    for knees.
 2    Q   Is Murati and Estivo, are they both orthopedic
 3    doctors?
 4    A   Yes.
 5    Q   So you were trying to get her to another physician
 6    to take a look at her knees; correct?
 7    A   Yes.
 8    Q   You did not just simply give her these pain
 9    medicines, ignore what she was telling you, and just
10    continue to give her more and more pain medicines
11    without trying to see if it helped; is that correct?
12    A   That's correct.
13    Q   Now, based on your referrals to the other doctors,
14    did she actually receive surgery on her right knee?
15    A   I believe she did.
16    Q   Look around; on the Government's chart it says April
17    15th of '04 she received right knee surgery.  Well --
18    A   Yes.
19    Q   Okay.  Let's look at 3-31 of '04 before we got to
20    the actual surgery.  On this visit did you give her an
21    exam?
22    A   Yes.
23    Q   Tell the jury what that diagram means?  What
24    happened there?
25    A   Well, there's a little diagram where I just kind of
```

4580

1    showed a couple spots that were tender to palpation.

2    Those areas where the X's are are the sacral iliac joint

3    areas.   And also area above where the lumbar spine is.

4    Looks like I checked for pedal pulses on this visit.

5    And she apparently had a positive straight leg also on

6    this visit.

7    Q    Positive straight leg meaning she had trouble -- she

8    didn't pass the test?

9    A    Straight leg test is where, you know, you lift the

10   leg and --

11   Q    I know; but what does the positive straight leg test

12   mean?

13   A    It indicates there's nerve impingement.

14   Q    All right.   And what does it say about trying to get

15   an MRI?

16   A    It says cannot schedule MRI, her insurance card has

17   somebody else's -- Ronald Ferris.   Has PCP.

18   Q    Okay.   Let's look at 6-17 of '04.   This is Kim's

19   note, isn't it?

20   A    That's correct.

21   Q    Okay.   Does Patricia G get a well woman exam on this

22   visit?

23   A    I don't know that she did or not.   She does comment

24   about her having a total hysterectomy.   But I'm not

25   seeing the exam.   Said schedule pap is what it says.

1    Q    Okay.  So at this meeting the provider, Kim, was

2    trying -- was scheduling a pap smear for this patient?

3    A    That's correct.

4    Q    Controlled substances are not involved in pap

5    smears, are they?

6    A    That's correct.

7    Q    And is this another example of this clinic trying to

8    make medical decisions for patients?

9    A    That's correct.

10   Q    And you didn't see Patricia G on her last visit to

11   the clinic, did you?

12   A    What date was that?

13   Q    June 18th of '05.

14   A    That's correct.

15   Q    Now, you heard Hien Nguyen state that Patricia did

16   not tell her about that emergency room visit?

17   A    That's correct.

18   Q    And you saw me cross-examine -- I can't remember who

19   the witness was -- but the fax didn't even go out until

20   10:00 on the 17th from the emergency room.  Correct?

21   A    10:07 p.m., correct.

22   Q    And you don't -- do you recall when Patricia G was

23   scheduled for June 18th of '05?

24   A    No, I do not.

25   Q    Government exhibit has fee tickets in there;

4582

1    correct?

2    A    Correct.

3    Q    And the fee tickets contain the actual time that the

4    appointments took place?

5    A    That's correct.

6    Q    On 6-18 of '05, what time was Patricia G scheduled

7    to be into the clinic?

8    A    At 8:25.

9    Q    In the morning?

10    A    That's correct.

11    Q    Multiple providers provided services to each one of

12    the patients that we have discussed; correct?

13    A    That's correct.

14    Q    Each one of these providers, were they able to

15    exercise their own independent medical judgment?

16    A    That's correct.

17    Q    These other providers aren't here to answer for

18    their own actions, are they?

19    A    That's correct.

20    Q    Did you ever tell any of these providers that I want

21    you to provide only pain medicine to people regardless

22    if they need it or not?

23    A    No, I never did that.

24    Q    Now I went through these three specific counts.  But

25    you understand there are more people in the Indictment

4583

1    where these records are?

2    A    Yes.

3    Q    Okay.  Now, in regards to each patient that you saw

4    in those counts, did you believe they had -- they were

5    suffering from a painful condition?

6    A    That's correct.

7    Q    Each person that are in these counts, did you

8    believe they had medical reasons for their pain?

9    A    Well, I need to go back to the last question.  I'd

10   probably have to see each person you're talking about

11   because there's some people I never seen so --

12   Q    All right.  Make sure I understand.  Everybody that

13   you saw and you personally gave care to, did you believe

14   they had pain if you prescribed them pain medicine?

15   A    Absolutely.

16   Q    Okay.  Now, you recall any patient ever telling you,

17   doctor, I'm really not in pain, but give me some pain

18   medicine anyway?

19   A    No.

20   Q    If they would have, would you have given them pain

21   medicine?

22   A    No.

23   Q    When we went through these charts, did we look at

24   evidence of medical decision-making?

25   A    Yes.

4584

1    Q    Were you ever, ever, ever attempting to stop acting

2    as a doctor with any of the patients that you ever saw?

3    A    No.

4    Q    Did you ever prescribe or exchange prescriptions for

5    cash with any patient or non-patient?

6    A    No.

7    Q    Did you ever exchange sex for prescriptions for any

8    patient or non-patient?

9    A    Say that again.

10   Q    Did you ever exchange sex?

11   A    Oh, sex?  No.

12   Q    Did you ever meet people in the back alley

13   somewhere, giving them prescriptions so you could pocket

14   the money?

15   A    No.

16   Q    Did you get any kickbacks whatsoever from the

17   prescriptions that were written to these patients?

18   A    No.

19   Q    Every time that you saw a patient, regardless if the

20   outcome was bad or whether the outcome -- well, strike

21   that.

22        Let me ask that -- do you make room now that you've

23   taken a look at the charts that were cherry-picked by

24   the Government and make room that you could have made

25   different medical decisions?

4585

1          MS. TREADWAY:  Objection; argumentative.

2          THE COURT:  Sustained.

3    BY MR. WILLIAMSON:

4    Q   Do you make room that in the charts that have been

5    presented to the jury that different medical decisions

6    could have been made?

7    A   Yes.

8    Q   Do you make room that some of these people actually

9    duped you in order to get some pain medication?

10   A   Yes.

11   Q   Did you ever prescribe medication, whether if it's

12   pain, blood pressure, antibiotics, to a person that you

13   did not believe needed that medication?

14   A   No.

15                    (Off-the-record.)

16          MR. WILLIAMSON:  Nothing further, Your Honor.

17          THE COURT:  Mr. Byers.

18          MR. BYERS:  Thank you, Your Honor.

19          THE COURT:  I don't know how long you plan on

20   going, but I need to stop about 10 'til 5.

21          MR. BYERS:  Well, that's why I was just going

22   to bring to the Court's attention, I suspect maybe the

23   jury is a bit saturated.  But I realistically think I'll

24   be done at 10 'til 5 so I guess it's their call or your

25   call or I'll just plow ahead.

4586

