4928

```
 1                      (Beginning at 1:00 p.m. June 1,

 2                  2010, the following proceedings

 3                  continued.)

 4          THE COURT:  Yes, sir.

 5          MR. WILLIAMSON:  Thank you, Your Honor.

 6                  REDIRECT EXAMINATION

 7   BY MR. WILLIAMSON:

 8   Q   Now, Dr. Schneider, what I want to do first, let's

 9   just kind of review and see if we can remember

10   everything that was discussed with you on

11   cross-examination.  When I say everything, not every

12   specific question, but general topics.  Okay?

13   A   Sure.

14   Q   Now, first, let's see, the Government covered with

15   you the fact that your documentation wasn't good.

16   Correct?

17   A   Yes.

18   Q   Okay.  I think on direct we testified -- at least my

19   question was that it sucked; right?

20   A   Yes.

21   Q   And you agreed with that on direct; correct?

22   A   Yes.

23   Q   So that wasn't a surprise of anything that we

24   learned on cross?

25   A   That's correct.
```

4929

1   Q    She spent time talking to you about the fact that

2   you hired family members and friends; correct?

3   A    That's correct.

4   Q    Okay.  Did you tell the jury on direct that you

5   hired family member and friends?

6   A    I believe so.

7   Q    Okay.  So that was something that you had already

8   told the jury; correct?

9   A    Correct.

10            THE COURT:  Let me stop you for a second.   On

11  redirect, I want you to confine your questioning to

12  direct non-leading questions.

13            MR. WILLIAMSON:  Yes, sir.

14            THE COURT:  That's Rule 611.  And you know

15  that's the rule.

16            MR. WILLIAMSON:  I can do that, Your Honor.

17            THE COURT:  Please do that.  Thank you.

18  BY MR. WILLIAMSON:

19  Q    On direct -- excuse me, on cross did the Government

20  cover with you that some people complained about

21  treatment they received at the clinic?

22  A    Yes.

23  Q    And did you tell the jury that on direct?

24  A    Yes.

25  Q    So was that something new that was covered on

4930

1    cross-examination?

2    A    Yes.

3    Q    Was that something new that was covered?

4    A    Oh, no.

5    Q    Okay.  And then we also learned that you had

6    patients -- strike that.  Did we also learn through

7    cross-examination that you had patients that passed

8    away?

9    A    Yes.

10    Q    And did you admit that to the jury on direct?

11    A    Yes.

12    Q    Now, maybe I was napping or something, but did --

13    because I was sick that day -- not that I'm lazy -- but

14    did the Government ever establish on cross-examination

15    one person that you provided pain medicine to that did

16    not have a pain condition?

17    A    No.

18    Q    Patricia G, did you send her out for multiple

19    referrals in order to try to help her with her pain

20    conditions?

21    A    I believe so.

22    Q    Did she have two surgeries?  At least one while she

23    was treating with you?

24          THE COURT:  These are leading questions.

25    Please don't ask leading questions on redirect

4931

1  examination.

2  BY MR. WILLIAMSON:

3  Q   Did Patricia G have surgeries while she was treating

4  with you?

5  A   Yes, she did.

6  Q   Do you remember how many?

7  A   I know she had stomach surgery and a knee surgery

8  for sure.

9  Q   Did Eric T have surgeries based on your referrals

10  while he was treating with you?

11  A   Yes.  He had a back surgery.

12  Q   Did you send Robin G out for expert evaluations in

13  regards to her migraines?

14  A   Yes, I believe so.

15  Q   Were you doing all of these in an effort to try to

16  treat these patients for their true pain conditions?

17  A   Yes.

18          THE COURT:  Please, I want you to confine your

19  questions to non-leading questions.  That is a question

20  that telegraphs, suggests, the answer to the witness.

21  That's not a direct question.  I don't want on redirect

22  you to ask questions that suggest the answer that only

23  require the witness to say yes or no.

24          MR. WILLIAMSON:  Just to make sure I

25  understand your --

4932

 1          THE COURT:  Come here.
 2                      (Thereupon, the following
 3                       proceedings were had at the
 4                       bench by Court and Counsel
 5                       outside the hearing of the
 6                       jury.)
 7          THE COURT:  What I mean, here's how to ask
 8   non-leading questions:  Who, what, when, where, why; and
 9   since he's your client, how.  That's the way to do it.
10          MR. WILLIAMSON:  Okay.  I'll try to do that.
11   I'm not trying to be bad, Your Honor.
12          THE COURT:  I know you aren't.
13          MR. WILLIAMSON:  All right.
14                      (Thereupon, the following
15                       proceedings continued in the
16                       hearing of the jury.)
17   BY MR. WILLIAMSON:
18   Q   Do you recall whether or not when Robin G's husband
19   took the stand he testified she was not an addict?
20   A   Yes.
21   Q   What do you recall his answer being?
22   A   He said that she had severe migraines and he never
23   mentioned that she had an addiction.
24   Q   Now, the Government covered several exhibits with
25   you in regards to the Kansas Board of Healing Arts.  Do

4933

1    you remember that?

2    A    Yes.

3    Q    Now, looking at these documents, did the Government

4    read these entire letters into the record?

5    A    No.

6    Q    Did the Government read snippets of the letters into

7    evidence?

8    A    Yes.

9    Q    Well, let's talk about a few of these documents and

10   just kind of share with the jury a couple of other

11   pieces of information that were in these documents.

12   First let's take a look at Exhibit 255.

13        And before we talk about these, the letters -- were

14   these letters, at least it was represented by the

15   Government, that were written in response to specific

16   complaints to the Kansas Board of Healing Arts?

17   A    Yes, I believe so.

18   Q    And do you know whether or not these were the final

19   letters or were these drafts?

20   A    I don't know.

21   Q    Can you tell the jury, looking at these letters,

22   what is the earliest date on the letters that I've sat

23   in front of you?

24   A    Looks to me like the earliest date I see is July

25   22nd, 2005.  I don't know about this other one.

4934

1    Q   Okay.  Now, I want to make sure that there was no

2    misimplication by some of the questions that the

3    Government asked.  Before these letters were written,

4    what would you do in order to compile the information

5    before sending information to the Kansas Board of

6    Healing Arts?

7    A   Well, if I was going to respond to something from

8    Kansas Board of Healing Arts I would definitely get the

9    chart and review the chart and document what I perceived

10   happened in the chart and send a letter to the Kansas

11   Board of Healing Arts regarding that patient.

12   Q   Okay.  And I recall a couple questions by the

13   Government.  But would you categorize that as -- and I

14   think the Government's term was -- looking into the

15   circumstances of the deaths?

16   A   You'll have to ask it different with me.

17   Q   When you were going in to review the charts, what

18   were you doing?

19   A   Just -- and I don't know without looking at all

20   these letters what they were regarding to, if they had

21   anything to do with a patient's death or if they were

22   just regarding the complaint.

23   Q   Let's look at Government's Exhibit 255.  And read

24   for the jury the first paragraph.  One of the paragraphs

25   that the Government didn't ask you about.

4935

1    A    Says:  "Kansas Foundation for Medical Care

2    Incorporated has already reviewed this case.  See

3    report.  After a thorough review of your medical records

4    and additional information provided by Stephen Schneider

5    D.O. and Schneider Medical Clinic, we have determined

6    that your services you received did meet professionally

7    recognized standards of quality."

8    Q    Okay.  Now, in regards to the episode that was

9    complained about with Lillian C, even though there was

10   no finding by that organization that the standard of

11   care was not met, did you take steps to insure that any

12   similar issues would not arise?

13   A    Yes, we did.

14   Q    And did you mention that in the letter?

15   A    Yes, we did.

16   Q    And can you tell the jury where you mention that at

17   the very next to the last paragraph?

18   A    It says:  "Since this episode, I have restricted

19   PA's from giving any pain shots without permission from

20   Dr. St. Clair or myself."

21   Q    Okay.  And why would you make the determination as

22   to not allow PA's to provide pain shots without prior

23   authorization from you or Dr. St. Clair?

24   A    Well, the only pain shots that we had at the clinic

25   were, one, Nubain; two, Stadol; or three, Toradol.  And

4936

1    the Nubain and Stadol did have -- I think it was Dr.

2    Parran suggested have an antagonistic effect on the

3    receptors which could cause acute withdrawal symptoms.

4    Q   And what was the goal -- the goal of the shots were

5    to relieve pain?

6    A   Yes.

7    Q   Now let's take a look at Government Exhibit 260.

8    Now, can you tell the jury whether or not you referred

9    this patient to any other physicians?

10   A   Yes.  This patient, it says here that she was

11   referred to an orthopedic surgeon regarding her tib/fib

12   fracture and also a neurologist for her headaches.  And

13   says that she was being seen by a psychiatrist also.

14   Q   Okay.  And does this letter reflect that you

15   actually asked the patient about her history of alcohol

16   and drug abuse?

17   A   It says here that she had reported -- let me see --

18   says she stated she no longer seen Dr. Stieshower (ph)

19   and that history of drug abuse was in the 1990s and she

20   no longer had a problem.

21   Q   Okay.  And why would you ask that question and why

22   is that information relevant to you?

23   A   Apparently there was a note from Dr. Sticehower

24   reporting she had a history of alcohol, marijuana and

25   narcotic abuse in the past.

 1   Q    Okay.  And did she report to you that the history

 2   stopped in the 1990s?

 3   A    That's correct.

 4   Q    And was that not an indication to you that you

 5   should not give her any kind of pain medicine?

 6   A    No.

 7   Q    Well, did you -- what did you -- what was the

 8   ultimate decision that happened with this patient?

 9   A    Well, I can read what, what this letter says anyway?

10   Q    Okay.

11   A    "Patient was dismissed from our practice due to

12   failing her serum drug screen and her aberrant

13   behavior."

14   Q    Well, according to the Government, you never fire

15   people if they failed a drug screen or if they have any

16   aberrant behavior.  Is that true?

17           MS. TREADWAY:  Objection, Judge.  Completely

18   mischaracterizes the evidence and it's leading.

19           THE COURT:  Well, it is leading, but, same

20   with respect to Mr. Williamson's objections.  You must

21   remember whether this mischaracterizes the testimony.

22   And I'm sure you will remember.

23   Q    Is it true that you would never terminate patients

24   that failed a drug screen?

25           MS. TREADWAY:  Objection; leading.

 1              THE COURT:  Sustained.

 2    BY MR. WILLIAMSON:

 3    Q   Did you ever terminate patients that failed drug

 4    screens?

 5    A   Yes.

 6    Q   And only one patient?

 7    A   No.

 8    Q   Do you know how many patients?

 9    A   Multiple.

10    Q   Did you care whether or not a person was

11    appropriately using their medication that you prescribed

12    to them?

13    A   Yes, I did care.

14    Q   And what would you do in order to try to make sure

15    that they were appropriately -- strike that.

16        Would you do anything to insure that they were

17    appropriately using their medication?

18    A   Yes.  We would have them come in on a monthly basis

19    to determine, you know, that they couldn't get more than

20    were allowed, per se, on a monthly basis.  We would do

21    the urine drug screens.  We would occasionally call them

22    in for pill counts.

23    Q   Well, you heard the Government say that one of these

24    patients beat you out of extra prescriptions.  You

25    remember that question?

4939

```
 1    A    Yes.
 2    Q    Well, do you make room that you got beat out
 3    multiple times?
 4    A    Do I make room?
 5    Q    Yes.  Is it possible?
 6    A    I'm certain it's possible.
 7    Q    Now, you testified to the jury that you changed
 8    certain things in regards to the way your charting
 9    occurred in order to keep track of the people that you
10    would dismiss from the practice; correct?
11    A    That's correct.
12    Q    Hand you what's been marked as D-018.  Do you
13    recognize that?
14    A    This looks like file cabinets with some files pulled
15    out -- or file cabinets with files and some files that
16    are pulled out.
17    Q    Okay.  And are those charts that the clinic would
18    keep?
19    A    Yes.
20    Q    And you recognize the charting system by looking at
21    the photographs on the picture -- excuse me -- the
22    charts on the photograph?
23    A    Yes.  They look like ours.
24    Q    And does that accurately reflect a shelf at the
25    clinic with certain charts pulled out?
```

1    A    That's correct.

2              MR. WILLIAMSON:  Move to admit D-018.

3              MS. TREADWAY:  Can we put it in time, Judge?

4    Have no idea when this was taken.  What part of the

5    clinic it was in.  Nothing.

