5084

```
 1
 2                            (Beginning at 1:00 p.m. June 2,
 3                            2010, the following proceedings
 4                            continued.)
 5            THE COURT:  Next witness please.
 6            MR. BYERS:  Defendant will call Brenda Beyer.
 7                          BRENDA BEYER
 8  Having been first duly sworn to tell the truth, the
 9  whole truth and nothing but the truth, testified as
10  follows on:
11                       DIRECT EXAMINATION
12  BY MR. BYERS:
13  Q    Good afternoon.
14  A    Hi.
15  Q    Would you tell the jury your name, please.
16  A    Brenda Beyer.
17  Q    How old are you, ma'am?
18  A    49.
19  Q    What's your marital status?
20  A    I'm single.
21  Q    Okay.  Any kids?
22  A    Three.
23  Q    Grandkids?
24  A    Any minute now.
25  Q    Literally; right?
```

5085

```
1    Q    She's due tomorrow.

2    Q    Are you employed, ma'am?

3    A    Yes, I am.

4    Q    As what?

5    A    A medical assistant.

6    Q    Okay.  And where is that at?

7    A    Dr. Kroeker

8    Q    Kroeker.  Here in Wichita?

9    A    Uh-huh.

10   Q    Prior to that, did you work as a -- well, how long

11   have you had that position?

12   A    Two years.

13   Q    Okay.  Prior to that, did you work as a medical

14   assistant?

15   A    Yes.

16   Q    And where was that at?

17   A    Schneider Medical.

18   Q    Okay.  And how long were you at Schneider Medical

19   Clinic?

20   A    Five years -- four years -- as long as they were

21   open.

22   Q    Okay.  So you were one of the original staff at the

23   new building?

24   A    Yes.

25   Q    And how long did you stay at Schneider?  When did
```

5086

1    you leave actually?

2    A    In December.

3    Q    Of?

4    A    It would have been '08.

5    Q    Well, maybe -- was it when they were --

6    A    It's been two and a half years ago.

7    Q    Was it when they were arrested?

8    A    Yes.

9    Q    So you were still at the clinic when they were

10   arrested.  And did the clinic stay open for a period of

11   time after the arrest?

12   A    Yes.

13   Q    So were you still in there at that point?

14   A    For a little while.

15   Q    Okay.  And then that's when you left?

16   A    Right.

17   Q    Okay.  I'm just trying to get an idea on that.

18   Prior to going to Schneider Medical Clinic, had you

19   worked as a medical assistant?

20   A    Yes.

21   Q    Okay.  Where was that at?

22   A    I worked in Haysville Med with Schneider there and

23   then at Riverside Clinic in Haysville.

24   Q    Okay.  And did you work with Dr. Schneider when he

25   was at Riverside also?

1    A    Yes.

2    Q    So, overall how many years had you worked with Dr.

3    Schneider as a medical assistant at these three places?

4    A    Seven to eight years.

5    Q    What were your duties at Schneider Medical Clinic,

6    just the last place, the new clinic in Haysville?

7    A    Primarily lab.

8    Q    And what kind of things did you do in the lab?

9    A    Drew blood, gave injections, did tests.

10   Q    Did you do any kind of training there of other

11   employees?

12   A    I did.

13   Q    In what kinds of things?

14   A    I would teach them how to run the, like, strep

15   screens or urine tests.  How to give injections.

16   Q    Okay.  Who taught you how to give injections?

17   A    I went to school.

18   Q    Okay.  Do you hold any kind of certificate or

19   anything as far as medical assistant?

20   A    I'm a Registered Medical Assistant.

21   Q    Okay.  What does that mean?  Is that a license by

22   the State of Kansas or something or what does that mean?

23   A    It's a trade school and they train you in medical

24   assisting, laboratory, front desk, and patient care.

25   Q    Okay.  And when would you have completed that

1    training?

2    A    Back in '88, 1988.

3    Q    Would that have been before your time working at

4    Riverside then?

5    A    Yes.

6    Q    Okay.  And then was Riverside your first medical

7    assisting job?

8    A    No.

9    Q    Okay.  What was before that?

10   A    I first started with Dr. Doris Butler, and then from

11   there I went to a DME company.  Then I went to Sports

12   Medicine.  Then I worked at The Cancer Center.

13   Q    Were all those medical assisting jobs?

14   A    Uh-huh.

15   Q    Including the DME?

16   A    Uh-huh.

17   Q    And that means Durable Medical Equipment company?

18   A    Uh-huh.  I did mainly insurance filing with

19   equipment.

20   Q    Overall how many years do you have doing this

21   medical assisting or being involved in medical --

22   A    20 years.

23   Q    Okay.  Now, at the Schneider clinic did you have

24   occasion to ever work as a roomer?  Actually placing

25   people, you know, going to reception and walking them

5089

1    back?

2    A    I have.

3    Q    What else -- are there other obligations or duties

4    of the roomers?

5    A    I did rooming.  I -- X-rays --

6    Q    But as part of rooming, was it just walking them

7    back or did you do other things?

8    A    Oh, no.  You do vitals.

9    Q    And then vitals are what?

10   A    Blood pressure, weight, temperature, and then you

11   assess.

12   Q    What do you mean assess?

13   A    What they're there for, what problems they have.

14   Q    Do you make notes about that?

15   A    Uh-huh.  On the progress sheet.

16   Q    And then what happens after you get that person in a

17   room and you've noted the vitals or whatever and the

18   assessment?  What happens?  What does the roomer do

19   next?

20   A    Then you put the chart up for the doctor to come in.

21   Q    Okay.  And then what?

22   A    And then you would go wait for another patient to

23   room, bring another patient in.

24   Q    And in your five years at Schneider Medical Clinic

25   do you have an opinion as to the percentages of pain

 1    patients versus regular non-pain family practice
 2    patients?  Do you have any idea how the practice was
 3    split?
 4    A   Well, it grew.
 5    Q   What grew?
 6    A   The amount of people coming in for pain issues.
 7    Q   Okay.  Do you have any -- do you have an idea what
 8    percentage of total patient population would have been
 9    pain patients?
10    A   Maybe 30, 40.
11    Q   So then that means another 70, 60 to 70% were
12    straight family practice?
13    A   Yes.
14    Q   Was it your -- did you see a lot of babies and
15    pediatric kinds of patients coming through the clinic?
16    A   Yes.
17    Q   Okay.  Now, assuming you were rooming a pain
18    patient -- well, no, strike that.
19        Did you ever see patients' demeanor obviously
20    change from the time they're out in the reception area
21    to going back and getting placed in the room?  Such as
22    did anybody seem happy and cheerful and great with the
23    world out in the reception area and then seem to be in
24    miserable pain by the time they got back and are sitting
25    in the room waiting for the doctor?

5091

1          MS. TREADWAY:  Objection, leading.

2          THE COURT:  Sustained.

3     BY MR. BYERS:

4     Q   Did you observe the patients' demeanor out in the

5     reception area generally?  The patient population?

6     A   I didn't usually, no.

7     Q   Okay.  Were the -- was the majority of your duties

8     at the new Schneider Medical Clinic in the lab?

9     A   Yes.

10    Q   Okay.  Were there urine drug screens ordered on a

11    regular basis by the providers there?

12    A   Yes.

13    Q   Okay.  And you would take care of the paperwork for

14    that.  Did you have to send those off then?

15    A   Yes.

16    Q   Okay.  That would have been with a contract with Lab

17    Corp or some kind of company like that?

18    A   Lab Corp, yes.

19    Q   Do you have any knowledge of what would happen with

20    patients, how they would be treated by the providers if

21    they came back with either dirty urine or lacking meds

22    that should have been in their system?  Do you know how

23    they were handled by providers?

24    A   Most of the providers wouldn't prescribe for them

25    after that.

5092

```
 1    Q   Okay.  And most meaning Stephen Schneider as well?
 2    He's included in the providers?
 3    A   Yes.
 4    Q   Can you tell me some of the providers that you
 5    remember that were there?
 6    A   There was Donna St. Clair.  There was Dr. Simons.
 7    There was PAs, there were a lot of PAs.  Klingsick I
 8    think her name was.  I can't remember their names.
 9    Q   Uh-huh.
10    A   Connie White was there.  There was several.
11    Q   Were you there working at the clinic on the days
12    of -- let's say the day of the first raid, which would
13    have been September '05?
14    A   Yes.
15    Q   Okay.  Were you there working on the day of the
16    second raid which would have been March '06?
17    A   I didn't go in that day because I knew that they
18    were there.
19    Q   Okay.  Were you ever interviewed by government
20    agents?
21    A   Yes.
22    Q   Do you know how many times?
23    A   At least twice.
24    Q   Okay.  You've also -- you've given at least one
25    deposition; is that correct?
```

```
 1   A    Yes.
 2   Q    In a civil case.
 3                      (Witness nods in the
 4                      affirmative.)
 5   Q    Okay.  Were you ever asked by Linda Schneider to do
 6   any kind of alteration or modification of records?
 7   A    No.
 8   Q    Were you ever asked to change fee tickets?
 9   A    No.
10   Q    Fill in missing vitals on progress notes or fee
11   tickets?
12   A    No.
13   Q    Okay.  Did you ever observe Linda Schneider doing
14   anything you thought was illegal or improper?
15   A    No.
16   Q    Did you ever see Linda Schneider shuffling patient
17   charts around, rearranging them in the order of how they
18   would be seen?
19   A    No.
20   Q    Did you ever see Linda Schneider going down the
21   hallways knocking on doors trying to speed things along?
22   A    Only when doctor had an engagement that he needed to
23   be to or before lunch or before quitting, before 5.
24   Q    You said only when doctor.  Did you see her doing it
25   with other providers?
```

5094

1    A    Yeah, sometimes.

2    Q    Okay.  Such as who?

3    A    Well, Dr. Simons or usually just the doctors.

4    Q    Okay.  And what would she do?  Would she say hurry

5    up or, I mean, how did that transaction occur?

6    A    I don't know what she said but I saw her, you know,

7    knock on the door; but she would ask them if they needed

8    lab before lunch because I had to leave for lunch.

9    Q    Okay.  So you had a regular lunch hour then?

10   A    Yes.

11   Q    Okay.  Was there ever knocking on doors at the end

12   of the day?

13   A    Yes.

14   Q    Why would that occur?

15   A    To see if they needed lab work before, before I

16   left.

17   Q    So to get the lab done before you were out of the

18   building?

19   A    Right.  Or to write 'em an order.

20   Q    Okay.  Did you ever -- were you ever aware of people

21   coming through from a place called I think it's the

22   Wichita Training Institute as trainees?

23   A    Yes.

24   Q    Tell me about that?

25   A    They would send them over and I would train them,

1   show 'em how to draw blood or give injections.  And I

2   had a check-on sheet and when they completed, or, you

3   know, they learned something, then I would check it off

4   or give an evaluation for the school.

5   Q   So, is this like an after high school kind of a

6   training program?  Beyond high school?

