5170

1           (Beginning at 9:03 a.m. June 3,

2           2010, the following proceedings

3           continued outside the presence

4           of the jury.)

5       THE COURT:  Well, looks like you were up all

6   night.

7       All right.  Here's what I'm going to do.  The first

8   thing I want from the Defendants is a proffer

9   regarding -- and I want it right now -- the names of all

10   the witnesses you propose to call to demonstrate Dr.

11   Schneider was a good doctor because that's what we're

12   talking about here in this case.  I want a proffer as to

13   their testimony.  A detailed proffer.  I'll keep the

14   jury in the jury room until I can get it.  I want to

15   know that they're prepared to come in here and testify.

16   Then I will consider -- reconsider my ruling.  But what

17   I saw and what the record will reflect is that the

18   Defendants have not been prepared in this case to put on

19   witnesses.  They've listed many, but you yourself,

20   Mr. Williamson, admitted that you haven't been able to

21   get them served.  And so for the last two days we've had

22   to quit at 3:30 in the afternoon.  Now, there's no

23   reason to expect that the jury likes that and there's no

24   reason to expect that I'm going to tolerate it.  I

25   realize you're probably having trouble getting some

5171

 1    witnesses in here.  I'm not stupid about that.  But that

 2    doesn't mean that I'm going to just sit here and let the

 3    Defendants put on however many witnesses they want to

 4    put on, if they can get them here.  I don't believe that

 5    the record in this case will ever demonstrate that the

 6    Defendants haven't been -- have been denied a fair trial

 7    and I intend to see that they get a fair trial.  I don't

 8    care how the case comes out, but I do want it to be

 9    fair.  They're entitled to a fair trial.  But it's not

10    the trial that they want to put on any more than it was

11    the trial that the Government wanted to put on.

12        I think the Government has overcharged this case.

13    That's my personal feeling.  And I tried to deal with

14    that over a year and a half ago and I got slapped around

15    by the Court of Appeals for it.  Now, I'm not going to

16    be slapped around by the Court of Appeals again, if I

17    can avoid it, because I didn't allow the Defendants to

18    put on a proper case; but I'm not going to allow you to

19    put on a case with people who are just repetitious

20    repetitious, repetitious.  I hope I've made that clear.

21        Now, as far as what remains for the jury.  No, I am

22    not going to, as you wanted me to, make a record as to

23    my discussions with the jury.  I've already told you

24    what I talked to the jury about and I did it with your

25    express permission.  I'm insulted that you would ask

5172

1    now -- essentially accuse me of lying -- to make a

2    proper record.  I don't know what you mean by a proper

3    record when you gave me permission to go in and talk to

4    the jury about how to wind up this case using your

5    problems with your schedule.  I've made my record on

6    that and I don't intend to respond to that kind of

7    insulting irresponsible request.

8         Now, let me hear who you want to call with respect

9    to the Schneiders, the way the clinic was being

10   operated.  I've already told Kevin that if he has

11   witnesses that he wants to call who can talk about how

12   Mrs. Schneider ran the clinic, he can do that.  So I

13   don't think Kevin's dog is in this fight.  But I'm not

14   going to allow Kevin to bring in eight or ten witnesses

15   either.  And I don't think he would.  So who are they

16   and what are they going to say?  Sir.

17             MR. WILLIAMSON:  If I can just have a moment,

18   Your Honor, I have a list but I wasn't prepared to -- I

19   don't have my detailed notes with me.

20             THE COURT:  That's the problem.  You write

21   these things and you say that I'm denying you a fair

22   trial, I'm denying due process and all of this kind of

23   stuff but you can't tell me who they are and what

24   they're going to say.

25             MR. WILLIAMSON:  I can, Your Honor.  I just

5173

1    don't have it with me.  I wasn't prepared for the

2    proffer this morning.

3            THE COURT:  All right.  Then we'll do it at

4    the recess.

5            MR. WILLIAMSON:  Okay.

6            THE COURT:  I assume we have an expert to put

7    on this morning.

8            MR. WILLIAMSON:  Yes, sir.

9            MR. GOROKHOV:  We do, Your Honor.

10           THE COURT:  What?

11           MR. WILLIAMSON:  Yes, sir.

12           THE COURT:  Now, Kevin, do you want to call

13   individualized witnesses to talk about what

14   Mrs. Schneider was doing as opposed to just, you know,

15   that Dr. Schneider was treating people properly?

16           MR. BYERS:  Right.  I do, Your Honor.

17           THE COURT:  You may do that.

18           MR. BYERS:  Okay.  Thank you.

19           THE COURT:  How many?

20           MR. BYERS:  I would think we probably have no

21   more than five more of those people.  Could be as much

22   as eight.

23           THE COURT:  Eight?

24           MR. BYERS:  I think eighth is stretching it.

25   Probably five.

5174

1          THE COURT:  That are going to be talking just

2     about Mrs. Schneider and how she was running things?

3          MR. BYERS:  We can limit it to that, right.

4     It was intended there would be more, but I understand

5     the Court's ruling.

6          THE COURT:  Well, you know, you all know this,

7     or I think you know it, I don't know that you do, but

8     one of the instructions that I give to the jury is that

9     they're not to decide the case based on the number of

10     witnesses.  Obviously, in almost all cases, the

11     Government calls more witnesses than the Defense does.

12     I mean, you all are experienced lawyers, you know that.

13     But we're at a point now where I think we're wearing

14     this jury out.  And we've got another two days this week

15     that the jury expects to be here.  You all can sit down.

16     And we've got Monday.  And doctor what's his name,

17     Karch, coming in on Monday.

18          MR. WILLIAMSON:  Yes, sir.

19          THE COURT:  Now, this is not what I told the

20     jury.  This is what the jury -- one of the jurors in

21     particular said, that he would like to know ahead of

22     time if he's going to have to be here a certain day or

23     not be here.  And I don't think that it's reasonable to

24     have just this sort of open-ended time and then call a

25     jury in and only have a couple of witnesses.  And I

5175

1    think that however many we have, we can finish these

2    additional witnesses.  And, Kevin, in view of the fact

3    you said there may be five, I'd like to have you make a

4    proffer as well because I'm not going to allow

5    duplicative testimony.  Some duplicative testimony, not

6    completely.  We don't -- of course, the jury will be

7    here whenever I tell them they have to be here, but that

8    isn't necessarily a fair thing.  And I've told them that

9    they are not going to have to be here on Tuesday and

10   Wednesday of next week.  Now, that was done with your

11   permission.  I didn't do that ex parte.  Well, I did it

12   ex parte but I told you and you agreed to that.  We can

13   use some of that time to discuss instructions.  Then the

14   next witness comes on Thursday.  And if there are -- how

15   long do you think his testimony will take, Lawrence?

16            MR. WILLIAMSON:  It will definitely be

17   finished by Thursday, assuming --

18            THE COURT:  Well, we have Thursday and then we

19   have Friday, and I've not made any restrictions about

20   that.  And I suppose if we don't get to -- if there are

21   a few of these clean-up witnesses that you need to call

22   in, we could do that.  But the following week we need to

23   get this case to the jury.  That will be the eighth week

24   that we've been here.  And we won't be here Monday so

25   that Kevin can go see his son graduate.  There's no

5176

1    complaint from the jury about that.  But we're going to

2    take, I'm sure, the better part of a day with arguments

3    and instructions.  And we have to squeeze in rebuttal on

4    Friday, too.

5              MS. TREADWAY:  It will be very brief, Judge.

6              THE COURT:  I know that.  But if you don't get

7    the point here, the point is that I want to end the

8    evidence on Friday so that when the jury comes back here

9    on the following Tuesday that we can have instructions,

10   arguments and let them start deliberating.  I don't

11   think this jury -- this is a jury -- I've been amazed,

12   frankly, that they've paid so close attention.  And I

13   think they'll spend time deliberating, but that's beyond

14   our control.  But I think it's fair to get the case to

15   them on Tuesday so that if they need three days to

16   deliberate that week, they can finish their

17   deliberations that week and don't have to come back the

18   following week.  I think we've got some problems the

19   following week as I -- no, we don't.

20       Now, here's the next thing, and I'm going to insist

21   on this.  I've covered this with Lawrence several times

22   about leading questions on direct examination.  This

23   isn't something I'm making up.  This is the rule.  This

24   is the rule of evidence.  Had Lawrence come up to the

25   bench -- and I don't think I needed to -- but I told him

1   how to ask non-leading questions.  You cannot have a

2   legitimate leading objection to questions that commence

3   with, you know, who, what, when, where, why, and how.

4   And that's what the rule requires.  And I'm going to

5   insist on it and I'm going to insist on it for any

6   rebuttal.  I don't think that's unreasonable.  I think

7   it will shorten things up with these witnesses.  And if

8   we continue with this, the first thing I'm going to

9   do -- continue with getting into these leading

10  testifying type questions -- I'm going to explain to the

11  jury why I have instructed that at this point in the

12  case only non-leading questions on direct and I'm going

13  to tell them about it.  And if I have to, I'll cut you

14  off if you keep doing it.  I think that it's the only

15  fair way to deal with this.  And certainly with experts.

16  I haven't been real impressed with some of the experts

17  in this case, but that's not my job.  I think that some

18  of them got led through their testimony -- I'm talking

19  about Government experts to some extent -- when they

20  didn't need to be.  And -- but, if I recall, almost all

21  the objections that were made, I sustained.  But the

22  time is now to get this case done and over with.  So

23  that's what I'm going to do.

24      And one last thing.  I have your proposed

25  instructions up here -- oh, not one last thing.  Two

5178

1    last things.  We'll start the trial at 8:00 on Monday

2    with Dr. Karch.  You can have the entire morning with

3    Dr. Karch.  You have the entire weekend to prepare him.

4    I don't know when he is coming into town, but he's, I'm

5    sure, a professional witness.  He understands what he

6    has to do.  Cross-examination starts at 1:00, ends at

7    4:00.  Redirect, if there's need for redirect, starts at

8    4 and ends at 5.  That gets Dr. Karch off the witness

9    stand and is consistent with what I've already

10   represented to the jury that they'll have Tuesday and

11   Wednesday off.  I don't know exactly when, but I'm going

12   to let you all help me out on this, we will have an

13   instruction conference.  We can do it -- I have a couple

14   of things on Tuesday afternoon, but we can do it Tuesday

15   and Wednesday, get the instructions over.

16       And that brings me to my last point.  If you have

17   any additional requested instructions in light of what

18   we've been doing here, then I want you to get those in

19   by Monday so that Rachael will have an opportunity to

20   look at them and I'll have an opportunity to look at

21   them.  Because before we discuss the instructions, I

22   will have a proposed packet ready for you.  I think you

23   all know this.  So that that's done in an orderly

24   fashion.

25       All right.  Now, anything else that needs to be

1    said and we can get the jury in here?

2           MR. WILLIAMSON:  Judge, I'm sorry for the

3    language in the motion.

4           THE COURT:  I know that, Lawrence.  That's why

5    I got everybody out of the courtroom.  I tried cases,

6    too, a long time ago, and I know it's a stressful thing.

7    And I like you and I respect you.  I like all of you.

8    Even you, Mr. Gorokhov.  And I know this is tough.  I

9    know there's a lot at stake here; but the thing that I

10   think sometimes lawyers forget, even good lawyers

11   forget, are the people sitting over here.  And they've

12   been so good to us in this case but I don't think we can

13   just feel that they'll be here and want to hear all of

14   this forever.  Thank goodness we still have twelve.  I

15   was getting a little nervous about that, but -- anyway.

16   All right.  Let's bring in -- you can bring in your

17   people, whoever they are, and we can get the next

18   witness going.

19          MR. BYERS:  Thank you, Judge.

20                  (Jury enters the courtroom.)

21          THE COURT:  All right.  Did you fill up on

22   doughnuts?  All right.  Call your next witness.

23          MR. GOROKHOV:  Defense calls Barbara Cobuzzi.

24          MR. GOROKHOV:  Judge, can we have a very quick

25   side bar just about the witness.

5180

```
 1          THE COURT:  Where is the witness?
 2          MR. GOROKHOV:  Lawrence went to get her.
 3   She's in the room next door.
 4                         (Thereupon, the following
 5                          proceedings were had at the
 6                          bench by Court and Counsel
 7                          outside the hearing of the
 8                          jury.)
 9          THE COURT:  He says that the witness has
10   diabetes.  I know we've dealt with that before.  You
11   tell her that if anything comes up that she needs a
12   break to let you know or let me know and we'll take care
13   of it.
14          MR. GOROKHOV:  Will do.  Thank you, Judge.
15                         (Thereupon, the following
16                          proceedings continued in the
17                          hearing of the jury.)
18                      **BARBARA COBUZZI**
19   Having been first duly sworn to tell the truth, the
20   whole truth and nothing but the truth, testified as
21   follows on:
22                    **DIRECT EXAMINATION**
23   BY MR. GOROKHOV:
24   Q    Good morning.
25   A    Good morning.
```

5181

1    Q    Would you please introduce yourself to the jury.

2    A    My name is Barbara Cobuzzi.

3    Q    Can you tell the jury a little bit about your

4    educational background, starting with your

5    undergraduate?

6    A    Okay.  I'm an Industrial Engineer from Renz-Lehr

7    Polytechnic Institute.  I have my MBA from NYU.  I

8    worked ten years in the pharmaceutical industry and

9    then, being a mom and wanting to have more time with my

10   kids, I went out and had a business of my own and got

11   into medical billing and had a medical billing company

12   of my own for twelve and a half years.  And then started

13   doing consulting for the past five years.

14         I'm a nationally known consultant who does

15   education; does auditing; does practice analysis using

16   my industrial engineering applicable to the practice;

17   and a multitude of services for practices.  I write

18   articles, things like that.

19   Q    Okay.  It seems you have several certifications and

20   such.  Can you just tell the jury about those?

21   A    Sure.  Besides my educational degrees, I have a CPC.

22   The first set of certifications are from the American

23   Academy of Professional Coders, which is one of the top

24   two certification bodies for coders.  The CPC, which is

25   Certified Professional Coder.  CPCH, which is a

5182

1    Certified Professional Coder for Hospital Outpatient.  A

2    CPCP, which is Certified Professional Coder for Payers.

3    A CPCI, which is Certified Professional Coder for -- as

4    an Instructor.  And a CENTC, which is a Certified

5    Professional Coder who specializes in otolaryngology

6    coding, ET coding, which is an ENT doctor.  And I'm one

7    of the nationally known experts in that area as well.

8    And I then, from the Health Care Compliance Resource

9    Organization, I am a CHCC, which is a Certified Health

10   Care Compliance Consultant.

11   Q    Okay.  Now, in addition to consulting services, what

12   other kinds of work do you do in your capacity as a

13   person who's involved in medical billing and coding?

14   A    Expert witness work.

15   Q    Okay.

16   A    And I do auditing.  I do education.  I write

17   articles.  I do process analysis for practices.  I do

18   all kinds of business-need type services for practices

19   because they seem to have a large need and a weakness in

20   the area of business.

21   Q    Okay.  Can you tell the jury a little bit more

22   specifically about what types of auditing you do and

23   what, you know, on behalf of whom, what are you looking

24   for in these audits, et cetera?

25   A    Well, I, I might do auditing requested at the behest

1    of an attorney who's trying to set up a compliance

2    program.  I might do auditing because a practice has

3    been audited by a payer and they want to be able to set

4    up a counter strategy.  I might be doing auditing

5    requested by the practice because they're working on

6    their compliance program.  I do auditing for a company

7    called The Coding Network, which uses auditing to

8    actually sell their services, but it's also used as an

9    educational tool for the practice on how well they're

10   doing at their coding.  The auditing involves both E and

11   M services, Evaluation and Management services, as well

12   as surgical coding, usually in the arena of

13   otolaryngology.

14   Q    Have you done -- audited doctors on behalf of

15   insurance companies before?

16   A    I have done it one time.  I was an expert witness

17   hired by Blue Cross/Blue Shield of North Carolina as an

18   expert witness to assist them in a case and so I audited

19   on a specific narrow area of a physician in that case.

20   Q    Was that a civil or criminal case?

21   A    It was a civil case.  Well, it was -- it really

22   never got to be a case.  It was, you know, they were

23   going after them for a refund and if they were not able

24   to come to a settlement it would have ended up being a

25   civil, probably a civil case; but it was able to be

5184

1    settled out of court.

2    Q    Okay.  Now, in your practice as an expert witness or

3    a consultant in litigation, what is your hourly rate?

4    A    My hourly rate is 350 an hour.

5    Q    And how much have you been paid in this case?

6    A    About $41,000.

7    Q    So based on my calculation, that's over 100 hours?

8    A    A lot of time has been spent, yes.

9    Q    And why did you spend so much time on this case?

10   A    The case has been protracted.  It was supposed to be

11   going to court a while ago and things were delayed and

12   so because they were delayed I had to rereview all of my

13   work to make sure I was adequately prepared for today

14   and I wanted to really make sure that I was on target,

15   you know, because it was over a year from the time I did

16   my original work.

17   Q    Is it fair to say that you had to review a large

18   number of material, a large amount of material?

19   A    There was a huge amount of material coming from the

20   prosecutor.  There was also five different payers that I

21   had to review their different rules.  So I had to go

22   over all of their rules and apply them during the

23   audits.  And there was just a huge amount of charts that

24   had to be looked at and then decisions had to be made in

25   terms of, you know, how many charts did we look at from

5185

1    a detail point of view.  It was a massive task.

2    Q   Okay.  Now, before we get into your specific

3    opinions, your specific opinions, I'd like to go over

4    with you some general areas that I think would be

5    helpful to cover for the jury before we get into the

6    opinion.  The first thing I'd like to talk to you about

7    is CPT coding.

8    A   Sure.

9    Q   That's been something we've heard a lot about and I

10   think it would be helpful to answer some questions about

11   that.  Can you tell the jury just very generally what is

12   CPT coding?

13   A   CPT coding is a standard under which physicians

14   define their services.  They define what they have done

15   using a five digit code to define what service they have

16   provided a patient.  They use that to the payer in order

17   to get paid.

18   Q   Okay.  Now, did you prepare a powerpoint that you

19   use when you instruct doctors on CPT coding?

20   A   Yeah, I use a powerpoint in order to educate doctors

21   as well as to educate staff, sort of to use as the

22   trainer to help them, uhm, learn and be educated on,

23   uhm, E and M coding, Evaluation and Management coding

24   because it's an area that's still such, uhm, a thorn in

25   their side and such an area of confusion.  Even though

5186

1    the area was first implemented in 1995 and here we are
2    in 2010, and it's still an area of immense confusion and
3    not being followed correctly by so many practices.  I
4    can't tell you how many -- how popular this presentation
5    is and requested by me to present.
6    Q    Okay.  Now, the presentation, does that consist of
7    basically excerpts of either the CPT code book or the
8    Evaluation and Management Guidelines which the jury has
9    heard about some in this case?
10   A    It has excerpts from the AMA book.  It has excerpts
11   from the CMS audit sheets.  It has parts from both.
12   Q    Okay.  Does it have some summaries as well?
13   A    Yes.  And it basically tries -- it tries for the
14   physician and the staff to wrap it all together to try
15   and make it more understandable because it is a rather
16   complex topic.  As an industrial engineer, I try to make
17   things easier to understand, for them to understand what
18   they have to do to adequately document the E and M so
19   that they're in a good position to provide good
20   documentation.
21           MR. GOROKHOV:  Okay.  If there's no objection,
22   we would like to use the powerpoint presentation to
23   help -- to aid in Ms. Cobuzzi's testimony.
24           THE COURT:  Any objection?
25           MS. TREADWAY:  No.

5187

```
 1              THE COURT:  You may.
 2    A    I left my pointer in my purse.
 3                    (Off-the-record.)
 4    A    This is a shortened version.  My normal version is
 5    about an hour presentation but I shortened it for
 6    your -- okay.  One of the first things I try to say to
 7    the physicians is don't let this make you crazy because
 8    it is very overwhelming to the physicians.  Do you have
 9    those cards to hand out?
10              MR. GOROKHOV:  If there's no objection from
11    the Government, we would like to pass out some cards
12    which also hopefully will aid the jury in understanding
13    how the CPT codes are determined.
14              THE COURT:  Any objection?
15              MS. TREADWAY:  May I see them?
16                    (Off the record.)
17              MR. GOROKHOV:  And for the Court, if the Court
18    would like a copy.
19              THE COURT:  Yeah.
20              MS. TREADWAY:  No objection.
21    A    The doctors feel very overwhelmed by what they have
22    to do, and what I try to do is try to simplify it as
23    much as I can for them because, you know, you've been to
24    a doctor's office and, you know, they see you, they
25    examine you, they make a decision on what your
```

5188

1    treatment's going to be; and then when you come out of

2    the office, they mark on a routing slip, a fee ticket or

3    whatever, what service they've provided.  And what goes

4    into that calculation is more work and more calculation

5    than the care of you almost, and that's what makes them

6    crazy.

7          So, next slide.  So basically we're looking at

8    evaluation and management services which means your

9    office visits, your hospital visits, any nonprocedural

10   coding which capture the patient's history, their exam

11   and the doctor's performing their medical

12   decision-making, which is capturing their intellectual

13   capability of making a decision of what to do for you in

14   terms of do we write a prescription, do we do a test,

15   what is wrong with you, et cetera.  That's what medical

16   decision-making is.

17         Next, so there's -- the key is, you have to know

18   more about the patient's status than their location.

19   With Dr. Schneider and his staff, because everything was

20   basically done in the office, it was pretty clear,

21   straight forward, because everything was office-based

22   which was codes 99201 through 215.

23         Then you determine -- I say H-E-M.  That stands for

24   History, Exam and Medical Decision-making.  And then you

25   have to do something called leveling.  Leveling makes it

1    more complicated because it's harder, believe it or not,

2    even though it takes more work to do a new patient

3    visit, you've been a new patient, than it does to do an

4    established patient, it's actually harder to get a

5    higher level, a better paying level for a new patient

6    because you have to reach all three of history, exam and

7    medical decision-making for a new patient or a consult.

8    Whereas, on an established patient, you only have to

9    meet two out of three of those elements which means

10   whichever one was weakest in the documentation, you can

11   throw out the door and not count.  So it's actually

12   easier to reach a higher level on an established patient

13   because you can throw something out.  So that's what

14   leveling is.

15        So if you're doing a new patient and you're not

16   very good on doing the exam, you did a really great

17   history, you did really great medical decision-making,

18   but the exam was weak, that's going to pull the whole,

19   the whole visit down.  Whereas, on an established

20   patient, if you didn't do much of an exam but you did a

21   great history and you did a great medical

22   decision-making, you can throw out the exam.

23        But let me clarify one thing.  All of this is

24   within the context of medical necessity.  Everything the

25   doctor does, has to be within medical necessity.  And

5190

1    how you can understand this is if you go to the doctor

2    for -- you bring your child, return for an earache and

3    the doctor is checking out that the patient had a --

4    that the earache has cleared up.  You don't expect the

5    doctor to do a full body exam on that patient.  You

6    don't expect the doctor to do extensive medical

7    decision-making and order all kinds of tests for that

8    patient because the patient's better.  So everything has

9    to be all within the context of medical decision-making.

10   So the doctor shouldn't be doing things that aren't

11   medically necessary in order to up their documentation.

12        Next slide.  So as I said, when it's three of

13   three, you code to the lowest element of history, exam

14   and medical decision-making; and when it's two out of

15   three, you drop the lowest and then code to the lowest

16   of the two remaining.

17        Next slide.  So you've got your little cards here

18   and basically, so if you look at your card, you can see

19   on a 99213 you need an expanded problem-focussed

20   history, an expanded problem-focussed exam and a low

21   medical decision-making.  Two out of three of those.

22   You don't need all three of those.  You just need two

23   out of three of those to meet a 99213.  Also what I want

24   you to notice is for a 99213, it is the second to lowest

25   level that a doctor can do on an established visit

5191

1    because a 99211 is considered a nursing visit, or even a

2    medical assistant visit.  A medical assistant who is

3    taking care of a patient and -- under doctor's plan of

4    care, could be a 99211.  But the minute a doctor sees a

5    patient, it's a 99212.  So, a 99213 is the second from

6    the bottom.  It's not a high level visit.  So, when

7    you're looking at your 99213, you see it's just pretty

8    low in terms of what the requirements are.

9        Next slide.  And then next slide.  So you're going

10   to have to do some clicking here, Shawn.

11       So, as we said, you have three out of three.  This

12   is right from the CPT book, this page.  I interposed

13   both new patient and established patient here.  You

14   have -- you only need three, you need three out of three

15   for a new patient.  And you need the history, exam and

16   medical decision-making.

17       Click.  Click.  Click.

18       And then on an established patient you only need

19   two out of three for the same thing.  So if you look at

20   the same patient and -- click -- click again -- let's

21   say you have, I don't know if you can see this down

22   here, you have a detailed history and then -- click

23   again -- you have a detailed exam.  And then you have

24   straight forward medical decision-making.  And because

25   you need three out of three -- click again -- that will

1    make it a 99202.

2         But if you come over here on an established

3    patient, and the same thing happens -- you're going to

4    have to scroll over, Shawn -- and you have a detailed

5    exam -- click -- and a detailed history -- a detailed

6    history and a detailed exam and straightforward medical

7    decision-making.  Because you only need two out of

8    three, we can throw out that medical decision-making,

9    assuming we met medical necessity, and that would be a

10   99214.  So on an established patient, it's a 202 and

11   on -- I mean, on a new patient it's a 202, and on an

12   established patient -- click -- it's a 99214.

13        So the same documentation requirements on an

14   established patient is a 202, and assuming medical

15   necessity was met, that same documentation requirement

16   is a 214 on an established patient.  So, that two out of

17   three and the three out of three really makes a

18   difference.

19        Next slide, Shawn.

20        So how do the doctors determine all this?  You

21   know, what goes on for the doctor to determine what the

22   history and what the exam is and what the medical

23   decision-making is.  So, in that card you have that the

24   history has -- can be pertinent, problem-focussed,

25   expanded problem-focussed, or comprehensive.  That's

1    what the exam or history can be.  And then the medical

2    decision-making can be either straightforward, low,

3    moderate or high.  Next.

4         So let's look at our history.  How do we calculate

5    whether a history is problem-focussed, expanded

6    problem-focussed, detailed or comprehensive?  The doctor

7    now has to calculate this in the few minutes after you

8    left the room.  He has to look at your history of

9    present illness.  Three elements, and all three of these

10   elements have to be met.  This is a three-of-three thing

11   with history.  He has to look at what he documented on

12   your review of systems and your past family social

13   history; and he has to then determine what level you

14   have.

15        Next slide.  Can't hit my mic.

16        So your history of present illness can either be

17   none, he gets none -- by the way, the doctor has to

18   document this, not medical assistant, the history of

19   present illness.  Brief would be one to three elements.

20   And extended would be four or more.  And what your

21   history of present illness is looking at things like

22   where does it hurt?  What is the quality?  Is it

23   burning?  Is it pulsing?  What is the type of pain you

24   have?  What is the severity?  Is it one to five.  What

25   is the timing?  Does it hurt more during the morning or

5194

1    the night?  Does it hurt when you wake up?  What is the
2    context, did it hurt after I fell or it hurt after
3    something happened at work?  What are modifying factors?
4    Does Ibuprofen help it or does it not help it?  What are
5    associated signs and symptoms?  Is there anything else
6    that, you know, my head hurts and it radiates down my
7    neck.  And what is the duration?  I've had this for two
8    months.  And so out of those eight elements, the doctor
9    needs to document anywhere from one to four of those
10   elements to be able to qualify for a different level of
11   history of present illness.  And so that's very
12   important.
13        Next slide.
14        Then we've got review of systems.  And review of
15   systems you have where the doctor -- the doctor can't
16   confuse the review of systems with the exam.  Review of
17   systems is talking about your history of different
18   places and systems in your body, not examining what's
19   going on now.  So that's like asking questions like have
20   you had any problems with your musculoskeletal system?
21   Have you had any problems with your cardiovascular, your
22   respiratory system, your endocrin system, your lymphatic
23   system, your constitutional, you know, and asking
24   problems.  And there can be a total of up to 14
25   different systems that the doctor can ask.  So, if they

5195

1    only ask one system, that's a problem-pertinent.  If

2    they ask two to nine systems, that's considered an

3    extended.  And if they ask 10 to 14 systems, that's a

4    complete.  So as you see now, the doctor has to worry

5    how much of a HPI did I do?  And by the way, review of

6    systems can be taken by a medical assistant or even

7    filled out by the patient and then the doctor sign that

8    they reviewed it.

9         And then -- next slide -- the last element of

10   history which is past family social history.  This has

11   three elements.  Three is a magic number in E and M.

12   And past history is looking at things like past medical

13   history, past illnesses, operations, current meds,

14   allergies, et cetera.  So listing the patient's meds.

15   And all you have to do is one thing in each category.

16   So you've fulfilled past history if you list the

17   patient's medications that they're on.

18   Q   I have a question --

19   A   Yeah, sorry.

20   Q   Can the patient fill out this part of the history as

21   well?

22   A   Yes.  The patient can actually fill out the whole

23   history but then the doctor has to then review the --

24   actually physically verbally review the HPI with the

25   patient and then sign off and probably review anything

5196

1   that's abnormal on the review of systems and the past

2   family social history with the patient.

3        I've actually developed a form that I've helped --

4   being an industrial engineer -- that's helped physicians

5   with doing that.

6   Q   Okay.  And is the next component a physical exam?

7   A   Yes.

8   Q   Okay.  Why don't you tell the jury about that?

9   A   Okay.  So we move on.  Look at that.  So, just to

10  show you how complicated the history is, just to get, to

11  go on here, there's all the different systems, as you

12  can see.  And if you move to the bottom, Shawn, to get a

13  detailed history -- click this a couple of times --

14  you'll see the detailed history you would need for an

15  extended HPI which is four elements.  Click it.  And you

16  would need an extended review of systems.  And you would

17  need a pertinent past family social history.  So,

18  besides what's on that, that card that you have, it's

19  like there's a cube behind it so it's pretty

20  complicated.  So that's just history.

21       Now we've only just done one-third of the element.

22  Now we go into exam.  Next slide.

23       Exam.  There again, there's four possible elements.

24  There's two exams out there:  There's the '95 and the

25  '97 exams.  Guidelines say you can audit a chart with a

5197

1    '95 and the '97 exam and you are to give the physician

2    whichever exam gives the doctor the best results.  It

3    doesn't matter whether one's more favorable to the

4    doctor or not.  The guidelines say give the doctor

5    whichever exam is more favorable to the physician.  So

6    if the '95 is more favorable to the physician based on

7    their documentation, give them the '95 exam.  If the '97

8    is more favorable to the physician, give them the '97.

9        Next slide.  So the '95 guidelines get a little

10   confusing.  There's a problem-focussed, which is just

11   looking at where the problem is.  So, you bring in your

12   child with an earache and all the doctor does is look at

13   the ear.  They don't look anywhere else.  That would be

14   a problem-focussed exam.

15       Then there's an expanded problem-focussed, which is

16   a limited exam of the affected body area or other -- and

17   other symptomatic or related organ systems.  So for that

18   earache they may look at the ear and they also look at

19   the nose.  They look down into the nasal pharynx, which

20   would give them the eustachian tube which is the other

21   end from the ear down to the eustachian tube.

22       Then a detailed exam is an extended examination of

23   the affected body area and other systematic or related

24   organ systems.  And as you see, an expanded problem-

25   focussed and a detailed exam almost look exactly the

5198

 1    same.  The only difference is one is a limited exam and

 2    one is an extended exam.  And where there is confusion

 3    between coders and between auditors is one auditor may

 4    say this documentation shows a limited exam and another

 5    auditor may say this shows an extended exam.  And so one

 6    auditor may say, this is a detailed exam and another

 7    auditor may say, this is an expanded problem-focussed

 8    exam for the same chart documentation.  So it's very

 9    confusing because there's a lot of judgment.  This is

10    not science.  This is feeling based on these guidelines.

11         And then comprehensive is a general multisystem

12    exam or a complete single system exam.

13         Next slide.

14         So we have this chart, so if the -- hit -- so, if

15    they did two to seven body areas, depending upon whether

16    it's limited or extended in the exam, it would determine

17    whether it would be expanded problem-focussed or

18    detailed if we're looking at the '95 exam.  And so

19    because they weren't sure whether -- what was the

20    expanded problem-focussed and the detailed, they decided

21    to come up with -- and they also didn't know what is a

22    comprehensive single specialty exam.

23         The ophthalmologist said I don't know what a single

24    specialty ophthalmology exam is that's going to pass.

25         The musculoskeletal people said I don't know what a

5199

1    comprehensive musculoskeletal exam is going to be that

2    passes from an audit point of view.

3         They came up with -- next slide -- they came up

4    with the '97 guidelines which gave us single-organ

5    system exams.  You can hit the button twice.  And you

6    see we got a whole bunch of single specialty exams as

7    well.

8         Next slide.

9         So, now the doctor had, after he finished

10   calculating history -- and you remember he is doing this

11   in the three seconds after you've left the office.  He's

12   had to calculate that history which was three of three

13   of HPI, review systems, past family social history; and

14   then he's had to calculate what he documented in his

15   exam.  He now has to look at what he's done on medical

16   decision-making.  All of this within the context of

17   medical necessity.  And the medical decision-making,

18   unlike history, it has three pieces like history, but

19   it's only two of three.  So, the doctor has to remember

20   two of three for medical decision-making, three of three

21   for history.  And medical decision-making looks at the

22   number of diagnostic options, the amount of data that

23   you look at and the table of risk.  And so if one of

24   them is weak, we can throw that one out because we only

25   have two of three.

1        And we can have four possible levels.

2        Next slide.

3        So -- you want to blow that up a little bit.  So

4    depending upon what we have, it will come out -- do you

5    want to do the circles.  No, it doesn't do the circles

6    there.  Okay.

7        Next slide.  So -- then the next slide is -- it's a

8    little hard to read because it's been scanned.  Why

9    don't you move over.  Just show the left side.  The top

10   part is the number of medical decision-making options,

11   and basically the audit forms that have come out of CMS

12   give actual points depending upon the type of diagnostic

13   options.

14       So when the doctor, particularly for a new problem,

15   he would get three or four points, depending upon

16   whether he's going to do additional work-up or whether

17   he's not going to do additional work-up plan, he would

18   actually get three or four points.  The maximum is only

19   one.

20       So, he has multiple problems, it doesn't matter, he

21   only can have one problem.  But when he's got an

22   established problem which is improved, he gets one

23   point; but he could have as many as two problems counted

24   there.  If it's a problem that's worsening, he gets two

25   points.  And he can also have a maximum of two problems

1    multiplied times those number of points.

2        You can go down -- and then you get points for

3    reviewing and or -- no, go up, for the data.

4        I find it's very hard to get very many points on

5    the data to be reviewed because you get a point for --

6    when you review or order X-rays, you get one point when

7    you review or order medical tests.  You get a point when

8    you review and/or order clinical lab tests.  You get a

9    point when you decide to get records from the -- a prior

10   physician.  When you get the CT scan, like if a patient

11   gets a CT scan but they bring the films to the doctor,

12   the doctor can't charge for reading the films because

13   the films have already been charged for reading the

14   films by the radiology department, but he would get two

15   points here because he's doing also a review of the

16   film.  So, that's where he gets credit for that.

17       Then the last thing is the table of risk.  I don't

18   know if you want to bring up the table of risk

19   separately -- I have a better picture of the table of

20   risk.  And this is the table of risk.  And to get risk

21   you have -- you just have to have anything in any of

22   these columns to be able to get that level of risk, and

23   I don't know if you can see, but under moderate risk

24   down here, it says prescription drug management falls

25   under moderate risk.

5202

1         And then if you go down to high risk, it's got

2    prescription -- drug therapy requiring intensive

3    monitoring for toxicity.  So, if a doctor is doing

4    either of those two things, he would actually fall under

5    moderate or high risk.  And all you need is one thing.

6         Go back to the chart, Shawn.  So when you've got

7    this chart -- woops, I'm sorry everybody.  So when

8    you've got this chart -- if you want to enlarge that

9    bottom third there.  You would look at the number of

10   diagnostic options and how many points you get so, for

11   example, let's say you have a new patient that has no

12   additional work-up.  That could be three points.  Let's

13   say you have nothing in data.  You're just ordering some

14   lab tests which would be one point.  And then you have

15   moderate risk, because you're doing prescription drug

16   management, or high risk because you're monitoring for

17   toxicity.  If you're doing it two out of three.  That

18   would bring this down to moderate risk because you have

19   to look at two out of three.

20        So, again, the doctor has to calculate all of this

21   when they walk out of the room and say, all right, I

22   have done a 99213, I've done a 99212, I've done a 99214

23   on this patient.  He has to know all of this information

24   in calculating this.  This is why a lot of doctors are

25   moving to electronic health records which actually

5203

1   calculates all of this for the doctor via computer and

2   they don't have to worry about it any more because it is

3   so difficult for physicians.

4        Next slide.

5        So the only time time comes into effect -- now

6   there's time on the right side of your plastic cards,

7   and the only reason that time is there is to tell the

8   physicians if they spend 50% or more time and document

9   this on counseling or coordinating care for that

10   patient, they're allowed to pick their code based on

11   time.

12        So, for example, let's say I have a patient who

13   just had a diagnosis come back as prostate cancer, and

14   they come back in to get that result of prostate cancer,

15   and we sit down and do some plans of what our plan of

16   care is going to be for this patient, you know, we're

17   going to send them to the oncologist, we're going to

18   send them to the radiation oncologist.  Are we going to

19   do surgery?  What are we going to do for this patient?

20   We don't do any history, we don't do any exam.

21   Basically all we do is medical decision-making.  So

22   instead of basing it on history, exam and medical

23   decision-making, we are allowed to base our E and M on

24   time as long as we put in the chart the total time that

25   is spent -- that 50% of the time was spent on counseling

5204

1    and what the counseling time -- what the counseling time

2    was spent on.  So that's what that time reference figure

3    is on there for.

4         It's also on there for something called prolonged

5    services.  And prolong -- if prolonged services is on

6    there.  But that time is never used to determine a level

7    of code or to say, oh, because I spent this much time,

8    this is that level of code.  We haven't done that since

9    pre-1992 when we used to have E and M levels called

10   90060 and a ten minute code was 90060.  Time is not

11   based on it.  Yes.

12   Q    Did we share with you in this case that there was at

13   least one witness who they took a look at the CPT codes

14   and the time components and his testimony was that these

15   codes are roughly expected to take, let's say with

16   respect to a 99213, 15 minutes.  Did we share that with

17   you?

18   A    Yeah, you did mention that to me.

19   Q    Okay.  Is that, in practice, as both an auditor and

20   an educator, is that the way it really works?  Is that

21   the way it's supposed to work?

22   A    No.  Most practices schedule like every ten minutes,

23   or usually it's about every ten minutes.  And basically

24   the doctors are seeing the patients every ten minutes.

25   I, you know, it's ten minutes or less that the doctors

1    are seeing the patients and it's because the time,

2    again, has nothing to do with the actual E and M.  Time

3    very specifically, it says in the E and M guideline,

4    time is only a factor if counseling is the overriding

5    factor.  If it's history, exam, medical decision-making,

6    time has nothing to do with it.

7    Q    Okay.  In your experience as an auditor and an

8    educator, do physicians undertake a detailed analysis

9    using something like this every time they see a patient

10   to fill out their --

11   A    No.  Physicians usually do something -- and I hope

12   the jury will excuse my language -- they do -- I'm an

13   industrial engineer and we learned a technique that we

14   used in industrial engineering.  It was called SWAG.  I

15   don't know how many of you have ever heard of SWAG.  But

16   please excuse my language because it's part of what SWAG

17   is.  But SWAG is scientific, which means it has a

18   scientific basis in it, which means they understand what

19   E and M is.  That's the scientific part.  And then

20   wild-ass guessing.  That's what SWAG is.  And that's

21   what most doctors are doing because if they did all

22   this, it probably would take them another ten minutes

23   after they saw the patient to make the calculation.

24   Doctors who have EMRs, the EMR is doing all this

25   calculation.  Part of the problem with EMRs is an EMR

5206

1    can very easily upcode the patient because it doesn't

2    consider medical necessity and then it's up to the

3    doctor to say, oh, no this is not a 99214 because of

4    medical necessity, we have to down code it.  And that's

5    part of the implementation problems of EMRs.

6    Q    Is there one CPT code that is the most commonly used

7    code?

8    A    Yes.  That's 99213.  If you look at bell curves that

9    come from Medicare, the bell curves sort of show

10   distribution of how often a code is used in terms of

11   percentages.  And the bell curves are perfect bells that

12   look like this (Witness indicating) on 99201 through 205

13   and 99211 through 213.  And they all spike at 213 and

14   203.

15   Q    Can you discuss with the jury some of the reasons

16   why the 99213 is so common?

17   A    Well, I think doctors feel safe with the 213, number

18   one.  I think they feel very comfortable with the 213.

19   They feel it's very easy to justify an expanded problem-

20   focussed history and exam and low medical

21   decision-making.  They don't -- they're very concerned

22   about having to defend higher.  I think they're

23   undercoding themselves very often when they could have

24   patients that they could support based on medical

25   necessity and comorbidities and things like that, a

5207

1    99214; and their documentation shows a 99214, but

2    they're scared.  They're scared of audits.  They're

3    scared of payers.  And they just, they just don't want

4    to have any trouble.  Just get paid, keep smooth seas,

5    just let me run my practice.  They're not good

6    businessmen.  They're just doctors.  They want to take

7    care of their patients.

8    Q    Is there a term in the industry, if any, for the

9    phenomenon of doctors who use the 99213?

10   A    When I go to my AAPC conference, American Academy of

11   Professional Coders, which I'm going to actually on

12   Saturday, we call 'em, free spikers.

13   Q    That's because of the bell curve?

14   A    Yeah.

15   Q    Is there also a disagreement -- now stepping away

16   from doctors -- is there a disagreement among coders

17   between when a 99213 is appropriate as opposed to, say,

18   a 214?

19   A    Oh, all coders there's a disagreement.  There are

20   articles out there that I have read where they've done

21   blind tests where they've given notes to both coders and

22   to physicians to code and not only did the physicians

23   code it differently, so did the coders code it

24   differently.

25   Q    I'd like to hand you a document that's been marked

5208

1    as D13-17-A1.  Do you recognize that document?

2    A    Yes.

3    Q    What is that?

4    A    This is an article, "Accuracy of CPT Evaluation and

5    Management Coding of Family Physicians" by Michelle S

6    King M.D., Lisa Sharp, PhD, and Martin S Lapisky M.D.

7    Q    And do you recognize those authors as authoritative

8    sources on coding?

9    A    Oh, definitely.

10   Q    Okay.  I'd like to discuss with you some parts of

11   the article.

12           MR. GOROKHOV:  I'd move to admit the article

13   first.  If there's no objection.

14           MS. TREADWAY:  No objection.

15           THE COURT:  It's received.

16   BY MR. GOROKHOV:

17   Q    Okay.  Barbara, can you just give the jury a, just

18   the most important points that you found there as to the

19   rates of disagreement between coders and what those

20   rates are?

21   A    Well, what they did was they sent out notes that

22   were manufactured and checked for accuracy so there was

23   no like financial incentive.  They weren't personal

24   notes of the physicians to physicians.  And they also

25   had five expert coders also assign the codes to the

5209

1    cases.  They looked at both new and established codes.

2    And the results were that 52% of established patient

3    notes were in agreement, where 17% of new patients were

4    in agreement.  And the rest -- and a predominant of

5    those were overcoded on new patients.  The exact rates,

6    there's actually a chart in here, established patients,

7    51.6% were in agreement on established patients.  17.3%

8    of new patients were in agreement.  On established

9    patients, 32.7 were undercoded and 15.6% were overcoded.

10   On new patients, 1.1% were undercoded and 81.5% were

11   overcoded.  And I think this is because, again, family

12   physicians don't -- didn't understand -- or any

13   physician, you know, didn't understand the concept of

14   three of three versus two of three.  Didn't understand

15   the difference, you know.  They put all this work into a

16   new patient, into establishing their relationship with a

17   new patient, et cetera, and they really felt that they

18   deserved a higher level for that initial visit for that

19   new patient.  But the interesting -- there were two

20   interesting comments within this article.  On the second

21   page it said -- I think it was the second, yeah.  On the

22   second page it said:  Informal discussions with

23   physicians suggesting that inaccurate coding is more

24   likely due to a difference of transferring of coding

25   guidelines into clinical practice rather than to

1    fraudulent act.  And then on the third page of the

2    article it said -- where is it -- somewhere in this

3    article it discussed the fact that actually the coders

4    themselves were in disagreement with -- oh, on the --

5    also on the second page.  The cases were sent to five

6    expert billing coders selected or recruited through the

7    coding and medical information systems department at the

8    American Medical Association.  So they were coders at

9    the AMA.  All the experts were certified coding

10   specialists and had at least twelve years of experience

11   with coding.  And had served as faculty in programs

12   designed to teach others how to code properly.  These

13   experts assigned CPT evaluation and management codes to

14   these cases.  The experts were not in full agreement to

15   all the assigned CPT evaluation and management code.  So

16   even the experts with twelve years of experience and all

17   they do is coding, they do not have to worry about

18   patient care.  They can spend as much time as they want

19   on the coding.  They can sit down, use their books, use

20   as many abstracting tools as they want.  Did not agree

21   on the coding of these cases.  What this shows is, this

22   is more of an art than an exact science.

23   Q    Then we'll be talking a little bit more about --

24   we'll come back a little bit to the CPT codes later; but

25   can you just give the jury just a very brief, very brief

```
 1    summary of what an ICD 9 code is and what the point is
 2    that is --
 3    A    An ICD 9 code, ICD stands for International
 4    Classification of Disease, Volume 9.  And that is a
 5    diagnostic code.  The purpose of the diagnostic code is
 6    to indicate what is wrong with the patient.  It defines
 7    the patient's acuity.  It helps payers in -- they have
 8    medical policies that they will pay for A only if a
 9    patient has certain diagnoses.  And it also feeds into
10    the Centers for Disease Control and the World Health
11    Organization in terms of collection of outcomes
12    information.
13    Q    Now, in terms of medical practices, based on your
14    experience as a biller, where does the CPT code and the
15    ICD 9 code get recorded?
16    A    They get reported on the fee ticket, which is a very
17    important document in my mind.  I don't know if you
18    remember I told you I used to own a billing company.  I
19    found that the fee tickets were very, very important.
20    Even though the statute of limitations would say that
21    you could throw your source documents away after so many
22    years, I would never throw away my fee tickets.  And the
23    reason for that is the fee tickets showed that I put
24    into my system and billed from my system exactly what
25    the doctor said.  The fee ticket has the patient's name
```

5212

1    on it, it has the date of service on it, it has the

2    doctor's name on it, it has the CPT, it has the ICD 9

3    and it has the referring doctor if there's a consult.

4    And so, it had all of the information for that bill that

5    I created.  And so I could only defend myself showing

6    that I didn't change a bill based on that I billed

7    exactly what was on that fee ticket.  And that's what a

8    good biller does.

9    Q   Okay.  I'd like to cover another subject really

10   briefly with you.  In the industry is there -- are

11   there -- do you use the terms fraud and abuse?  Are

12   those common terms that are used in the industry?

13   A   Yeah, but usually in relation to civil, in terms of,

14   you know, the civil penalties and things like that.

15   Q   Okay.  Can you -- the Judge is going to instruct the

16   jury on the law.  I'm just asking about what you know

17   from the industry.  What is the difference between fraud

18   and abuse?

19   A   Abuse is basically every day mistakes and doing them

20   very consistently and therefore you owe somebody money

21   back.  Fraud is willful and intent, that you had willful

22   intent to basically steal the money from the payer.  And

23   so you had to, you know, it's very different.  When I

24   think of fraud, and when I think of criminal fraud, I

25   think of the stories I've read in articles and things

5213

```
 1    like that of the Russian mafia down in Florida who have
 2    these back rooms, they buy Medicare numbers off the
 3    street --
 4             MS. TREADWAY:  Objection, Judge.  This is so
 5    irrelevant --
 6             THE COURT:  Sustained.
 7    BY MR. GOROKHOV:
 8    Q   Okay.  We'll move on.  With respect to as an
 9    auditor, when you're asked to review cases as an
10    auditor, is there a difference in the way that you
11    approach, say, a case that's solely concerned with
12    finding out if a person was overpaid, versus a case
13    where you're trying to find out if there was actual
14    fraud going on?
15    A   Uhm, I think I sort of start the same, uhm, but
16    basically the documentation sort of shows itself out as
17    I, you know, get going.  I look at policies and
18    procedures.  I look at the EOBs.  I look at the fee
19    tickets.  I look at the documentation.  I look at the
20    processes in the office.  I look at what's going on in
21    the office.  Is that what you mean?
22    Q   Yeah.  I think that answers the question.
23         Are there also ways to determine in a controlled
24    setting, is there something that can be done to
25    determine whether or not a doctor is billing
```

1    fraudulently versus just making a mistake?

2    A    Well, insurance companies do different things.  They

3    run computer reports to see if they're outliers.  They

4    do random audits.  They do secret shoppers.

5         Secret shoppers are interesting.  They send in --

6    they send in someone who acts as a patient and actually

7    goes through a practice and gets cared for by the

8    practice, has complaints, et cetera, et cetera, and that

9    patient then who actually works for the insurance

10   company can then testify that, you know, they were cared

11   for and, you know, they were with the doctor and the

12   doctor did only, you know, the doctor looked only at

13   their neck and they were billed at a 99214, et cetera,

14   et cetera.  And if it's a large practice, you know, with

15   many doctors, a medium sized practice with many doctors,

16   they might send in multiple secret shoppers and try to

17   actually get actual data from the practice operation

18   without the practice knowing.  So that's one way of

19   determining fraud.

20        But, I think right now they're using super

21   computers.  I mean the RAC system, the Medicare Recovery

22   Audit Contractor system, they're just using super

23   computers looking at patterns of billing and

24   reimbursement.

25        There are also companies that we call in the -- in

5215

1    my industry, as bounty hunters and, again, they're using

2    computers.  And the bounty hunters actually get paid a

3    piece of what they recover from the payers.  And so they

4    look at what the payer paid out.  They look at the rules

5    and decide the payer might have made a mistake and they

6    can either do it on one of two ways.  They can just make

7    a demand letter for a refund to the payer and say we

8    overpaid you by X amount, refund us this money; or they

9    can actually audit the payer and then ask for the refund

10   of the money.

11        So there are many different routes that payers can

12   take when they think that there might be an overpayment.

13   Q    Okay.  I'd like to turn to some of your specific

14   opinions and conclusions in this case.  Before starting

15   on that, did we share with you the Government's theories

16   as to why there was fraud in this case?

17   A    Yes.

18   Q    Can you tell the jury what those theories -- what

19   the Government's theories are as to the fraud?

20   A    They think there was --

21            MS. TREADWAY:  Judge, theories?  I'm not sure

22   that -- if she wants to talk about the Indictment and

23   what the charges are, but --

24            THE COURT:  Is that where you're headed, Mr.

25   Gorokhov?

5216

1          MR. GOROKHOV:  Yes, what the charges are.

2          THE COURT:  I think that, you know, I think

3    you heard me say during the trial that the rule about

4    not telling prospective witnesses what the evidence is

5    or has been from the witness stand so they can't conform

6    their testimony to somebody else's testimony.  That

7    doesn't apply to expert witnesses.  It's perfectly all

8    right for an expert witness to know what, for example,

9    the evidence has been in the case and what another

10   expert has said to formulate his or her opinion.  But

11   not theories.  That should be rephrased.

12         MR. GOROKHOV:  I should say allegations, Your

13   Honor.  The allegations.

14         THE COURT:  Well, allegations in the

15   Indictment --

16         MR. GOROKHOV:  That's correct.

17         THE COURT:  -- or the evidence has been

18   presented.

19   A    All right.  CPT upcoding.  That the practice upcoded

20   their CPT codes.  That they billed nurse -- excuse me,

21   not nurse -- nonphysician practitioners, which are PAs,

22   incorrectly, and that they billed for services not

23   provided, improperly.

24   BY MR. GOROKHOV:

25   Q    And there's a separate set of counts about Actiq.

5217

1   Is that --
2   A   Yeah, that's really not a coding issue.
3   Q   Okay.  I want to turn to these specific allegations
4   one by one and talk to you about what you reviewed and
5   your opinions as to them.  With respect to the upcoding
6   of claims, did we share with you in general the
7   Government's fraud exhibits in this case?
8   A   Yes, you did.
9   Q   Okay.  Did we share with you the audits that the
10  Government insurance -- I'm sorry -- that the insurance
11  companies in this case conducted?
12  A   Yes, you did.
13  Q   And did you review those audits?
14  A   Yes, I did.
15  Q   Did we share with you that several of the
16  Government's witnesses had stated -- given opinions that
17  based on the patterns that they observed in these audits
18  or the claims data, that they concluded the claims
19  submitted by the clinic were false and fraudulent?
20  A   Yes, you did.
21  Q   Okay.  I want to go into specifics, but just
22  generally speaking at first.  Did you agree with those
23  opinions?
24  A   No, I don't.
25  Q   Okay.  Let's talk about the bases for your opinions.

5218

1   Why did you not agree based on the patterns in this case

2   that there was fraudulent billing going on?

3   A    The charts that I audited consistently actually

4   showed undercoding, not overcoding.   Number one.

5        Two, it's very rare that you find someone who's

6   billing a 99213 as an overcoder since 99212 is the

7   lowest code and 99213 is the second code of four

8   basically, that you're billing as an established

9   patient.  And it's really for your average patient that

10  you're seeing.  It's not really a code that you're going

11  to see -- you know, I have rarely seen even in civil

12  type proceedings that someone saying that someone who's

13  billing a 99213 is overcoding.  But that was my bias

14  maybe to begin with.  But I didn't take that bias into

15  the audit.  I took each chart individually and audited

16  them as just that chart and I audited each chart.  And I

17  consistently found that the practice either coded

18  correctly, coded -- undercoded.  There were a few times

19  where the practice did get mixed up and coded new

20  patients by mistake when they should have coded

21  established patients which meant they basically

22  overcoded in those cases.  But they were mistakes.  They

23  were just like outliers.  But basically not very many.

24  Q    I'm going to hand you a document and I'm going to

25  ask you some questions about that document.

1          As part of your preparation to testify and your

2     consulting with the defense in this case, did you review

3     some of the charts that were presented in the

4     Government's audits in the Government's Exhibits 13

5     through 17?

6     A    Yes.

7     Q    Did you make a record of those findings?

8     A    Yes.

9     Q    The document that you're looking at -- and I

10    neglected to read the number, it's D13-17-D5.  Is that a

11    fair and accurate representation of your findings based

12    on what you reviewed?

13    A    Yes.

14    Q    Is that document a selection of a random sample of a

15    subset of claims that are found in the Government's --

16    in the audits presented by the Government?

17    A    Uhm, it's not a statistical random sample.

18    Q    Okay.

19    A    But it was randomly selected patients.

20    Q    So, can you explain to the jury what you mean by

21    that?

22    A    Uhm, there are ways in computers and RAD Stats and

23    all those things to do a statistically random sample.  I

24    didn't do that.  I just, you know, sort of (winess

25    indicating) pulled one out and just randomly selected

1    patients before I even saw the chart and randomly

2    selected them.  But it is not a statistically random

3    sample from that perspective.  However, the total number

4    of patients per payer is a -- does represent a random --

5    appropriate random number of patients of the amount of

6    the patients that were given to us.  I worked with Frank

7    Cohen, and he worked up that 30 patients were --

8             MS. TREADWAY:  Objection, Judge.  I don't even

9    know who this person is, Frank Cohen.  We've never heard

10   of this person.  This person was not disclosed as a

11   basis of this opinion.  Have no idea what this is about.

12            MR. GOROKHOV:  We have no obligation to

13   disclose Frank Cohen, Your Honor.  He wasn't a

14   testifying witness.

15            THE COURT:  Wait a minute --

16            MS. TREADWAY:  Well, he's the basis of her

17   opinion --

18            THE COURT:  If he's the basis of her

19   opinion -- who is he, ma'am?

20   A    Frank Cohen is a colleague of mine who does

21   statistics with E and M and operates his research work

22   with E and M with practices, bell curve distribution,

23   acuity factors, and things like that.

24            THE COURT:  What did he do?

25   A    He looked at the universe of the audit and he, uhm,

5221

1    gave me how many I needed to, uhm, look at in terms that

2    I needed to look at 30 patients to be a random total

3    number of patients.

4              THE COURT:  Did you want to question her -- if

5    this is going to come in as an opinion, did you want to

6    question her about this or just cross-examine her later?

7              MS. TREADWAY:  I'll just cross-examine, Judge.

8              THE COURT:  All right.  This is one of these

9    things I think, Ladies and Gentlemen, ultimately, that

10   you'll have to just judge the weight of the various

11   opinions that have been offered here about random

12   sampling and statistical.  But go ahead.

13   BY MR. GOROKHOV:

14   Q   Does this -- would reviewing this document save the

15   jury time in having to review the voluminous documents

16   that you looked at?

17   A   Definitely.  I mean, it was -- there were just huge

18   amounts of patients in the payer audits.  And if you

19   think that I spent a lot of hours and spent the

20   Schneiders a lot of money, I would have probably spent

21   triple that if I had to audit every one of those

22   patients.  So I was trying to be efficient in my work

23   that I did for them.

24             MR. GOROKHOV:  Your Honor, I'd like to publish

25   this exhibit just as a pedagogical aid for the same

5222

1   reasons that the Governments exhibits were allowed to

2   be.

3          THE COURT:  Any objection?

4          MS. TREADWAY:  Well, Judge, as it stands now,

5   yes, we have two objections.

6          THE COURT:  Well, could I see it?

7          MR. GOROKHOV:  Yes, Your Honor.

8          MS. TREADWAY:  Our two objections are that,

9   unfortunately, patient privacy has not been --

10          MR. GOROKHOV:  We've redacted the names on the

11   exhibits that would be published.

12          MS. TREADWAY:  Well, I don't have that.  There

13   is also hearsay on the bottoms of Page 2, 3, 4 and 5

14   which this witness could not have had knowledge of

15   except for information from others.  It's irrelevant.

16   It's prejudicial.  And it does not -- it should not be

17   on the chart.

18          THE COURT:  I can't identify what you're

19   talking about on the --

20          MS. TREADWAY:  I'll show it to you, Judge.

21          THE COURT:  Do you want to see this,

22   Mr. Gorokhov?

23                     (Thereupon, the following

24                      proceedings were had at the

25                      bench by Court and Counsel

5223

1                    outside the hearing of the

2                    jury.)

3          MS. TREADWAY:  She's claiming that she was not

4    able to review even all 30 charts that were pulled

5    because they were missing, because they were denied

6    access after the Marshals closed the clinic.  That's

7    nonsense.  Number one, our reviewers had all those

8    charts before '07 when the Indictment was issued.  Those

9    charts were given to the Defendants in electronic form

10   and the Defendants scanned those charts before we ever

11   took 'em.  And if we did take 'em, then we would give

12   them copies back.  So she is --

13         MR. GOROKHOV:  We would be glad to redact that

14   part of the exhibit.

15         MS. TREADWAY:  That's fine if they redact

16   that.

17         MR. GOROKHOV:  That's no problem.  There was

18   an issue with getting the charts and we just told her

19   that was a problem.

20         THE COURT:  All right.  So no objection after

21   that?

22         MS. TREADWAY:  If it's redacted and it's

23   pedagogical.

24         MR. GOROKHOV:  I'll give Mr. Hamm like five

25   minutes to take it out.

5224

 1           MS. TREADWAY:  Maybe we should break.

 2           MR. GOROKHOV:  Thanks, Judge.  Appreciate it.

 3           THE COURT:  All right.

 4                    (Thereupon, the following

 5                     proceedings continued in the

 6                     hearing of the jury.)

 7           THE COURT:  We've got to make one change in

 8   this exhibit; and rather than have you sit there through

 9   the miracles of modern technology, it can be done fairly

10   quickly, and why don't we take a break and you all -- 15

11   minutes or so.  Remember and heed the admonition.

12                    (Recess.)

13                    (Whereupon, the following

14                     proceedings continued OUTSIDE

15                     THE PRESENCE of the jury.)

16           THE COURT:  Did you want to -- outside the

17   presence of the jury -- did you want to question

18   Ms. Cobuzzi about the randomization technique that she

19   used?

20           MS. TREADWAY:  No, Judge, because she

21   basically admitted that her methodology was whoop,

22   whoop, whoop.  (Indicating.)  That is not a recognized

23   methodology of any shape or form.  And at this point,

24   this is not something that I can cure by

25   cross-examination.  This isn't a weight issue.  This is

5225

```
 1   an admissibility issue.  From this whoop, whoop, whoop
 2   (Indicating.) choosing of -- not a chart, Judge.  She's
 3   misrepresenting that to the jury.  She did not review a
 4   chart.  She reviewed a claim from a chart.  She didn't
 5   review 30 charts per provider.  She reviewed 30 claims.
 6   No methodology whatsoever has been established for
 7   choosing those 30 claims.  This is not weight.  This is
 8   admissibility.  This doesn't even come close to meeting
 9   Daubert.  We had no clue what her methodology was until
10   she testified to it.  Was never disclosed, even though
11   we asked for it.  The choice of 30 is not really the
12   point.  The point is she is now giving an opinion on
13   based on this whoop, whoop, whoop (Indicating) choice,
14   that she can make an opinion about this practice as a
15   whole.  That is patently ridiculous under Daubert.  This
16   is not weight.  This is admissibility, Judge.  She
17   cannot draw conclusions from this kind of a methodology
18   that encompasses this whole practice.  And trust me,
19   Judge, if I'd known this was what we were going to get
20   into, I would have challenged this witness on Daubert
21   many months ago.  But I didn't know.
22             THE COURT:  Do you know why you didn't know?
23   Because you brought that Tenth Circuit case to my
24   attention.  Or you'd have had a full report from this
25   lady.
```

5226

1          MS. TREADWAY:  No, Judge, report wouldn't have

2   helped.  This is a methodology issue, not a report

3   issue.  Methodology is supposed to be disclosed.

4          THE COURT:  Usually in a report I would expect

5   a witness to say how they reached the -- but in any

6   event, that's neither here nor there.  I think the

7   record is unclear about what whoop, whoop, whoop

8   (Indicating) selection is.  I'm not even sure Cindy can

9   get that down.  I think you need to see if you can lay a

10  little better foundation as to how she selected these 30

11  documents and then perhaps I'll be able to make a ruling

12  on this.

13          MR. GOROKHOV:  That's fine, Judge.

14          THE COURT:  Why don't you do that outside the

15  presence of the jury.  All right?

16          MR. GOROKHOV:  Sure.

17  BY MR. GOROKHOV:

18  Q   Ms. Cobuzzi, can you describe for the Court in a

19  little more detail when you did the random selection --

20  first of all, let's go back.

21      In terms of selecting these records and the manner

22  that you selected them, is that something that's done in

23  the industry?

24  A   Yeah.

25  Q   Okay.  And can you describe for the Court in a

5227

1    little more detail how that random selection was --

2    A    Basically I worked off the Government's exhibits and

3    went down and, you know, would go down the list, you

4    know, anywhere from like, you know, five to ten patients

5    and just, you know, stop and come to a patient and pick

6    that patient and the date of service that the Government

7    used and picked that chart.

8    Q    Okay.  Was there anything guiding your

9    decision-making process as to how to choose that other

10   than was there any -- you know, was there any preference

11   that you gave to certain claims?

12   A    No.  No preference.  And I'm not a statistician --

13            THE COURT:  What does she mean by claims?

14            MR. GOROKHOV:  The way that the Government's

15   audits were actually done was that they took -- there

16   was, say, one patient, and then for that one patient

17   there's numerous entries in the spreadsheet which cover

18   numerous dates of service for that patient and each date

19   of service is individually audited.  Okay.  What

20   Ms. Cobuzzi did was she just -- she chose those

21   specific, as I understand it --

22            THE COURT:  No, I don't mean to -- I wasn't

23   clear.  What document was she pulling?  That's what I

24   don't understand.

25            MR. GOROKHOV:  She was pulling the -- and

5228

1    correct me if I'm wrong, or you can even answer that

2    question yourself --

3    A    The spreadsheets from the Government.

4            THE COURT:  Can I see one?  What she's talking

5    about please?

6            MR. GOROKHOV:  I think, yes, we can pull one

7    off -- Shawn can probably pull one up.

8            MR. HAMM:  Can you give me an exhibit number?

9            MR. GOROKHOV:  It's the exhibit we've been

10   talking about and it's the underlying document for any

11   one of those audited dates.

12           THE COURT:  Well, that's her exhibit.  But

13   what did she look at?

14           MR. GOROKHOV:  She looked at the patient chart

15   pertaining to that date of service.  So, for example, if

16   we go over here, you know, there's 9-30, Kaileey F, 9-30

17   of '03, that would be a progress note for the services

18   rendered on that date.  What she did was she audited

19   this progress note and compared it to the claims data

20   and compared it to the Government's results as well.  So

21   she basically --

22           THE COURT:  So she looked at the progress note

23   for Kaileey F, for example --

24           MR. GOROKHOV:  For that date.

25           THE COURT:  That's all she looked at?  I

5229

1    should be asking you these questions probably.  Is that

2    correct?  That what we're talking about here when you

3    talk about what you looked at are the progress notes?

4    A   Yes.  I looked at the progress notes and I chose

5    Kaileey F from the spreadsheet provided by the

6    Government.

7              THE COURT:  Right.

8    A   And that's why there's information like from

9    checkmarks, that's information that I pulled off of the

10   Government spreadsheet.

11             THE COURT:  I understand, but the document

12   that you looked at that came from the Schneider medical

13   practice --

14   A   Was the progress note that was within the chart.

15             THE COURT:  And that's it?

16   A   Yes.

17             THE COURT:  That's it.  And then --

18   A   Well, not just the progress note.  I would look at

19   the PADT and what was in there for that date of service.

20             THE COURT:  The PADT?  What's that?

21   A   Pain assessment --

22             MR. GOROKHOV:  Diagnostic tool.

23             THE COURT:  That's another document from

24   the --

25   A   Yeah.  They had like three or four -- sometimes they

5230

```
1    had three or four documents.  If it was a new patient, I
2    would also look at the patient's history form that they
3    filled out.  So whatever was in the, uhm, chart that was
4    related to that date of service because that's what
5    would be used for an audit.
6            THE COURT:  Fair enough.  And then what did
7    you do to prepare your chart with respect to Kaileey F?
8    Says date of service 9-30-03.  E and M billed.  That's
9    the code billing.  Right?
10   A    Right.  I got that off the Government --
11           THE COURT:  Okay.  What does Y stand for?
12   A    Y was the Government said -- if checkmarked, they
13   put a Y -- I don't quite know what it means.  They
14   agreed that it would be a 99213 if it was checkmarked.
15   Then the audit E and M was what I came up with.
16           THE COURT:  All right.  You see, we haven't
17   heard that yet.
18   A    Right.
19           MR. GOROKHOV:  Yes, Your Honor.
20           THE COURT:  And, so, really, the only thing
21   that is on this pedagogical exhibit that we haven't
22   shown to the jury yet that she did was -- what she
23   thinks the E and M ought to be as opposed to --
24           MR. GOROKHOV:  That's right.
25           THE COURT:  -- what the Government says the E
```

5231

1    and M ought to be.

2              MR. GOROKHOV:  Yes.  It's a subset of the

3    Government's chart.  So that's -- and also the color

4    scheme.

5              THE COURT:  Now, to do that, if I understood

6    your testimony, ma'am, you -- and I hate to use this

7    terminology -- but it was kind of like pick a card, any

8    card.  In other words, you had a lot of documents and

9    you just sort of reached in and took one.

10   A    Yes.

11             THE COURT:  And you took 30 total?

12   A    Yes.  And I tried to spread it out evenly throughout

13   the Government's document.

14             THE COURT:  By doing what?

15   A    What?

16             THE COURT:  I mean, did you have a methodology

17   for spreading it out?

18   A    Well, that's why I did like every five to ten, 15 to

19   20, you know, like I just kept spreading it out

20   throughout the document so that, uhm, I, uhm, made sure

21   that I, you know, covered the full document.

22             THE COURT:  The full document?

23   A    It was many pages, the Excel spreadsheet.

24             MR. GOROKHOV:  This was the Government's

25   spreadsheet, Your Honor.

5232

1           THE COURT:  Right.  I understand; but other

2    than just sort of randomly picking the name of some

3    individual through a -- and I don't want to be flippant

4    about what you did --

5    A    No.

6           THE COURT:  -- but you just sort of reached

7    in, I think your testimony was you kind of reached in

8    and pulled one out.

9    A    Yes.

10          THE COURT:  And that was the extent of it?

11   A    Right.

12          THE COURT:  The issue that we've got to deal

13   with here is whether that's some kind of methodology

14   that is -- that would be scientifically accepted in your

15   area of expertise.

16   A    Because I'm not a statistician.  Unless a subset of

17   charts is given to me by a statistician, this is sort of

18   how it's done.  And the only other way would be if you

19   actually said I'm going to do every ten and then every

20   ten and every ten.

21          THE COURT:  Well, that's why I asked you

22   before we sent the jury out what that other individual

23   did.  I can't remember his name now.

24   A    Frank --

25          THE COURT:  Frank --

5233

1    A    All Frank did was tell me do 30 charts out of the

2    591.

3              THE COURT:  Do you have any idea how he came

4    up with that 30?

5    A    Uhm, he used statistics for it.  I am totally --

6              THE COURT:  But you aren't able to do that?

7    A    But I'm not able to do that.  I took college level

8    stats but I'm not a statistician.  And I do not hold

9    myself out to be a statistician.

10             THE COURT:  Did you have any questions of her

11   now that you wanted to ask?

12             MS. TREADWAY:  No, Judge.  I mean, she's

13   basically sunk herself.  This is not a valid random

14   sample; therefore, she cannot draw any large conclusions

15   from it.

16             THE COURT:  Why isn't it a valid random

17   sample?

18             MS. TREADWAY:  Because she admitted it wasn't.

19   She testified it wasn't a valid random sample.

20             THE COURT:  No, she didn't.

21             MS. TREADWAY:  Before we broke she did.  She

22   said this is not a statistically valid random sample.

23             THE COURT:  She said that?

24             MS. TREADWAY:  Yes, she did.

25             THE COURT:  I know I wrote it down --

5234

```
 1              MS. TREADWAY:  Right.  So it's not a

 2   statistically valid --

 3              THE COURT:  Why does it have to be a

 4   statistically valid --

 5              MR. GOROKHOV:  That's right.  It's a weight

 6   issue.  If there's an issue of ran --

 7   A   I worked from a statistically random sample of

 8   yours.

 9              MS. TREADWAY:  Well then, Judge, if that was

10   the basis, why did we spend cross-examination time in

11   which these Defendants tried to indicate to this jury by

12   implication that our sample was flawed and not

13   statistically valid and spent a lot of time on it.  So

14   now we have a situation --

15              THE COURT:  I don't know.  All I can remember

16   is that mousy little guy that came in as a statistician

17   that Eugene couldn't handle, for obvious reasons, and he

18   had to sit down.  But the point -- I'm not trying to be

19   flippant -- but there's got to be some humor in this

20   case someplace and I'm going to find it.

21              MS. TREADWAY:  Yes, Judge, I realize this.

22              THE COURT:  That you say that this was -- that

23   the Government says this is how you put on this type of

24   testimony, you have that guy come in and do all of this

25   kind of stuff.  But I don't know why I should find just
```

5235

```
 1    on the basis of what he had to say that this is not a
 2    legitimate way of doing it for purposes of her opinion.
 3    And you can then argue to the jury that you had, you
 4    know, you had your statistician in here and, whatever,
 5    and she didn't do any of that.  She just sort of went
 6    through and picked a few, picked 30 out of the stack.
 7              MS. TREADWAY:  Well, Judge, we don't have a
 8    problem with her saying I pulled this claim and I looked
 9    at it and I thought it should have been a 99214.  I
10    don't have a problem with that.
11              THE COURT:  Okay.
12              MS. TREADWAY:  That's exactly what she did.
13    That's not my problem.
14              THE COURT:  Okay.  Tell me what your problem
15    is.
16              MS. TREADWAY:  My problem is --
17              THE COURT:  Extrapolating it to --
18              MS. TREADWAY:  She takes this and says the
19    whole practice was not a problem.  That's ridiculous.
20    That's ridiculous.
21              THE COURT:  Well, I don't know about that.
22    Let's do this.  This is something I have to give a
23    little thought to, but if you don't have any problem
24    with her testifying that this is what she did, and on
25    those anyway, the 30 that she did, this is what she
```

5236

 1   found, different codings --

 2         MS. TREADWAY:  But we absolutely object to any

 3   extrapolation and we move to strike her prior testimony

 4   that based on this ridiculous unrandom

 5   pull-it-out-of-a-box sample that she has any basis

 6   whatsoever, scientifically or unscientifically, to

 7   extrapolate this to a practice as a whole.  There is no

 8   basis for that whatsoever, Judge, and it's misleading

 9   the jury.

10         MR. GOROKHOV:  Your Honor, as you've said many

11   times before, this is a smart jury.  I think they

12   understand how much weight to give things.  And

13   ultimately it's a weight of the evidence issue.

14         THE COURT:  Well, let me think about the

15   extrapolation issue.  Okay?  We'll have time to do that.

16   I'll have a little bit of time over the noon hour to do

17   that.  But she can go ahead and testify about her

18   exhibit, what she did, how she did it.  Just stay away

19   from the extrapolation aspect of it and I'll give some

20   thought to that and try to make a ruling.

21         MR. GOROKHOV:  Okay.  Now, the only other

22   point I would have is the extrapolation comes from

23   several bases other than just this.  Her ultimate

24   conclusion that there wasn't fraud going on, intentional

25   fraud, is not just based on this one chart.  It's based

5237

1    on a multitude of factors that she's going to talk

2    about.

3              THE COURT:  Well, I don't know what all those

4    are going to be.

5              MS. TREADWAY:  That's a 704 problem, Judge.

6    She can't sit here and say this wasn't fraud.  All she

7    can say -- all she can say is I didn't see evidence of

8    fraud.  She can't say they weren't acting intentionally.

9              THE COURT:  Well, we're talking the difference

10   here of terminology.  I know she can't tell the jury

11   what to do.  And they know that.  But she's already

12   testified at some length about what the insurance

13   companies used to determine fraud.

14             MS. TREADWAY:  That's fine.

15             THE COURT:  Same stuff that you got.

16             MS. TREADWAY:  That's right.  Evidence of --

17             THE COURT:  I don't know why she couldn't

18   testify that based on what she observed, she didn't see

19   that.

20             MS. TREADWAY:  Well, and it's limited to

21   this --

22             THE COURT:  Limited to this chart --

23             MS. TREADWAY:  Right.

24             THE COURT:  Extrapolating --

25   A    No, he says there's other evidence --

5238

1          MR. GOROKHOV:  Don't interrupt the Judge,

2     Barbara.

3     A    Sorry.

4          THE COURT:  Extrapolating it to the whole

5     practice is another matter; but I don't see any problem

6     with her observations about what she did and what she

7     saw.

8          MS. TREADWAY:  She reviewed less than 150

9     pieces of -- 150 claims.

10          MR. GOROKHOV:  I would just say that we

11     objected vigorously when the Government's witnesses,

12     particularly Dr. Jorgensen, sat up here and said that

13     Linda was responsible for people's death, that it was

14     his opinion that she was responsible and that it was his

15     opinion that she was responsible for patient care.  And

16     I think, you know, as the Court said, everyone knows

17     it's ultimately the jury's decision.  So I would just

18     ask for the same leeway, Judge.

19          THE COURT:  I don't know how she's going to

20     phrase it.  That's the problem.  I heard that testimony.

21     I hadn't heard her testimony on this and her opinion on

22     this, so it's pretty difficult for me to make some sort

23     of ruling without hearing the testimony.  I think the

24     best thing to do is for you to put the evidence on.  If

25     Ms. Treadway objects, depending on how the witness

5239

```
 1    phrases her testimony, she's obviously very

 2    knowledgeable about this, and she knows that ultimately

 3    she can't tell the jury how to reach a verdict --

 4               MR. GOROKHOV:  Right.

 5               THE COURT:  So let's go.  Let's keep going

 6    here.  Okay?

 7               MR. GOROKHOV:  Sounds good, Judge.  Thank you.

 8               THE COURT:  Bring them in.

 9                    (Jury enters the courtroom.)

10               THE COURT:  Thank you for your indulgence.

11    Please be seated.  All right, sir.

12    BY MR. GOROKHOV:

13    Q   Now, when we left off I think you were talking about

14    some of the charts that you reviewed that the Government

15    had previously reviewed and you reviewed from that

16    audit.  And I'd like to just go through with you just a

17    little bit about the chart that you produced based on

18    the review.  Can we go to Page 1 of that exhibit.  Okay.

19    Now that's the Blue Cross/Blue Shield and that doesn't

20    really have much color on there.  Is that right?

21    A   Yes.

22    Q   Okay.  What happened with that?

23    A   I don't know.  Somehow there was a technical error

24    and the -- I don't have my pointer, the audited E and M

25    somehow got --
```

5240

1    Q    The colors got left out?

2    A    Got left out, yeah.

3    Q    So we're not going to talk about that one.

4    A    There's no audited E and Ms in there.  Somehow we

5    have a technical error.

6    Q    Let's just talk about the next one here.  Can you

7    explain to the jury what this color system means and

8    what the various colors represent?

9    A    The yellows are -- well, the yellow means the doctor

10   undercoded which, for example, if you look at Barbara K,

11   if you want to, Shawn, point to Barbara K, Doctor coded

12   on 3-1-04 a 99213.  The Government says it should have

13   been a 99212.  But when I abstracted it, I actually came

14   out to a 99214.  So it actually says the doctor

15   undercoded it.

16   Q    What does the white color mean?

17   A    The white color means that I agree with the coding.

18   Q    Okay.  And do you see that dark color?

19   A    The dark color means he overcoded it and like I said

20   those are where he actually, by mistake I think, billed

21   new patients where it should have been established

22   patients.

23   Q    Now, can we go to the right a little bit.  All the

24   way to the right.  Okay.  There's another color scheme

25   there.  Can you tell the jury what that color scheme is?

5241

1    A    Go to the left again so I can on -- oh, red is the

2    Government agreed that it was correctly coded and the

3    green is that the Government says it was overcoded.  So

4    if you look at the far right.  Anything that's red, the

5    Government agrees with the coding.  Anything that's

6    green, the Government's saying on this far right that he

7    overcoded.  So if you look here, it's almost maybe two

8    thirds, one-third just by visual looking at it.

9    Q    Two-thirds overcoding?

10   A    Yeah, looks like that way, you know, maybe a half

11   overcoded.  I don't know.  I can't -- I haven't counted

12   the lines.

13   Q    Okay.  Did you find in the Government's audits which

14   have been shown to the jury as Exhibits 13 through 17

15   any instances of where the Government found that

16   something was actually undercoded?

17   A    No.

18   Q    Okay.  In your experience as an auditor, is it the

19   standard practice in the industry to look for overcoding

20   or both overcoding and undercoding?

21   A    Look for both.  You basically look for what is it

22   really supposed to be.  So if it's -- either it's going

23   to be equal to what it is, for example the article that

24   we talked about before, they looked at what was

25   undercoded, what was equal to the code and what was

5242

1    overcoded.  So you looked at all three.

2    Q    Okay.  Can you explain to the jury why it's

3    important to look at all three?

4    A    You want to get a picture of what's going on with

5    the practice.  And the practice is losing money when

6    they're undercoding.  And you want to train physicians

7    to be able to code properly and that means when they're

8    coding 213 and it should be a 214 or a 212 when it

9    should be a 213, you want to train them of how to code

10   as closely as possible to what it should be.

11   Q    Okay.  Now, did we share with you that the

12   Government's witnesses said that they looked at the

13   pattern of coding based on their review?

14   A    Yes.

15   Q    And did we talk to you about that their opinions

16   that this pattern indicates that it was fraudulent?

17   A    Yes.

18   Q    Okay.  In your experience is such a pattern

19   sufficient to indicate whether something is merely

20   mistake or whether it's fraud?

21   A    Patterns are just a starting point.  Patterns are

22   when you decide you're going to go in and audit a

23   practice, when you're going to decide to go in and look

24   at the fee tickets and look and compare the fee tickets

25   to the charts.  When you're going to look at the

5243

1    processes that are going on in the office.  That's just

2    a starting point.  That's an indicater.  That's not a

3    definitive indicater of fraud.  First of all, you don't

4    know the acuity of the patient population.  So if one

5    doctor has sicker patients, they may have higher codes.

6    If one practice has well patients, they're going to have

7    lower codes.  So even to compare a practice to national

8    averages is a mistake because you have to look at that

9    individual practice.

10   Q    Okay.  I want to switch gears a little bit and talk

11   about the second allegation or the second area that the

12   Government talks about in the Indictment which is the

13   improper billing of physicians assistants.

14   A    Okay.

15   Q    Did we share with you the Government's exhibits

16   regarding those claims?

17   A    Yes.

18   Q    Did we show you the Government's exhibits regarding

19   the claims that were submitted for dates in which Dr.

20   Schneider was not in the clinic?

21   A    Yes.

22   Q    Okay.  Did we share the opinions that the

23   Government's witnesses provided regarding these

24   billings?

25   A    Yes.

5244

1    Q    Did you agree with those opinions?

2    A    No.  Uhm, basically from what I saw is we looked at

3    the fee tickets and we compared the fee tickets to the

4    charts.  And the fee tickets, uhm, they would either

5    have the name of the provider that provided the service

6    or they would have the name of the provider crossed out

7    and the provider who actually provided the service put

8    at the top.  And the name of the provider put at the top

9    or the name of the provider that's already at the top

10   matched the chart note.  And so basically the fee ticket

11   which I had told you earlier, which is your Bible for a

12   billing operation which shows whether billing is doing

13   their job right, shows that what went down to the

14   billing office was the correct provider.  Now, the

15   billing office from what I understand had a billing

16   manager -- there were two different ones, both of which

17   purported to have experience as experienced billing

18   managers and so it was their job to make sure that the

19   billing was done right.  And so if a practice takes

20   incident-to, they knew that they were allowed to be able

21   to bill -- I don't know if the jury knows what

22   incident-to is from the prior expert witnesses, but --

23   Q    I was going to ask you to just give a very brief --

24   A    All right.  Well, incident-to is where you're

25   allowed to bill a physician assistant as long as the

5245

1    physician is in the clinic and a physician has done the

2    plan of care.  It's not a new problem, but the physician

3    has done a plan of care and you can bill it out under

4    the physician's name.  But they should not be billing it

5    out under Dr. Schneider's name if he's on vacation.

6    They should be billing it out under the doctor's name

7    who is there.  Let's say it's doctor B, doctor Smith is

8    in the clinic, it shouldn't be under Dr. Schneider's

9    name.  So, the billing managers are responsible for

10   making sure that this stuff gets billed right.  The

11   problem is that, unfortunately, Medicare is very clear,

12   that's Medicare's rules.  Medicare is very clear as to

13   what incident-to is.  Then you have a hundred different

14   insurance providers, payers, who all have different

15   rules.  And as a billing department, it's very hard to

16   manage for all of your billers and each one of your

17   claims that you send out that you make sure that, oh,

18   for this one we have to make sure we bill under the PA.

19   This one we're allowed to bill under the doctor who was

20   present today.  This one doctor present.  This one we

21   can bill under the PA.  This one, and it's very very

22   difficult to manage.  And so that's what has to be done.

23   And it's a lot of work.  But it has to be done.

24   Q    Okay.  In your experience as an auditor and

25   educator, does the -- do the incident-to rules pose an

5246

1    area of -- where people usually get it right or area

2    where there's confusion?

3    A    Oh, it's an area where there's a lot of confusion.

4    There's a lot of people -- I'm on a lot of lists and I'm

5    a big networker with the American Academy of

6    Professional Coders, I was the networker of the year in

7    1999, people, there's a lot of people who think that the

8    incident-to rules which are Medicare's rules apply

9    across the board to all payers.  They are clueless that

10   every payer has their rules.  And if a payer is silent

11   that doesn't necessarily mean that they accept the rules

12   and you really have to find out what that payer wants

13   you to do for nonphysician practitioners which are

14   mid-level providers, nurse practitioners, or PA's,

15   clinical nurse specialists.  So there is a lot of

16   confusion and a lot of assumptions that are made in the

17   industry in terms of incident-to rule.  People just

18   basically follow the Medicare rules for other payers.

19   Q    I'd like to put up actually a Government Exhibit,

20   Shawn, if you can put up 10-ASC.  The ascending chart of

21   patients over 50 days, where Dr. Schneider saw over 50

22   patients or it's claimed that he saw -- the ascend.

23   Yes, that's right.

24        Okay.  Now, did we share this exhibit with you as

25   an exhibit that the Government presented?

5247

1    A    Yes.  We talked about it.

2    Q    Did we share with you that the Government's several

3    witnesses expressed the opinion that --

4              THE COURT:  Well, be sure for the record to

5    identify what exhibit you're showing her.

6              MR. GOROKHOV:  Yes.  I'm sorry, Your Honor.

7    I'm referring to Exhibit 1-0-ASC, Government Exhibit.

8              THE COURT:  All right.

9    BY MR. GOROKHOV:

10   Q    Did we share with you that several witnesses who

11   testified on behalf of the Government expressed the

12   opinion that to see that many claims, 50 and up, on

13   behalf of Dr. Schneider was indicative of a serious

14   problem, that it was a problem in the clinic, with the

15   billing?

16   A    Yes.  And again I think the payer would use that

17   kind of information if they didn't allow incident-to

18   paying as an indicater to go in and audit practice, use

19   a secret shopper or something like that.  But the

20   problem was in Dr. Schneider's office is that they made

21   mistakes in billing Dr. Schneider when it was Kim or

22   somebody else actually providing the service.  So

23   although Dr. Schneider may have seen the normal 30

24   patients, Kim may have also seen 30 patients, so it was

25   very feasible for 60 patients to go out under Dr.

5248

1    Schneider's name.  Because the billing department, when

2    they got the charge tickets, the, they actually had

3    Kim's name on it but they still billed them out, whoever

4    the biller was, under Dr. Schneider's name.

5    Q   So what would it be helpful to know in addition to

6    what's presented in this chart, to determine whether --

7    I'm sorry.  Going back.  Can you just explain briefly

8    what it would be helpful to know with respect to the

9    incident-to rules as they applied in this kind of, in

10   this kind of chart?

11   A   Which payers they were billed out to during those

12   days so, first of all, you could eliminate how many of

13   the charges that went out were actually incident-to so

14   they didn't count in that 60.  And then the ones that

15   were left over, look for mistakes in billing.  You

16   actually go into the billing system, you audit the

17   billing system, and you look and see what the billers

18   did, and see what doctor they put in versus what is on

19   the fee ticket versus what's on the chart.  And see that

20   it's a billing error.

21   Q   So from the perspective of an auditor, does this

22   tell you -- does this exhibit alone give you sufficient

23   information?

24   A   No, it does not.  It's a starting point again just

25   like we were talking before.

5249

1    Q   I'd like to put up another Government Exhibit while

2    we're talking a little bit about the incident-to rules.

3    And specifically I'd like to put up Exhibit 16.

4    Government Exhibit 16.  Which is the Blue Cross/Blue

5    Shield audit.  And did you review the Blue Cross/Blue

6    Shield incident-to billing rules?

7    A   Yeah, that's the charts that I worked from.

8    Q   Did you review the billing, the incident-to billing

9    rules for First Guard -- I'm sorry, for Blue Cross/Blue

10   Shield?

11   A   Yes, I did.

12   Q   Can you summarize for the jury what that rule is?

13   A   It's sort of confusing.  It's a tiered rule.  They

14   have some procedures that are allowed that are

15   incident-to.  They have some procedures that are not

16   allowed.  And when they are allowed, you're allowed to

17   bill under the supervising physician.  So they have

18   their own tiered type rule.

19   Q   Can we scroll down just to the first page and zoom

20   in, if you can, on the column about the provider seen as

21   a physician.  Just looking at that column, is there

22   sufficient information for you to determine whether or

23   not a yes, which is whether provider was billed as a PA

24   and it says yes, whether that is a violation of a rule?

25   A   I would have to look at the list of CPT codes that

5250

1    they have in their tiers, but I would think it would be

2    perfectly fine, probably, for the PA to be billed for

3    99213.

4    Q    So it would depend on the circumstances, the service

5    provided?

6    A    Depends on the circumstances for Blue Cross/Blue

7    Shield, yeah.

8    Q    And would that information be needed for a complete

9    picture?

10   A    Excuse me.

11   Q    Would that information -- I'm trying to -- what, if

12   any, information would help in this chart to determine

13   whether those yeses and nos are significant in that

14   column?

15   A    What the tier is.  You know, for example, in all

16   probability I bet the tier is that the PAs can bill 99

17   through 99213 but 99214 and 15, they can't bill.  That's

18   what I would guess.  I can't remember.  I read it a long

19   time ago.

20          MS. TREADWAY:  Judge, we would move to strike

21   that testimony because it's based on speculation.

22          THE COURT:  Yeah.  Can't guess, sir -- ma'am.

23   You can't guess.

24   A    Okay.  I can't remember what it is.

25          THE COURT:  You can remember but you can't

5251

1    guess what you remember.

2    A    Okay.  I can't remember.

3                THE COURT:  All right.

4    A    So, uhm, but if 99213 is within the tier allowing

5    supervision, then the yes would be okay.

6    BY MR. GOROKHOV:

7    Q    Now, you do remember the Medicare rules?

8    A    Yes.

9    Q    Okay.  Why don't we look -- very briefly look at

10   chart, 15, Government Exhibit 15.  Just look at the same

11   column in that.

12       Now, again, looking at that column alone and in the

13   context of the Medicare rules, do those yeses and nos

14   give you any meaningful information as to whether it was

15   proper or improper to bill?

16   A    No.  No, because it's totally fine.  As -- the key

17   is, I would still have to look at the schedule and make

18   sure that a physician was present in the clinic and that

19   the physician that it was billed under was the physician

20   that was present in the clinic.  That's -- those are the

21   two key things with Medicare.

22   Q    Do you know how many companies or payers that the

23   Schneider Medical Clinic dealt with?

24   A    It was close to 100 as far as I know.

25   Q    I want to switch again to another area of the

5252

1    Government's allegations which is the billing for

2    services not rendered.  And I'd like to ask you

3    something about that.  In reference to these claims, did

4    we share with you -- did you review progress notes in

5    reference to these claims?

6    A    Yeah.  I reviewed progress notes.  I never saw any

7    progress -- I never saw any indication of services not

8    rendered.

9    Q    Did we share with you the opinion that some

10   Government witnesses gave that if a service isn't

11   legible, if it's bad handwriting or if it's not written

12   down, then it's as if it never happened?

13   A    Well, I think they're confused between surgical

14   services and E and M services.  In a surgical type

15   situation, and you've got an op note and so if my op

16   note in the top of the op note it says I did a maxillary

17   antrostomy with tissue removal and within the op note I

18   give no indication that the tissue was removed, I can't

19   code tissue removal.  So that's an example of it's not

20   documented, you can't -- it wasn't done.  And so it

21   doesn't matter whether the doctor really did it.  It

22   wasn't documented, it wasn't done.  Okay.  So that's

23   surgical coding.  When it comes to E and M coding, if

24   it's not documented, you can't count it for the E and M.

25   So, if it wasn't documented, instead of it being a

5253

1    99213, it may end up being a 212.  Instead of it being a

2    214, it may end up being a 213.  But it's not that the

3    service wasn't delivered.  It's just a lower level

4    service.  Or it may still end up being the same level of

5    service but it's just not as hardy as it would have

6    been.  So E and M services are different than surgical

7    services.  And that whole concept that if it wasn't

8    documented, it wasn't delivered is more of an operative

9    note type service or type idea than an E and M idea.

10   Q   Okay.  This rule about documentation as it relates

11   to the E and M code, does that -- when you're looking at

12   an auditor in terms of fraud versus just abuse, is there

13   a difference in the way that you apply that rule as an

14   auditor?

15   A   I just -- from a fraud point of view, I usually, I

16   usually would find that the notes look pristine because

17   the perpetrator really wants those notes to look

18   perfect.  They don't want you to know they're cheating.

19   They, they want -- they usually have nurses writing the

20   notes.  They want it to look wonderful.  They don't want

21   anybody to think they've made mistkes; whereas, abuse is

22   the doctor is spending more time with the patient than

23   documenting.  Paperwork is the last thing in their mind

24   than spending time with the patient and taking care of

25   the patient.  And that's the prevalent thing that you

5254

 1   find.  Fraud is someone who's really trying to get rich

 2   off the system and has this scheme.  They've got other

 3   people involved.  It's not just them.  It's a very

 4   elaborate thing and you're not going to find really bad

 5   notes.

 6   Q   With respect to this, these claims of services not

 7   rendered, did we give you other documentation other than

 8   just the progress notes to review in reaching your

 9   conclusion?

10   A   Well, you gave me the full charts which had

11   everything.

12   Q   Did we give you -- did we show you sign-in sheets?

13   A   Oh, yes, you showed me the sign-in sheets which

14   showed that the patients were physically there.

15   Q   Did we show you the fee tickets again?

16   A   Yes.  And I saw the fee tickets.  And what impressed

17   me was that if the physician who was assigned to the

18   patient in the schedule was not seeing the patient, that

19   physician was written over with the PA or physician who

20   really would see the patient.

21   Q   I'm almost done here.  I just want to cover one last

22   topic very quickly.  We talked -- I think we mentioned

23   just the Actiq, the allegations with respect to the

24   Actiq and I just want to ask you a few questions about

25   how the prescribing -- how the relationship between the

5255

1    doctor, the pharmacy and the insurance company when it

2    comes to the prescribing of medications.  When a doctor

3    prescribes -- who is it that the insurance company

4    ultimately pays for the medication?

5    A    The pharmacy.

6    Q    Does the insurance company -- what is the ability of

7    the insurance company to ascertain what prescriptions

8    the doctor is giving to the patient?

9    A    They have it all in their data bases because the

10   pharmacy transmits all that information via the claims

11   management system.

12   Q    What about the ability of an insurance company to

13   find out what the doctor is treating a patient for?  Is

14   that information available to them as well?

15   A    If they ask the doctor for the chart, the doctor

16   will provide the chart.

17   Q    Okay.  Did you see based on the charts that you

18   reviewed in this case, any charts where there was a

19   code -- I'm sorry -- a diagnosis code or actual charting

20   that reflected a false diagnosis of a disease that a

21   person didn't have?

22   A    Not that I could see; but I would have to know

23   patients or whatever.

24          MR. GOROKHOV:  I think I'm done.

25   A    Okay.

1          MR. GOROKHOV:  Thank you.

2          THE COURT:  Except there's one matter that

3    I've reserved a ruling on and he may come back depending

4    on my ruling.

5          MR. GOROKHOV:  Yes, Your Honor.

6          THE COURT:  Mr. Williamson.

7                    **CROSS EXAMINATION**

8    BY MR. WILLIAMSON:

9    Q   Ms. Cobuzzi, you mentioned a document called an E

10   OB.  Can you tell the jury what that is?

11   A   It's called an explanation of benefits or remittance

12   advice.  That's what comes from the insurance company

13   with a check which explains to the practice what they've

14   paid, what they've -- what was billed by the

15   insurance -- what was billed by the doctor, what was

16   allowed by the insurance company, what was applied to

17   deductible, co-pay and what was ultimately paid by the

18   insurance company, what was still owed by the patient.

19   Q   One of the Government's experts testified that he

20   did not receive an EOB and would have liked to have seen

21   that when making a decision.  Do you agree with that,

22   that would be a helpful document to have when --

23   A   Oh, definitely, yes.

24   Q   And why is that?

25   A   Because it would confirm who was being billed and

5257

```
 1    what the insurance company was doing.  If the insurance
 2    companies were reducing for PAs, how they were handling
 3    things, et cetera.
 4    Q    Now, this expert also testified that he did not
 5    receive any actual claims data, or claims information in
 6    order to render his opinion and that would have been
 7    helpful.  Do you agree with that?
 8    A    Yeah.  I mean, it's basically the same thing.  The
 9    claims data, is basically the same information that
10    comes from -- that's on the EOB.
11    Q    Now, did you --
12    A    That all comes from the payer.
13    Q    Okay.  And did you see any evidence of a secret
14    shopper or did you hear of any evidence being presented
15    to the jury of a secret shopper?
16    A    No.
17    Q    Have you heard of any evidence of patients
18    complaining of being billed for services that were not
19    rendered to them?
20    A    No.
21    Q    Are those pieces of information as an auditor that
22    you would like to see or know if they exist in order to
23    render a determination as to whether intentional fraud
24    was happening or mistake and abuse?
25    A    Definitely.
```

5258

1    Q    And so I'm clear, and I want to make sure the jury

2    is clear.  When you did your review of the Government's

3    audit, you disagreed with their findings?

4    A    Yes.

5    Q    Does that mean that you do not believe that the

6    Government's findings were a hundred percent accurate?

7    A    Correct.

8    Q    Do you believe that the Government findings were a

9    hundred percent complete based on the lack of

10   information that was in those charts?

11        You want me to rephrase that?

12   A    Yeah.

13   Q    Remember when Mr. Gorokhov went over the

14   spreadsheets with you and identified information missing

15   from the charting such as what the actual rule was, what

16   the tier was, who was on the schedules on those days.

17   Remember those questions?

18   A    Yeah.  It definitely would have made a difference,

19   including the fee ticket would definitely make a

20   difference in the conclusions.

21   Q    Did you see any evidence that the intent was to

22   defraud the insurance companies in your reviews?

23   A    No.

24   Q    Now, when -- well, strike that.

25        Did you see any evidence or learn of any evidence

5259

1    that Dr. Schneider or the clinic had been accused of

2    defrauding these Government benefits before this case

3    was ever filed?

4    A    Uhm, I saw something where Medicaid was trying to

5    work with him to get better documentation and he

6    complied.  He received a letter of improvement and that

7    he was working to try to improve his processes.  And I

8    don't know whether it was a Medicaid or Medicaid HMO but

9    he was working with Medicaid on that.  And the

10   interesting thing is that Medicaid in doing that audit

11   and everything never brought up his incorrect billing of

12   his PAs.

13          MR. WILLIAMSON:  I don't have anything else,

14   Your Honor.

15          THE COURT:  Thank you, Mr. Williamson.  I need

16   to resolve this issue before we proceed further so I'm

17   going to send you to lunch a little early today which

18   probably won't be too upsetting to you.  Again,

19   approximately one hour.  It may take a little longer

20   than that because I may need to talk to the lawyers

21   about it, but certainly at least an hour for lunch.

22   Remember and heed the admonition.

23                (Jury excused for lunch recess.)

24          MR. WILLIAMSON:  Judge, do you want to address

25   it now or come back --

5260

1              THE COURT:  I want to talk to you for a

2      minute.  Okay.  I want to make sure that -- you may sit

3      down, folks.  I want to make sure I understand what I'm

4      supposed to be looking for here.  I've heard nothing in

5      her testimony thus far that relates to -- I mean, what

6      I'm saying is I think her testimony thus far is fine.

7      She can criticize the Government's exhibits.  She can,

8      to the extent she has, criticize the opinions of the

9      Government witnesses.  There hasn't been too much of

10     that.  Is what you want me to look for, Ms. Treadway, is

11     simply the extrapolation that based on her 30 -- review,

12     I guess, of 30 files, I think that was the term she

13     used --

14             MR. GOROKHOV:  It's per payer, Your Honor.  30

15     files per payer.

16             THE COURT:  Per payer, I'm sorry, which would

17     be a total of --

18             MR. GOROKHOV:  150, Your Honor.

19             MS. TREADWAY:  And, again, it's not files,

20     Judge.

21     A    Dates of service.

22             MS. TREADWAY:  It's claims.

23             THE COURT:  Well, claims, I'm sorry.  30

24     claims times five, 150.  That she wants to extrapolate

25     to that there wasn't any fraudulent -- she saw no

5261

```
 1    evidence of fraudulent billing in the Schneider Medical

 2    Clinic billing practice.  Correct?

 3              MS. TREADWAY:  That's correct, Judge.

 4              THE COURT:  I'll take a look at that.

 5              MR. GOROKHOV:  Thank you, Judge.

 6              MR. WILLIAMSON:  Judge, that would be an

 7    admissible opinion and beyond what she's already talked

 8    about --

 9              THE COURT:  Right.  I think you all have

10    covered everything that she -- and if you can find any

11    cases that, you know, you need to bring them in to me

12    because I'm going to have to make this ruling quick.

13              MR. WILLIAMSON:  Yes, sir.

14              THE COURT:  Don't have a year to take it under

15    advisement and talk to other judges about it and get 75

16    law clerks involved.

17              MR. WILLIAMSON:  Thank you, Your Honor.

18                   (Noon recess.)

19

20

21

22

23

24

25
```