5262

1                    (Beginning at 1:55 p.m. June 3,

2                    2010, the following proceedings

3                    continued OUTSIDE THE PRESENCE

4                    of the jury.)

5          THE COURT:  Guess over the noon hour you were

6    able to resolve your problems.

7          MR. WILLIAMSON:  Yes, Your Honor.  We're not

8    going to offer a global opinion extrapolated from her --

9    the expert's opinion.

10         THE COURT:  I think so.  I think that's the

11   correct decision.  All right.  Ms. Cobuzzi, you can come

12   back up.  You got a proffer for me on your other

13   witnesses?

14         MR. WILLIAMSON:  Yes, Judge.  What I did was I

15   just focussed on patient witnesses as I understood the

16   Court's prior ruling.

17         THE COURT:  Right.

18         MR. WILLIAMSON:  Let me start with Marlene

19   Fether.  She is here.  She was scheduled to testify

20   today after Tim McDonald, who is also here.  Ms. Fether

21   essentially was a patient of Dr. Schneider's since 1988.

22   She suffered from serious migraines and Dr. Schneider

23   treated her with noncontrolled substances for a very

24   long time.  Do you want my rationale or do you just want

25   the facts?

5263

```
 1            THE COURT:  No, I just want you to tell me
 2   what these witnesses will testify about.
 3            MR. WILLIAMSON:  Okay.  Then we have
 4   Tonisha -- I can't pronounce her last name but it's
 5   Amunaka
 6            THE COURT:  Huh?  Tonisha somebody.
 7            MS. TREADWAY:  Amunaka.
 8            MR. WILLIAMSON:  And she essentially was a
 9   patient of Dr. Schneider's.  She was in a car accident,
10   treated for pain with non-controlled substances.  To the
11   extent this witness is a patient, I just decided to err
12   on the side of caution.
13       Alex Peters is the brother of Dustin L.  I don't
14   think he's necessarily going to talk a lot about his
15   personal treatment --
16            THE COURT:  Brother of who?  Which one?
17            MR. WILLIAMSON:  Dustin L.
18            THE COURT:  Okay.
19            MR. WILLIAMSON:  But he'll talk about the
20   circumstances surrounding Dustin L's treatment and where
21   Dustin L actually received the pills from that he took.
22   But he also -- I believe Alex treated as well but that's
23   why I just listed him just to be on the safe side.  But
24   his testimony will be more for about his brother.
25            THE COURT:  All right.
```

5264

1          MR. WILLIAMSON:  There's Brandy Morarie.

2          THE COURT:  Who?

3          MR. WILLIAMSON:  Brandy Morarie.  Essentially,

4   she was a patient of the clinic, very serious issues

5   that Dr. Schneider sent out for surgery and she had

6   difficulty finding another physician to help her after

7   Dr. Schneider was no longer practicing.

8          Carol Carter who is the mother of Toni W.  She was

9   also a patient of Dr. Schneider's, so I just listed her

10   as well; but I believe most of her testimony will be

11   discussing Toni W and the relationship that the family

12   had with Dr. Schneider, including the amount of time

13   that Dr. Schneider actually saw Toni W.  And the

14   circumstances of death.

15          Aimee L, was a former patient who suffers from

16   multiple medical issues.  Her primary testimony that we

17   will be discussing with her is the fact that she was

18   prescribed Actiq and how Actiq helped or didn't help her

19   medical conditions.  And the difficulty she has had

20   finding medical treatment after being treated at the

21   Schneider Medical Clinic.

22          Doris Scheidmaen.  She was a former patient.  She

23   had migraines and she was not prescribed any controlled

24   substances.

25          Kelly Gilbert.  Kelly was a patient that was

1    actually terminated from the clinic for violating the

2    pain management contract.  And he'll testify from a

3    patient's point of view in regards to when you have

4    pain, you violate the contract and what happened under

5    those circumstances when he was actually terminated.

6        Ray Carrol.  He also I believe he failed a urinary

7    drug screen and he will offer the jury information about

8    a patient failing a urinary drug screen and the

9    circumstances and how the Defendant addressed that

10   failed urine drug screen.

11           THE COURT:  And how he addressed it?

12           MR. WILLIAMSON:  Yes, sir.  We also have

13   Phyllis Rowland who is the mother of Robin G.  I don't

14   necessarily believe she's going to testify as a patient

15   but I just included her to be better safe than sorry.

16   And she'll, you know, discuss her observations of Robin

17   while she was being treated by the -- Dr. Schneider at

18   the Schneider Medical Clinic.

19       I believe that's the extent of the witnesses that

20   we would proffer to call.  I think a vast majority of

21   these will be completed tomorrow and, you know, maybe a

22   couple leftovers on Thursday if they're unable to come

23   tomorrow; but I don't believe that these witnesses would

24   extend the length of the trial any more.  As I stated

25   previously, Ms. Fether is here today already in the

5266

1     witness room.

2             THE COURT:  All right.  What's the

3     Government's response here?

4             MS. TREADWAY:  Well, Judge, the Government's

5     response is that which it has been from the beginning.

6     With regards to all these patients:  Marlene Fether,

7     Tanisha Amunaka, Randy Moriarity, Aimee L, Doris

8     Scheidmean, Kelly Gilbert, Ray Carrol.  This is good

9     acts evidence which is inadmissible.  It's simply not a

10    cognizable defense that you acted appropriately on one

11    day.  It does not negate intent.  It is not evidence of

12    anything.  And that's the law that I've provided the

13    Court in my response to the motion filed almost at

14    midnight last night.  It's very, very strong

15    well-settled law that this is just not a cognizable

16    defense.  It's not admissible.  It's not character

17    evidence.  And therefore it's just not admissible.

18    Again, the simple explanation is if I rob a bank on

19    Monday but I don't rob a bank on Tuesday, I can't bring

20    in the evidence that I didn't rob the bank Tuesday to

21    prove I didn't rob the bank Monday.  It's not relevant

22    evidence.  It's not a cognizable defense.

23        To the extent that these other people like Alex

24    Peters and Carol Carter and Phyllis Rowland want to talk

25    about specific patients and their observations, I

5267

1    believe that is relevant as testimony of the spouses was

2    relevant.  So we don't have objections to that.

3            THE COURT:  No objection to which ones?

4            MS. TREADWAY:  Mr. Peters, Ms. Carter and

5    Ms. Rowland.  Again, they can testify about their

6    observations of the patients.  That's fine.  But this

7    other information simply leads us nowhere.  It's not

8    relevant.  It's not admissible.  It's good acts evidence

9    and it's not a cognizable defense, Judge.

10           THE COURT:  All right.  Here's the Court's

11   ruling with respect to these people.  I'll allow

12   Fethers.  I will not allow Doris whatever her last name

13   is because the way you presented it, they have the same

14   testimony, that they had migraines and he didn't

15   prescribe controlled substances.  And I think we've

16   heard something like that before, too, but I can't

17   remember whether it was migraine or back pain or some

18   other problem.  I will allow and would have allowed

19   Peters, Carter and Robin G's mother.  Particularly Robin

20   G.  She's the, you know, he's alleged to have killed

21   her.  So those I'm going to allow -- is it Aimee --

22           MR. WILLIAMSON:  Yes, Your Honor.

23           THE COURT:  Because of all of the testimony

24   that we had regarding Actiq, I think that -- we haven't

25   heard from anybody that I can remember who was

5268

```
 1    prescribed Actiq.  So I'll allow her.  But I'm not going
 2    to allow Brandy because yesterday at least two of the
 3    witnesses yesterday talked about how they were referred
 4    out to other physicians, which, you know, I don't know
 5    what the real relevance of that is except that he looked
 6    at 'em and felt that he couldn't take care of 'em and
 7    referred 'em to somebody else and we've already heard
 8    people who that happened to.  Tell me, Tanisha again,
 9    what was -- she didn't get prescribed controlled
10    substances.  But what else?
11              MR. WILLIAMSON:  She was in a car accident.
12    She came in, the Defendant did not prescribe controlled
13    substances to her for her pain that she had in the car
14    accident.
15              THE COURT:  We had one lady yesterday that had
16    been in three car wrecks, the one in the yellow dress.
17    I don't remember the name, of course --
18              MR. WILLIAMSON:  Yes, but I think she did have
19    pain medication.  And this is, you know, Judge, you saw
20    how quick the day went yesterday.  We're not spending
21    unnecessary time like, you know, going into, well, like
22    things very collateral.  But the Government has
23    essentially said he's a pill pusher, he gives it every
24    time.  I think it's important for the jury to at least
25    hear from somebody that they came in in pain and he
```

5269

 1   didn't "push a pill on 'em".

 2            THE COURT:  All right.  I'll allow Tonisha

 3   whatever her name is.  All right.  Now, did you want --

 4   what about you, Kevin?

 5            MR. BYERS:  Yes, sir.  We're able to cull it

 6   down to --

 7            THE COURT:  Wait a minute.  I didn't address

 8   Kelly or Ray.  You can pick one of the two of those.  I

 9   don't care.  But it's the same basic testimony that one

10   of 'em violated the contract, I don't know how he

11   violated the contract.  The other one failed a UDS.  But

12   it's the same thing, you know.  So pick the one that you

13   want to call and it's one or the other.  All right.

14   Now, what about you, Kevin?

15            MR. BYERS:  Yes, sir.  We were able to cull it

16   down to seven people; and then, being aware of your

17   concerns about cumulative evidence, seven employees,

18   that would testify as to Linda's involvement maybe in

19   handling the charts and/or billing.

20            THE COURT:  We've already had some testimony

21   about that.

22            MR. BYERS:  I understand.  That's what I'm

23   saying.  We have the seven.  I've knocked it down to our

24   top four and those four are because they were in

25   positions that we've not yet heard from, I believe.  One

5270

 1    is -- was a receptionist.  We've not heard from the

 2    front desk.

 3              THE COURT:  Yeah, we did.  The lady -- we had

 4    a lady yesterday that --

 5              MR. BYERS:  We had Tes Gahman who was the

 6    scheduler.  She sat near the front.  She was not a

 7    reception person.  There was reception on each side.

 8    These were typically Aimee or this Brenda.

 9              THE COURT:  Well, hold on just a second.

10    Okay.  Teresa Gahman, that's Sonja's mother.

11              MR. BYERS:  Right.

12              THE COURT:  She's a scheduler.  Sonja was a

13    lot of things.  Brenda Beyer was a lot of things.  I

14    agree.  I don't think we've had a true receptionist.

15              MR. BYERS:  Right.  And that goes to

16    observations -- I mean, we asked a lot of people if they

17    observed the lobby; but these were people who were there

18    essentially the whole time.

19              THE COURT:  Who is this person?

20              MR. BYERS:  This would be Brenda Eller,

21    E-L-L-E-R.

22              THE COURT:  Okay.

23              MR. BYERS:  And I don't believe we've also

24    heard from a coder.  And the problem is we're having

25    great difficulty finding this person; but if we find

5271

```
 1    her, if we're able to serve her, her name is Martie
 2    Brown.  I believe she would testify the same things
 3    relative to Linda and her involvement in the charts and
 4    how the paper flowed and fraud and that kind of thing.
 5                THE COURT:  Okay.
 6                MR. BYERS:  Another one I'm not sure we've
 7    heard from this type of person was essentially an
 8    insurance researcher, sort of a rebilling, dealing with
 9    insurance company folks.  That would be Kathy Pauly.
10    And she would testify along the same lines, but it's a
11    person in that position I don't believe we've heard from
12    yet.
13                THE COURT:  Okay.
14                MR. BYERS:  And then the fourth -- and this
15    might actually be cumulative.  Would be a Deb McEachern
16    and she was a roomer slash X-ray tech and sort of
17    jack-of-all-trades.
18                THE COURT:  Haven't we heard enough of
19    jack-of-all-trades?
20                MR. BYERS:  I understand your ruling.  I
21    wanted to pitch four if I could.
22                THE COURT:  Well, three out of four ain't bad,
23    is it?
24                MR. BYERS:  That's not -- Meatloaf would
25    probably write a song about it.
```

5272

```
 1              THE COURT:  Well, I don't know about that, but
 2    I'm sure Kinky Friedman could.  A great American.  All
 3    right.  I'll allow those three.
 4              MR. BYERS:  Thank you, Your Honor.
 5              THE COURT:  All right.  Now, I think we're
 6    ready to go.
 7              MR. WILLIAMSON:  Judge, not to press my luck,
 8    but can I offer one more name.  I just overlooked this
 9    one.  And I'm not a hundred percent positive we can get
10    him here.  He leaves to go out of the country on the 6th
11    so it would have to be tomorrow.  It's Michael Irvin.
12    He was a patient that suffered from addictions but also
13    suffered from pain and I don't think the jury has heard
14    from a person at least from our side that has testified
15    about how Dr. Schneider may have tried to help with both
16    of those issues.
17              THE COURT:  What do you know about him,
18    Ms. Treadway?
19              MS. TREADWAY:  Nothing, Judge.  I know
20    nothing.
21              MR. WILLIAMSON:  I think he's been disclosed
22    already, Your Honor.
23              THE COURT:  He's in where?
24              MR. WILLIAMSON:  He's been disclosed.  You
25    know how we have to give these rolling disclosures --
```

1          THE COURT:  Well, if you can find him, I may

2     think about it; but I think we've had quite a bit of

3     testimony about that but let me know if you've got him

4     located and served.

5          MR. WILLIAMSON:  Yes, sir.

6          THE COURT:  All right.  Let's get 'em.

7               (Jury enters the courtroom.)

8          THE COURT:  Please be seated.  Yes, ma'am.

9          MS. TREADWAY:  Thank you, Judge.

**CROSS EXAMINATION**

BY MS. TREDWAY:

Q   Ms. Cobuzzi, would you agree with me that for a

medical service to be billable, it must be a legitimate

medical service?

A   Yes.

Q   It must be medically necessary; correct?

A   Yes.

Q   Are you aware that the Defendants are charged with

illegally distributing prescription drugs?

Specifically, controlled substances?

A   Yes.

Q   Would you agree with me that if a physician and a

clinic are illegally distributing controlled substances,

that such activity is not a medically necessary service?

A   Yes.

5274

1    Q   Would you also agree that the illegal distribution

2    of controlled substances is not a billable service?

3    A   Yes.

4    Q   Would you also agree that if a prescription for an

5    illegally distributed drug is paid for by a healthcare

6    program, that the provider has caused a false claim to

7    be submitted and paid?

8    A   Can you repeat that.

9    Q   Would you agree that if a prescription for an

10   illegally distributed drug is paid for by a healthcare

11   program that the provider issuing the prescription has

12   caused a false claim to be submitted and paid?

13   A   Yes.

14   Q   And would you agree that an illegal prescription

15   should not be paid for by the healthcare programs?

16   A   Yes.

17   Q   With regards to the big day charts, that's what we

18   call them, the 10 with the list of the 50 or more

19   patients a day.

20   A   Yeah.

21   Q   You remember looking at those charts prior to your

22   testimony?

23   A   Yes.

24   Q   Now, would you agree with me that one of two things

25   is going on there.  Either, A, they billed as though the

5275

1    Defendant Stephen Schneider saw the patient when in fact

2    he did not --

3              MR. WILLIAMSON:  Your Honor, I'm going to

4    object to the term "they".  It's unclear.

5              THE COURT:  This hour --

6              MR. WILLIAMSON:  No, they.

7              MS. TREADWAY:  They.  I'll say the clinic,

8    Judge.

9              THE COURT:  All right.

10   BY MS. TREADWAY:

11   Q   Would you agree with me there's one of two things

12   going on.  Either the clinic billed as though the

13   Defendant Stephen Schneider saw the patient when he did

14   not.  Correct?

15   A   Correct.

16   Q   Or, he didn't see the patients because there wasn't

17   sufficient time to do so?

18   A   There's a third option.

19   Q   Do you agree with my second option?

20   A   Yes, but --

21   Q   Now, you will also agree with me, won't you, that

22   willful and intentional upcoding is fraud?

23   A   Yes.

24   Q   And you would also agree with me that willfully and

25   intentionally billing for services not rendered is

5276

1    fraud?

2    A    Yes.

3    Q    When were you first contacted about serving as an

4    expert in this case?

5    A    I can't even remember because it's just dragged on

6    so long.  I would have to check my calendars.

7    Q    Well, let me tell you that -- this is of record in

8    the case -- the charges were issued by grand jury in

9    December of 2007.  Does that place it in time for you?

10   A    So I was probably contacted somewhere in 2008.

11   Q    Okay.  Who was it that contacted you?

12   A    Eugene Gorokhov.

13   Q    And how is it that he contacted you?  By phone, by

14   e-mail, by letter?

15   A    It was either by phone or e-mail.

16   Q    And what did Mr. Gorokhov tell you during that first

17   contact?

18   A    Uhm, I believe he asked if he could send the charges

19   to me, uhm, for me to review it and, uhm, and then have

20   a discussion about it.

21   Q    Did you enter into a written contract or agreement

22   at that time?

23   A    Probably not until I reviewed some charts or we

24   talked more about it.

25   Q    Did you eventually enter into a written contract or

5277

1    agreement?

2    A    Eventually, yes.

3    Q    And did that define what you were supposed to do?

4    A    It was, uhm, more global I think.  You know, it was

5    sort of an engagement letter.

6    Q    When did you first receive documents to review?

7    A    Again, I don't remember the date.

8    Q    What documents did you first review?

9    A    I got CDs from the Government.  I got the

10   spreadsheets.  Basically that's what I worked off of.

11   Q    Did you review a smaller number of documents prior

12   to receiving all that information?

13   A    Uhm, I can't remember.

14   Q    What would help you remember?

15   A    Bringing me back in time.  It just has been a long

16   time.

17   Q    So you didn't receive anything by transmittal letter

18   saying here is documents X through Z, nothing of that

19   nature?

20   A    I can't remember.

21   Q    So prior to July 31st, 2008, what had you reviewed

22   in the case?

23   A    I don't know.

24   Q    Well, your expert opinion was disclosed on July

25   31st, 2008.  So prior to your opinion being disclosed,

5278

```
 1    you're telling this jury you do not know what you

 2    reviewed?

 3    A   I don't remember at this point  I didn't --

 4    Q   Prior to forming your opinion, did you discuss this

 5    case with anyone on the defense team?

 6    A   I discussed it with Eugene Gorokhov mostly.

 7    Q   How many discussions did you have with Mr. Gorokhov?

 8    A   Uhm, quite a few.  Again, I would need my Outlook to

 9    see how often he and I discussed things.

10    Q   So this occurred by e-mail?

11    A   No, e-mail and phone conversations; but I kept track

12    of those.

13    Q   Did you rely on any of those discussions in forming

14    your opinion?

15    A   Some of my discussions with Eugene did help in

16    forming my discussions -- my, excuse me, my opinions.

17    Q   Other than the documents you identified for the jury

18    and your discussions with Mr. Gorokhov, what other

19    materials did the Defense team share with you for the

20    purpose of forming your opinion?

21    A   Basically what they had, which were the CDs provided

22    by the prosecution and the spreadsheets provided by the

23    prosecution.

24    Q   Did you ever --

25    A   And they also gave me --
```

5279

```
 1    Q    Sorry?
 2    A    -- like I said, they provided I think the rules for
 3    incident-to, for example, for the different payers.  I
 4    also did some research for them on those kinds of
 5    things, et cetera.
 6    Q    Did you ever speak with either one of the Defendants
 7    in forming your opinion?
 8    A    I do not believe so.
 9    Q    Did you ever speak with any of their former
10    employees?
11    A    No.
12    Q    Did you make reports to the defense team?
13    A    No.
14    Q    Did anyone instruct you not to put anything in
15    writing?
16    A    No.
17    Q    Did you correspond or otherwise communicate with the
18    Defense team in writing by e-mail or text or memos or
19    letters or faxes about your opinions?
20    A    Uhm, I don't know if it was -- yeah, but, opinions
21    or findings I did send e-mails to Eugene, copies I think
22    to Lawrence and Kevin somewhere along the way.  You
23    know, as I was doing my audit work.
24              MS. TREADWAY:  Judge, we would ask for
25    production of those materials under 26.2.
```

```
 1          THE COURT:  Do you have them?
 2          MR. GOROKHOV:  Judge, we had an agreement with
 3   the prosecution prior to this case that these -- the
 4   materials would not be disclosed.  We have it in
 5   writing.  We --
 6          MS. TREADWAY:  Not her e-mails.  Their
 7   e-mails.  I want her e-mails.  Those are her statements.
 8          MR. GOROKHOV:  -- regarding experts.  It's in
 9   writing.  We have a letter that's the understanding we
10   had all along --
11          THE COURT:  How am I supposed to know what
12   your agreement was?  Have you got anything in writing
13   that I can look at?
14          MS. TREADWAY:  This is rule -- Judge --
15          MR. GOROKHOV:  Do you have the e-mail, the
16   letter that we agreed upon?
17          MR. WILLIAMSON:  We would have to find it.  We
18   have an electronic copy of it.
19          MS. TREADWAY:  Well, Judge, I reserve the
20   right to recall this witness at their expense depending
21   on the ruling.
22          THE COURT:  What am I going to rule on?  I
23   don't even know what we're talking about.
24   A    I have to tell you that my computer has -- my
25   computer crashed last summer and I do not have my old
```

5281

1    Outlook files and I don't have that.  I mean, I -- all

2    I -- what I have when I tell you I have to look at my

3    Outlook to tell you when I spoke to or how often I spoke

4    to Eugene is in my Outlook contact for Eugene I have the

5    dates in terms of keeping my hours.

6            MS. TREADWAY:  Judge, I'll move on but I want

7    it recorded that this is a violation of the rule.

8            THE COURT:  Hey, I don't know whether it is or

9    it isn't.  I don't know what you all have agreed to.

10           MR. WILLIAMSON:  We agreed that --

11           THE COURT:  I don't want to hear about it.  I

12   don't want the jury to hear about it. I don't expect the

13   jury cares one way or another.  But if you've got

14   something in writing that you agreed to -- and what

15   she's asking for is this witness's e-mails to

16   Mr. Gorokhov, right?

17           MS. TREADWAY:  Communications to defense with

18   her findings, yes, Judge.

19           THE COURT:  And it's either in or not in the

20   agreement, you're going to have to show me whatever this

21   is.  So move along, please, and somehow I may resolve

22   this.

23           MS. TREADWAY:  I will, Judge.

24           THE COURT:  Or I may not.

25

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

5282

BY MS. TREADWAY:

Q   Ms. Cobuzzi, I think you repeatedly testified that you are an industrial engineer?

A   Yes.

Q   So is it safe to assume that you have no training in the medical field in terms of providing patient care?

A   Correct.

Q   You are not a medical professional now, nor have you ever been one?

A   Correct.

Q   You have never actually done any of the coding in the field as a medical professional; isn't that correct?

A   Correct.  I have never worked in an office.

Q   In terms of the CPT codes and the times associated with them, we have had a medical doctor who is also a certified coder testify that the time a physician spends with a patient typically increases with the level of service being provided and billed.  Do you disagree with that testimony?

A   No.

Q   Isn't that why the CPT codes indicate typical times associated with each code?

A   No.

Q   Let's look at that.  60-B, please.  Just as an example.  The 99213 says usually the presenting problems

5283

```
 1    are --
 2              THE COURT:  Well, she can't see that.
 3              MS. TREADWAY:  You're very familiar with
 4    these, aren't you?
 5    A   Well, I'd still like to see what you're reproducing.
 6              THE COURT:  Ma'am, you can get up and walk
 7    over there and look at it as far as I'm concerned.  Or
 8    she's showing it to you.
 9    A   I would like to compare that with what's in my CPT
10    book because I believe there's missing context of what's
11    in the CPT book.
12              THE COURT:  Well, you can cover that on
13    redirect examination but you need to answer the question
14    that she's asking you --
15    BY MS. TREADWAY:
16    Q   Does this state --
17              THE COURT:  -- if you can.
18    BY MS. TREADWAY:
19    Q   Usually the presenting problems are of low to
20    moderate severity.  Physicians typically spend 15
21    minutes face-to-face with the patient and or family.  Is
22    that what that states?
23    A   That is what that states.
24    Q   Now, part of that time is not only the time the
25    physician spends with the patient, but also includes the
```

5284

1    time documenting the encounter; correct?

2    A    Correct.

3    Q    Now, would you agree with me that you are not an

4    expert in determining a person's state of mind?

5    A    Correct.

6    Q    And would you agree with me that you are not an

7    expert in determining whether a person acted

8    intentionally?

9    A    Correct.

10   Q    You are not an expert about the billing rules for

11   Blue Cross & Blue Shield of Kansas, are you?

12   A    Correct.

13   Q    You are not an expert about the billing rules for

14   Kansas Medicaid, are you?

15   A    Correct.

16   Q    You are not an expert about the billing rules for

17   the Kansas Medicaid HMO called First Guard, are you?

18   A    Correct.

19   Q    You are not an expert about the billing rules for

20   Preferred Health Systems, are you?

21   A    Correct.

22   Q    Your claimed expertise relates to Medicare; correct?

23   A    Correct.

24   Q    What percentage of the Defendants' clinic's business

25   was Medicare?

5285

1    A    I did not calculate the percentage.

2    Q    Well, let's help you on that.  We have -- let me

3    hand you what has been admitted as Exhibit 1-J.  Did the

4    Defendant share that with you prior to your testimony?

5    A    No.

6    Q    According to Exhibit 1-J, Medicare was 12% of the

7    services and about 17% of the payments received.  Do you

8    see that?

9    A    I see that.

10    Q    Would it be fair to say then, Ms. Cobuzzi, that your

11    testimony relates to only 12% of the clinic's billings

12    and 17% of its payments?

13    A    No.

14    Q    Are you an expert regarding pain management billing?

15    A    No.

16    Q    Are you an expert in any respect to pain management?

17    A    Yes.

18    Q    And what is your expertise in pain management?

19    A    E and M, the use of pain assessment, the dismissal

20    of patients, the management of pain from that

21    perspective, of the use, how often the patients have to

22    come back, the various processes that have to go on

23    within a pain management practice for correct management

24    of patients.

25    Q    But you were not asked to render an opinion with

5286

1    regards to that expertise, were you?

2    A    I was not asked to address those issues.

3    Q    Would you agree with me that when someone serves as

4    an expert witness, that the expert witness should not be

5    an advocate for one party or another?

6    A    I don't know.

7    Q    So you believe your role here is to be an advocate

8    for the defense and not an expert witness?

9    A    My role here is to educate and to let the facts

10   speak.

11   Q    Well, in fact, you're not talking about the facts;

12   you're talking about your opinion, aren't you?

13   A    All right.  Opinions and facts.

14   Q    And in rendering those opinions, are you serving as

15   an advocate for a physician?

16   A    In a way that I don't necessarily agree with all

17   your opinions.

18   Q    Well, you have previously stated under oath that you

19   are an advocate for doctors; haven't you?

20   A    I have but -- well --

21   Q    You have; correct?

22   A    Correct.

23   Q    Now let's talk about incident-to.  The testimony in

24   this case has been that the Defendant Linda Schneider

25   told physician's assistant Charles Lee Craig that the

5287

```
1    Schneider Medical Clinic did not bill incident-to
2    because it was a bookkeeping nightmare.  Did anyone from
3    the Defense team tell you about that?
4    A    They mentioned it.
5    Q    And that means that if they did not bill
6    incident-to, that all physician's assistants should have
7    been billed under their unique provider numbers;
8    correct?
9    A    I don't agree.
10   Q    And why don't you agree?
11   A    Because I don't think Linda understood Mr. Craig's
12   question and --
13   Q    And how would you have any idea as to how to --
14   A    Because of her, because of her answer of it being a
15   bookkeeping nightmare.
16   Q    So this is pure speculation on your part, isn't it,
17   Mrs. Cobuzzi?
18   A    Because --
19   Q    Would you please answer my question.
20   A    -- because of it --
21            MR. WILLIAMSON:  Your Honor --
22            THE COURT:  Hold on.
23   A    -- the original question was why --
24            THE COURT:  No, hold on.  This witness cannot
25   nor can any witness testify what was going on in
```

5288

1    somebody else's mind.

2    A    All right.  It -- it's --

3              MS. TREADWAY:  Please, there's no question

4    before you, ma'am.

5    A    Okay.

6    BY MS. TREADWAY:

7    Q    Would you agree with me that if a physician was not

8    present in the clinic that the clinic could not bill any

9    physician's assistant services under the physician's

10   name and the billing number?

11   A    Correct.

12   Q    Would you agree with me that if a physician was not

13   present in the clinic that the clinic would have to bill

14   any physician's assistant services under the physician's

15   assistant's name and number?

16   A    Not necessarily.

17   Q    Have you ever offered the opinion that when the

18   physician was not present in the clinic the physician

19   assistant had to bill under their own number entitling

20   the doctor to a lower rate of reimbursement?

21   A    Yes.

22   Q    The evidence has been that the clinic did bill for

23   physician's assistants under the Defendant Stephen

24   Schneider's name and number when he was not there,

25   including nights and weekends.  Would you consider those

5289

1    false claims?

2    A    Yes.

3    Q    Would you agree that being available by beeper or

4    phone is not sufficient supervision such that the claim

5    can be submitted under the doctor's name and number?

6    A    Yes.

7    Q    The evidence has been that the clinic billed under

8    Defendant Stephen Schneider's name and number when he

9    was out of the country or at continuing medical

10   education.  And I believe that evidence was shared with

11   you in Exhibit 1-P.  You remember that?

12   A    Yes.

13   Q    Would you agree with me that if the Defendant's

14   clinic billed for services as though the Defendant

15   Stephen Schneider provided the services even though he

16   was not in the clinic to do so, that those claims would

17   be false?

18   A    Correct.

19   Q    Would you also agree with me that a physician

20   assistant could not bill Medicare for a new patient

21   visit under the incident-to rules?

22   A    Correct.

23   Q    Did you analyze the clinic's billing to determine if

24   they did this?

25   A    No.

1    Q   Isn't it true that if the clinic did bill Medicare

2    for a physician's fee when a physician's assistant saw a

3    new Medicare patient for the first visit, that such a

4    claim is false and there is no defense to such a claim?

5              MR. WILLIAMSON:  Your Honor, I'm going to

6    object to the no defense to such a claim.  To the extent

7    she's calling for a legal conclusion.

8              THE COURT:  You might want to clarify what you

9    mean by no defense.

10             MS. TREADWAY:  Well, it's an opinion she's

11   previously offered, Judge.  That's why I'm asking it.

12             THE COURT:  In this case?

13             MS. TREADWAY:  Well, it's an opinion she's

14   previously offered and I'm testing her credibility.

15             THE COURT:  Well, then in that case the

16   objection is overruled.

17   BY MS. TREADWAY:

18   Q   I'll ask it again.  Isn't it true that if the clinic

19   did bill Medicare for a physician's fee when a

20   physician's assistant saw a new Medicare patient for the

21   first time that such a claim is false and there is no

22   defense to such a claim?

23   A   Guess so.

24             THE COURT:  Is that a yes?

25   A   Yes.

5291

```
 1    BY MS. TREADWAY:

 2    Q    If the Defendants billed Medicare for new patient

 3    visits done by physician's assistants and billed

 4    Medicare using Stephen Schneider's name and number,

 5    would you agree with me those claims are false claims?

 6              MR. WILLIAMSON:   Your Honor -- never mind.

 7    I'll withdraw it.

 8    A    Yes.

 9    BY MS. TREADWAY:

10    Q    Let me hand you Exhibit 15 which was used as a

11    demonstrative exhibit but I believe you're familiar with

12    that.

13    A    Yep.

14    Q    That's the Medicare review.  I want to direct your

15    attention to Page 3, Line 148 of the large chart.  And

16    we're looking specifically at Columbus H.  Do you see

17    that?

18    A    Uh-huh.

19    Q    It indicates that a PA or a physician's assistant

20    was billed as a physician for a first office visit,

21    doesn't it?

22    A    Yes.

23    Q    That would be a false claim, wouldn't it?

24    A    Medicare would have denied it.

25    Q    That would have been a false claim, wouldn't it?
```

5292

```
 1    A    Yes.

 2    Q    Turn to the next page, Line 151.  Let's look at

 3    Grover J.  Again, a physician's assistant was billed as

 4    a physician for a first office visit.  Would that be a

 5    false claim?

 6    A    Yes, but Medicare denied it.

 7    Q    Turning to the next page, Line 220.  The same true

 8    for Cheryl McL.  Would that be a false claim?

 9    A    Yes, but Medicare denied it.

10    Q    Turning to the next page, Line 280.  Same --

11              THE COURT:  The witness's statements in these

12    last two answers that Medicare denied it are stricken.

13    You may consider whether -- you can consider her

14    testimony, yes.  She wasn't asked about Medicare and you

15    are not to consider that.

16    A    This is a Medicare --

17              THE COURT:  You know the rules here.

18    A    Sorry, sir.

19              THE COURT:  You better follow 'em.

20    BY MS. TREADWAY:

21    Q    Next page, Line 280.  Gerald S.  Another false

22    claim?

23    A    Yes.

24    Q    Turning to Page 8, Line 340, Peter S.  Another false

25    claim?
```

1    A    Yes.

2    Q    Page 10, Line 447, Dovie W, another false claim?

3    A    Yes.

4    Q    Let me hand you what has been marked and admitted as

5    Exhibit 5-J and also Exhibit 1-A.  For reference.

6    Trying to find Jo Jo.  That's the time line for Jo Jo R.

7    One of the individuals in Count 5 of the Indictment.

8    And according to our evidence, she was a Medicare

9    patient, I believe.  The evidence has been that the

10   physician's assistant Charles Craig performed her first

11   office visit but it was billed as though the Defendant

12   Schneider performed that service.  Would that be a false

13   claim to Medicare?

14   A    Yes.

15   Q    Let me hand you Exhibit 5-O, the timeline for Mary

16   S, another Medicare patient.  Again, the evidence has

17   been that Curtis Atterbury, a physician's assistant, and

18   the Defendant Linda Schneider's brother, performed this

19   first new patient office visit but it was billed as

20   though Dr. St. Clair provided the service.  Is that

21   another false claim?

22   A    Yes.

23   Q    Now let's talk about established patients.  Once a

24   physician has provided a face-to-face service to a

25   patient, is that patient an established patient?

5294

1    A    Yes.

2    Q    And once a patient is an established patient, should

3    that patient ever be billed again as a new patient for

4    the next several years?

5    A    No.

6    Q    Led me hand you Exhibit 5-B which is the timeline

7    for Dalene C.  On August 25th, 2003, the clinic billed

8    for a new patient office visit, 99203.  If you can then

9    turn to Page 5.  The clinic again billed for a new

10   patient office visit, 99202.  Is that a false claim?

11   A    Yes.

12   Q    Did you review the Defendant's records for these

13   types of false claims?

14   A    Yes, I did.

15   Q    Now let's talk about some things you didn't review.

16   The jury has heard from Dr. Doug Jorgensen, who is a

17   Doctor of Osteopathy, a Family Practitioner, and a

18   Certified Coder who specializes in chronic pain

19   management.  He specifically reviewed the files of

20   Patty, Eric and Robin, and testified that the

21   Defendants' healthcare fraud resulted in their deaths.

22   Did you review Patty's file and the claims the Defendant

23   submitted for her care, Patty G?

24   A    Uhm, I am not sure.

25   Q    Did you review Eric T's file and claims?

5295

1    A    I don't have my reviews in front of me so I'm not

2    sure.

3    Q    If they weren't a part of the less than 150 files

4    you reviewed, would you have reviewed them?

5    A    If they're not part of the 150 files, they won't be

6    here, correct.

7    Q    Was it your testimony that the fee ticket is the

8    evidence of what should have been billed to the

9    insurance companies?

10   A    Correct.

11   Q    But was it also your testimony that you compared the

12   fee tickets to the charts and not the claims submitted?

13   A    Correct.  I didn't have access to the system.

14   Q    Did you understand that the reviewers who did the

15   audits for the five payers had the fee tickets, the

16   complete charts, the claims submitted, as well as the

17   Schneider Medical Clinic's internal financial data which

18   indicated what was billed for and paid?

19            MR. WILLIAMSON:  Your Honor, I'm going to

20   object.  That miscategorizes (sic) the information that

21   these witnesses testified that they actually reviewed.

22            MS. TREADWAY:  No, it does not.

23            THE COURT:  Well, I don't know whether it did

24   or it didn't but the jury will have to remember whether

25   it did or it didn't; and, of course, you may redirect

5296

```
 1      her on this point by non-leading questions.
 2              MR. GOROKHOV:  Your Honor, just a brief
 3      objection.
 4              THE COURT:  Sir.
 5              MR. GOROKHOV:  The testimony I believe was
 6      that there was in these long spreadsheets that was --
 7      the claims data was reproduced in those spreadsheets.
 8      So she did look at the claims data that was reproduced
 9      in the spreadsheets.
10              THE COURT:  Well, here again, this is
11      something you can redirect her on if you wish to do so.
12      A    I know that payers have at their fingertips anything
13      they want.
14      BY MS. TREADWAY:
15      Q    Did you understand that each of the reviewers were
16      knowledgeable about their own rules and regulations when
17      they performed their audits?
18      A    I hope so.
19      Q    Do you have any of reason to doubt that they
20      weren't?
21      A    Yes.
22      Q    Really.  And what is the basis of your doubts,
23      Ms. Cobuzzi?
24      A    Because when you call the payer and you ask them a
25      question about what their rules are and you make five
```

1    calls, you will probably get three different answers as

2    to what the rules are.  And if you ask a hundred coders,

3    they will give you the exact same answer that I just

4    told you.

5    Q   So it's the insurance company's fault that they're

6    defrauded.  Is that your testimony?

7             MR. WILLIAMSON:  Your Honor, I'm going to

8    object that there has not been any evidence whatsoever

9    of defrauding.  And we'll clear it up on redirect.

10   Prosecution keeps saying false claims, which is

11   different than what we're here for.

12             THE COURT:  I'll -- I don't think so.  By any

13   stretch of the imagination.  Maybe that's what you're

14   here for but that's not what the jury is here for.

15   That's not what I'm here for and that's not what was

16   charged.  The jury will have to decide.

17       That last answer is stricken, Ladies and Gentlemen.

18   The question was what knowledge she has about the

19   particular providers in this case, not what she may

20   think about some speculative other insurance companies.

21   You need to keep it on the right track here, ma'am.  You

22   know the rules.  You're not here as -- you may think

23   you're an advocate in other cases, but if you turn out

24   to be an advocate in this case, it's going to be a

25   problem because one of the instructions that I'm going

5298

```
 1    to give the jury is to judge your credibility.
 2    A    Yes.  Yes, sir.
 3                THE COURT:  And, ma'am, you're here to help
 4    this jury; not be an advocate.  They've got three
 5    advocates right there.  Please sit down.  I am telling
 6    her what to do and I have every right to do it.  Go
 7    ahead.
 8    A    Can you repeat your question?
 9                MS. TREADWAY:  No.
10    BY MS. TREADWAY:
11    Q    You mentioned that you received a massive amount of
12    documents from the Government's audits; correct?
13    A    Yes.
14    Q    Therefore, you would agree that the Government made
15    an extensive effort in reviewing thousands of claims and
16    the supporting documents in this case; correct?
17    A    They audited the E and M's of a lot of charts.
18    Q    So is that a yes?
19    A    Yes.
20    Q    But you reviewed less than 150 claims and the
21    supporting documents; correct?
22    A    Correct.
23    Q    Not 150 charts, but 150 claims?
24    A    Claims, yes.
25    Q    And you did not do a statistically valid random
```

1    sample; correct?

2    A    Correct.

3    Q    You just literally grabbed a file from a box and

4    then looked at a claim in the file; correct?

5    A    Correct.

6    Q    And your testimony is the reasoning behind that is

7    you wanted to be efficient and not cost the Defendants a

8    lot of money.  That's your testimony?

9    A    Yes.

10   Q    Prior to your testimony today, did the defense team

11   tell you that one of the Defendant's employees,

12   Katherine Gaines, testified on the Defendant's behalf

13   here a couple of days ago?

14   A    I'm not sure that -- you would have to give me the

15   content.  They didn't give me names.

16   Q    Be glad to.  She was the individual who actually

17   keyed in the data.

18   A    So she was a biller?

19   Q    Yes.  Did the defense team tell you that Ms. Gaines

20   billed from fee tickets placed in stacks for her and

21   that she billed the provider depending on what stack it

22   was in rather than what provider was on the fee ticket?

23   Did they tell you that?

24   A    They said that the fee tickets were put in stacks by

25   provider and that's how they were handed to the billing

5300

1    department.  They did not tell me about that testimony.

2    Q   Did the defense team tell you that other employees

3    testified that the Defendant Linda Schneider told them

4    to bill physician's assistants as physicians to make

5    more money?

6    A   No, they did not.

7    Q   Did the defense team tell you that Sherrie Mills,

8    one of the billing department supervisors, testified

9    that she quit when she found out that physician's

10   assistants had been rebilled as physicians after the

11   claims were denied?

12   A   No, they did not.

13   Q   Did the defense team tell you that both of the

14   Defendants told their physician's assistants, bill

15   99213, mark 99213 on the fee tickets, don't mark 99212?

16            MR. WILLIAMSON:  I'm going to object.  There

17   was not testimony in regards to Stephen Schneider and

18   she's combining both Defendants again.

19            THE COURT:  The objection is sustained.

20   BY MS. TREADWAY:

21   Q   Did the defense team tell you that the Defendant

22   Stephen Schneider told his physician's assistants to

23   bill 99213 and not 99212?

24            MR. WILLIAMSON:  Objection, that is not what

25   the testimony was.

5301

```
 1            MS. TREADWAY:  It was, Judge.

 2            THE COURT:  Well --

 3            MS. TREADWAY:  I can say names.

 4            THE COURT:  Well, here again, I'm not helping

 5     you very much on this; but it's not my job at this point

 6     to tell you what the testimony was and what the

 7     testimony wasn't unless I have a transcript, and I

 8     don't, obviously.  So you'll have to remember the

 9     evidence on that point.

10            MS. TREADWAY:  Did the --

11            THE COURT:  I've gotten in trouble before

12     telling juries what the evidence was without a

13     transcript and I don't intend to get in trouble again.

14     BY MS. TREADWAY:

15     Q   Let me ask the question again.  Did the defense team

16     tell you that the Defendant Stephen Schneider told

17     physician's assistants to bill 99213s and not 99212s?

18            MR. WILLIAMSON:  Same objection, Judge.

19            THE COURT:  Same ruling.

20     BY MS. TREADWAY:

21     Q   Did they tell you that?

22     A   That is not what they told me.

23     Q   Did the defense team tell you that the Defendant

24     Linda Schneider instructed physician's assistants to

25     bill 99213s and not 99212s?
```

5302

```
 1              MR. GOROKHOV:  Same objection.
 2   A   That is not what they told me.
 3              THE COURT:  Just a minute.  Let me rule on the
 4   objection.
 5              MS. TREADWAY:  Sorry.
 6              THE COURT:  Overruled for the same reason.
 7   BY MS. TREADWAY:
 8   Q   Did the defense team tell you that physician
 9   assistant Mike Hall testified before the jury and said
10   the exams at the clinic barely met a 99212?
11   A   As I explained, in E and M, if the history is
12   sufficient and --
13              MS. TREADWAY:  Objection.  Nonresponsive.
14   Move to strike.
15              THE COURT:  Ma'am, please listen to the
16   question.
17   A   Sorry.
18              THE COURT:  Here's -- let me --
19   A   No, they did not.  No, they did not tell me that.
20   I'm sorry I did not answer the question.
21              THE COURT:  I'm trying to help you out here.
22   A   I know you are.  I'm sorry.
23              THE COURT:  The rule is that you must answer
24   the question if you understand it.  I'm not telling you
25   what your answer has to be, but you must --
```

5303

1    A    Answer the question.

2            THE COURT:  If you don't understand the

3    question, tell Mrs. Treadway you don't understand the

4    question and that forces her then to rephrase the

5    question until you do understand it.

6    A    Thank you, sir.

7            THE COURT:  That's the rules.  Let's go.

8    BY MS. TREADWAY:

9    Q    Did the defense team tell you that physician

10   assistant Charles Lee Craig testified that there was

11   insufficient time to do exams meeting a 99213 level?

12   A    No, they did not.

13   Q    Did the defense team tell you that physician

14   assistant Debra Klingsick testified there was

15   insufficient time to do an exam meeting a 99213 level?

16   A    No, they did not.

17   Q    Did the defense team tell that you physician

18   assistant Debra Klingsick wanted to learn how the

19   billing was done and that the Defendant Linda Schneider

20   told her it was none of her business?

21   A    No, they did not.

22   Q    Did the defense team tell you that physician

23   assistant Hien Tran testified there was insufficient

24   time to do exams meeting a 99213 level?

25   A    No, they did not.

5304

```
 1    Q    Did the defense team tell that you physician
 2    assistant Hien Tran testified that the Defendant Stephen
 3    Schneider's exams were basically a meet-and-greet and to
 4    write a prescription?
 5    A    No, they did not.
 6    Q    Did the defense team tell you that all of the
 7    physician's assistants testified that there was
 8    insufficient time to practice legitimate medicine at the
 9    clinic in terms of the pain management patients?
10    A    No, they did not.
11    Q    Did the defense team tell you that Defendant Linda
12    Schneider reviewed all of the charts and fee tickets
13    before they went to billing?
14    A    No, they did not.
15    Q    Did the defense team tell you that employees,
16    including medical assistants and physician's assistants,
17    witnessed both Defendants changing their fee tickets
18    from lower codes to higher codes?
19    A    No, they did not.
20    Q    Does any of this information change your opinions?
21    A    No.
22    Q    Would you agree with me that in the healthcare
23    industry, if it is not documented, it didn't happen?
24    A    Yes.
25    Q    Would you also agree with me that if it isn't
```

5305

1    documented, you can't bill for it?

2    A    Yes.

3    Q    Would you agree that an illegible record means that

4    the services have not been documented?

5    A    Yes.

6    Q    Let me hand you Exhibit 5-G which is the timeline

7    for Jeffrey J.  If there were no progress notes for the

8    office visit billed on October 18th, 2004, would that

9    claim be a false claim?

10   A    Yes.

11   Q    Moving to January 17th, 2005, would that claim also

12   be a false claim if there were no progress note

13   supporting what was billed?

14   A    Yes.

15   Q    Let me hand you what has been marked for

16   identification and admitted as Exhibit 5-H.  The

17   timeline for Mary L.  On December 2nd, 2003, if there

18   were no progress note for the office visit billed on

19   that date, would that be a false claim?

20   A    If there was no office note, yes.

21   Q    It looks like she was seen January 30th, 2002, for a

22   first office visit; correct?

23   A    Yes.

24   Q    A 99202.  And then she returned to the clinic about

25   a year later in February, 2003.  Do you see that?

5306

1    A    Yes.

2    Q    And she was again billed for a new patient visit?

3    A    Yes.

4    Q    That's another false claim, isn't it?

5    A    Yes.

6    Q    Let me hand you what has been marked and admitted as

7    Exhibit 5-L, which is the timeline for Brad S.  It would

8    appear that Brad was seen as a new patient on October

9    15th, 2004?

10   A    Yes.

11   Q    And again on June 30th, 2005?

12   A    Yes.

13   Q    Would that second claim be a false claim?

14   A    Yes.

15   Q    Let me hand you what has been admitted as Exhibit

16   5-P, which is the timeline for Robert S.  If there were

17   no progress note for the office visit billed on

18   September 2nd, 2003, would that be a false claim?

19   A    If there was no note, yep.

20   Q    How about on September 20th, 2003, same question?

21   A    Yep.

22   Q    September 24th, 2003, false claim?

23   A    Yep.

24   Q    And October 16th, 2003, false claim?

25   A    Yep.

5307

1    Q    Do you have an opinion on whether Medicare's rules

2    and regulations are too complex for doctors to

3    understand?

4    A    No.  Yes, yes, I have an opinion.

5    Q    And what is that opinion?

6    A    They are not too complex.

7    Q    And that would include the coding rules and

8    regulations that are a part of what Medicare expects

9    people to know when they submit claims; correct?

10   A    They are complex, E and M coding guidelines are

11   complex.

12   Q    But isn't it true that it's no more complex than

13   what a physician deals with in terms of medicine?

14   A    It's a different type of complex.  It moves from

15   science -- I'm sorry -- I have to do a yes or no.  So it

16   is -- the answer is yes it is more complex than what

17   they deal with in -- from a clinical point of view.

18   Q    So coding is more complex than diagnosing and

19   treating patients for their illnesses.  Is that your

20   testimony?

21   A    Yes.

22   Q    Prior to your testimony today, did you know that the

23   Defendant Linda Schneider told Sherrie Mills, the

24   billing supervisor in the billing department, that

25   monkeys could do billing?

5308

```
 1    A    No, I didn't.
 2    Q    Would that indicate to you that Linda Schneider
 3    didn't think billing was very complex?
 4    A    If it was said, yes.
 5              MR. GOROKHOV:  Object.  Calls for speculation,
 6    Your Honor.
 7              THE COURT:  Ask the question again please.
 8    Read the question back to her.
 9                    (Previous question read back.)
10              THE COURT:  The objection is sustained.
11    BY MS. TREADWAY:
12    Q    Now, you're big on compliance policies in practices,
13    aren't you?
14    A    Yes.
15    Q    You believe that clinics, doctors' practices, should
16    have compliance policies, don't you?
17    A    I would like them to, yes.
18    Q    What compliance policies did you review from the
19    Schneider Medical Clinic?
20    A    None.
21    Q    Do you know whether they even had any?
22    A    Nope.
23    Q    Did you ask?
24    A    Yes.
25    Q    Did you get any?
```

5309

```
 1    A    Nope.
 2    Q    Would that indicate to you that they didn't have
 3    any?
 4    A    Yes.
 5    Q    In terms of who is responsible for billing the
 6    healthcare benefit programs, would you agree with me
 7    that the physician is responsible for his billing?
 8    A    Yes.
 9    Q    In terms of the Schneider Medical Clinic, would you
10    agree with me that the Defendant Stephen Schneider was
11    responsible for his billing?
12    A    Ultimately, yes.
13    Q    Have you ever offered the opinion that a physician's
14    reliance on the knowledge of his office staff regarding
15    billing does not eliminate his responsibility to bill
16    correctly?
17    A    Correct.
18    Q    Have you ever offered the opinion that the ultimate
19    responsibility for the accuracy of all of a medical
20    clinic's claims rests upon the physician whose unique
21    provider number was submitted with the fraudulent claims
22    for reimbursement?
23         MR. WILLIAMSON:   Your Honor, I'm going to
24    object.   See, that's where she's going and intentionally
25    confusing those words false and fraudulent.   And that --
```

5310

1   she just flipped the script when she just did that, Your

2   Honor.   That is totally inappropriate and I will address

3   it on redirect.   But you can't just allow her to keep

4   interchanging these different burdens and different

5   standards.

6           MR. GOROKHOV:   And I would add, Your Honor,

7   this is not an expert on law.   When we talk about

8   responsibilities, it's did he find by the law of the

9   case.   This is a criminal case, Your Honor, and

10  there's --

11          THE COURT:   Gosh, the jury probably doesn't

12  know at this point, Mr. Gorokhov that this is a criminal

13  case.   Is that a surprise to you, Ladies and Gentlemen?

14  You'll get the appropriate instructions at the end of

15  the case when the case ends as to what the burden of

16  proof is.   I think I've already covered that with you

17  even during jury selection.   And these lawyers are

18  entitled to redirect this witness by non-leading

19  questions; but, frankly, I don't understand their

20  distinction between false and fraudulent.   I understand

21  what the witness said about it; but ultimately that's

22  going to be your job to determine under the Court's

23  instructions.   Go ahead.

24  BY MS. TREADWAY:

25  Q   I'll ask the question again, ma'am.   Have you ever

5311

1    offered the opinion that the ultimate responsibility for

2    the accuracy of all of a medical clinic's claims rests

3    upon the physician whose unique provider number was

4    submitted with the fraudulent claims for reimbursement?

5    A    Yes.

6    Q    Would you agree with me also that the Defendant

7    Linda Schneider was responsible for the billing of the

8    Schneider Medical Clinic as the office manager?

9    A    No.

10   Q    So have you not testified previously that it is

11   everyone's responsibility to follow the rules in a

12   medical clinic?

13   A    Yes.

14   Q    And therefore as the office manager, did Linda

15   Schneider have a responsibility to follow the rules?

16   A    Yes.

17   Q    Have you ever offered the opinion that a medical

18   clinic has a duty and obligation to understand and

19   comply with the applicable laws, guidelines, rules and

20   regulations when seeking reimbursement from healthcare

21   programs?

22   A    Yes.

23   Q    Would you agree with me that physicians are

24   responsible for managing their offices?

25   A    Yes.

5312

1   Q    Would you therefore agree that the Defendant Stephen

2   Schneider was as responsible for managing the Schneider

3   Medical Clinic as was his wife who was the office

4   manager?

5   A    Yes.

6   Q    Would you also agree with me that ignorance of the

7   rules is not an excuse not to follow the rules?

8   A    Yes.

9   Q    Would you also agree that not bothering to read the

10  CPT code book and not wanting to learn to do it right is

11  ignoring the rules?

12  A    Yes.

13  Q    Would you also agree that a physician is accountable

14  for correctly coding their services and knowing the

15  healthcare program rules?

16  A    Yes.

17  Q    Therefore, would you agree with me that the

18  Defendant Stephen Schneider was accountable for knowing

19  the rules and correctly coding his services?

20  A    Yes.

21  Q    And would you agree with me that the Defendant Linda

22  Schneider was accountable for knowing the rules and

23  correctly coding the services at the clinic?

24  A    No.

25  Q    So she's not accountable but she's responsible?

5313

```
 1   A   Right.  Because she didn't -- she wasn't the

 2   provider of the services.

 3   Q   But you just testified that she was responsible?

 4   A   Yeah.

 5   Q   But she's not accountable.  She's just responsible?

 6   A   Well, it's how you worded it.

 7   Q   Would you agree that if the clinic wanted to use

 8   physician's assistants, that the Defendants, both of

 9   them, had to keep up with the rules and how to bill for

10   those physician's assistants?

11   A   No.

12   Q   So neither of them are responsible?

13   A   No.

14   Q   Who's responsible the Defendant Stephen Schneider?

15   A   The billing manager is responsible for keeping up

16   with the rules.

17   Q   Well, ma'am, you just stated that everybody was

18   responsible to keep up with the rules and follow them.

19   A   Right.  But --

20   Q   Is that your testimony?  Everybody in a clinic?

21   A   Yeah, but you don't have the level of detail that

22   has -- that everybody has to know.  For example, the

23   billing manager --

24           MS. TREADWAY:  Judge, there's no question

25   requiring this length of answer.
```

5314

1    A    Sorry.

2              THE COURT:  Well, on this one I think I am

3    going to let her give her answer.

4    A    The billing manager doesn't need to know the OSHA

5    rules like the nursing staff needs to know the details

6    of OSHA rules.

7              THE COURT:  We're not talking about OSHA

8    rules.

9    A    No.  I'm just saying -- and then the nursing manager

10   doesn't need to know the incident-to rules by payer like

11   the billing manager does.  Everybody in the office needs

12   to know something different when it comes to compliance.

13   And it's delegated so that everybody in the office

14   covers something so that everything is covered by

15   something -- that every issue is covered by somebody and

16   ultimately the top guy, the owner of the clinic, knows

17   that all of the issues are being covered and is

18   ultimately accountable and responsible.  But the person

19   who has to know the detail is not necessarily the top

20   guy.

21             THE COURT:  I think that's a good answer and

22   that answer will stand.

23   BY MS. TREADWAY:

24   Q    So they're responsible and accountable for the

25   claims submitted to the insurance programs; correct?

1    The physician?

2    A    Yes.

3    Q    And the office manager is responsible for the claims

4    submitted on the clinic's behalf and for which she

5    receives money; correct?

6    A    Repeat that, please.

7    Q    Let me ask it a different way --

8              THE COURT:  No, if she wants it repeated, I'll

9    let Mrs. Schwemmer read it back.

10             MS. TREADWAY:  All right.

11                  (Previous question read back.)

12   A    No.

13   BY MS. TREADWAY:

14   Q    So when Linda Schneider is instructing people how to

15   bill the claims, she's not responsible for those

16   instructions; is that correct?

17             MR. GOROKHOV:  Object, Your Honor, for the

18   same reason.  I know the ruling already --

19             THE COURT:  Overruled.

20             MR. GOROKHOV:  Thank you.

21   A    No.

22   BY MS. TREADWAY:

23   Q    So when she instructs the providers to bill a

24   certain way, she's not responsible; correct?

25   A    We're talking about an office manager?

5316

 1    Q    That's directing how to bill claims, yes.

 2    A    Right.  Not necessarily Linda Schneider.  We're

 3    talking about an office manager.

 4    Q    I'm talking about Linda Schneider.  That's who's on

 5    trial here, ma'am.  I'm asking you a specific question.

 6    If Linda Schneider is directing how bills are submitted

 7    to the insurance company, is she responsible for how

 8    those bills have been submitted?

 9    A    If she is, yes.

10    Q    What is your opinion about physicians who create a

11    culture in which information is kept from them?

12    A    It's very common.

13    Q    Isn't that in your opinion creating a culture of

14    ignoring compliance?

15    A    Yes.

16    Q    Would you agree with me that 1300 false claims is

17    not a small amount of false claims?

18    A    Uhm, like to know the total universe.  I have to say

19    yes or no?

20    Q    Have you ever testified under oath that 1300 false

21    claims is not a small amount of false claims?

22    A    I don't remember.

23    Q    Would you like to hear yourself under oath?

24    A    Sure.

25           MS. TREADWAY:  Substantial pattern number 32,

5317

1    please.
2                    (Video clip played for the
3                    jury.)
4    BY MS. TREADWAY:
5    Q    That's from a videotape deposition you gave in a
6    case in Florida back in May of 2008; isn't it?
7    A    Yes.
8    Q    You were serving as an expert witness in a civil
9    case; were you not?
10   A    Yes.
11   Q    And you were providing sworn testimony under oath;
12   correct?
13   A    Yes.
14   Q    And the issue there was whether a clinic was
15   inappropriately billing for its physician extenders;
16   correct?
17   A    Incident-to providers, yes.
18   Q    And you were actually testifying on behalf of the
19   plaintiff who would have been the Government there;
20   correct?
21   A    Yes.  It was a qui tam, so I'm not always -- I'm not
22   always a physician advocate.
23   Q    Which is an -- which is a kind of claim that
24   somebody brings on behalf of the Government; correct?
25   A    Yes.

5318

```
 1    Q    You want to hear what you said about your being a
 2    physician's advocate in this deposition, ma'am?
 3    A    I --
 4    Q    Let's play that since you brought it up.
 5              MS. TREADWAY:   Clip bias number 1 and 2.
 6                        (Video clip played for the
 7                        jury.)
 8    BY MS. TREADWAY:
 9    Q    Do you know how many false claims have been alleged
10    in this case?
11    A    No.
12    Q    Have you have been provided the reviews performed by
13    Dr. Jorgensen?
14    A    I don't remember.
15    Q    Medicare?
16    A    Yes.
17    Q    Medicaid?
18    A    Yes.
19    Q    First Guard?
20    A    Yes.
21    Q    Blue Cross/Blue Shield?
22    A    Yes.
23    Q    Preferred Health Systems?
24    A    Uh-huh.
25    Q    Did you review all those findings?
```

```
 1    A    Yes.

 2    Q    Let me hand you what has been marked as Exhibit 1-Q

 3    which was a demonstrative exhibit during Dr. Jorgensen's

 4    testimony.   That's his findings.   Do you recognize that?

 5    A    No.

 6    Q    So you haven't seen that document before?

 7    A    No.

 8    Q    This is the summary of the problems Dr. Jorgensen

 9    found with the claims that the clinic submitted to the

10    various healthcare programs.   He reviewed over 1200

11    claims and found that 30% of those claims had upcoded

12    the provider and as many as 93% were upcoded in terms of

13    the services provided.   And 58% of the progress notes

14    were not legible.   Would you agree with me from those

15    findings that Dr. Jorgensen found a pattern of false

16    claims?

17    A    No.

18    Q    Here's Exhibit 13, the Medicaid review.   This is the

19    review of what Tracy Wagner found with regards to the

20    Defendants' claims.   She reviewed over 1,000 claims and

21    found that 30% upcoded the provider, and as much as 26

22    upcoded in terms of the services provided.   Would you

23    agree with me that Ms. Wagner found a pattern of false

24    claims?

25    A    No.
```

5320

1    Q    Here are the other findings, Exhibit 14.  You have

2    Medicare, 15; Blue Cross, 16, and PHS, 17.  I'm assuming

3    that for each of those, if I ask you the same question,

4    that of the thousands of claims these individuals

5    reviewed and as to the percentage of upcoded providers

6    and upcoded claims they found, you would not agree that

7    these were patterns of false claims?

8    A    No.

9    Q    Would you agree with me that a pattern is created

10   with three points?

11   A    Your location can be found with three points.

12   Q    Have you ever testified that a pattern is created

13   with three points?

14   A    I can't remember but I'm sure you have it.

15   Q    I do.  Substantial pattern number 33.

16                        (Video clip played for the

17                        jury.)

18   BY MS. TREADWAY:

19   Q    So you testified under oath that a pattern is three

20   points and a pattern of false claims is not acceptable;

21   correct?

22   A    Correct in that civil suit.

23   Q    Now, 1-Q-2.  You can display it for the jury and

24   I'll display it for her.  That is a combination chart of

25   all of the reviews, including Dr. Jorgensen.  Do you see

1    that?

2    A    Yep.

3    Q    Would you agree with me that the five reviewers

4    reviewed over 4700 claims?  Your math good?

5    A    Yeah.

6    Q    Would you agree with me that their findings are

7    consistent in that each and every one of them found

8    upcoded providers and upcoded services?

9    A    I will agree with you that that was their findings.

10   Q    Would you agree with me that based on these

11   findings, that there was a definitive pattern of the

12   Defendant submitting false claims to healthcare benefit

13   programs?

14   A    No.

15   Q    Would you agree that a pattern of false claims can

16   be evidence of intent?

17   A    No.

18            MS. TREADWAY:  Let the record reflect that the

19   witness was hinting at Mr. Gorokhov what to ask her by

20   holding up a document.

21            MR. GOROKHOV:  I object to that

22   characterization.  I don't know what she's talking

23   about.

24            MS. TREADWAY:  She absolutely did it, Judge.

25   It's improper.

5322

1           THE COURT:  Well, I'm sorry.  I didn't see it.
2   But maybe the jury did.  But I don't know what she was
3   holding up.
4           MS. TREADWAY:  Show him what you were holding
5   up.
6           THE COURT:  She doesn't have a document in her
7   hand right now.  What were you holding up, ma'am, if at
8   all?
9           MS. TREADWAY:  Are you denying that you were
10  holding up a document?
11  A   I was shuffling through your documents, all the
12  stuff I have here.
13          MR. WILLIAMSON:  Judge, I think that's a very
14  improper characterization, allegation, that the
15  prosecutor just made.  And that is very, very
16  prejudicial.
17          THE COURT:  Everything the Government puts on
18  in a criminal case is prejudicial.
19          MR. WILLIAMSON:  That's not evidence.  She
20  didn't do anything.
21          THE COURT:  I don't know whether she did or
22  not.  You didn't see anything either.
23          MR. WILLIAMSON:  I did.  I was watching her.
24  I was waving the witness --
25          THE COURT:  Were you now?  All right.  You're

5323

1    not a witness.  The jury will -- if it makes any

2    difference, remember what they saw if they saw anything.

3    She said she was shuffling.  I don't know what she was

4    doing and I'm not going to characterize what she was

5    doing.

6    BY MS. TREADWAY:

7    Q   The evidence in this case has been that the

8    Schneider Medical Clinic was a volume business.  The

9    evidence in this case has been that the Schneider

10   Medical Clinic was a patient mill -- a pill-mill, and

11   that there were many resulting overdoses and deaths.  At

12   any point before developing your opinion, did the

13   Defendants share with you Exhibit 1?

14           MR. WILLIAMSON:  Your Honor, I'm going to

15   object.  That is well outside this witness's expertise.

16   Outside the scope of direct and has no bearing

17   whatsoever on her opinion as to what she did.

18   A   They --

19           MS. TREADWAY:  The basis of her opinion,

20   Judge --

21   A   They --

22           MR. WILLIAMSON:  Wait, Barbara.

23           THE COURT:  Just a minute.  Cross-examination

24   is intended to be very, very broad, particularly with

25   respect to the witness's credibility.  Even more so,

1    with an expert witness.  Which is the reason, if you

2    recall, that I allowed unlimited cross-examination of --

3    what was that first witness's name that did the

4    autopsies that came here?

5              MS. TREADWAY:  Dr. Oeberst.

6              THE COURT:  Well, the woman --

7              MS. TREADWAY:  Dr. Jamie Oeberst.

8              THE COURT:  Right.  What's fair for the goose

9    is fair for the gander, as Judge Brown is fond of

10   saying, and that's what the purpose of this examination

11   is and you may consider it and, of course, the lawyers

12   have an opportunity to redirect this witness with

13   non-leading questions.  Go ahead.

14   BY MS. TREADWAY:

15   Q   My question was, ma'am, is did the Defendants share

16   with you Exhibit 1 prior to your forming your opinions?

17   A   No, they did not.

18   Q   Does the fact that that exhibit indicates that 176

19   individuals either overdosed or overdosed and died or

20   were presenting to the ER with withdrawal symptoms

21   affect your opinions in any way?

22   A   In the beginning of this case -- well, I'm supposed

23   to answer yes or no.  It does not affect my opinion.

24   Q   What percentage of your time do you spend serving as

25   a litigation consultant or as an expert witness?

5325

```
 1    A    20%.  It's an estimate.
 2    Q    What percentage of your yearly income is
 3    attributable to your work as a litigation consultant or
 4    as an expert witness?
 5    A    Maybe, again, I haven't calculated it.  It's
 6    probably an estimate of 30 or 40%.  I'm not sure.
 7    Q    In what tax year did you receive compensation in
 8    this case?
 9    A    I think '08, '09 and '10.
10    Q    And what percentage of your gross income did it
11    represent in 2008?
12    A    I don't know.
13    Q    In 2009?
14    A    I don't know.
15    Q    In 2010?
16    A    I don't know.
17    Q    Was it a significant amount in any year?
18    A    No.
19    Q    And you've been paid how much for your testimony in
20    this case?
21    A    About total of 41,000.
22              MS. TREADWAY:  Nothing further, Judge.
23              THE COURT:  Well, probably time to take our
24    afternoon recess, Ladies and Gentlemen.  Approximately
25    15 minutes.  Remember and heed the admonition.
```

5326

```
 1                        (Recess.)
 2              THE COURT:  Yes, sir, Mr. Gorokhov.
 3              MR. WILLIAMSON:  I'm going to go first, Judge,
 4    since I'm going to have the next witness.  Is that okay?
 5              THE COURT:  Yeah, sure.
 6              MR. WILLIAMSON:  Okay.
```

**REDIRECT EXAMINATION**

```
 8    BY MR. WILLIAMSON:
 9    Q   All right.  Ms. Cobuzzi, I want to visit with you
10    about a few of the topics that the Government discussed
11    with you.  First, if the -- if Dr. Schneider and Linda
12    Schneider are acquitted, do you get any more money than
13    what you received for your testimony?
14    A   No.
15    Q   If they were found guilty, do you get any more
16    money?
17    A   No.
18    Q   Do you have any personal stake in the outcome of
19    this case?
20    A   No.
21    Q   How long have you been a Certified Coder and biller?
22    A   Since 19 -- I've been a biller since 1989 and I've
23    been a Certified Coder since 1996.
24    Q   Okay.  And would you risk your future professional
25    career for -- or strike that.
```

5327

```
 1          Do you have a personal relationship with Dr.
 2   Schneider?
 3   A    No.
 4   Q    Do you have a personal relationship with Linda
 5   Schneider?
 6   A    No.
 7   Q    Would you risk your professional career by doing
 8   something that the Government has just alleged that you
 9   did in open court?
10   A    No.
11   Q    Can you show the jury what kind of documents you
12   have in front of you?
13   A    I have the --
14   Q    Just hold them all up.  Just hold them up for us.
15   A    The stuff from the Government.
16   Q    Okay.  So when Ms. Treadway saw you with documents
17   in your hand, folding over, what was happening?
18   A    I was just sort of like reviewing them.  I wanted to
19   see if one of the Medicare patients was in the Medicare
20   list and I was just like flipping through 'em.
21   Q    What could Mr. Gorokhov do sitting at counsel's
22   table while you're being questioned by the prosecutor?
23   A    Nothing.
24   Q    Okay.  Now, but did you have documents in your hand
25   flipping them over?
```

5328

```
 1    A    Yes.

 2    Q    Okay.

 3    A    Just going through them.  I've got this pile --

 4    Q    Now, were you here to judge the credibility of the

 5    physician's assistants that testified?

 6    A    No.

 7    Q    Were you -- have you been able to judge the

 8    credibility of the billing department employees?

 9    A    No.

10    Q    Were you able to judge the credibility of any of the

11    witnesses that the Government paraded in front of the

12    jury?

13    A    No.

14    Q    Now, were you aware that the billing managers, both

15    of them, expressly stated they were never instructed to

16    submit false documents to insurance companies?

17    A    Eugene did mention that.

18    Q    Is that an important fact in your mind?

19    A    That's very important.  That means that they were

20    not told by their bosses to do it wrong, you know.  They

21    were badly run, poorly managed, but they were not, you

22    know, part of a scheme to do things wrong.

23    Q    Okay.  Would those managers need to be in-the-know

24    in order for this "scheme" to be executed?

25    A    Yes.
```

5329

```
 1    Q    And why?

 2    A    Because --

 3              MS. TREADWAY:  Objection, Judge.  She has no

 4    idea that's true.

 5    A    Well, I do know the system they use.

 6              MS. TREADWAY:  That's way beyond her expertise

 7    or any ability to know that.

 8              THE COURT:  I don't know how in the world she

 9    would know that; but if you can lay a foundation, we'll

10    see.

11    BY MR. WILLIAMSON:

12    Q    You've been asked to look at audits in the past,

13    haven't you?  Been asked to look at audits in the past?

14    A    Yes.  And, I know that they don't have the Intergist

15    system.  I had a billing company, and from what I

16    understand, nobody has produced edit logs, and any time

17    somebody -- somebody has to be in on it either in the

18    billing company or somebody has to -- billing, excuse

19    me, not billing company, billing office, you know,

20    somebody who's entering the charges has to say, oh, when

21    it says Kim I'm gonna change it to Dr. Schneider, I'm

22    gonna make it a doctor --

23    Q    Have you --

24    A    -- in the billing department.  Or somebody has to,

25    once Kim's name has been put in, they have to change it.
```

5330

1           MS. TREADWAY:  Judge, this is so way beyond

2      any kind of expert opinion that's viable, it's just

3      ridiculous.  I move to strike it.

4           MR. WILLIAMSON:  Judge, she reviewed the

5      records.  She is an auditor and there is -- there are --

6      at this point I'll move on.  Let's just talk --

7           THE COURT:  I think so because I will sustain

8      the objection.  I understand that she's an expert and I

9      agree that she's an expert on a lot of things, but she's

10     not an expert about what was going on at the Schneider

11     clinic beyond what was revealed to her about what was

12     going on at the Schneider clinic.  And what may have

13     happened in other cases or her just general feelings

14     about that sort of thing are not relevant.  So I think

15     you should move on.

16          MR. WILLIAMSON:  All right.

17     BY MR. WILLIAMSON:

18     Q   You were asked questions about stuff being --

19     information being false and fraudulent.  Do you remember

20     that?

21     A   Yes.

22     Q   Actually, I think the questions you were plainly

23     asked about was was this entry false.  Do you remember

24     those questions?

25     A   Yes.

5331

1    Q    What is your definition of false?

2    A    Mistake.

3    Q    So it means that -- does it essentially mean that

4    it's an incorrect document being submitted?

5               THE COURT:  No.  Now, remember what I said

6    about leading questions.  That's a leading question.

7               MR. WILLIAMSON:  I'll rephrase.

8               THE COURT:  Please.

9    BY MR. WILLIAMSON:

10   Q    Is -- let me rephrase my question.

11        How does false equate to being incorrect?

12   A    A false claim is, uhm, well, is a mistake usually,

13   you know, unless, you know, there's an intent behind it.

14   Q    Well, let's pause there for a second.  You

15   understand that there's an Indictment filed against the

16   Defendants; correct?

17   A    Uh-huh.

18   Q    Shawn, can you pull up the Third Superseding

19   Indictment and let's take a look at Count 7.

20              MS. TREADWAY:  Are they going to admit this as

21   an exhibit, Judge?

22              MR. WILLIAMSON:  They're going to have a copy

23   of it in the jury instructions, Your Honor.

24              THE COURT:  At this point I think we can

25   consider this to be demonstrative.

5332

1              MR. WILLIAMSON:  Yes.

2              THE COURT:  But they will -- the jurors will

3       have a copy of the Indictment as part of the

4       instructions.

5       BY MR. WILLIAMSON:

6       Q   Now, looking at Paragraph 101, on Page 47 -- can you

7       read for the jury where it starts "and defrauded

8       Patricia G"?

9       A   "And defrauded Patricia G of money by knowingly and

10      willfully submitting and causing to be submitted to Blue

11      Cross/Blue Shield of Kansas and Preferred Health Systems

12      materially false and fraudulent claims for medical

13      services and prescriptions --"

14      Q   All right.  Let's stop there.  So under Count 7,

15      it's not just enough for a claim to be false, is it also

16      true that this document says it has to be fraudulent?

17      A   Correct.

18      Q   Now, as an expert in looking at fraudulent and false

19      claims, is there a difference between a claim simply

20      being false and a claim being fraudulent?

21      A   Yes, there is.

22      Q   And is that what you just told the jury about the

23      intent?

24      A   Yes, the willful and intent.

25      Q   Even with all the questions the Government was

5333

1    asking you, did you hear any question or suggestion that

2    Dr. Schneider knew these mistakes were being made?

3    A    No.

4    Q    Did you hear any questions or suggestions or any

5    representations of any evidence that Linda Schneider

6    knew that these mistakes were being made?

7    A    No.

8    Q    Did you hear any evidence, suggestions or

9    implications from the Government that Dr. Schneider

10   instructed people to bill claims that he knew to be

11   false?

12   A    No.

13   Q    Now look at Page 55.  Mr. Hamm.  Paragraph 124.  The

14   Government alleges that -- can you read that -- just

15   that highlighted part?

16   A    "The clinic was permeated by fraud and the claims

17   the Defendant submitted and received payments for were

18   materially false and fraudulent in more -- in one or

19   more of the following respects --".

20   Q    Again, the Government has alleged false and

21   fraudulent in this Indictment.  Do we understand that

22   correctly?

23   A    Yes.

24   Q    Were you aware that one of the auditors that the

25   Government called stated that she was not comfortable

5334

1    using the F word, i.e., being fraud.  Did you know that?

2    A   No, I did not know that.

3    Q   But according to the Government, is that why we're

4    here?

5    A   Yes.

6    Q   Do you remember being asked several questions about

7    this -- well, strike that.

8        You were shown several exhibits by the Government.

9    You remember that?

10   A   Yeah.

11   Q   And were you here to hear any cross-examination

12   about the accuracy of those exhibits?

13   A   No.

14   Q   And do you know anything about the reliability of

15   those exhibits?

16   A   No.

17   Q   Do you know how many mistakes that we were able to

18   point out were actually in those exhibits?

19   A   I'm not sure how many, but I found quite a few in my

20   interpretation of them.

21   Q   And is that the information that you shared with the

22   jury on direct?

23   A   Yes.  In the small sample of 150, I found quite a

24   few disagreements.

25   Q   Now, you were asked a question about a patient, Jo

5335

```
1    Jo R.  Do you remember that?
2    A   Yes.  Here.
3    Q   You remember testifying on direct that these fee
4    tickets were the Bible?
5    A   Yes.
6    Q   And did we understand you correctly that they're so
7    important that you would -- what would you do with your
8    fee tickets because of their importance?
9    A   I paid for a storage facility to keep them forever.
10   Q   And why is that?
11   A   Because they were my only proof that what I entered
12   into my billing system was what the physicians told me
13   to enter.
14   Q   Why was it important to you as a biller what the
15   physicians communicated to you?
16   A   It was compliance.  You know, from a compliance
17   point of view, you know, the doctors have their
18   compliance.  I had my compliance as a biller.  And from
19   my compliance perspective, it was important that I was
20   able to show that I was being compliant.
21   Q   And does that mean that you had to rely on the
22   physicians to ensure that the billing was accurate?
23   A   Yes.  I had to account that they were doing their
24   part for the compliance and then I had to do my part for
25   the compliance.  Basically there's two pieces to it.
```

5336

1    You know, if you're in a single practice and you're

2    doing your own billing, you have all of that.  When you

3    use a billing company, it's divided into two --

4    Q    I'm having a little technical problem here --

5    A    Is it plugged in?

6    Q    I need to show --

7                        (Off-the-record.)

8    Q    All right.  And did you learn during the course of

9    your review in this case that the fee tickets -- that if

10   the providers were going to misrepresent any services,

11   that it would have -- where would it have occurred?

12   A    If they wanted to misrepresent, Dr. Schneider's name

13   would have been up here.  And so, because that's where

14   it tells you who the provider is.  I'm not sure who's

15   initials this is.  But basically they crossed off

16   walk-in and the provider who it is has initialed it.

17   Okay.  I don't know if that's -- I don't think that's

18   Kim.  I'm not sure who that is.  And then I think that

19   may be Lee Atterbury, and then if you come -- move over

20   to -- move over, no, the other way.  See, originally

21   they actually had circled 99213 and someone actually --

22   and I don't know who -- crossed off 99213 and circled

23   99203.  The 203 is the wrong number and it should have

24   been 99203 billing it out as the non-physician provider.

25   I mean, billing it out because of non-physician provider

5337

1    saw them.  But if it was a new patient they, probably

2    they crossed off the 213 because Jo Jo was a new patient

3    and put the 203.

4    Q    And let's talk about these specifically.  Now, just

5    looking at a few of these, February 26 of '05 according

6    to the Government chart is Jo Jo R's first visit.

7    A    Right.

8    Q    Okay.  Now, we're looking at the correlating fee

9    ticket with Jo Jo R.  That does not say -- does that say

10   Dr. Schneider up there?

11   A    No, it does not.

12   Q    The Jo Jo -- excuse me, the government Exhibit 5-J

13   identifies Craig as the provider and billed as

14   Schneider.  Does this fee ticket misrepresent who the

15   provider was?

16   A    No.

17   Q    Looking at March 19th of '05.  The Government

18   exhibit claims that the service was billed as Dr.

19   Schneider even though Michael Hall was the provider.

20   Looking at the correlating fee ticket, who do the

21   providers represent provided the service on March 19 of

22   '05?

23   A    Hall.

24   Q    Now, we've been discussing differences between

25   mistakes and trying to intentionally get something for

5338

1    nothing; correct?

2    A    Yes.

3    Q    Well, let's look at a date.    June 6 of '05.    All

4    right.    Who is represented as seeing a patient on this

5    day?

6    A    Schneider.

7    Q    The Government exhibit claims that Dr. St. Clair

8    actually saw the patient.    Do you see that?

9    A    Yes.

10   Q    Now, is there a payment difference between Dr.

11   Schneider and Dr. St. Clair?

12   A    Yes.    Well, depends upon the payer.    It could be

13   anywhere between 15 and 25%.

14   Q    For two doctors?

15   A    Oh, Dr. St. Clair is a doctor.    Oh --

16   Q    Yes.

17   A    Oh, no, then there is no difference.

18   Q    Okay.    So talking about looking at -- for mistakes.

19   If this was a mistake -- strike that.    Let me rephrase

20   that.

21   A    This is listed as a false claim as when they billed

22   out Dr. Schneider incorrectly because if Dr. Schneider

23   provided the service and they billed it out as Dr. St.

24   Clair, that's improper because the payer thinks Dr. St.

25   Clair delivered the service and Dr. Schneider delivered

5339

1    the service.  Again, it's a poorly run operation but

2    it's worth the same amount of money.

3    Q   Okay.  Now, in other words, we're not seeing

4    mistakes just made -- are we seeing mistakes just made

5    in regards to physician's assistants and providers?

6    A   No.

7              MR. WILLIAMSON:  One second, Your Honor.

8              THE COURT:  Sir.

9                   (Off-the-record.)

10             MR. WILLIAMSON:  I don't have anything else,

11   Your Honor.

12             THE COURT:  Mr. Gorokhov, please.

13             MR. GOROKHOV:  Very briefly.

14                   **REDIRECT EXAMINATION**

15   BY MR. GOROKHOV:

16   Q   Okay.  Do you believe that physicians should be paid

17   for what you've described as false claims?

18   A   It depends.

19   Q   Can you explain that a little bit?

20   A   It depends if it's a mistake like Atterbury, Dr.

21   Atterbury -- I mean, Dr. St. Clair delivered the service

22   versus Dr. Schneider, versus they made a false claim

23   where it was a PA and, you know, to a provider that

24   requires you to do a PA and they pay you less.  The

25   physician should, just under civil issues, should, you

5340

1  know, negotiate a refund and refund the payer.

2  Q    Okay.  Now, let's talk about this case where the

3  Government played some snippets in this case, from

4  Florida.  Can you tell the jury, first of all, what kind

5  of case was that?

6  A    The case in Florida?

7  Q    Yes.

8  A    It was a whistle blower case.  It was a civil case.

9  Q    Do you know what law that was under?

10  A    It was under False Claims Act.  It was basically

11  what had happened was the person who brought it was a PA

12  for the practice.  She had brought to the office manager

13  that she had read an article that as of 1998 they were

14  supposed to get NPI -- they were PINS at the time, not

15  NPI, they change the terminology all the time to keep us

16  on our toes -- for the nonphysician practitioners, and

17  when a physician is not present or they're seeing new

18  patients with new problems -- or an established patient

19  with a new problem, they're supposed to be billing under

20  their own PIN and not the doctor's incident-to.  And the

21  office manager said, oh, don't worry about it, we have

22  it taken care of.  And they ignored her.  And then she

23  went back to them again and said we have a problem,

24  you're billing me out incident-to when I'm not

25  incident-to.  I'm here at night and there are no doctors

5341

1    here.  I'm here on the weekend and there are no doctors

2    here.  And I keep telling you you're putting me at risk,

3    you're putting my license at risk, I want you to change,

4    I'm asking you do it right.  And this was just for

5    Medicare.  It wasn't for any other payers.  And so it

6    was -- when you talk about the 1300 claims, it was just

7    1300 claims of their Medicare universe in this period of

8    time and she ended up quitting and going to another

9    practice because they refused to change and so she

10   brought a whistle blower suit against this practice.

11   Q    So what was the outcome of that practice, I -- I'm

12   sorry -- the outcome of that lawsuit in terms of the

13   actual result?

14   A    It did not go to court.  I did give a video

15   deposition.  And after that, they settled.  And up until

16   then, the doctors were in complete denial.

17   Q    Did the doctors pay money --

18   A    Yes.

19   Q    -- to the insurance companies?

20   A    They paid it to the federal government because it

21   was all Medicare.

22   Q    And you testified against the doctor in that case?

23   A    Yes, I did.

24   Q    Okay.  I want to switch gears a little bit.  You

25   talked about the word, I think, the word responsibility

5342

1    and accountability reviews.  But I don't think we ever

2    really got to talk about what that means to you.  Can

3    you just tell the jury what that means?

4    A    Uhm, that means that, you know, you're ultimately

5    responsible, you know, you're held -- I can't use the

6    word to define a word so let's come up with it.  The

7    buck stops with the physician in terms of what's going

8    on with their practice.  The problem is most physicians,

9    and we're talking about globally throughout the country,

10   are horrible businessmen.  They're not trained in this.

11   They're horrible when it comes to a lot of this

12   bureaucratic stuff because they're not trained in that

13   when they go to medical school.  And then they're thrown

14   in, you know, unless they go to like a university

15   environment or they join a large practice, they have no

16   idea what to do; but the bottomline is, the buck does

17   stop there.  And that's why the Government has the civil

18   remedies and has the False Claims Act and has all of

19   these things because the physicians are supposed to do

20   what they're supposed to do.  So what the physicians

21   should do, and hopefully to get the buck to stop there

22   is, they hire qualified people.  They hire qualified

23   nurses.  They hire qualified PAs.  They hire qualified

24   billers.  They hire qualified billing managers.  They

25   hire a qualified infrastructure to run their practice.

5343

1    Because why are doctors doctors?  Why did they open a

2    practice to begin with is they want to treat patients.

3    They don't want to spend time and effort on

4    administrative work.  They want to spend time treating

5    patients and that's why they're there.  And so they hire

6    people to do this for them.  And where the doctors get

7    in trouble and where the buck ends up stopping there,

8    and they end up getting in trouble is if they don't hire

9    the right people and if they don't necessarily have the

10   skills to manage them and so they don't have a well run

11   practice; but that doesn't mean fraud.  That means

12   stupidity, you know.  How many small businesses open up

13   and end up going bankrupt?  They're badly run medical

14   practices.  That doesn't mean they are bad medical care.

15   Lots of times they're some of the best medical care you

16   can get but they're badly run medical practices.

17   Q    Is it fraud -- is it -- I should ask this.  Is it,

18   to your knowledge, illegal not to have a compliance

19   policy?

20   A    It's not illegal.  Matter of fact, what the

21   Government says is they want you to have a compliance

22   policy.  It will mitigate damages if you have a

23   compliance policy; but you are not required to have a

24   compliance policy.  So, my take on it is I always tell

25   people is you should have one, you know, it's a good

5344

 1    idea, it's the best action to have, and you're going to

 2    not only protect yourself from, you know, Government and

 3    having to pay money back, et cetera, you're actually

 4    going to make more money.  You're going to have a better

 5    run practice.  You're going to have happier employees.

 6    You're going to have happier patients because you're

 7    going to have a better run practice if you have a

 8    compliance plan.  But having a compliance plan is a

 9    compliance plan customized to how you run your office.

10    Buying one of those off-the-shelf compliance plans that

11    sit on a bookshelf that has nothing to do with how you

12    run your practice is worse than having no compliance

13    plan at all.

14              MR. GOROKHOV:  Thank you very much.

15              THE COURT:  Yes, ma'am.

16                    **RECROSS EXAMINATION**

17    BY MS. TREADWAY:

18    Q    Would you agree with me that when providers upcode

19    claims, they get more money?

20    A    Yes.

21    Q    And in this situation, we have upcoded claims by who

22    provided the services; correct?

23    A    Yes.

24    Q    And we have upcoded claims as to what services were

25    provided; correct?

5345

1   A    Some.

2   Q    And the buck stops with the people that get the

3   money; correct?

4   A    Correct.

5            MS. TREADWAY:  Nothing further, Judge.

6            THE COURT:  Well, ma'am, thank you very much.

7   You're excused.

8   A    Thank you.

9            THE COURT:  Next witness please.

10           MR. WILLIAMSON:  Call Marlene Fether.

11                        **MARLENE FETHER**

12  Having been first duly sworn to tell the truth, the

13  whole truth and nothing but the truth, testified as

14  follows on:

15                     **DIRECT EXAMINATION**

16  BY MR. WILLIAMSON

17  Q    Could you introduce yourself to the jury.

18  A    My name is Marlene Fether.

19  Q    Ms. Fether, can I get you just to scoot up a little

20  bit closer to the microphone.  Make sure everybody can

21  hear you.

22  A    How's that?

23  Q    That's better.  Can you introduce yourself to the

24  jury.  I just asked you that.  Not even 4:00 yet.  Okay.

25  What do you do for a living Ms. Fether?

5346

```
 1    A    I work at Kelly Manufacturing.

 2    Q    And how long have you been there?

 3    A    About 26 years.

 4    Q    Are you married?

 5    A    I'm a widow.

 6    Q    And any children?

 7    A    I have three children.

 8    Q    And at some point were you a patient at the

 9  Schneider Medical Clinic?

10    A    Yes, I was.

11    Q    And when did you start -- strike that.  Was Dr.

12  Schneider your primary physician?

13    A    Yes, he was.

14    Q    And when did you start being seen at the Schneider

15  Medical Clinic?

16    A    Well, I saw him when he had his office on Lamar

17  street and then when he moved over there.

18    Q    Okay.  Do you know how long you've been a patient?

19    A    I think I was in like the later 1980s.

20    Q    And when did you cease being a patient?

21    A    When he was shut down.

22    Q    And when you were seeing Dr. Schneider were you a --

23  did he just treat you for one condition or was he your

24  physician for any conditions that you may have had?

25    A    For any condition.
```

```
 1   Q    And at some point did you suffer from migraine
 2   headaches?
 3   A    Yes.
 4   Q    Do you still suffer from them?
 5   A    Yes.
 6   Q    How often do you get migraine headaches?
 7   A    Well, it just depends.  Sometimes I'll have more
 8   than one a month.  Sometimes I'll go two months and
 9   won't have one.
10   Q    Okay.  And did you ever see Dr. Schneider regarding
11   those headaches?
12   A    Yes.
13   Q    And when you would meet with Dr. Schneider, were you
14   ever rushed out of the exam room?
15   A    No.
16   Q    Did he always take time to listen to your medical
17   concerns?
18   A    Yes.
19   Q    Did he attempt to address your medical concerns?
20   A    Yes.
21   Q    Did you -- when you talked with him regarding the
22   migraine headaches, did he provide a treatment for you?
23   A    Yes, he did.
24   Q    And did he provide one treatment that stayed the
25   same or did he try different things?
```

5348

1    A    Basically one.

2    Q    And what did you receive?

3    A    Fiorecet.

4    Q    And that's a noncontrolled substance?

5    A    It's a -- yeah.

6    Q    And how does that help with your migraines?

7    A    Well, it helps, you know.

8    Q    Is it -- does the medicine stop the headache like as

9    soon as it comes or does it --

10   A    Most of the time it does; but if I would get sick at

11   my stomach, then I usually had to go in to see him.

12   Q    And are you seeing another physician now?

13   A    Yes, I am.

14   Q    And are you receiving the same medication that you

15   received from him?

16   A    Yes.

17   Q    Okay.  Do you believe that Dr. Schneider helped you

18   with your medical concerns?

19   A    Yes, he did.

20   Q    And do you believe he helped with your migraines?

21   A    Yes.

22   Q    Did he ever try to force you to take any kind of

23   Oxycontin for your migraines?

24   A    No.

25   Q    Did he ever try to force you to take Actiq for your

```
 1   migraines?

 2   A   No.

 3   Q   Would he talk with you about side effects of any

 4   medications that you were taking?

 5   A   Yes.

 6           MR. WILLIAMSON:  I don't have anything

 7   further.

 8           THE COURT:  Sir.

 9           MR. BYERS:  No questions, Your Honor.

10           THE COURT:  Cross-examination.  Please.

11           MS. TREADWAY:  Not based on that, Judge, no.

12           THE COURT:  Thank you, ma'am.  You're excused.

13   Next witness please.

14           MR. BYERS:  Defense will call Tim McDonald.
```

**TIMOTHY McDONALD**

```
16   Having been first duly sworn to tell the truth, the

17   whole truth and nothing but the truth, testified as

18   follows on:
```

**DIRECT EXAMINATION**

```
20   BY MR. BYERS:

21   Q   Sir, would you state your name please.

22   A   Timothy McDonald.

23   Q   How old are you?

24   A   51.

25   Q   What's your marital status?
```

```
 1    A    Married.

 2    Q    Any kids from that union?

 3    A    I have a stepson.

 4    Q    How old is he?

 5    A    He's ten.

 6    Q    Any other kids?

 7    A    No.

 8    Q    All right.  Are you employed?

 9    A    Yes.

10    Q    As what?

11    A    I'm a Captain with Sedgwick County EMS.  Been a

12    paramedic for 25 years.

13    Q    The EMS you said?

14    A    Yes.

15    Q    Is that a full time position?

16    A    Yes.

17    Q    What are your duties as a Captain with the Sedgwick

18    County EMS?

19    A    I'm a shift supervisor.  Which means I have -- I

20    manage the daily operations of half of the county

21    ambulances.

22    Q    Okay.  So you're overseeing half the other EMS

23    workers on any particular shift?

24    A    Yes.

25    Q    What kind of shifts are those?  Are those like
```

5351

1    twelve hour shifts?

2    A    Yes, twelve hours.

3    Q    How many people would you typically have under your

4    supervision on a shift?

5    A    28, I believe.

6    Q    And how long have you served as a Captain with EMS?

7    A    Going on 11 years.

8    Q    Okay.  And is it safe to assume you worked your way

9    up to Captain?

10   A    Yes, I did.  I've been there 25 years.

11   Q    Any prior EMS work before Sedgwick County?

12   A    No.

13   Q    Okay.  Did there ever come an occasion -- well,

14   wait, let me back up.

15        Are you related in any fashion to Linda or Steve

16   Schneider?

17   A    No.

18   Q    Okay.  Are you a close family friend?

19   A    Yes.

20   Q    Okay.  And you actually live very close to where the

21   Schneiders live; correct?

22   A    Yes.

23   Q    And Lee Atterbury, who is Linda's dad, you live

24   close to him?

25   A    Yes.

5352

1    Q    You live close to Pat Hatcher, Linda's sister?

2    A    Yes.

3    Q    Okay.  Essentially on like a family plot of land out

4    there in Haysville; right?

5    A    Yes.

6    Q    Okay.  Did you build your house on that plot of

7    land?

8    A    Yes.

9    Q    Did you pay for the land there?

10   A    Yes.

11   Q    Who did you buy that from?

12   A    Mr. Atterbury.

13   Q    And how did you know Lee Atterbury then?

14   A    I've known him for almost 40 years.

15   Q    Okay.  How?

16   A    I met him when he came to my home town.

17   Q    What was your home town?

18   A    Osh Kosh, Wisconsin.

19   Q    Osh Kosh, Wisconsin?

20   A    Yes.

21   Q    What was Lee Atterbury doing there?

22   A    He was a concession person at the fair.  He ran

23   concession booths.

24   Q    And so how did that develop that you end up down

25   here in Wichita near Lee Atterbury?

5353

1   A   I went out and helped 'em out every year.  They were

2   there until I was 18.  And when I turned 18 I went with

3   'em for a short while and ended up moving here.

4   Q   Okay.  So did there come a time that you were

5   employed with the Schneider Medical Clinic?

6   A   Yes.

7   Q   And when was that?

8   A   December of 2002.

9   Q   That would have been -- was that shortly after they

10  opened?

11  A   About two months, yes.

12  Q   What was your position there?

13  A   My title was administrator.

14  Q   Was that a full time position?

15  A   No.

16  Q   And were you still working with EMS at that point?

17  A   Yes.

18  Q   So how did you work the two jobs?

19  A   At that time I was shift supervisor on nights so in

20  the afternoons I would come in and work there during the

21  afternoon.  I worked about 20 hours a week.

22  Q   20 hours a week at the Schneider clinic?

23  A   Yes.

24  Q   And as administrator, what were your duties there?

25  A   I took care of the bills.  I took care of the

5354

```
 1    banking.  Basically managed the money.  I took care of
 2    payroll.  Made sure all the employees were paid.  Got
 3    the mail out of the mailbox and sorted out the bills.  I
 4    took care of the -- I was the initial person on site for
 5    the computer system as far as setting it up and trying
 6    to work on any problems with that.
 7    Q   Were you responsible for hiring and firing any
 8    employees?
 9    A   No.
10    Q   Who was responsible for that?
11    A   Linda.
12    Q   And what was Linda's -- so Linda was employed at the
13    clinic?
14    A   Pardon.
15    Q   Linda was employed at the clinic also?
16    A   Yes.
17    Q   And what was her position?  Did she have a title?
18    A   I believe she was the Clinic Manager.
19    Q   Okay.  Did you see -- explain the relationship
20    between your position as administrator and Linda's
21    position as the office overseer or office manager
22    whatever you just said?
23    A   I was sort of a back office person.  Like I said, I
24    took care of the -- I didn't take care of patients.  I
25    didn't handle employees other than when they first came
```

5355

1   on and got paperwork, but Linda handled all of the

2   employees.

3   Q    So you would do, like, the tax forms and get them to

4   fill out things?

5   A    Yes.

6   Q    Do you have, like, employee handbooks you handed to

7   people?

8   A    Yes.

9   Q    Did you get verification that they received that?

10   Some kind of signed receipt or something?

11   A    Yes.

12   Q    That was all handled by you?

13   A    Yes.

14   Q    Did you have any assistants in that position who did

15   it when you weren't there?

16   A    No one.

17   Q    Now, how long were you at the clinic?  Assuming you

18   started December '02, how long did you stay with the

19   clinic?

20   A    Until it closed.

21   Q    Okay.

22   A    January or February of '08.

23   Q    Okay.  And we've already heard testimony Linda and

24   Steve were arrested in December '07.  Does that seem

25   about right?

5356

1    A    Correct.

2    Q    Okay.  But the clinic -- you just said you were

3    there until January or February of '08.  How was the

4    clinic working if the two of them were in jail?

5    A    There was a PA that was still working there that was

6    being overseen by another physician.

7    Q    Okay.  And who was that other physician overseeing

8    the PA that was still at the clinic?

9    A    I can't think of his name off the top of my head.

10   Q    Was he there full time?

11   A    No.

12   Q    How did that work?  Do you know how the operation

13   went between the PA and that physician?

14   A    He would come in and go over charts and sign off for

15   charts every, I don't know how often, once a week or so

16   and then he would be available to her for questions or,

17   you know.

18   Q    Did that seem similar to you as to the kind of

19   oversight that other physicians were utilizing with PA's

20   at the clinic?

21   A    Well, other than that they were on-site part of the

22   time and he wasn't usually on-site.

23   Q    Okay.  Now, in your five plus years at the clinic,

24   did you have occasion to see or to observe that patient

25   charts were flowing through Linda's office at some point

5357

1    in time?

2    A    Yes.

3    Q    What's your understanding of why that was happening?

4    A    My understanding was that she received the chart

5    when -- after the patient left and she would verify that

6    the front fee ticket was -- everything matched what was

7    inside the chart, in the progress notes.

8    Q    Okay.  Did you ever suspect Linda of doing anything

9    untoward or illegal, improper with those charts?

10   A    No.

11   Q    Did you ever hear rumors that she was asking people

12   to fill in vital signs or otherwise alter or manipulate

13   charts in an inappropriate fashion?

14   A    No.

15   Q    Or fee tickets?

16   A    No.

17   Q    Or sign-in sheets?

18   A    No.

19   Q    Or lab reports?

20   A    No.

21   Q    Did you ever have any cause to suspect that anyone

22   at the clinic was engaged in such activity?

23   A    No.

24   Q    Including the billing people downstairs?

25   A    No.

5358

1    Q    Now, who did they answer to?  Who was their direct

2    overseer, the billing people downstairs?

3    A    That would be Linda.

4    Q    Okay.  And --

5    A    Other than there was a -- I'm sorry -- there was a

6    billing manager and then she would, she would report to

7    Linda.

8    Q    Do you remember who the billing managers would have

9    been during your time there?

10   A    Brenda was the initial one and then -- I can't

11   remember her name.  Short lady was the second one.

12            MR. BYERS:  I don't know if this is leading or

13   not.  May I suggest a name to see if it refreshes his

14   recollection?

15            THE COURT:  Sure.

16            MR. BYERS:  Thank you.

17   Q    Sherrie Mills?

18   A    Yes.

19   Q    Matter of fact, did you field some type of complaint

20   from Sherrie Mills?

21   A    Right before she left, she came to -- she had an

22   issue with where she thought someone had changed some

23   statement on a patient's billing report and she thought

24   that someone had access to her password.

25   Q    Okay.  So I'm understanding she thought they did it

5359

1    like under her name?  It wasn't she saw somebody else

2    doing something?  She thought it was actually done as if

3    she had?

4    A    Correct.  She felt like someone got ahold of her

5    password and entered data under her name because

6    everything is tied to a user name.

7    Q    Did you -- well, how did you deal with that

8    complaint?

9    A    I explained to her that no one has access to her

10   password.  I was the one that managed the profiles and

11   gave them passwords; but even I couldn't see what her

12   password was.  It just was dots or asterisks, and I

13   could change it but then she would know it was changed.

14   And the only way someone could have her password is if

15   she gave it to 'em.

16   Q    Well, who initially set it up if it wasn't you?

17   A    I set up -- I set up their initial profiles, yes.

18   And I would put in a default password and they would

19   change it the minute they logged on.

20   Q    So then after that point you couldn't even see her

21   password?

22   A    Correct.

23   Q    Although you could change it?

24   A    It was X's.  I could change it but I could not see

25   it.

5360

```
 1   Q   Okay.  So did you take any kind of remedial action
 2   or what kind of follow-up there was with that complaint?
 3   A   Like I said, I explained how we could not do that
 4   and it was shortly after that that she left.
 5   Q   Okay.  Do you know, did she use -- did she list that
 6   concern over her pass -- apparent password breach, did
 7   she list that as a reason for her leaving the clinic?
 8   A   I don't remember.
 9   Q   Would she have tendered her resignation to you or do
10   you even remember?
11   A   She probably would have gave it to Linda but I would
12   have put it in her file if it was written.
13   Q   Okay.  So you were there essentially the whole time
14   the clinic existed; correct?
15   A   The first ones, yes.
16   Q   Would you have been on-site at the time of the first
17   raid, which I believe was September 2005?
18   A   I was not there.  I was out of town.
19   Q   Okay.  What about the second one which was about six
20   months later, I think, March '06, maybe May '06.  I
21   think March.
22   A   I was here, but I didn't go up there.
23   Q   So you weren't on-site at either one of those times?
24   A   No.
25   Q   So you didn't talk with federal agents on either of
```

5361

1   those days?

2   A   One called me on the phone, yes.

3   Q   Okay.  On which date?  Do you remember?

4   A   The first raid.

5   Q   Okay.  So you talked to somebody on the phone?

6   A   Yes.

7   Q   Do you remember how they identified themselves?

8   A   Told me -- well, they actually -- I believe it was

9   Linda that called me and told me that there was an agent

10  needed some information.  They needed the password to

11  the main computer system so they could get data off it.

12  Q   Okay.  So apparently someone was in the clinic,

13  Linda or somebody, giving out data to the federal

14  government?

15  A   Yeah.  She called me and then handed the phone to

16  this agent.  I don't know who it was.

17  Q   Did you talk them through that process so they could

18  get into the system?

19  A   Yes.

20  Q   Okay.  Did you have any other conversations with

21  federal agents subsequent to those two raids?

22  A   I had lots of conversations with agents throughout

23  the five years.

24  Q   How many -- any idea how many times or --

25  A   Multiple because I, I probably received over 100

5362

1    subpoenas over two or three years and I dealt with

2    agents completing those subpoenas.

3    Q    Did you do your best to comply with each and every

4    one of those subpoenas?

5    A    Yes.

6    Q    Did there come a time when you were advised by Linda

7    to withhold a bit of financial information and I think

8    in response to one of those subpoenas?

9    A    It was partly at my suggestion.  It was shortly

10   after the first raid.  I received a subpoena that they

11   needed the -- we ran -- we had all our financial data in

12   Quick-Books.  They wanted our Quick-Books file.  And I

13   said that they had just copied the whole hard-drive on

14   my computer in September of that year so did they just

15   need from that date on, forward, which was like three

16   months, I think it was in December.  And she asked her

17   attorney at the time and they said just, you know, from

18   that time on they already have it.  And then subsequent

19   to that they wanted the full thing.  So we gave 'em the

20   full thing.

21   Q    So when they came back and said we want it again,

22   you gave it again?

23   A    Yes.

24   Q    In what format?  Was that disk?  Paper?

25   Combination?  Do you remember?

5363

```
 1    A    I believe I burned them to disks, yes.

 2    Q    Okay.  So in all of these conversations with

 3    federal -- strike that.

 4         Did some of these conversations with federal agents

 5    actually occur in the clinic?

 6    A    Most of the time.

 7    Q    And that would have been during the service of those

 8    subpoenas?

 9    A    Yes.

10    Q    Was it on a very regular basis that federal agents

11    were at the clinic?

12    A    Quite often, yes.

13    Q    Did you ever direct any employee to be uncooperative

14    with the federal agent?

15    A    Absolutely not, no.

16    Q    Did you ever feel threatened at all during your

17    conversations with federal agents?

18    A    Only one time.

19    Q    When was that?

20    A    When they came to my home real shortly after the

21    raid, within a week or two, to talk to me.

22    Q    That the first raid?

23    A    Yes.

24    Q    And why did you feel threatened?

25    A    This particular agent told me that I had a nice home
```

5364

1    and that I'd sure hate to lose it by being uncooperative

2    with them.

3    Q    Were you being uncooperative?

4    A    No.

5    Q    Do you know who that agent was?

6    A    No.

7    Q    Were you compensated for your time serving as

8    administrator at the Schneider Medical Clinic?

9    A    Yes, most of it.

10   Q    Was it good money?

11   A    It was okay for a part-time job, yes.

12   Q    And you said that was like 20 hours a week?

13   A    Yes.

14   Q    Do you know what you were paid hourly?  How did that

15   work?

16   A    It worked out to around $30 an hour.

17   Q    $30 an hour.  Okay.

18            MR. BYERS:  Thank you.  That's all I have,

19   Your Honor.

20            THE COURT:  Sir?

21                    **CROSS EXAMINATION**

22   BY MR. WILLIAMSON:

23   Q    How you doing, Mr. McDonald?

24   A    Okay.

25   Q    So as I understand it, did you know the Atterbury

5365

1    family for a long time?

2    A    Yes.

3    Q    Throughout the time that you've known Steve and

4    Linda, have they lived in the same house since they've

5    been married?

6    A    Other than when he was at medical school, yes.

7    Q    And that's in Haysville?

8    A    Yes.

9    Q    Would the billing -- with the billing passwords, did

10   Dr. Schneider have a billing password to enter into the

11   system?

12   A    He had a password for his user name.

13   Q    Was that for the Intergy System?

14   A    Yes.

15   Q    And so, if he wanted to enter something, he had his

16   own contact information or his own user log-in?

17   A    Yes.

18   Q    Are you aware as to whether or not Dr. Schneider

19   ever provided free care to patients?

20   A    Yes.

21   Q    And when you were -- while you were at the -- well,

22   strike that.

23       When you were working as a paramedic and your other

24   part-time jobs, did you save -- did you and your wife

25   save money?

5366

1    A    Yes.

2    Q    Do you still currently regularly save money?

3    A    Try to.

4    Q    Okay.  Was there a point in time while you were at

5    the Schneider Medical clinic that the clinic was not

6    receiving money from Medicaid?

7    A    Medicaid?

8    Q    Or, excuse me, Medicare?

9    A    Medicare, correct, yes.

10   Q    And were you asked to help the clinic out during

11   that time?

12   A    No.

13   Q    Now, when you were handed the subpoenas from the

14   federal government, did Dr. Schneider ever ask you to

15   not to give any information to the federal government?

16   A    No.

17   Q    Did he ever try to instruct you to refuse to

18   cooperate with the federal government?

19   A    No.

20   Q    When you were employed at the clinic part-time, did

21   Dr. Schneider ever come to you and say we want to have

22   this fraudulent billing operation; we need your help?

23   A    No.

24   Q    If he would have asked to you do that, would you

25   have done it?

5367

1    A    No.

2              MR. WILLIAMSON:  I don't think I have anything

3    further, Your Honor.

4              THE COURT:  Yes, ma'am.  Oh, sorry.

5                     **CROSS EXAMINATION**

6     BY MR. FLEENOR:

7    Q    Mr. MacDonald my name is Jon Fleenor, Assistant

8    United States Attorney.  You and I have never spoken

9    before today, have we?

10   A    Not that I know.

11   Q    I have an opportunity to ask you some questions.  I

12   have a bad habit of talking fast.  If I ask something

13   you don't understand, I can reask the question again

14   better.

15   A    Okay.

16   Q    I did want to follow up on something you said.  You

17   met Linda Schneider.  You were living in Wisconsin at

18   the time?

19   A    Yes.  When I met the family.

20   Q    You worked concessions with her family?

21   A    Yes.

22   Q    What kind of concessions?  I'm just curious?

23   A    Games, carnival games.

24   Q    Okay.  Did you do the same thing when you came down

25   here to Kansas for a while, too?

5368

1    A    Yes.

2    Q    Was that something where you travel around with the

3    family?  It wasn't just local here?

4    A    Correct.  Most of it was in Wisconsin.

5    Q    So you guys have known Linda quite a long time ago

6    if I understand correctly?

7    A    Yes.

8    Q    And you're pretty close to her and her family?

9    A    Yes.

10   Q    In fact, I believe you've stated to law enforcement

11   that she is like a sister to you.  Is that accurate?

12   A    Yes.

13   Q    Now, when you eventually started to work at the

14   Schneider Medical Clinic December of 2002, who hired

15   you?

16   A    Linda.

17   Q    And you said you had the title of Clinic

18   Administrator.  Did I get that right?

19   A    Yes.

20   Q    Who assigned that title to you?

21   A    It was I guess Linda.  I don't know.  It was on the

22   door.

23   Q    And that title did not involve any medical or

24   business management, did it?

25   A    I'm sorry.

5369

```
 1    Q    Didn't involve any really medical management or
 2    business management for the clinic, did it?
 3    A    I guess I don't understand -- didn't involve medical
 4    but business management.  I'm not sure what you're
 5    asking me there.
 6    Q    All right.  You don't have a business degree?
 7    A    No.
 8    Q    And you don't have any prior training or education
 9    regarding -- or experience running any type of
10    healthcare clinic before that time?
11    A    No, I don't.
12    Q    Nor since then?
13    A    No.
14    Q    And I believe you said your duties included paying
15    the bills?
16    A    Yes.
17    Q    Sort of H-R to a certain extent?
18    A    Yes.
19    Q    And I think sort of I-T to a certain extent?
20    A    Yes.
21    Q    And even sometimes I believe you stated before,
22    janitor.  Would that be correct?
23    A    Yes.
24    Q    But you didn't manage any employees at the clinic?
25    A    No.
```

5370

```
 1    Q    You were not involved with any billing at the clinic

 2    for claims for services provided to patients?

 3    A    No.

 4    Q    In fact, you weren't involved with any patient care

 5    at the clinic?

 6    A    No.

 7    Q    You didn't handle any fee tickets, did you?

 8    A    No.

 9    Q    Who was your boss?

10    A    Who was my boss?  Linda.

11    Q    In fact, she pretty much ran the clinic.  Would that

12    be accurate?

13    A    I would say that she was the manager, yes.

14    Q    Part of your functions were to purchase things for

15    the clinic.  Would that be accurate?

16    A    Yes.

17    Q    And, in fact, for major purchases, you discussed

18    those with Linda, wouldn't you?

19    A    Yes.

20    Q    And Linda hired and fired the employees at the

21    clinic?

22    A    Yes.

23    Q    And she was also in charge of the employees'

24    salaries, too, wasn't she?

25    A    I did the payroll.  I guess --
```

1    Q    If somebody were to get a raise or docked salary,

2    that was her decision, wasn't it?

3    A    Yes.

4    Q    I believe you stated that while there were billing

5    managers, she supervised the employees in the clinic's

6    billing department?

7    A    She was in charge of them, yes.

8    Q    Would it be important -- or would it be accurate to

9    say that Linda Schneider handled most of the important

10   matters for the clinic?

11   A    I guess depends on how you define important.

12   Q    Well, for a couple of examples.  You've talked about

13   major purchases you discussed with her; correct?

14   A    Her and Dr. Schneider both sometimes.

15   Q    Hiring and firing of employees?  Raises?  Salary?

16   That type of thing was her decision?

17   A    That was, yes.

18   Q    If there was a Fed-Ex or certified mail, those items

19   would be taken to her, wouldn't they?

20   A    Sometimes.  Depends on what they're for I think.

21   Q    You remember talking with Special Agent Becky Martin

22   of the FBI?

23   A    I don't recognize the name.  I talked to several

24   agents.

25   Q    You told them you gave them the Linda mail and the

5372

1       Fed-Ex mail that came into the clinic?

2       A    If it was for her I would.

3       Q    You're not saying you took it all to her, just the

4       ones that were addressed to her?

5       A    Depends what it was for.  It was addressed to me, I

6       would take it, so I guess --

7       Q    Linda Schneider handled communication with the

8       Kansas Medical Assistance Program, that is Medicaid,

9       didn't she?

10      A    I believe that was billing, but I don't know.

11      Q    During all the years that you've worked there, you

12      weren't aware of any policies regarding care of

13      patients, were you?

14      A    I didn't deal with any policies, no.

15      Q    Were you aware of any policies regarding continuing

16      education for physician's assistants or doctors?

17      A    Not aware of that policy.

18      Q    In fact, you're not aware of any policies regarding

19      internal review or internal investigation at the clinic,

20      were you?

21      A    Not that I'm aware of.

22      Q    And not -- you're not aware of any compliance plans

23      at the clinic, are you?

24      A    No.

25      Q    Not aware of any training for the medical

1   assistants?

2   A   I didn't deal with that, no.

3   Q   Any policies regarding billing?

4   A   I don't know.

5   Q   You're not aware of policies about how medical

6   charts were created or maintained?

7   A   Not that I know of.

8   Q   Those were areas that Linda would have dealt with,

9   weren't they?

10  A   Yes.

11          MR. FLEENOR:  One moment, Your Honor.

12              (Off-the-record.)

13  BY MR. FLEENOR:

14  Q   I believe one of the defense counsels asked you

15  about subpoenas that were sent by the Government.  You

16  remember talking about that?

17  A   Yes.

18  Q   That was an ongoing process, wasn't it?

19  A   Yes.

20  Q   It wasn't all in one fell swooop?

21  A   No.

22  Q   Right.  Now, in fact, you mentioned -- I think Mr.

23  Byers asked you about subpoenas for particular billing

24  records.  Your Quiken books, I believe you mentioned.

25  A   Yes.

5374

1    Q    And you discussed that with Linda before you

2    produced anything for the Government, didn't you?

3    A    Yes.

4    Q    You were also asked about Sherrie Mills and Brenda

5    in billing.  You remember talking about that?

6    A    Identified those as the billing managers, yes.

7    Q    And they brought you concerns that they had about

8    what was taking place in the billing department, didn't

9    they?

10   A    I talked to Sherrie about her password.

11   Q    You don't remember talking to Brenda about anything,

12   any concerns she had?

13   A    I don't recall, no.

14   Q    In fact, Sherrie was so concerned about her password

15   she thought it was illegal activity that had taken

16   place, wasn't it?

17   A    She felt like someone had changed her -- got in

18   using her password, yes.

19   Q    But you didn't believe her, did you?  You didn't

20   believe her that anything illegal had happened?

21   A    I knew that we couldn't access it.  She would have

22   had to have given someone the password.

23   Q    You didn't believe the concerns that Brenda brought

24   to you about the billing department, did you?

25              MR. WILLIAMSON:  I'm going to object.  He is

5375

1    stating he doesn't recall any complaints made by Brenda.

2            THE COURT:  Sustained.

3    BY MR. FLEENOR:

4    Q   I'm sorry.  You remember no complaints by Brenda at

5    all?

6    A   Not that I recall.

7    Q   Okay.  If anyone had made statements about Linda

8    Schneider directing them to change fee tickets or

9    patient charts, you wouldn't believe them either, would

10   you?

11   A   Would I believe them?

12   Q   Yeah.  You don't know?

13   A   I don't know if I believe 'em or not.  I guess it

14   would depend on what they had to say.

15           MR. FLEENOR:  Thank you.  Nothing further.

16           MR. BYERS:  Very briefly, Your Honor.

17                    **REDIRECT EXAMINATION**

18    BY MR.BYERS:

19   Q   You were just talking to Mr. Fleenor about all of

20   Linda's responsibilities and things at the clinic.  Did

21   she have a computer in her office as you recall?

22   A   Yes.

23   Q   Was it your experience or observation that Linda was

24   computer literate?

25   A   She knew how to log-on.  That was about as far as we

5376

1    could get most of the time.

2    Q   Okay.  And you were also talking about your duties

3    as administrator.  Now, did there come a time as an

4    administrator that you investigated switching over to a

5    different kind of computer system?

6    A   Yes.  I spent almost nine months researching that.

7    Q   Okay.  And was part of that -- was the intention of

8    that to get into more of an electronic medical record

9    kind of a format?

10   A   That was one of the main reasons, yes.

11   Q   And did that involve the purchase of hardware,

12   software, other investments?

13   A   Yes.

14   Q   Do you recall what the --

15          MR. FLEENOR:  Objection, Your Honor.  This is

16   beyond the scope of cross.

17          THE COURT:  Sustained.

18   BY MR. BYERS:

19   Q   Mr. Williamson asked you on cross-examination about

20   if you were ever asked to contribute to the clinic.  You

21   remember that question?

22   A   Yes.

23   Q   And he asked you about saving money and then he

24   asked you that?

25   A   Yes.

5377

1   Q    It's correct you were never asked to contribute to

2   the clinic, were you?

3   A    No, I was not.

4   Q    But did you ever contribute to the clinic?

5   A    Yes.

6   Q    In what form or fashion?

7   A    I put some money into the account to make a payroll

8   one pay period because --

9   Q    I'm sorry.

10  A    -- because we were short that pay period for

11  payroll.

12  Q    And what kind of money did you put into that?

13  A    $25,000.

14  Q    Where did you get that money?

15  A    Out of my savings.

16           MR. BYERS:  Thank you.  That's all I have,

17  Your Honor.

18           THE COURT:  Do you have anything further?

19           MR. WILLIAMSON:  One question, Judge.  Sorry.

20                   **RECROSS EXAMINATION**

21  BY MR. WILLIAMSON:

22  Q    Were you ever paid that money back?

23  A    Yes.

24           MR. WILLIAMSON:  Nothing further.

25           MR. FLEENOR:  Nothing.

5378

```
 1              THE COURT:  Thank you, sir.  You're excused.
 2   Next witness please.
 3              MR. BYERS:  We're out, Judge.
 4              THE COURT:  All right.  3:40.  I think based
 5   on what the lawyers have told me, tomorrow is more
 6   likely to be a full day.  Now, Monday, we've got another
 7   expert witness, Dr --
 8              MR. WILLIAMSON:  Karch.
 9              THE COURT:  Karch.  You've heard about him.
10   We're going to start at 8:00 in the morning and we're
11   going to finish him on Monday.  Okay.  Because we won't
12   be in court on Tuesday and Wednesday.  Remember, we
13   talked about that.  We'll be back on Thursday to hear
14   expert witness Cole and clean up any odds and ends.  The
15   goal, which I'm sure we'll achieve, is that all of the
16   evidence will be in by the end of next week.  Then we
17   won't meet on Monday of the following week.  And on
18   Tuesday, unless something terrible happens, we'll be
19   ready for instructions and closing argument.  So
20   hopefully we'll be able to follow through on that and
21   get this case to you week after next.  So, have a good
22   evening.  Remember and heed the admonition.
23              MS. TREADWAY:  Judge, I'm sorry, I have a
24   housekeeping matter.  These little cards were handed out
25   and they were never admitted into evidence.  We would
```

1    ask they be collected.  I'm assuming they were just used

2    as demonstrative aids.

3            THE COURT:  Put your cards up there please.

4    Remember and heed the admonition and I'll see you

5    tomorrow at 9:00.

6                        (Jury excused for the evening at

7                        3:42 p.m.)

8            MS. TREADWAY:  Judge, may we take up a

9    discovery issue outside the presence of the jury?

10            THE COURT:  Yes.  Please be seated.  Yes,

11   ma'am.

12            MS. TREADWAY:  Yes Judge.  I'm not going to

13   ask to reopen Ms. Cobuzzi's cross because of the failure

14   of the Defendants to give me 26.2 materials, but I ask

15   again at this point that the Defendants provide me with

16   26.2 materials from their upcoming witnesses, Dr. Karch

17   and Dr. Cole.

18            THE COURT:  What do you think that they have?

19            MS. TREADWAY:  Well, obviously, this witness

20   corresponded with the Defendants by e-mail.  E-mail,

21   letter, memos, anything of that nature, a report, would

22   be 26.2 statements of that witness.  We gave the

23   Defendants that from our expert witnesses.  I do not

24   understand what they're talking about with regards to

25   this agreement that we didn't want 26.2 materials.  I

5380

1     believe what they're talking about is that in July of

2     2009 we met and it was their position that their

3     correspondence to their experts wasn't discoverable.

4     I'm not asking for that.  I'm asking for the expert's

5     26.2 statements.  They obviously had some from

6     Ms. Cobuzzi.  We didn't get it.  We didn't get

7     Mr. McDonald's 26.2 statements.  He has multiple

8     depositions.  And --

9              THE COURT:  I don't know what there could be

10    in there that would be relevant.

11             MS. TREADWAY:  And they have them.  So we are

12    not --

13             THE COURT:  The guy didn't have any real

14    damaging information or helpful information.

15             MS. TREADWAY:  No, his direct was worthless so

16    it doesn't matter; but it's still a violation.  It's an

17    ongoing violation.  They need to give us Rule 26.2

18    materials.  They said they would give them to us at the

19    first -- on the first day of their case.  Hasn't

20    happened.

21             THE COURT:  Okay.  What do you say?

22             MR. WILLIAMSON:  Judge, we agreed -- I'm going

23    to look for the letter because it was around July 31st

24    of 2009.  We agreed that the correspondence with, not

25    from the attorneys to, the correspondence with the

5381

 1   experts was not discoverable per agreement.  The

 2   Government gave us their files.  And there was a quote

 3   in there that says do not produce pursuant to agreement

 4   with defense counsel.  Mr. Byers called Ms. Treadway and

 5   said, hey, I believe you inadvertently gave this to us,

 6   let's -- I don't know if it was a call or e-mail.

 7            MR. BYERS:  E-mail.

 8            MR. WILLIAMSON:  You inadvertently gave this

 9   to us, we want to give it back, how do you want it back.

10   She says, don't worry about it, just keep it, there's

11   nothing in there anyway.  Well, that was their choice to

12   leave that in there.  But you can see the folder that

13   says do not produce according to agreement with defense

14   counsel.  And I will find that letter.

15            THE COURT:  She's looking for it.

16            MS. TREADWAY:  I'll get it.

17                 (Off-the-record.)

18            MS. TREADWAY:  Judge, I can't lay my hands on

19   it but I will be able to lay my hands on it at some

20   point.

21            MR. WILLIAMSON:  We will, too, Your Honor.

22            THE COURT:  Hopefully it will be the same

23   letter.

24            MR. WILLIAMSON:  I'm sure it will, Judge.  But

25   we do have the folder that says do not produce per

5382

1    agreement with defense counsel.

2              MR. BYERS:  That was relative to Dr.

3    Jorgensen.

4              THE COURT:  I don't know.  I don't know.  I

5    think the first step is to produce the letter and I will

6    read it.  And then I will try to resolve this issue.

7    But that's all I can tell you.  See you tomorrow.

8              MR. WILLIAMSON:  Thank you, Your Honor.

9              THE COURT:  When you find the letter, bring it

10   in and give it to Rachael.

11                      (Recessed for the day at 3:47

12                      p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25