4612

1                    (Beginning at 8:58 a.m. May 27,

2              2010, the following proceedings

3              continued OUTSIDE THE PRESENCE

4              OF THE JURY.)

5         THE COURT:  Did you want to see me before the

6    jury comes in?

7         MS. TREADWAY:  Thank you, Judge.  First of

8    all, prior to the Defendant's cross-examination, the

9    Government would appreciate that Martin Redd, DEA agent,

10   be released for sequestration for the purposes of

11   listening to his cross-examination.  To the extent the

12   Defendant will be talking about prior statements that he

13   gave to Mr. Redd, we believe it would be proper for Mr.

14   Redd to be in the courtroom to listen to that testimony

15   should rebuttal be necessary.  That's the easier way to

16   lay foundation for us without having Ms. Schwemmer have

17   to type the transcript for us.

18        THE COURT:  Any objection?

19        MS. TREADWAY:  They object.

20        MR. WILLIAMSON:  Yes, we do object, Judge.

21        THE COURT:  He can be here.  He's already

22   testified and been cross-examined.

23        MS. TREADWAY:  Yes, sir.  Thank you.  The

24   second issue I wish to bring to the Court's attention --

25   and I'm not really sure you can do anything about it,

1    Judge -- but we have been informed by the billboard

2    company that Ms. Reynolds has visited them again.  We

3    are at a very critical part in the trial and we

4    certainly do not want anything to happen that is even

5    close to improper with regards to influencing the jury.

6    We certainly don't want any improper billboards to be up

7    in the public again.

8           THE COURT:  Well, I'm not sure the first

9    billboard was improper.  It didn't do any good.  None of

10   the jurors saw it.  There's nothing I can do about it

11   except to say that this is a smart jury.  They're not

12   going to be influenced by a billboard or anything else.

13   There's a lot of stupidity exhibited in this case by

14   people who are not involved.  And it hasn't gone

15   unnoticed to me.  And it hasn't gone unnoticed to a lot

16   of people.  But I don't think that there's anything I

17   can do or should do to prevent people from exercising

18   their constitutional rights.  I want these Defendants

19   and the Government to have a fair trial.  And so far,

20   they've had a very fair trial.  And Ms. Reynolds, who is

21   known to the defense counsel -- it's not the defense

22   counsel's job to council with Ms. Reynolds either.  It's

23   their job to defend their clients, which they're doing.

24   So that's all I can say about it.

25          MS. TREADWAY:  Thank you, Judge.

4614

1              THE COURT:  Okay.  I think we're ready.

2                     (Jury enters the courtroom.)

3              THE COURT:  Good morning.  You may be seated.

4    All right.  Mrs. Treadway.

5              MS. TREADWAY:  Thank you, Judge.

6                     **CROSS EXAMINATION**

7    BY MS. TREADWAY:

8    Q   Let's start with a little background.  You were well

9    aware of the guidelines for the use of controlled

10   substances for the treatment of pain, weren't you?

11   A   I don't know about well aware, what you're saying.

12   Q   Well, let me hand you Government Exhibit 61.  Are

13   you familiar with those guidelines?

14   A   I believe I've read this before.

15   Q   In fact, haven't you given lectures about it, sir?

16   A   I don't remember giving lectures about it.

17   Q   Let me hand you what has been marked for

18   identification as Government Exhibit 313.  Do you

19   recognize that document?

20   A   No.

21   Q   Isn't it a consulting contract with you?

22   A   Appears to be so, yes.

23   Q   And what's attached to that, sir?

24             MR. WILLIAMSON:  Your Honor, I'm going to

25   object.  He's never seen that document before.  It's

4615

```
 1    improper foundation.
 2              THE COURT:  He just said it appears to be.
 3              MR. WILLIAMSON:  She asked -- it appears to be
 4    a certain document.  How can he testify about a document
 5    that --
 6              THE COURT:  Well, it might help if he would
 7    look beyond the first page.  Let him read it through.
 8    A    I don't remember this document.
 9    BY MS. TREADWAY:
10    Q    You don't remember it but it has your name on it,
11    does it not?
12    A    Yes, it does.
13    Q    It says "Addendum to the Consulting Agreement
14    between Stephen Schneider and Ortho-McNeil
15    Pharmaceutical".  Correct?
16    A    That's correct.
17    Q    And it's about a program April 16th, 2004; correct?
18    A    That's correct.
19    Q    And you were providing consulting services to
20    Ortho-McNeil Pharmaceutical; correct?
21    A    That's what it says, I believe.
22    Q    And you were paid $500; correct?
23    A    I don't remember that.
24    Q    And the attached -- next is a letter to you dated
25    June 3rd, 2004, talking to you about the speakers'
```

4616

1    bureau at which you're going to give a lecture; correct?

2    A   That's what it says, yes.

3    Q   And then attached to that is The Model Policy for

4    the Use of Controlled Substances for the Treatment of

5    Pain, which is your outline for that program, isn't it?

6    A   That's correct -- no, I can't say that's my outline.

7    No, I never made this outline.

8    Q   So you don't recognize your own speech that you got

9    paid $500 for?

10   A   I don't remember giving this speech.

11          MS. TREADWAY:  Government offers Exhibit 313.

12          MR. WILLIAMSON:  Objection.

13          THE COURT:  Well, if he doesn't remember it, I

14   don't see how it's admissible.

15          MS. TREADWAY:  Well, it's a prior statement,

16   Judge.

17          MR. WILLIAMSON:  This is not a statement by

18   him and that's a total misrepresentation.

19          THE COURT:  The objection is sustained.

20   BY MS. TREADWAY:

21   Q   Now, you would agree that a legitimate pain

22   management practice would follow those guidelines,

23   wouldn't you?

24   A   Like I say, unless I read the whole document and go

25   through it, I can't do any specifics about saying what

4617

1    somebody should do or not.

2    Q    So you're not familiar with the guidelines that

3    govern pain management practice in Kansas?

4    A    I'm suggesting that I've read this.  I can't

5    remember every detail.

6    Q    Okay.  So would you agree with me that a legitimate

7    pain management practice should not have a lot of

8    overdoses?

9    A    I would say that a legitimate pain practice -- and I

10   never had a legitimate pain practice.  My practice was

11   family practice so I can't really state what a

12   legitimate pain practice is because their clientele is

13   different than mine.

14   Q    So you would not agree with me that in a legitimate

15   pain practice, people should rarely overdose.  Is that

16   your testimony?

17   A    I'm saying that I've not had experience in a

18   legitimate pain practice.

19   Q    So you would not agree with me that in a legitimate

20   pain practice people should rarely die of overdoses?  Is

21   that your testimony?

22   A    I'm saying that if you want me to give my opinion

23   about a legitimate pain practice that does nothing but

24   pain, I don't have the experience properly to give that

25   opinion.

4618

1    Q    Do you agree with the information available from the

2    American Academy of Pain Medicine and the American Pain

3    Society?

4    A    Say again.

5    Q    Do you agree with the information available from the

6    American Academy of Pain Medicine and the American Pain

7    Society?

8    A    Well, I don't know that I know every piece of

9    information that's given to me by the American Academy

10   of Pain Management Society, so I can't say yes.

11   Q    Are you familiar with their consensus statement?

12   A    No.

13   Q    You're not?  Let me see if I can find that.

14          MS. TREADWAY:  Excuse me, Judge, I'm looking

15   for an exhibit.

16   BY MS. TREADWAY:

17   Q    Let me hand you what has been marked for

18   identification as Exhibit 203.  Is that a document that

19   you recognize as being a consensus statement from 1997

20   from the American Academy of Pain Medicine and the

21   American Pain Society?

22   A    I don't remember ever seeing this before.

23   Q    Nevertheless, do you recognize the American Academy

24   of Pain Medicine and the American Pain Society as

25   authoritative sources?

4619

1    A    I would agree, yes.

2    Q    Well let's take a look at Page 3.  Do you agree that

3    the principles of good medical practice should guide the

4    prescribing of opioids?

5    A    I would say that's an acceptable statement.

6    Q    Do you agree that the evaluation of the patient

7    should include a pain history?

8    A    Yes.

9    Q    Do you agree that an assessment of the impact of the

10   pain on the patient should be taken?

11   A    Yes.

12   Q    Do you believe a directed physical examination is

13   required?

14   A    I would say yes.

15   Q    Do you believe that you should review previous

16   diagnostic studies?

17   A    I would say that taking an appropriate history and

18   reviewing the diagnostic studies if available would be

19   appropriate.

20   Q    Do you believe you should review previous

21   interventions?

22   A    I would suggest reviewing with the patient what

23   procedures and things have been done, yes.

24   Q    Do you believe you should take a drug history?

25   A    What do you mean by drug history?

4620

1    Q    Well, a history of taking any drug, whether elicit

2    or licit, prescribed or not?

3    A    I would say yes, it would be helpful to know what

4    medications patients have taken, what have been helpful

5    for them and what medications have not been helpful for

6    them, yes.

7    Q    Do you believe there should be an assessment of

8    co-existing diseases and conditions?

9    A    Do I agree that what?

10   Q    That there should be an assessment of co-existing

11   diseases and conditions?

12   A    Yes, I think that that would be helpful.

13   Q    Do you agree that the treatment plan should be

14   tailored to both the individual and the presenting

15   problem?

16   A    I agree.

17   Q    Do you agree that consideration should be given to

18   different treatment modalities?

19   A    I believe that different modalities should

20   definitely be involved with anybody, that if it's

21   available and actually can be done with this patient.

22   There's a lot of times where modalities are definitely

23   indicated but the patient has no insurance and they

24   cannot afford it.  So I think it's ideal to have all

25   modalities done, but it's not practical sometimes.

4621

 1    Q   Do you agree that the use of medication should
 2    depend upon the physical and psychosocial impairment
 3    related to the pain?  As stated in that consensus
 4    statement?
 5    A   I believe that is definitely a factor in treating
 6    one's pain.
 7    Q   Do you agree that opioids should be used on a trial
 8    basis first, as does the American Academy of Pain
 9    Medicine?
10    A   I believe that the use of opioids is not indicated
11    in all, that's for sure; and definitely if they are
12    naive to opioids, they would have to have a trial, yes.
13    Q   Do you agree that consultation with a pain
14    management specialist is warranted according to the
15    consensus statement?
16    A   Let's see, consultation is needed.  Is that what
17    you're referring to down here?
18    Q   Do you agree with that?
19    A   It says consultation as needed.  Then it says:
20    Consultation with a specialist in pain medicine or the
21    psychologist may be warranted.  Yes, I agree, sometimes,
22    uh-huh.
23    Q   Do you agree that treatment efficacy should be
24    reviewed periodically to assess the functional status of
25    the patient?

1    A    Yes.

2    Q    Do you agree that periodic re-examination is

3    warranted to assess the nature of the pain complaint and

4    to assure that opioid therapy is still indicated?

5    A    Yes, I believe so.

6    Q    Do you agree that thorough documentation is

7    essential?

8    A    Well, thorough documentation is ideal.

9    Q    But you understand that the evidence in this case

10   has been that you and the other providers at the

11   Schneider Medical Clinic did not follow any of these

12   principles that you agree with, do you not?

13   A    I disagree.

14   Q    You don't agree with the evidence in the case?

15   A    Yes, I disagree.

16            MR. WILLIAMSON:   Object to the

17   characterization as to all the evidence in this case.

18            THE COURT:   Objection is overruled.   This is

19   cross-examination.

20   BY MS. TREADWAY:

21   Q    You and your wife organized the Schneider Medical

22   Clinic in June of 2002, didn't you?

23   A    No.

24   Q    When did you organize it?

25   A    We had assistance in organizing it and it was

4623

 1    basically the administrator at the time that helped us

 2    get going.

 3    Q    So you did not apply with the Secretary of State's

 4    office and get a LLC established?

 5    A    That was put through the lawyer that the

 6    administrator got us involved with.

 7    Q    And you signed those documents; correct?

 8    A    Yes, we did.

 9    Q    And you opened the clinic in approximately October,

10    November, of 2002; correct?

11    A    I believe so, yes.

12    Q    And you both owned and operated the clinic; correct?

13    A    No.

14    Q    Who owns the clinic?

15    A    I own the practice and Linda owned the medical

16    properties.

17    Q    And you both operated the clinic; correct?

18    A    With assistance.

19    Q    Your wife always served as the clinic manager,

20    didn't she?

21    A    I wouldn't say she had that title.  I don't know

22    that anybody said you are the office manager.  Nobody

23    that I know of ever said that.

24    Q    Despite the fact she didn't have the title, did she

25    have the role?

4624

1    A    She had the role of helping assist in managing the

2    front office with our hiring and firing and trying to

3    keep things organized in the front office.

4    Q    And your wife directed the clinic's operations,

5    didn't she?

6    A    No.

7    Q    She enforced the rules is what your testimony was

8    yesterday?

9    A    Well, I'm saying -- you're talking about operations.

10    When you're talking about operations, that involves the

11    whole scope and she did not do that.

12    Q    Your wife hired and fired staff, didn't she?

13    A    She did some, yes.

14    Q    Your wife directed how the clinic scheduled

15    patients, didn't she?

16    A    No.

17    Q    She did not?

18    A    No.

19    Q    She directed how the clinic billed for services,

20    didn't she?

21    A    No.

22    Q    And you didn't either, did you?

23    A    No.

24    Q    Would you agree with me that the clinic never had a

25    registered nurse or a licensed practical nurse?

4625

```
1    A    I disagree.
2    Q    So when your wife said that to the federal agents,
3    she was lying?
4    A    She said what?
5    Q    She said you never had a registered nurse or a
6    licensed practical nurse?
7    A    We never had a registered nurse.  We did have a
8    licensed practical nurse for a time other than Linda.
9    Q    So if she told the federal agents that you didn't
10   hire licensed practical nurses, that would have been a
11   lie?
12   A    I don't know what Linda told them.
13   Q    Well, you didn't see the videotape?
14   A    I don't remember that.  If you want to play it
15   again, I'll --
16   Q    Would you agree with me that the clinic used
17   individuals that you called medical assistants?
18   A    Yes.
19   Q    And isn't it true that most of them received
20   on-the-job training at the clinic?
21   A    Some of them did.
22   Q    They didn't have formal training?
23   A    That's correct.
24   Q    Did you hear your attorney suggest to Dr. Parran
25   that you got on-the-job training in pain management?
```

4626

```
 1   A   Well, I never went to, to get board certified.   I
 2   was not an anesthesiologist.  I would consider, you
 3   know, that not necessarily on-the-job training; but,
 4   yes, I didn't have any specific schooling to be trained
 5   in pain management.
 6   Q   Did you tell your patients you were learning on the
 7   job?
 8   A   No.  Like I said before, my philosophy is that every
 9   family practice physician deals --
10           MS. TREADWAY:  Judge, objection.
11   Non-responsive.  Move to strike.
12           THE COURT:  Please answer the question, sir.
13   A   I'm sorry.
14           MS. TREADWAY:  I believe he did.  I'd like to
15   move on.
16   BY MS. TREADWAY:
17   Q   Would you agree that the clinic had a high degree of
18   turnover when it came to staff?
19   A   I don't know how to compare that with other places.
20   Q   Well, in fact, you gave a deposition and you said we
21   have so many people coming and going I can't remember
22   their names, did you not?
23   A   There are some people, yeah, that I didn't know
24   their names; but a lot of the people in the back office
25   I did know their names.
```

4627

1    Q    Didn't you hire quite a few family members and

2    family friends to work at the clinic?

3    A    I never hired anybody.

4    Q    Did your wife hire family members and family

5    friends?

6    A    Yes, she did.

7    Q    Curtis Atterbury was one; correct?

8    A    Yes.  Actually I was part of -- in hiring him.  I

9    believe he came to me and asked for the job and I said

10   I'm sure we can put you to work so -- I worked with him

11   before when I worked for Riverside.

12   Q    So now you're saying you did hire people?

13   A    Well, it was, you know, he's my brother-in-law and

14   he came in -- actually, he asked me if I would be

15   interested in working for him and I said, well, no, I

16   don't think so, but if you wanted to work for me then

17   that would be okay.

18   Q    So the answer to my question that you hired family

19   members and family friends to work at the clinic should

20   have been a yes; is that correct?

21   A    Yes, I believe Curt was one that I was -- said --

22   offered him the job, yes.

23   Q    Did Michael Atterbury work at the clinic?

24   A    Yes.

25   Q    Who is he?

4628

```
 1   A    He is Linda's nephew.

 2   Q    Who is Jennifer Atterbury?

 3   A    It is Curt's daughter.

 4   Q    Who is Karen Atterbury?

 5   A    That is a nephew's wife.

 6   Q    Who is Samantha Atterbury?

 7   A    That was Curt's daughter.

 8   Q    Who's Patricia Hatcher?

 9   A    That's Linda's sister.

10   Q    Who's Ulysses Taylor?

11   A    He was a friend.

12   Q    Who's Catherine Gaines?

13   A    He was Curt's wife's sister's daughter.

14   Q    Who's Chad Hatcher?

15   A    Pat's son.

16   Q    And who's Tim McDonald?

17   A    He's a friend.

18   Q    All those people were at the clinic, weren't they,

19   at one time or the other?

20   A    At one time or another, yes.

21   Q    With regards to Tim McDonald, the clinic

22   administrator, what experience did he have in the

23   administration of a medical clinic?

24   A    None that I know of.

25   Q    You originally had a very qualified and experienced
```

4629

```
 1   administrator in Mike Robinson, didn't you?
 2   A   I don't know how qualified he was.  He got fired
 3   from the place he was working at prior to coming to our
 4   place; but he kind of convinced us to go out on our own.
 5   Q   So you let him go to hire a family friend; correct?
 6   A   He gave me an ultimatum and he was under the
 7   impression that we were going to be expanding soon,
 8   which that was not going to happen, and so we let him
 9   go.
10   Q   And Mike Robinson had to hire an attorney and
11   threaten to sue you for the money you never paid him;
12   isn't that correct?
13   A   I don't remember that.
14   Q   Isn't it Linda that wanted to get rid of
15   Mr. Robinson?
16   A   No, I don't believe that was the problem.  I think
17   Linda and him did not see eye to eye.
18   Q   Yes.  Wasn't the reason that Linda wanted to get rid
19   of him was that he was, in her words, too honest?
20   A   I don't know what Linda thought.
21   Q   Were you aware that you were known as Schneider the
22   Writer?
23   A   I heard that.
24   Q   The Pill Man?
25   A   I heard Schneider the Writer one time by Chip
```

1    Wayland when I called him about when --

2            MS. TREADWAY:  Objection.  Non-responsive.

3    Move to strike.

4            THE COURT:  Yes.  I believe he answered yes

5    and that's the extent of the answer that you need to

6    consider.  Remember, on these things, Ladies and

7    Gentlemen, and I will say this to witnesses, too, there

8    will be an opportunity for redirect examination.  And

9    cross-examination, as you know after sitting here for

10   three or four weeks, is basically intended to be an

11   opportunity to question a witness about things that may

12   not have been asked and to test credibility.  And if the

13   question is formulated in such a way that the witness

14   can answer it yes or no, the witness should answer it

15   yes or no.  If you can't, you tell Ms. Treadway that you

16   can't answer it yes or no.  She then can rephrase the

17   question, do whatever she wants to do; and then if

18   Mr. Williamson feels on redirect examination that he

19   needs to cover something with you that you didn't cover,

20   he has that opportunity.

21           MS. TREADWAY:  Thank you, Judge.

22           THE COURT:  Things will go a lot more

23   smoothly --

24   A    Okay.

25           THE COURT:  -- if we follow those rules.

4631

1    BY MRS. TREADWAY:

2    Q    Were you aware that you were known as The Pill Man?

3    A    No.

4    Q    Were you aware that you were known as The Candy Man?

5    A    No.

6    Q    Were you aware that you were known as Dr. Kevorkian,

7    Jr?

8    A    No.

9    Q    Were you aware that you were known as The Drug Lord

10   of Haysville?

11   A    No.

12   Q    Would you agree with me that the people you were

13   treating for pain management were not dying of cancer?

14   A    I believe that we did have some that were dying of

15   cancer.

16   Q    Would you agree with me that the vast majority of

17   the people you were treating for pain management were

18   not dying of cancer?

19   A    The vast majority, I agree.

20   Q    Would you agree with me that the people you were

21   treating for pain management were not dying of any other

22   life threatening medical conditions?

23   A    I disagree.  I disagree.

24   Q    Would you agree with me that the vast majority of

25   the people you were treating for pain management were

4632

1    not dying of any other life threatening medical

2    condition?

3    A    I can't answer that.

4    Q    Would you agree with me that most of the people you

5    were treating for pain had general complaints such as

6    back pain, fibromyalgia, lower back disease, pain in the

7    neck, pain in the shoulders?

8              MR. WILLIAMSON:  Your Honor, I'm going to

9    object to compound.

10             MS. TREADWAY:  I'm just giving some examples

11   of general complaints of pain.

12             THE COURT:  Go ahead.

13   A    Ask the question again.

14   Q    Would you agree with me that most of the people you

15   were treating for pain had general complaints of pain?

16   A    All the people that I was treating for pain had a

17   painful condition.

18   Q    That's not my question, sir.  They had general

19   complaints of pain; correct?

20   A    The word general is just kind of bothering me.  They

21   had complaints of pain, yes.

22   Q    You were aware that the people that had received

23   prescriptions for controlled substances at your clinic

24   were overdosing, weren't you?

25   A    Say that again.

4633

1   Q   You were aware that people that had received

2   prescriptions for controlled substances at your clinic

3   were overdosing, weren't you?

4   A   Some, yes.

5   Q   You were also aware that people were dying of

6   prescription drug overdoses, weren't you?

7   A   I'm not aware that all the people that you're

8   commenting about died of overdoses.

9   Q   Let's look at Exhibit 151.  You've seen that

10  document, haven't you?  That's the document that sets

11  forth all of the notice in your own medical records

12  about these individuals dying; correct?

13  A   I don't know that that is correct.

14  Q   So you dispute that you had notice?

15  A   Yes.

16  Q   Would you agree that prescriptions are not issued

17  for a legitimate medical purpose if they are issued to a

18  person you know is abusing or diverting the drugs being

19  prescribed?

20  A   I disagree.

21  Q   Would you also agree that a prescription is not

22  used -- not issued in the usual course of professional

23  medical practice if it is issued to a person you know is

24  abusing or diverting the drugs prescribed?

25  A   If the person is using or abusing the drug and they

4634

```
 1    are given a prescription that I know they are using or
 2    abusing the drug.  Is that the question?
 3    Q    Yes.
 4    A    Then, yes, I would say that's not legitimate.
 5    Q    You understand that Soma was a drug that many people
 6    became addicted to; correct?
 7    A    I don't know that.
 8    Q    You don't remember that Katherine D was addicted to
 9    Soma?
10    A    Yes, but I don't know about many as you state.
11    Q    She was also addicted to Lortab, wasn't she?
12    A    I don't know that.
13    Q    She told you that, didn't she?
14    A    I don't remember that.
15    Q    Her husband told you that?  Leo?
16    A    I don't remember that conversation about her
17    specifically saying she was addicted to Lortab.  I
18    assumed that her problem was Soma because that's what
19    was commented on in the discharge summary that I seen.
20    Q    Well, in fact, the discharge summary said that she
21    overdosed on Soma and Lortab, didn't it?
22    A    I don't remember the Lortab.  I remember Soma.
23    Q    Now, you understood that Soma had a high abuse
24    potential, didn't you?
25    A    I knew that there was people that abused it, yes.
```

4635

```
 1    Q    You understood that Soma was more addictive than

 2    other similar products on the market like Flexeril, for

 3    example, didn't you?

 4    A    I believe so, yes.

 5    Q    Despite that knowledge, you continued to prescribe

 6    it, didn't you?

 7    A    I prescribed Soma for appropriate patients, I

 8    believe.

 9    Q    Including people that became addicted to it like

10    Katherine; correct?

11    A    For Katherine I thought she was benefiting from

12    Soma, yes.

13    Q    Even though she told you she was addicted to it and

14    she overdosed on it, you continued to prescribe it?

15    A    I don't remember her saying she was addicted to it

16    when I had the conversation.

17    Q    But you knew about her overdose on it?

18    A    The overdose that I know about was after we had

19    already dismissed this patient.

20    Q    Would you agree that if the provider's treatment

21    makes the patient worse that the treatment should be

22    changed?

23    A    I agree that if the treatment is not effective then,

24    yes, it should be changed.

25    Q    Would you also agree that if a patient is getting
```

4636

1    worse and the provider does not make any changes, that

2    the provider is not practicing within the usual course

3    of a professional medical practice?

4    A    I disagree with that statement because I don't

5    believe that that is an accurate statement for -- unless

6    I have all the facts.

7    Q    Would you agree that an important risk of

8    prescribing controlled drugs for a long period of time

9    is the development of an addiction?

10   A    Say that one more time.

11   Q    Would you agree that an important risk of

12   prescribing controlled drugs for a long period of time

13   is the development of an addiction?

14   A    I disagree.

15   Q    Would you also agree that an important risk of

16   prescribing controlled drugs for a long period of time

17   is the re-establishment or worsening of an already

18   existing addiction?

19   A    If there is an addiction that the patient has and

20   they're on the medication for a -- to -- I disagree -- I

21   mean, I don't -- I think it's inappropriate to prescribe

22   medication to an addict that is using that medication

23   inappropriately.  I'm not certain that's how the

24   question was asked.

25   Q    Do you agree that the risks of addiction increase if

4637

1    the patient has a history of a psychiatric condition?

2    A   I don't believe that.

3    Q   Do you agree that the risk of addiction increases if

4    they have an addiction history to non-opiate drugs?

5    A   If they have a history of addiction to non-opiate

6    drugs --

7    Q   Do you believe the risk of addiction increases?

8    A   I believe that's possible.

9    Q   Do you agree that the risk of addiction increases if

10   the patient has a history of an opiate addiction?

11   A   Yes.

12   Q   Do you agree that the risks of addiction increase if

13   the patient has a history of addiction to illegal

14   substances?

15   A   I believe so, yes.

16   Q   Do you agree that the risks of addiction

17   significantly increase if the patient has a current

18   psychiatric condition?

19   A   I'm not certain that psychiatric disease means

20   addiction, so I don't agree with that.

21   Q   I didn't say means addiction.  I said do the risks

22   of addiction significantly increase if the patient

23   currently has a psychiatric condition?

24   A   I would say if a patient is mentally unstable and

25   has a psychiatric condition, then, yeah, I think they

4638

1    probably are not thinking clearly and could possibly

2    have an increased risk for an addiction or abuse.

3    Q    Do you agree that risks of addiction significantly

4    increase if the patient currently is addicted to

5    non-opiates, including alcohol?

6    A    Yes.

7    Q    Do you agree that the risks of addiction

8    significantly increase if the patient has a current

9    addiction to opiates?

10   A    Yes.

11   Q    And do you agree that the risks of addiction

12   significantly increase if the patient is addicted or

13   using illegal substances?

14   A    Yes.

15   Q    Do you agree that continuing to prescribe controlled

16   drugs to a person who is abusing, diverting or addicted

17   to the drugs is doing harm to that person?

18   A    I would say if they are abusing and it's known then,

19   yes, I'd agree.

20   Q    You were aware of the various red flags that would

21   indicate a person could be abusing, diverting or

22   addicted to drugs, weren't you?

23   A    I've heard the red flags, yes.

24   Q    And you saw these red flags all the time at your

25   clinic, didn't you?

4639

1    A    I apparently didn't -- I did not recognize red flags

2    that have been pointed out here in this courtroom.

3    Q    So you did not recognize the requests for early

4    refills as a red flag?

5    A    Early in the way it was presented here in this

6    courtroom was like they're here one day early.  I did

7    not consider that a red flag.

8    Q    Did you see a lot of specific requests for

9    particular drugs?

10   A    I would say no.

11   Q    Did you see that claims -- did you see a lot of

12   claims that certain drugs did not help people's pain?

13   A    Yes.

14   Q    Did you see a reluctance to change medications?

15   A    No.

16   Q    Did you see failed urine drug screens?

17   A    Yes.

18   Q    Did you see repeated failed urine drug screens for

19   some people?

20   A    I seen more than once that the person had failed a

21   drug screen, yes.

22   Q    Didn't you see documents that people claim they lost

23   their drugs?

24   A    Yes.

25   Q    That their drugs were stolen?

4640

1    A    Yes.

2    Q    That their grandchildren had dropped them in the tub

3    or the toilet?

4    A    I don't know about that, per se.

5    Q    Did you know that the clinic was receiving calls

6    from family members informing you that a person was

7    abusing or addicted --

8    A    We had phone calls, yes.

9    Q    Did you know that the clinic was receiving anonymous

10   calls from people informing you that your patients were

11   abusing or addicted?

12   A    We had anonymous phone calls; but I can't say

13   specifically what was said on those.

14   Q    You knew the clinic was receiving calls from the

15   pharmacies about forged prescriptions, didn't you?

16   A    Yes.

17   Q    You knew that the clinic was receiving calls from

18   the pharmacies about concerns that a person was abusing

19   or addicted, did you not?

20   A    Yes, I did.

21   Q    You knew that the clinic was receiving calls from

22   the pharmacies about pharmacy shopping, didn't you?

23   A    I don't remember that.

24   Q    You knew that the clinic was receiving calls from

25   the pharmacy questioning your prescription practices,

4641

1    didn't you?

2    A    I heard about that, yes.

3    Q    Well, in fact, Jamie Clowers spoke directly to you,

4    didn't she?

5    A    Yes.

6    Q    And Alice Fox spoke directly to you, didn't she?

7    A    She said she did, yes.

8    Q    The clinic was receiving calls from other doctors

9    informing you that people were doctor shopping; correct?

10   A    I think we had that a time or two, yes.

11   Q    You heard from hospitals that people were overdosing

12   and dying; correct?

13   A    We had discharge summaries from some of the

14   hospitals when that happened, yes.

15   Q    You heard about law enforcement -- you heard from

16   law enforcement that people were dying from overdoses,

17   didn't you?

18   A    I believe I remember one phone call, yes.

19   Q    And you got information from the medical examiner

20   about people dying from overdoses, didn't you?

21   A    I don't know about that.

22   Q    You knew from the beginning of your relationship

23   with some of the people that they had an addiction

24   problem, didn't you?

25   A    I don't recall that.

4642

1    Q    You took people in the Medicaid lock-in program,

2    didn't you, sir?

3    A    I believe so, yes.

4    Q    And the Medicaid lock-in program was to prevent

5    people from doctor shopping and pharmacy shopping

6    because they were addicted; correct?

7    A    I did not know that.

8    Q    Would you agree with me that overdoses and overdose

9    deaths became common at your clinic?

10   A    I disagree.

11   Q    Let me hand you Exhibit 312, which is a document

12   that was found during the search warrant, one of the

13   search warrants at your clinic.  Do you recognize that

14   document?

15   A    I really don't recognize it, no.

16   Q    So if it was found in your clinic, you don't

17   recognize it?

18   A    I don't remember who generated this.  I just don't

19   remember seeing it.

20   Q    Is it something you followed at your clinic?

21   A    It may have been at one time.  I don't know.

22   Q    Let me hand you what has been marked for

23   identification as Government Exhibit 106.  For the

24   record, that's the April 8th, 2005, memo from you and

25   Dr. St. Clair to First Guard.  You remember that?

4643

1    A    Yes.

2    Q    Mr. Moore, could you bring that up, please.  And the

3    first paragraph.

4         That's the document in which you're telling First

5    Guard that Terry Owens agreed to be your advisor.

6    There's no such person as Terry Owens, is there?

7    A    I didn't know what Graves T. Owen -- I thought T was

8    Terry; but apparently not.  But I didn't type this up.

9    Q    In fact, his name isn't Owens either.  It's Owen.

10   Says:  We have had several discussions with him and his

11   clinic, Texas Pain Rehabilitation Institute.  With their

12   help, we have adopted the following.

13        That's not true, is it?

14   A    I cannot say that is not true.  We did have

15   discussions with Graves T. Owens.  But if you're saying

16   Terry Owens is not a person, then I would say, yes,

17   that's true.

18   Q    Well, in fact, you only had one discussion with Dr.

19   Owen and that was when he came up and did that

20   presentation for the pharmaceutical company; correct?

21   A    No, that's not --

22   Q    So your testimony is that Dr. Owen was not telling

23   this jury the truth?

24   A    Yes.

25   Q    Let's see Exhibit 13-F.  Do you recognize that

1    document?  That was another document that was found

2    during the search at your clinic.  Those are the Kansas

3    Medical Assistant Program Pain Management Guidelines.

4    Were you familiar with those?

5    A   I don't remember reading this, but I may have.

6    Q   So you were engaged in pain management for Medicaid

7    patients but you didn't bother to read their pain

8    management guidelines.  Is that your testimony?

9    A   I think if this is the document that was sent to me

10   by Kansas Osteopathic Association, then, yeah, I read

11   that.

12   Q   You didn't follow it, though, did you?

13   A   Well, I'd have to reread this to see whether we

14   followed it or whether we didn't.

15   Q   Let's talk about Patty.  You still have Exhibit 2 up

16   here?  Yes, sir.  Here.  As we're talking about patients

17   today, the jury has their time line so they can follow

18   along with us if they want to.  And also on the screen

19   when we're presenting some documents.

20       First of all, sir, do you agree that your clinic

21   billed for 37 office visits allegedly provided to Patty?

22   A   I don't know.

23   Q   Do you agree that you saw Patty on 19 occasions?

24   A   I don't know that either.

25   Q   Did you agree that Patricia was scene by Dr. St.

4645

1    Clair and four physician's assistants:  Kim He'bert,

2    Curtis Atterbury, Hien Nguyen and Mike Hall?

3    A   Without reading through the chart and every progress

4    note, I can't say who or who did not see her.

5    Q   Would you like our time line?  Would it help to have

6    a time line?

7    A   Sure.

8    Q   Would you agree with me that you saw Patty for

9    approximately two years and four months?

10   A   Yes.

11   Q   During that time you would agree she only had one

12   urine drug screen on September 22nd, 2004?

13   A   It appears that's what's in this document.

14   Q   Would you agree with me she failed that urine drug

15   screen?

16   A   It says in this time line that she failed it.

17   Q   She had Valium in her drug screen and she wasn't

18   being prescribed Valium; correct?

19   A   I'd have to look in the progress note if that's

20   okay.

21   Q   And she didn't have Xanax in her system even though

22   she was being prescribed Xanax so she failed it in two

23   respects?

24   A   Well --

25   Q   You can find it.  September 22nd, 2004.

4646

1   A    Okay.  This looks like a drug screen done on 9-22-04

2   and it was positive for Oxazepam and Hydrocodone.  And

3   it says it was -- it's got a signature on the bottom.

4   It says it was discussed and it's got Kim's signature.

5   Q    Okay.  She had Valium in her drug screen; correct?

6   That's the Oxazepam?

7   A    Well, Valium isn't Oxazepam.

8   Q    That's a metabolite of Valium, isn't it?

9   A    It's possible, yes.

10  Q    And she did not have Xanax in her system; correct?

11  A    Well, Oxazepam could be a metabolite from Alprazolam

12  also.

13  Q    There were no consequences to that failed drug

14  screen, were there?

15  A    It says here UDS was passed.  So apparently she

16  discussed that with the patient.  Kim discussed that

17  with the patient.

18  Q    So there were no consequences, were there?  She

19  still got her controlled substances?

20          MR. WILLIAMSON:  I'm going to object.  His

21  testimony was that the records show that it was passed

22  so that showed it as being a consequence.

23          THE COURT:  This is cross-examination.

24  BY MS. TREADWAY:

25  Q    Did she still get her controlled substances, sir?

4647

1    A    Let me see what it says here.  She had Lortab.

2    Counseled on refills -- or refills it says.

3    Q    Let's talk about that.  You'd agree with me that

4    Patty came in early for her monthly visits a lot;

5    correct?

6    A    I would have to review that.

7    Q    My count is it was 26 times out of the 37 office

8    visits.

9    A    My -- our -- at the clinic we didn't consider one

10   day being early.  So usually it was between three and

11   five days of the 30 days is what we thought was

12   appropriate.

13   Q    Well let's talk about that rule that you had.  If my

14   math is correct and I come in five days early for six

15   consecutive months, I've just beaten you out of another

16   prescription, haven't I, Doctor?

17   A    Well, it's very possible if you want to consider it

18   that way.

19   Q    You would also agree with me that there were quite a

20   few days that Patty came to the clinic and you and your

21   wife billed as though you saw 50 or more patients that

22   same day; correct?

23   A    I don't believe that.

24   Q    My count was 16 of the 37 days.  So you disagree

25   with that?

4648

```
 1   A   I disagree with knowing all the -- I mean, I didn't
 2   bill for anything so I didn't -- I disagree.
 3   Q   You're not responsible for any of the bills, are
 4   you, sir?
 5   A   I had nothing to do with the billing process.
 6   Q   That's not my question, sir.  You want to take
 7   absolutely no responsibility for any of the claims you
 8   submitted to the insurance companies; correct?
 9   A   No.
10   Q   So you do want to take responsibility for those
11   claims?
12   A   I take responsibility as what went on on the fee
13   ticket.
14   Q   Did you take the money?
15   A   Did I take the money?  I never took anybody's money.
16   If the money came in to the clinic, it was deposited to
17   the bank.  If that's what you're saying, yes.
18   Q   So you took the money from the insurance company?
19   A   That came to the clinic, yes.
20   Q   Now, there was one day, November 29th, 2004, that's
21   a really big day.  That's the day that 108 office visits
22   were billed under your name and 9 nursing home visits.
23   Pretty busy day?
24   A   I'd say that would be an awful busy day, yes.
25   Q   And on January 28, 2005, Patty was supposedly one of
```

4649

1    86 people that was billed in your name, isn't that

2    correct?

3    A   I don't know.

4    Q   October 24th, 2003, when you billed as though you

5    saw Patty, you were actually out of town, weren't you?

6    A   I don't see an October 24th.  What year?

7    Q   2003?

8    A   I don't know about that.

9    Q   Well, you were in New Orleans for that Actiq

10   consultant's meeting, weren't you?

11   A   If that's the date I was there.

12   Q   Do you agree that you prescribed Schedule II drugs

13   to Patricia?  Specifically, Morphine and Oxycodone?

14   A   Yes.

15   Q   Do you agree that you prescribed Schedule III drugs

16   to Patty?  Specifically Hydrocodone?

17   A   Yes.

18   Q   Do you agree that you prescribed Schedule IV drugs

19   to Patty?  Specifically, Alprazolam or Xanax, and

20   Clonazepam or Klonopin?

21   A   Yes.

22   Q   Do you agree that Patricia's toxicology results

23   indicated that she had taken Oxycodone, Hydrocodone and

24   Benzodiazepines?

25   A   That's what was on the toxicology report, yes.

4650

1    Q    And do you agree that according to Exhibit 1-A, that

2    Patricia was the 37th person to die of a drug overdose?

3    A    Are you asking me if I agree?

4    Q    Yes, sir.

5    A    No.

6    Q    Did you hear Dr. Owen testify that if you had

7    followed his advice, Patty may not have died?

8    A    If I would have followed his advice?

9    Q    Yes, sir.

10   A    She would not have died?

11   Q    Yes, sir.

12   A    I don't remember his advice to me with -- regarding

13   Patricia G.

14   Q    He didn't give you advice about Patty G

15   specifically.  He gave you advice generally.  My

16   question for you is did you hear him testify that if you

17   had followed his advice, Patty may not have died?

18   A    I don't remember that testimony.

19   Q    Now let's look at some specific progress notes for

20   Patty.  I want to first look at your February 7th, 2003,

21   note.  And I believe it was your testimony that you

22   created that note because the progress note was missing?

23   Was that your testimony?

24   A    It very well may have been.  I really don't know for

25   certain; but that could have been a reason why this was

4651

```
 1    made.  It could have been that I thought I seen the
 2    patient and I -- but I don't know exactly why.
 3    Q    So that could be a false document, couldn't it?
 4    A    Yes, it could be.
 5    Q    How many other of these documents did you create
 6    whole cloth with not seeing the patient?
 7    A    I would say it would be an awful rare item.
 8    Q    How do we know that?
 9    A    I don't remember doing it that often.  This one here
10    I don't even remember doing; but I'm just assuming
11    that's the reason for it.
12    Q    Now, when Patty first came to your clinic, would you
13    agree with me that she came in with cold symptoms?
14    A    When she first came in?
15    Q    Yes.
16    A    It says severe sore throat, headache, nausea, for
17    two days.
18    Q    That's not a pain condition; right?  It's a cold
19    symptom?
20    A    Sore throat is a pain condition.  Headache's a pain
21    condition.
22    Q    But it's not something that she got controlled
23    substances for on that trip; right?
24    A    True.
25    Q    Now, she eventually came to you for an acute pain
```

```
 1    condition as a result of a motor vehicle accident;
 2    correct?
 3    A    I believe she seen Dr. St. Clair.
 4    Q    Looking at that time line, Doctor, can you identify
 5    when Patty's acute pain suddenly became chronic pain
 6    needing chronic prescriptions for controlled substances?
 7    A    I remember reading through the chart about her
 8    complaining of her chronic knee pain.
 9    Q    Let's look at the November 12th, 2003, progress
10    note.
11              THE COURT:   November 12?
12              MS. TREADWAY:   Yes, sir.   November 12, 2003.
13    BY MS. TREADWAY:
14    Q    Are you with me?
15    A    Yes.
16    Q    That progress note indicates that Kadian is no help;
17    correct?
18    A    That's what it says.
19    Q    And then you increased the dosage from 20 milligrams
20    to 50 milligrams, did you not?
21    A    That's what it looks like.
22    Q    You also added Klonopin, 5 milligrams twice per
23    day -- or .5 milligrams twice per day, didn't you?
24    A    It it says Klonopin wafers 0.5 milligrams and it
25    says number 60.
```

4653

 1    Q   Could you point to your explanation of why you upped
 2    the Kadian and added the Klonopin?  Where it is in the
 3    document.
 4    A   The reason why I upped the Kadian?
 5    Q   Yes, sir.
 6    A   And you're asking what the document is for the
 7    reason?
 8    Q   Yeah.  Where do you explain your decision in the
 9    progress note?
10    A   Well, there's no document stating why, but I'm
11    assuming --
12    Q   Well, I don't want you to assume.  I want you to
13    tell me where in the document you explain your medical
14    decision-making?
15    A   The Kadian says no help.  At that dose it was not
16    helping her pain.
17    Q   Sir, I'm not asking you to recreate your thinking
18    process.  I'm asking you to tell me where on the
19    document it states the medical justifications for your
20    decision?
21            MR. WILLIAMSON:  Your Honor, I'm going to
22    object.  I understand this is cross; but he's trying to
23    tell her where it is on the document.
24            THE COURT:  No, he's not.
25            MR. WILLIAMSON:  He said Kadian is no help.

1      That's on the document.

2              THE COURT:  I understand the question.  I

3      think the jury understands the question.  If you don't

4      understand the question, Doctor, then you tell

5      Mrs. Treadway that you don't understand it and she will

6      either rephrase or move on to something else.  But I

7      think that question is very clear and it deserves an

8      answer.

9      A   There is no document here stating the reason why

10     Kadian was increased.

11     BY MS. TREADWAY:

12     Q   Let me get that so I can help Mr. Moore out a little

13     bit.  I'm sorry, Mr. Moore.  Let's go to March 31st,

14     2004.  Now, this note says Patty has headaches, that she

15     fell, that she's falling asleep and that she's cold all

16     the time.  Other than that subjective complaint, can you

17     tell the jury what you learned about why she fell, why

18     she's falling asleep, and why she's cold all the time

19     from the document?

20     A   From the document it says Effexor was too much and

21     felt -- it says fell and hurt back and hips.  Falling

22     asleep.  Cold all the time.

23     Q   That's right.  That's her subjective complaint.

24     Please tell me in the document where you describe why

25     she fell, why she is falling asleep, and why she is cold

4655

1    all the time?

2    A    I don't see a document.

3    Q    It appears that your response was to increase the

4    morphine, the Kadian, back to 50 milligrams twice a day

5    and to refill the Lortab.  In the progress note, can you

6    point to where you explain your medical decisions?  It's

7    not there, is it, sir?

8    A    There is lots of things in this progress note --

9    Q    But I'm not asking you for lots of things.

10   A    -- that indicate how I was thinking.  There is not a

11   specific document stating this is what I thought.

12   Q    So people would have to come ask you, gosh, Doctor,

13   what were you thinking?  This document does not stand

14   alone to tell anybody about the medical decision-making

15   with regards to Patty on this day, does it, sir?

16   A    I think it does if you look at it as a whole.  When

17   scheduling an MRI of the brain because of the headaches

18   and that she's falling.  I would think that would

19   indicate some of my reasoning.

20   Q    But that's not why you increased the Kadian, is it?

21   That's not why you gave her more Lortab, is it?

22   A    The Lortab and the Kadian were for her chronic pain

23   condition.

24   Q    And that was the only treatment plan for her chronic

25   pain condition; correct?

4656

1    A    No.  There was Ultraset (ph) also given to her and

2    Centroid was increased.  And probably she was -- in the

3    note it says take 0.88 and that could have been the

4    reason why she was cold all the time.

5    Q    Well, Centroid is not for her pain, is it, sir?

6    A    No, it's for her being cold all the time.

7    Q    In retrospect, is it in the document?

8    A    What?

9    Q    Your medical decision-making, is it recorded in the

10   document?

11   A    I think by documenting what I wrote and what the

12   plan was, I think it is.

13   Q    Let's look at May 26, 2004.  That's Page 54,

14   Mr. Moore.  Now, it indicates that Patty is receiving no

15   significant pain relief and she's now having migraines

16   instead of just headaches.  And now she adds a new

17   complaint of low back pain.  Correct?  That's her

18   subjective statement?

19   A    It says still having migraines, and low back pain.

20   Headache and arthritis.  No significant pain relief.

21   Increased stress.  Weather aggravates --

22   Q    Can't read it, can you?

23   A    No.  I think it's migraine.

24   Q    She also reports running out of her pain meds,

25   doesn't she?

4657

1   A    It says ran out of pain meds, yes.

2   Q    And you prescribe her all the same narcotics again,

3   don't you?

4   A    I don't know what the previous visit was.

5   Q    Well, from the progress note can you tell why you

6   thought the same prescriptions would be appropriate

7   given the fact that she reported no significant pain

8   relief and that she's having migraines?  Can you point

9   to the medical decision-making in the document?

10  A    I think if you'll probably look at the PADT that

11  might be helpful.  It says see PADT.

12  Q    Well, in fact, you don't fill out that document, do

13  you?  She does.

14  A    I filled out part -- she fills out part of it but I

15  fill out some of it myself, yes.

16  Q    Says ran out of pain meds?

17  A    Yeah.  Ran out of pain meds.  And it says all these

18  conditions are worse because of that.

19  Q    So she's getting worse and you're prescribing her

20  more controlled substances; correct?

21  A    She was worse because she ran out of her pain meds.

22  Q    Now, look at Government Exhibit 2, the time line.

23  A    Well, you asked me earlier about if something else

24  was done about --

25  Q    Sir.  Sir.  The question is look at Exhibit 2, which

4658

1    is the time line --

2    A    Okay.

3    Q    -- for Patty.  Do you see where you and others at

4    the clinic continued to prescribe Patty Lortab until

5    September 1st?

6    A    September 1st of what year?

7    Q    2004.  So May 26 to September 1st, 2004?

8    A    Yes.

9    Q    And every one of those visits was early, wasn't it?

10   A    I don't know.

11   Q    I added all those up and I got a total of 960

12   Lortabs in 13 weeks.  Or 960 Lortabs in 91 days.

13   Doesn't that come out to more than ten Lortabs a day?

14   A    I'm not good at figuring on my feet like that, so if

15   I had a calculator, I could tell you.

16   Q    Will you trust me?

17   A    I believe you.

18   Q    What does that do to her Tylenol level?

19   A    Ten pills a day?

20   Q    Yes.

21   A    Ten pills a day was a little bit over, but that's,

22   you know, I'm not saying that she took all those or not,

23   so I don't know.

24   Q    Well, she was running out of her pills so why

25   wouldn't you think she was taking all her pills?

4659

 1     A    She was given an amount that was less than the

 2     maximum dose for a month's time when she came in.

 3     Q    So were you prescribing more than ten Lortabs a day?

 4     A    No.

 5     Q    Would this information therefore indicate to you

 6     that Patty was taking more Lortab than you had

 7     prescribed for her; and, in fact, as she reported to you

 8     in May of '04, that she had run out of her pain meds?

 9     A    Yeah, but it doesn't say the reason why she ran out.

10     Q    Is a possible explanation that Patty was self-

11     escalating her medications?

12     A    Yes, that's possible.

13     Q    And you were allowing her to do that with all those

14     early refills, weren't you?

15     A    I'm not going to say that, yes, I seen her every

16     time or that I realized that she was coming in early.

17     Q    Let's look at July 16th, 2004.  That's a visit she

18     had with you.  That's Page 66, Mr. Moore.  That's just

19     eight days after Patricia's last visit, isn't it?  You

20     can look at the time line if you wish.

21     A    Yes.

22     Q    And now we have a report that the grandson threw all

23     her pills in the tub.  Can you tell me on the progress

24     note how old her grandson is?

25     A    No.

4660

```
 1    Q   Can you tell me from the progress note whether you

 2    talked about how dangerous it is that her grandson had

 3    access to this powerful medication and was able to open

 4    the bottle and throw the medication into the tub?  Do

 5    you see where you talked to her about that?

 6    A   No.

 7    Q   Does this progress note indicate that Patty is

 8    crying all the time?

 9    A   It says crying all the time and then it says

10    anxiety.

11    Q   So you think she's crying all the time because she's

12    anxious.  Is that your diagnosis?

13    A   I'm assuming that's what she said.  At least I wrote

14    down anxiety after she said that.

15    Q   Let's move to July 29th, 2004.  71, Mr. Moore.  This

16    progress note, again, your progress note, indicates that

17    she's doubling up on her pain medications, doesn't it?

18    A   What date was that again?

19    Q   July 29th, 2004.  Sometimes she needs to double up

20    on pain med.

21    A   Yeah, sometimes.

22    Q   Do you see that?

23    A   Yeah.

24    Q   This is another early visit just 13 days after her

25    last visit, isn't it?
```

4661

1    A    Yes.

2    Q    And you prescribe her more Lortab, don't you?

3    A    Yes.

4    Q    Looking at the time line, in the month of July,

5    2004, Patricia succeeded in getting prescriptions for

6    360 Lortab that month, didn't she?

7    A    If that's what it adds up to.

8    Q    Let's look at September 22nd, 2004.  That's a day

9    that Kim He'bert saw her.  That's 86, Mr. Moore.  And

10   Kim was your physician's assistant, wasn't she?

11   A    Yeah, I was the primary supervising physician for

12   Kim.

13   Q    And if you could move down to the bottom of that

14   document, Mr. Moore.  There's that C there in the right

15   hand corner.  That's your counter signature, isn't it,

16   sir?

17   A    Yes.

18   Q    Now, on this occasion Kim increased the quantity of

19   Patty's Lortab from 120 a month to 180 a month.  Or from

20   four times a day to six times a day.  And you signed off

21   on that course of treatment, did you not?

22   A    Yes, I did.

23   Q    Can you tell the jury from Kim's progress note why

24   she increased the Lortab from four to six a day?

25   A    It says in the subjective that she had shots in both

4662

```
 1   knees and the low back and headache.

 2   Q    That's her subjective complaint?

 3   A    Correct.

 4   Q    Where in the document does Kim explain why she upped

 5   the dose from four a day to six a day?

 6   A    There's no document for that.

 7   Q    And yet you approved on that course of treatment,

 8   did you not?

 9   A    Yes, I did.

10   Q    Now let's find the February 4th letter.  February

11   4th, 2005, letter from Preferred Health.  Which is going

12   to be after the progress note dated January 28th, 2005.

13   It's Page 126, Mr. Moore.

14   A    Where are you at?

15   Q    I'm after the January 28, 2005, progress note.  It's

16   a couple of pages in.

17   A    Okay.

18   Q    Now, that letter tells you that Patty was in the

19   emergency room on January 1st, 2005, doesn't it?

20   A    Yes.

21   Q    Did you or anyone else obtain the emergency room

22   records for her file?

23   A    I don't remember.

24   Q    Did anyone talk to her about why she had been to the

25   ER on January 1st after receiving this letter?
```

4663

1   A   I don't know.

2   Q   On January 3rd, 2005, do you have Patricia sign her

3   first pain management agreement?

4   A   I don't know if that's the first one or not.

5   Q   How long had she been coming to the clinic by then?

6   About two years?

7   A   Yes.

8   Q   And that pain management agreement is actually from

9   Advanced Anesthesia, isn't it?  You were using their

10  pain management agreements?

11  A   Advanced Anesthesia is which place?

12  Q   Well, I don't know.  This is your document.

13  A   I've got a pain management agreement two pages

14  prior, just prior to that note, and it wasn't from --

15  Q   Well let's look at that.

16  A   -- this 1-28-05.

17  Q   I've got one on the 3rd day of January, '05, and

18  right at the bottom it says:  I acknowledge receipt of a

19  copy of this agreement on the date stated above.

20  Advanced Anesthesia Associates and Pain Management.

21  7-23 N. McClain Boulevard.

22  A   Yeah, that's Dr. Parks' pain management agreement

23  that he gave us that we could use.

24  Q   Now, on January 3rd, 2005, a couple of days after

25  she's been at the ER, you increase her prescriptions.

4664

1   Specifically you increase her Xanax from 1 milligram to

2   2 milligrams.  In essence doubling it.  Isn't that

3   right?

4   A   Xanax she was taking was the XR which is a once a

5   day Xanax.  It's much less potential for abuse is the

6   once a day.  So you're going -- typically on the Xanax

7   or Alprazolam it came in a shorter-acting.  This is a

8   long-acting once-a-day dose.  So going from 1 to 2 is

9   not that significant.

10  Q   And can you tell the jury from your progress note

11  why you did that?  What's medical justification is

12  written on that progress note?

13  A   I don't see that.

14  Q   Now let's find the May 12st letter from Preferred

15  Health Systems.  Which is going to be before the May

16  18th progress note.  Do you find that letter?  That's

17  148, Mr. Moore.

18  A   For Preferred Health?  Yes.

19  Q   This indicates she's in the ER again on March 19th

20  of 2005, doesn't it?

21  A   Yes.

22  Q   Do you know why she was in the hospital?

23  A   No.

24  Q   Did you ever talk to anybody about getting her

25  records from the ER to find out?

4665

1   A    I don't remember.

2   Q    Now, Patricia was in the hospital again from May

3   31st to June 6, 2005, and you got a fax from the

4   hospital about her admission.  Right?

5   A    I don't remember that.

6   Q    Well let's look at that.  You got a fax from the

7   hospital on June 17; right?

8            MR. MOORE:  Ms. Treadway, the page?

9            MS. TREADWAY:  Yes.  I'm sorry, 105.

10  A    There's a fax dated June 17th, 2005, yes.

11  Q    ER physician thinks maybe she overdosed on your

12  medication; right?

13  A    This is a history and physical form.

14  Q    Which you received in the clinic?

15  A    Yeah, but it wasn't from the ER physician.

16  Q    Who was it from?

17  A    Dr. Mancao.

18  Q    He was your hospitalist; right?

19  A    Yes.

20  Q    You believe him when he said possible drug overdose?

21  Do you believe Dr. Mancao?

22  A    I'm trying to read what you said he said.

23  Q    On the second page, his assessment is:  Altered

24  mental status, possibly drug overdose.

25  A    Yes, I see that.

4666

```
 1    Q    And you also see the depression?

 2    A    Yes.

 3    Q    Number four?

 4    A    Yes.

 5    Q    Did you ever refer Patty to a psychologist or

 6   psychiatrist for her depression?

 7    A    I don't remember.

 8    Q    In terms of other doctors Patty was seeing, you

 9   didn't coordinate care with them, did you?

10    A    What do you mean by that?

11    Q    I mean get 'em on the phone, talk to them, get

12   letters from them, ask for records, coordinate care,

13   sir?

14    A    Occasionally we would get, yes, conversations with

15   other physicians.  And I don't remember specifically

16   about Patty.

17    Q    Well, were you aware that Patty had been seeing Dr.

18   Murati for a while?

19    A    I think there was a note in there that we referred

20   her to Dr. Murati.

21    Q    But there aren't any of his records in her file, are

22   there?

23    A    I don't see that.

24    Q    And you knew that she was receiving Lortab from Dr.

25   Murati; correct?
```

4667

1    A    No, I did not know that.

2    Q    That's because you didn't have his records; right?

3    A    I don't know that.

4    Q    You were aware that Patty had been going to Dr.

5    Jones for epidural injections?

6    A    I don't remember that.

7    Q    So you didn't know where she was going for her

8    epidural injections?

9    A    I don't remember that.

10   Q    You knew that you sent her to Dr. Estivo?

11   A    I remember seeing the referral, or the note stating

12   that referred to Dr. Estivo and I know that she had

13   surgery for her knees.

14   Q    And you know she went to Dr. Doe (ph) and Dr. Nodson

15   (ph) for her knees?

16   A    I don't remember all that.

17   Q    Well, do you remember coordinating care with any of

18   these people when she was coming to get prescriptions

19   from you?

20   A    I remember scheduling -- having her follow up with

21   these people for specific problems, yes.

22   Q    Did you know that she was receiving prescriptions

23   for Lortab from them at the same time she was receiving

24   prescriptions for Lortab from you?

25   A    No.

4668

1    Q    Because you didn't have their records; correct?

2    A    Well, typically, if I refer somebody to somebody,

3    they send me a note on what the correspondence (sic) is,

4    yes.

5    Q    Can you find that in her file, sir?

6    A    I don't know where that is, no.

7    Q    Now, after Patty had been seeing you for a while,

8    she asked for you to fill out paperwork so she could

9    apply for disability insurance, didn't she?

10   A    I don't remember that.

11   Q    Well that showed up March 1st, 2004.  Let's look at

12   that.  That's a ways back.  March 1st, 2004.  That's

13   Page 32, Mr. Moore.  Do you find that document?  It's

14   right before the 31st -- right after March 1st progress

15   note.

16   A    Okay.

17   Q    Now Patty had only been seeing you about a year

18   before she asked you to fill out this disability

19   paperwork; isn't that correct?

20   A    Yes.

21   Q    So within that year, she had become disabled;

22   correct?

23   A    I don't know that for a fact.

24   Q    Well, you're filling out a form for her, aren't you?

25   A    I don't see the form that I filled out.

4669

1    Q    Well let's find that.  It's actually on January 28,

2    2005.  Let's find that progress note and your paperwork.

3    If I can find it.

4    A    Well, thumbing through this, I found two

5    correspondences from Mid America Orthopedics.

6    Q    Well look at Page -- the second page behind January

7    12th, 2005.  That's Page 122, Mr. Moore.  This is a

8    medical opinion dated January 19th, 2005, for Patty.

9    It's signed by you on January 28th, 2005, isn't it?

10   A    That's correct.

11   Q    And what you indicate is that she has disorders of

12   the spine, specifically 1.04A, which is defined as

13   evidence of nerve root compression characterized by

14   neuro anatomic distribution of pain, limitation of

15   motion of the spine, motor loss, accompanied by sensory

16   or reflex loss; and if there's involvement of the lower

17   back, positive straight leg raising test.  Do you see

18   that?

19   A    Yes.

20   Q    And you say this patient's conditions would meet

21   this medical listing, which is what I just read, as of

22   February 24th, 2003.  Do you see that?

23   A    Yeah, I see that.

24   Q    And you signed that?

25   A    Yes.

4670

1    Q    And said that was her condition as of September

2    24th, 2003?

3    A    February 24th.

4    Q    2003.

5    A    Yes.

6    Q    Show me in your progress notes where, as of February

7    24th, 2003, you or anyone else in the clinic had

8    diagnosed Patty with any of those conditions?

9    A    Well, I don't know.

10   Q    It's not there, is it, sir?

11   A    I don't know.

12   Q    She hadn't even come to you for a pain condition, a

13   chronic pain condition by then, had she, sir?

14   A    I don't remember.

15   Q    So that's another false document, isn't it, sir?

16   A    Well, I don't know the details with this document,

17   no.

18   Q    You did not document objective evidence over time

19   that Patty's pain was getting better, did you?

20   A    I believe we did.

21   Q    Objective evidence?  Not subjective evidence.

22   Objective evidence.

23   A    I believe we did.

24   Q    So at year-end she's disabled; and you believe

25   there's objective evidence that she is getting better,

```
 1    sir?
 2              MR. WILLIAMSON:  Your Honor, I'm going to
 3    object.  According to the Government, the disability
 4    happened prior to February 24, 2003.  That's a
 5    misleading question.
 6              THE COURT:  Objection is overruled.
 7    A    I think we have evidence in her medical -- past
 8    medical records; but I can't say for certain.
 9    BY MS. TREADWAY:
10    Q    You didn't document any objective evidence that her
11    function was getting better over time, did you?
12    A    I believe we did.
13    Q    You didn't document objective evidence that her
14    quality of life was getting better over time, did you,
15    sir?
16    A    I believe we did.
17    Q    And you didn't document the medical justifications
18    for the continuing and escalating prescriptions to
19    Patty, did you?
20    A    I believe we did.
21    Q    Did you ever imply to anyone that Patty died because
22    she had been beaten?
23    A    I had a conversation with somebody that said that.
24    Q    And you reported that to the Kansas Board of Healing
25    Arts in your defense, didn't you, sir?
```

4672

```
 1    A    I don't remember that.

 2    Q    Well let's look at that.  Let me hand you what has

 3    been marked for identification as Government Exhibit

 4    256.  Is that your letter to the Kansas Board of Healing

 5    Arts about Patty?

 6    A    Yes.

 7    Q    On the second page you tell the Kansas Board of

 8    Healing Arts:  I had another patient report to me that

 9    the night before Patty died, something was awry at

10    Patricia's house.  They were worried about Patricia and

11    notified another family member that they needed to go

12    over to her house that night or Patricia may not be

13    alive in the morning.

14        And you, you told the Kansas Board of Healing Arts

15    that, didn't you, sir?  And you didn't have a shred of

16    evidence that that was true, did you, sir?

17    A    I had a telephone conversation from a patient that I

18    thought was reliable.

19    Q    Oh?  So some people who called, you believed?

20    Correct?

21    A    I believed a lot of my patients.

22    Q    Especially if what they're telling you gets you out

23    of trouble; right?

24    A    No.

25    Q    So you weren't trying to dodge the problem with
```

4673

1    Patty with the Kansas Board of Healing Arts by trying to

2    blame someone else, sir?

3    A    No.

4    Q    Would you agree with me, sir, that as early as 2002,

5    with Heather's death, you were keenly aware that the

6    patients could be using the Oxycontin pills prescribed

7    to them, crush them and ingest them intravenously?

8    A    I was aware, yes.

9    Q    What did you do after Heather's death to insure that

10   patients were not IV drug users before you prescribed

11   Oxycontin?

12   A    What did I do?

13   Q    That's right.  What did you do?

14   A    For what patient?

15   Q    For any patient.

16   A    For any patient.  Have more detailed history, I

17   assumed, after that incident.  And more -- be aware

18   of -- but I don't remember any specifics.

19   Q    You put people in gowns and check for track marks?

20   A    No, I did not.

21   Q    You told physician's assistant Kim He'bert that you

22   had no responsibility for patients abusing their drugs,

23   didn't you?

24   A    I don't remember that statement.

25   Q    But that's what you believe, isn't it?

4674

1    A   No.

2    Q   So you do have responsibility for people abusing

3    their drugs?

4    A   I have a responsibility, I believe, by treating

5    every patient individually; and if they are abusing the

6    drugs and we find out that they're abusing the drugs,

7    then we discontinue the medication and get them

8    appropriate treatment.

9    Q   You knew people were abusing their medications,

10   didn't you?

11   A   No.

12   Q   You did know that people were addicted to the

13   medications, didn't you?

14   A   I know that people -- people?

15   Q   Your patients?

16   A   I don't know of any patient at the time I was

17   treating them for pain that they were addicted.

18   Q   You knew that people to whom you were prescribing

19   controlled substances were selling their drugs, didn't

20   you?

21   A   I found out one time from a phone call from the

22   pharmacist that the patient was selling their drugs.

23   Then I found out here in this courtroom that somebody

24   was selling their drugs.

25   Q   In fact, once again, when the Kansas Board of

1    Healing Arts came a calling, you told them about another

2    patient, didn't you?  Exhibit 260.  Is that another one

3    of your letters explaining yourself to the Kansas Board

4    of Healing Arts, sir?

5        I suspect there was truth to the anonymous call we

6    received stating she was selling her meds --

7            THE COURT:  Are you offering this?

8            MS. TREADWAY:  I will offer it, Judge, yes.

9            THE COURT:  How about the Exhibit 256?

10           MS. TREADWAY:  Yes, sir.

11           THE COURT:  Any objection?

12           MR. WILLIAMSON:  Not to 256.  But I don't know

13   if she's laid the foundation for 260.

14   BY MS. TREADWAY:

15   Q   Is it a letter you wrote to the Kansas Board of

16   Healing Arts, sir?

17   A   This is a letter that's got my name on it but no

18   signature.

19   Q   So you're saying you didn't write it?

20   A   I may have.

21           MS. TREADWAY:  Government offers 260.

22           MR. WILLIAMSON:  Lack of foundation.

23           THE COURT:  It's received.

24   BY MS. TREADWAY:

25   Q   Does it say:  I suspect there was truth to the

```
 1   anonymous call we received stating she was selling her
 2   meds?  Is that what it says, sir?
 3   A   Yes, it says that.
 4   Q   You knew that people to whom you were prescribing
 5   narcotics were trading their drugs with other people,
 6   did you not?
 7   A   No.
 8   Q   You didn't?  Well let's take another look at another
 9   letter.  Exhibit 255.  Is that yet another letter to the
10   Kansas Board of Healing Arts explaining yourself?
11   A   This is a letter and it's got my name but it doesn't
12   have my signature.
13   Q   Is it about one of your patients?  Lillian C?
14   A   Yes.
15   Q   And doesn't it say that she received --
16             THE COURT:  Are you offering it?
17             MS. TREADWAY:  Yes, Judge.  I'm sorry.
18             THE COURT:  Any objection?
19             MR. WILLIAMSON:  Same objection, Your Honor.
20   It's not sufficient foundation to say that his name is
21   on that document.  I can't cross-examine.
22             THE COURT:  It bears his name, does it not?
23             MS. TREADWAY:  It does, Judge.
24             MR. WILLIAMSON:  All right.
25             THE COURT:  The jury can decide -- you can
```

4677

1 decide, Ladies and Gentlemen, the weight of the evidence

2 in the case.  If the witness has identified it as having

3 his typewritten signature, it's not signed, you can then

4 decide based on the evidence whether or not this is in

5 fact a letter that he authored or approved of.  It's

6 received.

7 BY MS. TREADWAY:

8 Q And with regards to Lillian C, you said she

9 apparently received Stadol Nasal and Actiq from another

10 patient in the lobby.  Don't you, sir?

11 A That's what it says.

12 Q You knew that people to whom you were prescribing

13 narcotics were forging prescriptions, didn't you?

14 A I knew of reports that came in from the pharmacy

15 that they were forged.

16 Q And you knew that patients lied to you to get

17 narcotics, didn't you?

18 A I don't know that I knew patients lied to me.  I'd

19 have to know specifically.  But I'm certain patients did

20 lie to me.

21 Q Hand you what has been marked for identification as

22 Exhibit 256.  Another unsigned letter from you to the

23 Kansas Board of Healing Arts about another patient you

24 were having to explain about.  Correct?

25 A Apparently so.

4678

1    Q    You're not suggesting that these unsigned letters

2    were forged and sent to the Kansas Board of Healing Arts

3    by somebody, were you?

4    A    No.

5    Q    Now, this is about Zachary B.  You remember Zachary?

6    A    No.

7    Q    He committed suicide.  Remember him now?

8    A    I still don't.

9    Q    And he -- you talk about him and indicate that he

10   was lying to you, don't you?  On the last page:  Zachary

11   lied about his physical condition to obtain opiate meds.

12   A    This says he was a patient of Dr. St. Clair's and

13   Kim He'bert and --

14   Q    Can you turn to the last page and look at the last

15   paragraph over your signature line that you didn't sign.

16   And does it say:  Zachary lied about his physical

17   condition to obtain opiate meds?

18   A    Yes.

19   Q    You knew that people to whom you were prescribing

20   controlled substances were showing up -- I'm sorry.  I

21   need to move to admit 257, Judge.  Jabari is keeping

22   track of me.

23              MR. WILLIAMSON:  Same objection.

24              THE COURT:  Same ruling.  257 is received.

25

1    BY MS. TREADWAY:

2    Q    You knew that people were showing up at the

3    emergency rooms asking for drugs, didn't you?

4    A    I knew that there was patients that went to the

5    emergency rooms and from what the ER doctors were

6    stating, yes.

7    Q    You knew that people you were prescribing narcotics

8    to were showing up at the emergency rooms with

9    withdrawal symptoms, didn't you?

10   A    That's been stated by the ER doctors.

11   Q    So you knew, didn't you?

12   A    I don't know that for a fact.

13   Q    So you're telling this jury that Dr. Rody, Dr.

14   Rogers, and Dr. Katan were full of bull; right?

15   A    I'm not saying that.

16   Q    You know that people to whom you were prescribing

17   narcotics were showing up at the emergency rooms and

18   being admitted to the hospital under Dr. Mancao, didn't

19   you?

20   A    Yes.

21   Q    And you even told the Kansas Board of Healing Arts

22   that you knew a patient by the name of Katherine N who

23   had had a drug overdose, didn't you?

24   A    I don't remember that.

25   Q    Let me hand you what has been marked for

```
 1   identification as Exhibit 259.  Is that another one of
 2   your letters to the Kansas Board of Healing Arts
 3   explaining yourself, sir?
 4   A   Like I say, I don't know how these were produced;
 5   but it appears as though it has my name on it.
 6   Q   So they just magically appeared at the Kansas Board
 7   of Healing Arts with your name on it.  Is that your
 8   testimony?
 9           MR. WILLIAMSON:  Your Honor, I'm going to
10   object.  There's been no foundation as to where these
11   things even came from.  Your Honor, the problem is
12   this --
13           THE COURT:  The question was argumentative and
14   the question is sustained on that basis.
15           MS. TREADWAY:  I apologize, Judge.
16   BY MS. TREADWAY:
17   Q   Is this another letter about another one of your
18   patients?
19   A   Yes.
20   Q   And does it indicate that you knew that she
21   overdosed?
22   A   It says:  At the beginning this patient was never
23   seen by me.
24   Q   Could you turn to the second page.  And on the next
25   to the last paragraph does it say:  The next entry in
```

4681

```
 1    the chart is on hospitalization at Via Christi for
 2    accidental drug overdose?
 3    A    That's correct.
 4    Q    So you knew how to read a chart and figure that out,
 5    didn't you, sir?
 6    A    I read the chart and documented in -- if this was my
 7    letter, documented what I wrote and what I read.
 8    Q    So if it's your letter.  So somebody is writing
 9    letters with your name on it to the Kansas Board of
10    Healing Arts?
11    A    Like I say, it appears to me like this is a letter
12    that I would have wrote; but, like I say, it's got my
13    name on it, it doesn't have any signature.
14             MS. TREADWAY:  Government offers Exhibit 259.
15             MR. WILLIAMSON:  Same objection.
16             THE COURT:  The letter is received.  259.
17    BY MS. TREADWAY:
18    Q    You knew that people to whom you were prescribing
19    narcotics were dying from overdoses, didn't you, sir?
20    A    I know of some, yes.
21    Q    You were getting calls from family members about it;
22    right?
23    A    On some, yes.
24    Q    From the hospital?
25    A    Yes.
```

1    Q    From law enforcement?

2    A    Yes.

3    Q    You were getting records requests from the Sedgwick

4    County Forensic Science Center?

5    A    I believe so.

6    Q    You were getting faxes?

7    A    We were getting faxes.

8    Q    Your employees told you, didn't they?

9    A    Told me what?

10   Q    That people were dying of overdoses, sir?

11   A    I don't remember that.  Yes, I do remember one.

12   Q    And a lot of this information is in your own clinic

13   records, isn't it?

14   A    Yes, a lot of the information that you're talking

15   about is in the medical records.

16   Q    How many sympathy cards did you send out during the

17   life of the clinic when you found out people had died of

18   drug overdoses, sir?

19   A    I don't know.

20   Q    How many funerals did you attend of your patients

21   who had died of drug overdoses?

22   A    None that I know of.

23   Q    Would you agree with me that you and your wife did

24   not undertake any action at the clinic to determine the

25   circumstances of the deaths of which you were notified?

```
1    A    No.
2    Q    So you didn't know about 'em, but you took action to
3    find out about 'em?
4    A    I guess I misunderstood your question.
5             MR. WILLIAMSON:  Your Honor, I'm going to
6    object.  That misstates his testimony.  He said he knew
7    about some.
8             THE COURT:  Read the question back to him,
9    Mrs. Schwemmer.
10                  (Previous question read back.)
11            MR. WILLIAMSON:  Quote before that one I
12   think, Your Honor, when she asked him several questions
13   about ERs, faxes, he answered yes that he knew about
14   some of that.
15            THE COURT:  And this question was did you or
16   your wife do anything about it.
17            MR. WILLIAMSON:  The question that --
18            THE COURT:  Take any action.
19            MR. WILLIAMSON:  No.  The question I objected
20   to is even though you didn't know, you went to send out
21   a sympathy card --
22            THE COURT:  Well, I don't know; but if he
23   didn't know, then you're right.
24            MS. TREADWAY:  I'll ask the question again.
25            THE COURT:  Probably doesn't send too many
```

4684

1    sympathy cards if he didn't know about something.  Let's
2    go on here.
3    BY MS. TREADWAY:
4    Q   Would you agree with me that you and your wife did
5    not undertake any action at the clinic to determine the
6    circumstances of the deaths of which you were notified?
7              MR. BYERS:  Objection as to Linda Schneider.
8    There's been no evidence or testimony she was aware of
9    any of this from this witness.
10             THE COURT:  I think you ought to break the
11   question down please.
12   BY MS. TREADWAY
13   Q   Would you agree with me that you did not undertake
14   any action at the clinic to determine the circumstances
15   of the deaths of which you were notified?
16   A   I don't remember.
17   Q   Would you agree with me that your wife did not
18   undertake any action at the clinic to determine the
19   circumstances of the deaths of which you were notified?
20             MR. BYERS:  Objection.
21             THE COURT:  On what basis?
22             MR. BYERS:  Same reason.  There's been no
23   testimony from this witness that his wife was in a
24   position that she should have known.  He testified that
25   she took care of the HR process with the workers.  She

4685

 1    was not associated with the administration or the

 2    billing or anything else that she asked him about.

 3              THE COURT:  That's up to the jury to determine

 4    that, the weight of that testimony.  The question is, I

 5    think, does he know whether his wife did.  Please ask it

 6    in that form and I think that's an appropriate question.

 7    BY MS. TREADWAY:

 8    Q   Do you know whether your wife took any action at the

 9    clinic to determine the circumstances of the deaths of

10    which you were notified?

11    A   No.

12    Q   You heard the testimony from your employees that

13    when the Coroner called, these calls went to your wife?

14    Did you not hear that testimony?

15    A   I heard it, yes.

16    Q   Was that true?

17    A   I don't know that all the calls came in to my wife,

18    no.

19    Q   Would you agree with me that you did not undertake

20    any action at the clinic to determine the circumstances

21    of the hospitalizations of your patients of which you

22    were notified until you received a fax?

23    A   I don't remember.

24    Q   Do you know whether your wife took any actions to

25    determine circumstances of your patients'

4686

1    hospitalizations?

2    A    I don't know.

3    Q    Would you agree with me that you did not undertake

4    any action to determine if any of the clinic's practices

5    should or could be modified to prevent future drug

6    overdoses?

7    A    I believe we did.

8    Q    You believe you did?

9    A    Yes.

10   Q    Did your wife take any actions to prevent future

11   drug overdoses, sir?

12   A    I can't speak for my wife.

13   Q    You've been engaged in a lot of civil litigation as

14   a result of this case, haven't you?

15   A    Yes.

16   Q    And do you know what an admission is?

17   A    Admission?

18   Q    Yes, sir.

19   A    Like an admission to the hospital?  Admission --

20   Q    No.  I mean when you admit something to be true.

21   A    Oh, yes.

22   Q    And do you know that in the course of the civil

23   litigation you and your wife and the clinic made certain

24   admissions?

25   A    Okay.

1    Q    You remember those kinds of things?

2    A    Yes.

3    Q    Now, those are done through your lawyers; but you

4    know about those, don't you?

5    A    Some of them, yes.

6              THE COURT:  Would this be a good time for a

7    recess?

8              MS. TREADWAY:  Certainly, Judge.

9              THE COURT:  Now, Ladies and Gentlemen, there

10   are a lot of people here in the courtroom to hear this

11   case, which is fine, this is a public hearing and I

12   appreciate your being here.  But I do not appreciate

13   people coming in and out all the time.  I'm going to

14   take a 20 minute recess, which will give you enough time

15   to go out, do whatever you're going to do.  Anybody who

16   is not back here when I sit down will not be permitted

17   back in the courtroom.  It is disruptive to come in and

18   out of this courtroom during testimony.  Does everybody

19   understand that?  Is there anybody that doesn't

20   understand it?  Because the marshals will enforce it.

21   We're in recess.

22                        (Recess.)

23             THE COURT:  You may continue.

24   BY MS. TREADWAY:

25   Q    Before the break we were talking about the actions

1    that you and your wife and your clinic took after the

2    notices of the deaths.  And we were starting to talk

3    about the civil litigation and things called admissions.

4    Do you also know in civil litigation there are things

5    called interrogatories which are kind of questions that

6    are posed and that you answer?

7    A   I'm aware of that.

8    Q   Let me hand you what has been marked for

9    identification as Government Exhibit 301.  Is that one

10   of those sets of interrogatories in one of the civil

11   cases that you and your attorneys answered on behalf of

12   Schneider Medical Clinic?

13   A   I believe so.  I don't remember that I had too much

14   involvement in this though.

15   Q   But you don't disagree with what was answered in the

16   litigation, do you?

17   A   I would have --

18            MR. WILLIAMSON:  Your Honor, I'm going to

19   object to the extent that this is a clinic with its own

20   separate representative.  This was not by Dr. Schneider

21   himself.

22            THE COURT:  Who signed this?

23            MS. TREADWAY:  Excuse me.

24            THE COURT:  Who signed it?

25            MS. TREADWAY:  I will look, Judge.  This is on

1    behalf of the clinic, as I stated, Judge.

2                MR. WILLIAMSON:  Michael Vogt, V-O-G-T.

3                MS. TREADWAY:  And Randy Troutt, the attorney,

4    Judge.  I can lay some more foundation, Judge.

5                THE COURT:  I would think so, but -- I think

6    that would be appropriate so the jury understands what

7    we're talking about here.

8                MS. TREADWAY:  I sure will.

9    BY MS. TREADWAY:

10   Q    Now, your clinic has been sued as well as yourself;

11   correct?

12   A    That's correct.

13   Q    And you hired a corporate representative by the name

14   of Michael Vogt to serve as your representative for the

15   Schneider Medical Clinic in this litigation, did you

16   not?

17   A    No.

18   Q    Who did hire him?

19   A    I don't know.

20   Q    But he is your corporate representative?

21   A    That's what it says.

22   Q    And Mr. Troutt is a lawyer working on behalf of the

23   clinic?

24   A    Yes.

25                MS. TREADWAY:  I don't want to offer this,

4690

1    Judge.  I just want to use it as an admission.

2              MR. WILLIAMSON:  It can't be an admission if

3    he never authored or adopted the statements therein.

4              THE COURT:  Well, I think she can, under the

5    circumstances, I think that she can ask him if he agrees

6    with something that is in the -- she doesn't intend to

7    offer it.  He can be questioned as to whether he agrees

8    with it.  And you agree with that, too?

9              MR. WILLIAMSON:  Yes, Your Honor.

10   BY MS. TREADWAY:

11   Q    Could you turn to Page 21, first of all.

12   A    Yes.

13   Q    And interrogatory number 18 asks for the identity of

14   each officer and/or director of the Schneider Medical

15   Clinic.  Do you see that?

16   A    Yes.

17   Q    And the answer is that you are the officer and the

18   director of the Schneider Medical Clinic.  Do you agree

19   with that?

20   A    Yes.

21   Q    And then the next is please identify each employee

22   that was given managerial duties over other employees.

23   And the answer to that is Linda Atterbury.  Do you agree

24   with that?

25   A    Yes.

1    Q    Then turning back to Page 19, the question was in

2    part on Page 18, what conduct SMC, Schneider Medical

3    Clinic, undertook to determine the circumstances of

4    death.  Do you see that in C?

5    A    Did you say 18 or 19?

6    Q    Page 18, interrogatory number 14.

7    A    Okay.

8    Q    Says:  What conduct Schneider Medical Clinic

9    undertook to determine the circumstances of death.  What

10   conduct SNC undertook to determine the circumstances of

11   any related hospital treatments.  And what conduct SMC

12   undertook to determine if any practices of the clinic

13   could be modified to prevent future accidental drug

14   overdoses.

15        Do you see that question?

16   A    Yes.

17   Q    And specifically to that last question, is the

18   answer on the top of Page 19 "SMC did not undertake any

19   action to determine the circumstances of the deaths, the

20   circumstances of any related hospital treatments; or if

21   any practices of SMC should or could be modified to

22   prevent future drug overdoses by patients.  Do you agree

23   with that?

24   A    No.

25   Q    So that's a false document that was submitted in the

4692

```
 1    civil litigation?
 2              MR. WILLIAMSON:  Your Honor, I'm going to
 3    object.  She did not read that entire answer.  And
 4    there's predicate information that qualifies that
 5    answer.  And that is an intellectually dishonest
 6    question to ask that witness.  It's misleading and
 7    improper foundation.
 8              THE COURT:  Let me see it, please.
 9              MS. TREADWAY:  He doesn't agree with it,
10    Judge.
11              THE COURT:  Are you talking about the blanket
12    objections that usually come with the --
13              MS. TREADWAY:  Yes, Judge.
14                        (Document presented to the
15                        Court.)
16              THE COURT:  Well, this is the -- I want you to
17    read the full answer.
18              MS. TREADWAY:  Okay.  Sure.
19              THE COURT:  I want you to read the full
20    answer.
21              THE COURT:  Who's Vogt?
22              MR. WILLIAMSON:  Vogt's a custodian.  He's
23    been named to watch all of the records and he acts on
24    behalf of the clinic.  He doesn't have direct
25    interaction with Dr. Schneider.
```

1          THE COURT:  Okay.  Interrogatories are written

2     questions under oath -- or written questions that are

3     submitted to a party in civil litigation.  You can't use

4     interrogatories in criminal cases.  And they're a method

5     of discovery of information.  Sometimes the

6     interrogatories are answered by the particular party if

7     they're directed to the particular party.  In this case

8     the interrogatory was directed to Schneider Medical

9     Clinic, which is a party in the civil litigation.  So

10    the interrogatory was answered by -- and Mr. Williamson

11    just told me -- by an individual named Michael Vogt who

12    is responsible for, what did you say?

13         MR. WILLIAMSON:  He's the custodian of

14    records.

15         THE COURT:  The custodian of records.

16         MS. TREADWAY:  And he's also been named as the

17    corporate representative for the Clinic in the civil

18    litigation, Judge.

19         THE COURT:  Right.  So he's the one who

20    answered the interrogatory under oath.  He answered it

21    under oath.  Now, I'm letting Ms. Treadway use these

22    simply to -- this one, use this one, to determine

23    whether or not the witness agrees with the answer that

24    was given on behalf of the Clinic.  If the interrogatory

25    had been directed to him as an individual then he would

1    have had to have signed the interrogatory, but that's

2    not what happened here.  But I do want, with that

3    explanation in mind, I want her to read the entire

4    answer and not just -- and then she can, again, ask the

5    witness if he agrees with it.  Is that satisfactory

6    Mr. Williamson?

7              MR. WILLIAMSON:  Yes, Your Honor.

8              MS. TREADWAY:  I'll be glad to do so, Judge.

9    BY MRS. TREADWAY:

10   Q    To put it in context again.  The question was:  "For

11   the time period November, 2002, to December, 2004,

12   approximately 15 clinic patients or more died from

13   accidental mixed drug intoxications as concluded by the

14   Sedgwick County Coroner's office.  With regard to those

15   deaths, please identify and/or describe:  A, how SMC

16   learned of the deaths; B, when SMC learned of the

17   deaths; C, what conduct SMC undertook to determine the

18   circumstances of death; D, what conduct SMC undertook to

19   determine the circumstances of any related hospital

20   treatments; E, what conduct SMC undertook to determine

21   if any practices of SMC could be modified to prevent

22   future accidental drug overdose for the same time

23   period.  Please identify and describe any SMC conduct to

24   determine the causes of any emergency room

25   hospitalizations of SMC patients not resulting in death,

1   including clinic patients transported from SMC, and

2   describe what conduct SMC undertook to determine if any

3   practices of SMC could be modified to prevent future

4   accidental emergency room visits or hospitalizations."

5       Answer:  You have defined SMC to mean, quote,

6   Schneider Medical Clinic, LLC, and/or its officers,

7   directors and employees, acting under the scope of

8   employment individually or together.  End quote.  To

9   fully answer this question as literally written would

10  require SMC to contact every past employee who ever

11  worked at the clinic and ask them what they recall in

12  this regard.  We do not have the current information as

13  to how to contact many of these people.  Some of them

14  have not been willing or able to talk to us.  Therefore,

15  it will always be impossible to fully answer this

16  question.  The past employees are accessible to

17  plaintiffs as well as defendant.  If plaintiffs want

18  this information, there is nothing stopping plaintiffs

19  from making contact with these individuals.  SMC did not

20  undertake any action to determine the circumstances of

21  the deaths, the circumstances of any related hospital

22  treatments, or if any practices of SMC should or could

23  be modified to prevent future drug overdoses by

24  patients.  Your interrogatory as phrased may imply SMC

25  was at fault for these deaths and we were not.

4696

1          Have I read that correctly, sir?

2    A    Yes.

3    Q    And you don't agree with that, is that your

4    testimony?

5    A    Yes.

6    Q    Now, during your direct testimony yesterday you

7    indicated that you were knowledgeable about the CPT

8    codes, didn't you?

9    A    I don't remember saying that.

10   Q    Well, you talked about 'em?

11   A    Yes.

12   Q    And you talked about them in terms of the CPT codes

13   and the requirements and what a 99202 was and a 99203

14   was.  You don't remember that?

15   A    I don't remember exactly what I said.

16   Q    But you remember talking about it?

17   A    Yes, I do.

18   Q    You were talking to your attorney about the various

19   kinds of exams and the codes that would be applicable

20   after the demonstration.  Correct?

21   A    Yes.

22   Q    And you indicated that most of your initial office

23   visit codes were billed as a 99202.  Do you remember

24   that testimony?

25   A    I believe so.

4697

```
 1   Q    Is it still your testimony?

 2   A    Yes.

 3   Q    Now, would you be surprised if the data showed that

 4   you billed 99203 initial office visits 64% of the time?

 5   A    Yeah, I would be surprised.

 6   Q    If the data shows that, would you disagree with it?

 7   A    I guess I wouldn't if the data shows that.

 8   Q    And you also testified during your direct testimony

 9   about how the billing worked in terms of how the paper

10   flowed.  You remember that?

11   A    Yeah.

12   Q    You remember talking about the charts and the fee

13   tickets being separated and the fee tickets going to the

14   billing department and the charts going back for filing?

15   A    Yes.

16   Q    And you remember that you testified that all the

17   charts went through Linda's office?

18   A    Well, I don't know that all of 'em did; but I think

19   they were -- that's where they were supposed to go

20   before they were broke apart, yes.

21   Q    You've been in medicine since the late 1908s,

22   haven't you, sir?

23   A    Yes.

24   Q    And you remember those old paper claim forms, don't

25   you?  Those HICVA 1500s?
```

1   A   No, I don't.

2   Q   You don't?  Well, let me see if this will refresh

3   your recollection.  This is Government Exhibit 328.

4   That's a blank one of those forms.  That bring it back

5   to you?

6   A   No.

7   Q   Never saw one of those?

8   A   I can't say that I never saw one.  I just don't

9   remember it.

10  Q   So you've seen it?

11  A   I can't say that I have.

12  Q   So you don't remember filling out claim forms to

13  receive payments from the insurance companies?

14  A   I don't remember that at all, no.

15  Q   Would you accept my representation that that is a

16  standard form in the industry called a HCVA 1500?

17          MR. WILLIAMSON:  Your Honor, I'm going to

18  object.  Lack of foundation.  She cannot testify and

19  then just ask the witness would she trust -- would he

20  trust her representation.  She has to lay independent

21  foundation.

22          THE COURT:  He says he doesn't recall it.

23  I'll let her ask that question -- or let him answer that

24  question if he'll accept her representation.  He

25  certainly doesn't have to.

4699

```
 1   BY MS. TREADWAY:
 2   Q   Would you accept my representation that that HCVA
 3   1500 form is the standard paper claim form that was used
 4   in the industry for years?
 5   A   Yeah, I believe that.
 6   Q   And now we've gone to electronic forms, haven't we?
 7   So we don't use paper?
 8   A   I don't know that either.
 9   Q   Now, on that form on the back do you see something
10   that I've highlighted?
11   A   Yes.
12          MS. TREADWAY:  Government would offer Exhibit
13   328 as a Government record of public record.  It's a
14   HCVA 1500 claim form.
15          MR. WILLIAMSON:  No objection.
16          THE COURT:  328 is received.
17   BY MS. TREADWAY:
18   Q   Now, on the back of that form there's a lot of
19   information, isn't there, Doctor?
20   A   Yes, there is.
21   Q   I would like you to read out loud what I've
22   highlighted?
23   A   Sure.  Says:  "Notice.  Any person who knowingly
24   files a statement of claim containing a
25   misrepresentation; or any false, incomplete or
```

4700

1    misleading information, may be guilty of a criminal act

2    punishable under law and may be subject to civil

3    penalties."

4    Q   Okay.  And there's some more down at the bottom?

5    A   Yeah.  There's another notice on the bottom.  It

6    says: "This is to certify that the foregoing information

7    is true, accurate and complete.  I understand that the

8    payment and satisfaction of this claim will be from

9    federal and state funds and that any false claims,

10   statements or documents, or concealment of a material

11   fact may be prosecuted under applicable federal or state

12   laws."

13   Q   Now, would you agree with me, sir, that that gives

14   anybody making claims to insurance companies notice that

15   false claims are subject to both civil and criminal

16   penalties?

17   A   Say that again.

18   Q   Would you agree with me that that form gives people

19   notice that if they submit a false claim to the

20   insurance companies that they can be subject to civil or

21   criminal penalties?

22   A   I agree that it gives people notice that if they

23   read this, yes.

24   Q   Now, you testified yesterday that none of the

25   insurance companies had any billing concerns until the

4701

1    federal investigation began.  Do you remember that

2    testimony?

3              MR. WILLIAMSON:  Objection.  Misstates his

4    testimony.  He stated there was no fraud --

5              THE COURT:  I think that's correct.  I think

6    that was the question.  Whether they had any notice of

7    fraud.

8              MS. TREADWAY:  I'll ask that.

9    BY MS. TREADWAY:

10   Q    I believe your testimony yesterday was that none of

11   the insurance companies had any fraud concerns until the

12   federal investigation began.  Is that your testimony?

13   A    Yes.

14   Q    Let me hand you what has been marked for

15   identification as 13-M, which is the notice of intent to

16   terminate from Medicaid.  You remember that document,

17   don't you, sir?

18   A    No, I don't remember it.

19   Q    So you don't remember receiving a document from

20   Medicaid telling you that they were intending to

21   terminate you?

22   A    I remember knowing about a -- remember being told

23   that; but I don't remember the document.

24   Q    Well let's look at it.

25              THE COURT:  Is that 13-M?

4702

1           MS. TREADWAY:  Yes.

2           THE COURT:  It's in evidence?

3           MS. TREADWAY:  It is, Judge.

4   BY MRS. TREADWAY:

5   Q   Could we move to I believe the second or third page.

6   And down at the bottom.  I'll point these out to you,

7   sir.

8       The three bullet points there.  It says:  Poor

9   documentation that did not meet the guidelines for

10  documentation standards for an office visit

11  reimbursement per KMAP provider manual.  Concerns with

12  handwriting and signatures that did not correspond

13  correctly with the provider's signature sheet submitted

14  for this review.  And missing and/or incomplete progress

15  notes on claims billed and paid in the system.

16      Do you understand that Medicaid was telling you

17  that your documents did not support the claims billed?

18  A   No.  I mean, I don't understand that specifically.

19  I don't remember reading this document so --

20  Q   Well, really what Medicaid was concerned about at

21  this point in time really wasn't billing issues.  It was

22  quality of care, wasn't it?

23  A   I don't know that.

24  Q   Well, isn't that at the top of that bullet list?

25  Quality of care?

4703

1     A    It says quality of care, yes.

2     Q    Do you think Medicaid was more concerned about the

3     health and safety of the patients that were dying than

4     your billing at that point in time, sir?

5     A    I don't know what Medicaid was thinking.

6     Q    That's what the PERC was concerned about; right?

7     The Peer Education Resource Council.  Remember them?

8     A    Yes.

9     Q    They were concerned about quality of care, weren't

10    they?

11    A    I believe so, yes.

12    Q    First Guard was concerned about quality of care,

13    weren't they?

14    A    I don't remember exactly what First Guard was

15    specifically concerned about.

16    Q    Preferred Health Services was also concerned about

17    quality of care, weren't they?

18    A    I remember First -- Preferred Health coming to us

19    and definitely was concerned about our documentation.

20    Q    They were also concerned about the quality of care,

21    weren't they?

22    A    I don't remember a quality of care issue.

23    Q    Well, we'll get to that in a minute.

24         Now, in terms of billing, you admitted that the

25    insurance companies were billed as though you provided

4704

1    the services when you couldn't have because you were out

2    of town, didn't you?

3    A   Say that again.

4    Q   You admitted that the insurance companies were

5    billed as though you provided the services when you

6    couldn't have because you were out of town, didn't you?

7    A   I don't remember that statement.

8    Q   You don't remember talking about being out of town?

9    A   Yes.

10   Q   And you don't remember admitting that you didn't

11   provide those services, I was out of town?  You admitted

12   that?

13   A   I probably said that yeah.

14   Q   So we submitted to the jury Exhibit 1-P, which is

15   that chart of all the billings for when you were out of

16   town.  Remember that?

17   A   Yes.

18   Q   So you admit those billings are false, don't you?

19              MR. WILLIAMSON:  Your Honor, I'm going to

20   object.  He answered that question that he did not

21   remember saying that and those questions she's asking

22   are misleading and improper.

23              MS. TREADWAY:  This is cross, Judge.

24              THE COURT:  Well, I'm just thinking about

25   something.  I think to be fair to him you need to show

4705

1    him 1-P.

2              MS. TREADWAY:  I'll be glad to.

3              THE COURT:  There have been so many

4    exhibits --

5              MS. TREADWAY:  I understand, Judge.

6              THE COURT:  -- that have been received.  I

7    can't even remember what 1-P is.

8              MS. TREADWAY:  Isn't it a separate notebook?

9    Here it is.

10   BY MS. TREADWAY:

11   Q    You remember this chart that Mr. Seaton and Mr.

12   Barger talked about?  And it lists all the days you're

13   out of town and it lists all the billings that were made

14   under your name.  So you now have to admit, don't you,

15   Doctor, that those are false claims?

16   A    Well, if I was out of town then it was a false --

17   it's a false claim.

18   Q    You just don't want to take responsibility for

19   those, do you?

20   A    Well, I don't see how we could have billed for

21   something if I was out of town.

22   Q    You don't want to take any responsibility for the

23   claims that were submitted and for which you accepted

24   money; right?

25   A    I'm not saying that.  I'm saying I didn't know about

4706

1    being -- about our billing department billing something

2    under me when I was out of town.

3    Q    But you took the money, didn't you?

4    A    Well, I didn't even know about it.

5    Q    Was it your job to know about it, sir?

6    A    I don't know that it was my job.

7    Q    Now, you testified yesterday that there just weren't

8    enough people seeing Medicaid patients in Wichita.  Do

9    you remember that testimony?

10   A    I don't remember saying that specifically.

11   Q    Well, do you remember talking to your attorney and

12   complaining about the fact that you were the only person

13   that was seeing Medicaid pain patients?  You remember

14   that?

15   A    I remember saying that I needed some help with

16   Medicaid pain patients, yes.

17   Q    And your philosophy was that nobody was seeing

18   enough Medicaid patients, period; right?

19   A    I probably would agree that there was not enough

20   providers caring for the Medicaid population.

21   Q    Do you know how many providers there were in

22   Sedgwick and Butler Counties during the years 2002

23   through 2007 that took Medicaid patients?

24   A    No.

25   Q    Would you believe that there were over 320?

4707

1   A   I wouldn't have any idea.

2   Q   So when you gave that information, you really didn't

3   know one way or the other?  Is that what you're saying?

4   A   I know from my own experience.

5   Q   Now let me hand you what has been marked and

6   admitted as Exhibit 13-E.  Do you remember that document

7   coming into evidence when Tracy Wagner was here

8   testifying?  She was from Medicaid.  And that's the list

9   of all the doctors in Wichita that took Medicaid pain

10  patients.

11  A   Yeah, I remember seeing this.

12  Q   Remember that?  And then you had that pain society

13  meeting in August of 2005; right?

14  A   That's correct.

15  Q   And there were at least 14 doctors that showed up at

16  that meeting that were interested in treating pain

17  patients; correct?

18  A   I don't remember how many people were there.

19  Q   Well let me hand you your own exhibit here.  This is

20  Exhibit D-1-E-42.  Are there 14 names besides the folks

21  from your clinic at that time, Donna and you?

22  A   Yeah.  But I, I know specifically that Dr. Simons

23  wasn't there so I don't know if this is accurate.

24  Q   But nevertheless, there are 14 other doctors listed

25  on that piece of paper indicating interest in treating

4708

1    pain patients in Wichita; right?

2    A    It says this is 14 people that -- doctors that are

3    committed to this organization.

4    Q    And you indicated yesterday that it was people

5    interested in treating pain patients, didn't you?

6    A    I don't remember saying that.

7    Q    Now, do you remember testifying that you said you

8    were not overwhelmed with patients until after the first

9    search warrant?  You remember that testimony?

10   A    I was not overwhelmed, no.  I guess you might say

11   that.

12   Q    But that meeting occurred before the search warrant,

13   didn't it?

14   A    Yes.

15   Q    So you're standing up in this meeting saying I'm

16   overwhelmed, but now your testimony is you weren't

17   overwhelmed until the first search warrant.  Which is

18   it?

19   A    I was overwhelmed with the Medicaid population, yes;

20   but I wasn't overwhelmed, per se, with the number of

21   patients that were being seen.

22   Q    And just after this meeting, and just after the

23   search warrant which was a month later, you wrote

24   Medicaid -- or your wife wrote Medicaid and said no more

25   new patients please.  Correct?

```
 1   A    I believe that's true.

 2   Q    Do you want to see that document?

 3   A    If you want to show it to me, that's fine.

 4   Q    It's Exhibit 13-Q and it's dated October 13th, 2005.

 5   So just two months after you stood up at this meeting

 6   and claimed that you were seeing Medicaid patients, you

 7   wrote Medicaid and said I don't want any more Medicaid

 8   patients; right?

 9   A    No.

10   Q    No?  So that wasn't the purpose of that letter?

11   A    This says we will no longer be accepting new

12   Medicaid patients.  Thank you for your time in this

13   matter.

14   Q    So you'll not be accepting any new Medicaid patients

15   as of October, '05; correct?

16   A    It was dated October the 13th, '05, yes.

17   Q    Now, would you agree with me, sir, that Medicaid and

18   First Guard and Medicare brought a significant amount of

19   income into your clinic?

20   A    I don't know that for a fact.

21   Q    Well, let me hand you Exhibit 1-J which has been

22   admitted into evidence, which indicates how much money

23   those programs paid you over the years in question, 2002

24   through 2006.  And doesn't that indicate that Medicare

25   paid you $707,000.
```

4710

1    A    707,684.45, if you go by this chart.

2    Q    And Medicaid paid you over $650,000.

3    A    $659,77.68.

4    Q    And First Guard paid you over 580,000?

5    A    That's correct.

6    Q    So, again, my question is, you received a lot of

7    money from those public programs, didn't you?

8    A    Yeah.  Between the years 2002 and 2006.

9    Q    Now, sir, you don't really think much about the

10   requirements that a doctor should review a patient's

11   prior medical charts before prescribing narcotics, do

12   you?  You don't think that's necessary, do you?

13   A    No, I don't believe that.

14   Q    You don't believe that?

15   A    I don't believe that I don't think much about it.

16   Q    Well, I mean, you don't think it should be a

17   requirement, do you?

18   A    State that again.

19   Q    You don't think it should be a requirement that

20   doctors see prior medical records before prescribing

21   narcotics, do you?

22   A    That they have to see prior medical records

23   before --

24   Q    Correct?

25   A    -- writing a prescription for a narcotic?

1    Q    Correct.

2    A    I agree.

3    Q    You agree that you don't think much of that

4    requirement?

5    A    No, I agree with the statement.  I didn't say I

6    didn't think much about it.

7    Q    Okay.  So you do agree with that statement?

8    A    No, I did not say that.

9    Q    Well, which is it?

10   A    You asked me --

11   Q    Do doctors need prior records before they prescribe

12   narcotics?

13   A    No.

14   Q    They do not?

15   A    They do not.

16   Q    In fact, do you remember being recorded when you

17   were talking to your sister-in-law?  Remember that?

18   Remember that happened; right?

19   A    No.

20   Q    You don't remember being recorded.  Do you remember

21   telling Pat, I don't know that many of these doctors

22   really need the stupid charts, but they've made it clear

23   that if you don't have the charts to give them

24   prescriptions, that it's inappropriate.

25        You remember saying that, sir?

1    A    I don't remember saying it.

2    Q    Do you agree with it?

3    A    I might agree with it.

4    Q    You had difficulty reading the medical charts at the

5    clinic, didn't you?

6    A    On occasion, yes.

7    Q    In fact, you had difficultly reading them here in

8    court, haven't you?

9    A    Yes.

10   Q    Even your own handwriting; correct?

11   A    On occasion.

12   Q    And in fact, you've admitted under oath that you

13   don't recognize Dr. St. Clair's handwriting and could

14   not distinguish it from Kim's, haven't you?

15   A    I don't remember saying that.

16   Q    You remember giving a deposition in a lawsuit

17   regarding one of the deceased individuals by the name of

18   Robert S?  You remember that deposition, sir?

19   A    No.

20   Q    Let me hand you what has been marked for

21   identification as Government Exhibit 254.  Does that

22   refresh your recollection that you gave a deposition

23   under oath with regards to the deceased individual by

24   the name of Robert S?

25   A    Yes.

4713

```
 1    Q   He's part of Count 5 of the Indictment.  And that
 2    deposition occurred on May 12, 2005, didn't it?
 3    A   Yes.
 4    Q   Can you turn to Page 13, please, sir.  And could you
 5    go down to Line 13.
 6    A   Yes.
 7    Q   And do you say:  This was Dr. St. Clair, I believe,
 8    or it could have been Kim, my PA.  I can't remember
 9    whose writing this is.  So this isn't my evaluation.
10        Is that your testimony?
11    A   I think you misread that.  It says:  Well, this
12    wasn't my evaluation.  This was Dr. St. Clair, I
13    believe, or it could have been Kim, my PA.  I can't
14    remember whose writing this is.  So this isn't my
15    evaluation."
16    Q   So my question is you stated under oath that you
17    couldn't recognize St. Clair's writing versus Kim
18    He'bert's righting; correct?
19             MR. WILLIAMSON:  Your Honor, I'm going to
20    object.  That's misstating the testimony.  He said under
21    that occasion with that record.  She's asking a general
22    question.
23             THE COURT:  The objection is overruled.  It
24    relates to this specific answer.  You may answer,
25    Doctor, if you understand the question.
```

1    A    Yes, for this specific progress note I could not

2    distinguish what it says.  I can't remember whose

3    writing this is.  So I couldn't give an evaluation.

4    Q    You have admitted under oath that the clinic

5    progress notes were hard to read, haven't you?

6    A    Some were, yes.

7    Q    And you have admitted the clinic was not well

8    organized, haven't you?

9    A    I don't remember saying that.

10   Q    Well, turn to Page 16, sir.  Do you see the

11   questions that start on Line 12.  Would you have a

12   record of who paid the bills for your evaluation and

13   treatment?  Answer:  I'm sure billing probably does.

14   Question:  Before we finish this deposition maybe we can

15   take a break and have them provide that information.

16   Answer:  I don't know if we can or not.  Question:

17   Okay.  When did you next -- Answer:  I don't know how

18   well organized we are here.

19        Was that your testimony?

20   A    Yes, that was my testimony regarding the billing

21   area.

22   Q    Now, with regards to being able to interpret what

23   was meant by certain entries in the progress notes,

24   you've admitted that you had trouble doing so; correct?

25   A    On occasion, yes.

4715

1    Q    And you've admitted that the clinic's progress notes

2    don't look good; correct?

3    A    I don't know what you mean by don't look good.

4    Q    Well, I'm just using your words, sir.  Turn to Page

5    20, please.  And it says starting with line 9:  And then

6    under FH, first of all, what does the F-H stand for?

7    Answer:  Where?  Question:  Right here.  Answer:  Oh,

8    that's family history.  Question:  Okay.  And what does

9    that say?  Answer:  I put by it PMH which stands for

10   past medical history.  And meds reviewed.  I don't know.

11   That doesn't look too good.  But that's what it means.

12        Is that your testimony?

13   A    That's what it says here, yes.

14   Q    And yesterday I believe your testimony was that you

15   needed to document a lot more information when it was a

16   pain management patient.  Would you agree with that

17   testimony yesterday?

18   A    Yes.

19   Q    Would you agree that you didn't practice that?

20   A    No, I disagree.

21   Q    So you believe you documented a lot more for your

22   pain management patients?  Is that your testimony?

23   A    My testimony is that we documented more on pain

24   patients.

25   Q    You testified yesterday that reading your own

1    clinic's charts you did not know why people made the

2    medical decisions they made.  Do you remember that

3    testimony?

4    A    No.

5    Q    Is that true that by reading your own progress notes

6    you cannot determine why people made the medical

7    decisions they made?

8    A    No.

9    Q    It's not?

10   A    No.

11   Q    But you weren't able to identify this morning for

12   the jury what your medical decisions were in your own

13   notes, were you, sir?

14            MR. WILLIAMSON:  Your Honor, I'm going to

15   object.  He was not allowed to explain.  He was made to

16   ask -- answer yes or no on the face of the document.

17            THE COURT:  That's entirely appropriate on

18   cross-examination.  You have the opportunity, as you are

19   well aware, by non-leading questions, to clear that up

20   on redirect.

21   A    Say it again.

22   BY MS. TREADWAY:

23   Q    You were unable to identify in your own progress

24   notes where you wrote down your medical decision-making

25   so that the next provider could read it and know what

4717

1    you were thinking; correct?

2    A    That's incorrect.   There was no document stating

3    what you were asking me earlier about if there was a

4    specific document indicating what my reasoning was.

5    Q    And that's my question.   There was no document;

6    correct?

7    A    Yes.   Yes.

8    Q    Now, if that was true of not only you, sir, but all

9    the providers in the clinic, how can you pick up a chart

10   and understand what has gone on with a patient

11   previously if you don't know why people are making the

12   medical decisions they are making?

13   A    Every patient is dealt by individually and we would

14   ask questions to the patient.   Whether or not that got

15   into the chart as a document, that was maybe not

16   provided, but every patient that came in was asked

17   questions about their condition and treated

18   appropriately.

19   Q    And so you relied on the patient?

20   A    And their documentation.

21   Q    Now, you also testified that you would document when

22   calls came in about patients abusing, selling and being

23   addicted.   Correct?

24   A    I don't remember documenting those specifically

25   myself.

4718

1    Q   But do you remember saying that they are in the

2    documents?

3    A   Yes.

4    Q   Would you agree with me that documenting such

5    information and taking action in response to them are

6    two different things?

7    A   Yes.

8    Q   Now, you mentioned yesterday when you were looking

9    at the pictures of the clinic that you didn't have any

10   pictures of any exam rooms.  I've got some for us.  Let

11   me hand you what has been marked for identification as

12   Exhibit 311.  Is that an accurate representation of the

13   examination room, some of the examination rooms there at

14   the clinic?

15   A   This looks pretty typical of an exam room.

16          MS. TREADWAY:  Government offers Exhibit 311.

17          MR. WILLIAMSON:  No objection.

18          THE COURT:  311 is received.

19   BY MS. TREADWAY:

20   Q   I just want to take a quick purview of those.

21   Previously we had Mr. Craig, remember him, talk about

22   the bench --

23   A   Yes.

24   Q   -- in the examination room.  Is that an example of

25   that bench?

1    A    Yeah.   That's an OMT table.

2    Q    Uh-huh.  Where's the stool to get on that bench?

3    A    We have a stool out there in the nurses' area for

4    any patient that needs to be -- that needs a stool to

5    get up on the bench.

6    Q    But it's not in the exam room, is it?

7    A    No, it would be cluttered in the room.  Plus we only

8    had two of 'em.  We had one in the X-ray room and one in

9    the nurse's station for use of people that needed

10   assistance.

11   Q    Ever come up in the exam room with a pain patient on

12   the bench without a stool in there?

13   A    Say again.

14   Q    Did you ever come into an examination room like that

15   and see somebody in pain on the bench without a stool

16   being present?

17   A    No.  If they had trouble with getting up there on

18   the bench, they typically wouldn't get up on the bench.

19   They would sit in that chair.  And if they wanted to be

20   on the bench then they would use the step stool that we

21   had.

22   Q    So they sat in the chair and didn't get on the bench

23   for an examination?

24   A    No, I'm not saying that.  I'm saying if I went into

25   the room and there's somebody really in pain.  That's

4720

1    what you asked.  Would I see them up on the table.

2    Well, they may not be up on the table.  They may be

3    sitting there.  If I needed them on the exam table then

4    I would have them get up on the exam table.

5    Q    And you would have to go get the stool to do that?

6    A    Yes.

7    Q    Now let's talk about Eric.  I believe I've put the

8    book there for you.  Do you remember Eric?

9    A    Yes.

10   Q    His wife described him as her grizzly teddy bear.

11   You remember that?

12   A    Yes.

13   Q    She also said by the end of the treatment at your

14   clinic he was much less of a man, didn't she?

15   A    I don't remember that statement.

16   Q    That he was weak and lost weight?  Was no longer

17   strong?

18   A    I remember that statement.

19   Q    Was no longer employed?

20   A    Yes.

21   Q    And had a D.U.I.?

22   A    I don't remember that one.

23   Q    Now, do you agree that your clinic billed for 47

24   office visits allegedly provided to Eric?

25   A    I don't know how many visits he came in.

4721

1    Q    Do you agree that you saw Eric on 20 occasions?

2    A    I don't know how many visits I seen him.

3    Q    Do you know that Eric was seen by Dr. St. Clair and

4    six different physician's assistants?

5    A    It's possible.

6    Q    That's no surprise to you, is it?

7    A    No.

8    Q    Do you agree that Eric came to your clinic for

9    approximately three years and one month?

10   A    Yes.

11   Q    And during that time would you agree that he had

12   only two urine drug screens?

13   A    I don't know.

14   Q    You can look at the time line if you wish.   I

15   believe the first one was on August 17th, 2003, and the

16   second was on December 7th, 2004.

17   A    Yeah, that's what the time line says.

18   Q    And you would agree with me that he failed both of

19   those drug screens because he had marijuana in his

20   system; right?

21   A    That's what it says on the time line.

22   Q    And the second drug screen, the Valium that you had

23   been prescribing did not show up in his urine drug

24   screen.  Is that correct?

25   A    I don't know.  I'd have to look at the urine drug

4722

1    screen.

2    Q    What were the consequences when he failed those

3    urine drug screens with illegal marijuana in his system?

4    A    I would have to look at the progress note and see

5    what was discussed.

6    Q    Well, in fact there were no consequences because I

7    think the records will reflect, sir, that Eric continued

8    to get controlled substances until just the days before

9    his death.  Is that not your memory?

10    A    That's not my memory.

11    Q    Would you agree with me that Eric came in early for

12    his monthly visits and he did so frequently?

13    A    I don't know that.

14    Q    By my count it was 35 out of 47 office visits.  Do

15    you agree with that?

16    A    I disagree.

17    Q    Would you also agree with me that there were quite a

18    few days that Eric came to the clinic and you and your

19    wife billed as though you saw 50 or more patients that

20    same day?

21    A    That's what this chart says here.

22    Q    My count is that it was about a third of those days

23    that you saw him.  Do you agree with that?

24    A    Looks like 16.  And then there's two that say out of

25    town.

4723

1    Q   And two out of town.  There was one day, March 31st,

2    2005, that you build for 58 office visits and eight

3    nursing home visits.  Isn't that true?

4    A   No.

5    Q   So you don't agree with the data?

6    A   I didn't bill for anything.

7    Q   Yeah, you're not responsible for any of those bills;

8    right?

9    A   I did not bill for anything.

10   Q   And you're not responsible for them, are you, sir?

11   A   I don't know what my responsibility is for that.

12   Q   But you did take the money; right?

13   A   The money that was billed?

14   Q   Yes.

15   A   Went to the Schneider Medical Clinic.

16   Q   Which you own; correct?

17   A   Yes.

18   Q   Now, on April 8th, 2003, Eric was supposedly one of

19   71 people you claim to have seen; isn't that correct?

20   A   I never claimed to see 71 people.

21   Q   You just billed as though you did; correct?

22   A   I didn't bill anything.

23   Q   And on September 12 Eric was supposedly one of 73

24   people; correct?

25   A   September 12th of what?

4724

1    Q    2003?

2    A    That's what it says here in your chart.

3    Q    And November 25th, 2003, you were out of town,

4    weren't you?

5    A    I don't know.  That's what it says in your chart

6    here.

7    Q    In fact, you were in Mexico in your condo

8    overlooking the Pacific, weren't you?

9    A    I don't have a condo.

10   Q    Do you have a place?

11   A    Yes, we have a place in Mexico.

12   Q    Does it overlook the Pacific?

13   A    Yes.

14   Q    Do you agree that you prescribed Schedule II drugs

15   to Eric?

16   A    Yes.

17   Q    Schedule III drugs?

18   A    Yes.

19   Q    Schedule IV drugs?

20   A    Yes.

21   Q    And do you agree that Eric's toxicology result on

22   his autopsy indicated that he had taken Oxycodone,

23   Methadone and Hydrocodone, all of which had been

24   prescribed at your clinic?

25   A    That's correct.

4725

1   Q   Do you agree that according to Exhibit 1-A, Eric was

2   the 50th person to die of a drug overdose?

3   A   I don't agree.

4   Q   Now let's look at specific progress notes for Eric.

5   Looking at his first office visit on March 24, 2003.

6   That was with you, wasn't it?

7   A   Yes.

8   Q   Did you have Eric undress and put a gown on for his

9   initial visit?

10  A   I don't know that I did.

11  Q   Did he bring his prior medical records with him?

12  A   I don't know.

13  Q   Did you get a complete list of all his prior

14  doctors?

15  A   I don't think so.  I mean, I don't have that on

16  record here.

17  Q   Did you get any of his prior medical records?

18  A   Before he came on that first visit?  I doubt it.

19  Q   Did you ask for them on that visit?

20  A   I don't remember saying -- asking for it.

21  Q   Now, you testified yesterday that Eric was not

22  honest about his other doctors.  Remember that?

23  A   Yes.

24  Q   Can you point to anywhere in this medical record

25  where it indicates that you asked him about whether he

```
 1   had seen other doctors or was seeing other doctors?
 2   A   I don't see that on this first visit here.  There's
 3   a medical history thing and it doesn't talk about any
 4   other doctors there.
 5   Q   And on this first visit did Eric ask for Lortab?
 6   A   I just seen this -- I've got the wrong chart.
 7   Q   I'm sorry.  March 14, 2003?
 8   A   Okay, yes.
 9   Q   So do you see any record of you asking him for prior
10   doctors' records?
11   A   No.  But typically when a patient comes in, we have
12   them sign a medical record release, so I'm certain that
13   that was given to him at the front desk.
14   Q   But are there any prior medical records in his
15   chart?
16   A   No.
17   Q   Did Eric ask for Lortab and Soma on his first visit?
18   A   It says here Lortab, Soma, and it says helps with
19   back pain.
20   Q   Did you give him prescriptions for both Lortab and
21   Soma?
22   A   Yes, I did.
23   Q   And from your progress notes did you give him the
24   highest strength of Lortab, Lortab 10?
25   A   Lortab 10 is what he was given, yes.
```

1    Q    And why?  From your documentation, why did you give

2    Eric the highest dosage of Lortab on his first visit?

3    A    Lortab 10 was given to him and on his previous -- it

4    says he had Lortab.  So I'm thinking that Lortab 10 is

5    what he had.  And also mentioned something about other

6    doctors, Dr. Poole and Dr. Eyster in here.

7    Q    Does it anywhere say on that document that he

8    received Lortab 10 from prior doctors?

9    A    No.

10   Q    And the treatment plan is controlled substances,

11   isn't it?

12   A    The plan says Lortab 10, Soma, and Arthrotec.  And

13   follow up for OMT.

14   Q    So that's the plan?

15   A    Yes.

16   Q    Are Eric's next 13 visits early?

17   A    I don't know.  I mean, I don't know what you

18   consider early.

19   Q    By September 12th, his ninth visit, you had

20   increased the number of Lortabs from 120 to 180 per

21   month or four to six times per day.  Looking at the

22   September 12th progress note, which is your progress

23   note, where do you document the reason for that

24   increase?

25   A    It says in the subjective, Percocet, he didn't

4728

1    tolerate.  Pain med helps.  He was taking Lortab, six to

2    eight per day.

3    Q    So he's already violating your prescription by

4    taking more than he needs; right?

5    A    I'd have to look at the previous visit to verify.  I

6    don't see on his previous visit that he got any Lortabs.

7    Q    So he's taking six to eight Lortabs that he has not

8    been prescribed and he gets a prescription for 180

9    Lortabs.  Is that your testimony?

10   A    Looks to me like on the August 17th is when he was

11   getting -- got his last prescription of Lortab.  It was

12   120 on that date.  And then on September the 12th is

13   when he came in stating he was taking six to eight per

14   day.

15   Q    So he's already self-escalating, isn't he, sir?

16   A    It says pain med helps.  So, yes, he self-escalated.

17   Q    And says Percocet, he didn't tolerate.  What was the

18   problem with Percocet?  On your note, tell me what it

19   was about Percocet that he didn't tolerate?

20   A    It doesn't say.

21   Q    It doesn't say.  If he didn't tolerate Percocet, Dr.

22   Schneider, why did you give him Percocet again on March

23   1st, 2005?

24   A    I don't know.

25   Q    Why did you sign off on Kim He'bert giving it to him

4729

1    again on June 15th, 2004?

2    A    What was the date again?

3    Q    June 15th, 2004.

4    A    June 15th it says Percocet, Kim gave him 10-325,

5    number 50 at that time.

6    Q    No.  My question to you is, sir, if he didn't

7    tolerate Percocet, why did you prescribe it again and

8    why did you approve Kim prescribing it again?

9    A    When did I prescribe it?

10   Q    On March 1st, 2005.

11   A    March 1st was after June 15.  I was going the wrong

12   direction.  I don't know.

13   Q    Okay.  Let's go to April 22nd, 2004.  That's Page

14   25, Mr. Moore.  It indicates that he went to the ER

15   Monday night for a Demerol shot.  That's a violation of

16   the pain agreement, isn't it, sir?

17   A    What date is that?

18   Q    4-22-04?

19   A    It says went to ER Monday night, Demerol, 100

20   milligram.

21   Q    My question is that's a violation of the pain

22   management agreement, isn't it, sir?

23   A    I don't know that he signed a pain management

24   agreement here but --

25   Q    If he did, would it be a violation, sir?

4730

1    A    Yes.

2    Q    I thought all your patients signed pain management

3    agreements.  Are you saying that Eric didn't?

4    A    Well, I'm assuming he did; but if he came in early

5    '03 we may not have had a pain management agreement with

6    him at that time.  I don't know.

7    Q    What were the consequences of his violation of the

8    pain management agreement that he may have signed?

9    A    Did you see one that was signed before this April

10   22nd visit?

11   Q    If you'll look on the time line you'll see when his

12   pain management agreement was signed.

13   A    Okay.  Where is that?  Okay.  There's one on March

14   6, '03, yes.

15   Q    So, again, my question is, sir, what were the

16   consequences of his violating the pain management

17   agreement by going to the ER for a Demerol shot?

18   A    I don't see that the person that seen this patient

19   did anything at that time.

20   Q    Now, on August 5th, 2004, Kim He'bert with your

21   concurrence doubled his Oxycontin prescription from 20

22   milligrams to 40 milligrams.  That's Page 41.

23   A    I see that the Oxycontin was 40 milligrams number

24   60.

25   Q    Tell me where Kim He'bert explains her medical

4731

1    decision-making about why she increased his dosage by

2    twice?  Isn't it because in the subjective part of that

3    note, sir, Eric says wants to increase Oxycontin, 40.

4    A    Well, it says on her PADT form she increased the

5    Oxycontin 40 milligrams.  And stopped the Percocet.

6    Q    Sir, my question is does the subjective part of that

7    note say Eric wants to increase his Oxycontin to 40?

8    A    It says wants to increase Oxycontin 40 milligrams.

9    That's what it says in the subjective area.

10   Q    Isn't that what Eric got?

11   A    That is what he got a prescription of, yes.

12   Q    Now go to August 26, the next visit.  Kim He'bert,

13   with your concurrence, increases the number of Oxycontin

14   from two a day to three a day.  From 60 to 90 pills.

15   Right?

16   A    Correct.

17   Q    Point to us where in the progress note Ms. He'bert

18   explains her decision?

19   A    Just as she documented in the PADT that increasing

20   Oxycontin 40, number 90, on TID, one month.

21   Q    That's what she's doing.  It doesn't tell you why

22   she's doing it, does it, sir?

23   A    Well, under that area it says assessment, is your

24   overall impression that the patient is benefiting, and

25   that's where the area she is talking about she says

4732

1    adjust dose of present analgesic.

2    Q   Why?  Tell me why, sir.

3    A   Well, I can tell you that his pain level I assume

4    was not where she wanted it.

5    Q   So you assume that's why.  You don't know, do you?

6    A   No, I wasn't in the room.  I didn't see the patient

7    this visit.  I was going by her documentation.

8    Q   Which doesn't tell you anything, does it, sir?

9    A   Yes, it tells me.

10   Q   And you signed off on that, didn't you, sir?

11   A   Yes.

12   Q   On April 19th, 2006, just a few days before Eric's

13   death, do you see a report from him that he is suffering

14   from a lot of fatigue?

15   A   Are you talking about the last visit?

16   Q   April 19th, 2006?

17   A   It says fatigue a lot.

18   Q   147.  Can you point to anything in that progress

19   note where his fatigue is explored and addressed?

20   A   Whoever wrote this note, it appears to be Connie,

21   put down patient appears appropriate.  No indication of

22   depression.  Appears well motivated, mood, affect,

23   within normal limits.  Will adjust meds slightly for

24   better pain control.  It says Valium made me dopey.

25   Patient only aware of muscle spasm at night with

4733

1    decreased sleep secondary to spasm.

2    Q   And none of that addresses his fatigue, does it,

3    sir?  Not the cause of it?  And you don't respond to it

4    through Connie White?

5    A   I would say when he mentioned about meds making him

6    dopey, the Valium, that that was part of the fatigue,

7    probably.

8    Q   Well, probably is not documented.  Is there a

9    documentation on that record that shows why he is

10   fatigued?  Not dopey.  Fatigued.

11   A   Well, she said she did a physical exam but I don't

12   see a documentation why fatigued.

13   Q   All right.  Now, in terms of other doctors, Eric was

14   seeing Dr. Merrick, Dr. Borwn, Dr. Poole.  What did you

15   do to coordinate care with them and make sure that your

16   prescriptions and their prescriptions weren't

17   overlapping?

18   A   I don't know that.

19   Q   So you didn't do anything?

20   A   No, I'm not saying that.  I would have to review the

21   whole chart and go through what they sent me and what

22   was being done.

23   Q   Well, if I represent to you, sir, that Dr. Poole's

24   records are nowhere to be found in these progress notes,

25   would you trust me on that?

4734

1   A    Well, I don't know that I trust you; but I

2   believe -- if you're saying there's no notes of Dr.

3   Poole in here, I believe you.

4   Q    And you knew that Dr. Poole was doing his back

5   surgery; right?

6   A    I don't remember that.

7   Q    You don't remember that?  And if he was getting a

8   back surgery, wouldn't you expect the surgeon to give

9   him some controlled substances?

10  A    Not if he was aware that we were giving him the pain

11  medication.

12  Q    Well, did you make him aware?

13  A    No, I'm not certain that we did that.

14  Q    Now, Eric had been seeing you a while and he

15  eventually asked you to fill out paperwork so that he

16  could apply for disability, didn't he?

17  A    I don't remember.

18  Q    Well, look at April 7, 2005.  That's Page 86, Shawn.

19  And Eric had been seeing you about two years.  And now

20  he's asking for you to fill out a disability insurance

21  form so he can be on disability.  Correct?

22  A    No.

23  Q    What happened within that period of time to make

24  Eric disabled?

25  A    I didn't fill out this disability form so --

4735

1    Q    Who did?

2    A    Looks to me like Curt did.  And then it was

3    co-signed by Dr. St. Clair.

4    Q    They employees of your clinic?

5    A    Correct.

6    Q    So employees of your clinic are filling out a

7    disability form for Eric.  What happened to make him

8    disabled?

9    A    You want me to read the disability form for you?

10   Q    I thought you said you remembered Eric?

11   A    Yes, I remember him, but I didn't fill out this form

12   and so I would probably have to go through it to say why

13   he was disabled.

14   Q    Well, let me ask you another question then.  Just a

15   month before this document, did you know that Dr. Poole,

16   his surgeon, indicated that he was fit to work?

17   A    No.

18   Q    During the course of Eric's treatment, you and the

19   other people under your employ did not document

20   objective evidence that Eric's pain was getting better,

21   did you, sir?

22   A    I disagree.

23   Q    You didn't document objective evidence that his

24   function was increasing, did you?

25   A    I disagree.

4736

```
 1    Q   You didn't document objective evidence that his
 2    quality of life was getting better over time, did you,
 3    sir?
 4    A   I disagree.
 5    Q   And so he's seeing you, he's now disabled, and by
 6    the time he's dead, his wife is saying he's not the man
 7    I married, he's weak, he's crying, and he's had a D.U.I.
 8    And you can sit there and tell this jury that he did not
 9    decline over time.  Is that your testimony?
10    A   I did not say that.
11    Q   You have no objective evidence that he ever got
12    better under your care, do you, sir?
13    A   I believe he did.
14    Q   You didn't document the medical justifications for
15    the continuing and escalating prescriptions to Eric, did
16    you?
17    A   I believe we documented the reasons for his
18    medication.
19    Q   But you just can't find it, can you?
20    A   And how he was functioning -- yes, it was on a PADT
21    form.  That's what they were for.  Activities of daily
22    living are right there.
23    Q   And that's not objective evidence, is it, sir?
24    That's the patient's subjective statement to you, isn't
25    it?
```

4737

1    A    That is, yes, part of it is subjective.  But the

2    person is coming in and walking and we sent him to get

3    his back looked at by the orthopedic guy and he had

4    surgery on his back.  I mean, these are signs that he

5    was improving.  And his pain management, we can't, we

6    can't get a crystal ball and say, hey, what's your pain

7    level.  That's what we were treating was his pain level.

8    And --

9    Q    And you were relying --

10   A    -- so it has to be a subjective area.

11   Q    So you're relying on the subjective statements of

12   the patient, correct, sir?

13   A    On, yes, adjusting his medication.

14   Q    And do you remember Dr. Owen's testimony that

15   subjective information from the patient is an inadequate

16   basis on which to prescribe controlled substances?

17   A    No, I don't remember that.

18   Q    And you, of course, wouldn't agree with it; correct?

19   A    I think that there's more than just documenting.

20   It's taking what you believe the patient is telling you

21   and giving him the medication that we believe is helping

22   him.

23   Q    So the answer to my question is you don't agree with

24   Dr. Owen; correct?

25   A    I don't agree with everything Dr. Owen says.

4738

1              MS. TREADWAY:  Is this a good breaking point,

2    Judge?

3              THE COURT:  It is.  Approximately one hour,

4    Ladies and Gentlemen.

5                        (Noon Recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25