5519

 1                    (Beginning at 8:00 a.m. June 7,

 2                    2010, the following proceedings

 3                    continued IN CHAMBERS.)

 4          THE COURT:  Okay.  Everybody's here including

 5   the Schneiders.  In chambers.  Juror # 073's son tried

 6   to commit suicide over the weekend and is in the

 7   hospital.  I've talked to him.  He would like to be with

 8   his son but he recognizes his responsibilities here.  I

 9   suppose perhaps -- and I told him that you all might

10   like to talk to him to get a feel for whether he can

11   remain a fair and impartial juror.  So, Rachael, would

12   you go get him, please.

13                    (Juror # 073 enters chambers.)

14          THE COURT:  Come in, Juror # 073.  Have a

15   seat.  I've told everybody what you told me.  I told you

16   when you came in here that they might have some

17   questions for you.

18   A   (Juror # 073) Right.

19          THE COURT:  So, Ms. Treadway.

20          MS. TREADWAY:  Juror # 073, I'm so sorry.  Is

21   your son hospitalized right now?

22   A   Yes, he is.

23          MS. TREADWAY:  And is he stable?

24   A   Yes, he is.

25          MS. TREADWAY:  All right.  And is he going to

1   have care so that you think he's going to be able to
2   come out of this situation that caused him to try to
3   take his life?
4   A   That's our whole goal right now is to get him
5   admitted, get him the help that he needs.
6              MS. TREADWAY:  All right.  And do you think
7   that having tomorrow and Wednesday off will help you do
8   that?
9   A   Hopefully.
10             MS. TREADWAY:  Okay.  Do you think you'll be
11   able to listen to the testimony today such that --
12   A   I told the Judge I would try to be very objective
13   and attentive today so --
14             MS. TREADWAY:  Well, that's all we can ask,
15   sir.  That's a great burden on you and we certainly
16   appreciate your doing your duty and coming forward and
17   telling us about this.  And we certainly appreciate it.
18   We have nothing further.
19             THE COURT:  Mr. Williamson.
20             MR. WILLIAMSON:  Can Mr. Byers go first, Your
21   Honor?
22             THE COURT:  Yes.  If he would like to.
23             MR. BYERS:  When did this actually happen?
24   A   Well, it started Friday night.  He started by
25   cutting and then Saturday he took 20, 20 Lexapro.

1    Yesterday he took 42 Tylenol PM.

2              MR. BYERS:  I don't have anything else.

3              THE COURT:  Mr. Williamson?

4              MR. WILLIAMSON:  I don't know if I really have

5    anything, Judge.  I'm sorry to hear about that.  I just

6    don't have anything to ask.

7              THE COURT:  All right.  Well, thanks, Juror #

8    073.  I'll let you know pretty quickly.

9    A    Thank you.

10                   (Juror # 073 returns to jury

11                    room.)

12             THE COURT:  Well, what should we do?

13             MR. BYERS:  I couldn't sit here.

14             MS. TREADWAY:  I think we keep him.  He said

15   he could.  He came in.  He's got tomorrow and Wednesday.

16   His son is stable.  He's hospitalized.  So he's being

17   taken care of.

18             THE COURT:  I'd like to keep him; but if my

19   son was in the hospital having tried twice to commit

20   suicide, it would be a little hard for me to sit and

21   keep my mind on what we're likely to hear today.

22             MS. TREADWAY:  He hasn't asked to be excused

23   though, Judge.  That's key.  I mean, this --

24             THE COURT:  He's a strong guy --

25             MS. TREADWAY:  He wants to serve.

1      THE COURT:  -- and he's proud.  And he's proud

2   that he's sat here all this time and told me that he's

3   made every effort to keep an open objective mind.  As

4   I'm sure they all have.  I've never had a child who

5   tried to commit suicide.  I don't think I'd be -- I'm

6   like Kevin, I don't think I'd be able to listen and keep

7   my mind on what's going on.  But if we excuse him, he's

8   gone.  We can't stop the trial at this point.  The train

9   is too close to the station.  You've agreed to go down

10  to 11.  I think that's what we have to do.  I would do

11  it anyway even if we hadn't had that agreement, which we

12  do.  Because we don't know that Tuesday and Wednesday

13  will solve the problem for him.

14      MS. TREADWAY:  Well, I would ask that we wait

15  and see then, Judge, because I think that --

16      THE COURT:  How are we going to wait?

17      MS. TREADWAY:  Well, Judge, again, this man

18  did not ask to be excused.  He sat right in front of you

19  and these gentlemen and said that he is going to do his

20  best to listen.  And I think he will.  And that's all we

21  can ask of him.  If he doesn't make it through the day,

22  that's a different issue; but I am just very, very

23  cautious at this --

24      THE COURT:  Well, all right, let's say that I

25  go in and say, Juror # 073, you're going to have to

1    stay.  He'll stay.  I'm sure he will.  Is there some

2    other alternative that we could explore with respect to

3    rescheduling people so that he could have today and

4    perhaps tomorrow and Wednesday off to make sure that he

5    was getting things squared away with his family?

6         MS. TREADWAY:  Or just maybe today and

7    tomorrow.  Maybe that would -- because basically, if I

8    can offer my totally nonprofessional opinion in terms

9    of -- I'm not a psychiatrist but I've dealt with a lot

10   of psychiatric patients in terms of witnesses in prior

11   cases.  And I've dealt with this exact issue with a

12   juror one time in a case where the individual's son

13   tried to commit suicide.  And what happens is, they're

14   hospitalized, they are stabilized.  They are then put in

15   a very structured environment.  It's not necessarily a

16   lock-down, but it's a secured environment.  So once they

17   get that handled, he will be safe.  And that is his

18   concern.  So if we can wait until his son is safe, and I

19   think that would be a day, maybe two days, but they

20   should be able to get that done very, very quickly,

21   Judge.  The psychiatric community does not move slowly

22   when it comes to these suicide issues.

23        MR. WILLIAMSON:  Judge, I think I would

24   disagree.  I've been trying to process this.  Primary

25   reason I don't have any questions.  It's not about the

5524

1   son's safety.  It's about Juror # 073's emotional state.

2   And being a father, knowing that your child has gone to

3   that level emotionally, I don't see how you can sit here

4   in our artificial world of a trial, which is important,

5   but not the end of the world for these jurors, and

6   really focus in on the type of evidence without thinking

7   about your child, what you could have done, when you

8   could have done it, did you miss any signs, what can we

9   do to make this better.  And I don't particularly want

10  to try this case to 11 jurors, but we made that

11  agreement.  And I think it's almost mean to keep him

12  here.  I just don't see how, at least this fresh, that

13  he could sit here.  And I believe him.  I believe he

14  would try.

15          THE COURT:  Yeah, he's kind of a tough guy.

16  He's our truck driver as I recall.

17          MS. TREADWAY:  Well, Judge, if he has a son

18  that's a cutter, this has been a long term problem.

19  This is not something that's just come up.

20          MR. WILLIAMSON:  That's speculation.

21          MS. TREADWAY:  No, Judge, cutters don't all

22  the sudden --

23          THE COURT:  Really, honestly, Ms. Treadway.

24  I've got four sons.  If one of my sons had tried that

25  over the weekend, I wouldn't even be here.

 1            MS. TREADWAY:  Well, I understand, Judge.

 2            THE COURT:  I'd be at the hospital with my

 3    son.

 4            MS. TREADWAY:  And I think that's an option.

 5    I think we can take today and tomorrow and give him the

 6    option to get his child safe and I think he would be

 7    able to serve.

 8            THE COURT:  What do you think, Kevin?

 9            MR. BYERS:  I don't think he should be here.

10    We agreed to 11 if need be.

11            MS. TREADWAY:  But if we lose one more, Judge,

12    we have a mistrial and we do this all over again.

13            THE COURT:  Well, of course, that is a

14    consideration; but as far as I know, all of the rest of

15    'em are hale and hearty.  Do you want to talk to your

16    clients?

17            MR. WILLIAMSON:  Yeah.  Probably chat a little

18    bit.

19                    (Off-the-record.)

20            MR. BYERS:  Judge, I think we're of the same

21    mind we were when we left here.  We think he should be

22    excused.

23            MR. WILLIAMSON:  Dr. Karch is a very, you

24    know, important witness when it comes to the deaths and

25    I don't believe the juror, no matter how hard he tries,

5526

```
 1    could be fully focussed in on listening to more indepth

 2    testimony.

 3              THE COURT:  I don't either.  Certainly not

 4    today by any stretch of the imagination.  And your guy's

 5    here, I take it.

 6              MR. WILLIAMSON:  Yes, sir.

 7              THE COURT:  You know, I think if we didn't

 8    excuse him, what we would have to do would be to

 9    essentially suspend things until he said he could come

10    back.  And I don't know whether that's a very good idea.

11    You know, if this was somebody that, you know, his son

12    had been in a car wreck and had a broken arm and that

13    sort of thing, then that would be different but -- I'm

14    going to excuse him.

15        I think we all better keep our fingers crossed

16    because my guess is that there isn't a single person in

17    this room, particularly the Defendants, who want to go

18    through this again.  But I just don't see that I have

19    any choice.  I don't know that it's even a matter so

20    much of his inability to be fair and impartial at this

21    point.  I think it's the fact that we need to be fair to

22    him, not him be fair to us, you know.  So if you don't

23    mind, I'm going to go back and excuse him and talk to

24    him and tell him that we've really appreciated what he's

25    done.  Any objection to that?
```

5527

1          MR. WILLIAMSON:  No.

2          MR. BYERS:  Are you going to do that in front

3    of the full jury, Your Honor?

4          THE COURT:  No, just him.

5          MR. WILLIAMSON:  Just give him our condolences

6    to his family.

7          THE COURT:  I'm not sure he's told the other

8    jurors.

9          MR. BYERS:  I just don't --

10         THE COURT:  Well, do you want me to bring him

11   in here?

12         MR. BYERS:  Well, I didn't know if they're

13   starting to wonder then what are our peers doing wrong.

14   I don't want them to get antsy about why are people

15   disappearing off the jury.

16         MS. TREADWAY:  I think we can just say that

17   his son is in the hospital and --

18         THE COURT:  Well, I think it's up to him to

19   tell the other jurors --

20         MR. BYERS:  That's a good point.

21         THE COURT:  -- why he's leaving.  All I want

22   to do is tell him that we understand and why he's being

23   excused.  This is a little different situation than the

24   other individual.  I felt very badly about letting him

25   go.  I think it was the wrong decision perhaps, but this

5528

 1   one I don't have any problems with at all.  He needs to

 2   be with his son.  So what do you want me to do?  Bring

 3   him in here and you can all tell him how sorry you feel

 4   or do you want me to just go back and --

 5            MR. WILLIAMSON:  You can just go.

 6            MR. BYERS:  You can tell him, Judge.

 7            THE COURT:  Let's do that.  And then we'll get

 8   started.

 9            MS. TREADWAY:  Before we get away from

10   chambers, Judge, I'd like to make a record on something

11   else.  We continue to play cat and mouse games with

12   discovery in this case.  Although Mr. Hamm, who's

13   supposedly their paralegal in this case, has been told

14   on multiple occasions to send notices to me and not just

15   Mr. Moore, this weekend all the notices with regards to

16   Dr. Karch was sent to Mr. Moore and nobody else.  I

17   think that was done purposefully, Judge.  I did not get

18   anything about Dr. Karch until this morning.  The

19   Defendants have also filed another motion claiming that

20   they do not want to give over Rule 26.2 materials.

21            THE COURT:  Well, let me just say this -- I'd

22   kind of like to attend to our juror.  I would suggest to

23   the defense counsel that you read what the notes say

24   with respect to what I can do if you don't turn that

25   material over.  I can and probably will instruct the

1   jury to -- and I will strike that witness's testimony.

2   That's what the rule says.  If you need to look at the

3   rule, here it is.  I'm not -- you know, I don't even

4   know what week we're in here; but it's high time that

5   this kind of stuff stopped.  Under this rule, if a

6   defendant refuses to comply with a court's disclosure

7   order, the court's only alternative is to enter an order

8   striking or precluding the testimony of the witness.  As

9   was done in *Nobles*, which is a U.S. Supreme Court

10  decision.  I've had all of this I'm going to deal with.

11  You all turn that over or risk me striking your

12  witnesses.

13                    (Recess.)

14                    (Beginning at 8:35 a.m. June 7,

15                    2010, the following proceedings

16                    continued IN THE PRESENCE of the

17                    jury.)

18        THE COURT:  Next witness please.

19        MR. WILLIAMSON:  Defense calls Dr. Steven

20  Karch.

21                    **STEVEN KARCH**

22  Having been first duly sworn to tell the truth, the

23  whole truth and nothing but the truth, testified as

24  follows on:

25                 **DIRECT EXAMINATION**

5530

BY MR. WILLIAMSON:

Q   Introduce yourself to the jury.

A   My name is Dr. Steven B Karch, K-A-R-C-H.

Q   And what is your profession, Dr. Karch?

A   I'm a physician.

Q   And before we go too far in your testimony, let's talk about your educational background.  Where did you do your undergraduate at?

A   I was an undergraduate at Brown University.

Q   Okay.  And medical school?

A   Tulane University.

Q   And what year did you graduate medical school?

A   1969.

Q   And did you begin a residency after that time?

A   No, I didn't.  I did almost a year at Stanford in biophysics and biochemistry and cell biology.

Q   Okay.  And are you a pathologist?

A   I'm a cardiac pathologist.  I'm not a general pathologist.

Q   Can you tell the jury what a cardiac pathologist is?

A   Sort of like the name implies.  I look at diseased hearts.  My primary interest is in research; and within that field, my interest is how drugs effect the structure of the heart.

Q   And do you have any specialized training as a

5531

 1   cardiac pathologist?

 2   A   Yes.

 3   Q   And where did you train?

 4   A   At Stanford University Transplant Laboratory under

 5   Professor Margaret Billingham.

 6   Q   Is she an authoritative figure in cardiac pathology?

 7   A   She single-handedly made heart transplantation

 8   possible.  I worked with her one day a week for about

 9   ten years.

10   Q   And you mentioned research.  Do you have a certain

11   field of research in regards to cardiac pathology and

12   drugs?

13   A   Yes.  It sort of evolved topsy.  I started out as an

14   emergency room doctor and soon noticed that most of my

15   patients with cardiac arrest died and went back to

16   school to do research on better ways to resuscitate

17   patients.  And Dr. Billingham was gracious enough to

18   take me into her laboratory; and I started out with

19   looking at the effects of adrenaline on the heart, which

20   was a very hot topic 30 years ago, but not so hot now.

21   And it just so happens that adrenaline effects the heart

22   exactly the same way that meth and cocaine effect the

23   heart.  And then I decided, well, I might as well

24   continue on researching how stimulant drugs damage the

25   heart.

5532

1    Q    Are you a board certified cardiac pathologist?

2    A    There is no board in cardiac pathology.

3    Q    Okay.  And why not?

4    A    Well, I think there are only about 200 people in the

5    whole world that care about it.

6    Q    What do you mean care about it?  You mean that are

7    actually cardiac pathologists?

8    A    That are actually cardiac pathologists and have an

9    interest in pursuing the research.

10   Q    And I noticed behind your name you have initials

11   including F-F-F-L-M.  Can you tell the jury what that

12   stands for?

13   A    It's a mouthful.  It's a Fellow of the Faculty of

14   Forensic and Legal Medicine of the Royal College of

15   Physicians in London.

16   Q    And what is the Royal College of Physicians in

17   London?

18   A    Well, it's the authoritative place for everybody

19   who's in medicine in England who is not a surgeon.

20   Q    Well, are you English?

21   A    Hardly.

22   Q    Well, how many Americans are part of that Royal

23   College?

24   A    I'm the only one.

25   Q    How do you become a member of this organization?

5533

```
 1    A    Well, normally there's an exam; and, in fact, last
 2    year I was appointed an examiner for the Royal College;
 3    but in my case I was awarded for my scientific
 4    contributions and because I helped -- was one of the
 5    team that helped catch England's largest worst serial
 6    killer.
 7    Q    And is that -- would that be the Dr. Harold Shipman?
 8    A    Yes.  He killed 250 of his patients.
 9    Q    And did that involve any kind of illegal drugs?
10    A    Well, yes and no.  Not in England.  In Europe and
11    most countries, heroin is a legal drug.  One that's used
12    primarily for people with terminal cancer.  If you try
13    to give somebody a shot of morphine under the skin, it
14    hurts.  But if you give heroin under the skin, it
15    doesn't hurt.  And heroin is very cheap so it's used a
16    lot to take care of hospice patients and cancer
17    patients.
18    Q    In England?
19    A    In England.  But, of course, it's a Schedule II drug
20    here.
21    Q    And you understand that in this case there is issues
22    regarding scheduled medication and how they may or may
23    not have effected a person's death; correct?
24    A    Yes.
25    Q    Well, in the Dr. Shipman case that you worked on,
```

5534

```
 1    did the British Government rely on any of your materials
 2    in analyzing that case?
 3    A    Yes.
 4    Q    Okay.  And what did they rely on to your knowledge?
 5    A    Well, my textbook is the standard textbook that's
 6    used in training young forensic toxicologists and young
 7    forensic pathologists.  I think that -- and my
 8    publication record is worldwide, not just confined to
 9    the United States.
10    Q    What is your textbook called?
11    A    Karch's Pathology of Drug Abuse.
12    Q    And just for the record, is this your textbook?
13    A    Yes, that's my last copy.
14    Q    Okay.  Just so the jury can see, Karch's Pathology
15    of Drug Abuse Fourth Edition.
16         Now, were you -- was the Government -- strike that.
17         In the Shipman case, were you called to give an
18    opinion by the government?
19    A    Yes.
20    Q    And were you able to give an opinion as to whether
21    or not Dr. Shipman actually poisoned his patients with
22    heroin?
23    A    Yes.
24    Q    And what methods did you use in that case?  Because
25    I'm sure as we talked about, you understand the role of
```

5535

1      medication is key to all the charges against Dr.

2      Schneider and Linda Schneider.  So how was that

3      possible?

4      A    Oh, it was actually fairly simple once we had the

5      idea.  The way Dr. Shipman killed all of his patients

6      was by giving them what they thought was a B12 shot or a

7      shot of penicillin or whatever, except it was a hot shot

8      of heroin.  If you take enough heroin, you die

9      instantly, as was the case in most of these victims.

10     Many were found sitting in their chair having tea.  Dr.

11     Shipman would make house calls.  And the deaths went

12     unnoticed, which is sad; but the social community is not

13     cohesive, and a very brave police detective decided to

14     exhume 15 of the bodies and see if there was any

15     evidence of poisoning.  Fortunately for the prosecution,

16     heroin, which converts to morphine, is a very stable

17     drug and it stays in the body forever.  And so we were

18     able to measure enormous amounts of heroin in the liver

19     and the muscle and in what was left of the blood.  And

20     absolutely no heroin in the hair except maybe a tiny

21     little bit in the very root.  Now, whenever you take a

22     drug, the drug is distributed through your hair.  So,

23     like, if you're a long term Methadone user, you'll find

24     Methadone from one end of the hair to the other.  On the

25     other hand, if you've never had a drug, there won't be

5536

1    any in your hair.  This is recommended all the time and

2    I teach -- it's especially useful in cases of sexual

3    assault because, as is too often the case, the person

4    that's assaulted will be said to be a drug user or an

5    incompetent and be accused of the crime themselves; but

6    if they were drug users then it would be in their hair.

7    So in most states now when someone is accused of rape,

8    whether it's a man or a woman, you take hair samples to

9    make sure what their drug use history was.

10   Q    And by comparing the amount of heroin in the

11   individual's hair versus the amount of heroin in the

12   blood, were you able to determine whether the use was

13   very short term or long term?

14   A    Absolutely.  Of course, it's a misnomer to talk

15   about blood because once you're dead.  You're dead, and

16   you don't have blood any more.  You have red stuff

17   that's dead and decomposing.  But, if none of the heroin

18   has made it from the rest of the body into the hair --

19   and drugs get into the hair through the circulation.

20   You have a hair follicle and the hair follicle is

21   indirectly connected to the blood system.  So any drug

22   you take, could be penicillin, could be seizure

23   medication, doesn't matter, as long as you take it

24   orally or even by injection it will eventually end up in

25   the hair.

5537

 1    Q    Now, have you written any other books besides your

 2    textbook that we just discussed?

 3    A    I think I've written twelve books and some are about

 4    to be translated into Italian.

 5    Q    And are they circulated around the world?

 6    A    Yes.

 7    Q    Are your textbooks considered authoritative in the

 8    field of cardiac pathology?

 9    A    I don't know who you would ask.  I mean, they were

10    thought to be authoritative enough for the British

11    government and the Australian government and the Italian

12    government.  I don't know.

13    Q    Now, are these books -- strike that.

14         We heard testimony by Dr. Dudley that she publishes

15    some books on her web site and she self-publishes.  Do

16    you self-publish your books?

17    A    No.  I get paid for it.

18    Q    And does that mean you have a third party publisher?

19    A    Yes.  It was an American company called CRC Press

20    and I think the name still exists but it's owned by a

21    large English conglomerate now and my editor is in

22    London.

23    Q    And where do you currently work right now?

24    A    From my home.

25    Q    And are you semi retired?

5538

1    A    Yes.

2    Q    And what -- where was your last position before you

3    semi retired?

4    A    I had a clinical appointment as a medical examiner

5    with the San Francisco Medical Examiner's Office.  My

6    sole job was -- my sole interest was my sole job.  I'm

7    interested in how abused drugs effect the heart.  To

8    this day I published the largest series of what changes

9    occur in the bodies of methamphetamine users that's ever

10   been published.  We looked at 415 autopsies and nobody's

11   ever done that before.  And so one day a week I work in

12   the emergency room most of the time.  And then one day a

13   week on Fridays we would go do research on -- they'd

14   save all the good hearts for me from the autopsies and I

15   would dissect those.  It takes a certain amount of

16   special training to dissect a heart properly.

17   Q    And have you consulted or worked for any United

18   States governmental agencies?

19   A    I don't think so.  We publish a newsletter -- well,

20   I take that back.  I mean, sure, lots of them.  I do

21   cases for the Department of Justice in California.

22   Right now I'm working for the attorney -- well, I was

23   working for the Attorney General in Louisiana except my

24   services were felt not to be needed.  And I'm now

25   working for the Risk Management Office in the State of

5539

```
 1    Louisiana.  I think I've testified to help the
 2    prosecution in a number of cases where people have been
 3    accused of homicide by injecting drugs, but I can't
 4    honestly remember them all.
 5    Q   Okay.  And have you ever been hired by any other
 6    governments to -- based on your expertise?
 7    A   Well, the Australian government.  I think it was the
 8    Australian government.  I testified in Australia.  I
 9    think it may have been Interpol that hired me.
10    Q   Okay.  Now, in regards to your area of research that
11    you have a focus in in regards to the effects of drugs
12    on hearts, have you published any papers on those
13    topics?
14    A   Oh, yes.  Probably around a hundred.
15    Q   And have those been published in any peer review
16    journals?
17    A   I only publish in peer review journals unless
18    somebody asks me to write a newspaper article or a
19    magazine article.  But I don't count those.
20    Q   Okay.  I noticed when I was reading your C.V. that
21    you lectured for the Office of the Armed Forces Medical
22    Examiner at the Armed Forces Institute of Pathology.
23    What did that entail?
24    A   The Armed Forces Institute of Pathology does all of
25    the pathology for all of the armed forces.  Everybody
```

5540

1    who, since the Civil War, for instance, anybody is

2    killed in Iraq or Afghanistan is flown back and then has

3    their autopsy done at Dover.  This is done under a

4    special office called the Armed Forces Medical Examiner.

5    And each year the Armed Forces Medical Examiner in

6    conjunction with the Armed Forces Institute puts on a

7    one-week introductory course to forensic pathology for

8    pathologists who are, for reasons that escape me,

9    interested in gynecologic pathology or gastro intestinal

10   pathology, areas I don't know anything about.  They put

11   on a one-week course that covers all the highlights of

12   forensic pathology.  And I was asked maybe at least ten

13   years ago to teach the toxicology component.

14   Q    Well, they didn't call a toxicologist like I believe

15   Dr. Rohrig who testified as a forensic toxicologist.

16   They decided to call you instead?

17   A    Yes.  The circumstances were such that for maybe the

18   ten years before a very famous toxicologist had taught

19   the course and he retired.  And I was at a meeting with

20   Colonel Spencer, who is the -- was the Chief Army

21   Medical Examiner, and he asked me if I would like to do

22   it.  He happens to use my book, too.  And I said, yes,

23   but wouldn't you really rather have a toxicologist,

24   somebody who was ABFT, which is an organization for

25   people with Doctorates that do chemistry.  And he said,

1   no, absolutely not, the course is for doctors, we don't

2   want to teach them about the chemistry and structure of

3   molecules, we want to teach them how drugs effect with

4   and interact with the body.  And I was honored and I did

5   it every year until last year when, for lack of funding,

6   the course was put on hold.

7   Q   Now, do you continue to research the latest findings

8   in regards to drugs and how they effect the human heart?

9   A   Oh, yes.  I probably spend four hours reading a day

10  and I'm hopefully -- a friend and I are trying to

11  organize a research project.  We're submitting a grant

12  to see if we can tell at autopsy whether patients are

13  tolerant by looking at some of the molecules that are

14  floating around in their spinal fluid.

15  Q   And tolerance is a topic we'll talk about a little

16  bit later.  But suffice it to say right now that you're

17  still doing research on tolerance in autopsies?

18  A   Well, I don't have any formal research projects, no.

19  Q   Trying to get some started?

20  A   Some more, yes.  The last ones I did would have been

21  probably ten years ago.

22  Q   Okay.  Besides the Royal College of Physicians, do

23  you have any other board certifications?

24  A   Oh, I was a family doctor once and I recertified

25  twice.  I was certified in quality assurance for

5542

 1    hospitals dealing with Medicare.  But I don't do

 2    anything like that any more.  All I do is look at cases

 3    of poisoning or look at hearts that have been sent to me

 4    by people that were unsure of the diagnosis.

 5    Q    Okay.  Do you also publish a newsletter?

 6    A    I do.

 7    Q    And what is that newsletter called?

 8    A    It's called *The Forensic Drug Abuse Advisor*.

 9    Q    And I asked Dr. Rohrig about that newsletter.  He

10    said that he didn't subscribe to it, that he just found

11    some laying around.  Were you able to look at your

12    records and determine whether or not Dr. Rohrig ever

13    subscribed to your newsletter?

14    A    It's kind of hard to imagine, but actually he was a

15    subscriber for about 20 years.  I think his subscription

16    terminated about when this trial started.  We brought

17    with you and I gave you a copy yesterday, after going

18    through the warehouse, we found his purchase order from

19    1993 --

20    Q    And that's --

21    A    -- with his signature.

22    Q    And that's available for the Government if they want

23    to take a look at it?

24    A    If they want to, I've got it.

25    Q    Is that newsletter free?

5543

1    A    Hardly.

2    Q    And can you tell the jury what goes into producing

3    that newsletter?

4    A    Well, as I indicated earlier, I spend hours each day

5    reading and a good deal of time either consulting or

6    testifying; and when something interesting happens, for

7    instance, last month a friend called me from London and

8    told me they had isolated anthrax from heroin that's on

9    the streets.  And then it appeared in *Nature Magazine* I

10   think.  So I try to put breaking news that will effect

11   practicing medical examiners and death investigators,

12   make it available in more or less English.

13   Q    And do you know, how many subscribers do you have to

14   this newsletter?

15   A    I honestly don't know.  It's small.  Probably about

16   300 or so.  But for the jury's information, 300, 350, is

17   considered good for a journal.  There are more than

18   5,000 journals.  There are a few mega monsters like *The*

19   *New England Journal of Medicine* and *JAMA* and *The British*

20   *Medical Journal* and *Lancet* and they must sell in the

21   hundreds of thousands; but, you know, your average

22   obscure journal, *The American Journal of Hormonal*

23   *Deviations in Obese People* probably has 112 subscribers

24   or something.  But 300 is generally considered the break

25   point.

5544

```
1    Q    Do any government agencies subscribe to your
2    newsletter?
3    A    Yes.
4    Q    Which government agencies?
5    A    I really don't track it very closely.  I know the
6    DEA does and I know the DEA has on occasion asked
7    permission to reprint articles from my newsletter.  And
8    I the same.  And, in fact, in my textbook there's
9    several photographs that they were kind enough to make
10   available.  I believe the FBI.  I think The Mounties,
11   the Canadian Mounties are our biggest fans.  Always made
12   me wonder what they're doing up there; but a number of
13   the Mountie offices subscribe.
14   Q    Now, do you do any teaching?
15   A    Yes, when I'm invited.
16   Q    Have you ever been asked to give lectures outside of
17   the United States?
18   A    Oh, frequently, yes.
19   Q    Inside of the United States?
20   A    Not as frequently as outside of the United States I
21   don't think.
22   Q    And, now, you were consulted by our defense team.
23   Do you charge for your consulting?
24   A    I do.
25   Q    And how much is your hourly rate?
```

5545

1    A    $750 an hour.

2    Q    And how much money have you received to date

3    regarding this case?

4    A    I believe it's $75,000.

5    Q    Does that represent all of the work that you've done

6    in this case?

7    A    No.  I'm so far in arrears I more or less decided

8    that I'm doing a pro bono case at this point.

9    Q    And do you know whether or not your payments

10   regularly came from a L E Atterbury?

11   A    I know they didn't come from Dr. Schneider.  I paid

12   no attention whatsoever to the name.  And actually most

13   of the deposits came as wire transfers so I don't know

14   who originated them.

15   Q    Okay.  Well, let's turn to your testimony in this

16   case.  What were you asked to do?

17   A    I was asked to look at the autopsies and the autopsy

18   record and review them to see if in fact drugs were the

19   obvious cause of death or whether there was some

20   alternative present that might account for death.

21   Q    And did you ever speak with anybody from the

22   Government?

23   A    Yes.  I was called by an FBI agent.

24   Q    And did they ask you to discuss your testimony with

25   them?

1    A    Yes, they did.

2    Q    And did you discuss your testimony with them?

3    A    I told them I would be happy to but that not being

4    an attorney I had no idea of what information was

5    considered confidential and what-not and that I'd be

6    happy to meet with the prosecutor in your presence and

7    answer whatever she wanted, but I also remember adding

8    that they really didn't need to waste their time.  They

9    could just buy a copy of my textbook and they would know

10   what I was going to say.

11   Q    Okay.  And in preparation of providing an opinion,

12   did you review autopsies?

13   A    Of course not.  These were in a different state and

14   a long time ago.  I did review or made an attempt to

15   review the histology, the microscopic appearance of the

16   slides.

17   Q    And what other records did you review in preparation

18   of making -- forming an opinion?

19   A    I don't think anything else.  I read the narrative

20   report that was produced by the pathologist that

21   accomopanied each autopsy.  Initially when you contacted

22   me I thought I was going to be dealing with close to 70

23   cases, which is an awful lot of cases and I couldn't

24   have done any more research than that.

25   Q    Okay.  And did you also review any of the Schneider

5547

1    medical records?

2    A    No.

3    Q    Now, when you first agreed to take this case, did

4    you attempt to look at the microscopic slides?

5    A    Yes.

6    Q    Were you able to get all of the slides?

7    A    No.

8    Q    And why not?

9    A    That would be for Dr. Rohrig to explain.  I know

10   that in a number of the cases, and I tallied it, I don't

11   remember the number, but I do have it on the slide, no

12   slides were ever done; but in other cases, the autopsy

13   indicated that there was microscopic examination of the

14   tissue and I was surprised when I got to the office and

15   asked to see the slides and they weren't there.

16   Q    Is that common for a medical examiner's office not

17   to have slides if they say that they were actually made

18   at some point?

19   A    No, it's not common at all.

20   Q    Were you required to fly into Wichita to review

21   slides?

22   A    Yes.  Normally the standard in the profession is if

23   you have a case that's from far away, you contact the

24   person with the slides and you say would you please make

25   me a set of recuts.  In other words, when an autopsy is

5548

1    done and you have the heart, you examine the whole

2    heart, and if you see anything that looks suspicious,

3    you take a piece of it and you put it in a little block.

4    I think I read in somebody's testimony this was

5    explained to you before.  And you put it in a little

6    block and you throw the block in a machine and a couple

7    days later the block pops out and it's the tissue

8    impregnated with wax and then you can cut it with a very

9    sharp knife.  And when you do that the second time, it's

10   called a recut.  And the normal procedure followed

11   through the United States is if you want to see a set of

12   slides, you contact the medical examiner or -- you

13   contact the medical examiner and you ask them for a set

14   of recuts.  We pay for it.  The client pays for it.  And

15   in very contentious cases you will ask for two sets of

16   recuts and one set of recuts will come to the plaintiff

17   expert and one set of recuts will go to the defense

18   expert and then after you've both read them and

19   photographed them, you swap to make sure that there's no

20   difference between the two.

21   Q    And did the Sedgwick County Medical Examiner's

22   Office refuse to provide us with recuts?

23   A    Yes, they did.  I thought it was very strange.

24   First of all, that never had happened to me; but, second

25   of all, they don't even do the slides.  They subcontract

5549

1    it out.  So all they would have had to do was call up

2    and order another set of slides.

3    Q   And did you just tell the jury that this has never

4    happened to you before?

5    A   Never.  And I don't know of anybody it's ever

6    happened to.  I once had to fly from San Francisco to

7    Boston to see a heart but the heart was intact so it

8    made sense to go see it and also I could understand why

9    they wouldn't exactly want to put it in the mail to me

10   Fed Ex.  But short of that, no, I've never been refused.

11   Q   And did you fly to Wichita in order to review the

12   slides that were available?

13   A   Yes, I did.

14   Q   And did the Sedgwick County Medical Examiner's

15   Office allow you to utilize their microscope?

16   A   No.  They had an FBI agent present to make sure I

17   didn't, I believe.

18   Q   And how did you review the slides?

19   A   I had just bought a new very expensive microscope

20   from Lyca, which is an extremely good microscope but

21   rather complicated.  And it uses digital technology.

22   And I had no idea how to take it apart so I called the

23   Lyca tech rep for the San Francisco Bay area, had 'em

24   disassemble it and teach me how to put it back together

25   again and then we shipped it Fed Ex.  I think it cost

5550

1    about a thousand dollars.  Even when I got it put back

2    together, I didn't get it quite right back together and

3    I had to call the company and ask to be talked through a

4    recalibration phase that I didn't know how to do.

5    Q   Well, you know, I'm not a scientist, and when I

6    think of a microscope I remember like going to K Mart as

7    a kid and getting that little thing that's about yea big

8    (indicating) and you can just adjust the lens.  Are we

9    talking about a microscope that's just simple and about

10   that big (indicating)?

11   A   Well, mine -- I'm not going to talk about mine's

12   bigger than yours, but I would say it's about a foot and

13   a half high.  What makes it unique is it has a port and

14   the port connects to a digital ultra high resolution

15   video camera, and instead of looking through eyepieces

16   in the microscope, the camera connects an interface on

17   my computer and I compose and look at the pictures on

18   the computer.  And then graph and process them through

19   the appropriate software.

20   Q   And when you were at the Wichita Sedgwick County

21   Medical Examiner's Office utilizing your microscope, did

22   Dr. Rohrig ever come into the room with you?

23   A   Yes.

24   Q   And did he look at your microscope?

25   A   Yes.

5551

1    Q    Did he make a comment about your microscope?

2    A    He said it was way cool.

3    Q    And, now, did you ever make a request to see any of

4    the actual tissues that still remained?

5    A    Well, it was my impression that no tissues remained,

6    actually.  Part of a normal autopsy report is at the end

7    you'll see a list of things that have been done like

8    heart blood is submitted, urine is submitted, stomach

9    contents are submitted, pieces of heart are submitted,

10   pieces of spleen are submitted.  And that's not included

11   in any of the autopsy reports.  And since that's a

12   variance of normal procedure, I figured, well, they

13   didn't take any.  And if you're referring to looking at

14   the paraffin blocks, well, they're little square blocks

15   of paraffin and looking at them wouldn't have helped me

16   at all.

17   Q    Okay.  And I think we mentioned briefly about the

18   records that you reviewed.  Did you rely on the

19   pathologist reports and the investigation that they did

20   in rendering your opinions?

21   A    To the extent that there were no slides available, I

22   had to.

23   Q    And when there were slides available, did you

24   consider what you found on the slides in rendering your

25   opinion?

5552

1    A   Yes, I did.

2    Q   Now, we mentioned briefly about tolerance.

3    Tolerance is something that the jury has heard about.

4    Do you need -- and let's just turn our discussion to

5    tolerance now for a while.  Do you need to take a drug

6    history when you're investigating a suspected drug

7    related death?

8    A   Yes.

9    Q   And why do you need to do that?

10   A   Well, it doesn't matter whether you're taking heroin

11   or coke, your body readjusts.  Now, this was explained

12   to you incorrectly before.  It isn't that your body

13   readjusts and clears the drug from your system any

14   quicker.  It doesn't.  If you put in six lines of

15   cocaine, that six lines of cocaine is still there 45

16   minutes later even though it's partly metabolized.  If

17   you put in 50 milligrams of heroin, it's still there an

18   hour later.  What changes is the brain; and the brain

19   readjusts itself so that even though all this cocaine

20   and heroin is running around, your brain says so what, I

21   don't want any.  And your brain has the ability -- we

22   call it receptors.  The brain receptors turn off and are

23   incapable of further stimulation.  The experience of

24   most stimulant abusers and heroin abusers is that, wow,

25   the first time was great, second time, oh, it wasn't so

```
 1    good; but if I take a whole lot more than I did the
 2    first time, it comes back.  So what they do is take
 3    enough additional drug to overcome the receptor block
 4    that the brain has erected to protect itself.
 5    Q    And does the -- why is that important when you're
 6    trying to determine the effects of a certain drug on a
 7    person at the time that they passed away?
 8    A    Well, unfortunately, you will all at some point have
 9    family in hospices and you will -- if you know
10    pharmacology, you will know that they're getting amounts
11    of any one -- maybe getting, say, somebody with a
12    carcinoma of the tongue that you've taken off half the
13    jaw, you know, they will be taking as much -- enough
14    morphine to kill every one of you.  And they're still
15    crying out in pain.  And that's because the brain has
16    readjusted and doesn't care how much you're pouring in
17    and you have to put in ever more and ever more to get
18    the brain to respond to it.
19    Q    Okay.  Is it possible to become tolerant to the
20    effects of more than one drug at the same time?
21    A    Sure.  You can take as much drugs as you want and
22    your brain has receptors for different drugs and the
23    brain sees something it doesn't like and it says, no,
24    I'll have none of that and it turns the key and it
25    doesn't respond.
```

5554

Q   Now, is it possible to determine how tolerant a
person is to a particular drug after they have passed
away?

A   Yes, in a couple situations.  There are three that
come to my mind.  The Shipman case was the first time
that I'd ever thought about it.  And you can test
somebody's hair and see no drug and then test their
liver and see 14 pounds of drug and you can be safe in
assuming they'd never taken the drug before.  You can
take somebody -- and this was done and published in
Lancet by a man named Tagersio (ph) probably ten years
ago, and he did a very novel thing.  He took a group of
heroin users, because they're legal where he is, the
government supplies heroin rather than have the people
go steal it, and then he took another group of heroin
users who were in rehab and they had been in rehab for
about a month so they were clean.  And he knew they were
clean because he had tested their urine and blood.  And
then he took a third group of people who were dead from
a heroin OD.  And what he found was that the heroin
concentration in the hair of the people that were dead
was just about the same as the heroin concentration of
the people in rehab and way, way, lower than the
concentration of the people that were still out on the
streets taking heroin.  So you can look.  There's a

5555

1    paper that I know I supplied to the defense team by a

2    man named Poscoukins (ph) --

3    Q    So let me make sure I understand.  What about the

4    cases here.  Would hair testing have been of any value?

5    A    It would have been of enormous value.

6    Q    I'll let you get that water.

7    A    Well, it may be more complicated than I can figure

8    out.

9                        (Off-the-record.)

10   Q    And why do you believe hair testing would have been

11   of value in the cases being presented here?

12   A    Well, Methadone is the issue in a number of the

13   cases and you become tolerant to Methadone.  But while

14   you're becoming tolerant to it, it's accumulating in

15   your hair.  I sent you a paper by the leading hair

16   researcher --

17   Q    Is that Pascal Kents?

18   A    Yes.  He's the president of the European hair

19   testing society.  And he cites an opiate overdose death.

20   And to paraphrase him, he said, well, here's somebody

21   that's dead and they've got a Methadone level of 800.

22   What am I supposed to do?  If they're tolerant, that

23   just means they got their Methadone that morning and

24   went to work.  If they're not tolerant, it means the

25   Methadone killed them.  So if there's a lot of Methadone

5556

1    in their hair, you can pretty much discount the

2    Methadone in their blood.  If there's no Methadone in

3    their hair or only a small amount, then you have a real

4    problem.  And Kents is proposing that hair testing be

5    done in all cases of opiate overdose as a diagnostic

6    tool.

7    Q   Now, I believe I asked Dr. Rohrig about hair testing

8    when he was on the stand and he did not believe it would

9    be beneficial.  Are you saying that the scientific

10   literature actually disagrees with Dr. Rohrig?

11   A   I'd say it contradicts him completely.

12   Q   I'm going to hand you what's been marked as

13   D-2-6-A-55.

14            THE COURT:  Tell me the number again.

15            MR. WILLIAMSON:  Yes, Your Honor.  D-2-6-A-55.

16            THE COURT:  A-55.  Yes.  All right.  Thank

17   you.

18   BY MR. WILLIAMSON:

19   Q   Can you look at that document and identify it?

20   A   Yes, I can.  This is the document I sent you.  It

21   was published in 2004.

22   Q   What is the title of that article?  I'm sorry.  What

23   is that document?

24   A   It is from *Forensic Science International*, and in

25   the interest of full disclosure, I am a reviewer for

5557

1    *Forensic Science International*, although I had nothing

2    to do with this paper.

3    Q   And who is the author?

4    A   Pascal Kents.

5    Q   And is the *Forensic Science International Journal* a

6    peer review journal?

7    A   It's a peer review journal and it's considered the

8    premier forensics journal.

9          MR. WILLIAMSON:  At this time defense moves to

10   admit Exhibit D-2-6-A-55.

11         THE COURT:  Any objection?

12         MS. TREADWAY:  No objection.

13         THE COURT:  It's received.

14   BY MR. WILLIAMSON:

15   Q   Is there a summary in there that you can read to the

16   jury so they can -- and they'll have the article

17   there -- but they can have an understanding as to what

18   the scientific literature states about hair testing in

19   regards to tolerance?

20   A   Yes, there is.  It would be on Page 130, Subsection

21   6.2.

22   Q   And if you can read that to the jury.

23   A   "A key issue when interpreting a post-mortem blood

24   Methadone concentration is to demonstrate chronic or not

25   consumption.  Without a hair analysis, 800 nanograms per

5558

1    mill of Methadone in peripheral blood concentration --

2    in peripheral blood concentration cannot be interpreted.

3    In other words, seeing the number by itself is

4    meaningless.  If the subject is a chronic Methadone

5    user, this concentration can at best be considered

6    slightly toxic.  If the subject is naive, it can be

7    considered potentially fatal.  Only hair would aid in

8    discrimination between naive and chronic Methadone use."

9    Q    Now, that article is specific to Methadone.  Would

10   the principles discussed in that article apply to other

11   drugs?

12   A    Yes, they do.

13   Q    And would they apply to the opiate class of drugs?

14   A    Yes, they do.  I've already explained the original

15   heroin experiments.

16   Q    Is this a -- strike that.

17        When Dr. Rohrig testified, I don't believe he cited

18   any scientific literature for his opinions.  Is this a

19   matter of debate or is this widely accepted without any

20   kind of disagreement?

21   A    Well, I can't speak for forensic pathology practice

22   because it varies, but as far as hair testing is

23   concerned, yes, that's universally accepted that that

24   would be like -- Kents saying that is like Jonas Salk

25   talking about polio vaccines.  I mean, this is the man

5559

1    that sort of single-handedly invented the field and is

2    hugely respected.

3    Q   And if you were the forensic pathologist doing the

4    autopsies for the patients involved in this case, would

5    you have performed hair testing?

6    A   That's a hard question to answer because there may

7    not have been money in the budget to do it.  It probably

8    costs -- I know in San Francisco I've been told it's

9    about -- they charge $1200 a hair.  And that could be a

10   real budget crusher.  And sometimes forensic

11   pathologists and coroners who run their lab are required

12   to do less than the ideal would call for because they

13   don't have the money.

14   Q   Now, we've heard this phrase the drug was found in a

15   toxic range from a couple of the prosecution witnesses.

16   Just because the blood level's in a toxic range, doesn't

17   that mean that the drug was the cause of death?

18   A   Well, that's what the Attorney General in Louisiana

19   thought when he charged Dr. Poe.  The grand jury didn't

20   think so.  There are several reasons for that.  The

21   chief reason being that every -- and I cite no

22   exceptions -- every scientific study to address the

23   issue has shown higher blood levels, and I don't care

24   which drug you want to talk about, although I have to

25   admit I don't know about things like arsenic or

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

malathion levels after death are higher than they are at
the time of death.  And we have no scientific method by
which to tell.  The one I'm thinking of right now is
that several of the cases under discussion involve
Fentanyl.  And I know that you heard about Dr. Apple's
patient -- or decedent several days ago.  Apple looked
at a bunch of people who died who were taking Fentanyl.
They weren't necessarily Fentanyl addicts or anything.
They were people that were sick that were taking
Fentanyl.  And he measured blood right after they died
and he measured blood I think on average 32 hours later.
I could look at the paper and give you the exact.  And
what he found was that in four of the nine patients he
studied, there was zero Fentanyl right after they died.
And then when you did the autopsy several days later,
there were numbers as high as 22 or 23, which are higher
than some of the people that are said to have died from
Fentanyl overdose in this case.  Now, as Dr. Rohrig
pointed out, Dr. Apple is a very well respected very
authoritative toxicologist who's been writing on this
subject for many years.  So when you talk about toxic,
the first thing to know is that's a term that's used for
live people.  Ain't nothing that's toxic to dead people.
The word toxic was derived from the fact that if you
take enough living patients and you give them substance

 1    A through D, some will have a good time, some will have
 2    a bad time, some will get better, some will get worse,
 3    some will get sick.  The ones that get sick, we call
 4    toxic.  None of these things apply to dead people.  For
 5    two reasons.  First of all, they're dead.  And I just
 6    have never understood why there's such difficulty in
 7    understanding the numbers derived from the bodies of
 8    people who are decaying should have any relationship
 9    whatsoever to numbers in bodies of people that are at
10    their doctor's offices.  Just has never made any sense
11    to me.  Certain drugs are more inclined to store in fat
12    than others.  Many marijuana users have found this out
13    when they go to work and even though they haven't had a
14    joint in three weeks, they still test positive.  The
15    reason being, marijuana accumulates in the fat, is
16    slowly released from the fat and they can still test
17    positive three weeks later.  The same is true for a drug
18    like Fentanyl.  Fentanyl goes into fat stores.  When you
19    die, you disintegrate.  When you disintegrate, drugs get
20    released.  I was going to say blood but I really try not
21    to because blood is a living tissue just like your
22    skin's a living tissue, just like your liver is a living
23    tissue.  Blood is doing stuff.  It's alive.  It takes
24    entropy.  It takes energy.  It's subject to negative
25    entropy.  It disorganizes.  It disinegrates.  And there

5562

1    isn't any reason the numbers from the two should

2    correlate at any point.  And there certainly isn't a way

3    to predict.  Now, I read the testimony of all the

4    pathologists, and I read Dr. Rohrig's testimony and all

5    of them assured you that they took this phenomena into

6    account.  And I would hope my trip to Kansas is worth it

7    today just so one of them will take me aside and explain

8    how they did it, because I've been doing this for 25

9    years and I don't know how to take it into account.

10   Q   Have you seen any peer reviewed scientific journal

11   articles that describe an accepted scientific method to,

12   quote, unquote, take it into account?

13   A   No.

14   Q   If you -- if a pathologist does not know what a

15   person's drug tolerance is prior to the time that they

16   passed away, what does the recorded post-mortem drug

17   level mean?

18   A   They took the drug.

19   Q   Can you interpret anything else from it without

20   knowing their tolerance history?

21   A   No.  I was always taught and read that you can die

22   of a drug or you can die with a drug.  And there isn't

23   any way to tell once you're dead.

24   Q   So let's say, for example, if a person who is

25   addicted to heroin, they take -- they go behind wherever

5563

1     they, you know, go, do their heroin stuff, they shoot

2     up, they sit there for a while and then they leave and

3     they, you know, cross a street and they get hit by a

4     truck.  Can you tell what killed that person just by

5     looking at the heroin blood levels?

6     A    No.  The track marks might be more useful.  The

7     heroin blood levels will tell you that heroin was taken.

8     And it may be that heroin was a contributory cause of

9     death because their judgment was impaired and they

10    shouldn't have stepped off the curb in the first place.

11    But that is different from the heroin having killed

12    them.

13    Q    And can you tell whether or not that heroin

14    contributed to that person's stepping off the curb

15    simply by looking at the post-mortem drug levels?

16    A    No.  I can and feel I have a fairly high -- or,

17    excuse me -- a fairly low error rate.  I can identify a

18    chronic cocaine user or a chronic meth user, and even a

19    chronic heroin user by their autopsy findings.  And I

20    feel I have a pretty high -- low, error rate.  And

21    that's because there's a constellation of symptoms that

22    are associated with each.  This is particularly true in

23    the heart.  And the only possibility when I look at one

24    of these hearts is that somebody had untreated high

25    blood pressure or they were a stimulant abuser.  It just

5564

1    so happens this is only known in the last two years,

2    that abused drugs like meth and coke fool the heart and

3    they throw a switch in the heart that tells the heart

4    that you have high blood pressure.  So it doesn't matter

5    how young, how healthy you are.  If you have a coke

6    habit, your heart, as far as it's concerned, thinks you

7    have high blood pressure and the heart starts to make

8    all sorts of changes to accommodate for high blood

9    pressure.  And so when I see a young person, yeah, I

10   find out first did this person have high blood pressure

11   because young people can, not too often, but they can.

12   And once I've eliminated that in my mind and once I know

13   the toxicologist tells me there aren't any anti

14   hypertensives in the blood, but there is this much coke,

15   and not only that, if you look in the hair, there's a

16   hell of a lot of coke in the hair, then, to me, the

17   diagnosis is fairly obvious.

18   Q   You mentioned a term that I've asked a couple of the

19   Government witnesses about.  Can you tell us what is an

20   error rate?

21   A   Sure.  An error rate is how often you're right and

22   how often you're wrong.  It's basic to the scientific

23   method.  I don't pretend to be an expert on the law, but

24   one of the criteria of science that's specified by the

25   laws is that you have a predictable error rate for

1   technique.  Suppose you have a technique to identify

2   people that file their taxes late.  And you say, well,

3   mostly they're well dressed people but slightly

4   disorganized and balding.  There are probably a lot of

5   people that meet that description that do file their

6   taxes on time.  Now, I happen not to fit in that

7   category and the only way you can know your error rate

8   is if we go find 500 guys that look like me and find out

9   did you or did you not have to file for an extension.

10  And if you find out that only three of the guys that

11  looked like me had to file for extensions, then you'd

12  say your error rate is pretty damned high and

13  unacceptable.  And that would not be a scientific way to

14  identify people that had to file for extensions and then

15  file their taxes late.  On the other hand, if you ask

16  those 500 people and 472 said, I know, the accountant

17  called me, but I didn't get it in.  I paid my estimated

18  income but I didn't get it done.  And you got 472 right.

19  Well, you have a hypothesis.  You've tested it.  And

20  you've tested it and found out your hypothesis is pretty

21  darn good.  So that's what an error rate is.

22  Q   Now, I asked the pathologists at the Sedgwick County

23  Medical Examiner's Office if they ever attempted to

24  determine their error rate when reaching their

25  diagnosises that mixed drug intoxication was the very

5566

1    cause or contributing factor of death and their answer

2    was no.  Does that mean that they have not tested their,

3    quote, unquote, methods that they use?

4    A    It certainly suggests that.  In fairness, I think it

5    was Dr. Oeberst said that they do have some sessions

6    where they discuss things, but I don't know whether they

7    really track it.  For a while you can see on my C.V. I

8    was the quality control administrator at what is now I

9    think the third biggest trauma center in the United

10   States.  And I would look at the cause of death of

11   people and also maintain the trauma registry; and part

12   of that job was we looked at every surgeon's

13   performance.  We looked at every single case they did;

14   and, you know, it works both ways.  It's a bell-shaped

15   curve.  Some people would have way too many people die

16   and get worried, get scared.  You'd say people with

17   these kinds of injuries really shouldn't be dying.  And

18   then you would get the other end of the curve and you'd

19   say I always thought Harold was a bozo and look at all

20   the people that are alive that should be dead.  What's

21   he doing right that the guy at the other end of the

22   curve is doing wrong.  And so that's very similar to an

23   error rate.  We knew what the norm was.  We knew how

24   many they should have gotten right.  Some got more; some

25   got less.  We investigated both.  But if you don't know

5567

1    your error rate, it's not science.  It's speculation.

2    Q    Now I want to make sure we understand this.  Are you

3    saying that there is no -- strike that.

4         Now, you understand that the patients that the

5    Government contends passed away as a result of mixed

6    drug intoxication either being caused or contributed to,

7    many of them were taking pain medicine for chronic pain

8    conditions.  Were you aware of that?

9    A    Yes.

10   Q    Now, Dr. Dudley testified that she would not take a

11   histology until she received the results of the

12   toxicology test, which if they came back positive for

13   any pain medicine or any other listed drugs, illegal

14   drugs, then she would not do a histology.  Is that an

15   accepted best practice?

16   A    No.  It's -- some might say it's the elephant in the

17   room.  It's terrible medicine; but it's forced upon

18   medical examiners for lack of funding.  I didn't know

19   this until a month ago that that's what happens in Los

20   Angeles as well.  They wait for the tox to come back and

21   if they don't find -- if they find something good, then

22   they don't bother with the histology.  The problem with

23   this is that the medical examiner's job is not just to

24   say what killed the person.  The medical examiner has a

25   public health role.

5568

 1        Now, let's suppose -- I think in one of your

 2   cross-examinations you talked about having a tooth

 3   pulled and taking Vicodin.  And let's suppose you were

 4   to walk out of here and do a header and drop dead and

 5   have an autopsy and we would find a lot of Vicodin in

 6   you for some reason.  Well, it redistributes and the

 7   level would go up.  Not to look at your heart is

 8   almost -- I don't -- is blatant malpractice.  And I'll

 9   tell you why.  You have a son.  I met him.  He seemed

10   like a nice little boy.  You're a young man.  You're in

11   the age where you could die from a genetically inherited

12   form of heart disease.  And if you died from a

13   genetically inherited form of heart disease, what's

14   stopping your son from dying of a genetically inherited

15   form of heart disease.  So you might be able to pick

16   that up with histology because some genetic heart

17   diseases are easy to see.  Or, push comes to shove, and

18   I've told people this, you may have to mortgage your

19   house and pay the $10,000 in costs to get the testing

20   done so you can go to sleep at night and know your kid's

21   okay.

22   Q   All right.  Now, did you also publish an editorial

23   in the *British Medical Journal* on the subject of

24   measuring drugs after death?

25   A   Yes, I did.  But it wasn't just me.  That was a

5569

1    group of 14 of us.

2    Q   Now, can you tell the jury what the *British Medical*

3    *Journal* is?

4    A   *British Medical Journal*, probably about the number

5    five medical journal in the world, maybe number four.

6    You have *New England Journal*.  You have *The British*

7    *Medical Journal*.  You have *Lancet*.  And you have *Nature*

8    *Medicine*.  And there's a thing that the industry uses

9    called an impact factor, and an impact factor is just an

10   arbitrary -- well, it's not an arbitrary number.  It's

11   based on the number of times an article gets read.  And

12   the BMJ is one of the highest.

13   Q   Okay.  And you mentioned there were other people

14   that helped write the paper.  Is that -- does that -- is

15   it a group of people?

16   A   Well, I sort of helped convene a meeting maybe seven

17   or eight years ago at the American Academy of Forensic

18   Science and there were -- it's not as common now -- but

19   there were toxicologists running around saying I can

20   calculate the dose of drug this person took just by back

21   calculating from what we found at autopsy.  And this

22   theory has no error rate.  No experiment has ever

23   confirmed it.  And it's misused a lot.  And I wanted to

24   help put a stop to that.  And I found 14 other kindred

25   souls who felt the same way who had impeccable academic

1    credentials.  And the *British Medical Journal* wouldn't

2    let us put everybody's name on it.  They said there

3    wasn't enough room.  My name is on it purely because of

4    alphabetical I think.  But I've given you a list of the

5    other participants.  They were all extremely well known.

6    The editors of most of the major forensics journals.

7    Q    And are these people from around the world?

8    A    Yes.

9    Q    And these are utmost experts from around the world

10   in regards to pathology?

11   A    The pathology of drug death, yes.

12   Q    I'm going to hand you what's been marked as

13   D-2-6-A-56.

14            THE COURT:  D-6-A-56.

15            MR. WILLIAMSON:  D-2-6-A-56.

16            THE COURT:  D-2-6-A-56.  Okay.

17            MS. TREADWAY:  No objection, Judge, since it's

18   already been displayed.

19   BY MR. WILLIAMSON:

20   Q    Now, is that the article that we've just been

21   telling the jury about?

22   A    Yes, it is.

23   Q    And we've been talking about the whole issue in

24   regards to tolerance and how tolerance can, quote,

25   unquote, just be taken into account.  Can you find the

1    paragraph beginning with "even in living bodies" and

2    read that for the jury.

3    A    Yes.   It's on the second page.   "Even in living

4    bodies, interpretation of a single blood concentration

5    measurement is impossible without considering the route

6    of administration, the number of doses taken, and the

7    amount of drug actually in the body.   Such information

8    is almost never available to investigators, making it

9    impossible to determine the cause of death by comparing

10   a single post-mortem drug concentration measurement with

11   a range of published values originally derived from

12   measurements made in the living.   With chronic use,

13   tolerance occurs; and tolerance cannot be measured or

14   examined after death.   Healthy patients enrolled in

15   methadone maintenance programs, for example, may have

16   blood Methadone concentrations in excess of other

17   non-tolerant Methadone users examined on the autopsy

18   table.   Similarly, we have long known that blood sampled

19   from the heart of a dead person who has been on long

20   term Digoxin treatment may contain a seemingly high

21   concentration of drug, of Digoxin, when in fact the

22   actual blood concentration immediately before death was

23   the approximate -- appropriate non-toxic therapeutic

24   concentration."

25   Q    Summarize for the jury what that -- what does that

5572

1  mean?

2  A   Well, it means you can't look at the number and say

3  that means you killed somebody unless you know a whole

4  lot more about them.  If I see a 800 nanogram per

5  milliliter concentration of Methadone and somebody's

6  never had Methadone before, yeah, I suppose they might

7  have some other obscure thing like curarty(ph) thaqt

8  killed them; but my money would be on Methadone being

9  the cause of death.

10  Q   We've also talked about this phenomenon called

11  post-mortem redistribution.  Are you familiar with that?

12  A   I am.

13  Q   And can you explain to the jury what post-mortem

14  redistribution is?

15  A   I think they've heard this a whole lot of times and

16  I don't want to bore anybody; but there may be a little

17  bit more to it than has been explained in the other

18  testimony.  Water runs downhill.  When you die,

19  everything in the body, every chemical, tends to

20  equalize out, go to areas where the concentration is

21  high; go to the areas where the concentration is low.

22  It's that simple.  Certain drugs tend to redistribute

23  faster.  Drugs that are fat soluble -- and I think

24  you've heard that before, too.  But the thing you

25  haven't heard before and which is really part of

5573

1    redistribution is that as your body disintegrates, drugs

2    get released from deep body stores.  So, sure, Apple was

3    able to find people who had no Fentanyl in their bodies

4    when they died.  They didn't have any 'cause they hadn't

5    had any in a day or so.  But that doesn't mean the

6    Fentanyl wasn't sitting in the fat and the fat starts to

7    disintegrate and it releases the drug.  So, knowing

8    that, to look at a number of concentration for Fentanyl

9    I think is a meaningless exercise.  Well, yeah, he was

10   taking Fentanyl.  That tells me he's got some serious

11   pain problem; or, alternatively, he may be some medical

12   professional who's a Fentanyl abuser.  But doesn't tell

13   me about the cause of death because I don't know what

14   the number was when they died.

15   Q   Now, if what you're saying is true, does that mean

16   that if you just take blood from the body of a person

17   who has utilized certain drugs or medicines over a long

18   period of time that you can't determine the cause of

19   death unless you do a complete autopsy?

20   A   I think so.  I think the definition of what a

21   complete autopsy is is in flux.  I mean, not only do

22   medical examiners not have the money to do hair testing,

23   they sure don't have the money to do DNA testing.  And

24   yet, you could have somebody you know is dead, you got

25   their heart in your hand, and have no clue why.  And the

1    next step is to do DNA analysis except the DNA analysis

2    would just chew up Dr. Rohrig's budget in like a couple

3    weeks and then what would you do for the rest of the

4    autopsies.  So there's a distinction between the real

5    world and what the ideal world would be.  Right now I

6    don't think anybody's doing a complete autopsy because

7    if you're not doing the DNA then you've left out a whole

8    lot of possibilities.

9    Q    Now, similarly, in regards to this post-mortem

10   redistribution, when I was questioning Dr. Rohrig he

11   assured the jury that he and his medical examiners,

12   again, quote, unquote, took into account the post-mortem

13   redistribution, end quote.  And I believe he testified

14   to that when asked by the Government.  Is there a

15   scientifically approved technique to, quote, unquote,

16   take post-mortem redistribution into account?

17   A    No.

18   Q    I mean, you said none.

19   A    Best of my knowledge, no one has ever published a

20   paper saying they were able to do that.  And if they

21   have a way of doing it, I would hope one of them would

22   tell me how.

23           MR. WILLIAMSON:  Judge, you want to take a

24   break now?

25           THE COURT:  I think it's a good time.

5575

1          MR. WILLIAMSON:  We've been going about an

2    hour and a half.

3          THE COURT:  Yeah.  Let's take about 15

4    minutes, Ladies and Gentlemen.  Remember and heed the

5    admonition.

6                    (Jury excused from the

7                     courtroom.)

8          THE COURT:  We had to start at 8:30 instead of

9    8, so we'll go until 12:30 if you need to.

10          MR. WILLIAMSON:  I think we'll be finished,

11   Judge, on time by 12.

12          THE COURT:  That's fine.  You all can go.  I

13   have to finish my notes here.

14                    (Recess.)

15          THE COURT:  Yes, sir.

16          MR. WILLIAMSON:  Thank you, Your Honor.

17   BY MR. WILLIAMSON:

18   Q   I want to talk to you about an organization that

19   we've come to know as NAME.  Are you familiar with that?

20   A   Yes.

21   Q   And is that the National Association of Medical

22   Examiners?

23   A   Yes.

24   Q   Now, did you learn that in several cases where Dr.

25   Schneider is accused of causing and/or contributing to a

5576

```
 1    person's death that no autopsy was done at all?
 2    A   Yes.
 3    Q   If no autopsy is performed at all, does that
 4    invalidate the medical examiner's findings?
 5    A   Well, I don't think that would be true in every
 6    case.  If a bus rolls over you and you can see the
 7    treadmarks, I think that's probably pretty fair.  But if
 8    you are going to diagnosis drug death, yes, it would,
 9    because the only way to get a blood sample would be to
10    take a very long needle and stick it into the chest and
11    hope to hit the heart.  And blood -- drug concentrations
12    are different in the left side of the heart than in the
13    right side of the heart.  There is a technical
14    explanation for that but I don't think it's mundane
15    (sic) to this.  And we've already heard Dr. Rohrig say
16    that left-sided heart blood is not a particularly good
17    specimen for measuring.  It's really good for screening
18    because everything that's in the body will be there; but
19    to determine how much is really there, it would be a
20    terrible choice.
21    Q   So make sure we understand.  In order to determine
22    what's there, would that be okay to look at that heart
23    blood?
24    A   Sure.
25    Q   But to determine how much is there, is that heart
```

5577

1    blood reliable for that?

2    A    No, it isn't; and I've done defense for physicians

3    who were accused because of medical examiners that only

4    stuck a needle into the heart and got a very high

5    number.

6    Q    Now, when an autopsy is performed, is it normal to

7    examine pieces of tissue under the microscope?

8    A    Rule G 27.1 of the NAME standards requires that when

9    there's no other obvious cause of death you need to do

10   microscopic examinations.  And if there are multiple

11   causes of death, possible causes of death, then you

12   definitely need to do the microscopic examination to be

13   sure that these other possibilities are only

14   possibilities and the drug is --

15   Q    I believe the standards actually use a term --

16   something about gross anatomical findings.  Is gross

17   anatomical findings what you mean when you say if there

18   is a person who is involved in a car accident and you

19   see tread marks or something obvious to the eye?

20   A    I don't think so.  I'm really not positive.  I'm not

21   on any of the committees who wrote that, but I'm -- a

22   friend of mine had a motorcycle accident a month ago and

23   ruptured his spleen, which was really good because when

24   they opened up his tummy to fix his spleen, they found a

25   tumor, and the tumor is an anatomic finding just like

5578

1    the ruptured spleen is.  In the case -- many of the

2    cases here, there is evidence even to the naked eye.  I

3    recall one case where cardiomegaly, enlarged heart, was

4    listed as a diagnosis, and I recall another case where

5    fibrosis was apparent even without microscopic

6    examination.  Now, if fibrosis is apparent without

7    microscopic examination, that's a heart transplant

8    candidate.  And that's sure a significant condition.

9    And in my mind, knowing that the drug level that I've

10   been given is in no way, predictable way, related to

11   what it was at the time of death, and knowing they got

12   something, a heart that I would want to replace, yeah, I

13   would call that a natural death would be my inclination.

14   Q    Now, were you aware that the evidence in this case

15   has been that over at least half of the cases where

16   autopsies were actually performed there were no

17   microscopic tissue examinations?

18   A    I was.

19   Q    Does that mean that in those standards, those

20   autopsies were incomplete?

21   A    I think it does.  As I said, it violates G -- the

22   standards, Rule G 27.1; but more than that, I think many

23   medical examiners fail in their role as public health

24   officials.  And what if that guy's heart showed signs of

25   AIDS infection and he was previously undiagnosed as

5579

1    AIDS.  And you can do that.  You can look at a heart and
2    you can make presumptions that this person has HIV.
3    Because you see a pattern of infection that's only seen
4    in HIV.  Well, you should be telling somebody about
5    that.  I mean, somebody from the Health Department
6    should be going out and huntin' down this person's
7    friends.  So it's not just an academic requirement that
8    you do microscopic exams.  It's not put there to be
9    academic or to waste money or to waste effort or to make
10   anybody else happy.  It's there as a public health
11   measure.
12   Q   Now, am I correct that the NAME standards were not
13   officially adopted until around 2006?
14   A   The copy that I have are dated 2005.
15   Q   Okay.  Now, before 2005, was there a recommendation
16   or a universal standard to actually perform these
17   microscopic examinations of tissues even though the NAME
18   standards hadn't been formally adopted?
19   A   I really don't know.  I'm totally apolitical with no
20   incentive to run for NAME office and never really
21   followed their standards very closely.  Which, in any
22   case, don't apply to me.  I have standards that I was
23   taught on the proper way to examine a heart and that's
24   pretty much where my standard making ability stops.
25   Q   And did that include examining tissue under a

5580

```
 1    microscope?
 2    A    Certainly did.
 3    Q    Now, does that mean that in the cases where there is
 4    not a microscopic examination that the decedents may
 5    have passed away from something else besides drug
 6    intoxication and we just don't know?
 7    A    Yes.
 8    Q    And why is that?
 9    A    Well --
10    Q    Strike that.  I think you may have just explained
11    that.  Is that when you say it could have scarring, it
12    could have infection; and without the microscopic exam,
13    we just don't know?
14    A    That would be fair, yes.
15    Q    Any other reason?
16    A    No.  Myocarditis is the really ugly problem.
17    Doesn't matter where you go in the world, but between
18    four and eight percent of people that come to autopsy
19    have myocarditis.  Now, that means that in most of them
20    it's just an incidental finding.  They're gettin' along
21    just fine.  I mean, you know, the truck driver had
22    myocarditis but he went to work and he was fine and the
23    only reason he's dead is he looked at the girl in the
24    pretty skirt coming out of the Seven/11 and drove his
25    rig through the Seven/11.  But that doesn't mean the
```

5581

1   myocarditis killed him.  And it's always difficult to

2   tell without going on and doing additional special

3   testing.  Similarly with heart attack.  Now, a number of

4   the decedents in this series of cases had major league

5   coronary artery disease.  And some of them were cocaine

6   users.  Well, cocaine causes spasm.  The way the body's

7   built, there's a lot of redundancy.  I know people that

8   sail around the world and always have four GPSs with

9   them.  Three for when they get washed overboard and one

10  to hang around their neck.  The body does much the same

11  thing and has protections in it.  But you can't always

12  be sure that they'll work.

13  Q   And did you notice that many of the decedents who

14  passed away suffered from other diseases such as obesity

15  and heart disease?

16  A   Yes.  And that's an important area of research.  I

17  think I sent you one paper.  Anybody who looks at hearts

18  notices -- and forensic pathologists notice this -- if

19  you look at fat folk, and I don't just mean obese like,

20  you know, I mean people that are 400 pounds.  If you

21  look at them, their hearts are abnormal and they're

22  abnormal in several ways.  First of all, there's fat

23  stuck in them where it shouldn't be.  But second of all,

24  they're too big.  They're too big because that poor

25  little heart has to supply all that extra miles of blood

5582

1    vessels.  Why is that a problem?  To supply the extra

2    blood vessels, it needs to generate a bigger pressure

3    head.  To generate the pressure head, it's got to be

4    bigger.  Being bigger is bad electrically because

5    electrical signals go from the inside of the heart to

6    the outside of the heart; and the farther away the

7    outside of the heart is, the more likely you are to get

8    electrical noise that's disruptive of the heart system.

9    I even have a slide that will show you that.  And I

10   realize I didn't quite finish off on my explanation to

11   you before.  A lot of these people had 80 and 90%.  90%

12   is a very bad thing to have.  A 90% means emergency

13   surgery.  The reason being you have a fail safe device

14   and that is you can have coronary artery disease, and

15   the odds are, some of you do, but as long as it's less

16   than 50%, you're cool.  Because the body has so much

17   redundancy and excess capacity, you can make up for 50%.

18   And I'm not talking about the big arteries on the

19   outside of the heart necessarily.  It can even be the

20   littler ones.  But once you cross the 75% mark, certain

21   hemodynamic things happen and your heart can't make up

22   the difference.  Now, if you take cocaine or

23   methamphetamine, they both have the ability to make

24   coronary arteries contract.  And I was never sure how

25   this study got approved at the University of Texas, but

5583

1    they took a group of cocaine users with chest pain and

2    they took 'em to the cath lab and they gave 'em cocaine.

3    Now, their institutional review panel is probably

4    different than the one at Stanford was, but they did,

5    and what they found was really interesting.  Cocaine and

6    methamphetamine do make your heart vessels contract.

7    Not that much.  Only about 15%.  So if you're at 50% and

8    you lose another 15%, you're cool.  But if you're at

9    85%, you lose 15%, you're dead.  And that's why there

10   must be at least a half a dozen of these cases, maybe

11   more, where meth or coke was present.

12   Q    Now, if a person is using drugs and also has heart

13   disease and they pass away, is it possible to tell

14   whether or not they died from their disease or from the

15   drugs?

16   A    Well, sometimes, I mean, sometimes it's a slam dunk.

17   They got a blood clot in their left anterior descending

18   artery and they died from coronary artery disease

19   exacerbated by their cocaine.

20   Q    Now --

21   A    But that's on your good days.  That's on the days

22   when you're not 50 cases behind.

23   Q    Now, we've heard -- I went through excruciating

24   detail with some of these autopsies and we looked at a

25   number of these individuals had enlarged hearts.  Can an

5584

1    enlarged heart by itself cause sudden death?

2    A    You bet.  And both Dr. Rohrig and Dr. Oeberst didn't

3    give you the complete picture.  Having an enlarged

4    heart -- and I'll show you some pictures that may make

5    it clearer -- makes the risk of electrical instability

6    greater.  You don't need to have low oxygen from taking

7    too much narcotics.  That will do it, though.  That's

8    good.  You can have a cardiac arrest from having a dirty

9    thought, let alone running for the bus.  And the reason

10   why is part of the enlargement process is scarring.

11   They go together.  You can't build a skyscraper without

12   putting up a steel infrastructure.  And you can't put up

13   a bigger heart without putting up material that looks an

14   awful lot like scar because the muscle has to pull

15   against something.  And sudden death can happen at any

16   time in these people.  There are other reasons for

17   sudden death that don't have anything to do with

18   hypoxia.  Hypoxia is probably the least likely reason we

19   see for sudden cardiac death.

20   Q    Now, I asked Dr. Oeberst about enlarged hearts and I

21   believe she stated that an enlarged heart could be a

22   cause of death -- or she agreed with me that it could.

23   Do you have an opinion as to whether an enlarged heart

24   is simply a symptom of another disease process?

25   A    Well, it's a symptom of the fact that the DNA, the

5585

1    blueprint according to which your heart is constructed

2    continuously, is confused.  And a switch is thrown and

3    the heart gets bigger.  So in a sense, that's correct.

4    If you have high blood pressure -- there are pressure

5    sensors in the heart.  They're real pressure gauges and

6    the pressure gauges are related back through a series of

7    steps to the DNA.  And the DNA says, okay, we gotta deal

8    with this, we need more fuel over here; and the DNA

9    makes new molecules that will build with the pressure

10   load.  The problem comes in not so much because cocaine

11   and methamphetamine cause high blood pressure, which

12   they can, but because they turn on this same switch, the

13   poor DNA doesn't know, it's just getting this message

14   and it gets switched on.

15   Q    Now, do those responses mean that if you did an

16   autopsy and you saw the heart was enlarged and you also

17   saw scarring inside that you would not be able to tell

18   whether the cause of death was an irregular heartbeat or

19   some kind of narcotic that was also present?

20   A    I don't know how you'd do it.

21   Q    Is there a scientific test --

22   A    Well, there's one, Methadone.  If you have a genetic

23   mutation of how I metabolize Methadone, it is actually

24   possible for the Methadone, even in therapeutic doses,

25   normal reasonable sensible doses, to kill you; but you

5586

1    have to be unfortunate enough to have this genetic

2    mutation.  Actually, I'm writing a paper about that

3    right now.  But most of the time, no.

4    Q    Okay.  And we also reviewed some autopsy reports

5    that -- well, quite a few -- that mention fibrosis.  Can

6    you -- what does parivascular fibrosis mean and is it

7    the same thing as regular fibrosis?

8    A    Well, first of all, it means you got a disease.  And

9    you could have -- parivascular fibrosis most commonly is

10   a complication of myocarditis which is a virus infection

11   of the heart.  I think it's most common.  Cocaine,

12   methamphetamine, cause what's called remodeling (sic) of

13   the heart.  They change the shape of the heart and you

14   get fibers forming around blood vessels.  It is not

15   normal to have parivascular fibrosis.  It is not normal

16   to have interstitial fibrosis.  You have fibrosis

17   because good heart has been destroyed.  It's like

18   probably when I talked to you about it, it's like some,

19   maybe some of you know someone with a Keloid.

20   Parivascular fibrosis is like having a Keloid except

21   it's in the middle of the heart and it's much smaller.

22   And it's electrically dense.  Heart muscle is designed

23   to conduct electricity.  There's special fibers in the

24   heart that conduct electricity.  Scar tissue doesn't

25   conduct electricity.  Now, there's another down side to

1   parivascular fibrosis and that is simply that the

2   fibrosis squishes down the blood vessel.  The fibrosis

3   is a scar.  And as the scar forms, it makes the blood

4   vessel smaller, less blood can go through it.  So a

5   heart that has a lot of parivascular fibrosis is short

6   of oxygen.  It's short of oxygen even if the coronary

7   arteries look great.

8   Q   Now, you mention that you had some slides.  Did you

9   prepare a powerpoint that would aid the jury in

10  understanding some of these concepts that we've been

11  discussing?

12  A   I did.  I apologize for the first slide because it's

13  a little gross.

14  Q   Okay.

15          MR. WILLIAMSON:  At this time we would like to

16  display the powerpoint as a pedagogical exhibit.

17  Government has been given a copy of the presentation.

18          THE COURT:  Any objection?

19          MS. TREADWAY:  No, Judge.

20          THE COURT:  All right, sir.  Are you going to

21  mark this as an exhibit?

22          MR. WILLIAMSON:  I can print it and mark it as

23  an exhibit.

24          THE COURT:  It's up to you.

25          MR. WILLIAMSON:  Actually, we won't move to

5588

1    admit it because there are some summary of opinions on

2    there; but we should probably mark it as a demonstrative

3    exhibit for the record.

4             THE COURT:  Have you got a number that you

5    want to give to it?

6             MR. WILLIAMSON:  I believe we're up to D-0-

7    excuse me, D-020.

8             THE COURT:  D-020.  Gotcha.  That's received

9    again as one of these pedagogical exhibits.  Which means

10   you won't have it in the jury room but it will help this

11   witness explain his testimony.

12   BY MR. WILLIAMSON:

13   Q   Now, the first slide is titled heart disease.  Let's

14   move to the next page.  And, Dr. Karch, whenever you're

15   ready for us to move to the next slide, let us know.

16                    (Off-the-record.)

17   A   The first slide, this slide is just an artist's

18   rendition of what a normal heart should look like lying

19   on its side.  This is a normal heart.  This is a person

20   that got killed on a bicycle --

21                    (Off-the-record.)

22   A   Now, what I've done here is I'm holding the heart in

23   my hand.  And this is not a normal way to dissect a

24   heart, but it's just to show you the shape of a normal

25   heart.  So I've got the heart in my hand and a big old

5589

1      knife and I just cut it right down the middle.  This is

2      the left side.  This is the business end.  This is the

3      right ventricle, this is where blood comes back before

4      it goes to the lung.  Okay.

5           Next slide.  Now, that is a guy named Pecko Sacoya.

6      He is the Chief Medical Examiner from Finland.  This is

7      from a series that *National Geographic* did on national

8      health.  It's really unusual.  And I had to use this

9      rather than anything I had because you almost never get

10     somebody with a completely normal heart and somebody

11     with a totally diseased heart.  You can see this heart

12     is about twice the size of this heart.  The reason you

13     never get a nice heart like this is because the guys

14     from Stanford are there first and when the body comes to

15     the autopsy there's no more heart in it.  This is, same

16     thing, same vessel.  He's holding it by the aorta.  And

17     it's about twice the size.  This is all that ventricle.

18     You can see here this left ventricle is about the size

19     of this whole heart almost.  And, in fact, this is about

20     a 600 gram heart, 650 gram heart.  And this is about a

21     250 gram heart, which is considered normal.

22          Next slide.  I added it up, and from reading the

23     autopsies I found that all of these individuals had

24     enlarged hearts.  Now, how do I measure an enlarged

25     heart?  What's normal?  Well, there are several

5590

1   competing tables.  I think Mr. Williamson has my

2   textbook.  In the back of my textbook I have a table

3   that I did not write.  It's from the Mayo Clinic and I

4   got their permission to reproduce it.  And I'm

5   determining normal based on the Mayo Clinic chart, which

6   is based on the height.

7        Next.  Now, if we could go back a minute to the

8   picture of the Finland pathologist.  Can we zip back.

9   Okay.  If I took a knife and went right across here,

10   just like that, now we can go back to the other one.

11   That's what you'd get.  That looks like a soccer ball.

12   Now it doesn't take a lot of imagination to see here's

13   the center and it's a lot smaller than it should be so

14   it's not holding enough blood.  And here is the outside

15   over here.  So that means any electrical signal which

16   starts right there has got to get from here to there.

17   And common sense would tell you that's going to take a

18   lot longer to get from here to there than from here to

19   here.  Now, this is the same heart.  But what I've done

20   is taken a knife and gone right through it.  Normally a

21   heart measures 1.2 centimeter and 1.4 centimeter thick.

22   In this particular case, it's almost two centimeters.

23   So that's a hell of a long way for electricity to be

24   moved from cell to cell.

25        Next slide.  This is an astonishing illustration

5591

1    because it's real and it was made like 25 years ago when

2    PC, when Mac -- I'm sorry -- when IBM still ran reels of

3    tape.  And what they did was they took a heart out of

4    somebody.  When you take somebody's heart out and say

5    they've died of a stroke, they're not dead yet, they're

6    in a permanent vegetative state, the heart is still

7    beating.  And so what they were able to do is they got a

8    heart like that and put in hundreds and hundreds of

9    electrodes and then did like a 500 channel recording of

10   what happened to one cardiac impulse as it traversed the

11   heart.  Now the colors here are wrong and I don't know

12   why but the signal to start is right here.  That's

13   called the sinoatrial node.  And it gets transmitted

14   down here to the atrial ventricular node.  It breaks up

15   in two little nodes called the AV nodes or tracks.  And

16   then it goes out into the heart and goes muscle cell to

17   muscle cell to muscle cell.  The blue and the dark

18   color, whatever you want to call it, means that's really

19   electricity arrived last.  So you can see, in this

20   heart, this is the appropriate distance; but you can go

21   back, if you want me to, I can show you that big round

22   heart again.  It's like twice as far away.  Next

23   picture --

24   Q   Doctor, let me interrupt you for a second.  When

25   it's twice as far away, what does that mean about the

5592

1    natural pulses and how does that effect a person?

2    A   Well, what that means is is the transmission through

3    muscle is much slower than transmission through nerve.

4    So you have signals arriving at different times and

5    these signals can cross each other and bounce off each

6    other and make the heart beat irregularly.

7    Q   And what is the effect of an irregular heartbeat?

8    A   Well, it could be just palpitations.  I'm sure

9    everybody in the room has had a palpitation.  Or it

10   could be a prolonged arrhythmia.  You might faint.  Or

11   it could be a real prolonged arrhythmia and you might

12   die.

13   Q   All right.  We can move to the next slide.

14   A   This is a crosssection of the left anterior

15   descending coronary artery.  It is the most important of

16   your coronary arteries.  It's a nice normal healthy one

17   and hope that yours looks like that.  You see how big

18   the space is.  This is called the media, this red stuff.

19   And it's muscle.  And so when you have a call for more

20   blood to flow through or less blood to flow through,

21   this muscle contracts and expands to control the caliber

22   of that.  This is Kandace B and this is a blood clot in

23   her left anterior descending artery.  You can see there

24   isn't any space.  And I can't tell you what's happening

25   up here.  There may be some space on top.  But you've

5593

1      sure lost all that.

2   Q   Now, so what -- make sure we understand what we're

3      looking at.  This coronary artery, when you see on the

4      right slide, is that a blockage we're looking at?

5   A   No, this is --

6   Q   No.  On the right.

7   A   Yes, that's a blockage.

8   Q   Okay.

9   A   Now we can go to the next slide.  Again, we've got a

10     color issue here.  This is a normal heart.  I filched it

11     from the Brown University digital pathology collection

12     so nobody can say I had a funny idea of normal.  This is

13     what it looks like.

14  Q   Okay.  Let me interrupt you.  With the white spaces

15     on the normal slide, what do those white spaces

16     represent?

17  A   They're just space between the cells.  When you

18     preserve tissue, it takes a little bit of a beating when

19     you cut it with a knife and there's some space there.

20  Q   Okay.  And we're looking at Heather M.  What is that

21     we're looking at in regards to Heather M?

22  A   Well, you see this material.  This is all terrible

23     scar.  This is all awful scar.  And Dr. Dudley said in

24     her report that the heart was normal.  And, in fact,

25     this is a profoundly abnormal heart.  Verging on heart

5594

 1   transplant country.

 2   Q    You say horrible scarring.  Can you just show the

 3   jury again where is this scarring you're mentioning?

 4   A    (Witness Indicating)

 5   Q    And how does that effect a person's heart operation?

 6   A    Well, because with this much scar, that means

 7   there's that much less muscle; and with that much less

 8   muscle, you don't get the heart to forcefully contract

 9   enough.  You can go into heart failure.  But my bigger

10   concern is there are electrical signals going all over

11   this thing, and I'll show you that in the next graph,

12   and those signals don't stand a chance in getting to the

13   right place at the right time.

14   Q    Now, are you ready for the next slide?

15   A    Neither of these are patients that are -- or

16   decedents that are being discussed.  This is about what

17   you can see in somebody who has a heart attack, keels

18   over and dies, and that's the end of it, maybe has a

19   minute or two of CPR.  And you can see there's

20   hemorrhage already.  And that's hemorrhage because the

21   blood flow's been blocked off and the muscle cells are

22   starting to break down.

23   Q    Is the darker color the hemorrhage?

24   A    Those are red blood cells.  Each one of those round

25   dark things are red blood cells.

5595

1    Q    What does that mean?  Because you have to remember,

2    we're not scientists and this is kind of new information

3    to us.  When you see these hemorrhages, what does that

4    mean?

5    A    It means something's real wrong.  And it means that

6    a vessel or an organ has been disrupted and is bleeding.

7    In this case it's the heart muscle itself that's

8    bleeding.

9    Q    And the right slide where it says recovered?

10   A    This is what happens if that happens to you and you

11   get good CPR and you go to the hospital and you get an

12   angioplasty and you survive and you get out of the

13   hospital two weeks later.  You have this white material

14   which is exactly like the white material I showed you in

15   the other slide.  This is all scar.  Now, may sound

16   flippant, but we refer to it as gristle.  The biggest

17   advance in modern cardiac surgery in the last couple

18   years is I can make a GPS map of the inside of the

19   heart.  I can't, but people can.  And so I know within

20   two decimal points where that is.  I can say that's 1.23

21   inches from the right border of the heart, one and a

22   half inches above, blah, blah, blah.  And then I just

23   put in, connect to a robot a catheter with an electrode

24   on it and direct it to those coordinants, dial in the

25   coordinants, catheter zips up there and blows up that

5596

1    white stuff.  It burns it up.  And that leaves -- that's

2    taken away a barrier for the normal flow of electricity.

3    As it stands now, there's not a hell of a lot of chance

4    that signals are going to get through there in a

5    coordinated fashion.  Whether you got a lot of oxygen,

6    whether you don't have a lot of oxygen, whether you got

7    drugs, whether or not, don't matter.  This is purely

8    structural mechanics.  These were the ones that I could

9    see.  I didn't get to see all the slides, but these are

10   the ones that I saw that if I'd been given a heart

11   biopsy with any -- and any of them looked like those

12   pictures I showed you, and they did, I would have said,

13   well, you need drugs to change the structure of the

14   heart.  And there are drugs that can make these scars

15   dissolve.  If they're past a certain point, the drugs

16   don't work and you have to go the electrical destructive

17   route.  But up to a point there are drugs that will

18   reverse these changes.  And if they're not reversed, the

19   outcome is probably going to be death.

20        Here again, same.  You saw this picture already.

21   It's a normal heart.  That's a piece of dirt.  I didn't

22   clean the slide.  This is all scar tissue in Eric T.

23   What do you think the odds are of an electrical signal

24   will get through that?

25   Q    Is that significant heart scarring?

1    A    Yeah.  I mean, it -- that's not heart transplant

2    country, that's not good enough to put you into heart

3    failure, but it's certainly big enough to put into your

4    report as being substantial interstitial fibrosis.

5         Next slide.  Now, this one is so good, or so bad.

6    It is one of the patients.  This should be in the fifth

7    edition of my textbook because it's one of the most

8    profound examples I've seen.  This is what's called an

9    intra myocardial pressure vessel.  It controls the flow

10   of blood through your heart muscle.  I mean, you all

11   know that you got those big fat arteries on the outside

12   of the heart and the big fat arteries give off little

13   arteries that go through the heart.  When you use drugs,

14   cocaine, meth, or if you've got really bad, bad high

15   blood pressure, you end up with this happening.  Now

16   look, this whole space from here to here should be all

17   white.  What you've got is you've got enlargement of the

18   outer layer of the heart and enlargement of the middle

19   layer of the heart.  And instead of having a big space

20   like this, that's all the blood that's going through the

21   heart.  And that's all the blood that would go through

22   the heart no matter which drug you took.  There is no

23   drug you could give to make that space bigger.  There is

24   no drug you can give to make that space smaller.  There

25   are drugs you can give that may cause the heart to

5598

1    change its infrastructure over a period of six months or

2    a year.  You'll see this sometimes in very bad

3    hypertensives.

4        Here's another blood vessel.  Look, this should be

5    you know, the size of, I don't know, it looks there like

6    about a dime.  And that's the space in it.  And that's

7    supposed to be all space.

8    Q   So make sure we understand.  Those two blood vessels

9    that you describe, the white area where we see the

10   space, that should be, in both of 'em, larger at least

11   to I guess where the lighter blue ring on the right

12   blood vessel begins?

13   A   It should be the whole thing.  It should be from

14   here where you see this fat cell -- I suspect this

15   person was overweight -- all the way down to there.

16   That should all be empty.  There shouldn't be any

17   impedence of flow.

18   Q   Next slide.

19   A   And this is just out of a recent journal article and

20   the deleterious effects of myocardial fibrosis.  And

21   here you see what happens in the nice normal heart.  The

22   electrical signal goes zip, zip, zip, zip, zip, right

23   across.  And here's what happens when you have the scars

24   I've shown you.  Look what, you know, you go over here

25   and it bounces off and it goes that way and it goes back

5599

 1    towards where it came from and this one goes south of

 2    where it should be and that one is north of where it

 3    should be.  But except for the branch it sends off, it

 4    goes back to where it came from.  And it's complete

 5    havoc.

 6    Q    And these impulse conductions, is that what makes

 7    the heart beat?

 8    A    Yes.

 9    Q    And if you have irregularity in that impulse, could

10    that cause a spasm of the heart?

11    A    Well, it would deprive it of oxygen.  Yeah, it could

12    cause a spasm of the heart, sure.

13    Q    All right.  Next slide.

14    A    Of the charts that I got to review, this was just a

15    summary in Counts 2 through 5, I found that nine charts

16    were complete and 12 were incomplete by NAME standards.

17    Not by my standards, just by the National Organization

18    of Medical Examiners' standards.  So 72% of 58 reviewed

19    decedents had evidence of serious potentially or fatal

20    heart disease.

21         Now, I'm not saying that heart disease killed a

22    single one of 'em.  I don't know.

23    Q    And let's turn to that.  Let's go to -- just go to

24    the next slide for me.  You were asked to review the

25    autopsies and determine whether or not you could

5600

```
 1   determine what the cause of death was; correct?
 2   A   Yes.
 3   Q   And in doing that, did you prepare a summary of a
 4   document that summarizes your opinion in regards to the
 5   individuals listed in Counts 2 through 5?
 6   A   I did.  I may have -- I made a briefing book up and
 7   put a summary of each case, a one or two sentence
 8   summary.
 9   Q   And would it assist you to have that book in front
10   of you --
11   A   It would.
12   Q   -- as we talk about these individuals?
13   A   Thank you.
14   Q   Now, let's turn to Patricia G.  Were you able beyond
15   a reasonable doubt to determine what Patricia G's cause
16   of death was?
17   A   Well, she didn't have an autopsy so I have no idea
18   what her cause of death was.
19   Q   Well, the Government says that Dr. Schneider caused
20   the death.  How can that be determined if there's no
21   autopsy?
22   A   You'd have to ask the Government.
23   Q   And when you say no autopsy, do you mean only an
24   external examination was performed?
25   A   Well, I consider only an external examination no
```

5601

 1    autopsy.

 2    Q   And let's turn to Eric T.  Were you able to

 3    determine beyond a reasonable doubt what his cause of

 4    death was?

 5    A   No.  According to Dr. Oeberst's description, and she

 6    did do microscopic examinations, this decedent met every

 7    criteria for having active myocarditis.  And myocarditis

 8    can kill you.  So I sort of put that down in one column.

 9    He also had a huge heart just like you saw on the

10    picture.  But he also had multiple drugs.  So you could

11    put the three causes in a hat and pull out a piece of

12    paper.  I don't know how to tell.

13    Q   Well, is there a technique -- when you have all

14    these co-possibilities, is there a scientific technique

15    to eliminate one or the other and make a selection?

16    A   Well, there is in that had hair testing been done

17    and there was very low levels of the drugs, yeah, then I

18    would have to say, well, it's myocarditis and

19    cardiomegaly, and/or cardiomegaly and I don't know which

20    one would be first and which one would be second.  But

21    without a hair test to let me know whether or not the

22    person was tolerant, no, it's a guess.  So we're not

23    paid to guess.  I tracked for many years in the San

24    Francisco office what percentage of deaths are

25    undetermined.  And it's always between 4 and 5.  In

5602

```
 1    Europe sometimes it's as high as 6 or 8.  I mean, you
 2    can't go too high or you won't have a job.  I mean, if
 3    everybody's undetermined, they don't need you.  But I
 4    would have to say it's undetermined.
 5    Q    And next Robin G.  Were you able to determine beyond
 6    a reasonable doubt what her cause of death was?
 7    A    I think it was heart disease.  I'm discounting the
 8    Fentanyl entirely based on Apple's new evidence that you
 9    could have zero Fentanyl when you die and then have a
10    whole lot of Fentanyl when your autopsy occurs.  Since
11    that's proven, I have no way, no method.  I can't take
12    that into account.  As far as I'm concerned, it proves
13    that sometimes she was treated with Fentanyl.  She might
14    have been treated with Fentanyl before she died.  She
15    might not.  I suppose a detailed review of hospital
16    records might show that she had been given an injection
17    of Fentanyl within an hour or so before she died; but I
18    didn't have that opportunity.  So given the information
19    I have, she's got an enlarged heart with fibrosis; and,
20    oh, by the way, has pneumonia.  And more than a few
21    people die from pneumonia.
22    Q    And is there a scientific technique that would have
23    eliminated the -- is there any way to determine what the
24    Fentanyl level was at the time prior to her passing
25    away?
```

5603

1    A    No.

2    Q    Next let's talk about Billy R.  Were you able to

3    determine beyond a reasonable doubt as to what Billy R's

4    cause of death was?

5    A    No.  She had an enlarged heart, as you've all seen.

6    She also had organizing pneumonia.  Organizing pneumonia

7    just means the pneumonia has been present for more than

8    a few hours.  It's taken quite a wild amount and

9    effective anti pneumonia response; and you can see that.

10   And so she's got two potentially fatal diseases.  And a

11   number that I don't know how to interpret.

12   Q    And the number, do you mean the toxicology number?

13   A    Yes.

14   Q    And why don't you know how to interpret it?

15   A    There is no method.

16   Q    Were there any -- would hair testing have assisted

17   in determining Billy -- how -- strike that.

18        Would hair testing have been able to help you

19   interpret the levels of drugs present in her system?

20   A    I can't say.  It wouldn't have determined the levels

21   present in her system at the time of her death, no.  It

22   would tell you whether she was on, chronically, on

23   Fentanyl.  For instance, was she a pain patient with

24   Duragesic patches.  Then the number would be less

25   impressive.  But it would be useful information.

5604

1    Something to take into account.

2    Q    Okay.  Now, Bradley S.  Were you able to determine

3    beyond a reasonable doubt as to Bradley S' cause of

4    death?

5    A    No.

6    Q    Why not?

7    A    His heart was massively enlarged and multiple drugs

8    were present and I don't know how to tell the

9    difference.

10   Q    Okay.  And, again, is there a scientific method to

11   tell the difference?

12   A    None that I've ever heard of.

13   Q    Dalene C, were you able to determine whether or not

14   beyond a reasonable doubt what her cause of death was?

15   A    No.  First of all, that is an incomplete

16   examination.  No microscopic examination was performed.

17   The narrative history says she was a drug abuser which

18   sort of suggests that she was tolerant but doesn't prove

19   it.  And many drugs were present.  I would call it

20   undetermined.

21   Q    Evelyn S.  Were you able to determine beyond a

22   reasonable doubt as to what her cause of death was?

23   A    Again, no.  I mean, my -- I lean very strongly

24   towards calling it a natural cause of death.  She was a

25   drug user by narrative history.  She had sick sinus

5605

1    syndrome.  Now, remember when I showed you the

2    electrical map of the heart?  That's the inside part.

3    That's where you put the pacemaker.  And, of course, the

4    pacemaker could have broke.  Battery could have run

5    down.  The pacemaker wire could have come free.  None of

6    these things were really documented.  And the pacemaker

7    device itself was never sent back to the manufacturer

8    for maintenance -- for -- maintenance -- for a computer

9    query.  Normal procedure for medical examiner offices

10   always is to take medical implants like an insulin pump

11   or like defibrillator or like a pacemaker and put it in

12   a box and send it back to Medtronics and say, hey, was

13   this thing working when this person died.  And they will

14   tell you.

15   Q    And did you see any evidence in the autopsy report

16   that those steps were ever taken in regards to Evelyn S?

17   A    They were not taken.

18   Q    Heather M.  Were you able to determine beyond a

19   reasonable doubt as to what her cause of death was?

20   A    No.  She had extreme myocardial fibrosis.  And that

21   certainly could be the cause of death.  Even though Dr.

22   Dudley thought the heart looked normal.  She had,

23   according to the narrative history, she was an

24   intravenous drug abuser.  And there were multiple drugs

25   present.  And perhaps somebody more experienced than I

5606

1    would know how to separate that, but I don't.

2    Q    Now, are you stating -- strike that.  We'll talk --

3    we'll wrap up at the very end.  Jeffrey H.  Were you

4    able to tell beyond a reasonable doubt as to whether or

5    not Jeffrey H -- what his cause of death was?

6    A    Well, he was sort of a perfect trifecta.  He had an

7    enlarged heart.  He had coronary artery disease

8    involving multiple blood vessels.  He had parivascular

9    fibrosis.  He had interstitial fibrosis.  So that all

10   argues to a natural death.  The only confusing factor is

11   that multiple drugs were present.  And there is no way

12   to tell whether the multiple drugs or the heart disease

13   did it.  Now, there are special tests that you can do to

14   tell whether somebody's had an acute cardiac event.  But

15   they're not routinely done in medical examiners offices

16   unless it's somebody like me that's interested in it.

17   There are a couple of techniques that will tell you

18   within 15 minutes of a heart attack very conclusively.

19   But they weren't done here, nor would I expect them to

20   be done here.  They're not NAME norms.  They do,

21   however, exist.

22   Q    What kind of tests are those?

23   A    Well, they're dyes.  They're immunohistochemical

24   dye.  And what you do, you make an antibody to part of

25   the heart muscle, inside, you grind up a whole bunch of

5607

```
 1    heart muscles and you make an antibody to one of the

 2    components and then you screw it on to a label torch, a

 3    molecule that fluoresces, and then you wash the slide in

 4    this and if it takes it up then that's proof that the

 5    stuff shouldn't be out there.  The older technique and

 6    the one that I learned and normally use in animal

 7    research in mice was nitrotestra (ph) blue.  And you cut

 8    the heart in half and you have blue stuff called

 9    nitrotestrazonium and you stick the heart in it and the

10    area that does not stain blue is infarcted because it

11    doesn't take up the dye.

12    Q   Even though those tests aren't NAME standards, are

13    they commonly known to pathologists and medical

14    examiners?

15    A   You know, I can't speak for all of them.  I suspect

16    for those of us that -- those people that don't do

17    cardiac pathology, they may not be.

18    Q   Now let's turn to -- let me just follow up with one

19    more thing.  If you say -- let's say you notice a

20    pattern of let's say 78% of autopsies that you do have

21    the people have severe cardiac issues.  But they also

22    were chronic pain patients.  Would these tests be

23    something you could do in that patient population to

24    determine whether or not these drugs that happen to be

25    on board were actually the cause or whether the person
```

1   suffered from an acute cardiac event?

2   A    If I got all that, you have a limited time window.

3   You can't do this out of stuff that you keep in a stock

4   pot.  So you have to know what you're looking for to

5   begin with or within a couple hours.  Put tissue aside

6   for it.  But if you knew those were all issues, I'd sure

7   pester my boss to let me do it.

8   Q    Okay.  Now let's turn to Jeffrey J.  Were you able

9   to determine beyond a reasonable doubt as to what his

10  cause of death was?

11  A    No.  He had a history of extreme chest -- a history

12  of chest pain.  He had a history of drug abuse.  He had

13  a history of coronary artery disease, which, of course,

14  causes chest pain.  And those would all be natural

15  causes of death.  He had an incomplete autopsy which

16  makes it very hard to decide what was going on.  And he

17  had multiple drugs present.  So the only plausible

18  explanation is undetermined.

19  Q    And Jo Jo R.  Were you able to determine beyond a

20  reasonable doubt what her cause of death was?

21  A    This was another person without a complete autopsy.

22  No microscopics.  Multiple drugs were present.  I don't

23  know which was responsible.

24  Q    Now, so when you have a situation where you have --

25  and I think we've talked about in theory previously but

1    let's talk about it in practice.  When you have an

2    individual like Jo Jo R where there's no microscopics,

3    as we saw with, let's say, Evelyn S, are you able to

4    tell whether or not this person had bronco -- I mean

5    interstitial or parivascular fibrosis?

6    A    No.

7    Q    Are you able to -- what other things are you not

8    able to see when you don't have these microscopics?

9    A    Well, I mean, tumors metastasize to the heart about

10   10% of the time.  There are systemic diseases that

11   people have like rheumatoid arthritis that can involve

12   the heart.  There is -- the big bugaboo is HIV which

13   causes secondary infections of the heart.  Remember, I'm

14   speaking only about the heart.  I'm not speaking about

15   autopsies.  I don't do autopsies.

16   Q    Right.  Okay.  Now let's look at Kandace B.  Were

17   you able to determine beyond a reasonable doubt the

18   cause of death for Kandace B?

19   A    No, I was not.

20   Q    And why not?

21   A    Well, she had perivascular fibrosis.  She had a clot

22   in her most important coronary artery diseased which

23   would have limited flow to most of the muscle in the

24   heart.  And she had multiple drugs present.  And there

25   were no tests done to determine whether heart disease

5610

1    was active and there is no way to interpret the drug

2    level.

3    Q    Turning to Katherine S.  Were you able to determine

4    beyond a reasonable doubt what Katherine S' cause of

5    death was?

6    A    This is another incomplete examination.  She had an

7    enlarged heart and she was grossly obese.  And gross

8    obesity is a risk factor for sudden death full stop.

9    You don't need any drugs or cigarettes or -- I guess you

10   just need Micky D's.  So I suspect it was natural.

11   Q    Okay.  Now, can you explain to the jury how does

12   just being -- I think you say grossly obese -- how can

13   that just lead to sudden death without the involvement

14   of any medication?

15   A    Because it leads to obstruction of the small blood

16   vessels inside the heart so that they're ischemic,

17   they're short of oxygen, even when they're watching

18   television.  And also because of what I explained about

19   the geography of the heart that the fatter you get, the

20   bigger your heart gets, the more likely electrical

21   signals are to become confused.

22   Q    Now, was that Katherine S we just discussed?

23   A    You're asking me.

24   Q    Let's move to Mary S.  Were you able to determine

25   beyond a reasonable doubt what her cause of death was?

5611

1    A    No.  She had a 90% obstruction of the left anterior

2    descending artery, which, as I said before, is the most

3    important coronary artery.  It is known in the trade as

4    the widowmaker.  And I guess even in men -- I mean, even

5    in women.  Although you see it less in women.  So there

6    isn't any way to tell whether the drugs made the

7    coronary blockage worse or whether they were completely

8    responsible or whether they weren't responsible at all.

9    And I have no idea how you would take that into account.

10   Q    Now, when you're saying you have no idea how you

11   take that into account, is that based off of your hours

12   and hours and hours of research into these areas?

13   A    Yes.

14   Q    Is this based off of the expertise that you've

15   developed in making your textbooks?

16   A    Well, partly, but part of it is -- the biggest part

17   is the research.  What I would do for -- early on our

18   laboratory did several very important papers.  We

19   predicted unbias what would happen.  We didn't have a

20   name -- but we predicted unbias what happened.  And we

21   wrote this enormous series of autopsies on

22   methamphetamine users.  And I didn't analyze the data.

23   I just took all the data.  And I gave it to the

24   University of Nevada where the professor of

25   biostatistics was teaching a graduate seminar and for

5612

```
 1    one year his six graduate students did my work.  I had
 2    to give him credit on the paper because the graduate
 3    students didn't get their name on the paper and we
 4    couldn't find any way.  I mean, we spent a year at it.
 5    Q    So this is something when you're telling the jury
 6    that you don't know of a way, you've actually been on
 7    the ground and you've tried to determine a way; is that
 8    correct?
 9    A    Yes.
10    Q    Now, Mary Sue L, were you able to determine beyond a
11    reasonable doubt as to what her cause of death was?
12    A    She had an incomplete autopsy.  And there were drugs
13    present.  They made the mistake of testing heart blood.
14    And Dr. Rohrig has already explained to you why heart
15    blood is not valuable except for screening purposes.
16    And her heart looked disastrously diseased to me.  Even
17    though Dr. Dudley felt it was not -- felt it was normal.
18    Q    Now, Pamela F, were you able to determine beyond a
19    reasonable doubt what her cause of death was?
20    A    Well, she had a number of candidates.  She was truly
21    massively obese.  The National Heart and Lung Institute
22    divides your risk categories with different designators.
23    Body mass index is calculated by dividing your weight in
24    kilograms by the square root of your height in meters.
25    Doesn't matter.  There are tables for it.  And if you're
```

5613

1    interested, you can just go to the National Heart and

2    Lung Institute and they have a table that will tell you

3    what your body mass index is.  And a marathon runner

4    would be about 15.  I'm closer to 25 or 26.  Eugene I

5    would best guess at --

6    Q    Are you talking about me?

7    A    20.

8    Q    You mean me?

9    A    Yeah.

10   Q    I'm Lawrence.

11   A    Lawrence, I mean.  Eugene may, too.  You're

12   considered obese if you're over a number of 30.  You're

13   considered fat if you're between about 27 and 30.  And

14   you're considered morbidly obese, which means you are

15   sick and you're probably gonna die, is over 40.  This

16   woman was over 40.  She had an enlarged heart as would

17   be expected.  She had perivascular fibrosis and she had

18   interstitial fibrosis.  All of which could have been a

19   natural cause of death.  She had severe medial

20   hyperplasia, which is blockage of the arteries within

21   the heart.

22   Q    Now, let's pause here for a second because the jury

23   saw a lot of these autopsies and many or most if not

24   every last one of them in Count 5 it was listed

25   something like, A, cardiomegaly; B, coronary artery

5614

 1    disease; C, pneumonia.  Then maybe D it would say mixed

 2    drug intoxication.  And the Sedgwick County Medical

 3    Examiners said that that mixed drug intoxication

 4    contributed to the death even though these natural

 5    processes and diseases were there.

 6         Do you disagree with that kind of analysis?

 7    A   I'm sure there's some cases where it did.  I just

 8    don't know how they decided which is which.

 9    Q   And is that what you're telling the jury?  That

10    there's just not a test to say in that kind of scenario

11    that, outside of what you discussed with them, that the

12    mixed drug actually contributed to these natural

13    processes that would be there regardless if they were on

14    drugs or not?

15    A   That's what I'm saying.

16    Q   Now let's go to Patsy W.  Were you able to determine

17    beyond a reasonable doubt as to what her cause of death

18    was?

19    A   No.  She was a very sick woman.  Remember I just

20    told you the marathon runners are around 14 or 12.

21    Women usually stop menstruating at about 12, maybe 15.

22    This woman had a body mass index of 15 which suggests

23    profound disease.  She had liver disease.  She had early

24    cirrhosis.  She had had a previous myocardial

25    infarction.  And I would guess -- I don't have the

5615

1    numbers at the tip of my fingers -- but an educated

2    guess would be that most people who have had a heart

3    attack and survived it die of the scarring causing

4    disruption of electrical activity and they die suddenly.

5    350,000 people die in the United States every year and

6    their first symptom is being dead.

7    Q    Is that why heart attacks are sometimes known as the

8    silent killer?

9    A    That is why.

10   Q    And with Robert S, were you able to determine beyond

11   a reasonable doubt as to what his cause of death was?

12   A    I believe it was an accidental death in the sense

13   that it was a drug death.  He had an enlarged heart.

14   And not to be boring, but the enlarged heart needs more

15   oxygen because there's more heart.  Now, there is an

16   enormous volume of dispute in literature about whether

17   marijuana causes psychosis, causes heart attacks, causes

18   all sorts of horrible diseases; or whether or not it's

19   therapeutic.  I don't know the answers to any of those

20   things.  One thing that is known for sure about

21   marijuana, and this is absolutely a hundred percent sure

22   take to the bank, it makes your heart beat faster.  And

23   anything that makes your heart beat faster makes your

24   heart use more oxygen.  If you already have an inability

25   to supply enough oxygen at rest, what's going to happen

5616

1    when your heart rate doubles?  Nothing good.  So my

2    guess is this is a natural -- an accidental death with

3    contributory heart disease.

4    Q    And what, based on the marijuana being present?

5    A    Yes.

6    Q    Okay.  Now, Terry C.  Were you able to determine

7    beyond a reasonable doubt what his cause of death was?

8    A    No, because there's no way I can tell whether the

9    Methadone that was detected in his blood was there when

10   he died.  And also because he had -- had he walked into

11   the emergency room, he would have had heart surgery that

12   night or at least stints put in that night.

13   Q    And why is that?

14   A    Because he had 90% blockages to the two most

15   important arteries.

16   Q    And with a 90% blockage, if he would have taken any

17   substances that would have sped up his heart, let's say

18   methamphetamine, could that have caused the -- a spasm

19   in the artery?

20   A    Certainly could.

21   Q    But based on what the medical examiner did and in

22   regards to their autopsy, were you able to make the

23   distinction?

24   A    Let me see the autopsy.  Could you let me have a

25   copy of the autopsy?

5617

1          MR. WILLIAMSON:  I can pull a copy, Your

2   Honor.  Which --

3          PARALEGAL MR. MOORE:  5-C.

4                    (Off-the-record.)

5   A   Yes, I'd forgotten.  She had 80 to 90% occlusion of

6   the left anterior, which is the most important.  There

7   were 90% occlusion in spots within the right coronary.

8   Now, in addition to that, she was born with a slightly

9   small ostium; and an ostium is where the coronary artery

10  starts.  It doesn't matter the coronary artery itself is

11  good.  The hole going into it isn't so good.  And she

12  had mixed drug intoxication.  And she had a huge heart.

13  She had a 550 gram heart just like that picture on the

14  screen.  She had perivascular and interstitial fibrosis.

15  And the Methadone is impossible to make any sense of.  I

16  notice a lot of Tramadol, which is not particularly

17  toxic.  In fact, Tramadol is not even a scheduled drug.

18  So it was undetermined.

19  Q   Let's turn to Toni W.  Were you able to determine

20  beyond a reasonable doubt as to Toni W's cause of death?

21  A   It's almost a complete replay of Robert S.  There

22  were 90% blockages of the left and right -- no, it was

23  the left and the circumflex I think.  And no testing was

24  done to rule out infarction.  And the Methadone

25  concentration was low; but if he'd not had Methadone, it

5618

1    would have been enough to kill him.  If he had been a

2    regular Methadone concentration -- user, then the

3    concentration was irrelevant.  So I had to go to

4    undetermined.

5    Q   And Toni W, did she have an enlarged heart?

6    A   She had a large heart and she was large.  She was a

7    body mass index of 41, which is extraordinary.  And she

8    was also a cocaine user.  So it was certainly an

9    accidental drug related death.

10   Q   And is that because the cocaine, again, causes these

11   different electronic impulses in the heart?

12   A   Well, it causes spasm of the coronary arteries.

13            THE COURT:  Are you still on Toni W?

14            MR. WILLIAMSON:  Yes, sir, Your Honor.

15            THE COURT:  All right.

16   A   There is one other factor.  Cocaine, unlike

17   methamphetamine, can combine with one of the lock and

18   key receptors on coronary arteries to disrupt electrical

19   signals even more than they would be disrupted by being

20   obese and even more than they would be by having a large

21   heart.

22   Q   Okay.  And Victor J, were you able to determine

23   beyond a reasonable doubt what his cause of death was?

24   A   No.  For two reasons.  It was an incomplete autopsy.

25   There wasn't a microscopic image done.  And I know my

5619

1    error rate is low because I've actually tested myself

2    and I can tell you whether somebody is a meth -- coke

3    user.  I can't tell you which one; but with better than

4    80% accuracy, I can.  Unfortunately, I didn't have that

5    opportunity.  And I would have loved it because his

6    methamphetamine level was about as high as I've ever

7    seen, recorded or discussed.  So he was either

8    exceedingly tolerant or he died from methamphetamine

9    toxicity.

10   Q    How come you didn't tell the difference?

11   A    They both cause the same set of changes.

12   Q    And I believe that covers all the individuals in

13   Counts 2 through 5.  Just a few follow-up questions.

14   When you have a person who -- strike that.

15        Is there -- what effect do opiates have on the

16   cardiac system?

17   A    Well, this will sound really strange, but they're

18   protective.  If any of you are unfortunate enough to

19   have to have open heart surgery, you will be given

20   Fentanyl.  Now, several of the decedents here today had

21   Fentanyl levels and they were said to be high.  They

22   were around 20.  If you're doing an open heart case,

23   your Fentanyl level is likely to be 50 to 70.  Now,

24   that's not for relief of pain because you're getting

25   internal anesthetic.  It is to protect the heart.  And

5620

```
 1    infant Fentanyl has been largely replaced by a drug
 2    that's a hundred times more powerful than Fentanyl
 3    called Sufentanil.  And not just the Fentanyl, but also
 4    morphine and perhaps some other opiates have been shown
 5    to be cardioprotective.  So they cause death by stopping
 6    respiration, which is a pretty good way to cause death.
 7    But as for toxicity to the heart, actually, no, they're
 8    cardia protective.
 9    Q   Does that mean it's actually beneficial to the
10    cardiac system?
11    A   Absolutely.
12    Q   Now, let's go to the next slide of your powerpoint.
13    And does this summarize that of the 21 individuals in
14    Counts 2 through 5, 19 of them had severe cardiac
15    issues?
16    A   I believe that does.  I would triple check the
17    names; but that appears to be correct.
18    Q   And the next slide, the remaining two, Victor J, is
19    that the individual you just told the jury about that
20    had the high concentrations of methamphetamines?
21    A   It was truly world class.
22    Q   And Patricia G, I think you told the jury that no
23    autopsy was performed?
24    A   Correct.
25    Q   You weren't given any evidence as to how these
```

5621

1    individuals were selected by the Government to be

2    included in the Indictment, were you?

3    A    No.  My presumption was that --

4              MS. TREADWAY:  Objection.  Calls for

5    speculation.

6              THE COURT:  Well, let me hear his answer and

7    then I'll decide.  He said he presumed something.

8    A    Thank you, Your Honor.  My presumption was that

9    somebody had looked for cases where the accused' name

10   appeared.  And, obviously, some of them had pain and

11   were taking pain medicines.

12   BY MR. WILLIAMSON:

13   Q    And does it --

14             THE COURT:  I think that requires me to

15   sustain that objection.  If you want to lay more

16   foundation, you can.  All right?

17             MR. WILLIAMSON:  That's okay, Your Honor.

18   Thank you.  One second please.

19                   (Off-the-record discussion.)

20   BY MR. WILLIAMSON:

21   Q    One more point, Dr. Karch, I'd like to discuss with

22   you in regards to performing autopsies and making

23   autopsy reports on these autopsies.  There's a place for

24   narratives.  Is that pretty standard in the industry to

25   have a narrative on the autopsy report?

5622

```
 1   A   Yes.  And, in fact, that's where I got most of my
 2   information.
 3   Q   And what type of information is the narrative
 4   supposed to include?
 5   A   Well, I don't think there's any --
 6             MS. TREADWAY:  Objection.  Lack of foundation.
 7   Dr. Karch has just testified he doesn't perform
 8   autopsies.
 9             MR. WILLIAMSON:  I'll ask another question,
10   Judge.
11             THE COURT:  Please do so.
12   BY MR. WILLIAMSON:
13   Q   Do you review autopsy reports regularly in the
14   course of consulting?
15   A   Yes.
16   Q   And when you review autopsy reports, what kind of
17   information is applicable for you to review in order to
18   form an opinion?
19   A   Well, when I do it, I have every bit of information
20   that's available.
21   Q   Now, we talked about Toni W.  Which -- Toni W --
22             PARALEGAL MR. MOORE:  5-R.
23   BY MR. WILLIAMSON:
24   Q   I'm going to hand you 5-R-7, which is the autopsy
25   report of Toni W.  Toni W's mother testified the other
```

5623

1    day that when she found Toni, she was laying in a pool

2    of blood, her -- all the medicine in the house had been

3    taken and her purse had been also stolen from the -- or

4    money had been stolen out of Toni's purse at the scene.

5    Can you look in that autopsy and tell us whether or not

6    any of that information is included in the circumstances

7    of death narrative?

8    A    No.

9    Q    Would that be part of the history you would want to

10   see and know when you're reviewing all the relevant

11   findings?

12   A    It would be contributory.

13           MR. WILLIAMSON:  I don't have anything else,

14   Your Honor.

15           THE COURT:  Mr. Byers?

16           MR. BYERS:  Nothing, Your Honor.  Thank you.

17           THE COURT:  All right.  Now, I think rather

18   than launch into cross-examination at 20 minutes 'til

19   12, we'll take our noon recess until 12:45.  And

20   remember and heed the admonition.  Thank you.

21               (Recess.)

22

23

24

25

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas