5624

1              (Beginning at 12:45 p.m. June 7,

2              2010, the following proceedings

3              continued.)

4         THE COURT:  Is the temperature okay for you

5    all?  All right.  Cross-examination, please.

6         MS. TREADWAY:  Thank you, Judge.

7                    **CROSS EXAMINATION**

8    BY MS. TREADWAY:

9    Q    Dr. Karch, you spoke about your book earlier today,

10   The Pathology of Drug Abuse, Fourth Edition.  Would it

11   be correct to say that that is a compilation of

12   information that you have obtained from other

13   publications and materials and references?

14   A    Yes.

15   Q    And mostly this is about illegal drugs, isn't it?

16   A    That is the emphasis.

17   Q    And earlier today you said heroin was a Schedule II

18   drug.  Were you not aware that heroin is actually a

19   Schedule I drug?

20   A    I meant Schedule I.

21   Q    In terms of your book, and with regards to the drugs

22   at issue in this case, would you agree with me that your

23   book, which is 663 pages long, only devotes ten pages to

24   Fentanyl?

25   A    Yes.  The next edition will devote considerably

```
 1    more.  Since the last two or three years --
 2              MS. TREADWAY:  Objection.  Non-responsive.
 3    Move to strike.
 4              THE COURT:  Here's the rules that we're going
 5    to follow on cross-examination.  Listen carefully.  You
 6    listen to the prosecutor's question.  If you can answer
 7    it yes or no -- and she likes to ask those type of
 8    questions -- then you answer it yes or no without any
 9    attempt to explain or add to it.  If you can't answer
10    the question, then you tell her that you cannot answer
11    the question.  She will then either rephrase the
12    question or go on to something else.  Mr. Williamson
13    will have his opportunity to redirect you on any areas
14    that he feels you did not have the opportunity to cover
15    on cross-examination.  Based on what you said earlier,
16    I'm sure that you know these are the rules.  I expect
17    them to be followed.  Every other witness has done so.
18         Any questions?
19    A   None, sir.
20    BY MS. TREADWAY:
21    Q   My next question was you've only devoted two pages
22    of your book to Hydrocodone; correct?
23    A   Yes.
24    Q   Ten pages to Methadone?
25    A   Yes.
```

5626

1    Q    About six pages to Oxycodone?

2    A    I don't recall.  I can't answer.

3    Q    And about 47 pages to Morphine and heroin?

4    A    I don't recall.  I can't answer.

5    Q    By my count, that's about 75 pages of your book.  Do

6    you know how many of the deceased individuals in this

7    case had the Fentanyl in their tox screens?

8    A    No.

9    Q    Do you know how many had Hydrocodone in their tox

10   screens?

11   A    No.

12   Q    Do you know how many had Methadone in their tox

13   screens?

14   A    No.

15   Q    Do you know how many had Oxycodone in their tox

16   screens?

17   A    No.

18   Q    Do you know how many had Morphine in their tox

19   screens?

20   A    I can't answer.

21   Q    In terms of your book, would you also agree with me

22   that your book does not discuss in detail any

23   benzodiazepines like Valium and Xanax?

24   A    Can't answer.

25   Q    Does your book talk about muscle relaxers like Soma

1   and Flexeril?

2   A   Can't answer.

3   Q   Does your book discuss antipsychotics?

4   A   Can't answer.

5   Q   Does your book have any antidepressants in it?

6   A   Can't answer.

7   Q   Does your book have any barbituates or sleep aids in

8   it?

9   A   Can't answer.

10   Q   Do you know how many of the deceased individuals in

11   the case had those types of drugs in their tox screens?

12   A   Can't answer.  I could go through the list.

13   Q   Have you ever performed any drug interaction studies

14   involving the narcotics like the ones at issue in this

15   case?

16   A   Yes.

17   Q   You remember giving a deposition in Florida

18   recently?

19   A   No.

20   Q   You remember Wise v Osborn, a case in the state of

21   Florida, May 9, 2008?  Did you give a videotaped

22   televideo conference deposition?

23   A   If that's what the date says on there.  I don't

24   recall.

25   Q   Well, let me hand you your deposition because we'll

5628

```
 1   be talking about it.

 2   A   Thank you.

 3   Q   Does that appear to be your deposition?

 4   A   May I have a moment to look?

 5   Q   Sure.

 6   A   Yes, it does appear to be my deposition.

 7   Q   All right.  Let the record reflect I'm giving copies

 8   to both defense counsel.

 9       Now, could you turn to Page 58 of that deposition

10   with me please.  Actually we have to go to Page 57, the

11   very bottom.  Were you asked the following question:

12   "Have you ever done any studies of drug interactions

13   that are not cocaine or amphetamine of any sort?"

14       And was your answer:  "No.  I have done drug

15   interaction studies that were cocaine and alcohol and

16   methamphetamine, but nothing with a narcotic."?

17   A   I haven't gotten to the --

18   Q   Let me ask my question again.  Is that your answer

19   in the deposition, sir?

20   A   I'm sorry.  I haven't gotten to the page yet.  I

21   need a second to turn there.  And could you repeat the

22   lines?

23   Q   Sure.  Was the question:  "Have you ever done any

24   studies of drug interactions that are not cocaine or

25   amphetamine of any sort?"
```

5629

1          Answer:  "No.  I have done drug interaction studies

2     that were cocaine and alcohol and methamphetamine, but

3     nothing with a narcotic."

4          Was that your answer?

5     A    Yes.

6     Q    And was that given under oath?

7     A    Yes.

8     Q    The medical examiners in this case that testified

9     before this jury, and Dr. Rohrig, when asked, testified

10    that they did not find your book authoritative.  Did the

11    defense team tell you that?

12    A    Actually, no.

13    Q    Based on your conclusions that heart disease may

14    explain the deaths in this case, did you alert the

15    Centers for Disease Control?

16    A    No.

17    Q    So you don't believe that all of these very young

18    people dieing of what you speculate to be heart disease

19    without such signs of disease on autopsy is significant?

20    A    I can't answer that fully; but I'll have to say no

21    unless you want me to explain more.

22    Q    Did you determine what percentage of the Defendants'

23    clinic patients were dying of what you claim to be heart

24    disease at a very young age?

25    A    No.  I could answer that if you wanted me to explain

5630

1    more.

2    Q    Did you determine whether the clinic was treating

3    any of the patients for their alleged heart diseases?

4    A    No.  I can answer that if I could explain more.

5    Q    Well, in fact, you didn't review any of the medical

6    records, did you?

7    A    No.  I relied upon the medical examiner's narrative

8    summaries.

9    Q    Were you aware that on 107 occasions people who had

10   received prescriptions at the Defendants' clinic ended

11   up in local emergency rooms with either overdoses or

12   withdrawal symptoms?

13           MR. WILLIAMSON:  Your Honor, I'm just going to

14   object.  Same objection we've been making.

15   Mischaracterization of the evidence.

16           THE COURT:  Same ruling that we've been

17   operating under throughout the entire case, Ladies and

18   Gentlemen.

19   BY MS. TREADWAY:

20   Q    I'll ask the question again.  Were you aware that on

21   107 occasions people who had received prescriptions at

22   the Defendants' clinic ended up in local emergency rooms

23   with overdoses or withdrawal symptoms?

24   A    I have to answer no.  I could explain why I'm

25   answering no if you wished.

5631

1          MS. TREADWAY:  Judge, I'm going to have a

2   continuing objection to Dr. Karch's little commentary.

3          THE COURT:  No, I think his commentary is

4   entirely appropriate.  That's what I told him to do.

5   That gives fair signal to Mr. Williamson if he wants to

6   redirect him on that point and then you will have the

7   final opportunity for recross.

8   BY MS. TREADWAY:

9   Q   So you reviewed 107 hospital records of those

10  individuals?

11  A   No.

12  Q   Is it your opinion that emergency room overdoses

13  were really emergencies related to people's hearts?

14  A   I have no opinion.

15  Q   Now, you talked about hair samples.  Now, would you

16  agree with me that hair samples are just one of very

17  many available tools to forensic pathologists in

18  performing autopsies?

19  A   Yes.

20  Q   If a patient's medical history speaks to what drugs

21  they were taking and how long they had been taking those

22  drugs, hair analysis would not be of very much use,

23  would it?

24  A   No.  I could explain further if you wish me to.

25  Q   Would you agree with me that a proper death

5632

```
 1   investigation consists of the medical history, the scene
 2   findings, the autopsy and the toxicology results?
 3   A   No.
 4   Q   Let's turn to your deposition, Page 66.  In front of
 5   you.  All right.  And can you go to Line 20.  In answer
 6   to a question did you say:  "A proper death
 7   investigation consists of the medical history, the scene
 8   findings, the autopsy and the toxicology results."?
 9   A   No.  I could explain why if you wish me to.
10   Q   So you're saying you did not state that under oath?
11            MR. WILLIAMSON:  Your Honor, I'm going to
12   object.  She is reading this out of context and not
13   giving the witness the chance to explain the context.
14            THE COURT:  You know this is
15   cross-examination.
16            MR. WILLIAMSON:  I understand.
17            THE COURT:  No.  We're in the seventh week of
18   this trial.  I think everybody, everybody, understands
19   what cross-examination is all about.  And particularly
20   she asked him about prior testimony.  And if I recall
21   the question, the witness either gave the prior
22   testimony or he didn't.
23            MS. TREADWAY:  Correct.
24            THE COURT:  He doesn't have to explain
25   anything.  You may proceed.
```

```
 1   BY MS. TREADWAY:
 2   Q   Again looking at Line 20 on Page 66 of your
 3   deposition.  Under oath did you state:  "A proper death
 4   investigation consists of the medical history, the scene
 5   findings, the autopsy and the toxicology results."?
 6   A   Yes.
 7   Q   So would you agree with me that toxicology results
 8   standing alone do not tell you the cause and manner of
 9   death?
10   A   Yes, I would agree with you.
11   Q   Would you also agree with me that the tissue slides,
12   standing alone, do not tell you the whole story about
13   the cause and manner of death?
14   A   No.  I could explain more if you wish me to.
15   Q   And your definition of an incomplete autopsy is that
16   there was no histology performed; correct?
17   A   No.  That is -- no.  I could explain more if you
18   wish me to.
19   Q   Well, you indicated on direct examination that when
20   the histology slides had not been performed and looked
21   at, that these were incomplete autopsies.  Is that not
22   your testimony?
23   A   My testimony was that NAME says they're not complete
24   autopsies.
25   Q   Would you agree with me that the interpretation of
```

5634

1    laboratory findings is based most importantly on the

2    person's history and the circumstances surrounding the

3    death?

4    A    No.  I could explain more if you wish me to.

5    Q    In addition to this book, are you the editor of

6    Post-mortem Toxicology of Abused Drugs?

7    A    I am.

8    Q    On Page 114 of that book there is an article written

9    by Graham R Jones who's in the Office of the Chief

10   Medical Examiner of Edmonton, Alberta, Canada.  Do you

11   agree with Dr. Jones' statements in your book?

12   A    I have no idea what they are as I am the editor and

13   do not have a copy in front of me.

14   Q    Well, let me read what Dr. Jones wrote in the book

15   you edited.  "The subsequent interpretation is in part

16   based on the scope of the toxicology tested; in part on

17   the quantitative results; and perhaps, most importantly,

18   on the history and circumstances surrounding the death."

19        Do you agree with Dr. Jones?

20   A    No.  I could explain further if you wished.

21   Q    Would you agree with me that post-mortem lab results

22   can be reliably interpreted if interpreted with regard

23   to all of the available information:  Medical history,

24   scene information, autopsy, the nature and location of

25   the samples collected and the circumstances of death?

5635

1    A    No.  I could explain more if you would permit me.

2    Q    And turning to your book that you edited, more of

3    Dr. Jones' article.  He states:  "In the final analysis,

4    post-mortem toxicology results must be interpreted with

5    regard to all of the available information, including

6    medical history, information from the scene, autopsy

7    findings, nature and exact location of post-mortem

8    samples collected and the circumstances of the death.

9    Only after weighing all of these variables can

10   post-mortem results be reliably interpreted."

11        Do you not agree with Dr. Jones in your book?

12   A    Do I not --

13   Q    Do you agree with Dr. Jones?

14   A    Yes, I do.

15   Q    Would you agree with me that the underlying approach

16   to the interpretation of post-mortem drug concentrations

17   includes the application of common sense?

18   A    One would hope.

19   Q    For each of the deaths in this case you did not

20   review the medical history; correct?

21   A    No.  And I would explain if you wished.

22   Q    The only medical history you reviewed was that in

23   the autopsy report; correct?

24   A    Correct.

25   Q    You did not review the medical records from the

5636

```
 1    Defendants' clinic; correct?
 2    A    No.  And I could explain if you would give me the
 3    opportunity.
 4    Q    You did not review any medical records independently
 5    from those mentioned in the autopsy report; correct?
 6    A    I may have reviewed one or two.
 7    Q    You did not review any hospital records that were
 8    not independent of the autopsy report; correct?
 9    A    Yes, I did not.
10    Q    You did not review any other medical records from
11    any other physicians that might have seen the patient;
12    correct?
13    A    No.  I could explain more if you wish me to.
14    Q    You did not review any other medical records from
15    any other physicians independent of what was in the
16    autopsy report; correct?
17    A    Correct.  And I could explain more if you wish me
18    to.
19    Q    You testified that a drug history is important in a
20    death investigation.  Was that your testimony?
21    A    I've testified that on multiple occasions and I
22    believe written it in books that you hold.
23    Q    So you agree that a drug history is important in a
24    death investigation?
25    A    I wouldn't have written it if I didn't believe it.
```

5637

 1    Q   But, again, outside the autopsy reports, you did not

 2    make the effort to review any of these individuals' drug

 3    history; correct?

 4    A   Yes -- or -- no.  I could explain if you wish me to.

 5    Q   So you did not review anything outside the autopsy

 6    reports; correct?

 7    A   No.  I've already told you that I saw one or two

 8    hospital records.

 9    Q   Did you review the scene findings in the Forensic

10    Science Center's files?

11    A   No.  I could explain if you wished.

12    Q   Did you review the death scene investigations done

13    by other law enforcement?

14    A   No.

15    Q   The testimony from the medical examiners and Dr.

16    Rohrig in this case is that they reviewed all of this

17    information before coming to their conclusions.  Would

18    you agree that your review was an incomplete review?

19    A   No.  And I could explain if you wished.

20    Q   Would you agree with me that the toxicology tests

21    can prove that a drug is present in someone's body?

22    A   Yes.

23    Q   Then you would agree that toxicology reports in this

24    case indicate what drugs were present in the victims;

25    correct?

5638

 1    A    No.  I could explain if you wished.

 2    Q    Did you determine whether the drugs found on

 3    toxicology were the same drugs that the Defendants'

 4    clinic had prescribed to the victims?

 5    A    No.  And I could explain if you wished.

 6    Q    Would you agree with me that people who die from

 7    drug overdoses die because their heart eventually stops?

 8    A    We all die because our heart eventually stops.

 9    Q    Would you agree with me that drug overdoses can

10    cause heart arrhythmias or irregular heartbeat?

11    A    Not all drugs, no.  Some.

12    Q    Would you agree with me that Oxycontin is a central

13    nervous system depressant?

14    A    Certainly.

15    Q    Would you agree with me that a person can overdose

16    on Oxycontin and die from that overdose?

17    A    Yes.

18    Q    Would you agree with me that Morphine is a central

19    nervous system depressant?

20    A    Yes.

21    Q    Would you agree with me that a person can overdose

22    on morphine and die from that overdose?

23    A    Yes.

24    Q    Would you agree with me that Methadone is a central

25    nervous system depressant?

5639

1    A    Yes.

2    Q    Would you agree with me a person can overdose on

3    Methadone and die from that overdose?

4    A    It's been known to happen.

5    Q    Would you agree with me that benzodiazepines like

6    Xanax and Valium and Klonopin are central nervous system

7    depressants?

8    A    No.  I could explain if you wished.

9    Q    Do you believe that a person can overdose on

10   benzodiazepines and die from that overdose?

11   A    Yes.

12   Q    Would you agree with me that Hydrocodone is a

13   central nervous system depressant?

14   A    Yes.

15   Q    Would you agree with me that a person can overdose

16   on Hydrocodone and die from that overdose?

17   A    Yes.

18   Q    Would you agree with me that Fentanyl is a central

19   nervous system depressant?

20   A    Yes.

21   Q    Would you agree with me that a person can overdose

22   on Fentanyl and die from that overdose?

23   A    All the time.

24   Q    Would you agree with me that a person can overdose

25   and die from a combination of the drugs we have just

5640

1   discussed?

2   A   No.  I could explain if you wished.

3   Q   So you've never seen anyone die from a combination

4   of those drugs?

5   A   No.  And I could explain if you wished.

6   Q   Would you agree that having a tolerance to a certain

7   dosage of a drug does not mean that a person cannot

8   overdose on the drug?

9   A   No.

10  Q   So you would not agree with that?

11  A   No.

12  Q   So if a person is tolerant to a drug, no matter how

13  much they take, they're not gonna overdose?  Is that

14  your testimony?

15  A   My testimony has to be no because I can't explain

16  what I know.

17  Q   Would you also agree that having a tolerance to a

18  certain dosage of a drug does not mean that a person

19  cannot overdose on a combination of drugs?

20  A   No.  And I'd have to ask to explain but --

21  Q   Now, you have reached the conclusion in other cases

22  that people have died of drug overdoses, haven't you,

23  Dr. Karch?

24  A   Yes.

25  Q   Didn't you testify in the Schipman case in England

5641

1   that multiple people died from drug overdoses?

2   A   I did.

3   Q   Didn't you testify in that Schipman case without

4   reviewing any tissue slides?

5   A   I think I finally saw the tissue slides but I did

6   not at the time I testified.

7   Q   Did you testify in the Schipman case that people

8   died from drug overdoses despite the presence of heart

9   disease?

10  A   That's twelve years ago and I don't recall.

11  Q   Well let me see if I can help you with it.   You

12  remember talking about hemorrhagic stroke?

13  A   Twelve years ago?

14  Q   You remember talking about the elderly women in this

15  case?

16          MR. WILLIAMSON:   Your Honor, I'm going to

17  object to either, A, improper method to refresh

18  recollection or improper impeachment.   She has a

19  document.   The witness has not even been given a chance

20  to see what it is to identify it.

21          THE COURT:   Mr. Williamson, she's just asking

22  if he remembers.

23  BY MS. TREADWAY:

24  Q   Do you remember any of your testimony?

25  A   Not really.

1          THE COURT:  Now, let the record show that she

2     is standing beside him with I presume some sort of

3     transcript of his testimony so that he can read along

4     with her.  And do you have a copy of that transcript?

5          MR. WILLIAMSON:  I do not, Your Honor.

6          THE COURT:  Then you may come up and stand

7     next to Mrs. Treadway if you wish so that you can see

8     it.

9     BY MS. TREADWAY:

10    Q   Is this a transcript for November 11th, 1999, in the

11    Schipman case?

12    A   I have only your word for it since I've never seen a

13    transcript.

14    Q   Is that your name?  Steven Bernard Karch?

15    A   Yes.

16    Q   Do you remember being examined by Mr. Wright by the

17    Government?

18    A   Actually I remember being examined by a woman, not a

19    man.

20    Q   Okay.  That would have been Ms. Davies?

21    A   Yes.

22    Q   On Page 5 of that transcript were you asked the

23    following question:  "In that regard, although there has

24    been reference to heart disease as identified by Dr.

25    Rutherford at the post-mortem and the pathological

5643

1    findings, do they, in your opinion, in any way effect

2    the cause of death?"

3        And was your answer no?

4    A    According to the piece of paper that you are holding

5    that is alleged to be the transcript of the trial, it

6    says exactly as you read:  "In that regard, although

7    there has been reference to heart disease as identified

8    by Dr. Rutherford at the post-mortem -- " which I did

9    not attend -- "and pathologic findings, do they in your

10   opinion in any way effect the cause of death? "

11       And my answer is no.

12   Q    And previously you said the mode of death was opiate

13   poisoning; correct?

14   A    Which paragraph are you pointing at?  "And do you

15   agree with Dr. Rutherford that the mode of death was

16   opiate poisoning?

17       "Yes.  The differential diagnosis in this case was

18   somewhat longer than in the others."

19       I wasn't referring to all the other cases that were

20   involved in this case was somewhat longer than the

21   others; but the ultimate diagnosis that I reached was

22   opiate related death.

23   Q    So my question to you again is -- assuming I didn't

24   present you a false transcript --

25   A    One never knows.

5644

```
 1              THE COURT:  That remark, which was totally
 2    unsolicited, will be stricken.  Sir, you've billed
 3    yourself here as a real professional and an expert
 4    witness.  We don't make those kind of comments.
 5    Witnesses don't make those kind of comments in my
 6    courtroom.  Maybe other judges allow it, but I don't.
 7    And that hasn't been done during the trial.  You're the
 8    first witness who's ever done that.  I think we've had
 9    eighty some witnesses now.  You're here to help this
10    jury understand what this case is about, not to be a
11    clown or a smart aleck.  I'm not going to tell you
12    again.  You understand what I'm telling you?
13    A    Fully.
14    BY MS. TREADWAY:
15    Q    So I'm going to ask my question again.  Didn't you
16    testify in the Schipman case that people died of drug
17    overdoses despite the presence of heart disease?
18    A    Yes.
19    Q    Didn't you testify in the Schipman case that people
20    died of drug overdoses despite the presence of other
21    underlying diseases?
22    A    Yes.  But I can't answer because -- unless you want
23    me to explain more fully.
24    Q    Were some of the people in the Schipman case quite
25    elderly?
```

5645

```
 1    A    Some of them were in their 80s, yes.
 2    Q    In this case, would you agree with me that you
 3    cannot testify under oath that any particular person did
 4    not die of a drug overdose?
 5    A    Excuse me.  I lost that question.
 6    Q    Can you testify under oath that any particular
 7    person did not die of a drug overdose?
 8    A    Or I'm sure -- yes, I can.  I'm sure.
 9    Q    In fact, that would be nothing more than speculating
10    about an alternative cause of death; isn't that correct?
11    A    Again, I've lost the question.
12    Q    You can do nothing but speculate about alternative
13    causes of death; isn't that correct?
14    A    My answer is no, but I would have to expand it.
15    Q    You cannot offer an opinion about a cause of death
16    that is more likely than the cause of death reached by
17    the six board certified medical examiners in this case,
18    can you?
19    A    Please repeat.
20    Q    You cannot offer an opinion about a cause of death
21    that is more likely the cause of death reached by the
22    six board certified medical examiners in this case, can
23    you?
24    A    I can.
25    Q    In fact, it would require you to guess to do that;
```

5646

1     correct?

2     A    No.

3     Q    Have you ever testified before that you cannot give

4     an opinion about a cause of death that is more likely

5     than the cause of death reached by a medical examiner

6     because to do so would require you to guess?

7     A    I apologize.  The questions are too long for me.

8     Would you please repeat it.

9     Q    Have you ever testified that you cannot offer an

10    opinion about a cause of death that is more likely than

11    the cause of death reached by a medical examiner because

12    to do so would be guessing?

13    A    I don't recall.

14    Q    Well, why don't you turn to Page 39 of your

15    deposition in front of you.  And turning to Line 6.  Did

16    the lawyer ask you this question:  "Let's try it this

17    way.  Do you have a cause of death that you contend is

18    more likely than the cause of death reached by the

19    pathologist who actually performed the autopsy?"

20         And was your answer:  "That would require me to

21    guess."

22         Was that your testimony, sir?

23    A    That is my testimony.

24    Q    Question:  "That would be speculation for you to

25    have the cause of death that is more likely than the

5647

1   cause of death reached by the pathologist who performed

2   the autopsy?"

3        Answer:  "In the absence of data, it's a guess."

4        Was that your testimony?

5   A   That's a quote.

6   Q   I believe it was your testimony on direct exam that

7   you could not say heart disease killed a single person

8   you reviewed.  Was that your testimony?

9   A   May I review my notes?

10  Q   You have notes?

11  A   I have my classification.  I made a little one

12  sentence note.

13  Q   Well, my question for you is not about a particular

14  person.  My question to you is in response to a question

15  asked by Mr. Williamson did you say you could not say

16  that heart disease killed a single person you reviewed?

17  A   I don't recall saying that.

18  Q   Now, in this testimony we've been looking at, this

19  deposition, the issue in that case was whether Mrs. Wise

20  died from an overdose of Oxycontin.  Remember that?

21  A   No.  I have no recollection of this specific case.

22  Q   You testified about the same theory in that case as

23  you testified here today, haven't you?

24  A   I haven't read the deposition.  I don't remember my

25  testimony.

5648

1    Q    Under oath in that deposition you stated that you

2    could not testify that Mrs. Wise did not die of an

3    overdose of Oxycontin.  Do you remember that?

4    A    I remember nothing about the deposition since it's

5    more than two and a half years ago.

6    Q    Well, let's look at the pages --

7    A    But if you want to read the quote.

8    Q    -- page 31, please.

9            THE COURT:  Sir, if you need to have her bring

10   it to you, she will.

11           MS. TREADWAY:  He's got it right there.

12           THE COURT:  Thought you were talking about

13   another deposition.

14           MS. TREADWAY:  No.  This is the same one,

15   Judge.

16           THE COURT:  All right.

17   BY MS. TREADWAY:

18   Q    Page 31.  Are you with me?

19   A    Not quite.  Now.

20   Q    Line 9.  Question:  "Is it a true statement that you

21   cannot say within a reasonable degree of medical

22   probability that she died related to anything relating

23   to the cardiac arrhythmia?"

24       Answer:  "That's true.  Well, no, because she would

25   have had an arrhythmia even presuming that she had a

5649

1    massive overdose, for instance, of Oxycodone and stopped

2    breathing.  Her heart wouldn't have just stopped.  She

3    would have had an arrhythmia.  I think maybe you should

4    narrow the question.

5         "Same question, just change the word arrhythmia to

6    dysrhythmia.  Do you have any reason to believe that she

7    died related to a dysrhythmia?

8         Answer:  "No.

9         Question:  "You can't say more probably --"

10            MR. WILLIAMSON:  Your Honor, I'm sorry.  I'm

11   going to have to object.  She is actually reading from

12   the transcript and the answer she just gave stopped at

13   no but that was not the complete answer.  You can't

14   represent you're reading a complete transcript and then

15   just --

16            THE COURT:  All right.  I'll require her to

17   read the complete question and answer.

18   BY MS. TREADWAY:

19   Q    Answer:  "No.  What I'm saying is that even if it

20   wasn't overdose, it eventually would have been an

21   arrhythmia, the terminal event.

22        "Question:  You can't say more probably than not

23   that she did not die from an Oxycodone overdose, can

24   you?

25        "Answer:  Absolutely not."

5650

```
 1          Was that your testimony?
 2   A    It appears to have been.
 3   Q    And you cannot sit here today and tell this jury
 4   that the individuals that the six board certified
 5   medical examiners concluded died of drug overdoses did
 6   not actually die of drug overdoses, can you?
 7   A    My answer is no because that would require further
 8   explanation.
 9   Q    Let me hand you what has been marked for
10   identification and admitted as Exhibit 2G.  What is
11   that, Doctor?
12   A    I don't know.  I have to look.
13              THE COURT:  Tell me the number again please.
14              MS. TREADWAY:  2-G as in George.
15              THE COURT:  Yes.  All right.
16   BY MS. TREADWAY:
17   Q    Isn't that the autopsy of Patricia G?  The autopsy
18   you said didn't exist?
19   A    I didn't say it didn't exist.
20   Q    You said it wasn't done?
21   A    I said the microscopics were not done.
22   Q    No, sir, you said there was no autopsy performed.
23   You want to see your powerpoint?  Is that your
24   powerpoint?
25   A    Yes.
```

5651

1    Q    Does it say Patricia G, no autopsy performed?

2    A    It was a mistype.

3    Q    Pretty inaccurate, isn't it?

4    A    Very.

5    Q    When Mr. Williamson was asking you questions about

6    your opinions, he kept asking you if you had developed

7    your opinion within beyond a reasonable doubt.  Is that

8    the standard you use in the medical field?

9    A    I rarely use it.

10   Q    In fact, the standard in the medical community is

11   within a reasonable degree of medical certainty or

12   probability, isn't it, Doctor?

13   A    Uhm, I believe so.

14   Q    You cannot testify under oath that the cause and

15   manner of Patty's death was other than a drug overdose,

16   can you?

17   A    My answer is no and it would require further

18   explanation.

19   Q    Do you have a reason to believe that Patty's death

20   was a homicide?

21   A    No.

22   Q    Do you have reason to believe that she died from a

23   chest full of little aliens?

24   A    No.

25   Q    Then can you explain to the jury why you wrote that

5652

1    in an e-mail dated May 6, 2010, at 6:28 p.m. Eugene

2    Gorokhov?

3    A    Oh, yes.

4    Q    Does it say maybe she had a chest full of little

5    aliens?

6    A    Yes, it does.

7    Q    Did you know that the Defendant Stephen Schneider

8    suggested to the Kansas Board of Healing Arts when they

9    were investigating him in the summer of 2005 that Patty

10   died a violent death?

11   A    No.

12   Q    Do you have any evidence that that's true?

13   A    I have no evidence either way.

14   Q    You cannot testify under oath that the cause and

15   manner of Eric T's death was other than a drug overdose,

16   can you?

17   A    You'll have to let me consult my notes.  Could you

18   restate the question, please.

19   Q    You cannot testify under oath that the cause and

20   manner of Eric's death to a reasonable degree of medical

21   certainty was other than a drug overdose, can you, sir?

22   A    No.  I'd have to explain why.

23   Q    You cannot testify under oath that the cause and

24   manner of Robin G's death to a reasonable degree of

25   medical certainty was other than a drug overdose, can

5653

1    you?

2    A    No.  I'd have to explain why.  Actually I classified

3    her death as natural.

4    Q    In fact, you admitted not knowing her drug history

5    on direct examination, didn't you?

6    A    I don't recall.

7    Q    You cannot testify under oath that the cause and

8    manner of Kandace B's death to a reasonable degree of

9    medical certainty was other than a drug overdose, can

10   you?

11   A    I have to find Kandace?

12   Q    B.

13   A    That's with the K?  I cannot testify to anything

14   about it because I would require an explanation.

15   Q    You cannot testify under oath that the cause and

16   manner of Dalene C's death to a reasonable degree of

17   medical certainty was other than a drug overdose, can

18   you?

19   A    No.  I'd have to explain.

20   Q    You cannot testify under oath that the cause and

21   manner of Terry C's death was other than a drug

22   overdose, can you?

23   A    No.  I'd have to explain.

24   Q    You kept referring to Terri as a she.  Did you know

25   Terri is actually a man?

5654

1    A    No.

2    Q    You cannot testify under oath that the cause and

3    manner of Pamela F's death was to a reasonable degree of

4    medical certainty other than from a drug overdose, can

5    you?

6    A    No.  I would have to explain.

7    Q    You cannot testify under oath that the cause and

8    manner of Jeff H's death to a reasonable degree of

9    medical certainty was other than a drug overdose, can

10   you?

11   A    No.  I'd have to explain.

12   Q    You cannot testify under oath that the cause and

13   manner of Victor J's death to a reasonable degree of

14   medical certainty was other than a drug overdose, can

15   you?

16   A    No.  I would have to explain.

17   Q    You cannot testify under oath that the cause and

18   manner of Jeffrey J's death was other than a drug

19   overdose, can you?

20   A    No.  I would have to explain.

21   Q    You cannot testify under oath that the cause and

22   manner of Mary Sue L's death was other than a drug over

23   dose, can you?

24   A    My notes may be incomplete.  I don't have a Mary Sue

25   L in Counts 2 through 5.

5655

1    Q    Well, in fact, you testified on direct examination

2    that her heart was disastrously diseased.

3    A    Mary Sue L?

4    Q    Yeah.

5    A    May I see the record?  Oh, I see it.  Yes.  My

6    answer is no.  I can explain but --

7    Q    Now, she is a person that you claimed had an

8    incomplete autopsy; correct?

9    A    I did.

10   Q    And that means that there weren't any histology

11   slides; correct?

12   A    Yes.

13   Q    If there were no histology slides, sir, how did you

14   determine that her heart was disastrously diseased as

15   you testified?

16   A    Uhm, I believe that maybe -- well, I have to review

17   the record and then I can tell you.  And this is?

18   Q    Mary Sue L.

19   A    Okay.  I think I'm relying on Dr. Dudley's weight of

20   the heart.

21   Q    You cannot testify under oath that the cause and

22   manner of Heather M's death to a reasonable degree of

23   medical certainty was other than from a drug overdose,

24   can you, sir?

25   A    No.  I would have to explain.

5656

```
 1    Q   You cannot testify under oath that the cause and
 2    manner of Jo Jo R's death was other than a drug
 3    overdose, can you?
 4    A   No.  I would have to explain.
 5    Q   Were you aware prior to your testimony that Jo Jo R
 6    was one of those many people that showed up at the
 7    emergency room with overdoses?
 8    A   As I've already stated, I don't know these histories
 9    except what I was able to read in the narrative.
10    Q   You cannot testify under oath that the cause and
11    manner of Billy R's death was other than a drug
12    overdose, can you?
13    A   No.  I would have to explain.
14    Q   You cannot testify under oath that the cause and
15    manner of Brad S' death was other than a drug overdose,
16    can you?
17    A   No.  I would have to explain.
18    Q   You cannot testify under oath that the cause and
19    manner of Katherine S' death was other than a drug
20    overdose, can you?
21    A   No.  I would have to explain.
22    Q   You cannot testify under oath that the cause and
23    manner of Evelyn S' death was other than a drug
24    overdose, can you?
25    A   I would have to explain.
```

5657

```
 1    Q    And you talked about Evelyn's pacemaker.  You are
 2    assuming that the pacemaker was not sent away; correct?
 3    A    No.  I read that in the pathologist's testimony.  Or
 4    perhaps it was Dr. Rohrig's testimony.  It was one or
 5    the other.  But I did read it in the transcript.  I'm
 6    not assuming anything.
 7    Q    You cannot testify under oath that the cause and
 8    manner of Mary Jo S' death was other than a drug
 9    overdose, can you?
10    A    No.  I'd have to explain.
11    Q    You cannot testify under oath that the cause and
12    manner of Robert S' death was other than a drug
13    overdose, can you, sir?
14    A    No, I'd have to explain.
15    Q    You cannot testify under oath that the cause and
16    manner of Patsy W's death was other than a drug
17    overdose, can you, sir?
18    A    No.  I would have to explain.
19    Q    You're a physician.  You talked about Patsy's BMI
20    being less than 15.  You ever heard of wasting?
21    A    I believe I used that word to describe her.
22    Q    Wasting can occur because of drug abuse, can't it?
23    A    Depend upon the type of drug being abused.
24    Q    Is that a yes?
25    A    It's a no, actually.  And I have to explain why.
```

5658

1    Q    You cannot testify under oath that the cause and

2    manner of Toni W's death was other than a drug overdose,

3    can you, sir?

4    A    No.  I'd have to explain why.

5    Q    Do you have any reason to believe that Toni W's

6    death was a homicide?

7    A    No.

8    Q    Mr. Williamson indicated to you that her mother was

9    here last week talking to the jury and she suggested

10   that it was a homicide and Mr. Williamson then asked you

11   questions about what was and wasn't an autopsy report

12   with regards to the circumstances of Toni's death.

13   Remember those questions?

14   A    I do.

15   Q    Well, if the scene investigation indicated that

16   Carol, Toni's mother, told the scene investigators that

17   her mother had traded her pills for cocaine, there

18   wouldn't be a reason for the information Mr. Williamson

19   suggested to be in the autopsy report, would there?

20   A    I don't follow the question.

21   Q    Well, Mr. Williamson was assuming that what Carol

22   testified to was true and then he related that to you.

23   My question to you is:  If in fact the evidence at the

24   crime scene, supposedly, was that there was no crime but

25   that there was an overdose because she had traded her

5659

1   pills for cocaine --

2   A   That would be a guess --

3               MR. WILLIAMSON:  Hold on.  I'm going to

4   object.  It assumes facts not in evidence.

5               THE COURT:  I don't understand your objection.

6               MR. WILLIAMSON:  I'm objecting it assumes

7   facts not in evidence.

8               THE COURT:  I heard you say that but I don't

9   understand it.

10              MR. WILLIAMSON:  It hasn't been introduced as

11  evidence at all in any shape, form or fashion.

12              THE COURT:  I see.  Overruled.

13  BY MS. TREADWAY:

14  Q   If Carol told the scene investigators that her

15  daughter had traded drugs for crack cocaine and that the

16  scene investigators found empty pill bottles with Dr.

17  Schneider's name on them, and if the investigators found

18  a crack pipe on the decedent, that's what would be in

19  the autopsy report; right?

20  A   I would hope.

21  Q   Was there any indication on Toni's autopsy -- and

22  I'll just hand it to you, that's 5-R-7 -- that she had

23  four kidneys?

24  A   No.

25  Q   If the testimony has been that the Defendant Stephen

5660

1    Schneider discovered that Toni had four kidneys, that

2    would not be supported by the autopsy, would it?

3    A    No.

4    Q    Do you remember reviewing the autopsy of a young man

5    by the name of Dustin L?  You didn't testify about him

6    but did you review his autopsy?

7    A    I don't remember but I can review it if you wish me

8    to.

9    Q    Well, our records reflect that you did review it.

10   A    Well, I'm sure they do.

11   Q    My question to you is did the toxicology report

12   indicate that Dustin had cocaine in his system at the

13   time he died?

14   A    No.

15   Q    So if his brother testified that he knew that Dustin

16   died of a cocaine overdose, that wouldn't be supported

17   by the autopsy, would it, Dr. Karch?

18   A    No.

19   Q    Assume for me that the six board certified medical

20   examiners and the two board certified toxicologists

21   correctly certified the 21 deaths I just reviewed with

22   you as drug overdose deaths.  Got that?

23   A    Yes.

24   Q    Also assume for me that Dr. Ted Parran testified

25   that the Defendants' course of conduct at their clinic

5661

1    and the prescription practices at their clinic, resulted

2    in those deaths.  Got that?

3    A   I got that.

4    Q   Also assume for me that Dr. Graves Owen testified

5    that the Defendants' prescription practices at their

6    clinic resulted in several of those deaths.  And also

7    assume for me that Dr. Doug Jorgensen testified that the

8    Defendants' courses of conduct was health care fraud and

9    that the fraud resulted in the deaths of Patty, Eric and

10   Robin.

11       With those assumptions in mind, Dr. Karch, isn't it

12   true that you cannot offer an opinion to rebut Dr.

13   Parran?

14   A   If I assume that -- how many things am I assuming

15   here?  Because I've lost track.

16   Q   Assume for me that the six board certified medical

17   examiners and the two board certified toxicologists

18   correctly certified the 21 deaths we just reviewed as

19   drug overdoses.

20   A   Yes.

21   Q   Assume for me that Dr. Ted Parran testified that the

22   Defendants' course of conduct and prescription practices

23   at their clinic resulted in those deaths.  With those

24   two assumptions in mind, isn't it true that you cannot

25   offer an opinion to rebut Dr. Parran?

5662

```
 1    A    Dr. Parran's opinion being that?

 2    Q    The Defendants' course of conduct and prescription

 3    practices at their clinic resulted in those 21 deaths.

 4    A    Oh, of course not.  If Dr. Parran is -- if all 21 of

 5    them died of drug overdoses, then Dr. Parran is correct.

 6    Q    And you are not offering an opinion about whether

 7    the Defendants were dealing drugs, are you?

 8    A    Absolutely no opinion.

 9    Q    And you cannot offer an opinion to rebut Dr. Owen's

10    testimony with those assumptions in mind, can you?

11    A    I don't even know who Dr. Owens is.

12    Q    And you cannot offer an opinion to rebut Dr.

13    Jorgensen's opinion, can you?

14    A    I'm not sure who Dr. Jorgensen is.

15    Q    Well, he was a D.O, certified family -- board

16    certified family physician that specializes in chronic

17    pain management.  Sound familiar?  A D.O. with a family

18    practice?

19    A    No.

20    Q    Doesn't sound familiar?

21    A    No.

22    Q    So you're not familiar with the fact that Dr.

23    Schneider was a D.O. with a family practice that had

24    pain management patients?  You're not familiar with that

25    fact?
```

5663

1    A    It would be hard not to know that he had pain

2    management patients; but I have no personal knowledge of

3    him, his practice, the mortality rate of his practice,

4    who's inspected his practice.  I know nothing about it.

5    My only task given by the attorneys was to see whether

6    there were alternative causes, medical causes of death.

7    Q    You are not rendering an opinion about the

8    Defendants' clinic or its prescription practices, are

9    you?

10   A    None whatsoever.

11   Q    Because you're not qualified to render such an

12   opinion, are you?

13   A    Absolutely not.

14   Q    And you're not offering an opinion about whether the

15   Defendants were committing health care fraud, are you?

16   A    I'm even less qualified to opine on that.

17   Q    When were you first contacted in this case, Dr.

18   Karch?

19   A    I don't remember.  It's several years ago.

20   Q    Who was it that contacted you?

21   A    I don't remember.

22   Q    Did you enter into a written contract or agreement?

23   A    No.

24   Q    When did you first receive documents to review?

25   A    Probably within a few months, but I don't have any

5664

```
1    record of it.
2    Q   Well, let's see if we can do a little time line
3    here.  Let me represent to you, sir, that on July 31st,
4    2008, your expert opinion was disclosed to the
5    Government.  All right?
6    A   Yes.
7    Q   How many days or weeks before July 31st did you
8    receive records for review?
9    A   I have no idea.
10   Q   Do you remember testifying under oath that you
11   cannot form an opinion without reviewing any tissue
12   slides?
13   A   I certainly would have said that.  I don't remember
14   the oath, but that certainly would be my opinion, yes.
15   Q   In fact, have you stated under oath that you refuse
16   to render an opinion without seeing a set of slides?
17   A   I don't recall.
18   Q   Well, turn to Page 33 in that deposition.  Are you
19   there?
20   A   Yes.
21   Q   Look at Line 19.  "I'm remembering no specifics of
22   the conversation but it is my practice to always ask for
23   a set of slides.  And I refuse to render an opinion
24   without seeing a set of slides if they are available."
25       Was that your testimony?
```

5665

1    A    As read, yes.

2    Q    You hadn't seen a single slide by July 31st, 2008,

3    had you?

4    A    I have absolutely no recollection.

5    Q    Well let me help you.  Do you remember coming to

6    Wichita?

7    A    Yes.

8    Q    Do you remember it was in the winter?

9    A    I don't think so.

10   Q    Do you remember specifically it was in November?

11   A    No.  I could establish the date through Fed Ex to

12   find out when I shipped my microscope, but I don't

13   remember the day.

14   Q    Do you remember it being near Thanksgiving?

15   A    If it was in November, I have a hunch it was.

16   Q    Well let me reflect -- let me represent to you, sir,

17   that I have information that you were here right before

18   Thanksgiving, November, 2008.  Do you have any reason to

19   doubt that that's when you were here, sir?

20   A    No.  And I could establish it exactly if it's

21   important.

22   Q    Well, close is good enough.  And would you agree

23   with me, sir, that November, 2008, is the first

24   opportunity you had to review slides?

25   A    Actual slides, yes.

5666

```
 1    Q   Are there --

 2    A   Virtual slides.

 3    Q   Virtual slides is your real slides?

 4    A   Yes, in the medical examiner's report.

 5    Q   Do you remember preparing a declaration in this

 6    case?

 7    A   Not in any detail.

 8    Q   Let me hand you what has been marked for

 9    identification as Government Exhibit 224.  You recognize

10    that?

11    A   No.

12    Q   Well, why don't you read it.  Is it entitled

13    "Declaration of Dr. Steven Karch"?

14    A   It is.

15    Q   Is that you?

16    A   That's me.

17    Q   Does it say:  I, Steven Karch, pursuant to 28 U.S.C.

18    1746, declare under penalty of perjury as follows."?

19    A   Yes.

20    Q   And then does it have several paragraphs?

21    A   Yes.  And it even refers to the third edition of my

22    textbook, the one before this one.

23    Q   Now, is this dated in August of '08 on the last

24    page?

25    A   Yes.
```

5667

1   Q    August 21st to be exact?

2   A    Yes.

3   Q    Based on Paragraph 5, do you indicate in your sworn

4   affidavit that you had reviewed three autopsies?

5   A    Yes.

6   Q    So would you agree with me, sir, that prior to July

7   31st, 2008, when your opinion was disclosed to the

8   Government, what you had reviewed was three autopsies

9   and no slides?

10  A    Only the reports of the slides.

11  Q    And if I recall your testimony, when we asked to

12  speak with you about your opinion, your response was

13  that if we wanted to know your opinion, we should just

14  buy your book.  Correct?

15  A    Absolutely.

16  Q    Prior to forming your opinion, did you discuss this

17  case with anyone on the defense team?

18  A    Well, I know I must have discussed it with someone

19  because I was retained; but I don't remember who.

20  Q    How many discussions did you have?

21  A    I don't remember.

22  Q    How frequently did they occur?

23  A    I don't remember.

24  Q    How did they occur?  In person or by telephone?

25  A    On the telephone.  We held a meeting in New Orleans

5668

1    after I'd received all the records and I explained to

2    the attorneys representing the Schneiders what the

3    issues were in post-mortem redistribution and what the

4    issues were in tolerance and I gave them an introduction

5    to the scientific method and how one would establish an

6    error rate.

7    Q   Did you ever speak with either of the Defendants?

8    A   I've never seen either of the Defendants until

9    today.

10   Q   Did you ever speak to any of their former employees?

11   A   Never.

12   Q   Did you ever make reports to the defense team?

13   A   A written report?  No.

14   Q   Did you make any reports?  E-mail?  Phone?

15   A   I'm certain I exchanged e-mails and phone calls but

16   I don't have records.

17   Q   So are you working from memory here today?

18   A   More or -- on the questions you're asking me, I'm

19   working entirely from memory.

20   Q   And you have no report to refer to; isn't that

21   correct?

22   A   That's correct.

23   Q   After you had been disclosed as an expert, we asked

24   if we could speak with you about your opinions; correct?

25   A   That's correct.

5669

1    Q    And you said that you would speak to us if the
2    attorneys representing the Defendants gave you
3    permission to do so; correct?
4    A    Yes.
5    Q    And we never were able to speak to you; correct?
6    A    Nobody ever got back.
7    Q    Well, isn't it true that the attorneys did not give
8    you permission to speak with us?
9    A    I'm not sure I ever discussed it with -- I must have
10   told them about it.  And certainly no one encouraged me
11   to.
12   Q    Now, after forming your opinion which was disclosed
13   on July 31st, 2008, you came to Wichita in November to
14   look at slides on one day at the Forensic Science
15   Center; correct?
16   A    Well, if it had taken more than one day, I would
17   have spent the time.
18   Q    Is it true that you started about 10:00 in the
19   morning and finished about 4:30?
20   A    Sounds like a reasonable estimate.  The FBI were
21   there and would have kept time.
22   Q    And you lost about an hour of time when your camera
23   didn't work; right?
24   A    That's correct.
25   Q    So would it be fair to say that you spent about five

5670

```
 1    hours reviewing the slides at the Forensic Science
 2    Center?
 3    A    It would be.  It would have been longer if more of
 4    them had been --
 5    Q    Well, were those slides of tissue that had been
 6    taken from the deceased victims during their autopsies?
 7    A    I hope so.
 8    Q    And how many slides did you review in that five hour
 9    period?
10    A    I don't recall.  Probably on the order of 20 or so.
11    Q    I have a record of 139.
12    A    Cases.  I'm sorry.
13    Q    139 slides, about 20 cases?
14    A    Roughly.
15    Q    Would you agree with me that there are 300 minutes
16    in five hours?
17    A    Seems fair.
18    Q    Would you agree with me then that you spent about
19    two minutes or less per slide in your review?
20    A    About right.
21    Q    Are you familiar with the guidelines for reviewing
22    tissue slides?
23    A    No.  I think it's a matter of proficiency.
24    Q    Isn't it true that the maximum recommended for
25    review is about 10 per hour?
```

5671

1    A    Not for any cardiology pathology organization I know

2    of.

3    Q    You reviewed almost 25 an hour, didn't you?

4    A    Oh, no, I wasn't that good.  I had too much trouble

5    reassembling the microscope and getting the camera to

6    run.

7    Q    Now, for some of the victims, slides had not been

8    prepared; correct?

9    A    Yes.

10   Q    But isn't it also true that the tissue was available

11   and the slides could have been prepared?

12   A    Actually, I don't think it was; and it never

13   occurred to me it would be for several reasons.  If you

14   would like me to list them, I will.  Otherwise, we can

15   move on.

16   Q    Well, let me offer you the testimony that the jury

17   has heard from Dr. Oeberst, Dr. Dudley and Dr. Rohrig,

18   that in fact the tissue was available and that you never

19   asked to have any cuts made of the tissue that was

20   preserved.  Do you disagree with that?

21   A    Yes, but it would require further discussion.

22   Q    In fact, you stated at the time you were here for

23   your review that it would not be your call to ask for

24   slides of the preserved tissue.  That that would be the

25   Defendants' call because it was going to cost some

5672

1  money; correct?

2  A   I believe that mischaracterizes what I said; but I

3  was intending to say that the Defendants would bear the

4  cost.

5  Q   So as a result of your not asking for slides to be

6  prepared from any of that preserved tissue, you have not

7  formed an opinion about anybody whose slides you've not

8  seen?

9  A   I can't answer that because -- my answer is no and I

10  may expound on it if you wish.

11  Q   Well, in fact, sir, you actually have formed

12  opinions about people in this case for whom you never

13  viewed what you say you have to review before making an

14  opinion; isn't that correct?

15  A   If forming an opinion of no opinion is an opinion,

16  then I have formed an opinion.

17  Q   So now it's no opinion on many of these?

18  A   On all but one I determined they were

19  undeterminable.

20  Q   Now, in direct testimony you were critical about

21  having to come to Wichita to review the slides and bring

22  your really cool microscope.  You remember that

23  testimony?

24  A   I was, yes.

25  Q   Did you know it was Judge Belot that ordered that?

5673

1    A    No.

2    Q    You want to complain to him about it?

3    A    I didn't see Judge Belot's name.  I saw a letter

4    from the city attorney who was concerned that I might

5    damage their Sedgwick County microscopes.

6    Q    Would you agree with me that there are literally

7    thousands upon thousands of autopsies around the country

8    in any given year that conclude that the cause and

9    manner of death is accidental prescription drug

10   overdose?

11   A    Yes.

12   Q    Are are all of those conclusions wrong in your

13   opinion?

14   A    I have no way to determine that.

15   Q    What percentage of those conclusions are wrong?

16   A    I have no way to determine that.  I'd be guessing.

17   Q    What percentage of those autopsies are, as you claim

18   here, based on blatant malpractice.

19   A    I never have used the word blatant or malpractice.

20   Q    Oh, Dr. Karch, I believe the jury will remember

21   earlier today that you used those exact words when you

22   were referring to the Sedgwick County Forensic Science

23   Center.  Blatant malpractice.  Have you called NAME and

24   told them that?

25   A    No.  And I don't remember using the words blatant

5674

1   malpractice in the same sentence.

2   Q   Well, maybe on a break Cindy can find that for us.

3       You spoke during your direct examination about

4   cardiomegaly.  That's an enlarged heart, isn't it?

5   A   Yes.

6   Q   Did you apply your cardiomegaly theory to every one

7   of the deceased patients in the case?

8   A   Cardiomegaly is not a theory.  And I applied it to

9   all cases I look at to see whether it's present or

10  absent.

11  Q   Did you do it with regards to Jessie D, the subject

12  of Count 6 J?

13  A   I haven't looked at any Count 6.

14  Q   Did you do so with regards to Lynnise G who's part

15  of the overt acts of the conspiracy?

16  A   What count would that be?

17  Q   It's not -- it's Count 1.

18  A   Oh, the one without the autopsy, yes.  Okay.  No,

19  that's PG.

20  Q   This is Lynnise G.

21  A   I'll have to find it.

22      I'm sorry, I don't have a Lynnise G.

23  Q   Well, Jessie D and Lynnise G were heart donors.

24  Would you agree with me that it's pretty rare that a

25  heart donor would be someone that died of heart disease?

5675

1    A    It's becoming less rare, but it's uncommon.

2    Q    Now, cardiomegaly was noted on the autopsies you

3    reviewed; correct?

4    A    Yes.

5    Q    So the six board certified forensic pathologists

6    took account of the cardiomegaly when forming their

7    conclusions; correct?

8    A    I don't know.

9    Q    So if they testified that they did, would you doubt

10   that testimony?

11   A    I would like to know how, by what method they took

12   account and I might agree and I might disagree.  But not

13   knowing how they took account, I can't comment.

14   Q    As to any of the victims in this case, can you offer

15   the opinion within a reasonable degree of medical

16   certainty that the consequences of cardiomegaly as

17   opposed to drug overdose was the cause of death?

18   A    No.  And I could explain given the opportunity.

19   Q    Have you formed opinions about any of the drug

20   overdose deaths of famous people?

21   A    Yes.

22   Q    Who?

23   A    The people that died at Memorial Hospital after

24   Katrina.

25   Q    They weren't famous people.  I'm talking about like

5676

```
 1    Elvis Presley.  Ever formed an opinion about Elvis?
 2    A    No.
 3    Q    How about Napoleon?
 4    A    Marilyn.
 5    Q    Marilyn Monroe you have?
 6    A    Yes.
 7    Q    And you concluded that she was murdered; correct?
 8    A    Yes.
 9    Q    And Napoleon, you concluded that he died of arsenic
10    poisoning; right?
11    A    Too many enemas, yes.
12    Q    Now, Dr. Karch, let's talk about your
13    qualifications.  You're not a toxicologist, are you?
14    A    If you would define what you mean by toxicologist.
15    Q    You are not a board certified toxicologist, are you?
16    A    Which board?
17    Q    The Society of Forensic Toxicologists would not
18    recognize you as a toxicologist, board certified, would
19    they?
20    A    I'm a member of the Society of Forensic
21    Toxicologists and my book is required reading for their
22    examination.
23    Q    But you do not qualify to be a full member of the
24    Society of Forensic Toxicologists, do you?
25    A    No, I do not.
```

5677

1    Q    To be a full member, you must be actively engaged in

2    forensic toxicology; correct?

3    A    By that you mean what?

4    Q    Do you not know what forensic toxicology is?

5    A    Frankly, it's always been a confusing issue to me.

6    If you mean do I go into the laboratory with a wrench

7    and adjust the column on a gas chromatograph, absolutely

8    not.  I am not a technician.  I am a physician.  I'm a

9    physician trained in the examination of patients and

10   studying the interaction of drugs within bodies.  That

11   is toxicology every bit as much as repairing a machine.

12   Q    Oh, so that's what Dr. Rohrig does, is goes in with

13   a wrench and repairs machines?  That's how he's a board

14   certified forensic toxicologist.  Are you kidding me?

15              MR. WILLIAMSON:  Your Honor --

16   Q    Is that your testimony, sir?  That's insulting.

17              MR. WILLIAMSON:  Your Honor, I'm going to

18   object to argumentative and compound.

19              THE COURT:  Yeah.  It's argumentative.

20   Rephrase the question.

21   BY MS. TREADWAY:

22   Q    Are you here testifying that Dr. Tim Rohrig, a 30

23   year board certified forensic toxicologist, is nothing

24   more than a repairman, sir?

25   A    I never used the word repairman.  All I said was he

1      can fix a gas chromatograph better than I can.  I can

2      interpret the numbers better than he can.  And, in fact,

3      if I remember reading his testimony correctly, he even

4      stated --

5              MS. TREADWAY:  Objection.  Non-responsive.

6      Move to strike.

7              MR. WILLIAMSON:  Your Honor, she asked the

8      question.  That was not just a --

9              THE COURT:  You know, here's the problem here,

10     and I hope we can reach a conclusion here fairly soon.

11     I don't know why the witness mentioned that

12     toxicologists adjust machines in the laboratory.  That

13     doesn't seem to me to be necessary.  But he opened the

14     door.  And I think the questions are appropriate.  But I

15     think the point has been made.

16             MS. TREADWAY:  I'll move on, Judge.  Thank

17     you.  Apologize for my temper.

18     BY MS. TREADWAY:

19     Q   To be a full member of the Society of Forensic

20     Toxicologists you must be able to demonstrate your

21     ability to function as a forensic toxicologist; correct?

22     A   I would think so.

23     Q   And you are not a full member of the Society of

24     Forensic Toxicologists, are you, sir?

25     A   No, I'm not.

5679

1    Q    Would that be also true as to your membership in the

2    International Association of Forensic Toxicologists?

3    A    No, I'm a full member.

4    Q    Are you a general pathologist?

5    A    No.  I'm a cardiac pathologist.

6    Q    Are you a forensic pathologist?

7    A    No.  As I stated at the outset, I'm not a forensic

8    pathologist.

9    Q    You are not a board certified toxicologist?

10   A    No.

11   Q    General pathologist or forensic pathologist;

12   correct?

13   A    That's correct.

14   Q    You are not board certified in anatomic pathology,

15   are you?

16   A    I am not.

17   Q    You are not board certified in clinical pathology,

18   are you?

19   A    I am not.

20   Q    To be certified in either anatomic pathology or

21   clinical pathology, you have to have performed at least

22   50 autopsies, isn't that correct?

23   A    Yes.

24   Q    And you have not done so, have you?

25   A    Something close to that between medical school and

5680

1    my first year of fellowship.

2    Q   Since medical school and your fellowship, have you

3    performed a single autopsy?

4    A   Whole autopsy, no.  Of a heart, thousands.

5    Q   You haven't performed a whole autopsy?

6    A   No.

7    Q   Now, you list on your resume that you are a member

8    of the American Academy of Forensic Scientists; correct?

9    A   I don't think so.  Oh, American Academy of Forensic

10   Science?  I apologize, yes.

11   Q   But you are not a board certified forensic

12   scientist, are you, sir?

13   A   I am not board certified in forensic pathology or

14   forensic toxicology.

15   Q   You also list on your resume that you are a member

16   of the National Association of Medical Examiners;

17   correct?

18   A   Correct.

19   Q   But you are not a medical examiner, are you?

20   A   I was for ten years.

21   Q   In fact, you weren't a medical examiner, you were a

22   researcher in the medical examiner's office; correct?

23   A   That's what I did.  I was Star 208 and I had an

24   appointment as assistant medical examiner and a thank

25   you note when I left as assistant medical examiner.

5681

1    Q    And, in fact, that's a little misleading because you

2    never performed autopsies except on hearts at the San

3    Francisco medical examiner's office, did you?

4    A    That's correct.

5    Q    You were board certified in family practice;

6    correct?

7    A    Yes.

8    Q    But you've given up that certification; correct?

9    A    Many years ago.

10   Q    Did you ever fail to pass a board certification?

11   A    In emergency medicine 40 years ago.

12   Q    Did you ever do a residency in cardiology?

13   A    No.

14   Q    Are you board certified in cardiology?

15   A    No.

16   Q    Did you ever do a residency in pathology?

17   A    No.  Well, I did a fellowship in neuropathology and

18   I trained in the cardiac pathology laboratory at

19   Stanford.

20   Q    Is that a residency?

21   A    No.  It was a visiting fellow.

22   Q    Even though you did not pass your emergency medicine

23   board certification, isn't it true that you worked as an

24   emergency room physician for about 15 years?

25   A    Yes, indeed, as director of the department.

5682

1    Q    During that time did you see people in the emergency

2    room who had overdosed on prescription medications?

3    A    Yes.

4    Q    And did you see people that had died from such

5    overdoses?

6    A    Yes.

7    Q    Now, when you are working on a case like this as an

8    expert, do you strive to make accurate statements about

9    the case you are working on?

10   A    Yes.

11   Q    Did you review the Indictment as a part of forming

12   your expert opinion?

13   A    Briefly.

14   Q    Are you aware that the Defendant Stephen Schneider

15   is a D.O. and not a M.D.?

16   A    No.

17   Q    Are you aware that the Defendants are charged with

18   illegal drug distribution?

19   A    No.

20   Q    Are you aware that the Defendants are charged with

21   health care fraud?

22   A    Yes.

23   Q    Are you aware that the Defendants are charged with

24   illegal drug distribution resulting in the death of 21

25   individuals?

5683

1    A    I get fuzzy at that point.

2    Q    Are you aware that the Defendants are charged with

3    health care fraud resulting in three deaths?

4    A    I'm not sure.

5    Q    Do you understand that the Defendants are not

6    charged with murder?

7    A    I didn't until yesterday.

8                THE COURT:  How much more do you have do you

9    think?

10               MS. TREADWAY:  Less than 30 minutes probably,

11   Judge.  But if you want to break, that's fine.

12               THE COURT:  I think so.  We've been here an

13   hour and a half.  Ladies and Gentlemen, approximately 15

14   minutes.  Remember and heed the admonition.

15                       (Recess.)

16   BY MS. TREADWAY:

17   Q    Before the break, Dr. Karch, I believe we were

18   talking about your knowledge of the charges in this case

19   and you agreed that they are not charged with murder;

20   correct?

21   A    Yes.  But I'm very -- I didn't know that until

22   yesterday.  I thought they were all murder ones and I

23   don't know the specifics of the charging.

24   Q    Do you remember writing a December 4th, 2008, e-mail

25   for help?

5684

1    A    Yes.

2    Q    And in that e-mail did you say the federal

3    government is charging a pain doctor with 56 counts of

4    murder, the defense begged lots of people, even some I

5    recommend, to help, but every one of them declined?

6    A    Yes.

7    Q    Did you say I am now the sole defense toxicologist

8    and pathologist?

9    A    Yes.

10   Q    But you're not a pathologist, are you?

11   A    I'm a cardiac pathologist.

12   Q    But you're not a general pathologist, are you?

13   A    No, and I've never claimed to be.

14   Q    And you're not a toxicologist, are you?

15   A    I'm a physician that interprets the effects of drugs

16   on bodies.

17   Q    And in a more recent e-mail dated May 5th, 2010, do

18   you remember doing a blast e-mail to everybody on the

19   NAME list server?

20   A    On what date, ma'am?

21   Q    May 5th, 2010.

22   A    Yes.  That was on the list.  I did, right.

23   Q    You said:  "I am consulting on a case in Wichita.

24   The government is charging an M.D. with 69 counts of

25   murder one.  The interesting thing is the judge has

1    ruled the toxicologist can opine to cause of death.  I

2    wondered if anybody had ever encountered this case

3    before.  It sure simplifies matters, just let the

4    toxicologist consult his copy of Bazzel (ph) and you

5    won't even need to do an autopsy, let alone appear in

6    court."

7        Is that your e-mail?

8    A    I believe it was worded that way, yes.  I did not

9    know it was not murder one.

10   Q    You're complaining about the fact that Judge Belot

11   allowed a board certified forensic toxicologist to offer

12   an opinion in this case; correct?

13   A    No.  And I could explain but -- no.

14   Q    If Dr. Rohrig, a board certified toxicologist, is

15   not qualified in your opinion to testify as to cause of

16   death, how in the heck are you?

17   A    I'm a doctor and he's a PhD.  I take care of living

18   patients.  He never has.  Does not know how to.

19   Q    Dr. Karch, you have stated in many publications and

20   depositions that you were an assistant medical examiner

21   for the city and county of San Francisco from 1995 to

22   2004; correct?

23   A    Correct.

24   Q    You did not actually perform the duties of a medical

25   examiner, did you?

5686

```
1    A   As we said before we broke, yes, that's correct.

2    Q   And although you did not perform autopsies, have you

3    ever stated under oath that you did perform autopsies in

4    San Francisco?

5    A   In San Francisco I think I took one heart out but

6    that's all.

7    Q   So did you ever testify under oath that you did

8    perform autopsies in San Francisco?

9    A   I don't recall that, no.

10   Q   Well, why don't you turn to Page 20 and 21 of your

11   deposition.

12   A   Of which --

13   Q   Your deposition in Wise.

14   A   In Wise.  Okay.

15   Q   And if you could look at the bottom of Page 20.

16   A   I'm not even close to -- it's out of order.  I have

17   to find it.

18   Q   Do you want me to bring my copy up?

19   A   Would you please.

20   Q   The bottom of page 20 was the question:  "Have you

21   ever conducted an autopsy where you concluded that

22   someone died from an overdose of any central nervous

23   system depressant?"

24       And your answer was:  "Indeed, yes.  In fact, for

25   ten years I examined every drug death in San Francisco
```

1    and retrieved the autopsy samples and reviewed them

2    microscopically."

3    A    Yes, that's absolutely correct.

4    Q    So by giving that testimony you indicated under oath

5    that you had conducted autopsies?

6    A    No.  I said reviewed.  That's not correct.

7    Q    Was your answer:  Indeed, yes?

8    A    I guess you have to show me that again.

9    Q    You performed research in San Francisco; correct?

10   A    Yes.  I looked at the heart of every drug abuser who

11   died in San Francisco for a ten year period.

12   Q    Do you know who Steven Gelman is?

13   A    No.

14   Q    Isn't Mr. Gelman the chief medical examiner or

15   someone in the chief medical examiner's office in San

16   Francisco?

17   A    I wouldn't know.  I haven't been there for five

18   years.  I certainly don't remember his name.  When Dr.

19   Stevens was the director and we co-wrote all our

20   research --

21   Q    Do you remember Mr. Gelman asking you to stop

22   representing that you were employed by the city and

23   county of San Francisco's medical examiner's office?

24   A    I certainly do not.  Never having met him, I can't

25   remember him telling me that.

5688

1   Q   Is that why your curriculum vitae now has the term

2   consultant in parenthesis behind the listing of the San

3   Francisco medical examiner's office?

4   A   I'd forgotten that it had consultant and I don't

5   remember why.

6   Q   Now, during your direct examination you lodged some

7   criticisms of the Forensic Science Center here in

8   Wichita.  You are familiar with the National Association

9   of Medical Examiners, NAME; correct?

10   A   I'm a member.

11   Q   And you are aware that the Forensic Science Center

12   is accredited by NAME; aren't you?

13   A   The web site says so.

14   Q   And to be accredited by NAME, the Forensic Science

15   Center has to be in compliance with the NAME standards;

16   correct?

17   A   Yes.

18   Q   Do you have any evidence that the Forensic Science

19   Center is not in compliance with the NAME standards such

20   that they should not be accredited?

21   A   Yes.

22   Q   And have you informed NAME?

23   A   No.  I thought it would be inappropriate before

24   the -- while the trial was still going on.  I didn't

25   want to generate any publicity that would effect the

5689

1    trial.

2    Q    And the Forensic Science Center routinely takes and

3    maintains specimens, doesn't it?

4    A    I have no knowledge direct of what the center does.

5    I do have knowledge of -- I'm sorry, that's going on.

6    If you want me to explain, I can.

7    Q    The Forensic Science Center prepared slides of

8    tissues in this case that they thought were necessary,

9    didn't they?

10   A    Yes.

11   Q    And that is all the NAME standards require, isn't

12   it?

13   A    Well, they also require that they be available.

14   Q    Which they were.  You just didn't ask for them;

15   correct?

16   A    No, that's not correct.  I asked for every slide

17   that was available.

18   Q    You know Mary Dudley, don't you?

19   A    Yes.  Nice lady.

20   Q    She testified before this jury that she actually was

21   on the committee that developed the standards for the

22   histology slides?

23   A    I'm not quite sure why she said that.  I have the

24   document with me and it has not got her name on it.

25   Q    So you're saying that Mary Dudley took the stand and

```
 1   lied to this jury about being on the committee?

 2   A   I'll be glad to give you the copy of the document if

 3   you'd like it.

 4   Q   So you're saying that Mary Dudley did not

 5   participate in the Forensic Autopsy Performance

 6   Standards for the National American Association of

 7   Medical Examiners?

 8   A   Oh, for all I know she was there for every meeting

 9   and everything else; but if you'll read that document

10   that you're holding, it doesn't mention her name.  I

11   have it here in front of me.  As prepared by Gary

12   Peterson, Steven Clark, submitted for board review and

13   consideration October 12th, 2005.

14   Q   And she's not listed as a board member; correct?

15   A   She is not listed as board member or a preparer.  On

16   the next page it goes on to list the officers and board

17   of directors and her name isn't there.

18   Q   May I see what you're looking at?

19   A   Sure.  It's probably easier to just --

20   Q   And this is the August 12th version, isn't it?

21   A   Yes.

22   Q   Do you have a copy of the October 16th, 2006,

23   version?

24   A   No, I do not.

25   Q   If Mary Dudley testified that she was on that
```

5691

1    committee in October, 2006, you have no evidence to

2    contradict that, do you, sir?

3    A    I have no evidence either way.  I can't confirm or

4    deny it.

5    Q    Well, I'll see if I can find that for you.

6         Would you agree with me that the NAME standards are

7    not absolutes?

8    A    I don't know.  I've never given it thought and

9    consideration.  I've never seen anything written saying

10   if you don't do this, you are automatically not a

11   member.  I believe I learned from reading Dr. Oeberst's

12   report that there's a rating system now used and you can

13   make so many mistakes and still keep your accreditation.

14   Q    Actually, the NAME standards are guidelines, aren't

15   they, sir?

16   A    That's not what it says on this document that we

17   were both just looking at.  It says standards.

18   Q    You do agree with me that the NAME standards

19   incorporate the recognized judgment of board certified

20   medical examiners?

21   A    No.  There are no board certified medical examiners,

22   as Dr. Rohrig pointed out.  There are board certified

23   forensic pathologists.

24   Q    Would you agree with me that the NAME standards

25   incorporate the recognized judgment of board certified

5692

1    forensic pathologists?

2    A    I would.

3    Q    Would you agree with me that the law of diminishing

4    returns applies in forensic medicine?

5    A    Yes.

6    Q    In other words, would you agree with me that it is

7    not necessary to perform every test on every autopsy to

8    determine cause and manner of death?

9    A    No.  But I'd have to explain so --

10   Q    Would you agree with me that board certified

11   forensic pathologists are expected to exercise their

12   educated judgments every day in every autopsy they

13   perform?

14   A    Yes.

15   Q    Do you have any evidence that any of the six board

16   certified forensic pathologists in this case failed to

17   exercise their educated judgments?

18   A    Yes.

19   Q    And that's coming from a physician who is not a

20   board certified forensic pathologist; correct?

21   A    Correct.

22   Q    Isn't it true that the DNA testing you talked about

23   during your direct testimony is very expensive?

24   A    Very expensive.

25   Q    About $8,000 per test; correct?

5693

```
1    A    I think it's down to 6,000 now.

2    Q    So you do not expect every autopsy to perform DNA

3    testing, do you?

4    A    No.

5    Q    And you cannot fault any medical examiner's office

6    for not performing such testing, can you?

7    A    I can, yes.

8    Q    You can?

9    A    Yes.

10   Q    Well, let's take a look at that deposition again,

11   sir.  Let's look at Page 13 this time.  Can you find

12   that?

13   A    The chances are small, but I'll look.  I'm sorry.

14   I'll have to look at yours again.  This thing is all

15   over everywhere.

16   Q    "So they can be diagnosed with DNA testing.  I do

17   not fault Dr. Shorman for not doing this because it

18   costs about $8,000 and I rather suspect that's equal to

19   his full lab budget for the year.  So that test wasn't

20   done."

21        So, again, you can't fault every medical examiner's

22   office for not performing DNA testing; correct?

23   A    In 2008, I absolutely meant every word of it.  Since

24   then, I would not agree with that.

25   Q    Would it be fair to say that you make your living in
```

5694

```
 1    part by serving as an expert witness across the country?
 2    A    Across the world.
 3    Q    What percentage of your income has come from your
 4    work as an expert witness?
 5    A    You mean earned income?  Not investment income?
 6    Q    Correct.
 7    A    Probably 90%.
 8    Q    90%.  In the past 13 years I've counted at least 50
 9    times you've testified as an expert.  Could there be
10    more than that?
11    A    I think it's less than that because I've listed
12    every trial and deposition that I've ever given and it
13    doesn't come to 50 on my C.V.
14    Q    Do you testify as a forensic science professional?
15    A    Yes.
16    Q    Are you familiar with the Committee on Identifying
17    the Needs of the Forensic Science Community?
18    A    Yes.  A friend of mine was just nominated to the new
19    academy.
20    Q    Are you familiar with the National Research Council?
21    A    Yes.
22    Q    Are you familiar with the recent publication
23    "Strengthening Forensic Science in the United States, A
24    Path Forward."?
25    A    Yes.
```

5695

```
 1    Q   You generally agree with the recommendations found
 2    in that publication?
 3    A   Generally.
 4    Q   So you have been a critic of forensic science,
 5    haven't you?
 6    A   Yes.
 7    Q   And you want forensic science to be the best it can
 8    be, don't you?
 9    A   Yes.
10    Q   And that was the purpose behind this recent
11    publication, wasn't it, making forensic science the best
12    it can be?
13    A   Yes.
14    Q   One of the recommendations in that publication was
15    as follows:  "No person should be allowed to practice in
16    a forensic science discipline without certification."?
17    A   I'd be glad to take any certification for cardiac
18    pathology --
19    Q   But you don't have certification now, do you, sir?
20    A   Can't get it.
21    Q   Another recommendation was that, quote:  "No person
22    should be allowed to testify as a forensic science
23    professional without certification."
24        Would you agree with me that certification is a
25    process specifically designed to ensure the competency
```

5696

1    of the individual?

2    A    Well, particularly for PhDs, but for M.D.s they've

3    already passed multiple national examinations to ensure

4    they're competence.

5    Q    You don't have a certification in forensic science,

6    do you?

7    A    There is no certification in forensic science for

8    cardiac pathologists.

9    Q    So based on the recent recommendations, you would

10   not be qualified to testify as you are testifying here

11   today, would you?

12   A    I believe I would, but I can't answer.

13   Q    Now, you previously served an as expert witness in

14   several cases involving a dietary supplement marketed

15   and sold by Metabolife, did you not?

16   A    I sure did.

17   Q    That Metabolife product contained ephedra, didn't

18   it?

19   A    It did.

20   Q    Tell the jury what ephedra is, Dr. Karch?

21   A    Well, ephedra is one of the most used medications in

22   hospitals today.  It's used for all women that have

23   C-sections.  It's used for people that get low blood

24   pressure during spinal taps.  And you would have to pry

25   the ephedra from the cold dead hand of any cardiac

5697

1    surgeon because it's always given after cardiac surgery.

2    It was first introduced in the 1930s when there was

3    concern that epinephrin wouldn't be available in enough

4    source supply.  The reason being that epinephrin was

5    then the chief medicine for asthma.  Ephedrine was

6    developed as an alternative.  I have a chapter on it in

7    my textbook.  The herbal -- there was an act passed in

8    1994 called Du Schae (ph).  Du Schae allowed herbal

9    medicines -- and you've probably all heard on the radio

10   talk about take this stuff, it supports heart health, or

11   this stuff supports eye health or whatever health.  And

12   the requirements are very loose.  They're not subject to

13   FDA approval that this stuff works.  A company in

14   southern California and many others discovered that they

15   could sell ephedrine to people, it makes you feel a

16   little bit better and it makes you lose weight.

17   Q    And that was one of the ingredients in Metabolife;

18   correct?

19   A    Yes.

20   Q    And you served as an expert witness for the company

21   in all of those related cases, did you not?

22   A    No, I didn't.  I did not serve as an expert in the

23   class action.

24   Q    Did you serve as an expert witness for Metabolife in

25   numerous related cases?

5698

```
1    A    Yes.
2    Q    Were the claims in those cases essentially that the
3    product had caused people to suffer heart attacks,
4    strokes, and seizures?
5    A    Those were the claims.  They were unsubstantiated,
6    but they were the claims.
7    Q    Were the claims in those cases that the product
8    caused people to die?
9    A    There were claims like that.
10   Q    But your testimony consistently was that the product
11   did not cause any of these injuries or death; correct?
12   A    That was part of it.  I could supply the complete
13   testimony in context if you wanted; but if you want a
14   simple answer, yes.
15   Q    Were you aware that the two founders of Metabolife
16   eventually pleaded guilty to federal criminal felonies?
17   A    I believe I knew that.
18   Q    Were you aware that in 2004 the FDA banned ephedra
19   in diet supplements like Metabolife?
20   A    Right.  They only continue to allow it for use in
21   hospitals.
22   Q    And the FDA banned it because the scientific
23   evidence showed that ephedra posed an unreasonable risk
24   to people who used it, including heart problems, strokes
25   and death; correct?
```

1    A    No.   Absolutely no.   But if you want an explanation,

2    I'll be glad to offer it.

3    Q    How much money did you make as an expert witness in

4    the Metabolife cases, Dr. Karch?

5                 MR. WILLIAMSON:   Your Honor I'm going to

6    object.   That's irrelevant to this testimony here.

7                 MS. TREADWAY:   It goes to credibility, Judge.

8                 THE COURT:   It sure does.   Man testifies he

9    makes 90% of his income being an expert.   Certainly

10   does.

11   A    About 90 -- probably between 90 and $100,000.

12   Q    Per case?

13   A    I wish.   No.   Maybe four or five thousand dollars.

14   As you pointed out, I did a lot of 'em.

15   Q    During the time you were serving as an expert

16   witness in the Metabolife cases, you were also working

17   for a group the supplement makers funded, weren't you?

18   A    I was.

19   Q    Were you being paid for that work, too?

20   A    I was.

21   Q    Did you reveal the fact that you were independently

22   working for the supplement makers at the same time you

23   were allegedly serving as an unbiased expert witness on

24   their behalf?

25   A    Oh, it was impossible not to reveal because every

5700

1    time I was deposed or every time I was in court that was

2    the first question that would be asked.

3    Q    During your long career as a paid expert witness,

4    Dr. Karch, has any court found your opinion to be

5    lacking in foundation?

6    A    There was a ruling several years ago and I could

7    explain why, but --

8    Q    Has any court found your opinion to be lacking the

9    necessary expertise?

10   A    Not that I know of.

11   Q    You list quite a lot of cases that you have

12   testified in on your curriculum vitae.  Is that a

13   complete list?

14   A    As I said five minutes ago, that's why I didn't

15   understand the 50 number that you had used because every

16   case I've ever done is listed there and I don't think it

17   comes to 50; but maybe it does.

18   Q    So every case you've ever done is listed in your

19   C.V.?

20   A    Well, I have to supplement that.  When I was an

21   emergency room doctor I had to testify about drunk

22   driving cases and child abuse cases.  I have none of

23   those records.

24   Q    In fact, in 2004, the California Court of Appeals in

25   Croitzer vs. Metabolife International, a case missing

5701

1    from your C.V. found that your broad conclusions and

2    opinions lacked adequate foundational support.  True?

3    A    True.

4    Q    And they reversed the trial court, didn't they?

5    A    I'm not sure that case ever went to trial.  And I'm

6    not sure I was ever deposed.

7    Q    Did the California Court of Appeals also conclude

8    that you failed to explain the criteria, if any, you had

9    relied upon to reach your conclusions?

10   A    I'm sorry.  I missed your last --

11   Q    Did the California Court of Appeals conclude that

12   you failed to explain the criteria, if any, you had

13   relied upon to reach your conclusions?

14   A    Yes.  That statement really puzzled me.

15   Q    Did the California Court of Appeals also conclude

16   that you had not given a reasoned explanation for the

17   basis of your conclusions?

18   A    I haven't read that ruling since it came out.  I

19   have no recollection of what it says.

20   Q    Did the California Court of Appeals conclude that

21   your background and experience did not provide a

22   sufficient foundation for your opinion?

23   A    I haven't read that since it came out and I have no

24   recollection as to what it says.

25   Q    Let me hand you Exhibit 223.  Is that a copy of that

5702

1     opinion?

2     A    I don't know.  I haven't seen it in quite a few

3     years so I'll have to look at it.

4     Q    Is it looking familiar?

5     A    It's looking familiar.

6     Q    Why don't you turn to Page 7.  Does it state there

7     Dr. Karch's declaration is conclusory?

8     A    Give me a hint.  Yes.

9     Q    So at least one court in a case you don't list in

10    your C.V. found that your conclusions did not have an

11    adequate basis; correct?

12    A    No.  And I could explain but --

13    Q    Now, you talked earlier about your compensation in

14    this case.

15    A    Yes.

16    Q    Was it your testimony that you did not receive any

17    payments from the Defendant Stephen Schneider?

18    A    That's correct.  I don't know the name of the person

19    and two of the payments were wire transfers and I'm not

20    entirely sure where they came from.

21    Q    Let me hand you what has been marked for

22    identification as Government Exhibit 225.  Are those two

23    $10,000 checks from Stephen Schneider?

24    A    They appear to be, yes.

25               MS. TREADWAY:  Government offers Exhibits 225.

```
 1              MR. WILLIAMSON:  No objection.
 2              THE COURT:  They're received.  Payable to him?
 3              MS. TREADWAY:  Yes, sir.
 4              THE COURT:  They're received.
 5   BY MS. TREADWAY:
 6   Q    You testified that you thought you'd gotten about
 7   $75,000; correct?
 8   A    That's correct.
 9   Q    Well, I'm going to hand you a pleading that the
10   Defendants and their counsel filed in February of 2009,
11   which is over a year ago.  Correct?
12   A    Yes.
13   Q    And can you read the highlighted portion there to
14   yourself, please.
15   A    Yes.
16   Q    The defense represented to a federal judge that you
17   had been paid $97,049.37 as of February 10th, 2009.  So
18   you want to change your testimony about how much you've
19   received in this case, sir?
20   A    I'd sure like to see the number that was based on
21   because that's not my recollection.
22   Q    Do you think the defense counsel lied to a federal
23   judge?
24   A    They may have added it incorrectly.
25   Q    Did you submit invoices for payment?
```

1    A    Oh, yes.  I can submit every invoice if you'd like.

2    Q    Have you been paid more since February of 2009?

3    A    Yes.  I received a payment of 25,000, leaving a

4    balance of about 50,000.

5    Q    So by the time this is all over, you're going to

6    have been paid almost $175,000 for your testimony?

7    A    I doubt that very much.  At this point, I consider

8    it a pro bono case.

9    Q    So after you reached the hundred thousand mark, it's

10   pro bono.  Is that your testimony?

11   A    No.  I just think my chances of collecting are not

12   there.

13   Q    So sitting here today, you have received almost

14   $100,000 according to the defense team for your

15   testimony; correct, sir?

16   A    That's correct.

17              MS. TREADWAY:  That's it, Judge.

18              THE COURT:  Redirect.

19              MR. WILLIAMSON:  Judge, I would like to see --

20   there were a couple of documents that counsel asked the

21   doctor about.

22              THE COURT:  You may.

23                    **REDIRECT EXAMINATION**

24   BY MR. WILLIAMSON:

25   Q    All right.  Dr. Karch, we're going to talk just a

1    few minutes on a few of the topics that the Government

2    spoke with you about.  I believe you were asked about

3    this California case and you wanted to explain it for

4    the jury.  Can you explain to them your understanding of

5    this case that the Government mentioned?

6    A   Well, it's my recollection it was a summary motion

7    judgment.  The court -- the case never came to trial and

8    I was never deposed.  And summary judgment motion was

9    filed and Metabolife lost.

10   Q   You hadn't testified as a witness in that case?

11   A   No.

12   Q   And how many cases do you believe you've actually

13   testified in?

14   A   We can add them up from my C.V. but I think it's

15   closer all together like 40 cases.  I do most of my work

16   consulting, not testifying in court.  And giving

17   depositions.

18   Q   Now, we talked about your Karch's Pathology of Drug

19   Abuse book.  How many times has this ever been rejected

20   as an authoritative text in the field of pathology?

21   A   Never to my knowledge.

22   Q   How many times has anybody ever found that you were

23   not authoritative when it comes to being a cardiac

24   pathologist?

25   A   Never to my knowledge.

5706

```
1    Q    Now, you were asked a lot of questions about Dr.
2    Rohrig and those kind of things.  You remember that?
3    A    Quite well.
4    Q    As we showed the jury, how many cases that at least
5    in the Counts 2 through 5 deal with individuals with
6    serious cardiac issues?
7    A    There was I think 19.
8    Q    Who is better to talk about specific patients with
9    specific cardiac issues, somebody specifically trained
10   in addressing cardiac issues with interrelation with
11   drugs or just a general pathologist?
12   A    I think I am.
13   Q    And why would you say that?
14   A    Well, I understand how the heart works and how
15   electricity is conducted in the heart and I know which
16   parts of the heart do what things which PhD toxicology
17   training does not include.  And you may be ABFT, but you
18   probably do not know how a taser is conducted from your
19   chest wall to your sinus node or issues like that.
20   Q    Did you just wake up one day with all of this
21   expertise in cardiac issues in relation to drugs in the
22   system?
23   A    No.  I was always interested in it and partially
24   from working in the emergency room; but then I had the
25   good fortune to apprentice myself to Professor
```

5707

1    Billingham, who is, arguably, was the world's best

2    cardiac pathologist and I trained at her side.

3    Q    Now, you were asked a series of questions by the

4    Government in regards to your ability to actually render

5    an opinion.  When you were called into this case, did we

6    ask you or tell you we need you to say that the causes

7    of death were something other than mixed drug

8    intoxication?

9    A    No.

10   Q    Did we at any time try to direct --

11            MS. TREADWAY:  This is leading, Judge.

12            THE COURT:  Particularly with this witness.

13   Particularly.  If you ask anything other than a

14   non-leading question, I will strike it.

15            MR. WILLIAMSON:  Yes, sir.

16            THE COURT:  I mean it.  I really, really mean

17   it.

18            MR. WILLIAMSON:  Okay.

19   BY MR. WILLIAMSON:

20   Q    Were you asked by the defense team to provide a

21   specific opinion -- strike that.

22       Were you asked by the defense team to provide a

23   specific cause of death?

24            MS. TREADWAY:  Leading.

25            THE COURT:  Sustained.

5708

1    BY MR. WILLIAMSON:

2    Q   Can you tell the jury whether or not you were asked

3    by the defense team, yes or no, as to whether or not you

4    were requested to provide a specific cause of death at

5    all?

6              MS. TREADWAY:  Objection.  Leading.

7              THE COURT:  Sustained.

8    BY MR. WILLIAMSON:

9    Q   Well, you were asked questions by the Government in

10   regards to these specific individuals and render an

11   opinion.  Do you remember that?

12   A   Yes.

13   Q   Now, let's just use Eric T as an example.  Can you

14   tell the jury, just explain to the jury one more time

15   without us going through each and every person, why you

16   came up with undetermined as a cause of death in all but

17   one of these instances?

18   A   Well, primarily it was going from the autopsy

19   report.  I think -- I had not yet even seen the slides

20   and was relying upon the opinions of Dr. Dudley or Dr.

21   Oeberst.  Dr. Oeberst.  And she very specifically

22   described, and I think it might help with the record,

23   she described a change in the heart that only means one

24   thing, which is myocarditis.  And myocarditis is a

25   sometimes fatal disease.  She says, quote "There is

5709

```
 1    perivascular fibrosis, focal scant, approximately 20
 2    cells, interstitial lymphoplasmacitic inflammatory
 3    infiltrate, a single giant cell myocite degeneration and
 4    necrosis." Now, that is accepted internationally as the
 5    diagnostic criteria for myocarditis. Having said that,
 6    myocarditis isn't always fatal. So I don't know that
 7    myocarditis was the death. I just do know that Dr.
 8    Oeberst saw it. I don't believe I got a chance to see
 9    the slides. It was one of the slides that couldn't be
10    found. In addition, he had pneumonia; and we've all
11    probably all had family members who died of pneumonia.
12    He had kidney failure. He had severe coronary artery
13    disease that was left anterior coronary artery and of
14    his right coronary artery. And he had elevated cardiac
15    enzymes. When you go to the hospital with chest pain
16    and they draw blood and that's the -- to measure cardiac
17    enzymes, that's an indicater of damage to the heart. It
18    could be myocarditis or it could be a heart attack from
19    his 70 to 80% occlusion. And there were a whole raft of
20    drugs found, including Methadone, Oxycodone, and
21    Carisoprodol, which is metabolized as Meprobamate.
22    Given all that information, I don't have a method and
23    don't know what method to sort this out. I know Dr.
24    Oeberst in her testimony said, well, sometimes you see
25    this with resuscitation. But I think it's sort of
```

5710

1    unusual to see with resuscitation.  At least in my

2    experience it is.  So those were all the issues that I

3    looked at.  And I couldn't think of any rational

4    sensible way to sort them out.  I certainly couldn't

5    think of any way to take into account tolerance.  I

6    didn't know whether the Methadone number was real.

7    Nobody knows whether the Methadone number was real.  And

8    I don't know whether he was tolerant.  I don't know he

9    was tolerant.  Dr. Oeberst doesn't know he's tolerant.

10   Dr. Rohrig doesn't know that he was tolerant.  Nobody

11   knows whether he was tolerant because his hair wasn't

12   tested.  Had his hair been tested and had been negative

13   and we would say, aha, got it, it was the Methadone

14   overdose and not the heart.  But it wasn't.  And I don't

15   know.  And when you don't know, the proper answer isn't

16   polydrug.  The proper answer is underdetermined, I don't

17   know the answer.  There's nothing particularly evil or

18   sinister or incompetent or anything else by saying I

19   don't know.

20   Q    Now, you say you don't know.  Are there any peer

21   review journal articles that identify a method to,

22   quote, unquote, sort those type of issues out?

23   A    None that I know of.  Doctor -- Mrs. Treadway,

24   prosecutor Treadway mentioned tolerant being the new

25   foundation that's being formed and we're drafting a

5711

1    grant to apply to the foundation to see if we can do

2    biochemical measurements that would tell us whether

3    tolerance existed; but we haven't even gotten the money

4    to do the research so I don't really have any answers to

5    give you.

6    Q    May I see that Schipman -- we're going to wait on

7    that Schipman transcript.  You were asked questions

8    about, from the prosecutor about a deposition that you

9    gave.  Do you remember that?

10   A    Yes, I do.

11   Q    Now, is today the first day that -- strike that.  Is

12   this case the first case where you have opined that you

13   cannot rely on post-mortem drug levels in determining

14   the cause of death alone?

15   A    No.  There was the editorial at the group of 14

16   people who who are all considered probably more

17   authoritative than I, that we wrote, we were asked to

18   write for the British medical journal.

19   Q    Does your pathology of drug abuse include any --

20   A    Oh, yes.  I've been writing about this subject for

21   many years.

22   Q    Has -- have you received any criticisms from any

23   other cardiac pathologist or otherwise in regards to

24   those specific opinions in your pathology of drug abuse

25   book?

5712

1    A    No.  Nor have I received any criticisms about the

2    handbook which prosecutor Treadway showed.  Which is in

3    fact required reading for the board.  She asked for the

4    board -- she asked me whether I belonged to --

5    Q    How many per review journal articles did the

6    prosecution give you to say that your opinion in this

7    case and in your books is not scientifically valid?

8    A    I've never heard any such criticism.

9    Q    Did they present you or the jury with any scientific

10   journal articles?

11   A    No, sir.

12   Q    Now I want you to read the highlighted part of Page

13   19 of this deposition transcript that the Government had

14   you read from a few minutes ago.  Read that for the

15   jury.

16   A    Principal one is she may have had a low Oxycodone

17   concentration when she died of her mitral prolapse

18   disease or had a stroke or had something called

19   rheumatic syndrome or something else.  Most important,

20   measurements are absolutely totally unreliable for any

21   purpose except to prove that the drug is present.  No

22   paper in the peer review literature has ever

23   demonstrated that drug levels measured after death are

24   lower than drug levels measured before death unless they

25   have been metabolized by cocaine.  On the contrary, a

5713

 1   number of studies have measured people's blood drug

 2   levels shortly before death and they have always been

 3   found to increase at autopsy.  And there are a number of

 4   experiments for animals who have been killed that after

 5   being given a drug and they had been precept after

 6   autopsy.  In fact there was nothing to conflict --

 7   contradict that position.

 8   Q   Was this testimony given before you provided an

 9   opinion in this case?

10   A   Almost three years probably.

11   Q   Was this opinion given before you ever received a

12   cent from Dr. Schneider or his family?

13   A   I had never heard of Dr. Schneider.

14   Q   When you made those opinions in this book, had you

15   heard of Dr. Schneider?

16   A   .

17   Q   When did you start publishing your pathology of drug

18   abuse book?

19   A   Back in 1992.

20   Q   And did you read the testimony where Dr. Oeberst

21   admitted to referring to your book when she conducts

22   autopsies?

23   A   Yes, I did.

24   Q   Now, you were asked questions by Ms. Treadway in

25   regards to Toni W's autopsy and circumstances of death.

1    Do you remember that?

2    A    Yes.

3    Q    And do you remember her giving a rendition of what

4    was allegedly told to the medical investigators in

5    regards to that?

6    A    Yes.

7    Q    And I believe that she stated that if the medical

8    examiner was told that Toni W had sold her medicine for

9    cocaine that that would be in the autopsy.  Do you

10   remember that?

11   A    Yes, I do.

12   Q    Read the circumstances of death for the jury because

13   I may just be missing something.  I just might be

14   missing it.  Read that for the jury.

15   A    Well, it's as I indicated earlier, that everything I

16   know about the cases I derived from reading the

17   circumstances of death which are supposed to be the

18   narrative that NAME specifies be included in all the --

19             THE COURT:  I think he is just asking you to

20   read what's in the document.

21   Q    Just read that circumstances of death for the jury.

22   A    The decedent had a past medical history significant

23   for chronic back pain, mitralvalve prolapse, poor

24   cardiac output, horseshoe kidney, diabetes mellitus and

25   prescription and illicit drug abuse.  She was last seen

5715

1    at her residence by her mother on the evening of

2    2-17-06, at which time she reportedly appeared

3    lethargic.  Her mother checked on her well being at 2:18

4    and found her unresponsive on the bedroom floor.  911

5    was contacted and emergency medical services responded

6    to the scene.  Cardiopulmonary resuscitation efforts

7    were attempted until death was pronounced at 10:46 at

8    2-8-16.

9    Q    Did you see anything in there about medicine being

10   sold for cocaine?

11   A    No, sir.

12   Q    But according to Ms. Treadway, you would expect

13   that -- according to Ms. Treadway, you would expect that

14   to be in that document if it was told to medical

15   examiners?

16   A    I would have, yes.

17   Q    Are toxicology results ever incorrect?

18   A    I'm not sure what you mean by that.  Are toxicology

19   results accurately done?  I'm sure that Sedgwick County

20   does as accurate testing as anybody else.

21   Q    Can it ever show a negative when it's actually a

22   positive?

23   A    It can.  Every laboratory has what is called its

24   limits of detection.  In other words, there might be

25   some cocaine in your blood but the amount would be so

5716

1    low that the technician they used cannot detect it.

2    Q    Now, you were asked questions about this e-mail

3    where you mention chest full of little aliens when you

4    were communicating to Eugene Gorokhov.  Do you remember

5    that?

6    A    Yes, I'm afraid I do.

7    Q    Okay.  And when you were on direct, did you ever

8    opine that a possible cause of death for Patricia G was

9    a chest full of little aliens.

10            MS. TREADWAY:  Objection.  Leading.

11            THE COURT:  Sustained.

12   BY MR. WILLIAMSON:

13   Q    Can you tell the jury what you meant when you sent

14   that e-mail to Mr. Gorokhov?

15   A    I was trying to make a point to Mr. Gorokhov that

16   this particular individual had not had an autopsy, only

17   an external examination, and Lord only knows what would

18   have been found inside the chest if it had been opened.

19   Q    Now, as part of this case, were you given documents

20   at one time or were you given them on a rolling basis?

21   A    On a rolling basis.

22   Q    You were asked questions -- well, let's talk about

23   this.  You were asked questions about you making an

24   opinion on Napoleon.  You remember that?

25   A    An opinion on?

5717

1    Q    On Napoleon's cause of death.   You remember that?

2    A    Yes, sir.

3    Q    Can you tell the jury about your opinion of

4    Napoleon's cause of death and how that even came about?

5    A    It came about because I was looking at the heart of

6    a man with leukemia who died suddenly and he was being

7    treated with arsenic which is now considered an

8    important drug for treating leukemia.  It has a bad side

9    effect of killing people though.  I was also at that

10   same time helping some friends translate a best selling

11   book in Italian into English and it was about famous

12   poisonings, the Napoleons and other famous people that

13   had been killed with poisons.  And I read about how

14   Napoleon had been poisoned with arsenic and made the

15   connection that, well, maybe he hadn't been

16   unconsciously poisoned.  But many of the medicines they

17   used then had arsenic in them and maybe he died the same

18   way the person with leukemia died, from being out of

19   balance in his electrolytes and particularly being short

20   of potassium.  That got picked up by the international

21   press and a great deal of fun was made of it because I

22   said they used to treat people with enemas, and I think

23   the British called it an enema too far or something of

24   the sort.

25   Q    Was that an article that you published in a journal

1    at all?

2    A    The Journal of the Royal Society of Medicine.

3    Q    Did you have any response to that journal article?

4    A    The phone rang for three days.  I did -- it

5    astonished me.  I did phone interviews all around the

6    world.

7    Q    Are you following up about that article?

8    A    I'm writing a history book about the death of

9    Napoleon.

10   Q    Is that a topic you consider to be serious?

11   A    I think it's very serious, yes.

12   Q    Now, you were asked questions about reviewing slides

13   at the Sedgwick County Medical Examiner office.  You

14   remember that?

15   A    Yes.

16   Q    I think Ms. Treadway was establishing that you spent

17   less than two minutes per slide in reviewing those?

18   A    Yes.

19   Q    I know you mentioned this a little bit on direct but

20   I want to make sure I don't lead so I don't get in

21   trouble with Judge Belot.  Can you tell the jury the

22   capabilities of that microscope that you have?

23   A    Well, it allows me to put a lot of pictures into my

24   computer very quickly.  So somebody that's trained at

25   looking at thousands of slides, I don't take two minutes

5719

1    to look at a slide.  I look at the slide under low power

2    and probably it's pattern recognition, it probably

3    doesn't take me more than 15 seconds.  Then as something

4    strikes my eye, I may zero in on it and look for a lot

5    longer.  The computer allows me to throw the images into

6    J-pegs and then at my leisure I can review them.  So I

7    don't know how many pictures I took that day.  I kept

8    taking pictures until I ran out of slides.  I would have

9    kept going if there were more.

10   Q    Now, you were asked questions about a Schipman

11   transcript.  You remember that?

12   A    Yes.

13   Q    Read just for the jury where this transcript came

14   from?  Can you read that URL at the very bottom?

15   A    It says HTTP/WWD dash Schipman dash inquiry dot org

16   dot UK, slash trial day, dot ASP question mark, day 21.

17   Q    So is that a certified transcript from the Schipman

18   trial or is that from some web site?

19   A    Oh, actually, no, it's from a web site.  And I know

20   which web site it is.  The original Schipman trial we

21   managed to get 15 convictions of Dr. Schipman for

22   killing 15 people.  And this caused a furor in the

23   government and two investigatory commissions were set up

24   to find out how many people he actually killed, which

25   turned out to be 250, and how he had gotten away with

 1    it.  And there is two web sites that are posted by the
 2    British government with the proceedings and the
 3    testimony and everything else of the investigation.  I
 4    wasn't aware that they had posted the transcript at all.
 5    Q   And that was given in 1999?
 6    A   Yes.  It was a few years ago.
 7    Q   Okay.
 8                     (Off-the-record.)
 9    BY MR. WILLIAMSON:
10    Q   You were asked questions by Ms. Treadway about this
11    A Path for Strengthening Forensic Science.  You remember
12    that?
13    A   Yes.
14    Q   And she asked you about a statement if you agreed
15    that you have to be -- you should be certified before
16    you, you know, perform autopsies or be involved in the
17    forensic process.  You remember that?
18    A   Yes.
19    Q   Okay.  Now, under recommendation 7 can you read the
20    underlined part of that document for the jury?
21            MS. TREADWAY:  I don't believe this has been
22    admitted but we don't object to it being admitted,
23    Judge.
24            THE COURT:  Is this from the Shipman case?
25            MR. WILLIAMSON:  No, sir.  This is just a

5721

 1   document that Ms. Treadway questioned the witness about.

 2   We can move for demonstrative purposes but --

 3            THE COURT:  If she doesn't object to him just

 4   reading from it, that's no problem.

 5            MR. WILLIAMSON:  Okay, Your Honor.

 6   A   "Laboratory accreditation.  Individual certification

 7   of forensic science professional should be manual (sic)

 8   and all forensic science professionals should have

 9   access to a certification process.

10   Q   Now, as a forensic -- strike that.  As a cardiac

11   pathologist, do you have access to a certification for

12   that specialty?

13   A   No.

14   Q   That's different than refusing to allow people to

15   participate because they do not have a certification?

16            MS. TREADWAY:  Objection.  Leading.

17            THE COURT:  Sustained.

18   BY MR. WILLIAMSON:

19   Q   Now, how many cases have you consulted since 2008?

20   A   Consulting meaning discussed on the phone or

21   talked --

22   Q   Or been involved in in any way?

23   A   Oh, probably between 25 and 50.

24   Q   Okay.  And the checks that Ms. Treadway gave you

25   from Dr. Stephen Schneider, when were those given?

5722

1    A    October, 2008.

2    Q    Is it possible that you forgot about those specific

3    checks?

4    A    It's very possible.

5    Q    Were you attempting to mislead the jury in any way?

6    A    No.

7    Q    Now, at the end of the day after you've had a chance

8    to review all of the autopsy reports, has your opinion

9    changed in relation to the specific individuals that you

10   specifically talked to the jury about and the reason why

11   that you previously told them?

12   A    No.  I have had one recollection on one thing I

13   would like to clarify.

14   Q    Okay.

15   A    That was I had forgotten that I talked about

16   malpractice.  And I did.  And I remember it now.  And

17   that was strictly in reference to not looking at the

18   heart.  A lot of diseases, and it's now appreciated it

19   maybe 10% of diseases that kill young people are

20   hereditary.  They don't have any obvious signs at all.

21   They can only be found with genetic testing.  And I --

22   when the prosecutor asked if the autopsies were

23   complete, I don't think they're complete if that part is

24   left out.  Now, obviously, if your grandmother dies and

25   you're 75, I don't see much point in testing your DNA

1    for certain inheritable diseases.  But if he were to

2    keel over right now, I'd sure want him and his son

3    tested genetically because if I know he's carrying a

4    potentially lethal gene, I can do something for the son

5    or a cardiologist can do something for the son that

6    prevents his dying needlessly.  So I feel strongly that

7    not following up on these cases is tantamount to

8    malpractice.  I know it's an impossible requirement

9    because the money is so expensive; but that doesn't

10   change the fact that the testing is needed.  Now,

11   sometimes you can get lucky and the malformation is

12   visible.  The common one is the one that kills all the

13   athletes and it's called hypertrophic myocardiopathy and

14   sometimes you can see what's wrong in the heart and save

15   a whole lot of money.  But a lot of times the

16   abnormality is at the molecular level and it cannot be

17   found any other way.  And as much of a responsibility as

18   I think a medical examiner has to determine the cause of

19   death, he also has a public health function and he

20   should prevent innocent young people from dying.

21          MR. WILLIAMSON:  Thank you for that

22   clarification, Dr. Karch.  And I don't have anything

23   further.

24          THE COURT:  Thank you, Mr. Williamson.

25   Anything further of this witness?

1          MS. TREADWAY:  Not based on that, Judge, no.

2          THE COURT:  Thank you, sir.  You're excused.

3  A    Thank you.

4          THE COURT:  And I believe, Ladies and

5  Gentlemen, that concludes our work today.  I'll see you

6  again Thursday morning at 9:00.  Now, we have another

7  expert witness.  I believe that day, don't we,

8  Mr. Williamson.

9          MR. WILLIAMSON:  Yes, Your Honor.

10          THE COURT:  And then there are a few

11  additional kind of clean up witnesses that couldn't come

12  last week.  Isn't that correct, Mr. Gorokhov?

13          MR. GOROKHOV:  Yes, sir.  We're still working

14  on it.  Maybe there won't be any.  We'll see.

15          THE COURT:  Well, I didn't mean to put you on

16  the spot.  If there aren't any, there aren't any and you

17  must not take any -- anything negative about

18  Mrs. Schneider from his comment.  He doesn't mean it

19  that way.  We're just trying to move this case forward

20  and get it to you.  But we will finish the evidence this

21  week and then get it to you next week.  And please,

22  please, all of you, stay safe.  No motorcycle riding.

23  You are both ordered not to ride your motorcycles until

24  after this case is over.  I'll see you Thursday.

25                    (Jury excused for the day at

```
1                    3:35 p.m.)

2          THE COURT:  You all can sit down.  Okay.

3     Rchael and I are working on the instructions.  My goal

4     is to get a set of instructions to you Wednesday

5     morning.  They're fairly extensive.  But what I propose

6     is to make it easier on all of us is that I'm not going

7     to include the Indictment in the set that you get.

8     You've got a copy, you know.  Then that will give you an

9     opportunity to read them, go over them, get your

10    thoughts together.  And we'll have an instruction

11    conference on Wednesday afternoon.  And I think that

12    ought to -- hopefully, we can get everything done then.

13    Kevin.

14          MR. BYERS:  Yes, sir.

15          THE COURT:  When are you coming back from your

16    son's graduation?

17          MR. BYERS:  I will be back -- you know, I

18    haven't looked at my flight yet.  I was intending to

19    come back on that Monday, use that as a travel day.

20    Graduation is Sunday.

21          THE COURT:  I want you to -- do you have any

22    of idea when --

23          MR. BYERS:  I've been getting in early, 10

24    a.m. or so, if I catch a 6 a.m. out.

25          THE COURT:  If for some reason something
```

1   happens and we can't get the instructions finalized this

2   week, do you think you could be here in the afternoon on

3   Monday.

4            MR. BYERS:  Sure.  I'll make a point of it.

5            THE COURT:  Okay.  That ought to do it.

6   There's always a problem of getting instructions

7   finalized and copied for everybody.  And as I told you,

8   we've got some notebooks and so we'll have notebooks for

9   them.  All right.  Thanks a lot.  I'll see you all --

10           MS. TREADWAY:  I'm sorry, Judge.  What time do

11  you anticipate the jury instruction conference to be?

12           THE COURT:  I don't know yet.  But you're all

13  around here.  Probably 1:00.

14           MS. TREADWAY:  And do you want us to come to

15  chambers for the copies of the instructions at a certain

16  time?

17           THE COURT:  I don't know.  I want you to tell

18  Rachael or Cindy where you're going to be so that we can

19  give you a call.

20           MS. TREADWAY:  Sure.

21           THE COURT:  Unless you're just going to be

22  here in the courthouse.  Where are you going to be,

23  Eugene?

24           MR. GOROKHOV:  We'll be nearby, Your Honor.

25  Within five minutes of the courthouse.

1           THE COURT:  That's good.

2           MS. TREADWAY:  We're just down the hall,

3     Judge.  You know where we are.

4           THE COURT:  Right.  Would you give Rachael

5     your number.

6           MR. GOROKHOV:  Yes, we will, Your Honor.  Your

7     Honor, there's just one quick point.  You mentioned the

8     Indictment, and I don't know if you have, if you've

9     decided whether the whole Indictment will go back to the

10    jury or not.  There's some content in there that based

11    on the Court's evidentiary ruling should be taken out.

12    And we can work with the Government as much as possible.

13          THE COURT:  Go ahead and work with them and be

14    ready to present that to me.  And if it needs to come

15    out, it will come out.  Okay.  All right.  Thanks.

16          MR. WILLIAMSON:  Thank you, Your Honor.

17                    (Recessed for the day at 3:37

18                     p.m.)

19

20

21

22

23

24

25