```
 1                    (Beginning at 9:20 a.m. June 10,

 2               2010, the following proceedings

 3               continued.)

 4          THE COURT:  I believe we've had another

 5   schedule modification, which I hope won't upset you; but

 6   I don't think we'll have court tomorrow.  I believe that

 7   we'll have all of the evidence in today with the

 8   exception of one short witness who will come on Tuesday

 9   morning and won't take long.  And on Tuesday morning I

10   will give you the instructions and the lawyers will

11   argue and you'll get the case.  So, I apologize.  It's

12   my fault for not running it more smoothly; but sometimes

13   in long trials like this, we have these problems.  All

14   right.  Next witness please.

15          MR. BYERS:  Defense calls Martha Brown, Your

16   Honor.

17                      **MARTHA BROWN**

18   Having been first duly sworn to tell the truth, the

19   whole truth and nothing but the truth, testified as

20   follows on:

21                 **DIRECT EXAMINATION**

22   BY MR. BYERS:

23   Q    Ma'am, would you state your name, please.

24   A    Martha Brown.

25   Q    How old are you?
```

5824

```
 1    A    53.

 2    Q    Okay.  Are you currently employed?

 3    A    No.

 4    Q    Okay.  What was your last employment?

 5    A    Schneider Medical Clinic.

 6    Q    And how long were you employed there?

 7    A    Five years.

 8    Q    I'm sorry.  You said five years?

 9    A    Yes.

10    Q    Do you remember the dates?

11    A    I think I started in 2002 and I was there until the

12    end.

13    Q    Until the end meaning what?

14    A    Until it was closed.

15    Q    Okay.  Do you remember when that was?

16    A    2007, February 2nd.  I'm not sure of the date.

17    Q    Well, if I tell you the Schneiders were arrested in

18    December of '07, did you -- does that help you remember?

19    Did you stay with the clinic a bit longer after they

20    were in jail?

21    A    Yes, I did.  I stayed until the doors were closed.

22    Q    Okay.  So that was, it was fair to say, sometime

23    very early of 2008?

24    A    I believe so.  I don't remember the date.

25    Q    Okay.  Before working at Schneider Medical Clinic,
```

5825

1    where did you work?

2    A    Spectra Health Care.

3    Q    And what is Spectra Health Care?

4    A    It's a third party billing company.  They bill for

5    physicians.

6    Q    Do you know how long you worked at Spectra?

7    A    Two years.

8    Q    Okay.  What did you do at Spectra?

9    A    I was a coder.

10    Q    Okay.  A medical coder?

11    A    Yes.

12    Q    Okay.  What job did you hold at Schneider Medical

13    Clinic?

14    A    I was a medical coder.

15    Q    Okay.  Now, going back even farther than Spectra,

16    what positions have you held right immediately before

17    Spectra?  What were you working as?

18    A    I was a coder at Physicians Billing Service for five

19    years.

20    Q    And is that like a third party billing entity?

21    A    Yes.

22    Q    Okay.  Did you have prior coding experience before

23    that Physician's Billing Service?

24    A    No.  I learned going into Physician's Billing

25    Service and then I took classes also.

5826

1    Q    Okay.  And at any point -- well, when you were at

2    Schneider Medical Clinic, were you a certified coder?

3    A    My certification ran out because I didn't get all my

4    CEUs in; but I, prior, was a certified coder.

5    Q    So when you hired on on at Schneider, were you

6    certified?

7    A    I believe I was still certified then.

8    Q    Okay.  Is it your understanding that it's a

9    requirement of any kind of entity or government?  Did

10   you have to be a certified coder?

11   A    You did not.  A lot of places preferred it; but at

12   that time you were not required to be certified, no.

13   Q    Okay.  And you mentioned CEUs, what is that?

14   A    That's just you have to have a certain amount of

15   CEUs every month.  It's just to make sure that you're

16   keeping up to date with the practice and the rules and

17   regulations and you do these little tests and send 'em

18   in and they grade 'em and then that will earn you CEU.

19   Q    Do you know what CEU stands for?

20   A    Certified Educational Unit, I believe.

21   Q    Okay.  And there's some entity you would do like a

22   self-test?  Is that what you're saying?

23   A    Yeah, you can do 'em online or a lot of times like

24   St. Francis, St. Jo, they'll hold classes you can go to

25   once a month to earn those CEUs.

5827

1   Q   So why did you let your certification lapse?

2   A   Just didn't have time.  Just put it off and put it

3   off until it was too late to get it done.

4   Q   Okay.  So tell me about your job duties as the coder

5   at the Schneider Medical Clinic?  What did you do on a

6   regular day?

7   A   Regular day I would collect all the fee tickets from

8   that day from Linda's office.  She would put them in a

9   basket and I would come in and get 'em, take 'em to my

10  office.  I would sort 'em by date, would alphabetize

11  them, sort them by doctor.  And once I got them all

12  sorted out, I would code 'em, which means I would make

13  sure the doctor had checked the level of service for

14  that day, make sure that was correct.  And then at the

15  bottom of the ticket he would write out the diagnosis

16  and I would look up that code and code that out.  And

17  that's about about what all I did with 'em.

18  Q   So if the doctor is writing out a diagnosis, that's

19  actually -- it's in words; right?

20  A   Yes.  He wrote out the diagnosis and I would look up

21  the code, the actual medical code.

22  Q   And where would you find this code?  What would you

23  look it up in?

24  A   A code book.  We had books.  We have code books that

25  we use.

5828

```
 1    Q    What, a big paper volume?
 2    A    Yeah, that big physician's -- I can't think of what
 3    it was called.
 4    Q    Was that updated?  Was that manual updated during
 5    the time you were there?
 6    A    Yes.  Every year we got new books with new codes and
 7    updates.
 8    Q    Okay.  And you said that you would get them out of
 9    Linda's office.  What's your understanding of why charts
10    would be in Linda's office?  Or fee tickets -- I'm not
11    clear?
12    A    Fee tickets.
13    Q    The chart wasn't necessarily with the fee ticket?
14    A    Yes.  The Doctor would see the patient.  He would
15    fill out his fee ticket.  He would attach it to the
16    chart.  And then those charts with the fee tickets
17    attached would go to Linda's office.  Linda would go
18    over them to make sure that the fee ticket matched up to
19    what the doctor had done, make sure everything was
20    right.  And then if everything was correct and didn't
21    need any other work, she would send -- she would send
22    the fee ticket on to me and the chart would go back to
23    be filed unless I needed the chart to look something up.
24    Q    And why might you need to see a chart as the coder?
25    A    If it had questions like if I needed to ask the lab,
```

5829

1    say the doctor had written out lab work to be done and

2    it wasn't checked on the fee ticket.  I would take that

3    chart and fee ticket back to the lab and ask them if

4    they did that and, you know, exactly what they did to

5    make sure that that should be billed.  That's the only

6    reason I would get a chart.

7    Q    Did you ever see Linda Schneider completing fee

8    tickets?

9    A    Never.

10   Q    Did you ever see her writing in charts such as

11   writing in progress notes?

12   A    She never -- no.

13   Q    Did you ever see Linda writing prescriptions?

14   A    No.

15   Q    Okay.  Did you ever hear of Linda somehow fiddling

16   with charts in an inappropriate fashion?

17   A    Never.

18   Q    Did Linda ever direct you on how to code fee

19   tickets?

20   A    No.

21   Q    Who was your supervisor then?

22   A    Linda was.

23   Q    But she never told you how to fill out a fee ticket

24   or how to code something?

25   A    No.  That was up to the doctor.  He would check the

5830

1   codes.  Linda would never tell me to code it this or

2   code it that.  That was done by the doctor.

3   Q   Now, were you working side-by-side with Linda all

4   the time?

5   A   What do you mean by side-by-side?

6   Q   Physically were you where you could see her all day

7   long?

8   A   No, I was in my own office.

9   Q   Okay.  And was that a regular four-wall office where

10  you could shut the door and be completely alone?

11  A   Yes.

12  Q   Okay.  Now, were there ever occasions -- because

13  we've heard some testimony about Linda or Linda and

14  Steve being out of the clinic for vacations and things

15  but the clinic would apparently still go forward with

16  seeing patients.  Is that correct?

17  A   Yes.

18  Q   Okay.  Because other providers were around; is that

19  right?

20  A   Right.

21  Q   Okay.  Did the fee ticket progress just stop on

22  those days in Linda's office or what happened?  Did

23  somebody fill in for what Linda was doing?

24  A   At the end, a couple of times I did.

25  Q   Okay.  And what would you do?

5831

```
 1   A   I would just look at the fee ticket and match it to
 2   the chart, make sure everything was marked that was done
 3   that day.  I would just check it with the chart to make
 4   sure it all matched up.
 5   Q   And -- I'm sorry, I thought you were done.  When you
 6   say checking, matching it with the chart, what exactly
 7   were you matching?
 8   A   Well, I would look like if he marked the level of
 9   service, I would read the progress note to make sure
10   that was the correct level of service.  I would look in
11   a chart and make sure the diagnosis matched up with what
12   he wrote and just to make sure everything was on the fee
13   ticket correctly from the chart.
14   Q   And if you're reading a note to determine an
15   appropriate level of service, how do you know what the
16   level of service should be?
17   A   Well, that's what you have your CPT books for.  And
18   that's what my training is for, to know how to do that.
19   Q   Okay.  So you would actually read the note and make
20   sure it matched -- now, is that like we've heard about a
21   99213?
22   A   Yes.
23   Q   That's the kind of code you would make sure it
24   matched up?
25   A   Correct.
```

1    Q    Did you do that on every fee ticket?

2    A    When Linda was gone I did.

3    Q    Okay.  So you saw that as part of her duty?  That's

4    what she was doing when she looked over things?

5    A    No.  She didn't -- she didn't do that.  That

6    would -- if there was a question, if she thought maybe

7    it was the wrong service marked, then she would send the

8    ticket and the chart to me.

9    Q    Okay.  Did Linda ever tell you to submit a fee

10   ticket that had been upcoded from like a PA, a PA

11   rendered the service but she wanted it coded and billed

12   as a doctor did?

13   A    Never.

14            MR. BYERS:  I believe that's all I have, Your

15   Honor.

16            THE COURT:  Mr. Williamson.

17                    **CROSS EXAMINATION**

18   BY MR. WILLIAMSON:

19   Q    Good morning.

20   A    Hi.

21   Q    Just a few follow-up questions and then I want you

22   to walk through a fee ticket with the jury.  Okay?

23   A    Okay.

24   Q    Now, when you were working at the Schneider Medical

25   Clinic, was there a person there who was a sorter?

5833

1    A    There was for a while and then I took that position

2    over, too.

3    Q    And what was the sorter's responsibility?

4    A    All they did was they would gather the fee tickets

5    for the day and they would sort 'em out by physician and

6    by date and then they would alphabetize them and then

7    they would send them to me to code.

8    Q    And once you finished with the fee ticket, where

9    would it go?

10   A    It would go to the person to enter the charges.

11   Q    And did you know that person to be Katherine Gaines?

12   A    Yes.

13   Q    And are you familiar with Sherrie Mills and Brenda

14   Whitehead?

15   A    Yes.

16   Q    And were they the managers in the billing

17   department?

18   A    Yes.

19          MS. TREADWAY:  Judge, this is leading.

20   Objection.

21          THE COURT:  Sustained.

22   BY MR. WILLIAMSON:

23   Q    Do you know -- strike that.

24       Let's take a look at one of the fee tickets, and

25   before we do, if you ever had a question about a

5834

1    diagnosis, what would you do?

2    A    I would go to the doctor and ask him about it.

3    Q    And were there occasions where you actually had to

4    go to the respective providers and ask them about

5    certain diagnoses?

6    A    Yes.

7    Q    And whenever you would go talk to a provider about a

8    diagnosis, specifically Dr. Schneider, did he ever tell

9    you don't bring any questions to me?

10   A    Never.

11   Q    Would he talk with you and try to work to figure,

12   you know, to make sure the document was correct?

13   A    Yes.

14            MS. TREADWAY:   Objection.   Leading.

15            THE COURT:   Sustained.

16   BY MR. WILLIAMSON:

17   Q    What would Dr. Schneider say if you had questions in

18   regards to a diagnosis?

19   A    He would answer my questions.

20   Q    Was he ever short or rude with you?

21   A    Never.

22   Q    All right.   Now, was this fee ticket -- would you

23   consider a communication tool between the physicians and

24   the billing department and all the -- and even the

25   coder?

5835

1    A    I'm sorry.  Repeat that.

2    Q    Would you consider the fee ticket a communication

3    tool?

4    A    Yes.

5    Q    And let's just walk through and if you can see let

6    me know.  If not, I can give you a copy of one of these.

7    A    If I could, I'd appreciate it.

8    Q    For the record, we're looking at a fee ticket for

9    Patricia G on 5-18-2005.  A redacted copy.  Now, we see

10   something here, this big circled area on the fee ticket.

11   I'm just going to turn it sideways because there's

12   writing there.

13   A    Okay.

14   Q    If you would see this come back as a coder, what

15   does that communicate to you?

16   A    Which part of it are you talking about?

17   Q    Where it says schedule PT, F-U-L --

18   A    The circled part?

19   Q    Yes, ma'am.

20   A    It would mean they would have PT scheduled.

21   Q    And what is PT?

22   A    Physical Therapy.

23   Q    So would Dr. Schneider also put referrals on fee

24   tickets?

25   A    No.

5836

1    Q    Okay.  What would this be for, this type of
2    language?
3    A    To schedule the PT that would -- I'm trying to
4    remember who scheduled.  I believe it we want to
5    referrals, but I'm not positive.
6    Q    Okay.
7    A    I don't remember who scheduled that.
8    Q    And let's show the jury, there are some numbers and
9    some writing down at the bottom righthand side.  Can you
10   just kind of walk the jury through, let's see, where you
11   see 900, 5-20-05 and all that information down there.
12   Can you tell them what all this means?
13   A    Oh, the 900 5-20-05, that's the date that the
14   therapy was scheduled.  They write that on the fee
15   ticket.  That's the date.
16   Q    Okay.  And there are some circles.  Would you have
17   been the person to make those circles?
18   A    No.
19   Q    Is that what the doctor would do?
20   A    Yes.
21   Q    And there are some numbers, 784, 401, 244.  What are
22   those?
23   A    Those are the diagnosis codes.
24   Q    All right.  And is that something you would do?
25   A    Well, on the ticket -- I can't see that on the

5837

1    ticket here, these numbers over here.  Okay.  See, these

2    are the diagnosis codes.  And then I just rewrite them

3    up there for my own information.

4    Q    And when Mr. Byers was asking you a question

5    regarding the doctor's writing the codes, is this the

6    language down at the bottom righthand side there?  Is

7    that what you would rely on?

8    A    Yes.

9    Q    Okay.  And if you were unclear about what was here,

10   is that when you would go speak with the provider?

11   A    Oh, yes, definitely.

12   Q    Now, at any time did Dr. Schneider ever instruct you

13   to bill or create a diagnosis code for a service he did

14   not render?

15   A    No.

16   Q    Did he ever instruct you to change a provider's name

17   on a fee ticket?

18   A    No.

19   Q    Okay.  Even though he didn't instruct you, did he

20   ever ask you to create a diagnosis code for a service

21   that was not rendered?

22   A    No.

23   Q    Did he ever ask you to change the representations as

24   to which provider actually saw a patient?

25   A    No.

5838

 1    Q   Did he ever ask you to charge for a service that he

 2    knew was not rendered?

 3    A   No.

 4    Q   And at any point in time did Dr. Schneider ever ask

 5    you to submit any kind of fraudulent documents?

 6    A   Never.

 7    Q   If he would have asked you, is that something you

 8    would have done?

 9    A   No.

10    Q   And are you married?

11    A   Yes.

12    Q   Do you have children?

13    A   Yes.

14    Q   Would you have risked your family to do something

15    fraudulent at the request of Dr. Schneider?

16    A   Never.

17            MR. WILLIAMSON:  I don't have anything

18    further.

19            THE COURT:  Cross-examination.

20            MS. TREADWAY:  Thank you, Judge.

21                       **CROSS EXAMINATION**

22    BY MS. TREADWAY:

23    Q   Do you sometimes go by the name Marti?

24    A   Yes.

25    Q   When Mr. Byers was talking to you, you said that you

5839

1    worked until the clinic was closed.  In January of 2008,

2    that last month, isn't it true that Connie White, the

3    physician's assistant, was working there alone without a

4    physician?

5    A    I believe so.

6    Q    And isn't it true that you continued to submit

7    claims to insurance companies during that month?

8    A    I didn't submit claims to insurance.

9    Q    Do you know who did?

10   A    I'm not sure who was doing insurance at that time.

11   Q    But somebody was?

12   A    I believe so.

13   Q    Now, when you worked at the Schneider Medical

14   Clinic -- I'm a little unclear.  You weren't a certified

15   coder the whole time; is that correct?

16   A    Correct.

17   Q    And did Linda Schneider know that?

18   A    I don't know that we discussed that.

19   Q    When she hired you, did she require you to be a

20   certified coder?

21   A    It was not required.

22   Q    And did she ever offer to pay for your education

23   units?

24   A    No.

25   Q    Now, I think you just answered this but I just want

1    to make sure.  You were not the person that submitted

2    the claims to the insurance company; correct?

3    A    Correct.

4    Q    So you do not know what was submitted in terms of

5    what CPT codes were submitted or what providers were

6    billed, do you?

7    A    I wouldn't know that.

8    Q    Were you aware that the Defendants have indicated to

9    this jury that it was the coders and the billers that

10   were responsible for the false claims submitted to the

11   insurance companies?

12          MR. WILLIAMSON:  Your Honor, I'm going to

13   object to the, A, the lumping of the Defendants, and

14   that is a total mis-categorization of the testimony.

15          THE COURT:  Well, here again, Ladies and

16   Gentlemen, I think by reference to the Defendants she's

17   talking about Dr. Schneider; but be that as it may --

18   because he's testified.  You'll have to remember if he

19   said something like that.  Frankly, I don't.  But the

20   objection is -- I'm going to overrule the objection.

21   A    I'm sorry.  Would you repeat it.

22   BY MS. TREADWAY:

23   Q    Sure.  Were you aware that the Defendant Stephen

24   Schneider indicated that false claims, if they were

25   submitted, were submitted as a result of the coders and

5841

1    the billers?

2    A    No.

3              MR. WILLIAMSON:   Your Honor --

4    BY MS. TREADWAY:

5    Q    Now, the fee ticket that Mr. Williamson was showing

6    you, there was one number at the bottom of the page, at

7    the bottom righthand corner, it was a 99.  And we see

8    numbers like that on the bottom righthand corners.  75,

9    45, 120.  Tell the jury what those are?

10   A    Those are the total amounts that was billed.

11   Q    That's the charges?

12   A    Yes.

13   Q    The amount of money?

14   A    Yes.

15   Q    And if I understand your testimony, when you had an

16   issue with a fee ticket, one of the things that your job

17   was, was to make sure that all the charges were on the

18   fee ticket so all the charges would get submitted to the

19   insurance company?

20   A    Correct.

21   Q    Is that correct?

22   A    Yes.

23   Q    Now, as I understand, you reported directly to the

24   Defendant Linda Schneider?

25   A    Yes.

5842

1   Q   Is that correct?

2   A   Yes.

3   Q   And your coding responsibilities were primarily for

4   the diagnosis codes; correct?

5   A   Well, that and the CPT codes to make sure they were

6   correct.

7   Q   But you only did that when Linda was gone; correct?

8   A   Well, no, I would go over those, too.  I would make

9   sure everything -- all the codes were correct, CPT and

10  diagnosis.

11  Q   But you didn't have the charts?  You had the fee

12  tickets; correct?

13  A   On some.  Not all.

14  Q   Now, if the insurance companies didn't pay for a

15  claim based on a certain diagnosis, did you resubmit the

16  claim with a different diagnosis so the claim would get

17  paid?

18  A   If there was another diagnosis; but, no, not

19  primarily.

20  Q   So you're saying that you never resubmitted claims

21  with different diagnoses?

22  A   I won't say never.

23  Q   If the fee tickets were missing, didn't you always

24  tell Linda Schneider that a fee ticket was missing?

25  A   Yes.

5843

1    Q   And wouldn't she then get the providers to

2    regenerate missing fee tickets?

3    A   I believe so.

4    Q   Did she do the same with progress notes that were

5    missing?

6    A   I don't know.

7    Q   Did you have the capability of printing out reports

8    of the claims submitted to the insurance companies on

9    any given day?

10   A   I had nothing to do with the insurance end of it.

11   Q   Well, I'm not asking you whether you had the

12   responsibility.  I'm asking whether you, Marty Brown,

13   could printout a report through the computer system at

14   the Schneider Medical Clinic that would tell you what

15   claims had been submitted?

16   A   I don't know because I never did it.

17   Q   Well, do you remember being interviewed by Agents

18   Andrew Stewart on -- Agent Andrew Stewart of HHS on

19   October 15th, 2007?  Do you remember that?

20   A   Yes.

21   Q   And do you remember during that interview he talked

22   to you about how the charges were posted?  You remember

23   that?

24   A   It's been a while.  I don't remember a lot of what

25   we discussed.

5844

1    Q   Well, let me hand you the document you gave him that

2    day and see if it refreshes your recollection.

3    A   Okay.

4    Q   Do you recognize that document?

5    A   I don't.

6    Q   Well, do you remember telling Agent Stewart that

7    that was a program that you were able to printout on a

8    daily basis that indicated what claims had been

9    submitted?

10   A   I don't even know what this is.  I don't understand

11   it because I had nothing to do with this end of the

12   billing.

13   Q   So when you told Agent Stewart that you were

14   responsible for posting charges, which was essentially

15   compiling the fees for the associated services and

16   submitting them electronically to the insurance

17   companies, you didn't -- you weren't telling the truth?

18   A   No, I'm sorry.  I did post charges after Katherine

19   had quit.  I didn't understand that's what you were

20   talking about.  But, yes, I did post the charges.

21   Q   And so that document is something that the computer

22   can generate and printout to tell you what charges were

23   submitted on a given day to various insurance companies;

24   correct?

25   A   I assume that's what this is.

5845

1    Q    Okay.

2    A    All I --

3              MR. WILLIAMSON:   Your Honor, may we see a copy

4    of that?  We have not seen that.

5    BY MS. TREADWAY:

6    Q    Did your supervisor Linda Schneider ever ask you to

7    printout reports like that for her review?

8    A    No.

9    Q    To your knowledge, was it ever anyone's

10   responsibility to do a quality assurance review of the

11   claims being submitted to the insurance companies?

12   A    I don't know.

13   Q    Do you understand what an upcoded claim is?

14   A    Yes.

15   Q    And do you understand that a claim can be upcoded in

16   terms of the provider who provided the service?

17   A    Yes.

18   Q    And do you understand that a claim can be upcoded in

19   terms of what service was provided?

20   A    Yes.

21   Q    And do you understand that an upcoded claim will

22   generate more money --

23   A    Yes.

24   Q    -- for a practice?  Now, during your five years at

25   the clinic, Ms. Brown, were you aware of the quality of

5846

1   care reviews being conducted by various insurance

2   companies?

3   A    No.

4   Q    Were you aware of the Medicaid intent to terminate

5   the practice from Medicaid?

6   A    I don't remember.

7   Q    Were you aware of the First Guard audit?

8   A    No.

9   Q    Were you aware of the Preferred Health Systems

10  audit?

11  A    Yes.

12  Q    And part of the Preferred Health System audit at one

13  time was not only quality of care, but they were

14  concerned about Lawrence Simons' coding, weren't they?

15  A    Yes.

16  Q    And they were concerned about the fact that they

17  were receiving codes of 99214 when the documentation

18  didn't support it; correct?

19  A    Yes.

20  Q    When you were there do you remember that the Blue

21  Cross/Blue Shield company was requesting prepayment

22  review of all claims submitted to Blue Cross?  Do you

23  remember that?

24  A    Yes.

25  Q    And that issue, again, starting in 2006, was the

5847

1    upcoding issue, wasn't it?  They were concerned about

2    the upcoding?

3    A    Yes.

4    Q    Of both the provider?  Yes?

5    A    Yes.

6    Q    And the codes; correct?

7    A    Yes.

8    Q    So as a person in coding and seeing the diagnosis

9    codes coming through the clinic, you were aware that a

10   good portion of the clinic's patients were pain

11   patients; correct?

12   A    Yes.

13   Q    Did you know at the time you worked at the clinic

14   that none of the physician's assistants who worked there

15   had been trained in pain management?

16   A    I did not know that.

17   Q    Did you know that both of the Defendants had bragged

18   that the clinic was writing the most narcotics of any

19   clinic in the state?

20   A    No.

21           MR. WILLIAMSON:  Your Honor, I'm going to

22   object.  These questions are well beyond the scope of

23   direct.

24           MS. TREADWAY:  Credibility, Judge.

25           THE COURT:  Not for this witness.  The

 1    objection is sustained.  Jury's heard plenty of that.

 2    It's repetitious.

 3              MS. TREADWAY:  I believe that's all, Judge.

 4    Thank you.

 5              THE COURT:  Mr. Byers?

 6              MR. BYERS:  Just very briefly, Your Honor.

 7                    **REDIRECT EXAMINATION**

 8    BY MR. BYERS:

 9    Q    Ma'am, Ms. Treadway was asking you about the Connie

10    White working at the clinic in January of 2008.  Do you

11    remember that?

12    A    Yes.

13    Q    Are you familiar with the rules and regulations that

14    control the practice of physician's assistants in the

15    State of Kansas?

16    A    No.

17    Q    Okay.  She also just asked you about upcoding.  You

18    recall those questions?

19    A    I'm sorry.

20    Q    About the types of upcodes?

21    A    Yes.

22    Q    Did you see those types of upcoding occurring during

23    your --

24    A    No.

25    Q    -- during your five years there?

5849

```
 1    A    I did not.
 2    Q    Were you instructed by any person to upcode charges
 3    or change fee tickets in any way to increase revenue
 4    that wasn't due to the clinic?
 5    A    Never.
 6    Q    Thank you.
 7              THE COURT:  Sir.
 8                     RECROSS EXAMINATION
 9    BY MR. WILLIAMSON:
10    Q    Ms. Brown, when you met with the Federal Government,
11    did either Defendant ever instruct you not to speak with
12    those agents?  Let me get to the microphone.
13    A    Sorry.
14    Q    Did any Defendants every instruct you not to speak
15    with federal agents?
16    A    No.
17    Q    Did any Defendant ever instruct you to withhold any
18    documents from federal agents?
19    A    No.
20    Q    Did any Defendant ever instruct you to lie to
21    federal agents?
22    A    No.
23    Q    When you were -- gave those documents to the federal
24    agent that we just saw, were you somehow punished by the
25    Defendants for helping the federal agents?
```

1    A    No.

2    Q    Do you have any clue as to why the federal

3    government had those documents back in '07 and we

4    wouldn't have seen them before today?

5    A    No.

6              MR. WILLIAMSON:  Nothing further.

7              THE COURT:  Anything further?

8              MS. TREADWAY:  Nothing, Judge.

9              THE COURT:  Thank you, Ms. Brown.  Next

10   witness please.

11             MR. BYERS:  Defense will call Kathy Pauly.

12                       **KATHY PAULY**

13   Having been first duly sworn to tell the truth, the

14   whole truth and nothing but the truth, testified as

15   follows on:

16                   **DIRECT EXAMINATION**

17   BY MR. BYERS:

18   Q    Ma'am, would you state your name please.

19   A    Kathy Pauly.

20   Q    And how old are you?

21   A    47.

22   Q    Are you currently employed?

23   A    Yes.

24   Q    As what?

25   A    I do customer service at U.S. 800.

5851

1    Q    U.S. 800?

2    A    Uh-huh.

3    Q    How long have you held that position?

4    A    Since February of this year.

5    Q    Okay.  What positions did you hold before that?

6    A    I did, uhm, I was unemployed.  Basically delivered

7    newspapers.  I was unemployed more than anything.

8    Q    How long were you unemployed?

9    A    From February of 2008 until February.

10   Q    February of this year?

11   A    Uh-huh.

12   Q    For two years then?

13   A    Uh-huh.

14   Q    Okay.  So going back to February of 2008, did you

15   hold a position before that period of unemployment?

16   A    Yes, I did.

17   Q    What was that?

18   A    I worked at Schneider Medical.

19   Q    Okay.  How long did you work at Schneider Medical?

20   A    From June of 2006 to February of 2008.

21   Q    Okay.  So a little -- about a year and a half or so;

22   is that fair?

23   A    Yeah.

24   Q    Okay.  What position did you hold at Schneider

25   Medical?

5852

1    A   I did everything.  I did some appointment setting.

2    I worked down in billing occasionally.  I did rooming.

3    I cleaned the clinic, you know.

4    Q   How did you hear about that job?

5    A   Through a friend that was also employed there that

6    worked part-time.

7    Q   Okay.  And you said you worked down in billing.  Do

8    you remember what kind of duties you had when you were

9    in billing?

10   A   It was basically going and getting charts and

11   information.  Because I wasn't in billing very much

12   because I was running to and from billing up to the

13   appointment desk because when nobody came to fill in --

14   because there was supposed to be two people on the

15   appointment desk.  When the person was scheduled to come

16   in at 10 didn't come in, I got pulled up and put into

17   the appointment desk.

18   Q   And by pulled up, you mean because billing was

19   physically downstairs; right?

20   A   Uh-huh.

21   Q   So I'm trying to understand.  Were you actually

22   submitting claims to insurance companies?

23   A   No.

24   Q   Were you --

25   A   I didn't actually do any submitting.  I did -- we

5853

1    started doing a little bit of posting and that but I

2    never was down there for any great length of time

3    because it would be -- I may be down there for an hour

4    and then I had to go up and do appointment setting and

5    then I would be down there for another hour, you know,

6    so it was more running and getting things and -- that

7    they needed.

8    Q    Who did you answer to at the clinic?  Who was your

9    boss?

10   A    Linda.

11   Q    Okay.  Is that who hired you?

12   A    Yes.

13   Q    Okay.  Now, as part of this billing stuff, I'm

14   trying to figure out, was it fair to say it's like a

15   reconciliation thing?  Were you looking for charts that

16   needed to be --

17   A    Uh-huh.

18   Q    -- to be rebilled?

19   A    I was looking for charts that -- for another person

20   that worked down there in billing that he needed

21   different things for different charts and they needed

22   this and they needed that and that was basically more of

23   what I did.

24   Q    And who would that he have been?

25   A    Mark Friend.

5854

1    Q    Was he your supervisor down there?

2    A    No.  Linda was my supervisor.

3    Q    Okay.  And during your time at Schneider Medical

4    Clinic, did Linda ever ask you to do anything you

5    thought was improper?

6    A    No.

7    Q    Did she ever ask you to fill in forms?

8    A    No.

9    Q    Did she ever ask you to -- did you ever see Linda

10   Schneider filling in progress notes?

11   A    No.

12   Q    Fee tickets?

13   A    No.

14   Q    Did you ever see her writing 'scripts?

15   A    No.

16   Q    Did you ever hear rumors about Linda doing any of

17   that?

18   A    No.

19   Q    Did you associate with other people at the clinic?

20   A    Oh, yeah.

21   Q    And you never heard any of that?

22   A    No.

23   Q    We've heard -- so, we've heard you say also that you

24   were a roomer some of the time?

25   A    Uh-huh.

5855

1    Q   Did you room for all providers or one specific

2    person?

3    A   I roomed primarily for Dr. Schneider and Connie.

4    Occasionally I would room for Dr. Simons, yeah.  There

5    was occasions that I was rooming for all three.

6    Q   Okay.  And then you say you also worked appointment

7    desk?

8    A   Uh-huh.

9    Q   And then you were down in billing doing the research

10   type stuff?

11   A   Uh-huh.

12   Q   Any other duty -- and you did some cleaning?

13   A   Oh, I did cleaning.

14   Q   Did Linda ask you to do that?

15   A   Yeah.

16   Q   Were you paid for it?

17   A   Yeah.

18   Q   Okay.  Any other job duties you can think of there?

19   A   No.

20   Q   Now, when you were rooming, did you ever see -- did

21   you have occasion to go out into the reception area and

22   contact patients?

23   A   Oh, yeah.

24   Q   Did you ever see anything happening in the reception

25   area you thought was unusual?

5856

1    A   No.  No.

2    Q   You need to slow down just a little bit because

3    Cindy is trying to get your answers and you're answering

4    just before I finish.

5        Did you ever see anything happening out in the

6    parking lot you thought was unusual around the clinic?

7    A   No.  Not that I can recall.

8    Q   Did you ever see patients when you were rooming them

9    that seemed to change their demeanor as you took them

10   back to the room?

11          MS. TREADWAY:  Judge, this has been leading

12   for quite sometime.  I'm going to object now.

13          THE COURT:  Sustained.

14          MR. BYERS:  That's all I have, Your Honor.

15          THE COURT:  Mr. Williamson.

16                  **CROSS EXAMINATION**

17   BY MR. WILLIAMSON:

18   Q   Hi.  How are you?

19   A   Pretty good.

20   Q   Just a few questions.  When you would pull charts

21   for Mark down in billing, were you ever instructed by

22   Dr. Schneider to falsify charts before those charts went

23   back to billing?

24   A   No.

25   Q   When you were a roomer did Dr. Schneider ever ask

5857

1   you to falsify any information on the progress notes?

2   A   No.

3   Q   Were you ever asked by Dr. Schneider at any point in

4   time to pretend that you did something even though you

5   did not do it?

6   A   Oh, no.

7   Q   Okay.  If he would have asked to you do something --

8   well, strike that.

9       Did he ever ask you to do anything fraudulent?

10  A   No.

11  Q   If he would have asked you, would you have?

12  A   No.

13          MR. WILLIAMSON:  I don't have anything

14  further.

15          THE COURT:  Cross-examination.

16          MS. TREADWAY:  No questions, Judge.

17          THE COURT:  Thank you very much, ma'am.

18  You're excused.  Next witness.

19          MR. WILLIAMSON:  Judge, our last witness is on

20  the way here.  I think she's going to be here in about

21  15 to 20 minutes.  I just got word from her husband that

22  she's --

23          THE COURT:  We'll take a short recess, Ladies

24  and Gentlemen.  Remember and heed the admonition.

25                  (Recess.)

5858

1      THE COURT:  Next witness.

2      MR. WILLIAMSON:  Defense calls Phyllis

3  Rowland.

4                  **PHYLLIS ROWLAND**

5  Having been first duly sworn to tell the truth, the

6  whole truth and nothing but the truth, testified as

7  follows on:

8              **DIRECT EXAMINATION**

9  BY MR. WILLIAMSON:

10  Q   Ms. Rowland, could you introduce yourself to the

11  jury.

12  A   My name is Phyllis Rowland.

13  Q   And where are you from, Ms. Rowland?

14  A   Wichita.

15  Q   And have you been a life-long Wichita resident?

16  A   No.  I've lived here since '96.

17  Q   And are you married?

18  A   Yes, I am.

19  Q   Any children?

20  A   Yes.  Five counting Robin.

21  Q   Okay.  And was Robin G your daughter?

22  A   Yes.

23  Q   And we'll just spend a few minutes talking with you

24  a little bit about Robin and some of her medical issues

25  and some of her medical care.  Okay?

5859

1       All right.  Can you tell the jury -- strike that.

2       Did you and Robin have a good relationship?

3   A   Yes.  We were close.

4   Q   Would you talk to -- how often would you talk to

5   each other?

6   A   Oh, I'd say every week, sometimes more often than

7   that.  Sometimes she stayed at our house.

8   Q   And would you also talk to her on the phone on a

9   regular basis?

10  A   Yes.

11  Q   And were you aware of medical issues she was having?

12  A   Yes, I was.

13  Q   Would she share those with you?

14  A   Yes.

15  Q   Now, can you share with the jury some of the medical

16  issues that Robin had as an adult?

17  A   Well, the main thing was migraines that she had for

18  I think 16 years.  I'm not sure how many years.

19  Q   And did she ever suffer bouts of pneumonia?

20  A   Yes.  Bronchitis for her whole life really.

21  Q   Now, at some point or time -- you mentioned that she

22  had migraines.  Would her migraines, did they start

23  increasing in frequency and getting worse?

24  A   Yes.

25           MS. TREADWAY:  Objection.  Leading, Judge.

5860

1            THE COURT:  Oh, I'll allow it.

2   BY MR. WILLIAMSON:

3   Q    Now, can you tell the jury when her headaches began

4   to increase in frequency and got worse?

5   A    I don't really know.  It just seemed like it was a

6   gradual thing until they were very, very bad.

7   Q    Okay.  Now, before she saw Dr. Schneider, did Robin

8   see any other physicians regarding her migraines?

9   A    Yes.

10  Q    Who do you recall her seeing for her migraines?

11  A    Well, her regular doctor in ElDorado was Dr. Olsen.

12  And he sent her also to a pain doctor somewhere, I don't

13  remember where; but the prescriptions that doctor gave

14  her were the same ones that Dr. Olsen had given her that

15  really weren't very successful.

16  Q    Okay.  Do you remember what all Dr. Olsen tried to

17  help Robin with her migraines?  Do you remember?

18  A    I can't remember.

19  Q    At some point did -- well, strike that.

20       Were those medicines ever helpful for Robin?

21  A    Perhaps.  I think it was the pain that made her grit

22  her teeth a lot and she just wore holes in her

23  mouthpieces, they were so severe.  And I know he gave

24  her things to help her relax and kind of might have

25  helped relieve that problem.

5861

```
 1   Q   And at some point -- excuse me.  Well, strike that.
 2        Well, at some point did Robin see Dr. Schneider at
 3   the Schneider Medical Clinic for her migraines?
 4   A   Yes.
 5   Q   Now, prior to that, could you share with the jury
 6   how the migraines effected Robin's life?
 7   A   Oh, she was just unable to do things maybe three
 8   days a week.  And the migraines were so bad that I know
 9   she went to the emergency room at ElDorado 16 times the
10   year before she started going to Dr. Schneider.
11   Q   And was she going because she was in pain or
12   because --
13   A   Yes.  She was in terrible pain and crying and
14   screaming and saying I don't know how I can live with
15   this, this is so bad.
16   Q   And did that also interfere with her ability to go
17   to school?
18   A   Yes.  And the pneumonia and bronchitis did also.
19   She couldn't be out in the wind.
20   Q   Now, do you recall exactly when she began seeing Dr.
21   Schneider?
22   A   No.
23   Q   And did you ever attend any visits with her when Dr.
24   Schneider was there?  I'm sorry.  Let me ask that
25   better.  Did you ever attend any visits when Robin went
```

5862

1    to visit Dr. Schneider?

2    A   Yes, several times.

3    Q   And when you would go with Robin to see Dr.

4    Schneider, can you just kind of share with the jury what

5    would normally happen during those visits?

6    A   Well, he had a lot of patients.  I would say they

7    were poor people.  They were probably Medicare patients.

8    But often there was a long wait because there was so

9    many people there to see him.  And then when she would

10   be called, uhm, he sat down with her and talked with

11   her, sometimes sent her to their lab to have something

12   done.  I don't remember what, even though I was with

13   her.  He would talk with her maybe 10 minutes or 15, and

14   adjust her medicines or try to help what she was

15   reporting.

16   Q   Do you recall whether or not Dr. Schneider ever sent

17   Robin to either another doctor, specialist or a

18   hospital?

19   A   Yes.  He sent her to Via Christi Hospital for a

20   complete examination.

21   Q   When you were in the rooms during these visits, did

22   Dr. Schneider -- was Dr. Schneider ever rude?

23   A   Oh, no.

24   Q   Was he attentive and -- well, strike that.

25       Did he ever exclude you and say you can't come in

5863

1    this room with us?

2    A    No, not at all.

3    Q    Would you talk with Robin and attempt to try to

4    determine if the medicine was working or how is it

5    effecting her?

6    A    Yes.

7    Q    Was this an interactive process or was one person

8    doing more talking?

9    A    Oh, it was interactive.  She said I think maybe the

10   last time she saw him they'd intended to lower her dose

11   and she asked him not to do that because it was the

12   season for burning fields.

13   Q    Why would the season for burning fields be important

14   to Robin?

15   A    The smoke was sure to make her headaches worse.  The

16   smell of the smoke.

17   Q    Now, you mentioned the long wait in the waiting

18   room.  The jury has heard from some Government witness

19   that the only people -- reason people would wait very

20   long in the waiting room is if they were there to get

21   basically their fix.  Is that why Robin and you would

22   wait long to see Dr. Schneider?

23   A    Oh, no.  It was just important for her.  She

24   couldn't have her prescription renewed unless he said so

25   every month.

5864

```
 1    Q    And what kind of prescription do you recall Robin
 2    taking from Dr. Schneider for her migraines?
 3    A    She probably took something similar of what Dr.
 4    Olsen was prescribing.  But she also took Fentanyl.
 5    Q    Was that -- I think we've heard it called Actiq?
 6    A    Yes.
 7    Q    Were you -- did you personally observe Robin before
 8    taking the medicine Actiq and personally observe her
 9    after taking Actiq?
10    A    Yes.  Many times.
11    Q    Can you tell the jury what you would observe before
12    and what you would observe after?
13    A    It relieved her headache.  She probably didn't take
14    it soon enough.  I think she was supposed to take it
15    before it really got a good hold and she tried to avoid
16    taking it; but it did give her relief.
17    Q    Was -- were you -- when she was taking Actiq, was
18    she able to function better and do things with you that
19    she otherwise was not able to do?
20    A    Yes.
21    Q    Can you give the jury an example of things that you
22    guys were able to do when she was actually taking Actiq?
23    A    I went to school with her for probably two or three
24    semesters.  She was trying very hard to get through
25    algebra and it was difficult and I took the class along
```

5865

1    with her.  And it was difficult for me, too.

2    Q    Me, too.

3    A    And we went out to eat a lot.  Sometimes she stayed

4    at our house, especially when she was in college so she

5    wouldn't have to make the drive so many times.  And I

6    could see that she was more able to function when she

7    had the medicine.

8    Q    Did Actiq actually help relieve her headache pain?

9    A    Oh, yes.

10   Q    Was she thankful that she had that medicine?

11   A    Very much so.  In fact, she wrote a letter to Dr.

12   Schneider to thank him for giving her her life back.

13   Q    When you were -- I'm sorry I'm jumping around a

14   little bit.  But when you would be going to the visits

15   at the clinic, was this a -- was it dirty and dingy when

16   you would go?

17   A    Not at all.

18   Q    Can you tell the jury, tell the jury what, in

19   regards to the level of cleanliness, did the clinic have

20   when you would visit?

21   A    Well, the lobby was a little messy.  I suppose

22   because there were so many people there, children and

23   adults.  But his offices were so clean.  In fact, the

24   cleaning solution they used gave her a headache.  But

25   the floors were shiny.  Everything was just spick and

5866

1    span.

2    Q    And when you're talking about the offices, you mean

3    like the exam rooms that you guys went in?

4    A    Yes.

5    Q    And you say the cleaning would give -- who would it

6    give a headache to?  Robin?

7    A    Yes.

8    Q    And was that because of the cleaning smells that --

9    A    Yes.

10   Q    Okay.  Now, did you and Robin ever discuss any

11   potential adverse effects that her medicines may be

12   having on her?

13   A    I don't know if we discussed it; but I know she was

14   very concerned about becoming addicted to any kind of

15   pain medicine and tried not to take more than, more than

16   she had to.

17   Q    And at one time you and the family were out at

18   dinner, was Robin nodding off at one dinner?

19   A    Yes.

20   Q    And did you talk to her about that nodding off?

21   A    Yes.

22   Q    And when -- that same evening were you able to

23   observe her demeanor, her walking and talking?

24   A    Well, except when she was nodding off, I didn't see

25   anything wrong.  And when they brought me home, she got

5867

```
 1    out of the car with me, she always did, and walked me to

 2    our elevator.  And I talked to her then and I said,

 3    Robin, this is, this isn't right, you shouldn't be going

 4    to -- nodding off like that.  I hadn't seen her do that

 5    before.

 6    Q   And what was her response?

 7    A   Well, she was --

 8              MS. TREADWAY:  Objection; hearsay.

 9              THE COURT:  Go ahead, ma'am.

10    A   She was responsive to my suggestions.  I don't know

11    that she said, okay, then I'll do something about it,

12    you know.

13    BY MR. WILLIAMSON:

14    Q   Okay.  Was she -- she didn't cut you off or say,

15    mom, you're paranoid?  She was like --

16    A   Oh, no.

17    Q   -- she was responsive?

18    A   Uh-huh.

19    Q   And I think you told the jury just now, but were you

20    guys conscious and aware of the addictive potential for

21    taking pain medication?

22    A   Yes.

23    Q   And at the same time was this pain medication

24    actually helping Robin?

25    A   Yes.  I don't believe she could have survived
```

5868

```
 1   without it.
 2   Q    Now, before seeing Dr. Schneider -- strike that.
 3        Did she ever, to your knowledge, take any medicine
 4   besides Actiq that gave her that level of relief for her
 5   migraines?
 6   A    No.
 7   Q    And when she would go to these ER visits, these
 8   several, 16, I believe you said, before she met with Dr.
 9   Schneider, did -- do you know what they would do for her
10   headaches?  Do you know?
11   A    They gave her a shot, maybe Phenergan, I'm not sure
12   what it was.  She knew what worked and that's always
13   what she wanted but they gave her a bad time about
14   coming in to get it.
15   Q    They gave her a bad time even though she was really
16   in pain when she would go?
17   A    Yes.
18   Q    Now, did Robin continue to go to the clinic after
19   the clinic was featured in various news reports?
20   A    Yes.
21   Q    And when you went to the clinic, do you know if you
22   went with her after those times?
23   A    Yes, I did.
24   Q    Why did you continue to go after you saw these
25   allegations in the newsprint?
```

5869

1    A    Why did we continue to go?

2    Q    Yes, ma'am.

3    A    Well, I guess we didn't believe them and we knew

4    that it was very necessary for her.  No one else had

5    helped her.

6    Q    Okay.  As you sit here today, do you believe -- is

7    it your opinion that Dr. Schneider was truly trying to

8    help Robin when he was seeing her?

9    A    Absolutely.

10   Q    And at any time when you all would visit the clinic,

11   did Dr. Schneider ever rush out based on somebody

12   knocking on the door?

13   A    No.

14   Q    Was he ever inattentive to Robin's needs during any

15   of your visits?

16   A    No.

17   Q    Do you believe that Dr. Schneider actually helped

18   prolong Robin's life?

19   A    Yes, I certainly do.

20              MR. WILLIAMSON:  Nothing further, Your Honor.

21              MR. BYERS:  No questions, Your Honor.

22              THE COURT:  Cross-examination.

23              MS. TREADWAY:  Thank you, Judge.

24                    **CROSS EXAMINATION**

25   BY MS. TREADWAY:

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

5870

1    Q   Ms. Rowland, did Robin go to a primary care

2    physician in ElDorado?

3    A   Yes.

4    Q   And am I saying that right?  ElDorado?  Or is it

5    ElDorado?

6    A   Yes, ElDorado.

7    Q   El Dorado.  And his name was Dr. Olsen; is that

8    right?

9    A   Yes.

10   Q   And so Robin was going to the Defendant's clinic

11   only for the management of her pain.  Isn't that

12   correct?

13   A   Yes, I believe that's true.  She had a contract

14   saying she couldn't go to another doctor for pain

15   management.

16   Q   That's in evidence.  That's right.  Before she began

17   going to the Schneider Medical Clinic, you indicated

18   that she was a frequent visitor at the El Dorado

19   emergency room; is that correct?

20   A   Yes.

21   Q   And you said the year before she went, she was there

22   16 times?

23   A   The year before she started with Dr. Schneider, yes.

24   Q   In fact, would it surprise you if the records

25   reflected that she went to the emergency room 47 times

5871

1    between February, 2001, and June of 2004?

2    A    No, it wouldn't surprise me.

3    Q    Did you know that Dr. Olsen thought that Robin

4    needed mental health treatment?

5    A    No, I didn't know that.

6    Q    Did you know that Robin had been diagnosed as being

7    bipolar?

8    A    No, I didn't know that.

9    Q    Did you know that Dr. Olsen also thought Robin

10   needed help with her depression?

11   A    No, I don't think I knew that.

12   Q    Did anyone at the Schneider Medical Clinic explain

13   to you that having a mental health issue could increase

14   Robin's perception of pain?

15   A    No, I don't remember talking about that.

16   Q    Did anyone at the Schneider Medical Clinic explain

17   to you that having a mental health issue could increase

18   Robin's risk of becoming addicted to pain medicine?

19   A    No, I didn't know that.

20   Q    Now, the records in this case reflect that Robin

21   started going to the Defendant's clinic July of 2004.

22   Does that sound about right?

23   A    Yes.

24   Q    That first visit, the Defendant Stephen Schneider

25   prescribed her morphine and those Actiq suckers.  And he

5872

1    prescribed her enough for two suckers a day.

2    A    Okay.

3    Q    Do you remember her starting out at a very low

4    level, two suckers a day?

5    A    I don't remember what it was.

6    Q    But just four days later she was back at the El

7    Dorado emergency room getting a shot of Demerol.  Do you

8    remember that?

9    A    No.

10   Q    Did you know that not very long after that, in

11   September of 2004, Dr. Olsen counseled her about his

12   concerns regarding the morphine and the Actiq she was

13   being prescribed at the Schneider Medical Clinic?

14   A    No, I never heard him say anything like that to her.

15   Q    Did you know that Dr. Olsen was concerned that over

16   time her increasing migraines were actually being caused

17   by the morphine and the Actiq?

18   A    I don't know if Dr. Olsen said that; but we were

19   aware that there could be headaches caused -- I forget

20   what they're called now.

21   Q    Rebound?

22   A    Rebound, uh-huh.

23   Q    And you knew that even when Robin was going to the

24   Schneider Medical Clinic that she continued to go to the

25   emergency room for those Demerol shots, didn't she?

5873

1    A    No, I think not.

2    Q    Okay.  So if the records reflect that she in fact

3    did go to those emergency rooms even when she was at the

4    clinic, you don't have any reason to disagree with the

5    records, do you?

6    A    Well, I suppose not.  And I know she went once

7    because she thought Schneider's clinic was closed and

8    she was in such pain she didn't know what else to do.

9    But they wouldn't give her anything because she was Dr.

10   Schneider's patient.  And when we finally got ahold of

11   him -- and I remember he said that there was always

12   someone at his clinic that could take care of her.

13   Q    But he did approve the ER to give her a Demerol

14   shot, didn't he?

15   A    I didn't think so; but it's been several years.  I

16   don't remember.

17   Q    I understand that.  In fact, ma'am, the records

18   reflect that your daughter was at the Schneider Medical

19   Clinic on November 10th, 2004, and she was in the El

20   Dorado emergency room the very next day getting a

21   Demerol shot.  Do you remember that?

22   A    No.

23   Q    And then just four days later on November 14 --

24   15th, she went again.  Do you remember that?

25   A    No.

5874

```
 1    Q    Now --
 2    A    You mean to the emergency room?
 3    Q    Yes, ma'am.
 4    A    No, I don't remember that.
 5    Q    Did you report to the Defendant Stephen Schneider
 6    that your daughter wasn't eating?
 7    A    I don't know if I did.
 8    Q    You don't remember writing him a letter about that?
 9    A    No, I don't remember.
10    Q    This is in your daughter's medical record.  All
11    right?
12    A    Okay.  I'm not saying I didn't.  I just don't
13    remember it.
14    Q    I understand.  Does that look familiar?
15    A    I'm sure it does.
16    Q    And in that letter, ma'am, do you report to the
17    Defendant Stephen Schneider that your daughter wasn't
18    eating?
19    A    Yes.
20    Q    And that she was having bouts of vomiting?
21    A    Yes.
22    Q    And that she was getting worse?
23    A    The vomiting, yes.
24    Q    That she had lost 12 pounds in a week and couldn't
25    even keep liquids down?
```

1    A    Yes.

2    Q    And that she was dehydrated?

3    A    Well, it's obvious that she would be dehydrated.

4    Q    Did you ask the Defendant to send you some written

5    directions about how to get Robin seen quicker and not

6    wait a long time at the Schneider Medical Clinic?

7    A    Well, I believe that refers to the time when she

8    thought she needed to go to Schneider and his office was

9    closed or she thought it was closed because it was

10   Friday and Saturday.  And so I wanted to know how to get

11   help because she had gone to the emergency room when she

12   couldn't reach him and they found a way for her to reach

13   him.

14   Q    Now, on the days that Robin was at the clinic, did

15   you know how many patients any given provider was seeing

16   on that given day?

17   A    Oh, no.  A lot I would think.

18   Q    The records in this case reflect that on many

19   occasions when the Defendant Stephen Schneider saw your

20   daughter, the billings indicate that he saw more than 50

21   patients in a given day.  Would you be surprised at

22   that?

23            MR. WILLIAMSON:  Your Honor, I'm just going to

24   object.  Misstatement of the evidence.  Same objection

25   I've been making.

1    A    I would not have any idea.

2              THE COURT:  She's answered it.

3              MR. WILLIAMSON:  Withdrawn.

4    A    He saw her sufficient amount of time as long as any

5    doctor had ever seen me when I went to the doctor.

6    BY MS. TREADWAY:

7    Q    Did you know that Robin went in early for her

8    prescriptions at the clinic?  Earlier than every 30

9    days?

10   A    I don't believe that.

11   Q    Did you know that Robin saw a lot of different

12   providers at the clinic?

13   A    Well, occasionally she saw the PA.

14   Q    Do you remember her seeing Kim He'bert?

15   A    No, I don't remember.

16   Q    JR Jones?

17   A    I don't remember.

18   Q    Mohammed Akram?

19   A    I don't remember.

20   Q    Connie White?

21   A    I don't remember.

22   Q    Lawrence Simons?

23   A    I remember that she went to him.

24   Q    Now, were you aware that when Robin first went to

25   the clinic she was reporting that she was having two or

5877

```
 1    three migraines a month?
 2              MR. WILLIAMSON:  Your Honor, I'm going to
 3    object.  That is total mischaracterization of what the
 4    records say and we showed that through
 5    cross-examination.
 6              THE COURT:  I don't remember that specific
 7    record.  If it's in evidence then I think --
 8    A    I don't believe that's true.
 9              THE COURT:  -- perhaps that should be shown to
10    the witness.
11              MS. TREADWAY:  Yes, Judge.  I'll find it.
12    Thank you.
13    BY MS. TREADWAY:
14    Q    This is a December 21st, 2004, progress note.  And,
15    again, the records reflect that your daughter started
16    going there in July?
17    A    Yes.
18    Q    Okay.  So about six months later did she say H-A,
19    headache, two to three times month.  Is that what that
20    says?
21    A    I think that's what that says.  Kind of hard to read
22    the writing.
23    Q    We would agree.  So at least in December of '04,
24    which was fairly early on in her treatment at the
25    clinic, she was reporting that she was having two or
```

5878

1    three's headaches or migraines a month?

2          MR. WILLIAMSON:  Your Honor, let me just lodge

3    a second objection.  When it was testified to on direct

4    by our witness, it may say that, it may not.  Just

5    couldn't tell.  And I think that predicate makes that

6    question invalid.

7          THE COURT:  I don't know.  Here again, the

8    jury's going to have to remember this evidence, but the

9    witness -- this witness, who was present, apparently,

10   with Robin on several occasions, has been shown the

11   record.  She -- that's her interpretation of it.  You're

12   free to cross-examine her about it or redirect her about

13   it and the jury will have to make up its mind with

14   respect to exactly what that record says.

15         MR. WILLIAMSON:  Thank you, Your Honor.

16   BY MS. TREADWAY:

17   Q    Now, Ms. Rowland, do you know that by the time of

18   your daughter's death, she was being prescribed as much

19   as four suckers per day?

20   A    Yes, I know that.  I know she asked for that much

21   when the fields were burning.

22   Q    Was she having four migraines a day by then?

23   A    Yes.

24   Q    Do you know that her husband Robert had to hide the

25   suckers from her so she wouldn't take too many each day

5879

1    and run out?

2    A   I'm not sure that's true.  She told me that she kind

3    of hid the suckers from herself because she wanted to be

4    sure she didn't take too many.  And she wanted to be

5    sure she didn't run out before she could have her

6    prescription refilled.

7    Q   Did you have to drive Robin around during the last

8    few months of her life?  Remember that?

9    A   No.

10   Q   Wasn't that because she wasn't able to drive

11   herself?

12            MR. WILLIAMSON:  Your Honor, I'm going to

13   object.  The answer was no.  The predicate question was

14   did you have to drive her and she said no.

15            THE COURT:  Ma'am, was your answer, no, that

16   you don't remember doing that or, no, that you didn't do

17   it?

18   A   I don't recall ever driving Robin around.

19            THE COURT:  That's fine.  Thank you very much.

20   BY MS. TREADWAY:

21   Q   Did you know that the Defendant Stephen Schneider

22   was the last provider at the clinic to see your

23   daughter?

24   A   I suppose so.

25   Q   Did you know that he prescribed her Actiq, 800

5880

1    micrograms, four a day, plus Valium, four a day?  Did

2    you know that?

3    A    I didn't remember the Valium.  I know she took

4    Valium sometimes from Dr. Olsen also.

5    Q    Did you know that your daughter Robin and her

6    husband Robert asked for a referral to Mayo Clinic?

7    A    No.

8    Q    Did you know that the Defendant Stephen Schneider

9    discouraged them from going to Mayo Clinic?

10            MR. WILLIAMSON:  Your Honor, I'm going to

11   object.  That is totally incorrect.  Mr. W stated on the

12   stand that he -- they were sent to those specialists

13   based -- by Dr. Schneider.  That's just total

14   misrepresentation.

15            THE COURT:  I think the question relates

16   solely to the Mayo Clinic.

17            MS. TREADWAY:  Yes, it does, Judge.  Mayo

18   Clinic.

19            THE COURT:  Not just specialists in general.

20            MR. WILLIAMSON:  I believe his testimony was

21   that Dr. Schneider sent them to the Mayo Clinic.

22            MS. TREADWAY:  That's incorrect, Judge.

23            THE COURT:  You remember any of that, Ladies

24   and Gentlemen?  It's up to you to try to remember these

25   things.  I, frankly, don't.  And -- but, again, you'll

5881

1    have an opportunity, Mr. Williamson, to redirect her on

2    that point.

3    A    I believe they checked with Mayo Clinic but I didn't

4    remember whose advice that was.  And they said they

5    didn't think they could help her so she didn't want to

6    go.

7    BY MS. TREADWAY:

8    Q    So you're saying Robert's memory is incorrect?

9    A    I, I'm not sure what it was he said.

10   Q    Do you remember talking to Special Agent William

11   Rowland in about September of 2007 at your house?

12   Remember that?

13   A    Yes, I do.

14   Q    And he called you and asked if he could come by and

15   talk to you?

16   A    Yes.

17   Q    And you said yes?

18   A    Yes.

19   Q    And so he came by and talked to you?

20   A    Yes.

21   Q    Do you remember telling Agent Rowland that your

22   daughter's prescription would not last her an entire

23   month?

24   A    No, I don't believe I said that.

25   Q    Do you remember telling Agent Rowland that the

5882

1    muscle relaxants your daughter was receiving would cause

2    her to be out of it?

3    A   She had trouble walking up the stairs sometimes when

4    she was taking the muscle relaxants.

5    Q   Do you remember telling Agent Rowland that based on

6    your observations in the lobby at the Schneider Medical

7    Clinic, that the patients there were drug seekers?

8    A   No, I did not say that.

9    Q   Did you remember telling Agent Rowland that you

10   believed that the Defendant was a pain management

11   specialist?

12   A   I don't remember that.  I probably might have said

13   that.

14   Q   And do you remember telling Agent Rowland that your

15   daughter's migraines had been diagnosed at Via Christi

16   hospital as being psychosomatic or part of her mental

17   illness?

18   A   She had five specialists examining her and they

19   didn't find anything wrong except some abrasions in her

20   stomach.  She had had trouble a long, long time with

21   something she ate making her stomach bleed.  The main

22   doctor came in and said it's all in her head.  And I

23   don't know if you've been in --

24   Q   Ma'am, I'm sorry.  Thank you.  That was an answer to

25   my question.

5883

1       You stated on direct examination that the

2   prescriptions that the Defendant Stephen Schneider gave

3   your daughter kept her alive?

4   A   I believe so.

5   Q   In fact, ma'am, the evidence has been those

6   prescriptions were the cause of her death.  But you

7   don't believe that, do you?

8   A   No.

9   Q   And you won't believe that, will you?

10  A   No.  I saw the autopsy.  I don't believe the

11  results.  She also had pneumonia and bronchitis at the

12  same time.

13  Q   And you just can't bring yourself to believe that,

14  can you, ma'am?

15  A   Well, I could, but I don't -- I was with her.  I

16  know how bad the pain was before she was at Schneiders.

17          MS. TREADWAY:  Nothing further, Judge.

18          MR. WILLIAMSON:  Very briefly, Your Honor.

19                  **REDIRECT EXAMINATION**

20  BY MR. WILLIAMSON:

21  Q   Ms. Treadway just asked you questions about a doctor

22  stating that your daughter's pain was in her head.  You

23  remember those questions?

24  A   Yes.

25  Q   When you were with Robin prior to her seeing Dr.

5884

1    Schneider, did you see her in pain?

2    A    Oh, yes.

3    Q    Was the -- do you believe the pain was in her head?

4    A    Well, a headache is in your head.  To that extent,

5    yes.

6                MR. WILLIAMSON:  I don't think I'll ask

7    anything else, Judge.

8                THE COURT:  Mr. Byers?

9                MR. BYERS:  Nothing.  Thank you, Your Honor.

10                THE COURT:  All right.  Anything further?

11                MS. TREADWAY:  No, Judge.  Thank you.

12                THE COURT:  Thank you, ma'am.  You're excused.

13   Next witness please.

14                MR. WILLIAMSON:  Judge, we don't have any

15   further witnesses.  We do have an evidentiary issue that

16   Mr. Byers needs to take up regarding a transcript.

17                THE COURT:  All right.  Is it something you

18   want to talk about up here or do you need extra time?

19                MR. BYERS:  I think maybe a side bar, Your

20   Honor.

21                THE COURT:  Come up.

22                         (Thereupon, the following

23                          proceedings were had at the

24                          bench by Court and Counsel

25                          outside the hearing of the

5885

1                          jury.)

2              MR. BYERS:  Judge, this is under 106 for the

3     rule of completeness.  This is the paper transcript of

4     the video of Linda's -- the voluntary statement she gave

5     to the agents.  Just wanted to submit this.  It's

6     redacted in accordance with your prior rulings, taking

7     out two topics you said couldn't be in there.  It was

8     actually offered by the Government in their case in

9     chief.  We objected and they pulled it back.  But it

10    would just be under Rule 106 as completeness.  I

11    actually expect to use some of it in my closing.

12             MS. TREADWAY:  Judge, we don't object to a

13    redacted videotape.  That is the proper evidence.  We do

14    object to the transcript.  We never admitted the

15    transcript because the rule is it's the audio -- or the

16    video that controls not the written transcript.  So we

17    don't have any objection to a redacted videotape being

18    offered.

19             THE COURT:  Well, how long would that take?

20             MR. BYERS:  Well, see, that's the thing --

21             MS. TREADWAY:  I thought he had it prepared.

22             MR. BYERS:  In my closing, I'm not keen -- I

23    don't really want to use video.  Frankly, I'm a paper

24    kind of guy.

25             MS. TREADWAY:  I don't mind you using it in

5886

1    closing.  I just don't think it's a proper exhibit.

2    That can be demonstrative, that's fine.  Because we used

3    it demonstratively as well --

4            MR. BYERS:  Right.  But also under 1003 it

5    could be admitted as a duplicate.  The only objection to

6    admission as a duplicate is if the authenticity of the

7    original is in question.

8            THE COURT:  Well, my concern really is more of

9    a 403 issue and that is it was relatively small portions

10   of her testimony -- not testimony -- of her statement

11   that was shown.  That looks like it's how many pages?

12           MR. BYERS:  It's 210 pages.  Four hours.

13           THE COURT:  Four hours.  And I would think

14   that it would be appropriate -- I hate to get into

15   this -- but it would be appropriate to use the written

16   exhibit from the time standpoint if nothing else to

17   specifically respond or put in anything that you feel is

18   responsive to the things that were shown to the jury.

19   But to put the whole thing in --

20           MR. BYERS:  Well, see, my concern, Judge, is

21   that as part of what we've been saying is --

22           THE COURT:  My point is the whole thing might

23   be a complete response.  Surely there would be more

24   things in there than just for the purposes of

25   completeness.  A response to what the Government showed.

5887

1    Do you see my point?

2              MR. BYERS:  I believe so.  My concern is that

3    I want to give them the full picture of that interview.

4    They've seen the tiny snippets.  Even if I do my own

5    corresponding tiny snippets, either by reading or even

6    the video thing, then I'm just playing the snippet game.

7    I want them -- I'm not so sure anyone would sit there

8    and read that but I think they have to have access for

9    that full interview.  And I think it's more likely that

10   they pick this thing up and look at it than sit there

11   and just start poking buttons on a TV and look at a

12   video.  I think as a practical matter --

13             THE COURT:  I maybe am not making myself

14   clear.  You say that you want to use this for purposes

15   of completeness.  My feeling is that you're certainly

16   entitled to use any of it that would give a complete

17   picture with respect to the things that were shown to

18   the jury during the Government's case.  In other words,

19   the one I specifically remember is her statement that

20   she hired misfits.

21             MR. BYERS:  Uh-huh.

22             THE COURT:  Now, if, for example, in there she

23   explains what she means by that, there's something else

24   in there that would shed some light on that, make it

25   look better than it does, for example, I don't have any

5888

1    problem with you using it either by putting it in

2    evidence in the form of the transcript or somehow

3    extracting it and playing it to the jury by video.  But

4    to just put the whole transcript of the statement in, I

5    don't think that that's being complete.  I think that's

6    being overcomplete.  I think what happens, Kevin, is

7    that then we'll want rebuttal with respect to the other

8    things in here.  And there's got to be an end to it.  I

9    want to be as liberal as I can with you, but to just put

10   a 200 page transcript in evidence, I don't think that's

11   just completeness.

12          MS. TREADWAY:  The other problem it creates,

13   Judge, is that false exculpatory statement issue.

14          THE COURT:  Well, that's another problem.  But

15   I don't know what's in there, obviously.

16          MS. TREADWAY:  Well, we would ask that either

17   the video be put in as redacted or that your suggestion,

18   Judge, be followed that only the elements of the

19   transcript related to the parts played be given to the

20   jury.

21          THE COURT:  I'll let you do either of those

22   things.

23          MR. BYERS:  But then I could still use

24   anything out of here in closing as demonstrative --

25          THE COURT:  I don't see how --

```
 1          MS. TREADWAY:  No, just that part that's
 2   admitted unless it's the videotape that you want to
 3   play.
 4          MR. BYERS:  You see, Judge, I'm going to end
 5   up admitting half the transcript at least.  I have like
 6   60 instances of conversation I want to talk about.
 7          MS. TREADWAY:  That's because they want to use
 8   this as testimony, Judge, and that's inappropriate.  If
 9   the goal of this is to have Linda testify through this
10   document, that's inappropriate.
11          THE COURT:  I know that's inappropriate.  And
12   I'm not going to permit that.  But I will let you use it
13   for the purposes I said.  And I've not read it.  That's
14   all -- that's my ruling.  And I'll let you do it however
15   you want to do it; but, to conform with that ruling.
16          MR. BYERS:  So I'm clear.  If we put -- have a
17   redacted video, the whole thing can go in --
18          THE COURT:  No.
19          MR. BYERS:  Okay.  That's --
20          THE COURT:  Redacted, yes.  Redacted.
21          MR. BYERS:  But, I mean, redacted taking out
22   the two issues that you said couldn't be in there.  You
23   still want excerpts in a video --
24          THE COURT:  I'm going to say it one last time.
25   I think that the video was only shown twice.  Maybe
```

5890

1      three times.

2                 MS. TREADWAY:  Twice.

3                 THE COURT:  If there's something in there, in

4      the transcript, that is either responsive or would

5      complete the picture that was portrayed by the two

6      snippets that were shown to the jury, just like when

7      Lawrence objected one time when things weren't being

8      read and I said you had to read the whole thing.  So

9      getting back to the issue of hiring misfits.  If she

10     goes ahead and said, you know, I didn't really mean that

11     the way it sounded, or that's, you know, whatever, then

12     sure, you can definitely show that.  I don't have any

13     problem.  You can read it or show it.  But to just start

14     reading things from the interview, whatever happens to

15     be in there, I'd have to -- we would have to take the

16     time to go through it and make sure, for example, there

17     isn't any exculpatory hearsay in there.  You know what

18     I'm talking about, don't you?

19                 MR. BYERS:  Uh-huh.

20                 THE COURT:  The *Savianno* case.  The Tenth

21     Circuit is very clear on that rule.  And if you want to

22     take the time to do it, we can.  It's really up to you.

23     I'm trying to be as liberal as possible to you here.

24     But to just get up and start reading it or just get up

25     and start playing it, I'm not going to allow that.

5891

1    Because I'm not going to allow it.  I don't think the

2    rules permit that.

3              MR. WILLIAMSON:  So if we keep moving, can we

4    rest and reserve ruling on that?

5              THE COURT:  Well, it's --

6              MS. TREADWAY:  He ruled on it.

7              MR. WILLIAMSON:  Well, no, he has to have a

8    chance to go through and pull out what he wants.

9              THE COURT:  I'll send the jury to lunch until

10   1:00.  It's 11:30.  You can decide what you want to do

11   over the noon hour.  You have to show it to her so she

12   knows what we're doing.  Here we are we're at the tail

13   end of the case here, I'm not trying to deprive of you

14   anything that's really important.  But I think -- I

15   don't mind sending the jury out.  They're here.  If you

16   want to go through that.  If not, we're going to start

17   rebuttal at 1:00 and go wherever we're going.

18             MS. TREADWAY:  I have only three witnesses

19   this afternoon, Judge.  And they'll be very quick.

20             THE COURT:  That's fine.

21             MR. WILLIAMSON:  Can you tell us who they are?

22             MS. TREADWAY:  Uh-huh.  Well, I already gave

23   you the disclosure in an e-mail.  The only person that's

24   fallen out is Kim Roberts.  He was not mentally capable

25   to come and deal with the testimony.  So it will be Tim

1    Rohrig, Sean Moore, Terry Blosser and then we will have

2    Dr. Davidson on Tuesday when he returns to town.

3              THE COURT:  Okay.  And after the rebuttal is

4    over on Monday --

5              MS. TREADWAY:  Tuesday.

6              THE COURT:  Tuesday, I mean, we'll take up --

7              MR. WILLIAMSON:  Rule 29.

8              THE COURT:  -- Rule 29.  But I'll talk to you

9    a little bit more about that after we're through with

10   the evidence today.

11             MS. TREADWAY:  Yes.  And we have some other

12   issues to discuss, Judge.  Thank you.

13             THE COURT:  I'm sure we do.

14                      (Thereupon, the following

15                       proceedings continued in the

16                       hearing of the jury.)

17             THE COURT:  All right.  I'm going to let you

18   go to lunch a little early, Ladies and Gentlemen, until

19   1:00.  Please remember and heed the admonition.  I think

20   we should be through with things today probably by 3 as

21   far as you're concerned.  And then you won't have to

22   come back until Tuesday.  And I hope you're paying

23   attention to me about being careful.  No motorcycles.

24                      (Jury excused for Noon Recess.)

25