5893

```
1                    (Beginning at 1:00 p.m. June 10,
2                2010, the following proceedings
3                continued OUTSIDE THE PRESENCE
4                of the jury.)
5           THE COURT:  You're up, Kevin.
6           MR. BYERS:  Thanks, Judge.  First off, I
7     utterly failed on trying to get through here and put
8     context to some of this stuff -- well, I won't say
9     utterly.  I made it about halfway and then I ran into
10    the 82-E which actually rather than being the type of
11    clip that I thought it was, actually four clips.  It's
12    16 because it goes from here to two hours later to two
13    hours back for 13 seconds to 20 seconds forward to 10
14    seconds forward.  And then that's just the first clip.
15    So I just now finished logging these times of where I
16    need to look at in the video and then trying to from
17    there, frankly, I was trying to -- I was intending to do
18    it on paper but I have no way to match up on paper where
19    these times are.  So I may just have to do a video and
20    then figure out what to do from there.  But I've got
21    what I think would put the first 82-C in context in the
22    paper version.  Essentially a couple pages on each side
23    of it.  Just to show a little bigger picture.  But on
24    82-E I've got -- I know what I need to look for now but
25    that's where I'm stymied and I ran out of time.
```

5894

1           THE COURT:  What am I going to do?  We're

2    through with the Defendants' evidence except for this.

3    You've known about this for several weeks.

4           MR. BYERS:  Uh-huh.  I actually thought I

5    would get the whole transcript in, Your Honor.  I hadn't

6    thought to go back and look at these 16 bits and try to

7    put --

8           THE COURT:  Well, as I told you at the bench,

9    I'm not trying to frustrate your defense, but there

10   wouldn't be any legitimate basis for you to think that

11   you would be able to get the whole transcript in in my

12   opinion.  Because there was such a small amount of

13   testimony taken that was shown to the jury.  I don't

14   know how many pages that comes out to, but it would be,

15   you know, somewhere, maybe 10% of the -- I just -- the

16   whole problem that you get into on this sort of thing is

17   a *Savianno* problem.

18          MR. BYERS:  Right.

19          THE COURT:  And without going through the

20   whole transcript, I wouldn't be able to know if there

21   was any true exculpatory hearsay in there.  And that --

22   there's no question that doesn't come in and we all know

23   that.

24          MR. BYERS:  Uh-huh.

25          THE COURT:  So I wish you'd have done this,

1    you know, a couple of weeks ago and then we could have

2    had a better idea of what you want to do.  You certainly

3    can put that in there, whatever you've isolated so far.

4    But how am I going to do this from a timing standpoint?

5            MR. BYERS:  If I could have until like noon

6    tomorrow to submit something, to look over and see, and

7    work on this 82-E --

8            THE COURT:  Well, but the Government's

9    prepared to put on its rebuttal today unless you --

10   unless we could do this -- at this point probably

11   doesn't make any difference to the jury.  Let you do it

12   out of time.  But how long is that going to take on

13   Tuesday when we've got a whole day basically devoted to

14   instructions and closing argument.

15           MR. BYERS:  Well, if I just offer it as paper

16   then I can use it in my closing, too, to show context of

17   the statements.  I'm not necessarily intending to show

18   these.

19           THE COURT:  I thought you said to --

20           MR. BYERS:  I'm just trying to figure out how

21   to get it into the body so then I can reference it --

22           THE COURT:  Do you have any objection to that?

23           MS. TREADWAY:  So if I'm understanding

24   correctly, what Mr. Byers wants to do is simply place it

25   in the record so that he can use it in closing.  Well,

5896

1    if I have an opportunity to look at it beforehand and we

2    have an opportunity to put objections on the record, I

3    don't have an objection.

4            THE COURT:  Well, let's do that.

5            MR. BYERS:  Okay.

6            THE COURT:  I want you to be able to use it in

7    the record but it's got to be something that would be

8    otherwise admissible.  I mean, this isn't exactly a

9    pedagogical, whatever the hell that is.

10           MS. TREADWAY:  No, sir.

11           THE COURT:  All right.  So, you can go ahead

12   and do that.

13           MR. BYERS:  Do I have a time frame then, Your

14   Honor?

15           THE COURT:  Well, can't you -- we're going to

16   be done about 3:00 this afternoon.  Can't you -- don't

17   you think you can look through that and get something to

18   her so that we can discuss it on Monday.

19           MR. BYERS:  Oh, sure.  Sure.  Maybe even

20   tomorrow.  But I'll make my best effort.

21           THE COURT:  But what I want to do is I was

22   going to tell you this after we were through with the

23   evidence but, today, but, there's still I guess some

24   outstanding questions on a few of the instructions and

25   if you want to submit, you know, if you want to submit

1    anything, get those in by, say, noon tomorrow so that

2    Rachael and I can look at them tomorrow afternoon.

3    We'll have another instruction conference on Monday

4    afternoon, say, about 3:00 or 1:00 -- we've got a docket

5    on Monday morning.  It will have to be Monday afternoon.

6    Finalize the instructions.  Give us time to put them

7    together so you'll know what they are.

8              MS. TREADWAY:  Can we do that earlier instead

9    of 3:00?

10             THE COURT:  We can do it at 1:00.  That will

11   take care of that.  Okay.  And if you need to, whatever

12   you need to do, we'll talk about it then.  Okay.

13             MR. BYERS:  Okay.  That's fair.

14             THE COURT:  Good enough.  Let's go.

15             MR. BYERS:  Well, Your Honor, I think we had

16   one other issue.

17             MR. WILLIAMSON:  We do have a couple -- one

18   other issue, maybe two.  The Government's calling four

19   rebuttal witnesses, two of them we object to.  One is

20   Terry -- what's --

21             MR. BYERS:  Blosser.

22             MR. WILLIAMSON:  -- Blosser, who I believe is

23   a court security --

24             THE COURT:  Yeah.  He is a CSO.

25             MR. WILLIAMSON:  We believe it's going to be

5898

1      about the whole issue with Ms. Cobuzzi and the document.

2      We believe that's not admissible under 608 and

3      Mr. Gorokhov actually pulled a Tenth Circuit case that

4      discusses that.  Two, Sean Moore is supposed to

5      introduce the medical record of Carol Carter.

6              THE COURT:  Who is that?

7              MR. WILLIAMSON:  Mother of Toni W that

8      testified.  One of the -- the older lady with the broken

9      leg who sat on the ground, or sat, you know, in the

10     chair on the floor.

11             THE COURT:  Yeah.

12             MR. WILLIAMSON:  A, we believe that's a

13     collateral matter; B, we don't believe he has -- he

14     can't lay the foundation for that document.  We would

15     object to that document coming in.

16             THE COURT:  Why would -- what is rebuttal

17     about her other than --

18             MS. TREADWAY:  It's actually about her and

19     Mr. Gilbert who were two of the patients that testified.

20     Unfortunately, they did not testify in keeping with the

21     records of the Defendant's clinic.  We subpoenaed their

22     patient records to verify what they were saying was true

23     and it was not.  This is a very small rebuttal.

24             THE COURT:  About what though?

25             MS. TREADWAY:  Using their records.

5899

```
 1              THE COURT:  No, but what is it about what they
 2    said that you're rebutting besides just saying it's the
 3    records?
 4              MS. TREADWAY:  She said specifically I didn't
 5    get Percocet because it made me sick.  She got Percocet
 6    for over a year.
 7              MR. WILLIAMSON:  That's not what she said.
 8              MS. TREADWAY:  Or it made her drunk.
 9              MR. WILLIAMSON:  She stopped taking it and
10    asked for an exchange because it made her drunk.
11              MS. TREADWAY:  She says that she did not fail
12    urine drug screens and then get drugs.  She failed seven
13    urine drug screens and continued to get drugs.
14              THE COURT:  But this is the mother, not the --
15              MS. TREADWAY:  The mother.  But it goes
16    directly to her testimony about her treatment, that she
17    never violated the pain contract because he was so
18    strict about the pain contract.  Well, he wasn't.  Their
19    own records make the testimony from these witnesses
20    false.  And it's really a problem of, Judge, that the
21    Defendants put on testimony which was not accurate and
22    there was no ability for us to know that until we
23    reviewed the patient records.  And these patient records
24    absolutely negate what these people said on the stand.
25    They were brought in for the purpose of saying he was
```

1   strict about that pain management contract, if you did

2   anything wrong, you were cut off.  Well, Judge, their

3   own records belie that.  And it's improper for the jury

4   to have an incomplete picture of these patients.  These

5   are -- these are the Defendant's own records.  They are

6   admissible under 803(6) and 801(d)(2)(A) as all of the

7   records have been before.  They don't like these records

8   because --

9            MR. WILLIAMSON:  We haven't seen the records.

10  She didn't give us a copy of them yet.

11           MS. TREADWAY:  They're their own records.

12           THE COURT:  You don't have copy of them?

13           MS. TREADWAY:  I can give it to them now.  I

14  now have it.

15           THE COURT:  Well, you've told them what it is,

16  let 'em see a copy of it.  What's the deal about --

17           MS. TREADWAY:  Mr. Gilbert, it's the same

18  issue.  Mr. Blosser --

19           THE COURT:  -- about Trooper Blosser.  What's

20  the problem with him?

21           MR. WILLIAMSON:  We don't know what he can

22  testify to other than whatever happened in the courtroom

23  which was a collateral matter.

24           THE COURT:  Collateral to what?

25           MR. WILLIAMSON:  I don't know.  We don't know

5901

1    exactly what he's going to say.

2              THE COURT:  She doesn't have to tell you.

3              MS. TREADWAY:  It's not collateral, Judge.  It

4    goes directly to credibility and it goes directly to

5    bias.

6              THE COURT:  I know exactly what it is and it's

7    not collateral.

8              MR. GOROKHOV:  Judge, the problem is that the

9    rules clearly say that you can't have extrinsic

10   testimony or evidence on a matter that can only be used

11   in the witness's impeachment which the witness was

12   impeached on.

13             THE COURT:  I'll tell you what, I know what it

14   is and just let me say this now that we're in chambers.

15   If I was your witness, I'd be worried about getting

16   charged with perjury.  It's gonna come in.  I know

17   exactly what it is.

18             MS. TREADWAY:  Judge, with regards to that,

19   since we are talking about Ms. Cobuzzi, I do need to

20   make a record as to this.  You ordered after her

21   testimony that the Defendants immediately provide 26.2

22   material, which she revealed did exist.  We got that at

23   3:00 yesterday.

24             THE COURT:  So?  She's gone.

25             MS. TREADWAY:  Well, I realize that, Judge.

1    But the reason that it was not given to us in the timely

2    manner is because it would have been highly devastating

3    to her cross-examination.

4             MR. GOROKHOV:  That's not true, Judge.

5             THE COURT:  Well, I don't know.  I don't know

6    whether it would have been or not, but it's a moot

7    point.

8             MS. TREADWAY:  But I just want to, again, for

9    the record, Judge, this was a strategic and tactical

10   choice by the Defendants not give us this.

11            MR. GOROKHOV:  It was not.

12            THE COURT:  I don't know, but my feeling is

13   that based on what I think is going -- the evidence is

14   going to come in about Ms. Cobuzzi, the jury is going --

15   may not believe anything she says anyway because of

16   that.

17            MS. TREADWAY:  I agree, Judge.

18            THE COURT:  Regardless of what the Rule 26.2

19   said.

20            MS. TREADWAY:  Well, Judge, I don't want you

21   to be impatient with me, but I do have one more issue

22   which I do think is very important to bring up.  And

23   this is about our Rule 23 situation.  I believe that

24   based on my reading of the rule and my appellate

25   counsel's reading of the rule that it would be very,

5903

1    very smart of us and very prudent of us to put into the

2    record, in addition to everything that we've put on the

3    record orally, that we enter into a written stipulation

4    that the parties sign, and that you approve with your

5    signature.  The rule reads that the parties can

6    stipulate in writing with your approval.  That's B(2) A

7    and B.  And you've been also operating on -- under B(3).

8    I believe, however, for the record, for everybody's

9    protection, now that we are at 11, that we enter into

10   that stipulation.

11            THE COURT:  All right.

12            MS. TREADWAY:  I wrote up one.  I presented it

13   to the defense and they refuse to sign it.

14            MR. WILLIAMSON:  Judge, her language says

15   fewer than 12.

16            MS. TREADWAY:  Which is the language of the --

17            MR. WILLIAMSON:  We don't mind 11 but we never

18   agreed to go to ten.

19            THE COURT:  They never agreed to go to 10.

20   And if it says 11, that's what we agreed to.  That's

21   where we're at.  We all agreed to that.  Even the

22   Defendants.  Who didn't speak but they had an

23   opportunity -- you took them out and they're sitting

24   here right now.  What we ought to be doing is not

25   arguing over the stipulation, we ought to be crossing

5904

1    our fingers that those people are all going to be here

2    on Tuesday morning ready to go.  That's what we ought to

3    be crossing our fingers about.  But that's wrong.  If it

4    says less than 12 or whatever, it should say 11 because

5    that's what we talked about.

6              MS. TREADWAY:  Well, I just -- it's just the

7    language of the statute; but I can specify it less than

8    12 but no less than 11.  Is that what you want me --

9              THE COURT:  Why don't you just say that you

10   agreed to 11.  That's what we agreed to here.

11             MS. TREADWAY:  I will.

12             THE COURT:  I think our record will reflect

13   that.  And if it doesn't, I don't know who your

14   appellate counsel is but -- is it that guy in

15   Washington?

16             MS. TREADWAY:  Oh, no.  Huh-uh.  No, it's

17   James Brown in Topeka, Judge.

18             THE COURT:  I don't know him.

19             MR. BYERS:  Thank you, Judge.

20                       (Whereupon, the following

21                        proceedings continued IN THE

22                        PRESENCE of the jury.)

23             THE COURT:  I'll let counsel correct me, but I

24   think this is where we're at.  I believe we're through

25   with any further witness testimony of the Defendants.

1     Correct?

2              MR. WILLIAMSON:  That's correct, Your Honor.

3              THE COURT:  Now, I've given Mr. Byers a little

4     leeway.  There's a written transcript that he needs to

5     look through.  It may be that on Tuesday morning I'll

6     let him put that in after the Government's rebuttal.

7     We're a little bit -- the way things usually go is the

8     Government puts on its case, then Defendants if they

9     want to put on their case.  Then the Government has an

10    opportunity for rebuttal.  The Defendants theoretically

11    have an opportunity for sur rebuttal, come back and say

12    that, you know, the Government's rebuttal witnesses

13    aren't testifying truthfully or something.  What he's

14    looking at is not true sur rebuttal.  But given the

15    length of the trial, I'm going to let him do it anyway

16    if he comes across what he thinks he's looking for.

17    But, you know, in this trial there's so much that it's

18    kind of hard for him to find that in a short period of

19    time.  But, we're going to now, unless there's an

20    objection, move into the Government's rebuttal.  Any

21    objection, gentlemen?

22              MR. WILLIAMSON:  No, Your Honor.

23              MR. BYERS:  No, sir.

24              THE COURT:  All right.  And then after we're

25    through with that, I'm going to send you home until

5906

1      Tuesday morning with the special admonition to you two.

2      And we've all got our fingers crossed.  We're countin'

3      on you.  All right.

4                  THE COURT:   Call your first rebuttal witness.

5                  MS. TREADWAY:  Government calls Dr. Timothy

6      Rohrig.

7                  THE COURT:  Still sworn, sir.

8                          **TIMOTHY ROHRIG**

9      Having been previously duly sworn to tell the truth, the

10     whole truth and nothing but the truth, testified further

11     as follows on:

12                       **DIRECT EXAMINATION**

13     BY MS. TREADWAY:

14     Q   Dr. Rohrig, were you present in the courtroom for a

15     good portion of Dr. Steven Karch's testimony?

16     A   Yes, I was.

17     Q   And have we shared with you other portions of his

18     testimony?

19     A   Yes, you have.

20     Q   Did you hear Dr. Karch testify about the forensic

21     autopsy performance standards?

22     A   Yes, I did.

23     Q   And he was referencing standards from 2005.  Was he

24     referencing the most recent publication of those

25     standards?

5907

1    A    No, he was not.

2    Q    Let me hand you what has been marked for

3    identification as Government Exhibit 226.  What is that?

4    A    226 is the Forensic Autopsy Performance Standards

5    promulgated by National Association of Medical

6    Examiners, Amendments, approved October 16, 2006.

7    Q    Is that the most recent publication of the Forensic

8    Autopsy Performance Standards published by NAME?

9    A    That I'm aware of, yes.

10   Q    And whose name appears as a part of the committee

11   that developed those standards on the second page?

12   A    Well, there's several names.  I recognize several of

13   them.  But one in particular is Dr. Mary Dudley who used

14   to be with our office.

15            MS. TREADWAY:  Government would offer Exhibit

16   226.

17            MR. WILLIAMSON:  No objection.

18            MR. BYERS:  No objection.

19            THE COURT:  226 is received.

20   BY MS. TREADWAY:

21   Q    Dr. Karch was critical of your Forensic Science

22   Center for not performing histology or gathering tissue

23   slides on every autopsy and that that decision was in

24   violation of the NAME standards.  What is your response

25   to that testimony?

1    A    Well, one, it's not -- I disagree with Dr. Karch.

2    It's not, one, in violation of the NAME standards; two,

3    the NAME standard he was citing is the G 27 and G 27 has

4    changed over the time frame that we were doing these

5    particular cases.  The standard that I recall him

6    quoting was the most current one which talks about

7    histology shall be taken on cases where you do not have

8    a gross anatomical cause of death.  Back in 2005, when

9    the first final draft of the standards were promulgated,

10   the G 27 spoke about if you do not have an anatomical or

11   toxicological cause of death then histological slides

12   were suggested to be taken.

13   Q    So was Dr. Karch wrong?

14   A    Yes, ma'am.

15   Q    Dr. Karch testified that it was a requirement to

16   send pacemakers off for testing.  What is your response

17   to that statement?

18   A    Well, he's incorrect.

19   Q    When does a pacemaker need to be sent off for

20   testing?

21   A    Well, it depends on the circumstance of the case.

22   But in our office, and to my knowledge most offices,

23   it's up to the discretion of the examining physician,

24   the forensic pathologist, to make the determination

25   whether or not the pacemaker is sent off for

1    examination.  In our office, if the pathologist feels

2    it's necessary, it is sent off.  It's happened before.

3    We have no prohibition against that in our office.

4    Q   Dr. Karch testified that your board certified

5    forensic pathologists were engaged in what he called

6    blatant malpractice.  What is your response to that?

7    A   Well, he's incorrect.  I do not feel -- and I was

8    surprised by that allegation.

9    Q   Dr. Karch testified that in his opinion the Science

10   Center should not be NAME accredited.  What is your

11   response to that?

12   A   Well, we are NAME accredited.  We've been

13   re-accredited and we continue to follow the rules

14   promulgated by NAME as far as their checklist and that's

15   what they test us against on a -- when they come in to

16   do their accreditation inspection.  So I, again, was

17   surprised with that comment.

18   Q   Did he have any foundation for that opinion?

19   A   I did not hear any foundation for it.

20   Q   Let me hand you what has been marked for

21   identification as Government Exhibit 228.  Do you

22   recognize those, sir?

23   A   228 is two documents.  Both of them are NAME or

24   National Association of Medical Examiner accreditation

25   certificates.  228-A, I'll call it, the one on top,

1    shows that we're accredited from March 16, 2001, through

2    March 16, 2006.  The second document, 228, and I'll call

3    it 228-B, is our accreditation certificate which states

4    grants full accreditation to the Sedgwick County

5    Regional Forensic Science Center, Wichita, Kansas,

6    granted from the period of April 7, 2006, through April

7    7th, 2011.

8              MS. TREADWAY:  Government offers Exhibit 228.

9              MR. WILLIAMSON:  No objection.

10             MR. BYERS:  No objection.

11             THE COURT:  It's received.

12   BY MS. TREADWAY:

13   Q   Therefore, for the time period in question in this

14   case, namely, 2002 through 2008, was the Sedgwick County

15   Forensic Science Center accredited by the National

16   Association of Medical Examiners?

17   A   Yes, we were.

18   Q   And what responsibility do you have with regards to

19   that accreditation?

20   A   Well, one of my primary job responsibilities is to

21   make sure that the Center is accredited not only by

22   NAME, but also by the ASCLAD (ph), the accreditation

23   board which looks at the laboratories?

24   Q   Did you hear Dr. Karch's testimony about his trip to

25   Wichita and his complaints about that trip?

1    A    I heard about his trip and some of his complaints.

2    Q    Dr. Karch testified that Forensic Science Center had

3    not preserved tissue and it was therefore not available.

4    What is your response to that?

5    A    Well, we preserve tissue.  All tissue taken from the

6    body is preserved for a minimum of three years.

7    Histological slides, if they're taken, are preserved in

8    perpetuity.  We still have them.  Paraffin blocks are

9    for ten years.  So a lot of material with these cases

10   was still available.

11   Q    Dr. Karch testified that he asked for recuts of the

12   tissue slides and you refused to provide them.  What is

13   your response?

14   A    That's totally incorrect.

15   Q    Did he ask for recuts?

16   A    At the time he was at our office, no, he did not.

17   Q    What did you understand Dr. Karch's complaint to be

18   about the microscope?

19   A    Well, my understanding was he was not happy that he

20   had to bring his own microscope to do his own

21   examination.

22   Q    And what is your response to that complaint?

23   A    Well, we have a limited number of microscopes.  We

24   have three pathologists.  We have three microscopes.

25   We're a busy office.  And I just, I couldn't authorize

1   using county equipment for this endeavor and then back

2   everything else up that's a part of our normal duties.

3   My understanding is that someone that's going to review

4   the histological slides would most likely have his own

5   microscope.  So I didn't see it as an issue.

6   Q   Is it your policy that you apply to all people?

7   A   Yes, ma'am.

8   Q   Let me hand you what has been marked for

9   identification as Government Exhibit 227.  Do you

10   recognize that document?

11   A   227 is a letter from one of the attorneys that

12   represents me, or our office, that is, to Kevin Byers in

13   regards to a motion for subpoena that was asking for

14   certain documents and records and also to confirm a

15   visit by Dr. Karch to our office.

16         MS. TREADWAY:  Government offers Exhibit 227.

17         MR. BYERS:  No objection.

18         MR. WILLIAMSON:  No objection.

19         THE COURT:  It's received.

20         MS. TREADWAY:  Do we have that, Mr. Moore?

21   Q   We're going to display those.  First of all, what is

22   the date of this letter?

23   A   Letter was dated November 10, 2008.

24   Q   And in the first paragraph does it state what dates

25   Dr. Karch is going to be available to come to Wichita?

5913

1    A    The letter states that November 20th and 21st will

2    work for Dr. Karch's visit.

3    Q    And in Paragraph 3, what does it state in the very

4    first sentence?

5    A    It does not appear that Dr. Karch is requesting any

6    additional recuts.  Since he is coming to Wichita for

7    his examination, there is no necessity to make or mail

8    any to him.

9    Q    And Paragraph 5 on the second page.  Is this the

10   issue about the microscope?

11   A    Yes, ma'am.

12   Q    Please read that.

13   A    "The reason for the county's request concerning the

14   microscope is twofold.  First, this avoids any

15   controversy about whether the potential expert believes

16   the equipment is suitable; and, second, it does not tie

17   up the equipment which is needed for the regular

18   function of the laboratory."

19   Q    You can go on.

20   A    I'm sorry.  "Other outside experts have agreed to

21   this arrangement in the past and it seems to work out

22   well without significant inconvenience.  I ask you to

23   reconsider this."

24   Q    Thank you.  Now, Dr. Karch also testified about

25   testing hair samples.  In your opinion was it necessary

5914

```
 1   in any of the autopsies and external examinations to
 2   perform these expensive tests on the victims' hair?
 3   A    No.
 4   Q    If any of the board certified forensic pathologists
 5   had felt it necessary to perform such a test, could you
 6   have done so?
 7   A    Yes.
 8   Q    Dr. Karch also testified that DNA testing was
 9   required to be done in order for the forensic
10   pathologist to protect public health.  What response do
11   you have?
12   A    Well, no.  I'm not really quite sure which DNA tests
13   he was referring to, but the answer is still no.
14   Q    In any of the deaths in question in this case would
15   DNA have added any additional information in terms of
16   the cause and manner of death?
17   A    No, ma'am.
18   Q    Do you have any concerns, Dr. Rohrig, about how Dr.
19   Karch arrived at his opinions that cause and manner of
20   death could not be determined?
21   A    I don't know if concern would be the right word; but
22   I -- I'm still in a quandry.  From the testimony that I
23   heard, he only looked at partial information, and as I
24   had testified to and I believe he's also alluded to, if
25   not directly testified to, that you need to look at
```

5915

1    medical records available, complete scene investigation,

2    the autopsy, toxicology, and other pieces of

3    information.  From what I gathered, he looked at cardiac

4    slides only.  And on the cases that we have histology,

5    we take more than just cardiac slides.  He did not

6    review medical records that were available.  And the

7    only scene information I recall him reviewing was what

8    was summarized in the autopsy protocol.

9    Q   Did he also seem to isolate his review to

10   toxicology?

11   A   Yes.

12   Q   What is the problem with isolating these issues and

13   then attempting to develop an opinion from them?

14   A   Well, one should never take partial information and

15   develop an opinion.  You should look at all the

16   available information at hand, and based upon that

17   information, come to the best conclusion.

18   Q   And was his opinion in using only these issues

19   contrary to what he states is necessary in his book?

20   A   That's my understanding, yes.

21   Q   In reaching their conclusions about the causes and

22   manners of death in this case, did the six board

23   certified pathologists and the two board certified

24   toxicologists isolate their reviews to one or two

25   issues?

5916

1    A    I'm not aware of it.  I can definitely tell you I

2    did not.

3    Q    And did you and your certified pathologists look at

4    the medical history, including the drug history?

5    A    Everything that was available was reviewed.

6    Q    Family and social history?

7    A    Yes, ma'am.

8    Q    Scene investigation?

9    A    Yes.

10   Q    Autopsy reports?

11   A    That's correct.

12   Q    Toxicology reports?

13   A    Absolutely.

14   Q    And with all of this in mind, did the forensic

15   pathologists and the toxicologists use their best

16   medical and scientific judgment?

17   A    Always.

18   Q    And did they use their common sense?

19   A    Yes.

20   Q    Therefore, do you have a response as to Dr. Karch's

21   opinion that the autopsies at issue in this case were

22   incomplete?

23   A    Yes, I do have an opinion.

24   Q    And what is your opinion?

25   A    They were not.

1    Q    In your opinion, were they sufficient?

2    A    Yes.

3    Q    And were they correctly determining the causes and

4    manners of death?

5    A    In my opinion, yes, they did.

6    Q    Now, on a very minor issue, Dr. Karch also testified

7    that you lied about having a subscription to his

8    newsletter, Dr. Rohrig.  What is your response?

9    A    Well, I did hear him say that I allegedly signed a

10   PO 17 years ago when I worked for the state of Oklahoma.

11   If he has a PO, I wouldn't question that I signed it.

12   That long ago, I don't pretend to remember everything

13   over the last 17 years.  But that was on behalf of the

14   state of Oklahoma.  And I left Oklahoma in '94.  That

15   subscription, if in fact it exists, would have remained

16   there.

17   Q    So, again, was Dr. Karch wrong?

18   A    He may not have been wrong about the '93, but I

19   currently do not and I don't recall over the last ten

20   years ever subscribing to his newsletter.

21   Q    Finally, Dr. Rohrig, as to the scene investigation

22   for Toni W, the defense presented testimony from Toni's

23   mother Carol.  Let me hand you what has been marked for

24   identification as Government Exhibit 333.  Are those

25   documents from the scene investigation of Toni W's

5918

1    death?

2    A   Yes.  There's also a case that correlated to that

3    case as well in here.

4    Q   Are those business records from the Forensic Science

5    Center?

6    A   Yes, they are.

7    Q   And did the investigators talk to Toni's mother

8    Carol at the scene?

9    A   Well, indirectly.  A lot of this information was

10   derived from a sheriff's deputy who gathered information

11   and relayed that to our investigator; but it did

12   indicate that it came from the mother of the decedent.

13   Q   What, if anything, did Carol report about intruders

14   having been at the house?

15           THE COURT:  Well, before he starts talking

16   about what's in the document, it needs to be in

17   evidence.

18           MS. TREADWAY:  I'm sorry, Judge.  Let me admit

19   that, Judge.  We would offer Exhibit 333 as a 803(6) and

20   803(8) public record.

21           MR. WILLIAMSON:  No objection.

22           MR. BYERS:  No objection.

23           THE COURT:  It's received.

24   BY MS. TREADWAY:

25   Q   Did Carol report anything about intruders coming

1    into the house?

2    A    There's nothing in the report of death, the

3    supplemental investigative report, nor in our case

4    inquiry log that suggests that.

5    Q    Carol also told the jury that there were no

6    prescription bottles to be found at the scene.  Did the

7    investigators in fact find prescription pill bottles at

8    the scene?

9    A    Yes.  They not only found but they collected and

10   submitted to our office numerous prescription bottles.

11   Q    And is the inventory of those prescription bottles

12   Page 6 of that exhibit, the last page?

13   A    Yes, ma'am.

14   Q    Are the prescriptions from the Defendant Stephen

15   Schneider?

16   A    Six of them are from Dr. Schneider.

17   Q    Would all of this information have been available to

18   you and the forensic pathologist performing Toni's

19   autopsy?

20   A    Oh, absolutely.

21          MS. TREADWAY:  That's all, Judge.

22          MR. WILLIAMSON:  Thank you.  I'll go first.

23                  **CROSS EXAMINATION**

24   BY MR. WILLIAMSON:

25   Q    Dr. Rohrig, you remember just being asked some

5920

1    questions about Government Exhibit 226?

2    A    226 is?

3    Q    The NAME Forensic Autopsy Performance Standards?

4    A    Yes.   The October '06 set, yes, sir.

5    Q    You remember Ms. Treadway asked you that Dr. Karch

6    had the -- Dr. Karch, the one that he had was in 2005 so

7    it wasn't the most recent?

8    A    I believe that's what she stated, that's correct.

9    Q    Well, you remember testifying that the G 27 in the

10   version that you just introduced and the version that

11   Dr. Karch was looking at was different?   You remember

12   that?

13   A    I didn't introduce anything.   I was responding to

14   Ms. Treadway's questioning.

15   Q    Well, you remember testifying that the G 27 in Dr.

16   Karch's standard or in his book was different than the

17   one that you were just testifying about.   You remember

18   that?

19   A    Well, G 27 is not in his book.   He was testifying to

20   G 27.   The G 27 that he was testifying to was in the '06

21   set of rules; however, it was presented to me that he

22   was claiming that was from the '05 set of rules.

23   Q    Okay.   Well, I'm just going to hand you D-21.   This

24   is an excerpt of the -- that's the actual excerpt that

25   Dr. Karch had when he was on the stand.   Can you look at

5921

1    G 27 and compare it to Government Exhibit 226 and tell

2    me if it's any different?

3    A    No, G 27 and defense 21, which has a date of August,

4    05, is the same as G 27 in the '06 set of rules.

5    Q    All right.  Thank you.  If you would hand me the

6    other two pages.

7    A    Sure.

8    Q    So Dr. Karch wasn't wrong when he was relying on the

9    same definition that was stated in Government Exhibit

10   226; correct?

11   A    I'm not sure what you mean he wasn't wrong.

12   Q    Okay.  Well, let's talk about this pacemaker issue.

13   You state that there is -- you're saying there is not a

14   standard to send a pacemaker off to a manufacture in a

15   death, when a person passes away with a pacemaker in

16   their heart?

17   A    As far as it's required on every case, no.

18   Q    Is there a standard -- are you saying there is -- is

19   there a standard anywhere that states when it should or

20   should not take place?

21   A    My understanding and the policy in our office is

22   it's up to the discretion of the examining forensic

23   pathologist.

24   Q    And what standards does that pathologist apply when

25   using that discretion?

5922

1    A    The professional judgment.

2    Q    Okay.  Well, would it be a situation where you

3    expect your pathologist to send off a pacemaker when

4    there's information in the medical record that the

5    pacemaker should be checked?

6    A    I'm sorry.  I didn't hear you.

7    Q    Yes.  Do you believe your pathologist would send off

8    a pacemaker to be checked when, if, if this patient's

9    medical records say, hey, this pacemaker should probably

10   be looked at by the manufacturer before she passed away.

11   A    Again, I can't speak for their professional judgment

12   on that.  That's a medical opinion; and if they felt

13   that it was necessary, I know because we've sent them

14   off in the past, it would happen.

15   Q    Under what circumstances would you expect it to be

16   sent away?

17   A    I can't make that medical conclusion.

18   Q    You're not a medical doctor, are you?

19   A    No, sir.

20   Q    Are you aware that Evelyn S in this case had a

21   pacemaker?

22   A    Yes, I am.

23   Q    And are you aware that the visit before she passed

24   away that the physician's assistant stated this

25   pacemaker needs to be checked out by the manufacturer?

5923

1    A    I believe it was pacemaker needs to be checked.

2    Q    Okay.  Well, in that situation don't you think your

3    medical examiner would say, hey, we have an issue with

4    this pacemaker in the medical records, probably we

5    should send this off to just double check?

6    A    I can't sit here and guess what they were thinking

7    at the time.

8    Q    Now, you were asked questions about the microscope.

9    When you came in and saw Dr. Karch's microscope, did you

10   not tell Dr. Karch that you could have used our

11   microscope?

12   A    After he relayed to me all the difficulty, I said I

13   wish you would have called me and I probably would have

14   gone against policy and made an exception.

15   Q    Now, you were shown that letter about this recuts

16   issue.  You remember that?

17   A    From my attorney to Mr. Byers, yes, sir.

18   Q    Okay.  That wasn't any communication directly

19   between you and Dr. Karch, was it?

20   A    No.  Most of my communication was with my attorney

21   on that matter.

22   Q    And you heard Dr. Karch say he's never had to fly in

23   his microscope in any of the consults he's ever done.

24   You heard that?

25   A    I heard him say that, yes, sir.

1    Q    But everybody that comes in to Sedgwick County that

2    has to do recuts, they have to bring in their own

3    microscope?

4    A    Not recuts.  But if they want to come in and do

5    examinations in our facilities, they need to bring their

6    own equipment.

7    Q    Everybody?

8    A    Yes.

9    Q    Now, you were asked questions about these hair

10   samples.  When Dr. Karch was on the stand he identified

11   literature that supports the proposition that hair

12   testing can be valuable in post-mortem toxicology

13   interpretations.  Do you disagree with that?

14   A    That he presented that information?  No, he did

15   present it.

16   Q    Do you disagree with that analysis?

17   A    That Dr. Karch feels that hair testing in

18   post-mortem cases is valuable?  In some cases it may be.

19   Q    What cases?

20   A    Well, if that's all you have to test, hair, that

21   would definitely be a good sample.

22   Q    Are you not aware of any studies that state that

23   testing hair in addition to blood and urine provide --

24   is preferred?  You're not aware of any studies?

25   A    Preferred over what?

5925

1   Q    That's the preferred method in interpreting

2   post-mortem toxicology results?

3   A    Any time you test additional specimens, it may add

4   additional information; and, obviously, the more

5   information you have, you know, that's good; but you

6   have to use your judgment and assess the case in total

7   to make a determination of whether or not additional

8   testing is necessary.

9   Q    Do you disagree with this statement that hair

10  testing in particular enables a significantly wider

11  window of detection for most commonly abused substances

12  than brain, blood or urine toxicology alone?

13  A    If you're looking at detection type --

14  Q    Sir, I'm sorry.  Yes or no.  Do you disagree with --

15  A    Well, could you repeat the question.

16  Q    Yes.  Hair testing in a particular -- I lost my

17  place -- hair testing in particular enables a

18  significantly wider window of detection for most

19  commonly abused substances than brain, blood or urine

20  toxicology alone?

21  A    Yes, it does provide a wider window.

22  Q    Now, your office chose not to do hair testing on any

23  of the decedents in this case; correct?

24  A    That's correct.

25  Q    Who made the decision not to do the hair testing?

5926

1    A    It was generally a joint decision.  If the
2    pathologist didn't collect hair, then that's real
3    simple, there's nothing to test.
4    Q    How many of these decedents was hair preserved that
5    could be tested?
6    A    I won't say none of them; but most likely, very few.
7    That's not a standard sample.
8    Q    It's not a standard based on whose standard?
9    A    It's just not a standard sample that's collected.
10   Q    Now, you keep mentioning that you have to use these
11   collective thoughts and processes to come to a
12   conclusion.  You remember that?
13   A    Yes, sir.
14   Q    Now, when you all made your conclusion as to these
15   alleged cause of deaths, did you do it to a beyond a
16   reasonable doubt standard, beyond any doubt standard,
17   clear and convincing standard, preponderance standard?
18   What standard did you use?
19   A    Well, none of those.  When we make determination of
20   cause of death, it's within a reasonable degree of
21   medical certainty.
22   Q    Okay.  Are you aware that NAME has a guide for the
23   manner of death classifications?
24   A    I believe there's a guidance document by Dr.
25   Hanslick that talks about certification on death

5927

1    certificates.

2    Q   And are you familiar with the degrees of certainty?

3    A   Relative to?

4    Q   Making a cause of death determination.

5    A   I don't pretend to recall all of Dr. Hanslick's

6    suggestions.

7    Q   Now, you say it's Dr. Hanslick; but isn't this a

8    document from NAME?

9    A   I believe it was published or promulgated under

10   NAME.  I believe Dr. Hanslick was the author of it.  But

11   I could be wrong on that.

12   Q   And John Huntsaker?

13   A   He is another forensic pathologist.

14   Q   And Gregory Davis?

15   A   Another forensic pathologist.

16   Q   But you're not familiar with what the degrees of

17   certainty are?

18   A   I don't have every document memorized, no, sir.

19   Q   I'm not asking about documents you have memorized.

20   I'm asking about the concept of degrees of certainty.

21   A   Relative, again, to --

22   Q   To determining cause of death.

23   A   In our office we use within a reasonable degree of

24   medical and/or scientific certainty.

25   Q   Doesn't NAME allow in this degrees of certainty to

1    go anywhere from undetermined, which is less than 50%

2    certainty, to beyond any doubt, to 100% certainty?

3    A    I don't know.

4    Q    Now, isn't it true that Dr. Karch didn't want recuts

5    after he was already scheduled to come into Wichita?

6    A    He hadn't requested recuts, period.  At least to my

7    knowledge.

8    Q    Okay.  To your knowledge.  All right.

9              MR. WILLIAMSON:  One second, Your Honor.

10                  (Off-the-record.)

11   Q    Dr. Rohrig, didn't you prepare an affidavit in

12   response to these issues we were having?

13   A    Yes, sir.

14   Q    And isn't it true that you explain that recuts were

15   not -- were too expensive to have?

16   A    Well, we weren't talking about recuts.  If I recall.

17   In the affidavit I'm looking at is one --

18   Q    Look at Paragraph 8, please.

19   A    Paragraph 8.

20   A    Preparing smaller samples would be additionally time

21   consuming and extremely expensive.

22   Q    Isn't preparing smaller samples recuts?

23   A    No.  It could have been preparing samples for

24   toxicological studies.  Could have been preparing

25   samples in paraffin blocks.  That was one of the issues

```
 1    is the initial information presented to our office was
 2    vague and unclear; and given that fact, I mean, the
 3    initial request basically said all human tissue and
 4    fluids and specimens and other bodily samples from
 5    approximately 60 unnamed individuals without limitation
 6    or specific purpose.  That is a horrendous amount of
 7    work.  So without narrowing the scope, our position was
 8    that was too broad and overburdensome for the office.
 9    Q   What is preparing smaller samples from multiple
10    specimen?  You're talking about pulling other tissue off
11    of other tissue.  What are you talking about right here?
12    A   In there we have --
13    Q   No.  I'm sorry.  In Paragraph 8 when you say
14    preparing smaller samples from the multiple specimens,
15    what are you referring to?
16    A   That's what I was going to answer.
17    Q   Okay.
18    A   We have a what's called a stock jar --
19    Q   What?
20    A   A stock jar.
21    Q   Okay.
22    A   This has multiple samples that's taken at autopsy.
23    From that, samples are retrieved.  First thing we have
24    to do is identify what sample it is.  Is it kidney
25    tissue, lung tissue, heart tissue, muscle tissue, liver.
```

1    Once that's identified, then a paraffin block can be

2    made.  Once a paraffin block can be made, that's taking

3    a hunk of that and making a paraffin block out of it.

4    That's what I was referring to there.

5    Q    Okay.  Well, let me stop you for a second.  Did you

6    interpret Dr. Karch's request was to take -- was for you

7    to go pull tissue and make cuts from those tissues?

8    A    I had no idea what was being requested.  That's why

9    we filed this response to the particular --

10   Q    So you don't know if he really asked for tissues in

11   the beginning.  Is that what you're saying?

12   A    All I know is I responded in this affidavit to the

13   information that was presented to me.

14   Q    My question is you don't know whether or not he was

15   asking for tissues in the beginning when he first was

16   asking to review information from your office; correct?

17   A    I had no specific information that --

18   Q    You don't know if he was asking for recuts, do you?

19   A    As I said, I don't have any specific information as

20   far as what he was requesting.

21   Q    Now, you mention that Dr. Karch was wrong on several

22   of his opinions.  One thing that -- well, strike that.

23   You don't have any scientific literature that says that

24   hair testing should not be employed when trying to

25   determine the tolerance of the individual; correct?

5931

```
 1   A    No.
 2   Q    Okay.  Now, Dr. Karch also testified that if you
 3   have several potential causes of death, i.e., cardiac,
 4   pulmonary, others, and you have a positive toxicology
 5   result, that there's no scientific method found or
 6   existing that can be employed to eliminate one or the
 7   other.  Do you have any scientific literature to rebut
 8   that?
 9   A    Well, first of all, he --
10   Q    No, sir.  My question is do you have any of
11   scientific literature?
12   A    I can't answer that question.
13             MR. WILLIAMSON:  Okay.  One second, Your
14   Honor.  I think I'm finished.
15                   (Off-the-record.)
16             MR. WILLIAMSON:  Nothing further.
17             THE COURT:  Mr. Byers, do you have anything?
18             MR. BYERS:  Nothing, Your Honor.  Thank you.
19             THE COURT:  Anything further of Dr. Rohrig?
20             MS. TREADWAY:  No, Judge.
21             THE COURT:  Thank you, Doctor.
22   Next witness please.
23             MS. TREADWAY:  Government calls Sean Moore.
24             THE COURT:  Still sworn.
25   A    Yes, sir.
```

1                           **SEAN MOORE**

2    Having been previously duly sworn to tell the truth, the

3    whole truth and nothing but the truth, testified further

4    as follows on:

5                        **DIRECT EXAMINATION**

6    BY MS. TREADWAY:

7    Q   Mr. Moore, were you here when Ms. Carol C testified

8    last week?

9    A   Yes.

10   Q   Was she the lady with the broken leg?

11   A   Yes.

12   Q   And who was she related to?

13   A   Ms. Toni W who was a part of the subject of Count 5.

14   Q   Did we obtain her patient file from the custodian of

15   records for the Schneider Medical Clinic?

16   A   Yes, we did.

17   Q   Let me hand you what has been marked for

18   identification as Government Exhibit 332.  Are those

19   relevant excerpts from her medical record?

20   A   Yes, they are.

21          MS. TREADWAY:  Government would offer Exhibit

22   332 as admissions under 801(d)(2)(A) and business

23   records under 803(6).

24          MR. WILLIAMSON:  Brief voir dire?

25          THE COURT:  Yes, you may, sir.

5933

1              MR. WILLIAMSON:  Who pulled these medical

2      charts?

3      A   Who pulled them?  The custodian of records was

4      subpoenaed and they gave 'em to us, the entire file.

5              MR. WILLIAMSON:  Okay.  Is this -- does this

6      represent the entire file?

7      A   No.  As we just stated, it's part of the file.

8              MR. WILLIAMSON:  All right.  First we would

9      request a full copy of the file.  Who decided which

10     documents would be used?

11     A   I was given the task of looking at specific issues

12     that Ms. Carter addressed, and I looked through these

13     and these addressed those.

14             MR. WILLIAMSON:  Who gave you that task?

15     A   Ms. Treadway.

16             THE COURT:  Mr. Williamson.

17             MR. WILLIAMSON:  Yes.

18             THE COURT:  There they are.

19             MR. WILLIAMSON:  Okay.  And did you speak with

20     the custodian of records about how these documents were

21     pulled?

22     A   No.  We subpoenaed them, sir.

23             MR. WILLIAMSON:  All right.  Nothing further

24     right now, Your Honor.

25             THE COURT:  Thank you.  Do you object to the

1    admission of 332?

2         MR. WILLIAMSON:  I would just because I

3    haven't had a chance to look at the full file; but other

4    than that, no objection.

5         MR. BYERS:  Would just join in that objection,

6    Your Honor.

7         THE COURT:  332 is received.

8    BY MS. TREADWAY:

9    Q    Did you hear Carol testify about Percocet?

10   A    Yes.

11   Q    What did you hear her testify?

12   A    I heard her testify that it made her drunk.

13   Q    Based on the information in the medical file on how

14   many office visits did Ms. Carol receive a prescription

15   for Percocet?

16   A    20.

17   Q    During what timeframe?

18   A    The first progress note that indicates that is July

19   30th of '02, and in this exhibit the last one is on

20   December 2nd of 2004.

21   Q    And have you tabbed those for the jury?

22   A    Yes.  They're blue tabbed.

23   Q    Did you hear Carol state during her testimony about

24   the number of urine drug screens she had while going to

25   the Defendant's clinic?

5935

1   A   Yes.  She said she didn't -- she didn't fail any, I

2   believe is what her testimony was.

3   Q   Based on the information in the medical file, how

4   many urine drug screens did she have and fail?

5   A   She had seven and failed all.

6   Q   And are those tabbed?

7   A   They're tabbed in orange.

8   Q   Do you remember what she testified about with

9   regards to being referred to drug rehabilitation?

10  A   Yes.  I believe she said she never was.

11  Q   What is indicated on the April 29th, 2006, progress

12  note?

13  A   There is a note that states refer for drug rehab,

14  and fired from pain management, only two week supply,

15  referring to the narcotics she was prescribed.

16  Q   Is that note tabbed?

17  A   Yes, it's green.

18  Q   After those failed urine drug screens, what happened

19  in terms of Carol's controlled substances prescriptions?

20  A   They continued.

21  Q   After the April 29th, 2006, progress note about

22  referring for drug rehab and being fired from pain

23  management, for what length of time did Carol receive

24  prescriptions for controlled substances?

25  A   From May 3rd of '06 until her last office visit in

5936

1   January 2nd of '08.

2   Q   Do you remember Carol testifying about early

3   refills?

4   A   Yes.

5   Q   What did she say?

6   A   She said she didn't get any.

7   Q   Based on the medical records, did Carol come in for

8   early refills?

9   A   Yes.

10   Q   And were some of those early refills significant?

11   A   Yes, they were.

12   Q   And did she get early refills?

13   A   Yes.

14   Q   And with regards to the significant early refills,

15   how were they significant?

16   A   Well, for example, on December 2nd of '04 she is

17   coming in for refills.  Is prescribed Percocet, 30

18   pills; Methadone, 360 pills; Xanax, 120 pills; and Soma,

19   120 pills.  Provider is Mr. Atterbury.

20       On the very next day, December 3rd of '04, she

21   comes in for refills and is prescribed the same

22   medications with the same quantities with the Defendant

23   Stephen Schneider.

24   Q   And are those -- are these progress notes that

25   you're reading from now also tabbed?

5937

1    A   Yes, they're purple.

2    Q   Was there another occasion where we had several

3    early refills very close together?

4    A   Yes.  In April of '05, April 1st of '05, she comes

5    in for refills.  She receives Oxy IR, 60 pills; Lortab

6    180 pills; Methadone, 480 pills; and Xanax, 120 pills.

7    Provider was Charles Craig, the PA.  Countersigned by

8    the Defendant Steve Schneider.

9        Then on 4-25 of '05, comes in for the same

10   medications, Mohammed Akram is the provider.

11   Countersigned by the Defendant Schneider.

12       And then two days later on 4-27 of '05 comes in for

13   essentially the same medications with provider Kim

14   He'bert and again a countersignature by Defendant

15   Stephen Schneider.

16   Q   On June 5th, 2005, approximately two months later,

17   what of significance is noted in the progress note?

18   A   I'm sorry.  You said June 5th?

19   Q   June 5, 2005.

20   A   There's a note that says had phone call she was

21   selling UDS, must be good.

22   Q   Who was the provider on that occasion?

23   A   Charles Craig with the counter signature of Dr.

24   Schneider.

25   Q   Based on the medical records, did Carol receive

1    prescriptions after the note about her selling her meds?

2    A   Yes, she did.

3    Q   Were you also here when Kelly G testified, the nice

4    looking gentleman who had been a musician?

5    A   Yes, I was.

6    Q   Did you hear him testify about the Defendant's

7    clinic being strict about violating the pain management

8    agreement?

9    A   Yes, I did.

10   Q   Did we obtain his patient file from the custodian of

11   records for the Schneider Medical Clinic?

12   A   Yes, we did.

13   Q   Let me hand you what has been marked for

14   identification as Government Exhibit 335.  Are those the

15   relevant excerpts from Kelly G's medical record relevant

16   to his testimony before this jury?

17   A   Yes, they are.

18            MS. TREADWAY:  Government offers Exhibit 335

19   as both an admission under 801(d)(2)(A) and as a

20   business record under 803(6).

21            MR. WILLIAMSON:  Same objection as far as just

22   now getting handed the records.

23            THE COURT:  Remember, this is rebuttal.  The

24   Government's not required to disclose anything to the

25   Defendants in advance of rebuttal.  So the objection is

5939

1    overruled and 335 is received.

2    BY MS. TREADWAY:

3    Q    Based on the information in the medical file, when

4    was Mr. Kelly's first office visit?

5    A    First office visit was November 28 of 2003.

6    Q    And who was his first office visit with?

7    A    Atteberry, the PA.

8    Q    What prescription did Kelly receive on his first

9    office visit?

10   A    Oxycontin.

11   Q    And when was his first urine drug screen?

12   A    First urine drug screen was approximately a month

13   later, a little less than a month later, on December 9th

14   of 2003.

15   Q    Did he pass or fail?

16   A    Failed.  Because there was Hydrocodone or Lortab

17   present and there was no prescribing of Lortabs prior to

18   that.

19   Q    Was the fact that he failed noted in the records?

20   A    Note on there says discussed.

21   Q    Nevertheless, what did he continue to receive?

22   A    Oxycontin.

23   Q    Based on the information in the medical file, were

24   any of Kelly G's visits early visits?

25   A    Yes.

5940

1    Q    What happened on the early visits?

2    A    Continued to receive the prescriptions, oxycontin.

3    Q    On May 13th, 2004, what is recorded as the

4    subjective report from Kelly?

5    A    That a woman was in his house, stole his medicine,

6    he filed a police report and wanted more medicine.

7    Q    How does this entry relate to his testimony?

8    A    He testified that this was the event that caused him

9    to be fired from the pain management part of the clinic.

10   Q    Based on the medical records, was he in fact fired

11   or terminated?

12   A    No.

13   Q    What happened instead?

14   A    He continued to receive Oxycontin.

15   Q    And were some of those prescriptions from the

16   Defendant Stephen Schneider?

17   A    Yes, they were.

18   Q    On June 5th, 2004, does Kelly come in early for

19   refills?

20   A    Yes.

21   Q    What happens?

22   A    Receives Oxycontin.

23   Q    Who was the provider?

24   A    The provider was the PA Debra Klingsick,

25   countersigned by Dr. Schneider.

5941

1    Q    On June 15th, 2004, ten days later, did Kelly come

2    in early?

3    A    Yes.

4    Q    What happened?

5    A    Received Oxycontin.

6    Q    Who was the provider?

7    A    Provider was Kim He'bert, with the countersignature

8    of Dr. Schneider.

9    Q    On June 30, 2004, 15 days later, did Kelly come in

10   early?

11   A    Yes.

12   Q    What happened?

13   A    He received Oxycontin.

14   Q    Who was the provider?

15   A    Provider again was Kim He'bert, countersignature of

16   Dr. Schneider.

17   Q    What does the progress note indicate happened on

18   April 25th, 2005?

19   A    April 25th?

20   Q    Yes, sir.

21   A    Okay.  Yes.  The progress note at the bottom in the

22   assessment says fired from pain management.

23   Q    Does it say why?

24   A    Not clearly.

25   Q    What does the progress note indicate happened on May

5942

1    17th 2005, less than a month later?

2    A    Received oxycontin.

3    Q    What happened on June 2nd, 2005?

4    A    He had another urine drug screen.

5    Q    Did he fail?

6    A    Yes.

7    Q    Why?

8    A    Presence of Hydrocodone in the urine.

9    Q    And that was not prescribed?

10   A    No.

11   Q    Nevertheless, what happened after this failed urine

12   drug screen?

13   A    Continued to receive prescriptions throughout the

14   entire time period of this exhibit.

15           MS. TREADWAY:  Nothing further, Judge.

16           MR. WILLIAMSON:  Judge, I need just about ten

17   minutes to go through a couple of these charts.

18           THE COURT:  You may.  We'll take a short

19   recess, Ladies and Gentlemen, so that counsel can review

20   those documents.

21                   (Recess.)

22           THE COURT:  Yes, sir.

23           MR. WILLIAMSON:  Thank you, Your Honor.

24                   **CROSS EXAMINATION**

25   BY MR. WILLIAMSON:

1   Q   Mr. Moore you're not a medical doctor; are you?

2   A   No, sir.

3   Q   You weren't in the patient rooms when Kelly G and

4   Carol Carter talked to Dr. Schneider and the other

5   providers; were you?

6   A   No, sir.

7   Q   You did not provide the jury with the complete

8   charts; did you?

9   A   The complete charts for each patient?

10  Q   Yes.  That we're discussing --

11  A   That's correct.

12  Q   You decided to -- you and whoever your employer is,

13  decided to take out excerpts of the charts; correct?

14  A   I want to clarify for the record, the Carol Carter

15  chart is all the progress notes.  It may not be all the

16  PADT and other things, but it's all the progress chart.

17  Q   Let's talk about the other things.  Weren't there

18  some CAT scans things in this record?

19  A   May have been.

20  Q   Weren't there MRI results in the record?

21          THE COURT:  No.  We're not going to go into

22  this.  The only cross-examination at this point is

23  limited to his testimony about what he found.  Not --

24  we're not going to through another one of these

25  examinations about everything that Dr. Schneider and

5944

1    everybody else did out there.  This is extremely

2    limited.

3            MR. WILLIAMSON:  Okay.

4    BY MR. WILLIAMSON:

5    Q   Did you find MRI results in the chart?

6            THE COURT:  No.

7            MS. TREADWAY:  Objection.

8            THE COURT:  Not unless the MRI results somehow

9    relate to Percocet, the urine drug screens, drug rehab,

10   early refills, selling her meds and the other things

11   that she talked about -- or that he talked about which

12   are in the records.  If there's anything in the records

13   that rebuts that, you certainly may go into it.

14           MR. WILLIAMSON:  Okay.  I think I understand,

15   Your Honor.

16   BY MR. WILLIAMSON:

17   Q   Now, let's talk about James G for a minute.  You

18   heard her -- excuse me Kelly G.  You heard him testify;

19   correct?

20   A   Yes.

21   Q   And you heard him testify that he was terminated

22   from the clinic; correct?

23   A   Correct.

24   Q   Now, in the records that you're admitting, isn't it

25   true that Kelly G did not see a provider at Schneider

5945

1    Medical Clinic between September of '04 and March of

2    '05?

3    A    Let me check.  That's correct.

4    Q    And Mr. G testified under oath that he was

5    terminated for about six months; correct?

6    A    I believe that's what he said.

7    Q    Now, in any of these records that you have

8    introduced in regards to Kelly G, did you see any

9    explanation as to why he may be getting early refills

10   for Oxycontin?

11   A    Well, there's notes in the progress notes.  I didn't

12   see -- I didn't go into and read every progress note to

13   find out why.  Again, I'm not a medical doctor.

14   Q    Turn to the one -- strike that.

15        Did you see in these records that you introduced

16   any times that the clinic refused to provide Mr. G with

17   an early refill?

18   A    Possibly.  If you could point me to the one that

19   you're referring to.

20   Q    How about 1-8-2 on '04.

21   A    Correct.  That states no early refill at the bottom.

22   Q    Okay.  Now, in regards to the previous question I

23   asked you, any information in the record as to why

24   Mr. Gilbert was receiving Oxycontin early.  You remember

25   that question?

5946

1    A    I remember the question.

2    Q    Let's look at the 11-28 of '03 progress note.  Do

3    you see that?

4    A    Yes.

5    Q    And down at the bottom what does it say about Purdue

6    Pharmacy or Pharma?

7    A    States:  Purdue Pharmacy in St. Louis, holding -- I

8    believe it says holding, RX, can't reach doctor

9    somebody.

10   Q    Okay.  Now, isn't it true -- well, strike that.

11        Don't you remember Kelly G testifying that he was

12   part of a manufacturer's program in order to get

13   Oxycontin?

14   A    I remember that.

15   Q    And does that chart, that information, identify

16   that?

17   A    I don't know what it relates to.

18   Q    So you're here with all these records and you don't

19   know what that relates to?

20   A    I don't know what Purdue -- I just know what it

21   says.  It says Purdue Pharmacy in St. Louis holding

22   something.

23   Q    Make sure I understand your testimony.  You know

24   what's in these records, in these records you guys

25   selectivey chose, but you don't always know what certain

1   things happened in these records.  Is that fair?

2   A   I suppose that's fair.

3           MR. WILLIAMSON:  Nothing further.

4           THE COURT:  Mr. Byers.

5           MR. BYERS:  No questions, Your Honor.

6           THE COURT:  Anything further?

7           MS. TREADWAY:  No, sir.

8           THE COURT:  Thank you, Mr. Moore.  Next

9   witness please.

10          MR. WAMBLE:  Government calls Terry Blosser.

11                      **TERRY BLOSSER**

12   Having been first duly sworn to tell the truth, the

13   whole truth and nothing but the truth, testified as

14   follows on:

15                    **DIRECT EXAMINATION**

16   BY MR. WAMBLE:

17   Q   Could you please state your name.

18   A   My name is Terry Blosser.

19   Q   And where are you employed?

20   A   I'm employed with ACALL Security under the Marshal's

21   security at the federal courthouse here in Wichita.

22   Q   And how long have you been so employed?

23   A   Approximately six years.

24   Q   As a part of your duties as a court security

25   officer, or CSO, do you monitor what is going on in the

1    courtrooms?

2    A   Yes, sir, I do.

3    Q   And how particularly -- or this particular

4    courtroom, how is it monitored?

5    A   It is monitored visually and audibly.  There's a

6    camera up in the corner to my left and also it has audio

7    on it which I can watch both ways.

8    Q   Last week, I believe it was Thursday, June 3rd, were

9    you on duty?

10   A   Yes.

11   Q   And what were you doing in terms of monitoring the

12   courtroom on that day?

13   A   I was in the command center in the basement of the

14   building monitoring numerous cameras and audio and

15   alarms throughout the building.  And I was watching this

16   particular courtroom at the time --

17   Q   And were you monitoring the courtroom when defense

18   witness Barbara Cobuzzi was testifying?

19   A   I believe that's her name, yes.

20   Q   And you were doing this from the basement of the

21   courthouse?

22   A   That's correct.

23   Q   Were you physically watching the monitor as

24   Ms. Cobuzzi was testifying?

25   A   Yes, I was.

1    Q    And during that time, was she being recorded?

2    A    Yes.  She was recorded visually, but I believe

3    the -- I could hear it audibly but I do not believe it

4    recorded audibly.

5    Q    Is this a standard practice?

6    A    Yes, sir.

7    Q    And how long do you keep the tape recording?

8    A    I do not know.

9    Q    Are you familiar with the prosecutor in this case

10   Ms. Treadway?

11   A    Yes, sir.

12   Q    And during Ms. Treadway's cross-examination of

13   Ms. Cobuzzi, did you have the opportunity to see what

14   Ms. Cobuzzi did when she was on the witness stand?

15   A    Yes, I did.

16   Q    And what did you see her do?

17   A    I saw her lift up a sheet of normal paper, she

18   turned toward the defense table, lifted the paper up,

19   and looked directly at the defense table.

20   Q    And she was directing this towards defense counsel?

21   A    Yes.

22   Q    And was this action recorded?

23   A    Yes.

24   Q    And this recording doesn't include audio, does it?

25   A    No.  This recording does not include audio.

5950

1    Q    Did you make a digital copy of Ms. Cobuzzi holding

2    up the document?

3    A    I did not, no.

4    Q    Did your office?

5    A    Yes.

6    Q    And is that Government Exhibit -- may I approach,

7    Your Honor -- 231?

8    A    I haven't -- if that's the one I reviewed earlier,

9    yes, it is.

10   Q    That was my next question.  Have you reviewed the

11   recording that was submitted to the Government?

12   A    Yes.  I reviewed it with you earlier.

13   Q    And approximately how long is that clip?

14   A    Very short.  No more than 15, 30 seconds.  I just

15   don't remember.  It's very short.

16   Q    Is that a fair and accurate depiction of the clip

17   that you saw?

18   A    Yes, this is.

19   Q    And will it allow the jury to see what Ms. Cobuzzi

20   actually did last Thursday?

21   A    Excuse me.

22   Q    Will the video recording allow the jury to see

23   actually what Ms. Cobuzzi did on the stand last

24   Thursday?

25   A    At that particular point in time, yes.

1    Q   And were you able to transfer what you saw on the

2    recording to a DVD?

3    A   I did not.  My supervisor did.

4    Q   But your supervisor did?

5              MR. WAMBLE:  Government offers Exhibit 231

6    into evidence.

7              MR. WILLIAMSON:  No objection.

8              MR. GOROKHOV:  No objection.

9              THE COURT:  It's received.

10             MR. WAMBLE:  We would ask Mr. Moore to play

11   that clip.

12                      (Portion of video clip played

13                       before the jury.)

14   BY MR. WAMBLE:

15   Q   Now, Mr. Blosser, it appears that you can zoom in on

16   this particular clip.  Is that a feature that you can do

17   manually from --

18   A   I can manually zoom.  That is correct, yes, sir.

19   Q   Okay.  Mr. Moore, would you mind playing that and

20   pausing that towards the end.

21                      (Paralegal Mr. Moore complies

22                       with request.)

23   Q   And is that what you remember going on last

24   Thursday?

25   A   That's correct, yes, sir.

1    MR. WAMBLE:  No further questions.

2    MR. WILLIAMSON:  I'll go first, Your Honor.

3                    **CROSS EXAMINATION**

4  BY MR. WILLIAMSON:

5  Q   Can you replay that for me, just the starting at the

6  beginning.  Let me see what I was doing when that

7  happened.  All right.  Can you bring that up a little

8  bit.  You missed me.  All right.  Stop.  Okay.  All

9  right.  All right.

10       Well, know, they say a picture is worth a thousand

11  words; right?

12  A   That's a statement, yes.

13  Q   That's a statement.  I want to apologize to the jury

14  because my head was down and I squarely didn't see that.

15  But the witness did what she did, didn't she?

16                    (Witness nods in the

17                    affirmative.)

18    MR. WILLIAMSON:  All right.  Nothing further.

19    MR. GOROKHOV:  May I just be heard briefly,

20  Your Honor.  I don't have any questions for the officer.

21    THE COURT:  No.  If you have any questions --

22  what do you want --

23    MR. GOROKHOV:  I just want to say that

24  obviously there's no reason to doubt what the officer

25  has testified.  We attorneys tend to stand up for our

1    witnesses.  And based on this video, I apologize that I

2    didn't stand up for our witness -- that I did stand up

3    for our witness, Your Honor.  That's all we have.

4              THE COURT:  Your apologies are accepted.

5              MR. BYERS:  I know you let Mr. Gorokhov speak;

6    but you could see me, too.  I was sitting away from the

7    table looking that way.

8              THE COURT:  I know.  This is not for any

9    purpose to judge the credibility of the lawyers or what

10   they did.  This is only -- you're only to judge

11   Ms. Cobuzzi's credibility when she later testified, as I

12   recall, but you'll have to recall, that she didn't do

13   it.  All right.  Thank you, Trooper.

14   A    Thank you.

15             THE COURT:  Next witness.

16             MS. TREADWAY:  Judge, our next witness, again,

17   is out of town and will be presented Tuesday but another

18   very, very short witness.

19             THE COURT:  All right.  Well, Ladies and

20   Gentlemen, have a good weekend.  See you Tuesday.

21   Remember and heed the admonition.  Would you all mind

22   coming in at 8:30.  Is that okay?

23                       (Off-the-record.)

24             THE COURT:  Yes.  We'll see you all at 8:30.

25                       (Jury excused for the weekend at

5954

```
 1                      2:25 p.m.)

 2            THE COURT:  You may be seated.  Okay.  We'll

 3   reconvene Monday afternoon.  Did I say 1 or 1:30?

 4   Whatever I said in chambers.  If you have any additional

 5   requested instructions, get them in to me.  Didn't I say

 6   tomorrow or did I say Monday?

 7            MR. WILLIAMSON:  I think you said tomorrow,

 8   Your Honor.

 9            THE COURT:  Yeah.  Now, as far as this

10   question of distributing versus dispensing.  Here's what

11   I want from the Government.  I don't want all these

12   cases that -- this string site of cases that you said

13   yesterday.  Those cases say -- don't say anything about

14   the issue we're faced with here.  They just said that

15   the Government -- or that they just relate to -- well,

16   they don't even relate to the issue.  They just talk

17   about the statute saying distributing and dispensing.

18   If you can find a case that says that it is absolute

19   clear error for me to fail in this case to give an

20   instruction that uses and defines the term distributing,

21   I'll consider it.  Otherwise, I'm going to stick with it

22   and give only a dispensing instruction.  If there's

23   nothing further.  We're in recess.

24                      (Recessed for the weekend at

25                       2:27 p.m.)
```