1                    (Beginning at 8:50 a.m. June 15,

2                    2010, the following proceedings

3                    were had.)

4              THE COURT:  Good morning.  Next witness

5    please.

6              MS. TREADWAY:  Government calls Dr. Joe

7    Davison.

8                         **JOE DAVISON**

9    Having been first duly sworn to tell the truth, the

10   whole truth and nothing but the truth, testified as

11   follows on:

12                     **DIRECT EXAMINATION**

13   BY MS. TREADWAY:

14   Q    Please introduce yourself to the jury.

15   A    I am Dr. Joe Davison.

16   Q    And what kind of practice are you involved in?

17   A    I have a family physician practice in Wichita.

18   Q    How long have you been a family medicine physician

19   in Wichita?

20   A    For over 25 years.

21   Q    As a family medicine physician, have you treated

22   patients with chronic pain?

23   A    Yes, I have.

24   Q    And have you done so sometimes with the use of

25   controlled substances?

 1    A    Yes, I have.

 2    Q    Do you know a Dr. Greg Lakin?

 3    A    Yes, I do.

 4    Q    The jury heard from Dr. Greg Lakin earlier in this

 5    case and he said that following the Schneider Medical

 6    Clinic being closed that Wichita physicians would not

 7    see chronic pain patients from the Defendant's clinic.

 8    Did you see former chronic pain patients from the

 9    Defendant's clinic?

10    A    Yes, I did.

11    Q    Are you familiar with the Sedgwick County Medical

12    Society?

13    A    Yes, I am.

14    Q    What is it?

15    A    That's an association of physicians made up of

16    doctors from this county.

17    Q    Following the Defendant's clinic being closed, what

18    did the Sedgwick County Medical Society do?

19    A    County, realizing that there will be many patients

20    coming to our community that will be in need of care,

21    established a process to educate the physicians.  And we

22    did that by a meeting, an educational meeting, that

23    lasted one evening to educate the physicians on how to

24    manage chronic pain patients.

25    Q    How many doctors attended this meeting?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

1    A    Somewhere between 80 and 100.

2    Q    And were you one of those doctors?

3    A    I was.

4    Q    After the meeting, did your practice receive calls

5    from individuals who had been receiving prescriptions

6    for controlled drugs at the Schneider Medical Clinic?

7    A    In our intake process, we had approximately 300

8    phone calls.

9    Q    When these individuals called, did your staff inform

10   them of what would be expected of them if they wanted to

11   be seen at your practice?

12   A    Yes, they did.

13   Q    And what was expected at your practice?

14   A    In general, on those intake phone calls we were

15   trying to assure that patients who call us want to

16   establish a patient relationship.

17   Q    Of the 300 who called, approximately how many came

18   in to establish a doctor/patient relationship at your

19   clinic?

20   A    Approximately 100.

21   Q    And of those 100, how many remained patients at your

22   practice?

23   A    We have a little over 10 physicians who have taken

24   approximately 10 of those patients, and of those that --

25   of all of those patients who originally were seen in our

5989

```
 1    office, I would say half of them have remained patients

 2    at our office.

 3    Q    So that would be approximately 50?

 4    A    That's true.

 5    Q    Based on your evaluations of these individuals, do

 6    you know why others did not stay with you?

 7              MR. WILLIAMSON:   Your Honor, I'm going to

 8    object.   That calls for speculation and way beyond the

 9    scope of his rebuttal.

10              MS. TREADWAY:   Based on his evaluations,

11    Judge.

12              THE COURT:   Going to have to lay a better

13    foundation than that.

14    BY MS. TREADWAY:

15    Q    How many personally did you see?

16    A    I saw approximately ten patients.

17    Q    And how many have you continued to see?

18    A    Five.

19    Q    And do you know why the other five did not stay with

20    you?

21              MR. WILLIAMSON:   Your Honor, I'm going to

22    object.   That calls for hearsay and speculation.

23              THE COURT:   Overruled.

24    A    Those patients did not want to establish a

25    relationship with me.
```

 1    BY MS. TREADWAY:

 2    Q    What did they want instead?

 3    A    Some of those patients came to my office wanting

 4    simply to be prescribed medicine.

 5    Q    To treat the individuals who came to your clinic,

 6    did you ask them about their prescription history with

 7    the Schneider Medical Clinic?

 8    A    When a patient would come to my office, you do a

 9    complete history and physical.  You try to establish

10    relationship and you try to establish agreements between

11    that patient and yourself.

12    Q    And as a part of that, did you ask for their

13    prescription history from the Schneider Medical Clinic?

14    A    Yes.

15    Q    What patterns, if any, did you see with regards to

16    these prescriptions?

17          MR. WILLIAMSON:  Your Honor, I'm going to

18    object.  He's been called specifically to rebut Greg

19    Lakin and now she is going back into direct testimony

20    kind of stuff.  This is way beyond the scope of

21    rebuttal.

22          THE COURT:  I think so.  The objection is

23    sustained.

24    BY MS. TREADWAY:

25    Q    In terms of the prescriptions the former Schneider

1    Medical Clinic patients are receiving now from you, how

2    do they compare to the prior prescriptions?

3             MR. WILLIAMSON:  Your Honor, I'm going to

4    object.  Again, that's beyond the scope of rebuttal.  He

5    was called to rebut one specific point by Greg Lakin.

6             THE COURT:  Well, I don't know what one

7    specific point you're talking about.

8             MR. WILLIAMSON:  The fact as to whether or not

9    other physicians would be able to see the Schneider

10   Medical patients.

11            THE COURT:  I think this is within that area.

12   At least so far.  Go ahead.

13   BY MS. TREADWAY:

14   Q   In terms of the prescriptions that former Schneider

15   Medical patients are receiving from you now, how do they

16   compare to prior prescriptions?

17   A   The amount of pain medicine is far less.

18   Q   Do you treat Medicaid patients?

19   A   No, I do not.

20   Q   Nevertheless, do you often treat people for free?

21   A   Our office is part of Project Access, which is a

22   charitable organization within our community, and we

23   accept Project Access patients freely.

24   Q   And are some of those people Medicaid insured?

25   A   Some of them may be.

5992

```
 1    Q    Nevertheless, how much do you charge --

 2    A    May I correct my answer?

 3    Q    Sure.

 4    A    To qualify for Project Access, they cannot be on

 5    Medicaid.  These are the people who literally have no

 6    sort of insurance.

 7    Q    And although you do not take Medicaid insurance, do

 8    you often treat Medicaid patients that have been in your

 9    practice?

10    A    It's been a long-term habit of our practice and mine

11    that if a Medicaid patient comes into our practice, in

12    lieu of signing up with the Medicaid program, we will

13    see that patient free.

14              MS. TREADWAY:  Nothing further, Judge.

15              THE COURT:  Yes, sir.

16                   CROSS EXAMINATION

17    BY MR. WILLIAMSON:

18    Q    How you doing this morning?

19    A    Pretty good.

20    Q    Few questions.  Make sure I understand.  You do not

21    see Medicaid patients; correct?

22    A    That's correct.

23    Q    And you don't see Medicaid chronic pain patients;

24    correct?

25    A    That is not correct.
```

5993

 1   Q   Okay.  You do see Medicaid chronic pain patients?

 2   A   If you're referring do I charge Medicaid for my

 3   services, I do not.

 4   Q   How many people do you see for free every day?

 5   A   I probably see one or two patients free every day.

 6   Q   How many of these people used to be treated by the

 7   Schneider Medical Clinic?

 8   A   Currently I see five patients in my practice from

 9   his previous clinic.

10   Q   Are you familiar with the fact that the Clinic and

11   all the providers had over 10,000 patients?

12   A   I was not aware of the numbers, no.

13   Q   Do you know how many other physicians these five

14   people had tried to see before they saw you?

15   A   Of those people, I was the first physician they

16   called.

17   Q   Now, you don't have any board certified pain

18   management specialists at your facility, do you?

19   A   No, we do not.

20              MS. TREADWAY:  Objection.  Beyond the scope.

21              THE COURT:  He said that he saw pain patients,

22   so, the objection is overruled.

23   BY MR. WILLIAMSON:

24   Q   Now, Dr. Lakin testified that he and a receptionist

25   called your office and asked would you be willing --

5994

 1    would your office be willing to see some of the patients

 2    that were at their office seeking services.  And he said

 3    that your office said no.  Are you aware of that fact?

 4    A    I'm not aware of Dr. Lakin calling our office.

 5    Q    So you're not aware of any specific facts to rebut

 6    that assertion; correct?

 7    A    I'm aware that Dr. Lakin -- I am not aware that Dr.

 8    Lakin called our office.

 9              MR. WILLIAMSON:  I don't have anything

10    further, Your Honor.

11              THE COURT:  Sir.  Mr. Byers?

12              MR. BYERS:  No questions, Your Honor.

13              THE COURT:  Anything further of Dr. Davison?

14              MS. TREADWAY:  No, Judge.

15              THE COURT:  Thank you, Doctor.  You're

16    excused.  Any further rebuttal?

17              MS. TREADWAY:  No, Judge.  The Government

18    rests.

19              THE COURT:  Mr. Byers?

20              MR. BYERS:  Yes, sir.  I would like to offer

21    at this point Defendants D-021 as we talked about

22    yesterday.  And then also Defendants D-022 which would

23    go to supplement the video snippet reference Linda

24    talking about like selling concert tickets.  I gave the

25    Government a copy of this just this morning so I don't

5995

1     know if they've had a chance to go through it.

2              THE COURT:  Any objection?

3              MS. TREADWAY:  No objection.

4              THE COURT:  All right.  Is it D-021 and 022?

5              MR. BYERS:  Exactly, Your Honor.

6              THE COURT:  They're received.

7              MR. BYERS:  Thank you.

8              THE COURT:  Anything further in the way of

9     evidence?

10             MR. WILLIAMSON:  Not from the Defendant.

11             THE COURT:  All right.  Well --

12             MR. BYERS:  Your Honor, if I might note for

13    the record, we discussed the Rule 29 and that has been

14    filed as of moments ago.

15             THE COURT:  Haven't seen it yet but --

16             MR. BYERS:  I understand you haven't seen it.

17    I just didn't know if it mattered to have it in this

18    record or not.

19             THE COURT:  Thank you.

20        Here's what we're going to do.  I'm going to read

21    these instruction to you.  Then we'll take a break so

22    that the lawyers can begin to set up for their closing

23    arguments.  We'll have the Government's opening argument

24    and then I suspect it may be time for you to go to

25    lunch.  And after lunch, we'll have the Defendants'

1   closing arguments and the Government's final argument

2   and then the case is yours.

3       Now that you have heard all the evidence it becomes

4   my duty to instruct you on the law applicable to this

5   case.  In the interest of clarity, I'll read these

6   instructions to you and each of you has a copy to use in

7   the jury room and you certainly may read along with me

8   if you wish.

9                   (Judge Belot reads instructions

10                      to jury)

11          THE COURT:  Does the Government have any

12   additional requested instructions or any additional

13   objections to the instructions given?

14          MS. TREADWAY:  No, Judge.

15          THE COURT:  Does the Defendant Stephen

16   Schneider?

17          MR. WILLIAMSON:  No, Your Honor.

18          THE COURT:  Does Defendant Linda Schneider?

19          MR. BYERS:  No, Your Honor.

20          THE COURT:  All right.  Now, let's take a

21   recess, Ladies and Gentlemen.  Probably 15 or 20

22   minutes.

23       Now, for those of you who are seated here, you're

24   welcome to be here, but you must be back in your seats

25   when the closing arguments start.  You cannot leave

5997

1    during the closing arguments.  That rule is out of

2    fairness to the lawyers and the jurors so that the

3    jurors will not be distracted and the lawyers will not

4    be distracted by people coming in and out of the

5    courtroom.  All right.  We'll be in recess.

6                        (Recess.)

7

8                        (NOTE:  Transcript of Closing

9                        Arguments filed separately.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas