1          IN THE UNITED STATES DISTRICT COURT

2

3                    DISTRICT OF KANSAS

4

UNITED STATES OF AMERICA,            )
5                                     )
                        Plaintiff,)  District Court
6                                     )  Case No. 07-10234
    vs.                               )  Circuit Court
7                                     )  Case No.10-3281
    STEPHEN J. SCHNEIDER &            )
8   LINDA K. SCHNEIDER, a/k/a         )
    LINDA ATTERBURY,                  )
9   d/b/a SCHNEIDER MEDICAL CLINIC,   )
                                      )
10                      Defendants,)
                                      )
11  _____

12

13

14      **TRANSCRIPT OF CLOSING STATEMENTS IN JURY TRIAL**

15

        On the 15th day of June, 2010, came on to be heard
16  Closing Statements in Jury Trial in the above-entitled
    and numbered cause before the HONORABLE MONTI L. BELOT,
17  Judge of the United States District Court for the
    District of Kansas, Sitting in Wichita.

18

19

20

21  APPEARANCES

22      The Plaintiff appeared by and through Ms. Tanya
    Treadway, Mr. Jon Fleenor and Mr. Jabari Wamble;
23
        The Defendant Stephen Schneider appeared by and
24  through Mr. Lawrence Williamson and Mr. Eugene Gorokhov;
        The Defendant Linda Schneider appeared by and
25  through Mr. Kevin Byers.

```
 1                    (Beginning at 10:22 a.m. June

 2                    15, 2010, the following

 3                    proceedings continued.)

 4          THE COURT:  You may proceed, Ms. Treadway.

 5          MS. TREADWAY:  May it please the Court.

 6   Counsel.  Ladies and Gentlemen of the jury.

 7        Over the past several weeks you have now heard what

 8   I told you would be the sordid tale of how money and not

 9   medicine controlled the Defendants' choices and

10   activities and how they used their medical clinic to

11   make money by illegally dispensing drugs and cheating

12   people and health insurance companies out of money.

13   Through their policies, practices, and prescriptions,

14   Defendant Stephen and Linda Schneider not only cheated

15   people out of legitimate medical services, they cheated

16   many people out of their lives because the predictable

17   consequences of the Defendants' choosing to illegally

18   dispense drugs and commit fraud were numerous overdoses

19   and deaths.

20        During opening statement I told you that the

21   evidence presented in this case would prove beyond a

22   reasonable doubt that the Defendants were guilty of

23   multiple crimes.  During my closing argument I am given

24   the opportunity to summarize how the evidence proves

25   their guilt.  And because the Government has the burden
```

1    of proof, I will also have another opportunity to

2    address you after the defense arguments.

3        This trial has been a long one with numerous

4    witnesses and documents; and you have paid close

5    attention during the entire trial, for which the parties

6    are extremely grateful.  But you are no doubt wondering

7    how on earth are we going to sift through all this

8    evidence?  The purpose of my closing argument is to give

9    you a focus for your deliberations and to provide you a

10   map that will lead you through all this evidence.

11       Now, although you have heard a great deal of

12   testimony and seen a lot of documents, this case is

13   neither complicated nor complex.  The evidence you have

14   heard and seen can easily be summarized into five

15   questions which will be the focus of your deliberations.

16       Did the Defendants illegally dispense controlled

17   drugs through the manner in which they operated their

18   medical clinic and through their course of conduct over

19   time?

20       Did the Defendants execute a scheme to defraud the

21   health care benefit programs by submitting false and

22   fraudulent claims and by causing false and fraudulent

23   claims to be submitted by others?

24       Did the Defendants' illegal drug dispensing and

25   health care fraud result in the deaths of Patty, Eric

1    and Robin?

2         Did the Defendants' illegal drug dispensing result

3    in the deaths of any one of the 18 individuals named in

4    Count 5 of the Indictment?

5         And finally, did the Defendants launder the

6    proceeds of their criminal activity by engaging in

7    financial transactions involving more than $10,000?

8         Based on the evidence you have heard in this case,

9    you can confidencely answer each and every one of these

10   questions with an unqualified yes.  Therefore, you

11   should find the Defendants guilty of each and every

12   count in the Indictment.

13        Actions often speak louder than words.  And the

14   Defendants' actions proved they were motivated to run a

15   volume business for money; not to run a legitimate pain

16   management practice to help people.  But the Defendants

17   have tried to take you on detours, lead you to some

18   deadends; and therefore, I will ask that you do what you

19   do every time you get into your car, or your motor

20   vehicle, keep your eye on the road.  If you keep your

21   eyes on the Defendants' action and failures to act, you

22   will convict them.

23        As Judge Belot has instructed you, in order to

24   prove the Defendants guilty of the crimes charged, the

25   Government must prove the elements of each crime beyond

 1    a reasonable doubt.  But while each crime charged has

 2    different elements, you will quickly understand that

 3    they are interrelated and overlap.  You also know from

 4    the evidence that many of the elements are not in

 5    dispute.  Since you will have the Indictment as a part

 6    of the Court's instructions, I strongly encourage you to

 7    take the time to read it and use it as your map through

 8    the evidence.  A map that will keep your eyes on the

 9    relevant road of the Defendants' conduct, the

10    Defendants' choices, to elevate money over medicine.

11    And as additional maps, you have the many summary

12    exhibits the Government introduced into evidence.

13    Especially Exhibits 1 through 1-T.  And the time lines

14    for Counts 2 through 5.

15        So let's begin with the evidence that proves beyond

16    a reasonable doubt that the defendants illegally

17    dispensed controlled drugs as charged in Counts 2

18    through 6.

19        The Defendants are charged with illegally

20    dispensing drugs to specific individuals.  Patty, Eric

21    and Robin, Counts 2, 3 and 4; the 18 individuals in

22    Count 5; and the 27 individuals named in Count 6.

23        The first two elements of the drug dispensing

24    charges which involve act and intent are not in dispute.

25    First, through the joint operation of their medical

clinic, both of the Defendants dispensed controlled

drugs when the Defendant Stephen Schneider, the other

doctors and the physician's assistants or PAs employed

at that clinic issued prescriptions.  And as to Counts 2

through 6, you may remember on cross-examination Steve

Schneider admitted to issuing the prescriptions relevant

to these counts.

Second, the prescriptions were all issued knowingly

and intentionally.  There was no dispute that each

prescription went out of the clinic with the Defendants'

blessing.  Because they both were eager to brag about

their clinic being the number one writer of narcotics in

the State of Kansas.

Therefore, only the third element is in dispute.

And because we are dealing with prescription drugs, not

illegal street drugs, the Government must prove beyond a

reasonable doubt that the prescriptions were not issued

for a legitimate medical purpose in the usual course of

medical practice and were issued beyond the bounds of

medical practice.  For the sake of my argument, I'm

going to refer to this element as not for a legitimate

medical purpose.  The evidence as to this element of the

offense has overwhelmingly proved the Defendants' guilt

beyond a reasonable doubt.  You heard numerous witnesses

testify that Steve and Linda Schneider, working as a

1    team, operated their clinic in such a way that the

2    legitimate practice of medicine not only did not occur,

3    it had little chance to occur.  And remarkably, much of

4    this evidence was not disputed.  The clinic was

5    undisputedly about volume.  Open seven days a week for

6    long hours; people scheduled every ten minutes with

7    walk-in's squeezed in between.  Linda even bragged to

8    Jamie Layten from PHS that her walk-in list was full by

9    9 in the morning.  As the medical assistants and the

10   PA's consistently told you, Linda and others knocked on

11   the exam room doors to hurry the process along, running

12   people through as three witnesses, Jamie Hilliard, Laura

13   Land and Jody Reagans told you, like herding sheep or

14   cattle.  Of course, if the exam was quick enough, no

15   knocks were necessary.  People lined up at the front

16   door waiting to get in.  Even Carol Carter, the

17   Defendants' witness, corroborated that.  People waited

18   in the waiting room for many hours, standing room only.

19   Larry G, Patty's husband, told you he would wait in the

20   car to avoid the crowds in the waiting room.  As Linda

21   told in you her own words in that videotape, Exhibit

22   82-C, so many folks lined up to get their drugs the day

23   after the first search warrant, she thought she was

24   sellin' concert tickets.

25        An office visit at the Defendants' clinic was

1    described by several witnesses as sometimes just long

2    enough for Stephen Schneider to walk in, pen and

3    prescription pad in hand, and ask "what do ya need", as

4    Robbie Swonger testified; "what will it be" as Tab and

5    Barbara testified; or "what can I write you" as Jody

6    Reagans testified.  Or as Hien Tran described when she

7    shadowed Steve Schneider, his exams were just

8    meet-and-greet, and writing the prescriptions that

9    people asked for.

10        Did this happen on every visit?  Of course not.

11   And the Government never said it did.  Instead, the

12   evidence has been that the volume-driven clinic provided

13   little time for legitimate pain management; and that

14   often the only thing that did happen during an office

15   visit was refilling prescriptions.  The documents are

16   full of progress notes that corroborate this.  Since the

17   reason for the visit is simply med refills.  In fact,

18   you can thumb through the progress notes admitted in

19   this case and see med refills or something similar to

20   that hundreds of times.  That's the chief reason people

21   came to the clinic.  In just the progress notes for the

22   individuals named in Counts 2 through 6, there are

23   hundreds of these med refills entries.  The PAs who you

24   met, all of whom Steve Schneider admitted were

25   excellent, Mike Hall, Debra Klingsick, Hien Tran, they

1    all testified consistently, we didn't have time to do

2    much more than write a prescription.  Charles Craig, J R

3    Jones testified they were constrained by the volume of

4    people such that it was just faster to write scripts.

5    And all of the PAs were told to just write the same

6    prescriptions that had been written before.  That's what

7    Debra Klingsick told Medicaid in her June, 2005, letter,

8    Exhibit 108:  My job was to do what the two physicians

9    instructed me to do and there was no autonomy given to

10   make decisions on my own regarding the care of the

11   patients being seen for pain management.  She told the

12   Board of Healing Arts the same thing in Exhibit 108-A:

13   I did not feel that I had the authority to make any

14   changes in the pain management regimen.  As Jody Reagans

15   and Chanda Little told you, people talked about swapping

16   pills in the lobby.  And they were fine in the lobby,

17   but suddenly in pain as they walked back for their

18   examinations.  Corroborating that testimony was the

19   testimony of Jamie Clowers, the Walgreen pharmacist who

20   said that the vast majority of folks from the clinic who

21   showed up at her pharmacy were not in pain.  When people

22   were in the exam room, they weren't asked to disrobe,

23   put on a gown to be examined and they weren't examined.

24   Do you remember the PAs Mike Hall and Charles Craig

25   telling you that when they tried to perform physical

1    examinations people asked them, wow, what are you doing,

2    nobody's ever examined me before?  And, as Jamie

3    Hilliard, Jody Reagans and Hien Tran told you:  Rarely

4    did they see Steve Schneider have physical contact with

5    people; and when it was needed, he passed those duties

6    along to other people.  Tab, Barbara, Robert, and Alicia

7    told you the same thing.  Steve Schneider didn't touch

8    folks.  Alicia told you on her very first visit there

9    was no question, no physical, but she got what she came

10   for, pain pills.  Even though at the time she was not in

11   pain.  Not only do the medical assistants and the PAs

12   and the victims and the relatives tell you this, the

13   Defendants own records told you this through the

14   experts' testimony.  Doctors Owen, Parran and Jorgensen,

15   all three experts, reviewed the Defendants' records and

16   all of them told you the same thing.  The Defendants'

17   records were woefully silent when it came to evidencing

18   any type of legitimate pain management practice.  There

19   simply wasn't time.  But there was always time to write

20   another prescription.  And what Jamie Clowers, Alice Fox

21   and the emergency room doctors and the experts told you

22   was a cocktail of dangerous addictive and often

23   redundant drugs.

24       But there was even more evidence of the Defendant

25   Steve and Linder Schneider were not concerned about

1    running a legitimate pain management practice.  The
2    Defendants' own expert, Barbara Cobuzzi told you that
3    this was a poorly managed practice and that it was the
4    clinic's responsibility to hire qualified people.
5    Evidently Ms. Cobuzzi was unaware of the evidence you
6    heard:  That in order to save money, Linda hired folks
7    with little or no medical training and simply provided
8    them limited on-the-job training.  As Linda admitted in
9    that videotape, she did not hire RNs or LPNs but instead
10   hired people she called misfits that wouldn't have been
11   able to get jobs elsewhere.  And then she took advantage
12   of those people.  Because she knew once hired, these
13   single moms, these sole providers for their families,
14   had no choice but to stay because they needed the job.
15   Even though they desperately wanted to quit.  And as
16   Steve Schneider admitted, none of the physician's
17   assistants had training in pain management and no
18   training was provided.  Even Steve Schneider himself
19   admitted that he was learning on-the-job, a fact he
20   evidently forgot to tell people that came to the clinic.
21       As Cindy Curry and Chanda Little told you:  Linda
22   prioritized which people would be seen first.  Not by
23   the urgency of their medical need, but whether their
24   insurance paid well.  If you had cash or good insurance,
25   you moved to the front of the line.  Even if you had

1  just walked in without an appointment.  The Defendants'

2  own witnesses told you this.  Most of the defense

3  witnesses who came to talk to you said they didn't have

4  to wait long.  Well, that's because they were Blue Cross

5  patients or cash patients.  The defense didn't bring in

6  one Medicaid patient to tell you about those three to

7  four hour waits.  Not coincidentally, Linda's

8  prioritization of Blue Cross over Medicaid had positive

9  results for the clinic.  As Exhibit 1-J tells you, the

10  clinic made more money from Blue Cross than any other

11  insurance company.

12      And then we have the problem with the charts.  If

13  they could be found, they were often missing vital

14  information.  As you heard from multiple witnesses,

15  Charles Craig, Jennifer Harry, Jody Reagans, the faxes

16  just stacked up unaddressed, unfiled for weeks, with

17  deadly consequences.  As you saw in the pictures, and as

18  many witnesses testified, charts were strewn throughout

19  the clinic.  Even the patients were able to figure it

20  out that the problems with medical records made it easy

21  to doctor shop and get early refills.  As Charles Craig

22  told you and as Steve Schneider admitted himself in that

23  deposition about Robert S, a victim in Count 5.

24      Were the Defendants concerned about the problem?

25  According it to Charles Craig, not in the least.  As

1    Hien Tran told you, the complete disorder and disregard

2    of proper charting policies and procedures played a role

3    in costing Patty G her life because had that fax from

4    the hospital been handled with the urgency and priority

5    it deserved, Hien would never have given Patty more

6    controlled drugs, especially not a repeat of the

7    cocktail that the Defendant Stephen Schneider

8    continually prescribed to Patty.

9         The undisputed result of all of this course of

10   conduct and the manner in which both Defendants ran,

11   chose to operate and run this clinic was an overwhelming

12   and chaotic environment where people saw multiple

13   providers with no continuity of care.  As Steve

14   Schneider told the federal agents and as he admitted

15   during his testimony, the clinic was open seven days a

16   week, not to help people, but for financial reasons.

17   This chaos was not by chance.  It was by design.  The

18   Defendants, as Steve Schneider testified, if you were an

19   employee and had a complaint, Linda made you get a chart

20   and make an appointment.  Everything the Defendants did

21   fueled their money-making operation.  They had to have

22   volume to assure adequate income.

23        The employees quickly figured out what the

24   Defendants and their clinic were really all about:

25   Making money by dispensing drugs.  Remember little timid

1    Lori Maddox.  Fresh out of school.  It took her eight

2    days to figure this place out.  She called it sketchy.

3    If this were a legitimate medical practice, why did the

4    Defendants hire, as the Defendant Linda described in the

5    videotape, any warm body that walked in the door.  Dr.

6    Lawrence Simons, and keep him for two years.  Despite

7    his credentialing problems, his having sued everyone he

8    had worked for in Wichita, his lack of work ethic, his

9    coming to work impaired, his stealing drugs.  Despite

10   the fact that Linda thought he was having sexual

11   relationships with minors such that a mom blackmailed

12   Dr. Simons to write her prescriptions for controlled

13   drugs.  Why would Linda need to instruct Robbie Swonger

14   to see Dr. Simons' appointments when he showed up

15   impaired; and, as her own attorney suggested, have

16   Robbie practice medicine without a license.  None of

17   this evidence suggests a legitimate medical practice,

18   Ladies and Gentlemen.

19        The evidence has proved that these Defendants

20   created an environment where their need for volume,

21   their choice of quantity over quality, simply left

22   little time to practice medicine.  That a few people

23   over the course of time were happy at the clinic does

24   not negate the prevailing impact of the Defendants'

25   choices to put money before medicine.  The evidence you

1   have heard revealed little about the pain management

2   practice at the Defendants' clinic that even remotely

3   resembled the legitimate practice of medicine.

4   Therefore, as the evidence has overwhelmingly proved, as

5   the Government experts, the medical assistants, the

6   excellent physician's assistants told you, Defendants

7   were running a pill mill.  Not a medical clinic.  Or as

8   Dr. Jorgensen said, a narcotics delivery system.  And as

9   a result, the Defendants illegally dispensed drugs.

10  Every single medical professional that testified for the

11  Government told you the prescriptions issued for the

12  individuals in Counts 2 through 6 were not legitimate.

13  Why?  Because those prescriptions were written at the

14  Schneider Medical Clinic and they created and fed

15  addictions.  Only one defense witness was offered to

16  rebut that.  The Defendant, Stephen Schneider.  Again,

17  as every single medical professional that testified told

18  you, in a legitimate medical pain management practice,

19  the prescribing of controlled drugs is just one of many

20  options for treating chronic pain.  But at the Schneider

21  Medical Clinic, these Defendants made sure it was the

22  primary option.  Because treatment was not the real

23  purpose.  Money was.  Because as long as people were

24  coming back monthly for their prescriptions, Defendants

25  Stephen and Linda Schneider were able to bill that

1    insurance company for those 99213 office visits and

2    collect money.

3        If the Defendants and their clinic were issuing

4    legitimate prescriptions, Ladies and Gentlemen, do you

5    think Jamie Hilliard would have told you that people

6    knew Steve Schneider was a doctor that could hook you

7    up?  That's street lingo for drugs.  Would Angela

8    Dunnavent have called him a pill pusher?  Would Cindy

9    Curry have called him a drug dealer in a white coat?

10   Would Chanda Little have told you that the Defendants

11   were dealin' drugs out the front door?  Would Debra

12   Klingsick have testified that the clinic was nothing

13   more than a legalized drug dealing?  Would Alicia C have

14   testified that the clinic was the Burger King for pain

15   pill addicts?  Would Steve Schneider's nicknames have

16   been Candy Man, as Dr. Rogers and Rody told you?  Or as

17   Jody Reagans told you, Schneider the Writer, the drug

18   Lord of Haysville or Kevorkian Jr?  If the prescriptions

19   were legitimate, would Linda be brazenly forging her

20   husband's name on those prescription pads as Jennifer

21   hairy told you?  Would Steve Schneider need to leave

22   presigned prescription pads for the PAs who didn't have

23   their DEA numbers yet?  That one weekend they left

24   Charles Craig at the clinic without the ability to

25   write.  And they put a note on the door, no controlled

1    drugs today.  They didn't get any patients.  They didn't

2    get any customers.  The solution, give Charles those

3    presigned prescription pads and they could dispense

4    drugs to their appreciative customers uninterrupted.

5    Those prescription pads became the Defendants method of

6    generating income.

7         If the prescriptions were legitimate, do you think

8    they would have been issued to folks that had overdosed

9    on them previously?  Look at Exhibit 1-B.  It clearly

10   shows that the clinic wrote prescriptions after the

11   people had overdosed 76 times; and of those 76 times,

12   issued the same prescriptions for the same drugs they'd

13   overdosed on 46 times.  And, of course, if these

14   prescriptions had been legitimate, if these Defendants

15   had been running a legitimate pain management practice

16   instead of a pill mill, there would not have been 176

17   overdoses and deaths outlined in Exhibits 1, 1-A and

18   1-B.  There wouldn't have been responsibility at the

19   clinic for 18% of the overdose deaths in a multiple

20   county area.  Exhibit 1-C.  If this clinic had been a

21   legitimate pain management practice, issuing

22   prescriptions for legitimate medical purposes, the

23   Defendants would have taken action in the face of these

24   overdoses and deaths, which over time put them on

25   repeated notice that what they were doing was deadly.

1    But, of course, we know they took no action.  As Stephen

2    Schneider told Jamie Hilliard and Robbie Swonger, the

3    people who died of overdoses were just bad grapes.  As

4    Stephen Schneider told Charles Craig, the people who

5    overdosed were just acceptable casualties.  As Linda

6    told Jennifer Harry, it was the victims' fault, nobody

7    put a gun to their head to take their pills.  These

8    prescriptions were not issued for a legitimate medical

9    purpose because, as Dr. Parran explained, these

10   prescriptions did harm.  As Dr. Jorgensen explained,

11   these prescriptions did not resemble any true medical

12   care and were not legitimate.  And, as Dr. Owen

13   explained, these prescriptions were of no therapeutic

14   benefit.  As the ER physicians and the pharmacists told

15   you, the combinations and amounts of prescriptions were

16   like nobody else's in the Wichita community.  The manner

17   in which Steve Schneider and the Defendants' employees

18   issued these prescriptions resulted in death.  Which

19   brought Dr. Owen and Jorgensen to tears.  And,

20   unfortunately, brings us now to the specific counts in

21   the Indictment.

22        Turning to Counts 2, 3 and 4, and the companion

23   fraud counts, Counts 7, 8 and 9, you heard about Patty,

24   Eric, and Robin from several witnesses.  Including the

25   spouses their untimely deaths left behind.  Dr. Parran

1   told you that the Defendants' prescription practices

2   directly caused these three individuals to die from

3   accidental overdoses.  These three individuals died

4   unnecessarily because of the Defendants course of

5   conduct and because the Defendants refused to change

6   that conduct despite repeated notice that it was deadly.

7   Similarly, Dr. Jorgensen told you that the Defendants

8   health care fraud resulted in these individuals' deaths.

9   The defense presented no one to rebut Dr. Jorgensen's

10  conclusions.  Isn't it interesting that their fraud

11  expert, Barbara Cobuzzi, revealed for the first time on

12  cross-examination that she purported to be an expert on

13  pain management coding?  Isn't it interesting that she

14  didn't review the claims for Patty, Eric and Robin?  And

15  was not asked to offer an opinion about their claims.

16      The Government submits that the evidence has proved

17  beyond a reasonable doubt that the Defendants illegal

18  drug dispensing and health care fraud resulted in Patty,

19  Eric and Robin's drug overdose deaths.  Of the 37 office

20  visits, Steve Schneider personally saw Patty 19 times.

21  And supervised her so-called medical care through his

22  PAs on many other occasions.  Of those 37 office visits,

23  Patty was early 26 times.  And on each occasion, got

24  refills.  Of those 37 office visits, 16 were big days

25  with one being an incredible one, 108 clinic office

1    visits and 9 nursing home visits.  As multiple witnesses

2    told you, impossible.  Therefore, only two explanations.

3    He was billing as though he were seeing the patient when

4    it was really the PAs, or he was billing for services

5    not rendered because he just didn't render any services.

6        Dr. Jorgensen's review found that all but one of

7    her claims had been upcoded in terms of the services

8    provided and found less than one-third of her progress

9    notes legible.  Patty failed her one and only drug

10   screen.  And Steve Schneider and the Defendants'

11   employees did nothing but keep issuing her prescriptions

12   for more drugs.  On cross-examination Steve Schneider

13   could not identify when Patty changed from an acute pain

14   patient from her motor vehicle accident to a chronic

15   pain patient needing more and more drugs which did less

16   and less for her over time.  On cross-examination, the

17   Defendant admitted that through her early visits, she

18   self-escalated her Lortab to 10 pills a day, which would

19   have created Tylenol toxicity.  The result, more drugs.

20   As Patty got worse, the prescriptions increased.  The

21   clinic received information she had been in the

22   hospital.  But they made no effort to get the records.

23   Patty became depressed.  The prescriptions increased.

24   But nobody referred Patty to a psychologist or

25   psychiatrist.  She was seeing multiple physicians and

1    there was no attempt to coordinate care.  By March 2004,

2    she had declined into disability.  And then we have that

3    false document on January 28, 2005, signed by Stephen

4    Schneider himself claiming that Patty had been disabled

5    from the date of her first visit to the clinic when she

6    came complaining of a cold.  The objective evidence in

7    the Defendants own records, the evidence her husband

8    related to you, was that Patty's pain was getting worse,

9    not better.  Her function was declining, not improving.

10   And yet the so-called treatment of drugs and more drugs

11   continued until that fateful day when she walked into

12   the clinic to be seen by a brand new employee, Hien

13   Tran, no pain management experience, no training, and

14   with the instructions just write the same scripts.  That

15   fax from the hospital sat somewhere amongst the hundreds

16   the thousands that had sat there before.  And two days

17   later, Patty was dead of an accidental drug overdose at

18   the age of 49.  Leaving her husband Larry to grieve.  To

19   this day he blames himself for not doing as he wanted to

20   do, packin' her bags and takin' her away from that

21   clinic and the drugs they were giving her that addicted

22   her and killed her.  Unbelievably, Steve Schneider had

23   the gall to tell the Board of Healing Arts who was

24   investigating Patty's death and his responsibility for

25   it, he had the gall to imply that her husband caused her

1   death.  What that evidences is evidence of a desperate

2   attempt at placing blame on anyone and everyone else.

3   The Defendants do not want to take responsibility for

4   Patty's death.  The 37th of 68, three years after the

5   first overdose death.  They don't want you to believe

6   they had notice that their course of conduct at their

7   clinic was deadly.  They don't want you to believe they

8   took no action to prevent further addiction, abuse and

9   death.  Because if you believe they had ample notice,

10  you must hold them responsible for Patty's death.

11      Doctors Parran, Owen and Jorgensen's testimony as

12  well as the documents themselves, especially Patty's

13  time line, Exhibit 2, tells you what you need to know,

14  Ladies and Gentlemen.  The Defendants illegal drug

15  dispensing and health care fraud, their actions and

16  inactions, directly resulted in Patty's death.

17      Lori Lynn T testified Eric became an addict because

18  of the Defendants' course of conduct.  And over time his

19  pain increased and his function decreased.  Lori Lynn

20  testified I told the doctor that Eric was abusing his

21  medications.  Although his back surgeon released him to

22  work, Steve Schneider evidently knew better and claimed

23  he was disabled.  But he wasn't disabled by the surgery.

24  He was disabled by his addiction and the fact that that

25  so-called pain management he was receiving was making

 1    him worse, not better.  Indeed, in the last weeks of his

 2    life, Eric was passed out on the side of the road in his

 3    car and got a D.U.I.  The solution for Eric was as it

 4    was for Patty:  More and more drugs.  Eric's care was

 5    fragmented amongst six providers, including Steve

 6    Schneider who saw him 20 times, and supervised many PA

 7    visits.  Steve Schneider saw Eric on his first office

 8    visit.  And without a thorough examineexam, without

 9    prior records and without any verification whatsoever,

10    began Eric on controlled drugs.  Of his 47 office

11    visits, he was early 35 times.  Always getting more

12    drugs.  He failed the only two drug screens he got.  But

13    he got more drugs anyway.  He got drugs from other

14    doctors when he was first at the clinic.  But still got

15    drugs at the clinic.  There was no evidence at the

16    clinic that anyone coordinated care with his back

17    surgeon.  One-third of the visits Eric had were on those

18    big days.  Dr. Jorgensen's review found that all but two

19    of his claims had been upcoded in terms of the services

20    provided.  Eric's records indicate that he violated the

21    pain management agreement by going to the emergency room

22    for Demerol shots.  Without consequences, except for

23    escalating dosages and amounts of drugs.  And as Steve

24    Schneider admitted, he could not find in the

25    documentation any medical justification for those

increases.  Eric's records, like Patty's, were full of
those red flags, putting everyone on notice that he was
addicted, abusing and declining instead of improving.
As Doctors Parran, Jorgensen, testified, and as Eric's
time line, Exhibit 3, tells you, the Defendants' actions
and inactions directly resulted in Eric's death.  He was
46.  And he never got to see that brand new grandbaby
because he died that weekend in April of 2006.  The 50th
person to die of an accidental overdose, a preventible
and unnecessary death.  Had the Defendants only cared
enough to change their ways, after four years of
mounting overdoses and deaths, as Doctors Parran and
Jorgensen explained, and as the evidence tells you, the
Defendants illegal drug dispensing and health care fraud
resulted in Eric's death.

Six months into her time at the Defendants' clinic
Robin was having two to three headaches a month.  By the
time she was dead, she was consuming four or more Actiq
suckers a day.  Her husband Robert was trying to hide
them from her.  Her mother Phyllis told you that Robin
tried to hide them from herself.  I don't know quite how
you do that.  As her time line indicates, she continued
to violate the pain management agreement, going to the
ERs for Demerol shots, despite being on morphine and
Actiq.  This is not objective evidence of Robin getting

better.  It is objective evidence that she was getting

worse, much worse, under the so-called care at the

clinic.  She had 40 office visits; and on 21, she was

personally seen by the Defendant Stephen Schneider,

including her first and last visits.  She never had a

drug screen.  She was early 17 times out of 40, a fact

her mother wouldn't even admit to.  On many occasions

she was seen on one of those big days.  Dr. Jorgensen's

review found that all but seven of her claims had been

upcoded in terms of services.  On that first visit, you

can read that progress note as many times as you want,

but you will never see an assessment of her migraines,

what caused them, how long they acted up, nothing.  What

was the plan?  Drugs.  He prescribes her enough Actiq

for two suckers a day.  Why?  She's not having two

migraines a day.  On subsequent visits there's never an

indication of Robin has used all her suckers.  Instead,

they're just rewritten and escalate over time in both

dosage and amount.  Why?  Isn't she supposed to be using

this only when she gets a migraine?  Is she getting 60 a

month?  Is she getting 120 a month?  There's absolutely

no sense to the prescribing as Dr. Parran and Jorgensen

explained.  There's no objective evidence that Robin is

getting better.  And there's no effort to get her the

mental health treatment she needs for her depression.

1    Even her own mother had to admit, two to three a month

2    to four a day.  That's simply not getting better.  And,

3    as her mother admitted, what was happening was exactly

4    what her primary care physician told her was happening.

5    She was actually getting headaches from the medicines

6    that the Schneider Medical Clinic was prescribing, those

7    rebound headaches.  Even her own mother wrote a letter

8    to the clinic pleading for help about how sick her

9    daughter was, losing weight, vomiting.  But you don't

10   see that in the records of the pain assessment

11   diagnostic tools.  Why?  Because Robin knew what she

12   needed to say to get those suckers.  They're savin' my

13   life.  She got 'em.  If that were true, Ladies and

14   Gentlemen, why did she and Robert ask for a referral to

15   Mayo clinic?  Defendant's response to Robin and Robert

16   was similar to his response to Alicia who wanted to go

17   to a neurosurgeon, who wanted to get treatment for

18   addiction, nah, we'll just handle it in-house.  Do you

19   remember my cross-examination of the Defendant Stephen

20   Schneider concerning Robin?  He was defiant, wasn't he?

21   He wasn't concerned.  He wasn't remorseful.  I asked him

22   Robin's quality of life isn't better now, is it?  And he

23   scowled at me and in a hateful manner said, no, it

24   isn't.  Not the demeanor of a caring and compassionate

25   physician he wants and needs you to believe he is.  Far

1    from it.  Her grieving mother does not want to believe
2    the objective evidence either.  Not even the autopsy.
3    And I cannot say that I blame her.  She doesn't want to
4    believe that the very drugs she thought were helping
5    Robin were actually addicting her and eventually led to
6    her death.  By the time Robin died of an accidental drug
7    overdose, the Defendants had five years of notice that
8    their policies and practices of prescribing drugs were
9    deadly.  As Dr. Parran and Jorgensen explained, Robin
10   died unnecessarily at the young age of 45 as the 58th
11   person of 68 and as the direct result of the Defendants'
12   illegal drug dispensing and health care fraud.
13        The prolonged, fraudulent and illegitimate
14   treatment of these individuals which arose from the
15   manner in which Steve and Linda chose to operate their
16   clinic resulted in their unnecessary deaths.  It wasn't
17   any single visit.  It wasn't any single prescription.
18   As Doctors Parran, Owen and Jorgensen testified, the
19   Defendants' conduct resulted in Patty's, Eric's and
20   Robin's untimely deaths.  Government asks that you hold
21   the Defendants responsible.  Mark your verdict forms
22   guilty on Counts 2, 3, 4, 7, 8, 9.  Mark your verdict
23   forms that these deaths resulted in the Defendants
24   illegal drug dispensing and health care fraud scheme and
25   conspiracy.

 1        Count 5 lists another 18 individuals who died from

 2   drug overdoses.  As Dr. Parran testified and as Dr. Owen

 3   testified as to some of these folks, the manner in which

 4   the Defendants operated their clinic and issued

 5   prescriptions outside the usual course of medicine and

 6   not for a legitimate medical purpose contributed to each

 7   and every one of these individuals' deaths.  Exhibit 5

 8   summarized for you what controlled drugs each individual

 9   received and you can see those prescriptions in the

10   series 5 exhibits.  Those exhibits also revealed that

11   there was no legitimate medical treatment over the

12   course of time.  And as the judge has instructed you,

13   you need to consider each of these individuals

14   separately and come to a unanimous verdict as to each

15   one; but, you only need to find that the Defendants

16   illegally distributed drugs to one person to convict

17   them of Count 5.  The Government asks that you review

18   the time lines for each of these individuals.  Because

19   those time lines singly tell the story of the Defendants

20   illegal drug dispensing and expose the patterns Dr.

21   Parran, Owen and Jorgensen told you about.  The time

22   lines, along with Exhibit 1-A, show these 18 individuals

23   overdosed on the drugs prescribed.  The Government

24   submits the evidence has proved beyond a reasonable

25   doubt that each of these people died unnecessarily as a

1    result of the Defendants' actions and inactions and that

2    your verdicts should reflect that.

3        I want to take them in chronological order to show

4    you how the Defendants over time continued to ignore the

5    repeated notice that their policies, practices and

6    prescriptions were deadly.  Consequently, as Dr. Parran

7    explained, each of these victims died as a result of how

8    both of the Defendants ran their clinic and how the

9    prescriptions for controlled drugs were issued for other

10   than a legitimate medical purpose.  Dr. Parran's

11   testimony has gone undisputed in this case by any

12   comparable objective witness and has been corroborated

13   by the rest of the Government's evidence, not the least

14   of which has been the live victim exhibits we presented:

15   Tab, Barbara, Alicia, Mike, and Leo.  Heather died at

16   the age of 28.  Steve Schneider saw her twelve times.

17   Twelve of her visits were early.  She never had a drug

18   screen.  She was the first person to die of an overdose,

19   an overdose of Oxycontin, only one day after her last

20   office visit.  Steve Schneider admitted he took no

21   actions thereafter to assure that people weren't IV drug

22   users or using their oxycontin inappropriately.

23       Billy died at 45.  Steve Schneider saw her 19

24   times, including first and last office visits.  She had

25   24 early visits; no drug screens.  She was the 24th

1    person -- -- I'm sorry -- the second person to die of a

2    drug overdose.  She died only two days after her last

3    office visit.

4          Heather and Billy died long before the Schneider

5    Medical Clinic was opened.  Therefore, just like those

6    call notes that Tom Wagner presented, Exhibit 156, that

7    predated the opening of the clinic.  Stephen and Linda

8    Schneider began acting out of the mainstream of

9    legitimate pain medicine once they broke away from the

10   family med centers and started up their own clinic in

11   that optometrist's office.  Even then people brought

12   their own chairs to wait in the parking lot for their

13   drugs.

14         Terry died at 48.  Returning to the clinic after a

15   drug overdose that landed him in the hospital.  Steve

16   Schneider personally saw him 19 times, including his

17   first and last visits.  Terry had 15 early visits, no

18   drug screens.  He was the sixth person to die just six

19   days after his last office visit.

20         Mary Jo died at 52.  Steve Schneider personally saw

21   her ten times, including her last visit.  Of her 20

22   visits, she was early 19 times and she failed two of her

23   three urine drug screens but still got prescriptions.

24   She was the 8th person to die of a drug overdose.  Just

25   five days after her last office visit.

1    Kandace died at 43.  Steve saw her six times;

2    supervised multiple PA visits.  She was early 13 times,

3    failed all three of her drug screens but kept receiving

4    drugs despite her history of addiction and mental

5    illness.  Dr. Owen also reviewed Kandace' medical chart

6    and he came to the same conclusion Dr. Parran had, the

7    way the Defendants ran their clinic and issued

8    prescriptions resulted in her death.  Kandace was the

9    13th person to die two days after her last office visit.

10    Katherine died at 46, only 11 days after Kandace.

11   Four of her seven visits were early.  No drug screens.

12   Although she was seen by Donna St. Clair, the evidence

13   has been that Dr. St. Clair's prescriptions mirrored

14   Steve Schneider's and that she had as many big days as

15   he did.  Dr. Parran and Jorgensen saw no difference

16   between her treatment and the Defendants.  She had no

17   pain management training and no more time to practice

18   legitimate medicine than anyone else did.  Katherine was

19   the 14th person to die only six days after her last

20   office visit.

21    Robert died at 31.  Steve Schneider personally saw

22   him ten times, including his first and last visits.  He

23   was early 14 times and failed both of his drug screens

24   yet continued to receive prescriptions.  He was the 15th

25   person to die only one day after his last office visit.

1    Jeff died at 45.  Never saw a physician at the

2    clinic, only PAs Kim He'bert, especially who Steve

3    Schneider supervised.  He had a history of addiction,

4    failed his one and only drug screen, and Curtis

5    Atterbury told Chanda Little he was just there for

6    drugs.  But he got them anyway.  Like Heather, he abused

7    his Oxycontin not by IV injection but by snorting it.

8    Dr. Owen reviewed Jeff's medical chart and he came to

9    the same conclusion as Dr. Parran did.  Jeff died as a

10   result of the Defendants illegally dispensing drugs.

11   Jeff was the 28th person to die of a drug overdose just

12   21 days after his last office visit and just four days

13   after Christmas, 2004.

14       Victor died at 48.  Steve saw Victor on his first

15   visit and immediately prescribed controlled drugs.

16   Without prior records or a drug screen.  He had a

17   history of IV drug use that was never explored.  And he

18   was homeless.  Victor overdosed on February 5th, 2005,

19   and returned to the clinic only to receive more drugs.

20   He was the 33rd person to die of an accidental drug

21   overdose and he died only seven days after his last

22   office visit at which his prescriptions were

23   significantly increased.

24       Brad died at 53.  Steve saw Brad on every visit and

25   every visit was a big day.  He was early seven of his

1    ten visits.  He always got drugs.  He was the 41st

2    person to die.  Only 11 days after his last office

3    visit.

4         Toni, 37.  Steve Schneider saw her 63 times,

5    including her first and last office visits.  Early 60%

6    of the time.  Failed her drug screens.  She was a crack

7    cocaine addict.  Admitted to addiction.  Was declining

8    precipitously and all the while receiving drugs, drugs,

9    and more drugs.  We can all understand her mother's need

10   to believe that the Defendants were not responsible for

11   her death.  And we can understand her mother's need to

12   blame some unknown intruder that she didn't tell the

13   investigator's about.  But the evidence is that Toni was

14   the 47th person to die of a prescription drug overdose

15   at the hands of the Defendants' clinic, just two days

16   after her last visit.

17        Dalene died at 45.  Steve saw Dalene personally 36

18   times, including her first visit.  She was early two

19   their of the times and failed four drug screens.  She

20   was the 49th person to die, two days after her last

21   office visit.

22        Jo Jo was 46.  She had repeated admissions to the

23   hospital for drug related incidents, including drug

24   injection soars on her legs that wouldn't heel.  Steve

25   Schneider saw Jo Jo eight times.  She was early 13 of

1    her 24 visits.  And she was the woman who was obviously

2    inappropriately injecting her drugs.  She failed all

3    four drug screens, but continued to get drugs through

4    that last office visit, which was two days before she

5    was the 51st person to die.

6        Mary Sue died at 55.  Mary Sue saw Steve ten times,

7    including her first and last office visits.  She saw a

8    total of ten providers over 49 visits, over half of

9    which were early.  She failed two of her five urine drug

10   screens and was the 52nd person to die.

11       Pamela died at 42.  She saw Steve Schneider four

12   times, including her first visit, had no drug screens.

13   In her 51 visits, 38 of those were early.  And Pam died

14   just one day after her last office visit, the 53rd

15   person to die.

16       Jeffrey died at 40.  Seeing Steve Schneider 14

17   times, including his first visit.  Early more than half

18   the time.  Failed five of seven drug screens, had two

19   overdoses and kept gettin' those drugs.  Until one day

20   before his death.  He was the 55th person to die.

21       Evelyn died at 50.  Of the six providers Evelyn saw

22   in her 29 visits, she saw Steve four times and saw his

23   PAs.  She failed both of her drug screens and was early

24   on ten visits.  She received those prescriptions anyway

25   through her last visit which was one day before she died

1    as the 57th person.

2         Patsy died at 50.  Wasting away from her drug

3    addiction before the Defendants very eyes.  Patsy

4    started her time at the clinic with the Defendant

5    Stephen Schneider and saw him over 80 times.  She was

6    early more than half of her visits.  Failed ten out of

7    11 drug screens.  And just ten, after ten days after her

8    last visit where she continued to receive drugs, she was

9    the 60th person to die of an accidental drug overdose.

10        As you are contemplating the evidence as to each of

11   these victims, please remember the Defendants'

12   testimony.  I went through the evidence with him,

13   reviewing with him who he personally saw, reviewing the

14   progress notes he countersigned approving the actions of

15   the PAs he employed.  Following that review, you may

16   remember I asked him if he would now admit that he had

17   directly participated in the care of each of these

18   individuals.  And as you may remember, he denied it.  In

19   the face of his own documents, he denied it.  That

20   testimony speaks volumes.  Because he cannot admit to

21   seeing these people and writing prescriptions after his

22   attorney told you in opening statement that he hadn't

23   seen these people and that he hadn't had a hand in their

24   scripts.

25        False clues and detours, Ladies and Gentlemen.

1    Leading to false testimony from the witness stand.

2         Also remember that there was nobody presented by

3    the defense to rebut Doctors Parran and Owen.  The only

4    way the Defendants escape guilty verdicts on Count 5 is

5    if you don't believe the six board certified medical

6    examiners and two toxicologists and if you believe Steve

7    Schneider and nothing else.  Mark your verdict forms

8    guilty on Count 5.  Hold the Defendants responsible for

9    these deaths.

10        Thankfully, not every one to whom the Defendants

11   illegally dispensed drugs died.  But as Dr. Parran

12   testified, and as Dr. Owen testified as to Danny, Lacey,

13   Darrell and Mark, the Defendants illegally dispensed

14   drugs to the 27 folks listed in Counts 6.  Doctors

15   Parran and Owen reviewed these folks medical records and

16   found the same pattern from Counts 2 through 5 that they

17   and Dr. Jorgensen discussed with you throughout their

18   testimony and which you can find listed in the

19   Indictment at Paragraph 38:  The indiscriminate

20   prescription of controlled drugs in excessive and

21   escalating amounts out of proportion to the alleged

22   disease being treated; indiscriminate prescribing of

23   redundant controlled drugs; indiscriminate prescribing

24   of combinations of addictive controlled and

25   noncontrolled drugs; prescribing controlled drugs in the

 1   time and amount the person requested; relentlessly

 2   continuing to prescribe controlled drugs in the face of

 3   deteriorating conditions, contraindications, and despite

 4   obvious signs of abuse, multiple red flags, scams for

 5   early refills, failed drug screens, other violations of

 6   the pain management agreements and calls from family and

 7   friends; failing to adapt treatment in the face of

 8   deteriorating conditions despite obvious signs of abuse;

 9   prescribing controlled drugs in a way that was likely to

10   cause and did cause dependence and addiction and that

11   fed existing addictions, including long term prescribing

12   of short-acting drugs, that popping pills as Dr. Owen

13   told you, often in combination with benzodiazepines;

14   early refills, allowing self-escalation and stockpiling;

15   combinations of drugs that had heroin-like effects as

16   Dr. Parran told you, The Holy Trinity; failing to treat

17   the cause of the pain and other diseases; just treating

18   the pain; failing to conduct adequate medical

19   evaluations; failing to monitor or use objective

20   treatment information and instead relying only on the

21   subjective reports of the patients; failing to prevent

22   diversion of controlled drugs amongst and between family

23   members; failing to document the medical justification

24   for prescribing increasing or changing the controlled

25   drugs; failing to monitor for toxic levels of Tylenol;

1   prescribing controlled drugs to minors; continuing to

2   prescribe drugs in the same manner despite notice that

3   the clinic's practices resulted in scrutiny by the

4   programs; obvious drug-seeking behavior and addiction,

5   overdoses, and deaths.

6       The Count 6 exhibits, like all of the Defendants'

7   records, reveal that there was no legitimate medical

8   care being provided to these individuals.  Look through

9   Exhibit 6-V, the multitude of office visits for Jamie S.

10   She came in for all those pain shots, usually two to

11   three times a week.  Both Doctors Parran and Jorgensen

12   told you totally irrational, totally illegitimate.  Look

13   at 6-11, the inexplicable prescription to the minor

14   Lacey F.  They prescribed Xanax to her for her

15   performance anxiety so she could go strip.  She's the

16   young lady that Alice Fox took aside and said, Lacey,

17   get out of that clinic, you're gonna die, get another

18   doctor.

19       Look through 6-I, the numerous office visits for

20   Katherine D.  You heard testimony from her husband Leo

21   and yet you see these prescriptions just comin' at a

22   steady pace despite him begging him to stop.  She's

23   addicted.  She needs help.  Please stop.  He didn't.

24       Other than general denials, the Defendants have

25   offered no evidence to contradict Dr. Parran or Dr.

1    Owen's opinions with regards to the individuals in Count

2    6.  And as the Judge has instructed you again, you need

3    to consider each of these but you only need to find

4    illegal dispensing of drugs as to one to hold the

5    Defendants guilty on this count.

6         The fact that the Defendants illegally dispensed

7    drugs to these folks is important.  And the fact that

8    some of these individuals died, as Dr. Parran said

9    predictably, is also important.  Why?  Because it's all

10   a part of the pattern, the course of conduct that the

11   Defendants devised and repeatedly followed without care,

12   compassion or concern for their victims.

13        Similarly, the other people that died who are

14   listed in the overt acts of the Indictment are

15   important.  Because all of these deaths should have

16   shouted the Defendants down from continuing undeterred

17   from their policies, practices and prescriptions.

18        As Tab told you, he's one of the lucky ones.  He

19   could have easily been one of the people we've just

20   discussed.  As a result of the Defendants putting money

21   before medicine.

22        Mark your verdict form guilty on Count 6.

23        There is no reasonable doubt, Ladies and Gentlemen,

24   the manner in which the Defendants Steve and Linda

25   Schneider jointly operated their clinic and the course

of conduct they chose directly to pursue for many years resulted in their clinic becoming a pill mill.  The Defendants illegally dispensed drugs to individuals in Count 2 through 6, directly resulting in the deaths of Patty, Eric and Robin, contributing to and therefore resulting in the deaths of the individuals in Count 18 -- I'm sorry -- in Count 5.  These are the consequences of the Defendants' choices.

     That leads us to the charges that involve the money, Ladies and Gentlemen.  Counts 7 through 17, the health care fraud counts and Counts 18 through 34, the money laundering counts.  The Government is going to address the Judge's instructions in a little different order when it comes to the elements that we need to prove beyond a reasonable doubt for you to convict the Defendants of health care fraud.  First, that there was a scheme to defraud a health care benefit program in connection with the delivery or payment of benefits. Second, the Defendants knowingly and willfully executed or attempted to execute the scheme, and the scheme included material misrepresentations or omissions. Third, the Defendants acted with the intent to defraud; and fourth, the health care benefit program effected commerce.

     There is no dispute that the Defendants' actions

1   were in connection with the delivery and payment of

2   benefits under health care benefit programs.  There is

3   also no dispute that the programs effected interstate

4   commerce.  All of the ladies from the reviews told you

5   that.  The Government would also submit that there's

6   really no dispute that there were material

7   misrepresentations and omissions since all of the

8   evidence, even Ms. Cobuzzi agreed, that upcoded claims

9   are false claims and they are material because the

10  insurance programs pay more money.  Thus, the Government

11  submits that the disputed elements of the health care

12  fraud counts are:  Did the Defendants execute a scheme

13  to defraud and did they act intentionally and willfully?

14  Therefore, I would like to review the evidence that the

15  Defendants beyond a reasonable doubt intentionally and

16  willfully executed a scheme to defraud the many

17  insurance companies to which they submitted claims and

18  from which they received over $4.2 million in payments.

19  They also defrauded the cash and copayment patients who

20  contributed another $3 million to the practice.  Unlike

21  the drug counts which relate only to the pain management

22  practice, the evidence has proved this practice was

23  permeated by fraud and the health care relates to the

24  whole practice.

25       The Defendants' scheme to defraud continued over

1    time.  And as with any fraud case, repetitive behavior

2    over time, patterns over time, are the confirming proof

3    of knowing and intentional conduct.  Patterns of conduct

4    over time refute claims of mistake, negligence or

5    ignorance.  Because people who do things repeatedly are

6    acting intentionally.  What patterns did we see through

7    the evidence?  The patterns we told you about in

8    opening.  Billing for services not rendered;

9    misrepresenting the services provided; and billing for

10   services not documented.

11        Let's talk about the billing for services not

12   rendered, which has several subparts.  As the evidence

13   proved, the clinic was permeated by fraud which netted

14   the Defendants a lot of money.  Money to which they were

15   not entitled.  As I just reviewed for you, the evidence

16   has proved beyond a reasonable doubt that the Defendants

17   were illegally dispensing drugs; therefore, they were

18   not providing legitimate medical services to the people

19   who came in for pain management.  As Doctors Parran,

20   Owen, Jorgensen told you, the PAs told you, documents

21   corroborated, medical needs were ignored and instead the

22   prescriptions just kept coming.  If the Defendants were

23   not providing legitimate medical services, the claims

24   for those services are false and fraudulent and they

25   should not have been paid for.  Even the Defendants own

1   expert, Barbara Cobuzzi, when I forced her, agreed with

2   that proposition.  And as the reviewers told you, Tracy,

3   Jamie Dahlberg, Jamie Leyden, Marguerite and Dr.

4   Jorgensen, simply refilling prescriptions and nothing

5   more is not a legitimate medical service and it's not a

6   billable one.  At a minimum, the services provided to

7   the individuals named in Counts 2 through 6 were not

8   billable services.

9        Similarly, because the prescriptions were illegal,

10  nobody should have been paying for them.  That's what

11  all the reviewers told you.  That's what Dr. Jorgensen

12  told you.  And again, when forced, Ms. Cobuzzi had to

13  agree.  Exhibit 1-K showed you that the programs paid

14  over $6 million for controlled drugs.  But you need not

15  be concerned about how much of that $6 million was paid

16  out for illegal prescriptions because loss is not an

17  element the Government must prove, as the Judge just

18  instructed you.

19       As to the Actiq prescriptions which are the subject

20  of Counts 10 through 12, Dr. Parran explained that the

21  program should not have paid for these illegal

22  prescriptions.  Dr. Parran's description of Actiq was

23  chilling.  Actiq is a powerful potent addictive drug,

24  many times more potent than Morphine.  It's used as an

25  anesthetic.  It's FDA approved for cancer pain.  That's

1    why pharmacist Jamie Clowers told you she had never

2    before filled a prescription for Actiq and had never

3    done so again after she left the pharmacy that dealt

4    with the clinic's prescriptions.  Dr. Parran explained

5    that the Defendants' clinic prescribed Actiq to 37

6    individuals indiscriminately without a legitimate

7    medical purpose and outside the usual course of medical

8    practice.  Exhibit 1-L-3 lists the general complaints of

9    pain which these suckers were handed out like candy for.

10   And remember, Steve Schneider admitted to the Board of

11   Healing Arts that he prescribed Actiq to people he knew

12   were addicts.  Dr. Parran was especially disturbed by

13   what he called the crazy prescribing of Actiq to minors,

14   including Michael, Lacey and Tori, all of whom are in

15   Count 6.  For the 37 people Dr. Parran identified as

16   having received Actiq illegally, Medicaid, First Guard

17   and Blue Cross paid an aggregated total of $523,000, as

18   Exhibit 1-L indicates.  Had it not been for the

19   Defendants illegal prescriptions, that money would not

20   have been paid.  It is irrelevant that the Defendants

21   themselves did not receive the money.

22        Another way the Defendants billed for services not

23   rendered is through what we call the big days.  Days

24   where the billing indicates that Steve Schneider saw

25   more than 50 people a day.  That evidence is greatly

1   summarized for you in Exhibit 1-O.  And you'll see those

2   big days on the time lines.  The evidence has been that

3   in a legitimate medical practice, especially a pain

4   management practice, you can't see 50 or more people a

5   day.  It's not realistic.  That provides further

6   evidence of fraud, as well as not legitimate practice.

7   Even the Defendants own witness, Brenda Eller, told you,

8   no, you can't see that many people a day.  Therefore,

9   there are only two possible explanations.  He was not

10  providing the services or he was billing PAs as though

11  he was providing the services.  And, again, all of these

12  claims are false as the Defendants own expert was forced

13  to agree.

14      The Defendants volume business meant they were

15  providing poor inattentive medical care while they

16  billed for providing quality care.  If you get a Yugo,

17  you don't wanna pay for a Cadillac.  Neither about the

18  programs.  Neither did the people going to the clinic.

19      The final way the Defendants billed for services

20  not rendered is probably the most blatant.  They billed

21  for services when they were out of town at their place

22  in Mexico, out of the clinic.  Again, you can find

23  evidence nicely summarized for you in Exhibit 1-P, which

24  the Defendants did not dispute except to blame their

25  billing personnel.

1          Turning to the second kind of fraud,

2     misrepresenting the services provided.  Again, we go

3     back to opening and we know that there's two kinds of

4     misrepresentations.  The who and the what.  They

5     misrepresented the who to get that 15 to 25% more

6     because PAs are paid less because they're not doctors.

7     They marked up or upcoded to indicate a physician was

8     providing the services when in fact the PA provided the

9     service to get that extra percentage.  As Angela

10    Dunnavent and Jennifer Harry and Sherrie Mills told you,

11    Linda had the billing folks bill the PAs as doctors to

12    get more money.  As the defense witness Katherine Gaines

13    told you, she billed based on what pile the fee tickets

14    were in.  She didn't look to see who the provider was.

15    And as Charles Craig told you, Linda told him that the

16    clinic did not do incident-to billing where you can bill

17    the PA as a doctor, too much of a paperwork nightmare.

18    So those claims to First Guard before they recognized

19    PAs, they're false.  Just like Tracy Wagner told you,

20    the claims to Medicare, are false.  And as to Medicaid,

21    PHS and Blue Cross, they never used the incident-to

22    rules.  They always wanted the PAs to bill on their own

23    number.  Based on the six reviews, the providers were

24    upcoded anywhere from 30 to 53% of the time or an

25    average of 37% of the time.

1        The what.  The Defendants also misrepresented what

2    services were provided.  Again, upcoding or marking up

3    to get more money.  As you heard from the PAs, both the

4    Defendants clearly instructed them how to mark the fee

5    tickets with that middle office code, 99213.  Debra

6    Klingsick told Medicaid and the Kansas Board of Healing

7    Arts this information in her June letters, Exhibit 108.

8    I was instructed to fill out the fee tickets a certain

9    way with no room for leniency.  I was instructed that

10   everyone was to receive a CPT code of 99213, no matter

11   what they were being seen in the clinic for, or how long

12   I was present in the roo.  As you heard from the

13   employees, including the PAs, Debra Klingsick and Hien

14   Tran, they saw both Defendants change their fee tickets

15   from the lesser code to the higher code.  As Jennifer

16   Harry told you, she saw Linda daily change the fee

17   tickets from the lesser of $45 to the higher, $75.  And

18   there's a representative example of those changed fee

19   tickets in Exhibit 153, which Sherri Mills told you,

20   common.  Sherri Mills and Brenda Maurer also told you

21   something very important.  That they both told you there

22   was no coding of the office visits from the charts.

23   Instead, the fee tickets were billed as marked.  As

24   Brenda Maurer stated, they came charge-ready when it

25   came to the office visit codes.  Only the diagnosis

48

1     codes were being coded by someone else.  The billers had

2     no input in how the fee tickets were marked.  That was

3     the doctors, the PAs and Linda.  Based on the six

4     reviews, the services were upcoded anywhere from 20 to

5     93%, depending on the checklist being taken into

6     account.  When the checklist was discounted, the average

7     of the false claims was 58%.  And when it came to the

8     pain practice, which was the focus of Dr. Jorgensen's

9     review, he told you emphatically that 93% of the

10    documents did not support the claims.  93%.  That

11    corroborates the illegitimate nature of the pain

12    practice, because 93% of the documents don't support the

13    services.  The data Perry Seaton told you about at the

14    beginning of the trial tells you the story.  The clinic

15    chose to bill 99213 and did so consistently.  Nobody

16    bothered about the correct coding.  They just played it

17    safe and billed the 99213 to avoid the audits at the

18    higher codes.  Dr. Jorgensen told you that.  And again,

19    when forced, Ms. Cobuzzi also said, yeah, those higher

20    codes are the ones that you audit.  If you're 99213,

21    you're not gonna get audited.  So to avoid the audits,

22    they chose 99213.  But to make money, they had to herd

23    people through like cattle.

24          And the third pattern of the Defendants' fraud is

25    billing for services not documented and falsely

1    documented.  The lack of documentation is not a sign of

2    laziness or ignorance, Ladies and Gentlemen.  It's,

3    again, a sign of a practice that was permeated by fraud

4    where the rules meant nothing because speed was the

5    goal.  But even more important than the missing

6    documentation is the false documentation which the

7    Defendants created to make it look like something was

8    going on.  Remarkably, Steve Schneider told you he

9    created a progress note for Patty G out of thin air.

10   Just like Debra Klingsick told you Linda Schneider asked

11   her to do.  And just like Jamie Hilliard told you

12   happened.  That's why there are two progress notes dated

13   February 7th, 2003, in Exhibit 2-D.  As Doctors Parran,

14   Owen and Jorgensen told you, and as the documents

15   themselves reveal, those pain assessment documentation

16   tools, the PADTs, they were largely ignored.  They were

17   not created by the doctor.  They weren't reviewed by the

18   doctor.  And they were just used to paper the file to

19   satisfy the insurance audits.  You remember Mr. Fleenor,

20   my colleague, was going there with Ms. G taking her

21   through her PADT which showed her pain getting worse and

22   the meds helping less, the pain getting worse, the meds

23   helping less.  And yet she still gets more drugs.  They

24   don't address the issue, as the PAs told you, and as the

25   experts told you, especially in the environment of

1    fragmented care the Defendants created at their clinic.

2    The checklist on those progress notes were largely

3    useless for medical treatment other than to speed things

4    along.  Medicaid and Blue Cross don't even recognize

5    these checklists.  And in a couple of depositions, the

6    Defendant Steve Schneider didn't even know what the

7    abbreviations meant.  He had to admit on

8    cross-examination that his own documents provided him no

9    information about what had occurred with the medical

10   decisions involved.

11        The evidence has also revealed that the pain

12   management agreements had forged signatures and they

13   were largely for show since all the experts told you and

14   the time lines tell you they were not followed.  The

15   Defendants' records are simply teeming with false

16   information.  Not information that was false out of

17   ignorance, but because of calculated and intentional

18   manipulations.  Again, Steve Schneider admitted to

19   creating that false progress note for Patty out of thin

20   air, which completely corroborates what Jennifer Harry

21   told you, that creating missing progress notes was a

22   daily occurrence under Linda's direction.  As Jamie

23   Hillard, Angela Dunnavent, Cindy Curry and Crystal

24   Updegraff told you, Linda directed them to create false

25   documents.  And as Cindy Curry told you, Linda wanted

 1   her to shred documents from Kandace' records.  That's

 2   not evidence of anything other than fraud and guilt.

 3        The defense has suggested to you that there was no

 4   fraud here because the documents exist and they have

 5   harmful information in them.  What competent criminal

 6   would do that?  Well, this is the insurance industry,

 7   Ladies and Gentlemen.  All medical practices have to

 8   have records because the insurance programs can audit

 9   them at any time.  They have to have the records to

10   assure the payment.  But the evidence has not shown

11   these to be legitimate records.  That's why they are

12   evidence against the Defendants.  As multiple witnesses

13   testified, many F words applied to these documents.

14   They are false, forged and for-show.  Even when the

15   staff couldn't find records, that didn't stop the

16   Defendants stickin' to the plan and billing the

17   insurance companies because Linda would always have what

18   she needed recreated.  So even the Defendants didn't

19   treat these like real medical records.  And in this

20   case, false translates into fraudulent because the

21   pattern of conduct over time speaks to intentional

22   conduct, not mistake.  The reviewers don't like to use

23   that F word because they know they're not supposed to

24   comment on the Defendants' state of mind; but they saw

25   evidence of fraud in their reviews, which brings us to

1    Counts 13 through 17.

2        You heard the consistent testimony of the four

3    ladies who did the reviews of thousands of claims from

4    the valid random sample that Steve Sulpor and Rodney

5    Brown designed.  They all found the same patterns of

6    fraud:  Upcoding the provider, upcoding the services.

7    Medicaid, PHS and Blue Cross performed additional audits

8    and found the same patterns of false claims.  Finally,

9    Dr. Jorgensen, a certified coder, a physician, reviewed

10   almost 1300 claims.  The same patterns in his review.

11   They also found the documents pretty much illegible.

12   Not disputed.  Illegible documents do not corroborate

13   the claims, so they're undocumented in another respect.

14   Dr. Jorgensen called these things horrendiomous.  Worst

15   he had ever seen.  But the reviewers gave every document

16   the benefit of the doubt.  So, the percentages are

17   conservative.

18       The Government submits that the evidence from the

19   insurance reviews and Dr. Jorgensen's review stands

20   undisputed.  Ms. Cobuzzi made some general comments

21   about undercoding, but she really offered no evidence as

22   to any specific person or claim.  And she conducted what

23   can only be described as a completely unprofessional and

24   unconvincing review of less than 150 claims.  Not

25   charts, not people.  Claims.  She pulled charts willy

1    nilly and then chose claims indiscriminately.  She also

2    testified that coding was based on feelings.  No, not in

3    anybody's universe except yours.  Ms. Cobuzzi had her

4    own little universe because she thought she could get

5    away with lying to you on the stand.  But we caught her

6    at it, didn't we?  If she is willing to lie about

7    something so insignificant, Ladies and Gentlemen, what

8    was she willing to lie about for that $44,000 that she

9    admitted she got paid, not for her time, but for her

10   testimony.

11        Are all of these patterns coincidence?  Of course

12   not.  There is no reasonable doubt, Ladies and

13   Gentlemen, the Defendants executed a scheme to defraud

14   the health care programs and did so repeatedly over

15   time, proving their intentional and willful conduct.

16        So who's responsible?  The Defendants.  Why?

17   Because, as I again pinned Ms. Cobuzzi down when she was

18   furtively looking to the defense for help, the person

19   who gets the money is responsible.  The buck stops

20   there.  The money went to the Defendants.  All of the

21   reviewers told you the physician is responsible for the

22   claims submitted.  The clinic manager is responsible.

23   Especially when she's directing how fee tickets are to

24   be filled out and she's directing how the claims are

25   submitted.  Throughout the trial the Defendants tried to

 1    tell you that they were not responsible for the false

 2    claims.  It was the billing department.  They must have

 3    made mistakes.  But how do mistakes occur ad nauseum for

 4    four years over many, many different people?  If monkeys

 5    can do billing, as Linda told Sherri Mills, the

 6    Defendants were evidently never concerned about

 7    correcting the so-called mistakes they directed to occur

 8    over a four year period that netted them a lot of money.

 9    If monkeys can do billing, Linda made sure how they did

10    it by reviewing every single chart and fee ticket before

11    it went to billing.  Again, at the beginning of the

12    trial, the Defendants wanted to deny this activity.  But

13    as the evidence of her knowledge and involvement piled

14    up, they tried instead to deflect it.  If this were a

15    bank robbery, Ladies and Gentlemen, the explosive dye

16    hidden in the money would be all over the Defendants.

17         In their opening statements the Defendants claimed

18    they weren't responsible for the claims submitted to the

19    programs.  But the evidence did not support that claim.

20    The Defendants were responsible because they were

21    receiving the money.  They were the ones with the house

22    in Mexico overlooking the Pacific.  They were the ones

23    with a Hummer in the driveway.  And they are the ones

24    that took $1.4 million out of the clinic.  Not the

25    billing personnel who they now want to blame.  The

1    evidence is the Defendants cleverly with calculation

2    and, I would submit to you, a degree of arrogance,

3    submitted false and fraudulent claims to the programs

4    with that one goal in mind:  Money.

5        We have proved beyond a reasonable doubt that the

6    Defendants are guilty of Counts 7 through 17.  Mark your

7    verdict forms guilty as charged in those counts.

8        Money laundering.  As we told you in opening

9    statement, money laundering simply means taking the

10   dirty money from criminal activity and transferring it

11   in sums greater than $10,000.  There's really no dispute

12   that the transfers occurred in greater than $10,000

13   chunks.  No dispute that they were from -- to and from

14   financially, federally insured banks, which puts them in

15   interstate commerce.

16       So, really, the only dispute here is whether the

17   Defendants knew the money laundering -- money was being

18   transferred, came from criminal activity, and whether

19   that criminal activity were the charges in the

20   Indictment.

21       The Government submits that, again, this has been

22   undisputed evidence.  The evidence is clear and

23   consistent with verdicts of guilty.  They did illegally

24   dispense drugs.  They did commit health care fraud.  As

25   summarized in Exhibit 1-J, they received millions from

1    their fraud.  They deposited it into their bank account

2    at Valley State Bank and those funds were the majority

3    of the Defendants' income, as Bob Hawkins told you, and

4    as Exhibits 46 and 47 showed you.  Once the audits and

5    investigations began, money laundering began.  Where did

6    130,000 end up?  Mexico.  That's summarized for you in

7    Exhibit 37.  As Bob Hawkins told you, those earlier

8    transfers, the $50,000 rolling through several accounts,

9    no sense.  Make no sense unless you're trying to hide

10   something from the Government.  And if they did nothing

11   wrong, why try to hide money through these convoluted

12   transactions.  And just in case you missed this tidbit,

13   it was Steve that sent that money to Mexico.  If they

14   did nothing wrong, why shuffle that money around to your

15   parents and Dr. Estivo as is shown in Exhibit 38, 39 and

16   40, which Mr. Hawkins told you were these circular

17   transactions.  Why do that right after the Medicaid

18   intent to terminate?  Why do that right after we've done

19   the first search warrant?  If they did nothing wrong,

20   why try to phoney up that promissory note for a debt you

21   don't owe to your father-in-law?  So when you convict

22   the Defendants of their illegal drug dispensing and

23   their health care fraud, you must convict them of the

24   money laundering.  They took dirty money, transferred it

25   into chunks into $10,000 or more.  Case closed.  No

1    reasonable doubt.  Mark your verdict forms guilty Count

2    18 through 34.

3         Finally, let's look at Count 1, the conspiracy

4    count.  Where the Indictment begins.  The conspiracy

5    includes all of the criminal conduct we have just

6    reviewed.  Evidence in this case has proved a classic

7    conspiracy which typically involves an implicit

8    agreement to engage in criminal conduct and then an

9    agreement to divide the labor with everyone performing a

10   particular function necessary to the success of the

11   illegal venture.  In this case there's no dispute the

12   Defendants jointly owned and operated the Schneider

13   Medical Clinic.  Additionally and most importantly, both

14   Defendants benefited.  In all of these respects the

15   Defendants acted together and interdependently.  Their

16   actions are proof of their agreement.  As the Judge

17   instructed you, the very nature of a conspiracy means

18   that there is no meeting or majority vote needed for a

19   conspiracy.  People who engage in criminal conspiracies

20   don't enter into written contracts to violate the law.

21   In fact, they rarely even talk about it openly.  They

22   don't explicitly say, oh, hey, let's, uhm, break a law

23   today.  That's not how it works.  That's why you have to

24   look at their actions.  And all of the evidence I just

25   reviewed for you with regards to the illegal drug

1    dispensing and the health care fraud and the money

2    laundering proves that they were acting together to

3    violate those laws.  All of the criminal activities are

4    overt acts of the conspiracy.  All of the evidence in

5    this case proves the conspiracy because it shows the

6    Defendants' purpose, their participation, and their

7    profit.

8         Another thing about conspiracy that you've got to

9    consider is it's like the Three Musketeers:  All for

10   one, one for all.  Therefore, whatever either Defendant

11   did or directed to be done, you consider that both were

12   taking those actions.  And most importantly, when one

13   conspirator commits a crime in furtherance of the

14   conspiracy, all of the conspirators are held

15   responsible, because as Judge Belot instructed you,

16   conspirators act as agents for each other.  As a very

17   simple example, if I go buy a car and my buddy buys a

18   gun and I drive him to the bank to rob the bank, and he

19   goes in and I stay in the car, and he kills somebody.

20   Guess what?  We've both robbed the bank, and we're both

21   responsible for that death.  So no matter who does what,

22   if you've got conspirators working together, both

23   Defendants must be held responsible.  All the false

24   claims, all of the money laundering, all of the drug

25   dealing and the deaths that resulted.

         1          The defense has been, well, if this were a

         2     conspiracy and a scheme, why didn't Defendant ask other

         3     people to get involved.  Well, the evidence is that they

         4     did for a while; but when those people quit, they went

         5     to law enforcement.  So like any good criminals, they're

         6     gonna adapt, they're gonna change their ways.  And

         7     they're not gonna involve anybody else.  That's what

         8     happened.  That other people didn't engage in criminal

         9     conduct does not exonerate the Defendants from their

        10     criminal conduct.  The evidence has overwhelmingly

        11     proved that the Defendants conspired together to commit

        12     the acts charged in Counts 2 through 34 of the

        13     Indictment.  Mark guilty on Count 1.

        14          Well, you're probably going to be glad that I'm

        15     almost finished.  But, before the defense speaks to you

        16     after lunch, I thought I ought to mention a little about

        17     what the Government expects to be their defenses.

        18          The defense appears to have chosen what I call the

        19     shotgun approach.  They are throwing out as many

        20     defenses as possible, hoping they'll hit something.  But

        21     the defenses are all geared to do the same thing:  To

        22     divert your attention from the facts; to send you on

        23     detours and deadends.  The Government submits to you

        24     that the defense does not want you to keep your eyes on

        25     the road.  The Government submits they will be working

1    diligently to shift your focus away from the facts to

2    lead you to detours and deadends.  And all of those

3    deadends and detours are paved with excuses, silly

4    explanations and empty denials.

5        The defense will also no doubt be trying to shift

6    focus away from them and on to other people.

7    Additionally, the Government predicts that they'll spend

8    some time in closing argument trying to convince you

9    that the Government witnesses cannot be believed.  But

10   remember the Judge's instructions about witness

11   credibility.  The Government's witnesses, unlike many of

12   the defense witnesses, withstood cross-examination

13   without wavering.  Each and every Government witness was

14   consistent, credible, and corroborated.  Just remember,

15   Leo, Tab, Barbara, Alicia, and Mike.  They consistently

16   described the same thing.  They were all fighting to

17   escape from the Defendants' scheme that was destroying

18   their lives.  In contrast, the Defendants' witnesses

19   were not consistent, were caught in some false

20   testimony, and many were brought here without knowledge

21   of the facts of the case.  Remember the witnesses

22   surprise when we asked them about the overdose deaths.

23   The Government submits that the defense witnesses did

24   nothing to help you understand what was really happening

25   at the Defendants' clinic and did nothing to help you

1      reach a verdict.  That was especially true of the expert

2      witnesses the defense called.  As Judge Belot has

3      instructed, those experts were supposed to be here to

4      help you.  In some cases involving experts, people might

5      think that it's just a battle between the experts.  But

6      that isn't what occurred here.

7          The Government's experts were professional,

8      credible, and gave detailed explanations to help you

9      decide this case.  By comparison, the defense experts

10     were unprofessional, and sometimes untruthful, like

11     Ms. Cobuzzi, or unqualified and of no help, like Dr.

12     Karch, who despite his hefty price tag of over $100,000,

13     didn't even follow the teachings of his own book and

14     came here to testify without a thorough and fair review

15     of all the information.  But, in a way, the defense

16     experts ended up helping you because even they had to

17     agree with a lot of the Government's propositions when

18     forced to do so on cross-examination.  So it wasn't a

19     battle.  It really wasn't even a skirmish.  It was more

20     of a smackdown by the Government's witnesses.  The

21     Government's witnesses, unlike the Defendants'

22     witnesses, owe nobody any favor, not one had a dog in

23     this fight.  None of the Government's witnesses had a

24     stake in the outcome.  The only individuals that have a

25     stake in the outcome are the Defendants, Stephen and

 1    Linda Schneider.   Perhaps some of their loyal but

 2    misguided patients who want the clinic to reopen have a

 3    stake in the outcome because they want to receive their

 4    drugs, which, but for chance, could have cost them their

 5    lives, too.   And remember that none of the Government's

 6    witnesses stand alone in their telling of the

 7    Defendants' conspiracy and scheme to defraud.

 8    Everything the Government witnesses told you was

 9    corroborated over and over again by other witnesses, the

10    documents, and sometimes by even the Defendants own

11    statements.   Everything the witnesses and the documents

12    tell you is corroborated by something very important.

13    You all brought it with you April 26.   Your common

14    sense.   Don't leave that behind.   Take that to the jury

15    room with so when the defense is offering what we

16    believe will be their many detours and deadends, please

17    do what I ask:   Keep your eyes on the road.

18        Throughout this trial, the Defendants have been

19    trying to convince you that they did nothing wrong; they

20    were not criminal co-conspirators; they didn't illegally

21    dispense drugs; they didn't commit health care fraud;

22    they didn't launder money.   But the evidence defeats

23    each and every one of these claims, Ladies and

24    Gentlemen.   The evidence proves that the Defendants

25    engaged in a joint criminal venture through the

1    Schneider Medical Clinic and together they illegally

2    dispensed drugs and committed health care fraud

3    resulting in the deaths of as many as 21 individuals.

4        When you're listening to the Defendants' closing

5    arguments, see what facts they talk about.  On the other

6    hand, see what facts they avoid like the plague.  See

7    what assumptions and speculations and theories they ask

8    you to swallow.  But remember, assumptions, speculations

9    and theories are not evidence.  And cross-examination

10   questions, no matter at what volume, are not evidence.

11       The Government has met its obligation of proving

12   all of the elements of the crimes charged beyond a

13   reasonable doubt.  There is no reason to not convict the

14   Defendants.  Given the evidence you have heard, it is

15   clear that the Defendants committed the crimes with

16   which they are charged:  Count 1, they conspired to

17   violate the law; Counts 2 through 6, they illegally

18   dispensed drugs; Counts 7 through 17, health care fraud;

19   Counts 18 through 34, they laundered money.  Therefore,

20   the Government asks that you return verdicts supported

21   by all of the evidence in this case.  Verdicts of guilty

22   on each and every count of the Indictment.  And special

23   verdicts of illegally dispensing drugs, resulting in

24   deaths for Counts 2 through 5, and health care fraud

25   resulting in deaths for Count 7 through 9.  Thank you.

1              THE COURT:  All right.  We'll take our lunch

2    recess, Ladies and Gentlemen.  Approximately until 1:00

3    or thereabouts.

4                        (Noon recess.)

5

6                        (No omissions.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25