1          THE COURT:  Yes, sir.  Mr. Williamson.

2          MR. WILLIAMSON:  All right everybody.  Back

3    and ready.  Well, here we are.  This is my last

4    opportunity to speak with you all.  You know I hate the

5    podium so I'm going to kind of stand off to the side for

6    the most part.  If anybody can't hear me, let me know.

7    I've been struggling with this voice thing for about a

8    week and a half or two.  Speaking of that, you and I

9    have gone on a pretty long journey together.  We started

10   off on April 26, and just like Mr. Byers, this is the

11   longest trial I've had.  This will be my longest closing

12   argument that I've ever given.  Most probably the most

13   important one that I've given in all of my 32 -- turning

14   33 years on Friday.  A little bit afraid as I stand

15   here, but I'm proud.

16        As an attorney, you always try to dig deep inside

17   and make sure that you can give a jury what they need in

18   order to make a decision.  And I promised you during

19   opening statements that I would do my darnedest, my

20   level best, to give you the whole truth in this case and

21   let you make a judgment; and that based on that whole

22   truth as to whether or not any crimes actually occurred.

23   I've tried hard and you guys have been extremely

24   attentive.  You have paid attention.  And with that in

25   mind, you've gotten to see me get yelled at by the

1    judge, and you've gotten to see me at my best and at my

2    worst, and I just feel like when you have an experience

3    like this together like we've had, you can't walk away

4    but feeling as if we know each other.  We've been in

5    this combat for eight weeks where people's lives are at

6    stake, where liberties are at issue; and you cannot help

7    but form some kind of bond when you are in that process.

8         And I take us back to opening because, again, I

9    promised you I would do my level best to give you the

10   whole truth in this case.  I also promised you that this

11   was an important case and a serious case and I believe

12   that you've seen that from the evidence thus far.  As a

13   jury, your duty is extremely extremely important, and

14   Mr. Byers touched on this.  You know, you're not here

15   just because.  You're here for a reason.  And that

16   Constitution that he pulled out, please never lose sight

17   of the fact of how important of a document that is.  And

18   hundreds of years later, we may forget sometimes, we may

19   want to say, well, it's just the Constitution, it's just

20   a document.  But remember the lives that were shed, the

21   blood that was spread on battlefields for you and I to

22   be able to enjoy liberty and the declaration of

23   independence.  Life, liberty and the pursuit of

24   happiness, that is what makes us American.  And juries

25   like you are the ones who protect our liberties and it's

1    not a duty that you should take lightly.  It's not a

2    responsibility that you should just shun at.  You should

3    be proud for being here, as I am being here to talk with

4    you.

5         Unfortunately, I feel like your job has been made

6    very difficult by the Government and I'll talk to you

7    about that.  But right now, you 11 people are more

8    powerful than the FBI.  You're more powerful than the

9    DEA.  You're more powerful than the prosecutor.  You're

10   more powerful than the judge because the judge gives you

11   the law; but you, you pass the judgment in this case.

12   And what you say stands.  That is an awesome

13   responsibility and it is why I am humbled to be standing

14   before you with this opportunity to tell you why justice

15   is on our side.  It's going to take me a while.  I'm

16   going to probably get emotional at times.  I'm going to

17   have to be dry at times; but at the end of the day, I'm

18   going to do my best to give you what I think you need in

19   order to make a just decision in this case.

20        Now, what I want to start off with are these jury

21   instructions.  I want us to talk about some of these

22   together.  It's almost going to be like being in school.

23   I want you to pull out your books and turn to a certain

24   page.  And the reason we're going to do this first is

25   because, unlike what the Government represented to you

1    in their closing, they told you that the Indictment was

2    the roadmap.  Huh-uh.  Instruction number 3 that the

3    judge gave you tells you that the Indictment is not

4    evidence.  The roadmap that you have are these jury

5    instructions.  And Mr. Byers spent a lot of time telling

6    you where there's charged crimes or uncharged crimes.

7    And by the way, some of the things he may have said,

8    make sure he was clear, they may be written in the

9    Indictment but they're not charged conduct.  And what we

10   have to do is we have to say, okay, all right, let us

11   sift between what is relevant to the criminal conduct

12   and what is just stuff that the Government was trying to

13   throw on the wall to maybe confuse us or snow us over.

14   I always start with -- let's start with Instruction

15   Number 38.  Always start with beyond a reasonable doubt

16   because of the sacrifices that were made for this

17   standard to be in place.  And when you're there, just

18   look up and I'll know to move on.

19       Let's talk about this burden.  What I really want

20   to focus on here is at the very last sentence.  If, on

21   the other hand, you think there is a real possibility

22   that he or she is not guilty, you must give him or her

23   the benefit of the doubt and return verdicts of not

24   guilty.  Understand that.  That if there's a close call,

25   but there is a real possibility that they're not guilty,

1    you have to, must is the word, give the benefit of the

2    doubt to the Defendants.  Now, one thing you're going to

3    have to look at and ask yourself:  Does the Government's

4    theory make sense?  Does it actually apply to the

5    elements that are presented to us?  Using our common

6    sense, did this really happen this way?  Were their

7    witnesses credible?  Were they believable?  Are there

8    two sides to this story, that their story may not

9    necessarily be true?  When you ask yourself those

10   questions, and you believe there's a real possibility,

11   you have to, in order to preserve the liberties in this

12   country, you have to apply that burden.

13        Now, take a look at this page and tell me if you

14   see anywhere in there reasonable medical certainty.  You

15   heard that term tossed around by the Government.  It's

16   irrelevant.  You heard, per se, in her closing argument,

17   well, the buck stops here, they're responsible.  You

18   look through these jury instructions.  And what she's

19   trying to get you to apply as the law, you look to

20   determine whether or not that is actually in there.  I'm

21   going to go through some more of those with you.  But

22   everything that they have to prove has to be proved

23   beyond a reasonable doubt.  You remember me asking Dr.

24   Karch questions about beyond a reasonable doubt?  I

25   asked Dr. Oeberst questions beyond a reasonable doubt to

1   which she could not say that she could say it beyond a

2   reasonable doubt.  Government came back with this

3   reasonable medical certainty.  With Dr. Parran,

4   reasonable medical certainty.  With Dr. Jorgensen,

5   reasonable medical certainty.  Ladies and Gentlemen,

6   we're in a criminal court, where the liberty of citizens

7   are at stake and it's beyond a reasonable doubt.

8   Without question.

9        Next let's turn to -- well, we looked at jury

10  instruction 3.  And any time that I am working a case I

11  do lay awake at night and I try to say what is this case

12  about.  What is this case really about?  I think for you

13  to really be able to render a verdict, you have to see

14  what was happening here.  And I have to be able to point

15  that out to you.  And the first thing that jumps to

16  mind, Ladies and Gentlemen, that there has been a huge

17  betrayal of trust by the Government.  You heard Kevin

18  Byers mention a few things of where the ball was hid and

19  things like that.  I don't play raquetball so I'm not

20  going to use that analogy.  But, his points were

21  extremely valid.  It is not the Government's job to

22  secure a conviction.  It's the Government's job to do

23  justice.  Do you ignore favorable evidence to a party

24  and call it justice?

25        First let's talk about these deaths.  Let's talk

1    about what that really was.  First, you heard -- you

2    heard family members get up and tell you we don't

3    believe Dr. Schneider was responsible.  Did the

4    Government ever take the time to contact these family

5    members that they decide to parade in 1-A that you heard

6    over and over and over and over again?  What was that?

7    That was a ploy.  What kind of ploy was it?  To play on

8    human sympathy.  We all, when we hear of a person

9    passing away, we all want to feel sympathetic.  We all

10   want to -- it tugs at our heart.  Why did they spend

11   several days talking to you about people passing away

12   before ever attempting to establish that a law was

13   broken?  Because understand this, that if Dr. Schneider

14   was being a medical doctor and these people passed away,

15   it's irrelevant.

16       But beyond that, I want to talk about the steps

17   that they went through to compile these 68 people.

18   First, understand that they went through every patient

19   record that Dr. Schneider saw since 2002 and probably

20   even before that.  What they decided to do was eliminate

21   one area and represent that as representative of the

22   whole practice.  All right.  Let's give 'em that.

23   That's, you know, that's just something they did.  But

24   maybe that doesn't say anything.  Ladies and Gentlemen,

25   they were looking to inflate numbers.  Don't believe me?

1    Well, they added two people who passed away after Dr.

2    Schneider was in jail.  Well, mind you, Dr. Schneider is

3    the only provider from the Schneider Medical Clinic

4    sitting here.  So why are they adding people that passed

5    away after he couldn't even do anything?  They added

6    people who did not ever receive a controlled substance

7    from Dr. Schneider.  Why?  Because they wanted to

8    inflate the numbers.  Let's say 68.  Let's inflame the

9    jury.  Let's make them vote off passion and sympathy.

10   Let's snow them over so they won't take a look at the

11   actual facts.  Okay.  Well, they added people who took

12   illegal drugs.  Cocaine, methamphetamine.  Who was never

13   issued by Dr. Schneider.  Why did they add those in

14   there?  Pilin' up.  Let's get as many as we can.  Let's

15   not go talk about these families.  Let's not treat these

16   people as people.  Let's treat these people as numbers.

17   That's what they did.  They've treated these people as

18   numbers.  You don't know what their conditions were.

19   Did they look at that 1-A?  Do they talk about what

20   their medical conditions were?  No.  They don't care.

21   Now, beyond that, they had people who took their own

22   life in that chart.  So now Dr. Schneider is somehow

23   responsible for people deciding to take their own life?

24   He's supposed to be swami and see all and know all?  No.

25   It's an attempt to take advantage of your human

 1    sympathy.  And nobody can take a look at this -- and I

 2    don't care who you are -- I represent Dr. Schneider.

 3    You cannot look -- and I don't care if it's 68 out of

 4    10,000.  Whenever you see 68, your brain does something

 5    funny.  I have legal training that I can probably undo

 6    it.  And then you have to sit back and say, okay, well,

 7    all right, 68.  But I'm called to use my reason, to use

 8    my common sense.  What does this 68 really mean?  How

 9    many people in that 68 chart never ever saw Dr.

10    Schneider at all?  That saw some other provider?  Some

11    other doctor?  How many people in there didn't see Dr.

12    Schneider for over 50 days?  30 days?  Where does the

13    continuum stop?  Where was their cut off?  If you ever

14    went at any point in time, you got included on that

15    chart.  Matter of fact, we're not going to call your

16    family but we're going to go through your medical

17    records.  My gosh, you heard the federal government.

18    They're not bound by HIPAA.  They can go in your records

19    whenever they want to.  They can go pull other people's

20    records.  What were they doing with these deaths?

21    Trying to inflate the numbers.  Now, oh, you had a

22    person who took the drugs of their mother, of their

23    friend.  You had people stop at a car light -- excuse

24    me -- stopped on the side of the road by police.  They

25    made the conscious choice to eat all of these pills in

1    order not to go to jail.  And the pills came from

2    another patient of Dr. Schneider.  But somehow that

3    person who Dr. Schneider never gave any medicine to at

4    all, is somehow in this chart of 68.

5        Ladies and Gentlemen, you have two choices.  You

6    can be insulted by the simple attempt to take advantage

7    of your human element; or you can say, oh, yeah,

8    Government really didn't prove it but somebody died so

9    I'm just going to consider it anyway.  Your collective

10   power, your collective minds, are way more sophisticated

11   than to let that happen in this case.  You take it for

12   what it's worth.  But let's just finish talking about

13   these people who passed away for a moment.  We brought

14   in an expert, an expensive expert.  Very expensive

15   expert.  But one thing you cannot deny, Dr. Karch's

16   textbook has been around the world.  It's used here by

17   the Sedgwick County Coroner's office.  He's been in

18   London.  He's been in England.  He's been a world-

19   renowned cardiac pathologist.  Now, why is that

20   important?  Because 20 -- and we made a mistake.  We

21   said 19 but it's really 20 of the 21 people charged

22   between counts 2 and 5 suffered serious cardiac issues.

23   So what does that mean?  And you saw -- you saw the

24   autopsies.  You saw some of those medical records.

25   Rarely, if ever, did you see a person pass away without

1    some serious medical condition.  That's why the absence

2    of a person's condition out of that chart 1-A where they

3    keep flashing the people who passed away, number 30, you

4    know, out of 68, number 50 out of 68.  That feeble

5    attempt that they keep trying to snow you over.  That's

6    why it's important to have the actual medical issues

7    identified in that document.  But we bring in a cardiac

8    pathologist because these people have cardiac issues.

9        Now, what did our experts say?  We never went and

10   got some jack-in-the-box off the street and say, oh,

11   cause of death is cardiomegaly, nothing else.  We could

12   have got somebody to say, oh, severe cardiac arrhythmia,

13   you know, that's the cause of death and I know beyond a

14   reasonable doubt.  Huh-uh.  We brought somebody who

15   studied this information, who studied how these drugs

16   play into the human body and how they help and how they

17   hurt.  And he told you that you cannot determine based

18   on what was done by the Sedgwick County forensic office.

19       Now, what the Government's response is:  Parran.

20   It's expensive.  Really?  You look at that Constitution

21   and you tell me and you look at these jury instructions

22   and you tell me the Government's burden is relieved

23   because there's a test available and it was too

24   expensive.  You tell this man here whose life and

25   liberty is hanging in your hands that it's too

1    expensive.  You had a test that could determine how long

2    a person had been taking certain medications.  Now, mind

3    you, you wouldn't know just by looking at the records.

4    A lot of those people were taking these same treatments

5    for years and years and years and years.  But did the

6    Sedgwick County medical examiner ever try to tell you,

7    take you to the evidence that could have helped

8    determine what did it mean.

9         Now, you heard about that tolerance.  Well, how

10    does it apply?  Well, if the person was -- let's say

11    they were under .40 methadone and that's what, that

12    would be their level at life.  And then you have a .40

13    at death.  You know what?  That rules out the mixed drug

14    intoxication.  And then Mary Dudley takes the stand and

15    tells you that I didn't even do a microscopic exam.  If

16    it came back positive for any kind of pain medicines or

17    illicit drugs.  They don't even check the heart.  But

18    they say that's enough to show beyond a reasonable doubt

19    that these people passed away at the prescribing

20    practices from Dr. Schneider?  Really?

21         Ladies and Gentlemen, these were people taking pain

22    medication.  Do you understand that?  These were people

23    taking pain medication.  So if they pass away and they

24    do a tox screen and it comes up, what is going to

25    happen?  It's gonna be pain medication in the system.

1    It's like a circular argument.  You know it's going to

2    come up.  You don't take that into account.  Do they not

3    go get -- they don't go get the medical records either.

4    They make no attempt whatsoever to verify whether or not

5    these drugs in their system caused or contributed to

6    them.  If it was there, it contributed.  Now, you see,

7    Ladies and Gentlemen, please don't misunderstand.  I try

8    to be as sincere as possible.  I don't know if some of

9    these people passed away from mixed drugs.  We just

10   don't know.  The tests that were available weren't done.

11        Now, remember that Schipman issue that the

12   prosecutor was talking to Dr. Karch about?  Remember

13   that?  This Schipman that he went overseas and he found

14   that this doctor went around and poisoned 250 of his

15   patients injecting heroin into the system.  Well, how

16   did he do that?  He tested the hair which showed zero.

17   And he tested the postmortem even though it's

18   unreliable, to show something excessive.  That gives you

19   an indicater.  He did the steps necessary for that

20   Government to find that doctor guilty.  Those steps

21   weren't done here.  You cannot come into a court of law

22   and say, well, we think it was.  We don't have a

23   scientific methodology, so to speak, to really, to

24   really rule out cause one through cause D.  Yeah, there

25   is this test that could have gotten us closer but we

 1  didn't do it.  And say that that's sufficient to meet
 2  your burden.  Is there a real possibility that somebody
 3  with a 600 gram heart can pass away regardless if
 4  they're on medicine or if they're not?  Is it a real
 5  possibility if somebody's sittin' at their table and
 6  they choke and asphyxiate?  You remember that autopsy.
 7  The gentleman asphyxiated but he had medicine in his
 8  system so Dudley said this has to be a mixed drug
 9  intoxication.  How does she know?  How?  Did he take the
10  medicine and stop breathing and try to eat when he
11  wasn't breathing?  Unlikely.  Possible?  Maybe.  But did
12  they know beyond a reasonable doubt?  You take somebody
13  who asphyxiates and happens to have medicine on board,
14  but you bring that into a court of law.  No.  You can't
15  let that happen.  You can't let that happen for several
16  reasons.  And we'll talk about 'em a little bit later.
17      Take a look at instruction number 24 for me please.
18  Last sentence as to Count 5.  Actually this is 2 through
19  4 and 5.  You have to unanimously determine beyond a
20  reasonable doubt which, if any, of the named 18
21  individuals suffered serious bodily injury or death as a
22  result of the controlled substances illegally dispensed
23  by Stephen Schneider.  Keep that in mind as you get
24  ready to proceed.  But remember, beyond a reasonable
25  doubt.  Not beyond reasonable medical certainty.  Not

1   beyond a preponderance of the evidence.  Beyond a

2   reasonable doubt.

3        Now, Count 5 -- oh, let me -- let's talk about one

4   other thing that the Government threw in because they

5   started confounding these numbers later.  They started

6   talking about overdoses.  Right?  All these people

7   overdosed.  You heard 'em in closing, well, they

8   overdosed and five years later he is still prescribing

9   to somebody, four years later he is still prescribing to

10  somebody.  What did the Government do?  Did they give

11  you the charts of the people who allegedly overdosed?

12  Huh-uh.  They put an agent up.  They don't trust you to

13  look at the documents.  They trust their agent to look

14  at the documents, interpret the documents, and tell you

15  which decision you should come to.  Huh-uh.  Who are you

16  more powerful than?  Prosecutor, DEA, FBI.  You're

17  intelligent enough to take a look at those documents.

18  Now, I questioned this officer in detail, and what did

19  he say.  I don't know about this; I don't know about

20  that.  Well, how long -- what was the overdose for?  I'm

21  not for certain.  How long were they in the hospital?  I

22  don't know.  Who was the treating physician?  We don't

23  know.  You look at that chart.  What information does it

24  tell you?  Beyond a reasonable doubt is not met by these

25  summary charts and general opinions that you heard from

 1   people taking the stand.  We'll get into that a little

 2   bit more later.

 3        But in regard to these overdoses, these alleged

 4   overdoses, we don't have anything specific.  What did --

 5   the officer didn't know many of the questions.  Oh,

 6   somebody made a mistake.  Well, we know they went in; we

 7   know they went out.  Why were they even termed

 8   overdoses?  Do we know?  Beyond a reasonable doubt.

 9   Now, why is that relevant to Dr. Schneider?  They say,

10   well, if these people are overdosing, you should have

11   notice of it.  They put in this little exhibit that

12   says, oh, you knew about it.  How many times did I ask

13   him with these different faxes and these different

14   documents:  Do you know for certain that Dr. Schneider

15   got it?  No.  Well, yeah, on this one because he what?

16   He signed it.  How many of those do they say in that

17   chart he actually saw?  What does a chart mean?  What

18   does this number 176 really mean?  It means that some

19   government agent went in, not concerned about the whole

20   truth, as you have already seen throughout this trial,

21   not concerned about getting the whole picture but trying

22   to pull out snippets that support their theory.  Because

23   they don't want to do justice.  They want to get

24   convictions.  They want to lay the smackdown, as

25   Ms. Treadway stated.  This is not about the smackdown,

1    as Mr. Byers said.  This is about justice.  And did they

2    meet their burden?

3         So what do these documents mean?  Well, we don't

4    know.  Well, what did they do to try to supplement that?

5    Let's bring in emergency room doctors.  Great idea.

6    Great idea.  But, wait a second.  We don't have any

7    letters to Dr. Schneider.  Oh, well, e-mails, e-mails,

8    you got e-mails.  No, we don't have e-mails to Dr.

9    Schneider.  Really?  Wow.  Phone calls, yeah, in the

10   grand jury I told 'em I made at least two phone calls.

11   But when I got here?  Oh, it was about ten a year.  Ten

12   a year?  Really?  They bring in three emergency room

13   doctors.  On the face when you hear that you're like,

14   wow, that's impressive.  They're bringing in a whole lot

15   of people.  Ladies and Gentlemen, came from the same

16   darned emergency room.  Is that the only hospital in

17   town?  What about that place called Wesley?  Why didn't

18   they bring in anybody from over there?  Why did they

19   bring in three people who share the same opinion who

20   work together, who talk together?  You don't think that

21   somebody at Wesley noticed this problem that they would

22   have been here?  They brought in over 60 people to come

23   talk to you.  Most of 'em didn't have anything but

24   general opinions, and nothing specific; but they brought

25   'em anyway.  We'll talk about that here in a few

142

1     minutes, too.

2         Now, what they want you to believe is this.  They

3     want you to believe that in 2002 all these people

4     started overdosing.  These emergency room doctors see

5     this pattern but they don't report it to the Kansas

6     Board of Healing Arts.  No written complaint.  They

7     don't send letters to Dr. Schneider.  They don't send

8     letters to the medical society.  Ladies and Gentlemen,

9     all doctors have a duty.  And I submit to you that if it

10    was true that these people saw these amount of overdoses

11    going on and they attribute it to Dr. Schneider, they

12    would have done something about it.  None of this stuff

13    happened until all this stuff hits the media and

14    everybody wants to get in.

15        Now let's talk about that e-mail that Dr. Kaden

16    sent.  You remember that?  I call it a CYA e-mail.  I

17    don't curse in court because my mom would hear about it

18    and she'll get me; but you know what that means.  CYA.

19    You saw all those long names on this e-mail saying, hey,

20    I just had a conversation with Dr. Schneider.  When did

21    that happen?  Two days after the raid, by the way, after

22    this public raid happens.  Two days after.  I sent all

23    my colleagues an e-mail.  I had a conversation with Dr.

24    Schneider, by the way, I told him I had conversations

25    with you before.  Why did he send it to Dr. Schneider?

1    Oh, I don't have his e-mail.  Why not put in a letter

2    and CC?  Were they serious?  You believe that?  Does it

3    make sense?  Were they concerned that the feds may come

4    in their hospital next?  Did they just have a grudge

5    against Dr. Schneider?  Who knows.  But it's not

6    believable.

7         Ladies and Gentlemen, when you take this oath, you

8    do not throw away your common sense to evaluate this

9    "evidence" that's presented before you.  And you sure

10   enough have enough pride to say to the Government that,

11   hey, you want us to convict somebody, you better bring

12   us -- you better bring it to us for real.  You better

13   bring us the real evidence, enough for us to say that an

14   actual law was violated.  And they have not done that.

15   Especially in regards to these overdosing deaths.

16   They're trying to play on your emotions.  They're trying

17   to play on your sympathy.  They put up 176.  Now, I may

18   talk about this a little bit, Ladies and Gentlemen, but

19   176 -- I'll talk about that now.  What else did -- what

20   else has the Government done here that should cause you

21   some real concern?  Well, we talked a little bit about

22   those summaries.  Let's talk just a little bit more

23   about the summaries then.  You know, unlike Mr. Byers, I

24   try to stay halfway up to date with the technology so

25   I'm going to try something here.  If it doesn't work --

1   never mind, it will work.  So, let's look at this.  This

2   is the summary charts.  Right?  They put in all these

3   different charts.  They put 'em in.  Over and over and

4   over and over again.  Will this aid the jury?  Will this

5   aid the jury?  Will this aid the jury?  Ladies and

6   Gentlemen, in the jury box, in the jury deliberation

7   room, you need evidence.  You don't need some documents

8   that an agent sat in his office and spent time after

9   time after time putting together.  You need evidence.

10  So they give you summaries of medical records.  They

11  gave summaries of those overdoses.  They gave you

12  summaries of deaths.  They gave you summaries of

13  billings, which we'll talk about later.  Summary,

14  summary, summary.  Ladies and Gentlemen, if you really

15  want to test the accuracy, go look at these.  Look at

16  the actual documents and compare them.  That binder that

17  they gave you with these summaries of the office visits

18  is so incomplete.  They don't give you the complete

19  picture in there.  They make it seem like these patients

20  just came to Dr. Schneider for pain medicine.  Came in,

21  got pain medicine.  They're -- they reduce these people

22  to summaries.

23      I'm going to talk to you about some of these

24  medical issues that these people had.  They're not

25  summaries.  I questioned these people on these

145

1    summaries.  Dr. Jorgensen had to admit, oh, that's a

2    mistake there.  Really?  You gonna come in this

3    courtroom when you have the burden -- I know nobody's

4    perfect.  I don't claim to try to beat people up for

5    being imperfect.  But when you represent something on

6    direct as being accurate and complete, which was their

7    representation, every single time, I just went in, two,

8    three, four entries on multiple documents, showing that

9    this stuff is inaccurate and incomplete.  That's enough.

10   I saw you guys getting tired at times, but, you know, I

11   tried my best to give you what you need to show that

12   this stuff isn't accurate and complete as the Government

13   said.

14        Now, the thing about these many urine drug screens

15   that they put up.  First, you won't see urinary drug

16   screen in the jury instructions anywhere.  We'll

17   probably talk about that, too.  But the chart is wrong.

18   You go look at Patricia G's file.  The urinary drug

19   screen that they said was failed says P-A-S-S-E-D on

20   there.  Means you can't trust that either.  So what do

21   you do?  You need to review it.  Again, these summaries,

22   they lack context.  They lack completeness is exactly

23   what they lack.  You don't come in with these incomplete

24   charts, summaries, saying this is our burden, it's met

25   by a summary that a federal agent decides to put

 1   together.  By the way, Government says these agents
 2   don't have a stake -- or their witnesses don't have a
 3   stake in what happened.  Do you believe that?  Do you
 4   believe federal agents are gonna take the stand for
 5   their government and they don't have a stake in what
 6   happens?  That's their representation to you.  Not mine.
 7   Common sense.  What does she do when jury selection
 8   started?  This is my agent James Greer.  This is my
 9   agent Martin Redd.  This is mine, this is mine, this is
10   mine.  But now she disclaims them.  Oh, they're not
11   really with us.  They just, they just -- they're just
12   disinterested witnesses even though they're our case
13   agents.  Believe it if you like.
14       Now, we talked about that jury instruction, I think
15   it was 24, and we looked at that and it's talking about
16   Count 5.  This is another one of those government
17   tricks.  And you heard me talk about it in opening,
18   those shotgun charges.  Remember that?  She said we're
19   doing a shotgun defense.  Huh-uh.  I'm taking you down
20   the jury instructions and talking to you about the facts
21   of this case.  Okay?  Not taking you on only end-up
22   versions.  I'm taking you right to where you need to be.
23   How many jury instructions did she walk you through?
24   Zero.  She wants you to go back to that darn Indictment.
25   Remember?  That historical fiction thing I was telling

147

1    you about?  That's what that Indictment is.  Yeah, may

2    be some truth mixed in there somewhere.  It reads well.

3    Heck, when I read it I was like, dang.  Then I started

4    looking at medical records and I'm like, oh, wait a

5    minute, something don't jive here.  That's not your map.

6    I'm taking you through the jury instructions.

7         Now, these shotgun charges.  Right.  What did she

8    tell you?  Count 5, and even Count 6, all they have to

9    do is find Dr. Schneider guilty of one and they're gonna

10   go home happy.  They do this in order to play on our

11   human emotions of wanting to compromise and try to be

12   fair.  All right.  How how Indictments have you seen

13   from the federal government announced in the news that

14   say one charge?  Really?  I can't think of any.  It's

15   always multiple this, multiple that, multiple this.  And

16   she sat up here and told you that if you -- all you have

17   to do is find them guilty of just one.  Ladies and

18   Gentlemen, I'm going to get to the real relevant jury

19   instructions just here in a minute, but the bottom line

20   is, you follow the law.  That's what I'm asking you to

21   do.  I can't tell you to do anything.  You're way more

22   powerful than me.  This is my last chance to speak to

23   you.  But you follow the law.

24        Oh, you know what else they like to do?  Pile it on

25   regardless of the relevance.  Pile it on.  Pile on the

1    witnesses.  Put all these documents in.  Look at -- must

2    be something illegal happening, it has to be, look at

3    all these binders that the Government spent our money

4    puttin' together, killin' trees.  There has to be

5    something.  Right?  That's what we as citizens want to

6    believe.  Why are they going to put all of this

7    information before us if it's not relevant?  Why are you

8    going to waste our time?  Ladies and Gentlemen, they

9    decided to go quality -- excuse me -- quantity over

10   quality.  You remember that one witness, the Homeland

11   Security guy, who knew nothing about nothing?  He was up

12   and down in like two minutes.  Even His Honor said what

13   the heck, why you bringing him here?  Quantity is what

14   it's about.  Why did they bring in witnesses to talk

15   about cats?  Quantity.  Why did they bring in witnesses

16   to talk about candles?  Quantity.  Ladies and Gentlemen,

17   these are all these little things from the Government

18   playbook that you have a chance to say, huh-uh, we're

19   not gonna buy that, I want to see the evidence.  You set

20   through it.  You heard all of it.

21       I'm going to talk to you about the evidence here in

22   a minute; but beyond that, why can't you trust what

23   these summaries say?  Why can't you trust what the

24   "evidence" is?  Well, Ladies and Gentlemen, they also

25   have proven beyond any doubt that their only concern is

1   about presenting you with the side of the story that

2   supports their "theory", that fits into the historical

3   fiction document that they have attached to these jury

4   instructions.  Why?  Think about one instance.  This is

5   the most blatant instance that I can think of that's

6   burned in my memory here.  They brought you the First

7   Guard lady.  Right?  They had her talking about

8   complaints.  They had her talking about, well, we put

9   them under review.  Then guess what?  They sat down.

10  Now remember, they have the burden.  Right?  To give you

11  the truth so you can make a verdict.  What did I do?  I

12  got up.  But what if I didn't?  What if Dr. Schneider

13  was sitting here without a lawyer?  What if he didn't

14  have the skill and requisite knowledge to ask these type

15  of questions?  Could you have made a decision?  You

16  would have just thought First Guard went around and

17  punished these people and that was it.  But, Ladies and

18  Gentlemen, we had to come up and we had to complete the

19  story.  You remember that?  You guys remember that.

20  When I had to come up and show that First Guard did a

21  performance review.  The Schneider Medical Clinic

22  finished the performance review.  And what did -- what

23  were they found to have?  Outstanding compliance.  Now,

24  why didn't the Government want you to know that?  Why?

25  What if I would have been asleep at the wheel?  What if

1    I would have been some incompetent lawyer who actually

2    falls asleep at the table when they're not sick?  What

3    if I would have missed that?  What if I would have

4    trusted them and said, you know what, I know the

5    Government is going to give them everything so I'm

6    really not going to pay attention.  You would have been

7    walking away with an incomplete picture of a process.

8    Now, why didn't they do it?  A, it doesn't support their

9    theory; and, B, it actually shows that people who truly

10   do not -- who do not have an interest in what's going on

11   here actually found that the clinic was trying to do

12   things right.  And I'm going to show you what jury

13   instruction that applies to a little bit later.  Okay?

14   Now, I'm not just telling you this because Lawrence says

15   so.  I think I'm a halfway smart guy.  But these jury

16   instructions are what they are and we're bound to follow

17   those.  What else did you learn from that First Guard

18   lady when I had to come up and bring out the

19   information?  A pain management doctor says, hey, you

20   know what, we noticed some things, these charts, you

21   know, documentation is not great, you know, some of

22   these modalities could be a little bit better, but I do

23   not see anything illegal or fraudulent occurring.

24        Now, you want to talk about notice to the clinic?

25   That's the notice.  That's notice.  That's not a summary

1    chart.  That's a letter in evidence.  Now this

2    information has been passed on to the clinic.  And,

3    again, not going to get too far into it because there is

4    a certain jury instruction I want you to look at in that

5    regard.

6         Now, Dr. Schneider and Linda Schneider trusted the

7    government, too.  They trusted their government.  They

8    let the government come in, take records, they sat down

9    with the government.  You remember Dr. Schneider met

10   with the agent during the raid.  No lawyer.  Goes in and

11   voluntarily talks.  Remember that?  They -- Linda goes

12   and talks to the agents on her own.  Dr. Schneider told

13   you when he was on the stand that he let the Government

14   come in because he thought they were interested in the

15   truth.  Whoa, don't be so naive, Dr. Schneider.  Don't

16   be so naive.  You've seen it.  They're not interested in

17   finding the truth.

18        Okay.  You're not convinced yet?  Think about this.

19   They went into that clinic in 2005.  Right?  Now, when

20   Dr. Schneider supposedly allegedly is prescribing to

21   these people and continuously killing them from 2005 to

22   2007, you are mean they just let him stay open.  With

23   all the infinite power that the federal government has,

24   if they truly thought that he was doing something wrong

25   and that it really was truly about patients' safety, do

1    you really think that they would sit back and

2    investigate billing when they had clear evidence?

3    Because according to them:  What do you need?  Write a

4    script?  What do you need?  Write a script.  According

5    to them.  Right?  Do you think that they could pick up a

6    few charts and say, wow, why do you need to write a

7    script, shut 'em down, let's investigate billing.  They

8    let him continue to practice for two years.  So what is

9    it about?  Is it about getting that big score, that big

10   hit, that smackdown that she told you?  Or is it about

11   finding the truth?  God, I'm happy we have juries.

12   Because if we didn't, that press release would have --

13   would have caused -- would have just shut everything

14   down.  You remember that?  We talked about it.  The

15   Government filed press release upon arresting.  No

16   evidence presented in court.  But now the whole public

17   has heard and formed opinions.  Do you know how hard --

18   remember how many people we had to ask to leave because

19   they had formed opinions either one way or the other?  A

20   lot.  You think that was by accident?  Come on.  I'm not

21   a conspiracy theory guy, I promise you I'm not; but the

22   evidence here is telling you one thing, and she admitted

23   it, they want the smackdown.  The smackdown.

24        They talked to federal agents without lawyers.

25   They let federal agents come into their clinic over and

153

1     over and over again.  And Dr. Schneider told you, look,

2     I had nothing to hide.  I wanted them to see.  He

3     admitted leaving prescription pads to agents.  Without a

4     lawyer there.  Now, as Mr. Byers said, that's not even a

5     charge in the Indictment.  But why is it there?  Uhm,

6     let's get the focus off the facts and let's talk about

7     things that may make 'em look bad.  Let's talk about

8     things that make them look like an overwhelmed clinic

9     based on less than 1% of the medical records.  It's okay

10    to test Dr. Schneider's honesty and integrity, but the

11    Government is the accuser in this case and it's just as

12    relevant to test theirs.  You ask yourself:  Have they

13    truly tried to give you the full picture of what

14    happened at the clinic?

15         Lastly, before we move on.  When Dr. Schneider was

16    on the stand -- and Mr. Moore even confirmed this the

17    other day -- what are they concerned about?  The what,

18    not the why.  Dr. Schneider, does your document support

19    or show this?  What does the document say?  What does

20    the document this; what does the document that.  Not,

21    Dr. Schneider, you know, did you really believe this

22    person was in pain?  Not any of that.  I asked him that.

23    I didn't just ask him easy questions either, by the way.

24    I tried to sit back and say if I'm sitting in your

25    position, what do I want to know.  What is it that I

1   need to know.  At that point you didn't have the law.

2   But we're going to talk about that law in just a moment.

3   But when Dr. Schneider was on the stand, what did they

4   say?  What does your document say?  Ladies and

5   Gentlemen, that's the most hypocritical stance that's

6   been taken by the Government.  Don't believe me?  Think

7   about it like this.  What are they telling you in one

8   breath:  The documents are bad.  Which we've never

9   denied, but yet they spent witness after witness after

10  witness putting these people in front of you.  Again,

11  quality -- excuse me -- quantity over quality.  But your

12  documents are bad.  You're documents are so bad that you

13  don't deserve to get paid by the insurance company.

14  But, same breath, your documents are good enough for us

15  to convict you beyond a reasonable doubt.  How is that

16  possible?  How is it possible that you can in good faith

17  say that this document here -- let's look at just

18  this -- I want to give this to you.  But you say that's

19  not good enough under a civil standard; but I can give

20  it to 'em even though it's unreliable.  You state that

21  this is unreliable, but you want to rely on this to take

22  away somebody's liberty, to meet your burden beyond a

23  reasonable doubt.  Everybody that testified for the

24  Government giving these opinions -- and, by the way, we

25  don't need an expert to tell you what drug dealing is

1   and what drug dealing is not.  You know it.  You'll see

2   it.  You'll -- we'll talk about the instructions and

3   what you have to apply to the facts.  But how can they

4   do that?  How can they honestly say that these documents

5   don't support getting paid but they support beyond a

6   reasonable doubt.

7        All right.  Now let's talk about some of these

8   critical elements, these charges.  I want to first talk

9   about Counts 2 through 9 because at the end of the day

10  if you believe that Dr. Schneider was being a doctor

11  with the patients in Counts 2 through 5 and 6, then you

12  have to find not guilty on all of those counts.  Okay?

13  So let's talk about that so you don't think it's

14  Lawrence just tellin' you stuff.  Let's turn first to

15  Instruction 51.  You heard about this -- I'm sorry.

16  Everybody ready?  You heard about this from the judge in

17  the very early part of the case.  Okay.  This isn't a

18  medical malpractice case.  We're not here talking about

19  reasonable medical standards.  Look in there and what

20  does it say beyond a reasonable doubt.  That Dr.

21  Schneider dispensed.  Okay.  Keep that in mind because

22  that's a very important instruction.

23        Now let's turn to -- let's go to Instruction Number

24  20 real quick.  20, 21 and 22 and 23 and 24, I believe,

25  are all pretty much the same, just different people.

1    Okay.  You talk about these elements.  These are the

2    elements that you have to apply here.  You look at

3    Instruction 20 through 23, 24, and you look in there and

4    tell me if you see any words about urinary drug screen.

5    You look in there and tell me if you see anything about

6    early visits.  You have look in there and you tell me if

7    you see anything about prescribing to anybody who may

8    have suffered addiction in the past or who actually

9    suffers from addiction and being in pain.  Nowhere.

10   Okay?  These are your instructions.  This is the law.

11   You know, it's really appealing to say, hey, somebody

12   gave prescription drugs to a person who suffers from an

13   addiction.  Very appealing.  It's not the law and that's

14   not why we're here.  And we'll get into a little bit

15   more detail about that.

16       Now this third element, that's the one I actually

17   agree with the Government on that small point.  That's

18   why we're here.  Okay?  We're talking about whether or

19   not Dr. Schneider was being a doctor or a drug dealer.

20   You remember me telling you at the very first part of

21   the case that this is about whether or not he was a drug

22   dealer or whether or not he was a doctor.  Well, those

23   word aren't used in the jury instructions; but you read

24   the two of them together, it tells you exactly what you

25   need to look at.  In order to interpret element number 3

1   you have to look at jury Instruction 18.  Okay?  Let's

2   turn to jury Instruction 18.  Are you there?  All right.

3        Now, the first part of that says to be lawful and

4   effective a prescription must meet the requirements of

5   1306.04 Title 21 of the Federal Regulations.  And this

6   section starts in pertinent part -- in pertinent part is

7   just a legal term to say, look, we're excerpting out of

8   this big statute or this regulation and these are the

9   parts that are relevant to you.  So, for our purposes

10  for the rest of our discussion we're determining whether

11  or not Dr. Schneider was acting as a doctor or he was

12  acting as a drug dealer.  This is the relevant part.

13  Whether or not he can be held liable for whose acts and

14  when.  This is the relevant jury instruction.  This

15  helps you interpret.  This actually interprets the

16  language in element number 3.  So let's start with the

17  first part.  In order for it to be effective, it must be

18  issued for a legitimate medical purpose by an individual

19  practitioner acting in the usual course of what?  His

20  professional practice.  Okay?  Remember that one?

21  Because we're going to talk about that.  All right.

22       Second part of this that is really important where

23  the Government really really tries to confuse you is

24  this whole issue of who is Dr. Schneider responsible for

25  prescribing for.  Now, I'll give you something.  If Dr.

 1        Schneider left a presigned pad and a PA who was

 2        pending -- their DEA number was pending, and that PA

 3        wrote a prescription, Dr. Schneider would be held

 4        civilly, criminally, liable for that because he signed

 5        it and he trusted 'em.  Okay.  Now why do we say that?

 6        Now look at the next sentence.  It's the responsibility

 7        for the proper prescribing and dispensing of controlled

 8        substances upon the prescribing practitioner.  You get

 9        that?  It's upon the prescribing practitioner.  Well,

10        what does practitioner mean?  Well, look in jury

11        Instruction Number 17.  That's defined for you.  A

12        practitioner means a physician or other person licensed,

13        registered or otherwise permitted by the United States

14        or the jurisdiction in which he or she practices to

15        dispense a controlled substance in the usual course of

16        professional practice.  Know what that means?  That

17        means that hogwash that the Government has been feedin'

18        you about Dr. Schneider being responsible for Dr. St.

19        Clair's, for Curtis Atterbury, for Connie White, for Kim

20        He'bert, for all of their prescriptions, that means that

21        that, everything they been feeding you is not supported

22        by the law.  That's what that means.  Is that a waste of

23        your time?  I'll let you be the judge of that.  But the

24        bottom line is Dr. Schneider is responsible for what he

25        dispenses.  The PA's are responsible for what they

1   dispense because you heard uncontroverted evidence that

2   PA's are registered with the DEA and can prescribe their

3   own medicine.  That is huge.  You go through the

4   Government, even their slanted charts, and Dr. Schneider

5   didn't even give these people medicines on their last

6   visit, their last couple of visits.  Jeff H, he never

7   gave anything to.  Katherine S, he never gave anything

8   to.  Yes, we said that in opening because it's the

9   truth.  These people have -- the law says they're

10  responsible for their own.

11      Now, what's the final part of this that we need to

12  talk about in number 18?  Now, sometimes these people

13  who write these regulations and these people who write

14  our laws, they don't always use the best language.  When

15  I first started law school I remember reading this case

16  called Pinaya (ph).  It was in 1885 or 1887.  I'm

17  sittin' there, the first case I read, I'm sittin' here,

18  like, I made the wrong choice, I'm not gonna last a

19  week, man, what was I thinkin' about, I can't believe I

20  let my mom talk me into this.  The language in the law

21  sometimes is just very confusing.  This is just one of

22  those instances so we're going to have to read it and

23  then just kind of single out words and saying what it

24  really says.  It says a prescription issued in the usual

25  course of professional treatment is not a prescription

 1    within the meaning and intent of the Act.  That's the

 2    law.  If you're treating somebody and you give a

 3    prescription in the treatment, whether or not the

 4    treatment is good, great, bad, indifferent, if you do it

 5    within the professional treatment in your professional

 6    practice, federal law does not apply.  You go to civil

 7    court and you deal with that stuff.  Did they tell you

 8    that?  Remember, they put it up but they didn't talk

 9    about it, did they?  Nope.  They took it down real

10    quick.  Puts a little different light on what we're

11    going to talk about.  Now you have some context to put

12    these facts in.  Doesn't that give you a different light

13    as to, oh, whoa, okay, what were these PA's doing?  Now

14    you know they're responsible for their own, which begs

15    the next question.

16        I'm not going to really talk about a whole lot

17    about conspiracy because I don't think any crimes

18    happened.  But the Government wants you to believe that

19    these two, these two right here, powerfully orchestrated

20    a criminal conspiracy without the help of anybody else

21    in the clinic.  How many other people did you hear about

22    being involved in this conspiracy?  How do they get the

23    medicine to people when it has to go through a pharmacy?

24    How do they get the billing to the insurance company

25    when you hire a billing department?  If none of these

1    people are in on on it.  They want you to believe that

2    this grand conspiracy exists.  You know why?  Because

3    that's the only way they can try to hold him accountable

4    for things that other people did.  Why aren't they here

5    answering for themselves?  You know why?  Because I told

6    you in opening statements that this was about protecting

7    the profits of big insurance.  What did you hear about

8    Dr. Schneider?  Well -- excuse me -- when I asked the

9    agent when did you hear about Dr. Schneider?  2002.

10   He's been practicing since 1988 and you mean it's not

11   until he starts costing these insurance companies all

12   this money that he actually hits the radar.  You

13   remember First Guard.  They were making it sound like,

14   oh, my gosh, he had so many complaints.  It was six

15   complaints one about quality of care.  Three or four of

16   'em were about access.  But that spawned a whole review

17   of everything.  Preferred Health as well.  She made it

18   sound like 127 complaints were lodged against Schneider

19   Medical Clinic.  Oh, my God.  Four.  About quality of

20   care.  That initiated a whole review.  Wasn't just

21   talking to hear myself talk, Ladies and Gentlemen.  I

22   told you what I knew the evidence was going to show.

23        Now, back to this, these people who prescribe

24   should be here to answer for their own.  What they tried

25   to do is make Dr. Schneider answer as to why these

 1   people decided to give certain medicines.  Now let's
 2   talk about this.  Why?  And think about this.  Right.
 3   Doctors are given this permission to give prescriptions.
 4   Why?  To treat.  That's why this law makes sense.
 5   That's why you don't go in judging the treatment.
 6   That's why you didn't go in and try to weigh whether or
 7   not they're a good doctor or bad doctor.  You just say,
 8   all right, was it treatment or was he being a drug
 9   dealer?  Was he acting as a doctor or was he being a
10   drug dealer?  Now, Ladies and Gentlemen, the evidence
11   conclusively in this case shows that Dr. Schneider was
12   being a doctor.
13        Now let's talk a little bit about what the
14   Government has promised you in that regard.  They told
15   you that no medical care was given.  No?  Not sometimes?
16   Now, remember this, they're not just saying that on
17   occasion Dr. Schneider happened to give a pill to
18   somebody as a drug dealer.  They're sayin' they ran a
19   narcotics delivery system and a pill mill.  Keep that in
20   mind.  That's the allegation.  She said, oh, but --
21   today she said, oh, yeah, they -- she said she never
22   said that.  That's what -- I'm sorry.  I'm misreading
23   it.  She said she never stated no medical care was
24   given.  Well, let's look at what she actually said in
25   opening.  Says the Defendants created an environment

1    where their need for volume, their choice for quantity

2    over quality, simply left -- what?  No time to practice

3    medicine.  No time.  Not rarely.  Not sometimes.  No

4    time.  Oh, it gets better.  What else did she say in

5    opening?  She said -- this is what she promised you.

6    The evidence in this case will be that the prescriptions

7    for controlled substances come out of Defendants'

8    medical clinic were not issued for legitimate medical

9    purpose and were not issued in the usual course of

10   medical or professional practice.  Ladies and Gentlemen,

11   we heard from witnesses.  Okay?  We heard from

12   witnesses.

13        Now, you remember Eric T, Patricia G and Robin G?

14   These are people in Counts 2, 3 and 4.  You also

15   remember the family members of Toni W and Dustin L.

16   What did their relatives have to say?  Think about this.

17   Were their loved ones in pain?  Everybody who took the

18   stand either said that their loved ones were in pain or

19   they said I lied about being in pain so I could get some

20   pain medicine.  Pain medicine?  Pain?  How many

21   witnesses -- and this is why I asked this question over

22   and over -- how many witnesses did they bring before you

23   where pain medicine was given to somebody who did not

24   represent to them were in pain?  How many people took

25   the stand that did not -- admittedly did not suffer from

1    pain that pain medicine was given to them?  How many

2    times did you ever hear of an instance that Dr.

3    Schneider shoved some pill down somebody's throat even

4    though they didn't need it?  How many times did you ever

5    hear one one piece of evidence that Dr. Schneider was

6    out selling these prescriptions for money?  How many

7    times did you ever hear any evidence that Dr. Schneider

8    was out selling his prescriptions for sex?  How many

9    times did they present one person who came into the

10   clinic without a pain condition and walking away with

11   pain medicine?

12        Now, they tell you that all he cared about was

13   being a pill mill and they rely on some nicknames to try

14   to show intent.  Say he must have been doing this

15   because people call him "Schneider the Writer" or "the

16   candy man".  Think of common sense.  Please do not leave

17   your common sense at the jury door when you go back

18   there.  Why do you need to trick a person to get

19   medicine if they're going to give it to you?  Why did

20   Alicia C have to send a letter lying about being in

21   pain?  Why did Tabbie H tell you, yes, I had to do what

22   I had to do to get my fix.  Why do you do that if you

23   know this person doesn't care about your medical well

24   being and all he wants to do is give you medicine or

25   pain pills?  Why?  That common fact -- that common sense

1    fact tells you without question that people had to trick

2    Dr. Schneider in order to go in there and walk away with

3    pain medication.  But according to the Government, that

4    doesn't matter, all they want to reduce it to is a

5    urinary drug screen or early refill.  You heard Eric T's

6    wife tell you that he didn't get worse.  He didn't get

7    worse when Dr. Schneider started treating him.  He

8    actually got better.  When did the worse part start

9    happening?  Remember?  Back surgery.  Remember that?

10   Showed up after the back surgery.  He just got worse and

11   worse and worse.  Patricia G had bad knees.  Dr.

12   Schneider sent her out for tests.  She had surgeries.

13   MRIs.  But that's not professional treatment?

14   Government may not like the fact that he got it in less

15   than 30 days.  That's not against the law.  Government

16   may not like the fact that they have some non-doctor

17   sitting over there looking at urinary drug screens and

18   making a judgment call without talking to the person to

19   find out why these results came up.  They may not like

20   the fact.  Look in your jury instructions.  It's not

21   against the law.  You have to apply the law.  They also

22   promised you that no diagnostic work-ups or utilization

23   of results of any test were performed and ordered.

24   There were no assessments.  That's what they told you.

25   What's that?  Is that a diagnostic test?  Does that mean

1     that their promise to you is already broken?  That's

2     Patricia G.  They talk about the MRI results.  What drug

3     dealer sends you off to an MRI, brings you in --

4     remember, they promised you all you're gonna see in this

5     case is what do you need, write a script.  They're

6     reviewing MRIs.  They're sending off to Dr. Estivo for

7     treatment.  Yeah, I can't read Steve's writing half the

8     time, I mean, I know you can't either; but, you know,

9     numbness, left leg, left straight leg test, L4-L5 -- I

10    know that's something in your back.  They said none of

11    that happened.  They didn't say occasionally.  They

12    didn't say sometimes.  They said it didn't happen.  No

13    assessments.  What's that?  What are we looking at?  But

14    that's not good enough for the Government.  You know,

15    we're talking about all this government take-over of

16    health care.  You see what happens when the federal

17    government starts reviewing your charts?  Look at

18    Kandace B.  They said all she did was come in and get

19    medicine, there was no good attempt to treat Kandace B.

20    Is that a referral?  Is, is that a, is that an

21    assessment and a discussion about an assessment from,

22    from that?  Really?  These records don't jive to what

23    the Government's representing to you.  They go through

24    these records in five or ten minutes with people with

25    very complicated medical history, complicated medical

1      issues.

2          Ladies and Gentlemen, if you look at the records in

3      this case, you will see the truth.  I submit to you,

4      though, that if you go back to that jury room and, you

5      know, they haven't proved to you beyond a reasonable

6      doubt that Dr. Schneider was only acting as a pill mill

7      and a narcotics delivery system, you don't have to go

8      through those records.  But you can.  They're actually

9      there.  Keep in mind, though, when you go through 'em

10     like this, this isn't how they were kept in the clinic.

11     You heard about the horrific charting.  Again, look in

12     the jury instructions.  That's not a crime.  No efforts,

13     they promised you, at finding and treating the causes of

14     reported pain.  There was no time to monitor anyone.

15     These are statements, global statements.

16         Let's look at Eric T.  What do you see?  Is that a

17     referral?  Is that somebody you go and try to find out

18     what the cause of the pain is?  Is that an MRI?  Do you

19     remember Dr. Estivo -- excuse me -- Alvarez telling you

20     Dr. Schneider was the number one referral to MRIs.  Why

21     do you send people out for MRIs?  To try to figure out

22     what the pain is.  The promises are just falling flat,

23     Ladies and Gentlemen.  And not only do they do that,

24     they talk about the MRIs.  They also talk about is the

25     pain getting better.  Then they talk about the PADT.

168

1    They go through the pain.  Now, you'll see they say,

2    well, these PADTs are worthless.  Ladies and Gentlemen,

3    if you decide to look at somebody's actions through one

4    eye, the evil eye, which is the only way they can even

5    in good faith even be here is they just put an evil eye

6    offering.  Well, you don't do it; but you're doing it.

7    It ain't for real.  You don't do it; but you do it, now

8    it's not good enough.  Well, you don't do it, you're a

9    bad guy.  But you do it this time, well, it really

10   doesn't mean anything.  God, what can they do?  They

11   can't win with the federal government here.

12        Ladies and Gentlemen, you look in those records,

13   you will see the truth.  What's another promise they

14   gave you?  All these people were treated the same, they

15   were just given prescriptions for controlled drugs, they

16   were not given medical treatment.  You ask yourself when

17   you go through those records:  Did every person receive

18   the same cookie-cutter medicine?  No.  All the records

19   show that MRIs, CAT scans, blood tests, mammogram,

20   colonoscopy, et cetera, et cetera.  Well-woman exams.

21   What a drug dealer.  Refers people to go get their

22   well-woman exams.  You remember Alicia C who took the

23   stand?  You remember what the clinic did for her?  They

24   caught cervical cancer.  Wait.  But the Government said

25   all they were concerned about was writing scripts.  How

169

1    did they even know to send her off for that?  Makes you

2    wonder.  You look at those and you'll see the truth,

3    Ladies and Gentlemen.

4         Let's just look at Jo S.  Just briefly.  Do you see

5    all the referrals and everything?  Sent her to MRI.  Dr.

6    Estivo.  They are keeping record of when these people

7    come in and get their medicine, by the way.  Government

8    wants to discount that and say, well, they have to for

9    insurance purposes.  Who had to write that?  Why would

10   they be writing that if they're trying to be selling

11   some drugs?  The X-rays for the spine.  This is

12   treatment.  Now, whether or not the treatment was

13   successful with this select group of patients that the

14   Government selected is a different question.  Were they

15   trying to treat?  They did not just give more and more

16   and more and more as the Government said.  But, yes, at

17   times they increased the medicine.  You remember that

18   journal article I put into evidence in regards to Actiq?

19   The literature says if it doesn't work, you increase the

20   dosage and try the next one so you can get pain control.

21   That's what this is.  But you're not eliminating the

22   pain.  Some of these people have gone through multiple,

23   multiple levels and layers.  You heard about Robin G who

24   neurologist couldn't find out what happened.  You heard

25   about these people.  This is to help get control of the

1    pain.  And sometimes you have to increase the medicine
2    to get control of the pain.  Sometimes they decrease.
3    Sometimes they change the medications around.  And they
4    want to demonize the fact that Dr. Schneider asked them
5    what worked.  Really?  I go to a doctor and I know that
6    Oxycontin works for this condition and he wants to try
7    me on some Avenza, I can't tell him that or I'm a
8    drug-seeker.  Ladies and Gentlemen, here it is again.
9    There's another example.  Documents.  MRI's.  Remember
10   the allegation that they never did any epidural, no
11   other modalities, they never sent anybody out for any
12   other modalities.  Do you see what that says?  Cervical
13   epidural injection.  They told you that didn't exist.
14       Let's look at Jeffrey J.  You go through this, look
15   at all of that.  But according to the Government,
16   whatever is there is not enough.  They talk about the
17   bulging disc in the back.  We talk about the broken C-2.
18   They go over a list of the medication.  You talk about
19   the assessment.  You talk about the treatment.  But
20   according to Government in your exam room, that's not
21   enough.
22       Now let's talk about -- I have some more stuff on
23   here that I don't think I want to spend a lot of time
24   going over.  Well, here's one.  You know, they send
25   people out to psychologists, psychiatrists.  Did you

1    ever hear the Government experts or Government witnesses

2    tell you about that?  Nope.  Is it in that little

3    summary that you got?  Probably not.

4         Lastly, they mention Katherine D and they told you

5    that all she did was get more, more, more.  They talked

6    about the letter from Dr. Scanlin states patient has

7    been abusing meds.  She says it's a misunderstanding

8    between Scanlin and her husband and will follow up.

9    Nonetheless, ten days later, they learn that she

10   overdosed and they said no more abusable meds.  Did they

11   tell you that?  Why is this the first time that you're

12   hearing about some of these things when you're supposed

13   to be given the whole truth and nothing but the truth.

14        Now, what else?  What else supports the fact that

15   Dr. Schneider was actually a doctor and not a drug

16   dealer -- Judge, can you give me maybe like a ten minute

17   warning?

18             THE COURT:  Well, I'll tell you right now

19   you've got 20 minutes left.  And I'll be happy to give

20   you a ten minute warning.

21             MR. WILLIAMSON:  Thank you, Your Honor.

22        What are some of these other facts that suggest to

23   you that Dr. Schneider was acting as a doctor?  Think

24   about these physician's assistants.  They can have all

25   the opinions they want to.  We all know everybody has an

1    opinion, right?  But no physician's assistant took that

2    stand and told you that Dr. Schneider ever told them to

3    prescribe to a person who wasn't in pain.  No

4    physician's assistant took the stand and told you that

5    they ever prescribed to somebody who they truly didn't

6    believe was in pain.  No physician's assistant took the

7    stand and told you that Dr. Schneider instructed us to

8    hide the fact if a family member was to call in and

9    report what was going on.  It's in the records.  They

10   were -- I think Craig told you that he was keeping a

11   list.  And I asked him:  Well, did Dr. Schneider ever

12   instruct you not to keep that list?  He said:  No, he

13   told me to keep it going.  Why does a drug dealer keep a

14   list of these horrible facts that the Government is now

15   misconstruing?  Not concerned about what really happened

16   but just concerned about what the document said and now

17   trying to use it against them.  They want to tell you

18   about, oh, the family members.  They get invited into

19   the rooms.  Really?  So you gonna bring somebody into a

20   room when you know you're going to get a drug deal, have

21   a drug deal.  You just bring in family members?  You

22   didn't hear a family member take the stand and say Dr.

23   Schneider ignored my concerns and I came into the office

24   and he wouldn't let me in, I just took my family member

25   by themselves.  You heard Robin G's husband say, yes, I

```
 1    had a concern I brought to Dr. Schneider and we
 2    addressed it.  Even Tabbie's girlfriend, or whoever,
 3    said, yeah, I talked to Dr. Schneider, he actually
 4    talked to me about it.  You don't bring people in --
 5    common sense shows that what the Government is alleging
 6    here makes no sense.  All they want to talk about are
 7    these red flags and they bring in Dr. Parran to talk
 8    about all these red flags.  Ladies and Gentlemen, he
 9    told you that it's very, very difficult for doctors to
10    detect addicts.  And can you imagine?  Did you see
11    Alicia C?  If you're a doctor and you get that letter
12    that says I'm in so much pain that my boyfriend had to
13    carry me into the hospital.  You look at her back and
14    she has all these scars from prior surgeries.  You see
15    her in the office, she gets this cervical surgery and
16    you don't think that you would believe that she is in
17    pain.  No?  These red flags could be anything.  Early
18    refills.  Well, Kim got fired, at least as a pain
19    management patient, because he had an early refill
20    because he said one of these red flags of Parran's that,
21    hey, medicine got stolen.  That's a red flag for Parran.
22    But guess what?  He told you that, yes, and I got --
23    that is what happened, I got a police report.  And he
24    was still in excruciating pain.  He was in so much pain
25    he had to go back.  Now, you could just want to use the
```

 1    evil eye and say he only went back to Schneider because

 2    he wanted the pain pills.  Well, yeah, he wanted the

 3    pain pills; but did he want 'em because he was in pain

 4    or did he want 'em because he was an addict?  You tell

 5    me.  By looking at Kelly G, what does that tell you?

 6    You can just tell.  He has a limp.  He has a cane.  Is

 7    that an act?  It's in his medical records so I don't

 8    think that's an act.  But what if you're in the

 9    physician room and you have to make that call?  Dr.

10    Schneider had to make a call.  He said he can't get any

11    more even though this man was truly in pain.

12        The long distance.  Oh, they come from a long

13    distance.  Well, Laurie, she was a red flag acccording

14    to Dr. Parran.  You heard her.  Dr. Parran opined that

15    Dr. Schneider was dishonest.  Okay.  First of all, this

16    doctor is a man who lied on the stand.  And you know

17    what?  If a witness lies like that, reject what they

18    say.  Reject what Barbara Cabuzzi says.  Reject what

19    Parran says.  He sat there on the stand and told you

20    that, oh, I really, yeah, I filled this information out

21    but he was found out to be not tellin' the truth.  You

22    don't do that.  I don't care who you testify for.  I

23    don't care if I call you.  You don't do that.  But he

24    had the nerve to say Dr. Schneider was a dishonest

25    doctor, not duped, but dishonest.  Ladies and Gentlemen,

1    did you ever hear any instructions that Dr. Schneider
2    ever instructed any of his assistants, medical
3    assistants, receptionists, to hide the fact that phone
4    calls were coming in?  No.  Did you ever hear an
5    instruction for him to destroy any lab records?  No.
6    Did you hear any instruction for him to cover up what
7    was going on?  No.  What does that say?  Overdose.  They
8    kept the records.  Not great.  Look in the jury
9    instructions.  That's not the question.  Were they
10   trying?  They're keeping records of everything.
11        I'm going to briefly talk about this fraud; but
12   before I do, a couple other facts that you really have
13   to think about.  No drug -- first of all, Medicaid was
14   sending lock-in patients to the clinic.  All right?
15   They were sending those "drug seekers".  You saw that
16   language.  It doesn't say drug seekers but that's what
17   it means.  Why?  Why do they send them to Schneider if
18   he is such a bad evil guy?  They're sending the problems
19   to him.  Now criticizing him because he couldn't handle
20   all the problems.  He advertised the positions at WSU.
21   Not just physician's assistants.  He advertised student
22   rotations.  You come into my office, you report back to
23   your facility what happens.  Come on, Ladies and
24   Gentlemen, at some point this stuff makes no sense.  And
25   then we talk about Actiq.  Look at the chart.  How many

1    times did he prescribe Actiq to somebody who wasn't

2    suffering in pain?  We put in a medical journal, there's

3    two of 'em, that support giving Actiq for breakthrough

4    pain.  How many did they provide?  The Government, that

5    is.  Zero.  We just don't think it should be done.  So

6    you should find him guilty because the Government

7    doesn't think so?

8        Now, one thing about this fraud and then I'm going

9    to be moving to my last little bit.  The Government just

10   totally glances over what would have had to happen for

11   fraud to occur.  They ignore the intent.  You have it.

12   You have Instruction Number 33.  It has to be a specific

13   intent to defraud.  Specific intent to defraud.  I'm

14   going to slide through some of these because I didn't

15   cover them because I'm getting close here.  Has to be a

16   specific intent to defraud?  Well, what specific intent

17   did you ever hear?  Ladies and Gentlemen, as we have

18   told you over and over and over again, if there was

19   going to be an intent to defraud, it would have been

20   found on the fee ticket.  This is their document that

21   the doctors, the physicians, rely on to communicate to

22   the billing department.  But the Government didn't go

23   the step beyond to get the explanation of benefits, to

24   get the claims data.  Even though their expert said I

25   would have liked to see that.  Remember when Dr.

1    Jorgensen said that I really would have liked to have

2    seen these pieces of information.  They ignore that.

3    Ignore it.  But they're trying to give you the whole

4    picture?  If there was going to be some fraud, it would

5    had to have been found on the fee ticket and they did

6    not give that to you.  In fact, all the billing managers

7    came and told you that they weren't asked to do anything

8    wrong.

9         Now, they talk about fraud, the motive.  Well, it

10   was about volume, blah, blah, blah, blah, blah, blah.

11   Well, let's look at this.  Let's look does it make

12   sense.  First, if you break down the numbers that the

13   Government gives you, they say, you know, is 7 million

14   over all these years.  Blue Cross/Blue Shield, Preferred

15   Health, that comes out to about eighteen forty-nine per

16   service.  Well, Medicare/Medicaid and First Guard comes

17   out to $7.90 per service.

18             THE COURT:  Ten minutes, Mr. Williamson.

19             MR. WILLIAMSON:  Thank you, Your Honor.  Now,

20   you see that comparison there; right?  You see that

21   comparison?  If the clinic really wanted to make money

22   and that was their goal, then they would have decreased

23   the patient population and increased the -- just

24   eliminated the Medicaid people.

25        Now, I have ten minutes left with you.  I want to

1    talk to you about one more instruction that I think is

2    extremely, extremely important.  Look at Instruction

3    Number 27.  Ladies and Gentlemen, in regards of whatever

4    under Instruction Number 27, Counts 2 through 6 -- and

5    there is another good faith instruction in regards to

6    the fraud that you saw.  But if a doctor is exercising

7    their good professional judgment to a patient's medical

8    need, then -- and they're reasonably trying to meet

9    proper, I believe -- excuse me -- trying to give what's

10   reasonably believed to be proper medical practice, you

11   have to find them not guilty.  There's no violation.

12   Now, does that mean that they have to meet it?  No.

13   That means that they have to try to meet it.

14       Now, Ladies and Gentlemen, you can look at Dr.

15   Schneider through the evil eye like the Government did;

16   but Dr. Schneider learned that people were trying to

17   take advantage of the clinic.  They were putting dye in

18   his toilets, exchanging urinalysis, exchange -- made the

19   exchange in the urinalysis room.  They changed the cover

20   sheets of these terminated patients to red folders.

21   They kept documentation of this "drug seeking behavior".

22   They're using the clinic's own attempts to try to

23   monitor against them.  They did pill counts.  They moved

24   to electronic records.  They sent people to

25   psychologists.  You don't do things like that, Ladies

179

1    and Gentlemen, if you're just trying to be a drug

2    dealer.  He was trying.

3        Now, I'm going to end with this because I don't

4    want this to be mistaken.  I want you to know this when

5    you go back to the room.  You heard from patients:  Dr.

6    Schneider was a good doctor.  Point blank.  What you

7    have presented to you is a slanted view of what can

8    happen when the federal government goes through and

9    looks in your darkest corners and nooks and crannies of

10   your closet.  But there were over 10,000 patients at

11   that clinic and you saw a representative sample of them

12   come and take the stand.  And, Ladies and Gentlemen, say

13   what you will, but Dr. Schneider -- you heard Dr.

14   Watson, you heard Dr. Lakin, they -- Dr. Schneider stood

15   up for a patient population that even Dr. Owen did not

16   want to see.  Remember?  He said he turned them away.

17   The Medicaid, the people with the less income, because

18   the risk was more than the reward.  Remember that?  Dr.

19   Schneider said I'm not gonna do that.  And you can say

20   it's about the money, but what about in 2001 when the

21   man refused to stop seeing them when he wasn't making a

22   cent?  The man had been working hard since 1988.  This

23   is not a fraudulent person.  This is not a drug dealer.

24   This is a man who cared about his patients.  This is a

25   man that got in over his head at some point in time.  He

1    went and asked for help with these patients.  Nobody

2    around the community wanted to step up.  This man is out

3    working as a delivery driver to take care of his family.

4    He's not some scam artist.  He is not some get rich

5    person.  He works since 1988 as a physician, Ladies and

6    Gentlemen.  You heard Marlene Fether.  You heard the

7    firefighter whose daughter he saved.  You heard story

8    after story after story after story of people whose

9    lives he touched.  And many of the people are here

10   today.  And for the Government to reduce these people to

11   charts -- you heard after the witness took the stand,

12   all they want to do is come back and get the charts, the

13   charts, the charts.  Well, the people were on the stand.

14   For them to reduce this case to charts and documents and

15   not about people suffering and not about this man who

16   risked his neck, who he said if he was smart he probably

17   should have quit trying to see these patients, people

18   that other people don't want to see.  For him trying and

19   trying hard to give the medical care that poor people in

20   the community would not give, for them to sit back and

21   just reduce that to paperwork that they decided to

22   present before you --

23          THE COURT:  Five minutes, Mr. Williamson.

24          MR. WILLIAMSON:  Thank you, Your Honor.  Is

25   insulting.  He had to trust his patients.  Ladies and

1    Gentlemen, you can get an MRI, you can get a CAT scan.

2    But guess what?  That may not show the source of your

3    pain.  Some of these people looked very healthy as they

4    took the stand.  I'm glad you got to see people in

5    chronic pain that they don't have this big black mark on

6    their forehead where you just know.  But you have to

7    trust.  And you heard him say on the stand that he

8    was -- these people are discriminated against.  And you

9    heard the prosecutor talk to Phyllis about her daughter,

10   oh, it's all in her head.  Why?  Because they can't

11   confirm it.  When she's the one on the ground seeing her

12   person in pain.  How many people in these charts did

13   they bring for you to show whether or not these people

14   were in pain?

15        Ladies and Gentlemen, at the very end of the day,

16   Dr. Schneider was being a doctor.  He never submitted

17   anything fraudulent and he never instructed anybody to

18   submit something fraudulent.  He did his level best.

19   And for the people who followed his instruction and,

20   again, I'm not harping on personal responsibility, but

21   some people, you got to understand that if you go in

22   tricking people and then you make the choice not to use

23   something the way it's supposed to be used and follow

24   his recommendations, you have to bear that burden.  Dr.

25   Schneider never tried to hurt anybody.  He never gave a

1   pill to somebody he knew was going to hurt them.  He

2   told you that if he missed an opportunity to save

3   somebody's life, he truthfully regrets that.  This is

4   not about whether or not he missed the opportunity to

5   save somebody's life.  He's helped hundreds if not

6   thousands of people.  Right now he sits in the chair

7   because he needs your help.  He took the stand.  With

8   stood a day and a half of cross-examination, vigorous

9   cross-examination.  Admitted mistakes.  But at the end

10  of the day, he admitted his humanity that he did not try

11  to hurt anybody.  The only rightful verdict in this case

12  is not guilty on all counts.  No suspense.  No weeks of

13  waiting.  If you believe he was trying, let him go home,

14  let him go home to his daughters, his family.  Let this

15  nightmare finally come to an end.

16      At this point, Dr. Schneider is in your hands.  And

17  I thank you for listening.

18          THE COURT:  All right.  Ladies and Gentlemen,

19  we'll take about 15 minutes.  Remember and heed the

20  admonition.

21              (Recess.)

22

23              (No omissions.)

24

25