183

1              THE COURT:  All right.  Mrs. Treadway.

2              MS. TREADWAY:  Thanks, Judge.

3         We take crime as we find it, we investigate it; and

4    when appropriate, we prosecute.  Our job is over.  And

5    your job begins.  Because as the Judge instructed you,

6    as I said that many times, as the Judge instructed you,

7    you are the judges of the facts.  And we need to get

8    back to the facts.

9         This case is not about the Government.  This case

10   is about the Defendants and their conduct.  This case is

11   not about numbers.  It's about people, people who became

12   victims of the Defendants' conduct.  Only the Defendants

13   have seen their victims as numbers, as less than 1%.

14   Only the Defendants have treated these victims as

15   nothing but numbers.

16        Remember the movie Field of Dreams?  Build it and

17   they will come.  That's what happened here.  Except when

18   the Defendants built their clinic, they moved from

19   inadequate space to inadequate care.  According to the

20   statement he made in May, 2006, Steve Schneider did plan

21   to build a pain management practice.  It didn't just

22   happen.  They always intended to have a pain practice, a

23   niche market with few requirements.  The way they

24   planned it.  They planned for volume.  They built for

25   volume.  Even Tom Wagner's call notes, which are long

1    before the clinic opened, clearly showed that the

2    Defendants were already doing pain management.  Heather

3    and Billy died long before the clinic's doors were

4    opened and the drugs were flowing long before the clinic

5    was built.  And don't forget, when you brag about being

6    the number one narcotics writer in Kansas, that's what

7    you're planning on.  That was the purpose of the scheme

8    to begin with.  A high volume of drugs out the door.

9    Otherwise, why brag about it.

10        The Defendants lived by what I call the rule of

11   excess.  Their clinic was open an excessive number of

12   days; an excessive number of hours.  They scheduled

13   excessive numbers of people.  They billed excessive

14   numbers of services.  They prescribed excessive numbers

15   of drugs.  They made an excessive amount of money in

16   comparison to other family practices.  And all of this

17   resulted in an excessive number of overdoses and

18   overdose deaths.

19        The Defendants' defense is really simple.  It's

20   either everyone's fault but theirs or everyone's lying

21   but the Defendant Steve Schneider.  That's the blame

22   game, Ladies and Gentlemen.  The Government didn't do

23   enough.  The physician's assistants got it wrong.  The

24   billers got it wrong.  The coders got it wrong.  The

25   medical examiners got it wrong.  The victims are to

1    blame.  The victims' families are wrong.  The pharmacies

2    were wrong.  The ER doctors were wrong.  And don't

3    forget, early in the case and I think we heard a little

4    bit of it again, the fax machine didn't work and that's

5    why we didn't get notice.

6        But the evidence has been the Defendants are to

7    blame.  They are responsible.  They are guilty.  It is

8    the Defendants' actions and no one else's at issue in

9    this case.

10       It is unbelievable to me that after all of the

11   evidence in this case, after all the documents reviewed

12   and summarized, the defense can still tell you with a

13   straight face that these people in the Indictment were

14   not Steve Schneider's patients.  Well then, whose were

15   they?  You and your wife owned the clinic.  You and your

16   wife got the money.  You and your wife employed the

17   staff.  You saw the people.  You wrote the scripts.  You

18   supervised the PAs.  You were the only full time

19   physician.  Your wife did the hiring.  You and your wife

20   set the policies and procedures, or failed to do so.

21   You signed the prescription pads and made fun of Debra

22   Klingsick when she didn't use her whole prescription pad

23   in a given day.  Your wife signed your name to

24   prescriptions.  And when the other providers wouldn't

25   give out prescriptions for drugs, she made sure you got

1    that prescription done for that person.  You told the

2    physician's assistants to just fill the meds you had

3    started.  And you got the money.  The programs paid for

4    what was wrongly thought to be excellent medical care

5    when it was not.  I guess the only people who didn't

6    overdose or die were his patients.  That means he needs

7    to blame those overdoses and deaths on someone, anyone

8    else.

9         Linda Schneider also wants to desperately avoid

10   liability by saying she didn't provide direct patient

11   care.  But every action she took determined how the

12   clinic operated and how the people who came to the

13   clinic received little, if any, care.  So every action

14   she took directed what occurred at the clinic, including

15   how the people were handled.

16        Mr. Byers is wrong.  All of that information that

17   he said isn't in the Indictment, it is in the

18   Indictment.  And the reason it's in the Indictment is

19   it's about the manner and means of this conspiracy.  All

20   of that information is important because it's how the

21   conspiracy operated.  Yes, not everything was illegal;

22   but as the Judge instructed, it doesn't have to be.  Let

23   me take you back to my example about robbing the bank.

24   It's not illegal to buy a car.  It's not illegal to buy

25   a gun.  It's not illegal to drive down the street to the

1    bank.  It's not illegal to go in the bank.  But, once

2    somebody pulls a gun and asks for the money, a crime has

3    been committed.  And all of those legal acts are part of

4    the manner and means to make the conspiracy work.

5    That's why all that information is important.  And

6    that's why it is in the Indictment.

7         The Defendant is guilty as a co-conspirator for

8    every count in the Indictment.  Both the Defendant Steve

9    and both the Defendant Linda.  As the Judge instructed

10   you, the Defendants are charged with conspiracy and they

11   acted together for a purpose.  They don't each have to

12   perform the same jobs.  They were agents for one

13   another.  And they are liable for each other's actions.

14   And they are also guilty under that aiding and abetting

15   theory.  As the Judge instructed you, people can't avoid

16   responsibility by doing things through other people.

17   She contributed every step of the way.  The evidence

18   against Linda Schneider has been as compelling as it has

19   been against her husband.  Her own words in those

20   videotape excerpts convict her because it proves with

21   her own mouth that she knew about and was involved in

22   every aspect of the clinic from the time people came in

23   the door until the insurance payment hit the bank

24   account.  And those video statements, which you're

25   welcome to listen to at your heart's content, tell you

1    something else about Linda Schneider.  It tells you that

2    she is willing to go to great lengths to deflect

3    responsibility from herself.  She didn't go to talk to

4    the agents for any other purpose than to get that

5    investigation focused on someone else:  Dr. Simons.  But

6    it backfired on her.

7         Where were the Defendants throughout all the

8    testimony about Linda?  How can Mr. Byers say that there

9    was no evidence as against Linda?  The evidence was

10   throughout the case.  She managed the clinic, hiring,

11   firing, disciplining.  She's scheduling, shuffling the

12   charts.  She's knockin' on the exam room doors.  She's

13   reinstating fired patients.  Making sure cash paying

14   patients like Jamie S weren't terminated even though her

15   own brother wanted her to be terminated.  She's making

16   sure the VIP people see her husband for prescriptions

17   when the other providers won't issue them.  She knows

18   people are lying, selling, forging, overdosing, dying.

19   She knows Lawrence Simons is worthless.  She is

20   directing Robbie Swonger to see Dr. Simons'

21   appointments.  She is forging documents directing others

22   to do the same.  She is signing her husband's name to

23   prescriptions.  She's bragging to potential employees

24   about the clinic being the number one writer of

25   narcotics in the state.  She's calling Steve at 5:00 to

1    get him home.  She's making sure that there's a pharmacy
2    lunch every day that takes the providers out of the
3    clinic.  So she knows what's going on.  She's the one
4    touching every chart, every fee ticket.  Those are the
5    tar babies she cannot escape from.  She was the person
6    who set the policies, who supervised the billing and who
7    handled the finances.

8        Look at those money laundering transactions.  She's
9    the one moving the money around until they send it to
10   Mexico and then Steve does that.  And, she's the one
11   threatening people.  Why do you threaten people if you
12   haven't done anything wrong?  Why do you tell Jamie
13   Hilliard if you tell, you're gonna go down with us?  Why
14   do you threaten Cindy Curry with a Mexican mafia?  As
15   much as these folks want to get rid of all their
16   employees, it's kind of like spitting in the wind.  They
17   want to keep the employees that are loyal to them and
18   say these are wonderful employees.  And they want to
19   tell you that the employees that left this time bomb, as
20   Jennifer Harry said, they want to say, oh, you can't
21   believe them.  Well, it can't be both ways, Ladies and
22   Gentlemen.

23       The Defendants also want to continue in this theory
24   that they didn't tell anybody to do anything wrong.
25   Well, I have three responses to that.  First, it's not

1    true.  They did tell people to do things wrong.  Steve
2    Schneider gave PA's presigned prescription pads before
3    they had their DEA number.  That's illegal.  Linda
4    forged referrals and signatures on pain management
5    agreements.  Both Defendants instructed that those fee
6    tickets be upcoded.  And if they weren't, they changed
7    'em.  Linda Schneider told people to bill PAs as
8    physicians.  Steve Schneider told PAs to write the
9    scripts he wrote, not to exercise their medical
10   judgment.
11        Then the second response is:  At some point in time
12   you don't need to tell people to do something illegal
13   because you take charge of everything, like Linda did.
14   She reviewed all of the fee tickets.  And as Linda told
15   Debra Klingsick, billing's none of your business.  Well,
16   if this is such an open and honest and wonderful place,
17   why isn't it everybody's business what the clinic is
18   doing?  And as Marty Brown admitted, although the clinic
19   had the ability to review things every day that had been
20   sent off to insurance companies, nobody did it.  And,
21   everyone that had been asked to do something illegal,
22   what happened?  They left.  They finally had it.  They
23   left.  Because no matter how many times they complained
24   about it, no matter who they talked to, nobody did
25   anything about it.  So they left because they didn't

1    want to be pulled into this illegal conspiracy.

2        And this other defense that doesn't make any sense

3    is the fee tickets match the progress notes and

4    therefore there's no fraud.  They've got it backwards.

5    As their witness Barbara Cobuzzi says, it's the fee

6    tickets that should take the billing.  It's not the

7    billing that should go backwards.  That's right.  The

8    fee ticket is what you bill from.  But that's not what

9    happened in this case.  That's why the fee tickets are

10   the evidence against the Defendants.  Their billers were

11   instructed to bill something else.  Bill the PA as the

12   physician.  Oh, didn't get that 99213 marked, let's mark

13   that.  Let's upcode it.  That pattern is important in

14   convicting them of the fraud.

15       The defense wants you to believe that by putting

16   everything in the documents, they must be innocent.  But

17   that assumes two things we know not to be true.  That

18   the documents are truthful and accurate.  We know that's

19   not true.  And that the Defendants acted on the

20   information in the documents.  We know that not to be

21   true.  Yeah, there's MRI's in there.  Yeah, there's

22   referrals in there.  But when did they act on 'em?  When

23   did they do something?  When do they monitor the

24   patient?  When do they assess the patient?  When do they

25   do something besides give them more drugs?  Again, the

1    documents show that they are false, forged and for show.

2    They are not legitimate medical records.

3        The Defendants argue that if they did something

4    wrong, the Government should have acted earlier.  Well,

5    there's a flaw in that argument.  Two ways.  First, if

6    you didn't do anything wrong, why do you think the

7    Government should have done something?  And, second of

8    all, if it's the Government's fault, then why would the

9    Government take the effort it did in this case?  If the

10   Government is hiding the ball, why did we not jump to

11   unsupported conclusions?  We interviewed everyone that

12   would talk to us.  We had experts review numerous files.

13   Dr. Parran reviewed over 100.  Dr. Jorgensen reviewed

14   over 50.  And the fraud review, we did almost 5,000

15   claims.  Why?  Because the Government knew that it's

16   actions would have consequences not only on the

17   Defendants but on every person that went to the clinic.

18   And the Government and the insurance companies didn't

19   just sit on their hands.  We showed you a pattern of

20   notice through the evidence.  From the PERC review in

21   February 5, 2004; the First Guard audit in the fall of

22   '04; Graves Owen talks to the Defendants in December of

23   '04; Medicaid intends to terminate in '05; the search is

24   done in September of '05.  We have the PHS review in

25   2006.  We have the KBHA trying to take his license away

1    in '06 and '07.  He's finally indicted along with his

2    wife.  And finally his license is suspended.  And he

3    fights every step of the way.  Fights every step of the

4    way.  And he doesn't fight by changing his conduct.

5    That is key, Ladies and Gentlemen.  If this were an

6    honest physician, if this were an honest clinic manager,

7    the response to this notice would have been change, not

8    resistance to change.  Not continuing to do it the way

9    he did it, which destroyed lives.

10        Then we have the new defense after many years of

11   the deaths have started, long after the fact, the

12   Defendants have now decided, well, gosh, these people

13   didn't really die of drug overdoses.  Who knows what

14   they died of.  The Defendants cannot avoid

15   responsibility by claiming that the 68 individuals who

16   died are not dead.  So the next best thing is to claim

17   they did not die of the prescriptions that they gave

18   them.  That's the only way they can exonerate

19   themselves.  And that was a big detour sponsored by Dr.

20   Karch.  The defense has basically put all their eggs in

21   a very holey basket.  Dr. Karch was nothing more than a

22   hired gun.  He got so many things wrong, as Dr. Rohrig

23   pointed out, he couldn't have explained himself on

24   redirect by the time Mr. Williamson got up to talk to

25   him.  That's why he never explained himself.  It was too

1    late by that point.  Dr. Karch claimed you cannot
2    determine the cause and the manner of death when drugs
3    are present with other diseases, yet that's exactly what
4    he did in London in the Schipman case.  Dr. Karch's
5    testimony reminded me of that old proverb of the five
6    guys that are blind that are put around the elephant and
7    they're asked to describe it.  Obviously, the guy
8    holding the tail and the guy holding the trunk are
9    seeing a very different animal.  And that's what Karch
10   did.  He held just part of the case and closed his eyes
11   to the rest of it.  He was closing his eyes to all the
12   evidence that the medical examiners and the
13   toxicologists reviewed.  Dr. Karch didn't really have an
14   opinion.  He just had a theory that he applies to all
15   cases.  Including those cases involving Metabolife where
16   all those people died.  He disagrees with the FDA
17   banning it even though people died from that ephedra in
18   that pill.  Dr. Karch's theory requires you to basically
19   throw the baby out with the bath water because he
20   admittedly ignored much of what the six board certified
21   forensic pathologists relied on:  Medical history; drug
22   history; family and social history; scene investigation;
23   autopsy and toxicology.  Instead, he developed his
24   opinion on an incomplete and narrow review.  The
25   Defendants want to talk about credibility of witnesses.

```
 1    Well, Dr. Karch is an excellent example of how you judge
 2    someone's credibility.  He first lost credibility when
 3    he had to admit that he formed his opinions in July of
 4    2008 on the basis of three autopsies and no slides.
 5    Even though his own book says you need more than that;
 6    and even though he said repeatedly I have to have slides
 7    before an opinion.  Evidently, he threw all the rules
 8    out to testify in this case.  He got on the stand,
 9    sponsored by the Defendants, and lied to you.  He said
10    there was no autopsy for Patricia.  Remember that?  His
11    powerpoint said no autopsy.  They sponsored that.
12    Knowing that Mary Dudley had put that into evidence on
13    May 3rd.  And the Defendant Stephen Schneider had
14    already talked about that autopsy.  Don't forget,
15    however, that Dr. Karch could not testify under oath
16    that any of the 21 people he talked about had died from
17    other than a drug overdose.  So his opinion was not
18    helpful at all and it rebutted nothing at all.  Plus,
19    credibility.  What cardiac pathologist worth any salt
20    comes and tells you under oath that people can die of a
21    cardiac event just by having a dirty thought?  I'm in
22    trouble there.  That's ridiculous.  What cardiac
23    pathologist is worth his salt when he writes an e-mail
24    and says, oh, Patty must have died because little aliens
25    were in her chest.  Does he think this is funny?  It
```

1   isn't.  The final nail in the coffin of his credibility

2   was when the foundation of his testimony boiled down to

3   throwing mud at the forensic science center.  That's

4   when you know he doesn't have anything to say.  He's a

5   full time witness.

6        By comparison, the Government's medical experts,

7   each and every one of them, was a practicing doctor and

8   not a professional witness.  That's very important,

9   Ladies and Gentlemen.  They're coming from a practice,

10   not from a professional witness standpoint.  And Dr.

11   Karch admitted that if you accept the causes and manners

12   of death certified by the board certified forensic

13   pathologists, which you should, he could not tell you

14   that the Defendants' policies, practices and

15   prescriptions did not result in those deaths.  The

16   individuals who died from drug overdoses did not die

17   because of heart disease, terminal illnesses, their back

18   pain, their knee pain, their migraines, or any of their

19   pain conditions.  That is not the evidence in this case.

20   The evidence in this case is people died because the

21   Defendants were dealing drugs and not practicing

22   legitimate medicine.  People who came to the clinic

23   seeking help, unfortunately, didn't get it.  And they

24   paid sometimes the ultimate price because these folks

25   died because the Defendants had embraced one of those

1       seven deadly sins:  Greed.

2           Throughout the trial the Defendants did what I call

3       a twist and shout defense.  They twisted the evidence

4       and then they shouted about it.  They did it here in

5       closing today.  Taking a phrase out of context from the

6       Government's closing about the witness' credibility, the

7       expert witness' credibility.  And trying to use it to

8       indicate that the Government is only interested in

9       winning.  No, Ladies and Gentlemen, the Government is

10      here to do justice.  Mr. Williamson spent over half of

11      his closing argument suggesting that the Government is

12      at fault.  The Government lied to you.  And Mr. Byers

13      spent most of his closing argument saying the Government

14      lied to you by hiding the ball.  I told you; I told you.

15      Detours.  Focus.  Don't look at the evidence.  Don't

16      look at what we did.  Focus your attention on somebody

17      else.  And in this case, the Government.

18          But in this case, Ladies and Gentlemen, you don't

19      have to look at the Government.  What you look at is the

20      evidence the Government presented.  And the evidence the

21      Government presented was a fair and complete picture of

22      the evidence of what really went on at the Defendants'

23      clinic.  There is no battle of the experts for you to

24      decide.  Cobuzzi relied on her feelings.  Karch relied

25      on less than the facts.  And our medical experts used a

1    higher standard than beyond a reasonable doubt.  They

2    used the standard of within a reasonable degree of

3    medical certainty.  That's not a lesser standard, Ladies

4    and Gentlemen.  It's a higher standard.  And we chose to

5    have them testify under that higher standard.  And as

6    Dr. Parran testified, this clinic was a scientific study

7    on how not to practice chronic pain management.  Dr.

8    Jorgensen told you that this clinic was not legitimate

9    and its claims were fraudulent.  Dr. Owen told you the

10   clinic did not practice evidence-based medicine.  The ER

11   physicians, the PAs, the employees over the lifespan of

12   the clinic.  Remember that chart with all the dates on

13   it that showed you we pulled employees from the entire

14   lifetime of the clinic.  We didn't cherrypick.  And

15   everybody with any sense and anybody with any objective

16   eye saw this clinic for what it was.  A pill mill and a

17   patient mill.  The defense offered you no objective

18   expert, no objective witness who came in and told you

19   that what the Defendants were doing was reasonable.  Not

20   in terms of their drug distribution and not in terms of

21   their billing.

22        The Defendants chose to attack our witnesses

23   personally because they couldn't attack their testimony

24   or their stellar qualifications.  The forensic

25   pathologist, the toxicologist, they weren't hired guns.

1    They were just doing their jobs.  No qualified expert

2    testified or rebutted their testimony.  The ER

3    physicians, unscathed by cross-examination.  And nothing

4    in rebuttal was offered.  Our fraud reviewers were all

5    medical people, save one, Barbara Cobuzzi.  She was an

6    industrial engineer.  The results of the fraud stand

7    unrebutted by any credible witness.  And Dr. Jorgensen,

8    why did we pick him?  He's a D.O., family practitioner,

9    that does a lot of pain management, that graduated from

10   the same school the Defendant did.  His conclusions were

11   never rebutted.  Dr. Owen was a chronic pain management

12   specialist.  Dr. Parran was both a pain management

13   specialist and an addiction specialist.  And the more

14   mud they tried to fling, the brighter his star shined.

15   His and Dr. Owen's testimony stands unrebutted by any

16   objective expert.  Dr. Parran never lied to you.  He

17   told you the truth about what this practice was about.

18   And, of course, if the Defendant Stephen Schneider wants

19   to maintain that he is not a pain management expert, he

20   cannot rebut Dr. Parran, Dr. Jorgensen or Dr. Owen.

21       The Defendants have accused the Government of

22   hiding the ball; but when the Government put documents

23   into evidence so that you can read the whole thing,

24   that's not hiding the ball.  Even though we might have

25   just displayed part of it, even though we might have

1    just offered you summary exhibits so it would be easier

2    for you to review the evidence, we put in the medical

3    records because we wanted you to see them.  The

4    Government has not presented just a bit of the truth.

5    We have presented you the whole picture.  It's not what

6    the Defendants want you to look at.  The Government has

7    delivered on everything it said in opening statement;

8    but the defense has not.

9        In fact, the Government submits that from opening

10   statement forward, the Defendants have painted a

11   picture, a deceptive picture, with brushes that were not

12   dipped in the bucket of truth.  The Government did not

13   sponsor witnesses who lied and did not help them lie;

14   but the Defendants did.  They allowed Dr. Karch to

15   testify falsely about Patty's autopsy.  They allowed

16   people to testify to less than the whole truth about

17   their medical histories and drug histories.  It's not

18   fun to cross-examine patients about their medical

19   histories.  Especially when they're lying to you, Ladies

20   and Gentlemen.  And then there's Ms. Cobuzzi.  She

21   obviously lied to you.  They've completely thrown her to

22   the wayside.

23       Mr. Williamson showed you one overdose of Katherine

24   D, one of the people in Count 6.  He didn't tell you

25   that she had five additional overdoses, and after each

 1   overdose, she got more drugs.  But the records tell you

 2   that.  The records the Government put into evidence.

 3   Who did the defense choose to pull in as witnesses?

 4   People totally unrelated to the facts of this case.

 5   Employees who were there for three months and left for

 6   better paying jobs; family practice patients like the

 7   sheriff and the firefighter.  This isn't about the

 8   family practice.  It's about the pain management

 9   practice.  Patients who have moved on to other

10   successful treatments, unlike what they said that nobody

11   else could get treatment.  A pharmacy sales rep who sold

12   reflux medications.  No relevance.  Patients who knew

13   nothing about the facts and patients whose medical

14   histories with the clinic were misrepresented until the

15   Government presented you the whole truth.

16        In opening statements the Defendants claimed the

17   Government's evidence was smoke and mirrors and

18   historical fiction.  What the evidence has revealed is

19   that's what the defense case is.  The defense has been a

20   continuation of what occurred during the life of the

21   clinic: material misrepresentations and material

22   omissions.  Mr. Byers brought up Investigator Linda

23   Sifford from the medical examiner's office.  Linda

24   Schneider, as early as 2003, was already lying.  And

25   that Exhibit 160, that's Linda Sifford's report.  She

1   says that this is what Linda Schneider told her:

2   Everybody received a psych evaluation before getting

3   medicines; everyone got a sonogram to make sure that

4   they had pain; everyone had to be emotionally and

5   psychologically sound; everyone had random drug screens,

6   and if illegal drugs were found, they got fired.  All

7   lies, as the evidence has proved.

8       During the First Guard audit, the Defendants are

9   saying that Dr. Owen is their consultant.  You heard

10  from Dr. Owen.  It didn't happen.  And you heard from

11  Jean Rumbaugh, gosh, had we known that, they wouldn't

12  have passed outstanding; gosh, if we'd have known that

13  Medicaid was going to terminate them, they wouldn't have

14  passed the audit; gosh, if we had known about our own

15  beneficiaries dying and overdosing, they wouldn't have

16  passed the audit.  But, of course, the Defendants

17  omitted telling them that material information.

18      In 2005, right after the search warrant, Dr.

19  Schneider is on the phone to Dr. Kaden in the emergency

20  room and saying, hey, I didn't get any notice of all

21  this stuff.  That's why Dr. Kaden wrote that e-mail

22  calling him out, calling him for his false statement.

23  That's in Exhibit 157.  And then I want you to go to

24  Exhibit 151.  That's the summary of all the notices that

25  the Defendants received of all the deaths, all the 68

1    deaths.  The notice of the overdoses is in 1-B.  And

2    when you look at all that, what you're going to see is

3    this:  That the notice is recorded in their own records.

4    How can they stand up in opening and say we didn't get

5    notice?  How can they stand up in closing and say we

6    didn't get notice?  How can the Defendant take the stand

7    and say we didn't get notice?  During the Medicaid

8    audit, they lie about getting the letter.  Oh, no, we

9    didnt get that certified letter.  Well then, why is it

10   in your clinic when we find it during the search?  We've

11   got the lie to the state court judge across the street

12   in that verified petition.  Medicaid is trying to

13   terminate this clinic and they're saying, hey, we're the

14   only Medicaid provider in town, you can't terminate us.

15   Tracy Wagner told you that is not true.  The reason they

16   fought that termination was not because they wanted to

17   save Medicaid patients.  It's because they wanted to

18   save that valuable source of income.  The Defendants

19   were hiding the truth of the overdoses and deaths from

20   First Guard, from Medicaid and from the state court.

21   They were hiding the truth of the overdoses and deaths

22   to the people who came to the clinic.  Remember all the

23   witnesses that came?  They didn't hear about that when

24   they were patients.  Perhaps they would have changed

25   their mind about the clinic had they known that at the

1    time.

2         The Government has not looked at this case with an

3    evil eye; but with its eyes wide open.  Unfortunately,

4    in mounting horror, as the evidence and the facts unfold

5    for us.  The Defendants have looked at this case with

6    their eyes closed.  Shut tight.  Deliberately ignoring

7    what they knew to be true: that their practices,

8    policies and prescriptions were deadly.  And they want

9    to make a lot of hay about the fact that we didn't do an

10   undercover operation.  Well, Mr. Byers found out what

11   happened to the undercover operation when he was

12   cross-examining Chanda Little.  Chanda Little made the

13   undercover detective who was posing as a patient.  End

14   of operation.  But, you know, Ladies and Gentlemen, we

15   didn't need undercover operators here.  You didn't need

16   to hear from a police officer who was faking being a

17   patient.  You heard from somebody much more valuable in

18   this case.  You heard from live victims.  You heard from

19   Tab.  You heard from Alicia.  You heard from Barbara.

20   You heard from Mike.  And you heard from Leo.  Those

21   exhibits are more valuable than any undercover tape

22   could ever be.  The Defendants fought every effort to

23   stop what they were doing and ignored all the notices.

24   How many notices do you have to have before you move

25   from duped to dishonest?  How can they argue that they

1    didnt know what was happening?  They knew.  They just

2    deliberately chose to ignore it.  We had a long list of

3    information sources:  The victims, the victims'

4    families, the medical assistants, the physician's

5    assistants.  They're not trying to talk to the doctor

6    about whatever.  They're trying to tell Doctor, hey, we

7    got a fax from the hospital about an overdose.  Oh, my

8    God, we got a call from the Coroner.  Response:  I'll

9    take care of it; oh, well, it's their fault, they should

10   have known better.

11        Ladies and Gentlemen, they got calls from the

12   hospital, faxes from the hospital, calls and faxes from

13   the Coroner's office, from law enforcement.  They had

14   quality of care reviews, prepayment reviews, the intent

15   to terminate.  They got information from the pharmacies;

16   from Dr. Owen.  How much notice do you need?  It's just

17   mind-boggling.  They had notice that people were faking

18   pain, swapping pills, waiting in line to get into the

19   clinic at 5:00 in the morning.  What legitimate practice

20   has that happen?  Even their own witnesses said, yeah,

21   people would come up to us in the line and ask us for

22   our drugs.  How much notice do you need?  They said

23   people were getting a buzz from the drugs, that they

24   were abusing, addictive, selling, forging scripts,

25   saying they needed it, saying anything to get a fix.

1    They knew people were trying to beat the urine drug

2    screens.  They knew people were stealing stuff from

3    their charts.  They knew people were failing urine drug

4    screens, doing early scripts, having DUIs, going to

5    jail.  Even the patients knew about the doctor shopping.

6    You remember Aletha?  She was a defense witness.  She

7    told you, oh, yeah, I knew about the patients doing the

8    doctor shopping.  That's why they died.  If the patients

9    knew this, how didn't the Defendants know this.  And if

10   you need a bouncer at a medical clinic -- that's

11   Ulysses' job -- do you have a problem?  How much notice

12   do you need, Ladies and Gentlemen?  And on top of that,

13   how many overdoses and deaths do you have to let pile up

14   before you change your ways?

15       Although it's true that the Defendants did not deal

16   drugs at the street corner; the manner in which they

17   jointly operated this clinic created exactly what Dr.

18   Jorgensen told you it was, a narcotics delivery system

19   and a pill mill.  And every critical aspect, the

20   Defendants created a drug dealing operation.  They had

21   the product: controlled substances.  They had the mode

22   of delivery: the prescriptions.  They had the dealers:

23   the doctors and the PAs writing the scripts.  They had

24   the distribution network: the clinic.  They had the

25   customers: the people coming in for their monthly

1    prescriptions.  And they acted to create dependence and

2    addiction in those customers so they kept coming back

3    for their prescriptions and their fix.  Even people who

4    may have had legitimate pain, which we agree they did,

5    eventually became customers, addicted like Patty and

6    Eric and Robin; like the 18 individuals in Count 5; like

7    the 27 individuals in Count 6.  And, again, don't forget

8    those live exhibits we had in this case:  Tab and Alicia

9    and Leo, who told you about his wife Katherine.  And

10   even the Defendants' own witnesses, Carol and Kelly,

11   whose testimony didn't give you the whole picture until

12   we put their medical records in.  Even they, like Tab,

13   may very well be lucky to be alive.

14       The Defendants answer to this is:  Well, I wasn't

15   trading scripts for sex.  Oh, well, Dr. Simons was,

16   according to your wife.  I wasn't trading prescriptions

17   for money.  Well, you got money for those office visits

18   and, according to the patients who went to the ER, if

19   you didn't have the money for the office visit, you

20   didn't get the script.  The Defendants want you to

21   ignore all of the evidence save for one person:

22   Defendant Stephen Schneider, and his testimony that he

23   never wrote a script to someone who wasn't in pain.  Yet

24   he now claims he was duped by drug seekers.  He was

25   deceived.  Well, which is it?  Actually he knew he had

208

1    been duped long ago.  He told Tom Wagner long ago before

2    the clinic opened, he told the Board of Healing Arts in

3    those letters, even before the first search warrant.

4    The Defendants ask that you believe Stephen Schneider

5    never wrote a prescription to hurt anyone; but the

6    Defendants did not talk about the people in Exhibits 1,

7    1-A, 1-B, 1-C and 1-D.  They didn't explain to you how

8    those people weren't hurt.  They never explained his

9    comment to Debra Klingsick that if she didn't use all

10   her prescription pads in a single day, she wasn't

11   writing enough scripts.  What about Alicia and Mike?

12   What about Leo and Katherine?  What about Tab and

13   Barbara?  What about Eric and Lori Lynn?  What about

14   Robert and Robin?  What about Patty and Laurie?  What

15   about the 18 people in Count 5?  What about the 2 people

16   in Count 6?  What about the 37 people that you illegally

17   dispensed Actiq to?  What about the minors?  How did you

18   help those people and not hurt them?  The defense claims

19   of helping people rings hollow in the face of the

20   overwhelming objective evidence to the contrary.  What

21   we have here is the kids who have gotten in the cookie

22   jar, crumbs and chocolate all over their face, look at

23   you and say, no, I didn't eat any cookies.  That is not

24   good faith, Ladies and Gentlemen.  He claims to have

25   trusted people.  But why?  With all that notice, with

1   all that going on.  A reasonable doctor is going to

2   trust but verify.  But the second step never happened

3   here.  Again, the defense wants you to trust Steve

4   Schneider and ignore the objective evidence.  Just as he

5   said he did with the patients.  He trusted what they

6   said, not what they did.  That is not what evidence is

7   all about.  How could the Defendants have not known of

8   the harm they were causing?  Everybody else knew.  Their

9   own employees knew.  The pharmacist knew.  The ER knew.

10  The victims' families knew.  How could they not have

11  known.

12       For the Defendants to claim that they were ever

13  acting in good faith on behalf of the patients is

14  evidence of what Dr. Kaden called incredible gall.

15  Other than the Defendant Steve Schneider's own

16  testimony, which did not stand up on cross-examination,

17  there's been no evidence of the good faith efforts to

18  help these patients.  There's been no circumstantial

19  evidence of that either.  Instead, all of the evidence

20  points to a physician and clinic manager jointly

21  operating a clinic that does not remotely resemble any

22  reasonable attempt to operate a pain management

23  legitimately.  Everyone with any desire to do so and any

24  sense left.

25       Good faith and wanting to help people would mean

 1    that the Defendants would have hired qualified people

 2    and trained them.  Good faith means you don't prescribe

 3    drugs, the same drugs people just overdosed on.  Good

 4    faith means you pay attention to all that notice and

 5    change your ways.  You take action instead of no action.

 6    There is simply no evidence before you that these people

 7    were trying to help people.

 8         Returning to opening statements.  Mr. Williamson

 9    told you that you would receive evidence of a caring

10    compassionate and courageous clinic.  There's no doubt

11    that there are people who believe that the Defendant

12    Stephen Schneider was caring and compassionate; but the

13    people who held that belief admittedly did not know what

14    you now know.  They did not have all the facts.  Once

15    again, the Defendants want you to do what they did:

16    Trust but not verify.  But the objective evidence is in

17    the Defendants' actions, not their words.  Do those

18    actions evidence caring and compassionate and courageous

19    medical professionals?  No.  A caring and compassionate

20    doctor would not leave at 5:00 leaving people who had

21    waited hours to see him, leaving just a prescription pad

22    for the PA's as his callig card.  A caring and

23    compassionate doctor and clinic manager would not blame

24    the individuals, calling them bad grapes and acceptable

25    casualties.  As Mr. Williamson stated in opening and in

 1  closing, it was the victims' fault because they were

 2  deceptive.  But, of course, again, as the Defendants

 3  knew, people were lying to them and yet they still gave

 4  them drugs.  A caring and compassionate doctor and

 5  clinic manager would not suggest, well, less than 1

 6  percent died, isnt' that just another way of saying, oh,

 7  well, acceptable casualties.  A caring and compassionate

 8  doctor and clinic manager would not have Alex Peters

 9  come into this courtroom and tell you that he blamed his

10  own brother for overdosing at the age of 18.  A caring

11  and compassionate doctor and clinic manager would not

12  claim in a letter to the Kansas Board of Healing Arts

13  that Larry had a hand in Patty's death.  A caring and

14  compassionate doctor and clinic manager would not have

15  the rseults we have in this case.

16      Secondly, going to the clinic was playing Russian

17  roulette.  There were winners and there were losers.

18  The lucky ones like Tab came out alive.  Although they

19  are still suffering from their addictions acquired at

20  the clinic; but the unlucky ones ended up at the

21  addiction treatment centers by the hundreds here in

22  Wichita and others ended up in the emergency rooms.  And

23  the really unlucky ones ended up at the morgue. A caring

24  and compassionate doctor and clinic manager would not

25  play Russian roulette.  They would figure out what was

1    going wrong and they would call all hands on deck and
2    get it fixed.  A caring and compassionate doctor would
3    be like Dr. Jorgensen and Dr. Owen and Dr. Parran, and
4    even Dr. Davison, who you met today.  A caring and
5    compassionate doctor and clinic manager would be
6    remorseful, devastated, and choked up about every single
7    overdose and every single death, and we've seen no
8    evidence of that, Ladies and Gentlemen.  What will it be
9    is what your bartender asks you.  Not your doctor.  Oh,
10   well, is what somebody says when somebody drops a ball
11   at a baseball game.  It's not when people die.  Bad
12   grapes is talkin' about wine, not dead people.  A doctor
13   running a legitimate pain management practice and the
14   clinic manager would not accept any casualties at all.
15        And there has also been no evidence of courage,
16   Ladies and Gentlemen.  A courageous doctor and clinic
17   manager would not have the audacity to blame the
18   victims.  Courage means taking responsibility.  On the
19   one hand, they want to brag about being the number one
20   narcotic writer in Kansas; but on the other hand, they
21   don't want to take responsibility for what that resulted
22   in.  When Dr. Rody called and challenged the Defendant,
23   he said, hey, get off my case, I'm the pain management
24   specialist.  But that went right out the window when the
25   investigation started, didn't it?  He's no longer a pain

213

1    management specialist.  Once things started falling

2    apart, once the true clinic was revealed, all of a

3    sudden, he's not a specialist any more.  Courageous

4    people do not make threats to their employees like Linda

5    Schneider did.  Courageous people would have shown their

6    witnesses Exhibit 1 and 1-A.  But they didn't show any

7    of their witnesses those exhibits.  Not before they

8    testified.  Because they knew that those exhibits tell

9    the story that will lead to their convictions.  They

10   cannot run from the facts, Ladies and Gentlemen.  They

11   can only hope to hide them from you.  That is not

12   evidence of courage.

13       Mr. Byers told you in opening and in closing that

14   this case would not be a close call.  We agree.  It is

15   not a close call because the evidence overwhelmingly

16   supports verdicts of guilty.  All of the witnesses and

17   all of the documents speak for the 68 peple who can no

18   longer speak for themselves.  If this had been a

19   legitimate pain practice, there would be nobody to speak

20   for.  The Defendants want to portray themselves as these

21   chronic pain missionaries with their mission being to

22   save the poor Medicaid people in pain through the clinic

23   they operated as doctor and nurse, husband and wife.

24   The people would come and they would trust the doctor to

25   help them.  Who would expect the missionaries to hurt

1    the people it was their mission to help?  According to

2    the Defendants, they took the outcasts, the downtrodden,

3    the down on their luck as both employees and patients.

4    But the sickest of the sick need the best medical

5    attention, not the quickest.  After a point it is almost

6    like a cult developed around the cinic where addiction

7    brought them and kept them coming back.  They were

8    converts.  That is why you have people denying that the

9    Defendant hurt them or their loved ones.  That is why

10   you have whole families coming in for pain medications.

11   What missionary ignores the sign that their mission is

12   hurting and not helping.  What missionaries ask others

13   to bury their dead?  It didn't matter if the victims

14   died.  The Defendants knew full well that the addictions

15   they had set in motion were spreading throughout the

16   community they claimed to be helping.  The Burger King

17   sign was on, as Alicia said, and people came to have it

18   their way.  What missionaries could get rich from their

19   converts?  For the Defendant, money and not medicine

20   became their real mission.

21       I want to leave you with two key points of

22   testimony.  One from the Defendant and one from a

23   victim.  On cross-exanination, within the first few

24   minutes, the Defendant remarkably admimtted I never had

25   a legitimate pain practice.  We agree.  And thats quite

 1      the admission, Ladies and Gentlemen.  But it's an

 2      admission that's absolutely consistent with all of the

 3      eivdence you have heard.  And although the defense

 4      didn't want to hear this testimony, Mr. Williamson asked

 5      Tab:  He was trying to help you, wasn't he?  And Tab's

 6      response sums up this case.  Tab told you:  I think it

 7      may appear to be that way, but you want my honest

 8      opinion, I think I was overwritten prescriptions.  I'm

 9      lucky to be alive here.  I could have died many times.

10      Many nights.  I went for weeks without knowing where I

11      was.  I don't believe he really cared.  If he would have

12      overwrote me, which he did, and I would have died, I'd

13      just be another person today that was in the books with

14      the rest of 'em.

15          All the victims and exhibits 1, 1-A can't speak.

16      As you review the evidence, Ladies and Gentlemen, let

17      Tab's words speak for them all.  He told us what

18      happened and what the Defendants' clinic was really all

19      about.  When you let Tab speak for them and speak for

20      the evidence, you will know that you need to mark your

21      verdict forms guilty, guilty as charged.

22              THE COURT:  All right.  Now, does the

23      Government have any additional requested instructions or

24      any additional objections to the instructions given?

25              MS. TREADWAY:  No, Your Honor.

1           THE COURT:  Mr. Williamson?

2           MR. WILLIAMSON:  No, Your Honor, not from Dr.

3    Schneider.

4           THE COURT:  Mr. Byers?

5           MR. BYERS:  No, sir.

6           THE COURT:  Thank you.  Well, now, Ladies and

7    Gentlemen, I want you to go to the jury room and do one

8    thing.  I want you to elect your foreperson.  Then I

9    want you to go home and come back tomorrow.  As I told

10   you, I think, earlier, the time -- your time in

11   deliberations is within your control basically.  So, you

12   need to decide when you're going to come in in the

13   morning.  Tell Rachael or tell Robert when you're going

14   to come in.  You come in at that time; and when you're

15   all in the jury room, then you can begin your

16   deliberations.  But remember about the admonition.  The

17   admonition is still in effect.  The only time it isn't

18   is when all of you are in the jury room.  We won't be

19   interrupting you much during your deliberations.  But,

20   you know, Robert or Rachael will come in to get your

21   lunch orders.  They won't be talking to you about the

22   case.  You're not to talk to them about the case, about

23   where you're at in your deliberations.  Probably at the

24   end of the day, somebody will come in and ask you what

25   time you plan to go home so that we're aware of your

1    schedule.  But that's about it.  So, go into the jury

2    room, take care of electing the foreman -- or the

3    foreperson I guess would be politically correct -- and

4    Robert will come in.  Now, tomorrow morning we will

5    bring in the exhibits and everything that you will need

6    and they will all be in there.  If there's something --

7    I think there were a couple of -- that one interview of

8    Mrs. Schneider.  If that's something that you want to

9    see, you're going to have to let Rachael or Robert know

10   and we'll have you come in here to the courtroom and you

11   can watch it because we don't have any equipment in the

12   jury room for you to do that.  But I think the rest of

13   the -- all the other evidence and exhibits will be in

14   there.  So with that, thank you very much.  I'll see you

15   tomorrow.

16                    (Jury retires to deliberate

17                    their verdict at 5:25 p.m. June

18                    15, 2010.)

19                    (Ms. Silva and Mr. Moody sworn

20                    as bailiffs.)

21          THE COURT:  All right.  Gentlemen, and Lady,

22   where will you be tomorrow?

23          MR. WILLIAMSON:  We'll be about five minutes

24   away.

25          MS. TREADWAY:  We'll be in the courthouse,

1    Judge.

2              THE COURT:  All right.  We're in recess.

3                        (Recessed for the day at 5:26

4                        p.m.)

```
 1                    C E R T I F I C A T E

 2

 3          I, Cindy L. Schwemmer, United States Court

 4    Reporter in and for the District of Kansas, do hereby

 5    certify:

 6              That the above and foregoing proceedings were

 7    taken by me at said time and place in stenotype;

 8              That thereafter said proceedings were

 9    transcribed under my direction and supervision by means

10    of computer-aided transcription, and that the above

11    and foregoing constitutes a full, true and correct

12    transcript of said proceedings;

13              That I am a disinterested person to the said

14    action.

15              IN WITNESS WHEREOF, I hereto set my hand on

16    this the 4th day of April, 2011.

17

18

19

20                         s/ Cindy L. Schwemmer

21                         Cindy L. Schwemmer

22                         United States Court Reporter

23

24

25
```