1          IN THE UNITED STATES DISTRICT COURT

2

3                    DISTRICT OF KANSAS

4

UNITED STATES OF AMERICA,          )

5                                   )
                          Plaintiff,) District Court
6                                   ) Case No. 07-10234
vs.                                 ) Circuit Court
7                                   ) Case No. 10-3281
LINDA K. SCHNEIDER, a/k/a          )
8  LINDA ATTERBURY,                 )
                                    )
9                       Defendant,) 
                                    )
10 _____

11

12

13              **TRANSCRIPT OF MOTION HEARING**

14       ** PORTIONS OF TRANSCRIPT FILED UNDER SEAL **

15      On the **17th day of July, 2008**, came on to be heard
    Motion in the above-entitled and numbered cause before
16  the HONORABLE DONALD W. BOSTWICK, Magistrate Judge of
    the United States District Court for the District of
17  Kansas, Sitting in Wichita.

18

19

20
    APPEARANCES
21

22      The Plaintiff appeared by and through Ms. Tanya
    Treadway and Mr. Alan Metzger;

23      The Defendant Linda Schneider appeared by and
    through Mr. Kevin Byers, Mr. Eugene Gorokhov and Mr. Uzo
24  Ohaebosim.

25

**I N D E X**

**JULY 17, 2008**:

**STACEY HILL**
Direct Examination by Ms. Treadway:        8
Cross Examination by Mr. Byers:           31

**NOTE**:  Pgs 60-77 of transcript FILED UNDER SEAL as
              ordered by Judge Bostwick

**CINDY TUCKER**
Direct Examination by Mr. Ohaebosim:      78
Cross Examination by Ms. Treadway:        84
Redirect Examination by Mr. Ohaebosim:    85

**NOTE**:  Pgs 87-93 of transcript FILED UNDER SEAL as
              ordered by Judge Bostwick

**DESTINY SCHULZE**
Direct Examination by Mr. Byers:          94

Certificate of Certified Shorthand Reporter: 116

1

2                          (Beginning at 10:00 a.m. July

3                          17, 2008, the following

4                          proceedings were had before

5                          Magistrate Judge Bostwick.)

6          THE COURT:  We have on for hearing today an

7   evidentiary hearing in case number 07-10234-02-MLB,

8   United States of America vs. Linda K Schneider a/k/a

9   Linda Atterbury.  May I have the appearances for the

10  Government please.

11         MS. TREADWAY:  May it please the Court.  On

12  behalf of the Government, Assistant United States

13  Attorneys Tanya J. Treadway and Alan Metzger.

14         THE COURT:  Thank you.  For the Defendant.

15         MR. BYERS:  Your Honor, Kevin Byers on behalf

16  of the Defendant, as well as Mr. Eugene Gorokhov and Mr.

17  Uzo Ohaebosim.

18         THE COURT:  Very well.  Before we start, let

19  me indicate that this is a limited evidentiary hearing.

20  This is not a reopening of the detention hearing.  I've

21  already heard those arguments previously.  I was ready

22  to rule on them and the matter got taken under

23  advisement.  It was back ready for me to rule on when

24  this motion came up.

25         I reviewed the Government's motion, which is

1  Document 96, to supplement the record in connection with

2  the detention issues.  And I reviewed the Defendant's

3  response.  Decided that I would allow an evidentiary

4  hearing; but it is limited to the issues raised in the

5  Government's motion to supplement.  That motion raises

6  two issues.  The first issue raises evidence concerning

7  alleged attempts by the Defendant to mislead the Court

8  concerning her mental condition as a result of her stay

9  in the Butler County jail.  And the second issue,

10  evidence concerning the alleged attempts for the

11  Defendant to obtain false identification documents that

12  would pertain to the issue of her possibility of flight

13  if she were released on condition.  As I see it, those

14  are the only two issues and that's the only two issues I

15  intend to hear evidence on today.

16      Is there any concern about that or anyone going to

17  take issue with me before we get started on that kind of

18  issue?

19          MS. TREADWAY:  Not on behalf of the

20  Government, Judge.

21          MR. BYERS:  Not on behalf of the Defendant,

22  Your Honor.

23          THE COURT:  All right.  Now, I have issued

24  writs of habeas corpus for three witnesses:  One on

25  behalf of the Government and two on behalf of the

1    Defense.  Just so that I know where we're going, can I

2    ask the Government, do you have any other witnesses

3    other than the one that I've issued the writ for that

4    you wish to present today on these issues?

5              MS. TREADWAY:  No, Judge.

6              THE COURT:  All right.  From defense

7    standpoint, any witnesses other than the two I've issued

8    the writs on?

9              MR. BYERS:  No, sir.

10             THE COURT:  All right.  Now, I have segregated

11   those witnesses.  I'm not going to allow them to be

12   present in the courtroom while other people testify.

13   I'm going to bring them up one at a time.  When they're

14   finished, I'm going to take them back.  So you'll have

15   your opportunity to cross-examine but then they're going

16   to be released back to the custody of the Marshal and

17   taken back downstairs.  So I'll turn to the Government.

18   It's the Government's motion.  Are you prepared to

19   proceed?

20             MS. TREADWAY:  Yes, Judge.  In addition to

21   Ms. Hills' testimony, we will ask the Court to take some

22   judicial notice of issues that are before the Court in

23   terms of the psychological evaluation.  And I would

24   imagine the Court would want to address that after the

25   witness testimony so that the witnesses can be taken

1  back where they need to be taken to.

2      THE COURT:  That is correct.  All right.  I

3  will then allow you to proceed.  And you do wish to call

4  your first witness and your only witness?

5      MS. TREADWAY:  Yes.  The Government calls

6  Stacy Hill.

7      THE COURT:  Uh-huh.  The Marshals get me Stacy

8  Hill, please.  I should also say, while the Marshals are

9  doing that, that after reviewing the pleadings in this

10  case and the allegations in the Government's motion to

11  supplement, the Court determined that it would be

12  appropriate to appoint a counsel to advise this witness

13  in connection with her testimony today because, as the

14  parties recognize, the allegations made in the

15  Government's motion to supplement at least border on the

16  possibility of potential criminal conduct on behalf of

17  this defendant.  Accordingly, I have appointed Mr. Steve

18  Gradert, Assistant Federal Public Defender's Office, to

19  be available for consultation with the Government's

20  witness in connection with today's testimony.

21      Mr. Gradert, if you want to be present over here

22  where you're close to the witness.  We've got a seat for

23  you.  I think you can pull around on this side of the

24  witness table so that you can confer without being

25  hampered.

 1          MR. GRADERT:  Thank you, Your Honor.

 2          THE COURT:  And we don't have a podium, as you

 3     know.  We don't really have room for one.  So you're

 4     free to question from the table and you don't need to

 5     stand while you do it.  If it's easier for you to use

 6     your notes and records, you may remain seated.  I'll

 7     allow you to proceed however you wish.

 8          MS. TREADWAY:  Judge, while we're waiting for

 9     the witness, some housekeeping matters.  I would like

10     the record to reflect the Government is providing

11     defense counsel with Ms. Hill's NCIC printout which is

12     her criminal history.  The government requests that that

13     be returned at the end of the hearing.  Also, we are

14     handing to the defense a letter Ms. Hill wrote which is

15     going to be Government Exhibit Hill 1; as well as three

16     warning and waiver forms that Ms. Hill has signed in

17     addition to some federal agents, which is marked as Hill

18     2.  I will also provide copies of those for the Court.

19          THE COURT:  Thank you.

20          MS. TREADWAY:  If Mr. Gradert will help me

21     out, I'll just pass them to you so you can pass them to

22     the witness.

23          MR. GRADERT:  Thank you.

24          MS. TREADWAY:  Judge, I'm sorry.  I gave you

25     copies instead of the originals.  Let me give you the

1      originals.  I apologize.

2             THE COURT:  Thank you.  If you would, before

3      you are seated, face me, please, and take the following

4      oath.

5                          **STACEY HILL**

6      Having been first duly sworn to tell the truth, the

7      whole truth and nothing but the truth, testified as

8      follows on:

9                      **DIRECT EXAMINATION**

10            THE COURT:  Please have a seat.  As I

11     announced to counsel before we called you up, in

12     connection with this matter I have appointed Mr. Steve

13     Gradert, he is an Assistant Federal Public Defender, in

14     this matter to consult with you if you wish to do so in

15     connection with your testimony.  So if you have

16     questions, Mr. Gradert is available to you.

17            WITNESS MS. HILL:  Okay.

18            THE COURT:  All right.  You may proceed.

19            MS. TREADWAY:  Thank you.

20     BY MS. TREADWAY:

21     Q    Could you please state your name for the Court.

22     A    Stacey Hill.

23     Q    And could you please spell that?

24     A    H-I-L-L, S-T-A-C-E-Y.

25     Q    Thank you.  How old are you, Ms. Hill?

1    A    I'm 37.

2    Q    And where are you currently residing?

3    A    622 East Central.

4    Q    And what is that?

5    A    Residential.

6    Q    And what does that mean?

7    A    It's like a Department of Corrections.

8    Q    So it's kind of a halfway house.  Would that be an

9    appropriate term?

10   A    Yes.

11   Q    Let me introduce myself.  My name is Tanya Treadway.

12   I'm an Assistant U.S. Attorney in this district.  Have

13   you and I met before?

14   A    No.

15   Q    How long have you been in the halfway house, ma'am?

16   A    Since June 24th.

17   Q    Were you previously in the Sedgwick County jail?

18   A    Yes.

19   Q    And why were you in Sedgwick County jail?

20   A    Community Corrections violation, forgery.

21   Q    Forgery.  Now, during your life, Ms. Hill, have you

22   used aliases or other names besides Stacey Hill?

23   A    Yes.

24   Q    And do you know how many aliases you have used over

25   time?

1    A    No.

2    Q    Quite a few?

3    A    Yes.

4    Q    Would it be fair to say that you have used your

5    aliases to engage in criminal activities?

6    A    Yes.

7    Q    In fact, would it be fair to say, Ms. Hill, that you

8    have been fairly steadily engaged in criminal activities

9    through your adult life?  At least since approximately

10   1988?

11   A    Yes.

12   Q    Prior to turning 18, had you been involved in

13   criminal activities?

14   A    Yes.

15   Q    In terms of your criminal activity since you've been

16   an adult, Ms. Hill, have you been involved in

17   shoplifting, theft and larceny?

18   A    Yes.

19   Q    Have you been involved in the sale of illegal drugs

20   like marijuana?

21   A    Yes.

22   Q    Have you been involved in passing worthless checks?

23   A    Yes.

24   Q    Have you been involved in welfare fraud?

25   A    Yes.

```
 1    Q    And have you been involved in forgery?

 2    A    Yes.

 3    Q    Identity theft?

 4    A    Yes.

 5    Q    Impersonations resulting in a benefit to yourself?

 6    A    Yes.

 7    Q    False identification?

 8    A    Yes.

 9    Q    Possessing and receiving stolen property?

10    A    Yes.

11    Q    Have you been a fugitive and failed to appear for

12    many court appearances?

13    A    Yes.

14    Q    In what states have you been engaged in criminal

15    activities, Ms. Hill?

16    A    Kansas, Oklahoma, Missouri.

17    Q    As a result of these criminal activities that we

18    reviewed for the Court, how much of your adult life have

19    you spent in jail, ma'am?

20    A    To the best of my knowledge, I'd say about ten

21    years.  Maybe more.

22    Q    Thank you.  Now, at some point in the recent past

23    were you also an inmate in the Butler County jail

24    located in ElDorado, Kansas?

25    A    Yes.
```

1    Q    Why were you an inmate in the Butler County jail?

2    A    Forgery.

3    Q    Do you know approximately when you arrived at Butler

4    County jail?

5    A    It was, I would say, somewhere around October 12.

6    Q    And that would have been in 2007?  Last year?

7    A    Yes.

8    Q    And do you know approximately when you left Butler

9    County jail?

10   A    February 4th of '08.

11           MS. TREADWAY:  Judge, at this time I'd like to

12   ask you to take judicial notice that Linda Schneider was

13   incarcerated on your detention order as of December

14   21st, 2007, and was incarcerated at Butler County jail?

15           THE COURT:  Any objection to that finding?

16           MR. BYERS:  No, sir.

17           THE COURT:  All right.  So find.

18   BY MS. TREADWAY:

19   Q    During your stay at the Butler County jail,

20   Ms. Hill, did you meet the Defendant Linda Schneider?

21   A    Yes.

22   Q    How did you come to meet her?

23   A    We were all inmates.

24   Q    Is the Butler County jail a dormitory type jail as

25   opposed to a cell jail?

 1    A    It's a dormitory.

 2    Q    And so the female inmates are in a dormitory all

 3    together; is that correct?

 4    A    Yes.

 5    Q    Approximately how many hours per day did you spend

 6    in this group setting?

 7    A    We're locked down to our bunks at least anywhere

 8    from about 17 to 19 hours a day.

 9    Q    And where was your bunk in relationship to the

10    Defendant's bunk?

11    A    Right beside her.

12    Q    What would you do during the time that you were

13    locked down to your bunks during the day?

14    A    We would all talk.  Write letters.

15    Q    Did the fact that you were essentially very close to

16    Defendant Linda Schneider's bunk allow for frequent

17    conversations with her?

18    A    Yes.

19    Q    And, in fact, did you have frequent conversations

20    with her?

21    A    We did have conversations.

22    Q    All right.  Do you know about how often?  Did you

23    have daily conversations?

24    A    We all talked every day.

25    Q    And could you estimate how many times you spoke with

1    her?

2    A    Quite a few.

3    Q    Now, I want to hand you first what's been marked for

4    identification as Exhibit 1.  All right.  Do you want to

5    get that to her.  And your counsel has given you a copy

6    of that?

7    A    Yes.

8    Q    Do you recognize that?

9    A    Yes, I do.

10   Q    What is that, ma'am?

11   A    This is a letter.

12   Q    And did you write that letter?

13   A    Yes.

14   Q    And is it a true and accurate copy of the letter you

15   wrote on April 8th, 2008?

16   A    Yes, it is.

17   Q    And did you address that letter to me?

18   A    Yes.

19   Q    How did you know to address it to me, ma'am?

20   A    Somebody had talked to me about it.

21   Q    And is that somebody in the Butler County jail?

22   A    Sedgwick County.

23   Q    Sedgwick County jail.  All right.  And is that

24   letter in your handwriting?

25   A    Yes.

1    Q    And is there also a copy attached to the back that

2    is the envelope in which you mailed the letter?

3    A    Yes.

4    Q    And did you address that envelope?

5    A    Yes.

6    Q    And does it indicate that it was mailed on April

7    10th, 2008?

8    A    Yes.

9    Q    Where did you mail the letter from, Ms. Hill?

10   A    The Sedgwick County jail.

11   Q    And what is the return address listed on the

12   envelope?

13   A    141 West Elm.

14   Q    And what address is that?

15   A    Sedgwick County jail.

16   Q    All right.

17              MS. TREADWAY:  Government would offer Exhibit

18   1.

19              THE COURT:  Objection?

20              MR. BYERS:  No, sir.

21              THE COURT:  Exhibit 1 will be admitted.

22   BY MS. TREADWAY:

23   Q    Now, Ms. Hill, I would like you to read this aloud

24   please and I may stop you at points to explain some

25   terms you've used.  But could you just start with "Dear

```
 1    Tanya Treadway"?
 2    A   "Dear Tanya Treadway.  My name is Stacey Hill.  I
 3    have wrote to you before and heard nothing back.  The
 4    reason I'm writing again is because, obviously, you did
 5    not receive my kite from the Sedgwick County jail."
 6    Q   All right.  You say kite from the Sedgwick County
 7    jail.  You evidently sent me something prior to this
 8    letter.  What did you send?
 9    A   They call it a kite.  It's like a, I don't know
10    exactly, it's a, it's a correspondence form basically.
11    Q   All right.  So you sent something previously and
12    then you followed up with this letter; is that correct?
13    A   Yeah.
14    Q   All right.  Could you please continue reading?
15    A   "I was in Butler County jail --"
16             THE COURT:  You need to slow down.  The court
17    reporter needs to take this down.  She's very fast, but
18    not quite that fast.
19    A   "I was in the Butler County jail with Linda
20    Schneider from the time she got there in December until
21    I left February 4 of '08.  During that time I talked to
22    Linda a lot, especially when she moved her bunk area
23    next to mine.  Then we were able to talk even more.  We
24    talked a lot about her case and how maybe she could get
25    out of it.  She talked about saying she had multiple
```

1   personalities, bipolar, memory loss, et cetera, to

2   compare animals to humans with the suffering.  There is

3   too much to mention on paper; but here are a few other

4   topics:  Mexico, new birth certificates, social security

5   card, et cetera.  You may not need to hear -- or, you

6   may not need to hear or know what I know, but I will not

7   be able -- I will not be here much longer for I will be

8   done and be in Oklahoma.  If you have any questions,

9   feel free to speak with me.  Sincerely, Stacey Hill."

10  Q    Thank you.  Now, you reference Oklahoma.  What is

11  that reference about.  Why were you going to Oklahoma?

12  A    I had a warrant out of Washington County for a

13  parole violation.

14  Q    Are you still going to be sent back to Oklahoma?

15  A    No.

16  Q    Has that been resolved?

17  A    Yes.  I've already been to Oklahoma.

18  Q    Now, Ms. Hill, did anyone from my office, the United

19  States Attorney's Office, ask you to gather information

20  from the Defendant Linda Schneider?

21  A    No.

22  Q    Did anyone from federal law enforcement agencies ask

23  you to gather information from the Defendant Linda

24  Schneider?

25  A    No.

1   Q   Did anyone from any local or state law enforcement

2   agencies ask you to gather information from the

3   Defendant Linda Schneider?

4   A   No.

5   Q   Why did you write this letter to me, Ms. Hill?

6   A   I really don't know.

7   Q   Did you expect to get something in return for your

8   information?

9   A   No.

10  Q   Have you gotten anything in return for your

11  information?

12  A   No.

13  Q   Has the Government offered you anything in return

14  for your information?

15  A   No.

16  Q   Do you remember Agent Stewart and another agent

17  named Laticia Cleveland coming to talk to you about your

18  letter back in April?

19  A   Yes.

20  Q   Since then have you also met with Agent Stewart and

21  Agent Martin?

22  A   Yes.

23  Q   And before being interviewed, did you agree to sign

24  a warning and waiver form?

25  A   Yes.

1    Q    On each occasion?

2    A    Yes.

3            MS. TREADWAY:  Mr. Gradert, could you please

4    hand the witness Exhibit 2.

5                        (Mr. Gradert complies with

6                        request.)

7    BY MS. TREADWAY:

8    Q    And are these warning and waiver forms accurate and

9    true copies of the forms that you signed on April 17th,

10   2008, June 18th, 2008, on two occasions?

11   A    Yes.

12   Q    And is that your signature there?

13   A    Yes.

14   Q    And did you watch the agents actually sign this form

15   in front of you?

16   A    Yes.

17   Q    Was that true for each occasion?

18   A    Yes.

19            MS. TREADWAY:  Government would offer Exhibit

20   2.

21            THE COURT:  Any objection?

22            MR. BYERS:  No, sir.

23            THE COURT:  Exhibit 2 will be admitted.

24   BY MS. TREADWAY:

25   Q    So, Ms. Hill, when you agreed to speak with the

1 agents on these three occasions, did you understand that

2 you would be receiving no benefit from your interview

3 and that if you made any statements that were lies that

4 you could be in trouble?

5 A Yes.

6 Q And you would be prosecuted for perjury?

7 A Yes.

8 Q Do you understand that the same holds true for your

9 testimony today?

10 A Yes.

11 Q And you understand that if you lie under oath that

12 that conduct is punishable?

13 A Yes.

14 Q Now let's talk about your conversations with

15 Defendant Linda Schneider.  When you were incarcerated

16 with the Defendant at Butler County jail, did you have

17 conversations about her alleged mental disorders?

18 A Yes.

19 Q Can you tell the Court about some of those

20 conversations?

21 A Yeah.  She, uhm, asked about bipolar multiple

22 personalities.  You know, how to be playing them off.

23 Q And did she ask you whether a diagnosis of one of

24 those would get her off?

25 A Yeah.

```
 1   Q   Get her out of her potential crimes in this case?
 2   A   How it would help her, yeah.
 3   Q   She asked you about talking to the nurse?
 4   A   Yes.
 5   Q   What did she say?
 6   A   What she should say.
 7   Q   What do you mean what she should say?
 8   A   What she could say to the nurse to I guess have the
 9   diagnosis of bipolar.
10   Q   So what symptoms to offer the nurse?
11   A   Yeah.
12   Q   And you talked to her about those symptoms?
13   A   A little bit.
14   Q   Did she ask you what type of medications would be
15   prescribed?
16   A   Yes.
17   Q   And did you talk about that?
18   A   Well, a little bit.
19   Q   Why do you know something about bipolar disease,
20   ma'am?
21   A   Because people in prison.
22   Q   There are a lot of people in prison with bipolar
23   disorder?
24   A   Uh-huh.
25   Q   Did you say to Ms. Schneider that in fact there were
```

1    a lot of people in prison that had bipolar?

2    A    Yes.

3    Q    Did you talk about that?

4    A    Yes.

5    Q    Based on your observations during the months that

6    you were incarcerated with the Defendant, did you

7    observe her to be suffering from any mental disorder?

8    A    No.

9              MR. BYERS:   Objection, Your Honor.

10   Foundation.

11             THE COURT:   I'm going to sustain it at this

12   point and allow you to lay a better foundation for that

13   question.

14   BY MS. TREADWAY:

15   Q    Having been incarcerated for ten years with a lot of

16   bipolar people, did Ms. Schneider indicate to you that

17   she was bipolar based on your observations and based on

18   your experience with other such people in the criminal

19   justice system?

20             MR. BYERS:   Objection, Your Honor.   I can't

21   see where every day experiences with supposedly bipolar

22   people could possibly lay a proper foundation for what

23   is essentially a lay person's expert opinion about our

24   client's mental condition.

25             MS. TREADWAY:   She can certainly talk about

```
 1    her observations, Judge, in comparison.
 2              THE COURT:  I think you need a better
 3    foundation as to what her observations have been in the
 4    past before I can allow that kind of question.
 5    BY MS. TREADWAY:
 6    Q    Have you observed other people incarcerated with
 7    bipolar disorder?
 8    A    Yes.
 9    Q    And what kind of symptoms did they display?
10    A    Happy one minute, moody the next.  Kind of distant.
11    Q    And did Ms. Schneider indicate any of those symptoms
12    to you?
13    A    No.
14    Q    Now, based on your observations of the Defendant,
15    how would you describe her?
16    A    I would describe Linda as a concerned person.
17    Q    Concerned about her future?
18    A    And her family.
19              MR. BYERS:  Objection, Your Honor.  Leading.
20              THE COURT:  Did you say concerned?
21    A    Uh-huh.
22    BY MS. TREADWAY:
23    Q    Concerned about what?
24    A    Her future.  Her family.
25    Q    During your incarceration with the Defendant Linda
```

1    Schneider in Butler County jail, did you have

2    conversations with her about financial issues such as

3    property she and her husband Defendant Stephen Schneider

4    owned?

5    A    She did mention some property that they had owned.

6    Q    All right.  Did the Defendant talk to you about

7    their home in Mexico?

8    A    Yes.

9    Q    And what did she say about that?

10   A    She had discussed about their vacation home down in

11   Mexico, how the government wanted her to sign it over.

12   Q    And did she talk about anybody in Mexico?

13   A    She had mentioned that there was -- that she had a

14   translator and a driver.

15   Q    And did she say anything about their relationship?

16   A    The relationship between?

17   Q    Her and the interpreter or driver?

18   A    Just that there was another side.

19   Q    And what was that other side that she talked about?

20   A    Her personal side.

21   Q    And was that a sexual side?

22   A    Well, I don't know.  She didn't say that.

23   Q    Did she ever tell you that she would get wild with

24   him in Mexico?

25              MR. BYERS:  Objection.  I'm sorry, I thought

```
 1    you were done.
 2              THE COURT:  I'm going to sustain that as
 3    leading.
 4    BY MS. TREADWAY:
 5    Q   Did she ever mention what she would do with this
 6    gentleman in Mexico?
 7    A   She did say there was a wild side that she couldn't
 8    have here.
 9    Q   All right.  Did the Defendant talk about owning
10    other medical clinics besides the one in Haysville?
11    A   She had mentioned one in California.
12    Q   All right.
13    A   And one out in Romania.
14    Q   In Romania.  All right.
15    A   And that they had done some work.
16    Q   Did the Defendant make any specific statements about
17    the California clinic and how it had been set up?  Its
18    ownership?
19    A   That it was run by somebody else.
20    Q   All right.  And what about its ownership?
21    A   They had owned it but it was run by somebody else.
22    Q   Did the Defendant make any specific statements about
23    transferring property to her parents?
24    A   To her family, yes.
25              MR. BYERS:  I'm sorry, Your Honor, objection
```

1    as to relevancy.  Thought the scope of this hearing was

2    going to be related to risk of flight and the supposed

3    obstruction by trying to feign a mental illness or some

4    such thing.

5               MS. TREADWAY:  Risk of flight in terms of

6    putting money in someone else's hands to get access to,

7    Judge.  I believe that is relevant.

8               THE COURT:  I think that's broad enough I'm

9    going to allow it.

10   BY MS. TREADWAY:

11   Q    Again, Ms. Hill, what did she say about transferring

12   property to her parents and why she did so?

13   A    So that the -- so nobody could touch it.

14   Q    Including the Government?

15   A    Yes.

16   Q    Now, during your conversations with the Defendant in

17   Butler County jail, did she discover from you what your

18   past criminal activities had been?

19   A    She had discovered it from me and others, yes.

20   Q    Did you discuss with her that you'd been engaged in

21   identity theft and forgery and false impersonation and

22   other such criminal activities?

23   A    Yes.

24   Q    And when she learned of your past criminal

25   activities, did she ask you for help?

```
 1    A    Yes.

 2    Q    And what did she ask you for help with?

 3    A    Social security card, birth certificate and an ID.

 4    Q    And did she want you to obtain these in a different

 5    name or what?

 6              MR. BYERS:  Objection as to leading.

 7              THE COURT:  I'm going to sustain it.

 8    BY MS. TREADWAY:

 9    Q    What did she want from you?

10    A    Birth certificate, social security card and ID.

11    Q    And did she suggest a name?

12              MR. BYERS:  Objection as to leading.

13              THE COURT:  I'm going to allow that question.

14    A    She did not give me a specific name.

15    Q    And what did you tell her you could do to help her?

16    A    I told her that I could probably get it.

17    Q    All right.  So you offered to provide those items

18    for her?

19    A    Yes.

20    Q    Was there a price for obtaining these fake documents

21    for the Defendant?

22    A    Yes.

23    Q    What was the price?

24    A    50,000.

25    Q    And did the Defendant express an interest in your
```

```
 1    help?
 2    A    Yes.
 3    Q    And what did she say?
 4    A    She was interested.
 5    Q    Did she give you a piece of paper?
 6    A    Yes, I did receive a paper.
 7    Q    What was on the paper?
 8    A    Her sister's name and number.
 9    Q    And what were you supposed to do with her sister's
10    name and number?
11    A    Contact her sister.
12    Q    For what purpose?
13    A    To set up the arrangement.
14    Q    All right.  Did you ever end up doing that, ma'am?
15    A    No.
16    Q    Did you follow up with the Defendant about obtaining
17    these fake documents for her?
18    A    No.
19    Q    Did she tell you why she didn't any longer need
20    them?
21    A    It was under control.
22    Q    And what did she say was under control?
23    A    That her sister had it under control.
24    Q    All right.  And did she say specifically what her
25    sister had done?
```

29

```
1    A    That it was gonna be used under her sister's name.
2    Q    Did she indicate to you that she was going to assume
3    her sister's identity?
4    A    She didn't exactly put it that way.  She said that
5    she was going to use her sister's ID.
6    Q    Thank you.  Did the Defendant discuss with you the
7    fact that someone had told her that it would be best if
8    she stayed in jail?
9    A    Yes.
10   Q    What did she tell you about that?
11   A    It was some woman's right activist or something like
12   that.  I don't remember the whole name.
13   Q    Did the Defendant ever discuss with you the fact
14   that she had already been convicted of a federal felony
15   involving a false social security card?
16   A    No, I never knew that.
17   Q    Have you met with any of the defense attorneys in
18   the courtroom today --
19   A    Yes.
20   Q    -- that represent -- oh, I'm sorry -- that represent
21   the Defendant?
22   A    Yes.
23   Q    Who did you meet with?
24   A    Uzo.
25   Q    And do you remember when approximately that was,
```

1  ma'am?

2  A   I'm guessing it -- I'm guessing it was, it was in

3  June.

4  Q   All right.

5  A   Middle part of June.

6  Q   Would it have been the day before you met with the

7  agents?

8  A   Yes.

9  Q   In June?

10  A   Yes.

11  Q   And looking at Exhibit 2, you met with the agents on

12  June 18th?

13  A   Yes.

14  Q   So would you have met with Mr. Ohaebosin the day

15  before?

16  A   Yes.

17  Q   Junq 17th.

18        MS. TREADWAY:  Government would ask the Court

19  to take judicial notice that it was June 17 on which the

20  Defendants moved for a continuance of this hearing.

21        THE COURT:  All right.  I'll note the date of

22  the filing, yes.

23  BY MS. TREADWAY:

24  Q   During that conversation, did Mr. Ohaebosim ask you

25  whether you thought the Defendant Linda Schneider would

1    flee?

2    A    Yes.

3    Q    And what did you tell him?

4    A    I had told him that I felt that maybe she may leave

5    but I felt that she would still come back for court.

6    Q    And why did you say that she would leave?

7    A    I think I would want to leave for a minute, too.

8    Q    Especially if you had a house in Mexico would you

9    want to leave?

10            MR. BYERS:  Objection.

11            THE COURT:  Sustained.

12            MS. TREADWAY:  Nothing further, Judge.

13            THE COURT:  All right.  Cross-examination.

14            MR. BYERS:  Thank you, Your Honor.

15                    **CROSS EXAMINATION**

16   BY MR. BYERS:

17   Q    You've been a liar your whole adult life, haven't

18   you?

19   A    No.

20   Q    When were you not a liar?

21   A    Well, I'm not lying right now.

22   Q    And what compelled you to come forward with this

23   information and write to the Assistant United States

24   attorney to disclose this?

25   A    I really don't know.

```
 1    Q    A premonition?  A specter?  A voice?  Some guidance
 2    from some source?
 3    A    No.
 4    Q    You don't know why you wrote the letter?
 5    A    Honestly, no, I don't.
 6    Q    Okay.  You remember meeting with Mr. Ohaebosim?  You
 7    said that; right?
 8    A    Yes.
 9    Q    Was there anybody else in that meeting?
10    A    Yes.  He did have another attorney there.
11    Q    Do you remember that person's name?
12    A    No, I don't.
13    Q    You don't remember meeting with any other attorneys
14    for the Defendant that same day June 17?
15    A    I remember meeting with this gentleman and another
16    attorney but I do not remember his name.
17    Q    Okay.  Was he a Caucasian or black man?
18    A    He was a black man.
19    Q    Okay.  You don't remember speaking with me in the
20    Sedgwick County jail on June 17 at the counter by the
21    guard?
22    A    Now I do, yes.
23    Q    Okay.  You often suffer lapses of memory?
24    A    Well, I didn't speak with you but for maybe a
25    minute.
```

1    Q    So you did speak with me?

2    A    Briefly now that I remember.

3    Q    Okay.  Do you remember what we spoke about?

4    A    No.

5    Q    Do you remember telling Mr. Ohaebosim and the other

6    person there that you often have a bad memory and you

7    don't recall things specifically?

8    A    Yes.

9    Q    Do you remember saying that?  Was that a true

10   statement?

11   A    I remember certain things.  There's some things I

12   just don't care to remember.

13   Q    Did you tell Mr. Ohaebosim on June 17 that you never

14   had a conversation with Linda about -- with Linda

15   Schneider, the Defendant, about getting documents?

16   A    I -- me and Linda lived in the same dorm, of course

17   we spoke.

18   Q    Okay.  Did you deny on June 17 to Mr. Ohaebosim that

19   you ever said or talked with Linda Schneider about

20   getting false documents?

21   A    I don't recall that.

22   Q    Okay.  What do you recall from your conversation

23   with Mr. Ohaebosim?

24   A    I really didn't have a conversation with him.

25   Q    Were you there?

```
 1   A   Yes, I was there; but it was the other attorney
 2   asking all the questions.
 3   Q   Okay.  What do you recall about the conversation
 4   with the other attorney?
 5   A   About my letter.
 6   Q   What about your letter?
 7   A   Whether I wrote it; what I wrote.
 8   Q   Did you show these people a copy of the letter?
 9   A   No, I did not.
10   Q   Did you remember what you had written at that point
11   in time?
12   A   Some, yes.
13   Q   Some.  What some did you remember when you spoke
14   with the attorneys on June 17?
15   A   We didn't discuss what part I wrote about the
16   letter.  I did write the letter, yes.
17   Q   Did you tell those attorneys you had no idea or --
18   what did you tell them about your motivation for writing
19   the letter?
20   A   I told 'em I really didn't know.
21   Q   And you're in community placement now?
22   A   Yes.
23   Q   Is that like a halfway house setting?  Is that what
24   I heard the Government's attorney reference it?
25   A   Yes.
```

35

```
 1    Q    So that means you have freedom during the day?
 2    A    Yes.
 3    Q    Okay.  Can you leave the facility?
 4    A    If you're able to.
 5    Q    What's that mean able to?
 6    A    Well, you have to complete certain steps of the
 7    program in order to leave.
 8    Q    Okay.  Is it less restrictive than jail?
 9    A    Yes.
10    Q    Have you been through community placements before?
11    A    No.
12    Q    Now, in this letter, Government Exhibit Hill 1 -- do
13    you have that in front of you?
14    A    Yes.
15    Q    Okay.  Can you look down about the one, two, three,
16    four, fifth paragraph -- and the Government specifically
17    asked you about this.  Do you see paragraph -- and I'll
18    read it:  "We talked a lot about her case and how maybe
19    she could get out of it."  Do you see that paragraph?
20    A    Yes.
21    Q    And you wrote that; correct?
22    A    Yes.
23    Q    Is it unusual for someone who's locked up pending
24    trial to want to get out of the charge in your
25    experience?
```

36

```
 1    A    It's very common for somebody to try to get out of
 2    their charge.
 3    Q    Okay.  Which could be proclaiming your innocence,
 4    beating the charges and going back to your life;
 5    correct?
 6    A    Yes.
 7    Q    Now, in your experiences with these bipolar people
 8    over your many years in the institutions, have you come
 9    across other disorders or diagnoses that you thought
10    were appropriate for people that you mingled with?
11    A    Well, I'm not a doctor so I can't really determine
12    what's normal and what's not normal on other people.
13    Q    Well, okay.  Well, is bipolar your specialty then?
14    Is that what you focus on?
15    A    I don't have a specialty.
16    Q    Do you know what schizophrenia is?
17    A    Yes.
18    Q    What is that?
19    A    Somebody who's paranoid.
20    Q    Okay.  What about paraphilia?
21    A    No.
22    Q    Do you know -- are you familiar with the DSM III R
23    or DSM IV TR?
24    A    No.
25    Q    You may have done this, I don't recall, can you give
```

1    me a definition of a bipolar person?  What are the

2    characteristics of that kind of a person?

3    A    Happy one minute, moody the next.  Distant.

4    Q    I believe you testified that Linda Schneider

5    approached you about getting some kind of bogus

6    documents; is that correct?

7    A    We were all talking and it was brought up, yes.

8    Q    Okay.  How was it brought up?

9    A    It was just brought up during conversation.

10   Q    By?

11   A    By Linda.

12   Q    And so she just pitched it to the group can anybody

13   get me outta here with bogus something or other?  I

14   don't understand how that comes up in a group of

15   inmates?

16   A    A lot of things come up with a group of inmates.

17   Q    So assuming she made this pitch to the group, how

18   did you respond?

19   A    I just told her, yes, I can come up with ID's.

20   Q    With ID's?

21   A    Yes.

22   Q    Identity cards?

23   A    Yes.

24   Q    Is that when you named a price?

25   A    I didn't name the price.

```
 1    Q    Did you ever name a price?

 2    A    She named the price.

 3    Q    Did that seem like a fair price to you?

 4    A    Sounded high.

 5    Q    Did you say, oh, no, that's too much?

 6    A    No.

 7    Q    Have you ever assaulted anyone?

 8    A    Yes.

 9    Q    When and where if you remember?

10    A    At the Butler County jail I have.

11    Q    What did that involve?

12              MS. TREADWAY:  Judge, I'm going to object to

13    this as not relevant to her credibility.

14              THE COURT:  I'm going to let him go a ways on

15    this and see.  You are going to have to connect up the

16    issue.

17              MR. BYERS:  I think it will bear greatly on

18    her credibility eventually, Your Honor.

19              THE COURT:  Okay.

20    A    Yes, I have assaulted someone.

21    BY MR. BYERS:

22    Q    And I think I asked you the details -- or I was

23    going to.  That was at the Butler County jail.  What did

24    that involve?

25    A    That involved another lady that wouldn't -- how do I
```

```
 1    say this -- that continued to talk about me.

 2    Q    Okay.  What did you do to that person?

 3    A    I struck her.

 4    Q    Okay.  Maybe you hit her with a book that she was

 5    reading?

 6    A    Yes.

 7    Q    Any other assaults that you committed at the Butler

 8    County jail?

 9    A    Well, there was one I was being accused of that I

10    admitted to.

11    Q    And what was that?

12                        (Off-the-record discussion

13                         between Witness Hill and

14                         Attorney Gradert.)

15    A    Urinating in another girl's cup.

16    BY MR. BYERS:

17    Q    You consider that an assault?

18    A    No.

19    Q    Okay.  What is that?

20    A    Well, it didn't happen.  It was an accusation.

21    Q    Okay.  Did you go to the hole for that?  Did you get

22    restricted?

23    A    Yes.

24    Q    Now, you say your bunk was beside Linda Schneider's?

25    A    Yes.
```

1    Q    Is that like how many feet apart?  Or were they

2    touching?  I don't know the logistics.

3    A    The only thing that separated us was a partition.

4    Q    A partition.  How tall was that?

5    A    I don't know.

6    Q    As tall as me?

7    A    Yes.

8    Q    Taller?

9    A    Maybe six foot.

10   Q    How long?

11   A    I don't know.

12   Q    How many partitions were there in that dorm setting?

13   A    Maybe four.

14   Q    So if you wanted to converse with Linda Schneider

15   and she was on her bunk, how would you do it?

16   A    Just right through that partition.

17   Q    What's the partition made of?

18   A    A material.

19   Q    What kind of material?

20   A    It was just like a thin material.

21   Q    Could you see through it?

22   A    No.

23   Q    Was it like wood?

24   A    I didn't see no wood.

25   Q    Cardboard?

1    A    I didn't see no cardboard either.  It just -- you

2    can poke right through it.  (Witness indicating)

3    Q    When Linda Schneider first appeared at the Butler

4    County jail as an inmate, did you make an effort to

5    introduce yourself to her?

6    A    No.

7    Q    Did you recall your first conversation with her?

8    A    I don't recall the very first conversation.  It

9    may -- it may have been, you know, I had asked her what

10   her connection was.

11   Q    What her what?

12   A    Her connection was.  Why she was being charged with

13   it.

14   Q    So you knew about her case?

15   A    I didn't know everything about it, no.

16   Q    What did you know about it?

17   A    That her and her husband was arrested.

18   Q    You knew she was a doctor's wife?

19   A    Yes.

20   Q    Would it be fair to characterize Linda Schneider as

21   a sort of a loner in the dorm setting at the Butler

22   County jail?

23   A    I wouldn't really say loner.  I mean, she associates

24   with people.

25   Q    Okay.  Were you her best friend in jail?

1    A    No.

2    Q    Who was her best friend in jail by your estimation

3    and observations?

4    A    I don't think she had one.

5    Q    Okay.  You testified about these clinics that

6    supposedly exist in California and Romania.  Do you

7    recall that testimony moments ago?

8    A    Yes.

9    Q    Is it illegal for someone else to run a medical

10   clinic if it actually exists?

11   A    I don't know.  I don't run a business.

12   Q    You had a paper with Linda Schneider's and Steve's

13   name and address, or name and number; is that right?

14   A    Yes.

15   Q    Where's that paper?

16   A    I no longer have it.

17   Q    What did you do with it?

18   A    When I was transferred to the Sedgwick County jail,

19   then when I received my property, I did not receive all

20   of my property.

21   Q    So it went missing?

22   A    Along with other things.

23   Q    What else went missing?

24   A    Some of my jewelry.

25   Q    Any other papers?

43

```
 1   A    I'm sure, yes.
 2   Q    Like what?
 3   A    Some legal papers.
 4   Q    Which ones?
 5   A    From Butler County.
 6   Q    Pertaining to what?
 7   A    To my own cases.
 8   Q    And those cases would have been for what?
 9   A    Forgery.
10   Q    That was in Butler.  Okay.  Then why did you move to
11   Sedgwick?
12   A    Because I had charges here.
13   Q    Okay.  And those charges were what?
14   A    A PV and forgery.
15   Q    Okay.  Was the PV for methamphetamine violation
16   originally?
17   A    Yes.
18   Q    Do you remember what date you left out of Butler
19   County and arrived in Sedgwick?
20   A    I left February 4th.  Arrived in Sedgwick County
21   February 4th.
22   Q    What date was this non-assault urination event in
23   Butler County?
24   A    I don't know what date it was.
25   Q    Were you still on disciplinary lockdown when you
```

1   left Butler County?

2   A    It was pending I believe.

3   Q    Do you remember the penalty you received for that

4   supposed event?

5   A    Ten days.

6   Q    Ten days.  Not 15?

7   A    I really don't know.  I thought it was ten days but

8   it's very well possible it could have been 15.

9   Q    Okay.  When you're on disciplinary lockdown at

10  Butler County, how are you segregated?  Do you still

11  stay in the dorm or how is that handled?

12  A    Normally you're in the dorm.

13  Q    Well, how do people know you're different?  How do

14  they know?

15  A    Because you're in red and you have to stay on your

16  bunk.

17  Q    So you're confined to your bunk and you wear red?

18  A    Uh-huh.

19  Q    Were you wearing red the day you left Butler County?

20  A    No.

21  Q    Why not?

22  A    I was in booking.

23  Q    You were?

24  A    I was in booking.

25  Q    In booking.  Before you went to booking, were you

45

```
 1    wearing red that day?

 2    A    No, not that I remember.

 3    Q    How many conversations did you have with Linda about

 4    setting up this plan with the ID's?

 5    A    I had several.

 6    Q    How many is that?

 7    A    Maybe three.

 8    Q    How long were they in duration?

 9    A    What do you mean how long in duration?

10    Q    One minute?  Two minutes?

11    A    I don't know.  A couple of minutes.

12    Q    Okay.  So how detailed did it get?

13    A    It didn't get real detailed.

14    Q    So you talked three times about it but it never got

15    into detail?

16    A    I didn't say we talked three times.  I said maybe

17    three times.  I'm uncertain about the amount.

18    Q    Okay.  You talked maybe three times but you never

19    got into detail as to how to actually do this and

20    collect your $50,000?

21    A    It's hard to get in detail when you're in a

22    dormitory with 30 other women.

23    Q    Right.  Who else overheard these conversations?

24    A    I don't know.

25    Q    Where did they take place?
```

46

1    A    At the table.

2    Q    What table?

3    A    In by the phones.

4    Q    Okay.

5    A    We have several tables that we eat at and play cards

6    at and draw at.

7    Q    Okay.  Were there ever other inmates sitting there

8    specifically participating in that conversation?

9    A    No.

10   Q    Was that a calculated plan as far as you know to

11   just have you and Linda doing this conniving?

12   A    Nothing's ever calculated.

13   Q    Okay.  So what did you do to follow through on this

14   request from Linda to create bogus ID's for her?

15   A    I didn't do anything.

16   Q    What were you going to do?

17   A    I wasn't gonna do anything.

18   Q    Were you gonna take her money?

19   A    No.  I wasn't getting out of jail.

20   Q    So this maybe just bolstered your reputation as a

21   master criminal?

22   A    No.  I don't want that reputation.

23   Q    Do you remember telling Mr. Ohaebosim and his

24   colleague that you don't read the newspapers or watch

25   television?

47

1   A   Yes.

2   Q   How did you know who Linda Schneider was when she

3   appeared at the jail if you don't watch TV or read

4   newspapers?

5   A   Because there's one TV when you're in open dorm and

6   everybody thought that she was somebody else at the

7   time.

8   Q   So you watch TV at the dorm?

9   A   I didn't set and watch TV, no.  Like I said,

10  everybody else thought that she was somebody else when

11  she had came in.

12  Q   Okay.  So they thought she was not Linda Schneider?

13  A   Not at first.

14  Q   Okay.  So how did you discover who she really was?

15  A   We wear name or wrist bands with our names on it and

16  then other people introducing herself or introducing

17  themselves and then it did come across the TV.

18          MR. BYERS:  If I may have just a moment, Your

19  Honor.

20          THE COURT:  You may.

21          MR. BYERS:  Thank you.

22                  (Off-the-record.)

23          MR. BYERS:  Thank you, Your Honor.  A few more

24  questions.

25

BY MR. BYERS:

Q   Ma'am, can you tell me, can you -- let me try to do this.  What do you think your reputation is in a jail house community?

A   I don't think I hold a good reputation.

Q   You don't think you have a good one?

A   No.

Q   What do you think your reputation is?

A   I'm just there like everybody else.

Q   So everybody there has a bad reputation?

A   That's not what I'm saying.

Q   What are you saying?

A   I'm not saying I have a bad reputation either.  I don't know what my reputation is in jail.

Q   You don't know what your reputation is?

A   Exactly.

Q   Okay.  What do you think it is?  How do you perceive yourself -- maybe that's the better question -- in the jailhouse community in Butler County in January of 2008?

A   I'm just there to do my time.  I don't care what other people think.

Q   The person you smacked the book out of her hand, you apparently cared what she thought?

A   I didn't care what she thought.  I cared about what she was saying.

49

```
 1    Q    Right.  Because she was running her mouth about you?
 2    A    It wasn't all just about me either.
 3    Q    Okay.  You were defending someone?
 4    A    To a point, yes.
 5    Q    Another inmate?
 6    A    No.
 7    Q    Who were you defending?
 8    A    I don't see -- I'm not gonna answer that.  I plead
 9    the Fifth on that.
10    Q    You plead the Fifth on who you were defending who
11    was not an inmate?
12    A    Yes.
13    Q    Aren't you just making that up?
14    A    No.  It was my kids.  I was defending my kids.  When
15    somebody tends to start runnin' their mouth about my
16    kids, yes, tend to get a little defensive.
17    Q    That's honorable.  I understand that.  So this
18    person in the jail was running your kids down and you
19    defended them?
20    A    Exactly.
21    Q    Have you ever been known as Tiffany Archer?
22    A    Yes.
23    Q    Stacey Lynn Hasting?
24    A    Yes.
25    Q    Stacey L Hastin?
```

1    A    It might be a typo error, but okay.

2    Q    Jeri Osborn, J-E-R-I?

3    A    Yes.

4    Q    Okay.  Stacey L Hill?

5    A    Yes.

6    Q    Is that your given name?

7    A    That's my married name.

8    Q    How about Stacey Johnson?

9    A    Yes.

10   Q    Stacey Steven hasting?  Or maybe it's Stephanie?

11   A    I've never heard of that one.

12   Q    Okay.  How about Stacey Lynn Osborn?

13   A    That's my maiden name.

14   Q    Okay.  How about Stacey Osborune, spelled

15   O-S-B-O-R-U-N-E?  O-S-B-U-R-N-E or some such thing?

16   A    Some of those are not ones I have given.  Some

17   people spell it the way they foresee it.  But if that's

18   what's on there then --

19   Q    What about Stacey Stephan Hill?

20   A    I have never used that.

21   Q    Okay.  Stacey Howard?

22   A    Yes.

23   Q    Stacey -- just plain Stacey Hasting with no Lynn?

24   A    Yes.

25   Q    Stacey Porter?

 1   A    Yes.

 2   Q    Stacey Hill with no middle name?

 3   A    Yes.

 4   Q    Stacey L Osburn?

 5   A    That's my maiden name.

 6   Q    Debra Evans?

 7   A    I've never used that name.

 8   Q    How about Stacey Stephen Porter?

 9   A    Porter, but I don't know where the Stephen is coming

10   from.

11   Q    It may be Stephen, too.  It's S-T-E-P-H-E-N.  Stacey

12   Lynn Osburn?

13   A    Yes.  That is my maiden name.

14   Q    Again, the spellings are often varied.  I could

15   spell them out but we may just submit this.  Stacey

16   Stephen Osburne ending in an E, the Osburne?

17   A    Osborn is my maiden name and people tend to spell it

18   however they want to spell it, but it's O-S-B-O-R-N.

19   Q    Okay.  So that could hold true for if you were known

20   as Stacey Stephen Osborn, O-S-B --

21   A    I don't know where the Stephen comes from.

22   Q    How about Osborn as a last name you've used?

23   A    I've always used either Osborn, Hasting or Hill as a

24   name.

25              MS. TREADWAY:  Judge, I think we're beating

 1    this dead horse now.

 2              THE COURT:  I was about to ask the relevance

 3    of all the names.  Do you have something you're going to

 4    tie up with all the names?

 5              MR. BYERS:  The fact that she's a career

 6    criminal and her credibility is absolutely zero.

 7              THE COURT:  I think she testified she has

 8    numerous aliases.  I don't think we need to go through

 9    all of them unless there's some specific purpose to be

10    gained by a specific name.  And if you do, you're

11    certainly free to do that.

12              MR. BYERS:  I understand.  Thank you.  I

13    appreciate that, Your Honor.  And also I was

14    contemplating going through 17 pages of this wrap sheet

15    but I would just as soon submit it to the Court as an

16    exhibit.

17              THE COURT:  Any objection from the Government?

18              MS. TREADWAY:  As long as it's kept under seal

19    and in camera.

20              THE COURT:  I think because of the nature of

21    the document we probably do need to keep it under seal.

22    But I will mark it.  Do you want to mark it as a defense

23    exhibit or --

24              MR. BYERS:  Yes, please.

25              THE COURT:  I'm going to give it a letter and

1   give it A.

2                        (Off-the-record.)

3             THE COURT:  I don't have a copy of this.  But

4   if you want to take it back for anything -- do you want

5   anything further with this or just move its admission?

6             MR. BYERS:  I would just move its admission.

7             MS. TREADWAY:  No objection.

8             THE COURT:  All right.  Exhibit A will be

9   admitted and will be filed under seal.

10            MR. BYERS:  Thank you, Your Honor.  With the

11  Court's indulgence, I just have a couple other notes to

12  look over here.

13                       (Off-the-record.)

14            MR. BYERS:  If I may, Your Honor, a few more

15  questions.

16            THE COURT:  Uh-huh.

17  BY MR. BYERS:

18  Q   In this letter you wrote to Ms. Treadway, the

19  Government's attorney, you reference -- I think it's

20  about the fourth paragraph down -- you talked with Linda

21  a lot especially when she moved her bunk area next to

22  mine.  When did that occur?

23  A   After she had got back from booking.

24  Q   From what?

25  A   From booking.

1   Q   Okay.

2   A   I'm not certain on the exact date.

3   Q   And do you know what caused that move closer to you?

4   A   Well, the original bunk that she was in was then

5   taken.

6   Q   Okay.  So she --

7   A   When she came back from booking she was placed over

8   by where I was.

9   Q   Okay.  So she was placed there?

10  A   Yes.  We don't have -- we can't go wherever we want

11  to go.

12  Q   Right.  Okay.  Well, I was just curious because you

13  say when she moved her bunk area next to mine.  She was

14  put there by the jail administration; correct?

15  A   Yes.

16  Q   The Government's attorney may have asked you this

17  but I don't recall your response if it was asked.  How

18  did you know to direct this letter to Assistant United

19  States Attorney Treadway?

20  A   I had got the name from somebody else.

21  Q   In the Butler County jail?

22  A   Sedgwick County.

23  Q   In Sedgwick.  Okay.  Because by the time you wrote

24  this, you had been moved?

25  A   Yes.  Her name was brought to my attention by

1      somebody else I should say.

2      Q    Was brought to your attention by somebody else.

3      What do you mean?

4      A    Somebody else had mentioned her name.

5      Q    Okay.  Did they also mention you should probably

6      write some information about Linda?

7      A    No.

8      Q    Did you consult with anybody else before sending

9      this letter?

10     A    No.

11     Q    Who was the person that told you Ms. Treadway's

12     name?

13     A    I don't remember what her name was.

14     Q    What was she in there for?

15     A    I don't know.  I -- you can be in there for one

16     thing but really say you're in there for something else.

17     Q    What did she look like?

18     A    She was a Caucasian lady.

19     Q    How tall?

20     A    I don't know.

21     Q    What did she weigh?

22     A    I don't even know what I weigh.

23              MS. TREADWAY:  Objection, Your Honor.  What's

24     the relevance of this?

25              MR. BYERS:  Goes directly to credibility, Your

1    Honor.

2              MS. TREADWAY:  I don't see how, Judge.

3              THE COURT:  Well, I'm going to allow just a

4    little bit but I'm not going to go through every vital

5    statistic that we have available.

6              MR. BYERS:  I understand, Your Honor.  I'm

7    done with that.  I'm satisfied she has no clue what the

8    woman looked like.

9              THE COURT:  All right.

10             MR. BYERS:  I believe that's it.  Thank you,

11   Your Honor.

12             THE COURT:  All right.  Any redirect?

13             MS. TREADWAY:  No, Judge.  Thank you.

14             THE COURT:  All right.  The witness may step

15   down.  The Marshals will --

16             MR. BYERS:  Do we need to specifically reserve

17   a right to recall if necessary?

18             THE COURT:  Well, I'm not going to -- I think

19   we pretty much got your questions because once I get

20   them back here, it means we're going to have to

21   transport them all again.  So I'm going to do one run on

22   each witness and then that's it, we're going to be done.

23             MR. BYERS:  I understand.

24             THE COURT:  Is there anything further from the

25   Government on this motion other than the argument that

1    you want to make?

2              MS. TREADWAY:  Other than what we want you to

3    take judicial notice of and argument, no further witness

4    evidence, Judge.

5              THE COURT:  I'd like to move -- first of all,

6    I'd like to let Mr. Gradert go back to work.

7              MR. GRADERT:  Thank you, Judge.

8              THE COURT:  Thank you.  I appreciate your

9    service.

10             MS. TREADWAY:  I object to him being released,

11   Judge.  I'm sorry.

12             MR. GRADERT:  Are you going to rule on that,

13   Your Honor?

14             THE COURT:  I'll deny that motion.  You're

15   released.

16        Rather than arguing about judicial notice matters,

17   I'd like to get the testimony taken so that these people

18   can be returned.  So let me turn then to the Defendant

19   and tell me who you would like to call first as your

20   witness.

21             MR. BYERS:  We'll call Cindy Tucker, Your

22   Honor.

23             THE COURT:  All right.

24             MS. TREADWAY:  Judge, before we have the

25   Marshals bother about this, I think it would probably be

 1    appropriate for the Defendants to proffer exactly what

 2    it is that Ms. Tucker is going to testify about because

 3    if it is what I believe it to be, I believe it's going

 4    to be irrelevant given Ms. Hill's admission to the

 5    urination incident.

 6            THE COURT:  Well, I have brought the witness

 7    over here.  The only proffer that you made, of course,

 8    was in your motion.  I'm not going to require them to

 9    proffer.  I'm going to allow them to bring the witness

10    up but I am going to watch the relevance and if there is

11    no relevance then we're going to cut the testimony

12    short.

13            MR. BYERS:  Thank you, Your Honor.

14            THE COURT:  I am going to allow them.  And

15    this is Cindy Tucker; is that correct?

16            MR. BYERS:  Yes, sir.

17            THE COURT:  If the Marshal would bring Cindy

18    Tucker up.  Court is going to take a brief recess while

19    the Marshal is transporting the prisoner.  We're subject

20    to call.

21                    (Recess.)

22            MS. TREADWAY:  Judge, prior to this witness

23    testifying, we need to address something with the Court

24    before her testimony because it needs to be dealt with

25    now as opposed to after.

1          THE COURT:  I wish we could have done this

2     before I got the witness up here.  We had a break and we

3     had five minutes, ten minutes, we could have done it.

4          MS. TREADWAY:  I apologize, Judge.  I just

5     read a report that gave the information to me but it

6     will take one minute.

7          THE COURT:  All right.  Do you think it's --

8     this is a very difficult area to do a bench conference.

9     Would it be appropriate to go in the back room.

10          MS. TREADWAY:  I think it would, yes, Judge.

11    I'm sorry.

12          THE COURT:  I'm going to ask the court

13    reporter then to -- everybody stay in place and we'll do

14    a short bench conference and I'll be back on the bench

15    in a moment.

16                    (Recess.)

17                    (Proceedings continued in

18                    chambers.  **Pgs 60-77 of this**

19                    **transcript are FILED UNDER SEAL**

20                    **by Order of Judge Bostwick**.)

21

22

23

24

25

1                        (NOTE:  Pages 60-77 of this

2                        transcript FILED UNDER SEAL by

3                        Order of Judge Bostwick.)

4                        (Whereupon, the following

5                        proceedings continued in the

6                        courtroom.)

7            THE COURT:  You all may be seated.

8    Ms. Tucker, if you would remain standing to take the

9    oath for me, please.

10                        **CINDY TUCKER**

11   Having been first duly sworn to tell the truth, the

12   whole truth and nothing but the truth, testified as

13   follows on:

14                     **DIRECT EXAMINATION**

15   BY MR. OHAEBOSIM:

16   Q    Ma'am, would you please state your name for the

17   record.

18   A    Cindy A Tucker.

19   Q    And how old are you?

20   A    42.

21   Q    Ma'am, where do you currently reside?

22   A    Sedgwick County jail.

23   Q    And how long have you been in Sedgwick County jail?

24   A    Since June 11th.

25   Q    And where were you prior to June 11th?

1    A    Within six months?

2    Q    Within -- well, where were you just prior to June

3    11?  Were you at your home at that time?

4    A    At 940 Hiram.

5    Q    Now, within the last six months have you had cause

6    to be incarcerated anywhere?

7    A    Yes.  Butler County jail.

8    Q    And from what periods were you incarcerated at

9    Butler County jail?

10   A    It was before Thanksgiving of '07 to February 6 or

11   7th of '08.

12            MR. OHAEBOSIM:  At this time we would like the

13   Court to take judicial notice at that time Linda

14   Schneider was also at Butler County jail.

15            THE COURT:  Court has already done that and

16   will do it again.  You may proceed.

17            MR. OHAEBOSIM:  Thank you, Your Honor.

18   Q    Were you incarcerated at the Butler County jail at

19   the time that Linda Schneider came in?

20   A    Yes, I was.

21   Q    So you remember on or about the time she came in?

22   A    Yes, I do.

23   Q    Now, when she arrived, do you know where it was she

24   was placed in the facility?

25   A    It's, it's set up in like bunk beds and it would be

1    from about from here to where she is right now from me.

2    Q    All right.  So there was probably about 20 feet

3    between the two of you the whole time that she was

4    there?

5    A    No, not the whole time.

6    Q    Did they move you around?

7    A    Linda was taken to solitary confinement and when she

8    came back she was moved almost directly -- she was

9    directly beside me about from you to the gentleman

10   there, you to there.  And then I was moved after that

11   across the room about the same distance again.

12   Q    Were there partitions between your bunks in this

13   particular facility?

14   A    Yeah, kind of like the things they use in cubicles

15   or whatever.

16   Q    If you want to have a conversation with someone that

17   was next to you but there was a partition in between

18   you, could you do it?

19   A    Normally the person would get up and come around.

20   And when we were locked down to the bunks, we weren't

21   supposed to do that.

22   Q    You weren't supposed to come around is what you're

23   saying?

24   A    Right.

25   Q    Could you have conversations, private conversations,

1    with other inmates while you were in the facility?

2    A   Normally when we were in our bunks we were locked

3    down and, I mean, I guess if they were right beside you,

4    yeah, you could talk to 'em; but normally you didn't

5    talk to people in the other areas whenever you were

6    locked down.

7    Q   So it would be pretty difficult is what you're

8    saying?

9    A   Right.

10   Q   In the general areas where they had tables where

11   there was a TV, was it, was it easy for two individuals

12   to have private conversations and people couldn't hear

13   what was going on?

14   A   Everybody can hear everything and everybody knows

15   everything there.

16   Q   So it was pretty hard in the open to have a very

17   private conversation?

18   A   Right.  If not, somebody's gonna tell you anyway

19   that was settin' beside you.  I mean, everybody knows

20   everything that's going on.

21   Q   Do you know of another inmate named Stacey Hill?

22   A   Unfortunately, yeah.

23   Q   Was she ever logistically, or in terms of where she

24   was placed, was she ever near Linda Schneider's bunk?

25   A   No.  You know, she was before Linda came back from

82

```
 1    the solitary confinement, she would have been on the
 2    other side of the partition.  Okay.  But once Linda came
 3    back, then Stacy was placed in solitary confinement
 4    which is way -- I mean, you have no one around.
 5    Q   So do you know what period of time they would have
 6    been close to each other close to that partition?
 7    A   I really don't think that they were there at the
 8    same time that I recall.
 9    Q   So if they were there, would it have been more than
10    a day or two or three or four or --
11    A   No.
12    Q   All right.  Now, you say you were already present
13    when Linda Schneider came into the facility; is that
14    correct?
15    A   Yes.
16    Q   Did Linda Schneider have cause to speak about her
17    case to you?
18    A   No.
19    Q   Did she have cause -- or did she speak to anybody
20    about her case?
21    A   That's why she was placed in solitary confinement
22    because she talked to a reporter or something like that.
23    Q   Okay.  But did she speak to any other inmates you
24    know of about what was going on with her case?
25    A   No.  I think that was just from talking to a
```

83

1    reporter is why she was placed in solitary.

2    Q    Now, she came -- when she came out of solitary, you

3    were still present; is that correct?

4    A    Yes.

5    Q    And at that point, from that point on, again, do you

6    have any knowledge of her speaking to anyone about her

7    case?

8    A    No.

9    Q    Now, going back to Stacey Hill.  Just speaking

10   specifically about knowledge you have just about her

11   reputation.  What kind of reputation did she have while

12   she was there?

13            MS. TREADWAY:  Objection, Judge.  That's

14   pretty broad.  Can we get to credibility issues.  That's

15   what's -- that's all there is, Judge.

16            MR. OHAEBOSIM:  Your Honor, on cross of

17   Ms. Hill she was asked about her own reputation.  This,

18   I believe, it was the very same question.

19            THE COURT:  You made it, though.  The

20   Government didn't.

21            MR. OHAEBOSIM:  That's correct.

22            THE COURT:  It was a little different.  It was

23   in cross-examination and a little broader aspect.  I'm

24   going to ask you to be more specific.

25   BY MR. OHAEBOSIM:

84

```
 1   Q   Does Ms. Stacey Hill to your knowledge have a
 2   reputation of being a snitch?
 3   A   She has the reputation of being a snitch, yeah.   She
 4   was labeled as that and that was by a lot of people in
 5   Sedgwick County and in Butler County.
 6   Q   Did she have a reputation of being truthful?
 7   A   I would say she was not truthful and I would say
 8   that she's pretty vindictive.
 9           MR. OHAEBOSIM:  One moment, Your Honor.
10                    (Off-the-record.)
11           MR. OHAEBOSIM:  At this time we have no
12   further questions, Your Honor.
13           THE COURT:  All right.  Cross-examination by
14   the Government?
15           MS. TREADWAY:  Just briefly, Judge.
16           THE COURT:  All right.
```

**CROSS EXAMINATION**

```
18   BY MS. TREADWAY:
19   Q   During your interaction with the Defendant Linda
20   Schneider in the Butler County jail, did you find out
21   that she was fluent in Spanish?
22   A   She spoke Spanish, or she listened or spoke Spanish
23   with the girls that did the -- it was the rosary.  I'm
24   Catholic, too.  She's Catholic, Linda's Catholic.  She
25   just -- she was always did whenever they did the rosary
```

1    and that's it, the rosary, and like the Our Father or

2    something like that and the Hail Mary.

3    Q    So you heard her speaking Spanish in jail; correct?

4    A    Yeah.  I do, too, though.  I mean, knowing the

5    Catholic -- I do, too, so --

6    Q    Now, did you have a conversation with Linda

7    Schneider in the Butler County jail where she told you

8    that she had decided to remain in jail?

9    A    Yeah, I think that she said -- well, it wasn't to me

10   specifically.  She was talking to somebody else.  Like I

11   said, everybody knows everything.  The prosecuting

12   attorney or something like that.  I can't say for a fact

13   because I don't know.  It's just hearsay.  But they said

14   that they were gonna let her out but she was gonna stay

15   for principle.

16              MS. TREADWAY:  Nothing further.

17              THE COURT:  Any redirect?

18              MR. OHAEBOSIM:  Just one question.

19                    **REDIRECT EXAMINATION**

20   BY MR. OHAEBOSIM:

21   Q    You never heard her make a comment like that?

22   A    No.  It was hearsay.

23              MR. OHAEBOSIM:  Nothing further.

24              THE COURT:  Any other questions?

25              MS. TREADWAY:  No, Judge.

86

```
 1              THE COURT:  All right.

 2              MR. OHAEBOSIM:  None at this time, Your Honor.

 3              THE COURT:  Thank you.  Cindy, mark that for

 4    me.

 5         All right.  If there are no further questions, I'm

 6    going to allow this witness to step down and the

 7    Marshals to transport her back and to bring up any other

 8    witnesses.  Next witness for the Defendant.

 9              MR. BYERS:  Your Honor, in lieu of the in

10    camera session, can we have a brief recess so I can talk

11    with the next witness and set certain parameters.

12              THE COURT:  Certainly can.  How long do you

13    anticipate the next one would take?

14              MR. BYERS:  15 minutes.

15              THE COURT:  My inclination, Counsel, if it's

16    not a problem, would be to go on through and finish up

17    the testimony even though it is approaching the noon

18    hour.  Anyone have any objection or problem with that?

19              MS. TREADWAY:  No, Judge.

20              MR. BYERS:  Not from the Defendant.

21              THE COURT:  Court will be in recess subject to

22    call.  Take whatever time you need to get prepared.

23                   (Recess.)

24                   **NOTE:  Pages 87 -93 FILED UNDER**

25                   **SEAL by order of Judge Bostwick.**
```

```
 1                     (Whereupon, the following
 2                     proceedings continued in the
 3                     courtroom.)
 4          THE COURT:  All right.  Would the witness
 5   please stand and raise your right hand.
```

**DESTINY SCHULZE**

```
 7   Having been first duly sworn to tell the truth, the
 8   whole truth and nothing but the truth, testified as
 9   follows on:
```

**DIRECT EXAMINATION**

```
11          THE COURT:  You may be seated.  And please
12   state your name for the record.
13   A   Destiny Schulze.
14          MR. BYERS:  Thank you, Your Honor.
15   BY MR. BYERS
16   Q   Ma'am, could you spell your name for me please?
17   A   D-E-S-T-I-N-Y, S-C-H-U-L-Z-E.
18   Q   How old are you, ma'am?
19   A   I'm 27.
20   Q   Where do you presently reside?
21   A   Wichita.  I'm an inmate at Butler County jail
22   though.
23   Q   Okay.  Are you awaiting sentencing or what's your
24   status as an inmate there?
25   A   I was sentenced Monday.
```

95

```
 1    Q    Okay.  And what kind of offense would that be for?
 2    A    Possession of a firearm to which drug trafficking.
 3    Q    I'm sorry?
 4    A    Drug trafficking.
 5    Q    And possession of a firearm?
 6    A    Yes, sir.
 7    Q    Okay.  And what is your sentence on those charges?
 8    A    54 months incarceration, 36 months parole
 9    afterwards.
10    Q    Okay.  Were those federal or state charges?
11    A    Federal.
12    Q    Okay.  Have you had occasion -- I'm sorry.  Strike
13    that.  Do you know Linda Schneider?
14    A    Yes.
15    Q    How do you know her?
16    A    I met her actually at the federal courthouse.
17    Q    Do you remember when that would have been?
18    A    December of '07.
19    Q    Tell me about that meeting and what transpired from
20    that?
21    A    I had a court date here.  She was brought over from
22    Sedgwick County.  I didn't even recognize who she was.
23    We just started talking in the holding cell.
24    Q    Okay.  Did that relationship extend any farther than
25    that one contact?
```

1   A    Yes.  I stayed in contact, close touch with Linda
2   since then.
3   Q    And how is that?  So that was -- you were over here
4   in Sedgwick County?
5   A    Going to court.  I was housed in Butler but I was
6   here on court date.
7   Q    Okay.  Did you ever have occasion to be housed in
8   Butler with Linda Schneider?
9   A    Yes, I am currently.
10  Q    Okay.  Did you have occasion to be transported over
11  to Butler County with her on her first ride over there?
12  A    Yes.  The day she went from here to Butler County, I
13  was with her.
14  Q    Okay.  Were there other inmates involved in that
15  transportation as well?
16  A    Yes, sir, there was.
17  Q    Do you remember who they were?
18  A    One of 'em was her husband.  The other ones were
19  INS, I do believe, a couple inmates that were INS.  I
20  don't know who they were.
21  Q    INS?
22  A    INS custody.
23  Q    Okay.  Did you have any conversations with Linda
24  Schneider during that ride over to Butler County about
25  institutional conduct or anything like that?

1    A    Yes, I did.  Her and her husband seemed very nervous

2    and I gave 'em a few pointers.  I remember my first ride

3    over there.

4    Q    Pointers about what?

5    A    Not to discuss their case with anyone.  To stay to

6    themselves.  There were certain inmates I warned her

7    about.  Not to speak with anything to do with her case.

8    Pretty much it was like my main goal was to tell them

9    don't discuss your case.

10   Q    Why would you forewarn Linda Schneider like that?

11   A    Uhm, there was a -- there was two or three females

12   in our dorm that would use the information that they

13   could get and use it for their own benefit if they

14   thought they could to help themselves.

15   Q    So after that trip over to Butler County -- that was

16   in December of '07?

17   A    Uh-huh.

18   Q    And have you consistently been housed in Butler

19   County with Linda Schneider?

20   A    Yes, sir.

21   Q    Did you develop a close personal relationship with

22   her?

23   A    Uhm, yes.

24   Q    Is she your best friend in the jail?

25   A    I wouldn't really call her my best friend, but she's

1    close.

2    Q    Do you eat dinner together?

3    A    No, we do not.  We don't sleep next to each other.

4    We don't eat together.  But we do talk on a daily basis.

5    Q    Okay.  In your time at Butler County with Linda

6    Schneider, have you ever heard her talk about her case

7    with other inmates?

8    A    No, sir.

9    Q    Have you ever heard Linda Schneider inquire of any

10   inmate in the institution in Butler County about getting

11   false identification papers or cards or passports?

12   A    No, sir.

13   Q    Have you ever heard Linda Schneider talk about

14   fleeing the country if she could ever get out on bond or

15   somehow be released?

16   A    No, sir.

17   Q    Are you familiar with an inmate, a former inmate, at

18   Butler County by the name of Stacy Hill?

19   A    Yes, I am.

20   Q    Who -- is Stacy Hill one of the inmates you warned

21   Linda Schneider about?

22   A    Yes, she is.

23   Q    And why is that?

24   A    Stacy Hill is very institutionalized.  She has been

25   in and out of prison a lot, from my understanding.  She

```
 1     is conniving and very misleading.

 2     Q    Very?

 3     A    Misleading.

 4     Q    Misleading.  So what is her reputation for

 5     truthfulness?

 6     A    She doesn't have one for truthfulness.

 7     Q    Do you have any prior contacts with Stacy Hill

 8     before this bit of incarceration?

 9     A    Not this, no, not this incarceration.  I did not

10     know her before this, no.

11     Q    When were you first locked up on these charges?

12     A    I was arrested in November of '07.

13     Q    So you had only been in jail, what, a month or more

14     when you met Linda Schneider?

15     A    Right around a month.

16     Q    Have you previously been in jail?

17     A    Yes, sir.

18     Q    How many times?

19     A    Uhm, a few.  I'm not really sure.  Four or five.

20     Q    What kind of charges?

21     A    One was disturbing the peace.  A domestic violence.

22     Probation violation on a misdemeanor marijuana charge

23     through the City of Wichita.

24     Q    When did your criminal record start?  Do you recall

25     your first arrest?
```

1   A   My first arrest was in '99 for domestic violence.

2   Q   During your time at Butler County did you ever learn

3   of an incident that happened between Stacy Hill and

4   another inmate?

5   A   Yes.  Cindy Tucker.

6   Q   What was involved with that?

7   A   Stacy Hill played a practical joke on -- so she

8   would call it -- on Cindy Tucker by urinating in her

9   drinking cup and placing it back on the counter where

10  Cindy Tucker had placed it before.  And Cindy didn't

11  realize this and she drank from it.

12  Q   How did you learn about this event?

13  A   Linda came to me one, the -- morning afterwards, I

14  guess, and told me that she had witnessed it the night

15  before.  Cindy Tucker and I are -- we're closer than

16  Linda and Cindy.  So she brought it to me so that I

17  could inform Cindy of it.  Knowing that I would do so.

18  Q   So you didn't directly witness it?

19  A   No, sir, I did not.

20  Q   Okay.  But you were the conduit, the messenger, to

21  Cindy about it?

22  A   Yes, I was.

23  Q   And you think that message was delivered the day

24  after it happened?

25  A   Yes.  The morning after.

1   Q   Did you ever see Stacy Hill and Linda Schneider

2   having conversations?

3   A   I did witness one conversation.  It was shortly

4   after Linda had arrived to Butler County.  I was

5   standing behind Stacy as she approached Linda and I was

6   telling her do not -- don't talk to her, that's one of

7   the ones that I was warning her about.  Stacy sat down

8   on Linda's bed uninvited and continued to conversate

9   (sic) with her.  Linda just kept looking back at me and

10  looking at Stacy and shaking her head like she really

11  wasn't paying attention to what she was saying and did

12  not want to conversate with her.  Stacy got up and

13  walked away eventually.  There wasn't really a

14  conversation.  It was one-sided.

15  Q   Could you hear what the words were between them?

16  A   No, I could not.  I was too far away.

17  Q   How long was Stacy Hill sittin on Linda's bed?

18  A   Maybe four minutes, five minutes.  Not very long.

19  Q   Do you know if Stacy Hill seemed to have any

20  particular interest in becoming acquainted with Linda

21  Schneider?

22  A   Stacy would ask me and other inmates that would talk

23  to Linda what her case was about, if we knew anything

24  about her court dates, anything like that; but she never

25  actually approached Linda after that.  She never asked

102

1    her.

2    Q    That you saw?

3    A    That you saw.

4    Q    You didn't spend every day and every minute watching

5    Linda Schneider, did you?

6    A    No, I didn't; but we're all in the same room.

7    Q    How many women would typically be in that room?

8    A    It can house 40 women.  Right now we have 35.

9    Q    Are there any hidden areas or areas where a private

10   conversation could be had between two inmates?

11   A    No, sir.

12   Q    Is it typical in that setting, given your

13   experience, for conversations to be generally overheard

14   by anyone nearby?

15   A    Oh, yes.

16   Q    Is there a way you personally try to guard against

17   that?  Can you fix it?

18   A    I really don't conversate with that many people.

19   You can't fix it.

20   Q    When Linda Schneider came to you and told you about

21   this event, was it your perception that that was so you

22   could be the one to tell Cindy Tucker since you were

23   closer with her?

24   A    Yes, that's exactly right.

25   Q    Did she tell you anything else about that whole

1  scenario?

2  A    The guard was involved that was on duty that night.

3  Her name is Ms. Peters.  She said that Peters had

4  approached Schneider and told her that it was just a

5  practical joke, they're gonna keep it under wraps.  And

6  she asked if she thought any less of -- Peters asked

7  Schneider if she thought any less of her at that point

8  for knowing about it and not doing anything.  Other than

9  that --

10                    (Off-the-record discussion

11                     between counsel.)

12            MR. BYERS:  That's all I have, Your Honor.

13  Thank you.

14            THE COURT:  Cross-examination.

15            MS. TREADWAY:  Not based on that, Judge, no.

16            THE COURT:  All right.  You may step down.

17  Marshals may take you back.

18     All right.  This was an evidentiary hearing.  We

19  now have concluded, I think, the live testimony.  I

20  believe there is some other matters that you wish -- I'm

21  going to start with the Government because it was their

22  motion.  They indicated they were going to request, I

23  think, some judicial notice or something to that effect

24  as to information concerning mental examines.  Is that

25  correct?

1          MS. TREADWAY:  Yes, Judge.  Thank you.

2          THE COURT:  All right.  You may proceed.  This

3    is not going to be argument.  Simply going to be proffer

4    on his both sides.  Okay.

5          MS. TREADWAY:  Yes, Judge.  Judge, I believe

6    that you can take judicial notice of the following

7    comments that the Defendant made during her forensic

8    evaluation in Carswell, Texas.  She stated that she did

9    not have any history of serious mental health problems.

10   She denied symptoms of mania or hypomania, which stands

11   in direct contradiction to Dr. Shell's testimony before

12   this court.  She denied any problems with depression

13   other than the period of time she spent in county jail.

14        The Court can also take judicial notice of the

15   results of the March 7, 2008, forensic evaluation at

16   Carswell, Texas, which was sent to this court.  And the

17   findings in that were that the evaluators found no past

18   or present symptoms of mania or hypomania.  In stark

19   contrast to Dr. Shell's testimony, Defendant was

20   oriented to person, place, time and situation.  Her

21   speech was logical, coherent and goal directed.  Her

22   memory was unimpaired.  Both recent and remote.  Her

23   attention and concentration were intact.  She was able

24   to attend and maintain focus throughout the evaluation

25   process.  There was no active psychotic symptoms.  She

1   was prescribed no psychiatric medications.  She is

2   capable of learning and retaining new information.  She

3   has an intellectual capacity to appreciate her

4   circumstances and work with her attorneys.  She does not

5   meet the diagnostic criteria for any known psychological

6   disorder at this time.  Again, in stark contrast to Dr.

7   Shell's testimony.  Her sadness and anxiety are normal

8   reactions to a stressful situation.  Again, in stark

9   contrast to Dr. Shell's testimony.  Her sadness and

10  anxiety are not interfering with her current

11  functioning.  Again, in stark contrast to Dr. Shell's

12  testimony.  And she does not currently meet the criteria

13  for a mental disease or defect which would render her

14  unable to understand the proceedings against her or to

15  assist in her defense.  Thank you, Judge.

16          THE COURT:  Let me ask counsel before I turn

17  to the Defendants on this matter.  Is there anything

18  that you've indicated that I can take judicial notice of

19  in connection with this examination that is not included

20  in the forensics examination itself that was filed under

21  seal in this case?

22          MS. TREADWAY:  That's all in the evaluation

23  itself, Judge.

24          THE COURT:  All right.  I think that I have

25  the sealed document and I think I can take judicial

1    notice of what it is and I don't know that I need the

2    specific statements made here.  I think they were

3    attempted to be made here to remove them from the actual

4    sealed document.

5        Does any party have any objection to my reference

6    or review of that document?  I've already looked at it,

7    I will tell you briefly.  But what they're proffering

8    here is that basically I be able to take judicial notice

9    of the results of the examination.  And I think that's

10   appropriate.  Do you agree, Counsel?

11              MR. BYERS:  Yes, sir, Your Honor.

12              THE COURT:  And I know that you're arguing

13   it's not -- that it's not the test and I've seen that in

14   your briefs and I don't want to get into the argument on

15   the issue today.  But in terms of taking notice of the

16   report itself.

17              MR. BYERS:  Yes, Your Honor.  And just hope as

18   part of that notice, the Court recognizes the timing of

19   that and that as Ms. Treadway just said the Defendant

20   disclaimed anything other than depression since she had

21   been away from the county jail.

22              THE COURT:  I think we're getting very close

23   to argument.  I think in stark contrast to something

24   else that was said is a little bit of argument and I

25   think that's a little -- and that's about as little as

1   we're going to hear.  So I will then take notice of the

2   statements that have been made that are included in the

3   forensic exam that's filed in this case under seal.

4   Document 121.

5           MS. TREADWAY:  Judge, I don't want to indicate

6   anything other than because Dr. Shell's testimony was

7   made public, we believe it was important to make public

8   the counter of that.  That was not something that the

9   Government brought to the Court's attention.  This was

10  something Defendant brought up.  She brought her own

11  mental condition into evidence; and, therefore, we

12  believe we have a right to rebut it in public.

13          THE COURT:  All right.  With that additional

14  matter, is there anything else the Government wishes to

15  present in connection with this pending motion to

16  supplement?

17          MS. TREADWAY:  Just argument, Judge.

18          THE COURT:  I'm going to turn to the Defendant

19  then for a moment and ask:  You had indicated I believe

20  earlier you had some kind of a proffer or additional

21  evidence that you wish to present.  Is that correct?

22          MR. BYERS:  Yes, Your Honor.  First off, we

23  would like to have the opportunity for Mr. Ohaebosim to

24  proffer his recollection of his interview with Ms. Hill

25  in the jail house.

1    THE COURT:  Okay.  How do you wish to do that

2    proffer?  Are you going to put him on the stand and take

3    him through the exam.

4    MR. BYERS:  I did not intend to.  I just

5    thought he could summarize points of difference from

6    what we heard her say today under oath if that's

7    appropriate with the Court.

8    THE COURT:  Well, since this is all related to

9    the issue of detention and detention does allow a

10   Defendant to proceed by way of proffer, I'm going to

11   allow him to make that proffer at this point.  So,

12   Mr. Ohaebosim, if you would.

13   MR. OHAEBOSIM:  Thank you, Your Honor.  There

14   was only four points.  At this time, I, Uzo Ohaebosim,

15   as counsel for Linda K Schneider, proffer that on June

16   17th, 2008, I did have an interview with Stacy Hill.

17   Number one, Ms. Hill never stated that she was asked by

18   Linda Schneider what she needed to tell the Butler

19   County jail nurse and the psychiatrist to convince them

20   that she had a mental disorder.  And she never discussed

21   feigning being bipolar.

22   Number two, she never had a conversation about

23   getting documents.

24   Number three, never spoke of fleeing after the bond

25   hearing, or being granted bond.

1      And finally, number four, she never said the

2   Defendant told her that, quote, unquote, her sister had

3   taken care of it.

4      That concludes the proffer of the interview that

5   took place on June 17, Your Honor.  Thank you.

6            THE COURT:  Okay.

7            MS. TREADWAY:  Judge, may I offer a rebuttal

8   proffer?

9            THE COURT:  You may.

10            MS. TREADWAY:  Judge, the Government's proffer

11   is that Stacy Hill was interviewed on three different

12   occasions by Mr. Stewart.  One time he was with another

13   agent, Latisha Cleveland.  The other two times he was

14   with Ms. Martin.  Additionally, Ms. Martin has had a

15   fourth conversation with Ms. Hill.  In all four

16   conversations with Ms. Hill, she stated exactly what she

17   stated under oath in court today.  That's our proffer,

18   Judge.

19            THE COURT:  All right.  Anything else from the

20   Defendant, then, that you wish in the way of what I'd

21   call evidentiary matters?

22            MR. BYERS:  Yes, Your Honor.  We would like to

23   proffer some records from Butler County.  We did release

24   the custodian.  He is available by telephone if there's

25   any concern with the authenticity of these.  And also I

1    am certain there are some references in these documents

2    to issues which were taken in camera or out of the

3    public record.  So if this is accepted, I think I would

4    move for it to be sealed.

5              THE COURT:  All right.  Does Government have a

6    copy of this?

7              MR. BYERS:  They do now, Your Honor.

8              MS. TREADWAY:  Just got it, Judge.

9              THE COURT:  All right.  Just take a moment

10   please.

11             MR. BYERS:  These are not represented as the

12   totality of the records we received.  Those are here.

13   These are specific excerpts related to the incident.

14                    (Off-the-record.)

15             THE COURT:  This is a single document; is that

16   correct?  Or is it two different documents?

17             MR. BYERS:  It's a single document, Your

18   Honor.

19             THE COURT:  That's what I thought.  Okay.  I

20   had two copies of it then apparently.  I just want to

21   make certain.  As I started to read it, it looked like

22   the same thing twice.  All right.  Government have any

23   objection to the consideration of this document?

24             MS. TREADWAY:  No, Judge.

25             THE COURT:  I will admit it and I'm going to

1    put a defendant's exhibit sticker on it.  I'm going to

2    file it under seal.  Defendant's Exhibit B.

3              MR. BYERS:  Thank you, Your Honor.

4              THE COURT:  All right.  Back to the Defendant.

5    Anything else that you wish to proffer or place into the

6    record in connection with the issues that have been the

7    subject of today's evidentiary hearing?

8              MR. BYERS:  Yes, Your Honor.  I believe this

9    should be the final proffer.  And it is a media

10   publication, I believe, dated about a day or two ago

11   related to Stacy Hill and her apparent condition or --

12   not condition -- her perception, her willingness to

13   participate in this process at this time.  I think it

14   goes perhaps, again, to reflect somewhat on her

15   credibility.

16             THE COURT:  All right.  Have you provided a

17   copy to the Government?

18             MR. BYERS:  Yes.  Government has a copy.

19                  (Off-the-record.)

20             THE COURT:  Government.

21             MS. TREADWAY:  Judge, we don't believe it's

22   relevant; but if you wish to receive it, that's fine.

23             THE COURT:  When I start receiving stuff out

24   of the news media in this case, I think I've reached the

25   end of the line.  I'm not going to accept it.  I've read

 1    it.  I know what it is.  But I'm not going to make it an

 2    exhibit and I'm not going to make it part of the record.

 3    We've heard the testimony here.  That's the evidence

 4    that we have.  Secondhand hearsay to somebody who

 5    reports it on some news media that comes out later is

 6    not something I'm going to take into consideration.

 7                 MR. BYERS:  Thank you, Your Honor.

 8                 THE COURT:  Anything further that we need --

 9                 MR. BYERS:  I just have one other item.  I

10    guess just to highlight for the Court the fact that

11    Linda Schneider is a licensed nurse and that would

12    relate to her going to Stacy Hill and asking her about

13    mental conditions.

14                 THE COURT:  I think I can take notice of that.

15    I think that's been in her pretrial report, as I recall.

16    No objection, I assume, from the Government on that?

17                 MS. TREADWAY:  No, Judge.

18                 THE COURT:  All right.  Well, that concludes

19    the evidentiary part of the hearing then, if I'm

20    correct.  Let me ask you, I heard some suggestion about

21    argument.  I set it for evidentiary hearing simply

22    because I wanted to hear the evidence.  I think I have

23    some capability of deciding the issues of credibility

24    and importance of the evidence I've listened to.  I've

25    seen your written briefs.  I see no reason to prolong

1     this any longer by hearing argument from both sides on

2     whether or what evidence I ought to consider or

3     shouldn't consider or what is relevant, what is

4     credible.  After practicing law for 31 years before I

5     started this job, I think I can work my way through that

6     without additional assistance of counsel.  So with that

7     kind of a comment made, does anybody have anything else

8     we need to take up in the record today?

9              MS. TREADWAY:  Judge, my arguments would not

10    have been going to that.  I believe that my arguments

11    are simply legal ones that the Defendants have not met

12    the legal standards for 3142(f).  If you wish to hear

13    argument on that, fine.  If not, fine.

14             THE COURT:  No, I don't think I do.  I think

15    that's been basically raised.  This supplemental

16    evidence, I think, fits in with the arguments that were

17    made previously.  As I indicated, this isn't a reopening

18    of the detention hearing itself but simply the

19    evidentiary hearing to take supplemental evidence to

20    consider as I apply those factors.  I'm going to get an

21    opinion out as quickly as I can.  I'm not going to

22    decide this matter today.  I don't think anyone would

23    want me to decide until I had an opportunity to hear all

24    of this evidence.  And now that I have, Court will issue

25    an order then on the pending motion for release that's

1   been filed on behalf of Linda Schneider and we'll get

2   this filed as quickly as we can.   Anything further we

3   need to take up today?

4          MS. TREADWAY:   I really appreciate your

5   patience, Judge.   This doesn't have anything to do with

6   the detention issue.

7          THE COURT:   All right.

8          MS. TREADWAY:   And, again, I don't want to

9   seem impatient with the Court; but we have had pending

10  before you the custodian issue for a while.

11         THE COURT:   I do.   And I have that matter.

12  I'm drafting on that now.   I don't think that I want to

13  take it up here in terms of any discussion of it because

14  I think it impacts on Mr. Williamson and his client who

15  really aren't a part of the hearing.

16         MS. TREADWAY:   I understand, Judge.   I am just

17  very concerned that documents are going missing.   We

18  have had reports of that from multiple sources at this

19  point in time and so we would urge the Court to get that

20  handled very quickly.

21         THE COURT:   All right.   Very well.

22         MS. TREADWAY:   Thank you.

23         THE COURT:   I don't know that I need any

24  comment from you.   I'm not really hearing anything on

25  this, but I think the position has been made and I don't

1    know to what extent you on behalf of Ms. Schneider

2    wanted to weigh in on that.  I think Mr. Williamson took

3    the lead on that from Dr. Schneider's standpoint since

4    he is the licensed professional that has the obligation

5    to maintain the patient records.

6            MR. BYERS:  Right, Your Honor.  Just if the

7    Government knows things are disappearing, we would like

8    to hear about it and how it's happening so it could be

9    stopped.

10           THE COURT:  Well, I want it stopped, too, if

11   it's happening.  So feel free to investigate that.  But

12   I don't believe I'm going to take it up on the record

13   today.

14       If there's nothing further, that concludes the

15   hearing in this matter.  Court is in recess subject to

16   call.

17                   (Adjourned at 12:54 p.m.)

18

19

20

21

22

23

24

25

1

2                            C E R T I F I C A T E

3

4              I, Cindy L. Schwemmer, United States Court

5      Reporter in and for the District of Kansas, do hereby

6      certify:

7                   That the above and foregoing proceedings were

8      taken by me at said time and place in stenotype;

9                   That thereafter said proceedings were

10     transcribed under my direction and supervision by means

11     of computer-aided transcription, and that the above

12     and foregoing constitutes a full, true and correct

13     transcript of said proceedings;

14                  That I am a disinterested person to the said

15     action.

16                  IN WITNESS WHEREOF, I hereto set my hand on

17     this the 8th day of May, 2011.

18

19

20

21                            s/ Cindy L. Schwemmer

22                            Cindy L. Schwemmer

23                            United States Court Reporter

24

25