1           IN THE UNITED STATES DISTRICT COURT

2

3                      DISTRICT OF KANSAS

4

UNITED STATES OF AMERICA,            )
5                                     )
                          Plaintiff,) District Court
6                                     ) Case No. 07-10234
vs.                                   ) Circuit Court
7                                     ) Case No. 10-3281
STEPHEN J. SCHNEIDER &                )
8  LINDA K. SCHNEIDER, a/k/a           )
LINDA ATTERBURY,                      )
9  d/b/a SCHNEIDER MEDICAL CLINIC,     )
                                      )
10                        Defendants,)
                                      )
11  _____

12

13

14              **TRANSCRIPT OF MOTION HEARING**

15

       On the **2nd day of September, 2008**, came on to be
16  heard Motion in the above-entitled and numbered cause
before the HONORABLE MONTI L. BELOT, Judge of the United
17  States District Court for the District of Kansas,
Sitting in Wichita.

18

19

20  APPEARANCES

21      The Plaintiff appeared by and through Ms. Tanya
Treadway and Mr. Alan Metzger;

22
       The Defendant Stephen Schneider appeared by and
23  through Mr. Eugene Gorokhov and Mr. Uzo Ohaebosim;
       The Defendant Linda Schneider appeared by and
24  through Mr. Kevin Byers.

25

```
 1                    (Beginning at 9:30 a.m.
 2                    September 2, 2008, the following
 3                    proceedings were held.)
 4          THE COURT:  This is United States against
 5   Linda Schneider.  07-10234.  Tanya Treadway and Alan
 6   Metzger appear for the Government.  Uzo Ohaebosim -- and
 7   you're -- I haven't seen you two but one time.  Are you
 8   Mr. Byer?
 9          MR. GOROKHOV:  I'm Mr. Gorokhov, Your Honor.
10          THE COURT:  Mr. Gorokhov and Mr. Byer.
11          MR. BYERS:  Byers.  Yes, sir.
12          THE COURT:  All right.  They appear for the
13   Defendant who also appears.  What I have today is the
14   Defendant's motion for release and appeal from Judge
15   Bostwick's decision of August 19, denying release of the
16   Defendant on bail.  I set this matter for an evidentiary
17   hearing.  Who's going to take the lead for the
18   Defendant?
19          MR. OHAEBOSIM:  Your Honor, we intend to
20   proceed.  Mr. Gorokhov will deal with some points and
21   authorities concerning the legal argument.  Mr. Byers
22   will go ahead and make a proffer.  He will also do a
23   summation.
24          THE COURT:  Thank you, Mr. Ohaebosim.  Do you
25   intend to call any witnesses?
```

1          MR. GOROKHOV:  No, Your Honor.

2          THE COURT:  All right.  That's fine.  I just

3     wanted you to be aware that you could if you wanted to.

4     Well, the Defendant has the burden of going forward here

5     so however you've worked it out, you may proceed.

6     Mr. Gorokhov, did you want to start.

7          MR. GOROKHOV:  Yes, Your Honor.  Should I

8     address the Court from the podium --

9          THE COURT:  You may.

10          MR. GOROKHOV:  Your Honor, just have a few

11    quick points on the legal issues in response to

12    Government filing in response to our appeal.  First, on

13    the issue of presumption.  We stated it in our brief and

14    I just want to restate that I think we've overcome the

15    presumption here by showing that this is not a typical

16    drug dealing case within the Congressional intent in the

17    Bail Reform Act of 1984.  It's not a case where the

18    person is alleged to be a member of some kind of a

19    cartel with outside connections to drug dealing sources.

20    Simply put, if there ever was an instrumentality of a

21    crime, has now gone.  And this is a case about medical

22    issues.  This is a case about disagreement with medical

23    issues.  And so I would just reiterate that I think that

24    the cases we've cited that discuss the Legislative

25    history of the Bail Reform Act show that either the

1   presumption doesn't apply, or if it does apply, that

2   we've overcome that presumption against bail in this

3   case.

4       The second point is in response to the Government's

5   arguments with respect to issue preclusion.  The first

6   point is that issue preclusion doesn't apply in a

7   criminal case.  There's a Tenth Circuit case on this

8   issue and I can provide the cite.  That case is U.S. v

9   Giyardo Mendez, which discusses the fact that the Tenth

10  Circuit hasn't applied issue preclusion in the criminal

11  context before.  And furthermore states that there's

12  policy reasons not to apply issue preclusion.

13          THE COURT:  Do you have the Fed 3rd cite on

14  that?

15          MR. GOROKHOV:  Yes, I do, Your Honor.  I

16  apologize.  It's 150 F 3rd 1240.

17          THE COURT:  All right.

18          MR. GOROKHOV:  The second point is that all

19  the cases that the Government has cited are, number won,

20  they're all civil cases; and number two, they all

21  involve subsequent actions.  The issue is decided in one

22  case and then another case arises and then at that time

23  the court is precluded from considering the issue again.

24          THE COURT:  I noted that when I read the

25  response but --

1          MR. GOROKHOV:  Thank you, Your Honor.  And

2    finally, the last point on preclusion is that these are

3    different issues.  The Defendants presented 7(c)

4    arguments with respect to the pleading and the

5    Indictment.  They also presented a constitutionality

6    argument.  What we have not argued was jurisdiction

7    which can be considered by the court at any point even

8    if not raised by any party.  And probable cause has not

9    been considered.  Probable cause with respect to the

10   Indictment other than the return of the Indictment by

11   the grand jury.  So these are different issues.  These

12   aren't the same issues that were raised in our motions

13   to dismiss.

14       Quick point on the application of the law of the

15   case doctrine.  Again, I reiterate for the same reason

16   these are different issues.  These are not the same

17   issues.  And the second point is that the case cited by

18   the Government, it's an opinion of a higher court that

19   is then becomes the law of the case to the lower court

20   once the case goes back to the lower court.  So, again,

21   the law of the case should not apply in this case

22   either.

23       And finally, the review is de novo.  As the

24   Government itself says, the review is de novo, so I take

25   that to mean that they were arguing issue preclusion

1    only with respect to the matters that we raised.  But I

2    would just say that everything needs to be considered

3    anew by this court.

4           THE COURT:  Well, I wanted to ask you about

5    that.  I have this notebook here which you can see is

6    about the size of a New York City telephone directory

7    that has Judge Bostwick's orders and the various motions

8    that have been filed.  I think the earliest was last

9    December, perhaps, about bail issues.  I have the CD's

10   that were provided with jail conversations.  I have I

11   think everything that Judge Bostwick considered in the

12   two or three hearings that he had with respect to these

13   issues.  I think you need to tell me when you say you

14   want me to review everything, do you want me to review

15   everything that happened in front of Judge Bostwick?

16           MR. GOROKHOV:  Your Honor, we realize it's a

17   lengthy record, but I would say that our position has

18   always been fairly straightforward so we would stress

19   the points that we made in our initial motion for bond

20   back in March, I believe it was.  So I would stress

21   those points.  Since that time, several other motions

22   have been made from the Government and I believe those

23   motions shouldn't be given credibility, the issues

24   raised in those motions shouldn't be given any weight;

25   however, I think that --

1          THE COURT:  Well, but if I'm doing a de novo
2   review, I can't just de novo review what you've
3   presented.
4          MR. GOROKHOV:  Your Honor, I absolutely agree
5   with you.  In fact, we would urge the Court to consider
6   everything in the record because --
7          THE COURT:  Well, I will try to do that but
8   I'm trying to pin you down here --
9          MR. GOROKHOV:  Yes, Your Honor.
10          THE COURT:  -- because there were transcripts
11   made -- or there were recordings made, transcripts have
12   not been made -- of witnesses.  For example, the
13   psychologist that you called.  There may be a transcript
14   of that, but there were -- are you saying that I should
15   review the testimony of these women that came from the
16   penitentiary?  I'm not real familiar with all the
17   evidence that Judge Bostwick heard, much less all the
18   arguments that were made, but if you are wanting me to
19   review that from a de novo point of view, it will slow
20   this process down because I will have to order
21   transcripts to be made of all the proceedings that were
22   held in front of Judge Bostwick and that's somewhat
23   contrary to the language of the statute that says that
24   this is to be heard and decided -- I can't remember the
25   exact term -- and as I say, you have the burden of going

 1    forward, Mr. Gorokhov, so you're going to have to kind

 2    of tell me what it is that you think that I would have

 3    to do to satisfy a de novo review.

 4            MR. GOROKHOV:  I understand, Your Honor.  I

 5    think I would go back to the point that the main thing

 6    that -- what Mr. Byers is going to discuss today is, as

 7    you say, it's our burden and we're going to be telling

 8    the Court why we feel that Ms. Atterbury is not a flight

 9    risk, nor is she a danger to the community.  From the

10    perspective of the defense, the only value of

11    subsequent -- the subsequent issues that arose as far as

12    the Government's subsequent motions, is to show that it

13    casts doubt on everything the Government has said prior

14    to the time that the Government brought those motions.

15    With respect to Ms. Hill specifically, you know, we had

16    to wait a month because we had to investigate the

17    matter, set it down for a hearing.  We went to court and

18    the credibility of Ms. Hill was absolutely obliterated

19    at that hearing.

20            THE COURT:  I don't think Judge Bostwick paid

21    any attention to --

22            MR. GOROKHOV:  Yes, as he noted.

23            THE COURT:  I think what he did was he put it

24    in the order because he had heard the testimony but he

25    didn't give the testimony any credit.

1          MR. GOROKHOV:  Yes, Your Honor.

2          THE COURT:  But what about the witnesses,

3    other witnesses?

4          MR. GOROKHOV:  I would say that with respect

5    to Dr. Shell, I don't believe it's necessary to review

6    his full testimony.  I think that our filings, the

7    defense' filings only, summarize that testimony and I

8    believe the Government's answers to that testimony are

9    also available so I don't know that it's necessary to go

10   back and read the transcripts.  I think that the

11   pleadings have enough information in them as to what

12   actually occurred.  So I think the pleadings themselves

13   might be enough.

14         THE COURT:  And those go clear back to last

15   December?

16         MR. GOROKHOV:  That's correct, Your Honor.

17         THE COURT:  All right.  So you want me to read

18   the pleadings that have been filed that deal with the

19   issue of her release on bond?

20         MR. GOROKHOV:  Yes, Your Honor.

21         THE COURT:  Now, Dr. Shell, of course, we have

22   the examination that was down in Texas.  No one's ever

23   requested a hearing on that and I assume you did not

24   want to have a hearing with respect to that.

25         MR. GOROKHOV:  That's correct, Your Honor.

1    THE COURT:  But I have to take that into

2    consideration, too, don't I?

3         MR. GOROKHOV:  You certainly can, yes.

4         THE COURT:  Right.  Anything else that you

5    specifically want me to take into consideration?

6         MR. GOROKHOV:  Your Honor, if I may have a

7    moment to confer with Mr. Byers.

8         THE COURT:  Yes, you may.

9              (Off-the-recorde discussion

10             between Mr. Gorokhov and Mr.

11             Byers.)

12        MR. GOROKHOV:  Your Honor, for now I think

13   that's all and I think that Mr. Byers is going to talk

14   specifically about some fact points and if there's

15   anything that comes up during that conversation, I'll

16   address it.

17        THE COURT:  Let me ask you this and, either

18   you or Mr. Byers can comment on this since he's

19   apparently going to deal with some factual issues.  Are

20   there any -- I know that you think that Judge Bostwick

21   didn't apply a proper legal standard and what-not, but

22   are there any specific factual errors in his order that

23   you're pointing to?

24        MR. GOROKHOV:  Your Honor, off the top of my

25   head, I can't think of any errors.  I mean, we certainly

1     disagree with some of his interpretation of the facts;

2     but as far as factual error, I don't believe --

3              THE COURT:  Right.  I'm thinking of, you know,

4     the record would show that the witness said the light

5     was green when the car ran through and he found that it

6     was red.  Where it was, you know, just a clear error.

7              MR. GOROKHOV:  I understand.  I don't believe

8     there are any factual errors.

9              THE COURT:  All right.  Thank you

10    Mr. Gorokhov.  Mr. Byers did you want to address any --

11             MR. BYERS:  Thank you, Your Honor.  I

12    appreciate the Court's willingness to explore this and

13    really give us a chance to fully point to issues in the

14    record that we want the Court to consider.  As Mr.

15    Gorokhov noted, I would initially like to just offer

16    some pretty simple proffers.  These would be -- some

17    have been pointed out in the Government's pleadings.

18    Some were pointed out by Judge Bostwick.  Some we just

19    realize, you know, it's in the record but it wasn't

20    specifically as a proffer.  So if I may do that, I will

21    try to be very swift with that.

22        If our client were to testify -- and this, what

23    this does, Your Honor, really goes back to one of the

24    allegations and some of the conjecture and things that

25    the Government brought as far as trying to show that

1    Linda Schneider would be a risk of flight.

2         THE COURT:  Can I stop you just for a minute.

3    Is this a proffer of her testimony?

4         MR. BYERS:  Yes, Your Honor.

5         THE COURT:  Is that proper?

6         MR. BYERS:  I believe it is.

7         THE COURT:  Do you have some authority that I

8    should consider a proffer as to her testimony in that

9    she is a witness who cannot be cross-examined?

10         MR. BYERS:  Well, the Bail Reform Act notes

11   that a proffer is appropriate at this hearing, at the de

12   novo hearing, as well as at the hearing below, Your

13   Honor.  I don't have a case on that.

14         THE COURT:  All right.  Well, if it does, I'll

15   find it in the Bail Reform Act.

16         MR. BYERS:  Okay.

17         THE COURT:  And I'm sure you've discussed this

18   with her; but I want to interrupt you for a moment and

19   direct this to her specifically.  Do you understand what

20   a proffer is, Mrs. Schneider?

21         DEFENDANT MRS. SCHNEIDER:  The way I

22   understand it is if somebody was to ask me the questions

23   that he asked me, how I would respond to it.

24         THE COURT:  All right.  It's basically his

25   summary of facts from your mouth that you would say.

1          DEFENDANT MRS. SCHNEIDER:  Right.

2          THE COURT:  Now, at this hearing you have a

3     right to testify.  Do you understand that?

4          DEFENDANT MRS. SCHNEIDER:  Yes.

5          THE COURT:  You have a right not to testify.

6          DEFENDANT MRS. SCHNEIDER:  Right.

7          THE COURT:  I will not hold it against you if

8     you don't testify; but I want you to understand that

9     while it may be appropriate for Mr. Byers to make a

10    proffer on your behalf, you can, if you wish, get up on

11    the witness stand and testify about the issues before me

12    which, as you know, are whether you present a flight

13    risk and a danger to the community, and I would listen

14    to that.  You'd be cross-examined, of course, but I

15    would listen.

16       The other thing is that you also have a right,

17    you've exercised it before, but you also have a right at

18    this hearing to call witnesses.  You understand that?

19         DEFENDANT MRS. SCHNEIDER:  Yes, I do, Your

20    Honor.

21         THE COURT:  And these are your rights.  Not

22    your lawyer's rights.  These have to be your decisions.

23    You understand that?

24         DEFENDANT MRS. SCHNEIDER:  Yes, I do.

25         THE COURT:  And is it your decision here today

1    not to testify?

2              DEFENDANT MRS. SCHNEIDER:  Yes, Your Honor.

3              THE COURT:  All right.  And is it your

4    decision not to call witnesses here at this hearing

5    today?

6              DEFENDANT MRS. SCHNEIDER:  Yes, that is.

7              THE COURT:  Because you understand, as far as

8    district court goes, this is the only time that we'll be

9    dealing with this matter today of your release.

10             DEFENDANT MRS. SCHNEIDER:  Okay.

11             THE COURT:  You understand that?

12             DEFENDANT MRS. SCHNEIDER:  Yes.

13             THE COURT:  Fair enough.  All right.  Go

14   ahead, Mr. Byers.

15             MR. BYERS:  Thank you, Your Honor.  The

16   proffers would be, and, again, I'm starting to go back

17   to this, it was sort of a cat and mouse allegation that

18   led to the arrest.  Our client would simply explain back

19   in December what kind of errands she was running with

20   her family, with her husband, her two daughters.  Why

21   they went -- why she specifically went into two or three

22   different places for very short visits.  She was trying

23   to find a store to use a coupon that she had that

24   expired shortly.  And when they got to the location of

25   the store, it had moved and she was going to places

1    accompanied by her family looking for that store and

2    asking for directions.  That would be the explanation of

3    the supposed cat and mouse, avoiding detection, setting

4    up some kind of a plan to flee.

5                THE COURT:  What kind of coupon was it?

6                MR. BYERS:  I believe it was for men's

7    clothing.

8                DEFENDANT MRS. SCHNEIDER:  Yes, it was a --

9    can I say --

10                         (Off-the-record discussion

11                         between Defendant Mrs. Schneider

12                         and Mr. Gorokhov.)

13                MR. GOROKHOV:  It was for men's clothing.

14                THE COURT:  All right.

15                MR. BYERS:  Our client would proffer that

16    you'll see in the record when you have a chance to study

17    it, Your Honor, that there was a sort of a Tweety Bird

18    conspiracy allegation from the Government based upon

19    this item, which is an envelope that went -- it actually

20    was not sent by Linda Atterbury Schneider, but received

21    by her at the jail where an inmate had drawn Tweety Bird

22    on here apparently lying on the beach and it says be on

23    the beach in no time.  That was submitted in the record

24    as evidence that our client intended to flee.  She would

25    explain how that envelope came into being and how she

1    had no knowledge of that coming to her and that there

2    was absolutely no intent to flee this court's

3    jurisdiction and go lie on a beach somewhere.

4         She would also, would also proffer that in the

5    latest pleading, government, at Page 12, notes that

6    apparently Linda Schneider regularly prays in Spanish

7    while she's confined in the Butler County jail,

8    apparently drawing a tie to an intent to flee to Mexico

9    by being able to speak Spanish.  The proffer would be

10   that Linda Attebury Schneider does not pray in Spanish.

11   She says the rosary -- or said the rosary with Spanish

12   speaking female inmates in the Butler County jail, she

13   said the rosary with them in English because she doesn't

14   speak Spanish fluently enough to say the rosary.  A

15   proffer on the desire to visit Mexico, which Judge

16   Bostwick found from some piecing together the various

17   phone calls, snippets, and other items at the hearing

18   below, a desire to visit Mexico, the proffer would be

19   that she certainly does desire to visit Mexico.  She has

20   close ties in that country.  And the desire, though,

21   would be once she's exonerated or she is somehow

22   released by this court and allowed to do so.  The desire

23   is not to leave this court's jurisdiction without

24   approval.

25         Proffer regarding the Stacy Hill fiasco at the July

1    hearing would be that Ms. Schneider would specifically

2    and vehemently deny ever speaking with that individual

3    about arranging some type of bogus paperwork.  That she

4    ever talked to her about her case in any fashion.  She

5    would also deny that she ever spoke with her sister in

6    any regard whatsoever about switching identities or some

7    other such thing that this individual had apparently

8    told the Government was a topic of discussion with

9    Ms. Schneider.

10        Would also proffer that any perceived threats that

11   have been taped on phone conversations and uttered by

12   Linda Schneider were simply injudicious remarks in

13   perhaps a fit of frustration or frustration with the

14   system where she understands she's presumed innocent but

15   she remains in custody.  She would specifically deny any

16   intent to harm any person anywhere, whether connected

17   with these proceedings or not.

18        And would also proffer that she has no intention of

19   harboring a fugitive or in any way assisting someone who

20   is apparently absconded and has pending charges.  She

21   simply has no intention of doing that.  And that would

22   be the conclusion of the proffers.

23             THE COURT:  Thank you, Mr. Byers.

24             MR. BYERS:  I don't know if you want to let

25   the Government respond now to what we've said because

1    really all we have is essentially a summation, a bit of

2    argument and summation.

3             THE COURT:  Why don't you go ahead.

4             MR. BYERS:  Okay.  Thank you, Your Honor.  I

5    think once you see the whole record, and I realize is it

6    voluminous and I hope we narrowed it down somewhat, not

7    requiring transcripts of those witnesses because there

8    really were few.  The Dr. Shell and the three at the

9    July hearing.  But I realize the Court is going to have

10   to spend some significant time reviewing it on a de novo

11   basis.  But I really need to highlight in the record

12   some of the pattern of almost frivolity that has perked

13   up to this point.  We start with cat and mouse claims

14   which are simply not well founded.  There's a reasonable

15   rational explanation if you give credence to the proffer

16   that was also explained in front of Judge Bostwick but

17   it was not specifically entitled a proffer but there was

18   explanation as to the cat and mouse events which led to

19   the arrest in December.  We next, and these are roughly

20   in chronological order, we next have the Tweety Bird

21   conspiracy, which really, receiving an envelope with a

22   Tweety Bird on it is no different than the envelope with

23   Tom and -- not Jerry, but Tom chasing a bug, I think,

24   and these are envelopes to or from Linda Schneider.

25   With Donald Duck and some other duck.  I mean, these are

 1    just innocuous benign doodlings of either other inmates

 2    or Linda Schneider herself.  We submit that that's

 3    simply in no way to be a nefarious intent to Tweety

 4    Bird.

 5             THE COURT:  What is -- you held that up but

 6    it's not a -- in evidence.  What is it?

 7             MR. BYERS:  I'm sorry.  These are just other

 8    envelopes that have been going to or from the jail.

 9    This is the one that was attached to the Government's

10    motion, Tweety Bird lying on the beach.

11             THE COURT:  Oh, I see.  That's something she

12    drew.

13             MR. BYERS:  This is not -- this was drawn by

14    an inmate unknown to her, sent to her by her husband

15    through the U.S. Postal Service.  But Government used it

16    as an intent against Linda Schneider to flee even though

17    she didn't send the envelope that said be on the beach

18    in no time.  I'm just trying to analogize, Your Honor,

19    with these other envelopes that have gone between Linda

20    Schneider and various people outside the institution,

21    outside the jail.

22        We then move on where we have the many short

23    seven -- sometimes seven seconds, sometimes less than

24    that, telephone snippets that the Government relied on,

25    taking out of context.  I know that the court magistrate

1    Judge Bostwick and the court now has hopefully the full

2    CD's of those conversations.  So if necessary can be

3    listened to and put in the appropriate context.

4              THE COURT:  Well, now, I think that Judge

5    Bostwick listened to them in their entirety.  I think he

6    reflected that in his order.

7              MR. BYERS:  He did, Your Honor.

8              THE COURT:  So that's why I asked Mr. Gorokhov

9    if the Defendants are making a claim here that Judge

10   Bostwick erred factually in terms of a finding.

11             MR. BYERS:  Well, it's --

12             THE COURT:  He may -- you may disagree, of

13   course, with his interpretation; but I believe the

14   record reflects that Judge Bostwick listened to

15   everything.

16             MR. BYERS:  It does reflect that, Your Honor,

17   and I think that the problem is it's human nature,

18   people come to different conclusions or interpretations

19   based upon the very same thing.  Certainly trust this

20   court, if you're interested, to listen to those and you

21   may very well --

22             THE COURT:  I intend to listen to them.  I

23   haven't done it yet because I wanted to know if you

24   wanted me to listen to them.

25             MR. BYERS:  Okay.  Appreciate that.

1          THE COURT:  But I think the record should

2     reflect that he did listen to them.

3          MR. BYERS:  Okay.  Yes.  And I'm sorry if I

4     misrepresented anything or misspoke.  I understand Judge

5     Bostwick listened to the totality of the recordings that

6     were provided by the Government to hopefully put it in

7     context what these snippets were because that was part

8     of our position that these were just pulled so out of

9     context.

10          THE COURT:  I understand.

11          MR. BYERS:  Again, in this litany of the

12     Government actions specifically related to the bond

13     issues under the Bail Reform Act.  And the Court

14     inquired about this earlier about a hearing on the

15     mental evaluation.  And I think it's important to bear

16     in mind that wasn't our motion.  And then what's ironic

17     is when our client is determined to be fit for trial,

18     then there was a threat of obstruction raised by the

19     Government.  They make the motion, have our client

20     evaluated, then when she is not sick or incompetent,

21     then there's a threat of obstruction and she --

22          THE COURT:  I'm not following you.  Where did

23     the Government threaten --

24          MR. BYERS:  In follow-up pleadings they cite

25     the statute and say she could be charged with a criminal

1   offense of obstruction because essentially thinks she

2   was malingering but doing it poorly because she was

3   found to be competent.  And I know it's cyclical, Judge,

4   and it doesn't really make sense to me but I'm just

5   trying to highlight some of the things the Court will

6   see when you have a chance to study the record below

7   that have actually has been very obstructionistic and

8   diversionary.  I don't know if -- and I know some of the

9   motions that this court has overruled, but I'm just

10  trying to set the scenario.

11              THE COURT:  No, I understand.  I must have

12  missed -- was that in the Government's response where

13  they --

14              MR. BYERS:  You know, Judge, I don't even have

15  a specific document to cite.  I can certainly provide it

16  post hearing if I could have leave for that.

17              THE COURT:  I'm sure Ms. Treadway knows where

18  it is if that's -- I was not aware that -- well, even --

19  the way I look at it on these things, if the Government

20  believes that she's done something that would amount to

21  obstruction of justice then it's up to the Government to

22  decide whether to charge her.  If the Government doesn't

23  charge her with it then I don't place a lot of credence

24  in the claim that she could be charged with it.  You

25  understand what I'm saying?

1         MR. BYERS:  I believe I do, Your Honor.

2         THE COURT:  I don't remember that being

3    discussed in Judge Bostwick's order.

4         MR. BYERS:  No, I don't think he touched on it

5    at all.  As far as the threat of an obstruction

6    charge --

7         THE COURT:  I think that -- I read Dr. Shell's

8    transcript before I ordered her to go to Texas.  I

9    ordered her to go to Texas because it really isn't

10   practical to have people in custody examined here

11   locally.  Frequently what happens is that the -- well,

12   I've had this happen before, not in this case, but the

13   psychiatrists or the psychologist refuses to go to the

14   jail, say that they can't perform adequate tests, if

15   they are going to do those tests that psychologists do

16   or that they can't adequately interview the person so

17   they insist that the person be brought to their office

18   for an examination.  I won't order that.  If the

19   person's in custody, then they're in custody and that's

20   why I ordered her to go to Texas.  But at this point in

21   time, is there any contention that she's not competent?

22        MR. BYERS:  No, sir.

23        THE COURT:  I didn't think so.  Can we just

24   kind of put that aside?

25        MR. BYERS:  We can.  Because frankly it wasn't

1    our motion to start the process.  We certainly brought

2    the issue to Judge Bostwick in a due process context.

3    And then the Government made the motion which was their

4    right but -- so it was not an issue with us.  We were

5    never contending she was potentially incompetent for

6    trial.

7              THE COURT:  I have to take a telephone call.

8    I'll be right back.

9              MR. BYERS:  Thank you, Your Honor.

10                    (Recess.)

11             THE COURT:  I'm sorry I interrupted you but I

12   had to take that call.

13             MR. BYERS:  I appreciate the Court's

14   indulgence.  I'll try to get through this hearing.

15             THE COURT:  I'm not in any hurry.  I'll listen

16   to whatever you have to say.

17             MR. BYERS:  Excellent.  That's what I wanted

18   to hear.  Now what can I do to make it a filibuster --

19             THE COURT:  I didn't say a filibuster.

20             MR. BYERS:  Okay.  I pushed it.  I was talking

21   about -- okay, I pretty much wrapped up as far as trying

22   to explain the motion for the evaluation, subsequent

23   threats -- I think it's important on that point to bear

24   in mind I think the way the statute reads is there has

25   to be a good faith or good cause belief to petition for

1    such a motion.  Again, we didn't make the petition we.

2    Didn't make the motion anyway, but I think it's just

3    ironic that in the course of this proceeding and

4    specifically related under the Bail Reform Act

5    proceeding that the Government makes a motion and then

6    turns around essentially threatens the subject of the

7    competency evaluation.

8         Moving along with the scenario or the chronology of

9    events below, the Court will find in the record is a

10   motion for conflict.  That was a motion for conflict,

11   number one.  I believe Judge, that was actually a little

12   bit out of order here.  I think that was Judge Brown

13   actually ruled on that one.  And it was also the motion

14   to gag members of the public and defense counsel.  I

15   believe this Court denied that motion.

16        THE COURT:  What was the one that Judge

17   Brown -- I wasn't aware of that.

18        MR. BYERS:  I believe there was -- I know

19   there was an earlier motion for declaration of conflict

20   to disqualify defense counsel, some or all of defense

21   counsel.

22        THE COURT:  Well, if Judge Brown --

23        MR. BYERS:  You know, Your Honor, what I think

24   happened is I think we resolved that to Judge Brown's

25   satisfaction and he may not have even issued a ruling as

1    I recall now.

2              THE COURT:  I don't remember any order from

3    him.

4              MR. BYERS:  I don't believe there was a docket

5    entry relative to that.

6              THE COURT:  I do know the one about the gag

7    order because I did that one.

8              MR. BYERS:  Right.  I recalled --

9              THE COURT:  There aren't going to be any gag

10   orders in these cases.

11             MR. BYERS:  You denied that, I remembered

12   that.  The Government has also mentioned in pleadings

13   again in the process of the bail reform proceeding below

14   has made mention of that threatening criminal action

15   against Ms. Schneider because of these supposed threats

16   she has issued.  And certainly the words are what they

17   are as the Court will find on the telephone calls and

18   things, that was part of the proffer earlier today,

19   certainly injudicious, not well-advised comments, but

20   understandable given the circumstances that she was

21   under at the time.  And they are quite dated, as I

22   recall, those comments that government perceives as

23   threats and Judge Bostwick addressed that in his ruling

24   below.  He didn't minimize it, but he didn't find those

25   rose to the level to present the danger to the community

1    that would justify continued detention.

2         I mentioned earlier in some of the my proffers the

3    whole sort of the July fiasco, I call it, with the

4    individual who came in and claimed to have been

5    approached by Ms. Schneider.  I think it's important to

6    bear in mind there, given the voluminous tapes we've

7    seen of telephone conversations early in Ms. Schneider's

8    custodial detention, we know those tapes are made and

9    virtually any jail ever walked in I think they warn you

10   there are going to be tapes made when inmates are making

11   calls.  So I think it's important that the government --

12   part of that was they said she also arranged this with

13   her sister Pat, who is also on the fringe of things in

14   the Government's pleadings.  She arranged them with her

15   sister Pat.  So that's why she didn't use this inmate

16   and pay her the $50,000.  But the thing was there was no

17   telephone snippets, no calls whatsoever, produced to

18   show how this arrangement happened between Linda and

19   Pat.  It was just tossed out there and left to linger

20   with no real resolution other than the innuendo and bad

21   inference that could be directed toward Linda Schneider

22   because of these allegations from this individual.

23              THE COURT:  Is this the comments that are

24   attributed to -- or the conversation that's attributed

25   to your client and her sister?  Is that what you're

1    speaking about?

2              MR. BYERS:  It's actually attributed -- it

3    came from Stacy Hill, the witness the Government put on

4    in July when she said -- when she went back to Linda and

5    said, hey, what about our deal -- and I'm

6    paraphrasing -- and she said Linda said, oh, my sister's

7    taking care of it.  But there was no conversation that

8    we've seen evidence of telephone wise or otherwise that

9    that was actually done.  It was just -- it was actually

10   Stacy Hill's way out of what she had created.

11             THE COURT:  I see.

12             MR. BYERS:  But, again, it sort of goes --

13   fits with the flow and tenor of the process we've been

14   going through below.

15             THE COURT:  What you're attacking is the

16   Government's arguments.  You're not attacking Judge

17   Bostwick's finding in this regard.  And my recollection

18   is he didn't pay a heck of a lot of attention to any of

19   that.

20             MR. BYERS:  He pretty clearly said that; but

21   it's been resurrected in front of this Court in response

22   to our motion and that's why -- I think it's laughable -

23             THE COURT:  Well, I saw it in there but I'm

24   not, I'm not going to hear any testimony from -- hear

25   that kind of testimony again.

1           MR. BYERS:  Okay.  Well, the concern,

2   obviously, lawyers are usually over inclusive.  I don't

3   want to address something even if it seems laughable or

4   Judge Bostwick essentially didn't give it any credence;

5   but if it's been raised again in front of this Court, I

6   have to touch on it.

7           THE COURT:  I understand.

8           MR. BYERS:  Going on in the scenario here, the

9   chronology, the second motion for conflict that was

10  directed only at Mr. Gorokhov.  Again, the court ruled

11  on this quickly and succinctly.  And then we have this

12  allegation that --

13          THE COURT:  Well, that didn't have anything to

14  do with her being released on bond.

15          MR. BYERS:  Well, it was after the last

16  hearing, Your Honor, I believe it was after the July

17  hearing.  You're right, it didn't specifically go to an

18  issue on the merits of the bond release, or danger to

19  the public or risk of flight.

20          THE COURT:  But that didn't have anything to

21  do with her as I recall.  It was that Mr. Gorokhov made

22  some sort of statement to the media that she knew a lot

23  about the operation of the clinic.

24          MR. BYERS:  You're right, Your Honor.  I'm

25  just sort of maybe snowballing a bit that, again, just

1  trying to show the whole process, how, to be generous,

2  vigorous the Government has been in throwing these

3  allegations out there and essentially obfuscating what

4  the defense is trying to do, including two separate

5  disqualification motions.

6         THE COURT:  Well, I don't want to get into

7  this too much, but I think both sides have been pretty

8  vigorous in their approach to this.  But like I said,

9  when I issued the order, and if you couldn't figure it

10  out, when an order like that comes out and it's pretty

11  short and to the point, I didn't pay much attention to

12  that.

13         MR. BYERS:  I appreciate that, Your Honor.

14  And then just to comment very briefly on one of the

15  proffers from today about Linda regularly praying in

16  Spanish.  That was explained via a proffer.  The Court

17  will give that appropriate weight.  I realize that you

18  know it is in the form of a proffer as allowed under the

19  de novo review under the Bail Reform Act.  And really I

20  just have like a summation at this point.  I don't know

21  if you want to give the Government a chance to respond

22  at this point --

23         THE COURT:  Well, I do think that you all have

24  the burden here of going forward and you may as well go

25  ahead and sum up, Mr. Byers; and you know, it doesn't

1   make much difference to me in a hearing like this who is

2   first and who's second.  I'll take that all into

3   consideration.

4           MR. BYERS:  I appreciate that, Your Honor.

5   Just very briefly.  Obviously, the Court needs to

6   reasonably assure the appearance of a defendant under 18

7   U.S.C. 3142 (f) -- I'm sorry if I sped through that.

8   And as, again, looking at the total picture here.

9   Hopefully, the Court realized, as did Judge Bostwick, as

10   at least as far as the July proceeding, there really was

11   nothing of value that came out of that hearing.  There

12   was nothing incriminating.  There was nothing to show

13   the Court that Linda Schneider either is a flight risk

14   or that she's a danger to the community.  As

15   Mr. Gorokhov mentioned earlier, assuming she was a

16   danger at some point in time, that instrumentality is

17   gone.  The danger simply has been eradicated.  There was

18   no clinic.  She cannot function there.  And any other,

19   any other stretches of the imagination as far as

20   posturing her as a danger are simply not supported by

21   the evidence in this record.

22       Now, of course, there is a rebuttable presumption

23   that detention is to be continued because of the nature

24   of the allegations.  We realize that it is our burden to

25   rebut that presumption.  We simply assert that the

1    evidence, the totality of the evidence in this record,

2    certainly rebuts that presumption.  And the burden is

3    upon the Government to prove both by a preponderance on

4    one aspect and a clear and convincing, which goes to the

5    danger to the community, they have to show that.  And we

6    submit that the particularized evidence in this record

7    about Linda Schneider's ties to the community, the

8    evaporation of the instrumentality of the alleged

9    criminal conduct, her strong and loving ties to her

10   children and her family, and prior compliance with this

11   Court's expectations when she was on, and still is on

12   probation actually for the social security case.  She

13   was allowed to travel.  She always returned on schedule.

14   She left her itinerary as she was supposed to.  She

15   fully complied and showing she was under investigation

16   for these other health care related things from the

17   clinic.  She returned every time as scheduled and it was

18   never an issue with her compliance.

19       Also can't gloss over the fact that there is at

20   least a colorable due process claim with every day she

21   spends in jail.  Now, cases are all over the place

22   certainly as far as what -- at what point is the due

23   process infringement.  But that certainly cannot be

24   ignored by the Court and is serious consideration now

25   that she's been in custody over eight months with a

1     trial date still approximately six, five months away.

2            THE COURT:  I was going to ask, and I guess

3     may as well ask it right now.  The reason that we

4     couldn't have the trial earlier was because of Judge

5     Robinson trying those two characters, Whittig and I

6     can't think of the other guy's name.

7            MS. TREADWAY:  Lake --

8            THE COURT:  That trial still going or has that

9     been rescheduled?

10            MS. TREADWAY:  Judge Robinson has told the

11     parties to be ready to go within days after the appeal

12     is decided, which is going to be expedited.  So we still

13     anticipate, we still anticipate, we still anticipate

14     that trial to be going in October, Judge.  October,

15     November, December.

16            THE COURT:  Because if that trial doesn't go,

17     I'm prepared to move this case up.

18            MS. TREADWAY:  When, Judge?

19            THE COURT:  I said if for some reason the

20     Whittig case doesn't go, I'm prepared to move this case

21     up.

22            MS. TREADWAY:  We would have trouble with our

23     experts, Judge.  Some of them are out of the country.

24            THE COURT:  Yeah.  I've heard that before.

25     You can get 'em back in the country.  If I say a case is

 1    going to go to trial, either they're going to be here or

 2    they won't testify.  This business of experts who are

 3    being paid means that they're at my beck and call.  Now,

 4    that, you may as well tell 'em that right now.  But,

 5    right now, there's nothing I can do about it because

 6    apparently the case is going to go to trial in Topeka.

 7              MR. BYERS:  And just one final comment, Your

 8    Honor, if I may.  Ms. Schneider's codefendant, her

 9    husband, has been out since April under electronic

10    monitoring and various other pretrial services

11    techniques.  And I'm sure the Court is well aware of how

12    sensitive those electronic monitors are.

13              THE COURT:  Actually, I'm not.

14              MR. BYERS:  Well, I could proffer it's

15    incredibly sensitive.  He sits beside a file cabinet in

16    his house and he'll get a call saying where are you, the

17    monitor went off.  Or he walks outside to the garage,

18    which he now has permission to do, to go out to the

19    garage, and he'll get a call from a -- some overseer

20    saying where are you, we're getting a hit on you.  So

21    it's stunningly accurate and sensitive.  And we simply

22    submit that conditions that mirror her husband's

23    conditions are certainly appropriate given the lack of

24    proof of danger to the community and real articulable

25    risk of flight.  Thank you.

1        THE COURT:  Thank you.  Appreciate it.  All

2   right.  Let's have the Government's response.  First of

3   all, do you have any evidence?

4        MS. TREADWAY:  No, Judge.

5        THE COURT:  All right.

6        MS. TREADWAY:  May it please the Court.

7   Counsel.  Judge, I think we need to start with where the

8   Defendants have agreed that there are no factual errors

9   in the Magistrate's findings.  And as you noted,

10  although they continue to attack the Government's

11  arguments, they do not attack Judge Bostwick's findings.

12  And that is very important in your consideration of the

13  review of the Magistrate's orders in a de novo review or

14  otherwise.

15       THE COURT:  Well, you don't disagree that I

16  have to do a de novo review?

17       MS. TREADWAY:  I do not, Judge.

18       THE COURT:  Do you disagree with

19  Mr. Gorokhov's position that that means that I have to

20  review everything that happened in front of Judge

21  Bostwick from December of 2007 on?

22       MS. TREADWAY:  Judge, I think under a de novo

23  review you may review the record as you see fit.  And

24  that certainly is the record.  And that would include

25  Judge Bostwick's orders.  I believe he's issued three

1    orders in this case.

2            THE COURT:  I've read them.

3            MS. TREADWAY:  And I believe all of that is

4    part of the record and that you may rely on any part of

5    it or all of it.  The first thing that we start with,

6    Judge, is the rebuttable presumption.  And the

7    rebuttable presumption in this case applies both to the

8    risk of flight and the danger to the community.  As I

9    understand Mr. Gorokhov's argument, he says that they've

10   overcome the presumption because this is not a typical

11   drug case.  Judge, it doesn't matter whether it's a

12   typical drug case or not.  What matters is how the

13   Defendants have been charged upon probable cause finding

14   of the Grand Jury.  And there's no argument that they've

15   been charged with Controlled Substances Act violations

16   and that raises the rebuttable presumption.  And I agree

17   this is not a typical drug case, Judge, but for a

18   different reason.  I don't know that in many drug

19   distribution cases we're faced with a prospect of as

20   many as 58 deaths resulting from the drug distribution.

21   So in that way it certainly isn't typical.

22       To the extent that they claim there is no probable

23   cause to believe these crimes have been committed, as

24   the Judge, Magistrate Bostwick, has pointed out and as

25   the law makes clear, the Grand Jury's return of the

 1    Indictment is a sufficient finding of probable cause.

 2    And I'm not understanding their jurisdictional argument,

 3    Judge, so I, I'm afraid I cannot respond to that.

 4              THE COURT:  Well, I'm going to let

 5    Mr. Gorokhov get back up later.  But let's be clear

 6    here.  The defense may disagree with me, but I think I

 7    have jurisdiction, and I intend to keep on keepin' on

 8    here, so to speak, so, if that was Mr. Gorokhov's

 9    position that I don't have jurisdiction, that is the law

10    of the case.  I mean, that's my law of the case.  If

11    there's something else, then I'll listen to anything he

12    has to say, but I'm not -- I'm not going to revisit the

13    order that I previously made about the constitutionality

14    of such a line in this order.  That's just not part of

15    it.  Go ahead.

16              MS. TREADWAY:  We agree, Judge.  So now let me

17    move to the flight risk issue, Judge.  Not only do we

18    have the rebuttable presumption, but the Government has

19    gone further in its proof and the Magistrate has gone

20    further in his factual and legal findings.  First of

21    all, we have verifiable connections to Mexico to make

22    the Defendant a flight risk, and there are simply no

23    conditions of release that can cure that flight risk.

24    She has not rebutted or even attempted to rebut many of

25    the prior findings and she's not even met her very

1     limited burden of production.  She has never rebutted

2     the following facts.  That she regularly traveled to

3     Mexico.  That she has a home in Mexico.  A bank account

4     in Mexico.  Family living in Mexico in the form of her

5     adopted son Ulysses who can assist her there.  The

6     financial ability to flee.  Although she claims she does

7     not speak Spanish, I believe the tapes will indicate

8     that she was attempting to learn Spanish in jail.  And

9     her own witness in the prior hearing indicated that she

10    in fact did speak Spanish.

11            THE COURT:  Well, they speak English in

12    Mexico.

13            MS. TREADWAY:  As well -- yes, Judge,

14    especially in Acapulco where her home is.  The issue

15    with regards to --

16            THE COURT:  By the way, I don't attach much

17    significance to this business of praying in Spanish.  So

18    what?  Maybe the witness was mistaken.  Perhaps she was

19    praying in Latin.  That's really not -- those are

20    insignificant things.

21            MS. TREADWAY:  The situation with Mexico,

22    Judge, is surrendering a passport is fairly meaningless.

23    Although we've requested that to prevent travel to other

24    places in the world, you don't need a passport to get in

25    and out of Mexico unless you're traveling by air.  The

1    other thing that is very key is that the jailhouse

2    conversations confirm her intent to flee.  Again, that

3    was a factual finding that the Magistrate made and the

4    Defendant does not have any objection to those factual

5    findings.  He also found in a letter to this Court in

6    the social security fraud case context, that was a

7    letter dated March 2nd, 2007, indicated that this

8    Defendant had strong ties to Mexico, had strong feelings

9    for Mr. Taylor, she had a strong desire to put all her

10   family back together again, including Mr. Taylor.

11             THE COURT:  That a letter to me?

12             MS. TREADWAY:  Yes, it was, Judge.  And Judge

13   Bostwick mentioned it in his order.  And the only way to

14   put the family back together again, including

15   Mr. Taylor, is to do so in Mexico because Mr. Taylor is

16   a fugitive from this court.

17        The Defendant has a greater incentive to flee now

18   given that she has had a taste of jail and the potential

19   life sentence as to sum of the charges that she is

20   facing.  Again, that was a finding that was directly

21   made by the Magistrate and this Defendant has no

22   argument with.

23        Moving on to the danger to the community, Judge.

24   If I understand the Defendant's argument, they have

25   limited their rebuttal of this argument to one fact and

1       that is they claim she's no longer a danger to the

2       community in terms of the charges in the Indictment

3       which were linked to the running of the Schneider

4       Medical Clinic.  While that may be true, Judge, that

5       doesn't answer all of the other problems with regard to

6       danger to the community.  And danger to the community is

7       not just a possible -- possibility of violence against

8       others, et cetera.  All it really means, Judge, is does

9       this Defendant have the potential of committing further

10      crimes while on release.  If by clear and convincing

11      evidence, we have -- we show that, then she remains a

12      danger to the community.  And we believe that the

13      evidence has shown that.  In that way, we would disagree

14      with Magistrate Bostwick's findings, respectfully, of

15      course.

16              THE COURT:  Well, what findings do you

17      specifically disagree with?

18              MS. TREADWAY:  Well, Judge, he just made the

19      finding that she was not a danger to the community.  And

20      I would like to state what facts I would like you to

21      look to --

22              THE COURT:  Go ahead.

23              MS. TREADWAY:  -- and determine whether she in

24      fact does pose a danger to the community.  Essentially

25      the Defendant's argument is she's always done what she's

1    supposed to do.  But that's clearly not the case.  She

2    was a convicted felon.  She's been on release since

3    October 6, 2006, when she entered her plea.  And she's

4    been on probation since April 1st, 2007.  After release

5    and after probation.  It's the Government's evidence

6    that she has demonstrated no respect for the law and no

7    intent to follow the law.  She has engaged in and

8    attempted to engage in further criminal activity during

9    her release and during her probation.  The crimes

10   charged in the Indictment indicate that.  The conspiracy

11   continued through December, 2007.  Counts 4 and 6

12   continue through May, 2007.  Counts 9 through 12

13   continuing fraud through May of 2007.  And Counts 13

14   through 17 allege fraud continuing through December,

15   2006.

16        THE COURT:  Well, you've got an Indictment

17   that satisfies probable cause.  But she's still presumed

18   innocent of those charge, isn't she?

19        MS. TREADWAY:  I understand that, Judge;

20   however, probable cause, you may take that into

21   consideration when you're determining whether she

22   remains a danger to the community.  Because she

23   committed these crimes knowing she was under

24   investigation and knowing she was on probation for a

25   prior conviction.  That's the important point, Judge.

42

1    She's also engaged in additional crimes or attempted

2    crimes during the course of her release and probation.

3    She instructed the clinic administrator not to provide

4    documents in response to a subpoena.  She instructed a

5    real estate agent in April, 2007, to destroy documents

6    she believed would be incriminating.  She continues to

7    harbor a fugitive.  Although they say she has no intent

8    to harbor a fugitive, she offers no information about

9    his whereabouts.

10             THE COURT:  Has anybody asked her?

11             THE COURT:  You may ask her.

12             THE COURT:  It's not my job to ask her.

13             MS. TREADWAY:  Well, she is not --

14             THE COURT:  Huh?

15             MS. TREADWAY:  We did ask her, yes, Judge, and

16   she would refuse to tell us.  In the October, 2007,

17   meeting she had with the agents, we specifically asked

18   her where he was and she would not tell us.

19             THE COURT:  All right.

20             MS. TREADWAY:  I believe that's in front of

21   the Court in the prior social security fraud case.

22        With regards to the mental illness claim, Judge.

23   The Defendants continue to myself the point here.  We

24   did not threaten her with an obstruction charge.  We

25   never threatened her with any charges.  What we pointed

1    out to the Court is that what she did was essentially a
2    fraud on the court.  And it's amazing to me that Mr.
3    Byers can stand up here and say that we never claimed
4    she was mentally ill.  In fact, that was the whole
5    purpose of their March hearing and for bringing Dr.
6    Shell in front of the court.  What they argued was that
7    she was so depressed that she was functionally unable
8    and mentally incapable of assisting them in their
9    defense.  That's how mentally ill she was.  That's how
10   depressed she was.  And that it was only going to
11   deteriorate further.  That was their argument, Judge.
12   In fact, we believe that to have all been a fraud on the
13   court and completely false.  It was to present to the
14   magistrate a new condition for reopening the hearing.
15   When in fact it wasn't a new condition.  Now, although
16   that is obstructive conduct, we have never threatened
17   her with obstructive conduct.  We just believe that the
18   Court should take that into account when you're
19   determining whether this person continues to be a danger
20   to the community.  She's made threats against former
21   counsel John Rapp.  She's made threats against me.
22   Again, Judge --
23           THE COURT:  Since I haven't listened to the
24   tapes yet, what did she say about John Rapp?
25           MS. TREADWAY:  I believe the comment was that

1   they wanted to slit his throat.  And immediately, on

2   hearing that, I called Mr. Rapp, Judge.  I take such

3   statements very seriously.  And the marshals, in

4   listening to the tapes, certainly took the threats

5   against me very seriously.  When you have someone in

6   jail speaking to someone outside of jail and they are

7   talking about putting me out of my misery, I believe

8   that those kind of comments should be taken seriously.

9   And the Magistrate did take them seriously.

10          THE COURT:  Oh, I think they should be taken

11   seriously; but I saw that in the pleadings, I didn't

12   ever see, I didn't think, what supposedly was said about

13   Mr. Rapp.  That's all -- the only thing I was asking.

14          MS. TREADWAY:  And Judge, on balance, we have

15   a person who purports to be law abiding but who clearly

16   isn't.  She's a convicted felon, Judge.  You never hear

17   her admit to that.  You never hear her bring that up.

18   And she --

19          THE COURT:  Well, she really doesn't have to

20   before me since I sentenced her.

21          MS. TREADWAY:  That's right.

22          THE COURT:  I mean, I know she's a convicted

23   felon.

24          MS. TREADWAY:  I know you know, Judge, but she

25   purports to be this innocent flower of goodness when in

1    fact the evidence before this court in this trial is

2    going to be that she's a manipulative, cunning and

3    scheming criminal.  And that is the evidence that's

4    going to be before this court.

5              THE COURT:  But it isn't before me at this

6    point.

7              MS. TREADWAY:  But what you need to decide

8    now, Judge, is whether the evidence before you proves by

9    a preponderance of the evidence that she's a flight

10   risk.  And it does because she's never ever rebutted

11   much of the findings the Magistrate used to make that

12   finding, nor the finding as we've learned today.  And

13   she continues to flout the law in the manner that we've

14   just outlined.  So she continues to be a danger to the

15   community.  And, Judge, we would ask that her detention

16   be continued.

17        And with regards to the due process arguments, if

18   this Court finds that she's a flight risk, the law is

19   clear there is no due process problem.  The due process

20   argument comes when people are detained only because

21   they are a danger to the community.  When people are

22   detained because they are a flight risk, due process

23   does not get violated.  That's the law.  And that's

24   clearly set forth in our pleading.  Unless you have

25   questions, Judge, that's our argument.

1          THE COURT:  Thank you.  Mr. Gorokhov, you may

2     respond.  I want to make sure I understand what your

3     position is on the legal issue.  Go ahead.

4          MR. GOROKHOV:  Is this with respect to

5     jurisdiction, Your Honor?

6          THE COURT:  Right.

7          MR. GOROKHOV:  Yes.  I think Your Honor is

8     correct that the jurisdictional issue is bound up with

9     the constitutional issue.  It's simply two ways to look

10    at it.  I think the jurisdictional issue is stated in

11    our brief in this case.  It's simply that the Government

12    doesn't have the jurisdiction to prosecute the case as

13    it is.  I understand the Court disagrees with that

14    position and, Your Honor, we're just merely putting it

15    into the record because we --

16          THE COURT:  No, I want you all to feel you

17    can -- any time you want to make a record on something,

18    but I wanted to be sure that the record is also clear

19    from my standpoint that I'm not going to revisit in

20    terms of her being released on bond whether I have

21    jurisdiction.  As far as I'm concerned, I have

22    jurisdiction in this case.

23          MR. GOROKHOV:  I understand, Your Honor.

24          THE COURT:  All right.

25          MR. GOROKHOV:  The probable cause issue, Your

1     Honor discussed with Ms. Treadway and the issue there is

2     that I think Your Honor raised a good point is that

3     she's presumed innocent.  But the second point here is

4     that the Court may in fact revisit probable cause after

5     the Grand Jury returns an Indictment.  And I do have a

6     cite back at the table I could give the Court.  It's

7     United States vs. Monsanto, Second Circuit case, I can

8     provide the specific cite.  But basically that was in

9     the context of forfeiture.  The Second Circuit held that

10    the court can revisit the issue of probable cause

11    subsequent to return of an indictment by grand jury.  So

12    we just make that point again for the record that the

13    Court --

14              THE COURT:  Is that a recent case?

15              MR. GOROKHOV:  I believe it's a 1991 case.

16    But I can check on that.

17              THE COURT:  Okay.

18              MR. GOROKHOV:  I believe, Your Honor, that

19    whether the Court is inclined to revisit probable cause

20    or not, we have an obligation to state for the record on

21    consideration of bond that the Court may revisit that

22    issue.

23              THE COURT:  Well, let's say that I agree with

24    you.  How would you suggest that I revisit probable

25    cause?

48

1          MR. GOROKHOV:  Well, I think, Your Honor, I

2    think probable cause, like the issue of jurisdiction,

3    goes back to -- these issues of constitutionality,

4    jurisdiction and probable cause are all bound up

5    together.  So I would say that if the Court were to

6    consider those other arguments about the Government's

7    jurisdiction to bring this case and the Court's

8    jurisdiction to hear it, that would implicate issues of

9    whether there's probable cause for the Indictment as

10   well.  But I understand the Court's position that it's

11   not going to revisit this issue.

12          THE COURT:  That's my point.  I'm not going to

13   go back and look at that.  I mean, I looked at that

14   pretty hard, you understand.

15          MR. GOROKHOV:  I understand, Your Honor.

16          THE COURT:  So I don't see -- is there

17   something else about the probable cause issue that I

18   could revisit other than what I've already visited, so

19   to speak?

20          MR. GOROKHOV:  I understand.  I would just say

21   that right now there's not a whole lot of actual

22   evidence before the Court.  The only evidence really

23   before the Court has to do with the bond issue.  But I

24   would say that, unfortunately, we're in a vacuum.  We're

25   in a vacuum where we don't really have any -- that many

1    facts to deal with at this point.  So I would just

2    restate my position with the probable cause being bound

3    up with jurisdiction, constitutionality and so forth.

4              THE COURT:  All right.

5              MR. GOROKHOV:  Now, I just have a few points

6    in response, a few other points in response.

7              THE COURT:  Yes, sir.

8              MR. GOROKHOV:  I would just say for the record

9    that Magistrate Judge Bostwick, his decision doesn't

10   reflect the consideration of Ms. Atterbury's ties to the

11   community.  The only consideration reflected in that is

12   the likelihood that she would flee or her connections to

13   Mexico.  There is some mention of her children and their

14   passports.  But I think that a large part of this case

15   has to do with, you know, who this person is.  You know,

16   she brought these -- and I don't believe that -- I don't

17   know if this was proffered, so I can go ahead and

18   proffer it.  She brought two girls from Romania, two

19   orphans that she adopted.

20             THE COURT:  That's in the pleadings.

21             MR. GOROKHOV:  Okay.  Your Honor, then I'll

22   just say that, you know, those are significant ties to

23   the community.  She's got a family here.  And she

24   wouldn't leave those children for anything.  Judge

25   Bostwick's decision just doesn't reflect that

1    consideration of that.  And I think the overall point is

2    it has to be considered in the context of why wouldn't

3    electronic monitoring work.  I mean, given its

4    sensitivity, how could she escape?  I mean, she would

5    be -- the Government would know about it that she's out

6    of her house within seconds.

7         With respect to danger to the community, the

8    Government says it's the potential of committing a

9    crime.  While everybody has the potential to commit a

10   crime.  I think that Ms. Atterbury's record speaks for

11   itself.  She's got the one conviction which is related

12   to this case.  We believe it was a precursor to this

13   case in many ways.  The Government anticipated this case

14   was coming.  But other than that, she doesn't have a

15   criminal record.  Certainly no record of violence.  And

16   these statements, I think, I don't want to --

17             THE COURT:  I'm not sure I understand what you

18   mean that her conviction before me was a precursor to

19   this case.  I didn't know anything about -- I don't

20   remember anything being brought to my attention in that

21   case about her involvement in matters that are the

22   subject of the Indictment.

23             MR. GOROKHOV:  Your Honor, what I mean by that

24   is I think that case came up in the context of the

25   investigation relating to this case.  That's my

1    understanding.

2              THE COURT:  Oh, well, nobody told me that.  To

3    me, that case stands on its own in terms of the little

4    that I remember about it.  But, anyway, go ahead.

5              MR. GOROKHOV:  I'm sorry, Your Honor.  If I

6    can just look at my notes briefly.

7              THE COURT:  Sure.

8              MR. GOROKHOV:  I think that the Court touched

9    on this issue briefly with Ms. Treadway.  But the fact

10   is that the Government's main argument with respect to

11   the probation violation and relating to the fact that

12   she's a danger to the community is that an Indictment

13   has been returned.  And I think that is merely a case of

14   bootstrapping.  She's presumed innocent.  We haven't had

15   a trial in this matter yet.  And I also say with respect

16   to the probation violation claims, as a procedural

17   matter, if the Court finds probable cause, which

18   effectively the Court has with respect to the return of

19   the Indictment, I think, you know, the only conviction

20   for probation violation can occur once we know whether

21   there's a conviction for the underlying offense.

22             THE COURT:  Well, I was kind of tweaking her a

23   little bit, but I'm sure you all are aware that at least

24   here in Kansas that we detain many, many, many

25   defendants on the basis in part of the charges in the

1    Indictment.  The Indictment is -- the existence of the

2    Indictment is a basis to detain someone.  That's not the

3    only basis.  I'm not sure I understand the point you're

4    making.  I know that she's presumed innocent.  I'm well

5    aware of that.  But I don't think that I'm -- that I can

6    just pretend like the Indictment doesn't -- if it hadn't

7    been for the Indictment, then we wouldn't be here, would

8    we?

9              MR. GOROKHOV:  No, I understand that, Your

10   Honor.  I just think that the point you were making

11   earlier about the fact that essentially the Indictment

12   is what the Government is now using as its basis.  I

13   mean, it does seem like bootstrapping.  And also I would

14   say that Judge Bostwick, in the very beginning, I

15   believe it was his first decision with respect to bond,

16   and he found the weight of the evidence to be neutral.

17   So I think that should be considered as well.  I think

18   the weight of the evidence, if anything, is for the

19   Defendant; but at the very least, it's neutral at this

20   point.

21             THE COURT:  It's what?  Neutral?

22             MR. GOROKHOV:  Neutral.  Yes.  That's what

23   Judge Bostwick found.

24             THE COURT:  I haven't read that.  I guess I

25   haven't read that order.

 1          MR. GOROKHOV:  It's a long way back, Your

 2    Honor, maybe late December.

 3          THE COURT:  Okay.

 4          MR. GOROKHOV:  Just a few more points.  The

 5    Government talked about threats that are on tape.  I

 6    think we'll let those speak for themselves.  I think

 7    we're confident that when the Court hears the tapes, the

 8    Court will come to the same conclusion that this was

 9    blowing off steam.  Ill-advised, but nevertheless,

10    they're not real threats against anybody.  Especially

11    considering the fact this woman never hurt anybody in

12    her life.

13          And finally, with respect to the claim of mental

14    competency.  The Government has said we've committed a

15    fraud on the court.  I think if we're going to talk

16    about fraud on the court we should talk about the fact

17    that the Government stood in front of Judge Bostwick and

18    claimed that Ms. Atterbury's claims of incompetency are

19    worthless, that they should be disbelieved and then

20    turned around and asked the court, said, we have a good

21    faith that she is not competent.  Because that's

22    standard.  They asked for a competency evaluation.

23          THE COURT:  Well, I think we're getting off

24    the point here about that.  The only reason I say that

25    is because I know about that.  Because I issued the

1    order.  When a defendant claims that she is not

2    competent, not that she's depressed and doesn't like to

3    be in jail, but that she's not competent, and she puts

4    on evidence that she's not competent, and the Government

5    has an obligation to seek its own examination.  I don't

6    think the Government did anything wrong.  I don't think

7    anybody would find the Government did anything wrong by

8    seeking its examination.  And my recollection is that

9    the Defendant didn't object to the examination at the

10   time.  Only objected to her being examined in custody.

11   So I really think that's something I'm not going to give

12   a lot of consideration to because that's what happens in

13   every case where the defendant raises a matter of

14   competency.  And the reason it came to me, the request

15   came to me as opposed to being decided by Judge

16   Bostwick, was because, obviously, if she's not

17   competent, it isn't just limited to the question of

18   whether she can be released on bond.  It goes far beyond

19   that.  It goes to whether or not the case can go forward

20   as to her.  You understand that?

21           MR. GOROKHOV:  I understand that, Your Honor.

22   I just wanted to clarify something about our evidence

23   with Dr. Shell versus a competency evaluation.  And I

24   would just say it's fully briefed where we didn't object

25   to the competency evaluation but objected to doing it in

1    confinement.  And also made the very same objection that

2    I'm making now, the Government's basis.  Our point at

3    the competency hearing -- I'm sorry -- at the bond

4    hearing, was not about competency.  It was not about the

5    standard under I believe it was United States vs. Dusky,

6    Supreme Court case, that lays out a standard for

7    competency.  Our point was that her condition and her

8    depression, she may still understand what's going on,

9    she may understand the process that she's involved in,

10   but it was severely impacting her ability to help in her

11   case.

12              THE COURT:  Well, I guess my point is simply

13   this.  I don't remember you raising that argument before

14   me.  You just said you don't object to her being

15   examined.

16              MR. GOROKHOV:  I think, Your Honor, that we

17   did raise it in our response.

18              THE COURT:  I may have missed it, but -- and I

19   don't really remember what Dr. Shell said, whether she

20   invoked competency.

21              MR. GOROKHOV:  I understand.

22              THE COURT:  You well know, you're experienced,

23   competency is a magic word, it is, and that word is

24   uttered then whether it's by the lawyers in a pleading

25   or by a witness, that moves the matter over to me to

1    make sure that the case can go forward.  You understand

2    that?

3              MR. GOROKHOV:  I understand that, Your Honor.

4              THE COURT:  Okay.

5              MR. GOROKHOV:  Your Honor, I believe that's

6    all we have so thank you very much.

7              THE COURT:  All right.  Well, I'll take this

8    under advisement.  It may take me a little while to get

9    out an order for you because you want me to review a

10   substantial amount of information.  Do you want to give

11   me that Second Circuit cite so I don't have to look

12   around for it.

13             MR. GOROKHOV:  Yes, Your Honor.  I apologize.

14   Okay.  I have it.  It's 924 F 2nd, 1186, Second Circuit,

15   1991.  Thank you Your Honor.

16             THE COURT:  Thank you.  Now, I'm aware that

17   there's been some filings relating to the expert

18   witnesses and I don't think those are all ripe yet, but

19   I'll take a look at those.  And if we have to have a

20   hearing with respect to those, I'll set one down on that

21   issue.  Since I don't think they're ready yet, I don't

22   see any point in discussing them today.

23             MR. GOROKHOV:  Your Honor, we had one question

24   on a scheduling matter.

25             THE COURT:  Yes, sir.

1          MR. GOROKHOV:  Does the Court still anticipate

2     holding the Daubert hearings on the 18th -- I'm sorry --

3     I believe it was the 16th of October?

4          THE COURT:  I didn't know we had any yet.

5          MR. GOROKHOV:  I thought there was a tentative

6     hearing date set down.

7          THE COURT:  There might be a tentative date

8     but I don't see any motions filed.

9          MS. TREADWAY:  I think what he's confusing is

10    the motions deadline, Judge, as opposed to a hearing.

11    Because you said in a recent order that you would

12    determine whether hearings are needed at that point.

13         THE COURT:  Right.

14         MR. GOROKHOV:  That's all, Your Honor.

15         THE COURT:  I don't know.  I think that I'm

16    trying to take this case one step at a time.  There have

17    been a lot of steps made upstairs by Judge Bostwick and

18    now it's down here to me.  I think the next step is this

19    issue about the expert witness disclosures, but I

20    haven't really looked at that yet.  I just know it's

21    there.  The next step after that would probably be

22    Daubert motions if there are any; but I haven't seen

23    those yet.  But there are deadlines so that we can get

24    this -- keep this case on track towards some sort of

25    resolution.  So I can't answer your question,

1   Mr. Gorokhov, but if it's in the schedule, it's in the

2   schedule I'm trying to follow.

3               MR. GOROKHOV:  I understand.  Thank you, Your

4   Honor.

5               THE COURT:  Yes.  Anything further?

6               MR. GOROKHOV:  Not from the defense, Your

7   Honor.

8               THE COURT:  All right.  Anything further from

9   the Government?

10              MS. TREADWAY:  No, Judge.  Thank you.

11              THE COURT:  All right.  We're in recess.

12                    (Adjourned at 10:50 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4          I, Cindy L. Schwemmer, United States Court

5   Reporter in and for the District of Kansas, do hereby

6   certify:

7               That the above and foregoing proceedings were

8   taken by me at said time and place in stenotype;

9               That thereafter said proceedings were

10  transcribed under my direction and supervision by means

11  of computer-aided transcription, and that the above

12  and foregoing constitutes a full, true and correct

13  transcript of said proceedings;

14              That I am a disinterested person to the said

15  action.

16              IN WITNESS WHEREOF, I hereto set my hand on

17  this the 8th day of May, 2011.

18

19

20

21                    s/ Cindy L. Schwemmer

22                    Cindy L. Schwemmer

23                    United States Court Reporter

24

25