1                IN THE UNITED STATES DISTRICT COURT

2

3                         DISTRICT OF KANSAS

4

   UNITED STATES OF AMERICA,            )
5                                       )
                            Plaintiff,) District Court
6                                       ) Case No. 07-10234
   vs.                                  ) Circuit Court
7                                       ) Case No. 10-3281
   STEPHEN J. SCHNEIDER &               )
8  LINDA K. SCHNEIDER, a/k/a            )
   LINDA ATTERBURY,                     )
9  d/b/a SCHNEIDER MEDICAL CLINIC,      )
                                        )
10                          Defendants,)
                                        )
11 _____

12

13

14                  **TRANSCRIPT OF MOTION**

15

         On the **19th day of September, 2008**, came on to be
16 heard Motion in the above-entitled and numbered cause
   before the HONORABLE MONTI L. BELOT, Judge of the United
17 States District Court for the District of Kansas,
   Sitting in Wichita.

18

19

20 APPEARANCES

21      The Plaintiff appeared by and through Ms. Tanya
   Treadway and Mr. Alan Metzger;

22
        The Defendant Stephen Schneider appeared by and
23 through Mr. Lawrence Williamson;
        The Defendant Linda Schneider appeared by and
24 through Mr. Uzo Ohaebosim, Mr. Kevin Byers and Mr.
   Eugene Gorokhov.

25

```
 1
 2                    (Beginning at 9:30 a.m.
 3                    September 19, 2008, the
 4                    following proceedings were
 5                    held.)
 6          THE COURT:  This is United States against
 7  Stephen and Linda Schneider.  Case number 07-10234.  Let
 8  me have the appearances please.
 9          MS. TREADWAY:  May it please the Court.  On
10  behalf of the Government, Assistant U.S. Attorney Tanya
11  J Treadway.  Mr. Metzger is also here but he has to
12  leave for a plea.  Seated with me at counsel table,
13  Judge, I'd like to introduce Mr. James Greer, who is
14  with the HHS AIG and he is one of the agents in the
15  case.
16          MR. WILLIAMSON:  Dr. Schneider appears in
17  person by and through counsel Lawrence Williamson.
18          THE COURT:  He may come up and sit at counsel
19  table.
20          MR. WILLIAMSON:  Can we just grab another
21  chair?
22          THE COURT:  Yes.
23          MR. OHAEBOSIM:  Linda Schneider appears in
24  person and through private counsel, Uzo Ohaebosim,
25  Eugene Gorokhov and Kevin Byers, Your Honor.
```

1          THE COURT:  Now, with the exception of my

2    other law clerk and the U.S. Attorney, everyone is to

3    leave the courtroom.  All the spectators.

4                    (Courtroom cleared.)

5          THE COURT:  Now, the reason I excused the

6    spectators is because the first thing that we're going

7    to take up this morning is the summary by counsel of the

8    weight of the evidence so that I can conclude my order

9    with respect to Mrs. Schneider's release.  And I don't

10   know what all is going to be said, but I didn't want

11   counsel to feel that there was something that they

12   couldn't say with spectators here; and, in addition, I

13   don't want to see anything about this in the newspaper.

14   And if I do see something about it in the newspaper,

15   it's going to be because somebody in here told the

16   newspaper.  I'm not telling you you can't, but I'm

17   telling you that it's not in the interest of this case.

18   And so if you do it, it will be the responsibility of

19   the lawyers to decide whether that's the proper thing to

20   do, not spectators who will, or I don't even know if

21   there was a news media person here, but once we're

22   through with that, we'll let everybody back in because

23   the rest of this is, as far as I'm concerned, is part of

24   the public record.  Is there any objection to that?

25         MR. OHAEBOSIM:  No objection.

1          MR. WILLIAMSON:  Not from the defense.

2          THE COURT:  All right.  Now, I do think that

3   just for the record, I don't see any problem here, but I

4   do want to make sure that we understand that I was ready

5   to take up the motion with respect to -- or this

6   additional presentation with respect to the weight of

7   the evidence last Monday, and I believe it was Mr. Byers

8   that called and said that you were not -- or that the

9   lawyers agreed to today.  Is that correct, Mr. Byers?

10         MR. BYERS:  That is, Your Honor.

11         THE COURT:  All right.  Well, is there any

12  problem -- I want to make this decision promptly but I

13  deferred to Mr. Byers.  Is there any problem with the

14  fact that we've had a little delay here?  I don't see

15  any --

16         MR. WILLIAMSON:  No, Your Honor.

17         THE COURT:  All right.  By the way, it's good

18  to see you Mr. Williamson.  I haven't seen you for a

19  long time.

20         MR. WILLIAMSON:  Thank you, Judge.  It's been

21  a while.

22         THE COURT:  All right.  Now, I'll hear -- what

23  I'd like to do so that we have some ground rules here,

24  I'd like to hear from the Government, obviously, and I

25  want to hear from Mr. Williamson on this weight of the

1    evidence and from one of Mrs. Schneider's lawyers.  And

2    you all can decide who you want to be the spokesperson.

3    All right.  So go ahead, Ms. Treadway.

4            MS. TREADWAY:  Thank you, Judge.  I have

5    captured this with regards to Linda Schneider more

6    specifically than the Defendant Stephen Schneider

7    because it's she that is detained, however --

8            THE COURT:  Well, it is true that it really

9    only applies to her but I wanted to give Mr. Williamson

10   a chance on this if he felt there was anything that was

11   appropriate to add.

12           MS. TREADWAY:  I will say that this is a

13   conspiracy case and an aiding and abetting case, so to

14   the extent that the evidence is with regards to her, it

15   is also with regards to Mr. Schneider as well.

16           THE COURT:  Right.

17           MS. TREADWAY:  I'd first like to inform the

18   Court Linda Schneider has education and training in the

19   medical field.  She is both a licensed practical nurse

20   and an emergency medical technician.  The Defendants

21   owned and operated Schneider Medical Clinic as a team.

22   In the fall of 2002 she and her husband opened the newly

23   built medical clinic at 7030 South Broadway Street in

24   Haysville, Kansas.  And since its inception, the

25   Defendant Linda Schneider and her husband have owned and

operated the clinic and she served as the general

manager of the clinic.  Additionally, she was the sole

organizer of Schneider Medical Properties, LLC, the

entity that actually owns the clinic building.

As the clinic's general manager, the Defendant

Linda Schneider was in charge of and directed the

clinic's medical and financial operations.  Virtually

every former employee interviewed has identified the

Defendant Linda Schneider as the person who ran every

aspect of the clinic.  She set all policies.  She made

decisions about who to hire and fire.  She made

decisions about patient care.  She even made decisions

about which patients would be kept as pain management

patients and who would be terminated.  And even who

would be reinstated as a pain management patient

following termination for a period of time.

First of all, let's talk about her hiring and

firing of staff.  She was well aware that the clinic had

a high concentration of patients being prescribed a

large quantity of controlled drugs.  When she

interviewed prospective employees, she bragged that the

clinic wrote more narcotics prescriptions than any other

medical clinic in the State of Kansas.  Nevertheless,

she hired many physician's assistants right out of

school knowing that they had no specialized training or

1    experience in pain management.  And the Defendants

2    provided no training.  Prior to the physician's

3    assistants receiving their DEA numbers allowing them to

4    prescribe controlled drugs, the Defendants allowed the

5    prescriptions to be issued over blank signed

6    prescription pads.  They would give these signed and

7    blank prescription pads to the physician's assistants so

8    they could issue prescriptions for controlled substances

9    without a DEA number and without a physician present at

10   the Clinic.  The Defendants also chose not to employ

11   registered nurses or licensed practical nurses, instead

12   employing individuals at the Clinic they called medical

13   assistants, most of whom had no prior or formal medical

14   training.  She preferred hiring people with little or no

15   experience because she could pay them less.  And as she

16   herself has described her employees, they were misfits

17   that would not be able to get a job anywhere else.

18            THE COURT:  She described them -- I'm sorry.

19   Did you say that Linda Schneider described them as

20   misfits?

21            MS. TREADWAY:  Yes, sir.  That's in a recorded

22   conversation from October 17th, 2007.

23       Defendant Linda Schneider would fire employees who

24   questioned her practices and policies and the

25   consequences that were very prominent at the clinic,

namely deaths and overdoses.  Defendant Linda Schneider
also hired a number of family members and family friends
at the clinic, including her brother, Curtis Atterbury,
who served as a physician's assistant; and a long term
family friend, Timothy McDonald, who was the clinic's
administrator.  She also hired Ulysses Eric Taylor as
her second in command at the clinic after helping him
fraudulently apply for a social security number.
Mr. Taylor had no medical training, but nonetheless was
involved in all aspects of the clinic, both medical and
operational, as was the Defendant Linda Schneider.

     After the first search warrant was served in
September of '05, the Defendant hired another physician,
a man by the name of Dr. Lawrence Simons, without even
checking his references or his qualifications.  As she
told the agents on October 17th, 2007, she would have
hired anybody that was a warm body and had a license.

     The Defendant Linda Schneider was the one who
determined how the clinic scheduled patients and how the
patients were treated.  She determined what patients
would be seen in what order, prioritizing them by the
type of insurance they had behind higher paying
insurance and the cash patient being prioritized above
patients that had Medicaid.  As a result of this
prioritization practice and the practice of seeing walk

1    in's, some patients waited as many as three to four

2    hours for rush visits lasting only long enough for a

3    provider to ask what you need and write a prescription

4    for it.  She even determined what injectable drugs would

5    be used based on cost.  The Defendants operated this

6    clinic in a manner that emphasized quantity over quality

7    and volume over quality of care.  In operating the

8    clinic in this manner, the Defendants placed economic

9    incentives above good medical practices and appropriate

10   medical judgment.  For example, the following occurred

11   and were largely the result of the policies developed

12   and implemented by the Defendant Linda Schneider.

13   Nonemergency walk-in patients were worked in to the

14   schedule in addition to scheduled patients.  She

15   determined how long a provider could spend with a

16   patient.  She wanted patients scheduled every ten

17   minutes.  She would instruct physician's assistants to

18   speed up, don't spend too much time with the patients.

19   Providers who did spend too much time with the patients

20   were encouraged to speed up the visits with knocks on

21   the examination door or she would pace outside the exam

22   room and admonish the slow providers to pick up the

23   pace.  The Defendant Linda Schneider kept track of how

24   many patients a given provider saw each day and would

25   praise those providers who saw large numbers of patients

1    and encouraged others to follow their example.  Clinic

2    providers were often required to see more than one

3    patient at a time and sometimes saw a whole family of

4    patients simultaneously in a single examination room.

5        The Defendants required patients to return for

6    monthly office visits to obtain prescriptions.  As the

7    Defendant stated during her October 17th, 2007,

8    discussion with the agents, she was upset with her new

9    hire Dr. Simons because he would write scripts for

10    patients who did not come into the clinic which meant

11    she lost every month office visits.  The Defendants

12    required patients to schedule office visits to even

13    obtain lab results.

14        The claims the clinic submitted to the health care

15    benefit programs indicate that individual providers

16    billed for ostensibly providing services to 50 or more

17    patients per day on a regular basis.  As a result,

18    health care providers who worked at the clinic described

19    the environment as overwhelming and chaotic.  There was

20    an overwhelming number of patients to be seen, resulting

21    in rushed and insufficient examinations.

22        It was also the Defendant Linda Schneider's job to

23    keep the medical charts in order.  She reviewed every

24    medical chart prior to it being sent to the billing

25    department and she was well aware of the many many

1    problems with the documentation.  Former employees will

2    testify that they witnessed her filling in missing

3    information on the charts.  Patients' medical charts

4    were often missing or they were missing key

5    documentation.  The medical records were scant and often

6    illegible.  The clinic fragmented patient care among the

7    various providers, with patients seeing multiple

8    providers.  Consequently, the chaotic environment,

9    including the poor documentation, resulted in poor

10   quality of care and opportunities for a patient to

11   obtain inappropriate early refills of controlled

12   substances.  Although the health care providers

13   complained to both Defendants about this situation, and

14   especially complained to the manager Defendant Linda

15   Schneider about the overwhelming work load, the chaotic

16   working conditions, the fragmented care, the poor

17   documentation, the clinic nevertheless continued to

18   operate in the manner I've described.

19        Defendant Linda Schneider handled incoming calls

20   and therefore knew about the clinic patients drug

21   seeking behaviors.  She verified prescriptions for

22   controlled substances when pharmacies called to question

23   the prescriptions or voice concern about the clinic's

24   practices.  She handled the incoming calls from

25   patients' friends and families who called to complain

1   about the patient's addiction to the drugs being

2   prescribed at the clinic.  She handled incoming calls

3   from the hospital providers concerned about the clinic's

4   practices.  And she responded to the Coroner's office

5   when they requested records of deceased individuals who

6   had been receiving prescriptions from the clinic.  Given

7   her daily and intrinsic involvement in every aspect of

8   the clinic, Defendant Linda Schneider was responsible

9   for the manner in which the clinic operated and she knew

10  that the consequences were death and overdoses.  And she

11  knew that Schneider Medical Clinic was a pill mill and a

12  narcotics delivery system, not a legitimate medical

13  practice.

14      After establishing Schneider Medical Clinic, the

15  Defendants chose to focus the clinic's practice on pain

16  management, even though Stephen Schneider was not a pain

17  management specialist.  The Government's hired experts,

18  the experts in the civil lawsuits, the Sedgwick County

19  Regional Forensic Science Center's employees, local ER

20  and other physicians have all indicated and will testify

21  that in their opinion the Schneider Medical Clinic was

22  nothing more than what amounted to a drug dealing

23  operation.

24      The evidence will be that many clinic patients were

25  on excessive dosages of narcotics -- more than what a

 1   severe burn patient would need for what one doctor

 2   called garbage can ailments.  Defendants and their

 3   employees ostensibly offered patients pain management by

 4   doing little more than writing prescriptions for

 5   narcotics and other controlled drugs that the patients

 6   simply requested.  Virtually every former employee and

 7   patient that has been interviewed described the clinic

 8   as a place where narcotics could be obtained without

 9   question.  Virtually every former employee and patient

10   that has been interviewed also described the clinic's

11   waiting room as one that was obviously full of drug

12   seekers.  They've described conversations occurring in

13   the waiting room that involved trading drugs, and those

14   conversations were reported to both Defendants.

15   Employees and patients described waiting patients as

16   tweaked, going through withdrawal, obviously

17   overmedicated, slurring words and stumbling.  Therefore,

18   it was apparent to anyone at the clinic that the primary

19   service they were providing was giving out prescriptions

20   for narcotics to individuals who were misusing and

21   abusing those medications.

22        During her discussion with law enforcement agents

23   on October 17th, 2007, the Defendant Linda Schneider

24   related the following anecdote about the clinic.

25   Following the first search warrant in September, 2005,

1    which tells a lot about her knowledge of what the clinic

2    was doing.  She told the agents that people started

3    showing up at 5:00 in the morning, standing in line

4    waiting for the clinic doors to open because word got

5    out that all the providers had left and that Dr.

6    Schneider would only be seeing 30 patients per day.

7    Linda Schneider described it as, quote, "I felt like we

8    were selling concert tickets, " end quote.  Therefore,

9    she was well aware that people were coming to the clinic

10   to get their fix of prescribed narcotics.  Both of the

11   Defendants received repeated notices from numerous

12   patients that the patients were abusing and diverting

13   the prescriptions issued by the clinic providers.  The

14   clinic didn't follow their own policies with regards to

15   their pain management agreement which was simply used to

16   paper the file.  Those pain management agreements

17   provided that a patient who didn't follow the terms of

18   the agreement would be terminated from pain management.

19   That would include getting narcotics from more than one

20   doctor, getting narcotics from more than one pharmacy,

21   failing a drug screen.  And the pain management

22   agreement said in absolute terms:  We will not give you

23   early refills.  The clinic providers routinely broke all

24   those rules, routinely giving patients early refills,

25   routinely continuing to issue prescriptions for

1    controlled drugs to people who had failed drug screens,

2    who had doctor-shopped and who had pharmacy-shopped.

3    Both Defendants would reverse other clinic providers'

4    decisions to terminate a patient from pain management

5    treatment.  Thereafter, those patients were known as

6    Schneider only or VIP patients.  And only Stephen

7    Schneider would see them.  And he would continue to

8    prescribe controlled drugs.  It was Defendant Linda

9    Schneider who kept the VIP list.  Defendants were well

10   aware of the clinic's practices and the clinic's patient

11   population.  Defendant Linda Schneider commented during

12   the October 17th, 2007, discussion that she had with the

13   agents that she knew that patients causing commotion at

14   the clinic were of two sorts:  Either ones that were

15   selling their prescriptions or ones that were really in

16   pain.  But it was her policy not to believe any patient

17   and to suspect all patients lied; but it was also her

18   policy to keep patients, even known drug seeking

19   patients, coming back for more until their bills were

20   paid in full.

21       Beginning at least in February of 2002 both

22   Defendants were on repeated notice that their purported

23   pain management practice treatment was resulting in

24   patient deaths and overdoses, yet they did nothing to

25   alter the clinic's practices and deaths and overdoses

1    continued.  From 2002 through 2007, at least 58 patients

2    died of accidental drug overdoses of prescription

3    narcotics issued by the clinic.  Judge, these were not

4    patients suffering from old age, and cancer.  The

5    average age of these patients was 42.  And their

6    conditions were typically back pain and knee pain.  The

7    youngest person was 18 years old.  The oldest person was

8    59.

9         The Government's expert testimony at trial will be

10   that the Defendants' practices at the clinic and their

11   choice to distribute narcotics in the manner in which

12   they did, directly caused four deaths and contributed to

13   18 additional deaths; and that the issuance of the

14   prescribed narcotics was outside the normal course of

15   business of a medical practitioner; and that

16   prescriptions were not issued for legitimate purpose.

17        Both Defendants were responsible for submitting

18   claims and receiving payment for medical services not

19   provided.  The Defendants received a substantial income,

20   over $4.24 million in a four year period, from the

21   health care benefit programs.  Both Defendants

22   instructed providers to indicate that they had given a

23   higher pain office visit service known as a 99213 office

24   visit even though they had not provided such a service.

25   Both Defendants changed fee tickets.  That's the

1    document the clinic used to determine what should be

2    billed.  They would indicate that the higher pain, 99213

3    service had been provided when it had not been provided

4    which resulted in the clinic receiving monies to which

5    it was not entitled.

6        The testimony will be that Defendant Linda

7    Schneider falsified documents and directed employees to

8    falsify documents in support of claims submitted to

9    health care benefit programs.  Including, filling in

10   missing information for audits, forging referral forms,

11   creating false referrals to specialists and forging

12   patients' signatures on pain management agreements.

13       Under the Defendants' management, the clinic was

14   permeated by fraud and the claims the Defendant

15   submitted and received payment for were materially false

16   and fraudulent in one or more of the following respects.

17   They made claims for services not rendered, including

18   office visits billed by providers who were out of town,

19   office visits billed by providers who were not present

20   at the clinic, especially weekends, office visits that

21   were not for a legitimate medical purpose or within the

22   course of usual medical practice.  The Defendants also

23   upcoded office visits, that is, they made claims for an

24   office visit at a higher code than the service actually

25   provided.  They also upcoded the providers.  They made

1    claims for office visits as though a physician saw the

2    patient when in fact a physician's assistant saw the

3    patient.   And the Defendants made claims for services

4    that were not sufficiently documented in the patient's

5    medical record.   One Government expert will testify that

6    the Defendants' manner of operating the clinic and their

7    health care fraud resulted in the deaths of Patricia,

8    Eric and Robin.

9         As to Patricia, of the 37 office visits for which

10   the Defendant submitted claims, eight claims were

11   upcoded on the provider, between 27 and 36 claims were

12   upcoded on the service side, and on 30% of her visits

13   she was allegedly one of 50 or more patients that the

14   Defendant Stephen Schneider ostensibly provided services

15   to on one day.   One notable day for Patricia was Monday

16   November 29, 2004.   She was one of 108 patients that the

17   Defendant ostensibly saw, in addition to nine nursing

18   home patients he saw at a different location.

19   Similarly, as to Eric, he had 46 office visits.   The

20   provider was upcoded on at least 18 claims.   The service

21   was upcoded on between 30 and 44 claims, and on 25% of

22   his visits, he was one of 50 or more patients.   On

23   Thursday March 31st, 2005, Eric was one of 58 patients

24   at the clinic, in addition to eight nursing home

25   patients.   And in a similar situation is set forth in

1   the Indictment with regards to Robin.

2       The five top paying providers Medicare, Medicaid,

3   Blue Cross/Blue Shield of Kansas and Preferred Health

4   Systems reviewed statistically valid random samples of

5   clinic patient files to determine if the office visits

6   had been correctly billed.  Based on those reviews,

7   which were a claim by claim review as against the

8   documents in the patients' files, as many as 53% of the

9   claims submitted were materially false and fraudulent

10  because the provider had been upcoded, and as many as

11  72% had been upcoded on the service side.

12      The money laundering transactions evidence that the

13  Defendants profited from the manner in which they

14  operated the clinic and attempted to hide those profits

15  from law enforcement.  Both Defendants, but especially

16  Defendant Linda Schneider, engaged in convoluted

17  financial transactions in an attempt to conceal the

18  source of the assets and to place the assets outside the

19  Government's reach.  She moved money from the clinic

20  account in multiple accounts which had no legitimate

21  purpose other than to make the source of the money

22  harder to detect.  She moved money through accounts she

23  created in her parents' names and even through her

24  daughter's savings account.  She also involved her own

25  father in her money laundering to the extent that he may

1   have lied to federal agents and perjured himself before

2   the Grand Jury to legitimize those convoluted financial

3   transactions.  Far beyond the salaries that the

4   Defendants received from the clinic, the Defendants took

5   hundreds of thousands of dollars from the clinic's

6   account for personal benefit, including sending money to

7   Mexico and sending money to California for investments.

8        In sum, Your Honor, the evidence will be that the

9   Defendants were full partners in the conspiracy charge

10  and in each and every substancetive count of the

11  Indictment.  As defense counsel admitted to former

12  expert Patrick Marian, even they believed the

13  Government's drug distribution case against these

14  Defendants to be a pretty good one.  Therefore, the

15  weight of the evidence favors the continued detention of

16  Linda Schneider.

17       THE COURT:  Thank you, Ms. Treadway.  Did you

18  want to go first, Mr. Williamson, or who would like to

19  speak for Linda Schneider?

20       MR. WILLIAMSON:  I'll speak first and briefly,

21  Your Honor.

22       THE COURT:  Yes, sir.

23       MR. WILLIAMSON:  At this stage, Judge, you're

24  called to look at the weight of the evidence, not a mere

25  resuscitation of the facts or the allegations set forth

 1    in the Indictment.  And I think that what's telling from

 2    the Government's presentation is the lack of weight of

 3    evidence to support the allegations in the Indictment.

 4    And I believe what this case comes down to and what we

 5    have repeatedly stated in briefs is summed up by the

 6    statement that the Government made that this case is

 7    about quantity versus quality.  This is not a medical

 8    malpractice case.  This case is about whether or not the

 9    Defendants committed fraud and whether or not they acted

10    as conventional drug dealers.  And I would submit that

11    this Court heard multiple allegations of issues

12    regarding the quality of care which is subject to

13    malpractice laws in the state.

14        Another issue that the Court heard is that the

15    Defendant should have known.  The statute that we're

16    dealing with in this case is an intentional statute

17    where they knowingly acted in a certain way.  And,

18    again, I would just stress that in light of what we're

19    looking at, the lack of any weight regarding the intent

20    of the Defendants is striking.  And I would also note

21    that there were certain statements regarding the weight,

22    i.e., virtually every employee.  We have not been

23    provided with certain statements according to the Jencks

24    Act and so we're not necessarily prepared to mention

25    that.  But I would state before I sit down, Judge, is

 1      that this clinic saw legitimate patients with legitimate

 2      medical issues and one thing the Government did not tell

 3      you is that everybody that -- these patients that were

 4      listed in the Indictment actually suffered from

 5      legitimate medical issues.  The Government has issues as

 6      to the type of care that was given.  That's not

 7      appropriate for this case.  Thus, the average age of the

 8      patients aren't relevant.  I would also point out that

 9      some of the Government's own allegations trip over each

10      other.  For instance, they say that the Defendants were

11      money hungry but in the next breath they say, well,

12      Linda Schneider did not bill people who still owed

13      money, refused to see people if they were just trying to

14      deliver narcotics, then they would get whatever money

15      they can.  And, Judge, this is a medical practice that

16      billed through insurance companies that billed through

17      DEA numbers that tracked every transaction that

18      occurred.

19          And lastly, one issue was raised that the

20      Defendants did nothing when issues of their care was

21      brought to their attention; however, Judge, the evidence

22      in this case will definitely show that the Schneider

23      Medical Clinic underwent audits from First Guard and

24      other insurance providers; and based on the results of

25      those audits, and if they were deficient in certain

23

1    areas they made adjustments, made changes over time.

2    And you will learn that they actually received letters

3    commending them for the turn-around in the clinic.  And

4    I think just for the weight of holding Ms. Schneider

5    here pretrial, the Court really needs to try to ferret

6    out what is the allegation and what is any weight that

7    the Government provided to support those allegations.

8    And on behalf of Dr. Schneider I would say that the

9    Government did not provide the Court with any new weight

10   to support the allegations in the Indictment.

11              THE COURT:  Thank you, Mr. Williamson.  Who's

12   going to speak on behalf of -- Mr. Byers.

13              MR. BYERS:  I will, Your Honor.  Thank you.

14   Initially, I'd like to express my appreciation to the

15   court And government counsel for moving this at my

16   request.  It really helped my schedule out.

17       I'm going to try to not reiterate points that

18   Mr. Williamson made as Dr. Schneider's counsel, but I

19   think I'm compelled to try to narrow the Court's view

20   down on this because as I understand this, the reason

21   we're having this today, this portion of today's hearing

22   is to review continued detention of my client under the

23   Bail Reform Act.

24              THE COURT:  Correct.

25              MR. BYERS:  Which means there's a rebuttable

1  presumption we all know about under the Bail Reform Act

2  because of the potential sentence and narcotics charges.

3  So looking at the Indictment, I can only find six counts

4  that relate to that.  Everything else related to health

5  care fraud, money laundering.  I don't think those

6  issues are even before the Court in this proceeding.

7      The Court needs to look at the weight of the

8  evidence relative to the rebuttable presumption so

9  looking at the Indictment and going past the conspiracy

10 count, which is number one, because it's a derivative of

11 the following counts, we have Counts 2 through 6 which

12 allege that my client was involved in the unlawful

13 distribution of dispensing of controlled substances that

14 resulted in serious injury or death.  Now, at this

15 point, there's been nothing offered by the Government,

16 even in the proffer, which was essentially an opening

17 statement, that is evidence.  The Court I think is in a

18 conundrum actually at this point in the procedural

19 process because there is no evidence before this Court.

20 There may be an extensive proffer or opening by the

21 Government which was very comprehensive, but I don't

22 believe the Court has evidence to weigh.  And just

23 taking that sort of simplistic facial view of it I think

24 that has to mitigate in favor or against the presumption

25 of continued detention.  The Court simply has no

1    evidence.

2              THE COURT:  Well, I don't know how else to do

3    it.

4              MR. BYERS:  And I understand that, Your Honor,

5    do.

6              THE COURT:  I'm just trying to follow the

7    statute --

8              MR. BYERS:  And I don't know how you can weigh

9    evidence that doesn't exist so, you know, the Indictment

10   is not evidence.  So to counter that and focusing on

11   these six points, I have to go through and essentially

12   make a proffer as well I think.

13             THE COURT:  Well, I want you to.

14             MR. BYERS:  And the Court will hear at trial

15   that Linda Schneider never issued a prescription.  She

16   never changed a prescription.  She's not authorized to

17   issue prescriptions.  She cannot prescribe, thus

18   resulting in unlawful distribution or dispensing of

19   controlled substances.  I don't think the Court will

20   hear at trial that Linda was stealing drugs and dealing

21   them out of the trunk of her car.  Then maybe there

22   would be, you know, an unlawful dispensing or

23   distribution.  But she is not a licensed practitioner or

24   registrant of the DEA.  That was her husband, the

25   codefendant.  Any prescriptions that came out of the

1    clinic that are in this Indictment I believe were issued

2    by him or perhaps some other doctors under the clinic's

3    employ such as Dr. Simons.  I think it's that simple,

4    Your Honor, and that takes care of Counts 2, 3, 4, 5 and

5    6.  There's simply no evidence that Linda Schneider

6    falls within the rebuttable presumption for continued

7    detention.

8       And then the number one count, the conspiracy to

9    dispense or distribute controlled substances, falls by

10   the wayside as well.  All this other discussion about

11   health care fraud, billing control, talking to

12   government agents, illegal aliens, that has nothing to

13   do with this Court's very focussed review at this point

14   in time.  And it's like unringing a bell with a jury.

15   But I know the Court has vast experience in these

16   matters and I trust it can just stay narrowed down and

17   stay focussed on the aspects of the presumption under

18   the Bail Reform Act.

19          THE COURT:  Well, I'm not sure I really follow

20   you on that argument.  I understand that -- are you

21   saying that I cannot consider any of the other counts of

22   the Indictment in determining whether -- in determining

23   the weight of the evidence as to my decision whether or

24   not to release her on bond or detain her?

25          MR. BYERS:  I believe the way the statute

 1     reads is that because of the drug offenses and the

 2     potential sentence over ten years, I believe that that

 3     creates a rebuttal presumption.  So I think the Court

 4     needs to stay narrowed down to the six counts that

 5     allege that Linda Schneider did this unlawful

 6     distribution of controlled substances, bearing in mind

 7     the proffer that there's not going to be a single

 8     prescription with her signature on it.  She wasn't a

 9     physician.  She couldn't issue prescriptions.

10          THE COURT:  Well, go ahead.  Thank you, Mr.

11     Byers.  Go ahead.

12          MR. BYERS:  And really that's essentially it,

13     Your Honor.  I think what the Government made was a very

14     comprehensive -- what was essentially an opening; but I

15     think it rings its hollowest as the knocking on the

16     podium, you know.  There will be testimony that Linda

17     Schneider knocked on doors.  If she was in some kind of

18     managerial role at the clinic, I can certainly -- there

19     will be testimony that it's not unusual to have managers

20     in health care businesses rushing people along, keeping

21     the flow going.  It's, you know, it's not a favorable

22     analogy; but sometimes it's an assembly line to get

23     people in in a reasonable working day when you have lots

24     and lots of patients, particularly in a specialized

25     practice where people need to come from great distances

1    to receive appropriate care.  So, again, I just -- I

2    think the matter really is the six counts that allege

3    the controlled substance issues and at this point in the

4    hearing the Court's looking at rebuttable presumption

5    and, frankly, what I've said is not evidence, what the

6    Government said is not evidence.  So I think the Court's

7    in a tough spot, really, weighing evidence; but I assume

8    the proffers will be considered.

9              THE COURT:  Well, I'm not going to ask either

10   side to brief this but I was unable to find any case law

11   that said that I was required to make -- or to make the

12   judgment as to weight of the evidence that I had to hear

13   testimony.  This is a preliminary -- isn't this a

14   preliminary matter under Rule, what, 104?

15             MR. BYERS:  I believe it is, Your Honor.

16             THE COURT:  That can be handled by proffer.

17   We would be here -- ostensibly we could be here for

18   days.  Are you aware of any case law that says that it's

19   inappropriate for me to judge weight of the evidence by

20   virtue of just proffers?

21             MR. BYERS:  No, sir.

22             THE COURT:  All right.  Well, thank you very

23   much.

24             MR. BYERS:  Thank you.

25             THE COURT:  Now, before we bring in the

1    spectators, whoever they were, here's how I would like

2    to handle the remainder of the proceeding this morning.

3    I'm going to go by the order, the docket order here, so

4    that we can keep things straight for purposes of the

5    record.  The first thing I'm going to consider is the

6    motion to substitute the expert.  And I can tell you,

7    although I'll hear the arguments, that I'm favorably

8    inclined to allow that but I'm going to put some

9    conditions on it.  Then we'll turn to the motion for a

10   more definite expert notice and the response to the

11   joint motion.  If Ms. Treadway can talk me out of the

12   substitute expert, I'll listen to whatever she has to

13   say, but I think that I've already decided that.

14   Subject to certain conditions.  Then we will turn to the

15   joint cross motion for discovery and corrective action

16   and the joint reply to the opposition to substitute the

17   expert.  And that has been extensively briefed.  And

18   then Ms. Treadway has responded to that.  I think that

19   takes care of the motions.  But I do have the motion for

20   clarification and I think we'll take that up last.

21   That's the last one that's been filed.  I did have Cindy

22   do me a very small snippet of the transcript where that

23   came up and by that time we'll have taken a recess and I

24   will give a copy of this little snippet to counsel so

25   that they can refresh their recollection as to what

1    actually occurred.  And then we'll probably discuss some

2    other matters.  I'll let the lawyers express any

3    concerns to me about how the case is going and then

4    hopefully we'll conclude matters that way.  Any problem

5    with that order of business?

6              MR. WILLIAMSON:  Not from me.

7              THE COURT:  All right.  Please bring the --

8    one other thing.  I want to give counsel the opportunity

9    to speak here and we have one counsel here for the

10   Government so I know who's going to speak on her behalf.

11   We have Mr. Williamson who's going to speak on

12   Mr. Schneider's behalf.  I would -- I was tempted to

13   tell Mrs. Schneider's lawyers that only one could speak

14   and I really wish that that would be the case.  I think

15   it would be much more helpful if the person who drafted

16   the joint cross motion would speak.  And I see the first

17   person on the line is Mr. Byers but I don't know if he's

18   the one who actually did it.  So that we don't have too

19   much confusion.  Because I'm going to have some

20   questions about some of these things and it probably

21   makes sense for the person who actually wrote the

22   document to speak to it.  All right.  Everybody okay or

23   do we need a recess?

24             MR. WILLIAMSON:  We're okay, Judge.

25             THE COURT:  Okay.

 1                    (spectators return to the

 2                    courtroom.)

 3          THE COURT:  We will now take up Docket 170,

 4   which is the motion to substitute the expert.  Who would

 5   like to make that presentation?

 6          MR. GOROKHOV:  Yes, Your Honor.

 7          THE COURT:  Mr. Gorokhov.

 8          MR. GOROKHOV:  Yes.  It's very brief.  Your

 9   Honor, I think it's fairly well laid out in the brief,

10   in our brief.  And I can reserve my comments after

11   Ms. Treadway responds or I could just address the new

12   issues now, however the Court would prefer for me to

13   handle it.

14          THE COURT:  I think there's no point in

15   having -- if you already have your argument made with

16   respect to what you think she's going to say, go ahead

17   and say it.

18          MR. GOROKHOV:  The only points I would add,

19   Your Honor, and this pertains both to the substitution

20   and to the cross motion, is that with respect to

21   Mr. McClave -- I'm sorry -- with respect to Mr. Marian's

22   withdrawal, just for the record, I'd like to make clear

23   that the Government's statement that, you know, we told

24   Mr. Marian that, you know, we thought this was a pretty

25   good case, just for the record, I'd like to lay out

1    that, you know, if I said those words, it was in favor

2    of my clients.  I obviously represent the client.  There

3    wouldn't be a pretty good case for me or for my client

4    if it was a strong case for the Government.  So just for

5    the record, I'd like to say that.

6              THE COURT:  So Mr. Marian's affidavit is

7    correct that you said it was a pretty good case.

8              MR. GOROKHOV:  Yea.  I mean, I may have said

9    those words.  The words are not an issue.  Obviously,

10   what's in issue is the meaning of those words.  And the

11   other point of clarification is that the Government says

12   it's our fault that Mr. Marian didn't know the nature of

13   the case.  Well, Your Honor, I can represent to the

14   Court as an officer of the court and Mr. Byers can

15   represent to the Court that we had a conversation with

16   Mr. Marian, a phone conference, in which we specifically

17   discussed patient deaths.  So he --

18             THE COURT:  When did you have that conference

19   with him?

20             MR. GOROKHOV:  We had that conference -- I

21   don't remember the exact date.  It was shortly after a

22   hearing, the phone conference took place from Wichita.

23   Because I remember we were here when we were on the

24   phone with him.  Do you have an approximate date on

25   that?

33

1          MR. BYERS:  The July hearing.

2          MR. GOROKHOV:  I believe it was the July

3    hearing, Your Honor.  So we could go back and check the

4    docket for when we appeared before Judge Bostick on

5    that, but it was at that time.  So I would say that any

6    argument that it's our fault that Mr. Marian withdrew

7    from this case is not a valid argument.

8          THE COURT:  Well, I've already told you that I

9    am probably going to allow him to be substituted by

10   doctor -- is it McClave.

11         MR. GOROKHOV:  That's correct, Your Honor.

12         THE COURT:  I'd rather not get involved in

13   fault here.  I don't think that's going to move the case

14   forward if we argue about fault.  The question that I

15   have about Dr. McClave is what is the status of his

16   participation in the case.

17         MR. GOROKHOV:  Dr. McClave is up to speed on

18   what's been done.  There's a statistician that Dr.

19   McClave and his coworkers are working with who's done

20   substantial amount of work on this.  In fact, they've

21   done everything they could with the data provided by the

22   Government and the data obtained by the experts.  So

23   he's, you know, I had a phone conference with him last

24   week and he's fully up to speed on what's been done thus

25   far.

 1          THE COURT:  Can you tell me so that I can put

 2   up to speed in context, what his role in this is going

 3   to be?

 4          MR. GOROKHOV:  Yes, Your Honor.  Dr. McClave

 5   is going to, obviously, conduct the statistical

 6   analysis, but comparing the Government's claims that,

 7   you know, the Schneider clinic was somehow aberrant to

 8   national averages, to the average, or to the national

 9   data, to data of local clinics and so forth.  And local

10   providers and usage of CPT codes and procedure codes.

11   Additionally, they're going to talk about the

12   Government's methodology in selecting their sample and

13   the Government's auditing process.  So he's going to

14   talk about all those things to the jury.  And I did

15   provide Ms. Treadway with a disclosure, I believe it was

16   on Wednesday or Thursday, Thursday morning, yesterday

17   morning, provided Ms. Treadway with disclosure for Dr.

18   McClave.

19          THE COURT:  Do you have a copy of it that I

20   can see?

21          MR. GOROKHOV:  I don't have one with me, Your

22   Honor, but I'd be glad to --

23          MS. TREADWAY:  I brought a copy, Judge,

24   anticipating that you would want it.

25          THE COURT:  Let me read it.

1     Well, I don't see in this document an opinion.  Is

2     there an opinion in here someplace?

3          MR. GOROKHOV:  Your Honor, I believe that, you

4     know, we provided what we were required to but based

5     on --

6          THE COURT:  No, you haven't provided -- you

7     have not provided -- and this is going to be a topic of

8     conversation about some of the others.  You have covered

9     topics that he may testify about, which is fine; but I

10    don't see any opinions in here.

11         MR. GOROKHOV:  I understand, Your Honor.  I

12    mean, if, to the extent that, you know, the Court feels

13    those disclosures are not sufficient, we would be glad

14    to supplement them where the Court finds it necessary.

15    All I can say is that we provided the disclosures based

16    on our understanding of the Court's ruling of what was

17    sufficient.

18         THE COURT:  Well, you've misunderstood then.

19    The whole -- I think Rule 16 is pretty clear that there

20    has to be a summary of the testimony and the opinions;

21    and what I see here is a very concise summary of what

22    his testimony will cover, but nothing about the

23    opinions.  And, obviously, that is of some significance

24    here when we're talking about expert witnesses.

25    Otherwise, you wouldn't want to waste your money on him,

 1    would you?

 2              MR. GOROKHOV:  That's true, Your Honor.

 3              THE COURT:  So I think what we'll do, if I

 4    allow him to testify, we'll have to have some

 5    understanding about the Rule 16 disclosure; but I'll

 6    hand this back -- I'll leave this up here for

 7    Ms. Treadway, but --

 8              MS. TREADWAY:  You may keep it, Judge.

 9              THE COURT:  Well, good.  All right.  Anything

10    that you want to say further about that?

11              MR. GOROKHOV:  Not at this time, Your Honor.

12              THE COURT:  All right.  Thank you very much.

13    Ms. Treadway, you may respond.

14              MS. TREADWAY:  Yes, Judge.  My position has

15    not changed since I talked to Mr. Byers on August 8th.

16    My position is -- stays the same.  We don't have an

17    objection to a substitute expert.

18              THE COURT:  Didn't think you did.

19              MS. TREADWAY:  But we have an objection to

20    disclosure, because as you pointed out, it isn't a

21    disclosure of opinions.  Just like the entirety of the

22    Rule 16 disclosure from the Defendants is lacking.  I

23    believe the person that comes closeest to offering any

24    kind of opinions in their summary is Dr. Cole.  But as

25    to everyone else, there are just simply no opinions

1   expressed.  And, again, we appreciate the notice about

2   the factual issues that these experts will talk about in

3   their testimony and that's fine.  We did the same thing.

4   But we don't have any opinions from any of these experts

5   yet.  And we are entitled to them under the rule and

6   under the Court's order.  And so our objection really is

7   not to who they bring as an expert; but we want a

8   summary of their opinions.

9        Now, Judge, in good faith, I have to tell you that

10  I believe that there have been no opinions rendered and

11  that's why there are no opinions there.  Now I can be

12  dispossessed of that idea, but it is my thought that

13  given our conversation with Mr. Marian and given our

14  conversation with Dr. Karch, that they have simply not

15  done any work on this case to form an opinion.  So

16  that's the problem we have.  And it may be a time

17  element.  And, again, the Government has no objection to

18  giving the Defendants some additional time to get this

19  done.  But let's go.  They've known since March of this

20  impending deadline.  They didn't contact Mr. Marian

21  until the first of July.  So there has been some

22  dilatory conduct here that needs to stop and we need to

23  get on with this case.  And the Defendants need to give

24  the Government a proper Rule 16 disclosure.

25            THE COURT:  All right.  Well, I will allow the

1       substitution, and at the end of, or towards the end of

2       our hearing here today we'll talk about some procedural

3       aspects of these Rule 16 disclosures.

4           All right.  Now let's take up the joint motion for

5       discovery, et cetera, which is Docket 178.  And who will

6       speak to that?  Mr. Gorokhov, are you the designated

7       hitter today on all these?

8               MR. GOROKHOV:  Yes, Your Honor.  And I think

9       Mr. Williamson may or may not have some points to add.

10      But we'll see how it goes.

11          A few points on this.  This is in response to -- I

12      feel like I shouldn't repeat what's already been

13      briefed.  I think it's been briefed pretty extensively

14      so I'll just respond to the Government's most recent --

15              THE COURT:  Well, let's look at this a little

16      bit before you respond to the Government's response.

17      Here's what has been attached to this.  First of all, we

18      have the declaration of Steven Karch who's one of your

19      experts.  He says on -- in Paragraph 5 that on August 12

20      when he was contacted by Agent Greer, he had reviewed

21      three autopsies.  Now, would you again sort of summarize

22      for me what his area of expertise is and what he's

23      likely to testify about.

24              MR. GOROKHOV:  I'd be glad to, Your Honor.

25      Dr. Karch is a medical examiner and pathologist.  He

1    reviewed those files to get a sense of the kinds of

2    issues we were dealing with.  We were able to talk to

3    him about some of the other files.  Since that time,

4    he's reviewed many more files than just those three.

5    The essence of his testimony -- I'd be glad to say it

6    right here what his opinion is.  The essence of his

7    testimony is that where an individual has a disease, a

8    documented disease and where the individual has --

9    there's suspected overdose, there's no scientific way to

10   determine the actual cause of death.

11            THE COURT:  I see.

12            MR. GOROKHOV:  That's the essence of his

13   testimony.  And so his opinion is that in a sense it's

14   the fact that there is no scientific -- there can be no

15   scientific conclusion.

16            THE COURT:  I see.  Well, now, has he reviewed

17   all of the information that's been provided to the

18   Defendants by the Government?

19            MR. GOROKHOV:  He's reviewed, I believe at

20   this point he has reviewed the indicted deaths, all of

21   the indicted deaths, and with respect to the other

22   deaths, obviously, this is very voluminous here.

23   There's 58 alleged deaths.  And for the reason I stated,

24   the nature of his opinion, we've asked him to hold off

25   on reviewing all the other deaths until the Court --

1    until we have an opportunity to make our Daubert

2    motions.  Because as I'm sure the Court knows, that the

3    time of these --

4           THE COURT:  Well, you would not present him

5    for a Daubert.

6           MR. GOROKHOV:  No, I wouldn't.  If the

7    Government wanted to question him --

8           THE COURT:  Oh, I see.

9           MR. GOROKHOV:  But our arguments of Daubert

10   are going to relate in part to this inability to have a

11   scientific determination for cause of death.  And for

12   that reason we've asked him to hold off on reviewing the

13   remaining deaths because, as the Court, I'm sure, knows,

14   time of such an expert is extremely costly and we have

15   to make sure that, you know, we used the resources in a

16   wise manner.

17          THE COURT:  Does the Government intend to seek

18   a Daubert hearing as to Dr. Karch?

19          MS. TREADWAY:  Judge, since I don't know what

20   his opinions are, it's very difficult --

21          THE COURT:  Well, you heard it as to however

22   many he's reviewed now.  How many, Mr. Gorokhov, three,

23   is that all?

24          MR. GOROKHOV:  I believe he has now reviewed

25   all the Indicted deaths, which I think is 15, since the

1    Superseding Indictment.

2           MS. TREADWAY:  Based on our discussion with

3    Dr. Karch, Dr. Karch made it clear to us that he could

4    not render an opinion until he reviewed the tissue

5    slides.  He's not done that.  So based on what he told

6    us, I would think that then he hasn't actually rendered

7    an opinion on the cause of death.  If he's simply going

8    to talk to the jury about the fact that these autopsies

9    in his opinion are false and have come to false

10   conclusions, that's different than what I understand Dr.

11   Karch does in his typical testimony.  In his typical

12   testimony, some of which is out there in public, he

13   actually takes tissue and says this person died of X,

14   not Y.

15          THE COURT:  That's what the forensic

16   pathologists do, isn't it?

17          MS. TREADWAY:  Right.  But that's not what

18   Mr. Gorokhov just said he was going to do.  So they're

19   changing, evidently, what his opinion is going to be.

20   But, again, I don't know what that opinion is.  And

21   until I know that -- but I would not at this point,

22   Judge, anticipate a Daubert challenge, for instance, on

23   his qualifications.  He's obviously very well qualified.

24   And I wouldn't anticipate any kind of Daubert challenge

25   on methodology.  Obviously, he's qualified and knows

1    what he's doing.  So I can't anticipate that we would

2    have a Daubert challenge unless his opinion is such that

3    it doesn't have any basis.  And I just don't know that

4    yet because I don't know his opinion and I don't know

5    the basis.

6              THE COURT:  Well, we've got 16 people who are

7    alleged to have died.

8              MS. TREADWAY:  More than that, Judge,

9    actually.  There's 58 people that died.

10             THE COURT:  I understand that, but he's

11   reviewed 16, you said, Mr. Gorokhov?

12             MR. GOROKHOV:  I believe that's correct, yes

13   Your Honor.

14             THE COURT:  Only 16?

15             MR. GOROKHOV:  Because, I mean, there's 58

16   deaths in this case.  We have to do this in a manner

17   that's efficient.  We believe there's no scientific

18   basis to allow testimony or evidence about deaths at all

19   in this case pursuant to Daubert.  We're not raising

20   those points now, obviously, this is not the proper

21   time; but our view is that there should be no evidence

22   of death in this case.

23             THE COURT:  Well, let me just say this to make

24   this a little shorter, and we may talk about the

25   disclosure as to Dr. Karch a little later.  But,

1    obviously, it will be your choice as to how many autopsy

2    reports he reads.  And his testimony, as all witness's

3    testimony, I don't care whether they're Government

4    witnesses or Defendant witnesses, will be limited to the

5    information that he reviews.  So if you choose to limit

6    him to receive 16 or 20, I don't care how many, then he

7    can't come in and offer opinions as to the records or

8    the patients he has not reviewed.  And I think that's --

9    I don't think anybody can disagree with that.  So I'll

10   leave that to you at this point as to Dr. Karch.  Just

11   out of curiosity, he says here on Page 6, or paragraph

12   6, he's never been contacted by the Government and in

13   the federal criminal case.  How many -- I haven't seen

14   his C.V., how many federal cases he has he served as a

15   defense witness in.

16           MR. GOROKHOV:  I'm not sure, Your Honor.  I

17   know he's served as a witness in general in something

18   like 50 cases he estimated, but I'm not sure of the

19   exact number, Your Honor.

20           THE COURT:  Okay.  He didn't break that down.

21   Now, we have the declaration of Barbara Cobuzzi.

22           MR. GOROKHOV:  Cobuzzi.  That's correct, Your

23   Honor.  And I guess my question is with respect to her,

24   the same question, how many federal cases has she been a

25   defense witness in.

1            MR. GOROKHOV:  Again, Your Honor, I don't have

2     that number.

3            THE COURT:  Okay.  All right.  Now let's turn

4     to Docket 179 which is your brief.  And I appreciate

5     that you've written a thorough brief here.  I want you

6     to understand that.  But you made mention of things here

7     that I have some questions about.  Not specific

8     questions, I don't want to note details, necessarily,

9     but I want to know whether these things have been done.

10    Have you provided any privileged information to any of

11    your experts?

12           MR. GOROKHOV:  Off the top of my head, Your

13    Honor, I can't think of anything other than the work

14    product that our experts generate.

15           THE COURT:  No.  Let's talk about privileged

16    information.  In other words, a statement that your

17    client has made to you.

18           MR. GOROKHOV:  I don't believe so.  I think

19    what we provided them are the documents that Government

20    has provided to us.

21           THE COURT:  So when you refer to privileged,

22    you're kind of lumping that together with work product.

23           MR. GOROKHOV:  Right.  The work product

24    option.  That's what I was mainly focussed on.

25           THE COURT:  All right.  I'm not asking for

 1    disclosure of specifics.

 2              MR. GOROKHOV:  Sure.

 3              THE COURT:  But have you provided at least

 4    what you consider to be work product?  Provided to

 5    the -- to the experts.

 6              MR. GOROKHOV:  I think there was some

 7    information that was provided that we called work

 8    product to some experts, and I can tell you that at

 9    least with respect to one expert we provided --

10              THE COURT:  I want you to keep in mind that

11    that may present some problems with respect to the

12    expert's opinion later on.  In the sense that if you, if

13    the expert's opinion is based upon something that you

14    feel is work product, then we're going to have a problem

15    about whether or not the expert can testify about it.

16              MR. GOROKHOV:  I understand that, Your Honor,

17    and I think at that time if he is going to present such

18    an opinion, that that would be disclosed.

19              THE COURT:  You'll have to disclose it.

20              MR. GOROKHOV:  Sure.

21              THE COURT:  I think that's often --

22              MR. GOROKHOV:  Sure.

23              THE COURT:  And that's for the Government,

24    too, by the way.  Now, I know that you are concerned, or

25    very critical of the fact that Agent Greer called these

1  experts.  And I have read the affidavits, those that you

2  provided me here.  Have any of these experts told you

3  that as a result of what Agent Greer did, they would not

4  testify?

5          MR. GOROKHOV:  No.  All they told us was that

6  they were troubled by the fact that they were contacted.

7          THE COURT:  I see.

8          MR. GOROKHOV:  With respect to Mr. Marian, it

9  came as a shock to us that he withdraw from this case.

10         THE COURT:  But remember Agent Greer had not

11  talked to Mr. Marian when he decided he wasn't going to

12  do any more in this case.

13         MR. GOROKHOV:  That's the Government's

14  representation --

15         THE COURT:  No, that's Dr. Marian's

16  representation.

17         MR. GOROKHOV:  I understand that, Your Honor.

18         THE COURT:  Are you saying Dr. Marian's

19  affidavit is not correct?

20         MR. GOROKHOV:  I don't know when he was

21  contacted.  I know what his representation is but I

22  don't know the answer to that question.  I mean, if

23  that's the representation, that's all we have.  Do I

24  have any evidence that they contacted him before, I

25  don't have any evidence today.

47

1          THE COURT:  I mean, after all, he was your

2    witness.

3          MR. GOROKHOV:  I understand.  The only point

4    was that it was certainly a surprise.  I mean, he was

5    working with us, working with us and all of a sudden he

6    withdrew.  And the fact is, as I said earlier, we

7    discussed the deaths with him.  The fact that he's now

8    saying I didn't know the nature of the case, that I know

9    is not true because we discussed the deaths with Mr.

10   Byers.

11         THE COURT:  I see.  Now, I've read your cases

12   talking about the fact that some cases have held that it

13   is inappropriate for an opposing party's expert -- or

14   opposing party to contact the expert.  These are all

15   civil cases, as I read them.  Have you come across any

16   criminal cases that say that what Agent Greer did is

17   somehow a violation of the Federal Rules of Criminal

18   Procedure?

19         MR. GOROKHOV:  There's a case U.S. vs. Lewis,

20   which is cited in our brief, 2000 U.S. App, Lexis,

21   15373, Ninth Circuit case, 2000 and that's a criminal

22   case.  And in that case the government in a similar

23   situation once it was discovered that they made such

24   contact came out and said that they called it, and I

25   quote, "inappropriate and ill advised."

 1          THE COURT:  Well, I've got Lewis here, 232

 2   Fed. 3rd 898.  Is that the case you're referring to?

 3          MR. GOROKHOV:  Your Honor, I don't have the F

 4   3rd cite.  For some reason I only have the Lexis cite.

 5          THE COURT:  Well, the cite is 2000 WESTLAW

 6   800725.

 7          MR. GOROKHOV:  That sounds right, Your Honor.

 8          THE COURT:  Well, here's -- this is a very

 9   short memorandum decision of the Ninth Circuit and it

10   says here:  During the trial the government engaged in

11   ex parte discussions and meetings with the protesting

12   party's fingerprint expert who subsequently changed his

13   opinion.  The government admits that its actions were

14   inappropriate and ill advised.

15      But the court goes on to say:  "in light of the

16   circumstances, we conclude there was no constitutional

17   violation.  And that the extremely high burden for

18   dismissal of the indictment was not met."

19      That apparently was the relief that was being

20   sought by the defendant in that case.  So it isn't like

21   this case.  The contact was made during the trial.  And

22   the witness apparently changed his opinion; but no

23   opinion has been changed in this case by your experts as

24   a result of Agent Greer's contact.  Is that correct?

25          MR. GOROKHOV:  I think that's correct, Your

1   Honor.  On the other hand, I would say we're not seeking

2   the remedy sought there, which was an extraordinary

3   remedy, dismissal of the indictment.  We're just seeking

4   merely a protective order.

5            THE COURT:  I thought you were wanting to --

6   wanting me to get rid of Ms. Treadway.

7            MR. GOROKHOV:  Well, I believe that the

8   conduct here does constitute misconduct.  It constitutes

9   ethical violation.  And that should be reason alone.

10  But we understand the Court has not been inclined to --

11           THE COURT:  No.  Hold on a minute.  Have you

12  got a criminal case that says that this would be ethical

13  misconduct by the prosecutor?

14           MR. GOROKHOV:  I do not have a criminal case

15  as to the ethical issue.  All the ethical discussions

16  took place in the civil cases cited there.

17           THE COURT:  Right.  Now, assuming that I would

18  think that those cases apply, and somehow by implication

19  or something else, I didn't read in any of those cases

20  that there was a drastic remedy of disqualifying the

21  lawyer who was responsible for the conduct.  Is that in

22  here somewhere?

23           MR. GOROKHOV:  I believe I did see that, Your

24  Honor, in the --

25           THE COURT:  Which case is it?

1          MR. GOROKHOV:  And I confess I don't know it

2     off the top of my head right now and I don't have it,

3     but I'd be glad to supplement with either a supplemental

4     brief or send the case over.

5          THE COURT:  No, I don't think that -- you've

6     done enough.  I mean, you've worked hard on this and

7     I -- but I have read the Carlson vs. Monaco case which

8     is an Eastern District of California case, and I didn't

9     believe I saw that kind of relief in that case.  That

10    judge does quote an ABA opinion, it being a flagrant

11    violation, in turn quoting the Campbell's Industries

12    case, which I also have, that's this 1980, 9th Circuit

13    case.  And in that case the district judge simply

14    precluded the testimony of the expert, as I understand

15    it.  And the court said basically that was okay.  But

16    that kind of remedy wouldn't work here, would it?

17         MR. GOROKHOV:  No, it would not.  It certainly

18    would not.

19         THE COURT:  Then there's the Sanderson case.

20    That's an Eastern District of Virginia case, Judge

21    Payne.  And he again quotes these other cases, the Ninth

22    Circuit case.  It's kind of a long opinion, but -- he

23    refused to dismiss the case.  This is at the very end.

24    Taking into account all the facts and the factors, the

25    court concludes the sanction of dismissal is not

1    appropriate.  The court has considered removing

2    Mr. Bieber as counsel of record, but that sanction,

3    although appropriate, will cause serious harm to the

4    plaintiff and additional harm to the defendant.  On

5    balance, he told Mr. Bieber he had to pay some fees.

6    But, here again, he didn't take the lawyer out of the

7    case.  Is there some other case where that was, even a

8    civil case, where that was the remedy that the Court --

9              MR. GOROKHOV:  Your Honor, I'd have to go back

10   and check.  I honestly tell you I don't know right now.

11             THE COURT:  That's fine.  Of course, the most

12   serious allegation that you make is that what Agent

13   Greer did violated the client's constitutional rights.

14             MR. GOROKHOV:  That's correct, Your Honor.

15             THE COURT:  And you cite this case United

16   States vs -- I'm not even going to begin to try to

17   pronounce this -- E-N-U-E-G-B-U-N-A-M, a 2001, Sixth

18   Circuit case, and there was some -- I don't think this

19   was the -- involved a government agent contacting an

20   expert, but I notice that the court says a defendant's

21   right to present its own witnesses to establish a

22   defense constitutes a fundamental element of due process

23   and is protected by the Sixth Amendment.  And I

24   certainly agree with that.  But the court then goes on

25   to say on Page 400, this reason, governmental misconduct

1    which apparently dissuaded a witness from testifying, as

2    I read it, must amount to a substantial interference

3    with the witness's free and unhampered determination to

4    testify before we will find a violation of due process

5    under the Sixth Aamendment.

6         Based on what you're telling me here today, that

7    has not occurred.  None of your witnesses have said I

8    won't testify because of what Agent Greer did.  Correct?

9              MR. GOROKHOV:  That's correct.  Well, again,

10   we don't know with respect to Mr. Marian, but I --

11             THE COURT:  I don't think Mr. Marian is going

12   to be your witness, is he?

13             MR. GOROKHOV:  That's correct.  Now he's not.

14   I guess the question is why did he withdraw.

15             THE COURT:  Well, I think I've resolved that

16   question.

17             MR. GOROKHOV:  I understand, Your Honor.

18             THE COURT:  If you don't have something to

19   counter his affidavit, and in any event, it's kind of a

20   moot point --

21             MR. GOROKHOV:  I understand, Your Honor.

22   That's true.

23             THE COURT:  I want to make sure I understand

24   your arguments here.  Now, Page 14, disqualification.  I

25   want to make clear to all counsel in this case, because

53

1    the Government wants to disqualify you, you want to

2    disqualify Ms. Treadway.  And I've told you that I don't

3    want to get involved in that.  And I don't.  But what I

4    do want to tell you is that if you all are -- this is

5    either side of the case -- we have a local rule that

6    deals with this.  It's 83.6.3 -- just a minute.  Yes.

7    83.6.3.  And that talks about the procedure in

8    disciplinary cases.  And what I'm calling to your

9    attention here is that if anybody feels that it's

10   appropriate to invoke that rule, the rule is very

11   specific and very detailed about how all this is to be

12   done.  And it doesn't involve me.  In other words, I

13   don't think that it's appropriate for me to start

14   getting involved in making decisions about lawyers'

15   conduct.  I think if there's a question about that, the

16   lawyers need to follow the rule that we've established

17   in this court.  And I would just commend that rule to

18   you.  And I'm not telling you not to do it or to do it.

19   I'm just commending the rule to you.

20        I'm about done with your submission here.  I think

21   I am.  And I think what we'll do is take a recess and

22   then I'll hear from Mr. Williamson.  All right.  About

23   ten minutes please.

24                    (Recess.)

25            THE COURT:  Mr. Williamson.

1          MR. WILLIAMSON:  Judge, this issue has been

2     thoroughly briefed so I'll try to keep my arguments

3     pretty concise.

4          THE COURT:  Yes, sir.

5          MR. WILLIAMSON:  But I just wanted the Court

6     to be aware this seems to be an issue of first

7     impression.  And I know the brief was heavy with civil

8     cases, but in all honesty, there aren't any criminal

9     cases and we don't know if there aren't any criminal

10    cases because government agents have no better and don't

11    do this every where else, or we don't know if there

12    aren't any cases because no other defense attorneys

13    decided to challenge it.  But I think the bottom line is

14    that the issue that's raised here this court is in a

15    unique position to set forth some ground rules, some

16    ground work, that apply in criminal cases.  And I think

17    the policy reasons that are expressed in the civil cases

18    apply equally if not more strongly and in the criminal

19    cases, for instance, in civil cases, have Rule 26 which

20    this court has noted is a much broader discovery rule.

21    In criminal cases you have Rule 16 which is narrower.

22    If this, if, in civil cases it's inappropriate to

23    contact opposing experts when you have a broad discovery

24    rule; it is logical that in a narrow discovery rule that

25    the restrictions should apply even more strongly.

1    Secondly, what's at stake in a criminal case is a

2    lot higher than what's at stake in a civil case.  Civil

3    case at most people lose money and those type of, or

4    other type of injunctive reliefs.  In criminal cases,

5    people lose years of their lives.  And when you employ

6    an expert, you want to be confident that the issues that

7    you discuss with that expert are properly disclosed in

8    accordance to the rules.  And if there was a real need

9    to talk to the expert outside of what Rule 16 sets

10   forth, then you have the opportunity to apply for

11   depositions.  The Rule 16 allows the expert or gives the

12   government the framework of the information they

13   receive.  And we understand that there is some issues

14   that we'll discuss later as far as the sufficiency of

15   the disclosures, but the bottom line is Rule 16 states

16   what you can learn from this expert witness.

17        THE COURT:  But that raises the question, what

18   has the Government through Mr. Greer learned from your

19   experts?

20        MR. WILLIAMSON:  Well, fortunately, our

21   experts had enough foresight in this case to talk to us

22   before they talked to the government.  But we cannot

23   look forward and say, well, harm hasn't happened so

24   let's wait until it happens.  We can't say let's wait

25   until the Sixth Amendment violation actually occurs,

1    because it hasn't occurred, and I'm not saying that

2    Mr. Greer, you know, is intentionally, you know, trying

3    to do something underhanded.  But the bottom line is

4    there may be cases where there are federal agents who

5    try to do something underhanded.

6             THE COURT:  Well, I don't make those -- that's

7    not in my department to make policy.  I deal only with

8    the case in front of me.  And the case in front of me,

9    if I read the affidavits of your experts, nothing was

10   obtained from them that is harmful to your side of the

11   case because Mr. -- and even if Mr -- or doctor whatever

12   his name is, was a witness, I wouldn't let him testify

13   that Mr. Gorokhov told him that he thought the

14   government had a great case or didn't.  That doesn't

15   have anything to do with his opinion.

16            MR. WILLIAMSON:  Right.  But we wouldn't want

17   the government knowing that if Mr. Gorokhov did

18   express -- for instance, let's say Mr. Gorokhov says,

19   hey, we have a real troubling issue in this case and the

20   issue is X, and then he's contacted by the Government

21   agent and this expert just happens to be loose at the

22   tongue and then he expressed that to the other party.

23   Is that fair for the other party to be able to get at

24   what our impressions are?

25            THE COURT:  I don't know.  But at this point

1    today, nothing has been disclosed in the contacts

2    between Mr -- Agent Greer and your experts that is

3    deleterious to your side of the case.

4            MR. WILLIAMSON:  That's correct.  And I think

5    the best way to address that is this court should issue

6    an opinion with the rule and then a protective order.

7    And a protective order basically maintains the status

8    quo.  But it is important in this case to establish a

9    rule.  And again this is an issue of first impression

10   and I know this court, I've read numerous opinions of

11   yours, and I know this court is concerned with not just

12   these defendants but all defendants making sure, look,

13   if you're convicted, you're going to have a fair trial.

14   And I think that --

15           THE COURT:  Sure.

16           MR. WILLIAMSON:  You want to make sure that

17   you have a rule in place that says, look, we're going to

18   maintain the status quo, there is no reason why this

19   rule should be any different in criminal cases than it

20   is in civil cases.  And if it happens to get to the

21   Tenth Circuit, let them review it later.  But for now,

22   for now, there needs to be a rule and protective order.

23           THE COURT:  My guess is that Agent Greer won't

24   be contacting any of your experts at this point in time.

25   That probably Ms. Treadway will accede to that.  Agreed,

1    Ms. Treadway?

2              MS. TREADWAY:  No, Judge, I will not.  Because

3    there is no --

4              THE COURT:  Oh --

5              MS. TREADWAY:  -- requirement that we not talk

6    to witnesses, experts.

7              THE COURT:  No, not witnesses.

8              MS. TREADWAY:  Not experts either.  Judge,

9    there is no such rule in the criminal procedure.  And we

10   will not agree.

11             THE COURT:  All right.

12             MR. WILLIAMSON:  And on the same token, why

13   this is so important, there is no rule that says that

14   they can do that.  There is no expressed statutory

15   authority that gives them the permission to contact our

16   experts.  You look at what we have expressed in the

17   statute and that's Rule 16 which lays forth how the

18   other party learns of the other, the expert's opinions,

19   and, again, that's why it's important in this case.  And

20   me personally, I'm not really advocating for

21   disqualification, but if you don't raise it, you lose

22   it.  So it's an issue preserved.  I think the more

23   prudent remedy here is issue a rule finding either why

24   or why not the same rules that apply in civil cases

25   should or should not apply in criminal cases.  And make

1    a protective order according to that.  And I would just

2    end by, Judge, you're aware even in civil cases if there

3    is an issue of first impression, you look out to see

4    what's the most analogous issue that could be persuasive

5    to the court, or be instructive.  The closest thing we

6    have is the civil context.  And I know there are cases

7    where they distinguish between civil and criminal, but

8    the distinctions in this case favor protecting the

9    contact with the experts as opposed to allowing the

10   contact with the experts.

11              THE COURT:  Well, you know, I've thought a

12   little bit about this and you know I respect your

13   opinions in all things.  This expert business in this

14   case, and I'm addressing this to everybody here, to me,

15   has been -- well, it would have been so much easier in

16   this case, so much easier, to follow the format, if not

17   the civil rule itself, to follow the format.  Which is

18   what I wanted to do.  I mean, to me, if all experts in

19   this case were required to submit reports, we wouldn't

20   be here arguing about this in all probability.  And I

21   guess it's not my place in life to disagree with the

22   Tenth Circuit, but I think I'm entitled to some extent

23   and I certainly disagree in some respects with this

24   Nacchio case.  And evidently while the Tenth Circuit's

25   taking another look at it, as Mr. Gorokhov pointed out,

1     they're not looking at this issue.  But what I guess the

2     line that they drew, that the judge drew, I should say,

3     I don't want to indict all the members of that court,

4     was that there were specific civil rules that could not

5     be applied to criminal cases.  But that's essentially

6     what you're asking me to do here is to apply civil rules

7     to criminal cases.  And I'm not inclined to do that.

8     Frankly, at this point, whether the Government -- I'll

9     listen to what Ms. Treadway has to say, I'm not sure if

10    the disclosures are adequate and the remedy is there,

11    the if Nacchio remedy is there, to have Daubert

12    hearings, why it would be necessary to contact experts

13    at this point in time.  But you have that Tenth Circuit

14    case that she cited that says that witnesses are

15    everybody's and that's the law here.  You know, I'm not

16    very inclined to try to issue policy decisions.  You

17    said you've reviewed my -- some of my cases, and you and

18    I have had several cases.  Have you ever rendered a

19    policy opinion in any of my cases?

20              MR. WILLIAMSON:  No, I can pretty expressly

21    remember you stating Tenth Circuit says and that's what

22    I'm gonna do.  But we have to raise the issue, we have

23    to preserve the issue.

24              THE COURT:  That's kind of my Navy training,

25    you know.  I don't know whether they're my superior

1    officers or not, but if they tell me to do something, or

2    if they say this is what the law is, that's what I'm

3    going to do.  I may not like it, and I've just told you

4    that I think this case would have been so much easier

5    had the Nacchio case not been decided and everybody had

6    to provide opinions, I mean, reports.  But, you know, I

7    respect you and what you're saying, but I'm probably not

8    going to issue any policy rulings here.  You can get the

9    Circuit to do that maybe but --

10             MR. WILLIAMSON:  Thank you, Judge.  And you

11   know, again, I think I'd just simply request a

12   protective order and we're good to go.

13             THE COURT:  I'll give it some consideration

14   but -- well, I will.  You know I will.

15             MR. WILLIAMSON:  Thank you, Judge.

16             THE COURT:  Now, Ms. Treadway.

17             MS. TREADWAY:  Thank you, Judge.  This issue

18   has come up in a lot of cases because I think in white

19   collar prosecutions they are very similar to civil cases

20   in many respects.  And --

21             THE COURT:  Well, not according to the panel

22   in the Nacchio case.

23             MS. TREADWAY:  And not attending to the Tenth

24   Circuit and many other cases, Judge.  Criminal cases are

25   different because the government as well as the defense

1    as well as the court has to protect the defendant's

2    constitutional rights.  And that is why all witnesses

3    have to be everyone's witness.  And it is the witness

4    who has the right to choose to talk to opposing counsel

5    or even the counsel that's sponsoring them as a witness.

6    I've had witnesses say they don't wanna talk to me.  And

7    I've put 'em on the stand and talked to 'em under oath.

8    And you know that happens, Judge.  Happens to the

9    defense.  But that is why the rules have to be different

10   because we're talking about witnesses that are going to

11   be testifying in a case in which the Defendants' lives

12   are in jeopardy, not their money as in a civil context.

13   This came up in a case that I tried in front of Judge

14   Vratil and she wrote an extensive opinion about it and I

15   apologize for not citing to it in my brief, but it

16   follows Carrigan and the cases that I cited to you.  And

17   what happened in that case was that the plaintiffs

18   had -- I'm sorry -- the defendants had retained an

19   expert and he gave them very bad news.  He agreed with

20   the government.  And they tried to prevent the

21   government from talking to that expert and using him in

22   our case.  And Judge Vratil wrote a very strong opinion

23   that that was absolutely improper.  And, in fact, in a

24   civil context.

25             THE COURT:  What was improper?

1          MS. TREADWAY:  The defense trying to prevent

2     the government from talking to this witness.

3          THE COURT:  Oh, that was improper.  Did she

4     say that it was proper, though, for the government, a

5     government agent to talk with the witness?

6          MS. TREADWAY:  Absolutely.  Absolutely proper.

7     And it's absolutely proper for the defense to call all

8     the government witnesses, experts included, and say do

9     you wanna talk to me.  And it's the witness' right to

10    say yes, no, or yes with conditions.  For instance, yes

11    I'll talk to you but my fee is $150.  Yes, I'll talk to

12    you but I want somebody present.

13         THE COURT:  Must not be much of an expert if

14    the fee is only $150.

15         MS. TREADWAY:  But the reason is, Judge, is

16    the rules are completely different, civil/criminal, to

17    the point that if you look at the Carrigan case and the

18    Soap case and all of those cases, if the government had

19    done what the defense did in this case, I would be

20    subject to sanctions.

21         THE COURT:  You mean Mr. Gorokhov told 'em

22    they weren't supposed to talk.

23         MS. TREADWAY:  Correct.  And that's what those

24    cases stand for, Judge.  That's completely different

25    than the civil rules.  And the reason again is is

1    because in a criminal case all witnesses have the right

2    to talk or refuse to talk.  And we've done -- I've done

3    this for 18 years, Judge, and this is typically what

4    happens.  You call the expert and the expert says I'll

5    call counsel, and if they let -- if that's okay with

6    them, I'll talk to you.  And you know what.  Most of

7    them do talk to us.  It's the rare case that they refuse

8    to talk to us.  And the reason is, you know what happens

9    on the stand.  It looks bad when the very first thing

10   you say is, well, you refused to talk to the government

11   about your opinions, didn't you.  That's right, I did.

12   That doesn't look good for the defense.  It doesn't look

13   good for the government if the government witnesses

14   refuse to talk.  So it's just a whole different arena,

15   Judge, and I understand --

16              THE COURT:  I know that.  I know that and --

17              MS. TREADWAY:  I understand your frustration.

18              THE COURT:  And by the way, I've,

19   Mr. Gorokhov, I don't blame Mr. Gorokhov for doing that.

20   I don't think that was appropriate and I think he knows

21   it wasn't appropriate, probably wouldn't do it again,

22   but that's not what we're here today to deal with.

23              MS. TREADWAY:  No, Judge.

24              THE COURT:  Whether he did something right or

25   wrong.

65

1          MS. TREADWAY:  Absolutely not.  And again,

2     motions for disqualification, motions for determination

3     of conflict, I have a duty to bring motions for conflict

4     determination before you.  I have an express duty to do

5     that.

6          THE COURT:  I know that and you can bring it

7     and I've told you what you can do with it.

8          MS. TREADWAY:  Right.  I'm not talking about

9     disqualification though, Judge.  I'm talking about

10    issues of conflict that relate to the Defendant's Sixth

11    Amendment right to counsel.  And you have to --

12         THE COURT:  Which one are you talking about?

13         MS. TREADWAY:  We had a couple of motions.

14    One in front of Judge Brown and one in front of you

15    and --

16         THE COURT:  But I ruled on them.

17         MS. TREADWAY:  But you decided those, that's

18    right.  And there's absolutely nothing improper about

19    that.  I didn't say it was improper.  All I said was

20    that we have a standard procedure to be followed in

21    these matters and I want that standard procedure

22    followed.  I'm not telling you or Mr. Gorokhov or

23    anybody else that you can't do it.  But it makes sense

24    to me, you know what the procedure is, that this is a --

25    there's a separate panel of judges that makes those

```
 1    determinations, there's an investigation, there's

 2    various other things, I think that is the procedure that

 3    needs to be followed.

 4         MS. TREADWAY:  But you're talking about

 5    allegations that somebody has violated the ethical rules

 6    and needs to be disciplined.  That's -- we haven't said

 7    that, Judge.  We haven't asked for that.  What we, we

 8    have always looked at this as, again, the Defendants

 9    Sixth Amendment right to conflict-free counsel.  That is

10    outside of those procedures that are disciplinary.  So

11    those are the motions that we've made and I just wanted

12    to make sure that the Court understood that.  And we

13    have a duty to do that, as you well know.

14         THE COURT:  You can raise -- either side can

15    raise anything they want, but --

16         MS. TREADWAY:  But basically, Judge, the

17    bottom line here is the reason we call the experts as we

18    always do, it's not, it's absolutely standard operating

19    procedure to call experts and see if they're willing to

20    talk to us if we don't have their opinions.  We don't

21    have any opinions in the disclosures here.  And I think

22    it would be a complete waste of the Court's time for us

23    to go through Daubert hearings so we can figure out what

24    their opinions are.  That's not what Rule 16 is designed

25    for.
```

1          THE COURT:  I don't know.

2          MS. TREADWAY:  If we have some Rule 16

3     disclosures that are more specific as to the Defendant's

4     experts' opinions, I largely believe that Daubert

5     motions would be unneeded.

6          THE COURT:  Well, you may or may not be right,

7     Ms. Treadway, and I, like my expression to you is the

8     same I made to Mr. Williamson and the other lawyers.  I

9     really respect what you're saying, but this case would

10    have been so much simpler in this particular instance if

11    we had had reports from the experts.

12         MS. TREADWAY:  But, Judge, we don't even want

13    a report.

14         THE COURT:  But now we can't --

15         MS. TREADWAY:  We don't want reports.  We just

16    want to know what their opinions are and we don't know.

17         THE COURT:  Well, I'm going to fix that.  All

18    right.  I'm going to try to fix it anyway.  But, you

19    know, I don't want to get into problems here with

20    dealing with whether the lawyers have done something

21    that they should or shouldn't do.  I've been doing this

22    job long enough to know when I think lawyers are not

23    acting properly and I certainly haven't seen that in any

24    of the lawyers in this case.

25         MS. TREADWAY:  Judge --

68

1          THE COURT:  And don't expect to either.

2          MS. TREADWAY:  Judge, with regards to reports,

3     the Government did in large measure provide reports.  We

4     provided all the autopsy reports.  We provided the

5     spread sheets from Dr. Jorgensen with all of his

6     conclusions.  We provided the spread sheets of the

7     reviewers with all of their conclusions.  And so it's

8     difficult to understand what else we can do.

9          THE COURT:  I don't think I've heard the

10    Defendants asking for anything more from you.

11         MS. TREADWAY:  They did.  They complained in

12    their most recent motion that we haven't given them

13    data, we haven't given them this, we haven't given them

14    that.  I'm just plummexed --

15         THE COURT:  I asked Mr. Gorokhov if there was

16    anything else that needed to be provided.  Maybe I

17    didn't ask him enough.  But if they think there's

18    something else that needs to be provided, I'll consider

19    it.  Is there anything else that needs to be provided,

20    Mr. Gorokhov or Mr. Williamson?

21         MR. WILLIAMSON:  No, Judge, we raised the

22    issue, you ruled on the motion and we're able to

23    proceed.

24         THE COURT:  Okay.  I don't like this either.

25    I mean, I think that it would be much better to have --

1    I've said this about four times and I'm not going to say

2    it again -- experts to do reports just like they do in

3    civil cases.  I don't see any reason why that can't be

4    done, but I can't order it and, obviously, I can't force

5    the parties to agree to that sort of thing.  And we're

6    past that now anyway.  I agree that it would probably,

7    if not eliminate Daubert motions, it would certainly

8    help the lawyers get ready for trial.  It would help me.

9    It would do a lot of things.  But I don't think I can do

10   it and -- I don't think I can order it and I'm not going

11   to order it.

12       MS. TREADWAY:  Bottom line, Judge, I don't

13   believe you can order a protective order preventing the

14   Government speaking to witnesses.

15       THE COURT:  Well, I'm going to think about

16   that.  Now that's a different story.  I'm going to think

17   about that.  You haven't briefed that.  I haven't seen

18   any case law in your submission that says that I can't

19   do a protective order.

20       MS. TREADWAY:  Well, Judge --

21       THE COURT:  Similarly, I haven't seen one from

22   them that says I can't do a protective order.  And I

23   haven't seen Judge Vratil's opinion.  And I haven't seen

24   any of the underlying briefs in that opinion.  So here

25   again, I don't know what the -- I don't want to start

1    issuing protective orders unless there's a reason to do

2    it and I have authority to do it.

3            MS. TREADWAY:  Right.  And I think that it

4    would be a change in criminal procedure, Judge, if you

5    issued a protective order.

6            THE COURT:  I can tell you this:  If I issue a

7    protective order in this case, it's going to say that it

8    is only this case and that I don't expect to ever see

9    this case cited to somebody else.  You know, what is it,

10   Rule 1 or Rule 2 of the Federal Rules of Criminal

11   Procedure give me some latitude in ruling on certain

12   procedural matters.

13           MS. TREADWAY:  If you issue a protective order

14   as against the Government with regards to contacting

15   experts, in all fairness, Judge, you're going to have to

16   issue the same order --

17           THE COURT:  They know that.  What's fair for

18   the goose is fair for the gander.

19           MS. TREADWAY:  And, again, that is very

20   problematic, Judge, in a criminal case.  And I ask you

21   to think about that hard before you do that because I,

22   with all due respect, don't think it will be

23   appropriate.

24           THE COURT:  Well, I don't know whether it

25   would be or not; but I want you to send me and send the

1   lawyers Judge Vratil's opinion.

2            MS. TREADWAY:  I will be glad to, Judge.

3            THE COURT:  And the underlying briefs.

4            MS. TREADWAY:  That, I don't know whether we

5   have any more, but I'll look for it.

6            THE COURT:  Well, then --

7            MS. TREADWAY:  I will definitely look for

8   those, Judge.  We've gone through so many computer

9   changes over the last seven years that some of that

10  stuff is difficult to recapture; but the court may have

11  copies so I'll look for it.  But she wrote a very -- a

12  very good opinion.  I believe it's a published opinion

13  in the F. Supp.

14           THE COURT:  Well if it's in the F. Supp. just

15  give us the cite.

16           MS. TREADWAY:  I will.

17           THE COURT:  And we'll -- and then if I think

18  that I want any further briefing on this business about

19  a protective order, I'll send you a short letter and ask

20  you, on a short string, to get me a brief.  But we'll

21  see.

22           MS. TREADWAY:  Thank you, Judge.

23           THE COURT:  All right.  I think that takes

24  care of the written submissions on this.  Is there

25  anything else that we need to talk about in terms of the

1   written submissions today?  I forgot, I'm sorry, I

2   forgot to hand out -- I'm going to have Ms. Silva make a

3   couple of copies of this little portion of the

4   transcript.  I'm sorry I forgot that.  And I'll give you

5   that and then we'll talk about the joint motion for

6   clarification.  But is there anything that anybody else

7   wants to say about what we've already talked about?

8               MR. WILLIAMSON:  Not from the defense, Your

9   Honor.

10              THE COURT:  All right.  Now, have you all had

11  an opportunity to read that little snippet of

12  testimony -- or, rather, comment.  I guess this is your

13  motion, Mr. Gorokhov.  I mean, you wrote it.  Is that

14  right?

15              MR. GOROKHOV:  Yes, Your Honor.  We both wrote

16  it, Mr. Williamson, and I believe he --

17              THE COURT:  What don't you understand here in

18  light of what I said the last time we were here?

19              MR. WILLIAMSON:  Judge, I wasn't --

20              THE COURT:  I know you weren't here.

21              MR. WILLIAMSON:  Yes.  I wasn't here; but

22  based on what was told to me by Mr. Gorokhov and the

23  reflections and then us taking a look at the scheduling

24  order and in taking a look at Nacchio and Adams, I think

25  we had just a little -- we wanted to make sure that we

1    weren't waiving any potential Daubert issues.  One of us

2    thought that it was necessary to make proffers.  The

3    other said we -- I didn't particularly believe that we

4    needed to make proffers.  And my reading of Nacchio and

5    Adams is that you only make a proffer if you feel like

6    the disclosures, I mean, are necessary for you to make a

7    Daubert issue, but the scheduling, the wording in the

8    scheduling order when you mentioned the hearing kind of

9    threw a little loop in that in that I believe you state

10   that Daubert motions based on proffers would be due on a

11   certain day.  And we believed that was more of a wording

12   issue that proffers aren't necessary to invoke the

13   Daubert hearing but they're only required if you need

14   them in order to make the Daubert hearing.

15             THE COURT:  So that was your concern that -- I

16   don't know why you all didn't raise that at the time.

17   But I don't think -- I'm looking at the amended

18   scheduling order.  I don't see anything in here that

19   says that a proffer is a condition precedent to a

20   Daubert hearing.  Is there?

21             MR. WILLIAMSON:  It's not express in there but

22   we didn't want the issue to pop up on October 4 that

23   there's an argument that we waived it after you filed a

24   motion on October 3.

25             THE COURT:  Well, you haven't waived it.

1           MR. WILLIAMSON:  Perfect.

2           THE COURT:  All right.  Now let's turn to the

3  issue of disclosures.  I have the Defendant's Rule 16

4  disclosures with the exception of Dr. McClave.  I mean

5  what I saw today.  I have that.  And I have the

6  Government's.  And I see this in basically all of the

7  Defendants' disclosures with the exception of -- well,

8  just let me say this as to all of the disclosures.  Some

9  of the -- turning first to the Government's disclosures,

10  because the Government has the burden here.  I'm looking

11  at Jill Cobb, for example, M.D.  I'm not sure that Jill

12  Cobb is a true expert in this case, but she apparently

13  prepared an autopsy report.

14           MS. TREADWAY:  Yes.  She was one of the

15  Coroners that prepared an autopsy report, Judge.

16           THE COURT:  And it says Dr. Cobb will testify

17  about her autopsy and the cause and manner of death for

18  Ronald W.  But what it doesn't say is what her opinion

19  is.  Do you see what I'm saying?

20           MS. TREADWAY:  Well, it's in the report,

21  Judge, and we provided the report.

22           THE COURT:  It's in the report?

23           MS. TREADWAY:  Yes, Judge.

24           THE COURT:  All right.  Well, all right.

25  Because I don't have that.  And maybe that's -- in

1   connection with all these autopsies, do they all -- I'm

2   sure autopsy reports generally do -- do they state the

3   doctor's opinion relating to the cause or causes of

4   death?

5          MS. TREADWAY:  Yes, Judge.  There's

6   essentially two opinions at the end of an autopsy

7   report.  It's the cause of death and the manner of

8   death.  And the cause of death in these cases will be

9   typically mixed drug intoxication, and the manner of

10  death will typically be accident.  As opposed to

11  suicide.

12         THE COURT:  All right.  Well, since I'm not

13  really -- I haven't reviewed the reports provided in

14  connection with this disclosure by the Government.  Are

15  there certain disclosures in the Government's notice

16  that the Defendant wants, the Defendants want to make an

17  argument do not sufficiently disclose the opinions of

18  the expert?

19         MR. GOROKHOV:  I'm sorry, Your Honor.  Could

20  you repeat the question.

21         THE COURT:  I did not know -- should have

22  known but did not know, that autopsy reports had been

23  provided which state the cause of death.  So as to any

24  of the other experts listed in the Government's

25  disclosure, are there any which the Defendants feel are

1    inadequate in that they do not express the opinion of

2    the expert as required by Rule 16?

3              MR. WILLIAMSON:  Can we conference just

4    briefly, Judge?

5              THE COURT:  Sure.

6                        (Off-the-record discussion

7                         between Mr. Williamson and

8                         Mr. Gorokhov.)

9              MR. WILLIAMSON:  Judge --

10             THE COURT:  Yes, sir.

11             MR. WILLIAMSON:  We've had an opportunity to

12   review all the -- basically every document that the

13   Government had available; and once we took a look at the

14   documents and then you combine them with the

15   disclosures, we're able to discern what the opinions

16   are.  There still may be some issues with the

17   statistical analyses that we may not be clear on, but

18   we're still working through some of that; but as of

19   right now, I think we have enough to proceed and move

20   forward.

21             THE COURT:  All right.  Fair enough.  I take

22   it you're speaking for both Defendants, Mr. Williamson?

23             MR. WILLIAMSON:  That's correct, Your Honor.

24             THE COURT:  All right.  Now let's turn to the

25   Defendants' Rule 16 disclosures.  Same question.  You

1    mentioned one earlier, Ms. Treadway, which you thought

2    was adequate.  Which one was that?

3          MS. TREADWAY:  I believe the only disclosure

4    that has some opinions in it is Dr. Cole's opinion.  But

5    looking at Ms. Cobuzzi's disclosure, it looks like

6    everything through 17, Paragraphs 1 through 17, are

7    factual issues.  And then 18 is a very broad opinion.

8    She will state that the coding and billing practices of

9    the Schneider Medical Clinic was not a fraudulent

10   operation.

11         THE COURT:  She may have trouble with that.  I

12   want you all to take a close look at Rule 704.

13         MS. TREADWAY:  Right.  That's my argument,

14   Judge, that that would be a 704 problem.  And then she

15   also violates another 704 clause by stating in that any

16   mistakes in billing and coding were done in good faith.

17   I don't know how she can talk about the Defendants'

18   intent.

19         THE COURT:  I don't know either but that's not

20   before me today.  I'm just saying that the parties need

21   to take a look at Rule 704 as they apply -- as that rule

22   applies specifically to criminal cases.

23         MS. TREADWAY:  Right, Judge.  And then

24   Paragraph 19 indicates a possibility of some opinion in

25   the future but it doesn't state what that opinion is.

1    So we don't know what her opinion is, Judge.

2            THE COURT:  All right.  Let's turn then to --

3    have you got any others?

4            MS. TREADWAY:  Dr. Cole again for the most

5    part he is going to be educating the jury which we

6    understand and we appreciate the notice of that.  In

7    Paragraph 38, he starts actually stating some opinions,

8    so 38 are a statement of opinions that he plans to

9    offer.  39 is again one of those he may offer additional

10   opinions but we don't know what those opinions are.

11      Mr. Marian is not going to testify.  Apparently.

12   Dr. Passick, based on our discussions with Dr. Passick,

13   he's not going to be offering an opinion about anything.

14   He is going to be an expert that is going to be

15   educating the jury from his specialized knowledge.  And,

16   again, we appreciate that kind of notice but it really

17   doesn't fit into that kind of opinion category.  Now, if

18   we are wrong about Dr. Passick and he is actually going

19   to render an opinion, it is not expressed in the

20   disclosure.  Dr. Karch, again, has not rendered an

21   opinion.  All we have here is the promise that he will

22   provide an opinion as to the causes of death of some or

23   all of the patients named in the counts of the

24   Indictment.  That doesn't tell us anything, Judge.  And

25   paragraph 9 of his disclosure is again a similar

1   projection that he may offer opinions.  And I believe in

2   your earlier review of Dr. McClave's disclosure you

3   found the same problem with it that we did which is

4   there's just no opinions there, Judge.  And, again,

5   Judge, if the witness is not going to offer any

6   opinions, that's fine.  We put in our expert disclosure

7   witnesses that will not be offering those kind of

8   traditional opinions; but, 702 is much broader than

9   that.  It's anybody that's gonna testify from

10  specialized knowledge.  And so our Rule 702 disclosure

11  as well as the Defendants, has to meet that broad

12  standard and sometimes there will not be opinions.  And

13  if that's the case, just tell us and we understand.  But

14  I believe that these experts are going to offer opinions

15  except for Dr. Passick.

16          THE COURT:  All right.  Well, let's take

17  Mrs. Cobuzzi first.  As I said, in terms of Paragraph

18  18, take a pretty close look at Rule 704.  But I don't

19  see any opinions here and I want that to be -- I want

20  this to be amended to state any opinions that she's

21  going to offer.

22      Dr. Cole, he's been -- I think that this is the way

23  I would like to see -- expect to see, rather, the

24  Defendants' disclosures as has been done with Dr. Cole.

25  Paragraph 38, Dr. Cole will provide the following

1    opinions about the care and treatment provided by Dr.

2    Schneider.  And I don't have any problem with any of

3    that and the Government doesn't either.  The only one

4    that I thought was perhaps an opinion as opposed to just

5    educating the jury was Paragraph 25, the number of

6    patients seen by Dr. Schneider was not aberrant or

7    excessive.  Seems to me that's an opinion.  That's not a

8    fact.  But I have no problem with him.  Is Paragraph 25

9    an opinion or a fact?

10            MR. WILLIAMSON:  Maybe a little bit of both,

11   Judge.  But we can move it to the opinion.

12            THE COURT:  Well, then it's an opinion.  Yeah,

13   move it to the opinion.  Then we're okay.  Marian, he's

14   not going to be around.  Dr. Passick, I think that the

15   Defendant must provide -- it says here in Paragraph 15,

16   Dr. Passick may provide opinions with respect to Dr.

17   Schneider's treatment of specific patients named in the

18   Indictment.  I think that all that's necessary here is

19   two things.  One, that there be a summary of his

20   opinions.  And I think Mr. Williamson said basically

21   that his opinions are going to be, what, or Mr. Byers,

22   one of the two of you, that these people died of

23   something else.

24            MR. GOROKHOV:  That's Dr. Karch, Your Honor.

25            THE COURT:  What's this guy going to testify

1    about?

2          MR. GOROKHOV:  I can address that briefly.

3    Dr. Passick is an expert in these so-called aberrant

4    drug related behaviors or what the Government calls red

5    flags.  And the reason that opinion is stated the way

6    it's stated is because his testimony about specific

7    patients may be in rebuttal to the Government's case.

8    He's going to educate the jury about the issues

9    involving red flags if that testimony is admitted.

10         THE COURT:  So he's not going to be a direct

11   evidence witness then?

12         MR. GOROKHOV:  He will be a witness who will

13   educate the jury.  That's what we foresee.  Now then,

14   his only role on specific patients may be in response to

15   the Government.  That's why it was written the way it

16   was.  But, again, if the Court wants a little more

17   specific statement --

18         THE COURT:  You could have fooled me on that,

19   Mr. Gorokhov, and you did.  So what I expect for Dr.

20   Passick is if he is going to offer opinions as to

21   specific patients, that that be specified.  And as I

22   said earlier, if he's only reviewed the records of some

23   but not all the patients, then his opinions, whatever

24   they are, are going to be limited to the people he's

25   reviewed.  I mean, that's standard.  I've had a lot of

1   experts in here try to testify to things they don't know

2   anything about; but I'm not going to let that happen

3   here if I can avoid it.  Dr. Karch, same.  He can only

4   testify with respect to the persons -- the patients who

5   he has -- whose records he has reviewed.  And that has

6   to be -- you have to provide that information.  He now

7   has that.  If he's going to look at all of them, he's

8   certainly entitled to.  But if he is only going to look

9   at some, we need to know who those are.  Same with Dr.

10  Passick.  And then doctor, the new doctor, as I said

11  this morning, I didn't see any opinions in his

12  disclosure so there have to be some opinions put forth

13  in the disclosure.  And once that's done then -- I want

14  all of that done by a week from today, so that we can

15  keep on track for any Daubert motions.  Now, am I

16  correct in that the Government is contemplating some

17  Daubert hearings?

18          MS. TREADWAY:  Judge, you know I'm not big on

19  those.  I think I've only requested one in my career

20  since Daubert came out.  If we are provided with

21  sufficient information about these experts' opinions and

22  the basis for them, I don't see a need for Daubert

23  hearing unless their opinions are just so whacky, like

24  Ms. Steinhouser's in the Kaufman case, and I don't see

25  that because I think these experts are fairly run of the

83

1    mill and straight forward.

2              THE COURT:  Well, I guess that's my thought,

3    but I'm not prohibiting anyone from requesting a Daubert

4    hearing.  Do the Defendants plan on a Daubert hearing?

5              MR. GOROKHOV:  Yes, Your Honor, we most

6    certainly do.

7              THE COURT:  Who?

8              MR. GOROKHOV:  Well, we were going to discuss

9    that because given the number of witnesses that the

10   Government has named, I think there's 56 or 58 --

11             THE COURT:  Yeah but those are not all

12   experts.

13             MR. GOROKHOV:  I agree, Your Honor.  I think

14   it's going to be the main experts, Dr. Parran,

15   Jorgensen, and I think with respect to the -- I guess

16   Dr. Jorgensen is testifying both on the fraud aspects

17   and the prescribing aspects.  We would have said they

18   could send in one expert as long as they're willing to

19   take, you know, the testimony of one expert on

20   scientific issues, not patient specific issues but

21   scientific issues, as long as they're willing to take

22   the testimony of one expert, we could limit, for

23   example, people from the Coroner's office or medical

24   examiners.  We could say, you know, if you would be

25   willing to do a hearing with one medical examiner as

84

1    long as it's on matters of medical science, they're

2    willing to take the answers of that one expert.  That

3    way we don't have to call, you know, 10, 15 people.

4             THE COURT:  I guess I'm not following what

5    you're saying.

6             MR. GOROKHOV:  I'll give Mr. Williamson a try.

7             MR. WILLIAMSON:  Basically, Judge, what we

8    want to avoid is calling in 54 medical examiners who are

9    talking about specific patients.  What we're going to

10   take issue with is the science behind how they made the

11   determination and we believe that most of all if not all

12   the autopsies were done in Sedgwick County, thus,

13   they're going to be using the same scientific procedure.

14   So since we're challenging the scientific procedure as

15   if it's accepted in the medical community and the

16   Daubert standing, we don't have a need for the other 50

17   witnesses.  They're all going to be specific issues

18   redating solely to Daubert.  We're not getting into the

19   facts, but we have issues as to whether or not they're

20   scientific.

21            THE COURT:  Don't you know or can't you tell

22   from looking at the autopsy reports whether those have

23   been done in accordance with the standard procedure?

24            MR. WILLIAMSON:  That's -- we can, and that's

25   why we don't need to call everybody to the stand.  We

1          can just talk about the procedure and whether or not

2          it's accepted and all the other Daubert markers that

3          have to be met.

4                    THE COURT:  Well, I'm not making any rulings

5          on Daubert issues today.  But the deadline is the 3rd of

6          October and I want to stick to that deadline.  And let

7          me just say this.  Now, and Mr. Williamson's touched on

8          this, you all know, criminal, civil, doesn't make any

9          difference, you can't use Daubert for purposes of

10         discovery.  So if any requests for Daubert hearings are

11         filed, you have to be very specific here regarding why

12         you believe that a Daubert hearing is necessary in

13         accordance with the standards that are set forth in the

14         Daubert cases and all the other cases that have been

15         decided following Daubert and Kuhmo Tire and all the

16         rest of these.  Because I don't intend to revisit the

17         disclosures at this point.  I think you all know what

18         needs to be done.  And I will tell you, frankly, you're

19         all very good lawyers, there's nothing wrong if you have

20         some question in getting on the telephone and calling

21         your opposing counsel and saying we got a question about

22         this one aspect, is this guy going to offer an opinion

23         on such and such and, you know, rather than file

24         motions, because the 3rd of October isn't too far away

25         now.  But I'm not in favor of having many Daubert

```
 1    hearings and certainly none that would be unnecessary.
 2    And that's probably same for you.  So I think we're on
 3    track here as to the case and I'm glad we had this
 4    hearing today.  Government have any additional comments
 5    or concerns you want to raise at this time?
 6              MS. TREADWAY:  Judge, I would just like to
 7    point out to the defense counsel that there has been a
 8    lot of recent case law about the fact that autopsy and
 9    toxicology reports don't even have to be sponsored by
10    the writer at trial.  There's no proffered problem.
11    They are 8036 and 8038 documents.  And to the extent
12    that the Court will agree with that, we intend to put
13    the autopsy reports in summary fashion --
14              THE COURT:  Why don't you write them a letter
15    and point out the authority and if they have some
16    problem with it, because the jury isn't going to like it
17    if we have a parade of witnesses in here just to
18    authenticate an autopsy report.
19              MS. TREADWAY:  I totally agree, Judge, and you
20    know from having tried cases with me before that I love
21    summary presentations because it's so efficient.  And
22    what we were anticipating is based on this recent case
23    law coming out, Ellis is probably the big case out of
24    the Tenth Circuit, and everybody is following it on
25    these autopsy reports and toxicology reports, I believe
```

1    that the administrator is the Sedgwick County Forensic

2    Center, who is Dr. Tim Rohrig, and who is actually the

3    toxicologist, can place into evidence all the autopsies

4    and they say what they say.  And we don't have to have a

5    parade of witnesses.  So to the extent that that's a

6    Daubert challenge that we can avoid, I'll be glad to

7    send counsel all of that recent case law, because it is

8    recent and it's because of the Crawford decision that

9    it's all -- that it's developed.  So I do want to bring

10   that to your attention.

11              THE COURT:  And you get that letter to 'em by

12   next Friday and if they have a problem with that they

13   can respond a week later, and if we need to have a

14   discussion about it, fine; but it's to everybody's

15   advantage to not have more witnesses than are really

16   necessary.  And the same -- I was thinking of what

17   Mr. Williamson had to say.  I don't know if the Sedgwick

18   County Coroner has a standard protocol, written

19   protocol.  I suppose they do, don't they?

20              MR. WILLIAMSON:  I believe so, Judge.

21              THE COURT:  I would think so.  And you can get

22   a copy of that.  All right.  Anything else?  Anything

23   from the defense regarding --

24              MR. WILLIAMSON:  Nothing from the defense,

25   Your Honor.

1          THE COURT:  All right.  Well, here's what I'm

2    going to do.  I'll get out a decision promptly, probably

3    Monday, on the matter of Mrs. Schneider's release.  I'm

4    trying to remember what I've taken under advisement

5    here.  And I think the only thing I've taken under

6    advisement is the protective order.  Is that agreed?

7          MR. WILLIAMSON:  I think so, Judge.

8          THE COURT:  All right.  And then I will get

9    out a decision on the protective order after I see Judge

10   Vratil's decision and if I think I need any more

11   briefing or argument, I'll write you a letter and tell

12   you.  So that's all we need to do today, then we're in

13   recess.  Right at noon.  Amazing.

14                    (Adjourned at 11:58 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T E

3

4          I, Cindy L. Schwemmer, United States Court

5    Reporter in and for the District of Kansas, do hereby

6    certify:

7               That the above and foregoing proceedings were

8    taken by me at said time and place in stenotype;

9               That thereafter said proceedings were

10   transcribed under my direction and supervision by means

11   of computer-aided transcription, and that the above

12   and foregoing constitutes a full, true and correct

13   transcript of said proceedings;

14              That I am a disinterested person to the said

15   action.

16              IN WITNESS WHEREOF, I hereto set my hand on

17   this the 8th day of May, 2011.

18

19

20

21                        s/ Cindy L. Schwemmer

22                        Cindy L. Schwemmer

23                        United States Court Reporter

24

25