IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIMINAL ACTION** |
| | ) | |
| v. | ) | No.  07-10234-01, 02 |
| | ) | |
| STEPHEN J. SCHNEIDER and | ) | |
| LINDA SCHNEIDER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

Before the court are defendants' submissions pursuant to 28 U.S.C. § 2255 and the government's responses: Docs. 759, 761, 764, 769, 770, 771, 772, 773.[1]  Subsequent to receiving the briefs, the court ordered supplemental briefing on the implication of the Supreme Court's decision in <u>Burrage v. United States</u>, 134 S. Ct. 881 (2014). (Doc. 774).  Defendants requested counsel be appointed to assist them with the questions posed by the court and the court granted that request.[2]  (Doc. 778).  Defendants' counsel have now filed a joint supplemental brief on the issues raised by <u>Burrage</u>, the government responded, and defendants filed a joint reply.  (Docs. 784, 785, 786).

I.  **Facts and Procedural History**

Defendant Stephen Schneider ("Stephen") was a doctor of osteopathic medicine and his wife, defendant Linda Schneider ("Linda"), was a licensed practical nurse ("LPN").  In October 2002,

---

[1] While defendants have filed separate § 2255 motions and briefs, the filings are identical.  Therefore, the court will issue one ruling for both defendants.

[2] Defendants motions to proceed <u>in forma pauperis</u> are granted. (Docs. 760, 762, 765).

they opened Schneider Medical Clinic ("SMC") in Haysville, Kansas, where they provided pain management treatment[3] including the prescription of controlled substances. The prescriptions were usually written in combinations of dangerous and addictive drugs from Schedules II, III and IV.

SMC was a large facility and accommodated a large number of patients. It was open seven days a week, for long hours. Stephen was the only full-time doctor on staff. At times, SMC had a part-time doctor on staff but SMC usually utilized physician's assistants (PA) to see patients. Stephen provided the PAs with full, pre-signed prescription pads. The PAs did not have specialized training in pain management and they were given little discretion to alter Stephen's prescriptions.

Linda managed SMC and was in charge of all of the scheduling and billing. The patient charts were disorganized and strewn all over the office. It was often difficult to locate a patient chart and the charts would often be missing key documentation. Linda prioritized the patients who would be seen by the type of insurance they carried. Patients were scheduled every ten minutes and Linda would frequently knock on the exam room door in order to hurry the exam along. Patients waited for many hours in the lobby. On some days, according to the bills submitted to providers, Stephen would see up to 100 patients. Additionally, Linda stated that patients would wait in the parking lot at 5:00 a.m. because SMC would only take the first 30

---

[3] Defendants assert that SMC provided patient services other than pain management but admit that "approximately 30-40% were chronic pain patients. . ." (Doc. 764 at 18). Stephen admitted that he "never had a legitimate pain practice." (Doc. 771).

people to walk in.  Linda felt like they were selling concert tickets.

On May 3, 2010, the grand jury returned a third superseding indictment charging both defendants as follows: Count 1 — conspiracy to unlawfully distribute drugs, commit health care fraud, engage in money laundering, and defraud the United States in violation of 18 U.S.C. § 371; Counts 2–6 — unlawful drug dispensing and distribution and unlawful drug distribution resulting in death in violation of 21 U.S.C. § 841(a)(1); Counts 7–17 — health care fraud and health care fraud resulting in death in violation of 18 U.S.C. § 1347; and Counts 18–34 — money laundering in violation of 18 U.S.C. § 1957.  (Doc. 414).

During Spring 2010, the case proceeded to trial.  Stephen was represented by Lawrence Williamson.  Linda was represented by Kevin Byers[4] and Eugene Gorokhov.  The evidentiary portion of the trial, including jury selection, lasted seven weeks.  Approximately ninety witnesses testified, including many experts.  Through lay testimony from patients and former employees, along with expert testimony, the government presented an extensive amount of evidence detailing the operations of SMC and, more specifically, defendants' conduct.

The evidence, viewed in the light most favorable to the government, overwhelmingly demonstrated that the Schneiders operated SMC as a revenue-generating facility, with little or no concern for the welfare of its "patients."[5]  Simply stated, SMC was operated as

---

[4] Kevin Byers is deceased.

[5] On appeal, the only sufficiency of the evidence claim related to the charge of health care fraud resulting in death.  The Tenth Circuit rejected the claim.

a "pill mill."   The patient records showed that inadequate or no medical histories were taken, there was a lack of treatment plans, no visible effort to treat the cause of the patients' pain, failure to monitor patients' progress, a lack of documentation, escalating dosages of prescriptions and prescription practices which were likely to cause dependance.   The patient records also contained numerous "red flags" which would support a finding that patients were addicted to the prescriptions, i.e., early refills, failed urine tests, claims of lost prescriptions, and reports of abuse.   There was evidence that some patients were selling SMC-prescribed drugs in SMC's parking lot.

Dr. Theodore Parran, the government's expert on patient care, reviewed over 100 patient records and concluded that the Schneiders: "(1) ran a practice that attracted drug addicts; (2) took inadequate medical histories; and (3) indiscriminately prescribed controlled drugs in excessive and escalating amounts." United States v. Schneider, 704 F.3d 1287, 1291 (10th Cir. 2013).   Dr. Douglas Jorgensen, the government's expert on pain management and billing practices, reviewed fifty-four medical charts, numerous autopsy and toxicology reports, and information about billing and coding practices.   Dr. Jorgensen summarily opined that the Schneiders filed fraudulent claims to insurance providers and the Schneiders' health care fraud resulted in patients' deaths.   Dr. Graves Owen, an expert in pain management, testified that Stephen did not prescribe controlled substances for a legitimate medical purpose.

From February 2002 to February 2008, sixty-eight SMC patients died of drug overdoses.   Stephen called overdosing patients "bad grapes."   The average age of these patients was 41, with the youngest

-4-

being 18 years old, and the oldest being 61.  During the same time period, over 100 SMC patients were admitted to local hospitals for overdoses.  Defendants received repeated calls from law enforcement, concerned family members about patients' drug addictions, concerned pharmacists, and calls from Emergency Room physicians about SMC's prescription practices.  SMC's method of operation continued without change.

The government also introduced extensive evidence of defendants' fraudulent billing practices.  Defendants billed for services allegedly performed by Stephen when he was out of town or not in the office.  Defendants billed for services rendered by a PA as though a doctor had seen the patient.  Defendants billed visits at a higher code than the level of service that was provided, i.e. utilizing the 99213 code when the visit was just for a med refill.

At the close of the government's evidence, defendants presented evidence through twenty-eight witnesses, including Stephen.  Linda chose not to testify.[6]  Defendants' witnesses included patients, employees and experts.  The defense case consumed eight trial days.

After the conclusion of the evidence, the jury deliberated for seven days.  The jury found Stephen guilty of Counts 1-17 and two money laundering charges (Counts 26 and 28), and found Linda guilty of all charges save two money laundering charges (Counts 23 and 24). The court sentenced Stephen to 360 months' imprisonment on counts 1-5

---

[6] The court instructed the jury that the law does not compel Linda to testify and that the jury should not allow that fact to considered in their deliberations or weigh against Linda.

and 7-9, to run concurrently.  Linda was sentenced to 396 months'
imprisonment on counts 1-5 and 7-9, to run concurrently.

Defendants timely appealed and the Tenth Circuit affirmed the
convictions and sentences.  Schneider, 704 F.3d 1287.  Defendants'
section 2255 motions raise two substantive issues: 1) whether the
Supreme Court's recent decision in Burrage v. United States, 134 S.
Ct. 881 (2014), interpreting statutory language concerning a
sentencing enhancement, requires the court to set aside defendants'
convictions and/or sentences on certain counts; and 2) whether
defendants' trial and appellate counsel were ineffective.  The court
will address these issues in turn.

II.  **Counts Concerning the "death . . . results from" Sentencing
     Enhancement**

The Third Superceding Indictment charged defendants with unlawful
drug dispensing and distribution resulting in death in violation of
21 U.S.C. § 841(a)(1) in counts 2-5 and health care fraud resulting
in death in violation of 18 U.S.C. § 1347 in counts 7-9.  Penalties
for violations of these charges vary, however.  The penalty for a
violation of section 841(a)(1) is enhanced to a mandatory minimum
sentence of 20 years for a Schedule II controlled substance, and a
maximum of 15 years for a Schedule III controlled substance, "if death
or serious bodily injury results from the use of such substance." 18
U.S.C. § 841(b)(1)(C) & (b)(1)(E)(i).[7]

---

[7] Section 1347 provides that if the violation results in death,
a defendant may be imprisoned for any term of years or life.  Without
this enhancement, the maximum sentence cannot be more than ten years.
    The conspiracy charge in count 1 cites to both sections 371 and
1349.  Section 371 has a maximum sentence of 5 years.  Section 1349
states that the penalty will be the same as "those prescribed for the

The jury was instructed in accordance with Tenth Circuit law on the elements of sections 371, 841 and 1347. (See Inst. Nos. 8, 15, 20, 21, 22, 23, 29).  These instructions are not challenged by defendants.  The jury was also instructed that if defendants were found guilty of unlawful dispensing and/or health care fraud, that it must also determine whether those crimes resulted in serious bodily injury or death[8]:

> Counts 2 through 4 charge that the illegal dispensing of specifically identified controlled substances resulted in the serious bodily injury or death of three individuals. Count 5 charges that the illegal dispensing of controlled substances resulted in the serious bodily injury or death of 18 named individuals.
>
> If you find Stephen Schneider guilty of illegally dispensing controlled substances, as charged in Counts 2, 3, or 4, or any of them, you will then have to unanimously determine beyond a reasonable doubt whether the illegal dispensing of the specifically identified controlled substances resulted in serious bodily injury or death as to each of the three named individuals.
>
> As to Count 5, you will have to unanimously determine beyond a reasonable doubt which, if any, of the named 18 individuals suffered serious bodily injury or death as a result of the controlled substance(s) illegally dispensed by Stephen Schneider.
>
> Your findings must be noted on the verdict form.

---

offense, the commission of which was the object of the attempt or conspiracy."  In this case, the jury found defendants guilty of conspiring to commit health care fraud, 18 U.S.C. § 1347.

[8] The court need not review the instructions concerning the conspiracy charge.  The penalty for the violation of that charge merely follows the provisions in the underlying crime found by the jury, health care fraud.  Defendants challenge the sentence on count 1 because it was enhanced as a result of the enhancement applicable to the health care fraud counts.

Inst. No. 24.[9]

> Counts 7, 8 and 9 additionally charge that the health care fraud resulted in serious bodily injury to or death of three individuals: Patricia G, Eric T and Robin G. If you find a defendant guilty on any of those counts, you will then have to determine beyond a reasonable doubt if serious bodily injury or death resulted from the health care fraud.

> For you to find that serious bodily injury or death resulted from the health care fraud committed by a defendant, the government must prove beyond a reasonable doubt that the individual's serious bodily injury or death was a result of the health care fraud alleged.

> For purposes of Counts 7, 8 and 9, the term "serious bodily injury" means bodily injury which involves (1) a substantial risk of death; (2) extreme physical pain; or (3) protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

Inst. No. 32.

Prior to trial, defendants submitted the following instruction on the question of whether a patient's death resulted from the prescriptions:

> In addition to charging that the Defendants knowingly and willfully dispensed controlled substances by writing prescriptions as a drug dealer and outside the course of professional practice, counts 2-5 also charge that deaths resulted from the use of those prescriptions. In order to find the defendants guilty of counts 2-5, the government must also show beyond a reasonable doubt that the deaths resulted from the use of those prescriptions.

> First, if you do not find that Dr. Schneider prescribed outside the scope of professional practice, that is, acted as a drug dealer with respect to any particular patient, then you should not consider the cause of death as to that patient. Only if you first find that the government has shown beyond a reasonable doubt that Dr. Schneider prescribed outside the scope of his professional practice may you then consider whether the government has shown

---

[9] Although this instruction specifically states Stephen Schneider, the jury was instructed in Instruction No. 15 on the elements of 18 U.S.C. section 2, aiding and abetting, which were applicable to the charges against Linda Schneider in counts 2 through 34 of the indictment.

beyond a reasonable doubt that the prescription was the cause of the patient's death.

In order to establish that a death "resulted" from the Defendants' conduct, the government must prove beyond a reasonable doubt that the Defendants' conduct directly and in natural and continuous sequence produced or contributed substantially to producing the death. The government must prove beyond a reasonable doubt that the prescription was the "but for" cause of the death. That is, the government must prove beyond a reasonable doubt that the patient would not have died if the patient had not received the prescription.

(Doc. 451 at 6). Defendants did not offer an instruction concerning the sentencing enhancement on counts 7-9. Defendants also did not object to the court's instruction concerning whether the health care fraud resulted in death.

During the instruction conference, defense counsel argued their position on the requested instruction. The court found that an attempt to explain causation to the jury would be confusing and that the decision cited by defendants, United States v. Hatfield, 591 F.3d 945 (7th Cir. 2010) did not require specific language in an instruction. Defense counsel appeared to concede that instructing the jury on causation would be confusing but asked for an opportunity to brief the issue. The court granted the request and allowed supplemental briefing. (Tr. at 5762-65). Defendants filed a supplemental brief the next day. (Doc. 483). Defendants argued that the term "resulted in death" is too vague and that proof of "but for" causation is required. Defendants requested that their submitted instruction be given to the jury. The court declined to give defendants' proposed instruction.

At the end of the evidence, defendants moved for acquittal on all counts. Defendants argued that the government did not prove that the

prescriptions were the "but for" cause of the patients' deaths. (Doc. 485 at 8). The court denied the motion. (Doc. 497). After the jury verdicts were returned, defendants moved for a new trial, arguing that the government did not prove that the patients' deaths were caused by the prescriptions and health care fraud. (Doc. 505 at 5-6, 13). Defendants also argued that the court erred in refusing to give a causation instruction. The court denied the motion. (Doc. 509).

Defendants appealed their convictions. On appeal, defendants did not raise the "but for" causation issue. Defendants challenged the court's decision to admit certain expert testimony, claimed that the court erroneously instructed the jury on the unlawful dispensing counts and asserted that there was insufficient evidence to support the convictions on counts 7-9, health care fraud resulting in death. The Tenth Circuit affirmed. Schneider, 704 F.3d 1287. The Supreme Court denied certiorari. Schneider v. United States, 133 S. Ct. 2868 (2013).

A.   The **Burrage** Decision

In January 2014, the Supreme Court issued Burrage v. United States, 134 S. Ct. 881 (2014). In that case, Marcus Burrage was charged with violating § 841(a)(1) for distributing heroin to Joshua Banka who later died. The government alleged that Burrage was subject to the enhanced penalty because Banka's death "resulted from" the heroin use. Burrage, 134 S. Ct. at 885. Two medical experts testified regarding the cause of Banka's death. Id. The first testified that multiple drugs were present at the time of death and that only the heroin was above the therapeutic range, but he was not sure "whether Banka would have lived had he not taken the heroin."

Id.  The expert opined that the combined drugs caused "respiratory and/or central nervous system depression" and the heroin was a "contributing factor" to Banka's death.  Id.  The second expert also testified that the heroin played a "contributing role," but could not say whether Banka would have lived had he not taken the heroin.  Id. at 886.  The jury was instructed that the government only had to prove that the heroin was a "contributing cause" of death.  Id.  Burrage was convicted and received the enhanced penalty.  Id.

The Eighth Circuit affirmed.  United States v. Burrage, 687 F.3d 1015 (8th Cir. 2012).  The Supreme Court rejected the Eighth Circuit's contributing cause standard by stating: "The language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed." Burrage, 134 S. Ct. at 891.  Instead, the court held: "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death." Id. at 892.

Four years before Burrage was decided, and in the absence of a controlling Tenth Circuit case, this court elected to instruct in the language of the statute.  The government cites several reasons why the failure to give a "but for" instruction does not require defendants' convictions and sentences to be changed.

**B.   Procedural Default**

Defendants contend that their convictions on the enhanced charges, counts 1-5 and 7-9, must be set aside in light of Burrage

-11-

because the court did not instruct on "but-for" causation.    The government argues that defendants cannot raise this issue as their claim has been procedurally defaulted.[10]

When a Supreme Court decision "results in a 'new rule,' that rule applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." Schriro v. Summerlin, 542 U.S. 348, 351, 124 S. Ct. 2519, 2522 (2004) (citation omitted).    While new substantive rules generally apply retroactively, new procedural rules do not.  See id. at 2522-23.  The government concedes, and the court agrees, that Burrage announces a new substantive rule of law applicable to cases on initial collateral review.  (Doc. 775).

The government, however, contends that defendants' Burrage claim implicates United States v. Frady, 456 U.S. 152, 102 S. Ct. 1584 (1982), which states that a defendant's failure to raise an issue at trial or on direct appeal imposes a procedural bar to the review of that claim in a habeas proceeding that is excusable only if certain conditions are met.  See id. at 167-68; United States v. Barajas-Diaz, 313 F.3d 1242, 1245 (10th Cir. 2002).

Defendants assert that their Burrage claim does not implicate Frady because they raised the "but-for" causation issue during trial and in post-trial briefing.  The Tenth Circuit, however, requires a defendant to raise an issue on direct appeal in order to raise that

---

[10] The government also asserts that this court's instructions and the evidence complied with Burrage.  This court, however, must first determine whether a defendant is procedurally barred from presenting a claim prior to reviewing the claim on the merits.  See United States v. Harms, 371 F.3d 1208, 1211 (10th Cir. 2004).

same issue in a section 2255 motion. "When a defendant fails to raise an issue on direct appeal, he is barred from raising it in a § 2255 motion unless he can show cause excusing his procedural default and actual prejudice resulting from the errors of which he complains, or can show that a fundamental miscarriage of justice will occur if his claim is not addressed." United States v. McGaughy, 670 F.3d 1149, 1159 (10th Cir. 2012) (internal citations omitted).   Contrary to defendants' position, "the Frady cause and prejudice standard applies if a § 2255 movant has failed to raise an issue on direct appeal, regardless of whether the movant made a contemporaneous objection to the alleged error at trial." Hines v. United States, 971 F.2d 506, 507-508 (10th Cir. 1992).

### 1.   Ineffective Assistance of Appellate Counsel[11]

Defendants argue that the cause of their procedural default was ineffective assistance of appellate counsel.   A meritorious claim of ineffective assistance of counsel constitutes cause and prejudice for purposes of surmounting the procedural bar. United States v. Horey, 333 F.3d 1185, 1187 (10th Cir. 2003).   A successful claim of ineffective assistance of counsel must meet the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). First, a defendant must show that his counsel's performance was deficient in that it "fell below an objective standard of

---

[11] The court acknowledges his responsibility to consider and rule on the effectiveness of appellate counsel and has done so.   However, none of defendants' appellate counsel appeared at trial and, of course, this court was not present at oral argument.   It is worth noting that appellate counsel were not retained, as were trial counsel, but rather were appointed by the Tenth Circuit whose judges were familiar with counsels' qualifications.

reasonableness." Id. at 688.  Second, a defendant must show that counsel's deficient performance actually prejudiced his defense.  Id. at 687.  That is, that "there is a reasonable possibility that, but for counsel's professional error, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The standard required to prove ineffective assistance of appellate counsel is, if anything, more strict than for trial counsel. As the court observed in Upchurch v. Bruce, 333 F.3d 1158, 1163 (10th Cir. 2003), cert. denied, 540 U.S. 1050 (2003):

> Claims of appellate-counsel ineffectiveness are often based on counsel's failure to raise a particular issue on appeal. Appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.  Although it is possible to bring a Strickland claim based on counsel's failure to raise a particular issue, it is difficult to demonstrate that counsel was incompetent.

(Internal citations and quotations omitted).  Indeed, the process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy. United States v. Challoner, 583 F.3d 745, 749 (10th Cir. 2009) (internal citations and quotations omitted).  The Sixth Amendment does not "require counsel to raise, or even be cognizant of, all potential defenses." United States v. Harms, 371 F.3d 1208, 1212 (10th Cir. 2004).  "Precedent from both the Supreme Court and our sister circuits clearly holds that counsel's failure to raise or recognize a potential legal argument does not automatically render counsel's performance constitutionally deficient." Id.

Defendants contend that appellate counsel was ineffective for

-14-

failing to raise the "but-for" causation argument on appeal because there was a circuit split on the issue and the Tenth Circuit was silent. (Doc. 784 at 10). At the time of trial, there was a split among the circuits as to the government's burden of proof to establish that the victim's death or serious injury "results from" the defendant's distribution of drugs. See United States v. Hatfield, 591 F.3d 945, 948 (7th Cir. 2010)(The statutory term "results from" required the government to prove the "death or injury would not have occurred had the drugs not been ingested: 'but for' (had it not been for) the ingestion, no injury."); United States v. Rodriquez, 279 F.3d 947, 951 (11th Cir. 2002)(same); United States v. Pacheco, 489 F.3d 40, 46-47 (1st Cir. 2007)("the government was not required to show that [the drug] was either the sole or the direct cause of [the victim's] injuries; it had to show only that there was a but-for causal connection between [the drug] and those injuries."); United States v. Martinez, 588 F.3d 301, 318-19 (6th Cir. 2009) ("proximate cause is the appropriate standard to apply in determining whether a health care fraud violation 'results in death.'"); United States v. Carbajal, 290 F.3d 277, 284 (5th Cir. 2002)(strict liability, no proof of proximate causation or reasonable foreseeability); United States v. Monnier, 412 F.3d 859, 862 (8th Cir. 2005)("results from" requirement is met by a "contributing cause.")

In United States v. Demeree, No. 02-5170, 2004 WL 1941305 (10th Cir. Sept. 1, 2004), the Tenth Circuit held that counsel was ineffective for failing to raise an issue when there was a circuit split and the Tenth Circuit had not yet ruled on the issue. Therefore, in light of the circuit split at the time of appeal and the

fact that trial counsel had researched and raised the issue at trial, it is at least arguable that appellate counsel were obligated to raise this issue.  See id.

Defendants must next show that appellate counsel's deficient performance actually prejudiced their defense.  Strickland, 466 U.S. at 687.  That is, defendants "must show a reasonable probability that, but for [their] counsel's unreasonable failure to file a merits brief, [they] would have prevailed on his appeal."  Smith v. Robbins, 528 U.S. 259, 286, 120 S. Ct. 746, 764 (2000).

Defendants argue that they have established prejudice because regardless of the outcome at the Tenth Circuit on their direct appeals, they would have ultimately prevailed on their appeals at the Supreme Court had they raised the "but-for" issue.  Burrage holds that "the language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed."  Id. at 891.  "At least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death."  Id. at 892.

Based on the evidence introduced at trial pertaining to counts 2,3,and 5, discussed infra, the government did not prove that the prescriptions issued by Stephen Schneider were a "but-for" cause of the patients' deaths listed in counts 2,3, and 5.  Therefore, the court finds that defendants have established actual prejudice and the court may proceed to their Burrage claim on the merits.  See United

-16-

States v. Ford, 750 F.3d 952, 955 (8th Cir. 2014)("Under <u>Burrage</u>, this evidence is insufficient to sustain a conviction" and would have resulted in a reversal on appeal.)

   **C.   <u>Burrage</u> Claim of Error**

   The government next argues that no <u>Burrage</u> error occurred because the court instructed on the statutory language and the Supreme Court did not mandate that a jury be given further explanation of the term "results from."   (Doc. 785 at 3).   The government, however, is incorrect.   The Supreme Court held that the "results from" death enhancement charged in the indictment requires the jury to find beyond a reasonable doubt the following two elements: "(i) knowing or intentional distribution of [prescription drugs], § 841(a)(1), and (ii) death caused by ("resulting from") the use of that drug, § 841(b)(1)(C)." <u>Burrage</u>, 134 S. Ct. at 887.

   The court's instructions, <u>supra</u>, utilized the statutory language, death "resulted from" the prescriptions, but did not instruct the jury that the death must be <u>caused</u> by the prescription drugs.   Nor did the court instruct that the government was required to prove that the patients would not have died "but-for" the prescriptions issued by Stephen Schneider.   The <u>Burrage</u> decision imposes a "new and stricter burden of proof that the government needs to prove in order to establish that 'death resulted' from drug distribution." <u>Weldon v. United States</u>, No 14-0691, 2015 WL 1806253, 3 (S.D. Ill. April 17, 2015).   At the time of trial, this court did not have the benefit of <u>Burrage</u> or a Tenth Circuit case which interpreted the sentencing enhancement.   Had this court been able to predict the ruling in <u>Burrage</u>, it certainly would have instructed the jury differently, and

would most likely have granted defendants' motion for judgment of acquittal on counts 2 and 3, as well as count 5, for the reasons discussed infra.

The government nevertheless argues that the instructions were sufficient because the Supreme Court interpreted the term "results from" by utilizing its ordinary meaning. Essentially, the government wants this court to presume that the jury interpreted the term "results from" as requiring the government to prove "but-for" causation. The problem with the government's argument is that the jury was not instructed any further on the term "results from" and the government's own expert, Dr. Parran, essentially defined "results from" as requiring only a contributory cause, not a direct cause of death.

> Question: Now, what I want you to do for the jury is explain to them as you have to me how you differentiate a person like Robin [Count 4] and Eric [Count 3] and Patricia [Count 2] and Katherine [Count 5], where you have offered the opinion that the prescription practice **directly caused** their death, as opposed to these other 17 individuals [listed in count 5] where your opinion is that the prescription practice **contributed** to their death.

> Dr. Parran: Okay. If a patient died and there were medical issues going on in that patient's -- or documented in that patient's autopsy which could have caused a person to die, you know, around that time, but the prescriptions appeared to play a significant role, then I had an opinion that the prescriptions **contributed** to the patient's death. Or, if a patient died and they also had cocaine in their system or methamphetamine in their system or some illicit drug, that certainly would not have been prescribed from the office practice. In those cases, I had the opinion that the prescribing **contributed** to the death. In cases where there was not substantial -- there wasn't a substantial amount of other medical diseases currently active in the patient and there also weren't a lot of other drugs or street drugs or drugs that clearly weren't prescribed by this practice in the patient, then it was my opinion that the prescribing played a **direct or causative role** in the patient's death.

> Question: Either way, whether the prescribing practices were the direct or the contributing cause of death, is it your opinion for all 21 of these individuals that the prescription practices, the illegal drug distribution at the Schneider Medical Clinic, **resulted in** these individuals' deaths?
>
> Dr. Parran: Yes.

Tr. at 2305-06 (emphasis supplied).

As seen in the transcript, the government's expert testified that the statutory term "results" is satisfied when the drugs either contribute to or are a direct cause of the patient's death. Because the jury was not instructed on the meaning of "results from" and was not instructed that they must find that the death was "caused" by defendants' illegal dispensing of prescription drugs or health care fraud, the court finds that the instructions on counts 2-5 and 7-9, the counts charging death, were erroneous. However, for the following reasons, the error as to count 4 was harmless.

**D.   Harmless Error**

"As the Supreme Court confirmed in Neder v. United States, [527 U.S. 1, 7, 119 S. Ct. 1827 (1999)] the conclusion that a jury instruction was erroneous does not necessarily end the inquiry. Rather, like most constitutional violations, an instructional error on an element of the offense is generally subject to harmless error review."   United States v. Holly, 488 F.3d 1298, 1305 (10th Cir. 2007).

The court may determine that the error was harmless and may be disregarded if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."   Id. at 1307 (quoting Neder, 527 U.S. at 15). "An instructional error may be

-19-

harmless where the element on which the jury was not properly instructed was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." Id. at 1307 (quoting Neder, 527 U.S. at 17) (internal quotations omitted). Because this court's harmless error review must focus exclusively on the erroneously instructed causation element, the error is harmless in this case only if it is clear beyond a reasonable doubt that the jury would have found defendants' illegal dispensing of prescription drugs was the "but-for" cause of death for the individuals named in counts 2-5 and the health care fraud charged in counts 7-9 was the "but-for" cause of death of the individuals named in those counts. See Holly, 488 F.3d at 1307.

In order to make the determination, the court is required to conduct a "thorough examination of the record." Neder, 527 U.S. at 19. "If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error . . . it should not find the error harmless." Id.; United States v. Sierra-Ledesma, 645 F.3d 1213, 1223 (10th Cir. 2011)(court's error deleting "knowingly" from an element was harmless "because we find beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error.")

The court conducted a thorough examination of the record which consists of a 6,000-plus page transcript and numerous exhibits. Each count affected by Burrage will be addressed in turn.

### 1.   Count 2 - Patricia G

Turning to the evidence presented by the government at trial,

defendants were charged and found guilty of illegal distribution and dispensing of prescription drugs which resulted in the death of Patricia G.[12] The government's experts testified Patricia G died from mixed drug intoxication. Patricia G's death certificate states that the cause of death was mixed drug intoxication. Patricia G had the following drugs in her system at the time of death: Oxycodone, Hydrocodone, Alprazolam, Diazepam, Carisoprodol, and Atropine. Stephen Schneider had prescribed Oxycodone, Hydrocodone and Alprazolam to Patricia G. When asked if Patricia would have "died of mixed drug intoxication even without considering the effects of the Soma or the carisoprodol found on toxicology," Dr. Rohrig testified "It's possible; but, I mean, the Soma was pretty significant." Tr. at 1797.

Based on this evidence, the government has not met its burden to prove that the instructional error was harmless. United States v. Serawop, 410 F.3d 656, 669 (10th Cir. 2005) (burden to prove harmless error is on the government). The government's expert could not conclusively say that the prescription drugs dispensed by Stephen Schneider were the "but-for" cause of Patricia G's death. As in Burrage, the expert could only opine that it was the combination of drugs provided by Schneider and other drugs that caused Patricia G's death. Therefore, the government has not established that the causation issue with respect to Patricia G was "uncontested and supported by overwhelming evidence." Neder, 527 U.S. at 17. The court cannot conclude that the instructional error was harmless as to count 2.

---

[12] The jury found Stephen guilty of illegal distribution and found Linda guilty of aiding and abetting Stephen.

### 2.   Count 3 - Eric T

In count 3, defendants were charged and found guilty of unlawful dispensing and distribution of prescription drugs resulting in the death of Eric T.  Eric T's death certificate states that he died of a mixed drug intoxication with a contributing factor of atherosclerotic cardiovascular disease.  (Exh. 3F).  The drugs found in Eric T's blood were all prescribed by Stephen Schneider. Defendants, however, argued that his death was caused by a heart attack.  The following testimony was given by Dr. Oeberst, the government's expert:

> Question: And in this situation the cause of death for Eric T was complications of mixed drug intoxication and atherosclerotic cardiovascular disease. Could you please tell the jury what atherosclerotic cardiovascular disease is? Or ASCVD?
>
> Dr. Oeberst: In this particular case it's coronary -- it's also known as coronary artery disease. Basically, atherosclerotic disease refers to the plaques that you hear about that are formed by high cholesterol and other things; but, essentially, in this particular case, it's another descriptor for coronary artery disease or heart disease.
>
> Question: Did Eric T die of heart disease?
>
> Dr. Oeberst: It was listed as a contributing cause of death.
>
> Question: Was it the primary cause of death?
>
> Dr. Oeberst: No.
>
> Question: What is the primary cause of death?
>
> Dr. Oeberst: Complications of a mixed drug intoxication.

Tr. at 726.

On cross-examination, defense counsel questioned Dr. Oeberst's findings as follows:

> Question: Okay. Now, back to my other question. What did

-22-

you do to eliminate the natural preexisting diseases as the cause of Mr. Eric T's passing?

Dr. Oeberst: I didn't eliminate them. I listed it as a contributing condition.

Question: How much did the mixed drug intoxication contribute as opposed to the cardiovascular disease?

Dr. Oeberst: Are you asking like a percentage?

Question: Yes.

Dr. Oeberst: There's not really a medical answer for that.

Question: So you cannot, as you sit here, say, say which preexisting cardiac condition or mixed drug intoxication, which played a greater percentage in his passing away; correct?

Dr. Oeberst: Well, he had the cardiac disease before he became intoxicated. He had been living with cardiac disease. So that's why I put the mixed drug intoxication as primary.

Question: And isn't it true that he was living taking Soma; correct?

Dr. Oeberst: Yes.

Question: He was living taking methadone; correct?

Dr. Oeberst: Yes.

Question: He was living taking oxycodone; correct?

Dr. Oeberst: Apparently, yes.

Tr. at 820-821.

Question: Again, my question is you can't rule it out beyond a reasonable doubt, can you, that he had a heart attack?

Dr. Oeberst: I can't completely rule it out.

Tr at 824.

In addition, defendants introduced the following testimony of Dr. Karch, their medical expert.

Question: And let's turn to Eric T. Were you able to

-23-

determine beyond a reasonable doubt what his cause of death was?

Dr. Karch: No. According to Dr. Oeberst's description, and she did do microscopic examinations, this decedent met every criteria for having active myocarditis. And myocarditis can kill you. So I sort of put that down in one column. He also had a huge heart just like you saw on the picture. But he also had multiple drugs. So you could put the three causes in a hat and pull out a piece of paper. I don't know how to tell.

Question: Well, is there a technique -- when you have all these co-possibilities, is there a scientific technique to eliminate one or the other and make a selection?

Dr. Karch: Well, there is in that had hair testing been done and there was very low levels of the drugs, yeah, then I would have to say, well, it's myocarditis and cardiomegaly, and/or cardiomegaly and I don't know which one would be first and which one would be second. But without a hair test to let me know whether or not the person was tolerant [to the drugs], no, it's a guess. So we're not paid to guess. I tracked for many years in the San Francisco office what percentage of deaths are undetermined. And it's always between 4 and 5. In Europe sometimes it's as high as 6 or 8. I mean, you can't go too high or you won't have a job. I mean, if everybody's undetermined, they don't need you. But I would have to say it's undetermined.

Tr. at 5601-5602.

Based on the evidence, Eric T's cause of death was not uncontested. The government's expert listed heart disease as a contributing cause of death and defendant's expert testified that the cause of death was undetermined due to Eric T's heart condition and the lack of testing to determine his tolerance to the prescription drugs. While evidence that Eric T overdosed on prescription drugs was supported by evidence at trial, the cause of his death was clearly contested. The court cannot say beyond a reasonable doubt that the jury would have found that the prescription drugs were the "but-for" cause of Eric T's death. Therefore, the court cannot conclude that

the instructional error was harmless as to count 3.  See United States
v. McKye, 734 F.3d 1104, 1111 (10th Cir. 2013)(error was not harmless
because the issue was contested at trial).

   **3.   Count 4 - Robin G**

   In count 4, defendants were charged and found guilty of unlawful
dispensing and distribution of prescription drugs resulting in the
death of Robin G.  Robin G's death certificate states that she died
of toxic effects of fentanyl.  (Exh. 4F).  The government's experts
also opined that the case of Robin G's death was an overdose of
fentanyl, which was prescribed by Stephen Schneider.  Tr. at 838,
1015, 2303.  Defendants' expert, Dr. Karch, however, opined as
follows:

> Question: And next Robin G. Were you able to determine
> beyond a reasonable doubt what her cause of death was?
>
> Dr. Karch: I think it was heart disease. I'm discounting
> the Fentanyl entirely based on Apple's new evidence that
> you could have zero Fentanyl when you die and then have a
> whole lot of Fentanyl when your autopsy occurs. Since
> that's proven, I have no way, no method. I can't take that
> into account. As far as I'm concerned, it proves that
> sometimes she was treated with Fentanyl. She might have
> been treated with Fentanyl before she died. She might not.
> I suppose a detailed review of hospital records might show
> that she had been given an injection of Fentanyl within an
> hour or so before she died; but I didn't have that
> opportunity. So given the information I have, she's got an
> enlarged heart with fibrosis; and, oh, by the way, has
> pneumonia. And more than a few people die from pneumonia.
>
> Question: And is there a scientific technique that would
> have eliminated the -- is there any way to determine what
> the Fentanyl level was at the time prior to her passing
> away?
>
> Dr. Karch: No.

Tr. at 5602-03.

   During cross-examination, Dr. Karch was questioned as

follows:

> Question: You cannot testify under oath that the cause and manner of Robin G's death to a reasonable degree of medical certainty was other than a drug overdose, can you?
>
> Dr. Karch: No. I'd have to explain why. Actually I classified her death as natural.

Tr. at 5652-53.

Dr. Karch based his opinion in part on a medical study which was authored by a well respected physician and contained in a peer reviewed journal. That study concluded that fentanyl levels can rise to high levels after death. The study showed that out of nine patients who died while being treated with fentanyl, four of those patients' fentanyl levels rose after death. Both government experts were questioned about the study and its author. Dr. Oeberst testified that she probably would have done some additional consultation if she had known that there was literature regarding inflated fentanyl levels post-mortem. Tr. at 831-832. Dr. Oeberst, however, would not alter her opinion that Robin G died of a fentanyl overdose. Robin G also had evidence of heart damage but Dr. Oeberst testified that the damage occurred post-mortem. Tr. at 834-36.

In order to decide whether the erroneous instruction was harmless error with respect to Robin G, the court must determine after reviewing the record whether there is "evidence that could rationally lead to a contrary finding with respect to the omitted element." Neder, 527 U.S. at 19-20. While defendants did contest the cause of Robin G's death, Dr. Karch "thinks" it is heart disease or it may "by the way" be pneumonia. Dr. Karch does not opine with a reasonable degree of medical certainty that Robin G died from heart disease or

-26-

pneumonia.  Rather, Dr. Karch admits that he does not have sufficient information to testify about her cause of death.  Moreover, Dr. Karch totally discounts the extremely high amount of fentanyl in Robin G's system on the basis of one study in which less than half of the decedents had their fentanyl level rise.  This testimony, in light of the medical evidence presented by the government, is not sufficient for the court to conclude that a rational jury would have found that Robin G.'s death was not caused by fentanyl.  <u>Neder</u>, 527 U.S. at 19 (In order to conclude that the error was not harmless, the court must find that the element was contested and defendant "raised evidence sufficient to support a contrary finding.") And, of course, the jury was entitled to disregard Dr. Karch's testimony.

Therefore, after reviewing the entire record, the court concludes that it is clear beyond a reasonable doubt that the jury would have found defendants' illegal dispensing of fentanyl was the "but-for" cause of Robin G's death.  <u>See</u> <u>United States v. Sierra-Ledesma</u>, 645 F.3d 1213, 1223 (10th Cir. 2011)(omitted element was harmless error); <u>Neder</u>, 527 U.S. at 19-20 (if the record does not contain sufficient evidence that could rationally lead to a contrary finding, holding the error harmless does not "reflec[t] a denigration of the constitutional rights involved.")  Defendants' motion to vacate the jury's verdict on count 4 is denied.

**4.   Count 5**

In Count 5, defendants were charged with distributing and dispensing prescription drugs to eighteen patients resulting in their deaths.  The jury found defendants illegally dispensed prescription drugs to thirteen of the charged patients.  The jury further found

-27-

that defendants' conduct resulted in bodily injury to eleven of the patients and resulted in death to seven of those eleven patients.

While the government cites to the record in an attempt to show that the instructional error was harmless as to counts 2-4, the government does not even attempt to cite to relevant evidence which would support a finding that defendants' conduct was the "but-for" cause of death for the individuals in count 5. The burden of proving harmless error is on the government. United States v. Lott, 310 F.3d 1231, 1250 (10th Cir. 2002). The government has not done so.

After reviewing the record, the court cannot conclude beyond a reasonable doubt that the jury would have returned a verdict of guilty on count 5 if it had been instructed on "but-for" causation. Notably, the government's expert, Dr. Parran, testified that the prescriptions issued to the individuals in count 5 contributed to their death, but did not directly cause their death. Tr. at 2305-06.

In addition, several individuals in count 5 died as a result of a mixed drug intoxication and had consumed drugs which were not prescribed by Stephen Schneider: Kandace B, overdosed on a combination of prescription drugs including prescriptions which were not prescribed by SMC (Tr. at 1806-1807, Exh. 1A at 4); Billie R (same)(Tr. at 2371; Exh. 1A at 1); Robert S (same)(Tr. at 1807-08; Exh. 1A at 5); Mary S (same; primary cause of death listed on death certificate was cardiovascular disease)(Tr. at 2398; exh. 1A at 3, 5O-6); Toni W (same; blood results also showed cocaine present in brain) ("Since we found free cocaine in the blood and also in her brain, it played -- it definitely played a role in her death." Tr. at 1810); JoJo R (same)(Tr. at 1083, 2367; Exh. 1A at 18).

-28-

This evidence is not sufficient to support "but-for" causation. <u>Burrage</u>, 134 S. Ct. at 891.  Therefore, the court cannot conclude that the instructional error was harmless as to count 5.

**5.   Counts 7, 8, 9**

In Counts 7, 8, and 9 defendants were charged and convicted of health care fraud resulting in the deaths of Patricia G, Eric T and Robin G.  The health care fraud statute states that if the health care fraud "results in death," a defendant may be sentenced to any term of years or life.  18 U.S.C. § 1347.  Without the death enhancement, the maximum sentence is 10 years.  The government agrees that the statutory interpretation set forth in <u>Burrage</u> is applicable to the sentencing enhancement in section 1347.  (Doc. 785 at 8).  Therefore, in order to uphold the jury verdict on these counts, the court must find beyond a reasonable doubt that the government proved defendants' health care fraud was the "but-for" cause of Patricia G, Eric T and Robin G's deaths.  To do so, the court must find that the evidence of "but-for" causation was "uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error."  <u>Sierra-Ledesma</u>, 645 F.3d at 1224 (citing <u>Neder</u>, 527 U.S. at 17).

The government contends that it has proven but-for causation because its expert, Dr. Jorgensen testified that defendants' health care fraud resulted in the deaths of Patricia G, Eric T and Robin G. Dr. Jorgensen testified as follows:

> Question: Do you have an opinion whether the Defendant Stephen Schneider was engaged in health care fraud, and as a result of that health care fraud, Patty G died?
>
> Dr. Jorgensen: I do.

Question: What is that opinion?

Dr. Jorgensen:  My opinion is that Dr. Stephen Schneider engaged in health care fraud, and as a result of that, Patty G's death occurred.

Tr. at 3982.

Question: Therefore, Dr. Jorgensen, as to Eric, do you have an opinion as to whether his death resulted from the failure of the Defendant Stephen Schneider to provide him legitimate medical services and the false claims arising from that failure?

Dr. Jorgensen:  I do.

Question: What is that opinion?

Dr. Jorgensen:  That the false claims and the failure to render care appropriately for Eric T resulted in his death by Dr. Schneider.

Question: As to Eric T, do you have an opinion as to whether his death resulted from the failure of the Defendant Linda Schneider to provide legitimate medical services and the false claims arising from that failure?

Dr. Jorgensen:  Based upon her involvement in the clinic and the evidence before me, I do believe that false claims and the failure to provide legitimate medical care at the practice resulted in Eric's death with Linda Schneider being culpable as well.

Tr. at 3988.

Question: And in your opinion, was Eric's death the result of the Defendant Stephen Schneider's health care fraud?

Dr. Jorgensen:  Yes, I believe the death was a result of Dr. Schneider's health care fraud.

Tr. at 3989.

Question: And do you believe that health care fraud resulted in [Robin's] death?

Dr. Jorgensen:  The health care fraud did result in Robin G's death, yes.

Tr. at 3997.

Defense counsel questioned Dr. Jorgensen's opinions as follows:

-30-

Question: How does -- aside from the care now -- how does false billing lead to someone's death?

Dr. Jorgensen:  You can't separate the two, sir.

Question: Okay. It's your testimony that submitting a bill that's not correct can lead to a person's death?

Dr. Jorgensen:  That's not what I said.

Question: Okay.

Dr. Jorgensen:  The mass quantity and the volume-based business that we were talking about here led to irregular and dangerous medical practices, and that volume-based piece is where the health care fraud -- because they were going after money and because they were doing that type of volume led to markedly irregular medical practices which therefore resulted in the death of those patients.

Tr. at 4089.

Dr. Jorgensen "summarily opined that the Schneiders' health care fraud resulted in" the deaths Robin G, Eric T and Patricia G. Schneider, 704 F.3d at 1291.  Dr. Jorgensen did not opine nor was he asked if the health care fraud was the "but-for" cause of death of Robin G, Eric T and Patricia G.  Notably, Dr. Jorgensen did not even testify that the health care fraud "caused" the deaths.  The court has no way of knowing what Dr. Jorgensen's opinion would have been if he was asked his opinion on causation.  The question is then whether health care fraud and the prescription drug distribution can both be the "but-for" cause of death for the three patients listed in the indictment.  Based on the decision in Burrage, the court does not believe so.

The causation issue was clearly contested at trial and, given the summary testimony of Dr. Jorgensen, the court cannot conclude that the evidence of "but-for" causation was overwhelming.  Therefore, the government has not satisfied its burden to establish that the failure

to instruct on causation in counts 7, 8, and 9 was harmless.

### 6.   Count 1 - Conspiracy to Commit Health Care Fraud

Defendants also move for the court to vacate the sentence on count 1, conspiracy to commit health care fraud in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1349. The jury found that defendants conspired to commit health care fraud and the instructions given on that charge are not challenged by defendants. The sentence applicable to section 1349 is as follows: "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

As stated previously, the maximum statutory sentence for a violation of section 1347, health care fraud, is ten years unless the violation results in death. The court has held that the conviction on the underlying charges of health care fraud resulting in death were based on erroneous jury instructions, supra. As a result, the court must set aside those convictions and vacate the sentences. See Holly, 488 F.3d at 1310-11. Therefore, defendants' conspiracy sentences cannot be enhanced based on the underlying health care fraud charges and must be set aside.

### 7.   Summary

After a thorough review of the record, the court cannot conclude beyond a reasonable doubt that the jury verdict on counts 2,3,5 and 7-9 would have been the same if the omitted "but-for" causation element, which is required by the Supreme Court in its recent Burrage opinion, would have been submitted to the jury. Neder, 527 U.S. at 19. Therefore, the failure to instruct on "but-for" causation was not

harmless error and the convictions on those counts must be vacated.[13]
Holly, 488 F.3d at 1310-11.  The reversal of the convictions on these
counts does not preclude a retrial "because the double jeopardy clause
bars retrial only where the government presents no evidence that could
support a conviction."  Id. at 1311.  Because defendants' conspiracy
sentences were based on the jury's findings in counts 7-9, those
sentences must be set aside and defendants must be resentenced in
accordance with the statute.

However, the court finds that the evidence presented to the jury
on count 4 was sufficient to establish beyond a reasonable doubt that
the dispensing of fentanyl to Robin G was the "but-for" cause of her
death.  Neder, 527 U.S. at 19.

## III. Ineffective Assistance of Counsel[14]

Defendants make numerous allegations of trial errors which
allegedly occurred as a result of ineffective assistance.  As stated
supra, defendants must meet a two-part burden in order to prevail on
an ineffective assistance of counsel claim.  Defendants must first
show that counsel's representation fell below an objective standard
of reasonableness.  United States v. Chavez-Marquez, 66 F.3d 259, 262

---

[13] Because the court has vacated counts 2, 3 and 5, the counts
which involved overdoses on multiple prescription drugs, defendants'
motion to amend to add claims concerning jury unanimity on the type
of drug which resulted in the patients' death is denied as futile.
(Doc. 784 at 19).  Count 4, the lone count the court has upheld,
involved an overdose of fentanyl, a schedule II drug.

[14] The court will not hold a hearing on defendants' claims of
ineffective assistance of trial counsel because "the motion and the
files and records of the case conclusively show that [defendants are]
entitled to no relief."  28 U.S.C. § 2255(b).  Defendants' claim of
Burrage error did not necessitate an evidentiary hearing as it was a
legal question which was based on the evidence presented at trial.

(10th Cir. 1995). Defendants must then show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068; <u>see</u> <u>also</u> <u>Hatch v. Oklahoma</u>, 58 F.3d 1447, 1457 (10th Cir. 1995).

The failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. <u>See</u> <u>Strickland</u>, 466 U.S. at 700, 104 S. Ct. at 2071. "The Supreme Court has observed that often it may be easier to dispose of an ineffectiveness claim for lack of prejudice than to determine whether the alleged errors were legally deficient." <u>United States v. Haddock</u>, 12 F.3d 950, 955 (10th Cir. 1993). A defendant's proof must overcome the "strong presumption" that counsel was effective. <u>Id.</u> Strategic choices of attorneys are given great deference and a court will not question tactical decisions of trial counsel. Trial strategies necessarily evolve without the benefit of hindsight. A high level of deference is afforded to the reasonableness of counsel's performance in light of all the circumstances at the time. <u>See</u> <u>United States v. Dean</u>, 76 F.3d 329, 334 (10th Cir. 1996); <u>see</u> <u>also</u> <u>Williamson v. Ward</u>, 110 F.3d 1508, 1513-14 (10th Cir. 1997). The bottom line is that a defendant who claims his lawyer's performance was deficient must show the performance was "completely unreasonable, not merely wrong." <u>Hooks v. Workman</u>, 606 F.3d 715, 723 (10th Cir. 2010) (citing <u>Boyd v. Ward</u>, 179 F.3d 904, 914 (10th Cir. 1999), <u>cert.</u> <u>denied</u>, 528 U.S. 1167 (2000)).

### A.   Failure to Investigate and Prepare for Trial[15]

Defendants contend that trial counsel were ineffective for failing to go "through every one of the patient charts." (Doc. 764 at 33). Defendants suggest that reviewing the charts would have established that Stephen Schneider only saw 35 patients a day, instead of the "enormous amounts of patients that were suppose [sic] to have been seen on particular days." Id. Defendants' argument is nonsensical. Part of the government's theory of health care fraud was that Stephen Schneider did not see the patients that he billed for. Therefore, defendants committed health care fraud when he billed for those visits.

Clearly, defendants have failed to show how reviewing 10,000 patient charts in order to determine when Stephen Schneider actually saw patients prejudiced the trial. Strickland, 466 U.S. at 694.

### B.   Failure to Object

Defendants assert that trial counsel should have objected to the use of Linda's interview with DEA Agent Martin Redd on the basis that it violated her Miranda rights and counsel should have objected to the introduction of photographs depicting the inside SMC. With respect to Linda's interview, the evidence introduced at trial was that Linda called and asked to meet with the agent. Miranda is "applicable only when the suspect is in custody." Beckwith v. United States, 425 U.S. 341, 96 S. Ct. 1612 (1976). Based on the facts introduced at trial, there was no evidence that Linda was in custody at the time of the

---

[15] Defendants' claims of ineffective assistance are not numbered or organized in any manner. Therefore, for the purpose of continuity, the court will largely organize the claims in the same manner as set forth in the government's response. (Doc. 771).

interview.   Rather, Linda voluntarily sought out the DEA agent to discuss the investigation of SMC.

Turning to the pictures of SMC, defendants argue that the state of disarray visible in the pictures was not defended by trial counsel and that SMC was in that condition due to Linda's extended vacation at the time of the pictures.   The pictures were taken pursuant to a valid search warrant and clearly admissible at trial.   Defense counsel did attempt to rebut the presumption that SMC was always in disarray through the testimony of employees and by introducing different photographs of SMC which were taken when it did not appear so disorganized.   Therefore, defendants have not established that trial counsel were ineffective for failing to object to the introduction of the photographs.

### C.   Failure to Call Expert Witnesses

Defendants contend that defense counsel should have called several experts including, a pain management specialist, Dr. Voth, a pathologist, a toxicologist, experts used in defending the ongoing civil malpractice lawsuits, the malpractice attorneys and the malpractice insurance investigators.   Defendants, however, make no showing regarding the content of these witnesses' testimony, much less that they would have qualified to give expert testimony, that their testimony (if admitted) would have been favorable and that the witnesses would have withstood cross-examination.[16]   Defendants'

---

[16] Indeed, defendants admit that one of their experts, Barbara Cobuzzi, "purjurized herself" because their counsel had not warned Cobuzzi about the prosecutor's skill in cross-examination.  This non-sensical argument is typical of defendants' ineffectiveness claims.
Another typical example is that certain expert witnesses could have verified that Stephen was credentialed in pain management by the

conclusory and unsupported statements that the "pain experts" and Dr. Voth would testify that SMC was operating above standards in treating chronic pain patients is not sufficient to meet their burden. Therefore, they have failed to establish that the failure to call these witnesses was deficient. See Cummings v. Sirmons, 506 F.3d 1211, 1233 (10th Cir.2007) (holding that a petitioner's ineffective assistance claim failed to satisfy Strickland's first prong because nothing demonstrated the content of a potential expert's testimony).

Moreover, "although the medical experts may have provided helpful testimony on direct examination, the admissions and qualifications elicited by prosecutors on cross examination may have been damaging." Boyle v. McKune, 544 F.3d 1132, 1138 (10th Cir. 2008). "This is why the decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney." Id.

Defendants assert that defense counsel should have called a pathologist and a toxicologist so that the jury could have better understood the testimony of Dr. Karch. (Doc. 764 at 27). Again, defendants make no attempt at showing what these witnesses would have testified about or, for that matter, that they were legally qualified to give expert testimony. Finally, defendants argue that defense counsel should have called all of the unidentified individuals involved in the malpractice suits to testify that they did not see any

American Academy of Pain Management. Stephen testified for 2 days and certainly could have commented on the subject, assuming he was credentialed. He didn't. Testimony by other witnesses would have been inadmissible hearsay. Finally, assuming the Academy is legitimate (and there is no proof that it is), why would it credential someone who admits, under oath, that he never had a "legitimate pain practice?"

"illegal activity" when they investigated SMC.  (Doc. 764 at 29).
This vague and conclusory suggested testimony does not establish that
the failure to call these witnesses was deficient and would have
resulted in a different outcome.

### D.    Failure to Have a Defense Strategy

Defendants assert that defense counsel were ineffective for
failing to have "any real defense strategy." (Doc. 759 at 5).
Defendants, however, offer no argument or support for this claim, nor
do they suggest what "real defense strategy" would have proved
successful.  Therefore, defendants have failed to establish deficient
performance.  United States v. Fisher, 38 F.3d 1144, 1147 (10th Cir.
1994) (rejected several § 2255 arguments for ineffective assistance
of counsel as conclusory).

### E.    Failure to Call Other Witnesses

Throughout their motion, defendants list various non-expert
witnesses who should have been called by defense counsel.  In support
of their contentions, defendants offer nothing but their own
descriptions of these witnesses' supposed testimony.  At times,
defendants do not even explain what the witnesses would have testified
about.  For example, defendants state that defense counsel should have
called agent Bill Rowland to testify in order to question him about
his involvement in the investigation.  (Doc. 764 at 34).  Defendants,
however, fail to identify what Rowland's testimony would have been or
that it would have been favorable to them.  Defendants also argue that
Kim Hebert and Charles Craig, PAs who worked at SMC, should have been
called as witnesses to testify that "SMC was a progressive family
clinic." (Doc. 764 at 44).  Defendants do not explain how the absence

-38-

of this testimony prejudiced their trial.

Defendants also list a variety of pain patients, past employees and members of the medical community who should have been called by defense counsel. Defendants offer unsupported descriptions of these witnesses' testimony and "fail to show that the uncalled witnesses would have testified at trial." United States v. Gallant, No. 13-1041, 562 Fed. Appx. 712 (10th Cir. Apr. 23, 2014). Notably, defendants claim that the following witnesses did not testify because defense counsel failed to request immunity from the court for their testimony: Dr. Donna St. Clair, Dr. Joe Sack, Dr. Lawrence Simons[17], Curt Atterbury P.A., Kim Hebert P.A., and Connie White P.A. This claim speculates that these witnesses were unwilling to testify on behalf of defendants without being promised immunity from prosecution. The court does not have the authority to initiate and grant immunity from prosecution.

To overcome the presumption of objective reasonableness, defendants have the "burden of showing that counsel's action or inaction was not based on a valid strategic choice." Bullock v. Carver, 297 F.3d 1036, 1047 (10th Cir. 2002). "Whether to call a particular witness is a tactical decision and, thus, a 'matter of discretion' for trial counsel." United States v. Miller, 643 F.2d 713, 714 (10th Cir. 1981).

Because defendants have not shown specific testimony which would

---

[17] This is the same Lawrence Simons who has been twice-convicted in this court and whose convictions have been affirmed. United States v. Simons, No. 14-3047, 592 Fed. Appx. 717 (10th Cir. Dec. 2, 2014); United States v. Simons, No. 12-3137, 2013 WL 2130264 (10th Cir. May 17, 2013).

have been favorable <u>and</u> that the witnesses would have testified at trial, defendants cannot show that they have been prejudiced by the failure to call these witnesses. <u>Gallant</u>, 562 Fed. Appx. 712 (citing <u>Snow v. Sirmons</u>, 474 F.3d 693, 730 n. 42 (10th Cir. 2007) (to show prejudice, habeas petitioner "must show not only that the testimony of an uncalled witness would have been favorable, but also that the witness would have testified at trial.")).

### F.   Failure to Cross Examine and Ask Specific Questions

Defendants assert defense counsel was ineffective for failing to ask questions on cross examination which were written by Stephen Schneider. (Doc. 759 at 25). The questions are not in the record. Counsel for both defendants vigorously cross-examined the government witnesses at trial. In their motion, defendants do not identify which witnesses defense counsel failed to adequately cross examine. Moreover, they have failed to show how any omitted questions "might have changed the outcome of the trial." <u>United States v. Miller</u>, 907 F.2d 994, 1002 (10th Cir. 1990). Therefore, defendants have failed to show that the failure to ask specific questions "fell below the prevailing professional norm and that this failure prejudiced" their defense. <u>Id.</u>; <u>see</u> <u>also</u> <u>Richie v. Mullin</u>, 417 F.3d 1117, 1124 (10th Cir. 2005)("We have previously concluded that counsel's cross-examination method is a matter of trial strategy subject to the strong presumption that the counsel acted reasonably.")

### G.   Failure to Provide the Jury with Clear Instructions

Defendants argue that various jury instructions were "vague and

discriminatory" and confusing to the jury.[18]   Defendants do not, however, identify proposed instructions which defense counsel failed to request.   Defendants have also failed to show how they were prejudiced by the given instructions.

###    H.   Failure to Ask for a Change in Venue

Defendants contend that defense counsel were ineffective for failing to ask for a change in venue.   The government sought a change in trial location due to potential prejudicial impact on the jury pool.   (Doc. 57).   The court denied the motion on the basis that the government had not established that pretrial publicity was so prejudicial that it would severely impact the jury pool.   (Doc. 146). The court held that the Tenth Circuit preferred that the court conduct voir dire of the venire panel to determine if the jury pool was tainted by pretrial publicity.   The court did so.   The court sent out questionnaires to determine if jurors had any prior contact with defendants, SMC, or were exposed to any publicity concerning the charges.   The questionnaires were reviewed by the court, defense counsel and the government.   The questionnaires and the questioning during voir dire revealed that there were a significant number of potential jurors who had no knowledge of defendants or the charges.

Therefore, defense counsel's performance did not fall below the standard set forth in Strickland for failing to move for a change in venue.   There was no evidence that the jury pool was so tainted by pretrial publicity that a change in venue was necessary.   Moreover, the court would have denied the motion for the reasons set forth its

---

[18]   In this claim, defendants do not attack the instructions concerning the sentencing enhancement which are discussed supra.

Memorandum and Order of July 10, 2008.  (Doc. 146).

## I.   Failure to Object to the Jury Pool

Defendants assert that the jury pool did not reflect a fair cross section of the city of Wichita.  (Doc. 764 at 36).[19]  In a 2255 motion, to establish prejudice, defendants must show that there is a reasonable probability that but for defense counsel's error, the result of the proceeding would have been different.  United States v. Orange, 447 F.3d 792, 797 (10th Cir. 2006).  That means that defendants must establish that there was a violation of the fair cross section requirement.  Id.  To do so, defendants must show "(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process. Id. (citing Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664 (1979)).

Defendants have not attempted to establish the elements required by Duren.  Therefore, defense counsel's performance did not fall below the standard set forth in Strickland.

## J.   Failure to Ask for a Mistrial

Defendants argue that defense counsel was ineffective for failing to "recommend retrial when a juror was dismissed leaving the jury less than the normal 12." (Doc. 764 at 43).  Pursuant to Fed. R. Civ. P. 23(b), a jury of less than 12 may deliberate and return a verdict if

---

[19] The jury was summoned from 11 counties, not just Sedgwick, where Wichita is located.  D. Kan. Rule 38.1(a)(2).

all parties stipulate in writing.  On April 29, 2010, the court discussed Rule 23(b) with counsel and defendants when there was an issue with a juror.  (Tr. at 510-22).  At that time, the full panel of 12 jurors and 2 alternates had not been sworn.  Defense counsel and defendants discussed Rule 23(b) and agreed to stipulate to a jury of less than 12 if need be.  The proposed stipulation was discussed again on June 7, 2010, when defendants urged the court to excuse a juror over the government's objection.  All parties then signed a stipulation and it was entered into the record.  (Doc. 484).

Defendants do not challenge the stipulation which they knowingly signed.  Because there was a valid stipulation to try the case to a jury of 11 pursuant to Rule 23(b), defense counsel cannot be ineffective for failing to move for a mistrial.

### K.   Remaining Claims

The remaining claims in defendants' petition are denied for the reasons set forth in the government's response and/or for failing to establish prejudice.

The Tenth Circuit observed in <u>United States v. Rivera</u>, 900 F.2d 1462, 1474 (10th Cir. 1990): "When, as here, the prosecutor has an overwhelming case, 'there is not too much the best defense attorney can do.'" (citations omitted).  Such was the situation here. Defendants' trial counsel did their best to put on the defense defendants wanted.  That's hardly the mark of inadequate representation.

## IV.  Conclusion

Defendants' motion to set aside is granted in part and denied in part.  Defendants' convictions on counts 2,3,5 and 7-9 are vacated.

-43-

Defendants' sentence on count 1 is vacated.  Defendants' motion to set aside count 4 is denied. Defendants' motion to set aside the remaining convictions on the basis of ineffective trial counsel is denied.


        IT IS SO ORDERED.

        Dated this   22nd   day of June 2015, at Wichita, Kansas.


                                    s/ Monti Belot
                                Monti L. Belot
                                UNITED STATES DISTRICT JUDGE