```
 1          THE COURT:  I think they probably want to go
 2   on.  They're indicating they do.
 3          MR. BYERS:  That sounds good, Your Honor.  I
 4   think -- 4:50.  I'll be done by then or before.
 5          THE COURT:  Thank you.
 6                     CROSS EXAMINATION
 7   BY MR. BYERS:
 8   Q    Good afternoon, Doctor.
 9   A    Hi.
10   Q    We've known each other about two and a half years
11   now; right?
12   A    That's correct.
13   Q    I hope you're aware that every slight you've sent my
14   way, perceived or real, in that two and a half years is
15   now going to be subject to pay back from a grueling
16   cross-examination.
17        You talked early on with Mr. Williamson about I
18   think the phrase I wrote down was you were talked into
19   starting the SMC, the Schneider Medical Clinic.  Is that
20   a fair recall of your testimony?
21   A    I believe so.
22   Q    Okay.  Who were you talked -- and this was -- you
23   were in Haysville then; correct?
24   A    It was called Haysville Family Med.
25   Q    Okay.  Who talked you into trying to go out on your
```

4587

1    own and have your own clinic?

2    A    It was the previous -- I don't know what his title

3    was when he worked for Family Med Center, but he was in

4    the business office and he was the one that actually

5    came to our clinic and reviewed what we were doing and

6    so he was kind of like our administrator there at

7    Haysville Family Med.

8    Q    Okay.  So it wasn't your wife Linda who talked you

9    into trying to start up this business?

10   A    That's true.

11   Q    Okay.  And actually was this Mike Robinson?

12   A    Yes.

13   Q    I think we heard his name earlier.  And he was the

14   fella who was actually brought on as an administrator

15   initially?

16   A    That's correct.

17   Q    But he wasn't with the clinic very long?

18   A    That's correct.

19   Q    You remember identifying those pictures of the

20   Clinic?

21   A    Yes.

22   Q    Earlier in your testimony?

23   A    Yes.

24   Q    Okay.  Were you proud of the ability to raise a

25   building like that from the ground up?

1    A   Yes.  It was, it was a fantastic building.  I mean,

2    it was, it was the best family practice clinic building

3    I've ever seen.

4    Q   And is it true that you took your experience in

5    family practice at various locations and used that

6    experience to come up with the ideas to make the Clinic

7    something you can be proud of?

8    A   Yes.

9    Q   Is that Clinic up for auction today?

10   A   Yes.

11   Q   Why is that?

12   A   Well, the Clinic was seized by the federal

13   government and so I assume that's what they're doing,

14   they're selling it.

15   Q   It's not being sold because of some kind of a lien

16   or a bank foreclosing on it?

17   A   There is a bank lien on it, but I don't think that's

18   in play here.

19   Q   Now, I think you touched on it briefly with

20   Mr. Williamson.  What was Linda's role at the Clinic?

21   What did you perceive her role to be once Schneider

22   clinic was up and running?

23   A   Well, she kind of took care of the front office, you

24   know.  She would help, you know, enforce the rules, you

25   know, make certain that all the employees wouldn't take

4589

 1    too many breaks or go for their smoke breaks; or help,

 2    help organize things up in front.

 3    Q    Okay.  So sort of a personnel, HR type person right

 4    up there where most of the workers were?

 5    A    That's correct.

 6    Q    Okay.  And then once Mike Robinson was not on the

 7    scene, was that when Tim McDonald appeared as the

 8    administrator?

 9    A    Yes.  He was the administrator.

10    Q    So what was his role?

11    A    He was the administrator.  He was over, basically,

12    the Clinic.  He was everybody's boss, per se.  He had to

13    deal with all the paperwork and all the computer stuff

14    and the billing and just making certain that the clinic

15    was running appropriate.

16    Q    So Tim's the big boss.  But we've heard that Linda

17    did the hiring and apparently some of the firing.  Is

18    that true?

19    A    Yes.  She did most, I think, most of the hiring and

20    most of the firing; but I think Tim had done some

21    firing, too, and hiring, too, I think.

22    Q    And was -- you were aware that Linda was doing the

23    hiring?  That was with your approval?

24    A    Yes.

25    Q    And why would you let her do the hiring if Tim was

1    actually the higher boss?

2    A   Well, Tim wasn't there all the time.  And Tim -- and

3    Linda was, I think, doing a very good job of hiring

4    people.

5    Q   Did you expect Linda to oversee the clinical care of

6    the providers at Schneider Medical?

7    A   No.

8    Q   Did she?

9    A   No.

10   Q   Do you know if Linda ever substantively changed a

11   fee ticket?

12   A   No.

13   Q   Or progress note?

14   A   No.

15   Q   Or any other type of a paper in a medical chart?

16   A   No.

17   Q   Do you not know or -- well, strike that.

18       You've been sitting here for weeks with us,

19   correct?

20   A   That's correct.

21   Q   You've heard testimony that charts went through

22   Linda's office; correct?

23   A   That's correct.

24   Q   Is that accurate?

25   A   Yes.

1    Q    Why was that?

2    A    Well, she would make certain that the charts were

3    done before they went to billing.  She would make

4    certain that, you know, all the X's and O's were done.

5    Like make certain that, you know, the chart was done or

6    that the -- make certain the fee tickets were done and

7    the codes were on the fee ticket and so --

8    Q    And what was the point of all of that?  Why have all

9    of that stuff in place?

10   A    Well, it's just organizing to make certain things

11   get done and get things movin'.

12   Q    Okay.  I think we heard Government, particularly

13   Agent Stewart, maybe others, but some Government

14   witnesses talk about how often they were in the clinic.

15   Were you aware, say, for the year or two leading up to

16   the raid that Government agents were often in the clinic

17   getting charts and asking for information?

18   A    Before the raid?

19   Q    Yeah, before the raid?

20   A    No.

21   Q    Okay.  How about after the raid.  Were you aware

22   that Government agents were in there on a fairly regular

23   basis?

24   A    Yes.

25   Q    Did you ever instruct anyone with the Schneider

1    Medical Clinic to prevent access or to dishonor

2    subpoenas or requests for information?

3    A    No.

4    Q    Did you ever know of Linda doing that, trying to

5    block access to information to the federal government?

6    A    No.

7    Q    We've heard of a clinic philosophy that all walk-

8    in's would be seen.  Do you remember testimony to that

9    effect?

10   A    Yes.

11   Q    Was that your personal philosophy as well?

12   A    Yes.

13   Q    Why?

14   A    Well, my philosophy that if somebody was sick, they

15   didn't want to wait, you know, a week or two to get in

16   to see the doctor.  They wanted to be seen right then

17   and there.  And so I didn't want, especially if it was

18   an infant or something that, you know, I wanted to make

19   certain that we had availability for our patients to

20   come in.

21   Q    Another clinic philosophy we heard about, and

22   actually you mentioned it earlier today, was the

23   proclivity to hire people who were down on their luck.

24   Do you remember you used those terms this morning?

25   A    Yes.

4593

1    Q    And that was your own personal philosophy?

2    A    Not necessarily.

3    Q    Okay.  Did you ever try to dissuade Linda from

4    hiring people who may have appeared to be down on their

5    luck?

6    A    No.

7    Q    Okay.  It's just not necessarily maybe what you

8    would have done?

9    A    Well, I, you know --

10              MR. WILLIAMSON:  Objection, Your Honor.

11              THE COURT:  I'm sorry.

12              MR. WILLIAMSON:  I'm sorry.  I couldn't help

13   it.

14              MR. BYERS:  He objected.

15              MR. WILLIAMSON:  I'll withdraw it.

16   BY MR. BYERS:

17   Q    Do you remember what you were talking about?

18   A    Yes.  I trusted her judgment and she did, I think, a

19   pretty good job of hiring and firing.  I mean, there's a

20   lot of -- some of the people did well that were down and

21   out and improved themselves, and there was other people

22   that didn't do so good and we had problems with them.

23   Q    Were all those people fired as far as you know?

24   Ones you would consider problematic employees?

25   A    I think after they were given chances and they

4594

1    didn't improve they were fired, yes.

2    Q    So did Linda consult with you on issues about

3    employees like, you know, somebody smoking too much,

4    somebody not doing their job, somebody is loitering

5    around being lazy?

6    A    I'm sure she probably did.  I just probably didn't

7    deal with that though.

8    Q    Okay.  Do you remember hearing testimony from

9    various witnesses that they were essentially threatened

10   by Linda that if they took problems to you they would be

11   fired on the spot?  Do you remember any testimony like

12   that?  I think maybe specifically LeBroke and --

13   A    Yes.  Yes.

14   Q    -- another witness?

15   A    Yeah, I remember that.

16   Q    Was that a policy -- was that something you were

17   aware of that employees were prohibited from talking to

18   you?

19   A    No.  I think the problem was we were a very busy

20   clinic and a lot of the employees sometimes would, you

21   know, have their own personal problems that they wanted

22   to address to one of the providers and I think that was

23   getting in the way with seeing patients and so I think

24   Linda suggested if they did have a problem that to get a

25   chart and be checked in as a patient.

4595

1    Q   Okay.  So -- all right.  I understand.  Did you

2    expect -- never mind.  Strike that.

3        We've heard some testimony about you going to

4    lunches on a regular basis with pharmaceutical reps.  Do

5    you recall that testimony?

6    A   Yes.

7    Q   And actually one of the reps was in here yesterday,

8    or recently, and talked about that a little bit.  Do you

9    remember that?  With Mr. Wagner?

10   A   Yes.

11   Q   Okay.  As long as you've been a physician, have you

12   seen and parts -- have you seen other physicians going

13   to lunch with various sale reps?

14   A   Yeah.  As a matter of fact, there was some meetings

15   that we would attend during our lunch hour that had

16   other physicians in the meeting at the same time.  I

17   mean other physicians in the area.  Meeting to hear a

18   speaker or the pharmaceutical rep give a presentation.

19   Q   Did you participate in such lunches when you were at

20   Riverside?

21   A   Yes.

22   Q   Or even dinner sometimes; right?  Evening

23   gatherings?

24   A   Very much so.  There was a lot of dinner meetings.

25   I didn't always go to those, though.

4596

1    Q    Like that first meeting of the pain society trying

2    to get a little local pain group together.  That was an

3    evening session, wasn't it?

4    A    That was an evening session, yes.

5    Q    Okay.  Do you know, were there pharmaceutical reps

6    involved there?

7    A    Yes, there was pharmaceutical reps there.  Matter of

8    fact, the first one that I attended they utilized our

9    pain management agreement and also our PADT to hand out

10   to all the people that were there at the meeting.

11   Q    In your experience -- and you've been a physician

12   since '88; right?

13   A    Yes.

14   Q    Okay.  In your experience as a physician over the

15   last 22 years, or say nineteen-ish years before you were

16   shut down, is it common for pharmaceutical reps to take

17   additional personnel in the office to lunch as well, not

18   just a single physician?

19   A    A lot of times the pharmaceutical reps will bring

20   dinner to the clinic and that's the clinic's own policy.

21   A lot of times I know over at Derby Family Med that's

22   the way they were.  They would not see a pharmaceutical

23   rep unless they brought 'em in a lunch and they'd have

24   to feed the whole place.

25   Q    Okay.  Did you ever work at Derby?

1   A   No.

2   Q   Okay.  Isn't it true that some of the times when you

3   would go out with pharmaceutical reps when you were with

4   Schneider Medical Clinic you would actually just go to a

5   pizza buffet, grab the pizza and go back to the office

6   and listen to them and work at the same time?

7   A   That would happen sometimes.

8   Q   Now, did your, your coding people downstairs, did

9   they ever come to you and question why certain things

10  were marked in particular ways?

11  A   Occasionally someone from, I think it was from

12  coding, would talk to us about if there was a lab that

13  was ordered that didn't correspond with the diagnosis.

14  And so the coder would come and address that problem

15  with us and say, hey, why did you do this.  If you want

16  to get paid for this, you have to have the appropriate

17  diagnosis.  And so a lot of times it was just somebody

18  forgot to put the appropriate diagnosis down.

19  Q   You were talking with Mr. Williamson a little bit

20  about the people from WSU coming in; correct?

21  A   Yes.

22  Q   And those were specifically people in the physician

23  assistant training program there?

24  A   That's correct.

25  Q   Okay.  Isn't it true you also had either actual

 1    involvement or inquiries from a local alternative school

 2    about sending some kids in to shadow providers at

 3    Schneider Medical?

 4    A   Yes, we did.  The Haysville alternative high school.

 5    We would employ some of those kids to give them a

 6    chance.

 7    Q   You actually employed them or --

 8    A   Yeah, we would have employment for them sometimes.

 9    Q   And what about WTI, which is, I think, the Wichita

10    Technical Institute.  Did you have any affiliation with

11    that organization?

12    A   Yes.  They approached us.  And it was even after the

13    raid, I believe, that they approached us and asked if we

14    would mind helping train some of their students as

15    coders and also medical assistants.

16    Q   And involvement with both these outside institutions

17    would appear to subject your operations to even more

18    scrutiny by people unfamiliar with the medical practice;

19    right?

20    A   That's correct.

21    Q   Now, you remember specifically Jamie Hilliard talked

22    about being asked by Linda to fill in vital signs

23    specifically because of the First Guard audit?  You

24    remember her testimony?  It was clear back on May 4.

25    A   Yeah.

```
 1    Q    Okay.  I'm going to hand you a packet of
 2    documents -- this is from Government Exhibit 6-V as in
 3    Victor.  I'll represent those are progress notes for the
 4    time period of the First Guard audit pulled from that
 5    Government exhibit.  And because, as I recall -- you
 6    tell me if you recall it this way -- I think, did Jamie
 7    Hilliard testify that she was told by Linda that if the
 8    vitals were blank, you just take the vitals from the
 9    previous visit and transpose them to the blank sheet?
10    A    I don't remember exact words, but I believe it was
11    something to that effect.
12    Q    Okay.  So we need to go through these sheets.  And
13    there are 27 of them here.  If you look at the top one
14    dated February 5th, 2003 --
15    A    Yes.
16    Q    -- does that show a pulse of 60?
17    A    Pulse of 60, yes.
18    Q    Blood pressure 80 over 50?
19    A    That's correct.
20    Q    Respiration 14?
21    A    Yes.
22    Q    Next visit.  These would be in chronological order.
23    2-9, four days later.  And this is Jamie S who was a
24    frequent visitor at the clinic?
25    A    That's correct.
```

4600

1    Q    Remember the testimony about her?

2    A    Yes.

3    Q    Pulse on the next visit 88?

4    A    Yes.

5    Q    96 over 60 BP?

6    A    Yes.

7    Q    Ten respirations?

8    A    Correct.

9    Q    That's different than the first one; right?

10   A    Correct.

11   Q    The next one, 2-16.  Pulse is 78?

12   A    Yes.

13   Q    Blood pressure is 92 over 68?

14   A    That's correct.

15   Q    Respiration is not filled in?

16   A    Correct.

17   Q    Okay.  2-18.  We have a pulse of 78?

18   A    Yes.

19   Q    Which is the same as the previous visit; right?  If

20   you look back, you see 78?

21   A    That's correct.

22   Q    But the blood pressure is 100 over 60 instead of 92

23   over 68; correct?

24   A    That's correct.

25   Q    And respirations are filled in as 16?

4601

```
 1   A    That's correct.

 2   Q    Okay.  Visit of 2-21?

 3   A    Yes.

 4   Q    We have, again, pulse of 78.  So that's three in a

 5   row?

 6   A    Yes.

 7   Q    But we have blood pressure of 112 over 70?

 8   A    That's correct.

 9   Q    And respirations are 12?

10   A    That's correct.

11   Q    And then we run into 2-24?

12   A    Yes.

13   Q    And vitals are all blank; right?

14   A    That's correct.

15   Q    Contrary to Jamie Hilliard's assertion that she was

16   told to fill in all the blank vitals?

17   A    That's correct.

18   Q    All right.  Next visit is 2-27.  We have a pulse of

19   90?

20   A    Yes.

21   Q    Blood pressure 120 over 80?

22   A    Yes.

23   Q    Lacks respirations again; right?

24   A    That's correct.

25   Q    I'll represent if you go back to 2-21 you'll see 78,
```

4602

```
1    112 over 70 and 12.  Different from 90 over 120 and 80;

2    correct?

3    A   That's correct.

4    Q   Next visit, one day later, 2-28.  It shows a pulse

5    of 72?

6    A   Yes.

7    Q   A blood pressure 116 over 74?

8    A   That's correct.

9    Q   Respirations of 12?

10   A   That's correct.

11   Q   Just from the prior visit --

12   A   That's correct.

13   Q   3-4-03 during the First Guard audit period?

14   A   That's correct.

15   Q   We have a pulse of 76 -- wait, I'm wrong.  We have

16   no pulse.

17   A   There's no pulse.

18   Q   I assume the patient is alive but we don't have a

19   pulse marked?

20   A   That's correct.

21   Q   We have a blood pressure of 96 over 60?

22   A   Yep.

23   Q   No respirations?

24   A   That's correct.

25   Q   We're lacking two of the three vitals we've been
```

4603

```
1    looking at?

2    A    That's correct.

3    Q    If we look at 3-8 we see a pulse of 76?

4    A    Yes.

5    Q    A blood pressure of 102 over 60?

6    A    Yes.

7    Q    And we're lacking respirations again?

8    A    That's correct.

9    Q    3-10, we don't show a pulse on that one, do we?

10   A    That's correct.

11   Q    But we see a blood pressure of 88 over 60?

12   A    Yes.

13   Q    Respirations of 16?

14   A    That's correct.

15   Q    3-11 is the next visit.  You see an 88 pulse?

16   A    That's correct.

17   Q    100 over 64 BP?

18   A    Yes.

19   Q    Respirations of 12?

20   A    That's correct.

21   Q    All right.  Four days later we have a visit, March

22   15.  Do you see the pulse of 84?

23   A    Yes.

24   Q    BP is 110 over 68?

25   A    That's correct.
```

4604

1    Q    And respirations of 13?

2    A    That's correct.

3    Q    One day later, another visit, 3-16.  That's an 84

4    pulse; right?

5    A    That's correct.

6    Q    Same as the prior visit?

7    A    That's correct.

8    Q    110 over 60.  I'm sorry -- 68.  Same as the prior

9    visit?

10   A    That's correct.

11   Q    And respirations of 12.

12   A    That's correct.

13   Q    Okay.  So that's pretty close; right?

14   A    That's pretty close.

15   Q    We have a one point, one breath difference in

16   respirations.  And those visits were one day apart;

17   right?

18   A    That's correct.

19   Q    Next visit is March 18th?

20   A    Yes.

21   Q    Pulse 60?

22   A    Yes.

23   Q    Blood pressure 110 over 60?

24   A    Mine says 100 over 60.

25   Q    I'm sorry.  100 over 60?

1    A    Yes.

2    Q    And then respiration is 12; is that correct?

3    A    That's correct.

4    Q    Okay.  Next visit, 3-20.  Pulse of 70?

5    A    Yes.

6    Q    Blood pressure of 100 over 60?

7    A    That's correct.

8    Q    And respiration is up to 18?

9    A    That's correct.

10   Q    Okay.  3-22.  Respirations are -- I'm sorry -- pulse

11   is not filled in?

12   A    That's correct.

13   Q    We have BP of 100 over 70?

14   A    That's correct.

15   Q    And we have no respirations marked?

16   A    That's correct.

17   Q    All right.  3-25, still in the year 2003.  We show a

18   pulse of 68?

19   A    That's correct.

20   Q    And BP of 124 over 72?

21   A    That's correct.

22   Q    And respirations of 14?

23   A    That's correct.

24   Q    3-26, pulse of 64?

25   A    That's correct.

4606

```
 1   Q   BP 118 over 80?

 2   A   Correct.

 3   Q   Respirations 12?

 4   A   Correct.

 5   Q   Moving into April.  April 3rd.  Do you see a pulse

 6   of 72?

 7   A   Yes.

 8   Q   BP of 100 over 70?

 9   A   That's correct.

10   Q   And respiration of 16?

11   A   That's correct.

12   Q   The very next day, April 4, do you see pulse of 84?

13   A   That's correct.

14   Q   BP is 108 over 62?

15   A   That's correct.

16   Q   Respiration is 12?

17   A   That's correct.

18   Q   Four days later, April 8th.  You see a pulse of 76?

19   A   Correct.

20   Q   BP of 80 over 40?

21   A   Correct.

22   Q   And respirations of 12?

23   A   That's correct.

24   Q   Okay.  April 14th, six days later.  Do you see a

25   pulse of 78?
```

1    A    Correct.

2    Q    I think the PB is 102 over 64?

3    A    That's correct.

4    Q    Respiration is 10?

5    A    That's correct.

6    Q    All right.  Then look at the next date, or next

7    visit.  4-17, three days later.  Pulse is the same at 78

8    from the prior visit.  You can put them side by side.

9    Is that right?

10   A    That's correct.

11   Q    And the PB is the same at 120 over 64; right?

12   A    That's correct.

13   Q    Respirations were doubled to 20; right?

14   A    That's correct.

15   Q    4-19, we see a pulse of 64?

16   A    Yes.

17   Q    BP 100 over 60?

18   A    Yes.

19   Q    Respirations of 12?

20   A    That's correct.

21   Q    4-24, we see a pulse of 68.

22   A    Yes.

23   Q    BP of 110 over 72?

24   A    That's correct.

25   Q    Respirations of 12?

1    A    That's correct.

2    Q    And the final visit, the 27th -- April 30th, 2003.

3    We see a pulse of 78?

4    A    Yes.

5    Q    A BP of 102 over 60?

6    A    Yes.

7    Q    And respirations of 10?

8    A    That's correct.

9    Q    So if I represent to you, having gone through those,

10   that we have two days that arguably carry over vitals,

11   that being 3-16, from the 3-15 visit where it was 84,

12   110 and 68 and respirations varied by one.  And the

13   second time that I spotted would be this 4-14 and 4-17

14   where we have 78 each day on pulse, 102 over 64 each day

15   on BP, and respirations were doubled from 10 to 20.  If

16   I represent to you that those appear to be the only

17   times that were even arguably filled in vitals from a

18   prior visit, would you disagree with me?

19   A    I wouldn't disagree with you.

20   Q    And to avoid everyone in the room the pain of doing

21   that again with the second named person -- and this

22   person was picked because this is who Jamie Hilliard

23   named -- the second person named by her would show 16

24   visits where there are no arguable carry-overs and

25   actually one, two, three, four, five, six, 16 missing

4609

1    vitals when Hilliard was told she was to fill in vitals.

2    And that's from Sharon B if I didn't say that.  And not

3    really a question.  So would that -- giving my

4    representation about the second patient credence and

5    what you just went through looking at this with Jamie S

6    and these 27 visits, would that appear to comport with

7    what we heard Ms. Hilliard say about being told to copy

8    vitals from a prior visit in preparation for a First

9    Guard audit?

10   A    No.

11   Q    Now, you know you've been charged with a conspiracy

12   here; right?

13   A    Yes.

14   Q    With your wife?

15   A    Yes.

16   Q    Okay.  Specifically from the Indictment, that you

17   knowingly and willfully combined, conspired,

18   confederated and agreed with each other and with other

19   persons both known and unknown to the grand jury to do a

20   string of bad things.  Did you guys write this

21   conspiracy down?  Can we see the contract?

22   A    There was no conspiracy.

23   Q    There is no written conspiracy; right?

24   A    There's no written conspiracy.

25   Q    Okay.  When did you enter into an oral conspiracy to

1    conduct a criminal enterprise through the Schneider

2    Medical Clinic?

3    A    There was no oral conspiracy.

4    Q    When did you wink and nod at each other --

5    A    We do that all the time.

6    Q    -- in a criminal fashion?

7    A    No.

8    Q    I think Mr. Williamson asked you if the Government

9    case, as you sat and heard it, had presented a complete

10   picture of maybe you and/or the clinic.  Do you remember

11   that kind of a question:  Was that a full picture of

12   what you were doing at the clinic?

13   A    No, it was not a full picture.

14   Q    Did the Government present a full picture of what

15   Linda, your wife's, role was at the clinic?

16   A    No.

17   Q    And her conduct there?

18   A    No.

19              MR. BYERS:  That's all I have, Your Honor.

20              THE COURT:  Well, I've got to assume that the

21   Government's cross-examination is going to be fairly

22   lengthy.

23              MS. TREADWAY:  I don't know if fairly lengthy,

24   Judge, but I can certainly cut it down if I had

25   overnight to work on it.

1          THE COURT:  How about that, Ladies and

2   Gentlemen.  I'll see you tomorrow at 9:00.  Remember and

3   heed the admonition.

4                    (Recessed for the day at 4:32

5                    p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25