6              THE COURT:  You can cover that with him on

7    cross-examination, or, rather, recross-examination.

8    D-018 is received.

9    BY MR. WILLIAMSON:

10   Q    And we have a blow-up of this in color but we don't

11   have it with us.  Let me take a look at that.  And let's

12   explain to the jury what we're looking at.

13        Is this just one shelf of charts that the clinic

14   kept?

15   A    That's just one rack, yes.

16   Q    And can you tell, these folders are dark.  Can you

17   tell the jury what color those folders actually are?

18   A    The darker folders are red charts.

19   Q    Now, does that represent the charting difference

20   that you made so you and your clinic could identify

21   people who were terminated from the clinic easier?

22   A    These red charts indicate they were fired from pain

23   management.  Not necessarily that they were fired from

24   the clinic.

25   Q    Okay.  Now, you were asked questions on

4941

1    cross-examination about trusting patients.  Do you

2    remember that?

3    A    Yes.

4    Q    And you also heard testimony -- I guess you've heard

5    evidence from Dr. Lakin, Dr. Watson, Dr. Parran, Dr.

6    Jorgensen, maybe even Dr. Owens, that illegitimate

7    patients will try to -- I'll just use the word --

8    infiltrate and get mixed in with legitimate patients.

9    You remember all that testimony?

10   A    Yes.

11   Q    Now, am I understanding you right?  Has the

12   Government -- all these patients are patients who are

13   either family practice patients or pain patients that

14   didn't have any problems?

15   A    I don't know about not having problems, but they

16   were not flagged as being discharged from pain

17   management.

18   Q    And what I want to ask you is, you have -- let's say

19   this person here who has done something to violate your

20   trust.  Why don't you penalize all of these patients and

21   start being a detective with them because these people

22   made mistakes and weren't able to do what they were

23   supposed to do?

24   A    Well, I wouldn't do that.

25   Q    Well, according to the Government, we have these 68

1    individuals and your practice is, you know, a pill mill,

2    according to them.  What about these legitimate

3    patients, or these charts that aren't marked?

4    A    The charts that are not marked are charts that are

5    either family practice patients or pain management

6    patients that are being treated routinely with no reason

7    to fire them from pain management.

8    Q    You mean you actually treated family practice

9    patients with no chronic -- no pain medicines?

10   A    Yes.

11   Q    But if you're trying to run a pill mill and just

12   give out as many pain pills as you can, why didn't you

13   just give those to them?  To the family practice

14   patients?

15   A    Well, that's inappropriate.

16   Q    Does this kind of give the jury an idea of you have

17   to see, let's say, 50 patients a day, and, according to

18   them, we'll do their big day, and trying to distinguish

19   between these people who are actually telling you the

20   truth and then maybe these couple every now and then who

21   may not be telling you the truth?

22   A    Yes.

23   Q    Now, you heard Dr. Lakin say that it is difficult.

24   Was it difficult for you?

25   A    Of course.

1    Q   Nonetheless, did you continue to try to weed out the

2    people who were trying to take advantage of you and the

3    clinic as opposed to people who truly needed medicine?

4    A   Yes, we did.

5    Q   Okay.  Now, you were asked questions by the

6    Government in regards to this objective, you know, look

7    at the records and say tell us what it is objective in

8    these records about their function.  You remember those

9    questions?

10   A   That's correct.

11   Q   Okay.  Let's talk about that briefly.  First, is it

12   possible that you were told things about their

13   functionality that didn't make it into the

14   documentation?

15   A   Yes.

16   Q   Now, second, if you want to, quote, unquote,

17   objectively identify, let's say, range of motion, you

18   can put range of motion and run a test for that.  Is

19   that fair?

20   A   Yes.

21   Q   Now, if you have a complaint of pain and you send

22   the person off for a MRI and it comes back negative, you

23   send a person for a CAT scan and it comes back negative,

24   what else can you do besides trust the person that they

25   are suffering the pain that they believe they're

4944

1   suffering?

2   A   Well, we didn't have a crystal ball or a lie

3   detector machine in our office to tell, you know, the

4   amount of pain or if they were lying or not to us; but

5   we would have to trust that their perception of pain was

6   accurate.  And a lot of times these procedures, whether

7   MRI, CAT scans, even though they were negative, doesn't

8   necessarily mean that they didn't have pain.  I seen a

9   lot of CT scans where they didn't even document or

10   report what the facet joint findings were.  And that's

11   where a lot of people's back pain were, in the facet

12   joints.

13   Q   Now let's take a look at Government Exhibit 256.

14   Are you there?

15   A   Yes.

16   Q   Do you remember being asked questions by the

17   Government about you reporting to the Kansas Board of

18   Healing Arts that a patient told you -- and I believe it

19   was regards Patricia G -- that somebody -- that

20   something happened with her husband.  You remember those

21   questions?

22   A   Yes.

23   Q   Okay.  Well, the Government didn't have you to talk

24   about the other sources that you provided to the Kansas

25   Board of Healing Arts, did they?

1    A    What other sources are you talking about?

2    Q    Well, let's take a look at Page 2, the third from

3    the bottom of the end of the page.  Can you tell the

4    jury who else -- strike that.

5         Did you have a conversation with an officer in

6    regards to Patricia G?

7    A    Yes.

8    Q    And can you tell the jury what you noted that the

9    officer informed you?  What did you tell the Kansas

10   Board of Healing Arts?

11   A    It says:  "At the time of Patricia's death, an

12   officer notified our office.  He commented that

13   Patricia's husband was acting suspicious and not

14   cooperating with the police.  I believe the prescription

15   bottles were not found."

16   Q    Well, how dare you, Doctor, tell the Kansas Board of

17   Healing Arts what a police officer told you.  Why would

18   you do that?

19             MS. TREADWAY:  Objection, argumentative.

20             THE COURT:  Well, the objection is sustained

21   as to the first part of the question.  The witness can

22   answer why he would tell the Board about the police

23   officer.

24   BY MR. WILLIAMSON:

25   Q    Can you tell the jury why would you tell the Kansas

1    Board of Healing Arts about that information?

2    A    I was trying to relay the whole picture that I seen

3    regarding her death.

4    Q    Well, did you stop there or did you tell the Kansas

5    Board of Healing Arts any other information that you

6    learned?

7    A    Yes.  I continued to report more here in this

8    letter.

9    Q    And what did you say?

10   A    I said:  "If you look at the autopsy report, the

11   cause of death is accidental overdose; but if you look

12   at the complete report, it comments about bruises on her

13   body and swelling of the brain, which sounds suspicious

14   to me.  And there was no comment as to stomach content."

15   Q    Well, when the Government asked you the questions,

16   the impression was where you were just taking some

17   anonymous complaint from some patient and passing it off

18   to the Kansas Board of Healing Arts.  But --

19              MS. TREADWAY:  Objection, argumentative.

20              THE COURT:  Sustained.

21   BY MR. WILLIAMSON:

22   Q    On Page 1, can you tell the jury what you informed

23   the Kansas Board of Healing Arts as to the number of

24   Patricia G's medical history and surgical history?

25              THE COURT:  Did you say 257 or are you still

1    on 256?

2              MR. WILLIAMSON:  Still on 256, Your Honor.

3    Page 1.

4              THE COURT:  Okay.

5    A    Patricia's medical history was remarkable for

6    migraines; hypertension; degenerative joint disease of

7    the knees; hypothyroidism; general anxiety disorder;

8    degenerative disc disease of the lumbar spine with

9    chronic lumbago; scoliosis; anemia; pharyngitis;

10   conjunctivitis; depression; candidia cyst;

11   osteoarthritis and hyperlipidemia.

12   Q    Let me pause you there.  Did the clinic only treat

13   Patricia G for her pain conditions?

14   A    No.

15   Q    Did the clinic treat her for many of these

16   conditions, if not all, that she suffered from?

17   A    Many of them, yes.

18   Q    Now, can you tell the jury what her surgical history

19   was?

20   A    Her surgical history was remarkable for gastric

21   bypass surgery; hysterectomy; kidney stone surgery;

22   urinary bladder repair; thyroid surgery; colocecostomy

23   (sic); bilateral arthroscopy; boney tumor removal from

24   the left leg; and a recent total knee replacement.

25   Q    Well, the Government represented that you didn't do

4948

1    anything to try to find out what her prior history was.

2    But you laid it out here for the Kansas Board of Healing

3    Arts.  Why did you do that?

4    A    It was in the chart and it was a review of her

5    medical information.

6    Q    Let's take a look at 257.

7    A    Okay.

8    Q    Now, I think the Government pointed out just a

9    couple of small things with Zachary P.  Let's tell the

10   jury what you communicated to them.  Look in the first

11   paragraph, the first full paragraph, which would

12   technically be the third paragraph.  What was Zachary

13   B's chief complaint?

14   A    Under chief complaint it says:  Zachary mentioned

15   right hip pain, multiple fractures of sacrum, left foot,

16   bilateral arm fracture, back fracture and leg fracture.

17   Q    Okay.  And you've testified on direct and cross that

18   you trusted what patients told you; correct?

19   A    Yes.

20   Q    Now, way back in July 22nd, 2005, can you read the

21   sentence what you told the Kansas Board of Healing Arts

22   where it begins with we assume?

23   A    "We assume when someone comes in complaining of pain

24   and going over their history that they are telling the

25   truth.  Especially a 28 year old teacher.  We don't have

4949

1   a lie detector in our office."

2   Q   And read the next sentence for the jury?

3   A   "Dr. St. Clair and Kim He'bert were trying to help

4   Zachary with his chronic pain."

5   Q   Is that consistent with what you have been telling

6   this jury since you have been talking to them?

7   A   Yes.

8   Q   Have we heard any evidence from any provider that

9   any time a pain prescription was issued that it wasn't

10  designed to try to help that patient?

11  A   No.

12  Q   Speaking of the other providers.  I think

13  Ms. Treadway asked you questions about whether or not

14  you disagree with these different providers' opinions of

15  what was happening at the clinic.  Remember that?

16  A   Yes.

17  Q   Do you disagree with those opinions?

18  A   Yes.

19  Q   Did these people ever communicate these opinions to

20  you while they were working there?

21  A   No.

22  Q   Why do you disagree with their opinions?

23  A   Because they're not accurate.

24  Q   Well, what does that mean?  Why aren't they

25  accurate?  What makes them inaccurate?

4950

1    A    Well, because we had a family practice clinic that

2    we were treating all sorts of people and I don't know of

3    any prescription that was wrote in our clinic -- I know

4    from my own experience that I didn't write any

5    prescriptions to anybody that I didn't think the

6    medication I was giving them wasn't going to help them.

7    Q    Well, what about the people that wound up passing

8    away.  Government says that they weren't helped.  I

9    think you said you disagreed with that when Ms. Treadway

10   asked you.  Why did you disagree with that?

11   A    Well, from the months and months of visits prior to

12   them passing away, it appeared to me that they were

13   being helped by the medication.

14   Q    Well, we heard from Eric T's wife that said after

15   her second -- after his surgery, his back surgery, he

16   started getting worse.  Why did you think the pain

17   medicine would help?

18   A    Well, I seen that a lot of times where after back

19   surgeries and pain gets worse.  And typically most of

20   the orthopedic surgeons or neurosurgeons are going to

21   tell the patient that this is just a 50% chance that

22   they will get better and it's a 50% chance that they can

23   get worse.  I mean, of the 50%, you know, that don't

24   improve, 50% of those actually get worse.

25   Q    You were asked questions about whether or not you

1   heard that you were called Schneider the Writer.  Do you

2   remember that?

3   A   Yes.

4   Q   Okay.  And I believe you were getting ready to tell

5   the jury when you heard about that and the circumstances

6   before there was an objection.  When did you learn about

7   somebody calling you Schneider the Writer?

8   A   Well, I called Chip Weyland, who was head of the

9   Kansas Association of Osteopathic Medicine at the time

10  and -- because we were getting the Medicaid problems as

11  far as being taken off the Medicaid list.  And so I

12  called him about this and wanted to know what was going

13  on, if he had heard anything.  And he said, yes, he had

14  talked to, I can't remember the guy's name that was head

15  of the Kansas Medical Society, or Sedgwick County

16  Medical Society here, and he had mentioned to him that

17  he had heard my name as Schneider the Writer.

18  Q   Was that the first time that you heard about that?

19  A   I believe I'd heard it maybe once before and I

20  thought it was a joke or something; but this is the

21  first time that I ever remembered exactly a person

22  saying that.

23  Q   And what was your response?

24  A   I said to him at the time, I said, well, I didn't

25  think that, and that I explained myself, that we were

1   treating a lot of patients with chronic pain and may be

2   perceived that I am Schneider the Writer, but we were

3   actually treating a lot of people and I wasn't the only

4   one in the clinic.  Other providers were treating

5   chronic pain.  And that I was needing help with the

6   Medicaid population.  And he agreed with me at the time

7   that that was a problem and that it was his experience

8   personally that it was hard to find --

9            MS. TREADWAY:  Objection; hearsay.

10           MR. WILLIAMSON:  It goes to his state of mind,

11   Your Honor.  It's not for the truth of the matter

12   asserted.

13           THE COURT:  I'm going to overrule the

14   objection on that basis.

15   A   Yeah.  He -- it was his own personal experience

16   that -- or he was having a hard time finding specialists

17   to see Medicaid people that he knew.

18   BY MR. WILLIAMSON:

19   Q   Okay.  And was this information that you received

20   that lead you or caused you to believe that you were

21   providing a service that people actually needed this

22   help?

23   A   Yes.  I truly believe that we were helping people,

24   specifically in the Medicaid population.  And that was a

25   problem in the state as far as finding providers to care

1    for Medicaid population.  And Chip also said at that

2    time, he said, we were, he thought, we were costing the

3    Government a lot of money with the amount of things we

4    were doing actually.

5    Q   And did we see a diagram -- or I guess we spent the

6    first two days talking about how much money you were

7    costing the Government, didn't we?

8    A   Yes.

9    Q   Did you ever have any problems with Medicaid or

10   Medicare before you started costing them so much money?

11   A   No.

12   Q   How long had you been seeing Medicaid patients?

13   A   I'd always seen Medicaid population.

14   Q   Ever since 1988?

15   A   Yes.

16   Q   And you were asked some questions about your volume

17   and that the only reason you were doing it was to make

18   money.  When you first declined to stop seeing Medicaid

19   patients when you were with the Haysville Family Medical

20   Center, were you seeing this number of Medicaid

21   patients?

22   A   When I first was declined?

23   Q   When you first declined.  Remember our conversation

24   with the jury that we had when you were asked to stop

25   taking Medicaid patients when you were with the

4954

1    Haysville medical center?

2    A    Oh, yes.

3    Q    Okay.  When you declined to stop seeing the Medicaid

4    patients then, were you making the kind of money that

5    the clinic wound up making in 2004 and 2005?

6    A    No.

7    Q    Now, you were asked questions about but you took the

8    money.  You remember that?

9    A    Yes.

10   Q    Now, you were also asked questions along those lines

11   of you don't want to be responsible for the bills that

12   were submitted.  You remember those questions?

13   A    Yes.

14   Q    Is that what you're telling the jury?  That you bear

15   no responsibility for the bills that were submitted?

16   A    I didn't have anything -- involvement in the billing

17   process other than writing the fee ticket on there and

18   so I was unaware of what was happening in the basement

19   as far as the billing process.

20   Q    Well, but the clinic, quote, unquote, took the

21   money.  If they -- well, strike that.

22        Are you aware as to whether or not these programs

23   could have requested the money back?

24   A    Yes.  If they did, we could reimburse it.

25   Q    Okay.  If they would have asked you for the money

1    back, would you say no, you're not entitled to it

2    because I'm not the one that personally submitted these

3    bills?

4    A    No.

5    Q    But are you saying that you shouldn't go to jail for

6    something that was unintentional, that you never

7    intended to happen?

8              MS. TREADWAY:  Objection; leading.

9              THE COURT:  Please, please, Mr. Williamson,

10   I've told you not only not to ask questions like that in

11   that form, but how to ask it properly.

12             MR. WILLIAMSON:  Sorry, Your Honor.

13             THE COURT:  Objection is sustained.  Jury will

14   disregard the question.

15   BY MR. WILLIAMSON:

16   Q    Were you -- well, strike that.  All right.  Now, you

17   stated to the jury that I didn't have anything to do

18   with billing, but, like, filling out these fee tickets.

19   Correct?

20   A    Yes.

21   Q    I believe the Government has an exhibit that

22   identified some days that you were out of town.

23   Mr. Moore, do you have that exhibit?

24             MS. TREADWAY:  1-P.  It's on the back and it's

25   the little -- it's the second one.

4956

1    BY MR. WILLIAMSON:

2    Q    You remember questions being asked by the Government

3    in regards to these days that you were allegedly billing

4    for something while you were out of town?

5    A    Yes.

6    Q    Now, have you seen one fee ticket presented by the

7    Government that -- where you represent that you saw a

8    patient on these days that was submitted to the billing

9    department?

10   A    No.

11   Q    I'm going to hand you what we're marking at Defense

12   Exhibit D-019.  Do you recognize those documents?

13   A    These appear to be fee tickets.

14   Q    Fee tickets that were generated in the course of

15   business at the Schneider Medical Clinic?

16   A    Yes.

17            MR. WILLIAMSON:  Your Honor, we would move to

18   admit D-019.

19            MS. TREADWAY:  No objection.

20            THE COURT:  It's received.

21   BY MR. WILLIAMSON:

22   Q    What we did, Dr. Schneider, was we reviewed all of

23   the source documents from the Government's exhibits, or

24   for Government Exhibit 1-P.  Do you remember us going

25   through, the attorneys, going through those documents

1   and talking to you about it?

2   A   Yes.

3   Q   And in order to save, I guess, considerable amount

4   of hours as to reviewing each and every fee ticket, did

5   we pull out samples from days that are identified on

6   Exhibit 1-P as for you billing out of town?

7   A   I believe so.

8   Q   Now, let's turn --

9           MS. TREADWAY:   Judge, the Government will

10  stipulate that the fee tickets state that physician's

11  assistants provided the services.

12          THE COURT:   Well, I appreciate that; but I'm

13  going to let Mr. Williamson continue his examination.

14  BY MR. WILLIAMSON:

15  Q   Okay.

16          THE COURT:   But I think -- go ahead.

17          MR. WILLIAMSON:   It's going to be brief.

18          THE COURT:   It's in evidence, so go ahead.

19          MR. WILLIAMSON:   Yes.

20  BY MR. WILLIAMSON:

21  Q   All right.   Now, on 4-29-04 you were accused of

22  submitting information that led to billing with you

23  being out of town.   Do you remember that?

24  A   Yes.

25  Q   That's in Exhibit 1-P?

1    A    Yes.

2    Q    Now, on 4-29-04 the first one states that Curt

3    actually saw the patient?

4    A    Correct.

5    Q    The next one says walk-in without anybody

6    identified?

7    A    That's correct.

8    Q    The next one states He'bert?

9    A    Yes.

10   Q    The next one states He'bert?

11   A    Yes.

12   Q    The next one states He'bert?

13   A    Yes.

14   Q    The next one states Kim, next to the walk-in?

15   A    Yes.

16   Q    Now, this is a different day.  This is 12-12 of '05.

17   This one identified Akram as the provider; correct?

18   A    Correct.

19   Q    Next one identified Akram?

20   A    Yes.

21   Q    Akram?

22   A    Yes.

23   Q    Akram?

24   A    Yes.

25   Q    Akram?

4959

1    A    Yes.

2    Q    Akram?

3    A    Yes.

4    Q    Now, next is 10-24 of '03.  Do you see that one?

5    A    Yes.

6    Q    What does that K mean?

7    A    That means Kim seen the patient.

8    Q    So even though your name was on there Kim, signed it

9    to represent she saw the patient?

10   A    Yes.

11   Q    On the next one, how did she do it?

12   A    The same way.

13   Q    On the next one?

14   A    Yeah, that's Kim.

15   Q    On the next one?

16   A    Yes.

17   Q    On the next one?

18   A    That's correct.

19   Q    Now, again, these are just examples of what these

20   fee tickets showed.  Is that fair?

21   A    Yes.

22   Q    Now, if you were going to attempt to bill for a

23   service that you did not provide that was rendered while

24   you were out of town, would the one way you would do

25   that be by using the fee ticket?

                                                                    4960

```
 1    A    Yeah.   That's the only way we communicate with the
 2    billing.
 3    Q    Before the federal government got involved, did
 4    Medicaid or Medicare ever attempt to have you repay the
 5    money at issue in this case?
 6    A    Not that I'm aware of.
 7    Q    At one point did Medicare ever withhold paying the
 8    clinic money?
 9    A    Yes.
10    Q    And what was the end result of that?
11    A    Oh, over a year, I believe, they held the money and
12    then all of a sudden they cut us a check and then
13    allowed us to start seeing Medicare patients again.
14    Q    Well, were you still seeing Medicare patients in the
15    interim of that year period when you were not getting
16    paid?
17    A    Yes.
18    Q    You mean you didn't just stop people from coming in
19    the door saying, oh, nope, you can't come in because
20    we're not getting paid by Medicare?
21    A    No, we didn't do that.
22    Q    You were asked questions about whether or not you
23    coordinated care with other physicians.  Do you remember
24    that?
25    A    I don't remember a specific question.
```

4961

1   Q   Do you remember Ms. Treadway asking you, well, you

2   didn't contact Dr. Olsen or you didn't contact this

3   doctor or that doctor?

4   A   Yes, I remember that.

5   Q   Okay.  And did Dr. Olsen ever contact you?

6   A   No.

7   Q   Did these same physicians that you're criticized for

8   not contacting, did they contact you?

9   A   No.

10  Q   Were there times with patients that you actually

11  coordinated care with other physicians?

12  A   Yes.

13  Q   Did a physician ever attempt to coordinate care with

14  you and you refused to communicate with that physician?

15  A   No.

16  Q   Why wouldn't you do that?

17  A   Well, if he's wanting to discuss a patient, then I

18  would be glad to discuss a patient with them if it was

19  concerning their care.

20  Q   In regards to the billing department, did you and

21  Linda hire people that you believed had experience to

22  oversee that department?

23  A   Yes.

24  Q   If you were so freely willing to give pain medicine

25  to people regardless, why would people have to fake

4962

1   being in pain before they saw you and the other

2   providers?

3   A   That doesn't make much sense, does it?

4   Q   Now, you were also asked questions about were you

5   aware of certain statements by this doctor in these

6   civil cases.  You remember that?

7   A   Yes.

8   Q   Now, are you aware that in regards to Kandace B that

9   an expert opined that at 6 of 14 clinic visits the note

10  reflected attempt to assist the intensity of Ms. B's

11  pain, both with and without her medication?

12          MS. TREADWAY:  Objection Judge.  Unless it's

13  the same expert, it's beyond the scope.

14          THE COURT:  Is it the same one?

15          MR. WILLIAMSON:  It's the same one.

16          THE COURT:  I don't remember his name.

17          MR. WILLIAMSON:  Twisey (ph).

18          MS. TREADWAY:  Twillman.

19          THE COURT:  Twillman.  If it's the same one,

20  the objection is overruled.

21  BY MR. WILLIAMSON:

22  Q   Are you aware that Dr. Twillman stated that the

23  clinic was attempting to manage Kandace B's complaints

24  appropriately?

25  A   No, I wasn't aware of what Dr. Twillman said.

4963

1    Q    Okay.  Were you aware that Dr. Twillman identified

2    that two separate consultations with back surgery

3    specialists were made in regards to Kandace B by your

4    office?

5    A    No.  Like I said, I'm not aware of what was said.

6    Q    Well, are you aware that Dr. Twillman identified

7    that MRI's were scheduled for Kandace B and that these

8    MRI's were discussed?

9    A    No, I'm not aware of what Mr. Twillman or Dr.

10   Twillman said.

11   Q    Are you aware that on another occasion regards

12   doctor -- excuse me, with Darrell H, Dr. Twillman stated

13   that while the overall picture presented by the

14   available records in the case of H vs. Schneider Medical

15   Clinic is one of, at best, inadequate documentation,

16   there is adequate documentation to demonstrate that Dr.

17   Schneider and employees of the clinic were attempting to

18   manage the pain disorder reported by Mr. H with some

19   degree of appropriate attention and practice.  You

20   didn't know that either, did you?

21   A    No, I didn't.

22   Q    You weren't asked about that on cross-examination

23   either, were you?

24   A    That's correct.

25   Q    Now, you were asked questions about the Kansas Board

4964

1   of Healing Arts.  Remember that?

2   A   Yes.

3   Q   And you were asked questions as to why you believe

4   that -- strike that.

5        That the first complaint was issued sometime in

6   2006 and they didn't take any action on your license

7   until 2008.  You remember that?

8   A   Yes.

9   Q   Have you had a full hearing in front of the Kansas

10  Board of Healing Arts?

11  A   No, we have not.

12  Q   So there has not been a full finding in front of the

13  Kansas Board that you are actually below the standard of

14  care with any of the patient -- excuse me -- with

15  regards to any of the patients in this case?

16  A   That's correct.

17  Q   And are you aware that the Government told the

18  Kansas Board of Healing Arts to hold off with your case

19  because they were concerned it was going to impede the

20  Government's case?

21          MS. TREADWAY:  Objection.  Objection, Judge.

22  This was handled in pretrial.  That is an absolute

23  misrepresentation of the facts and Mr. Williamson knows

24  it.

25          MR. WILLIAMSON:  Judge, she opened the door.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

1    And I have an affidavit.

2              THE COURT:  From whom?

3              MR. WILLIAMSON:  From three people at the

4    Kansas Board of Healing Arts, including an attorney.

5              THE COURT:  Let me see it.

6              MS. TREADWAY:  That were dismissed by the

7    Kansas Legislature because of their false affidavits.

8                        (Mr. Williamson provides

9                        document to the Court.)

10             THE COURT:  I want to talk to the lawyers

11   about this and I think it would be better if you all

12   went to the jury room just for a few minutes so I don't

13   have to bring them up here to the bench.

14                       (Jury excused to the jury room.)

15             THE COURT:  I'll ask the rest of you to leave,

16   please.

17                       (Courtroom cleared with the

18                       exception of Defendants and all

19                       counsel.)

20             THE COURT:  You all can be seated.  You say I

21   made a ruling on this.  Where did I make a ruling on

22   this?

23             MS. TREADWAY:  Judge, this dates back to early

24   in the case.

25             THE COURT:  Yeah, but I've got a notebook up

1    here with all of my rulings.

2              MS. TREADWAY:  And this was relative to their

3    motion for abstention.  They made a motion saying that

4    you didn't have jurisdiction over this case and the case

5    should go back to the Kansas Board of Healing Arts for a

6    hearing.  And their reasons in that motion were that,

7    again, falsely represented, that United States

8    Attorney's Office had asked the Kansas Board of Healing

9    Arts to somehow delay action in the case.

10   Unfortunately --

11             THE COURT:  Was this something you made to me

12   or to Bostwick?

13             MS. TREADWAY:  You.  This was a motion for

14   abstention and relative to that motion and they

15   presented to you those affidavits.  I presented to you a

16   letter that I had written the Kansas Board of Healing

17   Arts early in -- I think early in my involvement in the

18   case in October of '06.  That's all a part of the

19   documentation in the case.  Following Mr. Buhning (ph)

20   and Ms. Stevens and others filing those false

21   affidavits, which the Kansas Judicial Committee, Senator

22   Wagle's committee, found were false.  Mr. Buhning,

23   Mr. Stafford, and all of the attorneys were let go from

24   the Kansas Board of Healing Arts.  That was the result

25   of this.  And they have continued to misrepresent this

4967

1    issue.  It is a jury nullification issue.  It is

2    intended to make the Government look bad.  They wanted

3    to get into these collateral issues from the beginning

4    of this case, Judge.  And it's totally collateral, it's

5    totally irrelevant and it's totally false.  And I would

6    become a witness in this collateral matter, Judge,

7    because I'm the one that wrote the letter telling the

8    KBHA we want to stay out of your way.

9              THE COURT:  Okay.  I've found the order.  It's

10   Docket 154.  It was entered on 7-15-08.  Have you got a

11   copy of it, Lawrence?

12             MR. WILLIAMSON:  I don't, but we can --

13             THE COURT:  Let me read it into the record and

14   that will solve the problem because this is going to be

15   a big record in the event it's reviewed.

16             MR. WILLIAMSON:  Okay.

17             THE COURT:  On Page 8, here's what I say.

18   "Finally, Defendants move the Court to abstain from

19   hearing this case in order to allow the Kansas State

20   Board of Healing Arts to proceed in its administrative

21   proceeding against Stephen Schneider.  Defendants assert

22   that the exercise of federal jurisdiction in this case

23   would not only be disruptive of state efforts to

24   regulate the practice of medicine, and in particular to

25   resolve the issues involving Dr. Schneider, but would

4968

1      also condone the Government's impermissible efforts to

2      override the state's regulatory process.  Allowing the

3      Government to proceed in this case would embolden the

4      federal authorities to continue to act in a similar

5      manner, ensuring that the state's regulatory process

6      will forever be at its whim and mercy."

7           That is a quote from Docket 107 at Page 11.

8           "Essentially, Defendants argue that the Government

9      impermissibly interfered with the administrative

10     proceeding and caused that proceeding to halt in favor

11     of the ongoing criminal investigation.  The Government,

12     of course, vehemently denies those accusations and has

13     attached its own exhibits in support of its position

14     that the Board made its own decision to continue the

15     proceeding.  And most importantly, Stephen Schneider

16     agreed to the continuance."

17          "Defendants argue that the Court should abstain

18     under either Younger or Buford doctrines of abstention."

19          Then I start quoting:  "Younger abstention dictates

20     that federal courts not interfere with state court

21     proceedings by granting equitable relief such as

22     injunctions of important state proceedings or

23     declaratory judgments regarding constitutional issues in

24     those proceedings when such relief could adequately be

25     sought before the state court.  A Federal court must

4969

1    abstain from exercising jurisdiction when, (1), there is

2    an ongoing state criminal, civil or administrative

3    proceeding; and, (2), the state court provides an

4    appropriate forum to hear the claims raised in the

5    federal complaint; and, (3), the state proceedings

6    involve important state interests, matters which

7    traditionally look to state law for their resolution or

8    implicate separately articulated state policies.

9    Younger abstention is nondiscretionary and must be

10   invoked once the three conditions are met, absent

11   extraordinary circumstances."  Citing a Tenth Circuit

12   case.

13        "It is unclear how Defendants can possibly view a

14   criminal prosecution as seeking equitable or declaratory

15   relief.  Nevertheless, the Court will discuss

16   Defendants' positions.

17        "Defendants site three case which is are factually

18   inapposite.  All involving a plaintiff filing an action

19   against an administrative board.  In *Amanatullah* the

20   plaintiff filed a Section 1983 claim against the Board

21   to stop the administrative proceedings.  The court

22   determined the doctrine applied.  In *Weitzel v Division*

23   *of Occupational and Professional Licensing* -- " again, a

24   Tenth Circuit case " -- the plaintiff also brought a

25   1983 action asserting that a state statute which

1    required his license to be suspended was

2    unconstitutional.  Again, the court applied the *Younger*

3    doctrine and abstained.  In *Simopoulos v State Board of*

4    *Medicine* -- " a Fourth Circuit case "-- the plaintiff

5    filed an action for injunctive relief, declaratory

6    relief, after being convicted in state court under anti-

7    abortion statute.  The Fourth Circuit affirmed the

8    district court's order abstaining from the case because

9    plaintiff's state action was an active case on appeal to

10   the state appellate court.

11       Defendants have failed to cite a case that is

12   factually similar to the one at bar, probably because

13   there isn't one.  They have not even tried to show that

14   the *Younger* factors are applicable in this case.

15       "The second requirement of the *Younger* test is that

16   the state court provides an adequate forum to hear the

17   claims raised in the federal complaint.  The Indictment

18   lists violations of federal criminal laws.  Defendants

19   have failed to show how the state administrative

20   proceeding can, much less will, provide the adequate

21   forum to hear and decide the alleged criminal

22   violations.  Therefore, the *Younger* abstention doctrine

23   is not appropriate.

24       "Unlike the *Younger* abstention doctrine, the *Buford*

25   abstention doctrine is discretionary.  In *Buford v Sun*

1    *Oil Company*, the Supreme Court --" this is that quote --
2    "the Supreme Court held that federal courts should
3    exercise their discretionary power to refuse to hear
4    cases within their jurisdiction when to do so would
5    impair the independence of state governments in carrying
6    out their domestic policy."  That's a quote.  "In *Grimes*
7    *v. Crown Life Insurance Company*, a Tenth Circuit case,
8    Defendants failed to point out how proceeding in this
9    case will impair independence of a board proceeding
10   against Stephen Schneider.  Defendants assert that the
11   state court proceeding is very important because it will
12   answer questions of whether Stephen Schneider was
13   prescribing medicine with a legitimate medical purpose.
14   One problem with Defendants' argument is that the court
15   has no idea what questions are in front of the Board.
16   Defendants have only submitted the front page of the
17   complaint against Stephen Schneider.  The Court declines
18   to speculate what the Board will rule on and whether it
19   will decide issues that are central to this case;
20   moverover, even if the Board will be determining whether
21   Stephen Schneider's conduct was appropriate in all
22   instances that are alleged in the Indictment, (which
23   seems highly unlikely) Defendants do not present any
24   authority for the proposition that a medical board's
25   ruling will have a conclusive effect on the questions

4972

1    that will be before the jury.  Actually, the findings of

2    the board are -- actually, if the findings of the board

3    are adverse to Stephen Schneider, the Court expects

4    motions to bar evidence of such findings at the trial.

5    Defendants motion for abstention is denied."

6            MS. TREADWAY:  Judge, just to remind you of

7    another ruling -- that was your first ruling.  In

8    Document 264 and in a pretrial motion the Defendants

9    raised this issue once again.  They basically wanted to

10   include evidence about the scope and breadth of the

11   federal investigation and interference.  Section B of

12   that argument was right back to the Kansas Board of

13   Healing Art claiming that we had interfered with the

14   state regulatory process.  Your response in Docket 312

15   was to hold very succinctly, not relevant.  The

16   Defendants are absolutely trying to get back into issues

17   that you have ruled against them on.  You have ruled

18   that they weren't relevant.  They continually

19   misrepresent the facts regarding the Kansas Board of

20   Healing Arts situation.  That's what Dr. Watson's

21   testimony was trying to get to, Judge.  That was what he

22   was talking about with regard to Senator Wagel's

23   judicial committee.  That was an attempt to get around

24   your prior rulings.  That is an attempt at jury

25   nullification which they claimed they were not going to

4973

1    do.  We would ask that the question be struck in front

2    of the jury and that counsel be admonished to stop it.

3              MR. WILLIAMSON:  Judge --

4              THE COURT:  Anything Senator Wagel does or

5    doesn't do is not something that I'm very interested in.

6    She's one of the, in my opinion, least -- more

7    irresponsible of the Kansas Legislators.  But be that as

8    it may, it seems to me -- I'm not interrupting you.  I'm

9    going to let you speak.  What I can't remember, we had

10   testimony that his license was suspended by the Board.

11   That is an allegation in the Indictment and I made a

12   checkmark by that because the Government did make that

13   allegation.

14     Now, what other evidence have we had about the

15   Board at this point?

16             MR. WILLIAMSON:  On cross today the Government

17   asked the doctor, established when the proceeding

18   actually started in front of the Kansas Board which was

19   in 2006 and she asked several questions.  She then

20   asked -- established that the suspension, I believe it

21   was, didn't take place until 2008.

22             THE COURT:  Something like that.

23             MR. WILLIAMSON:  She opened the door as to

24   this investigation and she also established that, you

25   know, he was considered a danger to the society as from

1   a judge.  And bottom line is if he was considered such a

2   danger -- and this is the test, Judge, it's not whether

3   or not those affidavits are a hundred percent true.

4   That's a credibility issue.  The question is do I have a

5   good faith basis.  And we have three affidavits from

6   people --

7           THE COURT:  I don't see how the jury could

8   ever judge the credibility of those affidavits.

9           MR. WILLIAMSON:  Judge, we've been dealing

10  with this with the Government's whole case in chief.

11          THE COURT:  Here's what I'm going to do.  What

12  week are we on -- is this the sixth week of this trial.

13  Nobody knows.  Here we are.  I think basically what the

14  Kansas Board of Healing Arts has done or not done,

15  whether the people on that board were fired or whatever

16  happened to 'em, I remember something happened but I

17  don't remember what happened -- is not relevant and,

18  with the exception -- what I'm going to do is I'm going

19  to instruct the jury to disregard all testimony with

20  respect to the Kansas Board of Healing Arts with the

21  sole exception that his license was suspended and

22  whatever date it was.  And we'll go beyond this.

23  Because, you know, having -- I don't know if the Doctor

24  even knows about these affidavits, but -- which to me

25  would be a predicate question, but it's a rabbit trail,

1     as Judge Theis used to say.

2               MS. TREADWAY:  Well, except for the fact that

3     he made statements to the Kansas Board of Healing Arts

4     during the investigation that are damaging to him,

5     Judge.  And those letters are now in evidence.  If you

6     want us to withdraw them, we will.

7               THE COURT:  No.  I'm not going to take the

8     letters out of evidence because they're in evidence and

9     they've been gone over.  But what the Kansas Board of

10    Healing Arts did, whether they delayed their

11    investigation because of something that you asked them

12    to do, you know, whatever, that is truly irrelevant.

13    Now, any objection to that type of ruling?

14              MR. WILLIAMSON:  Just to make sure I'm clear.

15    The instruction is going to be to disregard all

16    testimony regardless if it was brought --

17              THE COURT:  I'm going to tell them to

18    disregard -- here's what I'm going to tell them.  That

19    they may consider the testimony that he surrendered his

20    license and whatever date that was, in 2008.

21              MS. TREADWAY:  He didn't surrender it, Judge.

22              THE COURT:  He did something.

23              MS. TREADWAY:  No, they suspended it.

24              MR. WILLIAMSON:  It was temporarily suspended

25    by agreement.

1    THE COURT:  I'm going to tell them that it was

2    temporarily suspended by agreement on whatever date.

3    They may consider that.  It's not in dispute anyway.

4    MR. WILLIAMSON:  No.

5    THE COURT:  I'm going to tell them that there

6    are these letters, which are 255, 256, whatever, that

7    they may consider those letters.  They're already in

8    evidence.  We can't unring the bell about that.  But in

9    terms of whatever was done by or at the Kansas Board of

10   Healing Arts, is not relevant and they're to not

11   consider it.  And hopefully, I won't tell them this, but

12   hopefully we can get beyond the Kansas Board of Healing

13   Arts and get back to what this case is about.  Who is

14   the judge that -- Bostwick said that -- isn't this a

15   state judge that's involved in this somehow?

16   MR. WILLIAMSON:  There are several involved

17   but the issue was with Judge Bostwick in regards to bond

18   and so long as Dr. Schneider could write prescriptions,

19   Judge Bostwick felt like he would be a danger to society

20   and --

21   THE COURT:  Well, I'm not going to mention

22   Judge Bostwick.  I'm just going to mention the Board of

23   Healing Arts with the exception.  Any objection to that?

24   MS. TREADWAY:  Judge, I don't believe this was

25   by agreement.  I'm looking at the document right now and

1    I do not see that this suspension was by agreement.  In

2    fact, it was an emergency motion filed by the Kansas

3    Board of Healing Arts.  Both the Kansas Board of Healing

4    Arts and Dr. Schneider's attorney, Marty Ross, appeared.

5    There were findings of fact made.  There was applicable

6    law cited.  And there were conclusions of law made.

7    This was not a stipulated agreed to suspension.  In

8    fact, it was contested.

9            THE COURT:  Is it a temporary suspension?

10           MS. TREADWAY:  It is a temporary suspension,

11   Judge.  Perhaps the best thing to do is put it into

12   evidence.

13           THE COURT:  Oh, no.  That would just take care

14   of me telling them not to consider it.  It's not really

15   relevant.

16           MS. TREADWAY:  But it wasn't by agreement,

17   Judge.  That's false.

18           MR. WILLIAMSON:  Dr. Schneider agreed not to

19   appeal that decision pending the outcome of this case.

20   That's --

21           MS. TREADWAY:  That's a different issue.

22           THE COURT:  Let's take a little recess.  I'll

23   tell Rachael to go back and tell the jury we're going to

24   be a few minutes and then we'll go on from there.

25           MR. BYERS:  Judge, may I be heard on two

4978

1    witness issues.  I wanted to do this outside the jury

2    and since we're out anyway --

3              THE COURT:  Yes sure.

4              MR. BYERS:  First is we intend to -- well,

5    we've got a witness here who was going to be on

6    Wednesday because we're concerned about not being able

7    to fill the day.  So if -- and now that she's here she

8    has a 4:00 appointment so I told her we would probably

9    put her on first to get her in and out.  I believe

10   that's probably going to be a technical violation of the

11   48 hour disclosure --

12             THE COURT:  Who is it?

13             MR. BYERS:  Katherine Gaines.  She's a fact

14   witness.

15             MS. TREADWAY:  That's fine.  No problem.

16             MR. BYERS:  And she has -- her left ear, she's

17   deaf so she might have some problems hearing.  I just

18   wanted to tell everybody.  Second issue is relative to

19   another witness who is Elaine Gallagher and she also has

20   a hearing impairment but she doesn't want it advertised.

21   So I just wanted to let everybody know both these two

22   seem to have trouble picking up on this.  I have never

23   had trouble conversing with them but they both raised

24   it.

25             THE COURT:  Let me ask you something.  Now,

4979

1   are we talking this out of time.  In other words, we're

2   putting on Linda Schneider's witnesses and then are we

3   going to come back to Dr. Schneider's witness.

4          MR. BYERS:  Both of these will talk about

5   Linda and Steve.

6          MS. TREADWAY:  I'm not being -- been given

7   information that these witnesses are separate.  I've

8   always assumed that they were as to both defendants.

9          THE COURT:  Okay.  We'll put those two on.

10          MR. BYERS:  Then we have a third one today,

11   too, and we should fill the day.

12          THE COURT:  And you guys can yell at them or

13   something.

14          MR. WILLIAMSON:  2:30, Your Honor.

15          THE COURT:  Yeah.  I think so.  That ought to

16   give everybody enough time.  And here's this exhibit

17   back unless you want to make an exhibit for the record.

18   You want to mark it a court exhibit.

19          MS. TREADWAY:  It's in the pleadings, Judge.

20   I believe they're in the pleadings.

21          MR. WILLIAMSON:  I think we're fine.  I think

22   you made an excellent record.

23             (Recess.)

24             (Whereupon, the proceedings

25                 continued in the hearing of the

1              jury.)

2              THE COURT:  I've talked this over with the

3    lawyers.  This is what I want you to consider about the

4    Kansas Board of Healing Arts.  You may consider the

5    testimony that Dr. Schneider's license was temporarily

6    suspended by that board sometime in 2008.  I don't

7    remember the date.  You may consider the letters that

8    have already been in evidence that have been discussed

9    by both sides, Exhibits 255, 256, something like that.

10   Beyond that, whatever the Kansas Board of Healing Arts

11   has done, or will do or will not do, with respect to Dr.

12   Schneider's license is simply not relevant and you're

13   not to consider it or speculate about it.  Okay.

14             MR. WILLIAMSON:  Thank you, Your Honor.

15   BY MR. WILLIAMSON:

16   Q   You were asked questions about a lot of these like

17   civil depositions and things like that.  You remember a

18   lot of those questions?

19   A   Yes.

20   Q   Now, are all of the -- strike that.  Can you tell

21   the jury whether or not all of these civil cases arise

22   out of these same facts and circumstances that we've

23   been discussing in this case?

24   A   I'm certain they were.

25   Q   Okay.  Did you have a long history of being sued by

1    patients before the federal government got involved in

2    this case?

3    A    No.

4    Q    Now, you were asked questions about Mohammed Akram.

5    You remember that?

6    A    Yes.

7    Q    And I believe the questions were was he accused of

8    touching a patient inappropriately?

9    A    I believe so.

10   Q    Do you recall whether or not you actually received

11   an allegation that Mr. Akram was touching a patient

12   inappropriately?

13   A    Yes, we did.

14   Q    And did you investigate it?

15   A    Yes.  I asked Mohammed about it and he said that he

16   did not touch the patient inappropriately and he said he

17   just touched her on her leg, you know, to do the

18   physical exam; but he didn't do anything

19   inappropriately.

20   Q    And did you ask him to cooperate or go down to the

21   Haysville police department at any time?

22   A    Yes, he did.  He went to the Haysville police

23   department regarding this incident and when he got over

24   there, there were more than just the Haysville PD there.

25   There were federal agents that were there asking him

1     questions.

2     Q    And did you ask him about that occurrence when he

3     went to the Haysville police department?

4     A    Yes.  And so I just assumed by that that it was

5     just -- I thought it was -- he was being set up.  So I

6     didn't, I really didn't put any weight to the

7     allegation.

8     Q    But didn't just ignore the allegation.  Is that

9     fair?

10    A    That's correct.

11    Q    You were shown a letter by the federal government in

12    regards to not taking any new Medicaid patients.  I

13    believe it was around October 4th or so of 2005.  Do you

14    remember that letter?

15    A    Yes.

16    Q    And can you tell the jury why the decision was made

17    to stop taking new Medicaid patients at that time?

18    A    Well, after the raid, there was just me and Mohammed

19    and Mohammed wasn't there that much longer.  I couldn't

20    handle seeing any more new patients.

21    Q    Was that a decision you made lightly?

22    A    No.

23    Q    Was that the first time in your career that you

24    actually restricted your practice from seeing new

25    Medicaid patients?

4983

1    A    I believe so.

2    Q    You were asked on cross-examination about

3    conversations you had with Federal Agent Watterson.  You

4    remember that?

5    A    Yes.

6    Q    I believe one of the questions was did you tell the

7    agent that you saw -- that the clinic saw 150 patients

8    per day?

9    A    Yes.

10   Q    Did you -- I don't recall your answer.  Do you

11   remember telling her that?

12   A    No, I don't remember saying that.

13   Q    If that was an accurate statement that Agent

14   Watterson remembers, that 150 per day, how many

15   providers would the clinic normally have working?

16   A    Well, at that time we had six providers.

17   Q    So dividing 150 into six gives us about twenty

18   something per person?

19   A    Approximately.

20   Q    About 25 patients per person?

21   A    Yeah.  But, like I say, that's, I mean, not all the

22   providers worked at the same time.  Typically it would

23   be, you know, the doctors and I would have two PAs and I

24   don't know if all the PAs were working the same day.

25   Q    Did you ever see 100 patients in one day?

4984

1    A    No.

2    Q    Did you ever ask anybody to bill as though you saw

3    100 patients per day?

4    A    I take that back.  I may have seen 100 patients a

5    day one time when I did sports physicals at the high

6    school.  But that was, that was -- I don't know how many

7    patients I seen, but all I remember is my ears really

8    hurt at the end of the day.

9    Q    And in regards to the Schneider Medical Clinic, did

10    you ever see 100 patients per day?

11    A    No.

12    Q    And did you ever authorize anybody to bill as though

13    you saw 100 patients per day?

14    A    No.

15    Q    And you were asked questions, you know, we went over

16    this 255, these letters to the Kansas Board of Healing

17    Arts just a few minutes ago.  I believe there may have

18    been a small implication that, based on the questions,

19    that you knew that the people identified in these

20    letters were having problems at the time that you gave

21    the prescription.  Do you remember those questions?

22    A    Say that one more time.

23    Q    Yeah.  Let me just ask the question better.

24        In Exhibits 255, 56, 57 and I believe 59 and 60,

25    did you know all of those facts?  And you can look at

4985

1   the letters if you need to, that you learned after

2   reviewing charts, talking with people, did you know

3   those at the time that you made the prescription?

4   A   No.

5   Q   So, for instance, if you learned later that somebody

6   had forged a prescription, did you -- strike that.   Did

7   you ever prescribe a prescription to anybody that you

8   believe had forged a prior prescription?

9   A   No.

10   Q   Did you ever provide a prescription to anybody who

11   you knew had sold the prescriptions that you had given

12   them previously?

13   A   No.

14   Q   And you were asked questions regarding a federal

15   judge stating that you are a danger in this case.   You

16   remember that?

17   A   Yeah.

18   Q   Okay.   Wasn't that in regards to your bail hearing,

19   your bond?

20   A   Yes.

21   Q   And wasn't that just based on the allegations that

22   the federal government had made in this case?

23   A   Yes.

24   Q   You hadn't had a trial at that point in time;

25   correct?

1    A    That's correct.

2    Q    Did the Government also contend that you were a

3    flight risk to this judge?

4    A    Yes.

5    Q    What did the Government (sic) say he would do if you

6    got out on bond?

7    A    I think they thought I was going to go to Mexico.

8    Q    Have you attempted to flee since being out?

9    A    No.

10   Q    You decided to take the stand in this case.  Can you

11   tell the jury why?

12   A    Well, I mean, I'm innocent of these allegations and

13   I don't -- I've never wrote a prescription to any

14   patient that I didn't think the medication was going to

15   be helpful for them.

16            MR. WILLIAMSON:  I don't think I have anything

17   further, Your Honor.

18            THE COURT:  Mr. Byers.

19            MR. BYERS:  Thank you, Judge.  This will be

20   pretty brief.

21                    **RECROSS EXAMINATION**

22   BY MR. BYERS:

23   Q    First, Doctor, I'm going to ask you questions in

24   follow up to your testimony back on Thursday.  So we'll

25   be on the same page, remember you were asked about this

1    Mike Vogt?  I think the name is V-O-G-T.  Do you

2    remember that?

3    A    Yes.

4    Q    And he was some kind of a clinic representative in

5    the civil actions; is that right?

6    A    That's correct.

7    Q    Because he signed as a clinic representative on

8    interrogatories I think; is that right?

9    A    I believe so, yes.

10   Q    You recall that testimony?  Okay.  Prior to these

11   civil suits and Mr. Vogt's involvement in that, was he

12   involved in any way with the clinic?

13   A    No.

14   Q    Did you even know of him before the civil suits?

15   A    No.

16   Q    Is he also currently the custodian of the clinic's

17   records?

18   A    Yes.

19   Q    So is this someone you had to hire, then, to watch

20   over the records?

21   A    We did not.

22   Q    Okay.  Who set this up?  Do you know?

23   A    I assume it was the civil attorneys.  I don't know.

24   Q    Okay.  Now, you were asked some on Thursday about

25   Linda's responsibilities.  Just so I'm clear.  It's your

4988

1    understanding that Linda was not directly responsible

2    for billing; correct?

3    A    That's correct.

4    Q    She was not directly responsible for scheduling;

5    correct?

6    A    That's correct.

7    Q    She was not directly responsible for coding;

8    correct?

9    A    That's correct.

10   Q    She was not directly responsible for collections,

11   accounts receivable; correct?

12   A    That's correct.

13   Q    Okay.  What's your understanding of Linda's

14   responsibilities at the clinic?

15   A    She just coordinated things at the front desk and

16   the office people and she helped in hiring and firing.

17   Q    I believe you also testified about her breaking down

18   the charts; right?

19   A    Yes.

20   Q    What do you mean by breaking down?  I'm not sure if

21   you explained that or not.

22   A    Well, we have the chart and then we have the fee

23   ticket.  And then she would make certain everything was

24   documented, per se, make certain that the office visit

25   was circled or that there was -- the chart had -- the

4989

```
1    progress note had been filled out and signed and that
2    was done, everything was correct.  Then she would take
3    the fee ticket off and place it in one spot and then put
4    the chart in another spot.
5    Q   As part of Linda's responsibilities there, was it
6    your expectation that she would fill in missing
7    information on her own?
8    A   No, she never did that.
9    Q   Okay.  You were asked about a taped phone call with
10   Pat Hatcher who is your sister-in-law.  Do you remember
11   that conversation with the Government?
12   A   Yes.
13   Q   And that was taped because you were in jail at the
14   time; right?
15   A   That's correct.
16   Q   And there was a warning there in the jail that tells
17   you your phone calls are subject to monitoring; right?
18   A   That's correct.
19   Q   And Linda was also in jail at the same time?
20   A   Yes, she was.
21   Q   And Linda was actually denied bail much longer than
22   you, 14 months, because she was a supposed flight risk;
23   right?
24   A   That's correct.
25   Q   Okay.  And even though the Government contended
```

4990

1    Linda was a a flight risk, the day she was finally
2    released from jail in February of '09, she was put out
3    in the parking lot in the waiting room by herself with
4    no one there to pick her up or watch over her?
5    A    That's correct.  Yeah.  She was in the parking lot
6    waiting for somebody to pick her up.
7    Q    Now, as I understand your testimony, at least at one
8    point you said you were overwhelmed with the patients at
9    the clinic.  And I believe you were testifying about the
10   day after the raid when you showed up and you were
11   essentially the only provider.  Correct?
12   A    That's correct.
13   Q    Okay.  Do you remember seeing that little tiny
14   little snippet of the video where Linda says -- and this
15   is during the October 17th, 2007, interview with the
16   Government.  There was a snippet they played again or a
17   new one that said she felt like she was selling concert
18   tickets.  Do you remember that?
19   A    Yes.
20   Q    Okay.  She was also talking about the day after the
21   raid when all the providers quit except for you; right?
22   A    That's correct.  It was -- it was chaotic.
23   Q    So if your testimony -- or your conversation with
24   Agent Watterson, which I can't remember -- that was the
25   day of the raid, the very first raid; correct?

4991

1    A    That's correct.

2    Q    So if you're telling Watterson that you have 150

3    patients a day in the clinic with four providers, then

4    the next day you had 150 patients with one provider,

5    that's what you and Linda were talking about?

6    A    That's how many patients were probably scheduled,

7    yes.

8    Q    And it may be more than four providers; right?  You

9    said sometimes you had two PAs --

10   A    Yeah.

11   Q    -- at a time?

12   A    Yeah.  I would sometimes have two PAs at a time and

13   sometimes Dr. St. Clair would have two PAs at a time.

14   Depends upon how the PA's scheduled.  Actually they were

15   responsible for their own scheduling and sometimes they

16   would trade days and this, that and the other.

17   Q    Okay.  You were asked about Government Exhibit 252,

18   that e-mail where Demerol was mentioned.  You remember

19   that?  That was during today's examination?

20   A    Yes.

21   Q    Okay.  Did you routinely have Demerol available at

22   Schneider Medical Clinic?

23   A    No, we never had Demerol in our clinic.

24   Q    Why not?

25   A    Well, I didn't believe much in Demerol or keeping

1   Schedule II drugs in our clinic.  So that was the main

2   reason.

3   Q   And what about Nubain?  I believe you testified it's

4   not a controlled substance; correct?

5   A   That's correct.

6   Q   Okay.  So the Government, probably FDA, has

7   determined it's not of great risk to the population?

8   A   It's not as risky, I assume, seeing how it's not

9   controlled.

10          MR. BYERS:  I believe that's all I have, Your

11  Honor.  Thank you.

12          THE COURT:  Thank you, Mr. Byers.  Recross,

13  please.

14          MS. TREADWAY:  Judge, based on that, I have

15  nothing further.

16          THE COURT:  I'm sorry.

17          MS. TREADWAY:  Based on that, I have nothing.

18          THE COURT:  All right.  Sir, you may resume

19  your seat.  Next witness please.

20          MR. BYERS:  We'll call Katherine Gaines.  If I

21  may go get her.

22                    **KATHERINE GAINES**

23  Having been first duly sworn to tell the truth, the

24  whole truth and nothing but the truth, testified as

25  follows on:

4993

1                    **DIRECT EXAMINATION**

2    BY MR. BYERS:

3    Q    Good afternoon

4    A    Hello.

5    Q    Would you introduce yourself to the jury please.

6    A    My name is Katherine Gaines.

7    Q    Okay.  How old are you Katherine?

8    A    36.

9    Q    Okay.  What's your marital status?

10   A    Married.

11   Q    Any kids?

12   A    Three.

13   Q    Three?

14   A    Uh-huh.

15   Q    What are their ages?

16   A    16, 14 and 10.

17   Q    Okay.  I'm going to cut right to the chase.  Have

18   you ever worked -- did you ever work at the Schneider

19   Medical Clinic?

20   A    Yes, I did.

21   Q    Okay.  Do you remember what time frame that would

22   have been in?

23   A    2004, 2007.

24   Q    Okay.  What drew you to the Schneider Medical

25   Clinic?  Why did you end up there?

```
 1    A    I knew one of the PAs there who was my uncle and I
 2    needed a job at the time.
 3    Q    Okay.  And what did you go in there as?
 4    A    Data entry clerk.
 5    Q    Data entry?
 6    A    Uh-huh.
 7    Q    Dealing with what?
 8    A    The billing department.
 9    Q    Okay.  So would that be the fee tickets?
10    A    Uh-huh.
11    Q    Were they colored at that point in time when you
12    were working there?
13    A    Yes.
14    Q    Okay.  What color were they?
15    A    Pink.
16    Q    Did you regularly handle any other records there?
17    A    No.
18    Q    Okay.  So tell me what you would do as the data
19    entry person?
20    A    Generally a pile of fee tickets would come down and
21    I would -- they were separated into four stacks or
22    according to doctor and physician assistant.  And then I
23    would, all the information that was on the fee ticket, I
24    would put into the computer system.
25    Q    So you were actually inputting the billing that
```

4995

1    would go to insurance companies or third party payers?

2    A    Yes.

3    Q    Okay.  So, and you said they would be typically like

4    in four stacks; is that right?

5    A    In the beginning, yes.

6    Q    Okay.

7    A    If we added a physician then there would be another

8    stack but --

9    Q    Okay.  So they're separated by the providers?

10   A    Uh-huh.

11   Q    Okay.  And how long over all did you work there?

12   You said '04 to like '06.  Is it like two full years?

13   Over two years?

14   A    Just a little over three years.

15   Q    A little over three?

16   A    Uh-huh.

17   Q    So essentially?

18   A    '04 to 2007.

19   Q    Oh, into '07?

20   A    Uh-huh.

21   Q    Okay.  So when you first started at this position,

22   we've heard testimony that the billing department was

23   downstairs.  Is that correct?

24   A    Uh-huh.

25   Q    Is that where you worked when you --

4996

1   A   Not originally.  I worked upstairs wherever there

2   was a computer available for me to do the data entry

3   into.

4   Q   Okay.  So you floated around from computer to

5   computer?

6   A   Yes.

7   Q   Upstairs?

8   A   Uh-huh.

9   Q   For how long?

10  A   I would say anywhere from six months, maybe over --

11  anywhere from six months to a year.

12  Q   And then what happened?

13  A   And then they moved us down, all the billing

14  department downstairs into the basement area and I

15  worked down there in a cubicle.

16  Q   Who was your supervisor in the billing department?

17  A   Brenda Whitehead.

18  Q   Okay.  And did you ever work under Sherrie Mills

19  also?

20  A   Yes.

21  Q   So you were there when there was a transition from

22  Brenda to Sherrie?

23  A   Yes.

24  Q   Throughout your course of working in the billing

25  department, was it -- did you observe that these things

4997

1   always, these fee tickets always came to you separated

2   by provider?

3   A   Yes.

4   Q   Were you ever told that you should check the fee

5   ticket itself, look at it, to make sure it was in the

6   right provider pile?

7   A   No.  No.

8   Q   Okay.  So assuming a fee ticket clearly shows on its

9   face that Kim He'bert rendered the service, she would

10  have her K or something on there or it says He'bert as a

11  provider.  If that were in the Schneider pile, would you

12  perhaps have billed that as a Schneider without knowing

13  to check who really did it?

14  A   Very possibly.

15  Q   Okay.  Did there ever come a time when somebody

16  pulled you aside and said, look, we're having whacky

17  billing, we need to pay more attention to these and you

18  actually need to scrutinize who the provider was?

19  A   Uhm, I would say that there were a few times where

20  if I was repeating a mistake that it was brought to my

21  attention, yes; but as far as billing under the wrong

22  provider, no.

23  Q   Okay.  Did anybody at the Schneider Medical Clinic

24  ever ask you to do anything, commit any kind of like

25  forgery or alteration of records?

1    A    No.

2    Q    Did you ever observe anybody at the Schneider

3    Medical Clinic improperly filling in records?

4    A    No.

5    Q    Or altering records?

6    A    No.

7    Q    Now, what was the reason you left the clinic?

8    A    There was an incident involving my mother who worked

9    with me down in the billing department.  A situation

10   with a doctor that we felt kind of slighted and after

11   that situation I just didn't want to be a part of it any

12   more --

13   Q    With what doctor?

14   A    -- I wanted to move on.

15   Q    With what doctor?

16   A    Lawrence Simons.

17   Q    So you quit over that?

18   A    Yes.

19   Q    So you didn't really leave on the best of terms, did

20   you?

21   A    No, probably not.  I didn't feel like it was.

22   Q    Did your mother quit the employment, also?

23   A    Yes.

24   Q    Over the same incident?

25   A    Yes.

1    Q    And this was with Dr. Simons?

2    A    Yes.

3    Q    Okay.  Now, did you ever have occasion when you were

4    upstairs to observe, like, the patients being roomed?

5    A    No, I was kind of separated from that.

6    Q    Okay.  Were you typically in an office where you

7    didn't have a good view of other things?

8    A    Yes.  I was --

9    Q    They didn't just stick you out in the hallway where

10   everybody walked by you?

11   A    No.

12              MR. BYERS:  I think that's all I have, Your

13   Honor.

14              THE COURT:  Mr. Williamson?

15              MR. WILLIAMSON:  Thank you, Your Honor.

16                   **CROSS EXAMINATION**

17   BY MR. WILLIAMSON:

18   Q    How you doing today?

19   A    Good.

20   Q    Few questions.  One, you were -- you are related to

21   Linda Schneider in some way?

22   A    My aunt on my mother's side is married to Linda

23   Schneider's brother.

24   Q    Okay.  Now, when you were at the Schneider Medical

25   Clinic, did you get any kind of benefits because you had

5000

1    this distant familial relationship with Linda?

2    A   No.

3    Q   She didn't give you extra raises because you were a

4    family member?

5    A   No.

6    Q   In fact, you quit even though you were a family

7    members?

8    A   Uh-huh, yes, I did.

9    Q   When you were down in the billing department, did

10   Dr. Schneider ever instruct you to submit documents that

11   he knew were false?

12   A   No.

13   Q   Would you have done so if it would have been asked

14   of you?

15   A   No.

16   Q   Did the federal government ever talk to you about

17   how you inputted data into the billing system.

18   A   You mean did they come and speak to me after I left

19   there?

20   Q   Yes.

21   A   Yes.

22   Q   Okay.  And did you tell them the same thing you're

23   telling the jury, that you were never instructed to do

24   anything fraudulent?

25   A   Yes.

5001

1    Q    But they didn't call you as a witness, did they?

2    A    No.

3    Q    Now, did you also treat with Dr. Schneider?

4    A    Yes.

5    Q    And did your children also treat with him?

6    A    Yes.

7    Q    Did he ever try to sit down -- when you come in, you

8    just sit down and he says, what do you need and write

9    you a prescription for a pain medicine?

10   A    No.  No.

11   Q    Did you ever have need to have any pain medicine

12   written by Dr. Schneider?

13   A    No.

14   Q    Even though you didn't have the need, did he ever

15   try to give you a prescription for pain medicine?

16   A    No.

17   Q    And you trusted him to treat your children as well?

18   A    Yes.

19   Q    The data entry that you were doing down in the

20   basement, was that supposed to be -- strike that.

21        Brenda Whitehead was your manager when you first

22   got there?

23   A    Supervisor, yes.

24   Q    Was she in charge of reviewing your data entry to

25   make sure it was going in correctly?

1    A    I don't know if she directly checked every fee

2    ticket; but there was a system that they would use to

3    run through and it would kick out anything that was an

4    error that we could change before it went.  Like an

5    invalid number, PIN number or something so --

6    Q    Okay.  And did Brenda ever tell you that she was

7    instructed by Dr. Schneider to submit fraudulent bills

8    to the insurance companies?

9    A    No.

10   Q    Before the federal government got involved in this,

11   did you ever receive a complaint of fraudulent billing

12   from, regards to providers from Medicaid?

13   A    Not that I'm aware of.

14   Q    Okay.  Before the federal government got involved in

15   this case, did you receive any complaints from Medicare

16   that they were concerned that billing was fraudulent

17   based on the providers?

18   A    No.

19   Q    Before this case, did you receive any complaints

20   from Blue Cross/Blue Shield that they believed

21   fraudulent billing was going on based on the providers

22   being submitted?

23   A    No.

24   Q    Before this case, did you receive any complaints

25   that -- from Preferred Health that they were concerned

1    that fraudulent billing was being submitted based on the

2    providers being submitted?

3    A    Yes.

4    Q    And what did they say?

5    A    They were questioning the progress notes for

6    Lawrence Simons, whether or not he had actually seen

7    them for a certain amount of time that he was saying he

8    did.  And in return, my job was to type in the office,

9    or the procedure code for that office visit and a lot of

10   times we had to take it down another level from the

11   office visit on his because it didn't match up with what

12   he had written down.

13   Q    Okay.  So Preferred Health, when they actually got

14   information that they were concerned about, they could

15   have contacted you?

16   A    Yes.

17   Q    And they did that with Lawrence Simons; correct.

18   A    Yes.

19   Q    Did anybody at Preferred Health ever do that with

20   Dr. Schneider?

21   A    No.

22   Q    When you first started down in the billing

23   department, was there a learning curve that you had to

24   undergo?

25   A    I'm not sure what you mean.

5004

1    Q   Well, when you came in, did you -- you had to learn

2    what to do and when to do it?

3    A   Yes.

4    Q   And was Brenda in charge of helping you learn how to

5    input information appropriately?

6    A   Ultimately, yes; but there was another girl there

7    that did most of the training.

8    Q   Who was that?

9    A   Amber Durrant.

10   Q   And do you make room -- strike that.

11       The evidence in this case is that roughly around

12   30% of bills that were submitted to the various

13   insurance companies between 2002 and 2006 had the wrong

14   provider on there.  Is it possible that mistakes were

15   made down in the billing department both before you came

16   and after you came?

17   A   Very likely.

18   Q   And because those mistakes were made, did you

19   intentionally make those mistakes?

20   A   No.

21   Q   Were you aware of the people who were before you,

22   did they intentionally just make mistakes?

23   A   I wouldn't think so, no.

24            MR. WILLIAMSON:  I don't have anything

25   further.

5005

```
1            THE COURT:  Yes, ma'am.

2            MS. TREADWAY:  Thank you, Judge.

3                    CROSS EXAMINATION

4  BY MS. TREADWAY:

5  Q   Just going back to some points that Mr. Williamson

6  asked you about.  With regard to Lawrence Simons, do I

7  understand you correctly that Preferred Health Systems

8  made you resubmit his bills at lower code?

9  A   Yes.

10 Q   Mr. Williamson asked you about complaints about

11 billing.  Were you aware of the quality of complaint,

12 quality of care complaints while you were employed at

13 the Schneider Medical Clinic?

14 A   No.  I had heard.  I really was separated from the

15 whole clinic upstairs so whatever -- it would have just

16 been something that I heard.  I never saw it.

17 Q   So you weren't involved in gathering documents for

18 those audits?

19 A   No.

20 Q   Now, is it correct, ma'am, that you don't have any

21 formal medical training?

22 A   No, not formally.

23 Q   And you don't have any formal insurance billing

24 training, do you?

25 A   I do now; but then, no.
```

5006

1    Q    When you were at the clinic, you didn't have any

2    formal training --

3    A    No.

4    Q    -- right?  And you didn't do any diagnosis coding at

5    the clinic and you didn't code the office visits, did

6    you?

7    A    No.

8    Q    All right.  You just essentially did the data entry?

9    A    Yes.

10   Q    Keying in the information; is that right?

11   A    Yes, uh-huh.

12   Q    And what you used was what we know is a fee ticket?

13   A    Yes.

14   Q    All right.  And actually we don't have the colored

15   fee tickets here because we've had to redact the patient

16   names, but weren't they a bright pink?

17   A    Yes.

18   Q    Almost a fuchsia color?

19   A    Yes.

20   Q    All right.  Now, when it came to Medicaid, do you

21   remember that you always billed the physician's

22   assistants as though they were physicians?  You remember

23   that?

24   A    Not always, I don't think.

25   Q    Do you remember giving an interview on August 21st,

5007

1    2007, to some federal agents that came to your house.

2    Remember them?

3    A    Yes.

4    Q    Remember Agent Greer and Agent Barger.  Do you

5    remember them?

6    A    I remember two men.  I'm not sure of their names,

7    but, yes.

8    Q    And during that interview do you remember telling

9    them that you always billed physician assistant services

10   the same way you billed physician services?

11   A    No.

12   Q    You don't remember telling them that?

13   A    No.

14   Q    Do you deny telling them that?

15   A    I don't know if that was something that was

16   misconstrued as what I meant.

17   Q    So you deny you're saying that?

18   A    Not to my recollection, no.

19   Q    Now, the testimony from quite a lot of folks in this

20   case has been that the Defendant Linda Schneider

21   reviewed all of the fee tickets before they came to the

22   billing department.  Is that your memory of how things

23   worked?

24   A    Yes.

25   Q    And would you agree that the Defendant Linda

5008

```
 1    Schneider was the boss at the Schneider Medical when it
 2    was -- the business side of the clinic?
 3    A    She ran it, yes.
 4    Q    She hired and fired people?
 5    A    Yes.
 6    Q    And she's the one that wouldn't give you a raise;
 7    right?
 8    A    Yes.
 9    Q    And that's why you left because you told the agents
10    you could make more money at a retail store; isn't that
11    right?
12    A    No.
13    Q    That's not right?
14    A    I don't think so.  I wouldn't have left there to go
15    to a retail store so I can't imagine saying that.
16    Q    So do you deny saying that?
17    A    Yes.
18    Q    Who was Ulysses?
19             MR. WILLIAMSON:  Your Honor, I'm going to
20    object.  Well beyond the scope of my cross and doctor --
21    I mean, Mr. Byers' direct.
22             THE COURT:  Overruled.
23    BY MS. TREADWAY:
24    Q    Who was Ulysses?
25    A    He was a man that worked there at the clinic.
```

5009

```
1    Q    Do you know what he did?
2    A    No.  I don't directly know what his job entitlement
3    was, no.
4    Q    That's fine.  Now you testified that nobody asked
5    you to falsify documents.  Can you testify under oath
6    whether anybody else was asked to falsify documents?
7    You don't know that, do you?
8    A    I can't answer that.
9    Q    You were in the basement most of the time; right?
10   A    Yes.
11   Q    And you don't know what went on upstairs, do you?
12   A    No.
13   Q    You don't know what Defendant Linda Schneider asked
14   people to do, did you?
15   A    Can you repeat that.
16   Q    You don't know what Defendant Linda Schneider asked
17   you to do, do you?
18   A    No.
19   Q    You just know what she asked you to do; correct?
20   A    Yes.
21             MS. TREADWAY:  Nothing further, Judge.
22             MR. BYERS:  No redirect, Judge.
23             MR. WILLIAMSON:  No recross.
24             THE COURT:  Thank you very much, ma'am.
25   You're excused.  Next witness, please.
```

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

5010

1           MR. BYERS:  We'll next call Elaine Gallagher,

2    Your Honor.

3                      **ELAINE GALLAGHER**

4    Having been first duly sworn to tell the truth, the

5    whole truth and nothing but the truth, testified as

6    follows on:

7                     **DIRECT EXAMINATION**

8    BY MR. BYERS:

9    Q    Good afternoon.  Would you state your name please?

10   A    My name is Elaine Gallagher.

11   Q    Gallagher?

12   A    Uh-huh.

13   Q    Would you spell that please?

14   A    G-A-L-L-A-G-H-E-R.

15   Q    Okay.  Ma'am, are you over 18 years of age?

16   A    Yes, I am.

17   Q    Okay.  Can you tell me a little bit about your work

18   experience as an adult?

19   A    I'm a medical assistant.

20   Q    Okay.  How long have you been a medical assistant?

21   A    16 years.

22   Q    Are you presently working as a PA -- I'm sorry -- a

23   MA?

24   A    Right now, I'm not working.

25   Q    Okay.

5011

1    A    I'm taking the summer off.

2    Q    Okay.  Was there ever a point in time where you

3    worked at the Schneider Medical Clinic as a MA?

4    A    Yes.

5    Q    When was that?

6    A    When he first started his clinic when he first got

7    out on his own from Riverside.

8    Q    When he first got out on his own from Riverside.

9                THE COURT:  I don't think the jurors are --

10               MR. BYERS:  Let's slide up a little more.

11   Q    Don't be afraid.

12   A    I am.  I'm nervous.

13   Q    All right.  So there was a practice before

14   Riverside.  The Haysville Medical Center.  Did you work

15   there as a MA?

16   A    That was after.

17   Q    I'm sorry.  That was -- so there's Riverside, you're

18   working as a MA?

19   A    Uh-huh.

20   Q    And with Dr. Schneider?  You were familiar with him

21   there?

22   A    Right.

23   Q    How long did you work at Riverside when Dr.

24   Schneider was there?

25   A    Four years.

1    Q   Did you work directly with him?

2    A   Yes.

3    Q   Okay.  How many other physicians were there at

4    Riverside?

5    A   I believe there was one, a pediatrician.

6    Q   Okay.  So that was just a two person family

7    practice?

8    A   Right.

9    Q   Okay.  And then there's the Haysville Medical

10   Center; right?

11   A   The Family Med Center.

12   Q   Yeah.  Family Med Center.  Did you work there?

13   A   Yes.  I worked for them there.

14   Q   Okay.  How long did you work at the Haysville

15   facility?

16   A   Well, I worked a total of 16 months.  I started back

17   with them when he went on his own with them and stayed

18   until three months after they moved to the new clinic.

19   Q   Okay.  You stayed with them -- I don't get it.

20   Three months?

21   A   We worked in a really small office while the new

22   clinic was being built.

23   Q   Okay.

24   A   So I was with them until about three months after

25   the clinic was built.

5013

1    Q    Okay.  And then what happened?

2    A    I got a better job offer.

3    Q    Okay.  So you were at the clinic when it first --

4    the Schneider Medical Clinic when it first started up.

5    A    Right.

6    Q    Okay.  And you were only there about three months?

7    A    The new clinic, yes.

8    Q    Okay.

9    A    I was with him a total of 16 months.

10   Q    Okay.  After Riverside?

11   A    Right.

12   Q    Did anyone at the Schneider Medical Clinic ever ask

13   you to alter or change records?

14   A    No.

15   Q    Did you ever see anyone doing that?

16   A    No.

17   Q    Did Linda Schneider specifically ever ask you to do

18   anything that you thought was inappropriate?

19   A    No.

20   Q    Did you ever -- well, as an MA, you would actually

21   go out and get the patients from the reception area and

22   get them in a room; right?

23   A    Yes.

24   Q    And then what would you do?

25   A    Room them, take vitals, ask what their chief

5014

1    complaint was and take the chart and put it on the

2    outside wall and go to the next patient.

3    Q    Okay.  Was it a pretty busy clinic?

4    A    Very busy.

5    Q    Okay.  And the way you performed your duties as an

6    MA at Schneider Medical Clinic, were they similar or the

7    same as to what you'd done in your prior experiences as

8    a MA?

9    A    Yes.

10   Q    Okay.  Now, were you a MA even before Riverside?

11   A    No.  I did my externship with them and they hired

12   me.

13   Q    So the 16 years you're talking about starts at

14   Riverside and progresses through essentially the current

15   time?

16   A    Right.

17   Q    Were you ever involved in the billing function at

18   all --

19   A    No.

20   Q    -- at the clinic?

21   A    No.

22   Q    Okay.  And beyond doing some rooming, did you serve

23   in any other capacities at Schneider Medical Clinic?

24   A    I was a lab tech and radiology tech.

25   Q    Okay.  Were you specifically trained in those

5015

1    things?

2    A    Yes.

3    Q    And so did you do both at the same time?

4    A    Uh-huh.

5    Q    Okay.  So were you busy?

6    A    Too busy.

7    Q    Okay.  And as lab tech, would you have seen the

8    majority or perhaps even all of the labs that were

9    ordered by the providers?

10   A    Yes.  I drew them.

11   Q    And would that include a urine drug screen to

12   monitor pain patients?

13   A    Yes, it would.

14   Q    Do you have -- looking back at those early days of

15   the Schneider Medical Clinic, do you have a perception

16   as to how much of the practice was family, pure family

17   medicine versus pain medication people?

18   A    There were a lot of just family practice.  Pain

19   management, I guess, started later on.

20   Q    Okay.  Do you remember any of the other providers

21   that were around back then.

22   A    Dr. Donna St. Clair was one.  There was a

23   cardiologist that came once a week I believe, Daniel

24   Alvarez.  And Michael Estivo, orthopedic surgeon came --

25   Q    What was the last time Estivo --

5016

1    A    Estivo.

2    Q    So he was there sporadically like Alvarez was?

3    A    Right.  One day a week, I believe.

4    Q    And when you left there, was it -- I guess you said

5    you just got a better paying job.  And that was also as

6    a MA?

7    A    Yes.

8    Q    Did you give them appropriate notice like two weeks

9    notice or something like that?

10   A    I did give them two weeks notice.

11   Q    Had you asked anybody at the clinic for more money

12   in trying to negotiate to stay there?

13   A    Yeah, I talked to Linda about it but they couldn't

14   afford it at that time so --

15   Q    Did you find it a pleasant place to work?

16   A    Yeah, I enjoyed it.

17   Q    Even though it was hectic?

18   A    They all are.

19   Q    They.  What do you mean?

20   A    All clinics are busy.

21          MR. BYERS:  That's all I have, Your Honor.

22                    **CROSS EXAMINATION**

23   BY MR. WILLIAMSON:

24   Q    Hi.

25   A    Hi.

5017

1    Q    Now, you left the clinic in 2002 or 2003?

2    A    I'm not positive on that.

3    Q    Did you ever leave and come back or did you just

4    leave one time?

5    A    No, I left.

6    Q    Okay.  And when you were at the clinic, can you kind

7    of tell the jury what your duties were as a lab tech?

8    A    I drew blood, and processed blood, and wrote up

9    requisitions, and did urine drug screens, and did

10   records.  Just whatever a lab tech does.

11   Q    And what about the radiology tech.  Was that dealing

12   with X-rays?

13   A    I did X-rays, yes.

14   Q    Now, so as I understand it, you were busy as a lab

15   tech and radiology tech; correct?

16   A    Right.

17   Q    And to be busy, that means the doctors and providers

18   have to order these tests to be performed on these

19   patients; correct?

20   A    Right.

21   Q    And so Dr. Schneider and the providers were actually

22   utilizing the lab services and the X-ray machines that

23   they invested in; correct?

24   A    Yes.

25   Q    And it wasn't just one out of, you know, one hundred

5018

1    people that they would run these tests on.  It would be

2    regular --

3    A    Yeah, it was regularly.

4    Q    Now, did Dr. Schneider also treat you as a patient?

5    A    Yes, he did.

6    Q    Did he also see your children?

7    A    Yes, he did.

8    Q    And how long was he -- was he your primary care

9    physician?

10   A    Yes, he was.

11   Q    How long was he your primary care physician?

12   A    Probably 10, 12 years.

13   Q    And during that time period, did Dr. Schneider ever

14   try to make you take any pain pills if you complained

15   about something other than pain?

16   A    No.

17   Q    And you were with Dr. Schneider since 1988 when he

18   first started?

19   A    No, not -- I graduated in '95 so I started at

20   Riverside then.

21   Q    And then you just moved with him with the

22   transition?

23   A    Well, no, I left Riverside and I went to work for a

24   private doctor and then when Dr. Schneider went out on

25   his own they called and offered me a job and I went

5019

```
1    back.
2    Q    Okay.  Now, have these ten or twelve years that Dr.
3    Schneider was treating you and your children, did you
4    ever have any complaints about the way he treated you?
5    A    No.
6    Q    Did you have any complaints about the way he took
7    care of you as a patient?
8    A    No.
9              MR. WILLIAMSON:  I don't have anything
10   further.
11             THE COURT:  Yes, ma'am.
12             MS. TREADWAY:  I have nothing of this witness,
13   Judge.
14             THE COURT:  All right.  Thank you, ma'am.
15   Please call your next witness.
16                    (Off-the-record.)
17             MR. BYERS:  I've looked everywhere, Judge.  I
18   can't find our next witness and our other workers are
19   out on the road.  If I could have a couple minutes to
20   make a call or two and see where she might be.
21             THE COURT:  You may.
22             MR. BYERS:  Thank you.
23             THE COURT:  You all can go to the jury room
24   while he does that, please.  Thank you.
25                    (Recess.)
```

5020

1            THE COURT:  Well, we've run out of witnesses

2       at 3:30.  I guess we've gone faster than we anticipated.

3       So you all have a good rest of the day and I'll see you

4       tomorrow morning.  Remember and heed the admonition.

5       Thanks.

6                       (Jury excused for the day at

7                       3:30 p.m.)

8            THE COURT:  What's the schedule, gentlemen?

9            MR. WILLIAMSON:  Judge, based on how quickly

10      we went through the witnesses today, we were initially

11      trying to schedule between six and seven a day.  We're

12      going to have to redo that.  This is the problem we're

13      going to face.  One of our experts can't come in until

14      June 10th.  I expected him to be one of our last.

15      Initially I thought that we would be able to fill up the

16      time between now and then.  But we're going to have to

17      look, because we may not.  We have an expert coming in

18      Thursday that will probably take some time.  We have an

19      expert coming in Monday that will take some time.  So we

20      have several witnesses prepared and already scheduled

21      for a certain day, but we're basically going to try to

22      just bring them in as soon as they can come in now as

23      opposed to scheduling like six or seven a day.

24           THE COURT:  You mean that it's possible that

25      we would only have one witness on Monday and --

5021

1           MR. WILLIAMSON:  No.  We should have maybe --
2    I mean, his is going to be fairly lengthy.  It's Dr.
3    Karch.
4           THE COURT:  That would be next Monday he is
5    scheduled.
6           MR. WILLIAMSON:  That's correct.  Then we have
7    a fraud expert coming in on Thursday.  We just expect a
8    full day of fact witnesses tomorrow.
9           THE COURT:  What about next Tuesday and
10   Wednesday?
11          MR. WILLIAMSON:  I'll tell you tomorrow,
12   Judge.  I'm going to look at it tonight.  We have people
13   scheduled.  It's just like when we were doing like six,
14   I mean, we went through basically six people today,
15   including Dr. Schneider.  And we're still finished at
16   3:30.
17          THE COURT:  I know.  I'm just concerned that
18   we would have two days where we might not have any
19   witnesses or we might have very short days.  Why don't
20   you all go out and talk about it and let me know
21   tomorrow because if, for example, we weren't -- we're
22   going to be here next Monday but not next Tuesday or
23   Wednesday, I think I need to tell them about that.
24          MR. WILLIAMSON:  Okay.
25          THE COURT:  And then the 10th, that's when

1    your witness can be here.  Which one is that?

2              MR. WILLIAMSON:  Barry Cole, our pain

3    specialist.

4              MS. TREADWAY:  Well, I find it very difficult

5    to believe that Dr. Cole cannot make it here for this

6    trial, Judge.  He's known about it for two years.  He is

7    not a practicing physician.  He works for the insurance

8    companies.  I can't imagine that he can't get here.

9              MR. WILLIAMSON:  Judge, we have his travel

10   schedule.  I'm willing to show the Court everything.  I

11   mean, that was the --

12             THE COURT:  Lawrence, I believe what you tell

13   me.

14             MR. WILLIAMSON:  Okay.

15             MR. BYERS:  He is now practicing.

16             THE COURT:  The point is, though, is there any

17   chance that he can get here before the 10th?

18             MR. WILLIAMSON:  I'm going to check it

19   tonight.

20             THE COURT:  I think you ought to talk to him

21   because what's happened here then is that today is

22   Tuesday.  We've got this whole week which we may or may

23   not fill at this point.  And then you've got a witness

24   here on Monday.  That's Dr. Karch.

25             MR. WILLIAMSON:  Correct.

5023

1            THE COURT:  And then, you know, we could be

2    with no witnesses on Tuesday or Wednesday of next week.

3    Then we have a long expert on Thursday who may not

4    finish on Friday, until Friday.  And then, of course,

5    we're going to have to talk about instructions and

6    closing argument, all of that.  I'm concerned about how

7    this might be taken by the jury -- and not against

8    you -- it's just that, you know, I have them hold that

9    stuff against me, and rightfully so.  I think that you

10   better talk to him and tell him what your situation is

11   and that perhaps he can reschedule.  You can always

12   subpoena him, you know.

13            MS. TREADWAY:  Judge, I have tried to warn

14   Defendants, I don't do long crosses.  Longest cross I

15   will have in this case will have been of the Defendant.

16   And absent another Defendant testifying, I probably will

17   not be spending the kind of time that the defense spent

18   on cross.  So to the extent that they need to plan for

19   that, I've given them fair warning.

20            THE COURT:  Well, I'm sure you have.  And

21   they're trying to move it along; but, you know, it's one

22   thing to quit at 3:30.  I don't think the jury minds

23   that.  It might be another thing to have down days like

24   that.

25            MR. WILLIAMSON:  I understand.

5024

1          THE COURT:  All right.  I'll see you tomorrow

2     morning at 9:00.  I assume you'll have a pretty

3     fairly -- full schedule tomorrow.

4          MR. WILLIAMSON:  I believe so, Your Honor.

5               (Recessed for day at 3:35 p.m.)