7   A   It's a technical school program.

8   Q   And what were they training as?  Do you know?

9   A   Medical assistants.

10  Q   Okay.  Do you remember what time span those people

11  would have been in there as trainees?

12  A   Probably three to four months.

13  Q   Okay.  During what years?  Do you know?  Was it

14  consistent throughout your five years there I guess is

15  what I'm asking?

16  A   It -- no, it was just -- I only remember two or

17  three times they came in.  Had different groups come in.

18          MR. BYERS:  I think that's all I have, Your

19  Honor.

20          THE COURT:  Mr. Williamson.

21          MR. WILLIAMSON:  Thank you, Your Honor.

22                  **CROSS EXAMINATION**

23  BY MR. WILLIAMSON:

24  Q   How you doing, Ms. Beyers?

25  A   Good.

5096

1    Q    Few questions.  With this knocking on the doors.

2    Would that happen all the time or only if Linda needed

3    the providers for a specific reason?

4    A    Only if there was a reason.

5    Q    And, now, as I understand it, you were with Dr.

6    Schneider from the time he was at Riverside?

7    A    Yes.

8    Q    Okay.  And when Dr. Schneider decided to open up the

9    Schneider Medical Clinic, to your knowledge was it ever

10   designed to be only a pain management clinic?

11   A    No.

12   Q    Were you guys a family practice clinic?

13   A    Yes.

14   Q    And I believe you told the jury that the number of

15   pain patients grew by the time that -- as time went on?

16   A    Right.

17   Q    Okay.  Now, with this growth of these chronic pain

18   patients, did the clinic have to learn as time went on?

19   A    Yes.

20   Q    Okay.  And you were working in the lab taking

21   urinary drug screens as well?

22   A    Right.

23   Q    And drawing blood and other lab work?

24   A    Yes.

25   Q    Okay.  Was the clinic taking a lot of labs during

5097

1    this time period?

2    A    Yeah.

3    Q    Okay.  It was enough for you to have a full time

4    position doing just that?

5    A    Yes.

6    Q    Okay.  Now, with the lab process, were there things

7    that you weren't doing in the beginning that you started

8    to do later to ensure that -- of the integrity of the

9    lab process?

10   A    Yes.

11   Q    Such as ensuring one person only went to the

12   bathroom at a time?

13   A    Right.

14            MS. TREADWAY:  Judge, again, this is very

15   leading.

16            MR. WILLIAMSON:  I'm crossing.

17            THE COURT:  No, she's not a hostile witness to

18   you.  Non-leading questions please.

19            MR. WILLIAMSON:  Okay.

20   BY MR. WILLIAMSON:

21   Q    Can you tell the jury what else that you guys did in

22   the lab to ensure that the integrity of the lab process

23   was in place?

24   A    Okay.  We had to start putting dye in the toilet,

25   turning off the sink so it wouldn't run.

5098

1    Q    Okay.  And why were those steps taken?

2    A    Because people were putting water in their cups.

3    Q    So did the clinic actually care about getting the

4    proper urinary drug results?

5    A    Yes.

6    Q    And was it a continuous learning process for the

7    clinic in order to be able to address the specific needs

8    that these pain patients may have?

9    A    Yes.

10   Q    Now, would you also -- were you -- strike that.

11        Did the clinic have a company that processed

12   urinary drug screens?

13   A    Lab Corp.

14   Q    And what was your role in getting the specimens to

15   Lab Corp?

16   A    Packaging it, doing a requisition for what tests we

17   wanted done.

18   Q    Did Dr. Schneider ever instruct you not to take

19   accurate lab results from people?

20   A    No.

21   Q    Were you ever instructed to ignore any lab results?

22   A    No.

23   Q    Were you ever instructed by Dr. Schneider to destroy

24   any lab results?

25   A    No.

5099

```
 1    Q   Were you ever instructed by Dr. Schneider to destroy
 2    any correspondence from Lab Corp?
 3    A   No.
 4    Q   Was the clinic attempting to monitor these patients
 5    when they would -- when you guys would take these lab --
 6    or get these lab results?
 7    A   Yes.
 8    Q   And it wasn't just limited to urinary drug screens,
 9    as I understand it.  Did you all also attempt to monitor
10    blood pressure, cholesterol levels and things like that?
11    A   Yes.
12    Q   Now, I think you told Mr. Byers that you spoke with
13    the government agents on two occasions?
14    A   Yes.
15    Q   When was the first time?
16    A   The first raid.
17    Q   And did they talk to you on location?
18    A   Yes.
19    Q   Did Dr. Schneider instruct you not to speak with the
20    agents?
21    A   No.
22    Q   Did he instruct you to lie to the agents?
23    A   No.
24    Q   Did he ever instruct you to destroy any potential
25    evidence?
```

5100

```
 1    A    No.
 2    Q    When was the second time that you spoke with agents?
 3    A    They followed me from the clinic to my home.
 4    Q    Who did?
 5    A    The government people.  I don't remember any names.
 6    Q    So you mean they didn't talk to you at the clinic?
 7    A    No.
 8    Q    Did they let you know before they were following you
 9    that they were going to try to set up a interview with
10    you?
11    A    No.
12    Q    Were you in the car by yourself?
13    A    Yes.
14    Q    Were you scared?
15    A    Yes.
16    Q    When was it that you realized that they were
17    government agents?
18    A    I recognized the car.
19    Q    Okay.  Had you been avoiding government agents?
20    A    No.
21    Q    And you had already voluntarily talked to 'em;
22    correct?
23    A    Yes.
24    Q    And when they arrived at your house, did you speak
25    with them at that time?
```

5101

1    A    Yes.

2    Q    Now, I think you mentioned with Mr. Byers that you

3    would train medical assistants from Wichita Technical

4    Institute?

5    A    Yes.

6    Q    Did they actually continue to send medical

7    assistants to the Schneider Medical Clinic for training

8    after the first raid?

9    A    We had some there and then they took -- they

10   cancelled.  They took 'em out.

11   Q    And that was after the raid?

12   A    Yes.

13   Q    Now, when you were there did you ever hear Dr.

14   Schneider be referred to as the "Drug Lord of

15   Haysville"?

16   A    No.

17   Q    Did you ever hear him referred to as "Kevorkian,

18   Jr"?

19   A    No.

20   Q    What else did we hear from that lady?  What about

21   did you ever hear him referred to as "Schneider the

22   Writer"?

23   A    Yes.

24   Q    When did you learn about that?

25   A    After the first raid.  Somebody told me that they

5102

```
1    had heard he was being called that.
2    Q   Now, when you were a roomer, did you actually sit in
3    any exam rooms when Dr. Schneider would see patients or
4    would you be moving on to --
5    A   I'd be moving on.
6    Q   Okay.  And I think Mr. Byers asked you this in
7    regards to Mrs. Schneider, but did Dr. Schneider ever
8    ask you to falsify vitals?
9    A   No.
10   Q   Did he ever ask you to falsify progress notes?
11   A   No.
12   Q   Did you ever witness Dr. Schneider falsifying vitals
13   and progress notes?
14   A   No.
15   Q   Okay.  Would you have -- if Dr. Schneider would have
16   been asking you to fraudulently fill out all these
17   papers, would you have done it?
18   A   No.
19   Q   Would you have followed him from Riverside all the
20   way to the Schneider Medical Clinic if you saw any
21   evidence that he was doing this illegal -- these illegal
22   things as the Government alleges?
23   A   No.
24   Q   Now, is it my understanding -- let me rephrase.
25       Would the clinic hire people who may not be the
```

5103

1    most qualified in certain positions?

2    A    Yes.

3    Q    And was it commonly understood that -- as to the

4    reason why this would occur?

5    A    We would give 'em a chance to learn.

6    Q    Were there some people who actually excelled at

7    learning?

8    A    Some.

9    Q    And were there some people who did not excel at

10   learning?

11   A    Yes.

12   Q    Now, working in the lab, did you also have

13   responsibility to handle any disposal of medication?

14   A    Yes.

15   Q    Can you tell the jury about that?

16   A    If they brought medication in that they didn't want

17   or wasn't working for them or wanted it destroyed then I

18   would put it in the biohazard, just dump it in the

19   biohazard containers.

20   Q    Okay.  And so the jury understands about this, would

21   there be times that patients would return pills that

22   either didn't work or they didn't need any more?

23   A    Yes.

24   Q    And the clinic actually had a process to dispose of

25   those?

5104

1    A    Yes.

2    Q    Did Dr. Schneider ever say, when somebody returns

3    pills don't destroy them but give 'em to me so we can

4    hand them out to somebody else?

5    A    No.

6    Q    Would you have done it if he would have asked?

7    A    No.

8              MR. WILLIAMSON:  I don't have anything else,

9    Your Honor.

10             THE COURT:  Yes, ma'am.

11             MS. TREADWAY:  Thank you, Judge.

12                      **CROSS EXAMINATION**

13     BY MS. TREADWAY:

14   Q    Now, Ms. Beyer, first of all, I'd like to ask you

15   about the last days at the clinic.  Were you there in

16   January of 2008?

17   A    Yes.

18   Q    And the clinic continued to operate even though

19   there was no physician present; isn't that correct?

20   A    Wait a minute.  I did not -- I wasn't there in

21   January.  I didn't come back after Christmas.

22   Q    December -- after Christmas?

23   A    Yeah.

24   Q    Did you know that the clinic continued to operate

25   without a physician present?

5105

```
1    A    I believe Connie White was there.  I don't know if

2    there was any other physicians there.

3    Q    But she's not a physician, is she?

4    A    She's a PA.

5    Q    She's a physician's assistant, isn't she?

6    A    Yes.

7    Q    With regards to your learning curve at the clinic

8    with regards to the urine drug screens, when did you

9    start putting dye in the toilet?

10   A    I don't know exactly when, but probably when I

11   started getting results back that were -- from the lab

12   that would say diluted.

13   Q    And who did you discuss this problem with?

14   A    Linda or Doctor.

15   Q    So both the Defendants Linda Schneider and Steve

16   Schneider knew that patients were trying to beat the

17   urine drug screens at that point; correct?

18   A    Yes.

19   Q    Now, during the course of your job there you said

20   that you did urine drug screens?

21   A    Yes.

22   Q    And I'm assuming that urine drug screens were done

23   for purposes other than the pain management practice;

24   correct?

25   A    Yes.
```

5106

1    Q   For instance, if somebody thought they had a urinary

2    infection.  Is it a common thing to have a urine drug

3    screen for a well-woman examine, for instance?

4    A   Not a drug screen but just a screen.

5    Q   A screen for your urine?

6    A   Yes.

7    Q   Okay.  You also said that urine drug screens were

8    pretty regular.  Do you know whether there was a

9    random -- regular randomization of urine drug screens

10   for the pain management patients?

11   A   It was random.

12   Q   But was it routine?

13   A   It started to become routine, yes.

14   Q   And when was that?

15   A   When we started getting more pain patients.

16   Q   Well, let me hand you what has been marked for

17   identification and admitted as Government Exhibit 1-F.

18   That is a chart about the urine drug screens that were

19   or were not performed on the individuals named in the

20   Indictment in this case, most of whom are deceased.  And

21   when you see a yellow line there, or a highlighted line,

22   that indicates there were no urine drug screens

23   performed.  Do you see that?

24   A   Yes.

25   Q   Would that indicate to you that at least as to those

5107

```
 1    patients there weren't any random or routine urine drug
 2    screens?
 3    A    If you say so.  I mean, I don't remember who and who
 4    did not.
 5    Q    Well, if the clinic's record reflects there were no
 6    urine drug screens, would you have any reason to doubt
 7    the clinic's records?
 8    A    No.
 9    Q    Now, if I understand you correctly, you're a Medical
10    Assistant; is that right?
11    A    Yes.
12    Q    You're not a nurse?
13    A    No.
14    Q    And were you aware that the clinic didn't hire
15    Registered Nurses?
16    A    Yes.
17    Q    And were you also aware that they didn't hire
18    Licensed Practical Nurses?
19    A    We had one Licensed Practical Nurse.
20    Q    And who was that?
21    A    Her name was Dee.
22    Q    Dee.  And how long did she work there?
23    A    Maybe a year or so.
24    Q    So for the most part, the clinic didn't have
25    Licensed Practical Nurses either?
```

5108

```
 1    A    For the most part.
 2    Q    But you were called the nurse supervisor, weren't
 3    you?
 4    A    Yes.
 5    Q    But that was not correct.  You didn't supervise any
 6    nurses, did you?
 7    A    I tried to keep them busy.
 8    Q    But there were no nurses so --
 9    A    No -- medical assistants, yes.
10    Q    So actually who you supervised were the medical
11    assistants?
12    A    Right.
13    Q    Now, during the course of your employment at the
14    clinic did you routinely see and deal with angry
15    patients?
16    A    Not regularly, no.
17    Q    Not regularly.  Do you remember giving your
18    deposition under oath in the civil case?
19    A    I remember the depositions, yes.
20    Q    Let me hand you volume I of your deposition which
21    was taken August 2nd, 2006.  And I'd like you to read to
22    yourself --
23    A    Okay.
24    Q    -- the highlighted areas --
25    A    Okay.
```

5109

```
 1   Q    -- on those two pages.
 2                    (Witness complies with request.)
 3             MR. WILLIAMSON:  Can we have a page and line
 4   reference.
 5             MS. TREADWAY:  I'm sorry.  It's pages 138 and
 6   139.
 7   A    Okay.
 8   Q    Does that refresh your recollection about how often
 9   angry people were at the clinic?
10   A    Well, I mean, it wasn't regularly by any -- you
11   know, but he would get one or two or three a week that I
12   would either hear about or hear.
13   Q    You had patients storm out of the clinic?
14   A    Oh, yeah.
15   Q    You had patients yell?
16   A    Yes.
17   Q    You had patients complain about not getting enough
18   drugs, didn't ya?
19   A    This -- they couldn't get their medications.
20   Q    Right.  And they'd scream and cry and make a scene;
21   right?
22   A    Sometimes.
23   Q    And you said that happened three or four days a
24   week; right?
25   A    It could, yeah.
```

5110

1  Q   Now, you mentioned some of the physician's

2  assistants.  Do you remember a young woman by the name

3  of Lori Hunter, very very timid?

4  A   Barely.

5  Q   Do you remember telling the folks in your deposition

6  that she cried every day?

7  A   They said she cried every day and I saw her cry when

8  she left.

9  Q   Working at the clinic upset her, didn't it?

10  A   I don't know what was upsetting her.

11  Q   And the physician's assistants had to get a

12  physician's okay before you could take an order from a

13  physician's assistant to inject a Schedule II drug;

14  isn't that correct?

15  A   Yes.

16  Q   And it was your understanding when you were at the

17  clinic that the physicians were in charge of the

18  patient's treatment; correct?

19  A   Yes.

20  Q   Now, Linda was the office manager, wasn't she?

21  A   Yes.

22  Q   And one of the things that the doctors and Linda was

23  concerned about was that when the doctors and the

24  physician's assistants return from lunch with the

25  pharmaceutical representatives, they wanted to make sure

5111

 1   all the exam rooms were full of patients; didn't they?

 2   A   They'd prefer.

 3   Q   Now, when you were at the clinic did you become

 4   aware during the course of your employment that patients

 5   were overdosing?

 6   A   I'd heard of overdoses.

 7   Q   And did you hear that people were also dying from

 8   drug overdoses?

 9   A   Yes, I heard that.

10   Q   But isn't it true, Ms. Beyer, that there were never

11   any discussions about the overdoses and how to prevent

12   them?

13   A   I don't know.

14   Q   You weren't a part of any, were you?

15   A   No.

16   Q   Would you agree with me, ma'am, that it's wrong to

17   put profit before patients' interests?

18   A   Yes.

19   Q   Do you know anything about how profitable the clinic

20   was?

21   A   No.

22   Q   After the search in September of '05 and the second

23   search in May of '06 and after the allegations being

24   publicized against the Defendant Stephen Schneider and

25   Linda Schneider, did either of them ever come to you and

5112

1    say I'm innocent, all of these charges are bogus?

2    A    Not that I recall.

3              MS. TREADWAY:   Nothing further, Judge.

4                  **REDIRECT EXAMINATION**

5    BY MR. BYERS:

6    Q    Just a couple follow up questions, Brenda.   As the

7    office manager that you just characterized Linda as with

8    Ms. Treadway, is it your understanding that Linda was

9    responsible for directing patient care?   Did she make

10   clinical decisions as the Office Manager?

11   A    Yes.

12   Q    She decided how medicine was practiced?

13   A    Well, no, I mean as far as scheduling and things

14   like that.

15   Q    Okay.   Scheduling.   And as the Office Manager, did

16   Linda have you help pull some charts for any insurance

17   audits?

18   A    Yes.

19   Q    Okay.   As part of pulling those charts, did she tell

20   you to alter, destroy or somehow fiddle around with the

21   records you were pulling?

22   A    No.

23   Q    Did you hear her instructing anyone to do that?

24   A    No.

25   Q    As the Office Manager and specifically at that first

1    raid when you were at the clinic, did Linda Atterbury

2    tell you to tell the agents the truth?

3    A    Yes.

4    Q    And you just testified on cross-examination about a

5    Schedule II injectable.  You remember that testimony?

6    A    Yes.

7    Q    What would that have been?

8    A    Like the Nubain, or I don't know what schedule it

9    was I guess.

10   Q    A pain shot?  Nubain.  But you said you just don't

11   know what schedule that was?

12   A    I don't know what schedule that was.

13             MR. BYERS:  That's all I have.  Thank you.

14             THE COURT:  Yes, sir.

15                   **RECROSS EXAMINATION**

16   BY MR. WILLIAMSON:

17   Q    Okay.  I think I'll be the last one asking you

18   questions and then you can leave.  Okay?

19   A    Okay.

20   Q    Make sure I understand your testimony from

21   Ms. Treadway.  If there were people upset in the

22   lobbies, did that mean that the clinic was refusing to

23   give them medicine on certain days?

24   A    Could have been, yes.

25   Q    And could that -- could they have been upset because

5114

1    they were in pain and they felt like they really needed

2    the medicine?

3    A    Possibly.

4    Q    Okay.  But nevertheless, are you aware that the

5    clinic refused to provide pain medicine to numerous

6    people?

7    A    Yes.

8    Q    They didn't just give it to anybody that walked in

9    the door and said I want pain medicine; is that correct?

10    A    No.

11              MS. TREADWAY:  Objection, leading.

12              MR. WILLIAMSON:  Sorry, Your Honor.  That was

13    leading.  I withdraw it.

14    BY MR. WILLIAMSON:

15    Q    Now, you were also asked questions about the -- Dr.

16    Schneider being aware of people trying to beat the

17    urinary drug screens.  You remember that?

18    A    Yes.

19    Q    Okay.  Was the dye put in place to help prevent

20    those people from beating urinary drug screens?

21    A    From cheating on them, yeah.

22    Q    And also this bathroom, did it have a -- can you

23    describe for the jury how you would collect a specimen

24    in the lab from the person in the bathroom?

25    A    It had a rotating door.

5115

1   Q    So maybe like a twelve-by-twelve cut out between the

2   bathroom and the lab area?

3   A    Yeah.

4   Q    And would that prevent people from having an

5   opportunity to exchange it out in the hallway before it

6   came to the lab?

7   A    Yes.

8   Q    And was it a rotating kind of deal?

9   A    Yeah.

10  Q    You know, like some of those drive-throughs where --

11  A    Yeah, it was a -- yeah, it rolled back.

12  Q    And when Dr. Schneider learned that people were

13  trying to trick these urinary drug screens, did he ever

14  tell you ignore it, don't worry about it?

15  A    No.

16          MR. WILLIAMSON:  I don't have anything

17  further.

18          THE COURT:  Yes.

19          MS. TREADWAY:  Nothing further, Judge.

20          THE COURT:  Thank you, ma'am.  You're excused.

21  Next witness, please.

22                   **SONJA DAVIS**

23  Having been first duly sworn to tell the truth, the

24  whole truth and nothing but the truth, testified as

25  follows on:

```
 1                      DIRECT EXAMINATION

 2    BY MR. BYERS:

 3    Q    Hi.  Would you state your name please.

 4    A    Sonja Davis.

 5    Q    Are you over 18 years of age?

 6    A    Yes.

 7    Q    What's your marital status?

 8    A    I am engaged.

 9    Q    Have any kids?

10    A    Yes.

11    Q    Are you employed?

12    A    Yeah.  Part-time.

13    Q    What do you do?

14    A    Right now I'm PRN at Wichita Family Medicine

15    Specialist, and I also bar-tend.

16    Q    Okay.  PRN meaning what?

17    A    As needed.

18    Q    Okay.  And at what?  Wichita --

19    A    Family Medicine Specialists.

20    Q    Okay.  Where's that at?

21    A    That's over in Carriage Parkway.

22    Q    What side of town is that?

23    A    Central.

24    Q    Central?

25    A    Uh-huh.
```

5117

```
 1    Q   And what do you do there?  You're just called PRN
 2   means as needed?
 3    A   If they need me, they call me.
 4    Q   And what do you do when you're called in?
 5    A   I nurse.  I'm a nurse.
 6    Q   Okay.  Registered nurse?
 7    A   I'm a MA.
 8    Q   Okay.  Do you have any kind of certification or
 9   training?
10    A   I have a CNA and a CMA and I'm in school right now
11   getting my RN.
12    Q   Okay.  And what's a CNA?
13    A   Certificated Nurse's Aide.
14    Q   And what was the other one?
15    A   Certified Medical Assistant.
16    Q   Okay.  And you had some kind of training for those?
17    A   Yes.  I went to Hutchinson Community College.
18    Q   Okay.  Was there -- did there come a time when you
19   were employed at the Schneider Medical Clinic?
20    A   Yes.
21    Q   Okay.  Do you remember the timeframe when you worked
22   there?
23    A   It was spring of, spring or summer of '06 until late
24   '07.
25    Q   Why did you leave there?
```

5118

```
1    A    I got another job opportunity.

2    Q    Was it better paying?

3    A    Yes.

4    Q    What were your duties at Schneider Medical Clinic?

5    A    I did reconciling and, with the insurance, when the

6    insurance companies would send in the payments.  I

7    was -- I roomed for Dr. Schneider and for Connie White.

8    And I was also trained to draw blood in the lab.

9    Q    Okay.  So you did all those functions.  How long did

10   you do this reconciliation work?

11   A    That was just if they needed some extra help, if

12   they were shorthanded.

13   Q    Now, we've heard testimony that most of the billing

14   operations were down in the basement.  Would you have

15   gone down there to do that?

16   A    I was down there briefly and then I began working

17   right outside Linda's office.

18   Q    Doing the reconciliation?

19   A    Uh-huh.

20   Q    Okay.  Did you -- during your time at Schneider

21   Medical Clinic, did you ever see Linda Schneider

22   handling patient charts?

23   A    Yeah.

24   Q    Okay.  Was that on a regular basis?

25   A    Yes.
```

5119

1    Q    Was it a procedure there where virtually every chart

2    went back through Linda's office before it went down to

3    billing?  Do you know how the flow occurred?

4    A    I know that we used to put charts outside Linda's

5    office at the end of the day.

6    Q    Did you have an understanding or a belief as to why

7    they were passing through Linda's office?

8    A    That she was making sure that all the vitals were

9    taken, all the lab documentations were in there and then

10   that the chart was complete for the visit.

11   Q    Did you ever know of any medical assistant who was

12   fired for filling in false vitals?

13   A    Not to my recall.

14   Q    Did anybody at Schneider Medical Clinic ever ask you

15   to fill something in falsely or to alter a record?

16   A    Absolutely not.

17   Q    Did you ever suspect that of any of your coworkers

18   that they were falsely filling in information or

19   altering medical records?

20   A    No.

21   Q    Did you ever perceive -- so you were there from

22   spring of '06 to the end '07.  So at least 18 months; is

23   that correct?

24   A    Uh-huh.

25   Q    Maybe 20 or --

5120

1    A    Uh-huh.

2    Q    During that 20 month or so period working there, did

3    you ever think there was anything improper or illegal

4    transpiring at Schneider Medical Clinic?

5    A    No.  I wouldn't have continued to work there.

6              MR. BYERS:  That's all I have, Your Honor.

7              THE COURT:  Yes, sir.

8                        **CROSS EXAMINATION**

9    BY MR. WILLIAMSON:

10   Q    How are you doing?

11   A    Good.

12   Q    Now, when you were working at the clinic did Dr.

13   Schneider also take care of your children?

14   A    Yes.

15   Q    Was he their primary caregiver?

16   A    Yes.

17   Q    Did you also see Dr. Schneider for any issues?

18   A    Yes.

19   Q    Were you what we've termed a chronic pain patient?

20   A    No.

21   Q    What kind of illness would you see Dr. Schneider

22   for?

23   A    I had pneumonia.  I had caught pneumonia while I was

24   employed there.

25   Q    Did he offer you Oxycontin for that pneumonia?

1   A   No.

2   Q   Did he offer you Lortab for that pneumonia?

3   A   No.

4   Q   Did he appropriately treat that pneumonia?

5   A   Yes.

6   Q   Did you trust him with your children?

7   A   Obviously.

8   Q   And were you satisfied with the treatment that he

9   provided your kids?

10  A   Yes.

11  Q   Now, when you -- would you say -- did you say you

12  were a roomer at one point?

13  A   Yes.

14  Q   Did you ever -- did Dr. Schneider ever ask you to

15  falsify any progress notes?

16  A   No.

17  Q   Did he ever ask you to falsify vitals on progress

18  notes?

19  A   No.

20  Q   Did he ever ask you to falsify any information on

21  fee tickets?

22  A   No.

23  Q   Did you ever witness Dr. Schneider being rude or

24  short with a patient?

25  A   No.

```
 1    Q    Did he ever tell you, hey, I don't want to be in
 2    here with this patient more than three minutes so come
 3    get me out of here?
 4    A    No.
 5    Q    When he would see your children and even see you,
 6    would he take as much time as necessary to see if he
 7    could figure out what was wrong?
 8    A    Yes.
 9    Q    Okay.
10              MR. WILLIAMSON:  I don't have anything
11    further, Your Honor.
12              THE COURT:  Yes, ma'am.
13              MS. TREADWAY:  Thank you, Judge.
14                    CROSS EXAMINATION
15    BY MS. TREADWAY:
16    Q    You said that you started working in the spring of
17    2006 at the clinic?
18    A    I believe that's correct.
19    Q    And who were the providers there at the time, ma'am?
20    A    It was Dr. Schneider, Connie White and Dr. Simons.
21    Q    Prior to going to the Schneider Medical Clinic and
22    applying for a job, did you know that the clinic had
23    been under investigation?
24    A    Yes.
25    Q    And why did you seek employment there?
```

5123

```
 1    A    Well, my mom worked there.  And I just knew that
 2    that was a good place to work because my mom had worked
 3    there.
 4    Q    And who is your mother?
 5    A    Teresa Gahman.
 6    Q    And how long had she worked there?
 7    A    I don't recall.
 8    Q    Do you know what she did?
 9    A    Yes.  She set appointments.
10    Q    Now, do you know whether this practice was engaged
11    in pain management?
12    A    I believe that's --
13    Q    Do you know what percentage of the patients that you
14    saw were pain management patients?
15    A    I don't recall the percentage.
16    Q    Was it more than half?  Less than half?
17    A    I can't make an estimate.
18    Q    Did you know, although this was a clinic that saw
19    pain management patients, that nobody there was a
20    specialist in pain management?
21    A    I'm sorry?
22    Q    Did you know that even though the clinic saw pain
23    management patients, did you know that no one there was
24    a pain management specialist?
25    A    Yes.
```

5124

1    Q   And you knew that nobody had training in pain

2    management there?

3    A   I didn't really, per se, ask.

4    Q   Okay.  Did you have any training in pain management?

5    A   No, ma'am.

6    Q   Did you know that both of the Defendants bragged

7    about the fact that the clinic was the number one writer

8    of narcotic prescriptions in the State of Kansas?

9    A   No.

10   Q   Before you worked there, did you know how many

11   overdoses had shown up at the emergency rooms in the

12   local hospitals?

13   A   No.

14   Q   Did you know how many people had died of drug

15   overdoses before you went to work there?

16   A   No.

17   Q   Did your mother ever discuss that with you?

18   A   No.

19   Q   Let me hand you what has been marked for

20   identification as Exhibit 1-A.  That's a chronology of

21   the individuals who died of drug overdoses from the

22   prescription medications received from the Schneider

23   Medical Clinic.

24           MR. WILLIAMSON:  Your Honor, I'm going to

25   object.  Same objection I've been making that it's

5125

1    mischaracterization of the testimony, the facts, and

2    that document is an improper predicate before this

3    question.

4            THE COURT:  Same ruling.

5    A   I'm sorry.  Does that mean I can --

6    BY MS. TREADWAY:

7    Q   I didn't ask you a question yet.  I was just telling

8    you what that was.

9    A   Okay.

10   Q   All right.  Can you take a look through that and can

11   you see the dates of death in that one column?  Do you

12   see that?

13   A   Yeah.

14   Q   Prior to your getting there in the spring of 2006,

15   there were quite a few deaths, weren't there, ma'am?  It

16   goes on for pages, doesn't it?

17   A   That's what it appears, yes.

18   Q   Did you know about that before you went to work

19   there?

20   A   No, ma'am.

21   Q   And then after you were there, those deaths

22   continued, didn't they?

23   A   I knew of some patients that had passed.

24   Q   Did you also know that there were a lot of patients

25   that were ending up at the emergency rooms for

5126

1   overdoses?

2   A    From what I understood, yes.

3   Q    Let me hand you what has been marked for

4   identification and admitted as Government Exhibit 1.

5   That's a combination list, chronological order of both

6   the overdose and withdrawal admissions at the ERs as

7   well as the deaths in that other chart that you were

8   looking through.  If you'll flip back to the final page.

9   Would you agree with me that's 176 lines long?

10             MR. WILLIAMSON:  Your Honor, I'm going to

11   object.  It's improper just to have this witness reread

12   the Government's exhibits that we spent weeks already

13   hearing about.

14             THE COURT:  Already what?

15             MR. WILLIAMSON:  Hearing about.  I mean, this

16   has been introduced to the jury.  It's been admitted.

17   But now she's asking her to read whether it's 176 lines

18   long.

19             THE COURT:  I think she just asked her to read

20   it.

21             MR. WILLIAMSON:  And agree whether it's 176

22   lines long.

23             MS. TREADWAY:  Right.  He opened the door,

24   Judge, with that broad question.

25             THE COURT:  I can't remember what the exhibit

1    looks like but -- are you asking her to count the lines?

2                 MS. TREADWAY:  No.

3                 THE COURT:  You don't have to agree or

4    disagree, ma'am.  If you understand the question -- I

5    don't have the exhibit in front of me so I don't know

6    what it looks like -- but answer the question.

7    A    It says 176 on the last page.

8    BY MS. TREADWAY:

9    Q    And would you agree based on the dates on that,

10   there were a lot of people who both overdosed or

11   overdosed and died both before you came to the clinic

12   and after you were working at the clinic?

13   A    That's the way it appears.

14   Q    Now, during the course of your employment there, was

15   it ever a subject of discussion at the clinic amongst

16   the professional staff like yourself what to do to

17   change the fact that there were lots of people ending up

18   at the ER with overdoses or lots of people ending up at

19   the Coroner's office dead from overdoses?

20   A    I mean, I didn't -- it wasn't -- I roomed patients.

21   It was not my responsibility.

22   Q    Oh, I'm not saying it's your responsibility, ma'am.

23   I'm asking if the problem was ever discussed?

24   A    There was procedures taken.

25   Q    Okay.  I'm not asking that.  I'm asking if the

5128

```
 1   problem was ever discussed?
 2   A   I don't recall a specific conversation.
 3   Q   You don't remember meetings where the staff were
 4   gathered together and the issue of overdoses and
 5   overdose deaths were discussed?
 6   A   There was meetings of employees and staff but I
 7   don't recall specific topics.
 8   Q   So that's a no, you don't remember that?
 9   A   I'm saying I don't recall it.  I'm not saying yes or
10   no.
11   Q   And wouldn't you recall that topic being discussed
12   at a clinic in which you were working if that in fact
13   occurred?
14   A   There was so many meetings about so many topics.
15   Q   So the fact that 68 people had died or were dying
16   and hundreds of people were going to the emergency room
17   with overdoses wouldn't have caught your attention?  Is
18   that what you're saying?
19   A   I'm not saying that it didn't catch my attention at
20   the time but --
21   Q   But that you don't remember any discussions today,
22   do you?
23   A   Not specifically, no.
24   Q   Before you went to the clinic, did you know that
25   employees at the clinic called the Defendant Stephen
```

5129

1    Schneider "Schneider the Writer"?

2    A   No, I never knew that.

3    Q   Did you hear it when you were there?

4    A   No, I never knew that.

5    Q   Prior to your going there, did you hear he was

6    called the "Drug Lord of Haysville"?

7    A   No.

8    Q   Did you hear it when you were there?

9    A   No.

10   Q   Did you ever hear him called "Schneider the Writer"?

11   A   No.

12           MR. WILLIAMSON:   Objection.   Asked and

13   answered.

14           THE COURT:   Sustained.

15   BY MS. TREADWAY:

16   Q   Apologize.   Did you ever hear him called "Kevorkian

17   Jr --"?

18       If you knew that people that had been previously

19   employed there had called him that, would you have

20   employed for work there -- or, I'm sorry -- applied for

21   work there?

22   A    Possibly.

23   Q   There have been patients that came to testify before

24   the jury that the Defendants' clinic was a Burger King

25   for prescription addicts.   Were you aware of that before

1    you went there?

2              MR. WILLIAMSON:  Your Honor, objection.  Same

3    thing.  It has not been patients --

4              THE COURT:  Well, the question is improper

5    because -- it's not properly phrased, let me put it that

6    way.

7              MS. TREADWAY:  I'll rephrase it, Judge.

8              THE COURT:  The object is sustained.

9    BY MS. TREADWAY:

10   Q   Before you went to be employed at the clinic did you

11   know that a patient had said that it was a Burger King

12   for prescription pill addicts?

13   A   No.

14   Q   Did you know that employees and patients referred to

15   the clinic as a pill-mill before you went to work at the

16   clinic?

17   A   No.

18   Q   Would you have liked to have known that information

19   before you were employed there?

20   A   I could have heard the information; but I'm an adult

21   and can form my own opinion.

22   Q   So knowing that today doesn't alter your opinions in

23   any way of this place, does it?

24   A   No.

25             MS. TREADWAY:  Thank you.  Nothing further.

1          THE COURT:  Mr. Byers?

2          MR. BYERS:  Nothing else, Your Honor.

3          MR. WILLIAMSON:  Very brief.

4                    **RECROSS EXAMINATION**

5   BY MR. WILLIAMSON:

6   Q    The exhibits the Government put in front of you.

7   You don't know if they're accurate, do you?

8   A    No, sir.

9   Q    You don't know if these people that are on these

10  lists visited the Schneider Medical Clinic once or if

11  they were regular patients, do you?

12  A    No.

13  Q    You don't know whether or not these patientS were

14  following instructions that were given to them by the

15  doctors, do you?

16  A    No.

17  Q    You don't know whether or not these patients were

18  actually taking medicines, drugs or -- strike that --

19  medicines from other doctors, do you?

20  A    No.

21  Q    You don't know whether these people on these charts,

22  whether or not they were taking illegal narcotics, do

23  you?

24  A    No.

25  Q    And you're not aware as to what Dr. Schneider

5132

1    actually knew in regards to any alleged overdoses or any

2    alleged deaths, do you?

3    A    No.

4    Q    And are you -- have you been testifying to the jury

5    based on your personal experiences at the Schneider

6    Medical Clinic?

7    A    Yes.

8    Q    And in your personal experience, did you ever

9    witness Dr. Schneider prescribe medicine to somebody who

10   did not present for a pain condition?

11   A    No.

12   Q    Did you ever witness Dr. Schneider committing any

13   kind of fraudulent acts?

14   A    No.  I wouldn't have continued to work there.

15   Q    You would not have continued?

16   A    No.

17           MR. WILLIAMSON:  Okay.  I don't have anything

18   further.

19           THE COURT:  Anything further of this witness?

20           MS. TREADWAY:  No, Judge.

21           THE COURT:  Thank you, ma'am.  You're excused.

22   Next witness.

23   A    Thank you.

24           MR. BYERS:  Defense calls Tes Gahman.

25

5133

**TERESA GAHMAN**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. BYERS:

Q   Ma'am, would you state your name please.

A   It's Teresa Gahman.

Q   And you go by Tes?

A   Yes.

Q   Okay.  How old are you, ma'am?

A   54.

Q   What's your marital status?

A   Married.

Q   Do you have any kids?

A   Yes, I do.

Q   How many of those?

A   Two.

Q   And their names?

A   Sonja Davis and Miguel Rodriguez.

Q   And Sonja was the one who just testified before you; right?

A   Yes.

Q   Okay.  Was there ever a time when you were employed at the Schneider Medical Clinic?

5134

1    A    Yes.

2    Q    Would you know the years you worked there or the

3    time span?

4    A    I worked there from May '06 until the day they

5    closed.

6    Q    And this is obvious.  You're wearing a cervical

7    brace; right?  You've recently had surgery; is that

8    right?

9    A    Two weeks ago, neck surgery.

10   Q    Laminectomy.  Was it a fusion?

11   A    Yes, fusions and metal plates.

12   Q    Okay.  Going back to the clinic now.  Did you --

13   what were your duties there?

14   A    I was the one -- I was the scheduler.

15   Q    Okay.  Where were you physically located in the

16   clinic?

17   A    Okay.  I was in the front on the lefthand side.  If

18   you're facing the doors, I was on the lefthand side

19   actually what they called Simon's side, Dr. Simons.

20   Q    So that faces out looking -- if someone came in, you

21   would be looking at them?

22   A    I'm pretty much looking at a wall because it was

23   kind of enclosed a little but I could see the

24   receptionist and then they had a door over here where

25   the patients when they come out rescheduled.

5135

```
 1    Q    Okay.  So you dealt directly with the patients after
 2    a visit to reschedule the next one or --
 3    A    Well, I did phone calls when they were calling in to
 4    schedule appointments also.
 5    Q    Okay.  And is that what you did the full time you
 6    worked at Schneider Medical Clinic?
 7    A    Yes.
 8    Q    Okay.  During that time did anyone -- well,
 9    specifically, did Linda Schneider ever ask you to do
10    anything that you felt was improper or perhaps even
11    illegal?
12    A    No.
13    Q    Did Linda ever pressure you to put more and more
14    patients in the schedule and speed things along?
15    A    No.  You couldn't.  The computer had slots to
16    schedule.  You couldn't put anything where there was not
17    --
18    Q    Were your scheduling duties always done on the
19    computer as far as you recall?
20    A    Yes.  Except for when I had to reschedule somebody.
21    I would get a list of patients, you know, if they
22    were -- had to be cancelled.
23    Q    Okay.
24    A    And we would reschedule them into another spot
25    another day.
```

5136

1    Q   So if you were sitting on what you said was like the

2    Dr. Simons side, did you just schedule that side of the

3    clinic?

4    A   No.  I scheduled for Dr. Schneider, Simons and

5    Connie White.

6    Q   Okay.  And were there other people doing scheduling

7    at the time?

8    A   Yes.

9    Q   Who would that have been?

10   A   Kayla.  She scheduled.  There was another one,

11   Shelly, she scheduled.  I mean, they worked at different

12   times.

13   Q   Do you know how the -- well, strike that.

14        Do you know if patient charts would typically be

15   reviewed by Linda Schneider?

16   A   Yes.

17   Q   What's your understanding of that, why that

18   occurred?

19   A   Well, the only time I would get a chart is if I

20   needed to schedule an epidural with Dr. Simons.  I would

21   get a chart with a note on it to schedule the epidural.

22   I'd call, schedule it, write it on the front and I would

23   give the chart to Linda; and my understanding is she

24   made sure everything was right in the chart.

25   Q   Did you ever have any other employee -- any employee

1    at the Schneider Medical Clinic tell you that they had

2    been instructed by Linda to do something improper such

3    as altering a record or filling in a blank somewhere in

4    a medical record?

5    A    No.

6              MR. BYERS:  That's all I have, Your Honor.

7              THE COURT:  Anything?

8              MR. WILLIAMSON:  Brief.

9                    **CROSS EXAMINATION**

10   BY MR. WILLIAMSON:

11   Q    How you doing?

12   A    I'm fine.

13   Q    Under the circumstances?

14   A    Yeah.

15   Q    Did you ever treat with Dr. Schneider as a patient?

16   A    Yes.  He was my doctor.

17   Q    Was he your doctor prior to you starting at the

18   clinic, starting employment at the clinic?

19   A    No.

20   Q    And even though you worked on the Simons' side, was

21   Dr. Schneider your doctor?

22   A    Yes.

23   Q    Now, are you married?

24   A    Yes.

25   Q    I'm from Memphis originally, and can you tell the

5138

1    jury what your husband does that has a little connection

2    with Memphis?

3    A    My husband does tributes to Elvis.  He has his own

4    band.

5    Q    Okay.  And does he perform?  Is that what we kind of

6    call an Elvis impersonator?

7    A    Yeah, he doesn't like that word, but, yeah.

8    Q    Does he dress up like Elvis?

9    A    Yeah, he wears --

10   Q    He wear the bell bottoms?

11   A    Yes.

12   Q    All right.  The older or the younger Elvis?

13   A    He does -- he does it all but he has actual outfits

14   that were made.

15   Q    Sure makes for some fun conversations.

16        When you would see Dr. Schneider -- I'm sorry, do

17   you have kids as well?

18   A    Yes, I do.

19   Q    And did they see Dr. Schneider as well?

20   A    Yes, they did.

21   Q    And what kind of ailments did you see Dr. Schneider

22   for?

23   A    I seen Dr. Schneider when I had pneumonia.  And when

24   I was having abdominal problems, pain in my stomach.

25   That's pretty much it.  I mean --

5139

1    Q    What kind of treatment would he give you for your

2    abdominal pain?

3    A    He actually referred me to a place to have a

4    sonogram for my stomach to see if they found anything

5    and that was it.

6    Q    You mean he didn't just prescribe you a Lortab and

7    say get over this pain?

8    A    He's never prescribed me Lortabs.

9    Q    Even though you were in pain?

10   A    No.

11   Q    Well, did you ever have any problems, I guess, with

12   your back or neck when you were seeing Dr. Schneider?

13   A    I already had had back surgery and I had very bad

14   knees.  And I already had an orthopedic doctor that I

15   was seeing.  I didn't go to Dr. Schneider for any of

16   that.  He did send me to somebody for my infection I had

17   in my leg.  He sent me to a dermatologist.

18   Q    Again, he just didn't give you any kind of pain

19   pills for any pain that this infection may have been

20   causing?

21   A    No.

22   Q    Okay.  Do you feel like that you were helped by Dr.

23   Schneider when you were seeing him as a patient?

24   A    Yes, very much so because he was the one that told

25   me to talk to my orthopedic doctor about some numbness I

5140

1    was having in my hands and feet and my orthopedic doctor

2    did a nerve conduction test and we found out I had a

3    neuropathy and --

4    Q   Can you tell the jury what happened?  How did that

5    develop?  I mean, because as we understand it, you had

6    your own orthopedic doctor.  But you were also

7    discussing with Dr. Schneider about numbness and

8    tingling you had?

9    A   I wasn't sure what it was caused from and so I went

10   to him and asked him.

11   Q   Him being Dr. Schneider?

12   A   Dr. Schneider, yes.

13   Q   Okay.

14   A   And asked him what could cause this numbness and

15   tingling that went throughout my feet and my hands and

16   he suggested I talk to my orthopedic doctor for a nerve

17   conduction test.

18   Q   And did you do that?

19   A   Yes.

20   Q   And then did that orthopedic doctor follow the

21   recommendation that Dr. Schneider had passed on to you?

22   A   Yes.

23   Q   And did that -- what did the nerve conduction test

24   show?

25   A   I have a form of -- it's a nerve disease from the

5141

1    neck to the feet and it's a form of neuropathy that I

2    have to take medication for.

3    Q    Before the time that Dr. Schneider discussed that

4    nerve conduction test with you, had your orthopedic

5    doctor tried that?

6    A    No.

7    Q    And do you believe that Dr. Schneider was able to

8    help your kids when they would see him as well?

9    A    Oh, yes.

10   Q    Did Dr. Schneider also see your husband?

11   A    Yes, he did.

12   Q    Was there a time that Dr. Schneider would not let

13   your husband go perform without providing an exam to

14   him?

15   A    Well, actually, we had our own club and he invited

16   Dr. Schneider and his wife to the club for an Elvis

17   show.  And he had had a black out a few weeks before

18   that and fell and Dr. Schneider actually was at the club

19   and talked to him before he took the stage.

20   Q    And he refused to let him go on without --

21   A    Well, basically I think he wanted to make sure he

22   was okay to go on the stage.

23   Q    Okay.  Did you get a bill for that?

24   A    No.

25            MR. WILLIAMSON:  Okay.  I don't have anything

5142

1    further, Your Honor.

2              THE COURT:  Yes, ma'am.

3              MS. TREADWAY:  Thank you, Judge.

4                   **CROSS EXAMINATION**

5    BY MS. TREADWAY:

6    Q    That looks really uncomfortable.

7    A    It is.

8    Q    Did you take walk-in patients when you worked at the

9    clinic?

10   A    I was just a scheduler.  I wasn't a receptionist so,

11   you know, all I did was schedule.  I didn't take the

12   patients.

13   Q    Okay.  So that would have been done by somebody else

14   at the front desk but not by you?

15   A    A receptionist or something.

16   Q    Were you aware that in 2006 Preferred Health System

17   was doing a quality of care audit at the clinic?

18   A    Didn't know anything about it.

19   Q    Didn't know about that.  And I'm assuming from what

20   your testimony has been that you, your husband and your

21   children were never chronic pain patients at the clinic.

22   Is that right?

23   A    My husband had a bad neck and back and Dr. Schneider

24   referred him over to Simons for epidural injections.

25   Q    So you didn't get controlled substance medication at

5143

1    the clinic?

2    A   Not for anything controlled substance, no.

3              MS. TREADWAY:  Nothing further, Judge.

4              THE COURT:  Sir.

5              MR. BYERS:  Nothing else, Your Honor.

6              MR. WILLIAMSON:  Nothing else.

7              THE COURT:  Thank you, ma'am.  You're excused.

8    Next witness, please.

9              MR. WILLIAMSON:  Defense would call Laurie

10   Brown.

11                       **LAURIE BROWN**

12   Having been first duly sworn to tell the truth, the

13   whole truth and nothing but the truth, testified as

14   follows on:

15                   **DIRECT EXAMINATION**

16   BY MR. WILLIAMSON:

17   Q   Hi.

18   A   Hi.

19   Q   If I might have you just to scoot up a little bit

20   towards the microphone and make sure that we all can

21   hear you.

22        Can you introduce yourself to the jury.

23   A   My name is Laurie Brown.

24   Q   Ms. Brown, what do you do for a living?

25   A   I work for United -- USD 394, but I've been on

5144

1   medical leave.

2   Q   How long have you been on medical leave?

3   A   Almost three years.

4   Q   And is that related to some of the conditions as to

5   what led you to see the Schneider Medical Clinic?

6   A   Yes and no.

7   Q   Okay.  We'll talk a little bit more about that.

8   What did you do before you worked at USD 394?

9   A   I owned a non-profit organization.  It was an

10  environmental organization.

11  Q   And what was the goal or the mission of that

12  organization?

13  A   It was to educate people to what we could be exposed

14  to and how to take steps to protect yourself a little

15  better.

16  Q   Okay.  In regards to like toxic issues in the air

17  or --

18  A   Everything.

19  Q   Everything.  Okay.  And are you married?

20  A   Yes.

21  Q   How long have you been married?

22  A   Ten years.

23  Q   Any kids?

24  A   Yes.

25  Q   And how many children do you have?

5145

1    A    Three children.

2    Q    Now, where do you live?

3    A    The address?  Physical address?

4    Q    Yes.

5    A    23172 Southwest Prairie Creek Road, Douglass,

6    Kansas.

7    Q    And how far is that from Wichita?

8    A    I don't know the exact miles but it takes me almost

9    an hour to get into Wichita proper.

10   Q    Okay.  And is that, maybe, how close is that to

11   Oklahoma?

12   A    As the crow flies, it's about 16 miles.  I'm by

13   Winfield, down in that area.

14   Q    Okay.  Well, I'm a city boy from Memphis so when you

15   say when the crow flies, can you tell me what that

16   means?

17   A    Well, everyone from Kansas knows what it means, but

18   it's from one point to another as the crow would fly

19   across the sky.

20   Q    Okay.  So basically in a straight line without all

21   the winding roads?

22   A    Correct.

23   Q    Okay.  All right.  I'm with you.  Somebody laughin'

24   at me?  Okay.

25        At some point were you a patient at the Schneider

5146

1    Medical Clinic?

2    A    Yes.

3    Q    Okay.  Do you know when you started with the

4    Schneider Medical Clinic?

5    A    I don't remember the year but I believe it was the

6    mid if not early 2000s.

7    Q    And was Dr. Schneider your primary physician there?

8    A    Yes, he was.

9    Q    And what kind of conditions -- strike that.

10        Were you what we've been known as a chronic pain

11   patient?

12   A    I'm sorry.

13   Q    Are you considered a chronic pain patient?  Let me

14   rephrase that because that's more of a term of art from

15   us.

16        Did you suffer from pain conditions that you have

17   to take medication for?

18   A    Yes.

19   Q    Okay.  And did you -- and what kind of conditions do

20   you suffer from?

21   A    I have Lupus and Rheumatoid Arthritis.  I also broke

22   my leg and in a pretty serious car accident three years

23   ago which ruptured the L4 and L5 in my back.

24   Q    Okay.  And how long were you a patient at the

25   Schneider Medical Clinic?

5147

1    A    About five years.

2    Q    Did you -- were you still a patient up until Dr.

3    Schneider was incarcerated on this case?

4    A    No.  I had already gone to another physician at that

5    point.

6    Q    Now, when you were being treated by the Schneider

7    Medical Clinic, can you tell the jury what kind of

8    treatment that you would receive?

9    A    When I first started going there I was very unhappy

10   with the physician I was with.  It was a physician in

11   Derby.  And I could barely walk when I went to the

12   Schneider clinic.  I'm sorry.  Your direct question was

13   what?  I apologize.

14   Q    Oh, you're fine.  What kind of treatment did you

15   receive?

16   A    At first there was not a definitive diagnosis for

17   the Rheumatoid Arthritis.  I already knew about the

18   Lupus but I had not had a flare up.  Dr. Schneider sat

19   down, his staff sat down, we talked about my condition

20   at great length and we started to running tests to find

21   out why I was in the condition I was in at a relatively

22   young age.

23   Q    And let's pause there.  You were seeing a physician

24   in Derby before you went to the Schneider Medical

25   Clinic?

5148

1    A    That's correct.

2    Q    And for those of us who are unfamiliar with, like,

3    the flare ups in regards to Lupus, can you tell the jury

4    what that is and how that effects you?

5    A    A flare up?

6    Q    Yes.

7    A    A Lupus flare up is your joints become real stiff

8    and tight and you're very tired, very fatigued.  You

9    don't have much energy.  Just tremendous amount of pain.

10   You just don't feel like you normally feel.

11   Q    Okay.  And would that stop you from doing your

12   normal daily activities such as walking and doing other

13   things to enjoy life?

14   A    Oh, yeah.

15   Q    And you could barely walk when you first went in

16   with the Schneider Medical Clinic?

17   A    That's correct.

18   Q    And as I understand it, did they -- did they

19   actually do tests to try to figure out what was going on

20   with you?

21   A    We thought at that point it was my feet and the

22   other doctor in Derby kept on saying it was gout and Dr.

23   Schneider felt that it was a little more than gout and

24   he sent me to a specialist, a foot specialist, a

25   podiatrist.  And Dr. Schneider and the podiatrist came

5149

1    to the conclusion that I had Rheumatoid Arthritis and

2    then Dr. Schneider sent me to a rheumatologist and

3    that's when we discovered that I did have Rheumatoid

4    Arthritis and it was settled in my feet and other areas

5    of my body.

6    Q    Okay.  Before you went to see Dr. Schneider, did you

7    have trouble sleeping?

8    A    Oh, yeah.

9    Q    And was that because of the pain that you were in?

10   A    Yes.

11   Q    And was it a constant pain that stayed with you all

12   day or was it just something, okay, this hour I'm okay

13   and the next hour I'm not?

14   A    It was constant.  It was -- there were times when it

15   was a lot worse; and believe it or not, sometimes in the

16   middle of the night it was worse.  And when I woke up in

17   the morning it was awful.

18   Q    And during your treatment with Dr. Schneider, did he

19   start prescribing you pain medicine to help control this

20   pain?

21   A    I had been on pain medicine prior.  But, yes, he

22   continued a regimen of pain medications.

23   Q    Can you tell the jury what you recall being your

24   medical regimen in regards to the medicine you were

25   receiving from Dr. Schneider?

5150

1   A   I took Tylenol IV PRN, up to eight a day.  And he

2   tried me on other medications and we settled on a new

3   medication called Opana, and it was an emergency release

4   and it seemed to really -- I mean, I could work again.

5   I felt great.

6   Q   Now, you said that we tried.  Did you and Dr.

7   Schneider discuss your medications and what was working

8   and what wasn't?

9   A   Oh, yes.

10   Q   Are you aware that the Government witnesses have

11   classified, if a patient tells a doctor what medicine

12   they like or what works for them, that that's called,

13   "drug seeking behavior".

14          MS. TREADWAY:  Objection, argumentative.

15          THE COURT:  Yes.  The objection is sustained.

16   BY MR. WILLIAMSON:

17   Q   When you were discussing these medicines with Dr.

18   Schneider, were you discussing it to tell him what

19   worked for you and what didn't work?

20   A   Absolutely.

21   Q   Was it an open dialogue between you and Dr.

22   Schneider?

23   A   I did most of the talking.  He did most of the

24   listening.

25   Q   Did he appear to be concerned about the kind of pain

5151

1    that you were in and how this medicine may have been

2    helping or not helping?

3    A    Absolutely.

4    Q    And when he prescribed this Opana, did you express

5    to him that this medicine helps me?

6    A    Yes, I did.   Matter of fact, I'm very frightened of

7    medication.   I don't like to try anything new because I

8    don't know how it works.   So, Dr. Schneider was very

9    good about going through exactly what the medication

10   would do and how it might effect me.   And we started on

11   a relatively low dose and it worked.   I mean, there

12   was -- it was slow and gradual, but it did seem to work

13   over a period of time.

14   Q    Okay.   When you would go to the clinic, would there

15   be a lot of people waiting in the waiting room

16   sometimes?

17   A    Sometimes.

18   Q    And as I understand it, you don't live too far from

19   Oklahoma as we talked about?

20   A    Right.

21   Q    Okay.   Did you travel all the way from Oklahoma to

22   Wichita because you were addicted and just wanting to

23   get medication?

24   A    No.

25   Q    Why did you come from Oklahoma and see Dr. Schneider

5152

1    or even the doctors in Derby?

2    A   Well, it's Kansas.  I still live in Kansas but I was

3    raised in Haysville.  Been there all my life since 1959.

4    My parents are up in age.  They're almost 90.  And I'm

5    their primary caregiver so most of my time was spent in

6    Haysville anyway.

7    Q   So, just because you lived close to Oklahoma didn't

8    mean that you spent all your time close to Oklahoma?

9    A   Seemed like I spent very little time there.

10   Q   Now, what other medicines do you recall receiving

11   while you were treated by Dr. Schneider?

12   A   I have a heart condition and Dr. Schneider sent me

13   to a heart specialist and we started those medications

14   which Dr. Schneider oversaw all my specialists.  He

15   introduced me to a whole new world of specialists.

16   Q   And outside of -- strike that.

17       When you left Dr. Schneider, who was your next

18   provider that you saw?

19   A   Well, I had to have two different providers.

20   Because Dr. Schneider oversaw all of my specialists, he

21   handled all my medications.  When I broke my leg, I went

22   to Dr. Eyster.  Dr. Eyster, I don't know if he and Dr.

23   Schneider spoke, but Dr. Schneider was the one who

24   handled my medications during that period and that was

25   fine with Dr. Eyster because, I don't know why, but it

5153

1    was.

2    Q   So let's make sure the jury understands.  At one

3    point you were having to see Dr. Eyster for -- was he

4    the orthopedic issue?

5    A   Yes.  I broke my leg.

6    Q   And Dr. Eyster knew that you were seeing Dr.

7    Schneider to help control your pain issues?

8    A   He knew that Dr. Schneider was my primary care

9    physician.  But he was more than pain.  I mean, he

10   was -- he oversaw my heart issues.  He oversaw my broken

11   leg.

12   Q   Okay.  And that Opana that we talked about, is that

13   like an Oxymorphone kind of combination?

14   A   I have no idea.  I don't know that much about

15   medicines.

16   Q   Okay.  But -- okay.  And then ultimately you have

17   found another doctor who will treat you now?

18   A   I had a -- I'm sorry, I didn't answer your question;

19   but, yes, I went to down closer to Oklahoma down in

20   Winfield.  I went to a physician, doctor, down there,

21   Dr. Ryan Davis, and then went to a pain management

22   clinic in Wichita.

23   Q   And who did you settle on to provide your ongoing

24   treatment now?

25   A   For what?

5154

1    Q    Everything.

2    A    For everything?

3    Q    Yeah.

4    A    I'm now in Rose Hill with that doctor and I have a

5    primary care physician, but it seems like since I left

6    the Schneider group, no one talks to each other any more

7    so I kinda have to go to my heart specialist and my leg

8    specialist and -- but Dr. Marty Turner is who is my

9    primary care physician.

10   Q    Okay.  Now, so the jury can have an understanding,

11   can you tell them, give them an example of what your

12   life was like before you saw Dr. Schneider and you guys

13   found the medicines that worked for you and then how

14   you're able -- and the difference when you're actually

15   taking your medication?

16   A    Prior to -- when I went to Dr. Schneider I was

17   already on Tylenol IV but it was not working and I had

18   been on it for many years.  And when I saw Dr.

19   Schneider, I could barely walk and I was very -- I did

20   not walk with a cane because I didn't think -- I didn't

21   need a cane for my feet.  But I didn't walk around very

22   much, to be real honest with you.  I became very

23   sedentary.

24   Q    And are you currently still taking medication for

25   your pain conditions?

5155

1    A    Yes.

2    Q    And the physician that you see now in regards to

3    your pain issues, are you still receiving the same type

4    of medication?

5    A    I'm still receiving the same type, yes, but not the

6    same amount.

7    Q    Well, did he reduce that amount you were taking?

8    A    No.

9    Q    What did he do?

10   A    They increased it.

11   Q    So, you're actually now taking more medication than

12   you were when you were with the Schneider Medical

13   Clinic?

14   A    That's correct.

15   Q    Now, are you currently taking pain medication now?

16   A    Yes.

17   Q    So you've taken your amount for today?

18   A    Yes.  Until 3:00.

19   Q    And why is it important -- why do you know at 3:00

20   you should be taking some more medication?

21   A    It's a twelve-hour time release medication and you

22   have to stay on top of it to stop the breakthrough pain

23   as much as you possibly can.

24   Q    Now, can you tell the jury what would you be like

25   sitting up here right now if you were not taking your

5156

1    pain medication?

2    A    I'd probably look the same.  I wouldn't sound the

3    same.  I'd be pretty grouchy.

4    Q    Would you be pretty hurting?

5    A    Oh, yeah, more so.

6    Q    So is it possible that you can be grouchy when

7    you're not getting your pain medication because you're

8    hurting and in pain?

9    A    Oh, yeah.  When you're in pain, it seems like you

10   don't take care of yourself very well.

11   Q    Now, when you were seeing Dr. Schneider, would he

12   hurry you through the exam room?

13   A    No.

14   Q    Was he personable?

15   A    Oh, yeah.

16   Q    Would he take the time necessary, that you felt was

17   necessary to give you a diagnosis and treatment?

18   A    Oh, yeah.  I did not have a definitive diagnosis

19   until I went to Dr. Schneider.

20   Q    So, as we understand it, he didn't just give you

21   pain medication and say I'm not concerned about trying

22   to figure out what's wrong with you?

23   A    No.  It was definitely we're going to figure out

24   what's wrong with you and go from there, from the heart

25   down to the bones to the everything.

5157

```
1    Q   Do you feel like that you were helped by Dr.
2    Schneider?
3    A   Yes, I do.
4    Q   And why do you say that?
5    A   Oh, because today I feel like I -- I feel good.  I
6    feel like I look alright for an old woman.
7    Q   You look great.
8    A   I was fishin'.  I feel a lot better.  I feel really
9    good.  I have a wonderful life and I'm happy and I'm not
10   depressed any more.  There was a time that I became very
11   depressed because I just hurt so much.  And I had just
12   married the man of my dreams and I just didn't do much
13   and it was very depressing.
14           MR. WILLIAMSON:  I don't have anything
15   further, Your Honor.
16           THE COURT:  Mr. Byers?
17           MR. BYERS:  No questions, Your Honor.
18           THE COURT:  Ms. Treadway.
19           MS. TREADWAY:  Thank you, Judge.
20                     CROSS EXAMINATION
21   BY MS. TREADWAY:
22   Q   Now, when you were at the Schneider Medical Clinic
23   you saw other providers other than Dr. Schneider;
24   correct?
25   A   That's correct.
```

5158

1   Q   You saw Kim He'bert?

2   A   That's correct.

3   Q   You saw Curtis Atterbury?

4   A   I did.

5   Q   Do you know he was related to the Defendant?

6   A   I went to school with them all.

7   Q   So you'd known them for a long time?

8   A   Known of them.  We didn't hang around together.

9   Q   Did you see Donna St. Clair?  Remember her?

10  A   Probably not.  I mean --

11  Q   You don't remember her?

12  A   I'm terrible with names.  I apologize.

13  Q   She had long brown hair, very nice, attractive.

14  A   Oh, young woman?

15  Q   Yes.

16  A   Yes, yes.

17  Q   Do you remember seeing Charles Lee Craig?  He used

18  to be a firefighter and he became a physician's

19  assistant.  Kind of sandy blonde hair, blue eyes.  Do

20  you remember him?

21  A   I do not.

22  Q   Do you remember seeing an Asian woman by the name of

23  Hien Nguyen?

24  A   Yes.

25  Q   Do you remember seeing Mohammed Akram?

5159

```
 1    A    One time.

 2    Q    Do you remember seeing Connie White?

 3    A    I do.

 4    Q    And Lawrence Simons?

 5    A    I do.

 6    Q    What kind of insurance did you have, ma'am?

 7    A    Blue Cross/Blue Shield.

 8    Q    Now, when you were going to the clinic, did you know

 9    that the Defendant was not a pain management specialist?

10    A    Yes.

11    Q    He never told you that he was a pain management

12    specialist?

13    A    No.   He was a general practitioner.

14    Q    And when you were going to the clinic, were you on

15    controlled substances other than the Tylenol IV?

16    A    No.

17    Q    That was it?

18    A    I believe so.

19    Q    And that was something that had worked for you and

20    had been prescribed before you went to the clinic?

21    A    I had been on it so long that I was familiar with it

22    and I felt like it did give me some degree of relief.

23    Not much.

24    Q    And you left to go to other doctors before the

25    clinic ever closed; is that correct?
```

5160

```
1    A    That's correct.

2    Q    And you've got a wonderful life?

3    A    I've got an awesome life.

4    Q    That's great.

5    A    Yeah, it is.

6              MS. TREADWAY:  Thank you.

7    A    I'm very lucky.

8              MS. TREADWAY:  Thank you.  Nothing further.

9    A    Thank you.

10             THE COURT:  Really?  Is this necessary?

11             MR. WILLIAMSON:  Who me?

12             THE COURT:  Yes.

13             MR. WILLIAMSON:  Yes.

14             THE COURT:  I don't think so.  I don't think

15   so.

16             MR. WILLIAMSON:  It's real quick, Judge.

17             THE COURT:  No.  It's always real quick.  I

18   think we've covered this territory quite adequately.

19   Thank you, ma'am.  You're excused.

20   A    Thank you, sir.

21             THE COURT:  Any more witnesses?

22             MR. WILLIAMSON:  Not for today, Your Honor.

23             THE COURT:  All right.  Ladies and Gentlemen,

24   I'll see you at 9:00 tomorrow morning.  Please remember

25   and heed the admonition.
```

1          (Jury excused at 2:30 p.m.)

2          THE COURT:  I have heard enough of these type

3     of witnesses.  There will be no more.  We've had a

4     balance now of Government witnesses who have damned the

5     clinic.  We've now had a number of witnesses,

6     practically equal number or greater, who have praised

7     the clinic.  I think the jury must be dead tired of

8     hearing these leading questions and repetitive

9     questions, Mr. Williamson.  They'll give an answer and

10    then you will repeat the answer in a way that sounds

11    better to you.  Now, we have plenty of evidence in this

12    case on both sides about what was going on at the

13    clinic.  I've talked to you about timing and I'm not

14    going to allow any more of this parade of these people.

15    I wouldn't allow it from the Government.  I won't allow

16    it from the Defendants.  And I won't allow any

17    arguments.  I can see it on your face, Lawrence, that

18    you want to argue about it and I won't let you argue

19    about it.  This is a 403 ruling.  And we've had enough

20    of this.  Let's get this case now to the experts and the

21    other people that you all want to call.

22          MS. TREADWAY:  Judge, for the record, I

23    would -- I do want to raise that 403 objection at this

24    time.  I believe it's absolutely proper.

25          THE COURT:  You don't need to raise it.  I

5162

 1    just made the ruling.

 2              MS. TREADWAY:  I realize that, but for the

 3    record, Judge, the Government would move that as well.

 4              THE COURT:  We've -- this is our -- too long

 5    on this, on this stuff.

 6              MR. WILLIAMSON:  Judge, can you give me two

 7    minutes just to make a record.  I mean, I'll --

 8              THE COURT:  I'll let you make a record because

 9    I do not like to not allow lawyers to make a record; but

10    you're not going to change my mind.

11              MR. WILLIAMSON:  I understand.

12              THE COURT:  We have heard all of this

13    constant -- these people that come in here, their whole

14    families are seen by the Schneiders.  They all work

15    there.  They all have the same thing to say.  The jury

16    has heard enough.  Now, make your record and then let's

17    get on with this case.

18              MR. WILLIAMSON:  Thank you, Your Honor.  I

19    understand that the Court has its mind made up.  It's

20    definitely -- I just have to do it.  Bottom line is is

21    the Government put on four and a half weeks of very

22    weakly linked witnesses.  They brought in three people

23    from the same ER.  They brought in three different

24    doctors to give opinions.  And they have painted the

25    clinic as a pill-mill and a narcotics delivery system.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

5163

1    They have painted people who come from long distances as

2    drug addicts, as red flags --

3              THE COURT:  Now, please, Mr. Williamson, you

4    don't need to make a record like this.  This is closing

5    argument.

6              MR. WILLIAMSON:  No, it's not, Your Honor.

7              THE COURT:  Yes, it is.

8              MR. WILLIAMSON:  No, it's not.

9              THE COURT:  Will you not argue with me any

10   more.  I'm sick of it.

11             MR. WILLIAMSON:  All right.

12             THE COURT:  Now, listen to me instead of

13   talking all the time.  Open your ears and listen for

14   once.  I've listened to you and your repetitious type of

15   argumentative questions now for six weeks.  And I'm

16   tired of it.  Now, you've still got an opportunity to

17   put on witnesses.  You've got three experts lined up,

18   one of whom refuses to come until he's ready.

19   Inconveniencing me.  Inconveniencing the jury.  I'm not

20   disallowing the Defendants to put on evidence in this

21   case.  What I'm saying is we've heard enough and -- of

22   this type of evidence.  Now, if you can't get that

23   through your head and your clients are convicted, make

24   an argument to the Court of Appeals.  I'm sure you'll be

25   able to find at least one judge up there who will agree

5164

 1    with you.

 2         Now, I've talked to the jurors in this case.

 3    Here's what we're going to do.  We will finish out this

 4    week --

 5              MR. WILLIAMSON:  We don't have any more

 6    witnesses.  All our witnesses are --

 7              THE COURT:  You have no more witnesses this

 8    week?

 9              MR. WILLIAMSON:  Let me clarify.  We have

10    maybe two or three more employee witnesses.  We also

11    have patients --

12              THE COURT:  No.  They'll just say the same

13    thing that these people have said.  These are nice

14    people.  They believe what they're saying.  The

15    Government people are nice people.  They believe what

16    they're saying.  The jury is going to have to decide on

17    that basis.  I will let you have your other witnesses.

18    I'm not restricting that at all.  What I'm telling you

19    is I'm telling -- I've told the jury what we talked

20    about in chambers on the record.  They're willing to

21    work with us on this.  We'll finish out this week with

22    your experts or whoever it is that you're going to call.

23    We'll have your expert on Monday, whoever that is, Dr.

24    Karch.  I hope we can finish on Monday with Dr. Karch,

25    and I want you two to plan on that because I've told the

5165

```
 1    jury that we will not have trial next Tuesday and
 2    Wednesday.  It is inconvenient for them to come in for
 3    an hour or two's testimony.  So on Monday, if we don't
 4    finish with Dr. Karch by 5:00, I'm going to make
 5    arrangements to keep the courthouse open so that we can
 6    finish with him -- or her -- I can't remember which it
 7    is -- in that day.  We will not have court on Tuesday or
 8    Wednesday to convenience the Defendants so that this
 9    other arrogant witness who says he can't be here until
10    he wants to be here can come in here.  Then we will
11    finish the evidence by next Friday.  And, Ms. Treadway,
12    that means any rebuttal has to be done by Friday.  We
13    will meet either probably on Wednesday to discuss the
14    instructions.  So that by next -- the following
15    Tuesday -- we're going to take Monday off so that Mr.
16    Byers can go to his son's graduation.  And I sure want
17    him to do that.  That's an important thing in his life.
18            MS. TREADWAY:  Is that June 15, Judge?  I'm
19    just trying to keep track of everything.
20            THE COURT:  I don't know when --
21            MR. BYERS:  He graduates the 13th, so the 14th
22    is the Monday --
23            THE COURT:  We're not going to have trial that
24    day so that Kevin can go to his son's graduation.  And
25    by that time, on Tuesday, we will reconvene and we will
```

5166

1    have closing arguments and we'll have instructions.  And
2    the jury then can take the case and have whatever time
3    it needs that week.  If my calculations are correct,
4    that would be basically week number eight, whatever it
5    is.  We've got to finish this case.  We've got to move
6    it along.  And that's what I'm doing after week number
7    six or whatever week we're in, I don't know, and we'll
8    get it done.
9               MS. TREADWAY:  Judge --
10              MR. WILLIAMSON:  Can I make one request?
11              THE COURT:  Yes.
12              MR. WILLIAMSON:  Can you at least instruct the
13   jury on your ruling --
14              THE COURT:  No.  No.  Instruct the jury that I
15   won't let you call more repetitious witnesses?
16              MR. WILLIAMSON:  Yes.
17              THE COURT:  Heavens, no.
18              MR. BYERS:  Judge, I need to at least make a
19   record on behalf of Linda just -- I'm not arguing --
20              THE COURT:  If you have a different set of
21   witnesses that aren't going to just come in and say that
22   Dr. Schneider treated them properly and spent time with
23   them, then that's a different story.  What have you got,
24   Kevin?
25              MR. BYERS:  Well, I was just going to note,

5167

 1    Your Honor, by my calculations, the Government indeed

 2    put on 60 witnesses and they recalled four of those.

 3    Because I have 64 slots with 60 distinct witnesses.  And

 4    we're at number 14 and the Court has now ruled we're

 5    done --

 6              THE COURT:  No, I said you were done with

 7    these witnesses who come in from the clinic and say it

 8    was a great place to work, that Dr. Schneider was a

 9    great doctor.  If you have witnesses with respect to

10    your client who deal -- who dealt with billing, who

11    dealt with those discrete areas, I'll let you call them.

12    Because we have not had the same number.  But the

13    Government called a lot more witnesses because it

14    covered a lot more territory.  We all know that.  And

15    I'm going to allow you to cover the same territory to

16    the extent you want to with your experts or any other

17    witness who will say anything other than just what we've

18    heard all day today and that is -- and yesterday and

19    whenever -- about what a great place it was to work at

20    the clinic and what a good doctor Dr. Schneider was.  At

21    some point you all have to realize the jury's got this

22    picture.  He either was or wasn't the kind of doctor

23    that the Government wants to paint him as.

24              MR. WILLIAMSON:  Judge, one --

25              THE COURT:  No.  No.  Come on -- you always

5168

1    want to talk, Lawrence, and I don't want to hear any

2    more.  You know, this is too much.  You always have

3    wanted to talk and I've listened and listened and

4    listened.  It's now time for me to make some rulings and

5    get this case moving.  If you'd have had all your

6    witnesses here yesterday and today, we wouldn't, to some

7    extent, we wouldn't be having this discussion.  Yes,

8    what do you want, Tanya?

9              MS. TREADWAY:  Judge, I just want to ask for a

10   little special dispensation as to Dr. Karch.  I totally

11   agree we should try to get him done in a day and I am

12   more than willing to work within that.  I was wondering,

13   however, if we could balance that a bit by telling the

14   defense that, okay, you have four hours and the

15   Government has an hour --

16             THE COURT:  I don't have any idea what this

17   guy is going to say.

18             MS. TREADWAY:  I don't either, Judge.

19             THE COURT:  Well, you ought to know because

20   they provided you with sufficient information about

21   his -- keep in mind, while we're talking about this,

22   that if you hadn't filed that motion pointing out the

23   case in Denver to me, you'd all have reports.  You're

24   the one who got that started by attempting to show me

25   how smart you were and what the law in the Tenth Circuit

1    was.  Otherwise, we would have complete reports from all

2    these experts.

3         I am not going to put time limits on Dr. Karch.

4    So, I've told this jury that they don't have to work on

5    Tuesday and Wednesday so they can plan their schedules,

6    and that means Dr. Karch will have to be back here on

7    Thursday if he's not done, so you tell him that.  We're

8    going to finish this case.  At some point even the

9    judges on the Court of Appeals, some of them, recognize

10   that the district judge has to be in charge of how the

11   case is managed.  And if they don't like it, they can

12   tell me I didn't do it the right way.  But I don't see

13   any of them in here telling me after six weeks how to

14   try this case and I'm going to make the decisions.

15        Now, is there anything else we need to talk about

16   today?  I'll see you tomorrow at 9:00.

17                    (Recessed for the day at 2:45

18                    p.m.)

19

20

21

22

23

24

25

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas